# EXHIBIT "7"

# In the Matter Of:

## BRYSON V. ROUGH COUNTRY

2:22-CV-017-RWS

## TROOPER ANDREW PHILLIPS

*April 26, 2023*



800.211.DEPO (3376)
EsquireSolutions.com

1  had, what type.

2           If they -- if they were under the

3  influence of any alcohol or drugs, we do find

4  out what those levels are.

5        Q.   What was determined as far as the

6  human factors that affected Hunter Elliott's

7  driving?

8        A.   He was -- he was under the influ-

9  ence of alcohol notated by his blood results

10  in the case file.

11          He was -- he was also distracted.

12  He was -- he admitted and it was found later

13  that he did -- or -- or was on his cell phone

14  FaceTiming his fiance at the time of the --

15  of the collision.

16        Q.   And -- and the level -- the blood

17  draw for the blood alcohol, the level was

18  .252?

19        A.   Yes.

20        Q.   And this -- your report indicates

21  that was taken at 1:42 a.m.?

22        A.   Yes.

23        Q.   So the accident I will represent



TROOPER ANDREW PHILLIPS                             April 26, 2023
BRYSON V. ROUGH COUNTRY                                        37

1  to you happened about 11:15 p.m.

2              So the blood draw was over two --

3  two and a half hours after the accident;

4  correct?

5       A.   Yes.

6       Q.   Would his blood alcohol level have

7  been higher had the blood draw been closer in

8  time to the actual accident?

9       A.   Yes.

10       Q.   And is that over the legal limit?

11       A.   Yes.

12       Q.   How much over the legal limit?

13       A.   About a little over 3 times.

14       Q.   And then there's a little bit of

15  information about the human factor analysis

16  for Santana Kelley, and can you tell me what

17  you determined for her?

18       A.   That she -- that she was stopped

19  at the red light in the left lane on Georgia

20  2.  She had a valid Class C license and then

21  she was transported to Erlanger Hospital for

22  serious injuries along with her baby that she

23  was pregnant with.



 1          Q.    And did Mr. Elliott have a valid

 2    driver's license?

 3          A.    No, they were suspend -- they were

 4    suspended.

 5          Q.    And then looking at page 19, about

 6    halfway down, and I'm just reading from the

 7    middle of the report, "Based on the analysis

 8    and review of the evidentiary materials and

 9    interviewing some of the drivers and witnes-

10    ses involved in the collision, the following

11    facts and conclusions are offered."

12          Did you eventually come to the

13    conclusion Ms. Kelley was, in fact, stopped

14    at a stoplight --

15          A.    Yes.

16          Q.    -- when the accident occurred?

17          A.    Yes.

18          Q.    Just try to let me finish the

19    question.

20          A.    I'm sorry.

21          Q.    I'm not trying to be mean.  I just

22    want a clear record.

23          And looking down just further down



TROOPER ANDREW PHILLIPS                                    April 26, 2023
BRYSON V. ROUGH COUNTRY                                              39

1   the page, what was your conclusion about the

2   proximate cause of the accident?

3       A.    That Mr. Hunter Elliott operated

4   is vehicle in a reckless and unsafe manner

5   while under the influence of alcohol.

6       Q.    And what else did you determine as

7   far as what his actions resulted in?

8       A.    He -- his -- Mr. Elliott's actions

9   were the direct cause or the -- sorry -- the

10  direct result of the death of Cohen Bryson.

11      Q.    And did you base your conclusion

12  as to the proximate cause of the accident on

13  your investigation of the accident, gathering

14  facts, gathering evidence, interviewing of

15  witnesses, and then also communicating with

16  other members of the SCRT Team?

17      A.    Yes.

18      Q.    And then if you could turn to

19  quickly the scaled diagram at page 21 through

20  26.

21      A.    Okay.

22      Q.    Did you create these?

23      A.    Yes.



1          Q.    What's the purpose of these?

2          A.    Well, we -- we always do -- we

3    always do forensic mapping of -- of every

4    scene that we do to this magnitude and this

5    is our forensic mapping.

6          Q.    And then if you could turn to page

7    35.

8          A.    Okay.

9          Q.    Roadway Information is listed on

10   this page and -- and, just to clarify, you

11   did not find -- or, correct me if I'm wrong;

12   but you did not find that there was anything

13   with the roadway that contributed to causing

14   this accident?

15         A.    No.

16         Q.    Is that correct?

17         A.    That's correct.

18         Q.    Then, turning to page 37 and 38,

19   this is the Driver 1, Hunter Elliott.

