# EXHIBIT "4"

**Page 1**

1          IN THE UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF GEORGIA

3                  GAINESVILLE DIVISION

4

5    SANTANA BRYSON and JOSHUA BRYSON, )

6    As Administrators of the Estate of)

7    C.Z.B., and as surviving parents  )

8    C.Z.B., a deceased minor,         )

9         Plaintiffs,                  )

10   vs                      )Case No.:

11   ROUGH COUNTRY, LLC,        )2:22-CV-017-RWS

12        Defendant.          )

13

14

15         STENOGRAPHIC & VIDEOGRAPHIC

16      DEPOSITION OF TROOPER ANDREW PHILLIPS

17              11:52 a.m.

18           APRIL 26, 2023

19

20

21

22   BY:  Susan Bell

23        Certified Court Reporter, CSR, CCR#14

**Page 2**

1                STIPULATIONS

2          IT IS HEREBY STIPULATED AND AGREED,

3    by and between the parties through the respective

4    counsel that the deposition of TROOPER ANDREW

5    PHILLIPS, a witness in the above-entitled cause,

6    may be taken before Susan Bell, Certified Short-

7    hand Reporter, REMOTELY VIA ZOOM, on the 26th of

8    April, 2023, commencing at 11:52 a.m.

9

10         IT IS FURTHER STIPULATED AND AGREED

11   that the signature to and the reading of the

12   deposition by the witness is waived, the

13   deposition to have the same force and effect as if

14   full compliance had been had with all laws and

15   rules of court relating to the taking of

16   depositions.

17

18

19

20

21

22

23

**Page 3**

1          IT IS FURTHER STIPULATED AND AGREED

2    that it shall not be necessary for any objection

3    to be made by counsel as to any questions except

4    as to form or leading questions, and that counsel

5    for the parties may make objections and assign

6    ground at the time of trial, or at the time said

7    deposition is offered in evidence, or prior

8    thereto.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**Page 4**

1                APPEARANCES

2    FOR THE DEFENDANT:

3        WEINBERG, WHEELER, HUDGINS

4        GUNN & DIAL, LLC

5        Ms. Lindsay G. Ferguson

6        3344 Peachtree Street, NE, Suite 4200

7        Atlanta, GA  30326

8        (404)876-2700

9        lferguson@wwhgd.com

10

11   FOR THE PLAINTIFFS:

12        CANNELLA SNYDER, LLC

13        Ms. Tedra L. Cannella

14        315 Ponce de Leon Avenue, Suite 885

15        Decatur, GA  30030

16        (404)800-4828

17        tedra@cannellasnyder.com

18

19

20

21

22

23



Page 5

                    INDEX

EXAMINATION BY:                        PAGE:

  Ms. Ferguson                          8

  Ms. Cannella                          65

FURTHER EXAMINATION BY:

  Ms. Ferguson                          84


                  EXHIBITS

FOR THE DEFENDANT:                     PAGE:

  Exhibit Number 1 ....................... 24


FOR THE PLAINTIFF:                     PAGE:

  Exhibit Number 1 ....................... 72

  Exhibit Number 2 ....................... 74




                 --o0o--

---

Page 6

1        I, Susan Bell, Certified Shorthand
2 Reporter, acting as commissioner, certify
3 that there came before me REMOTELY VIA ZOOM
4 on April 26th, 2023 at 11:52 a.m., TROOPER
5 ANDREW PHILLIPS, witness in the above cause,
6 for oral examination, whereupon the following
7 proceedings were had:
8
9        TROOPER ANDREW PHILLIPS, first
10 having been duly sworn (affirmed) and
11 testified as follows:
12
13        VIDEOGRAPHER:  Today's date is
14 April 26th, 2023 and the time is now 11:52
15 a.m.
16        This will be the Videotaped
17 Deposition of Trooper Andrew Phillips in the
18 Matter of Santana Bryson versus Rough County
19 taken at -- taken at 402 Bel -- Belwood Road,
20 SE, Calhoun, Georgia, 30701
21        Will counsel please identified
22 yourselves for the record?
23        MS. FERGUSON:  Lindsay Ferguson on

---

Page 7

1 behalf of Defendant Rough County, LLC.
2        MS. CANNELLA:  Tedra Cannella on
3 behalf of the Plaintiff, the Bryson family.
4
5        TROOPER ANDREW PHILLIPS, first
6 having been duly sworn (affirmed) testified
7 as follows:
8
9        MS. FERGUSON:  This will be the
10 Deposition of Trooper Andrew Phillips taken
11 pursuant to subpoena, notice and agreement of
12 counsel for all purposes allowed under the
13 Federal Rules.
14        I propose all objections except to
15 the form of the question and responsiveness
16 of the answer be reserved until such time as
17 the first use of the deposition takes place.
18        Is that agreeable?
19        MS. CANNELLA:  We (inaudible) on
20 taking the (inaudible) Federal Rules of Civil
21 Procedure.
22        MS. FERGUSON:  And so is it your
23 intent to advance all of your objections

---

Page 8

1 today?
2        MS. CANNELLA:  No, just the ones
3 that can be cured.
4        MS. FERGUSON:  Okay.
5
6 EXAMINATION BY MS. FERGUSON:
7
8    Q.   So could you state your full name
9 for the record, please?
10    A.   By name is Andrew Phillips.
11    Q.   And what is your date of birth?
12    A.   I'd prefer not to give that.
13    Q.   Would you mind telling us how old
14 you are?
15    A.   I'm 39.
16    Q.   And the reason I'm asking some of
17 these background questions is just, if this
18 were ever played to the jury they -- they're
19 entitled to know some information about you
20 so they can evaluate your testimony.
21    A.   I -- I can explain why.
22    Q.   That's fine.  No problem.  Your
23 age is -- is good enough for me.



TROOPER ANDREW PHILLIPS
BRYSON V. ROUGH COUNTRY

April 26, 2023
9–12

Page 9

1    Have you ever given a deposition
2 before today?
3    A.  Yes.
4    Q.  How many times?
5    A.  I think three.
6    Q.  And have you --
7    A.  This is my fourth one.
8    Q.  Have you ever given trial testi-
9 mony before?
10    A.  Yes.
11    Q.  How many times?
12    A.  Roughly ten.
13    Q.  So I understand you are pretty
14 familiar with the process.  I'll just going
15 over some brief ground rules to help us move
16 along pretty quickly today.
17    Please let me know at any time
18 today if you don't understand one of my ques-
19 tions, if it's a bad question and it doesn't
20 make sense, and I'll try to rephrase it.
21    Let's try to make sure we don't
22 talk over each other; that is, let me finish
23 my question before you start your answer even

Page 10

1 if you think you know what I'm going to ask.
2 So let me get the question fully out because
3 we've got a court reporter on the Zoom typing
4 down everything we say.  I want to make sure
5 it's taken down clearly and I will do my best
6 to make sure you have finished your answer
7 before I move on to my next question.
8    If you could, make sure to give a
9 verbal answers rather than just head shakes
10 so, again, the court reporter can hear you
11 and take down your answer accurately.
12    If you need to take a break at any
13 time, please let me know.  I would just, if
14 there's a pending question, that you answer
15 the question that's pending and then we can
16 take a break.
17    We're going to try to get you out
18 of here as quickly as possible so hopefully
19 there won't be a big need for that but just
20 let me know if you need a break; all right?
21    A.  Yes.
22    Q.  What county and state do you
23 currently live in?

Page 11

1    A.  Gilmer County, Georgia.
2    Q.  Do you have any plans to move away
3 from this area?
4    A.  Not at the moment.
5    Q.  Like I said just a minute ago, I'm
6 going to ask just a few background questions.
7    Where did you -- where were you
8 born?
9    A.  I was born in Blairsville,
10 Georgia.
11    Q.  Is that where you grew up?
12    A.  Yes.
13    Q.  Where did you go to high school?
14    A.  Union County High School.
15    Q.  What year did you graduate?
16    A.  2002.
17    Q.  And did you attend college after
18 high school at all?
19    A.  Yes.
20    Q.  Where did you go?
21    A.  Truett McConnell.
22    Q.  Did you obtain a degree?
23    A.  Yes, Associates Degree in general

Page 12

1 studies.
2    Q.  Okay.  What year did you get that
3 degree?
4    A.  2006.
5    Q.  Where are you currently employed?
6    A.  With the Georgia Department of
7 Public Safety.
8    Q.  And are you part of the Georgia
9 State Patrol?
10    A.  Yes.
11    Q.  Are you part of any specialized
12 team for the Georgia State Patrol?
13    A.  Yes, I am actually on the SCRT
14 team.  That stands for Specialize Collision
15 Reconstruction Team; and that is here in
16 Troop A, which is based out of Calhoun,
17 Georgia.
18    Q.  And how long have you worked for
19 Georgia State Patrol?
20    A.  This August will be 13 years.
21    Q.  And how long have you been a part
22 of the SCRT Team?
23    A.  For five years, since March of



Page 13

1  2018.
2      Q.   And I don't want to spend much
3  time on it; but, prior to starting work 13
4  years ago for Georgia State Patrol, what did
5  -- just very generally, what did you do for
6  employment between college and starting in
7  law enforcement?
8      A.   I worked at a golf course for a
9  little bit.  Then I worked for a bank as a
10  teller.  Then I worked as an operator for a
11  construction company.
12      Q.   Is that an equipment operator?
13      A.   Yeah.  Grading company, I should
14  say that.
15      Q.   The way I asked it, I assumed that
16  you hadn't worked in other law enforcement
17  jobs before Georgia State Patrol; but I don't
18  know that.
19          So have you had any other jobs --
20      A.   No.
21      Q.   Okay.  So Georgia State Patrol is
22  your first law enforcement job and that was
23  August 13 years ago?

