# EXHIBIT "5"

**In The Matter Of:**

*Bryson, et al v.*
*Rough Country, LLC*

---

*Jonathan Eisenstat, MD*
*January 15, 2024*

---

*D'Amico & Associates, Inc.*
*Court Reporters & Videoconferencing*
*5855 Sandy Springs Circle #140, Atlanta, GA 30328*
*(770) 645-6111 or toll-free (888) 355-6111*



Min-U-Script® with Word Index

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                    GAINESVILLE DIVISION

 3

 4   SANTANA BRYSON and JOSHUA   )
     BRYSON, as Administrators   )
 5   of the Estate of C.Z.B.,    )
     and as surviving parents of )
 6   C.Z.B., a deceased minor,   )
                                 )
 7            Plaintiffs,        )   CIVIL ACTION FILE
                                 )
 8      vs.                      )   NO. 2:22-CV-017-RWS
                                 )
 9   ROUGH COUNTRY, LLC,         )
                                 )
10            Defendant.         )

11

12            Deposition of JONATHAN EISENSTAT, M.D.,

13   taken on behalf of the Defendant, pursuant to the

14   stipulations contained herein, signature being

15   reserved, in accordance with the Federal Rules of

16   Civil Procedure, before Kelly D'Amico, RPR, Certified

17   Court Reporter and Notary Public, at 5855 Sandy

18   Springs Circle, Suite 140, Atlanta, Georgia, on the

19   15th day of January, 2024, commencing at the hour of

20   9:04 a.m.

21

22              D'AMICO & ASSOCIATES, INC.
                Court Reporters & Videoconferencing
23            5855 Sandy Springs Circle, Suite 140
                     Atlanta, Georgia  30328
24                      (770) 645-6111
                     www.DamicoAssociates.com
25
```

Page 2

```
 1              INDEX TO EXAMINATIONS

 2   Examination By Mr. Hill                    6

 3   Examination By Ms. Cannella               57

 4

 5

 6                DISCLOSURE(S)

 7   Reporter Disclosure of No Contract         3

 8   Firm Disclosure of No Contract             4

 9

10

11              INDEX TO EXHIBITS

12   Defendant's     Description        Marked/First
     Exhibit                            Identified
13
14   Exhibit 1    Notice of Deposition       7

15   Exhibit 2    Jump Drive                 9

16   Exhibit 3    Materials Reviewed        13

17   Exhibit 4    Bryson 1198 - 1222        51

18   Exhibit 5    Photos, Bryson 33 - 50    51

19

20

21

22

23

24

25
```

Page 3

```
 1            REPORTER DISCLOSURE OF NO CONTRACT

 2

 3            I, Kelly D'Amico, Certified Court
     Reporter, do hereby disclose pursuant to
 4   Article 10.B of the Rules and Regulations of
     the Board of Court Reporting of the Judicial
 5   Council of Georgia that I am a Georgia
     Certified Court Reporter.  D'Amico &
 6   Associates/I was contacted by the party taking
     the deposition to provide court reporting
 7   services for this deposition; D'Amico &
     Associates/I will not be taking this deposition
 8   under any contract that is prohibited by
     O.C.G.A. 15-14-37(a) and (b); nor am I
 9   disqualified for a relationship of interest
     under the provisions of O.C.G.A. 9-11-28(c).

10
            There is no contract to provide reporting
11   services between myself or any person with whom
     I have a principal and agency relationship nor
12   any attorney at law in this action, party to
     this action, party having a financial interest
13   in this action, or agent for an attorney at law
     in this action, party to this action, or party
14   having a financial interest in this action.
     Any and all financial arrangements beyond
15   my/D'Amico & Associates' usual and customary
     rates have been disclosed and offered to all
16   parties.

17            This, the 15th day of January, 2024.

18

19

20

21

22            KELLY D'AMICO, RPR, CCR-B-1322

23

24

25
```

Page 4

```
 1            FIRM DISCLOSURE OF NO CONTRACT

 2

 3            I, Kelly D'Amico, do hereby disclose
     pursuant to Article 10.B of the Rules and
 4   Regulations of the Board of Court Reporting of
     the Judicial Council of Georgia that D'Amico
 5   Associates was contacted by the taking
     attorney/firm to provide court reporting
 6   services for this deposition and there is no
     contract that is prohibited by O.C.G.A.
 7   15-14-37(a) and (b) for the taking of this
     deposition.

 8
            There is no contract to provide reporting
 9   services between D'Amico & Associates or any
     person with whom D'Amico & Associates has a
10   principal and agency relationship nor any
     attorney at law in this action, party to this
11   action, party having a financial interest in
     this action, or agent for an attorney at law in
12   this action, party to this action, or party
     having a financial interest in this action.
13   Any and all financial arrangements beyond
     D'Amico & Associates' usual and customary rates
14   have been disclosed and offered to all parties.

15            This, the 15th day of January, 2024.

16

17

18

19            KELLY D'AMICO, CEO
              D'AMICO & ASSOCIATES
20

21

22

23

24

25
```

Bryson, et al v.
Rough Country, LLC

Jonathan Eisenstat, MD
January 15, 2024

---

Page 5

