Case 2:22-cv-00017-RWS   Document 102-2   Filed 09/05/24   Page 1 of 251
Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 1

1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF GEORGIA
2                       GAINESVILLE DIVISION
3
4    SANTANA BRYSON AND JOSHUA BRYSON,
     AS ADMINISTRATORS OF THE ESTATE OF
5    C.Z.B., AND AS SURVIVING PARENTS OF
     C.Z.B., A DECEASED MINOR,
6
         Plaintiffs,
7    v.                         CASE NO. 2:22-CV-017-RWS
8    ROUGH COUNTRY, LLC,
9        Defendant.
10
11
12
             The videotaped deposition of PAUL LEWIS,
13
         JR., M.S., BME, taken on behalf of the Defendant,
14
         taken pursuant to agreement of counsel, taken for
15
         all purposes authorized by the Federal Rules
16
         of Civil Procedure; the reading and signing
17
         of the deposition being waived; taken before
18
         Leita J. Seaborn, Certified Court Reporter,
19
         commencing at 10:38 a.m., on this the 18th day
20
         of March 2024, at the law offices of Cannella
21
         Snyder, LLC, 315 W Ponce de Leon Ave, Suite 885
22
         Decatur, Georgia.
23
24
25

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

```
                                                Page 2

 1                     A P P E A R A N C E S   O F   C O U N S E L :

 2

 3    For  the  Plaintiff:

 4         Tedra  Cannella,  Esquire
           Cannella  Snyder  LLC
 5         315  W  Ponce  de  Leon  Ave
           Suite  885
 6         Decatur,  Georgia    30030

 7    For  the  Defendant:

 8         Richard  H.  Hill,  II,  Esquire
           Weinberg,  Wheeler,  Hudgins,
 9         Gunn  &  Dial,  LLC
           3344  Peachtree  Road,  N.E.
10         Suite  2400
           Atlanta,  Georgia    30326
11         404-876-2700

12    Also  Present:   David  Ramirez,  Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:22-cv-00017-RWS   Document 102-2   Filed 09/05/24   Page 3 of 251
Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 3

```
 1    1                    C O N T E N T S

 2    2

 3    3                 EXAMINATION INDEX

 4    4

                                                    PAGE

 5    5   PAUL LEWIS, JR., M.S., BME
                BY MR. HILL                            4

 6    6         BY MS. CANNELLA                       187
                BY MR. HILL                          188

 7    7

 8    8

                         EXHIBIT INDEX

 9    9

10   10

                                                    PAGE

11   11   Defendant's Exhibit No.

12   12   Exhibit 1     Fourth Amended Notice          5

13   13   Exhibit 1A    Surrogate/Exemplary Study      8

14   14   Exhibit 1B    Supplemental Report           20

15   15   Exhibit 2     Curriculum Vitae              27

16   16   Exhibit 3A    Rule 26                       30

17   17   Exhibit 4     Invoices                      43

18   18   Exhibit 5     Supplement to Plaintiff's     48

19   20                 Initial Disclosures

20   21   Exhibit 6     Mr. Lewis's Report            52

21   22   Exhibit 7     3-15-24 Supplemental Report  138

22   23   Exhibit 8     Testing Data Set             163

23   24   Exhibit 9     Wichita State University Test 180

24

25   25
```

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 4

1                          PROCEEDINGS

2          (Video On)

3          THE VIDEOGRAPHER:  We are on the record, and

4     the time is approximately 10:38 a.m.  This is the

5     beginning of the videotaped deposition for Paul

6     Lewis, Jr.

7          Would counsel present please identify

8     themselves and who they represent for the record.

9          MS. CANNELLA:  Tedra Cannella for the

10    plaintiffs.

11         MR. HILL:  Rick Hill for defendant Rough

12    Country.

13         THE VIDEOGRAPHER:  Thank you, Counsel.

14         Would the court reporter please swear in the

15    witness.

16         THE COURT REPORTER:  Would you raise your

17    right hand, please, to be sworn.

18   THEREUPON:

19              PAUL LEWIS, JR., M.S., BME,

20   was called as a witness, and having been first duly

21   sworn, was examined and testified as follows:

22                         EXAMINATION

23   BY MR. HILL:

24         Q.  Thank you, Mr. Lewis.  Good morning.

25         A.  Good morning.

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 5

1          Q.  I'd like to start -- you've produced some

2     documents this morning, so I want to start by going

3     over what you've brought with you today and what you've

4     produced to us today and make sure we're on the same

5     page with regard to what you relied upon in giving your

6     opinions in the case.

7          A.  Okay.

8          Q.  So I'll start with just the Notice of

9     Deposition, just so we have it in the record.  We can

10    mark that as Exhibit 1.  I have a copy, but it looks

11    like you have it.

12         A.  I do.

13         Q.  It's the fourth amended notice.  We can mark

14    that as Exhibit 1.

15              (Defendant's Exhibit No. 1 was marked for

16              identification.

17              MS. CANNELLA:  And just for the record,

18         Mr. Hill, we didn't do an objection to this one,

19         but it's the same objections as before since it's

20         only been date --

21              MR. HILL:  That's fine.  They can apply to --

22              MS. CANNELLA:  Great.

23              MR. HILL:  And I don't know if you need a copy

24         of the court reporter can use this as an exhibit

25         or whatever.

Paul Lewis , Jr., M.S., BME                          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 6

1    BY MR. HILL:

2         Q.   The notice, Exhibit A, lists file material

3    that we've asked you to produce at the time of the

4    deposition or prior to the deposition by agreement of

5    counsel.  Have you reviewed that notice prior to today?

6         A.   I did.

7         Q.   And have you provided to us -- or have you

8    brought with you today everything that's responsive to

9    that notice?

10        A.   Well, I think it's a combination of the two.

11        Q.   Okay.

12        A.   What I have here, and I think there may have

13   been some additional things that I don't -- maybe don't

14   have printed out that are also produced when we sent

15   you all of my file and everything.

16        Q.   Okay.  Well, let's start with what we know

17   have been -- has been produced in the past.  We have

18   your expert report dated October 16th that was produced

19   at that time.  You brought that with you here today.

20        A.   I do.

21        Q.   And within that report on pages 3 through 4 we

22   have a list under a section called Database, Roman

23   Numeral III, and it says you've reviewed the following

24   case-specific information.  And it lists 46 specific

25   items with subparts.

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 7

1      I assume that this represents the material that
2  you reviewed in connection with preparing this report
3  dated October 16, 2023.
4      A.  That's a list of everything I had at that
5  point, yes, sir.
6      Q.  So that's everything that you have relied upon
7  in forming your opinions in that report at that time.
8      A.  As far as materials that have been provided to
9  me, I'd also conducted a vehicle inspection, as well as
10  a surrogate exemplar study too.
11      Q.  Sure.  And that was a bad question.  I meant
12  this is the material that you reviewed that had been
13  supplied to you by Ms. Cannella.
14      A.  Yes.
15      Q.  Okay.  And then we have file material that we
16  received from you that would include what you just
17  mentioned that was produced to us back on February
18  16th.  And that included your photos from your vehicle
19  examinations that you just mentioned, the surrogate
20  study that you performed in connection with the case,
21  your CV, your Rule 26 disclosure of your testimonial
22  history, and I believe your invoices and billing
23  records for this case.
24      A.  Yes.
25      Q.  Okay.  Then we have what was produced to us

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 8

1   just last Friday, on March 15th, which was a

2   supplemental report of the same date which attached two

3   studies that you reference in your supplemental report

4   plus material from the Bacho and Mendoza cases.

5        A.   Correct.

6        Q.   Okay.  And then today we've been provided with

7   a document I guess I'll mark as Exhibit -- I already

8   had my exhibits numbered, so why don't we call this

9   1-A.  And this is entitled Surrogate back slash

10  Exemplary Study, Bryson 9346 through 9347.

11          (Defendant's Exhibit No. 1-A was marked for

12          identification.)

13       Q.   When was that prepared?  It's not dated.

14       A.   It was just prepared like the other day

15  because I realized it's -- I hadn't dictated notes

16  from -- from the study or, you know, they hadn't been

17  put into typed form.

18       Q.   Okay.  And when you say "the other day," do

19  you know what day it was?

20       A.   It was, I think, sometime last -- oh, no, this

21  was this weekend.

22       Q.   Okay.  So this was prepared this weekend.  You

23  mean March 16th and 17th?

24       A.   I -- I think so, unless it was done last

25  Friday.  I don't remember specifically which day but

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                        Page 9

1    very, very recently.

2        Q.  All right.  And you said the purpose of this

3    is you did not create this contemporaneous with

4    performing your surrogate exemplar study.

5        A.  Not in the typed form, correct.

6        Q.  Okay.  And is that something you normally do

7    in your regular course is to create this

8    contemporaneously with performing the study?

9        A.  Yes, just -- well, I -- I don't create it.

10   It's dictated and then gets typed, just like my vehicle

11   exam notes as well.

12       Q.  And -- and you didn't realize till this

13   weekend that you had not done that in this case.

14       A.  Yes.

15       Q.  Okay.

16           MS. CANNELLA:  To be clear, he just typed it.

17       He had the dictation, but he typed it.

18           Right?

19           THE WITNESS:  Yeah.

20   BY MR. HILL:

21       Q.  What does that mean?  You dictated it

22   contemporaneous with the study or --

23       A.  That's what we always do, and then it just

24   hadn't been transcribed.

25       Q.  Okay.  So you just had it transcribed this

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 10

1    weekend.

2          A.  Right, because I didn't -- I realized finally

3    as I was getting ready that that wasn't in there.

4          Q.  All right.  And you performed this study back

5    in 2022?

6          A.  September of '23.

7          Q.  September of '23.  Sorry, I meant '23.

8          All right.  And you just went back and found the

9    dictation from September of 2023?

10         A.  Uh-huh (positive response).

11         Q.  And it had just never been transcribed by your

12   staff.

13         A.  Correct.

14         Q.  All right.  1-A, thanks.  And mine's just got

15   a -- kind of numbered the other one, so...

16         All right.  The second document we received for

17   the first time today starts at Bryson 9280 and runs

18   through 9345, is entitled Case Review.  When was that

19   document created?  Again, it doesn't have a date.

20         A.  Well, this -- this is a living document.  So

21   it starts from the time the case starts, and as we

22   continue to get materials, it keeps being added to.

23         Q.  Okay.  So --

24         A.  And we did produce a version of this, I'm

25   sure, back -- I forget when my depo was supposed to

Paul Lewis , Jr., M.S., BME            March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 11

1    have been.  So the only -- as far as I can remember,

2    the only real difference is I added some more

3    information to the front sheet that wasn't on that

4    previous version.

5        Q.  Okay.  So let's talk about that.  You provided

6    it in its living form to Ms. Cannella, I guess, back --

7    prior to February 16th, when your file was produced in

8    this case.

9        A.  Yeah, whenever the -- right, whenever that

10   was.

11       Q.  And -- and you say the only change to it since

12   then is some additional information on the front sheet.

13       A.  I think so.  Other -- the rest of it will be

14   just, you know, I found some misspelled words or

15   something like -- so no other substantive change.

16       Q.  Okay.  And you don't know whether it was

17   produced to us after you produced it to Ms. Cannella

18   prior to today.

19       A.  I -- I don't.

20       Q.  And, again, as of February 16th substantively

21   everything that's in this document now was in it at

22   that time.  You didn't make any substantive additions.

23       A.  Give me one second.

24       Q.  Sure.

25       A.  It looks like I've -- I've received two other

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 12

1    materials since February 16th.
2        Q.  All right.  And how do you know that?  Where
3    is that you're looking at the page?
4        A.  Because it lists a date of when materials were
5    provided.
6        Q.  Okay.
7        A.  So the last was February 14th of '24.  So
8    probably this had to be produced prior to February
9    16th, I would imagine, if that's when the depo date was
10   going to be.
11       Q.  All right.  Well -- so you were provided on
12   February 14th the two tests that you reference in your
13   supplemental report dated March 15th.
14       A.  Correct.
15       Q.  Okay.  And how did you receive those tests?
16   Who were they provided by?
17       A.  Just like everything else, by the law firm.
18       Q.  Okay.  So everything that you have listed in
19   here that you didn't generate yourself -- I mean I'm
20   excluding your own surrogate study notes or your own
21   notes.  All of the material in here you received from
22   Mr. Cannella.
23       A.  Yes, just like in any other case.
24       Q.  Sure, I understand.  But sometimes people get
25   documents from other sources or you research and find a

Paul Lewis , Jr., M.S., BME     March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 13

1    document on the Internet or something.

2         A.   Yeah.

3         Q.   That's just what I'm trying to make sure.  So

4    all of the material that you didn't actually draft or

5    create you received from Ms. Cannella.

6         A.   That's correct.

7         Q.   Okay.  Then it appears that you also received

8    on February 29th from Ms. Cannella the deposition of

9    Bryant Buchner that was taken on January 23rd, with the

10   exhibits, and Mrs. Bryson's driver's license.

11        A.   Correct.

12        Q.   So that's -- those last two things are the

13   only items that you received subsequent to February

14   16th.

15        A.   Yes.

16        Q.   Okay.  The only items on here that are

17   referenced in your supplemental report dated March 15th

18   are Items 51 and 52 on page 9283; correct?

19        A.   In addition to the Bacho and Mendoza cases.

20        Q.   Okay.  So the material that you produced

21   related to Bacho and Mendoza, where did that come from?

22        A.   From my files.

23        Q.   Okay.  So you had that material prior to

24   February 16, 2023.

25        A.   Yeah, I've had it for almost 20 years.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 14

1      Q.   Right.  And so you had it prior to the time of

2   your expert disclosure on October 16th of 2023.

3      A.   Of course.

4      Q.   Right.  And you had it at the time that you

5   created your report dated October 16, 2023.

6      A.   Yes, certainly did.

7      Q.   So the only new material since February 16,

8   2024, is the deposition of Bryant Buchner and

9   Ms. Santana's -- I meant Mrs. Bryson's driver's

10  license.

11     A.   Yes.

12     Q.   Okay.  There's a reference on the last page of

13  this document, 9345, to the deposition of Mr. Buchner

14  and Mrs. Bryson's driver's license.  And so that was

15  added at some time, I guess, after February 29, 2024?

16     A.   Say that one more time?

17     Q.   You had mentioned there's no substantive

18  changes --

19     A.   Oh.

20     Q.   -- to the first page.  Would that be a

21  substantive change to this document since February 16,

22  2024?

23     A.   Since February 16th?

24     Q.   Right.

25     A.   Yes.

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 15

1      Q.   Okay.

2      A.   I mean just listing there, but that's all.

3      Q.   Okay.  And you say here on page 9345 that you

4  reviewed the deposition of Bryant Buchner but you did

5  not transcribe anything related due to time

6  constraints.

7      A.   I briefly skimmed it.  And frankly, yeah,

8  after that depo got cancelled that kind of got pushed

9  off.  And so I haven't gone and fully dictated it or

10 anything even up to today.

11     Q.   Okay.  At the time that you drafted your

12 October 16, 2023 report, had you received documents

13 related to Mr. Buchner's review and opinions in the

14 case?

15     A.   Yes, because I mean I even quoted his

16 reconstruction all in my -- in the report, which was

17 the 46th item.

18     Q.   Right.  And so the only additional information

19 related to Mr. Buchner since that time was the receipt

20 of his transcript of his deposition.

21     A.   And the exhibits.

22     Q.   Yeah, sure.

23     All right.  When was the final version of -- and

24 this we've marked as Exhibit 1 to the case review, the

25 one that was produced today for the first time -- when

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 16

1   was it finalized?

2        A.  Past week or so, I guess.

3        Q.  You're not sure of the exact date that it was

4   finalized.

5        A.  No, I don't try to keep up with that.  And

6   it's -- technically it's not finalized because I'm sure

7   I'll still continue to get materials.  But as far as

8   what's listed there, I mean probably in the -- you

9   know, at least the past week or maybe a little before

10  that.

11       Q.  Okay.  As far as in its current form.  I

12  understand it's a living document and you might add to

13  it.  But its current form existed sometime last week.

14       A.  At least.  It may have been --

15       Q.  May have been earlier?

16       A.  May have been two to three weeks, yeah, may

17  have been two weeks ago.

18       Q.  Okay.  Did you have an expectation that it

19  would be produced to us on February 16th with the rest

20  of your file?

21       A.  You know, I guess I would -- I assumed.  But,

22  you know, again, I don't know what (indicating) people

23  do.  I just provide what I'm asked for.

24       Q.  Right.  But you did provide this to

25  Ms. Cannella prior to February 16, 2024.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 17

1        A.  With -- again, for the most part, the body of
2    it was the same.  I think realistically just as I was
3    going through I added a few things on the front.
4        Q.  Sure.
5        A.  But that's -- you know, and then as you
6    pointed out, the two or three other items at the end.
7    That's really all.  The rest of it is the same.
8        Q.  But whatever version of it existed on February
9    16th, you provided that to Ms. Cannella.
10       A.  I did, yeah.
11       Q.  Okay.
12       A.  I mean there's no -- you know, I don't know
13   just really a conspiracy here.  I mean there's no
14   opinions of mine in there or anything else.  It's just
15   underlying data basically.
16       Q.  Okay.  And so there is certain information
17   that I gleaned from it that I reviewed that you've also
18   included in your report.
19       A.  Of course, yes.
20       Q.  And so anything that's important that's in
21   here that relates to your opinions you've included in
22   your report or referenced it in one of your two
23   reports.
24       A.  If I had it before, yes.  I mean, obviously,
25   my first report there's been a few items I've received

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 18

1    since then that certainly weren't included in the first

2    report.

3        Q.   Sure.  But whatever existed that you had at

4    the time of your first report, that was contained

5    within Exhibit 1-B that you felt was important to your

6    opinions, you referenced it in your report.

7        A.   Yes.

8        Q.   And then your supplemental report -- just to

9    be clear, make sure -- the only two items you received

10   prior -- or I guess four items you received prior to

11   your supplemental report are the test data listed at

12   Paragraph 51 and 52 and the deposition of Mr. Buchner

13   with exhibits and then Mrs. Bryson's driver's license.

14       A.   Correct.

15       Q.   Did you ask for Mrs. Bryson's driver's

16   license?

17       A.   I don't think I did.  I think they just sent

18   it to me.

19       Q.   Okay.  And are you relying upon it for any of

20   your opinions in the case?

21       A.   Well, I mean it's a part of multiple data

22   points I have of what her height and weight is.

23       Q.   Yeah.  So it just confirmed that you already

24   had that information from her medical records.

25       A.   Well, like it has listed here, I have a number

Paul Lewis , Jr., M.S., BME        March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 19

1    of different spots.

2         Q.  Sure.  All right.

3         Was there anything about your review of

4    Mr. Buchner's deposition that relates to your

5    supplemental report?

6         A.  No.  I think it was just basically going

7    through, you know, obviously following the bases of his

8    report, which I had that information and some of the

9    scans which we utilized.

10        Q.  Sure.  But there was nothing in that

11   transcript that changed or altered any of your opinions

12   in the case.

13        A.  No.

14        Q.  Okay.  Did you ask for the two tests under

15   Paragraphs 51 and 52 that you received from

16   Ms. Cannella?

17        A.  No.  I mean in general I just receive

18   materials over the course of time, so...

19        Q.  So she sent those to you just out of the blue.

20   It was not solicited by you.

21        A.  Well, that's what I just answered, didn't I?

22        Q.  I'm just making sure.

23        A.  Yeah.

24        Q.  Yeah.

25        Did she tell you where she obtained those

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 20

1   documents?

2        A.  I don't think so.

3            (Defendant's Exhibit No. 1-B was marked for

4        identification.)

5        Q.  Let me see that back real quick.

6            MR. HILL:  Sorry, I just got this, so there

7        may be some delays in questioning on it.

8            MS. CANNELLA:  The case review we provided

9        for, Cathy said she gave you those Bates numbers?

10           MR. HILL:  Yeah, those were not this case

11       review.  The Bates numbers she gave me were the

12       case review in the Bacho case.  They were not in

13       the case review for this case.

14           MS. CANNELLA:  Oh.  The 9142 through 9176?

15           MR. HILL:  Yeah.  That's in Bacho.  That's not

16       for this case.

17           MS. CANNELLA:  Oh, okay.

18           MR. HILL:  Same with the surrogate study, 9177

19       through 9178.  That was for Bacho, not for this

20       case.

21           MS. CANNELLA:  Okay.

22   BY MR. HILL:

23       Q.  There have been a number of documents that

24   you've received in addition to the ones we just

25   discussed since your initial report dated October 16,

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 21

1    2023.  If you look at page 4 of this case review, it

2    appears that on January 18th of 2024 you received a

3    Ford production, PF Bates numbers -- I'm not sure what

4    that means -- with a date of 11/16/2023?

5              MS. CANNELLA:  Plaintiffs' Bates numbers, I

6         think.

7              MR. HILL:  Plaintiffs' Bates numbers?  Okay.

8    BY MR. HILL:

9         Q.  It's listed under Paragraph 49?

10        A.  Right.

11        Q.  Have you reviewed those documents?

12        A.  I have.

13        Q.  Then we have on January 25th you received the

14   deposition transcript for Dr. Eisenstat with exhibits;

15   is that correct?

16        A.  That is correct.

17        Q.  All right.  Those are the only two additional

18   items since your October report you've received other

19   than the four additional items we've already discussed;

20   correct?

21        A.  Yes.

22        Q.  And I assume, now that you've issued a

23   supplemental report dated last Friday, that if there

24   was anything about the Ford production or the

25   deposition of Dr. Eisenstat that would modify or change

Paul Lewis , Jr., M.S., BME                  March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 22

1    your opinions you would've included that in your

2    supplemental report dated March 15, 2024.

3         A.  Correct.  I mean, again, they're just further

4    additional support or, you know, data points, so to

5    speak.

6         Q.  Okay.

7             MR. HILL:  Just put it right here.

8         Q.  One of the items listed in your report prior

9    to -- and this is your report from October 16th of

10   2023 -- Item No. 25 is the deposition of Rad Hunsley

11   taken on August 4, 2023, with exhibits; is that

12   correct?

13        A.  Yes.

14        Q.  So you had that deposition transcript prior to

15   the time you drafted your October 16, 2023 report.

16        A.  Obviously.

17        Q.  Yeah.  Are there any additional materials

18   other than what we just discussed -- and I know we

19   talked about a lot, but I tried to keep it as brief as

20   possible -- any additional materials, data, testing,

21   anything that you've received or generated that you're

22   relying upon to give your opinions in this case?

23        A.  No.  I mean everything is basically listed in

24   1-B, in addition to the other, what I call my work

25   product.

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 23

1        Q.   Sure.  And can you generally describe what

2    you've brought with you today, what these documents are

3    here?  And I know there's a lot.  I'm not saying you

4    have to list every one, but -- and we'll maybe mark

5    that at the end of the deposition just so I know what

6    you've brought.  But can you just generally tell me

7    what you brought with you today?

8        A.   Sure.  So I brought a copy of my case review,

9    which again is just basically a chronological listing

10   of the materials I've been provided to review in the

11   case.  And then the body is just a summarization like

12   of depositions, medical records, et cetera, like I told

13   you earlier.  There's nothing that's an opinion of mine

14   that's anywhere in this.  It's just kind of like

15   basically what I call my study guide because, you know,

16   we don't keep paper files anymore, so -- you know, and

17   I never highlight, underline, or do anything.  So this

18   is just, you know, more readable form.

19       Q.   While we're taking about that, do you generate

20   that entirely by yourself, or do you have help in

21   generating that case review?

22       A.   It's a combination of myself and my staff.

23       Q.   Okay.

24       A.   But --

25       Q.   The only -- I'm sorry, I didn't mean to

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 24

1    interrupt you.

2         A.   Sorry.

3         But ultimately, even if I didn't dictate a

4    particular deposition or something, I still ultimately

5    go back through things anyway.

6         Q.   And when you say "go back through things," you

7    actually read the deposition transcript, or would you

8    rely upon the summary provided by your staff?

9         A.   I would rely on the summary.  But if there was

10   something I was looking at in the summary that I had

11   more interest and I might want to go look at context,

12   you know, I might go back and read certain pages of it.

13        Q.   The only staff person that is listed on your

14   billing is Jessica Henson, I believe.  What is her role

15   with your company?

16        A.   It's Jenica.

17        Q.   Oh, Jenica?  I'm sorry.

18        A.   Yeah.  J-e-n-i-c-a.

19        Basically support stuff.  So she helps me with

20   reviewing materials or, you know, preparing reports as

21   far as, you know, doing the typing or putting figures

22   in, things of that nature.  She's got a law degree, so

23   I'm -- I'm the only technical person.  So as far as the

24   true analysis or opinions, that's all only my work.

25   There's nobody else at the office that can help with

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 25

1    that part.

2         Q.   Okay.  So her role is to -- is what?  How

3    would you describe it?  To summarize depositions, help

4    collect materials?  She's not assisting you with

5    generating your opinions?

6         A.   No, she's not.

7         Q.   And she's not qualified to help you with

8    rendering the actual opinions.

9         A.   That's correct.

10        Q.   Okay.  If anyone else had assisted you with

11   this case, would they be listed in your billing

12   records?

13        A.   Yes.  I mean usually -- I'm surprised there

14   wasn't something maybe from Jamie Hamilton, just

15   because she's in charge of -- since all this stuff now

16   is electronic, she's who downloads and gets it listed

17   and all.  But -- and occasionally she'll review.  But

18   if there wasn't anything on there, then she must not

19   have reviewed anything so far.

20        Q.   Is she considered a secretary?  Would she be

21   listed that way in the billing?

22        A.   I think it is or -- I mean she's got a

23   paralegal degree, so...

24        Q.   Well, there was a listing for assistance from

25   a secretary, just didn't have a name.

Paul Lewis , Jr., M.S., BME                          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 26

1          A.   Yeah.  Well, and that could include also

2     typing so...

3          Q.   Okay.  Sure.  I didn't mean to interrupt you

4     but just --

5          A.   Okay.

6          Q.   -- thought we'd cover that while we're on that

7     document.

8          A.   Yeah, no problem.

9          I have a copy of both the reports.  I have the

10    vehicle exam notes and then also the photographs that I

11    took from the vehicle inspection.  I have the notes for

12    the surrogate study which we've talked about.  I didn't

13    realize they hadn't printed the photos for me, but I

14    think we're trying to get a copy just so I have them on

15    hand, but you should already have those photos.

16         Q.   And that's the photos from the surrogate

17    study.

18         A.   Correct.

19         And then billing, Rule 26, which is -- I think

20    there's been a few things since then.  And then, like I

21    said, the two Bacho and Mendoza file materials that

22    we'd already sent you.

23         Q.   That's what you brought with you today.

24         A.   Well, and I had the notice too.

25         Q.   Yeah, sure.  All right.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 27

1          Did you bring with you a updated CV?

2          A.  I didn't, but it's -- what you have is -- is

3     the current.

4          Q.  Sure.  I'll just go ahead and mark that as

5     Exhibit 2 --

6               (Defendant's Exhibit No. 2 was marked for

7               identification.)

8          Q.  -- so we'll have it.  And do you need a copy?

9     Here we go.  I'm sorry.

10         A.  I mean I should know it.

11         Q.  Yeah.  All right.

12         So this is Exhibit 2.  It's Bates labeled Bryson

13    144 through 1450.  It's not dated, but you say that

14    it's -- and your belief is that this version that

15    would've been supplied back in October of 2023 is

16    current and up to date.

17         A.  Yes, there hadn't been anything added.

18         Q.  Sure.  And it -- this CV that was produced

19    then is a -- contains all of the experience, education,

20    and training that you've undergone that you intend to

21    rely upon in giving your opinions in this case.

22         A.  As well as publications as well, yes.

23         Q.  And the publications are listed in the CV

24    that's been marked as Exhibit 2.

25         A.  They are.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 28

1      Q.  And just real quick, I mean you've owned your

2  own consulting firm since 2011.

3      A.  Correct.

4      Q.  And you've mentioned a few employees of the

5  firm.  How many employees do you have?

6      A.  Counting myself, four.

7      Q.  And you've mentioned two others.  Who's the

8  fourth?

9      A.  Chris Olley, O-l-l-e-y.  And he's just, you

10  know, like copy guy.  And when we do surrogate work and

11  all, he goes -- he tries to find the vehicles and

12  things of that nature.  So he doesn't really work the

13  files, so to speak, or anything.

14      Q.  Right.  And if he's involved -- do you bill

15  for his time?

16      A.  I do.

17      Q.  Okay.  And so if he had been involved in this

18  case, you would expect his name to be in the billing

19  records.

20      A.  Yes.

21      Q.  And, again, just to be clear, you're the only

22  employee of your firm who is qualified to actually

23  render biomedical opinions.

24      A.  That's correct.

25      Q.  Okay.  Sorry, I'm dealing with COVID rebound,

Paul Lewis , Jr., M.S., BME            March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 29

1   so I have a little COVID brain.  If I am slow today, I

2   apologize.

3          A.  That's all right.

4             MR. HILL:  You've had it three times?

5             THE COURT REPORTER:  No, I was going to say

6       it's 3 if you're marking that.

7             MR. HILL:  Exhibit 3.  I was like good gosh, I

8       hope you haven't had it three times.

9             THE WITNESS:  I've had it three times.

10   BY MR. HILL:

11         Q.  I don't know if I have an extra copy of that,

12   but you brought a copy today; right?

13         A.  Of the Rule 26?

14         Q.  Yeah.

15         A.  I do.

16         Q.  Do you mind letting me have that?  Sorry.

17         All right.  So you indicated that the version you

18   brought today may be updated a little bit from the one

19   from October of 2023?

20         A.  No.  I -- the one I have even here is still

21   missing probably a couple of testimonies.

22         Q.  Okay.  It's just missing the stuff that you

23   might've done between October of last year and today.

24         A.  Oh --

25         Q.  Or some -- some of them.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 30

1      A.   No.  This one's got December '24.  Yeah,

2   there's some depos in '24.

3      Q.   All right.  Well, why don't we mark that one

4   as 3-B or 3-A, whatever -- whatever makes more sense.

5           MS. CANNELLA:  3-A.  Okay.  You want me to get

6        some copies of this?

7           MR. HILL:  I'm not -- no, I'm not worried

8        about it.  I'm not going to belabor this.

9           (Defendant's Exhibit No. 3-A was marked for

10       identification.)

11  BY MR. HILL:

12     Q.   In the version that we received back in

13  October there were no cases where you had testified in

14  a case involving Ms. Cannella.  Has that changed since

15  October of 2023?

16     A.   No.  I think this is the only case I have with

17  her.

18     Q.   Okay.  And you've testified in the past that a

19  hundred percent of your work is in litigation, cases

20  like we're here today?

21     A.   That's correct.

22     Q.   And that's still true.

23     A.   It is.

24     Q.   And that's been true since 2011, when you

25  started your own firm?

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 31

1        A.  Oh, absolutely.

2        Q.  Okay.

3        A.  It was true even before I started my firm or

4    the other firm.

5        Q.  So that goes back to when you -- does that go

6    all the way back to when you began as a consultant in

7    1999?

8        A.  Well, I started at Burton and Associates in

9    '98.

10       Q.  Yeah, well, '98.  Sorry.

11       A.  Yeah.

12       Q.  Okay.  So the entire time you've been a

13   consultant a hundred percent of your activities have

14   been in connection with litigation like we have here

15   today.

16       A.  It ultimately all did --

17       Q.  Right.

18       A.  Even if I did some research, ultimately it was

19   used in litigation as well.

20       Q.  Sure.  And you testified in the past that

21   about 90 percent of your work over that time period has

22   been for plaintiffs.

23       A.  That's correct.

24       Q.  And that's still accurate today --

25       A.  Yes, sir.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 32

1          Q.   -- right?

2          And you were retained by counsel for the plaintiff

3    in this case, Ms. Cannella?

4          A.   Yes.

5          Q.   That's correct?

6          And you said this is the first time you've handled

7    a case with her.

8          A.   I believe so, yes.

9          Q.   Okay.  And I believe you've testified that

10   since 1998 -- sorry, get the date wrong -- that you've

11   probably given several hundred depositions.

12         A.   At this point well over a thousand.

13         Q.   Right.  That's what I thought.

14         And how many times have you testified in trial?  I

15   think you've recently said that's at least a couple

16   hundred times --

17         A.   Yes.

18         Q.   -- since that time.

19         A.   That's correct.

20         Q.   And do you recall the last time that you

21   testified or gave a deposition on behalf of a

22   defendant?

23         A.   I do.

24         Q.   And when was that?

25         A.   Last week.

Paul Lewis , Jr., M.S., BME                        March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                      Page 33

1        Q.  Prior to that when was the last time that you

2    gave a deposition or trial testimony on behalf of the

3    defendant?

4        A.  I think I gave three or four last year.  I

5    just testified in a trial for a defendant last week

6    (indicating), but I didn't get deposed in that case.

7        Q.  And what was that trial testimony about?  What

8    was that case about?

9        A.  It was about a -- sorry.  It was about a

10   little child that got run over by a car, and there was

11   a question -- or the plaintiffs were saying that the

12   child had been run over by the tires of the vehicle and

13   if -- at least once, if not twice, by the tires.

14       So I was working for the defendant that was

15   representing both the apartment complex and the driver

16   of the vehicle.  And so, again, it was still -- I was

17   still doing only biomechanics or injury causation

18   issues.

19       Q.  Okay.  We know that you were involved in the

20   Bacho and Mendoza cases which were cases brought

21   against Rough Country related to a vehicle that had a

22   lift kit installed.

23       Other than those two cases, have you been involved

24   in any other cases involving a vehicle with a lift kit?

25       A.  I don't think so.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 34

1      Q.   Okay.  Have you ever testified on behalf of a

2   lift kit manufacturer?

3      A.   No.

4      Q.   And I'm just making sure we're current.

5   You've recently testified in other cases that you're

6   not aware of any orders issued against you by any

7   courts that in any way limited your testimony, you

8   know, whether in whole or part, whether due to Daubert

9   or any other type of challenge.  Is that still true

10  today?

11     A.   Yes, sir.

12     Q.   Okay.  And you've never been disqualified as

13  an expert.  Is that still true today?

14     A.   Yes.  Or correct, sorry.

15     Q.   Yeah.  And none of your opinions to your

16  knowledge have ever been limited or excluded from

17  trial?

18     A.   Not that I know of.

19     Q.   Okay.  I'm not going to go through your CV,

20  but I just want to make a few things clear.  You're not

21  going -- holding yourself out as an expert in accident

22  reconstruction?

23     A.   I certainly am not.

24     Q.   And you don't intend to give any expert

25  opinions in this case regarding accident

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 35

1    reconstruction.

2         A.   No, sir.  That's why I have Mr. Buchner's

3    report and utilize his findings.

4         Q.   Sure.  So you're relying upon his report and

5    his testimony in giving your opinions today.

6         A.   Correct.  And obviously at this point that's

7    the only reconstruction I've seen.

8         Q.   Right.  And you're relying upon the accuracy

9    and reliability of his reconstruction both of the

10   actual accident and of his simulation of the

11   hypothetical accident that would be where the -- the

12   F-250 was not lifted; correct?

13        A.   Yes.

14        Q.   And if you are allowed by this Court to give

15   any testimony regarding your opinions in the Bacho and

16   Mendoza cases, it's also true in those cases you did

17   not act as an accident reconstructionist; correct?

18        A.   That is absolutely correct.

19        Q.   And you relied upon the opinions of the

20   accident reconstructionist in those cases in giving

21   your opinions in those cases.

22        A.   Yes, sir.

23        Q.   And you relied upon the accuracy and

24   reliability of those -- of the work by those experts in

25   those cases.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 36

1          A.   Just like any other case, yes.

2          Q.   Right.  And because you're not qualified as an

3    accident reconstructionist, you're not qualified to

4    judge the accuracy and reliability of those opinions.

5          A.   Well, I have the background that I could.

6    It's just not something that I do.  And certainly since

7    I don't, you know, provide reconstruction opinions, I'm

8    certainly not going to critique it.

9          Q.   Sure.  And in this case Mr. Buchner, you know,

10   created a computer simulation of the hypothetical

11   incident.  And when I say "hypothetical incident," I'm

12   talking about a hypothetical scenario where the F-250

13   involved in this case had not had the lift kit

14   installed --

15         A.   Yes.

16         Q.   -- if that makes sense.

17         And he ran a computer simulation, and my question

18   is do you have any experience with the software that he

19   used to run that simulation?

20         A.   I don't know how to use it or manipulate it.

21   I mean I've seen it a lot of times before.  But, yeah,

22   I don't own it or know how to use it.

23         Q.   So you can't evaluate how Mr. Buchner used it

24   in this case.

25         A.   Certainly not.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 37

1      Q.  Right.  And you can't -- you wouldn't have the
2   expertise or knowledge to determine whether he used the
3   appropriate inputs in using that software.
4      A.  Of course not.
5      Q.  Yeah.  And so you wouldn't have the ability to
6   know whether that software is even appropriate in
7   performing a simulation of this hypothetical crash.
8      A.  I do not, one way or the other.
9      Q.  Okay.  Would you agree that your opinions
10  regarding what might have happened in that hypothetical
11  situation, including the potential G-forces experienced
12  by Cohen in that hypothetical situation, that all of
13  your data and information related to that comes from
14  Mr. Buchner and not from any work you've done
15  independent from his work?
16     A.  Well, as far as from a reconstruction
17  standpoint that's true.  I mean obviously from my
18  understanding of the kinematics and injury reference
19  values and things of that nature, that's my own work;
20  but as far as what may be stated as to what those G's
21  are, certainly I'd have to rely on him.
22     Q.  Right.
23         MS. CANNELLA:  Do you want a bottle of water?
24         THE WITNESS:  Yeah, if you don't mind.
25         MR. HILL:  If you want to take a break or --

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 38

1              MS. CANNELLA:  I don't think we need to.

2              THE VIDEOGRAPHER:  You want to stay on the

3        record?

4              MR. HILL:  It doesn't matter.

5              THE WITNESS:  I'm just going to grab a water.

6              (Brief recess)

7              MR. HILL:  And I know you've done this so many

8        times.  It goes without saying anytime you want to

9        take a break or anything, just let me know.

10             THE WITNESS:  Right.

11             Starting to be good old pollen season, so...

12   BY MR. HILL:

13        Q.  See, I appreciate you agreeing to reschedule

14   this due to my -- my COVID.  I couldn't even speak,

15   speaking of coughing and stuff, at that time.

16        A.  Oh, okay.  I -- I couldn't remember why it got

17   postponed, but now that you say that I remember.

18        Q.  Well, it was originally postponed -- I think

19   you had a trial conflict, but then a rescheduled one

20   was my fault so...

21        A.  Okay.

22        Q.  All right.  Similarly with regard to your

23   expertise, because it's not in your area, you're not

24   going to be testifying in this case that the lift kit

25   installed on the Bryson vehicle was defective or

Paul Lewis , Jr., M.S., BME        March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 39

1   unreasonably dangerous; correct?

2        A.  I am not.  That will be for somebody else.

3        Q.  And you don't plan to give any testimony

4   regarding any possible alternative designs of the lift

5   kit.

6        A.  No.

7        Q.  And you're not an expert in automotive design

8   or manufacturing.

9        A.  No.  Correct.

10       Q.  You've never worked for an automobile

11  manufacturer.

12       A.  I have not.

13       Q.  Never designed any product that was put into

14  the stream of commerce.

15       A.  I have not.

16       Q.  Also with regard to your background, you're

17  not a medical doctor; correct?

18       A.  I certainly am not.

19       Q.  And don't possess any medical related degrees.

20       A.  No.

21       Q.  You're not a D.O.

22       A.  No.

23       Q.  I know you completed a two-year internship

24  back in the late '90s with the office of the medical

25  examiner in Atlanta.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 40

```
 1        A.   (Witness nods affirmatively).

 2        Q.   And I understand that encompassed working for

 3   three of the metro county area coroners.

 4        A.   (Indicating affirmatively).

 5        Q.   Can you just tell me a little bit about what

 6   you did during that two-year internship?

 7        A.   Sure.  So basically I'd go out on scenes,

 8   whether they were homicide, suicides, natural deaths,

 9   car crashes, plane crashes; would help assist with the

10   on-scene investigation, remove the bodies, help

11   transport them back to the morgue.  I also as a

12   technician helped to assist in doing the autopsies,

13   where ultimately the pathologist would determine the

14   cause and manner of death based on, you know, the

15   findings both externally and internally.  So that was

16   basically what I -- the benefit.  So, you know, kind of

17   a supplement or augmentation of my medical knowledge

18   from being out of grad school.

19        Q.   And when you say your "medical knowledge from

20   grad school," what are you referencing there?

21        A.   Well, I'm just saying instead of just being

22   all engineering related, so to speak, and all, it was

23   kind of a different view seeing it from more the

24   medical perspective and actually being able to truly

25   see these injuries we learn about and all and even
```

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 41

1    gives you a better understanding how they may be

2    injured or so based on certain conditions.

3        Q.  And what did you do as a technician during the

4    autopsies?

5        A.  So we would -- typically we'd document

6    externally and then usually would do the initial

7    opening incisions and opening the body up and then

8    ultimately in documenting some of what we see, and then

9    ultimately the pathologist would come and section the

10   organs and -- you know, if they needed to, you know,

11   depending on what type of case, you know, there may be

12   some additional work to cut out the spinal cord or --

13   so...

14       Q.  But you did not participate in the coroner or

15   the medical examiner's determination as to cause of

16   death.

17       A.  I did not, no.  That's correct.

18       Q.  And you weren't asked by any of the medical

19   examiners to exercise any independent medical judgment

20   regarding the injuries or cause of death.

21       A.  Well, no.  Since I'm not -- wasn't a medical

22   doctor, no.  I mean we did kind of discuss or talk

23   about things from my biomechanical perspective and

24   their medical perspective.

25       Q.  Is there any other aspect or any other type of

Paul Lewis , Jr., M.S., BME        March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 42

1   medical-related training, education, or experience

2   beyond that, your education and the two-year internship

3   that we just discussed?

4        A.  Well, I continued to do that work even though

5   I wasn't employed for several years after that.  And

6   even as a part of that we would -- we did what we call

7   exhumations, where there may have been someone who was

8   deceased and for some reason either an autopsy wasn't

9   done or there was a question of whether it was done

10  correctly.  So we would go exhume the body and do

11  another autopsy but -- so we did a number of those as

12  well.  But I think by -- I forget the dates now, but I

13  want to say by around 2003 or so I wasn't really doing

14  that work anymore.

15       Q.  And you did that work voluntarily?  You

16  weren't actually employed by the medical examiner's

17  office?

18       A.  No, I wasn't.  It was unpaid.  And then after

19  that time, starting in '98, then I was paid but not to

20  still do that assistance.  I was paid as far as an

21  employee of Burton and Associates, and Dr. Burton had

22  the contract with the medical examiner's office.  So I

23  would still do some of that work, but, again, I wasn't

24  being paid by the County.

25       Q.  Right.  You were paid by Burton --

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 43

1        A.   Correct.

2        Q.   -- who was paid by the County.

3        A.   Correct.

4        Q.   All right.  Could you pull out your -- the

5    billing records that you brought with you today?  It

6    may help me if I can just --

7        A.   Yeah.

8        Q.   -- compare real quick to what we already have.

9    All right.

10        A.   There you go.

11             MR. HILL:  We'll mark this as Exhibit --

12        whatever we're on -- 4.

13             THE COURT REPORTER:  Yes.

14             (Defendant's Exhibit No. 4 was marked for

15        identification.)

16        Q.   All right.  Exhibit 4 are the invoices that

17    we'd received Bates labeled 9053 through 9056 back in

18    October of -- no, I'm sorry.  These would've been

19    received with your file on February 16th of this year.

20    I apologize.

21        And what you've brought with you today, has it

22    been undated at any time since to your knowledge

23    October 16, 2023?  That appears to be the last entry on

24    these invoices.

25             A.   I have four invoices so...

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 44

1      Q.   Right.  And the most recent entry on any of

2    those four, would it be October 16, 2023?

3      A.   Oh, I was looking at the wrong number, wrong

4    one.

5      Q.   That's all right.

6      A.   Yes.

7      Q.   Okay.  And you've obviously done work since

8    that time, but you haven't brought any invoices

9    reflecting the work you've done since October 16, 2023.

10     A.   Right.  I haven't billed for any of the

11   additional work since it hasn't really been a whole

12   lot.

13     Q.   So these invoices reflect what you've actually

14   sent to Ms. Cannella, not all of the work you've

15   actually done on the case.

16     A.   Correct.

17     Q.   Do these invoices -- they appear to have a

18   date on them and then an activity description, quantity

19   rate.  Is that intended to reflect the work that you

20   did on that particular date?  Is that how that works?

21     A.   Well, to some extent.  Now, as far as like the

22   report and all, I don't do all that work in one day and

23   get it done.  That's just the -- now you've got me to

24   where I can't talk.

25     Q.   I'm sorry.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 45

1        A.   That's just, you know, the accumulation of

2   what ultimately the work was when we finished.  So that

3   date is basically, you know, when we do a report or

4   when we do a vehicle inspection or whatever.

5        Q.   So with the report, you might work on the

6   report on days other than the day you bill for it?

7        A.   Correct.

8        Q.   Okay.  But you don't bill for it until you

9   complete it?  Is that --

10        A.   Right.

11        Q.   -- what you're going to tell me?  Okay.

12        A.   Yes.

13        Q.   So you don't know the actual days that you

14   started the report or that you worked on it.  You just

15   bill at the very end of that process.

16        A.   Correct.

17        Q.   And others in your firm bill the exact same

18   way.

19        A.   Correct.

20        Q.   So there's no way to determine when you

21   might've begun drafting a report.  You only know when

22   it's finished because that's when it's billed for.

23        A.   Yes.  And part of that's also reviewing

24   materials during that time too.  So that's a part of

25   it.  It's not all just working on the report.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 46

1      Q.   Okay.  And that review of materials could be

2   spread out over some distance that's not delineated in

3   your invoices.

4      A.   That's correct.  I mean I don't have like some

5   kind of software program where I can do each day or

6   whatever.  We just -- it's a small company.  We don't

7   do that (indicating).

8      Q.   How do you keep track of your -- your time?

9   If you're -- if you're not going to bill for it until

10  potentially months later, how do you keep track of it

11  until you bill for it?

12     A.   The bookkeeper typically keeps up within -- I

13  think she either starts like a running invoice or

14  something.

15     Q.   And do you provide the information to the

16  bookkeeper?

17     A.   Right.

18     Q.   And do you do that contemporaneous with doing

19  the work, or do you go back and tell her at the end?

20  How does that work?

21     A.   Usually, depending on how long it is in

22  between, you know, I'll give her information between --

23  you know, in the times in between.

24     Q.   But she's instructed not to bill for that task

25  until the task is completed.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 47

1      A.  Right.  We don't -- you know, I don't send

2   monthly invoices because I mean I don't -- I just -- if

3   there's only like an hour or two done, it's not really

4   to me worth generating a bill for that.

5      Q.  Okay.  How do you bill for the generation of

6   the case review document?

7      A.  Well, it's a part of what's in the case --

8   where it says review of materials, that's covering

9   that.

10     Q.  Okay.  So any of the entries on whatever this

11  is, Exhibit 4, that say Review of Case File Materials

12  and Analysis --

13     A.  Right.

14     Q.  -- that would also include potentially time

15  generating the case review document.

16     A.  Yes.

17     Q.  And the same if the entry says Review of Case

18  File Materials and Prepare Report, that also

19  encompasses time generating the case review document.

20     A.  It is, or going through that and doing my bio

21  analysis of the materials and information that I have,

22  yes, sir.

23     Q.  Okay.  You have an entry on October 16th for

24  paralegal services, quantity seven hours, billed at

25  $125 an hour.  What's -- what is that for?

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 48

1         A.   Give me -- which one was that?

2         Q.   The last page of these, October 16, 2023, the

3    last entry.

4         A.   So that would probably mean then that Jamie

5    did review something or did do some work on the case.

6         Q.   Okay.  And she's the person you mentioned

7    earlier that's sort of a paralegal -- she a paralegal,

8    but she also does secretarial work and --

9         A.   Sure.  Everybody does a little of everything.

10   I mean, you know, it's not really set titles, so to

11   speak.

12        Q.   All right.  The next exhibit, Exhibit 5, is

13   going to be the expert disclosure.  It's entitled

14   Supplement to Plaintiff's Initial Disclosures.

15             (Defendant's Exhibit No. 5 was marked for

16             identification.)

17        Q.   And I've sort of given you the page there.

18   That relates to your disclosure on Exhibit 5?  The

19   pages aren't numbered, but you'll see it's -- there's a

20   title heading that says Paul Lewis, Jr. and has your

21   disclosure.  Have you seen this document before today?

22        A.   Excuse me.  Not that I recall.

23        Q.   Okay.  Did you draft the section of this

24   document that pertains to you and your opinions?

25        A.   I don't think so.  I mean certainly it could

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 49

1    be something that I discussed with Ms. Cannella, but...

2        Q.   Do you recall whether you reviewed this

3    disclosure before it was provided to the defendants?

4        A.   Like I said, I don't think so.

5        Q.   And take a minute to read it then since you

6    don't recall having seen it before today and tell me if

7    there's anything in the disclosure that you disagree

8    with.

9        A.   No, I think it's pretty much right down the

10   line of what my report is.

11       Q.   Okay.  And this was provided to us the same

12   day your report -- and you're talking about your first

13   initial October 16, 2023 report.

14       A.   Okay.

15       Q.   And in neither this document nor the report is

16   there any mention of the Bacho or Mendoza cases; is

17   that correct?

18       A.   Well, I guess not specifically, but I mean

19   that would be under my experience, but...

20       Q.   But there's no mention either in your

21   disclosure or your expert report that you intended to

22   rely upon the Bacho or Mendoza cases to give any

23   opinions in this case; correct?

24       A.   There was no mention of it, that's correct.

25       Q.   Right.  So at the time that -- that you

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 50

```
1   drafted your October 16, 2023 report you did not intend

2   to give any opinions related to the Bacho or Mendoza

3   cases in this case; correct?

4        A.  Well, I don't know that that's necessarily

5   true.  I mean certainly I've worked on those cases, and

6   I have knowledge of them.  I mean it's not necessarily

7   a basis for what the opinions in this specific case

8   are, but certainly that's history or experience from

9   investigating other cases with this similar issue.

10       Q.  You understand that the -- there was a

11  deadline for your report and disclosure of October 16,

12  2023, under a scheduling order in this case.

13       A.  Well, I would assume so.  That's why we had a

14  date it was turned in.

15       Q.  Sure.  And you understand that the purpose of

16  that deadline is for you to disclose all of the

17  opinions that you intend to give in the case at that

18  time.

19       A.  At that time, sure, but I mean that's why

20  discovery is always ongoing, and so, you know, you

21  typically supplement at times.

22       Q.  What aspect of the discovery that's occurred

23  since October 16, 2023, is new that required you or --

24  it required you to supplement your opinions with a

25  brand -- with a brand-new report last Friday?
```

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 51

1        A.   Just that I was asked to add additional
2    information.

3        Q.   Who asked you to add additional information?

4        A.   Ms. Cannella.

5        Q.   And what specifically did she ask you to add
6    with regard to new information?

7        A.   Well, I had some -- those test reports.  So I
8    thought those were additional bases or support for my
9    opinion, and then she asked me to discuss the other two
10   cases.

11       Q.   Okay.  And so prior to her asking -- when did
12   she ask you to discuss the other two cases?

13       A.   I don't know.  In the past, you know, maybe
14   couple weeks, something.

15       Q.   Okay.  And so prior to that you had not
16   intended to discuss those two cases or give any
17   testimony regarding -- specifically regarding those two
18   cases; correct?

19            MS. CANNELLA:  Objection, asked and answered.

20       A.   I wouldn't say that's true, no, sir.  I mean I
21   figured I ultimately at some point in time would be
22   talking about those.

23       Q.   Okay.  But, again, you did not disclose that
24   you had any intention to talk about those two cases at
25   the time your report was due.

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 52

1          A.   They were not in my first report.

2          Q.   Okay.

3          A.   We can agree.

4          Q.   While we're on this subject -- and we'll talk

5     about this a bunch later with regard to your

6     supplemental report -- for the first time in that

7     report you make reference to the testimony of Rough

8     Country's corporate representative in relation to the

9     Bacho and Mendoza cases.

10         You had the benefit of Mr. Hunsley's deposition

11    prior to your October 16, 2023 report; correct?

12         A.   Sure.

13         Q.   All right.  And nowhere in that report is

14    there any mention of your intention to give any

15    opinions with regard to that testimony in relation to

16    the Bacho and Mendoza cases; correct?

17         A.   Again, as I've already said, certainly it was

18    not in my first report, that's right.

19         Q.   Okay.  As exhibit -- next I'm going to mark as

20    Exhibit 6 your October 16, 2023 report.

21              (Defendant's Exhibit No. 6 was marked for

22         identification.)

23         Q.   You brought a copy of it; right?

24         A.   I did, yes.

25         Q.   I didn't give you a copy.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 53

1      A.  No, I don't -- that's fine.

2      Q.  Give me a second here.  I'm getting swamped

3   with all this paperwork.

4      A.  Uh-huh (positive response).

5      Q.  Just -- hopefully this is obvious, but I want

6   to just be clear on the record.  You state in your

7   supplemental report that your opinions contained in

8   your first report have not changed since that drafting

9   of the initial report on October 16, 2024.  Is that

10  still true today?

11     A.  Right.  My opinions as far as the injury

12  causation and the kinematics and all that is still the

13  same.

14     Q.  All right.  And so if you combine this October

15  16th report with your supplemental report received last

16  Friday, does that contain -- or does that encompass all

17  of the reports that you've prepared in this case?

18     A.  Yes.

19     Q.  Okay.  And do both of these reports contain

20  all of the opinions you intend to give in this case?

21     A.  I believe so.

22     Q.  Do you intend to give any additional opinions?

23  You made reference to it's always ongoing and there

24  might be additional work.  Do you have any plans to do

25  any additional work in this case?

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 54

1        A.   Well, I mean it's the usually caveat.

2    Obviously I haven't seen anything that your people have

3    done, so certainly depending upon what I read from

4    that, there might be something else I might want to do.

5    But, you know, at this point in time I don't have any

6    plans to do any other work other than that.

7        Q.   Okay.  And you haven't asked for any

8    additional materials or information or anything from

9    Ms. Cannella.

10        A.   No.

11        Q.   Okay.  The reason I ask is your deposition was

12    originally scheduled for last November.  It was

13    postponed multiple times, and then now we find out that

14    as of the business day before this deposition we have

15    new opinions.  And so I just want to see when you're

16    actually finally going to be, okay, here are my

17    opinions in the case, this is it.

18        A.   I think we're there.  Again, other than

19    potentially if I have something in rebuttal from your

20    experts.

21        Q.   All right.  We've already talked about how

22    this report lists the materials you have reviewed, and

23    we've talked about the additional ones contained in

24    your case review file.  We've talked about your

25    surrogate study that you generated yourself.  I want to

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 55

1    talk about things above and beyond those things that

2    you've done.  And one of them would be you inspected

3    the vehicles involved in this accident.

4         A.  I did.

5         Q.  How many times did you inspect?

6         A.  Well, I inspected it as far as both vehicles

7    on September 12, 2022.  And then I think I -- I didn't

8    do any notes, but I went back one other time to do some

9    work in -- excuse me -- in conjunction with

10   Mr. Buchner's people.  I don't -- I don't remember the

11   date.

12        Q.  Okay.  And what was involved in that

13   subsequent inspection involving Mr. Buchner's people?

14        A.  Basically scanning some -- I guess additional

15   scanning of the vehicle and also placing an exemplar

16   seat or trying to place an exemplar seat back in the

17   No. 4 seat position.  And I'm sorry, by exemplar seat I

18   mean the exemplar child seat.  So that they're doing

19   some additional work as far as looking at the intrusion

20   crush and in those kind of areas.

21        Q.  Was Mr. Buchner present for that inspection?

22        A.  No.  It was two people from his office.  I

23   don't even remember their names.

24        Q.  Okay.

25        A.  But I didn't -- you know, I didn't make any

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 56

```
 1   additional notes or anything like that.
 2        Q.  Did you take any additional photographs from
 3   that second inspection?
 4        A.  No.  Otherwise, I would've produced them.
 5        Q.  Okay.
 6        A.  Keep checking.
 7        Q.  Sure, yeah, I'm going.  Always get ahead of --
 8   you know --
 9        A.  Well, I'm certainly not going to argue if it's
10   not all day.
11        Q.  I'm going to go as fast as I can, I promise.
12        All right.  You've -- talking about additional
13   work you've done, you have not visited the crash site;
14   correct?
15        A.  I have not, and that's typically not something
16   I do anyway.
17        Q.  Sure.  You've not talked to Mr. or Mrs. Bryson
18   about the incident.
19        A.  No, sir, I have not had any personal
20   communication with them.
21        Q.  And you just mentioned there were a couple of
22   people from Mr. Buchner's office present at your second
23   inspection.
24        A.  (Witness nods affirmatively).
25        Q.  Did you discuss the case with them during that
```

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 57

1    inspection?

2         A.  Well, I mean obviously we're there working.  I

3    -- I don't know as far as specifics of any of my

4    opinions or not, but we were -- like I said, we were

5    trying to get a child seat in to where we could try and

6    get some scans with some -- with that in there.  So I

7    mean a lot -- part of it was just talking about how to

8    get it in there and all given the lack of space or

9    survival space that's in there.

10        Q.  Right.  Since you didn't take any photographs

11   at that inspection, were you able to get the exemplar

12   child seat into the No. 4 position?

13        A.  We did.

14        Q.  And so it was scanned and used by

15   Mr. Buchner's crowd as part of their analysis in this

16   case?

17        A.  That's my understanding.

18        Q.  Yeah.  But you did not use anything that you

19   gathered at that inspection.  You relied upon

20   Mr. Buchner's scanning and photographs or whatever they

21   did with regard to that exemplar seat in the No. 4

22   position.  Is that fair?  Am I understanding correctly?

23             MS. CANNELLA:  Object to the form of the

24        question as vague.

25        A.  Well, again, I don't have scanners and things

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 58

1    of that nature.

2         Q.   Right.

3         A.   So, yes, certainly I knew I was going to rely

4    on whatever output ultimately they came up with.

5         Q.   Gotcha.  Have you talked with Mr. Buchner

6    about the case?

7         A.   I don't think I have for this particular case.

8         Q.   Okay.  Have you talked to any of the experts

9    retained by Ms. Cannella?

10        A.   No.

11        Q.   Have you talked to Dr. Eisenstat about the

12   case?

13        A.   No.

14        Q.   Have you talked to any employees of Rough

15   Country about the case?

16        A.   No, sir.

17        Q.   Just making sure.  You'd be shocked.  I've had

18   that happen before.

19        A.   No, I have not.

20             MR. HILL:  All right.  We've been going a

21        little over an hour.  I know we started late, but

22        I promise I'll go fast.  I need to use the rest

23        room, and I'm about to get to your report.

24             THE WITNESS:  Sure.

25             MR. HILL:  So we'll take a quick five-minute

Paul Lewis , Jr., M.S., BME                 March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 59

1       break.  I'd appreciate it.

2              THE WITNESS:  Okay.

3              THE VIDEOGRAPHER:  The time is 11:45 a.m.  We

4       are off video record.

5                  (Video off)

6                  (Recess taken)

7                  (Video on)

8              THE VIDEOGRAPHER:  The time is 12:02 p.m.  We

9       are back on video record.

10  BY MR. HILL:

11      Q.  You've got your report from October 16th;

12  correct --

13      A.  I do.

14      Q.  -- right in front of you.  And we've marked

15  it, I believe, as Exhibit 6; is that correct?

16      A.  Yes, sir.

17      Q.  On page 2 of the report -- it's not delineated

18  as page 2, but it's the second page of the report -- if

19  you look at the third paragraph, you have a description

20  of the F-250 pickup truck involved in the incident.  Do

21  you see that on the second page, third paragraph down?

22      A.  Yes.

23      Q.  Okay.  And you make the statement that the

24  truck was equipped with a Rough Country lift kit that

25  raised the vehicle approximately six inches above the

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 60

1    factory recommendation.

2         What was the factory recommendation?  Do you know?

3         A.  I think it was four and a half inches.

4         Q.  Meaning what?  What do you mean by that?

5         A.  What -- I'm sorry, I don't understand.

6         Q.  Sure.  You used the term "factory

7    recommendation," and I want to know what's your

8    definition of that term.  It's used multiple times

9    throughout your report.

10        A.  Well, there's -- I think there was a -- a

11   number like that they're -- recommend for what's the

12   normal lift, I guess.

13        Q.  And who -- who recommends for a normal lift?

14        A.  Well, again, I thought it was my understanding

15   that there's some Rough Country, you know,

16   recommendation for it, or either there's a number not

17   to go above or so.

18        Q.  Okay.  So if you're raising the vehicle you

19   say six inches above the factory recommendation -- and

20   you're saying that that's the recommendation by Rough

21   Country of what level of lift not to go above?

22        A.  That was my understanding --

23        Q.  Okay.

24        A.  -- that it's higher than what it should be or

25   above what's -- I mean there's -- there's a statute or

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 61

1   so.  I think at least my understanding is that they're

2   not supposed to be over a certain height based on, I

3   think, the state of Georgia has a limitation or so.

4        Q.  What factory are you referencing when you say

5   factory recommendation?

6        A.  Well, it was probably meaning the Rough

7   Country factory.

8        Q.  And that's true -- whenever you use the term

9   "factory recommendation," you're talking about Rough

10  Country.

11       A.  Yes, I believe so.

12       Q.  Okay.

13       A.  Again, that's not the primary focus of my

14  report as far as opinions though.

15       Q.  I just want to understand the terms you're

16  using, and that's the source of your term "factory" --

17  or what you understand to be conveying when you say

18  factory recommendation throughout the report.

19       A.  I believe so.

20       Q.  Okay.  At the bottom of this page you have a

21  section called Statement of the Issues to be Addressed.

22       A.  Yes, sir.

23       Q.  All right.  And the first paragraph says, The

24  case has been evaluated by engineers with expertise in

25  reconstruction, in vehicle construction design, who

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 62

1    determined the amount of damage crush sustained to the

2    Escape's vehicle structures was significantly

3    enhanced -- paren, greater -- due to the Ford pickup

4    truck being lifted above the factory recommendation.

5         Do I understand you to mean that -- when you

6    reference evaluated by engineers, who are you talking

7    about there?

8         A.  Well, that would be Mr. Buchner and Mr. Roche

9    or Roche.

10        Q.  Right.  And so you're relying upon their

11   opinions to support that first paragraph, what I just

12   said.  It has -- you didn't come to any of those

13   conclusions yourself.

14        A.  Oh, that's -- yes, correct.

15        Q.  Okay.  And the same goes for the next

16   paragraph, where it talks about that if the truck had

17   been -- I guess it's meaning to say it did not have a

18   lift, then the amount of structural damage and

19   intrusion would be lessened in that Cohen's occupant's

20   survival space would have been preserved.

21        Again, you did not make that determination on your

22   own.  That is the opinion of the experts you've just

23   mentioned.

24        A.  Of course, yes.

25        Q.  And so whenever you talk about what intrusion

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 63

1   would or would not have occurred in the hypothetical

2   crash where the truck did not have a lift, that's not

3   anything that you have done any testing to determine

4   any evaluation, any analysis.  You're just taking that

5   straight from the other experts you've just mentioned.

6          A.   Absolutely.

7          Q.   Okay.

8          A.   Because I mean those subjects are obviously

9   well beyond my area of expertise.

10         Q.   Right.  And so any opinion you might give as

11  to the survivability of the hypothetical crash, it has

12  to start first with the assumptions that are made by

13  the other experts and the opinions that they formulate

14  as to what might have happened in that hypothetical

15  crash.

16         A.   Certainly.

17         Q.   Right.  And so if they're mistaken, if their

18  simulation was wrong or if their opinions are not

19  valid, then that would impact your ability to give any

20  biomedical opinions regarding what might happen in that

21  hypothetical crash.

22         A.   Well, I think part of that would be depending

23  upon what may have been allegedly incorrect or not

24  and -- and the basis for that.  So, you know, first

25  off, it still may not take away my ability to provide

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 64

```
 1   that opinion, depending upon what supposedly may have

 2   been wrong.

 3        Q.  I understand.

 4        A.  And I don't know how I skipped page numbers on

 5   that one.

 6        Q.  All right.  On the next page... you got it --

 7   you got the report?

 8        A.  Yeah.

 9        Q.  Okay.  On what is now -- it does have a page

10   No. 3 at the top of the third page.

11        A.  Uh-huh (positive response).

12        Q.  Yeah.  Under 3 -- Section 3-E, you list photos

13   taken at dealership inspection, eight.  What are you

14   referring to there?

15        A.  That's No. 3.  I mean they're just some

16   additional photos of the F-250.  That's just how it

17   was -- the folder that they're in was titled.

18        Q.  So these were not photographs that you took.

19        A.  Oh, none of those are.

20        Q.  Right.  These are photographs that were

21   provided to you.

22        A.  Correct.  I don't list my photos per se as an

23   item reviewed.

24        Q.  Sure.  And you don't know why it's -- they're

25   called dealership inspection.
```

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 65

1      A.   I do not.

2      Q.   Okay.

3      A.   Although my assumption is it's at some dealer

4    maybe so it could be lifted or something.  I don't

5    know.

6      Q.   Were they photos of the actual F-250 involved

7    in the accident?

8      A.   I think it was, yeah.

9      Q.   All right.  Skipping ahead to page 4, there's

10   a section called Section 4 Injury Information for

11   Cohen.  And in the first paragraph at the end you say,

12   There are no opinions contained herein.

13       Is that -- am I to read that to mean that in that

14   section, Section 4, there are no opinions of yours that

15   are contained with that.  That's just a recitation of

16   medical information that you received from

17   Ms. Cannella.

18      A.   Correct, yeah.

19      Q.   Okay.

20      A.   And I think I've started changing that now

21   where I make sure I say there are no opinions of mine

22   in there.

23      Q.   Right.  In looking at that description or that

24   Section 4, which runs through --

25      A.   Page 5.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 66

1        Q.   -- page -- I think it goes to page 9; right?

2        A.   Oh, sorry, I thought you were just talking

3    about the EMS.   Sorry.

4        Q.   Yeah.   It starts on page 4 and runs through

5    page 9.   And that is, I guess, your summary of what you

6    find to be the relevant medical records that you

7    reviewed in the case.   Is that a fair description?

8        A.   Sure.   And I think the autopsy report's almost

9    typed verbatim.

10       Q.   Right.   And that's contained under No. 4,

11   autopsy report --

12       A.   Yes, sir.

13       Q.   -- right?

14       So that's -- obviously the autopsy report was

15   something you found germane to your opinions in the

16   case and that you relied upon in giving your opinions.

17       A.   Absolutely.

18       Q.   Okay.   And throughout Section 4 -- which

19   includes the autopsy report plus the coroner's report

20   plus hospital records related to -- to Cohen plus the

21   MS report -- in all of that information that's cited,

22   is there anywhere where any medical provider gives any

23   indication as to what may have struck Cohen's head?

24       A.   No.

25       Q.   Okay.   Has any medical provider provided any

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 67

1    opinion as to what may have struck his head?

2          A.   No.   I mean other than I guess technically

3    Dr. Eisenstat said his blunt force trauma, meaning

4    impact to his head, but not anything specifically as

5    far as an object.

6          Q.   Right.   All right.   You yourself mentioned the

7    autopsy report, which is described -- beginning to be

8    described on page 7.   You are relying upon photographs

9    taken by Dr. Eisenstat during the autopsy; correct, in

10   giving your opinions?

11         A.   That's -- that's certainly part of the -- the

12   totality of those work, yes, sir.

13         Q.   Right.   And you've reviewed his autopsy report

14   as listed here.   Did you find any content of his report

15   that you disagreed with?

16         A.   No.   I mean, again, it's not my role to try to

17   disagree with it.   And certainly after reading his

18   deposition he noted that he specified an incorrect bone

19   that was fractured that was a bone that was more in --

20   what I'd say in the facial area versus being in the

21   temporal bone.

22         Q.   Right.   He meant to reference the temporal

23   bone --

24         A.   Correct.

25         Q.   -- right?

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 68

1        Any aspect of his testimony or his autopsy report

2    that you disagree with -- and I know it's not your job

3    to disagree with -- but that part, inconsistent with

4    your findings?

5        A.   No.  And in fact now, given that if it's not

6    the sphenoid, then, you know, that seems to make more

7    sense with the more focalized impact to the side of the

8    head, so to speak.

9        Q.   So you're talking about his correction of the

10   bone --

11       A.   Yes.

12       Q.   -- that he referenced?  Okay.

13       A.   Which I had already said that he had impact

14   to -- partially to the front and the right side.  So

15   now we know it's really only focused to more the right

16   side (indicating).

17       Q.   Okay.  And so when you say "now we know," what

18   do you mean by that?

19       A.   Well, because instead of trying to have a

20   fracture where you have an impact that's including both

21   kind of the -- it's still the right side to some

22   extent, but now we know that with as far as the

23   fractures and everything it's more to the side like

24   around the ear and temporal lobes, which then

25   propagates through the petrous ridge.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 69

1        Q.  Okay.  So based upon -- are you saying that

2    based upon Dr. Eisenstat correcting his reference to a

3    fractured bone in his deposition, that that has

4    modified what we know or what you believe happened?

5        A.  No.  I just think it makes it even more clear

6    where the blunt force impact was.

7        Q.  Okay.  And prior to reading that what was --

8    how has that changed?  When you say "more clear," has

9    it changed where you believe the blunt force trauma

10   occurred?

11       A.  Not in totality.  I mean I said a little bit

12   of front right -- in my report I said front slash side.

13   So realistically it hasn't changed.  It's just that we

14   now know there's not something that's more to the front

15   of his head.

16       Q.  Okay.  All right.  While we're talking about

17   that, let's skip ahead to page 11 and Section 1.31.

18   And you say in that paragraph that, The image on the

19   next page on page 12 shows that there was a contusion

20   and swelling to Cohen's right eye consistent with an

21   impact to this area of his face.

22       All right.  And that -- do you have any -- do you

23   still believe that there was an impact to his right

24   eye?

25       A.  No, that's what I was just saying.  Because

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 70

1    after further clarification from Dr. Eisenstat in his

2    deposition, he is saying that that is more bleeding

3    associated with other injuries that has essentially

4    dissected or moved to that area.  So that's what I

5    said.  Now it's not that I have to encompass a larger

6    area of the head to be impacted.

7         Q.  But your opinions that you gave in this

8    report, you came to the conclusion that he -- there was

9    impact to his right eye at the time that you

10   initiate -- you drafted this October 16 report;

11   correct?

12        A.  In the area of the posterior aspect of his

13   eye, yes, because that's where you can see the little

14   contusion.

15        Q.  Right.  And you now are saying that based upon

16   Dr. Eisenstat clarifying a reference to a bone, that

17   you no longer believe that the contusion and edema that

18   is in the photograph on page 12 that you relied upon,

19   that that is no longer evidence of impact to the right

20   eye?

21        A.  Correct.

22        Q.  Okay.  So you don't mention in your original

23   report any evidence of impact to the right eye other

24   than the photograph listed on page 12.  You didn't say

25   you were relying upon Dr. Eisenstat's reference to a

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 71

1   bone.  So I'm trying to understand --

2        A.   Well, so from my reading of the autopsy report

3   and what he was describing as the various fractures of

4   the skull, that included the sphenoid bone, and then,

5   obviously, there was a description of the contusion or

6   area around the right eye or in the -- what I'd say the

7   lateral side or outer side (indicating).  After he then

8   described more, then it made more sense to me even more

9   so, even though my opinion's still the same as far as

10  you still have an impact to the right side of the head.

11       Q.   This sphenoid bone, where -- where is that?

12       A.   It's more in the internal -- like more --

13  typically the face to the side (indicating).

14       Q.   And so you -- his reference to a fracture of

15  the sphenoid bone was part of the reasons why you

16  thought there was an impact to the right eye.

17       A.   Well, I thought the impact would've -- not to

18  the right eye, slightly posterior to the right eye from

19  that side, but still essentially the side of the head,

20  yes, sir.

21       Q.   Okay.  So -- but now after reading

22  Dr. Eisenstat's deposition, you believe that the sole

23  impact was to the area of his right ear.

24       A.   Correct.  Because, again, given what he

25  further described -- because he even described more

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 72

1   fracturing in the deposition as well.  So, yes, I think

2   that is now that we have a more focused area for sure.

3        Q.   And when you say "more focused area," can you

4   describe in layman's terms -- like I guess show to the

5   jury -- what part of his head was struck?

6        A.   Like basically looking around the right ear

7   moving down to the temporal bone, so kind of going and

8   gravitating down toward the foramen magnum or the base

9   of the skull.

10       Q.   Okay.

11       A.   And then we can't see -- there's fractures

12  internally that are extending from that more toward the

13  interior of the skull.

14       Q.   Okay.  And you were kind of motioning, you

15  know, I guess for the camera.  Where are the base -- or

16  the fractures actually located?  I know they're

17  internal, but where would you point to them --

18       A.   Well, the temporal -- oh, I'm sorry.

19       Q.   Go ahead.

20       A.   So the temporal bone is that lower bone as you

21  were describing, because we had the parietal above and

22  then the temporal below.  So essentially there's impact

23  and he has bleeding out of his right ear, which again

24  is consistent with the basilar skull fracture.  So it's

25  all along that right side (indicating).  And then, like

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 73

1    I said, internally we have a fracture that's kind of

2    going from the right ear trying to go toward the left

3    ear (indicating).

4         I'm sorry, I got a little fast there.

5         Q.  On page 9 of your report there's a Section 5

6    that's basically a recitation of Mr. Buchner's work.

7    Is that similar to the other section?  It doesn't

8    contain any of your personal opinions.  It's simply a

9    recitation of the report by Mr. Buchner.

10        A.  That's correct, and some of his diagrams.

11        Q.  Right.  And unlike the autopsy report, which

12   you almost put in verbatim, you sort of summarized --

13   and this is not all of the opinions and conclusions of

14   Mr. Buchner.  So is it fair to say that the ones you

15   decided to include in here were the ones that -- the

16   aspects of his opinion that you're relying upon to give

17   your opinions in the case?

18        A.  Well, I mean this is the complete list of his

19   opinions and conclusions that was in the report so...

20        Q.  Okay.  So it's intended to give a summary of

21   all of his opinions and conclusions from his report.

22        A.  Well, certainly at least all the opinions that

23   I'm relying on.

24        Q.  Okay.  That's what I meant.  It's the ones

25   you're relying upon.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 74

1        A.   Right, as far as the crash and everything.

2        Q.   Right.  And I guess just so we're clear for

3   the jury, there's sort of -- you have one opinion in

4   the case; right?  Because you've listed as No. 1 and

5   then it's all subparts of No. 1.  I assumed if there

6   was a second opinion back in October 16, it would be

7   listed as No. 2 with subparts supporting that opinion.

8   Is that fair?

9        A.   Right.  I mean this is -- you know, sometimes

10  the cases have multiple injury patterns or things so

11  that, you know, I may have to be addressing different

12  things.  This is pretty straightforward and pretty

13  focused to one issue.

14       Q.   And is it fair to characterize, just so we're

15  all on the same page, that that one opinion kind of has

16  two facets to it?  One is your opinion as to what

17  caused the skull fracture experienced by Cohen that led

18  to the internal decapitation which led to his death.

19  That's your analysis of the actual factors involved in

20  the crash itself.  That's one aspect.

21       A.   Correct.

22       Q.   Correct.  And for that opinion did you need

23  any information or opinions from any of the other

24  experts, or was that formulated by your inspection of

25  the vehicles and your review of the medical information

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 75

1    that we've discussed?

2         A.   Well, I mean I think as far as -- you know,

3    certainly I needed Mr. Buchner as far as quantifying,

4    certainly as far as the amount of crush and the -- the

5    crash forces themselves.  Obviously from my inspection

6    and also reviewing of the photographs, you know, I had

7    an understanding of the catastrophic loss of occupant

8    survival space that Cohen sustained in this crash.  But

9    as far as ultimately, I do have to rely on them to

10   quantify those -- that information.

11        Q.   And when you say quantify, you're talking

12   about the subject crash, not the hypothetical crash

13   without the lift.  I want to focus just on your

14   analysis of the injuries suffered by Cohen in the

15   actual crash.

16        A.   Right.  So -- yes, so I still need Buchner to

17   talk about, you know, the Delta-v, things of that

18   nature, and the quantification of all that crush.

19   Certainly I mean after looking at 5,000 crashes I've

20   not a pretty good idea dynamically how much worse that

21   is what we see statically and all.  But I can't put a

22   number on that per se or something.

23        Q.   And when you say a number on that, you mean

24   the level of dynamic crush as compared to the static

25   crush.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 76

1      A.  Well, just the Delta-v and all those things as

2   far as a part of what the reconstructionist does.

3      Q.  If your opinion is that his head impacted the

4   driver's seat, why do you need a Delta-v in order to

5   give your opinions if you believe that was the

6   mechanism of injury?  That's what I'm trying to

7   understand.

8      A.  Well, it's still a part of the analysis is

9   typically you have an understanding of what the crash

10  severity was or so.

11     Q.  All right.  There's the second aspect of the

12  opinion, which relates to the hypothetical crash as

13  I've defined it.  And that is that the mechanism of

14  injury for Mr. -- for Cohen that you believe occurred

15  in the actual crash would not have occurred in the

16  hypothetical crash.

17     A.  Absolutely.

18     Q.  So we -- we kind of break it into those two

19  different areas.

20     A.  Sure.

21     Q.  All right.  And with regard to the second

22  opinion, you would agree that you're a hundred percent

23  relied upon information from Mr. Buchner with regard to

24  what level of intrusion and crush would have occurred

25  in the hypothetical crash.

Paul Lewis , Jr., M.S., BME        March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 77

1        A.   Yes.  And, again, I would've already assumed

2    that as far forward as he is from the back of the

3    vehicle that I still wouldn't have had any expectation

4    of any significant alteration of his occupant survival

5    space.  But I think, again, from a different analysis

6    standpoint that's what Mr. Buchner is providing me.

7        Q.   And that's through his computer simulation of

8    the hypothetical crash.

9        A.   Yes, sir.

10        Q.   And you're not aware of any actual crash

11    testing that's been done by anybody with regard to

12    analyzing the hypothetical crash.

13        A.   I don't know of any car-to-car crash that's

14    been done, no, sir.

15        Q.   Okay.  All right.  If we go back to that page

16    11 where you have your opinions, I guess it's safe to

17    say now that we -- you do not agree with your

18    conclusions that you originally put in paragraph 1.3,

19    because you now believe that there was no actual impact

20    to the front of Cohen's head; is that fair?

21        A.   So, again, I was still assuming -- I wasn't

22    meaning the very front of his face like this

23    (indicating).  That's still considered the front if it

24    was to the side of his eye.

25        Q.   Right.

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 78

1        A.   But that's --

2        Q.   The front is -- I didn't mean to interrupt

3   you, but front's the term you used, so I was trying to

4   use your term.

5        A.   I understand, just -- because that part of the

6   right eye is more in the front.  But, right, it's

7   still -- I mean I think it's now more focused after,

8   you know, further clarification of some of the injuries

9   that were listed, that it's more just focused to the

10  side.

11       Q.   When you say "focused," I want -- I just want

12  to make sure.  They're -- you now are going to testify

13  that the contusion and edema in his right eye, that

14  that was not caused by trauma or impact.  You agree

15  with that.

16       A.   After reading Dr. Eisenstat's deposition and

17  his further clarification, then that's correct.

18       Q.   All right.  And that's based upon his

19  mischaracterization or misdescription of the bone that

20  was fractured.

21       A.   Yes.

22       Q.   Okay.

23       A.   Well, and also I mean he didn't -- I'm

24  sorry -- he didn't describe it, at least from my

25  recall, in the autopsy report that that was just

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 79

1    dissected.  It seemed to be more like that was another

2    injury, although being a soft tissue injury, in

3    conjunction with the other skull fractures and then

4    internal brain bleeding.

5         Q.  But you now agree with him that that wasn't

6    from the trauma, it was the raccoon eyes that -- that

7    you mentioned.

8         A.  Yes, sir.

9         Q.  It was sort of a symptom of the temporal

10   impact and temporal basilar skull fracture.

11        A.  From -- it was from the blunt force impact

12   like he said.

13        Q.  Right.

14        A.  These are not deceleration injuries.  These

15   are associated with blunt force impact --

16        Q.  Right.

17        A.  -- which is what I've been saying all along

18   anyway.

19        Q.  Sure.

20        Is it safe to say then that anywhere in your

21   report where you reference the right front or the front

22   of his head that you would now delete that if you were

23   to redo the report, you don't believe that anymore?

24        A.  If I'd had his deposition before I did my

25   report then, correct, that's -- it would only be right

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 80

1    side.

2         Q.   All right.  So as you've said, you believe

3    that the -- we now have one spot of -- of impact.

4         A.   (Witness nods affirmatively).

5         Q.   And you believe that that -- the source of

6    that impact is Cohen colliding with the driver's seat

7    in front of him.

8         A.   A portion of the driver's seat, what I'd say

9    is more focused around what you'd call the top of the

10   seat back and where the headrest posts are coming in,

11   because that's the -- really the only stiff, more rigid

12   portion, other than you can bottom out that to get to

13   the upper -- what we call the perimeter frame or the

14   metal perimeter frame of the seat, the internal

15   structure (indicating).  But those are only stiff

16   places.  I mean like the headrest is not rigid enough

17   to create it.  So as far as the headrest area that's

18   above those posts, that's typically not something you

19   would see to have skull fractures like this.  So we're

20   looking at something more focused that's going to be

21   like where the -- the metal headrest posts and then

22   the -- the sleeves where they go into the seat itself

23   (indicating).

24        Q.   Okay.  So you don't believe that the skull

25   fracture was caused by an impact with the headrest.  Is

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 81

1    that what you just said?

2         A.   Correct.  No, not what you think of as that

3    big wide part of the headrest, no.  In fact, I don't --

4    I've never seen somebody have a skull fracture from

5    contacting one of those.

6         Q.   Okay.  And did you determine exactly what

7    location on the driver's seat was the impact location

8    for Cohen's head injury?

9         A.   So as far as an actual witness mark or

10   something like that or some biological or anything of

11   that nature, no, sir, I did not.  So that's why I'm

12   saying these are the structures that can cause this

13   type of harm, but I can't pinpoint you any more

14   because, you know, there was no other obvious physical

15   evidence.

16        Q.   Okay.  So you were not able to uncover any

17   evidence on the driver's seat of the location of the

18   impact with Cohen's head.

19        A.   Not specifically.  That's why I then have to

20   look at what is rigid enough to create or inflict this

21   type of harm.

22        Q.   Okay.  And all of this is based on an

23   assumption that his head actually impacted the driver's

24   seat.

25        A.   Well, there's nothing else for him -- or

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 82

1    that's capable of impacting him, especially when you

2    consider the child seat that he's in and how he's got

3    wings and is well protected by that, especially from

4    just a rear impact crash mode.

5        Q.  So did you -- I'll scratch that.  We'll get to

6    that in a minute.

7        A.  Okay.

8        Q.  Yeah.  Was -- could you -- can you cite to any

9    actual physical evidence on the driver's seat that --

10   that Cohen impacted it at all?  Not just the location,

11   but any physical evidence on the -- actually found on

12   the seat that proves that his head impacted the

13   driver's seat.

14       A.  No.  I thought I'd already answered that.  No,

15   I don't have any witness mark or any type of, you know,

16   hair or anything else like that.  No, he didn't really

17   have an open wound until after it was over, and it

18   really wasn't an open wound.  He just later on was --

19   had some blood coming out of his right ear, but that

20   would be well post the actual injury causation.

21       Q.  Right.  And there was no physical evidence of

22   damage to the seat or anything like that, not

23   biological but like physical evidence on the seat that

24   there was an impact to his head.

25       A.  No, because his skull fractured, his skull was

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 83

1   softer than what part of the seat there was.

2        Q.   Right.  And is that also true with regard to

3   the injuries to his left side, his left leg and his

4   left arm?  There was no physical evidence on the seat

5   showing that those parts of his body impacted the

6   driver's seat?

7        A.   Correct, there was not, I mean even though we

8   know absolutely its interaction with the seat.

9        Q.   And you know that why?  Give me all of the

10  bases for why you conclude that all of his injuries

11  I've just mentioned -- his basilar skull fracture and

12  the injuries to his left extremities -- that they all

13  occurred via impact with the driver's seat.

14       A.   Because there is nothing about his occupant

15  kinematics in the rear crash that in any way could

16  create an axial load or bending load to his left femur

17  to cause that fracture nor realistically even for his

18  left arm.  So all of that is associated with being

19  jammed and shoved forward into the seat (indicating).

20       Q.   Could the left-sided injuries be due to -- to

21  impact with the door or the left-sided frame of the

22  vehicle?

23       A.   No.

24       Q.   And how did you rule that out?

25       A.   Because this is all basically a straight front

Paul Lewis , Jr., M.S., BME        March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 84

1    to back.  There's not any lateral component, so to

2    speak.  So there's nothing really trying to take him

3    left.  It's -- it's basically he starts to go back and

4    then he's just jammed forward as all this intrusion

5    comes in and takes out his survival space.

6        Q.  Did you consider whether the injury to Cohen's

7    head could have occurred via impact from the rear?

8        A.  From something from the rear?

9        Q.  The rear of the vehicle.

10       A.  Well, sure.  I mean, and essentially that's

11   physically impossible.  That would defy physics for

12   something to now go forward when everything about that

13   interaction is trying to take everything backwards

14   relative to the vehicle.

15       Q.  Well, there was significant intrusion, as

16   you've put in your reports and Mr. Buchner said, into

17   the rear of the vehicle.  In fact, you remember that he

18   said that the -- or his opinion is that the actual

19   grill, the Ford emblem, made it all the way to the head

20   position of Cohen during the accident --

21           MS. CANNELLA:  Object to form of the question,

22       misstates his testimony.

23       Q.  Go ahead.

24       A.  He said to the headrest.

25       Q.  Yeah, to the headrest behind --

Paul Lewis , Jr., M.S., BME            March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 85

1      A.   Which is above Cohen, not -- and then also

2   that would mean that Cohen would have to be essentially

3   almost 90 degrees and elevated up to where he could be

4   above that headrest for the grill or anything to impact

5   him, and we know that he -- number one, that's

6   physically impossible because of the restraints and the

7   child seat itself.

8      Q.   How is that physically possible based on the

9   restraints and the child seat itself?  Explain what you

10  mean by that.  What's your basis for that opinion?

11     A.   He's got a five-point harness that he's got

12  on.  So he's got a strap across each thigh, which he's

13  got evidence of bruising on some of those that probably

14  is from those straps, and he's got two shoulder straps

15  with a chest clip.  So all of that is significantly

16  limiting what vertical motion, if any, he can have in

17  that seat.  Not to mention, you know, he's -- he's got

18  a plastic shell and everything that's above the level

19  even of his head (indicating).

20     Q.   What is the lowest level of the Ford -- the

21  F-250's intrusion?  Are you saying that the lowest

22  level of the intrusion by the F-250 is above Cohen's

23  head?

24     A.   Well, as far as your question and what you

25  were talking about is the emblem.  And my understanding

Page 86

1   from his testimony and his report as well is that that

2   emblem is at the No. 4 -- the vehicle seat headrest,

3   not Cohen's headrest, as far as his child seat

4   headrest.

5        Q.  Well, below the emblem there's a significant

6   portion of the vehicle; right?

7        A.  Absolutely.

8        Q.  And if the emblem is at the level of the

9   headrest you're going to have significant portions of

10  the F-250 below that level; correct?

11       A.  I certainly agree.

12       Q.  And that's going to be equal to or even below,

13  depending on what part you measure, of where Cohen's

14  head was at the time of the incident.

15       A.  It could be, yes --

16       Q.  Right.

17       A.  -- certainly.  And then -- but again then

18  you've got to look at, you know, he doesn't have any

19  injuries to his shoulders, to his back, anything else

20  like that.  So that's why it's -- that is the force

21  that's driving and driving him forward in his seated

22  area, but it's certainly not the impacter that's

23  creating this injury.

24       Q.  All right.  And, again, you have the bumper on

25  the vehicle, on the F-250, that would stick out farther

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 87

1   than the rest of the surfaces of the front of the

2   F-250; correct?

3       A.  Yes.

4       Q.  And did you consider whether the bumper

5   would've been at the height to cause the basilar skull

6   fracture from an impact from behind and -- but the rest

7   of the vehicle would not impact his shoulder and other

8   parts of his body.  Did you consider that as a

9   potential cause of the injury?

10      A.  Again, I don't even think that's physically

11  possible given the construction.  So the bumper's going

12  to be below.  So I mean the bumper's not just right

13  about the -- the emblem.  You still have part of the

14  grill work, and then you go down further to get to the

15  bumper.  So that bumper would probably be -- since it

16  overrode the frame rails, you know, that would probably

17  be at the level of his pelvis (indicating).

18      Q.  But you didn't measure that; correct?

19      A.  Measure what?

20      Q.  The level of the bumper where it intruded into

21  the Escape.

22      A.  No.  I mean that would be Mr. Buchner's job.

23      Q.  Right.  But you don't know whether the bumper

24  was at his level of his pelvis, level of his head or --

25  you don't know where it was; correct?

Paul Lewis , Jr., M.S., BME        March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 88

1      A.   Other than looking at his scans you can tell

2    where it is.  But certainly, again, we know there's

3    probably a foot or more between the emblem till you get

4    to the bumper.

5      Q.   Well, you've just said that the emblem --

6    Mr. Buchner has it as higher, too high to cause the

7    head injury to Cohen.  Now you're just assuming, I

8    guess, that you think the bumper would be too low to

9    cause the head injury of Cohen.  Is that what you're

10   saying?

11     A.   So the -- from my understanding of his

12   testimony, that the emblem is at the headrest that's

13   sitting at the top of Cohen's seat.  All right.  That

14   bumper is not just going to be about this much below

15   that emblem (indicating.)  So it's going to be lower

16   than that.  So, if anything, it would be mid back to

17   pelvic level of Cohen.

18     Q.   And so is that -- is there any other basis for

19   you ruling out an actual impact with the -- from the

20   F-250 causing the basilar skull fracture?

21     A.   Well, number one, he wouldn't even be

22   contacting the actual -- any part of the vehicle

23   structure of the F-250.  He's still got the No. 4 seat

24   back between him and his own plastic shell and padded

25   interior of his -- of his child seat also (indicating).

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 89

1      Q.   Right.  The impact, though -- he doesn't

2   actually -- you can have an impact that hits the back

3   of the child seat or the seat and the forces of that

4   impact could cause a basilar skull fracture without the

5   actual physical bumper having to be the material that

6   touches his head; correct?

7      A.   I don't know that I've ever seen something

8   like that occurring.  I mean that's why there's

9   energy-absorbing attenuation padding and -- all inside

10  the inner shell of that child seat (indicating).

11     Q.   Did you -- do you know what material was in

12  the storage area of the F -- I mean of the Escape, in

13  the back behind the second row?

14     A.   So there were a couple of -- I think -- I

15  think the parents called it like camp chairs, so just

16  those regular little folding chairs.  There was a --

17  obviously I know there was a shop vac that was crushed.

18  There was a stroller that also had -- was damaged.  But

19  I think those structures were still compressed and

20  still down in between the hatch and the -- and the Back

21  of the seat (indicating).

22     Q.   Do you know where they were located prior to

23  the crash?

24     A.   Behind in the cargo area, which is where you

25  put cargo (indicating).

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 90

1      Q.  But I meant do you know where each of those

2  items you mentioned was located within the cargo area.

3  Do you know the configuration of the cargo area?

4      A.  I mean they were laying -- my understanding is

5  from their testimony they were laying -- what would you

6  say -- laterally, I guess, in there, because certainly

7  the stroller would be too long to go longitudinally.

8  So they were laid in the back like that, and I think

9  they even said there was a plastic bag of clothes.

10     Q.  Right.  And would you agree that that material

11 would have been pushed forward when the F-250 intruded

12 into the cargo area?

13     A.  We see that physically, sure.

14     Q.  Right.  And did you rule out the potential for

15 that material that was pushed forward from impacting

16 Cohen's head from the rear?  And I don't mean -- and I

17 don't mean actually impacting it.  It's obviously

18 causing the injury via impact through his child seat.

19         MS. CANNELLA:  Object to the form of the

20     question.

21     A.  I didn't see any evidence of that.

22     Q.  All right.  And what did you do to rule that

23 out?

24     A.  Well, I looked at the child seat.  I looked at

25 the No. 4 seat.  I've also considered the injury

Paul Lewis , Jr., M.S., BME        March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 91

1   pattern that -- or the injuries that Cohen sustained as
2   well.
3       Q.  And when you say you looked at the child seat,
4   you did an inspection of the child seat.
5       A.  I did, yes, sir.
6       Q.  And did you examine it for any type of damage
7   to the plastic structures or any kind of evidence of
8   impact to the plastic structure?
9       A.  I did.  In fact, in my notes I talk about some
10  white stressing and all from it being shoved forward.
11  But there's not a focalized like bar or something
12  that's focal.  It's associated with the entire back
13  seat or No. 4 seat pushing and driving it forward
14  (indicating) and compressing it.  Plus, it's kind of
15  rotating because it's squeezing it not only between the
16  seat cushion but also then ultimately the driver's
17  seat.
18      Q.  Is there any other basis for you ruling out
19  the potential for the injury to have come from an
20  impact from the rear, anything else you haven't
21  mentioned?
22      A.  I think that's it, especially from the
23  vertical -- vertical nature of the fracture that were
24  -- have been described.
25      Q.  And explain what you mean by that.  The

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 92

1   vertical nature of the basilar skull fracture?

2        A.   Yes.

3        Q.   And when you say vertical, what do you mean by

4   that?

5        A.   Up and down versus side to side (indicating),

6   which would be lateral or horizontal.

7        Q.   Right.  And why is that something that relates

8   to you ruling out an impact from the rear?

9        A.   Because if it's just from one of those chairs

10  or something, then that's basically something that's

11  running horizontally relative to the head.  So you

12  would think then it would start -- instead of going

13  more up and down the skull, it would be going right to

14  left, left to right (indicating).

15       Q.   And what if the chair was in a vertical

16  position?  Would that explain the vertical nature of

17  the fracture?

18       A.   Well, I didn't see any physical evidence on

19  the back of the No. 4 seat that would be consistent

20  with that to begin with.

21       And then even more so, that's not really capable

22  of going through because you still have a metal

23  perimeter frame of that No. 4 seat as well.  So if it's

24  vertical it's going to be stopped by the upper and

25  lower margins of that (indicating).

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 93

1      Q.  Did you consider whether the metal frame of

2   the No. 4 position seat could have been pushed into the

3   car seat and caused the trauma from the back due to the

4   intrusion of the F-250?  Did you consider that?

5      A.  Well, again, I think that's something that's

6   not even possible because he's below the level of that

7   peri -- upper perimeter frame.  And then the rest is

8   just soft padding or the foam cushioning and the fabric

9   covering.

10      Q.  And did you actually measure the -- the height

11   of the surrogate with the actual frame of the No. 4

12   seat?  Did you actually measure that, or are you just

13   concluding that his head would've been below the frame?

14      A.  You can see from the photo that the head's

15   below the top of the seat back.

16      Q.  And so the top of the seat back is the area

17   where the frame exists that you're talking about.

18      A.  Well, it's -- that why they call it a

19   perimeter, so it goes around the perimeter of the seat

20   (indicating).

21      Q.  Right.  Any other basis for that -- ruling

22   that out as a potential source of the basilar skull

23   fracture?

24      A.  His head's not even at that level to begin

25   with so...

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 94

1      Q.  You mean the level of the frame of the No. 4

2  seat.

3      A.  Correct.

4      Q.  Okay.  Do you know how Cohen's head was

5  positioned just prior to the incident?

6      A.  I'd say not specifically.  But obviously based

7  on the pattern, at some point he has to be to where

8  more of the right side is presented.

9      Q.  So that meaning at some point you believe that

10  his -- he's -- his face is facing left prior to the

11  impact.

12      A.  Yes, sir, most likely, yes, sir.

13      Q.  Okay.  So you don't believe that he could be

14  facing to the right and there be impact and his head

15  swivel enough so that it causes the impact to the right

16  ear area.

17      A.  Oh, sure, it could (indicating).  But we don't

18  know for sure one way or the other.  But that would be

19  the only other possibility.

20      Q.  All right.  Do you know -- did you read the

21  testimony from Ms. Bryson about which way he was

22  facing?

23      A.  Absolutely.  And that was when they were

24  still -- when they just swapped driving and she just

25  got in the driver's seat, and the crash didn't happen

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 95

1   for like 15 minutes or so later.  So the child could

2   easily move or, again, the other option is the fact

3   when it gets hit that it does rotate that way.

4        Q.  And that's what I'm getting to.  You're saying

5   that it's possible that he could be in the position as

6   described by Mrs. Bryson right before the impact and

7   still have the injury that we have in this case.

8        A.  His head would have to rotate then, yes.

9        Q.  But you're saying that's physically possible.

10       A.  It can, sure.  But, again, there's a lot of

11   time in between when she makes that observation because

12   she doesn't really testify to any observation any

13   later.  And that was all down at the bottom of the road

14   before they were really getting out on the trip.

15       Q.  Right.  Do you know how much time passed

16   between when she made that observation and the actual

17   accident?

18       A.  That's what I said, it was around at least --

19   about 15 minutes, maybe 20 minutes, somewhere in there.

20       Q.  That's your understanding?

21       A.  Yeah, from reading the -- from ready their

22   testimony.

23       Q.  Right.

24           MR. HILL:  Why don't we take a five-minute

25       break.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 96

1           THE WITNESS:  Okay.

2           THE VIDEOGRAPHER:  The time is 12:52 p.m.  We

3      are off video record.

4           (Video off)

5           (Recess taken)

6           (Video on)

7           THE VIDEOGRAPHER:  The time is 1:57 p.m.  We

8      are back on video record.

9           MR. HILL:  Thank you.

10    BY MR. HILL:

11      Q.  Right before the break I was questioning you

12    about your analysis of whether the impact could've come

13    from the rear.  And when I say the rear, from the back

14    of the vehicle obviously.  And we were talking about

15    the items that were in the storage compartment.

16      A.  Uh-huh (positive response).

17      Q.  And you had mentioned that if a chair that was

18    there had, you know, been pushed forward by the F-250

19    that you would've expected to see a horizontal

20    fracture, I believe you said, with regard to the

21    basilar skull fracture.  Is that -- is that right?  Is

22    that what you were --

23      A.  Well, yeah, I mean I -- not that I agreed that

24    that would be impossible.  But it would seem to be if

25    that's the impacter that the line of force would be

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 97

1   kind of different than what we have (indicating).

2          Q.   Okay.  And describe for me the line of force

3   that we do have.  I think you said it was vertical?

4          A.   More vertical than horizontal certainly.

5          Q.   Okay.  And what evidence leads you to conclude

6   that it was more vertical than horizontal?

7          A.   Just from. Dr. Eisenstat's description of the

8   in -- of the skull fracture.

9          Q.   Okay.  So he actually used the term it was a

10  horizontal -- I mean a vertical skull fracture?

11         A.   No, he didn't use that term, at least --

12         Q.   Okay.

13         A.   -- not that I -- not that I remember.

14         Q.   So what about his description leads you to

15  believe that he saw it as a vertical skull fracture?

16  That's what I'm trying to figure out?

17         A.   Well, from the way he's describing the damage

18  around the right ear, and then we know we have the

19  fracture line going through the petrous ridge, but then

20  we also, at least the way I was understanding him

21  describing it, we had kind of a ring fracture too that

22  he was talking about.  So it sounded to me like it was

23  all pretty much kind in a -- in a line.  I mean there

24  can be a little angle to it or something, but seemed

25  like at least the way he was describing in his

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 98

1   deposition (indicating).

2       Q.  Okay.  So the fracture progresses, as I -- if

3   I understand you, from the ear inward, and you're

4   saying that that progression inward by the way he

5   described it in your interpretation was more of a

6   vertical nature.  Is that what you mean?  I'm confused

7   a little bit.  I'm sorry.

8       A.  No.  That is -- that's a propagation from the

9   upper part, but at least the way I was understanding

10  the way he's describing, it's coming because you've got

11  the -- the bruising or whatever in the temporalis

12  muscle and then you have the fracture in the temporal

13  bone, but then it sounded like it kind of goes --

14  continues from that to the ring or the foramen magnum

15  (indicating).

16      Q.  And the ring is lower than the temporal bone.

17      A.  Yes.

18      Q.  And so that would be the vertical aspect of

19  it --

20      A.  Well, in the temporal --

21      Q.  -- from top to bottom?

22      A.  Right.

23      Q.  Okay.  And -- and you brought that up in

24  connection with, I think, if I understood, that if it

25  was a chair, it would be -- the striking device would

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 99

1   be more horizontal, and it wouldn't explain this

2   vertical kind of up-toward-down nature of the skull

3   fracture; is that fair?

4        A.  Well, you probably see going more from side to

5   side, I guess you'd say.

6        Q.  Okay.  And is that due to the fact that the

7   chair would be a vertical -- I mean a horizontal -- you

8   know, impacting instrument?

9        A.  I think the way you were describing how it was

10  oriented.

11       Q.  And so does that mean that the -- you would

12  expect the whatever hard surface or -- that, you know,

13  that caused the fracture that that would be more

14  vertical than horizontal?

15       A.  Well, some portion of it could be, yes.  But,

16  again, if you're coming down onto something then that's

17  still as far as -- because like I said, you've got that

18  metal -- excuse me -- upper parameter of the perimeter

19  frame of the seat.  So between that or where that

20  connection is from where the headrests are coming down,

21  I mean that's, you know, more rigid, stiff areas

22  (indicating).

23       Q.  And that's what I'm trying to get at is where

24  is the vertical surface on the driver's seat that would

25  cause a more vertically shaped skull fracture?

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 100

1          A.   Well, either around those posts unless it's
2     just basically that you've got a propagation from that
3     more pointed where you go both to the petrous ridge,
4     but kind of down the skull too.  So it's still a very
5     rigid portion if it is fully verticalized in catching
6     the portion of that post and sleeve connection with the
7     seat back frame that will comport with that to me
8     (indicating).
9          Q.   So when you say the post and seat back frame,
10    are you saying that he had to have hit part of the post
11    holding the headrest that are vertical?
12         A.   Like that or the sleeve that area, yes.  Kind
13    of more toward where it would insert into the seat
14    back.
15         Q.   When you say sleeve area, just explain so I
16    understand that.
17         A.   There's a plastic sleeve that the metal post
18    goes -- slides in and out of (indicating).
19         Q.   So --
20         A.   Because it's fixed at the top into the
21    headrest itself.
22         Q.   Okay.  So it's kind of a supporting sleeve
23    that the headrest posts go into.  Is that what you
24    mean?
25         A.   And the posts, yes.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 101

1        Q.   And the post themselves.

2        A.   Yes.  And there's a wide kind of a, you know,

3    piece of metal about this wide that those posts are

4    anchored into to where, you know, adjust the headrest

5    up or down (indicating).

6        Q.   And that post you just mentioned to you made a

7    horizontal sort of motion.

8        A.   It is.

9        Q.   That support post is horizontal.

10       A.   It is.

11       Q.   So the only vertical aspects of that would be

12   the posts themselves from the headrest.

13       A.   And/or where they attach at the sleeve.

14       Q.   Okay.  And that part of the sleeve that

15   holds -- the sleeve's like right on top of the seat?

16       A.   Correct.

17       Q.   It has a little clip where you could adjust

18   it?

19       A.   Correct.

20       Q.   So you're saying -- does that mean that he had

21   to have impacted that particular portion of the seat to

22   explain the vertical nature of the fracture?

23       A.   Well, as I said at the very beginning, that's

24   the only rigid areas are basically the top of that

25   perimeter frame and/or those inserts for the headrest.

Paul Lewis , Jr., M.S., BME                     March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 102

1    That's the only thing -- the rest of the -- above the

2    post, that part of the headrest is pretty well padded

3    and is not something that you would expect to see.  And

4    then I don't think you could get the head really

5    significantly below and really in the middle of the

6    back of the seat.  It is pretty soft as well.  There's

7    no, you know, rigid structure immediately behind that.

8    And we know that the seat is shoved in because we've

9    got significant compression of both of them where the

10   little cupholders are and all on each side of the

11   front.  So that's showing us that we're being driven

12   forward, and, again, probably is tilting a little bit.

13   So kind of have, you know, coming down into it.  And

14   there probably is, obviously, some dynamic motion, a

15   little bit of the seat itself -- the driver's seat, I'm

16   sorry (indicating).

17        Q.  And when you say dynamic motion, you mean the

18   driver's seat extending rearward, or what do you mean

19   by that last comment?

20        A.  Yes.

21        Q.  Okay.  And I know you have an opinion here

22   that it wasn't the rearward deflection of the driver's

23   seat that -- that it wasn't significant, I think is the

24   term you used -- or it would not have impeded his

25   driver -- or his passenger compartment significant

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 103

1   enough to have caused the impact.

2       A.  Well, I think that was in the hypothetical

3   part, right.

4       Q.  Right.  And when you're analyzing the

5   hypothetical crash that was analyzed by Mr. Buchner.

6       A.  Right.  And realistically I think it was more

7   that we couldn't get the trajectories to where

8   anything -- because obviously then the child if it's

9   not being shoved toward the seat that's trying to

10  deflect a little bit backward, then there's a space

11  there, not to mention the child seat would be partially

12  helping to hold that seat up.  So I think you can't get

13  any trajectories that would match up.

14      Q.  And when you say the child seat was holding it

15  up, you -- you -- that's switching back to the subject

16  accident; right?  So that's confusing.  We were talking

17  about the hypothetical but then you switched to the

18  subject there; right?  Or --

19      A.  No, no.  So in the hypothetical, there may be

20  a little bit more deflection of the driver's seat, but,

21  again, it's going to be limited by that child seat as

22  it's coming back.  The child seat's still there because

23  it's not being pushed.  So it's still going to impede

24  that coming back which alters the angle which then

25  alters any other kinematic trajectories.

Paul Lewis , Jr., M.S., BME        March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 104

1      Q.  So you mean like the bottom of the child seat

2    would -- would impede the driver's seat (indicating).

3      A.  Like those -- the vertical front face where

4    the cupholders and all that are at some point, as well

5    as the child's legs.

6      Q.  Right, right.

7      Would you agree that the skull fracture in this

8    case was a depressed skull fracture?

9      A.  I don't remember.  Let me look real quick.

10      Q.  Sure.

11      A.  Yeah.  He does describe it as depressed.

12      Q.  And -- and what usually causes -- what type of

13    object causes a depressed skull fracture?

14      A.  Well, I mean I've certainly seem them on flat

15    surfaces before as well, but typically you have

16    something kind of like that seat back frame or that --

17    excuse me -- or that headrest area as far as the metal

18    portions of it.  So those tend to be some type of

19    impactor that can -- can do that.  I mean I think

20    sometimes if you look in -- what is it... I think it's

21    Spitz, S-p-i-t-z, somebody -- some of those places

22    sometimes say it's like a two-by-two impact or

23    something along that line.  But in general you've got

24    something a little more focused, but certainly I've

25    seen depressed skull fractures from rollovers and

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 105

1    people hitting their head on the roadway surface.  But

2    a lot of times you have some type of little bit more

3    focal object, which again, what I've been describing

4    anyway.

5         Q.  So what -- what aspect of the driver's seat is

6    a focal object?

7         A.  That seat back frame and/or where those --

8    where the headrest come into the frame (indicating).

9         Q.  I guess we can agree that you don't believe

10   his head impacted the side frames of the driver's seat;

11   is that correct?

12        A.  I mean it doesn't -- I mean that would be one

13   other option, but it looks like the way that the seat

14   has gone in -- although we do know that right cupholder

15   was a little -- was into the center console.  So that

16   could be the only other possibility because that's

17   still going to be metal coming around which would still

18   be a fairly focused object once you go through the --

19   the covering on the back (indicating).

20        Q.  All right.  I lost you a little bit there.  So

21   what did you mean by that last -- like what object were

22   you referring to?

23        A.  It's still the seat back frame, right.

24   Because it goes and curves around to go down to the

25   vertical portions.  So that would be the only other

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 106

1  possibility is what I was saying, but that's still a

2  part of the seat back frame (indicating).

3       Q.  And you're saying that the right edge of the

4  seat might have been the vertical component?

5       A.  (Nods affirmatively).

6       Q.  So you're saying it's possible that he could

7  have impacted the -- the vertical right edge from his

8  vantage point frame of the driver's seat.

9       A.  That curved area, right.  And -- and part of

10 it could be just because it's depressing in that that

11 makes it go vertically down because it's still

12 propagation.  Everything is associated with that impact

13 and then we have fracture lines continuing to extend

14 both inward and down.

15      Q.  So you did not make a specific determination

16 or don't have an opinion as to whether his head hit the

17 vertical right edge of the frame or the horizontal

18 portion below the headrest or the area where the post

19 from the headrest entered into the seat -- like all

20 those are options, but you don't have an opinion as to

21 exactly where his hit -- head hit on the driver's seat;

22 is that fair?

23      A.  I don't.  Because as I told you earlier today,

24 I didn't find a witness mark or something to where I

25 would be more comfortable telling you more pinpointed

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 107

1    this is where it is.  So then I have to look at what is

2    capable and not capable of creating this type of injury

3    (indicating).

4         Q.  And the location of the seat after the

5    accident, I know it was removed at some point.  You

6    only have photos of that.  But that wasn't enough for

7    you to determine which area of the front seat he

8    impacted?

9         A.  Oh, the child seat?

10        Q.  Uh-huh (positive response).

11        A.  I don't think I made a determination from

12   that, no, sir.

13        Q.  Do you believe you could have, is what I'm

14   saying?

15        A.  Again, I -- I don't think that would alter

16   anything about the kind of scope of where I'm talking

17   about would be likely.

18        Q.  Okay.  So you made a determination that he had

19   to have hit the driver's seat because that was the only

20   structure that you identified that could cause the

21   fracture that was in front of him; is that fair?

22        A.  Yes.

23        Q.  But you didn't go to the point of determining

24   exactly where on the driver's seat the impact occurred.

25             MS. CANNELLA:  Object to the form of the

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 108

1          question.

2          A.   That's not true.

3          Q.   Okay.

4          A.   Like I said, when I inspected the vehicle I

5     certainly was looking to see if -- because occasionally

6     you do find a mark that is evidence of where they hit,

7     but in this case I did not.

8          Q.   And I didn't mean to say you didn't make an

9     effort.  I meant to say -- that was a -- that you were

10    not able to identify the specific spot on the driver's

11    seat where the impact occurred.

12         A.   That's correct.

13         Q.   Okay.  Now I assume you're familiar with

14    linear skull fractures.

15         A.   Yes.

16         Q.   And I think you were kind of describing what

17    type of object usually causes a linear skull fracture.

18    Is that a more flattened, smooth surface as opposed to

19    the more focal point?  You said -- you said two-by-two

20    for the depressed skull fracture.  Is a linear skull

21    fracture something that's caused by flatter objects?

22         A.   Well, I just said I've seen depressed skull

23    fractures from flat surfaces, but certainly I've seen

24    that from linear -- or with a linear fracture as well.

25         Q.   And is that more common with a linear

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 109

1    fracture, to be a flat surface?

2         A.   Well, typically it may be a more broader flat

3    surface, yes.

4         Q.   Right.

5         A.   So meaning a lot wider (indicating).

6         Q.   Sure.  And this is to kind of put a bow on our

7    discussion about the -- your analysis of the potential

8    of the impact coming from the rear, are you saying that

9    because of the number four seat back, that it is

10   impossible for the injury to have occurred from an

11   impact from the rear in this case?

12        A.   I think given the location of the injury that

13   he has as well as all the attenuating structures

14   between that because then -- like I said, you've still

15   got all the foam and the frame of the number four seat

16   or the vehicle seat back.  And then also you've got the

17   energy absorption of the interior of that child seat as

18   well.  So, yeah, that does not look like this

19   particular injury.  I mean -- sorry -- I have seen some

20   where maybe the head was exposed and something coming

21   from the back struck the child, but that's not the case

22   for this particular case.

23        Q.   Okay.  I appreciate that, but I -- the

24   question was, is your testimony that in this particular

25   case it's not possible in your opinion for the impact

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 110

1  to have been to the back of his head from a -- a object

2  coming from the rear?

3       A.  I don't believe so for the number of reasons

4  I've already told you.

5       Q.  Okay.  And, again, you inspected the child

6  seat involved in the accident.  Did you take the

7  covering off of the child seat and inspect it?

8       A.  I did.

9       Q.  And you -- I think you said that you did not

10  see any evidence on the child seat that it had suffered

11  an impact to the rear.

12       A.  I didn't.  I felt some stressing and all from

13  being compressed (indicating) but not from impact.

14       Q.  Okay.  So it's your opinion that the --

15  there's no evidence on the child seat that it was

16  impacted from the rear.

17       A.  Well, I think that's a little bit of

18  semantics.  Because I mean it's being shoved from the

19  impact from the rear forward.  So there is damage

20  from -- obviously, it has to be from the rear force

21  trying to shove it forward as it's compressing and

22  decreasing the survival space.

23       Q.  Got you.  But you didn't find any evidence

24  that an object struck the back of the car seat that

25  would have caused the basilar skull fracture that Cohen

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 111

1    suffered from.

2         A.   I don't believe so.

3         Q.   That's what I meant say.

4         A.   Okay.

5         Q.   Obviously I know it's moving forward, and it's

6    being pushed forward by something.

7         A.   Right.

8         Q.   Whether it's the stuff in the storage area,

9    whether it's the seat, where it's the F250 itself, you

10   know, which went all the way back into the back of the

11   number four position.  Something pushed it forward.

12   But what I was asking is there's no evidence that you

13   saw on the car seat that an object struck the car seat

14   that would have caused the basilar skull fracture.

15        A.   I did not.  In fact from what I remember, I

16   don't think even the back covering of the seat is torn

17   or anything like where something could even go through

18   it.

19        Q.   So you did inspect the covering of the seat.

20        A.   Yeah.

21        Q.   Okay.  That's -- that's fine.

22             THE WITNESS:  Sorry.

23        Q.   I know that you -- sorry, do you --

24        A.   No, go ahead.  I'm listening.

25        Q.   I know that you -- you said that that in your

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 112

 1    opinion did not occur in this case.  Is it possible for
 2    a child to suffer head trauma when the car seat is
 3    pushed into their head due to an impact to the back of
 4    a car seat?  Is that even possible?
 5         A.  Well, I mean, I guess anything's possible, but
 6    frankly I -- and I do a lot of child car seat cases and
 7    all.  I don't know that I've seen that, at least that I
 8    recall.
 9         Q.  Okay.  So in your experience you're not aware
10    of any situation where something struck the back of the
11    car seat and that caused the car seat to hit the
12    child's head, the plastic part of the car seat, and
13    caused head trauma.  You haven't seen that in your
14    experience?
15         A.  Like I said, nothing is jumping out that I can
16    recall of a case like that.  I mean I've had some where
17    they've gotten around the wing and maybe had neck
18    injuries or something and might have had one that the
19    child's head impacted the wing, but as far as straight
20    back, I don't think I have.
21         Q.  Okay.  You said anything's possible, but you
22    don't believe in this case it was possible for his
23    injury to be caused by an impact to the back of the car
24    seat.
25         A.  In this case I don't think that's how it

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 113

1    occurred, correct.

2        Q.  Okay.  Do -- do you even consider that a

3    possibility?

4            MS. CANNELLA:  Objection.  Asked and answered.

5        A.  Again, given his injury pattern and the

6    dynamics of this crash, I do not believe so.

7        Q.  Okay.  Thanks.

8        Let's switch to the surrogate study.  I have a few

9    questions about that.

10       A.  Excuse me.

11       Q.  Bless you.

12       You said you adjusted the driver's seat to

13   as-found position in doing your surrogate study.

14       A.  Correct.

15       Q.  And what -- I just want to make sure I

16   understand what that means.  What does the as-found

17   position mean?

18       A.  It means... got to find my notes.

19       Q.  Is that as found during your inspection?

20       A.  Like as far as where the seat is for and aft

21   on the tracks, yes, sir.

22       Q.  Okay.  So that's -- you used the position the

23   seat was in at the time you did your inspection.

24       A.  Correct.

25       Q.  Okay.  Gotcha.  And you don't know whether

Paul Lewis , Jr., M.S., BME            March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 114

1    that was moved or anything from the time of the

2    accident to the time of your inspection.

3         A.   Well, I certainly don't have any testimony or

4    anybody else describing it was.  And plus, I think, the

5    driver even self-extricated herself, so it doesn't

6    appear to have been a reason to move it as far as on

7    the tracks that I know of.

8         Q.   Right.  As far as the position of the number

9    four seat that Cohen was in, do you know if that seat

10   is adjustable forward and aft?

11        A.   I don't think it is.  Let me just check my

12   notes on that real quick.  Some of the newer ones are,

13   but I don't think these are.

14             (Witness perusing documents)

15        A.   It doesn't look like it's adjustable.

16        Q.   Do you know if it's adjustable from a

17   reclining perspective?  Not fore and aft but does it --

18   the back recline?

19        A.   I don't believe it does.  No, it looks -- it's

20   fixed.

21        Q.   Okay.  On page 18 of your report, do you mind

22   pulling that back up if you've got it.

23        A.   Okay.

24        Q.   Paragraph 1.17 you're discussing your

25   surrogate study and then your reference a photograph

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 115

1   below it.  Tell me again, what was the purpose of this

2   photograph and what are the opinions in 1.17?

3       A.  Well, the purpose was I was trying to --

4   obviously this is a static condition, not dynamic.  So

5   I was trying to do as best I could to kind of show the

6   displacement of the child seat relative to the back of

7   the driver seat.  So, again, it's just a one-G

8   environment, but I was just trying to kind of show

9   approximately where that was maybe, statically,

10  understanding dynamically you've probably got a little

11  motion of both of the child seat and the child going

12  forward and the driver's seat back coming back.

13      Q.  How did you -- I mean obviously you were not

14  able to deform the seat.  So how did you position the

15  car seat in order to take this photograph, because you

16  can't see the car seat in the photograph?

17      A.  Oh.  Well, not in that one, but, yeah --

18      Q.  Right.

19      A.  -- there are photos.  So -- so I basically

20  slid it forward because, you know, the people who we

21  were borrowing the car from I don't think would have

22  appreciated me breaking the seat.

23      Q.  Sure, sure.

24      A.  So -- and I can't remember.  It either had a

25  ball or something I think to kind of hold it and

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 116

1    elevate it because we know we've got -- the vehicle
2    seat back is somewhat forward, and you can tell that
3    the child sheet had been kind of dipped forward as
4    well.  So I was just trying to do the best I could,
5    obviously, statically to kind of get it closer to look
6    at that -- those measurements.
7          Q.  And this is just an approximation from the
8    police photographs, because that's the only evidence
9    you have of the position of the child's seat after the
10   accident.
11         A.  It is.  And I think also -- also in
12   conjunction with, I think, kind of some of the work
13   Buchner may have done with his scans.
14         Q.  Where he placed the child seat into his scan
15   of the accident vehicle.  Is that what you're referring
16   to?
17         A.  Well, me and his group did yes.
18         Q.  Right.  And did you use that scan to actually
19   determine specific distances and measurements in order
20   to approximate this photo?
21         A.  Well, so I was thinking that he said it was
22   six inches or something like that.  I think is where
23   that came from.  But essentially, yes, looking at --
24   using the -- the scene photograph and just trying to
25   get as close as I could, you know, to match it.  I mean

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 117

1    certainly I couldn't -- I couldn't crush the front of

2    the child seat much and whatever.  So, you know, again,

3    it's not meant to be exact, but it certainly gives us

4    an understanding of some of the spacial requirements or

5    so based on the child and all being there.

6         Q.  And is the purpose of your surrogate study to

7    show that based upon the static condition of the

8    accident vehicle that the child was pushed far enough

9    forward for his head to have struck the driver's seat.

10   Is that basically what -- the purpose of the study?

11        A.  Well, kind of.  I think it's a combination.

12   Like I said, we know there is some deflection of the

13   driver's seat, so it's kind of like they're sort of

14   both coming at each other.  And certainly the big

15   driving force is the intrusion and crush shoving that

16   child and seat forward, but also that distance is

17   getting closed a little bit by some deflection of the

18   driver seat back.

19        Q.  Okay.  In this photo on page 18 you're

20   obviously not showing -- showing the deflection

21   backward of the driver's seat.

22        A.  I know I did some with --

23        Q.  Right.

24        A.  -- the seat back, so let me see if I can find

25   that photo just to make sure I don't answer you

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 118

1   incorrectly.

2          (Witness perusing documents)

3       A.   Yeah, I think that one is at the angle of what

4   I found the subject seat back at -- subject driver's

5   seat back at.

6       Q.   And the angle that it was at when you did the

7   inspection, would that be the angle of the deflection

8   backwards?  Would that be reflected [sic] or would --

9   does it reflects [sic] dynamically back to the position

10  it was in statically at the time of the accident;

11  correct?  Is that right or --

12      A.   It's kind of a little overlapping.

13      Q.   Right.

14      A.   So at the end of the day what we see is the

15  static.

16      Q.   Right.

17      A.   So the seat would have been further

18  dynamically in the crash, but then it restitutes back

19  to what we at least see that.  So there would -- it

20  would be a little further back in the crash.

21      Q.   Right.  So further back than what's reflected

22  in this photograph on page 18, is what you're saying.

23      A.   Correct.

24      Q.   All right.  But it's your estimation that

25  combining that seat back deflection that Cohen would

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 119

1   have had to have reached the point that you illustrate

2   in this photograph in order for his head to have struck

3   the driver's seat.

4        A.  Oh, no, I'm not -- so where the ruler is is

5   not about a point of impact.

6        Q.  No, I wasn't talking about the ruler.

7        A.  Oh, I'm sorry.  So that's what I thought you

8   meant.  So I'm just -- I'm just showing you this is

9   roughly -- and this is without any dynamic motion of

10  the intrusion or the driver's seat back (indicating).

11       Q.  Right.  Well, without the dynamic intrusion

12  like in this actual photograph his head would not

13  impact the driver's seat.

14       A.  Well, it's without both sides.

15       Q.  Right.

16       A.  We've got more -- more motion coming from the

17  back impact.

18       Q.  Right.

19       A.  And we have a little bit more motion from the

20  driver's seat back.

21       Q.  Right.  And so I'm trying to figure out this

22  photograph.  You're saying that counting the

23  deflection, this is how close he needs to be statically

24  in order for the combined dynamic deflection to lead to

25  his head impacting the seat.  Is that what the purpose

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 120

1   of this is?

2        A.   I'm just showing how with -- just trying to do

3   some static representations without taking in any

4   dynamic that we're at least this close, if not closer,

5   and then adding dynamic then it's easy that there's

6   going to be impact.

7        Q.   I got you.  So this is just showing statically

8   the distance you believe is reflected in the accident

9   vehicle, the representation of that.

10       A.   Somewhere close maybe.  May not be exactly.

11  It's just more trying to understand how all that

12  intrusion, how we can even get the child anywhere close

13  to something in front of him that could cause the skull

14  fractures.

15       Q.   Okay.

16       A.   I'm not in any way trying to exactly replicate

17  anything.  This is just showing that how close you can

18  be.

19       Q.   Did you inspect the rear of the number four

20  seat for damage during your inspection?

21       A.   I did, that's what I said earlier, and there's

22  -- I've got some photos that show the back, and what

23  I'd say looks pretty clean.  There's a little -- little

24  small tear, but that's on like what would be the number

25  five part of the seat.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 121

1     Q.   Okay.  So you didn't find any evidence from

2   your inspection of seat number four that would indicate

3   that it received an impact that could have led to the

4   basilar skull fracture.

5     A.   No.  But the seat is deformed, and it's

6   pushed -- it's bent forward like I said (indicating).

7   So I mean, obviously, something had to push that

8   forward to cause --

9     Q.   Right.

10    A.   -- that deformation.

11    Q.   All right.  If you'd turn to page 19 of your

12  report.

13    A.   Okay.

14    Q.   All right.  And Section 1.20 through 1.24 is

15  when you discuss whether the reconstruction or the

16  simulation of the hypothetical incident would have been

17  enough --

18         (Brief interruption)

19    A.   Sorry

20    Q.   No problem -- that the G-forces involved in

21  that hypothetical incident whether they would have been

22  enough to cause Cohen's injuries and death.  That's

23  what you're discussing in these four -- five

24  paragraphs; correct?

25    A.   Right.  Because like I said earlier, his --

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 122

1   the injury is not associated with the G-forces per se,

2   and even Dr. Eisenstat said that.  This is due to blunt

3   force trauma.

4        Q.  Right.  Well, we know we have blunt force

5   trauma in this case.  Is it possible in the subject

6   accident, not the hypothetical but the subject

7   accident, that in the milliseconds prior to the blunt

8   force trauma the G-forces that Cohen experienced could

9   have led to the injury?

10       A.  In a millisecond before what?

11       Q.  Before the actual trauma.  Before the hit to

12   the head.  You're going to have G-forces exerted at

13   some point prior to the actual impact.

14       A.  Right.  And you've got to remember this

15   child's sleeping, so the head's already against -- so

16   there's no relative velocity between the head and the

17   child's seat itself.  So basically I'm already

18   contained against it.  So there's nothing that would

19   lead to having an impact to that and certainly nothing

20   that's going transmit all the way through several

21   layers that's behind the child.

22       Q.  When you say trans -- you mean the G-forces

23   transfer at the time.  Is that what you mean?

24       A.  Or -- or some type of impactor, correct.

25       Q.  But I was talking about pure G-forces.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 123

1        A.   Right.

2        Q.   So you could have an incident where assuming

3    that G-forces alone can cause the internal

4    decapitation, if you've got a certain movement.  Do you

5    believe that's even possible?

6             MS. CANNELLA:   Object to the form of the

7             question, vague.

8        A.   In this case, no; and, again, that's also

9    consistent with Dr. Eisenstat's testimony as well.

10       Q.   And why in this case?  Because what I'm trying

11   to get at is, you have the G-forces exerted on the

12   child prior to the impact as you believe to the front

13   seat.

14       A.   Well, there's G-forces being exerted

15   throughout the crash.  That's what's causing the

16   deformation and shoving forward and all, but it's

17   actually hitting (indicating) the seat is what

18   ultimately causes that fracture.  So if it's just from

19   the inertia, the child is packaged back there.  So as

20   long as we don't have something that he can be shoved

21   into to impact, just me up against the interior of the

22   child seat, there's nothing that would cause that.

23       Q.   Okay.  And that's in the subject accident

24   we're talking about.

25       A.   In -- in the hypothetical accident too.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 124

1   Because the child's still going to be against his --

2   the interior of the head -- I mean -- I'm sorry -- of

3   the child seat.  So he's already kind of packaged

4   basically, and he's -- and it's a rear impact, so he's

5   staying within the confines of that child seat.  So

6   there's nothing really to allow that inertial movement

7   to potentially cause an AO in that -- in that manner.

8        Q.  And that's because his head is going to be

9   prevented from going backward, you're saying.  But what

10  about -- he's not prevented from moving forward;

11  correct?

12       A.  Well, he wouldn't -- only thing, if he ever

13  moved forward would be rebound --

14       Q.  Right.

15       A.  -- which is a small percent of what the

16  initial energy is.

17       Q.  That's what I was getting at.  And so the

18  rebound effect in your opinion is not going to ever be

19  enough to cause the internal decapitation.

20            MS. CANNELLA:  Objection to the form of the

21       question as vague.

22       A.  Not in this case, no, sir, I don't believe so.

23  I mean I've never seen rebound that was more

24  significant than the initial onset.

25       Q.  Okay.  Well, paragraphs 1.20 through 1.25 are

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 125

1    discussing the hypothetical crash --

2         A.  Yes, sir.

3         Q.  -- only.  So let's go back to that.  I know

4    it's easy to jump back and forth between the two.

5         A.  Sure.

6         Q.  Under paragraph 1.21, you say, Had the Ford

7    truck not been lifted, it would engage the rear

8    structures of the Escape as -- such as the bumper that

9    attenuate and distribute crash forces.

10        What is your basis for that statement?

11        A.  Well, I mean my own understanding of how when

12   vehicles crash that's what they're designed to do, but

13   also that's a part of why you -- in this case you want

14   to get -- and with every vehicle -- you want to have

15   compatibility so that the vehicle structures can do

16   what they're designed to do, i.e., you know, crumple

17   and deform, and that work done is absorbing energy.  Oh

18   gosh -- that's absorbing energy, so that's dissipating

19   energy that ultimately the occupant may have to try to

20   handle or not.

21        Q.  What evidence do you have that that would have

22   occurred in this hypothetical crash?

23        A.  Well, I think that's based on what Mr. Roche

24   was saying because if you're lower -- and I think even

25   Buchner was talking about that.

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 126

1          Q.   But what evidence do you have that the

2     nonlifted version of this F250 would have engaged the

3     rear structures of the Escape, as you describe in this?

4          A.   Again, I think that's part of what Mr. Roche

5     is saying in his report.  And, obviously, the lower it

6     is, then the more likely -- because you still have

7     other structures, and the bumper's, you know, fairly

8     tall, so to speak, I mean from top to bottom of it

9     (indicating).

10          Q.   So your comment concluding that the

11     hypothetical incident -- are you saying in the

12     hypothetical incident we're not going to have any

13     override of the bumper?

14          A.   The whole point is that from what we're

15     talking about is you make it more to where the

16     vehicle's stay in alignment, and you just continue the

17     crush so you have those frame rails and everything that

18     are helping to prevent or resist the significant

19     intrusion.

20          Q.   But any statement you make regarding whether

21     that would have occurred or not in the hypothetical

22     crash is dependent upon what Mr. Buchner and Mr. Roche

23     have testified to.  It's not based on anything that

24     you've independently determined.

25          A.   No, I mean that's where I'm getting

Paul Lewis , Jr., M.S., BME            March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 127

1    information, and I mean my own previous knowledge

2    that's what I would be expecting, but that's not an

3    independent opinion of mine.

4        Q.  Okay.  Under 1.22, that paragraph, you're

5    there discussing the simulation by Buchner of the

6    hypothetical accident and you're talking about the peak

7    G-forces that he might have -- that he generated during

8    that simulation.  Is that a fair description of that?

9        A.  Yes.

10       Q.  And the next paragraph talks about a peak or

11   worse case scenario of 45 G's.  Are you saying that

12   that is the worst case peak 45 G's or is -- what --

13   what do you mean by that?

14       A.  Well, I mean at least my understanding of

15   Mr. Buchner's work is that's what he came up with.

16       Q.  And he came up with that with a computer

17   simulation.

18       A.  He did.

19       Q.  Right.  And do you know where in the vehicle

20   that simulation says the peak G's would have been 45

21   G's?

22       A.  You mean where on -- in the vehicle?

23       Q.  Uh-huh (positive response).

24       A.  You know I don't know that he discussed that,

25   but certainly probably at the most at the outset would

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 128

1    be at the rear of the vehicle.

2         Q.   Okay.  So you don't know whether his

3    measurement or his simulation of 45 G's was at the rear

4    of the vehicle, at the center of gravity of the

5    vehicle, at the number four position -- you're not

6    aware from his work where that peak level that he

7    simulates occurs.

8         A.   So I don't remember specifically if he stated

9    it to that extent.  Let me look back at his report.

10             (Witness perusing document)

11        A.   No, he doesn't delineate in the report.

12        Q.   All right.  Do you agree that the peak G's can

13   vary depending on the location within the vehicle?

14        A.   They can and certainly they may -- you may

15   have another peak somewhere further, but obviously that

16   would be less than -- because the first initial is

17   where you get the biggest speed change going, but it's

18   going to progress but certainly some of those G's are

19   being bled off because of damage being deformed or so

20   to the vehicle.

21        Q.   I agree that the peak G is going to be at the

22   time-wise at the initial, but it's going to be

23   different at different locations on the vehicle.

24        A.   The G's will be different throughout sure, but

25   they're never going to be higher than what the

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 129

1    initial -- at least my understanding of the peak at the

2    start.

3        Q.  Right.  Well, assuming that these 45 G's was

4    not the measurement -- or not measurement.  He didn't

5    measure anything.  Is not the guesstimate from his

6    simulation of the peak G's at the number four seating

7    position.  That's what I'm getting at is you don't know

8    what the peak G's would be even in his simulation in

9    the number four position.

10       A.  I don't think he broke it down to that, but

11   certainly if we're doing deformation, I wouldn't expect

12   the peak G's to be as high as the 45 at the number four

13   because you've got to work your way to get to that

14   position, so it's certainly not going to get higher.

15       Q.  But you don't know where the 45 G position

16   was, so you're --

17       A.  We've already agreed with that.

18       Q.  Right.  So that means -- I don't understand

19   your answer then.  How would you -- how can you

20   conclude that the peak G's of the number four position

21   might not have been higher than 45 G's at the initial

22   point of impact when you don't know where the 45 G's

23   estimate comes from?

24       A.  Well, I guess just I've never seen where the

25   G's grow higher than the initial impact force to some

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 130

1    other seated position.

2        Q.   Let's assume the 45 G's in his simulation was

3    at the center of gravity of the vehicle.

4        A.   Okay.

5        Q.   Okay.  I agree with you that the -- the center

6    of gravity peak G would be at the initial part of the

7    accident sequence and would bleed down from there like

8    you mentioned.

9        A.   Right.

10       Q.   But that has no bearing or relation on what

11   the peak G at the initial impact would be in the number

12   four seat position.

13       A.   Well, the CG of that vehicle is probably not

14   far from the number four position.  It's probably, you

15   know, typically it's about the center between the two

16   front seats.

17       Q.   How do you know that?  Did you measure that in

18   this case?

19       A.   No.

20       Q.   Did you look that up anywhere?

21       A.   (Shakes head negatively).

22       Q.   You're just guessing where the peak -- where

23   the center of gravity may be on the Escape?

24       A.   I'm just saying typically that's around where

25   it is.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 131

1      Q.   Right.

2      A.   I'm certainly not opining where it is,

3  absolutely.

4      Q.   All right.   In Paragraph 1.23 you reference

5  FMVSS 208.  You would agree that that relates to

6  frontal offset crashworthiness; is that correct?

7      A.   Well, 208 is the occupant protection standard,

8  and actually those values apply to rear impacts, side

9  impacts, and frontal impacts.

10     Q.   So you have to comply with FMVS [sic] 208 by

11  showing that your vehicle can comply from all those

12  different areas.   It's not just the frontal offset

13  crash?

14     A.   No, the compliance test is only a frontal

15  test.  It's not even a frontal offset.  The offsets are

16  done above what the compliance test of the 30-mile-hour

17  is.  But as far as injury assessments and all, we --

18  typically you still apply the values of 208 in

19  whichever crash.

20     Q.   But it's not required of the manufacturer test

21  even though they're in a frontal crash.

22     A.   Oh.  Well, they do have to test in other crash

23  modes, and you're still looking at 208 values or HIC

24  values in side impacts, the frontal impacts.  The rear

25  impact is mainly just 301 which is a field system

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 132

1    integrity.

2         Q.   Right.  I'm just trying to get to the fact

3    that in order to comply with 208, you don't have to

4    test any crash other than the frontal 30 mile-per-hour

5    test.  That's the only test you have to -- to pass.  Is

6    that correct --

7         A.   No.

8         Q.   -- or not?

9         A.   You've got to pass 214 which is the side

10   impact standard.

11        Q.   That's a different standard.  That's what I'm

12   saying.  For 208, in order to comply with 208 --

13        A.   Oh.

14        Q.   -- you just have to pass the frontal crash

15   test.

16        A.   Okay.

17        Q.   Is that -- is that fair?

18        A.   Sure.

19        Q.   Okay.

20        A.   But you use the same 208 note criteria for the

21   side impacts as well.

22        Q.   All right.  And -- but for rear impacts, we

23   have entirely different criteria.

24        A.   There's technically no injury --

25        Q.   Right.

Paul Lewis , Jr., M.S., BME                 March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 133

1      A.  -- requirement.  It's basically whether or not

2      the vehicle leaks fuel or not.

3      Q.  Okay.  The 208 level that you reference here

4      not exceeding 70 G's, what type of person is that

5      applicable to?

6      A.  Well, they typically use a 50th percentile

7      Hybrid III dummy.

8      Q.  Of -- of a male, average male.  Would that be

9      a fair way of saying that?

10     A.  Yes.

11     Q.  All right.  So those -- that's where that

12     level comes from.  Would you agree that in order to

13     prevent injury to a child, a two-year-old child, you

14     would need a different standard than what's applied to

15     the average -- average male -- adult male?

16     A.  Well, I mean, certainly that gives us a data

17     point, and there's been some attempts to do some

18     scaling for the children as well, and seems like some

19     of that shows that they at times can sustain a little

20     higher accelerations.

21     Q.  But you're not aware of any specific criteria

22     which would say here is a safe level for a child in

23     order to prevent a brain injury.

24     A.  Well, I'm trying to remember... they do have

25     some criteria for like the six-year-old dummy, but I

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 134

1  can't cite it to you exactly.

2       Q.  All right.  And this last thing in 1.24 you're

3  talking about the preservation of the occupant survival

4  space.  And just to be sure that -- you're stating that

5  that would have occurred not based upon any work or

6  opinions you developed, but based upon Buchner's

7  interpretation of his computer simulation of the

8  hypothetical crash.

9       A.  Yes.

10      Q.  Okay.  I think you -- you would agree that the

11  potential for error in your conclusions related to the

12  hypothetical crash, is dependent upon the accuracy of

13  Mr. Buchner's simulation; is that fair?

14      A.  Well, I'd say technically really with these

15  type kind of clinical opinions it's hard to really put

16  any type of error rate on it.  Because it's not like an

17  empirical study per se like, you know, calculating a

18  Delta-v of doing a scientific experiment in that

19  manner.

20      Q.  Right.  So how did you consider the potential

21  for error in your occlusion -- in your conclusions and

22  opinions in this case?

23      A.  Well, I think from, again, the total analysis

24  of the child spectrum of injuries, injuries he does not

25  have, inspection of the vehicle, the occupant space,

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 135

1     the damage to the vehicle as well, and then in

2     conjunction with the work of Mr. Buchner as well.

3          Q.  And I asked that poorly.  I meant to make it

4     reference only your opinions related to the

5     hypothetical crash.

6               MS. CANNELLA:  Can you repeat the question?

7          Q.  Sure.  You state on page 20 of your report

8     that one of the criteria of the scientific method of

9     analysis in your words is consideration for the

10    potential for error in the conclusions and -- and

11    opinions stated.

12         A.  Yes.

13         Q.  And I'm assuming that you applied that

14    scientific method in this case, and I want to know how

15    you applied that to your opinions that relate to the

16    hypothetical crash.

17         A.  Oh.  Okay.

18         Q.  Does that make sense?  I thought you said

19    subject, so I apologize.

20         Well, again, I considered the information that's

21    been provided to me from Mr. Buchner, and, again, it

22    would be my assumption that we're going to

23    significantly decrease the amount of intrusion at least

24    as far as relative to Cohen's occupant survival space.

25    There still is going to be some crush I'm sure of the

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 136

1    rear cargo area and all, but not -- at least to my

2    understanding, not to the extent that we have.

3         Q.   But the potential for him to have erred in

4    performing his -- his computer simulation, that's

5    something that's outside of your ability to -- to check

6    or consider; is that fair?

7         A.   Yes, sir.

8         Q.   Okay.  And I think you've stated your

9    hypothesis was -- as you've stated in this report

10   numerous places -- was to determine whether if the

11   vehicle had been in its stock configuration, Cohen

12   would not have suffered the injuries and fatality that

13   he did in the subject hip (phonetic)-- crash.  Is that

14   a fair statement of your hypothesis?

15        A.   Yes, sir.

16        Q.   Okay.  And how did you specifically test the

17   validity of that hypothesis?

18        A.   Well, that's part of going through, again,

19   analyzing the injury pattern, the lack of certain --

20   certain injuries from, like  -- like I said, just

21   straight G-forces, consideration of the -- basically

22   the loss of survival space and the directionality that

23   Cohen would be moving during this crash.

24        Q.   And with regard to the hypothetical crash, how

25   did you test the validity of the hypothesis related to

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 137

1    the hypothetical crash?

2         A.   Well, in the same way, but obviously with the

3    understanding from what Mr. Bucker said was going to --

4    would occur or would happen as far as the alteration of

5    the damage profile.

6         Q.   So you weren't able to test the validity of

7    his opinions.  That's what I'm trying to get at;

8    correct?

9         A.   I would never would do that.  I mean that's

10   not my job.

11        Q.   Right.

12        A.   Because then you'll scold me because I'm not a

13   reconstructionist.

14        Q.   Sure.  I mean I'm just establishing you're

15   relying upon the validity of his report if there's

16   nothing you can do to test it from your chair.

17        A.   Well, that's true -- from the hypothetical

18   right.

19        Q.   Right, the hypothetical.

20        A.   But certainly I don't necessarily need him for

21   the initial or the subject crash.

22        Q.   All right.

23             MR. HILL:  What exhibit are we on now?

24        Exhibit 7?

25             THE COURT REPORTER:  Seven.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 138

1          (Defendant's Exhibit No. 7 was marked for

2      identification by Mr. Hill.)

3      Q.   Okay.   This is the supplemental report dated

4  March 15, 2024, Bate's labeled 009132.

5          MR. HILL:   And before I ask questions about

6      this I just want to state on the record that I'm

7      not -- by asking questions on this topic of the

8      report we just received the business day prior to

9      the deposition, that I'm not waiving any

10      objections to the timeliness or admissibility of

11      the report or any of the opinions contained in the

12      report.   And I'm asking limited questions related

13      to the supplemental report until the Court can

14      rule on our -- the motions that will be coming to

15      strike this supplemental report under the reasons

16      I've just mentioned.

17          It's impossible for me today with less than a

18      business day's notice to properly examine

19      Mr. Lewis based upon his entirety of his work in

20      two other cases from over a decade ago.   And so I

21      will ask limited questions to support the motion,

22      but there's no way that I could be expected to

23      thoroughly examine him regarding all his opinions

24      in the Bacho Case and the Mendoza Case and the

25      foundation for those opinions and the evidence

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 139

1          upon which they're based and the expert work in

2          those cases by multiple other experts.  So I just

3          want to get that on the record.

4              MS. CANNELLA:  We would ask that you -- we do

5          not agree to produce him a second time for

6          deposition, so we ask that you ask whatever

7          questions you have about it.

8              MR. HILL:  Well, I'm not going to agree to

9          terminate the deposition.  I will say it will be

10          suspended at the end of the deposition pending the

11          Court's ruling on this late disclosure and

12          improper disclosure, and the fact that it covers

13          evidence and information that will be likely

14          inadmissible in this case, so that's my -- that's

15          my position.

16     BY MR. HILL:

17          Q.  When did you begin working on this report

18     dated March 15, 2024?  Do you know?

19          A.  Probably last week, I think or -- yeah, I

20     think so.  It's possible it was the week before.

21          Q.  So at the earliest it would have been, you're

22     saying, the week of March 4th?

23          A.  If that's two week ago.

24          Q.  Okay.  But you're not sure exactly when you

25     began drafting this supplemental report.

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 140

```
 1        A.   No.  I mean it's been in the past two weeks.

 2        Q.   Okay.  And I think you said what prompted you

 3   to draft this report was a request from Ms. Cannella to

 4   issue opinions relate to Bacho and Mendoza.  Is that a

 5   fair statement of your prior testimony?

 6        A.   Sure.  I mean I don't spontaneously generate

 7   any report until an attorney asked me to do that.

 8        Q.   Okay.  I'm confused.  If you're not planning

 9   to give certain opinions in a case or do you find that

10   certain opinions are necessary to validate your

11   testimony in a case, you don't wait for the attorney to

12   tell you what you should or shouldn't consider in order

13   to give your opinions; correct?

14        A.   That's not what I said.  So in general I don't

15   just write a report in a case unless the attorney asks

16   me to because I have a lot of cases where we don't even

17   write a report.

18        Q.   Well, this is a federal court case.  You know

19   a report's required.

20        A.   Honestly, I don't always know whether they're

21   federal or state court.

22        Q.   Okay.  Well, assuming that, you know, this is

23   a state -- a federal court case with a deadline of

24   October 16th to provide all of your opinions you're

25   going to give in the case, based upon everything known
```

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 141

1   at that time at the minimum, and prior to October 16th

2   you were fully aware of all the details of the Bacho

3   and Mendoza cases; correct?  You said you've known

4   about them for decades.

5        A.  Right.  They're -- like I said, they're quite

6   old cases.

7        Q.  Right.  And if they were relevant to your

8   opinions in this case, you don't wait for the lawyer to

9   tell you what facts and information is or is not

10  relevant when you're required to issue a report that

11  outlines all of your opinions in the case; correct?

12       A.  Well, again, I'm not saying that it's

13  relevant, like it's not something I'm relying on as far

14  as the opinions I have in this current case, but it

15  does show that I have investigated and seen this

16  similar issue.  So it's a part of, again, my

17  experience, background, education, and training.

18       Q.  All of which could have been included in your

19  October 16, 2023 report.

20       A.  It probably could, sure, but, again, it was

21  not necessarily something that I need as a bases for my

22  opinions in this case.

23       Q.  Okay.  The information that you've provided in

24  connection with your discussion of those two cases in

25  this report include your expert file material from

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 142

1   those cases; correct?

2       A.   It includes my -- the reports that I wrote and

3   the case review which has all the underlying data to

4   it, and I think even my vehicle inspection information

5   as well.

6       Q.   Which is all part of your file -- your

7   generated file from that case, from those cases?

8       A.   It is, but it also has listed all of the other

9   experts and everything else that were in there and all

10  their information, so that's all summarized in here as

11  well.

12      Q.   But you did not produce all of the materials

13  and information that you reviewed in connection with

14  issuing your opinions in those two cases; is that

15  correct?

16      A.   I produced my summary of all those materials.

17  I did not produce each and every individual file.

18      Q.   Right.  But we don't have any of the

19  depositions from those cases, any of the reports from

20  the other experts in the cases, any of the documents

21  produced in those cases that you relied upon or

22  reviewed, none of the evidence that formed the basis of

23  your opinions in those cases was actually produced to

24  us by you in this case; correct?

25           MS. CANNELLA:  Objection to the form of the

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 143

1          question.  Rough Country's had all those materials

2          since they were provided in the cases that they

3          refer to.

4               THE WITNESS:  I'm just saying he hasn't --

5               MS. CANNELLA:  No, you said we didn't -- we

6          don't have them and we, being Rough Country, does

7          have them -- has had them.

8               MR. HILL:  I didn't say "we" don't have them.

9          I said "he" hasn't provided to us, is how I

10         question -- phrased the question.

11              MS. CANNELLA:  The question was "we."  I

12         listened very carefully.

13              MR. HILL:  Okay.

14              MS. CANNELLA:  Object to the form of the

15         question.

16              MR. HILL:  I'll rephrase it then.

17    BY MR. HILL:

18         Q.  You haven't provided to us any of the

19    materials that you relied upon or reviewed in

20    connection with forming your opinion in the Bacho or

21    Mendoza cases; correct?

22              MS. CANNELLA:  Objection.  Object to the form

23         of the question.  Mr. Lewis has provided that

24         information.

25              MR. HILL:  That's a speaking objection.  I'm

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 144

1          talking about he hasn't provided anything other

2          than what he just mentioned.

3          Q.  You haven't provided to us any of the

4     depositions that you read, any of the documents you

5     reviewed, any of the expert reports from other experts

6     in that case, or any of the actual raw material that

7     was used to formulate your report.  That's my question.

8          MS. CANNELLA:  Object to the form of the

9          question.  It is vague because it doesn't say

10         which case you're asking him about.

11         Q.  Either Bacho --

12         MS. CANNELLA:  There are two cases.

13         Q.  -- or Mendoza.  Either one.

14         MS. CANNELLA:  You -- the question doesn't

15         state whether you're asking if he produced it in

16         this case or if he's produced it in Bacho or

17         Mendoza.

18         Q.  Obviously, I'm talking about this case.

19         A.  So that's not completely true because there

20    are copies or portions of the expert reports are within

21    the case reviews of these, and then there's the summary

22    -- summaries of all the various depositions of both

23    sides' experts in every one of those cases as well, not

24    to mention medical records summary and reviews and

25    numerous photographs.

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 145

1          Q.  I think my question was very clear.  I'm not

2     talking about your summary of any information.  I'm

3     talking about the actual information itself.  The

4     depositions, the expert reports, the documents you

5     reviewed -- those -- that material has not been

6     produced to us in this case to enable us to see what

7     you based your opinions in both Bacho and Mendoza on.

8          MS. CANNELLA:  Objection to the form of the

9          question.  Misstates the reality.

10         Q.  Go ahead answer.

11         A.  Well, this does produce the basis of what I

12    wrote the report on and the material that I relied on.

13         Q.  I'm not saying -- I'm saying the actual

14    material.  None of the actual material you relied upon

15    was produced by you to us in this case from your

16    opinions in Bacho and Mendoza.

17         A.  Well, I would agree that probably the

18    depositions are not in there.  I'm pretty sure reports

19    are, but, yeah, I didn't individually produce a medical

20    record or a deposition.

21         Q.  Let's talk about -- you say on page 2 of this

22    report, you admit that the details of Mendoza and Bacho

23    are different from Bryson.  Let's talk about what is

24    the same from Bryson.  In Mendoza and Bacho the vehicle

25    was involved in the accident was equipped with a Rough

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 146

1    Country lift kit.  We can agree on that?

2         A.   Yes, sir.

3         Q.   Were the vehicles involved in Mendoza or Bacho

4    the same as the vehicles involved in this case?

5         A.   I think they both dealt with 2500 pickup

6    trucks, but the struck vehicle was -- one was a Mustang

7    and one was a Sienna minivan.  But in all the cases,

8    basically the impacts were above where the expected

9    vehicle structures were that were meant to carry loads.

10        Q.   Well, let's talk about that.  When you say a

11   2500 pickup, are you saying that that's what was

12   involved in this case?

13        A.   A 250, yes.

14        Q.   Okay.  And so in what other case between

15   Mendoza and Bacho was a Ford F250 involved?

16        A.   Oh, I didn't say a Ford.  One was a dodge and

17   one was a Chevrolet.

18        Q.   All right.  So a Dodge 2500, RAM 2500 is not

19   the same vehicle as a Ford F250, is it?

20        A.   It's still a three-quarter ton pickup truck.

21        Q.   But that's the only similarity between those

22   two.  You don't know the -- whether they're the same

23   height, whether they're the same weight, whether they

24   have the same coefficient of restitution and stiffness.

25        A.   Well, I certainly -- some of that I would

Paul Lewis , Jr., M.S., BME         March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 147

1   never know to begin with, but I -- I don't have that

2   kind of detail memorized, no, sir.

3       Q.   Okay.   The incident that occurred in Bacho,

4   was it a rear-end collision?

5       A.   No, sir.

6       Q.   It was a side-swipe collision; correct?

7       A.   It wasn't a side swipe.   It was a side impact.

8   It was a T-bone.

9       Q.   Well, that's what I meant to say.   I'm talking

10  about a T-bone, a side-impact collision.

11      A.   Yes, sir.

12      Q.   And the collision in Mendoza was a frontal

13  impact collision.

14      A.   It's kind of an offset frontal, yes, sir.

15      Q.   Neither of them were a rear-end collision.

16      A.   They were not.

17      Q.   You would admit that the speeds of the

18  vehicles involved in those two incidents are not the

19  same as the speeds involved in the Bryson matter.

20      A.   The Delta-v's were -- were different.

21      Q.   All right.   Do you know the size of the lift

22  kit in the Bacho case?

23      A.   I -- I don't recall offhand, no, sir.

24      Q.   Do you know the size of the lift kit in the

25  Mendoza case?

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 148

1          A.   Not without going back and look.

2          Q.   Do you know the height of the bumpers of any

3    of the vehicles if any of those cases?

4          A.   If I go through the materials that I've

5    provided you I could find that.

6          Q.   Well, if you'd like to.  But you would agree

7    that they're not identical.  Would you agree to that,

8    to the Bryson vehicles?

9          A.   Without looking back, I -- I don't know for

10   sure.

11         Q.   Okay.  Well, you -- are you intending to give

12   any opinions that relate to Mendoza and Bacho other

13   than what's listed and described in your supplemental

14   report?

15         A.   No.

16         Q.   Okay.  So let's talk about what your opinions

17   are that you intend to give in this case that relate to

18   Bacho and Mendoza.  So what are they?  I'm not sure I

19   understand this disclosure because it seems to cite

20   conclusions of experts in other cases.  What exactly

21   are you intending to testify about in this case that

22   relate to Bacho and Mendoza?

23         A.   That they are other examples of what --

24   exactly what we have here based upon the lifting of the

25   vehicle or the application of the Rough Country lift,

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 149

1    that you had created a significantly incompatible

2    vehicle-to-vehicle situation where you cause much more

3    catastrophic deformation of the occupant's survival

4    space for the individuals in the struck vehicle by

5    that; and thus you've also rendered that vehicle not

6    capable to utilize the as-designed safety features of

7    the cage and all to manage the energy to crumple zones

8    to help with the deformation and dissipation of the

9    energy.  Rather you basically just have catastrophic

10   intrusion into the occupant survival space that

11   ultimately becomes catastrophically as far as

12   injuries -- sorry -- injury causation.

13       Q.  You've testified multiple times today that

14   you're not qualified to give accident reconstruction

15   opinions.  And you just said that you intend to give

16   opinions in this case related to accident

17   reconstruction issues in Bacho and Mendoza.

18           MS. CANNELLA:  Objection to the form --

19       Q.  Do you agree with that?

20           MS. CANNELLA:  Objection to the form of the

21       question.  Misstates his testimony.

22       A.  Those words never even came out of my mouth,

23   so that's an absolutely mischaracterization of what i

24   just said.  I'm basically talking about the actual

25   physical evidence of what the defamation profile is to

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 150

```
 1   these.  I'm certainly not putting a Delta-v or anything
 2   of that nature.  You can look at the photographs and
 3   tell how detrimental the impact was.
 4        Q.  Well, I think the record will speak for
 5   itself.  I almost don't need to ask any questions on
 6   this, but you just summarized the conclusions of the
 7   accident reconstruction and other experts when you talk
 8   about the safety features of the crashed vehicles and
 9   the ineffectiveness of the crash protection.  Again,
10   you've testified earlier that those are within the
11   expertise of an accident reconstructionist, and they're
12   not within your expertise to talk about the design of
13   the vehicle, the potential for override of the vehicle,
14   the potential for intrusion, the -- all of the dynamics
15   involved with a vehicle crash.
16        MS. CANNELLA:  Object to the form of the
17        questions.  It's compound, confusing, and not
18        really a question.
19        Q.  Go ahead.
20        A.  It's straightforward that obviously for the
21   frontal crash when you did not engage the bumpers or
22   the main load-bearing structures of the vehicle.  For
23   the side impact you're above all the side door beams
24   and all the robust structure.  So that's not really a
25   reconstruction opinion.  That's obviously based on my
```

Paul Lewis , Jr., M.S., BME                 March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 151

1   extensive knowledge of vehicles and looking at it.

2   Now, I'm not saying how the car was designed

3   differently or anything of that nature.  I'm just

4   saying it's obvious that the deformation profile is

5   much greater because of the incompatibility of how

6   they're supposed to line up.  I mean there's been a lot

7   of literature written about this especially from IIHS

8   and NHTSA about vehicle compatibility.

9       Q.  Are you able to give testimony about vehicle

10  compatibility and the IHS comments about that?  What --

11  what qualifies you to even talk about vehicle

12  compatibility?

13      A.  From a performance standpoint and injury

14  causation standpoint.  I'm not getting down into the

15  intricacies of the design itself, but certainly I don't

16  design a seat, but I certainly can talk about the

17  performance of a seat and how that may lead to injury,

18  just like whether an air bag does or doesn't go off an

19  how that may affect it.  Certainly I'm not an air bag

20  designer either, but, you know, I don't know need to

21  know how to design the bag.  I know what the purpose is

22  and how that may play a role in protecting or not being

23  able to protect an occupant.

24      Q.  Well, your opinion basically is that in those

25  other two cases that the intrusion would have been

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 152

1   significantly lessened in the hypothetical situation of

2   those vehicles not having a Rough Country lift kit;

3   correct?

4        A.  Yes, sir.

5        Q.  And in order to give any opinion regarding

6   what intrusion may or may not have occurred in a

7   hypothetical crash, you would have to rely upon

8   accident reconstructionist's estimation or simulation

9   or testing with regard to what would happen in that

10   hypothetical crash; correct?

11       A.  I did, and that information is contained in

12   the documents that I produced.

13       Q.  Right.  And I'm saying that you would have to

14   rely upon their opinions to make this conclusion.

15   They're not opinions that you yourself are qualified to

16   give.

17       A.  I'm sorry.  What -- what opinions am I not

18   qualified to give?

19       Q.  The opinion that the intrusion in Mendoza and

20   Bacho would have been significantly lessened, the

21   safety features of the struck vehicles would have been

22   allowed to function as designed if there had not been a

23   lift in either Bacho or Mendoza.  That specific opinion

24   on page 2 of your report.

25       A.  No, that's from using other experts just like

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 153

1    Mr. Buchner who provided that information.

2        Q.   You've already said in this case Mr. Buchner's

3    conclusions regarding the hypothetical incident are his

4    opinions, not your opinions, and that you relied upon

5    them to then give opinions about assuming he's [sic]

6    true, this is what injuries would or would not have

7    occurred.

8        A.   And that's the same thing I did in these other

9    two cases as well.

10       Q.   Right.  And in this case what I'm saying is in

11   both Bacho and Mendoza in order to make that statement,

12   you have to rely upon the conclusions and opinions and

13   the work of the accident reconstruction experts in

14   those cases.

15       A.   So it's like a dog chasing its tail.  You've

16   already asked me that and I've answered you that yes

17   there were other experts and that information is

18   contained in these documents (indicating).

19       Q.   Right.  But we don't have those other experts

20   to cross-examine in this case, do we?

21       A.   I guess not.  I mean I don't think I've seen

22   whether they're -- they've certainly been cross-

23   examined before.

24       Q.   But we don't -- we haven't had an opportunity

25   to cross-examine them on these issues in this case even

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 154

1    if it was relevant because we didn't even know that you

2    intended to give any opinions related to Bacho and

3    Mendoza until March 15th.

4         MS. CANNELLA:  Object to the form of the

5         question.  What is the question?

6         Q.   The question is, we did not -- you did not

7    make us aware that you intended to give any opinions

8    related to Bacho and Mendoza until over five months

9    past the deadline for you disclose your opinions in

10   this case.  Would you agree with that statement?

11        MS. CANNELLA:  Object to the form of the

12        question.

13        A.   Well, I don't know that technically I'm giving

14   you opinions other than it shows similar damage

15   profiles and results from other cases with Rough

16   Country lift kits.  That's I think really is about the

17   extent of it.

18        Q.   But you did not disclose even to that extent

19   of it, whatever the extent of it is, that you intended

20   to even reference Bacho and Mendoza until March 15,

21   2024, five months after the deadline for your opinions

22   to be disclosed in this case; is that true?

23        MS. CANNELLA:  Object to the form of the

24        question.  The report states about his experience

25        and education.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 155

1      Q.  No, is that true.  Is my question true?

2      A.  I did not specifically mention those in the

3   first report because, again, it's not really a basis

4   for this case's report, but certainly it's just other

5   examples of the same thing.

6      Q.  Well, it's testimony you intend to give in the

7   case and the purpose of your disclosure is to disclose

8   not just your opinions but all of the testimony you

9   intend to give in the case.  Is that understanding of

10  Rule 26 in the federal courts?

11          MS. CANNELLA:  Object to the form of the

12          question.  Outside the scope of his testimony.  I

13          think we get your point, Mr. Hill.

14          MR. HILL:  Well, I want to hear the answer.

15          MS. CANNELLA:  Well, he doesn't know what the

16          purpose of the Rule 26 is.

17      Q.  He is -- he --

18      A.  That goes without saying.

19      Q.  You don't -- you don't understand the rule of

20  the purpose of Rule 26.

21          MS. CANNELLA:  Object to the form of the

22          question.  Outside the scope of his testimony.

23      A.  I mean, I'm not a lawyer so I don't know the

24  whole legal standard or whatever it is or not, no.

25      Q.  How many times do you believe you've testified

Paul Lewis , Jr., M.S., BME        March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 156

1    in federal court in your career in a case that was

2    filed in federal court.

3         A.   I mean I'm sure a lot, but --

4         Q.   Okay.  And --

5         A.   -- again, that doesn't mean that I know all

6    the intricacies of some legal doctrine.

7         Q.   Well, in each of those case over the last --

8    what is it now -- 30 plus years, you've been required

9    to comply with Rule 26 in drafting your report.  You

10   would agree with that?

11        A.   Well, yes, and they -- certainly the

12   requirements have changed over the years as well.

13        Q.   And did you keep up with those changes because

14   you're required to comply with Rule 26.

15             MS. CANNELLA:  Object to the form of the

16        question.  This is getting to be badgering at this

17        point.  You're just asking him about Rule 26.

18             MR. HILL:  Well, I'm not.  Well, he said he

19        doesn't know the legal standard required for him

20        in disclosing his opinions in this case even

21        though he's been testifying for 30 years and has

22        done it, what he said, hundreds of times.  So I'm

23        just trying to get to the bottom of it.

24             MS. CANNELLA:  The judge doesn't care

25        about what he knows about Rule 26.  If there's

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 157

```
 1        something you have to ask about his opinion, let's
 2        do that.
 3              MR. HILL:  I've asked those questions.  I'm
 4        just curious --
 5   BY MR. HILL:
 6        Q.  Are you saying -- I think you just testified
 7   that you're not aware of the specific legal
 8   requirements of some law, Rule 26, and how it applies
 9   to your duties to disclose your testimony and opinions
10   in the case; is that fair?
11        A.  Not from as far as an attorney standpoint or
12   anything else no, sir.  I mean I understand now that we
13   write reports, and I think even in federal courts
14   provided supplemental reports as well.
15        Q.  Right.  Supplemental reports in the past, have
16   they always been based upon additional information that
17   was provided to you subsequent to the time of your
18   initial report?
19        A.  Or if somehow a different issue is at hand as
20   well.
21        Q.  Something that's been presented after the time
22   of your original report.
23        A.  Or maybe became an issue even though it wasn't
24   initially.
25        Q.  Right.  Became an issue be it testimony from
```

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 158

1    other experts or something new that was uncovered in

2    the case; is that fair?

3         A.   Those are certainly some of the possibilities

4    of reasons one doing that, yes, sir.

5         Q.   All right.  In the last paragraph on page 2

6    you reference the testimony of Rough Country's

7    corporate representative in this case, the Bryson case.

8    And you say that he testified that Rough Country is not

9    aware of any other cases involving lawsuits against

10   their company.  Where -- what is your source of -- of

11   that opinion that Rough Country's corporate

12   representative stated that he is not aware of any other

13   cases involving lawsuits against the company.  What's

14   your source of that opinion?

15        A.   That was my interpretation of reading the

16   deposition.

17        Q.   Can you show me where in the deposition that

18   statement is -- is made by -- by Rough Country's

19   corporate representative?

20        A.   I don't have the depo.

21        Q.   Okay.  So you can't cite to any specific

22   testimony where Rough Country corporate representative

23   stated that Rough Country's not aware of any other

24   cases involving lawsuits against Rough Country.

25        A.   Other than from my reading the deposition, no.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 159

1      Q.   So that's your personal interpretation of the

2   testimony in this case from Mr. Hunsley, but you can't

3   cite to any specific place in his deposition where he

4   made this statement that you have on page 2.

5      A.   I don't have the page or line right now, no,

6   sir.

7      Q.   Okay.  All right.  Just real quick so I make

8   sure I understand this.

9      A.   Okay.

10     Q.   These stated similarities that you have in

11  this supplemental report related to Bacho and Mendoza

12  when compared to this case are that even striking

13  vehicle was equipped with a Rough County lift kit and

14  that the lift kits elevated the striking vehicles such

15  that there was structural intrusion that was

16  catastrophic.  Did I fairly state your -- where you've

17  said the similarities between the cases?

18     A.   Yes.

19     Q.   Can you cite to any other similarities between

20  Bacho and Mendez -- and Mendoza -- sorry -- in this

21  case?

22     A.   Well, Mendoza had a fatal head injury.  And

23  Bacho also had a fatal head injury as well.

24     Q.   Any other similarities?

25     A.   I mean I think that's it.  There was

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 160

1  significant intrusion into the occupants' survival

2  space, and they all received fatal blows to their head,

3  some directly from the actual lifted vehicle and some

4  from the structural intrusion (indicating).

5       Q.  Right.  So we -- we talked about that.  Three

6  similarities.

7       A.  Yeah.

8       Q.  Rough Country lift kit; intrusion;

9  catastrophic injury to the head.

10      A.  And three-quarter-ton trucks.

11      Q.  All right.  And -- among two of them?  Or all

12  three or just two of them?

13      A.  I thought the Chevrolet was as well.

14      Q.  All right.  Any other -- and that's -- that's

15 the full extent of the similarities between those two

16 cases and our case that you can cite to today.

17      A.  Yes.

18      Q.  Okay.

19          MR. HILL:  Why don't we just take a five-

20      minute break and hopefully we'll be on to the last

21      subject or two.

22          THE VIDEOGRAPHER:  The time is 3:19 p.m.

23      We're off video record.

24          (Video On)

25          (Recess taken)

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 161

1          (Video on)

2          THE VIDEOGRAPHER:  The time is 3:33 p.m.

3      We're back on video record.

4  BY MR. HILL:

5      Q.  Thank you.

6      Going back to the -- again, the report dated March

7  15 on the last page.  You mention that, Since my

8  opinion report in this case I've received testing data

9  for two sets of testing that support my opinions in

10 this case.

11     I think we talked about this a little bit earlier.

12 What was the source of these two sets of tests?  How --

13 how did you come to have them?

14          MS. CANNELLA:  Asked and answered.

15     A.  Ms. Cannella.

16     Q.  All right.  And did you ask her to go find any

17 testing that might support your opinions in this case?

18     A.  No, I didn't.  And really it's not necessarily

19 support per se, but it just shows some of the effects

20 of some of the accelerations on the head and the

21 expectation of no injuries.

22     Q.  Right.  But did you need either of those

23 reports in order to give your opinions that you've

24 listed in your October 16th report?

25     A.  Not really no.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 162

1      Q.  Okay.  And do you need them in this case in

2    order to give the opinions you intend to give in this

3    case?

4      A.  No, not specifically, but, again, they just --

5    part of it talks about accelerations on the head and

6    obviously the lack of injuries.

7      Q.  All right.  But for Ms. Cannella sending these

8    to you, you would not have rely -- relied upon them

9    anyway in giving your opinions in this case.

10     A.  Probably not.

11     Q.  Okay.  Let me mark, I guess -- the first one

12   referenced is -- doesn't have a title to it.  It's

13   testing regarding a Chevy Astro and a Mercedes-Benz

14   van -- or a Chevy Astro van versus a Mercedes Benz

15   sedan.  I'm going to mark, I guess, as this test -- and

16   you can confirm whether I'm right or not -- I believe

17   it's been produced as Bryson 9070 through 09118.  Here,

18   you can look at that first.  The last couple of pages

19   look like a summary; is that right?

20     A.  Yes.

21     Q.  All right.  And then this -- the first part of

22   it is -- when I say first part whatever it is 9070

23   through 9114.

24     A.  It's like the acceleration pulses like on the

25   head.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 163

1      Q.   Right.

2      A.   And then what they used to ultimately look at

3   the HIC -- and that's all caps, HIC -- HIC values.

4      Q.   Right.  And when I'm marking this as this --

5   as whatever exhibit we're on --

6           MS. CANNELLA:   Eight.

7           (Defendant's Exhibit No. 8 was marked for

8           identification.)

9      Q.   Eight, is that the full extent of the testing

10  data set for the first test you reference in your -- in

11  your report of March 15th?

12     A.   Yes.

13     Q.   Okay.  Tell me how that test shows that when

14  the intrusion is tempered -- scratch that.

15          Why don't you just explain to me in your own words

16  how this test in any way relates to this case so I can

17  understand?

18     A.   If you look at the accelerations on the head,

19  the head acceleration and the X are basically the

20  direction that this crash is in.  It was around 50 G's,

21  and ultimately the HIC value was a very low score.  I

22  don't have it memorized, but I want to say in the

23  200's, so no expected probability of a fatal head

24  injury.

25     Q.   All right.  Well, tell me about how was this

Paul Lewis , Jr., M.S., BME        March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 164

1    test set up?  What -- what vehicles were involved in

2    this test?

3        A.  It was a Mercedes sedan that was offset left

4    rear impact into the back of a Chevrolet Astro van.

5        Q.  All right.  So this -- and so each of these

6    tests involved a Mercedes hitting the back of the Astro

7    van?

8        A.  No.  This is just --

9        Q.  I was confused.

10       A.  -- it's just one test with a Mercedes hitting

11   the back of an Astro van.

12       Q.  Okay.  So one test run at 59 miles per hour;

13   is that correct?

14       A.  Yes, sir.

15       Q.  All right.

16       A.  So, you know, about roughly same impact speed

17   or close.  So it's 59 and then, again, I was just

18   looking at the accelerations on the head.

19       Q.  All right.  And do you know what it means to

20   say Tracy Law Test at the top of the summary page 9115.

21           MR. HILL:  Have you got -- I may have a

22       another copy if you need one.  There's the

23       summary.  And here, here's the other part.

24           MS. CANNELLA:  Thank you.

25       Q.  If you look at 09115 through 09118 it says,

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 165

1    Injury Summary.

2         A.  Yes, sir.

3         Q.  All right.  And we have an injury summary for

4    the driver of the Astro van, that's 9115; the driver of

5    the Mercedes 9116; the right rear passenger in the

6    Mercedes is 9117; and the left rear passenger in the

7    Mercedes 9118; is that correct?  Is that what this

8    injury summary's showing?

9         A.  Yes.

10        Q.  All right.  And it says under, Test vehicle

11   CAL 3490 Tracy Law Test 6.  Do you know what Tracy Law,

12   what's that referencing?

13        A.  I don't.

14        Q.  Do you know if these tests were performed in

15   connection with any kind of lawsuit?

16        A.  I -- I don't know one way or the other.

17        Q.  Do you know who performed this test?

18        A.  Looks like Calspan.

19        Q.  Who?  I'm sorry?

20        A.  Calspan (indicating).

21        Q.  All right.  And that's -- you're getting that

22   just from the test data sheet?

23        A.  Yeah, they're -- it's a test facility.

24        Q.  Okay.  The test date is April 1, 2019.

25        A.  Yes, it looks like.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 166

1       Q.  All right.  At the top of the -- of 9115 it

2   says, Driver H3 (50th male), Serial Number 143 Injury

3   Summary.

4       What -- what does the H3 stand for?  Do you know?

5       A.  Hybrid III.

6       Q.  And what does that mean?  Is that the dummy

7   that was used in the test?

8       A.  Correct.

9       Q.  And 50th male, that means 50th percentile

10  of -- of male adult?

11      A.  Correct.

12      Q.  All right.  And then what is the serial number

13  reference?

14      A.  I guess the serial number of that particular

15  dummy.

16      Q.  Okay.  And so that's all referring to the

17  dummy used -- used in the test.

18      A.  Yes.

19      Q.  At least in that position in that vehicle.

20      A.  Right.  Because as you go through, each dummy

21  has a different serial number.

22      Q.  All right.  Great.  And so similarly when you

23  look at 9116, the driver, HM -- so is that -- what does

24  that mean?

25      A.  I'm sorry, which page?

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 167

1          Q.   9116.

2          A.   Oh.  Again, it's a hybrid III male.

3          Q.   So if they're the same, why does one say H3

4     and one say HM?

5          A.   I have no idea.

6          Q.   And this one is the -- is a 95th percentile of

7     an adult male --

8          A.   Right.

9          Q.   Correct.

10          A.   About 6-2, 220.

11          Q.   Okay.  And then I guess just to be consistent,

12     9117, the right rear passenger in the Mercedes Benz,

13     was a hybrid female 5th percentile adult?

14          A.   Yeah, 5th percentile female, correct.

15          Q.   All right.  And then the left rear passenger

16     in the Mercedes was a Q10 dummy.  Do you know what that

17     stands for?

18          A.   I -- I don't.  Let's see... I don't.

19          Q.   That -- you're assuming that refers to the

20     type of dummy used; correct?

21          A.   Yes.

22          Q.   And we don't know anything about the

23     male/female percentile, adult/child.  We can't tell

24     from the test; right?

25          A.   No.

Paul Lewis , Jr., M.S., BME                 March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 168

1        Q.  All right.  And do we know whether either of

2    these vehicles had a lift kit installed?

3        A.  They did not.

4        Q.  Do we know anything about the height of the

5    bumpers of either of these vehicles?

6        A.  Standard of whatever the -- they're

7    manufactured as.

8        Q.  Right.  But we --

9        A.  Probably 22 inches somewhere, but I don't know

10   specifically.

11       Q.  Okay.  You made a reference to the HIC values

12   and that's the head injury criterion?

13       A.  Yes, sir.

14       Q.  And so -- like, let's use 9115.  This is a

15   measurement of the dummy in the Astro van that was

16   struck by the Mercedes in the test.  Is that your

17   understanding?

18       A.  You said 115?

19       Q.  Yes.

20       A.  Okay.

21       Q.  The first page of the injury summary.

22       A.  Yes.

23       Q.  And that was a -- he was in a 1999 Chevrolet

24   Astro van.

25       A.  Correct.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 169

1       Q.  Okay.  and the HIC values appear to be under

2   the head criteria here, and there's two different

3   values.  There's one says 36 MS.  Is that 36

4   milliseconds?

5       A.  It is.

6       Q.  And is that is after impact?

7       A.  It's during the crash because they integrate

8   over time the accelerations and then they take the

9   largest integral where you have the largest number.

10      Q.  And so just so I understand it, so I

11  understand the crash goes longer than 36 milliseconds,

12  but is that a measurement of that value at 36

13  milliseconds into the crash, or is it the -- explain

14  that to me.  Sorry.

15      A.  So these are both what they call HIC 36 and

16  HIC 15.  They're the eclipse.  So what it's doing is,

17  in order to calculate HIC, it's an integration over

18  time.  So it -- for -- if you're looking at 36, it's

19  iterating over looking at a 36 millisecond window

20  throughout the crash, and ultimately it takes the

21  largest one to create, and then it calculates out what

22  the HIC is, which then that gives you -- for the HIC 36

23  that gives you a 382 and then -- and that's the score

24  that you're looking at is to be under a thousand.  So

25  that's significantly under a thousand, so there's a

Paul Lewis , Jr., M.S., BME         March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 170

1   very low expectation of any type of head injury.

2       And then if you look at the HIC 15, that's 218.

3   So, again, even lower and pretty much nowadays we

4   usually use the HIC 15.

5       Q.  And that 15 is the same thing.  It takes a 15

6   millisecond bracket within the accident sequence that

7   is the highest average level during that 15 millisecond

8   bracket.

9       A.  Correct.

10      Q.  Okay.  And so, again, do you know anything

11  about the vehicle compatibility between a 2014 Mercedes

12  Benz E350 and a 1999 Chevrolet Astro van?

13      A.  No, other than they're basically under the

14  standard lumbar heights that a -- regular vehicles are

15  manufactured at.

16      Q.  That's all you know about the heights of those

17  vehicles.

18      A.  Correct.

19      Q.  And that's all you know about the

20  compatibility between the two vehicles.

21      A.  Oh, yeah.

22      Q.  Okay.  And --

23      A.  And I'm not really looking at that part.  I'm

24  basically just looking at some accelerations on the

25  head.

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 171

1    Q.  I understand.  But you -- in order to evaluate

2    that with relation to this case you would need to know

3    whether the two vehicles are actually striking frame to

4    frame or not or whether there's override or underride.

5    A.  Well, not really.  I'm just looking at

6    accelerations and seeing whether they may or may not be

7    injurious.

8    Q.  Okay.  For the per -- for the dummy in the

9    particular passenger position of the type of dummy

10   used, that's what applies to each of these tests.

11   A.  Right.  Well, they -- they all have -- they

12   all have the same accelerometer in the head, it's just

13   they -- they're a different height and a different

14   weight.  That's -- that's really the only difference.

15   The accelerometers are the same.

16   Q.  Right.  But the impact on the accelerometer

17   may be impacted by which type of dummy it's installed

18   into.

19   A.  I don't know that that's necessarily for that

20   portion.  Now the chest acceleration certainly could be

21   different based on the size dummy.

22   Q.  Well, why would you need to vary the type and

23   size of dummy if it doesn't impact the accelerometer

24   measurements of the head?

25   A.  Well, it could be affecting other body

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 172

1   portions.

2        Q.  But you said in no way would it affect the

3   measurements of the H-I-C related to the head.

4        A.  Unless -- not unless there's a significant

5   impact, I mean depending on how much weight you have.

6   But in general if you're just looking at the

7   accelerations -- because the heads weigh the same

8   between all of them.

9        Q.  All right.  Any aspect of this -- this testing

10  other than the head injury criteria that you rely upon

11  at all in your opinions in this case?

12       A.  Well, again, I'm not necessarily relying on.

13  It's just some other data I looked at for accelerations

14  to the head and whether they may be potentially

15  injurious, assuming that we're going to have from the

16  hypothetical situation, you know, higher G's.

17       Q.  And let's look at, let's say, the 9118.  So

18  you've got a -- the 36th and 15 millisecond HIC values

19  are both 410.92.

20       A.  Correct.

21       Q.  All right.  What is that value?  Is that

22  acceleration?  Is that -- I mean that's not G's.  What

23  is it?

24       A.  So what you're looking at is you've got G's on

25  the head of a 115 G's.  So from that 115 G's that's

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 173

1    acting on the head, which is certainly way more than

2    45, that you've still only got a HIC value of 410.  So

3    internally manufacturers typically use 700 as their

4    bogey value, but according to the standard, a thousand

5    is all you have to comply or be below.

6         Q.  But what is that unit?  What's the unit under

7    the column max?

8         A.  That is the -- there's not a unit per se.

9    It's HIC, so it's head injury criteria.  So it just

10   comes out as a number like that.

11        Q.  I understand.

12        A.  It doesn't have G's or pounds force or

13   anything of that nature.

14        Q.  So it's not related to acceleration speed

15   or --

16        A.  It is related to acceleration.  Because you're

17   integrating the acceleration to come up with this

18   number.  It's a big, long formula that basically the

19   computer does that.

20        Q.  I understand that.  So there's a HIC formula

21   that the computer calculates this number.  It's

22   computed.  That's where that source is computed --

23        A.  Yes, sir.

24        Q.  -- on this column.  And it computes that based

25   upon the accelerometer in the head in the dummy.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 174

1      A.  Yes, sir.

2      Q.  Okay.  And it uses, obviously, those two

3  different time frame values maximum, puts it in the

4  formula and kicks out the number.

5      A.  Right.

6      Q.  I understand.

7      All right.  All of these other values under --

8  under the head portion that talk about CG, X, Y, and Z

9  acceleration, head resultant acceleration.  Are you

10 relying upon any of those to give any opinions in this

11 case?

12     A.  Well, so those are the different vectors, and

13 so X is really the one that's going longitudinally, so

14 to speak, that's why we're seeing the highest because

15 obviously the accelerations are going planar along the

16 X axis, but you still combine all of them to get the

17 resultant that's on there.  So, again, for this one

18 with everything combined, the brain -- we're still

19 seeing accelerations of a hundred and fifteen G's.

20     Q.  And where do you get the 115 G's as the --

21 where is that from?

22     A.  Head -- Under the CG Z, the head resultant

23 acceleration.

24     Q.  Right.  So which -- which value are you

25 looking at?

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 175

1          A.  Oh.  Well, we're on 118.

2          Q.  You're -- I'm talking about on 118.

3          A.  Right.

4          Q.  So that -- that's not -- that max number head

5     resultant acceleration, you're saying that's in actual

6     G's because it says unit G's.

7          A.  All -- all four of those measures right there

8     are in G's, correct?

9          Q.  Okay.  It says that head resulting

10    acceleration is computed.

11         A.  It is.

12         Q.  Okay.

13         A.  Because that's square the sum of all three.

14         Q.  All three of the X, Y, and Z?

15         A.  Correct.  But you can see the X's obviously

16    the -- significantly greater than -- than the other two

17    like going vertically or laterally.

18         Q.  And that's true for the left rear passenger in

19    the Mercedes-Benz.

20         A.  Correct.

21         Q.  Right.  If you look at the head acceleration

22    for the driver of the Astro van, the X acceleration is

23    minimal and the Z acceleration framework is higher.

24         A.  It is, but it's still a total of 52 or almost

25    53 G's on the head.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 176

1      Q.  Again, we've talked about -- you -- you made

2   reference just a second ago to the 45 G calculation

3   from Mr. Buchner.  And I think you've testified that --

4   that that -- you don't know where that's calculated.

5   That you -- you can't say that that's the G's he

6   simulated for the head that the head would experience

7   in the fourth seated position in -- in the Escape.

8      A.  I think it is for the CG.  I don't think it's

9   specific to the number four position.

10     Q.  Right.  So you think it's for the center of

11  gravity of the vehicle; right?

12     A.  Yes, sir.

13     Q.  And it's certainly not specific to the -- to

14  any of the acceleration axis for the head.

15     A.  No, but it would be what's driving those but

16  -- correct.  It's not specific to that seated position.

17     Q.  Do you know whether Mr. Buchner in any way

18  measured the -- or simulated the head CG, X, Y, Z

19  acceleration values for any position in the Ford

20  Escape?

21     A.  I don't.

22     Q.  Okay.  And does his simulation in any way

23  create a H-I-C value?

24     A.  No.

25     Q.  Okay.  He could have done that with a actual

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 177

1   crash test using a dummy and the vehicles involved in

2   the Bryson incident.

3          MS. CANNELLA:  Object to the form of the

4       question.

5       A.  Well, you could, sure.  I mean you could do --

6   I don't know if a -- maybe -- I don't know if a SLED

7   test necessarily would do that or not, but it's

8   possible.

9       Q.  Right.  So you have a SLED test as an option,

10  but you're not sure, because it's possible.  And then

11  you could also like what was done in this case actually

12  crash the two vehicles involved in the Bryson incident

13  with an accelerometer inside the head of a dummy in the

14  number four position in the Escape.

15      A.  Sure.  Just like, I mean, the defendant could

16  have run some tests as well, right.

17      Q.  I know you said you're not aware of the source

18  of this other than the test was done at Calspan, and

19  you said that was a testing facility you're aware of?

20      A.  It is.

21      Q.  And you don't know whether this involves a

22  particular lawsuit.  I mean you've got very specific

23  types of dummies in specific locations in two specific

24  vehicles.  Is it your understanding that this was

25  performed in connection with an actual case?

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 178

1          A.   Like I already said, I don't know.

2          Q.   You don't know?

3          A.   Huh-uh (negative response).

4          Q.   Okay.   And likewise, do you have any

5     information regarding, you know, how this test was

6     performed?  How it was set up?  Who -- you know,

7     anything about it.

8               MS. CANNELLA:   Objection, asked and answered.

9          A.   I mean other that what I previously said, no,

10    I mean I certainly wasn't there or anything.

11         Q.   Right.

12         A.   Is that the piece that goes with this?

13         Q.   It's probably connected to the back of this.

14         A.   Okay.   I just wanted to make sure I didn't

15    somehow get it in my stack.

16         Q.   Anything else I didn't ask you about this test

17    that's relevant to your opinions?

18         A.   No.   And, again, it's not necessarily, you

19    know, that I'm relying on it per se, but it's just

20    looking at some of these accelerations and how they're

21    higher than what may be the expected acceleration and

22    they're not injurious.   That's really the main point.

23         Q.   What do you mean they're higher than expected?

24         A.   Well, if you're only going to get 45 G's on

25    the car, these accelerations are -- some of them are in

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 179

1    the hundreds, and it's still coming out with a low HIC

2    value.

3        Q.  Right.  And, again, that's the G computed for

4    the head of each of these.

5        A.  Yes, sir.

6        Q.  Not the vehicle itself.

7        A.  No.  In this case, you know, we're looking at

8    the head.

9        Q.  But we don't know the actual G acceleration

10   involved or -- or experienced by Cohen in this case?

11       A.  Well, I think it was 23.6 G's or something

12   like that.

13       Q.  And where did that come from?

14       A.  Mr. Buchner's report.

15       Q.  Yeah.  You're talking about the subject

16   incident.

17       A.  Oh, yeah.

18       Q.  I'm talking about the hypothetical crash.  We

19   don't have any values for what G's Mr. Cohen's --

20   excuse me -- Mr. Cohen, I'm sorry -- that Cohen's head

21   would have experienced in the hypothetical crash?

22       A.  Other than 45 G's in the vehicle.

23       Q.  Right.  At the center of gravity.

24       A.  Correct.

25       Q.  Right.  Okay.  All right.  Whatever's next --

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 180

1          (Defendant's Exhibit No. 9 was marked for

2     identification.)

3          Q.  All right.  I've just marked as -- whatever

4     this number is.  Exhibit 9.

5          THE COURT REPORTER:  Nine.

6          Q.  What was produced to us on March 15th, and it,

7     I believe, is the second test you referred to that was

8     performed by Wichita State University; is that correct?

9          A.  Yes.

10         Q.  And this testing involved a 2010 Toyota

11    Corolla.

12         A.  Correct.

13         Q.  And that was the only vehicle involved in this

14    test; is that correct?

15         A.  Yes, sir.

16         Q.  And tell me just in your own words what -- why

17    did you produce this test and reference it in your

18    March 15th report.

19         A.  Again, looking at the head accelerations, and

20    you have about 50 G's on the head, and you see a very

21    low HIC, whether it's HIC 15 or HIC 36, it was around

22    118.

23         Q.  All right.  And what page of this -- you can

24    use the Bate's numbers at the bottom -- are you

25    referencing when you mention the HIC values and so

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 181

1    forth?

2         A.  9062.

3         Q.  All right.  HIC details in the bottom right

4    corner of that page?

5         A.  Yes, sir.

6         Q.  All right.  And it's given you a -- the HIC 15

7    and HIC 36 that are both 118.4?

8         A.  Correct.  And this is a six-year-old dummy.

9         Q.  All right.  So tell me what you know about

10   this test.  You say -- so tell me about the dummy.

11        A.  It's a six-year-old child dummy, and basically

12   it's a SLED test.

13        Q.  And what was the speed of the vehicle?

14        A.  Looks like it was -- looks like about 15 miles

15   an hour.

16        Q.  And where did you -- where does it say the

17   speed of the vehicle?

18        A.  I'm looking at sled velocity.

19        Q.  Yeah.

20        A.  Although, you know, what, it's hard to tell

21   since this isn't color but looks like it said 14.

22   Yeah, 14 miles per hour.

23        Q.  Right.  So that's on page 9059, Test summary.

24   Is that where you're looking at 14?

25        A.  Oh, I was looking at the graph, the next page.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 182

1       Q.   Okay.  And was this a rear-end sled collision,

2    frontal, side impact?  What was the type of impact?

3       A.   Looks like a rear impact.

4       Q.   And where do you get that from?

5       A.   Well, if you look on 9058 you've got a turbo

6    high-back booster in the headrest lowest position.  And

7    above that it says, Rear impact, child in high-back

8    booster seat, headrest in lowest position.

9       Q.   And this is -- what headrest is it referring

10   to?  The headrest for the booster seat?

11      A.   The headrest for the vehicle seat.

12      Q.   For the vehicle seat that -- the position that

13   the child was in which was the right rear; is that

14   correct?

15      A.   Yes, sir.

16      Q.   All right.  And so this child was in a high-

17   back booster seat which is not the same type of seat

18   that Cohen was in in our accident; correct?

19      A.   No, it's not.  I mean but it's a very tall

20   seat.  It provides head protection as far as from rear

21   -- forward accelerations with rearward head motions

22   just like Cohen's seat does.

23      Q.   All right.  But it was -- a high-back booster

24   seat is not the same as the booster seat that Cohen was

25   in.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 183

1          MS. CANNELLA:  Asked and answered.

2      A.  No, it's not.

3      Q.  All right.  And this page on 9059, it has a

4  test orientation?  You see that?

5      A.  I do.

6      Q.  What does that mean?

7      A.  So that shows it's a little -- so it's not

8  directly six o'clock or straight rear.  There's a

9  little obliqueness to it.  So in general that can get

10  some other accelerations and all, so it would be --

11  technically it could be a worse case than what we

12  actually had since we're pretty much at straight rear.

13      Q.  And this is -- so that's the orientation of

14  the impact of like the sled, the forces based upon the

15  way the sled moves?

16      A.  So the sled is probably mounted with a little

17  bit of an angulation to replicate this, yes.

18      Q.  Right.  And this was requested by Thorbole

19  Simulation Technologies on the front page; right?

20      A.  Yes.

21      Q.  And that was an expert that was involved in

22  the Bacho case; is that correct?

23      A.  I don't remember.  Give me a second.

24          MS. CANNELLA:  You guys had some Bacho

25       materials after all.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 184

1      Q.   Then what do you reference?  What he produced?

2      A.   Yes, he wrote a report, which is in these

3   materials.

4      Q.   Right.  So is it fair to say that this is a

5   test that he requested Wichita State University to run

6   related to another case that he was consulting on?

7          MS. CANNELLA:  Object to the form of the

8          question, foundation.

9      A.   I -- I don't know what it was run for.

10  Obviously he requested it.

11     Q.   All right.  Any aspect of this test other than

12  the HIC values on 9062 that you are relying upon to

13  give your opinions in this case?

14     A.   No.  That's just the portion that, you know,

15  I've been analyzing, looking at the accelerations.

16     Q.   Do you know the height of the sled used in

17  this test?

18     A.   I don't know exactly.  I mean they're typical.

19  The cart's the same for any SLED test you run,

20  basically.

21     Q.   All right.  They're always going to be

22  positioned within the 16-to-22-inch parameters of

23  bumpers under the bumper standard; correct?

24         MS. CANNELLA:  Object to the form of the

25         question.  Improper...

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 185

1        Q.   Just trying to figure out what you meant by

2    various -- that the sled is always at a standard

3    height.

4        A.   Yeah, these don't have anything to do with

5    bumper height or not.  So you've got a cart that's got

6    four wheels and it's a big, steel sled.  And then you

7    weld a buck on top of it.  So no, I mean like the car

8    would always be higher than what it would be if it was

9    in its normal configuration, but that's got nothing to

10   do with looking at the accelerations to the vehicles

11   and the bodies.

12       Q.   I'm just trying to understand.  So do you know

13   where the impact occurred to the rear of the 2010

14   Toyota Corolla?

15       A.   So --

16            MS. CANNELLA:  Object to the form of the

17            question.  Outside the scope of his testimony.

18       A.   No.  I mean typically a SLED test you have a

19   stack is what's creating the pulse that you've got a

20   wall and you run it into it.  And then based on how

21   that stack is configured gives you an acceleration

22   pulse to the vehicle that then provides accelerations

23   to the occupant for either kinematic motions and/or

24   measurements of potential, you know, forces in

25   accelerations on that dummy.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                    Page 186

1        Q.   Okay.   Anything else about this test that I

2    didn't ask you about that's relevant to your testimony

3    in this case?

4        A.   No, sir.   And, again, like I said, it's not

5    necessarily relevant per se.   It's just looking at

6    these accelerations patterns.

7        Q.   All right.

8            MR. HILL:   Let's take a five-minute break and

9        we could be finished.

10           THE VIDEOGRAPHER:   The time is 4:08 p.m.

11       We're off the video record.

12               (Video off)

13               (Recess taken)

14               (Video on)

15           THE VIDEOGRAPHER:   The time is 4:20 p.m. We're

16       back on video record.

17           MR. HILL:   All right.   Thanks.

18   BY MR. HILL:

19       Q.   Mr. Lewis, have we covered all of the opinions

20   you intend to give in this case?

21       A.   I think we have.

22       Q.   Have you started to create any exhibits you

23   intend to use at trial in this case?

24       A.   I'd say none other than basically what's in my

25   report or, you know, from my vehicle and surrogate

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 187

1    study photographs.

2         Q.  All right.  But you haven't turned any of

3    those into an actual exhibit.

4         A.  No.

5         Q.  Do you plan to do any future work in this case

6    as we sit here today?

7         A.  Well, not other than what I told you earlier

8    this morning that --

9         Q.  Right.

10        A.  -- you know, I've got to review your people's

11   stuff and, you know, whether that does or doesn't

12   elicit some additional work, I don't know yet.  But

13   beyond that like sitting here now I don't have plans to

14   do anything else.

15        Q.  All right.

16             MR. HILL:  All right.  I believe that's all I

17        have.  Like I said earlier, I'm -- it's my

18        position that the deposition is being suspended

19        pending the Court's ruling on the timeliness and

20        admissibility of the March 15, 2024 report that we

21        received on that day.

22             MS. CANNELLA:  Any other questions?

23             MR. HILL:  That's all I have at this time.

24                      EXAMINATION

25   BY MS. CANNELLA:

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 188

1        Q.  Mr. Lewis, is your work in the Bacho and

2    Mendoza case part of your experience as a biomechanic?

3        A.  Yes, ma'am.

4        Q.  And if you hadn't completed the report dated

5    March 15, 2024, would you have still testified today

6    about your experience including the Bacho and Mendoza

7    cases?

8             MR. HILL:  Object to the form.

9             Go ahead.

10       A.  Oh, I'm sure I would have discussed it or

11   talked about it.

12            MS. CANNELLA:  That's all I've got.

13            MR. HILL:  Just a quick follow-up.

14                      EXAMINATION

15   BY MR. HILL:

16       Q.  Did you indicate any intent to discuss your

17   experience in Bacho and Mendoza in your October 16,

18   2023 report issued in this case?

19       A.  I did not.  Because as far as the basis for

20   this case, I was not per se relying on it.  It's just,

21   again, a part of my experience like I said.

22       Q.  Okay.  And so to give your opinions in this

23   case you do not have to rely upon that experience in

24   Bacho and Mendoza.

25            MS. CANNELLA:  Object to the form of the

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 189

1      question.

2          A.  Well, again, it's just like all the other

3      thousands of cases I looked at.  It's part of my

4      background to testify about injuries I expect and don't

5      expect.

6          Q.  All right.  But that specific experience, if

7      you didn't -- if you weren't involved in Bacho and

8      Mendoza, do you think you still have the experience

9      from your involvement in other cases to give the

10     opinions that you issued in your October 16th report?

11         A.  Well, I think what it does, it shows that I've

12     had investigations of other similar instance so that I

13     have seen, you know, this isn't -- this case here is

14     not the first case where I've seen where these issues

15     were at hand.

16         Q.  And we've talked about those two cases are the

17     only cases that you've ever been involved in that you

18     recall that involved a lift kit.

19         A.  Well, I guess the way I'd say it, at least

20     where the lift kit was a part of some of the alleged

21     defects.

22         Q.  Where the lift kit was involved with a

23     striking vehicle and had issues similar to this case.

24         A.  Right.  I may have had some before that the

25     lift manufacturer may not have been a defendant.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 190

1    Q.  And, again, you've stated that all of the

2   opinions related to any reference to Bacho and Mendoza

3   are contained within your March 15, 2024 report?

4    A.  As well as the documents for those two cases,

5   right.

6    Q.  All right.  So what of the documents from

7   those two cases are you intending to testify about?

8    A.  Well, I think basically the same as what it

9   showed there, that they both involved fatal head

10  injuries to occupants that were struck by a lifted

11  truck.

12   Q.  And when you just made a reference to there,

13  you -- you were referencing your March 15, 2024 letter.

14   A.  Yes.

15   Q.  Okay.  Nothing beyond that that you can recall

16  as -- that you can state as we sit here today.

17        MS. CANNELLA:  What's the question, sir?

18        Objection.

19        MR. HILL:  Nothing beyond what he just said --

20        scratch that.  He already answered it.  That's

21        fine.  I'm good with that.

22        All right.  Again, suspended because obviously

23        there's no way that we could have anticipated or

24        prepared to cross-examine him on all of the

25        potential issues related to Bacho and Mendoza

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 191

1        which are obviously significant.  Regardless of

2        what material may or may not have been available

3        to Rough Country, there was no advance notice

4        within the deadline required to disclose his

5        opinions that he would be issuing any opinions

6        related to his experience in -- in Bacho or

7        Mendoza.

8            MS. CANNELLA:  I object to all that and

9        disagree, but we can deal with it on papers.

10           MR. HILL:  That's all I have.

11           (Deposition suspended)

12           THE VIDEOGRAPHER:  The time is 4:25 p.m.

13       We're off video record.

14            (Video off)

15

16

17

18

19

20

21

22

23

24

25

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 192

1                         DISCLOSURE
2    STATE OF GEORGIA      Deposition of PAUL LEWIS, JR.
                                          M.S., BME
3    COUNTY OF DEKALB      Date:  3-18-24
4         Pursuant to Article 10.B of the Rules and
     Regulations of the Board of Court Reporting of the
5    Judicial Council of Georgia, I make the following
     disclosure:
6
          I am a Georgia Certified Court Reporter. I
7    am here as a representative of American Court
     Reporting Company, Inc.
8
          I am not disqualified for a relationship of
9    Interest under provisions of O.C.G.A. 9-11-28(c).
     American Court Reporting Company, Inc., was
10   contacted by the offices of Veritext, to provide
     court reporting services for this deposition.
11
          American Court Reporting Company, Inc., will not
12   be taking this deposition under any contract that is
     prohibited by O.C.G.A. 15-14-37(a) and (b).
13
          American Court Reporting Company, Inc., has no
14   exclusive contract to provide reporting services with
     any party to the case, any counsel in the case, or
15   any reporter or reporting agency from whom referral
     might have been made to cover this deposition.
16
17        American Court Reporting Company, Inc., will
     charge its usual and customary rates to all parties
18   in the case, and a financial discount will not be
     given to any party to this litigation.
19
20        This the 1st day of April, 2024.
21
22
23
24        LEITA J. SEABORN, CCR B-1420
25

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 193

1                    C E R T I F I C A T E

2

3      (STATE OF GEORGIA)

4      (COUNTY OF GWINNETT)

5          I hereby certify that the foregoing transcript

6      was taken down, as stated in the caption, and the

7      proceedings were reduced to typewriting under my

8      direction and control.

9          I further certify that the transcript is a true

10     and correct record of the evidence given at the said

11     proceedings.

12         I further certify that I am neither a relative

13     or employee or attorney or counsel to any of the

14     parties, nor financially or otherwise interested in

15     this matter.

16             This the 1st day of April 2024.

17

18

19

20

21

               LEITA J. SEABORN, CCR B-1420

22

23

24

25

Veritext Legal Solutions

800.808.4958                                    770.343.9696

Paul Lewis , Jr., M.S., BME
Bryson, Santana and Joshua v. Rough Country, LLC
March 18, 2024

**[& - 2023]**

Page 1

| & |
|---|
| **&**   2:9 |

| 0 |
|---|
| **009132**   138:4 |
| **017**   1:7 |
| **09115**   164:25 |
| **09118**   162:17 |
| 164:25 |

| 1 |
|---|
| **1**   3:1,12 5:10 |
| 5:14,15 8:9,11 |
| 10:14 15:24 |
| 18:5 20:3 |
| 22:24 74:4,5 |
| 165:24 |
| **1.17**   114:24 |
| 115:2 |
| **1.20**   121:14 |
| 124:25 |
| **1.21**   125:6 |
| **1.22**   127:4 |
| **1.23**   131:4 |
| **1.24**   121:14 |
| 134:2 |
| **1.25**   124:25 |
| **1.3**   77:18 |
| **1.31.**   69:17 |
| **10**   3:10 |
| **10.b**   192:4 |
| **10:38**   1:19 4:4 |
| **11**   3:11 69:17 |
| 77:16 |
| **11/16/2023** |
| 21:4 |

**115**   168:18
172:25,25
174:20
**118**   175:1,2
180:22
**118.4**   181:7
**11:45**   59:3
**12**   3:12 55:7
69:19 70:18,24
**125**   47:25
**12:02**   59:8
**12:52**   96:2
**13**   3:13
**13048**   192:23
193:21
**138**   3:21
**14**   3:14 181:21
181:22,24
**1420**   192:24
193:21
**143**   166:2
**144**   27:13
**1450**   27:13
**14th**   12:7,12
**15**   3:15 22:2
95:1,19 138:4
139:18 154:20
161:7 169:16
170:2,4,5,5,7
172:18 180:21
181:6,14
187:20 188:5
190:3,13
**15-14-37**
192:12

**15th**   8:1 12:13
13:17 154:3
163:11 180:6
180:18
**16**   3:16 7:3
13:24 14:5,7
14:21 15:12
16:25 20:25
22:15 43:23
44:2,9 48:2
49:13 50:1,11
50:23 52:11,20
53:9 70:10
74:6 141:19
184:22 188:17
**163**   3:22
**16th**   6:18 7:18
8:23 11:7,20
12:1,9 13:14
14:2,23 16:19
17:9 22:9
43:19 47:23
53:15 59:11
140:24 141:1
161:24 189:10
**17**   3:17
**17th**   8:23
**18**   3:18 114:21
117:19 118:22
**180**   3:23
**187**   3:6
**188**   3:6
**18th**   1:19 21:2
**19**   121:11

**1998**   32:10
**1999**   31:7
168:23 170:12
**1:57**   96:7
**1a**   3:13
**1b**   3:14
**1st**   192:20
193:16

| 2 |
|---|
| **2**   3:2,15 27:5,6 |
| 27:12,24 59:17 |
| 59:18 74:7 |
| 145:21 152:24 |
| 158:5 159:4 |
| **20**   3:14,19 |
| 13:25 95:19 |
| 135:7 |
| **200's**   163:23 |
| **2003**   42:13 |
| **2010**   180:10 |
| 185:13 |
| **2011**   28:2 |
| 30:24 |
| **2014**   170:11 |
| **2019**   165:24 |
| **2022**   10:5 55:7 |
| **2023**   7:3 10:9 |
| 13:24 14:2,5 |
| 15:12 21:1 |
| 22:10,11,15 |
| 27:15 29:19 |
| 30:15 43:23 |
| 44:2,9 48:2 |
| 49:13 50:1,12 |
| 50:23 52:11,20 |

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[2023 - 885]**                                                    Page 2

141:19 188:18
**2024**   1:20 14:8
14:15,22 16:25
21:2 22:2 53:9
138:4 139:18
154:21 187:20
188:5 190:3,13
192:20 193:16
**208**   131:5,7,10
131:18,23
132:3,12,12,20
133:3
**21**   3:20
**214**   132:9
**218**   170:2
**22**   3:21 168:9
184:22
**220**   167:10
**23**   3:22 10:6,7
10:7
**23.6**   179:11
**23rd**   13:9
**24**   3:23 12:7
30:1,2
**2400**   2:10
**25**   3:25 22:10
**250**   35:12
36:12 59:20
64:16 65:6
85:22 86:10,25
87:2 88:20,23
90:11 93:4
96:18 146:13
**250's**   85:21

**2500**   146:5,11
146:18,18
**25th**   21:13
**26**   3:16 7:21
26:19 29:13
155:10,16,20
156:9,14,17,25
157:8
**27**   3:15
**29**   14:15
**29th**   13:8
**2:22**   1:7

**3**

**3**   3:3 6:21 29:6
29:7 30:4,4,5,9
64:10,12,12,15
**3-15-24**   3:21
**3-18-24**   192:3
**30**   3:16 131:16
132:4 156:8,21
**30030**   2:6
**301**   131:25
**30326**   2:10
**315**   1:21 2:5
**3344**   2:9
**3490**   165:11
**36**   169:3,3,11
169:12,15,18
169:19,22
180:21 181:7
**36th**   172:18
**382**   169:23
**3:19**   160:22
**3:33**   161:2

**3a**   3:16

**4**

**4**   3:4,5,17 6:21
21:1 22:11
43:12,14,16
47:11 55:17
57:12,21 65:9
65:10,14,24
66:4,10,18
86:2 88:23
90:25 91:13
92:19,23 93:2
93:11 94:1
**404-876-2700**
2:11
**410**   173:2
**410.92.**   172:19
**43**   3:17
**45**   127:11,12,20
128:3 129:3,12
129:15,21,22
130:2 173:2
176:2 178:24
179:22
**46**   6:24
**46th**   15:17
**48**   3:18
**49**   21:9
**4:08**   186:10
**4:20**   186:15
**4:25**   191:12
**4th**   139:22

**5**

**5**   3:5,12,18
48:12,15,18
65:25 73:5
**5,000**   75:19
**50**   163:20
180:20
**50th**   133:6
166:2,9,9
**51**   13:18 18:12
19:15
**52**   3:20 13:18
18:12 19:15
175:24
**53**   175:25
**59**   164:12,17
**5th**   167:13,14

**6**

**6**   3:6,20 52:20
52:21 59:15
165:11
**6-2**   167:10

**7**

**7**   3:7,21 67:8
137:24 138:1
**70**   133:4
**700**   173:3

**8**

**8**   3:8,13,22
163:7
**885**   1:21 2:5

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[9 - actually]**                                        Page 3

| 9 |
|---|

**9**   3:9,23 66:1,5
  73:5 180:1,4
**9-11-28**   192:9
**90**   31:21 85:3
**9053**   43:17
**9056**   43:17
**9058**   182:5
**9059**   181:23
  183:3
**9062**   181:2
  184:12
**9070**   162:17,22
**90s**   39:24
**9114**   162:23
**9115**   164:20
  165:4 166:1
  168:14
**9116**   165:5
  166:23 167:1
**9117**   165:6
  167:12
**9118**   165:7
  172:17
**9142**   20:14
**9176**   20:14
**9177**   20:18
**9178**   20:19
**9280**   10:17
**9283**   13:18
**9345**   10:18
  14:13 15:3
**9346**   8:10
**9347**   8:10

**95th**   167:6
**98**   31:9,10
  42:19

| a |
|---|

**a.m.**   1:19 4:4
  59:3
**ability**   37:5
  63:19,25 136:5
**able**   40:24
  57:11 81:16
  108:10 115:14
  137:6 151:9,23
**above**   55:1
  59:25 60:17,19
  60:21,25 62:4
  72:21 80:18
  85:1,4,18,22
  102:1 131:16
  146:8 150:23
  182:7
**absolutely**   31:1
  35:18 63:6
  66:17 76:17
  83:8 86:7
  94:23 131:3
  149:23
**absorbing**   89:9
  125:17,18
**absorption**
  109:17
**acceleration**
  162:24 163:19
  171:20 172:22
  173:14,16,17
  174:9,9,23

175:5,10,21,22
175:23 176:14
176:19 178:21
179:9 185:21
**accelerations**
  133:20 161:20
  162:5 163:18
  164:18 169:8
  170:24 171:6
  172:7,13
  174:15,19
  178:20,25
  180:19 182:21
  183:10 184:15
  185:10,22,25
  186:6
**accelerometer**
  171:12,16,23
  173:25 177:13
**accelerometers**
  171:15
**accident**   34:21
  34:25 35:10,11
  35:17,20 36:3
  55:3 65:7
  84:20 95:17
  103:16 107:5
  110:6 114:2
  116:10,15
  117:8 118:10
  120:8 122:6,7
  123:23,25
  127:6 130:7
  145:25 149:14
  149:16 150:7

150:11 152:8
153:13 170:6
182:18
**accumulation**
  45:1
**accuracy**   35:8
  35:23 36:4
  134:12
**accurate**   31:24
**act**   35:17
**acting**   173:1
**activities**   31:13
**activity**   44:18
**actual**   25:8
  35:10 45:13
  65:6 74:19
  75:15 76:15
  77:10,19 81:9
  82:9,20 84:18
  88:19,22 89:5
  93:11 95:16
  119:12 122:11
  122:13 144:6
  145:3,13,14
  149:24 160:3
  175:5 176:25
  177:25 179:9
  187:3
**actually**   13:4
  24:7 28:22
  40:24 42:16
  44:13,15 54:16
  72:16 81:23
  82:11 89:2
  90:17 93:10,12

Case 2:22-cv-00017-RWS   Document 102-2   Filed 09/05/24   Page 197 of 251
Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[actually - anyway]**                                              Page 4

97:9 116:18
123:17 131:8
142:23 171:3
177:11 183:12
**add**   16:12 51:1
51:3,5
**added**   10:22
11:2 14:15
17:3 27:17
**adding**   120:5
**addition**   13:19
20:24 22:24
**additional**   6:13
11:12 15:18
21:17,19 22:4
22:17,20 41:12
44:11 51:1,3,8
53:22,24,25
54:8,23 55:14
55:19 56:1,2
56:12 64:16
157:16 187:12
**additions**   11:22
**addressed**
61:21
**addressing**
74:11
**adjust**   101:4,17
**adjustable**
114:10,15,16
**adjusted**
113:12
**administrators**
1:4

**admissibility**
138:10 187:20
**admit**   145:22
147:17
**adult**   133:15
166:10 167:7
167:13,23
**advance**   191:3
**affect**   151:19
172:2
**affecting**
171:25
**affirmatively**
40:1,4 56:24
80:4 106:5
**aft**   113:20
114:10,17
**agency**   192:15
**ago**   16:17
138:20 139:23
176:2
**agree**   37:9 52:3
76:22 77:17
78:14 79:5
86:11 90:10
104:7 105:9
128:12,21
130:5 131:5
133:12 134:10
139:5,8 145:17
146:1 148:6,7
149:19 154:10
156:10
**agreed**   96:23
129:17

**agreeing**   38:13
**agreement**   1:14
6:4
**ahead**   27:4
56:7 65:9
69:17 72:19
84:23 111:24
145:10 150:19
188:9
**air**   151:18,19
**alignment**
126:16
**alleged**   189:20
**allegedly**   63:23
**allow**   124:6
**allowed**   35:14
152:22
**alter**   107:15
**alteration**   77:4
137:4
**altered**   19:11
**alternative**
39:4
**alters**   103:24
103:25
**amended**   3:12
5:13
**american**   192:7
192:9,11,13,17
**amount**   62:1,18
75:4 135:23
**analysis**   24:24
47:12,21 57:15
63:4 74:19
75:14 76:8

77:5 96:12
109:7 134:23
135:9
**analyzed**   103:5
**analyzing**
77:12 103:4
136:19 184:15
**anchored**   101:4
**angle**   97:24
103:24 118:3,6
118:7
**angulation**
183:17
**answer**   117:25
129:19 145:10
155:14
**answered**
19:21 51:19
82:14 113:4
153:16 161:14
178:8 183:1
190:20
**anticipated**
190:23
**anybody**   77:11
114:4
**anymore**   23:16
42:14 79:23
**anything's**
112:5,21
**anytime**   38:8
**anyway**   24:5
56:16 79:18
105:4 162:9

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[ao - autopsy]**                                        Page 5

| | | | |
|---|---|---|---|
| **ao** 124:7 | **april** 165:24 | 76:11 98:18 | 165:4 168:15 |
| **apartment** | 192:20 193:16 | 105:5 172:9 | 168:24 170:12 |
| 33:15 | **area** 38:23 40:3 | 184:11 | 175:22 |
| **apologize** 29:2 | 63:9 67:20 | **aspects** 73:16 | **atlanta** 2:10 |
| 43:20 135:19 | 69:21 70:4,6 | 101:11 | 39:25 |
| **appear** 44:17 | 70:12 71:6,23 | **assessments** | **attach** 101:13 |
| 114:6 169:1 | 72:2,3 80:17 | 131:17 | **attached** 8:2 |
| **appearances** | 86:22 89:12,24 | **assist** 40:9,12 | **attempts** |
| 2:1 | 90:2,3,12 | **assistance** | 133:17 |
| **appears** 13:7 | 93:16 94:16 | 25:24 42:20 | **attenuate** 125:9 |
| 21:2 43:23 | 100:12,15 | **assisted** 25:10 | **attenuating** |
| **applicable** | 104:17 106:9 | **assisting** 25:4 | 109:13 |
| 133:5 | 106:18 107:7 | **associated** 70:3 | **attenuation** |
| **application** | 111:8 136:1 | 79:15 83:18 | 89:9 |
| 148:25 | **areas** 55:20 | 91:12 106:12 | **attorney** 140:7 |
| **applied** 133:14 | 76:19 99:21 | 122:1 | 140:11,15 |
| 135:13,15 | 101:24 131:12 | **associates** 31:8 | 157:11 193:13 |
| **applies** 157:8 | **argue** 56:9 | 42:21 | **augmentation** |
| 171:10 | **arm** 83:4,18 | **assume** 7:1 | 40:17 |
| **apply** 5:21 | **article** 192:4 | 21:22 50:13 | **august** 22:11 |
| 131:8,18 | **asked** 6:3 16:23 | 108:13 130:2 | **authorized** |
| **appreciate** | 41:18 51:1,3,9 | **assumed** 16:21 | 1:15 |
| 38:13 59:1 | 51:19 54:7 | 74:5 77:1 | **automobile** |
| 109:23 | 113:4 135:3 | **assuming** 77:21 | 39:10 |
| **appreciated** | 140:7 153:16 | 88:7 123:2 | **automotive** |
| 115:22 | 157:3 161:14 | 129:3 135:13 | 39:7 |
| **appropriate** | 178:8 183:1 | 140:22 153:5 | **autopsies** 40:12 |
| 37:3,6 | **asking** 51:11 | 167:19 172:15 | 41:4 |
| **approximate** | 111:12 138:7 | **assumption** | **autopsy** 42:8 |
| 116:20 | 138:12 144:10 | 65:3 81:23 | 42:11 66:8,11 |
| **approximately** | 144:15 156:17 | 135:22 | 66:14,19 67:7 |
| 4:4 59:25 | **asks** 140:15 | **assumptions** | 67:9,13 68:1 |
| 115:9 | **aspect** 41:25 | 63:12 | 71:2 73:11 |
| **approximation** | 50:22 68:1 | **astro** 162:13,14 | 78:25 |
| 116:7 | 70:12 74:20 | 164:4,6,11 | |

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**available** 191:2
**ave** 1:21 2:5
**average** 133:8
  133:15,15
  170:7
**aware** 34:6
  77:10 112:9
  128:6 133:21
  141:2 154:7
  157:7 158:9,12
  158:23 177:17
  177:19
**axial** 83:16
**axis** 174:16
  176:14

**b**

**b** 18:5 20:3
  22:24 30:4
  192:12,24
  193:21
**bacho** 8:4
  13:19,21 20:12
  20:15,19 26:21
  33:20 35:15
  49:16,22 50:2
  52:9,16 138:24
  140:4 141:2
  143:20 144:11
  144:16 145:7
  145:16,22,24
  146:3,15 147:3
  147:22 148:12
  148:18,22
  149:17 152:20
  152:23 153:11

154:2,8,20
159:11,20,23
183:22,24
188:1,6,17,24
189:7 190:2,25
191:6
**back** 7:17 8:9
  10:4,8,25 11:6
  20:5 24:5,6,12
  27:15 30:12
  31:5,6 39:24
  40:11 43:17
  46:19 55:8,16
  59:9 74:6 77:2
  77:15 80:10
  84:1,3 86:19
  88:16,24 89:2
  89:13,20 90:8
  91:12 92:19
  93:3,15,16
  96:8,13 100:7
  100:9,14 102:6
  103:15,22,24
  104:16 105:7
  105:19,23
  106:2 109:9,16
  109:21 110:1
  110:24 111:10
  111:10,16
  112:3,10,20,23
  114:18,22
  115:6,12,12
  116:2 117:18
  117:24 118:4,5
  118:9,18,20,21

118:25 119:10
119:17,20
120:22 123:19
125:3,4 128:9
148:1,9 161:3
161:6 164:4,6
164:11 178:13
182:6,7,17,23
186:16
**background**
  36:5 39:16
  141:17 189:4
**backward**
  103:10 117:21
  124:9
**backwards**
  84:13 118:8
**bad** 7:11
**badgering**
  156:16
**bag** 90:9
  151:18,19,21
**ball** 115:25
**bar** 91:11
**base** 72:8,15
**based** 40:14
  41:2 61:2 69:1
  69:2 70:15
  78:18 81:22
  85:8 94:6
  117:5,7 125:23
  126:23 134:5,6
  138:19 139:1
  140:25 145:7
  148:24 150:25

157:16 171:21
173:24 183:14
185:20
**bases** 19:7 51:8
  83:10 141:21
**basically** 17:15
  19:6 22:23
  23:9,15 24:19
  40:7,16 45:3
  55:14 72:6
  73:6 83:25
  84:3 92:10
  100:2 101:24
  115:19 117:10
  122:17 124:4
  133:1 136:21
  146:8 149:9,24
  151:24 163:19
  170:13,24
  173:18 181:11
  184:20 186:24
  190:8
**basilar** 72:24
  79:10 83:11
  87:5 88:20
  89:4 92:1
  93:22 96:21
  110:25 111:14
  121:4
**basis** 50:7
  63:24 85:10
  88:18 91:18
  93:21 125:10
  142:22 145:11
  155:3 188:19

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[bate's - bring]**                                        Page 7

**bate's** 138:4
  180:24
**bates** 20:9,11
  21:3,5,7 27:12
  43:17
**beams** 150:23
**bearing** 130:10
  150:22
**began** 31:6
  139:25
**beginning** 4:5
  67:7 101:23
**begun** 45:21
**behalf** 1:13
  32:21 33:2
  34:1
**belabor** 30:8
**belief** 27:14
**believe** 7:22
  24:14 32:8,9
  53:21 59:15
  61:11,19 69:4
  69:9,23 70:17
  71:22 76:5,14
  77:19 79:23
  80:2,5,24 94:9
  94:13 96:20
  97:15 105:9
  107:13 110:3
  111:2 112:22
  113:6 114:19
  120:8 123:5,12
  124:22 155:25
  162:16 180:7
  187:16

**bending** 83:16
**benefit** 40:16
  52:10
**bent** 121:6
**benz** 162:13,14
  167:12 170:12
  175:19
**best** 115:5
  116:4
**better** 41:1
**beyond** 42:2
  55:1 63:9
  187:13 190:15
  190:19
**big** 81:3 117:14
  173:18 185:6
**biggest** 128:17
**bill** 28:14 45:6
  45:8,15,17
  46:9,11,24
  47:4,5
**billed** 44:10
  45:22 47:24
**billing** 7:22
  24:14 25:11,21
  26:19 28:18
  43:5
**bio** 47:20
**biological**
  81:10 82:23
**biomechanic**
  188:2
**biomechanical**
  41:23

**biomechanics**
  33:17
**biomedical**
  28:23 63:20
**bit** 29:18 40:5
  69:11 98:7
  102:12,15
  103:10,20
  105:2,20
  110:17 117:17
  119:19 161:11
  183:17
**bled** 128:19
**bleed** 130:7
**bleeding** 70:2
  72:23 79:4
**bless** 113:11
**blood** 82:19
**blows** 160:2
**blue** 19:19
**blunt** 67:3 69:6
  69:9 79:11,15
  122:2,4,7
**bme** 1:13 3:5
  4:19 192:2
**board** 192:4
**bodies** 40:10
  185:11
**body** 17:1
  23:11 41:7
  42:10 83:5
  87:8 171:25
**bogey** 173:4
**bone** 67:18,19
  67:21,23 68:10

  69:3 70:16
  71:1,4,11,15
  72:7,20,20
  78:19 98:13,16
  147:8,10
**bookkeeper**
  46:12,16
**booster** 182:6,8
  182:10,17,23
  182:24
**borrowing**
  115:21
**bottle** 37:23
**bottom** 61:20
  80:12 95:13
  98:21 104:1
  126:8 156:23
  180:24 181:3
**bow** 109:6
**bracket** 170:6,8
**brain** 29:1 79:4
  133:23 174:18
**brand** 50:25,25
**break** 37:25
  38:9 59:1
  76:18 95:25
  96:11 160:20
  186:8
**breaking**
  115:22
**brief** 22:19
  38:6 121:18
**briefly** 15:7
**bring** 27:1

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[broader - car]**                                        Page 8

| | | | |
|---|---|---|---|
| **broader** 109:2 | 176:3,17 | **calculate** | 65:17 84:21 |
| **broke** 129:10 | **buchner's** | 169:17 | 90:19 107:25 |
| **brought** 5:3 6:8 | 15:13 19:4 | **calculated** | 113:4 123:6 |
| 6:19 23:2,6,7,8 | 35:2 55:10,13 | 176:4 | 124:20 135:6 |
| 26:23 29:12,18 | 56:22 57:15,20 | **calculates** | 139:4 140:3 |
| 33:20 43:5,21 | 73:6 87:22 | 169:21 173:21 | 142:25 143:5 |
| 44:8 52:23 | 127:15 134:6 | **calculating** | 143:11,14,22 |
| 98:23 | 134:13 153:2 | 134:17 | 144:8,12,14 |
| **bruising** 85:13 | 179:14 | **calculation** | 145:8 149:18 |
| 98:11 | **buck** 185:7 | 176:2 | 149:20 150:16 |
| **bryant** 13:9 | **bucker** 137:3 | **call** 8:8 22:24 | 154:4,11,23 |
| 14:8 15:4 | **bumper** 86:24 | 23:15 42:6 | 155:11,15,21 |
| **bryson** 1:4,4 | 87:4,15,15,20 | 80:9,13 93:18 | 156:15,24 |
| 8:10 10:17 | 87:23 88:4,8 | 169:15 | 161:14,15 |
| 27:12 38:25 | 88:14 89:5 | **called** 4:20 6:22 | 162:7 163:6 |
| 56:17 94:21 | 125:8 126:13 | 61:21 64:25 | 164:24 177:3 |
| 95:6 145:23,24 | 184:23 185:5 | 65:10 89:15 | 178:8 183:1,24 |
| 147:19 148:8 | **bumper's** | **calspan** 165:18 | 184:7,24 |
| 158:7 162:17 | 87:11,12 126:7 | 165:20 177:18 | 185:16 187:22 |
| 177:2,12 | **bumpers** 148:2 | **camera** 72:15 | 187:25 188:12 |
| **bryson's** 13:10 | 150:21 168:5 | **camp** 89:15 | 188:25 190:17 |
| 14:9,14 18:13 | 184:23 | **cancelled** 15:8 | 191:8 |
| 18:15 | **bunch** 52:5 | **cannella** 1:20 | **capable** 82:1 |
| **buchner** 13:9 | **burton** 31:8 | 2:4,4 3:6 4:9,9 | 92:21 107:2,2 |
| 14:8,13 15:4 | 42:21,21,25 | 5:17,22 7:13 | 149:6 |
| 15:19 18:12 | **business** 54:14 | 9:16 11:6,17 | **caps** 163:3 |
| 36:9,23 37:14 | 138:8,18 | 12:22 13:5,8 | **caption** 193:6 |
| 55:21 58:5 | | 16:25 17:9 | **car** 33:10 40:9 |
| 62:8 73:9,14 | **c** | 19:16 20:8,14 | 77:13,13 93:3 |
| 75:3,16 76:23 | | 20:17,21 21:5 | 110:24 111:13 |
| 77:6 84:16 | **c** 3:1 24:18 | 30:5,14 32:3 | 111:13 112:2,4 |
| 88:6 103:5 | 172:3 176:23 | 37:23 38:1 | 112:6,11,11,12 |
| 116:13 125:25 | 192:9 193:1,1 | 44:14 49:1 | 112:23 115:15 |
| 126:22 127:5 | **c.z.b.** 1:5,5 | 51:4,19 54:9 | 115:16,21 |
| 135:2,21 153:1 | **cage** 149:7 | 57:23 58:9 | 151:2 178:25 |
| | **cal** 165:11 | | |

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[car - center]**                                                Page 9

185:7
**care** 156:24
**career** 156:1
**carefully**
143:12
**cargo** 89:24,25
90:2,3,12
136:1
**carry** 146:9
**cart** 185:5
**cart's** 184:19
**case** 1:7 5:6
6:24 7:20,23
9:13 10:18,21
11:8 12:23
15:14,24 18:20
19:12 20:8,10
20:12,12,13,13
20:16,20 21:1
22:22 23:8,11
23:21 25:11
27:21 28:18
30:14,16 32:3
32:7 33:6,8
34:25 36:1,9
36:13,24 38:24
41:11 44:15
47:6,7,11,15,17
47:19 48:5
49:23 50:3,7
50:12,17 53:17
53:20,25 54:17
54:24 56:25
57:16 58:6,7
58:12,15 61:24

66:7,16 73:17
74:4 95:7
104:8 108:7
109:11,21,22
109:25 112:1
112:16,22,25
122:5 123:8,10
124:22 125:13
127:11,12
130:18 134:22
135:14 138:24
138:24 139:14
140:9,11,15,18
140:23,25
141:8,11,14,22
142:3,7,24
144:6,10,16,18
144:21 145:6
145:15 146:4
146:12,14
147:22,25
148:17,21
149:16 153:2
153:10,20,25
154:10,22
155:7,9 156:1
156:7,20
157:10 158:2,7
158:7 159:2,12
159:21 160:16
161:8,10,17
162:1,3,9
163:16 171:2
172:11 174:11
177:11,25

179:7,10
183:11,22
184:6,13 186:3
186:20,23
187:5 188:2,18
188:20,23
189:13,14,23
192:14,14,18
**case's** 155:4
**cases** 8:4 13:19
30:13,19 33:20
33:20,23,24
34:5 35:16,16
35:20,21,25
49:16,22 50:3
50:5,9 51:10
51:12,16,18,24
52:9,16 74:10
112:6 138:20
139:2 140:16
141:3,6,24
142:1,7,14,19
142:20,21,23
143:2,21
144:12,23
146:7 148:3,20
151:25 153:9
153:14 154:15
158:9,13,24
159:17 160:16
188:7 189:3,9
189:16,17
190:4,7
**catastrophic**
75:7 149:3,9

159:16 160:9
**catastrophica...**
149:11
**catching** 100:5
**cathy** 20:9
**causation**
33:17 53:12
82:20 149:12
151:14
**cause** 40:14
41:15,20 81:12
83:17 87:5,9
88:6,9 89:4
99:25 107:20
120:13 121:8
121:22 123:3
123:22 124:7
124:19 149:2
**caused** 74:17
78:14 80:25
93:3 99:13
103:1 108:21
110:25 111:14
112:11,13,23
**causes** 94:15
104:12,13
108:17 123:18
**causing** 88:20
90:18 123:15
**caveat** 54:1
**ccr** 192:24
193:21
**center** 105:15
128:4 130:3,5
130:15,23

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[center - cohen]**                                              Page 10

176:10 179:23
**certain** 17:16
24:12 41:2
61:2 123:4
136:19,20
140:9,10
**certainly** 14:6
18:1 34:23
36:6,8,25
37:21 39:18
48:25 50:5,8
52:17 54:3
56:9 58:3
63:16 67:11,17
73:22 75:3,4
75:19 86:11,17
86:22 88:2
90:6 97:4
104:14,24
108:5,23 114:3
117:1,3,14
122:19 127:25
128:14,18
129:11,14
131:2 133:16
137:20 146:25
150:1 151:15
151:16,19
153:22 155:4
156:11 158:3
171:20 173:1
176:13 178:10
**certified** 1:18
192:6

**certify** 193:5,9
193:12
**cetera** 23:12
**cg** 130:13 174:8
174:22 176:8
176:18
**chair** 92:15
96:17 98:25
99:7 137:16
**chairs** 89:15,16
92:9
**challenge** 34:9
**change** 11:11
11:15 14:21
21:25 128:17
**changed** 19:11
30:14 53:8
69:8,9,13
156:12
**changes** 14:18
156:13
**changing** 65:20
**characterize**
74:14
**charge** 25:15
192:17
**chasing** 153:15
**check** 114:11
136:5
**checking** 56:6
**chest** 85:15
171:20
**chevrolet**
146:17 160:13
164:4 168:23

170:12
**chevy** 162:13
162:14
**child** 33:10,12
55:18 57:5,12
82:2 85:7,9
86:3 88:25
89:3,10 90:18
90:24 91:3,4
95:1 103:8,11
103:14,21,22
104:1 107:9
109:17,21
110:5,7,10,15
112:2,6 115:6
115:11,11
116:3,14 117:2
117:5,8,16
120:12 122:21
123:12,19,22
124:3,5 133:13
133:13,22
134:24 167:23
181:11 182:7
182:13,16
**child's** 104:5
112:12,19
116:9 122:15
122:17 124:1
**children**
133:18
**chris** 28:9
**chronological**
23:9

**cite** 82:8 134:1
148:19 158:21
159:3,19
160:16
**cited** 66:21
**civil** 1:16
**clarification**
70:1 78:8,17
**clarifying**
70:16
**clean** 120:23
**clear** 9:16 18:9
28:21 34:20
53:6 69:5,8
74:2 145:1
**clinical** 134:15
**clip** 85:15
101:17
**close** 116:25
119:23 120:4
120:10,12,17
164:17
**closed** 117:17
**closer** 116:5
120:4
**clothes** 90:9
**coefficient**
146:24
**cohen** 37:12
65:11 66:20
74:17 75:8,14
76:14 80:6
82:10 84:20
85:1,2 88:7,9
88:17 91:1

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[cohen - confused]**                                                      Page 11

110:25 114:9
118:25 122:8
136:11,23
179:10,20
182:18,24
**cohen's** 62:19
66:23 69:20
77:20 81:8,18
84:6 85:22
86:3,13 88:13
90:16 94:4
121:22 135:24
179:19,20
182:22
**collect** 25:4
**colliding** 80:6
**collision** 147:4
147:6,10,12,13
147:15 182:1
**color** 181:21
**column** 173:7
173:24
**combination**
6:10 23:22
117:11
**combine** 53:14
174:16
**combined**
119:24 174:18
**combining**
118:25
**come** 13:21
41:9 62:12
91:19 96:12
105:8 161:13

173:17 179:13
**comes** 37:13
84:5 129:23
133:12 173:10
**comfortable**
106:25
**coming** 80:10
82:19 98:10
99:16,20
102:13 103:22
103:24 105:17
109:8,20 110:2
115:12 117:14
119:16 138:14
179:1
**commencing**
1:19
**comment**
102:19 126:10
**comments**
151:10
**commerce**
39:14
**common**
108:25
**communication**
56:20
**company** 24:15
46:6 158:10,13
192:7,9,11,13
192:17
**compare** 43:8
**compared**
75:24 159:12

**compartment**
96:15 102:25
**compatibility**
125:15 151:8
151:10,12
170:11,20
**complete** 45:9
73:18
**completed**
39:23 46:25
188:4
**completely**
144:19
**complex** 33:15
**compliance**
131:14,16
**comply** 131:10
131:11 132:3
132:12 156:9
156:14 173:5
**component**
84:1 106:4
**comport** 100:7
**compound**
150:17
**compressed**
89:19 110:13
**compressing**
91:14 110:21
**compression**
102:9
**computed**
173:22,22
175:10 179:3

**computer**
36:10,17 77:7
127:16 134:7
136:4 173:19
173:21
**computes**
173:24
**conclude** 83:10
97:5 129:20
**concluding**
93:13 126:10
**conclusion** 70:8
152:14
**conclusions**
62:13 73:13,19
73:21 77:18
134:11,21
135:10 148:20
150:6 153:3,12
**condition** 115:4
117:7
**conditions** 41:2
**conducted** 7:9
**configuration**
90:3 136:11
185:9
**configured**
185:21
**confines** 124:5
**confirm** 162:16
**confirmed**
18:23
**conflict** 38:19
**confused** 98:6
140:8 164:9

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[confusing - correction]**                                    Page 12

| | | | |
|---|---|---|---|
| **confusing** | **consultant** 31:6 | 71:5 78:13 | 56:14 59:12,15 |
| 103:16 150:17 | 31:13 | **conveying** | 62:14 64:22 |
| **conjunction** | **consulting** 28:2 | 61:17 | 65:18 67:9,24 |
| 55:9 79:3 | 184:6 | **copies** 30:6 | 70:11,21 71:24 |
| 116:12 135:2 | **contacted** | 144:20 | 73:10 74:21,22 |
| **connected** | 192:10 | **copy** 5:10,23 | 78:17 79:25 |
| 178:13 | **contacting** 81:5 | 23:8 26:9,14 | 81:2 83:7 |
| **connection** 7:2 | 88:22 | 27:8 28:10 | 86:10 87:2,18 |
| 7:20 31:14 | **contain** 53:16 | 29:11,12 52:23 | 87:25 89:6 |
| 98:24 99:20 | 53:19 73:8 | 52:25 164:22 | 94:3 101:16,19 |
| 100:6 141:24 | **contained** 18:4 | **cord** 41:12 | 105:11 108:12 |
| 142:13 143:20 | 53:7 54:23 | **corner** 181:4 | 113:1,14,24 |
| 165:15 177:25 | 65:12,15 66:10 | **corolla** 180:11 | 118:11,23 |
| **consider** 82:2 | 122:18 138:11 | 185:14 | 121:24 122:24 |
| 84:6 87:4,8 | 152:11 153:18 | **coroner** 41:14 | 124:11 131:6 |
| 93:1,4 113:2 | 190:3 | **coroner's** 66:19 | 132:6 137:8 |
| 134:20 136:6 | **contains** 27:19 | **coroners** 40:3 | 140:13 141:3 |
| 140:12 | **contemporan...** | **corporate** 52:8 | 141:11 142:1 |
| **consideration** | 9:3,22 46:18 | 158:7,11,19,22 | 142:15,24 |
| 135:9 136:21 | **contemporan...** | **correct** 8:5 9:5 | 143:21 147:6 |
| **considered** | 9:8 | 10:13 12:14 | 152:3,10 |
| 25:20 77:23 | **content** 67:14 | 13:6,11,18 | 164:13 165:7 |
| 90:25 135:20 | **context** 24:11 | 18:14 21:15,16 | 166:8,11 167:9 |
| **consistent** | **continue** 10:22 | 21:20 22:3,12 | 167:14,20 |
| 69:20 72:24 | 16:7 126:16 | 25:9 26:18 | 168:25 170:9 |
| 92:19 123:9 | **continued** 42:4 | 28:3,24 30:21 | 170:18 172:20 |
| 167:11 | **continues** | 31:23 32:5,19 | 175:8,15,20 |
| **console** 105:15 | 98:14 | 34:14 35:6,12 | 176:16 179:24 |
| **conspiracy** | **continuing** | 35:17,18 39:1 | 180:8,12,14 |
| 17:13 | 106:13 | 39:9,17 41:17 | 181:8 182:14 |
| **constraints** | **contract** 42:22 | 43:1,3 44:16 | 182:18 183:22 |
| 15:6 | 192:12,14 | 45:7,16,19 | 184:23 193:10 |
| **construction** | **control** 193:8 | 46:4 49:17,23 | **correcting** 69:2 |
| 61:25 87:11 | **contusion** | 49:24 50:3 | **correction** 68:9 |
| | 69:19 70:14,17 | 51:18 52:11,16 | |

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**correctly**  42:10
  57:22
**coughing**  38:15
**could've**  96:12
**council**  192:5
**counsel**  1:14
  2:1 4:7,13 6:5
  32:2 192:14
  193:13
**counting**  28:6
  119:22
**country**  1:8
  4:12 33:21
  58:15 59:24
  60:15,21 61:7
  61:10 143:6
  146:1 148:25
  152:2 154:16
  158:8,22,24
  160:8 191:3
**country's**  52:8
  143:1 158:6,11
  158:18,23
**county**  40:3
  42:24 43:2
  159:13 192:3
  193:4
**couple**  29:21
  32:15 51:14
  56:21 89:14
  162:18
**course**  9:7 14:3
  17:19 19:18
  37:4 62:24

**court**  1:1,18
  4:14,16 5:24
  29:5 35:14
  43:13 137:25
  138:13 140:18
  140:21,23
  156:1,2 180:5
  192:4,6,7,9,10
  192:11,13,17
**court's**  139:11
  187:19
**courts**  34:7
  155:10 157:13
**cover**  26:6
  192:15
**covered**  186:19
**covering**  47:8
  93:9 105:19
  110:7 111:16
  111:19
**covers**  139:12
**covid**  28:25
  29:1 38:14
**crash**  37:7
  56:13 63:2,11
  63:15,21 74:1
  74:20 75:5,8
  75:12,12,15
  76:9,12,15,16
  76:25 77:8,10
  77:12,13 82:4
  83:15 89:23
  94:25 103:5
  113:6 118:18
  118:20 123:15

125:1,9,12,22
126:22 131:13
131:19,21,22
132:4,14 134:8
134:12 135:5
135:16 136:13
136:23,24
137:1,21 150:9
150:15,21
152:7,10
163:20 169:7
169:11,13,20
177:1,12
179:18,21
**crashed**  150:8
**crashes**  40:9,9
  75:19
**crashworthin...**
  131:6
**create**  9:3,7,9
  13:5 80:17
  81:20 83:16
  169:21 176:23
  186:22
**created**  10:19
  14:5 36:10
  149:1
**creating**  86:23
  107:2 185:19
**criteria**  132:20
  132:23 133:21
  133:25 135:8
  169:2 172:10
  173:9

**criterion**
  168:12
**critique**  36:8
**cross**  153:20,22
  153:25 190:24
**crowd**  57:15
**crumple**  125:16
  149:7
**crush**  55:20
  62:1 75:4,18
  75:24,25 76:24
  117:1,15
  126:17 135:25
**crushed**  89:17
**cupholder**
  105:14
**cupholders**
  102:10 104:4
**curious**  157:4
**current**  16:11
  16:13 27:3,16
  34:4 141:14
**curriculum**
  3:15
**curved**  106:9
**curves**  105:24
**cushion**  91:16
**cushioning**
  93:8
**customary**
  192:17
**cut**  41:12
**cv**  1:7 7:21 27:1
  27:18,23 34:19

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[d.o. - deposition]**                                                    Page 14

| d | | | |
|---|---|---|---|
| **d.o.** 39:21 | **day** 1:19 8:14 | **december** 30:1 | 129:11 149:3,8 |
| **damage** 62:1 | 8:18,19,25 | **decided** 73:15 | 151:4 |
| 62:18 82:22 | 44:22 45:6 | **decrease** | **deformed** |
| 91:6 97:17 | 46:5 49:12 | 135:23 | 121:5 128:19 |
| 110:19 120:20 | 54:14 56:10 | **decreasing** | **defy** 84:11 |
| 128:19 135:1 | 118:14 138:8 | 110:22 | **degree** 24:22 |
| 137:5 154:14 | 187:21 192:20 | **defamation** | 25:23 |
| **damaged** 89:18 | 193:16 | 149:25 | **degrees** 39:19 |
| **dangerous** 39:1 | **day's** 138:18 | **defective** 38:25 | 85:3 |
| **data** 3:22 17:15 | **days** 45:6,13 | **defects** 189:21 | **dekalb** 192:3 |
| 18:11,21 22:4 | **de** 1:21 2:5 | **defendant** 1:9 | **delays** 20:7 |
| 22:20 37:13 | **deadline** 50:11 | 1:13 2:7 4:11 | **delete** 79:22 |
| 133:16 142:3 | 50:16 140:23 | 32:22 33:3,5 | **delineate** |
| 161:8 163:10 | 154:9,21 191:4 | 33:14 177:15 | 128:11 |
| 165:22 172:13 | **deal** 191:9 | 189:25 | **delineated** 46:2 |
| **database** 6:22 | **dealer** 65:3 | **defendant's** | 59:17 |
| **date** 5:20 8:2 | **dealership** | 3:11 5:15 8:11 | **delta** 75:17 |
| 10:19 12:4,9 | 64:13,25 | 20:3 27:6 30:9 | 76:1,4 134:18 |
| 16:3 21:4 | **dealing** 28:25 | 43:14 48:15 | 147:20 150:1 |
| 27:16 32:10 | **dealt** 146:5 | 52:21 138:1 | **dependent** |
| 44:18,20 45:3 | **death** 40:14 | 163:7 180:1 | 126:22 134:12 |
| 50:14 55:11 | 41:16,20 74:18 | **defendants** | **depending** |
| 165:24 192:3 | 121:22 | 49:3 | 41:11 46:21 |
| **dated** 6:18 7:3 | **deaths** 40:8 | **defined** 76:13 | 54:3 63:22 |
| 8:13 12:13 | **decade** 138:20 | **definition** 60:8 | 64:1 86:13 |
| 13:17 14:5 | **decades** 141:4 | **deflect** 103:10 | 128:13 172:5 |
| 20:25 21:23 | **decapitation** | **deflection** | **depo** 10:25 |
| 22:2 27:13 | 74:18 123:4 | 102:22 103:20 | 12:9 15:8 |
| 138:3 139:18 | 124:19 | 117:12,17,20 | 158:20 |
| 161:6 188:4 | **decatur** 1:22 | 118:7,25 | **depos** 30:2 |
| **dates** 42:12 | 2:6 | 119:23,24 | **deposed** 33:6 |
| **daubert** 34:8 | **deceased** 1:5 | **deform** 115:14 | **deposition** 1:12 |
| **david** 2:12 | 42:8 | 125:17 | 1:17 4:5 5:9 |
| | **deceleration** | **deformation** | 6:4,4 13:8 14:8 |
| | 79:14 | 121:10 123:16 | 14:13 15:4,20 |

Paul Lewis , Jr., M.S., BME                              March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[deposition - discussed]**                                    Page 15

18:12 19:4
21:14,25 22:10
22:14 23:5
24:4,7 32:21
33:2 52:10
54:11,14 67:18
69:3 70:2
71:22 72:1
78:16 79:24
98:1 138:9
139:6,9,10
145:20 158:16
158:17,25
159:3 187:18
191:11 192:2
192:10,12,15
**depositions**
23:12 25:3
32:11 142:19
144:4,22 145:4
145:18
**depressed**
104:8,11,13,25
108:20,22
**depressing**
106:10
**describe**   23:1
25:3 72:4
78:24 97:2
104:11 126:3
**described**   67:7
67:8 71:8,25
71:25 91:24
95:6 98:5
148:13

**describing**   71:3
72:21 97:17,21
97:25 98:10
99:9 105:3
108:16 114:4
**description**
44:18 59:19
65:23 66:7
71:5 97:7,14
127:8
**design**   39:7
61:25 150:12
151:15,16,21
152:22
**designed**   39:13
125:12,16
149:6 151:2
152:22
**designer**
151:20
**designs**   39:4
**detail**   147:2
**details**   141:2
145:22 181:3
**determination**
41:15 62:21
106:15 107:11
107:18
**determine**   37:2
40:13 45:20
63:3 81:6
107:7 116:19
136:10
**determined**
62:1 126:24

**determining**
107:23
**detrimental**
150:3
**developed**
134:6
**device**   98:25
**diagrams**   73:10
**dial**   2:9
**dictate**   24:3
**dictated**   8:15
9:10,21 15:9
**dictation**   9:17
10:9
**difference**   11:2
171:14
**different**   19:1
40:23 74:11
76:19 77:5
97:1 128:23,23
128:24 131:12
132:11,23
133:14 145:23
147:20 157:19
166:21 169:2
171:13,13,21
174:3,12
**differently**
151:3
**dipped**   116:3
**direction**
163:20 193:8
**directionality**
136:22

**directly**   160:3
183:8
**disagree**   49:7
67:17 68:2,3
191:9
**disagreed**
67:15
**disclose**   50:16
51:23 154:9,18
155:7 157:9
191:4
**disclosed**
154:22
**disclosing**
156:20
**disclosure**   7:21
14:2 48:13,18
48:21 49:3,7
49:21 50:11
139:11,12
148:19 155:7
192:1,5
**disclosures**
3:19 48:14
**discount**
192:18
**discovery**
50:20,22
**discuss**   41:22
51:9,12,16
56:25 121:15
188:16
**discussed**   20:25
21:19 22:18
42:3 49:1 75:1

Case 2:22-cv-00017-RWS   Document 102-2   Filed 09/05/24   Page 209 of 251
Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[discussed - earlier]                                            Page 16

127:24 188:10

**discussing**
114:24 121:23
125:1 127:5

**discussion**
109:7 141:24

**displacement**
115:6

**disqualified**
34:12 192:8

**dissected**  70:4
79:1

**dissipating**
125:18

**dissipation**
149:8

**distance**  46:2
117:16 120:8

**distances**
116:19

**distribute**
125:9

**district**  1:1,1

**division**  1:2

**doctor**  39:17
41:22

**doctrine**  156:6

**document**  8:7
10:16,19,20
11:21 13:1
14:13,21 16:12
26:7 41:5 47:6
47:15,19 48:21
48:24 49:15
128:10

**documenting**
41:8

**documents**  5:2
12:25 15:12
20:1,23 21:11
23:2 114:14
118:2 142:20
144:4 145:4
152:12 153:18
190:4,6

**dodge**  146:16
146:18

**dog**  153:15

**doing**  24:21
33:17 40:12
42:13 46:18
47:20 55:18
113:13 129:11
134:18 158:4
169:16

**door**  83:21
150:23

**downloads**
25:16

**dr**  21:14,25
42:21 58:11
67:3,9 69:2
70:1,16,25
71:22 78:16
97:7 122:2
123:9

**draft**  13:4
48:23 140:3

**drafted**  15:11
22:15 50:1

70:10

**drafting**  45:21
53:8 139:25
156:9

**driven**  102:11

**driver**  33:15
102:25 114:5
115:7 117:18
165:4,4 166:2
166:23 175:22

**driver's**  13:10
14:9,14 18:13
18:15 76:4
80:6,8 81:7,17
81:23 82:9,13
83:6,13 91:16
94:25 99:24
102:15,18,22
103:20 104:2
105:5,10 106:8
106:21 107:19
107:24 108:10
113:12 115:12
117:9,13,21
118:4 119:3,10
119:13,20

**driving**  86:21
86:21 91:13
94:24 117:15
176:15

**due**  15:5 34:8
38:14 51:25
62:3 83:20
93:3 99:6
112:3 122:2

**duly**  4:20

**dummies**
177:23

**dummy**  133:7
133:25 166:6
166:15,17,20
167:16,20
168:15 171:8,9
171:17,21,23
173:25 177:1
177:13 181:8
181:10,11
185:25

**duties**  157:9

**dynamic**  75:24
102:14,17
115:4 119:9,11
119:24 120:4,5

**dynamically**
75:20 115:10
118:9,18

**dynamics**
113:6 150:14

**e**

**e**  3:1 24:18 28:9
64:12 193:1,1

**e350**  170:12

**ear**  68:24 71:23
72:6,23 73:2,3
82:19 94:16
97:18 98:3

**earlier**  16:15
23:13 48:7
106:23 120:21
121:25 150:10

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[earlier - exactly]**                                            Page 17

161:11 187:7
187:17
**earliest** 139:21
**easily** 95:2
**easy** 120:5
125:4
**eclipse** 169:16
**edema** 70:17
78:13
**edge** 106:3,7,17
**education**
27:19 42:1,2
141:17 154:25
**effect** 124:18
**effects** 161:19
**effort** 108:9
**eight** 64:13
163:6,9
**eisenstat** 21:14
21:25 58:11
67:3,9 69:2
70:1,16 122:2
**eisenstat's**
70:25 71:22
78:16 97:7
123:9
**either** 42:8
46:13 49:20
60:16 100:1
115:24 144:11
144:13 151:20
152:23 161:22
168:1,5 185:23
**electronic**
25:16

**elevate** 116:1
**elevated** 85:3
159:14
**elicit** 187:12
**emblem** 84:19
85:25 86:2,5,8
87:13 88:3,5
88:12,15
**empirical**
134:17
**employed** 42:5
42:16
**employee** 28:22
42:21 193:13
**employees** 28:4
28:5 58:14
**ems** 66:3
**enable** 145:6
**encompass**
53:16 70:5
**encompassed**
40:2
**encompasses**
47:19
**energy** 89:9
109:17 124:16
125:17,18,19
149:7,9
**engage** 125:7
150:21
**engaged** 126:2
**engineering**
40:22
**engineers**
61:24 62:6

**enhanced** 62:3
**entered** 106:19
**entire** 31:12
91:12
**entirely** 23:20
132:23
**entirety** 138:19
**entitled** 8:9
10:18 48:13
**entries** 47:10
**entry** 43:23
44:1 47:17,23
48:3
**environment**
115:8
**equal** 86:12
**equipped** 59:24
145:25 159:13
**erred** 136:3
**error** 134:11,16
134:21 135:10
**escape** 87:21
89:12 125:8
126:3 130:23
176:7,20
177:14
**escape's** 62:2
**especially** 82:1
82:3 91:22
151:7
**esquire** 2:4,8
**essentially** 70:3
71:19 72:22
84:10 85:2
116:23

**establishing**
137:14
**estate** 1:4
**estimate**
129:23
**estimation**
118:24 152:8
**et** 23:12
**evaluate** 36:23
171:1
**evaluated**
61:24 62:6
**evaluation** 63:4
**everybody** 48:9
**evidence** 70:19
70:23 81:15,17
82:9,11,21,23
83:4 85:13
90:21 91:7
92:18 97:5
108:6 110:10
110:15,23
111:12 116:8
121:1 125:21
126:1 138:25
139:13 142:22
149:25 193:10
**exact** 16:3
45:17 117:3
**exactly** 81:6
106:21 107:24
120:10,16
134:1 139:24
148:20,24
184:18

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[exam - eyes]**                                                    Page 18

| | | | |
|---|---|---|---|
| **exam** 9:11 | **exemplary** 3:13 | **expectation** | 62:22 63:5,13 |
| 26:10 | 8:10 | 16:18 77:3 | 74:24 139:2 |
| **examination** | **exercise** 41:19 | 161:21 170:1 | 142:9,20 144:5 |
| 3:3 4:22 | **exerted** 122:12 | **expected** 96:19 | 144:23 148:20 |
| 187:24 188:14 | 123:11,14 | 138:22 146:8 | 150:7 152:25 |
| **examinations** | **exhibit** 3:8,11 | 163:23 178:21 | 153:13,17,19 |
| 7:19 | 3:12,13,14,15 | 178:23 | 158:1 |
| **examine** 91:6 | 3:16,17,18,20 | **expecting** | **explain** 85:9 |
| 138:18,23 | 3:21,22,23 | 127:2 | 91:25 92:16 |
| 153:20,25 | 5:10,14,15,24 | **experience** | 99:1 100:15 |
| 190:24 | 6:2 8:7,11 | 27:19 36:18 | 101:22 163:15 |
| **examined** 4:21 | 15:24 18:5 | 42:1 49:19 | 169:13 |
| 153:23 | 20:3 27:5,6,12 | 50:8 112:9,14 | **exposed** 109:20 |
| **examiner** 39:25 | 27:24 29:7 | 141:17 154:24 | **extend** 106:13 |
| **examiner's** | 30:9 43:11,14 | 176:6 188:2,6 | **extending** |
| 41:15 42:16,22 | 43:16 47:11 | 188:17,21,23 | 72:12 102:18 |
| **examiners** | 48:12,12,15,18 | 189:6,8 191:6 | **extensive** 151:1 |
| 41:19 | 52:19,20,21 | **experienced** | **extent** 44:21 |
| **examples** | 59:15 137:23 | 37:11 74:17 | 68:22 128:9 |
| 148:23 155:5 | 137:24 138:1 | 122:8 179:10 | 136:2 154:17 |
| **exceeding** | 163:5,7 180:1 | 179:21 | 154:18,19 |
| 133:4 | 180:4 187:3 | **experiment** | 160:15 163:9 |
| **excluded** 34:16 | **exhibits** 8:8 | 134:18 | **externally** |
| **excluding** | 13:10 15:21 | **expert** 6:18 | 40:15 41:6 |
| 12:20 | 18:13 21:14 | 14:2 34:13,21 | **extra** 29:11 |
| **exclusive** | 22:11 186:22 | 34:24 39:7 | **extremities** |
| 192:14 | **exhumations** | 48:13 49:21 | 83:12 |
| **excuse** 48:22 | 42:7 | 139:1 141:25 | **extricated** |
| 55:9 99:18 | **exhume** 42:10 | 144:5,20 145:4 | 114:5 |
| 104:17 113:10 | **existed** 16:13 | 183:21 | **eye** 69:20,24 |
| 179:20 | 17:8 18:3 | **expertise** 37:2 | 70:9,13,20,23 |
| **exemplar** 7:10 | **exists** 93:17 | 38:23 61:24 | 71:6,16,18,18 |
| 9:4 55:15,16 | **expect** 28:18 | 63:9 150:11,12 | 77:24 78:6,13 |
| 55:17,18 57:11 | 99:12 102:3 | **experts** 35:24 | **eyes** 79:6 |
| 57:21 | 129:11 189:4,5 | 54:20 58:8 | |

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[f - first]**                                                    Page 19

| f | | | |
|---|---|---|---|
| **f**  35:12 36:12 | 106:22 107:21 | **fatality**  136:12 | **final**  15:23 |
| 59:20 64:16 | 127:8 132:17 | **fault**  38:20 | **finalized**  16:1,4 |
| 65:6 85:21,22 | 133:9 134:13 | **features**  149:6 | 16:6 |
| 86:10,25 87:2 | 136:6,14 140:5 | 150:8 152:21 | **finally**  10:2 |
| 88:20,23 89:12 | 157:10 158:2 | **february**  7:17 | 54:16 |
| 90:11 93:4 | 184:4 | 11:7,20 12:1,7 | **financial** |
| 96:18 193:1 | **fairly**  105:18 | 12:8,12 13:8 | 192:18 |
| **f250**  111:9 | 126:7 159:16 | 13:13,24 14:7 | **financially** |
| 126:2 146:15 | **familiar**  108:13 | 14:15,21,23 | 193:14 |
| 146:19 | **far**  7:8 11:1 | 16:19,25 17:8 | **find**  12:25 |
| **fabric**  93:8 | 16:7,11 24:21 | 43:19 | 28:11 54:13 |
| **face**  69:21 | 24:23 25:19 | **federal**  1:15 | 66:6 67:14 |
| 71:13 77:22 | 37:16,20 42:20 | 140:18,21,23 | 106:24 108:6 |
| 94:10 104:3 | 44:21 53:11 | 155:10 156:1,2 | 110:23 113:18 |
| **facets**  74:16 | 55:6,19 57:3 | 157:13 | 117:24 121:1 |
| **facial**  67:20 | 61:14 67:5 | **felt**  18:5 110:12 | 140:9 148:5 |
| **facility**  165:23 | 68:22 71:9 | **female**  167:13 | 161:16 |
| 177:19 | 74:1 75:2,3,4,9 | 167:14,23 | **findings**  35:3 |
| **facing**  94:10,14 | 76:2 77:2 | **femur**  83:16 | 40:15 68:4 |
| 94:22 | 80:17 81:9 | **field**  131:25 | **fine**  5:21 53:1 |
| **fact**  68:5 81:3 | 85:24 86:3 | **fifteen**  174:19 | 111:21 190:21 |
| 84:17 91:9 | 99:17 104:17 | **figure**  97:16 | **finished**  45:2 |
| 95:2 99:6 | 112:19 113:20 | 119:21 185:1 | 45:22 186:9 |
| 111:15 132:2 | 114:6,8 117:8 | **figured**  51:21 | **firm**  12:17 28:2 |
| 139:12 | 130:14 131:17 | **figures**  24:21 | 28:5,22 30:25 |
| **factors**  74:19 | 135:24 137:4 | **file**  6:2,15 7:15 | 31:3,4 45:17 |
| **factory**  60:1,2 | 141:13 149:11 | 11:7 16:20 | **first**  4:20 10:17 |
| 60:6,19 61:4,5 | 157:11 182:20 | 26:21 43:19 | 14:20 15:25 |
| 61:7,9,16,18 | 188:19 | 47:11,18 54:24 | 17:25 18:1,4 |
| 62:4 | **farther**  86:25 | 141:25 142:6,7 | 32:6 49:12 |
| **facts**  141:9 | **fast**  56:11 | 142:17 | 52:1,6,18 53:8 |
| **fair**  57:22 66:7 | 58:22 73:4 | **filed**  156:2 | 61:23 62:11 |
| 73:14 74:8,14 | **fatal**  159:22,23 | **files**  13:22 | 63:12,24 65:11 |
| 77:20 99:3 | 160:2 163:23 | 23:16 28:13 | 128:16 155:3 |
| | 190:9 | | 162:11,18,21 |

Paul Lewis , Jr., M.S., BME                     March 18, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[first - fracture]**                                                    Page 20

| | | | |
|---|---|---|---|
| 162:22 163:10 | **follows** 4:21 | 143:14,22 | 82:11 113:13 |
| 168:21 189:14 | **foot** 88:3 | 144:8 145:8 | 113:16,19 |
| **five** 58:25 | **foramen** 72:8 | 149:18,20 | 118:4 |
| 85:11 95:24 | 98:14 | 150:16 154:4 | **foundation** |
| 120:25 121:23 | **force** 67:3 69:6 | 154:11,23 | 138:25 184:8 |
| 154:8,21 | 69:9 79:11,15 | 155:11,21 | **four** 18:10 |
| 160:19 186:8 | 86:20 96:25 | 156:15 177:3 | 21:19 28:6 |
| **fixed** 100:20 | 97:2 110:20 | 184:7,24 | 33:4 43:25 |
| 114:20 | 117:15 122:3,4 | 185:16 188:8 | 44:2 60:3 |
| **flat** 104:14 | 122:8 129:25 | 188:25 | 109:9,15 |
| 108:23 109:1,2 | 173:12 | **formed** 142:22 | 111:11 114:9 |
| **flattened** | **forces** 37:11 | **forming** 7:7 | 120:19 121:2 |
| 108:18 | 75:5 89:3 | 143:20 | 121:23 128:5 |
| **flatter** 108:21 | 121:20 122:1,8 | **formula** 173:18 | 129:6,9,12,20 |
| **fmvs** 131:10 | 122:12,22,25 | 173:20 174:4 | 130:12,14 |
| **fmvss** 131:5 | 123:3,11,14 | **formulate** | 175:7 176:9 |
| **foam** 93:8 | 125:9 127:7 | 63:13 144:7 | 177:14 185:6 |
| 109:15 | 136:21 183:14 | **formulated** | **fourth** 3:12 |
| **focal** 91:12 | 185:24 | 74:24 | 5:13 28:8 |
| 105:3,6 108:19 | **ford** 21:3,24 | **forth** 125:4 | 176:7 |
| **focalized** 68:7 | 62:3 84:19 | 181:1 | **fracture** 68:20 |
| 91:11 | 85:20 125:6 | **forward** 77:2 | 71:14 72:24 |
| **focus** 61:13 | 146:15,16,19 | 83:19 84:4,12 | 73:1 74:17 |
| 75:13 | 176:19 | 86:21 90:11,15 | 79:10 80:25 |
| **focused** 68:15 | **fore** 114:17 | 91:10,13 96:18 | 81:4 83:11,17 |
| 72:2,3 74:13 | **foregoing** | 102:12 110:19 | 87:6 88:20 |
| 78:7,9,11 80:9 | 193:5 | 110:21 111:5,6 | 89:4 91:23 |
| 80:20 104:24 | **forget** 10:25 | 111:11 114:10 | 92:1,17 93:23 |
| 105:18 | 42:12 | 115:12,20 | 96:20,21 97:8 |
| **folder** 64:17 | **form** 8:17 9:5 | 116:2,3 117:9 | 97:10,15,19,21 |
| **folding** 89:16 | 11:6 16:11,13 | 117:16 121:6,8 | 98:2,12 99:3 |
| **follow** 188:13 | 23:18 57:23 | 123:16 124:10 | 99:13,25 |
| **following** 6:23 | 84:21 90:19 | 124:13 182:21 | 101:22 104:7,8 |
| 19:7 192:5 | 107:25 123:6 | **found** 10:8 | 104:13 106:13 |
| | 124:20 142:25 | 11:14 66:15 | 107:21 108:17 |

Paul Lewis , Jr., M.S., BME                     March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[fracture - given]**                                         Page 21

108:20,21,24
109:1 110:25
111:14 121:4
123:18
**fractured**
67:19 69:3
78:20 82:25
**fractures**  68:23
71:3 72:11,16
79:3 80:19
104:25 108:14
108:23 120:14
**fracturing**  72:1
**frame**  80:13,14
83:21 87:16
92:23 93:1,7
93:11,13,17
94:1 99:19
100:7,9 101:25
104:16 105:7,8
105:23 106:2,8
106:17 109:15
126:17 171:3,4
174:3
**frames**  105:10
**framework**
175:23
**frankly**  15:7
112:6
**friday**  8:1,25
21:23 50:25
53:16
**front**  11:3,12
17:3 59:14
68:14 69:12,12

69:14 77:20,22
77:23 78:2,6
79:21,21 80:7
83:25 87:1
102:11 104:3
107:7,21 117:1
120:13 123:12
130:16 183:19
**front's**  78:3
**frontal**  131:6,9
131:12,14,15
131:21,24
132:4,14
147:12,14
150:21 182:2
**fuel**  133:2
**full**  160:15
163:9
**fully**  15:9 100:5
141:2
**function**
152:22
**further**  22:3
70:1 71:25
78:8,17 87:14
118:17,20,21
128:15 193:9
193:12
**future**  187:5

**g**

**g**  37:11 115:7
121:20 122:1,8
122:12,22,25
123:3,11,14
127:7 128:21

129:15 130:6
130:11 136:21
176:2 179:3,9
**g's**  37:20
127:11,12,20
127:21 128:3
128:12,18,24
129:3,6,8,12,20
129:21,22,25
130:2 133:4
163:20 172:16
172:22,24,25
172:25 173:12
174:19,20
175:6,6,8,25
176:5 178:24
179:11,19,22
180:20
**gainesville**  1:2
**gathered**  57:19
**general**  19:17
104:23 140:14
172:6 183:9
**generally**  23:1
23:6
**generate**  12:19
23:19 140:6
**generated**
22:21 54:25
127:7 142:7
**generating**
23:21 25:5
47:4,15,19
**generation**
47:5

**georgia**  1:1,22
2:6,10 61:3
192:2,5,6
193:3
**germane**  66:15
**getting**  10:3
53:2 95:4,14
117:17 124:17
126:25 129:7
151:14 156:16
165:21
**give**  11:23
22:22 34:24
35:14 39:3
46:22 48:1
49:22 50:2,17
51:16 52:14,25
53:2,20,22
63:10,19 73:16
73:20 76:5
83:9 140:9,13
140:25 148:11
148:17 149:14
149:15 151:9
152:5,16,18
153:5 154:2,7
155:6,9 161:23
162:2,2 174:10
183:23 184:13
186:20 188:22
189:9
**given**  32:11
48:17 57:8
68:5 71:24
87:11 109:12

Paul Lewis , Jr., M.S., BME                      March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[given - head]**                                              Page 22

113:5 181:6
192:18 193:10
**gives**   41:1
66:22 117:3
133:16 169:22
169:23 185:21
**giving**   5:5
27:21 35:5,20
66:16 67:10
154:13 162:9
**gleaned**   17:17
**go**   24:5,6,11,12
27:4,9 31:5
34:19 40:7
42:10 43:10
46:19 56:11
58:22 60:17,21
72:19 73:2
77:15 80:22
84:3,12,23
87:14 90:7
100:3,23
105:18,24
106:11 107:23
111:17,24
125:3 145:10
148:4 150:19
151:18 161:16
166:20 188:9
**goes**   28:11 31:5
38:8 62:15
66:1 93:19
98:13 100:18
105:24 155:18
169:11 178:12

**going**   5:2 12:10
17:3 19:6 29:5
30:8 34:19,21
36:8 38:5,24
45:11 46:9
47:20 48:13
52:19 54:16
56:7,9,11 58:3
58:20 72:7
73:2 78:12
80:20 86:9,12
87:11 88:14,15
92:12,13,22,24
97:19 99:4
103:21,23
105:17 115:11
120:6 122:12
122:20 124:1,8
124:9,18
126:12 128:17
128:18,21,22
128:25 129:14
135:22,25
136:18 137:3
139:8 140:25
148:1 161:6
162:15 172:15
174:13,15
175:17 178:24
184:21
**good**   4:24,25
29:7 38:11
75:20 190:21
**gosh**   29:7
125:18

**gotcha**   58:5
113:25
**gotten**   112:17
**grab**   38:5
**grad**   40:18,20
**graph**   181:25
**gravitating**
72:8
**gravity**   128:4
130:3,6,23
176:11 179:23
**great**   5:22
166:22
**greater**   62:3
151:5 175:16
**grill**   84:19 85:4
87:14
**group**   116:17
**grow**   129:25
**guess**   8:7 11:6
14:15 16:2,21
18:10 49:18
55:14 60:12
62:17 66:5
67:2 72:4,15
74:2 77:16
88:8 90:6 99:5
105:9 112:5
129:24 153:21
162:11,15
166:14 167:11
189:19
**guessing**
130:22

**guesstimate**
129:5
**guide**   23:15
**gunn**   2:9
**guy**   28:10
**guys**   183:24
**gwinnett**   193:4

**h**

**h**   2:8 172:3
176:23
**h3**   166:2,4
167:3
**hair**   82:16
**half**   60:3
**hamilton**   25:14
**hand**   4:17
26:15 157:19
189:15
**handle**   125:20
**handled**   32:6
**happen**   58:18
63:20 94:25
137:4 152:9
**happened**
37:10 63:14
69:4
**hard**   99:12
134:15 181:20
**harm**   81:13,21
**harness**   85:11
**hatch**   89:20
**head**   66:23
67:1,4 68:8
69:15 70:6
71:10,19 72:5

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[head - horizontal]**                                                    Page 23

| | | | |
|---|---|---|---|
| 76:3 77:20 | **heading**  48:20 | 168:11 169:1 | 143:13,16,17 |
| 79:22 81:8,18 | **headrest**  80:10 | 169:15,16,17 | 143:25 155:13 |
| 81:23 82:12,24 | 80:16,17,21,25 | 169:22,22 | 155:14 156:18 |
| 84:7,19 85:19 | 81:3 84:24,25 | 170:2,4 172:18 | 157:3,5 160:19 |
| 85:23 86:14 | 85:4 86:2,3,4,9 | 173:2,9,20 | 161:4 164:21 |
| 87:24 88:7,9 | 88:12 100:11 | 179:1 180:21 | 186:8,17,18 |
| 89:6 90:16 | 100:21,23 | 180:21,21,25 | 187:16,23 |
| 92:11 93:13 | 101:4,12,25 | 181:3,6,7 | 188:8,13,15 |
| 94:4,14 95:8 | 102:2 104:17 | 184:12 | 190:19 191:10 |
| 102:4 105:1,10 | 105:8 106:18 | **high**  88:6 | **hip**  136:13 |
| 106:16,21 | 106:19 182:6,8 | 129:12 182:6,7 | **history**  7:22 |
| 109:20 110:1 | 182:9,10,11 | 182:16,23 | 50:8 |
| 112:2,3,12,13 | **headrests** | **higher**  60:24 | **hit**  95:3 100:10 |
| 112:19 117:9 | 99:20 | 88:6 128:25 | 106:16,21,21 |
| 119:2,12,25 | **heads**  172:7 | 129:14,21,25 | 107:19 108:6 |
| 122:12,16 | **hear**  155:14 | 133:20 172:16 | 112:11 122:11 |
| 124:2,8 130:21 | **height**  18:22 | 175:23 178:21 | **hits**  89:2 |
| 159:22,23 | 61:2 87:5 | 178:23 185:8 | **hitting**  105:1 |
| 160:2,9 161:20 | 93:10 146:23 | **highest**  170:7 | 123:17 164:6 |
| 162:5,25 | 148:2 168:4 | 174:14 | 164:10 |
| 163:18,19,23 | 171:13 184:16 | **highlight**  23:17 | **hm**  166:23 |
| 164:18 168:12 | 185:3,5 | **hill**  2:8 3:5,6 | 167:4 |
| 169:2 170:1,25 | **heights**  170:14 | 4:11,11,23 | **hold**  103:12 |
| 171:12,24 | 170:16 | 5:18,21,23 6:1 | 115:25 |
| 172:3,10,14,25 | **help**  23:20 | 9:20 20:6,10 | **holding**  34:21 |
| 173:1,9,25 | 24:25 25:3,7 | 20:15,18,22 | 100:11 103:14 |
| 174:8,9,22,22 | 40:9,10 43:6 | 21:7,8 22:7 | **holds**  101:15 |
| 175:4,9,21,25 | 149:8 | 29:4,7,10 30:7 | **homicide**  40:8 |
| 176:6,6,14,18 | **helped**  40:12 | 30:11 37:25 | **honestly** |
| 177:13 179:4,8 | **helping**  103:12 | 38:4,7,12 | 140:20 |
| 179:20 180:19 | 126:18 | 43:11 58:20,25 | **hope**  29:8 |
| 180:20 182:20 | **helps**  24:19 | 59:10 95:24 | **hopefully**  53:5 |
| 182:21 190:9 | **henson**  24:14 | 96:9,10 137:23 | 160:20 |
| **head's**  93:14,24 | **hic**  131:23 | 138:2,5 139:8 | **horizontal**  92:6 |
| 122:15 | 163:3,3,3,21 | 139:16 143:8 | 96:19 97:4,6 |

Case 2:22-cv-00017-RWS   Document 102-2   Filed 09/05/24   Page 217 of 251
Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[horizontal - improper]**                                      Page 24

97:10 99:1,7
99:14 101:7,9
106:17
**horizontally**
92:11
**hospital**  66:20
**hour**  47:3,25
58:21 131:16
132:4 164:12
181:15,22
**hours**  47:24
**hudgins**  2:8
**huh**  10:10 53:4
64:11 96:16
107:10 127:23
178:3
**hundred**  30:19
31:13 32:11,16
76:22 174:19
**hundreds**
156:22 179:1
**hunsley**  22:10
159:2
**hunsley's**  52:10
**hybrid**  133:7
166:5 167:2,13
**hypothesis**
136:9,14,17,25
**hypothetical**
35:11 36:10,11
36:12 37:7,10
37:12 63:1,11
63:14,21 75:12
76:12,16,25
77:8,12 103:2

103:5,17,19
121:16,21
122:6 123:25
125:1,22
126:11,12,21
127:6 134:8,12
135:5,16
136:24 137:1
137:17,19
152:1,7,10
153:3 172:16
179:18,21

**i**

**i.e.**  125:16
**idea**  75:20
167:5
**identical**  148:7
**identification**
5:16 8:12 20:4
27:7 30:10
43:15 48:16
52:22 138:2
163:8 180:2
**identified**
107:20
**identify**  4:7
108:10
**ihs**  151:10
**ii**  2:8
**iihs**  151:7
**iii**  6:23 133:7
166:5 167:2
**illustrate**  119:1
**image**  69:18

**imagine**  12:9
**immediately**
102:7
**impact**  63:19
67:4 68:7,13
68:20 69:6,21
69:23 70:9,19
70:23 71:10,16
71:17,23 72:22
77:19 78:14
79:10,11,15
80:3,6,25 81:7
81:18 82:4,24
83:13,21 84:7
85:4 87:6,7
88:19 89:1,2,4
90:18 91:8,20
92:8 94:11,14
94:15 95:6
96:12 103:1
104:22 106:12
107:24 108:11
109:8,11,25
110:11,13,19
112:3,23 119:5
119:13,17
120:6 121:3
122:13,19
123:12,21
124:4 129:22
129:25 130:11
131:25 132:10
147:7,10,13
150:3,23 164:4
164:16 169:6

171:16,23
172:5 182:2,2
182:3,7 183:14
185:13
**impacted**  70:6
76:3 81:23
82:10,12 83:5
101:21 105:10
106:7 107:8
110:16 112:19
171:17
**impacter**  86:22
96:25
**impacting**  82:1
90:15,17 99:8
119:25
**impactor**
104:19 122:24
**impacts**  131:8
131:9,9,24,24
132:21,22
146:8
**impede**  103:23
104:2
**impeded**
102:24
**important**
17:20 18:5
**impossible**
84:11 85:6
96:24 109:10
138:17
**improper**
139:12 184:25

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**inadmissible**
  139:14
**inch**  184:22
**inches**  59:25
  60:3,19 116:22
  168:9
**incident**  36:11
  36:11 56:18
  59:20 86:14
  94:5 121:16,21
  123:2 126:11
  126:12 147:3
  153:3 177:2,12
  179:16
**incidents**
  147:18
**incisions**  41:7
**include**  7:16
  26:1 47:14
  73:15 141:25
**included**  7:18
  17:18,21 18:1
  22:1 71:4
  141:18
**includes**  66:19
  142:2
**including**  37:11
  68:20 188:6
**incompatibility**
  151:5
**incompatible**
  149:1
**inconsistent**
  68:3

**incorrect**  63:23
  67:18
**incorrectly**
  118:1
**independent**
  37:15 41:19
  127:3
**independently**
  126:24
**index**  3:3,8
**indicate**  121:2
  188:16
**indicated**  29:17
**indicating**
  16:22 33:6
  40:4 46:7
  68:16 71:7,13
  72:25 73:3
  77:23 80:15,23
  83:19 85:19
  87:17 88:15,25
  89:10,21,25
  91:14 92:5,14
  92:25 93:20
  94:17 97:1
  98:1,15 99:22
  100:8,18 101:5
  102:16 104:2
  105:8,19 106:2
  107:3 109:5
  110:13 119:10
  121:6 123:17
  126:9 153:18
  160:4 165:20

**indication**
  66:23
**individual**
  142:17
**individually**
  145:19
**individuals**
  149:4
**ineffectiveness**
  150:9
**inertia**  123:19
**inertial**  124:6
**inflict**  81:20
**information**
  6:24 11:3,12
  15:18 17:16
  18:24 19:8
  37:13 46:15,22
  47:21 51:2,3,6
  54:8 65:10,16
  66:21 74:23,25
  75:10 76:23
  127:1 135:20
  139:13 141:9
  141:23 142:4
  142:10,13
  143:24 145:2,3
  152:11 153:1
  153:17 157:16
  178:5
**initial**  3:19
  20:25 41:6
  48:14 49:13
  53:9 124:16,24
  128:16,22

  129:1,21,25
  130:6,11
  137:21 157:18
**initially**  157:24
**initiate**  70:10
**injured**  41:2
**injuries**  40:25
  41:20 70:3
  75:14 78:8
  79:14 83:3,10
  83:12,20 86:19
  91:1 112:18
  121:22 134:24
  134:24 136:12
  136:20 149:12
  153:6 161:21
  162:6 189:4
  190:10
**injurious**  171:7
  172:15 178:22
**injury**  33:17
  37:18 53:11
  65:10 74:10
  76:6,14 79:2,2
  81:8 82:20
  84:6 86:23
  87:9 88:7,9
  90:18,25 91:19
  95:7 107:2
  109:10,12,19
  112:23 113:5
  122:1,9 131:17
  132:24 133:13
  133:23 136:19
  149:12 151:13

Paul Lewis , Jr., M.S., BME                                        March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[injury - involving]**                                                      Page 26

151:17 159:22
159:23 160:9
163:24 165:1,3
165:8 166:2
168:12,21
170:1 172:10
173:9
**inner**  89:10
**inputs**  37:3
**insert**  100:13
**inserts**  101:25
**inside**  89:9
   177:13
**inspect**  55:5
   110:7 111:19
   120:19
**inspected**  55:2
   55:6 108:4
   110:5
**inspection**  7:9
   26:11 45:4
   55:13,21 56:3
   56:23 57:1,11
   57:19 64:13,25
   74:24 75:5
   91:4 113:19,23
   114:2 118:7
   120:20 121:2
   134:25 142:4
**installed**  33:22
   36:14 38:25
   168:2 171:17
**instance**  189:12
**instructed**
   46:24

**instrument**
   99:8
**integral**  169:9
**integrate**  169:7
**integrating**
   173:17
**integration**
   169:17
**integrity**  132:1
**intend**  27:20
   34:24 50:1,17
   53:20,22
   148:17 149:15
   155:6,9 162:2
   186:20,23
**intended**  44:19
   49:21 51:16
   73:20 154:2,7
   154:19
**intending**
   148:11,21
   190:7
**intent**  188:16
**intention**  51:24
   52:14
**interaction**
   83:8 84:13
**interest**  24:11
   192:9
**interested**
   193:14
**interior**  72:13
   88:25 109:17
   123:21 124:2

**internal**  71:12
   72:17 74:18
   79:4 80:14
   123:3 124:19
**internally**
   40:15 72:12
   73:1 173:3
**internet**  13:1
**internship**
   39:23 40:6
   42:2
**interpretation**
   98:5 134:7
   158:15 159:1
**interrupt**  24:1
   26:3 78:2
**interruption**
   121:18
**intricacies**
   151:15 156:6
**intruded**  87:20
   90:11
**intrusion**  55:19
   62:19,25 76:24
   84:4,15 85:21
   85:22 93:4
   117:15 119:10
   119:11 120:12
   126:19 135:23
   149:10 150:14
   151:25 152:6
   152:19 159:15
   160:1,4,8
   163:14

**investigated**
   141:15
**investigating**
   50:9
**investigation**
   40:10
**investigations**
   189:12
**invoice**  46:13
**invoices**  3:17
   7:22 43:16,24
   43:25 44:8,13
   44:17 46:3
   47:2
**involved**  28:14
   28:17 33:19,23
   36:13 55:3,12
   59:20 65:6
   74:19 110:6
   121:20 145:25
   146:3,4,12,15
   147:18,19
   150:15 164:1,6
   177:1,12
   179:10 180:10
   180:13 183:21
   189:7,17,18,22
   190:9
**involvement**
   189:9
**involves**  177:21
**involving**  30:14
   33:24 55:13
   158:9,13,24

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[inward - know]**                                                    Page 27

| | | | |
|---|---|---|---|
| **inward** 98:3,4 | **jenica** 24:16,17 | 107:16 108:16 | 36:20,22 37:6 |
| 106:14 | **jessica** 24:14 | 109:6 115:5,8 | 38:7,9 39:23 |
| **issue** 50:9 | **job** 68:2 87:22 | 115:25 116:3,5 | 40:14,16 41:10 |
| 74:13 140:4 | 137:10 | 116:12 117:11 | 41:10,11 45:1 |
| 141:10,16 | **joshua** 1:4 | 117:13 118:12 | 45:3,13,21 |
| 157:19,23,25 | **jr** 1:13 3:5 4:6 | 124:3 134:15 | 46:22,23 47:1 |
| **issued** 21:22 | 4:19 48:20 | 147:2,14 | 48:10 50:4,20 |
| 34:6 188:18 | 192:2 | 165:15 | 51:13,13 54:5 |
| 189:10 | **judge** 36:4 | **kinematic** | 55:25 56:8 |
| **issues** 33:18 | 156:24 | 103:25 185:23 | 57:3 58:21 |
| 61:21 149:17 | **judgment** | **kinematics** | 60:2,7,15 |
| 153:25 189:14 | 41:19 | 37:18 53:12 | 63:24 64:4,24 |
| 189:23 190:25 | **judicial** 192:5 | 83:15 | 65:5 68:2,6,15 |
| **issuing** 142:14 | **jump** 125:4 | **kit** 33:22,24 | 68:17,22 69:4 |
| 191:5 | **jumping** | 34:2 36:13 | 69:14 72:15,16 |
| **item** 15:17 | 112:15 | 38:24 39:5 | 74:9,11 75:2,6 |
| 22:10 64:23 | **jury** 72:5 74:3 | 59:24 146:1 | 75:17 77:13 |
| **items** 6:25 | | 147:22,24 | 78:8 81:14 |
| 13:13,16,18 | **k** | 152:2 159:13 | 82:15 83:8,9 |
| 17:6,25 18:9 | | 160:8 168:2 | 85:5,17 86:18 |
| 18:10 21:18,19 | **keep** 16:5 22:19 | 189:18,20,22 | 87:16,23,25 |
| 22:8 90:2 | 23:16 46:8,10 | **kits** 154:16 | 88:2 89:7,11 |
| 96:15 | 56:6 156:13 | 159:14 | 89:17,22 90:1 |
| **iterating** | **keeps** 10:22 | **knew** 58:3 | 90:3 94:4,18 |
| 169:19 | 46:12 | **know** 5:23 6:16 | 94:20 95:15 |
| | **kicks** 174:4 | 8:16,19 11:14 | 96:18 97:18 |
| **j** | **kind** 10:15 15:8 | 11:16 12:2 | 99:8,12,21 |
| | 23:14 40:16,23 | 16:9,21,22,22 | 101:2,4 102:7 |
| **j** 1:18 24:18 | 41:22 46:5 | 17:5,12,12 | 102:8,13,21 |
| 192:24 193:21 | 55:20 68:21 | 19:7 22:4,18 | 105:14 107:5 |
| **jamie** 25:14 | 72:7,14 73:1 | 23:3,5,15,16,18 | 111:5,10,23,25 |
| 48:4 | 74:15 76:18 | 24:12,20,21 | 112:7 113:25 |
| **jammed** 83:19 | 91:7,14 97:1 | 27:10 28:10 | 114:7,9,16 |
| 84:4 | 97:21,23 98:13 | 29:11 33:19 | 115:20 116:1 |
| **january** 13:9 | 99:2 100:4,12 | 34:8,18 36:7,9 | 116:25 117:2 |
| 21:2,13 | 100:22 101:2 | | |
| | 102:13 104:16 | | |

Paul Lewis , Jr., M.S., BME                     March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[know - limited]**                                              Page 28

117:12,22
122:4 125:3,16
126:7 127:19
127:24,24
128:2 129:7,15
129:22 130:15
130:17 134:17
135:14 139:18
140:18,20,22
146:22 147:1
147:21,24
148:2,9 151:20
151:20,21,21
154:1,13
155:15,23
156:5,19
164:16,19
165:11,14,16
165:17 166:4
167:16,22
168:1,4,9
170:10,16,19
171:2,19
172:16 176:4
176:17 177:6,6
177:17,21
178:1,2,5,6,19
179:7,9 181:9
181:20 184:9
184:14,16,18
185:12,24
186:25 187:10
187:11,12
189:13

**knowledge**
  34:16 37:2
  40:17,19 43:22
  50:6 127:1
  151:1
**known**  140:25
  141:3
**knows**  156:25

**l**

**l**  28:9,9
**labeled**  27:12
  43:17 138:4
**lack**  57:8
  136:19 162:6
**laid**  90:8
**larger**  70:5
**largest**  169:9,9
  169:21
**late**  39:24
  58:21 139:11
**lateral**  71:7
  84:1 92:6
**laterally**  90:6
  175:17
**law**  1:20 12:17
  24:22 157:8
  164:20 165:11
  165:11
**lawsuit**  165:15
  177:22
**lawsuits**  158:9
  158:13,24
**lawyer**  141:8
  155:23

**layers**  122:21
**laying**  90:4,5
**layman's**  72:4
**lead**  119:24
  122:19 151:17
**leads**  97:5,14
**leaks**  133:2
**learn**  40:25
**led**  74:17,18
  121:3 122:9
**left**  73:2 83:3,3
  83:4,12,16,18
  83:20,21 84:3
  92:14,14 94:10
  164:3 165:6
  167:15 175:18
**leg**  83:3
**legal**  155:24
  156:6,19 157:7
**legs**  104:5
**leita**  1:18
  192:24 193:21
**leon**  1:21 2:5
**lessened**  62:19
  152:1,20
**letter**  190:13
**letting**  29:16
**level**  60:21
  75:24 76:24
  85:18,20,22
  86:8,10 87:17
  87:20,24,24
  88:17 93:6,24
  94:1 128:6
  133:3,12,22

170:7
**lewis**  1:12 3:5
  4:6,19,24
  48:20 138:19
  143:23 186:19
  188:1 192:2
**lewis's**  3:20
**license**  13:10
  14:10,14 18:13
  18:16
**lift**  33:22,24
  34:2 36:13
  38:24 39:4
  59:24 60:12,13
  60:21 62:18
  63:2 75:13
  146:1 147:21
  147:24 148:25
  152:2,23
  154:16 159:13
  159:14 160:8
  168:2 189:18
  189:20,22,25
**lifted**  35:12
  62:4 65:4
  125:7 160:3
  190:10
**lifting**  148:24
**likely**  94:12
  107:17 126:6
  139:13
**likewise**  178:4
**limitation**  61:3
**limited**  34:7,16
  103:21 138:12

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[limited - made]**                                        Page 29

138:21

**limiting**  85:16

**line**  49:10
  96:25 97:2,19
  97:23 104:23
  151:6 159:5

**linear**  108:14
  108:17,20,24
  108:24,25

**lines**  106:13

**list**  6:22 7:4
  23:4 64:12,22
  73:18

**listed**  12:18
  16:8 18:11,25
  21:9 22:8,23
  24:13 25:11,16
  25:21 27:23
  67:14 70:24
  74:4,7 78:9
  142:8 148:13
  161:24

**listened**  143:12

**listening**
  111:24

**listing**  15:2
  23:9 25:24

**lists**  6:2,24 12:4
  54:22

**literature**
  151:7

**litigation**  30:19
  31:14,19
  192:18

**little**  16:9 29:1
  29:18 33:10
  40:5 48:9
  58:21 69:11
  70:13 73:4
  89:16 97:24
  98:7 101:17
  102:10,12,15
  103:10,20
  104:24 105:2
  105:15,20
  110:17 115:10
  117:17 118:12
  118:20 119:19
  120:23,23
  133:19 161:11
  183:7,9,16

**living**  10:20
  11:6 16:12

**llc**  1:8,21 2:4,9

**load**  83:16,16
  150:22

**loads**  146:9

**lobes**  68:24

**located**  72:16
  89:22 90:2

**location**  81:7,7
  81:17 82:10
  107:4 109:12
  128:13

**locations**
  128:23 177:23

**long**  46:21 90:7
  123:20 173:18

**longer**  70:17,19
  169:11

**longitudinally**
  90:7 174:13

**look**  21:1 24:11
  59:19 81:20
  86:18 104:9,20
  107:1 109:18
  114:15 116:5
  128:9 130:20
  148:1 150:2
  162:18,19
  163:2,18
  164:25 166:23
  170:2 172:17
  175:21 182:5

**looked**  90:24
  90:24 91:3
  172:13 189:3

**looking**  12:3
  24:10 44:3
  55:19 65:23
  72:6 75:19
  80:20 88:1
  108:5 116:23
  131:23 148:9
  151:1 164:18
  169:18,19,24
  170:23,24
  171:5 172:6,24
  174:25 178:20
  179:7 180:19
  181:18,24,25
  184:15 185:10
  186:5

**looks**  5:10
  11:25 105:13
  114:19 120:23
  165:18,25
  181:14,14,21
  182:3

**loss**  75:7
  136:22

**lost**  105:20

**lot**  22:19 23:3
  36:21 44:12
  57:7 95:10
  105:2 109:5
  112:6 140:16
  151:6 156:3

**low**  88:8
  163:21 170:1
  179:1 180:21

**lower**  72:20
  88:15 92:25
  98:16 125:24
  126:5 170:3

**lowest**  85:20,21
  182:6,8

**lumbar**  170:14

**m**

**m.s.**  1:13 3:5
  4:19 192:2

**ma'am**  188:3

**made**  53:23
  63:12 71:8
  84:19 95:16
  101:6 107:11
  107:18 158:18
  159:4 168:11

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[made - mean]**                                                    Page 30

| | | | |
|---|---|---|---|
| 176:1 190:12 | **manufacturer** | **material**  6:2 | 37:17 41:22 |
| 192:15 | 34:2 39:11 | 7:1,12,15 8:4 | 46:4 47:2 48:4 |
| **magnum**  72:8 | 131:20 189:25 | 12:21 13:4,20 | 48:10,25 49:18 |
| 98:14 | **manufacturers** | 13:23 14:7 | 50:5,6,19 |
| **main**  150:22 | 173:3 | 89:5,11 90:10 | 51:20 54:1 |
| 178:22 | **manufacturing** | 90:15 141:25 | 55:18 57:2,7 |
| **make**  5:4 11:22 | 39:8 | 144:6 145:5,12 | 60:4,25 62:5 |
| 13:3 18:9 | **march**  1:20 8:1 | 145:14,14 | 63:8 64:15 |
| 34:20 52:7 | 8:23 12:13 | 191:2 | 65:13 67:2,16 |
| 55:25 59:23 | 13:17 22:2 | **materials**  7:8 | 68:18 69:11 |
| 62:21 65:21 | 138:4 139:18 | 10:22 12:1,4 | 73:18 74:9 |
| 68:6 78:12 | 139:22 154:3 | 16:7 19:18 | 75:2,19,23 |
| 106:15 108:8 | 154:20 161:6 | 22:17,20 23:10 | 78:2,7,23 |
| 113:15 117:25 | 163:11 180:6 | 24:20 25:4 | 80:16 83:7 |
| 126:15,20 | 180:18 187:20 | 26:21 45:24 | 84:10 85:2,10 |
| 135:3,18 | 188:5 190:3,13 | 46:1 47:8,11 | 87:12,22 89:8 |
| 152:14 153:11 | **margins**  92:25 | 47:18,21 54:8 | 89:12 90:4,16 |
| 154:7 159:7 | **mark**  5:10,13 | 54:22 142:12 | 90:17 91:25 |
| 178:14 192:5 | 8:7 23:4 27:4 | 142:16 143:1 | 92:3 94:1 |
| **makes**  30:4 | 30:3 43:11 | 143:19 148:4 | 96:23 97:10,23 |
| 36:16 69:5 | 52:19 81:9 | 183:25 184:3 | 98:6 99:7,11 |
| 95:11 106:11 | 82:15 106:24 | **matter**  38:4 | 99:21 100:24 |
| **making**  19:22 | 108:6 162:11 | 147:19 193:15 | 101:20 102:17 |
| 34:4 58:17 | 162:15 | **max**  173:7 | 102:18 104:1 |
| **male**  133:8,8 | **marked**  5:15 | 175:4 | 104:14,19 |
| 133:15,15 | 8:11 15:24 | **maximum** | 105:12,12,21 |
| 166:2,9,10 | 20:3 27:6,24 | 174:3 | 108:8 109:19 |
| 167:2,7,23 | 30:9 43:14 | **mean**  8:23 9:21 | 110:18 112:5 |
| **manage**  149:7 | 48:15 52:21 | 12:19 15:2,15 | 112:16 113:17 |
| **manipulate** | 59:14 138:1 | 16:8 17:12,13 | 115:13 116:25 |
| 36:20 | 163:7 180:1,3 | 17:24 18:21 | 121:7 122:22 |
| **manner**  40:14 | **marking**  29:6 | 19:17 22:3,23 | 122:23 124:2 |
| 124:7 134:19 | 163:4 | 23:25 25:13,22 | 124:23 125:11 |
| **manufactured** | **match**  103:13 | 26:3 27:10 | 126:8,25 127:1 |
| 168:7 170:15 | 116:25 | 28:1 36:21 | 127:13,14,22 |

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[mean - mischaracterization]**                                    Page 31

133:16 137:9
137:14 140:1,6
151:6 153:21
155:23 156:3,5
157:12 159:25
166:6,24 172:5
172:22 177:5
177:15,22
178:9,10,23
182:19 183:6
184:18 185:7
185:18
**meaning**   60:4
61:6 62:17
67:3 77:22
94:9 109:5
**means**   21:4
113:16,18
129:18 164:19
166:9
**meant**   7:11
10:7 14:9
67:22 73:24
90:1 108:9
111:3 117:3
119:8 135:3
146:9 147:9
185:1
**measure**   86:13
87:18,19 93:10
93:12 129:5
130:17
**measured**
176:18

**measurement**
128:3 129:4,4
168:15 169:12
**measurements**
116:6,19
171:24 172:3
185:24
**measures**   175:7
**mechanism**
76:6,13
**medical**   18:24
23:12 39:17,19
39:24 40:17,19
40:24 41:15,18
41:19,21,24
42:1,16,22
65:16 66:6,22
66:25 74:25
144:24 145:19
**memorized**
147:2 163:22
**mendez**   159:20
**mendoza**   8:4
13:19,21 26:21
33:20 35:16
49:16,22 50:2
52:9,16 138:24
140:4 141:3
143:21 144:13
144:17 145:7
145:16,22,24
146:3,15
147:12,25
148:12,18,22
149:17 152:19

152:23 153:11
154:3,8,20
159:11,20,22
188:2,6,17,24
189:8 190:2,25
191:7
**mention**   49:16
49:20,24 52:14
70:22 85:17
103:11 144:24
155:2 161:7
180:25
**mentioned**   7:17
7:19 14:17
28:4,7 48:6
56:21 62:23
63:5 67:6 79:7
83:11 90:2
91:21 96:17
101:6 130:8
138:16 144:2
**mercedes**
162:13,14
164:3,6,10
165:5,6,7
167:12,16
168:16 170:11
175:19
**metal**   80:14,21
92:22 93:1
99:18 100:17
101:3 104:17
105:17
**method**   135:8
135:14

**metro**   40:3
**mid**   88:16
**middle**   102:5
**might've**   29:23
45:21
**mile**   131:16
132:4
**miles**   164:12
181:14,22
**millisecond**
122:10 169:19
170:6,7 172:18
**milliseconds**
122:7 169:4,11
169:13
**mind**   29:16
37:24 114:21
**mine**   17:14
23:13 65:21
127:3
**mine's**   10:14
**minimal**   175:23
**minimum**
141:1
**minivan**   146:7
**minor**   1:5
**minute**   49:5
58:25 82:6
95:24 160:20
186:8
**minutes**   95:1
95:19,19
**mischaracteri...**
78:19 149:23

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[misdescription - number]**                                    Page 32

**misdescription**
78:19
**missing**  29:21
29:22
**misspelled**
11:14
**misstates**  84:22
145:9 149:21
**mistaken**  63:17
**mode**  82:4
**modes**  131:23
**modified**  69:4
**modify**  21:25
**monthly**  47:2
**months**  46:10
154:8,21
**morgue**  40:11
**morning**  4:24
4:25 5:2 187:8
**motion**  85:16
101:7 102:14
102:17 115:11
119:9,16,19
138:21
**motioning**
72:14
**motions**  138:14
182:21 185:23
**mounted**
183:16
**mouth**  149:22
**move**  95:2
114:6
**moved**  70:4
114:1 124:13

**movement**
123:4 124:6
**moves**  183:15
**moving**  72:7
111:5 124:10
136:23
**multiple**  18:21
54:13 60:8
74:10 139:2
149:13
**muscle**  98:12
**mustang**  146:6

**n**

**n**  3:1,1 24:18
**n.e.**  2:9
**name**  25:25
28:18
**names**  55:23
**natural**  40:8
**nature**  24:22
28:12 37:19
58:1 75:18
81:11 91:23
92:1,16 98:6
99:2 101:22
150:2 151:3
173:13
**necessarily**
50:4,6 137:20
141:21 161:18
171:19 172:12
177:7 178:18
186:5
**necessary**
140:10

**neck**  112:17
**need**  5:23 27:8
38:1 58:22
74:22 75:16
76:4 133:14
137:20 141:21
150:5 151:20
161:22 162:1
164:22 171:2
171:22
**needed**  41:10
75:3
**needs**  119:23
**negative**  178:3
**negatively**
130:21
**neither**  49:15
147:15 193:12
**never**  10:11
23:17 34:12
39:10,13 81:4
124:23 128:25
129:24 137:9
147:1 149:22
**new**  14:7 50:23
50:25 51:6
54:15 158:1
**newer**  114:12
**nhtsa**  151:8
**nine**  180:5
**nods**  40:1
56:24 80:4
106:5
**nonlifted**  126:2

**normal**  60:12
60:13 185:9
**normally**  9:6
**northern**  1:1
**note**  132:20
**noted**  67:18
**notes**  8:15 9:11
12:20,21 26:10
26:11 55:8
56:1 91:9
113:18 114:12
**notice**  3:12 5:8
5:13 6:2,5,9
26:24 138:18
191:3
**november**
54:12
**nowadays**
170:3
**number**  18:25
20:23 42:11
44:3 60:11,16
75:22,23 85:5
88:21 109:9,15
110:3 111:11
114:8 120:19
120:24 121:2
128:5 129:6,9
129:12,20
130:11,14
166:2,12,14,21
169:9 173:10
173:18,21
174:4 175:4
176:9 177:14

Paul Lewis , Jr., M.S., BME                              March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[number - okay]**                                        Page 33

180:4
**numbered**  8:8
10:15 48:19
**numbers**  20:9
20:11 21:3,5,7
64:4 180:24
**numeral**  6:23
**numerous**
136:10 144:25

**o**

**o**  3:1 28:9
**o'clock**  183:8
**o.c.g.a.**  192:9
192:12
**object**  57:23
67:5 84:21
90:19 104:13
105:3,6,18,21
107:25 108:17
110:1,24
111:13 123:6
143:14,22
144:8 150:16
154:4,11,23
155:11,21
156:15 177:3
184:7,24
185:16 188:8
188:25 191:8
**objection**  5:18
51:19 113:4
124:20 142:25
143:22,25
145:8 149:18
149:20 178:8

190:18
**objections**  5:19
138:10
**objects**  108:21
**obliqueness**
183:9
**observation**
95:11,12,16
**obtained**  19:25
**obvious**  53:5
81:14 151:4
**obviously**
17:24 19:7
22:16 35:6
37:17 44:7
54:2 57:2 63:8
66:14 71:5
75:5 89:17
90:17 94:6
96:14 102:14
103:8 110:20
111:5 115:4,13
116:5 117:20
121:7 126:5
128:15 137:2
144:18 150:20
150:25 162:6
174:2,15
175:15 184:10
190:22 191:1
**occasionally**
25:17 108:5
**occlusion**
134:21

**occupant**  75:7
77:4 83:14
125:19 131:7
134:3,25
135:24 149:10
151:23 185:23
**occupant's**
62:19 149:3
**occupants**
160:1 190:10
**occur**  112:1
137:4
**occurred**  50:22
63:1 69:10
76:14,15,24
83:13 84:7
107:24 108:11
109:10 113:1
125:22 126:21
134:5 147:3
152:6 153:7
185:13
**occurring**  89:8
**occurs**  128:7
**october**  6:18
7:3 14:2,5
15:12 20:25
21:18 22:9,15
27:15 29:19,23
30:13,15 43:18
43:23 44:2,9
47:23 48:2
49:13 50:1,11
50:23 52:11,20
53:9,14 59:11

70:10 74:6
140:24 141:1
141:19 161:24
188:17 189:10
**offhand**  147:23
**office**  24:25
39:24 42:17,22
55:22 56:22
**offices**  1:20
192:10
**offset**  131:6,12
131:15 147:14
164:3
**offsets**  131:15
**oh**  8:20 14:19
20:14,17 24:17
29:24 31:1
38:16 44:3
62:14 64:19
66:2 72:18
94:17 107:9
115:17 119:4,7
125:17 131:22
132:13 135:17
146:16 167:2
170:21 175:1
179:17 181:25
188:10
**okay**  5:7 6:11
6:16 7:15,25
8:6,18,22 9:6
9:15,25 10:23
11:5,16 12:6
12:15,18 13:7
13:16,20,23

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[okay - opinions]**                                              Page 34

| | | | |
|---|---|---|---|
| 14:12 15:1,3 | 101:14 102:21 | **old**   38:11 | 17:14,21 18:6 |
| 15:11 16:11,18 | 107:18 108:3 | 133:13,25 | 18:20 19:11 |
| 17:11,16 18:19 | 108:13 109:23 | 141:6 181:8,11 | 22:1,22 24:24 |
| 19:14 20:17,21 | 110:5,14 111:4 | **olley**   28:9 | 25:5,8 27:21 |
| 21:7 22:6 | 111:21 112:9 | **once**   33:13 | 28:23 34:15,25 |
| 23:23 25:2,10 | 112:21 113:2,7 | 105:18 | 35:5,15,19,21 |
| 26:3,5 28:17 | 113:22,25 | **one's**   30:1 | 36:4,7 37:9 |
| 28:25 29:22 | 114:21,23 | **ones**   20:24 | 48:24 49:23 |
| 30:5,18 31:2 | 117:19 120:15 | 54:23 73:14,15 | 50:2,7,17,24 |
| 31:12 32:9 | 121:1,13 | 73:24 114:12 | 52:15 53:7,11 |
| 33:19 34:1,12 | 123:23 124:25 | **ongoing**   50:20 | 53:20,22 54:15 |
| 34:19 37:9 | 127:4 128:2 | 53:23 | 54:17 57:4 |
| 38:16,21 44:7 | 130:4,5 132:16 | **onset**   124:24 | 61:14 62:11 |
| 45:8,11 46:1 | 132:19 133:3 | **open**   82:17,18 | 63:13,18,20 |
| 47:5,10,23 | 134:10 135:17 | **opening**   41:7,7 | 65:12,14,21 |
| 48:6,23 49:11 | 136:8,16 138:3 | **opining**   131:2 | 66:15,16 67:10 |
| 49:14 51:11,15 | 139:24 140:2,8 | **opinion**   23:13 | 70:7 73:8,13 |
| 51:23 52:2,19 | 140:22 141:23 | 51:9 62:22 | 73:17,19,21,22 |
| 53:19 54:7,11 | 143:13 146:14 | 63:10 64:1 | 74:23 76:5 |
| 54:16 55:12,24 | 147:3 148:11 | 67:1 73:16 | 77:16 115:2 |
| 56:5 58:8 59:2 | 148:16 156:4 | 74:3,6,7,15,16 | 134:6,15,22 |
| 59:23 60:18,23 | 158:21 159:7,9 | 74:22 76:3,12 | 135:4,11,15 |
| 61:12,20 62:15 | 160:18 162:1 | 76:22 84:18 | 137:7 138:11 |
| 63:7 64:9 65:2 | 162:11 163:13 | 85:10 102:21 | 138:23,25 |
| 65:19 66:18,25 | 164:12 165:24 | 106:16,20 | 140:4,9,10,13 |
| 68:12,17 69:1 | 166:16 167:11 | 109:25 110:14 | 140:24 141:8 |
| 69:7,16 70:22 | 168:11,20 | 112:1 124:18 | 141:11,14,22 |
| 71:21 72:10,14 | 169:1 170:10 | 127:3 143:20 | 142:14,23 |
| 73:20,24 77:15 | 170:22 171:8 | 150:25 151:24 | 145:7,16 |
| 78:22 80:24 | 174:2 175:9,12 | 152:5,19,23 | 148:12,16 |
| 81:6,16,22 | 176:22,25 | 157:1 158:11 | 149:15,16 |
| 82:7 94:4,13 | 178:4,14 | 158:14 161:8 | 152:14,15,17 |
| 96:1 97:2,5,9 | 179:25 182:1 | **opinion's**   71:9 | 153:4,4,5,12 |
| 97:12 98:2,23 | 186:1 188:22 | **opinions**   5:6 | 154:2,7,9,14,21 |
| 99:6 100:22 | 190:15 | 7:7 15:13 | 155:8 156:20 |

Paul Lewis , Jr., M.S., BME                               March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[opinions - participate]**                               Page 35

157:9 161:9,17
161:23 162:2,9
172:11 174:10
178:17 184:13
186:19 188:22
189:10 190:2
191:5,5
**opportunity**
153:24
**opposed**  108:18
**option**  95:2
105:13 177:9
**options**  106:20
**order**  50:12
76:4 115:15
116:19 119:2
119:24 132:3
132:12 133:12
133:23 140:12
152:5 153:11
161:23 162:2
169:17 171:1
**orders**  34:6
**organs**  41:10
**orientation**
183:4,13
**oriented**  99:10
**original**  70:22
157:22
**originally**
38:18 54:12
77:18
**outer**  71:7
**outlines**  141:11

**output**  58:4
**outset**  127:25
**outside**  136:5
155:12,22
185:17
**overlapping**
118:12
**override**
126:13 150:13
171:4
**overrode**  87:16
**own**  12:20,20
28:2 30:25
36:22 37:19
62:22 88:24
125:11 127:1
163:15 180:16
**owned**  28:1

**p**

**p**  104:21
**p.m.**  59:8 96:2
96:7 160:22
161:2 186:10
186:15 191:12
**packaged**
123:19 124:3
**padded**  88:24
102:2
**padding**  89:9
93:8
**page**  3:4,10 5:5
12:3 13:18
14:12,20 15:3
21:1 48:2,17
59:17,18,18,21

61:20 64:4,6,9
64:10 65:9,25
66:1,1,4,5 67:8
69:17,19,19
70:18,24 73:5
74:15 77:15
114:21 117:19
118:22 121:11
135:7 145:21
152:24 158:5
159:4,5 161:7
164:20 166:25
168:21 180:23
181:4,23,25
183:3,19
**pages**  6:21
24:12 48:19
162:18
**paid**  42:19,20
42:24,25 43:2
**paper**  23:16
**papers**  191:9
**paperwork**
53:3
**paragraph**
18:12 21:9
59:19,21 61:23
62:11,16 65:11
69:18 77:18
114:24 125:6
127:4,10 131:4
158:5
**paragraphs**
19:15 121:24
124:25

**paralegal**  25:23
47:24 48:7,7
**parameter**
99:18
**parameters**
184:22
**paren**  62:3
**parents**  1:5
89:15
**parietal**  72:21
**part**  17:1 18:21
25:1 34:8 42:6
45:23,24 47:7
57:7,15 63:22
67:11 68:3
71:15 72:5
76:2,8 78:5
81:3 83:1
86:13 87:13
88:22 98:9
100:10 101:14
102:2 103:3
106:2,9 112:12
120:25 125:13
126:4 130:6
136:18 141:16
142:6 162:5,21
162:22 164:23
170:23 188:2
188:21 189:3
189:20
**partially**  68:14
103:11
**participate**
41:14

Paul Lewis , Jr., M.S., BME                                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[particular - planar]**                                                    Page 36

**particular**  24:4
  44:20 58:7
  101:21 109:19
  109:22,24
  166:14 171:9
  177:22
**parties**  192:17
  193:14
**parts**  83:5 87:8
**party**  192:14
  192:18
**pass**  132:5,9,14
**passed**  95:15
**passenger**
  102:25 165:5,6
  167:12,15
  171:9 175:18
**past**  6:17 16:2
  16:9 30:18
  31:20 51:13
  140:1 154:9
  157:15
**pathologist**
  40:13 41:9
**pattern**  91:1
  94:7 113:5
  136:19
**patterns**  74:10
  186:6
**paul**  1:12 3:5
  4:5,19 48:20
  192:2
**peachtree**  2:9
**peak**  127:6,10
  127:12,20

128:6,12,15,21
  129:1,6,8,12,20
  130:6,11,22
**pelvic**  88:17
**pelvis**  87:17,24
**pending**  139:10
  187:19
**people**  12:24
  16:22 54:2
  55:10,13,22
  56:22 105:1
  115:20
**people's**  187:10
**percent**  30:19
  31:13,21 76:22
  124:15
**percentile**
  133:6 166:9
  167:6,13,14,23
**performance**
  151:13,17
**performed**  7:20
  10:4 165:14,17
  177:25 178:6
  180:8
**performing**  9:4
  9:8 37:7 136:4
**peri**  93:7
**perimeter**
  80:13,14 92:23
  93:7,19,19
  99:18 101:25
**period**  31:21
**person**  24:13
  24:23 48:6

133:4
**personal**  56:19
  73:8 159:1
**perspective**
  40:24 41:23,24
  114:17
**pertains**  48:24
**perusing**
  114:14 118:2
  128:10
**petrous**  68:25
  97:19 100:3
**pf**  21:3
**phonetic**
  136:13
**photo**  93:14
  116:20 117:19
  117:25
**photograph**
  70:18,24
  114:25 115:2
  115:15,16
  116:24 118:22
  119:2,12,22
**photographs**
  26:10 56:2
  57:10,20 64:18
  64:20 67:8
  75:6 116:8
  144:25 150:2
  187:1
**photos**  7:18
  26:13,15,16
  64:12,16,22
  65:6 107:6

115:19 120:22
**phrased**  143:10
**physical**  81:14
  82:9,11,21,23
  83:4 89:5
  92:18 149:25
**physically**
  84:11 85:6,8
  87:10 90:13
  95:9
**physics**  84:11
**pickup**  59:20
  62:3 146:5,11
  146:20
**piece**  101:3
  178:12
**pinpoint**  81:13
**pinpointed**
  106:25
**place**  55:16
  159:3
**placed**  116:14
**places**  80:16
  104:21 136:10
**placing**  55:15
**plaintiff**  2:3
  32:2
**plaintiff's**  3:18
  48:14
**plaintiffs**  1:6
  4:10 21:5,7
  31:22 33:11
**plan**  39:3 187:5
**planar**  174:15

Paul Lewis , Jr., M.S., BME                                          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[plane - prior]**                                                        Page 37

plane  40:9
planning  140:8
plans  53:24
  54:6 187:13
plastic  85:18
  88:24 90:9
  91:7,8 100:17
  112:12
play  151:22
please  4:7,14
  4:17
plus  8:4 66:19
  66:20,20 91:14
  114:4 156:8
point  7:5 32:12
  35:6 51:21
  54:5 72:17
  85:11 94:7,9
  104:4 106:8
  107:5,23
  108:19 119:1,5
  122:13 126:14
  129:22 133:17
  155:13 156:17
  178:22
pointed  17:6
  100:3
points  18:22
  22:4
police  116:8
pollen  38:11
ponce  1:21 2:5
poorly  135:3
portion  80:8,12
  86:6 99:15

100:5,6 101:21
106:18 171:20
174:8 184:14
portions  86:9
104:18 105:25
144:20 172:1
position  55:17
57:12,22 84:20
92:16 93:2
95:5 111:11
113:13,17,22
114:8 115:14
116:9 118:9
128:5 129:7,9
129:14,15,20
130:1,12,14
139:15 166:19
171:9 176:7,9
176:16,19
177:14 182:6,8
182:12 187:18
positioned  94:5
184:22
positive  10:10
53:4 64:11
96:16 107:10
127:23
possess  39:19
possibilities
158:3
possibility
94:19 105:16
106:1 113:3
possible  22:20
39:4 85:8

87:11 93:6
95:5,9 106:6
109:25 112:1,4
112:5,21,22
122:5 123:5
139:20 177:8
177:10
post  82:20
100:6,9,10,17
101:1,6,9
102:2 106:18
posterior  70:12
71:18
postponed
38:17,18 54:13
posts  80:10,18
80:21 100:1,23
100:25 101:3
101:12
potential  37:11
87:9 90:14
91:19 93:22
109:7 134:11
134:20 135:10
136:3 150:13
150:14 185:24
190:25
potentially
46:10 47:14
54:19 124:7
172:14
pounds  173:12
prepare  47:18
prepared  8:13
8:14,22 53:17

190:24
preparing  7:2
24:20
present  2:12
4:7 55:21
56:22
presented  94:8
157:21
preservation
134:3
preserved
62:20
pretty  49:9
74:12,12 75:20
97:23 102:2,6
120:23 145:18
170:3 183:12
prevent  126:18
133:13,23
prevented
124:9,10
previous  11:4
127:1
previously
178:9
primary  61:13
printed  6:14
26:13
prior  6:4,5 11:7
11:18 12:8
13:23 14:1
16:25 18:10,10
22:8,14 33:1
51:11,15 52:11
69:7 89:22

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[prior - qualifies]**                                          Page 38

94:5,10 122:7
122:13 123:12
138:8 140:5
141:1
**probability**
163:23
**probably**  12:8
16:8 29:21
32:11 48:4
61:6 85:13
87:15,16 88:3
99:4 102:12,14
115:10 127:25
130:13,14
139:19 141:20
145:17 162:10
168:9 178:13
183:16
**problem**  26:8
121:20
**procedure**  1:16
**proceedings**
4:1 193:7,11
**process**  45:15
**produce**  6:3
10:24 139:5
142:12,17
145:11,19
180:17
**produced**  5:1,4
6:14,17,18
7:17,25 11:7
11:17,17 12:8
13:20 15:25
16:19 27:18

56:4 142:16,21
142:23 144:15
144:16 145:6
145:15 152:12
162:17 180:6
184:1
**product**  22:25
39:13
**production**
21:3,24
**profile**  137:5
149:25 151:4
**profiles**  154:15
**program**  46:5
**progress**
128:18
**progresses**  98:2
**progression**
98:4
**prohibited**
192:12
**promise**  56:11
58:22
**prompted**
140:2
**propagates**
68:25
**propagation**
98:8 100:2
106:12
**properly**
138:18
**protect**  151:23
**protected**  82:3

**protecting**
151:22
**protection**
131:7 150:9
182:20
**proves**  82:12
**provide**  16:23
16:24 36:7
46:15 63:25
140:24 192:10
192:14
**provided**  6:7
7:8 8:6 11:5
12:5,11,16
17:9 20:8
23:10 24:8
49:3,11 64:21
66:25 135:21
141:23 143:2,9
143:18,23
144:1,3 148:5
153:1 157:14
157:17
**provider**  66:22
66:25
**provides**
182:20 185:22
**providing**  77:6
**provisions**
192:9
**publications**
27:22,23
**pull**  43:4
**pulling**  114:22

**pulse**  185:19,22
**pulses**  162:24
**pure**  122:25
**purpose**  9:2
50:15 115:1,3
117:6,10
119:25 151:21
155:7,16,20
**purposes**  1:15
**pursuant**  1:14
192:4
**push**  121:7
**pushed**  15:8
90:11,15 93:2
96:18 103:23
111:6,11 112:3
117:8 121:6
**pushing**  91:13
**put**  8:17 22:7
39:13 73:12
75:21 77:18
84:16 89:25
109:6 134:15
**puts**  174:3
**putting**  24:21
150:1

**q**

**q10**  167:16
**qualified**  25:7
28:22 36:2,3
149:14 152:15
152:18
**qualifies**
151:11

Paul Lewis , Jr., M.S., BME                                       March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**quantification**
  75:18
**quantify**   75:10
  75:11
**quantifying**
  75:3
**quantity**   44:18
  47:24
**quarter**   146:20
  160:10
**question**   7:11
  33:11 36:17
  42:9 57:24
  84:21 85:24
  90:20 108:1
  109:24 123:7
  124:21 135:6
  143:1,10,10,11
  143:15,23
  144:7,9,14
  145:1,9 149:21
  150:18 154:5,5
  154:6,12,24
  155:1,12,22
  156:16 177:4
  184:8,25
  185:17 189:1
  190:17
**questioning**
  20:7 96:11
**questions**   113:9
  138:5,7,12,21
  139:7 150:5,17
  157:3 187:22

**quick**   20:5 28:1
  43:8 58:25
  104:9 114:12
  159:7 188:13
**quite**   141:5
**quoted**   15:15

**r**

**r**   193:1
**raccoon**   79:6
**rad**   22:10
**rails**   87:16
  126:17
**raise**   4:16
**raised**   59:25
**raising**   60:18
**ram**   146:18
**ramirez**   2:12
**ran**   36:17
**rate**   44:19
  134:16
**rates**   192:17
**rather**   149:9
**raw**   144:6
**reached**   119:1
**read**   24:7,12
  49:5 54:3
  65:13 94:20
  144:4
**readable**   23:18
**reading**   1:16
  67:17 69:7
  71:2,21 78:16
  95:21 158:15
  158:25

**ready**   10:3
  95:21
**real**   11:2 20:5
  28:1 43:8
  104:9 114:12
  159:7
**realistically**
  17:2 69:13
  83:17 103:6
**reality**   145:9
**realize**   9:12
  26:13
**realized**   8:15
  10:2
**really**   17:7,13
  28:12 42:13
  44:11 47:3
  48:10 68:15
  80:11 82:16,18
  84:2 92:21
  95:12,14 102:4
  102:5 124:6
  134:14,15
  150:18,24
  154:16 155:3
  161:18,25
  170:23 171:5
  171:14 174:13
  178:22
**rear**   82:4 83:15
  84:7,8,9,17
  90:16 91:20
  92:8 96:13,13
  109:8,11 110:2
  110:11,16,19

  110:20 120:19
  124:4 125:7
  126:3 128:1,3
  131:8,24
  132:22 136:1
  147:4,15 164:4
  165:5,6 167:12
  167:15 175:18
  182:1,3,7,13,20
  183:8,12
  185:13
**rearward**
  102:18,22
  182:21
**reason**   42:8
  54:11 114:6
**reasons**   71:15
  110:3 138:15
  158:4
**rebound**   28:25
  124:13,18,23
**rebuttal**   54:19
**recall**   32:20
  48:22 49:2,6
  78:25 112:8,16
  147:23 189:18
  190:15
**receipt**   15:19
**receive**   12:15
  19:17
**received**   7:16
  10:16 11:25
  12:21 13:5,7
  13:13 15:12
  17:25 18:9,10

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[received - relative]**                                           Page 40

| | | | |
|---|---|---|---|
| 19:15 20:24 | 76:2 137:13 | **referenced** | **regardless** |
| 21:2,13,18 | 150:11 | 13:17 17:22 | 191:1 |
| 22:21 30:12 | **reconstructio...** | 18:6 68:12 | **regular**   9:7 |
| 43:17,19 53:15 | 152:8 | 162:12 | 89:16 170:14 |
| 65:16 121:3 | **record**   4:3,8 | **referencing** | **regulations** |
| 138:8 160:2 | 5:9,17 38:3 | 40:20 61:4 | 192:4 |
| 161:8 187:21 | 53:6 59:4,9 | 165:12 180:25 | **relate**   135:15 |
| **recent**   44:1 | 96:3,8 138:6 | 190:13 | 140:4 148:12 |
| **recently**   9:1 | 139:3 145:20 | **referral**   192:15 | 148:17,22 |
| 32:15 34:5 | 150:4 160:23 | **referred**   180:7 | **related**   13:21 |
| **recess**   38:6 | 161:3 186:11 | **referring**   64:14 | 15:5,13,19 |
| 59:6 96:5 | 186:16 191:13 | 105:22 116:15 | 33:21 37:13 |
| 160:25 186:13 | 193:10 | 166:16 182:9 | 39:19 40:22 |
| **recitation** | **records**   7:23 | **refers**   167:19 | 42:1 50:2 |
| 65:15 73:6,9 | 18:24 23:12 | **reflect**   44:13,19 | 66:20 134:11 |
| **recline**   114:18 | 25:12 28:19 | **reflected**   118:8 | 135:4 136:25 |
| **reclining** | 43:5 66:6,20 | 118:21 120:8 | 138:12 149:16 |
| 114:17 | 144:24 | **reflecting**   44:9 | 154:2,8 159:11 |
| **recommend** | **redo**   79:23 | **reflects**   118:9 | 172:3 173:14 |
| 60:11 | **reduced**   193:7 | **regard**   5:5 | 173:16 184:6 |
| **recommendat...** | **refer**   143:3 | 38:22 39:16 | 190:2,25 191:6 |
| 60:1,2,7,16,19 | **reference**   8:3 | 51:6 52:5,15 | **relates**   17:21 |
| 60:20 61:5,9 | 12:12 14:12 | 57:21 76:21,23 | 19:4 48:18 |
| 61:18 62:4 | 37:18 52:7 | 77:11 83:2 | 76:12 92:7 |
| **recommends** | 53:23 62:6 | 96:20 136:24 | 131:5 163:16 |
| 60:13 | 67:22 69:2 | 152:9 | **relation**   52:8 |
| **reconstruction** | 70:16,25 71:14 | **regarding** | 52:15 130:10 |
| 15:16 34:22 | 79:21 114:25 | 34:25 35:15 | 171:2 |
| 35:1,7,9 36:7 | 131:4 133:3 | 37:10 39:4 | **relationship** |
| 37:16 61:25 | 135:4 154:20 | 41:20 51:17,17 | 192:8 |
| 121:15 149:14 | 158:6 163:10 | 63:20 126:20 | **relative**   84:14 |
| 149:17 150:7 | 166:13 168:11 | 138:23 152:5 | 92:11 115:6 |
| 150:25 153:13 | 176:2 180:17 | 153:3 162:13 | 122:16 135:24 |
| **reconstructio...** | 184:1 190:2,12 | 178:5 | 193:12 |
| 35:17,20 36:3 | | | |

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**relevant**  66:6
141:7,10,13
154:1 178:17
186:2,5
**reliability**  35:9
35:24 36:4
**relied**  5:5 7:6
35:19,23 57:19
66:16 70:18
76:23 142:21
143:19 145:12
145:14 153:4
162:8
**rely**  24:8,9
27:21 37:21
49:22 58:3
75:9 152:7,14
153:12 162:8
172:10 188:23
**relying**  18:19
22:22 35:4,8
62:10 67:8
70:25 73:16,23
73:25 137:15
141:13 172:12
174:10 178:19
184:12 188:20
**remember**  8:25
11:1 38:16,17
55:10,23 84:17
97:13 104:9
111:15 115:24
122:14 128:8
133:24 183:23

**remove**  40:10
**removed**  107:5
**render**  28:23
**rendered**  149:5
**rendering**  25:8
**repeat**  135:6
**rephrase**
143:16
**replicate**
120:16 183:17
**report**  3:14,20
3:21 6:18,21
7:2,7 8:2,3
12:13 13:17
14:5 15:12,16
17:18,22,25
18:2,4,6,8,11
19:5,8 20:25
21:18,23 22:2
22:8,9,15 35:3
35:4 44:22
45:3,5,6,14,21
45:25 47:18
49:10,12,13,15
49:21 50:1,11
50:25 51:25
52:1,6,7,11,13
52:18,20 53:7
53:8,9,15,15
54:22 58:23
59:11,17,18
60:9 61:14,18
64:7 66:11,14
66:19,19,21
67:7,13,14

68:1 69:12
70:8,10,23
71:2 73:5,9,11
73:19,21 78:25
79:21,23,25
86:1 114:21
121:12 126:5
128:9,11 135:7
136:9 137:15
138:3,8,11,12
138:13,15
139:17,25
140:3,7,15,17
141:10,19,25
144:7 145:12
145:22 148:14
152:24 154:24
155:3,4 156:9
157:18,22
159:11 161:6,8
161:24 163:11
179:14 180:18
184:2 186:25
187:20 188:4
188:18 189:10
190:3
**report's**  66:8
140:19
**reporter**  1:18
4:14,16 5:24
29:5 43:13
137:25 180:5
192:6,15
**reporting**
192:4,7,9,10,11

192:13,14,15
192:17
**reports**  17:23
24:20 26:9
51:7 53:17,19
84:16 142:2,19
144:5,20 145:4
145:18 157:13
157:14,15
161:23
**represent**  4:8
**representation**
120:9
**representations**
120:3
**representative**
52:8 158:7,12
158:19,22
192:7
**representing**
33:15
**represents**  7:1
**request**  140:3
**requested**
183:18 184:5
184:10
**required**  50:23
50:24 131:20
140:19 141:10
156:8,14,19
191:4
**requirement**
133:1
**requirements**
117:4 156:12

Case 2:22-cv-00017-RWS   Document 102-2   Filed 09/05/24   Page 235 of 251
Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[requirements - right]                                        Page 42

157:8
**reschedule**
38:13
**rescheduled**
38:19
**research** 12:25
31:18
**resist** 126:18
**response** 10:10
53:4 64:11
96:16 107:10
127:23 178:3
**responsive** 6:8
**rest** 11:13
16:19 17:7
58:22 87:1,6
93:7 102:1
**restitutes**
118:18
**restitution**
146:24
**restraints** 85:6
85:9
**resultant** 174:9
174:17,22
175:5
**resulting** 175:9
**results** 154:15
**retained** 32:2
58:9
**review** 10:18
15:13,24 19:3
20:8,11,12,13
21:1 23:8,10
23:21 25:17

46:1 47:6,8,11
47:15,17,19
48:5 54:24
74:25 142:3
187:10
**reviewed** 6:5
6:23 7:2,12
15:4 17:17
21:11 25:19
49:2 54:22
64:23 66:7
67:13 142:13
142:22 143:19
144:5 145:5
**reviewing**
24:20 45:23
75:6
**reviews** 144:21
144:24
**richard** 2:8
**rick** 4:11
**ridge** 68:25
97:19 100:3
**right** 4:17 9:2
9:18 10:2,4,8
10:14,16 11:9
12:2,11 14:1,4
14:24 15:18,23
16:24 19:2
21:10,17 22:7
26:25 27:11
28:14 29:3,12
29:17 30:3
31:17 32:1,13
35:8 36:2 37:1

37:22 38:10,22
42:25 43:4,9
43:16 44:1,5
44:10 45:10
46:17 47:1,13
48:12 49:9,25
52:13,18,23
53:11,14 54:21
56:12 57:10
58:2,20 59:14
61:23 62:10
63:10,17 64:6
64:20 65:9,23
66:1,10,13
67:6,6,13,22,25
68:14,15,21
69:12,16,20,22
69:23 70:9,15
70:19,23 71:6
71:10,16,18,18
71:23 72:6,23
72:25 73:2,11
74:1,2,4,9
75:16 76:11,21
77:15,25 78:6
78:6,13,18
79:13,16,21,25
80:2 82:19,21
83:2 86:6,16
86:24 87:12,23
88:13 89:1
90:10,14,22
92:7,13,14
93:21 94:8,14
94:15,20 95:6

95:15,23 96:11
96:21 97:18
98:22 101:15
103:3,4,6,16,18
104:6,6 105:14
105:20,23
106:3,7,9,17
109:4 111:7
114:8 115:18
116:18 117:23
118:11,13,16
118:21,24
119:11,15,18
119:21 121:9
121:11,14,25
122:4,14 123:1
124:14 127:19
128:12 129:3
129:18 130:9
131:1,4 132:2
132:22,25
133:11 134:2
134:20 137:11
137:18,19,22
141:5,7 142:18
146:18 147:21
152:13 153:10
153:19 157:15
157:25 158:5
159:5,7 160:5
160:11,14
161:16,22
162:7,16,19,21
163:1,4,25
164:5,15,19

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[right - scold]**                                                    Page 43

165:3,5,10,21
166:1,12,20,22
167:8,12,15,24
168:1,8 171:11
171:16 172:9
172:21 174:5,7
174:24 175:3,7
175:21 176:10
176:11 177:9
177:16 178:11
179:3,23,25,25
180:3,23 181:3
181:3,6,9,23
182:13,16,23
183:3,18,19
184:4,11,21
186:7,17 187:2
187:9,15,16
189:6,24 190:5
190:6,22
**rigid** 80:11,16
81:20 99:21
100:5 101:24
102:7
**ring** 97:21
98:14,16
**road** 2:9 95:13
**roadway** 105:1
**robust** 150:24
**roche** 62:8,9
125:23 126:4
126:22
**role** 24:14 25:2
67:16 151:22

**rollovers**
104:25
**roman** 6:22
**room** 58:23
**rotate** 95:3,8
**rotating** 91:15
**rough** 1:8 4:11
33:21 52:7
58:14 59:24
60:15,20 61:6
61:9 143:1,6
145:25 148:25
152:2 154:15
158:6,8,11,18
158:22,23,24
159:13 160:8
191:3
**roughly** 119:9
164:16
**row** 89:13
**rule** 3:16 7:21
26:19 29:13
83:24 90:14,22
138:14 155:10
155:16,19,20
156:9,14,17,25
157:8
**ruler** 119:4,6
**rules** 1:15
192:4
**ruling** 88:19
91:18 92:8
93:21 139:11
187:19

**run** 33:10,12
36:19 164:12
177:16 184:5,9
184:19 185:20
**running** 46:13
92:11
**runs** 10:17
65:24 66:4
**rws** 1:7

**s**

**s** 3:1 104:21
**safe** 77:16
79:20 133:22
**safety** 149:6
150:8 152:21
**santana** 1:4
**santana's** 14:9
**saw** 97:15
111:13
**saying** 23:3
33:11 38:8
40:21 60:20
69:1,25 70:2
70:15 79:17
81:12 85:21
88:10 95:4,9
98:4 100:10
101:20 106:1,3
106:6 107:14
109:8 118:22
119:22 124:9
125:24 126:5
126:11 127:11
130:24 132:12
133:9 139:22

141:12 143:4
145:13,13
146:11 151:2,4
152:13 153:10
155:18 157:6
175:5
**says** 6:23 47:8
47:17 48:20
61:23 127:20
164:25 165:10
166:2 169:3
175:6,9 182:7
**scaling** 133:18
**scan** 116:14,18
**scanned** 57:14
**scanners** 57:25
**scanning** 55:14
55:15 57:20
**scans** 19:9 57:6
88:1 116:13
**scenario** 36:12
127:11
**scene** 40:10
116:24
**scenes** 40:7
**scheduled**
54:12
**scheduling**
50:12
**school** 40:18,20
**scientific**
134:18 135:8
135:14
**scold** 137:12

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[scope - september]**                                                    Page 44

| | | | |
|---|---|---|---|
| **scope** 107:16 | 101:15,21 | 182:22,24,24 | 117:24 118:14 |
| 155:12,22 | 102:6,8,15,15 | **seat's** 103:22 | 118:19 145:6 |
| 185:17 | 102:18,23 | **seated** 86:21 | 167:18 175:15 |
| **score** 163:21 | 103:9,11,12,14 | 130:1 176:7,16 | 180:20 183:4 |
| 169:23 | 103:20,21 | **seating** 129:6 | **seeing** 40:23 |
| **scratch** 82:5 | 104:1,2,16 | **seats** 130:16 | 171:6 174:14 |
| 163:14 190:20 | 105:5,7,10,13 | **second** 10:16 | 174:19 |
| **se** 64:22 75:22 | 105:23 106:2,4 | 11:23 53:2 | **seem** 96:24 |
| 122:1 134:17 | 106:8,19,21 | 56:3,22 59:18 | 104:14 |
| 161:19 173:8 | 107:4,7,9,19,24 | 59:21 74:6 | **seemed** 79:1 |
| 178:19 186:5 | 108:11 109:9 | 76:11,21 89:13 | 97:24 |
| 188:20 | 109:15,16,17 | 139:5 176:2 | **seems** 68:6 |
| **seaborn** 1:18 | 110:6,7,10,15 | 180:7 183:23 | 133:18 148:19 |
| 192:24 193:21 | 110:24 111:9 | **secretarial** 48:8 | **seen** 35:7 36:21 |
| **season** 38:11 | 111:13,13,16 | **secretary** 25:20 | 48:21 49:6 |
| **seat** 55:16,16 | 111:19 112:2,4 | 25:25 | 54:2 81:4 89:7 |
| 55:17,17,18 | 112:6,11,11,12 | **section** 6:22 | 104:25 108:22 |
| 57:5,12,21 | 112:24 113:12 | 41:9 48:23 | 108:23 109:19 |
| 76:4 80:6,8,10 | 113:20,23 | 61:21 64:12 | 112:7,13 |
| 80:14,22 81:7 | 114:9,9 115:6 | 65:10,10,14,14 | 124:23 129:24 |
| 81:17,24 82:2 | 115:7,11,12,14 | 65:24 66:18 | 141:15 153:21 |
| 82:9,12,13,22 | 115:15,16,22 | 69:17 73:5,7 | 189:13,14 |
| 82:23 83:1,4,6 | 116:2,9,14 | 121:14 | **self** 114:5 |
| 83:8,13,19 | 117:2,9,13,16 | **sedan** 162:15 | **semantics** |
| 85:7,9,17 86:2 | 117:18,21,24 | 164:3 | 110:18 |
| 86:3 88:13,23 | 118:4,5,17,25 | **see** 20:5 38:13 | **send** 47:1 |
| 88:25 89:3,3 | 119:3,10,13,20 | 40:25 41:8 | **sending** 162:7 |
| 89:10,21 90:18 | 119:25 120:20 | 48:19 54:15 | **sense** 30:4 |
| 90:24,25 91:3 | 120:25 121:2,5 | 59:21 70:13 | 36:16 68:7 |
| 91:4,13,13,16 | 122:17 123:13 | 72:11 75:21 | 71:8 135:18 |
| 91:17 92:19,23 | 123:17,22 | 80:19 90:13,21 | **sent** 6:14 18:17 |
| 93:2,3,12,15,16 | 124:3,5 130:12 | 92:18 93:14 | 19:19 26:22 |
| 93:19 94:2,25 | 151:16,17 | 96:19 99:4 | 44:14 |
| 99:19,24 100:7 | 182:8,10,11,12 | 102:3 108:5 | **september** 10:6 |
| 100:9,13 | 182:17,17,20 | 110:10 115:16 | 10:7,9 55:7 |

Paul Lewis , Jr., M.S., BME                                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[sequence - situation]                                                    Page 45

| | | | |
|---|---|---|---|
| **sequence** 130:7 | **show** 72:4 | **signature** | 127:17,20 |
| 170:6 | 115:5,8 117:7 | 192:23 193:21 | 128:3 129:6,8 |
| **serial** 166:2,12 | 120:22 141:15 | **significant** 77:4 | 130:2 134:7,13 |
| 166:14,21 | 158:17 | 84:15 86:5,9 | 136:4 152:8 |
| **services** 47:24 | **showed** 190:9 | 102:9,23,25 | 176:22 183:19 |
| 192:10,14 | **showing** 83:5 | 124:24 126:18 | **sir** 7:5 31:25 |
| **set** 3:22 48:10 | 102:11 117:20 | 160:1 172:4 | 34:11 35:2,22 |
| 163:10 164:1 | 117:20 119:8 | 191:1 | 47:22 51:20 |
| 178:6 | 120:2,7,17 | **significantly** | 56:19 58:16 |
| **sets** 161:9,12 | 131:11 165:8 | 62:2 85:15 | 59:16 61:22 |
| **seven** 47:24 | **shows** 69:19 | 102:5 135:23 | 66:12 67:12 |
| 137:25 | 133:19 154:14 | 149:1 152:1,20 | 71:20 77:9,14 |
| **several** 32:11 | 161:19 163:13 | 169:25 175:16 | 79:8 81:11 |
| 42:5 122:20 | 183:7 189:11 | **signing** 1:16 | 91:5 94:12,12 |
| **severity** 76:10 | **sic** 118:8,9 | **similar** 50:9 | 107:12 113:21 |
| **shakes** 130:21 | 131:10 153:5 | 73:7 141:16 | 124:22 125:2 |
| **shaped** 99:25 | **side** 68:7,14,16 | 154:14 189:12 | 136:7,15 146:2 |
| **she'll** 25:17 | 68:21,23 69:12 | 189:23 | 147:2,5,11,14 |
| **sheet** 11:3,12 | 71:7,7,10,13,19 | **similarities** | 147:23 152:4 |
| 116:3 165:22 | 71:19 72:25 | 159:10,17,19 | 157:12 158:4 |
| **shell** 85:18 | 77:24 78:10 | 159:24 160:6 | 159:6 164:14 |
| 88:24 89:10 | 80:1 83:3 92:5 | 160:15 | 165:2 168:13 |
| **shocked** 58:17 | 92:5 94:8 99:4 | **similarity** | 173:23 174:1 |
| **shop** 89:17 | 99:5 102:10 | 146:21 | 176:12 179:5 |
| **shoulder** 85:14 | 105:10 131:8 | **similarly** 38:22 | 180:15 181:5 |
| 87:7 | 131:24 132:9 | 166:22 | 182:15 186:4 |
| **shoulders** | 132:21 147:6,7 | **simply** 73:8 | 190:17 |
| 86:19 | 147:7,10 | **simulated** | **sit** 187:6 |
| **shove** 110:21 | 150:23,23 | 176:6,18 | 190:16 |
| **shoved** 83:19 | 182:2 | **simulates** 128:7 | **site** 56:13 |
| 91:10 102:8 | **sided** 83:20,21 | **simulation** | **sitting** 88:13 |
| 103:9 110:18 | **sides** 119:14 | 35:10 36:10,17 | 187:13 |
| 123:20 | 144:23 | 36:19 37:7 | **situation** 37:11 |
| **shoving** 117:15 | **sienna** 146:7 | 63:18 77:7 | 37:12 112:10 |
| 123:16 | | 121:16 127:5,8 | 149:2 152:1 |

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[situation - squeezing]**                                                    Page 46

172:16
**six** 59:25 60:19
  116:22 133:25
  181:8,11 183:8
**size** 147:21,24
  171:21,23
**skimmed** 15:7
**skip** 69:17
**skipped** 64:4
**skipping** 65:9
**skull** 71:4 72:9
  72:13,24 74:17
  79:3,10 80:19
  80:24 81:4
  82:25,25 83:11
  87:5 88:20
  89:4 92:1,13
  93:22 96:21
  97:8,10,15
  99:2,25 100:4
  104:7,8,13,25
  108:14,17,20
  108:20,22
  110:25 111:14
  120:13 121:4
**slash** 8:9 69:12
**sled** 177:6,9
  181:12,18
  182:1 183:14
  183:15,16
  184:16,19
  185:2,6,18
**sleeping** 122:15
**sleeve** 100:6,12
  100:15,17,22

101:13,14
**sleeve's** 101:15
**sleeves** 80:22
**slid** 115:20
**slides** 100:18
**slightly** 71:18
**slow** 29:1
**small** 46:6
  120:24 124:15
**smooth** 108:18
**snyder** 1:21 2:4
**soft** 79:2 93:8
  102:6
**softer** 83:1
**software** 36:18
  37:3,6 46:5
**sole** 71:22
**solicited** 19:20
**somebody** 39:2
  81:4 104:21
**somewhat**
  116:2
**sorry** 10:7 20:6
  23:25 24:2,17
  27:9 28:25
  29:16 31:10
  32:10 33:9
  34:14 43:18
  44:25 55:17
  60:5 66:2,3
  72:18 73:4
  78:24 98:7
  102:16 109:19
  111:22,23
  119:7 121:19

124:2 149:12
  152:17 159:20
  165:19 166:25
  169:14 179:20
**sort** 48:7,17
  73:12 74:3
  79:9 101:7
  117:13
**sounded** 97:22
  98:13
**source** 61:16
  80:5 93:22
  158:10,14
  161:12 173:22
  177:17
**sources** 12:25
**space** 57:8,9
  62:20 75:8
  77:5 84:5
  103:10 110:22
  134:4,25
  135:24 136:22
  149:4,10 160:2
**spacial** 117:4
**speak** 22:5
  28:13 38:14
  40:22 48:11
  68:8 84:2
  126:8 150:4
  174:14
**speaking** 38:15
  143:25
**specific** 6:24,24
  50:7 106:15
  108:10 116:19

133:21 152:23
  157:7 158:21
  159:3 176:9,13
  176:16 177:22
  177:23,23
  189:6
**specifically**
  8:25 49:18
  51:5,17 67:4
  81:19 94:6
  128:8 136:16
  155:2 162:4
  168:10
**specifics** 57:3
**specified** 67:18
**spectrum**
  134:24
**speed** 128:17
  164:16 173:14
  181:13,17
**speeds** 147:17
  147:19
**sphenoid** 68:6
  71:4,11,15
**spinal** 41:12
**spitz** 104:21
**spontaneously**
  140:6
**spot** 80:3
  108:10
**spots** 19:1
**spread** 46:2
**square** 175:13
**squeezing**
  91:15

Paul Lewis , Jr., M.S., BME                          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[stack - substantively]**                                                  Page 47

stack   178:15
185:19,21
staff   10:12
23:22 24:8,13
stand   166:4
standard   131:7
132:10,11
133:14 155:24
156:19 168:6
170:14 173:4
184:23 185:2
standpoint
37:17 77:6
151:13,14
157:11
stands   167:17
start   5:1,2,8
6:16 63:12
92:12 129:2
started   30:25
31:3,8 45:14
58:21 65:20
186:22
starting   38:11
42:19
starts   10:17,21
10:21 46:13
66:4 84:3
state   3:23 53:6
61:3 135:7
138:6 140:21
140:23 144:15
159:16 180:8
184:5 190:16
192:2 193:3

stated   37:20
128:8 135:11
136:8,9 158:12
158:23 159:10
190:1 193:6
statement
59:23 61:21
125:10 126:20
136:14 140:5
153:11 154:10
158:18 159:4
states   1:1
154:24
static   75:24
115:4 117:7
118:15 120:3
statically   75:21
115:9 116:5
118:10 119:23
120:7
stating   134:4
statute   60:25
stay   38:2
126:16
staying   124:5
steel   185:6
stick   86:25
stiff   80:11,15
99:21
stiffness   146:24
stock   136:11
stopped   92:24
storage   89:12
96:15 111:8

straight   63:5
83:25 112:19
136:21 183:8
183:12
straightforward
74:12 150:20
strap   85:12
straps   85:14,14
stream   39:14
stressing   91:10
110:12
strike   138:15
striking   98:25
159:12,14
171:3 189:23
stroller   89:18
90:7
struck   66:23
67:1 72:5
109:21 110:24
111:13 112:10
117:9 119:2
146:6 149:4
152:21 168:16
190:10
structural
62:18 159:15
160:4
structure   80:15
88:23 91:8
102:7 107:20
150:24
structures   62:2
81:12 89:19
91:7 109:13

125:8,15 126:3
126:7 146:9
150:22
studies   8:3
study   3:13 7:10
7:20 8:10,16
9:4,8,22 10:4
12:20 20:18
23:15 26:12,17
54:25 113:8,13
114:25 117:6
117:10 134:17
187:1
stuff   24:19
25:15 29:22
38:15 111:8
187:11
subject   52:4
75:12 103:15
103:18 118:4,4
122:5,6 123:23
135:19 136:13
137:21 160:21
179:15
subjects   63:8
subparts   6:25
74:5,7
subsequent
13:13 55:13
157:17
substantive
11:15,22 14:17
14:21
substantively
11:20

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[suffer - take]**                                                    Page 48

| | | | |
|---|---|---|---|
| **suffer** 112:2 | 52:6 53:7,15 | 79:19 84:10 | 110:22 134:3 |
| **suffered** 75:14 | 138:3,13,15 | 90:13 94:17,18 | 135:24 136:22 |
| 110:10 111:1 | 139:25 148:13 | 95:10 104:10 | 149:3,10 160:1 |
| 136:12 | 157:14,15 | 109:6 113:15 | **surviving** 1:5 |
| **suicides** 40:8 | 159:11 | 115:23,23 | **suspended** |
| **suite** 1:21 2:5 | **supplied** 7:13 | 117:25 125:5 | 139:10 187:18 |
| 2:10 | 27:15 | 128:24 132:18 | 190:22 191:11 |
| **sum** 175:13 | **support** 22:4 | 134:4 135:7,25 | **sustain** 133:19 |
| **summaries** | 24:19 51:8 | 137:14 139:24 | **sustained** 62:1 |
| 144:22 | 62:11 101:9 | 140:6 141:20 | 75:8 91:1 |
| **summarization** | 138:21 161:9 | 145:18 148:10 | **swamped** 53:2 |
| 23:11 | 161:17,19 | 148:18 156:3 | **swapped** 94:24 |
| **summarize** | **supporting** | 159:8 177:5,10 | **swear** 4:14 |
| 25:3 | 74:7 100:22 | 177:15 178:14 | **swelling** 69:20 |
| **summarized** | **supposed** 10:25 | 188:10 | **swipe** 147:6,7 |
| 73:12 142:10 | 61:2 151:6 | **surface** 99:12 | **switch** 113:8 |
| 150:6 | **supposedly** | 99:24 105:1 | **switched** |
| **summary** 24:8 | 64:1 | 108:18 109:1,3 | 103:17 |
| 24:9,10 66:5 | **sure** 5:4 7:11 | **surfaces** 87:1 | **switching** |
| 73:20 142:16 | 10:25 11:24 | 104:15 108:23 | 103:15 |
| 144:21,24 | 12:24 13:3 | **surprised** | **swivel** 94:15 |
| 145:2 162:19 | 15:22 16:3,6 | 25:13 | **sworn** 4:17,21 |
| 164:20,23 | 17:4 18:3,9 | **surrogate** 3:13 | **symptom** 79:9 |
| 165:1,3 166:3 | 19:2,10,22 | 7:10,19 8:9 9:4 | **system** 131:25 |
| 168:21 181:23 | 21:3 23:1,8 | 12:20 20:18 | |
| **summary's** | 26:3,25 27:4 | 26:12,16 28:10 | **t** |
| 165:8 | 27:18 31:20 | 54:25 93:11 | |
| **supplement** | 34:4 35:4 36:9 | 113:8,13 | **t** 3:1,1 104:21 |
| 3:18 40:17 | 40:7 48:9 | 114:25 117:6 | 147:8,10 193:1 |
| 48:14 50:21,24 | 50:15,19 52:12 | 186:25 | 193:1 |
| **supplemental** | 56:7,17 58:17 | **survivability** | **tail** 153:15 |
| 3:14,21 8:2,3 | 58:24 60:6 | 63:11 | **take** 37:25 38:9 |
| 12:13 13:17 | 64:24 65:21 | **survival** 57:9 | 49:5 56:2 |
| 18:8,11 19:5 | 66:8 72:2 | 62:20 75:8 | 57:10 58:25 |
| 21:23 22:2 | 76:20 78:12 | 77:4 84:5 | 63:25 84:2,13 |
| | | | 95:24 110:6 |
| | | | 115:15 160:19 |

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[take - testing]**                                              Page 49

| | | | |
|---|---|---|---|
| 169:8 186:8 | 125:25 126:15 | **temporal** 67:21 | 185:18 186:1 |
| **taken** 1:13,14 | 127:6 134:3 | 67:22 68:24 | **testified** 4:21 |
| 1:14,17 13:9 | 144:1,18 145:2 | 72:7,18,20,22 | 30:13,18 31:20 |
| 22:11 59:6 | 145:3 147:9 | 79:9,10 98:12 | 32:9,14,21 |
| 64:13 67:9 | 149:24 175:2 | 98:16,20 | 33:5 34:1,5 |
| 96:5 160:25 | 179:15,18 | **temporalis** | 126:23 149:13 |
| 186:13 193:6 | **talks** 62:16 | 98:11 | 150:10 155:25 |
| **takes** 84:5 | 127:10 162:5 | **tend** 104:18 | 157:6 158:8 |
| 169:20 170:5 | **tall** 126:8 | **term** 60:6,8 | 176:3 188:5 |
| **talk** 11:5 41:22 | 182:19 | 61:8,16 78:3,4 | **testify** 78:12 |
| 44:24 51:24 | **task** 46:24,25 | 97:9,11 102:24 | 95:12 148:21 |
| 52:4 55:1 | **tear** 120:24 | **terminate** | 189:4 190:7 |
| 62:25 75:17 | **technical** 24:23 | 139:9 | **testifying** 38:24 |
| 91:9 145:21,23 | **technically** | **terms** 61:15 | 156:21 |
| 146:10 148:16 | 16:6 67:2 | 72:4 | **testimonial** |
| 150:7,12 | 132:24 134:14 | **test** 3:23 18:11 | 7:21 |
| 151:11,16 | 154:13 183:11 | 51:7 131:14,15 | **testimonies** |
| 174:8 | **technician** | 131:16,20,22 | 29:21 |
| **talked** 22:19 | 40:12 41:3 | 132:4,5,5,15 | **testimony** 33:2 |
| 26:12 54:21,23 | **technologies** | 136:16,25 | 33:7 34:7 35:5 |
| 54:24 56:17 | 183:19 | 137:6,16 | 35:15 39:3 |
| 58:5,8,11,14 | **tedra** 2:4 4:9 | 162:15 163:10 | 51:17 52:7,15 |
| 160:5 161:11 | **tell** 19:25 23:6 | 163:13,16 | 68:1 84:22 |
| 176:1 188:11 | 40:5 45:11 | 164:1,2,10,12 | 86:1 88:12 |
| 189:16 | 46:19 49:6 | 164:20 165:10 | 90:5 94:21 |
| **talking** 36:12 | 88:1 115:1 | 165:11,17,22 | 95:22 109:24 |
| 49:12 51:22 | 116:2 140:12 | 165:23,24 | 114:3 123:9 |
| 56:12 57:7 | 141:9 150:3 | 166:7,17 | 140:5,11 |
| 61:9 62:6 66:2 | 163:13,25 | 167:24 168:16 | 149:21 151:9 |
| 68:9 69:16 | 167:23 180:16 | 177:1,7,9,18 | 155:6,8,12,22 |
| 75:11 85:25 | 181:9,10,20 | 178:5,16 180:7 | 157:9,25 158:6 |
| 93:17 96:14 | **telling** 106:25 | 180:14,17 | 158:22 159:2 |
| 97:22 103:16 | **tempered** | 181:10,12,23 | 185:17 186:2 |
| 107:16 119:6 | 163:14 | 183:4 184:5,11 | **testing** 3:22 |
| 122:25 123:24 | | 184:17,19 | 22:20 63:3 |

Paul Lewis , Jr., M.S., BME                          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[testing - tires]**                                           Page 50

| | | | |
|---|---|---|---|
| 77:11 152:9 | 46:13 48:25 | 161:11 176:3,8 | 15:11,19,25 |
| 161:8,9,17 | 49:4,9 54:18 | 176:8,10 | 18:4 19:18 |
| 162:13 163:9 | 55:7 58:7 60:3 | 179:11 186:21 | 22:15 28:15 |
| 172:9 177:19 | 60:10 61:1,3 | 189:8,11 190:8 | 31:12,21 32:6 |
| 180:10 | 63:22 65:8,20 | **thinking** | 32:18,20 33:1 |
| **tests**   12:12,15 | 66:1,8 69:5 | 116:21 | 38:15 42:19 |
| 19:14 161:12 | 72:1 75:2 77:5 | **third**   59:19,21 | 43:22 44:8 |
| 164:6 165:14 | 78:7 81:2 | 64:10 | 45:24 46:8 |
| 171:10 177:16 | 87:10 88:8 | **thorbole** | 47:14,19 49:25 |
| **thank**   4:13,24 | 89:14,15,19 | 183:18 | 50:18,19 51:21 |
| 96:9 161:5 | 90:8 91:22 | **thoroughly** | 51:25 52:6 |
| 164:24 | 92:12 93:5 | 138:23 | 54:5 55:8 59:3 |
| **thanks**   10:14 | 97:3 98:24 | **thought**   26:6 | 59:8 70:9 |
| 113:7 186:17 | 99:9 102:4,23 | 32:13 51:8 | 86:14 95:11,15 |
| **thigh**   85:12 | 103:2,6,12 | 60:14 66:2 | 96:2,7 113:23 |
| **thing**   102:1 | 104:19,20 | 71:16,17 82:14 | 114:1,2 118:10 |
| 124:12 134:2 | 107:11,15 | 119:7 135:18 | 122:23 128:22 |
| 153:8 155:5 | 108:16 109:12 | 160:13 | 139:5 141:1 |
| 170:5 | 110:9,17 | **thousand**   32:12 | 157:17,21 |
| **things**   6:13 | 111:16 112:20 | 169:24,25 | 160:22 161:2 |
| 13:12 17:3 | 112:25 114:4 | 173:4 | 169:8,18 174:3 |
| 24:5,6,22 | 114:11,13 | **thousands** | 186:10,15 |
| 26:20 28:12 | 115:21,25 | 189:3 | 187:23 191:12 |
| 34:20 37:19 | 116:11,12,22 | **three**   16:16 | **timeliness** |
| 41:23 55:1,1 | 117:11 118:3 | 17:6 29:4,8,9 | 138:10 187:19 |
| 57:25 74:10,12 | 125:23,24 | 33:4 40:3 | **times**   29:4,8,9 |
| 75:17 76:1 | 126:4 129:10 | 146:20 160:5 | 32:14,16 36:21 |
| **think**   6:10,12 | 134:10,23 | 160:10,12 | 38:8 46:23 |
| 8:20,24 11:13 | 136:8 139:19 | 175:13,14 | 50:21 54:13 |
| 17:2 18:17,17 | 139:20 140:2 | **till**   9:12 88:3 | 55:5 60:8 |
| 19:6 20:2 21:6 | 142:4 145:1 | **tilting**   102:12 | 105:2 133:19 |
| 25:22 26:14,19 | 146:5 150:4 | **time**   4:4 6:3,19 | 149:13 155:25 |
| 30:16 32:15 | 153:21 154:16 | 7:7 10:17,21 | 156:22 |
| 33:4,25 38:1 | 155:13 157:6 | 11:22 14:1,4 | **tires**   33:12,13 |
| 38:18 42:12 | 157:13 159:25 | 14:15,16 15:5 | |

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[tissue - two]**                                                    Page 51

tissue  79:2
title  48:20
    162:12
titled  64:17
titles  48:10
today  5:3,4 6:5
    6:8,19 8:6
    10:17 11:18
    15:10,25 23:2
    23:7 26:23
    29:1,12,18,23
    30:20 31:15,24
    34:10,13 35:5
    43:5,21 48:21
    49:6 53:10
    106:23 138:17
    149:13 160:16
    187:6 188:5
    190:16
told  23:12
    106:23 110:4
    187:7
ton  146:20
    160:10
took  26:11
    64:18
top  64:10 80:9
    88:13 93:15,16
    98:21 100:20
    101:15,24
    126:8 164:20
    166:1 185:7
topic  138:7
torn  111:16

total  134:23
    175:24
totality  67:12
    69:11
touches  89:6
toward  72:8,12
    73:2 99:2
    100:13 103:9
toyota  180:10
    185:14
track  46:8,10
tracks  113:21
    114:7
tracy  164:20
    165:11,11
training  27:20
    42:1 141:17
trajectories
    103:7,13,25
trans  122:22
transcribe  15:5
transcribed
    9:24,25 10:11
transcript
    15:20 19:11
    21:14 22:14
    24:7 193:5,9
transfer  122:23
transmit
    122:20
transport
    40:11
trauma  67:3
    69:9 78:14
    79:6 93:3

112:2,13 122:3
    122:5,8,11
trial  32:14 33:2
    33:5,7 34:17
    38:19 186:23
tried  22:19
tries  28:11
trip  95:14
truck  59:20,24
    62:4,16 63:2
    125:7 146:20
    190:11
trucks  146:6
    160:10
true  24:24
    30:22,24 31:3
    34:9,13 35:16
    37:17 50:5
    51:20 53:10
    61:8 83:2
    108:2 137:17
    144:19 153:6
    154:22 155:1,1
    175:18 193:9
truly  40:24
try  16:5 57:5
    67:16 125:19
trying  13:3
    26:14 55:16
    57:5 68:19
    71:1 73:2 76:6
    78:3 84:2,13
    97:16 99:23
    103:9 110:21
    115:3,5,8

116:4,24
    119:21 120:2
    120:11,16
    123:10 132:2
    133:24 137:7
    156:23 185:1
    185:12
turbo  182:5
turn  121:11
turned  50:14
    187:2
twice  33:13
two  6:10 8:2
    11:25 12:12
    13:12 16:16,17
    17:6,22 18:9
    19:14 21:17
    26:21 28:7
    33:23 39:23
    40:6 42:2 47:3
    51:9,12,16,17
    51:24 55:22
    74:16 76:18
    85:14 104:22
    104:22 108:19
    108:19 125:4
    130:15 133:13
    138:20 139:23
    140:1 141:24
    142:14 144:12
    146:22 147:18
    151:25 153:9
    160:11,12,15
    160:21 161:9
    161:12 169:2

Paul Lewis , Jr., M.S., BME

Bryson, Santana and Joshua v. Rough Country, LLC

March 18, 2024

**[two - usually]**

Page 52

| | | | |
|---|---|---|---|
| 170:20 171:3 | **u** | **underride** | **university** 3:23 |
| 174:2 175:16 | | 171:4 | 180:8 184:5 |
| 177:12,23 | **uh** 10:10 53:4 | **understand** | **unpaid** 42:18 |
| 189:16 190:4,7 | 64:11 96:16 | 12:24 16:12 | **unreasonably** |
| **type** 34:9 41:11 | 107:10 127:23 | 40:2 50:10,15 | 39:1 |
| 41:25 81:13,21 | 178:3 | 60:5 61:15,17 | **updated** 27:1 |
| 82:15 91:6 | **ultimately** 24:3 | 62:5 64:3 71:1 | 29:18 |
| 104:12,18 | 24:4 31:16,18 | 76:7 78:5 98:3 | **upper** 80:13 |
| 105:2 107:2 | 40:13 41:8,9 | 100:16 113:16 | 92:24 93:7 |
| 108:17 122:24 | 45:2 51:21 | 120:11 129:18 | 98:9 99:18 |
| 133:4 134:15 | 58:4 75:9 | 148:19 155:19 | **use** 5:24 36:20 |
| 134:16 167:20 | 91:16 123:18 | 157:12 159:8 | 36:22 57:18 |
| 170:1 171:9,17 | 125:19 149:11 | 163:17 169:10 | 58:22 61:8 |
| 171:22 182:2 | 163:2,21 | 169:11 171:1 | 78:4 97:11 |
| 182:17 | 169:20 | 173:11,20 | 116:18 132:20 |
| **typed** 8:17 9:5 | **uncover** 81:16 | 174:6 185:12 | 133:6 168:14 |
| 9:10,16,17 | **uncovered** | **understanding** | 170:4 173:3 |
| 66:9 | 158:1 | 37:18 41:1 | 180:24 186:23 |
| **types** 177:23 | **undated** 43:22 | 57:17,22 60:14 | **used** 31:19 |
| **typewriting** | **under** 6:22 | 60:22 61:1 | 36:19,23 37:2 |
| 193:7 | 19:14 21:9 | 75:7 76:9 | 57:14 60:6,8 |
| **typical** 184:18 | 49:19 50:12 | 85:25 88:11 | 78:3 97:9 |
| **typically** 41:5 | 64:12 66:10 | 90:4 95:20 | 102:24 113:22 |
| 46:12 50:21 | 125:6 127:4 | 97:20 98:9 | 144:7 163:2 |
| 56:15 71:13 | 138:15 165:10 | 115:10 117:4 | 166:7,17,17 |
| 76:9 80:18 | 169:1,24,25 | 125:11 127:14 | 167:20 171:10 |
| 104:15 109:2 | 170:13 173:6 | 129:1 136:2 | 184:16 |
| 130:15,24 | 174:7,8,22 | 137:3 155:9 | **uses** 174:2 |
| 131:18 133:6 | 184:23 192:9 | 168:17 177:24 | **using** 37:3 |
| 173:3 185:18 | 192:12 193:7 | **understood** | 61:16 116:24 |
| **typing** 24:21 | **undergone** | 98:24 | 152:25 177:1 |
| 26:2 | 27:20 | **unit** 173:6,6,8 | **usual** 192:17 |
| | **underline** | 175:6 | **usually** 25:13 |
| | 23:17 | **united** 1:1 | 41:6 46:21 |
| | **underlying** | | 54:1 104:12 |
| | 17:15 142:3 | | |

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[usually - wait]**                                    Page 53

108:17 170:4
**utilize**  35:3
149:6
**utilized**  19:9

**v**

**v**  1:7 75:17
76:1,4 134:18
150:1
**v's**  147:20
**vac**  89:17
**vague**  57:24
123:7 124:21
144:9
**valid**  63:19
**validate**  140:10
**validity**  136:17
136:25 137:6
137:15
**value**  163:21
169:12 172:21
173:2,4 174:24
176:23 179:2
**values**  37:19
131:8,18,23,24
163:3 168:11
169:1,3 172:18
174:3,7 176:19
179:19 180:25
184:12
**van**  162:14,14
164:4,7,11
165:4 168:15
168:24 170:12
175:22

**vantage**  106:8
**various**  71:3
144:22 185:2
**vary**  128:13
171:22
**vectors**  174:12
**vehicle**  7:9,18
9:10 26:10,11
33:12,16,21,24
38:25 45:4
55:15 59:25
60:18 61:25
62:2 77:3
83:22 84:9,14
84:17 86:2,6
86:25 87:7
88:22 96:14
108:4 109:16
116:1,15 117:8
120:9 125:14
125:15 127:19
127:22 128:1,4
128:5,13,20,23
130:3,13
131:11 133:2
134:25 135:1
136:11 142:4
145:24 146:6,9
146:19 148:25
149:2,2,4,5
150:13,13,15
150:22 151:8,9
151:11 159:13
160:3 165:10
166:19 170:11

176:11 179:6
179:22 180:13
181:13,17
182:11,12
185:22 186:25
189:23
**vehicle's**
126:16
**vehicles**  28:11
55:3,6 74:25
125:12 146:3,4
147:18 148:3,8
150:8 151:1
152:2,21
159:14 164:1
168:2,5 170:14
170:17,20
171:3 177:1,12
177:24 185:10
**velocity**  122:16
181:18
**verbatim**  66:9
73:12
**veritext**  192:10
**version**  10:24
11:4 15:23
17:8 27:14
29:17 30:12
126:2
**versus**  67:20
92:5 162:14
**vertical**  85:16
91:23,23 92:1
92:3,15,16,24
97:3,4,6,10,15

98:6,18 99:2,7
99:14,24
100:11 101:11
101:22 104:3
105:25 106:4,7
106:17
**verticalized**
100:5
**vertically**  99:25
106:11 175:17
**video**  4:2 59:4
59:5,7,9 96:3,4
96:6,8 160:23
160:24 161:1,3
186:11,12,14
186:16 191:13
191:14
**videographer**
2:12 4:3,13
38:2 59:3,8
96:2,7 160:22
161:2 186:10
186:15 191:12
**videotaped**
1:12 4:5
**view**  40:23
**visited**  56:13
**vitae**  3:15
**voluntarily**
42:15

**w**

**w**  1:21 2:5
**wait**  140:11
141:8

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[waived - x's]**                                                    Page 54

| | | | |
|---|---|---|---|
| **waived** 1:17 | **we've** 6:3 8:6 | **wider** 109:5 | 139:1 153:13 |
| **waiving** 138:9 | 15:24 21:19 | **window** 169:19 | 187:5,12 188:1 |
| **wall** 185:20 | 26:12 54:21,23 | **wing** 112:17,19 | **worked** 39:10 |
| **want** 5:2 24:11 | 54:24 58:20 | **wings** 82:3 | 45:14 50:5 |
| 30:5 34:20 | 59:14 75:1 | **wise** 128:22 | **working** 33:14 |
| 37:23,25 38:2 | 102:8 116:1 | **witness** 4:15,20 | 40:2 45:25 |
| 38:8 42:13 | 119:16 129:17 | 9:19 29:9 | 57:2 139:17 |
| 53:5 54:4,15 | 176:1 189:16 | 37:24 38:5,10 | **works** 44:20 |
| 54:25 60:7 | **week** 16:2,9,13 | 40:1 56:24 | **worried** 30:7 |
| 61:15 75:13 | 32:25 33:5 | 58:24 59:2 | **worse** 75:20 |
| 78:11,11 | 139:19,20,22 | 80:4 81:9 | 127:11 183:11 |
| 113:15 125:13 | 139:23 | 82:15 96:1 | **worst** 127:12 |
| 125:14 135:14 | **weekend** 8:21 | 106:24 111:22 | **worth** 47:4 |
| 138:6 139:3 | 8:22 9:13 10:1 | 114:14 118:2 | **would've** 22:1 |
| 155:14 163:22 | **weeks** 16:16,17 | 128:10 143:4 | 27:15 43:18 |
| **wanted** 178:14 | 51:14 140:1 | **words** 11:14 | 56:4 71:17 |
| **water** 37:23 | **weigh** 172:7 | 135:9 149:22 | 77:1 87:5 |
| 38:5 | **weight** 18:22 | 163:15 180:16 | 93:13 96:19 |
| **way** 25:21 31:6 | 146:23 171:14 | **work** 22:24 | **wound** 82:17 |
| 34:7 37:8 | 172:5 | 24:24 28:10,12 | 82:18 |
| 45:18,20 83:15 | **weinberg** 2:8 | 30:19 31:21 | **write** 140:15,17 |
| 84:19 94:18,21 | **weld** 185:7 | 35:24 37:14,15 | 157:13 |
| 95:3 97:17,20 | **went** 10:8 55:8 | 37:19 41:12 | **written** 151:7 |
| 97:25 98:4,9 | 111:10 | 42:4,14,15,23 | **wrong** 32:10 |
| 98:10 99:9 | **whatever's** | 44:7,9,11,14,19 | 44:3,3 63:18 |
| 105:13 111:10 | 179:25 | 44:22 45:2,5 | 64:2 |
| 120:16 122:20 | **wheeler** 2:8 | 46:19,20 48:5 | **wrote** 142:2 |
| 129:13 133:9 | **wheels** 185:6 | 48:8 53:24,25 | 145:12 184:2 |
| 137:2 138:22 | **whichever** | 54:6 55:9,19 | |
| 163:16 165:16 | 131:19 | 56:13 67:12 | **x** |
| 172:2 173:1 | **white** 91:10 | 73:6 87:14 | **x** 163:19 174:8 |
| 176:17,22 | **wichita** 3:23 | 116:12 125:17 | 174:13,16 |
| 183:15 189:19 | 180:8 184:5 | 127:15 128:6 | 175:14,22 |
| 190:23 | **wide** 81:3 | 129:13 134:5 | 176:18 |
| | 101:2,3 | 135:2 138:19 | **x's** 175:15 |

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[y - zones]**                                                Page 55

| y | z |
|---|---|
| **y**  28:9 174:8 | **z**  104:21 174:8 |
| 175:14 176:18 | 174:22 175:14 |
| **yeah**  9:19 11:9 | 175:23 176:18 |
| 13:2,25 15:7 | **zones**  149:7 |
| 15:22 16:16 | |
| 17:10 18:23 | |
| 19:23,24 20:10 | |
| 20:15 22:17 | |
| 24:18 26:1,8 | |
| 26:25 27:11 | |
| 29:14 30:1 | |
| 31:10,11 34:15 | |
| 36:21 37:5,24 | |
| 43:7 56:7 | |
| 57:18 64:8,12 | |
| 65:8,18 66:4 | |
| 82:8 84:25 | |
| 95:21 96:23 | |
| 104:11 109:18 | |
| 111:20 115:17 | |
| 118:3 139:19 | |
| 145:19 160:7 | |
| 165:23 167:14 | |
| 170:21 179:15 | |
| 179:17 181:19 | |
| 181:22 185:4 | |
| **year**  29:23 33:4 | |
| 39:23 40:6 | |
| 42:2 43:19 | |
| 133:13,25 | |
| 181:8,11 | |
| **years**  13:25 | |
| 42:5 156:8,12 | |
| 156:21 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.