Wesley Grimes                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 1

1            UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF GEORGIA
2                 GAINESVILLE DIVISION
3
      SANTANA BRYSON and JOSHUA    )
4     BRYSON, as Administrators of )
      the Estate of C.Z.B., and    )
5     as surviving parents of      )
      C.Z.B., a deceased minor,    )
6                                  )
               Plaintiffs,         )
7                                  )   CIVIL ACTION FILE
      vs.                          )
8                                  )   NO. 2:22-cv-17-RWS
      ROUGH COUNTRY, LLC,          )
9                                  )
               Defendant.          )
10    _____
11
12            VIDEOTAPED DEPOSITION OF
13                WESLEY D. GRIMES
14                 May 9, 2024
15                 10:17 a.m.
16
17      Weinberg Wheeler Hudgins Gunn & Dial
18           3344 Peachtree Road, NE
19                 Suite 2400
20
21              Atlanta, Georgia
22
23
24
25      Reported by:  Marsi Koehl, CCR-B-2424

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                    Page 2

1                   C O N T E N T S
2                 E X A M I N A T I O N
3                                                    Page
4      Examination by Mr. Mashman........................6
5
6                   E X H I B I T S
       Deposition
7      Exhibit No.         Description              Page
8      Exhibit 50          Appendix C: CV of           9
                           Wesley Grimes
9
       Exhibit 51          Appendix E: Testimony      26
10                         List
11     Exhibit 52          Notice                     39
12     Exhibit 53          Thumb Drive - Electronic   33
                           File
13
       Exhibit 54          (Not marked)
14
       Exhibit 55          Letter from W. Grimes      42
15                         11/7/22
16     Exhibit 56          Invoices                   44
17     Exhibit 57          Invoice Summary/Issue      84
                           Date
18
       Exhibit 58          Preliminary Analysis       94
19                         Report by W. Grimes
20     Exhibit 59          Types Inspection Notes    105
21     Exhibit 60          Diagram                   101
22     Exhibit 61          Typed Notes: Inspection   109
                           of Ford Escape
23
       Exhibit 62          Typed Notes: Inspection   109
24                         of Ford F-250
25     Exhibit 63          Order Confirmation 1152715 116

Wesley Grimes                                              May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 3

1                          E X H I B I T S
2       Deposition
        Exhibit No.              Description                    Page
3
4       Exhibit 64              Photographs                     113
5       Exhibit 65              Exemplar Vehicle                125
                                Weights and Measurements
6
        Exhibit 66              Photographs                     126
7
        Exhibit 67              (Not marked)
8
        Exhibit 68              (Not marked)
9
        Exhibit 69              CDR Analysis Chart              146
10
        Exhibit 70              (Not marked)
11
        Exhibit 71              Measurements of                 217
12                              Vehicles Received
13      Exhibit 72              (Not marked.)
14      Exhibit 73              (Not marked.)
15      Exhibit 74              Photographs                     178
16      Exhibit 75              Photographs                     194
17      Exhibit 76              Photographs                     196
18      Exhibit 77              Photographs                     196
19      Exhibit 78              Photographs                     196
20      Exhibit 79              Responses to Second             201
                                Set of Interrogatories
21
        Exhibit 80              Photograph                      212
22
        Exhibit 81              Figure 29                       205
23
        Exhibit 82              Photographs                     215
24
        Exhibit 83              Photographs                     216
25

Wesley Grimes                                              May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                              Page 4

1                          E X H I B I T S
2       Deposition
        Exhibit No.            Description                    Page
3
4       Exhibit 84            (Not marked.)
5       Exhibit 85            Exponent Vehicle                219
                              Receiving Summary
6
        Exhibit 86-89         (Not marked)
7
        Exhibit 90            CV                              10
8
        Exhibit 91            (Not marked)
9
        Exhibit 92            Protective Order Folder         37
10
        Exhibit 93            E-mail Chain                    42
11
        Exhibit 94            Prelim Speed Analysis           68
12
        Exhibit 95            Corrected Weights/              69
13                            Measurements
14      Exhibit 96            Mecanica Scientific             71
                              Vehicle Information Sheet
15
16
17
18
19
20
21
22
23
24
25

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                    Page 5

```
 1     APPEARANCES OF COUNSEL
 2     On behalf of the Plaintiffs:
 3               DEVIN MASHMAN
                 TEDRA L. CANNELLA
 4               Attorneys at Law
                 CANNELLA SNYDER, LLC
 5               315 West Ponce de Leon Avenue
                 Suite 885
 6               Decatur, Georgia  30030
                 (404) 800-4828
 7               devin@cannellasnyder.com
                 tedra@cannellasnyder.com
 8
       On behalf of the Defendant:
 9
                 RICHARD H. HILL, II
10               Attorney at Law
                 WEINBERG WHEELER HUDGINS GUNN & DIAL
11               3344 Peachtree Road, NE
                 Suite 2400
12               Atlanta, Georgia  30326
                 (404) 876-2700
13               rhill@wwhgd.com
14     Also present:
15               Jess Higgins, Videographer
16
17
18
19
                 (Pursuant to OCGA 15-14-37 (a) and (b) a
20           written disclosure statement was submitted
             by the court reporter to all counsel present
21           at the deposition and is attached hereto.)
22
23
24
25
```

Wesley Grimes                                              May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 6

```
 1                    P R O C E E D I N G
 2            THE VIDEOGRAPHER:  Today's date is
 3       May 9th, 2024, and the time is 10:17 a.m.
 4            This will be the videotaped deposition
 5       of Wesley Grimes.
 6            Will counsel present please identify
 7       themselves for the record starting with the
 8       taking attorney.
 9            MR. GRIMES:  What time did you say it
10       was?
11            THE VIDEOGRAPHER:  10:17 a.m.
12            MR. GRIMES:  Oh, okay.  I'm sorry.  I
13       apologize.
14            MR. MASHMAN:  Devin Mashman and Tedra
15       Cannella representing the plaintiffs.
16            MR. HILL:  Rick Hill representing Rough
17       Country.
18            THE VIDEOGRAPHER:  Thank you.  Would the
19       court reporter please swear in the witness.
20                    WESLEY D. GRIMES,
21       having been first duly sworn, was examined and
22       testified as follows:
23                         EXAMINATION
24       BY MR. MASHMAN:
25            Q.  Good morning, Mr. Grimes.
```

Wesley Grimes                                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 7

1          A.   Good morning, sir.

2          Q.   We met a moment ago.

3          A.   Yes, sir.

4          Q.   I'm Devin Mashman.  I represent the

5     plaintiffs in this case.

6               I know you've -- this isn't the first time

7     you've had your deposition taken, so I'm not going to

8     belabor the rules.  If you ever don't understand a

9     question that ask, please just ask me to clarify it.

10    I'll do my best to rephrase it so it makes sense.

11              And if you ever need to take a break, please

12    let me know.  And as long as there's not a question

13    pending, we can -- we can take some time.

14              Fair enough?

15         A.   Yes, sir.

16              MR. MASHMAN:  This is the deposition of

17         Wesley Grimes taken pursuant to agreement

18         and Notice for all purposes permitted by the

19         Federal Rules of Civil Procedure, including

20         for use at trial.

21    BY MR. MASHMAN:

22         Q.   Can you please state your full name.

23         A.   Wesley Dean Grimes.

24         Q.   And what is your current address?

25         A.   The office is 2820 North Norwalk, Suite 123,

```
                                                      Page 8

 1      Mesa, Arizona 85215.
 2           Q.  Do you agree that Mr. Elliott's lifted F-250
 3      struck the Bryson's family Ford Escape above the
 4      Escape's rear bumper?
 5              MR. HILL:  Object to the form but go
 6           ahead.
 7              THE WITNESS:  There was contact above
 8           the rear bumper.  My concern about the
 9           question is that I think there was also
10           contact on the bumper.
11              But there was certainly contact above
12           the bumper, yes.
13      BY MR. MASHMAN:
14           Q.  Do you agree that the F-250 overrode the
15      Escape's bumper?
16           A.  It did.
17           Q.  Do you agree that the F-250 intruded into
18      the Escape?
19           A.  It did.  Yes, sir.
20           Q.  Do you agree that the F-250 intruded far
21      enough into the Escape to displace the second row
22      seat that Cohan was sitting in?
23           A.  The -- and let's just be clear.  When you
24      say the F-250, it's the front of the F-250 that
25      intrudes in.
```

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 9

1            And the front of the F-250 intruded in.  And

2      with the cargo that was between the tailgate and the

3      back of the rear seat, it did displace the rear seat

4      forward.

5            Q.  So the amount of intrusion from the F-250

6      into the Escape was enough to displace the second row

7      seat that Cohan was sitting in?

8            A.  It was.  Yes.

9            Q.  And it was enough to push Cohan's car seat

10     forward while he was sitting in it?

11           A.  Yes.  As the seat back was -- was displaced

12     forward, the car seat would have been displaced as

13     well.

14           MR. MASHMAN:  Okay.  I'm going to hand

15           you Plaintiff's Exhibit 50, which is a copy

16           of the CV that you attached to your report.

17           (Plaintiff's Exhibit 50 was marked for

18           identification.)

19           MR. MASHMAN:  Rick, I have a copy for

20           you.

21           MR. HILL:  Thanks.

22     BY MR. MASHMAN:

23           Q.  Is this your current CV?

24           A.  No.  There are a couple of changes.  I

25     brought a more current one.

Page 10

1          Q.  Okay.  So I'm going to pass you an exhibit

2     sticker -- if you can hand me the more current

3     version.

4              And this current version wasn't a part of

5     your file materials, right?

6          A.  That is correct.

7          Q.  Okay.

8          A.  And I actually have a couple of copies.

9              MR. MASHMAN:  Okay.  I appreciate that.

10         Thank you.

11              And I'll mark the most current version

12         as Plaintiff's Exhibit 90.

13              THE WITNESS:  For Mr. Hill, as well.

14              (Plaintiff's Exhibit 90 was marked for

15         identification.)

16              MR. MASHMAN:  And I'll hand this back to

17         you.

18     BY MR. MASHMAN:

19         Q.  So what updates have been made to the more

20     current version of your CV since the one that you

21     attached to your report?

22         A.  There were -- there was a presentation, I

23     think, or two and a class.  Let me get to that point.

24         Q.  When you get there, can you let me know what

25     page you're on?

Wesley Grimes                              May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 11

1          A.  Yes.  Yeah, absolutely.

2              On page 4, just above "Publications and

3      Presentations," so you're at the end of

4      "Presentations, Other Activities, Awards."

5              In April, I think, we -- I was part of a

6      presentation made at a NAPARS conference in Oklahoma

7      City about analyzing HVEDR data.

8          Q.  And that's the last bullet in that section?

9          A.  On the new one, yes, sir, it is.

10         Q.  And are you relying at all on the materials

11     you used in that presentation for your opinions in

12     this case?

13         A.  No.

14         Q.  You mentioned there might be some new

15     publications or presentations?

16         A.  The publication is there, so -- and then --

17     oh, then on the very last page, there are two

18     bullets.  One is attending the NAPARS -- that same

19     NAPARS symposium I attended other lectures -- or

20     other presentations that other people made.

21             And then also I attended an SAE class a few

22     weeks ago about applying EDR data to traffic crash

23     reconstruction, Rick Ruth's class.  Anybody in the

24     industry knows that class.

25         Q.  Are you relying on either of those

Wesley Grimes                                            May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 12

1    attendances for either of your --

2         A.  Rick Ruth's class, the SAE class deals

3    specifically with the kind of data that was extracted

4    from the Ford.  There was nothing new that I would

5    say applies specifically to this case because this

6    EDR is older.  I rely on the information of that

7    class, but I've had that class several times, so...

8         Q.  Okay, understood.

9             And when was this CV in Plaintiff's

10   Exhibit 90 last updated?

11        A.  On the bottom, you see the date, bottom

12   left:  April 26th.

13        Q.  26th.  And does this CV include all your

14   professional activities and experience that are

15   relevant to your testimony in this case?

16        A.  I think so.  I try to keep it updated.

17        Q.  You currently work at Mecanica Scientific

18   Services, right?

19        A.  Yes, sir.

20        Q.  What is Mecanica?

21        A.  A company that is primarily based out of

22   California that does accident reconstruction, heavy

23   truck download, download analysis, HVEDR -- heavy

24   vehicle event data recorders.

25             We do some testing.  We do analysis for

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 13

1    different types of things of -- a lot of heavy truck
2    crash analysis and data retrieval and analysis and
3    accident reconstruction.
4        Q.  And you mentioned the phrase "heavy truck."
5             How do you define a heavy truck crash?
6        A.  Well, a crash involving a heavy truck.
7        Q.  What --
8        A.  Like a tractor-trailer, a tractor
9    semitrailer, commercial heavy truck:  A Freightliner,
10   a Peterbilt.
11       Q.  So you're talking about something like an
12   18-wheeler where the primary purpose of it is to
13   transport commercial property --
14       A.  Yes, sir.
15       Q.  -- as opposed to this case, an F-250, the
16   primary purpose is to transport people, right --
17       A.  That's a fair breakdown.  Yes, sir.
18            THE REPORTER:  If I can remind you-all
19       to speak one at a time.  Thank you.
20            (Discussion ensued off the record.)
21   BY MR. MASHMAN:
22       Q.  What is your current title at Mecanica
23   Scientific Services?
24       A.  I think I'm listed as Director of Forensic
25   Services.

Page 14

1        Q.   What does it mean to say that you're the

2   "Director of Forensic Services"?

3        A.   Not a lot, really.  It means that I have a

4   role in the forensic side of the business where

5   there's testing or there's data analysis or accident

6   reconstruction, inspections, documentation of crashes

7   for the forensic side of things.

8        Q.   What are your responsibilities as Director

9   of Forensic Services?

10       A.   To do accident reconstruction and to do

11  testing and analysis of testing, downloads, analysis

12  of downloads and so assist others as they need it.

13       Q.   Are those -- those roles that you mentioned

14  accident reconstruction, downloads, testing is that

15  primarily done with respect to litigation or outside

16  the context of litigation?

17       A.   Most of it is either in litigation or in

18  anticipation of litigation.  There's a lot of

19  casework that I do that there -- what we call fast

20  response where I'm there within hours.

21            And there's not a side yet, so there's no

22  litigation.  But it is anticipated -- in anticipation

23  of litigation.  Sometimes the litigation comes;

24  sometimes it doesn't.

25       Q.   And when you say it's in anticipation of

Page 15

1    litigation, who typically is calling you to let you

2    know to go to this site and perform a preliminary

3    reconstruction?

4         A.   Typically trucking companies or insurance

5    companies looking to get things documented, attorneys

6    working for those -- those entities looking to get

7    things documented before evidence dissipates.

8         Q.   And so a trucking company or insurance

9    company would say, Hey, there's been a crash, we need

10   you to come out to the site, perform a preliminary

11   analysis of it because we anticipate this might

12   become a litigation issue later?

13        A.   Yeah.  And, you know, in reality it's more

14   the attorneys that are calling me.  I think 30 years

15   ago sometimes it would be the trucking company or --

16   or even a -- a police agency that maybe knew I had

17   some specialized equipment or something like that.

18             You know, but nowadays, the last 10, 15

19   years it's really more attorneys or attorney offices

20   making that phone call.

21        Q.   And about what percentage of your time do

22   you spend working on matters either in litigation or

23   in anticipation of litigation?

24        A.   I don't know.  It's not something I keep

25   track of.  The majority of it.

Wesley Grimes                                May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 16

1          Q.   Would you say it's a substantial majority?
2          A.   What do you mean by "substantial"?  It's the
3    majority.  There's no question it's the majority.
4          Q.   Where is Mecanica's headquarters?
5          A.   Their main office is in Oxnard, California,
6    and then we're the Arizona office there in Mesa.
7          Q.   Does Mecanica have its own building?
8          A.   They -- yeah, I mean they have a building.
9    I don't know if they own it or lease it or rent it.
10   I don't know in California and then the same thing in
11   Arizona.  They -- I mean it is -- they are the only
12   ones in the building.
13         Q.   Okay.  How many offices does Mecanica have?
14         A.   They have some type of facility in Mexico --
15   I've never been to it -- where they do -- they do
16   some work with Mexican government and things.  I'm
17   not involved in that at this point.
18              They have an office in San Diego and in
19   Oxnard and -- it's not in Sacramento.  I think it's
20   in Fresno.  And then I don't think it's in Portland,
21   but it's in one of the suburbs of Portland and Mesa,
22   Arizona.
23              And then they have someone that works
24   remotely.  I don't know if they would consider it an
25   office.  I think they are around Boise.  I don't know

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 17

1    if they would consider that an office.  I don't think

2    they would.  I don't know for sure.

3         Q.  So not counting the person that works

4    remotely, is that six offices?

5         A.  Yeah, if that's number.  I wasn't counting.

6    I was listing them.

7         Q.  It was my attempt to take down -- does that

8    sound about right to you?

9         A.  It does.  Yes, sir.

10        Q.  How many employees does Mecanica have?

11        A.  I don't know.  Thirty?  Thirty-five?  Forty?

12        Q.  Of those, how many testify in court as

13   expert witnesses?

14        A.  I don't know about the other offices.  In

15   Arizona, five -- five -- five of us, I guess.  And in

16   California and the other parts, I know most of the

17   employees out there, so I'm going to -- I'm going to

18   guess somewhere between five and 10.  But, again, I

19   don't -- I don't know really know.  I don't keep

20   track of that.

21        Q.  Do you have an ownership interest in --

22        A.  No.

23        Q.  -- Mecanica?

24            How are you compensated?  Is it just a

25   straight salary or are there bonuses?

Page 18

1          A.   It's a salary.

2          Q.   So you don't get bonuses at the end of the

3     year?

4          A.   No.  I think there's like a bonus program or

5     something, but I -- I don't -- I have never seen one.

6          Q.   What is Mecanica's revenue per year?

7          A.   I don't know.

8          Q.   What is Mecanica's net profit per year?

9          A.   I don't know.

10          MR. HILL:  I'm not waiving any

11          objections the company might want to make to

12          those questions.  He answered it.

13     BY MR. MASHMAN:

14          Q.   Has Mecanica to your knowledge been retained

15     by any auto makers since you've worked there?

16          A.   I don't know.  I hear people talking about

17     cases with different manufacturers and things, but

18     there's nothing I'm involved with that's with a

19     manufacturer.

20          Q.   Other than this case, has Mecanica done any

21     work for automotive component manufacturers that you

22     know of?

23          A.   I'm sure they have.

24          Oh, you know what?  Let me correct

25     something.  I know that two of the guys in the

Wesley Grimes                               May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 19

1    Arizona office do work for U-Haul and I think they

2    could be considered -- I know they get incomplete

3    vehicles and then add their equipment.  So if you're

4    counting U-Haul as a manufacturer, then they are

5    involved in those cases.

6            Component manufacturers and stuff, I'm sure

7    that they are.  I -- it's not something that I'm

8    involved in.

9        Q.  Aside from this case, has Mecanica done any

10   work for lift kit manufacturers since you've worked

11   there?

12       A.  Not that I know of.  This is the only case

13   I'm aware of.

14       Q.  Before joining Mecanica, you worked at

15   Collision Engineering Associates, right?

16       A.  Yes, sir.

17       Q.  What was your title there?

18       A.  I was the Owner/President of the

19   corporation.

20       Q.  What percentage of ownership did you have in

21   Collision Engineering Associates?

22       A.  My wife and I owned the company.

23       Q.  And did -- I'm sorry.

24            Is your wife Ann Grimes?

25       A.  She is.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 20

1        Q.  And did you and Mrs. Grimes share in

2    Collision Engineering Associates' profits?

3        A.  I guess I'm not sure what you're asking.  I

4    mean, we owned the company and we received a salary.

5        Q.  As the owners, would you be compensated more

6    if the company does better, less if the company does

7    worse?

8        A.  I suppose so.  I mean, we -- we missed

9    paychecks if -- if money didn't come in and we got

10   paychecks if money came in so -- it's a small

11   business.

12       Q.  How many -- that was going to be my next

13   question.  How many employees did you have?

14       A.  There -- when we merged in with Mecanica

15   there were four employees.

16       Q.  And that merger in with Mecanica happened in

17   February of 2022, right?

18       A.  That's correct.

19       Q.  And why did you merge in with Mecanica?

20       A.  Several reasons.  One is I wanted to

21   facilitate a way out of the business.  I've been

22   doing it a long time.  And it was clear to me that I

23   would have trouble slowing down if I didn't have more

24   of a support group and Mecanica offered that.

25            I also saw that they had some capabilities

Wesley Grimes                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 21

1    that I would like to have access to.  And I thought
2    that we brought in capabilities for them.  And so it
3    was a good fit.
4          I had known the two owners John Grindey and
5    John Steiner for a long, long time and I thought we
6    would work well together.
7          You know, part of it also was I had a really
8    dear friend that was in the business that passed away
9    from Covid and this was all right at the tail end of
10   Covid.  And I'm like, you know, I'm not immune here
11   and I need to -- I need to have more security for the
12   employees of Collision Engineering.  And I wanted to
13   make sure that they were -- that they had security if
14   something happened to me.
15   Q.  And when you refer to wanting a way to
16   facilitate slowing down, are you referring to as
17   going towards retirement or going towards some
18   other -- like -- scratch -- strike all of that.
19         What do you mean when you say you wanted to
20   slow down and that that was part of the motivation?
21   A.  You know, a lot of it is trying to move
22   towards retirement and not work the hours that I
23   worked, not travel as much as I traveled and, you
24   know, be able to focus more on some of the research
25   that I enjoy doing, having the time to do those types

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 22

1    of things.

2         Q.  And when you were at Collision Engineering

3    Associates, did you work as a testifying expert

4    witness?

5         A.  Yes.

6         Q.  And do you agree that most of your work at

7    Collision Engineering Associates was also for

8    litigation or in anticipation of litigation?

9         A.  The majority of it was.  Yes.

10        Q.  And you were at Collision Engineering

11   Associates from 1994 until 2022, right?

12        A.  Yes.

13             What is that?  Twenty-eight years?  Yeah.

14        Q.  Were you an owner that entire time?

15        A.  Yes.

16        Q.  Before Collision Engineering Associates you

17   worked at Cromack Engineering Associates; is that

18   right?

19        A.  Yes.

20        Q.  What type of work did you do there?

21        A.  Same type of work.  He was, again, a small

22   company that dealt with accident reconstruction.  I

23   did more heavy trucks than anyone else there.  Bob

24   did a lot of product work for different automotive

25   manufacturers.  And then he was moving towards

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 23

1      retirement and so I left.

2           Q.  When you say automotive work for component

3      manufacturers, that refers to working as a testifying

4      expert in a company that's -- for a company that's

5      defending itself in a product lawsuit?

6           A.  Well, he would be working for the attorneys

7      just as we are now for -- yeah, for different vehicle

8      manufacturers.

9           Q.  And it looks like there are two periods of

10     time where you worked at Cromack Engineering

11     Associates.

12          Can you walk me through when you were there

13     and --

14          A.  Sure.

15          Q.  -- the break?

16          A.  Sure.  After high school, I went to Brigham

17     Young University on football scholarship and after a

18     year decided football was not the way to pay for my

19     education because I wanted to still be able to walk.

20          And so I went to work for Bob.  I was one of

21     or the first full-time employee he had.  He had

22     started his company -- he had been at what at the

23     time was Dynamic Sciences as the testing director.

24     And he had left there and had a government contract

25     to look at airbags and other passive restraints.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 24

1            And so I came in and helped with that and we

2        did a lot of research for some arm of Congress.  I --

3        what we -- what we did was look at a lot of research

4        testing done on passive restraints systems.  This

5        would have been in '79-'80 time period.

6            And after a year or so, I -- my family -- I

7        was raised in a little airport in New Mexico.  My

8        father was the airport manager in an FBO, a

9        fixed-based operation, so did air charter, rented

10       aircraft, car rentals, stuff like that, a little tiny

11       airport in New Mexico.

12           So after a year my father asked me if I

13       would come back and help with the family business.

14       So I left Cromack and went back and helped with

15       family business.  It was going -- it was pretty clear

16       that my father and I were going to end up killing

17       each other if we continued to work together.  So I

18       then went back to Arizona, went back into school and

19       went back to work for Bob Cromack.

20           Q.  So that second stint starting in July 1981

21       lasted until 1993.  That's about 13 years --

22           A.  Yes, sir.

23           Q.  -- at Cromack?

24           A.  Yes, sir.

25           Q.  And that was also primarily for litigation

Wesley Grimes                                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 25

1   matters or in anticipation of litigation matters; is

2   that fair?

3       A.  Certainly towards the end it was.

4   Initially, my role was a lot of the research on the

5   passive restraints systems.  But the last 10-plus

6   years it was primarily crash reconstruction,

7   documentation, things like that.

8       Q.  And your CV lists several memberships,

9   presentations and publications.  We talked about some

10  of those earlier.

11      Are you relying on any of these in

12  particular for your expert opinion in this case?

13      A.  Not specific presentations.  One of the

14  things listed there is I have taught different

15  courses on HVE, which is a computer software.  You're

16  probably familiar with it.  It's HVE stands for human

17  vehicle environment.

18      I started out teaching basic classes for

19  that and have ended up teaching the advanced classes

20  with others, but I teach advanced classes in using

21  that software.  There's not any specific class or

22  presentation that I'm relying on, but the fact that I

23  teach those classes, I'm pretty familiar with the

24  software.

25      Q.  So you're teaching role related to HVE

Wesley Grimes                                      May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 26

1    informs your knowledge base about it, but you're not

2    going to rely on any particular course you taught or

3    presentation you gave as the basis for your opinions

4    in this case?

5             A.  I think that's fair.  Yeah.

6             MR. MASHMAN:  All right.  I'm going to

7        hand you Plaintiff's Exhibit 51, which is

8        the testimony list.

9             (Plaintiff's Exhibit 51 was marked for

10       identification.)

11            (Discussion ensued off the record.)

12   BY MR. MASHMAN:

13            Q.  And is this testimony list up to date?

14            A.  I believe it is.

15            Q.  Does this list include all the times you've

16   testified in a deposition or trial in the last

17   four years?

18            A.  Yes.  I think it actually goes past four

19   years.  I'm not good at taking them off the list, so

20   yeah -- but, yeah.

21            Again, I have -- I have tried to maintain

22   this list and I think it's accurate.

23            Q.  That was going to be my next question.

24            The list goes back from -- the first date I

25   see on there is January 2012 through the present

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 27

1    time.

2         A.  Yeah.

3         Q.  Does this appear to capture all the times

4    that you've testified at trial or in a deposition in

5    the last 12 years?

6         A.  I think it does.  I'm not aware of any that

7    are not on here.

8         Q.  Does this list cover all the times that

9    you've provided deposition or trial testimony in your

10   career?

11        A.  No.

12        Q.  What testimony -- strike that.

13             Is the only testimony that's not included on

14   this list, times that you testified prior to January

15   of 2012?

16        A.  That's my goal.  Yes.

17             I'm not -- all of them that I'm aware of are

18   before the 2012 date.  You know, there's none that

19   are missing off of this list as far as I know.

20        Q.  Do you maintain this list as part of your

21   role as a testifying expert?

22        A.  I do.  Yes.

23        Q.  This list doesn't include times that you've

24   been retained to assess a case where deposition or

25   trial testimony wasn't given; is that fair?

Wesley Grimes                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 28

1        A.   That's correct.

2        Q.   Do you know how many times you've been

3    disclosed as an expert witness?

4        A.   No.

5        Q.   And what percentage of your cases result in

6    testimony?

7        A.   Not many.  I don't know of some percentage.

8    I testify, you know, a few times a year.  And I do --

9    I don't know.  It depends -- 35, 40, 45, 50 cases a

10   year, generally.

11            A lot of them are fast response, as I

12   explained earlier, where there's not a side and it

13   just never develops into a case.  That's a lot of my

14   work.  So I don't testify very often.

15       Q.   In what percentage of cases are you retained

16   by attorneys representing defendants?

17       A.   I don't know.

18       Q.   Would you say it's the majority of the time?

19       A.   It is.  Yeah, it is.

20       Q.   And of the times you've testified in the

21   last 12 years, it appears that your client

22   represented the defendants in all but three of those

23   cases; is that right?

24       A.   That is correct.

25       Q.   What was Bartley versus Blackwell about?

Page 29

 1        A.   Is that the one here in Georgia?  Yeah.

 2             That is a case where there's a -- there's a

 3    box truck towing a large compressor like a

 4    construction site compressor on a -- on a trailer and

 5    that -- the trailer didn't have brakes.

 6             And so someone else did the reconstruction.

 7    I came in and did HVE case work where we analyzed the

 8    effect of that trailer if it had brakes whenever the

 9    driver lost control.

10             He loses control because he's got a tire

11    disablement and he loses control.  So I ran HVE and

12    created simulations to duplicate the event as closely

13    as we could following the evidence and then made the

14    change to add brakes to the trailer and see how that

15    affected things.

16             And then later it -- it -- they -- they

17    looked at what the ton load was.  And so I made

18    additional runs there to move the CG so that the ton

19    load was more appropriate and then ended up creating

20    those simulations and then testifying in trial.

21        Q.   Did the attorney in Bartley represent an

22    individual plaintiff bringing a personal injury suit?

23        A.   Well, the family that the gentleman was

24    killed.

25        Q.   And was that -- who was that suit against?

Wesley Grimes                                           May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 30

1          A.   I don't know all the parties.  I think that

2     a tire manufacturer was involved.  At least when I

3     first got in the case I know people settled out of

4     things so I don't know everybody, but I think a tire

5     manufacturer was involved.

6               I think the company with the box truck was

7     involved.  The company that manufactured the trailer

8     that had the compressor on it was involved.  And the

9     driver of the box truck may have been.  I don't -- I

10    don't know.

11         Q.   What was the alleged defect in the Stewart

12    versus Ford Motor Company?

13         A.   My recollection is that they were looking at

14    restraint systems on that.  I did the reconstruction

15    and then they had somebody else look at the restrain

16    system.

17              A young lady was -- the vehicle went through

18    several collisions and ended up outside the vehicle

19    and was -- received fatal injuries.  So I did the

20    reconstruction and then they had someone else look at

21    how the occupant would move and looking at restraint

22    systems.

23         Q.   And what was the basic nature of Carlos

24    Rodriguez versus ProPetro Services?

25         A.   I don't remember.

Wesley Grimes                                              May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 31

1          Q.   That case was back in 2012, right?

2          A.   Yeah, Utah.  It would have been some type of

3     crash analysis.  I don't remember.

4          Q.   Did any of the cases on this list involve

5     allegations related to a lift kit?

6          A.   No, not that I recall.

7          Q.   Have you ever testified that a safety defect

8     caused or contributed to the severity of a collision?

9               MR. HILL:  Object to form but go ahead.

10              THE WITNESS:  Not that I recall.

11    BY MR. MASHMAN:

12         Q.   Have you ever testified that an auto product

13    was defective?

14         A.   Not that I recall.

15         Q.   Have you ever been retained by the lawyers

16    representing Rough Country in this case which would

17    be Rick Hill and Lindsay Ferguson?

18         A.   I don't think so.

19         Q.   How many cases have you worked on for the

20    law firm representing Rough Country, Weinberg

21    Wheeler?

22         A.   I think this is the only one.

23         Q.   Have you ever -- I think my earlier question

24    was only about testimony.

25              Have you ever been retained in a case

Page 32

```
 1    involving allegations related to a lift kit?

 2        A.  Not that I recall.  There may have been

 3    cases where a vehicle had a lift kit, but it wasn't

 4    part of anything I looked at.

 5        Q.  How many times have you been retained by an

 6    attorney representing a vehicle manufacturer or

 7    component manufacturer being sued for an alleged

 8    defect?

 9        A.  This case and then there was one -- I'm

10    sorry.

11             THE WITNESS:  I'm sorry.  I gave you --

12             (Reporter retrieves exhibit for

13        witness.)

14             THE WITNESS:  You're right.  You're

15        right.  He put his list away, so I

16        thought...

17             (Discussion ensued off the record.)

18             THE WITNESS:  I think it was the

19        Cannaday versus Ford out of South Carolina.

20        I did the reconstruction and we did some

21        testing.  It was a wheel manufacturer -- the

22        attorneys for a wheel manufacturer retained

23        me, again, to do simulations and we ended up

24        doing some testing.

25             And other than that, I can't think of
```

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 33

```
 1          any others.
 2              (Plaintiff's Exhibit 53 was marked for
 3          identification.)
 4     BY MR. MASHMAN:
 5          Q.  I'm going to hand you Plaintiff's Exhibit
 6     53.
 7          A.  I'm done with 51?
 8          Q.  Yes.  I might even just put it down here.
 9     We're not going to open it.
10              But this is an electronic version of your
11     file, which has been produced to us by the lawyers.
12              Is the file that you produced to Mr. Hill
13     the same as the paper materials that you have in
14     front of you today?
15          A.  No.
16          Q.  Is the only thing missing the items that
17     wouldn't be able to be printed such FARO scans, 3D
18     scans, alignment, that kind of thing?
19          A.  Right.  And then like my raw photos.  I'm --
20     I'm a photo geek and so I shoot what they call raw
21     images.  My images are 50 megabytes or 60 megabytes
22     each.  So I produced the PDF of those.  I didn't
23     produce the raw images.
24              So those would not be there.  The point
25     clouds, obviously, we can't print those out.
```

Wesley Grimes                                      May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 34

1        There's some Rhino, which is a CAD software.
2   It's similar to like AutoCAD.  It's called Rhino 3D
3   or Rhinoceros 3D or something like that.  There's a
4   file there that, again, you can't print that out.
5        Q.  I want to make sure I understand.
6            So the raw photos, the Rhino, the AutoCAD,
7   all of that is on your electronic file but not in the
8   binders in front of you; is that fair?
9        A.  That's correct.  And the movies, right, the
10  movies, I think.
11           You know, I didn't produce the movies
12  because I knew you guys had the movies, the crash
13  test movies.
14       Q.  Those aren't in either.  Those aren't in the
15  electronic file or --
16       A.  That is correct.  I actually tried to keep
17  the electronic file small, but I know it's huge.
18       Q.  Aside from the raw photos -- scratch that.
19           Aside from the raw photos, the Rhino the CAD
20  and the video from the crash test, are there any
21  materials that were excluded from either your
22  electronic file or your paper file in front of you?
23       A.  Yes.
24       Q.  What materials were those?
25       A.  I have a folder that's marked with

Wesley Grimes                                      May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 35

1      protective order that I -- I think I signed it or
2      John Grindey signed that we wouldn't disclose it, so
3      I didn't produce any of that.
4          Q.  What's in that folder?
5          A.  You know, I think it's mainly drawings and
6      things like that, that I, quite frankly, didn't rely
7      on.  I opened it when we got it and looked through
8      it, but there was nothing that -- that I needed.  But
9      it's marked as a protected --
10         Q.  You said --
11         A.  -- set of documents.
12         Q.  I apologize.  I didn't mean to interrupt
13     you.
14              You said it's mainly drawings.  Is there
15     anything in it other than drawings?
16         A.  There's PDFs.  I know there were some
17     interrogatories and things like that.  There's a lot
18     of just -- I think there's some legal proceedings --
19     legal pleadings and interrogatories.  I don't know
20     the -- the proper words for them, but they were all
21     issued to me under a protective order, so I didn't
22     produce them.  And, again, I haven't relied on them
23     at all.
24         Q.  Are any of those materials in the folder
25     marked "protective order" not listed in the materials

1    relied on list that you put in your report?

2        A.  I think I heard like two noes or nots.

3            Can you ask it again?

4        Q.  Do you have your report in front of you?

5        A.  I do.

6        Q.  Do you see the "items obtained and reviewed"

7    list starting on page 1?

8        A.  Yes, sir.

9        Q.  Are any of the materials in the folder

10   marked "protective order" that was not a part of your

11   introduced file not included on this items obtained

12   and reviewed list?

13       A.  None of the items under the protective

14   folder are listed here.

15       Q.  None of the items in the protective folder

16   are listed in your report?

17       A.  That's -- that's -- I think that's correct.

18       Q.  I'm going to create a blank place holder

19   exhibit.  I'm going to label it Plaintiff's

20   Exhibit 92 and title it -- did you say the name of

21   the folder is "protective order"?

22       A.  I don't know -- I don't recall the exact

23   name of it.  But it's clear that it's protected

24   material or protective order materials or materials

25   under protective order or something.  They are

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 37

1    separated out and -- so I didn't -- didn't use them

2    at all and didn't produce them.

3              (Plaintiff's Exhibit 92 was marked for

4         identification.)

5              MR. MASHMAN:  Okay.  I'm going to hand

6         you a blank exhibit.  It just says

7         "protective order."  That would be just a

8         place holder for that folder.

9    BY MR. MASHMAN:

10        Q.  And we're not going to -- scratch that.

11             Would you agree to provide Mr. Hill with a

12   list of the documents in that folder, so he can

13   produce it to the plaintiff?

14        A.  Well, I did the protective order for him, so

15   if he -- I'll do whatever he directs me to do.

16             MS. CANNELLA:  Do you guys agree to

17        that --

18             MR. HILL:  I don't mind providing you a

19        list.  It's obviously the discovery and

20        other things covered by the protective

21        order.

22             THE WITNESS:  Yeah.  I don't know

23        exactly what's in it.  It was protected.  I

24        looked at it.  I didn't need it.  I haven't

25        touched it since, so...

Page 38

1    BY MR. MASHMAN:

2         Q.  Did you rely on anything in that folder to

3    form your opinions?

4         A.  No.  I did not rely upon anything in that

5    folder.

6         Q.  Aside from that one folder, did you bring --

7    strike that.

8              Aside from that one folder, did you provide

9    your complete file for production?

10        A.  I think I have.  Yes.

11             MR. HILL:  And the other items mentioned

12        earlier.

13             Is that what you -- is your question

14        meant to encompass and include the other

15        items mentioned earlier that he did not

16        bring or produce?

17   BY MR. MASHMAN:

18        Q.  Well, the other items would be on

19   your electronic file, correct?

20        A.  Except the raw photos were not and the crash

21   test video was not, those things that we talked about

22   just a few minutes ago.

23        Q.  So aside from the raw photos and the crash

24   test video and the protected folder, was everything

25   in your electronic file?

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 39

```
 1        A.  I think so.  Yes.
 2            MR. MASHMAN:  I'm handing you
 3        Plaintiff's Exhibit 52, which is a copy of
 4        your Notice of Deposition.
 5            (Plaintiff's Exhibit 52 was marked for
 6        identification.)
 7    BY MR. MASHMAN:
 8        Q.  Have you seen this?
 9        A.  I did.  Yes.
10        Q.  And your file didn't include any
11    communications.
12            Have you had any communications with anyone
13    about this case in a written format?
14        A.  Yes.  I had my office -- I typically don't
15    save E-mails but then Mr. Hill asked me to go back
16    and see.  So I had my office go back and pull E-mails
17    of where materials were transmitted to me.  And
18    that's that list that my office...
19        Q.  And is this -- what you just handed me, is
20    this only a list of E-mails where materials were sent
21    to you?
22        A.  Yes.
23            MR. HILL:  Object to the form.  It's not
24        a list.
25            THE WITNESS:  Yes.
```

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 40

1    BY MR. MASHMAN:

2          Q.   And under Schedule A of documents on page 4

3    of your deposition Notice, item 3 asked for a copy of

4    all communications with anyone other than the

5    attorneys in this case whether written, electronic or

6    otherwise sent, received or viewed by you, which

7    communications related in any way to the facts of

8    this case.

9          Am I right that your search for

10   communications was limited to transmittals sending

11   you documents from the attorneys?

12          MR. HILL:  Object to the form.

13          THE WITNESS:  Yes.  That's what I asked

14   my office to do, yes.

15   BY MR. MASHMAN:

16         Q.   Did you ask your office to search for

17   internal communications between you and other people

18   at Mecanica discussing the case?

19         A.   No because there aren't any.

20         Q.   Did you ask your office to search for any

21   communications between you and other experts related

22   to the case?

23         A.   No.  There aren't any.

24         Q.   How do you communicate internally with

25   members of Mecanica?

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 41

1        A.   Phone calls or Zoom calls.

2        Q.   Do you ever use a messaging service to

3    coordinate travel, talk about the case, anything like

4    that?

5        A.   Generally, it's a phone call.

6        Q.   And then item 4 -- do you still have the

7    Notice in front of you?

8        A.   I do.

9        Q.   On page 4 --

10       A.   Mm-hmm.

11       Q.   -- item 4 lists a copy of communications

12   with lawyers in this case to the extent that they --

13   I'll paraphrase -- relate to compensation, identify

14   facts or data or identify assumptions.

15            Did you ask your office to find all

16   categories of the documents in item 4?

17       A.   No.  There aren't any where I've been asked

18   to make assumptions or anything like that.

19       Q.   But you haven't asked your office to look --

20            (Overlapping speakers.)

21            THE WITNESS:  I have not, no.

22            THE REPORTER:  I'm sorry.  What was your

23       answer?

24            THE WITNESS:  I have not.

25            THE REPORTER:  Thank you.

Wesley Grimes                                     May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 42

1    BY MR. MASHMAN:

2         Q.  Are you relying on anything for your

3    opinions in this case that are not a part of your

4    file?

5              MR. HILL:  Object to form.  Go ahead.

6              THE WITNESS:  No, nothing comes to mind.

7              Are we done with this?

8              MR. MASHMAN:  For now, yes.

9              I don't think we have yet, so I'm going

10             to mark -- I'm going to mark the

11             communications that you handed me as

12             Plaintiff's Exhibit 93.

13             (Plaintiff's Exhibit 93 was marked for

14             identification.)

15             MR. MASHMAN:  And I'm going to keep

16             this, so I can look through it on a break.

17             I'm handing you Plaintiff's Exhibit 55,

18             which is a letter that was a part of your

19             file to Ms. Ferguson.

20             (Plaintiff's Exhibit 55 was marked for

21             identification.)

22    BY MR. MASHMAN:

23        Q.  You sent this to Rough Country's lawyers on

24    November 7 of 2022, correct?

25        A.  Yes, sir.

Wesley Grimes                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 43

1       Q.  And this was a letter from you acknowledging

2    that you were opening the matter related to this

3    lawsuit, correct?

4       A.  Yes, sir.

5       Q.  Had you heard -- strike that.

6           Had you worked on the case prior to opening

7    the matter?

8       A.  Well, the fact that this is a Monday makes

9    me wonder if maybe I had a phone call on Friday or

10   something.  I -- or Thursday, and this was whenever

11   Tara got back in the office to open it.

12          So I guess it's possible.  I don't recall

13   doing anything.

14      Q.  If you had a phone call the previous week,

15   would that be reflected in the invoices?

16      A.  It might not because if it's a new case

17   that's coming up, I frequently don't bill for that.

18   You know, it's a conversation.  Sometimes I do,

19   sometimes I don't.  Usually, I don't.

20      Q.  Would that initial conversation -- you're

21   not saying that conversation did happen.  You're

22   saying you don't remember, right?

23      A.  That's correct.

24      Q.  Would that initial conversation typically

25   just be for something like a conflict check to make

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 44

```
 1      sure you'd be able to participate in the case?
 2           A.  Not only a conflict check, but what is it
 3      that you are looking for me to do?  Am I -- am I
 4      qualified to do it?
 5              We frequently get phone calls where they
 6      want something that I'm not comfortable doing and so,
 7      you know, there's a lot of that as part of the
 8      conversation.
 9              (Plaintiff's Exhibit 56 was marked for
10          identification.)
11      BY MR. MASHMAN:
12           Q.  I'm handing you Plaintiff's Exhibit 56,
13      which is the invoices you included as a part of your
14      file.
15              And looking at that first entry on
16      November 7th, 2022, it says you did a teleconference
17      with client to discuss the case on November 7th.
18              Does that refresh your memory that that was
19      that initial call?
20           A.  Yeah.  That would have been either that week
21      or that day, yeah.
22           Q.  And prior to that initial call, would you
23      have heard of the case or worked on it at all?
24           A.  No.
25           Q.  At the bottom of page 1 of the invoices, it
```

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 45

1       indicates that Tara Lee from Mecanica ran a conflict

2       check and opened new matter on that same day on

3       November 7, right?

4              A.   That is correct.

5              Q.   There are several names in these invoices.

6                   How many people worked on this case with

7       you?

8              A.   I don't know as I sit here.  Probably five

9       or six, maybe -- maybe eight.  I -- you know...

10             Q.   Who is Ann Grimes?

11             A.   She's my wife.  She's got a masters degree

12      in engineering.  She does accident reconstruction.

13             Q.   What was her role in this case?

14             A.   She assisted with some of the inspections.

15      She did some scans of vehicles.  I think she looked

16      at some of the data as well.  She assisted in the

17      reconstruction, the analysis, the set-up, the

18      discussions about the crash test and so on.

19             Q.   Who is Christopher Romo?

20             A.   He is out of the San Diego office and he's

21      another engineer involved.

22             Q.   What was his role?

23             A.   He looked at some of the police information,

24      I think, and some of the interrogatories.

25             Q.   Who's John Grindey?

Page 46

1        A.   John Grindey is one of the owners of the

2    company.

3        Q.   Is Mr. Grindey an engineer?

4        A.   He is not.

5        Q.   What was Mr. Grindey's role in this case?

6        A.   He -- I don't know exactly.  I know that he

7    looked at the confidentiality agreements and signed

8    those.  He may have looked at some of the data and

9    had been part of a conversation about the case, but I

10   don't think he had an active role in the analysis.

11       Q.   We mentioned Tara Lee a moment ago.

12            What was her role in this case?

13       A.   She's an administrator in the Mesa office.

14       Q.   Is she -- sorry, scratch that.

15            She billed for her work on this case,

16   correct?

17       A.   Probably most of it.  Maybe not all of it.

18   I don't know.

19       Q.   Who is Josh Cota?

20       A.   Josh Cota is a gentleman out of the

21   California office.

22       Q.   What was Josh Cota's role?

23       A.   I think he did some of the scan

24   registrations.  He may have done drone registration,

25   too.  I think he did scan registrations.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 47

1      Q.   What is a scan or drone registration?

2      A.   Scan file is essentially a point cloud of

3   measurements made by a three-dimensional scanner.

4           Whenever you scan an object like a vehicle,

5   you have to move the scanner around because it can

6   only scan what it can see.  Once you have a series of

7   scans, you have to register them together to make the

8   final point cloud.

9      Q.   Who is Cheryl Shoemake?

10     A.   She's one of the admin people out of the

11  California office.

12     Q.   Who is Kathy Curry?

13     A.   She's no longer with the company, but she

14  was part of the admin team in California.

15     Q.   And Kathy Curry and Sheryl Shoemake both

16  billed to this matter, correct?

17     A.   I don't know.

18     Q.   Does would it surprise you --

19     A.   It wouldn't --

20     Q.   I apologize.

21     A.   No, no, my fault.

22          It wouldn't surprise me if they did.  I

23  just -- I don't know specifically that they did.

24     Q.   If they were listed in here, that would mean

25  that they billed to the matter, right?

Wesley Grimes                              May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 48

1        A.   That's correct.

2        Q.   Who is Jamey Cobb?

3        A.   He -- he's also no longer with the company.

4    He was part of the media group out in California.  If

5    Josh Cota did the registrations, he would have done

6    it under Jamey Cobb's direction.  Jamey Cobb directed

7    that part of the company.

8        Q.   Who is David Daren?

9        A.   David Daren is another engineer out of the

10   California office.

11       Q.   What was David Daren's role?

12       A.   He would look at the analysis and have

13   discussions with me especially -- well, initially,

14   looking at different possible ways to analyze this.

15   And then as we got closer and decided to run the

16   crash test, I talked to as many people as I could to

17   just make sure that we got it right.

18       Q.   Who is Mark Leonard?

19       A.   Mark Leonard is an engineer out of the

20   Arizona office.

21       Q.   What was Mark Leonard's role in this case?

22       A.   He was active in the analysis of the crash

23   to begin with.  Very active in setting up -- helping

24   to set up the crash test parameters and then

25   analyzing the crash test data.  And also he looked

Page 49

1    at -- along with myself he looked at a lot of the

2    things that the other experts Mr. Buchner and

3    Mr. Lewis and Mr. Roach had done.

4         Q.   Who is Jon Balasa?

5         A.   He is one of the engineers out of the

6    California office.

7         Q.   What was Mr. Balasa's role?

8         A.   Same type of thing.  He would help with the

9    analysis.  I would have discussions with him about

10   what we were doing, if he saw anything that I was

11   missing.

12        Q.   Who is John Steiner?

13        A.   He's the other owner of the company.

14        Q.   What was Mr. Steiner's role in this case?

15        A.   I think he looked at some of the data

16   initially, the CDR data, as I recall.  He may have --

17   he may have looked at other things, but that's --

18   that's my main recollection.

19        Q.   Is Mr. Steiner an engineer?

20        A.   He is.

21        Q.   Who is Clare Wallace?

22        A.   She is the young lady that is out of the

23   Boise office where she works remotely from Boise.

24        Q.   What was her role in this case?

25        A.   She would have either registered scans or

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 50

1    registered drone images.

2          Q.  Who is Christian Fernandez?

3          A.  He's an engineer, kind of an entry level

4    engineer, out of the oxford office.

5          Q.  What was Christian Fernandez's role in this

6    case?

7          A.  I think he mainly looked at vehicle specs.

8          Q.  For what vehicles?

9          A.  All of them.  I mean, we had several people

10   looking at vehicle specs for the Escape and the 250.

11         Q.  When you say looking at vehicle specs for

12   the Escape and the F-250, does that refer to the

13   subject Escape, subject F-250, test Escape and test

14   F-250?

15         A.  Yeah.  Primarily the subject vehicles, but

16   he could have also looked at some of the specs for

17   the test vehicles.  I think he mainly dealt with the

18   subject vehicles.

19         Q.  Are you aware of Christian Fernandez or

20   anyone else assessing the specs of any other vehicles

21   other than those four that I just mentioned?

22         A.  In this case?

23         Q.  In this case.

24         A.  No.

25         Q.  Who is Dave Gifford?

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 51

1          A.   He is part of the media group.

2          Q.   And what was Dave Gifford's role?

3          A.   I think he did some drawings or -- the

4     overlays where we lined up the vehicles.  He did all

5     of that in CAD, the ones that are in the report.

6          Q.   And did you participate in those drawings

7     and overlays with Mr. Gifford or did he provide them

8     to you and then you relied on those?

9          A.   I worked with him as well, but Mark Leonard

10    also worked with him on getting the data, getting

11    things aligned and then he produced -- he pushes the

12    buttons to produce the images.

13         Q.   Okay.  So you and Mark -- is this a fair

14    summary?  You and Mark Leonard are providing the

15    information about how to align the vehicles and

16    Mr. Gifford is executing that in the program?

17         A.   Yes.

18         Q.   Who is Kristina Lombardi?

19         A.   She is one of the engineers out of the

20    Arizona office.

21         Q.   That was all the names that I saw in your

22    invoices.  Is there anyone else that you can think of

23    that worked on this case from Mecanica?

24         A.   I don't think so.  One of the other young

25    engineers that sometimes does vehicle specs is Henry

Wesley Grimes                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 52

1     Schmoker, but I don't think he -- I -- I haven't gone

2     through this, so I don't know what it is, but he may

3     show up.  I don't think he does, but I don't know.

4          Q.  So not counting Mr. --

5          A.  -- Schmoker, yeah, yeah.  S-C-H -- Schmoker,

6     yeah.

7          Q.  Not counting Mr. Schmoker, I count 16 people

8     from your office billed to this matter.

9              Does that sound about right?

10         A.  If that's the count.

11         Q.  It wouldn't surprise you if you had a team

12    of 16 people working on this case?

13         A.  No.

14         Q.  And of those I count -- well, strike that.

15             I count eight engineers, not including

16    yourself.  Does that surprise you?

17         A.  That's probably right.

18         Q.  It sounds right to you that eight engineers

19    were working on this matter?

20         A.  Well, assisted.  Yeah.

21         Q.  Assisted in this matter?

22         A.  Yeah.

23         Q.  All right.  Do you still have the invoices

24    in front of you?

25         A.  I do.

Wesley Grimes                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                    Page 53

1          Q.  That first invoice entry that we were

2     talking about earlier, it says:  Wes Grimes

3     teleconference with the client to discuss case,

4     review materials, work on obtaining rough estimate

5     for crash testing, discuss with C. Romo.

6               Did I read that correctly?

7          A.  You did.

8          Q.  What did you talk about during that

9     teleconference?

10         A.  The case, what the case involved, the

11    vehicles, things like that is my recollection.

12              I don't have specific memories of that

13    conversation, but that would typically be a first

14    type contact.

15         Q.  So a broad outline of what the case is

16    about, what the allegations are and what vehicles

17    were involved?

18         A.  Yes.

19         Q.  How long was that teleconference?

20         A.  I don't -- I don't know.

21         Q.  The time that you billed for teleconference

22    plus reviewing materials, plus obtaining estimate for

23    crash testing was three hours -- three and-a-half

24    hours?

25         A.  Yes.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 54

1          MR. HILL:  Object to the form.  Go
2      ahead.
3    BY MR. MASHMAN:
4        Q.  Yeah, let me ask that again.
5            In that first entry you billed three
6    and-a-half hours for a teleconference, reviewing
7    materials and obtaining an estimate for crash
8    testing, right?
9          MR. HILL:  Object to form.
10          THE WITNESS:  And also discussion with
11      Chris Romo.
12    BY MR. MASHMAN:
13        Q.  And also discussions with Chris Romo.  Let
14    me try that one more time.
15            In that first billing entry, you billed
16    three and-a-half hours for a teleconference,
17    reviewing materials, obtaining an estimate for crash
18    testing and discussing the case with Mr. Romo, right?
19        A.  Yes.
20        Q.  So is it fair that that teleconference
21    lasted less than three and-a-half hours?
22        A.  I'm sure it did.
23        Q.  Do you have an approximation of what would
24    be typical for that initial teleconference?
25        A.  No.  No case is typical.

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 55

1          Q.  After the teleconference, it says you worked

2     on obtaining a rough estimate for crash testing.

3               Did Rough Country ask you to obtain an

4     estimate for crash testing during that

5     teleconference?

6          A.  No.

7               MR. HILL:  I'm going to object -- hold

8          on.  Communications with lawyers are limited

9          to those that relate to compensation for the

10         expert's study or testimony, the

11         identification of facts or data that the

12         attorneys provided and/or assumptions that

13         is the attorney provided.

14              So to the extent you're asking beyond

15         those types of communications with the

16         lawyers, I would object and instruct the

17         witness not to answer.

18              MR. MASHMAN:  It's reflected in the

19         invoice and it says that he went on to

20         obtain a rough estimate for crash testing as

21         part of the work in this case.  The facts

22         underlying that work are discoverable even

23         if they came from attorneys.

24              MR. HILL:  I would disagree with that,

25         but you heard my objection.

Wesley Grimes                              May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 56

1    BY MR. MASHMAN:

2         Q.  Are you going to follow your attorney's

3    instruction not to answer?

4         A.  He has instructed me not to answer that

5    question.  Yes.

6              MR. HILL:  Not that question.  It was

7         the -- I instructed you not to disclose

8         communications beyond those allowed by

9         Rule 26 as I stated in my objection.

10   BY MR. MASHMAN:

11        Q.  Was it Rough Country's idea to run the crash

12   test?

13             MR. HILL:  Same objection.

14             THE WITNESS:  It was my idea.  And

15        especially at this point, I was looking at

16        all kinds of different options to try to

17        understand what we could do and what could

18        be done.  But it was my idea to start

19        exploring our different options.

20   BY MR. MASHMAN:

21        Q.  And it says you went on to obtain a rough

22   estimate for crash testing.

23             Is that a financial estimate?

24             MR. HILL:  Object to the form, but go

25        ahead.

Page 57

```
 1            THE WITNESS:  It's an -- well, first of
 2        all, is the test facility available?  Rough
 3        idea of what it would cost.  Is it -- you
 4        know, is it feasible, the vehicles, the
 5        scheduling.  You know, there's a lot that
 6        goes into that.
 7    BY MR. MASHMAN:
 8        Q.  So when you billed on November 7th of 2022
 9    for obtaining a rough estimate for crash testing,
10    what facilities did you check for whether they were
11    available?
12            MR. HILL:  Object to the form.  Go
13        ahead.
14            THE WITNESS:  I think I talked to
15        Exponent and it seems like there was someone
16        else, but I don't remember whether I talked
17        to somebody like SEA or somebody like that.
18        I don't remember.
19    BY MR. MASHMAN:
20        Q.  But you remember speaking with Exponent to
21    see if they were available --
22        A.  Yes.
23        Q.  -- on November 7th of 2022?
24        A.  I don't know that it would have been contact
25    with them on that date.  I may have contacted
```

Wesley Grimes                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 58

1    somebody else.  I know I ended up speaking with

2    Exponent as well.  I don't know that it was that

3    date.

4         Q.  And that was part of your work on obtaining

5    a rough estimate for crash testing which you billed

6    for on November 7th.  Is that fair?

7         A.  What was part of it?  Part of it was

8    contacting -- talking to people who could run a crash

9    test, when they might be available and things like

10   that.  That was all part of that.

11        Q.  When you say "part of that," you mean part

12   of obtaining the rough estimate for the crash

13   testing?

14        A.  Yes.

15        Q.  And the other thing that you mentioned was

16   cost.

17             What was the cost estimate that you came

18   with for the crash testing?

19             MR. HILL:  Object to the form.  Go

20        ahead.

21             THE WITNESS:  I don't remember exactly.

22        I -- I think it was somewhere, you know, a

23        hundred to $150,000, but I -- at that point,

24        it was a very rough estimate, you know.

25   BY MR. MASHMAN:

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 59

1        Q.  Was that rough estimate based on Exponent's
2    pricing for running this type of crash test?
3        A.  I don't remember.  I'm sure that they were
4    in that ballpark, but I don't remember.
5        Q.  Not all crash tests cost the same, right?
6    Is that fair?
7        A.  Well, it's my understanding -- I don't run a
8    lot of crash tests, but that's my understanding.
9        Q.  When you were obtaining this rough estimate
10    for crash testing, what configurations or variables
11    were you looking at?
12        A.  You know, at that point I don't remember the
13    details of it, but I know that we were talking about
14    these vehicles, you know, a Ford F-250 and a Ford
15    Escape and a rear impact type scenario.
16            So we're talking about obtaining vehicles
17    and instrumenting vehicles and things like that.
18        Q.  Did your rough estimate include the cost of
19    crash test dummies?
20            MR. HILL:  Object to the form.
21            THE WITNESS:  I don't remember.  It may
22        have.  I don't remember.  Again, it was a
23        very rough estimate of is this even
24        feasible.
25    BY MR. MASHMAN:

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 60

1        Q.  Did your rough estimate assume there would

2    only be one crash test?

3            MR. HILL:  Same objection to form.

4            THE WITNESS:  I know that at one point

5        we talked about maybe running a separate

6        one.  So that number, I don't remember

7        whether it was just one or, hey, if we run

8        one and we immediately run another, do we

9        get a break on the price and things like

10       that?  I just don't remember those details.

11   BY MR. MASHMAN:

12       Q.  You mentioned that you had talked about

13   running a second crash test.

14           What would the second crash tests have been

15   based on those discussions?

16       A.  There wasn't a configuration at that point.

17   Again, same vehicles.

18       Q.  So was the idea to run two crash tests both

19   with the F-250 not lifted?

20           MR. HILL:  Object to the form but go

21       ahead.

22           THE WITNESS:  The idea was I knew there

23       were time constraints with test facilities.

24       And so we hadn't decided what the test

25       configuration was at that point.

Wesley Grimes                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 61

1          But I knew that time always gets away

2      and if you don't schedule testing well in

3      advance, then you're not going to have a

4      test facility available.

5          And so even the remote possibility that

6      we might run a second one, I would have

7      discussed that --

8  BY MR. MASHMAN:

9      Q.  And --

10     A.  -- with whoever it was.

11     Q.  I apologize.  I didn't mean to cut you off.

12         Given those time -- strike that.

13         I understand what you're saying to be that

14  test facilities book up and you wanted to make sure

15  that you would get at slot reserved.

16         Is that a fair summary of what you just

17  said?

18     A.  Well, again, at that point I'm not actually

19  looking for a slot.  I'm looking at the

20  possibilities.  I'm looking for a rough estimate.

21  I'm not looking to schedule anything.  I'm not

22  looking for a price quote.  I'm not looking for

23  anything like that.  I'm looking for rough estimates

24  that, you know, here's generally what we're going to

25  look at.

Page 62

1        Q.  I understand.  So what I was asking about

2    was in answer to one of my questions, you mentioned

3    that there were discussions about running a second

4    crash test.

5             My question for you is:  In those

6    discussions, was the idea to book a facility for two

7    crash tests in case they book up later?

8        A.  That was part of my concern and the

9    discussions that we're having are internally within

10   our office, you know, of here some of the things.  We

11   were looking at all kinds of different options to

12   analyze this other than crash tests.  What are some

13   other things we could do?

14            And the crash test scenario was one of many

15   options that we talked about but, again, rough

16   estimates.

17       Q.  Did you book -- I understand the point about

18   the discussion.

19            Subsequent to the discussion, did you book

20   two slots for crash tests?

21       A.  I didn't, no.

22       Q.  What would the purpose have been for a

23   second crash test?

24       A.  In case something goes wrong with the first

25   crash test.

Wesley Grimes                                           May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 63

1        Q.  Would the two crash tests have been

2     configured the same?

3        A.  We never discussed the -- a second

4     configuration.  We never discussed it.

5            We -- what we -- what I tried to do was set

6     myself up where I had options where I had a second

7     slot in case -- I've attended crash tests where

8     something goes wrong, a vehicle comes lose or a cable

9     breaks or whatever and I didn't then to have to wait

10     for a second slot.

11            And, you know, we -- I knew that we had time

12     constraints on us and so I was trying to give myself

13     as many options as I possibly could.

14        Q.  So the only purpose of discussing two crash

15     tests was in case something went wrong in the first

16     one and you'd have to run a second one with the same

17     configuration?

18            MR. HILL:  Object to the form but go

19        ahead.

20            THE WITNESS:  That's not what I said.

21        That's one possibility.  The other thing is

22        if we run one and we see something, we may

23        want to run another.  Maybe we run one and

24        it's sufficient.  It turns out one was

25        sufficient for everybody involved.  But I

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 64

1        was concerned about running out of time to

2        get things done.

3    BY MR. MASHMAN:

4        Q.  Was there ever a discussion of running two

5    crash tests, one where the F-250 is lifted and one

6    where the F-250 is not lifted?

7        A.  I think we had that conversation within the

8    office and I may have had that conversation with

9    Mr. Hill but, again, just what those possibilities

10   were.

11        We -- I mean, we ended up buying a second

12   set of vehicles.  I ended up buying tires and wheels

13   so that, again, if those decisions were made, then I

14   wasn't facing a bottleneck of materials.

15        Q.  Have you ever booked two crash tests at the

16   same time in a case where the first one went wrong

17   and you had to use the second one?

18        A.  No, no.  But in fairness, this is the first

19   crash test I've ever run on a case.  I've run

20   handling tests, but I've never run a crash test where

21   it was my case.  I did when I was with Cromack, but

22   they were his cases.

23        Q.  How many crash tests have you designed?

24        A.  I'm not sure what you mean by "design."

25   This is the only case that I can recall where I was

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 65

1     involved where we were -- where I was part of a crash

2     test where it was my case.

3          Q.  What about where it wasn't your case?

4          A.  Again, I didn't -- I wouldn't have designed

5     those.  I would have attended those and assisted back

6     when I was at Cromack, whatever, 30 years ago.

7          Q.  And since your time at Cromack, had you

8     attended and assisted in a crash test prior to this

9     case?

10          A.  After I left Cromack?

11          Q.  Yes.

12          A.  I can't recall a case where we ran a crash

13     test.  I know that I've been involved in cases where

14     crash tests were run but not by me.

15          Q.  Did you participate in the design and

16     configuration of this crash test?

17               MR. HILL:  Object to the form.  Go

18          ahead.

19               THE WITNESS:  I participated in

20          selecting the vehicles, selecting the speed,

21          selecting the orientation of the vehicles

22          and participated in how the vehicles would

23          be configured, loaded.

24     BY MR. MASHMAN:

25          Q.  That last part, you're referencing the

Page 66

1    weight, how much ballast to put on both vehicles?

2          A.   How much and where, yeah.

3          Q.   And where, okay.

4          A.   But just to be clear, what I -- what I did

5    was give Mr. Crosby targets.  And then he --

6    Mr. Crosby -- I think Mr. Crosby designing is a

7    better word for him versus me.  I helped layout the

8    configuration, but there's a lot -- design implies a

9    lot to me, you know, where accelerometers are going

10   to be --

11          (Reporter clarification.)

12          THE WITNESS:  There's a lot -- design to

13       me is a much more detailed thing than what I

14       would give my contribution here.

15   BY MR. MASHMAN:

16          Q.   Is it fair to say you gave Mr. Crosby the

17   configurations and he figured out how to achieve it

18   with respect to speeds, loading, vehicle orientation?

19          A.   That's probably a fair statement.

20          Q.   What standards and methodologies are used to

21   design crash tests?

22          A.   I don't know.

23          Q.   How did you communicate the speed, loading

24   and orientation of the crash test to Mr. Crosby?

25          A.   We had several phone conversations and -- am

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 67

```
 1        I done with this letter?

 2            Q.  Yes.  And I'll re-ask the question so we

 3        have a clear -- how did you communicate the speed,

 4        the loading and orientation of this crash test to

 5        Mr. Crosby?

 6            A.  I had phone conversations and I gave him

 7        numbers and then we had diagrams, things like this.

 8            Q.  And those would not have been transmitted

 9        orally, correct?

10            A.  They might have been.  I mean, it was

11        probably a Zoom call where I would pull it up and he

12        would look at it.  I don't recall frankly.

13                (Reporter asks for a break.)

14                THE VIDEOGRAPHER:  The time is

15        11:35 a.m.  We are off video record.

16                (Recess from 11:35 a.m. to 11:53 a.m.)

17                THE VIDEOGRAPHER:  The time is

18        11:53 a.m.  We are back on video record.

19        BY MR. MASHMAN:

20            Q.  All right.  Mr. Grimes, I want to pick up

21        where we left off, but before we do that, you

22        mentioned off the record that there were a couple of

23        corrections in your paper file that are not reflected

24        in the electric file.

25                Would you be able to pull those up?
```

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 68

1      A.  And just to be clear, if I don't -- I want
2  to make sure we're clear on it.  I don't know if they
3  are on there, on that thumb drive.  I don't think
4  they are but I want -- and that's why I want to make
5  sure that you're aware of them.
6      Q.  Okay.
7      A.  We can start with these two pages.  It is
8  the exact same calculation.  This is the old one.
9  This is the updated one.
10     Q.  And this is your preliminary speed analysis
11  calculation?
12     A.  Yes.
13     Q.  And what is the change on the preliminary
14  speed analysis calculation?
15     A.  The weight on the old one was the test
16  weight of the vehicle, the F-250 and for this
17  calculation it should be the weight of the actual
18  vehicle in the crash, so I made that change.
19     Q.  Okay.  I'm going to hand you a sticker that
20  says "Plaintiff's Exhibit 94," if you can put that on
21  the new version.
22     A.  Okay.
23         (Plaintiff's Exhibit 94 was marked for
24         identification.)
25             THE WITNESS:  Okay.  And can we get it

Wesley Grimes                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 69

1          copied because I'm not leaving this?

2                   MR. MASHMAN:  Yeah.  We'll --

3                   MR. HILL:  We'll do that later.

4                   MR. MASHMAN:  Let me get all the

5          corrections first.

6                   THE WITNESS:  I understand.

7     BY MR. MASHMAN:

8          Q.  So that's Exhibit 94.  That was one

9     correction of your preliminary speed analysis

10    document.

11                 Were there any other corrections that are in

12    the paper file you brought with you?

13         A.  Yes, sir.  This is a two-page document.  The

14    first page deals with the tire size.  There was

15    nothing changed there.

16                 But on the second page, again, the old one

17    had the test weight of the Ford F-250 and for this

18    calculation, I changed it to the weight of the actual

19    vehicle at the time of the crash.

20                 (Plaintiff's Exhibit 95 was marked for

21          identification.)

22    BY MR. MASHMAN:

23         Q.  All right.  I'm going to hand you an exhibit

24    sticker with Plaintiff's Exhibit 95 on it.  And if

25    you could put that on the new --

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 70

1          A.  Do you want just the page that changed or do
2      you want both pages?
3          Q.  Both pages.
4          A.  So I'll put it on this cover here.
5          Q.  Yes.  On the corrected version?
6          A.  Yes.
7          Q.  Yes, okay.  And were there any other
8      corrections that were in your paper file?
9          A.  There's one more.
10         Q.  Okay.  And if you could keep those out, so
11     we don't lose them as they get shuffled back into the
12     binder.
13              Is the preliminary speed analysis exhibit
14     out as well?
15         A.  Yes.
16         Q.  Great, great.
17              MR. HILL:  After we get done with these
18          three, why don't we take a 20-second break
19          and get these copied, so you have them for
20          later?
21              MR. MASHMAN:  I appreciate that.
22              THE WITNESS:  These are the vehicle spec
23          sheets.  We call them green sheets.  And
24          this is the one that's updated and the CG
25          location -- it was just wrong.  Whenever I

Page 71

1             did the calculation or whoever did it, it

2             was just wrong and I caught it when I was

3             reviewing.  So the updated one has the

4             correct CG location.

5     BY MR. MASHMAN:

6             Q.  Is this the green sheet for the Escape or

7     the F-250?

8             A.  The Escape.

9             Q.  And the subject Escape or the test Escape.

10            A.  That doesn't matter.  The weights -- well,

11    this is for the subject vehicle.

12            Q.  For is subject vehicle?

13            A.  Yeah, yeah.

14            Q.  And we'll get into this later, but you used

15    that calculation then and applied it to how the test

16    vehicle was configured --

17            A.  For the total weight, yes.

18                MR. MASHMAN:  Let me pass you a sticker

19            that says Plaintiff's Exhibit 96 to put on

20            the corrected version on the vehicle specs

21            sheet for the subject Escape.

22                (Plaintiff's Exhibit 96 was marked for

23            identification.)

24    BY MR. MASHMAN:

25            Q.  Just for purposes of the record, is "CG"

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 72

1    center of gravity?

2         A.  Yes.

3              MR. HILL:  You got another sticker?  It

4         kind of got smudged.

5              MR. MASHMAN:  Yes.

6              (Discussion ensued off the record.)

7              MR. HILL:  You-all want to take a break

8         for me to copy these?

9              MR. MASHMAN:  Yes, please.

10             THE VIDEOGRAPHER:  The time is

11        11:58 a.m.  We are off video record.

12             (Recess from 11:58 a.m. to 12:01 a.m.)

13             THE VIDEOGRAPHER:  The time is

14        12:01 p.m.  We are back on video record.

15   BY MR. MASHMAN:

16        Q.  All right.  I don't think I asked you this

17   on the record.

18             Other than those three corrections on

19   Plaintiff's Exhibit 94 to 96, are there any

20   corrections that are in your paper files that are not

21   in the digital file?

22        A.  No, sir.

23             MR. MASHMAN:  Okay.  And, Mr. Hill, I'm

24        going to hand you Plaintiff's Exhibit 53,

25        which is the digital version.  If you'd be

Page 73

```
1            willing to add the corrected version of

2            those documents onto the digital ones just

3            so at the end of it we have a full corrected

4            version of this file.

5                  MR. HILL:  Sure.

6                  THE WITNESS:  So she's --

7                  MR. HILL:  I will need to get it in

8            electronic format.  So, yeah, she'll have to

9            scan it --

10     BY MR. MASHMAN:

11           Q.  All right.  I want to ask you about an entry

12     on -- in your invoices if you still have that in

13     front of you --

14           A.  Yes, sir.

15           Q.  -- on February 24, 2023?

16           A.  Can you give me a page number?

17           Q.  They are not numbered --

18           A.  Oh, okay.

19           Q.  -- consecutively.

20           A.  Okay.  February?

21           Q.  February 23 and 24th of 2023.

22           A.  Okay.  There's two items on that page.

23           Q.  And the issue date for that invoice is

24     February 24th of 2023 just to make sure we're looking

25     at the same thing in the top right?
```

Page 74

1        A.   Oh, yes.  Got it.

2        Q.   There are two invoices here, one of which is

3   fees for Wes Grimes and the other which is listed

4   under expenses.

5             The fees item says:  Wes Grimes discussion

6   with client.  Order tires and wheels for testing.

7             Is that correct?

8        A.   Yes.

9        Q.   That was on February 23rd of 2023?

10       A.   Yes.

11       Q.   And the expenses items says:  Wes Grimes,

12   tires and wheels for vehicle testing, specialized

13   wheels and tires; is that correct?

14       A.   Yes.

15       Q.   And that expense cost $7,987.11?

16       A.   Yes.

17       Q.   Do these reflect you purchasing the tires

18   that Mr. Elliott had on the subject F-250 for the

19   purpose of testing?

20       A.   Not the tires but the same make model of

21   tires and wheels.

22       Q.   And the purpose of that was to outfit the

23   test F-250 with those tires for the crash test?

24       A.   The purpose was to have them with us

25   because -- whenever I checked on the availability,

Wesley Grimes                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 75

1     there was -- they were limited.  They weren't making

2     them anymore, at least weren't shipping them anymore.

3     So I grabbed them as quickly as I could, so we didn't

4     have to substitute a different wheel.  And it was to

5     have them there in case we ever decided to test with

6     wheels and tires.

7          Q.  So at that time, what you're saying is that

8     these were not purchased -- strike that.

9              At the time of this invoice, you did not

10    purchase these tires for use in the test but just in

11    case you wanted to use them in the test?

12         A.  Yes.  I just wanted options.

13         Q.  And those tires, ultimately, were not used

14    in the test?

15         A.  That is correct.

16         Q.  Where are they now?

17         A.  I think Exponent has them.  They better have

18    them.  I had them shipped to Exponent and I think

19    that they have them.

20         Q.  When was the decision made not to use the

21    larger tires that had been on the subject F-250 in

22    the crash test?

23         A.  Well, I guess I think of it differently.  We

24    just never made the decision to use them.  You know,

25    we -- as we looked at what we were going to do and I

Wesley Grimes                                              May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 76

1    was talking to various people within the company

2    and -- about the testing and, you know, I'm getting

3    ready to spend a lot of money, is there anything I'm

4    missing, what do you think and having those

5    discussions.

6              I decided to test without any lift kit and

7    without any tires and wheels first.  And then we

8    proceeded that way.  I had options if we chose to do

9    something different.

10        Q.  When was a decision made to run the first

11   iteration of the crash test without any modifications

12   to the wheels or lift?

13             MR. HILL:  Object to the form.  Go

14        ahead.

15             THE WITNESS:  I don't know when that

16        exact decision was made.

17   BY MR. MASHMAN:

18        Q.  Do you agree that if you had run the test

19   with the wheels that you ordered on February 24th of

20   2023, you would have to put a lift on the test F-250?

21        A.  Well, you wouldn't have to but it wouldn't

22   make sense to do it otherwise.

23             The tires would fit but with the width of

24   it, it wasn't -- it wasn't roadworthy, so it just

25   didn't make any sense.  We never considered -- I

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 77

1    never considered doing that.  If you're going to put

2    the large tires on it, you've got to put the lift kit

3    on it.

4         Q.  That's what I was going to ask.

5              The intent of purchasing these tires was not

6    to run a crash test where these tires on but the

7    vehicle is not lifted.  The only time it would make

8    sense to use these tires would be if you were lifting

9    the F-250 for the crash test, right?

10        A.  I don't know that I had made that decision

11   at that point.  Ultimately, that was my decision,

12   though, that it doesn't make sense to have it without

13   the lift kit.

14             Again, whenever I ordered them and received

15   them and sent them over to Exponent, I was just

16   trying to give myself options.

17        Q.  And so you bought these tires in case you

18   would need them, right?

19        A.  Yes.

20        Q.  You would only need them if you were lifting

21   the F-250, right?

22        A.  With my knowledge now, yes.  What I'm saying

23   is I don't know that I had that knowledge when I

24   ordered the tires.  I may have.  I just don't

25   remember.

Page 78

1           You know, again, I was giving myself

2    options.  And then later it became clear that there

3    was no reason to consider running it without the lift

4    with the large tires because it just wasn't going to

5    be roadworthy.

6        Q.  Do you agree that you bought the tires to

7    run the crash test with a lifted F-250?

8        A.  That's not what I said.  I bought the tires

9    and wheels to give myself options so that if I ever

10   wanted to -- as we got closer to making those

11   decisions, if I needed those larger wheels and tires,

12   I had them.

13       Q.  Do you -- I'll change the question slightly

14   then.

15           Do you agree that you bought the tires to

16   run the crash test with -- I apologize.  One moment.

17           Do you agree you bought the tires -- I

18   apologize.

19           Do you agree you bought the tires in case

20   the decision was later made to run the crash test

21   with the lifted F-250?

22           MR. HILL:  Object to the form but go

23       ahead.

24           THE WITNESS:  I bought the tires and

25       wheels so that I had them because I knew

Page 79

1           they were in short supply in case I ever

2           wanted to use them in a test.  Whether

3           lifted or not, when I made that decision --

4           what I'm trying to convey to you is I don't

5           know when I came to the realization of, you

6           know, we really can't run it with just the

7           large tires because it's not roadworthy.

8                I don't think I had that knowledge when

9           I bought the wheels and tires.  I think it

10          was once we got them and looked at them, it

11          was like, hold on, this -- this doesn't make

12          sense.

13               So I later -- or at some point rejected

14          the very concept of running it with large

15          wheels and tires without the lift kit.  I

16          don't know as I sit here today, whatever, a

17          year plus a few months later, when I finally

18          decided that.  I bought the wheels and tires

19          in February to give myself options.

20    BY MR. MASHMAN:

21       Q.  Do you agree --

22       A.  Do you want me to keep the original or do

23    you want me to put a color copy and you keep the

24    originals?  I really don't care.

25               (Discussion ensued off the record.)

Wesley Grimes                                              May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 80

1    BY MR. MASHMAN:

2         Q.  Do you agree that you bought the tires so

3    that you would be able to run the crash test with a

4    lifted F-250 if you decided to?

5              MR. HILL:  Object to the form but go

6         ahead.

7              THE WITNESS:  I bought the wheels and

8         tires so if I ever decided to use them, I

9         had them.

10   BY MR. MASHMAN:

11        Q.  So it's a --

12        A.  Give me just a second.  I'm trying to get

13   things put away.

14             MR. HILL:  I didn't mean to interrupt

15        that.  You can do that during a break.

16             THE WITNESS:  Okay.  Yeah, you know

17        what?  Let me just set these down here.  I

18        apologize.  Go ahead.

19   BY MR. MASHMAN:

20        Q.  Do you agree that you bought the tires so

21   that you would be able to run the crash test with a

22   lifted F-250 if that decision was made down the line?

23             MR. HILL:  Object to the form but go

24        ahead.

25             THE WITNESS:  I think I've answered that

Wesley Grimes                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 81

1              over and over.  I mean, I bought the wheels
2              and tires so I had options.  I wasn't going
3              to -- I wasn't going to run the test -- at
4              that time, anyway, I don't think I had the
5              intention of running the test with the lift
6              kit without the large tires but -- and later
7              I came to the conclusion I can't run it with
8              the large tires without the lift kit.
9                  I've said it several times now.  In
10             February of 2023, I don't know that I had
11             thought that through.  I bought the wheels
12             and tires so I had options because they were
13             in short supply.
14       BY MR. MASHMAN:
15             Q.  You said so I had options.  One of those
16       options would be to run the crash test with the lift
17       with the oversize tires, correct?
18             A.  Yes.
19             Q.  When I asked you some time ago about whether
20       you had reserved a second slot at a testing facility
21       to run a second crash test, you said I didn't.  I
22       just wanted to follow up on that.
23                 To your knowledge, did anyone reserve a
24       second slot at a crash test facility?
25             A.  I don't know.  I know there was discussions

Page 82

1    about it, but I don't know.

2         Q.  There were discussions about reserving a

3    second slot at a crash test facility?

4         A.  Yes.

5         Q.  And you're saying you don't know whether

6    that was ever done?

7         A.  I don't.  I think it may have before, but I

8    don't even know.  It would have been within a few

9    days of the first one if we were going to do it.

10   That was the discussion.

11        Q.  And would that have been done by someone

12   working for Mecanica?

13            MR. HILL:  Object to the form but go

14        ahead.

15            THE WITNESS:  If it was done by somebody

16        from Mecanica, it would have been me and I

17        didn't do it.

18        I think Exponent worked out a second

19        contract.  I never was involved in any of

20        the contract stuff, so I'm sure they worked

21        it out with Mr. Hill's office to pay for the

22        test.  We didn't pay for the test.  Mecanica

23        didn't pay for the test.

24   BY MR. MASHMAN:

25        Q.  Oh, I see.  I'm asking about reserving a

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 83

1     slot for the test and there were discussions about
2     reserving two lot slots.
3          A.   Right.
4          Q.   You said you don't know of anybody at
5     Mecanica reserving a second slot for a crash test,
6     but that may have happened.  Is that a fair summary?
7          A.   Yeah.  And if it was -- if the second slot
8     was reserved, it would have been me reserving it in
9     my discussions with Charlie Crosby.  I know we're
10    going to run this test.  Do we have a second day?
11    But I'm not sure if that's reserving it.
12              I don't know.  We had those conversations
13    about having a second day if something went wrong.
14    We had back-up vehicles.  We had all of that ready in
15    case we needed to do it.
16         Q.   Okay.  Just to understand that, are you
17    saying a second reservation also -- strike that.
18              Are you saying a second reservation at
19    Exponent or are you saying a second reservation at a
20    separate facility other than Exponent?
21         A.   The thing that bothers to me is the
22    reservation because I -- I think -- and I don't know
23    Exponent.  I don't run crash tests routinely.
24              I think that if you're going to do a
25    reservation, you probably have to sign some contract

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 84

1    and give them some money.  I wasn't involved in any

2    of that.

3           Mr. Crosby and I talked about having a

4    second day at Exponent that we could run a second

5    test in case something went wrong or -- or we needed

6    a second test.  It turns out we didn't.

7        Q.  And a second day where Exponent's facility

8    is available for your use, is that a fair way of

9    putting that instead of reservation?

10       A.  Yes.

11          MR. MASHMAN:  All right.  I'm going to

12          hand you what's been marked as Plaintiff's

13          Exhibit 57.

14          (Plaintiff's Exhibit 57 was marked for

15          identification.)

16   BY MR. MASHMAN:

17       Q.  And this is a sheet summarizing your

18   invoicing in this case to date.

19          Does this appear to be a fair summary of the

20   invoices that you have submitted to Rough Country to

21   today's date?

22       A.  If -- if those are the numbers that were

23   produced.  I haven't looked at them.  But if those

24   were the numbers produced, yeah, that's it.

25       Q.  Would these numbers surprise you?

Wesley Grimes                                           May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 85

1          A.  Not really.  We spent a lot of time trying
2     to make sure we got it right.  You know, I've never
3     done a case where I ran a crash -- or had a crash
4     test run, so I'm not sure that I have what's typical.
5     I don't know.
6          Q.  And the -- this would include all the work
7     on the invoices, which would be your work plus the
8     team of 15, 16 other Mecanica employees that were
9     billing to this file correct?
10         A.  Right.  And all the expenses.
11         Q.  And all the expenses.
12              And adding up the invoices, the total to
13    date is $200,668.68.
14              Sitting here today, do you have any reason
15    to disagree that Mecanica has charged Rough Country
16    that amount for its work in this case?
17         A.  No.  I mean, I haven't checked your math,
18    but the list is the list.
19         Q.  And the last invoice produced is dated
20    April 15th of 2024, right?
21         A.  Yes.
22         Q.  So that $200,668 number would not include
23    preparation for today's deposition, travel or the
24    deposition itself, right?
25         A.  That's correct.

Wesley Grimes                                           May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 86

1       Q.  And it wouldn't include any future work that

2    you performed leading up to trial, right?

3       A.  That's correct.

4       Q.  How many different cases are you working on

5    at the moment?

6       A.  I don't know.  Probably 20 or so, 25.  I

7    don't know.

8       Q.  Twenty to 25 is your best estimate of how

9    many cases you have right now?

10      A.  Well, that's not what you asked.  You asked

11   cases I was working on.

12      Q.  Okay.

13      A.  I mean, there's a lot of cases that we have

14   that are dormant.  I don't have something due for a

15   long time, so I'm not actively working on them.

16      Q.  Let me re-ask the question.

17          Is 20 to 25 your best estimate of how many

18   cases you have that you are working on at the moment?

19      A.  Yeah.  Let me -- let me say it this way.

20   That's my estimate of the cases that I've worked on

21   in the last couple of months, you know.

22      Q.  Okay.

23      A.  Are we done with this?

24      Q.  Yes.  Did you participate in an LEC in this

25   case?

Wesley Grimes                           May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 87

```
1          A.   What do you mean by "LEC"?
2          Q.   Well, have you heard the term "LEC"?
3          A.   I have.
4          Q.   And do you understand that to be a
5      lawyer-engineer conference?
6          A.   That's the way I have heard it used.  Yes.
7          Q.   And to your understanding, what is an "LEC"?
8          A.   Well, from my point of view, it's either a
9      telephone call or a -- nowadays a Zoom call where you
10     have attorneys and engineers, maybe not all of them
11     involved but attorneys and engineers.  And you're
12     discussing a case or discussing analysis or, you
13     know, future work things like that.  You're just kind
14     of reviewing the case and the analysis.
15         Q.   And you said you have attorneys and
16     engineers present.  You're talking about the
17     attorneys who hired you, right, not all the attorneys
18     in the case?
19         A.   Correct, yes.
20         Q.   And with engineers you're talking about the
21     engineers who were hired by the attorneys who hired
22     you, not all the expert witnesses in the case, right?
23         A.   That's correct.  Yes.
24         Q.   Meaning -- what I'm getting at there, the
25     plaintiff's attorneys weren't present and the
```

Wesley Grimes                                      May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 88

1      plaintiff's experts weren't present, right?

2           A.   That's correct.

3           Q.   It's the defendant's attorneys in this case

4      and the defendant's experts that were present on

5      these LECs --

6                THE REPORTER:  Slow down.

7                MR. MASHMAN:  I apologize.

8                THE WITNESS:  Well, I'm not sure when

9           you say these LECs.  We had conversations.

10          I would not have called them LECs.  If

11          somebody called them LECs, I'm not going to

12          dispute the term if somebody else called it

13          that.

14               We had telephone conversations.  We had

15          Zoom conversations with the attorneys and

16          the experts involved in the case.

17     BY MR. MASHMAN:

18          Q.   You've had --

19          A.   We had those conversations.

20          Q.   I apologize.

21               You've had conversations where the attorneys

22     representing Rough Country and the other expert

23     witnesses hired by Rough Country are present?

24          A.   And I don't know that they are all the other

25     experts, you know, but some of them, sure.

Wesley Grimes                                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 89

1          Q.  Okay.  And what is the purpose of having
2     these LEC calls?
3               MR. HILL:  Object to form.  Go ahead.
4               THE WITNESS:  Well, my purpose is to
5          communicate with the attorneys and either
6          obtain information or give information to
7          other experts if that needs to happen.
8     BY MR. MASHMAN:
9          Q.  Do you have your invoices in front of you?
10         A.  Yes.
11         Q.  Exhibit 56, I think.
12         A.  Page 56?
13         Q.  I'm sorry.  Exhibit 56.  This one isn't page
14    numbered.
15         A.  Yes, yes.  This is Exhibit 56.
16         Q.  I'm looking at the entry -- and, again,
17    there's no page number -- for March 27th of 2023.
18              Can you let me know when you get there?
19         A.  Okay.  Does the -- issue date 4/15?
20         Q.  Yes.
21         A.  Okay.  I think I'm on that page.
22         Q.  All right.  And there's a billing entry.
23    It's the second one on this page.  It says:  Wes
24    Grimes -- I assume that's review -- review photos,
25    scans, et cetera, prepare for Zoom meeting.  Meet

Wesley Grimes                                May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 90

1    with client to discuss case.  Possible testing, ECM

2    data from Escape, et cetera.

3              Did I read that correctly?

4         A.  Yes, sir.

5         Q.  Were there other experts on that Zoom call

6    as well?

7         A.  Not that I recall.  There may have been.  I

8    don't know.  Let me look at this.

9              There may have been.  I don't know.

10        Q.  You recall there being Zoom meetings where

11   other experts were present, though, right?

12        A.  I think there were Zoom meetings.  I don't

13   think they were just phone calls.  I think they were

14   Zoom meetings.

15        Q.  And the time for this entry is three

16   and-a-half hours, correct?

17        A.  It is.

18        Q.  Did you ever show a presentation via

19   PowerPoint, documents, exhibits, or otherwise, to

20   other experts at any point?

21        A.  No.

22        Q.  Do you recall other experts showing you a

23   presentation?

24        A.  Not that I recall.  Like a PowerPoint type

25   presentation or something?

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 91

1        Q.   Any sort of presentation.

2        A.   No, no.  Nothing like that, that I recall.

3        Q.   Did you take notes during meetings with

4    other experts?

5        A.   No.

6        Q.   What other experts do you recall attending

7    these lawyer-engineering conference meetings with

8    Rough Country?

9        A.   Sometimes it would be Dr. Nguyen and

10   sometimes it would be Mr. Crosby.

11           There may have been one where Mr. Leonard

12   joined us.  I don't recall, you know, specific

13   meetings and specific attendees.

14       Q.   And Mr. Leonard is another engineer from

15   your office, right?

16       A.   He is.  Yes.

17       Q.   Do you recall being asked to do additional

18   work after an LEC?

19           MR. HILL:  I'm object to the form.

20           Answer it to the extent you can.

21           THE WITNESS:  Not like that.  I mean,

22           some of -- again, I wouldn't use the term

23           LEC.  If you want the use it, that's fine.

24           I had conversations with the attorneys.

25           Sometimes other experts were there.  Most of

Wesley Grimes                                      May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 92

1          the time it was to give a status and, Hey,

2          here's what we're working on, here's where

3          we're going.  We certainly had a lot of

4          conversations around the crash test and

5          things like that.

6     BY MR. MASHMAN:

7          Q.  I'm going to refer you to the entry of

8     May 5th of 2023 in your invoices.

9          A.  Okay.

10         Q.  And that's -- it says page 2 of 4 for that

11    particular invoice, right?

12         A.  Okay.

13         Q.  And there's an entry there that says:  Wes

14    Grimes.  Work on analysis.  Review photos and make

15    notes regarding cargo in both vehicles.  Discussions

16    with M. Leonard about cargo and vehicle weights.

17    Attend Zoom meeting to discuss crash testing, comma,

18    case issues.  Work on determining vehicle alignment

19    at impact.

20              Did I read that correctly?

21         A.  Yes.

22         Q.  And that billing entry is for seven

23    and-a-half hours, correct?

24         A.  Yes.

25         Q.  The crash testing in this case was done on

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 93

1     May 13th of that year; is that right?

2          A.  I know it was May.  I want to say it was the

3     15th, but if you say the 13th -- yeah, it shows

4     here -- let's see.  Yeah, the test date was May 15th.

5          Q.  The test date was May 15th?

6          A.  Yeah.  That's what the report shows anyway.

7          Q.  So this Zoom meeting in your billing entry

8     was 10 days before the crash test was run; is that

9     right?

10         A.  Yes.

11         Q.  And at that time you were having

12    conversations about cargo and vehicle weights; is

13    that correct?

14         A.  Yes.

15         Q.  Had the decision been made at that point

16    whether to put cargo in the rear seat -- strike that.

17              Had the decision been made at that point to

18    put cargo in the rear of the test Escape for the

19    crash test?

20         A.  It certainly would have been made around

21    that time period.  Yes.

22         Q.  So approximately 10 days before the crash

23    test?

24         A.  It had been made by that time.  I don't

25    know -- I can't tell you exactly when that decision

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 94

1   was made, but the decision was made to not to put

2   cargo in the back.

3       Q.  You said around that time period, so shortly

4   before --

5       A.  I'm going to say within -- I'm going to say

6   within 30 days of that probably.  Again, I don't

7   recall exactly when that decision was made.

8           And just to be clear, it wasn't -- the

9   decision was never let's put cargo in the back and

10  then later we rescinded that.  That decision was

11  never made.  It was always we were discussing it,

12  looking at, you know, the effects of that.  And we

13  generally defaulted to we don't know where the cargo

14  would be located, so let's not put the cargo in, you

15  know, especially in that first test.

16          MR. MASHMAN:  I'm handing you

17          Plaintiff's Exhibit 58.  That is a copy of

18          your report in this case.

19          (Plaintiff's Exhibit 58 was marked for

20          identification.)

21  BY MR. MASHMAN:

22      Q.  Have you written a report for a federal

23  court before?

24      A.  I'm sure we have.  I'm sure I have, yeah.

25      Q.  Approximately, how many times?

Wesley Grimes                                   May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 95

1          A.  I don't know.  Over all the years, I don't
2     know, several times, yeah.
3          Q.  Are you familiar with the rule that governs
4     what an expert's reports must contain in federal
5     court?
6          A.  Well, I think I am.
7          Q.  You --
8          A.  I -- it's my attempt to do that.  If I'm
9     missing something, I'm sure you'll tell me.  It's my
10    attempt to follow that rule.
11         Q.  Does your report contain a complete
12    statement of all the opinions that you will express
13    in this case?
14         A.  I think it contains the majority of it.  I
15    mean, within the report -- obviously, I don't know
16    what I'm going to be asked.  But I think it contains
17    everything I can think of as I sit here today.
18         Q.  Sitting here today, are there any opinions
19    that is you intend to offer about this case that are
20    not included in your report?
21         A.  I received some documents from
22    Mr. Buchner's -- well, I received them from Mr. Hill
23    but I guess they were generated by Mr. Buchner
24    yesterday.  I received those.  And I looked through
25    them last night.

Wesley Grimes                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 96

1              I might develop opinions about that new

2       material that, quite frankly, I just haven't had a

3       chance to go through yet in detail.

4          Q.  So aside from the material that you got that

5       was generated by Mr. Buchner's office yesterday, are

6       there any additional opinions that you intend to

7       offer about this case that are not in your report?

8              MR. HILL:  Object to the form.  You can

9          go ahead.

10             THE WITNESS:  Nothing comes to mind as I

11         sit here.

12      BY MR. MASHMAN:

13         Q.  And does your report include a complete

14      statement of all the basis and reasons for your

15      reasons?

16             MR. HILL:  Object to the form.  Go

17         ahead.

18             THE WITNESS:  I believe it does.  As I

19         sit here, I believe it does, again, other

20         than what I received from Mr. Buchner.

21      BY MR. MASHMAN:

22         Q.  You didn't leave out any of the support that

23      you intend to rely on for your opinions?

24         A.  I don't think so.

25         Q.  And does your report include all the facts

Wesley Grimes                                                May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 97

1      and data and research you considered in forming your

2      opinions?

3                MR. HILL:  Object to form.

4                THE WITNESS:  I believe it does.  Yes.

5      BY MR. MASHMAN:

6           Q.  And it include all of your qualifications

7      relevant to this case?

8           A.  That, along with my CV, yes, sir, I believe

9      it does.

10          Q.  Sitting here today, is there any other work

11     that you're planning to do in this case?

12               MR. HILL:  I'll lodge an objection just

13               for the record saying that -- sorry.  Are

14               you okay?

15               THE WITNESS:  I just didn't want to

16               blast his ears out with my cough.

17               MR. HILL:  No problem.  As he mentioned,

18               we received late last night -- or last

19               evening additional work from Mr. Buchner.

20               We -- obviously, we're not waiving any

21               objection we have to the timeliness of that

22               material and/or this witness' ability to

23               review and give comments on that and reserve

24               the right for him to supplement or amend his

25               opinions based upon that new information

Wesley Grimes                                     May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 98

1          produced, whatever it was, 14 hours ago.

2               So go ahead.  You can answer.

3               MR. MASHMAN:  I'll re-ask the question.

4     BY MR. MASHMAN:

5          Q.  Sitting here today, is there any other work

6     that you are planning to do in this case?

7          A.  I'm planning on having a conversation with

8     Mr. Hill about whether I should delve in more detail

9     into Mr. Buchner's materials.  Again, I looked at it

10    last night, but I may ask for approval to go into it

11    in more detail.  I haven't thought about that enough

12    yet.

13         Q.  When you Mr. Buchner's materials, you're not

14    referring to all of Mr. Buchner's materials.  You're

15    referring to Mr. Buchner's materials that you

16    received yesterday; is that fair?

17         A.  Well, that I received yesterday and that

18    reliance upon his other materials, but yeah.

19         Q.  Aside from that, is there any other work

20    you're planning on doing in this case sitting here

21    today?

22         A.  I plan on creating some exhibits for trial

23    if we go to trial some of those exhibits that we

24    talked about that I listed in the report.  You know,

25    we may or may not use all of them, but we would

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 99

1    certainly work on those.

2         Q.  Is there anything -- I apologize.  Were you

3    done with your answer?

4         A.  I was going to say I think that's the only

5    thing I can think of.

6         Q.  You anticipated my next question.

7              You're not offering an opinion on the topic

8    of defect in this case; is that right?

9         A.  That's correct.

10        Q.  So you're not intending to offer the opinion

11   at trial that the Rough Country lift kit was not

12   defective?

13             MR. HILL:  Object to the form.  Go

14        ahead.

15             THE WITNESS:  I have no plans to address

16        that.  I'm doing the accident

17        reconstruction.

18   BY MR. MASHMAN:

19        Q.  You performed a scene inspection on

20   December 12th, 2022, correct?

21        A.  Yes.

22        Q.  And on -- I believe it's page 5 of your

23   report -- do you have your report in front of you?

24   I'll wait for you to get to it.

25        A.  Okay.

Wesley Grimes                                     May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 100

1          Q.   You discuss your conclusions related to the

2     scene of the accident on page 5 of your report,

3     correct?

4          A.   Yes.

5          Q.   And in Figure 3, you documented the location

6     of the points of rest for the Bryson Escape and the

7     lifted F-250 after the collision; is that right?

8          A.   Yes, as shown in the SCRT photos.

9          Q.   So those points of rest were originally

10    indicated by police, right?

11         A.   Well, I think that they were originally

12    indicated by police.  I mean, there's paint marks in

13    the SCRT photos.

14         Q.   And is this consistent with your opinion

15    about the ultimate points of rest after the subject

16    collision?

17         A.   Yes.

18         Q.   Do you have any opinion about whether the

19    Georgia statute -- strike that.

20              Do you have any opinion regarding the

21    Georgia statute about altering a vehicle's

22    suspension?

23         A.   I don't have any conclusion specifically.

24    It's my understanding -- I actually was talking to

25    Mr. Hill about this yesterday.  It's my understanding

Wesley Grimes                                      May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                              Page 101

1      there's I guess some new proposed statute that he

2      showed me.

3             It is what it is.  I mean, I -- I'm not here

4      to talk about whether a statute applied or didn't

5      apply, you know.

6             Q.  That's what I was going to ask.  You're not

7      intending to offer the opinion about whether a

8      particular statute apply or didn't apply to this

9      case, right?

10            A.  That to me sounds like a legal question and

11      I don't typically deal with legal questions.

12            Q.  Going back to the scene inspection, did you

13      determine the point of impact for the collision?

14            A.  Basically, just as SCRT had -- whenever I

15      was there, there really wasn't any evidence left.  So

16      everything we rely upon is from the SCRT materials.

17            Q.  You didn't find any evidence to dispute the

18      SCRT materials regarding the point of rest or the

19      point of impact?

20            A.  That's correct.

21            MR. MASHMAN:  I'm handing you

22            Plaintiff's Exhibit 60, which is materials

23            from your file labeled as:  Aerial mosaic of

24            the scene of the collision.

25            (Plaintiff's Exhibit 60 was marked for

Page 102

1            identification.)

2       BY MR. MASHMAN:

3            Q.  I'm going to hand you a Sharpie.

4            Would you be able to circle on Plaintiff's

5       Exhibit 60 where you determined the point of impact

6       to be?

7                 MR. HILL:  Object to form.

8                 THE WITNESS:  You want a circle?

9                 MR. MASHMAN:  Yes, please.

10                (Witness complies.)

11      BY MR. MASHMAN:

12           Q.  And can you hold that up?

13           A.  (Witness complies.)

14           Q.  Did you determine within -- that circle

15      appears to cover multiple lanes.

16           Did you determine which of those lanes the

17      point of impact was in?

18           A.  It would be the inside lane.  I don't know

19      how you number them in Georgia.  In Arizona, it would

20      be lane number one.  I think it's the same in

21      Georgia, the inside lane.

22           Q.  Does that mean the left lane that is not a

23      turn lane?

24           A.  It is the -- yes, the left through lane.

25           Q.  The left through lane.  So not the turn lane

Page 103

1    which is to the left of that, right?

2         A.  That is correct.

3         Q.  Did you determine how far the Escape

4    traveled between the point of impact and the point of

5    rest?

6         A.  Just approximately, again, from the SCRT

7    materials.

8         Q.  And where -- strike that.

9             How far did you determine the Ford escaped

10   travel forward from the point of impact to the point

11   of rest?

12        A.  That's why I can't find it.

13            I think I estimated it to be about 150 to

14   155 feet, but I would rely upon the SCRT materials.

15        Q.  Do you agree that the Escape point of rest

16   was to the left of the point of impact?

17        A.  It was.  Yes.

18        Q.  Did you determine how far to the left --

19        A.  And just to be clear to the left relative to

20   the lanes on the roadway.

21        Q.  If someone were traveling in the same

22   direction as the Ford Escape, it would be to the left

23   and forward of the point of impact, correct?

24        A.  Yes.

25        Q.  Did you determine how far to the left of the

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 104

1    point of impact the Escape's point of rest was?

2         A.   Not specifically other than what SCRT says.

3         Q.   Sitting here today, do you have an

4    approximation?

5         A.   I don't.  I can look it up in the SCRT

6    materials.

7         Q.   And did you determine how far the F-250

8    traveled between the point of impact and the point of

9    rest?

10        A.   Again, just from the SCRT materials.

11             It's my understanding that, essentially, the

12   vehicles stayed very near each other and then the

13   F-250 backed away.

14             So when you say "final rest," he actually

15   had backed away some distance before he actually came

16   to a stop.  That wasn't the uncontrolled point of

17   rest during the crash.

18        Q.   Did you determine where the uncontrolled

19   point of rest during the crash was?

20        A.   It would have been right behind the Escort,

21   again, relying just upon the SCRT materials.

22        Q.   So would that be approximately 150 to

23   155 feet forward from the point of impact?

24        A.   Again, whatever the SCRT materials show.  As

25   I sit here, I can't give you a specific number.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 105

1      Q.  Would you agree that that was -- that --
2    strike that.
3            Do you agree that the F-250's point of rest
4    from the accident sequence was also to the left of
5    the point of impact?
6      A.  I believe it was.  Yes, sir.
7            MR. MASHMAN:  I'm handing you
8          Plaintiff's Exhibit 59, which are your notes
9          from your scene inspection.
10           (Plaintiff's Exhibit 59 was marked for
11         identification.)
12           MR. HILL:  Did you say 59?
13           MR. MASHMAN:  Yes, 59.
14           MR. HILL:  Thank you.
15   BY MR. MASHMAN:
16     Q.  Did these notes capture all of your
17   observations and conclusions related to the scene
18   inspection performed on December 12th of 2022?
19     A.  I'm not going to say all of them and my
20   photos as well.  But in general, these are the notes
21   that I made while I was there.
22     Q.  Is there anything particular in the photos
23   or videos that you took at the scene on December 12th
24   of 2022 that form the basis of your opinions that's
25   not captured in these notes?

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 106

1        A.   Nothing that I can think of.

2        Q.   Your notes mention the grading of the

3   intersection.

4             Did the grading of the intersection impact

5   your reconstruction of the collision?

6        A.   I looked at what kind of deceleration rate

7   would be involved there.  But, really, it didn't have

8   a great effect on it, on my reconstruction.

9             I started down doing a traditional

10  reconstruction.  We have airbag data and the case

11  quickly became about the intrusion.  And so I didn't

12  spend a lot of time exploring what that grade was and

13  how it affected things.

14       Q.   When you say -- strike that.

15            When you say that your reconstruction did

16  not have a grade effect, does that mean that you

17  functionally applied a grade of zero or flat as

18  you're analyzing the collision?

19       A.   No.  I didn't apply -- I didn't do that

20  calculation.  I mean, I did a rough calculation here

21  to get a rough idea.  This is one of those that was

22  updated of what kind of deceleration rate we were

23  looking at.

24       Q.   What I'm trying to get at:  Was there

25  anything about the grade that changed any of your

Page 107

1      analysis or conclusions about the collision that

2      would not apply to just a collision on flat gravel?

3           A.  I don't think so.  Nothing that comes to

4      mind.

5           Q.  And did you measure the slope or grade at

6      the point of the collision?

7           A.  I didn't measure it.  I couldn't get out

8      there safely and do that.  So we used the SCRT photos

9      and had them processed and you could extract the

10     grade from that.

11          Q.  You inspected the F-250 and Escape that were

12     involved in this collision, right?

13          A.  Yes, sir.

14          Q.  And that was the next day, December 13 of

15     2022, right?

16          A.  Yes, sir.

17          Q.  Do you agree that you and Ms. Grimes both

18     attended that inspection?

19          A.  Yes, sir.

20          Q.  You took photographs of the vehicles?

21          A.  Yes, sir.

22          Q.  Performed 3- -- you and Ms. Grimes performed

23     3D scans of the vehicles?

24          A.  Yes, sir.

25          Q.  You observed the vehicles?

Page 108

1      A.  Yes, sir.

2      Q.  Was there anything else that you did at the

3  inspection of the F-250 and Escape?

4      A.  We tried to locate the airbag control module

5  out of the Escape.  We were originally told -- I

6  don't know if it was you or someone in your office

7  that it was there.  And we looked throughout the

8  vehicle and couldn't find it, so we spent a lot of

9  time trying to track that down while we were there.

10      Q.  Did you ultimately locate the airbag control

11  module for the Escape?

12      A.  Yes.  One of your experts had it.

13      Q.  And were you able to download any

14  information off of it that you used in your analysis?

15      A.  That particular module was not assessable by

16  the publicly available tool that we used, which is

17  the Bosch CDR tool.  And so we made arrangements

18  through your office to obtain the module.  And then

19  we sent it to a company called Veoneer and they

20  attempted a download.

21          And I think we produced that material to

22  everybody.  But, essentially, there was no data in

23  that module which is what we expected, but we had to

24  look.

25      Q.  Was there anything else that you -- strike

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 109

1    that.

2            Did you do any other work at the inspection

3    that we haven't talked about?

4        A.  Notes, photographs and scans.  I mean -- and

5    observations.

6        Q.  Did you weigh either of the vehicles?

7        A.  We did not.

8            MR. MASHMAN:  I'm going to hand you

9            Plaintiff's Exhibit 61 and 62, which are

10           your notes from the December 13, 2022

11           inspection of the two vehicles.

12           (Plaintiff's Exhibit 61 and Exhibit 62

13           were marked for identification.)

14   BY MR. MASHMAN:

15       Q.  Did you take these notes using a Dictaphone?

16       A.  Yes.

17       Q.  And were these notes later transcribed by

18   someone in your office?

19       A.  Yes.

20       Q.  Do these notes capture all of your

21   observations of the two vehicles from that

22   inspection?

23       A.  Probably not.  I mean, these are the notes

24   that I took while I was there.  But in going back

25   through photographs, there may be other observations.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 110

1        Q.  Were there any other observations from your

2    inspection that informed your reconstruction that are

3    not included in these notes?

4        A.  There's nothing that wouldn't be included in

5    these notes and the photos that I reviewed.

6        Q.  Is there any particular piece of evidence in

7    the photos that you rely on for you reconstruction

8    that is not noted in these inspections?

9        A.  Well, the overall damage, I mean, some of

10   that would also -- not just photos but the scans.  We

11   use the scans to align the vehicles as they would

12   have been aligned at impact.  So that's not in the

13   notes, but that's in the notes, photos, scans, all of

14   that type of material.

15            Are we done these?

16       Q.  Yes.

17       A.  Are we done with this?

18       Q.  I can't see --

19       A.  That's the scene notes --

20       Q.  Yes we're done with the scene notes --

21       A.  Okay.  I'm just trying to keep my stack

22   organized.

23       Q.  I appreciate that.

24       A.  But hers isn't.

25       Q.  Do you have an opinion about what model of

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 111

1    kit was installed on Mr. Elliott's vehicle?

2         A.   I don't.  I know Mark went up online and

3    tried to get some information of what the lift kits

4    contained and we put that in our report as we

5    understand it.  But I'm not looking at a specific

6    model or serial number or anything like that.

7         Q.   Do you have any reason to disagree that

8    Rough Country sold this lift kit as a 4.5 inch lift

9    kit?

10        A.   I have no information.  I have no opinion

11   about that.

12        Q.   Do you agree the lift kit was installed

13   properly?

14        A.   I have no idea.  I don't do lift kit

15   installation analysis.

16        Q.   Is it your opinion -- strike that.

17             So I understand your answer to be that

18   you're not saying it was installed improperly, you're

19   not saying it was installed properly, you just don't

20   have an opinion either way; is that fair?

21        A.   That's fair, yeah.  I know the vehicle had a

22   lift kit.

23        Q.   Did you form an opinion about how much the

24   Rough Country lift kit raised the front bumper of the

25   subject F-250?

Wesley Grimes                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 112

1       A.  I didn't look at that specifically.  I've
2   seen in Mr. Buchner's materials -- I think he said
3   like 5 and-a-half or 6 inches.  I don't dispute that
4   it's certainly in that range, but I haven't measured
5   that specifically.
6       Q.  So you don't have any disagreement with
7   Mr. Buchner's analysis of how much the Rough Country
8   lift kit raised the front bumper of Mr. Elliott's
9   F-250?
10      A.  Well, I didn't look at the front bumper.  I
11  looked at the frame rails.  And it looks like, again,
12  it's about five to six inches, something like that.
13  Closer to six than to five, but I'm looking at the
14  bottom of the frame rail.
15      Q.  You don't have any criticism of Mr.
16  Buchner's analysis on the amount of practical lift on
17  the front of the F-250?
18      A.  I haven't looked at it specifically but as I
19  sit here, no.
20      Q.  So you have no reason to disagree with his
21  conclusion about how much the lift raised the front
22  frame rail of the F-250?
23      A.  As I sit here, no.
24      Q.  Ms. Grimes performed a 3D scan of an
25  exemplar Escape on December 20th of 2022, right?

Page 113

1          A.  Yes.

2          Q.  And the purpose of scanning that exemplar,

3     as I understand it, was to create a baseline scan for

4     a nonimpacted Ford Escape; is that fair?

5          A.  Yes.

6              MR. MASHMAN:  And I'm handing you what's

7          been marked as Plaintiff's Exhibit -- strike

8          that.

9              I'm handing you what's been marked as

10         Plaintiff's Exhibit 64.  I only have one

11         copy of this one, Rick.

12             MR. HILL:  That's all right.

13             (Plaintiff's Exhibit 64 was marked for

14         identification.)

15    BY MR. MASHMAN:

16         Q.  This is a series of pictures from your file

17    of what I understand to be the exemplar Escape.

18             Is that the exemplar Escape?

19         A.  Yes.

20         Q.  And based on these pictures, Ms. Grimes did

21    not weigh this vehicle; is that right?

22         A.  That's correct.

23         Q.  And Mecanica never bought or received this

24    vehicle, right?

25         A.  This exemplar vehicle?

Wesley Grimes                                            May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 114

1          Q.   The exemplar vehicle.

2          A.   No.   No.   We find them and pay the people

3     usually a hundred dollars to let us look at it

4     and document it.

5          Q.   When you say people, whoever --

6          A.   Whoever --

7          Q.   -- owns -- I apologize.

8          A.   No, no.   It's my fault.   You go ahead.

9          Q.   Mecanica reached out to whoever the owner

10    was of that exemplar Escape, met them in the parking

11    lot where they were keeping it and scanned it; is

12    that right?

13         A.   Photographed it and scanned it, yes.

14         Q.   Was there any purpose of that other than to

15    create a baseline of the Ford Escape that had not

16    been impacted?

17         A.   That was the primary purpose.

18         Q.   Was there any other purpose?

19         A.   Just to see what it looks like in general.

20         Q.   So other than seeing what it looks like in

21    general and getting a baseline scan of a nonimpacted

22    Ford Escape, was there any other purpose for this

23    exemplar?

24         A.   No.

25         Q.   And Ms. Grimes also performed a scan of an

Wesley Grimes                                            May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 115

1    exemplar F-250, correct?

2        A.   Yes.

3        Q.   Where was that exemplar located?

4        A.   That's my truck.

5        Q.   That's your truck?

6        A.   Yeah.  I didn't get the finder's fee; I'll

7    tell you.

8        Q.   What model year of F-250 is it?

9        A.   It's a 2016 F-250.  It's a gasoline not

10   diesel.

11       Q.   What trim?

12       A.   Lariat.

13       Q.   Was the purpose of this scan to create a

14   baseline of a nonimpacted F-250?

15       A.   In general, yes.

16       Q.   Was there any other purpose?

17       A.   Again, just to document what they look like.

18       Q.   I didn't see any photographs in the file or

19   any other reference to it.

20            Were pictures taken of the exemplar F-250?

21       A.   They may not have been.  It's my truck.  I

22   mean, I can go photograph it at any time.  I think it

23   was primarily scans.

24       Q.   Would it surprise you that there weren't

25   photographs or were there photographs that aren't a

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 116

1    part of your file that were taken?

2         A.  I think that she probably did not take

3    photographs of it.

4         Q.  Do you agree this truck was not weighed?

5         A.  Right.  Yeah, my truck wouldn't be

6    representative.  I've got a lot of stuff in it, so...

7         Q.  Other than to the extent that you personally

8    own it, do you agree that Mecanica never received

9    this truck; it went out and performed a 3D scan of

10   your truck?

11        A.  Correct.

12             MR. MASHMAN:  I'm probably at a decent

13        point if the lunch is here.

14             MR. HILL:  Let me check on it.

15             (Discussion ensued off the record.)

16

17             THE VIDEOGRAPHER:  The time is

18        12:55 p.m.  We are off record.

19             (Recess from 12:55 p.m. to 1:41 p.m.)

20             THE VIDEOGRAPHER:  The time is 1:41 p.m.

21        We're back on video record.

22             MR. MASHMAN:  All right.  I'm going to

23        hand you what's been previously marked

24        Plaintiff's Exhibit 63.

25             (Plaintiff's Exhibit 63 was marked for

Wesley Grimes                                      May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 117

1          identification.)

2     BY MR. MASHMAN:

3          Q.  Did you review this as part of this case?

4          A.  It's probably part of our material.  I don't

5     remember specifically looking that this as I sit

6     here.

7          Q.  Do you recognize it as an order confirmation

8     for the subject lift kit?

9          A.  That's what it looks like.

10         Q.  It's item No. 567.20?

11         A.  That's what it says.  Yes.

12         Q.  And it's sold as a 4.5 inch lift kit with

13    overloads.  Do you see that?

14         A.  Yes.

15         Q.  It was shipped to Will Hollaway in

16    Georgia --

17         A.  Yes.

18         Q.  -- as a part of this case?

19              Did you ever install a lift kit on an F-250?

20         A.  No.

21         Q.  Including for testing?  For measurements?

22    For any reason?

23         A.  Correct.

24         Q.  Okay.  I didn't ask this earlier.

25              Have you ever had your testimony limited in

Page 118

1    any way as a result of a Daubert motion?

2         A.   No.  At least not that I know of.

3         Q.   Have you ever had a motion to limit your

4    testimony granted with any respect?

5         A.   There was.  I don't think it had anything to

6    do with Daubert.  It was many years ago in the

7    Chicago area.

8         Q.   What was the nature of that motion?

9         A.   The issue, as I understand it, was that at

10   the time in Illinois, if you had a witness testify

11   about some fact of the case, such as vehicle speed,

12   the judge could limit an expert talking about that

13   same topic.

14        So I was limited as a reconstructionist

15   coming in and talking about the speed of a vehicle

16   because they had witness testimony.  And my client

17   ended up appealing that.  And as I understand it, the

18   judge came back and ordered that not only can I

19   testify, but he directed I would testify and the case

20   settled.

21        Q.   I think I wrote Chicago.

22             Is that where it was?

23        A.   It was in the -- it wasn't Chicago, but it

24   was some little town there outside of Chicago.

25        Q.   Do you remember approximately what year that

Wesley Grimes                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 119

1    was in?
2         A.  I think it was probably mid- to late '80s.
3    I don't know.  It was a long time ago.
4         Q.  Do you remember any of the parties' names?
5         A.  I know I was working for a trucking company.
6    It might have been Knight Transportation or Swift --
7    I think it was Knight Transportation.
8         Q.  Was that in state or federal court?
9         A.  I don't know.
10        Q.  Other than that case from the Chicago area,
11   were there any other times that your testimony was
12   limited as a result of a motion?
13        A.  Not that I'm aware of.
14        Q.  Are there any other times that your
15   testimony has been limited by a judge?
16        A.  Not that I'm aware of.
17        Q.  As part of your analysis in this case, did
18   you talk to Mr. Pascarella at any time?
19        A.  I don't think so because I don't know who
20   that is offhand.
21        Q.  Did you rely on any of Mr. Pascarella's
22   conclusions in forming your opinions in accident
23   reconstruction?
24        A.  I don't think so.
25        Q.  Was Mr. Pascarella at the crash test that

Page 120

1    was done at Exponent?

2          A.  I don't think so.  I don't know who

3    Mr. Pascarella is as I sit here.

4          Q.  So as you sit here, you don't know what any

5    of his opinions would be related to this case; is

6    that fair?

7          A.  I think that's true.  Yeah.  Unless I know

8    him as some role in it, but I don't think I do.

9          Q.  Did you review any prior crash testing or

10   safety testing that had been performed by Rough

11   Country as part of this case?

12         A.  No.

13         Q.  Do you know of any crash testing or safety

14   testing that Rough Country performed on its

15   products -- strike that.

16             Do you know of any crash testing or safety

17   testing that Rough Country performed on its lift kit

18   before releasing it for public sale?

19         A.  No.

20         Q.  All right.  Did you measure the height of

21   the bottom edge of the subject F-250's C-Bracket at

22   the inspection?

23         A.  Yes.

24         Q.  And what measurement did you reach for that?

25         A.  It's about 18 inches.

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 121

1          Q.   You say about 18 inches?

2          A.   Well, on the left side -- the right front

3     tire was deflated and so we tried to level up the

4     vehicle as best we could.  And the measurements that

5     I have, on the left side it was 18 and-a-quarter

6     inches.  On the right side, it was 17 and 7/8ths

7     inches.  I think there's a photograph of it.

8          Q.   I'm looking at your report on page 20.

9               Do you see figure 22 there?

10         A.   Yes.

11         Q.   Does that show the measurements that you

12    were just talking about?

13         A.   Yes.

14         Q.   And you mentioned that the -- it looks like

15    the report says the left front tire was flat.

16              That should say right front tire --

17         A.   I think it's the right front tire.

18         Q.   You mentioned that the right front tire was

19    flat during the inspection.

20              It looks like there were two pieces of wood

21    placed under it to level it; is that right?

22         A.   Yes.  I measured to the bottom of the wheel

23    on the left side and then tried to put wood under on

24    the right side and -- to try to at least get it

25    approximately leveled.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 122

1        Q.   Okay.  And you agree, there was a little bit
2    of variance between the left and right measurements
3    of the C-Brackets, right?
4        A.   There were.  And it could be due to the
5    pickup not being fully level but also one of them was
6    distorted rearward, the C-Brackets, and one of them
7    was distorted slightly forward.  They are very close,
8    about 18 inches.
9        Q.   I apologize.  You said they were very close,
10   about 18 inches?
11       A.   Yes.
12       Q.   Was the left front tire also deflated?
13       A.   I don't think so.
14       Q.   Did you agree with Mr. Buchner's
15   determination that the F-250's tow hooks were
16   approximately 30 inches from the ground?
17       A.   I didn't look at that.
18       Q.   I wanted to ask you about some of the
19   formatting of your report starting on page 19 and on
20   to page 20.  There are sometimes where you use
21   italics and a series of bullet points.
22            Do you see what I'm referencing with that?
23       A.   Yes.
24       Q.   Is that to denote that these are
25   Mr. Buchner's observations and that you don't adopt

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 123

1    them?

2         A.  Yes.

3         Q.  And then later there are sometimes where

4    there are not italics and bullet points related to

5    the EDR.  Are these your observations?

6         A.  No.  Those are also from him as well.  Later

7    on, we talked about the EDR as well.

8         Q.  I'm referring to pages 20 and 21.

9         A.  Yeah, 20, those were -- data was downloaded

10   20 ignition cycles later.  They did that.  We didn't

11   do that.

12        Q.  It appears there's several times where you

13   list a series of observations from Mr. Buchner and

14   then only comment on some of them.

15             When the -- when you don't offer a comment

16   on one of the observations that Mr. Buchner made, is

17   it fair to say that you don't have a critique of that

18   observation?

19             MR. HILL:  Object to form but go ahead.

20             THE WITNESS:  I think it depends on

21        which one.  I mean, I list them out to try

22        and get his -- the material from him out

23        there.  I didn't go through and look at

24        every single one and say, Do I agree or do I

25        disagree with this?  I was trying to put the

Wesley Grimes                                       May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 124

1          information out that I retrieved from his

2          report.

3      BY MR. MASHMAN:

4          Q.  So, for example, on page 19 there's a bullet

5      point that Mr. Buchner observed a gap between the

6      rear passenger seat and the hatch, which corresponded

7      to the trunk contents such as a Shop-Vac and folding

8      chairs in the vehicle.

9              Do you have any disagreement with that

10     observation?

11         A.  Not specifically, no.

12         Q.  Do you have any disagreement with the

13     observation that the Escape's static rear crush

14     damage extended forward to a depth of 3.66 feet?

15         A.  I haven't measured it the way he did, but I

16     don't dispute that it's about that.

17         Q.  Do you have any dispute Mr. Buchner's

18     observation of the Escape's rear occupant seat pushed

19     visibly forward from the impact?

20         A.  No.

21         Q.  Looking at the F-250 section on the same

22     page, page 19 --

23         A.  Page 19?  Okay.

24         Q.  There's a comment where Mr. Buchner mentions

25     that the F-250 crush extended slightly further back

Page 125

1    on the right side of the vehicle.

2            Do you agree with that statement?

3        A.   I think that that's true.

4        Q.   Do you agree with the next statement that

5    two impact marks were present on the top of the hood

6    of the F-250 about 28 inches apart which corresponded

7    to the Escape's hatch hinges?

8        A.   I don't know about the 28 inches.  I know

9    it's going to be pretty close to that.  And I would

10   associate those also with the hatch hinges on the

11   Escape.

12       Q.   Meaning that you associate the marks on the

13   F-250 with the -- with contact with those hatch

14   hinges?

15       A.   With contact from the Escape and more than

16   likely the hinges.

17       Q.   The hinges, okay.

18            Okay.  Looking at the vehicle weights.

19       A.   Yes.

20       Q.   What is your opinion about the weight of the

21   subject F-250 on the date of the collision?

22            I'll pass you Plaintiff's Exhibit 65 which

23   has some weight calculations from your file.

24            (Plaintiff's Exhibit 65 was marked for

25            identification.)

Wesley Grimes                                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 126

1            THE WITNESS:  Our calculation, our

2       estimation on it is that on the day of the

3       crash the vehicle would have weighed

4       approximately 8,833 pounds.

5   BY MR. MASHMAN:

6       Q.  Can you -- can you walk me through how you

7   got to that number?

8       A.  Sure.  We started with an estimated curb

9   weight and then we add a driver, a car seat or cargo

10  seat -- I'm sorry, rear -- rear seat cargo.

11           There are beer cans.  I don't remember if

12  there were bottles, but we don't know whether the

13  beer cans are empty or full or whatever.  There's a

14  tool box.  There's a back cover.  There's a lift kit

15  and the large tires and things like that.

16           (Plaintiff's Exhibit 66 was marked for

17       identification.)

18  BY MR. MASHMAN:

19      Q.  I'm going to hand you Plaintiff's Exhibit

20  66, which is your weights and vehicles document.

21           Do you recognize that?

22      A.  Yes.

23      Q.  You mentioned that you start with an

24  estimated curb weight.  How do you get that number?

25      A.  We looked at specifications in general, but

Wesley Grimes                                         May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 127

1    we also looked at the weights of the two vehicles
2    that Charlie Crosby weighed after he bought them.
3         Q.  So the estimated curb weight is determined
4    by looking at the specification of the subject
5    vehicle as sold and also the test vehicles when they
6    first came in to Exponent; is that fair?
7         A.  Yes.
8         Q.  How do you choose between those two if
9    there's any difference?
10        A.  It's an estimate and we -- I think we came
11   up with 7850 is our estimate of how much it weighed.
12   It would have weighed curb without the cargo and
13   driver and so on.
14        Q.  Then you add -- you mentioned you added the
15   driver's weight plus the rear seat cargo.  And I
16   think that that's reflected on Plaintiff's Exhibit 66
17   how you got to that; is that fair?
18        A.  Well, it's also in 65, the last page of 65.
19        Q.  So the last page of -- all right.
20        A.  Up at the top there.
21        Q.  You added 170 pounds for Mr. Elliott's
22   weight.
23        A.  And then car seat, rear seat cargo, a cover,
24   the tool box and so on.  So we -- we estimate that
25   the total addition would be 6830.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 128

1          Q.   How did you come up for the weights for the
2     car seat, rear seat cargo, cover and tool box?
3          A.   We made estimates -- well, the tool box also
4     includes -- I think there was a chain saw and there
5     was something else in there that we just lumped
6     together.  There's a tool box and there's some tools
7     in the back.  We don't know what's in the tool box.
8     So we made that estimate.
9          Q.   Did you weigh any of the cargo in the F-250
10    to make those estimates?
11         A.   No.
12         Q.   And it appears that there are -- there's a
13    series of searches on Google and Amazon of various
14    products for the Escape and the F-250?
15         A.   Yes.
16         Q.   Is it fair to say that's what you based your
17    weight estimates on for those products?
18         A.   Yes.
19         Q.   Did you use the same serial numbers for each
20    of the products as you looked up their weights --
21         A.   No.
22         Q.   -- for the exemplars?
23         A.   No.  We tried to look and figure out what
24    the items were and make estimates on them.
25         Q.   So were any of the weights -- and this is

Page 129

1      for the F-250 and the Escape.

2               Were any of the weights of cargo that you

3      incorporated based on the weights of the actual cargo

4      that you weighed or weights of objects with the same

5      serial number?

6           A.  No.  I mean, they may -- the search may have

7      had the same type of serial numbers, but we weren't

8      looking at serial numbers.  We were looking at here's

9      the product; here's about what it weighs.

10          Q.  So it was an approximation based more or

11     less visually, looking for something of similar size,

12     shape and product?

13          A.  It's an estimate that we made trying to look

14     at the same product.

15          Q.  So you added that all together for the

16     F-250, came up to 683 pounds and then added that to

17     the 7850 curb weight and that's how you got the

18     weight of the F-250 on the day of the subject

19     collision; is that fair?

20          A.  Give me just a second and let me make sure.

21               The other thing that you're not including on

22     that weight is the lift kit and the large wheels and

23     tires.  And you'll see those towards the bottom of

24     the last page where we estimate the lift kit and

25     tires end up adding about 300 pounds.

Page 130

1        Q.  Let me try again and see if I can get it

2    right.

3            The two numbers that I just mentioned, the

4    curb weight of 7850, plus the occupant plus cargo of

5    683, that adds up to 8,533 pounds; is that right?

6        A.  Yes.

7        Q.  And that is what you based the weight of the

8    crash test F-250 on; is that right?

9        A.  Yes.

10       Q.  And then you take that weight of 8,533

11   pounds and add -- I think you just said the estimated

12   weight of the lift kit and tires?

13       A.  And wheels.

14       Q.  And wheels; is that fair?

15       A.  Yes.

16       Q.  How did you get the estimated weight of the

17   lift kit, tires and wheels?

18       A.  Mark did a search on those to try to

19   estimate what those types of wheels and tires and the

20   lift components would weigh.

21       Q.  And what did he search?

22       A.  He looked for the same model of wheel and

23   tire and got estimated weights on them.

24       Q.  Do you know whether -- that's Mr. Leonard;

25   is that right?

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 131

1          A.  Yes.

2          Q.  Do you know whether Mr. Leonard used the

3     same product number from the same manufacturer when

4     coming up with those weights?

5          A.  I'm pretty sure he did.  But as I sit here,

6     I can't -- can't swear to it.  But, yeah, that's what

7     he would have tried to do for sure.

8          Q.  For the other cargo, you include screen

9     shots in your file showing where those estimates come

10    from.

11          Is there anything like that showing where

12    Mr. Leonard is getting his estimates for the lift kit

13    or the wheels or the tires?

14          A.  I don't think so.  If it's not in this

15    document, then I don't think so.

16          Q.  I might have asked this already.

17          Did you weigh the subject F-250 during your

18    inspection?

19          A.  No.

20          Q.  Can you walk me through how you came up with

21    the weight for the subject Escape?

22          A.  Same way.

23          We had some specifications but also Charlie

24    Crosby weighed the two Escapes that we purchased.

25    And the one we ended up using for the test, we used

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                    Page 132

1     the weight that he measured on that vehicle.
2          Q.  So you took the weight for the test Escape
3     and added in estimates of the occupants and cargo --
4          A.  Yes.
5          Q.  -- is that fair?
6              And you got the estimates of the occupants
7     and cargo the same we just discussed by looking up
8     products, looking them up online and then adding them
9     up; is that correct?
10         A.  Yes.
11         Q.  Did you use the serial numbers when doing
12     that?
13         A.  I don't think serial numbers were used.  I
14     think they were looking for product names and models,
15     things like that.
16         Q.  And I may have asked you this earlier.
17             Did you weigh the actual --
18         A.  (Coughing.)
19         Q.  I'll ask it again just to make sure that
20     I've got it clear.
21             Did you weigh the actual cargo that was in
22     the Escape after the collision?
23         A.  No.
24         Q.  How did you determine the weight
25     distribution of the F-250 and Escape?

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                Page 133

1          A.  We made estimates of where the various cargo
2     would be located and did a moment arm analysis --
3               THE REPORTER:  A what arm?
4               THE WITNESS:  Moment arm.
5               THE REPORTER:  Thank you.
6               THE WITNESS:  -- analysis where you're
7          calculating the effect of where things are
8          and how that weight is distributed.
9     BY MR. MASHMAN:
10         Q.  So a moment arm analysis, you take the
11    weight, the distance from the center of gravity and
12    with that you get one measurement?
13         A.  Yeah.
14         Q.  You add all that together to come up with
15    what the distribution would be; is that fair?
16         A.  An estimate of that distribution, yes.
17         Q.  Okay.  And then you took that weight
18    distribution and used that to determine where to put
19    the ballast in the crash test vehicles to replicate
20    that; is that right?
21         A.  Well, I didn't determine where to put the
22    ballast.  That would have been Mr. Crosby.  I gave
23    him the information that I was looking for.
24              Part of that conversation, I knew that he --
25    I knew that we were going to have trouble loading the

Page 134

1    Escape especially because we weren't going to put
2    cargo behind the rear seat.  So that limited how much
3    weight we could get on the rear axle and not overload
4    different parts.
5            So I made the determination to have less
6    weight on the rear axle than what I believe was there
7    at the time of the crash.
8            And the effect of that was that it -- I
9    wanted to run the test and the configuration where I
10   wouldn't be subject to criticism that we artificially
11   lowered the bumper on the back of the Escape.
12           So we put -- I think it's, I don't know,
13   250, 300 pounds less on the rear axle than the
14   specifications that we think really were there.  And
15   the effect of that -- might be 200 pounds.
16           The effect of that is that we're not
17   artificially lowering that rear bumper because I
18   don't want to make it easier to override.
19           And then we did the same thing on the Ford
20   pickup.  We put a little bit more weight on the front
21   so that the bumper was -- if anything, it probably
22   doesn't make even a quarter inch difference.  But if
23   anything, the bumper on the pickup is a little bit
24   lower and the bumper on the Escape is little bit
25   higher.  So we're trying to make it where it's harder

Wesley Grimes                                                  May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                        Page 135

1      to override to avoid some of the criticism that we

2      knew would come.

3           Q.  I was trying to get at specifically your

4      interactions with Mr. Crosby on this.

5                You took your estimated weight distribution

6      and gave that to Mr. Crosby with the intention he

7      would ballast it however necessary to replicate that;

8      is that fair?

9           A.  Yes.

10          Q.  Page 20 of your report mentions your

11     opinions related to Mr. Buchner's analysis of the

12     subject F-250's weight.

13               Do you see that?

14          A.  Where on page -- oh, the middle of that

15     first paragraph?

16          Q.  Yes.

17          A.  Yeah.  Eight thousand forty pounds?

18          Q.  Yes.

19          A.  Mm-hmm.

20          Q.  You mentioned there's no indication of what

21     was in the vehicle or cargo area of the vehicle when

22     it was weighed.

23               Can you explain that opinion?

24          A.   I didn't find anything in his report that

25     indicated what was in the vehicle when he weighed the

Page 136

```
1    vehicle, you know, like the chain saw, any of the

2    tools.  You know, he weighed it at 8,040 pounds which

3    is a little lighter than what we feel it would have

4    weighed on the day of the crash.

5         Q.  Did you review all of Mr. Buchner's file

6    materials, including his inspection photographs?

7         A.  I did long ago, but yeah.

8         Q.  Is there anything in particular that you

9    don't believe was included in Mr. Buchner's weight?

10        A.  As I sit here, I can't point to anything.  I

11   don't remember the -- like the -- I think there was a

12   chain saw and there was some other gas-powered tool.

13   I don't know what was in the tool box or anything --

14   you know -- as I -- I'm sorry.

15             As I sit here, there's not anything specific

16   that I'm pointing to and saying, See, look, he didn't

17   include this.  I'm saying I don't know exactly what

18   he included.  His weight is a little lighter than our

19   weight.

20        Q.  Okay.  Your report also mentions the affects

21   that fuel levels have on vehicle weight?

22        A.  Yes.

23        Q.  Let me ask you this.

24             For you weight estimate, how much fuel did

25   you account for?
```

Page 137

1          A.   Full fuel.  That would be curb, yeah.

2          Q.   Okay.  And do you know whether the F-250 was

3     at full fuel at the time --

4          A.   I don't.

5          Q.   Do you have any reason to believe that the

6     F-250's fuel level was different at the time

7     Mr. Buchner weighed it versus on the day of the

8     incident?

9          A.   I have no idea what fuel was in it.  I would

10    assume that whoever stored it drained the fuel just

11    for safety, but I don't know.

12         Q.   And then for Mr. Buchner's estimate of the

13    Escape's weight, do you disagree with Mr. Buchner's

14    measured weight at 3,410 pounds?

15         A.   Well, again, that's lighter than our weight.

16    He's measuring it -- I don't know exactly what

17    components are in there.  I think he says that, you

18    know, the cargo was in there.  I don't know if any of

19    the cargo had been removed by the people.  I don't

20    know, the people obviously aren't in there, things

21    like that.

22              His weight there is 3410 and our curb was, I

23    think, 3451.  So our curb no -- no cargo at all is

24    slightly heavier than that.

25         Q.   Do you have any reason to believe that

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 138

1    Mr. Buchner's inspection photographs don't show what
2    was in the Escape when he weighed the vehicle?
3         A.  As I sit here, I haven't looked at that.
4         Q.  Is there anything in particular you don't
5    believe he included in his weight or accounted for in
6    his weight that he should have?
7         A.  As I sit here, no.
8         Q.  You and Mr. Buchner agree on the maximum
9    delta-v for the collision as negative
10   18.21 longitudinally and negative .76 laterally,
11   right?
12        A.  Well, that's what the airbag control module
13   says, but it depends on how you define the collision.
14   If you look at Part 563, it defines it very
15   specifically of when a collision is over.  And we
16   talk about that in the report.
17             I agree that's what the CDR report shows.
18        Q.  As the maximum recorded delta-v, right?
19        A.  As the maximum throughout the -- the record,
20   yes.
21        Q.  And this may be a basic question.
22             The -- a negative value longitudinally,
23   which way does that indicate the force is moving?
24        A.  The vehicle is slowing down.  It's being
25   pushed from the front.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 139

1        Q.  And then same question laterally, is
2    negative --
3        A.  Negative means --
4        Q.  -- left or --
5        A.  Negative would mean to the left.
6        Q.  Meaning that the force is going from right
7    to left; is that correct?
8        A.  That's my recollection.  I was reading
9    through the airbag module data here to see if it says
10   and I don't see it offhand.
11       Q.  But your --
12       A.  But in general negative would be right to
13   left.
14       Q.  And you reported -- I think you were getting
15   to this a moment ago.  You reported the delta-v for
16   the subject collision at the time of 141 milliseconds
17   after times zero, right?
18       A.  Can you ask that again, please?
19       Q.  Yeah.  And if there's something wrong with
20   the wording, please let me know.
21           You conclude -- scratch that.
22           You reported the delta-v for the subject
23   collision at the time of 141 milliseconds after times
24   zero; is that right?
25       A.  Yes.

Wesley Grimes                                         May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 140

1        Q.  And you concluded that the longitudinal

2     delta-v was negative 17.48 and the lateral delta-v

3     was negative .4 --

4        A.  Yes.

5        Q.  -- is that correct?

6        A.  And that's on page 27 of my report.

7        Q.  Speaking earlier about conservative

8     assumptions in the context of weight distribution, do

9     you agree that Mr. Buchner's delta-v values are

10    higher than yours?

11       A.  They are slightly, but I've got to tell you.

12    In my business -- I'm not going to speak for

13    Mr. Buchner -- I think that we're 38, 39.  He's 40.

14    That's a match, I mean, for the Escape.

15            And same thing for the Ford F-250.  I think

16    he's 17.8 or something.  We're 17.5.  There's a

17    difference there.  To me it's not -- it's not real

18    significant.

19       Q.  So for your purposes, you consider your

20    delta-v and Mr. Buchner's delta-v to be similar

21    enough to not impact the analysis; is that fair?

22       A.  Right.  Well, I give a range and his number

23    is within my range, so I can't disagree with it, you

24    know.

25       Q.  So you sitting here today aren't critical of

Wesley Grimes                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                              Page 141

1       Mr. Buchner's delta-v estimations or believe that it

2       somehow negatively impacted his analysis; is that

3       fair?

4            A.  I don't think it did.  He doesn't give a

5       range, per se.  But, again, our numbers are really

6       close and his numbers are within my range.

7                 MR. MASHMAN:  Okay.  We were talking

8            about these documents earlier and I think

9            some of them have a corrected version now,

10           so I want to make sure I give you the right

11           versions.

12                I'm handing you Plaintiff's Exhibit 94.

13      BY MR. MASHMAN:

14           Q.  Is this the corrected version of the

15      preliminary speed analysis that you did?

16           A.  Yes, sir.

17           Q.  And can you walk me through the calculation

18      here, what you were trying to find and what you

19      concluded?

20           A.  Sure.  What I was looking at was trying to

21      do a calculation of the post impact speeds of the

22      vehicle.  I looked at it and said, you know, that's

23      the 150 to 155 feet.  I made an estimate to have .2

24      to .25 Gs when I'm combining both of these masses.

25                And then the delta-v is the 18.6.  That's

Wesley Grimes                                              May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 142

1    from the CDR max.  And I add that and it gives me a

2    speed of 48 to 52.  And I looked at that.  That's

3    within the range of what's being recorded by the CDR.

4            Immediate -- immediately below that, what I

5    do is take a mass distribution between the two

6    vehicles and then kind of calculate if -- if

7    they're -- if we're using approximately 50 percent of

8    available braking, that would generate about a .208

9    to a .267 to just kind of validate my number above

10   where it estimated .2 to .25.

11           Q.  I have a couple of follow-ups.

12           A.  Okay.

13           Q.  You mentioned a speed estimate between 48

14   and 52 -- 48.1 and 52.2 --

15           A.  Yes.

16           Q.  -- miles per hour.

17               Which vehicle is that for?

18           A.  The Ford F-250.

19           Q.  And is that at the time of the impact?

20           A.  Yes.

21           Q.  And then I'll admit you lost me a bit on the

22   Gs.  Can you explain that again?

23           A.  On the what?

24           Q.  On your .267 Gs.

25           A.  Sure.  The -- I'm estimating the friction

Page 143

1    including the -- or the grade about .75 to .8.

2    Again, I'm making rough estimates here to try to make

3    sure I'm in the ballpark with all of these numbers.

4              I then take the rear weight of the Escape

5    and put it over the combination weight and the front

6    weight on the Ford front axle and combine it, divide

7    it by the combined weight and that gives me effective

8    deceleration rate, if you will, assuming the rear

9    tires on the Escape are essentially 50 percent

10   applied and the front tires on the Ford are

11   essentially 50 percent applied.  That then gives me

12   an estimate, and estimated value of .208 to .267.

13        Q.  And that's to estimate the deceleration rate

14   for the Ford Escape after the impact?

15        A.  For both.

16        Q.  For both?

17        A.  Yeah.  And that's what that combination is.

18   I'm trying to combine them assuming that they're

19   essentially stuck together or pushing on each other

20   the whole time.

21        Q.  And the purpose of this preliminary speed

22   analysis calculation was to check the approximate

23   distance that they went before the point of rest; is

24   that fair?

25        A.  No.  Really, it was to check that I got a

Wesley Grimes                                           May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 144

1    reported value of 51 in the CDR.  And I do this, you

2    know, quick and dirty.  This was done very early, I

3    think.  And I get to forty-eight fifty-two.  I'm

4    like, okay, I'm in the ballpark; I'm okay.  I didn't

5    look at it further.

6        Q.  I apologize.  This is to check the reported

7    CDR value of the speed of the F-250 at time of

8    impact.  And with this calculation you essentially

9    confirmed that or that it's close enough?

10       A.  It's close enough.  Yes, sir.

11       Q.  Okay.

12       A.  Are we done with that?

13           MR. MASHMAN:  Yes.  I think you updated

14       this one, too.  I'm going to pass you

15       Plaintiff's Exhibit 95.

16   BY MR. MASHMAN:

17       Q.  And this appears to be two calculations in

18   your file.  On the first page, is this where you

19   adjusted the F-250's reported speed to account for

20   the tire size installed on the vehicle?

21       A.  Yes.

22       Q.  And you came up with the 51 MPH number that

23   we talked about a second ago?

24       A.  Yes.  And because it's a reported value,

25   it's plus or minus 4 percent, so you get a 49 to 53.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 145

1           Q.  And this is the value that you were checking

2      in the calculations you did on the last exhibit we

3      were looking at --

4           A.  Just to --

5           Q.  -- is that right?

6           A.  Just to make sure everything is consistent,

7      yes, sir.

8           Q.  On the second page, this shows your

9      calculations for the approximate delta-v of the F-250

10     and the Escape, right?

11          A.  Yes, sir.

12          Q.  You apply a range of plus or minus

13     10 percent; is that right?

14          A.  Yes, sir.

15          Q.  And where's -- what's the basis for that

16     range?

17          A.  Research has shown that the speed change

18     being reported by airbag control modules is accurate

19     to within about 10 percent.  It's better than that,

20     so if you use 10 percent, you've got it within your

21     range.

22              MR. MASHMAN:  All right.  I'm going to

23          hand you Plaintiff's Exhibit --

24              THE WITNESS:  Are we done with 95?

25              MR. MASHMAN:  Yes.

Wesley Grimes                           May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                        Page 146

1              (Plaintiff's Exhibit 69 was marked for
2         identification.)
3    BY MR. MASHMAN:
4         Q.  I hand you Plaintiff's Exhibit 69, which is
5    your CDR analysis chart that was a part of your file?
6         A.  Yes.
7         Q.  On page 3 there is a speed of impact table.
8         A.  Yes.
9         Q.  Can you walk me through that table?
10        A.  Sure.  The -- what we have is the last
11   recorded speed at times zero.  And what we know is
12   that the collision happens shortly after that.
13             This is taking the absolute extreme that
14   because the driver was on the brakes at times zero --
15   hold on.  Let me say it more precisely.  Give me just
16   a moment here.
17             If you look at page 78 of the CDR download.
18        Q.  Give me one moment to get there.
19        A.  Mine actually says 78 of 195.  It's in the
20   appendix on my report.
21        Q.  My page numbers are slightly cut off.  Can
22   you describe --
23        A.  Page 6 there's -- in the middle of the
24   page -- do you see a page 6?
25        Q.  Yes.  I'm there.

Wesley Grimes                                      May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 147

1          A.   So this is -- it's showing 50 miles an hour

2     at times zero.  So times zero in this case is

3     basically algorithm enabled, but it could have

4     occurred shortly after this.  Okay?  We don't know

5     exactly when it occurred.

6               So back to Exhibit 69, what -- what we're

7     doing here is taking the absolute extreme and saying,

8     well, could there be a little bit more braking during

9     that time?  And that gives us the absolute low end

10    here of the 43.9 and then assuming the high end would

11    be, what, 55.6, I think.

12         Q.   And that's the low and high end of the speed

13    of the F-250 at the time of impact?

14         A.   Yes.  Assuming those types of things, which

15    I don't believe are true.  I don't think there was

16    significant braking effort, but this was the extreme

17    that we did early on to get a feel for all the

18    numbers that we were dealing with.

19         Q.   So the braking we're talking about is that

20    the CDR indicates that Mr. Elliott applied his brakes

21    sometime in the last .5 seconds before impact; is

22    that correct?

23         A.   Yes.

24         Q.   And --

25         A.   And we don't know -- I'm sorry.  We don't

Page 148

1     know two things.  We don't know when and we don't

2     know how much.

3          Q.  You have your second row in the speed at

4     impact chart.  It says:  Correction for braking,

5     miles per hour?

6          A.  Yes.

7          Q.  And that's based on .5 seconds of braking I

8     assume; is that right?

9          A.  No.  Well, you see it's a percent.  It's a

10    slip.

11         Q.  Okay.

12         A.  So what we're assuming is that the speed

13    being shown is -- do you know how ABS works.

14         Q.  Why don't you remind me?

15         A.  ABS anti-brake -- antilock braking system

16    slows the wheel.  And so as the vehicle is going down

17    the road under hard braking, the wheel is going

18    slightly slower over the ground than the vehicle is.

19         Research has shown that a reasonable loss on

20    passenger cars is about five percent.  So what this

21    does is, say, if the vehicle speed was 50 miles an

22    hour, if there was a lot of slip going on there, it

23    actually could be 50 plus five percent of that which

24    would have -- so it could be 52.5.

25         Q.  Is that the third row of this chart, the

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 149

1      correction for ABS braking?

2              A.  Yeah.  Isn't that what we're talking about?

3              Q.  I was asking about the second row.

4              A.  I apologize.

5              Q.  So correction for braking and it says

6      .5 seconds next to time --

7              A.  Yes.

8              Q.  -- is that correct?

9              A.  Yes.

10             Q.  And it says .7 next to braking, parenthesis,

11     G.  What is that?

12             A.  Deceleration rate.  An estimated

13     deceleration rate.

14                 I apologize.  I misunderstood your question.

15             Q.  So that estimates that given a half second

16     of braking and .7 Gs of braking, the speed would have

17     been reduced by 7.7 miles per hour; is that right?

18             A.  It could have been at the maximum.  Yes,

19     sir.

20             Q.  And that reduction of speed wasn't applied

21     to the crash test; is that correct?

22             A.  It was not.  No.

23             Q.  And the crash test, there was no braking

24     applied to that 250, right?

25             A.  After the crash there was, it was not

Veritext Legal Solutions

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 150

1     before.  We have to stop the vehicle after the crash.

2          Q.   Understood.

3          A.   But not before impact.  There was no braking

4     before impact.

5          Q.   There was no braking before the F-250 hit

6     the Escape in the crash test, correct?

7          A.   That's correct.

8          Q.   And then after the crash test, the brakes

9     were applied remotely just to stop the F-250 from

10    continuing to run away down the track, right?

11         A.   Yes.

12              Are we done this?

13         Q.   I'm figuring that out.

14         A.   Okay.  I'm not hurrying you.

15         Q.   I wanted to ask you about page 1.

16         A.   Okay.

17         Q.   What is -- is this a calculation done for

18    the crash test?

19         A.   No.  This was early on in our analysis of

20    getting all the information together.  So you can see

21    where at that point I was estimating the vehicle, the

22    pickup at 8800 pounds, the Escape at 3900 pounds, the

23    51 miles per hour.

24              And what you can do is calculate the speed

25    change shown.  And you're seeing that here it's

Wesley Grimes                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 151

1      showing a speed change on the pickup, which would be

2      17.2.  And the issue is if you drop the speed at

3      impact significantly, that delta-v goes down as well.

4      And so that's why I don't think there was a lot of

5      braking pre-impact.

6           Q.  Okay.

7           A.  Are we done with that now?

8           Q.  Yes, yes.

9               You included several handwritten witness

10     statement from the date of the collision in your

11     report.

12          A.  Yes.

13          Q.  Did you rely on those witness statements to

14     form any of your substantive opinions about the

15     collision's reconstruction?

16          A.  Not really.  It was more to just give the

17     context of what was happening.

18          Q.  So it's --

19          A.  Of the environment.

20          Q.  I apologize.

21              It's to give context and color, but it

22     doesn't inform any of your ultimate opinions about

23     the reconstruction; is that fair?

24          A.  I'm not sure about the color comment, but,

25     yeah, to just give context to -- to the event.

Page 152

1          Q.   Okay.  In your report you make a point about

2     the difference between referring to the CDR relative

3     to airbag deployment versus algorithm enable?

4          A.   Yeah.

5          Q.   Do you have any substantive criticism of

6     Mr. Buchner or Mr. Roche's opinions based on that

7     language?

8          A.   Not specifically, no.  Just -- it's a

9     detail.

10         Q.   And you agree that Mr. Buchner and Mr. Roche

11    both acknowledged that the subject F-250's airbags

12    didn't deploy, right?

13         A.   That's correct.

14         Q.   Page 23 of your report, you discuss

15    Mr. Buchner's moment calculations?

16         A.   Yes, sir.

17         Q.   And I take your point there to be

18    Mr. Buchner's methodology for momentum calculations

19    is acceptable as long as he accounted for the

20    occupant and cargo weights.  Is that a fair summary?

21         A.   Yes.

22         Q.   Do you have any opinion about whether

23    Mr. Buchner accounted for those?

24         A.   You know, I think that his ratio is probably

25    close to my ratio because our delta-v are about the

Wesley Grimes                                      May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 153

1    same.  So we may be off a little bit.  That doesn't

2    bother me, per se, about his delta-vs.  He's a little

3    higher than I am, but he's within my range, so...

4         Q.  So you're not saying that Mr. Buchner's

5    momentum calculation was wrong in any way.  You're

6    just pointing out that he needs to make sure that

7    he's accounting for those two things; is that fair?

8         A.  Correct.

9         Q.  Your report raises the issue of whether the

10   Bryson family's Escape was stopped at the time of

11   impact.

12        Do you agree it was either stopped or

13   virtually stopped?

14        A.  Yes.

15        Q.  How many times have you used crush analysis

16   to calculate the speeds of vehicles?

17        A.  Hundreds.  You're looking at crush energy to

18   get delta-vs and then look at closing speeds.  Crush

19   itself doesn't give you speeds.  It gives you closing

20   speeds and delta-v.

21        Q.  When you do that, how do you use the crush

22   analysis to calculate the closing speeds and delta-vs

23   of the vehicles?

24        A.  You use the crush along with appropriate

25   stiffness coefficients and weights and calculate the

Wesley Grimes                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 154

1      energy dissipated in crushing the vehicles.  And then

2      distribute that across the two masses because they

3      will -- it will distribute based upon the ratio of

4      the masses.  And I that will give you a delta-v and

5      you can use that same type of thing to calculate a

6      closing speed.

7              In this case, assuming the Escape is

8      essentially stopped or moving very slowly, then that

9      would also be travel speed.

10          Q.  And on page 23 of your report, you critique

11     Mr. Buchner's crush calculations.

12              Can you explain your critique?

13          A.  Specifically about using the SIMON model?

14              (Reporter clarification.)

15     BY MR. MASHMAN:

16          Q.  The paragraph before that.

17          A.  Yeah.  Again, I don't know what crush

18     profiles he's using and I don't know the specifics of

19     the stiffness.

20              There's actually an SAE paper that talks

21     about doing that type of thing where you vary the --

22     the amount of crush at different levels across the

23     back of a vehicle that has had override on it.  And

24     it discusses using -- that you get pretty good

25     results if you use a hundred percent of the crush on

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                        Page 155

1     bumper and then about 50 percent above that, but you
2     then have to reduce the stiffness of that.
3              And that's the challenge is how stiff is it
4     when you don't really have a lot of testing that
5     doesn't include the bumper.  So there's an SAE paper
6     talking about doing that type of thing.  And that's
7     what I mention there is that in this approach damage
8     energy can be estimated by using a hundred percent of
9     the energy at the bumper, 50 percent of the energy
10    above the bumper.
11             Again, the problem is different parameters
12    of the collision, the stiffness and things like that
13    that have to be adjusted.  And you have to be -- you
14    have to base those stiffness values on something,
15    some basis for them.
16        Q.  Do you -- I have a couple of -- limited
17    questions about that.
18             You reference an SAE paper.  Is that the
19    2001 SAE paper in your file?
20        A.  I thought it was -- no, you're right.  Jeff
21    Croteau and Werner, yeah.  2001-01-1170 --
22    2001-01-1170.
23        Q.  Your criticism of Mr. Buchner's crush
24    calculations, do you agree that's based on the
25    premise that his stiffness coefficient would not be

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 156

1     appropriate in an override collision?

2          A.   It would not be appropriate to use the

3     stiffness of the bumper system on an override, but

4     you can derive stiffnesses for the other components

5     without the bumper.  I just don't think he did that.

6          Q.   What I'm trying to get at is:  Is your

7     criticism limited to an override scenario on this

8     point?

9          A.   That -- the general technique is you have to

10    have stiffness values that are appropriate.  That

11    goes across all crash analysis but specifically this

12    one.

13         Q.   Would you disagree with Mr. Buchner's

14    stiffness coefficients if there was not an override

15    scenario?

16         A.   Probably not.  I'd have to look at his

17    stiffness coefficients and where he got them and what

18    he's doing with them, but probably not.

19         Q.   And what is your basis for referring to the

20    collision between a nonlifted version of Mr.

21    Elliott's F-250 and a Ford Escape as an override?

22         A.   I don't understand your question.

23              MR. HILL:  Yeah.  Object to the form.

24    BY MR. MASHMAN:

25         Q.   Mr. Buchner's crush calculation, he was

Page 157

1    calculating -- scratch that.

2         A.  If you point to a certain thing in my

3    report that you're trying to talk about --

4         Q.  I'm on the same paragraph.  The second

5    paragraph on page 23, you state:  The problem with

6    predicting the amount of deformation in a crash with

7    different parameters is whether the dynamics of the

8    collision will result in an override or not.

9              Did I read that correctly?

10        A.  You did.

11        Q.  What is the basis for referring to the

12   calculation that Mr. Buchner was performing as a

13   calculation involving an override?

14        A.  Because I don't see where he reduced the

15   stiffness and because it's -- because there's an

16   override, you have to account for the bumper

17   deformation and the other deformation.

18        Q.  I think we're talking past each other a

19   little bit.

20        A.  Okay.

21        Q.  You said where there's an override you have

22   to account for that.

23              What's your basis for saying there's an

24   override here?

25              MR. HILL:  Object to the form.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                              Page 158

 1            THE WITNESS:  Because the F-250 overrode
 2       the bumper on the Escape in the crash.
 3   BY MR. MASHMAN:
 4       Q.  You're talking about the subject crash?
 5       A.  Yes.  That's what we're talking about here.
 6       Q.  Okay.  I understand.  And then your next
 7   paragraph discusses HVE and SIMON simulation; is that
 8   right?
 9       A.  Yes.
10       Q.  And your criticism of Mr. Buchner's use of
11   HVE also is because in your opinion this is using HVE
12   in what you consider an override collision, correct?
13       A.  Yes.  And you can use HVE in an override
14   collision; you can do that.
15            The problem that I have with what Mr.
16   Buchner did is he's using a model that was derived
17   for use of looking at an end condition, if you will,
18   that is the crush on a real vehicle and modeling
19   different aspects of that to figure out speed.
20            What Mr. Buchner is doing is using the SIMON
21   model to predict an outcome when he doesn't have a
22   basis to compare to.
23            Whenever you're running a simulation, you
24   put in initial conditions and you predict a final
25   condition.  And the way you know you're reasonably

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 159

1        close is that you match the final condition.
2                But Mr. Buchner doesn't have a final
3        condition to compare it to.  So it's an improper use
4        of the software.
5                The DyMesh model is -- is a mechanical
6        shell.  If you think about -- are you comfortable
7        talking about vertices and meshes?
8            Q.  I am not.
9            A.  Simplest form.  Think about three tennis
10       balls.
11               Are you a tennis player?
12           Q.  (No audible response.)
13           A.  Are you a golf ball player?
14           Q.  (No audible response.)
15           A.  You don't get out of the office much.
16           Q.  No, I don't.
17           A.  Imagine three golf balls in space and they
18       are connected by strings, if you will.  Okay?  That
19       forms a surface.  Okay?
20               Now, cover the vehicle with that.  And each
21       one of these, you know, three corner triangles,
22       whenever you combine them all, it's a mesh.  But it's
23       infinitely thin and that's why it's called a shell;
24       there's no thickness to it.
25               The way the DyMesh model works is each

Page 160

1    vehicle has these little tennis balls or golf balls

2    or whatever.  They are connected by lines that can

3    neither push nor pull.

4              And the way it works is it looks at a

5    vehicle where -- the terminology is a master vehicle

6    and a slave vehicle.  And when's it's the master

7    vehicle, it looks at one of the golf balls on one

8    vehicle, let's say just for example, the Ford F-250

9    and how it interacts with a given triangle on the

10   Ford Escape.

11             And if there's penetration, it moves the

12   golf ball out to where it's on the surface, but it

13   moves it relative to the velocity vector of that ball

14   relative to the vehicle and it moves it back out to

15   the surface.  And it does that across the whole

16   thing, across the whole surface.

17             It then swaps the vehicles so that the other

18   vehicle becomes master and the first one is slave and

19   it does again, and it swaps them again and does it

20   again and it swaps them so it effectively does it --

21             THE REPORTER:  Slow down, please.  Thank

22        you.

23             THE WITNESS:  It effectively does it

24        four times.

25             The issue is that when it's moving these

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 161

1          individual golf balls that make up the mesh,

2          what we would call a vertices or a vertex --

3          that vertex, if I move a certain vertex, it

4          cannot pull or push any other vertex.  The

5          mathematical formulas are just not there.

6          That's not what it's made for.

7               The effect of that is that whenever

8          you -- whenever the vehicles interact, it

9          cannot push down and pull surrounding the

10         material with it, so you can't get

11         distortion and induced damage.

12              It's okay to look at a crashed vehicle

13         where you have crush and say I'm going to

14         try and model that crush with appropriate

15         stiffness coefficients, vehicle motion and

16         things like that.  That's what SIMON is made

17         for and it does a great job for that, but it

18         is not appropriate to blindly say, I'm going

19         to crush one vehicle into another and

20         accurately predict the crush profile because

21         there's no mechanism inside the model --

22         there's no mathematical formulas to handle

23         the one vehicle overriding the other.  It

24         just -- there's no math there to do it.  So

25         it can't be done.  And there's so many

Page 162

1    little permutations that take place.  It's

2    just inappropriate to do.

3         So it would be the same thing in

4    accident reconstruction.  We deal with where

5    a vehicle comes to rest and we work

6    backwards to try and figure out its speed at

7    impact.  We know the final condition.  We

8    know where it is.  And we know the speed is

9    zero because it's stopped there, right?

10        In accident reconstruction, we typically

11   work backwards to then figure out impact

12   speeds.  We then go simulations and we input

13   initial conditions, the speed, the offset

14   here, the CG height, the specifications, the

15   weights, you know, things like that.  And we

16   have it predict an outcome and it's really

17   good at that, but we have something to

18   compare to at the end.

19        And so we may run it over and over and

20   over until we match final or end conditions.

21   And that's how we know we're reasonably

22   close is we're matching a final condition.

23        That's -- that's really a requirement

24   for running a simulation in a case like this

25   of you need something to match to at the end

Wesley Grimes                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 163

1          and that doesn't exist here.

2     BY MR. MASHMAN:

3          Q.  Can you provide any documents that support

4     your opinion that Mr. Buchner needed to perform a

5     crash test to validate his simulation?

6               MR. HILL:  Object to form.  Misstates

7          his testimony.

8               THE WITNESS:  Well, the -- there's no

9          document, per se, other than an

10         understanding of how the DyMesh model works.

11    BY MR. MASHMAN:

12         Q.  Is it your opinion that no one can use the

13    simulation software Mr. Buchner used to predict crush

14    unless they perform a crash test to validate it?

15         A.  You don't have to have a crash test to

16    validate a simulation but you have to have some type

17    of end condition that, in other words, you know that

18    override did occur.

19              Like our crash test, you could take HVE and

20    SIMON and probably replicate our crash test because

21    you have an end condition to match to.  But the

22    software that we use in accident reconstruction

23    assumes that you have that end condition and that

24    you're not blindly predicting something.

25         Q.  In your opinion, can you use SIMON to

Page 164

1      predict crush if there is no override?

2          A.   Sure.

3          Q.   How do you define "override"?

4          A.   Where one -- part of one vehicle rides up on

5      top of part of the other one.  And our crash test

6      clearly shows that that happens.

7               And that's the problem, if you're going to

8      run HVE and you're going to assume no override, then

9      you're going to get a result like Mr. Buchner got,

10     but it's inappropriate because our crash test clearly

11     shows -- I think that it's really just the magnitude

12     of the speed we're dealing with here.  Fifty miles an

13     hour with an F-250 just overwhelms the back of the

14     Ford Escape.

15              But the crash test clearly shows that even

16     in that situation without a lifted vehicle, that

17     there's override.  And the HVE SIMON model using

18     DyMesh simply cannot be used to predict that.  You

19     have to know that that happened and try to model it.

20         Q.   On page 22 of your report --

21         A.   Yes.

22         Q.   -- you note that Mr. Buchner used an

23     exemplar F-250 with different tire sizes from the

24     recommended tire size for the subject F-250 --

25         A.   Yes.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 165

1          Q.  -- correct?

2          A.  Yes.

3          Q.  Do you have any criticism of the methodology

4     Mr. Buchner used to account for that difference in

5     tire size?

6          A.  Not as I sit here.  I think if he

7     acknowledges that it was a different tire -- I

8     noticed that on the material that I got last night,

9     he had changed the tires out on his HVE run.

10         Q.  Sitting here today, you have no criticism of

11    Mr. Buchner's materials earlier in the way that he

12    accounted for tire size, do you?

13         A.  I don't know that he did account for it in

14    his HVE one.  So you need to account for the proper

15    tires.

16         Q.  If he did account for the proper tires and

17    used that to inform his inputs, you would have no

18    issue with the tire size, correct?

19             MR. HILL:  Object to the form.  Go

20         ahead.

21             THE WITNESS:  The tire size is not the

22         main issue here.  The main issue is the

23         DyMesh model is not made to blindly predict

24         crush.

25    BY MR. MASHMAN:

Page 166

1      Q.  Have you ever heard of the term "safety

2   cage"?

3      A.  Yes.

4      Q.  What is a "safety cage"?

5      A.  When I think of a safety cage, I think of --

6   on a vehicle, like a roll cage type thing for racing.

7   I've also seen structures.  We have some -- some

8   devices where we test air brake system, air brake

9   chambers and we put like Kevlar cages around that in

10  case something -- a safety cage is just to prevent --

11  at least that's the way I'm thinking of it as I sit

12  here.

13     Q.  Is it fair to say that the structure around

14  the occupant compartment in a vehicle should act as a

15  safety cage for people in the car?

16          MR. HILL:  Object to the form.  Go

17      ahead.

18          THE WITNESS:  You know, I don't know if

19      that's true.  It probably is.  I'm not an

20      automotive designer.

21  BY MR. MASHMAN:

22     Q.  All right.  On page 24 of your report --

23     A.  Yes, sir.

24     Q.  -- you critique Mr. Roche referring to the

25  subject F-250's trim level as a King Ranch instead of

Wesley Grimes                                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 167

1    a Lariat?

2         A.   Yes.

3         Q.   Do you have any substantive criticism of

4    Mr. Roche's vehicle compatibility defect or crash

5    worthiness opinions based on that decision?

6         A.   Not based on that, no.  It's really more the

7    report that he basis things on.  It doesn't include

8    many F-250s and so he's making a lot of statistical

9    statements that really don't include many F-250s of

10   this vintage.

11        Q.   I think -- are you referring to that SAE

12   paper that you cite in your report?

13        A.   Yes.  That he also cites.

14        Q.   Did you review subsequent SAE paper to

15   determine whether there was a difference in the

16   probability of deployment thresholds as published in

17   later dates?

18        A.   I haven't.

19        Q.   Do you agree that the airbag did not deploy

20   in the lifted F-250 that Mr. Elliott was driving?

21        A.   That's correct.

22        Q.   Do you agree that the airbag did deploy in

23   the unlifted F-250 used in the Exponent crash test?

24        A.   Yes.

25        Q.   On page 26 --

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 168

1          A.  Yes, sir.

2          Q.  -- you have a series of opinions about

3     Mr. Lewis' analysis in this case?

4          A.  Yes, sir.

5          Q.  You're not providing any opinions about

6     Mr. -- about Cohan's injuries, right?

7          A.  I'm am --

8          Q.  You're not giving --

9          A.  -- not, no sir.

10         Q.  I apologize.

11             You're not giving an opinion about injury

12    causation?

13         A.  That's correct.

14         Q.  You're not giving an opinion about

15    biomechanics?

16         A.  Correct.

17         Q.  And you don't hold yourself out as an expert

18    in biomechanics?

19         A.  That is correct.

20         Q.  Your opinions about Mr. Lewis' analysis

21    relate only to accident reconstruction?

22         A.  Yes, sir.

23         Q.  In section one you have it as .1 in the

24    indented portion.  Do you see where I'm looking?

25         A.  Yes, sir.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 169

1        Q.  Your critique is that Mr. Lewis relied on

2    Mr. Buchner's reconstruction to determine the degree

3    of intrusion of a nonlifted vehicle; is that fair?

4        A.  Yes.

5        Q.  And that's the same point you make in

6    section 1.21 and 1.24, right?

7        A.  Yes, sir.

8        Q.  In section 1.10, you critique the

9    information that Mr. Lewis gave about the exemplar

10   car seat he used?

11       A.  Yes.

12       Q.  Your report states that the manufacture date

13   of the car seat should have been provided, right?

14       A.  Yes.  And I just didn't see it in his

15   report.

16       Q.  Did you review Mr. Lewis' file materials?

17       A.  I didn't.

18       Q.  Your report also states that Mr. Lewis

19   should have provided the VIN number, year, make and

20   model of the exemplar Escape?

21       A.  Yes.

22       Q.  Did you review his file materials to see if

23   he did that?

24       A.  I did not.  I just reviewed his report --

25   well, that's not fair.  I looked through his

Page 170

```
 1    material, but because I wasn't really looking for
 2    details, it wasn't I something I saw in my cursory
 3    review of things.
 4         Q.  What I'm trying to get at, if he had taken a
 5    picture of the VIN, would that have been enough?
 6         A.  Sure.
 7         Q.  Did you help design crash testing in this
 8    case?
 9             MR. HILL:  Object to form but go ahead.
10             THE WITNESS:  What do you mean by
11         "design"?
12    BY MR. MASHMAN:
13         Q.  Did you contribute to the discussion of how
14    it would be performed?
15         A.  Yes.
16         Q.  When did those discussions take place?
17         A.  Within the two, three, four months before
18    the crash test.
19         Q.  And you attended the crash testing, right --
20         A.  Yes.
21         Q.  -- as well as Ann Grimes and Mark Leonard
22    from your office --
23         A.  Yes.
24         Q.  -- is that right?
25             Was anybody else from your office present at
```

Page 171

1    the crash test?

2         A.   No.

3         Q.   And who else was there?

4         A.   All of the Exponent staff and an attorney

5    from Mr. Hill's office.

6         Q.   Was Dr. Nguyen there?

7         A.   Oh, yes, yes.  Thank you.  She was.

8         Q.   How many Exponent staff were present

9    approximately?

10        A.   I don't know.  Five or six.  You know, I'm

11   running cameras and setting up things.  There may

12   have been 10.  I don't know.

13        Q.   Did you make any changes to the crash test

14   setup on the day of the test?

15        A.   No.

16        Q.   Was the purpose of the crash test to

17   recreate the subject collision if the F-250 had not

18   been lifted?

19        A.   It wasn't really to recreate it.  It was to

20   explore what type of intrusion would occur without

21   the lift kit on the vehicle.  We're not trying to

22   recreate it because we don't have cargo in the back.

23        Q.   The purpose of it was to isolate how

24   different the intrusion would be had the F-250 not

25   been lifted; is that fair?

Page 172

1          A.   That was one goal, yeah.  And for me, that

2     was the primary goal was to -- to look at if we make

3     the test as simple as we can with a nonlifted

4     vehicle, but we want to match as closely as we

5     reasonably can the speeds, the weights, the offset,

6     the angles; things like that.  We want to match all

7     of that as much as we can.

8               But we don't have cargo in the vehicle, so

9     I'm not going to say we're trying to recreate the

10    crash.  We're looking at what type of intrusion is

11    going to happen without a lift kit on the pickup

12    truck.

13         Q.   Why do you want to match the speeds, weight,

14    offsets and angles?

15         A.   So that we can -- I can come to the

16    conclusion that the lifted -- the lift kit on the

17    pickup didn't affect significantly the amount of

18    intrusion that would have occurred.

19         Q.   If the speeds, weights, offsets and angles

20    weren't matched, are you saying that you wouldn't be

21    comfortable coming to that conclusion?

22              MR. HILL:  Object to form.

23              THE WITNESS:  I think there's a range

24         for all of those things and we want to be

25         within that range.

Page 173

1    BY MR. MASHMAN:

2        Q.  But the goal of matching is so that you can

3    reasonably say as a scientific principle that the

4    difference in height is what resulted in the

5    difference of intrusion; is that fair?

6            MR. HILL:  Object to form.

7            THE WITNESS:  Or didn't.  Yeah, yeah.

8        We want to be able to draw conclusions.

9    BY MR. MASHMAN:

10       Q.  And the way to do that is to isolate the

11   variable that you're changing; is that fair?

12       A.  Well, we're -- the way to do it for what we

13   did is to run the simplest test we could for a pickup

14   to match the key components of the crash without a

15   lifted truck.

16       Q.  Why didn't you run a second crash test with

17   all of the cargo directly behind Cohan as a worst

18   case scenario to see how it affected the intrusion?

19       A.  Because we didn't know exactly where the

20   cargo was and I didn't to subject myself to the

21   criticism of you had the bag of clothing in the wrong

22   place or you had the Shop-Vac in the wrong place or

23   whatever.

24           And really more importantly is Dr. Nguyen

25   looked at the actual vehicle and said it was

Page 174

1    sufficient for her needs and that's really what drove

2    the decision for me.

3        Q.  So is it fair to say that it was Dr.

4    Nguyen's decision not to put the cargo in the crash

5    test?

6        A.  That's not what I said.  The -- Dr.

7    Nguyen -- and I'll let her speak for herself.  But

8    it's my understanding that after the first test, Dr.

9    Nguyen did not feel that there would be any benefit

10   to running a second test trying to place cargo when

11   we really didn't know where the cargo was.

12           The test went off well, so there was no

13   reason to run a second test.

14       Q.  Did you tell Exponent to put an exemplar car

15   seat in the same position Cohan was in for the crash

16   test?

17       A.  No.

18       Q.  Why not?

19       A.  Because Dr. Nguyen didn't feel it was

20   necessary for her purpose.

21       Q.  Did Dr. Nguyen ever suggest the idea of

22   putting a child's car seat in the same position Cohan

23   was in for the crash test?

24       A.  I don't remember her ever talking about

25   that.  She may have.  It -- because the ultimate

Page 175

1    decision was to not do it, I don't remember -- I

2    don't remember her doing it.  I'm not going to say --

3    if she comes in and says, yeah, I talked about it,

4    okay, fine, I don't remember her talking about it

5    though.

6         Q.  Did anyone ever discuss the idea of putting

7    an instrumented crash test dummy in a car seat in the

8    crash test?

9         A.  We talked about that early on and, again,

10   Dr. Nguyen indicated she didn't feel it was

11   necessary.  I know there was also some concern about

12   the testing device size and weight and having to use

13   a smaller one and scale it.

14         There were complications.  And so we decided

15   to make the test as simple as possible and not do

16   that.  And Dr. Nguyen felt like that was all she

17   needed for her purposes.

18        Q.  Did anyone ever discuss ever putting any

19   kind of dummy in a car seat in the crash test?

20        A.  Yeah.  Early on we talked is there a reason

21   to do it?  And Dr. Nguyen kind of indicated she

22   didn't think there was.

23         In addition to that complication that it

24   could cause, the decision was made to not do.  That

25   but it was Dr. Nguyen's recommendation that she

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 176

1    didn't need it that really drove that -- that

2    decision.

3         Q.  Did anyone ever suggest putting an adult

4    crash test dummy in the front driver's seat?

5         A.  Not that I recall.

6         Q.  Can you -- I apologize.

7              How did you select the vehicles used in the

8    crash test?

9         A.  Charlie Crosby and Exponent located those

10   vehicles and purchased them.

11        Q.  Is it important to have vehicles with

12   similar structural characteristics in a crash test?

13             MR. HILL:  Object to form but go ahead.

14             THE WITNESS:  Of the structures that

15        we're interested in, sure.

16   BY MR. MASHMAN:

17        Q.  Do you agree that vehicles with different

18   structural characteristics could perform differently

19   from the subject crash?

20             MR. HILL:  Object to form.

21             THE WITNESS:  I guess it would depend on

22        what the structural difference is.  If it's

23        something that's away from the crash zone,

24        it doesn't have significant effect on the

25        overall structure, then it wouldn't matter.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 177

1    BY MR. MASHMAN:

2         Q.  Your report mentions a VIN analysis

3    performed to determine the F-250 and Escape used in

4    the crash test?

5         A.  Yes.

6         Q.  Can you briefly walk me through what you

7    were looking at?

8         A.  We simply looked at the VINs of the two

9    vehicles used in the test compared to the VINs of the

10   vehicles involved in the actual crash and highlighted

11   the differences.  One of them was different by the

12   factory and I think the other one was simply a check

13   digit and serial number.

14        Q.  Aside from comparing the VIN numbers --

15   sorry, scratch that.

16             VIN numbers represent differences with

17   respect to 17 categories that are represented by the

18   number; is that fair?

19        A.  Yes.

20        Q.  And they don't tell you anything outside of

21   those 17 categories; is that fair?

22        A.  That's probably -- that's probably fair.

23        Q.  And aside from comparing the VIN numbers,

24   what else did you do to select the vehicles?

25        A.  Charlie Crosby would -- would have looked at

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 178

1    those vehicles, made that decision.  I'm sure that

2    he -- he told me which vehicles he was looking at and

3    I approved them.  I don't remember specifically doing

4    that.

5         Q.  Do you agree that the Escape used in the

6    crash test did not have a sunroof?

7         A.  Yes.

8         Q.  Did you do anything to determine what effect

9    the sunroof has on the strength of the Escape's

10   structure?

11        A.  No.

12        Q.  I want to ask you about how the vehicles

13   were set up for the crash test.

14        A.  Okay.

15            MR. MASHMAN:  I'm going to show you

16        Plaintiff's Exhibit 74, which is a series of

17        photographs from the crash test set-up.

18            (Plaintiff's Exhibit 74 was marked for

19        identification.)

20            MR. MASHMAN:  Sorry, Rick.  I don't have

21        another copy of this one, but it's in his

22        file.

23            MR. HILL:  That's all right.

24   BY MR. MASHMAN:

25        Q.  These pictures show how the vehicles were

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 179

1    lined up before the crash test, right?

2         A.  Yes.

3         Q.  And looking at -- do you see the photo

4    numbers under each one of the --

5         A.  I do.

6         Q.  You're going to be referring to those.

7              Let's start with photo 226.

8         A.  226?

9         Q.  Yes.  It should be the first one.

10        A.  The very first photo.

11        Q.  The very first photo.  Make it easy.

12        A.  No, that's 225.

13        Q.  Oh, the first noncover sheet.

14        A.  Got it.

15        Q.  This shows the Escape's starting position in

16   the crash test; is that right?

17        A.  Yes.

18        Q.  And no one moved the Escape from this

19   position before the crash; is that right?

20        A.  I think that's correct.  Yes, sir.

21        Q.  The F-250 had a different starting point

22   from this in the crash test; is that fair?

23        A.  Yes, sir.

24        Q.  The F-250 was moved backwards along the

25   track before the crash test, right?

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 180

1          A.  Yes.

2          Q.  And it's starting position was off the

3     screen of this picture.  It was way further back

4     along the track, right?

5          A.  Yes.

6          Q.  And then the F-250 was towed into the Escape

7     using a device in the track; is that correct?

8          A.  Yes.

9          Q.  And looking at photos 276 and 277 --

10         A.  276 and 277?

11         Q.  Yes.

12         A.  Okay.

13         Q.  Do those two photos show the device that was

14    used to tow the Escape along the track?

15         A.  I believe they do.

16         Q.  And it's -- sorry.  Strike that.

17              The purpose of this device was to pull the

18    F-250 forward up to the desired speed and then let go

19    at the last second to cause the F-250 to crash into

20    this Escape; is that fair?

21         A.  Essentially, yes.

22         Q.  What's that device called?  Does it have a

23    name?

24         A.  I have no idea.  I think of it as a track

25    and a sled on the track, but I don't know what they

Page 181

1    call it there.

2         Q.  I wouldn't be wrong if I referred to it as a

3    sled, a sled pulling the F-250 --

4         A.  Or a slider pulling it along the rail.

5              MR. MASHMAN:  Okay.  I think we've been

6         going for a while.  Let's -- let's go ahead

7         and take a break.

8              THE WITNESS:  Okay.

9              THE VIDEOGRAPHER:  The time is 3:01 p.m.

10        We are off video record.

11             (Recess from 3:05 p.m. to 3:19 p.m.)

12             THE VIDEOGRAPHER:  The time is 3:19 p.m.

13        We are back on video record.

14   BY MR. MASHMAN:

15        Q.  We were talking a second ago about the setup

16   of the crash test.

17        A.  Can I -- I was thinking through in the other

18   room drinking my diet Coke and thinking through.  I

19   just want to make it clear about the HVE SIMON, that

20   I don't think it's appropriate to just blindly

21   predict crush without some reference to compare to.

22   I hope that came across, but that's the shortest and

23   sweetest statement I can make about it.

24        Q.  Okay.  This crash test had an offset, right?

25        A.  Yes, sir.

Wesley Grimes                                      May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 182

1        Q.   And it's my understanding, correct me if I'm
2    wrong, that your conclusion was that in the subject
3    crash, the Escape's center line was offset 10.9
4    inches to the right of the F-250's center line; is
5    that correct?
6        A.   Approximately, yes.
7        Q.   And you could say the same thing in reverse,
8    that the F-250 center line was 10.9 inches to the
9    left of the Escape's center line; is that right?
10       A.   Yes.
11       Q.   I just want to make sure that goes both
12   ways?
13       A.   I think our estimate was 10.9 and that
14   would -- I don't know -- plus or minus a quarter or
15   something, probably.
16       Q.   How did you come to that estimate of
17   10.9 inches offset?
18       A.   By looking at the interaction between the
19   vehicles where the tow hooks made contact, where the
20   hinge points made contact between the Ford Escape and
21   the F-250.
22       Q.   And did you use the alignment of the three
23   scans to come up with the 10.9 inches of offset?
24       A.   Yes.
25       Q.   And you mentioned the tow hooks.  Were the

Wesley Grimes                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 183

1    tow hooks the only match point that you used to line

2    up those two vehicles?

3         A.  I think -- as I recall, it was the tow

4    hooks.  And there were -- there was some indentations

5    on the hood of the F-250 that lined up, I want to

6    say, with the hinges or part of the hatch on the

7    Escape.

8             It seems like one of the C-Brackets had made

9    an imprint or something like that.  There were three

10   or four points -- three or four components like that

11   that we tried to line up.  And, of course, you're

12   lining it up visually, you know.

13        Q.  Lining it up visually --

14        A.  Using the point clouds.

15        Q.  -- using the point clouds.  That's what I

16   was trying to get to.

17        A.  Yes.

18        Q.  So you take the point clouds from the 3D

19   scan of the Escape, the 3D scan of the F-250 and line

20   up the tow hooks, indentations on the F-250's hood

21   and C-Bracket to align those two vehicles.

22            Is that a fair summary?

23        A.  That's my recollection.  There may have been

24   other components, but those are the ones that I

25   remember.

Page 184

1          Q.   Okay.

2          A.   I think that there were a lot of little

3     marks that were looking at trying to associate

4     between the two.

5          Q.   Sitting here today, you don't recall any

6     other match points that you relied on in aligning the

7     two point clouds in the subject collision; is that

8     fair?

9          A.   That's fair.

10         Q.   Did you rely on anything else to come up

11    with the 10.9 inches of lateral offset?

12         A.   No.

13         Q.   Why did you decide to set up the crash test

14    with the same amount of offset as there was in the

15    subject collision?

16         A.   Because we're exploring the intrusion into

17    the rear occupant compartment.

18         Q.   Could the amount of offset potentially

19    impact the characteristics of the collision?

20         A.   Sure.  I don't think little changes.  I

21    think like Mr. Buchner says it's about 12 inches.

22    I'm not going to argue about an inch.

23              You know, I think five or six inches,

24    eight inches, yeah, that could make a difference, but

25    I think half an inch, an inch, I'm not going to argue

Page 185

1     about that.

2          Q.  Do you agree the more offset there is in a

3     crash, the more likely intrusion into the occupant

4     compartment is?

5               MR. HILL:  Object to the form.  Go

6          ahead.

7               THE WITNESS:  Within a certain reason,

8          that's probably fair.  I mean, you know, if

9          you -- if you -- again, if you go to an

10         extreme, you're going to generate more

11         intrusion.

12    BY MR. MASHMAN:

13         Q.  What I'm trying to get at, all things being

14    equal, more offset would mean more intrusion.

15              Is that the right relationship?

16              MR. HILL:  Object to the form.  Go

17         ahead.

18              THE WITNESS:  Again, within a range, I

19         don't know -- within a short range, I don't

20         think it's going to matter significantly.

21         But a large range.  I think that's probably

22         true.

23    BY MR. MASHMAN:

24         Q.  Do I have the directions right?  It's not

25    the opposite of what I said, right, that more offset

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 186

1      means less intrusion?

2           A.   Again, that's probably true.  I mean, I'd

3      have to look at it and research but, in general, I

4      think that that's probably true.

5           Q.   I found a statement on IIHS website that in

6      an offset crash --

7                THE REPORTER:  What's the website?  I'm

8           sorry.

9                MR. MASHMAN:  IIHS.

10               THE REPORTER:  Thank you.

11               THE WITNESS:  Institute -- Insurance

12          Institute for Highway Safety.

13     BY MR. MASHMAN:

14          Q.   In the statement I found was that in an

15     offset crash, quote, a smaller part of the structure

16     has to manage the crash energy and intrusion into the

17     occupant compartment is more likely.

18               Is that accurate and fair to your knowledge?

19          A.   If that's what's on their website, that's

20     what's on there.  You know, I'm not going to dispute

21     that.  Okay?

22          Q.   And do you agree with the IIHS that an

23     offset test is more demanding of a vehicle structure

24     than a full width test?

25          A.   If you have a lot of offset versus a full

Bryson, Santana and Joshua v. Rough Country, LLC

Page 187

1    center line to center line, I think that's probably

2    true.

3         Q.  Do you still have the photos --

4         A.  I do.

5         Q.  -- from the crash test setup?

6              Looking at the photos 238 to 240.  Just let

7    me know when you're there.

8         A.  238?

9         Q.  Yes, sir.

10        A.  I'm at 238.

11        Q.  This shows how the Escape was oriented

12   10.9 inches to the right of the center line of the

13   track; is that correct?

14        A.  I think that that's correct.

15        Q.  Is the Sharpie mark in photograph 238 the

16   Escape's midpoint?

17        A.  I don't know.  I'm assuming it is, but I

18   don't know.  I'm not the one that made the mark.

19        Q.  But that measurement is -- at least appears

20   to indicate that this is how they lined up, that the

21   Escape was 10.9 inches to the right of the track's

22   center line, right?

23        A.  Yes.  That's what this implies.

24        Q.  Go to page -- photos 243 to 245.

25        A.  Okay.

Wesley Grimes                                      May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 188

1        Q.  These show that the F-250 was set up with

2    its center line directly above the center line of the

3    track; is that correct?

4        A.  Yes.

5        Q.  So the way the crash test was set up --

6    well, I think I asked that.

7             Was the intent of this test to keep the

8    vehicles in this same alignment where the center line

9    of the F-250 was at the center line of the track at

10   the moment of impact and the Escape was offset

11   10.9 inches to the right?

12       A.  In general that would be the desire of this.

13   That's why they released the vehicle right before

14   impact.

15       Q.  At one point in your report you mention that

16   the front bumper of the F-250 and the rear bumper of

17   the Escape were approximately aligned at impact.

18             Does that refer to being aligned in terms of

19   height?

20       A.  Yes, sir.

21       Q.  I'm going to refer back to these photos.

22       A.  To which photos?  The test photos?  Okay,

23   yeah.

24       Q.  Photograph 284.

25       A.  Yes.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 189

1         Q.  This shows that the Escape was placed in
2    neutral for the crash test, right?
3         A.  Yes, sir.
4         Q.  And skipping ahead to 286, this shows that
5    the Escape's parking brake was engaged for the crash
6    test, right?
7         A.  That's what it looks like.  Yes, sir.
8         Q.  Was there any evidence that the parking
9    brake was engaged in the subject collision?
10        A.  No.
11        Q.  Is there any test procedure to your
12   knowledge that requires a parking brake to be engaged
13   in a rear impact crash test?
14        A.  I don't know.
15        Q.  There's yellow and black tape on the hood of
16   the F-250 and Escape in some of these photographs?
17        A.  Yes.
18        Q.  Is that to show where the center line is?
19        A.  It's just showing references.  I think that
20   those are one-inch squares, as I recall, if that's
21   what you're talking about.  You're just talking about
22   the checkers --
23        Q.  The yellow and black tape.
24        A.  I think -- my recollection is those are
25   one-inch squares.

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                        Page 190

1          Q.  Are those -- the ones on the hood, are those
2     aligned over the center line of the vehicles?
3          A.  I'm assuming that they are.  I don't know.
4     I'm not the one that did that.
5          Q.  Looking at photograph 280, this is of the
6     interior of the F-250 used in the crash test,
7     correct?
8          A.  Yes.
9          Q.  And there isn't -- I don't see any sort of
10    steering mechanism; is that right?
11         A.  That's correct.
12         Q.  So if the -- I forgot what you called it
13    earlier.  The sled is what was pulling the F-250, but
14    as far as the steering wheel itself, nothing was
15    holding or stabilizing it during the test, right?
16         A.  I don't know.  They may have locked the
17    steering.  I don't know.
18         Q.  The crash test F-250 was ballasted off to
19    8,533 pounds for the crash test, right?
20         A.  Yes, sir.
21         Q.  And the Escape was ballasted up to
22    3,940 pounds for the crash test?
23         A.  Was it 40 or 41?  I can't remember now.
24    Three thousand nine hundred and forty-one on page --
25    I don't see a page number.  It's under vehicle crash

Wesley Grimes                                              May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 191

1    test condition for the Escape.  Total weight is

2    3,941.

3          Q.  Okay.  It was ballasted up to 3,941 pounds

4    for the crash test, right?

5          A.  Yes, sir.

6          Q.  And we talked about how you got to those

7    calculations earlier, right, adding the occupants and

8    cargo to curb weights of the F-250 and Escape; is

9    that fair?

10         A.  Yes, sir.

11         Q.  Do you agree that changing the weights of

12   vehicles could impact results in a crash test?

13             MR. HILL:  Object to the form.  Go

14         ahead.

15             THE WITNESS:  If you change them

16         significantly, they could.  I think minor

17         changes are not going to greatly affect --

18         substantially affect the results.

19   BY MR. MASHMAN:

20         Q.  Do you agree that all else being equal, a

21   collision with heavier vehicles will result in more

22   intrusion and crush damage in a collision?

23             MR. HILL:  Object to the form.

24             THE WITNESS:  That might be true.  I

25         don't know.  That might be true.

Page 192

1    BY MR. MASHMAN:

2         Q.  I want to ask you about the emergency brake

3    we talked about a second ago.

4              Did you direct Exponent to engage the

5    emergency brake of the Escape before the crash test?

6         A.  Not specifically.  I think that was a

7    decision -- first of all, I don't know that it was on

8    at the actual impact.  It may have been on to make

9    sure the vehicle didn't move before the test.  I

10   don't know.  As I sit here, I don't know.

11             But it doesn't bother me because you then

12   have an axle that's locked.  That's not an issue for

13   me because the vehicle was in gear.

14        Q.  I think my -- my question was whether you

15   directed Exponent to engage the emergency --

16        A.  I did not.

17        Q.  Were you ware that Exponent had pulled the

18   emergency brake before the test?

19        A.  You know, they may have told me that out

20   there.  I don't specifically recall being told that.

21        Q.  Do you have any recollection of Exponent

22   telling you why they did that?

23        A.  No.

24        Q.  The test Escape did not have any cargo in

25   the cargo area during the crash test, correct?

Wesley Grimes                                                 May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 193

1        A.   Correct.

2        Q.   Why not?

3        A.   Because we didn't feel it was necessary to

4    put that in for our purposes and we didn't know

5    exactly where the cargo was -- was at the time of the

6    crash.

7             Ms. Kelley and Mr. Bryson didn't recall

8    either.  And so instead of guessing at that, we

9    wanted to understand what would happen without the

10   cargo.  We always knew that if we put cargo in,

11   whatever displacement we had of the tailgate would be

12   amplified if there were materials in there taking up

13   that space.

14            So it was the simplest test we could run

15   without -- without compromising those types of

16   things.

17       Q.   I think you said earlier you didn't want to

18   guess where the cargo was located in the Escape; is

19   that fair?

20       A.   Yes.

21       Q.   Why is it important not to guess where the

22   cargo was located in the Escape?

23       A.   Because if we had put the cargo in and we

24   got whatever that result was, we could be subject to

25   criticism for not knowing where it was and

Page 194

1    purposefully placing it for some purp- -- some of our

2    own purposes and we had no desire to do that.

3         Q.  And that criticism would be that the cargo

4    was in a different location than where it was in the

5    subject wreck, right?

6         A.  Yes.

7         Q.  And isn't it true by not including any

8    cargo, the cargo was not in the same location that it

9    was in the subject wreck?

10        A.  That's true.  But it also then doesn't have

11   an artificial effect on the seat back displacement.

12             MR. MASHMAN:  I'm showing you

13        Plaintiff's Exhibit -- I think that says

14        75 -- yes.  It's two pictures of the damage

15        to the Escape after the crash test.

16             (Plaintiff's Exhibit 75 was marked for

17        identification.)

18   BY MR. MASHMAN:

19        Q.  The second picture might be a little better

20   for this, picture 385.  Do you see that?

21        A.  Yes.

22        Q.  Do you see a mark left by the Ford F-250's

23   Ford emblem on the rear of the Escape?

24        A.  No.

25        Q.  I'm looking at this mark above where it

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 195

1    says:  Escape XLT.

2         A.  Okay.

3         Q.  Is that mark consistent with the Ford emblem

4    on the F-250?

5         A.  I don't know.  I don't see what you're

6    seeing.  I don't know if it is or not.

7         Q.  Do you see a mark in an approximate oval

8    shape above "Escape XLT"?

9         A.  No.  Just right above it?  I see something

10   there.  I don't know that it's necessarily a Ford

11   emblem.  I see something there.  There's definitely

12   something there.

13        Q.  Is it your opinion that it's inconsistent

14   with being a Ford emblem or just that you can't say

15   one way or another?

16        A.  I just can't say one way or another.

17        Q.  I asked you this earlier.

18             The crash test didn't apply any braking for

19   the F-250, right?

20        A.  Yes.  It did.

21        Q.  I apologize.  Before impact, the crash test

22   did not apply any braking for the Ford F-250, right?

23        A.  That's correct.

24        Q.  Did you perform any testing to determine how

25   much .5 seconds of braking lowers the front bumper of

Wesley Grimes                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 196

1    a 2016 F-250?

2            A.  No.

3            Q.  Did you perform any calculations to

4    determine how much .5 seconds of braking lowered the

5    front bumper of a 2016 F-250?

6            A.  No.

7                MR. MASHMAN:  I'm going to hand you

8            three exhibits.  These are Exhibits 76, 77

9            and 78.

10               (Plaintiff's Exhibit 76, Exhibit 77 and

11           Exhibit 78 were marked for identification.)

12   BY MR. MASHMAN:

13           Q.  Here's 76.  That's a figure from your

14   report.  77 is a series of pictures of the Escape

15   after the crash test.  And 78 is a series of pictures

16   of the subject Escape after the collision.

17               Do you agree that the second row seat Cohan

18   was sitting in deformed farther forward in the

19   subject collision than in the crash test?

20           A.  It certainly appears to have.  Yes.

21           Q.  Did you quantify how much the second row

22   seat deformed statically in the subject collision?

23           A.  No.

24           Q.  Did you take any measurements of how much

25   the second row seat deformed statically in the

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 197

1      subject collision?

2          A.   We have scans where we can pull measurements

3      off of that, but we have not done that.

4          Q.   Did you quantify how much the second row

5      seat deformed statically in the crash test?

6          A.   No.

7          Q.   Did you quantify how much farther forward

8      the subject Escape's seat back is deformed compared

9      to the test Escape's seat back?

10         A.   No.

11         Q.   Did you measure the angle of either seat

12     back?

13         A.   No.

14         Q.   Do you have your report in front of you?

15         A.   Yes.

16              Are you done with these images or --

17         Q.   I'd like to keep them --

18         A.   Okay.

19         Q.   On page 33 of your report --

20              (Discussion ensued off the record.)

21              THE WITNESS:  Page 33?

22              MR. MASHMAN:  Yes.

23              THE WITNESS:  Okay.

24     BY MR. MASHMAN:

25         Q.   You offer the opinion that the test Escape

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                             Page 198

1    would have sustained more seat deformation if it had
2    been loaded with exemplar cargo; is that right?
3         A.  Yes.
4         Q.  What is the basis of your opinion that the
5    difference between the second row seat deformation
6    was due to the lack of cargo in the test Escape?
7         A.  Because the rear hatch came forward and made
8    contact with the seat back.  And if there has been
9    cargo there, it would have taken up that space and
10   would have caused the seat back of the second seat in
11   the Escape to have been displaced more forward.
12        Q.  Did you base that conclusion on any testing?
13        A.  The crash test.
14        Q.  The crash -- I'm specifically talking about
15   the conclusion that if cargo had been placed in the
16   cargo area, the seat back would have deformed more
17   than in the crash test.
18        A.  There was not any additional testing for
19   that, no.
20        Q.  Did you perform any calculations to reach
21   that conclusion?
22        A.  No.
23        Q.  Does your report cite any literature for
24   that conclusion?
25        A.  I don't think so.

Page 199

1          Q.  Did you perform any analysis to determine

2     what the total volume is of the cargo that was in the

3     subject Escape?

4          A.  No.

5          Q.  Did you perform any analysis to determine

6     whether the cargo would have deformed before the

7     second row seat deformed?

8          A.  No.  We didn't do a specific analysis for

9     that.

10         Q.  Did you analyze whether the Shop-Vac is

11    stronger than the bolted down second row seat of the

12    Bryson's SUV?

13         A.  No.

14         Q.  Did you analyze whether a bag of clothing is

15    stronger than the second row of the Bryson's SUV?

16         A.  We didn't, but it would depend upon how much

17    it was compressed obviously.

18         Q.  But you didn't analyze how much it was

19    compressed relative to the strength --

20         A.  We did not.

21         Q.  Did you analyze whether the camping chairs

22    were stronger than the second row of the Bryson's

23    SUV?

24         A.  We did not.

25              THE REPORTER:  Slow down.

Wesley Grimes                                            May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                        Page 200

1       BY MR. MASHMAN:

2            Q.  I apologize.

3                Did you analyze whether the umbrella

4       stroller was stronger than the second row of the

5       Bryson's SUV?

6            A.  We did not.

7            Q.  And I think you mentioned this earlier.

8                Do you hold yourself out as an expert in

9       seat back design?

10           A.  No.

11           Q.  Do you have any basis to offer an expert

12      opinion on seat back design?

13           A.  On seat back design?  No.

14           Q.  Isn't it true that seat backs have a frame

15      around the outer edge and the inside of that frame is

16      mostly filling?

17           A.  I think in some cases there is a lot of

18      filling.  I think there's some substructures.  You

19      would have to deglove that seat.  Again, I'm not an

20      expert on seat backs.

21           Q.  And did you de-trim the seat in either the

22      subject wreck or the test Escape to determine the

23      internal make-up of the seat?

24           A.  No.

25           Q.  Do you have an opinion about how much more

Wesley Grimes                                            May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 201

1      the second row seat in the test Escape would have

2      been deformed if you had loaded the same cargo into

3      it that was in the subject wreck?

4              A.  No.

5                  MR. MASHMAN:  I'm going to show you

6              Plaintiff's Exhibit 79.

7                  (Plaintiff's Exhibit 79 was marked for

8              identification.)

9      BY MR. MASHMAN:

10             Q.  This is an interrogatory that the

11     plaintiff's responded to in this case.

12                 Did Rough Country provide this to you before

13     the crash test?

14             A.  I don't remember seeing this, but we may

15     have seen it.

16             Q.  Do you agree that this itemizes what was in

17     the back seat of -- strike that.

18                 Do you agree that this itemizes what was in

19     the rear compartment of the Bryson's Escape?

20             A.  That's what it says it does.  Yes.

21             Q.  Did you rely on this in any way when you

22     decided on how to configure the crash test?

23             A.  No.  Because we weren't putting cargo back

24     there.

25             Q.  Do you agree that if you had made the

Page 202

1    decision of what to put in the rear, this would have

2    told you?

3         A.  It would have told us what to put there.  It

4    wouldn't have told us where to put it.

5         Q.  What's the difference between static

6    deformation and dynamic deformation?

7         A.  A dynamic deformation occurs during force

8    application.  As the forces are removed, the system

9    material relaxes and restores some of its original

10   shape.

11        Q.  Did you analyze the amount of dynamic

12   deformation in the subject Escape's second row seat?

13        A.  No.

14        Q.  Did you analyze the amount of dynamic

15   deformation in the test Escape's second row seat?

16        A.  No.

17        Q.  Did you see any physical evidence showing

18   that the second row seat in the test Escape

19   dynamically deformed past where it had deformed

20   statically?

21        A.  I didn't look for it.  So, no, I didn't.

22        Q.  I asked a similar question, not this exact

23   question:  Did you measure the amount of dynamic

24   deformation in the subject Escape?

25        A.  No.

Case 2:22-cv-00017-RWS   Document 102-3   Filed 09/05/24   Page 203 of 305
Wesley Grimes                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 203

1      Q.  Did you measure the amount of dynamic
2   deformation in the test Escape?
3      A.  No.
4      Q.  And same question with respect to the amount
5   of intrusion.
6          Did you measure the amount of dynamic
7   deformation with respect to intrusion in the subject
8   Escape?
9      A.  No.
10     Q.  Did you measure the amount of dynamic
11  deformation with respect to intrusion in the test
12  Escape?
13     A.  No.
14     Q.  Do you have any criticism of Mr. Buchner's
15  analysis of the dynamic deformation in the subject
16  collision?
17     A.  The only criticism is I'm not sure exactly
18  how he does it; he talks about seeing different
19  features that must have interacted.  I'm not sure
20  that it's that simple.  I think that some of the
21  features interacting could as be caused by just
22  movements up and down and things like that.
23         I don't know exactly what features he's
24  talking about, so I'm not going to -- I can't be
25  specific about those criticisms because I'm not sure

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 204

1      I understand fully exactly what he did.

2           Q.  Do you have any disagreement with

3      Mr. Buchner's conclusion about the amount of dynamic

4      deformation in the subject collision?

5           A.  I haven't looked at that.  I -- I agree that

6      there would be dynamic deformation.  I just am not

7      sure that you can quantify it as accurately as he

8      calculates.

9           Q.  Sitting here today, you haven't looked at

10     the amount of dynamic deformation and don't disagree

11     with the number he came up with; is that fair?

12          A.  I don't --

13               MR. HILL:  Object to the form.  Go

14          ahead.

15               THE WITNESS:  I don't agree or disagree.

16          I -- I agree that there would be dynamic

17          deformation.  I haven't made any attempt to

18          quantify it.

19     BY MR. MASHMAN:

20          Q.  Your report -- I'm going back to static

21     deformation.

22               Your report says that the static deformation

23     of the second row of the subject Escape and test

24     Escape are substantially similar.

25               What is your basis for that conclusion?

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 205

1          A.   Just looking at the two vehicles and looking

2     at photographs.

3          Q.   So that's a visual conclusion; is that fair?

4          A.   It is.

5               MR. MASHMAN:   I'm showing you what's

6               been marked as Plaintiff's Exhibit 81.   This

7               is figure 29 from your report.

8               (Plaintiff's Exhibit 81 was marked for

9               identification.)

10    BY MR. MASHMAN:

11         Q.   This graph compares the delta-v for the

12    subject F-250 and crash test F-250, correct?

13         A.   It does.

14         Q.   And you note in your report that the

15    delta-vs are different between approximately 50

16    milliseconds and 130 milliseconds, correct?

17         A.   There is a short area there where they

18    are -- they do diverge.

19         Q.   And you call it a short area.  Is the

20    subject test shorter or is the crash test shorter?  I

21    think that I said wrong.

22              MR. HILL:   Object to the form.

23              MR. MASHMAN:   I apologize.  Let me say

24              that question again.  I think I made a

25              mistake.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 206

1    BY MR. MASHMAN:

2         Q.  Are you saying that the subject collision

3    has a shorter delta-v or the crash test has a shorter

4    delta-v?

5              MR. HILL:  Object to the form.

6              THE WITNESS:  There's -- I think I

7         understand what you're asking me.  Shorter

8         delta-v doesn't make sense to me.

9              If you -- if you look at, say,

10        100 milliseconds, the delta-v on the

11        collision Ford is slightly lower than the

12        delta-v on the crash test Ford.  And if you

13        look at the slope there, then the crash test

14        was a little bit stiffer during that time.

15   BY MR. MASHMAN:

16        Q.  Okay.  And I'll try -- let me see if I can

17   get this right.

18             The crash test achieved a higher delta-v in

19   less time between 50 milliseconds and

20   130 milliseconds; is that fair?

21        A.  Well, I don't know that it's 131, but it

22   will be close to that.  Whatever it is.  I mean, the

23   data is what the data is.

24        Q.  But the relationship I described is

25   correct --

Page 207

1        A.  It does.  Yeah, the Ford in the crash

2    test -- it appears to me that it encounter some

3    siffer -- some stiffer structures during that time

4    period just because the slope of the delta-v is

5    different.

6        Q.  In your report, you conclude that the

7    difference between the two delta-vs in this diagram

8    is due to the cargo not being present in the rear of

9    the Escape in the crash test; is that right?

10       A.  Well, it's not just the difference in the

11   cargo but also your -- you are a little bit lower, so

12   you are engaging some of the lower structures that in

13   the crash vehicle, the subject vehicle, those lower

14   structures weren't engaged.

15       Q.  So it's not just the cargo in the rear area

16   of the Escape but also the different structures were

17   interacted with in the crash test; is that fair?

18       A.  I think that that's it.  Again, we

19   haven't -- we haven't done a detailed analysis why

20   they are different, but those are some of the things

21   that make sense to me.

22       Q.  When we talk about the cargo, we're talking

23   about the items in the trunk of the Escape, right,

24   the Shop-Vac, the camping chairs, the stroller and

25   the bag of clothes?

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 208

1      A.  Right.  But the difference between the crash
2   test and the subject crash is that the F-250 was
3   lower, so it engaged some of the lower structures and
4   those structures are different.
5      Q.  I understand that.  With respect to the
6   cargo, what you say contributed to the difference in
7   the delta-vs, what is that portion of your conclusion
8   based on, that the cargo caused some of that
9   difference?
10      A.  I think that what may be happening there --
11   again, we haven't done a film analysis or anything
12   like that.  But I think that the tailgate engages the
13   seat back in the test where the tailgate engages
14   cargo in the subject crash.
15      Q.  What is that based on?
16      A.  There wasn't any cargo there in the test.
17      Q.  I apologize.  The tailgate engaging the seat
18   back in the test?
19      A.  There wasn't any cargo there in the test.
20   There wasn't any cargo for it to interact with.
21      Q.  Do you agree that in the subject collision
22   the lateral delta-vs for the F-250 were initially
23   positive and then subsequently negative?
24      A.  I haven't looked at that detail, but we can
25   go look at it.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 209

1            If you're looking at the lateral delta-v, on
2      page 9 of the report, the lateral delta-v goes
3      negative .02 plus .01 negative .70, .12 and so on.
4            Is that what you're talking about?
5      Q.  Yes.
6      A.  Okay.
7      Q.  Is it fair to say the lateral delta-vs are
8      largely negative in the subject collision for that
9      F-250?
10     A.  Yes.
11     Q.  And then looking at the lateral delta-vs for
12     the crash test, is it fair to say that the lateral
13     delta-vs are initially negative and then subsequently
14     positive?
15     A.  That's true.
16     Q.  Why were the lateral delta-vs different
17     between subject wreck and the crash test?
18     A.  I don't know without doing a detailed
19     analysis of it, but my suspicion is that you're
20     engaging different structures.
21     Q.  On page 34 of your report -- sorry.  I'll
22     give you a second to get there.
23          MR. HILL:  What page did you say?
24          MR. MASHMAN:  34.
25          THE WITNESS:  Yes.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 210

1      BY MR. MASHMAN:

2           Q.  You state that the crash test had more

3      intrusion than the subject vehicle from the crash.

4               Did I read that correctly?

5           A.  The crash test had more intrusion than the

6      subject vehicle from the crash.

7           Q.  Is it your opinion that lift kits reduce

8      intrusion into other vehicles in rear impacts?

9           A.  No --

10              MR. HILL:  Object to the form but go

11          ahead.

12              THE WITNESS:  -- not necessarily.

13          That's -- you know, that's this vehicle,

14          this configuration, these speeds and also

15          aligning things up visually.  You know, they

16          might be closer to the exactly the same.

17              Lining things up visually, that's what

18          we came up with.

19      BY MR. MASHMAN:

20          Q.  What is your explanation for the result that

21      the crash test had more intrusion than the subject

22      vehicle?

23          A.  There wasn't cargo there that would have

24      loaded the rear seat, that would have then deformed

25      the rear seat.

Page 211

1          Q.   And have we discussed the basis for that

2     conclusion already?

3          A.   I think so.

4          Q.   And the -- when we talked about the cargo

5     earlier, we talked about the cargo affecting the

6     amount of deformation to the rear seat.  But I

7     understand your point here to be that the cargo was

8     the reason why the crash test had more intrusion

9     overall into the subject vehicle; is that right?

10         A.   What I'm saying is that I have not done a

11    detailed analysis of that.  But as I sit here what I

12    would tell you is without -- you've got a lot of

13    basically empty space there in the test.  That empty

14    space is not applying any force other than the

15    tailgate and -- until the tailgate hits the seat

16    back.

17              So if you have cargo there, it's going to

18    hit resistance sooner.  That resistance is going to

19    be transferred to the seat back.

20         Q.   So are you saying that the cargo keeps the

21    F-250 further out?

22         A.   Well, I think that's the net effect.  But

23    the issue is we weren't applying a force to the seat

24    back through the cargo because there's -- there's

25    empty space there.

Page 212

```
 1              MR. MASHMAN:  Okay.  I'm showing you
 2         Plaintiff's Exhibit 80, which is a screen
 3         shot from the video of the crash test.
 4              (Plaintiff's Exhibit 80 was marked for
 5         identification.)
 6    BY MR. MASHMAN:
 7         Q.  It was taken shortly before impact.
 8              Do you agree that the F-250's center line is
 9    not aligned with the center line of the track?
10         A.  From this perspective, I would agree with
11    that.
12         Q.  Do you believe that the perspective is the
13    only reason why the F-250 center line is not aligned
14    to the center of the track?
15         A.  I don't know.  I haven't looked at it.
16         Q.  But at least in this photo you agree that
17    the F-250's center line is to the left of the center
18    line of the track.
19         A.  I think the tape that's on the center of the
20    hood appears to be to the left.  But the center of
21    the bumper may still be because there's parallax
22    issues.
23         Q.  What is a parallax issue?
24         A.  Distortion of the imagine because of
25    photography and lenses where things don't line up the
```

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 213

1     way you think they do.

2          Q.  Have you done any analysis to determine how

3     far to the left of the center line of the track the

4     center line of the F-250 was at the moment of impact?

5          A.  No.

6          Q.  Page 34 of your report --

7          A.  Yes.

8          Q.  -- describes how you determined the amount

9     of static crush in the subject collision and in the

10    crash test, right?

11         A.  Yes.

12         Q.  Can you -- I'm sorry.  You've already

13    explained your methodology for determining the amount

14    of static crush in the subject collision, right?

15         A.  Yes.

16         Q.  And that was taking the point clouds and

17    aligning them with -- I believe, it was the tow

18    hooks, the C-Brackets and impacts on the hood; is

19    that right?

20         A.  Yes.

21         Q.  Did you --

22         A.  And just to be clear, also just general

23    shape of the crush, it helps you align those things.

24         Q.  And general shape?

25         A.  Yeah.

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 214

1       Q.  Did you use the same process to determine

2   the amount of maximum static crush in the crash test?

3       A.  We used the -- basically the point clouds

4   and trying to align the -- the crush profiles that

5   we're seeing.  I don't recall having specific

6   landmarks like that, but we could have, you know.

7            We look -- we look at the point cloud.  We

8   cut the point cloud apart and try to look at matching

9   structures and that's the way it's done.

10      Q.  And you said you didn't use specific

11  landmarks.  Is that the same thing as match points?

12      A.  I don't recall using specific ones.  We

13  probably did.  I just -- as I sit here, I don't

14  remember those specific ones.

15      Q.  So you don't remember which match points you

16  did or didn't use to align the F-250 and the Escape

17  after the crash test?

18      A.  That's fair.

19      Q.  Do you agree that the F-250's intrusion into

20  the Ford Escape was at a lower height in the crash

21  test than in the subject collision?

22      A.  I don't know.  I haven't looked at that.

23  You have that rear cover.  It probably is, but I

24  haven't looked at that detail.

25           MR. MASHMAN:  I'm going to show you

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 215

1          Plaintiff's Exhibit 82.  This is the Escape

2          comparative crush document from your file.

3                (Plaintiff's Exhibit 82 was marked for

4          identification.)

5      BY MR. MASHMAN:

6          Q.  What conclusions are you illustrating or

7      drawing about the amount of crush in the subject

8      Escape versus the test Escape with the document?

9          A.  Just that the crush is in the same area and

10     it's the same general magnitude.

11         Q.  And are there particular measurements that

12     you're relying on for that or is it just a visual --

13         A.  Just a visual analysis.

14         Q.  Do you agree that these scans show less

15     occupant space in the second row of the subject

16     vehicle than in the crash test vehicle?

17              MR. HILL:  Object to the form.

18              THE WITNESS:  That's probably true.

19     BY MR. MASHMAN:

20         Q.  Did you quantify the amount of occupant

21     space isn't the subject -- second row of the subject

22     vehicle versus the crash test vehicle?

23         A.  No.

24         Q.  Do you agree these scans show more forward

25     deformation of the second row seat where Cohan was

Wesley Grimes                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 216

1    sitting in the subject vehicle versus the test

2    vehicle?

3           A.  I think that's true.

4               MR. MASHMAN:  All right.  I'm showing

5           you Plaintiff's Exhibit 83, which is the

6           Ford F-250 comparative crush document from

7           your file.

8               (Plaintiff's Exhibit 83 was marked for

9           identification.)

10   BY MR. MASHMAN:

11          Q.  What conclusions, if any, are you

12   illustrating in this document?

13          A.  Again, that the general crush profile is

14   substantially similar.  It doesn't match exactly, but

15   it's similar.

16          Q.  Do you have any threshold for how you

17   determine similarity or is that based on a visual

18   comparison?

19          A.  Visual comparison of the point clouds in the

20   photos and seeing the actual vehicles.

21          Q.  Are there measurements you're relying on for

22   similarity or same answer?

23          A.  Same answer.

24          Q.  The only crash test produced to the

25   plaintiffs in this case was the test run by Exponent

Page 217

1    on May 15th, 2023, test number TEC 2210759.

2              Is that the test that was in your file?

3        A.   What's the test number?

4        Q.   TEC 2210759.

5        A.   Yes.  That's the one that's in my file.

6        Q.   Other than this crash test, has Exponent run

7    any other test in this case?

8        A.   Not to my knowledge.

9        Q.   Other than this crash test, have you run any

10   other test in this case?

11       A.   No.

12       Q.   Other than this crash test, have there been

13   any other tests that you were present for?

14       A.   In this case, no.

15       Q.   Has anyone run any other tests in this case

16   on Rough Country's behalf other than this crash test?

17       A.   Not that I'm aware of.

18            MR. MASHMAN:  I'm showing you

19       Plaintiff's Exhibit 71.

20            (Plaintiff's Exhibit 71 was marked for

21       identification.)

22   BY MR. MASHMAN:

23       Q.   It's a document produced as part of your

24   file in the testing folder.

25            Who created this document?

Page 218

1          A.  I did.

2          Q.  Isn't it true this document identifies

3     four vehicles?

4          A.  It does.

5          Q.  It identifies two F-250s?

6          A.  Yes.

7          Q.  It identifies two Escapes?

8          A.  Yes.

9          Q.  And each has a different weight?

10         A.  Yes.

11         Q.  Do you agree that -- I apologize.

12             At the top it says "as received;" is that

13    right?

14         A.  Yes.

15         Q.  And then it says:  First set of vehicles as

16    received?

17         A.  Yes.

18         Q.  And the weights in the first set of vehicles

19    as received match the weights used in the crash test;

20    is that right?

21         A.  Of the curb weight of it, yes.  For the

22    Escape, yeah.  The curb weight, yeah.

23         Q.  The first set of vehicles as received refers

24    to the vehicles that were used in the crash test,

25    right?

Wesley Grimes                                       May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                    Page 219

 1          A.  I think that's correct.  I'm not sure on the

 2     F-250.  I'm pretty sure on the Escape that it is.  We

 3     could go and look at the test report and it would

 4     give you the as-received weight.

 5              MR. MASHMAN:  I have an exhibit for it.

 6          I'm handing you Plaintiff's Exhibit 85.

 7              THE WITNESS:  Yeah.

 8              (Plaintiff's Exhibit 85 was marked for

 9          identification.)

10     BY MR. MASHMAN:

11          Q.  This is the as-received report for the F-250

12     and the Escape --

13          A.  Yes.

14          Q.  -- used in the crash test, right?

15          A.  Yes.

16          Q.  And the weights match the first set of

17     vehicles as received, correct?

18          A.  Yes.

19          Q.  Who received the two sets of vehicles in

20     this document?

21          A.  Exponent.

22          Q.  Did you receive them?

23          A.  No.

24          Q.  On the second set of vehicles as received,

25     it lists the weight of a separate F-250 and Escape,

Wesley Grimes                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 220

1    right?

2         A.   It does.

3         Q.   And that second set of vehicles as received

4    doesn't match any other F-250 and Escape referred to

5    anywhere else in the file, right?

6         A.   That's true.

7         Q.   Did anyone perform any testing on the second

8    set of vehicles listed in this document?

9         A.   Not to my knowledge.

10        Q.   Did you ever discuss the purpose of the

11   second set of vehicles listed in this document with

12   anyone?

13        A.   Yes.

14        Q.   What was that purpose?

15        A.   To be prepared in case we wanted to or

16   needed to run a second test.

17        Q.   Where is the second set of vehicles now?

18        A.   I don't know whether Exponent has them or

19   whether they sold them.  I don't know.

20        Q.   Would you expect Exponent to preserve the

21   second set of vehicles while litigation is pending?

22        A.   No, not necessarily.

23        Q.   Would you expect Exponent to have

24   documentation related to the second set of vehicles

25   if Exponent bought and sold them?

Wesley Grimes                                      May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 221

1          A.   They probably would have some records.  I

2     don't know.  I don't know how they do the buying and

3     selling of their vehicles.

4          Q.   To your knowledge, has any evidence been

5     destroyed in this case?

6          A.   No.

7          Q.   Have you been involved in any E-mails, Zoom

8     calls, conversations or other communications

9     discussing any use of the second set of vehicles as

10    received?

11         A.   No, other than to be prepared in case we

12    needed to run a second test.  That was the only

13    conversation about it.

14         Q.   Have you ever discussed whether additional

15    testing has been run with Rough Country's lawyers?

16         A.   No.  I'm not aware of anything that's been

17    done like that.

18         Q.   Has anyone ever told you affirmatively that

19    a second set of testing was not run?

20         A.   I never asked the question.  So, no, we've

21    never had that conversation.

22         Q.   Dr. Nguyen testified that Rough Country

23    could have run a set of experiments where the only

24    variable change was to isolate how much crush was

25    caused by the lift.  Do you agree with her?

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 222

1            MR. HILL:  Object to form.

2            THE WITNESS:  On -- are you talking

3        about in general or are you talking about

4        this specific case?

5    BY MR. MASHMAN:

6        Q.  Let me ask it this way.

7            If Exponent had two sets of vehicles, do you

8    agree that Exponent could have run the same test

9    again and put a lift on the F-250?

10       A.  I suppose that's possible.  I never heard

11   anything about that.

12       Q.  And Exponent could have change nothing else

13   except for adding a lift to the F-250 on the second

14   test?

15       A.  Again, I suppose anything like that is

16   possible.  I haven't heard a thing about it.

17       Q.  Do you know why Exponent didn't do that?

18       A.  I'll let Exponent talk about it themselves.

19       Q.  But you haven't been involved in any

20   conversation about why that wasn't done?

21       A.  No, no.  I guess -- you know, as I sit here

22   and think about it, I guess the conversation I had

23   was with Dr. Nguyen and that was that there was no

24   other -- there was no second test required for her

25   purposes, so we didn't run a second test.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                Page 223

1          Q.  On December 13th of 2022 you inspected the
2     subject vehicle, right?
3          A.  That sounds right.  December -- yes, mm-hmm.
4          Q.  And Rough Country's executive Rad Hunsley
5     attended that inspection, right?
6          A.  He did.  Yes.
7          Q.  Did you and Rad Hunsley talk at the
8     inspection?
9          A.  Yes.
10         Q.  Did Mr. Hunsley say anything to you about
11    the crash?
12         A.  Nothing that I remember.
13         Q.  Did Mr. Hunsley say anything to you about
14    other tests Rough Country had run, crash tests or
15    computer simulations?
16         A.  Nothing like that that I remember.
17         Q.  Did Mr. Hunsley say to you what Rough
18    Country had done to investigate the effects of its
19    lift in occupant protection in crash tests?
20         A.  No, nothing like that, that I recall.
21         Q.  Did Mr. Hunsley tell you that Rough Country
22    had been sued before in cases where people were hurt
23    in cars that were struck by lifted vehicles?
24              MR. HILL:  Object to form but go ahead.
25              THE WITNESS:  I -- I don't recall

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 224

1          conversations about that.  We may have, you

2          know, as we're looking at the vehicles

3          chitchatting, but I don't remember any

4          conversation like that.

5     BY MR. MASHMAN:

6          Q.  Has anyone told you about that?

7          A.  No -- well, you know what?  I saw something

8     in -- was it Paul Lewis had a supplemental report

9     where he talked about a couple of cases, like a

10    Mustang and minivan or something.  I saw that in his

11    report or materials that he made a supplemental --

12    that's the only knowledge I have is what I saw in his

13    file that he produced.

14         Q.  Did Mr. Hunsley tell you about the Bacho

15    (phonetic) family who lost their daughter?

16         A.  No, not that I recall.

17         Q.  Did Mr. Hunsley tell you about the Mendoza

18    family?

19         A.  Not that I recall.

20         Q.  Did you review documents from those crashes?

21         A.  No --

22         Q.  Did you receive --

23         A.  Well, other than -- are those the ones in

24    Mr. Lewis' supplemental?  I don't know the names but

25    there were two crashes in Mr. Lewis' supplemental

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 225

1    materials.  I looked at it.  I didn't do anything

2    with it.

3        Q.  Did Rough Country ever give you documents

4    about the Bacho (phonetic) family or the Mendoza

5    family?

6        A.  The materials I received was from Mr. Hill's

7    office, but they were produced by Mr. Lewis, I

8    believe.  So, I mean, I got them from Mr. Hill, but I

9    think it was Mr. Lewis that produced them.

10       Q.  So did -- aside from them sending you

11   documents because plaintiff's experts talked about

12   them, did Rough Country send you documents telling

13   you what happened to the Bacho (phonetic) family and

14   the Mendoza family?

15           MR. HILL:  Object to the form.  Go

16       ahead.

17           THE WITNESS:  No.

18   BY MR. MASHMAN:

19       Q.  What did you and Mr. Hunsley talk about?

20       A.  You know, we mainly talked about the weather

21   and talked about different things.  I did ask him

22   questions about the U-bolts that I saw on the back of

23   the pickup and how those things were installed, you

24   know, just the general installation and things like

25   that, but it was more chit-chat than anything else.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 226

1        Q.  Did the U-bolts ultimately play a role in

2    your substantive opinions about the accident

3    reconstruction in this case?

4        A.  No.

5        Q.  On page 35 of your report, I'm looking at

6    figure 40.

7        A.  Okay.

8        Q.  How is this document -- scratch that.

9            How is this figure created?

10       A.  Using the point clouds and aligning those

11   and then putting trace outlines around the vehicles

12   and printing this image out.

13       Q.  Do you agree that both vehicles have a

14   sunroof in figure 40?

15       A.  They do.  Yes.

16       Q.  Do you agree that the mirrors on the F-250

17   are the same in figure 40?

18       A.  They do look the same.  Yes.

19       Q.  Were these stock pictures of an Escape and

20   F-250 that were overlaid on top of each other?

21       A.  I think they were drawings made from point

22   clouds to basically trace the outline and the

23   features of the vehicles.  They may have been stock

24   and scaled.  I don't know.  I didn't create the

25   image.

Page 227

1       Q.  All right.  On page 36, you outline your
2   conclusions about the case?
3       A.  Yes, sir.
4       Q.  The first conclusion is that the collision
5   between the F-250 and the Escape occurred on Georgia
6   State Route 2 at the intersection with Georgia State
7   Route 5.
8           The speed limit on Georgia State Route 2 was
9   45 miles per hour; is that correct?
10      A.  Yes.
11      Q.  The second opinion states that a lift kit
12  was installed on the subject F-250; is that correct?
13      A.  Yes.
14      Q.  We've discussed the third opinion, right?
15      A.  Yes.
16      Q.  We've discussed the basis for the fourth
17  opinion; is that right?
18      A.  Yes.
19      Q.  We've discussed the basis for the fifth
20  opinion?
21      A.  Yes.
22      Q.  Have we discussed the basis for the sixth
23  opinion?
24      A.  Yes.  That was the corrected value where
25  the -- the new values were 35 to like 44.  The

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                    Page 228

 1    updated calculation that we went through.

 2         Q.  I believe we discussed the basis for your

 3    seventh opinion as well, right?

 4         A.  Yes, sir.

 5         Q.  As well as your eighth opinion?

 6         A.  Yes, sir.

 7         Q.  The ninth opinion outlines the crash test,

 8    right?

 9         A.  Yes, sir.

10         Q.  And the 10th opinion discusses the slope of

11    the crash and test delta-vs as well as why cargo was

12    not placed in the rear, correct?

13         A.  Yes, sir.

14         Q.  And we've discussed all the reasoning for

15    that?

16         A.  Yes, sir.

17         Q.  And have we discussed all to have basis and

18    analysis going into your 11th opinion?

19         A.  I think we have.

20              MR. MASHMAN:  I'd like to take a break

21         and go off the record.

22              THE VIDEOGRAPHER:  The time is 4:18 p.m.

23         We have off video record.

24              (Recess from 4:18 p.m. to 4:30 p.m.)

25              THE VIDEOGRAPHER:  The time is 4:30 p.m.

Wesley Grimes                                           May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 229

1        We are back on video record.

2    BY MR. MASHMAN:

3        Q.  All right.  Do you have another copy of your

4    communications file in front of you?

5        A.  Yes.

6            MR. MASHMAN:  So I'm going to mark your

7        copy as Plaintiff's Exhibit 93.

8    BY MR. MASHMAN:

9        Q.  On the first page, you received a subpoena

10   response from the Ford dealer and installer of the

11   lift kit.

12           Is it your opinion that there was any

13   mistake by the installer?

14       A.  I haven't looked at that issue at all.

15       Q.  So no opinion one way or another?

16       A.  No opinion one way or the other.

17       Q.  This document isn't page numbered, but I'm

18   looking at April 12, 2023.

19       A.  Okay.

20       Q.  It appears that you were sent a document

21   called Field Report Complete by a paralegal from

22   Mr. Hill's office; is that correct?

23       A.  Yes.

24       Q.  What is that field report?

25       A.  I think that's the download from the airbag

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 230

1      module from the Escape.

2           Q.  And that download showed no retrievable

3      information?

4           A.  Yes, sir.

5           Q.  On the next page towards the bottom, it

6      says:  Quoted text hidden?

7           A.  Yeah.

8           Q.  What is that?

9           A.  I think that that's -- whenever we print

10     these, if -- if I was responding to something, it --

11     it doesn't show that.  It just showed the E-mail that

12     was being sent not previous E-mails in a big, long

13     chain.

14              I know whenever I'm on the Gmail, it shows

15     little dots and I have to click that and then it

16     shows all the chain to it.

17          Q.  Two pages later, there's just a share file

18     doc sent.  What docs were sent that day?

19          A.  As I sit here, I don't know.

20          Q.  Then going back to February 6th of 2023 --

21          A.  February?

22          Q.  February 6th, yes.

23          A.  Okay.

24          Q.  You got an E-mail from Rough Country's

25     lawyer forwarding the plaintiff's responses to

Page 231

1    defendant's second interrogatories; is that right?

2        A.  Yes.

3        Q.  I'll represent to you that that's the same

4    interrogatories we were looking at earlier that shows

5    what was in the trunk.

6            Does this show that you got that document on

7    February 6, 2023?

8        A.  Okay.  I'll not dispute that.

9        Q.  Does this show that the receipt date for

10   that was February 6, 2023?

11       A.  Yes.

12       Q.  Did you prepare a budget in this case?

13       A.  No.

14       Q.  What is the basis of your opinion that the

15   sunroof had no effect on the strength of the roof

16   structure between the subject Escape and the test

17   Escape?

18       A.  Well, first of all, the sunroof would be

19   forward some distance from where the crush is

20   actually occurring.  And second of all, I don't think

21   that removing part of a structure is going to make it

22   stronger.

23       Q.  Did you compare the distance between where

24   the sunroof is and where the crush occurred?

25       A.  No.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 232

1         Q.  Did you review design drawings of the

2    Escape's roof with or without a sunroof?

3         A.  No.

4         Q.  Did you review the orientation of where

5    structural components in the roof are of the Ford

6    Escape with or without a sunroof?

7         A.  No.

8         Q.  Did you review the effects that it has on

9    strength based on testing that had been performed?

10        A.  No.

11        Q.  Did you review any literature on whether

12   that sunroof would have an impact on the strength?

13        A.  No.

14        Q.  Did you perform any testing of the

15   differences between the strength of an Escape with

16   the sunroof versus without a sunroof?

17        A.  No.

18        Q.  Did you review any testing of the strength

19   of different component materials such as the glass or

20   the structures that make up the roof?

21        A.  No.

22             MR. MASHMAN:  Okay.  I don't think I

23        have any more questions for you.  I

24        appreciate your time.

25             MR. HILL:  Thank you.  No questions.

Wesley Grimes                                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 233

1          THE VIDEOGRAPHER:  The time 4:35 p.m.

2      This concludes the videotaped deposition.

3      We are off video record.

4          THE REPORTER:  You said he's reading and

5      signing?

6          MR. HILL:  I don't think we discussed

7      it, but I'm sure he wants to.

8          THE WITNESS:  Yeah...

9          (Discussion ensued off the record.)

10          THE REPORTER:  Did you want a copy of

11      his transcript?

12          MR. HILL:  Yes.  In fact, I need a rough

13      as fast as you can get it.

14          (Deposition concluded at 4:36 p.m.)

15          (Signature reserved.)

16

17

18

19

20

21

22

23

24

25

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 234

1                          CERTIFICATE

2

3       STATE OF GEORGIA:

4       COUNTY OF FULTON:

5

6               I hereby certify that the foregoing

7       transcript was taken down, as stated in the caption,

8       and the colloquies, questions, and answers were

9       reduced to typewriting under my direction; that the

10      transcript is a true and correct record of the

11      evidence given upon said proceeding.

12              I further certify that I am not a relative

13      or employee or attorney of any party, nor am I

14      financially interested in the outcome of this action.

15              This the 5th day of June, 2024.

16

17

18

19      _____

20              Marsi Koehl, CCR-B-2424

21

22

23

24

25

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 235

1                        DISCLOSURE

2

3      STATE OF GEORGIA:

4      COUNTY OF DEKALB:

5                Deposition of WESLEY D. GRIMES.

6                Pursuant to Article 8.B. of the Rules and
       Regulations of the Board of Court Reporting of the
7      Judicial Counsel of Georgia, I make the following
       disclosure:

8

                 I am a Georgia Certified Court Reporter
9      acting as an agent of Veritext Legal Solutions, who
       was contacted by the offices of CANNELLA SNYDER, LLC,
10     to provide court reporting services for this
       deposition.  I will not be taking this deposition
11     under any contract that is prohibited by O.C.G.A.
       15-14-37 (a) and (b).

12

                 Veritext Legal Solutions, has no contract to
13     provide reporting services with any party to the case,
       any counsel in the case, or any reporter or reporting
14     agency from whom a referral might have been made to
       report this deposition.  Veritext Legal Solutions,
15     will charge its usual and customary rate to all
       parties in the case, and a financial discount will not
16     be given to any party to this litigation.

17

18

19

20

21      Marsi Koehl, CCR-B-2424              Date: 6/5/24

22

23

24

25

Case 2:22-cv-00017-RWS  Document 102-3  Filed 09/05/24  Page 236 of 305
Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 236

1    Richard Hill, Esquire

2    rhill@wwhgd.com

3                          June 5, 2024

4    RE:    Bryson, Santana And Joshua v. Rough Country, LLC

5          5/9/2024, Wesley Grimes (#6672275)

6          The above-referenced transcript is available for

7    review.

8          Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-southeast@veritext.com.

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 237

1    Bryson, Santana And Joshua v. Rough Country, LLC

2    Wesley Grimes (#6672275)

3                E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24   Wesley Grimes                                Date

25

Case 2:22-cv-00017-RWS   Document 102-3   Filed 09/05/24   Page 238 of 305
Wesley Grimes                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 238

1    Bryson, Santana And Joshua v. Rough Country, LLC

2    Wesley Grimes (#6672275)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Wesley Grimes, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____   _____

12   Wesley Grimes                         Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20___.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

Wesley Grimes
May 9, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[& - 217]**

Page 1

| & | | | |
|---|---|---|---|
| **&**   1:17 5:10 | **11:58**   72:11,12 | **16**   52:7,12 85:8 | **2001**   155:19 |
| **0** | **11th**   228:18 | **17**   1:8 121:6 | **2001-01-1170** |
| **01**   209:3 | **12**   27:5 28:21 | 177:17,21 | 155:21,22 |
| **02**   209:3 | 184:21 209:3 | **17.2.**   151:2 | **201**   3:20 |
| **1** | 229:18 | **17.48**   140:2 | **2012**   26:25 |
| **1**   36:7 44:25 | **12038**   234:18 | **17.5.**   140:16 | 27:15,18 31:1 |
| 150:15 168:23 | **123**   7:25 | **17.8**   140:16 | **2016**   115:9 |
| **1.10**   169:8 | **125**   3:5 | **170**   127:21 | 196:1,5 |
| **1.21**   169:6 | **126**   3:6 | **178**   3:15 | **2022**   20:17 |
| **1.24**   169:6 | **12:01**   72:12,14 | **18**   13:12 | 22:11 42:24 |
| **10**   4:7 15:18 | **12:55**   116:18 | 120:25 121:1,5 | 44:16 57:8,23 |
| 17:18 25:5 | 116:19 | 122:8,10 | 99:20 105:18 |
| 93:8,22 145:13 | **12th**   99:20 | **18.21**   138:10 | 105:24 107:15 |
| 145:19,20 | 105:18,23 | **18.6.**   141:25 | 109:10 112:25 |
| 171:12 | **13**   24:21 | **19**   122:19 | 223:1 |
| **10.9**   182:3,8,13 | 107:14 109:10 | 124:4,22,23 | **2023**   73:15,21 |
| 182:17,23 | **130**   205:16 | **194**   3:16 | 73:24 74:9 |
| 184:11 187:12 | 206:20 | **195**   146:19 | 76:20 81:10 |
| 187:21 188:11 | **131**   206:21 | **196**   3:17,18,19 | 89:17 92:8 |
| **100**   206:10 | **13th**   93:1,3 | **1981**   24:20 | 217:1 229:18 |
| **101**   2:21 | 223:1 | **1993**   24:21 | 230:20 231:7 |
| **105**   2:20 | **14**   98:1 | **1994**   22:11 | 231:10 |
| **109**   2:22,23 | **141**   139:16,23 | **1:41**   116:19,20 | **2024**   1:14 6:3 |
| **10:17**   1:15 6:3 | **146**   3:9 | **2** | 85:20 234:15 |
| 6:11 | **15**   15:18 85:8 | **2**   92:10 141:23 | 236:3 |
| **10th**   228:10 | **15-14-37**   5:19 | 142:10 227:6,8 | **205**   3:22 |
| **11/7/22**   2:15 | 235:11 | **20**   70:18 86:6 | **208**   142:8 |
| **113**   3:4 | **150**   103:13 | 86:17 121:8 | 143:12 |
| **1152715**   2:25 | 104:22 141:23 | 122:20 123:8,9 | **20th**   112:25 |
| **116**   2:25 | **150,000**   58:23 | 123:10 135:10 | **21**   123:8 |
| **11:35**   67:15,16 | **155**   103:14 | 238:15 | **212**   3:21 |
| **11:53**   67:16,18 | 104:23 141:23 | **200**   134:15 | **215**   3:23 |
| | **15th**   85:20 93:3 | **200,668**   85:22 | **216**   3:24 |
| | 93:4,5 217:1 | **200,668.68.** | **217**   3:11 |
| | | 85:13 | |

Wesley Grimes
May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[219 - 3d]**
Page 2

| | | | **3** |
|---|---|---|---|
| **219** 4:5 | 80:22 100:7 | 213:4 214:16 | **3** 40:3 100:5 |
| **22** 121:9 | 104:7,13 | 216:6 219:2,11 | 107:22 146:7 |
| 164:20 | 107:11 108:3 | 219:25 220:4 | **3,410** 137:14 |
| **2210759** 217:1 | 111:25 112:9 | 222:9,13 | **3,940** 190:22 |
| 217:4 | 112:17,22 | 226:16,20 | **3,941** 191:2,3 |
| **225** 179:12 | 115:1,8,9,14,20 | 227:5,12 | **3.66** 124:14 |
| **226** 179:7,8 | 117:19 124:21 | **250's** 105:3 | **30** 15:14 65:6 |
| **23** 73:21 | 124:25 125:6 | 120:21 122:15 | 94:6 122:16 |
| 152:14 154:10 | 125:13,21 | 135:12 137:6 | 236:16 |
| 157:5 | 128:9,14 129:1 | 144:19 152:11 | **300** 129:25 |
| **238** 187:6,8,10 | 129:16,18 | 166:25 182:4 | 134:13 |
| 187:15 | 130:8 131:17 | 183:20 194:22 | **30030** 5:6 |
| **23rd** 74:9 | 132:25 134:13 | 212:8,17 | **30326** 5:12 |
| **24** 73:15 | 137:2 140:15 | 214:19 | **315** 5:5 |
| 166:22 | 142:18 144:7 | **250s** 167:8,9 | **33** 2:12 197:19 |
| **240** 187:6 | 145:9 147:13 | 218:5 | 197:21 |
| **2400** 1:19 5:11 | 149:24 150:5,9 | **26** 2:9 56:9 | **3344** 1:18 5:11 |
| **2424** 1:25 | 156:21 158:1 | 167:25 | **34** 209:21,24 |
| 234:20 235:21 | 160:8 164:13 | **267** 142:9,24 | 213:6 |
| **243** 187:24 | 164:23,24 | 143:12 | **3410** 137:22 |
| **245** 187:24 | 167:20,23 | **26th** 12:12,13 | **3451** 137:23 |
| **24th** 73:21,24 | 171:17,24 | **27** 140:6 | **35** 28:9 226:5 |
| 76:19 | 177:3 179:21 | **276** 180:9,10 | 227:25 |
| **25** 86:6,8,17 | 179:24 180:6 | **277** 180:9,10 | **36** 227:1 |
| 141:24 142:10 | 180:18,19 | **27th** 89:17 | **37** 4:9 |
| **250** 2:24 8:2,14 | 181:3 182:8,21 | **28** 125:6,8 | **38** 140:13 |
| 8:17,20,24,24 | 183:5,19 188:1 | **280** 190:5 | **385** 194:20 |
| 9:1,5 13:15 | 188:9,16 | **2820** 7:25 | **39** 2:11 140:13 |
| 50:10,12,13,14 | 189:16 190:6 | **284** 188:24 | **3900** 150:22 |
| 59:14 60:19 | 190:13,18 | **286** 189:4 | **3:01** 181:9 |
| 64:5,6 68:16 | 191:8 195:4,19 | **29** 3:22 205:7 | **3:05** 181:11 |
| 69:17 71:7 | 195:22 196:1,5 | **2:22** 1:8 | **3:19** 181:11,12 |
| 74:18,23 75:21 | 205:12,12 | | **3d** 33:17 34:2,3 |
| 76:20 77:9,21 | 208:2,22 209:9 | | 107:23 112:24 |
| 78:7,21 80:4 | 211:21 212:13 | | |

Wesley Grimes
May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[3d - 82]**

Page 3

116:9 183:18
183:19

**4**

**4** 11:2 40:2
41:6,9,11,16
92:10 140:3
144:25
**4.5** 111:8
117:12
**4/15** 89:19
**40** 28:9 140:13
190:23 226:6
226:14,17
**404** 5:6,12
**41** 190:23
**42** 2:14 4:10
**43.9** 147:10
**44** 2:16 227:25
**45** 28:9 227:9
**48** 142:2,13
**48.1** 142:14
**49** 144:25
**4:18** 228:22,24
**4:30** 228:24,25
**4:35** 233:1
**4:36** 233:14

**5**

**5** 99:22 100:2
112:3 147:21
148:7 149:6
195:25 196:4
227:7 236:3
**5/9/2024** 236:5

**50** 2:8 9:15,17
28:9 33:21
142:7 143:9,11
147:1 148:21
148:23 155:1,9
205:15 206:19
**51** 2:9 26:7,9
33:7 144:1,22
150:23
**52** 2:11 39:3,5
142:2,14
**52.2** 142:14
**52.5.** 148:24
**53** 2:12 33:2,6
72:24 144:25
**54** 2:13
**55** 2:14 42:17
42:20
**55.6** 147:11
**56** 2:16 44:9,12
89:11,12,13,15
**563** 138:14
**567.20** 117:10
**57** 2:17 84:13
84:14
**58** 2:18 94:17
94:19
**59** 2:20 105:8
105:10,12,13
**5th** 92:8 234:15

**6**

**6** 2:4 112:3
146:23,24
231:7,10

**6/5/24** 235:21
**60** 2:21 33:21
101:22,25
102:5
**61** 2:22 109:9
109:12
**62** 2:23 109:9
109:12
**63** 2:25 116:24
116:25
**64** 3:4 113:10
113:13
**65** 3:5 125:22
125:24 127:18
127:18
**66** 3:6 126:16
126:20 127:16
**6672275** 236:5
237:2 238:2
**67** 3:7
**68** 3:8 4:11
**683** 129:16
130:5
**6830** 127:25
**69** 3:9 4:12
146:1,4 147:6
**6th** 230:20,22

**7**

**7** 42:24 45:3
149:10,16
**7,987.11** 74:15
**7.7** 149:17
**7/8ths** 121:6
**70** 3:10 209:3

**71** 3:11 4:14
217:19,20
**72** 3:13
**73** 3:14
**74** 3:15 178:16
178:18
**75** 3:16 143:1
194:14,16
**76** 3:17 138:10
196:8,10,13
**77** 3:18 196:8
196:10,14
**78** 3:19 146:17
146:19 196:9
196:11,15
**7850** 127:11
129:17 130:4
**79** 3:20 24:5
201:6,7
**7th** 44:16,17
57:8,23 58:6

**8**

**8** 143:1
**8,040** 136:2
**8,533** 130:5,10
190:19
**8,833** 126:4
**8.b.** 235:6
**80** 3:21 24:5
212:2,4
**800-4828** 5:6
**80s** 119:2
**81** 3:22 205:6,8
**82** 3:23 215:1,3

Wesley Grimes
May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[83 - admit]**
Page 4

**83**  3:24 216:5,8
**84**  2:17 4:4
**85**  4:5 219:6,8
**85215**  8:1
**86-89**  4:6
**876-2700**  5:12
**8800**  150:22
**885**  5:5

**9**

**9**  1:14 2:8
   209:2
**90**  4:7 10:12,14
   12:10
**91**  4:8
**92**  4:9 36:20
   37:3
**93**  4:10 42:12
   42:13 229:7
**94**  2:18 4:11
   68:20,23 69:8
   72:19 141:12
**95**  4:12 69:20
   69:24 144:15
   145:24
**96**  4:14 71:19
   71:22 72:19
**9th**  6:3

**a**

**a.m.**  1:15 6:3
   6:11 67:15,16
   67:16,18 72:11
   72:12,12
**ability**  97:22

**able**  21:24
   23:19 33:17
   44:1 67:25
   80:3,21 102:4
   108:13 173:8
**above**  8:3,7,11
   11:2 142:9
   155:1,10 188:2
   194:25 195:8,9
   236:6 238:7
**abs**  148:13,15
   149:1
**absolute**
   146:13 147:7,9
**absolutely**  11:1
**accelerometers**
   66:9
**acceptable**
   152:19
**access**  21:1
**accident**  12:22
   13:3 14:5,10
   14:14 22:22
   45:12 99:16
   100:2 105:4
   119:22 162:4
   162:10 163:22
   168:21 226:2
**account**  136:25
   144:19 157:16
   157:22 165:4
   165:13,14,16
**accounted**
   138:5 152:19
   152:23 165:12

**accounting**
   153:7
**accuracy**  236:9
**accurate**  26:22
   145:18 186:18
**accurately**
   161:20 204:7
**achieve**  66:17
**achieved**
   206:18
**acknowledged**
   152:11
**acknowledge...**
   238:3
**acknowledges**
   165:7
**acknowledging**
   43:1
**acknowledg...**
   236:12
**act**  166:14
**acting**  235:9
**action**  1:7
   234:14
**active**  46:10
   48:22,23
**actively**  86:15
**activities**  11:4
   12:14
**actual**  68:17
   69:18 129:3
   132:17,21
   173:25 177:10
   192:8 216:20

**actually**  10:8
   26:18 34:16
   61:18 100:24
   104:14,15
   146:19 148:23
   154:20 231:20
**add**  19:3 29:14
   73:1 126:9
   127:14 130:11
   133:14 142:1
**added**  127:14
   127:21 129:15
   129:16 132:3
**adding**  85:12
   129:25 132:8
   191:7 222:13
**addition**
   127:25 175:23
**additional**
   29:18 91:17
   96:6 97:19
   198:18 221:14
**additions**  238:6
**address**  7:24
   99:15
**adds**  130:5
**adjusted**
   144:19 155:13
**admin**  47:10,14
**administrator**
   46:13
**administrators**
   1:4
**admit**  142:21

Wesley Grimes                                           May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[adopt - analysis]**                                       Page 5

| | | | |
|---|---|---|---|
| **adopt** 122:25 | 138:17 140:9 | **air** 24:9 166:8,8 | **allowed** 56:8 |
| **adult** 176:3 | 152:10 153:12 | **airbag** 106:10 | **altering** 100:21 |
| **advance** 61:3 | 155:24 167:19 | 108:4,10 | **amazon** 128:13 |
| **advanced** | 167:22 176:17 | 138:12 139:9 | **amend** 97:24 |
| 25:19,20 | 178:5 185:2 | 145:18 152:3 | **amount** 9:5 |
| **aerial** 101:23 | 186:22 191:11 | 167:19,22 | 85:16 112:16 |
| **affect** 172:17 | 191:20 196:17 | 229:25 | 154:22 157:6 |
| 191:17,18 | 201:16,18,25 | **airbags** 23:25 | 172:17 184:14 |
| **affected** 29:15 | 204:5,15,16 | 152:11 | 184:18 202:11 |
| 106:13 173:18 | 208:21 212:8 | **aircraft** 24:10 | 202:14,23 |
| **affecting** 211:5 | 212:10,16 | **airport** 24:7,8 | 203:1,4,6,10 |
| **affects** 136:20 | 214:19 215:14 | 24:11 | 204:3,10 211:6 |
| **affirmatively** | 215:24 218:11 | **algorithm** | 213:8,13 214:2 |
| 221:18 | 221:25 222:8 | 147:3 152:3 | 215:7,20 |
| **agency** 15:16 | 226:13,16 | **align** 51:15 | **amplified** |
| 235:14 | **agreement** 7:17 | 110:11 183:21 | 193:12 |
| **agent** 235:9 | **agreements** | 213:23 214:4 | **analysis** 2:18 |
| **ago** 7:2 11:22 | 46:7 | 214:16 | 3:9 4:11 12:23 |
| 15:15 38:22 | **ahead** 8:6 31:9 | **aligned** 51:11 | 12:25 13:2,2 |
| 46:11 65:6 | 42:5 54:2 | 110:12 188:17 | 14:5,11,11 |
| 81:19 98:1 | 56:25 57:13 | 188:18 190:2 | 15:11 31:3 |
| 118:6 119:3 | 58:20 60:21 | 212:9,13 | 45:17 46:10 |
| 136:7 139:15 | 63:19 65:18 | **aligning** 184:6 | 48:12,22 49:9 |
| 144:23 181:15 | 76:14 78:23 | 210:15 213:17 | 68:10,14 69:9 |
| 192:3 | 80:6,18,24 | 226:10 | 70:13 87:12,14 |
| **agree** 8:2,14,17 | 82:14 89:3 | **alignment** | 92:14 107:1 |
| 8:20 22:6 | 96:9,17 98:2 | 33:18 92:18 | 108:14 111:15 |
| 37:11,16 76:18 | 99:14 114:8 | 182:22 188:8 | 112:7,16 |
| 78:6,15,17,19 | 123:19 165:20 | **allegations** | 119:17 133:2,6 |
| 79:21 80:2,20 | 166:17 170:9 | 31:5 32:1 | 133:10 135:11 |
| 103:15 105:1,3 | 176:13 181:6 | 53:16 | 140:21 141:2 |
| 107:17 111:12 | 185:6,17 189:4 | **alleged** 30:11 | 141:15 143:22 |
| 116:4,8 122:1 | 191:14 204:14 | 32:7 | 146:5 150:19 |
| 122:14 123:24 | 210:11 223:24 | **allotted** 236:19 | 153:15,22 |
| 125:2,4 138:8 | 225:16 | | 156:11 168:3 |

Wesley Grimes
May 9, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[analysis - artificially]**

Page 6

168:20 177:2
199:1,5,8
203:15 207:19
208:11 209:19
211:11 213:2
215:13 228:18
**analyze**  48:14
62:12 199:10
199:14,18,21
200:3 202:11
202:14
**analyzed**  29:7
**analyzing**  11:7
48:25 106:18
**angle**  197:11
**angles**  172:6,14
172:19
**ann**  19:24
45:10 170:21
**answer**  41:23
55:17 56:3,4
62:2 91:20
98:2 99:3
111:17 216:22
216:23
**answered**
18:12 80:25
**answers**  234:8
**anti**  148:15
**anticipate**
15:11
**anticipated**
14:22 99:6
**anticipation**
14:18,22,25

15:23 22:8
25:1
**antilock**  148:15
**anybody**  11:23
83:4 170:25
**anymore**  75:2,2
**anyway**  81:4
93:6
**apart**  125:6
214:8
**apologize**  6:13
35:12 47:20
61:11 78:16,18
80:18 88:7,20
99:2 114:7
122:9 144:6
149:4,14
151:20 168:10
176:6 195:21
200:2 205:23
208:17 218:11
**appealing**
118:17
**appear**  27:3
84:19
**appearances**
5:1
**appears**  28:21
102:15 123:12
128:12 144:17
187:19 196:20
207:2 212:20
229:20
**appended**
238:7

**appendix**  2:8,9
146:20
**applicable**
236:8
**application**
202:8
**applied**  71:15
101:4 106:17
143:10,11
147:20 149:20
149:24 150:9
**applies**  12:5
**apply**  101:5,8,8
106:19 107:2
145:12 195:18
195:22
**applying**  11:22
211:14,23
**appreciate**  10:9
70:21 110:23
232:24
**approach**
155:7
**appropriate**
29:19 153:24
156:1,2,10
161:14,18
181:20
**approval**  98:10
**approved**
178:3
**approximate**
143:22 145:9
195:7

**approximately**
93:22 94:25
103:6 104:22
118:25 121:25
122:16 126:4
142:7 171:9
182:6 188:17
205:15
**approximation**
54:23 104:4
129:10
**april**  11:5
12:12 85:20
229:18
**area**  118:7
119:10 135:21
192:25 198:16
205:17,19
207:15 215:9
**argue**  184:22
184:25
**arizona**  8:1
16:6,11,22
17:15 19:1
24:18 48:20
51:20 102:19
**arm**  24:2 133:2
133:3,4,10
**arrangements**
108:17
**article**  235:6
**artificial**
194:11
**artificially**
134:10,17

Wesley Grimes                                           May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[aside - backed]**                                       Page 7

| | | | |
|---|---|---|---|
| **aside**  19:9 | **assume**  60:1 | 234:13 236:13 | **b** |
| 34:18,19 38:6 | 89:24 137:10 | **attorney's**  56:2 | |
| 38:8,23 96:4 | 148:8 164:8 | **attorneys**  5:4 | **b**  1:25 2:6 3:1 |
| 98:19 177:14 | **assumes**  163:23 | 15:5,14,19 | 4:1 5:19 |
| 177:23 225:10 | **assuming**  143:8 | 23:6 28:16 | 234:20 235:11 |
| **asked**  24:12 | 143:18 147:10 | 32:22 40:5,11 | 235:21 |
| 39:15 40:3,13 | 147:14 148:12 | 55:12,23 87:10 | **bacho**  224:14 |
| 41:17,19 72:16 | 154:7 187:17 | 87:11,15,17,17 | 225:4,13 |
| 81:19 86:10,10 | 190:3 | 87:21,25 88:3 | **back**  9:3,11 |
| 91:17 95:16 | **assumptions** | 88:15,21 89:5 | 10:16 24:13,14 |
| 131:16 132:16 | 41:14,18 55:12 | 91:24 | 24:18,18,19 |
| 188:6 195:17 | 140:8 | **audible**  159:12 | 26:24 31:1 |
| 202:22 221:20 | **atlanta**  1:21 | 159:14 | 39:15,16 43:11 |
| **asking**  20:3 | 5:12 | **auto**  18:15 | 65:5 67:18 |
| 55:14 62:1 | **attached**  5:21 | 31:12 | 70:11 72:14 |
| 82:25 149:3 | 9:16 10:21 | **autocad**  34:2,6 | 83:14 94:2,9 |
| 206:7 | 236:11 | **automotive** | 101:12 109:24 |
| **asks**  67:13 | **attempt**  17:7 | 18:21 22:24 | 116:21 118:18 |
| **aspects**  158:19 | 95:8,10 204:17 | 23:2 166:20 | 124:25 126:14 |
| **assess**  27:24 | **attempted** | **availability** | 128:7 134:11 |
| **assessable** | 108:20 | 74:25 | 147:6 154:23 |
| 108:15 | **attend**  92:17 | **available**  57:2 | 160:14 164:13 |
| **assessing**  50:20 | **attendances** | 57:11,21 58:9 | 171:22 180:3 |
| **assist**  14:12 | 12:1 | 61:4 84:8 | 181:13 188:21 |
| **assisted**  45:14 | **attended**  11:19 | 108:16 142:8 | 194:11 197:8,9 |
| 45:16 52:20,21 | 11:21 63:7 | 236:6 | 197:12 198:8 |
| 65:5,8 | 65:5,8 107:18 | **avenue**  5:5 | 198:10,16 |
| **associate** | 170:19 223:5 | **avoid**  135:1 | 200:9,12,13 |
| 125:10,12 | **attendees**  91:13 | **awards**  11:4 | 201:17,23 |
| 184:3 | **attending** | **aware**  19:13 | 204:20 208:13 |
| **associates** | 11:18 91:6 | 27:6,17 50:19 | 208:18 211:16 |
| 19:15,21 20:2 | **attorney**  5:10 | 68:5 119:13,16 | 211:19,24 |
| 22:3,7,11,16,17 | 6:8 15:19 | 217:17 221:16 | 225:22 229:1 |
| 23:11 | 29:21 32:6 | **axle**  134:3,6,13 | 230:20 |
| | 55:13 171:4 | 143:6 192:12 | **backed**  104:13 |
| | | | 104:15 |

Wesley Grimes
Bryson, Santana and Joshua v. Rough Country, LLC
May 9, 2024

**[backs - box]**

Page 8

**backs** 200:14
200:20
**backwards**
162:6,11
179:24
**bag** 173:21
199:14 207:25
**balasa** 49:4
**balasa's** 49:7
**ball** 159:13
160:12,13
**ballast** 66:1
133:19,22
135:7
**ballasted**
190:18,21
191:3
**ballpark** 59:4
143:3 144:4
**balls** 159:10,17
160:1,1,7
161:1
**bartley** 28:25
29:21
**base** 26:1
155:14 198:12
**based** 12:21
24:9 59:1
60:15 97:25
113:20 128:16
129:3,10 130:7
148:7 152:6
154:3 155:24
167:5,6 208:8
208:15 216:17

232:9
**baseline** 113:3
114:15,21
115:14
**basic** 25:18
30:23 138:21
**basically**
101:14 147:3
211:13 214:3
226:22
**basis** 26:3
96:14 105:24
145:15 155:15
156:19 157:11
157:23 158:22
167:7 198:4
200:11 204:25
211:1 227:16
227:19,22
228:2,17
231:14
**beer** 126:11,13
**behalf** 5:2,8
217:16
**belabor** 7:8
**believe** 26:14
96:18,19 97:4
97:8 99:22
105:6 134:6
136:9 137:5,25
138:5 141:1
147:15 180:15
212:12 213:17
225:8 228:2

**benefit** 174:9
**best** 7:10 86:8
86:17 121:4
**better** 20:6
66:7 75:17
145:19 194:19
**beyond** 55:14
56:8
**big** 230:12
**bill** 43:17
**billed** 46:15
47:16,25 52:8
53:21 54:5,15
57:8 58:5
**billing** 54:15
85:9 89:22
92:22 93:7
**binder** 70:12
**binders** 34:8
**biomechanics**
168:15,18
**bit** 122:1
134:20,23,24
142:21 147:8
153:1 157:19
206:14 207:11
**black** 189:15
189:23
**blackwell**
28:25
**blank** 36:18
37:6
**blast** 97:16
**blindly** 161:18
163:24 165:23

181:20
**board** 235:6
**bob** 22:23
23:20 24:19
**boise** 16:25
49:23,23
**bolted** 199:11
**bolts** 225:22
226:1
**bonus** 18:4
**bonuses** 17:25
18:2
**book** 61:14
62:6,7,17,19
**booked** 64:15
**bosch** 108:17
**bother** 153:2
192:11
**bothers** 83:21
**bottleneck**
64:14
**bottles** 126:12
**bottom** 12:11
12:11 44:25
112:14 120:21
121:22 129:23
230:5
**bought** 77:17
78:6,8,15,17,19
78:24 79:9,18
80:2,7,20 81:1
81:11 113:23
127:2 220:25
**box** 29:3 30:6,9
126:14 127:24

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[box - california]**                                    Page 9

128:2,3,6,7
136:13
**bracket** 120:21
183:21
**brackets** 122:3
122:6 183:8
213:18
**brake** 148:15
166:8,8 189:5
189:9,12 192:2
192:5,18
**brakes** 29:5,8
29:14 146:14
147:20 150:8
**braking** 142:8
147:8,16,19
148:4,7,15,17
149:1,5,10,16
149:16,23
150:3,5 151:5
195:18,22,25
196:4
**break** 7:11
23:15 42:16
60:9 67:13
70:18 72:7
80:15 181:7
228:20
**breakdown**
13:17
**breaks** 63:9
**briefly** 177:6
**brigham** 23:16
**bring** 38:6,16

**bringing** 29:22
**broad** 53:15
**brought** 9:25
21:2 69:12
**bryson** 1:3,4
100:6 153:10
193:7 236:4
237:1 238:1
**bryson's** 8:3
199:12,15,22
200:5 201:19
**buchner** 49:2
95:23 96:20
97:19 123:13
123:16 124:5
124:24 137:7
138:8 140:13
152:6,10,23
157:12 158:16
158:20 159:2
163:4,13 164:9
164:22 165:4
184:21
**buchner's**
95:22 96:5
98:9,13,14,15
112:2,7,16
122:14,25
124:17 135:11
136:5,9 137:12
137:13 138:1
140:9,20 141:1
152:15,18
153:4 154:11
155:23 156:13

156:25 158:10
165:11 169:2
203:14 204:3
**budget** 231:12
**building** 16:7,8
16:12
**bullet** 11:8
122:21 123:4
124:4
**bullets** 11:18
**bumper** 8:4,8
8:10,12,15
111:24 112:8
112:10 134:11
134:17,21,23
134:24 155:1,5
155:9,10 156:3
156:5 157:16
158:2 188:16
188:16 195:25
196:5 212:21
**business** 14:4
20:11,21 21:8
24:13,15
140:12
**buttons** 51:12
**buying** 64:11
64:12 221:2

**c**

**c** 2:1,8 6:1 52:5
53:5 120:21
122:3,6 183:8
183:21 213:18
**c.z.b.** 1:4,5

**cable** 63:8
**cad** 34:1,19
51:5
**cage** 166:2,4,5
166:6,10,15
**cages** 166:9
**calculate** 142:6
150:24 153:16
153:22,25
154:5
**calculates**
204:8
**calculating**
133:7 157:1
**calculation**
68:8,11,14,17
69:18 71:1,15
106:20,20
126:1 141:17
141:21 143:22
144:8 150:17
153:5 156:25
157:12,13
228:1
**calculations**
125:23 144:17
145:2,9 152:15
152:18 154:11
155:24 191:7
196:3 198:20
**california**
12:22 16:5,10
17:16 46:21
47:11,14 48:4
48:10 49:6

Wesley Grimes

May 9, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

[call - caught]

Page 10

| | | | |
|---|---|---|---|
| **call** 14:19 | **car** 9:9,12 | 208:19,20 | 87:12,14,18,22 |
| 15:20 33:20 | 24:10 126:9 | 210:23 211:4,5 | 88:3,16 90:1 |
| 41:5 43:9,14 | 127:23 128:2 | 211:7,17,20,24 | 92:18,25 94:18 |
| 44:19,22 67:11 | 166:15 169:10 | 228:11 | 95:13,19 96:7 |
| 70:23 87:9,9 | 169:13 174:14 | **carlos** 30:23 | 97:7,11 98:6 |
| 90:5 161:2 | 174:22 175:7 | **carolina** 32:19 | 98:20 99:8 |
| 181:1 205:19 | 175:19 | **cars** 148:20 | 101:9 106:10 |
| **called** 34:2 | **care** 79:24 | 223:23 | 117:3,18 |
| 88:10,11,12 | **career** 27:10 | **case** 7:5 11:12 | 118:11,19 |
| 108:19 159:23 | **cargo** 9:2 92:15 | 12:5,15 13:15 | 119:10,17 |
| 180:22 190:12 | 92:16 93:12,16 | 18:20 19:9,12 | 120:5,11 147:2 |
| 229:21 | 93:18 94:2,9 | 25:12 26:4 | 154:7 162:24 |
| **calling** 15:1,14 | 94:13,14 126:9 | 27:24 28:13 | 166:10 168:3 |
| **calls** 41:1,1 | 126:10 127:12 | 29:2,7 30:3 | 170:8 173:18 |
| 44:5 89:2 | 127:15,23 | 31:1,16,25 | 201:11 216:25 |
| 90:13 221:8 | 128:2,9 129:2 | 32:9 39:13 | 217:7,10,14,15 |
| **cameras** 171:11 | 129:3 130:4 | 40:5,8,18,22 | 220:15 221:5 |
| **camping** | 131:8 132:3,7 | 41:3,12 42:3 | 221:11 222:4 |
| 199:21 207:24 | 132:21 133:1 | 43:6,16 44:1 | 226:3 227:2 |
| **cannaday** | 134:2 135:21 | 44:17,23 45:6 | 231:12 235:13 |
| 32:19 | 137:18,19,23 | 45:13 46:5,9 | 235:13,15 |
| **cannella** 5:3,4 | 152:20 171:22 | 46:12,15 48:21 | **cases** 18:17 |
| 6:15 37:16 | 172:8 173:17 | 49:14,24 50:6 | 19:5 28:5,9,15 |
| 235:9 | 173:20 174:4 | 50:22,23 51:23 | 28:23 31:4,19 |
| **cannellasnyd...** | 174:10,11 | 52:12 53:3,10 | 32:3 64:22 |
| 5:7,7 | 191:8 192:24 | 53:10,15 54:18 | 65:13 86:4,9 |
| **cans** 126:11,13 | 192:25 193:5 | 54:25 55:21 | 86:11,13,18,20 |
| **capabilities** | 193:10,10,18 | 62:7,24 63:7 | 200:17 223:22 |
| 20:25 21:2 | 193:22,23 | 63:15 64:16,19 | 224:9 |
| **caption** 234:7 | 194:3,8,8 | 64:21,25 65:2 | **casework** 14:19 |
| **capture** 27:3 | 198:2,6,9,15,16 | 65:3,9,12 75:5 | **categories** |
| 105:16 109:20 | 199:2,6 201:2 | 75:11 77:17 | 41:16 177:17 |
| **captured** | 201:23 207:8 | 78:19 79:1 | 177:21 |
| 105:25 | 207:11,15,22 | 83:15 84:5,18 | **caught** 71:2 |
| | 208:6,8,14,16 | 85:3,16 86:25 | |

Case 2:22-cv-00017-RWS   Document 102-3   Filed 09/05/24   Page 249 of 305

Wesley Grimes
Bryson, Santana and Joshua v. Rough Country, LLC

May 9, 2024

[causation - closer]

Page 11

**causation**
168:12
**cause**  175:24
180:19
**caused**  31:8
198:10 203:21
208:8 221:25
**ccr**  1:25 234:20
235:21
**cdr**  3:9 49:16
108:17 138:17
142:1,3 144:1
144:7 146:5,17
147:20 152:2
**center**  72:1
133:11 182:3,4
182:8,9 187:1
187:1,12,22
188:2,2,8,9
189:18 190:2
212:8,9,13,14
212:17,17,19
212:20 213:3,4
**certain**  157:2
161:3 185:7
**certainly**  8:11
25:3 92:3
93:20 99:1
112:4 196:20
**certificate**
234:1
**certified**  235:8
**certify**  234:6,12
**cetera**  89:25
90:2

**cg**  29:18 70:24
71:4,25 162:14
**chain**  4:10
128:4 136:1,12
230:13,16
**chairs**  124:8
199:21 207:24
**challenge**  155:3
**chambers**
166:9
**chance**  96:3
**change**  29:14
68:13,18 78:13
145:17 150:25
151:1 191:15
221:24 222:12
237:4,7,10,13
237:16,19
**changed**  69:15
69:18 70:1
106:25 165:9
**changes**  9:24
171:13 184:20
191:17 236:10
238:6
**changing**
173:11 191:11
**characteristics**
176:12,18
184:19
**charge**  235:15
**charged**  85:15
**charlie**  83:9
127:2 131:23
176:9 177:25

**chart**  3:9 146:5
148:4,25
**charter**  24:9
**chat**  225:25
**check**  43:25
44:2 45:2
57:10 116:14
143:22,25
144:6 177:12
**checked**  74:25
85:17
**checkers**
189:22
**checking**  145:1
**cheryl**  47:9
**chicago**  118:7
118:21,23,24
119:10
**child's**  174:22
**chit**  225:25
**chitchatting**
224:3
**choose**  127:8
**chose**  76:8
**chris**  54:11,13
**christian**  50:2,5
50:19
**christopher**
45:19
**circle**  102:4,8
102:14
**cite**  167:12
198:23
**cites**  167:13

**city**  11:7
**civil**  1:7 7:19
**clare**  49:21
**clarification**
66:11 154:14
**clarify**  7:9
**class**  10:23
11:21,23,24
12:2,2,7,7
25:21
**classes**  25:18
25:19,20,23
**clear**  8:23
20:22 24:15
36:23 66:4
67:3 68:1,2
78:2 94:8
103:19 132:20
181:19 213:22
**clearly**  164:6
164:10,15
**click**  230:15
**client**  28:21
44:17 53:3
74:6 90:1
118:16
**close**  122:7,9
125:9 141:6
144:9,10
152:25 159:1
162:22 206:22
**closely**  29:12
172:4
**closer**  48:15
78:10 112:13

Wesley Grimes                                      May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[closer - complete]**                                    Page 12

210:16
**closing** 153:18
   153:19,22
   154:6
**clothes** 207:25
**clothing** 173:21
   199:14
**cloud** 47:2,8
   214:7,8
**clouds** 33:25
   183:14,15,18
   184:7 213:16
   214:3 216:19
   226:10,22
**cobb** 48:2,6
**cobb's** 48:6
**coefficient**
   155:25
**coefficients**
   153:25 156:14
   156:17 161:15
**cohan** 8:22 9:7
   173:17 174:15
   174:22 196:17
   215:25
**cohan's** 9:9
   168:6
**coke** 181:18
**collision** 19:15
   19:21 20:2
   21:12 22:2,7
   22:10,16 31:8
   100:7,16
   101:13,24
   106:5,18 107:1

107:2,6,12
125:21 129:19
132:22 138:9
138:13,15
139:16,23
146:12 151:10
155:12 156:1
156:20 157:8
158:12,14
171:17 184:7
184:15,19
189:9 191:21
191:22 196:16
196:19,22
197:1 203:16
204:4 206:2,11
208:21 209:8
213:9,14
214:21 227:4
**collision's**
   151:15
**collisions** 30:18
**colloquies**
   234:8
**color** 79:23
   151:21,24
**combination**
   143:5,17
**combine** 143:6
   143:18 159:22
**combined**
   143:7
**combining**
   141:24

**come** 15:10
   20:9 24:13
   128:1 131:9
   133:14 135:2
   172:15 182:16
   182:23 184:10
**comes** 14:23
   42:6 63:8
   96:10 107:3
   162:5 175:3
**comfortable**
   44:6 159:6
   172:21
**coming** 43:17
   118:15 131:4
   172:21
**comma** 92:17
**comment**
   123:14,15
   124:24 151:24
**comments**
   97:23
**commercial**
   13:9,13
**communicate**
   40:24 66:23
   67:3 89:5
**communicati...**
   39:11,12 40:4
   40:7,10,17,21
   41:11 42:11
   55:8,15 56:8
   221:8 229:4
**companies** 15:4
   15:5

**company** 12:21
   15:8,9,15
   18:11 19:22
   20:4,6,6 22:22
   23:4,4,22 30:6
   30:7,12 46:2
   47:13 48:3,7
   49:13 76:1
   108:19 119:5
**comparative**
   215:2 216:6
**compare**
   158:22 159:3
   162:18 181:21
   231:23
**compared**
   177:9 197:8
**compares**
   205:11
**comparing**
   177:14,23
**comparison**
   216:18,19
**compartment**
   166:14 184:17
   185:4 186:17
   201:19
**compatibility**
   167:4
**compensated**
   17:24 20:5
**compensation**
   41:13 55:9
**complete** 38:9
   95:11 96:13

Wesley Grimes                                            May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[complete - conversation]**                                Page 13

229:21 238:8
**completed**
  236:16
**complication**
  175:23
**complications**
  175:14
**complies**
  102:10,13
**component**
  18:21 19:6
  23:2 32:7
  232:19
**components**
  130:20 137:17
  156:4 173:14
  183:10,24
  232:5
**compressed**
  199:17,19
**compressor**
  29:3,4 30:8
**compromising**
  193:15
**computer**
  25:15 223:15
**concept**  79:14
**concern**  8:8
  62:8 175:11
**concerned**  64:1
**conclude**
  139:21 207:6
**concluded**
  140:1 141:19
  233:14

**concludes**
  233:2
**conclusion**  81:7
  100:23 112:21
  172:16,21
  182:2 198:12
  198:15,21,24
  204:3,25 205:3
  208:7 211:2
  227:4
**conclusions**
  100:1 105:17
  107:1 119:22
  173:8 215:6
  216:11 227:2
**condition**
  158:17,25
  159:1,3 162:7
  162:22 163:17
  163:21,23
  191:1
**conditions**
  158:24 162:13
  162:20
**conference**
  11:6 87:5 91:7
**confidentiality**
  46:7
**configuration**
  60:16,25 63:4
  63:17 65:16
  66:8 134:9
  210:14
**configurations**
  59:10 66:17

**configure**
  201:22
**configured**
  63:2 65:23
  71:16
**confirmation**
  2:25 117:7
**confirmed**
  144:9
**conflict**  43:25
  44:2 45:1
**congress**  24:2
**connected**
  159:18 160:2
**consecutively**
  73:19
**conservative**
  140:7
**consider**  16:24
  17:1 78:3
  140:19 158:12
**considered**
  19:2 76:25
  77:1 97:1
**consistent**
  100:14 145:6
  195:3
**constraints**
  60:23 63:12
**construction**
  29:4
**contact**  8:7,10
  8:11 53:14
  57:24 125:13
  125:15 182:19

182:20 198:8
**contacted**
  57:25 235:9
**contacting**  58:8
**contain**  95:4,11
**contained**
  111:4
**contains**  95:14
  95:16
**contents**  124:7
**context**  14:16
  140:8 151:17
  151:21,25
**continued**
  24:17
**continuing**
  150:10
**contract**  23:24
  82:19,20 83:25
  235:11,12
**contribute**
  170:13
**contributed**
  31:8 208:6
**contribution**
  66:14
**control**  29:9,10
  29:11 108:4,10
  138:12 145:18
**conversation**
  43:18,20,21,24
  44:8 46:9
  53:13 64:7,8
  98:7 133:24
  221:13,21

Wesley Grimes                                           May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[conversation - crash]**                                Page 14

| | | | |
|---|---|---|---|
| 222:20,22 | 86:3 87:19,23 | 238:6 | 221:15 223:4 |
| 224:4 | 88:2 90:16 | **correctly**  53:6 | 230:24 |
| **conversations** | 92:23 93:13 | 90:3 92:20 | **county**  234:4 |
| 66:25 67:6 | 99:9,20 100:3 | 157:9 210:4 | 235:4 |
| 83:12 88:9,14 | 101:20 103:2 | **corresponded** | **couple**  9:24 |
| 88:15,19,21 | 103:23 113:22 | 124:6 125:6 | 10:8 67:22 |
| 91:24 92:4 | 115:1 116:11 | **cost**  57:3 58:16 | 86:21 142:11 |
| 93:12 221:8 | 117:23 132:9 | 58:17 59:5,18 | 155:16 224:9 |
| 224:1 | 139:7 140:5 | 74:15 | **course**  26:2 |
| **convey**  79:4 | 147:22 149:8 | **cota**  46:19,20 | 183:11 |
| **coordinate** | 149:21 150:6,7 | 48:5 | **courses**  25:15 |
| 41:3 | 152:13 153:8 | **cota's**  46:22 | **court**  1:1 5:20 |
| **copied**  69:1 | 158:12 165:1 | **cough**  97:16 | 6:19 17:12 |
| 70:19 | 165:18 167:21 | **coughing** | 94:23 95:5 |
| **copies**  10:8 | 168:13,16,19 | 132:18 | 119:8 235:6,8 |
| 236:14 | 179:20 180:7 | **counsel**  5:1,20 | 235:10 |
| **copy**  9:15,19 | 182:1,5 187:13 | 6:6 235:7,13 | **cover**  27:8 70:4 |
| 39:3 40:3 | 187:14 188:3 | 236:14 | 102:15 126:14 |
| 41:11 72:8 | 190:7,11 | **count**  52:7,10 | 127:23 128:2 |
| 79:23 94:17 | 192:25 193:1 | 52:14,15 | 159:20 214:23 |
| 113:11 178:21 | 195:23 205:12 | **counting**  17:3,5 | **covered**  37:20 |
| 229:3,7 233:10 | 205:16 206:25 | 19:4 52:4,7 | **covid**  21:9,10 |
| **corner**  159:21 | 219:1,17 227:9 | **country**  1:8 | **crash**  11:22 |
| **corporation** | 227:12 228:12 | 6:17 31:16,20 | 13:2,5,6 15:9 |
| 19:19 | 229:22 234:10 | 55:3 84:20 | 25:6 31:3 |
| **correct**  10:6 | 238:8 | 85:15 88:22,23 | 34:12,20 38:20 |
| 18:24 20:18 | **corrected**  4:12 | 91:8 99:11 | 38:23 45:18 |
| 28:1,24 34:9 | 70:5 71:20 | 111:8,24 112:7 | 48:16,22,24,25 |
| 34:16 36:17 | 73:1,3 141:9 | 120:11,14,17 | 53:5,23 54:7 |
| 38:19 42:24 | 141:14 227:24 | 201:12 221:22 | 54:17 55:2,4 |
| 43:3,23 45:4 | **correction**  69:9 | 223:14,18,21 | 55:20 56:11,22 |
| 46:16 47:16 | 148:4 149:1,5 | 225:3,12 236:4 | 57:9 58:5,8,12 |
| 48:1 67:9 71:4 | **corrections** | 237:1 238:1 | 58:18 59:2,5,8 |
| 74:7,13 75:15 | 67:23 69:5,11 | **country's**  42:23 | 59:10,19 60:2 |
| 81:17 85:9,25 | 70:8 72:18,20 | 56:11 217:16 | 60:13,14,18 |

Wesley Grimes                                                            May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[crash - cursory]**                                                      Page 15

| | | | |
|---|---|---|---|
| 62:4,7,12,14,20 | 176:4,8,12,19 | 223:14,19 | 131:24 133:22 |
| 62:23,25 63:1 | 176:23 177:4 | 228:7,11 | 135:4,6 176:9 |
| 63:7,14 64:5 | 177:10 178:6 | **crashed** 161:12 | 177:25 |
| 64:15,19,20,23 | 178:13,17 | **crashes** 14:6 | **croteau** 155:21 |
| 65:1,8,12,14,16 | 179:1,16,19,22 | 224:20,25 | **crush** 124:13 |
| 66:21,24 67:4 | 179:25 180:19 | **create** 36:18 | 124:25 153:15 |
| 68:18 69:19 | 181:16,24 | 113:3 114:15 | 153:17,18,21 |
| 74:23 75:22 | 182:3 184:13 | 115:13 226:24 | 153:24 154:11 |
| 76:11 77:6,9 | 185:3 186:6,15 | **created** 29:12 | 154:17,22,25 |
| 78:7,16,20 | 186:16 187:5 | 217:25 226:9 | 155:23 156:25 |
| 80:3,21 81:16 | 188:5 189:2,5 | **creating** 29:19 | 158:18 161:13 |
| 81:21,24 82:3 | 189:13 190:6 | 98:22 | 161:14,19,20 |
| 83:5,23 85:3,3 | 190:18,19,22 | **critical** 140:25 | 163:13 164:1 |
| 92:4,17,25 | 190:25 191:4 | **criticism** | 165:24 181:21 |
| 93:8,19,22 | 191:12 192:5 | 112:15 134:10 | 191:22 213:9 |
| 104:17,19 | 192:25 193:6 | 135:1 152:5 | 213:14,23 |
| 119:25 120:9 | 194:15 195:18 | 155:23 156:7 | 214:2,4 215:2 |
| 120:13,16 | 195:21 196:15 | 158:10 165:3 | 215:7,9 216:6 |
| 126:3 130:8 | 196:19 197:5 | 165:10 167:3 | 216:13 221:24 |
| 133:19 134:7 | 198:13,14,17 | 173:21 193:25 | 231:19,24 |
| 136:4 149:21 | 201:13,22 | 194:3 203:14 | **crushing** 154:1 |
| 149:23,25 | 205:12,20 | 203:17 | **cs** 236:15 |
| 150:1,6,8,18 | 206:3,12,13,18 | **criticisms** | **curb** 126:8,24 |
| 156:11 157:6 | 207:1,9,13,17 | 203:25 | 127:3,12 |
| 158:2,4 163:5 | 208:1,2,14 | **critique** 123:17 | 129:17 130:4 |
| 163:14,15,19 | 209:12,17 | 154:10,12 | 137:1,22,23 |
| 163:20 164:5 | 210:2,3,5,6,21 | 166:24 169:1,8 | 191:8 218:21 |
| 164:10,15 | 211:8 212:3 | **cromack** 22:17 | 218:22 |
| 167:4,23 170:7 | 213:10 214:2 | 23:10 24:14,19 | **current** 7:24 |
| 170:18,19 | 214:17,20 | 24:23 64:21 | 9:23,25 10:2,4 |
| 171:1,13,16 | 215:16,22 | 65:6,7,10 | 10:11,20 13:22 |
| 172:10 173:14 | 216:24 217:6,9 | **crosby** 66:5,6,6 | **currently** 12:17 |
| 173:16 174:4 | 217:12,16 | 66:16,24 67:5 | **curry** 47:12,15 |
| 174:15,23 | 218:19,24 | 83:9 84:3 | **cursory** 170:2 |
| 175:7,8,19 | 219:14 223:11 | 91:10 127:2 | |

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[customary - degree]**                                    Page 16

customary
  235:15
cut  61:11
  146:21 214:8
cv  1:8 2:8 4:7
  9:16,23 10:20
  12:9,13 25:8
  97:8
cycles  123:10

**d**

d  1:13 6:1,20
  235:5
damage  110:9
  124:14 155:7
  161:11 191:22
  194:14
daren  48:8,9
daren's  48:11
data  11:7,22
  12:3,24 13:2
  14:5 41:14
  45:16 46:8
  48:25 49:15,16
  51:10 55:11
  90:2 97:1
  106:10 108:22
  123:9 139:9
  206:23,23
date  2:17 6:2
  12:11 26:13,24
  27:18 57:25
  58:3 73:23
  84:18,21 85:13
  89:19 93:4,5
  125:21 151:10

169:12 231:9
235:21 237:24
238:12
dated  85:19
dates  167:17
daubert  118:1
  118:6
daughter
  224:15
dave  50:25
  51:2
david  48:8,9,11
day  44:21 45:2
  83:10,13 84:4
  84:7 107:14
  126:2 129:18
  136:4 137:7
  171:14 230:18
  234:15 238:15
days  82:9 93:8
  93:22 94:6
  236:16
de  5:5 200:21
deal  101:11
  162:4
dealer  229:10
dealing  147:18
  164:12
deals  12:2
  69:14
dealt  22:22
  50:17
dean  7:23
dear  21:8

decatur  5:6
deceased  1:5
deceleration
  106:6,22 143:8
  143:13 149:12
  149:13
december
  99:20 105:18
  105:23 107:14
  109:10 112:25
  223:1,3
decent  116:12
decide  184:13
decided  23:18
  48:15 60:24
  75:5 76:6
  79:18 80:4,8
  175:14 201:22
decision  75:20
  75:24 76:10,16
  77:10,11 78:20
  79:3 80:22
  93:15,17,25
  94:1,7,9,10
  167:5 174:2,4
  175:1,24 176:2
  178:1 192:7
  202:1
decisions  64:13
  78:11
declare  238:4
deemed  238:6
defaulted  94:13
defect  30:11
  31:7 32:8 99:8

167:4
defective  31:13
  99:12
defendant  1:9
  5:8
defendant's
  88:3,4 231:1
defendants
  28:16,22
defending  23:5
define  13:5
  138:13 164:3
defines  138:14
definitely
  195:11
deflated  121:3
  122:12
deformation
  157:6,17,17
  198:1,5 202:6
  202:6,7,12,15
  202:24 203:2,7
  203:11,15
  204:4,6,10,17
  204:21,22
  211:6 215:25
deformed
  196:18,22,25
  197:5,8 198:16
  199:6,7 201:2
  202:19,19
  210:24
deglove  200:19
degree  45:11
  169:2

Wesley Grimes
May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[dekalb - differently]**                                    Page 17

**dekalb** 235:4
**delta** 138:9,18
  139:15,22
  140:2,2,9,20,20
  141:1,25 145:9
  151:3 152:25
  153:2,18,20,22
  154:4 205:11
  205:15 206:3,4
  206:8,10,12,18
  207:4,7 208:7
  208:22 209:1,2
  209:7,11,13,16
  228:11
**delve** 98:8
**demanding**
  186:23
**denote** 122:24
**depend** 176:21
  199:16
**depends** 28:9
  123:20 138:13
**deploy** 152:12
  167:19,22
**deployment**
  152:3 167:16
**deponent**
  236:13 238:3
**deposing**
  236:13
**deposition** 1:12
  2:6 3:2 4:2
  5:21 6:4 7:7,16
  26:16 27:4,9
  27:24 39:4

40:3 85:23,24
  233:2,14 235:5
  235:10,10,14
**depth** 124:14
**derive** 156:4
**derived** 158:16
**describe**
  146:22
**described**
  206:24
**describes** 213:8
**description** 2:7
  3:2 4:2
**design** 64:24
  65:15 66:8,12
  66:21 170:7,11
  200:9,12,13
  232:1
**designed** 64:23
  65:4
**designer**
  166:20
**designing** 66:6
**desire** 188:12
  194:2
**desired** 180:18
**destroyed**
  221:5
**detail** 96:3 98:8
  98:11 152:9
  208:24 214:24
**detailed** 66:13
  207:19 209:18
  211:11

**details** 59:13
  60:10 170:2
**determination**
  122:15 134:5
**determine**
  101:13 102:14
  102:16 103:3,9
  103:18,25
  104:7,18
  132:24 133:18
  133:21 167:15
  169:2 177:3
  178:8 195:24
  196:4 199:1,5
  200:22 213:2
  214:1 216:17
**determined**
  102:5 127:3
  213:8
**determining**
  92:18 213:13
**develop** 96:1
**develops** 28:13
**device** 175:12
  180:7,13,17,22
**devices** 166:8
**devin** 5:3,7
  6:14 7:4
**diagram** 2:21
  207:7
**diagrams** 67:7
**dial** 1:17 5:10
**dictaphone**
  109:15

**diego** 16:18
  45:20
**diesel** 115:10
**diet** 181:18
**difference**
  127:9 134:22
  140:17 152:2
  165:4 167:15
  173:4,5 176:22
  184:24 198:5
  202:5 207:7,10
  208:1,6,9
**differences**
  177:11,16
  232:15
**different** 13:1
  18:17 22:24
  23:7 25:14
  48:14 56:16,19
  62:11 75:4
  76:9 86:4
  134:4 137:6
  154:22 155:11
  157:7 158:19
  164:23 165:7
  171:24 176:17
  177:11 179:21
  194:4 203:18
  205:15 207:5
  207:16,20
  208:4 209:16
  209:20 218:9
  225:21 232:19
**differently**
  75:23 176:18

Wesley Grimes
May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[digit - doing]**                                                        Page 18

**digit**  177:13
**digital**  72:21,25
  73:2
**dimensional**
  47:3
**direct**  192:4
**directed**  48:6
  118:19 192:15
**direction**  48:6
  103:22 234:9
**directions**
  185:24
**directly**  173:17
  188:2
**director**  13:24
  14:2,8 23:23
**directs**  37:15
**dirty**  144:2
**disablement**
  29:11
**disagree**  55:24
  85:15 111:7
  112:20 123:25
  137:13 140:23
  156:13 204:10
  204:15
**disagreement**
  112:6 124:9,12
  204:2
**disclose**  35:2
  56:7
**disclosed**  28:3
**disclosure**  5:20
  235:1,7

**discount**
  235:15
**discoverable**
  55:22
**discovery**
  37:19
**discuss**  44:17
  53:3,5 90:1
  92:17 100:1
  152:14 175:6
  175:18 220:10
**discussed**  61:7
  63:3,4 132:7
  211:1 221:14
  227:14,16,19
  227:22 228:2
  228:14,17
  233:6
**discusses**
  154:24 158:7
  228:10
**discussing**
  40:18 54:18
  63:14 87:12,12
  94:11 221:9
**discussion**
  13:20 26:11
  32:17 54:10
  62:18,19 64:4
  72:6 74:5
  79:25 82:10
  116:15 170:13
  197:20 233:9
**discussions**
  45:18 48:13

  49:9 54:13
  60:15 62:3,6,9
  76:5 81:25
  82:2 83:1,9
  92:15 170:16
**displace**  8:21
  9:3,6
**displaced**  9:11
  9:12 198:11
**displacement**
  193:11 194:11
**dispute**  88:12
  101:17 112:3
  124:16,17
  186:20 231:8
**dissipated**
  154:1
**dissipates**  15:7
**distance**  104:15
  133:11 143:23
  231:19,23
**distorted**  122:6
  122:7
**distortion**
  161:11 212:24
**distribute**
  154:2,3
**distributed**
  133:8
**distribution**
  132:25 133:15
  133:16,18
  135:5 140:8
  142:5

**district**  1:1,1
**diverge**  205:18
**divide**  143:6
**division**  1:2
**doc**  230:18
**docs**  230:18
**document**
  69:10,13 114:4
  115:17 126:20
  131:15 163:9
  215:2,8 216:6
  216:12 217:23
  217:25 218:2
  219:20 220:8
  220:11 226:8
  229:17,20
  231:6
**documentation**
  14:6 25:7
  220:24
**documented**
  15:5,7 100:5
**documents**
  35:11 37:12
  40:2,11 41:16
  73:2 90:19
  95:21 141:8
  163:3 224:20
  225:3,11,12
**doing**  20:22
  21:25 32:24
  43:13 44:6
  49:10 77:1
  98:20 99:16
  106:9 132:11

Wesley Grimes                                           May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[doing - employees]**                                  Page 19

147:7 154:21
155:6 156:18
158:20 175:2
178:3 209:18
**dollars**  114:3
**dormant**  86:14
**dots**  230:15
**download**
12:23,23
108:13,20
146:17 229:25
230:2
**downloaded**
123:9
**downloads**
14:11,12,14
**dr**  91:9 171:6
173:24 174:3,6
174:8,19,21
175:10,16,21
175:25 221:22
222:23
**drained**  137:10
**draw**  173:8
**drawing**  215:7
**drawings**  35:5
35:14,15 51:3
51:6 226:21
232:1
**drinking**
181:18
**drive**  2:12 68:3
**driver**  29:9
30:9 126:9
127:13 146:14

**driver's**  127:15
176:4
**driving**  167:20
**drone**  46:24
47:1 50:1
**drop**  151:2
**drove**  174:1
176:1
**due**  86:14
122:4 198:6
207:8
**duly**  6:21
**dummies**  59:19
**dummy**  175:7
175:19 176:4
**duplicate**  29:12
**dymesh**  159:5
159:25 163:10
164:18 165:23
**dynamic**  23:23
202:6,7,11,14
202:23 203:1,6
203:10,15
204:3,6,10,16
**dynamically**
202:19
**dynamics**
157:7

**e**

**e**  2:1,2,6,9 3:1
4:1,10 6:1,1
39:15,16,20
221:7 230:11
230:12,24
237:3,3,3

**earlier**  25:10
28:12 31:23
38:12,15 53:2
117:24 132:16
140:7 141:8
165:11 190:13
191:7 193:17
195:17 200:7
211:5 231:4
**early**  144:2
147:17 150:19
175:9,20
**ears**  97:16
**easier**  134:18
**easy**  179:11
**ecm**  90:1
**edge**  120:21
200:15
**edr**  11:22 12:6
123:5,7
**education**
23:19
**effect**  29:8
106:8,16 133:7
134:8,15,16
161:7 176:24
178:8 194:11
211:22 231:15
**effective**  143:7
**effectively**
160:20,23
**effects**  94:12
223:18 232:8
**effort**  147:16

**eight**  22:13
45:9 52:15,18
135:17 144:3
184:24
**eighth**  228:5
**either**  11:25
12:1 14:17
15:22 34:14,21
44:20 49:25
87:8 89:5
109:6 111:20
153:12 193:8
197:11 200:21
**electric**  67:24
**electronic**  2:12
33:10 34:7,15
34:17,22 38:19
38:25 40:5
73:8
**elliott**  74:18
147:20 167:20
**elliott's**  8:2
111:1 112:8
127:21 156:21
**emblem**  194:23
195:3,11,14
**emergency**
192:2,5,15,18
**employee**  23:21
234:13
**employees**
17:10,17 20:13
20:15 21:12
85:8

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[empty - estimate]**                                      Page 20

| | | | |
|---|---|---|---|
| **empty**  126:13 | 91:7 | 108:11 112:25 | 207:16,23 |
| 211:13,13,25 | **engineers**  49:5 | 113:4,17,18 | 214:16,20 |
| **enable**  152:3 | 51:19,25 52:15 | 114:10,15,22 | 215:1,8,8 |
| **enabled**  147:3 | 52:18 87:10,11 | 125:11,15 | 218:22 219:2 |
| **encompass** | 87:16,20,21 | 128:14 129:1 | 219:12,25 |
| 38:14 | **enjoy**  21:25 | 131:21 132:2 | 220:4 226:19 |
| **encounter** | **ensued**  13:20 | 132:22,25 | 227:5 230:1 |
| 207:2 | 26:11 32:17 | 134:1,11,24 | 231:16,17 |
| **ended**  25:19 | 72:6 79:25 | 138:2 140:14 | 232:6,15 |
| 29:19 30:18 | 116:15 197:20 | 143:4,9,14 | **escape's**  8:4,15 |
| 32:23 58:1 | 233:9 | 145:10 150:6 | 104:1 124:13 |
| 64:11,12 | **entire**  22:14 | 150:22 153:10 | 124:18 125:7 |
| 118:17 131:25 | **entities**  15:6 | 154:7 156:21 | 137:13 178:9 |
| **energy**  153:17 | **entry**  44:15 | 158:2 160:10 | 179:15 182:3,9 |
| 154:1 155:8,9 | 50:3 53:1 54:5 | 164:14 169:20 | 187:16 189:5 |
| 155:9 186:16 | 54:15 73:11 | 177:3 178:5 | 197:8,9 202:12 |
| **engage**  192:4 | 89:16,22 90:15 | 179:18 180:6 | 202:15 232:2 |
| 192:15 | 92:7,13,22 | 180:14,20 | **escaped**  103:9 |
| **engaged**  189:5 | 93:7 | 182:20 183:7 | **escapes**  131:24 |
| 189:9,12 | **environment** | 183:19 187:11 | 218:7 |
| 207:14 208:3 | 25:17 151:19 | 187:21 188:10 | **escort**  104:20 |
| **engages**  208:12 | **equal**  185:14 | 188:17 189:1 | **especially** |
| 208:13 | 191:20 | 189:16 190:21 | 48:13 56:15 |
| **engaging** | **equipment** | 191:1,8 192:5 | 94:15 134:1 |
| 207:12 208:17 | 15:17 19:3 | 192:24 193:18 | **esquire**  236:1 |
| 209:20 | **errata**  236:11 | 193:22 194:15 | **essentially**  47:2 |
| **engineer**  45:21 | 236:13,16 | 194:23 195:1,8 | 104:11 108:22 |
| 46:3 48:9,19 | **escape**  2:22 8:3 | 196:14,16 | 143:9,11,19 |
| 49:19 50:3,4 | 8:18,21 9:6 | 197:25 198:6 | 144:8 154:8 |
| 87:5 91:14 | 50:10,12,13,13 | 198:11 199:3 | 180:21 |
| **engineering** | 59:15 71:6,8,9 | 200:22 201:1 | **estate**  1:4 |
| 19:15,21 20:2 | 71:9,21 90:2 | 201:19 202:18 | **estimate**  53:4 |
| 21:12 22:2,7 | 93:18 100:6 | 202:24 203:2,8 | 53:22 54:7,17 |
| 22:10,16,17 | 103:3,15,22 | 203:12 204:23 | 55:2,4,20 |
| 23:10 45:12 | 107:11 108:3,5 | 204:24 207:9 | 56:22,23 57:9 |

Wesley Grimes                                                      May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[estimate - expert]**                                              Page 21

58:5,12,17,24
59:1,9,18,23
60:1 61:20
86:8,17,20
127:10,11,24
128:8 129:13
129:24 130:19
133:16 136:24
137:12 141:23
142:13 143:12
143:13 182:13
182:16
**estimated**
103:13 126:8
126:24 127:3
130:11,16,23
135:5 142:10
143:12 149:12
155:8
**estimates**  61:23
62:16 128:3,10
128:17,24
131:9,12 132:3
132:6 133:1
143:2 149:15
**estimating**
142:25 150:21
**estimation**
126:2
**estimations**
141:1
**et**  89:25 90:2
**evening**  97:19
**event**  12:24
29:12 151:25

**everybody**  30:4
63:25 108:22
**evidence**  15:7
29:13 101:15
101:17 110:6
189:8 202:17
221:4 234:11
**exact**  36:22
68:8 76:16
202:22
**exactly**  37:23
46:6 58:21
93:25 94:7
136:17 137:16
147:5 173:19
193:5 203:17
203:23 204:1
210:16 216:14
**examination**
2:4 6:23
**examined**  6:21
**example**  124:4
160:8
**except**  38:20
222:13
**excluded**  34:21
**executing**
51:16
**executive**  223:4
**exemplar**  3:5
112:25 113:2
113:17,18,25
114:1,10,23
115:1,3,20
164:23 169:9

169:20 174:14
198:2
**exemplars**
128:22
**exhibit**  2:7,8,9
2:11,12,13,14
2:16,17,18,20
2:21,22,23,25
3:2,4,5,6,7,8,9
3:10,11,13,14
3:15,16,17,18
3:19,20,21,22
3:23,24 4:2,4,5
4:6,7,8,9,10,11
4:12,14 9:15
9:17 10:1,12
10:14 12:10
26:7,9 32:12
33:2,5 36:19
36:20 37:3,6
39:3,5 42:12
42:13,17,20
44:9,12 68:20
68:23 69:8,20
69:23,24 70:13
71:19,22 72:19
72:24 84:13,14
89:11,13,15
94:17,19
101:22,25
102:5 105:8,10
109:9,12,12
113:7,10,13
116:24,25
125:22,24

126:16,19
127:16 141:12
144:15 145:2
145:23 146:1,4
147:6 178:16
178:18 194:13
194:16 196:10
196:10,11
201:6,7 205:6
205:8 212:2,4
215:1,3 216:5
216:8 217:19
217:20 219:5,6
219:8 229:7
**exhibits**  90:19
98:22,23 196:8
196:8
**exist**  163:1
**expect**  220:20
220:23
**expected**
108:23
**expense**  74:15
**expenses**  74:4
74:11 85:10,11
**experience**
12:14
**experiments**
221:23
**expert**  17:13
22:3 23:4
25:12 27:21
28:3 87:22
88:22 118:12
168:17 200:8

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[expert - fair]**                                    Page 22

200:11,20
**expert's**   55:10
  95:4
**experts**   40:21
  49:2 88:1,4,16
  88:25 89:7
  90:5,11,20,22
  91:4,6,25
  108:12 225:11
**explain**   135:23
  142:22 154:12
**explained**
  28:12 213:13
**explanation**
  210:20
**explore**   171:20
**exploring**
  56:19 106:12
  184:16
**exponent**   4:5
  57:15,20 58:2
  75:17,18 77:15
  82:18 83:19,20
  83:23 84:4
  120:1 127:6
  167:23 171:4,8
  174:14 176:9
  192:4,15,17,21
  216:25 217:6
  219:21 220:18
  220:20,23,25
  222:7,8,12,17
  222:18
**exponent's**
  59:1 84:7

**express**   95:12
**extended**
  124:14,25
**extent**   41:12
  55:14 91:20
  116:7
**extract**   107:9
**extracted**   12:3
**extreme**   146:13
  147:7,16
  185:10

**f**

**f**   2:24 8:2,14,17
  8:20,24,24 9:1
  9:5 13:15
  50:12,13,14
  59:14 60:19
  64:5,6 68:16
  69:17 71:7
  74:18,23 75:21
  76:20 77:9,21
  78:7,21 80:4
  80:22 100:7
  104:7,13 105:3
  107:11 108:3
  111:25 112:9
  112:17,22
  115:1,8,9,14,20
  117:19 120:21
  122:15 124:21
  124:25 125:6
  125:13,21
  128:9,14 129:1
  129:16,18
  130:8 131:17

132:25 135:12
137:2,6 140:15
142:18 144:7
144:19 145:9
147:13 150:5,9
152:11 156:21
158:1 160:8
164:13,23,24
166:25 167:8,9
167:20,23
171:17,24
177:3 179:21
179:24 180:6
180:18,19
181:3 182:4,8
182:21 183:5
183:19,20
188:1,9,16
189:16 190:6
190:13,18
191:8 194:22
195:4,19,22
196:1,5 205:12
205:12 208:2
208:22 209:9
211:21 212:8
212:13,17
213:4 214:16
214:19 216:6
218:5 219:2,11
219:25 220:4
222:9,13
226:16,20
227:5,12

**facilitate**   20:21
  21:16
**facilities**   57:10
  60:23 61:14
**facility**   16:14
  57:2 61:4 62:6
  81:20,24 82:3
  83:20 84:7
**facing**   64:14
**fact**   25:22 43:8
  118:11 233:12
**factory**   177:12
**facts**   40:7
  41:14 55:11,21
  96:25
**fails**   236:18
**fair**   7:14 13:17
  25:2 26:5
  27:25 34:8
  51:13 54:20
  58:6 59:6
  61:16 66:16,19
  83:6 84:8,19
  98:16 111:20
  111:21 113:4
  120:6 123:17
  127:6,17
  128:16 129:19
  130:14 132:5
  133:15 135:8
  140:21 141:3
  143:24 151:23
  152:20 153:7
  166:13 169:3
  169:25 171:25

Wesley Grimes
Bryson, Santana and Joshua v. Rough Country, LLC
May 9, 2024

**[fair - five]**

Page 23

173:5,11 174:3
177:18,21,22
179:22 180:20
183:22 184:8,9
185:8 186:18
191:9 193:19
204:11 205:3
206:20 207:17
209:7,12
214:18
**fairness** 64:18
**familiar** 25:16
25:23 95:3
**family** 8:3 24:6
24:13,15 29:23
224:15,18
225:4,5,13,14
**family's** 153:10
**far** 8:20 27:19
103:3,9,18,25
104:7 190:14
213:3
**faro** 33:17
**farther** 196:18
197:7
**fast** 14:19
28:11 233:13
**fatal** 30:19
**father** 24:8,12
24:16
**fault** 47:21
114:8
**fbo** 24:8
**feasible** 57:4
59:24

**features** 203:19
203:21,23
226:23
**february** 20:17
73:15,20,21,24
74:9 76:19
79:19 81:10
230:20,21,22
231:7,10
**federal** 7:19
94:22 95:4
119:8
**fee** 115:6
**feel** 136:3
147:17 174:9
174:19 175:10
193:3
**fees** 74:3,5
**feet** 103:14
104:23 124:14
141:23
**felt** 175:16
**ferguson** 31:17
42:19
**fernandez** 50:2
50:19
**fernandez's**
50:5
**field** 229:21,24
**fifth** 227:19
**fifty** 144:3
164:12
**figure** 3:22
100:5 121:9
128:23 158:19

162:6,11
196:13 205:7
226:6,9,14,17
**figured** 66:17
**figuring** 150:13
**file** 1:7 2:12
10:5 33:11,12
34:4,7,15,17,22
34:22 36:11
38:9,19,25
39:10 42:4,19
44:14 47:2
67:23,24 69:12
70:8 72:21
73:4 85:9
101:23 113:16
115:18 116:1
125:23 131:9
136:5 144:18
146:5 155:19
169:16,22
178:22 215:2
216:7 217:2,5
217:24 220:5
224:13 229:4
230:17
**files** 72:20
**filling** 200:16
200:18
**film** 208:11
**final** 47:8
104:14 158:24
159:1,2 162:7
162:20,22

**finally** 79:17
**financial** 56:23
235:15
**financially**
234:14
**find** 41:15
101:17 103:12
108:8 114:2
135:24 141:18
**finder's** 115:6
**fine** 91:23
175:4
**firm** 31:20
**first** 6:21 7:6
23:21 26:24
30:3 44:15
53:1,13 54:5
54:15 57:1
62:24 63:15
64:16,18 69:5
69:14 76:7,10
82:9 94:15
127:6 135:15
144:18 160:18
174:8 179:9,10
179:11,13
192:7 218:15
218:18,23
219:16 227:4
229:9 231:18
**fit** 21:3 76:23
**five** 17:11,15
17:15,15,18
45:8 112:12,13
148:20,23

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[five - functionally]                                   Page 24

171:10 184:23
**fixed**   24:9
**flat**   106:17
   107:2 121:15
   121:19
**focus**   21:24
**folder**   4:9
   34:25 35:4,24
   36:9,14,15,21
   37:8,12 38:2,5
   38:6,8,24
   217:24
**folding**   124:7
**follow**   56:2
   81:22 95:10
   142:11
**following**   29:13
   235:7
**follows**   6:22
**football**   23:17
   23:18
**force**   138:23
   139:6 202:7
   211:14,23
**forces**   202:8
**ford**   2:22,24
   8:3 12:4 30:12
   32:19 59:14,14
   69:17 103:9,22
   113:4 114:15
   114:22 134:19
   140:15 142:18
   143:6,10,14
   156:21 160:8
   160:10 164:14

182:20 194:22
194:23 195:3
195:10,14,22
206:11,12
207:1 214:20
216:6 229:10
232:5
**foregoing**
   234:6 238:5
**forensic**   13:24
   14:2,4,7,9
**forgot**   190:12
**form**   8:5 31:9
   38:3 39:23
   40:12 42:5
   54:1,9 56:24
   57:12 58:19
   59:20 60:3,20
   63:18 65:17
   76:13 78:22
   80:5,23 82:13
   89:3 91:19
   96:8,16 97:3
   99:13 102:7
   105:24 111:23
   123:19 151:14
   156:23 157:25
   159:9 163:6
   165:19 166:16
   170:9 172:22
   173:6 176:13
   176:20 185:5
   185:16 191:13
   191:23 204:13
   205:22 206:5

210:10 215:17
222:1 223:24
225:15
**format**   39:13
73:8
**formatting**
   122:19
**forming**   97:1
119:22
**forms**   159:19
**formulas**   161:5
161:22
**forty**   17:11
   135:17 144:3
   190:24
**forward**   9:4,10
   9:12 103:10,23
   104:23 122:7
   124:14,19
   180:18 196:18
   197:7 198:7,11
   215:24 231:19
**forwarding**
   230:25
**found**   186:5,14
**four**   20:15
   26:17,18 50:21
   160:24 170:17
   183:10,10
   218:3
**fourth**   227:16
**frame**   112:11
   112:14,22
   200:14,15

**frankly**   35:6
   67:12 96:2
**freightliner**
   13:9
**frequently**
   43:17 44:5
**fresno**   16:20
**friction**   142:25
**friday**   43:9
**friend**   21:8
**front**   8:24 9:1
   33:14 34:8,22
   36:4 41:7
   52:24 73:13
   89:9 99:23
   111:24 112:8
   112:10,17,21
   121:2,15,16,17
   121:18 122:12
   134:20 138:25
   143:5,6,10
   176:4 188:16
   195:25 196:5
   197:14 229:4
**fuel**   136:21,24
   137:1,3,6,9,10
**full**   7:22 23:21
   73:3 126:13
   137:1,3 186:24
   186:25
**fully**   122:5
   204:1
**fulton**   234:4
**functionally**
   106:17

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[further - golf]**                                        Page 25

| | | | |
|---|---|---|---|
| **further** 124:25 | 227:8 234:3 | **go** 8:5 15:2 | 37:10 42:9,10 |
| 144:5 180:3 | 235:3,7,8 | 31:9 39:15,16 | 42:15 55:7 |
| 211:21 234:12 | **getting** 51:10 | 42:5 54:1 | 56:2 61:3,24 |
| **future** 86:1 | 51:10 76:2 | 56:24 57:12 | 66:9 68:19 |
| 87:13 | 87:24 114:21 | 58:19 60:20 | 69:23 72:24 |
| | 131:12 139:14 | 63:18 65:17 | 75:25 77:1,4 |
| **g** | 150:20 | 76:13 78:22 | 78:4 81:2,3 |
| **g** 6:1 149:11 | **gifford** 50:25 | 80:5,18,23 | 82:9 83:10,24 |
| **gainesville** 1:2 | 51:7,16 | 82:13 89:3 | 84:11 88:11 |
| **gap** 124:5 | **gifford's** 51:2 | 96:3,9,16 98:2 | 92:3,7 94:5,5 |
| **gas** 136:12 | **give** 63:12 66:5 | 98:10,23 99:13 | 95:16 99:4 |
| **gasoline** 115:9 | 66:14 73:16 | 114:8 115:22 | 101:6,12 102:3 |
| **gear** 192:13 | 77:16 78:9 | 123:19,23 | 105:19 109:8 |
| **geek** 33:20 | 79:19 80:12 | 162:12 165:19 | 109:24 116:22 |
| **general** 105:20 | 84:1 89:6 92:1 | 166:16 170:9 | 125:9 126:19 |
| 114:19,21 | 97:23 104:25 | 176:13 180:18 | 133:25 134:1 |
| 115:15 126:25 | 129:20 140:22 | 181:6 185:5,9 | 139:6 140:12 |
| 139:12 156:9 | 141:4,10 | 185:16 187:24 | 144:14 145:22 |
| 186:3 188:12 | 146:15,18 | 191:13 204:13 | 148:16,17,22 |
| 213:22,24 | 151:16,21,25 | 208:25 210:10 | 161:13,18 |
| 215:10 216:13 | 153:19 154:4 | 219:3 223:24 | 164:7,8,9 |
| 222:3 225:24 | 209:22 219:4 | 225:15 228:21 | 172:9,11 175:2 |
| **generally** 28:10 | 225:3 | **goal** 27:16 | 178:15 179:6 |
| 41:5 61:24 | **given** 27:25 | 172:1,2 173:2 | 181:6 184:22 |
| 94:13 | 61:12 149:15 | **goes** 26:18,24 | 184:25 185:10 |
| **generate** 142:8 | 160:9 234:11 | 57:6 62:24 | 185:20 186:20 |
| 185:10 | 235:16 238:9 | 63:8 151:3 | 188:21 191:17 |
| **generated** | **gives** 142:1 | 156:11 182:11 | 196:7 201:5 |
| 95:23 96:5 | 143:7,11 147:9 | 209:2 | 203:24 204:20 |
| **gentleman** | 153:19 | **going** 7:7 9:14 | 211:17,18 |
| 29:23 46:20 | **giving** 78:1 | 10:1 17:17,17 | 214:25 228:18 |
| **georgia** 1:1,21 | 168:8,11,14 | 20:12 21:17,17 | 229:6 230:20 |
| 5:6,12 29:1 | **glass** 232:19 | 24:15,16 26:2 | 231:21 |
| 100:19,21 | **gmail** 230:14 | 26:6,23 33:5,9 | **golf** 159:13,17 |
| 102:19,21 | | 36:18,19 37:5 | 160:1,7,12 |
| 117:16 227:5,6 | | | |

Wesley Grimes
Bryson, Santana and Joshua v. Rough Country, LLC

May 9, 2024

**[golf - highway]**

Page 26

161:1
**good**   6:25 7:1
   21:3 26:19
   154:24 162:17
**google**   128:13
**government**
   16:16 23:24
**governs**   95:3
**grabbed**   75:3
**grade**   106:12
   106:16,17,25
   107:5,10 143:1
**grading**   106:2
   106:4
**granted**   118:4
**graph**   205:11
**gravel**   107:2
**gravity**   72:1
   133:11
**great**   70:16,16
   106:8 161:17
**greatly**   191:17
**green**   70:23
   71:6
**grimes**   1:13 2:8
   2:14,19 6:5,9
   6:12,20,25
   7:17,23 19:24
   20:1 45:10
   53:2 67:20
   74:3,5,11
   89:24 92:14
   107:17,22
   112:24 113:20
   114:25 170:21

235:5 236:5
   237:2,24 238:2
   238:4,12
**grindey**   21:4
   35:2 45:25
   46:1,3
**grindey's**   46:5
**ground**   122:16
   148:18
**group**   20:24
   48:4 51:1
**gs**   141:24
   142:22,24
   149:16
**guess**   17:15,18
   20:3 43:12
   75:23 95:23
   101:1 176:21
   193:18,21
   222:21,22
**guessing**   193:8
**gunn**   1:17 5:10
**guys**   18:25
   34:12 37:16

**h**

**h**   2:6 3:1 4:1
   5:9 52:5 237:3
**half**   53:23 54:6
   54:16,21 90:16
   92:23 112:3
   149:15 184:25
**hand**   9:14 10:2
   10:16 26:7
   33:5 37:5
   68:19 69:23

72:24 84:12
   102:3 109:8
   116:23 126:19
   145:23 146:4
   196:7
**handed**   39:19
   42:11
**handing**   39:2
   42:17 44:12
   94:16 101:21
   105:7 113:6,9
   141:12 219:6
**handle**   161:22
**handling**   64:20
**handwritten**
   151:9
**happen**   43:21
   89:7 172:11
   193:9
**happened**
   20:16 21:14
   83:6 164:19
   225:13
**happening**
   151:17 208:10
**happens**
   146:12 164:6
**hard**   148:17
**harder**   134:25
**hatch**   124:6
   125:7,10,13
   183:6 198:7
**haul**   19:1,4
**headquarters**
   16:4

**hear**   18:16
**heard**   36:2 43:5
   44:23 55:25
   87:2,6 166:1
   222:10,16
**heavier**   137:24
   191:21
**heavy**   12:22,23
   13:1,4,5,6,9
   22:23
**height**   120:20
   162:14 173:4
   188:19 214:20
**help**   24:13 49:8
   170:7
**helped**   24:1,14
   66:7
**helping**   48:23
**helps**   213:23
**henry**   51:25
**hereto**   5:21
   238:7
**hey**   15:9 60:7
   92:1
**hidden**   230:6
**higgins**   5:15
**high**   23:16
   147:10,12
**higher**   134:25
   140:10 153:3
   206:18
**highlighted**
   177:10
**highway**
   186:12

Wesley Grimes
May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[hill - illustrating]**

Page 27

**hill**   5:9 6:16,16
8:5 9:21 10:13
18:10 31:9,17
33:12 37:11,18
38:11 39:15,23
40:12 42:5
54:1,9 55:7,24
56:6,13,24
57:12 58:19
59:20 60:3,20
63:18 64:9
65:17 69:3
70:17 72:3,7
72:23 73:5,7
76:13 78:22
80:5,14,23
82:13 89:3
91:19 95:22
96:8,16 97:3
97:12,17 98:8
99:13 100:25
102:7 105:12
105:14 113:12
116:14 123:19
156:23 157:25
163:6 165:19
166:16 170:9
172:22 173:6
176:13,20
178:23 185:5
185:16 191:13
191:23 204:13
205:22 206:5
209:23 210:10
215:17 222:1

223:24 225:8
225:15 232:25
233:6,12 236:1
**hill's**   82:21
171:5 225:6
229:22
**hinge**   182:20
**hinges**   125:7,10
125:14,16,17
183:6
**hired**   87:17,21
87:21 88:23
**hit**   150:5
211:18
**hits**   211:15
**hmm**   41:10
135:19 223:3
**hold**   55:7 79:11
102:12 146:15
168:17 200:8
**holder**   36:18
37:8
**holding**   190:15
**hollaway**
117:15
**hood**   125:5
183:5,20
189:15 190:1
212:20 213:18
**hooks**   122:15
182:19,25
183:1,4,20
213:18
**hope**   181:22

**hour**   142:16
147:1 148:5,22
149:17 150:23
164:13 227:9
**hours**   14:20
21:22 53:23,24
54:6,16,21
90:16 92:23
98:1
**hudgins**   1:17
5:10
**huge**   34:17
**human**   25:16
**hundred**   58:23
114:3 154:25
155:8 190:24
**hundreds**
153:17
**hunsley**   223:4
223:7,10,13,17
223:21 224:14
224:17 225:19
**hurrying**
150:14
**hurt**   223:22
**hve**   25:15,16,25
29:7,11 158:7
158:11,11,13
163:19 164:8
164:17 165:9
165:14 181:19
**hvedr**   11:7
12:23

**i**

**idea**   56:11,14
56:18 57:3
60:18,22 62:6
106:21 111:14
137:9 174:21
175:6 180:24
**identification**
9:18 10:15
26:10 33:3
37:4 39:6
42:14,21 44:10
55:11 68:24
69:21 71:23
84:15 94:20
102:1 105:11
109:13 113:14
117:1 125:25
126:17 146:2
178:19 194:17
196:11 201:8
205:9 212:5
215:4 216:9
217:21 219:9
**identifies**   218:2
218:5,7
**identify**   6:6
41:13,14
**ignition**   123:10
**ii**   5:9
**iihs**   186:5,9,22
**illinois**   118:10
**illustrating**
215:6 216:12

Wesley Grimes                                                May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[image - inspection]**                                     Page 28

| | | | |
|---|---|---|---|
| **image** 226:12 | **impacted** | 136:17 155:5 | **induced** 161:11 |
| 226:25 | 114:16 141:2 | 167:7,9 | **industry** 11:24 |
| **images** 33:21 | **impacts** 210:8 | **included** 27:13 | **infinitely** |
| 33:21,23 50:1 | 213:18 | 36:11 44:13 | 159:23 |
| 51:12 197:16 | **implies** 66:8 | 95:20 110:3,4 | **inform** 151:22 |
| **imagine** 159:17 | 187:23 | 136:9,18 138:5 | 165:17 |
| 212:24 | **important** | 151:9 | **information** |
| **immediate** | 176:11 193:21 | **includes** 128:4 | 4:14 12:6 |
| 142:4 | **importantly** | **including** 7:19 | 45:23 51:15 |
| **immediately** | 173:24 | 52:15 117:21 | 89:6,6 97:25 |
| 60:8 142:4 | **imprint** 183:9 | 129:21 136:6 | 108:14 111:3 |
| **immune** 21:10 | **improper** 159:3 | 143:1 194:7 | 111:10 124:1 |
| **impact** 59:15 | **improperly** | **incomplete** | 133:23 150:20 |
| 92:19 101:13 | 111:18 | 19:2 | 169:9 230:3 |
| 101:19 102:5 | **inappropriate** | **inconsistent** | **informed** 110:2 |
| 102:17 103:4 | 162:2 164:10 | 195:13 | **informs** 26:1 |
| 103:10,16,23 | **inch** 111:8 | **incorporated** | **initial** 43:20,24 |
| 104:1,8,23 | 117:12 134:22 | 129:3 | 44:19,22 54:24 |
| 105:5 106:4 | 184:22,25,25 | **indentations** | 158:24 162:13 |
| 110:12 124:19 | 189:20,25 | 183:4,20 | **initially** 25:4 |
| 125:5 140:21 | **inches** 112:3,12 | **indented** | 48:13 49:16 |
| 141:21 142:19 | 120:25 121:1,6 | 168:24 | 208:22 209:13 |
| 143:14 144:8 | 121:7 122:8,10 | **indicate** 138:23 | **injuries** 30:19 |
| 146:7 147:13 | 122:16 125:6,8 | 187:20 | 168:6 |
| 147:21 148:4 | 182:4,8,17,23 | **indicated** | **injury** 29:22 |
| 150:3,4 151:3 | 184:11,21,23 | 100:10,12 | 168:11 |
| 151:5 153:11 | 184:24 187:12 | 135:25 175:10 | **input** 162:12 |
| 162:7,11 | 187:21 188:11 | 175:21 | **inputs** 165:17 |
| 184:19 188:10 | **incident** 137:8 | **indicates** 45:1 | **inside** 102:18 |
| 188:14,17 | **include** 12:13 | 147:20 | 102:21 161:21 |
| 189:13 191:12 | 26:15 27:23 | **indication** | 200:15 |
| 192:8 195:21 | 38:14 39:10 | 135:20 | **inspected** |
| 212:7 213:4 | 59:18 85:6,22 | **individual** | 107:11 223:1 |
| 232:12 | 86:1 96:13,25 | 29:22 161:1 | **inspection** 2:20 |
| | 97:6 131:8 | | 2:22,23 99:19 |

Wesley Grimes                                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[inspection - items]**                                            Page 29

101:12 105:9
105:18 107:18
108:3 109:2,11
109:22 110:2
120:22 121:19
131:18 136:6
138:1 223:5,8
**inspections**
  14:6 45:14
  110:8
**install**  117:19
**installation**
  111:15 225:24
**installed**  111:1
  111:12,18,19
  144:20 225:23
  227:12
**installer**  229:10
  229:13
**institute**  186:11
  186:12
**instruct**  55:16
**instructed**  56:4
  56:7
**instruction**
  56:3
**instrumented**
  175:7
**instrumenting**
  59:17
**insurance**  15:4
  15:8 186:11
**intend**  95:19
  96:6,23

**intending**
  99:10 101:7
**intent**  77:5
  188:7
**intention**  81:5
  135:6
**interact**  161:8
  208:20
**interacted**
  203:19 207:17
**interacting**
  203:21
**interaction**
  182:18
**interactions**
  135:4
**interacts**  160:9
**interest**  17:21
**interested**
  176:15 234:14
**interior**  190:6
**internal**  40:17
  200:23
**internally**
  40:24 62:9
**interrogatories**
  3:20 35:17,19
  45:24 231:1,4
**interrogatory**
  201:10
**interrupt**  35:12
  80:14
**intersection**
  106:3,4 227:6

**introduced**
  36:11
**intruded**  8:17
  8:20 9:1
**intrudes**  8:25
**intrusion**  9:5
  106:11 169:3
  171:20,24
  172:10,18
  173:5,18
  184:16 185:3
  185:11,14
  186:1,16
  191:22 203:5,7
  203:11 210:3,5
  210:8,21 211:8
  214:19
**investigate**
  223:18
**invoice**  2:17
  53:1 55:19
  73:23 75:9
  85:19 92:11
**invoices**  2:16
  43:15 44:13,25
  45:5 51:22
  52:23 73:12
  74:2 84:20
  85:7,12 89:9
  92:8
**invoicing**  84:18
**involve**  31:4
**involved**  16:17
  18:18 19:5,8
  30:2,5,7,8

45:21 53:10,17
63:25 65:1,13
82:19 84:1
87:11 88:16
106:7 107:12
177:10 221:7
222:19
**involving**  13:6
  32:1 157:13
**isolate**  171:23
  173:10 221:24
**issue**  2:17
  15:12 73:23
  89:19 118:9
  151:2 153:9
  160:25 165:18
  165:22,22
  192:12 211:23
  212:23 229:14
**issued**  35:21
**issues**  92:18
  212:22
**italics**  122:21
  123:4
**item**  40:3 41:6
  41:11,16 74:5
  117:10
**itemizes**  201:16
  201:18
**items**  33:16
  36:6,11,13,15
  38:11,15,18
  73:22 74:11
  128:24 207:23

Wesley Grimes

May 9, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[iteration - know]**

Page 30

| | | | |
|---|---|---|---|
| **iteration** 76:11 | **keeping** 114:11 | 133:25 135:2 | 85:2,5 86:6,7 |
| **j** | **keeps** 211:20 | 193:10 | 86:21 87:13 |
| | **kelley** 193:7 | **knight** 119:6,7 | 88:24,25 89:18 |
| **jamey** 48:2,6,6 | **kevlar** 166:9 | **know** 7:6,12 | 90:8,9 91:12 |
| **january** 26:25 | **key** 173:14 | 10:24 15:2,13 | 93:2,25 94:12 |
| 27:14 | **killed** 29:24 | 15:18,24 16:9 | 94:13,15 95:1 |
| **jeff** 155:20 | **killing** 24:16 | 16:10,24,25 | 95:2,15 98:24 |
| **jess** 5:15 | **kind** 12:3 33:18 | 17:2,11,14,16 | 101:5 102:18 |
| **job** 161:17 | 50:3 72:4 | 17:19,19 18:7 | 108:6 111:2,21 |
| **john** 21:4,5 | 87:13 106:6,22 | 18:9,16,22,24 | 118:2 119:3,5 |
| 35:2 45:25 | 142:6,9 175:19 | 18:25 19:2,12 | 119:9,19 120:2 |
| 46:1 49:12 | 175:21 | 21:7,10,21,24 | 120:4,7,13,16 |
| **joined** 91:12 | **kinds** 56:16 | 27:18,19 28:2 | 125:8,8 126:12 |
| **joining** 19:14 | 62:11 | 28:7,8,9,17 | 128:7 130:24 |
| **jon** 49:4 | **king** 166:25 | 30:1,3,4,10 | 131:2 134:12 |
| **josh** 46:19,20 | **kit** 19:10 31:5 | 34:11,17 35:5 | 136:1,2,13,14 |
| 46:22 48:5 | 32:1,3 76:6 | 35:16,19 36:22 | 136:17 137:2 |
| **joshua** 1:3 | 77:2,13 79:15 | 37:22 43:18 | 137:11,16,18 |
| 236:4 237:1 | 81:6,8 99:11 | 44:7 45:8,9 | 137:18,20 |
| 238:1 | 111:1,8,9,12,14 | 46:6,6,18 | 139:20 140:24 |
| **judge** 118:12 | 111:22,24 | 47:17,23 52:2 | 141:22 144:2 |
| 118:18 119:15 | 112:8 117:8,12 | 52:3 53:20 | 146:11 147:4 |
| **judicial** 235:7 | 117:19 120:17 | 57:4,5,24 58:1 | 147:25 148:1,1 |
| **july** 24:20 | 126:14 129:22 | 58:2,22,24 | 148:2,13 |
| **june** 234:15 | 129:24 130:12 | 59:12,13,14 | 152:24 154:17 |
| 236:3 | 130:17 131:12 | 60:4 61:24 | 154:18 158:25 |
| **k** | 171:21 172:11 | 62:10 63:11 | 159:21 162:7,8 |
| | 172:16 227:11 | 65:13 66:9,22 | 162:8,15,21 |
| **kathy** 47:12,15 | 229:11 | 68:2 75:24 | 163:17 164:19 |
| **keep** 12:16 | **kits** 111:3 | 76:2,15 77:10 | 165:13 166:18 |
| 15:24 17:19 | 210:7 | 77:23 78:1 | 166:18 171:10 |
| 34:16 42:15 | **knew** 15:16 | 79:5,6,16 | 171:10,12 |
| 70:10 79:22,23 | 34:12 60:22 | 80:16 81:10,25 | 173:19 174:11 |
| 110:21 188:7 | 61:1 63:11 | 81:25 82:1,5,8 | 175:11 180:25 |
| 197:17 | 78:25 133:24 | 83:4,9,12,22 | 182:14 183:12 |

Wesley Grimes
Bryson, Santana and Joshua v. Rough Country, LLC

May 9, 2024

**[know - lift]**

Page 31

184:23 185:8
185:19 186:20
187:7,17,18
189:14 190:3
190:16,17
191:25 192:7
192:10,10,19
193:4 195:5,6
195:10 203:23
206:21 209:18
210:13,15
212:15 214:6
214:22 220:18
220:19 221:2,2
222:17,21
224:2,7,24
225:20,24
226:24 230:14
230:19
**knowing**
193:25
**knowledge**
18:14 26:1
77:22,23 79:8
81:23 186:18
189:12 217:8
220:9 221:4
224:12
**known** 21:4
**knows** 11:24
**koehl** 1:25
234:20 235:21
**kristina** 51:18

**l**

**l** 5:3
**label** 36:19
**labeled** 101:23
**lack** 198:6
**lady** 30:17
49:22
**landmarks**
214:6,11
**lane** 102:18,20
102:21,22,23
102:24,25,25
**lanes** 102:15,16
103:20
**language** 152:7
**large** 29:3 77:2
78:4 79:7,14
81:6,8 126:15
129:22 185:21
**largely** 209:8
**larger** 75:21
78:11
**lariat** 115:12
167:1
**lasted** 24:21
54:21
**late** 97:18
119:2
**lateral** 140:2
184:11 208:22
209:1,2,7,11,12
209:16
**laterally**
138:10 139:1

**law** 5:4,10
31:20
**lawsuit** 23:5
43:3
**lawyer** 87:5
91:7 230:25
**lawyers** 31:15
33:11 41:12
42:23 55:8,16
221:15
**layout** 66:7
**leading** 86:2
**lease** 16:9
**leave** 96:22
**leaving** 69:1
**lec** 86:24 87:1,2
87:7 89:2
91:18,23
**lecs** 88:5,9,10
88:11
**lectures** 11:19
**lee** 45:1 46:11
**left** 12:12 23:1
23:24 24:14
65:10 67:21
101:15 102:22
102:24,25
103:1,16,18,19
103:22,25
105:4 121:2,5
121:15,23
122:2,12 139:4
139:5,7,13
182:9 194:22
212:17,20

213:3
**legal** 35:18,19
101:10,11
235:9,12,14
236:23
**lenses** 212:25
**leon** 5:5
**leonard** 48:18
48:19 51:9,14
91:11,14 92:16
130:24 131:2
131:12 170:21
**leonard's** 48:21
**letter** 2:14
42:18 43:1
67:1
**level** 50:3 121:3
121:21 122:5
137:6 166:25
**leveled** 121:25
**levels** 136:21
154:22
**lewis** 49:3
168:3,20 169:1
169:9,16,18
224:8,24,25
225:7,9
**lift** 19:10 31:5
32:1,3 76:6,12
76:20 77:2,13
78:3 79:15
81:5,8,16
99:11 111:3,8
111:8,12,14,22
111:24 112:8

Wesley Grimes
May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[lift - looked]**
Page 32

112:16,21
117:8,12,19
120:17 126:14
129:22,24
130:12,17,20
131:12 171:21
172:11,16
210:7 221:25
222:9,13
223:19 227:11
229:11
**lifted** 8:2 60:19
64:5,6 77:7
78:7,21 79:3
80:4,22 100:7
164:16 167:20
171:18,25
172:16 173:15
223:23
**lifting** 77:8,20
**lighter** 136:3
136:18 137:15
**likely** 125:16
185:3 186:17
**limit** 118:3,12
227:8
**limited** 40:10
55:8 75:1
117:25 118:14
119:12,15
134:2 155:16
156:7
**lindsay** 31:17
**line** 80:22
182:3,4,8,9

183:1,11,19
187:1,1,12,22
188:2,2,8,9
189:18 190:2
212:8,9,13,17
212:18,25
213:3,4 237:4
237:7,10,13,16
237:19
**lined** 51:4
179:1 183:5
187:20
**lines** 160:2
**lining** 183:12
183:13 210:17
**list** 2:10 26:8
26:13,15,19,22
26:24 27:8,14
27:19,20,23
31:4 32:15
36:1,7,12
37:12,19 39:18
39:20,24 85:18
85:18 123:13
123:21
**listed** 13:24
25:14 35:25
36:14,16 47:24
74:3 98:24
220:8,11
**listing** 17:6
**lists** 25:8 41:11
219:25
**literature**
198:23 232:11

**litigation** 14:15
14:16,17,18,22
14:23,23 15:1
15:12,22,23
22:8,8 24:25
25:1 220:21
235:16
**little** 24:7,10
118:24 122:1
134:20,23,24
136:3,18 147:8
153:1,2 157:19
160:1 162:1
184:2,20
194:19 206:14
207:11 230:15
**llc** 1:8 5:4
235:9 236:4
237:1 238:1
**load** 29:17,19
**loaded** 65:23
198:2 201:2
210:24
**loading** 66:18
66:23 67:4
133:25
**locate** 108:4,10
**located** 94:14
115:3 133:2
176:9 193:18
193:22
**location** 70:25
71:4 100:5
194:4,8

**locked** 190:16
192:12
**lodge** 97:12
**lombardi** 51:18
**long** 7:12 20:22
21:5,5 53:19
86:15 119:3
136:7 152:19
230:12
**longer** 47:13
48:3
**longitudinal**
140:1
**longitudinally**
138:10,22
**look** 23:25 24:3
30:15,20 41:19
42:16 48:12
61:25 67:12
90:8 104:5
108:24 112:1
112:10 114:3
115:17 122:17
123:23 128:23
129:13 136:16
138:14 144:5
146:17 153:18
156:16 161:12
172:2 186:3
202:21 206:9
206:13 208:25
214:7,7,8
219:3 226:18
**looked** 29:17
32:4 35:7

Wesley Grimes
May 9, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[looked - make]**

Page 33

37:24 45:15,23
46:7,8 48:25
49:1,15,17
50:7,16 75:25
79:10 84:23
95:24 98:9
106:6 108:7
112:11,18
126:25 127:1
128:20 130:22
138:3 141:22
142:2 169:25
173:25 177:8
177:25 204:5,9
208:24 212:15
214:22,24
225:1 229:14
**looking**   15:5,6
30:13,21 44:3
44:15 48:14
50:10,11 56:15
59:11 61:19,19
61:20,21,22,22
61:23 62:11
73:24 89:16
94:12 106:23
111:5 112:13
117:5 121:8
124:21 125:18
127:4 129:8,8
129:11 132:7,8
132:14 133:23
141:20 145:3
153:17 158:17
168:24 170:1

172:10 177:7
178:2 179:3
180:9 182:18
184:3 187:6
190:5 194:25
205:1,1 209:1
209:11 224:2
226:5 229:18
231:4
**looks**   23:9
112:11 114:19
114:20 117:9
121:14,20
160:4,7 189:7
**lose**   63:8 70:11
**loses**   29:10,11
**loss**   148:19
**lost**   29:9
142:21 224:15
**lot**   13:1 14:3,18
21:21 22:24
24:2,3 25:4
28:11,13 35:17
44:7 49:1 57:5
59:8 66:8,9,12
76:3 83:2 85:1
86:13 92:3
106:12 108:8
114:11 116:6
148:22 151:4
155:4 167:8
184:2 186:25
200:17 211:12
**low**   147:9,12

**lower**   134:24
206:11 207:11
207:12,13
208:3,3 214:20
**lowered**   134:11
196:4
**lowering**
134:17
**lowers**   195:25
**lumped**   128:5
**lunch**   116:13

**m**

**m**   2:2 92:16
**made**   10:19
11:6,20 29:13
29:17 47:3
64:13 68:18
75:20,24 76:10
76:16 77:10
78:20 79:3
80:22 93:15,17
93:20,24 94:1
94:1,7,11
105:21 108:17
123:16 128:3,8
129:13 133:1
134:5 141:23
161:6,16
165:23 175:24
178:1 182:19
182:20 183:8
187:18 198:7
201:25 204:17
205:24 224:11
226:21 235:14

238:5
**magnitude**
164:11 215:10
**mail**   4:10
230:11,24
**mails**   39:15,16
39:20 221:7
230:12
**main**   16:5
49:18 165:22
165:22
**maintain**   26:21
27:20
**majority**   15:25
16:1,3,3 22:9
28:18 95:14
**make**   18:11
21:13 34:5
41:18 43:25
47:7 48:17
61:14 68:2,4
73:24 74:20
76:22,25 77:7
77:12 79:11
85:2 92:14
128:10,24
129:20 132:19
134:18,22,25
141:10 143:2
145:6 152:1
153:6 161:1
169:5,19
171:13 172:2
175:15 179:11
181:19,23

182:11 184:24
192:8 200:23
206:8 207:21
231:21 232:20
235:7
**makers**  18:15
**makes**  7:10
43:8
**making**  15:20
75:1 78:10
143:2 167:8
**manage**  186:16
**manager**  24:8
**manufacture**
169:12
**manufactured**
30:7
**manufacturer**
18:19 19:4
30:2,5 32:6,7
32:21,22 131:3
**manufacturers**
18:17,21 19:6
19:10 22:25
23:3,8
**march**  89:17
**mark**  10:11
42:10,10 48:18
48:19,21 51:9
51:13,14 111:2
130:18 170:21
187:15,18
194:22,25
195:3,7 229:6

**marked**  2:13
3:7,8,10,13,14
4:4,6,8 9:17
10:14 26:9
33:2 34:25
35:9,25 36:10
37:3 39:5
42:13,20 44:9
68:23 69:20
71:22 84:12,14
94:19 101:25
105:10 109:13
113:7,9,13
116:23,25
125:24 126:16
146:1 178:18
194:16 196:11
201:7 205:6,8
212:4 215:3
216:8 217:20
219:8
**marks**  100:12
125:5,12 184:3
**marsi**  1:25
234:20 235:21
**mashman**  2:4
5:3 6:14,14,24
7:4,16,21 8:13
9:14,19,22
10:9,16,18
13:21 18:13
26:6,12 31:11
33:4 37:5,9
38:1,17 39:2,7
40:1,15 42:1,8

42:15,22 44:11
54:3,12 55:18
56:1,10,20
57:7,19 58:25
59:25 60:11
61:8 64:3
65:24 66:15
67:19 69:2,4,7
69:22 70:21
71:5,18,24
72:5,9,15,23
73:10 76:17
79:20 80:1,10
80:19 81:14
82:24 84:11,16
88:7,17 89:8
92:6 94:16,21
96:12,21 97:5
98:3,4 99:18
101:21 102:2,9
102:11 105:7
105:13,15
109:8,14 113:6
113:15 116:12
116:22 117:2
124:3 126:5,18
133:9 141:7,13
144:13,16
145:22,25
146:3 154:15
156:24 158:3
163:2,11
165:25 166:21
170:12 173:1,9
176:16 177:1

178:15,20,24
181:5,14
185:12,23
186:9,13
191:19 192:1
194:12,18
196:7,12
197:22,24
200:1 201:5,9
204:19 205:5
205:10,23
206:1,15
209:24 210:1
210:19 212:1,6
214:25 215:5
215:19 216:4
216:10 217:18
217:22 219:5
219:10 222:5
224:5 225:18
228:20 229:2,6
229:8 232:22
**mass**  142:5
**masses**  141:24
154:2,4
**master**  160:5,6
160:18
**masters**  45:11
**match**  140:14
159:1 162:20
162:25 163:21
172:4,6,13
173:14 183:1
184:6 214:11
214:15 216:14

Wesley Grimes
Bryson, Santana and Joshua v. Rough Country, LLC

May 9, 2024

**[match - mentioned]**

Page 35

218:19 219:16
220:4
**matched**
172:20
**matching**
162:22 173:2
214:8
**material**  36:24
96:2,4 97:22
108:21 110:14
117:4 123:22
161:10 165:8
170:1 202:9
**materials**  10:5
11:10 33:13
34:21,24 35:24
35:25 36:9,24
36:24 39:17,20
53:4,22 54:7
54:17 64:14
98:9,13,14,15
98:18 101:16
101:18,22
103:7,14 104:6
104:10,21,24
112:2 136:6
165:11 169:16
169:22 193:12
224:11 225:1,6
232:19
**math**  85:17
161:24
**mathematical**
161:5,22

**matter**  43:2,7
45:2 47:16,25
52:8,19,21
71:10 176:25
185:20
**matters**  15:22
25:1,1
**max**  142:1
**maximum**
138:8,18,19
149:18 214:2
**mean**  14:1 16:2
16:8,11 20:4,8
21:19 35:12
47:24 50:9
58:11 61:11
64:11,24 67:10
80:14 81:1
85:17 86:13
87:1 91:21
95:15 100:12
101:3 102:22
106:16,20
109:4,23 110:9
115:22 123:21
129:6 139:5
140:14 170:10
185:8,14 186:2
206:22 225:8
**meaning**  87:24
125:12 139:6
**means**  14:3
139:3 186:1
**meant**  38:14

**measure**  107:5
107:7 120:20
197:11 202:23
203:1,6,10
**measured**
112:4 121:22
124:15 132:1
137:14
**measurement**
120:24 133:12
187:19
**measurements**
3:5,11 4:13
47:3 117:21
121:4,11 122:2
196:24 197:2
215:11 216:21
**measuring**
137:16
**mecanica**  4:14
12:17,20 13:22
16:7,13 17:10
17:23 18:14,20
19:9,14 20:14
20:16,19,24
40:18,25 45:1
51:23 82:12,16
82:22 83:5
85:8,15 113:23
114:9 116:8
**mecanica's**
16:4 18:6,8
**mechanical**
159:5

**mechanism**
161:21 190:10
**media**  48:4
51:1
**meet**  89:25
**meeting**  89:25
92:17 93:7
**meetings**  90:10
90:12,14 91:3
91:7,13
**megabytes**
33:21,21
**members**  40:25
**memberships**
25:8
**memories**
53:12
**memory**  44:18
**mendoza**
224:17 225:4
225:14
**mention**  106:2
155:7 188:15
**mentioned**
11:14 13:4
14:13 38:11,15
46:11 50:21
58:15 60:12
62:2 67:22
97:17 121:14
121:18 126:23
127:14 130:3
135:20 142:13
182:25 200:7

Wesley Grimes                                              May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[mentions - necessary]**                                Page 36

**mentions**
124:24 135:10
136:20 177:2
**merge** 20:19
**merged** 20:14
**merger** 20:16
**mesa** 8:1 16:6
16:21 46:13
**mesh** 159:22
161:1
**meshes** 159:7
**messaging** 41:2
**met** 7:2 114:10
**methodologies**
66:20
**methodology**
152:18 165:3
213:13
**mexican** 16:16
**mexico** 16:14
24:7,11
**mid** 119:2
**middle** 135:14
146:23
**midpoint**
187:16
**miles** 142:16
147:1 148:5,21
149:17 150:23
164:12 227:9
**milliseconds**
139:16,23
205:16,16
206:10,19,20

**mind** 37:18
42:6 96:10
107:4
**mine** 146:19
**minivan** 224:10
**minor** 1:5
191:16
**minus** 144:25
145:12 182:14
**minutes** 38:22
**mirrors** 226:16
**missed** 20:8
**missing** 27:19
33:16 49:11
76:4 95:9
**misstates** 163:6
**mistake** 205:25
229:13
**misunderstood**
149:14
**mm** 41:10
135:19 223:3
**model** 74:20
110:25 111:6
115:8 130:22
154:13 158:16
158:21 159:5
159:25 161:14
161:21 163:10
164:17,19
165:23 169:20
**modeling**
158:18
**models** 132:14

**modifications**
76:11
**module** 108:4
108:11,15,18
108:23 138:12
139:9 230:1
**modules**
145:18
**moment** 7:2
46:11 78:16
86:5,18 133:2
133:4,10
139:15 146:16
146:18 152:15
188:10 213:4
**momentum**
152:18 153:5
**monday** 43:8
**money** 20:9,10
76:3 84:1
**months** 79:17
86:21 170:17
**morning** 6:25
7:1
**mosaic** 101:23
**motion** 118:1,3
118:8 119:12
161:15
**motivation**
21:20
**motor** 30:12
**move** 21:21
29:18 30:21
47:5 161:3
192:9

**moved** 179:18
179:24
**movements**
203:22
**moves** 160:11
160:13,14
**movies** 34:9,10
34:11,12,13
**moving** 22:25
138:23 154:8
160:25
**mph** 144:22
**multiple**
102:15
**mustang**
224:10

**n**

**n** 2:1,1,2,2 6:1
**name** 7:22
36:20,23
180:23
**names** 45:5
51:21 119:4
132:14 224:24
**napars** 11:6,18
11:19
**nature** 30:23
118:8
**ne** 1:18 5:11
**near** 104:12
**necessarily**
195:10 210:12
220:22
**necessary**
135:7 174:20

Wesley Grimes
May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[necessary - object]**

Page 37

175:11 193:3
238:6
**need** 7:11 14:12
15:9 21:11,11
37:24 73:7
77:18,20
162:25 165:14
176:1 233:12
**needed** 35:8
78:11 83:15
84:5 163:4
175:17 220:16
221:12
**needs** 89:7
153:6 174:1
**negative** 138:9
138:10,22
139:2,3,5,12
140:2,3 208:23
209:3,3,8,13
**negatively**
141:2
**neither** 160:3
**net** 18:8 211:22
**neutral** 189:2
**never** 16:15
18:5 28:13
63:3,4 64:20
75:24 76:25
77:1 82:19
85:2 94:9,11
113:23 116:8
221:20,21
222:10

**new** 11:9,14
12:4 24:7,11
43:16 45:2
68:21 69:25
96:1 97:25
101:1 227:25
**nguyen** 91:9
171:6 173:24
174:7,9,19,21
175:10,16,21
221:22 222:23
**nguyen's** 174:4
175:25
**night** 95:25
97:18 98:10
165:8
**nine** 190:24
**ninth** 228:7
**noes** 36:2
**noncover**
179:13
**nonimpacted**
113:4 114:21
115:14
**nonlifted**
156:20 169:3
172:3
**north** 7:25
**northern** 1:1
**norwalk** 7:25
**notary** 238:13
238:19
**note** 164:22
205:14 236:10

**noted** 110:8
238:7
**notes** 2:20,22
2:23 91:3
92:15 105:8,16
105:20,25
106:2 109:4,10
109:15,17,20
109:23 110:3,5
110:13,13,19
110:20
**notice** 2:11
7:18 39:4 40:3
41:7
**noticed** 165:8
**nots** 36:2
**november**
42:24 44:16,17
45:3 57:8,23
58:6
**nowadays**
15:18 87:9
**number** 17:5
60:6 73:16
85:22 89:17
102:19,20
104:25 111:6
126:7,24 129:5
131:3 140:22
142:9 144:22
169:19 177:13
177:18 190:25
204:11 217:1,3
**numbered**
73:17 89:14

229:17
**numbers** 67:7
84:22,24,25
128:19 129:7,8
130:3 132:11
132:13 141:5,6
143:3 146:21
147:18 177:14
177:16,23
179:4

**o**

**o** 2:1,2 6:1
**o.c.g.a.** 235:11
**object** 8:5 31:9
39:23 40:12
42:5 47:4 54:1
54:9 55:7,16
56:24 57:12
58:19 59:20
60:20 63:18
65:17 76:13
78:22 80:5,23
82:13 89:3
91:19 96:8,16
97:3 99:13
102:7 123:19
156:23 157:25
163:6 165:19
166:16 170:9
172:22 173:6
176:13,20
185:5,16
191:13,23
204:13 205:22
206:5 210:10

Veritext Legal Solutions
800.808.4958
770.343.9696

Wesley Grimes                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[object - opened]**                                 Page 38

| | | | |
|---|---|---|---|
| 215:17 222:1 | 186:17 215:15 | 170:22,25 | 136:20 137:2 |
| 223:24 225:15 | 215:20 223:19 | 171:5 225:7 | 141:7 142:12 |
| **objection**  55:25 | **occupants** | 229:22 | 144:4,4,11 |
| 56:9,13 60:3 | 132:3,6 191:7 | **offices**  15:19 | 147:4 148:11 |
| 97:12,21 | **occur**  163:18 | 16:13 17:4,14 | 150:14,16 |
| **objections** | 171:20 | 235:9 | 151:6 152:1 |
| 18:11 | **occurred**  147:4 | **offset**  162:13 | 157:20 158:6 |
| **objects**  129:4 | 147:5 172:18 | 172:5 181:24 | 159:18,19 |
| **observation** | 227:5 231:24 | 182:3,17,23 | 161:12 175:4 |
| 123:18 124:10 | **occurring** | 184:11,14,18 | 178:14 180:12 |
| 124:13,18 | 231:20 | 185:2,14,25 | 181:5,8,24 |
| **observations** | **occurs**  202:7 | 186:6,15,23,25 | 184:1 186:21 |
| 105:17 109:5 | **ocga**  5:19 | 188:10 | 187:25 188:22 |
| 109:21,25 | **offer**  95:19 | **offsets**  172:14 | 191:3 195:2 |
| 110:1 122:25 | 96:7 99:10 | 172:19 | 197:18,23 |
| 123:5,13,16 | 101:7 123:15 | **oh**  6:12 11:17 | 206:16 209:6 |
| **observed** | 197:25 200:11 | 18:24 73:18 | 212:1 226:7 |
| 107:25 124:5 | **offered**  20:24 | 74:1 82:25 | 229:19 230:23 |
| **obtain**  55:3,20 | **offering**  99:7 | 135:14 171:7 | 231:8 232:22 |
| 56:21 89:6 | **offhand**  119:20 | 179:13 | **oklahoma**  11:6 |
| 108:18 | 139:10 | **okay**  6:12 9:14 | **old**  68:8,15 |
| **obtained**  36:6 | **office**  7:25 16:5 | 10:1,7,9 12:8 | 69:16 |
| 36:11 | 16:6,18,25 | 16:13 37:5 | **older**  12:6 |
| **obtaining**  53:4 | 17:1 19:1 | 51:13 66:3 | **once**  47:6 79:10 |
| 53:22 54:7,17 | 39:14,16,18 | 68:6,19,22,25 | **ones**  16:12 51:5 |
| 55:2 57:9 58:4 | 40:14,16,20 | 70:7,10 72:23 | 73:2 183:24 |
| 58:12 59:9,16 | 41:15,19 43:11 | 73:18,20,22 | 190:1 214:12 |
| **obviously** | 45:20 46:13,21 | 80:16 83:16 | 214:14 224:23 |
| 33:25 37:19 | 47:11 48:10,20 | 86:12,22 89:1 | **online**  111:2 |
| 95:15 97:20 | 49:6,23 50:4 | 89:19,21 92:9 | 132:8 |
| 137:20 199:17 | 51:20 52:8 | 92:12 97:14 | **open**  33:9 |
| **occupant**  30:21 | 62:10 64:8 | 99:25 110:21 | 43:11 |
| 124:18 130:4 | 82:21 91:15 | 117:24 122:1 | **opened**  35:7 |
| 152:20 166:14 | 96:5 108:6,18 | 124:23 125:17 | 45:2 |
| 184:17 185:3 | 109:18 159:15 | 125:18 133:17 | |

**opening** 43:2,6
**operation** 24:9
**opinion** 25:12
  99:7,10 100:14
  100:18,20
  101:7 110:25
  111:10,16,20
  111:23 125:20
  135:23 152:22
  158:11 163:4
  163:12,25
  168:11,14
  195:13 197:25
  198:4 200:12
  200:25 210:7
  227:11,14,17
  227:20,23
  228:3,5,7,10,18
  229:12,15,16
  231:14
**opinions** 11:11
  26:3 38:3 42:3
  95:12,18 96:1
  96:6,23 97:2
  97:25 105:24
  119:22 120:5
  135:11 151:14
  151:22 152:6
  167:5 168:2,5
  168:20 226:2
**opposed** 13:15
**opposite**
  185:25
**options** 56:16
  56:19 62:11,15

63:6,13 75:12
  76:8 77:16
  78:2,9 79:19
  81:2,12,15,16
**orally** 67:9
**order** 2:25 4:9
  35:1,21,25
  36:10,21,24,25
  37:7,14,21
  74:6 117:7
**ordered** 76:19
  77:14,24
  118:18
**organized**
  110:22
**orientation**
  65:21 66:18,24
  67:4 232:4
**oriented**
  187:11
**original** 79:22
  202:9
**originally**
  100:9,11 108:5
**originals** 79:24
**outcome**
  158:21 162:16
  234:14
**outer** 200:15
**outfit** 74:22
**outline** 53:15
  226:22 227:1
**outlines** 226:11
  228:7

**outside** 14:15
  30:18 118:24
  177:20
**oval** 195:7
**overall** 110:9
  176:25 211:9
**overlaid** 226:20
**overlapping**
  41:20
**overlays** 51:4,7
**overload** 134:3
**overloads**
  117:13
**override**
  134:18 135:1
  154:23 156:1,3
  156:7,14,21
  157:8,13,16,21
  157:24 158:12
  158:13 163:18
  164:1,3,8,17
**overriding**
  161:23
**overrode** 8:14
  158:1
**oversize** 81:17
**overwhelms**
  164:13
**own** 16:7,9
  116:8 194:2
**owned** 19:22
  20:4
**owner** 19:18
  22:14 49:13
  114:9

**owners** 20:5
  21:4 46:1
**ownership**
  17:21 19:20
**owns** 114:7
**oxford** 50:4
**oxnard** 16:5,19

**p**

**p** 6:1
**p.m.** 72:14
  116:18,19,19
  116:20 181:9
  181:11,11,12
  228:22,24,24
  228:25 233:1
  233:14
**page** 2:3,7 3:2
  4:2 10:25 11:2
  11:17 36:7
  40:2 41:9
  44:25 69:13,14
  69:16 70:1
  73:16,22 89:12
  89:13,17,21,23
  92:10 99:22
  100:2 121:8
  122:19,20
  124:4,22,22,23
  127:18,19
  129:24 135:10
  135:14 140:6
  144:18 145:8
  146:7,17,21,23
  146:24,24
  150:15 152:14

Wesley Grimes
May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[page - periods]**

Page 40

| | | | |
|---|---|---|---|
| 154:10 157:5 | **parents** 1:5 | **party** 234:13 | 52:7,12 58:8 |
| 164:20 166:22 | **parking** 114:10 | 235:13,16 | 76:1 114:2,5 |
| 167:25 187:24 | 189:5,8,12 | **pascarella** | 137:19,20 |
| 190:24,25 | **part** 10:4 11:5 | 119:18,25 | 166:15 223:22 |
| 197:19,21 | 21:7,20 27:20 | 120:3 | **percent** 142:7 |
| 209:2,21,23 | 32:4 36:10 | **pascarella's** | 143:9,11 |
| 213:6 226:5 | 42:3,18 44:7 | 119:21 | 144:25 145:13 |
| 227:1 229:9,17 | 44:13 46:9 | **pass** 10:1 71:18 | 145:19,20 |
| 230:5 237:4,7 | 47:14 48:4,7 | 125:22 144:14 | 148:9,20,23 |
| 237:10,13,16 | 51:1 55:21 | **passed** 21:8 | 154:25 155:1,8 |
| 237:19 | 58:4,7,7,10,11 | **passenger** | 155:9 |
| **pages** 68:7 70:2 | 58:11 62:8 | 124:6 148:20 | **percentage** |
| 70:3 123:8 | 65:1,25 116:1 | **passive** 23:25 | 15:21 19:20 |
| 230:17 | 117:3,4,18 | 24:4 25:5 | 28:5,7,15 |
| **paint** 100:12 | 119:17 120:11 | **past** 26:18 | **perform** 15:2 |
| **paper** 33:13 | 133:24 138:14 | 157:18 202:19 | 15:10 163:4,14 |
| 34:22 67:23 | 146:5 164:4,5 | **paul** 224:8 | 176:18 195:24 |
| 69:12 70:8 | 183:6 186:15 | **pay** 23:18 | 196:3 198:20 |
| 72:20 154:20 | 217:23 231:21 | 82:21,22,23 | 199:1,5 220:7 |
| 155:5,18,19 | **participate** | 114:2 | 232:14 |
| 167:12,14 | 44:1 51:6 | **paychecks** 20:9 | **performed** 86:2 |
| **paragraph** | 65:15 86:24 | 20:10 | 99:19 105:18 |
| 135:15 154:16 | **participated** | **pdf** 33:22 | 107:22,22 |
| 157:4,5 158:7 | 65:19,22 | **pdfs** 35:16 | 112:24 114:25 |
| **paralegal** | **particular** | **peachtree** 1:18 | 116:9 120:10 |
| 229:21 | 25:12 26:2 | 5:11 | 120:14,17 |
| **parallax** | 92:11 101:8 | **pending** 7:13 | 170:14 177:3 |
| 212:21,23 | 105:22 108:15 | 220:21 | 232:9 |
| **parameters** | 110:6 136:8 | **penetration** | **performing** |
| 48:24 155:11 | 138:4 215:11 | 160:11 | 157:12 |
| 157:7 | **parties** 30:1 | **people** 11:20 | **period** 24:5 |
| **paraphrase** | 119:4 235:15 | 13:16 18:16 | 93:21 94:3 |
| 41:13 | **parts** 17:16 | 30:3 40:17 | 207:4 |
| **parenthesis** | 134:4 | 45:6 47:10 | **periods** 23:9 |
| 149:10 | | 48:16 50:9 | |

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[permitted - point]**                                    Page 41

| | | | |
|---|---|---|---|
| permitted  7:18 | photography | placed  121:21 | 225:11 229:7 |
| permutations | 212:25 | 189:1 198:15 | 230:25 |
| 162:1 | photos  33:19 | 228:12 | plaintiffs  1:6 |
| person  17:3 | 34:6,18,19 | placing  194:1 | 5:2 6:15 7:5 |
| personal  29:22 | 38:20,23 89:24 | plaintiff  29:22 | 216:25 |
| personally | 92:14 100:8,13 | 37:13 | plan  98:22 |
| 116:7 | 105:20,22 | plaintiff's  9:15 | planning  97:11 |
| perspective | 107:8 110:5,7 | 9:17 10:12,14 | 98:6,7,20 |
| 212:10,12 | 110:10,13 | 12:9 26:7,9 | plans  99:15 |
| peterbilt  13:10 | 180:9,13 187:3 | 33:2,5 36:19 | play  226:1 |
| phone  15:20 | 187:6,24 | 37:3 39:3,5 | player  159:11 |
| 41:1,5 43:9,14 | 188:21,22,22 | 42:12,13,17,20 | 159:13 |
| 44:5 66:25 | 216:20 | 44:9,12 68:20 | pleadings |
| 67:6 90:13 | phrase  13:4 | 68:23 69:20,24 | 35:19 |
| phonetic | physical  202:17 | 71:19,22 72:19 | please  6:6,19 |
| 224:15 225:4 | pick  67:20 | 72:24 84:12,14 | 7:9,11,22 72:9 |
| 225:13 | pickup  122:5 | 87:25 88:1 | 102:9 139:18 |
| photo  33:20 | 134:20,23 | 94:17,19 | 139:20 160:21 |
| 179:3,7,10,11 | 150:22 151:1 | 101:22,25 | plus  25:5 53:22 |
| 212:16 | 172:11,17 | 102:4 105:8,10 | 53:22 79:17 |
| photograph | 173:13 225:23 | 109:9,12 113:7 | 85:7 127:15 |
| 3:21 115:22 | picture  170:5 | 113:10,13 | 130:4,4 144:25 |
| 121:7 187:15 | 180:3 194:19 | 116:24,25 | 145:12 148:23 |
| 188:24 190:5 | 194:20 | 125:22,24 | 182:14 209:3 |
| photographed | pictures  113:16 | 126:16,19 | point  10:23 |
| 114:13 | 113:20 115:20 | 127:16 141:12 | 16:17 33:24 |
| photographs | 178:25 194:14 | 144:15 145:23 | 47:2,8 56:15 |
| 3:4,6,15,16,17 | 196:14,15 | 146:1,4 178:16 | 58:23 59:12 |
| 3:18,19,23,24 | 226:19 | 178:18 194:13 | 60:4,16,25 |
| 107:20 109:4 | piece  110:6 | 194:16 196:10 | 61:18 62:17 |
| 109:25 115:18 | pieces  121:20 | 201:6,7,11 | 77:11 79:13 |
| 115:25,25 | place  36:18 | 205:6,8 212:2 | 87:8 90:20 |
| 116:3 136:6 | 37:8 162:1 | 212:4 215:1,3 | 93:15,17 |
| 138:1 178:17 | 170:16 173:22 | 216:5,8 217:19 | 101:13,18,19 |
| 189:16 205:2 | 173:22 174:10 | 217:20 219:6,8 | 102:5,17 103:4 |

Wesley Grimes
Bryson, Santana and Joshua v. Rough Country, LLC

May 9, 2024

**[point - probably]**

Page 42

103:4,10,10,15
103:16,23
104:1,1,8,8,16
104:19,23
105:3,5 107:6
116:13 124:5
136:10 143:23
150:21 152:1
152:17 156:8
157:2 169:5
179:21 183:1
183:14,15,18
184:7 188:15
211:7 213:16
214:3,7,8
216:19 226:10
226:21
**pointing**
136:16 153:6
**points** 100:6,9
100:15 122:21
123:4 182:20
183:10 184:6
214:11,15
**police** 15:16
45:23 100:10
100:12
**ponce** 5:5
**portion** 168:24
208:7
**portland** 16:20
16:21
**position** 174:15
174:22 179:15
179:19 180:2

**positive** 208:23
209:14
**possibilities**
61:20 64:9
**possibility** 61:5
63:21
**possible** 43:12
48:14 90:1
175:15 222:10
222:16
**possibly** 63:13
**post** 141:21
**potentially**
184:18
**pounds** 126:4
127:21 129:16
129:25 130:5
130:11 134:13
134:15 135:17
136:2 137:14
150:22,22
190:19,22
191:3
**powered**
136:12
**powerpoint**
90:19,24
**practical**
112:16
**pre** 151:5
**precisely**
146:15
**predict** 158:21
158:24 161:20
162:16 163:13

164:1,18
165:23 181:21
**predicting**
157:6 163:24
**prelim** 4:11
**preliminary**
2:18 15:2,10
68:10,13 69:9
70:13 141:15
143:21
**premise** 155:25
**preparation**
85:23
**prepare** 89:25
231:12
**prepared**
220:15 221:11
**present** 5:14,20
6:6 26:25
87:16,25 88:1
88:4,23 90:11
125:5 170:25
171:8 207:8
217:13
**presentation**
10:22 11:6,11
25:22 26:3
90:18,23,25
91:1
**presentations**
11:3,4,15,20
25:9,13
**preserve**
220:20

**president** 19:18
**pretty** 24:15
25:23 125:9
131:5 154:24
219:2
**prevent** 166:10
**previous** 43:14
230:12
**previously**
116:23
**price** 60:9
61:22
**pricing** 59:2
**primarily**
12:21 14:15
24:25 25:6
50:15 115:23
**primary** 13:12
13:16 114:17
172:2
**principle** 173:3
**print** 33:25
34:4 230:9
**printed** 33:17
**printing** 226:12
**prior** 27:14
43:6 44:22
65:8 120:9
**probability**
167:16
**probably** 25:16
45:8 46:17
52:17 66:19
67:11 83:25
86:6 94:6

Wesley Grimes                                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[probably - put]**                                                 Page 43

109:23 116:2
116:12 117:4
119:2 134:21
152:24 156:16
156:18 163:20
166:19 177:22
177:22 182:15
185:8,21 186:2
186:4 187:1
214:13,23
215:18 221:1
**problem**   97:17
155:11 157:5
158:15 164:7
**procedure**   7:19
189:11
**proceeded**   76:8
**proceeding**
234:11
**proceedings**
35:18
**process**   214:1
**processed**
107:9
**produce**   33:23
34:11 35:3,22
37:2,13 38:16
51:12
**produced**
33:11,12,22
51:11 84:23,24
85:19 98:1
108:21 216:24
217:23 224:13
225:7,9

**product**   22:24
23:5 31:12
129:9,12,14
131:3 132:14
**production**
38:9
**products**
120:15 128:14
128:17,20
132:8
**professional**
12:14
**profile**   161:20
216:13
**profiles**   154:18
214:4
**profit**   18:8
**profits**   20:2
**program**   18:4
51:16
**prohibited**
235:11
**proper**   35:20
165:14,16
**properly**
111:13,19
**property**   13:13
**propetro**   30:24
**proposed**   101:1
**protected**   35:9
36:23 37:23
38:24
**protection**
223:19

**protective**   4:9
35:1,21,25
36:10,13,15,21
36:24,25 37:7
37:14,20
**provide**   37:11
38:8 51:7
163:3 201:12
235:10,13
**provided**   27:9
55:12,13
169:13,19
**providing**
37:18 51:14
168:5
**public**   120:18
238:19
**publication**
11:16
**publications**
11:2,15 25:9
**publicly**   108:16
**published**
167:16
**pull**   39:16
67:11,25 160:3
161:4,9 180:17
197:2
**pulled**   192:17
**pulling**   181:3,4
190:13
**purchase**   75:10
**purchased**   75:8
131:24 176:10

**purchasing**
74:17 77:5
**purp**   194:1
**purpose**   13:12
13:16 62:22
63:14 74:19,22
74:24 89:1,4
113:2 114:14
114:17,18,22
115:13,16
143:21 171:16
171:23 174:20
180:17 220:10
220:14
**purposefully**
194:1
**purposes**   7:18
71:25 140:19
175:17 193:4
194:2 222:25
**pursuant**   5:19
7:17 235:6
**push**   9:9 160:3
161:4,9
**pushed**   124:18
138:25
**pushes**   51:11
**pushing**   143:19
**put**   32:15 33:8
36:1 66:1
68:20 69:25
70:4 71:19
76:20 77:1,2
79:23 80:13
93:16,18 94:1

Wesley Grimes
May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[put - reasoning]**

Page 44

94:9,14 111:4
121:23 123:25
133:18,21
134:1,12,20
143:5 158:24
166:9 174:4,14
193:4,10,23
202:1,3,4
222:9
**putting**  84:9
174:22 175:6
175:18 176:3
201:23 226:11

221:20
**questions**  18:12
62:2 101:11
155:17 225:22
232:23,25
234:8
**quick**  144:2
**quickly**  75:3
106:11
**quite**  35:6 96:2
**quote**  61:22
186:15
**quoted**  230:6

**rate**  106:6,22
143:8,13
149:12,13
235:15
**ratio**  152:24,25
154:3
**raw**  33:19,20
33:23 34:6,18
34:19 38:20,23
**reach**  120:24
198:20
**reached**  114:9
**read**  53:6 90:3
92:20 157:9
210:4 236:9
238:5
**reading**  139:8
233:4
**ready**  76:3
83:14
**real**  140:17
158:18
**reality**  15:13
**realization**
79:5
**really**  14:3
15:19 17:19
21:7 79:6,24
85:1 101:15
106:7 134:14
141:5 143:25
151:16 155:4
162:16,23
164:11 167:6,9
170:1 171:19

173:24 174:1
174:11 176:1
**rear**  8:4,8 9:3,3
59:15 93:16,18
124:6,13,18
126:10,10
127:15,23
128:2 134:2,3
134:6,13,17
143:4,8 184:17
188:16 189:13
194:23 198:7
201:19 202:1
207:8,15 210:8
210:24,25
211:6 214:23
228:12
**rearward**
122:6
**reason**  78:3
85:14 111:7
112:20 117:22
137:5,25
174:13 175:20
185:7 211:8
212:13 236:11
237:6,9,12,15
237:18,21
**reasonable**
148:19
**reasonably**
158:25 162:21
172:5 173:3
**reasoning**
228:14

**q**

**qualifications**
97:6
**qualified**  44:4
**quantify**
196:21 197:4,7
204:7,18
215:20
**quarter**  121:5
134:22 182:14
**question**  7:9,12
8:9 16:3 20:13
26:23 31:23
38:13 56:5,6
62:5 67:2
78:13 86:16
98:3 99:6
101:10 138:21
139:1 149:14
156:22 192:14
202:22,23
203:4 205:24

**r**

**r**  6:1 237:3,3
**racing**  166:6
**rad**  223:4,7
**rail**  112:14,22
181:4
**rails**  112:11
**raised**  24:7
111:24 112:8
112:21
**raises**  153:9
**ran**  29:11 45:1
65:12 85:3
**ranch**  166:25
**range**  112:4
140:22,23
141:5,6 142:3
145:12,16,21
153:3 172:23
172:25 185:18
185:19,21

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[reasons - relationship]**                                    Page 45

**reasons**  20:20
  96:14,15
**recall**  31:6,10
  31:14 32:2
  36:22 43:12
  49:16 64:25
  65:12 67:12
  90:7,10,22,24
  91:2,6,12,17
  94:7 176:5
  183:3 184:5
  189:20 192:20
  193:7 214:5,12
  223:20,25
  224:16,19
**receipt**  231:9
  236:17
**receive**  219:22
  224:22
**received**  3:12
  20:4 30:19
  40:6 77:14
  95:21,22,24
  96:20 97:18
  98:16,17
  113:23 116:8
  218:12,16,19
  218:23 219:4
  219:11,17,19
  219:24 220:3
  221:10 225:6
  229:9
**receiving**  4:5
**recess**  67:16
  72:12 116:19

181:11 228:24
**recognize**
  117:7 126:21
**recollection**
  30:13 49:18
  53:11 139:8
  183:23 189:24
  192:21
**recommendat...**
  175:25
**recommended**
  164:24
**reconstruction**
  11:23 12:22
  13:3 14:6,10
  14:14 15:3
  22:22 25:6
  29:6 30:14,20
  32:20 45:12,17
  99:17 106:5,8
  106:10,15
  110:2,7 119:23
  151:15,23
  162:4,10
  163:22 168:21
  169:2 226:3
**reconstructio...**
  118:14
**record**  6:7
  13:20 26:11
  32:17 67:15,18
  67:22 71:25
  72:6,11,14,17
  79:25 97:13
  116:15,18,21

138:19 181:10
  181:13 197:20
  228:21,23
  229:1 233:3,9
  234:10
**recorded**
  138:18 142:3
  146:11
**recorders**
  12:24
**records**  221:1
**recreate**  171:17
  171:19,22
  172:9
**reduce**  155:2
  210:7
**reduced**  149:17
  157:14 234:9
**reduction**
  149:20
**refer**  21:15
  50:12 92:7
  188:18,21
**reference**
  115:19 155:18
  181:21
**referenced**
  236:6
**references**
  189:19
**referencing**
  65:25 122:22
**referral**  235:14
**referred**  181:2
  220:4

**referring**  21:16
  98:14,15 123:8
  152:2 156:19
  157:11 166:24
  167:11 179:6
**refers**  23:3
  218:23
**reflect**  74:17
**reflected**  43:15
  55:18 67:23
  127:16
**refresh**  44:18
**regarding**
  92:15 100:20
  101:18
**register**  47:7
**registered**
  49:25 50:1
**registration**
  46:24 47:1
**registrations**
  46:24,25 48:5
**regulations**
  235:6
**rejected**  79:13
**relate**  41:13
  55:9 168:21
**related**  25:25
  31:5 32:1 40:7
  40:21 43:2
  100:1 105:17
  120:5 123:4
  135:11 220:24
**relationship**
  185:15 206:24

Wesley Grimes                                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[relative - resistance]**                                      Page 46

| | | | |
|---|---|---|---|
| **relative** 103:19 | 190:23 201:14 | 152:1,14 153:9 | 231:3 |
| 152:2 160:13 | 214:14,15 | 154:10 157:3 | **representative** |
| 160:14 199:19 | 223:12,16 | 164:20 166:22 | 116:6 |
| 234:12 | 224:3 | 167:7,12 | **represented** |
| **relaxes** 202:9 | **remind** 13:18 | 169:12,15,18 | 28:22 177:17 |
| **released** 188:13 | 148:14 | 169:24 177:2 | **representing** |
| **releasing** | **remote** 61:5 | 188:15 196:14 | 6:15,16 28:16 |
| 120:18 | **remotely** 16:24 | 197:14,19 | 31:16,20 32:6 |
| **relevant** 12:15 | 17:4 49:23 | 198:23 204:20 | 88:22 |
| 97:7 | 150:9 | 204:22 205:7 | **required** |
| **reliance** 98:18 | **removed** | 205:14 207:6 | 222:24 238:13 |
| **relied** 35:22 | 137:19 202:8 | 209:2,21 213:6 | **requirement** |
| 36:1 51:8 | **removing** | 219:3,11 224:8 | 162:23 |
| 169:1 184:6 | 231:21 | 224:11 226:5 | **requires** |
| **rely** 12:6 26:2 | **rent** 16:9 | 229:21,24 | 189:12 |
| 35:6 38:2,4 | **rentals** 24:10 | 235:14 | **rescinded** |
| 96:23 101:16 | **rented** 24:9 | **reported** 1:25 | 94:10 |
| 103:14 110:7 | **rephrase** 7:10 | 139:14,15,22 | **research** 21:24 |
| 119:21 151:13 | **replicate** | 144:1,6,19,24 | 24:2,3 25:4 |
| 184:10 201:21 | 133:19 135:7 | 145:18 | 97:1 145:17 |
| **relying** 11:10 | 163:20 | **reporter** 5:20 | 148:19 186:3 |
| 11:25 25:11,22 | **report** 2:19 | 6:19 13:18 | **reservation** |
| 42:2 104:21 | 9:16 10:21 | 32:12 41:22,25 | 83:17,18,19,22 |
| 215:12 216:21 | 36:1,4,16 51:5 | 66:11 67:13 | 83:25 84:9 |
| **remember** | 93:6 94:18,22 | 88:6 133:3,5 | **reserve** 81:23 |
| 30:25 31:3 | 95:11,15,20 | 154:14 160:21 | 97:23 |
| 43:22 57:16,18 | 96:7,13,25 | 186:7,10 | **reserved** 61:15 |
| 57:20 58:21 | 98:24 99:23,23 | 199:25 233:4 | 81:20 83:8 |
| 59:3,4,12,21,22 | 100:2 111:4 | 233:10 235:8 | 233:15 |
| 60:6,10 77:25 | 121:8,15 | 235:13 | **reserving** 82:2 |
| 117:5 118:25 | 122:19 124:2 | **reporting** | 82:25 83:2,5,8 |
| 119:4 126:11 | 135:10,24 | 235:6,10,13,13 | 83:11 |
| 136:11 174:24 | 136:20 138:16 | **reports** 95:4 | **resistance** |
| 175:1,2,4 | 138:17 140:6 | **represent** 7:4 | 211:18,18 |
| 178:3 183:25 | 146:20 151:11 | 29:21 177:16 | |

Wesley Grimes                                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[respect - right]**                                                 Page 47

| | | | |
|---|---|---|---|
| **respect** 14:15 | **results** 154:25 | **rhinoceros** | 113:12,21,24 |
| 66:18 118:4 | 191:12,18 | 34:3 | 114:12 116:5 |
| 177:17 203:4,7 | **retained** 18:14 | **richard** 5:9 | 116:22 120:20 |
| 203:11 208:5 | 27:24 28:15 | 236:1 | 121:2,6,16,17 |
| **responded** | 31:15,25 32:5 | **rick** 6:16 9:19 | 121:18,21,24 |
| 201:11 | 32:22 | 11:23 12:2 | 122:2,3 125:1 |
| **responding** | **retirement** | 31:17 113:11 | 127:19 130:2,5 |
| 230:10 | 21:17,22 23:1 | 178:20 | 130:8,25 |
| **response** 14:20 | **retrievable** | **rides** 164:4 | 133:20 138:11 |
| 28:11 159:12 | 230:2 | **right** 10:5 | 138:18 139:6 |
| 159:14 229:10 | **retrieval** 13:2 | 12:18 13:16 | 139:12,17,24 |
| **responses** 3:20 | **retrieved** 124:1 | 17:8 19:15 | 140:22 141:10 |
| 230:25 | **retrieves** 32:12 | 20:17 21:9 | 145:5,10,13,22 |
| **responsibilities** | **return** 236:13 | 22:11,18 26:6 | 148:8 149:17 |
| 14:8 | 236:16 | 28:23 31:1 | 149:24 150:10 |
| **rest** 100:6,9,15 | **revenue** 18:6 | 32:14,15 33:19 | 152:12 155:20 |
| 101:18 103:5 | **reverse** 182:7 | 34:9 40:9 | 158:8 162:9 |
| 103:11,15 | **review** 53:4 | 43:22 45:3 | 166:22 168:6 |
| 104:1,9,14,17 | 89:24,24 92:14 | 47:25 48:17 | 169:6,13 |
| 104:19 105:3 | 97:23 117:3 | 52:9,17,18,23 | 170:19,24 |
| 143:23 162:5 | 120:9 136:5 | 54:8,18 59:5 | 178:23 179:1 |
| **restores** 202:9 | 167:14 169:16 | 67:20 69:23 | 179:16,19,25 |
| **restrain** 30:15 | 169:22 170:3 | 72:16 73:11,25 | 180:4 181:24 |
| **restraint** 30:14 | 224:20 232:1,4 | 77:9,18,21 | 182:4,9 185:15 |
| 30:21 | 232:8,11,18 | 83:3 84:11 | 185:24,25 |
| **restraints** | 236:7 | 85:2,10,20,24 | 187:12,21,22 |
| 23:25 24:4 | **reviewed** 36:6 | 86:2,9 87:17 | 188:11,13 |
| 25:5 | 36:12 110:5 | 87:22 88:1 | 189:2,6 190:10 |
| **result** 28:5 | 169:24 | 89:22 90:11 | 190:15,19 |
| 118:1 119:12 | **reviewing** | 91:15 92:11 | 191:4,7 194:5 |
| 157:8 164:9 | 53:22 54:6,17 | 93:1,9 97:24 | 195:9,19,22 |
| 191:21 193:24 | 71:3 87:14 | 99:8 100:7,10 | 198:2 206:17 |
| 210:20 | **rhill** 5:13 236:2 | 101:9 103:1 | 207:9,23 208:1 |
| **resulted** 173:4 | **rhino** 34:1,2,6 | 104:20 107:12 | 211:9 213:10 |
| | 34:19 | 107:15 112:25 | 213:14,19 |

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[right - saying]**                                      Page 48

roof   231:15
232:2,5,20
room   181:18
rough   1:8 6:16
31:16,20 42:23
53:4 55:2,3,20
56:11,21 57:2
57:9 58:5,12
58:24 59:1,9
59:18,23 60:1
61:20,23 62:15
84:20 85:15
88:22,23 91:8
99:11 106:20
106:21 111:8
111:24 112:7
120:10,14,17
143:2 201:12
217:16 221:15
221:22 223:4
223:14,17,21
225:3,12
230:24 233:12
236:4 237:1
238:1
route   227:6,7,8
routinely   83:23
row   8:21 9:6
148:3,25 149:3
196:17,21,25
197:4 198:5
199:7,11,15,22
200:4 201:1
202:12,15,18
204:23 215:15

216:4 218:13
218:20,25
219:14 220:1,5
223:2,3,5
227:1,14,17
228:3,8 229:3
231:1
roach   49:3
road   1:18 5:11
148:17
roadway
103:20
roadworthy
76:24 78:5
79:7
roche   152:10
166:24
roche's   152:6
167:4
rodriguez
30:24
role   14:4 25:4
25:25 27:21
45:13,22 46:5
46:10,12,22
48:11,21 49:7
49:14,24 50:5
51:2 120:8
226:1
roles   14:13
roll   166:6
romo   45:19
53:5 54:11,13
54:18

215:21,25
rule   56:9 95:3
95:10
rules   7:8,19
235:6
run   48:15
56:11 58:8
59:7 60:7,8,18
61:6 63:16,22
63:23,23 64:19
64:19,20 65:14
76:10,18 77:6
78:7,16,20
79:6 80:3,21
81:3,7,16,21
83:10,23 84:4
85:4 93:8
134:9 150:10
162:19 164:8
165:9 173:13
173:16 174:13
193:14 216:25
217:6,9,15
220:16 221:12
221:15,19,23
222:8,25
223:14
running   59:2
60:5,13 62:3
64:1,4 78:3
79:14 81:5
158:23 162:24
171:11 174:10
runs   29:18

ruth's   11:23
12:2
rws   1:8

**s**

s   2:1,6 3:1 4:1
52:5 237:3
sacramento
16:19
sae   11:21 12:2
154:20 155:5
155:18,19
167:11,14
safely   107:8
safety   31:7
120:10,13,16
137:11 166:1,4
166:5,10,15
186:12
salary   17:25
18:1 20:4
sale   120:18
san   16:18 45:20
santana   1:3
236:4 237:1
238:1
save   39:15
saw   20:25
49:10 51:21
128:4 136:1,12
170:2 224:7,10
224:12 225:22
saying   43:21,22
61:13 75:7
77:22 82:5
83:17,18,19

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[saying - second]**                                    Page 49

97:13 111:18
111:19 136:16
136:17 147:7
153:4 157:23
172:20 206:2
211:10,20
**says**   37:6 44:16
53:2 55:1,19
56:21 68:20
71:19 74:5,11
89:23 92:10,13
104:2 117:11
121:15 137:17
138:13 139:9
146:19 148:4
149:5,10 175:3
184:21 194:13
195:1 201:20
204:22 218:12
218:15 230:6
**scale**   175:13
**scaled**   226:24
**scan**   46:23,25
47:1,2,4,6 73:9
112:24 113:3
114:21,25
115:13 116:9
183:19,19
**scanned**   114:11
114:13
**scanner**   47:3,5
**scanning**   113:2
**scans**   33:17,18
45:15 47:7
49:25 89:25

107:23 109:4
110:10,11,13
115:23 182:23
197:2 215:14
215:24
**scenario**   59:15
62:14 156:7,15
173:18
**scene**   99:19
100:2 101:12
101:24 105:9
105:17,23
110:19,20
**schedule**   40:2
61:2,21
**scheduling**
57:5
**schmoker**   52:1
52:5,5,7
**scholarship**
23:17
**school**   23:16
24:18
**sciences**   23:23
**scientific**   4:14
12:17 13:23
173:3
**scratch**   21:18
34:18 37:10
46:14 139:21
157:1 177:15
226:8
**screen**   131:8
180:3 212:2

**scrt**   100:8,13
101:14,16,18
103:6,14 104:2
104:5,10,21,24
107:8
**se**   141:5 153:2
163:9
**sea**   57:17
**search**   40:9,16
40:20 129:6
130:18,21
**searches**
128:13
**seat**   8:22 9:3,3
9:7,9,11,12
93:16 124:6,18
126:9,10,10
127:15,23,23
128:2,2 134:2
169:10,13
174:15,22
175:7,19 176:4
194:11 196:17
196:22,25
197:5,8,9,11
198:1,5,8,10,10
198:16 199:7
199:11 200:9
200:12,13,14
200:19,20,21
200:23 201:1
201:17 202:12
202:15,18
208:13,17
210:24,25

211:6,15,19,23
215:25
**second**   3:20
8:21 9:6 24:20
60:13,14 61:6
62:3,23 63:3,6
63:10,16 64:11
64:17 69:16
70:18 80:12
81:20,21,24
82:3,18 83:5,7
83:10,13,17,18
83:19 84:4,4,6
84:7 89:23
129:20 144:23
145:8 148:3
149:3,15 157:4
173:16 174:10
174:13 180:19
181:15 192:3
194:19 196:17
196:21,25
197:4 198:5,10
199:7,11,15,22
200:4 201:1
202:12,15,18
204:23 209:22
215:15,21,25
219:24 220:3,7
220:11,16,17
220:21,24
221:9,12,19
222:13,24,25
227:11 231:1
231:20

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[seconds - show]**                                    Page 50

| | | | |
|---|---|---|---|
| **seconds** 147:21 148:7 149:6 195:25 196:4 | 201:15 **select** 176:7 177:24 | **services** 12:18 13:23,25 14:2 14:9 30:24 235:10,13 | **share** 20:1 230:17 **sharpie** 102:3 187:15 |
| **section** 11:8 124:21 168:23 169:6,8 | **selecting** 65:20 65:20,21 **selling** 221:3 | **set** 3:20 35:11 45:17 48:24 63:5 64:12 | **she'll** 73:8 **sheet** 4:14 71:6 71:21 84:17 |
| **security** 21:11 21:13 | **semitrailer** 13:9 | 80:17 178:13 178:17 184:13 | 179:13 236:11 **sheets** 70:23,23 |
| **see** 12:11 26:25 29:14 36:6 39:16 47:6 | **send** 225:12 **sending** 40:10 225:10 | 188:1,5 218:15 218:18,23 219:16,24 | **shell** 159:6,23 **sheryl** 47:15 **shipped** 75:18 |
| 57:21 63:22 82:25 93:4 | **sense** 7:10 76:22,25 77:8 77:12 79:12 | 220:3,8,11,17 220:21,24 221:9,19,23 | 117:15 **shipping** 75:2 **shoemake** 47:9 |
| 110:18 114:19 115:18 117:13 121:9 122:22 | 206:8 207:21 **sent** 39:20 40:6 42:23 77:15 | **sets** 219:19 222:7 **setting** 48:23 171:11 | 47:15 **shoot** 33:20 **shop** 124:7 |
| 129:23 130:1 135:13 136:16 139:9,10 | 108:19 229:20 230:12,18,18 236:14 | **settled** 30:3 118:20 **setup** 171:14 | 173:22 199:10 207:24 **short** 79:1 |
| 146:24 148:9 150:20 157:14 168:24 169:14 | **separate** 60:5 83:20 219:25 **separated** 37:1 | 181:15 187:5 **seven** 92:22 **seventh** 228:3 | 81:13 185:19 205:17,19 **shorter** 205:20 |
| 169:22 173:18 179:3 190:9,25 194:20,22 | **sequence** 105:4 **serial** 111:6 128:19 129:5,7 | **several** 12:7 20:20 25:8 30:18 45:5 | 205:20 206:3,3 206:7 **shortest** 181:22 |
| 195:5,7,9,11 202:17 206:16 | 129:8 132:11 132:13 177:13 | 50:9 66:25 81:9 95:2 123:12 151:9 | **shortly** 94:3 146:12 147:4 212:7 |
| **seeing** 114:20 150:25 195:6 | **series** 47:6 113:16 122:21 123:13 128:13 | **severity** 31:8 **shape** 129:12 | **shot** 212:3 **shots** 131:9 **show** 52:3 |
| 201:14 203:18 214:5 216:20 | 168:2 178:16 196:14,15 | 195:8 202:10 213:23,24 | 90:18 104:24 121:11 138:1 |
| **seems** 57:15 183:8 **seen** 18:5 39:8 112:2 166:7 | **service** 41:2 | | |

Wesley Grimes                                         May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[show - slot]**                                              Page 51

178:15,25
180:13 188:1
189:18 201:5
214:25 215:14
215:24 230:11
231:6,9
**showed** 101:2
230:2,11
**showing** 90:22
131:9,11 147:1
151:1 189:19
194:12 202:17
205:5 212:1
216:4 217:18
**shown** 100:8
145:17 148:13
148:19 150:25
**shows** 93:3,6
138:17 145:8
164:6,11,15
179:15 187:11
189:1,4 230:14
230:16 231:4
**shuffled** 70:11
**side** 14:4,7,21
28:12 121:2,5
121:6,23,24
125:1
**siffer** 207:3
**sign** 83:25
236:12
**signature**
233:15 234:18
**signed** 35:1,2
46:7 236:19

**significant**
140:18 147:16
176:24
**significantly**
151:3 172:17
185:20 191:16
**signing** 233:5
**similar** 34:2
129:11 140:20
176:12 202:22
204:24 216:14
216:15
**similarity**
216:17,22
**simon** 154:13
158:7,20
161:16 163:20
163:25 164:17
181:19
**simple** 172:3
175:15 203:20
**simplest** 159:9
173:13 193:14
**simply** 164:18
177:8,12
**simulation**
158:7,23
162:24 163:5
163:13,16
**simulations**
29:12,20 32:23
162:12 223:15
**single** 123:24
**sir** 7:1,3,15
8:19 11:9

12:19 13:14,17
17:9 19:16
24:22,24 36:8
42:25 43:4
69:13 72:22
73:14 90:4
97:8 105:6
107:13,16,19
107:21,24
108:1 141:16
144:10 145:7
145:11,14
149:19 152:16
166:23 168:1,4
168:9,22,25
169:7 179:20
179:23 181:25
187:9 188:20
189:3,7 190:20
191:5,10 227:3
228:4,6,9,13,16
230:4
**sit** 45:8 79:16
95:17 96:11,19
104:25 112:19
112:23 117:5
120:3,4 131:5
136:10,15
138:3,7 165:6
166:11 192:10
211:11 214:13
222:21 230:19
**site** 15:2,10
29:4

**sitting** 8:22 9:7
9:10 85:14
95:18 97:10
98:5,20 104:3
140:25 165:10
184:5 196:18
204:9 216:1
**situation**
164:16
**six** 17:4 45:9
112:12,13
171:10 184:23
**sixth** 227:22
**size** 69:14
129:11 144:20
164:24 165:5
165:12,18,21
175:12
**sizes** 164:23
**skipping** 189:4
**slave** 160:6,18
**sled** 180:25
181:3,3 190:13
**slider** 181:4
**slightly** 78:13
122:7 124:25
137:24 140:11
146:21 148:18
206:11
**slip** 148:10,22
**slope** 107:5
206:13 207:4
228:10
**slot** 61:15,19
63:7,10 81:20

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[slot - state]**                                          Page 52

81:24 82:3
83:1,5,7
**slots**  62:20 83:2
**slow**  21:20 88:6
160:21 199:25
**slower**  148:18
**slowing**  20:23
21:16 138:24
**slowly**  154:8
**slows**  148:16
**small**  20:10
22:21 34:17
**smaller**  175:13
186:15
**smudged**  72:4
**snyder**  5:4
235:9
**software**  25:15
25:21,24 34:1
159:4 163:13
163:22
**sold**  111:8
117:12 127:5
220:19,25
**solutions**  235:9
235:12,14
236:23
**somebody**
30:15 57:17,17
58:1 82:15
88:11,12
**sooner**  211:18
**sorry**  6:12
19:23 32:10,11
41:22 46:14

89:13 97:13
126:10 136:14
147:25 177:15
178:20 180:16
186:8 209:21
213:12
**sort**  91:1 190:9
**sound**  17:8
52:9
**sounds**  52:18
101:10 223:3
**south**  32:19
**southeast**
236:15
**space**  159:17
193:13 198:9
211:13,14,25
215:15,21
**speak**  13:19
140:12 174:7
**speakers**  41:20
**speaking**  57:20
58:1 140:7
**spec**  70:22
**specialized**
15:17 74:12
**specific**  25:13
25:21 53:12
91:12,13
104:25 111:5
136:15 199:8
203:25 214:5
214:10,12,14
222:4

**specifically**
12:3,5 47:23
100:23 104:2
112:1,5,18
117:5 124:11
135:3 138:15
152:8 154:13
156:11 178:3
192:6,20
198:14
**specification**
127:4
**specifications**
126:25 131:23
134:14 162:14
**specifics**
154:18
**specs**  50:7,10
50:11,16,20
51:25 71:20
**speed**  4:11
65:20 66:23
67:3 68:10,14
69:9 70:13
118:11,15
141:15 142:2
142:13 143:21
144:7,19
145:17 146:7
146:11 147:12
148:3,12,21
149:16,20
150:24 151:1,2
154:6,9 158:19
162:6,8,13

164:12 180:18
227:8
**speeds**  66:18
141:21 153:16
153:18,19,20
153:22 162:12
172:5,13,19
210:14
**spend**  15:22
76:3 106:12
**spent**  85:1
108:8
**squares**  189:20
189:25
**stabilizing**
190:15
**stack**  110:21
**staff**  171:4,8
**standards**
66:20
**stands**  25:16
**start**  56:18
68:7 126:23
179:7
**started**  23:22
25:18 106:9
126:8
**starting**  6:7
24:20 36:7
122:19 179:15
179:21 180:2
**state**  7:22
119:8 157:5
210:2 227:6,6
227:8 234:3

Case 2:22-cv-00017-RWS   Document 102-3   Filed 09/05/24   Page 291 of 305
Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[state - substantial]                                        Page 53

235:3
**stated** 56:9
  234:7
**statement** 5:20
  66:19 95:12
  96:14 125:2,4
  151:10 181:23
  186:5,14
**statements**
  151:13 167:9
**states** 1:1
  169:12,18
  227:11
**static** 124:13
  202:5 204:20
  204:22 213:9
  213:14 214:2
**statically**
  196:22,25
  197:5 202:20
**statistical**
  167:8
**status** 92:1
**statute** 100:19
  100:21 101:1,4
  101:8
**stayed** 104:12
**steering** 190:10
  190:14,17
**steiner** 21:5
  49:12,19
**steiner's** 49:14
**stewart** 30:11
**sticker** 10:2
  68:19 69:24

71:18 72:3
**stiff** 155:3
**stiffer** 206:14
  207:3
**stiffness** 153:25
  154:19 155:2
  155:12,14,25
  156:3,10,14,17
  157:15 161:15
**stiffnesses**
  156:4
**stint** 24:20
**stock** 226:19,23
**stop** 104:16
  150:1,9
**stopped** 153:10
  153:12,13
  154:8 162:9
**stored** 137:10
**straight** 17:25
**strength** 178:9
  199:19 231:15
  232:9,12,15,18
**strike** 21:18
  27:12 38:7
  43:5 52:14
  61:12 75:8
  83:17 93:16
  100:19 103:8
  105:2 106:14
  108:25 111:16
  113:7 120:15
  180:16 201:17
**strings** 159:18

**stroller** 200:4
  207:24
**stronger**
  199:11,15,22
  200:4 231:22
**struck** 8:3
  223:23
**structural**
  176:12,18,22
  232:5
**structure**
  166:13 176:25
  178:10 186:15
  186:23 231:16
  231:21
**structures**
  166:7 176:14
  207:3,12,14,16
  208:3,4 209:20
  214:9 232:20
**stuck** 143:19
**study** 55:10
**stuff** 19:6 24:10
  82:20 116:6
**subject** 50:13
  50:13,15,18
  71:9,11,12,21
  74:18 75:21
  100:15 111:25
  117:8 120:21
  125:21 127:4
  129:18 131:17
  131:21 134:10
  135:12 139:16
  139:22 152:11

158:4 164:24
166:25 171:17
173:20 176:19
182:2 184:7,15
189:9 193:24
194:5,9 196:16
196:19,22
197:1,8 199:3
200:22 201:3
202:12,24
203:7,15 204:4
204:23 205:12
205:20 206:2
207:13 208:2
208:14,21
209:8,17 210:3
210:6,21 211:9
213:9,14
214:21 215:7
215:15,21,21
216:1 223:2
227:12 231:16
**submitted** 5:20
  84:20
**subpoena**
  229:9
**subscribed**
  238:14
**subsequent**
  62:19 167:14
**subsequently**
  208:23 209:13
**substantial**
  16:1,2

Wesley Grimes                                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[substantially - talking]                                        Page 54

| | | | |
|---|---|---|---|
| **substantially** 191:18 204:24 216:14 | **supply** 79:1 81:13 | **surrounding** 161:9 | **take** 7:11,13 17:7 70:18 72:7 91:3 |
| **substantive** 151:14 152:5 167:3 226:2 | **support** 20:24 96:22 163:3 | **surviving** 1:5 | 109:15 116:2 130:10 133:10 |
| **substitute** 75:4 | **suppose** 20:8 222:10,15 | **suspension** 100:22 | 142:5 143:4 152:17 162:1 |
| **substructures** 200:18 | **sure** 17:2 18:23 19:6 20:3 | **suspicion** 209:19 | 163:19 170:16 181:7 183:18 |
| **suburbs** 16:21 | 21:13 23:14,16 34:5 44:1 | **sustained** 198:1 | 196:24 228:20 |
| **sued** 32:7 223:22 | 48:17 54:22 59:3 61:14 | **suv** 199:12,15 199:23 200:5 | **taken** 7:7,17 115:20 116:1 |
| **sufficient** 63:24 63:25 174:1 | 64:24 68:2,5 73:5,24 82:20 | **swaps** 160:17 160:19,20 | 170:4 198:9 212:7 234:7 |
| **suggest** 174:21 176:3 | 83:11 85:2,4 88:8,25 94:24 | **swear** 6:19 131:6 | **talk** 41:3 53:8 101:4 119:18 |
| **suit** 29:22,25 | 94:24 95:9 126:8 129:20 | **sweetest** 181:23 | 138:16 157:3 207:22 222:18 |
| **suite** 1:19 5:5 5:11 7:25 | 131:5,7 132:19 141:10,20 | **swift** 119:6 | 223:7 225:19 |
| **summarizing** 84:17 | 142:25 143:3 145:6 146:10 | **sworn** 6:21 238:14 | **talked** 25:9 38:21 48:16 |
| **summary** 2:17 4:5 51:14 | 151:24 153:6 164:2 170:6 | **symposium** 11:19 | 57:14,16 60:5 60:12 62:15 |
| 61:16 83:6 84:19 152:20 | 176:15 178:1 182:11 184:20 | **system** 30:16 148:15 156:3 | 84:3 98:24 109:3 123:7 |
| 183:22 | 192:9 203:17 203:19,25 | 166:8 202:8 | 144:23 175:3,9 |
| **sunroof** 178:6 178:9 226:14 | 204:7 219:1,2 233:7 | **systems** 24:4 25:5 30:14,22 | 175:20 191:6 192:3 211:4,5 |
| 231:15,18,24 232:2,6,12,16 | **surface** 159:19 160:12,15,16 | **t** | 224:9 225:11 225:20,21 |
| 232:16 | **surprise** 47:18 | **t** 2:1,1,2,6 3:1 4:1 237:3,3 | **talking** 13:11 18:16 53:2 |
| **supplement** 97:24 | 47:22 52:11,16 84:25 115:24 | **table** 146:7,9 | 58:8 59:13,16 76:1 87:16,20 |
| **supplemental** 224:8,11,24,25 | | **tail** 21:9 | 100:24 118:12 |
| | | **tailgate** 9:2 193:11 208:12 208:13,17 211:15,15 | |

**[talking - testified]**                                      Page 55

| | | | |
|---|---|---|---|
| 118:15 121:12 | **telephone** 87:9 | 78:20 79:2 | 190:22 191:1,4 |
| 141:7 147:19 | 88:14 | 80:3,21 81:3,5 | 191:12 192:5,9 |
| 149:2 155:6 | **tell** 93:25 95:9 | 81:16,21,24 | 192:18,24,25 |
| 157:18 158:4,5 | 115:7 140:11 | 82:3,22,22,23 | 193:14 194:15 |
| 159:7 174:24 | 174:14 177:20 | 83:1,5,10 84:5 | 195:18,21 |
| 175:4 181:15 | 211:12 223:21 | 84:6 85:4 92:4 | 196:15,19 |
| 189:21,21 | 224:14,17 | 93:4,5,8,18,19 | 197:5,9,25 |
| 198:14 203:24 | **telling** 192:22 | 93:23 94:15 | 198:6,13,17 |
| 207:22 209:4 | 225:12 | 119:25 127:5 | 200:22 201:1 |
| 222:2,3 | **tennis** 159:9,11 | 130:8 131:25 | 201:13,22 |
| **talks** 154:20 | 160:1 | 132:2 133:19 | 202:15,18 |
| 203:18 | **term** 87:2 | 134:9 149:21 | 203:2,11 |
| **tape** 189:15,23 | 88:12 91:22 | 149:23 150:6,8 | 204:23 205:12 |
| 212:19 | 166:1 | 150:18 163:5 | 205:20,20 |
| **tara** 43:11 45:1 | **terminology** | 163:14,15,19 | 206:3,12,13,18 |
| 46:11 | 160:5 | 163:20 164:5 | 207:2,9,17 |
| **targets** 66:5 | **terms** 188:18 | 164:10,15 | 208:2,13,16,18 |
| **taught** 25:14 | **test** 34:13,20 | 166:8 167:23 | 208:19 209:12 |
| 26:2 | 38:21,24 45:18 | 170:18 171:1 | 209:17 210:2,5 |
| **teach** 25:20,23 | 48:16,24,25 | 171:13,14,16 | 210:21 211:8 |
| **teaching** 25:18 | 50:13,13,17 | 172:3 173:13 | 211:13 212:3 |
| 25:19,25 | 56:12 57:2 | 173:16 174:5,8 | 213:10 214:2 |
| **team** 47:14 | 58:9 59:2,19 | 174:10,12,13 | 214:17,21 |
| 52:11 85:8 | 60:2,13,23,24 | 174:16,23 | 215:8,16,22 |
| **tec** 217:1,4 | 61:4,14 62:4 | 175:7,8,15,19 | 216:1,24,25 |
| **technique** | 62:14,23,25 | 176:4,8,12 | 217:1,2,3,6,7,9 |
| 156:9 | 64:19,20 65:2 | 177:4,9 178:6 | 217:10,12,16 |
| **tedra** 5:3,7 | 65:8,13,16 | 178:13,17 | 218:19,24 |
| 6:14 | 66:24 67:4 | 179:1,16,22,25 | 219:3,14 |
| **teleconference** | 68:15 69:17 | 181:16,24 | 220:16 221:12 |
| 44:16 53:3,9 | 71:9,15 74:23 | 184:13 186:23 | 222:8,14,24,25 |
| 53:19,21 54:6 | 74:23 75:5,10 | 186:24 187:5 | 228:7,11 |
| 54:16,20,24 | 75:11,14,22 | 188:5,7,22 | 231:16 |
| 55:1,5 | 76:6,11,18,20 | 189:2,6,11,13 | **testified** 6:22 |
| | 77:6,9 78:7,16 | 190:6,15,18,19 | 26:16 27:4,14 |

Case 2:22-cv-00017-RWS   Document 102-3   Filed 09/05/24   Page 294 of 305
Wesley Grimes
May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[testified - think]                                                Page 56

| | | | |
|---|---|---|---|
| 28:20 31:7,12 | 217:24 220:7 | **things** 13:1 | 35:1,5,18 36:2 |
| 221:22 | 221:15,19 | 14:7 15:5,7 | 36:17 38:10 |
| **testify** 17:12 | 232:9,14,18 | 16:16 18:17 | 39:1 42:9 |
| 28:8,14 118:10 | **tests** 59:5,8 | 22:1 25:7,14 | 45:15,24 46:10 |
| 118:19,19 | 60:14,18 62:7 | 29:15 30:4 | 46:23,25 49:15 |
| **testifying** 22:3 | 62:12,20 63:1 | 35:6,17 37:20 | 50:7,17 51:3 |
| 23:3 27:21 | 63:7,15 64:5 | 38:21 49:2,17 | 51:22,24 52:1 |
| 29:20 | 64:15,20,23 | 51:11 53:11 | 52:3 57:14 |
| **testimony** 2:9 | 65:14 66:21 | 58:9 59:17 | 58:22 64:7 |
| 12:15 26:8,13 | 83:23 217:13 | 60:9 62:10,13 | 66:6 68:3 |
| 27:9,12,13,25 | 217:15 223:14 | 64:2 67:7 | 72:16 75:17,18 |
| 28:6 31:24 | 223:14,19 | 80:13 87:13 | 75:23 76:4 |
| 55:10 117:25 | **text** 230:6 | 92:5 106:13 | 79:8,9 80:25 |
| 118:4,16 | **thank** 6:18 | 126:15 132:15 | 81:4 82:7,18 |
| 119:11,15 | 10:10 13:19 | 133:7 137:20 | 83:22,24 89:11 |
| 163:7 236:9,17 | 41:25 105:14 | 147:14 148:1 | 89:21 90:12,13 |
| 238:8 | 133:5 160:21 | 153:7 155:12 | 90:13 95:6,14 |
| **testing** 12:25 | 171:7 186:10 | 161:16 162:15 | 95:16,17 96:24 |
| 14:5,11,11,14 | 232:25 | 167:7 170:3 | 99:4,5 100:11 |
| 23:23 24:4 | **thanks** 9:21 | 171:11 172:6 | 102:20 103:13 |
| 32:21,24 53:5 | **thickness** | 172:24 185:13 | 106:1 107:3 |
| 53:23 54:8,18 | 159:24 | 193:16 203:22 | 108:21 112:2 |
| 55:2,4,20 | **thin** 159:23 | 207:20 210:15 | 115:22 116:2 |
| 56:22 57:9 | **thing** 16:10 | 210:17 212:25 | 118:5,21 119:2 |
| 58:5,13,18 | 33:16,18 49:8 | 213:23 225:21 | 119:7,19,24 |
| 59:10 61:2 | 58:15 63:21 | 225:23,24 | 120:2,7,8 |
| 74:6,12,19 | 66:13 73:25 | **think** 8:9 10:23 | 121:7,17 |
| 76:2 81:20 | 83:21 99:5 | 11:5 12:16 | 122:13 123:20 |
| 90:1 92:17,25 | 129:21 134:19 | 13:24 15:14 | 125:3 127:10 |
| 117:21 120:9 | 140:15 154:5 | 16:19,20,25 | 127:16 128:4 |
| 120:10,13,14 | 154:21 155:6 | 17:1 18:4 19:1 | 130:11 131:14 |
| 120:16,17 | 157:2 160:16 | 26:5,18,22 | 131:15 132:13 |
| 155:4 170:7,19 | 162:3 166:6 | 27:6 30:1,4,6 | 132:14 134:12 |
| 175:12 195:24 | 182:7 214:11 | 31:18,22,23 | 134:14 136:11 |
| 198:12,18 | 222:16 | 32:18,25 34:10 | 137:17,23 |

Wesley Grimes                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[think - today]**                                        Page 57

139:14 140:13
140:15 141:4,8
144:3,13
147:11,15
151:4 152:24
156:5 157:18
159:6,9 164:11
165:6 166:5,5
167:11 172:23
175:22 177:12
179:20 180:24
181:5,20
182:13 183:3
184:2,20,21,23
184:25 185:20
185:21 186:4
187:1,14 188:6
189:19,24
191:16 192:6
192:14 193:17
194:13 198:25
200:7,17,18
203:20 205:21
205:24 206:6
207:18 208:10
208:12 211:3
211:22 212:19
213:1 216:3
219:1 222:22
225:9 226:21
228:19 229:25
230:9 231:20
232:22 233:6
**thinking**
166:11 181:17

181:18
**third**  148:25
227:14
**thirty**  17:11,11
**thought**  21:1,5
32:16 81:11
98:11 155:20
**thousand**
135:17 190:24
**three**  28:22
47:3 53:23,23
54:5,16,21
70:18 72:18
90:15 159:9,17
159:21 170:17
182:22 183:9
183:10 190:24
196:8
**threshold**
216:16
**thresholds**
167:16
**thumb**  2:12
68:3
**thursday**  43:10
**time**  6:3,9 7:6
7:13 13:19
15:21 20:22
21:5,25 22:14
23:10,21,23
24:5 27:1
28:18 53:21
54:14 60:23
61:1,12 63:11
64:1,16 65:7

67:14,17 69:19
72:10,13 75:7
75:9 77:7 81:4
81:19 85:1
86:15 90:15
92:1 93:11,21
93:24 94:3
106:12 108:9
115:22 116:17
116:20 118:10
119:3,18 134:7
137:3,6 139:16
139:23 142:19
143:20 144:7
147:9,13 149:6
153:10 181:9
181:12 193:5
206:14,19
207:3 228:22
228:25 232:24
233:1 236:18
**timeframe**
236:8
**timeliness**
97:21
**times**  12:7
26:15 27:3,8
27:14,23 28:2
28:8,20 32:5
81:9 94:25
95:2 119:11,14
123:12 139:17
139:23 146:11
146:14 147:2,2
153:15 160:24

**tiny**  24:10
**tire**  29:10 30:2
30:4 69:14
121:3,15,16,17
121:18 122:12
130:23 144:20
164:23,24
165:5,7,12,18
165:21
**tires**  64:12 74:6
74:12,13,17,20
74:21,23 75:6
75:10,13,21
76:7,23 77:2,5
77:6,8,17,24
78:4,6,8,11,15
78:17,19,24
79:7,9,15,18
80:2,8,20 81:2
81:6,8,12,17
126:15 129:23
129:25 130:12
130:17,19
131:13 143:9
143:10 165:9
165:15,16
**title**  13:22
19:17 36:20
**today**  33:14
79:16 85:14
95:17,18 97:10
98:5,21 104:3
140:25 165:10
184:5 204:9

800.808.4958                                        770.343.9696

Wesley Grimes
May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[today's - trying]**                                                     Page 58

| | | | |
|---|---|---|---|
| **today's** 6:2 | 183:20 213:17 | **transmitted** | 172:12 173:15 |
| 84:21 85:23 | **towards** 21:17 | 39:17 67:8 | **trucking** 15:4,8 |
| **together** 21:6 | 21:17,22 22:25 | **transport** | 15:15 119:5 |
| 24:17 47:7 | 25:3 129:23 | 13:13,16 | **trucks** 22:23 |
| 128:6 129:15 | 230:5 | **transportation** | **true** 120:7 |
| 133:14 143:19 | **towed** 180:6 | 119:6,7 | 125:3 147:15 |
| 150:20 | **towing** 29:3 | **travel** 21:23 | 166:19 185:22 |
| **told** 108:5 | **town** 118:24 | 41:3 85:23 | 186:2,4 187:2 |
| 178:2 192:19 | **trace** 226:11,22 | 103:10 154:9 | 191:24,25 |
| 192:20 202:2,3 | **track** 15:25 | **traveled** 21:23 | 194:7,10 |
| 202:4 221:18 | 17:20 108:9 | 103:4 104:8 | 200:14 209:15 |
| 224:6 | 150:10 179:25 | **traveling** | 215:18 216:3 |
| **ton** 29:17,18 | 180:4,7,14,24 | 103:21 | 218:2 220:6 |
| **took** 105:23 | 180:25 187:13 | **trial** 7:20 26:16 | 234:10 238:8 |
| 107:20 109:24 | 188:3,9 212:9 | 27:4,9,25 | **trunk** 124:7 |
| 132:2 133:17 | 212:14,18 | 29:20 86:2 | 207:23 231:5 |
| 135:5 | 213:3 | 98:22,23 99:11 | **try** 12:16 54:14 |
| **tool** 108:16,17 | **track's** 187:21 | **triangle** 160:9 | 56:16 121:24 |
| 126:14 127:24 | **tractor** 13:8,8 | **triangles** | 123:21 130:1 |
| 128:2,3,6,7 | **traditional** | 159:21 | 130:18 143:2 |
| 136:12,13 | 106:9 | **tried** 26:21 | 161:14 162:6 |
| **tools** 128:6 | **traffic** 11:22 | 34:16 63:5 | 164:19 206:16 |
| 136:2 | **trailer** 13:8 | 108:4 111:3 | 214:8 |
| **top** 73:25 125:5 | 29:4,5,8,14 | 121:3,23 | **trying** 21:21 |
| 127:20 164:5 | 30:7 | 128:23 131:7 | 63:12 77:16 |
| 218:12 226:20 | **transcribed** | 183:11 | 79:4 80:12 |
| **topic** 99:7 | 109:17 | **trim** 115:11 | 85:1 106:24 |
| 118:13 | **transcript** | 166:25 200:21 | 108:9 110:21 |
| **total** 71:17 | 233:11 234:7 | **trouble** 20:23 | 123:25 129:13 |
| 85:12 127:25 | 234:10 236:6 | 133:25 | 134:25 135:3 |
| 191:1 199:2 | 236:19 238:5,8 | **truck** 12:23 | 141:18,20 |
| **touched** 37:25 | **transferred** | 13:1,4,5,6,9 | 143:18 156:6 |
| **tow** 122:15 | 211:19 | 29:3 30:6,9 | 157:3 170:4 |
| 180:14 182:19 | **transmittals** | 115:4,5,21 | 171:21 172:9 |
| 182:25 183:1,3 | 40:10 | 116:4,5,9,10 | 174:10 183:16 |

Veritext Legal Solutions
800.808.4958                                                    770.343.9696

Wesley Grimes                                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[trying - using]**                                                 Page 59

184:3 185:13
214:4
**turn** 102:23,25
**turns** 63:24
84:6
**twenty** 22:13
86:8
**two** 10:23
11:17 18:25
21:4 23:9 36:2
60:18 62:6,20
63:1,14 64:4
64:15 68:7
69:13 73:22
74:2 83:2
109:11,21
121:20 125:5
127:1,8 130:3
131:24 142:5
144:3,17 148:1
153:7 154:2
170:17 177:8
180:13 183:2
183:21 184:4,7
194:14 205:1
207:7 218:5,7
219:19 222:7
224:25 230:17
**type** 16:14
22:20,21 31:2
49:8 53:14
59:2,15 90:24
110:14 129:7
154:5,21 155:6
163:16 166:6

171:20 172:10
**typed** 2:22,23
**types** 2:20 13:1
21:25 55:15
130:19 147:14
193:15
**typewriting**
234:9
**typical** 54:24
54:25 85:4
**typically** 15:1,4
39:14 43:24
53:13 101:11
162:10

---

**u**

---

**u** 19:1,4 225:22
226:1
**ultimate**
100:15 151:22
174:25
**ultimately**
75:13 77:11
108:10 226:1
**umbrella** 200:3
**uncontrolled**
104:16,18
**under** 35:21
36:13,25 40:2
48:6 74:4
121:21,23
148:17 179:4
190:25 234:9
235:11
**underlying**
55:22

**understand** 7:8
34:5 56:17
61:13 62:1,17
69:6 83:16
87:4 111:5,17
113:3,17 118:9
118:17 156:22
158:6 193:9
204:1 206:7
208:5 211:7
**understanding**
59:7,8 87:7
100:24,25
104:11 163:10
174:8 182:1
**understood**
12:8 150:2
**united** 1:1
**university**
23:17
**unlifted** 167:23
**updated** 12:10
12:16 68:9
70:24 71:3
106:22 144:13
228:1
**updates** 10:19
**ups** 142:11
**use** 7:20 37:1
41:2 64:17
75:10,11,20,24
77:8 79:2 80:8
84:8 91:22,23
98:25 110:11
122:20 128:19

132:11 145:20
153:21,24
154:5,25 156:2
158:10,13,17
159:3 163:12
163:22,25
175:12 182:22
214:1,10,16
221:9
**used** 11:11
66:20 71:14
75:13 87:6
107:8 108:14
108:16 131:2
131:25 132:13
133:18 153:15
163:13 164:18
164:22 165:4
165:17 167:23
169:10 176:7
177:3,9 178:5
180:14 183:1
190:6 214:3
218:19,24
219:14 236:19
**using** 25:20
109:15 131:25
142:7 154:13
154:18,24
155:8 158:11
158:16,20
164:17 180:7
183:14,15
214:12 226:10

Wesley Grimes                                             May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[usual - vertices]**                                    Page 60

| | | | |
|---|---|---|---|
| **usual**  235:15 | **vary**  154:21 | 172:4,8 173:25 | 210:8 216:20 |
| **usually**  43:19 | **vector**  160:13 | 186:23 188:13 | 218:3,15,18,23 |
| 114:3 | **vehicle**  3:5 4:5 | 190:25 192:9 | 218:24 219:17 |
| **utah**  31:2 | 4:14 12:24 | 192:13 207:13 | 219:19,24 |
| **v** | 23:7 25:17 | 207:13 210:3,6 | 220:3,8,11,17 |
| | 30:17,18 32:3 | 210:13,22 | 220:21,24 |
| **v**  138:9,18 | 32:6 47:4 50:7 | 211:9 215:16 | 221:3,9 222:7 |
| 139:15,22 | 50:10,11 51:25 | 215:16,22,22 | 223:23 224:2 |
| 140:2,2,9,20,20 | 63:8 66:18 | 216:1,2 223:2 | 226:11,13,23 |
| 141:1,25 145:9 | 68:16,18 69:19 | **vehicle's** | **velocity**  160:13 |
| 151:3 152:25 | 70:22 71:11,12 | 100:21 | **veoneer**  108:19 |
| 153:20 154:4 | 71:16,20 74:12 | **vehicles**  3:12 | **verify**  236:9 |
| 205:11 206:3,4 | 77:7 92:16,18 | 19:3 45:15 | **veritext**  235:9 |
| 206:8,10,12,18 | 93:12 108:8 | 50:8,15,17,18 | 235:12,14 |
| 207:4 209:1,2 | 111:1,21 | 50:20 51:4,15 | 236:14,23 |
| 236:4 237:1 | 113:21,24,25 | 53:11,16 57:4 | **veritext.com.** |
| 238:1 | 114:1 118:11 | 59:14,16,17 | 236:15 |
| **vac**  124:7 | 118:15 121:4 | 60:17 64:12 | **version**  10:3,4 |
| 173:22 199:10 | 124:8 125:1,18 | 65:20,21,22 | 10:11,20 33:10 |
| 207:24 | 126:3 127:5 | 66:1 83:14 | 68:21 70:5 |
| **validate**  142:9 | 132:1 135:21 | 92:15 104:12 | 71:20 72:25 |
| 163:5,14,16 | 135:21,25 | 107:20,23,25 | 73:1,4 141:9 |
| **value**  138:22 | 136:1,21 138:2 | 109:6,11,21 | 141:14 156:20 |
| 143:12 144:1,7 | 138:24 141:22 | 110:11 126:20 | **versions**  141:11 |
| 144:24 145:1 | 142:17 144:20 | 127:1,5 133:19 | **versus**  28:25 |
| 227:24 | 148:16,18,21 | 142:6 153:16 | 30:12,24 32:19 |
| **values**  140:9 | 150:1,21 | 153:23 154:1 | 66:7 137:7 |
| 155:14 156:10 | 154:23 158:18 | 160:17 161:8 | 152:3 186:25 |
| 227:25 | 159:20 160:1,5 | 176:7,10,11,17 | 215:8,22 216:1 |
| **variable**  173:11 | 160:5,6,7,8,14 | 177:9,10,24 | 232:16 |
| 221:24 | 160:18 161:12 | 178:1,2,12,25 | **vertex**  161:2,3 |
| **variables**  59:10 | 161:15,19,23 | 182:19 183:2 | 161:3,4 |
| **variance**  122:2 | 162:5 164:4,16 | 183:21 188:8 | **vertices**  159:7 |
| **various**  76:1 | 166:6,14 167:4 | 190:2 191:12 | 161:2 |
| 128:13 133:1 | 169:3 171:21 | 191:21 205:1 | |

Wesley Grimes

May 9, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[video - weights]**

Page 61

| | | | |
|---|---|---|---|
| **video** 34:20 | **vs** 1:7 153:2,18 | 193:9 220:15 | 132:17,21 |
| 38:21,24 67:15 | 153:22 205:15 | **wanting** 21:15 | **weighed** 116:4 |
| 67:18 72:11,14 | 207:7 208:7,22 | **wants** 233:7 | 126:3 127:2,11 |
| 116:21 181:10 | 209:7,11,13,16 | **ware** 192:17 | 127:12 129:4 |
| 181:13 212:3 | 228:11 | **way** 20:21 | 131:24 135:22 |
| 228:23 229:1 | **w** | 21:15 23:18 | 135:25 136:2,4 |
| 233:3 | | 40:7 76:8 84:8 | 137:7 138:2 |
| **videographer** | **w** 2:14,19 | 86:19 87:6 | **weighs** 129:9 |
| 5:15 6:2,11,18 | **wait** 63:9 99:24 | 111:20 118:1 | **weight** 66:1 |
| 67:14,17 72:10 | **waiving** 18:10 | 124:15 131:22 | 68:15,16,17 |
| 72:13 116:17 | 97:20 | 138:23 153:5 | 69:17,18 71:17 |
| 116:20 181:9 | **walk** 23:12,19 | 158:25 159:25 | 125:20,23 |
| 181:12 228:22 | 126:6 131:20 | 160:4 165:11 | 126:9,24 127:3 |
| 228:25 233:1 | 141:17 146:9 | 166:11 173:10 | 127:15,22 |
| **videos** 105:23 | 177:6 | 173:12 180:3 | 128:17 129:17 |
| **videotaped** | **wallace** 49:21 | 188:5 195:15 | 129:18,22 |
| 1:12 6:4 233:2 | **want** 18:11 | 195:16 201:21 | 130:4,7,10,12 |
| **view** 87:8 | 34:5 44:6 | 213:1 214:9 | 130:16 131:21 |
| **viewed** 40:6 | 63:23 67:20 | 222:6 229:15 | 132:1,2,24 |
| **vin** 169:19 | 68:1,4,4 70:1,2 | 229:16 | 133:8,11,17 |
| 170:5 177:2,14 | 72:7 73:11 | **ways** 48:14 | 134:3,6,20 |
| 177:16,23 | 79:22,23 91:23 | 182:12 | 135:5,12 136:9 |
| **vins** 177:8,9 | 93:2 97:15 | **we've** 181:5 | 136:18,19,21 |
| **vintage** 167:10 | 102:8 134:18 | 221:20 227:14 | 136:24 137:13 |
| **virtually** | 141:10 172:4,6 | 227:16,19 | 137:14,15,22 |
| 153:13 | 172:13,24 | 228:14 | 138:5,6 140:8 |
| **visibly** 124:19 | 173:8 178:12 | **weather** 225:20 | 143:4,5,6,7 |
| **visual** 205:3 | 181:19 182:11 | **website** 186:5,7 | 172:13 175:12 |
| 215:12,13 | 183:5 192:2 | 186:19 | 191:1 218:9,21 |
| 216:17,19 | 193:17 233:10 | **week** 43:14 | 218:22 219:4 |
| **visually** 129:11 | **wanted** 20:20 | 44:20 | 219:25 |
| 183:12,13 | 21:12,19 23:19 | **weeks** 11:22 | **weights** 3:5 |
| 210:15,17 | 61:14 75:11,12 | **weigh** 109:6 | 4:12 71:10 |
| **volume** 199:2 | 78:10 79:2 | 113:21 128:9 | 92:16 93:12 |
| | 81:22 122:18 | 130:20 131:17 | 125:18 126:20 |
| | 134:9 150:15 | | |

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[weights - wreck]**                                    Page 62

| | | | |
|---|---|---|---|
| 127:1 128:1,20 | **wheels** 64:12 | 102:13 118:10 | 23:2,20 24:17 |
| 128:25 129:2,3 | 74:6,12,13,21 | 118:16 123:20 | 24:19 28:14 |
| 129:4 130:23 | 75:6 76:7,12 | 126:1 133:4,6 | 29:7 46:15 |
| 131:4 152:20 | 76:19 78:9,11 | 145:24 151:9 | 53:4 55:21,22 |
| 153:25 162:15 | 78:25 79:9,15 | 151:13 158:1 | 58:4 85:6,7,16 |
| 172:5,19 191:8 | 79:18 80:7 | 160:23 163:8 | 86:1 87:13 |
| 191:11 218:18 | 81:1,11 129:22 | 165:21 166:18 | 91:18 92:14,18 |
| 218:19 219:16 | 130:13,14,17 | 170:10 172:23 | 97:10,19 98:5 |
| **weinberg** 1:17 | 130:19 131:13 | 173:7 176:14 | 98:19 99:1 |
| 5:10 31:20 | **when's** 160:6 | 176:21 181:8 | 109:2 162:5,11 |
| **went** 23:16,20 | **width** 76:23 | 185:7,18 | **worked** 18:15 |
| 24:14,18,18,19 | 186:24 | 186:11 191:15 | 19:10,14 21:23 |
| 30:17 55:19 | **wife** 19:22,24 | 191:24 197:21 | 22:17 23:10 |
| 56:21 63:15 | 45:11 | 197:23 204:15 | 31:19 43:6 |
| 64:16 83:13 | **willing** 73:1 | 206:6 209:25 | 44:23 45:6 |
| 84:5 111:2 | **witness** 6:19 | 210:12 215:18 | 51:9,10,23 |
| 116:9 143:23 | 8:7 10:13 22:4 | 219:7 222:2 | 55:1 82:18,20 |
| 174:12 228:1 | 28:3 31:10 | 223:25 225:17 | 86:20 |
| **werner** 155:21 | 32:11,13,14,18 | 233:8 236:8,10 | **working** 15:6 |
| **wes** 53:2 74:3,5 | 37:22 39:25 | 236:12,18 | 15:22 23:3,6 |
| 74:11 89:23 | 40:13 41:21,24 | **witnesses** 17:13 | 52:12,19 82:12 |
| 92:13 | 42:6 54:10 | 87:22 88:23 | 86:4,11,15,18 |
| **wesley** 1:13 2:8 | 55:17 56:14 | **wonder** 43:9 | 92:2 119:5 |
| 6:5,20 7:17,23 | 57:1,14 58:21 | **wood** 121:20 | **works** 16:23 |
| 235:5 236:5 | 59:21 60:4,22 | 121:23 | 17:3 49:23 |
| 237:2,24 238:2 | 63:20 65:19 | **word** 66:7 | 148:13 159:25 |
| 238:4,12 | 66:12 68:25 | **wording** | 160:4 163:10 |
| **west** 5:5 | 69:6 70:22 | 139:20 | **worse** 20:7 |
| **wheel** 32:21,22 | 73:6 76:15 | **words** 35:20 | **worst** 173:17 |
| 75:4 121:22 | 78:24 80:7,16 | 163:17 | **worthiness** |
| 130:22 148:16 | 80:25 82:15 | **work** 12:17 | 167:5 |
| 148:17 190:14 | 88:8 89:4 | 16:16 18:21 | **wreck** 194:5,9 |
| **wheeler** 1:17 | 91:21 96:10,18 | 19:1,10 21:6 | 200:22 201:3 |
| 5:10 13:12 | 97:4,15,22 | 21:22 22:3,6 | 209:17 |
| 31:21 | 99:15 102:8,10 | 22:20,21,24 | |

Wesley Grimes                                May 9, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[written - zoom]**                              Page 63

| | | |
|---|---|---|
| **written**   5:20 | 116:5 120:7 | **z** |
| 39:13 40:5 | 123:9 131:6 | **zero**   106:17 |
| 94:22 | 133:13 135:17 | 139:17,24 |
| **wrong**   62:24 | 136:7 137:1 | 146:11,14 |
| 63:8,15 64:16 | 139:19 143:17 | 147:2,2 162:9 |
| 70:25 71:2 | 149:2 151:25 | **zone**   176:23 |
| 83:13 84:5 | 152:4 154:17 | **zoom**   41:1 |
| 139:19 153:5 | 155:21 156:23 | 67:11 87:9 |
| 173:21,22 | 172:1 173:7,7 | 88:15 89:25 |
| 181:2 182:2 | 175:3,20 | 90:5,10,12,14 |
| 205:21 | 184:24 188:23 | 92:17 93:7 |
| **wrote**   118:21 | 207:1 213:25 | 221:7 |
| **wwhgd.com** | 218:22,22 | |
| 5:13 236:2 | 219:7 230:7 | |
| | 233:8 | |
| **x** | **year**   18:3,6,8 | |
| **x**   2:2,6 3:1 4:1 | 23:18 24:6,12 | |
| **xlt**   195:1,8 | 28:8,10 79:17 | |
| | 93:1 115:8 | |
| **y** | 118:25 169:19 | |
| **yeah**   11:1 | **years**   15:14,19 | |
| 15:13 16:8 | 22:13 24:21 | |
| 17:5 22:13 | 25:6 26:17,19 | |
| 23:7 26:5,20 | 27:5 28:21 | |
| 26:20 27:2 | 65:6 95:1 | |
| 28:19 29:1 | 118:6 | |
| 31:2 37:22 | **yellow**   189:15 | |
| 44:20,21 50:15 | 189:23 | |
| 52:5,5,6,20,22 | **yesterday** | |
| 54:4 66:2 69:2 | 95:24 96:5 | |
| 71:13,13 73:8 | 98:16,17 | |
| 80:16 83:7 | 100:25 | |
| 84:24 86:19 | **young**   23:17 | |
| 93:3,4,6 94:24 | 30:17 49:22 | |
| 95:2 98:18 | 51:24 | |
| 111:21 115:6 | | |

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under

rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.