UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

Santana Bryson and Joshua Bryson,       *
as Administrators of the                *
Estate of C.Z.B., and as surviving      *
parents of C.Z.B., a deceased minor,    *
                                        *     Civil Action File
        Plaintiffs,                     *
                                        *     No. 2:22-cv-17-RWS
v.                                      *
                                        *
Rough Country, LLC                      *
                                        *
        Defendant.                      *

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT
ROUGH COUNTRY'S MOTION FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION

On March 15, 2020, the Bryson family was driving home from a birthday

party for C.Z.B.'s (C.'s) grandmother.  Joshua and Santana Bryson were sitting in

the front row of the family car—a 2008 Ford Escape.  Their two-year-old son C.

was buckled into his car seat in the second row.  The family was stopped at a red

light when they were rear-ended by a Ford F-250 equipped with a Rough Country

lift kit.

Rough Country's lift kit raised the F-250 by six inches, making it tall

enough to bypass the structural crash protection features of the Brysons' car.

Instead of engaging the protective bumper and frame rails of the Escape, the F-250

sliced through the sheet metal of the Escape like butter:



*Fig. 1.  Bryson Family Escape after the collision.*

Before the collision, the Escape provided more than enough survival space between C. and the driver's seat.  But the lifted F-250 intruded 4.3 feet into the Escape and shoved C.'s second-row seat forward over two feet,[1] pushing his body and head forward until his head hit the structures of his mom's driver's seat.[2]  The force of that impact was enough to fracture his skull and sever his brain stem.[3]  He was pushed far enough forward that his femur, ulna, and radius were all fractured by the impact with his mom's seat.[4]

The below pictures compare C.'s survival space before the wreck with the crushed space after the wreck:

---

[1] *See* Ex. 1, Buchner Rep. at 10.
[2] See Ex. 2, Lewis Dep. 117:11-18.
[3] See Ex. 3, Lewis Dep. Ex. 6 (Lewis Rep.) at 17.
[4] *Id.*

 

*Fig. 2.  Surrogate Study by Paul Lewis representing C.Z.B.'s occupant space before the collision [5]*

*Figure 3. Post-collision view of the area where C.Z.B. was seated*

His parents were in the front seats, away from the F250's intrusion.  They, along with C.'s unborn brother, all survived without serious injury.  C. should have survived like the rest of his family, but he was killed as a result of the intrusion that Rough Country's lift kit caused.

This case is unique because *the automakers agree with Plaintiffs and their experts*: when vehicle heights differ dramatically, it creates a serious safety risk that outweighs any potential utility.  Established industry safety research has shown for years that raising the height of vehicles causes potentially fatal intrusion levels during foreseeable collisions.  The risk is so serious that automakers did not wait for federal regulations—they *voluntarily agreed* to design their fleets to prevent significant mismatch.  The Vehicle Compatibility Agreement exists to prevent pickup trucks from overriding smaller vehicles' crash protection features

---

[5] *Id.*

and intruding into their occupant space—exactly what happened in this case.[6]

Rough Country knew about this agreement and the studies that prompted it. Even though there is not a single licensed engineer, biomechanic, or safety expert on Rough Country's staff, Rough Country disregarded the industry standard and made no effort to design products that eliminated or even reduced the risk of lifts in crashes.

Stunningly, Rough Country's Motion for Summary Judgment claims that what happened in this case could not be foreseen, even though it knew all the automakers had concluded vehicle mismatch put people at risk and even though by 2014 Rough Country had already been sued *twice* for this exact same defect.  One of those lawsuits stemmed from the death of nine-year-old child in the *Bacho* case (A.B.), brought in the Northern District of Georgia.[7]  Rough Country claims it relies on "consumer feedback" to decide whether its products are dangerous.[8]  But even learning about its product's role in A.'s death was not enough "feedback" to change any of its designs or practices—or even consider doing so.

Any reasonable manufacturer faced with the overwhelming evidence of its product's dangerousness would have done something to investigate how to address

---

[6] *See* Ex. 4, Vehicle Compatibility Agreement.
[7] *See* Ex. 5, *Bacho v. Rough Country* Complaint; Ex. 6, *Mendoza v. Heckenthorn Products* Complaint.
[8] *See* Ex. 7, Rough Country 30(b)(6) Dep., at 9:17-12:9 [Doc. 97].

it.  But Rough Country did not perform any analysis at all.  It conducted no engineering analysis or crash testing to ensure that its products do not lead to preventable deaths.[9]  Instead, Rough Country affirmatively hid what it knew from those who inquired.[10]

Rough Country has sold millions of its lift kits for use on public roads while ignoring the fatal consequences of its actions.[11]  The Court should deny summary judgment and allow a jury to determine Rough Country's responsibility for C.Z.B.'s death.

