UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| Santana Bryson and Joshua Bryson, | * | |
| as Administrators of the | * | |
| Estate of C.Z.B., and as surviving | * | |
| parents of C.Z.B., a deceased minor, | * | |
| | * | Civil Action File |
| Plaintiffs, | * | |
| | * | No. 2:22-cv-17-RWS |
| v. | * | |
| | * | |
| Rough Country, LLC | * | |
| | * | |
| Defendant. | * | |

**PLAINTIFFS' RESPONSE TO ROUGH COUNTRY LLC'S
STATEMENT OF UNDISPUTED MATERIAL FACTS AND
PLAINTIFFS' STATEMENT OF ADDITIONAL
<u>DISPUTED MATERIAL FACTS</u>**

Plaintiffs Joshua and Santana Bryson, in accordance with Federal Rule of

Civil Procedure 56 and Local Rule 56.1, file this Response to Rough Country

LLC's Statement of Undisputed Material Facts.

1.

Automobile lift kits are intended to raise the suspension or body of a motor
vehicle to provide greater utility and, in some cases, for aesthetics. [Rough
Country's First Supplemental Response to Plaintiffs' First Interrogatories (the "RC
Interrogatory Responses," attached to Rough Country's Memorandum of Law in
Support of the Motion (the "Brief") as Exhibit 1), ¶ 6.]

**RESPONSE: Plaintiffs do not dispute that automobile lift kits are intended to raise the suspension or body of a motor vehicle.  Plaintiffs dispute Rough Country's claim that the primary purpose of lift kits relates to utility for the vehicle and not aesthetics.  A third-party marketing study performed on Rough Country's behalf reveals that a vast majority of its customers go off-roading fewer than seven times per year.  [*See* Ex. 25, Stax, Inc. Marketing Survey Excerpt, at RC-BRYSON005119-CONFIDENTIAL].  The same survey describes Rough Country customers as people who value the look of the product over its performance.  [*Id.* at RC-BRYSON005112-CONFIDENTIAL].**

2.

Lift kits are a product that has been on the market for over 40 years. (RC Interrogatory Responses, ¶ 6.)

**RESPONSE:  Undisputed but immaterial.**

3.

Rough Country is engaged in the business of designing, manufacturing, inspecting, marketing, promoting, advertising, distributing, and selling automobile lift kits. [Rough Country's Answer and Defenses to Plaintiffs' First Amended Complaint for Damages (the "Answer") (Doc. 40), ¶ 8.]

**RESPONSE: Undisputed.**

4.

Rough Country does not install lift kits on automobiles.

**RESPONSE: Plaintiffs do not dispute that Rough Country did not install the subject lift kit on Mr. Elliott's Ford F-250.  With respect to Rough Country's statement that it does not install lift kits on automobiles at all, Plaintiffs note, pursuant to Local Rule 56.1(B)(2)(a)(iii), that Rough Country has failed to support this statement with any citation to evidence in the record. Plaintiffs have no knowledge of Rough Country's statement, so it is disputed.**

5.

Rough Country has been placing its products in commerce for over 30 years. [30(b)(6) Deposition of Rough Country taken on August 4, 2023 ("RC Depo.," from which the specific pages referenced herein are attached to the Brief as Exhibit 2), at 9:22-23 and 10:22-23.]

**RESPONSE: Undisputed.**

6.

Rough Country makes products for more than 80 different applications. (RC Depo., at 44:14-15.)

**RESPONSE: Undisputed.**

7.

Rough Country sells lift kits to all 50 states. [Rough Country's Responses and Objections to Plaintiffs' Second Requests to Admit ("RC Admissions," attached to the Brief as Exhibit 3), ¶ 3.]

**RESPONSE: Undisputed.**

8.

Rough Country's lift kits go through extensive design to ensure that they maintain the original equipment's (OE) performance. (RC Depo., at 32:11-18.)

