# EXHIBIT 7

30(b)(6) Rad J. Hunsley                    August 4, 2023
Bryson, Santana And Joshua Vs. Rough Country, LLC

Page 1

1              IN THE UNITED STATES DISTRICT COURT

                 NORTHERN DISTRICT OF GEORGIA

2                   GAINESVILLE DIVISION

3    SANTANA BRYSON AND JOSHUA BRYSON, )

     AS ADMINISTRATORS OF THE ESTATE   )

4    OF C.Z.B., AND AS SURVIVING        )

     PARENTS OF C.Z.B., A DECEASED      )

5    MINOR,                             )   CIVIL ACTION FILE NO.:

                                        )

6          Plaintiffs,                  )   2:22-CV-17-RWS

                                        )

7    v.                                 )

                                        )

8    ROUGH COUNTRY, LLC,                )

                                        )

9          Defendant.                   )

10        _____

11

12            VIDEOTAPED VIDEOCONFERENCE

13            RULE 30(B)(6) DEPOSITION OF

14                 RAD J. HUNSLEY

15                  ON BEHALF OF

16              ROUGH COUNTRY, LLC

17               August 4, 2023

18                10:08 a.m.

19             Dyersburg, Tennessee

20

21

22

23            Jennifer B. Ourada, CCR

24             Certificate No. 2658

25

Page 8

1    heights.

2        Q    Okay.  So if I heard you correctly, you

3    said that Rough Country reviewed Bacho's reports,

4    NHTSA literature.

5             And was there something else that Rough

6    Country reviewed?  I'm just trying to remember

7    everything you said.

8        A    No, that's it.

9        Q    Do you know what Rough Country reviewed

10   from NHTSA?

11       A    The 2012 study or evaluation, you know,

12   of -- I can't remember what the exact type the

13   document was regarding vehicle compatibility.

14       Q    And so Rough Country is aware that when

15   someone installs a Rough Country lift, that causes

16   vehicles to be less compatible.  Correct?

17             MR. HILL:  Object to the form.  Go ahead.

18   BY THE WITNESS:

19       A    No.  Not to my knowledge, no.

20   BY MS. CANNELLA:

21       Q    Does Rough Country disagree with NHTSA's

22   conclusions in the 2012 paper that you're talking

23   about?

24       A    No.  To my knowledge, their conclusions

25   were relatively inconclusive.

30(b)(6) Rad J. Hunsley          August 4, 2023
Bryson, Santana And Joshua Vs. Rough Country, LLC

Page 9

1     Q     Okay.  So it's Rough Country's position

2   that no one knows if lifting a truck causes --

3   increases the chance of injury in a wreck; is that

4   right?

5     A     We have never been -- I've never been

6   presented with evidence to that, yes.

7     Q     You've never been presented with evidence

8   that injuries can be caused because of a lift kit?

9           MR. HILL:  Object to the form.  Go ahead.

10  BY THE WITNESS:

11    A     Injuries could be caused in any vehicle

12  accident.

13  BY MS. CANNELLA:

14    Q     I'm sorry, can you repeat that?

15    A     I said:  Injuries could be caused in any

16  vehicle accident.

17    Q     And what did Rough Country do to figure

18  out whether its lift kits would increase or cause --

19  increase the chances of injury or death?

20          MR. HILL:  Object to the form.  Go ahead.

21  BY THE WITNESS:

22    A     Basically, you know, we've been selling

23  the kits for 30 years.  And from consumer feedback,

24  we have -- don't have any evidence that the inherent

25  nature of our kits cause any issue.

30(b)(6) Rad J. Hunsley                    August 4, 2023
Bryson, Santana And Joshua Vs. Rough Country, LLC

Page 10

1            THE COURT REPORTER:  Ms. Cannella?

2            MS. CANNELLA:  Yes, ma'am.

3            THE COURT REPORTER:  I'm sorry, can we go

4       off for one moment.

