UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| Santana Bryson and Joshua Bryson, as Administrators of the Estate of C.Z.B. and as surviving parents of C.Z.B., a deceased minor,<br><br>　　　Plaintiffs,<br><br>v.<br><br>Rough Country, LLC,<br><br>　　　Defendant. | Case No. 2:22-CV-017-RWS<br><br>JURY TRIAL DEMANDED |

**DEFENDANT ROUGH COUNTRY, LLC'S REPLY IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant Rough Country, LLC ("Rough Country"), pursuant to Local Rule 7.1(C) and the Court's Standing Order Regarding Civil Litigation (Doc. 4, at 13), and files this, its Reply in Support of its Motion for Summary Judgment, and respectfully shows this Honorable Court as follows:

**I.     Plaintiffs' "Kitchen Sink" Approach in the Response is Misleading.**

As expected, Plaintiffs Santana Bryson and Joshua Bryson, as Administrators of the Estate of C.Z.B. and as surviving parents of C.Z.B., a deceased minor ("Plaintiffs") proffered numerous additional "facts" that they contend mitigate

against summary judgment. But the mere fact that Plaintiffs cited them does not make them material or even relevant.

Plaintiffs focus on three core themes in the Response. *First*, Plaintiffs allege that Rough Country knew its lifts were dangerous because automobile manufacturers separately agreed to voluntary vehicle height requirements. *Second*, Plaintiffs contend that Rough Country was aware of certain risks because of the *Mendoza* and *Bacho* cases. *Third*, Plaintiffs incorrectly assert that Rough Country knew its lift kits violated Georgia law.

> A. Plaintiffs Overstate the Role of the Automakers' Commitment Related to Vehicle-to-Vehicle Crash Compatibility

Plaintiffs rely heavily on a non-binding "Vehicle Compatibility Agreement" ("the VCA") made by certain automakers in 2003. [*See* Doc. 103-6, at 5 (it is a "voluntary commitment").] Plaintiffs' reliance is misleading and they misstate the objective of the VCA. Critically, Plaintiffs pointedly refuse to inform the Court that the VCA related only to Front-*to-Side* and Front-*to-Front* crashes. [*See id.*, at 5-6, §§ 1 and 2; *see also id.*, at 7, § 3.1 (referencing production of models "that have been engineered according to the front-to-front and front-to-side performance criteria"); *see also id.*, at 6-7, § 2.1 (discussing "frontal energy-absorbing structures" in connection with "Front-to-Front Crashes").] As recognized in a later study cited by Plaintiffs, the VCA's "measures were specifically aimed to reduce fatalities when

the front of the LTV contacts the side or the front of the car." (Doc. 103-12, at 7.) The VCA did not mention - and was not directed towards – Front-*to-Rear* crashes of the type at issue in this case. The VCA is therefore immaterial because the crash at issue involved a front-to-rear impact.

Similarly, while Plaintiffs posit that the VCA is relevant to the injuries suffered by C.Z.B., this is refuted by the express language in the VCA: it is limited solely to protecting "the driver's seating position" in connection with crash testing. [*Id.*, at 5, § 1.1.] C.Z.B. was not located in the "driver's seating position," such that the VCA would not apply to this case.

Further, the studies cited by Plaintiffs refute their premise. In fact, they show that subsequent analysis of data related to vehicles that participated in the VCA was "not sufficiently strong to permit an unequivocal conclusion that [the VCA] has been effective in reducing fatality risk to car occupants." (Doc. 103-12, at 4.) More specifically, the data showed that "[p]ickup trucks experienced a non-significant increase [in] likelihood of occupant fatalities." [*Id.; see also id.*, at 20 ("the result for pickup trucks is not positive, let alone significant").] Finally, the "effectiveness" of the VCA is in doubt because any decrease in fatalities could be caused by a myriad of factors, including "a combination of compatibility improvements in the light trucks; crashworthiness improvements in the cars; crash avoidance technologies; and

changes in vehicle mix, vehicle use, driving patterns, or the overall decline in fatality risk for all vehicles." (*Id.*, at 20.)

