# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

Santana Bryson and Joshua Bryson,
as Administrators of the Estate of
C.Z.B. and as surviving parents of
C.Z.B., a deceased minor,

     Plaintiffs,

v.

Rough Country, LLC,

     Defendant.

Case No. 2:22-CV-017-RWS

JURY TRIAL DEMANDED

## DEFENDANT ROUGH COUNTRY, LLC'S REPLY TO PLAINTIFFS' STATEMENT OF ADDITIONAL DISPUTED MATERIAL FACTS

COMES NOW Defendant Rough Country, LLC ("Rough Country"), pursuant to Local Rule 56.1 and the Court's Standing Order Regarding Civil Litigation (Doc. 4, at 17), and files this, its Reply to Plaintiffs Santana Bryson and Joshua Bryson, as Administrators of the Estate of C.Z.B. and as surviving parents of C.Z.B., a deceased minor ("Plaintiffs") Statement of Additional Disputed Material Facts (Doc. 104-1):

### 10.

Various trim levels of Ford F-250 trucks have different front bumper heights. (Plaintiffs' Admissions, ¶ 8).

*RESPONSE: Undisputed but irrelevant. All trim levels of the Ford F-250 fall within the guidelines of the Vehicle Compatibility Agreement. [See Ex. 4, Vehicle Compatibility Agreement]. Plaintiffs also note that the variations in bumper height that accompany different trim levels are minor. [Plaintiffs' Response to Def's First Req. for Admissions, at No. 8].*

**REPLY: Plaintiffs fail to support their statement or conclusions with citation to evidence in the record.**

16.

The lift kit at issue was a 4.5-inch lift kit. (*See* Exhibit 8.)

*RESPONSE: Denied, as stated. Although Rough Country advertised and sold the subject lift kit as a 4.5-inch lift kit, it is undisputed that the subject lift kit raised the front bumper of Mr. Elliott's Ford F-250 by six inches. [See Ex. 22, Buchner Dep., at 226:10-14; see also Ex. 24, Grimes Dep., at 111:23-112:23].*

**REPLY: Plaintiffs misstate the cited deposition testimony. Mr. Grimes specifically testified that he "ha[d] no opinion about" whether Rough Country sold the subject lift kit "as a 4.5 inch lift kit," [Doc. 103-26 (Ex. 24), at 111:7-11], and that he did not "form an opinion about how much the Rough Country lift kit raised the front bumper of the subject F-250," [*id.*, at 111:23-112:5 ("I haven't measured that specifically")].**

## RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS

36.

This case arises from a collision on March 15, 2020. The Bryson family was driving home from a birthday party for C.Z.B.'s grandmother. [*See* Doc. 98, Santana Bryson Dep., at 14:17-23].

**RESPONSE: Undisputed.**

37.

The Bryson family was stopped at a red light when the collision happened. The Bryson family did nothing to cause the crash. [*See* Ex. 7, Rough Country 30(b)(6) Dep., at 34:11-16].

**RESPONSE: Undisputed.**

38.

Rough Country's lift kit raised the F-250's bumper by six inches, causing it to override the rear bumper of the Escape in the collision. [*See* Ex. 1, Buchner Report, at BRYSON001360].

**RESPONSE: Disputed, but immaterial and irrelevant to the matters presently before the Court. Plaintiffs mischaracterize Mr. Buchner's testimony. First, on BRYSON001360, there is no mention whatsoever about how much the lift kit raised the F-250. Second, Mr. Buchner did not elsewhere say *the lift kit* raised the bumper by six inches; he said the "effective total body lift" was six**

inches and at least ½ inch of that was because Mr. Elliott installed oversized tires on the F-250. [Doc. 103-3 (Ex. 1), at 5 (BRYSON001353) and 11 (BRYSON001359).] Additionally, Mr. Buchner did not explain how he calculated the total "effective" raise of six inches.

39.

