# EXHIBIT 2

Case 2:22-cv-00017-RWS   Document 115-4   Filed 01/15/25   Page 2 of 29
Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 1

1           UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF GEORGIA
2                GAINESVILLE DIVISION

3

    SANTANA BRYSON and JOSHUA   )
4   BRYSON, as Administrators of)
    the Estate of C.Z.B., and   )
5   as surviving parents of     )
    C.Z.B., a deceased minor,   )
6                               )
              Plaintiffs,       )
7                               )   CIVIL ACTION FILE
    vs.                         )
8                               )   NO. 2:22-cv-17-RWS
    ROUGH COUNTRY, LLC,         )
9                               )
              Defendant.        )
10  _____

11

12          VIDEOTAPED DEPOSITION OF
13             WESLEY D. GRIMES
14              May 9, 2024
15              10:17 a.m.

16

17    Weinberg Wheeler Hudgins Gunn & Dial
18         3344 Peachtree Road, NE
19             Suite 2400

20

21           Atlanta, Georgia

22

23

24

25    Reported by:  Marsi Koehl, CCR-B-2424

Wesley Grimes                                         May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 147

1      A.  So this is -- it's showing 50 miles an hour

2    at times zero.  So times zero in this case is

3    basically algorithm enabled, but it could have

4    occurred shortly after this.  Okay?  We don't know

5    exactly when it occurred.

6           So back to Exhibit 69, what -- what we're

7    doing here is taking the absolute extreme and saying,

8    well, could there be a little bit more braking during

9    that time?  And that gives us the absolute low end

10   here of the 43.9 and then assuming the high end would

11   be, what, 55.6, I think.

12     Q.  And that's the low and high end of the speed

13   of the F-250 at the time of impact?

14     A.  Yes.  Assuming those types of things, which

15   I don't believe are true.  I don't think there was

16   significant braking effort, but this was the extreme

17   that we did early on to get a feel for all the

18   numbers that we were dealing with.

19     Q.  So the braking we're talking about is that

20   the CDR indicates that Mr. Elliott applied his brakes

21   sometime in the last .5 seconds before impact; is

22   that correct?

23     A.  Yes.

24     Q.  And --

25     A.  And we don't know -- I'm sorry.  We don't

Wesley Grimes                                              May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 149

1    correction for ABS braking?

2           A.  Yeah.  Isn't that what we're talking about?

3           Q.  I was asking about the second row.

4           A.  I apologize.

5           Q.  So correction for braking and it says

6    .5 seconds next to time --

7           A.  Yes.

8           Q.  -- is that correct?

9           A.  Yes.

10          Q.  And it says .7 next to braking, parenthesis,

11   G.  What is that?

12          A.  Deceleration rate.  An estimated

13   deceleration rate.

14              I apologize.  I misunderstood your question.

15          Q.  So that estimates that given a half second

16   of braking and .7 Gs of braking, the speed would have

17   been reduced by 7.7 miles per hour; is that right?

18          A.  It could have been at the maximum.  Yes,

19   sir.

20          Q.  And that reduction of speed wasn't applied

21   to the crash test; is that correct?

22          A.  It was not.  No.

23          Q.  And the crash test, there was no braking

24   applied to that 250, right?

25          A.  After the crash there was, it was not

Wesley Grimes                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 150

1      before.  We have to stop the vehicle after the crash.

2             Q.  Understood.

3             A.  But not before impact.  There was no braking

4      before impact.

5             Q.  There was no braking before the F-250 hit

6      the Escape in the crash test, correct?

7             A.  That's correct.

8             Q.  And then after the crash test, the brakes

9      were applied remotely just to stop the F-250 from

10     continuing to run away down the track, right?

11            A.  Yes.

12                Are we done this?

13            Q.  I'm figuring that out.

14            A.  Okay.  I'm not hurrying you.

15            Q.  I wanted to ask you about page 1.

16            A.  Okay.

17            Q.  What is -- is this a calculation done for

18     the crash test?

