Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

```
 1                  UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF GEORGIA
 2                      GAINESVILLE DIVISION

 3

 4   SANTANA BRYSON AND JOSHUA BRYSON,
     AS ADMINISTRATORS OF THE ESTATE OF
 5   C.Z.B., AND AS SURVIVING PARENTS OF
     C.Z.B., A DECEASED MINOR,
 6
          Plaintiffs,
 7   v.                        CASE NO. 2:22-CV-017-RWS
 8   ROUGH COUNTRY, LLC,
 9        Defendant.
10
11
12
              The videotaped deposition of PAUL LEWIS,
13
         JR., M.S., BME, taken on behalf of the Defendant,
14
         taken pursuant to agreement of counsel, taken for
15
         all purposes authorized by the Federal Rules
16
         of Civil Procedure; the reading and signing
17
         of the deposition being waived; taken before
18
         Leita J. Seaborn, Certified Court Reporter,
19
         commencing at 10:38 a.m., on this the 18th day
20
         of March 2024, at the law offices of Cannella
21
         Snyder, LLC, 315 W Ponce de Leon Ave, Suite 885
22
         Decatur, Georgia.
23
24
25
```

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 2

```
 1        APPEARANCES OF COUNSEL:
 2
 3  For the Plaintiff:
 4     Tedra Cannella, Esquire
          Cannella Snyder LLC
 5     315 W Ponce de Leon Ave
          Suite 885
 6     Decatur, Georgia  30030
 7  For the Defendant:
 8     Richard H. Hill, II, Esquire
          Weinberg, Wheeler, Hudgins,
 9     Gunn & Dial, LLC
          3344 Peachtree Road, N.E.
10     Suite 2400
          Atlanta, Georgia  30326
11     404-876-2700
12  Also Present:  David Ramirez, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          C O N T E N T S
 2
 3        EXAMINATION INDEX
 4
                        PAGE
 5  PAUL LEWIS, JR., M.S., BME
        BY MR. HILL           4
 6     BY MS. CANNELLA          187
        BY MR. HILL          188
 7
 8
          EXHIBIT INDEX
 9
10                      PAGE
11  Defendant's Exhibit No.
12  Exhibit 1  Fourth Amended Notice      5
13  Exhibit 1A  Surrogate/Exemplary Study    8
14  Exhibit 1B  Supplemental Report      20
15  Exhibit 2  Curriculum Vitae      27
16  Exhibit 3A  Rule 26        30
17  Exhibit 4  Invoices        43
18  Exhibit 5  Supplement to Plaintiff's    48
19        Initial Disclosures
20  Exhibit 6  Mr. Lewis's Report      52
21  Exhibit 7  3-15-24 Supplemental Report    138
22  Exhibit 8  Testing Data Set      163
23  Exhibit 9  Wichita State University Test   180
24
25
```

Page 4

```
 1          PROCEEDINGS
 2     (Video On)
 3     THE VIDEOGRAPHER:  We are on the record, and
 4  the time is approximately 10:38 a.m.  This is the
 5  beginning of the videotaped deposition for Paul
 6  Lewis, Jr.
 7     Would counsel present please identify
 8  themselves and who they represent for the record.
 9     MS. CANNELLA:  Tedra Cannella for the
10  plaintiffs.
11     MR. HILL:  Rick Hill for defendant Rough
12  Country.
13     THE VIDEOGRAPHER:  Thank you, Counsel.
14     Would the court reporter please swear in the
15  witness.
16     THE COURT REPORTER:  Would you raise your
17  right hand, please, to be sworn.
18  THEREUPON:
19        PAUL LEWIS, JR., M.S., BME,
20  was called as a witness, and having been first duly
21  sworn, was examined and testified as follows:
22        EXAMINATION
23  BY MR. HILL:
24     Q.  Thank you, Mr. Lewis.  Good morning.
25     A.  Good morning.
```

Page 5

```
 1     Q.  I'd like to start -- you've produced some
 2  documents this morning, so I want to start by going
 3  over what you've brought with you today and what you've
 4  produced to us today and make sure we're on the same
 5  page with regard to what you relied upon in giving your
 6  opinions in the case.
 7     A.  Okay.
 8     Q.  So I'll start with just the Notice of
 9  Deposition, just so we have it in the record.  We can
10  mark that as Exhibit 1.  I have a copy, but it looks
11  like you have it.
12     A.  I do.
13     Q.  It's the fourth amended notice.  We can mark
14  that as Exhibit 1.
15     (Defendant's Exhibit No. 1 was marked for
16  identification.
17     MS. CANNELLA:  And just for the record,
18  Mr. Hill, we didn't do an objection to this one,
19  but it's the same objections as before since it's
20  only been date --
21     MR. HILL:  That's fine.  They can apply to --
22     MS. CANNELLA:  Great.
23     MR. HILL:  And I don't know if you need a copy
24  of the court reporter can use this as an exhibit
25  or whatever.
```

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 6

1 BY MR. HILL:
2    Q. The notice, Exhibit A, lists file material
3 that we've asked you to produce at the time of the
4 deposition or prior to the deposition by agreement of
5 counsel. Have you reviewed that notice prior to today?
6    A. I did.
7    Q. And have you provided to us -- or have you
8 brought with you today everything that's responsive to
9 that notice?
10    A. Well, I think it's a combination of the two.
11    Q. Okay.
12    A. What I have here, and I think there may have
13 been some additional things that I don't -- maybe don't
14 have printed out that are also produced when we sent
15 you all of my file and everything.
16    Q. Okay. Well, let's start with what we know
17 have been -- has been produced in the past. We have
18 your expert report dated October 16th that was produced
19 at that time. You brought that with you here today.
20    A. I do.
21    Q. And within that report on pages 3 through 4 we
22 have a list under a section called Database, Roman
23 Numeral III, and it says you've reviewed the following
24 case-specific information. And it lists 46 specific
25 items with subparts.

Page 7

1    I assume that this represents the material that
2 you reviewed in connection with preparing this report
3 dated October 16, 2023.
4    A. That's a list of everything I had at that
5 point, yes, sir.
6    Q. So that's everything that you have relied upon
7 in forming your opinions in that report at that time.
8    A. As far as materials that have been provided to
9 me, I'd also conducted a vehicle inspection, as well as
10 a surrogate exemplar study too.
11    Q. Sure. And that was a bad question. I meant
12 this is the material that you reviewed that had been
13 supplied to you by Ms. Cannella.
14    A. Yes.
15    Q. Okay. And then we have file material that we
16 received from you that would include what you just
17 mentioned that was produced to us back on February
18 16th. And that included your photos from your vehicle
19 examinations that you just mentioned, the surrogate
20 study that you performed in connection with the case,
21 your CV, your Rule 26 disclosure of your testimonial
22 history, and I believe your invoices and billing
23 records for this case.
24    A. Yes.
25    Q. Okay. Then we have what was produced to us

Page 8

1 just last Friday, on March 15th, which was a
2 supplemental report of the same date which attached two
3 studies that you reference in your supplemental report
4 plus material from the Bacho and Mendoza cases.
5    A. Correct.
6    Q. Okay. And then today we've been provided with
7 a document I guess I'll mark as Exhibit -- I already
8 had my exhibits numbered, so why don't we call this
9 1-A. And this is entitled Surrogate back slash
10 Exemplary Study, Bryson 9346 through 9347.
11    (Defendant's Exhibit No. 1-A was marked for
12 identification.)
13    Q. When was that prepared? It's not dated.
14    A. It was just prepared like the other day
15 because I realized it's -- I hadn't dictated notes
16 from -- from the study or, you know, they hadn't been
17 put into typed form.
18    Q. Okay. And when you say "the other day," do
19 you know what day it was?
20    A. It was, I think, sometime last -- oh, no, this
21 was this weekend.
22    Q. Okay. So this was prepared this weekend. You
23 mean March 16th and 17th?
24    A. I -- I think so, unless it was done last
25 Friday. I don't remember specifically which day but

Page 9

1 very, very recently.
2    Q. All right. And you said the purpose of this
3 is you did not create this contemporaneous with
4 performing your surrogate exemplar study.
5    A. Not in the typed form, correct.
6    Q. Okay. And is that something you normally do
7 in your regular course is to create this
8 contemporaneously with performing the study?
9    A. Yes, just -- well, I -- I don't create it.
10 It's dictated and then gets typed, just like my vehicle
11 exam notes as well.
12    Q. And -- and you didn't realize till this
13 weekend that you had not done that in this case.
14    A. Yes.
15    Q. Okay.
16    MS. CANNELLA: To be clear, he just typed it.
17 He had the dictation, but he typed it.
18    Right?
19    THE WITNESS: Yeah.
20 BY MR. HILL:
21    Q. What does that mean? You dictated it
22 contemporaneously with the study or --
23    A. That's what we always do, and then it just
24 hadn't been transcribed.
25    Q. Okay. So you just had it transcribed this

Paul Lewis , Jr., M.S., BME                                   March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 10

1  weekend.
2     A.  Right, because I didn't -- I realized finally
3  as I was getting ready that that wasn't in there.
4     Q.  All right.  And you performed this study back
5  in 2022?
6     A.  September of '23.
7     Q.  September of '23.  Sorry, I meant '23.
8     All right.  And you just went back and found the
9  dictation from September of 2023?
10    A.  Uh-huh (positive response).
11    Q.  And it had just never been transcribed by your
12 staff.
13    A.  Correct.
14    Q.  All right.  1-A, thanks.  And mine's just got
15 a -- kind of numbered the other one, so...
16    All right.  The second document we received for
17 the first time today starts at Bryson 9280 and runs
18 through 9345, is entitled Case Review.  When was that
19 document created?  Again, it doesn't have a date.
20    A.  Well, this -- this is a living document.  So
21 it starts from the time the case starts, and as we
22 continue to get materials, it keeps being added to.
23    Q.  Okay.  So --
24    A.  And we did produce a version of this, I'm
25 sure, back -- I forget when my depo was supposed to

Page 11

1  have been.  So the only -- as far as I can remember,
2  the only real difference is I added some more
3  information to the front sheet that wasn't on that
4  previous version.
5     Q.  Okay.  So let's talk about that.  You provided
6  it in its living form to Ms. Cannella, I guess, back --
7  prior to February 16th, when your file was produced in
8  this case.
9     A.  Yeah, whenever the -- right, whenever that
10 was.
11    Q.  And -- and you say the only change to it since
12 then is some additional information on the front sheet.
13    A.  I think so.  Other -- the rest of it will be
14 just, you know, I found some misspelled words or
15 something like -- so no other substantive change.
16    Q.  Okay.  And you don't know whether it was
17 produced to us after you produced it to Ms. Cannella
18 prior to today.
19    A.  I -- I don't.
20    Q.  And, again, as of February 16th substantively
21 everything that's in this document now was in it at
22 that time.  You didn't make any substantive additions.
23    A.  Give me one second.
24    Q.  Sure.
25    A.  It looks like I've -- I've received two other

Page 12

1  materials since February 16th.
2     Q.  All right.  And how do you know that?  Where
3  is that you're looking at the page?
4     A.  Because it lists a date of when materials were
5  provided.
6     Q.  Okay.
7     A.  So the last was February 14th of '24.  So
8  probably this had to be produced prior to February
9  16th, I would imagine, if that's when the depo date was
10 going to be.
11    Q.  All right.  Well -- so you were provided on
12 February 14th the two tests that you reference in your
13 supplemental report dated March 15th.
14    A.  Correct.
15    Q.  Okay.  And how did you receive those tests?
16 Who were they provided by?
17    A.  Just like everything else, by the law firm.
18    Q.  Okay.  So everything that you have listed in
19 here that you didn't generate yourself -- I mean I'm
20 excluding your own surrogate study notes or your own
21 notes.  All of the material in here you received from
22 Mr. Cannella.
23    A.  Yes, just like in any other case.
24    Q.  Sure, I understand.  But sometimes people get
25 documents from other sources or you research and find a

Page 13

1  document on the Internet or something.
2     A.  Yeah.
3     Q.  That's just what I'm trying to make sure.  So
4  all of the material that you didn't actually draft or
5  create you received from Ms. Cannella.
6     A.  That's correct.
7     Q.  Okay.  Then it appears that you also received
8  on February 29th from Ms. Cannella the deposition of
9  Bryant Buchner that was taken on January 23rd, with the
10 exhibits, and Mrs. Bryson's driver's license.
11    A.  Correct.
12    Q.  So that's -- those last two things are the
13 only items that you received subsequent to February
14 16th.
15    A.  Yes.
16    Q.  Okay.  The only items on here that are
17 referenced in your supplemental report dated March 15th
18 are Items 51 and 52 on page 9283; correct?
19    A.  In addition to the Bacho and Mendoza cases.
20    Q.  Okay.  So the material that you produced
21 related to Bacho and Mendoza, where did that come from?
22    A.  From my files.
23    Q.  Okay.  So you had that material prior to
24 February 16, 2023.
25    A.  Yeah, I've had it for almost 20 years.

4 (Pages 10 - 13)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 14

1    Q. Right. And so you had it prior to the time of
2  your expert disclosure on October 16th of 2023.
3    A. Of course.
4    Q. Right. And you had it at the time that you
5  created your report dated October 16, 2023.
6    A. Yes, certainly did.
7    Q. So the only new material since February 16,
8  2024, is the deposition of Bryant Buchner and
9  Ms. Santana's -- I meant Mrs. Bryson's driver's
10 license.
11   A. Yes.
12   Q. Okay. There's a reference on the last page of
13 this document, 9345, to the deposition of Mr. Buchner
14 and Mrs. Bryson's driver's license. And so that was
15 added at some time, I guess, after February 29, 2024?
16   A. Say that one more time?
17   Q. You had mentioned there's no substantive
18 changes --
19   A. Oh.
20   Q. -- to the first page. Would that be a
21 substantive change to this document since February 16,
22 2024?
23   A. Since February 16th?
24   Q. Right.
25   A. Yes.

Page 15

1    Q. Okay.
2    A. I mean just listing there, but that's all.
3    Q. Okay. And you say here on page 9345 that you
4  reviewed the deposition of Bryant Buchner but you did
5  not transcribe anything related due to time
6  constraints.
7    A. I briefly skimmed it. And frankly, yeah,
8  after that depo got cancelled that kind of got pushed
9  off. And so I haven't gone and fully dictated it or
10 anything even up to today.
11   Q. Okay. At the time that you drafted your
12 October 16, 2023 report, had you received documents
13 related to Mr. Buchner's review and opinions in the
14 case?
15   A. Yes, because I mean I even quoted his
16 reconstruction all in my -- in the report, which was
17 the 46th item.
18   Q. Right. And so the only additional information
19 related to Mr. Buchner since that time was the receipt
20 of his transcript of his deposition.
21   A. And the exhibits.
22   Q. Yeah, sure.
23      All right. When was the final version of -- and
24 this we've marked as Exhibit 1 to the case review, the
25 one that was produced today for the first time -- when

Page 16

1  was it finalized?
2    A. Past week or so, I guess.
3    Q. You're not sure of the exact date that it was
4  finalized.
5    A. No, I don't try to keep up with that. And
6  it's -- technically it's not finalized because I'm sure
7  I'll still continue to get materials. But as far as
8  what's listed there, I mean probably in the -- you
9  know, at least the past week or maybe a little before
10 that.
11   Q. Okay. As far as its current form. I
12 understand it's a living document and you might add to
13 it. But its current form existed sometime last week.
14   A. At least. It may have been --
15   Q. May have been earlier?
16   A. May have been two to three weeks, yeah, may
17 have been two weeks ago.
18   Q. Okay. Did you have an expectation that it
19 would be produced to us on February 16th with the rest
20 of your file?
21   A. You know, I guess I would -- I assumed. But,
22 you know, again, I don't know what (indicating) people
23 do. I just provide what I'm asked for.
24   Q. Right. But you did provide this to
25 Ms. Cannella prior to February 16, 2024.

Page 17

1    A. With -- again, for the most part, the body of
2  it was the same. I think realistically just as I was
3  going through I added a few things on the front.
4    Q. Sure.
5    A. But that's -- you know, and then as you
6  pointed out, the two or three other items at the end.
7  That's really all. The rest of it is the same.
8    Q. But whatever version of it existed on February
9  16th, you provided that to Ms. Cannella.
10   A. I did, yeah.
11   Q. Okay.
12   A. I mean there's no -- you know, I don't know
13 just really a conspiracy here. I mean there's no
14 opinions of mine in there or anything else. It's just
15 underlying data basically.
16   Q. Okay. And so there is certain information
17 that I gleaned from it that I reviewed that you've also
18 included in your report.
19   A. Of course, yes.
20   Q. And so anything that's important that's in
21 here that relates to your opinions you've included in
22 your report or referenced it in one of your two
23 reports.
24   A. If I had it before, yes. I mean, obviously,
25 my first report there's been a few items I've received

5 (Pages 14 - 17)

Paul Lewis , Jr., M.S., BME                                   March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 18

1 since then that certainly weren't included in the first
2 report.
3    Q. Sure. But whatever existed that you had at
4 the time of your first report, that was contained
5 within Exhibit 1-B that you felt was important to your
6 opinions, you referenced it in your report.
7    A. Yes.
8    Q. And then your supplemental report -- just to
9 be clear, make sure -- the only two items you received
10 prior -- or I guess four items you received prior to
11 your supplemental report are the test data listed at
12 Paragraph 51 and 52 and the deposition of Mr. Buchner
13 with exhibits and then Mrs. Bryson's driver's license.
14    A. Correct.
15    Q. Did you ask for Mrs. Bryson's driver's
16 license?
17    A. I don't think I did. I think they just sent
18 it to me.
19    Q. Okay. And are you relying upon it for any of
20 your opinions in the case?
21    A. Well, I mean it's a part of multiple data
22 points I have of what her height and weight is.
23    Q. Yeah. So it just confirmed that you already
24 had that information from her medical records.
25    A. Well, like it has listed here, I have a number

Page 19

1 of different spots.
2    Q. Sure. All right.
3       Was there anything about your review of
4 Mr. Buchner's deposition that relates to your
5 supplemental report?
6    A. No. I think it was just basically going
7 through, you know, obviously following the bases of his
8 report, which I had that information and some of the
9 scans which we utilized.
10    Q. Sure. But there was nothing in that
11 transcript that changed or altered any of your opinions
12 in the case.
13    A. No.
14    Q. Okay. Did you ask for the two tests under
15 Paragraphs 51 and 52 that you received from
16 Ms. Cannella?
17    A. No. I mean in general I just receive
18 materials over the course of time, so...
19    Q. So she sent those to you just out of the blue.
20 It was not solicited by you.
21    A. Well, that's what I just answered, didn't I?
22    Q. I'm just making sure.
23    A. Yeah.
24    Q. Yeah.
25       Did she tell you where she obtained those

Page 20

1 documents?
2    A. I don't think so.
3       (Defendant's Exhibit No. 1-B was marked for
4    identification.)
5    Q. Let me see that back real quick.
6       MR. HILL: Sorry, I just got this, so there
7    may be some delays in questioning on it.
8       MS. CANNELLA: The case review we provided
9    for, Cathy said she gave you those Bates numbers?
10       MR. HILL: Yeah, those were not this case
11    review. The Bates numbers she gave me were the
12    case review in the Bacho case. They were not in
13    the case review for this case.
14       MS. CANNELLA: Oh. The 9142 through 9176?
15       MR. HILL: Yeah. That's in Bacho. That's not
16    for this case.
17       MS. CANNELLA: Oh, okay.
18       MR. HILL: Same with the surrogate study, 9177
19    through 9178. That was for Bacho, not for this
20    case.
21       MS. CANNELLA: Okay.
22 BY MR. HILL:
23    Q. There have been a number of documents that
24 you've received in addition to the ones we just
25 discussed since your initial report dated October 16,

Page 21

1 2023. If you look at page 4 of this case review, it
2 appears that on January 18th of 2024 you received a
3 Ford production, PF Bates numbers -- I'm not sure what
4 that means -- with a date of 11/16/2023?
5       MS. CANNELLA: Plaintiffs' Bates numbers, I
6    think.
7       MR. HILL: Plaintiffs' Bates numbers? Okay.
8 BY MR. HILL:
9    Q. It's listed under Paragraph 49?
10    A. Right.
11    Q. Have you reviewed those documents?
12    A. I have.
13    Q. Then we have on January 25th you received the
14 deposition transcript for Dr. Eisenstat with exhibits;
15 is that correct?
16    A. That is correct.
17    Q. All right. Those are the only two additional
18 items since your October report you've received other
19 than the four additional items we've already discussed;
20 correct?
21    A. Yes.
22    Q. And I assume, now that you've issued a
23 supplemental report dated last Friday, that if there
24 was anything about the Ford production or the
25 deposition of Dr. Eisenstat that would modify or change

6 (Pages 18 - 21)

Paul Lewis , Jr., M.S., BME                  March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 22

1 your opinions you would've included that in your
2 supplemental report dated March 15, 2024.
3    A. Correct. I mean, again, they're just further
4 additional support or, you know, data points, so to
5 speak.
6    Q. Okay.
7       MR. HILL: Just put it right here.
8    Q. One of the items listed in your report prior
9 to -- and this is your report from October 16th of
10 2023 -- Item No. 25 is the deposition of Rad Hunsley
11 taken on August 4, 2023, with exhibits; is that
12 correct?
13    A. Yes.
14    Q. So you had that deposition transcript prior to
15 the time you drafted your October 16, 2023 report.
16    A. Obviously.
17    Q. Yeah. Are there any additional materials
18 other than what we just discussed -- and I know we
19 talked about a lot, but I tried to keep it as brief as
20 possible -- any additional materials, data, testing,
21 anything that you've received or generated that you're
22 relying upon to give your opinions in this case?
23    A. No. I mean everything is basically listed in
24 1-B, in addition to the other, what I call my work
25 product.

Page 23

1    Q. Sure. And can you generally describe what
2 you've brought with you today, what these documents are
3 here? And I know there's a lot. I'm not saying you
4 have to list every one, but -- and we'll maybe mark
5 that at the end of the deposition just so I know what
6 you've brought. But can you just generally tell me
7 what you brought with you today?
8    A. Sure. So I brought a copy of my case review,
9 which again is just basically a chronological listing
10 of the materials I've been provided to review in the
11 case. And then the body is just a summarization like
12 of depositions, medical records, et cetera, like I told
13 you earlier. There's nothing that's an opinion of mine
14 that's anywhere in this. It's just kind of like
15 basically what I call my study guide because, you know,
16 we don't keep paper files anymore, so -- you know, and
17 I never highlight, underline, or do anything. So this
18 is just, you know, more readable form.
19    Q. While we're taking about that, do you generate
20 that entirely by yourself, or do you have help in
21 generating that case review?
22    A. It's a combination of myself and my staff.
23    Q. Okay.
24    A. But --
25    Q. The only -- I'm sorry, I didn't mean to

Page 24

1 interrupt you.
2    A. Sorry.
3       But ultimately, even if I didn't dictate a
4 particular deposition or something, I still ultimately
5 go back through things anyway.
6    Q. And when you say "go back through things," you
7 actually read the deposition transcript, or would you
8 rely upon the summary provided by your staff?
9    A. I would rely on the summary. But if there was
10 something I was looking at in the summary that I had
11 more interest and I might want to go look at context,
12 you know, I might go back and read certain pages of it.
13    Q. The only staff person that is listed on your
14 billing is Jessica Henson, I believe. What is her role
15 with your company?
16    A. It's Jenica.
17    Q. Oh, Jenica? I'm sorry.
18    A. Yeah. J-e-n-i-c-a.
19       Basically support stuff. So she helps me with
20 reviewing materials or, you know, preparing reports as
21 far as, you know, doing the typing or putting figures
22 in, things of that nature. She's got a law degree, so
23 I'm -- I'm the only technical person. So as far as the
24 true analysis or opinions, that's all only my work.
25 There's nobody else at the office that can help with

Page 25

1 that part.
2    Q. Okay. So her role is to -- is what? How
3 would you describe it? To summarize depositions, help
4 collect materials? She's not assisting you with
5 generating your opinions?
6    A. No, she's not.
7    Q. And she's not qualified to help you with
8 rendering the actual opinions.
9    A. That's correct.
10    Q. Okay. If anyone else had assisted you with
11 this case, would they be listed in your billing
12 records?
13    A. Yes. I mean usually -- I'm surprised there
14 wasn't something maybe from Jamie Hamilton, just
15 because she's in charge of -- since all this stuff now
16 is electronic, she's who downloads and gets it listed
17 and all. But -- and occasionally she'll review. But
18 if there wasn't anything on there, then she must not
19 have reviewed anything so far.
20    Q. Is she considered a secretary? Would she be
21 listed that way in the billing?
22    A. I think it is or -- I mean she's got a
23 paralegal degree, so...
24    Q. Well, there was a listing for assistance from
25 a secretary, just didn't have a name.

7 (Pages 22 - 25)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 26

1    A. Yeah. Well, and that could include also
2 typing so...
3    Q. Okay. Sure. I didn't mean to interrupt you
4 but just --
5    A. Okay.
6    Q. -- thought we'd cover that while we're on that
7 document.
8    A. Yeah, no problem.
9    I have a copy of both the reports. I have the
10 vehicle exam notes and then also the photographs that I
11 took from the vehicle inspection. I have the notes for
12 the surrogate study which we've talked about. I didn't
13 realize they hadn't printed the photos for me, but I
14 think we're trying to get a copy just so I have them on
15 hand, but you should already have those photos.
16    Q. And that's the photos from the surrogate
17 study.
18    A. Correct.
19    And then billing, Rule 26, which is -- I think
20 there's been a few things since then. And then, like I
21 said, the two Bacho and Mendoza file materials that
22 we'd already sent you.
23    Q. That's what you brought with you today.
24    A. Well, and I had the notice too.
25    Q. Yeah, sure. All right.

Page 27

1    Did you bring with you a updated CV?
2    A. I didn't, but it's -- what you have is -- is
3 the current.
4    Q. Sure. I'll just go ahead and mark that as
5 Exhibit 2 --
6      (Defendant's Exhibit No. 2 was marked for
7 identification.)
8    Q. -- so we'll have it. And do you need a copy?
9 Here we go. I'm sorry.
10    A. I mean I should know it.
11    Q. Yeah. All right.
12    So this is Exhibit 2. It's Bates labeled Bryson
13 144 through 1450. It's not dated, but you say that
14 it's -- and your belief is that this version that
15 would've been supplied back in October of 2023 is
16 current and up to date.
17    A. Yes, there hasn't been anything added.
18    Q. Sure. And it -- this CV that was produced
19 then is a -- contains all of the experience, education,
20 and training that you've undergone that you intend to
21 rely upon in giving your opinions in this case.
22    A. As well as publications as well, yes.
23    Q. And the publications are listed in the CV
24 that's been marked as Exhibit 2.
25    A. They are.

Page 28

1    Q. And just real quick, I mean you've owned your
2 own consulting firm since 2011.
3    A. Correct.
4    Q. And you've mentioned a few employees of the
5 firm. How many employees do you have?
6    A. Counting myself, four.
7    Q. And you've mentioned two others. Who's the
8 fourth?
9    A. Chris Olley, O-l-l-e-y. And he's just, you
10 know, like copy guy. And when we do surrogate work and
11 all, he goes -- he tries to find the vehicles and
12 things of that nature. So he doesn't really work the
13 files, so to speak, or anything.
14    Q. Right. And if he's involved -- do you bill
15 for his time?
16    A. I do.
17    Q. Okay. And so if he had been involved in this
18 case, you would expect his name to be in the billing
19 records.
20    A. Yes.
21    Q. And, again, just to be clear, you're the only
22 employee of your firm who is qualified to actually
23 render biomedical opinions.
24    A. That's correct.
25    Q. Okay. Sorry, I'm dealing with COVID rebound,

Page 29

1 so I have a little COVID brain. If I am slow today, I
2 apologize.
3    A. That's all right.
4      MR. HILL: You've had it three times?
5      THE COURT REPORTER: No, I was going to say
6 it's 3 if you're marking that.
7      MR. HILL: Exhibit 3. I was like good gosh, I
8 hope you haven't had it three times.
9      THE WITNESS: I've had it three times.
10 BY MR. HILL:
11    Q. I don't know if I have an extra copy of that,
12 but you brought a copy today; right?
13    A. Of the Rule 26?
14    Q. Yeah.
15    A. I do.
16    Q. Do you mind letting me have that? Sorry.
17    All right. So you indicated that the version you
18 brought today may be updated a little bit from the one
19 from October of 2023?
20    A. No. I -- the one I have even here is still
21 missing probably a couple of testimonies.
22    Q. Okay. It's just missing the stuff that you
23 might've done between October of last year and today.
24    A. Oh --
25    Q. Or some -- some of them.

8 (Pages 26 - 29)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 30

1    A. No. This one's got December '24. Yeah,
2 there's some depos in '24.
3    Q. All right. Well, why don't we mark that one
4 as 3-B or 3-A, whatever -- whatever makes more sense.
5       MS. CANNELLA: 3-A. Okay. You want me to get
6    some copies of this?
7       MR. HILL: I'm not -- no, I'm not worried
8    about it. I'm not going to belabor this.
9       (Defendant's Exhibit No. 3-A was marked for
10    identification.)
11 BY MR. HILL:
12    Q. In the version that we received back in
13 October there were no cases where you had testified in
14 a case involving Ms. Cannella. Has that changed since
15 October of 2023?
16    A. No. I think this is the only case I have with
17 her.
18    Q. Okay. And you've testified in the past that a
19 hundred percent of your work is in litigation, cases
20 like we're here today?
21    A. That's correct.
22    Q. And that's still true.
23    A. It is.
24    Q. And that's been true since 2011, when you
25 started your own firm?

Page 31

1    A. Oh, absolutely.
2    Q. Okay.
3    A. It was true even before I started my firm or
4 the other firm.
5    Q. So that goes back to when you -- does that go
6 all the way back to when you began as a consultant in
7 1999?
8    A. Well, I started at Burton and Associates in
9 '98.
10    Q. Yeah, well, '98. Sorry.
11    A. Yeah.
12    Q. Okay. So the entire time you've been a
13 consultant a hundred percent of your activities have
14 been in connection with litigation like we have here
15 today.
16    A. It ultimately all did --
17    Q. Right.
18    A. Even if I did some research, ultimately it was
19 used in litigation as well.
20    Q. Sure. And you testified in the past that
21 about 90 percent of your work over that time period has
22 been for plaintiffs.
23    A. That's correct.
24    Q. And that's still accurate today --
25    A. Yes, sir.

Page 32

1    Q. -- right?
2    And you were retained by counsel for the plaintiff
3 in this case, Ms. Cannella?
4    A. Yes.
5    Q. That's correct?
6    And you said this is the first time you've handled
7 a case with her.
8    A. I believe so, yes.
9    Q. Okay. And I believe you've testified that
10 since 1998 -- sorry, get the date wrong -- that you've
11 probably given several hundred depositions.
12    A. At this point well over a thousand.
13    Q. Right. That's what I thought.
14    And how many times have you testified in trial? I
15 think you've recently said that's at least a couple
16 hundred times --
17    A. Yes.
18    Q. -- since that time.
19    A. That's correct.
20    Q. And do you recall the last time that you
21 testified or gave a deposition on behalf of a
22 defendant?
23    A. I do.
24    Q. And when was that?
25    A. Last week.

Page 33

1    Q. Prior to that when was the last time that you
2 gave a deposition or trial testimony on behalf of the
3 defendant?
4    A. I think I gave three or four last year. I
5 just testified in a trial for a defendant last week
6 (indicating), but I didn't get deposed in that case.
7    Q. And what was that trial testimony about? What
8 was that case about?
9    A. It was about a -- sorry. It was about a
10 little child that got run over by a car, and there was
11 a question -- or the plaintiffs were saying that the
12 child had been run over by the tires of the vehicle and
13 if -- at least once, if not twice, by the tires.
14    So I was working for the defendant that was
15 representing both the apartment complex and the driver
16 of the vehicle. And so, again, it was still -- I was
17 still doing only biomechanics or injury causation
18 issues.
19    Q. Okay. We know that you were involved in the
20 Bacho and Mendoza cases which were cases brought
21 against Rough Country related to a vehicle that had a
22 lift kit installed.
23    Other than those two cases, have you been involved
24 in any other cases involving a vehicle with a lift kit?
25    A. I don't think so.

9 (Pages 30 - 33)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 34

1    Q.  Okay.  Have you ever testified on behalf of a
2  lift kit manufacturer?
3    A.  No.
4    Q.  And I'm just making sure we're current.
5  You've recently testified in other cases that you're
6  not aware of any orders issued against you by any
7  courts that in any way limited your testimony, you
8  know, whether in whole or part, whether due to Daubert
9  or any other type of challenge.  Is that still true
10  today?
11    A.  Yes, sir.
12    Q.  Okay.  And you've never been disqualified as
13  an expert.  Is that still true today?
14    A.  Yes.  Or correct, sorry.
15    Q.  Yeah.  And none of your opinions to your
16  knowledge have ever been limited or excluded from
17  trial?
18    A.  Not that I know of.
19    Q.  Okay.  I'm not going to go through your CV,
20  but I just want to make a few things clear.  You're not
21  going -- holding yourself out as an expert in accident
22  reconstruction?
23    A.  I certainly am not.
24    Q.  And you don't intend to give any expert
25  opinions in this case regarding accident

Page 35

1  reconstruction.
2    A.  No, sir.  That's why I have Mr. Buchner's
3  report and utilize his findings.
4    Q.  Sure.  So you're relying upon his report and
5  his testimony in giving your opinions today.
6    A.  Correct.  And obviously at this point that's
7  the only reconstruction I've seen.
8    Q.  Right.  And you're relying upon the accuracy
9  and reliability of his reconstruction both of the
10  actual accident and of his simulation of the
11  hypothetical accident that would be where the -- the
12  F-250 was not lifted; correct?
13    A.  Yes.
14    Q.  And if you are allowed by this Court to give
15  any testimony regarding your opinions in the Bacho and
16  Mendoza cases, it's also true in those cases you did
17  not act as an accident reconstructionist; correct?
18    A.  That is absolutely correct.
19    Q.  And you relied upon the opinions of the
20  accident reconstructionist in those cases in giving
21  your opinions in those cases.
22    A.  Yes, sir.
23    Q.  And you relied upon the accuracy and
24  reliability of those -- of the work by those experts in
25  those cases.

Page 36

1    A.  Just like any other case, yes.
2    Q.  Right.  And because you're not qualified as an
3  accident reconstructionist, you're not qualified to
4  judge the accuracy and reliability of those opinions.
5    A.  Well, I have the background that I could.
6  It's just not something that I do.  And certainly since
7  I don't, you know, provide reconstruction opinions, I'm
8  certainly not going to critique it.
9    Q.  Sure.  And in this case Mr. Buchner, you know,
10  created a computer simulation of the hypothetical
11  incident.  And when I say "hypothetical incident," I'm
12  talking about a hypothetical scenario where the F-250
13  involved in this case had not had the lift kit
14  installed --
15    A.  Yes.
16    Q.  -- if that makes sense.
17    And he ran a computer simulation, and my question
18  is do you have any experience with the software that he
19  used to run that simulation?
20    A.  I don't know how to use it or manipulate it.
21  I mean I've seen it a lot of times before.  But, yeah,
22  I don't own it or know how to use it.
23    Q.  So you can't evaluate how Mr. Buchner used it
24  in this case.
25    A.  Certainly not.

Page 37

1    Q.  Right.  And you can't -- you wouldn't have the
2  expertise or knowledge to determine whether he used the
3  appropriate inputs in using that software.
4    A.  Of course not.
5    Q.  Yeah.  And so you wouldn't have the ability to
6  know whether that software is even appropriate in
7  performing a simulation of this hypothetical crash.
8    A.  I do not, one way or the other.
9    Q.  Okay.  Would you agree that your opinions
10  regarding what might have happened in that hypothetical
11  situation, including the potential G-forces experienced
12  by Cohen in that hypothetical situation, that all of
13  your data and information related to that comes from
14  Mr. Buchner and not from any work you've done
15  independent from his work?
16    A.  Well, as far as from a reconstruction
17  standpoint that's true.  I mean obviously from my
18  understanding of the kinematics and injury reference
19  values and things of that nature, that's my own work;
20  but as far as what may be stated as to what those G's
21  are, certainly I'd have to rely on him.
22    Q.  Right.
23    MS. CANNELLA:  Do you want a bottle of water?
24    THE WITNESS:  Yeah, if you don't mind.
25    MR. HILL:  If you want to take a break or --

10 (Pages 34 - 37)

Paul Lewis , Jr., M.S., BME                           March 18, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 38

1    MS. CANNELLA:  I don't think we need to.

2    THE VIDEOGRAPHER:  You want to stay on the

3  record?

4    MR. HILL:  It doesn't matter.

5    THE WITNESS:  I'm just going to grab a water.

6    (Brief recess)

7    MR. HILL:  And I know you've done this so many

8  times.  It goes without saying anytime you want to

9  take a break or anything, just let me know.

10    THE WITNESS:  Right.

11    Starting to be good old pollen season, so...

12 BY MR. HILL:

13    Q.  See, I appreciate you agreeing to reschedule

14  this due to my -- my COVID.  I couldn't even speak,

15  speaking of coughing and stuff, at that time.

16    A.  Oh, okay.  I -- I couldn't remember why it got

17  postponed, but now that you say that I remember.

18    Q.  Well, it was originally postponed -- I think

19  you had a trial conflict, but then a rescheduled one

20  was my fault so...

21    A.  Okay.

22    Q.  All right.  Similarly with regard to your

23  expertise, because it's not in your area, you're not

24  going to be testifying in this case that the lift kit

25  installed on the Bryson vehicle was defective or

Page 39

1  unreasonably dangerous; correct?

2    A.  I am not.  That will be for somebody else.

3    Q.  And you don't plan to give any testimony

4  regarding any possible alternative designs of the lift

5  kit.

6    A.  No.

7    Q.  And you're not an expert in automotive design

8  or manufacturing.

9    A.  No.  Correct.

10    Q.  You've never worked for an automobile

11  manufacturer.

12    A.  I have not.

13    Q.  Never designed any product that was put into

14  the stream of commerce.

15    A.  I have not.

16    Q.  Also with regard to your background, you're

17  not a medical doctor; correct?

18    A.  I certainly am not.

19    Q.  And don't possess any medical related degrees.

20    A.  No.

21    Q.  You're not a D.O.

22    A.  No.

23    Q.  I know you completed a two-year internship

24  back in the late '90s with the office of the medical

25  examiner in Atlanta.

Page 40

1    A.  (Witness nods affirmatively).

2    Q.  And I understand that encompassed working for

3  three of the metro county area coroners.

4    A.  (Indicating affirmatively).

5    Q.  Can you just tell me a little bit about what

6  you did during that two-year internship?

7    A.  Sure.  So basically I'd go out on scenes,

8  whether they were homicide, suicides, natural deaths,

9  car crashes, plane crashes; would help assist with the

10  on-scene investigation, remove the bodies, help

11  transport them back to the morgue.  I also as a

12  technician helped to assist in doing the autopsies,

13  where ultimately the pathologist would determine the

14  cause and manner of death based on, you know, the

15  findings both externally and internally.  So that was

16  basically what I -- the benefit.  So, you know, kind of

17  a supplement or augmentation of my medical knowledge

18  from being out of grad school.

19    Q.  And when you say your "medical knowledge from

20  grad school," what are you referencing there?

21    A.  Well, I'm just saying instead of just being

22  all engineering related, so to speak, and all, it was

23  kind of a different view seeing it from more the

24  medical perspective and actually being able to truly

25  see these injuries we learn about and all and even

Page 41

1  gives you a better understanding how they may be

2  injured or so based on certain conditions.

3    Q.  And what did you do as a technician during the

4  autopsies?

5    A.  So we would -- typically we'd document

6  externally and then usually would do the initial

7  opening incisions and opening the body up and then

8  ultimately in documenting some of what we see, and then

9  ultimately the pathologist would come and section the

10  organs and -- you know, if they needed to, you know,

11  depending on what type of case, you know, there may be

12  some additional work to cut out the spinal cord or --

13  so...

14    Q.  But you did not participate in the coroner or

15  the medical examiner's determination as to cause of

16  death.

17    A.  I did not, no.  That's correct.

18    Q.  And you weren't asked by any of the medical

19  examiners to exercise any independent medical judgment

20  regarding the injuries or cause of death.

21    A.  Well, no.  Since I'm not -- wasn't a medical

22  doctor, no.  I mean we did kind of discuss or talk

23  about things from my biomechanical perspective and

24  their medical perspective.

25    Q.  Is there any other aspect or any other type of

11 (Pages 38 - 41)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 42

1 medical-related training, education, or experience
2 beyond that, your education and the two-year internship
3 that we just discussed?
4     A. Well, I continued to do that work even though
5 I wasn't employed for several years after that. And
6 even as a part of that we would -- we did what we call
7 exhumations, where there may have been someone who was
8 deceased and for some reason either an autopsy wasn't
9 done or there was a question of whether it was done
10 correctly. So we would go exhume the body and do
11 another autopsy but -- so we did a number of those as
12 well. But I think by -- I forget the dates now, but I
13 want to say by around 2003 or so I wasn't really doing
14 that work anymore.
15     Q. And you did that work voluntarily? You
16 weren't actually employed by the medical examiner's
17 office?
18     A. No, I wasn't. It was unpaid. And then after
19 that time, starting in '98, then I was paid but not to
20 still do that assistance. I was paid as far as an
21 employee of Burton and Associates, and Dr. Burton had
22 the contract with the medical examiner's office. So I
23 would still do some of that work, but, again, I wasn't
24 being paid by the County.
25     Q. Right. You were paid by Burton --

Page 43

1     A. Correct.
2     Q. -- who was paid by the County.
3     A. Correct.
4     Q. All right. Could you pull your out your -- the
5 billing records that you brought with you today? It
6 may help me if I can just --
7     A. Yeah.
8     Q. -- compare real quick to what we already have.
9 All right.
10     A. There you go.
11     MR. HILL: We'll mark this as Exhibit --
12 whatever we're on -- 4.
13     THE COURT REPORTER: Yes.
14     (Defendant's Exhibit No. 4 was marked for
15 identification.)
16     Q. All right. Exhibit 4 are the invoices that
17 we'd received Bates labeled 9053 through 9056 back in
18 October of -- no, I'm sorry. These would've been
19 received with your file on February 16th of this year.
20 I apologize.
21     And what you've brought with you today, has it
22 been undated at any time since to your knowledge
23 October 16, 2023? That appears to be the last entry on
24 these invoices.
25     A. I have four invoices so...

Page 44

1     Q. Right. And the most recent entry on any of
2 those four, would it be October 16, 2023?
3     A. Oh, I was looking at the wrong number, wrong
4 one.
5     Q. That's all right.
6     A. Yes.
7     Q. Okay. And you've obviously done work since
8 that time, but you haven't brought any invoices
9 reflecting the work you've done since October 16, 2023?
10     A. Right. I haven't billed for any of the
11 additional work since it hasn't really been a whole
12 lot.
13     Q. So these invoices reflect what you've actually
14 sent to Ms. Cannella, not all of the work you've
15 actually done on the case.
16     A. Correct.
17     Q. Do these invoices -- they appear to have a
18 date on them and then an activity description, quantity
19 rate. Is that intended to reflect the work that you
20 did on that particular date? Is that how that works?
21     A. Well, to some extent. Now, as far as like the
22 report and all, I don't do all that work in one day and
23 get it done. That's just the -- now you've got me to
24 where I can't talk.
25     Q. I'm sorry.

Page 45

1     A. That's just, you know, the accumulation of
2 what ultimately the work was when we finished. So that
3 date is basically, you know, when we do a report or
4 when we do a vehicle inspection or whatever.
5     Q. So with the report, you might work on the
6 report on days other than the day you bill for it?
7     A. Correct.
8     Q. Okay. But you don't bill for it until you
9 complete it? Is that --
10     A. Right.
11     Q. -- what you're going to tell me? Okay.
12     A. Yes.
13     Q. So you don't know the actual days that you
14 started the report or that you worked on it. You just
15 bill at the very end of that process.
16     A. Correct.
17     Q. And others in your firm bill the exact same
18 way.
19     A. Correct.
20     Q. So there's no way to determine when you
21 might've begun drafting a report. You only know when
22 it's finished because that's when it's billed for.
23     A. Yes. And part of that's also reviewing
24 materials during that time too. So that's a part of
25 it. It's not all just working on the report.

12 (Pages 42 - 45)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 46

1    Q.  Okay.  And that review of materials could be
2 spread out over some distance that's not delineated in
3 your invoices.
4    A.  That's correct.  I mean I don't have like some
5 kind of software program where I can do each day or
6 whatever.  We just -- it's a small company.  We don't
7 do that (indicating).
8    Q.  How do you keep track of your -- your time?
9 If you're -- if you're not going to bill for it until
10 potentially months later, how do you keep track of it
11 until you bill for it?
12    A.  The bookkeeper typically keeps up within -- I
13 think she either starts like a running invoice or
14 something.
15    Q.  And do you provide the information to the
16 bookkeeper?
17    A.  Right.
18    Q.  And do you do that contemporaneous with doing
19 the work, or do you go back and tell her at the end?
20 How does that work?
21    A.  Usually, depending on how long it is in
22 between, you know, I'll give her information between --
23 you know, in the times in between.
24    Q.  But she's instructed not to bill for that task
25 until the task is completed.

Page 47

1    A.  Right.  We don't -- you know, I don't send
2 monthly invoices because I mean I don't -- I just -- if
3 there's only like an hour or two done, it's not really
4 to me worth generating a bill for that.
5    Q.  Okay.  How do you bill for the generation of
6 the case review document?
7    A.  Well, it's a part of what's in the case --
8 where it says review of materials, that's covering
9 that.
10    Q.  Okay.  So any of the entries on whatever this
11 is, Exhibit 4, that say Review of Case File Materials
12 and Analysis --
13    A.  Right.
14    Q.  -- that would also include potentially time
15 generating the case review document.
16    A.  Yes.
17    Q.  And the same if the entry says Review of Case
18 File Materials and Prepare Report, that also
19 encompasses time generating the case review document.
20    A.  It is, or going through that and doing my bio
21 analysis of the materials and information that I have,
22 yes, sir.
23    Q.  Okay.  You have an entry on October 16th for
24 paralegal services, quantity seven hours, billed at
25 $125 an hour.  What's -- what is that for?

Page 48

1    A.  Give me -- which one was that?
2    Q.  The last page of these, October 16, 2023, the
3 last entry.
4    A.  So that would probably mean then that Jamie
5 did review something or did do some work on the case.
6    Q.  Okay.  And she's the person you mentioned
7 earlier that's sort of a paralegal -- she a paralegal,
8 but she also does secretarial work and --
9    A.  Sure.  Everybody does a little of everything.
10 I mean, you know, it's not really set titles, so to
11 speak.
12    Q.  All right.  The next exhibit, Exhibit 5, is
13 going to be the expert disclosure.  It's entitled
14 Supplement to Plaintiff's Initial Disclosures.
15       (Defendant's Exhibit No. 5 was marked for
16 identification.)
17    Q.  And I've sort of given you the page there.
18 That relates to your disclosure on Exhibit 5?  The
19 pages aren't numbered, but you'll see it's -- there's a
20 title heading that says Paul Lewis, Jr. and has your
21 disclosure.  Have you seen this document before today?
22    A.  Excuse me.  Not that I recall.
23    Q.  Okay.  Did you draft the section of this
24 document that pertains to you and your opinions?
25    A.  I don't think so.  I mean certainly it could

Page 49

1 be something that I discussed with Ms. Cannella, but...
2    Q.  Do you recall whether you reviewed this
3 disclosure before it was provided to the defendants?
4    A.  Like I said, I don't think so.
5    Q.  And take a minute to read it then since you
6 don't recall having seen it before today and tell me if
7 there's anything in the disclosure that you disagree
8 with.
9    A.  No, I think it's pretty much right down the
10 line of what my report is.
11    Q.  Okay.  And this was provided to us the same
12 day your report -- and you're talking about your first
13 initial October 16, 2023 report.
14    A.  Okay.
15    Q.  And in neither this document nor the report is
16 there any mention of the Bacho or Mendoza cases; is
17 that correct?
18    A.  Well, I guess not specifically, but I mean
19 that would be under my experience, but...
20    Q.  But there's no mention either in your
21 disclosure or your expert report that you intended to
22 rely upon the Bacho or Mendoza cases to give any
23 opinions in this case; correct?
24    A.  There was no mention of it, that's correct.
25    Q.  Right.  So at the time that -- that you

13 (Pages 46 - 49)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 50

1  drafted your October 16, 2023 report you did not intend
2  to give any opinions related to the Bacho or Mendoza
3  cases in this case; correct?
4      A.  Well, I don't know that that's necessarily
5  true.  I mean certainly I've worked on those cases, and
6  I have knowledge of them.  I mean it's not necessarily
7  a basis for what the opinions in this specific case
8  are, but certainly that's history or experience from
9  investigating other cases with this similar issue.
10     Q.  You understand that the -- there was a
11 deadline for your report and disclosure of October 16,
12 2023, under a scheduling order in this case.
13     A.  Well, I would assume so.  That's why we had a
14 date it was turned in.
15     Q.  Sure.  And you understand that the purpose of
16 that deadline is for you to disclose all of the
17 opinions that you intend to give in the case at that
18 time.
19     A.  At that time, sure, but I mean that's why
20 discovery is always ongoing, and so, you know, you
21 typically supplement at times.
22     Q.  What aspect of the discovery that's occurred
23 since October 16, 2023, is new that required you or --
24 it required you to supplement your opinions with a
25 brand -- with a brand-new report last Friday?

Page 51

1      A.  Just that I was asked to add additional
2  information.
3      Q.  Who asked you to add additional information?
4      A.  Ms. Cannella.
5      Q.  And what specifically did she ask you to add
6  with regard to new information?
7      A.  Well, I had some -- those test reports.  So I
8  thought those were additional bases or support for my
9  opinion, and then she asked me to discuss the other two
10 cases.
11     Q.  Okay.  And so prior to her asking -- when did
12 she ask you to discuss the other two cases?
13     A.  I don't know.  In the past, you know, maybe
14 a couple weeks, something.
15     Q.  Okay.  And so prior to that you had not
16 intended to discuss those two cases or give any
17 testimony regarding -- specifically regarding those two
18 cases; correct?
19        MS. CANNELLA:  Objection, asked and answered.
20     A.  I wouldn't say that's true, no, sir.  I mean I
21 figured I ultimately at some point in time would be
22 talking about those.
23     Q.  Okay.  But, again, you did not disclose that
24 you had any intention to talk about those two cases at
25 the time your report was due.

Page 52

1      A.  They were not in my first report.
2      Q.  Okay.
3      A.  We can agree.
4      Q.  While we're on this subject -- and we'll talk
5  about this a bunch later with regard to your
6  supplemental report -- for the first time in that
7  report you make reference to the testimony of Rough
8  Country's corporate representative in relation to the
9  Bacho and Mendoza cases.
10     You had the benefit of Mr. Hunsley's deposition
11 prior to your October 16, 2023 report; correct?
12     A.  Sure.
13     Q.  All right.  And nowhere in that report is
14 there any mention of your intention to give any
15 opinions with regard to that testimony in relation to
16 the Bacho and Mendoza cases; correct?
17     A.  Again, as I've already said, certainly it was
18 not in my first report, that's right.
19     Q.  Okay.  As exhibit -- next I'm going to mark as
20 Exhibit 6 your October 16, 2023 report.
21        (Defendant's Exhibit No. 6 was marked for
22 identification.)
23     Q.  You brought a copy of it; right?
24     A.  I did, yes.
25     Q.  I didn't give you a copy.

Page 53

1      A.  No, I don't -- that's fine.
2      Q.  Give me a second here.  I'm getting swamped
3  with all this paperwork.
4      A.  Uh-huh (positive response).
5      Q.  Just -- hopefully this is obvious, but I want
6  to just be clear on the record.  You state in your
7  supplemental report that your opinions contained in
8  your first report have not changed since that drafting
9  of the initial report on October 16, 2024.  Is that
10 still true today?
11     A.  Right.  My opinions as far as the injury
12 causation and the kinematics and all that is still the
13 same.
14     Q.  All right.  And so if you combine this October
15 16th report with your supplemental report received last
16 Friday, does that contain -- or does that encompass all
17 of the reports that you've prepared in this case?
18     A.  Yes.
19     Q.  Okay.  And do both of these reports contain
20 all of the opinions you intend to give in this case?
21     A.  I believe so.
22     Q.  Do you intend to give any additional opinions?
23 You made reference to it's always ongoing and there
24 might be additional work.  Do you have any plans to do
25 any additional work in this case?

14 (Pages 50 - 53)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 54

1    A. Well, I mean it's the usually caveat.
2  Obviously I haven't seen anything that your people have
3  done, so certainly depending upon what I read from
4  that, there might be something else I might want to do.
5  But, you know, at this point in time I don't have any
6  plans to do any other work other than that.
7    Q. Okay. And you haven't asked for any
8  additional materials or information or anything from
9  Ms. Cannella.
10    A. No.
11    Q. Okay. The reason I ask is your deposition was
12  originally scheduled for last November. It was
13  postponed multiple times, and then now we find out that
14  as of the business day before this deposition we have
15  new opinions. And so I just want to see when you're
16  actually finally going to be, okay, here are my
17  opinions in the case, this is it.
18    A. While we're there. Again, other than
19  potentially if I have something in rebuttal from your
20  experts.
21    Q. All right. We've already talked about how
22  this report lists the materials you have reviewed, and
23  we've talked about the additional ones contained in
24  your case review file. We've talked about your
25  surrogate study that you generated yourself. I want to

Page 55

1  talk about things above and beyond those things that
2  you've done. And one of them would be you inspected
3  the vehicles involved in this accident.
4    A. I did.
5    Q. How many times did you inspect?
6    A. Well, I inspected it as far as both vehicles
7  on September 12, 2022. And then I think I -- I didn't
8  do any notes, but I went back one other time to do some
9  work in -- excuse me -- in conjunction with
10  Mr. Buchner's people. I don't -- I don't remember the
11  date.
12    Q. Okay. And what was involved in that
13  subsequent inspection involving Mr. Buchner's people?
14    A. Basically scanning some -- I guess additional
15  scanning of the vehicle and also placing an exemplar
16  seat or trying to place an exemplar seat back in the
17  No. 4 seat position. And I'm sorry, by exemplar seat I
18  mean the exemplar child seat. So that they're doing
19  some additional work as far as looking at the intrusion
20  crush and in those kind of areas.
21    Q. Was Mr. Buchner present for that inspection?
22    A. No. It was two people from his office. I
23  don't even remember their names.
24    Q. Okay.
25    A. But I didn't -- you know, I didn't make any

Page 56

1  additional notes or anything like that.
2    Q. Did you take any additional photographs from
3  that second inspection?
4    A. No. Otherwise, I would've produced them.
5    Q. Okay.
6    A. Keep checking.
7    Q. Sure, yeah, I'm going. Always get ahead of --
8  you know --
9    A. Well, I'm certainly not going to argue if it's
10  not all day.
11    Q. I'm going to go as fast as I can, I promise.
12    All right. You've -- talking about additional
13  work you've done, you have not visited the crash site;
14  correct?
15    A. I have not, and that's typically not something
16  I do anyway.
17    Q. Sure. You've not talked to Mr. or Mrs. Bryson
18  about the incident.
19    A. No, sir, I have not had any personal
20  communication with them.
21    Q. And you just mentioned there were a couple of
22  people from Mr. Buchner's office present at your second
23  inspection.
24    A. (Witness nods affirmatively).
25    Q. Did you discuss the case with them during that

Page 57

1  inspection?
2    A. Well, I mean obviously we're there working. I
3  -- I don't know as far as specifics of any of my
4  opinions or not, but we were -- like I said, we were
5  trying to get a child seat in to where we could try and
6  get some scans with some -- with that in there. So I
7  mean a lot -- part of it was just talking about how to
8  get it in there and all given the lack of space or
9  survival space that's in there.
10    Q. Right. Since you didn't take any photographs
11  at that inspection, were you able to get the exemplar
12  child seat into the No. 4 position?
13    A. We did.
14    Q. And so it was scanned and used by
15  Mr. Buchner's crowd as part of their analysis in this
16  case?
17    A. That's my understanding.
18    Q. Yeah. But you did not use anything that you
19  gathered at that inspection. You relied upon
20  Mr. Buchner's scanning and photographs or whatever they
21  did with regard to that exemplar seat in the No. 4
22  position. Is that fair? Am I understanding correctly?
23        MS. CANNELLA: Object to the form of the
24    question as vague.
25    A. Well, again, I don't have scanners and things

15 (Pages 54 - 57)

Paul Lewis , Jr., M.S., BME    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 58

1 of that nature.
2    Q. Right.
3    A. So, yes, certainly I knew I was going to rely
4 on whatever output ultimately they came up with.
5    Q. Gotcha. Have you talked with Mr. Buchner
6 about the case?
7    A. I don't think I have for this particular case.
8    Q. Okay. Have you talked to any of the experts
9 retained by Ms. Cannella?
10    A. No.
11    Q. Have you talked to Dr. Eisenstat about the
12 case?
13    A. No.
14    Q. Have you talked to any employees of Rough
15 Country about the case?
16    A. No, sir.
17    Q. Just making sure. You'd be shocked. I've had
18 that happen before.
19    A. No, I have not.
20    MR. HILL: All right. We've been going a
21 little over an hour. I know we started late, but
22 I promise I'll go fast. I need to use the rest
23 room, and I'm about to get to your report.
24    THE WITNESS: Sure.
25    MR. HILL: So we'll take a quick five-minute

Page 59

1 break. I'd appreciate it.
2    THE WITNESS: Okay.
3    THE VIDEOGRAPHER: The time is 11:45 a.m. We
4 are off video record.
5    (Video off)
6    (Recess taken)
7    (Video on)
8    THE VIDEOGRAPHER: The time is 12:02 p.m. We
9 are back on video record.
10 BY MR. HILL:
11    Q. You've got your report from October 16th;
12 correct --
13    A. I do.
14    Q. -- right in front of you. And we've marked
15 it, I believe, as Exhibit 6; is that correct?
16    A. Yes, sir.
17    Q. On page 2 of the report -- it's not delineated
18 as page 2, but it's the second page of the report -- if
19 you look at the third paragraph, you have a description
20 of the F-250 pickup truck involved in the incident. Do
21 you see that on the second page, third paragraph down?
22    A. Yes.
23    Q. Okay. And you make the statement that the
24 truck was equipped with a Rough Country lift kit that
25 raised the vehicle approximately six inches above the

Page 60

1 factory recommendation.
2    What was the factory recommendation? Do you know?
3    A. I think it was four and a half inches.
4    Q. Meaning what? What do you mean by that?
5    A. What -- I'm sorry, I don't understand.
6    Q. Sure. You used the term "factory
7 recommendation," and I want to know what's your
8 definition of that term. It's used multiple times
9 throughout your report.
10    A. Well, there's -- I think there was a -- a
11 number like that they're -- recommend for what's the
12 normal lift, I guess.
13    Q. And who -- who recommends for a normal lift?
14    A. Well, again, I thought it was my understanding
15 that there's some Rough Country, you know,
16 recommendation for it, or either there's a number not
17 to go above or so.
18    Q. Okay. So if you're raising the vehicle you
19 say six inches above the factory recommendation -- and
20 you're saying that that's the recommendation by Rough
21 Country of what level of lift not to go above?
22    A. That was my understanding --
23    Q. Okay.
24    A. -- that it's higher than what it should be or
25 above what's -- I mean there's -- there's a statute or

Page 61

1 so. I think at least my understanding is that they're
2 not supposed to be over a certain height based on, I
3 think, the state of Georgia has a limitation or so.
4    Q. What factory are you referencing when you say
5 factory recommendation?
6    A. Well, it was probably meaning the Rough
7 Country factory.
8    Q. And that's true -- whenever you use the term
9 "factory recommendation," you're talking about Rough
10 Country.
11    A. Yes, I believe so.
12    Q. Okay.
13    A. Again, that's not the primary focus of my
14 report as far as opinions though.
15    Q. I just want to understand the terms you're
16 using, and that's the source of your term "factory" --
17 or what you understand to be conveying when you say
18 factory recommendation throughout the report.
19    A. I believe so.
20    Q. Okay. At the bottom of this page you have a
21 section called Statement of the Issues to be Addressed.
22    A. Yes, sir.
23    Q. All right. And the first paragraph says, The
24 case has been evaluated by engineers with expertise in
25 reconstruction, in vehicle construction design, who

16 (Pages 58 - 61)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 62

1 determined the amount of damage crush sustained to the
2 Escape's vehicle structures was significantly
3 enhanced -- paren, greater -- due to the Ford pickup
4 truck being lifted above the factory recommendation.
5     Do I understand you to mean that -- when you
6 reference evaluated by engineers, who are you talking
7 about there?
8     A. Well, that would be Mr. Buchner and Mr. Roche
9 or Roche.
10     Q. Right. And so you're relying upon their
11 opinions to support that first paragraph, what I just
12 said. It has -- you didn't come to any of those
13 conclusions yourself.
14     A. Oh, that's -- yes, correct.
15     Q. Okay. And the same goes for the next
16 paragraph, where it talks about that if the truck had
17 been -- I guess it's meaning to say it did not have a
18 lift, then the amount of structural damage and
19 intrusion would be lessened in that Cohen's occupant's
20 survival space would have been preserved.
21     Again, you did not make that determination on your
22 own. That is the opinion of the experts you've just
23 mentioned.
24     A. Of course, yes.
25     Q. And so whenever you talk about what intrusion

Page 63

1 would or would not have occurred in the hypothetical
2 crash where the truck did not have a lift, that's not
3 anything that you have done any testing to determine
4 any evaluation, any analysis. You're just taking that
5 straight from the other experts you've just mentioned.
6     A. Absolutely.
7     Q. Okay.
8     A. Because I mean those subjects are obviously
9 well beyond my area of expertise.
10     Q. Right. And so any opinion you might give as
11 to the survivability of the hypothetical crash, it has
12 to start first with the assumptions that are made by
13 the other experts and the opinions that they formulate
14 as to what might have happened in that hypothetical
15 crash.
16     A. Certainly.
17     Q. Right. And so if they're mistaken, if their
18 simulation was wrong or if their opinions are not
19 valid, then that would impact your ability to give any
20 biomedical opinions regarding what might happen in that
21 hypothetical crash.
22     A. Well, I think part of that would be depending
23 upon what may have been allegedly incorrect or not
24 and -- and the basis for that. So, you know, first
25 off, it still may not take away my ability to provide

Page 64

1 that opinion, depending upon what supposedly may have
2 been wrong.
3     Q. I understand.
4     A. And I don't know how I skipped page numbers on
5 that one.
6     Q. All right. On the next page... you got it --
7 you got the report?
8     A. Yeah.
9     Q. Okay. On what is now -- it does have a page
10 No. 3 at the top of the third page.
11     A. Uh-huh (positive response).
12     Q. Yeah. Under 3 -- Section 3-E, you list photos
13 taken at dealership inspection, eight. What are you
14 referring to there?
15     A. That's No. 3. I mean they're just some
16 additional photos of the F-250. That's just how it
17 was -- the folder that they're in was titled.
18     Q. So these were not photographs that you took.
19     A. Oh, none of those are.
20     Q. Right. These are photographs that were
21 provided to you.
22     A. Correct. I don't list my photos per se as an
23 item reviewed.
24     Q. Sure. And you don't know why it's -- they're
25 called dealership inspection.

Page 65

1     A. I do not.
2     Q. Okay.
3     A. Although my assumption is it's at some dealer
4 maybe so it could be lifted or something. I don't
5 know.
6     Q. Were they photos of the actual F-250 involved
7 in the accident?
8     A. I think it was, yeah.
9     Q. All right. Skipping ahead to page 4, there's
10 a section called Section 4 Injury Information for
11 Cohen. And in the first paragraph at the end you say,
12 There are no opinions contained herein.
13     Is that -- am I to read that to mean that in that
14 section, Section 4, there are no opinions of yours that
15 are contained with that. That's just a recitation of
16 medical information that you received from
17 Ms. Cannella.
18     A. Correct, yeah.
19     Q. Okay.
20     A. And I think I've started changing that now
21 where I make sure I say there are no opinions of mine
22 in there.
23     Q. Right. In looking at that description or that
24 Section 4, which runs through --
25     A. Page 5.

17 (Pages 62 - 65)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 66

1    Q. -- page -- I think it goes to page 9; right?
2    A. Oh, sorry, I thought you were just talking
3 about the EMS.  Sorry.
4    Q. Yeah.  It starts on page 4 and runs through
5 page 9.  And that is, I guess, your summary of what you
6 find to be the relevant medical records that you
7 reviewed in the case.  Is that a fair description?
8    A. Sure.  And I think the autopsy report's almost
9 typed verbatim.
10    Q. Right.  And that's contained under No. 4,
11 autopsy report --
12    A. Yes, sir.
13    Q. -- right?
14    So that's -- obviously the autopsy report was
15 something you found germane to your opinions in the
16 case and that you relied upon in giving your opinions.
17    A. Absolutely.
18    Q. Okay.  And throughout Section 4 -- which
19 includes the autopsy report plus the coroner's report
20 plus hospital records related to -- to Cohen plus the
21 MS report -- in all of that information that's cited,
22 is there anywhere where any medical provider gives any
23 indication as to what may have struck Cohen's head?
24    A. No.
25    Q. Okay.  Has any medical provider provided any

Page 67

1 opinion as to what may have struck his head?
2    A. No.  I mean other than I guess technically
3 Dr. Eisenstat said his blunt force trauma, meaning
4 impact to his head, but not anything specifically as
5 far as an object.
6    Q. Right.  All right.  You yourself mentioned the
7 autopsy report, which is described -- beginning to be
8 described on page 7.  You are relying upon photographs
9 taken by Dr. Eisenstat during the autopsy; correct, in
10 giving your opinions?
11    A. That's -- that's certainly part of the -- the
12 totality of those work, yes, sir.
13    Q. Right.  And you've reviewed his autopsy report
14 as listed here.  Did you find any content of his report
15 that you disagreed with?
16    A. No.  I mean, again, it's not my role to try to
17 disagree with it.  And certainly after reading his
18 deposition he noted that he specified an incorrect bone
19 that was fractured that was a bone that was more in --
20 what I'd say in the facial area versus being in the
21 temporal bone.
22    Q. Right.  He meant to reference the temporal
23 bone --
24    A. Correct.
25    Q. -- right?

Page 68

1    Any aspect of his testimony or his autopsy report
2 that you disagree with -- and I know it's not your job
3 to disagree with -- but that part, inconsistent with
4 your findings?
5    A. No.  And in fact now, given that if it's not
6 the sphenoid, then, you know, that seems to make more
7 sense with the more focalized impact to the side of the
8 head, so to speak.
9    Q. So you're talking about his correction of the
10 bone --
11    A. Yes.
12    Q. -- that he referenced?  Okay.
13    A. Which I had already said that he had impact
14 to -- partially to the front and the right side.  So
15 now we know it's really only focused to more the right
16 side (indicating).
17    Q. Okay.  And so when you say "now we know," what
18 do you mean by that?
19    A. Well, because instead of trying to have a
20 fracture where you have an impact that's including both
21 kind of the -- it's still the right side to some
22 extent, but now we know that with as far as the
23 fractures and everything it's more to the side like
24 around the ear and temporal lobes, which then
25 propagates through the petrous ridge.

Page 69

1    Q. Okay.  So based upon -- are you saying that
2 based upon Dr. Eisenstat correcting his reference to a
3 fractured bone in his deposition, that that has
4 modified what we know or what you believe happened?
5    A. No.  I just think it makes it even more clear
6 where the blunt force impact was.
7    Q. Okay.  And prior to reading that what was --
8 how has that changed?  When you say "more clear," has
9 it changed where you believe the blunt force trauma
10 occurred?
11    A. Not in totality.  I mean I said a little bit
12 of front right -- in my report I said front slash side.
13 So realistically it hasn't changed.  It's just that we
14 now know there's not something that's more to the front
15 of his head.
16    Q. Okay.  All right.  While we're talking about
17 that, let's skip ahead to page 11 and Section 1.31.
18 And you say in that paragraph that, The image on the
19 next page on page 12 shows that there was a contusion
20 and swelling to Cohen's right eye consistent with an
21 impact to this area of his face.
22    All right.  And that -- do you have any -- do you
23 still believe that there was an impact to his right
24 eye?
25    A. No, that's what I was just saying.  Because

18 (Pages 66 - 69)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 70

1  after further clarification from Dr. Eisenstat in his
2  deposition, he is saying that that is more bleeding
3  associated with other injuries that has essentially
4  dissected or moved to that area. So that's what I
5  said. Now it's not that I have to encompass a larger
6  area of the head to be impacted.
7      Q. But your opinions that you gave in this
8  report, you came to the conclusion that he -- there was
9  impact to his right eye at the time that you
10 initiate -- you drafted this October 16 report;
11 correct?
12     A. In the area of the posterior aspect of his
13 eye, yes, because that's where you can see the little
14 contusion.
15     Q. Right. And you now are saying that based upon
16 Dr. Eisenstat clarifying a reference to a bone, that
17 you no longer believe that the contusion and edema that
18 is in the photograph on page 12 that you relied upon,
19 that that is no longer evidence of impact to the right
20 eye?
21     A. Correct.
22     Q. Okay. So you don't mention in your original
23 report any evidence of impact to the right eye other
24 than the photograph listed on page 12. You didn't say
25 you were relying upon Dr. Eisenstat's reference to a

Page 71

1  bone. So I'm trying to understand --
2      A. Well, so from my reading of the autopsy report
3  and what he was describing as the various fractures of
4  the skull, that included the sphenoid bone, and then,
5  obviously, there was a description of the contusion or
6  area around the right eye or in the -- what I'd say the
7  lateral side or outer side (indicating). After he then
8  described more, then it made more sense to me even more
9  so, even though my opinion's still the same as far as
10 you still have an impact to the right side of the head.
11     Q. This sphenoid bone, where -- where is that?
12     A. It's more in the internal -- like more --
13 typically the face to the side (indicating).
14     Q. And so you -- his reference to a fracture of
15 the sphenoid bone was part of the reasons why you
16 thought there was an impact to the right eye.
17     A. Well, I thought the impact would've -- not to
18 the right eye, slightly posterior to the right eye from
19 that side, but still essentially the side of the head,
20 yes, sir.
21     Q. Okay. So -- but now after reading
22 Dr. Eisenstat's deposition, you believe that the sole
23 impact was to the area of his right ear.
24     A. Correct. Because, again, given what he
25 further described -- because he even described more

Page 72

1  fracturing in the deposition as well. So, yes, I think
2  that is now that we have a more focused area for sure.
3      Q. And when you say "more focused area," can you
4  describe in layman's terms -- like I guess show to the
5  jury -- what part of his head was struck?
6      A. Like basically looking around the right ear
7  moving down to the temporal bone, so kind of going and
8  gravitating down toward the foramen magnum or the base
9  of the skull.
10     Q. Okay.
11     A. And then we can't see -- there's fractures
12 internally that are extending from that more toward the
13 interior of the skull.
14     Q. Okay. And you were kind of motioning, you
15 know, I guess for the camera. Where are the base -- or
16 the fractures actually located? I know they're
17 internal, but where would you point to them --
18     A. Well, the temporal -- oh, I'm sorry.
19     Q. Go ahead.
20     A. So the temporal bone is that lower bone as you
21 were describing, because we had the parietal above and
22 then the temporal below. So essentially there's impact
23 and he has bleeding out of his right ear, which again
24 is consistent with the basilar skull fracture. So it's
25 all along that right side (indicating). And then, like

Page 73

1  I said, internally we have a fracture that's kind of
2  going from the right ear trying to go toward the left
3  ear (indicating).
4      I'm sorry, I got a little fast there.
5      Q. On page 9 of your report there's a Section 5
6  that's basically a recitation of Mr. Buchner's work.
7  Is that similar to the other section? It doesn't
8  contain any of your personal opinions. It's simply a
9  recitation of the report by Mr. Buchner.
10     A. That's correct, and some of his diagrams.
11     Q. Right. And unlike the autopsy report, which
12 you almost put in verbatim, you sort of summarized --
13 and this is not all of the opinions and conclusions of
14 Mr. Buchner. So is it fair to say that the ones you
15 decided to include in here were the ones that -- the
16 aspects of his opinion that you're relying upon to give
17 your opinions in the case?
18     A. Well, I mean this is the complete list of his
19 opinions and conclusions that was in the report so...
20     Q. Okay. So it's intended to give a summary of
21 all of his opinions and conclusions from his report.
22     A. Well, certainly at least all the opinions that
23 I'm relying on.
24     Q. Okay. That's what I meant. It's the ones
25 you're relying upon.

19 (Pages 70 - 73)

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 74

1  A. Right, as far as the crash and everything.
2  Q. Right. And I guess just so we're clear for
3  the jury, there's sort of -- you have one opinion in
4  the case; right? Because you've listed as No. 1 and
5  then it's all subparts of No. 1. I assumed if there
6  was a second opinion back in October 16, it would be
7  listed as No. 2 with subparts supporting that opinion.
8  Is that fair?
9  A. Right. I mean this is -- you know, sometimes
10 the cases have multiple injury patterns or things so
11 that, you know, I may have to be addressing different
12 things. This is pretty straightforward and pretty
13 focused to one issue.
14 Q. And is it fair to characterize, just so we're
15 all on the same page, that that one opinion kind of has
16 two facets to it? One is your opinion as to what
17 caused the skull fracture experienced by Cohen that led
18 to the internal decapitation which led to his death.
19 That's your analysis of the actual factors involved in
20 the crash itself. That's one aspect.
21 A. Correct.
22 Q. Correct. And for that opinion did you need
23 any information or opinions from any of the other
24 experts, or was that formulated by your inspection of
25 the vehicles and your review of the medical information

Page 75

1  that we've discussed?
2  A. Well, I mean I think as far as -- you know,
3  certainly I needed Mr. Buchner as far as quantifying,
4  certainly as far as the amount of crush and the -- the
5  crash forces themselves. Obviously from my inspection
6  and also reviewing of the photographs, you know, I had
7  an understanding of the catastrophic loss of occupant
8  survival space that Cohen sustained in this crash. But
9  as far as ultimately, I do have to rely on them to
10 quantify those -- that information.
11 Q. And when you say quantify, you're talking
12 about the subject crash, not the hypothetical crash
13 without the lift. I want to focus just on your
14 analysis of the injuries suffered by Cohen in the
15 actual crash.
16 A. Right. So -- yes, so I still need Buchner to
17 talk about, you know, the Delta-v, things of that
18 nature, and the quantification of all that crush.
19 Certainly I mean after looking at 5,000 crashes I've
20 not a pretty good idea dynamically how much worse that
21 is what we see statically and all. But I can't put a
22 number on that per se or something.
23 Q. And when you say a number on that, you mean
24 the level of dynamic crush as compared to the static
25 crush.

Page 76

1  A. Well, just the Delta-v and all those things as
2  far as a part of what the reconstructionist does.
3  Q. If your opinion is that his head impacted the
4  driver's seat, why do you need a Delta-v in order to
5  give your opinions if you believe that was the
6  mechanism of injury? That's what I'm trying to
7  understand.
8  A. Well, it's still a part of the analysis is
9  typically you have an understanding of what the crash
10 severity was or so.
11 Q. All right. There's the second aspect of the
12 opinion, which relates to the hypothetical crash as
13 I've defined it. And that is that the mechanism of
14 injury for Mr. -- for Cohen that you believe occurred
15 in the actual crash would not have occurred in the
16 hypothetical crash.
17 A. Absolutely.
18 Q. So we -- we kind of break it into those two
19 different areas.
20 A. Sure.
21 Q. All right. And with regard to the second
22 opinion, you would agree that you're a hundred percent
23 relied upon information from Mr. Buchner with regard to
24 what level of intrusion and crush would have occurred
25 in the hypothetical crash.

Page 77

1  A. Yes. And, again, I would've already assumed
2  that as far forward as he is from the back of the
3  vehicle that I still wouldn't have had any expectation
4  of any significant alteration of his occupant survival
5  space. But I think, again, from a different analysis
6  standpoint that's what Mr. Buchner is providing me.
7  Q. And that's through his computer simulation of
8  the hypothetical crash.
9  A. Yes, sir.
10 Q. And you're not aware of any actual crash
11 testing that's been done by anybody with regard to
12 analyzing the hypothetical crash.
13 A. I don't know of any car-to-car crash that's
14 been done, no, sir.
15 Q. Okay. All right. If we go back to that page
16 11 where you have your opinions, I guess it's safe to
17 say now that we -- you do not agree with your
18 conclusions that you originally put in paragraph 1.3,
19 because you now believe that there was no actual impact
20 to the front of Cohen's head; is that fair?
21 A. So, again, I was still assuming -- I wasn't
22 meaning the very front of his face like this
23 (indicating). That's still considered the front if it
24 was to the side of his eye.
25 Q. Right.

20 (Pages 74 - 77)

Veritext Legal Solutions
800.808.4958                                    770.343.9696

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 78

1    A.  But that's --
2    Q.  The front is -- I didn't mean to interrupt
3  you, but front's the term you used, so I was trying to
4  use your term.
5    A.  I understand, just -- because that part of the
6  right eye is more in the front.  But, right, it's
7  still -- I mean I think it's now more focused after,
8  you know, further clarification of some of the injuries
9  that were listed, that it's more just focused to the
10  side.
11    Q.  When you say "focused," I want -- I just want
12  to make sure.  They're -- you now are going to testify
13  that the contusion and edema in his right eye, that
14  that was not caused by trauma or impact.  You agree
15  with that.
16    A.  After reading Dr. Eisenstat's deposition and
17  his further clarification, then that's correct.
18    Q.  All right.  And that's based upon his
19  mischaracterization or misdescription of the bone that
20  was fractured.
21    A.  Yes.
22    Q.  Okay.
23    A.  Well, and also I mean he didn't -- I'm
24  sorry -- he didn't describe it, at least from my
25  recall, in the autopsy report that that was just

Page 79

1  dissected.  It seemed to be more like that was another
2  injury, although being a soft tissue injury, in
3  conjunction with the other skull fractures and then
4  internal brain bleeding.
5    Q.  But you now agree with him that that wasn't
6  from the trauma, it was the raccoon eyes that -- that
7  you mentioned.
8    A.  Yes, sir.
9    Q.  It was sort of a symptom of the temporal
10  impact and temporal basilar skull fracture.
11    A.  From -- it was from the blunt force impact
12  like he said.
13    Q.  Right.
14    A.  These are not deceleration injuries.  These
15  are associated with blunt force impact --
16    Q.  Right.
17    A.  -- which is what I've been saying all along
18  anyway.
19    Q.  Sure.
20      Is it safe to say then that anywhere in your
21  report where you reference the right front or the front
22  of his head that you would now delete that if you were
23  to redo the report, you don't believe that anymore?
24    A.  If I'd had his deposition before I did my
25  report then, correct, that's -- it would only be right

Page 80

1  side.
2    Q.  All right.  So as you've said, you believe
3  that the -- we now have one spot of -- of impact.
4    A.  (Witness nods affirmatively).
5    Q.  And you believe that that -- the source of
6  that impact is Cohen colliding with the driver's seat
7  in front of him.
8    A.  A portion of the driver's seat, what I'd say
9  is more focused around what you'd call the top of the
10  seat back and where the headrest posts are coming in,
11  because that's the -- really the only stiff, more rigid
12  portion, other than you can bottom out that to get to
13  the upper -- what we call the perimeter frame or the
14  metal perimeter frame of the seat, the internal
15  structure (indicating).  But those are only stiff
16  places.  I mean like the headrest is not rigid enough
17  to create it.  So as far as the headrest area that's
18  above those posts, that's typically not something you
19  would see to have skull fractures like this.  So we're
20  looking at something more focused that's going to be
21  like where the -- metal headrest posts and then
22  the -- the sleeves where they go into the seat itself
23  (indicating).
24    Q.  Okay.  So you don't believe that the skull
25  fracture was caused by an impact with the headrest.  Is

Page 81

1  that what you just said?
2    A.  Correct.  No, not what you think of as that
3  big wide part of the headrest, no.  In fact, I don't --
4  I've never seen somebody have a skull fracture from
5  contacting one of those.
6    Q.  Okay.  And did you determine exactly what
7  location on the driver's seat was the impact location
8  for Cohen's head injury?
9    A.  So as far as an actual witness mark or
10  something like that or some biological or anything of
11  that nature, no, sir, I did not.  So that's why I'm
12  saying these are the structures that can cause this
13  type of harm, but I can't pinpoint you any more
14  because, you know, there was no other obvious physical
15  evidence.
16    Q.  Okay.  So you were not able to uncover any
17  evidence on the driver's seat of the location of the
18  impact with Cohen's head.
19    A.  Not specifically.  That's why I then have to
20  look at what is rigid enough to create or inflict this
21  type of harm.
22    Q.  Okay.  And all of this is based on an
23  assumption that his head actually impacted the driver's
24  seat.
25    A.  Well, there's nothing else for him -- or

21 (Pages 78 - 81)

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 82

1 that's capable of impacting him, especially when you
2 consider the child seat that he's in and how he's got
3 wings and is well protected by that, especially from
4 just a rear impact crash mode.
5    Q.  So did you -- I'll scratch that.  We'll get to
6 that in a minute.
7    A.  Okay.
8    Q.  Yeah.  Was -- could you -- can you cite to any
9 actual physical evidence on the driver's seat that --
10 that Cohen impacted it at all?  Not just the location,
11 but any physical evidence on the -- actually found on
12 the seat that proves that his head impacted the
13 driver's seat.
14    A.  No.  I thought I'd already answered that.  No,
15 I don't have any witness mark or any type of, you know,
16 hair or anything else like that.  No, he didn't really
17 have an open wound until after it was over, and it
18 really wasn't an open wound.  He just later on was --
19 had some blood coming out of his right ear, but that
20 would be well post the actual injury causation.
21    Q.  Right.  And there was no physical evidence of
22 damage to the seat or anything like that, not
23 biological but like physical evidence on the seat that
24 there was an impact to his head.
25    A.  No, because his skull fractured, his skull was

Page 83

1 softer than what part of the seat there was.
2    Q.  Right.  And is that also true with regard to
3 the injuries to his left side, his left leg and his
4 left arm?  There was no physical evidence on the seat
5 showing that those parts of his body impacted the
6 driver's seat?
7    A.  Correct, there was not, I mean even though we
8 know absolutely its interaction with the seat.
9    Q.  And you know that why?  Give me all of the
10 bases for why you conclude that all of his injuries
11 I've just mentioned -- his basilar skull fracture and
12 the injuries to his left extremities -- that they all
13 occurred via impact with the driver's seat.
14    A.  Because there is nothing about his occupant
15 kinematics in the rear crash that in any way could
16 create an axial load or bending load to his left femur
17 to cause that fracture nor realistically even for his
18 left arm.  So all of that is associated with being
19 jammed and shoved forward into the seat (indicating).
20    Q.  Could the left-sided injuries be due to -- to
21 impact with the door or the left-sided frame of the
22 vehicle?
23    A.  No.
24    Q.  And how did you rule that out?
25    A.  Because this is all basically a straight front

Page 84

1 to back.  There's not any lateral component, so to
2 speak.  So there's nothing really trying to take him
3 left.  It's -- it's basically he starts to go back and
4 then he's just jammed forward as all this intrusion
5 comes in and takes out his survival space.
6    Q.  Did you consider whether the injury to Cohen's
7 head could have occurred via impact from the rear?
8    A.  From something from the rear?
9    Q.  The rear of the vehicle.
10    A.  Well, sure.  I mean, and essentially that's
11 physically impossible.  That would defy physics for
12 something to now go forward when everything about that
13 interaction is trying to take everything backwards
14 relative to the vehicle.
15    Q.  Well, there was significant intrusion, as
16 you've put in your reports and Mr. Buchner said, into
17 the rear of the vehicle.  In fact, you remember that he
18 said that the -- or his opinion is that the actual
19 grill, the Ford emblem, made it all the way to the head
20 position of Cohen during the accident --
21        MS. CANNELLA:  Object to form of the question,
22 misstates his testimony.
23    Q.  Go ahead.
24    A.  He said to the headrest.
25    Q.  Yeah, to the headrest behind --

Page 85

1    A.  Which is above Cohen, not -- and then also
2 that would mean that Cohen would have to be essentially
3 almost 90 degrees and elevated up to where he could be
4 above that headrest for the grill or anything to impact
5 him, and we know that he -- number one, that's
6 physically impossible because of the restraints and the
7 child seat itself.
8    Q.  How is that physically possible based on the
9 restraints and the child seat itself?  Explain what you
10 mean by that.  What's your basis for that opinion?
11    A.  He's got a five-point harness that he's got
12 on.  So he's got a strap across each thigh, which he's
13 got evidence of bruising on some of those that probably
14 is from those straps, and he's got two shoulder straps
15 with a chest clip.  So all of that is significantly
16 limiting what vertical motion, if any, he can have in
17 that seat.  Not to mention, you know, he's -- he's got
18 a plastic shell and everything that's above the level
19 even of his head (indicating).
20    Q.  What is the lowest level of the Ford -- the
21 F-250's intrusion?  Are you saying that the lowest
22 level of the intrusion by the F-250 is above Cohen's
23 head?
24    A.  Well, as far as your question and what you
25 were talking about is the emblem.  And my understanding

22 (Pages 82 - 85)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 86

1  from his testimony and his report as well as that that
2  emblem is at the No. 4 -- the vehicle seat headrest,
3  not Cohen's headrest, as far as his child seat
4  headrest.
5      Q.  Well, below the emblem there's a significant
6  portion of the vehicle; right?
7      A.  Absolutely.
8      Q.  And if the emblem is at the level of the
9  headrest you're going to have significant portions of
10  the F-250 below that level; correct?
11     A.  I certainly agree.
12     Q.  And that's going to be equal to or even below,
13  depending on what part you measure, of where Cohen's
14  head was at the time of the incident.
15     A.  It could be, yes --
16     Q.  Right.
17     A.  -- certainly.  And then -- but again then
18  you've got to look at, you know, he doesn't have any
19  injuries to his shoulders, to his back, anything else
20  like that.  So that's why it's -- that is the force
21  that's driving and driving him forward in his seated
22  area, but it's certainly not the impacter that's
23  creating this injury.
24     Q.  All right.  And, again, you have the bumper on
25  the vehicle, on the F-250, that would stick out farther

Page 87

1  than the rest of the surfaces of the front of the
2  F-250; correct?
3      A.  Yes.
4      Q.  And did you consider whether the bumper
5  would've been at the height to cause the basilar skull
6  fracture from an impact from behind and -- but the rest
7  of the vehicle would not impact his shoulder and other
8  parts of his body.  Did you consider that as a
9  potential cause of the injury?
10     A.  Again, I don't even think that's physically
11  possible given the construction.  So the bumper's going
12  to be below.  So I mean the bumper's not just right
13  about the -- the emblem.  You still have part of the
14  grill work, and then you go down further to get to the
15  bumper.  So that bumper would probably be -- since it
16  overrode the frame rails, you know, that would probably
17  be at the level of his pelvis (indicating).
18     Q.  But you didn't measure that; correct?
19     A.  Measure what?
20     Q.  The level of the bumper where it intruded into
21  the Escape.
22     A.  No.  I mean that would be Mr. Buchner's job.
23     Q.  Right.  But you don't know whether the bumper
24  was at his level of his pelvis, level of his head or --
25  you don't know where it was; correct?

Page 88

1      A.  Other than looking at his scans you can tell
2  where it is.  But certainly, again, we know there's
3  probably a foot or more between the emblem till you get
4  to the bumper.
5      Q.  Well, you've just said that the emblem --
6  Mr. Buchner has it as higher, too high to cause the
7  head injury to Cohen.  Now you're just assuming, I
8  guess, that you think the bumper would be too low to
9  cause the head injury of Cohen.  Is that what you're
10  saying?
11     A.  So the -- from my understanding of his
12  testimony, that the emblem is at the headrest that's
13  sitting at the top of Cohen's seat.  All right.  That
14  bumper is not just going to be about this much below
15  that emblem (indicating.)  So it's going to be lower
16  than that.  So, if anything, it would be mid back to
17  pelvic level of Cohen.
18     Q.  And so is that -- is there any other basis for
19  you ruling out an actual impact with the -- from the
20  F-250 causing the basilar skull fracture?
21     A.  Well, number one, he wouldn't even be
22  contacting the actual -- any part of the vehicle
23  structure of the F-250.  He's still got the No. 4 seat
24  back between him and his own plastic shell and padded
25  interior of his -- of his child seat also (indicating).

Page 89

1      Q.  Right.  The impact, though -- he doesn't
2  actually -- you can have an impact that hits the back
3  of the child seat or the seat and the forces of that
4  impact could cause a basilar skull fracture without the
5  actual physical bumper having to be the material that
6  touches his head; correct?
7      A.  I don't know that I've ever seen something
8  like that occurring.  I mean that's why there's
9  energy-absorbing attenuation padding and -- all inside
10  the inner shell of that child seat (indicating).
11     Q.  Did you -- do you know what material was in
12  the storage area of the F -- I mean of the Escape, in
13  the back behind the second row?
14     A.  So there were a couple of -- I think -- I
15  think the parents called it like camp chairs, so just
16  those regular little folding chairs.  There was a --
17  obviously I know there was a shop vac that was crushed.
18  There was a stroller that also had -- was damaged.  But
19  I think those structures were still compressed and
20  still down in between the hatch and the -- and the Back
21  of the seat (indicating).
22     Q.  Do you know where they were located prior to
23  the crash?
24     A.  Behind in the cargo area, which is where you
25  put cargo (indicating).

23 (Pages 86 - 89)

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 90

1    Q.  But I meant do you know where each of those
2 items you mentioned was located within the cargo area?
3 Do you know the configuration of the cargo area?
4    A.  I mean they were laying -- my understanding is
5 from their testimony they were laying -- what would you
6 say -- laterally, I guess, in there, because certainly
7 the stroller would be too long to go longitudinally.
8 So they were laid in the back like that, and I think
9 they even said there was a plastic bag of clothes.
10    Q.  Right.  And would you agree that that material
11 would have been pushed forward when the F-250 intruded
12 into the cargo area?
13    A.  We see that physically, sure.
14    Q.  Right.  And did you rule out the potential for
15 that material that was pushed forward from impacting
16 Cohen's head from the rear?  And I don't mean -- and I
17 don't mean actually impacting it.  It's obviously
18 causing the injury via impact through his child seat.
19        MS. CANNELLA:  Object to the form of the
20    question.
21    A.  I didn't see any evidence of that.
22    Q.  All right.  And what did you do to rule that
23 out?
24    A.  Well, I looked at the child seat.  I looked at
25 the No. 4 seat.  I've also considered the injury

Page 91

1 pattern that -- or the injuries that Cohen sustained as
2 well.
3    Q.  And when you say you looked at the child seat,
4 you did an inspection of the child seat.
5    A.  I did, yes, sir.
6    Q.  And did you examine it for any type of damage
7 to the plastic structures or any kind of evidence of
8 impact to the plastic structure?
9    A.  I did.  In fact, in my notes I talk about some
10 white stressing and all from it being shoved forward.
11 But there's not a focalized like bar or something
12 that's focal.  It's associated with the entire back
13 seat or No. 4 seat pushing and driving it forward
14 (indicating) and compressing it.  Plus, it's kind of
15 rotating because it's squeezing it not only between the
16 seat cushion but also then ultimately the driver's
17 seat.
18    Q.  Is there any other basis for you ruling out
19 the potential for the injury to have come from an
20 impact from the rear, anything else you haven't
21 mentioned?
22    A.  I think that's it, especially from the
23 vertical -- vertical nature of the fracture that were
24 -- have been described.
25    Q.  And explain what you mean by that.  The

Page 92

1 vertical nature of the basilar skull fracture?
2    A.  Yes.
3    Q.  And when you say vertical, what do you mean by
4 that?
5    A.  Up and down versus side to side (indicating),
6 which would be lateral or horizontal.
7    Q.  Right.  And why is that something that relates
8 to you ruling out an impact from the rear?
9    A.  Because if it's just from one of those chairs
10 or something, then that's basically something that's
11 running horizontally relative to the head.  So you
12 would think then it would start -- instead of going
13 more up and down the skull, it would be going right to
14 left, left to right (indicating).
15    Q.  And what if the chair was in a vertical
16 position?  Would that explain the vertical nature of
17 the fracture?
18    A.  Well, I didn't see any physical evidence on
19 the back of the No. 4 seat that would be consistent
20 with that to begin with.
21        And then even more so, that's not really capable
22 of going through because you still have a metal
23 perimeter frame of that No. 4 seat as well.  So if it's
24 vertical it's going to be stopped by the upper and
25 lower margins of that (indicating).

Page 93

1    Q.  Did you consider whether the metal frame of
2 the No. 4 position seat could have been pushed into the
3 car seat and caused the trauma from the back due to the
4 intrusion of the F-250?  Did you consider that?
5    A.  Well, again, I think that's something that's
6 not even possible because he's below the level of that
7 peri -- upper perimeter frame.  And then the rest is
8 just soft padding or the foam cushioning and the fabric
9 covering.
10    Q.  And did you actually measure the -- the height
11 of the surrogate with the actual frame of the No. 4
12 seat?  Did you actually measure that, or are you just
13 concluding that his head would've been below the frame?
14    A.  You can see from the photo that the head's
15 below the top of the seat back.
16    Q.  And so the top of the seat back is the area
17 where the frame exists that you're talking about.
18    A.  Well, it's -- that why they call it a
19 perimeter, so it goes around the perimeter of the seat
20 (indicating).
21    Q.  Right.  Any other basis for that -- ruling
22 that out as a potential source of the basilar skull
23 fracture?
24    A.  His head's not even at that level to begin
25 with so...

24 (Pages 90 - 93)

Paul Lewis , Jr., M.S., BME                                         March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 94

1    Q.  You mean the level of the frame of the No. 4
2  seat.
3    A.  Correct.
4    Q.  Okay.  Do you know how Cohen's head was
5  positioned just prior to the incident?
6    A.  I'd say not specifically.  But obviously based
7  on the pattern, at some point he has to be to where
8  more of the right side is presented.
9    Q.  So that meaning at some point you believe that
10  his -- he's -- his face is facing left prior to the
11  impact.
12    A.  Yes, sir, most likely, yes, sir.
13    Q.  Okay.  So you don't believe that he could be
14  facing to the right and there be impact and his head
15  swivel enough so that it causes the impact to the right
16  ear area.
17    A.  Oh, sure, it could (indicating).  But we don't
18  know for sure one way or the other.  But that would be
19  the only other possibility.
20    Q.  All right.  Do you know -- did you read the
21  testimony from Ms. Bryson about which way he was
22  facing?
23    A.  Absolutely.  And that was when they were
24  still -- when they just swapped driving and she just
25  got in the driver's seat, and the crash didn't happen

Page 95

1  for like 15 minutes or so later.  So the child could
2  easily move or, again, the other option is the fact
3  when it gets hit that it does rotate that way.
4    Q.  And that's what I'm getting to.  You're saying
5  that it's possible that he could be in the position as
6  described by Mrs. Bryson right before the impact and
7  still have the injury that we have in this case.
8    A.  His head would have to rotate then, yes.
9    Q.  But you're saying that's physically possible.
10    A.  It can, sure.  But, again, there's a lot of
11  time in between when she makes that observation because
12  she doesn't really testify to any observation any
13  later.  And that was all down at the bottom of the road
14  before they were really getting out on the trip.
15    Q.  Right.  Do you know how much time passed
16  between when she made that observation and the actual
17  accident?
18    A.  That's what I said, it was around at least --
19  about 15 minutes, maybe 20 minutes, somewhere in there.
20    Q.  That's your understanding?
21    A.  Yeah, from reading the -- from ready their
22  testimony.
23    Q.  Right.
24    MR. HILL:  Why don't we take a five-minute
25  break.

Page 96

1    THE WITNESS:  Okay.
2    THE VIDEOGRAPHER:  The time is 12:52 p.m.  We
3  are off video record.
4    (Video off)
5    (Recess taken)
6    (Video on)
7    THE VIDEOGRAPHER:  The time is 1:57 p.m.  We
8  are back on video record.
9    MR. HILL:  Thank you.
10  BY MR. HILL:
11    Q.  Right before the break I was questioning you
12  about your analysis of whether the impact could've come
13  from the rear.  And when I say the rear, from the back
14  of the vehicle obviously.  And we were talking about
15  the items that were in the storage compartment.
16    A.  Uh-huh (positive response).
17    Q.  And you had mentioned that if a chair that was
18  there had, you know, been pushed forward by the F-250
19  that you would've expected to see a horizontal
20  fracture, I believe you said, with regard to the
21  basilar skull fracture.  Is that -- is that right?  Is
22  that what you were --
23    A.  Well, yeah, I mean I -- not that I agreed that
24  that would be impossible.  But it would seem to be if
25  that's the impacter that the line of force would be

Page 97

1  kind of different than what we have (indicating).
2    Q.  Okay.  And describe for me the line of force
3  that we do have.  I think you said it was vertical?
4    A.  More vertical than horizontal certainly.
5    Q.  Okay.  And what evidence leads you to conclude
6  that it was more vertical than horizontal?
7    A.  Just from.  Dr. Eisenstat's description of the
8  in -- of the skull fracture.
9    Q.  Okay.  So he actually used the term it was a
10  horizontal -- I mean a vertical skull fracture?
11    A.  No, he didn't use that term, at least --
12    Q.  Okay.
13    A.  -- not that I -- not that I remember.
14    Q.  So what about his description leads you to
15  believe that he saw it as a vertical skull fracture?
16  That's what I'm trying to figure out?
17    A.  Well, from the way he's describing the damage
18  around the right ear, and then we know we have the
19  fracture line going through the petrous ridge, but then
20  we also, at least the way I was understanding him
21  describing it, we had kind of a ring fracture too that
22  he was talking about.  So it sounded to me like it was
23  all pretty much kind in a -- in a line.  I mean there
24  can be a little angle to it or something, but seemed
25  like at least the way he was describing in his

25 (Pages 94 - 97)

Paul Lewis , Jr., M.S., BME                            March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 98

1  deposition (indicating).
2     Q. Okay. So the fracture progresses, as I -- if
3  I understand you, from the ear inward, and you're
4  saying that that progression inward by the way he
5  described it in your interpretation was more of a
6  vertical nature. Is that what you mean? I'm confused
7  a little bit. I'm sorry.
8     A. No. That is -- that's a propagation from the
9  upper part, but at least the way I was understanding
10  the way he's describing, it's coming because you've got
11  the -- the bruising or whatever in the temporalis
12  muscle and then you have the fracture in the temporal
13  bone, but then it sounded like it kind of goes --
14  continues from that to the ring or the foramen magnum
15  (indicating).
16     Q. And the ring is lower than the temporal bone.
17     A. Yes.
18     Q. And so that would be the vertical aspect of
19  it --
20     A. Well, in the temporal --
21     Q. -- from top to bottom?
22     A. Right.
23     Q. Okay. And -- and you brought that up in
24  connection with, I think, if I understood, that if it
25  was a chair, it would be -- the striking device would

Page 99

1  be more horizontal, and it wouldn't explain this
2  vertical kind of up-toward-down nature of the skull
3  fracture; is that fair?
4     A. Well, you probably see going more from side to
5  side, I guess you'd say.
6     Q. Okay. And is that due to the fact that the
7  chair would be a vertical -- I mean a horizontal -- you
8  know, impacting instrument?
9     A. I think the way you were describing how it was
10  oriented.
11     Q. And so does that mean that the -- you would
12  expect the whatever hard surface or -- that, you know,
13  that caused the fracture that that would be more
14  vertical than horizontal?
15     A. Well, some portion of it could be, yes. But,
16  again, if you're coming down onto something then that's
17  still as far as -- because like I said, you've got that
18  metal -- excuse me -- upper parameter of the perimeter
19  frame of the seat. So between that or where that
20  connection is from where the headrests are coming down,
21  I mean that's, you know, more rigid, stiff areas
22  (indicating).
23     Q. And that's what I'm trying to get at is where
24  is the vertical surface on the driver's seat that would
25  cause a more vertically shaped skull fracture?

Page 100

1     A. Well, either around those posts unless it's
2  just basically that you've got a propagation from that
3  more pointed where you go both to the petrous ridge,
4  but kind of down the skull too. So it's still a very
5  rigid portion if it is fully verticalized in catching
6  the portion of that post and sleeve connection with the
7  seat back frame that will comport with that to me
8  (indicating).
9     Q. So when you say the post and seat back frame,
10  are you saying that he had to have hit part of the post
11  holding the headrest that are vertical?
12     A. Like that or the sleeve that area, yes. Kind
13  of more toward where it would insert into the seat
14  back.
15     Q. When you say sleeve area, just explain so I
16  understand that.
17     A. There's a plastic sleeve that the metal post
18  goes -- slides in and out of (indicating).
19     Q. So --
20     A. Because it's fixed at the top into the
21  headrest itself.
22     Q. Okay. So it's kind of a supporting sleeve
23  that the headrest posts go into. Is that what you
24  mean?
25     A. And the posts, yes.

Page 101

1     Q. And the post themselves.
2     A. Yes. And there's a wide kind of a, you know,
3  piece of metal about this wide that those posts are
4  anchored into to where, you know, adjust the headrest
5  up or down (indicating).
6     Q. And that post you just mentioned to you made a
7  horizontal sort of motion.
8     A. It is.
9     Q. That support post is horizontal.
10     A. It is.
11     Q. So the only vertical aspects of that would be
12  the posts themselves from the headrest.
13     A. And/or where they attach at the sleeve.
14     Q. Okay. And that part of the sleeve that
15  holds -- the sleeve's like right on top of the seat?
16     A. Correct.
17     Q. It has a little clip where you could adjust
18  it?
19     A. Correct.
20     Q. So you're saying -- does that mean that he had
21  to have impacted that particular portion of the seat to
22  explain the vertical nature of the fracture?
23     A. Well, as I said at the very beginning, that's
24  the only rigid areas are basically the top of that
25  perimeter frame and/or those inserts for the headrest.

26 (Pages 98 - 101)

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 102

1 That's the only thing -- the rest of the -- above the
2 post, that part of the headrest is pretty well padded
3 and is not something that you would expect to see. And
4 then I don't think you could get the head really
5 significantly below and really in the middle of the
6 back of the seat. It is pretty soft as well. There's
7 no, you know, rigid structure immediately behind that.
8 And we know that the seat is shoved in because we've
9 got significant compression of both of them where the
10 little cupholders are and all on each side of the
11 front. So that's showing us that we're being driven
12 forward, and, again, probably is tilting a little bit.
13 So kind of have, you know, coming down into it. And
14 there probably is, obviously, some dynamic motion, a
15 little bit of the seat itself -- the driver's seat, I'm
16 sorry (indicating).
17    Q. And when you say dynamic motion, you mean the
18 driver's seat extending rearward, or what do you mean
19 by that last comment?
20    A. Yes.
21    Q. Okay. And I know you have an opinion here
22 that it wasn't the rearward deflection of the driver's
23 seat that -- that it wasn't significant, I think is the
24 term you used -- or it would not have impeded his
25 driver -- his passenger compartment significant

Page 103

1 enough to have caused the impact.
2    A. Well, I think that was in the hypothetical
3 part, right.
4    Q. Right. And when you're analyzing the
5 hypothetical crash that was analyzed by Mr. Buchner.
6    A. Right. And realistically I think it was more
7 that we couldn't get the trajectories to where
8 anything -- because obviously then the child if it's
9 not being shoved toward the seat that's trying to
10 deflect a little bit backward, then there's a space
11 there, not to mention the child seat would be partially
12 helping to hold that seat up. So I think you can't get
13 any trajectories that would match up.
14    Q. And when you say the child seat was holding it
15 up, you -- you -- that's switching back to the subject
16 accident; right? So that's confusing. We were talking
17 about the hypothetical but then you switched to the
18 subject there; right? Or --
19    A. No, no. So in the hypothetical, there may be
20 a little bit more deflection of the driver's seat, but,
21 again, it's going to be limited by that child seat as
22 it's coming back. The child seat's still there because
23 it's not being pushed. So it's still going to impede
24 that coming back which alters the angle which then
25 alters any other kinematic trajectories.

Page 104

1    Q. So you mean like the bottom of the child seat
2 would -- would impede the driver's seat (indicating).
3    A. Like those -- the vertical front face where
4 the cupholders and all that are at some point, as well
5 as the child's legs.
6    Q. Right, right.
7    Would you agree that the skull fracture in this
8 case was a depressed skull fracture?
9    A. I don't remember. Let me look real quick.
10    Q. Sure.
11    A. Yeah. He does describe it as depressed.
12    Q. And -- and what usually causes -- what type of
13 object causes a depressed skull fracture?
14    A. Well, I mean I've certainly seem them on flat
15 surfaces before as well, but typically you have
16 something kind of like that seat back frame or that --
17 excuse me -- or that headrest area as far as the metal
18 portions of it. So those tend to be some type of
19 impactor that can -- can do that. I mean I think
20 sometimes if you look in -- what is it... I think it's
21 Spitz, S-p-i-t-z, somebody -- some of those places
22 sometimes say it's like a two-by-two impact or
23 something along that line. But in general you've got
24 something a little more focused, but certainly I've
25 seen depressed skull fractures from rollovers and

Page 105

1 people hitting their head on the roadway surface. But
2 a lot of times you have some type of little bit more
3 focal object, which again, what I've been describing
4 anyway.
5    Q. So what -- what aspect of the driver's seat is
6 a focal object?
7    A. That seat back frame and/or where those --
8 where the headrest come into the frame (indicating).
9    Q. I guess we can agree that you don't believe
10 his head impacted the side frames of the driver's seat;
11 is that correct?
12    A. I mean it doesn't -- I mean that would be one
13 other option, but it looks like the way that the seat
14 has gone in -- although we do know that right cupholder
15 was a little -- was into the center console. So that
16 could be the only other possibility because that's
17 still going to be metal coming around which would still
18 be a fairly focused object once you go through the --
19 the covering on the back (indicating).
20    Q. All right. I lost you a little bit there. So
21 what did you mean by that last -- like what object were
22 you referring to?
23    A. It's still the seat back frame, right.
24 Because it goes and curves around to go down to the
25 vertical portions. So that would be the only other

27 (Pages 102 - 105)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 106

1 possibility is what I was saying, but that's still a
2 part of the seat back frame (indicating).
3    Q. And you're saying that the right edge of the
4 seat might have been the vertical component?
5    A. (Nods affirmatively).
6    Q. So you're saying it's possible that he could
7 have impacted the -- the vertical right edge from his
8 vantage point frame of the driver's seat.
9    A. That curved area, right. And -- and part of
10 it could be just because it's depressing in that that
11 makes it go vertically down because it's still
12 propagation. Everything is associated with that impact
13 and then we have fracture lines continuing to extend
14 both inward and down.
15    Q. So you did not make a specific determination
16 or don't have an opinion as to whether his head hit the
17 vertical right edge of the frame or the horizontal
18 portion below the headrest or the area where the post
19 from the headrest entered into the seat -- like all
20 those are options, but you don't have an opinion as to
21 exactly where his hit -- head hit on the driver's seat;
22 is that fair?
23    A. I don't. Because as I told you earlier today,
24 I didn't find a witness mark or something to where I
25 would be more comfortable telling you more pinpointed

Page 107

1 this is where it is. So then I have to look at what is
2 capable and not capable of creating this type of injury
3 (indicating).
4    Q. And the location of the seat after the
5 accident, I know it was removed at some point. You
6 only have photos of that. But that wasn't enough for
7 you to determine which area of the front seat he
8 impacted?
9    A. Oh, the child seat?
10    Q. Uh-huh (positive response).
11    A. I don't think I made a determination from
12 that, no, sir.
13    Q. Do you believe you could have, is what I'm
14 saying?
15    A. Again, I -- I don't think that would alter
16 anything about the kind of scope of where I'm talking
17 about would be likely.
18    Q. Okay. So you made a determination that he had
19 to have hit the driver's seat because that was the only
20 structure that you identified that could cause the
21 fracture that was in front of him; is that fair?
22    A. Yes.
23    Q. But you didn't go to the point of determining
24 exactly where on the driver's seat the impact occurred.
25        MS. CANNELLA: Object to the form of the

Page 108

1    question.
2    A. That's not true.
3    Q. Okay.
4    A. Like I said, when I inspected the vehicle I
5 certainly was looking to see if -- because occasionally
6 you do find a mark that is evidence of where they hit,
7 but in this case I did not.
8    Q. And I didn't mean to say you didn't make an
9 effort. I meant to say -- that was a -- that you were
10 not able to identify the specific spot on the driver's
11 seat where the impact occurred.
12    A. That's correct.
13    Q. Okay. Now I assume you're familiar with
14 linear skull fractures.
15    A. Yes.
16    Q. And I think you were kind of describing what
17 type of object usually causes a linear skull fracture.
18 Is that a more flattened, smooth surface as opposed to
19 the more focal point? You said -- you said two-by-two
20 for the depressed skull fracture. Is a linear skull
21 fracture something that's caused by flatter objects?
22    A. Well, I just said I've seen depressed skull
23 fractures from flat surfaces, but certainly I've seen
24 that from linear -- or with a linear fracture as well.
25    Q. And is that more common with a linear

Page 109

1 fracture, to be a flat surface?
2    A. Well, typically it may be a more broader flat
3 surface, yes.
4    Q. Right.
5    A. So meaning a lot wider (indicating).
6    Q. Sure. And this to kind of put a bow on our
7 discussion about the -- your analysis of the potential
8 of the impact coming from the rear, are you saying that
9 because of the number four seat back, that it is
10 impossible for the injury to have occurred from an
11 impact from the rear in this case?
12    A. I think given the location of the injury that
13 he has as well as all the attenuating structures
14 between that because then -- like I said, you've still
15 got all the foam and the frame of the number four seat
16 or the vehicle seat back. And then also you've got the
17 energy absorption of the interior of that child seat as
18 well. So, yeah, that does not look like this
19 particular injury. I mean -- sorry -- I have seen some
20 where maybe the head was exposed and something coming
21 from the back struck the child, but that's not the case
22 for this particular case.
23    Q. Okay. I appreciate that, but I -- the
24 question was, is your testimony that in this particular
25 case it's not possible in your opinion for the impact

28 (Pages 106 - 109)

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 110

1 to have been to the back of his head from a -- a object
2 coming from the rear?
3    A. I don't believe so for the number of reasons
4 I've already told you.
5    Q. Okay. And, again, you inspected the child
6 seat involved in the accident. Did you take the
7 covering off of the child seat and inspect it?
8    A. I did.
9    Q. And you -- I think you said that you did not
10 see any evidence on the child seat that it had suffered
11 an impact to the rear.
12    A. I didn't. I felt some stressing and all from
13 being compressed (indicating) but not from impact.
14    Q. Okay. So it's your opinion that the --
15 there's no evidence on the child seat that it was
16 impacted from the rear.
17    A. Well, I think that's a little bit of
18 semantics. Because I mean it's being shoved from the
19 impact from the rear forward. So there is damage
20 from -- obviously, it has to be from the rear force
21 trying to shove it forward as it's compressing and
22 decreasing the survival space.
23    Q. Got you. But you didn't find any evidence
24 that an object struck the back of the car seat that
25 would have caused the basilar skull fracture that Cohen

Page 111

1 suffered from.
2    A. I don't believe so.
3    Q. That's what I meant say.
4    A. Okay.
5    Q. Obviously I know it's moving forward, and it's
6 being pushed forward by something.
7    A. Right.
8    Q. Whether it's the stuff in the storage area,
9 whether it's the seat, where it's the F250 itself, you
10 know, which went all the way back into the back of the
11 number four position. Something pushed it forward.
12 But what I was asking is there's no evidence that you
13 saw on the car seat that an object struck the car seat
14 that would have caused the basilar skull fracture.
15    A. I did not. In fact from what I remember, I
16 don't think even the back covering of the seat is torn
17 or anything like where something could even go through
18 it.
19    Q. So you did inspect the covering of the seat.
20    A. Yeah.
21    Q. Okay. That's -- that's fine.
22    THE WITNESS: Sorry.
23    Q. I know that you -- sorry, do you --
24    A. No, go ahead. I'm listening.
25    Q. I know that you -- you said that that in your

Page 112

1 opinion did not occur in this case. Is it possible for
2 a child to suffer head trauma when the car seat is
3 pushed into their head due to an impact to the back of
4 a car seat? Is that even possible?
5    A. Well, I mean, I guess anything's possible, but
6 frankly I -- and I do a lot of child car seat cases and
7 all. I don't know that I've seen that, at least that I
8 recall.
9    Q. Okay. So in your experience you're not aware
10 of any situation where something struck the back of the
11 car seat and that caused the car seat to hit the
12 child's head, the plastic part of the car seat, and
13 caused head trauma. You haven't seen that in your
14 experience?
15    A. Like I said, nothing is jumping out that I can
16 recall of a case like that. I mean I've had some where
17 they've gotten around the wing and maybe had neck
18 injuries or something and might have had one that the
19 child's head impacted the wing, but as far as straight
20 back, I don't think I have.
21    Q. Okay. You said anything's possible, but you
22 don't believe in this case it was possible for his
23 injury to be caused by an impact to the back of the car
24 seat.
25    A. In this case I don't think that's how it

Page 113

1 occurred, correct.
2    Q. Okay. Do -- do you even consider that a
3 possibility?
4    MS. CANNELLA: Objection. Asked and answered.
5    A. Again, given his injury pattern and the
6 dynamics of this crash, I do not believe so.
7    Q. Okay. Thanks.
8    Let's switch to the surrogate study. I have a few
9 questions about that.
10    A. Excuse me.
11    Q. Bless you.
12    You said you adjusted the driver's seat to
13 as-found position in doing your surrogate study.
14    A. Correct.
15    Q. And what -- I just want to make sure I
16 understand what that means. What does the as-found
17 position mean?
18    A. It means... got to find my notes.
19    Q. Is that as found during your inspection?
20    A. Like as far as where the seat is for and aft
21 on the tracks, yes, sir.
22    Q. Okay. So that's -- you used the position the
23 seat was in at the time you did your inspection.
24    A. Correct.
25    Q. Okay. Gotcha. And you don't know whether

29 (Pages 110 - 113)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 114

1  that was moved or anything from the time of the
2  accident to the time of your inspection.
3      A.  Well, I certainly don't have any testimony or
4  anybody else describing it was.  And plus, I think, the
5  driver even self-extricated herself, so it doesn't
6  appear to have been a reason to move it as far as on
7  the tracks that I know of.
8      Q.  Right.  As far as the position of the number
9  four seat that Cohen was in, do you know if that seat
10  is adjustable forward and aft?
11      A.  I don't think it is.  Let me just check my
12  notes on that real quick.  Some of the newer ones are,
13  but I don't think these are.
14          (Witness perusing documents)
15      A.  It doesn't look like it's adjustable.
16      Q.  Do you know if it's adjustable from a
17  reclining perspective?  Not fore and aft but does it --
18  the back recline?
19      A.  I don't believe it does.  No, it looks -- it's
20  fixed.
21      Q.  Okay.  On page 18 of your report, do you mind
22  pulling that back up if you've got it.
23      A.  Okay.
24      Q.  Paragraph 1.17 you're discussing your
25  surrogate study and then your reference a photograph

Page 115

1  below it.  Tell me again, what was the purpose of this
2  photograph and what are the opinions in 1.17?
3      A.  Well, the purpose was I was trying to --
4  obviously this is a static condition, not dynamic.  So
5  I was trying to do as best I could to kind of show the
6  displacement of the child seat relative to the back of
7  the driver seat.  So, again, it's just a one-G
8  environment, but I was just trying to kind of show
9  approximately where that was maybe, statically,
10  understanding dynamically you've probably got a little
11  motion of both of the child seat and the child going
12  forward and the driver's seat back coming back.
13      Q.  How did you -- I mean obviously you were not
14  able to deform the seat.  So how did you position the
15  car seat in order to take this photograph, because you
16  can't see the car seat in the photograph?
17      A.  Oh.  Well, not in that one, but, yeah --
18      Q.  Right.
19      A.  -- there are photos.  So -- so I basically
20  slid it forward because, you know, the people who we
21  were borrowing the car from I don't think would have
22  appreciated me breaking the seat.
23      Q.  Sure, sure.
24      A.  So -- and I can't remember.  It either had a
25  ball or something I think to kind of hold it and

Page 116

1  elevate it because we know we've got -- the vehicle
2  seat back is somewhat forward, and you can tell that
3  the child sheet had been kind of dipped forward as
4  well.  So I was just trying to do the best I could,
5  obviously, statically to kind of get it closer to look
6  at that -- those measurements.
7      Q.  And this is just an approximation from the
8  police photographs, because that's the only evidence
9  you have of the position of the child's seat after the
10  accident.
11      A.  It is.  And I think also -- also in
12  conjunction with, I think, kind of some of the work
13  Buchner may have done with his scans.
14      Q.  Where he placed the child seat into his scan
15  of the accident vehicle.  Is that what you're referring
16  to?
17      A.  Well, me and his group did yes.
18      Q.  Right.  And did you use that scan to actually
19  determine specific distances and measurements in order
20  to approximate this photo?
21      A.  Well, so I was thinking that he said it was
22  six inches or something like that.  I think is where
23  that came from.  But essentially, yes, looking at --
24  using the -- the scene photograph and just trying to
25  get as close as I could, you know, to match it.  I mean

Page 117

1  certainly I couldn't -- I couldn't crush the front of
2  the child seat much and whatever.  So, you know, again,
3  it's not meant to be exact, but it certainly gives us
4  an understanding of some of the spacial requirements or
5  so based on the child and all being there.
6      Q.  And is the purpose of your surrogate study to
7  show that based upon the static condition of the
8  accident vehicle that the child was pushed far enough
9  forward for his head to have struck the driver's seat.
10  Is that basically what -- the purpose of the study?
11      A.  Well, kind of.  I think it's a combination.
12  Like I said, we know there is some deflection of the
13  driver's seat, so it's kind of like they're sort of
14  both coming at each other.  And certainly the big
15  driving force is the intrusion and crush shoving that
16  child and seat forward, but also that distance is
17  getting closed a little bit by some deflection of the
18  driver seat back.
19      Q.  Okay.  In this photo on page 18 you're
20  obviously not showing -- showing the deflection
21  backward of the driver's seat.
22      A.  I know I did some with --
23      Q.  Right.
24      A.  -- the seat back, so let me see if I can find
25  that photo just to make sure I don't answer you

30 (Pages 114 - 117)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 118

1 incorrectly.
2        (Witness perusing documents)
3    A. Yeah, I think that one is at the angle of what
4 I found the subject seat back at -- subject driver's
5 seat back at.
6    Q. And the angle that it was at when you did the
7 inspection, would that be the angle of the deflection
8 backwards? Would that be reflected [sic] or would --
9 does it reflects [sic] dynamically back to the position
10 it was in statically at the time of the accident;
11 correct? Is that right or --
12    A. It's kind of a little overlapping.
13    Q. Right.
14    A. So at the end of the day what we see is the
15 static.
16    Q. Right.
17    A. So the seat would have been further
18 dynamically in the crash, but then it restitutes back
19 to what we at least see that. So there would -- it
20 would be a little further back in the crash.
21    Q. Right. So further back than what's reflected
22 in this photograph on page 18, is what you're saying.
23    A. Correct.
24    Q. All right. But it's your estimation that
25 combining that seat back deflection that Cohen would

Page 119

1 have had to have reached the point that you illustrate
2 in this photograph in order for his head to have struck
3 the driver's seat.
4    A. Oh, no, I'm not -- so where the ruler is is
5 not about a point of impact.
6    Q. No, I wasn't talking about the ruler.
7    A. Oh, I'm sorry. So that's what I thought you
8 meant. So I'm just -- I'm just showing you this is
9 roughly -- and this is without any dynamic motion of
10 the intrusion or the driver's seat back (indicating).
11    Q. Right. Well, without the dynamic intrusion
12 like in this actual photograph his head would not
13 impact the driver's seat.
14    A. Well, it's without both sides.
15    Q. Right.
16    A. We've got more -- more motion coming from the
17 back impact.
18    Q. Right.
19    A. And we have a little bit more motion from the
20 driver's seat back.
21    Q. Right. And so I'm trying to figure out this
22 photograph. You're saying that counting the
23 deflection, this is how close he needs to be statically
24 in order for the combined dynamic deflection to lead to
25 his head impacting the seat. Is that what the purpose

Page 120

1 of this is?
2    A. I'm just showing how with -- just trying to do
3 some static representations without taking in any
4 dynamic that we're at least this close, if not closer,
5 and then adding dynamic then it's easy that there's
6 going to be impact.
7    Q. I got you. So this is just showing statically
8 the distance you believe is reflected in the accident
9 vehicle, the representation of that.
10    A. Somewhere close maybe. May not be exactly.
11 It's just more trying to understand how all that
12 intrusion, how we can even get the child anywhere close
13 to something in front of him that could cause the skull
14 fractures.
15    Q. Okay.
16    A. I'm not in any way trying to exactly replicate
17 anything. This is just showing that how close you can
18 be.
19    Q. Did you inspect the rear of the number four
20 seat for damage during your inspection?
21    A. I did, that's what I said earlier, and there's
22 -- I've got some photos that show the back, and what
23 I'd say looks pretty clean. There's a little -- little
24 small tear, but that's on like what would be the number
25 five part of the seat.

Page 121

1    Q. Okay. So you didn't find any evidence from
2 your inspection of seat number four that would indicate
3 that it received an impact that could have led to the
4 basilar skull fracture.
5    A. No. But the seat is deformed, and it's
6 pushed -- it's bent forward like I said (indicating).
7 So I mean, obviously, something had to push that
8 forward to cause --
9    Q. Right.
10    A. -- that deformation.
11    Q. All right. If you'd turn to page 19 of your
12 report.
13    A. Okay.
14    Q. All right. And Section 1.20 through 1.24 is
15 when you discuss whether the reconstruction or the
16 simulation of the hypothetical incident would have been
17 enough --
18        (Brief interruption)
19    A. Sorry
20    Q. No problem -- that the G-forces involved in
21 that hypothetical incident whether they would have been
22 enough to cause Cohen's injuries and death. That's
23 what you're discussing in these four -- five
24 paragraphs; correct?
25    A. Right. Because like I said earlier, his --

31 (Pages 118 - 121)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 122

1 the injury is not associated with the G-forces per se,
2 and even Dr. Eisenstat said that. This is due to blunt
3 force trauma.
4     Q. Right. Well, we know we have blunt force
5 trauma in this case. Is it possible in the subject
6 accident, not the hypothetical but the subject
7 accident, that in the milliseconds prior to the blunt
8 force trauma the G-forces that Cohen experienced could
9 have led to the injury?
10     A. In a millisecond before what?
11     Q. Before the actual trauma. Before the hit to
12 the head. You're going to have G-forces exerted at
13 some point prior to the actual impact.
14     A. Right. And you've got to remember this
15 child's sleeping, so the head's already against -- so
16 there's no relative velocity between the head and the
17 child's seat itself. So basically I'm already
18 contained against it. So there's nothing that would
19 lead to having an impact to that and certainly nothing
20 that's going transmit all the way through several
21 layers that's behind the child.
22     Q. When you say trans -- you mean the G-forces
23 transfer at the time. Is that what you mean?
24     A. Or -- or some type of impactor, correct.
25     Q. But I was talking about pure G-forces.

Page 123

1     A. Right.
2     Q. So you could have an incident where assuming
3 that G-forces alone can cause the internal
4 decapitation, if you've got a certain movement. Do you
5 believe that's even possible?
6     MS. CANNELLA: Object to the form of the
7     question, vague.
8     A. In this case, no; and, again, that's also
9 consistent with Dr. Eisenstat's testimony as well.
10     Q. And why in this case? Because what I'm trying
11 to get at is, you have the G-forces exerted on the
12 child prior to the impact as you believe to the front
13 seat.
14     A. Well, there's G-forces being exerted
15 throughout the crash. That's what's causing the
16 deformation and shoving forward and all, but it's
17 actually hitting (indicating) the seat is what
18 ultimately causes that fracture. So if it's just from
19 the inertia, the child is packaged back there. So as
20 long as we don't have something that he can be shoved
21 into to impact, just me up against the interior of the
22 child seat, there's nothing that would cause that.
23     Q. Okay. And that's in the subject accident
24 we're talking about.
25     A. In -- in the hypothetical accident too.

Page 124

1 Because the child's still going to be against his --
2 the interior of the head -- I mean -- I'm sorry -- of
3 the child seat. So he's already kind of packaged
4 basically, and he's -- and it's a rear impact, so he's
5 staying within the confines of that child seat. So
6 there's nothing really to allow that inertial movement
7 to potentially cause an AO in that -- in that manner.
8     Q. And that's because his head is going to be
9 prevented from going backward, you're saying. But what
10 about -- he's not prevented from moving forward;
11 correct?
12     A. Well, he wouldn't -- only thing, if he ever
13 moved forward would be rebound --
14     Q. Right.
15     A. -- which is a small percent of what the
16 initial energy is.
17     Q. That's what I was getting at. And so the
18 rebound effect in your opinion is not going to ever be
19 enough to cause the internal decapitation.
20     MS. CANNELLA: Objection to the form of the
21     question as vague.
22     A. Not in this case, no, sir, I don't believe so.
23 I mean I've never seen rebound that was more
24 significant than the initial onset.
25     Q. Okay. Well, paragraphs 1.20 through 1.25 are

Page 125

1 discussing the hypothetical crash --
2     A. Yes, sir.
3     Q. -- only. So let's go back to that. I know
4 it's easy to jump back and forth between the two.
5     A. Sure.
6     Q. Under paragraph 1.21, you say, Had the Ford
7 truck not been lifted, it would engage the rear
8 structures of the Escape as -- such as the bumper that
9 attenuate and distribute crash forces.
10 What is your basis for that statement?
11     A. Well, I mean my own understanding of how when
12 vehicles crash that's what they're designed to do, but
13 also that's a part of why you -- in this case you want
14 to get -- and with every vehicle -- you want to have
15 compatibility so that the vehicle structures can do
16 what they're designed to do, i.e., you know, crumple
17 and deform, and that work done is absorbing energy. Oh
18 gosh -- that's absorbing energy, so that's dissipating
19 energy that ultimately the occupant may have to try to
20 handle or not.
21     Q. What evidence do you have that that would have
22 occurred in this hypothetical crash?
23     A. Well, I think that's based on what Mr. Roche
24 was saying because if you're lower -- and I think even
25 Buchner was talking about that.

32 (Pages 122 - 125)

Paul Lewis , Jr., M.S., BME                                    March 18, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 126

1    Q.  But what evidence do you have that the
2  nonlifted version of this F250 would have engaged the
3  rear structures of the Escape, as you describe in this?
4    A.  Again, I think that's part of what Mr. Roche
5  is saying in his report.  And, obviously, the lower it
6  is, then the more likely -- because you still have
7  other structures, and the bumper's, you know, fairly
8  tall, so to speak, I mean from top to bottom of it
9  (indicating).
10    Q.  So your comment concluding that the
11  hypothetical incident -- are you saying in the
12  hypothetical incident we're not going to have any
13  override of the bumper?
14    A.  The whole point is that from what we're
15  talking about is you make it more to where the
16  vehicle's stay in alignment, and you just continue the
17  crush so you have those frame rails and everything that
18  are helping to prevent or resist the significant
19  intrusion.
20    Q.  But any statement you make regarding whether
21  that would have occurred or not in the hypothetical
22  crash is dependent upon what Mr. Buchner and Mr. Roche
23  have testified to.  It's not based on anything that
24  you've independently determined.
25    A.  No, I mean that's where I'm getting

Page 127

1  information, and I mean my own previous knowledge
2  that's what I would be expecting, but that's not an
3  independent opinion of mine.
4    Q.  Okay.  Under 1.22, that paragraph, you're
5  there discussing the simulation by Buchner of the
6  hypothetical accident and you're talking about the peak
7  G-forces that he might have -- that he generated during
8  that simulation.  Is that a fair description of that?
9    A.  Yes.
10    Q.  And the next paragraph talks about a peak or
11  worse case scenario of 45 G's.  Are you saying that
12  that is the worst case peak 45 G's or is -- what --
13  what do you mean by that?
14    A.  Well, I mean at least my understanding of
15  Mr. Buchner's work is that's what he came up with.
16    Q.  And he came up with that with a computer
17  simulation.
18    A.  He did.
19    Q.  Right.  And do you know where in the vehicle
20  that simulation says the peak G's would have been 45
21  G's?
22    A.  You mean where on -- in the vehicle?
23    Q.  Uh-huh (positive response).
24    A.  You know I don't know that he discussed that,
25  but certainly probably at the most at the outset would

Page 128

1  be at the rear of the vehicle.
2    Q.  Okay.  So you don't know whether his
3  measurement or his simulation of 45 G's was at the rear
4  of the vehicle, at the center of gravity of the
5  vehicle, at the number four position -- you're not
6  aware from his work where that peak level that he
7  simulates occurs.
8    A.  So I don't remember specifically if he stated
9  it to that extent.  Let me look back at his report.
10      (Witness perusing document)
11    A.  No, he doesn't delineate in the report.
12    Q.  All right.  Do you agree that the peak G's can
13  vary depending on the location within the vehicle?
14    A.  They can and certainly they may -- you may
15  have another peak somewhere further, but obviously that
16  would be less than -- because the first initial is
17  where you get the biggest speed change going, but it's
18  going to progress but certainly some of those G's are
19  being bled off because of damage being deformed or so
20  to the vehicle.
21    Q.  I agree that the peak G is going to be at the
22  time-wise at the initial, but it's going to be
23  different at different locations on the vehicle.
24    A.  The G's will be different throughout sure, but
25  they're never going to be higher than what the

Page 129

1  initial -- at least my understanding of the peak at the
2  start.
3    Q.  Right.  Well, assuming that these 45 G's was
4  not the measurement -- or not measurement.  He didn't
5  measure anything.  Is not the guesstimate from his
6  simulation of the peak G's at the number four seating
7  position.  That's what I'm getting at is you don't know
8  what the peak G's would be even in his simulation in
9  the number four position.
10    A.  I don't think he broke it down to that, but
11  certainly if we're doing deformation, I wouldn't expect
12  the peak G's to be as high as the 45 at the number four
13  because you've got to work your way to get to that
14  position, so it's certainly not going to get higher.
15    Q.  But you don't know where the 45 G position
16  was, so you're --
17    A.  We've already agreed with that.
18    Q.  Right.  So that means -- I don't understand
19  your answer then.  How would you -- how can you
20  conclude that the peak G's of the number four position
21  might not have been higher than 45 G's at the initial
22  point of impact when you don't know where the 45 G's
23  estimate comes from?
24    A.  Well, I guess just I've never seen where the
25  G's grow higher than the initial impact force to some

33 (Pages 126 - 129)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 130

1 other seated position.
2    Q.  Let's assume the 45 G's in his simulation was
3 at the center of gravity of the vehicle.
4    A.  Okay.
5    Q.  Okay.  I agree with you that the -- center
6 of gravity peak G would be at the initial part of the
7 accident sequence and would bleed down from there like
8 you mentioned.
9    A.  Right.
10    Q.  But that has no bearing or relation on what
11 the peak G at the initial impact would be in the number
12 four seat position.
13    A.  Well, the CG of that vehicle is probably not
14 far from the number four position.  It's probably, you
15 know, typically it's about the center between the two
16 front seats.
17    Q.  How do you know that?  Did you measure that in
18 this case?
19    A.  No.
20    Q.  Did you look that up anywhere?
21    A.  (Shakes head negatively).
22    Q.  You're just guessing where the peak -- where
23 the center of gravity may be on the Escape?
24    A.  I'm just saying typically that's around where
25 it is.

Page 131

1    Q.  Right.
2    A.  I'm certainly not opining where it is,
3 absolutely.
4    Q.  All right.  In Paragraph 1.23 you reference
5 FMVSS 208.  You would agree that that relates to
6 frontal offset crashworthiness; is that correct?
7    A.  Well, 208 is the occupant protection standard,
8 and actually those values apply to rear impacts, side
9 impacts, and frontal impacts.
10    Q.  So you have to comply with FMVS [sic] 208 by
11 showing that your vehicle can comply from all those
12 different areas.  It's not just the frontal offset
13 crash?
14    A.  No, the compliance test is only a frontal
15 test.  It's not even a frontal offset.  The offsets are
16 done above what the compliance test of the 30-mile-hour
17 is.  But as far as injury assessments and all, we --
18 typically you still apply the values of 208 in
19 whichever crash.
20    Q.  But it's not required of the manufacturer test
21 even though they're in a frontal crash.
22    A.  Oh.  Well, they do have to test in other crash
23 modes, and you're still looking at 208 values or HIC
24 values in side impacts, the frontal impacts.  The rear
25 impact is mainly just 301 which is a field system

Page 132

1 integrity.
2    Q.  Right.  I'm just trying to get to the fact
3 that in order to comply with 208, you don't have to
4 test any crash other than the frontal 30 mile-per-hour
5 test.  That's the only test you have to -- to pass.  Is
6 that correct --
7    A.  No.
8    Q.  -- or not?
9    A.  You've got to pass 214 which is the side
10 impact standard.
11    Q.  That's a different standard.  That's what I'm
12 saying.  For 208, in order to comply with 208 --
13    A.  Oh.
14    Q.  -- you just have to pass the frontal crash
15 test.
16    A.  Okay.
17    Q.  Is that -- is that fair?
18    A.  Sure.
19    Q.  Okay.
20    A.  But you use the same 208 note criteria for the
21 side impacts as well.
22    Q.  All right.  And -- but for rear impacts, we
23 have entirely different criteria.
24    A.  There's technically no injury --
25    Q.  Right.

Page 133

1    A.  -- requirement.  It's basically whether or not
2 the vehicle leaks fuel or not.
3    Q.  Okay.  The 208 level that you reference here
4 not exceeding 70 G's, what type of person is that
5 applicable to?
6    A.  Well, they typically use a 50th percentile
7 Hybrid III dummy.
8    Q.  Of -- of a male, average male.  Would that be
9 a fair way of saying that?
10    A.  Yes.
11    Q.  All right.  So those -- that's where that
12 level comes from.  Would you agree that in order to
13 prevent injury to a child, a two-year-old child, you
14 would need a different standard than what's applied to
15 the average -- average male -- adult male?
16    A.  Well, I mean, certainly that gives us a data
17 point, and there's been some attempts to do some
18 scaling for the children as well, and seems like some
19 of that shows that they at times can sustain a little
20 higher accelerations.
21    Q.  But you're not aware of any specific criteria
22 which would say here is a safe level for a child in
23 order to prevent a brain injury.
24    A.  Well, I'm trying to remember... they do have
25 some criteria for like the six-year-old dummy, but I

34 (Pages 130 - 133)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 134

1 can't cite it to you exactly.
2    Q. All right. And this last thing in 1.24 you're
3 talking about the preservation of the occupant survival
4 space. And just to be sure that -- you're stating that
5 that would have occurred not based upon any work or
6 opinions you developed, but based upon Buchner's
7 interpretation of his computer simulation of the
8 hypothetical crash.
9    A. Yes.
10    Q. Okay. I think you -- you would agree that the
11 potential for error in your conclusions related to the
12 hypothetical crash, is dependent upon the accuracy of
13 Mr. Buchner's simulation; is that fair?
14    A. Well, I'd say technically really with these
15 type kind of clinical opinions it's hard to really put
16 any type of error rate on it. Because it's not like an
17 empirical study per se like, you know, calculating a
18 Delta-v of doing a scientific experiment in that
19 manner.
20    Q. Right. So how did you consider the potential
21 for error in your occlusion -- in your conclusions and
22 opinions in this case?
23    A. Well, I think from, again, the total analysis
24 of the child spectrum of injuries, injuries he does not
25 have, inspection of the vehicle, the occupant space,

Page 135

1 the damage to the vehicle as well, and then in
2 conjunction with the work of Mr. Buchner as well.
3    Q. And I asked that poorly. I meant to make it
4 reference only your opinions related to the
5 hypothetical crash.
6       MS. CANNELLA: Can you repeat the question?
7    Q. Sure. You state on page 20 of your report
8 that one of the criteria of the scientific method of
9 analysis in your words is consideration for the
10 potential for error in the conclusions and -- and
11 opinions stated.
12    A. Yes.
13    Q. And I'm assuming that you applied that
14 scientific method in this case, and I want to know how
15 you applied that to your opinions that relate to the
16 hypothetical crash.
17    A. Oh. Okay.
18    Q. Does that make sense? I thought you said
19 subject, so I apologize.
20    Well, again, I considered the information that's
21 been provided to me from Mr. Buchner, and, again, it
22 would be my assumption that we're going to
23 significantly decrease the amount of intrusion at least
24 as far as relative to Cohen's occupant survival space.
25 There still is going to be some crush I'm sure of the

Page 136

1 rear cargo area and all, but not -- at least to my
2 understanding, not to the extent that we have.
3    Q. But the potential for him to have erred in
4 performing his -- his computer simulation, that's
5 something that's outside of your ability to -- to check
6 or consider; is that fair?
7    A. Yes, sir.
8    Q. Okay. And I think you've stated your
9 hypothesis was -- as you've stated in this report
10 numerous places -- was to determine whether if the
11 vehicle had been in its stock configuration, Cohen
12 would not have suffered the injuries and fatality that
13 he did in the subject hip (phonetic)-- crash. Is that
14 a fair statement of your hypothesis?
15    A. Yes, sir.
16    Q. Okay. And how did you specifically test the
17 validity of that hypothesis?
18    A. Well, that's part of going through, again,
19 analyzing the injury pattern, the lack of certain --
20 certain injuries from, like -- like I said, just
21 straight G-forces, consideration of the -- basically
22 the loss of survival space and the directionality that
23 Cohen would be moving during this crash.
24    Q. And with regard to the hypothetical crash, how
25 did you test the validity of the hypothesis related to

Page 137

1 the hypothetical crash?
2    A. Well, in the same way, but obviously with the
3 understanding from what Mr. Bucker said was going to --
4 would occur or would happen as far as the alteration of
5 the damage profile.
6    Q. So you weren't able to test the validity of
7 his opinions. That's what I'm trying to get at;
8 correct?
9    A. I would never would do that. I mean that's
10 not my job.
11    Q. Right.
12    A. Because then you'll scold me because I'm not a
13 reconstructionist.
14    Q. Sure. I mean I'm just establishing you're
15 relying upon the validity of his report if there's
16 nothing you can do to test it from your chair.
17    A. Well, that's true -- from the hypothetical
18 right.
19    Q. Right, the hypothetical.
20    A. But certainly I don't necessarily need him for
21 the initial or the subject crash.
22    Q. All right.
23       MR. HILL: What exhibit are we on now?
24 Exhibit 7?
25       THE COURT REPORTER: Seven.

35 (Pages 134 - 137)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 138

1      (Defendant's Exhibit No. 7 was marked for
2    identification by Mr. Hill.)
3      Q.  Okay.  This is the supplemental report dated
4    March 15, 2024, Bate's labeled 009132.
5      MR. HILL:  And before I ask questions about
6    this I just want to state on the record that I'm
7    not -- by asking questions on this topic of the
8    report we just received the business day prior to
9    the deposition, that I'm not waiving any
10   objections to the timeliness or admissibility of
11   the report or any of the opinions contained in the
12   report.  And I'm asking limited questions related
13   to the supplemental report until the Court can
14   rule on our -- the motions that will be coming to
15   strike this supplemental report under the reasons
16   I've just mentioned.
17     It's impossible for me today with less than a
18   business day's notice to properly examine
19   Mr. Lewis based upon his entirety of his work in
20   two other cases from over a decade ago.  And so I
21   will ask limited questions to support the motion,
22   but there's no way that I could be expected to
23   thoroughly examine him regarding all his opinions
24   in the Bacho Case and the Mendoza Case and the
25   foundation for those opinions and the evidence

Page 139

1    upon which they're based and the expert work in
2    those cases by multiple other experts.  So I just
3    want to get that on the record.
4      MS. CANNELLA:  We would ask that you -- we do
5    not agree to produce him a second time for
6    deposition, so we ask that you ask whatever
7    questions you have about it.
8      MR. HILL:  Well, I'm not going to agree to
9    terminate the deposition.  I will say it will be
10   suspended at the end of the deposition pending the
11   Court's ruling on this late disclosure and
12   improper disclosure, and the fact that it covers
13   evidence and information that will be likely
14   inadmissible in this case, so that's my -- that's
15   my position.
16   BY MR. HILL:
17     Q.  When did you begin working on this report
18   dated March 15, 2024?  Do you know?
19     A.  Probably last week, I think or -- yeah, I
20   think so.  It's possible it was the week before.
21     Q.  So at the earliest it would have been, you're
22   saying, the week of March 4th?
23     A.  If that's two week ago.
24     Q.  Okay.  But you're not sure exactly when you
25   began drafting this supplemental report.

Page 140

1      A.  No.  I mean it's been in the past two weeks.
2      Q.  Okay.  And I think you said what prompted you
3    to draft this report was a request from Ms. Cannella to
4    issue opinions relate to Bacho and Mendoza.  Is that a
5    fair statement of your prior testimony?
6      A.  Sure.  I mean I don't spontaneously generate
7    any report until an attorney asked me to do that.
8      Q.  Okay.  I'm confused.  If you're not planning
9    to give certain opinions in a case or do you find that
10   certain opinions are necessary to validate your
11   testimony in a case, you don't wait for the attorney to
12   tell you what you should or shouldn't consider in order
13   to give your opinions; correct?
14     A.  That's not what I said.  So in general I don't
15   just write a report in a case unless the attorney asks
16   me to because I have a lot of cases where we don't even
17   write a report.
18     Q.  Well, this is a federal court case.  You know
19   a report's required.
20     A.  Honestly, I don't always know whether they're
21   federal or state court.
22     Q.  Okay.  Well, assuming that, you know, this is
23   a state -- a federal court case with a deadline of
24   October 16th to provide all of your opinions you're
25   going to give in the case, based upon everything known

Page 141

1    at that time at the minimum, and prior to October 16th
2    you were fully aware of all the details of the Bacho
3    and Mendoza cases; correct?  You said you've known
4    about them for decades.
5      A.  Right.  They're -- like I said, they're quite
6    old cases.
7      Q.  Right.  And if they were relevant to your
8    opinions in this case, you don't wait for the lawyer to
9    tell you what facts and information is or is not
10   relevant when you're required to issue a report that
11   outlines all of your opinions in the case; correct?
12     A.  Well, again, I'm not saying that it's
13   relevant, like it's not something I'm relying on as far
14   as the opinions I have in this current case, but it
15   does show that I have investigated and seen this
16   similar issue.  So it's a part of, again, my
17   experience, background, education, and training.
18     Q.  All of which could have been included in your
19   October 16, 2023 report.
20     A.  It probably could, sure, but, again, it was
21   not necessarily something that I need as a bases for my
22   opinions in this case.
23     Q.  Okay.  The information that you've provided in
24   connection with your discussion of those two cases in
25   this report include your expert file material from

36 (Pages 138 - 141)

Paul Lewis , Jr., M.S., BME                        March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 142

1 those cases; correct?
2    A. It includes my -- the reports that I wrote and
3 the case review which has all the underlying data to
4 it, and I think even my vehicle inspection information
5 as well.
6    Q. Which is all part of your file -- your
7 generated file from that case, from those cases?
8    A. It is, but it also has listed all of the other
9 experts and everything else that were in there and all
10 their information, so that's all summarized in here as
11 well.
12    Q. But you did not produce all of the materials
13 and information that you reviewed in connection with
14 issuing your opinions in those two cases; is that
15 correct?
16    A. I produced my summary of all those materials.
17 I did not produce each and every individual file.
18    Q. Right. But we don't have any of the
19 depositions from those cases, any of the reports from
20 the other experts in the cases, any of the documents
21 produced in those cases that you relied upon or
22 reviewed, none of the evidence that formed the basis of
23 your opinions in those cases was actually produced to
24 us by you in this case; correct?
25    MS. CANNELLA: Objection to the form of the

Page 143

1 question. Rough Country's had all those materials
2 since they were provided in the cases that they
3 refer to.
4    THE WITNESS: I'm just saying he hasn't --
5    MS. CANNELLA: No, you said we didn't -- we
6 don't have them and we, being Rough Country, does
7 have them -- has had them.
8    MR. HILL: I didn't say "we" don't have them.
9 I said "he" hasn't provided to us, is how I
10 question -- phrased the question.
11    MS. CANNELLA: The question was "we." I
12 listened very carefully.
13    MR. HILL: Okay.
14    MS. CANNELLA: Object to the form of the
15 question.
16    MR. HILL: I'll rephrase it then.
17 BY MR. HILL:
18    Q. You haven't provided to us any of the
19 materials that you relied upon or reviewed in
20 connection with forming your opinion in the Bacho or
21 Mendoza cases; correct?
22    MS. CANNELLA: Objection. Object to the form
23 of the question. Mr. Lewis has provided that
24 information.
25    MR. HILL: That's a speaking objection. I'm

Page 144

1 talking about he hasn't provided anything other
2 than what he just mentioned.
3    Q. You haven't provided to us any of the
4 depositions that you read, any of the documents you
5 reviewed, any of the expert reports from other experts
6 in that case, or any of the actual raw material that
7 was used to formulate your report. That's my question.
8    MS. CANNELLA: Object to the form of the
9 question. It is vague because it doesn't say
10 which case you're asking him about.
11    Q. Either Bacho --
12    MS. CANNELLA: There are two cases.
13    Q. -- or Mendoza. Either one.
14    MS. CANNELLA: You -- the question doesn't
15 state whether you're asking if he produced it in
16 this case or if he's produced it in Bacho or
17 Mendoza.
18    Q. Obviously, I'm talking about this case.
19    A. So that's not completely true because there
20 are copies or portions of the expert reports are within
21 the case reviews of these, and then there's the summary
22 -- summaries of all the various depositions of both
23 sides' experts in every one of those cases as well, not
24 to mention medical records summary and reviews and
25 numerous photographs.

Page 145

1    Q. I think my question was very clear. I'm not
2 talking about your summary of any information. I'm
3 talking about the actual information itself. The
4 depositions, the expert reports, the documents you
5 reviewed -- those -- that material has not been
6 produced to us in this case to enable us to see what
7 you based your opinions in both Bacho and Mendoza on.
8    MS. CANNELLA: Objection to the form of the
9 question. Misstates the reality.
10    Q. Go ahead answer.
11    A. Well, this does produce the basis of what I
12 wrote the report on and the material that I relied on.
13    Q. I'm not saying -- I'm saying the actual
14 material. None of the actual material you relied upon
15 was produced by you to us in this case from your
16 opinions in Bacho and Mendoza.
17    A. Well, I would agree that probably the
18 depositions are not in there. I'm pretty sure reports
19 are, but, yeah, I didn't individually produce a medical
20 record or a deposition.
21    Q. Let's talk about -- you say on page 2 of this
22 report, you admit that the details of Mendoza and Bacho
23 are different from Bryson. Let's talk about what is
24 the same from Bryson. In Mendoza and Bacho the vehicle
25 was involved in the accident was equipped with a Rough

37 (Pages 142 - 145)

Paul Lewis , Jr., M.S., BME                        March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 146

1 Country lift kit.  We can agree on that?
2    A.  Yes, sir.
3    Q.  Were the vehicles involved in Mendoza or Bacho
4 the same as the vehicles involved in this case?
5    A.  I think they both dealt with 2500 pickup
6 trucks, but the struck vehicle was -- one was a Mustang
7 and one was a Sienna minivan.  But in all the cases,
8 basically the impacts were above where the expected
9 vehicle structures were that were meant to carry loads.
10    Q.  Well, let's talk about that.  When you say a
11 2500 pickup, are you saying that that's what was
12 involved in this case?
13    A.  A 250, yes.
14    Q.  Okay.  And so in what other case between
15 Mendoza and Bacho was a Ford F250 involved?
16    A.  Oh, I didn't say a Ford.  One was a dodge and
17 one was a Chevrolet.
18    Q.  All right.  So a Dodge 2500, RAM 2500 is not
19 the same vehicle as a Ford F250, is it?
20    A.  It's still a three-quarter ton pickup truck.
21    Q.  But that's the only similarity between those
22 two.  You don't know the -- whether they're the same
23 height, whether they're the same weight, whether they
24 have the same coefficient of restitution and stiffness.
25    A.  Well, I certainly -- some of that I would

Page 147

1 never know to begin with, but I -- I don't have that
2 kind of detail memorized, no, sir.
3    Q.  Okay.  The incident that occurred in Bacho,
4 was it a rear-end collision?
5    A.  No, sir.
6    Q.  It was a side-swipe collision; correct?
7    A.  It wasn't a side swipe.  It was a side impact.
8 It was a T-bone.
9    Q.  Well, that's what I meant to say.  I'm talking
10 about a T-bone, a side-impact collision.
11    A.  Yes, sir.
12    Q.  And the collision in Mendoza was a frontal
13 impact collision.
14    A.  It's kind of an offset frontal, yes, sir.
15    Q.  Neither of them were a rear-end collision.
16    A.  They were not.
17    Q.  You would admit that the speeds of the
18 vehicles involved in those two incidents are not the
19 same as the speeds involved in the Bryson matter.
20    A.  The Delta-v's were -- were different.
21    Q.  All right.  Do you know the size of the lift
22 kit in the Bacho case?
23    A.  I -- I don't recall offhand, no, sir.
24    Q.  Do you know the size of the lift kit in the
25 Mendoza case?

Page 148

1    A.  Not without going back and look.
2    Q.  Do you know the height of the bumpers of any
3 of the vehicles if any of those cases?
4    A.  If I go through the materials that I've
5 provided you I could find that.
6    Q.  Well, if you'd like to.  But you would agree
7 that they're not identical.  Would you agree to that,
8 to the Bryson vehicles?
9    A.  Without looking back, I -- I don't know for
10 sure.
11    Q.  Okay.  Well, you -- are you intending to give
12 any opinions that relate to Mendoza and Bacho other
13 than what's listed and described in your supplemental
14 report?
15    A.  No.
16    Q.  Okay.  So let's talk about what your opinions
17 are that you intend to give in this case that relate to
18 Bacho and Mendoza.  So what are they?  I'm not sure I
19 understand this disclosure because it seems to cite
20 conclusions of experts in other cases.  What exactly
21 are you intending to testify about in this case that
22 relate to Bacho and Mendoza?
23    A.  That they are other examples of what --
24 exactly what we have here based upon the lifting of the
25 vehicle or the application of the Rough Country lift,

Page 149

1 that you had created a significantly incompatible
2 vehicle-to-vehicle situation where you cause much more
3 catastrophic deformation of the occupant's survival
4 space for the individuals in the struck vehicle by
5 that; and thus you've also rendered that vehicle not
6 capable to utilize the as-designed safety features of
7 the cage and all to manage the energy to crumple zones
8 to help with the deformation and dissipation of the
9 energy.  Rather you basically just have catastrophic
10 intrusion into the occupant survival space that
11 ultimately becomes catastrophically as far as
12 injuries -- sorry -- injury causation.
13    Q.  You've testified multiple times today that
14 you're not qualified to give accident reconstruction
15 opinions.  And you just said that you intend to give
16 opinions in this case related to accident
17 reconstruction issues in Bacho and Mendoza.
18        MS. CANNELLA:  Objection to the form --
19    Q.  Do you agree with that?
20        MS. CANNELLA:  Objection to the form of the
21 question.  Misstates his testimony.
22    A.  Those words never even came out of my mouth,
23 so that's an absolutely mischaracterization of what i
24 just said.  I'm basically talking about the actual
25 physical evidence of what the defamation profile is to

38 (Pages 146 - 149)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 150

1  these.  I'm certainly not putting a Delta-v or anything
2  of that nature.  You can look at the photographs and
3  tell how detrimental the impact was.
4      Q.  Well, I think the record will speak for
5  itself.  I almost don't need to ask any questions on
6  this, but you just summarized the conclusions of the
7  accident reconstruction and other experts when you talk
8  about the safety features of the crashed vehicles and
9  the ineffectiveness of the crash protection.  Again,
10  you've testified earlier that those are within the
11  expertise of an accident reconstructionist, and they're
12  not within your expertise to talk about the design of
13  the vehicle, the potential for override of the vehicle,
14  the potential for intrusion, the -- all of the dynamics
15  involved with a vehicle crash.
16      MS. CANNELLA:  Object to the form of the
17      questions.  It's compound, confusing, and not
18      really a question.
19      Q.  Go ahead.
20      A.  It's straightforward that obviously for the
21  frontal crash when you did not engage the bumpers or
22  the main load-bearing structures of the vehicle.  For
23  the side impact you're above all the side door beams
24  and all the robust structure.  So that's not really a
25  reconstruction opinion.  That's obviously based on my

Page 151

1  extensive knowledge of vehicles and looking at it.
2  Now, I'm not saying how the car was designed
3  differently or anything of that nature.  I'm just
4  saying it's obvious that the deformation profile is
5  much greater because of the incompatibility of how
6  they're supposed to line up.  I mean there's been a lot
7  of literature written about this especially from IIHS
8  and NHTSA about vehicle compatibility.
9      Q.  Are you able to give testimony about vehicle
10  compatibility and the IHS comments about that?  What --
11  what qualifies you to even talk about vehicle
12  compatibility?
13      A.  From a performance standpoint and injury
14  causation standpoint.  I'm not getting down into the
15  intricacies of the design itself, but certainly I don't
16  design a seat, but I certainly can talk about the
17  performance of a seat and how that may lead to injury,
18  just like whether an air bag does or doesn't go off an
19  how that may affect it.  Certainly I'm not an air bag
20  designer either, but, you know, I don't know need to
21  know how to design the bag.  I know what the purpose is
22  and how that may play a role in protecting or not being
23  able to protect an occupant.
24      Q.  Well, your opinion basically is that in those
25  other two cases that the intrusion would have been

Page 152

1  significantly lessened in the hypothetical situation of
2  those vehicles not having a Rough Country lift kit;
3  correct?
4      A.  Yes, sir.
5      Q.  And in order to give any opinion regarding
6  what intrusion may or may not have occurred in a
7  hypothetical crash, you would have to rely upon
8  accident reconstructionist's estimation or simulation
9  or testing with regard to what would happen in that
10  hypothetical crash; correct?
11      A.  I did, and that information is contained in
12  the documents that I produced.
13      Q.  Right.  And I'm saying that you would have to
14  rely upon their opinions to make this conclusion.
15  They're not opinions that you yourself are qualified to
16  give.
17      A.  I'm sorry.  What -- what opinions am I not
18  qualified to give?
19      Q.  The opinion that the intrusion in Mendoza and
20  Bacho would have been significantly lessened, the
21  safety features of the struck vehicles would have been
22  allowed to function as designed if there had not been a
23  lift in either Bacho or Mendoza.  That specific opinion
24  on page 2 of your report.
25      A.  No, that's from using other experts just like

Page 153

1  Mr. Buchner who provided that information.
2      Q.  You've already said in this case Mr. Buchner's
3  conclusions regarding the hypothetical incident are his
4  opinions, not your opinions, and that you relied upon
5  them to then give opinions about assuming he's [sic]
6  true, this is what injuries would or would not have
7  occurred.
8      A.  And that's the same thing I did in these other
9  two cases as well.
10      Q.  Right.  And in this case what I'm saying is in
11  both Bacho and Mendoza in order to make that statement,
12  you have to rely upon the conclusions and opinions and
13  the work of the accident reconstruction experts in
14  those cases.
15      A.  So it's like a dog chasing its tail.  You've
16  already asked me that and I've answered you that yes
17  there were other experts and that information is
18  contained in these documents (indicating).
19      Q.  Right.  But we don't have those other experts
20  to cross-examine in this case, do we?
21      A.  I guess not.  I mean I don't think I've seen
22  whether they're -- they've certainly been cross-
23  examined before.
24      Q.  But we don't -- we haven't had an opportunity
25  to cross-examine them on these issues in this case even

39 (Pages 150 - 153)

Paul Lewis , Jr., M.S., BME                     March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 154

1  if it was relevant because we didn't even know that you
2  intended to give any opinions related to Bacho and
3  Mendoza until March 15th.
4       MS. CANNELLA:  Object to the form of the
5       question.  What is the question?
6  Q.  The question is, we did not -- you did not
7  make us aware that you intended to give any opinions
8  related to Bacho and Mendoza until over five months
9  past the deadline for you disclose your opinions in
10 this case.  Would you agree with that statement?
11      MS. CANNELLA:  Object to the form of the
12      question.
13 A.  Well, I don't know that technically I'm giving
14 you opinions other than it shows similar damage
15 profiles and results from other cases with Rough
16 Country lift kits.  That's I think really is about the
17 extent of it.
18 Q.  But you did not disclose even to that extent
19 of it, whatever the extent of it is, that you intended
20 to even reference Bacho and Mendoza until March 15,
21 2024, five months after the deadline for your opinions
22 to be disclosed in this case; is that true?
23      MS. CANNELLA:  Object to the form of the
24      question.  The report states about his experience
25      and education.

Page 155

1  Q.  No, is that true.  Is my question true?
2  A.  I did not specifically mention those in the
3  first report because, again, it's not really a basis
4  for this case's report, but certainly it's just other
5  examples of the same thing.
6  Q.  Well, it's testimony you intend to give in the
7  case and the purpose of your disclosure is to disclose
8  not just your opinions but all of the testimony you
9  intend to give in the case.  Is that understanding of
10 Rule 26 in the federal courts?
11      MS. CANNELLA:  Object to the form of the
12      question.  Outside the scope of his testimony.  I
13      think we get your point, Mr. Hill.
14      MR. HILL:  Well, I want to hear the answer.
15      MS. CANNELLA:  Well, he doesn't know what the
16      purpose of the Rule 26 is.
17 Q.  He is -- he --
18 A.  That goes without saying.
19 Q.  You don't -- you don't understand the rule of
20 the purpose of Rule 26.
21      MS. CANNELLA:  Object to the form of the
22      question.  Outside the scope of his testimony.
23 A.  I mean, I'm not a lawyer so I don't know the
24 whole legal standard or whatever it is or not, no.
25 Q.  How many times do you believe you've testified

Page 156

1  in federal court in your career in a case that was
2  filed in federal court.
3  A.  I mean I'm sure a lot, but --
4  Q.  Okay.  And --
5  A.  -- again, that doesn't mean that I know all
6  the intricacies of some legal doctrine.
7  Q.  Well, in each of those case over the last --
8  what is it now -- 30 plus years, you've been required
9  to comply with Rule 26 in drafting your report.  You
10 would agree with that?
11 A.  Well, yes, and they -- certainly the
12 requirements have changed over the years as well.
13 Q.  And did you keep up with those changes because
14 you're required to comply with Rule 26.
15      MS. CANNELLA:  Object to the form of the
16      question.  This is getting to be badgering at this
17      point.  You're just asking him about Rule 26.
18      MR. HILL:  Well, I'm not.  Well, he said he
19      doesn't know the legal standard required for him
20      in disclosing his opinions in this case even
21      though he's been testifying for 30 years and has
22      done it, what he said, hundreds of times.  So I'm
23      just trying to get to the bottom of it.
24      MS. CANNELLA:  The judge doesn't care
25      about what he knows about Rule 26.  If there's

Page 157

1  something you have to ask about his opinion, let's
2  do that.
3       MR. HILL:  I've asked those questions.  I'm
4       just curious --
5  BY MR. HILL:
6  Q.  Are you saying -- I think you just testified
7  that you're not aware of the specific legal
8  requirements of some law, Rule 26, and how it applies
9  to your duties to disclose your testimony and opinions
10 in the case; is that fair?
11 A.  Not from as far as an attorney standpoint or
12 anything else no, sir.  I mean I understand now that we
13 write reports, and I think even in federal courts
14 provided supplemental reports as well.
15 Q.  Right.  Supplemental reports in the past, have
16 they always been based upon additional information that
17 was provided to you subsequent to the time of your
18 initial report?
19 A.  Or if somehow a different issue is at hand as
20 well.
21 Q.  Something that's been presented after the time
22 of your original report.
23 A.  Or maybe became an issue even though it wasn't
24 initially.
25 Q.  Right.  Became an issue be it testimony from

40 (Pages 154 - 157)

Paul Lewis , Jr., M.S., BME                 March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 158

1 other experts or something new that was uncovered in
2 the case; is that fair?
3     A.  Those are certainly some of the possibilities
4 of reasons one doing that, yes, sir.
5     Q.  All right.  In the last paragraph on page 2
6 you reference the testimony of Rough Country's
7 corporate representative in this case, the Bryson case.
8 And you say that he testified that Rough Country is not
9 aware of any other cases involving lawsuits against
10 their company.  Where -- what is your source of -- of
11 that opinion that Rough Country's corporate
12 representative stated that he is not aware of any other
13 cases involving lawsuits against the company.  What's
14 your source of that opinion?
15     A.  That was my interpretation of reading the
16 deposition.
17     Q.  Can you show me where in the deposition that
18 statement is -- is made by -- by Rough Country's
19 corporate representative?
20     A.  I don't have the depo.
21     Q.  Okay.  So you can't cite to any specific
22 testimony where Rough Country corporate representative
23 stated that Rough Country's not aware of any other
24 cases involving lawsuits against Rough Country.
25     A.  Other than from my reading the deposition, no.

Page 159

1     Q.  So that's your personal interpretation of the
2 testimony in this case from Mr. Hunsley, but you can't
3 cite to any specific place in his deposition where he
4 made this statement that you have on page 2.
5     A.  I don't have the page or line right now, no,
6 sir.
7     Q.  Okay.  All right.  Just real quick so I make
8 sure I understand this.
9     A.  Okay.
10     Q.  These stated similarities that you have in
11 this supplemental report related to Bacho and Mendoza
12 when compared to this case are that even striking
13 vehicle was equipped with a Rough County lift kit and
14 that the lift kits elevated the striking vehicles such
15 that there was structural intrusion that was
16 catastrophic.  Did I fairly state your -- where you've
17 said the similarities between the cases?
18     A.  Yes.
19     Q.  Can you cite to any other similarities between
20 Bacho and Mendez -- and Mendoza -- sorry -- in this
21 case?
22     A.  Well, Mendoza had a fatal head injury.  And
23 Bacho also had a fatal head injury as well.
24     Q.  Any other similarities?
25     A.  I mean I think that's it.  There was

Page 160

1 significant intrusion into the occupants' survival
2 space, and they all received fatal blows to their head,
3 some directly from the actual lifted vehicle and some
4 from the structural intrusion (indicating).
5     Q.  Right.  So we -- we talked about that.  Three
6 similarities.
7     A.  Yeah.
8     Q.  Rough Country lift kit; intrusion;
9 catastrophic injury to the head.
10     A.  And three-quarter-ton trucks.
11     Q.  All right.  And -- among two of them?  Or all
12 three or just two of them?
13     A.  I thought the Chevrolet was as well.
14     Q.  All right.  Any other -- and that's -- that's
15 the full extent of the similarities between those two
16 cases and our case that you can cite to today.
17     A.  Yes.
18     Q.  Okay.
19     MR. HILL:  Why don't we just take a five-
20     minute break and hopefully we'll be on to the last
21     subject or two.
22     THE VIDEOGRAPHER:  The time is 3:19 p.m.
23     We're off video record.
24     (Video On)
25     (Recess taken)

Page 161

1     (Video on)
2     THE VIDEOGRAPHER:  The time is 3:33 p.m.
3     We're back on video record.
4 BY MR. HILL:
5     Q.  Thank you.
6     Going back to the -- again, the report dated March
7 15 on the last page.  You mention that, Since my
8 opinion report in this case I've received testing data
9 for two sets of testing that support my opinions in
10 this case.
11     I think we talked about this a little bit earlier.
12 What was the source of these two sets of tests?  How --
13 how did you come to have them?
14     MS. CANNELLA:  Asked and answered.
15     A.  Ms. Cannella.
16     Q.  All right.  And did you ask her to go find any
17 testing that might support your opinions in this case?
18     A.  No, I didn't.  And really it's not necessarily
19 support per se, but it just shows some of the effects
20 of some of the accelerations on the head and the
21 expectation of no injuries.
22     Q.  Right.  But did you need either of those
23 reports in order to give your opinions that you've
24 listed in your October 16th report?
25     A.  Not really no.

41 (Pages 158 - 161)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 162

1    Q. Okay. And do you need them in this case in
2 order to give the opinions you intend to give in this
3 case?
4    A. No, not specifically, but, again, they just --
5 part of it talks about accelerations on the head and
6 obviously the lack of injuries.
7    Q. All right. But for Ms. Cannella sending these
8 to you, you would not have rely -- relied upon them
9 anyway in giving your opinions in this case.
10    A. Probably not.
11    Q. Okay. Let me mark, I guess -- the first one
12 referenced is -- doesn't have a title to it. It's
13 testing regarding a Chevy Astro and a Mercedes-Benz
14 van -- or a Chevy Astro van versus a Mercedes Benz
15 sedan. I'm going to mark, I guess, as this test -- and
16 you can confirm whether I'm right or not -- I believe
17 it's been produced as Bryson 9070 through 09118. Here,
18 you can look at that first. The last couple of pages
19 look like a summary; is that right?
20    A. Yes.
21    Q. All right. And then this -- the first part of
22 it is -- when I say first part whatever it is 9070
23 through 9114.
24    A. It's like the acceleration pulses like on the
25 head.

Page 163

1    Q. Right.
2    A. And then what they used to ultimately look at
3 the HIC -- and that's all caps, HIC -- HIC values.
4    Q. Right. And when I'm marking this as this --
5 as whatever exhibit we're on --
6    MS. CANNELLA: Eight.
7    (Defendant's Exhibit No. 8 was marked for
8    identification.)
9    Q. Eight, is that the full extent of the testing
10 data set for the first test you reference in your -- in
11 your report of March 15th?
12    A. Yes.
13    Q. Okay. Tell me how that test shows that when
14 the intrusion is tempered -- scratch that.
15    Why don't you just explain to me in your own words
16 how this test in any way relates to this case so I can
17 understand?
18    A. If you look at the accelerations on the head,
19 the head acceleration and the X are basically the
20 direction that this crash is in. It was around 50 G's,
21 and ultimately the HIC value was a very low score. I
22 don't have it memorized, but I want to say in the
23 200's, so no expected probability of a fatal head
24 injury.
25    Q. All right. Well, tell me about how was this

Page 164

1 test set up? What -- what vehicles were involved in
2 this test?
3    A. It was a Mercedes sedan that was offset left
4 rear impact into the back of a Chevrolet Astro van.
5    Q. All right. So this -- and so each of these
6 tests involved a Mercedes hitting the back of the Astro
7 van?
8    A. No. This is just --
9    Q. I was confused.
10    A. -- it's just one test with a Mercedes hitting
11 the back of an Astro van.
12    Q. Okay. So one test run at 59 miles per hour;
13 is that correct?
14    A. Yes, sir.
15    Q. All right.
16    A. So, you know, about roughly same impact speed
17 or close. So it's 59 and then, again, I was just
18 looking at the accelerations on the head.
19    Q. All right. And do you know what it means to
20 say Tracy Law Test at the top of the summary page 9115.
21    MR. HILL: Have you got -- I may have a
22    another copy if you need one. There's the
23    summary. And here, here's the other part.
24    MS. CANNELLA: Thank you.
25    Q. If you look at 09115 through 09118 it says,

Page 165

1 Injury Summary.
2    A. Yes, sir.
3    Q. All right. And we have an injury summary for
4 the driver of the Astro van, that's 9115; the driver of
5 the Mercedes 9116; the right rear passenger in the
6 Mercedes is 9117; and the left rear passenger in the
7 Mercedes 9118; is that correct? Is that what this
8 injury summary's showing?
9    A. Yes.
10    Q. All right. And it says under, Test vehicle
11 CAL 3490 Tracy Law Test 6. Do you know what Tracy Law,
12 what's that referencing?
13    A. I don't.
14    Q. Do you know if these tests were performed in
15 connection with any kind of lawsuit?
16    A. I -- I don't know one way or the other.
17    Q. Do you know who performed this test?
18    A. Looks like Calspan.
19    Q. Who? I'm sorry?
20    A. Calspan (indicating).
21    Q. All right. And that's -- you're getting that
22 just from the test data sheet?
23    A. Yeah, they're -- it's a test facility.
24    Q. Okay. The test date is April 1, 2019.
25    A. Yes, it looks like.

42 (Pages 162 - 165)

Paul Lewis , Jr., M.S., BME                        March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 166

1    Q. All right. At the top of the -- of 9115 it
2  says, Driver H3 (50th male), Serial Number 143 Injury
3  Summary.
4        What -- what does the H3 stand for? Do you know?
5    A. Hybrid III.
6    Q. And what does that mean? Is that the dummy
7  that was used in the test?
8    A. Correct.
9    Q. And 50th male, that means 50th percentile
10 of -- of male adult?
11   A. Correct.
12   Q. All right. And then what is the serial number
13 reference?
14   A. I guess the serial number of that particular
15 dummy.
16   Q. Okay. And so that's all referring to the
17 dummy used -- used in the test.
18   A. Yes.
19   Q. At least in that position in that vehicle.
20   A. Right. Because as you go through, each dummy
21 has a different serial number.
22   Q. All right. Great. And so similarly when you
23 look at 9116, the driver, HM -- so is that -- what does
24 that mean?
25   A. I'm sorry, which page?

Page 167

1    Q. 9116.
2    A. Oh. Again, it's a hybrid III male.
3    Q. So if they're the same, why does one say H3
4  and one say HM?
5    A. I have no idea.
6    Q. And this one is the -- is a 95th percentile of
7  an adult male --
8    A. Right.
9    Q. Correct.
10   A. About 6-2, 220.
11   Q. Okay. And then I guess just to be consistent,
12 9117, the right rear passenger in the Mercedes Benz,
13 was a hybrid female 5th percentile adult?
14   A. Yeah, 5th percentile female, correct.
15   Q. All right. And then the left rear passenger
16 in the Mercedes was a Q10 dummy. Do you know what that
17 stands for?
18   A. I -- I don't. Let's see... I don't.
19   Q. That -- you're assuming that refers to the
20 type of dummy used; correct?
21   A. Yes.
22   Q. And we don't know anything about the
23 male/female percentile, adult/child. We can't tell
24 from the test; right?
25   A. No.

Page 168

1    Q. All right. And do we know whether either of
2  these vehicles had a lift kit installed?
3    A. They did not.
4    Q. Do we know anything about the height of the
5  bumpers of either of these vehicles?
6    A. Standard of whatever the -- they're
7  manufactured as.
8    Q. Right. But we --
9    A. Probably 22 inches somewhere, but I don't know
10 specifically.
11   Q. Okay. You made a reference to the HIC values
12 and that's the head injury criterion?
13   A. Yes, sir.
14   Q. And so -- like, let's use 9115. This is a
15 measurement of the dummy in the Astro van that was
16 struck by the Mercedes in the test. Is that your
17 understanding?
18   A. You said 115?
19   Q. Yes.
20   A. Okay.
21   Q. The first page of the injury summary.
22   A. Yes.
23   Q. And that was a -- he was in a 1999 Chevrolet
24 Astro van.
25   A. Correct.

Page 169

1    Q. Okay. and the HIC values appear to be under
2  the head criteria here, and there's two different
3  values. There's one says 36 MS. Is that 36
4  milliseconds?
5    A. It is.
6    Q. And is that after impact?
7    A. It's during the crash because they integrate
8  over time the accelerations and then they take the
9  largest integral where you have the largest number.
10   Q. And so just so I understand it, so I
11 understand the crash goes longer than 36 milliseconds,
12 but is that a measurement of that value at 36
13 milliseconds into the crash, or is it the -- explain
14 that to me. Sorry.
15   A. So these are both what they call HIC 36 and
16 HIC 15. They're the eclipse. So what it's doing is,
17 in order to calculate HIC, it's an integration over
18 time. So it -- for -- if you're looking at 36, it's
19 iterating over looking at a 36 millisecond window
20 throughout the crash, and ultimately it takes the
21 largest one to create, and then it calculates out what
22 the HIC is, which then that gives you -- for the HIC 36
23 that gives you a 382 and then -- and that's the score
24 that you're looking at is to be under a thousand. So
25 that's significantly under a thousand, so there's a

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 170

1 very low expectation of any type of head injury.
2       And then if you look at the HIC 15, that's 218.
3 So, again, even lower and pretty much nowadays we
4 usually use the HIC 15.
5       Q. And that 15 is the same thing. It takes a 15
6 millisecond bracket within the accident sequence that
7 is the highest average level during that 15 millisecond
8 bracket.
9       A. Correct.
10      Q. Okay. And so, again, do you know anything
11 about the vehicle compatibility between a 2014 Mercedes
12 Benz E350 and a 1999 Chevrolet Astro van?
13      A. No, other than they're basically under the
14 standard lumbar heights that a -- regular vehicles are
15 manufactured at.
16      Q. That's all you know about the heights of those
17 vehicles.
18      A. Correct.
19      Q. And that's all you know about the
20 compatibility between the two vehicles.
21      A. Oh, yeah.
22      Q. Okay. And --
23      A. And I'm not really looking at that part. I'm
24 basically just looking at some accelerations on the
25 head.

Page 171

1       Q. I understand. But you -- in order to evaluate
2 that with relation to this case you would need to know
3 whether the two vehicles are actually striking frame to
4 frame or not or whether there's override or underride.
5       A. Well, not really. I'm just looking at
6 accelerations and seeing whether they may or may not be
7 injurious.
8       Q. Okay. For the per -- for the dummy in the
9 particular passenger position of the type of dummy
10 used, that's what applies to each of these tests.
11      A. Right. Well, they -- they all have -- they
12 all have the same accelerometer in the head, it's just
13 they -- they're a different height and a different
14 weight. That's -- that's really the only difference.
15 The accelerometers are the same.
16      Q. Right. But the impact on the accelerometer
17 may be impacted by which type of dummy it's installed
18 into.
19      A. I don't know that that's necessarily for that
20 portion. Now the chest acceleration certainly could be
21 different based on the size dummy.
22      Q. Well, why would you need to vary the type and
23 size of dummy if it doesn't impact the accelerometer
24 measurements of the head?
25      A. Well, it could be affecting other body

Page 172

1 portions.
2       Q. But you said in no way would it affect the
3 measurements of the H-I-C related to the head.
4       A. Unless -- not unless there's a significant
5 impact, I mean depending on how much weight you have.
6 But in general if you're just looking at the
7 accelerations -- because the heads weigh the same
8 between all of them.
9       Q. All right. Any aspect of this -- this testing
10 other than the head injury criteria that you rely upon
11 at all in your opinions in this case?
12      A. Well, again, I'm not necessarily relying on.
13 It's just some other data I looked at for accelerations
14 to the head and whether they may be potentially
15 injurious, assuming that we're going to have from the
16 hypothetical situation, you know, higher G's.
17      Q. And let's look at, let's say, the 9118. So
18 you've got a -- the 36th and 15 millisecond HIC values
19 are both 410.92.
20      A. Correct.
21      Q. All right. What is that value? Is that
22 acceleration? Is that -- I mean that's not G's. What
23 is it?
24      A. So what you're looking at is you've got G's on
25 the head of a 115 G's. So from that 115 G's that's

Page 173

1 acting on the head, which is certainly way more than
2 45, that you've still only got a HIC value of 410. So
3 internally manufacturers typically use 700 as their
4 bogey value, but according to the standard, a thousand
5 is all you have to comply or be below.
6       Q. But what is that unit? What's the unit under
7 the column max?
8       A. That is the -- there's not a unit per se.
9 It's HIC, so it's head injury criteria. So it just
10 comes out as a number like that.
11      Q. I understand.
12      A. It doesn't have G's or pounds force or
13 anything of that nature.
14      Q. So it's not related to acceleration speed
15 or --
16      A. It is related to acceleration. Because you're
17 integrating the acceleration to come up with this
18 number. It's a big, long formula that basically the
19 computer does that.
20      Q. I understand that. So there's a HIC formula
21 that the computer calculates this number. It's
22 computed. That's where that source is computed --
23      A. Yes, sir.
24      Q. -- on this column. And it computes that based
25 upon the accelerometer in the head in the dummy.

44 (Pages 170 - 173)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 174

1    A. Yes, sir.
2    Q. Okay. And it uses, obviously, those two
3 different time frame values maximum, puts it in the
4 formula and kicks out the number.
5    A. Right.
6    Q. I understand.
7    All right. All of these other values under --
8 under the head portion that talk about CG, X, Y, and Z
9 acceleration, head resultant acceleration. Are you
10 relying upon any of those to give any opinions in this
11 case?
12    A. Well, so those are the different vectors, and
13 so X is really the one that's going longitudinally, so
14 to speak, that's why we're seeing the highest because
15 obviously the accelerations are going planar along the
16 X axis, but you still combine all of them to get the
17 resultant that's on there. So, again, for this one
18 with everything combined, the brain -- we're still
19 seeing accelerations of a hundred and fifteen G's.
20    Q. And where do you get the 115 G's as the --
21 where is that from?
22    A. Head -- Under the CG Z, the head resultant
23 acceleration.
24    Q. Right. So which -- which value are you
25 looking at?

Page 175

1    A. Oh. Well, we're on 118.
2    Q. You're -- I'm talking about on 118.
3    A. Right.
4    Q. So that -- that's not -- that max number head
5 resultant acceleration, you're saying that's in actual
6 G's because it says unit G's.
7    A. All -- all four of those measures right there
8 are in G's, correct?
9    Q. Okay. It says that head resulting
10 acceleration is computed.
11    A. It is.
12    Q. Okay.
13    A. Because that's square the sum of all three.
14    Q. All three of the X, Y, and Z?
15    A. Correct. But you can see the X's obviously
16 the -- significantly greater than -- than the other two
17 like going vertically or laterally.
18    Q. And that's true for the left rear passenger in
19 the Mercedes-Benz.
20    A. Correct.
21    Q. Right. If you look at the head acceleration
22 for the driver of the Astro van, the X acceleration is
23 minimal and the Z acceleration framework is higher.
24    A. It is, but it's still a total of 52 or almost
25 53 G's on the head.

Page 176

1    Q. Again, we've talked about -- you -- you made
2 reference just a second ago to the 45 G calculation
3 from Mr. Buchner. And I think you've testified that --
4 that that -- you don't know where that's calculated.
5 That you -- you can't say that that's the G's he
6 simulated for the head that the head would experience
7 in the fourth seated position in -- in the Escape.
8    A. I think it is for the CG. I don't think it's
9 specific to the number four position.
10    Q. Right. So you think it's for the center of
11 gravity of the vehicle; right?
12    A. Yes, sir.
13    Q. And it's certainly not specific to the -- to
14 any of the acceleration axis for the head.
15    A. No, but it would be what's driving those but
16 -- correct. It's not specific to that seated position.
17    Q. Do you know whether Mr. Buchner in any way
18 measured the -- or simulated the head CG, X, Y, Z
19 acceleration values for any position in the Ford
20 Escape?
21    A. I don't.
22    Q. Okay. And does his simulation in any way
23 create a H-I-C value?
24    A. No.
25    Q. Okay. He could have done that with an actual

Page 177

1 crash test using a dummy and the vehicles involved in
2 the Bryson incident.
3    MS. CANNELLA: Object to the form of the
4    question.
5    A. Well, you could, sure. I mean you could do --
6 I don't know if a -- maybe -- I don't know if a SLED
7 test necessarily would do that or not, but it's
8 possible.
9    Q. Right. So you have a SLED test as an option,
10 but you're not sure, because it's possible. And then
11 you could also like what was done in this case actually
12 crash the two vehicles involved in the Bryson incident
13 with an accelerometer inside the head of a dummy in the
14 number four position in the Escape.
15    A. Sure. Just like, I mean, the defendant could
16 have run some tests as well, right.
17    Q. I know you said you're not aware of the source
18 of this other than the test was done at Calspan, and
19 you said that was a testing facility you're aware of?
20    A. It is.
21    Q. And you don't know whether this involves a
22 particular lawsuit. I mean you've got very specific
23 types of dummies in specific locations in two specific
24 vehicles. Is it your understanding that this was
25 performed in connection with an actual case?

45 (Pages 174 - 177)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 178

1    A. Like I already said, I don't know.
2    Q. You don't know?
3    A. Huh-uh (negative response).
4    Q. Okay. And likewise, do you have any
5 information regarding, you know, how this test was
6 performed? How it was set up? Who -- you know,
7 anything about it.
8        MS. CANNELLA: Objection, asked and answered.
9    A. I mean other that what I previously said, no,
10 I mean I certainly wasn't there or anything.
11    Q. Right.
12    A. Is that the piece that goes with this?
13    Q. It's probably connected to the back of this.
14    A. Okay. I just wanted to make sure I didn't
15 somehow get it in my stack.
16    Q. Anything else I didn't ask you about this test
17 that's relevant to your opinions?
18    A. No. And again, it's not necessarily, you
19 know, that I'm relying on it per se, but it's just
20 looking at some of these accelerations and how they're
21 higher than what may be the expected acceleration and
22 they're not injurious. That's really the main point.
23    Q. What do you mean they're higher than expected?
24    A. Well, if you're only going to get 45 G's on
25 the car, these accelerations are -- some of them are in

Page 179

1 the hundreds, and it's still coming out with a low HIC
2 value.
3    Q. Right. And, again, that's the G computed for
4 the head of each of these.
5    A. Yes, sir.
6    Q. Not the vehicle itself.
7    A. No. In this case, you know, we're looking at
8 the head.
9    Q. But we don't know the actual G acceleration
10 involved or -- or experienced by Cohen in this case?
11    A. Well, I think it was 23.6 G's or something
12 like that.
13    Q. And where did that come from?
14    A. Mr. Buchner's report.
15    Q. Yeah. You're talking about the subject
16 incident.
17    A. Oh, yeah.
18    Q. I'm talking about the hypothetical crash. We
19 don't have any values for what G's Mr. Cohen's --
20 excuse me -- Mr. Cohen, I'm sorry -- that Cohen's head
21 would have experienced in the hypothetical crash?
22    A. Other than 45 G's in the vehicle.
23    Q. Right. At the center of gravity.
24    A. Correct.
25    Q. Right. Okay. All right. Whatever's next --

Page 180

1        (Defendant's Exhibit No. 9 was marked for
2    identification.)
3    Q. All right. I've just marked as -- whatever
4 this number is. Exhibit 9.
5        THE COURT REPORTER: Nine.
6    Q. What was produced to us on March 15th, and it,
7 I believe, is the second test you referred to that was
8 performed by Wichita State University; is that correct?
9    A. Yes.
10    Q. And this testing involved a 2010 Toyota
11 Corolla.
12    A. Correct.
13    Q. And that was the only vehicle involved in this
14 test; is that correct?
15    A. Yes, sir.
16    Q. And tell me just in your own words what -- why
17 did you produce this test and reference it in your
18 March 15th report.
19    A. Again, looking at the head accelerations, and
20 you have about 50 G's on the head, and you see a very
21 low HIC, whether it's HIC 15 or HIC 36, it was around
22 118.
23    Q. All right. And what page of this -- you can
24 use the Bate's numbers at the bottom -- are you
25 referencing when you mention the HIC values and so

Page 181

1 forth?
2    A. 9062.
3    Q. All right. HIC details in the bottom right
4 corner of that page?
5    A. Yes, sir.
6    Q. All right. And it's given you a -- the HIC 15
7 and HIC 36 that are both 118.4?
8    A. Correct. And this is a six-year-old dummy.
9    Q. All right. So tell me what you know about
10 this test. You say -- so tell me about the dummy.
11    A. It's a six-year-old child dummy, and basically
12 it's a SLED test.
13    Q. And what was the speed of the vehicle?
14    A. Looks like it was -- looks like about 15 miles
15 an hour.
16    Q. And where did you -- where does it say the
17 speed of the vehicle?
18    A. I'm looking at sled velocity.
19    Q. Yeah.
20    A. Although, you know, what, it's hard to tell
21 since this isn't color but looks like it said 14.
22 Yeah, 14 miles per hour.
23    Q. Right. So that's on page 9059, Test summary.
24 Is that where you're looking at 14?
25    A. Oh, I was looking at the graph, the next page.

46 (Pages 178 - 181)

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 182

1    Q. Okay. And was this a rear-end sled collision,
2  frontal, side impact? What was the type of impact?
3    A. Looks like a rear impact.
4    Q. And where do you get that from?
5    A. Well, if you look on 9058 you've got a turbo
6  high-back booster in the headrest lowest position. And
7  above that it says, Rear impact, child in high-back
8  booster seat, headrest in lowest position.
9    Q. And this is -- what headrest is it referring
10 to? The headrest for the booster seat?
11   A. The headrest for the vehicle seat.
12   Q. For the vehicle seat that -- the position that
13 the child was in which was the right rear; is that
14 correct?
15   A. Yes, sir.
16   Q. All right. And so this child was in a high-
17 back booster seat which is not the same type of seat
18 that Cohen was in in our accident; correct?
19   A. No, it's not. I mean but it's a very tall
20 seat. It provides head protection as far as from rear
21 -- forward accelerations with rearward head motions
22 just like Cohen's does.
23   Q. All right. But it was -- a high-back booster
24 seat is not the same as the booster seat that Cohen was
25 in.

Page 183

1     MS. CANNELLA: Asked and answered.
2    A. No, it's not.
3    Q. All right. And this page on 9059, it has a
4  test orientation? You see that?
5    A. I do.
6    Q. What does that mean?
7    A. So that shows it's a little -- so it's not
8  directly six o'clock or straight rear. There's a
9  little obliqueness to it. So in general that can get
10 some other accelerations and all, so it would be --
11 technically it could be a worse case than what we
12 actually had since we're pretty much at straight rear.
13   Q. And this is -- so that's the orientation of
14 the impact of like the sled, the forces based upon the
15 way the sled moves?
16   A. So the sled is probably mounted with a little
17 bit of an angulation to replicate this, yes.
18   Q. Right. And this was requested by Thorbole
19 Simulation Technologies on the front page; right?
20   A. Yes.
21   Q. And that was an expert that was involved in
22 the Bacho case; is that correct?
23   A. I don't remember. Give me a second.
24     MS. CANNELLA: You guys had some Bacho
25   materials after all.

Page 184

1    Q. Then what do you reference? What he produced?
2    A. Yes, he wrote a report, which is in these
3  materials.
4    Q. Right. So is it fair to say that this is a
5  test that he requested Wichita State University to run
6  related to another case that he was consulting on?
7     MS. CANNELLA: Object to the form of the
8     question, foundation.
9    A. I -- I don't know what it was run for.
10 Obviously he requested it.
11   Q. All right. Any aspect of this test other than
12 the HIC values on 9062 that you are relying upon to
13 give your opinions in this case?
14   A. No. That's just the portion that, you know,
15 I've been analyzing, looking at the accelerations.
16   Q. Do you know the height of the sled used in
17 this test?
18   A. I don't know exactly. I mean they're typical.
19 The cart's the same for any SLED test you run,
20 basically.
21   Q. All right. They're always going to be
22 positioned within the 16-to-22-inch parameters of
23 bumpers under the bumper standard; correct?
24     MS. CANNELLA: Object to the form of the
25     question. Improper...

Page 185

1    Q. Just trying to figure out what you meant by
2  various -- that the sled is always at a standard
3  height.
4    A. Yeah, these don't have anything to do with
5  bumper height or not. So you've got a cart that's got
6  four wheels and it's a big, steel sled. And then you
7  weld a buck on top of it. So no, I mean like the car
8  would always be higher than what it would be if it was
9  in its normal configuration, but that's got nothing to
10 do with looking at the accelerations to the vehicles
11 and the bodies.
12   Q. I'm just trying to understand. So do you know
13 where the impact occurred to the rear of the 2010
14 Toyota Corolla?
15   A. So --
16     MS. CANNELLA: Object to the form of the
17     question. Outside the scope of his testimony.
18   A. No. I mean typically a SLED test you have a
19 stack is what's creating the pulse that you've got a
20 wall and you run it into it. And then based on how
21 that stack is configured gives you an acceleration
22 pulse to the vehicle that then provides accelerations
23 to the occupant for either kinematic motions and/or
24 measurements of potential, you know, forces in
25 accelerations on that dummy.

47 (Pages 182 - 185)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 186

1    Q.  Okay.  Anything else about this test that I
2  didn't ask you about that's relevant to your testimony
3  in this case?
4    A.  No, sir.  And, again, like I said, it's not
5  necessarily relevant per se.  It's just looking at
6  these accelerations patterns.
7    Q.  All right.
8       MR. HILL:  Let's take a five-minute break and
9  we could be finished.
10      THE VIDEOGRAPHER:  The time is 4:08 p.m.
11  We're off the video record.
12      (Video off)
13      (Recess taken)
14      (Video on)
15      THE VIDEOGRAPHER:  The time is 4:20 p.m. We're
16  back on video record.
17      MR. HILL:  All right.  Thanks.
18  BY MR. HILL:
19    Q.  Mr. Lewis, have we covered all of the opinions
20  you intend to give in this case?
21    A.  I think we have.
22    Q.  Have you started to create any exhibits you
23  intend to use at trial in this case?
24    A.  I'd say none other than basically what's in my
25  report or, you know, from my vehicle and surrogate

Page 187

1  study photographs.
2    Q.  All right.  But you haven't turned any of
3  those into an actual exhibit.
4    A.  No.
5    Q.  Do you plan to do any future work in this case
6  as we sit here today?
7    A.  Well, not other than what I told you earlier
8  this morning that --
9    Q.  Right.
10    A.  -- you know, I've got to review your people's
11  stuff and, you know, whether that does or doesn't
12  elicit some additional work, I don't know yet.  But
13  beyond that like sitting here now I don't have plans to
14  do anything else.
15    Q.  All right.
16      MR. HILL:  All right.  I believe that's all I
17  have.  Like I said earlier, I'm -- it's my
18  position that the deposition is being suspended
19  pending the Court's ruling on the timeliness and
20  admissibility of the March 15, 2024 report that we
21  received on that day.
22      MS. CANNELLA:  Any other questions?
23      MR. HILL:  That's all I have at this time.
24            EXAMINATION
25  BY MS. CANNELLA:

Page 188

1    Q.  Mr. Lewis, is your work in the Bacho and
2  Mendoza case part of your experience as a biomechanic?
3    A.  Yes, ma'am.
4    Q.  And if you hadn't completed the report dated
5  March 15, 2024, would you have still testified today
6  about your experience including the Bacho and Mendoza
7  cases?
8       MR. HILL:  Object to the form.
9       Go ahead.
10    A.  Oh, I'm sure I would have discussed it or
11  talked about it.
12      MS. CANNELLA:  That's all I've got.
13      MR. HILL:  Just a quick follow-up.
14            EXAMINATION
15  BY MR. HILL:
16    Q.  Did you indicate any intent to discuss your
17  experience in Bacho and Mendoza in your October 16,
18  2023 report issued in this case?
19    A.  I did not.  Because as far as the basis for
20  this case, I was not per se relying on it.  It's just,
21  again, a part of my experience like I said.
22    Q.  Okay.  And so to give your opinions in this
23  case you do not have to rely upon that experience in
24  Bacho and Mendoza.
25      MS. CANNELLA:  Object to the form of the

Page 189

1    question.
2    A.  Well, again, it's just like all the other
3  thousands of cases I looked at.  It's part of my
4  background to testify about injuries I expect and don't
5  expect.
6    Q.  All right.  But that specific experience, if
7  you didn't -- if you weren't involved in Bacho and
8  Mendoza, do you think you still have the experience
9  from your involvement in other cases to give the
10  opinions that you issued in your October 16th report?
11    A.  Well, I think what it does, it shows that I've
12  had investigations of other similar instance so that I
13  have seen, you know, this isn't -- this case here is
14  not the first case where I've seen where these issues
15  were at hand.
16    Q.  And we've talked about those two cases are the
17  only cases that you've ever been involved in that you
18  recall that involved a lift kit.
19    A.  Well, I guess the way I'd say it, at least
20  where the lift kit was a part of some of the alleged
21  defects.
22    Q.  Where the lift kit was involved with a
23  striking vehicle and had issues similar to this case.
24    A.  Right.  I may have had some before that the
25  lift manufacturer may not have been a defendant.

48 (Pages 186 - 189)

Q. And, again, you've stated that all of the opinions related to any reference to Bacho and Mendoza are contained within your March 15, 2024 report?

A. As well as the documents for those two cases, right.

Q. All right. So what of the documents from those two cases are you intending to testify about?

A. Well, I think basically the same as what it showed there, that they both involved fatal head injuries to occupants that were struck by a lifted truck.

Q. And when you just made a reference to there, you -- you were referencing your March 15, 2024 letter.

A. Yes.

Q. Okay. Nothing beyond that that you can recall as -- that you can state as we sit here today.

MS. CANNELLA: What's the question, sir? Objection.

MR. HILL: Nothing beyond what he just said -- scratch that. He already answered it. That's fine. I'm good with that.

All right. Again, suspended because obviously there's no way that we could have anticipated or prepared to cross-examine him on all of the potential issues related to Bacho and Mendoza

which are obviously significant. Regardless of what material may or may not have been available to Rough Country, there was no advance notice within the deadline required to disclose his opinions that he would be issuing any opinions related to his experience in -- in Bacho or Mendoza.

MS. CANNELLA: I object to all that and disagree, but we can deal with it on papers.

MR. HILL: That's all I have.

(Deposition suspended)

THE VIDEOGRAPHER: The time is 4:25 p.m. We're off video record.

(Video off)

DISCLOSURE

STATE OF GEORGIA Deposition of PAUL LEWIS, JR. M.S., BME

COUNTY OF DEKALB Date: 3-18-24

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a representative of American Court Reporting Company, Inc.

I am not disqualified for a relationship of Interest under provisions of O.C.G.A. 9-11-28(c). American Court Reporting Company, Inc., was contacted by the offices of Veritext, to provide court reporting services for this deposition.

American Court Reporting Company, Inc., will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b).

American Court Reporting Company, Inc., has no exclusive contract to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom referral might have been made to cover this deposition.

American Court Reporting Company, Inc., will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

This the 1st day of April, 2024.

LEITA J. SEABORN, CCR B-1420

C E R T I F I C A T E

(STATE OF GEORGIA)
(COUNTY OF GWINNETT)

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the proceedings were reduced to typewriting under my direction and control.

I further certify that the transcript is a true and correct record of the evidence given at the said proceedings.

I further certify that I am neither a relative or employee or attorney or counsel to any of the parties, nor financially or otherwise interested in this matter.

This the 1st day of April 2024.

LEITA J. SEABORN, CCR B-1420

Paul Lewis , Jr., M.S., BME

March 18, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[& - 2024]**

Page 1

| **&** |
|---|
| **&**   2:9 |

| **0** |
|---|
| **009132**   138:4 |
| **017**   1:7 |
| **09115**   164:25 |
| **09118**   162:17 |
| 164:25 |

| **1** |
|---|
| **1**   3:12 5:10,14 |
| 5:15 8:9,11 |
| 10:14 15:24 |
| 18:5 20:3 |
| 22:24 74:4,5 |
| 165:24 |
| **1.17**   114:24 |
| 115:2 |
| **1.20**   121:14 |
| 124:25 |
| **1.21**   125:6 |
| **1.22**   127:4 |
| **1.23**   131:4 |
| **1.24**   121:14 |
| 134:2 |
| **1.25**   124:25 |
| **1.3**   77:18 |
| **1.31.**   69:17 |
| **10.b**   192:4 |
| **10:38**   1:19 4:4 |
| **11**   69:17 77:16 |
| **11/16/2023** |
| 21:4 |
| **115**   168:18 |
| 172:25,25 |

174:20

**118**   175:1,2
180:22

**118.4**   181:7

**11:45**   59:3

**12**   55:7 69:19
70:18,24

**125**   47:25

**12:02**   59:8

**12:52**   96:2

**13048**   192:23
193:21

**138**   3:21

**14**   181:21,22,24

**1420**   192:24
193:21

**143**   166:2

**144**   27:13

**1450**   27:13

**14th**   12:7,12

**15**   22:2 95:1,19
138:4 139:18
154:20 161:7
169:16 170:2,4
170:5,5,7
172:18 180:21
181:6,14
187:20 188:5
190:3,13

**15-14-37**
192:12

**15th**   8:1 12:13
13:17 154:3
163:11 180:6
180:18

**16**   7:3 13:24
14:5,7,21
15:12 16:25
20:25 22:15
43:23 44:2,9
48:2 49:13
50:1,11,23
52:11,20 53:9
70:10 74:6
141:19 184:22
188:17

**163**   3:22

**16th**   6:18 7:18
8:23 11:7,20
12:1,9 13:14
14:2,23 16:19
17:9 22:9
43:19 47:23
53:15 59:11
140:24 141:1
161:24 189:10

**17th**   8:23

**18**   114:21
117:19 118:22

**180**   3:23

**187**   3:6

**188**   3:6

**18th**   1:19 21:2

**19**   121:11

**1998**   32:10

**1999**   31:7
168:23 170:12

**1:57**   96:7

**1a**   3:13

**1b**   3:14

**1st**   192:20
193:16

| **2** |
|---|
| **2**   3:15 27:5,6 |
| 27:12,24 59:17 |
| 59:18 74:7 |
| 145:21 152:24 |
| 158:5 159:4 |
| **20**   3:14 13:25 |
| 95:19 135:7 |
| **200's**   163:23 |
| **2003**   42:13 |
| **2010**   180:10 |
| 185:13 |
| **2011**   28:2 |
| 30:24 |
| **2014**   170:11 |
| **2019**   165:24 |
| **2022**   10:5 55:7 |
| **2023**   7:3 10:9 |
| 13:24 14:2,5 |
| 15:12 21:1 |
| 22:10,11,15 |
| 27:15 29:19 |
| 30:15 43:23 |
| 44:2,9 48:2 |
| 49:13 50:1,12 |
| 50:23 52:11,20 |
| 141:19 188:18 |
| **2024**   1:20 14:8 |
| 14:15,22 16:25 |
| 21:2 22:2 53:9 |
| 138:4 139:18 |
| 154:21 187:20 |

Paul Lewis , Jr., M.S., BME
March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[2024 - 9114]**

Page 2

188:5 190:3,13
192:20 193:16
**208** 131:5,7,10
131:18,23
132:3,12,12,20
133:3
**214** 132:9
**218** 170:2
**22** 168:9
184:22
**220** 167:10
**23** 10:6,7,7
**23.6** 179:11
**23rd** 13:9
**24** 12:7 30:1,2
**2400** 2:10
**25** 22:10
**250** 35:12
36:12 59:20
64:16 65:6
85:22 86:10,25
87:2 88:20,23
90:11 93:4
96:18 146:13
**250's** 85:21
**2500** 146:5,11
146:18,18
**25th** 21:13
**26** 3:16 7:21
26:19 29:13
155:10,16,20
156:9,14,17,25
157:8
**27** 3:15

**29** 14:15
**29th** 13:8
**2:22** 1:7

### 3

**3** 6:21 29:6,7
30:4,4,5,9
64:10,12,12,15
**3-15-24** 3:21
**3-18-24** 192:3
**30** 3:16 131:16
132:4 156:8,21
**30030** 2:6
**301** 131:25
**30326** 2:10
**315** 1:21 2:5
**3344** 2:9
**3490** 165:11
**36** 169:3,3,11
169:12,15,18
169:19,22
180:21 181:7
**36th** 172:18
**382** 169:23
**3:19** 160:22
**3:33** 161:2
**3a** 3:16

### 4

**4** 3:5,17 6:21
21:1 22:11
43:12,14,16
47:11 55:17
57:12,21 65:9
65:10,14,24
66:4,10,18

86:2 88:23
90:25 91:13
92:19,23 93:2
93:11 94:1
**404-876-2700**
2:11
**410** 173:2
**410.92.** 172:19
**43** 3:17
**45** 127:11,12,20
128:3 129:3,12
129:15,21,22
130:2 173:2
176:2 178:24
179:22
**46** 6:24
**46th** 15:17
**48** 3:18
**49** 21:9
**4:08** 186:10
**4:20** 186:15
**4:25** 191:12
**4th** 139:22

### 5

**5** 3:12,18 48:12
48:15,18 65:25
73:5
**5,000** 75:19
**50** 163:20
180:20
**50th** 133:6
166:2,9,9
**51** 13:18 18:12
19:15

**52** 3:20 13:18
18:12 19:15
175:24
**53** 175:25
**59** 164:12,17
**5th** 167:13,14

### 6

**6** 3:20 52:20,21
59:15 165:11
**6-2** 167:10

### 7

**7** 3:21 67:8
137:24 138:1
**70** 133:4
**700** 173:3

### 8

**8** 3:13,22 163:7
**885** 1:21 2:5

### 9

**9** 3:23 66:1,5
73:5 180:1,4
**9-11-28** 192:9
**90** 31:21 85:3
**9053** 43:17
**9056** 43:17
**9058** 182:5
**9059** 181:23
183:3
**9062** 181:2
184:12
**9070** 162:17,22
**90s** 39:24
**9114** 162:23

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[9115 - additional]**                                                Page 3

| | | | |
|---|---|---|---|
| **9115**   164:20 | 85:1,4,18,22 | **accelerometer** | 75:15 76:15 |
| 165:4 166:1 | 102:1 131:16 | 171:12,16,23 | 77:10,19 81:9 |
| 168:14 | 146:8 150:23 | 173:25 177:13 | 82:9,20 84:18 |
| **9116**   165:5 | 182:7 | **accelerometers** | 88:19,22 89:5 |
| 166:23 167:1 | **absolutely**   31:1 | 171:15 | 93:11 95:16 |
| **9117**   165:6 | 35:18 63:6 | **accident**   34:21 | 119:12 122:11 |
| 167:12 | 66:17 76:17 | 34:25 35:10,11 | 122:13 144:6 |
| **9118**   165:7 | 83:8 86:7 | 35:17,20 36:3 | 145:3,13,14 |
| 172:17 | 94:23 131:3 | 55:3 65:7 | 149:24 160:3 |
| **9142**   20:14 | 149:23 | 84:20 95:17 | 175:5 176:25 |
| **9176**   20:14 | **absorbing**   89:9 | 103:16 107:5 | 177:25 179:9 |
| **9177**   20:18 | 125:17,18 | 110:6 114:2 | 187:3 |
| **9178**   20:19 | **absorption** | 116:10,15 | **actually**   13:4 |
| **9280**   10:17 | 109:17 | 117:8 118:10 | 24:7 28:22 |
| **9283**   13:18 | **acceleration** | 120:8 122:6,7 | 40:24 42:16 |
| **9345**   10:18 | 162:24 163:19 | 123:23,25 | 44:13,15 54:16 |
| 14:13 15:3 | 171:20 172:22 | 127:6 130:7 | 72:16 81:23 |
| **9346**   8:10 | 173:14,16,17 | 145:25 149:14 | 82:11 89:2 |
| **9347**   8:10 | 174:9,9,23 | 149:16 150:7 | 90:17 93:10,12 |
| **95th**   167:6 | 175:5,10,21,22 | 150:11 152:8 | 97:9 116:18 |
| **98**   31:9,10 | 175:23 176:14 | 153:13 170:6 | 123:17 131:8 |
| 42:19 | 176:19 178:21 | 182:18 | 142:23 171:3 |
| | 179:9 185:21 | **accumulation** | 177:11 183:12 |
| **a** | **accelerations** | 45:1 | **add**   16:12 51:1 |
| **a.m.**   1:19 4:4 | 133:20 161:20 | **accuracy**   35:8 | 51:3,5 |
| 59:3 | 162:5 163:18 | 35:23 36:4 | **added**   10:22 |
| **ability**   37:5 | 164:18 169:8 | 134:12 | 11:2 14:15 |
| 63:19,25 136:5 | 170:24 171:6 | **accurate**   31:24 | 17:3 27:17 |
| **able**   40:24 | 172:7,13 | **act**   35:17 | **adding**   120:5 |
| 57:11 81:16 | 174:15,19 | **acting**   173:1 | **addition**   13:19 |
| 108:10 115:14 | 178:20,25 | **activities**   31:13 | 20:24 22:24 |
| 137:6 151:9,23 | 180:19 182:21 | **activity**   44:18 | **additional**   6:13 |
| **above**   55:1 | 183:10 184:15 | **actual**   25:8 | 11:12 15:18 |
| 59:25 60:17,19 | 185:10,22,25 | 35:10 45:13 | 21:17,19 22:4 |
| 60:21,25 62:4 | 186:6 | 65:6 74:19 | 22:17,20 41:12 |
| 72:21 80:18 | | | |

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[additional - applied]**                                              Page 4

44:11 51:1,3,8
53:22,24,25
54:8,23 55:14
55:19 56:1,2
56:12 64:16
157:16 187:12
**additions** 11:22
**addressed**
61:21
**addressing**
74:11
**adjust** 101:4,17
**adjustable**
114:10,15,16
**adjusted**
113:12
**administrators**
1:4
**admissibility**
138:10 187:20
**admit** 145:22
147:17
**adult** 133:15
166:10 167:7
167:13,23
**advance** 191:3
**affect** 151:19
172:2
**affecting**
171:25
**affirmatively**
40:1,4 56:24
80:4 106:5
**aft** 113:20
114:10,17

**agency** 192:15
**ago** 16:17
138:20 139:23
176:2
**agree** 37:9 52:3
76:22 77:17
78:14 79:5
86:11 90:10
104:7 105:9
128:12,21
130:5 131:5
133:12 134:10
139:5,8 145:17
146:1 148:6,7
149:19 154:10
156:10
**agreed** 96:23
129:17
**agreeing** 38:13
**agreement** 1:14
6:4
**ahead** 27:4
56:7 65:9
69:17 72:19
84:23 111:24
145:10 150:19
188:9
**air** 151:18,19
**alignment**
126:16
**alleged** 189:20
**allegedly** 63:23
**allow** 124:6
**allowed** 35:14
152:22

**alter** 107:15
**alteration** 77:4
137:4
**altered** 19:11
**alternative**
39:4
**alters** 103:24
103:25
**amended** 3:12
5:13
**american** 192:7
192:9,11,13,17
**amount** 62:1,18
75:4 135:23
**analysis** 24:24
47:12,21 57:15
63:4 74:19
75:14 76:8
77:5 96:12
109:7 134:23
135:9
**analyzed** 103:5
**analyzing**
77:12 103:4
136:19 184:15
**anchored** 101:4
**angle** 97:24
103:24 118:3,6
118:7
**angulation**
183:17
**answer** 117:25
129:19 145:10
155:14

**answered**
19:21 51:19
82:14 113:4
153:16 161:14
178:8 183:1
190:20
**anticipated**
190:23
**anybody** 77:11
114:4
**anymore** 23:16
42:14 79:23
**anything's**
112:5,21
**anytime** 38:8
**anyway** 24:5
56:16 79:18
105:4 162:9
**ao** 124:7
**apartment**
33:15
**apologize** 29:2
43:20 135:19
**appear** 44:17
114:6 169:1
**appearances**
2:1
**appears** 13:7
21:2 43:23
**applicable**
133:5
**application**
148:25
**applied** 133:14
135:13,15

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[applies - axis]**                                                    Page 5

| | | | |
|---|---|---|---|
| **applies** 157:8 | **argue** 56:9 | **associates** 31:8 | 157:11 193:13 |
| 171:10 | **arm** 83:4,18 | 42:21 | **augmentation** |
| **apply** 5:21 | **article** 192:4 | **assume** 7:1 | 40:17 |
| 131:8,18 | **asked** 6:3 16:23 | 21:22 50:13 | **august** 22:11 |
| **appreciate** | 41:18 51:1,3,9 | 108:13 130:2 | **authorized** |
| 38:13 59:1 | 51:19 54:7 | **assumed** 16:21 | 1:15 |
| 109:23 | 113:4 135:3 | 74:5 77:1 | **automobile** |
| **appreciated** | 140:7 153:16 | **assuming** 77:21 | 39:10 |
| 115:22 | 157:3 161:14 | 88:7 123:2 | **automotive** |
| **appropriate** | 178:8 183:1 | 129:3 135:13 | 39:7 |
| 37:3,6 | **asking** 51:11 | 140:22 153:5 | **autopsies** 40:12 |
| **approximate** | 111:12 138:7 | 167:19 172:15 | 41:4 |
| 116:20 | 138:12 144:10 | **assumption** | **autopsy** 42:8 |
| **approximately** | 144:15 156:17 | 65:3 81:23 | 42:11 66:8,11 |
| 4:4 59:25 | **asks** 140:15 | 135:22 | 66:14,19 67:7 |
| 115:9 | **aspect** 41:25 | **assumptions** | 67:9,13 68:1 |
| **approximation** | 50:22 68:1 | 63:12 | 71:2 73:11 |
| 116:7 | 70:12 74:20 | **astro** 162:13,14 | 78:25 |
| **april** 165:24 | 76:11 98:18 | 164:4,6,11 | **available** 191:2 |
| 192:20 193:16 | 105:5 172:9 | 165:4 168:15 | **ave** 1:21 2:5 |
| **area** 38:23 40:3 | 184:11 | 168:24 170:12 | **average** 133:8 |
| 63:9 67:20 | **aspects** 73:16 | 175:22 | 133:15,15 |
| 69:21 70:4,6 | 101:11 | **atlanta** 2:10 | 170:7 |
| 70:12 71:6,23 | **assessments** | 39:25 | **aware** 34:6 |
| 72:2,3 80:17 | 131:17 | **attach** 101:13 | 77:10 112:9 |
| 86:22 89:12,24 | **assist** 40:9,12 | **attached** 8:2 | 128:6 133:21 |
| 90:2,3,12 | **assistance** | **attempts** | 141:2 154:7 |
| 93:16 94:16 | 25:24 42:20 | 133:17 | 157:7 158:9,12 |
| 100:12,15 | **assisted** 25:10 | **attenuate** 125:9 | 158:23 177:17 |
| 104:17 106:9 | **assisting** 25:4 | **attenuating** | 177:19 |
| 106:18 107:7 | **associated** 70:3 | 109:13 | **axial** 83:16 |
| 111:8 136:1 | 79:15 83:18 | **attenuation** | **axis** 174:16 |
| **areas** 55:20 | 91:12 106:12 | 89:9 | 176:14 |
| 76:19 99:21 | 122:1 | **attorney** 140:7 | |
| 101:24 131:12 | | 140:11,15 | |

Paul Lewis , Jr., M.S., BME                                      March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[b - behalf]**                                                        Page 6

| **b** | | | |
|---|---|---|---|
| **b** 18:5 20:3 22:24 30:4 192:12,24 193:21 | 84:1,3 86:19 88:16,24 89:2 89:13,20 90:8 91:12 92:19 93:3,15,16 96:8,13 100:7 | **backwards** 84:13 118:8 **bad** 7:11 **badgering** 156:16 **bag** 90:9 151:18,19,21 | 133:1 136:21 146:8 149:9,24 151:24 163:19 170:13,24 173:18 181:11 184:20 186:24 190:8 |

**b**  18:5 20:3
  22:24 30:4
  192:12,24
  193:21
**bacho**  8:4
  13:19,21 20:12
  20:15,19 26:21
  33:20 35:15
  49:16,22 50:2
  52:9,16 138:24
  140:4 141:2
  143:20 144:11
  144:16 145:7
  145:16,22,24
  146:3,15 147:3
  147:22 148:12
  148:18,22
  149:17 152:20
  152:23 153:11
  154:2,8,20
  159:11,20,23
  183:22,24
  188:1,6,17,24
  189:7 190:2,25
  191:6
**back**  7:17 8:9
  10:4,8,25 11:6
  20:5 24:5,6,12
  27:15 30:12
  31:5,6 39:24
  40:11 43:17
  46:19 55:8,16
  59:9 74:6 77:2
  77:15 80:10

84:1,3 86:19
88:16,24 89:2
89:13,20 90:8
91:12 92:19
93:3,15,16
96:8,13 100:7
100:9,14 102:6
103:15,22,24
104:16 105:7
105:19,23
106:2 109:9,16
109:21 110:1
110:24 111:10
111:10,16
112:3,10,20,23
114:18,22
115:6,12,12
116:2 117:18
117:24 118:4,5
118:9,18,20,21
118:25 119:10
119:17,20
120:22 123:19
125:3,4 128:9
148:1,9 161:3
161:6 164:4,6
164:11 178:13
182:6,7,17,23
186:16
**background**
  36:5 39:16
  141:17 189:4
**backward**
  103:10 117:21
  124:9

**backwards**
  84:13 118:8
**bad**  7:11
**badgering**
  156:16
**bag**  90:9
  151:18,19,21
**ball**  115:25
**bar**  91:11
**base**  72:8,15
**based**  40:14
  41:2 61:2 69:1
  69:2 70:15
  78:18 81:22
  85:8 94:6
  117:5,7 125:23
  126:23 134:5,6
  138:19 139:1
  140:25 145:7
  148:24 150:25
  157:16 171:21
  173:24 183:14
  185:20
**bases**  19:7 51:8
  83:10 141:21
**basically**  17:15
  19:6 22:23
  23:9,15 24:19
  40:7,16 45:3
  55:14 72:6
  73:6 83:25
  84:3 92:10
  100:2 101:24
  115:19 117:10
  122:17 124:4

133:1 136:21
146:8 149:9,24
151:24 163:19
170:13,24
173:18 181:11
184:20 186:24
190:8
**basilar**  72:24
  79:10 83:11
  87:5 88:20
  89:4 92:1
  93:22 96:21
  110:25 111:14
  121:4
**basis**  50:7
  63:24 85:10
  88:18 91:18
  93:21 125:10
  142:22 145:11
  155:3 188:19
**bate's**  138:4
  180:24
**bates**  20:9,11
  21:3,5,7 27:12
  43:17
**beams**  150:23
**bearing**  130:10
  150:22
**began**  31:6
  139:25
**beginning**  4:5
  67:7 101:23
**begun**  45:21
**behalf**  1:13
  32:21 33:2

Paul Lewis , Jr., M.S., BME                                  March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[behalf - bryson]**                                                        Page 7

34:1

**belabor** 30:8

**belief** 27:14

**believe** 7:22
24:14 32:8,9
53:21 59:15
61:11,19 69:4
69:9,23 70:17
71:22 76:5,14
77:19 79:23
80:2,5,24 94:9
94:13 96:20
97:15 105:9
107:13 110:3
111:2 112:22
113:6 114:19
120:8 123:5,12
124:22 155:25
162:16 180:7
187:16

**bending** 83:16

**benefit** 40:16
52:10

**bent** 121:6

**benz** 162:13,14
167:12 170:12
175:19

**best** 115:5
116:4

**better** 41:1

**beyond** 42:2
55:1 63:9
187:13 190:15
190:19

**big** 81:3 117:14
173:18 185:6

**biggest** 128:17

**bill** 28:14 45:6
45:8,15,17
46:9,11,24
47:4,5

**billed** 44:10
45:22 47:24

**billing** 7:22
24:14 25:11,21
26:19 28:18
43:5

**bio** 47:20

**biological**
81:10 82:23

**biomechanic**
188:2

**biomechanical**
41:23

**biomechanics**
33:17

**biomedical**
28:23 63:20

**bit** 29:18 40:5
69:11 98:7
102:12,15
103:10,20
105:2,20
110:17 117:17
119:19 161:11
183:17

**bled** 128:19

**bleed** 130:7

**bleeding** 70:2
72:23 79:4

**bless** 113:11

**blood** 82:19

**blows** 160:2

**blue** 19:19

**blunt** 67:3 69:6
69:9 79:11,15
122:2,4,7

**bme** 1:13 3:5
4:19 192:2

**board** 192:4

**bodies** 40:10
185:11

**body** 17:1
23:11 41:7
42:10 83:5
87:8 171:25

**bogey** 173:4

**bone** 67:18,19
67:21,23 68:10
69:3 70:16
71:1,4,11,15
72:7,20,20
78:19 98:13,16
147:8,10

**bookkeeper**
46:12,16

**booster** 182:6,8
182:10,17,23
182:24

**borrowing**
115:21

**bottle** 37:23

**bottom** 61:20
80:12 95:13
98:21 104:1
126:8 156:23
180:24 181:3

**bow** 109:6

**bracket** 170:6,8

**brain** 29:1 79:4
133:23 174:18

**brand** 50:25,25

**break** 37:25
38:9 59:1
76:18 95:25
96:11 160:20
186:8

**breaking**
115:22

**brief** 22:19
38:6 121:18

**briefly** 15:7

**bring** 27:1

**broader** 109:2

**broke** 129:10

**brought** 5:3 6:8
6:19 23:2,6,7,8
26:23 29:12,18
33:20 43:5,21
44:8 52:23
98:23

**bruising** 85:13
98:11

**bryant** 13:9
14:8 15:4

**bryson** 1:4,4
8:10 10:17

Paul Lewis , Jr., M.S., BME                                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[bryson - case]**                                                    Page 8

27:12 38:25
56:17 94:21
95:6 145:23,24
147:19 148:8
158:7 162:17
177:2,12
**bryson's** 13:10
14:9,14 18:13
18:15
**buchner** 13:9
14:8,13 15:4
15:19 18:12
36:9,23 37:14
55:21 58:5
62:8 73:9,14
75:3,16 76:23
77:6 84:16
88:6 103:5
116:13 125:25
126:22 127:5
135:2,21 153:1
176:3,17
**buchner's**
15:13 19:4
35:2 55:10,13
56:22 57:15,20
73:6 87:22
127:15 134:6
134:13 153:2
179:14
**buck** 185:7
**bucker** 137:3
**bumper** 86:24
87:4,15,15,20
87:23 88:4,8

88:14 89:5
125:8 126:13
184:23 185:5
**bumper's**
87:11,12 126:7
**bumpers** 148:2
150:21 168:5
184:23
**bunch** 52:5
**burton** 31:8
42:21,21,25
**business** 54:14
138:8,18

**c**

**c** 3:1 24:18
172:3 176:23
192:9 193:1,1
**c.z.b.** 1:5,5
**cage** 149:7
**cal** 165:11
**calculate**
169:17
**calculated**
176:4
**calculates**
169:21 173:21
**calculating**
134:17
**calculation**
176:2
**call** 8:8 22:24
23:15 42:6
80:9,13 93:18
169:15

**called** 4:20 6:22
61:21 64:25
65:10 89:15
**calspan** 165:18
165:20 177:18
**camera** 72:15
**camp** 89:15
**cancelled** 15:8
**cannella** 1:20
2:4,4 3:6 4:9,9
5:17,22 7:13
9:16 11:6,17
12:22 13:5,8
16:25 17:9
19:16 20:8,14
20:17,21 21:5
30:5,14 32:3
37:23 38:1
44:14 49:1
51:4,19 54:9
57:23 58:9
65:17 84:21
90:19 107:25
113:4 123:6
124:20 135:6
139:4 140:3
142:25 143:5
143:11,14,22
144:8,12,14
145:8 149:18
149:20 150:16
154:4,11,23
155:11,15,21
156:15,24
161:14,15

162:7 163:6
164:24 177:3
178:8 183:1,24
184:7,24
185:16 187:22
187:25 188:12
188:25 190:17
191:8
**capable** 82:1
92:21 107:2,2
149:6
**caps** 163:3
**caption** 193:6
**car** 33:10 40:9
77:13,13 93:3
110:24 111:13
111:13 112:2,4
112:6,11,11,12
112:23 115:15
115:16,21
151:2 178:25
185:7
**care** 156:24
**career** 156:1
**carefully**
143:12
**cargo** 89:24,25
90:2,3,12
136:1
**carry** 146:9
**cart** 185:5
**cart's** 184:19
**case** 1:7 5:6
6:24 7:20,23
9:13 10:18,21

Paul Lewis , Jr., M.S., BME
Bryson, Santana and Joshua v. Rough Country, LLC

March 18, 2024

**[case - certainly]**

Page 9

| | | | |
|---|---|---|---|
| 11:8 12:23 | 141:8,11,14,22 | 49:16,22 50:3 | 120:13 121:8 |
| 15:14,24 18:20 | 142:3,7,24 | 50:5,9 51:10 | 121:22 123:3 |
| 19:12 20:8,10 | 144:6,10,16,18 | 51:12,16,18,24 | 123:22 124:7 |
| 20:12,12,13,13 | 144:21 145:6 | 52:9,16 74:10 | 124:19 149:2 |
| 20:16,20 21:1 | 145:15 146:4 | 112:6 138:20 | **caused** 74:17 |
| 22:22 23:8,11 | 146:12,14 | 139:2 140:16 | 78:14 80:25 |
| 23:21 25:11 | 147:22,25 | 141:3,6,24 | 93:3 99:13 |
| 27:21 28:18 | 148:17,21 | 142:1,7,14,19 | 103:1 108:21 |
| 30:14,16 32:3 | 149:16 153:2 | 142:20,21,23 | 110:25 111:14 |
| 32:7 33:6,8 | 153:10,20,25 | 143:2,21 | 112:11,13,23 |
| 34:25 36:1,9 | 154:10,22 | 144:12,23 | **causes** 94:15 |
| 36:13,24 38:24 | 155:7,9 156:1 | 146:7 148:3,20 | 104:12,13 |
| 41:11 44:15 | 156:7,20 | 151:25 153:9 | 108:17 123:18 |
| 47:6,7,11,15,17 | 157:10 158:2,7 | 153:14 154:15 | **causing** 88:20 |
| 47:19 48:5 | 158:7 159:2,12 | 158:9,13,24 | 90:18 123:15 |
| 49:23 50:3,7 | 159:21 160:16 | 159:17 160:16 | **caveat** 54:1 |
| 50:12,17 53:17 | 161:8,10,17 | 188:7 189:3,9 | **ccr** 192:24 |
| 53:20,25 54:17 | 162:1,3,9 | 189:16,17 | 193:21 |
| 54:24 56:25 | 163:16 171:2 | 190:4,7 | **center** 105:15 |
| 57:16 58:6,7 | 172:11 174:11 | **catastrophic** | 128:4 130:3,5 |
| 58:12,15 61:24 | 177:11,25 | 75:7 149:3,9 | 130:15,23 |
| 66:7,16 73:17 | 179:7,10 | 159:16 160:9 | 176:10 179:23 |
| 74:4 95:7 | 183:11,22 | **catastrophica...** | **certain** 17:16 |
| 104:8 108:7 | 184:6,13 186:3 | 149:11 | 24:12 41:2 |
| 109:11,21,22 | 186:20,23 | **catching** 100:5 | 61:2 123:4 |
| 109:25 112:1 | 187:5 188:2,18 | **cathy** 20:9 | 136:19,20 |
| 112:16,22,25 | 188:20,23 | **causation** | 140:9,10 |
| 122:5 123:8,10 | 189:13,14,23 | 33:17 53:12 | **certainly** 14:6 |
| 124:22 125:13 | 192:14,14,18 | 82:20 149:12 | 18:1 34:23 |
| 127:11,12 | **case's** 155:4 | 151:14 | 36:6,8,25 |
| 130:18 134:22 | **cases** 8:4 13:19 | **cause** 40:14 | 37:21 39:18 |
| 135:14 138:24 | 30:13,19 33:20 | 41:15,20 81:12 | 48:25 50:5,8 |
| 138:24 139:14 | 33:20,23,24 | 83:17 87:5,9 | 52:17 54:3 |
| 140:9,11,15,18 | 34:5 35:16,16 | 88:6,9 89:4 | 56:9 58:3 |
| 140:23,25 | 35:20,21,25 | 99:25 107:20 | 63:16 67:11,17 |

Paul Lewis , Jr., M.S., BME                                                        March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[certainly - cohen's]**                                                                Page 10

| | | | |
|---|---|---|---|
| 73:22 75:3,4 | **changed** 19:11 | 115:11,11 | **clinical** 134:15 |
| 75:19 86:11,17 | 30:14 53:8 | 116:3,14 117:2 | **clip** 85:15 |
| 86:22 88:2 | 69:8,9,13 | 117:5,8,16 | 101:17 |
| 90:6 97:4 | 156:12 | 120:12 122:21 | **close** 116:25 |
| 104:14,24 | **changes** 14:18 | 123:12,19,22 | 119:23 120:4 |
| 108:5,23 114:3 | 156:13 | 124:3,5 133:13 | 120:10,12,17 |
| 117:1,3,14 | **changing** 65:20 | 133:13,22 | 164:17 |
| 122:19 127:25 | **characterize** | 134:24 167:23 | **closed** 117:17 |
| 128:14,18 | 74:14 | 181:11 182:7 | **closer** 116:5 |
| 129:11,14 | **charge** 25:15 | 182:13,16 | 120:4 |
| 131:2 133:16 | 192:17 | **child's** 104:5 | **clothes** 90:9 |
| 137:20 146:25 | **chasing** 153:15 | 112:12,19 | **coefficient** |
| 150:1 151:15 | **check** 114:11 | 116:9 122:15 | 146:24 |
| 151:16,19 | 136:5 | 122:17 124:1 | **cohen** 37:12 |
| 153:22 155:4 | **checking** 56:6 | **children** | 65:11 66:20 |
| 156:11 158:3 | **chest** 85:15 | 133:18 | 74:17 75:8,14 |
| 171:20 173:1 | 171:20 | **chris** 28:9 | 76:14 80:6 |
| 176:13 178:10 | **chevrolet** | **chronological** | 82:10 84:20 |
| **certified** 1:18 | 146:17 160:13 | 23:9 | 85:1,2 88:7,9 |
| 192:6 | 164:4 168:23 | **cite** 82:8 134:1 | 88:17 91:1 |
| **certify** 193:5,9 | 170:12 | 148:19 158:21 | 110:25 114:9 |
| 193:12 | **chevy** 162:13 | 159:3,19 | 118:25 122:8 |
| **cetera** 23:12 | 162:14 | 160:16 | 136:11,23 |
| **cg** 130:13 174:8 | **child** 33:10,12 | **cited** 66:21 | 179:10,20 |
| 174:22 176:8 | 55:18 57:5,12 | **civil** 1:16 | 182:18,24 |
| 176:18 | 82:2 85:7,9 | **clarification** | **cohen's** 62:19 |
| **chair** 92:15 | 86:3 88:25 | 70:1 78:8,17 | 66:23 69:20 |
| 96:17 98:25 | 89:3,10 90:18 | **clarifying** | 77:20 81:8,18 |
| 99:7 137:16 | 90:24 91:3,4 | 70:16 | 84:6 85:22 |
| **chairs** 89:15,16 | 95:1 103:8,11 | **clean** 120:23 | 86:3,13 88:13 |
| 92:9 | 103:14,21,22 | **clear** 9:16 18:9 | 90:16 94:4 |
| **challenge** 34:9 | 104:1 107:9 | 28:21 34:20 | 121:22 135:24 |
| **change** 11:11 | 109:17,21 | 53:6 69:5,8 | 179:19,20 |
| 11:15 14:21 | 110:5,7,10,15 | 74:2 145:1 | 182:22 |
| 21:25 128:17 | 112:2,6 115:6 | | |

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[collect - consider]**                                              Page 11

| | | | |
|---|---|---|---|
| **collect** 25:4 | 179:1 | **compliance** | 73:21 77:18 |
| **colliding** 80:6 | **commencing** | 131:14,16 | 134:11,21 |
| **collision** 147:4 | 1:19 | **comply** 131:10 | 135:10 148:20 |
| 147:6,10,12,13 | **comment** | 131:11 132:3 | 150:6 153:3,12 |
| 147:15 182:1 | 102:19 126:10 | 132:12 156:9 | **condition** 115:4 |
| **color** 181:21 | **comments** | 156:14 173:5 | 117:7 |
| **column** 173:7 | 151:10 | **component** | **conditions** 41:2 |
| 173:24 | **commerce** | 84:1 106:4 | **conducted** 7:9 |
| **combination** | 39:14 | **comport** 100:7 | **configuration** |
| 6:10 23:22 | **common** | **compound** | 90:3 136:11 |
| 117:11 | 108:25 | 150:17 | 185:9 |
| **combine** 53:14 | **communication** | **compressed** | **configured** |
| 174:16 | 56:20 | 89:19 110:13 | 185:21 |
| **combined** | **company** 24:15 | **compressing** | **confines** 124:5 |
| 119:24 174:18 | 46:6 158:10,13 | 91:14 110:21 | **confirm** 162:16 |
| **combining** | 192:7,9,11,13 | **compression** | **confirmed** |
| 118:25 | 192:17 | 102:9 | 18:23 |
| **come** 13:21 | **compare** 43:8 | **computed** | **conflict** 38:19 |
| 41:9 62:12 | **compared** | 173:22,22 | **confused** 98:6 |
| 91:19 96:12 | 75:24 159:12 | 175:10 179:3 | 140:8 164:9 |
| 105:8 161:13 | **compartment** | **computer** | **confusing** |
| 173:17 179:13 | 96:15 102:25 | 36:10,17 77:7 | 103:16 150:17 |
| **comes** 37:13 | **compatibility** | 127:16 134:7 | **conjunction** |
| 84:5 129:23 | 125:15 151:8 | 136:4 173:19 | 55:9 79:3 |
| 133:12 173:10 | 151:10,12 | 173:21 | 116:12 135:2 |
| **comfortable** | 170:11,20 | **computes** | **connected** |
| 106:25 | **complete** 45:9 | 173:24 | 178:13 |
| **coming** 80:10 | 73:18 | **conclude** 83:10 | **connection** 7:2 |
| 82:19 98:10 | **completed** | 97:5 129:20 | 7:20 31:14 |
| 99:16,20 | 39:23 46:25 | **concluding** | 98:24 99:20 |
| 102:13 103:22 | 188:4 | 93:13 126:10 | 100:6 141:24 |
| 103:24 105:17 | **completely** | **conclusion** 70:8 | 142:13 143:20 |
| 109:8,20 110:2 | 144:19 | 152:14 | 165:15 177:25 |
| 115:12 117:14 | **complex** 33:15 | **conclusions** | **consider** 82:2 |
| 119:16 138:14 | | 62:13 73:13,19 | 84:6 87:4,8 |

Case 2:22-cv-00017-RWS    Document 118-2    Filed 01/20/25    Page 61 of 107
Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[consider - country]**                                        Page 12

93:1,4 113:2
134:20 136:6
140:12
**consideration**
135:9 136:21
**considered**
25:20 77:23
90:25 135:20
**consistent**
69:20 72:24
92:19 123:9
167:11
**console** 105:15
**conspiracy**
17:13
**constraints**
15:6
**construction**
61:25 87:11
**consultant** 31:6
31:13
**consulting** 28:2
184:6
**contacted**
192:10
**contacting** 81:5
88:22
**contain** 53:16
53:19 73:8
**contained** 18:4
53:7 54:23
65:12,15 66:10
122:18 138:11
152:11 153:18
190:3

**contains** 27:19
**contemporan...**
9:3,22 46:18
**contemporan...**
9:8
**content** 67:14
**context** 24:11
**continue** 10:22
16:7 126:16
**continued** 42:4
**continues**
98:14
**continuing**
106:13
**contract** 42:22
192:12,14
**control** 193:8
**contusion**
69:19 70:14,17
71:5 78:13
**conveying**
61:17
**copies** 30:6
144:20
**copy** 5:10,23
23:8 26:9,14
27:8 28:10
29:11,12 52:23
52:25 164:22
**cord** 41:12
**corner** 181:4
**corolla** 180:11
185:14
**coroner** 41:14

**coroner's** 66:19
**coroners** 40:3
**corporate** 52:8
158:7,11,19,22
**correct** 8:5 9:5
10:13 12:14
13:6,11,18
18:14 21:15,16
21:20 22:3,12
25:9 26:18
28:3,24 30:21
31:23 32:5,19
34:14 35:6,12
35:17,18 39:1
39:9,17 41:17
43:1,3 44:16
45:7,16,19
46:4 49:17,23
49:24 50:3
51:18 52:11,16
56:14 59:12,15
62:14 64:22
65:18 67:9,24
70:11,21 71:24
73:10 74:21,22
78:17 79:25
81:2 83:7
86:10 87:2,18
87:25 89:6
94:3 101:16,19
105:11 108:12
113:1,14,24
118:11,23
121:24 122:24
124:11 131:6

132:6 137:8
140:13 141:3
141:11 142:1
142:15,24
143:21 147:6
152:3,10
164:13 165:7
166:8,11 167:9
167:14,20
168:25 170:9
170:18 172:20
175:8,15,20
176:16 179:24
180:8,12,14
181:8 182:14
182:18 183:22
184:23 193:10
**correcting** 69:2
**correction** 68:9
**correctly** 42:10
57:22
**coughing** 38:15
**could've** 96:12
**council** 192:5
**counsel** 1:14
2:1 4:7,13 6:5
32:2 192:14
193:13
**counting** 28:6
119:22
**country** 1:8
4:12 33:21
58:15 59:24
60:15,21 61:7
61:10 143:6

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[country - data]**                                        Page 13

146:1 148:25
152:2 154:16
158:8,22,24
160:8 191:3
**country's** 52:8
143:1 158:6,11
158:18,23
**county** 40:3
42:24 43:2
159:13 192:3
193:4
**couple** 29:21
32:15 51:14
56:21 89:14
162:18
**course** 9:7 14:3
17:19 19:18
37:4 62:24
**court** 1:1,18
4:14,16 5:24
29:5 35:14
43:13 137:25
138:13 140:18
140:21,23
156:1,2 180:5
192:4,6,7,9,10
192:11,13,17
**court's** 139:11
187:19
**courts** 34:7
155:10 157:13
**cover** 26:6
192:15
**covered** 186:19

**covering** 47:8
93:9 105:19
110:7 111:16
111:19
**covers** 139:12
**covid** 28:25
29:1 38:14
**crash** 37:7
56:13 63:2,11
63:15,21 74:1
74:20 75:5,8
75:12,12,15
76:9,12,15,16
76:25 77:8,10
77:12,13 82:4
83:15 89:23
94:25 103:5
113:6 118:18
118:20 123:15
125:1,9,12,22
126:22 131:13
131:19,21,22
132:4,14 134:8
134:12 135:5
135:16 136:13
136:23,24
137:1,21 150:9
150:15,21
152:7,10
163:20 169:7
169:11,13,20
177:1,12
179:18,21
**crashed** 150:8

**crashes** 40:9,9
75:19
**crashworthin...**
131:6
**create** 9:3,7,9
13:5 80:17
81:20 83:16
169:21 176:23
186:22
**created** 10:19
14:5 36:10
149:1
**creating** 86:23
107:2 185:19
**criteria** 132:20
132:23 133:21
133:25 135:8
169:2 172:10
173:9
**criterion**
168:12
**critique** 36:8
**cross** 153:20,22
153:25 190:24
**crowd** 57:15
**crumple** 125:16
149:7
**crush** 55:20
62:1 75:4,18
75:24,25 76:24
117:1,15
126:17 135:25
**crushed** 89:17
**cupholder**
105:14

**cupholders**
102:10 104:4
**curious** 157:4
**current** 16:11
16:13 27:3,16
34:4 141:14
**curriculum**
3:15
**curved** 106:9
**curves** 105:24
**cushion** 91:16
**cushioning**
93:8
**customary**
192:17
**cut** 41:12
**cv** 1:7 7:21 27:1
27:18,23 34:19

**d**

**d.o.** 39:21
**damage** 62:1
62:18 82:22
91:6 97:17
110:19 120:20
128:19 135:1
137:5 154:14
**damaged** 89:18
**dangerous** 39:1
**data** 3:22 17:15
18:11,21 22:4
22:20 37:13
133:16 142:3
161:8 163:10
165:22 172:13

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[database - deposition]**                                      Page 14

| | | | |
|---|---|---|---|
| **database** 6:22 | **dealership** | **defendant's** | **delineated** 46:2 |
| **date** 5:20 8:2 | 64:13,25 | 3:11 5:15 8:11 | 59:17 |
| 10:19 12:4,9 | **dealing** 28:25 | 20:3 27:6 30:9 | **delta** 75:17 |
| 16:3 21:4 | **dealt** 146:5 | 43:14 48:15 | 76:1,4 134:18 |
| 27:16 32:10 | **death** 40:14 | 52:21 138:1 | 147:20 150:1 |
| 44:18,20 45:3 | 41:16,20 74:18 | 163:7 180:1 | **dependent** |
| 50:14 55:11 | 121:22 | **defendants** | 126:22 134:12 |
| 165:24 192:3 | **deaths** 40:8 | 49:3 | **depending** |
| **dated** 6:18 7:3 | **decade** 138:20 | **defined** 76:13 | 41:11 46:21 |
| 8:13 12:13 | **decades** 141:4 | **definition** 60:8 | 54:3 63:22 |
| 13:17 14:5 | **decapitation** | **deflect** 103:10 | 64:1 86:13 |
| 20:25 21:23 | 74:18 123:4 | **deflection** | 128:13 172:5 |
| 22:2 27:13 | 124:19 | 102:22 103:20 | **depo** 10:25 |
| 138:3 139:18 | **decatur** 1:22 | 117:12,17,20 | 12:9 15:8 |
| 161:6 188:4 | 2:6 | 118:7,25 | 158:20 |
| **dates** 42:12 | **deceased** 1:5 | 119:23,24 | **depos** 30:2 |
| **daubert** 34:8 | 42:8 | **deform** 115:14 | **deposed** 33:6 |
| **david** 2:12 | **deceleration** | 125:17 | **deposition** 1:12 |
| **day** 1:19 8:14 | 79:14 | **deformation** | 1:17 4:5 5:9 |
| 8:18,19,25 | **december** 30:1 | 121:10 123:16 | 6:4,4 13:8 14:8 |
| 44:22 45:6 | **decided** 73:15 | 129:11 149:3,8 | 14:13 15:4,20 |
| 46:5 49:12 | **decrease** | 151:4 | 18:12 19:4 |
| 54:14 56:10 | 135:23 | **deformed** | 21:14,25 22:10 |
| 118:14 138:8 | **decreasing** | 121:5 128:19 | 22:14 23:5 |
| 187:21 192:20 | 110:22 | **defy** 84:11 | 24:4,7 32:21 |
| 193:16 | **defamation** | **degree** 24:22 | 33:2 52:10 |
| **day's** 138:18 | 149:25 | 25:23 | 54:11,14 67:18 |
| **days** 45:6,13 | **defective** 38:25 | **degrees** 39:19 | 69:3 70:2 |
| **de** 1:21 2:5 | **defects** 189:21 | 85:3 | 71:22 72:1 |
| **deadline** 50:11 | **defendant** 1:9 | **dekalb** 192:3 | 78:16 79:24 |
| 50:16 140:23 | 1:13 2:7 4:11 | **delays** 20:7 | 98:1 138:9 |
| 154:9,21 191:4 | 32:22 33:3,5 | **delete** 79:22 | 139:6,9,10 |
| **deal** 191:9 | 33:14 177:15 | **delineate** | 145:20 158:16 |
| **dealer** 65:3 | 189:25 | 128:11 | 158:17,25 |
| | | | 159:3 187:18 |

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[deposition - dissipating]                                      Page 15

191:11 192:2
192:10,12,15
**depositions**
23:12 25:3
32:11 142:19
144:4,22 145:4
145:18
**depressed**
104:8,11,13,25
108:20,22
**depressing**
106:10
**describe**  23:1
25:3 72:4
78:24 97:2
104:11 126:3
**described**  67:7
67:8 71:8,25
71:25 91:24
95:6 98:5
148:13
**describing**  71:3
72:21 97:17,21
97:25 98:10
99:9 105:3
108:16 114:4
**description**
44:18 59:19
65:23 66:7
71:5 97:7,14
127:8
**design**  39:7
61:25 150:12
151:15,16,21

**designed**  39:13
125:12,16
149:6 151:2
152:22
**designer**
151:20
**designs**  39:4
**detail**  147:2
**details**  141:2
145:22 181:3
**determination**
41:15 62:21
106:15 107:11
107:18
**determine**  37:2
40:13 45:20
63:3 81:6
107:7 116:19
136:10
**determined**
62:1 126:24
**determining**
107:23
**detrimental**
150:3
**developed**
134:6
**device**  98:25
**diagrams**  73:10
**dial**  2:9
**dictate**  24:3
**dictated**  8:15
9:10,21 15:9
**dictation**  9:17
10:9

**difference**  11:2
171:14
**different**  19:1
40:23 74:11
76:19 77:5
97:1 128:23,23
128:24 131:12
132:11,23
133:14 145:23
147:20 157:19
166:21 169:2
171:13,13,21
174:3,12
**differently**
151:3
**dipped**  116:3
**direction**
163:20 193:8
**directionality**
136:22
**directly**  160:3
183:8
**disagree**  49:7
67:17 68:2,3
191:9
**disagreed**
67:15
**disclose**  50:16
51:23 154:9,18
155:7 157:9
191:4
**disclosed**
154:22
**disclosing**
156:20

**disclosure**  7:21
14:2 48:13,18
48:21 49:3,7
49:21 50:11
139:11,12
148:19 155:7
192:1,5
**disclosures**
3:19 48:14
**discount**
192:18
**discovery**
50:20,22
**discuss**  41:22
51:9,12,16
56:25 121:15
188:16
**discussed**  20:25
21:19 22:18
42:3 49:1 75:1
127:24 188:10
**discussing**
114:24 121:23
125:1 127:5
**discussion**
109:7 141:24
**displacement**
115:6
**disqualified**
34:12 192:8
**dissected**  70:4
79:1
**dissipating**
125:18

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**dissipation**
149:8
**distance** 46:2
117:16 120:8
**distances**
116:19
**distribute**
125:9
**district** 1:1,1
**division** 1:2
**doctor** 39:17
41:22
**doctrine** 156:6
**document** 8:7
10:16,19,20
11:21 13:1
14:13,21 16:12
26:7 41:5 47:6
47:15,19 48:21
48:24 49:15
128:10
**documenting**
41:8
**documents** 5:2
12:25 15:12
20:1,23 21:11
23:2 114:14
118:2 142:20
144:4 145:4
152:12 153:18
190:4,6
**dodge** 146:16
146:18
**dog** 153:15

**doing** 24:21
33:17 40:12
42:13 46:18
47:20 55:18
113:13 129:11
134:18 158:4
169:16
**door** 83:21
150:23
**downloads**
25:16
**dr** 21:14,25
42:21 58:11
67:3,9 69:2
70:1,16,25
71:22 78:16
97:7 122:2
123:9
**draft** 13:4
48:23 140:3
**drafted** 15:11
22:15 50:1
70:10
**drafting** 45:21
53:8 139:25
156:9
**driven** 102:11
**driver** 33:15
102:25 114:5
115:7 117:18
165:4,4 166:2
166:23 175:22
**driver's** 13:10
14:9,14 18:13
18:15 76:4

80:6,8 81:7,17
81:23 82:9,13
83:6,13 91:16
94:25 99:24
102:15,18,22
103:20 104:2
105:5,10 106:8
106:21 107:19
107:24 108:10
113:12 115:12
117:9,13,21
118:4 119:3,10
119:13,20
**driving** 86:21
86:21 91:13
94:24 117:15
176:15
**due** 15:5 34:8
38:14 51:25
62:3 83:20
93:3 99:6
112:3 122:2
**duly** 4:20
**dummies**
177:23
**dummy** 133:7
133:25 166:6
166:15,17,20
167:16,20
168:15 171:8,9
171:17,21,23
173:25 177:1
177:13 181:8
181:10,11
185:25

**duties** 157:9
**dynamic** 75:24
102:14,17
115:4 119:9,11
119:24 120:4,5
**dynamically**
75:20 115:10
118:9,18
**dynamics**
113:6 150:14

**e**

**e** 3:1 24:18 28:9
64:12 193:1,1
**e350** 170:12
**ear** 68:24 71:23
72:6,23 73:2,3
82:19 94:16
97:18 98:3
**earlier** 16:15
23:13 48:7
106:23 120:21
121:25 150:10
161:11 187:7
187:17
**earliest** 139:21
**easily** 95:2
**easy** 120:5
125:4
**eclipse** 169:16
**edema** 70:17
78:13
**edge** 106:3,7,17
**education**
27:19 42:1,2
141:17 154:25

Paul Lewis , Jr., M.S., BME                                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

effect  124:18
effects  161:19
effort  108:9
eight  64:13
  163:6,9
eisenstat  21:14
  21:25 58:11
  67:3,9 69:2
  70:1,16 122:2
eisenstat's
  70:25 71:22
  78:16 97:7
  123:9
either  42:8
  46:13 49:20
  60:16 100:1
  115:24 144:11
  144:13 151:20
  152:23 161:22
  168:1,5 185:23
electronic
  25:16
elevate  116:1
elevated  85:3
  159:14
elicit  187:12
emblem  84:19
  85:25 86:2,5,8
  87:13 88:3,5
  88:12,15
empirical
  134:17
employed  42:5
  42:16

employee  28:22
  42:21 193:13
employees  28:4
  28:5 58:14
ems  66:3
enable  145:6
encompass
  53:16 70:5
encompassed
  40:2
encompasses
  47:19
energy  89:9
  109:17 124:16
  125:17,18,19
  149:7,9
engage  125:7
  150:21
engaged  126:2
engineering
  40:22
engineers
  61:24 62:6
enhanced  62:3
entered  106:19
entire  31:12
  91:12
entirely  23:20
  132:23
entirety  138:19
entitled  8:9
  10:18 48:13
entries  47:10
entry  43:23
  44:1 47:17,23

48:3
environment
  115:8
equal  86:12
equipped  59:24
  145:25 159:13
erred  136:3
error  134:11,16
  134:21 135:10
escape  87:21
  89:12 125:8
  126:3 130:23
  176:7,20
  177:14
escape's  62:2
especially  82:1
  82:3 91:22
  151:7
esquire  2:4,8
essentially  70:3
  71:19 72:22
  84:10 85:2
  116:23
establishing
  137:14
estate  1:4
estimate
  129:23
estimation
  118:24 152:8
et  23:12
evaluate  36:23
  171:1
evaluated
  61:24 62:6

evaluation  63:4
everybody  48:9
evidence  70:19
  70:23 81:15,17
  82:9,11,21,23
  83:4 85:13
  90:21 91:7
  92:18 97:5
  108:6 110:10
  110:15,23
  111:12 116:8
  121:1 125:21
  126:1 138:25
  139:13 142:22
  149:25 193:10
exact  16:3
  45:17 117:3
exactly  81:6
  106:21 107:24
  120:10,16
  134:1 139:24
  148:20,24
  184:18
exam  9:11
  26:10
examination
  3:3 4:22
  187:24 188:14
examinations
  7:19
examine  91:6
  138:18,23
  153:20,25
  190:24

Paul Lewis , Jr., M.S., BME                                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[examined - f250]**                                          Page 18

examined   4:21
  153:23
examiner   39:25
examiner's
  41:15 42:16,22
examiners
  41:19
examples
  148:23 155:5
exceeding
  133:4
excluded   34:16
excluding
  12:20
exclusive
  192:14
excuse   48:22
  55:9 99:18
  104:17 113:10
  179:20
exemplar   7:10
  9:4 55:15,16
  55:17,18 57:11
  57:21
exemplary   3:13
  8:10
exercise   41:19
exerted   122:12
  123:11,14
exhibit   3:8,11
  3:12,13,14,15
  3:16,17,18,20
  3:21,22,23
  5:10,14,15,24
  6:2 8:7,11

15:24 18:5
20:3 27:5,6,12
27:24 29:7
30:9 43:11,14
43:16 47:11
48:12,12,15,18
52:19,20,21
59:15 137:23
137:24 138:1
163:5,7 180:1
180:4 187:3
exhibits   8:8
  13:10 15:21
  18:13 21:14
  22:11 186:22
exhumations
  42:7
exhume   42:10
existed   16:13
  17:8 18:3
exists   93:17
expect   28:18
  99:12 102:3
  129:11 189:4,5
expectation
  16:18 77:3
  161:21 170:1
expected   96:19
  138:22 146:8
  163:23 178:21
  178:23
expecting
  127:2
experience
  27:19 36:18

42:1 49:19
50:8 112:9,14
141:17 154:24
176:6 188:2,6
188:17,21,23
189:6,8 191:6
experienced
  37:11 74:17
  122:8 179:10
  179:21
experiment
  134:18
expert   6:18
  14:2 34:13,21
  34:24 39:7
  48:13 49:21
  139:1 141:25
  144:5,20 145:4
  183:21
expertise   37:2
  38:23 61:24
  63:9 150:11,12
experts   35:24
  54:20 58:8
  62:22 63:5,13
  74:24 139:2
  142:9,20 144:5
  144:23 148:20
  150:7 152:25
  153:13,17,19
  158:1
explain   85:9
  91:25 92:16
  99:1 100:15
  101:22 163:15

169:13
exposed   109:20
extend   106:13
extending
  72:12 102:18
extensive   151:1
extent   44:21
  68:22 128:9
  136:2 154:17
  154:18,19
  160:15 163:9
externally
  40:15 41:6
extra   29:11
extremities
  83:12
extricated
  114:5
eye   69:20,24
  70:9,13,20,23
  71:6,16,18,18
  77:24 78:6,13
eyes   79:6

**f**

f   35:12 36:12
  59:20 64:16
  65:6 85:21,22
  86:10,25 87:2
  88:20,23 89:12
  90:11 93:4
  96:18 193:1
f250   111:9
  126:2 146:15
  146:19

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[fabric - flat]                                                      Page 19

fabric  93:8
face  69:21
  71:13 77:22
  94:10 104:3
facets  74:16
facial  67:20
facility  165:23
  177:19
facing  94:10,14
  94:22
fact  68:5 81:3
  84:17 91:9
  95:2 99:6
  111:15 132:2
  139:12
factors  74:19
factory  60:1,2
  60:6,19 61:4,5
  61:7,9,16,18
  62:4
facts  141:9
fair  57:22 66:7
  73:14 74:8,14
  77:20 99:3
  106:22 107:21
  127:8 132:17
  133:9 134:13
  136:6,14 140:5
  157:10 158:2
  184:4
fairly  105:18
  126:7 159:16
familiar  108:13
far  7:8 11:1
  16:7,11 24:21

24:23 25:19
37:16,20 42:20
44:21 53:11
55:6,19 57:3
61:14 67:5
68:22 71:9
74:1 75:2,3,4,9
76:2 77:2
80:17 81:9
85:24 86:3
99:17 104:17
112:19 113:20
114:6,8 117:8
130:14 131:17
135:24 137:4
141:13 149:11
157:11 182:20
188:19
farther  86:25
fast  56:11
  58:22 73:4
fatal  159:22,23
  160:2 163:23
  190:9
fatality  136:12
fault  38:20
features  149:6
  150:8 152:21
february  7:17
  11:7,20 12:1,7
  12:8,12 13:8
  13:13,24 14:7
  14:15,21,23
  16:19,25 17:8
  43:19

federal  1:15
  140:18,21,23
  155:10 156:1,2
  157:13
felt  18:5 110:12
female  167:13
  167:14,23
femur  83:16
field  131:25
fifteen  174:19
figure  97:16
  119:21 185:1
figured  51:21
figures  24:21
file  6:2,15 7:15
  11:7 16:20
  26:21 43:19
  47:11,18 54:24
  141:25 142:6,7
  142:17
filed  156:2
files  13:22
  23:16 28:13
final  15:23
finalized  16:1,4
  16:6
finally  10:2
  54:16
financial
  192:18
financially
  193:14
find  12:25
  28:11 54:13
  66:6 67:14

106:24 108:6
110:23 113:18
117:24 121:1
140:9 148:5
161:16
findings  35:3
  40:15 68:4
fine  5:21 53:1
  111:21 190:21
finished  45:2
  45:22 186:9
firm  12:17 28:2
  28:5,22 30:25
  31:3,4 45:17
first  4:20 10:17
  14:20 15:25
  17:25 18:1,4
  32:6 49:12
  52:1,6,18 53:8
  61:23 62:11
  63:12,24 65:11
  128:16 155:3
  162:11,18,21
  162:22 163:10
  168:21 189:14
five  58:25
  85:11 95:24
  120:25 121:23
  154:8,21
  160:19 186:8
fixed  100:20
  114:20
flat  104:14
  108:23 109:1,2

Paul Lewis , Jr., M.S., BME                                      March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[flattened - fractures]**                                               Page 20

**flattened**
  108:18
**flatter** 108:21
**fmvs** 131:10
**fmvss** 131:5
**foam** 93:8
  109:15
**focal** 91:12
  105:3,6 108:19
**focalized** 68:7
  91:11
**focus** 61:13
  75:13
**focused** 68:15
  72:2,3 74:13
  78:7,9,11 80:9
  80:20 104:24
  105:18
**folder** 64:17
**folding** 89:16
**follow** 188:13
**following** 6:23
  19:7 192:5
**follows** 4:21
**foot** 88:3
**foramen** 72:8
  98:14
**force** 67:3 69:6
  69:9 79:11,15
  86:20 96:25
  97:2 110:20
  117:15 122:3,4
  122:8 129:25
  173:12

**forces** 37:11
  75:5 89:3
  121:20 122:1,8
  122:12,22,25
  123:3,11,14
  125:9 127:7
  136:21 183:14
  185:24
**ford** 21:3,24
  62:3 84:19
  85:20 125:6
  146:15,16,19
  176:19
**fore** 114:17
**foregoing**
  193:5
**forget** 10:25
  42:12
**form** 8:17 9:5
  11:6 16:11,13
  23:18 57:23
  84:21 90:19
  107:25 123:6
  124:20 142:25
  143:14,22
  144:8 145:8
  149:18,20
  150:16 154:4
  154:11,23
  155:11,21
  156:15 177:3
  184:7,24
  185:16 188:8
  188:25

**formed** 142:22
**forming** 7:7
  143:20
**formula** 173:18
  173:20 174:4
**formulate**
  63:13 144:7
**formulated**
  74:24
**forth** 125:4
  181:1
**forward** 77:2
  83:19 84:4,12
  86:21 90:11,15
  91:10,13 96:18
  102:12 110:19
  110:21 111:5,6
  111:11 114:10
  115:12,20
  116:2,3 117:9
  117:16 121:6,8
  123:16 124:10
  124:13 182:21
**found** 10:8
  11:14 66:15
  82:11 113:13
  113:16,19
  118:4
**foundation**
  138:25 184:8
**four** 18:10
  21:19 28:6
  33:4 43:25
  44:2 60:3
  109:9,15

**111:11 114:9
  120:19 121:2
  121:23 128:5
  129:6,9,12,20
  130:12,14
  175:7 176:9
  177:14 185:6
**fourth** 3:12
  5:13 28:8
  176:7
**fracture** 68:20
  71:14 72:24
  73:1 74:17
  79:10 80:25
  81:4 83:11,17
  87:6 88:20
  89:4 91:23
  92:1,17 93:23
  96:20,21 97:8
  97:10,15,19,21
  98:2,12 99:3
  99:13,25
  101:22 104:7,8
  104:13 106:13
  107:21 108:17
  108:20,21,24
  109:1 110:25
  111:14 121:4
  123:18
**fractured**
  67:19 69:3
  78:20 82:25
**fractures** 68:23
  71:3 72:11,16
  79:3 80:19

Paul Lewis , Jr., M.S., BME                                      March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[fractures - giving]**                                                    Page 21

| | | | |
|---|---|---|---|
| 104:25 108:14 | **frontal** 131:6,9 | 130:2 133:4 | 151:14 156:16 |
| 108:23 120:14 | 131:12,14,15 | 163:20 172:16 | 165:21 |
| **fracturing** 72:1 | 131:21,24 | 172:22,24,25 | **give** 11:23 |
| **frame** 80:13,14 | 132:4,14 | 172:25 173:12 | 22:22 34:24 |
| 83:21 87:16 | 147:12,14 | 174:19,20 | 35:14 39:3 |
| 92:23 93:1,7 | 150:21 182:2 | 175:6,6,8,25 | 46:22 48:1 |
| 93:11,13,17 | **fuel** 133:2 | 176:5 178:24 | 49:22 50:2,17 |
| 94:1 99:19 | **full** 160:15 | 179:11,19,22 | 51:16 52:14,25 |
| 100:7,9 101:25 | 163:9 | 180:20 | 53:2,20,22 |
| 104:16 105:7,8 | **fully** 15:9 100:5 | **gainesville** 1:2 | 63:10,19 73:16 |
| 105:23 106:2,8 | 141:2 | **gathered** 57:19 | 73:20 76:5 |
| 106:17 109:15 | **function** | **general** 19:17 | 83:9 140:9,13 |
| 126:17 171:3,4 | 152:22 | 104:23 140:14 | 140:25 148:11 |
| 174:3 | **further** 22:3 | 172:6 183:9 | 148:17 149:14 |
| **frames** 105:10 | 70:1 71:25 | **generally** 23:1 | 149:15 151:9 |
| **framework** | 78:8,17 87:14 | 23:6 | 152:5,16,18 |
| 175:23 | 118:17,20,21 | **generate** 12:19 | 153:5 154:2,7 |
| **frankly** 15:7 | 128:15 193:9 | 23:19 140:6 | 155:6,9 161:23 |
| 112:6 | 193:12 | **generated** | 162:2,2 174:10 |
| **friday** 8:1,25 | **future** 187:5 | 22:21 54:25 | 183:23 184:13 |
| 21:23 50:25 | **g** | 127:7 142:7 | 186:20 188:22 |
| 53:16 | | **generating** | 189:9 |
| **front** 11:3,12 | **g** 37:11 115:7 | 23:21 25:5 | **given** 32:11 |
| 17:3 59:14 | 121:20 122:1,8 | 47:4,15,19 | 48:17 57:8 |
| 68:14 69:12,12 | 122:12,22,25 | **generation** | 68:5 71:24 |
| 69:14 77:20,22 | 123:3,11,14 | 47:5 | 87:11 109:12 |
| 77:23 78:2,6 | 127:7 128:21 | **georgia** 1:1,22 | 113:5 181:6 |
| 79:21,21 80:7 | 129:15 130:6 | 2:6,10 61:3 | 192:18 193:10 |
| 83:25 87:1 | 130:11 136:21 | 192:2,5,6 | **gives** 41:1 |
| 102:11 104:3 | 176:2 179:3,9 | 193:3 | 66:22 117:3 |
| 107:7,21 117:1 | **g's** 37:20 | **germane** 66:15 | 133:16 169:22 |
| 120:13 123:12 | 127:11,12,20 | **getting** 10:3 | 169:23 185:21 |
| 130:16 183:19 | 127:21 128:3 | 53:2 95:4,14 | **giving** 5:5 |
| **front's** 78:3 | 128:12,18,24 | 117:17 124:17 | 27:21 35:5,20 |
| | 129:3,6,8,12,20 | 126:25 129:7 | 66:16 67:10 |
| | 129:21,22,25 | | |

Paul Lewis , Jr., M.S., BME                     March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[giving - head]**                                         Page 22

| | | | **h** |
|---|---|---|---|

154:13 162:9
**gleaned** 17:17
**go** 24:5,6,11,12
  27:4,9 31:5
  34:19 40:7
  42:10 43:10
  46:19 56:11
  58:22 60:17,21
  72:19 73:2
  77:15 80:22
  84:3,12,23
  87:14 90:7
  100:3,23
  105:18,24
  106:11 107:23
  111:17,24
  125:3 145:10
  148:4 150:19
  151:18 161:16
  166:20 188:9
**goes** 28:11 31:5
  38:8 62:15
  66:1 93:19
  98:13 100:18
  105:24 155:18
  169:11 178:12
**going** 5:2 12:10
  17:3 19:6 29:5
  30:8 34:19,21
  36:8 38:5,24
  45:11 46:9
  47:20 48:13
  52:19 54:16
  56:7,9,11 58:3
  58:20 72:7

73:2 78:12
80:20 86:9,12
87:11 88:14,15
92:12,13,22,24
97:19 99:4
103:21,23
105:17 115:11
120:6 122:12
122:20 124:1,8
124:9,18
126:12 128:17
128:18,21,22
128:25 129:14
135:22,25
136:18 137:3
139:8 140:25
148:1 161:6
162:15 172:15
174:13,15
175:17 178:24
184:21
**good** 4:24,25
  29:7 38:11
  75:20 190:21
**gosh** 29:7
  125:18
**gotcha** 58:5
  113:25
**gotten** 112:17
**grab** 38:5
**grad** 40:18,20
**graph** 181:25
**gravitating**
  72:8

**gravity** 128:4
  130:3,6,23
  176:11 179:23
**great** 5:22
  166:22
**greater** 62:3
  151:5 175:16
**grill** 84:19 85:4
  87:14
**group** 116:17
**grow** 129:25
**guess** 8:7 11:6
  14:15 16:2,21
  18:10 49:18
  55:14 60:12
  62:17 66:5
  67:2 72:4,15
  74:2 77:16
  88:8 90:6 99:5
  105:9 112:5
  129:24 153:21
  162:11,15
  166:14 167:11
  189:19
**guessing**
  130:22
**guesstimate**
  129:5
**guide** 23:15
**gunn** 2:9
**guy** 28:10
**guys** 183:24
**gwinnett** 193:4

**h** 2:8 172:3
  176:23
**h3** 166:2,4
  167:3
**hair** 82:16
**half** 60:3
**hamilton** 25:14
**hand** 4:17
  26:15 157:19
  189:15
**handle** 125:20
**handled** 32:6
**happen** 58:18
  63:20 94:25
  137:4 152:9
**happened**
  37:10 63:14
  69:4
**hard** 99:12
  134:15 181:20
**harm** 81:13,21
**harness** 85:11
**hatch** 89:20
**head** 66:23
  67:1,4 68:8
  69:15 70:6
  71:10,19 72:5
  76:3 77:20
  79:22 81:8,18
  81:23 82:12,24
  84:7,19 85:19
  85:23 86:14
  87:24 88:7,9
  89:6 90:16

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[head - hospital]**                                                    Page 23

92:11 93:13
94:4,14 95:8
102:4 105:1,10
106:16,21
109:20 110:1
112:2,3,12,13
112:19 117:9
119:2,12,25
122:12,16
124:2,8 130:21
159:22,23
160:2,9 161:20
162:5,25
163:18,19,23
164:18 168:12
169:2 170:1,25
171:12,24
172:3,10,14,25
173:1,9,25
174:8,9,22,22
175:4,9,21,25
176:6,6,14,18
177:13 179:4,8
179:20 180:19
180:20 182:20
182:21 190:9
**head's** 93:14,24
122:15
**heading** 48:20
**headrest** 80:10
80:16,17,21,25
81:3 84:24,25
85:4 86:2,3,4,9
88:12 100:11
100:21,23

101:4,12,25
102:2 104:17
105:8 106:18
106:19 182:6,8
182:9,10,11
**headrests**
99:20
**heads** 172:7
**hear** 155:14
**height** 18:22
61:2 87:5
93:10 146:23
148:2 168:4
171:13 184:16
185:3,5
**heights** 170:14
170:16
**help** 23:20
24:25 25:3,7
40:9,10 43:6
149:8
**helped** 40:12
**helping** 103:12
126:18
**helps** 24:19
**henson** 24:14
**hic** 131:23
163:3,3,3,21
168:11 169:1
169:15,16,17
169:22,22
170:2,4 172:18
173:2,9,20
179:1 180:21
180:21,21,25

181:3,6,7
184:12
**high** 88:6
129:12 182:6,7
182:16,23
**higher** 60:24
88:6 128:25
129:14,21,25
133:20 172:16
175:23 178:21
178:23 185:8
**highest** 170:7
174:14
**highlight** 23:17
**hill** 2:8 3:5,6
4:11,11,23
5:18,21,23 6:1
9:20 20:6,10
20:15,18,22
21:7,8 22:7
29:4,7,10 30:7
30:11 37:25
38:4,7,12
43:11 58:20,25
59:10 95:24
96:9,10 137:23
138:2,5 139:8
139:16 143:8
143:13,16,17
143:25 155:13
155:14 156:18
157:3,5 160:19
161:4 164:21
186:8,17,18
187:16,23

188:8,13,15
190:19 191:10
**hip** 136:13
**history** 7:22
50:8
**hit** 95:3 100:10
106:16,21,21
107:19 108:6
112:11 122:11
**hits** 89:2
**hitting** 105:1
123:17 164:6
164:10
**hm** 166:23
167:4
**hold** 103:12
115:25
**holding** 34:21
100:11 103:14
**holds** 101:15
**homicide** 40:8
**honestly**
140:20
**hope** 29:8
**hopefully** 53:5
160:20
**horizontal** 92:6
96:19 97:4,6
97:10 99:1,7
99:14 101:7,9
106:17
**horizontally**
92:11
**hospital** 66:20

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[hour - incident]**                                                    Page 24

**hour** 47:3,25
58:21 131:16
132:4 164:12
181:15,22
**hours** 47:24
**hudgins** 2:8
**huh** 10:10 53:4
64:11 96:16
107:10 127:23
178:3
**hundred** 30:19
31:13 32:11,16
76:22 174:19
**hundreds**
156:22 179:1
**hunsley** 22:10
159:2
**hunsley's** 52:10
**hybrid** 133:7
166:5 167:2,13
**hypothesis**
136:9,14,17,25
**hypothetical**
35:11 36:10,11
36:12 37:7,10
37:12 63:1,11
63:14,21 75:12
76:12,16,25
77:8,12 103:2
103:5,17,19
121:16,21
122:6 123:25
125:1,22
126:11,12,21
127:6 134:8,12

135:5,16
136:24 137:1
137:17,19
152:1,7,10
153:3 172:16
179:18,21

**i**

**i.e.** 125:16
**idea** 75:20
167:5
**identical** 148:7
**identification**
5:16 8:12 20:4
27:7 30:10
43:15 48:16
52:22 138:2
163:8 180:2
**identified**
107:20
**identify** 4:7
108:10
**ihs** 151:10
**ii** 2:8
**iihs** 151:7
**iii** 6:23 133:7
166:5 167:2
**illustrate** 119:1
**image** 69:18
**imagine** 12:9
**immediately**
102:7
**impact** 63:19
67:4 68:7,13
68:20 69:6,21
69:23 70:9,19

70:23 71:10,16
71:17,23 72:22
77:19 78:14
79:10,11,15
80:3,6,25 81:7
81:18 82:4,24
83:13,21 84:7
85:4 87:6,7
88:19 89:1,2,4
90:18 91:8,20
92:8 94:11,14
94:15 95:6
96:12 103:1
104:22 106:12
107:24 108:11
109:8,11,25
110:11,13,19
112:3,23 119:5
119:13,17
120:6 121:3
122:13,19
123:12,21
124:4 129:22
129:25 130:11
131:25 132:10
147:7,10,13
150:3,23 164:4
164:16 169:6
171:16,23
172:5 182:2,2
182:3,7 183:14
185:13
**impacted** 70:6
76:3 81:23
82:10,12 83:5

101:21 105:10
106:7 107:8
110:16 112:19
171:17
**impacter** 86:22
96:25
**impacting** 82:1
90:15,17 99:8
119:25
**impactor**
104:19 122:24
**impacts** 131:8
131:9,9,24,24
132:21,22
146:8
**impede** 103:23
104:2
**impeded**
102:24
**important**
17:20 18:5
**impossible**
84:11 85:6
96:24 109:10
138:17
**improper**
139:12 184:25
**inadmissible**
139:14
**inch** 184:22
**inches** 59:25
60:3,19 116:22
168:9
**incident** 36:11
36:11 56:18

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[incident - inputs]**                                              Page 25

59:20 86:14
94:5 121:16,21
123:2 126:11
126:12 147:3
153:3 177:2,12
179:16
**incidents**
147:18
**incisions**  41:7
**include**  7:16
26:1 47:14
73:15 141:25
**included**  7:18
17:18,21 18:1
22:1 71:4
141:18
**includes**  66:19
142:2
**including**  37:11
68:20 188:6
**incompatibility**
151:5
**incompatible**
149:1
**inconsistent**
68:3
**incorrect**  63:23
67:18
**incorrectly**
118:1
**independent**
37:15 41:19
127:3
**independently**
126:24

**index**  3:3,8
**indicate**  121:2
188:16
**indicated**  29:17
**indicating**
16:22 33:6
40:4 46:7
68:16 71:7,13
72:25 73:3
77:23 80:15,23
83:19 85:19
87:17 88:15,25
89:10,21,25
91:14 92:5,14
92:25 93:20
94:17 97:1
98:1,15 99:22
100:8,18 101:5
102:16 104:2
105:8,19 106:2
107:3 109:5
110:13 119:10
121:6 123:17
126:9 153:18
160:4 165:20
**indication**
66:23
**individual**
142:17
**individually**
145:19
**individuals**
149:4
**ineffectiveness**
150:9

**inertia**  123:19
**inertial**  124:6
**inflict**  81:20
**information**
6:24 11:3,12
15:18 17:16
18:24 19:8
37:13 46:15,22
47:21 51:2,3,6
54:8 65:10,16
66:21 74:23,25
75:10 76:23
127:1 135:20
139:13 141:9
141:23 142:4
142:10,13
143:24 145:2,3
152:11 153:1
153:17 157:16
178:5
**initial**  3:19
20:25 41:6
48:14 49:13
53:9 124:16,24
128:16,22
129:1,21,25
130:6,11
137:21 157:18
**initially**  157:24
**initiate**  70:10
**injured**  41:2
**injuries**  40:25
41:20 70:3
75:14 78:8
79:14 83:3,10

83:12,20 86:19
91:1 112:18
121:22 134:24
134:24 136:12
136:20 149:12
153:6 161:21
162:6 189:4
190:10
**injurious**  171:7
172:15 178:22
**injury**  33:17
37:18 53:11
65:10 74:10
76:6,14 79:2,2
81:8 82:20
84:6 86:23
87:9 88:7,9
90:18,25 91:19
95:7 107:2
109:10,12,19
112:23 113:5
122:1,9 131:17
132:24 133:13
133:23 136:19
149:12 151:13
151:17 159:22
159:23 160:9
163:24 165:1,3
165:8 166:2
168:12,21
170:1 172:10
173:9
**inner**  89:10
**inputs**  37:3

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[insert - issued]**                                                    Page 26

| | | | |
|---|---|---|---|
| **insert**  100:13 | **integrity**  132:1 | **internship** | **invoice**  46:13 |
| **inserts**  101:25 | **intend**  27:20 | 39:23 40:6 | **invoices**  3:17 |
| **inside**  89:9 | 34:24 50:1,17 | 42:2 | 7:22 43:16,24 |
| 177:13 | 53:20,22 | **interpretation** | 43:25 44:8,13 |
| **inspect**  55:5 | 148:17 149:15 | 98:5 134:7 | 44:17 46:3 |
| 110:7 111:19 | 155:6,9 162:2 | 158:15 159:1 | 47:2 |
| 120:19 | 186:20,23 | **interrupt**  24:1 | **involved**  28:14 |
| **inspected**  55:2 | **intended**  44:19 | 26:3 78:2 | 28:17 33:19,23 |
| 55:6 108:4 | 49:21 51:16 | **interruption** | 36:13 55:3,12 |
| 110:5 | 73:20 154:2,7 | 121:18 | 59:20 65:6 |
| **inspection**  7:9 | 154:19 | **intricacies** | 74:19 110:6 |
| 26:11 45:4 | **intending** | 151:15 156:6 | 121:20 145:25 |
| 55:13,21 56:3 | 148:11,21 | **intruded**  87:20 | 146:3,4,12,15 |
| 56:23 57:1,11 | 190:7 | 90:11 | 147:18,19 |
| 57:19 64:13,25 | **intent**  188:16 | **intrusion**  55:19 | 150:15 164:1,6 |
| 74:24 75:5 | **intention**  51:24 | 62:19,25 76:24 | 177:1,12 |
| 91:4 113:19,23 | 52:14 | 84:4,15 85:21 | 179:10 180:10 |
| 114:2 118:7 | **interaction** | 85:22 93:4 | 180:13 183:21 |
| 120:20 121:2 | 83:8 84:13 | 117:15 119:10 | 189:7,17,18,22 |
| 134:25 142:4 | **interest**  24:11 | 119:11 120:12 | 190:9 |
| **installed**  33:22 | 192:9 | 126:19 135:23 | **involvement** |
| 36:14 38:25 | **interested** | 149:10 150:14 | 189:9 |
| 168:2 171:17 | 193:14 | 151:25 152:6 | **involves**  177:21 |
| **instance**  189:12 | **interior**  72:13 | 152:19 159:15 | **involving**  30:14 |
| **instructed** | 88:25 109:17 | 160:1,4,8 | 33:24 55:13 |
| 46:24 | 123:21 124:2 | 163:14 | 158:9,13,24 |
| **instrument** | **internal**  71:12 | **investigated** | **inward**  98:3,4 |
| 99:8 | 72:17 74:18 | 141:15 | 106:14 |
| **integral**  169:9 | 79:4 80:14 | **investigating** | **issue**  50:9 |
| **integrate**  169:7 | 123:3 124:19 | 50:9 | 74:13 140:4 |
| **integrating** | **internally** | **investigation** | 141:10,16 |
| 173:17 | 40:15 72:12 | 40:10 | 157:19,23,25 |
| **integration** | 73:1 173:3 | **investigations** | **issued**  21:22 |
| 169:17 | **internet**  13:1 | 189:12 | 34:6 188:18 |
| | | | 189:10 |

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[issues - know]**                                                    Page 27

| | | | |
|---|---|---|---|
| **issues** 33:18 | **judgment** | **kinematics** | 60:2,7,15 |
| 61:21 149:17 | 41:19 | 37:18 53:12 | 63:24 64:4,24 |
| 153:25 189:14 | **judicial** 192:5 | 83:15 | 65:5 68:2,6,15 |
| 189:23 190:25 | **jump** 125:4 | **kit** 33:22,24 | 68:17,22 69:4 |
| **issuing** 142:14 | **jumping** | 34:2 36:13 | 69:14 72:15,16 |
| 191:5 | 112:15 | 38:24 39:5 | 74:9,11 75:2,6 |
| **item** 15:17 | **jury** 72:5 74:3 | 59:24 146:1 | 75:17 77:13 |
| 22:10 64:23 | **k** | 147:22,24 | 78:8 81:14 |
| **items** 6:25 | | 152:2 159:13 | 82:15 83:8,9 |
| 13:13,16,18 | **keep** 16:5 22:19 | 160:8 168:2 | 85:5,17 86:18 |
| 17:6,25 18:9 | 23:16 46:8,10 | 189:18,20,22 | 87:16,23,25 |
| 18:10 21:18,19 | 56:6 156:13 | **kits** 154:16 | 88:2 89:7,11 |
| 22:8 90:2 | **keeps** 10:22 | 159:14 | 89:17,22 90:1 |
| 96:15 | 46:12 | **knew** 58:3 | 90:3 94:4,18 |
| **iterating** | **kicks** 174:4 | **know** 5:23 6:16 | 94:20 95:15 |
| 169:19 | **kind** 10:15 15:8 | 8:16,19 11:14 | 96:18 97:18 |
| **j** | 23:14 40:16,23 | 11:16 12:2 | 99:8,12,21 |
| | 41:22 46:5 | 16:9,21,22,22 | 101:2,4 102:7 |
| **j** 1:18 24:18 | 55:20 68:21 | 17:5,12,12 | 102:8,13,21 |
| 192:24 193:21 | 72:7,14 73:1 | 19:7 22:4,18 | 105:14 107:5 |
| **jamie** 25:14 | 74:15 76:18 | 23:3,5,15,16,18 | 111:5,10,23,25 |
| 48:4 | 91:7,14 97:1 | 24:12,20,21 | 112:7 113:25 |
| **jammed** 83:19 | 97:21,23 98:13 | 27:10 28:10 | 114:7,9,16 |
| 84:4 | 99:2 100:4,12 | 29:11 33:19 | 115:20 116:1 |
| **january** 13:9 | 100:22 101:2 | 34:8,18 36:7,9 | 116:25 117:2 |
| 21:2,13 | 102:13 104:16 | 36:20,22 37:6 | 117:12,22 |
| **jenica** 24:16,17 | 107:16 108:16 | 38:7,9 39:23 | 122:4 125:3,16 |
| **jessica** 24:14 | 109:6 115:5,8 | 40:14,16 41:10 | 126:7 127:19 |
| **job** 68:2 87:22 | 115:25 116:3,5 | 41:10,11 45:1 | 127:24,24 |
| 137:10 | 116:12 117:11 | 45:3,13,21 | 128:2 129:7,15 |
| **joshua** 1:4 | 117:13 118:12 | 46:22,23 47:1 | 129:22 130:15 |
| **jr** 1:13 3:5 4:6 | 124:3 134:15 | 48:10 50:4,20 | 130:17 134:17 |
| 4:19 48:20 | 147:2,14 | 51:13,13 54:5 | 135:14 139:18 |
| 192:2 | 165:15 | 55:25 56:8 | 140:18,20,22 |
| **judge** 36:4 | **kinematic** | 57:3 58:21 | 146:22 147:1 |
| 156:24 | 103:25 185:23 | | |

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[know - line]**                                    Page 28

| | | | |
|---|---|---|---|

147:21,24
148:2,9 151:20
151:20,21,21
154:1,13
155:15,23
156:5,19
164:16,19
165:11,14,16
165:17 166:4
167:16,22
168:1,4,9
170:10,16,19
171:2,19
172:16 176:4
176:17 177:6,6
177:17,21
178:1,2,5,6,19
179:7,9 181:9
181:20 184:9
184:14,16,18
185:12,24
186:25 187:10
187:11,12
189:13
**knowledge**
34:16 37:2
40:17,19 43:22
50:6 127:1
151:1
**known** 140:25
141:3
**knows** 156:25

**l**

**l** 28:9,9
**labeled** 27:12
43:17 138:4
**lack** 57:8
136:19 162:6
**laid** 90:8
**larger** 70:5
**largest** 169:9,9
169:21
**late** 39:24
58:21 139:11
**lateral** 71:7
84:1 92:6
**laterally** 90:6
175:17
**law** 1:20 12:17
24:22 157:8
164:20 165:11
165:11
**lawsuit** 165:15
177:22
**lawsuits** 158:9
158:13,24
**lawyer** 141:8
155:23
**layers** 122:21
**laying** 90:4,5
**layman's** 72:4
**lead** 119:24
122:19 151:17
**leads** 97:5,14
**leaks** 133:2
**learn** 40:25

**led** 74:17,18
121:3 122:9
**left** 73:2 83:3,3
83:4,12,16,18
83:20,21 84:3
92:14,14 94:10
164:3 165:6
167:15 175:18
**leg** 83:3
**legal** 155:24
156:6,19 157:7
**legs** 104:5
**leita** 1:18
192:24 193:21
**leon** 1:21 2:5
**lessened** 62:19
152:1,20
**letter** 190:13
**letting** 29:16
**level** 60:21
75:24 76:24
85:18,20,22
86:8,10 87:17
87:20,24,24
88:17 93:6,24
94:1 128:6
133:3,12,22
170:7
**lewis** 1:12 3:5
4:6,19,24
48:20 138:19
143:23 186:19
188:1 192:2
**lewis's** 3:20

**license** 13:10
14:10,14 18:13
18:16
**lift** 33:22,24
34:2 36:13
38:24 39:4
59:24 60:12,13
60:21 62:18
63:2 75:13
146:1 147:21
147:24 148:25
152:2,23
154:16 159:13
159:14 160:8
168:2 189:18
189:20,22,25
**lifted** 35:12
62:4 65:4
125:7 160:3
190:10
**lifting** 148:24
**likely** 94:12
107:17 126:6
139:13
**likewise** 178:4
**limitation** 61:3
**limited** 34:7,16
103:21 138:12
138:21
**limiting** 85:16
**line** 49:10
96:25 97:2,19
97:23 104:23
151:6 159:5

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[linear - make]                                                Page 29

| | | | |
|---|---|---|---|
| **linear** 108:14 | 102:10,12,15 | 114:15 116:5 | **lost** 105:20 |
| 108:17,20,24 | 103:10,20 | 128:9 130:20 | **lot** 22:19 23:3 |
| 108:24,25 | 104:24 105:2 | 148:1 150:2 | 36:21 44:12 |
| **lines** 106:13 | 105:15,20 | 162:18,19 | 57:7 95:10 |
| **list** 6:22 7:4 | 110:17 115:10 | 163:2,18 | 105:2 109:5 |
| 23:4 64:12,22 | 117:17 118:12 | 164:25 166:23 | 112:6 140:16 |
| 73:18 | 118:20 119:19 | 170:2 172:17 | 151:6 156:3 |
| **listed** 12:18 | 120:23,23 | 175:21 182:5 | **low** 88:8 |
| 16:8 18:11,25 | 133:19 161:11 | **looked** 90:24 | 163:21 170:1 |
| 21:9 22:8,23 | 183:7,9,16 | 90:24 91:3 | 179:1 180:21 |
| 24:13 25:11,16 | **living** 10:20 | 172:13 189:3 | **lower** 72:20 |
| 25:21 27:23 | 11:6 16:12 | **looking** 12:3 | 88:15 92:25 |
| 67:14 70:24 | **llc** 1:8,21 2:4,9 | 24:10 44:3 | 98:16 125:24 |
| 74:4,7 78:9 | **load** 83:16,16 | 55:19 65:23 | 126:5 170:3 |
| 142:8 148:13 | 150:22 | 72:6 75:19 | **lowest** 85:20,21 |
| 161:24 | **loads** 146:9 | 80:20 88:1 | 182:6,8 |
| **listened** 143:12 | **lobes** 68:24 | 108:5 116:23 | **lumbar** 170:14 |
| **listening** | **located** 72:16 | 131:23 148:9 | |
| 111:24 | 89:22 90:2 | 151:1 164:18 | **m** |
| **listing** 15:2 | **location** 81:7,7 | 169:18,19,24 | **m.s.** 1:13 3:5 |
| 23:9 25:24 | 81:17 82:10 | 170:23,24 | 4:19 192:2 |
| **lists** 6:2,24 12:4 | 107:4 109:12 | 171:5 172:6,24 | **ma'am** 188:3 |
| 54:22 | 128:13 | 174:25 178:20 | **made** 53:23 |
| **literature** | **locations** | 179:7 180:19 | 63:12 71:8 |
| 151:7 | 128:23 177:23 | 181:18,24,25 | 84:19 95:16 |
| **litigation** 30:19 | **long** 46:21 90:7 | 184:15 185:10 | 101:6 107:11 |
| 31:14,19 | 123:20 173:18 | 186:5 | 107:18 158:18 |
| 192:18 | **longer** 70:17,19 | **looks** 5:10 | 159:4 168:11 |
| **little** 16:9 29:1 | 169:11 | 11:25 105:13 | 176:1 190:12 |
| 29:18 33:10 | **longitudinally** | 114:19 120:23 | 192:15 |
| 40:5 48:9 | 90:7 174:13 | 165:18,25 | **magnum** 72:8 |
| 58:21 69:11 | **look** 21:1 24:11 | 181:14,14,21 | 98:14 |
| 70:13 73:4 | 59:19 81:20 | 182:3 | **main** 150:22 |
| 89:16 97:24 | 86:18 104:9,20 | **loss** 75:7 | 178:22 |
| 98:7 101:17 | 107:1 109:18 | 136:22 | **make** 5:4 11:22 |
| | | | 13:3 18:9 |

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[make - mean]**                                                      Page 30

| | | | |
|---|---|---|---|
| 34:20 52:7 | **march**  1:20 8:1 | 145:14,14 | 63:8 64:15 |
| 55:25 59:23 | 8:23 12:13 | 191:2 | 65:13 67:2,16 |
| 62:21 65:21 | 13:17 22:2 | **materials**  7:8 | 68:18 69:11 |
| 68:6 78:12 | 138:4 139:18 | 10:22 12:1,4 | 73:18 74:9 |
| 106:15 108:8 | 139:22 154:3 | 16:7 19:18 | 75:2,19,23 |
| 113:15 117:25 | 154:20 161:6 | 22:17,20 23:10 | 78:2,7,23 |
| 126:15,20 | 163:11 180:6 | 24:20 25:4 | 80:16 83:7 |
| 135:3,18 | 180:18 187:20 | 26:21 45:24 | 84:10 85:2,10 |
| 152:14 153:11 | 188:5 190:3,13 | 46:1 47:8,11 | 87:12,22 89:8 |
| 154:7 159:7 | **margins**  92:25 | 47:18,21 54:8 | 89:12 90:4,16 |
| 178:14 192:5 | **mark**  5:10,13 | 54:22 142:12 | 90:17 91:25 |
| **makes**  30:4 | 8:7 23:4 27:4 | 142:16 143:1 | 92:3 94:1 |
| 36:16 69:5 | 30:3 43:11 | 143:19 148:4 | 96:23 97:10,23 |
| 95:11 106:11 | 52:19 81:9 | 183:25 184:3 | 98:6 99:7,11 |
| **making**  19:22 | 82:15 106:24 | **matter**  38:4 | 99:21 100:24 |
| 34:4 58:17 | 108:6 162:11 | 147:19 193:15 | 101:20 102:17 |
| **male**  133:8,8 | 162:15 | **max**  173:7 | 102:18 104:1 |
| 133:15,15 | **marked**  5:15 | 175:4 | 104:14,19 |
| 166:2,9,10 | 8:11 15:24 | **maximum** | 105:12,12,21 |
| 167:2,7,23 | 20:3 27:6,24 | 174:3 | 108:8 109:19 |
| **manage**  149:7 | 30:9 43:14 | **mean**  8:23 9:21 | 110:18 112:5 |
| **manipulate** | 48:15 52:21 | 12:19 15:2,15 | 112:16 113:17 |
| 36:20 | 59:14 138:1 | 16:8 17:12,13 | 115:13 116:25 |
| **manner**  40:14 | 163:7 180:1,3 | 17:24 18:21 | 121:7 122:22 |
| 124:7 134:19 | **marking**  29:6 | 19:17 22:3,23 | 122:23 124:2 |
| **manufactured** | 163:4 | 23:25 25:13,22 | 124:23 125:11 |
| 168:7 170:15 | **match**  103:13 | 26:3 27:10 | 126:8,25 127:1 |
| **manufacturer** | 116:25 | 28:1 36:21 | 127:13,14,22 |
| 34:2 39:11 | **material**  6:2 | 37:17 41:22 | 133:16 137:9 |
| 131:20 189:25 | 7:1,12,15 8:4 | 46:4 47:2 48:4 | 137:14 140:1,6 |
| **manufacturers** | 12:21 13:4,20 | 48:10,25 49:18 | 151:6 153:21 |
| 173:3 | 13:23 14:7 | 50:5,6,19 | 155:23 156:3,5 |
| **manufacturing** | 89:5,11 90:10 | 51:20 54:1 | 157:12 159:25 |
| 39:8 | 90:15 141:25 | 55:18 57:2,7 | 166:6,24 172:5 |
| | 144:6 145:5,12 | 60:4,25 62:5 | 172:22 177:5 |

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[mean - misspelled]**                                                 Page 31

177:15,22
178:9,10,23
182:19 183:6
184:18 185:7
185:18
**meaning**  60:4
61:6 62:17
67:3 77:22
94:9 109:5
**means**  21:4
113:16,18
129:18 164:19
166:9
**meant**  7:11
10:7 14:9
67:22 73:24
90:1 108:9
111:3 117:3
119:8 135:3
146:9 147:9
185:1
**measure**  86:13
87:18,19 93:10
93:12 129:5
130:17
**measured**
176:18
**measurement**
128:3 129:4,4
168:15 169:12
**measurements**
116:6,19
171:24 172:3
185:24

**measures**  175:7
**mechanism**
76:6,13
**medical**  18:24
23:12 39:17,19
39:24 40:17,19
40:24 41:15,18
41:19,21,24
42:1,16,22
65:16 66:6,22
66:25 74:25
144:24 145:19
**memorized**
147:2 163:22
**mendez**  159:20
**mendoza**  8:4
13:19,21 26:21
33:20 35:16
49:16,22 50:2
52:9,16 138:24
140:4 141:3
143:21 144:13
144:17 145:7
145:16,22,24
146:3,15
147:12,25
148:12,18,22
149:17 152:19
152:23 153:11
154:3,8,20
159:11,20,22
188:2,6,17,24
189:8 190:2,25
191:7

**mention**  49:16
49:20,24 52:14
70:22 85:17
103:11 144:24
155:2 161:7
180:25
**mentioned**  7:17
7:19 14:17
28:4,7 48:6
56:21 62:23
63:5 67:6 79:7
83:11 90:2
91:21 96:17
101:6 130:8
138:16 144:2
**mercedes**
162:13,14
164:3,6,10
165:5,6,7
167:12,16
168:16 170:11
175:19
**metal**  80:14,21
92:22 93:1
99:18 100:17
101:3 104:17
105:17
**method**  135:8
135:14
**metro**  40:3
**mid**  88:16
**middle**  102:5
**might've**  29:23
45:21

**mile**  131:16
132:4
**miles**  164:12
181:14,22
**millisecond**
122:10 169:19
170:6,7 172:18
**milliseconds**
122:7 169:4,11
169:13
**mind**  29:16
37:24 114:21
**mine**  17:14
23:13 65:21
127:3
**mine's**  10:14
**minimal**  175:23
**minimum**
141:1
**minivan**  146:7
**minor**  1:5
**minute**  49:5
58:25 82:6
95:24 160:20
186:8
**minutes**  95:1
95:19,19
**mischaracteri...**
78:19 149:23
**misdescription**
78:19
**missing**  29:21
29:22
**misspelled**
11:14

Paul Lewis , Jr., M.S., BME                                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[misstates - numbers]**                                                Page 32

**misstates** 84:22 145:9 149:21
**mistaken** 63:17
**mode** 82:4
**modes** 131:23
**modified** 69:4
**modify** 21:25
**monthly** 47:2
**months** 46:10 154:8,21
**morgue** 40:11
**morning** 4:24 4:25 5:2 187:8
**motion** 85:16 101:7 102:14 102:17 115:11 119:9,16,19 138:21
**motioning** 72:14
**motions** 138:14 182:21 185:23
**mounted** 183:16
**mouth** 149:22
**move** 95:2 114:6
**moved** 70:4 114:1 124:13
**movement** 123:4 124:6
**moves** 183:15
**moving** 72:7 111:5 124:10 136:23

**multiple** 18:21 54:13 60:8 74:10 139:2 149:13
**muscle** 98:12
**mustang** 146:6

**n**

**n** 3:1,1 24:18
**n.e.** 2:9
**name** 25:25 28:18
**names** 55:23
**natural** 40:8
**nature** 24:22 28:12 37:19 58:1 75:18 81:11 91:23 92:1,16 98:6 99:2 101:22 150:2 151:3 173:13
**necessarily** 50:4,6 137:20 141:21 161:18 171:19 172:12 177:7 178:18 186:5
**necessary** 140:10
**neck** 112:17
**need** 5:23 27:8 38:1 58:22 74:22 75:16 76:4 133:14 137:20 141:21

150:5 151:20 161:22 162:1 164:22 171:2 171:22
**needed** 41:10 75:3
**needs** 119:23
**negative** 178:3
**negatively** 130:21
**neither** 49:15 147:15 193:12
**never** 10:11 23:17 34:12 39:10,13 81:4 124:23 128:25 129:24 137:9 147:1 149:22
**new** 14:7 50:23 50:25 51:6 54:15 158:1
**newer** 114:12
**nhtsa** 151:8
**nine** 180:5
**nods** 40:1 56:24 80:4 106:5
**nonlifted** 126:2
**normal** 60:12 60:13 185:9
**normally** 9:6
**northern** 1:1
**note** 132:20
**noted** 67:18

**notes** 8:15 9:11 12:20,21 26:10 26:11 55:8 56:1 91:9 113:18 114:12
**notice** 3:12 5:8 5:13 6:2,5,9 26:24 138:18 191:3
**november** 54:12
**nowadays** 170:3
**number** 18:25 20:23 42:11 44:3 60:11,16 75:22,23 85:5 88:21 109:9,15 110:3 111:11 114:8 120:19 120:24 121:2 128:5 129:6,9 129:12,20 130:11,14 166:2,12,14,21 169:9 173:10 173:18,21 174:4 175:4 176:9 177:14 180:4
**numbered** 8:8 10:15 48:19
**numbers** 20:9 20:11 21:3,5,7 64:4 180:24

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[numeral - okay]**                                                    Page 33

numeral   6:23
numerous
  136:10 144:25

**o**

o   3:1 28:9
o'clock   183:8
o.c.g.a.   192:9
  192:12
object   57:23
  67:5 84:21
  90:19 104:13
  105:3,6,18,21
  107:25 108:17
  110:1,24
  111:13 123:6
  143:14,22
  144:8 150:16
  154:4,11,23
  155:11,21
  156:15 177:3
  184:7,24
  185:16 188:8
  188:25 191:8
objection   5:18
  51:19 113:4
  124:20 142:25
  143:22,25
  145:8 149:18
  149:20 178:8
  190:18
objections   5:19
  138:10
objects   108:21
obliqueness
  183:9

observation
  95:11,12,16
obtained   19:25
obvious   53:5
  81:14 151:4
obviously
  17:24 19:7
  22:16 35:6
  37:17 44:7
  54:2 57:2 63:8
  66:14 71:5
  75:5 89:17
  90:17 94:6
  96:14 102:14
  103:8 110:20
  111:5 115:4,13
  116:5 117:20
  121:7 126:5
  128:15 137:2
  144:18 150:20
  150:25 162:6
  174:2,15
  175:15 184:10
  190:22 191:1
occasionally
  25:17 108:5
occlusion
  134:21
occupant   75:7
  77:4 83:14
  125:19 131:7
  134:3,25
  135:24 149:10
  151:23 185:23

occupant's
  62:19 149:3
occupants
  160:1 190:10
occur   112:1
  137:4
occurred   50:22
  63:1 69:10
  76:14,15,24
  83:13 84:7
  107:24 108:11
  109:10 113:1
  125:22 126:21
  134:5 147:3
  152:6 153:7
  185:13
occurring   89:8
occurs   128:7
october   6:18
  7:3 14:2,5
  15:12 20:25
  21:18 22:9,15
  27:15 29:19,23
  30:13,15 43:18
  43:23 44:2,9
  47:23 48:2
  49:13 50:1,11
  50:23 52:11,20
  53:9,14 59:11
  70:10 74:6
  140:24 141:1
  141:19 161:24
  188:17 189:10
offhand   147:23

office   24:25
  39:24 42:17,22
  55:22 56:22
offices   1:20
  192:10
offset   131:6,12
  131:15 147:14
  164:3
offsets   131:15
oh   8:20 14:19
  20:14,17 24:17
  29:24 31:1
  38:16 44:3
  62:14 64:19
  66:2 72:18
  94:17 107:9
  115:17 119:4,7
  125:17 131:22
  132:13 135:17
  146:16 167:2
  170:21 175:1
  179:17 181:25
  188:10
okay   5:7 6:11
  6:16 7:15,25
  8:6,18,22 9:6
  9:15,25 10:23
  11:5,16 12:6
  12:15,18 13:7
  13:16,20,23
  14:12 15:1,3
  15:11 16:11,18
  17:11,16 18:19
  19:14 20:17,21
  21:7 22:6

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[okay - opinions]**                                              Page 34

| | | | |
|---|---|---|---|
| 23:23 25:2,10 | 112:21 113:2,7 | **once** 33:13 | 28:23 34:15,25 |
| 26:3,5 28:17 | 113:22,25 | 105:18 | 35:5,15,19,21 |
| 28:25 29:22 | 114:21,23 | **one's** 30:1 | 36:4,7 37:9 |
| 30:5,18 31:2 | 117:19 120:15 | **ones** 20:24 | 48:24 49:23 |
| 31:12 32:9 | 121:1,13 | 54:23 73:14,15 | 50:2,7,17,24 |
| 33:19 34:1,12 | 123:23 124:25 | 73:24 114:12 | 52:15 53:7,11 |
| 34:19 37:9 | 127:4 128:2 | **ongoing** 50:20 | 53:20,22 54:15 |
| 38:16,21 44:7 | 130:4,5 132:16 | 53:23 | 54:17 57:4 |
| 45:8,11 46:1 | 132:19 133:3 | **onset** 124:24 | 61:14 62:11 |
| 47:5,10,23 | 134:10 135:17 | **open** 82:17,18 | 63:13,18,20 |
| 48:6,23 49:11 | 136:8,16 138:3 | **opening** 41:7,7 | 65:12,14,21 |
| 49:14 51:11,15 | 139:24 140:2,8 | **opining** 131:2 | 66:15,16 67:10 |
| 51:23 52:2,19 | 140:22 141:23 | **opinion** 23:13 | 70:7 73:8,13 |
| 53:19 54:7,11 | 143:13 146:14 | 51:9 62:22 | 73:17,19,21,22 |
| 54:16 55:12,24 | 147:3 148:11 | 63:10 64:1 | 74:23 76:5 |
| 56:5 58:8 59:2 | 148:16 156:4 | 67:1 73:16 | 77:16 115:2 |
| 59:23 60:18,23 | 158:21 159:7,9 | 74:3,6,7,15,16 | 134:6,15,22 |
| 61:12,20 62:15 | 160:18 162:1 | 74:22 76:3,12 | 135:4,11,15 |
| 63:7 64:9 65:2 | 162:11 163:13 | 76:22 84:18 | 137:7 138:11 |
| 65:19 66:18,25 | 164:12 165:24 | 85:10 102:21 | 138:23,25 |
| 68:12,17 69:1 | 166:16 167:11 | 106:16,20 | 140:4,9,10,13 |
| 69:7,16 70:22 | 168:11,20 | 109:25 110:14 | 140:24 141:8 |
| 71:21 72:10,14 | 169:1 170:10 | 112:1 124:18 | 141:11,14,22 |
| 73:20,24 77:15 | 170:22 171:8 | 127:3 143:20 | 142:14,23 |
| 78:22 80:24 | 174:2 175:9,12 | 150:25 151:24 | 145:7,16 |
| 81:6,16,22 | 176:22,25 | 152:5,19,23 | 148:12,16 |
| 82:7 94:4,13 | 178:4,14 | 157:1 158:11 | 149:15,16 |
| 96:1 97:2,5,9 | 179:25 182:1 | 158:14 161:8 | 152:14,15,17 |
| 97:12 98:2,23 | 186:1 188:22 | **opinion's** 71:9 | 153:4,4,5,12 |
| 99:6 100:22 | 190:15 | **opinions** 5:6 | 154:2,7,9,14,21 |
| 101:14 102:21 | **old** 38:11 | 7:7 15:13 | 155:8 156:20 |
| 107:18 108:3 | 133:13,25 | 17:14,21 18:6 | 157:9 161:9,17 |
| 108:13 109:23 | 141:6 181:8,11 | 18:20 19:11 | 161:23 162:2,9 |
| 110:5,14 111:4 | **olley** 28:9 | 22:1,22 24:24 | 172:11 174:10 |
| 111:21 112:9 | | 25:5,8 27:21 | 178:17 184:13 |

Veritext Legal Solutions

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[opinions - particular]**                                    Page 35

186:19 188:22
189:10 190:2
191:5,5
**opportunity**
153:24
**opposed**  108:18
**option**  95:2
105:13 177:9
**options**  106:20
**order**  50:12
76:4 115:15
116:19 119:2
119:24 132:3
132:12 133:12
133:23 140:12
152:5 153:11
161:23 162:2
169:17 171:1
**orders**  34:6
**organs**  41:10
**orientation**
183:4,13
**oriented**  99:10
**original**  70:22
157:22
**originally**
38:18 54:12
77:18
**outer**  71:7
**outlines**  141:11
**output**  58:4
**outset**  127:25
**outside**  136:5
155:12,22
185:17

**overlapping**
118:12
**override**
126:13 150:13
171:4
**overrode**  87:16
**own**  12:20,20
28:2 30:25
36:22 37:19
62:22 88:24
125:11 127:1
163:15 180:16
**owned**  28:1

**p**

**p**  104:21
**p.m.**  59:8 96:2
96:7 160:22
161:2 186:10
186:15 191:12
**packaged**
123:19 124:3
**padded**  88:24
102:2
**padding**  89:9
93:8
**page**  3:4,10 5:5
12:3 13:18
14:12,20 15:3
21:1 48:2,17
59:17,18,18,21
61:20 64:4,6,9
64:10 65:9,25
66:1,1,4,5 67:8
69:17,19,19
70:18,24 73:5

74:15 77:15
114:21 117:19
118:22 121:11
135:7 145:21
152:24 158:5
159:4,5 161:7
164:20 166:25
168:21 180:23
181:4,23,25
183:3,19
**pages**  6:21
24:12 48:19
162:18
**paid**  42:19,20
42:24,25 43:2
**paper**  23:16
**papers**  191:9
**paperwork**
53:3
**paragraph**
18:12 21:9
59:19,21 61:23
62:11,16 65:11
69:18 77:18
114:24 125:6
127:4,10 131:4
158:5
**paragraphs**
19:15 121:24
124:25
**paralegal**  25:23
47:24 48:7,7
**parameter**
99:18

**parameters**
184:22
**paren**  62:3
**parents**  1:5
89:15
**parietal**  72:21
**part**  17:1 18:21
25:1 34:8 42:6
45:23,24 47:7
57:7,15 63:22
67:11 68:3
71:15 72:5
76:2,8 78:5
81:3 83:1
86:13 87:13
88:22 98:9
100:10 101:14
102:2 103:3
106:2,9 112:12
120:25 125:13
126:4 130:6
136:18 141:16
142:6 162:5,21
162:22 164:23
170:23 188:2
188:21 189:3
189:20
**partially**  68:14
103:11
**participate**
41:14
**particular**  24:4
44:20 58:7
101:21 109:19
109:22,24

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[particular - planning]**                                        Page 36

166:14 171:9
177:22
**parties** 192:17
193:14
**parts** 83:5 87:8
**party** 192:14
192:18
**pass** 132:5,9,14
**passed** 95:15
**passenger**
102:25 165:5,6
167:12,15
171:9 175:18
**past** 6:17 16:2
16:9 30:18
31:20 51:13
140:1 154:9
157:15
**pathologist**
40:13 41:9
**pattern** 91:1
94:7 113:5
136:19
**patterns** 74:10
186:6
**paul** 1:12 3:5
4:5,19 48:20
192:2
**peachtree** 2:9
**peak** 127:6,10
127:12,20
128:6,12,15,21
129:1,6,8,12,20
130:6,11,22

**pelvic** 88:17
**pelvis** 87:17,24
**pending** 139:10
187:19
**people** 12:24
16:22 54:2
55:10,13,22
56:22 105:1
115:20
**people's** 187:10
**percent** 30:19
31:13,21 76:22
124:15
**percentile**
133:6 166:9
167:6,13,14,23
**performance**
151:13,17
**performed** 7:20
10:4 165:14,17
177:25 178:6
180:8
**performing** 9:4
9:8 37:7 136:4
**peri** 93:7
**perimeter**
80:13,14 92:23
93:7,19,19
99:18 101:25
**period** 31:21
**person** 24:13
24:23 48:6
133:4
**personal** 56:19
73:8 159:1

**perspective**
40:24 41:23,24
114:17
**pertains** 48:24
**perusing**
114:14 118:2
128:10
**petrous** 68:25
97:19 100:3
**pf** 21:3
**phonetic**
136:13
**photo** 93:14
116:20 117:19
117:25
**photograph**
70:18,24
114:25 115:2
115:15,16
116:24 118:22
119:2,12,22
**photographs**
26:10 56:2
57:10,20 64:18
64:20 67:8
75:6 116:8
144:25 150:2
187:1
**photos** 7:18
26:13,15,16
64:12,16,22
65:6 107:6
115:19 120:22
**phrased** 143:10

**physical** 81:14
82:9,11,21,23
83:4 89:5
92:18 149:25
**physically**
84:11 85:6,8
87:10 90:13
95:9
**physics** 84:11
**pickup** 59:20
62:3 146:5,11
146:20
**piece** 101:3
178:12
**pinpoint** 81:13
**pinpointed**
106:25
**place** 55:16
159:3
**placed** 116:14
**places** 80:16
104:21 136:10
**placing** 55:15
**plaintiff** 2:3
32:2
**plaintiff's** 3:18
48:14
**plaintiffs** 1:6
4:10 21:5,7
31:22 33:11
**plan** 39:3 187:5
**planar** 174:15
**plane** 40:9
**planning** 140:8

Paul Lewis , Jr., M.S., BME                              March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[plans - prior]**                                              Page 37

| | | | |
|---|---|---|---|
| **plans** 53:24 | 174:8 184:14 | 109:25 112:1,4 | **preparing** 7:2 |
| 54:6 187:13 | **portions** 86:9 | 112:5,21,22 | 24:20 |
| **plastic** 85:18 | 104:18 105:25 | 122:5 123:5 | **present** 2:12 |
| 88:24 90:9 | 144:20 172:1 | 139:20 177:8 | 4:7 55:21 |
| 91:7,8 100:17 | **position** 55:17 | 177:10 | 56:22 |
| 112:12 | 57:12,22 84:20 | **post** 82:20 | **presented** 94:8 |
| **play** 151:22 | 92:16 93:2 | 100:6,9,10,17 | 157:21 |
| **please** 4:7,14 | 95:5 111:11 | 101:1,6,9 | **preservation** |
| 4:17 | 113:13,17,22 | 102:2 106:18 | 134:3 |
| **plus** 8:4 66:19 | 114:8 115:14 | **posterior** 70:12 | **preserved** |
| 66:20,20 91:14 | 116:9 118:9 | 71:18 | 62:20 |
| 114:4 156:8 | 128:5 129:7,9 | **postponed** | **pretty** 49:9 |
| **point** 7:5 32:12 | 129:14,15,20 | 38:17,18 54:13 | 74:12,12 75:20 |
| 35:6 51:21 | 130:1,12,14 | **posts** 80:10,18 | 97:23 102:2,6 |
| 54:5 72:17 | 139:15 166:19 | 80:21 100:1,23 | 120:23 145:18 |
| 85:11 94:7,9 | 171:9 176:7,9 | 100:25 101:3 | 170:3 183:12 |
| 104:4 106:8 | 176:16,19 | 101:12 | **prevent** 126:18 |
| 107:5,23 | 177:14 182:6,8 | **potential** 37:11 | 133:13,23 |
| 108:19 119:1,5 | 182:12 187:18 | 87:9 90:14 | **prevented** |
| 122:13 126:14 | **positioned** 94:5 | 91:19 93:22 | 124:9,10 |
| 129:22 133:17 | 184:22 | 109:7 134:11 | **previous** 11:4 |
| 155:13 156:17 | **positive** 10:10 | 134:20 135:10 | 127:1 |
| 178:22 | 53:4 64:11 | 136:3 150:13 | **previously** |
| **pointed** 17:6 | 96:16 107:10 | 150:14 185:24 | 178:9 |
| 100:3 | 127:23 | 190:25 | **primary** 61:13 |
| **points** 18:22 | **possess** 39:19 | **potentially** | **printed** 6:14 |
| 22:4 | **possibilities** | 46:10 47:14 | 26:13 |
| **police** 116:8 | 158:3 | 54:19 124:7 | **prior** 6:4,5 11:7 |
| **pollen** 38:11 | **possibility** | 172:14 | 11:18 12:8 |
| **ponce** 1:21 2:5 | 94:19 105:16 | **pounds** 173:12 | 13:23 14:1 |
| **poorly** 135:3 | 106:1 113:3 | **prepare** 47:18 | 16:25 18:10,10 |
| **portion** 80:8,12 | **possible** 22:20 | **prepared** 8:13 | 22:8,14 33:1 |
| 86:6 99:15 | 39:4 85:8 | 8:14,22 53:17 | 51:11,15 52:11 |
| 100:5,6 101:21 | 87:11 93:6 | 190:24 | 69:7 89:22 |
| 106:18 171:20 | 95:5,9 106:6 | | 94:5,10 122:7 |

Paul Lewis , Jr., M.S., BME                                        March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[prior - quantification]**                                                    Page 38

122:13 123:12
138:8 140:5
141:1
**probability**
163:23
**probably**  12:8
16:8 29:21
32:11 48:4
61:6 85:13
87:15,16 88:3
99:4 102:12,14
115:10 127:25
130:13,14
139:19 141:20
145:17 162:10
168:9 178:13
183:16
**problem**  26:8
121:20
**procedure**  1:16
**proceedings**
4:1 193:7,11
**process**  45:15
**produce**  6:3
10:24 139:5
142:12,17
145:11,19
180:17
**produced**  5:1,4
6:14,17,18
7:17,25 11:7
11:17,17 12:8
13:20 15:25
16:19 27:18
56:4 142:16,21

142:23 144:15
144:16 145:6
145:15 152:12
162:17 180:6
184:1
**product**  22:25
39:13
**production**
21:3,24
**profile**  137:5
149:25 151:4
**profiles**  154:15
**program**  46:5
**progress**
128:18
**progresses**  98:2
**progression**
98:4
**prohibited**
192:12
**promise**  56:11
58:22
**prompted**
140:2
**propagates**
68:25
**propagation**
98:8 100:2
106:12
**properly**
138:18
**protect**  151:23
**protected**  82:3
**protecting**
151:22

**protection**
131:7 150:9
182:20
**proves**  82:12
**provide**  16:23
16:24 36:7
46:15 63:25
140:24 192:10
192:14
**provided**  6:7
7:8 8:6 11:5
12:5,11,16
17:9 20:8
23:10 24:8
49:3,11 64:21
66:25 135:21
141:23 143:2,9
143:18,23
144:1,3 148:5
153:1 157:14
157:17
**provider**  66:22
66:25
**provides**
182:20 185:22
**providing**  77:6
**provisions**
192:9
**publications**
27:22,23
**pull**  43:4
**pulling**  114:22
**pulse**  185:19,22
**pulses**  162:24

**pure**  122:25
**purpose**  9:2
50:15 115:1,3
117:6,10
119:25 151:21
155:7,16,20
**purposes**  1:15
**pursuant**  1:14
192:4
**push**  121:7
**pushed**  15:8
90:11,15 93:2
96:18 103:23
111:6,11 112:3
117:8 121:6
**pushing**  91:13
**put**  8:17 22:7
39:13 73:12
75:21 77:18
84:16 89:25
109:6 134:15
**puts**  174:3
**putting**  24:21
150:1

**q**

**q10**  167:16
**qualified**  25:7
28:22 36:2,3
149:14 152:15
152:18
**qualifies**
151:11
**quantification**
75:18

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[quantify - received]**                                                    Page 39

**quantify** 75:10
75:11
**quantifying**
75:3
**quantity** 44:18
47:24
**quarter** 146:20
160:10
**question** 7:11
33:11 36:17
42:9 57:24
84:21 85:24
90:20 108:1
109:24 123:7
124:21 135:6
143:1,10,10,11
143:15,23
144:7,9,14
145:1,9 149:21
150:18 154:5,5
154:6,12,24
155:1,12,22
156:16 177:4
184:8,25
185:17 189:1
190:17
**questioning**
20:7 96:11
**questions** 113:9
138:5,7,12,21
139:7 150:5,17
157:3 187:22
**quick** 20:5 28:1
43:8 58:25
104:9 114:12

159:7 188:13
**quite** 141:5
**quoted** 15:15

**r**

**r** 193:1
**raccoon** 79:6
**rad** 22:10
**rails** 87:16
126:17
**raise** 4:16
**raised** 59:25
**raising** 60:18
**ram** 146:18
**ramirez** 2:12
**ran** 36:17
**rate** 44:19
134:16
**rates** 192:17
**rather** 149:9
**raw** 144:6
**reached** 119:1
**read** 24:7,12
49:5 54:3
65:13 94:20
144:4
**readable** 23:18
**reading** 1:16
67:17 69:7
71:2,21 78:16
95:21 158:15
158:25
**ready** 10:3
95:21
**real** 11:2 20:5
28:1 43:8

104:9 114:12
159:7
**realistically**
17:2 69:13
83:17 103:6
**reality** 145:9
**realize** 9:12
26:13
**realized** 8:15
10:2
**really** 17:7,13
28:12 42:13
44:11 47:3
48:10 68:15
80:11 82:16,18
84:2 92:21
95:12,14 102:4
102:5 124:6
134:14,15
150:18,24
154:16 155:3
161:18,25
170:23 171:5
171:14 174:13
178:22
**rear** 82:4 83:15
84:7,8,9,17
90:16 91:20
92:8 96:13,13
109:8,11 110:2
110:11,16,19
110:20 120:19
124:4 125:7
126:3 128:1,3
131:8,24

132:22 136:1
147:4,15 164:4
165:5,6 167:12
167:15 175:18
182:1,3,7,13,20
183:8,12
185:13
**rearward**
102:18,22
182:21
**reason** 42:8
54:11 114:6
**reasons** 71:15
110:3 138:15
158:4
**rebound** 28:25
124:13,18,23
**rebuttal** 54:19
**recall** 32:20
48:22 49:2,6
78:25 112:8,16
147:23 189:18
190:15
**receipt** 15:19
**receive** 12:15
19:17
**received** 7:16
10:16 11:25
12:21 13:5,7
13:13 15:12
17:25 18:9,10
19:15 20:24
21:2,13,18
22:21 30:12
43:17,19 53:15

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[received - relevant]**                                   Page 40

| | | | |
|---|---|---|---|
| 65:16 121:3 | **record** 4:3,8 | **referencing** | **regulations** |
| 138:8 160:2 | 5:9,17 38:3 | 40:20 61:4 | 192:4 |
| 161:8 187:21 | 53:6 59:4,9 | 165:12 180:25 | **relate** 135:15 |
| **recent** 44:1 | 96:3,8 138:6 | 190:13 | 140:4 148:12 |
| **recently** 9:1 | 139:3 145:20 | **referral** 192:15 | 148:17,22 |
| 32:15 34:5 | 150:4 160:23 | **referred** 180:7 | **related** 13:21 |
| **recess** 38:6 | 161:3 186:11 | **referring** 64:14 | 15:5,13,19 |
| 59:6 96:5 | 186:16 191:13 | 105:22 116:15 | 33:21 37:13 |
| 160:25 186:13 | 193:10 | 166:16 182:9 | 39:19 40:22 |
| **recitation** | **records** 7:23 | **refers** 167:19 | 42:1 50:2 |
| 65:15 73:6,9 | 18:24 23:12 | **reflect** 44:13,19 | 66:20 134:11 |
| **recline** 114:18 | 25:12 28:19 | **reflected** 118:8 | 135:4 136:25 |
| **reclining** | 43:5 66:6,20 | 118:21 120:8 | 138:12 149:16 |
| 114:17 | 144:24 | **reflecting** 44:9 | 154:2,8 159:11 |
| **recommend** | **redo** 79:23 | **reflects** 118:9 | 172:3 173:14 |
| 60:11 | **reduced** 193:7 | **regard** 5:5 | 173:16 184:6 |
| **recommendat...** | **refer** 143:3 | 38:22 39:16 | 190:2,25 191:6 |
| 60:1,2,7,16,19 | **reference** 8:3 | 51:6 52:5,15 | **relates** 17:21 |
| 60:20 61:5,9 | 12:12 14:12 | 57:21 76:21,23 | 19:4 48:18 |
| 61:18 62:4 | 37:18 52:7 | 77:11 83:2 | 76:12 92:7 |
| **recommends** | 53:23 62:6 | 96:20 136:24 | 131:5 163:16 |
| 60:13 | 67:22 69:2 | 152:9 | **relation** 52:8 |
| **reconstruction** | 70:16,25 71:14 | **regarding** | 52:15 130:10 |
| 15:16 34:22 | 79:21 114:25 | 34:25 35:15 | 171:2 |
| 35:1,7,9 36:7 | 131:4 133:3 | 37:10 39:4 | **relationship** |
| 37:16 61:25 | 135:4 154:20 | 41:20 51:17,17 | 192:8 |
| 121:15 149:14 | 158:6 163:10 | 63:20 126:20 | **relative** 84:14 |
| 149:17 150:7 | 166:13 168:11 | 138:23 152:5 | 92:11 115:6 |
| 150:25 153:13 | 176:2 180:17 | 153:3 162:13 | 122:16 135:24 |
| **reconstructio...** | 184:1 190:2,12 | 178:5 | 193:12 |
| 35:17,20 36:3 | **referenced** | **regardless** | **relevant** 66:6 |
| 76:2 137:13 | 13:17 17:22 | 191:1 | 141:7,10,13 |
| 150:11 | 18:6 68:12 | **regular** 9:7 | 154:1 178:17 |
| **reconstructio...** | 162:12 | 89:16 170:14 | 186:2,5 |
| 152:8 | | | |

Paul Lewis , Jr., M.S., BME                                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[reliability - reschedule]                                        Page 41

| | | | |
|---|---|---|---|
| **reliability** 35:9 | **rendering** 25:8 | 79:21,23,25 | 51:7 53:17,19 |
| 35:24 36:4 | **repeat** 135:6 | 86:1 114:21 | 84:16 142:2,19 |
| **relied** 5:5 7:6 | **rephrase** | 121:12 126:5 | 144:5,20 145:4 |
| 35:19,23 57:19 | 143:16 | 128:9,11 135:7 | 145:18 157:13 |
| 66:16 70:18 | **replicate** | 136:9 137:15 | 157:14,15 |
| 76:23 142:21 | 120:16 183:17 | 138:3,8,11,12 | 161:23 |
| 143:19 145:12 | **report** 3:14,20 | 138:13,15 | **represent** 4:8 |
| 145:14 153:4 | 3:21 6:18,21 | 139:17,25 | **representation** |
| 162:8 | 7:2,7 8:2,3 | 140:3,7,15,17 | 120:9 |
| **rely** 24:8,9 | 12:13 13:17 | 141:10,19,25 | **representations** |
| 27:21 37:21 | 14:5 15:12,16 | 144:7 145:12 | 120:3 |
| 49:22 58:3 | 17:18,22,25 | 145:22 148:14 | **representative** |
| 75:9 152:7,14 | 18:2,4,6,8,11 | 152:24 154:24 | 52:8 158:7,12 |
| 153:12 162:8 | 19:5,8 20:25 | 155:3,4 156:9 | 158:19,22 |
| 172:10 188:23 | 21:18,23 22:2 | 157:18,22 | 192:7 |
| **relying** 18:19 | 22:8,9,15 35:3 | 159:11 161:6,8 | **representing** |
| 22:22 35:4,8 | 35:4 44:22 | 161:24 163:11 | 33:15 |
| 62:10 67:8 | 45:3,5,6,14,21 | 179:14 180:18 | **represents** 7:1 |
| 70:25 73:16,23 | 45:25 47:18 | 184:2 186:25 | **request** 140:3 |
| 73:25 137:15 | 49:10,12,13,15 | 187:20 188:4 | **requested** |
| 141:13 172:12 | 49:21 50:1,11 | 188:18 189:10 | 183:18 184:5 |
| 174:10 178:19 | 50:25 51:25 | 190:3 | 184:10 |
| 184:12 188:20 | 52:1,6,7,11,13 | **report's** 66:8 | **required** 50:23 |
| **remember** 8:25 | 52:18,20 53:7 | 140:19 | 50:24 131:20 |
| 11:1 38:16,17 | 53:8,9,15,15 | **reporter** 1:18 | 140:19 141:10 |
| 55:10,23 84:17 | 54:22 58:23 | 4:14,16 5:24 | 156:8,14,19 |
| 97:13 104:9 | 59:11,17,18 | 29:5 43:13 | 191:4 |
| 111:15 115:24 | 60:9 61:14,18 | 137:25 180:5 | **requirement** |
| 122:14 128:8 | 64:7 66:11,14 | 192:6,15 | 133:1 |
| 133:24 183:23 | 66:19,19,21 | **reporting** | **requirements** |
| **remove** 40:10 | 67:7,13,14 | 192:4,7,9,10,11 | 117:4 156:12 |
| **removed** 107:5 | 68:1 69:12 | 192:13,14,15 | 157:8 |
| **render** 28:23 | 70:8,10,23 | 192:17 | **reschedule** |
| **rendered** 149:5 | 71:2 73:5,9,11 | **reports** 17:23 | 38:13 |
| | 73:19,21 78:25 | 24:20 26:9 | |

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[rescheduled - right]**                                                     Page 42

| | | | |
|---|---|---|---|
| **rescheduled** | 74:25 142:3 | 44:10 45:10 | 103:3,4,6,16,18 |
| 38:19 | 187:10 | 46:17 47:1,13 | 104:6,6 105:14 |
| **research**  12:25 | **reviewed**  6:5 | 48:12 49:9,25 | 105:20,23 |
| 31:18 | 6:23 7:2,12 | 52:13,18,23 | 106:3,7,9,17 |
| **resist**  126:18 | 15:4 17:17 | 53:11,14 54:21 | 109:4 111:7 |
| **response**  10:10 | 21:11 25:19 | 56:12 57:10 | 114:8 115:18 |
| 53:4 64:11 | 49:2 54:22 | 58:2,20 59:14 | 116:18 117:23 |
| 96:16 107:10 | 64:23 66:7 | 61:23 62:10 | 118:11,13,16 |
| 127:23 178:3 | 67:13 142:13 | 63:10,17 64:6 | 118:21,24 |
| **responsive**  6:8 | 142:22 143:19 | 64:20 65:9,23 | 119:11,15,18 |
| **rest**  11:13 | 144:5 145:5 | 66:1,10,13 | 119:21 121:9 |
| 16:19 17:7 | **reviewing** | 67:6,6,13,22,25 | 121:11,14,25 |
| 58:22 87:1,6 | 24:20 45:23 | 68:14,15,21 | 122:4,14 123:1 |
| 93:7 102:1 | 75:6 | 69:12,16,20,22 | 124:14 127:19 |
| **restitutes** | **reviews**  144:21 | 69:23 70:9,15 | 128:12 129:3 |
| 118:18 | 144:24 | 70:19,23 71:6 | 129:18 130:9 |
| **restitution** | **richard**  2:8 | 71:10,16,18,18 | 131:1,4 132:2 |
| 146:24 | **rick**  4:11 | 71:23 72:6,23 | 132:22,25 |
| **restraints**  85:6 | **ridge**  68:25 | 72:25 73:2,11 | 133:11 134:2 |
| 85:9 | 97:19 100:3 | 74:1,2,4,9 | 134:20 137:11 |
| **resultant**  174:9 | **right**  4:17 9:2 | 75:16 76:11,21 | 137:18,19,22 |
| 174:17,22 | 9:18 10:2,4,8 | 77:15,25 78:6 | 141:5,7 142:18 |
| 175:5 | 10:14,16 11:9 | 78:6,13,18 | 146:18 147:21 |
| **resulting**  175:9 | 12:2,11 14:1,4 | 79:13,16,21,25 | 152:13 153:10 |
| **results**  154:15 | 14:24 15:18,23 | 80:2 82:19,21 | 153:19 157:15 |
| **retained**  32:2 | 16:24 19:2 | 83:2 86:6,16 | 157:25 158:5 |
| 58:9 | 21:10,17 22:7 | 86:24 87:12,23 | 159:5,7 160:5 |
| **review**  10:18 | 26:25 27:11 | 88:13 89:1 | 160:11,14 |
| 15:13,24 19:3 | 28:14 29:3,12 | 90:10,14,22 | 161:16,22 |
| 20:8,11,12,13 | 29:17 30:3 | 92:7,13,14 | 162:7,16,19,21 |
| 21:1 23:8,10 | 31:17 32:1,13 | 93:21 94:8,14 | 163:1,4,25 |
| 23:21 25:17 | 35:8 36:2 37:1 | 94:15,20 95:6 | 164:5,15,19 |
| 46:1 47:6,8,11 | 37:22 38:10,22 | 95:15,23 96:11 | 165:3,5,10,21 |
| 47:15,17,19 | 42:25 43:4,9 | 96:21 97:18 | 166:1,12,20,22 |
| 48:5 54:24 | 43:16 44:1,5 | 98:22 101:15 | 167:8,12,15,24 |

Paul Lewis , Jr., M.S., BME                                                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[right - score]**                                                        Page 43

| | | | |
|---|---|---|---|
| 168:1,8 171:11 | **room** 58:23 | **running** 46:13 | 155:18 157:6 |
| 171:16 172:9 | **rotate** 95:3,8 | 92:11 | 175:5 |
| 172:21 174:5,7 | **rotating** 91:15 | **runs** 10:17 | **says** 6:23 47:8 |
| 174:24 175:3,7 | **rough** 1:8 4:11 | 65:24 66:4 | 47:17 48:20 |
| 175:21 176:10 | 33:21 52:7 | **rws** 1:7 | 61:23 127:20 |
| 176:11 177:9 | 58:14 59:24 | | 164:25 165:10 |
| 177:16 178:11 | 60:15,20 61:6 | **s** | 166:2 169:3 |
| 179:3,23,25,25 | 61:9 143:1,6 | **s** 3:1 104:21 | 175:6,9 182:7 |
| 180:3,23 181:3 | 145:25 148:25 | **safe** 77:16 | **scaling** 133:18 |
| 181:3,6,9,23 | 152:2 154:15 | 79:20 133:22 | **scan** 116:14,18 |
| 182:13,16,23 | 158:6,8,11,18 | **safety** 149:6 | **scanned** 57:14 |
| 183:3,18,19 | 158:22,23,24 | 150:8 152:21 | **scanners** 57:25 |
| 184:4,11,21 | 159:13 160:8 | **santana** 1:4 | **scanning** 55:14 |
| 186:7,17 187:2 | 191:3 | **santana's** 14:9 | 55:15 57:20 |
| 187:9,15,16 | **roughly** 119:9 | **saw** 97:15 | **scans** 19:9 57:6 |
| 189:6,24 190:5 | 164:16 | 111:13 | 88:1 116:13 |
| 190:6,22 | **row** 89:13 | **saying** 23:3 | **scenario** 36:12 |
| **rigid** 80:11,16 | **rule** 3:16 7:21 | 33:11 38:8 | 127:11 |
| 81:20 99:21 | 26:19 29:13 | 40:21 60:20 | **scene** 40:10 |
| 100:5 101:24 | 83:24 90:14,22 | 69:1,25 70:2 | 116:24 |
| 102:7 | 138:14 155:10 | 70:15 79:17 | **scenes** 40:7 |
| **ring** 97:21 | 155:16,19,20 | 81:12 85:21 | **scheduled** |
| 98:14,16 | 156:9,14,17,25 | 88:10 95:4,9 | 54:12 |
| **road** 2:9 95:13 | 157:8 | 98:4 100:10 | **scheduling** |
| **roadway** 105:1 | **ruler** 119:4,6 | 101:20 106:1,3 | 50:12 |
| **robust** 150:24 | **rules** 1:15 | 106:6 107:14 | **school** 40:18,20 |
| **roche** 62:8,9 | 192:4 | 109:8 118:22 | **scientific** |
| 125:23 126:4 | **ruling** 88:19 | 119:22 124:9 | 134:18 135:8 |
| 126:22 | 91:18 92:8 | 125:24 126:5 | 135:14 |
| **role** 24:14 25:2 | 93:21 139:11 | 126:11 127:11 | **scold** 137:12 |
| 67:16 151:22 | 187:19 | 130:24 132:12 | **scope** 107:16 |
| **rollovers** | **run** 33:10,12 | 133:9 139:22 | 155:12,22 |
| 104:25 | 36:19 164:12 | 141:12 143:4 | 185:17 |
| **roman** 6:22 | 177:16 184:5,9 | 145:13,13 | **score** 163:21 |
| | 184:19 185:20 | 146:11 151:2,4 | 169:23 |
| | | 152:13 153:10 | |

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[scratch - serial]**                                          Page 44

| | | | |
|---|---|---|---|
| **scratch** 82:5 | 104:1,2,16 | **seating** 129:6 | **seeing** 40:23 |
| 163:14 190:20 | 105:5,7,10,13 | **seats** 130:16 | 171:6 174:14 |
| **se** 64:22 75:22 | 105:23 106:2,4 | **second** 10:16 | 174:19 |
| 122:1 134:17 | 106:8,19,21 | 11:23 53:2 | **seem** 96:24 |
| 161:19 173:8 | 107:4,7,9,19,24 | 56:3,22 59:18 | 104:14 |
| 178:19 186:5 | 108:11 109:9 | 59:21 74:6 | **seemed** 79:1 |
| 188:20 | 109:15,16,17 | 76:11,21 89:13 | 97:24 |
| **seaborn** 1:18 | 110:6,7,10,15 | 139:5 176:2 | **seems** 68:6 |
| 192:24 193:21 | 110:24 111:9 | 180:7 183:23 | 133:18 148:19 |
| **season** 38:11 | 111:13,13,16 | **secretarial** 48:8 | **seen** 35:7 36:21 |
| **seat** 55:16,16 | 111:19 112:2,4 | **secretary** 25:20 | 48:21 49:6 |
| 55:17,17,18 | 112:6,11,11,12 | 25:25 | 54:2 81:4 89:7 |
| 57:5,12,21 | 112:24 113:12 | **section** 6:22 | 104:25 108:22 |
| 76:4 80:6,8,10 | 113:20,23 | 41:9 48:23 | 108:23 109:19 |
| 80:14,22 81:7 | 114:9,9 115:6 | 61:21 64:12 | 112:7,13 |
| 81:17,24 82:2 | 115:7,11,12,14 | 65:10,10,14,14 | 124:23 129:24 |
| 82:9,12,13,22 | 115:15,16,22 | 65:24 66:18 | 141:15 153:21 |
| 82:23 83:1,4,6 | 116:2,9,14 | 69:17 73:5,7 | 189:13,14 |
| 83:8,13,19 | 117:2,9,13,16 | 121:14 | **self** 114:5 |
| 85:7,9,17 86:2 | 117:18,21,24 | **sedan** 162:15 | **semantics** |
| 86:3 88:13,23 | 118:4,5,17,25 | 164:3 | 110:18 |
| 88:25 89:3,3 | 119:3,10,13,20 | **see** 20:5 38:13 | **send** 47:1 |
| 89:10,21 90:18 | 119:25 120:20 | 40:25 41:8 | **sending** 162:7 |
| 90:24,25 91:3 | 120:25 121:2,5 | 48:19 54:15 | **sense** 30:4 |
| 91:4,13,13,16 | 122:17 123:13 | 59:21 70:13 | 36:16 68:7 |
| 91:17 92:19,23 | 123:17,22 | 72:11 75:21 | 71:8 135:18 |
| 93:2,3,12,15,16 | 124:3,5 130:12 | 80:19 90:13,21 | **sent** 6:14 18:17 |
| 93:19 94:2,25 | 151:16,17 | 92:18 93:14 | 19:19 26:22 |
| 99:19,24 100:7 | 182:8,10,11,12 | 96:19 99:4 | 44:14 |
| 100:9,13 | 182:17,17,20 | 102:3 108:5 | **september** 10:6 |
| 101:15,21 | 182:22,24,24 | 110:10 115:16 | 10:7,9 55:7 |
| 102:6,8,15,15 | **seat's** 103:22 | 117:24 118:14 | **sequence** 130:7 |
| 102:18,23 | **seated** 86:21 | 118:19 145:6 | 170:6 |
| 103:9,11,12,14 | 130:1 176:7,16 | 167:18 175:15 | **serial** 166:2,12 |
| 103:20,21 | | 180:20 183:4 | 166:14,21 |

Paul Lewis , Jr., M.S., BME                     March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[services - six]**                                                Page 45

| | | | |
|---|---|---|---|
| **services** 47:24 192:10,14 | **showed** 190:9 | 124:24 126:18 160:1 172:4 191:1 | **sir** 7:5 31:25 34:11 35:2,22 |
| **set** 3:22 48:10 163:10 164:1 178:6 | **showing** 83:5 102:11 117:20 117:20 119:8 120:2,7,17 131:11 165:8 | **significantly** 62:2 85:15 102:5 135:23 149:1 152:1,20 169:25 175:16 | 47:22 51:20 56:19 58:16 59:16 61:22 66:12 67:12 71:20 77:9,14 79:8 81:11 |
| **sets** 161:9,12 | **shows** 69:19 133:19 154:14 161:19 163:13 183:7 189:11 | **signing** 1:16 | 91:5 94:12,12 107:12 113:21 124:22 125:2 |
| **seven** 47:24 137:25 | | **similar** 50:9 73:7 141:16 154:14 189:12 189:23 | |
| **several** 32:11 42:5 122:20 | **sic** 118:8,9 131:10 153:5 | | 136:7,15 146:2 147:2,5,11,14 147:23 152:4 |
| **severity** 76:10 | **side** 68:7,14,16 68:21,23 69:12 71:7,7,10,13,19 71:19 72:25 77:24 78:10 80:1 83:3 92:5 92:5 94:8 99:4 99:5 102:10 105:10 131:8 131:24 132:9 132:21 147:6,7 147:7,10 150:23,23 182:2 | **similarities** 159:10,17,19 159:24 160:6 160:15 | 157:12 158:4 159:6 164:14 165:2 168:13 173:23 174:1 |
| **shakes** 130:21 | | **similarity** 146:21 | 176:12 179:5 180:15 181:5 182:15 186:4 190:17 |
| **shaped** 99:25 | | **similarly** 38:22 166:22 | |
| **she'll** 25:17 | | **simply** 73:8 | **sit** 187:6 190:16 |
| **sheet** 11:3,12 116:3 165:22 | | **simulated** 176:6,18 | **site** 56:13 |
| **shell** 85:18 88:24 89:10 | | **simulates** 128:7 | **sitting** 88:13 187:13 |
| **shocked** 58:17 | | **simulation** 35:10 36:10,17 36:19 37:7 63:18 77:7 121:16 127:5,8 127:17,20 128:3 129:6,8 130:2 134:7,13 136:4 152:8 176:22 183:19 | **situation** 37:11 37:12 112:10 149:2 152:1 172:16 |
| **shop** 89:17 | **sided** 83:20,21 | | |
| **shoulder** 85:14 87:7 | **sides** 119:14 144:23 | | |
| **shoulders** 86:19 | **sienna** 146:7 | | |
| **shove** 110:21 | **signature** 192:23 193:21 | | |
| **shoved** 83:19 91:10 102:8 103:9 110:18 123:20 | **significant** 77:4 84:15 86:5,9 102:9,23,25 | | **six** 59:25 60:19 116:22 133:25 181:8,11 183:8 |
| **shoving** 117:15 123:16 | | | |
| **show** 72:4 115:5,8 117:7 120:22 141:15 158:17 | | | |

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[size - stack]**                                                    Page 46

size  147:21,24
  171:21,23
skimmed  15:7
skip  69:17
skipped  64:4
skipping  65:9
skull  71:4 72:9
  72:13,24 74:17
  79:3,10 80:19
  80:24 81:4
  82:25,25 83:11
  87:5 88:20
  89:4 92:1,13
  93:22 96:21
  97:8,10,15
  99:2,25 100:4
  104:7,8,13,25
  108:14,17,20
  108:20,22
  110:25 111:14
  120:13 121:4
slash  8:9 69:12
sled  177:6,9
  181:12,18
  182:1 183:14
  183:15,16
  184:16,19
  185:2,6,18
sleeping  122:15
sleeve  100:6,12
  100:15,17,22
  101:13,14
sleeve's  101:15
sleeves  80:22

slid  115:20
slides  100:18
slightly  71:18
slow  29:1
small  46:6
  120:24 124:15
smooth  108:18
snyder  1:21 2:4
soft  79:2 93:8
  102:6
softer  83:1
software  36:18
  37:3,6 46:5
sole  71:22
solicited  19:20
somebody  39:2
  81:4 104:21
somewhat
  116:2
sorry  10:7 20:6
  23:25 24:2,17
  27:9 28:25
  29:16 31:10
  32:10 33:9
  34:14 43:18
  44:25 55:17
  60:5 66:2,3
  72:18 73:4
  78:24 98:7
  102:16 109:19
  111:22,23
  119:7 121:19
  124:2 149:12
  152:17 159:20
  165:19 166:25

169:14 179:20
sort  48:7,17
  73:12 74:3
  79:9 101:7
  117:13
sounded  97:22
  98:13
source  61:16
  80:5 93:22
  158:10,14
  161:12 173:22
  177:17
sources  12:25
space  57:8,9
  62:20 75:8
  77:5 84:5
  103:10 110:22
  134:4,25
  135:24 136:22
  149:4,10 160:2
spacial  117:4
speak  22:5
  28:13 38:14
  40:22 48:11
  68:8 84:2
  126:8 150:4
  174:14
speaking  38:15
  143:25
specific  6:24,24
  50:7 106:15
  108:10 116:19
  133:21 152:23
  157:7 158:21
  159:3 176:9,13

176:16 177:22
  177:23,23
  189:6
specifically
  8:25 49:18
  51:5,17 67:4
  81:19 94:6
  128:8 136:16
  155:2 162:4
  168:10
specifics  57:3
specified  67:18
spectrum
  134:24
speed  128:17
  164:16 173:14
  181:13,17
speeds  147:17
  147:19
sphenoid  68:6
  71:4,11,15
spinal  41:12
spitz  104:21
spontaneously
  140:6
spot  80:3
  108:10
spots  19:1
spread  46:2
square  175:13
squeezing
  91:15
stack  178:15
  185:19,21

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[staff - suffered]                                                    Page 47

**staff** 10:12 23:22 24:8,13
**stand** 166:4
**standard** 131:7 132:10,11 133:14 155:24 156:19 168:6 170:14 173:4 184:23 185:2
**standpoint** 37:17 77:6 151:13,14 157:11
**stands** 167:17
**start** 5:1,2,8 6:16 63:12 92:12 129:2
**started** 30:25 31:3,8 45:14 58:21 65:20 186:22
**starting** 38:11 42:19
**starts** 10:17,21 10:21 46:13 66:4 84:3
**state** 3:23 53:6 61:3 135:7 138:6 140:21 140:23 144:15 159:16 180:8 184:5 190:16 192:2 193:3
**stated** 37:20 128:8 135:11

136:8,9 158:12 158:23 159:10 190:1 193:6
**statement** 59:23 61:21 125:10 126:20 136:14 140:5 153:11 154:10 158:18 159:4
**states** 1:1 154:24
**static** 75:24 115:4 117:7 118:15 120:3
**statically** 75:21 115:9 116:5 118:10 119:23 120:7
**stating** 134:4
**statute** 60:25
**stay** 38:2 126:16
**staying** 124:5
**steel** 185:6
**stick** 86:25
**stiff** 80:11,15 99:21
**stiffness** 146:24
**stock** 136:11
**stopped** 92:24
**storage** 89:12 96:15 111:8
**straight** 63:5 83:25 112:19 136:21 183:8

183:12
**straightforward** 74:12 150:20
**strap** 85:12
**straps** 85:14,14
**stream** 39:14
**stressing** 91:10 110:12
**strike** 138:15
**striking** 98:25 159:12,14 171:3 189:23
**stroller** 89:18 90:7
**struck** 66:23 67:1 72:5 109:21 110:24 111:13 112:10 117:9 119:2 146:6 149:4 152:21 168:16 190:10
**structural** 62:18 159:15 160:4
**structure** 80:15 88:23 91:8 102:7 107:20 150:24
**structures** 62:2 81:12 89:19 91:7 109:13 125:8,15 126:3 126:7 146:9 150:22

**studies** 8:3
**study** 3:13 7:10 7:20 8:10,16 9:4,8,22 10:4 12:20 20:18 23:15 26:12,17 54:25 113:8,13 114:25 117:6 117:10 134:17 187:1
**stuff** 24:19 25:15 29:22 38:15 111:8 187:11
**subject** 52:4 75:12 103:15 103:18 118:4,4 122:5,6 123:23 135:19 136:13 137:21 160:21 179:15
**subjects** 63:8
**subparts** 6:25 74:5,7
**subsequent** 13:13 55:13 157:17
**substantive** 11:15,22 14:17 14:21
**substantively** 11:20
**suffer** 112:2
**suffered** 75:14 110:10 111:1

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[suffered - taken]**                                              Page 48

136:12
**suicides** 40:8
**suite** 1:21 2:5
2:10
**sum** 175:13
**summaries**
144:22
**summarization**
23:11
**summarize**
25:3
**summarized**
73:12 142:10
150:6
**summary** 24:8
24:9,10 66:5
73:20 142:16
144:21,24
145:2 162:19
164:20,23
165:1,3 166:3
168:21 181:23
**summary's**
165:8
**supplement**
3:18 40:17
48:14 50:21,24
**supplemental**
3:14,21 8:2,3
12:13 13:17
18:8,11 19:5
21:23 22:2
52:6 53:7,15
138:3,13,15
139:25 148:13

157:14,15
159:11
**supplied** 7:13
27:15
**support** 22:4
24:19 51:8
62:11 101:9
138:21 161:9
161:17,19
**supporting**
74:7 100:22
**supposed** 10:25
61:2 151:6
**supposedly**
64:1
**sure** 5:4 7:11
10:25 11:24
12:24 13:3
15:22 16:3,6
17:4 18:3,9
19:2,10,22
21:3 23:1,8
26:3,25 27:4
27:18 31:20
34:4 35:4 36:9
40:7 48:9
50:15,19 52:12
56:7,17 58:17
58:24 60:6
64:24 65:21
66:8 72:2
76:20 78:12
79:19 84:10
90:13 94:17,18
95:10 104:10

109:6 113:15
115:23,23
117:25 125:5
128:24 132:18
134:4 135:7,25
137:14 139:24
140:6 141:20
145:18 148:10
148:18 156:3
159:8 177:5,10
177:15 178:14
188:10
**surface** 99:12
99:24 105:1
108:18 109:1,3
**surfaces** 87:1
104:15 108:23
**surprised**
25:13
**surrogate** 3:13
7:10,19 8:9 9:4
12:20 20:18
26:12,16 28:10
54:25 93:11
113:8,13
114:25 117:6
186:25
**survivability**
63:11
**survival** 57:9
62:20 75:8
77:4 84:5
110:22 134:3
135:24 136:22
149:3,10 160:1

**surviving** 1:5
**suspended**
139:10 187:18
190:22 191:11
**sustain** 133:19
**sustained** 62:1
75:8 91:1
**swamped** 53:2
**swapped** 94:24
**swear** 4:14
**swelling** 69:20
**swipe** 147:6,7
**switch** 113:8
**switched**
103:17
**switching**
103:15
**swivel** 94:15
**sworn** 4:17,21
**symptom** 79:9
**system** 131:25

**t**

**t** 3:1,1 104:21
147:8,10 193:1
193:1
**tail** 153:15
**take** 37:25 38:9
49:5 56:2
57:10 58:25
63:25 84:2,13
95:24 110:6
115:15 160:19
169:8 186:8
**taken** 1:13,14
1:14,17 13:9

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[taken - testing]**                                                    Page 49

| | | | |
|---|---|---|---|
| 22:11 59:6 | 145:3 147:9 | 98:16,20 | 33:5 34:1,5 |
| 64:13 67:9 | 149:24 175:2 | **temporalis** | 126:23 149:13 |
| 96:5 160:25 | 179:15,18 | 98:11 | 150:10 155:25 |
| 186:13 193:6 | **talks** 62:16 | **tend** 104:18 | 157:6 158:8 |
| **takes** 84:5 | 127:10 162:5 | **term** 60:6,8 | 176:3 188:5 |
| 169:20 170:5 | **tall** 126:8 | 61:8,16 78:3,4 | **testify** 78:12 |
| **talk** 11:5 41:22 | 182:19 | 97:9,11 102:24 | 95:12 148:21 |
| 44:24 51:24 | **task** 46:24,25 | **terminate** | 189:4 190:7 |
| 52:4 55:1 | **tear** 120:24 | 139:9 | **testifying** 38:24 |
| 62:25 75:17 | **technical** 24:23 | **terms** 61:15 | 156:21 |
| 91:9 145:21,23 | **technically** | 72:4 | **testimonial** |
| 146:10 148:16 | 16:6 67:2 | **test** 3:23 18:11 | 7:21 |
| 150:7,12 | 132:24 134:14 | 51:7 131:14,15 | **testimonies** |
| 151:11,16 | 154:13 183:11 | 131:16,20,22 | 29:21 |
| 174:8 | **technician** | 132:4,5,5,15 | **testimony** 33:2 |
| **talked** 22:19 | 40:12 41:3 | 136:16,25 | 33:7 34:7 35:5 |
| 26:12 54:21,23 | **technologies** | 137:6,16 | 35:15 39:3 |
| 54:24 56:17 | 183:19 | 162:15 163:10 | 51:17 52:7,15 |
| 58:5,8,11,14 | **tedra** 2:4 4:9 | 163:13,16 | 68:1 84:22 |
| 160:5 161:11 | **tell** 19:25 23:6 | 164:1,2,10,12 | 86:1 88:12 |
| 176:1 188:11 | 40:5 45:11 | 164:20 165:10 | 90:5 94:21 |
| 189:16 | 46:19 49:6 | 165:11,17,22 | 95:22 109:24 |
| **talking** 36:12 | 88:1 115:1 | 165:23,24 | 114:3 123:9 |
| 49:12 51:22 | 116:2 140:12 | 166:7,17 | 140:5,11 |
| 56:12 57:7 | 141:9 150:3 | 167:24 168:16 | 149:21 151:9 |
| 61:9 62:6 66:2 | 163:13,25 | 177:1,7,9,18 | 155:6,8,12,22 |
| 68:9 69:16 | 167:23 180:16 | 178:5,16 180:7 | 157:9,25 158:6 |
| 75:11 85:25 | 181:9,10,20 | 180:14,17 | 158:22 159:2 |
| 93:17 96:14 | **telling** 106:25 | 181:10,12,23 | 185:17 186:2 |
| 97:22 103:16 | **tempered** | 183:4 184:5,11 | **testing** 3:22 |
| 107:16 119:6 | 163:14 | 184:17,19 | 22:20 63:3 |
| 122:25 123:24 | **temporal** 67:21 | 185:18 186:1 | 77:11 152:9 |
| 125:25 126:15 | 67:22 68:24 | **testified** 4:21 | 161:8,9,17 |
| 127:6 134:3 | 72:7,18,20,22 | 30:13,18 31:20 | 162:13 163:9 |
| 144:1,18 145:2 | 79:9,10 98:12 | 32:9,14,21 | 172:9 177:19 |

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[testing - titled]**                                        Page 50

| | | | |
|---|---|---|---|
| 180:10 | 63:22 65:8,20 | **thinking** | 32:18,20 33:1 |
| **tests**  12:12,15 | 66:1,8 69:5 | 116:21 | 38:15 42:19 |
| 19:14 161:12 | 72:1 75:2 77:5 | **third**  59:19,21 | 43:22 44:8 |
| 164:6 165:14 | 78:7 81:2 | 64:10 | 45:24 46:8 |
| 171:10 177:16 | 87:10 88:8 | **thorbole** | 47:14,19 49:25 |
| **thank**  4:13,24 | 89:14,15,19 | 183:18 | 50:18,19 51:21 |
| 96:9 161:5 | 90:8 91:22 | **thoroughly** | 51:25 52:6 |
| 164:24 | 92:12 93:5 | 138:23 | 54:5 55:8 59:3 |
| **thanks**  10:14 | 97:3 98:24 | **thought**  26:6 | 59:8 70:9 |
| 113:7 186:17 | 99:9 102:4,23 | 32:13 51:8 | 86:14 95:11,15 |
| **thigh**  85:12 | 103:2,6,12 | 60:14 66:2 | 96:2,7 113:23 |
| **thing**  102:1 | 104:19,20 | 71:16,17 82:14 | 114:1,2 118:10 |
| 124:12 134:2 | 107:11,15 | 119:7 135:18 | 122:23 128:22 |
| 153:8 155:5 | 108:16 109:12 | 160:13 | 139:5 141:1 |
| 170:5 | 110:9,17 | **thousand**  32:12 | 157:17,21 |
| **things**  6:13 | 111:16 112:20 | 169:24,25 | 160:22 161:2 |
| 13:12 17:3 | 112:25 114:4 | 173:4 | 169:8,18 174:3 |
| 24:5,6,22 | 114:11,13 | **thousands** | 186:10,15 |
| 26:20 28:12 | 115:21,25 | 189:3 | 187:23 191:12 |
| 34:20 37:19 | 116:11,12,22 | **three**  16:16 | **timeliness** |
| 41:23 55:1,1 | 117:11 118:3 | 17:6 29:4,8,9 | 138:10 187:19 |
| 57:25 74:10,12 | 125:23,24 | 33:4 40:3 | **times**  29:4,8,9 |
| 75:17 76:1 | 126:4 129:10 | 146:20 160:5 | 32:14,16 36:21 |
| **think**  6:10,12 | 134:10,23 | 160:10,12 | 38:8 46:23 |
| 8:20,24 11:13 | 136:8 139:19 | 175:13,14 | 50:21 54:13 |
| 17:2 18:17,17 | 139:20 140:2 | **till**  9:12 88:3 | 55:5 60:8 |
| 19:6 20:2 21:6 | 142:4 145:1 | **tilting**  102:12 | 105:2 133:19 |
| 25:22 26:14,19 | 146:5 150:4 | **time**  4:4 6:3,19 | 149:13 155:25 |
| 30:16 32:15 | 153:21 154:16 | 7:7 10:17,21 | 156:22 |
| 33:4,25 38:1 | 155:13 157:6 | 11:22 14:1,4 | **tires**  33:12,13 |
| 38:18 42:12 | 157:13 159:25 | 14:15,16 15:5 | **tissue**  79:2 |
| 46:13 48:25 | 161:11 176:3,8 | 15:11,19,25 | **title**  48:20 |
| 49:4,9 54:18 | 176:8,10 | 18:4 19:18 | 162:12 |
| 55:7 58:7 60:3 | 179:11 186:21 | 22:15 28:15 | **titled**  64:17 |
| 60:10 61:1,3 | 189:8,11 190:8 | 31:12,21 32:6 | |

Paul Lewis , Jr., M.S., BME
March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[titles - two]**

Page 51

| | | | |
|---|---|---|---|
| **titles** 48:10 | **touches** 89:6 | 38:19 186:23 | 133:24 137:7 |
| **today** 5:3,4 6:5 | **toward** 72:8,12 | **tried** 22:19 | 156:23 185:1 |
| 6:8,19 8:6 | 73:2 99:2 | **tries** 28:11 | 185:12 |
| 10:17 11:18 | 100:13 103:9 | **trip** 95:14 | **turbo** 182:5 |
| 15:10,25 23:2 | **toyota** 180:10 | **truck** 59:20,24 | **turn** 121:11 |
| 23:7 26:23 | 185:14 | 62:4,16 63:2 | **turned** 50:14 |
| 29:1,12,18,23 | **track** 46:8,10 | 125:7 146:20 | 187:2 |
| 30:20 31:15,24 | **tracks** 113:21 | 190:11 | **twice** 33:13 |
| 34:10,13 35:5 | 114:7 | **trucks** 146:6 | **two** 6:10 8:2 |
| 43:5,21 48:21 | **tracy** 164:20 | 160:10 | 11:25 12:12 |
| 49:6 53:10 | 165:11,11 | **true** 24:24 | 13:12 16:16,17 |
| 106:23 138:17 | **training** 27:20 | 30:22,24 31:3 | 17:6,22 18:9 |
| 149:13 160:16 | 42:1 141:17 | 34:9,13 35:16 | 19:14 21:17 |
| 187:6 188:5 | **trajectories** | 37:17 50:5 | 26:21 28:7 |
| 190:16 | 103:7,13,25 | 51:20 53:10 | 33:23 39:23 |
| **told** 23:12 | **trans** 122:22 | 61:8 83:2 | 40:6 42:2 47:3 |
| 106:23 110:4 | **transcribe** 15:5 | 108:2 137:17 | 51:9,12,16,17 |
| 187:7 | **transcribed** | 144:19 153:6 | 51:24 55:22 |
| **ton** 146:20 | 9:24,25 10:11 | 154:22 155:1,1 | 74:16 76:18 |
| 160:10 | **transcript** | 175:18 193:9 | 85:14 104:22 |
| **took** 26:11 | 15:20 19:11 | **truly** 40:24 | 104:22 108:19 |
| 64:18 | 21:14 22:14 | **try** 16:5 57:5 | 108:19 125:4 |
| **top** 64:10 80:9 | 24:7 193:5,9 | 67:16 125:19 | 130:15 133:13 |
| 88:13 93:15,16 | **transfer** 122:23 | **trying** 13:3 | 138:20 139:23 |
| 98:21 100:20 | **transmit** | 26:14 55:16 | 140:1 141:24 |
| 101:15,24 | 122:20 | 57:5 68:19 | 142:14 144:12 |
| 126:8 164:20 | **transport** | 71:1 73:2 76:6 | 146:22 147:18 |
| 166:1 185:7 | 40:11 | 78:3 84:2,13 | 151:25 153:9 |
| **topic** 138:7 | **trauma** 67:3 | 97:16 99:23 | 160:11,12,15 |
| **torn** 111:16 | 69:9 78:14 | 103:9 110:21 | 160:21 161:9 |
| **total** 134:23 | 79:6 93:3 | 115:3,5,8 | 161:12 169:2 |
| 175:24 | 112:2,13 122:3 | 116:4,24 | 170:20 171:3 |
| **totality** 67:12 | 122:5,8,11 | 119:21 120:2 | 174:2 175:16 |
| 69:11 | **trial** 32:14 33:2 | 120:11,16 | 177:12,23 |
| | 33:5,7 34:17 | 123:10 132:2 | 189:16 190:4,7 |

Veritext Legal Solutions
800.808.4958
770.343.9696

Paul Lewis , Jr., M.S., BME                                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[type - utilized]**                                                Page 52

| | | | |
|---|---|---|---|
| **type** 34:9 41:11 | 40:13 41:8,9 | 76:7 78:5 98:3 | **upper** 80:13 |
| 41:25 81:13,21 | 45:2 51:21 | 100:16 113:16 | 92:24 93:7 |
| 82:15 91:6 | 58:4 75:9 | 120:11 129:18 | 98:9 99:18 |
| 104:12,18 | 91:16 123:18 | 148:19 155:19 | **use** 5:24 36:20 |
| 105:2 107:2 | 125:19 149:11 | 157:12 159:8 | 36:22 57:18 |
| 108:17 122:24 | 163:2,21 | 163:17 169:10 | 58:22 61:8 |
| 133:4 134:15 | 169:20 | 169:11 171:1 | 78:4 97:11 |
| 134:16 167:20 | **uncover** 81:16 | 173:11,20 | 116:18 132:20 |
| 170:1 171:9,17 | **uncovered** | 174:6 185:12 | 133:6 168:14 |
| 171:22 182:2 | 158:1 | **understanding** | 170:4 173:3 |
| 182:17 | **undated** 43:22 | 37:18 41:1 | 180:24 186:23 |
| **typed** 8:17 9:5 | **under** 6:22 | 57:17,22 60:14 | **used** 31:19 |
| 9:10,16,17 | 19:14 21:9 | 60:22 61:1 | 36:19,23 37:2 |
| 66:9 | 49:19 50:12 | 75:7 76:9 | 57:14 60:6,8 |
| **types** 177:23 | 64:12 66:10 | 85:25 88:11 | 78:3 97:9 |
| **typewriting** | 125:6 127:4 | 90:4 95:20 | 102:24 113:22 |
| 193:7 | 138:15 165:10 | 97:20 98:9 | 144:7 163:2 |
| **typical** 184:18 | 169:1,24,25 | 115:10 117:4 | 166:7,17,17 |
| **typically** 41:5 | 170:13 173:6 | 125:11 127:14 | 167:20 171:10 |
| 46:12 50:21 | 174:7,8,22 | 129:1 136:2 | 184:16 |
| 56:15 71:13 | 184:23 192:9 | 137:3 155:9 | **uses** 174:2 |
| 76:9 80:18 | 192:12 193:7 | 168:17 177:24 | **using** 37:3 |
| 104:15 109:2 | **undergone** | **understood** | 61:16 116:24 |
| 130:15,24 | 27:20 | 98:24 | 152:25 177:1 |
| 131:18 133:6 | **underline** | **unit** 173:6,6,8 | **usual** 192:17 |
| 173:3 185:18 | 23:17 | 175:6 | **usually** 25:13 |
| **typing** 24:21 | **underlying** | **united** 1:1 | 41:6 46:21 |
| 26:2 | 17:15 142:3 | **university** 3:23 | 54:1 104:12 |
| | **underride** | 180:8 184:5 | 108:17 170:4 |
| **u** | 171:4 | **unpaid** 42:18 | **utilize** 35:3 |
| | **understand** | **unreasonably** | 149:6 |
| **uh** 10:10 53:4 | 12:24 16:12 | 39:1 | **utilized** 19:9 |
| 64:11 96:16 | 40:2 50:10,15 | **updated** 27:1 | |
| 107:10 127:23 | 60:5 61:15,17 | 29:18 | |
| 178:3 | 62:5 64:3 71:1 | | |
| **ultimately** 24:3 | | | |
| 24:4 31:16,18 | | | |

Paul Lewis , Jr., M.S., BME

Bryson, Santana and Joshua v. Rough Country, LLC

March 18, 2024

**[v - want]**

Page 53

| v | | | |
|---|---|---|---|
| **v**  1:7 75:17 | **vectors**  174:12 | 189:23 | 106:17 |
| 76:1,4 134:18 | **vehicle**  7:9,18 | **vehicle's** | **verticalized** |
| 150:1 | 9:10 26:10,11 | 126:16 | 100:5 |
| **v's**  147:20 | 33:12,16,21,24 | **vehicles**  28:11 | **vertically**  99:25 |
| **vac**  89:17 | 38:25 45:4 | 55:3,6 74:25 | 106:11 175:17 |
| **vague**  57:24 | 55:15 59:25 | 125:12 146:3,4 | **video**  4:2 59:4 |
| 123:7 124:21 | 60:18 61:25 | 147:18 148:3,8 | 59:5,7,9 96:3,4 |
| 144:9 | 62:2 77:3 | 150:8 151:1 | 96:6,8 160:23 |
| **valid**  63:19 | 83:22 84:9,14 | 152:2,21 | 160:24 161:1,3 |
| **validate**  140:10 | 84:17 86:2,6 | 159:14 164:1 | 186:11,12,14 |
| **validity**  136:17 | 86:25 87:7 | 168:2,5 170:14 | 186:16 191:13 |
| 136:25 137:6 | 88:22 96:14 | 170:17,20 | 191:14 |
| 137:15 | 108:4 109:16 | 171:3 177:1,12 | **videographer** |
| **value**  163:21 | 116:1,15 117:8 | 177:24 185:10 | 2:12 4:3,13 |
| 169:12 172:21 | 120:9 125:14 | **velocity**  122:16 | 38:2 59:3,8 |
| 173:2,4 174:24 | 125:15 127:19 | 181:18 | 96:2,7 160:22 |
| 176:23 179:2 | 127:22 128:1,4 | **verbatim**  66:9 | 161:2 186:10 |
| **values**  37:19 | 128:5,13,20,23 | 73:12 | 186:15 191:12 |
| 131:8,18,23,24 | 130:3,13 | **veritext**  192:10 | **videotaped** |
| 163:3 168:11 | 131:11 133:2 | **version**  10:24 | 1:12 4:5 |
| 169:1,3 172:18 | 134:25 135:1 | 11:4 15:23 | **view**  40:23 |
| 174:3,7 176:19 | 136:11 142:4 | 17:8 27:14 | **visited**  56:13 |
| 179:19 180:25 | 145:24 146:6,9 | 29:17 30:12 | **vitae**  3:15 |
| 184:12 | 146:19 148:25 | 126:2 | **voluntarily** |
| **van**  162:14,14 | 149:2,2,4,5 | **versus**  67:20 | 42:15 |
| 164:4,7,11 | 150:13,13,15 | 92:5 162:14 | |
| 165:4 168:15 | 150:22 151:8,9 | **vertical**  85:16 | w |
| 168:24 170:12 | 151:11 159:13 | 91:23,23 92:1 | **w**  1:21 2:5 |
| 175:22 | 160:3 165:10 | 92:3,15,16,24 | **wait**  140:11 |
| **vantage**  106:8 | 166:19 170:11 | 97:3,4,6,10,15 | 141:8 |
| **various**  71:3 | 176:11 179:6 | 98:6,18 99:2,7 | **waived**  1:17 |
| 144:22 185:2 | 179:22 180:13 | 99:14,24 | **waiving**  138:9 |
| **vary**  128:13 | 181:13,17 | 100:11 101:11 | **wall**  185:20 |
| 171:22 | 182:11,12 | 101:22 104:3 | **want**  5:2 24:11 |
| | 185:22 186:25 | 105:25 106:4,7 | 30:5 34:20 |
| | | | 37:23,25 38:2 |

Paul Lewis , Jr., M.S., BME

March 18, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[want - yeah]**

Page 54

| | | | |
|---|---|---|---|
| 38:8 42:13 | 176:1 189:16 | 37:24 38:5,10 | **works** 44:20 |
| 53:5 54:4,15 | **week** 16:2,9,13 | 40:1 56:24 | **worried** 30:7 |
| 54:25 60:7 | 32:25 33:5 | 58:24 59:2 | **worse** 75:20 |
| 61:15 75:13 | 139:19,20,22 | 80:4 81:9 | 127:11 183:11 |
| 78:11,11 | 139:23 | 82:15 96:1 | **worst** 127:12 |
| 113:15 125:13 | **weekend** 8:21 | 106:24 111:22 | **worth** 47:4 |
| 125:14 135:14 | 8:22 9:13 10:1 | 114:14 118:2 | **would've** 22:1 |
| 138:6 139:3 | **weeks** 16:16,17 | 128:10 143:4 | 27:15 43:18 |
| 155:14 163:22 | 51:14 140:1 | **words** 11:14 | 56:4 71:17 |
| **wanted** 178:14 | **weigh** 172:7 | 135:9 149:22 | 77:1 87:5 |
| **water** 37:23 | **weight** 18:22 | 163:15 180:16 | 93:13 96:19 |
| 38:5 | 146:23 171:14 | **work** 22:24 | **wound** 82:17 |
| **way** 25:21 31:6 | 172:5 | 24:24 28:10,12 | 82:18 |
| 34:7 37:8 | **weinberg** 2:8 | 30:19 31:21 | **write** 140:15,17 |
| 45:18,20 83:15 | **weld** 185:7 | 35:24 37:14,15 | 157:13 |
| 84:19 94:18,21 | **went** 10:8 55:8 | 37:19 41:12 | **written** 151:7 |
| 95:3 97:17,20 | 111:10 | 42:4,14,15,23 | **wrong** 32:10 |
| 97:25 98:4,9 | **whatever's** | 44:7,9,11,14,19 | 44:3,3 63:18 |
| 98:10 99:9 | 179:25 | 44:22 45:2,5 | 64:2 |
| 105:13 111:10 | **wheeler** 2:8 | 46:19,20 48:5 | **wrote** 142:2 |
| 120:16 122:20 | **wheels** 185:6 | 48:8 53:24,25 | 145:12 184:2 |
| 129:13 133:9 | **whichever** | 54:6 55:9,19 | |
| 137:2 138:22 | 131:19 | 56:13 67:12 | **x** |
| 163:16 165:16 | **white** 91:10 | 73:6 87:14 | **x** 163:19 174:8 |
| 172:2 173:1 | **wichita** 3:23 | 116:12 125:17 | 174:13,16 |
| 176:17,22 | 180:8 184:5 | 127:15 128:6 | 175:14,22 |
| 183:15 189:19 | **wide** 81:3 | 129:13 134:5 | 176:18 |
| 190:23 | 101:2,3 | 135:2 138:19 | **x's** 175:15 |
| **we've** 6:3 8:6 | **wider** 109:5 | 139:1 153:13 | **y** |
| 15:24 21:19 | **window** 169:19 | 187:5,12 188:1 | **y** 28:9 174:8 |
| 26:12 54:21,23 | **wing** 112:17,19 | **worked** 39:10 | 175:14 176:18 |
| 54:24 58:20 | **wings** 82:3 | 45:14 50:5 | **yeah** 9:19 11:9 |
| 59:14 75:1 | **wise** 128:22 | **working** 33:14 | 13:2,25 15:7 |
| 102:8 116:1 | **witness** 4:15,20 | 40:2 45:25 | 15:22 16:16 |
| 119:16 129:17 | 9:19 29:9 | 57:2 139:17 | 17:10 18:23 |

Paul Lewis , Jr., M.S., BME
Bryson, Santana and Joshua v. Rough Country, LLC

**[yeah - zones]**

| | |
|---|---|
| 19:23,24 20:10 | |
| 20:15 22:17 | |
| 24:18 26:1,8 | |
| 26:25 27:11 | |
| 29:14 30:1 | |
| 31:10,11 34:15 | |
| 36:21 37:5,24 | |
| 43:7 56:7 | |
| 57:18 64:8,12 | |
| 65:8,18 66:4 | |
| 82:8 84:25 | |
| 95:21 96:23 | |
| 104:11 109:18 | |
| 111:20 115:17 | |
| 118:3 139:19 | |
| 145:19 160:7 | |
| 165:23 167:14 | |
| 170:21 179:15 | |
| 179:17 181:19 | |
| 181:22 185:4 | |
| **year** 29:23 33:4 | |
| 39:23 40:6 | |
| 42:2 43:19 | |
| 133:13,25 | |
| 181:8,11 | |
| **years** 13:25 | |
| 42:5 156:8,12 | |
| 156:21 | |

**z**

**z** 104:21 174:8
174:22 175:14
175:23 176:18
**zones** 149:7

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.