20               And what did you determine as far

21   as his driver's attitude contributing to the

22   collision?

23         A.    That he was driving under the



1   influence of alcohol.

2        Q.   And then what about with regard to

3   the use of the phone?

4        A.   Yeah, he stated that he was on a

5   -- FaceTiming his fiance at the time.

6        Q.   And did you determine that to be

7   another contributing factor?

8        A.   Yes.

9        Q.   I want to move to the Vehicle 1

10  Information, which starts around page 69, I

11  believe.

12            Vehicle 1 would be the Ford F-250

13  Mr. Elliott was driving; is that correct?

14       A.   Yes.

15       Q.   Can you tell me what -- on page 73

16  what is the information that starts on that

17  page?

18       A.   This is the CDR Bosch Report from

19  that -- Hunter Elliott's F-250.

20       Q.   And have you ever done a Bosch CDR

21  download before?

22       A.   Yes.

23       Q.   Did you do the one for the F-250?



1  quantify how many bigger?

2        A.   I do not.

3        Q.   Do you have an understanding of

4  how a bigger tire affects a vehicle's speed-

5  ometer speed reading versus the actual speed

6  of that vehicle?

7        A.   Very little.

8             When we -- normally we do -- when

9  we do these we -- we have a website that we

10  go on and it calculates it for us.  We put in

11  the recommended tire size and then we put in

12  the actual tire size on the vehicle and it

13  tells us what -- if there's a difference in

14  the -- in the speedometer with the actual

15  tires on it.

16       Q.   You say "very little" but which

17  way does it -- does it impact it?

18       A.   Are you talking about on this

19  particular one?

20       Q.   Yeah.  If you have a bigger tire

21  than what's recommended, how does that impact

22  the actual speed versus what the speedometer

23  says?



```
 1        A.    It -- it would impact it a little

 2   bit, yes.  I mean, it varies -- it varies.

 3   It just depends on the size of the tire.

 4             Like if you have an enormous big-

 5   ger tire on -- on there than recommended, it

 6   may impact it -- it may impact it 5 to 10

 7   miles an hour; but, if it's relatively close

 8   in -- to the same size, it may not affect it

 9   as much as that.

10        Q.    So are you saying -- what I guess

11   I'm trying to understand is, was the actual

12   speed, when you say "5 to 10 miles an hour,"

13   faster or slower than --

14        A.    Faster.

15        Q.    Faster.

16        A.    Yes.

17        Q.    Than what you would be reading on

18   the speedometer?

19        A.    Yes.

20        Q.    Okay.  If you could turn to page

21   78, please.

22        A.    Okay.

23        Q.    And we are still on the -- the
```



1  North Georgia.  I don't know if you call it

2  North -- do you call it North Georgia, North-

3  west Georgia?

4          A.   I just call it North Georgia.

5          Q.   North Georgia.  Okay.

6               Limiting it to your time in the

7  last 12, 13 years working as a trooper, have

8  you seen pickup trucks on the road with lift

9  kits that raise the vehicle above the origi-

10 nal height that they would come out of the --

11 that they would be sold?

12         A.   Yes.

13         Q.   And then -- so, not just limiting

14 to your time work as a trooper but just over

15 the course of your life growing up in this

16 area, have you seen lifted trucks out on the

17 roadway?

18         A.   Yes.

19         Q.   How -- how often would you say you

20 see lifted trucks on the roadway?  Is this a

21 daily occurrence, weekly occurrence?

22         A.   It's probably daily.

23         Q.   And would you say -- strike that.



800.211.DEPO (3376)
EsquireSolutions.com

1   you wouldn't know how to do the measurement

2   of what the -- tell me what your answer was

3   for that again.

4        A.   I would not know how the measure

5   the -- say a lift or the suspension on the

6   vehicle to determine whether it was factory

7   stock or if it was illegal per the statute.

8        Q.   And so Georgia State Patrol SCRT

9   Team, none of the law enforcement training

10  that you've ever been provided teaches you

11  how to enforce that statute and do the mea-

12  surements that you need to be able to do?

13       A.   No.

14       Q.   It does not?

15       A.   No.  I've never been through

16  training to measure that.

17       Q.   Okay.  And no one's ever given you

18  instruct -- instructions around here, like in

19  the field "Hey, this is how you do it, you

20  need to write tickets for this"?

21       A.   No.

22       Q.   You would agree with what I said?

23       A.   Nobody has ever done that.