Page 14

1      A.   Yes.
2      Q.   Okay.  Can you describe for me the
3  training that you had to go through to become
4  a Georgia State Patrol Trooper when you first
5  joined?
6      A.   Yes.  I joined in 2010 as a radio
7  operator and then in April of 2011 I started
8  Trooper School.  That Trooper School lasted
9  until November of 2011, which I think that's
10  33 weeks, roughly seven months.
11      Q.   Where did that take place?
12      A.   At GPSTC, Georgia Public Safety
13  Training Center in -- for South Georgia.
14          I can't tell you the exact hours
15  the whole school is but it's -- like I said,
16  it's -- it was about 33 weeks.
17      Q.   Just generally, can you describe
18  for me the kinds -- the subject areas that
19  are generally covered during that 33-week
20  training?
21      A.   We do the -- one month of mandate
22  training as far as Crim -- Georgia Criminal
23  Law.  We do all types of traffic law classes.

Page 15

1  We do courtroom present -- presentation.  We
2  do firearms.
3          We do -- we do extensive firearms
4  training and extensive training in driving.
5  There's a lot of defensive tactics training
6  in there and there's also accident recon-
7  struction training in there.
8      Q.   With regard to traffic law classes
9  what are they covering generally in those
10  kind of classes?
11      A.   Just -- just trying to go over the
12  40 codes of the -- the law book.
13          We do a lot of DUI -- there's a
14  portion of -- of training that's -- as
15  far as field sobriety to get Field Sobriety
16  Certified, to get Radar and Light Certified
17  as well.
18      Q.   Okay.  Did they cover things like
19  various laws you can pull a driver over for
20  and inspect them on the roadway?
21      A.   Yes and no.  Mainly we learned
22  that in field training and when we're with
23  our field training officer.

Page 16

1      Q.   And when did that take place in
2  relation to your 2011 Trooper School?
3      A.   We spend -- we spend four months
4  at the Training Center doing the academy por-
5  tion and then we go three months out in the
6  field, three --- one month at a time with a
7  field training officer; and then we -- when
8  that month is over, we switch to a different
9  field -- FTO officer; and then for the third
10  month we do the same and then we come back
11  and graduate.
12      Q.   And then -- so after you graduated
13  from Trooper School up until you joined the
14  SCRT Team -- I want to talk about the SCRT
15  Team training separately; but -- so, from the
16  time you finished Trooper School up until the
17  point right before you joined -- joined the
18  SCRT Team, would you have annual trainings,
19  periodic trainings, thing like that?
20      A.   We -- we're man -- mandate to go
21  through -- do, of course, our firearms, we do
22  that twice a year.
23          I think we do driving -- maybe a



TROOPER ANDREW PHILLIPS
BRYSON V. ROUGH COUNTRY

April 26, 2023
17—20

Page 17

1  driving simulator.  We would do driving simu-
2  lator maybe a year -- year or two and then
3  we'd actually go down to the Training Center
4  on the driving track and maybe do driving
5  training in a live actual car.
6        We do pursuit liability and do --
7  do regard training twice a year and that's
8  pretty much the -- the automatic training
9  that we have to do every single year.
10       Q.   And what about when -- did you
11  apply to join the -- the SCRT Team --
12       A.   Yes.
13       Q.   -- or did they ask you?
14       A.   Yes.
15       Q.   You applied?
16       A.   Yes.
17       Q.   And, once you were accepted onto
18  the SCRT Team, what additional training did
19  you go through at that point?
20       A.   To -- to actually -- to get quali-
21  fied to even be considered for the SCRT Team
22  you have to have all seven levels of accident
23  reconstruction and that is On The Scene 1 and

Page 18

1  2 and then Recon 1 through 5.  So you have to
2  have those completed before you can apply to
3  be on the SCRT Team.
4        And then, after -- after you're
5  selected and you're on the SCRT Team, there
6  is an extensive amount of training that we go
7  through.  We have to go through a photography
8  class, evidence presentation, yeah, evidence
9  presentation, a CDR tech class, a CDR analyst
10  class, motorcycle reconstruction, pedestrian
11  reconstruction, crime scene, human factors.
12  There's a whole list.
13       Q.   And is -- is all of that training
14  done on the front end before you're a member
15  of the SCRT Team?
16       A.   My first day at the SCRT Office
17  we -- my supervisor put in for seven or eight
18  classes and I just got them throughout the
19  next year that I was on there, but we are
20  actually -- we're active -- actively working
21  cases as -- as soon as we get there.
22       Q.   Tell me a little about the human
23  factors training that you received.  What is

Page 19

1  that about?
2        A.   It's about like a person's -- how
3  a person perceives a threat.
4        Say, like a pedestrian walking out
5  in the road, how they see them, perceive them
6  in the road, and how they react.  So it's to
7  do -- it's a lot to do with reaction times on
8  all different types of -- of collisions and a
9  pedestrian in the road.
10       Q.   I know this is a broad question
11  but can you just generally tell me about what
12  your job responsibilities are now as a troop-
13  er for SCRT?
14       A.   It's still to -- mainly for SCRT
15  we are here to assist with -- with our field
16  troopers and investigate and document all of
17  the evidence pertaining to a serious injury
18  or fatality crash and see it through through
19  the prosecution if there is such prosecution.
20       Q.   Over the course of your employment
21  with Georgia State Patrol, so that would be
22  dating back to the beginning, can you give
23  me just a ballpark number of the fatality

Page 20

1  accidents you have responded to as a trooper?
2        A.   The whole 13 years that I have
3  responded to -- I'm trying to do quick addi-
4  tion in my head.
5        I would say it's approximately 300
6  to 400 that I've responded to that.  That's
7  not the ones I've actually worked myself or,
8  you know, did a case file on as far as being
9  a part of SCRT.
10       Q.   And, before you even became part
11  of SCRT, would you have been -- you wouldn't
12  have been the lead investigator on -- you for
13  like a SCRT report like we're going to talk
14  about for today?
15       A.   No.
16       Q.   So, once you joined SCRT, how many
17  times would you estimate that you've been --
18  just first responded to a fatality accident?
19       A.   Before I joined SCRT, I kind of --
20  it's kind of weird, it's going to even number
21  but I worked 1,000 crashes on the road where
22  I did a report myself.
23        Of those, I would say maybe 30 of



TROOPER ANDREW PHILLIPS

April 26, 2023

BRYSON V. ROUGH COUNTRY

21–24

Page 21

1 them were fatalities that I worked myself but
2 also assisted in many more that -- that were
3 not mine that I did not complete the report
4 on.
5     Q.   Before you joined SCRT, you worked
6 1,000 crashes on the roadways?
7     A.   Yes.
8     Q.   That could've been --
9     A.   A fender bender in a parking lot
10 or a fender bender on the road or somebody
11 pulled out in front of somebody, yes.
12     Q.   And, of those 1,000 before SCRT,
13 30 happened to be fatalities?
14     A.   Yes.
15     Q.   So, then, once you've been with
16 SCRT -- I know earlier you estimated you have
17 worked 300 to 400 fatalities over the course
18 of your career.  So that -- would that be the
19 -- basically the balance -- after the 30, the
20 balance would be since you've been with SCRT?
21     A.   Yes.
22     Q.   That's a convoluted question.  Did
23 it make sense?

Page 22

1     A.   The balance of --
2     Q.   Well, let me just break it down
3 like this.  So you worked you think 30 fatal-
4 ity accidents prior to joining SCRT, and how
5 many fatalities have you worked since you
6 joined SCRT?
7     A.   Where I've -- where I've been the
8 actual lead investigator?
9     Q.   I want to ask responded to and
10 also as a lead.  First responded to.
11     A.   What I've been a part of or helped
12 in some way is probably -- probably close to
13 the 400 mark because we worked typically --
14 when I was out of the Gainesville office and
15 here, we worked typically -- typically have
16 at least 100 cases a year.
17     Q.   And, as far as a number -- a ball-
18 park number is fine -- where you have been
19 the lead investigator for SCRT on a fatality
20 accident?
21     A.   Roughly, 150 where I've been the
22 lead investigator.
23     Q.   Okay.  And could some of those 150

Page 23

1 include serious injury as opposed to fatality
2 or would those all be fatality?
3     A.   That's -- that's going off of 100
4 cases a year of us having three people on a
5 team, what I've always been a part of.
6         So it's a little over 30 cases a
7 year and some of them are serious injury and
8 some of them -- but the majority of them are
9 fatality crashes.
10         I know that's a lot of different
11 numbers.
12     Q.   That's okay.  I think my chicken
13 scratch over here I think I've got an idea of
14 the numbers.  Thank you.
15         What about for this year?  We're
16 in late April of 2023.  Could you estimate --
17 how many fatalities have you been a lead
18 investigator on this year?
19     A.   This year?  Approximately 4 to 5
20 this year so far.
21     Q.   And do you regular like draft SCRT
22 reports as part of your job?
23     A.   Yes.