```
1              A P P E A R A N C E S
2
3    On behalf of the Plaintiffs:
4              TEDRA L. CANNELLA
               Attorney at Law
5              Cannella Snyder, LLC
               315 W Ponce de Leon Avenue
6              Suite 885
               Decatur, Georgia  30030
7              T:  (404) 800-4828
               E:  tedra@cannellasnyder.com
8
9    On behalf of the Defendant:
10             RICHARD H. HILL, II
               Attorney at Law
11             Weinberg, Wheeler, Hudgins, Gunn & Dial
               3344 Peachtree Road
12             Suite 2400
               Atlanta, Georgia  30326
13             T:  (404) 876-2700
               E:  rhill@wwhgd.com
14
15
16                    - - -
17
18
19
20
21
22
23
24
25
```

---

Page 6

1       JONATHAN EISENSTAT, M.D.,
2  having been first duly sworn, was examined and
3  testified as follows:
4       MR. HILL: Thank you.
5       EXAMINATION
6       BY MR. HILL:
7  Q.  It's Dr. Eisenstat?  Did I pronounce that
8  correctly?
9  A.  Yep, yes.
10 Q.  Well, thank you for being here this
11 morning.  My name is Rick Hill and I represent the
12 defendant in this case, Rough Country.
13      You can correct me if I'm wrong, but I'm
14 not sure we have ever met before.
15 A.  No, I don't think we have.
16 Q.  And no one from our office has discussed
17 this case with you prior to today; is that correct?
18 A.  That's correct.
19 Q.  And have you discussed the case with
20 counsel for the plaintiffs prior to today?
21 A.  I have.
22 Q.  And I know you were the ME who performed
23 the autopsy in this case, but you also work as a
24 consultant where you can be retained by parties in
25 litigation to give your opinions?

---

Page 7

1  A.  That's correct.
2  Q.  Okay.  Which of those hats are you
3  wearing today?  Are you just here because you
4  performed the autopsy or have you been retained by the
5  plaintiffs to give testimony in this case?
6  A.  I've not been retained, so I'm here as
7  the medical examiner who did the autopsy.
8       MR. HILL: Okay.  I'll mark as Exhibit 1
9  just a copy of the notice just so we'll have it
10 in there.  This is the notice of your
11 deposition.
12      (Thereupon, marked for identification,
13 Defendant's Exhibit 1.)
14      BY MR. HILL:
15 Q.  Have you seen that before today?
16 A.  I have.
17 Q.  And have you provided to counsel for the
18 plaintiffs all of the material responsive to Exhibit A
19 in the notice?
20 A.  Everything that I have I did.  Let me
21 look to see if there's anything -- so obviously
22 there's things in here since I'm not a retained expert
23 in this case --
24 Q.  Sure.
25 A.  -- that I did I don't have, but

---

Page 8

1  everything that I do have that's responsive I did
2  supply.
3  Q.  And the things you don't have are not
4  applicable you're saying --
5  A.  That's correct.
6  Q.  -- because you're not retained in this
7  case?
8  A.  That's correct.
9  Q.  All right.  Put a sticker on there.
10      All right.  So you haven't billed anyone
11 for your time in this case?
12 A.  Not yet, but I will just as at the GBI.
13 So I don't work at the GBI anymore.  So if this was
14 occurring while I was still at the GBI, the State of
15 Georgia would have billed Ms. Cannella's firm for the
16 time and preparation for the deposition and then the
17 GBI -- I don't know if it would be to you or to the
18 plaintiff's firm for the deposition.
19 Q.  Sure.
20      So in this case you're going to bill her
21 eventually for your time preparing for today and then
22 for your time today?
23 A.  Correct.
24 Q.  And that's just -- we have an agreement
25 that we would, you know, absorb the costs of our own

---

Bryson, et al v.
Rough Country, LLC

Jonathan Eisenstat, MD
January 15, 2024

---

Page 9

1  experts in this case so that's why it's going to her.
2  A.  Okay.  Got it.
3  Q.  I kind of have a list here, I believe, of
4  what you have provided.  You brought a disc with you
5  today that has your file material on it?
6  A.  A jump drive, yes.
7  Q.  A jump drive.  And is that for us to
8  keep?
9  A.  Yes.
10      (Thereupon, marked for identification,
11  Defendant's Exhibit 2.)
12      BY MR. HILL:
13  Q.  We'll mark that as Exhibit 2 just so we
14  have it.  And I've got a laptop if we want to punch it
15  up and look at it; and then if you want to look at
16  anything on there at any time, just let me know and I
17  can make it available to you.
18      It appears to me that what we have
19  received is autopsy photographs in both printed out
20  and JPG, JPEG formats and those were photographs that
21  you took of the autopsy of the child in this case?
22  A.  It was a forensic photographer who took
23  them at my request.
24  Q.  Got it.
25  A.  I blanked on the word for a second.

---

Page 10

1  Q.  Sure.
2      But he was there while you were
3  performing the autopsy and took the photographs at
4  your request?
5  A.  That's correct.
6  Q.  And then we have a certification for
7  those photographs.  Coroner photos, are those
8  different from autopsy photographs?
9  A.  Yes, those are photographs of the child
10  in the hospital.
11  Q.  Okay.  And then we have the autopsy
12  report, which is your three-page report, dated I
13  believe April 13th, 2020?
14  A.  Correct.
15  Q.  Then we have the Georgia Department of
16  Public Safety SCRT inspection?
17  A.  Correct.
18  Q.  And you have -- it says (as read):
19  Photos of the vehicles.  Did you receive the entire
20  SCRT report?
21  A.  I don't know because I don't know how
22  many pages the entire SCRT report would have been.
23  I'd have to look at that jump drive to tell you how
24  many pages I did receive, but in all honesty, if I
25  were a retained expert, it would become much more

---

Page 11

1  important for me than my role here today.
2  Q.  Sure.
3      So your role here today is to discuss
4  your autopsy of the child involved in the accident?
5  A.  Yes, and obviously within that the cause
6  of death.
7  Q.  Sure.
8      Your role here today is not to give
9  opinions with regard to how the accident occurred?
10  A.  That's correct.
11  Q.  Or anything related to the drivers
12  involved in the accident?
13  A.  That's correct.
14  Q.  Okay.  How did you obtain the SCRT
15  report?
16  A.  From Ms. Cannella's office.
17  Q.  Is that the only thing that she sent you?
18  The rest of this appears to be things that you would
19  have probably had on your own or did she send you
20  materials above and beyond the SCRT report?
21  A.  She sent me everything in that list.
22  Q.  Okay.
23  A.  Since I again don't work at the GBI
24  anymore, I don't have, and I shouldn't have, the right
25  to say, hey, give me whatever I need.  So any case --

---

Page 12

1  I'll just say any case that I get involved in, you
2  know, even criminal cases through district attorneys
3  around the state, if it's a case that I did while I
4  was at GBI and the trial or the case is going forward
5  after I left GBI, I always get the materials through
6  the attorneys whether it be the district attorney, a
7  plaintiff's attorney, a defense attorney, whatever.
8  Q.  Sure.  Makes sense.
9      The last thing I have here on the list
10  is -- well, you have the Fannin County coroner's
11  autopsy report?
12  A.  Right, so that's not really the autopsy
13  report.  That's -- in the state of Georgia the coroner
14  is the one who responds to the phone call about the
15  death.
16  Q.  Right.
17  A.  So it's actually not an autopsy report.
18  It's their file.  Just a little bit of investigative
19  background and the death certificate and things of
20  that sort.
21  Q.  Sure.  So it would be more properly
22  described as a coroner's report; right?
23  A.  That's correct.
24  Q.  And then the last document I have is a
25  document we were provided last week, which is Bates

---

Bryson, et al v.
Rough Country, LLC

Jonathan Eisenstat, MD
January 15, 2024

Page 13

1  labeled Bryson 3955 through 3961.  And that appears to
2  be a document that you created called Materials
3  Reviewed.  Is that -- and I'll hand you a copy of
4  that.
5  A.  Yes, sir, that's correct.
6        MR. HILL: We can make that Exhibit 3
7  just to have it.
8        (Thereupon, marked for identification,
9  Defendant's Exhibit 3.)
10       BY MR. HILL:
11 Q.  All right.  And describe this document
12 for me.  Was I correct in saying that you drafted that
13 in connection with, I guess, preparing for this
14 deposition?
15 A.  That's exactly right.  So when I was
16 contacted about this case, I didn't know if I was
17 being retained or if I was just doing this as the GBI.
18 Q.  Right.
19 A.  And so what I -- what I do in every case
20 now is I basically go through the documents and I cut
21 and paste.  There's no opinions in this document.  Cut
22 and paste from the documents I reviewed to try to pare
23 down the number of pages I have to go back and look
24 at.  So they're my notes, in essence, but again, no
25 opinions in this document.

Page 14

1  Q.  Gotcha.
2       When you were -- when were you first
3  contacted by Ms. Cannella about the case?  And I don't
4  need an exact date.  Just --
5  A.  Yeah, if I remember correctly -- gosh, I
6  should -- and I should have looked that up.  I
7  honestly don't recall if it was a year ago or how long
8  ago, but I can look that up real quickly if you would
9  like.
10 Q.  That's okay for now.  It was after you
11 performed the autopsy?
12 A.  Oh, yes, it was -- it was way after I
13 performed the autopsy.
14 Q.  After you had retired or left the GBI?
15 A.  That's correct.
16 Q.  And what did she ask you to do when she
17 contacted you?
18 A.  She just asked me to look at the case.
19 That was all.  And that's why I wasn't sure what I was
20 doing.  So that's why this document was formed.  And
21 then when we spoke, when I, you know, finished my
22 review and we spoke, I realized -- well, obviously
23 while I was reviewing I realized it was an autopsy I
24 did.
25      So that's when we discussed my findings

Page 15

1  and I said:  So I did the autopsy.  Am I a fact
2  witness or an expert witness?  And we decided -- or
3  she decided that I would be a fact witness in this
4  case.
5  Q.  I understand.  And so -- go ahead.
6  A.  I was just going to say as of right now.
7  I don't know what happens down the road, but...
8  Q.  As we sit here today, though, you are
9  just a fact witness because you performed the autopsy?
10 A.  Yes, sir.
11 Q.  And did you have any discussions with her
12 above and beyond the findings in your autopsy?
13 A.  Well, I mean, we discussed everything
14 that was here, you know.  The autopsy report lays out
15 the findings.  We did discuss that, you know, this is
16 a blunt impact to the head, what does that blunt
17 impact mean, and I'm sure we'll get into that.
18 Q.  Sure.
19 A.  And really I think that was it, you know.
20 We didn't go into anything further.
21 Q.  Beyond these materials we've just
22 discussed, are you relying upon anything else in
23 giving your testimony today?
24 A.  No, sir.
25 Q.  Okay.  Have you inspected the vehicles?

Page 16

1  A.  No.
2  Q.  Or the car seat involved?
3  A.  No, sir.
4  Q.  Have you spoken to any of the other
5  experts in the case?
6  A.  I don't even know who they are.
7  Q.  Okay.  So obviously you haven't been
8  provided their reports or their opinions?
9  A.  I have not.
10 Q.  Did you discuss their opinions with
11 Ms. Cannella?
12 A.  No.  Again, I don't even know who the
13 experts are, anything to that effect -- that effect.
14 I would say if I was being retained as an expert there
15 is a lot more that I would like to do before I would
16 come to maybe other conclusions.
17 Q.  Sure.
18      Have you received any indication that you
19 will eventually be retained as an expert?
20 A.  No, sir.
21 Q.  Since you've retired -- before you
22 retired from the GBI, you've also worked as a
23 consultant in litigation; correct?
24 A.  Yes, I have.
25 Q.  And in that capacity what percentage of

Bryson, et al v.
Rough Country, LLC

Jonathan Eisenstat, MD
January 15, 2024

Page 17

1 your cases are you retained by the plaintiff?
2 A.  So in the totality of my expert work I
3 would say it's about 80 percent, maybe 85 percent
4 plaintiff and then 15 to 20 percent defense.
5 Q.  And what percentage is in civil cases
6 versus criminal cases?
7 A.  Oh, 95 to 99 percent are civil.  When I
8 was at the GBI, we had an agreement that I would not
9 look at a criminal case or consult in criminal cases
10 for, you know, obvious conflict-of-interest reasons.
11 Q.  Sure.
12 A.  So I have only started looking at
13 criminal cases as an expert or I should say as a
14 consultant maybe a year or two ago or probably about
15 two years ago.  So I think I have maybe three to five
16 criminal cases I've looked at.
17 Q.  I understand.  And that's -- you were
18 talking February of 2022 from the GBI; is that right?
19 A.  '20 -- I always forget if it's '21 or '22
20 because it seems like 100 years ago now.
21 Q.  Right, sure.
22 A.  But yeah, at the very end of January.
23 February 1st was my first day out.  So January 31st
24 was my last day at the GBI, and I believe it was '22.