## II.    FACTS

### A.    Rough Country knowingly designed, manufactured, and sold a defective and dangerous lift kit.

In 2005, every major manufacturer of pickup trucks and SUVs sold in the United States agreed to a voluntary safety agreement to prevent incidents like this case.  That agreement—the industry-wide Vehicle-To-Vehicle Compatibility Agreement—required all pickup truck manufacturers to design their crash absorbing features (like the bumper and frame rails) to overlap with the crash protection features of smaller cars: between 16 and 20 inches off the ground.[12]  The

---

[9] *Id.* at 15:21-17:5; 9:17-12:9.
[10] *See* Ex. 8, P. Just to W. Bradshaw emails, at RC-BRYSON006869-6870.
[11] *See* Ex. 7, Rough Country 30(b)(6) Dep., at 10:23-25 [Doc. 97].
[12] *See* Ex. 4, Vehicle Compatibility Agreement.  Manufacturers had two options for compliance: (1) design the pickup truck's primary energy absorption system to

express purpose of that Agreement was to "bring significant safety improvements into the fleet" and "reduce structural over-ride of a passenger car."[13]  Rough Country knew about the industry-wide agreement.[14]  Despite knowing about the safety agreement and the safety purpose of the vehicle height requirements, Rough Country designed and sold 4.5-inch and 6-inch lift kits that would remove this life-saving safety requirement.

Rough Country also knew about the extensive scientific research showing that raising the heights of pickup trucks will lead to catastrophic levels of intrusion in foreseeable collisions.  Studies from the IIHS and NHTSA confirm that "at higher impact speeds [increased vehicle height] can lead to occupant compartment intrusion"[15] and that highway fatality statistics show "a statistically significant 8-percent reduction in car-occupant fatalities after light trucks self-certified to the agreement."[16]  Those studies were not unique—a Ford study confirms that raising the height of its vehicles by less than four inches causes a significantly increased

---

overlap at least 50% with the 16-20 inch range, or (2) design the pickup truck's secondary energy absorption system to overlap fully with the 16-20 inch range.
[13] *Id.*
[14] Ex. 7, Rough Country 30(b)(6) Dep., at 48:22-24 [Doc. 97].
[15] *See* Ex. 9, Summers & Prasad, NHTSA, "NHTSA's Recent Compatibility Test Program."
[16] *See* Ex. 10, Greenwell Report, at 1 (although the report notes the statistics are not sufficient for "unequivocal" proof of the agreement's effectiveness, it concludes the statistics show "some evidence" of an association between height-compatibility and *nationwide* fatality rates).

danger to other vehicles' occupants in a crash.[17]  Rough Country knew about the industry studies of this danger.[18]

Rough Country also knew about the hazard through multiple lawsuits, each of which alleged an injury or death due to Rough Country lift kits causing pickup trucks to intrude into other vehicles.  In *Mendoza v. Heckenthorn Products*, a Rough Country lift kit caused a pickup truck to pass over a convertible's bumper and *directly contact the driver's head*, leaving her with permanent brain damage.[19] In *Bacho v. Rough Country*, a Rough Country lift kit caused a pickup truck to bypass a minivan's crash protection features and intrude into the back seat, killing a nine-year-old child.[20]  Rough Country changed nothing about its products and conducted no crash testing to investigate any potential danger after these tragedies.

The risk of a collision in which one vehicle is taller than another is also common sense even for lay people outside of the auto industry.  One ubiquitous example is tractor trailer guards, which prevent mismatch between cars and tractor trailers:[21]

---

[17] *See* Ex. 11, Roche Supp. Report, at 6.
[18] *See* Ex. 7, Rough Country 30(b)(6) Dep., at 8:21-9:6 [Doc. 97].
[19] *See* Ex. 12, *Mendoza* collision photographs shown to Rough Country's CEO during his deposition in *Bacho*; *see also* Ex. 6, *Mendoza* Complaint.
[20] *See* Ex. 5, *Bacho* Complaint.
[21] https://www.safertrucking.org/underride ("Because of the height difference between the vehicles, a passenger vehicle's safety features, like airbag deployment sensors and crumple zone, are bypassed because the point of impact is above the



Rough Country knew of the risk.  Not only did it ignore the risk, it also tried to conceal it.