**RESPONSE: Denied.  Rough Country did not perform any crash testing or engineering analysis to determine whether its lift kits would cause potentially fatal intrusion into other vehicles during foreseeable collisions.  [*See* Ex. 7, Rough Country 30(b)(6) Dep., at 15:21-17:5; 9:17-12:9].  Rough Country has no design criteria related to potentially lethal intrusion caused by aftermarket lifts.  [*Id.* at 19:21-20:3].  The only thing Rough Country did to determine whether its lift kits increase the chances of injury or death to people in collisions is to review the information it received when it was sued for the death of nine-year-old A.B. ("A.") in 2014.  [*Id.* at 11:25-12:9].**

9.

There is not a uniform bumper height for all vehicles. [Plaintiff's Responses to Rough Country's First Request for Admissions served on April 21, 2023 ("Plaintiffs' Admissions," a copy of which is attached to the Brief as Exhibit 4), ¶ 36.]

**RESPONSE: Undisputed that there is no uniform height that applies to all vehicles, but disputed as to the pickup trucks and passenger cars.  With respect to pickup trucks specifically, Plaintiffs note there is a vehicle compatibility agreement between OE manufacturers that dictates the height of pickup trucks to ensure compatibility between pickup trucks and other vehicles during collisions.  [*See* Ex. 4, Vehicle Compatibility Agreement].   The Federal Minimum Vehicle Safety Standards set out the bumper height requirements for nearly all passenger vehicles in "Part 581 – Bumper Standard."  [49 C.F.R. § 32502 et seq.]**

10.

Various trim levels of Ford F-250 trucks have different front bumper heights. (Plaintiffs' Admissions, ¶ 8.)

**RESPONSE: Undisputed but irrelevant.  All trim levels of the Ford F-250 fall within the guidelines of the Vehicle Compatibility Agreement.  [*See* Ex. 4, Vehicle Compatibility Agreement].  Plaintiffs also note that the variations in**

bumper height that accompany different trim levels are minor.  [Plaintiffs'
Response to Def's First Req. for Admissions, at No. 8].

11.

There is an infinite number of vehicles that Rough Country's products could
be involved with. (RC Depo., at 50:3-6.)

**RESPONSE: Disputed.  The definition of "infinite" is "limitless or endless in
space, extent, or size; impossible to measure or calculate."[1]  Plaintiffs admit
there are multiple different vehicles that pickup trucks equipped with Rough
Country lift kits could collide with.**

12.

It is not feasible for Rough Country to consider every possible bumper
height combination and configuration for every lifted vehicle make and model and
every non-lifted vehicle make and model in the context of considering the impact
of potential bumper heights. (RC Interrogatory Responses, ¶ 6.)

**RESPONSE:  Disputed.  The Federal Minimum Vehicle Safety Standards set
out the bumper height requirements for nearly all passenger vehicles in "Part
581 – Bumper Standard."  [49 C.F.R. § 32502 et seq.]  For light trucks and
vans, auto manufacturers created the Vehicle Compatibility Agreement,
which requires full compliance by 2009 to the bumper height standards for**

---

[1] https://www.encyclopedia.com/humanities/dictionaries-thesauruses-pictures-and-press-releases/infinite-0 (last visited September 5, 2024).

those vehicles.  [*See* Ex. 4, Vehicle Compatibility Agreement at 2-3.]  But Rough Country did not have to consider every possible combination and configuration because auto makers laid out the standard for compatibility in the Vehicle Compatibility Agreement.  [*Id.*]  Furthermore, it would be feasible for Rough Country to study the effect its lift kits have on vehicle intrusion before releasing them for public sale.  Automakers have done that, and it is therefore "feasible."  [*See* Ex. 11, Roche Supp. Report, at 6.]  Plaintiffs further object to this statement as it is "stated an issue or legal conclusion" without a tangible factual basis.  *See* Local Rule 56.1(B)(1)(c).

13.