5            MS. CANNELLA:  Yes, ma'am.

6            THE VIDEOGRAPHER:  Off the record, 10:15.

7            (There was a break in the proceedings from

8    10:15 a.m. through 10:17 a.m.)

9            THE VIDEOGRAPHER:  Back on the record.

10       The time is 10:17.

11   BY MS. CANNELLA:

12       Q    All right.  Mr. Hunsley, you said that

13   no -- that Rough Country has no evidence from

14   consumer feedback that its lift kits are causing an

15   issue with injury.

16            Is it Rough Country's testimony that it's

17   waiting for its consumers to tell it if people are

18   getting hurt in crashes because of the lift kit?

19   How would consumers know that?

20       A    Well, we've never had any feedback from

21   any government agencies.  What I mean by

22   "consumers," we've been putting our product in

23   commerce for 30 years.  And with the millions of

24   kits and billions of miles of exposure of our

25   product on the road, we've never had any incidents.

Page 11

1    I don't know of any incidents where the -- where our
2    kit is clearly defined as being an inherent negative
3    factor in any type of incident.
4        Q    All right.  Mr. Hunsley, we're going to
5    get back to Rough Country's knowledge of incidents
6    on the road.  So we'll come back to that in a little
7    bit, but I want to go back to something that you've
8    already said and my question specifically, which is:
9    What has Rough Country done to figure out if its
10   lift kits are increasing the chance of injury to
11   people on the road?
12            MR. HILL:  Object to the form.  Go ahead.
13   BY THE WITNESS:
14       A    Again, we -- you know, we've reviewed data
15   from the Bacho case.  In the last ten-plus years,
16   it's really the only one that I personally have had
17   information on regarding analysis, you know, kind of
18   real analysis of our kit, you know, and their effect
19   in a dynamic crash, you know, scenario.  And from
20   those results, there was, you know, no findings or,
21   you know, no findings that warranted any, you know,
22   need for redesign, corrective action, I guess
23   relative to our protocols and components and kit
24   performance.
25       Q    So is it true that what you're saying is

30(b)(6) Rad J. Hunsley                    August 4, 2023
Bryson, Santana And Joshua Vs. Rough Country, LLC

Page 12

1    all Rough Country has done to figure out if its lift

2    kits cause injury or increase the chances of injury

3    to people on the road is review the information that

4    it received in the Bacho case in 2014.  Correct?

5              MR. HILL:  Object to the form.

6    BY THE WITNESS:

7        A    As far as any specific data relative to

8    kind of our kits, you know, in a dynamic crash

9    scenario, that would be accurate.

10   BY MS. CANNELLA:

11       Q    What data are you talking about?

12       A    The expert reports that were generated

13   from that -- the investigation of that incident.

14       Q    Okay.  So let me go back to my question.

15   Is it just Bacho that RC -- that Rough Country has

16   looked at to figure out if there's any increase in

17   the chance of injury as a result of these lift kits;

18   is that right?

19             MR. HILL:  Object to the form.  Go ahead.

20   BY THE WITNESS:

21       A    Again, their review of NHTSA, you know,

22   testing that's been done.  There was a 2005 test.

23   Again, I don't recall the name of that test where

24   NHTSA had seven or eight different vehicles from

25   different categories, you know, sizes of vehicles

30(b)(6) Rad J. Hunsley                        August 4, 2023
Bryson, Santana And Joshua Vs. Rough Country, LLC

Page 15

1    about work it had done to figure out whether its

2    product cause injury?

3              MR. HILL:  Object to the form.  Go ahead.

4    BY THE WITNESS:

5         A    I'm stating that -- again, you know, we

6    have -- the documents that we have reviewed as a

7    company, that I personally have reviewed, you know,

8    even prior to this litigation.

9    BY MS. CANNELLA:

10        Q    Mr. Hunsley, I understand that and you've

11   talked about that, but I need you to answer my

12   specific question that I'm asking.  We've exchanged

13   written responses in this case.  Correct?