  B. *Mendoza* and *Bacho* Cases are Materially Different from this Case.

Plaintiffs focus heavily on the fact that Rough Country had been sued twice previously, in the *Mendoza* and *Bacho* cases, involving allegations of intrusion. Yet, it is undisputed that over Rough Country's 30-year history of selling lift kits, these are only two suits based on allegations of intrusion against it. These cases are red-herrings because they differ significantly from the present case.

As Plaintiffs' expert, Paul Lewis testified, this case concerns a rear-end collision; *Bacho* involved a side impact collision; and *Mendoza* involved a frontal impact. [*See, e.g.*, Deposition of Mr. Lewis, taken on March 18, 2024 (the "Lewis Depo.," excerpts of which are attached hereto as Exhibit 1), at 147:3-16.] Additionally, the speeds of the vehicles involved in the respective accidents were different. (*Id.*, at 147:20.) These distinctions are critical, given the Supreme Court of Georgia's discussion and holding in *Johnson v. Avis Rent A Car System, LLC*, 311 Ga. 588 (2021), as discussed below in Section III.

  C. Rough Country's Lift Kits Did Not Violate Georgia Law.

Finally, it is undisputed that Mr. Elliott's F-250 was within the legal limits of O.C.G.A. § 40-8-60.1. (*See* Doc. 95-6, at ¶ 11.) It is remarkable that Plaintiffs chose to ignore the facts and statutory law on this issue in their Response, despite their

reliance on the inaccurate premise that Mr. Elliott's lift kit violated Georgia law. There was no violation of Georgia law, and Plaintiff's commentary is misleading.

## II. Plaintiff Admits that Certain Identified Claims are Not at Issue.

In their First Amended Complaint for Damages (the "FAC"), Plaintiffs expressly referenced a "failure to warn" claim and a potential negligence *per se* claim. In Count One, Plaintiffs' claim for Strict Liability, Plaintiffs specifically alleged that Rough Country "did not warn anyone of the dangers that its lifts pose" and that Rough Country should have "warned potential customers," such that "people would chose not to buy" its lifts. (FAC, ¶¶ 61 and 62.) Similarly, Plaintiffs expressly invoked Georgia law in connection with their negligence and other claims. [*See* FAC, ¶¶ 45 (Rough Country's lifts "are defective because they . . . violate Georgia law").] Notwithstanding these express allegations, Plaintiffs now admit that they are not asserting either a "failure to warn" claim or a negligence *per se* claim. [*See* Response, at 13 ("Plaintiffs have not made" such claims).]

Because Plaintiffs have made allegations upon which "failure to warn" and negligence *per se* claims are otherwise based, summary judgment remains proper to ensure that Plaintiffs do not later attempt to make such claims based on the allegations in their FAC, for the reasons set forth in the Motion.

### III. Georgia Law Establishes That Rough Country Is Not Liable For Negligence Because Of Mr. Elliott's Intervening Criminal Act.

Plaintiffs' core response to Rough Country's foreseeability argument is that motor vehicle accidents are foreseeable. But this misstates the applicable law and otherwise misses the point. It is undisputed that Mr. Elliott's intervening and independent wrongful acts (of which there were many) caused C.Z.B.'s death. Mr. Elliott's intervening criminal act therefore "should be treated as proximate cause, insulating and excluding [alleged] negligence of" Rough Country. *Self v. Local Mechanical Networking, Inc.*, 369 Ga. App. 153, 156 (2023).

The exception to this rule is if Rough Country "had reasonable grounds for apprehending that such wrongful act would be committed," *Id*. "[W]here the criminal conduct is not foreseeable, the rule acts to limit liability." *Id*. Rough County is not liable, as a matter of law, for "a consequence which is merely possible, according to occasional experience, but only for a consequence which is probable, according to ordinary and usual experience." *Johnson v. Avis Rent A Car System, LLC*, 311 Ga. 588, 592 (2021) (quoting *Johnson v. American Nat. Red Cross*, 276 Ga. 270, 273 (2003)).