Due to the six inches of increased height, the F-250 intruded 4.3 feet deeper into the Bryson family's Ford Escape than it would have without a Rough Country lift kit installed and shoved C.'s second-row seat forward over two feet, [*see* Ex. 1, Buchner Rep. at 10], pushing C.'s body and head forward until his head hit the structures of his mom's driver's seat. [*See* Ex. 2, Lewis Dep. at 117:11-18].

**RESPONSE: Disputed, but immaterial and irrelevant to the matters presently before the Court. Rough Country's lift kit did not raise the F-250 by six inches. (*See* ¶ 38, *supra*.) Also, Mr. Lewis testified that C.Z.B.'s impact fell short of the driver's seat by 6 inches. [*See* Doc. 103-3 (Ex. 1), at 10.] C.Z.B.'s impact with the driver's seat occurred because the seat moved backwards, into C.Z.B.. [Doc. 103-4 (Ex. 2), at 117:11-18 ("we know there is some deflection of the driver's seat, so it's kind of like they're sort of both coming at each other. . . . that distance is getting closed a little bit by some deflection of the driver seat back").] The F-250's intrusion into Plaintiff's car was insufficient to push C.Z.B.'s car seat into the back of the driver's seat on its own.**

40.

The below pictures compare C.'s survival space before the wreck with the crushed space after the wreck:

[Images omitted]

**RESPONSE: For purposes of Rough Country's Motion for Summary Judgment only, this statement is undisputed, but it is immaterial and irrelevant to the matters presently before the Court. Rough Country reserves the right to dispute it at a later proceeding.**

41.

Three-dimensional scan data from the subject collision shows that the F-250 intruded so deeply into the Ford Escape that the "Ford" emblem was directly above C.Z.B.'s car seat. [*See* Ex. 1, Buchner Report, at BRYSON001370]. A visual of the scan data is below:

[Image omitted]

**RESPONSE: For purposes of Rough Country's Motion for Summary Judgment only, this statement is undisputed, but it is immaterial and irrelevant to the matters presently before the Court. Rough Country reserves the right to dispute it at a later proceeding.**

42.

The collision lasted roughly 140 milliseconds. [*See* Ex. 24, Grimes Dep., at 139:14-25.]

**RESPONSE: Undisputed.**

43.

If the lift kit had not been installed and the structure of the F250 had engaged with the structure of the Escape, it would have reduced the F250's intrusion into the Escape by roughly 2.3 feet, resulting in intrusion that stopped in the cargo area and never reached C.Z.B. [*See* Ex. 1, Buchner Report, at BRYSON001360].

**RESPONSE: Disputed, but immaterial and irrelevant to the matters presently before the Court. Had the lift kit not been installed, the F250's intrusion into the Escape would have been substantially similar to the intrusion in the subject accident. [*See* Ex. 2 hereto (Mecanica's Preliminary Analysis Report, Appendixes excluded), at 36 ("the deformation and accelerations of the Escape would have been substantially similar whether the F-250 was lifted or equipped with a stock suspension").]**

44.

The redline below represents the actual crush; the blue line represents the estimated crush without the lift kit. [Ex. 23, Buchner Dep. Ex. 7 at 1.]

**RESPONSE: Disputed, but immaterial and irrelevant to the matters presently before the Court. (*See* ¶ 43, *supra*.)**

45.

Even after the head trauma, he would have survived for some brief time: Dr. Eisenstat, the medical examiner who performed C.'s autopsy, testified that the medical evidence indicates his death did not occur until *after* the blunt trauma head impact, albeit milliseconds after that impact. [*See* Doc. 101, Eisenstat Dep., at 29:14-30:24].

**RESPONSE: It is undisputed that C.Z.B.'s death occurred within milliseconds after impact.**

46.

The Vehicle Compatibility Agreement exists to prevent pickup trucks from overriding smaller vehicles' crash protection features and intruding into their occupant space. [*See* Ex. 4, Vehicle Compatibility Agreement.]

**RESPONSE: Disputed, but immaterial and irrelevant to the matters presently before the Court. The Vehicle Compatibility Agreement focuses on front-to-front and front-to-side impacts. It does not mention front-to-rear impact of the type at issue in this case anywhere within its contents. [*See* Doc. 103-6 (Ex. 4).]**

47.