19            A.  No.  This was early on in our analysis of

20     getting all the information together.  So you can see

21     where at that point I was estimating the vehicle, the

22     pickup at 8800 pounds, the Escape at 3900 pounds, the

23     51 miles per hour.

24                And what you can do is calculate the speed

25     change shown.  And you're seeing that here it's

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 171

1       the crash test?

2              A.   No.

3              Q.   And who else was there?

4              A.   All of the Exponent staff and an attorney

5       from Mr. Hill's office.

6              Q.   Was Dr. Nguyen there?

7              A.   Oh, yes, yes.  Thank you.  She was.

8              Q.   How many Exponent staff were present

9       approximately?

10             A.   I don't know.  Five or six.  You know, I'm

11      running cameras and setting up things.  There may

12      have been 10.  I don't know.

13             Q.   Did you make any changes to the crash test

14      setup on the day of the test?

15             A.   No.

16             Q.   Was the purpose of the crash test to

17      recreate the subject collision if the F-250 had not

18      been lifted?

19             A.   It wasn't really to recreate it.  It was to

20      explore what type of intrusion would occur without

21      the lift kit on the vehicle.  We're not trying to

22      recreate it because we don't have cargo in the back.

23             Q.   The purpose of it was to isolate how

24      different the intrusion would be had the F-250 not

25      been lifted; is that fair?

Wesley Grimes                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 172

1        A.  That was one goal, yeah.  And for me, that

2    was the primary goal was to -- to look at if we make

3    the test as simple as we can with a nonlifted

4    vehicle, but we want to match as closely as we

5    reasonably can the speeds, the weights, the offset,

6    the angles; things like that.  We want to match all

7    of that as much as we can.

8            But we don't have cargo in the vehicle, so

9    I'm not going to say we're trying to recreate the

10   crash.  We're looking at what type of intrusion is

11   going to happen without a lift kit on the pickup

12   truck.

13       Q.  Why do you want to match the speeds, weight,

14   offsets and angles?

15       A.  So that we can -- I can come to the

16   conclusion that the lifted -- the lift kit on the

17   pickup didn't affect significantly the amount of

18   intrusion that would have occurred.

19       Q.  If the speeds, weights, offsets and angles

20   weren't matched, are you saying that you wouldn't be

21   comfortable coming to that conclusion?

22           MR. HILL:  Object to form.

23           THE WITNESS:  I think there's a range

24       for all of those things and we want to be

25       within that range.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 173

1     BY MR. MASHMAN:

2          Q.   But the goal of matching is so that you can

3     reasonably say as a scientific principle that the

4     difference in height is what resulted in the

5     difference of intrusion; is that fair?

6               MR. HILL:  Object to form.

7               THE WITNESS:  Or didn't.  Yeah, yeah.

8          We want to be able to draw conclusions.

9     BY MR. MASHMAN:

10         Q.   And the way to do that is to isolate the

11    variable that you're changing; is that fair?

12         A.   Well, we're -- the way to do it for what we

13    did is to run the simplest test we could for a pickup

14    to match the key components of the crash without a

15    lifted truck.

16         Q.   Why didn't you run a second crash test with

17    all of the cargo directly behind Cohan as a worst

18    case scenario to see how it affected the intrusion?

19         A.   Because we didn't know exactly where the

20    cargo was and I didn't to subject myself to the

21    criticism of you had the bag of clothing in the wrong

22    place or you had the Shop-Vac in the wrong place or

23    whatever.

24              And really more importantly is Dr. Nguyen

25    looked at the actual vehicle and said it was

Wesley Grimes                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 176

1    didn't need it that really drove that -- that

2    decision.

3        Q.  Did anyone ever suggest putting an adult

4    crash test dummy in the front driver's seat?

5        A.  Not that I recall.

6        Q.  Can you -- I apologize.

7            How did you select the vehicles used in the

8    crash test?

9        A.  Charlie Crosby and Exponent located those

10   vehicles and purchased them.

11       Q.  Is it important to have vehicles with

12   similar structural characteristics in a crash test?