Page 24

1     Q.   I've marked what's in front of you
2 here as Defendant's Exhibit 1.
3         Do you recognize this document?
4         (Defendant's Exhibit Number 1 was
5 marked for identification.)
6     A.   Yes.
7     Q.   Can you tell me what it is?
8     A.   This is my completed SCRT report.
9     Q.   Is this in regards to a fatality
10 accident that happened on March 15th, 2020 at
11 approximately 11:15 p.m.?
12     A.   Yes.
13     Q.   The accident -- and correct me if
14 I'm wrong -- occurred at the intersection of
15 Georgia 2 with Georgia 5, also known as Blue
16 Ridge Drive?
17     A.   Yes.
18     Q.   Okay.  And, obviously, feel free
19 to flip through this but do you recognize the
20 document as the report that you prepared in
21 regard to your investigation of a fatality
22 motor vehicle accident involving a minor two-
23 year-old, Cohen Bryson?



TROOPER ANDREW PHILLIPS
BRYSON V. ROUGH COUNTRY

April 26, 2023
25–28

Page 25

1    A.  Yes.
2    Q.  Do you have a specific memory of
3 investigating that accident?
4    A.  Yes.
5    Q.  The accident, as you can see on
6 the cover page, happened on March 15th, 2020;
7 and when would you have drafted that report?
8    A.  I do not know the specific date of
9 when I completed this report.
10    Q.  Would it have been drafted over a
11 period of time?
12    A.  Yes.
13    Q.  And, when you drafted it, were you
14 familiar with the facts and circumstances of
15 the accident?
16    A.  Yes.
17    Q.  And as part of your investigation
18 did you go to the scene of the accident at
19 any time?
20    A.  Yes.
21    Q.  Do you remember how many times?
22    A.  Well, I mean, I -- that's -- I
23 drive through there -- back then I would --

Page 26

1 when I was on the road, I would drive through
2 there two -- two or three times a day.  So
3 -- but this particular one I probably drove
4 through there five or six times during the
5 course of it.
6    Q.  And I guess what I meant with my
7 question --
8    A.  Examining the evidence?  Is that
9 what you're talking about?
10    Q.  Right.  Going for purposes of this
11 case did you go to the scene of the accident?
12    A.  I -- the -- on the scene the --
13 the night that it happened, I did not go to
14 the scene.  It would've been after the fact
15 of just looking at the roadway evidence and
16 taking aerial photographs with a drawing.
17    Q.  And -- but when you went the time
18 that you just referenced, it was as part of
19 your investigation for this case?
20    A.  Yes.  Yes.
21    Q.  And -- and so I just -- you may
22 have answered this but, to clarify, how many
23 times do you think you went to the scene

Page 27

1 where the accident occurred as part of your
2 work for the investigation?
3    A.  Probably three or four times,
4 five.
5    Q.  Is this the type of report that
6 you draft within the normal scope of your job
7 with SCRT?
8    A.  Yes.
9    Q.  Is this type of report kept in the
10 ordinary course of your business as a trooper
11 with SCRT?
12    A.  Yes.
13    Q.  Is it your regular practice to
14 draft reports like this one after incidents
15 like the case we're here to talk about today?
16    A.  Yes.
17    Q.  And does this report accurately
18 reflect SCRT's investigation of the fatality
19 accident that we're here to talk about today
20 that occurred on March 15th, 2020?
21    A.  Yes.
22    Q.  My plan is to walk through not all
23 of it but some of the SCRT report and ask you

Page 28

1 some questions.  You may remember some the
2 things I ask offhand.  Other things you may
3 not remember.  So feel free to look at the
4 report to refresh your recollection if you
5 need to.  Sometimes I may point you to a
6 certain page where I have a question.
7         If you'll turn to -- and I'm using
8 the page numbers on the bottom right corner.
9 The total number is 195.  If you'll turn to
10 page 3 of 195, please, in your report.
11    A.  Okay.
12    Q.  I'm sorry, page 4 of 195.
13         Based on the information on this
14 page, I believe you were the lead investigat-
15 or for this accident?
16    A.  Yes.
17    Q.  And, when I say "this accident,"
18 we already -- we already said that it was a
19 fatality accident involving Cohen Bryson.
20         Do you understand the -- he was in
21 the vehicle with his parents, Santana Bryson
22 and Joshua Bryson?
23    A.  Yes.



Page 29

1      Q.   And I had the chance to depose
2  the Brysons the week before last and Joshua
3  Bryson grew up in Blairsville and I believe
4  went to the same high school where you went
5  to school.
6          Did you know either of the Brysons
7  before this accident?
8      A.   No.
9      Q.   Did you know any of their cousins,
10  mom, dad, family members?
11     A.   I think I graduated with a female
12  that was in their family but never talked to
13  her about -- about this.
14     Q.   Do you -- what's her name?
15     A.   Erin.  I can't remember her last
16  name now but Erin is the only -- if you can
17  give me a minute I might -- it might come to
18  me.  Erin Thompson.  That's it.
19     Q.   Erin Thompson?
20     A.   Yeah, that was her maiden name.
21     Q.   Okay.  Do you think she might've
22  been Joshua Bryson's older sister?
23     A.   No, because the Erin that -- that

Page 30

1  I graduated with, I think she was an only
2  child.
3      Q.   Okay.  Related somehow you think?
4      A.   I think so some -- somehow by kin
5  or by marriage.
6      Q.   And Santana and Josh are married
7  now.  At the time of the accident they were
8  not married and Santana's name was Santana
9  Sherri Kelley.
10          Did you know -- to your knowledge,
11  did you know her or any of her family members
12  at the time of the accident?
13     A.   I think it was -- going back, I
14  don't think it was -- it might not have been
15  him but it might have been -- it was one of
16  them.  I don't know exactly which one them
17  that -- Erin came in the picture there but it
18  was one of them.
19     Q.   Looking back on page 4 of your
20  SCRT report, it looks like Trooper Matheson
21  was -- he was the primary responding officer
22  that came to the scene on the night of the
23  accident?

Page 31

1      A.   Yes.
2      Q.   So would you have had over the
3  course of your investigation conversations
4  with Trooper Matheson about what occurred
5  at the scene, what he observed, things like
6  that?
7      A.   Yes.
8      Q.   And, if you could, turn please to
9  page 14 of your SCRT report.
10     A.   Okay.
11     Q.   And it looks like from page 14 to
12  20 is a typed Investigative Summary; is that
13  correct?
14     A.   Yes.
15     Q.   Obviously, I can read the title
16  and I understand what those words mean but
17  can you just describe in a little more detail
18  what this is meant to be?
19     A.   This is just a -- just a summary
20  of the investigation that I had into this
21  collision.
22     Q.   Okay.  So the information that is
23  contained in this summary, is it from all the

Page 32

1  -- the evidence gathered, witness statements
2  gathered, evidence collected, things like
3  that?
4      A.   Yes.
5      Q.   And, if you can turn to page 16,
6  please.  About halfway down the page I'm just
7  going to read a sentence and then I have some
8  questions to ask you about it, starting with
9  "As."  "As is every motor vehicle collision,
10  there are three (3) elements that must be
11  addressed; the roadway, the vehicle(s), and
12  the human factor."
13          Is that something that you were
14  trained on over the course of the training
15  you went through to become a SCRT member?
16     A.   Yes.
17     Q.   Then the next sentence says: "The
18  first area to be addressed is the roadway
19  element;" right?
20     A.   Yes.
21     Q.   And, just generally, can you tell
22  me what your findings were with regard to the
23  roadway?