25 Q.  I understand you've not been retained in

Page 18

1 this case, but in prior instances have you worked for
2 Ms. Cannella's firm?
3 A.  I have.
4 Q.  And how many cases have you worked on for
5 her?
6 A.  Just a couple.  I think maybe two or
7 three.
8 Q.  Did either of those or any of those
9 involve motor vehicle accidents?
10 A.  Yes.
11 Q.  Did all of them involve motor vehicle
12 accidents?
13 A.  I'm not sure, but I would think probably.
14 Again, that's something easy for me to look at at a
15 break or something.
16 Q.  Sure.
17     What about Ms. Cannella's prior firms?
18 Did you work for her when she -- before she started
19 her own firm?
20 A.  I believe -- and Tedra, don't be upset.
21 You were with -- I think she was with Butler Wooten.
22 Q.  That's correct.
23 A.  Yeah, I believe that I looked at one or
24 two cases for her when she was at Butler Wooten.
25 Q.  All right.  So you think three to five

Page 19

1 cases total prior to this one?
2 A.  With Ms. Cannella directly, correct,
3 something in that area.
4 Q.  And then what about other cases for her
5 firm or her former firms?
6 A.  Her former firm, so Butler Wooten I've
7 looked at more cases for.  I don't think -- I don't
8 know what other firms other than Cannella Snyder and
9 Butler Wooten.
10 Q.  Sure.
11 A.  But at Butler Wooten I have probably
12 looked at about maybe ten cases total over the years.
13 Q.  And this dates back to when?
14 A.  Oh, goodness, probably about ten years
15 ago.  So maybe -- maybe in the area of 2015.
16 Q.  Have you ever been retained by Weinberg
17 Wheeler to consult on any cases -- that's my firm --
18 that you can recall?
19 A.  Well, you did -- your firm has definitely
20 taken my deposition.  I don't think I've been retained
21 by you guys.  I'd have to look, but I'm almost
22 positive I have not been retained by you guys, your
23 firm.
24 Q.  All right.  When you were with the GBI
25 and you were the chief medical examiner, approximately

Page 20

1 how many autopsies would you perform in a year?  I'm
2 just trying to get a flavor for your experience.
3 A.  Sure.  So I'll just summarize that when I
4 came to Georgia in 2006 --
5 Q.  Sure.
6 A.  -- I was doing probably about 250
7 autopsies a year for the first couple of years.  Then
8 things got busier and I probably ranged between 250
9 and 325 autopsies a year for a number of years.
10     When I took over as chief, which would be
11 in November of 2015, I probably did around 100
12 autopsies a year.  And then when I left the GBI at the
13 end of January 2022, I believe it was, I slowed down a
14 little bit; but over the last couple of years I've
15 averaged about 100 autopsies a year.
16 Q.  And just if you can estimate, how many of
17 those involve a death that occurred in a motor vehicle
18 accident?
19 A.  Oh.
20 Q.  What percentage?
21 A.  Oh, boy, I can tell you that I've looked
22 at many hundreds of motor vehicle collision cases,
23 deaths.  What percentage of the overall, that's really
24 difficult for me to say because we brought -- I mean,
25 we saw everything.

Page 21

1  Q.  Sure.  But you can say certainly in the
2  hundreds?
3  A.  Oh, no doubt.
4  Q.  Yeah.
5     Do you know if any of those prior
6  autopsies involve a motor vehicle accident where one
7  or more of the vehicles was lifted?
8  A.  I don't recall.  I don't know.  I do not
9  know.
10 Q.  Do you usually find out about the nature
11 of the vehicles involved in accidents when you perform
12 an autopsy?
13 A.  Sometimes.  It depends on where -- it
14 depends on the jurisdiction.
15 Q.  Sure.
16 A.  Sometimes we'll get the SCRT report,
17 sometimes the crash report.  The coroner will
18 sometimes -- and I can't tell you the percentage --
19 tell us what types of vehicles are involved.  Actually
20 almost always we'll know if it's a passenger vehicle
21 or a semi truck or things of that sort.
22    But getting into, you know, the nitty-
23 gritty of was it lifted, was it this or that,
24 that's -- that information usually only comes if that
25 case goes to trial and we're asked to do like what I'm

Page 22

1  doing today.  We'll want to know more information so
2  we can answer questions a little better.
3  Q.  Sure.
4     But as we sit here today, you don't
5  recall, you can't remember a case where you performed
6  an autopsy related to a death from a motor vehicle
7  accident involving a lifted vehicle?
8  A.  What I'll say is I don't recall getting
9  that information in cases.  Could it have been?  Of
10 course.
11 Q.  Sure.
12 A.  You know, we're in the South so we see
13 some lifted vehicles, lifted trucks, but I can't
14 recall today if I have done any others that that was
15 involved.
16 Q.  And that would apply both to when you've
17 performed the autopsy and when you've been hired as a
18 consultant to look at a case?
19 A.  Well, no.  When I'm hired as a consultant
20 to look at a case, you know, I go much further than
21 what I'll do today and so I will request all of that
22 information.
23 Q.  Right.
24 A.  Oh, I'm sorry, maybe I misunderstood
25 then.

Page 23

1  Q.  Yeah, my question was:  In that
2  context -- I asked the first question poorly.  I said,
3  "when you performed the autopsy."  I meant to cover
4  all types of cases you've been involved in.  Can you
5  recall one ever that involved a lifted vehicle?
6  A.  Oh, well, from consulting I know I have.
7  I -- I can't give you the name of the case.  I just
8  won't remember -- I just don't remember, but I know --
9  and again, that starts getting outside of my area of
10 expertise.
11 Q.  Right.
12 A.  You know, I know I've looked at cases, a
13 number of cases where trucks, pickup trucks have
14 been -- what do you call it? -- have been altered
15 after the purchase, whether it be lifted or, you know,
16 they've changed things out here and there, but that
17 usually doesn't have anything to do with my opinions.
18 Q.  Sure.
19    And does the fact that the truck was
20 lifted in this case have anything to do with your
21 opinions you're going to give in this case?
22 A.  Not as of today, no.
23 Q.  In your experience how many, if you can
24 estimate, cases have you looked at where it involved
25 an atlanto-occipital disc articulation, if I've

Page 24

1  pronounced that correctly --
2  A.  You did.
3  Q.  -- resulting from a motor vehicle
4  accident?
5  A.  Oh, and you mean both as a medical
6  examiner doing the autopsy as well as a consultant?
7  Q.  Yes.
8  A.  Oh, I've looked at -- from a motor
9  vehicle accident?  I don't know if we're getting out
10 in the hundreds, but I've looked at definitely more
11 than 50.  I would say probably -- probably more than
12 100.
13 Q.  More than -- probably more than 100; is
14 that what you said?
15 A.  Yeah.
16 Q.  Sure.
17 A.  Because there are certain -- it's a
18 pretty classic -- it's a pretty base knowledge in
19 forensic pathology to learn about atlanto-occipital
20 dislocations and disarticulations and things of that
21 sort.  It's always on our board exams, so we know them
22 pretty well.
23 Q.  Sure.
24    You were about to say it's kind of a
25 classic or common injury in a motor vehicle accident?

Page 25

1  A.  I wouldn't say it's a common injury, but
2  it has specific findings and what to look for and
3  things of that sort.  But it's -- it's well-known
4  within the forensic community.
5  Q.  Sure.
6      What are the other types of incidents
7  that can cause -- and I'll call it AOD if that's --
8  A.  Sure.
9  Q.  What are the other areas where you see
10  that happen?
11  A.  Oh, well, you can see it from anything
12  that has a strong enough impact to like the chin or to
13  the sides of the head.  You can have it without
14  impact, but that's a very large or a very high force
15  that needs to separate the skull from the spine.
16  Those are the most common.
17      As far as circumstances, falls,
18  extremely -- well, I shouldn't say "extremely," but
19  high impacts.  You can have them with high
20  acceleration/deceleration forces.
21  Q.  Would that be one example where you could
22  have an AOD without having a blunt trauma?
23  A.  Oh, yes.  You can have -- yes, that's
24  correct.
25      MS. CANNELLA: Sorry, what was "that,"

Page 26

1  the "that"?
2      MR. HILL: The AOD.  Sorry, I'll re-ask
3  it if you want me to.
4      BY MR. HILL:
5  Q.  That was the high acceleration and
6  deceleration forces/situation?
7      MS. CANNELLA: Okay.
8  A.  Yes, sir, that's what I understood.
9      BY MR. HILL:
10  Q.  Yeah.  And when you say "high impacts,"
11  are you referring to impact to the body or are you
12  referring to a high impact in an automobile accident
13  that may not necessarily involve blunt trauma?
14  A.  The may not necessarily involve blunt
15  trauma.
16  Q.  Gotcha.
17      Do you own a vehicle with a lift kit
18  installed?
19  A.  No.
20  Q.  Do you have any family members that have
21  lift kits installed on their vehicles?
22  A.  No, sir.
23  Q.  Have you ridden in a vehicle with a lift
24  kit installed?
25  A.  Not to my recollection.  Or I should

Page 27

1  say --
2  Q.  I had to ask.  I had to ask.
3  A.  Or I should say not -- of course -- not
4  to my knowledge.  I'll put it that way.
5  Q.  All right.  I want to ask you a few
6  questions about this accident.
7  A.  Sure.
8  Q.  Where -- do you know where CB was seated
9  in the vehicle?
10  A.  I know he was in the rear of the vehicle.
11  I believe he was behind the driver, so in the Number 4
12  seated position.
13  Q.  Okay.  And you've collected that
14  information because you had access to the SCRT report,
15  I suspect?
16  A.  That's correct.
17  Q.  And it's fair to say that your entire
18  knowledge regarding the accident circumstance comes
19  from the SCRT report?
20  A.  The SCRT report and the coroner's, when
21  the coroner calls the case, but that's basic knowledge
22  about, you know, it's a multi-vehicle accident, not a
23  single-vehicle accident.
24  Q.  Gotcha.
25      And you haven't read any depositions from

Page 28

1  anyone who has testified in this case?
2  A.  No, sir.
3  Q.  You haven't spoken to any of the police
4  officers that responded, the first responders, the
5  medical providers, anyone like that?
6  A.  That's correct, I have not.
7  Q.  Do you know how fast the Ford F-250 was
8  traveling at the time of impact?
9  A.  I think if I recall correctly there was
10  an estimate in the police report, but I don't recall
11  what it was.
12  Q.  Okay.  And do you know whether
13  Mr. Elliott, the driver of the F-250, made any evasive
14  maneuvers or did anything to prevent the accident?
15  A.  No.  Again, if I were an expert witness,
16  I may want to know those things; but no, I don't know
17  any of that information.
18  Q.  All right.  Do you know -- you've
19  indicated that you believe that CB was in the rear of
20  the vehicle behind the driver?
21  A.  Yes.
22  Q.  You know he was in a car seat?
23  A.  I do.
24  Q.  Do you know whether it was forward facing
25  or rear facing?

Bryson, et al v.
Rough Country, LLC

Jonathan Eisenstat, MD
January 15, 2024

Page 29

1  A.  I don't recall.
2  Q.  Okay.  Do you know where his head was
3  positioned prior to impact?
4  A.  I do not.
5  Q.  Do you know where he was positioned after
6  the accident while he was still in the vehicle?
7  A.  I don't recall.
8  Q.  Do you know whether he was conscious when
9  he was removed from the vehicle?
10  A.  I wasn't looking into that, so I
11  didn't -- again, I didn't really go in-depth into
12  looking into conscious pain and suffering so I don't
13  know because I didn't really look into it.
14  Q.  Do you plan to give any opinions in this
15  case regarding whether CB experienced any conscious
16  pain and suffering?
17  A.  No, sir.
18  Q.  So you can't say one way or the other is
19  what you're saying?
20  A.  Well, not as of today --
21  Q.  Right.
22  A.  -- with what I have looked at, that's
23  correct.
24  Q.  All right.  Would you agree that at the
25  time that he suffered the AOD that at least from that

Page 30

1  point forward he did not experience any conscious pain
2  and suffering?
3  A.  I would agree with that.
4  Q.  And you would agree that -- or you've
5  opined I believe in the report that the AOD was caused
6  by a blunt impact to his head and neck?
7  A.  That's correct.
8  Q.  And would you agree that the AOD occurred
9  at the moment of or at the time of the blunt trauma or
10  blunt impact?
11  A.  Yes, within milliseconds.  So in my
12  opinion, there's no doubt that this was a blunt impact
13  head injury, not a rapid acceleration/deceleration
14  injury because we have the fracture line that's coming
15  from one side to the other.  So once that impact
16  happens and the fracture line comes down and the head
17  gets pushed off of the spine, I agree after that
18  there's no more conscious pain and suffering.
19  Q.  It's basically like a laceration of his
20  brainstem; is that a fair way to describe it?
21  A.  That's exactly correct.
22  Q.  And it would occur within milliseconds of
23  the blunt impact?
24  A.  That's correct.