In 2014, Rough Country sought general liability insurance.  One company asked if Rough Country had "██████████████████████████████████████ ██████████████████████████████████████████████████████████"  Another insurer asked if Rough Country was in compliance with state laws limiting lift or bumper height.  They wanted to know if the laws were clearly stated on the packaging and what requirements existed and how Rough Country complied with them.[22]

In its response, Rough Country did not disclose the Vehicle Compatibility Agreement.  It did not tell the insurers that its lifts would cause vehicles to violate the Vehicle Compatibility Agreement.  It did not disclose any state laws that limited lifts or bumper heights.  Instead, it claimed "████████████████ ████"[23]

---

front bumper. As a result, passenger compartment intrusion can occur, which may result in death or severe head and neck injuries for the occupants.").

[22] Ex. 13, Rough Country 30(b)(6) Dep., Ex. 6, 12/22/14 Email string.

[23] *See* Ex. 8, P. Just to W. Bradshaw emails, at RC-BRYSON006869-6870.

Rough Country's website, however, includes a page called "STATE LIFT LAWS," which links to a page that lists § 40-8-6 as a statute that applies to lifted trucks and limits lifts to "2 inches."[24]



Despite knowing its lift kit violated a Georgia law designed to protect Georgia citizens, Rough Country shipped it directly to Georgia.[25]

Rough Country also concealed the degree to which its lift kits violated Georgia law.  Although Rough Country marketed the subject lift kit as a 4.5-inch lift kit, it is undisputed that it raised the front suspension of the subject F-250 by *six* inches.

Plaintiff's expert Chris Roche, an experienced automotive engineer who worked for Chrysler and other automotive companies, testified about several alternative designs—all of which are inexpensive and easy.  Rough Country could,

---

[24] https://www.roughcountry.com/state-lift-laws (last visited Sept. 4, 2024), linking to https://www.liftlaws.com/georgia_lift_laws.htm (last visited Sept. 4, 2024).
[25] *See* Ex. 14, Will Holloway Order Confirmation (Mr. Holloway is the prior owner of the F-250).

for example, provide a "secondary energy absorption system" ("SEAS") bracket that is big enough to account for the height of the lift, and which would help increase engagement between two vehicles in a crash and satisfy the requirements of the Vehicle Compatibility Agreement.  Similar designs are sold by Ford and *retail* for $25 each.[26]

**Rough Country knowingly designed a product that deprived people of a safety feature that the entire automotive industry agreed they needed**.  It did not tell its customers about any of this.  It did not tell them that as a result, they could end up killing a child.  It did nothing to fix the defect in its product.  And the victims of Rough Country's conscious disregard for human life are unsuspecting, blameless victims.  They did not choose to purchase or use a defective lift kit. Rough Country knowingly chose to put them in danger.

### B.   Rough Country did not ensure its lift kits would perform safely in collisions before selling them.

Rough Country admits it "generally considered" that its lift kits would cause pickup trucks to bypass smaller cars' crash protection features and intrude into the passengers' occupant space.[27]  Despite that, it never performed any crash tests or engineering analyses *at all* to determine whether its products would cause

---

[26] *See* Ex. 15, Roche Dep. Ex. 2 at 27-28.
[27] *See* Ex. 16, Def's Second Supp. Resp. to Pls' First Interrogs., at No. 6.

potentially lethal levels of intrusion during foreseeable crashes.[28]

Rough Country cares nothing about safe product design.  It does not have a single professional engineer at the company.[29]  Rough Country produced a Word document it calls its "internal development protocol" for its products.  That document does not include a *single* safety assessment before releasing its lift kits for sale.[30]  Rough Country testified it waits for "consumer feedback" in the form of injuries and deaths to alert it to potential safety problems with its products.[31]  But so far, the serious injury or death of three people has not led to any analysis or changes in design.

### C.   Rough Country's lift kit caused the F-250 to override the crash protection features of the Ford Escape, killing C.Z.B.