Lifted trucks are not uncommon in the North Georgia area where the accident underlying this action occurred. [Deposition of Plaintiff Santana Bryson taken on April 12, 2023 ("S. Bryson Depo.," from which the specific pages referenced herein are attached to the Brief as Exhibit 5), at 50:3-9 (2 out of 10 cars are lifted); Deposition of Plaintiff Joshua Bryson taken on April 12, 2023 ("J. Bryson Depo.," from which the specific pages referenced herein are attached to the Brief as Exhibit 6), at 46:20-47:1; Deposition of Trooper Andrew Phillips taken on April 26, 2023 ("Phillips Depo.," from which the specific pages referenced herein are attached to the Brief as Exhibit 7), at 60:19-22 (sees them "probably daily").]

**RESPONSE: Undisputed.**

14.

Rough Country sold the lift kit at issue to Will Holloway on or about June 21, 2016. (*See* Order Confirmation, RC-BRYSON 005377, attached hereto to the Brief as Exhibit 8.)

**RESPONSE: Undisputed.**

15.

The lift kit at issue was mailed by Rough Country to Mr. Holloway at his home address in Blue Ridge, Georgia. (*See* Exhibit 8.)

**RESPONSE: Undisputed.**

16.

The lift kit at issue was a 4.5-inch lift kit. (*See* Exhibit 8.)

**RESPONSE: Denied, as stated.  Although Rough Country advertised and sold the subject lift kit as a 4.5-inch lift kit, it is undisputed that the subject lift kit raised the front bumper of Mr. Elliott's Ford F-250 by six inches.  [*See* Ex. 22, Buchner Dep., at 226:10-14; *see also* Ex. 24, Grimes Dep., at 111:23-112:23].**

17.

Mr. Holloway then took the lift kit to Ronnie Thompson Ford, where a technician installed the lift kit onto his 2016 Ford F-250 Super Duty (the "F-250") truck on or about July 11, 2016. (*See* Repair Order Detail – Internal Copy, RONNIE THOMPSON FORD 000027-28, attached hereto as Exhibit 9.)

**RESPONSE: Undisputed.**

18.

Mr. Elliott subsequently obtained the F-250 truck with the lift kit already installed.

**RESPONSE: Undisputed.**

19.

Sadly, almost four years after the lift kit was purchased, on March 15, 2020, at approximately 11:15 p.m., Mr. Elliott – who was driving with a suspended license – drove the F-250 truck into the rear of Plaintiffs' Ford Escape, which was stopped at a red light ("the Accident"). (Answer, ¶ 19; Plaintiffs' Admissions, ¶ 42.)

**RESPONSE: Undisputed.  The status of Elliott's license as "suspended" is**

**irrelevant.  Plaintiffs note Rough Country's statement violates Local Rule**

**56.1(B)(1)(b) because it is "supported by a citation to a pleading rather than**

**to evidence."**

20.

As a result of the Accident, Plaintiffs Santana Bryson and Joshua Bryson's two-year old son, C.Z.B., who was asleep in the second row seat behind the driver's position, was killed. (S. Bryson Depo., at 19:15-20:3; J. Bryson Depo., at 25:14.)

**RESPONSE: Disputed.  The evidence shows C. was asleep the last time his**

**parents observed him.  Ms. Bryson had no memory of seeing C. at the scene.**

**[*See* S. Bryson Dep. 25:2-4.]  When Mr. Bryson observed C. sleeping, it was at**

**the end of the driveway of his mother-in-law's house, which was about 20**

**minutes from the scene of the crash.  [*See* J. Bryson Dep. 25:9-26:14.]**

9

**Whether the sound and feeling of being crashed into by the F-250 woke C.**

**before he passed is a jury question.**

21.

There is no evidence that C.Z.B. suffered any conscious pain and suffering. [Deposition of Johnathan Eisenstat, MD, taken on January 15, 2024 ("Eisenstat Depo.," from which the specific pages referenced herein are attached to the Brief as Exhibit 10), at 29:14-17 and 29:24-30:3 ("would agree" that C.Z.B. "did not experience any conscious pain and suffering" after C.Z.B. suffered the fatal atlanto-occipital disarticulation (AOD)); *see also id.*, 30:8-11 (AOD occurred "within milliseconds" of "the blunt impact").]