14        A    Yes.

15        Q    Okay.  And Plaintiffs asked, quote

16   (as read):  Describe all work done by you to account

17   for the possibility of such injury, including all

18   tests, design criteria, and performance objectives.

19             Is that correct?

20        A    Yes.

21        Q    Okay.  And in response to that in the

22   written discovery, there is no mention of any

23   testing done.  Correct?

24        A    Yes.  We have not personally conducted any

25   testing.  That is accurate.

30(b)(6) Rad J. Hunsley                    August 4, 2023
Bryson, Santana And Joshua Vs. Rough Country, LLC

Page 16

1      Q     You did not do any physical crash tests.

2   Correct?

3      A     That is correct.

4      Q     And Rough Country did not do any computer

5   crash-testing.  Correct?

6      A     No.  No, we have not been directly

7   involved, again other than expert tests that were

8   done for incidents, like for Bacho.

9      Q     I'm sorry.  Has Rough Country done any

10  computer tests to figure out whether its vehicles --

11  whether its lifts can cause injury?

12          MR. HILL:  Object to the form.  Go ahead.

13  BY THE WITNESS:

14     A     No.

15  BY MS. CANNELLA:

16     Q     And Rough Country hasn't done any research

17  about the possibility of creating such tests.

18  Correct?

19     A     You know, we, again in reviewing the data

20  that's out there from NHTSA, there doesn't appear to

21  be any inherent risk, you know, so, no, we don't --

22  I wouldn't know how to create a test to, you know,

23  verify what you're asking.

24          MS. CANNELLA:  Move to strike as

25      nonresponsive.

30(b)(6) Rad J. Hunsley                    August 4, 2023
Bryson, Santana And Joshua Vs. Rough Country, LLC

Page 17

1    BY MS. CANNELLA:

2        Q    Did Rough Country do any research to

3    figure out how it might design a test to know and to

4    explore and to research whether lift kits can

5    contribute or cause injury in wrecks?

6        A    No, we did not because we don't -- the

7    issue.

8            MS. CANNELLA:  Move to strike as

9        nonresponsive everything after the word "no."

10   BY MS. CANNELLA:

11       Q    Did Rough Country hire any safety

12   companies to explore this question?

13           MR. HILL:  Object to the form.  Go ahead.

14   BY THE WITNESS:

15       A    No, not that I'm aware.

16   BY MS. CANNELLA:

17       Q    Did Rough Country have any meetings with

18   NHTSA about this issue?

19       A    And what issue specifically?

20       Q    The possibility that vehicle mismatch in

21   raising bumpers can cause injury.

22           MR. HILL:  Object to form.  Go ahead.

23   BY THE WITNESS:

24       A    Again any vehicle impact is going to

25   potentially cause injury.  We have not had any

Page 19

1              MS. CANNELLA:  Move to strike as

2          nonresponsive.

3      BY MS. CANNELLA:

4          Q    Mr. Hunsley, has RC, has Rough Country had

5      any meetings with representatives of automakers

6      about the problems that can be caused when

7      aftermarket lift kits are installed on vehicles?

8              MR. HILL:  Object to form.  Go ahead.

9      BY THE WITNESS:

10         A    No, not that I'm aware of, that specific

11     topic, no.

12     BY MS. CANNELLA:

13         Q    Isn't it true that RC has never created

14     any design criteria to account for the possibility

15     of increased crash intrusion caused by a vehicle's

16     aftermarket lift?

17             MR. HILL:  Object to the form.  Go ahead.

18             THE WITNESS:  Could you repeat the

19         question again, please?

20     BY MS. CANNELLA:

21         Q    Isn't it true that RC did not create any

22     design criteria to account for the possibility of

23     increased crash intrusion caused by aftermarket

24     lifts?

25             MR. HILL:  Same objection.  Go ahead.

Page 20

1    BY THE WITNESS:

2         A    Yeah -- no -- yes, I guess, no, we have

3    not.