While motor vehicle accidents may be nominally "foreseeable," this is insufficient to establish an exception to the exception. Both the Supreme Court of Georgia and the Court of Appeals have held that criminal acts that lead to traffic

accidents are not sufficiently foreseeable so as to render the defendant liable for the intervening criminal action's injury. In *Johnson v. Avis Rent A Car System*, a car thief stole a car and, while driving it, "reached a speed of 73 miles per hour in a 25 mile-per-hour zone just before he lost control of the SUV and crashed into a wall . . . severely injuring" the plaintiffs. 311 Ga. at 590. The Supreme Court held that the intervening criminal act was not a natural consequence of the defendant's underlying negligence, and it excused them from liability to the plaintiffs. *Id.*, 311 Ga. at 594 ("the subsequent accident caused by Perry's criminal conduct was not a probable or natural consequence that could have been reasonably foreseen by the defendants"). Similarly, in *Self*, the Court of Appeals held that "Moss's criminal act of stealing LMN's van and driving into traffic was not a probable consequence of Alexander's conduct." 369 Ga. App. at 157. As in this case, "the evidence did not show that the defendants could have reasonably foreseen that Perry would lead police on a high-speed chase after stealing a car . . . and that a crash resulting in serious injuries would be the reasonably foreseeable consequences of the theft." *Johnson*, 311 Ga. at 594-95.

Further, while Plaintiffs rely on two prior cases (*Mendoza* and *Bacho*), the Supreme Court of Georgia has established that this is insufficient evidence for a contrary outcome in this case. In *Johnson*, there had only been "two other specific instances of theft involving high-speed chases among hundreds of thousands of

vehicles . . . in the decade before the incident involving Perry." 311 Ga. at 595. Similarly, Rough Country has faced only two related cases against it in the 30 years that it has sold lift kits. Thus,

> the evidence showed, at most, that an accident resulting in serious injuries during a high-speed chase following an afterhours car theft . . . was 'merely possible, according to occasional experience and not probable, according to usual experience.'

*Johnson*, 311 Ga. at 595 (quoting *Johnson*, 276 Ga. at 273).

Moreover, Plaintiffs do not address the extreme nature of the "high speed collision" at issue in this case in their Response. The issue in this case is whether the extreme nature of Mr. Elliott's collision with Plaintiffs' car was foreseeable. *See Johnson*, 311 Ga. at 590 (the intervening act "involved a high-speed chase or other danger to the public"). Such a high-speed and violent collision was not foreseeable to Rough Country. As Plaintiffs acknowledge in their Response, Mr. Elliott was speeding at 51 miles per hour when he slammed into Plaintiffs' stationary vehicle, causing "the F-250 [to] slice[] through the sheet metal of the Escape like butter."[1] *See, e.g., Timmonds v. Ford Motor Co.*, 982 F.Supp. 1475, 1477 (S.D. Ga. 1997) ("[a]s a result of the high-speed collision, the Ford Explorer's engine was pushed rearward and could actually be seen from inside the passenger compartment").

---

[1] Response, at 1-2 and 18, n. 46 ("speed at impact was 51 mph").