In 2003, virtually every major auto manufacturer that sells pickup trucks in the United States agreed to the Enhancing Vehicle-to-Vehicle Crash Compatibility" Agreement (the "Vehicle Compatibility Agreement"). The Vehicle Compatibility Agreement dictates the height of pickup trucks' energy absorption structures. To comply with the Agreement, a pickup truck must either (1) have its primary energy absorption structures (PEAS) overlap at least 50 percent with the range of 16-20 inches off the ground; or (2) have its secondary energy absorption structures (SEAS) overlap 100 percent with the range of 16-20 inches off the ground. [*See* Ex. 4, Vehicle Compatibility Agreement].

**RESPONSE: Disputed, but immaterial and irrelevant to the matters presently before the Court. The two options referenced by Plaintiffs applied only to "Front-to-Front Crashes." [Doc. 103-6 (Ex. 4), at 6-7 and 10.] The Vehicle Compatibility Agreement did not address Front-to-Rear impacts of the type at issue in this case. Additionally, the Vehicle Compatibility Agreement was a voluntary agreement subject to subsequent revision. [Doc. 103-6 (Ex. 4), at 5 ("there may be a need to reassess or refine aspects of the performance criteria contained [t]herein").]**

48.

The Agreement intended to "enhance vehicle-to-vehicle crash compatibility" by setting standards for bumper height to prevent excessive override and intrusion in foreseeable collisions. [*See* Ex. 4, Vehicle Compatibility Agreement, at 1; *see also* Ex. 15, Roche Report, at BRYSON001404].

**RESPONSE: Disputed, but immaterial and irrelevant to the matters presently before the Court. The Vehicle Compatibility Agreement only applied to Front-to-Side and Front-to-Front crashes. The Vehicle Compatibility Agreement did not address Front-to-Rear impacts of the type at issue in this case [*See, e.g.,* Doc. 103-6 (Ex. 4).] Additionally, the word "foreseeable" is not contained in the Vehicle Compatibility Agreement.**

49.

The Vehicle Compatibility Agreement was signed by BMW, DaimlerChrysler, Ford, General Motors, Honda, Hyundai, Isuzu, Kit, Mazda, Mitsubishi, Nissan, Subaru, Suzuki, Toyota, and Volkswagen. [*See* Ex. 4, Vehicle Compatibility Agreement at 5].

**RESPONSE: Undisputed, and immaterial and irrelevant to the matters presently before the Court.**

50.

Each manufacturer agreed that 100 percent of its new passenger car and light truck production intended for sale in the United States would comply with the Agreement's bumper height compatibility requirements by 2009. [*See* Ex. 4, Vehicle Compatibility Agreement at 3].

**RESPONSE: Undisputed, and immaterial and irrelevant to the matters presently before the Court. Further, there is no evidence that the manufacturers actually met the Vehicle Compatibility Agreement's voluntary deadline.**

51.

Studies from the IIHS and NHTSA confirm that "at higher impact speeds [increased vehicle height] can lead to occupant compartment intrusion" [*see* Ex. 9, Summers & Prasad, NHTSA, "NHTSA's Recent Compatibility Test Program."] and that highway fatality statistics show "a statistically significant 8-percent reduction in car-occupant fatalities after light trucks self-certified to the agreement." [*See* Ex. 10, Greenwell Report, at 1].

**RESPONSE: Disputed, but immaterial and irrelevant to the matters presently before the Court. Plaintiff's reference to Doc. 103-11 (Ex. 9) is taken out of context. First, the article references "frontal-frontal crash override behavior," not frontal-rear behavior of the type at issue in this case. Second, the article expressly states that "this test series and others have shown that override**

*does not always relate to a reduced safety outcome* **for the driver of the vehicle with the lower AHOF." (Italics added.) Third, the study focuses on the driver's seat positioning, not the rear passenger seat location which is at issue in this case. Thus, the article is discussing an entirely different "occupant compartment" than the one at issue in this case.**

**Additionally, with regard to Doc. 103-12 (Ex. 10), the data showed that "[p]ickup trucks experienced a non-significant increase [in] likelihood of occupant fatalities." [*Id.* at 4; *see also id.*, at 20 ("the result for pickup trucks is not positive, let alone significant").] Finally, the "effectiveness" of the Vehicle Compatibility Agreement is in doubt because any decrease in fatalities could be caused by a myriad of factors, including "a combination of compatibility improvements in the light trucks; crashworthiness improvements in the cars; crash avoidance technologies; and changes in vehicle mix, vehicle use, driving patterns, or the overall decline in fatality risk for all vehicles." (*Id.*, at 20.)**

52.