13           MR. HILL:  Object to form but go ahead.

14           THE WITNESS:  Of the structures that

15           we're interested in, sure.

16   BY MR. MASHMAN:

17       Q.  Do you agree that vehicles with different

18   structural characteristics could perform differently

19   from the subject crash?

20           MR. HILL:  Object to form.

21           THE WITNESS:  I guess it would depend on

22           what the structural difference is.  If it's

23           something that's away from the crash zone,

24           it doesn't have significant effect on the

25           overall structure, then it wouldn't matter.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 178

1      those vehicles, made that decision.  I'm sure that

2      he -- he told me which vehicles he was looking at and

3      I approved them.  I don't remember specifically doing

4      that.

5             Q.  Do you agree that the Escape used in the

6      crash test did not have a sunroof?

7             A.  Yes.

8             Q.  Did you do anything to determine what effect

9      the sunroof has on the strength of the Escape's

10     structure?

11            A.  No.

12            Q.  I want to ask you about how the vehicles

13     were set up for the crash test.

14            A.  Okay.

15            MR. MASHMAN:  I'm going to show you

16     Plaintiff's Exhibit 74, which is a series of

17     photographs from the crash test set-up.

18            (Plaintiff's Exhibit 74 was marked for

19     identification.)

20            MR. MASHMAN:  Sorry, Rick.  I don't have

21     another copy of this one, but it's in his

22     file.

23            MR. HILL:  That's all right.

24     BY MR. MASHMAN:

25            Q.  These pictures show how the vehicles were

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 184

1        Q.   Okay.

2        A.   I think that there were a lot of little

3    marks that were looking at trying to associate

4    between the two.

5        Q.   Sitting here today, you don't recall any

6    other match points that you relied on in aligning the

7    two point clouds in the subject collision; is that

8    fair?

9        A.   That's fair.

10       Q.   Did you rely on anything else to come up

11   with the 10.9 inches of lateral offset?

12       A.   No.

13       Q.   Why did you decide to set up the crash test

14   with the same amount of offset as there was in the

15   subject collision?

16       A.   Because we're exploring the intrusion into

17   the rear occupant compartment.

18       Q.   Could the amount of offset potentially

19   impact the characteristics of the collision?

20       A.   Sure.  I don't think little changes.  I

21   think like Mr. Buchner says it's about 12 inches.

22   I'm not going to argue about an inch.

23            You know, I think five or six inches,

24   eight inches, yeah, that could make a difference, but

25   I think half an inch, an inch, I'm not going to argue

Case 2:22-cv-00017-RWS    Document 115-4    Filed 01/15/25    Page 12 of 29
Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 185

1    about that.

2         Q.  Do you agree the more offset there is in a

3    crash, the more likely intrusion into the occupant

4    compartment is?

5              MR. HILL:  Object to the form.  Go

6         ahead.

7              THE WITNESS:  Within a certain reason,

8         that's probably fair.  I mean, you know, if

9         you -- if you -- again, if you go to an

10        extreme, you're going to generate more

11        intrusion.

12   BY MR. MASHMAN:

13        Q.  What I'm trying to get at, all things being

14   equal, more offset would mean more intrusion.

15             Is that the right relationship?

16             MR. HILL:  Object to the form.  Go

17        ahead.

18             THE WITNESS:  Again, within a range, I

19        don't know -- within a short range, I don't

20        think it's going to matter significantly.

21        But a large range.  I think that's probably

22        true.

23   BY MR. MASHMAN:

24        Q.  Do I have the directions right?  It's not

25   the opposite of what I said, right, that more offset

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                      Page 186

1    means less intrusion?

2         A.  Again, that's probably true.  I mean, I'd

3    have to look at it and research but, in general, I

4    think that that's probably true.

5         Q.  I found a statement on IIHS website that in

6    an offset crash --

7              THE REPORTER:  What's the website?  I'm

8         sorry.

9              MR. MASHMAN:  IIHS.

10             THE REPORTER:  Thank you.

11             THE WITNESS:  Institute -- Insurance

12        Institute for Highway Safety.

13   BY MR. MASHMAN:

14        Q.  In the statement I found was that in an

15   offset crash, quote, a smaller part of the structure

16   has to manage the crash energy and intrusion into the

17   occupant compartment is more likely.