Page 33

1    A.   This -- this collision happened on
2 Georgia 2, which is also Georgia 515 as well.
3         It is a four-lane divided highway.
4 It's divided by a grass median to the east of
5 this -- this collision on the right at the
6 collision.  It was -- it was at a red light
7 traffic control device.  There were four lane
8 -- actually five lanes with the center left
9 turn lane.
10        They -- both the vehicles were
11 traveling west on 515, Georgia 2, and they
12 were -- they were both in the left lane.
13        Ms. Kelley, at the time, she was
14 driving a Ford Escape and it was stopped at
15 the -- the red light in the left lane and
16 Mr. Elliott, he was driving a F -- a Ford
17 F-250 and it was traveling at the -- in the
18 left lane as well.
19        The stretch -- the -- the speed
20 limit on this stretch of Georgia 2 is 45.  I
21 know it says in here "55," but it -- it is --
22 it is 45 in that stretch of 515.
23    Q.   And, if you look -- I'm going to

Page 34

1 come back to this but, if you look quickly at
2 page 35 of your report, the title of the page
3 is "Roadway Information"?
4    A.   Yes.
5    Q.   And, down toward the bottom of
6 the page, is the correct speed limit listed
7 there?
8    A.   Yes.
9    Q.   And the speed limit listed is 45?
10   A.   Yes.
11   Q.   So that's the actual speed limit?
12   A.   Yes.
13   Q.   So it was just a --
14   A.   That was --
15   Q.   -- typo or --
16   A.   That was -- that was an error on
17 my part, yes.
18   Q.   What was your conclusion as to
19 whether the roadway was a proximate cause of
20 the -- of the collision?
21   A.   It didn't -- it didn't cause the
22 collision to occur.
23   Q.   And then the next element that you

Page 35

1 analyzed was the vehicles; correct?
2    A.   Yes.
3    Q.   The F-250 and then the Escape.
4         And what was your conclusion as to
5 whether the vehicles were a proximate cause
6 of the collision?
7    A.   No, the vehicles did not cause the
8 collision.
9    Q.   And then the next -- sorry -- the
10 next factor that you analyzed was the human
11 factor or the drivers; is that right?
12   A.   Yes.
13   Q.   You said -- I know I briefly asked
14 you earlier what is meant by that.
15        What were you doing for this case
16 for the human factor analysis?
17   A.   Just like in every case we're just
18 doing the human factors.
19        We're trying to find out you know
20 what was the drivers' and everybody involved
21 actions prior to the -- the collision whether
22 we -- we find out, you know, if their license
23 were good, if -- what kind of license they

Page 36

1 had, what type.
2         If they -- if they were under the
3 influence of any alcohol or drugs, we do find
4 out what those levels are.
5    Q.   What was determined as far as the
6 human factors that affected Hunter Elliott's
7 driving?
8    A.   He was -- he was under the influ-
9 ence of alcohol notated by his blood results
10 in the case file.
11        He was -- he was also distracted.
12 He was -- he admitted and it was found later
13 that he did -- or -- or was on his cell phone
14 FaceTiming his fiance at the time of the --
15 of the collision.
16   Q.   And -- and the level -- the blood
17 draw for the blood alcohol, the level was
18 .252?
19   A.   Yes.
20   Q.   And this -- your report indicates
21 that was taken at 1:42 a.m.?
22   A.   Yes.
23   Q.   So the accident I will represent



TROOPER ANDREW PHILLIPS                                                April 26, 2023
BRYSON V. ROUGH COUNTRY                                                     37–40

Page 37

1 to you happened about 11:15 p.m.
2       So the blood draw was over two --
3 two and a half hours after the accident;
4 correct?
5    A.   Yes.
6    Q.   Would his blood alcohol level have
7 been higher had the blood draw been closer in
8 time to the actual accident?
9    A.   Yes.
10    Q.   And is that over the legal limit?
11    A.   Yes.
12    Q.   How much over the legal limit?
13    A.   About a little over 3 times.
14    Q.   And then there's a little bit of
15 information about the human factor analysis
16 for Santana Kelley, and can you tell me what
17 you determined for her?
18    A.   That she -- that she was stopped
19 at the red light in the left lane on Georgia
20 2. She had a valid Class C license and then
21 she was transported to Erlanger Hospital for
22 serious injuries along with her baby that she
23 was pregnant with.

Page 38

1    Q.   And did Mr. Elliott have a valid
2 driver's license?
3    A.   No, they were suspend -- they were
4 suspended.
5    Q.   And then looking at page 19, about
6 halfway down, and I'm just reading from the
7 middle of the report, "Based on the analysis
8 and review of the evidentiary materials and
9 interviewing some of the drivers and witnes-
10 ses involved in the collision, the following
11 facts and conclusions are offered."
12       Did you eventually come to the
13 conclusion Ms. Kelley was, in fact, stopped
14 at a stoplight --
15    A.   Yes.
16    Q.   -- when the accident occurred?
17    A.   Yes.
18    Q.   Just try to let me finish the
19 question.
20    A.   I'm sorry.
21    Q.   I'm not trying to be mean. I just
22 want a clear record.
23       And looking down just further down

Page 39

1 the page, what was your conclusion about the
2 proximate cause of the accident?
3    A.   That Mr. Hunter Elliott operated
4 is vehicle in a reckless and unsafe manner
5 while under the influence of alcohol.
6    Q.   And what else did you determine as
7 far as what his actions resulted in?
8    A.   He -- his -- Mr. Elliott's actions
9 were the direct cause or the -- sorry -- the
10 direct result of the death of Cohen Bryson.
11    Q.   And did you base your conclusion
12 as to the proximate cause of the accident on
13 your investigation of the accident, gathering
14 facts, gathering evidence, interviewing of
15 witnesses, and then also communicating with
16 other members of the SCRT Team?
17    A.   Yes.
18    Q.   And then if you could turn to
19 quickly the scaled diagram at page 21 through
20 26.
21    A.   Okay.
22    Q.   Did you create these?
23    A.   Yes.

Page 40

1    Q.   What's the purpose of these?
2    A.   Well, we -- we always do -- we
3 always do forensic mapping of -- of every
4 scene that we do to this magnitude and this
5 is our forensic mapping.
6    Q.   And then if you could turn to page
7 35.
8    A.   Okay.
9    Q.   Roadway Information is listed on
10 this page and -- and, just to clarify, you
11 did not find -- or, correct me if I'm wrong;
12 but you did not find that there was anything
13 with the roadway that contributed to causing
14 this accident?
15    A.   No.
16    Q.   Is that correct?
17    A.   That's correct.
18    Q.   Then, turning to page 37 and 38,
19 this is the Driver 1, Hunter Elliott.
20       And what did you determine as far
21 as his driver's attitude contributing to the
22 collision?
23    A.   That he was driving under the



Page 41

1  influence of alcohol.
2      Q.  And then what about with regard to
3  the use of the phone?
4      A.  Yeah, he stated that he was on a
5  -- FaceTiming his fiance at the time.
6      Q.  And did you determine that to be
7  another contributing factor?
8      A.  Yes.
9      Q.  I want to move to the Vehicle 1
10 Information, which starts around page 69, I
11 believe.
12         Vehicle 1 would be the Ford F-250
13 Mr. Elliott was driving; is that correct?
14     A.  Yes.
15     Q.  Can you tell me what -- on page 73
16 what is the information that starts on that
17 page?
18     A.  This is the CDR Bosch Report from
19 that -- Hunter Elliott's F-250.
20     Q.  And have you ever done a Bosch CDR
21 download before?
22     A.  Yes.
23     Q.  Did you do the one for the F-250?

Page 42

1      A.  No.  My Corporal Jeremy Allison
2  did it.
3      Q.  Okay.  Were you --
4      A.  I was present at the time.
5      Q.  You were present when he did it?
6      A.  Yes.
7      Q.  On page 73, under the box that
8  says "CDR File Information, there's a heading
9  "Comments."
10         Do you see that?
11     A.  Yes.
12     Q.  And I'm just going to read two
13 sentences under there.  It first starts "Data
14 Imaged through DLC.  Recommended tire size
15 LT275/65R20E.  Tire size on vehicle LT325/
16 50R22."
17         Did I read that right?
18     A.  Yes.
19     Q.  Do you know if the tire size on
20 the vehicle was bigger than the recommended
21 tire size?
22     A.  Yes, it was.
23     Q.  Do you -- do you know -- can you

Page 43

1  quantify how many bigger?
2      A.  I do not.
3      Q.  Do you have an understanding of
4  how a bigger tire affects a vehicle's speed-
5  ometer speed reading versus the actual speed
6  of that vehicle?
7      A.  Very little.
8         When we -- normally we do -- when
9  we do these we -- we have a website that we
10 go on and it calculates it for us.  We put in
11 the recommended tire size and then we put in
12 the actual tire size on the vehicle and it
13 tells us what -- if there's a difference in
14 the -- in the speedometer with the actual
15 tires on it.
16     Q.  You say "very little" but which
17 way does it -- does it impact it?
18     A.  Are you talking about on this
19 particular one?
20     Q.  Yeah.  If you have a bigger tire
21 than what's recommended, how does that impact
22 the actual speed versus what the speedometer
23 says?