25  Q.  There was also, and I'll mispronounce

Page 31

1  this word, but an intraosseous needle placed in his
2  leg.  You found that during your autopsy; is that
3  correct?
4  A.  I did.
5  Q.  And was there any bruising in that area
6  when it was removed?
7  A.  I would have to look at the photographs
8  because he did have bruising on the thighs, which is
9  not where the intraosseous line goes or was, but I do
10  state (as read):  There are a few small, scattered
11  contusions around the thighs, knees and legs.  So I
12  would have to look at the photographs to tell you if
13  there was anything in that area.
14  What I'll say is, you know, I don't
15  describe a large area of what I would say is called
16  ecchymosis, which is bleeding from under the skin that
17  is not as the result of a blunt impact, and that's
18  what I would expect to see.  And I know why you're
19  asking it.  So if I could look at the picture, I could
20  tell you if there was bleeding around that.
21  Q.  (Complies).
22  A.  Great.  Thank you.
23  Q.  Sure.
24  A.  So from the photograph that shows the
25  left leg where the intraosseous line was, I don't see

Page 32

1  anything remarkable as to bleeding in that area.
2  Q.  And I think you anticipated the reason
3  why I was asking the question, but what does that
4  signify to you?
5  A.  So two things:  Number 1, you have to
6  recall we're not going into a vein there.  It's a
7  needle that goes down into the bone.  So, you know,
8  the question is would the person have been alive with
9  a blood pressure to allow bleeding to occur.  What
10  I'll say is that if we're looking at an IV in a
11  vein --
12  MS. CANNELLA:  I don't mean to interrupt
13  you, Dr. Eisenstat.
14  But can we mark those so we know what he
15  was looking at when he answers the questions --
16  MR. HILL:  Sure.
17  MS. CANNELLA:  -- since it's not a full
18  set.
19  MR. HILL:  Sure, I gave him Bryson 33
20  through 50.
21  MS. CANNELLA:  Okay.
22  MR. HILL:  And I'm not sure which
23  particular photograph he looked at to answer
24  the question.
25  THE WITNESS:  Yeah, I looked at two

Page 33

1 photographs. The first one is Bryson 35, and
2 that shows me the location of the line. And
3 then Bryson 36 is an overall photograph of the
4 child which -- now with the line taken out and
5 I'm just looking in the general area.
6    Do you want to mark the whole stack?
7    MS. CANNELLA: That's fine. As long as
8 we have the numbers on the record, that's fine.
9    THE WITNESS: Okay.
10    MR. HILL: We don't need to mark it.
11 Just --
12    MS. CANNELLA: Okay.
13    MR. HILL: -- you've referred to it now,
14 but now we know which ones you were exactly
15 referring to.
16    THE WITNESS: Okay. So --
17    MS. CANNELLA: Go ahead. I didn't mean
18 to interrupt you.
19    THE WITNESS: No, that's okay.
20 A. So to go back to answer the question, if
21 we were talking about an IV that goes into a vessel,
22 then I would want to look to see if there's blood
23 around there, which you don't always get even if the
24 person is alive. So you're looking to see if there's
25 anything to support the child, in this case the

Page 34

1 child, would have a blood pressure that would allow
2 pushing out of the blood to lead to bleeding.
3    This is a line that goes down into the
4 bone. Yes, you have tiny little capillaries and
5 venules, but I've seen plenty of cases where people
6 have obviously been alive in the hospital with blood
7 pressure, had intraosseous lines and there was no
8 bleeding around it. So to bring all of that together,
9 whether or not there was bleeding there doesn't really
10 help me one way or the other as to was the child
11 physiologically alive or not at the time it was
12 placed.
13 Q. Sure.
14    One last topic related to that issue and
15 that's he did suffer a subarachnoid hemorrhage;
16 correct?
17 A. Yes, that's correct.
18 Q. And would the type of hemorrhage that he
19 suffered, would that render him unconscious
20 immediately upon that bleed?
21 A. Well, not necessarily the bleeding
22 itself, but that bleeding is associated with the
23 laceration of the brainstem and so that's really what
24 renders him unconscious at that time.
25 Q. Makes sense. All right.

Page 35

1    All right. You have your report right
2 there; right?
3 A. Yes, sir.
4 Q. We'll jump to that.
5    All right. In the first paragraph under
6 Results and Conclusions, you state that you have
7 performed a limited examination. I was just curious,
8 what's the reason for that qualifier or what does that
9 mean?
10 A. Sure. So it means I didn't take every
11 single organ out of the body. And I usually do that
12 with trauma -- well, I shouldn't say "usually," but
13 many medical examiners will do that in trauma cases.
14 We'll look -- we'll document the trauma that's there.
15 We'll look to see if we see anything abnormal, you
16 know, like in a child is there a congenital heart
17 disease or an adult is there some weird tumor that
18 predisposed them to these types of injuries. And if
19 we don't see any of that, we don't take the organs
20 out. So that's why I put "limited" here.
21 Q. So you did actually look for that, but
22 because you didn't see anything of note, then you did
23 not actually remove the organs; is that correct?
24 A. Yes, that's correct.
25 Q. Otherwise though, your autopsy wasn't

Page 36

1 limited in any way?
2 A. No, sir. It just means I did not take
3 out all of the organs.
4 Q. Sure.
5    All right. And I'm assuming that
6 everything that you list with regard to his general
7 condition, you did not note anything out of the
8 ordinary like you just mentioned: No disease
9 processes, no abnormalities, nothing that would
10 indicate that he was unhealthy in any way?
11 A. That's correct.
12 Q. All right. Under Evidence of Injury, you
13 say (as read): There are blunt-impact injuries of the
14 head and extremities. These will be described by body
15 region. And then you say: No sequence is implied.
16    So just so that I understand that, what
17 does that, "no sequence is implied," mean?
18 A. Absolutely. So that is a qualifier that
19 I use in almost every trauma case. What I'm saying is
20 just because I have blunt impact of the head and neck
21 as the first section and blunt impact of extremities
22 as the second, that doesn't mean that the head and
23 neck happened first and the extremities second. I'm
24 not implying any organization in the sense of
25 time-wise.

Bryson, et al v.
Rough Country, LLC

Jonathan Eisenstat, MD
January 15, 2024

---

Page 37

1  Q.  Right.
2  A.  -- to these injuries I'm describing.
3  Q.  Great.  That's what I thought.
4      And so you did not make any effort to
5  determine the sequence of these injuries?
6  A.  I did not.
7  Q.  Did you make any effort to determine what
8  actual material impacted the child at any of these
9  locations?
10 A.  No, sir.  The only thing I can say is
11 that I didn't see any type of pattern to the injuries,
12 you know, like I know that -- I don't even know if
13 this has any bearing in this case, but let's just
14 think of like a waffle iron.  I didn't see any impact
15 of a waffle iron with that pattern there.  So these
16 are blunt-impact injuries that could have occurred
17 from a number of things.  What I will say -- and this
18 is sort of jumping ahead.
19 Q.  Sure.
20 A.  But the fact that he was in a child seat
21 and he has these two diagonally-oriented contusions on
22 his thighs, that is consistent with the type of, you
23 know, harness restraint that is in a child seat.
24 That's the only thing I would say as potentially more
25 specific.

---

Page 38

1  Q.  I'm trying to find this one specific
2  part, so bear with me.
3  A.  While you're doing that I would like to
4  say --
5  Q.  Sure.
6  A.  -- that this morning -- or last night
7  when I was just reviewing everything, it's not easy
8  for me to say on the record, but I put down one of the
9  wrong skull bones.
10 Q.  Okay.
11 A.  It doesn't change any of my opinions, but
12 I put sphenoid bone and it's actually temporal bone
13 and it's a little embarrassing.  But you know, I just
14 wanted to say that off the bat.  I said the wrong
15 bone.
16 Q.  Well, no problem.  And that was exactly
17 the question I was about to ask you.  You say in here
18 (as read):  There is a depressed underlying fracture
19 of the right sphenoid bone with linear extension along
20 the right petrous ridge.
21     So what is the appropriate bone there,
22 the temporal bone?
23 A.  Temporal, correct.
24 Q.  All right.  And where is the temporal
25 bone located?

---

Page 39

1  A.  Basically right under the ear.  And at
2  the petrous ridge -- well, it goes -- it's underneath
3  and above the ear, but the petrous ridge is a
4  continuation of that and within the petrous ridge are
5  the inner ear components, which all goes together with
6  an impact in that ear area.
7      Something else I noticed was that I
8  zoomed in on one of the autopsy photos, and I can tell
9  you which one.  I'm a little mortified with myself on
10 all of this, but -- this is not how I usually work,
11 but if we look at Bryson 48, and I'll show you in a
12 moment, you can see that it actually continues down
13 the fracture.  This right here is the foramen magnum.
14 This is the spine (indicating).
15     Actually I can do it this way so you can
16 both see.  So we're looking at the right side of the
17 head and the left side of the head and this is the
18 forehead.  So we're looking this way (indicating).
19 Q.  And let's stop you just so she can get
20 it.  So when he says -- this picture, the right side
21 of the picture is the right side of the head?
22 A.  Yes.
23 Q.  The top of the picture, and that's with
24 the base label at the bottom, the top of the picture
25 would be the top of the head and the left side of the

---

Page 40

1  picture would be the left side just so you can have it
2  down?
3  A.  Absolutely.
4      MS. CANNELLA: Can I make a request that
5  we just put a mark on it, our left?
6      MR. HILL: I was going to give him --
7  yeah.
8      MS. CANNELLA: Okay.  Sorry.
9      MR. HILL: Sure.
10     MS. CANNELLA: I'm a visual person.
11     THE WITNESS: Actually black will be
12 better because it's a blue background.
13     So on Bryson 48 I'm going to put an R for
14 right, I'm going to put an L for left, I'm
15 going to put a T for top.  So when I say --
16 actually, let me put an F for forehead because
17 the top of the head is actually taken off here,
18 the top of the skull.
19     BY MR. HILL:
20 Q.  Sure.
21 A.  And then I'll put a B for the back of the
22 head.
23 Q.  Sure.
24 A.  And so coming from the right you can see
25 this line of fracture.  So the temporal bone is here

---

Bryson, et al v.
Rough Country, LLC

Jonathan Eisenstat, MD
January 15, 2024

---

Page 41

1  (indicating). It continues as the petrous ridge, and
2  then if we come down to this ring around the -- oh,
3  I'm sorry --
4      MS. CANNELLA: That's okay.
5  A.  -- this ring around the foramen magnum
6  that goes down to the spine, there's a fracture on
7  both sides of that ring. I didn't describe that in
8  the autopsy report and I apologize. So --
9      BY MR. HILL:
10 Q.  You didn't describe the fact that there
11 was a fracture on both sides? Is that what you're --
12 A.  That's correct.
13 Q.  Okay.
14 A.  Well, I didn't even describe the fracture
15 here.
16 Q.  Okay.
17 A.  I didn't describe the fracture around the
18 ring of the foramen magnum.
19 Q.  Okay.
20 A.  So thanks for choosing the one case that
21 I forgot to do things on. But since I'm here I can go
22 ahead and just also show --
23 Q.  Sure.
24 A.  -- this should be completely open. You
25 shouldn't see anything inside of this circle except

---

Page 42

1  for down into the spinal cord -- or spinal canal,
2  excuse me. What we see is that hemorrhage here; and
3  this front half of the ring, that's the spine. That
4  shouldn't be there, and so that's that atlanto-
5  occipital dislocation or disarticulation pushing the
6  spine -- allowing the spine to pop into the opening,
7  which causes the laceration of the brainstem. So I
8  just -- I wanted to show where the actual fractures
9  were and then since we were there what happened.
10 Q.  Sure.
11     Is there -- would there be anything that
12 you would note in your report other than simply the
13 fact that there was fractures all the way to the -- I
14 don't know how you pronounce that word. But other
15 than the fact that you have those fractures there,
16 does it change anything about your report?
17 A.  No, sir.
18 Q.  All right. It's just a clear indication
19 of the atlanto-occipital disarticulation or
20 dislocation?
21 A.  So it's a clear indication of the fact
22 that this is an impact injury to the right side
23 because there's no fracture on the left side or left
24 temporal. And so if you think about a line, the
25 forces coming and hitting the right side causing that

---

Page 43

1  fracture line to go along and get to that ring,
2  fracture that ring, and push the skull off of the
3  spine.
4  Q.  Sure. So the trauma is to the right
5  temporal area; is that a good way to describe it?