March 15, 2020 was the inevitable consequence of Rough Country's conduct.  Rough Country's lift kit caused the F-250 to bypass the Bryson family Escape's crash protection features, cut through the Escape, and shove C.'s head into the structures of his mom's driver's seat.[32]  C.Z.B. suffered axial fractures on his arm and leg.[33]  The intrusion of the F250 into C.Z.B.'s seating area shoved him into the structures of his mom's driver's seat, causing skull fractures and an

---

[28] *See* Ex. 7, Rough Country 30(b)(6) Dep., at 15:21-17:5; 9:17-12:9 [Doc. 97].
[29] *Id.* at 23:2-12 [Doc. 97].
[30] *See* Ex. 17, Rough Country Development Protocol.
[31] *See* Ex. 7, Rough Country 30(b)(6) Dep., at 9:17-12:9 [Doc. 97].
[32] *See* Ex. 1, Buchner Report.
[33] *See* Ex. 2, Lewis Dep., at 83:2-23.

atlantooccipital dislocation, where "the head gets pushed off the spine."[34]

## III.  LEGAL STANDARD

Summary judgment must be denied unless there are no genuine disputes of material fact and "the facts and inferences point overwhelmingly in favor of [Rough Country], such that reasonable people could not arrive at a contrary verdict." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quotation omitted).  The Court must view the evidence in the light most favorable to the Bryson family, "and all justifiable inferences are to be drawn" in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999).  The Court "must disregard all evidence favorable to [Rough Country] that the jury is not *required to believe*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (emphasis added).

## IV.  ARGUMENT

Rough Country's motion does not argue that the lift was safe or non-defective. *None of its experts have offered that opinion*.  Apparently, it has never been able to find an expert to testify that its products are safe: in the *Bacho* case, Rough Country hired a testifier known for defending automotive product design, Michelle Vogler.  According to Rough Country, even Ms. Vogler "refus[ed] to say

---

[34] *See* Doc. 101, Eisenstat Dep., at 29:14-30:24.

[the lift] is a 'safe product.'"[35]

Absent any available defense of its product, Rough Country makes several weak legal arguments.  It seeks summary judgment on two claims Plaintiffs have not made: "failure to warn,"[36] and "negligence per se."  It argues that it cannot be liable for its defective product because the collision was "unforeseeable" to Rough Country—an argument that is contrary to a mountain of evidence, including the testimony of its own 30(b)(6) witness.  Finally, it asks the Court to dismiss the punitive damages claim because Rough Country claims the 2-year-old who died in the wreck did not suffer enough to warrant them.  All its arguments must be rejected.

### A. Rough Country admitted that this accident was foreseeable, and therefore there can be no "intervening cause" under Georgia law.

There is no universe in which Rough Country could establish as a matter of law that the subject collision or C.'s death was "unforeseeable."  The entire automotive industry foresaw what happened in this case, and it came together to create the Vehicle Compatibility Agreement to prevent it.  Rough Country knew

---

[35] 6/5/15 Def.'s Reply Mot. Summ. J., *Bacho v. Rough Country*, Case No. 3:14-CV-40, 2015 WL 5969149 (N.D. Ga.).

[36] Plaintiffs ask the Court to deny the motion for summary judgment on the failure to warn claim as moot.  *See McDonald v. Nicholas Fin., Inc.*, No. 1:10-CV-1732-MHS, 2011 WL 13319305, at *2 (N.D. Ga. Mar. 14, 2011) (denying a motion to dismiss as moot because the complaint did not make the claim defendant sought to dismiss).

about this agreement.  It knew that Georgia had banned lift kits over 2 inches for public safety reasons.  It knew that other people had died or suffered debilitating injuries as a result of its lifts.

Even on an extremely granular level, this collision was foreseeable.  Rough Country's corporate representative agreed that "it's foreseeable that an F-250 with a [Rough Country] lift will be involved in a collision."[37]  He also admitted that this *specific collision* was foreseeable—Rough Country knew vehicles equipped with its lift kits would be involved in rear-end collisions with smaller cars at *higher speeds* than the subject collision.[38]  Rough Country equally knew that a child could be sitting in the rear seat of one of those smaller cars.[39]

Based on these admitted facts, Rough Country not only fails to meet its burden to prove this affirmative defense—it has not even met its burden to present the argument to the jury.  This is because whenever "the [defendant] reasonably could have anticipated or foreseen the intervening act and its consequences, then the intervening act of negligence will not relieve the original actor from liability or the consequences resulting from the intervening act."  *Lindsey v. Navistar Intern.*

---

[37] *See* Ex. 7, Rough Country 30(b)(6) Dep., at 26:3-19 [Doc. 97].
[38] *Id.*; *see also* Ex. 18, Def's Resps. to Pls' First Reqs. for Admissions, at Nos. 6; 12.
[39] *Id.; see also* Ex. 16, Def's Second Supp. Resps. to Pls' First Interrogs., at No. 6 (it "generally considered" the possibility that its lift kits could collide with small vehicles, bypass their crash protection features, and intrude into the passengers' occupant space).