**RESPONSE: Denied.  The evidence is that C. suffered no fatal injury until the F250 traveled roughly 4.3 feet through the Escape and caused C. to strike the structures of the driver's seat.  [*See* Ex. 1, Buchner Rep. at 10; *See* Ex. 3 Lewis Dep. Ex. 6 (Lewis Rep.) at 14.]  The impact of C.'s head with the driver's seat is what caused his fatal skull fractures and atlanto-occiptal injury.  [See Ex. 3 Lewis Dep. Ex. 6 (Lewis Rep.) at 17.]  Dr. Johnathan Eisenstat, MD, performed C.Z.B.'s autopsy.  Dr. Eisenstat testified that C.Z.B. suffered an AOD milliseconds after impact.  [*See Doc. 101*, Eistenstat Dep., at 29:14-30:24].  Additionally, C.Z.B. had fractures on his left arm and left leg, consistent with an axial injury from being pushed into the seat in front of him. [*See* Ex. 2, Lewis Dep., at 83:2-23].  Whether C. experienced conscious pain and suffering is a jury question.**

10

22.

Mr. Elliott caused his F-250 truck to collide with Plaintiffs' Escape. (Plaintiffs' Admissions, ¶ 48.)

**RESPONSE: Undisputed.**

23.

Mr. Elliott failed to stop at a red light before colliding with Plaintiffs' car while speeding. (Plaintiffs' Admissions, ¶¶ 39 and 47.)

**RESPONSE: Undisputed.**

24.

Mr. Elliott was driving at least 50 miles per hour. (Plaintiffs' Admissions, ¶ 54.)

**RESPONSE: Undisputed.**

25.

At one second prior to the Accident, the speedometer in Mr. Elliott's F-250 truck registered a speed of 51 miles per hour. [SCRT Investigative Summary, Case Number SCRTB-017-20 (the "SCRT Report," attached to the Brief (without exhibits) as Exhibit 11), at 6.]

**RESPONSE: Undisputed.**

26.

The F-250 truck had oversized tires, which could add 5 to 10 miles per hour to the reported speedometer speed. (Phillips Depo., at 43:20-44:19.)

**RESPONSE: Denied.  Given the ratio between the size of the stock tires and oversized tires installed on the Subject F-250, the oversized tires only added one mile per hour to the reported speedometer speed.  [*See* Ex. 1, Buchner Report, at BRYSON001358].**

27.

Mr. Elliott was driving while intoxicated. (Plaintiffs' Admissions, ¶ 43.)

**RESPONSE: Undisputed but irrelevant and inadmissible.  Mr. Elliott's**

**alcohol consumption did not change the performance of the Rough Country**

**lift.**

28.

There were more than 25 empty beer cans in his F-250 truck at the time of the
Accident. [SCRT Report, at 3; *see also id.*, at 6 ("there were Budweiser cans
everywhere").]

**RESPONSE: Undisputed but irrelevant and inadmissible.  Mr. Elliott's**

**alcohol consumption did not change the performance of the Rough Country**

**lift.**

29.

Mr. Elliott's blood alcohol content (BAC) was at least 0.252, or more than three
times the legal limit. (Phillips Depo., at 36:16-37:13; *see also* SCRT Report, at 8.)

**RESPONSE: Undisputed but irrelevant and inadmissible.  Mr. Elliott's**

**alcohol consumption did not change the performance of the Rough Country**

**lift.**

30.

When Mr. Elliott drove into the rear of Plaintiff's car, he was on his cell phone and "FaceTiming" with his girlfriend. (Plaintiffs' Admissions, ¶ 44; Phillips Depo., at 36:14 and 41:4-5.)

**RESPONSE: Undisputed but irrelevant and inadmissible.  Mr. Elliott's cell**

**phone use did not change the performance of the Rough Country lift.**

31.

Following its investigation of the Accident, the Georgia State Patrol determined that the proximate cause of the Accident was Mr. Elliott's operation of his F-250 truck "in a reckless and unsafe manner while under the influence of alcohol," and his "actions were the direct result of" C.Z.B.'s death. (SCRT Report, at 8; Phillips Depo., at 39:8-10.)