4    BY MS. CANNELLA:

5         Q    And isn't it true that Rough Country has

6    not attempted to create any performance criteria to

7    account for the possibility of increased crash

8    intrusion caused by aftermarket lifts?

9              MR. HILL:  Object to the form.  Go ahead.

10   BY THE WITNESS:

11        A    I'm not sure what you're looking for

12   there, the performance of.  We don't believe that

13   the function or performance of our kits intuitively

14   increase any danger to the crashworthiness of any

15   vehicle.

16   BY MS. CANNELLA:

17        Q    Okay.  Mr. Hunsley, where are the meeting

18   minutes from the discussions that Rough Country is

19   saying today it had about the NHTSA study in 2012?

20             MR. HILL:  Object to the form.  Go ahead.

21   BY THE WITNESS:

22        A    There's no formal meeting minutes that I'm

23   aware of.

24   BY MS. CANNELLA:

25        Q    Who was at that meeting?

30(b)(6) Rad J. Hunsley                          August 4, 2023
Bryson, Santana And Joshua Vs. Rough Country, LLC

Page 23

1    BY MS. CANNELLA:

2        Q    Yes or no:  Are the people you just

3    discussed, none of them are licensed engineers.

4    Correct?

5        A    I guess in the term that you may be

6    saying.  I'm an engineer.  I'm not a professional, I

7    do not hold the professional engineer stamp.

8        Q    And professional engineering is a

9    credential that makes somebody a licensed engineer.

10   Correct?

11       A    I guess possibly in some states, yeah.  I

12   believe that's correct.

13       Q    Thank you.  And your background is, at the

14   time you came to Rough Country and started reviewing

15   the Bacho documents and deciding whether lifts were

16   dangerous, your background was in smokers.  Correct?

17           MR. HILL:  Object to the form.

18   BY THE WITNESS:

19       A    I came from a smoker manufacturing company

20   when I joined Rough Country --

21       Q    What was the -- sorry -- what was the name

22   of that company?

23       A    Southern Pride.  Prior to that --

24       Q    And Southern Pride -- I'm sorry, go ahead.

25       A    Prior to that, I spent 16 years in the

Page 26

1    consumer, then, yes, I would assume we would.

2    BY MS. CANNELLA:

3         Q    Okay.  Do you agree it's foreseeable that

4    an F-250 with an RC lift will be in a collision?

5         A    Yes.  Any vehicle could be involved in a

6    collision, yes.

7         Q    Okay.  And do you agree it's foreseeable

8    that an F-250 with a Rough Country lift will crash

9    into the rear of a car?

10        A    Yes, there's a potential for that.

11        Q    And do you agree it's foreseeable that an

12   F-250 with a Rough Country lift -- to collide with a

13   vehicle that has a child restrained in the backseat?

14        A    Yes.  Vehicles -- collisions could happen

15   in a multitude of configurations, yeah.

16        Q    And so you agree it's foreseeable that a

17   Rough Country lifted vehicle can crash into a car

18   that has a child restrained in the backseat?

19        A    Yes, ma'am.

20        Q    Okay.  Now, you and Rough Country have

21   been investigating the collision in this case for

22   some time.  Correct?

23        A    Yes, ma'am.

24        Q    You personally inspected the vehicles

25   involved in this collision; is that right?

Page 33

1    BY THE WITNESS:

2        A    Yeah, I guess you're probably accurate.

3    BY MS. CANNELLA:

4        Q    And isn't it true that if trucks didn't

5    get in crashes, they wouldn't need airbags.

6    Correct?

7            MR. HILL:  Same objection.

8    BY THE WITNESS:

9        A    Yes.  The intention of an airbag is to

10   lessen the severity of impact in the crash, yes.

11   BY MS. CANNELLA:

12       Q    And Rough Country agrees that trucks do

13   need seat belts and airbags.  Right?