## IV. The Court Should Rule on Rough Country's Argument that the Subject Lift Kit Did Not Violate Georgia Law.

Rather than address the merits of which statute – O.C.G.A. §§ 40-8-6 or 4-8-6.1 – applies in this case, or whether O.C.G.A. § 40-8-6 is constitutionally enforceable, Plaintiff states that it would not address "Rough Country's arguments about the applicability and constitutionality of" Georgia's statutory scheme governing vehicle heights "[i]n the interest of judicial economy." (Response, at 19-20.) Plaintiffs' effort to avoid dealing with this material issue is unavailing.[2]

Moreover, it is misplaced because Plaintiffs repeatedly attempt to argue throughout the Response that Rough Country's lift kit violated Georgia law. [*See* Response, at 9 ("its lift kits violated Georgia law"), 18 ("evidence that the Rough Country lift violated Georgia law is highly relevant"), 19 ("it sold lifts in Georgia that violated the express terms of a public safety statute"), and 24 ("violate a Georgia law").] Plaintiffs cannot ignore the issue of whether Rough Country's lifts are legal while simultaneously and repeatedly arguing that Rough Country's kits are illegal.

As demonstrated and explained previously in support of the Motion, Rough Country's lift did not violate O.C.G.A. § 40-8-6.1, the sole applicable statute.

---

[2] Plaintiffs make no substantive mention of the applicable statute, O.C.G.A. § 40-8-6.1, anywhere in the Response.

Plaintiff's repeated reliance and reference to O.C.G.A. § 40-8-6, which is not applicable and is otherwise constitutionally vague, is disingenuous.

Because of Plaintiffs' focus on whether Rough Country's lift kits are legal, the question of law of which statute applies – O.C.G.A. §§ 40-8-6.1 or 40-8-6 – is squarely before the Court. And if the Court finds that O.C.G.A. § 40-8-6 applies, then whether it is unconstitutionally vague is also properly before the Court.

## V. Summary Judgment is Appropriate As to Plaintiffs' Pain and Suffering Claim.

Plaintiffs do not materially dispute Rough Country's statement of the law regarding their claim for pain and suffering, which focuses on post-impact pain and suffering.[3] For post-impact pain and suffering, Georgia law is that, "[w]here . . . the medical evidence is that death was instantaneous, and there is no evidence the decedent exhibited consciousness of pain, recovery for the decedent's pain and suffering is not permitted." *Grant v. Georgia Pac. Corp.*, 239 Ga. App. 748, 751,

---

[3] Plaintiffs are not seeking damages for pre-impact pain and suffering, which requires some evidence that the decedent[] actually anticipated the collision before a recovery for pre-impact pain and suffering is allowed." *Byrd v. Wal-Mart Transp., LLC*, 2009 WL 3429562, *5 (S.D. Ga. Oct. 23, 2009). Rather, Plaintiffs specifically limit their claim for post-impact pain and suffering. [*See* Response, at 22 ("Rough Country is responsible for the fright, confusion, sadness, and pain that the Brysons' son experienced between the blue line [the start of impact] to the red line [the end of impact]."); *see also id.*, at 20 (stating the legal standard for post-impact pain and suffering).]

521 S.E.2d 868, 870 (1999). This is a two-part analysis: (1) how much time passed prior to death, and (2) whether there is evidence of "consciousness of pain." Summary judgment is appropriate when the moving party affirmatively demonstrates the absence of evidence to support an element of a plaintiff's claim. *Myers v. United States*, No. 1:19-CV-2486-CAP, 2022 WL 3589124, at *2 (N.D. Ga. June 13, 2022), *aff'd*, No. 22-12733, 2023 WL 6142175 (11th Cir. Sept. 20, 2023).

*First,* Plaintiffs admit that C.Z.B. was killed within "*milliseconds*" of impact. [*See* Doc. 104-1, ¶ 21 (C.Z.B. suffered fatal "AOD *milliseconds* after impact") (italics added); *see also* Response, at 22 ("the collision lasted roughly 140 milliseconds").] This is insufficient to support a claim for post-impact pain and suffering and summary judgment is proper in Rough Country's favor.