A Ford study confirms that raising the height of its vehicles by less than four inches causes a significantly increased danger to other vehicles' occupants in a crash. [*See* Ex. 15, Roche Supp. Report, at 6.]

**RESPONSE: Disputed, but immaterial and irrelevant to the matters presently before the Court. A review of Ex. 15, at page 6, shows that it makes**

**no mention whatsoever of "[a] Ford study" (or any other study). Further, this is the broad opinion of Mr. Roche and his interpretation of an unidentified "Ford study," which is immaterial and irrelevant to this case.**

53.

Rough Country was aware of scientific research showing that "at higher impact speeds [increased vehicle height] can lead to occupant compartment intrusion" in collisions. [Ex. 9, Summers & Prasad NHTSA Study; *see also* Ex. 7, Rough Country 30(b)(6) Dep., at 53:21-54:10].

**RESPONSE: Disputed, but immaterial and irrelevant to the matters presently before the Court. (*See* ¶ 51, *supra*.)**

54.

Rough Country was aware of scientific research showing evidence of a *nationwide* relationship between the Vehicle Compatibility Agreement and an eight percent reduction in fatality rates in collisions between Pickup Trucks and SUVs with cars. [Ex. 10, Greenwell Report, at 1; *see also* Ex. 7, Rough Country 30(b)(6) Dep., at 48:10-49:2].

**RESPONSE: Disputed, but immaterial and irrelevant to the matters presently before the Court. (*See* ¶ 51, *supra*.) Further, Plaintiffs mischaracterize Rough Country's testimony. Rough County does not dispute that it was aware**

of the "Greenwell Report," but disputes Plaintiff's interpretation of the Greenwell Report.

55.

Rough Country was aware of the Vehicle Compatibility Agreement. [*See* Ex. 7, Rough Country 30(b)(6) Dep., at 48:22-24].

**RESPONSE: Undisputed, but immaterial and irrelevant to the issues presently before the Court.**

56.

Rough Country's 4.5-inch and 6-inch lift kits raise the height of vehicles by more than the entire 16–20-inch range provided in the Vehicle Compatibility Agreement. They, therefore, cause compliant vehicles to become non-compliant with the Agreement. [*See* Ex. 4, Vehicle Compatibility Agreement].

**RESPONSE: Disputed, but immaterial and irrelevant to the matters presently before the Court. (*See* ¶ 51, *supra*.) Further, Plaintiffs cite to no evidence to support this statement or the conclusion contained therein.**

57.

Rough Country has produced no internal documents indicating it considered whether its lifts would affect pickup trucks' compliance with the Vehicle Compatibility Agreement. [*See* Ex. 7, Rough Country 30(b)(6) Dep., at 62:3-8].

**RESPONSE: Undisputed, but immaterial and irrelevant to the issues presently before the Court.**

58.

Rough Country has no design criteria or performance criteria to account for the possibility of increased crash intrusion caused by its lift kits. [*See* Ex. 7, Rough Country 30(b)(6) Dep., at 19:21-20:15].

**RESPONSE: Undisputed, but immaterial and irrelevant to the issues presently before the Court.**

59.

In *Mendoza v. Heckenthorn Products,* Rough Country was sued because its lift kit caused a pickup truck to pass over a convertible's bumper and directly contact a passenger's head, leaving her with permanent brain damage. [*See* Ex. 6, *Mendoza* Complaint].