18             Is that accurate and fair to your knowledge?

19        A.  If that's what's on their website, that's

20   what's on there.  You know, I'm not going to dispute

21   that.  Okay?

22        Q.  And do you agree with the IIHS that an

23   offset test is more demanding of a vehicle structure

24   than a full width test?

25        A.  If you have a lot of offset versus a full

Wesley Grimes                                       May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 187

1    center line to center line, I think that's probably

2    true.

3            Q.  Do you still have the photos --

4            A.  I do.

5            Q.  -- from the crash test setup?

6                Looking at the photos 238 to 240.  Just let

7    me know when you're there.

8            A.  238?

9            Q.  Yes, sir.

10           A.  I'm at 238.

11           Q.  This shows how the Escape was oriented

12   10.9 inches to the right of the center line of the

13   track; is that correct?

14           A.  I think that that's correct.

15           Q.  Is the Sharpie mark in photograph 238 the

16   Escape's midpoint?

17           A.  I don't know.  I'm assuming it is, but I

18   don't know.  I'm not the one that made the mark.

19           Q.  But that measurement is -- at least appears

20   to indicate that this is how they lined up, that the

21   Escape was 10.9 inches to the right of the track's

22   center line, right?

23           A.  Yes.  That's what this implies.

24           Q.  Go to page -- photos 243 to 245.

25           A.  Okay.

Wesley Grimes                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 188

1          Q.  These show that the F-250 was set up with

2      its center line directly above the center line of the

3      track; is that correct?

4          A.  Yes.

5          Q.  So the way the crash test was set up --

6      well, I think I asked that.

7              Was the intent of this test to keep the

8      vehicles in this same alignment where the center line

9      of the F-250 was at the center line of the track at

10     the moment of impact and the Escape was offset

11     10.9 inches to the right?

12         A.  In general that would be the desire of this.

13     That's why they released the vehicle right before

14     impact.

15         Q.  At one point in your report you mention that

16     the front bumper of the F-250 and the rear bumper of

17     the Escape were approximately aligned at impact.

18             Does that refer to being aligned in terms of

19     height?

20         A.  Yes, sir.

21         Q.  I'm going to refer back to these photos.

22         A.  To which photos?  The test photos?  Okay,

23     yeah.

24         Q.  Photograph 284.

25         A.  Yes.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 192

1    BY MR. MASHMAN:

2         Q.  I want to ask you about the emergency brake

3    we talked about a second ago.

4              Did you direct Exponent to engage the

5    emergency brake of the Escape before the crash test?

6         A.  Not specifically.  I think that was a

7    decision -- first of all, I don't know that it was on

8    at the actual impact.  It may have been on to make

9    sure the vehicle didn't move before the test.  I

10   don't know.  As I sit here, I don't know.

11             But it doesn't bother me because you then

12   have an axle that's locked.  That's not an issue for

13   me because the vehicle was in gear.

14        Q.  I think my -- my question was whether you

15   directed Exponent to engage the emergency --

16        A.  I did not.

17        Q.  Were you ware that Exponent had pulled the

18   emergency brake before the test?

19        A.  You know, they may have told me that out

20   there.  I don't specifically recall being told that.

21        Q.  Do you have any recollection of Exponent

22   telling you why they did that?

23        A.  No.

24        Q.  The test Escape did not have any cargo in

25   the cargo area during the crash test, correct?

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 193

1        A.   Correct.

2        Q.   Why not?

3        A.   Because we didn't feel it was necessary to

4    put that in for our purposes and we didn't know

5    exactly where the cargo was -- was at the time of the

6    crash.

7             Ms. Kelley and Mr. Bryson didn't recall

8    either.  And so instead of guessing at that, we

9    wanted to understand what would happen without the

10   cargo.  We always knew that if we put cargo in,

11   whatever displacement we had of the tailgate would be

12   amplified if there were materials in there taking up

13   that space.