Page 44

1      A.  It -- it would impact it a little
2  bit, yes.  I mean, it varies -- it varies.
3  It just depends on the size of the tire.
4         Like if you have an enormous big-
5  ger tire on -- on there than recommended, it
6  may impact it -- it may impact it 5 to 10
7  miles an hour; but, if it's relatively close
8  in -- to the same size, it may not affect it
9  as much as that.
10     Q.  So are you saying -- what I guess
11 I'm trying to understand is, was the actual
12 speed, when you say "5 to 10 miles an hour,"
13 faster or slower than --
14     A.  Faster.
15     Q.  Faster.
16     A.  Yes.
17     Q.  Than what you would be reading on
18 the speedometer?
19     A.  Yes.
20     Q.  Okay.  If you could turn to page
21 78, please.
22     A.  Okay.
23     Q.  And we are still on the -- the



Page 45

1  Bosch CDR download and I'm looking at the
2  table.
3          Do you recognize what that table
4  shows?
5      A.  Yes.
6      Q.  Okay.  Kind of explain to me what
7  -- looking at the time in seconds and then
8  the -- just take the first column.  We can
9  kind of walk across the table, what this
10 shows as far as time and the speed of the
11 vehicle and what this means.
12     A.  All right.  So, on the far left is
13 time in seconds and it starts -- do you want
14 me to wait on you?
15         At the column on the far left is
16 the time in seconds.  It starts at 5 seconds.
17 It's a negative 5.  That means it's prior to
18 airbag deployment.  It starts at 5 seconds
19 and it goes down to 0 in increments of a half
20 a second.  So it starts at negative 5 seconds
21 to negative 4.5 to 4, so on and so forth
22 until we get to 0.
23     Q.  Let me just ask you one question

Page 46

1  there.  You're saying 5 seconds before airbag
2  deployment?
3      A.  Yes.
4      Q.  So would that be at the actual
5  time -- airbag deployment at the actual time
6  of impact?
7      A.  In this particular case, yes, it
8  is.
9      Q.  Okay.  I just wanted to clarify
10 that.  You can keep going.
11     A.  We -- we say that because it's not
12 always -- airbag deploys -- airbag deploying
13 does not always happen when the two vehicles
14 collide, if that makes sense.
15     Q.  So then how do you know for this
16 case that it happened at the time of impact?
17     A.  Due to the fact that it was a
18 frontal impact and that was the first thing
19 that he did strike, was the rear-end of the
20 Ford Escape.
21     Q.  Just to speed this up a little
22 bit, so, as far as 5 seconds before impact,
23 how fast was Mr. Elliott driving?

Page 47

1      A.  52 miles an hour.
2      Q.  And then, at the point of impact,
3  how fast was he driving?
4      A.  50 miles an hour.
5      Q.  And then, moving over to the one
6  column to te right, Accelerator Pedal % Full,
7  does this show that he had his -- his foot on
8  the pedal -- on the accelerator up until the
9  point of impact or took it off just prior to
10 the impact?
11     A.  Half a second prior to the impact.
12 At half a second prior to impact, it shows
13 that he was traveling 51 miles an hour and he
14 had 22.9 percent of the pedal pressed.
15         And, since this is half a second,
16 he could have released the pedal and got on
17 his brakes, which is the fourth column, at
18 0.499999.
19         It just -- I don't know with what
20 -- what particular time in that half a second
21 that he put his brakes on and he dropped down
22 1 mile an hour.
23     Q.  Sometime between impact and half a

Page 48

1  second before?
2      A.  Correct.
3          I hope I made sense by saying
4  that.
5      Q.  Yeah.  Sure.
6          What does the Engine RPM column --
7  what does that tell us?
8      A.  Oh, that's just how much RPMs the
9  engine was putting out during that 5 seconds.
10     Q.  The ABS column, that was never
11 engaged?
12     A.  Correct, it was not.
13     Q.  What does Brake Powertrain Torque
14 Request, what does that mean?
15     A.  I could go back and look at this.
16     Q.  You know what, it doesn't matter.
17         "Driver Gear Selection," "Drive,"
18 does that just mean the gear is actually in
19 drive --
20     A.  Yes.
21     Q.  -- for this 5 seconds?
22     A.  Yes.
23     Q.  And then, looking at page 79, at 5



TROOPER ANDREW PHILLIPS
BRYSON V. ROUGH COUNTRY

April 26, 2023
49–52

1 seconds before impact, looking at the Steer-
2 ing Wheel Angle and Degrees, it shows "0" it
3 looks like all the way down the page; is that
4 right?
5     A.   Yes.
6     Q.   Does that mean that there was zero
7 input in the 5 seconds before the impact?
8     A.   That's what it appears to be.
9     Q.   Based on your experience investi-
10 gating these kinds of accidents that might
11 involve DUI and driver distraction on a phone
12 would -- would zero input be consistent with
13 someone that's drunk driving and FaceTiming
14 at the same time?
15     A.   Zero?  No.
16     Q.   No?
17     A.   No.
18     Q.   What do you think that means?
19     A.   That part, since it's zero for 5
20 seconds and it's going every 10th of a second
21 the ACMs could -- they -- they do give errors
22 a lot that could be an error in that.
23     Q.   For Stability Control Lateral

1 Acceleration, that number looks like it's
2 hovering fairly close to zero throughout
3 those 5 seconds?
4     A.   Yes.
5     Q.   So what does that indicate?
6     A.   The lat -- it just means how much
7 acceleration in -- in Gs the vehicle moved
8 laterally.
9     Q.   So does that indicate there's some
10 slight input?
11     A.   A little bit, yes.
12          Usually, the -- the steering wheel
13 -- steering wheel angle and degrees, usually
14 a normal -- us driving down the road every
15 day on the crown of the road, we're usually
16 between negative 3 to 3 -- to positive 3, is
17 what we're normally at.
18     Q.   What about the Stability Control
19 Longitudinal Acceleration, it looks like that
20 consistently hovers around the same number,
21 negative 0.021.
22          What does that mean to you?
23     A.   Let me look just back at the data

1 limitations here.
2          It is not showing what it is on
3 here.
4     Q.   And is it -- you tell me.  Is it
5 accurate to say that this chart shows that
6 there's no significant driver input in the
7 last 5 seconds before impact?
8     A.   Yes.
9     Q.   If you could, turn to page 110 and
10 111.
11     A.   Okay.
12     Q.   Really, it's 111.
13          Vehicle Information for the Ford
14 Escape that the Brysons were in?
15     A.   Yes.
16     Q.   Do you see that?
17          And then, looking down toward the
18 bottom of the page, I'm just going to read
19 what this one says.  "This vehicle was not
20 equipped with a readable ACM information."
21          What does "ACM" stand for?
22     A.   Airbag Control Module.
23     Q.   Did you make that determination?

1     A.   Yes.
2     Q.   How did you all figure out that it
3 was not equipped with a readable ACM?
4     A.   We -- the system we use is called
5 Bosch CDR and on that program on our computer
6 we look up -- there's a list of all of the
7 vehicles that are supported and it was not on
8 there.
9     Q.   Do you know if it was due to the
10 age of the vehicle?
11     A.   I do -- I don't know if it was the
12 age or that particular model.
13     Q.   Do you recall if you personally
14 interviewed any of the witnesses to the
15 accident?
16          There's statements -- handwritten
17 statements are around page 147.
18     A.   No.  I just used their statements
19 that -- that were given to me.
20     Q.   Then, if you could, please turn to
21 page 154.
22     A.   Okay.
23     Q.   The NIBRS Incident Report, can you



Page 53

1 tell me what this is, please?

2     A.   This is Trooper Matheson's Inci-
3 dent Report on this collision and the DUI
4 portion.

5     Q.   What -- do you know what "NIBRS"
6 stands for?

7     A.   I do not know.

8     Q.   Have you filled out one of these
9 reports, an NIBRS Incident Report?

10    A.   Well, they've -- they've just --
11 they've changed this in the last several
12 years since I've been on SCRT so I have not
13 had the pleasure of completing when it's been
14 named this.

15    Q.   Right.  It looks like it's some-
16 thing that maybe came out around 2021 is what
17 -- when I looked it up.

18    A.   Yeah.  So, yeah.

19    Q.   And you have not done one that's
20 called this but you've done something similar
21 to this before?

22    A.   Correct.

23    Q.   And is it -- is the purpose to --

Page 54

1 to report to federal agencies on certain
2 crimes?

3     A.   I think it has to do with the
4 reporting.

5          The one I filled out looks just --
6 it's -- it's the same one, it's just named a
7 different thing.

8     Q.   You -- you inspected Mr. Elliott's
9 truck at some point in time after the acci-
10 dent?

11    A.   Yes.

12    Q.   Do you recall if there were beer
13 cans in the truck?

14    A.   Yes.

15    Q.   Do you remember seeing a 12-pack
16 in the truck?

17    A.   Yes.

18    Q.   I believe your colleague's report
19 said there was in excess of 25 cans of beer
20 in the truck -- open cans of beer in the
21 truck at the scene of the accident.

22         Do you recall that?

23    A.   I -- I do remember there was a

Page 55

1 bunch.

2     Q.   There are two animations that were
3 produced as part of the SCRT file and then I
4 also think also as part of the DA's file and
5 I have them on my laptop.  I can show them to
6 you.

7          They're called "Animation 1" and
8 "Animation 2."  We can take a look at them.
9 I just want to ask you a couple of questions
10 about one of them.

11    A.   Okay.

12    Q.   I'm going to play Animation 1 now.

13         Can you -- can you see okay?

14    A.   Yes, I can.

15         MS. FERGUSON:  Tedra, do you want
16 to --

17         MS. CANNELLA:  I've got it.

18    Q.   (By Ms. Ferguson) See that?

19    A.   Yes.

20    Q.   All right.  Did you create this
21 animation?

22    A.   Yes.

23    Q.   And what kind of software did you

Page 56

1 use to create it?

2     A.   FARO Zone.

3     Q.   I don't know if you can answer
4 this.  What kind of information did you need
5 to plug in to the program to create this?