6  A.  That's correct, yes, sir.
7  Q.  Did you find any other trauma locations
8  on CB's head?
9  A.  I don't believe so, no.
10 Q.  Okay. Now, there's a mention in the
11 previous paragraph of your report of a contusion and
12 edema of the lateral aspect of the right upper eyelid.
13 Is that -- you just, I think, explained that that's
14 not indicative of trauma to that area?
15 A.  It is -- it's indicative of trauma to the
16 right side of the head, but -- and a skull -- base of
17 skull fracture, but you get bleeding through the soft
18 tissues. So if you look at any of the photographs
19 that show his face, you'll see that it's just blood
20 underneath the soft tissues. Very, very common. We
21 look for what are called raccoon eyes, and this is a
22 partial raccoon eye.
23 Q.  Right. Raccoon eye being a periorbital
24 eschymosis (sic); is that right?
25 A.  Ecchymosis.

---

Page 44

1  Q.  Ecchymosis. Okay. And you say that's
2  simply a bleeding into that area from the trauma area
3  on the right temporal side?
4  A.  It's more from the fracture of the base
5  of the skull and then blood leaking down through the
6  tissues.
7  Q.  Right. Gotcha. And so the raccoon eyes
8  are a result of the skull fracture, not necessarily a
9  result of actually trauma to the eye; is that fair?
10 A.  That's correct. It was not a secondary
11 impact.
12 Q.  Okay. So you don't believe that the
13 front of his face was impacted in any way like in the
14 right eye area?
15 A.  That's correct, I don't believe that
16 there's direct impact to the eye.
17 Q.  And again, you did not make an effort to
18 determine what actually impacted his right ear? Let's
19 just call it his right ear.
20 A.  Sure.
21 Q.  Is that fair?
22 A.  Yes.
23 Q.  You don't know what actual material
24 impacted his right ear?
25 A.  I do not.

---

Bryson, et al v.
Rough Country, LLC

Jonathan Eisenstat, MD
January 15, 2024

---

Page 45

1  Q.  Okay.  And I noticed there was one
2  photograph in your materials of the car seat he was
3  riding in, but it's just one from a face-on view.  Is
4  that the only one that you have seen?
5  A.  Yes.
6  Q.  And you are not able to tell from that
7  photograph whether the car seat was damaged in any
8  way?
9  A.  No.  Again, not pertinent to my opinions
10  as a fact witness.
11  Q.  Sure.
12     And again, you don't have an opinion as
13  to whether -- or do you have an opinion as to whether
14  any part of his head impacted the driver's seat in
15  front of him?
16  A.  I have no opinion on that.
17  Q.  And with regard to the blunt impact to
18  his extremities, again, you did not or are not able to
19  make an opinion as to what impacted his extremities to
20  cause that blunt trauma?
21  A.  Correct.  What I --
22  Q.  Other than the seat belt?
23  A.  Yeah, I was going to say.
24  Q.  Yeah.
25  A.  That -- that is pretty straight- -- to me

---

Page 46

1  it's very straightforward with the bruising that it's
2  highly consistent with the straps over the thighs; but
3  other than that all the other little small injuries,
4  no, I didn't make any effort to determine what caused
5  those.
6  Q.  You mentioned as one of the summaries of
7  your findings a laceration of the pontomedullary
8  junction.  Just describe what you mean by that
9  finding.
10  A.  So what that means is that there is -- in
11  layman's terms it would be a cut.  In true medical
12  terms it's not a cut.  It's a -- it's a tear, which is
13  different, that comes from a blunt impact.
14     But when we look at the -- at that
15  photograph where I was talking -- I showed you the
16  fracture line coming across, the laceration is due to
17  the spine cutting the brainstem.  The brainstem has
18  three portions to it, the midbrain, the pons and the
19  medulla, and the pontomedullary junction, or I should
20  say after the medulla it turns into the spinal cord.
21  So at the junction between the second and third
22  portions, which is the pons and the medulla, that
23  junction is where there was a laceration.
24     Saying "laceration" is very big to me
25  because it means it's not a full transection.  And why

---

Page 47

1  is that important?  A full transection, that's lights
2  out immediately; you've lost complete connection from
3  the brain to the rest of your body and vice versa.
4  The laceration means that there still could have been
5  some functionality of the child, meaning that he
6  didn't die immediately, but that's really as much as I
7  would say for that.
8     Can I point one more thing out in the
9  photograph --
10  Q.  Sure.
11  A.  -- which I think is important as well and
12  it will show you where the pontomedullary junction is?
13     Okay.  So looking at Bryson 44 right in
14  the middle, this is the brainstem coming off.  The
15  midbrain, it looks like it's been lacerated, but it
16  hasn't.  That's an artifact of removing the brain, and
17  that's very important.  Because whenever I have a
18  trauma case, I don't let the technicians remove the
19  brain.  I do it myself so I can see what's happening.
20  So that's a -- that's an artifact.  This
21  is the pons, the bigger white thing, and this is the
22  medulla (indicating).  And so here is the junction,
23  the pontomedullary junction.  The spinal cord would
24  continue here.  You can see there's blood over the
25  distal portion.  That's the subarachnoid hemorrhage.

---

Page 48

1     And the next photograph, Bryson 45, is
2  now going in closer to show you that there is this
3  laceration at the junction.  It sort of has like a --
4  sometimes we'll call it a rent, like you rent an
5  apartment, meaning a defect into it, but you can see
6  that lac- -- this rent or this laceration, which
7  on Photograph Bryson 46 we're going in closer, you can
8  see that it doesn't go all the way through.  In fact,
9  it doesn't even really go -- doesn't appear to go even
10  more than halfway through.  So that's why he did not
11  die, quote-unquote, immediately.
12     And that's why we have -- now I'm on
13  Bryson 41.  This is looking into the upper part of the
14  neck.  I've removed the neck organs.  The spine is
15  right behind all of this blood.  That's why we have
16  all of this blood here.  He still had enough of a
17  blood pressure to push that blood down from that
18  atlanto-occipital dislocation.  But again, as I stated
19  earlier, once that laceration happened I wouldn't
20  think he would have any consciousness anymore, but he
21  still could have had vital signs to push that blood
22  out.
23  Q.  I understand.
24     And the laceration you're referring to
25  there is of that joint or that junction?

---

D'Amico & Associates, Inc.
www.DamicoAssociates.com

Bryson, et al v.
Rough Country, LLC

Jonathan Eisenstat, MD
January 15, 2024

Page 49

1  A.  Junction.
2  Q.  Junction.  And then -- but you're saying
3  the AOD would have occurred simultaneous with that
4  laceration?
5  A.  Almost simultaneous, yes.
6  Q.  Right.  And once the AOD happens, he's
7  unconscious within milliseconds?
8  A.  I believe so, yes.
9      MR. HILL: Okay.  All right.  We've been
10  going an hour.  Let me take a break, use the
11  restroom if that's all right --
12      MS. CANNELLA: Okay.
13      THE WITNESS: Sure.
14      MR. HILL: -- maybe get another cup of
15  coffee, and then we can wrap things up
16  hopefully pretty quickly.
17      [ Recess ]
18      BY MR. HILL:
19  Q.  We haven't talked much about the records
20  from the first responders and I just have a few
21  questions about that.  There's a reference in there
22  that his vitals were PEA, and what does that stand
23  for?  What does that mean to you?
24  A.  Sure.  So PEA stands for pulseless
25  electrical activity.  So basically what that means is

Page 50

1  you feel for a pulse, you don't feel the pulse, but
2  there's still -- like on an EKG when you see the
3  blips, that's the electricity going through the heart.
4  Those -- there's a list of things that can lead to PEA
5  that a doctor needs to think about.  Excuse me.
6  Q.  Sure.
7      THE WITNESS: Off the record.
8      (Thereupon, an off-the-record discussion
9  was held.)
10  A.  And so what a lot of people -- what
11  doctors think of initially are respiratory types of
12  deaths or failure with pulseless electrical activity.
13  That's really what it means.
14      BY MR. HILL:
15  Q.  Right.  And again, that may be evidence
16  like you said that the laceration at the junction was
17  not full so he was still in some ways connected to his
18  brain, but again, we've already established at that
19  point he was unconscious and was not suffering any
20  conscious pain and suffering?
21  A.  Agreed.  Excuse me one more second.
22  Q.  Sure.  Take your time.
23      (Thereupon, an off-the-record discussion
24  was held.)
25      BY MR. HILL:

Page 51

1  Q.  The body fluids and tissue that you
2  collected, it's never been tested to your knowledge;
3  is that correct?
4  A.  To my knowledge, that's correct.
5  Q.  Right.  And it's usually disregarded
6  after a year; is that correct?
7  A.  I thought the GBI was two years.
8  Q.  Okay.
9  A.  But that's correct.
10      (Thereupon, marked for identification,
11  Defendant's Exhibit 4.)
12      BY MR. HILL:
13  Q.  All right.  Let me see what we've marked
14  and make sure I have got everything.  Why don't we
15  mark that packet right there as Exhibit 4, "that
16  packet" being the Bryson 1198 through 1222.
17      MR. HILL: I believe we're on 4; correct?
18      THE COURT REPORTER: Yes.
19      THE WITNESS: Do you want to mark any of
20  the -- since I wrote on the photos?
21      MR. HILL: Yeah, let's go ahead and do
22  that as well.
23      (Thereupon, marked for identification,
24  Defendant's Exhibit 5.)
25      BY MR. HILL:

Page 52

1  Q.  All right.  Exhibit 5 will be the full
2  collection of photographs, Bryson 33 through Bryson
3  50, I believe.  Hold on.  Yes, through 50.
4      Speaking of that, what do the numbers on
5  Bryson 33 represent?
6  A.  So that's the case number.  It starts
7  with the year, 2020.  The one at the beginning of the
8  second number means that it was a headquarters case,
9  so here in Decatur.  And it was the sixth -- excuse
10  me, the 6,710th case called to the headquarters office
11  of that year.
12  Q.  Gotcha.
13  A.  Everything that goes with this case
14  throughout the GBI will reflect back to this number.
15  Q.  When you mentioned earlier that you
16  recalled consulting on a case that involved a lifted
17  vehicle, can you tell me what state that was in?
18      MS. CANNELLA: Object to the form of the
19  question.  Misrepresents his testimony.
20  A.  I would -- I'd have to go back and look.
21  I honestly have no idea.  I think -- I think what I
22  said was that I looked at other -- I looked at cases
23  where vehicles had been altered, but I couldn't
24  remember if it was specifically lifted or not.
25      BY MR. HILL:

Bryson, et al v.
Rough Country, LLC

Jonathan Eisenstat, MD
January 15, 2024

---

Page 53

1 Q. Great. Thanks for clarifying that.
2 A. Sure. And I have no idea. I'd have to
3 look. I can tell you cases, I've looked at cases,
4 states I've looked at cases in, but I don't -- I don't
5 remember which one specifically to answer your
6 question.
7 Q. Right. And really what I'm trying to get
8 to is: Have you ever given opinions in a case that
9 involved a lifted vehicle that you can recall?
10 A. I may have, but what I would say is my
11 part of it would have nothing to do with did the
12 alterations of the vehicle have anything to do with
13 the accident. That is not for me to speak to. I
14 don't think I've ever been asked a question to that
15 effect, so then I don't think I have ever given an
16 opinion to that effect.
17 Q. Perfect.
18    And you can -- obviously you're qualified
19 to give opinions regarding the cause of death and the
20 injuries that the decedent suffered, but you would not
21 be qualified, I believe you said, to give opinions
22 with regard to whether any dynamic of the vehicles
23 involved caused the injury?
24 A. Well, sometimes I would be, but again, in
25 this case no because I haven't looked at that.

---

Page 54

1 Q. Right.
2 A. In other cases I absolutely have -- I
3 know I have given opinions that, you know, a specific
4 injury was because of something specific impacting
5 that individual, but that is obviously when I'm doing
6 expert work where I have a lot more information that
7 I've reviewed.
8 Q. Sure.
9 A. In this case, you know, with -- I mean, I
10 haven't really been asked to do anything because --
11 since I haven't been retained.
12 Q. Sure.
13 A. So in this case what I'm comfortable
14 talking about is, and I think is im- -- might be
15 important, I don't know, is that this is an injury
16 from a blunt impact to the head. This is not a
17 rotational injury, this is not an acceleration/
18 deceleration injury, this is not a head that went out
19 of a vehicle and was crushed, things of that sort.
20 That's what I'm comfortable talking about in this
21 case.
22 Q. Sure.
23    And that blunt impact was to the right