*Transp. Corp.*, 150 F.3d 1307, 1317 (11th Cir. 1998) (quotation omitted).

Georgia's appellate courts have repeatedly reiterated that a "[v]ehicular collision is an event which is foreseeable by the manufacturer." *Ford Motor Co. v. Stubblefield*, 319 S.E.2d 470, 477 (Ga. App. 1984); *Uniroyal Goodrich Tire Co. v. Ford*, 461 S.E.2d 877, 889 (Ga. App. 1995) (same) (reversed on other grounds). For that reason, "an automobile manufacturer may be held liable for negligently producing a vehicle with a defect which causes injury when activated by a foreseeable collision." *Id.*

As Rough Country readily admits, "Rough Country lifts have to be designed to be safe in crashes because crashes happen."[40] The fact that trucks equipped with Rough Country lift kits would inevitably collide with smaller vehicles was more than foreseeable to Rough Country—it was ***foreseen.***  Rough Country has been sued multiple times for injuries and deaths caused by the exact defect that caused C.Z.B.'s death in this case.[41]

Rough Country knows that its intervening cause argument is dead on arrival, given its admissions in the 30(b)(6) deposition and in written discovery.  The reason it nonetheless maintains the defense appears on page 12 of its brief: it aims to tell the jury that Rough Country is not liable unless it anticipated a crash caused

---

[40] *See* Ex. 7, Rough Country 30(b)(6) Dep., at 33:15-21 [Doc. 97].
[41] *See* Ex. 5, *Bacho* Complaint; Ex. 6, *Mendoza* Complaint.

by a driver that was "heavily intoxicated" and "on a mobile telephone."[42]  *First*, Rough Country claims that *this* driver's distracted driving was not "foreseeable"— but Rough Country has already been sued for a child's death in a wreck caused by a distracted driver with a Rough Country lift kit.  In *Bacho*, Rough Country claimed that the driver failed to stop at a redlight because he was distracted by a phone call with his girlfriend—just as it does here.[43]

Rough Country's "foreseeability" argument is not only disingenuous—it is contrary to Georgia law.  Georgia law only requires that the collision itself be foreseeable—not the *reason* the collision happened.  "The foreseeability analysis is not that specific: the relevant inquiry is not whether the exact intervening negligent act was foreseeable, but whether, as a general matter, the original negligent actor should have anticipated that this general type of harm might result."  *Granger v. MST Transp., LLC*, 764 S.E.2d 872, 875 (Ga. App. 2014).

Rough Country admitted it was able to foresee that a collision would occur at the speed and orientation of the subject collision.  Because "the character of the

---

[42] Rough Country continues to angle to introduce this unfairly prejudicial evidence at trial. Its first effort was its motion to add the striking driver as an "indispensable party," which this Court denied.

[43] *Compare* Ex. 19, Def's Initial Disclosures, *Bacho v. Rough Country*, at No. 3 ("the cause of the accident . . . was . . . driver who failed to stop at a redlight while he was distracted by a cell phone conversation with his girlfriend") *with* Def.'s Br. at 3 ("When Mr. Elliott drove into the rear of Plaintiff's car, he was on his cell phone and "FaceTiming" with his girlfriend").

intervening act […] was such that its probable or natural consequences could reasonably have been anticipated" by Rough Country, the intervening cause doctrine cannot apply. *Goldstein, Garber, & Salama, LLC v. J.B.*, 797 S.E.2d 87, 89 (Ga. 2017).[44]

Rough Country's citation to *Timmonds v. Ford Motor Co.*, 982 F. Supp. 1475 (S.D. Ga. 1997), is misleading, and its claim that intoxication was a "factor[]" in the Court's proximate cause analysis is false. *See* Br. at 14. In *Timmonds*, the driver was traveling at 102 miles per hour. The Court's proximate cause analysis centered *entirely around this fact*:

> Plaintiffs have not proffered any evidence that Defendant Ford should have known or was actually aware of the probable *consequences* of this type of high-speed accident to its product. The only real evidence Plaintiffs have presented is that the Defendant should be aware that high-speed collisions occur. Accordingly, **based upon the lack of evidence and the unreasonableness of testing at speeds in excess of 100 miles per hour**, I find that reasonable minds could not differ on proximate cause. Accordingly, manufacturers cannot reasonably be expected to foresee the probable consequences of these high-speed collisions.