**RESPONSE: Undisputed, but Elliott's intoxication is irrelevant and**

**inadmissible.  It did not change the performance of the Rough Country lift.**

32.

There is no dispute that the lift kit at issue did not contribute to the collision between Mr. Elliott's F-250 truck and Plaintiffs' Escape. (Plaintiffs' Admissions, ¶ 40.)

**RESPONSE: Denied, as stated.  Plaintiffs do not dispute that Rough**

**Country's lift kit did not cause the collision to occur.  Plaintiffs contend,**

**however, that Rough Country's lift kit "contributed to the collision" by**

**causing the subject F-250 to intrude into the subject Escape, causing the death**

**of C. in an otherwise survivable collision.**

33.

Mr. Elliott was charged, pleaded guilty and was convicted of DUI and vehicular homicide, as well as other charges, as a result of the accident.

**RESPONSE: Undisputed, but Elliott's intoxication is irrelevant and**

**inadmissible.  It did not change the performance of the Rough Country lift.**

34.

Plaintiffs' Ford Escape weighed less than Mr. Elliott's F-250 truck. (Plaintiffs' Admissions, ¶ 16.)

**RESPONSE: Undisputed.**

35.

Plaintiffs' Escape had less mass than Mr. Elliott's F-250 truck. (Plaintiffs' Admissions, ¶ 17.)

**RESPONSE: Undisputed.**

*–remainder of page intentionally left blank—*

## PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS

### 36.

This case arises from a collision on March 15, 2020.  The Bryson family was driving home from a birthday party for C.Z.B.'s grandmother.  [*See* Doc. 98, Santana Bryson Dep., at 14:17-23].

### 37.

The Bryson family was stopped at a red light when the collision happened. The Bryson family did nothing to cause the crash.  [*See* Ex. 7, Rough Country 30(b)(6) Dep., at 34:11-16].

### 38.

Rough Country's lift kit raised the F-250's bumper by six inches, causing it to override the rear bumper of the Escape in the collision.  [*See* Ex. 1, Buchner Report, at BRYSON001360].

### 39.

Due to the six inches of increased height, the F-250 intruded 4.3 feet deeper into the Bryson family's Ford Escape than it would have without a Rough Country lift kit installed and shoved C.'s second-row seat forward over two feet, [*see* Ex. 1, Buchner Rep. at 10], pushing C.'s body and head forward until his head hit the structures of his mom's driver's seat.  [*See* Ex. 2, Lewis Dep. at 117:11-18].

40.

The below pictures compare C.'s survival space before the wreck with the crushed space after the wreck:

 

*Fig. 2.  Surrogate Study by Paul Lewis representing C.Z.B.'s occupant space before the collision [2]*

*Figure 3. Post-collision view of the area where C.Z.B. was seated*

41.

Three-dimensional scan data from the subject collision shows that the F-250 intruded so deeply into the Ford Escape that the "Ford" emblem was directly above C.Z.B.'s car seat.  [*See* Ex. 1, Buchner Report, at BRYSON001370].  A visual of the scan data is below:

---

[2] *See* Ex. __ Lewis Dep. Ex. 6 (Lewis Rep.) at 17.



42.

The collision lasted roughly 140 milliseconds.  [*See* Ex. 24, Grimes Dep., at 139:14-25.]

43.

If the lift kit had not been installed and the structure of the F250 had engaged with the structure of the Escape, it would have reduced the F250's intrusion into the Escape by roughly 2.3 feet, resulting in intrusion that stopped in the cargo area and never reached C.Z.B.  [*See* Ex. 1, Buchner Report, at BRYSON001360].

44.

The redline below represents the actual crush; the blue line represents the estimated crush without the lift kit.



[Ex. 23, Buchner Dep. Ex. 7 at 1].

45.

Even after the head trauma, he would have survived for some brief time: Dr. Eisenstat, the medical examiner who performed C.'s autopsy, testified that the medical evidence indicates his death did not occur until *after* the blunt trauma head impact, albeit milliseconds after that impact.  [*See* Doc. 101, Eisenstat Dep., at 29:14-30:24].