14       A    Yes.

15       Q    Okay.  And isn't it true that Rough

16   Country knows that Rough Country lifts have to be

17   designed to be safe in crashes because crashes

18   happen?

19            MR. HILL:  Object to form.  Go ahead.

20   BY THE WITNESS:

21       A    Yes, we -- I would agree with that.

22   BY MS. CANNELLA:

23       Q    And isn't it true that Rough Country

24   blames its own customers for injuries and deaths

25   that happen in crashes involving Rough Country

Page 34

1    products, but Rough Country never tells those people

2    that they could kill someone if they choose to use a

3    Rough Country lift?

4            MR. HILL:  Object to the form.

5    BY THE WITNESS:

6       A    It could be false -- they -- that's false

7    because that would -- you're insinuating that the

8    lift of a truck inherently causes an increased risk

9    of severity in a crash, which is not accurate.

10   BY MS. CANNELLA:

11      Q    Does Rough Country agree that the Brysons

12   did nothing wrong?

13           MR. HILL:  Object to the form.  Go ahead.

14   BY THE WITNESS:

15      A    Yeah.  I don't know of anything that the

16   Brysons could have done differently at this point.

17   BY MS. CANNELLA:

18      Q    And does -- I'm sorry.  Finish that.

19      A    Based on what I know of the evidence, you

20   know, of what I've reviewed at this point.

21      Q    And does Rough Country agree that the

22   Bachos back in 2014, in the 2014 case, that the

23   Bachos did nothing wrong?

24      A    No.  I don't know of anything that they

25   did, no.

30(b)(6) Rad J. Hunsley                    August 4, 2023
Bryson, Santana And Joshua Vs. Rough Country, LLC

Page 48

1           Did I hear that correctly?

2      A    Yes, ma'am.

3      Q    Isn't it true that Rough Country doesn't

4  want to know if its lifts make vehicles more

5  dangerous in a crash?

6           MR. HILL:  Object to form.

7  BY THE WITNESS:

8      A    No, that's not accurate.

9  BY MS. CANNELLA:

10     Q    Okay.  Well, you talked about the 2012

11  study that Rough Country reviewed by NHTSA.

12  Correct?

13     A    Yes, ma'am.

14     Q    All right.  And that's the study written

15  by Nathan Greenwell.  Correct?

16     A    I mean, I'm not looking at it.  I would

17  have to agree with you, yes.

18     Q    Okay.  And it was about the

19  vehicle-to-vehicle crash compatibility agreement.

20  Correct?

21     A    Yes, ma'am.

22     Q    Rough Country is aware of that agreement.

23  Correct?

24     A    Yes, ma'am.

25     Q    All right.  And Rough Country reviewed

Page 53

1   data that specifically indicates the configuration

2   of the vehicles, whether they've been modified or

3   unmodified.

4   BY MS. CANNELLA:

5        Q    Are you aware of the FARS database?

6        A    Yes, ma'am.

7        Q    And do you agree that the FARS database

8   catalogs every death in every vehicle crash that

9   causes death?

10       A    I believe that's accurate.

11       Q    Okay.  And does Rough Country monitor that

12  database?

13       A    Not on a regular basis.

14       Q    Has it ever monitored the FARS database?

15       A    I'm not sure other than, again, the

16  reports that NHTSA has published based on the

17  analysis of that data, like the 2012.

18       Q    So Rough Country has never done any

19  regular monitoring of the FARS database.  Correct?

20       A    No, ma'am.

21       Q    Okay.  It's read one paper that uses FARS

22  crash data.  Correct?

23       A    I believe the 2005 NHTSA study references

24  FARS data as well.  I think there was a -- there's

25  probably been at least one National Institute.

Page 54

1   Maybe that was included in one of the NHTSA studies,

2   too, but there's been...

3        Q    Which 2005 study are you talking about?

4        A    I'm not -- I don't know exactly what the

5   title of it was.  It was something that was

6   presented during the Bacho case, I believe, and it

7   was part of the information I reviewed, you know,

8   when this claim came about but also back in 2014

9   when I joined the team and I was reviewing the Bacho

10  case.