In response, Plaintiff appears to argue that 140 milliseconds is not "instantaneous." But 140 milliseconds is instantaneous: it is less time than a single heartbeat or the blink of an eye.[4], [5] This is insufficient time for C.Z.B. to support a

---

[4] The normal heartbeat for a 2-year old, such as C.Z.B., is between 80 to 130 beats per minute. *See, e.g.*, https://www.ucsfbenioffchildrens.org/medical-tests/pulse#:~:text=Children%201%20to%202%20years,to%20115%20beats%20per%20minute (last visited on September 10, 2024). This equates to between 750 milliseconds at the slower pace of 80 BPM and 461.5 milliseconds at the faster rate of 130 BPM.

[5] "Each blink lasts between 0.1 and 0.4 seconds," or between 100 and 400 milliseconds. https://www.healthline.com/health/how-many-times-do-you-blink-a-day#blinking-frequency (last visited on September 10, 2024).

claim for post-impact pain and suffering and it places this case alongside of *Grant*, where the decedent had a "fatal heart attack."

The cases cited by Plaintiff do not establish otherwise because they involve periods of time far in excess of 140 milliseconds. In *Woodward v. Ford Motor Company*, 2007 WL 4125519 (N.D. Ga. Nov. 2, 2007), the District Court used survival of "less than a minute" as its baseline and it characterized fifteen seconds as a "mere" (*i.e.*, small or slight) period of time. *Id.*, at *3. Similarly, in *Dep't of Hum. Res. v. Johnson*, there was "expert testimony that Bryan was conscious for up to 15 seconds while he was being electrocuted." 264 Ga. App. 730, 738, 592 S.E.2d 124, 131 (2003). By comparison, fifteen seconds is over 107 times longer than the time at issue in this case. The evidence is that C.Z.B.'s death was instantaneous.

*Second,* Plaintiffs make no argument that C.Z.B. "exhibited consciousness of pain," as required by the second prong of the applicable standard. Plaintiffs do not identify a single action by C.Z.B. that would exhibit pain or indicate that C.Z.B. suffered pain. Plaintiffs do not even have any evidence that C.Z.B. was awake. Plaintiffs do not meaningfully dispute Rough Country's evidence that C.Z.B. was asleep at the time of impact. Rough Country cited to Plaintiffs' own deposition testimony to show that C.Z.B. was asleep at the time of impact. [*See* Doc. 95-2, ¶ 20; *see also* Doc. 104-1, ¶ 20 ("The evidence shows [C.Z.B.] was asleep the last time his parents observed him.").] Stated another way, Plaintiffs have no evidence that

C.Z.B. was awake at the time of impact. This is insufficient to defeat Rough Country's motion for summary judgment because Plaintiffs are required to present counter-evidence to support their claim for post-impact pain and suffering damages. *See, e.g., Beltz v. CitiMortgage, Inc.*, No. 1:15-CV-2649-AT, 2016 WL 11567828, at *1 (N.D. Ga. July 26, 2016) (defendant is "entitled to prevail [on summary judgment] because Plaintiff has failed to come forward with affirmative evidence"); *Long v. Kirby*, No. 2:11-CV-00294-RWS, 2014 WL 1153445, at *2 (N.D. Ga. Mar. 21, 2014) (Story, J.) ("in order to avoid summary judgment, the nonmoving party, Plaintiff here, must come forward with specific facts to show that there exists a genuine issue for trial"). There is no genuine issue for trial because the only evidence is that C.Z.B. was asleep.

Further, there is no evidence that C.Z.B. was awakened by the impact, so as to support a claim for post-impact pain and suffering. Instead, Plaintiffs speculate that it is *possible* that C.Z.B. was awakened by the impact of Mr. Elliott's F-250. (Doc. 104-1, at ¶ 20). This is insufficient as a matter of law. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (italics in original); *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981) (where party only offers "conclusional allegations, summary judgment for the defendants was not only proper but required"); *Gann v. Trabue*, No.