**RESPONSE: While Rough Country does not dispute that such allegations were made in the *Mendoza* Complaint, Rough Country disputes Plaintiffs' statement of fact that those allegations were what actually occurred and shows that allegations in a complaint are not evidence. This statement is immaterial and irrelevant to the matters presently before the Court. The *Mendoza* case did not involve a front-to-rear collision of the type at issue in this case.**

60.

In 2015, Rough Country's CEO Ken Dunn was shown photographs from the *Mendoza* case that irrefutably show the height of the pickup truck caused it to bypass the convertible's crash protection features:

[Image omitted]

[*See* Ex. 12, *Mendoza* Photographs].

**RESPONSE: Disputed, but immaterial and irrelevant to the matters presently before the Court. The *Mendoza* case did not involve a front-to-rear collision of the type at issue in this case. This is a conclusory and argumentative statement that lacks evidentiary support.**

61.

In 2014, Rough Country was sued in *Bacho v. Rough Country* because its lift kit caused a pickup truck to intrude into the second-row seat of a minivan, killing nine-year-old A.B. [*See* Ex. 5, *Bacho* Complaint].

**RESPONSE: While Rough Country does not dispute that such allegations were made in the *Bacho* Complaint, Rough Country disputes Plaintiffs' statement of fact that those allegations were what actually occurred and shows that allegations in a complaint are not evidence. This statement is immaterial and irrelevant to the matters presently before the Court. The *Bacho* case did not involve a front-to-rear collision of the type at issue in this case.**

62.

The risk of a collision in which one vehicle is taller than another is common sense even for lay people outside of the auto industry. One ubiquitous example is tractor trailer guards, which prevent mismatch between cars and tractor trailers:

[Image omitted]

**RESPONSE: Disputed. This is a conclusory and argumentative statement that lacks evidentiary support. Rough Country further shows that tractor trailer guards are immaterial and irrelevant to the issues presently before the Court.**

63.

In 2014, Rough Country sought general liability insurance. One company asked if Rough Country had "[redacted]." Another insurer asked if Rough Country was in compliance with state laws limiting lift or bumper height. They wanted to know if the laws were clearly stated on the packaging and what requirements existed and how Rough Country complied with them. [*See* Ex. 13, Rough Country 30(b)(6) Dep., Ex. 6, 12/22/14 Email string.]

**RESPONSE: For purposes of Rough Country's Motion for Summary Judgment only, this statement is undisputed, but it is immaterial and irrelevant to the matters presently before the Court. Rough Country reserves the right to dispute it at a later proceeding.**

64.

In its response, Rough Country did not disclose the Vehicle Compatibility Agreement. It did not tell the insurers that its lifts would cause vehicles to violate the Vehicle Compatibility Agreement. It did not disclose any state laws that limited lifts or bumper heights. Instead, it claimed "[redacted]." [*See* Ex. 8, P. Just to W. Bradshaw emails, at RC-BRYSON006869-6870.]

RESPONSE: **For purposes of Rough Country's Motion for Summary Judgment only, this statement is undisputed, but it is immaterial and irrelevant to the matters presently before the Court. Rough Country reserves the right to dispute it at a later proceeding.**

65.

Rough Country's website, however, includes a page called "STATE LIFT LAWS," which links to a page that lists § 40-8-6 as a statute that applies to lifted trucks and limits lifts to "2 inches." [*See* Ex. 7, Rough Country 30(b)(6) Dep., at 73:13-74:14; https://www.roughcountry.com/state-lift-laws (last visited Sept. 4, 2024), linking to https://www.liftlaws.com/georgia_lift_laws.htm (last visited Sept. 4, 2024)].

RESPONSE: **Undisputed, and immaterial and irrelevant to the matters presently before the Court.**

66.

Despite knowing its lift kit violated a Georgia law designed to protect Georgia citizens, Rough Country shipped it directly to Georgia. [*See* Ex. 14, Will Holloway Order Confirmation].

**RESPONSE: For the reasons set forth in its Motion for Summary Judgment, Rough Country disputes that its lift kit violated Georgia law. It is undisputed that Rough Country shipped the lift kit directly to Georgia.**

67.