14            So it was the simplest test we could run

15   without -- without compromising those types of

16   things.

17       Q.   I think you said earlier you didn't want to

18   guess where the cargo was located in the Escape; is

19   that fair?

20       A.   Yes.

21       Q.   Why is it important not to guess where the

22   cargo was located in the Escape?

23       A.   Because if we had put the cargo in and we

24   got whatever that result was, we could be subject to

25   criticism for not knowing where it was and

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 194

1    purposefully placing it for some purp- -- some of our

2    own purposes and we had no desire to do that.

3        Q.  And that criticism would be that the cargo

4    was in a different location than where it was in the

5    subject wreck, right?

6        A.  Yes.

7        Q.  And isn't it true by not including any

8    cargo, the cargo was not in the same location that it

9    was in the subject wreck?

10       A.  That's true.  But it also then doesn't have

11   an artificial effect on the seat back displacement.

12           MR. MASHMAN:  I'm showing you

13           Plaintiff's Exhibit -- I think that says

14           75 -- yes.  It's two pictures of the damage

15           to the Escape after the crash test.

16           (Plaintiff's Exhibit 75 was marked for

17           identification.)

18   BY MR. MASHMAN:

19       Q.  The second picture might be a little better

20   for this, picture 385.  Do you see that?

21       A.  Yes.

22       Q.  Do you see a mark left by the Ford F-250's

23   Ford emblem on the rear of the Escape?

24       A.  No.

25       Q.  I'm looking at this mark above where it

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 196

1    a 2016 F-250?

2         A.  No.

3         Q.  Did you perform any calculations to

4    determine how much .5 seconds of braking lowered the

5    front bumper of a 2016 F-250?

6         A.  No.

7              MR. MASHMAN:  I'm going to hand you

8         three exhibits.  These are Exhibits 76, 77

9         and 78.

10             (Plaintiff's Exhibit 76, Exhibit 77 and

11        Exhibit 78 were marked for identification.)

12   BY MR. MASHMAN:

13        Q.  Here's 76.  That's a figure from your

14   report.  77 is a series of pictures of the Escape

15   after the crash test.  And 78 is a series of pictures

16   of the subject Escape after the collision.

17             Do you agree that the second row seat Cohan

18   was sitting in deformed farther forward in the

19   subject collision than in the crash test?

20        A.  It certainly appears to have.  Yes.

21        Q.  Did you quantify how much the second row

22   seat deformed statically in the subject collision?

23        A.  No.

24        Q.  Did you take any measurements of how much

25   the second row seat deformed statically in the

Wesley Grimes                                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 197

```
 1    subject collision?
 2         A.   We have scans where we can pull measurements
 3    off of that, but we have not done that.
 4         Q.   Did you quantify how much the second row
 5    seat deformed statically in the crash test?
 6         A.   No.
 7         Q.   Did you quantify how much farther forward
 8    the subject Escape's seat back is deformed compared
 9    to the test Escape's seat back?
10         A.   No.
11         Q.   Did you measure the angle of either seat
12    back?
13         A.   No.
14         Q.   Do you have your report in front of you?
15         A.   Yes.
16              Are you done with these images or --
17         Q.   I'd like to keep them --
18         A.   Okay.
19         Q.   On page 33 of your report --
20              (Discussion ensued off the record.)
21              THE WITNESS:  Page 33?
22              MR. MASHMAN:  Yes.
23              THE WITNESS:  Okay.
24    BY MR. MASHMAN:
25         Q.   You offer the opinion that the test Escape
```

Wesley Grimes                                May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 198

1    would have sustained more seat deformation if it had

2    been loaded with exemplar cargo; is that right?

3         A.  Yes.

4         Q.  What is the basis of your opinion that the

5    difference between the second row seat deformation

6    was due to the lack of cargo in the test Escape?

7         A.  Because the rear hatch came forward and made

8    contact with the seat back.  And if there has been

9    cargo there, it would have taken up that space and

10   would have caused the seat back of the second seat in

11   the Escape to have been displaced more forward.