6          MS. CANNELLA:  You can answer but
7 I think we need a spelling of FARO Zone.

8          COURT REPORTER:  Yeah, I don't
9 know what you're saying.  Thank you.  Can you
10 spell that?

11         MS. CANNELLA:  Do you want him to
12 spell it?

13         COURT REPORTER:  Yes, please.

14         THE WITNESS:  F-A-R-O, Z-o-n-e.

15         COURT REPORTER:  Thank you.

16    Q.   (By Ms. Ferguson) What kind of
17 information did you plug in to the software
18 to generate this animation?

19    A.   I placed the -- my orthomosaic
20 that I created off of the aerial photographs
21 into FARO Zone.  I then placed the exemplar
22 vehicle, the Ford Escape at final rest at the
23 -- at the red light.  I then placed the truck



Page 57

1  at impact with the Ford Escape.  I then took
2  the ACM data and I started at zero and I went
3  back to 5 seconds based on the -- the speed
4  he was going at each -- at each second and
5  how many -- how much -- how many feet per
6  second that was and I just backed him up.
7       I have since learned that you can
8  place the whole entire data into that system
9  and it'll do it automatically, the technology
10  has gotten better since then.
11       Q.  So was this -- was this your first
12  time doing an animation like this?
13       A.  Yes.
14       Q.  So just a couple things.  It's --
15  they're not -- it's not nighttime conditions
16  in this animation; correct?
17       A.  No.
18       Q.  And then -- I'll play it one more
19  time but the -- the Animation 1 doesn't show
20  any of the crush damage; correct?
21       A.  That's correct.
22       Q.  So it's not meant to be an actual
23  reenactment of the accident?

Page 58

1       A.  Correct.
2       Q.  Why did you create this?
3       A.  Just to have -- it was new tech --
4  new technology for us and I was just trying
5  to do this to -- for the DA's office and for
6  the jury to -- to see a, you know, depiction
7  of the collision.
8       Q.  And then I'm going to open up
9  Animation 2.
10       Animation 2 is also done in date
11  -- daylight, not nighttime; right?
12       A.  Yes.  I don't understand why that
13  was.
14       Q.  Similar question.  No crush damage
15  is shown here; correct?
16       A.  No.
17       Q.  And, as far as like the vehicle's
18  motion as far as jerking, going up and down,
19  none of that kind of stuff is shown here;
20  correct?
21       A.  Right.
22       Q.  The actual motions that would've
23  happened in the real impact are not all

Page 59

1  depicted in here; correct?
2       A.  No.
3       Q.  Correct?
4       A.  Oh, yes, correct.  I'm sorry.
5       Q.  Same thing, with the animation, as
6  far as any like street lights or businesses,
7  other vehicles on the road, none of that kind
8  of stuff is depicted here in the animation;
9  correct?
10       A.  No.  Yes, correct.
11       THE WITNESS:  This battery is
12  running low on this computer.
13       VIDEOGRAPHER:  The time is now
14  12:52 p.m. and we are off the record.
15       (Short recess.)
16       VIDEOGRAPHER:  The time is now
17  12:53 and we are on the record.
18       Q.  Trooper Phillips, I know you grew
19  up in Blairsville and then you work now in
20  the Calhoun area; correct?
21       A.  Yes.
22       Q.  Over the course of -- of your time
23  living in this area, I guess I would call it

Page 60

1  North Georgia.  I don't know if you call it
2  North -- do you call it North Georgia, North-
3  west Georgia?
4       A.  I just call it North Georgia.
5       Q.  North Georgia.  Okay.
6       Limiting it to your time in the
7  last 12, 13 years working as a trooper, have
8  you seen pickup trucks on the road with lift
9  kits that raise the vehicle above the origi-
10  nal height that they would come out of the --
11  that they would be sold?
12       A.  Yes.
13       Q.  And then -- so, not just limiting
14  to your time work as a trooper but just over
15  the course of your life growing up in this
16  area, have you seen lifted trucks out on the
17  roadway?
18       A.  Yes.
19       Q.  How -- how often would you say you
20  see lifted trucks on the roadway?  Is this a
21  daily occurrence, weekly occurrence?
22       A.  It's probably daily.
23       Q.  And would you say -- strike that.



TROOPER ANDREW PHILLIPS                          April 26, 2023
BRYSON V. ROUGH COUNTRY                           61–64

Page 61

1          You're aware in this case that
2 Mr. Elliott was driving a lifted F-250?
3      A.  Yes.
4      Q.  And I'm assuming that you've seen
5 -- it's in the report if you want to flip to
6 it -- that he was cited for driving a truck
7 with a lifted suspension?
8      A.  Yes.
9      Q.  Have you ever cited anyone for
10 driving a -- a lifted vehicle?
11     A.  No.
12     Q.  He was cited and I'll -- the code
13 is OCGA-40-8-6.  Are you aware of any other
14 troopers besides Matheson in this case citing
15 drivers for driving lifted vehicles?
16     A.  No.
17     Q.  Had you heard of Statute OCGA-40-
18 8-6 prior to this case?
19     A.  Yeah, I was -- I was aware of it,
20 yes.
21     Q.  If there's lifted trucks commonly
22 on the road on I'd say a daily basis, do you
23 know why officers don't cite drivers for

Page 62

1 driving lifted trucks?
2          MS. CANNELLA:  Object to the form
3 of the question.  Calls for speculation.
4      A.  I do not.
5      Q.  (By Ms. Ferguson) Have you ever
6 read the Statute OCGA-40-8-6?
7      A.  Yes.
8      Q.  You have?
9      A.  Yes.
10     Q.  Have you been given any training
11 on the statute and issuing citations related
12 to it?
13     A.  As far as what kind of training?
14     Q.  Like was it covered?  I think you
15 talked about in your -- I don't know if it
16 was the initial training to become a trooper
17 but at some point they cover Title 40 and --
18 and teach you about the different rules of
19 the road and I guess things you can write
20 tickets for.
21          Was this statute ever covered in
22 any of that training?
23     A.  Not that I recall.

Page 63

1      Q.  How come you personally haven't
2 ever written a ticket for someone driving a
3 lifted truck under 40-8-6?
4      A.  I personally don't know how to
5 measure to see what is stock, say, straight
6 from the manufacturer from what is lifted any
7 amount.
8      Q.  You wouldn't know how to make that
9 determination?
10     A.  Yeah, I don't know how to measure
11 that.
12          MS. FERGUSON:  Can we go off the
13 record for just a second?
14          VIDEOGRAPHER:  The time is now
15 12:58 p.m. and we are off the record.
16          (Short recess.)
17          VIDEOGRAPHER:  The time is now
18 1:00 o'clock p.m. and we are on the record.
19     Q.  I asked you a couple of questions
20 just a second ago, Trooper Phillips, about
21 why you hadn't written tickets previously
22 for lifted vehicles under the Georgia Statue
23 40-8-6 and I believe you said something about

Page 64

1 you wouldn't know how to do the measurement
2 of what the -- tell me what your answer was
3 for that again.
4      A.  I would not know how the measure
5 the -- say a lift or the suspension on the
6 vehicle to determine whether it was factory
7 stock or if it was illegal per the statute.
8      Q.  And so Georgia State Patrol SCRT
9 Team, none of the law enforcement training
10 that you've ever been provided teaches you
11 how to enforce that statute and do the mea-
12 surements that you need to be able to do?
13     A.  No.
14     Q.  It does not?
15     A.  No.  I've never been through
16 training to measure that.
17     Q.  Okay.  And no one's ever given you
18 instruct -- instructions around here, like in
19 the field "Hey, this is how you do it, you
20 need to write tickets for this"?
21     A.  No.
22     Q.  You would agree with what I said?
23     A.  Nobody has ever done that.



Page 65

1    Q.   Okay.  Got it.  That -- that's all
2 I have.  Thank you for your time.
3         MS. FERGUSON:  Do you have any
4 questions?
5         MS. CANNELLA:  Right.  I'm going
6 to just very briefly repeat a few things in
7 case we need to use this for this trial.  So
8 apologize for that.
9
10 EXAMINATION BY MS. CANNELLA:
11
12    Q.   Trooper, thank you for being here.
13 I represent the family of the Brysons, as you
14 know, and I have a few brief question; but,
15 before we get going, can you please state
16 your full name for the record and your
17 position?
18    A.   It's Andrew Phillips and I am
19 Trooper First Class 3 and I work for the
20 Georgia Department of Public Safety and the
21 Georgia State Patrol and I am assigned to the
22 Specialized Collision Reconstruction Team
23 here in Troop A out of Calhoun, Georgia.

Page 66

1    Q.   And your position on the -- the --
2 can I call it the SCRT Team?
3    A.   Yeah, SCRT -- SCRT Team.  We call
4 it "SCRT" for short, yes.
5    Q.   Do you have specialized training
6 related to your investigation of crashes as
7 part of your position on the SCRT Team?
8    A.   Yes.
9    Q.   And would you consider yourself an
10 expert on recreating crashes?
11    A.   Yes.
12    Q.   How much law enforcement work for
13 the Georgia State Patrol did you do before
14 you joined the SCRT Team?
15        MS. FERGUSON:  Object to the form
16 of the question.
17    A.   Say that one more time or ask me
18 that one more time.
19    Q.   (By Ms. Cannella) Let me rephrase.
20        Did you do any work on the Georgia
21 State Patrol Force before you joined the
22 specialized SCRT Team?
23    A.   Yes.