24 ear area and the right ear area only?
25 A. That's correct.

---

Page 55

1 Q. And --
2 A. For the lethal injury, that's correct.
3 Q. Right. And let's assume that Ms. Bryson
4 has testified that she looked back and saw that her
5 son's head was turned to the right and he was asleep
6 as they left before the accident. Would that be
7 consistent with your finding that he suffered a blow
8 to the right ear and the right ear only?
9 A. And is that a front-facing car seat?
10 Q. It's a front-facing car seat.
11 A. So if the child is asleep in a front-
12 facing car seat with the child's head turned to the
13 right, then that would be consistent. Again, I
14 haven't looked at bio- -- the biomechanics of the
15 baby.
16 Q. Sure.
17 A. But something on the right impacting the
18 right side of the head, it could be consistent with
19 that, absolutely.
20 Q. Right. And the plastic of his car seat
21 would be on the right side if he's turned to the right
22 like we just mentioned?
23 A. Well, is he turned all the way to the
24 right or is he -- how far to the right is his head
25 turned?

---

Page 56

1 Q. Just turned to the right.
2 A. Oh, well, I mean, it could be the side
3 wings of the car seat or it could be the back portion
4 of the car seat, but either way it's not -- it
5 wouldn't be just that he gets hit from the back or the
6 vehicle gets hit from the back and the head just goes
7 against the car seat. It's got to be something is
8 pushing into that head.
9 Q. Sure.
10 A. So I mean, I can't really say much more
11 than that.
12 Q. Sure.
13    None of -- with his head turned to the
14 right, it would be inconsistent with an opinion that
15 his right side of his head struck the driver's seat in
16 front of him?
17 A. Oh, well, see, now we're getting out into
18 biomechanics and I'm not a biomechanic. So I would
19 have to defer to a biomechanic because I don't know
20 the directionality of the forces in this case.
21 Q. Sure.
22 A. So I don't know if the -- if the child's
23 head is to the right side, I mean, is it plausible
24 that the impact from the intrusion into the back of
25 the vehicle pushes his head this way (indicating)? I

---

Bryson, et al v.
Rough Country, LLC

Jonathan Eisenstat, MD
January 15, 2024

Page 57

1  don't know.  I mean, it's plausible, but I'd have to
2  defer that to a biomechanic.
3  Q.  Sure.
4      Are there any opinions that you have that
5  you intend to give in the case that I haven't covered?
6  A.  No, sir.
7      MR. HILL: All right.  I don't have any
8  other questions at this time.  Thank you,
9  Doctor.
10     THE WITNESS: Sure.
11     MS. CANNELLA: Just one.
12     EXAMINATION
13     BY MS. CANNELLA:
14 Q.  Are the injuries that you're describing,
15  could they also be consistent with the child's head
16  turned to the left?
17 A.  I mean, again, they could be.  If the
18  head is turned to the left, then the right side of the
19  head would have to be going forward or something from
20  the front coming back, but looking at the pictures of
21  the car, it looks like all of that intrusion is coming
22  from the back.
23     But anyways, it could be consistent with
24  the child's head turned in a bunch of directions.
25  It's just that the impact itself on the body is on the

Page 58

1  right side.  So if the child's head is turned to the
2  left, it wouldn't be something from the back hitting
3  the left side of the head.  The head would have to be
4  pushed forward and the right side of the head would
5  have to impact something in front of it.  Did that
6  make sense?
7 Q.  Uh-huh (affirmative).
8      Is it an injury that can happen from a
9  broad surface or does it have to be a focalized
10  impact?
11 A.  No, it can be from a broad surface.
12 Q.  Okay.  All right.  That's all I have.
13     Oh, and I'm sorry, one more thing.  Do
14  you have any opinion about whether his head was turned
15  left or right?
16 A.  No, I don't.
17     MS. CANNELLA: Okay.  That's it.
18     MR. HILL: That's it.
19     (Thereupon, an off-the-record discussion
20  was held.)
21     THE COURT REPORTER: Orders, do you have
22  preferences?
23     MR. HILL: Just a Minuscript and that's
24  it.  You don't have to -- that's all I need.  I
25  don't need --

Page 59

1      THE COURT REPORTER: You don't need an
2  E-tran or anything like that?
3      MR. HILL: Yeah, might as well do E-tran
4  too.  Sure.
5      THE COURT REPORTER: Same for you?
6      MS. CANNELLA: Yeah, just a PDF, the
7  whole package, the E-tran and the PDF.
8      (Deposition concluded at 10:19 a.m.)
9      - - -

Page 60

1              C E R T I F I C A T E
2
3          I hereby certify that the foregoing
   transcript was reported, as stated in the caption;
4  that the witness was duly sworn and elected to reserve
   signature in this matter; that the colloquies,
5  questions and answers were reduced to writing under my
   direction; and that the foregoing pages 1 through 59
6  represent a true, correct, and complete record of the
   evidence given.
7
          I further certify that I am not
8  disqualified for a relationship of interest under
   O.C.G.A. 9-11-28(c); that I am a Georgia Certified
9  Court Reporter here as a representative of D'Amico &
   Associates; that I/D'Amico & Associates was contacted
10  by the party taking the deposition to provide court
    reporting services for this deposition; that I will
11  not be taking this deposition under any contract that
    is prohibited by O.C.G.A. 15-14-37(a) and (b) or
12  Article 10.B of the Rules and Regulations of the
    Board; and by the attached disclosure forms I confirm
13  that I/D'Amico & Associates is not a party to a
    contract prohibited by O.C.G.A. 15-14-37 (a) or (b).
14
          The above certification is expressly
15  withdrawn and denied upon the disassembly or
    photocopying of the foregoing transcript, unless said
16  disassembly or photocopying is done under the auspices
    of D'Amico & Associates and the signature and original
17  seal is attached thereto.
18
          This, the 21st day of January, 2024.
19
20
21
22
          _____
          KELLY D'AMICO, RPR, CCR-B-1322
23
24
25

Bryson, et al v.
Rough Country, LLC

Jonathan Eisenstat, MD
January 15, 2024

Page 61

1          E R R A T A   S H E E T

2          Any changes in form or substance which you
desire to make to your deposition testimony shall be
3   entered upon the deposition with a statement of the
reasons given for making them.

4

5          To assist you in making any such
corrections, please use the form below.  If
6   supplemental or additional pages are necessary, please
furnish same and attach them to this errata sheet.

7

8                    - - -

9

10          I, the undersigned, JONATHAN EISENSTAT,
M.D., do hereby certify that I have read the foregoing
deposition and that said transcript is true and
11   accurate, with the exception of the following changes
noted below, if any:

12

13

14   Page_____/Line_____/Should Read:_____

15   _____

16   Reason:_____

17

18   Page_____/Line_____/Should Read:_____

19   _____

20   Reason:_____

21

22   Page_____/Line_____/Should Read:_____

23   _____

24   Reason:_____

25

Page 62

1   Page_____/Line_____/Should Read:_____

2   _____

3   Reason:_____

4

5   Page_____/Line_____/Should Read:_____

6   _____

7   Reason:_____

8

9   Page_____/Line_____/Should Read:_____

10   _____

11   Reason:_____

12

13   Page_____/Line_____/Should Read:_____

14   _____

15   Reason:_____

16

17   Page_____/Line_____/Should Read:_____

18   _____

19   Reason:_____

20

21          _____
JONATHAN EISENSTAT, M.D.,
22
Sworn to and subscribed before me,
23   _____, Notary Public.
24   This_____day of_____, 20_____.
25   My Commission Expires:

Bryson, et al v.
Rough Country, LLC

Jonathan Eisenstat, MD
January 15, 2024

## A

**able (2)**
45:6,18
**abnormal (1)**
35:15
**abnormalities (1)**
36:9
**above (3)**
11:20;15:12;39:3
**Absolutely (4)**
36:18;40:3;54:2;
55:19
**absorb (1)**
8:25
**acceleration (1)**
26:5
**acceleration/ (1)**
54:17
**acceleration/deceleration (2)**
25:20;30:13
**access (1)**
27:14
**accident (18)**
11:4,9,12;20:18;
21:6;22:7;24:4,9,25;
26:12;27:6,18,22,23;
28:14;29:6;53:13;
55:6
**accidents (3)**
18:9,12;21:11
**across (1)**
46:16
**activity (2)**
49:25;50:12
**actual (1)**
37:8;42:8;44:23
**actually (22)**
12:17;21:19;35:21,
23;38:12;39:12,15;
40:11,16,17;44:9,18
**adult (1)**
35:17
**affirmative (1)**
58:7
**again (17)**
11:23;13:24;16:12;
18:14;23:9;28:15;
29:11;44:17;45:9,12,
18;48:18;50:15,18;
53:24;55:13;57:17
**against (1)**
56:7
**ago (6)**
14:7,8;17:14,15,20;
19:15
**agree (5)**
29:24;30:3,4,8,17
**Agreed (1)**
50:21
**agreement (2)**
8:24;17:8

**ahead (5)**
15:5;33:17;37:18;
41:22;51:21
**alive (4)**
32:8;33:24;34:6,11
**allow (2)**
32:9;34:1
**allowing (1)**
42:6
**almost (4)**
19:21;21:20;36:19;
49:5
**along (2)**
38:19;43:1
**alterations (1)**
53:12
**altered (2)**
23:14;52:23
**always (5)**
12:5;17:19;21:20;
24:21;33:23
**anticipated (1)**
32:2
**anymore (3)**
8:13;11:24;48:20
**anyways (1)**
57:23
**AOD (8)**
25:7,22;26:2;29:25;
30:5,8;49:3,6
**apartment (1)**
48:5
**apologize (1)**
41:8
**appear (1)**
48:9
**appears (3)**
9:18;11:18;13:1
**applicable (1)**
8:4
**apply (1)**
22:16
**appropriate (1)**
38:21
**approximately (1)**
19:25
**April (1)**
10:13
**area (16)**
19:3,15;23:9;31:5,
13,15;32:1;33:5;39:6;
43:5,14;44:2,2,14;
54:24,24
**areas (1)**
25:9
**around (9)**
12:3;20:11;31:11,
20;33:23;34:8;41:2,5,
17
**articulation (1)**
23:25
**artifact (2)**
47:16,20

**asleep (2)**
55:5,11
**aspect (1)**
43:12
**associated (1)**
34:22
**assume (1)**
55:3
**assuming (1)**
36:5
**atlanto- (1)**
42:4
**atlanto-occipital (4)**
23:25;24:19;42:19;
48:18
**attorney (3)**
12:6,7,7
**attorneys (2)**
12:2,6
**automobile (1)**
26:12
**autopsies (6)**
20:1,7,9,12,15;21:6
**autopsy (28)**
6:23;7:4,7;9:19,21;
10:3,8,11;11:4;12:11,
12,17;14:11,13,23;
15:1,9,12,14;21:12;
22:6,17;23:3;24:6;
31:2;35:25;39:8;41:8
**available (1)**
9:17
**averaged (1)**
20:15

## B

**baby (1)**
55:15
**back (14)**
13:23;19:13;33:20;
40:21;52:14,20;55:4;
56:3,5,6,24;57:20,22;
58:2
**background (2)**
12:19;40:12
**base (4)**
24:18;39:24;43:16;
44:4
**basic (1)**
27:21
**basically (4)**
13:20;30:19;39:1;
49:25
**bat (1)**
38:14
**Bates (1)**
12:25
**bear (1)**
38:2
**bearing (1)**
37:13
**become (1)**

10:25
**beginning (1)**
52:7
**behind (3)**
27:11;28:20;48:15
**belt (1)**
45:22
**better (2)**
22:2;40:12
**beyond (3)**
11:20;15:12,21
**big (1)**
46:24
**bigger (1)**
47:21
**bill (1)**
8:20
**billed (2)**
8:10,15
**bio- (1)**
55:14
**biomechanic (3)**
56:18,19;57:2
**biomechanics (2)**
55:14;56:18
**bit (2)**
12:18;20:14
**black (1)**
40:11
**blanked (1)**
9:25
**bleed (1)**
34:20
**bleeding (11)**
31:16,20;32:1,9;
34:2,8,9,21,22;43:17;
44:2
**blips (1)**
50:3
**blood (13)**
32:9;33:22;34:1,2,
6;43:19;44:5;47:24;
48:15,16,17,17,21
**blow (1)**
55:7
**blue (1)**
40:12
**blunt (18)**
15:16,16;25:22;
26:13,14;30:6,9,10,
12,23;31:17;36:20,
21;45:17,20;46:13;
54:16,23
**blunt-impact (2)**
36:13;37:16
**board (1)**
24:21
**body (6)**
26:11;35:11;36:14;
47:3;51:1;57:25
**bone (10)**
32:7;34:4;38:12,12,
15,19,21,22,25;40:25

**bones (1)**
38:9
**both (4)**
9:19;22:16;24:5;
39:16;41:7,11
**bottom (1)**
39:24
**boy (1)**
20:21
**brain (4)**
47:3,16,19;50:18
**brainstem (6)**
30:20;34:23;42:7;
46:17,17;47:14
**break (2)**
18:15;49:10
**bring (1)**
34:8
**broad (2)**
58:9,11
**brought (2)**
9:4;20:24
**bruising (3)**
31:5,8;46:1
**Bryson (15)**
13:1;32:19;33:1,3;
39:11;40:13;47:13;
48:1,7,13;51:16;52:2,
2,5;55:3
**bunch (1)**
57:24
**busier (1)**
20:8
**Butler (5)**
18:21,24;19:6,9,11

## C

**call (5)**
12:14;23:14;25:7;
44:19;48:4
**called (4)**
13:2;31:15;43:21;
52:10
**calls (1)**
27:21
**came (1)**
20:4
**can (41)**
6:13,24;9:17;13:6;
14:8;19:18;20:16,21;
21:1;22:2;23:4,23;
25:7,11,13,19,23;
32:14;37:10;39:8,12,
15,15,19;40:1,4,24;
41:21;47:8,19,24;
48:5,7;49:15;50:4;
52:17;53:3,9,18;58:8,
11
**canal (1)**
42:1
**Cannella (22)**
14:3;16:11;19:2,8,

25:25;26:7;32:12,17,
21;33:7,12,17;40:4,8,
10;41:4;49:12;52:18;
57:11,13;58:17;59:6
**Cannella's (4)**
8:15;11:16;18:2,17
**capacity (1)**
16:25
**capillaries (1)**
34:4
**car (12)**
16:2;28:22;45:2,7;
55:9,10,12,20;56:3,4,
7;57:21
**case (50)**
6:12,17,19,23;7:5,
23;8:7,11,20;9:1,21;
11:25;12:1,3,4;13:16,
19;14:3,18;15:4;16:5;
17:9;18:1;21:25;22:5,
18,20;23:7,20,21;
27:21;28:1;29:15;
33:25;36:19;37:13;
41:20;47:18;52:6,8,
10,13,16;53:8,25;
54:9,13,21;56:20;
57:5
**cases (27)**
12:2;17:1,5,6,9,13,
16;18:4,24;19:1,4,7,
12,17;20:22;22:9;
23:4,12,13,24;34:5;
35:13;52:22;53:3,3,4;
54:2
**cause (4)**
11:5;25:7;45:20;
53:19
**caused (3)**
30:5;46:4;53:23
**causes (1)**
42:7
**causing (1)**
42:25
**CB (3)**
27:8;28:19;29:15
**CB's (1)**
43:8
**certain (1)**
24:17
**certainly (1)**
21:1
**certificate (1)**
12:19
**certification (1)**
10:6
**change (2)**
38:11;42:16
**changed (1)**
23:16
**chief (1)**
19:25;20:10
**child (13)**
9:21;10:9;11:4;

33:4,25;34:1,10;
35:16;37:8,20,23;
47:5;55:11
**child's (5)**
55:12;56:22;57:15,
24;58:1
**chin (1)**
25:12
**choosing (1)**
41:20
**circle (1)**
41:25
**circumstance (1)**
27:18
**circumstances (1)**
25:17
**civil (2)**
17:5,7
**clarifying (1)**
53:1