---

[44] It is also silly to suggest that drunk or distracted driving is not foreseeable. *See* Ex. 20, Georgia Department of Driver Services DUI Report (reporting over 12,000 reported DUI convictions in 2020), *available at* https://dds.georgia.gov/dui-data-reports (last accessed Sept. 5, 2024); *see also* Ex. 21, Georgia Department of Driver Services Distracted Driving Report (reporting over 39,000 citations for unlawful use of a wireless device while driving in 2021), *available at* https://dds.georgia.gov/distracted-driver-data-reports (last accessed Sept. 5, 2024).

*Id.* at 1481 (emphasis added).[45]  The court specifically enumerates what its proximate cause holding is "based upon" and it does not include intoxication. Furthermore, the speeds in these cases could not be more different—the longitudinal delta-V for the Ford Escape was 40.6 mph.[46]  Rough Country's intervening cause argument fails.

### B.    Plaintiffs did not make a "negligence per se" claim.

Plaintiffs have not made a "negligence per se" claim.  The term "per se" appears nowhere in Plaintiff's Complaint or Amended Complaint.[47]  This is because the statute prohibits a person from "alter[ing]" a suspension more than two inches or "operat[ing]" a vehicle that has been so altered on Georgia's highways, roadways, or streets.  *See* O.C.G.A. § 40-8-6.  Rough Country did not itself alter or operate the F-250.

However, the evidence that the Rough Country lift violated Georgia law is

---

[45] It is only *after* the court concluded that the manufacturer's conduct was not a proximate cause that the court acknowledged the only remaining proximate cause: "I conclude as a matter of law that Mr. Carr's drunk driving was the sole proximate cause of the deaths sustained in the ensuing collision."  *Id*.  Contrary to Rough Country's representation, intoxication was not a "factor" in the court's proximate cause analysis.

[46] Ex. 22, Buchner Dep. 111:18-20.  The delta-V represents the change in force for the Escape.  The F250's speed at impact was 51 mph.  Ex. 1, Buchner Rep. at 9.

[47] The only reference to Georgia's lift laws is in paragraph 46: "Rough Country suspension lifts are defective because they raise the suspension on passenger vehicles, including pickup trucks, to a degree that violates Georgia law."  [Doc. 39].

highly relevant.  Rough Country admitted *nine years ago* that the purpose of

O.C.G.A. § 40-8-1, *et seq.* is to avoid "endanger[ing] the driver or other occupant

or any person upon the highway."[48]  Rough Country therefore knew § 40-8-6 was

in place to protect the public.  It also knew that Georgia law prohibited the

installation or use of lift kits over two inches.[49]  Yet, it sold lifts in Georgia that

violated the express terms of a public safety statute.  Not only did the statute put

Rough Country on notice of a potential danger, it makes Rough Country's decision

not to investigate the problem or test its products for safety in a crash even more

egregious.

Furthermore, in *Bacho*, Rough Country repeatedly argued that its lift's

*compliance* with Georgia law was evidence of *no defect*; it cannot now be heard to

complain that a *violation* of Georgia law is evidence of *defect*.[50]

Plaintiffs vehemently disagree with all Rough Country's arguments about

the applicability and constitutionality of O.C.G.A. § 40-8-6.  In the interest of

---

[48] *See* Rough Country's 5/1/15 Br. Supp. Mot. Summ. J. at 12, *Bacho v. Rough Country*, 3:14-cv-00040, Doc. 71-1.

[49] *See supra*, n.29.