46.

The Vehicle Compatibility Agreement exists to prevent pickup trucks from overriding smaller vehicles' crash protection features and intruding into their occupant space.  [*See* Ex. 4, Vehicle Compatibility Agreement.]

47.

In 2003, virtually every major auto manufacturer that sells pickup trucks in the United States agreed to the Enhancing Vehicle-to-Vehicle Crash Compatibility" Agreement (the "Vehicle Compatibility Agreement").  The Vehicle Compatibility Agreement dictates the height of pickup trucks' energy absorption structures.  To comply with the Agreement, a pickup truck must either (1) have its primary energy absorption structures (PEAS) overlap at least 50 percent with the range of 16-20 inches off the ground; or (2) have its secondary energy absorption structures (SEAS) overlap 100 percent with the range of 16-20 inches off the ground.  [*See* Ex. 4, Vehicle Compatibility Agreement].

48.

The Agreement intended to "enhance vehicle-to-vehicle crash compatibility" by setting standards for bumper height to prevent excessive override and intrusion in foreseeable collisions.  [*See* Ex. 4, Vehicle Compatibility Agreement, at 1; *see also* Ex. 15, Roche Report, at BRYSON001404].

49.

The Vehicle Compatibility Agreement was signed by BMW, DaimlerChrystler, Ford, General Motors, Honda, Hyundai, Isuzu, Kit, Mazda,

Mitsubishi, Nissan, Subaru, Suzuki, Toyota, and Volkswagen.  [*See* Ex. 4, Vehicle Compatibility Agreement at 5].

50.

Each manufacturer agreed that 100 percent of its new passenger car and light truck production intended for sale in the United States would comply with the Agreement's bumper height compatibility requirements by 2009.  [*See* Ex. 4, Vehicle Compatibility Agreement at 3].

51.

Studies from the IIHS and NHTSA confirm that "at higher impact speeds [increased vehicle height] can lead to occupant compartment intrusion" [*see* Ex. 9, Summers & Prasad, NHTSA, "NHTSA's Recent Compatibility Test Program."] and that highway fatality statistics show "a statistically significant 8-percent reduction in car-occupant fatalities after light trucks self-certified to the agreement." [*See* Ex. 10, Greenwell Report, at 1].

52.

A Ford study confirms that raising the height of its vehicles by less than four inches causes a significantly increased danger to other vehicles' occupants in a crash.  [*See* Ex. 15, Roche Supp. Report, at 6.]

53.

Rough Country was aware of scientific research showing that "at higher impact speeds [increased vehicle height] can lead to occupant compartment intrusion" in collisions.  [Ex. 9, Summers & Prasad NHTSA Study; *see also* Ex. 7, Rough Country 30(b)(6) Dep., at 53:21-54:10].

54.

Rough Country was aware of scientific research showing evidence of a *nationwide* relationship between the Vehicle Compatibility Agreement and an eight percent reduction in fatality rates in collisions between Pickup Trucks and SUVs with cars.  [Ex. 10, Greenwell Report, at 1; *see also* Ex. 7, Rough Country 30(b)(6) Dep., at 48:10-49:2].

55.

Rough Country was aware of the Vehicle Compatibility Agreement.  [*See* Ex. 7, Rough Country 30(b)(6) Dep., at 48:22-24].

56.

Rough Country's 4.5-inch and 6-inch lift kits raise the height of vehicles by more than the entire 16–20-inch range provided in the Vehicle Compatibility Agreement.  They, therefore, cause compliant vehicles to become non-compliant with the Agreement.  [*See* Ex. 4, Vehicle Compatibility Agreement].

57.

Rough Country has produced no internal documents indicating it considered whether its lifts would affect pickup trucks' compliance with the Vehicle Compatibility Agreement.  [*See* Ex. 7, Rough Country 30(b)(6) Dep., at 62:3-8].

58.

Rough Country has no design criteria or performance criteria to account for the possibility of increased crash intrusion caused by its lift kits.  [*See* Ex. 7, Rough Country 30(b)(6) Dep., at 19:21-20:15].