11       Q    What other studies have you or anyone else

12  at Rough Country reviewed about the risk of

13  increased injury or death as a result of lifted

14  vehicles?

15            MR. HILL:  Object to the form.  Go ahead.

16  BY THE WITNESS:

17       A    None other to my knowledge.

18  BY MS. CANNELLA:

19       Q    Just those two.  Correct?

20       A    Those are the primary two, yes.  Those are

21  the two.

22       Q    Any others?

23       A    Not that I can recall, no, at the moment.

24       Q    All right.  I want to talk about one other

25  thing with you today, and then I'm going to let my

Page 62

1    handling tests.  Correct?

2        A    Yes.

3        Q    There's no document that shows whether the

4    lifts will affect trucks' compliance with a vehicle

5    compatibility agreement, are there?

6            MR. HILL:  Object to the form.  Go ahead.

7    BY THE WITNESS:

8        A    Not specifically that I know, no.

9    BY MS. CANNELLA:

10       Q    Isn't it true that when it comes to the

11   danger of its lifts, Rough Country is willing to

12   simply misrepresent facts to the people looking for

13   the truth?

14           MR. HILL:  Object to the form.  Go ahead.

15   BY THE WITNESS:

16       A    Absolutely not.

17   BY MS. CANNELLA:

18       Q    Let's go back to that exhibit that we were

19   just looking at -- or actually let's look at a

20   different one.  I'm going to show you, in that same

21   string, which we'll mark as Exhibit -- Devin, which

22   exhibit?

23           MR. MASHMAN:  6.

24           MS. CANNELLA:  6.

25           (Plaintiffs' Exhibit Number 6 was marked

Page 73

1    BY MS. CANNELLA:

2         Q    Okay.  And I'm going to scroll down just a

3    little bit here next to Suspension.  According to

4    this website, that Rough Country links to on its own

5    web page, it says (as read):  The suspension lift

6    limit in Georgia is 2 inches.

7              Is that correct?

8         A    Yes, ma'am.

9         Q    All right.  And it cites Georgia code

10   40-8-6; is that right?

11        A    Yes, ma'am.

12        Q    So isn't it true that Rough Country does

13   have evidence that its products violate state laws?

14        A    No, ma'am.  We state on our website, you

15   know, in the statement that -- if you go back to

16   that, we state that we cannot validate the entirety

17   of this liftlaws.com website.  And what you're

18   looking at, what you're showing me here is kind of

19   paraphrasing at best the Georgia law 'cause it's

20   definitely not a one-sentence regulation.

21        Q    Okay.  All right.  Well, let's look at

22   something else, then.  You're aware that Sergeant

23   Matheson of the Georgia State Patrol made a report

24   for this collision.  Correct?

25        A    Yes, ma'am.

Page 74

1       Q       Okay.  And he did the charging documents

2    as well and decided what the striking driver would

3    be charged with.  Correct?

4       A       Yes, ma'am.

5       Q       I'm going to show you the sentence from

6    that case.

7               Before I do that, do you agree that

8    Sergeant Matheson knows more about the criminal laws

9    of Georgia than anyone at Rough Country?

10              MR. HILL:  Object to the form.  Go ahead.

11   BY THE WITNESS:

12      A       Yeah.  I would say that that's probably,

13   you know...

14   BY MS. CANNELLA:

15      Q       And would Rough Country defer to Sergeant

16   Matheson about what's legal and illegal in Georgia?

17              MR. HILL:  Object to the form.

18   BY THE WITNESS:

19      A       No, ma'am.

20   BY MS. CANNELLA:

21      Q       Okay.  Isn't it true that Sergeant

22   Matheson charged the striking driver in this case

23   with the same statute cited on the page that Rough

24   Country's website links to?

25      A       I believe that is accurate.