2:20-CV-00090-RWS, 2021 WL 5034370, at *4 (N.D. Ga. Aug. 17, 2021) (Story, J.) (claim without evidence "amounts to guesses, speculation, and conjecture that are insufficient to merit consideration on summary judgment"); and *Carroll v. Jayco, Inc.*, No. 2:17-CV-111-RWS, 2018 WL 3949730, at *3 (N.D. Ga. July 13, 2018) (Story, J.) ("when the matter remains one of pure speculation or conjecture and the probabilities are at best evenly balanced it is appropriate for the court to grant summary judgment to the defendant").

Finally, there is an absence of any evidence that C.Z.B. suffered any conscious pain and suffering. [*See* Deposition of Dr. Eisenstat (Doc. 101), at 29:14-17 ("Do you plan to give any opinions . . . regarding whether CB experienced any conscious pain and suffering? No, sir.").] In a case relied on by Plaintiff, death was not instantaneous because there was "credible evidence" that the decedent "moan[ed] at least once." *Holland v. Cypress Ins. Co.*, 2020 WL 5742240, *10 (N.D. Ga. Aug. 21, 2020). There is absolutely no such evidence in this case. As a result, summary judgment is proper. *See, e.g., Byrd*, 2009 WL at *5 (granting summary judgment to defendant where "medical evidence showed that [decedent]'s death was virtually instantaneous, and Plaintiff has presented no evidence that [she] experienced pain and suffering after the collision").

## VI. Rough Country is Entitled to Summary Judgment as to Plaintiffs' Punitive Damages Claim.

In its closing remark in response to Rough Country's motion for summary judgment as to Plaintiffs' punitive damages claim, Plaintiffs cite to *Tookes v. Murray*, 678 S.E.2d. 209, 213 (Ga. App. 2009), for the general proposition that whether certain conduct "authorize[s] punitive damages is generally a jury question." (Response, at 24.) Rough Country does not dispute this but this does not preclude summary judgment as a matter of law. If that were the case, then summary judgment would never be available as to claims for punitive damages. Plaintiffs' statement recites a general principle; it does not state an absolute.

As explained above, Plaintiff's invocation of (1) the VCA; (2) *Mendoza* and *Bacho*; and (3) a (false) allegation that the lift was not compliant with Georgia law are all insufficient to defeat summary judgment as to Plaintiffs' claim for punitive damages because they are dissimilar and inapposite to the present case. Rough Country's conduct in selling the lift kit does not warrant punitive damages as a matter of law, so summary judgment is proper.

This 19th day of September, 2024.

                                    Respectfully submitted,
                                    WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC

/s/ *Aaron B. Chausmer*
Richard H. Hill, II
Georgia Bar No. 354425
Lindsay G. Ferguson
Georgia Bar No. 140970
Aaron B. Chausmer
Georgia Bar No. 119998
*Attorneys for Defendant Rough Country, LLC*

3344 Peachtree Road, N.E.
Suite 2400
Atlanta, GA 30326
Phone: 404-876-2700
Fax:   404-875-9433

## **RULE 7.1D CERTIFICATE OF TYPE, FORMAT, AND FONT SIZE**

Pursuant to Local Rule 7.1D of the United States District Court of the Northern District of Georgia, the undersigned certifies that the foregoing submission to the Court complies with Local Rule 5.1 in that it was computer-processed, double-spaced between lines, and used Times New Roman font of 14 point size.

>*/s/ Aaron B. Chausmer*
>Aaron B. Chausmer
>Georgia Bar No. 119998

## CERTIFICATE OF SERVICE

This is to certify that I have electronically served the foregoing filing with the Clerk of Court via CM/ECF, which will send a copy to the following attorneys of record:

Tedra L. Cannella
Robert H. Snyder, Jr.
Rory A. Weeks
Devin Mashman
CANNELLA SNYDER LLC
315 W Ponce de Leon Ave
Suite 885
Decatur, GA 30030
***ATTORNEYS FOR PLAINTIFFS***

This, the 19th day of September, 2024.

*/s/ Aaron B. Chausmer*
Aaron B. Chausmer
Georgia Bar No. 119998