Although Rough Country marketed the subject lift kit as a 4.5-inch lift kit, it is undisputed that it raised the front suspension of the subject F-250 by *six* inches. [Ex. 1, Buchner Rep. at 4]

**RESPONSE: Disputed, but immaterial and irrelevant to the matters presently before the Court. (*See* ¶ 38, *supra*.)**

68.

Plaintiff's expert Chris Roche, an experienced automotive engineer who worked for Chrysler and other automotive companies, testified about several alternative designs – all of which are inexpensive and easy. Rough Country could, for example, provide a "secondary energy absorption system" ("SEAS") bracket that is big enough to account for the height of the lift, and which would help increase engagement between two vehicles in a crash and satisfy the requirements of the

Vehicle Compatibility Agreement. Similar designs are sold by Ford and *retail* for $25 each. [*See* Ex. 15, Roche Dep. Ex. 2 at 27-28].

**RESPONSE: Disputed, but immaterial and irrelevant to the matters presently before the Court. . This is a conclusory and argumentative statement that lacks evidentiary support. At best, the evidence cited to – Doc. 103-17 (Ex. 15) –**

69.

Rough Country has "generally considered" that its lift kits may cause pickup trucks to bypass smaller cars' crash protection features and intrude into passengers' occupant space. [*See* Ex. 16, Def's Second Supp. Resps. to Pls' First Interrogs., at No. 6].

**RESPONSE: Plaintiffs mischaracterize Rough Country's referenced response. (Doc. 103-18, at ¶ 6). More specifically, Rough Country responded that it "generally considered *the remote possibility* of injury to a person arising from a collision with a vehicle using a Rough Country lift kit, including *the remote possibility* that those scenarios specified  in Interrogatory No. 6 might occur." (Italics added.)**

70.

Rough Country admits it has never performed any testing of its products to determine whether they cause potentially lethal levels of intrusion in foreseeable crashes. [Ex. 7, Rough Country 30(b)(6) Dep., at 15:21-17:5].

RESPONSE: **For purposes of Rough Country's Motion for Summary Judgment only, the statement of Mr. Roche's opinion is undisputed, but it is immaterial and irrelevant to the matters presently before the Court. Rough Country disputes that the practicability and functionality of the alleged alternative designs, and whether similar designs are sold by Ford. [*See, e.g.*, Doc. 103-17 (Ex. 15), at 28-29 (stating that Ford sells replacement SEAS brackets for stock F-250s, but not for lifted ones).]**

71.

Rough Country admits it did not perform any engineering analysis to determine whether its products would cause potentially lethal levels of intrusion during foreseeable crashes. [Ex. 7, Rough Country 30(b)(6) Dep., at 9:17-12:9].

**RESPONSE: For purposes of Rough Country's Motion for Summary Judgment only, this statement is undisputed, but it is immaterial and irrelevant to the matters presently before the Court. Rough Country reserves the right to dispute it at a later proceeding.**

72.

Rough Country's "Development Protocol" for designing new products does not include any review or analysis related to the product's safety before releasing it for sale. [*See* Ex. 17, Rough Country Development Protocol].

**RESPONSE: For purposes of Rough Country's Motion for Summary Judgment only, this statement is undisputed, but it is immaterial and irrelevant to the matters presently before the Court. Rough Country reserves the right to dispute it at a later proceeding.**

73.

Rough Country does not employ any professional engineers. [*See* Ex. 7, Rough Country 30(b)(6) Dep., at 23:2-12].

**RESPONSE: For purposes of Rough Country's Motion for Summary Judgment only, this statement is undisputed, but it is immaterial and irrelevant to the matters presently before the Court. Rough Country reserves the right to dispute it at a later proceeding.**

74.

Rough Country claims to wait for "consumer feedback" in the form of injuries and deaths to determine whether its lift kits cause excessive intrusion in foreseeable collisions. [Ex. 7, Rough Country 30(b)(6) Dep., at 9:17-12:9].

**RESPONSE: Disputed, and Rough Country further shows that Plaintiffs have mischaracterized the cited Exhibit and testimony contained therein.**

75.