12        Q.  Did you base that conclusion on any testing?

13        A.  The crash test.

14        Q.  The crash -- I'm specifically talking about

15   the conclusion that if cargo had been placed in the

16   cargo area, the seat back would have deformed more

17   than in the crash test.

18        A.  There was not any additional testing for

19   that, no.

20        Q.  Did you perform any calculations to reach

21   that conclusion?

22        A.  No.

23        Q.  Does your report cite any literature for

24   that conclusion?

25        A.  I don't think so.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 199

1        Q.  Did you perform any analysis to determine

2     what the total volume is of the cargo that was in the

3     subject Escape?

4        A.  No.

5        Q.  Did you perform any analysis to determine

6     whether the cargo would have deformed before the

7     second row seat deformed?

8        A.  No.  We didn't do a specific analysis for

9     that.

10       Q.  Did you analyze whether the Shop-Vac is

11    stronger than the bolted down second row seat of the

12    Bryson's SUV?

13       A.  No.

14       Q.  Did you analyze whether a bag of clothing is

15    stronger than the second row of the Bryson's SUV?

16       A.  We didn't, but it would depend upon how much

17    it was compressed obviously.

18       Q.  But you didn't analyze how much it was

19    compressed relative to the strength --

20       A.  We did not.

21       Q.  Did you analyze whether the camping chairs

22    were stronger than the second row of the Bryson's

23    SUV?

24       A.  We did not.

25            THE REPORTER:  Slow down.

Case 2:22-cv-00017-RWS   Document 115-4   Filed 01/15/25   Page 23 of 29
Wesley Grimes                           May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 200

1    BY MR. MASHMAN:

2        Q.   I apologize.

3            Did you analyze whether the umbrella

4    stroller was stronger than the second row of the

5    Bryson's SUV?

6        A.   We did not.

7        Q.   And I think you mentioned this earlier.

8            Do you hold yourself out as an expert in

9    seat back design?

10       A.   No.

11       Q.   Do you have any basis to offer an expert

12   opinion on seat back design?

13       A.   On seat back design?  No.

14       Q.   Isn't it true that seat backs have a frame

15   around the outer edge and the inside of that frame is

16   mostly filling?

17       A.   I think in some cases there is a lot of

18   filling.  I think there's some substructures.  You

19   would have to deglove that seat.  Again, I'm not an

20   expert on seat backs.

21       Q.   And did you de-trim the seat in either the

22   subject wreck or the test Escape to determine the

23   internal make-up of the seat?

24       A.   No.

25       Q.   Do you have an opinion about how much more

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 201

1    the second row seat in the test Escape would have

2    been deformed if you had loaded the same cargo into

3    it that was in the subject wreck?

4         A.  No.

5              MR. MASHMAN:  I'm going to show you

6         Plaintiff's Exhibit 79.

7              (Plaintiff's Exhibit 79 was marked for

8         identification.)

9    BY MR. MASHMAN:

10        Q.  This is an interrogatory that the

11   plaintiff's responded to in this case.

12             Did Rough Country provide this to you before

13   the crash test?

14        A.  I don't remember seeing this, but we may

15   have seen it.

16        Q.  Do you agree that this itemizes what was in

17   the back seat of -- strike that.

18             Do you agree that this itemizes what was in

19   the rear compartment of the Bryson's Escape?

20        A.  That's what it says it does.  Yes.

21        Q.  Did you rely on this in any way when you

22   decided on how to configure the crash test?

23        A.  No.  Because we weren't putting cargo back

24   there.