Page 67

1    Q.   And how much did you do, how much
2 time?
3    A.   About seven and a half years.
4    Q.   I'm going to tender you as an
5 expert in the field of accident reconstruc-
6 tion.
7        MS. CANNELLA:  Any objection to
8 that?
9        MS. FERGUSON:  I think certain
10 areas he certainly is qualified.  We will
11 reserve objections to anything -- I mean, I
12 don't know what all you're going to ask him
13 and, if you go beyond the scope, then we may
14 object to that; but I -- I can't predict what
15 you're going to ask him so I'll raise my ob-
16 jections as you go if I feel there's some-
17 thing that's outside of his area of exper-
18 tise.
19        MS. CANNELLA:  Okay.  Great.
20    Q.   Did Hunter Elliott begin -- let me
21 rephrase that.  Strike that.  I'm sorry.
22        Did Hunter Elliott's being drunk
23 change the height of the lift on his car?

Page 68

1    A.   No.
2    Q.   Did Hunter Elliott being drunk
3 change the height of his F-250 in any way?
4    A.   No.
5    Q.   Did the fact that Hunter Elliott
6 was drunk change the amount of intrusion in
7 -- that was caused in this wreck into the
8 Bryson's vehicle?
9        MS. FERGUSON:  Object to the form
10 of the question.
11    A.   I still answer; right?
12    Q.   (By Ms. Cannella) Yes.
13    A.   You said him being drunk changed
14 the intrusion of the collision?  No.
15        MS. FERGUSON:  Same objection.
16    Q.   (By Ms. Cannella) And, once the
17 crash began, did the fact that Hunter Elliott
18 was intoxicated or distracted or driving on
19 a suspended license, did any of those facts
20 affect the crash performance of either
21 vehicle in the wreck?
22        MS. FERGUSON:  Object to the form
23 of the question.



TROOPER ANDREW PHILLIPS
BRYSON V. ROUGH COUNTRY

April 26, 2023
69–72

Page 69

1     A.   No.

2     Q.   (By Ms. Cannella) In your report,
3  you note that the coll -- a collision can be
4  caused by one of three things.

5          Can you tell the jury what those
6  -- and, if I'm misphrasing it, I'm sorry; but
7  you mention in your report three things that
8  you have too consider, perhaps is a better
9  way to say it, when you investigate.  Can you
10  tell the jury what those three things are?

11     A.   It's the roadway, the vehicle, and
12  the human factors.

13     Q.   And in some cases can the roadway
14  contribute to a wreck?

15     A.   Yes.  Some -- some ways they can,
16  yes.

17     Q.   Well, can you give us a couple of
18  examples of that perhaps?

19     A.   I mean, if there was -- we call
20  them up here -- in North Georgia we call them
21  potholes where there's roads -- or there's a
22  hole in the road, I guess you'd say; or, if
23  somebody was to run off a shoulder that was

Page 70

1  not properly maintained, that could be a
2  contributing factor maybe.

3     Q.   Maybe if there was a sharp curve
4  and someone couldn't see, you know, traffic
5  stopped ahead of them or something like that,
6  would that be considered a roadway contribut-
7  ing factor?

8     A.   Yeah, depending on the distance
9  versus, you know, as far as where a driveway
10  is located or a -- a road -- road is located
11  as far as how much sight distance that they
12  allowed on the roadway.

13     Q.   What if the sun was in someone's
14  eyes, would that follow under one of those
15  three categories?

16     A.   I think that would -- that would
17  really fall under the human factors maybe.

18     Q.   What if someone's brakes weren't
19  working properly, would that be one of those
20  factors?

21     A.   Yeah, that would be under the
22  vehicle element.

23     Q.   And what if somebody had a heart

Page 71

1  attack, for example?

2     A.   That would be under human factor.

3     Q.   And how about if a deer crossed
4  the road?

5     A.   That would be a human factor as
6  well.

7     Q.   And all of those things -- would
8  you agree all of those things can contribute
9  to a -- a collision occurring?

10     A.   They can, yes.

11        MS. CANNELLA:  We can take one
12  pause for the videographer.

13        VIDEOGRAPHER:  The time is now
14  1:07 p.m. and we are off the record.

15        (Short recess.)

16        VIDEOGRAPHER:  The time is now
17  1:09 p.m. and we are on the record.

18     Q.   Would you agree that passengers
19  in vehicles need protection from crashes no
20  matter what causes them?

21     A.   Yes.

22        MS. FERGUSON:  Object to the form
23  of the question.

Page 72

1     Q.   (By Ms. Cannella) Let me rephrase
2  it then since there was an objection.

3        Do you agree that -- or do passen-
4  gers need -- do passengers need protection
5  from crashes no matter what causes them?

6     A.   Yes.

7        MS. FERGUSON:  Same objection --
8  or different objection.  Object to the form,
9  foundation.

10     Q.   (By Ms. Cannella) I'm going to
11  show you a picture from the items that we got
12  from the SCRT Team and I don't have a print-
13  out of it but it's Image 1069.

14        Can you see it there?

15        MS. CANNELLA:  And I'll E-mail it
16  to the court reporter so we have it in the
17  record.

18     A.   Yes.

19     Q.   Okay.  I'm going to mark this as
20  Plaintiff's Exhibit 1.

21        Do you recognize this photograph?

22        (Plaintiff's Exhibit Number 1 was
23  marked for identification.)



Page 73

1    A.  Yes.
2    Q.  Does it represent -- accurately
3 represent what you saw when you did your
4 inspection of the Bryson vehicle?
5    A.  Yes.
6    Q.  Can you describe the intrusion in
7 the back of the vehicle?
8        MS. FERGUSON:  Object to founda-
9 tion.  Qualification.  Subject to that.
10    A.  This is the -- a photograph of the
11 rear end of the Ford Escape and it shows the
12 damage that was -- that it sustained during
13 the collision.
14        This is where the F-250 impacted
15 the -- the Ford Escape in the rear end.
16    Q.  (By Ms. Cannella) And, on the left
17 side of the vehicle, can you -- can you tell
18 how far -- relative to the tire, how far the
19 intrusion goes in?
20        MS. FERGUSON:  Object to the form.
21 Foundation.  Qualification.
22    A.  Yeah, the intrusion does go over
23 top of the left -- or the -- yeah, the left

Page 74

1 rear tire.
2    Q.  (By Ms. Cannella) I want to show
3 you one other photo and that is 1075 from the
4 same group of photos we got from SCRT.
5        Can you see that?
6    A.  Yes.
7        MS. FERGUSON:  Are you going to
8 mark this as P2 or Composite 2?
9        MS. CANNELLA:  Yeah, Plaintiff's
10 2.
11    Q.  Can you see that?
12        (Plaintiff's Exhibit Number 2 was
13 marked for identification.)
14    A.  Yes.
15    Q.  How would you characterize what's
16 happening with the bench seat there?
17        MS. FERGUSON:  Let me objection.
18 Qualification.  Foundation.
19    A.  That it was -- it's moved forward.
20    Q.  (By Ms. Cannella) And is it -- is
21 that moved forward in like it was slid up or
22 it was more from crash intrusion?
23    A.  From --

Page 75

1        MS. FERGUSON:  Object to the form.
2 Foundation.  Qualification.
3    A.  From crash intrusion.
4    Q.  (By Ms. Cannella) You testified
5 earlier that it's -- it was your conclusion
6 that Hunter Elliott caused the death of Cohen
7 Bryson and my question about that is:  Did
8 you personally do any biomechanic assessment
9 or other type of assessment to determine
10 whether Cohen could have survived if the
11 intrusion had not been so severe in the Ford
12 Escape?
13    A.  No.
14    Q.  You don't have an opinion on that?
15    A.  No.
16    Q.  Okay.  I want to ask you about the
17 difference between impact speed and Delta-V.
18        Can you explain to the jury what
19 the difference between those things are just
20 generally?
21    A.  Let me get to the --
22    Q.  It might be page 76 that you're
23 looking for.