**classic (2)**
24:18,25
**clear (2)**
42:18,21
**closer (2)**
48:2,7
**coffee (1)**
49:15
**collected (2)**
27:13;51:2
**collection (1)**
52:2
**collision (1)**
20:22
**comfortable (2)**
54:13,20
**coming (7)**
30:14;40:24;42:25;
46:16;47:14;57:20,21
**common (4)**
24:25;25:1,16;
43:20
**community (1)**
25:4
**complete (1)**
47:2
**completely (1)**
41:24
**Complies (1)**
31:21
**components (1)**
39:5
**concluded (1)**
59:8
**conclusions (2)**
16:16;35:6
**condition (1)**
36:7
**conflict-of-interest (1)**
17:10
**congenital (1)**
35:16
**connected (1)**

50:17
**connection (2)**
13:13;47:2
**conscious (6)**
29:8,12,15;30:1,18;
50:20
**consciousness (1)**
48:20
**consistent (7)**
37:22;46:2;55:7,13,
18;57:15,23
**consult (2)**
17:9;19:17
**consultant (6)**
6:24;16:23;17:14;
22:18,19;24:6
**consulting (2)**
23:6;52:16
**contacted (3)**
13:16;14:3,17
**context (1)**
23:2
**continuation (1)**
39:4
**continue (1)**
47:24
**continues (2)**
39:12;41:1
**contusion (1)**
43:11
**contusions (2)**
31:11;37:21
**copy (2)**
7:9;13:3
**cord (3)**
42:1;46:20;47:23
**Coroner (4)**
10:7;12:13;21:17;
27:21
**coroner's (3)**
12:10,22;27:20
**correctly (4)**
6:8;14:5;24:1;28:9
**costs (1)**
8:25
**counsel (2)**
6:20;7:17
**Country (1)**
6:12
**County (1)**
12:10
**couple (3)**
18:6;20:7,14
**course (2)**
22:10;27:3
**COURT (4)**
51:18;58:21;59:1,5
**cover (1)**
23:3
**covered (1)**
57:5
**crash (1)**
21:17

**created (1)**
13:2
**criminal (6)**
12:2;17:6,9,9,13,16
**crushed (1)**
54:19
**cup (1)**
49:14
**curious (1)**
35:7
**cut (4)**
13:20,21;46:11,12
**cutting (1)**
46:17

# D

**damaged (1)**
45:7
**date (1)**
14:4
**dated (1)**
10:12
**dates (1)**
19:13
**day (2)**
17:23,24
**death (6)**
11:6;12:15,19;
20:17;22:6;53:19
**deaths (2)**
20:23;50:12
**Decatur (1)**
52:9
**decedent (1)**
53:20
**deceleration (2)**
26:6;54:18
**decided (2)**
15:2,3
**defect (1)**
48:5
**defendant (1)**
6:12
**Defendant's (5)**
7:13;9:11;13:9;
51:11,24
**defense (2)**
12:7;17:4
**defer (2)**
56:19;57:2
**definitely (2)**
19:19;24:10
**Department (1)**
10:15
**depends (2)**
21:13,14
**deposition (6)**
7:11;8:16,18;13:14;
19:20;59:8
**depositions (1)**
27:25
**depressed (1)**

38:18
**describe (9)**
13:11;30:20;31:15;
41:7,10,14,17;43:5;
46:8
**described (2)**
12:22;36:14
**describing (2)**
37:2;57:14
**determine (4)**
37:5,7;44:18;46:4
**diagonally-oriented (1)**
37:21
**die (2)**
47:6;48:11
**different (2)**
10:8;46:13
**difficult (1)**
20:24
**direct (1)**
44:16
**directionality (1)**
56:20
**directions (1)**
57:24
**directly (1)**
19:2
**disarticulation (2)**
42:5,19
**disarticulations (1)**
24:20
**disc (2)**
9:4;23:25
**discuss (3)**
11:3;15:15;16:10
**discussed (5)**
6:16,19;14:25;
15:13,22
**discussion (3)**
50:8,23;58:19
**discussions (1)**
15:11
**disease (2)**
35:17;36:8
**dislocation (3)**
42:5,20;48:18
**dislocations (1)**
24:20
**disregarded (1)**
51:5
**distal (1)**
47:25
**district (2)**
12:2,6
**doctor (2)**
50:5;57:9
**doctors (1)**
50:11
**document (8)**
12:24,25;13:2,11,
21,25;14:20;35:14
**documents (2)**
13:20,22

Bryson, et al v.
Rough Country, LLC

Jonathan Eisenstat, MD
January 15, 2024

**done (1)**
22:14
**doubt (2)**
21:3;30:12
**down (14)**
13:23;15:7;20:13;
30:16;32:7;34:3;38:8;
39:12;40:2;41:2,6;
42:1;44:5;48:17
**Dr (2)**
6:7;32:13
**drafted (1)**
13:12
**drive (3)**
9:6,7;10:23
**driver (3)**
27:11;28:13,20
**drivers (1)**
11:11
**driver's (2)**
45:14;56:15
**due (1)**
46:16
**duly (1)**
6:2
**during (1)**
31:2
**dynamic (1)**
53:22

**E**

**ear (11)**
39:1,3,5,6;44:18,19,
24;54:24,24;55:8,8
**earlier (2)**
48:19;52:15
**easy (2)**
18:14;38:7
**ecchymosis (3)**
31:16;43:25;44:1
**edema (1)**
43:12
**effect (4)**
16:13,13;53:15,16
**effort (4)**
37:4,7;44:17;46:4
**EISENSTAT (3)**
6:1,7;32:13
**either (2)**
18:8;56:4
**EKG (1)**
50:2
**electrical (2)**
49:25;50:12
**electricity (1)**
50:3
**Elliott (1)**
28:13
**else (2)**
15:22;39:7
**embarrassing (1)**
38:13

**end (2)**
17:22;20:13
**enough (2)**
25:12;48:16
**entire (3)**
10:19,22;27:17
**eschymosis (1)**
43:24
**essence (1)**
13:24
**established (1)**
50:18
**estimate (3)**
20:16;23:24;28:10
**E-tran (3)**
59:2,3,7
**evasive (1)**
28:13
**even (8)**
12:2;16:6,12;33:23;
37:12;41:14;48:9,9
**eventually (2)**
8:21;16:19
**Evidence (1)**
36:12;50:15
**exact (1)**
14:4
**exactly (4)**
13:15;30:21;33:14;
38:16
**EXAMINATION (3)**
6:5;35:7;57:12
**examined (1)**
6:2
**examiner (3)**
7:7;19:25;24:6
**examiners (1)**
35:13
**example (1)**
25:21
**exams (1)**
24:21
**except (1)**
41:25
**excuse (4)**
42:2;50:5,21;52:9
**Exhibit (11)**
7:8,13,18;9:11,13;
13:6,9;51:11,15,24;
52:1
**expect (1)**
31:18
**experience (3)**
20:2;23:23;30:1
**experienced (1)**
29:15
**expert (9)**
7:22;10:25;15:2;
16:14,19;17:2,13;
28:15;54:6
**expertise (1)**
23:10
**experts (3)**

9:1;16:5,13
**explained (1)**
43:13
**extension (1)**
38:19
**extremely (2)**
25:18,18
**extremities (5)**
36:14,21,23;45:18,
19
**eye (5)**
43:22,23;44:9,14,
16
**eyelid (1)**
43:12
**eyes (2)**
43:21;44:7

**F**

**F-250 (2)**
28:7,13
**face (2)**
43:19;44:13
**face-on (1)**
45:3
**facing (3)**
28:24,25;55:12
**fact (11)**
15:1,3,9;23:19;
37:20;41:10;42:13,
15,21;45:10;48:8
**failure (1)**
50:12
**fair (4)**
27:17;30:20;44:9,
21
**falls (1)**
25:17
**family (1)**
26:20
**Fannin (1)**
12:10
**far (2)**
25:17;55:24
**fast (1)**
28:7
**February (2)**
17:18,23
**feel (2)**
50:1,1
**few (3)**
27:5;31:10;49:20
**file (2)**
9:5;12:18
**find (3)**
21:10;38:1;43:7
**finding (2)**
46:9;55:7
**findings (5)**
14:25;15:12,15;
25:2;46:7
**fine (2)**

33:7,8
**finished (1)**
14:21
**firm (9)**
8:15,18;18:2,19;
19:5,6,17,19,23
**firms (3)**
18:17;19:5,8
**first (11)**
6:2;14:2;17:23;
20:7;23:2;28:4;33:1;
35:5;36:21,23;49:20
**five (2)**
17:15;18:25
**flavor (1)**
20:2
**fluids (1)**
51:1
**focalized (1)**
58:9
**follows (1)**
6:3
**foramen (3)**
39:13;41:5,18
**force (1)**
25:14
**forces (3)**
25:20;42:25;56:20
**forces/situation (1)**
26:6
**Ford (1)**
28:7
**forehead (2)**
39:18;40:16
**forensic (3)**
9:22;24:19;25:4
**forget (1)**
17:19
**forgot (1)**
41:21
**form (1)**
52:18
**formats (1)**
9:20
**formed (1)**
14:20
**former (2)**
19:5,6
**forward (5)**
12:4;28:24;30:1;
57:19;58:4
**found (1)**
31:2
**fracture (16)**
30:14,16;38:18;
39:13;40:25;41:6,11,
14,17;42:23;43:1,2,
17;44:4,8;46:16
**fractures (3)**
42:8,13,15
**front (6)**
42:3;44:13;45:15;
56:16;57:20;58:5

**front- (1)**
55:11
**front-facing (2)**
55:9,10
**full (5)**
32:17;46:25;47:1;
50:17;52:1
**functionality (1)**
47:5
**further (2)**
15:20;22:20

**G**

**gave (1)**
32:19
**GBI (17)**
8:12,13,14,17;
11:23;12:4,5;13:17;
14:14;16:22;17:8,18,
24;19:24;20:12;51:7;
52:14
**general (2)**
33:5;36:6
**Georgia (4)**
8:15;10:15;12:13;
20:4
**gets (3)**
30:17;56:5,6
**given (3)**
53:8,15;54:3
**giving (1)**
15:23
**goes (10)**
21:25;31:9;32:7;
33:21;34:3;39:2,5;
41:6;52:13;56:6
**good (1)**
43:5
**goodness (1)**
19:14
**gosh (1)**
14:5
**Gotcha (5)**
14:1;26:16;27:24;
44:7;52:12
**Great (3)**
31:22;37:3;53:1
**gritty (1)**
21:23
**guess (1)**
13:13
**guys (2)**
19:21,22

**H**

**half (1)**
42:3
**halfway (1)**
48:10
**hand (1)**
13:3

Bryson, et al v.
Rough Country, LLC

Jonathan Eisenstat, MD
January 15, 2024

**happen (2)**
25:10;58:8
**happened (3)**
36:23;42:9;48:19
**happening (1)**
47:19
**happens (3)**
15:7;30:16;49:6
**harness (1)**
37:23
**hats (1)**
7:2
**head (39)**
15:16;25:13;29:2;
30:6,13,16;36:14,20,
22;39:17,17,21,25;
40:17,22;43:8,16;
45:14;54:16,18;55:5,
12,18,24;56:6,8,13,
15,23,25;57:15,18,19,
24;58:1,3,3,4,14
**headquarters (2)**
52:8,10
**heart (2)**
35:16;50:3
**held (1)**
50:9,24;58:20
**help (1)**
34:10
**hemorrhage (4)**
34:15,18;42:2;
47:25
**hey (1)**
11:25
**high (6)**
25:14,19,19;26:5,
10,12
**highly (1)**
46:2
**HILL (34)**
6:4,6,11;7:8,14;
9:12;13:6,10;26:2,4,
9;32:16,19,22;33:10,
13;40:6,9,19;41:9;
49:9,14,18;50:14,25;
51:12,17,21,25;52:25;
57:7;58:18,23;59:3
**hired (2)**
22:17,19
**hit (2)**
56:5,6
**hitting (2)**
42:25;58:2
**Hold (1)**
52:3
**honestly (2)**
14:7;52:21
**honesty (1)**
10:24
**hopefully (1)**
49:16
**hospital (2)**
10:10;34:6

**hour (1)**
49:10
**hundreds (3)**
20:22;21:2;24:10

**I**

**idea (2)**
52:21;53:2
**identification (5)**
7:12;9:10;13:8;
51:10,23
**im- (1)**
54:14
**immediately (4)**
34:20;47:2,6;48:11
**impact (29)**
15:16,17;25:12,14;
26:11,12;28:8;29:3;
30:6,10,12,15,23;
31:17;36:20,21;
37:14;39:6;42:22;
44:11,16;45:17;
46:13;54:16,23;
56:24;57:25;58:5,10
**impacted (6)**
37:8;44:13,18,24;
45:14,19
**impacting (2)**
54:4;55:17
**impacts (2)**
25:19;26:10
**implied (2)**
36:15,17
**implying (1)**
36:24
**important (5)**
11:1;47:1,11,17;
54:15
**incidents (1)**
25:6
**inconsistent (1)**
56:14
**in-depth (1)**
29:11
**indicate (1)**
36:10
**indicated (1)**
28:19
**indicating (5)**
39:14,18;41:1;
47:22;56:25
**indication (3)**
16:18;42:18,21
**indicative (2)**
43:14,15
**individual (1)**
54:5
**information (7)**
21:24;22:1,9,22;
27:14;28:17;54:6
**initially (1)**
50:11

**injuries (9)**
35:18;36:13;37:2,5,
11,16;46:3;53:20;
57:14
**injury (13)**
24:25;25:1;30:13,
14;36:12;42:22;
53:23;54:4,15,17,18;
55:2;58:8
**inner (1)**
39:5
**inside (1)**
41:25
**inspected (1)**
15:25
**inspection (1)**
10:16
**installed (3)**
26:18,21,24
**instances (1)**
18:1
**intend (1)**
57:5
**interrupt (2)**
32:12;33:18
**into (20)**
15:17,20;21:22;
29:10,11,12,13;32:6,
7;33:21;34:3;42:1,6;
44:2;46:20;48:5,13;
56:8,17,24
**intraosseous (4)**
31:1,9,25;34:7
**intrusion (2)**
56:24;57:21
**investigative (1)**
12:18
**involve (6)**
18:9,11;20:17;21:6;
26:13,14
**involved (13)**
11:4,12;12:1;16:2;
21:11,19;22:15;23:4,
5,24;52:16;53:9,23
**involving (1)**
22:7
**iron (2)**
37:14,15
**issue (1)**
34:14
**IV (2)**
32:10;33:21

**J**

**January (3)**
17:22,23;20:13
**joint (1)**
48:25
**JONATHAN (1)**
6:1
**JPEG (1)**
9:20

**JPG (1)**
9:20
**jump (4)**
9:6,7;10:23;35:4
**jumping (1)**
37:18
**junction (12)**
46:8,19,21,23;
47:12,22,23;48:3,25;
49:1,2;50:16
**jurisdiction (1)**
21:14

**K**

**keep (1)**
9:8
**kind (2)**
9:3;24:24
**kit (2)**
26:17,24
**kits (1)**
26:21
**knees (1)**
31:11
**knowledge (6)**
24:18;27:4,18,21;
51:2,4

**L**

**label (1)**
39:24
**labeled (1)**
13:1
**lac- (1)**
48:6
**lacerated (1)**
47:15
**laceration (14)**
30:19;34:23;42:7;
46:7,16,23,24;47:4;
48:3,6,19,24;49:4;
50:16
**laptop (1)**
9:14
**large (2)**
25:14;31:15
**last (7)**
12:9,24,25;17:24;
20:14;34:14;38:6
**lateral (1)**
43:12
**layman's (1)**
46:11
**lays (1)**
15:14
**lead (2)**
34:2;50:4
**leaking (1)**
44:5
**learn (1)**
24:19

**least (1)**
29:25
**left (17)**
12:5;14:14;20:12;
31:25;39:17,25;40:1,
5,14;42:23,23;55:6;
57:16,18;58:2,3,15
**leg (2)**
31:2,25
**legs (1)**
31:11
**lethal (1)**
55:2
**lift (3)**
26:17,21,23
**lifted (11)**
21:7,23;22:7,13,13;
23:5,15,20;52:16,24;
53:9
**lights (1)**
47:1
**limited (3)**
35:7,20;36:1
**line (11)**
30:14,16;31:9,25;
33:2,4;34:3;40:25;
42:24;43:1;46:16
**linear (1)**
38:19
**lines (1)**
34:7
**list (5)**
9:3;11:21;12:9;
36:6;50:4
**litigation (2)**
6:25;16:23
**little (7)**
12:18;20:14;22:2;
34:4;38:13;39:9;46:3
**located (1)**
38:25
**location (1)**
33:2
**locations (2)**
37:9;43:7
**long (2)**
14:7;33:7
**look (27)**
7:21;9:15,15;10:23;
13:23;14:8,18;17:9;
18:14;19:21;22:18,
20;25:2;29:13;31:7,
12,19;33:22;35:14,15,
21;39:11;43:18,21;
46:14;52:20;53:3
**looked (20)**
14:6;17:16;18:23;
19:7,12;20:21;23:12,
24;24:8,10;29:22;
32:23,25;52:22,22;
53:3,4,25;55:4,14
**looking (12)**
17:12;29:10,12;

32:10,15;33:5,24;
39:16,18;47:13;
48:13;57:20
**looks (2)**
47:15;57:21
**lost (1)**
47:2
**lot (3)**
16:15;50:10;54:6

## M

**magnum (3)**
39:13;41:5,18
**Makes (2)**
12:8;34:25
**maneuvers (1)**
28:14
**many (8)**
10:22,24;18:4;20:1,
16,22;23:23;35:13
**mark (8)**
7:8;9:13;32:14;
33:6,10;40:5;51:15,
19
**marked (6)**
7:12;9:10;13:8;
51:10,13,23
**material (4)**
7:18;9:5;37:8;
44:23
**materials (5)**
11:20;12:5;13:2;
15:21;45:2
**may (5)**
26:13,14;28:16;
50:15;53:10
**maybe (10)**
16:16;17:3,14,15;
18:6;19:12,15,15;
22:24;49:14
**MD (1)**
6:1
**mean (17)**
15:13,17;20:24;
24:5;32:12;33:17;
35:9;36:17,22;46:8;
49:23;54:9;56:2,10,
23;57:1,17
**meaning (2)**
47:5;48:5
**means (8)**
35:10;36:2;46:10,
25;47:4;49:25;50:13;
52:8
**meant (1)**
23:3
**medical (6)**
7:7;19:25;24:5;
28:5;35:13;46:11
**medulla (4)**
46:19,20,22;47:22
**members (1)**

**26:20**
**mention (1)**
43:10
**mentioned (4)**
36:8;46:6;52:15;
55:22
**met (1)**
6:14
**midbrain (2)**
46:18;47:15
**middle (1)**
47:14
**might (2)**
54:14;59:3
**milliseconds (3)**
30:11,22;49:7
**Minuscript (1)**
58:23
**mispronounce (1)**
30:25
**Misrepresents (1)**
52:19
**misunderstood (1)**
22:24
**moment (2)**
30:9;39:12
**more (19)**
10:25;12:21;16:15;
19:7;21:7;22:1;24:10,
11,13,13;30:18;
37:24;44:4;47:8;
48:10;50:21;54:6;
56:10;58:13
**morning (2)**
6:11;38:6
**mortified (1)**
39:9
**most (1)**
25:16
**motor (9)**
18:9,11;20:17,22;
21:6;22:6;24:3,8,25
**much (5)**
10:25;22:20;47:6;
49:19;56:10
**multi-vehicle (1)**
27:22
**myself (2)**
39:9;47:19

## N

**name (2)**
6:11;23:7
**nature (1)**
21:10
**necessarily (4)**
26:13,14;34:21;
44:8
**neck (5)**
30:6;36:20,23;
48:14,14
**need (6)**

**11:25;14:4;33:10;**
58:24,25;59:1
**needle (2)**
31:1;32:7
**needs (2)**
25:15;50:5
**next (1)**
48:1
**night (1)**
38:6
**nitty- (1)**
21:22
**None (1)**
56:13
**note (3)**
35:22;36:7;42:12