[50] "[T]he Legislature has declared [the] purpose [of Chapter 8, Title 40] was 'to require every vehicle to be in safe mechanical condition and not to endanger the driver or other occupant or any person upon the highway.' . . .  Pertinently, O.C.G.A.§ 40-8-6.1 dictates the maximum distance from the street to the lowest point on the frame of a lifted truck, with which height Taylor Long's truck undisputedly complied."  *See* Rough Country's 5/1/15 Br. Supp. Mot. Summ. J. at 12, *Bacho v. Rough Country*, 3:14-cv-00040, Doc. 71-1.

judicial economy, Plaintiffs have not addressed those arguments because they concern a claim Plaintiffs have not made.[51]  Plaintiffs ask the Court to deny Rough Country's motion for summary judgment on a "negligence per se" claim as moot.[52]

### C. Material issues of fact preclude summary judgment on Plaintiffs' claim for C.'s pain and suffering.

Summary judgment on pain and suffering is only appropriate where death is instantaneous, and C.Z.B.'s death was not instantaneous.  Georgia law does not permit summary judgment on conscious pain and suffering where a person's death was "*almost* instantaneous."  *See Woodard v. Ford Motor Co.*, No. CIV.A 1:06CV2191TWT, 2007 WL 4125519, at *3 (N.D. Ga. 2007) (Thrash, J.) (medical examiner found death was "almost instantaneous"); *Holland v. Cypress Ins. Co.*, No. 2:17-CV-120-RWS, 2020 WL 5742250 (N.D. Ga. 2020) (Story, J.) (witness testimony of a single moan); *Dep't of Hum. Res. v. Johnson*, 592 S.E.2d 124, 131 (Ga. App. 2003) (decedent survived "up to 15 seconds").

There is evidence of both time and space that C. would have experienced pain and suffering.  *First*, the F-250 intruded so far into Bryson Family Escape that that the Ford emblem from the F-250 ended up directly over the place where

---

[51] If for some reason the Court would like to decide the issue of the applicability or constitutionality of § 40-8-6, then Plaintiffs respectfully request they be able to file a supplemental brief on those issues.

[52] *See McDonald v. Nicholas Fin., Inc.*, No. 1:10-CV-1732-MHS, 2011 WL 13319305, at *2 (N.D. Ga. Mar. 14, 2011) (denying a motion to dismiss as moot because the complaint did not make the claim defendant sought to dismiss).

C.Z.B.'s car seat should have been.  The below 3D model superimposes the F-250 onto an un-crashed Ford Escape at the F250's maximum engagement:



*Figure 1. 3D Model imposing Ford F250 on an un-crashed Escape.*
*Red circle indicates how far the Ford Emblem traveled forward.*

If the lift kit had not been installed and the structure of the F250 had engaged with the structure of the Escape, it would have reduced the F250's intrusion into the Escape by roughly 2.3 feet, resulting in intrusion that stopped in the cargo area and never reached C.Z.B.[53]  The red line below represents the actual crush; the blue line represents the estimated crush without the lift kit.[54]

---

[53] *See* Ex. 1, Buchner Report, at BRYSON001360.
[54] Ex. 23, Buchner Dep. Ex. 7 at 1.



Rough Country is responsible for the fright, confusion, sadness, and pain that the Brysons' son experienced between the blue line to the red line. If Rough Country believes the emotions that he experienced in that time are worth nothing, then it can make that argument to the jury.

*Second*, the collision lasted roughly 140 milliseconds.[55] C. did not receive his blunt head trauma until well into the crash. Even after the head trauma, he would have survived for some brief time: Dr. Eisenstat, the medical examiner who performed C.'s autopsy, testified that the medical evidence indicates his death did not occur until *after* the blunt trauma head impact, albeit milliseconds after that impact.[56]

Under Georgia law, if there is *any* evidence of conscious pain and suffering, a Court cannot hold that it was insufficient to permit punitive damages. The pain and suffering two-year-old C. experienced during the process of his

---

[55] *See* Ex. 24, Grimes Dep., at 139:14-25.
[56] *See* Doc. 101, Eisenstat Dep., at 29:14-30:24.

atlantooccipital dislocation is a fact question for the jury to decide.[57]  So is the

fright and shock C.Z.B. experienced during the 140-millisecond crash pulse

between when the F-250 impacted the Escape and when it reached his seat.

Because "[t]here is no principled way to distinguish those 'almost instantaneous'

deaths allowing recovery from the instant case[,]" the Court should deny Rough

Country's motion and allow the jury to determine the extent of C.Z.B.'s short but

unimaginable suffering.  *Woodard*, 2007 WL 4125519, at *3.