59.

In *Mendoza v. Heckenthorn Products*, Rough Country was sued because its lift kit caused a pickup truck to pass over a convertible's bumper and directly contact a passenger's head, leaving her with permanent brain damage.  [*See* Ex. 6, *Mendoza* Complaint].

60.

In 2015, Rough Country's CEO Ken Dunn was shown photographs from the *Mendoza* case that irrefutably show the height of the pickup truck caused it to bypass the convertible's crash protection features:

 

[*See* Ex. 12, *Mendoza* Photographs].

61.

In 2014, Rough Country was sued in *Bacho v. Rough Country* because its lift kit caused a pickup truck to intrude into the second-row seat of a minivan, killing nine-year-old A.B.  [*See* Ex. 5, *Bacho* Complaint].

62.

The risk of a collision in which one vehicle is taller than another is common sense even for lay people outside of the auto industry.  One ubiquitous example is tractor trailer guards, which prevent mismatch between cars and tractor trailers:[3]

---

[3] https://www.safertrucking.org/underride ("Because of the height difference between the vehicles, a passenger vehicle's safety features, like airbag deployment sensors and crumple zone, are bypassed because the point of impact is above the front bumper. As a result, passenger compartment intrusion can occur, which may result in death or severe head and neck injuries for the occupants.").



63.

In 2014, Rough Country sought general liability insurance.  One company asked if Rough Country had "█████████████████████████████████ ███████████████████████████████████████████████████████████" Another insurer asked if Rough Country was in compliance with state laws limiting lift or bumper height.  They wanted to know if the laws were clearly stated on the packaging and what requirements existed and how Rough Country complied with them.  [*See* Ex. 13, Rough Country 30(b)(6) Dep., Ex. 6, 12/22/14 Email string.]

64.

In its response, Rough Country did not disclose the Vehicle Compatibility Agreement.  It did not tell the insurers that its lifts would cause vehicles to violate the Vehicle Compatibility Agreement.  It did not disclose any state laws that limited lifts or bumper heights.  Instead, it claimed "███████████████████

██████ ”   *See* Ex. 8, P. Just to W. Bradshaw emails, at RC-BRYSON006869-6870.

65.

Rough Country's website, however, includes a page called "STATE LIFT

LAWS," which links to a page that lists § 40-8-6 as a statute that applies to lifted

trucks and limits lifts to "2 inches."



[*See* Ex. 7, Rough Country 30(b)(6) Dep., at 73:13-74:14;

https://www.roughcountry.com/state-lift-laws (last visited Sept. 4, 2024), linking

to https://www.liftlaws.com/georgia_lift_laws.htm (last visited Sept. 4, 2024)].

66.

Despite knowing its lift kit violated a Georgia law designed to protect

Georgia citizens, Rough Country shipped it directly to Georgia.  [*See* Ex. 14, Will

Holloway Order Confirmation].

67.

Although Rough Country marketed the subject lift kit as a 4.5-inch lift kit, it
is undisputed that it raised the front suspension of the subject F-250 by *six* inches.
[Ex. 1, Buchner Rep. at 4]

68.

Plaintiff's expert Chris Roche, an experienced automotive engineer who
worked for Chrysler and other automotive companies, testified about several
alternative designs—all of which are inexpensive and easy.  Rough Country could,
for example, provide a "secondary energy absorption system" ("SEAS") bracket
that is big enough to account for the height of the lift, and which would help
increase engagement between two vehicles in a crash and satisfy the requirements
of the Vehicle Compatibility Agreement.  Similar designs are sold by Ford and
*retail* for $25 each.  [*See* Ex. 15, Roche Dep. Ex. 2 at 27-28].

69.

Rough Country has "generally considered" that its lift kits may cause pickup
trucks to bypass smaller cars' crash protection features and intrude into passengers'
occupant space.  [*See* Ex. 16, Def's Second Supp. Resps. to Pls' First Interrogs., at
No. 6].

70.