Rough Country knew pickup trucks equipped with its lift kits would crash with smaller vehicles on the road. [*See* Ex. 7, Rough Country 30(b)(6) Dep., at 26:3-19].

**RESPONSE: Disputed, and Rough Country further shows that Plaintiffs have mischaracterized the cited Exhibit. Nowhere in Ex. 7, at 26:3-19 does Rough Country admit that it knows "pickup trucks equipped with its lift kits would crash into smaller vehicles on the road," and the term "smaller" does not appear anywhere in Ex. 7.**

76.

Rough Country admits, "Rough Country lifts have to be designed to be safe in crashes because crashes happen." [Ex. 7, Rough Country 30(b)(6) Dep., at 33:15-21].

**RESPONSE: Undisputed, but it immaterial and irrelevant to the matters presently before the Court.**

77.

It was foreseeable to Rough Country that an F-250 with a Rough Country lift kit would crash into the rear of a car. [Ex. 7, Rough Country 30(b)(6) Dep., at 26:7-10].

**RESPONSE: Disputed, and Rough Country shows that Plaintiffs have mischaracterized the cited Exhibit. As more fully explained at Ex. 7, at 26:7-10, Rough Country acknowledged that "there's potential for" an F-250 with a Rough Country lift to crash into the rear of a car.**

78.

It was foreseeable to Rough Country that a vehicle equipped with a Rough Country lift kit would crash into a car that has a child restrained in the backseat. [Ex. 7, Rough Country 30(b)(6) Dep., at 26:16-19].

**RESPONSE: Undisputed, but it immaterial and irrelevant to the matters presently before the Court.**

79.

It was foreseeable to Rough Country that vehicles equipped with its lift kits would be involved in collisions at *higher speeds* than the subject collision. [*See* Ex. 18, Def's Resps. to Pls' First Reqs. for Admissions, at Nos. 6; 12]

**RESPONSE: Disputed, and Rough Country shows that Plaintiffs have mischaracterized the cited Exhibit. As more fully explained in Rough Country's**

**response to Ex. 18, ¶¶ 6 and 12, "it has knowledge of a possibility that any vehicle on the road might be involved in a . . . collision with another vehicle at" higher speeds, but that "it is highly unusual to have a circumstance where a drunk driver travelling roughly 50 mph rearends a stationary vehicle, like what happened in this case."**

       This 19th day of September, 2024.

                          Respectfully submitted,

                          WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC

                          /s/ *Aaron B. Chausmer*
                          Richard H. Hill, II
                          Georgia Bar No. 354425
                          Lindsay G. Ferguson
                          Georgia Bar No. 140970
                          Aaron B. Chausmer
                          Georgia Bar No. 119998
                          *Attorneys for Defendant Rough Country, LLC*

3344 Peachtree Road, N.E.
Suite 2400
Atlanta, GA 30326
Phone:  404-876-2700
Fax:  404-875-9433

- 24 -

**<u>RULE 7.1D CERTIFICATE OF TYPE, FORMAT, AND FONT SIZE</u>**

Pursuant to Local Rule 7.1D of the United States District Court of the Northern District of Georgia, the undersigned certifies that the foregoing submission to the Court complies with Local Rule 5.1 in that it was computer-processed, double-spaced between lines, and used Times New Roman font of 14-point size.

*/s/ Aaron B. Chausmer*
Aaron B. Chausmer
Georgia Bar No. 119998

## **CERTIFICATE OF SERVICE**

This is to certify that I have electronically served the foregoing filing with the Clerk of Court via CM/ECF, which will send a copy to the following attorneys of record:

Tedra L. Cannella
Robert H. Snyder, Jr.
Rory A. Weeks
Devin Mashman
CANNELLA SNYDER LLC
315 W Ponce de Leon Ave
Suite 885
Decatur, GA 30030
***ATTORNEYS FOR PLAINTIFFS***

This, the 19th day of September, 2024.

*/s/ Aaron B. Chausmer*
Aaron B. Chausmer
Georgia Bar No. 119998