25        Q.  Do you agree that if you had made the

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                    Page 212

1            MR. MASHMAN:  Okay.  I'm showing you
2        Plaintiff's Exhibit 80, which is a screen
3        shot from the video of the crash test.
4            (Plaintiff's Exhibit 80 was marked for
5        identification.)
6    BY MR. MASHMAN:
7        Q.  It was taken shortly before impact.
8            Do you agree that the F-250's center line is
9    not aligned with the center line of the track?
10       A.  From this perspective, I would agree with
11   that.
12       Q.  Do you believe that the perspective is the
13   only reason why the F-250 center line is not aligned
14   to the center of the track?
15       A.  I don't know.  I haven't looked at it.
16       Q.  But at least in this photo you agree that
17   the F-250's center line is to the left of the center
18   line of the track.
19       A.  I think the tape that's on the center of the
20   hood appears to be to the left.  But the center of
21   the bumper may still be because there's parallax
22   issues.
23       Q.  What is a parallax issue?
24       A.  Distortion of the imagine because of
25   photography and lenses where things don't line up the

Wesley Grimes                                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 213

1    way you think they do.

2        Q.  Have you done any analysis to determine how

3    far to the left of the center line of the track the

4    center line of the F-250 was at the moment of impact?

5        A.  No.

6        Q.  Page 34 of your report --

7        A.  Yes.

8        Q.  -- describes how you determined the amount

9    of static crush in the subject collision and in the

10   crash test, right?

11       A.  Yes.

12       Q.  Can you -- I'm sorry.  You've already

13   explained your methodology for determining the amount

14   of static crush in the subject collision, right?

15       A.  Yes.

16       Q.  And that was taking the point clouds and

17   aligning them with -- I believe, it was the tow

18   hooks, the C-Brackets and impacts on the hood; is

19   that right?

20       A.  Yes.

21       Q.  Did you --

22       A.  And just to be clear, also just general

23   shape of the crush, it helps you align those things.

24       Q.  And general shape?

25       A.  Yeah.

Wesley Grimes                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 231

1    defendant's second interrogatories; is that right?

2         A.  Yes.

3         Q.  I'll represent to you that that's the same

4    interrogatories we were looking at earlier that shows

5    what was in the trunk.

6              Does this show that you got that document on

7    February 6, 2023?

8         A.  Okay.  I'll not dispute that.

9         Q.  Does this show that the receipt date for

10   that was February 6, 2023?

11        A.  Yes.

12        Q.  Did you prepare a budget in this case?

13        A.  No.

14        Q.  What is the basis of your opinion that the

15   sunroof had no effect on the strength of the roof

16   structure between the subject Escape and the test

17   Escape?

18        A.  Well, first of all, the sunroof would be

19   forward some distance from where the crush is

20   actually occurring.  And second of all, I don't think

21   that removing part of a structure is going to make it

22   stronger.

23        Q.  Did you compare the distance between where

24   the sunroof is and where the crush occurred?

25        A.  No.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 232

1        Q.  Did you review design drawings of the
2     Escape's roof with or without a sunroof?
3        A.  No.
4        Q.  Did you review the orientation of where
5     structural components in the roof are of the Ford
6     Escape with or without a sunroof?
7        A.  No.
8        Q.  Did you review the effects that it has on
9     strength based on testing that had been performed?
10       A.  No.
11       Q.  Did you review any literature on whether
12    that sunroof would have an impact on the strength?
13       A.  No.
14       Q.  Did you perform any testing of the
15    differences between the strength of an Escape with
16    the sunroof versus without a sunroof?
17       A.  No.
18       Q.  Did you review any testing of the strength
19    of different component materials such as the glass or
20    the structures that make up the roof?
21       A.  No.
22           MR. MASHMAN:  Okay.  I don't think I
23       have any more questions for you.  I
24       appreciate your time.
25           MR. HILL:  Thank you.  No questions.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 234

1                          CERTIFICATE

2

3      STATE OF GEORGIA:

4      COUNTY OF FULTON:

5

6            I hereby certify that the foregoing

7      transcript was taken down, as stated in the caption,

8      and the colloquies, questions, and answers were

9      reduced to typewriting under my direction; that the

10     transcript is a true and correct record of the

11     evidence given upon said proceeding.

12            I further certify that I am not a relative

13     or employee or attorney of any party, nor am I

14     financially interested in the outcome of this action.

15            This the 5th day of June, 2024.

16

17

18

19     _____

20            Marsi Koehl, CCR-B-2424

21

22

23

24

25