Page 76

1    A.  Yes, I think it is.  Let me just
2 double check.
3        Yes, 76 is where it shows the --
4 the maximum Delta-V in longitudinal direction
5 in miles an hour is what -- it's first using
6 Delta-V and then in parentheses it's in miles
7 an hour.
8    Q.  And, just for people who aren't
9 familiar with the difference between impact
10 speed and a Delta-V, can you kind of explain
11 what that means?
12    A.  I can try.  I may confuse myself
13 and you, too.
14        The miles an hour is -- it is what
15 it is, it's miles an hour; and the Delta-V is
16 basically the force that -- the amount of
17 force it had in Delta-V standards as far as
18 there.
19    Q.  Okay.
20    A.  And the -- in the longitudinal
21 direction.  The --
22    Q.  Well, let me ask it differently,
23 too.  You testified that the Ford F-250 -- I



TROOPER ANDREW PHILLIPS                          April 26, 2023
BRYSON V. ROUGH COUNTRY                              77—80

Page 77

1 don't want to mischaracterize it but; I think
2 you said, upon impact, he was going 50 miles
3 and hour; right?
4     A.  Yes.
5     Q.  And the Delta-V longitudinally
6 forward and backward, the direction the car
7 is traveling in, what is the Delta-V in the
8 case?
9     A.  The maximum Delta-V that the truck
10 had was a negative 18.21.
11     Q.  So, if he's going 50 miles an hour
12 but his Delta-V for or his change in force is
13 18 miles an hour, why are those numbers so
14 different?
15         MS. FERGUSON:  Object to the form.
16 Foundation.
17     Q.  (By Ms. Cannella) If you know.
18     A.  I do not know that.
19     Q.  Okay.  Did you guys do anything to
20 determine what the impact of the tire size
21 had on impact speed?
22     A.  I did not.
23     Q.  Okay.  And would tire size impact

Page 78

1 a Delta-V reading at all, do you know?
2         MS. FERGUSON:  Object to the form.
3 Foundation.
4     A.  I do not know that.
5     Q.  (By Ms. Cannella) Do you know why
6 there was no airbag deployment in the F-250?
7     A.  No; other than it, you know, did
8 not get those sensors that were in the front
9 that controls that.
10     Q.  Okay.
11     A.  That's my only explanation on
12 that.
13     Q.  So can you talk a little bit more
14 about that?  Why -- what are the sensors?
15     A.  There's -- there's sensors in the
16 front -- in the front of vehicles that, when
17 those sensors are alerted or impacted however
18 they are, it alerts the airbag control module
19 to say there's a significant enough event
20 that we need to deploy these airbags and, in
21 this particular case, it did not happen.
22     Q.  Okay.
23     A.  And I do not -- I can't explain

Page 79

1 why that is.
2     Q.  In your experience investigating
3 those thousands of crashes that you talked
4 about earlier -- well, let me ask that a
5 different way.
6         Do you have experience investigat-
7 ing thousands of crashes?
8     A.  Yes.
9     Q.  And, base on what you see given
10 the speeds in the wreck and the direction of
11 the wreck being a frontal collision, would
12 you expect the -- the F-250's airbag to have
13 deployed?
14         MS. FERGUSON:  Object to the form
15 of the question.
16     A.  Yes.
17     Q.  (By Ms. Cannella) I wanted to
18 touch on one other thing just to make sure
19 the record is right.
20         You talked about how frequently
21 the black box or airbag control module takes
22 readings on what's going on in the car being
23 every half a second.

Page 80

1         Do you recall that?
2     A.  Yes.
3     Q.  Let's get to that page so we can
4 talk about it together.
5         Can you see the braking point?
6     A.  78.
7     Q.  Thank you, sir.
8         All right.  So it's got the -- the
9 brake is on at 0 and off at .5.  So I think I
10 heard you correctly to say that it can be on
11 at .499 and any time before that -- or any
12 time closer to the wreck from that?
13     A.  Correct.
14     Q.  Okay.  Got it.
15     A.  Yeah, any -- any time between .5
16 and .0 is when that brake went on.
17     Q.  Right.  So we're just getting like
18 a snapshot picture of these different points
19 in time?
20     A.  Yes.
21     Q.  Okay.  In your role as a SCRT Team
22 member, is pulling over drivers for moving
23 violations something you typically do or are



TROOPER ANDREW PHILLIPS
BRYSON V. ROUGH COUNTRY

April 26, 2023
81–84

Page 81

1  you primarily doing investigations of fatal-
2  ity in a serious collision?
3      A.  As a SCRT officer?
4      Q.  Yes, sir.
5      A.  Mainly just doing investigating
6  collisions.
7      Q.  Okay.  Do you do reviews of other
8  trooper's citations to know whether they are
9  writing citations for certain types of
10  tickets or not?
11      A.  No.
12      Q.  After a wreck occurs and vehicles
13  are being moved, items that were in the car
14  that get jostled around or thrown out of the
15  car, what do troopers or what do investiga-
16  tors usually do with those?
17      A.  You talking about --
18      Q.  Like personal items.  Like in this
19  case there was a stroller and bag of clothes
20  and that kind of thing.
21          If those things get moved around
22  or thrown out of the car, what do people do
23  with those?

Page 82

1      A.  Usually it's put in --
2          MS. FERGUSON:  Object to the form.
3  Calls for speculation.
4      A.  Usually, you know, the tow truck
5  drivers, they'll put it in whichever vehicle
6  that is close by to where they're scooping it
7  up.
8          You know, it may end up -- in --
9  in this case, it might've ended up in the --
10  it could end up in the truck, the bed of the
11  truck; or it could've ended up in the Ford
12  Escape.  It just -- it just depends on what
13  the -- which one the wrecker driver puts it
14  in.
15      Q.  (By Ms. Cannella) Do you have any
16  experience or training in assessing whether a
17  car seat is properly installed?
18      A.  Yes.
19      Q.  Did you make that determination
20  in this case, whether Cohen's car seat was
21  properly installed?
22      A.  Yes.
23      Q.  And what's your opinion on that?

Page 83

1      A.  That it was installed correctly.
2      Q.  Was it -- was it secured tightly
3  in the vehicle?
4      A.  Yes.
5      Q.  That's reflected in your report at
6  page 112 I believe.  You noted it was both
7  properly positioned and properly secured; is
8  that correct?
9      A.  Yes.
10      Q.  And it has an expiration date for
11  the child restraint.  What did you note that
12  was?
13      A.  2028.
14      Q.  So the child restraint was -- was
15  not expired either; correct?
16      A.  Correct.
17      Q.  And it was forward facing.  Is
18  that appropriate for the situation in your
19  opinion?
20      A.  Yes.
21          MS. CANNELLA:  That's all I have.
22  Thank you.
23          MS. FERGUSON:  I may have just a

Page 84

1  couple of follow-up questions.
2
3  FURTHER EXAMINATION BY MS. FERGUSON:
4
5      Q.  Troop Phillips, you were just
6  asked some questions and shown some photos
7  about the extent of intrusion over the left
8  rear tire of the Escape.
9          Do you recall those questions?
10      A.  Yes.
11      Q.  Did you actually take any measure-
12  ments related to any intrusion that may have
13  occurred over the left rear tire?
14      A.  No.
15      Q.  Did you do any analysis related to
16  the extent or degree of intrusion that may or
17  may not have occurred with regard to the F-
18  250 and the Escape?
19          MS. CANNELLA:  Object to the form
20  of the question.  Vague.
21      A.  No.
22      Q.  (By Ms. Ferguson) And, with regard
23  to you were shown SCRT Photo 1075 Plaintiff's



Page 85

1   2 and you were asked some questions about the
2   bench seat and whether it moved forward due
3   to crash intrusion, did you personally take
4   any measurements or do any kind of analysis
5   when you inspected the vehicle to determine
6   whether the -- the bench was moved forward
7   from intrusion and, if so, the extent it was
8   moved forward?
9       A.  No.
10      Q.  And so was your testimony earlier
11  about intrusion, was it -- was it based sole-
12  ly on looking at the photos that were taken
13  at the inspection facility at some point in
14  time after the night of the crash?
15      A.  Yes.
16      Q.  Do you have any information about
17  what was stored in the cargo area of the Ford
18  Escape at the time of the collision?
19      A.  (Inaudible) about the only thing
20  that I can recall was maybe a stroller in the
21  back.  That's about the only thing I -- I do
22  -- I do know that they did have a lot of, you
23  know, like -- it looked like to me that they

Page 86

1   were moving at the time.
2       Q.  Do you recall there being a -- a
3   Shopvac somewhere in the vehicle contexts --
4   contents; right?
5       A.  It could've been.  I would have to
6   look at the -- look back at the photos to --
7   to be 100 percent certain on what was in the
8   back.
9       MS. FERGUSON:  I don't have any
10  other questions.  Thank you.
11      MS. CANNELLA:  I don't have any
12  other question either.
13      VIDEOGRAPHER:  This concludes this
14  Vide Deposition.  The time is now 1:25 p.m.
15  and we are off the record.
16      MS. CANNELLA:  Are you going to
17  read and sign?
18      THE WITNESS:  No, I'll waive.
19      MS. CANNELLA:  Okay.  He's going
20  to waive the read and sign.
21      COURT REPORTER:  I need to get the
22  exhibits and the transcript orders, please.
23      MS. CANNELLA:  I need a transcript

Page 87

1   with a PXT file and not synced and I'll take
2   the video as well.
3       MS. FERGUSON:  I'll take the same
4   thing.
5
6           --o0o--
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 88

1                    CERTIFICATE
2   STATE OF ALABAMA       )
3
4   COUNTY OF JEFFERSON    )
5
6           I hereby certify that the above and foregoing
7   deposition was taken down by me in stenotype and the questions
8   and answers thereto were transcribed by means of
9   computer-aided transcription, and that the foregoing
10  represents a true and correct transcript of the testimony
11  given by and witness upon said hearing.
12          I further certify that I am neither of counsel, nor
13  kin to the parties to the action, nor am I in anyway
14  interested in the result of said cause named in said caption.
15          I further certify that I am duly licensed by the
16  Alabama Board of Court Reporting as a Certified Court Reporter
17  evidenced by the CCR number following my name below.
18
19                    Susan Bell
20                    Susan Bell, Commissioner
21                    Certified Court Reporter
22                    CCR#14-Expires:  9/30/23
23                    Commission Expires:  10/24