**notes (1)**
13:24
**notice (3)**
7:9,10,19
**noticed (2)**
39:7;45:1
**November (1)**
20:11
**number (9)**
13:23;20:9;23:13;
27:11;32:5;37:17;
52:6,8,14
**numbers (2)**
33:8;52:4

## O

**Object (1)**
52:18
**obtain (1)**
11:14
**obvious (1)**
17:10
**obviously (7)**
7:21;11:5;14:22;
16:7;34:6;53:18;54:5
**occipital (1)**
42:5
**occur (2)**
30:22;32:9
**occurred (5)**
11:9;20:17;30:8;
37:16;49:3
**occurring (1)**
8:14
**off (6)**
30:17;38:14;40:17;
43:2;47:14;50:7
**office (3)**
6:16;11:16;52:10
**officers (1)**
28:4
**off-the-record (3)**
50:8,23;58:19
**once (1)**
30:15;48:19;49:6
**one (27)**

**6:16;12:14;18:23;**
19:1;21:6;23:5;25:21;
29:18;30:15;33:1;
34:10,14;38:1,8;39:8,
9;41:20;45:1,3,4;
46:6;47:8;50:21;52:7;
53:5;57:11;58:13
**ones (1)**
33:14
**only (8)**
11:17;17:12;21:24;
37:10,24;45:4;54:24;
55:8
**open (1)**
41:24
**opening (1)**
42:6
**opined (1)**
30:5
**opinion (8)**
30:12;45:12,13,16,
19;53:16;56:14;58:14
**opinions (16)**
6:25;11:9;13:21,25;
16:8,10;23:17,21;
29:14;38:11;45:9;
53:8,19,21;54:3;57:4
**Orders (1)**
58:21
**ordinary (1)**
36:8
**organ (1)**
35:11
**organization (1)**
36:24
**organs (4)**
35:19,23;36:3;
48:14
**others (1)**
22:14
**Otherwise (1)**
35:25
**out (17)**
9:19;15:14;17:23;
21:10;23:16;24:9;
33:4;34:2;35:11,20;
36:3,7;47:2,8;48:22;
54:18;56:17
**outside (1)**
23:9
**over (5)**
19:12;20:10,14;
46:2;47:24
**overall (2)**
20:23;33:3
**own (4)**
8:25;11:19;18:19;
26:17

## P

**package (1)**
59:7

**packet (2)**
51:15,16
**pages (3)**
10:22,24;13:23
**pain (5)**
29:12,16;30:1,18;
50:20
**paragraph (2)**
35:5;43:11
**pare (1)**
13:22
**part (4)**
38:2;45:14;48:13;
53:11
**partial (1)**
43:22
**particular (1)**
32:23
**parties (1)**
6:24
**passenger (1)**
21:20
**paste (2)**
13:21,22
**pathology (1)**
24:19
**pattern (2)**
37:11,15
**PDF (2)**
59:6,7
**PEA (3)**
49:22,24;50:4
**people (2)**
34:5;50:10
**percent (4)**
17:3,3,4,7
**percentage (5)**
16:25;17:5;20:20,
23;21:18
**Perfect (1)**
53:17
**perform (2)**
20:1;21:11
**performed (9)**
6:22;7:4;14:11,13;
15:9;22:5,17;23:3;
35:7
**performing (1)**
10:3
**periorbital (1)**
43:23
**person (3)**
32:8;33:24;40:10
**pertinent (1)**
45:9
**petrous (5)**
38:20;39:2,3,4;41:1
**phone (1)**
12:14
**photograph (9)**
31:24;32:23;33:3;
45:2,7;46:15;47:9;
48:1,7

**photographer (1)**
9:22
**photographs (11)**
9:19,20;10:3,7,8,9;
31:7,12;33:1;43:18;
52:2
**photos (4)**
10:7,19;39:8;51:20
**physiologically (1)**
34:11
**pickup (1)**
23:13
**picture (6)**
31:19;39:20,21,23,
24;40:1
**pictures (1)**
57:20
**placed (2)**
31:1;34:12
**plaintiff (2)**
17:1,4
**plaintiffs (3)**
6:20;7:5,18
**plaintiff's (2)**
8:18;12:7
**plan (1)**
29:14
**plastic (1)**
55:20
**plausible (2)**
56:23;57:1
**plenty (1)**
34:5
**point (3)**
30:1;47:8;50:19
**police (2)**
28:3,10
**pons (3)**
46:18,22;47:21
**pontomedullary (4)**
46:7,19;47:12,23
**poorly (1)**
23:2
**pop (1)**
42:6
**portion (2)**
47:25;56:3
**portions (2)**
46:18,22
**position (1)**
27:12
**positioned (2)**
29:3,5
**positive (1)**
19:22
**potentially (1)**
37:24
**predisposed (1)**
35:18
**preferences (1)**
58:22
**preparation (1)**
8:16

**preparing (2)**
8:21;13:13
**pressure (4)**
32:9;34:1,7;48:17
**pretty (5)**
24:18,18,22;45:25;
49:16
**prevent (1)**
28:14
**previous (1)**
43:11
**printed (1)**
9:19
**prior (7)**
6:17,20;18:1,17;
19:1;21:5;29:3
**probably (11)**
11:19;17:14;18:13;
19:11,14;20:6,8,11;
24:11,11,13
**problem (1)**
38:16
**processes (1)**
36:9
**pronounce (2)**
6:7;42:14
**pronounced (1)**
24:1
**properly (1)**
12:21
**provided (4)**
7:17;9:4;12:25;
16:8
**providers (1)**
28:5
**Public (1)**
10:16
**pulse (2)**
50:1,1
**pulseless (2)**
49:24;50:12
**punch (1)**
9:14
**purchase (1)**
23:15
**push (3)**
43:2;48:17,21
**pushed (2)**
30:17;58:4
**pushes (1)**
56:25
**pushing (3)**
34:2;42:5;56:8
**Put (11)**
8:9;27:4;35:20;
38:8,12;40:5,13,14,
15,16,21

---

**Q**

**qualified (2)**
53:18,21
**qualifier (2)**

35:8;36:18
**quickly (2)**
14:8;49:16
**quote-unquote (1)**
48:11

---

**R**

**raccoon (4)**
43:21,22,23;44:7
**ranged (1)**
20:8
**rapid (1)**
30:13
**read (5)**
10:18;27:25;31:10;
36:13;38:18
**real (1)**
14:8
**realized (2)**
14:22,23
**really (13)**
12:12;15:19;20:23;
29:11,13;34:9,23;
47:6;48:9;50:13;53:7;
54:10;56:10
**rear (3)**
27:10;28:19,25
**re-ask (1)**
26:2
**reason (2)**
32:2;35:8
**reasons (1)**
17:10
**recall (13)**
14:7;19:18;21:8;
22:5,8,14;23:5;28:9,
10;29:1,7;32:6;53:9
**recalled (1)**
52:16
**receive (2)**
10:19,24
**received (2)**
9:19;16:18
**Recess (1)**
49:17
**recollection (1)**
26:25
**record (3)**
33:8;38:8;50:7
**records (1)**
49:19
**reference (1)**
49:21
**referred (1)**
33:13
**referring (4)**
26:11,12;33:15;
48:24
**reflect (1)**
52:14
**regard (4)**
11:9;36:6;45:17;

53:22
**regarding (3)**
27:18;29:15;53:19
**region (1)**
36:15
**related (3)**
11:11;22:6;34:14
**relying (1)**
15:22
**remarkable (1)**
32:1
**remember (6)**
14:5;22:5;23:8,8;
52:24;53:5
**remove (2)**
35:23;47:18
**removed (3)**
29:9;31:6;48:14
**removing (1)**
47:16
**render (1)**
34:19
**renders (1)**
34:24
**rent (3)**
48:4,4,6
**report (23)**
10:12,12,20,22;
11:15,20;12:11,13,17,
22;15:14;21:16,17;
27:14,19,20;28:10;
30:5;35:1;41:8;42:12,
16;43:11
**REPORTER (4)**
51:18;58:21;59:1,5
**reports (1)**
16:8
**represent (2)**
6:11;52:5
**request (4)**
9:23;10:4;22:21;
40:4
**respiratory (1)**
50:11
**responded (1)**
28:4
**responders (2)**
28:4;49:20
**responds (1)**
12:14
**responsive (2)**
7:18;8:1
**rest (2)**
11:18;47:3
**restraint (1)**
37:23
**restroom (1)**
49:11
**result (3)**
31:17;44:8,9
**resulting (1)**
24:3
**Results (1)**

35:6
**retained (15)**
6:24;7:4,6,22;8:6;
10:25;13:17;16:14,
19;17:1,25;19:16,20,
22;54:11
**retired (3)**
14:14;16:21,22
**review (1)**
14:22
**Reviewed (3)**
13:3,22;54:7
**reviewing (2)**
14:23;38:7
**Rick (1)**
6:11
**ridden (1)**
26:23
**ridge (5)**
38:20;39:2,3,4;41:1
**riding (1)**
45:3
**right (88)**
8:9,10;11:24;12:12,
16,22;13:11,15,18;
15:6;17:18,21;18:25;
19:24;22:23;23:11;
27:5;28:18;29:21,24;
34:25;35:1,1,2,5;36:5,
12;37:1;38:19,20,24;
39:1,13,16,20,21;
40:14,24;42:18,22,25;
43:4,12,16,23,24;
44:3,7,14,18,19,24;
47:13;48:15;49:6,9,
11;50:15;51:5,13,15;
52:1;53:7;54:1,23,24;
55:3,5,8,8,13,17,18,
20,21,21,24,24;56:1,
14,15,23;57:7,18;
58:1,4,12,15
**ring (7)**
41:2,5,7,18;42:3;
43:1,2
**road (1)**
15:7
**role (3)**
11:1,3,8
**rotational (1)**
54:17
**Rough (1)**
6:12

---

**S**

**Safety (1)**
10:16
**Same (1)**
59:5
**saw (2)**
20:25;55:4
**saying (6)**
8:4;13:12;29:19;

Bryson, et al v.
Rough Country, LLC

Jonathan Eisenstat, MD
January 15, 2024

36:19;46:24;49:2

**scattered (1)**
31:10

**SCRT (9)**
10:16,20,22;11:14,
20;21:16;27:14,19,20

**seat (16)**
16:2;28:22;37:20,
23;45:2,7,14,22;55:9,
10,12,20;56:3,4,7,15

**seated (2)**
27:8,12

**second (6)**
9:25;36:22,23;
46:21;50:21;52:8

**secondary (1)**
44:10

**section (1)**
36:21

**seems (1)**
17:20

**semi (1)**
21:21

**send (1)**
11:19

**sense (4)**
12:8;34:25;36:24;
58:6

**sent (2)**
11:17,21

**separate (1)**
25:15

**sequence (3)**
36:15,17;37:5

**set (1)**
32:18

**show (6)**
39:11;41:22;42:8;
43:19;47:12;48:2

**showed (1)**
46:15

**shows (2)**
31:24;33:2

**sic (1)**
43:24

**side (21)**
30:15;39:16,17,20,
21,25;40:1;42:22,23,
25;43:16;44:3;55:18,
21;56:2,15,23;57:18;
58:1,3,4

**sides (3)**
25:13;41:7,11

**signify (1)**
32:4

**signs (1)**
48:21

**simply (2)**
42:12;44:2

**simultaneous (2)**
49:3,5

**single (1)**
35:11

**single-vehicle (1)**
27:23

**sit (2)**
15:8;22:4

**sixth (1)**
52:9

**skin (1)**
31:16

**skull (8)**
25:15;38:9;40:18;
43:2,16,17;44:5,8

**slowed (1)**
20:13

**small (2)**
31:10;46:3

**Snyder (1)**
19:8

**soft (2)**
43:17,20

**Sometimes (6)**
21:13,16,17,18;
48:4;53:24

**son's (1)**
55:5

**sorry (6)**
22:24;25:25;26:2;
40:8;41:3;58:13

**sort (7)**
12:20;21:21;24:21;
25:3;37:18;48:3;
54:19

**South (1)**
22:12

**speak (1)**
53:13

**Speaking (1)**
52:4

**specific (5)**
25:2;37:25;38:1;
54:3,4

**specifically (2)**
52:24;53:5

**sphenoid (2)**
38:12,19

**spinal (4)**
42:1,1;46:20;47:23

**spine (10)**
25:15;30:17;39:14;
41:6;42:3,6,6;43:3;
46:17;48:14

**spoke (2)**
14:21,22

**spoken (2)**
16:4;28:3

**stack (1)**
33:6

**stand (1)**
49:22

**stands (1)**
49:24

**started (2)**
17:12;18:18

**starts (2)**

23:9;52:6

**State (6)**
8:14;12:3,13;31:10;
35:6;52:17

**stated (1)**
48:18

**states (1)**
53:4

**sticker (1)**
8:9

**still (7)**
8:14;29:6;47:4;
48:16,21;50:2,17

**stop (1)**
39:19

**straight- (1)**
45:25

**straightforward (1)**
46:1

**straps (1)**
46:2

**strong (1)**
25:12

**struck (1)**
56:15

**subarachnoid (2)**
34:15;47:25

**suffer (1)**
34:15

**suffered (4)**
29:25;34:19;53:20;
55:7

**suffering (6)**
29:12,16;30:2,18;
50:19,20

**summaries (1)**
46:6

**summarize (1)**
20:3

**supply (1)**
8:2

**support (1)**
33:25

**sure (63)**
6:14;7:24;8:19;
10:1;11:2,7;12:8,21;
14:19;15:17,18;
16:17;17:11,21;
18:13,16;19:10;20:3,
5;21:1,15;22:3,11;
23:18;24:16,23;25:5,
8;27:7;31:23;32:16,
19,22;34:13;35:10;
36:4;37:19;38:5;40:9,
20,23;41:23;42:10;
43:4;44:20;45:11;
47:10;49:13,24;50:6,
22;51:14;53:2;54:8,
12,22;55:16;56:9,12,
21;57:3,10;59:4

**surface (2)**
58:9,11

**suspect (1)**

27:15

**sworn (1)**
6:2

---

**T**

**talked (1)**
49:19

**talking (5)**
17:18;33:21;46:15;
54:14,20

**tear (1)**
46:12

**technicians (1)**
47:18

**Tedra (1)**
18:20

**temporal (8)**
38:12,22,23,24;
40:25;42:24;43:5;
44:3

**ten (2)**
19:12,14

**terms (2)**
46:11,12

**tested (1)**
51:2

**testified (3)**
6:3;28:1;55:4

**testimony (3)**
7:5;15:23;52:19

**thanks (2)**
41:20;53:1

**Thereupon (8)**
7:12;9:10;13:8;
50:8,23;51:10,23;
58:19

**thighs (4)**
31:8,11;37:22;46:2

**third (1)**
46:21

**though (2)**
15:8;35:25

**thought (2)**
37:3;51:7

**three (4)**
17:15;18:7,25;
46:18

**three-page (1)**
10:12

**throughout (1)**
52:14

**time-wise (1)**
36:25

**tiny (1)**
34:4

**tissue (1)**
51:1

**tissues (3)**
43:18,20;44:6

**today (18)**
6:17,20;7:3,15;
8:21,22;9:5;11:1,3,8;

15:8,23;22:1,4,14,21;
23:22;29:20

**together (2)**
34:8;39:5

**took (4)**
9:21,22;10:3;20:10

**top (6)**
39:23,24,25;40:15,
17,18

**topic (1)**
34:14

**total (2)**
19:1,12

**totality (1)**
17:2

**transection (2)**
46:25;47:1

**trauma (16)**
25:22;26:13,15;
30:9;35:12,13,14;
36:19;43:4,7,14,15;
44:2,9;45:20;47:18

**traveling (1)**
28:8

**trial (2)**
12:4;21:25

**truck (2)**
21:21;23:19

**trucks (3)**
22:13;23:13,13

**true (1)**
46:11

**try (1)**
13:22

**trying (3)**
20:2;38:1;53:7

**tumor (1)**
35:17

**turned (12)**
55:5,12,21,23,25;
56:1,13;57:16,18,24;
58:1,14

**turns (1)**
46:20

**two (8)**
17:14,15;18:6,24;
32:5,25;37:21;51:7

**type (3)**
34:18;37:11,22

**types (5)**
21:19;23:4;25:6;
35:18;50:11

---

**U**

**unconscious (4)**
34:19,24;49:7;
50:19

**under (4)**
31:16;35:5;36:12;
39:1

**underlying (1)**
38:18

D'Amico & Associates, Inc.
www.DamicoAssociates.com

**underneath (2)**
39:2;43:20
**understood (1)**
26:8
**unhealthy (1)**
36:10
**up (4)**
9:15;14:6,8;49:15
**upon (2)**
15:22;34:20
**upper (2)**
43:12;48:13
**upset (1)**
18:20
**use (2)**
36:19;49:10
**usually (7)**
21:10,24;23:17;
35:11,12;39:10;51:5

**V**

**vehicle (25)**
18:9,11;20:17,22;
21:6,20;22:6,7;23:5;
24:3,9,25;26:17,23;
27:9,10;28:20;29:6,9;
52:17;53:9,12;54:19;
56:6,25
**vehicles (9)**
10:19;15:25;21:7,
11,19;22:13;26:21;
52:23;53:22
**vein (2)**
32:6,11
**venules (1)**
34:5
**versa (1)**
47:3
**versus (1)**
17:6
**vessel (1)**
33:21
**vice (1)**
47:3
**view (1)**
45:3
**visual (1)**
40:10
**vital (1)**
48:21
**vitals (1)**
49:22

**W**

**waffle (2)**
37:14,15
**way (17)**
14:12;27:4;29:18;
30:20;34:10;36:1,10;
39:15,18;42:13;43:5;
44:13;45:8;48:8;

**55:23;56:4,25
ways (1)**
50:17
**wearing (1)**
7:3
**week (1)**
12:25
**Weinberg (1)**
19:16
**weird (1)**
35:17
**well-known (1)**
25:3
**what's (2)**
35:8;47:19
**Wheeler (1)**
19:17
**whenever (1)**
47:17
**white (1)**
47:21
**whole (2)**
33:6;59:7
**wings (1)**
56:3
**within (6)**
11:5;25:4;30:11,22;
39:4;49:7
**without (2)**
25:13,22
**witness (15)**
15:2,2,3,9;28:15;
32:25;33:9,16,19;
40:11;45:10;49:13;
50:7;51:19;57:10
**Wooten (5)**
18:21,24;19:6,9,11
**word (3)**
9:25;31:1;42:14
**work (7)**
6:23;8:13;11:23;
17:2;18:18;39:10;
54:6
**worked (3)**
16:22;18:1,4
**wrap (1)**
49:15
**wrong (3)**
6:13;38:9,14
**wrote (1)**
51:20

**Y**

**year (10)**
14:7;17:14;20:1,7,
9,12,15;51:6;52:7,11
**years (8)**
17:15,20;19:12,14;
20:7,9,14;51:7
**Yep (1)**
6:9

**Z**

**zoomed (1)**
39:8

**1**

**1 (3)**
7:8,13;32:5
**10:19 (1)**
59:8
**100 (5)**
17:20;20:11,15;
24:12,13
**1198 (1)**
51:16
**1222 (1)**
51:16
**13th (1)**
10:13
**15 (1)**
17:4
**1st (1)**
17:23

**2**

**2 (2)**
9:11,13
**20 (2)**
17:4,19
**2006 (1)**
20:4
**2015 (2)**
19:15;20:11
**2020 (2)**
10:13;52:7
**2022 (2)**
17:18;20:13
**21 (1)**
17:19
**22 (2)**
17:19,24
**250 (2)**
20:6,8

**3**

**3 (2)**
13:6,9
**31st (1)**
17:23
**325 (1)**
20:9
**33 (3)**
32:19;52:2,5
**35 (1)**
33:1
**36 (1)**
33:3
**3955 (1)**
13:1

**3961 (1)**
13:1

**4**

**4 (4)**
27:11;51:11,15,17
**41 (1)**
48:13
**44 (1)**
47:13
**45 (1)**
48:1
**46 (1)**
48:7
**48 (2)**
39:11;40:13

**5**

**5 (2)**
51:24;52:1
**50 (4)**
24:11;32:20;52:3,3

**6**

**6,710th (1)**
52:10

**8**

**80 (1)**
17:3
**85 (1)**
17:3

**9**

**95 (1)**
17:7
**99 (1)**
17:7