> **D.    Defendant is not entitled to summary judgment on Plaintiffs'
> claim for punitive damages.**

Georgia law authorizes an award of punitive damages when "the defendant's

actions showed . . . that entire want of care which would raise the presumption of

conscious indifference to the consequences."  O.C.G.A. § 51-12-5.1(b).  Punitive

damages may be awarded even without direct evidence of a defendant's conscious

indifference to the consequences.  *McDonald v. Silver Hill Homes, LLC*, 806

S.E.2d 651, 652 (Ga. App. 2017) ("[A] jury may award punitive damages where

the clear and convincing evidence only creates an inference of the defendant's

conscious indifference to the consequences of its acts.").  Rough Country's motion

for summary judgment on Plaintiffs' claim for punitive damages fails.

There is ample evidence that Rough Country's conduct reflects a conscious

---

[57] *Id.* at 30:15-18.

indifference to the consequences of its actions.  Rough Country knew that selling

its lift kits would cost lives—it "generally considered" that its lift kits would cause

injuries and deaths by causing trucks to excessively intrude into other vehicles.[58]

Rough Country sold a lift kit that it *knew* would violate an industry-wide safety

agreement on vehicle height, violate a Georgia law designed to protect highway

passengers, and undermine decades of research in vehicle safety.  Most

importantly, Rough Country has already seen the devastating effects of its

products—it had already been sued *twice* for injuries and deaths from the exact

defect that caused C.Z.B.'s death in this case.  Despite that knowledge, Rough

Country did ***nothing*** to assess the risk of injury and death its lift kits posed to other

passengers on the road.  It is hard to imagine a clearer example of "conscious

indifference to the consequences of its acts."

Whether Rough Country's conduct is "sufficiently aggravating to authorize

punitive damages is generally a jury question."  *Tookes v. Murray*, 678 S.E.2d 209,

213 (Ga. App. 2009).  This case is no different.  The Court should deny

Defendant's motion for summary judgment.

## V.    CONCLUSION

Rough Country chose to sell a product it knew would turn survivable crashes

---

[58] *See* Ex. 16, Def's Second Supp. Resp. to Pls' First Interrogs., at No. 6.

deadly.  That choice cost the Brysons' son his life.  There is no legal or factual basis to dismiss the Bryson family's claims.  The Court should deny Rough Country's motion for summary judgment.

Respectfully submitted on September 5, 2024,

CANNELLA SNYDER LLC

*/s/ Tedra L. Cannella*

TEDRA L. CANNELLA
  Georgia Bar No. 881085
  tedra@cannellasnyder.com
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
  rob@cannellasnyder.com
DEVIN L. MASHMAN
  Georgia Bar No. 257588
  devin@cannellasnyder.com

315 W. Ponce de Leon Ave.
Suite 885
Decatur, GA 30030
(404) 800-4828
(404) 393-0365 (fax)
***Attorneys for Plaintiffs***

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rules 5.1(B) and 7.1(D), I hereby certify that the

foregoing filing complies with the applicable font and size requirements and is

formatted in 14-point Times New Roman font.

CANNELLA SNYDER LLC

*/s/ Tedra L. Cannella*
TEDRA L. CANNELLA
  Georgia Bar No. 881085
  tedra@cannellasnyder.com
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
  rob@cannellasnyder.com
DEVIN L. MASHMAN
  Georgia Bar No. 257588
  devin@cannellasnyder.com

315 W. Ponce de Leon Ave.
Suite 885
Decatur, GA 30030
(404) 800-4828
(404) 393-0365 (fax)

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing *PLAINTIFFS' RESPONSE IN OPPOSITION TO ROUGH COUNTRY'S MOTION FOR SUMMARY JUDGMENT* was electronically filed with the Clerk of Court via CM/ECF, which will automatically serve the following attorneys of record:

Richard H. Hill
Claire C. Murray
Lindsay G. Ferguson
Aaron B. Chausmer
3344 Peachtree Road, N.E.
Suite 2400
Atlanta, GA 30326
rhill@wwhgd.com
cmurray@wwhgd.com
lferguson@wwhgd.com
achausmer@wwhgd.com

This 5th day of September, 2024.

CANNELLA SNYDER LLC

*/s/ Tedra L. Cannella*
Tedra L. Cannella
Georgia Bar No. 881085
*Attorney for Plaintiffs*