Rough Country admits it has never performed any testing of its products to determine whether they cause potentially lethal levels of intrusion in foreseeable crashes.  [Ex. 7, Rough Country 30(b)(6) Dep., at 15:21-17:5].

71.

Rough Country admits it did not perform any engineering analysis to determine whether its products would cause potentially lethal levels of intrusion during foreseeable crashes.  [Ex. 7, Rough Country 30(b)(6) Dep., at 9:17-12:9].

72.

Rough Country's "Development Protocol" for designing new products does not include any review or analysis related to the product's safety before releasing it for sale. [*See* Ex. 17, Rough Country Development Protocol].

73.

Rough Country does not employ any professional engineers.  [*See* Ex. 7, Rough Country 30(b)(6) Dep., at 23:2-12].

74.

Rough Country claims to wait for "consumer feedback" in the form of injuries and deaths to determine whether its lift kits cause excessive intrusion in foreseeable collisions.  [Ex. 7, Rough Country 30(b)(6) Dep., at 9:17-12:9].

75.

Rough Country knew pickup trucks equipped with its lift kits would crash with smaller vehicles on the road.  [*See* Ex. 7, Rough Country 30(b)(6) Dep., at 26:3-19].

76.

Rough Country admits, "Rough Country lifts have to be designed to be safe in crashes because crashes happen."  [Ex. 7, Rough Country 30(b)(6) Dep., at 33:15-21].

77.

It was foreseeable to Rough Country that an F-250 with a Rough Country lift kit would crash into the rear of a car.  [Ex. 7, Rough Country 30(b)(6) Dep., at 26:7-10].

78.

It was foreseeable to Rough Country that a vehicle equipped with a Rough Country lift kit would crash into a car that has a child restrained in the backseat. [Ex. 7, Rough Country 30(b)(6) Dep., at 26:16-19].

79.

It was foreseeable to Rough Country that vehicles equipped with its lift kits would be involved in collisions at *higher speeds* than the subject collision.  [*See* Ex. 18, Def's Resps. to Pls' First Reqs. for Admissions, at Nos. 6; 12].

Respectfully submitted on September 5, 2024,

CANNELLA SNYDER LLC

*/s/ Tedra L. Cannella*

TEDRA L. CANNELLA
  Georgia Bar No. 881085
  tedra@cannellasnyder.com
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
  rob@cannellasnyder.com
DEVIN L. MASHMAN
  Georgia Bar No. 257588
  devin@cannellasnyder.com

315 W. Ponce de Leon Ave.
Suite 885
Decatur, GA 30030
(404) 800-4828
(404) 393-0365 (fax)
***Attorneys for Plaintiffs***

# CERTIFICATE OF COMPLIANCE

Pursuant to Local Rules 5.1(B) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font and size requirements and is formatted in 14-point Times New Roman font.

CANNELLA SNYDER LLC

*/s/ Tedra L. Cannella*

TEDRA L. CANNELLA
  Georgia Bar No. 881085
  tedra@cannellasnyder.com
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
  rob@cannellasnyder.com
DEVIN L. MASHMAN
  Georgia Bar No. 257588
  devin@cannellasnyder.com

315 W. Ponce de Leon Ave.
Suite 885
Decatur, GA 30030
(404) 800-4828
(404) 393-0365 (fax)

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing *PLAINTIFFS' RESPONSE TO ROUGH COUNTRY LLC'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND PLAINTIFFS' STATEMENT OF ADDITIONAL DISPUTED MATERIAL FACTS* was electronically filed with the Clerk of Court via CM/ECF, which will automatically serve the following attorneys of record:

Richard H. Hill
Claire C. Murray
Lindsay G. Ferguson
Aaron B. Chausmer
3344 Peachtree Road, N.E.
Suite 2400
Atlanta, GA 30326
rhill@wwhgd.com
cmurray@wwhgd.com
lferguson@wwhgd.com
achausmer@wwhgd.com

This 5th day of September, 2024.

CANNELLA SNYDER LLC

*/s/ Tedra L. Cannella*
Tedra L. Cannella
Georgia Bar No. 881085
*Attorney for Plaintiffs*