G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 1

1          UNITED STATES DISTRICT COURT

           NORTHERN DISTRICT OF GEORGIA

2              GAINSVILLE DIVISION

3

4    SANTANA BRYSON AND JOSHUA

     BRYSON, as Administrators

5    of the Estate of C.Z.B.,

     and as surviving parents of

6    C.Z.B., a deceased minor,

7        Plaintiffs,                    CASE NO.

8    vs.                          2:22-CV-017-RWS

9    ROUGH COUNTRY, LLC,

10        Defendant.

11

12

13      VIDEOTAPE DEPOSITION OF G. BRYANT BUCHNER, P.E.

14            APPEARING REMOTE FROM

15            TALLAHASSEE, FLORIDA

16

17            JANUARY 23, 2024

18              11:13 A.M.

19

20

21   Reported Remotely By:

22   Judith L. Leitz Moran

23   RPR, RSA, CCR-B-2312

24

25

G. Bryant Buchner , P.E.                                        January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 2

1      REMOTE APPEARANCES OF COUNSEL

2

3  On behalf of the Plaintiffs:

4      TEDRA L. CANNELLA, ESQUIRE

5      DEVIN L. MASHMAN, ESQUIRE

6      CANNELLA SNYDER LLC

7      315 W Ponce de Leon Avenue

8      Suite 885

9      Decatur, Georgia  30030

10

11  On behalf of Defendant:

12      RICHARD H. HILL, ESQUIRE

13      WEINBERG, WHEELER, HUDGINS,

14      GUNN & DIAL, LLC

15      3344 Peachtree Road, N.E.

16      Suite 2400

17      Atlanta, Georgia  30326

18

19  ALSO PRESENT:

20      JONATHAN MILLER, VIRTUAL VIDEO TECHNICIAN

21

22

23

24

25

Page 3

1          I N D E X

2  EXAMINATION                    PAGE

3      BY MR. HILL ..........................    5

4

5          E X H I B I T S

6      (EXHIBITS SUBMITTED ELECTRONICALLY)

7  EXHIBIT NO.                    PAGE

8  Exhibit 1      Defendant Rough Country,      10

9          LLC's Second Amended Notice

10         of Taking Videotaped

11         Deposition Duces Tecum of

12         G. Bryant Buchner, P.E.

13  Exhibit 2      Curriculum Vitae        12

14  Exhibit 3      Testimony List of G. Bryant    43

15         Buchner, September 17, 2020

16         to October 11, 2023

17  Exhibit 4      Fee Schedule        50

18  Exhibit 5      Invoices        50

19  Exhibit 6      10/12/2023 Report        73

20         (BRYSON 001350 - 001361)

21  Exhibit 7      Support Documents        75

22         (BRYSON 001362 - 1374)

23  Exhibit 8      Calculated Stock Vehicle    117

24         Crush

25         (BRYSON 003990 - 003999)

Page 4

1  WITNESS APPEARED REMOTELY FROM TALLAHASSEE, FL

2      JANUARY 23, 2024 - 11:13 A.M.

3

4      VIDEO TECHNICIAN:  We are on the record

5  January 23rd, 2024, at approximately 11:13 a.m.

6  Eastern Time.

7      This will be the videotape deposition of

8  George Bryant Buchner.

9      Would counsel please identify themselves

10  and who they represent for the record.

11      MR. HILL:  Rick Hill --

12      MS. CANNELLA:  Tedra Cannella and Devin

13  Mashman for the Plaintiffs.

14      MR. HILL:  We spoke over each other

15  there.  Did you catch that, Court Reporter?

16      MS. CANNELLA:  Oh, sorry.  Tedra Cannella

17  and Devin Mashman for the Plaintiffs.

18      MR. HILL:  Rick Hill on behalf of the

19  Defendant.

20      VIDEO TECHNICIAN:  Would the court

21  reporter please swear in the witness.

22      THE COURT REPORTER:  Mr. Buchner, please

23  raise your right hand.

24

25

Page 5

1          G. BRYANT BUCHNER, P.E.,

2  being first duly sworn, was examined as follows:

3      MR. BUCHNER:  Yes, I do.

4          EXAMINATION

5  BY MR. HILL:

6      Q    Thank you, Mr. Buchner.  My name is Rick

7  Hill.  I think we've met a couple of times in the

8  past.  It's good to see you again.

9      A    Thank you.

10      Q    I wanted to start just by identifying,

11  since I'm not there, what you may have brought with

12  you to the deposition.

13      I know you provided file material to

14  counsel for the Plaintiffs which have been provided

15  to us prior to the deposition.

16      Did you bring everything that you had

17  previously produced to the Plaintiff's counsel with

18  you today to the deposition?

19      A    Yes.

20      Q    Okay.  And do you have it in electronic

21  format or do you have it in paper format?

22      A    Yes, I have some of it in paper format.

23  All of it in electronic format to the best of my

24  abilities.  Every now and then things get crossed.

25  But, yeah, most of it's -- I should have everything

2 (Pages 2 - 5)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 6

1 in electronic.
2    Q    Sure.  One of the things that I don't
3 believe we have is the actual digital electronic
4 version of the HVE case file.
5       Have you provided that to counsel for the
6 Plaintiffs?
7    A    No, we have not.  We have -- our practice
8 is to record the printed copy because the
9 electronic copy sometimes doesn't get properly
10 saved or something will happen to it.
11       In this case I'm not aware that I have
12 been able to find the original electronic copy,
13 but -- so I'm -- I couldn't get it over the
14 weekend.  I wasn't here over the weekend.
15       So if we have to have it, we'll keep
16 looking, but at this point in time I don't have --
17 I don't have that exact document for you.  We have
18 the -- the archived document which is the data
19 itself.
20    Q    Okay.  When you say "the archived
21 document," just so I understand you have on your
22 system the original digital version of the case
23 file or is that what you're not able to locate and
24 you would just have an archive version of it
25 digitally somewhere?

Page 7

1    A    Well, you said case file just there.  A
2 minute ago, I thought you said the HVE file.
3    Q    Yeah, the HVE what I call case file which
4 is the original HVE file.
5    A    Yeah, I don't -- when I looked, we didn't
6 have that.  We have -- we maintain the paper copies
7 of everything obviously because they can be put
8 under lock and key, but anybody on the computer
9 doing other work can, you know, move things around
10 on us from time to time.
11       So I mean, I'm not saying I don't have
12 it, I'm saying I couldn't find it when they looked
13 for it this weekend.
14    Q    Now I understand.
15       So you -- after it was originally
16 generated, you printed out hard copies of the
17 various reports that it generates and you kept
18 those?
19    A    Right.  Yes.
20    Q    But you're not able to locate that
21 original HVE file that would contain all of those
22 reports in a digital format?
23    A    Not -- not as of yet, no, sir.
24    Q    Okay.
25    A    So.

Page 8

1       MS. CANNELLA:  Mr. Hill, what was the end
2 of that question?  I couldn't hear it.  The
3 original HVE file that would contain?
4 BY MR. HILL:
5    Q    All of the data and reports generated by
6 the HVE software.
7    A    Well, we -- we printed and generated
8 everything that we need or could possibly need.
9       If someone else wants something, we can
10 always re-enter it and rerun it, I don't have a
11 problem doing that.
12       I'm just telling you that what was open
13 when we hit print, we didn't find that the way we
14 thought we would and that's the electronic filing
15 issue.
16       But we can re-enter it and, you know,
17 give you that, that wouldn't be a problem.
18 BY MR. HILL:
19    Q    Sure.  And when you say re-enter it, just
20 so I understand, you would need -- actually, rerun
21 the test?
22    A    Right.  We would just --
23    Q    Rerun the same --
24    A    Rerun it again, yeah, to the best of our
25 abilities.

Page 9

1    Q    All right.  And I just ask that because I
2 believe we received the damage data report, the
3 accident history report.  Those were produced a
4 week ago or more than a week ago with your original
5 file.
6       And then over the weekend, we received
7 the event data report and the vehicle data report
8 and the geometry files.
9       But what we haven't seen is the driver
10 controls report, the environment data or the
11 messages report.
12       And I guess what you're saying is you
13 didn't print those other three reports out at the
14 time it was originally run and you're not sure
15 whether you still have it?
16    A    Right.  And to me, they're -- they
17 wouldn't be relevant because we're only simulating
18 the crash component of it, we're not trying to run
19 the vehicle to see if they go to rest or anything
20 like that.
21       It's a -- we're simply using it for the
22 contact phase, but -- so we -- we never printed
23 those.  But if we -- somebody's got to have them,
24 we'll just have to try to recreate the wheel which
25 we can do or anybody else can recreate the wheel --

3 (Pages 6 - 9)

G. Bryant Buchner , P.E.                           January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 10

1    Q    Sure.
2    A    -- if they have the program and want to.
3    Q    Okay.  But you have produced all the
4  printouts that you have from that HVE simulation?
5    A    Yes.
6    Q    Okay.  All right.  Just so that we have
7  it, I will share my screen here.  And we -- I'll
8  attempt to do this.  I'm having some issues.
9        Give me one second to figure this out.
10  Hopefully this will work.
11    A    Agreed.
12    Q    I'm nervous.  Got off to a rough start.
13        Okay.  Can you see my screen?
14    A    I can.
15    Q    Okay.  Great.
16        (Deposition Exhibit 1 marked.)
17  BY MR. HILL:
18    Q    I'm just going to attach this as
19  Exhibit 1.  This is just the notice to the
20  deposition just so we'll have it attached.
21        And I'll fast forward here hopefully to
22  the Exhibit A.  And I know that there were some
23  objections to some of the items requested here.
24        As I understand it, the objection was
25  based upon communications with counsel in

Page 11

1  anticipation or preparation for trial or for your
2  testimony.
3        Other than those types of communications,
4  have you withheld any other information requested
5  in this exhibit that relates to this case?
6    A    No.
7    Q    And I'm assuming you have the notice
8  there in front of you?
9    A    Yeah, and I don't know that I withheld
10  anything.  But again, I wasn't involved in the --
11  all my engineering stuff, I brought with me.
12    Q    Right.  So you basically brought
13  everything in your file that relates to this case.
14  And that means you produced that to Plaintiffs?
15    A    Yes.
16    Q    And you're not aware of what they may or
17  may not have withheld in producing to us?
18    A    That's right.
19    Q    Okay.
20        VIDEO TECHNICIAN:  Counsel, can we
21  actually go off the record briefly just to fix an
22  audio issue real fast.
23        MR. HILL:  Sure.
24        VIDEO TECHNICIAN:  The time is 11:21.  We
25  are off the record.

Page 12

1        (Off the record.)
2        VIDEO TECHNICIAN:  The time is 11:24.  We
3  are back on the record.
4        MR. HILL:  Thank you.  Sorry.  I was just
5  going to joke that I -- witnesses like to not be
6  able to hear my questions because my questions
7  don't make any sense.
8        THE WITNESS:  Well, we're getting it all
9  straightened.  We're going to be fine here.
10        MR. HILL:  Yeah, sorry for these glitches
11  here at the beginning.
12        All right.  Let me share my screen real
13  quickly.
14        (Deposition Exhibit 2 marked.)
15  BY MR. HILL:
16    Q    All right.  Can you see my screen now?
17    A    Yes, sir.
18    Q    Okay.  This is -- I'm going to mark this
19  as Exhibit 2.  This is your CV.
20        And we'll note that it appears to be
21  dated 11/20/22.  Is that the most current version
22  of your CV?  It's on the last page.
23    A    It would seem to me there has been one
24  published since 2022.  So, no.
25    Q    All right.  Did you bring a current copy

Page 13

1  of your CV with you today?
2    A    No.  I just thought there was a current
3  one in the file.  I didn't look at my CV.
4    Q    Sure.  Well, this is just the one that
5  was produced to us in the case with your expert
6  report.
7        Do you know of any particular experience,
8  education or training that would not be reflected
9  on this CV that you're relying upon in giving your
10  opinions today?  That's all I'm trying to verify.
11    A    No.  Should be no issues there at all.
12  Thank you.
13    Q    Okay.  And on this page right here, this
14  is, I believe, the third page of your CV, about a
15  third of the way -- or half of the way down there
16  is a bullet point for HVE User Software Training,
17  engineering Dynamics Corporation.
18        So I'm assuming that's reflected that you
19  have gone to EDC for HVE user training?
20    A    Yes.
21    Q    And when did you have that training?
22    A    Oh, in -- I've been using HVE for 30
23  years.  That may have been -- from what I remember,
24  it's almost 20 years ago.
25    Q    All right.  And did you actually go there

4 (Pages 10 - 13)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 14

1 in person for that training?
2    A    They -- I think that was -- my memory is
3 that was in Miami.  I think they came to Miami and
4 I went to Miami.
5    Q    All right.  Was that part of some larger
6 conference in Miami or do you remember the
7 circumstances surrounding that training?
8    A    No, it was just for that.  I went to, you
9 know, day training from HVE.  That was -- that was
10 what it was.
11    Q    Sure.  And you said it was approximately
12 20 or so years ago?
13    A    Yes, sir.
14    Q    All right.  Have you received any
15 additional training on the use of HVE since that
16 time?
17    A    I don't really remember.  We use it.  I
18 try to stay update.  I'll -- if we need some
19 information me and the staff will research.
20        They have different forums.  My junior
21 engineers will go to forums and then we'll talk
22 about, you know, what they did.
23        So I mean, I've -- I've stayed abreast
24 with it as far as using it, but I don't think I've
25 actually gone to any seminars personally since

Page 15

1 then.
2        I mean, I was using it for 10 years
3 before I ever went to a seminar, so it's really a
4 pretty straightforward program.
5    Q    Sure.  How did you learn how to use it
6 without going to any type of training?
7    A    I'm an engineer.  You know, most of the
8 programs I've used in my life didn't come with --
9 you didn't go to seminars, you learn how to use
10 them.  You investigate them.  They follow physics.
11        HVE's -- been a lot of updates.  I still
12 call it EDSMAC and EDCRASH because that's what they
13 were way back in the day.
14        But, you know, it's -- it's an iterative
15 process that they keep updating.  And as long as
16 you keep using it and keep working with it, you're
17 basically, you know, eating the elephant in small
18 bites.  I wouldn't mind going to a course but I
19 haven't needed to.
20    Q    Okay.  And when you use HVE, do you run
21 the simulations yourself and provide the input or
22 is that something your staff does?
23    A    I'll talk to staff.  I generally if I
24 need to show them some stuff, I will.  But
25 generally I'll let them set it up and get it

Page 16

1 running.  I'll go in and check it.
2        I'll -- sometimes I'll sit down and make
3 adjustments or to do some, I guess, experimenting
4 with it to see what's -- what's going on with any
5 particular accident we're using it in.  But most
6 time I have a junior engineer doing, you know, the
7 vast majority of -- of the keystroking and
8 everything.
9    Q    Okay.  And describe what keystroking is
10 kind of involved with HVE just at a -- so the jury
11 can understand it or I can understand it.  So what
12 type of inputs are needed in order to run the
13 simulation, just in general?
14    A    Well, it's got a lot of different modules
15 and things, but, you know, all of them are going to
16 start with you got to select a vehicle, you have to
17 modify a vehicle, you have to check the CG's in the
18 right location, right vehicle the tire size.
19        Then when you go in and you start
20 actually running your -- your impacts, you have to
21 position the two vehicles.  And that's -- you use
22 your -- that's the engineering judgment where first
23 contact is and their orientations and their speeds.
24 All of that is put in with keystrokes.
25        And then once you -- once you get it

Page 17

1 where it can run a simulation and it hits the
2 vehicles together, then you look at what happens
3 and the outputs.
4        And the outputs a lot of times aren't
5 exactly what you expected or what you wanted, so
6 you start making adjustments.
7        And in this case, the adjustments were we
8 knew the impact speed of the truck and we knew the
9 delta-V of the truck.
10        So we had to make -- we had to do a
11 little bit of tuning, which is the keystrokes,
12 where you change some of the parameters until you
13 see something that represents the accident that
14 you're trying to investigate.
15        But -- and so -- and in this case the
16 scene is very simple, it's a flat scene.  There
17 really isn't a scene, so we don't have to -- a lot
18 of times you'll be adjusting the scene and slopes
19 and, you know, where things are.
20        But in this case we're not doing --
21 really needing to do any of that.  I mean, it's
22 just about the size of the vehicles, how they hit,
23 their velocity vectors, when they hit and then a
24 little bit of adjusting like in this case, things
25 like the coefficient of restitution to -- to tune

5 (Pages 14 - 17)

G. Bryant Buchner , P.E.                        January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 18

1 it and then get everything right.
2     Q   Thanks.  And we'll go into all of that in
3 detail later.
4         Did you use HVE to try to simulate the
5 accident that happened in this case?
6     A   No.
7     Q   Okay.  And have you in the past when
8 you've used HVE to explore a hypothetical accident
9 that's different from the accident that you're
10 investigating, have you run a baseline HVE test to
11 try to simulate the actual accident?  Have you ever
12 done that?
13     A   That's a big question.  And I think -- I
14 think it boils down to, the simplified version,
15 have we ever used HVE to simulate an actual
16 accident, the answer is yes.
17     Q   And what would be your reasoning for
18 simulating an actual accident using HVE when you
19 actually know what happened in the accident?
20     A   Well, I'm -- I'm -- I -- you really
21 confused me with that question.
22     Q   All right.  Let me -- let me try to
23 rephrase it.  Sorry about that.
24     A   Sure.
25     Q   Part of your analysis of any accident is

Page 19

1 to actually physically look at the vehicles
2 involved, look at the scene and use that
3 information to recreate the accident, correct?
4 That's sort of Step 1?
5     A   Reasonably.  Reasonably.  We call it
6 reconstruct the accident, yes.
7     Q   Yeah.  And if you can do that using the
8 actual physical evidence from the actual accident,
9 why would you need to run an HVE simulation of the
10 actual accident?
11     A   Okay.  I think I understand your
12 question.
13         If we just look at the physical evidence,
14 we can tell where vehicles hit and tell where
15 vehicles move, but we can't always tell the speed
16 at which the vehicles hit.
17         And that's where HVE would be very
18 beneficial is to test different speeds and to see
19 which speeds match the physical evidence.  They
20 don't always perfectly match but, you know, within
21 reason.
22         However, in a case where we know the
23 speeds, say in this one because we have the speeds
24 recorded by the electronic data in the pickup
25 truck, we don't need a simulation program to

Page 20

1 reconstruct the speeds.
2         So HVE is very helpful when you're --
3 when you're missing some information.
4         Well, in this case we're really not
5 missing any information about the accident.  We
6 kind of know everything.  We don't need HVE.
7         But if we want to say what would happen
8 if the truck looked different, then that's where
9 HVE is very helpful.  And that's what we used it
10 for here, but...
11         So there's -- there's crashes that we
12 need HVE to fill in some of the blanks, but then
13 there's other crashes where we don't need HVE.  And
14 so, therefore, we don't use it.
15     Q   Other than determining the speed of the
16 vehicles when you don't know it, what other uses
17 would there be for HVE and simulating an actual
18 accident?  What other data can it provide?
19     A   I'm sorry, I spoke over you.  I think I
20 heard your whole question, but ask it again.
21     Q   Sure.  So you indicated that one reason
22 to run the HVE simulation on an accident that
23 you've actually -- that actually occurred would be
24 it could tell you the speeds when you don't know
25 the speeds in the accident.

Page 21

1         What are some other reasons you would run
2 an HVE on an actual accident?  What are some other
3 information you can glean from that that you can't
4 get from investigating the actual accident?
5     A   Rotation rates can be hard to get.
6 Accelerations at different parts of the vehicles
7 can sometimes be hard to hand calculate.
8         I mean, you can use some -- some Euler
9 mechanics calculations, but those are -- those are
10 -- can be pretty tough to do.
11         So sometimes it's just a convenient way
12 to fill in some of the more subtle blanks of what a
13 vehicle is doing.
14         And sometimes it's just because you want
15 to visualize it, you want to -- you want to kind of
16 -- you've done all your calculations and say, okay,
17 well, we think this evidence means this, let's run
18 an HVE to give us a quick visualization check on --
19 on what our brain is telling us.
20         So it's got some advantages depending on
21 the situation.
22     Q   I believe you indicated that, you know,
23 it's obviously only as good as the input you put
24 in.  And then sometimes you need to tweak those
25 inputs to get the result that you're looking for;

6 (Pages 18 - 21)

G. Bryant Buchner , P.E.                                January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 22

1 is that fair?
2     A   That was specifically for this case
3 because we -- we had -- we knew -- we knew the
4 inputs and the outputs with respect to speed, but
5 the program didn't admittedly match the input speed
6 with the output speed or the delta-V.
7         And that's because the program didn't
8 have the co-efficient of restitution quite right.
9 Because it comes with defaults and we had to work
10 on that a little bit to -- so that the mathematical
11 equations would -- would get from the beginning to
12 the end properly.  So we had to get a little
13 guidance.
14     Q   So to make sure I understand that, was it
15 the use of the default coefficient of restitutions
16 by the software the reason why the input and output
17 delta-Vs didn't match?
18     A   Essentially, yes.
19     Q   Was there any other aspect of the initial
20 run that you think contributed to the inputs and
21 outputs not matching?
22     A   No.
23     Q   Okay.  And in tweaking the coefficients
24 of restitution, and we'll get into this later, I
25 believe you had to look that up somewhere, correct?

Page 23

1         Did you get that from Neptune Engineering
2 for one on one -- at least one of the vehicles?
3     A   No, no, no.  That's just -- that's just a
4 tuning within the program.  That's -- once you run
5 it, the outputs were precisely matching the EDR
6 data in the truck.
7         So we -- we tuned effectively the
8 coefficient of restitution to -- to get it to
9 match.
10     Q   And just so I understand this, the
11 coefficient of restitution of what?
12     A   Of the collision.  It's --
13     Q   So that's not of the roadway?
14     A   Right.
15     Q   Not -- and it's -- is it of both
16 vehicles?  When you say "the collision," just so I
17 understand it, what do you mean?
18     A   It's a property of the -- let me see if I
19 want to use the right word, property.
20         It's a product of the collision of the
21 two vehicles.  They would independently have a
22 restitution associated with them if they ran into
23 an immovable barrier wall.
24         And when they hit each other, the
25 restitutions were of each individual and worked

Page 24

1 together for a total restitution of -- of the
2 accident.
3         So we do a -- so it's -- it's for the
4 crash.  It's not for each car.  It's for a crash.
5         Because if you hit the cars in a
6 different orientation, you -- you would -- you
7 would probably get a slightly different answer on
8 that.
9         So it's -- it's how much the -- the
10 vehicles rebound and how much they -- they -- they
11 spring off of each other, if you will.
12         They don't stick together perfectly, they
13 actually work to try to -- they bend -- like you
14 take a paper clip and bend it, then you let it go,
15 it springs open a little bit.  The metal bends in
16 and it wants to spring out a little bit.
17         And that's -- that's the -- the part that
18 nobody really knows about a crash or exactly
19 precisely sure.  And that's one of those things
20 that you have control over to try to refine your
21 analysis.
22     Q   And thanks for that explanation.
23         So you can't really calculate that
24 combined coefficient of restitution?  I think
25 that's what you just meant by the -- the very end

Page 25

1 of that answer.
2     A   Yes.
3     Q   What -- the way you can determine it is
4 by manipulating that combined coefficient of
5 restitution in the program until it outputs the
6 appropriate delta-Vs for both input and output; is
7 that a fair way to put that?
8     A   Right, when you know the delta-Vs.
9         Now, you can -- if you don't know them,
10 you can use a default in the program or you can use
11 a range.  But in this case we knew them, we knew --
12 we knew the two values.  We -- we knew the
13 beginning and ending.
14         We -- we knew the beginning speed of the
15 truck and the delta-V of the truck, so we know the
16 ending speed.
17         And the -- the tool to allow the -- those
18 -- all those numbers to match up is the
19 restitution.
20     Q   Gotcha.
21         And you knew that from the download from
22 the truck?
23     A   Yes, yeah.  The -- the truck measured the
24 crash for us, so.
25     Q   Right.

7 (Pages 22 - 25)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 26

1    A   It really did -- did a lot of what HVE
2 might normally do for us if we needed it.  We don't
3 -- or if we needed it.  But in this day and age,
4 the truck measures for us.
5    Q   Sure.  Now, is there anything preventing
6 you from using HVE to first simulate the actual
7 crash in this case?
8        If you are to do that using the actual
9 vehicles involved in this case, wouldn't that
10 generate a coefficient of restitution for the
11 actual accident that would be consistent with the
12 inputs and the outputs?
13    A   Well, that's two questions in there.
14 First, HVE would be quite suspect anyways starting
15 out trying to reconstruct this crash because of the
16 amount of -- I call it the -- the truck exploded
17 the rear of the car.
18        The -- the way that the -- that the
19 unibody rails bend down, the way that the wells
20 unzip, the way that metal was torn, the way that
21 the hatch was actually caved in.
22        You've actually defeated the structure of
23 the Escape so much that I would be worried about it
24 following HVE's, let's just say, thought process.
25        There's a -- in HVE, it's -- they're

Page 27

1 trying to model a vehicle that will follow -- that
2 will act like a vehicle.
3        I'm not so sure that the -- all the
4 damage on the back of the Escape would make it
5 robust to use an HVE simulation of the way it was
6 damaged in the accident.
7        The best answer to the question, I didn't
8 need to because I can measure everything and I can
9 have all of that.  I have everything I need about
10 the accident form the truck or the damage.
11        But if your question is, and I think it
12 was, why didn't we do HVE or why wouldn't we, well,
13 I would be very concerned that it would be actually
14 representative.
15    Q   And what differentiates an HVE of the
16 actual accident from the HVE simulation that you
17 ran using a -- a model stock 2015 F250?
18        So obviously, you're -- you're going to
19 testify here that the HVE simulation that you ran
20 of a hypothetical incident is reliable and is
21 valid, but I think you've just said that you would
22 not feel that way if you try to model the actual
23 accident.  So what's the difference between the
24 two?
25    A   Okay.  Well, first, when we used HVE we

Page 28

1 were using it on SV -- for two vehicles that hit as
2 vehicles should reasonably strike each other,
3 meaning bumper to bumper, structure to structure.
4        So, you know, in the development of the
5 program, it's clearly that -- that crash was
6 contemplated.  So we feel very comfortable about
7 that.  It's a robust platform to do that with.
8        I didn't say that it couldn't be used for
9 the other, I said I would be very suspect of it
10 because of the factors I gave you.  And I would say
11 we didn't need to.
12        In other words, it would be -- for our
13 purposes, it wouldn't add any knowledge, we already
14 had all the knowledge.  So we'd basically be adding
15 uncertainty on to certainty by trying to use HVE to
16 that.
17        So I -- I would be suspect of doing it
18 because of a -- but I didn't need to do it, and
19 that's why we didn't do it.
20    Q   So would you be critical of an approach
21 taken by others in your field that they would
22 always use HVE to simulate the actual crash first
23 to create a baseline report that would make sure
24 that the inputs that you used in the hypothetical
25 crash were consistent with the actual crash?

Page 29

1        MS. CANNELLA:  Object to the form of the
2 question as it assumes facts not in evidence.
3    A   Yeah, and there's two -- there were two
4 questions there.
5        The first one is, if someone says they're
6 always going to use HVE for everything.  I'm like,
7 well, close the door, I don't even want to --
8 that's a -- to me that's crazy.
9        HVE is not that good of program.  It's
10 got things that can be used for and things it can't
11 be.  It's like all the other calculation tools we
12 have.
13        If you're -- if that's what you think, is
14 that I can use it for everything to be
15 representative, many times HVE just -- we know all
16 the evidence, but when we start looking at
17 something in it, it -- it can't handle it.  It
18 can't handle it.
19        But clearly, in a straight-on rear
20 collision, bumper to bumper, it's -- it's a -- it's
21 a wonderful tool as we use.  It's just one of the
22 tools that we use.
23        But if -- if -- to say -- to give it the
24 amount of deference that's in your question, it's
25 like, oh, HVE knows physics better than physics

8 (Pages 26 - 29)

G. Bryant Buchner , P.E.                 January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 30

1 does.  HVE knows reality better than reality does.
2       I would disagree with that.  I would say,
3 hmm, that's -- maybe I'm misunderstanding
4 something, but I would not respect that approach
5 with the absolutism that you gave it.
6 BY MR. HILL:
7    Q   I appreciate that answer, and I guess I
8 phrased the question poorly.
9       Let's say you had an environment where
10 you believe HVE was a proper tool.  You just kind
11 of said it's limited.
12   A   I didn't hear one of the words.  If you
13 can ask that again, so I don't have to go back.  Or
14 say it again.
15   Q   Yep.
16      So let's say you have a bumper-to-bumper,
17 rear-end collision like you've just described where
18 you feel like the HVE program is sufficient to
19 actually use to analyze the crash.
20      All right, so let's assume that's the
21 case.  And let's say you wanted to change the
22 bumper height on one of the vehicles so that it
23 would still be a bumper-to-bumper impact, correct?
24 So it would still be a situation where you feel
25 like HVE would be a valid tool.

Page 31

1       Let's say in that situation, where it
2 could properly model both the actual crash and the
3 hypothetical crash when conditions changed.
4       In that situation would you agree that it
5 would be smart to do a baseline HVE simulation of
6 the actual crash in order to make sure that it can
7 properly simulate what you know happened before you
8 try to simulate a hypothetical crash?
9    A   I would say you wouldn't know unless you
10 showed me the crash and let me look at what you
11 were talking about.
12      I mean, that's -- that's -- that's --
13 that absolutism, oh, it must be okay.  We don't
14 know until we see -- until we see the evidence and
15 see what it is.
16      HVE is nothing more than a tool that we
17 have available to us along with other tools.
18      So I -- the question can't be answered.
19 It has -- we have to see the crash and have to know
20 what the data is and what we're looking at.
21 Because it may and may not be able to do it.
22   Q   Well, it would have --
23   A   I don't let HVE make the decisions for
24 me, I make the decisions.  HVE is just a tool.
25 It's like a wrench.

Page 32

1       You know, there are several different
2 wrenches you can turn a nut with.  You know, a
3 box-end wrench is going to be a whole lot better
4 than a crescent wrench.  But sometimes a crescent
5 wrench is a better one because -- for whatever
6 reason.  I don't know until I look at the nut.
7       I'm not going to know until I look at the
8 accident.  So I -- I would say I don't know.
9    Q   Well, I think you've indicated that with
10 this tool, this wrench, you have to calibrate it
11 properly in order for it to be effective.  Do you
12 agree with that?
13   A   Yeah, a crescent wrench you've got to
14 make -- you've got to adjust it tight to fit the
15 nut or it's not going to work.
16   Q   Right.  And what --
17   A   Same thing with any program, you're going
18 to have to -- you have to -- it's just called
19 tuning when you're doing your simulation.  It can't
20 know everything.  We have to give it some more
21 information sometimes.
22   Q   Right.  And one way to learn what the
23 proper -- appropriate tuning would be would be to
24 tune it until it properly simulates the actual
25 crash involved.  That would be one way to tune it,

Page 33

1 correct?
2    A   No, not in this case.  That would --
3 because -- look, you're -- that's the apples and
4 oranges comparison that -- it doesn't work.
5       Because in the accident the tailgate, in
6 the backseat of the car in the pillars, the C
7 pillars, or maybe it's the D pillars, absorb the
8 energy, not the frame of the vehicle or the -- or
9 the unibody in the rails.
10      So to say that -- that we have to trick
11 -- because it would be tricking, I think -- HVE
12 into making that crash happen because I don't think
13 it's really built for that crash.
14      I don't -- I think that's -- when the
15 truck gets so high above the bumper, as I told you
16 earlier, I would be very suspect to even try and
17 use it.  And then say you have to do that.
18      We have all of that data.  We know what
19 that information is.  We want to use HVEs for
20 something that's appropriate.
21      And I don't -- I'm not -- I'm not saying
22 you wouldn't learn something from it, but you would
23 never learn anywhere near what we already know
24 because of the -- the data that we have from the
25 truck and the physical evidence we can see.

9 (Pages 30 - 33)

G. Bryant Buchner , P.E.                              January 23, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 34

1     That would be a -- for me it would be a
2 useless endeavor and one fraught with -- fraught
3 with -- with danger that you would get that
4 information.
5     But if someone wants to do it, I'm happy
6 with them doing it.  I just don't think that would
7 be appropriate at all.
8     Q   So the distinction there is that if you
9 have bumper override and impact up -- that's above
10 the bumper in any way, are you saying that that
11 creates a situation where HVE is no longer
12 something you would rely upon because it just can't
13 handle that type of situation?  Is that kind of --
14 a way to describe that?
15     A   No, I told you about this earlier in the
16 first time you asked the question.
17     The first bumper came off, the bumper bar
18 came off of it, of the car.  The -- the unibody
19 rails, one went down, one went in.  We lost a lot
20 of the welds at the back.
21     So I think that the -- the back structure
22 of this vehicle wasn't performing anything like
23 what we imagined a car would actually perform.
24     It's outside of what a design or a
25 computer program, you know, in my opinion, would be

Page 35

1 taking into consideration in -- in putting one
2 that's -- you're going to be crashing vehicles that
3 should act somewhat like the structures they were
4 designed to be.  So that's really my complaint.
5     I've -- I've given other examples as we
6 go along.  But, you know, you can drive a nail with
7 a crescent wrench and it goes in, but that doesn't
8 mean you should be driving nails with crescent
9 wrenches.
10     I think that's what could be going on
11 here, is you could -- you can always get an answer
12 out of HVE, but I don't know what the answer would
13 be good for.
14     Because it's -- you know, it's -- one, we
15 don't need it; and second, it's taking it outside
16 of areas where I'd be comfortable that it would
17 reliably tell you something.
18     And it might tell you a few things.  I
19 mean, if you just look at the momentum of it and
20 things like that.
21     But as far as understanding the crash the
22 way I need to, I don't -- I don't think it would be
23 a good choice.
24     Q   All right.  So the HFE -- or HVE, sorry,
25 simulation that you ran was dependent upon -- in

Page 36

1 order for it to be useful and reliable to you, if I
2 understand what you're saying, it's dependent upon
3 there being bumper to bumper or frame to frame
4 impact?
5     A   No, no, you are dutifully trying to go
6 outside of my answer with this.
7     It's -- it's a normal vehicle-to-vehicle
8 collision.  The vehicles acting fairly normal if we
9 can get the truck to stay at the stock height.
10     It's -- it's well within the -- what the
11 program is made to do, which we easily appreciated.
12 It's made to handle a vehicle-to-vehicle collision
13 that's reasonable.
14     The accident wasn't reasonable.  And the
15 -- and the structure of the car didn't perform
16 like -- anything like what it was reasonably
17 intended to do because the head was so high and it
18 defeated, you know, basically the structure of the
19 car.
20     It's a unibody car that's no longer a
21 unibody car anymore, it's -- it's piecemeal.  It's
22 torn apart.  Pieces are hanging off of it.  It just
23 -- it just falls outside of what a car reasonably
24 should be expected to do in a crash.
25     And if a car can't reasonably expect it,

Page 37

1 how can we expect a computer program written to --
2 to analyze car crashes to handle that, that's my --
3 that's my real issue.
4     And I've answered it about four different
5 ways now.  I don't have anything else to tell you
6 on this.
7     You're asking me about a hypothetical can
8 we use HVE to do -- to stimulate the actual
9 accident?  And I'm like I would be suspect.  I've
10 given you a lot of reasons.  I wouldn't -- I --
11     Q   I'm sorry that we're misfiring.
12     A   I initially --
13     Q   Yep.  If I'm not ans -- asking it
14 appropriately, but I'm just trying to find out.
15     And -- and I'll move on and we'll talk
16 about this more in detail later, I guess.
17     But you've made the distinction between a
18 normal anticipated accident, which is how you're
19 describing your simulation of a stock 2015 F250
20 being involved in this accident instead of the
21 subject F250.
22     And you've kind of said, okay, with a
23 stock one, I can rely upon HVE because that creates
24 a crash that the program would expect.  Have I
25 correctly stated that?

10 (Pages 34 - 37)

G. Bryant Buchner , P.E.                    January 23, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 38

1    A    No, no.  You -- parts of it are stated.
2  But I just need to reiterate, we didn't need an HVE
3  for the crash that happened because we have
4  everything we need.
5        HVE was just a tool to analyze what
6  should have happened without a lifted truck.
7  That's all it was.
8        We're having this whole conversation
9  which is actually something I never really had to
10  have.
11       You're -- you're -- I'm just being -- I'm
12  answering your questions, they weren't mine.  I
13  don't need HVE for what you're asking it about.
14       And I never even -- I'm just answering --
15  I'm -- you have to tell the answers honestly now
16  because I'm -- I'm an engineer.
17       But the fact is, I didn't need HVE for
18  the accident because it add -- would add nothing.
19  What I needed HVE was to run what should have
20  happened.  Period.
21       All -- this whole debate, we've been
22  going for, you know, 45 minutes, is about -- about
23  something that is outside of our work.  I'm just
24  trying to answer your questions.
25    Q    Well, I don't mean to be debating

Page 39

1  anything.  And I'm not talking about using HVE
2  anymore to simulate the actual crash.
3        I'm talking about the parameters under
4  which you believe HVE is appropriate.  And you've
5  described the simulated HVE work that you ran here
6  as one of the circumstances where it's appropriate
7  because there's bumper-to-bumper contact that you
8  -- that you believed the program would expect.  Is
9  that fair to say?
10       I'm just saying that's why you believe it
11  was appropriate in the simulation you did in this
12  case?
13    A    No, no, you're -- you're -- you've still
14  got a twist to it that's not appropriate.
15    Q    Okay.
16    A    Basically -- basically we looked at the
17  cars and said, guys, if these were reasonable stock
18  cars, how can we tell what the crush would be?
19       One of the tools we used was HVE, but
20  that was just a, you know, choice.  We didn't
21  choose it -- we're not -- I'm not trying to
22  categorize use HVE in bumper-to-bumper crashes.
23       That's what you're trying to get me to do
24  is to go -- is to -- is to talk about HVE as a
25  universal, you know, when you can use it and when

Page 40

1  you can't.
2        And I've already answered, we -- we look
3  at each individual case by itself and we make
4  judgments there of all the tools we have.
5        So in this case I knew that it would be
6  reasonable with stock cars to run HVE and that's
7  the only decision I had to make and that's the only
8  one I did make.
9    Q    Sure.  Let me ask it this way: Do you
10  have any support -- or would you agree that this
11  was a complex crush-type situation that you're
12  analyzing here?
13    A    What -- what part are you talking about?
14    Q    So if you're going to anal -- use HVE to
15  -- what -- the tool -- the reason you use it in
16  this case is to assist you in determining what type
17  of crush would have been experienced under the
18  hypothetical simulation that you ran using a stock
19  F250, right?
20    A    We -- it was one of the tools to predict
21  what the crush would have been with a stock F250,
22  yes.
23    Q    Right.  And would you agree that the
24  crush with a stock 250 is a complex crush that
25  you lay?

Page 41

1    A    Not any more complex than what we do
2  every single day.  It's -- to us it's not
3  particularly complex, but maybe -- maybe to others
4  it is.
5        It's -- this is just a standard ho hum
6  every single day.  We -- this is what we do.  It's
7  not complex.
8    Q    Well, let me put it another way: Do you
9  have any support that you can cite to that would
10  validate your use of HVE to calculate or determine
11  crush in a hypothetical incident?
12    A    Sure.  I keep two of these books back
13  here.  This is just so I can give one to the staff
14  when they come in and they have all their own
15  books.
16       This is Traffic Crash Reconstruction by
17  Lynn Fricke from the Northwestern Traffic
18  Institute.
19       This is the first book that I have
20  everyone go to in my office to -- as a good primer.
21  It talks about HVE and the robustness of it.  And
22  it talks about crush and modeling the vehicles in
23  it.
24       So it's -- that's -- that's what I think
25  is the premier training organization.  And they --

G. Bryant Buchner , P.E.                                January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 42

1  you know, they -- they reference it and they
2  recommend it.
3      Q    You're saying that book is going to say
4  that HVE can be used to model complex crush
5  situations?
6      A    Yes.
7      Q    All right.
8      A    Accident reconstruction, it uses crush.
9  It references the programs that we used here, yes.
10     Q    Sure.  Now, I know that components of
11 HVE, while we're on it, would be the SIMON
12 software?
13     A    Yes.
14     Q    And whenever you use SIMON, you also need
15 to use the DyMESH model?
16     A    That's how we do it, yes.  I don't think
17 you always do, but yes.
18     Q    And have you had any specific training in
19 SIMON or DyMESH?
20     A    Other than using it for years, no, sir.
21     Q    Okay.  So you've not gone to any classes
22 or anything related to that software?
23     A    No.  If we need something, we'll contact
24 them and we'll talk to them, but no.
25     Q    Sure.  Let me change my screen here.

Page 43

1  Hold on.
2          Sorry, I didn't mean to be sharing it the
3  whole time there.
4      A    I'm only look -- I've got you in a little
5  box in the corner, so it doesn't matter at all.
6      Q    All right.  All right.  I've shared your
7  testimony list.  We'll mark that as Exhibit -- I
8  guess we're on No. 3.
9      A    Yes.
10         (Deposition Exhibit 3 marked.)
11 BY MR. HILL:
12     Q    And I think this goes back to September
13 of 2020.
14         Are you aware of any of these cases where
15 you -- and these are just cases where you've given
16 trial or deposition testimony, correct?
17     A    Yes.
18     Q    And so, you could work as a consulting
19 expert on many other cases where you don't get
20 trial or deposition testimony that are not on this
21 list?
22     A    Sure.  Most of -- majority of our work --
23 majority of our work doesn't ever require a
24 deposition or trial, so it's not listed.
25     Q    Right.  And that's what I'm kind of

Page 44

1  getting at is, with my questions I don't want them
2  to be limited just to trial or deposition cases.
3          But from this list or from your other
4  cases not on this list in this time period, did any
5  of them involve an analysis of an accident
6  involving lifted vehicle?
7      A    I don't know of any off the top of my
8  head, but I have a hard time believing that there
9  weren't lifted vehicle in some of these accidents.
10     Q    But as we sit here today, you don't
11 recall a specific case where you worked on that did
12 involve a lifted vehicle in the accident?  You
13 can't recall one specifically?
14     A    I mean, no, I didn't prepare for that and
15 I -- just sitting here, I don't remember.
16         I mean, I'm thinking -- I'm not able to
17 sit here and quickly recall that.  I'm sure I've
18 done some.  I'm just focused in on this case for
19 this deposition and that's where my mind is.  I'm
20 -- I'm focused here but -- and if I think of one,
21 I'll tell you.
22     Q    Sure.  So obviously you don't recall any
23 time in the past where you've ever testified that
24 the lift -- the lifted vehicle contributed in any
25 way to increased intrusion or crush in the vehicle

Page 45

1  that it hit?  That's what I'm trying to get at.
2      A    No, I -- probably not.  Basically I just
3  say here's what it is.  You know, in other words,
4  I'm not really -- I'm pretty much just a facts guy,
5  here's what happened, here's where it is.
6          You know, so it -- it just come out like
7  car A hit car B and this is the crush.
8      Q    Sure.
9      A    I don't remember specifically.  I'm sure
10 I've been asked a lot, well, if it didn't override
11 what would it look like or something like that, but
12 I just don't remember any of those cases.
13         Normally it's just what it is.  It is
14 what it is.
15     Q    Well, speaking to that, how many of the
16 cases that you can recall within this time period
17 that you investigated involved override, as you've
18 just described it?
19     A    Well, override, you know, can happen,
20 especially with an 18-wheeler.  A vehicle run into
21 the rear of an 18-wheeler, the side of an
22 18-wheeler.  You can also get -- run into objects
23 and cause override.  Sometimes you've got multiple
24 impacts where vehicles get -- you know, get
25 changed.

12 (Pages 42 - 45)

G. Bryant Buchner , P.E.                                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 46

1      So, you know, override is something that
2 we in some shape, form, or fashion deal with a fair
3 amount.
4      Q   Sure.  So it can happen without the
5 necessity of one of the vehicles being -- having a
6 lift kit installed?  You can have override in a lot
7 of different situations?
8      A   Yes.
9      Q   All right.  From this list and from your
10 general experience, can you give me a breakdown,
11 and I know you get asked this question in every
12 deposition, but the percentage of the cases you
13 work on that are for -- or where you're retained by
14 lawyers for the plaintiff versus the number of
15 cases where you're retained by lawyers for the
16 defense?
17     A   It's a 50/50 breakdown.  We got as many
18 plaintiff projects that I have defense cases over
19 the years and we maintain it about that at any
20 time.
21     Q   Right.  And so you would -- your
22 testimony would be from this testimony list you
23 would estimate that 50 percent of the cases on this
24 list you testified on behalf of the defense and 50
25 percent on behalf of the plaintiff.

Page 47

1      And I'm not holding you to an exact
2 percentage, but that's your testimony and probably
3 your recall of your role in these cases?
4      A   Yes.
5      Q   Okay.
6      A   Just because that's -- that's how we
7 manage the work when it comes in.  So it goes out
8 the same way it comes in usually.
9      Q   So how do you manage that?  I mean, you
10 can't control who calls you and asks you for your
11 help.  So do you actually limit the number of cases
12 you'll take from one side or the other in order to
13 keep the 50/50 ratio?
14     A   Right.  We'll get more calls than I can
15 handle.  And so, if we -- if there's an imbalance,
16 we just don't -- let's say we've been -- got too
17 many defense projects for that month, we'll just
18 back off.  And -- and before we finish the month
19 out, we'll -- we'll balance it out.
20     So we target a 50/50 on the intake side.
21 Because I can't -- we don't do every project we get
22 asked to do.
23     Q   Right.  How many of the cases on this
24 list were you retained by Ms. Cannella's firm or
25 her former firm, Butler Wooten, just give -- if you

Page 48

1 can recall?
2      MS. CANNELLA:  Object to the form of the
3 question as a compound question.
4 BY MR. HILL:
5      Q   Well, I just tried to make it simple in
6 one question, but I can ask it individually if you
7 want, if you don't understand it.
8      A   On here, three or four, is my guess with
9 you.
10     Q   Right.  So you don't know specifically
11 how many, but your guess would be three to four?
12     A   Yes.
13     Q   All right.  And just with Ms. Cannella's
14 firm, her new firm, how many cases have you worked
15 on with her?
16     A   I don't know.  I don't -- I didn't pay a
17 lot of attention.  I still have -- the original
18 group grouped in my mind, so I don't -- and I don't
19 know what happened to the projects that they had
20 and how they split them up or anything.
21     So I know of this project and I can think
22 of one other that I've worked on.  But there might
23 be more.
24     Q   Do you know of any other that you are
25 currently working on?

Page 49

1      A   Not off the top of my head, no.
2      All right.  I'm not sure who's got them.
3 I think I can think of three.
4      I think there is one other project.  I
5 don't know what it is, but I did hear a reference
6 recently to a project.  I didn't know the name of
7 it.  And I think Ms. Cannella was associated with
8 it.
9      Q   When you say recently a part of it, do
10 you mean that you're currently working on it or
11 you're just aware that you might be working on it?
12 Or what does that mean?
13     A   Well, I didn't recognize the style or the
14 name and I asked someone who that was.  And it was
15 alluded to that was one of Ms. Cannella's projects.
16 I think it's one we were working on.
17     But I never -- I don't remember names
18 very well.  So I'm -- I'm answering your question.
19 I think I would say three is the best answer.
20     Q   Three that you're currently working on?
21     A   Three I have.
22     Q   Three that you have.  Okay, I understand.
23 Sure.
24     MR. HILL:  All right.  And if I didn't
25 mention it, Ms. Court Reporter, that will be

13 (Pages 46 - 49)

G. Bryant Buchner , P.E.                          January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 50

1  Exhibit 3, I believe, that we were just talking
2  about, his testimony list.
3        (Deposition Exhibit 4 marked.)
4  BY MR. HILL:
5     Q   All right, now I've shared your fee
6  schedule.  I'll make that Exhibit 4 just so we have
7  it.
8        And the only question I really have is
9  that is your current fee schedule and -- and
10 reflects the fees.
11       I know this may not reflect the fees that
12 you charged throughout the history of this case,
13 but it reflects the fees that you're currently
14 charging in association with your work in this
15 case; is that fair?
16    A   Yes, sir.
17    Q   All right.  And that would include the
18 $1,800 deposition retainer fee related to today's
19 deposition?
20    A   Sure.
21       MR. HILL:  All right.  That's Exhibit 4.
22       (Deposition Exhibit 5 marked.)
23 BY MR. HILL:
24    Q   All right.  I've just shared what I
25 believed to be the invoices that you have invoiced

Page 51

1  from your work on this case.
2        We'll make that Exhibit -- whatever we're
3  on now, No. 4, I believe, or No. 5.
4        And I just have a few questions about
5  this.  I don't know if you have it with you there.
6  It might be easier to look at.
7        But I'll take us to what I am now showing
8  as Invoice No. 26196.  I believe that's the first
9  invoice chronologically that we have related to
10 your work in this case.  And I just want to confirm
11 a few things.
12       It appears -- appears that the new file
13 intake or setup occurred on December 16th of 2021.
14       Is that fair to indicate that would be
15 your company's first involvement with this case?
16    A   Yes.
17    Q   All right.  And do you normally on your
18 invoices indicate when you have communications with
19 the client, and the client being the lawyers that
20 have retained you?
21    A   I would say no.  If there's a formal
22 meeting set up or something, the office will
23 normally get it billed that way.  But if I just
24 accept a phone call or -- then probably doesn't get
25 recorded that way.

Page 52

1     Q   Well, on -- on December 21st, 2021, I
2  believe, someone from your office charging at a
3  rate of $150 indicates a telephone conference with
4  a client.  Is that what's kind of indicated on
5  this?  See on December 21st?
6     A   Yes.
7     Q   I notice that you don't indicate the
8  actual name of the person working on it, there's
9  just the rate.
10       So do you recall who the project
11 engineers or the other individuals on this who
12 worked on -- on this action matter for you?
13       I know you can tell by the rate that
14 $150 rate is going to be a project engineer, a
15 $400 rate is going to be the chief engineer, which
16 I assume is you.  Is all of that correct?
17    A   Yes.
18    Q   And then $105 or $100 might be a project
19 manager?
20    A   A staff engineer-type person, yes.  Could
21 be some project management there, too.  But it's a
22 junior -- junior technical person.  Could be a
23 project manager or it could be a staff engineer.
24    Q   Right.  And do you have a list anywhere
25 of the actual project managers, project engineers

Page 53

1  and other individuals that worked on this case with
2  you?
3     A   I don't.
4     Q   Okay.  And is there any way to determine
5  that, I mean, who was involved?  It's -- it's not
6  indicated on the billing.  I guess you'd have to
7  look back at each of these individual billing
8  records to determine which people were involved?
9     A   Right.  I don't know if that exists or
10 not.  The work I'm -- that was initial setup work
11 which probably -- you know, it's -- a lot of that
12 is just busy work.
13       It's very vital to us, but it's pulling
14 the specifications, getting Google aerial set up,
15 you know, reading through the initial accident
16 report.
17       So it's -- it's -- I don't know who did
18 that at that point in time.  I know who's done it
19 now, but not at that time.
20    Q   Fair enough.
21       Well, just -- with regard to your
22 activities here in the month of December of 2021,
23 there's what appears to be two entries.  Both are
24 for engineering analysis.  One on the 17th and one
25 on the 21st.  Is that --

14 (Pages 50 - 53)

G. Bryant Buchner , P.E.    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 54

1   A   Yes, sir.
2   Q   Is that correct?
3   A   Yeah, and that's -- and that was a good
4 example because more than likely I was involved in
5 the telephone conference, but it just says
6 engineering analysis.
7       So a junior engineer reviewed the
8 materials, had a telephone conference with the
9 client. I was also on that call looking at the
10 bill, but it just didn't show up on -- on my entry,
11 so.
12      This -- that's -- just trying to clarify.
13 Hope it helps.
14  Q   No, sure. That makes sense.
15      You would have put down all of the time
16 for your work on the case other than potentially,
17 you know, communications with the client; is that
18 right?
19  A   No. If I'm in the back working -- I say
20 in the back, most of the engineering goes on in the
21 back office, and I go up and I talk to somebody
22 about a case, you know, if it's an informal
23 meeting, we're going over what they're doing, you
24 know, that doesn't get billed.
25      If they come in here and schedule some

Page 55

1 time it'll -- it'll get captured a lot better.
2       But, you know, my aiding the staff, is
3 part of my job as the chief engineer, so that
4 doesn't always get billed.
5       If it's something specific that directly
6 requires me to sit down and -- and, you know,
7 schedule some time to do it, it will tend -- tend
8 to show up on the bill.
9   Q   All right. Well, is it fair to say that
10 in December you -- you billed 2.5 hours for
11 engineering analysis?
12  A   Yes.
13  Q   And you say there may be some additional
14 time you worked on this case, but you're not sure?
15  A   Right. Normally it's going to be a
16 little bit. But, you know, two and a half is what
17 we billed and two and a half is a good number.
18  Q   Right. And then if we turn to the next
19 page, this is for January of 2022, and it doesn't
20 appear that you billed any time during that time
21 period for work on this case, correct?
22  A   That is correct, yes.
23  Q   And if we go to the next invoice, this is
24 for the time period -- there's one day in
25 January -- but it's mostly for February of 2022.

Page 56

1 And it doesn't appear -- it appears at this point
2 that you billed for one hour of work on 2/22?
3   A   Yes.
4   Q   All right. And you have virtual vehicle
5 inspection listed as your work.
6       Just what -- what does that mean exactly?
7 What's a virtual vehicle inspection?
8   A   Sure. James Fries, with my office
9 F-R-I-E-S, looked at both the vehicles, and he
10 included me via a Zoom-type device so that I could
11 -- he does the preliminary inspections. He
12 contacts me. I look at what I want to look at, we
13 talk about the work we're going to do, and then he
14 proceeds to do it.
15      So that's -- that's a convenient way to
16 involve me without me having to travel all the way
17 to Atlanta or wherever the vehicle happened to be
18 at that moment.
19  Q   Great. That's what I thought.
20      So he actually traveled -- and I can't
21 tell which day exactly. I guess, the CDR download
22 probably would have been loaded later, but sometime
23 in February he actually performed a visual -- a
24 physical -- blah -- a visual inspection of the
25 vehicle and a CDR download; is that correct?

Page 57

1   A   I think he did more than a visual, but
2 yes, he did an inspection of both vehicles and a
3 CDR download of the truck.
4   Q   Yeah. And when I say "visual," I just
5 mean he was actually there?
6   A   Yes.
7   Q   Yeah. And then I know he did scans and
8 other things. I -- I didn't mean to exclude that,
9 but he was --
10  A   Okay.
11  Q   Yeah. And this is the first time someone
12 from your office actually was physically present
13 with the vehicles involved in the incident?
14  A   Yes.
15  Q   Okay. All right. Just quickly going to
16 the next invoice which is No. 26627.
17      There's a charge here for "Other: Lift
18 Kit." Can you explain that? Were there multiple
19 lift kits purchased from Rough Country or what's
20 occurring there?
21  A   Right, we bought two lift kits. I think
22 early on -- you know, so we bought a 4 1/2-inch and
23 6-inch lift kit from Rough Country just as
24 exemplars to have to look at.
25  Q   At this point had you determined whether

15 (Pages 54 - 57)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 58

1 a 4 1/2- or 6-inch lift was on the vehicle?
2    A   Not fully.  We knew the front of the
3 truck had gone up 6 inches, but I think we had
4 indications it was a 4 1/2-inch lift, so we looked
5 at both of those.
6         I don't remember the exact process,
7 thought process at that time, though, but there was
8 -- there was always, you know, an observation that
9 it was near a 6-inch lift.
10        But also I believe we also had been told
11 or had documentation that it was a 4 -- 4 1/2-inch lift.
12    Q   And so during the vehicle inspection in
13 February, Mr. Fries -- is that how you pronounce
14 his name?
15    A   Fries (pronunciation), yes.
16    Q   Yeah.  That he had -- he was not able to
17 determine size of lift kit during that inspection?
18    A   Yeah, because of the confusion, yes.
19    Q   Right.
20    A   Quite possibly.
21    Q   And -- and what was the purpose of
22 obtaining exemplar lift kits?  What -- what did you
23 intend to do with them?
24    A   Just more information.  Clearly, I wanted
25 to see what the individual components were.  The

Page 59

1 Rough Country diagrams we had gotten from the
2 internet or wherever, they showed the same pictures
3 for the 4 1/2 kit and the 6-inch kit.
4         In other words, you can't tell from the
5 images that we were able to find the difference
6 between them.  So we said, well, let's just --
7 let's order them and make sure we're, you know --
8 we're not being fooled by a picture, which we were
9 being fooled by a picture.
10    Q   When you say you're being fooled by a
11 picture, what do you mean?  You couldn't --
12    A   The images that we were able to find for
13 a 4 1/2 and a 6-inch lift kit were the same image.
14        So we -- we -- we -- we realized that
15 that was not -- that the information we could get
16 was not reliable.  So we said, okay, let's just --
17 let's order the kit.
18    Q   Are you relying upon your inspection of
19 the exemplar lift kits to give your opinions in
20 this case?
21    A   I would say no because we have
22 documentation of it being a 4 1/2-inch lift kit
23 now, so I would say no.
24    Q   Okay.  I was hoping you would say that.
25 I didn't want to waste your time asking questions

Page 60

1 about what you ordered and when you ordered and all
2 of that stuff, but if --
3    A   Sure.  Thank you.
4    Q   So moving ahead to Invoice 27114-A.  And
5 there's a charge on September 29th of 2022 for
6 "Base: vehicle scan processing."
7         And then the next invoice has similar
8 charges in October for "Base: scene drawing; Base:
9 Vehicle drawing; Base: scene/vehicle drawing."
10        Just kind of tell me what -- what do
11 those represent and what's going on there.
12    A   Sure.  Base refers to just objective data
13 that's visible.  The shape of the vehicle.  The
14 outline from the measurements.  The shape of the
15 scene.
16        The officers did a great job of
17 photographing and making photo mosaics.  Well, we
18 turned those into drawings, you know, so that we
19 can make measurements on them.
20        You know, it's just -- it's the
21 background work to help with the later on detail
22 reconstruction.  This is foundational work that's
23 going on that you're looking at here.
24        The scans were taken.  We have to process
25 the scans, we can use it to make measurements and

Page 61

1 that type of stuff.
2    Q   That's what I thought.  So these are
3 processing the scans that Mr. Fries took back in --
4 in February of that year?
5    A   Yes.
6    Q   All right.  And scene drawing, have you
7 guys -- no one had been to the scene in October of
8 2022, correct?
9    A   That's correct.
10    Q   So when you say base scene drawing,
11 what's that mean?
12        And then he's using photographs that the
13 police took that you referenced, but how are
14 they -- they doing that?
15    A   The officers made a scale diagram.  So we
16 import their scale diagram.  So we draw on top of
17 them.  We also use aerials.
18        We're going to check their work, and
19 that's what's going on here.  And that can all be
20 done, you know, in-house with information we have
21 available over the -- you know, from Google and
22 other aerial services we use and that type of
23 stuff.  So that's all that's going on here.
24    Q   Okay.  Moving forward to Invoice 27394-A,
25 there's a reference to exemplar car seats.

16 (Pages 58 - 61)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 62

1        Was there more than one exemplar seat
2  purchased?
3      A   I only remember one.
4      Q   All right.  And do you remember the date
5  of manufacture of that exemplar seat?
6      A   Excuse me.  I coughed.
7        No, I don't remember the date of
8  manufacture.  It was the same seat as far as we
9  could tell, though.
10       I don't remember everything that we went
11 through to tell that, but it was -- really it was
12 the shape.
13       We were going to test it for -- we were
14 going to use it as a mockup to look at the geometry
15 of the seat and they matched perfectly there.
16     Q   And you -- you used it to place it in the
17 exemplar 2015 -- I'm sorry, the exemplar 2010 Ford
18 Escape that you used in the -- for the model?
19     A   Yes.
20     Q   All right.  And do you have any
21 documentation anywhere in your file as to when that
22 was purchased, who it was purchased from, what year
23 it was manufactured, anything like that that would
24 validate that it was the same as the seat involved
25 in the subject crash?

Page 63

1      A   Well, I validated it looking at it
2  because that's -- that's what I wanted.
3        But we can -- I'm sure there's some
4  documentation.  We have the seat itself somewhere
5  that we could provide.
6        So whatever someone needs, we could -- we
7  could go back and crowbar it out of a file
8  somewhere or maybe make the seat available.
9      Q   Sure.  Well, thanks.
10       I'm trying to get through this as fast as
11 I can and then we can take a break, if that's okay
12 with you.  Don't want to leave it up to me to make
13 you not be able to have a break.
14     A   Just for -- that was really hard to
15 understand.  All you said was we'll take a break
16 when we need to, thank you, but...
17     Q   Sorry for my poor audio.  I apologize.  I
18 was saying -- are you okay for us to just finish up
19 with these bills before we take a break?  I didn't
20 mean to go on and on without giving you an
21 opportunity for a break.
22     A   Thank you.  I'm -- I'm waiting on you to
23 get to the end of bills.  I think that's a great
24 idea.
25     Q   Okay.  Great.

Page 64

1        All right.  I've now put up there Invoice
2  29108-A from September 30th of 2023.
3        And there appears to be a bill here of
4  14.75, I guess that's hours, and that's at the rate
5  of 450.  So I assume that's you on September 6th of
6  2023.
7        Would that reflect you actually making a
8  trip to see the accident vehicles in person?
9      A   Yes.
10     Q   And that's the first time you actually
11 saw them in person?
12     A   Right, before I -- via video during the
13 inspections, but I actually was there in person for
14 the first time here.
15     Q   Sure.  And how much of this 14 -- does
16 the 14.75 include travel time as well?
17     A   I -- I wouldn't think so, but I don't --
18 I don't remember exactly.  I was there -- in my
19 memory, I was there for seven or eight hours, so
20 it's probably just -- maybe just one-way travel.
21 We were there for a long time.
22     Q   That's what I was getting at.  So you'd
23 estimate you visually inspected the vehicles -- and
24 I know you might have done other things other than
25 just look at it, but you were there for seven to

Page 65

1  eight hours on that day?
2      A   That's an estimate.  I don't -- I don't
3  remember exactly how many, but it was -- I was
4  there for, yeah, more than five I'm certain of.  I
5  -- I don't know the exact time.
6        So looking at that it looked like --
7  14.75 looks like too short a day to drive from here
8  to there and do that and get back, but...
9        And -- yeah, I had -- I had help with me,
10 too, that's not on the bill.  I don't know why.
11     Q   I would assume someone was there with
12 you, but that -- that person's time is not
13 reflected on this bill?
14     A   Right.  One of the project engineers or
15 the project engineer for this case went with me.
16 She had already seen the vehicle once before, so.
17     Q   And what was her name?
18     A   Melanie Porter, P-O-R-T-E-R.
19     Q   Right.  And I did not have anywhere here
20 where I saw that Melanie had visited the vehicles
21 in person prior to this, but -- but you're saying
22 she did and maybe just wasn't reflected on the
23 invoices?
24     A   No, she did.  She -- when the car seat
25 was put in the accident vehicle, she did that and

17 (Pages 62 - 65)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 66

1  scanned.  So you alluded at it a few minutes ago.
2  That was -- Ms. Porter did that.  So she had seen
3  the vehicles before.
4      Q    All right.  And I think if you look at
5  the next invoice which has got the same number, I
6  think it's the -- I should have shown you the first
7  page of it.
8          You'll see at the very bottom where it
9  appears that she billed the same amount of time for
10 "Document accident vehicles;travel" on 9/6.
11     A    You're right.  Thank you.
12     Q    Yeah, I didn't --
13     A    I didn't want to leave anything out.
14     Q    Yeah, I didn't realize this was the same.
15 Because this was basically the same invoice.  I
16 apologize.
17         On this invoice here where there is a
18 reference to "Engineering analysis; review file and
19 reconstruction," there are quite a number of
20 entries that reflect that.
21         Is this reference to reconstruction --
22 what is that referencing?
23         Is it referencing your reconstruction of
24 the actual accident or is it referencing the HVE
25 reconstruction or simulation?

Page 67

1      A    It could be any of that.  Depending on
2  how someone put it on their time sheet, we wouldn't
3  -- we wouldn't differentiate between those two
4  activities.
5      Q    So there's no way to differentiate from
6  your invoices how much time was spent on the HVE
7  simulation?
8      A    Right.  The HVE is really a small part of
9  the total work.  We -- we ran the calculations, but
10 it's -- it's in here somewhere.  I don't know where
11 it is.  But, yeah, it's -- it's just a tool.  But
12 most of this would not be related to HVE.
13     Q    Right.  Do you know how much time was
14 spent on the HVE simulator?
15     A    No, sir, not off the top of my head.
16     Q    Do you know when it was performed?
17     A    I -- I don't have a date memory.  I --
18 people have to still me it's 2024, so, no.
19         We've changed.  Can I take a break?
20     Q    Yeah, I was just looking at some real
21 quick.  We can take a break.
22     A    If we're not done with the bills, let's
23 go back and finish them.  I -- I didn't mean to
24 interrupt you.  I thought you were shifting gears.
25     Q    Well, my only other real question about

Page 68

1  billing is that the last one that I had on the
2  screen was the last one that we have in time.
3      A    Okay.
4      Q    And I was curious whether there's been
5  additional invoicing since then?
6      A    No, there has not.
7      Q    All right.  And I put my -- let me take
8  it off of sharing.
9          You've obviously done work since the end
10 of September of 2023 on this case, correct?
11     A    Yes.
12     Q    And your report was in October of 2023.
13         Since the issuance of your report, have
14 you done any work on this case other than preparing
15 for today?
16     A    Other than just trying to stay up to
17 speed, no.  There's only been Bate stamping things
18 and, you know, I think the depo's been scheduled a
19 couple of times.  I don't mean to infer anything.
20         It's just -- yeah, it's been -- but I --
21 practically I don't know that any real work's
22 happened, but I could be wrong.
23     Q    Well, that's what I'm getting on.  There
24 -- you're not aware of any additional simulations,
25 any additional trips to the vehicles, trips to the

Page 69

1  scene, anything of that nature, that's occurred in
2  this case since the time of these bills?
3      A    That's correct.
4      Q    Okay.  And one last thing on this bill.
5  There's a bill for "Scene visit; travel" on
6  July 14th of 2023.
7          I'm assuming that's the first time that
8  you visited the scene of the accident?
9      A    Yes.
10     Q    And it's the first time that anyone from
11 your office visited the scene of the accident?
12     A    Yes.
13     Q    And the purpose of that visit was to scan
14 the scene of the accident?
15     A    No.  The officers did -- we confirmed
16 through our drawings we thought that their drawings
17 were accurate, so our work -- I went to the scene
18 personally to look at it, make sure we weren't
19 missing some information that we needed.
20         I don't remember scanning it that day.  I
21 don't think I needed to.  So, I think I took
22 photographs and we're happy using the officer's
23 foundation of what they documented.  They did a
24 fine job.
25     Q    All right.  In totaling these invoices, I

18 (Pages 66 - 69)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 70

1 have approximately $65,000 in billings reflected on
2 this invoice. I wouldn't expect you to know off
3 the top of your head the total amount.
4      But does that sound like a fair
5 representation of your billing through the end of
6 September 2023?
7    A   Oh, yes, sir.
8    Q   All right.
9      MR. HILL: Why don't we take a break now.
10 I appreciate it.
11     THE WITNESS: All right. Thank you,
12 Rick. Back in a moment, Mr. Hill.
13     VIDEO TECHNICIAN: The time is 12:32. We
14 are off the record.
15     (Recess taken.)
16     VIDEO TECHNICIAN: The time is 12:48. We
17 are back on the record.
18     MR. HILL: Thank you.
19 BY MR. HILL:
20    Q   One last question that kind of relates to
21 what we were just talking about. I thought I'd
22 start with that.
23      And that is, you indicated from the
24 billing records you can't tell when the simulation
25 was run using HVE, but you mentioned that after it

Page 71

1 was run you would print out the reports it
2 generated and you have hard copies of those?
3    A   That's my understanding, yes, sir.
4    Q   All right. And when would those have
5 been printed out? Would it have been right after
6 the simulation was run?
7    A   Yeah, it says 10/13 of '23.
8    Q   Right. So that would be -- would that
9 indicate to you that that was the date that the
10 simulation was ran?
11    A   That would be my starting preliminary
12 belief, yes, sir.
13    Q   All right. Great.
14      All right. Let me see if I can share my
15 screen again.
16    A   Okay. Let me update that.
17    Q   All right.
18    A   See, if I'm looking at 10/13 of '23,
19 that's a print date. The report says 10/12 of '23,
20 and we had referenced it. So apparently in
21 collecting our materials that went into the report
22 it was printed.
23      So it was run maybe a day or two before,
24 but the reports were printed the day after the
25 report just for filing. Thank you.

Page 72

1    Q   All right. But you -- but you believe
2 the simulation was run a day or two before that?
3    A   Yes. I don't know if it was a day or two
4 or a week or two, but before that, yes, sir.
5    Q   All right. So you believe the date on
6 this is just the day it was printed, not the date
7 it was run?
8    A   We're -- we're swapping -- we're being
9 too fine here. It could have -- it was definitely
10 run before the report went out. What -- the
11 printing we have is on the -- the day after the
12 report went out.
13      Someone may have rerun it the day after
14 to generate the reports, but -- but all the
15 information I needed and wanted, I've been able to
16 look at before the report. I don't know whether it
17 was run and just wasn't printed or whether it was
18 rerun for the purpose of printing after the date.
19    Q   I understand.
20    A   Thanks.
21    Q   So you would have referenced the digital
22 file in preparing the report and not necessarily
23 needed a printed version of it?
24    A   No, I -- I like to work off of a printed
25 version. I -- I -- but I trust the staff to print

Page 73

1 copies and put them in the file. I'm -- I'm
2 working on a printed version and I'll throw mine
3 away when I get done. They're supposed to give me
4 a copy and have a copy.
5      But it's kind of messy, too, because, you
6 know, we're -- we're really not worried about
7 printing at that point in time, we're worried about
8 engineering, which is, believe it or not, two
9 different worlds.
10    Q   Sure.
11      MR. HILL: I'm sharing the screen. We
12 can mark this as whatever we're on now. I think
13 Exhibit 6 maybe?
14      THE COURT REPORTER: Correct.
15      (Deposition Exhibit 6 marked.)
16 BY MR. HILL:
17    Q   And this is -- I'm sure you've got a copy
18 of this there in front of you, Mr. Buchner. You
19 probably -- it would be easier for you to refer to
20 your hard copy, but this is your October 12th, 2023
21 report we were just mentioning?
22    A   Yes.
23    Q   It is Bates labeled Bryson 1350 through
24 1361.
25      Have you amended or changed or done

19 (Pages 70 - 73)

Veritext Legal Solutions
800.808.4958                                         770.343.9696

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 74

1 anything to this report since October 12th of 2023
2 or is this still your current version of your
3 report?
4     A   Still my current version.  I only have
5 one typo in the report.  We said the airbags of the
6 F250 deployed, they didn't.  That was a -- that was
7 a typo somewhere in the report.  Other than that,
8 no, sir.
9     Q   All right.  So have you gone back and
10 changed the report or is that -- you're just
11 pointing out something you noticed in reviewing for
12 the deposition?
13     A   Yes.
14     Q   Okay.  And I'm assuming you have that in
15 front of you so I don't have to have it up on the
16 screen?
17     A   I do, but I'm -- I -- it's very easy for
18 me to read it if you'll leave it up, but however
19 you want to do it.
20     Q   Okay.  Great.  Well, let me -- hold on
21 one second.  Just -- this is related to it.
22         All right.  I've now put on the screen
23 Bryson 1362 through 1374.  And in your digital
24 files this is entitled Support for your report.
25         Is this something that is part of your

Page 75

1 report, is it just like an attachment to the
2 report?  Like how would you describe this document?
3     A   I -- I don't know.  It's -- it's
4 materials that I think help you interpret the
5 report if you want to dig deep.  They're reference
6 materials.
7         I don't remember whether it was formally
8 attached or just sent as support information, you
9 know, for the reader's benefit.  I -- I don't
10 remember.  I don't know how to call it.
11         MR. HILL:  All right.  We'll mark what I
12 just mentioned, 1362 through 1374, as Exhibit 7 if
13 I'm correct.
14         (Deposition Exhibit 7 marked.)
15 BY MR. HILL:
16     Q   And you're okay with the title "Support"?
17     A   Report support, sure.
18     Q   All right.  Sure.
19         All right.  So here's the report.  And if
20 I don't have it on the right page, tell me at any
21 time, but it's about time we got down to your
22 report.
23         So I appreciate you -- you having the
24 patience going through all of that introductory
25 stuff.  Hopefully, that will make a lot of this go

Page 76

1 faster.
2     A   Okay.
3     Q   On -- on Page 1, you note that the posted
4 speed limit was 55 miles per hour at this incident.
5         Did you during your site visit to the
6 scene confirm that when you were at the scene?
7     A   No, I can go back and look.  But I'm
8 aware that in one place the officers said 45, and
9 in another place they said 55.
10         I -- I didn't have a thought to go back
11 and check my scene visit to see which one it was.
12 It doesn't make a difference to my opinions.
13     Q   Sure.  It makes no difference, we're just
14 -- I just want to make sure we're on the same page
15 with any typos and so forth.
16         Like on the very next page, Page 2, under
17 Work Performed, you said that your group inspected
18 and documented the two vehicles between February
19 2021 and September 2023?
20     A   Yes.
21     Q   Is that a typo there?  Is that meant to
22 be February 2022?
23     A   As a matter of fact, it is.  Thank you.
24     Q   No problem.
25         At one place in your material the -- if

Page 77

1 you look down here where you're listing the
2 exemplar vehicles, you have a 2008 Ford Escape
3 exemplar vehicle.
4         There was some notification in your
5 records that the exemplar vehicle was actually a
6 2010 Ford Escape.
7         Do you know which one is accurate?
8     A   I'm thinking to see if I can give you a
9 clear answer and I don't remember the date of that
10 vehicle, so I'd have to do a little research.
11 It's --
12     Q   Okay.
13     A   And it's specific to the exemplar.
14     Q   As we go through we may look at some
15 documents that may clear that up.  Just was curious
16 if that was just another typo or if that's actually
17 accurate.
18     A   Thank you.  I'll -- I'll watch to help
19 clear that up if we can.
20     Q   All right.  Next we're on Page 3 under a
21 section entitled Observations.  The very last
22 bullet point under Observations related to the
23 Escape.  You say: "The rear bumper of the Escape
24 was only slightly bent."
25     A   Yes.

20 (Pages 74 - 77)

G. Bryant Buchner , P.E.                     January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 78

1    Q   What do you mean by "slightly bent"?
2    A   It was very unremarkable in the amount of
3  damage to it.  In other words, I've seen cars in
4  minor collisions that had bumpers that were bent
5  this badly and still on the vehicle, you know, and
6  I'm talking about a vehicle, the vehicle drives off
7  and, in fact, you have to look under the bumper
8  cover to see this damage because the bumper cover
9  goes in and bounces out.
10       And so the photos show what it looked
11  like, but it was very unremarkable in the amount of
12  damage to it relative to the severity of the crash.
13   Q   Was the bumper of the Escape on the
14  vehicle when you inspected it?
15   A   By that time it was off if my -- it was
16  hang -- it was -- it had dropped off.  Gone after
17  the accident hanging by a thread more or less, but
18  then by the time I saw it, it had come completely
19  off.
20   Q   Sure.  And did you look at the brackets
21  that support the rear bumper?
22   A   Yeah, they were still on the bumper.
23  They had torn away from the frame rails or the
24  frame rails had torn away.
25       So, yeah, they had for -- damage for the

Page 79

1  bumper had allowed the bumper to come off, but the
2  metal that it had been bolted to was still attached
3  to the bumper.  And the metal had been ripped and
4  torn apart to allow it to dislodge.
5    Q   Gotcha.  And the holes in the brackets,
6  were they deformed or elongated?  Would that be a
7  proper way to describe it?
8    A   I don't remember that.  I'd have to go
9  back and look.  I -- I remember more the more
10  significant frame rails were basically -- we call
11  them frame rails.  That's what I like to call them,
12  but the unibody rails, were -- were -- were torn.
13  But we can look at the photos.  I don't -- I don't
14  remember the holes themselves being damaged.
15   Q   All right.
16   A   If I might interrupt.
17   Q   Sure.
18   A   The exemplar that we saw was manufactured
19  of 2 of '10.  So it actually could have been a --
20  yeah, 2 of '10, so it was a -- probably a 2010
21  vehicle.
22   Q   Right.  And then we're talking about the
23  Ford Escape exemplar that you used in your
24  analysis?
25   A   Yes, sir.

Page 80

1    Q   All right.  All right.  The second to
2  last bullet point under Observations on Page 3 you
3  indicate that "The Escape's measured weight was
4  3,410 pounds at the inspection on February 22nd,
5  2022."
6    A   Yes.
7    Q   How did you measure the weight of the
8  Escape on that day?
9    A   We have scales that we carry with us in
10  our field work trucks.  We drove it upon those
11  scales and photographed and wrote down the
12  measurements, the weights of the Ford --
13   Q   Right.
14   A   -- tires.
15   Q   Right.  Like wheel scales, I guess, would
16  be a common term for those?
17   A   Sure.
18   Q   Yeah.  And -- and who manufactured those
19  wheel scales, do you know?
20   A   I don't remember.  We've had them for a
21  long time.  Same manufacturer we've been using for
22  20 years.
23   Q   Do you know the capacity and readability
24  of those scales?
25   A   Some of them have a 10, plus or minus 10,

Page 81

1  some have a plus or minus 20, I think, but I'd have
2  to go back and look on them.
3    Q   Not sure which -- which one you used in
4  this case?
5    A   We have -- we have local ones we carry,
6  yes.  I don't remember off the top of my head.
7    Q   Okay.  And they're scales you own?  Like
8  you own those, right?
9    A   Yes.  Yeah, they're standard.  We use
10  them, you know, every week.
11   Q   All right.  How often do you calibrate
12  those?
13   A   Well, we -- we self-check them by putting
14  our vehicles on them.  So we -- we know when one's
15  out of calibration.  So we do a calibration check.
16       Whenever we find an issue, we'll have
17  them recalibrated by the manufacturer.  So it's on
18  an as-needed basis.
19       Every now and then we'll periodically
20  just send them off anyways.  But I don't -- I don't
21  remember the exact calibration schedule, but we are
22  checking the calibration.
23       I used to do calibrations at the other
24  firm I used to work at.  So as long I'm getting the
25  right reading, I'm happy.

21 (Pages 78 - 81)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 82

1    Q   Right.  But you can't say here today when
2  the last time they were calibrated prior to your
3  using them on February 22nd of 2022?
4    A   Right.  I just know that we do the
5  calibration checks regularly so that we'll -- if
6  there's a problem, we take that one, that one scale
7  out of rotation and, you know, put another one in
8  the rotation while that one gets calibrated.
9    Q   Right.  Given the weight you measured
10  that day of the post incident version of the
11  Escape, do you have an opinion about the total
12  weight of the Escape at the time of the crash?
13    A   Yes, I do.  It's in my materials.  But
14  basically we just add the weight of the occupants
15  to it.  It still had the --
16    Q   Right.
17    A   -- it still had the luggage in the back.
18  It wasn't luggage, but the cargo in the backseat
19  and the vacuum cleaner and a few other things.
20    Q   Yeah, did you in estimating the weight at
21  the time of the crash account for the items in the
22  cargo hold?
23    A   Yeah, they were in the car.
24    Q   Right.  But I'm saying -- they were in
25  the car at the time you weighed it?

Page 83

1    A   Yes.
2    Q   Weighed the vehicle?
3    A   Yeah.
4    Q   Okay.  Do you know at the time that you
5  weighed the car with the cargo in the cargo hold
6  whether those items were in the same position they
7  were in after the crash?
8    A   Reasonably, yes.  They were in the
9  backseat.  I mean, they -- I say in the backseat.
10  They were in the -- behind the backseat in the
11  hatch area, in front of the hatch.
12       That's my recollection of -- that's where
13  they were when I saw them, and that's my
14  recollection of where they were when we weighed it.
15    Q   Yeah.  And what I'm trying to get it is,
16  did -- I don't know if someone took it, took that
17  cargo out and you put it back in to weigh the
18  vehicle or it hasn't been touched since the time of
19  the crash and so you got to see it sort of how it
20  would have looked at the scene.
21       You know, what is your understanding as
22  to the location of those items when you saw them in
23  relation to where they were located at the time of
24  the crash?  That's just what I'm trying to get at.
25    A   My understanding and my recollection is

Page 84

1  that they were reasonably positioned as they were
2  at the time of the crash, but it would not change
3  any of my analysis if for some reason someone had
4  put the vacuum cleaner in the front seat.  We'd
5  still have the right weight for the calculations.
6       But my belief is they were in their
7  proper locations.
8    Q   And did you photograph the location of
9  those items when you inspected the vehicle in -- in
10  February of 2022?
11    A   I would say yes, but I certainly don't --
12  out of the thousands of photos we have, I don't
13  remember that particular photo.  We can go look if
14  you want, but I would say that we're supposed to
15  document where everything is when we get there, so
16  I believe it's documented.
17    Q   Sure.  Kind of what I'm getting at is,
18  did you do any analysis of the -- and let me put it
19  this way -- of what may have impacted the child's
20  head who was in the -- the rear seat?  What actual
21  physical item might have impacted his head?
22    A   Well, I'm not the biomechanic.  I did do
23  an analysis, though.  I'm -- I'm certainly not
24  opining anything hit the child's head because
25  that's not my area of expertise, but I can tell you

Page 85

1  that the rear seat was pushed to less than a foot
2  -- within a foot of the front seat.
3       In other words, the child's headrest area
4  of the car seat was pushed to less than a foot away
5  from the seat in front of it.
6       So that's information I have that might
7  be helpful, but I'm not here to talk about the
8  child's head hit or if it did hit anything.  It
9  seemed logical it did, but I'm not -- that's not my
10  area of expertise.
11    Q   I understand.  And so you're not a
12  biomechanical expert who's providing -- going to
13  provide any testimony about injury mechanisms or
14  anything like that in this case?
15    A   Right.  But I will give the measurement
16  between the headrest and the seat and the back of
17  the seat in front of it was less than a foot
18  because that's -- that's part of my geometric
19  analysis that I've done of the crush of the
20  vehicles.
21    Q   Right.  All right.  Turning to Page 4
22  here.  Make sure I'm on the right page, if you give
23  me one second.
24       Here at the top of Page 4, you make a
25  couple of comments about the F250 tires.

22 (Pages 82 - 85)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 86

1     The first being that the F250 tires were
2  about half an inch larger radius than stock tires.
3  And you're commenting here on the actual vehicle
4  involved in the incident, correct?
5     A   Yes.  Which line are you looking at?
6     Q   It's at the top of Page 4.
7     A   Got it.
8     Q   I don't know if you can see my cursor.
9     A   Yes, that -- so that is the action --
10 accident tires.  Versus the stock tires.
11    Q   All right.  So in the previous slide you
12 mentioned that the ground clearance from original
13 to the ground clearance of the subject vehicle was
14 .75 inches.
15    A   Yeah, I said about 10 inches because I'm
16 trying to measure it when I'm laying on the ground
17 underneath the truck.  And so, I'm -- that's a
18 measurement that I'm trying to make on a damaged
19 truck.
20        The radius on the tires is just a -- it's
21 a published value or a -- for the tires.  It's --
22 given the size of the tires, that's what it's
23 supposed to be.
24        So a quarter inch variability there is
25 not an issue for me.

Page 87

1     Q   Sure.  I understand.  I'm just trying to
2  get an explanation for why if it's only a half-inch
3  larger radius than stock tires, how is the ground
4  clearance .75?
5     A   Yeah, and you've also got -- there can be
6  tread differences on the tires itself that --
7  actually, you know, so the radiuses aren't perfect
8  calculations either.  So, you know, all of that
9  being within quarter inches, fine with me.
10    Q   Sure.  Right here at the --
11    A   If I might interrupt again.
12    Q   Sure.
13    A   You asked about weight earlier.  The
14 spare tire for the car got knocked off.  So when we
15 weighed it, I don't think it was in the back.  I
16 think it was in the back -- I think it was
17 somewhere else, so.  Because it was hard -- really
18 hard to get in and out of the back.
19        So I'm just pointing that out.  That
20 would be the -- the wild card in -- in weighing it,
21 but -- so the weights could shift around based on
22 where the spare tire was.
23    Q   Sure.  But you're going back to the
24 Escape when you -- the subject Escape?
25    A   Yes, sir.

Page 88

1     Q   And the bumper was off as well.  Did
2  you -- did you put that on the scale in any way or
3  was that another item that would have been --
4     A   No.
5     Q   -- not included in your measurement?
6     A   Well, it would have been just set on the
7  back of the vehicle for the weight.
8     Q   Right, but the spare tire and rim, there
9  wasn't a way to set it on the back of the vehicle
10 as part of the measurement?
11    A   Right.  So it's either floating around
12 or -- I mean, it's even a chance it wasn't in
13 there.  But it's -- it was in the backseat as best
14 as I can tell just sitting here.
15        So there's a little bit of variability
16 because, you know, it was knocked off.  And so it
17 -- I'm just pointing that out because I thought it
18 was something I forgot to mention in the previous
19 answer.
20    Q   Sure.  Thanks.
21        Speaking of weight, the next question is
22 about the weight of the F250.  Your bullet point's
23 saying it was 8,040 pounds.  I'm assuming you
24 weighed it with the same scales?
25    A   Yes.

Page 89

1     Q   And was the cover over the -- the cargo
2  area of the pickup truck, was that on the F250 when
3  you weighed it?
4     A   Well, however it shows up in our
5  inspection photos, I'll have to go back and look.
6  When you say cover, I --
7     Q   Yeah.
8     A   Go ahead.
9     Q   I'm always bad at this word, but, you
10 know, the tonneau cover, I don't know how --
11 exactly how you actually pronounce that.
12    A   Yeah, let me --
13    Q   That's the cover I'm talking about.
14    A   I don't remember there being a tonneau
15 cover on it when we saw it.  So might have to
16 investigate that.
17        I don't remember adding a weight to the
18 tonneau cover if it had a tonneau cover, but I'll
19 have to look to see if -- because that term has got
20 a lot of different term -- ways it can look.
21        So let me just look at a date of accident
22 photo real quick, please.
23    Q   Sure.
24    A   All my computers are apparently working
25 on video right now.

23 (Pages 86 - 89)

G. Bryant Buchner , P.E.                     January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 90

1    Q    We can come back to that. I was just
2 trying -- you were talking about things that may
3 not have been included in the measurement of the
4 weights of the vehicle, so I thought I would
5 mention it.
6    A    Okay.
7    Q    Again, you can figure it out when we take
8 a break.
9    A    Sure. No problem. Thank you.
10   Q    All right. Under the section entitled
11 "Based on the EDR of the -- of the F250," you say
12 the impact delta-V was 17.92 and the
13 longitudinal -- you know, longitudinal and .14
14 lateral.
15        Is there any difference between the term
16 impact delta-V and just delta-V? That's a term I
17 hadn't heard before.
18   A    Just to clarify, delta-V is a generic
19 term. It can be applied generically where people
20 understand it, but impact delta-V to me is making
21 sure that we're understanding that during the
22 collision the actual delta-V is what we're using
23 here.
24        I don't think it --
25   Q    I understand.

Page 91

1    A    I don't think it makes any difference at
2 all, it's just the way we happen to write it, but
3 we're talking about the collision between the two
4 vehicles.
5    Q    Right. Just wanted to make sure that was
6 the case in case there was some difference between
7 delta-V or im- -- and impact delta-V.
8    A    Sure.
9    Q    And you agree that the -- the delta-V
10 here listed should be in the negative?
11   A    No, negative/positive.
12   Q    Doesn't matter?
13   A    Yeah, it's -- negatives and positives is
14 relative anyways. But if -- if someone wants to
15 say it's technically supposed to be negative with
16 some convention, I'm -- I'm fine with that.
17        We're -- we're just talking about the
18 overall magnitude. We understand that the truck
19 was slowing down. We're not trying to misrepresent
20 that. It's just the way we wrote it.
21   Q    Sure. And this is where you talk about
22 airbag deployment. Is that where you said that was
23 a typo?
24   A    Yes.
25   Q    All right. And do you have any opinion

Page 92

1 as to why the airbag did not deploy on the F250?
2    A    Probably because it hit the -- a very
3 soft area of the Escape.
4        In other words, the airbag deployment is
5 based on the -- the rate of deceleration largely of
6 the vehicle, and the deceleration is going to be
7 less when you run into something soft and mushy.
8    Q    Did you, in looking at the download, note
9 that there was an airbag error code on the
10 download? Do you recall that?
11   A    I don't remember that, no, sir.
12   Q    There was a fault code of U3000-49
13 indicating an error in the electronic module.
14        Could that be an explanation for why the
15 airbag didn't deploy?
16   A    I might have to go back and look at it.
17 It hasn't been a concern of mine. You asked a
18 question and I answered it. I'll do more
19 investigation --
20   Q    Sure.
21   A    -- tonight if it's important. It hasn't
22 really been important to the work we've done.
23        And to go back one, thank you for always
24 letting me do that.
25        The tonneau cover was on it when we

Page 93

1 weighed it, it's just open. I -- because the job
2 box and everything was on it, I think, but it's --
3 it was definitely on there when we weighed it.
4 Thank you.
5    Q    Okay. Great. Thanks. I'm glad I
6 pronounced that word correctly. I was afraid you
7 were going to come out with a different
8 pronunciation and make me look foolish.
9    A    Together we'll try to get these things
10 right.
11   Q    Yeah.
12        All right. Just so we're clear on a
13 couple of things. How would you define "end of
14 event time"?
15   A    Where is it written, please, sir?
16   Q    Well, it's from 49 C.F.R. 563. Kind of
17 the terms that that code section uses.
18   A    Well, I -- I can see -- in the C.F.R. it
19 may have its very specific definition. I wouldn't
20 want to disagree with that.
21        But end of event time I would normally
22 just use as when the event in the download or when
23 the event in the black box data ends.
24        It wouldn't have to be associated with a
25 specific event. It could just be when they ended

24 (Pages 90 - 93)

G. Bryant Buchner , P.E.                                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 94

1 reporting information.
2        So it's kind of a gray term, that -- that
3 depending on the context we're using it in, might
4 have slightly different meanings.
5    Q   Sure.  And same with regard to the term
6 "time zero."  Is that different?
7    A   Well, time zero, we use it all the time
8 in many different situations.  So it -- it -- it
9 floats as well.
10       Time zero is what we normally call
11 impact, but I'm more than happy to define it
12 another way for the purpose of a conversation.
13       But time zero is normally the
14 collision -- time of collision.
15   Q   Perfect.  I just wondered if I used those
16 terms later, I wanted to make sure we were on the
17 same page.
18   A   Sure.
19   Q   All right.  Be happy I skipped over two
20 pages there.
21       All right.  This is Page 6 of your
22 report, and I believe this is where you start to
23 describe how you used exemplar vehicles that you
24 scanned to match up and determine the crush damage,
25 the static crush damage that occurred in the actual

Page 95

1 accident.
2        Is that a fair description of what is
3 being discussed here just so I understand that
4 we're on the same page?
5    A   That's part of it, sure, yes, sir.
6    Q   All right.  And the exemplar F250 you
7 used was a 2015?
8    A   Yes.
9    Q   And what do you mean by you verified it
10 using the VIN number?
11   A   We just pull the specs on both vehicles,
12 and you -- you use the VIN just to verify that it
13 is the vehicle we think we're looking at.
14       I mean, we can do it -- it's just the --
15 the standard way of referencing a particular
16 vehicle in the industry.
17   Q   Okay.  So you just use the VIN number to
18 make sure that the vehicle you were looking at was
19 actually attached to that VIN number?
20   A   We use the VIN number to make sure it was
21 the right year, make and model of the vehicle for
22 the study along with we were looking at the vehicle
23 just to --
24   Q   Gotcha.
25       Did you make any comparison of the height

Page 96

1 of a 2015 Ford F250 to a 2016 Ford F250 in the
2 stock configuration?
3    A   And there's not a difference at all --
4 from a gross standpoint an individual vehicle can
5 have different tires on it.
6        You know, in this case that happened in
7 this one, but it's not because this was a 2015 or
8 2016, it's just -- this is the exact same truck.
9 It's just whoever ordered the 20 -- the accident
10 truck it came with a slightly different tire than
11 the 2015 that we had available to us.
12       So it is the same truck, there's no -- I
13 mean, we're -- we're not talking about trim here,
14 but we're talking about the body of the truck and
15 the ride of truck and everything is -- is the same.
16   Q   Well, was there any difference in the
17 stock tire size that came with the vehicle from the
18 manufacturer between the 2015 and the 2016 F250?
19   A   Well, you can get 2015 -- so the answer
20 is, yes, but not necessarily the way you described
21 it.
22       In this model -- in any -- in this model
23 year's range, you can buy a truck with different
24 size tires on it.
25       It so happened that the 20 -- that the

Page 97

1 accident truck had tires that were .04 inches
2 potentially or .04 feet taller than the -- than the
3 2015 that we had.  They're both acceptable.
4        And you look at the door of each truck to
5 see what it came with.  And that can be a
6 supply/demand problem.
7        In other words, the -- the tires can
8 change because of who the manufacturer is
9 purchasing the tires from and, you know, there's
10 all kind of economies that go into that.
11       So, yeah, there -- there was a different
12 -- not necessarily because it was a different year,
13 it's just the two trucks had different tires on
14 them.
15   Q   Yeah, and I -- I think you're comparing
16 the subject truck to the exemplar you used.  We
17 know that there were aftermarket tires installed on
18 the subject truck.
19       But if you were to compare a stock, for
20 lack of a better word, OEM version of a 2016 versus
21 a 2015 truck, did you account for any difference in
22 the recommended tire sizes for those two models,
23 that's what I'm getting at?
24   A   Okay.  Yes.  And a better answer to your
25 question, the accident truck came stock with tires

25 (Pages 94 - 97)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 98

1 that were slightly .04 inches taller than the 2015
2 stock truck.  Then --
3    Q    Gotcha.
4    A    -- the accident will -- will -- the stock
5 truck got lifted and also had some slightly larger
6 tires on it in essence.
7    Q    Right.  I just want to make sure we were
8 talking about stock 2016.  I was confused there.
9    A    Understood.  No, it's -- thank you.
10    Q    And just because I was kind of confused
11 there, you say .04 feet or point --
12    A    Yes.
13    Q    Yeah, so that's about a half an inch, I
14 guess, or...
15    A    Yeah, pretty close to it.  Let me
16 multiply it out.
17       .48 inches.  It's a half an inch, yes,
18 sir.
19    Q    And when you used the scan for the 2015
20 and input it into the HVE, did you adjust it by
21 that half inch?
22    A    Yes.  We can change the tire size in HVE,
23 so we put the tires, the right tires on the vehicle
24 that were -- they call it a stock 2016 which is the
25 accident vehicle.

Page 99

1    Q    Gotcha.  And just -- what's the mechanism
2 in HVE for varying the height of the vehicle like
3 that from the one that you scanned and input into
4 the model?
5    A    Well, you go into its tire selection and
6 you choose a tire with the right diameter.
7    Q    Okay.
8    A    So we're -- we're looking for a 34 -- I
9 think it's a 34-inch diameter tire, but it's in my
10 material.  So we just -- they have a -- you select
11 the tire with the right -- the right size.
12    Q    I gotcha.  So the -- the model that you
13 ran that you rely upon did make that slight
14 adjustment for the stock tires that would have come
15 on a 2016 F250?  That's all I'm trying to confirm.
16    A    Yes.  Yes.
17    Q    If you look on Page 7 --
18       THE COURT REPORTER:  Mr. Hill, we've lost
19 your audio.
20       THE WITNESS:  Mr. Hill, we --
21       VIDEO TECHNICIAN:  Would you like to go
22 off the record, counsel?
23       MS. CANNELLA:  Yes.
24       VIDEO TECHNICIAN:  The time is 1:25.  We
25 are off the record.

Page 100

1       (Off the record.)
2       VIDEO TECHNICIAN:  The time is -- the
3 time is 1:28.  We are back on the record.
4 BY MR. HILL:
5    Q    Okay.  On Page 7, I was -- I was asking
6 about how the measurements were verified of the two
7 vehicles.  And the way it reads is that the
8 difference in height was determined using the scan
9 of the exemplar and then the F2 -- the subject F250
10 and then using the measurements of the subject F250
11 compared against the exemplar F250.
12       And I'm -- I'm -- is it compared against
13 the measurements of the exemplar F250?  It's --
14 it's just not clear what's being compared here and
15 I just want to clear that up.
16    A    Okay.  There's two things going on.
17       First is, we scan both the accident and
18 the exemplar.  And then from those scans, we can
19 make measurements.
20       So it's -- that's -- that's one of the
21 ways -- that's -- that's how the scans are used.
22 We have to, you know, level them up and account for
23 the tire size.
24       But then I also can go measure against
25 the accident F250 with tapes and rulers and do it

Page 101

1 that way as well, the manual way.  So we're doing
2 it both ways.
3       And then you get a -- I think if we go
4 through the file, you -- we may find that there's a
5 slightly different answer between them.
6       But there -- there -- it's always over 6
7 feet over -- not over 6 feet, over 6 inches of
8 elevation change.  I think 6.1 in one place and I
9 forget what the other is.
10       So that quarter inch that I was telling
11 you about earlier, you know, you've got to get
12 slight variability.
13       So we're -- we're looking -- when we say
14 "measures," we're using what I physically measure,
15 what my technicians physically measured, and then
16 in the scans what we're measuring out of the scans
17 as well.  Or off the CAD drawings once we put them
18 in -- in CAD.
19    Q    All right.  And they -- then the --
20 you're not -- and this may sound like the dumbest
21 question ever but I want to make sure I understand
22 it.
23       You're not actually physically measuring
24 the 2015 exemplar, you're just using the specs and
25 the CAD drawing; is that right?  Or are you

26 (Pages 98 - 101)

G. Bryant Buchner , P.E.                                  January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 102

1 actually going out and physically measuring that?
2    A   We're -- we're doing both.  Because --
3 no, we're going to -- we're going to approach it
4 with just pure measurements.
5         I'm going to go to the exemplar.  I put a
6 tape against it.  I know what the accident
7 measurements are.  I'm like, okay, this looks like
8 this many inches.  And we have to account for tire
9 size.  So I -- I do it that way and we do it in the
10 scans as well.
11        And when we're looking for, you know,
12 redundancy or -- or a confirmation in -- from the
13 two methods.
14        One's not any better than the others, we
15 just happen to did it -- do it both ways.
16    Q   At the very bottom of Page 6, the last
17 sentence you've got: "The movement of the headrest
18 area and the bottom of the seat were compared in
19 Figure 5."
20        And just to be clear, you're saying that
21 the movement of the headrest area of the child's
22 seat in comparison to the bottom of what seat?
23        The bottom -- like what's the -- not
24 the -- not the car seat but the bottom of, what?
25    A   No, the -- of the car seat.  The bottom

Page 103

1 -- the top of the car seat moved farther forward
2 than the bottom of the car seat.
3        The car seat actually rotated where the
4 head area -- what I'm going to call the headrest
5 area because that's what we measured.  The headrest
6 area moved farther forward than the base of the
7 seat, the base of the car seat.
8    Q   That's what I thought.  I just wanted to
9 clarify it.
10    A   Sure.
11    Q   Thank you.
12    A   You're no longer sharing.  If you want to
13 share, it'll -- I'll be quicker at understanding
14 what you're reading.
15    Q   Thanks.  I turned off the share when I
16 was trying to fix the audio problem.  Sorry, I
17 didn't mean to do that.
18    A   Understood.
19    Q   All right.  So Figure 7 here on Page 8 is
20 showing the maximum engagement as you modeled in
21 3D.
22        And I guess the initial question would be
23 was what was the lateral offset of the two vehicles
24 as you measured based on the combo, you know,
25 longitudinal center lines?

Page 104

1    A   All right.  I actually asked that
2 question this morning of myself because I knew you
3 would ask it and I forgot to go get the answer.
4        If we just look at the -- if you want me
5 to measure it quickly, I'll do that, but I don't
6 have it off the top of my head.
7        But it's shown there.  It's shown, you
8 know, a foot or so to -- the truck's a foot or so
9 to the driver side.  But I don't have the exact
10 measurement committed to memory.
11    Q   And you input that same offset into the
12 HVE simulation?
13    A   Yes, yes.
14    Q   Okay.  You did measure it some way,
15 right?
16    A   Yeah, we did it.  I just didn't
17 memorialize it, but it's in the drawings and
18 everywhere else.  It's just not spit out as a
19 number.
20    Q   Yeah, I just didn't see it as a number
21 anywhere and just didn't know if I was just missing
22 it.
23    A   You didn't miss it.  I thought the same
24 thing.  It's -- it's fully contained in the
25 drawings, but it's not memorialized as a number.

Page 105

1 And I don't see the drawing I'm looking for, but
2 I'll -- I'll look for it while we talk and I'll --
3 I'll give you that number in a minute.
4    Q   In this paragraph a little further down
5 on this page, Page 8, it starts with "A CAD
6 comparison of the post-crash vehicle."  You say
7 revealed over a half foot of dynamic rebound
8 occurred?
9        MS. CANNELLA:  What was that?  What was
10 that, Rick?
11        MR. HILL:  Yeah, I'm sorry.  I'll lean in
12 closer.  I apologize about all of this speaker
13 issues.
14 BY MR. HILL:
15    Q   There's a Paragraph on Page 8 that
16 begins: "A CAD comparison of the post-crash
17 vehicles," that's what I'm asking about.  And you
18 say it revealed over a half foot of dynamic
19 rebound.
20        And I'm just curious as to how exactly
21 did you determine that a half foot of dynamic
22 rebound, was it just comparing the maximum
23 engagement with what you measured as with the
24 static engagement or how is that determined?
25    A   You are correct.  The static bumper

27 (Pages 102 - 105)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 106

1 profiles and the profiles give one measurement, but
2 then we know that there were parts of the vehicles
3 that touched each other that would require 6 inches
4 of additional crush for those vehicles to touch.
5       So it's a dynam -- it's a static versus
6 what we've concluded would be the dynamic crush.
7    Q   Yeah, so it's not a calculation, like a
8 formula, it's just comparing two measurements?  And
9 that's --
10   A   Exactly.
11   Q   Okay.  That's what I was wondering.
12      And I guess you use specific math points
13 to make those comparisons?
14   A   Yes, we did.
15   Q   All right.  And it's -- it's the match
16 points that are highlighted with the -- I don't
17 know, like the shiny tape or whatever it was you
18 guys used to put a match up to match points.
19   A   Yes, it is.  Yes, the -- so points that
20 we documented, marked with tape.  And then in
21 the -- in the 3D world, put those points together
22 for the static and dynamic crush.
23   Q   Okay.  Real quick, under this section
24 with ACM Data Analysis.  Talking about the imaging
25 of the ACM.  That was done, I guess, by law

Page 107

1 enforcement on that date?  That was before you were
2 involved in the case?
3    A   Yes.
4    Q   And how did -- and this Crash Data
5 Retrieval Tool 19.3, you just know that from the
6 ADR readout, that's not referencing what you used;
7 is that right?
8    A   It was in their materials, in the
9 officers' materials.  They reported that.  It may
10 be in the actual printout itself.
11   Q   Gotcha.
12      Explain for me how the ACM recorded a
13 deployment of that when the airbags didn't actually
14 deploy.
15   A   Yeah, that's the actual typo or maybe
16 there's another one.  But the ACM recorded one
17 event.  I don't remember it being a -- it was an --
18 the airbags did not deploy, so that's -- that's
19 where I'm seeing a -- a problem.  I haven't fully
20 researched it, but it was a nondeployment event.
21      And remember you asked me earlier about
22 an error code or something like that.  I -- I want
23 to go back and look at all that, but it was a
24 nondeployment in actuality.  So I think that's a
25 typo.

Page 108

1    Q   Did ACMs record nondeployment events as
2 well?
3    A   Oh, yeah, sure, yes.
4    Q   Okay.  Now we're on Page 9.  This is the
5 ACM data.  Just a couple of minor points to make
6 sure I understand it.
7      Your sentence right below the figure
8 records those delta-Vs, and -- and that's simply --
9 you presented those values because those are the
10 ones at the end of the recording?
11   A   Yes, that's -- once we believe the
12 collision is over with, that's the delta-V,
13 effectively over with.
14   Q   All right.  Then there's a discussion in
15 the next paragraph about the speed indication from
16 how -- how the speed vehicle is indicated in the
17 ACM.
18      And I guess I'd question, do you know
19 whether the missed -- the 2016 F250 used wheel
20 speed or transmission speed?
21      I mean, you seem to reference wheel speed
22 here, but does it also have transmission speed?
23   A   When we say "wheel speed," we're talking
24 about how fast the truck thinks the wheels are
25 turning.

Page 109

1      So it's going to think they're turning a
2 little -- it's going to think they're -- he's -- he
3 knows how fast they're turning, but then it's going
4 to convert that to a speedometer speed.
5      And so, that's all we're talking about
6 here.  When we say wheel speed, it's -- it's
7 calibrated to calculate the wheel speed, so we're
8 just talking about the final answer here.
9      What -- how that -- you know, it probably
10 is mentioned in the transmission, but it can also
11 be checked with the ABS sensors and things like
12 that.
13      So I'm not getting into how this exact
14 truck does it, but it is looking for wheel speed.
15 I'll use more of a generic term.
16   Q   Yeah, yeah, there's also a three-channel,
17 you know, speed-sensing system related to the
18 transmission, and that's just another source of
19 speed.
20   A   Well, right, but it's calculating wheel
21 speed out of that.  That's what it --
22   Q   Right.
23   A   Yeah.
24   Q   There's a discussion about Momentum
25 Calculations.  I have a few questions about that.

28 (Pages 106 - 109)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 110

1    All right.  When we're -- under this
2 section, you're -- you're solely talking about the
3 actual vehicles involved in this accident.
4    This has nothing to do with the exemplar
5 models that you used, correct?
6 A   Yes, sir.
7 Q   All right.  I just want to make sure.
8    And the vehicle weight you used in these
9 momentum calculations were the ones you actually
10 measured on the subject vehicle?
11 A   We measured them and then added the
12 occupant weights on them.  We have a whole sheet in
13 our file about that.
14 Q   Right.
15 A   Yeah.  It's the weighed measurement is
16 the foundation.
17 Q   And what was the coefficient of
18 restitution that you used in these calculations?
19 A   Well, you don't -- in momentum, you don't
20 use a coefficient of restitution when you have this
21 type of information.  It's -- it's -- it's
22 accounted for just in the delta-V.
23 Q   That's because you have the pre-impact
24 and post-impact speeds in a delta-V?
25 A   Yes.

Page 111

1 Q   Right.
2 A   You -- you could calculate it from this
3 if you -- potentially but, you know, it -- you
4 don't need it.
5 Q   All right.  And you -- you basically
6 accounted for a zero pre-impact speed for the
7 Escape --
8 A   Yes.
9 Q   -- in the calculations?
10 A   Yes.
11 Q   And then your post-impact speed for the
12 Escape was what?
13 A   40.6 miles an hour in my calculation.
14 Q   Okay.  And so the delta-V for the Escape
15 will be approximately the same; is that right, or
16 no?
17 A   What was the question?
18 Q   Yeah.  So what was the delta-V of the
19 Escape?
20 A   40.6.
21    And I misspoke a minute ago.  If we input
22 the 0 miles per hour -- well, anyway, we did it --
23 we did set up a series of equations that used the
24 -- that saw for the restitution.  I said we didn't
25 do that, but we did actually -- we did use the

Page 112

1 coefficient of restitution in this to get
2 everything to balance out.
3    So we -- we didn't have to, I don't
4 think, but we did do it.  We got -- so I misspoke a
5 minute ago.
6    It would be -- it would be helpful if I
7 looked at the calculation before I answered the
8 question.
9 Q   Is this it?
10 A   Yes, sir.
11 Q   All right.  That's why I was asking you
12 about it.
13 A   Yeah.
14 Q   This is Bryson 4000.  And I guess since
15 you -- you know -- tell us what -- what you're
16 doing here with -- with both vehicles here just so
17 I understand it.
18    You've calculated a restitution of 0.148;
19 is that correct?
20 A   It's actually being used to solve there.
21 So I think I'd have to go back and -- go back
22 through the calculation carefully, but the way it's
23 being put in there, that's the effective
24 restitution this shows, yes.
25    And let me -- yeah.

Page 113

1 Q   I'm making sure you didn't need to see
2 any other part of this file to answer that
3 question.
4 A   Pardon me?
5 Q   I was just wanting to show you the rest
6 of this file in case --
7 A   Well -- yeah, let me do -- I'm trying --
8 unfortunately, you're looking at one thing and I'm
9 trying to look at something else so that I can get
10 on the same page and sometimes it's a little bit
11 slow with it.  Let me do something here.
12    MR. HILL:  Why don't we just take another
13 quick five-minute break while you look at that
14 because I kind of maybe need to use the restroom.
15 I apologize.
16    THE WITNESS:  Sure.
17    MR. HILL:  If that works.
18    THE WITNESS:  That's fine with me.
19 A   Basically, we set it up --
20    VIDEO TECHNICIAN:  The time is --
21 A   -- with a series of equations to get
22 everything to balance out using restitution.
23    And we got the 51 and the 17.92 to match
24 along with the weights.  So we believe that this is
25 a good momentum model.

29 (Pages 110 - 113)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 114

1    I had forgotten, but we did include
2 restitution. And so, all of our -- all of our
3 inputs balance with what we believed we know about
4 the accident using that .148.
5 BY MR. HILL:
6    Q   Right. And correct me if I'm wrong, but
7 when you did the HVE simulation, wouldn't there be
8 a place to input this same coefficient of
9 restitution?
10    A   Well, there's two different
11 methodologies, but, yes, you could input that but
12 it's -- it's really a -- kind of like earlier when
13 we were measuring how high the truck moved and I
14 said a quarter inch doesn't matter because you're
15 really using two different methods. It -- it
16 may -- it doesn't matter to me.
17    But you're just using a different method
18 here, another calculation method, which is -- is
19 robust.
20    So I don't want to mix my methods or
21 overvalue one above the other. I want to do them
22 independently and see what all the answers are.
23    So, but yes, someone could put that in
24 but in HVE it wouldn't quite balance because HVE is
25 looking at crush. This is not looking at crush.

Page 115

1    But the answers are probably the same
2 answers, 40-miles-an-hour delta-V.
3    Q   Right. And HVE has to use a coefficient
4 of restitution in determining its crush analysis,
5 correct?
6    A   Well, yes.
7    Q   Right. And you mentioned that the
8 default coefficient of restitution that was used
9 when you first ran the simulation did not create
10 the results that you expected and you had to change
11 or manipulate that coefficient of restitution to
12 make HVE create the results that you expected; is
13 that fair?
14    A   To create the results that were measured
15 by the truck, yes.
16    In other words, HVE has never seen this
17 crash, it's just a calculation. It's -- this is
18 just a calculation.
19    Calculations are nothing but simulations
20 of reality. We never expect a calculation to know
21 what really happened in the crash, it's just a tool
22 that we use as engineers to understand it.
23    Q   Gotcha.
24    MR. HILL: Let's take that break real
25 quick. Just a short one.

Page 116

1    THE WITNESS: Thank you.
2    VIDEO TECHNICIAN: The time is 1:49. We
3 are off the record.
4    (Recess taken.)
5    VIDEO TECHNICIAN: The time is 1:58. We
6 are back on the record.
7 BY MR. HILL:
8    Q   All right. I've got the -- your report
9 back up. I hope you can see it. I'm on Page 10
10 where it is entitled Crush Analysis, that section.
11    A   Yes.
12    Q   And just to make sure it's clear, this
13 section refers to your use of mathematical
14 calculations to estimate the amount of crush in the
15 hypothetical incident of a stock F250 being
16 involved in this accident; is that a fair way to
17 say it?
18    A   Yes.
19    Q   And -- and this is not really connected
20 to the simulation section below dealing with the
21 HVE simulator?
22    They're two separate ways or tools that
23 you use to try to analyze the amount of crush and
24 the hypothetical of a nonlifted stock 2016 F250; is
25 that fair?

Page 117

1    A   Right.
2    Q   Okay.
3    A   The pre-lifted vehicle. If the
4 pre-lifted F250 had been in the crash, that's what
5 we mean.
6    (Deposition Exhibit 8 marked.)
7 BY MR. HILL:
8    Q   All right. And if I pull up here -- let
9 me find it. This is what is listed in your
10 materials as Crush Analysis, Bates labeled 3990
11 through 39 -- 999.
12    A   Yes.
13    Q   Is this -- am I right to refer to this
14 when I'm talking about the crush analysis you
15 mentioned on Page 10?
16    A   Yes.
17    Q   All right. And it starts here with a
18 depiction and it has the Accident Damage in red and
19 the Calculated Damage in blue.
20    And what that means calculated damage in
21 blue is what you believe the crush would have been
22 in the quote/unquote stock configuration of the
23 F250.
24    A   That's what this method calculates, yes.
25    Q   All right. And so it's approximately

30 (Pages 114 - 117)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 118

1 2.3 feet. You're saying -- what is that -- that's
2 the delta, meaning, the difference between the
3 maximum or the crush with the -- with the accident
4 itself and crush with the stock vehicle?
5    A   Yes, that's how much less crush this
6 method predicts.
7    Q   And are both of these lines following --
8 well, obviously, the blue line is using the
9 calculated method. The red line, is that from
10 actual measurements or is that also using the same
11 method of calculations?
12    A   No, that's -- that's where the crush was
13 on the car, on the Escape in the accident.
14       So the red line is what did happen, the
15 blue line is what in my opinion using this
16 methodology would have happened had the vehicle not
17 been lifted.
18    Q   Right. And if we go down to this next
19 page, 3991, is the same type of -- I don't know the
20 right word -- showing the same type of -- of change
21 in crush between the accident damage and -- and
22 this methodology of calculating crush that's on the
23 pages we're about to get to, right?
24       The same thing, this is with a Ford F250?
25    A   Okay, this is -- yes, in the calculation

Page 119

1 methodology we were talking about the Ford F250
2 would have had slightly more crush, and this is
3 what it would have been.
4    Q   Right. And -- and 3992 is the
5 beginning -- 3993 illustrates how you use this
6 method to mathematically come to these conclusions?
7    A   Yes.
8    Q   That's correct, okay.
9       And we have a restitution on 3993 of 0.1.
10    Is that something that was calculated
11 based on these -- these calculations or was that
12 just input as part of the calculations?
13    A   That's input as part of the calculations.
14 So that was input.
15    Q   So what is the source of that number?
16 Why did you input .1 as the coefficient of
17 restitution?
18    A   Thought it was a reasonable value.
19    Q   Right. And it's -- it's different from
20 the value calculated with your momentum
21 calculations of .148?
22    A   Yeah, but remember the momentum was -- at
23 that point -- I -- I didn't point this out earlier.
24 The .148 is for the accident when the hatch was hit
25 and we're trying to balance out what did happen in

Page 120

1 the accident.
2       So it's not representative of what we did
3 in EDSMAC or the engine dynamics or in the other
4 calculation because this is -- this is, you know, a
5 -- the accident condition which is not what we're
6 trying to model in the other calculations. We're
7 trying to model a bumper-to-bumper-type hit.
8    Q   So you used an estimate of the difference
9 in the coefficient of restitution if only the
10 bumper was impacted of .1? And that was just
11 your --
12    A   That's correct.
13    Q   -- kind of reasonable value?
14    A   Yeah, not only the bumper because other
15 things will hit, but yeah, the .1 is what I -- what
16 I used for the stock truck hitting a stock Escape.
17    Q   And in your calculations here under the
18 stock you're assuming that there will be no bumper
19 override in this hypothetical impact?
20    A   I'm not assuming it, I'm -- I'm
21 concluding it as an engineer based on what I know
22 about the accident. But, yeah, I don't believe
23 there is going to be any.
24    Q   And you're concluding it based upon what,
25 just the heights of the two bumpers, based upon the

Page 121

1 measurements that you used from the exemplar, and
2 so forth?
3    A   I'm using it -- I'm using my study of
4 this crash in my experience and training. And part
5 of that is the height, yes, sir.
6    Q   What other factors led you to conclude
7 that there would be no bumper override than
8 just purely the measurement of the heights in that
9 hypothetical situation?
10    A   Well, we know -- okay, probably the -- a
11 factor that may not have been apparent yet but it
12 is if you look at the drawings and things.
13       The tow hooks of the accident truck went
14 into the hatch of the Escape, whereas, if the truck
15 had not been lifted, then the tow hooks would have
16 actually gone into the rear bumper fascia area and
17 actually under the -- the bumper bar itself.
18       So once this vehicle engaged, it would
19 have been impossible for it to go up and over
20 because you would have had a mechanical
21 interlocking to hold -- to prevent it from getting
22 up into the hatch.
23       It's kind of like a stop, if you will.
24 I'm a -- I'm a -- I'm an engineer. It's -- you
25 know, if -- if there's something that's underneath

31 (Pages 118 - 121)

G. Bryant Buchner, P.E.                January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 122

1 the bumper and penetrated underneath it, it can't
2 come back out and go around the bumper to get up
3 into the tailgate.
4        So, you know, there is some more
5 understanding coming in from it, but the other
6 thing is there's no forces going up or down in the
7 crash so that, you know, with good bumper-to-bumper
8 contact they're going to -- they're going to want
9 to stay married up with the original contact
10 elevation.
11        Whereas, in the accident, you know, the
12 -- the Ford F250 bumper actually hit the very top
13 of the Escape bumper and -- and helped push the
14 bumper down, bend it down and get the truck up into
15 the hatch.
16        So those would be the three -- that would
17 be the main things that I would point to and I
18 think that's all need to make that observation.
19     Q   Sure. If the -- what about if there were
20 no tow hooks, is that the factor that you're
21 relying upon the most to say that there would be no
22 override?
23     A   No. No, I'm looking at this particular
24 accident. I'm pointing that out as a -- I mean, to
25 me it's kind of like a giant billboard flashing in

Page 123

1 the sky.
2        But, you know, it's -- it's -- it's
3 obvious it wouldn't have gone over. But even if it
4 had been -- even without the tow hooks because of
5 what I was talking about earlier you would have
6 flush impact, there's no forces pushing them up or
7 down.
8        Remarkably you're in the collision phase
9 to -- to upset that engagement if the -- if the
10 truck had been a stock truck.
11     Q   Gotcha. I just want to make sure I
12 understand it.
13        So, in your opinion, that the tow hooks
14 would have played a role in this and would have
15 gone underneath the bumper of the Escape, that's
16 based upon just the pure height of the tow hooks in
17 your belief as to where they would have impacted
18 the bumper of the Escape?
19     A   It is not underneath the bumper,
20 depending on what we call bumper, but they would --
21 they would slide underneath the bumper bar that's
22 inside what's normally called the bumper area.
23        In other words, it would have -- instead
24 of poking into the tailgate, it would have poked in
25 -- it would have prevented the truck from being

Page 124

1 able to rise up and get to the tailgate.
2        That's just in the extreme if someone
3 thinks, you know, that a normal bumper to bumper it
4 wouldn't have worked out.
5     Q   But -- but you are saying that the tow
6 hooks would have been the bumper bar in a way that
7 would have prevented it from overriding the bumper
8 bar?
9        It would have been below the level of the
10 bumper bar and gone underneath, is that my
11 understanding of the record?
12     A   Yeah, it would basically serve to keep
13 the bumpers -- help serve to keep the bumpers
14 engaged if for some strange reason they didn't want
15 to which I don't have any evidence of.
16     Q   Gotcha.
17        Would it -- is it your opinion that it
18 would have been impossible for the stock version
19 with the tow hooks to have overridden the bumper?
20     A   Reasonably, yes.
21     Q   What do you mean, what's the
22 qualification of reasonably?
23     A   Well, you can tell me all the conditions
24 that were going on and everything, so.
25        So, but, you know, if you just -- if you

Page 125

1 just run that F250, a stock F250 in the back of an
2 Escape, you're not going to override it, no.
3        But I don't -- you're creating a new
4 accident -- I say you're creating a new accident.
5 I'm not sure how big your question was, but if they
6 just hit like they did in this accident, I would
7 say reasonably it's not -- not possible.
8     Q   And when you say "this accident," you
9 mean the subject accident we know they were higher
10 and there was override.
11        I'm talking about this hypothetical that
12 you're analyzing of this crush analysis of a
13 stock version.
14     A   Right. Where you change this accident
15 where a stock truck hits this vehicle the way the
16 subject truck did, it's just not lifted. No,
17 there's no reasonable possibility that they're
18 going to get an override situation out of it.
19     Q   Whether there's tow hooks on there or
20 not?
21     A   Right, with or without, but the tow hooks
22 are going to, you know, just be icing on the cake,
23 if you will.
24     Q   I understand.
25     A   Yes.

32 (Pages 122 - 125)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 126

1    Q    But your opinion with or without the tow
2  hooks, stock configuration, there's no chance of
3  override?
4    A    Right, no reason to chance at all.  But,
5  you know, if I'm showing this to the jury, I'm
6  going to show them that the tow hooks are going to
7  hit underneath that bumper bar and it's going to
8  lock that truck in so that they can have the same
9  billboard in the sky that I have.
10        I mean, it's got -- if you've got
11  something indexing and holding them at that
12  elevation, it's -- it can override it.
13        So to me that's an -- that's an important
14  argument but it doesn't -- doesn't mean that the
15  vehicles won't do it if they just hit bumper to
16  bumper.  It's just easier to understand.
17    Q    You're just saying that's one element of
18  your argument that a stock configuration can't
19  override, and that's the tow hooks would play a
20  role, that's all you're saying?
21    A    Very easy to understand.
22    Q    Sure.  All right.  This page here, 3994
23  from AutoStats, followed this factor into your
24  crush analysis using the mathematical point.
25    A    The crush -- when -- when we're reporting

Page 127

1  crush on the Escape sometimes we're just recording
2  from the back hatch because that's what crushed in
3  and -- and stopped the truck.  The bumper and
4  everything went down and got bent up.
5        So this is just reminding us that it's
6  about 5 inches from the back hatch to the bumper
7  itself.
8    Q    And when you say 5 inches, explain that.
9  When you say -- you mean the bumper protrudes
10  beyond the hatch about 5 inches?
11    A    Yes.
12    Q    Okay.  And this is -- again, you used the
13  2010 information from AutoStat?
14    A    It's the same as -- it's the same as '08,
15  yes.  It's -- yeah, it's -- all this data is for
16  that year range of vehicle.
17        I just happened -- or I didn't -- the
18  staff engineer that did this happened to print the
19  2010, but it's the same information as the 2008.
20    Q    And it has a weight distribution for the
21  Escape of 57 percent on the front and 43 percent on
22  the back; is that correct?
23    A    Yes.
24    Q    That relates to the overall weight or is
25  that the curb weight on the axis?

Page 128

1    A    Both.  The -- 57 percent of the curb
2  weight will be on the front axle and 43 percent
3  will be on the rear axle.
4    Q    And did you use that same distribution
5  when using the HVE simulation?
6    A    Yes.
7    Q    All right.  And then for the -- this is
8  just -- this page just has the information on the
9  Escape.  Did you use this same type of information
10  for the F250?
11    A    Yes.
12    Q    All right.  That's -- I don't see that
13  included with your crush analysis.  So is there a
14  page missing from this or --
15    A    No, the -- the specs are in the file.
16  For some -- when we're doing the crush analysis, we
17  want to remind ourselves about the difference in
18  5 inches.  That's what's highlighted here.
19        That wasn't important for the truck
20  because it used its bumper on everybody.
21        The weight percentages are in another
22  part of the file, they just happen to also be on
23  this page.
24    Q    Okay.  And tell me again the significance
25  of reminding yourself of the 5 inches.

Page 129

1    A    In the drawings -- and we're not looking
2  at a specific drawing here, but there's 5 inches
3  between where the bumper is and where the hatch is
4  on the Escape.
5        So because the hatch is the one that
6  crushed forward when we're -- sometimes when we're
7  measuring crush, we're measuring displacement of
8  the hatch.
9        And we want to remind ourselves that when
10  we're reporting total crush, we need to add
11  5 inches to that to measure from the bumper which
12  is more typical.
13        So it's just -- it's part of a
14  conversation when we're talking about crush.  It's
15  not right, it's not wrong, it's just a number.  And
16  we want to remember what the number is.
17    Q    Yeah.
18    A    So like right here see the 3.35 inches on
19  Page 003995 Bate stamped.  That 3.35 is measured to
20  the hatch.  So we need to add 0.4 feet to it to
21  express the total crush.
22    Q    Talking about crush in relation to the
23  end of the bar?
24    A    Right, which is where it's normally
25  expressed from.

33 (Pages 126 - 129)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 130

1    Q   Right.  This document labeled 3997, just
2  explain this for me.  This is from Neptune
3  Engineering.  This is an outside source that you
4  use to, I guess, determine a crush stiffness
5  coefficient?
6    A   Yes.
7    Q   All right.  And how did you do -- use
8  this?  There's a part that's highlighted.  How is
9  this used in your crush analysis?
10   A   For the crush stiffness of the pickup,
11 this is the crush stiffness that we used.  We
12 needed those values for the calculations in the
13 analysis that we did.  So this is the source.
14   Q   And this represents the crush stiffness
15 of the front bumper of the F250?
16   A   The front of the F250 which is generally
17 expressed at the bumper level, yes.
18   Q   And how did you determine the crush
19 stiffness of the rear bumper of the Escape?
20   A   Well, we did two things.
21        No. 1 is there's an essay paper, I
22 believe, that gives the class of vehicle that it
23 is.
24        And then when we ran the engineering
25 dynamics programs, they had stiffnesses in the

Page 131

1  program already for 2008 Escapes, and we used
2  those.
3        So we actually ranged it based on two
4  different sources.
5    Q   This is for the rear bumper of the
6  Escape, not the rear hatch?
7    A   Well, it's the rear.  When you do crush
8  stiffness, you don't have to -- you're talking
9  about one side of the vehicle.
10       You can do side stiffness, you can do
11 front stiffness, you can do rear stiffness.
12       But we typically measure crush at the
13 bumper level when calculating stiffness because
14 that's the part that's designed to take the crash.
15       We can do it at other elevations, but
16 when you look at something like the Neptune data
17 where the crush stiffness is in the papers like we
18 used for the Escape, you're going to see that, you
19 know, they're -- they're based on bumper level
20 crush meaning -- but it extends above and below
21 that, but the measurements are at the bumper level
22 as part of the protocol.
23   Q   So basically the height is -- would be
24 the height of the bumper that you're using as far
25 as -- is that right?  Or am I misunderstanding

Page 132

1  this?
2    A   You are and you aren't.  You're -- I
3  think technically from a -- there's a good
4  understanding there on your part.
5        We have to choose where to measure the
6  crush elevation, although, there's crush above and
7  below it.
8        We choose a bumper level to measure it so
9  that when we calculate the stiffness coefficients,
10 they're representative of crush above and below the
11 bumper, but we measure it at the bumper level.
12       So we're going to be expressing bumper
13 level crush using the calculation -- one of the
14 calculation methodologies we did.
15       But it's not just confining it to the
16 bumper level, but it's just part of the protocols.
17   Q   And that's all I was trying -- that makes
18 sense.
19   A   Okay.
20   Q   So if the height of your crush or
21 deformation calculations is basically at the bumper
22 level, that's -- correct?
23   A   Yeah.  The answer is given at bumper
24 level, yes.  But we can adapt it to other levels,
25 but it's -- the standard protocol is you're --

Page 133

1  you're looking at bumper level-type crush.
2    Q   So when you're doing these calculations,
3  the items in the cargo area are not going to factor
4  in when you got to determine crush because they're
5  above the height of the -- of the calculations; is
6  that fair?
7    A   No.
8    Q   Okay.  How am I wrong about that?
9    A   Pardon?  Pardon?
10   Q   Well, how -- how am I incorrect in that
11 statement?
12   A   It does include -- first, cargo should
13 not be part of the strength of a vehicle.  If it
14 is, then that's -- you know, that's -- that means
15 that we're not really doing a good job at designing
16 our vehicles or managing our -- our crashes.
17       But the hatch area and damage to it and
18 the seat fillers and all of that is included in the
19 crush stiffness coefficients.  The strength of
20 those do affect those coefficients.
21       But the protocol is to measure the static
22 crush at the bumper level even though we know
23 there's going to be crush above and below there.
24       It's just the protocol that Campbell and
25 everybody came up with when they were developing

34 (Pages 130 - 133)

G. Bryant Buchner , P.E.                January 23, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 134

1 this methodology.
2        We could -- we can adapt it and do it
3 other different ways.  We -- but, no, the standard
4 way is to do it.
5        Just like, you know, when you want to
6 learn how tall somebody is you take their shoes
7 off, but most of us are measured with our shoes on
8 at the doctor's office.  It's okay.
9    Q    And I just want to make sure I
10 understood.
11       So there's no way to account for any
12 stiffness or any impact of the cargo in the crush
13 analysis?  I mean, that's just -- that's your
14 opinion, it's not what you do?
15   A    It's never done because --
16       MS. CANNELLA:  Hold on.  Object to the
17 form of the question as vague.
18 BY MR. HILL:
19   Q    Go ahead.
20   A    I would say it would -- you could do it,
21 but it would be a little bit unusual to be thinking
22 that what was in the cargo area was adding to the
23 strength of the vehicle.  In this case I'm sure it
24 effectively didn't.
25       I mean, I can pick up the -- the shop vac

Page 135

1 and tap it on the side and grab it and bend it with
2 my arms.  There's no way that -- that we would
3 include that in there reasonably.
4        But if you did want to and there was
5 something in there like, I don't know, something
6 uncrushable, you know, a -- you know, a safe, then,
7 yeah, we could -- we could include that in there.
8        But it's in -- but, no, it's not included
9 because it's not reasonable to include under every
10 situation I've ever been a part of.
11   Q    All right.  You know, when you talk about
12 the deformation of the rear seat, that would be
13 impacted by items in the cargo area?
14   A    Yes.
15   Q    All right.  And -- and did you factor
16 that in when -- in any part of your analysis, the
17 effect of the cargo on the deformation of the rear
18 seat?
19   A    Yeah.  Well, yeah, because that's -- we
20 measure that and we show that and we show the rear
21 seat was pushed forward.  That's an observation.
22       You know, that -- that clearly affected
23 the survivability of the crash for the occupants.
24 The occupant space was crushed in.
25       But as far as calculating the strength of

Page 136

1 that seat, we're not using it because in a normal
2 crash it's not involved.
3        In the normal crash the strength of the
4 seat is -- is held to the -- protecting the
5 occupant and part of them.
6        It's not part of the -- it's not part of
7 defending the outside of the vehicle bumper, rear
8 bumper, from a rear impact.
9        So, you know, we're mixing apples and
10 oranges here, but in this case we measure it so we
11 can show how far it when in.
12       But when we -- but we're not calculating
13 how strong that seat is because in the normal event
14 it's not involved in the crash.
15   Q    And when you say "normal event," you mean
16 when there's no bumper override, that -- is that
17 what you mean by the term "normal event"?
18   A    When the bumper is on top of where I'm
19 sitting, that's an abnormal event.
20       The truck -- the bumper of this truck
21 made it in.  It doesn't -- however we want to call
22 it.  I'm not trying to -- in this crash, that's all
23 I'm talking about, is the bumper was in the rear
24 seat occupant space where the person used to be
25 sitting.  That's abnormal.

Page 137

1        In the normal event, we got stock
2 vehicles that hit each other and we can calculate
3 what that is.
4        So we observe the abnormal event because
5 it's not normal and then we also can calculate the
6 normal event which has got a bumper-to-bumper hit.
7 If someone wants to analyze other things
8 in between, that's fine.  We can go try to do that,
9 but those are the only two things we're looking at
10 here.
11   Q    Yeah, I think you answered.  I'm just
12 saying when you say "normal event," you mean a
13 bumper-to-bumper impact?
14   A    Of stock vehicles, yes.
15   Q    Yeah.
16   A    Let's say normal like would have happened
17 in this crash with stock vehicles.
18   Q    Let me pull up your report again.
19   A    Yes, sir.
20   Q    All right.  This is Page 11 -- or I'm
21 sorry, Page 10 of your report, Bryson 1359.
22       And the first bullet point under Analysis
23 and Conclusions is "The F250 was effectively lifted
24 over 6 inches."
25       Do you know how far the frame rails were

35 (Pages 134 - 137)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 138

1 lifted in the -- in the subject vehicle as compared
2 to a factory F250?
3     A    A lot of different questions in there.
4 But the frame rail -- in the simplest analysis,
5 this truck was measured -- was, I think, lifted
6 between 6 and 6 1/2, but over 6, probably less
7 than -- close to 6 1/2.
8         So if we take off the point, I think it
9 was 0.4 inches.  Let me look at my table here.
10        Yeah, 0.7 inches for the tires would be
11 -- if you take the tires out of it, you would be
12 somewhere above probably 5 1/2 inches or near
13 5 1/2.
14        However, we can also add back in, you
15 know, the -- we don't want to miss if the lift kit
16 recommended larger tires than were even on the
17 accident truck.
18        So, you know, it's -- so if you -- if you
19 just put the stock tires on, you would be down to
20 around 5 1/2.  If you -- with the frame and the
21 lift kit.
22     Q    I guess the answer is 5 1/2?
23     A    Around 5 1/2, yes.
24     Q    All right.  And you didn't actually
25 perform any calculations or measurements to

Page 139

1 determine that, that's just an estimate?
2     A    No, I calculated it and we got six -- we
3 -- so I -- yeah, I did calculations based on the
4 ranges I had just then.
5     Q    You just calculated it during the
6 deposition yourself?
7     A    Yeah.  Yeah, I did.
8     Q    Okay.  But there's not --
9     A    To answer your -- to answer your
10 question.
11     Q    Yeah.  I was just looking for any
12 calculations in all the materials you -- you -- you
13 found.
14     A    Thank you.  I misunderstood.
15     Q    And I guess you're saying that there's no
16 sheet that I can look to that shows those
17 calculations other than just being done by you
18 prior to the deposition?
19     A    Yeah.
20     Q    Fair?
21     A    What you do is you look at the lift that
22 we calculated and then subtract 0.7 inches.
23     Q    All right.
24     A    So you take what we already calculated
25 and measure and then you subtract 0.7 inches to get

Page 140

1 to the stock tire size.
2        And then that will give you the frame
3 with stock tire.  The actual distance the frame
4 moved up absent the tires.
5     Q    You have a comment in here about the F250
6 bumper, and is the second bullet point, how far it
7 penetrated into the rear of the Escape.
8        Is that based upon the deformation in the
9 rear seat or what is the basis for your conclusion
10 that the bumper actually went so far in that the
11 child seat was pushed forward by over 18 inches?
12        And I'm trying to understand how you
13 determined the location of the bumper at its
14 maximum intruding level?
15     A    We fit -- yeah, that's a -- let me read
16 here.
17        Yeah, that's the static analysis.  We
18 basically fit the bumper of the truck on to the
19 tailgate in the damaged condition after they have
20 rebounded.  And we fit those two together.
21        The front bumper of the truck is
22 literally -- and then we compare that to an
23 uncrushed Escape -- and the bumper is literally,
24 you know, in -- in -- in the rear seat area of the
25 truck -- I mean, of the Escape.

Page 141

1        That's where it is when you just do a
2 geometric matching of the two.
3     Q    And you're talking about using crush
4 standards (inaudible) to place the bumper of the
5 F250 and it's (inaudible) of components of the
6 Escape other than the seat?
7        I mean, what -- what are -- what is
8 the basis for your -- that comparison,
9 that (inaudible)?
10        MS. CANNELLA:  Did you hear that whole
11 question?  I didn't hear it.  You cut out a little
12 bit.
13        Could you read back the question, Madam
14 Court Reporter, I couldn't hear it.
15        THE COURT REPORTER:  I need it repeated,
16 Mr. Hill.
17        MR. HILL:  I'll repeat it.  Hopefully it
18 is better this time.
19 BY MR. HILL:
20     Q    When you overlay, as you just mentioned,
21 based upon the crush that you observed, you placed
22 the 250 in sort of its position at its maximum
23 intrusion.  Based upon an overlay.
24        And my question is, how do you determine
25 from the overlay the full extent of the intrusion

36 (Pages 138 - 141)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 142

1  of the bumper?
2     A   You -- you know the original seat
3  geometry from the inspection of the exemplar.  You
4  know where it's located.  And then you know from
5  the damaged vehicle how far the crush went forward.
6        And from those we can see that it's
7  invading the occupant's rear seat area.  It's just
8  a simple fit the Legos together problem.
9     Q   How -- I'm sorry.  You -- I didn't mean
10  to --
11     A   That's all it is.
12     Q   And that's exactly what I was getting at.
13  Is that it's a measurement of the deflection of the
14  seat and you're using --
15     A   We can do the -- we did do the deflection
16  of the seat and we can do that.  But -- but I think
17  what you're asking about is, how do we know how far
18  the bumper went in?
19        That's just -- that's just a pure
20  measurement from -- or the fitting of the pieces
21  together and then comparing it to what they used to
22  look like before they were deformed.
23     Q   Right.  So -- and what was deformed is
24  the seat.  And so you're measuring how far the seat
25  was pushed in?

Page 143

1     A   No, we're not.  Well, we can.
2        Okay.  What -- see, you think we're
3  measuring to the seat.  Here we're -- we're just
4  using the damage on the vehicles as a whole to
5  locate where the bumper is during the crash.
6        We -- we know the seat's been moved
7  around.  We -- we locate where it is during the
8  crash either statically or dynamically.
9        And then we compare that to where the
10  seat started out.  And the seat started out behind
11  where the bumper of the truck is.
12        In other words, I'm not doing it from how
13  far -- I could do it by how far the seat moved, but
14  that would be maybe not as accurate and be very
15  complex.
16        But we can simply do it from the -- from
17  the crush on the rear hatch and where it moved to
18  and -- and the front bumper on the truck and match
19  them together and know that they're sitting in the
20  rear seat where the rear seat used to be.
21        If you know the bumper of the truck is
22  sitting where there's -- where the seat used to be,
23  then you know that the rear seat was invaded and
24  moved.
25     Q   Okay.  Back to what I'm getting at.  Is

Page 144

1  that you're measuring it based upon the damage to
2  the rear hatch and the location of the rear hatch,
3  not the location of the seat.  That's what I was
4  trying to get.
5        And I thought you earlier said that you
6  calculated by overlay based upon the movement of
7  the seat.
8        But now I think I'm hearing you saying
9  that it was -- the bumper intrusion was calculated
10  based upon the damage to the hatch and the location
11  of the hatch?
12     A   I think you've changed -- I think you've
13  changed your question on me and are claiming you
14  didn't, but -- it's okay, it doesn't matter, the
15  answer is still the same.
16        You look at the macro damage on the
17  vehicles and match them together statically and
18  then dynamically and then you just look -- look
19  where the seat used to be and also where the seat
20  is to write these sentences that are on here.
21     Q   Okay.  But the -- the seat is obviously
22  going to be impacted by the cargo which is between
23  the bumper and the seat.
24        And so my point is, you can't measure the
25  full intrusion of the bumper as it's impacting the

Page 145

1  location of the seat without also factoring in the
2  cargo that was between -- will be between the
3  bumper and the seat.
4        And I think that's what you alluded to
5  about it being too complex of a -- an analysis
6  to -- to complete.
7     A   I disagree.  I think you're -- I think
8  you're twisting it in a way that I don't fully
9  understand.
10        You -- we know the cargo is in there and
11  we know it was flattened, but, you know, we -- we
12  don't agree with your statement in your question.
13        Again, I don't understand it, but I can't
14  agree with it, but I don't understand it either.
15     Q   Well, maybe I'll try a little bit better
16  and then we'll move on.
17        But you're talking about (inaudible.)
18  You can place the bumper at its maximum intrusion
19  based upon the physical condition of the Escape,
20  right?  We agree on that?
21     A   Sure.
22     Q   And I'm trying to nail down what physical
23  attributes of the Escape are you relying upon to
24  perform that overlay to put the actual Ford emblem
25  from the F250 on top of the head area of the cargo

37 (Pages 142 - 145)

G. Bryant Buchner , P.E.                                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 146

1  -- of the child seat.
2       What specific parts of the Escape are you
3  referencing to make that overlay?  That's what I'm
4  trying to get to.
5     A   Okay.  In the static condition after
6  everybody's crashed and crushed and kind of sprung
7  back a little bit, we use the imprint of the bumper
8  on the rear hatch primarily.
9       So it's just a -- take the front bumper
10 of the truck, slide it forward until it marries up
11 on the rear hatch damage imprint of the bumper.
12 You've got tow hooks and other things that are
13 helping you line all of that up.
14      That's -- that's just a static crush
15 after the accident.
16      But we also know that the roof of the
17 Escape came down and left two holes in the hood of
18 the truck.  Meaning, that the hinges for the rear
19 hatch literally came down and hit in the roof and
20 made two very specific marks and poked holes in it.
21      So those -- those are 6 inches -- a
22 little over 6 inches from the static crush.  So the
23 truck had to move an additional 6 inches forward
24 into the Escape for those marks to be left.
25      So we take our static crush, plus a

Page 147

1  little over 6 inches, I think it is, to get a
2  dynamic crush.
3       And so we can draw a truck and Escape
4  that are matched together statically and then we
5  can move that truck in there another 6 inches and
6  show the dynamic.
7       And then once we -- once we move it in
8  there, then because we -- we've got both the
9  vehicles in a 3D dynamic -- 3D world where we can
10 look at them and dynamically rotate them.  Not move
11 them, but just rotate them like on video and look
12 at them, we can see that the Ford logo is sitting,
13 you know, basically where the headrest area of the
14 child's seat used to be.
15    Q   Okay.  That was exactly what I was
16 getting at.  So you're -- you're using crush in the
17 hatch to establish the static extent of the -- of
18 the -- of the crush.  And then the imprints from
19 the hatches, the -- the seats or whatever you call
20 the --
21    A   Hinges.  Hinges.
22    Q   Hinges of the hatch where they impacted
23 the hood of the F250 to determine your dynamic
24 crush beyond the static crush, and those two
25 references on the Escape are what you're using to

Page 148

1  determine the full extent of the crush from the
2  F250?
3     A   Yes.  And there is --
4     Q   Okay.
5     A   We look at all parts of it at the same
6  time, but, yeah, that's the easiest explanation and
7  most straightforward and that's -- that's how we're
8  doing it.
9     Q   And that's shown on this Page 10 when you
10 say that "the bumper penetrated 4.36 feet into the
11 rear hatch trunk and rear seat position areas"?
12    A   That's what I said.
13    Q   You've just explained how you came up
14 with that number?
15    A   Yes.
16    Q   Okay.  On the top of Page 11, that bullet
17 point when you say that in the stock configuration,
18 the crush would have been reduced by nearly 1/2 or
19 over 2 feet, you're talking about the static
20 measurement of the crush in that bullet point,
21 right?
22    A   It'll apply to both.
23    Q   All right.  I'm trying to find something.
24    A   I'm going to stand up for a second.  I'm
25 more comfortable standing sometimes.  I'm just

Page 149

1  going to do this and I apologize.  I hope it will
2  work out okay.  I don't know if there's a
3  deposition requirement that the deponent sit.
4     Q   All right.  I'm sharing the screen.
5  I'm showing a photograph that's been marked
6  IMG 1125.jpg.
7       This is taken from the photographs that
8  we have in your file.  I don't have the Bates label
9  number of it, but it -- it obviously can be
10 identified by the photograph number.
11      You said upon your -- on Page 11 of your
12 report that "The Escape bumper level support
13 structures were largely intact"?
14    A   Yes.
15    Q   Can you point out in the photograph if
16 the bumper level support -- support structures are
17 largely intact?
18    A   Sure.  The two gray things kind of
19 sticking down -- no, they're closest to the tires
20 on the left.
21    Q   Here and here (indicating)?
22    A   On the left closest to the tire and on
23 the right -- yes, those two on the right.  You
24 know, you have to go across the bump -- the
25 muffler.

38 (Pages 146 - 149)

G. Bryant Buchner , P.E.                                January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 150

1    But, yeah, those are -- those are the
2 rails of the unibody and they're pushed down and
3 the bumper was torn off of them, but they didn't --
4 they didn't -- they didn't crush forward like we
5 expect to see in a rear-end collision based on, you
6 know, my years of experience.
7    Q   So when you say they're largely intact,
8 that's based upon they were not pushed forward as
9 much as you would expect based upon your
10 experience?
11   A   Yeah, relatively speaking, they're --
12 they're there to defend the vehicle and absorb the
13 forces and they didn't do that.  So it's a relative
14 term, yes.
15       They're -- they're certainly not usable
16 in a new car or anything, but they're relatively
17 intact compared to what we see in rear-end
18 collisions when they get to perform helping to
19 defend the -- the vehicle.
20   Q   All right.  Whoops.  I'm going back to
21 your report.
22       All right.  This is Page 11 of your
23 report where you are listing the maximum g's for
24 the F250 and the maximum for the Escape.
25   A   Can you share, please?

Page 151

1    Q   Oh, I'm sorry, I thought I was sharing.
2 My bad.
3        All right, can you see it now?
4    A   Yes, sir.
5    Q   All right.  When you say "The Escape was
6 near 23.6 g's," what do you mean by that?  What --
7 did you have to make an actual calculation of it?
8    A   Yes.  Numbers don't always model reality
9 perfectly.  We try to, you know, use a reasonable
10 value.
11       The F250 reported a value of 10.4 based
12 on its weight.  The Escape's based on our weights
13 and the calculation would be near 23.6.  It could
14 be 23.8, could be 23.2, could be, you know,
15 something in that range, but it's -- that's our
16 best number.
17   Q   Can you perform any type of analysis and
18 check for calculations like a Monte Carlo analysis
19 or anything like that?
20   A   We -- we chose a different method.  We
21 basically used three -- two different methods and
22 the two methods gave us a range, so we use that.
23       You know, we -- we could -- we can do it
24 Monte Carlo, but in this case we -- because we used
25 two different methods we believe that that gives us

Page 152

1 a reasonable range.
2    Q   And how would you describe those two
3 methods?  What -- what were the -- I'm confused by
4 that a little bit.
5    A   Sure.  Well, one's a calculation based on
6 Campbell's original formulas and the SAE training
7 courses I've been to and the Northwestern courses
8 where you -- you calculate based on static --
9 static crush.
10       And the other is the simulation with
11 EDSMAC.
12       And then you also just use standard, you
13 know, physics calculations from accident
14 reconstruction to help relate the delta-Vs that
15 were measured in the accident to the delta-Vs based
16 on the -- the weight ratios and whatnot of the
17 Escape.
18       So that's -- that's -- that's
19 fundamentally just physics relationships where data
20 is known and you want to derive more data from it.
21       So there's three -- really three
22 different methodologies in calculating the numbers.
23       Now, that's a part from measuring which
24 is what -- what we did for crush of the accident
25 vehicle in the accident itself.

Page 153

1    Q   The very last bullet point on this page,
2 Page 11, just so I understand it.
3        When you refer to calculations in that
4 paragraph -- that bullet point, you have the crush
5 analysis calculations we looked at for -- they may
6 be up here but maybe not -- but that's when you say
7 calculations, you're talking about the crush
8 analysis calculations that we've already talked
9 about; is that correct?
10   A   Yes.
11   Q   Are there any other calculations that
12 support that bullet point?
13   A   No, that's what I'm using.
14   Q   Okay.  And then when you say simulations,
15 you're talking about HVE; is that correct?
16   A   Yeah.  Yes.
17   Q   Now, did -- that uses the plural of that.
18       It's my understanding there was just one
19 simulation that you ran of the hypothetical
20 instance of a stock configuration on the F250 being
21 involved in this accident.
22       Was there more than that or is there more
23 than that one simulation?
24   A   There's only that one.  Remember, I told
25 you that when we started it we needed to refine it

39 (Pages 150 - 153)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 154

1 to produce the output data that matched the F250.
2        So, yeah, when you first put it in, you
3 have to -- it takes a little bit of work to get it
4 to the proper simulation.
5        So that's -- that's the reason I think
6 there's an S in there. It's -- we really weren't
7 thinking about it when we wrote it because we're
8 just using the one final one, but that's a
9 reasonable explanation.
10    Q   All right. Are the prior simulations
11 that you ran, were they saved in any way?
12    A   No. If someone wants to rerun them,
13 they're pretty easy, you just -- I mean, it's --
14 it's a piece of cake. Like I told you, there's
15 really only one number that we changed and that's
16 the relaxation which affects the restitution which
17 I'm basically changing the restitution.
18        So if someone wants to back -- back work
19 it, they can.
20    Q   Sure. But you didn't keep up on all of
21 like what restitutions you used in the prior
22 simulator?
23    A   No. We would have basically used an
24 iterative process -- an iterative process to get
25 the answer to match the download.

Page 155

1    Q   When you say "match the download," just
2 so I understand that, what actual data from the
3 F250 download are you trying to match in running
4 the HVE stimulator?
5    A   The impact speed and the exit speed.
6    Q   Right. Any other data you're trying to
7 match?
8    A   No.
9    Q   Okay. So you basically change around the
10 coefficient of restitution until you max those
11 speeds, and then that's what gives you confidence
12 that you've got the proper inputs from the HVE
13 simulation?
14    A   Well, we -- you know, we -- we work on
15 the vehicle itself, geometry, and all of that.
16 We're not talking about that.
17        From a calculation perspective, yes, we
18 use -- we -- we put in the crush stiffness
19 coefficients, which we've talked about.
20    Q   Right.
21    A   And then we put in the impact speed and
22 then we vary the restitution or what's also called
23 the relaxation in that particular program to
24 produce the 17.92 delta-V, I believe it is, or
25 17.93. Yes, that's -- that's all we're doing.

Page 156

1        We're letting the program do its thing,
2 but we're giving it a little bit of guidance.
3    Q   If you have the program, how -- how does
4 that DyMESH algorithm work?
5        Do you know how to explain it in -- like
6 if you have to explain it to the jury, I'd love to
7 hear what your explanation will be for how that
8 algorithm works.
9    A   Okay. Well, as I said earlier, it's
10 based on crush stiffness coefficients that are
11 derived standardly by measuring damage at bumper
12 level.
13        But then this particular algorithm looks
14 at the -- at the whole surface of the front of the
15 vehicle and -- and tries to do -- take into account
16 all of the forces.
17        So it actually discounts those AV values
18 and more or less spreads them out across the front.
19        And then it's just going to do some of
20 the forces between the -- the back of the Escape
21 and the front of the truck and it's going to say
22 that the forces are always balanced.
23        And it's going to determine those forces
24 from the AV values, which are the strength.
25        But it's also going to use the geometry

Page 157

1 of the vehicles that are -- are -- that DyMESH
2 uses.
3        You get an accurate geometry and so it's
4 actually trying to look at the overall contact
5 surfaces, not just the bumper level model.
6        Excuse me, let me turn this off.
7    Q   Go ahead.
8    A   My apologies.
9        So it's -- you know, it's just -- it's --
10 you used the word "complicated" earlier. It's a
11 more complicated calculation, more sophisticated
12 calculation.
13        But it gives virtually the same answer
14 that we do it -- when we do it the -- the more
15 classical way using the -- the calculator.
16    Q   Does DyMESH know the location of the
17 vehicle structures such as the frame rail over
18 where the bumper would be?
19    A   It -- it -- it does not. You do not tell
20 it, you know, exactly where the rails are or
21 anything like that.
22        It's -- just like in the standard
23 calculation, you're -- you're giving it
24 measurements at -- at a height that are usually
25 bumper level but they don't have to be bumper

Veritext Legal Solutions
800.808.4958                                        770.343.9696

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 158

1 level, so.
2        But it's -- so really it's -- it's a
3 variation of what we normally do, but it's doing it
4 by looking more at the area as opposed to more of a
5 contact line.  And that's really the difference to
6 it.
7        And engineering dynamics has their own
8 algorithm for doing that.  And they -- they, of
9 course, appreciate bumper level in -- when they
10 develop their algorithm.
11       But I don't think we're telling DyMESH --
12 we're not telling it, it's their algorithm that's
13 -- that's including it in their -- in their
14 algorithm.
15    Q   The algorithm basically assigns one
16 stiffness coefficient to the entire front or rear
17 end or whatever it's analyzing; is that correct?
18    A   Yes.
19    Q   And you can't modify that or change that
20 based upon the impact location in a particular
21 simulator?
22    A   Oh, well, you know, you could try to.
23 You could try to.  But then, again, you've got to
24 be careful where -- you're probably taking the
25 program outside the areas what it's been designed

Page 159

1 to be used, and then you would have to just take
2 responsibility for -- for controlling that.
3        In this case we're not, we're just using
4 it exactly as how it was designed to be used.
5 We're just using it as another calculation tool.
6        But if you get -- if you -- if you go
7 very -- very far afield, then, yes, you would run
8 into considerations that we didn't have to make.
9    Q   It's my understanding that the program
10 doesn't allow you to make those type of changes.
11 You can't adjust the stiffness coefficient to a
12 particular point on the vehicle, correct?
13       So you couldn't even run that type of
14 simulation if you wanted to using the program?
15    A   Look, we're not doing that and I'm not
16 trying to get into that.  But, you know, there are
17 things you can do to these programs to influence
18 beyond just the simplified observation that you're
19 making here.
20       That's what I'm saying you shouldn't be
21 doing.  And if you do, then you're totally
22 responsible for it.
23       But, you know, every -- every computer
24 program, you know, can be affected if one wants to.
25       And I'm not -- and I'm not saying it can

Page 160

1 be done or can't be done.  I'm just saying we're
2 not doing it and I don't -- I'm not aware of a way
3 to do it, but doesn't mean that someone couldn't --
4 couldn't do it.
5    Q   Maybe I'll ask it another way: If the
6 program doesn't know where the bumper or spring is
7 located on either vehicle, how can it determine
8 whether there was an override condition in the --
9    A   Well, first, it shouldn't be using an
10 override and nobody is using an override.  And if
11 anybody is, I think they're -- they're -- they're
12 off the reservation and then they have to become
13 responsible for -- for that work, in validating
14 that work.
15       And there's probably ways to do that, but
16 we don't -- we haven't done that.
17       So there -- it's not an override in the
18 engineering dynamics calculation and we didn't
19 intend it to be an override and it's not looking at
20 override.
21       The accident one is an override and we're
22 looking at that ourselves.  We're not trying to
23 take a program, you know, outside of what it's --
24 of what we consider a fairly normal collision.
25    Q   All right.  So you didn't use them to

Page 161

1 predict there would be no override in the
2 simulation with the stock, you assumed that there
3 would be no override based upon all the reasons we
4 talked about that form your opinion that there
5 wouldn't be an override in the F250 stock
6 configuration?  That's all I'm trying to get at.
7    A   Yeah, you're also trying to insert some
8 words in there that I can't agree with.
9        Fundamentally, the program's not designed
10 to tell me if it was an override or underride.
11       It's designed to tell me the crush at
12 whatever elevation I wanted to hit and I wouldn't
13 use it if I knew there was an override because I
14 don't -- I'm -- not normally use it, that means
15 there -- there might be a situation where you
16 couldn't use it to study something or observe
17 something.
18       But in this case, it's Bryant Buchner
19 that is letting the bumpers hit and it's letting
20 DyMESH calculate it.  And DyMESH and engineering
21 dynamics intend it to be a normal collision.
22       I'm not taking an abnormal collision, I'm
23 -- I'm not validating in any shape, form or fashion
24 that it should be used for that.
25       Although, someone might manipulate

41 (Pages 158 - 161)

G. Bryant Buchner , P.E.　　　　　　　　　January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 162

1 certain things to try to understand something for a
2 crash and that might be okay, but that would be on
3 their hands, not on mine.
4 　　Q　Perfect. Can the -- can DyMESH predict
5 the twisting and collapsing of -- of vehicle
6 components?
7 　　A　It doesn't -- it doesn't -- it's -- we're
8 not telling it -- the answer would be you might
9 could observe something that you could -- depending
10 on the shape of the vehicle and what vehicle's in
11 it, you could observe twisting or effectively
12 twisting.
13 　　　　But no, there -- it doesn't have frame
14 rails in it. It's not -- it's -- it's using --
15 that would have to be something you would conclude
16 based on the data. It's -- it's not going to tell
17 you that something twisted, no.
18 　　Q　Okay. Same thing, there's no mechanism
19 for DyMESH to distort the shell of how it might
20 pull on other parts of the vehicle? It's not
21 capable of doing that either?
22 　　A　No.
23 　　Q　And -- and we obviously know that
24 components could be pulled and twisted, they
25 collapse and rotate during a crash, but that's not

Page 163

1 part of the DyMESH --
2 　　A　Well, it is but indirectly. It's -- it's
3 -- it's not looking at those components being
4 twisted as you're saying, but it is -- it is
5 representing the crush of the vehicle, which is
6 what we do. It's what we chose to do a long time
7 ago was measure the crush and it's representing the
8 crush.
9 　　　　Why the crush is happening and how it's
10 happening involves twisting of metal and all that
11 other stuff that's going on.
12 　　　　But we don't have to -- that's called
13 finite element analysis when someone wants to model
14 that and, you know, that -- that can be done, but
15 that's a different methodology.
16 　　　　It doesn't invalidate the -- the
17 Engineering Dynamic simulation programs, it's --
18 it's actually, you know, been shown to be robust.
19 　　Q　Prior to this case, have you used HVE in
20 any other cases to simulate crush?
21 　　A　I mean, I -- I don't remember all the
22 times I've used HVE. We normally use it to look at
23 crush, and if we're not concerned about crush, we
24 might use PC-Crash. Or there's Brock Brothers has
25 a calculation simulation program.

Page 164

1 　　　　So it's just one of our many tools. I
2 don't remember every time I've used it, but crush
3 is normally one of the reasons why I use it because
4 I'm -- I'm interested in what it says about crush,
5 I'm interested in -- in -- in exploring crush.
6 　　Q　What other -- like PC-Crash and Brock
7 Brothers, would you use those to determine crush?
8 　　A　No, I wouldn't. No. But -- I'm not
9 saying you couldn't do it, but I'm -- I usually
10 don't. I usually use PC-Crash as a dynamics and
11 also a momentum-based analysis.
12 　　　　That's what I prefer it for, but, you
13 know, we can -- we can -- not saying we haven't
14 used it.
15 　　Q　Sure. But HVE, I guess is what you're
16 saying, is your primary simulation tool if you want
17 to explore crush?
18 　　A　Without knowing anymore about it, if --
19 if I just want to look at crush, I -- I tend to
20 like to use HVE because it tends to give me
21 information that I can use about crush.
22 　　Q　Assuming there's never been a situation
23 where you -- your use of HVE to analyze crush was
24 excluded, you know, by a court; is that correct?
25 　　A　That is correct. That is correct. There

Page 165

1 aren't any situations like that.
2 　　Q　And do you specifically recall situations
3 where you used HVE to analyze crush in a trial
4 where that evidence was actually admissible and
5 used by them?
6 　　A　As I sit here, I don't remember any.
7 　　Q　Okay.
8 　　A　Or as I stand here, excuse me.
9 　　Q　Do you recall whether you -- that use of
10 HVE in a -- as testimony in a case or as evidence
11 in a case whether that's ever been challenged based
12 upon Daubert or any other reason?
13 　　A　I've been using H -- I've been using
14 engineering dynamics programs for 30 years, over 30
15 years. It's been part of our regular work. I
16 don't ever remember it being a problem. I tend to
17 remember problems more than I do things that aren't
18 problems.
19 　　　　So my best answer is I don't -- when it
20 was appropriate, we used it, or one of the other
21 programs, and I haven't had an issue with it
22 because I try not to use it unless I believe it's a
23 reasonable representation for the study I'm trying
24 to perform.
25 　　Q　And what I'm getting at is, if you faced

42 (Pages 162 - 165)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 166

1  a challenge like that before, you may have
2  collected articles, peer-reviewed studies, or other
3  material that would support your argument that
4  using HVE to study crush is a reliable, scientific
5  method for simulating, you know, crush in a
6  hypothetical case.
7        It sounds like you haven't done that; is
8  that correct?
9     A   I really haven't done that because I've
10  been using it for so long and I try to stay up --
11  up-to-date on what's going on.
12        So, I mean, I -- I feel like I -- I
13  haven't and I -- I don't remember having --
14  remember having an issue with it.
15    Q   All right.
16    A   I'd be surprised if there's going to be
17  an issue here, but I'll look at it if it comes up.
18        You know, it's -- it's just a
19  straightforward use of a program that's available,
20  been around for 30 years and it's well-respected in
21  the industry.
22        I don't have any problem using it for
23  this. I don't expect anybody else to, but if they
24  do, I'll have to address it.
25    Q   So as we sit here today, you haven't

Page 167

1  selected any material that would support -- that
2  indicates, that you can apply it back to this case,
3  would be a reliable methodology for analyzing
4  crush?
5        MS. CANNELLA: I'm sorry, can you repeat
6  that? I couldn't hear it.
7        MR. HILL: Sure.
8  BY MR. HILL:
9     Q   What I'm getting at is, as we sit here
10  today you can't cite me to any peer-reviewed
11  articles or any other sources that would support
12  using HVE to analyze crush in a case like this one?
13        MS. CANNELLA: Object to the form of the
14  question as vague. "Case like this one" is unclear
15  what you mean.
16  BY MR. HILL:
17    Q   I've tried to establish it multiple
18  times. In a case where you're analyzing a complex
19  crush situation in a hypothetical simulation
20  involving vehicles that were not involved in the
21  actual crash itself, if that helps to define it?
22        MS. CANNELLA: You're asking him if he
23  has any papers that say you can use HVE to simulate
24  a complex crash situation in vehicles not in the
25  wreck?

Page 168

1        MR. HILL: That's right. As he's done in
2  this case. Meaning, what support would he have
3  that that's a reliable scientific method to support
4  his opinions in this case.
5        MS. CANNELLA: Okay, object to the form
6  of the question.
7     A   Okay. Well, first, you distorted. When
8  you -- when you have the override you had, that can
9  get a little complex.
10        We know exactly what's going to happen in
11  that because we have the measurements of it. We
12  don't have to guess at other things. It's just all
13  right there.
14        But when you have the bumper-to-bumper
15  stock vehicle, that's a normal crash. That's --
16  that's as ho-hum as it gets. This is -- this is
17  maybe the simplest crash I've had all year. A car
18  stopped, a truck runs into at 52 miles an hour.
19        HVE, if it can't do that, then it can't
20  do anything. I mean, that's -- that's -- that's
21  what it's designed for.
22        And then if you go look in the
23  literature, I mean, I've already pointed you over
24  there to Northwestern. Northwestern teaches that
25  it's -- that it's a good program to use in crash

Page 169

1  reconstruction and it mentions, you know, to use
2  it. It's one of the options that you have. So
3  it's been referenced in that publication right
4  there.
5        It's not -- this is not a complex crash
6  that we're using it to analyze. It's about as
7  simple as a crash can get.
8        One vehicle's sitting still and gets
9  almost perfectly rear ended by another vehicle.
10  And all the program's got to do is use -- we -- we
11  tell it what the two vehicles are.
12        And then we tell it the strength of the
13  two vehicles. In case of the one vehicle it knew
14  the strength, and the other we told it the
15  strength.
16        And then we -- we changed the relaxation
17  or the coefficient of restitution until the data
18  matches the -- the crash, the pulse that was
19  recorded by the truck as far as the -- the
20  beginning and ending speed.
21        That's -- that's like a 3-foot give me
22  putt for this program. It's -- it's designed to do
23  a whole lot more than that.
24        This is -- this is the fundamental
25  purpose of the -- of the engineering dynamics was

43 (Pages 166 - 169)

G. Bryant Buchner , P.E.                              January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 170

1  to look at crush in collisions and calculate this
2  stuff.
3         And it goes back 30 years.  This -- what
4  we're using, though, is just the latest iteration
5  of it.
6         So I kind of -- and I got a calculator,
7  too.  You know, it works pretty good as well.  It's
8  just a calculation tool, that's all it is for this
9  case.
10 BY MR. HILL:
11     Q    You would agree that it's obviously --
12 its results are dependent upon those variables you
13 just mentioned?
14     A    Within reason, yes.  But the vagaries of
15 the -- of the variables, you know, that are -- are
16 very, very minor.
17        In other words, we use two calculation
18 methodologies that are very far apart.  We got
19 2.1 feet -- less feet crush and 1 and 2.3 less feet
20 crush in the other, that's a -- that's a really
21 small window.
22        You know, if -- if it had been a large
23 window, we would have -- and maybe looked going
24 further, but we got the -- we got a very, very
25 tight result using two independent methodologies

Page 171

1  reasonably and --
2      Q    I'm sorry, are you finished?
3      A    And we're good with that.
4      Q    A third methodology you could have
5  employed would have been to actually develop a
6  crash test involving an exemplar 2016 F250 and a
7  2008 Ford Escape.  Do you agree with that?
8      A    I mean, that's possible, yes, sir.
9      Q    Yeah.  And obviously, that would be a
10 real, real crash test that would not involve or be
11 subject to input variables or other variables that
12 the program and the calculations can't account?
13     A    I can't agree with the last part of it.
14 It's just a different way.  You don't -- you don't
15 blame an orange tree for not bearing apples.  It's
16 an orange tree.  But yes, that is another thing
17 that could be used.
18        And if someone wanted to do that now,
19 there would still be variables that had to be
20 accounted for every time everyone does a crash test
21 that some guy says the humidity was different that
22 day or something.
23        I'm not saying humidity matters, it's
24 just, you know, there's always things that, you
25 know, enter into that, too.  It's -- it's not

Page 172

1  perfect, but it's -- it's a tool and can be used.
2  Sure.  No problem.
3      Q    But you, in your opinion, rate an actual
4  crash test higher than the simulations or
5  calculations with regard to reliability in
6  predicting what would happen in a hypothetical
7  crash?
8      A    Well, it depends on who did it and how
9  they did it.  I mean, very well -- you know, it
10 could be, it could not be, we would have to see it.
11        You know, if -- in a perfect world, I
12 would -- you know, I would like to -- I would
13 choose the crash test if it were done as well as it
14 should be done.  I would tend to choose it, but,
15 you know, we'd have to see it first.
16     Q    Have you done actual crash testing of
17 vehicles in your work in the past?
18     A    Yes.
19     Q    And in those cases when you did an actual
20 crash test, did you also do like crush calculations
21 like we did in this case or -- and/or any
22 simulations or did you just rely upon the actual
23 physical crash test?
24     A    All different ways.  But normally we do
25 calculations so that we can set up the crash test,

Page 173

1  you know, so.  Or sometimes do a crash test just
2  to -- just to evaluate one part of the crash.
3         So, you know, the simulation -- you know,
4  a crash test is just to explain some thing or to
5  investigate one thing and then the calculations are
6  still where the answers come.  So there's all
7  different versions of it.
8         THE WITNESS:  If you get to a good
9  stopping point, and I can wait, I would like to
10 take a break.
11        MR. HILL:  All right.  You can take a
12 break whenever you like and hopefully we're getting
13 towards the end.
14        THE WITNESS:  Okay.
15        MR. HILL:  Let's take a break.
16        THE WITNESS:  Thank you very much.
17        VIDEO TECHNICIAN:  The time is 3:10.  We
18 are off the record.
19        (Recess taken.)
20        VIDEO TECHNICIAN:  The time is 3:32.  We
21 are back on the record.
22        MR. HILL:  Thank you.
23 BY MR. HILL:
24     Q    A couple of clarifying questions
25 regarding the HVE simulation.

44 (Pages 170 - 173)

G. Bryant Buchner , P.E.                                January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 174

1    When you said that the initial -- and I
2 think you said relaxation coefficient is maybe the
3 term used by HVE?
4    A   Yeah, they have a relaxation link in
5 there that -- that manipulates the coefficient of
6 restitution.  So that's how you get to it in this
7 particular module.
8    Q   Right.  So you testified that the initial
9 relaxation values did not match up with the known
10 impact and -- you know, entry and exit velocities.
11 Is that not --
12    MS. CANNELLA:  Entry and exit, what did
13 you say?
14 BY MR. HILL:
15    Q   The velocities --
16    MS. CANNELLA:  Velocity.
17 BY MR. HILL:
18    Q   -- or whatever the appropriate term is.
19    A   Right, it didn't -- you know, it -- it
20 might have, but it didn't give the proper exit
21 velocity that we -- or the delta-V that we were
22 trying to use to represent this particular accident
23 because it was accident-related data.
24    And it was no surprise it didn't.  We
25 knew that it would be just a fluke if it did.

Page 175

1    Q   Sure.  And the relaxation value for the
2 Ford Escape that was used in the initial
3 simulations, where did that come from?
4    A   There's not a value for the Ford Escape.
5 It's an inter-vehicle, vehicle to vehicle.  So it
6 will change depending on where you hit on the
7 vehicles.  You can have the exact same two
8 vehicles.  Hit -- hit a little bit differently,
9 you'll get a different value.
10    So it just has a value when you turn the
11 program on and it has a value that pops up.  And
12 then it's one of the things that we expect to have
13 to modify.  I don't remember what the -- what the
14 value that pops up is.  We call it the default
15 value.  But it's pretty close to what we had.
16    Q   Is the default value based upon the
17 individual vehicles involved in the simulation or
18 was it just the standard default value?
19    A   I -- my recollection is it's just a
20 standard value that pops up.  It's what the program
21 starts with.
22    Q   Okay.
23    A   It's got to have something.
24    Q   Yeah.  So just that so that I understand
25 it, and I apologize for -- I'm not having one --

Page 176

1 one millionth of the expertise you have in this,
2 but -- so you're not inputting into HVE relaxation
3 or coefficient of stiffness or restitution?
4    A   Restitution.  Coefficient of restitution.
5    Q   Yeah, you're not inputting that for each
6 individual involved in the simulation?  The
7 simulation is generating a combined, for lack of a
8 better word, coefficient of restitution for the
9 accident and then using that in the simulation?
10    A   That was almost but not quite.  It needs
11 a value to run the simulated crash.
12    So it has a value it'll typically start
13 with, but if we know better or if we know an answer
14 at the -- at the -- after the crash, we can --
15 that's a tool we can use to get the proper input
16 and the proper exit speeds.
17    And it's called tuning.  We're just
18 tuning it to match the data that we -- we believe
19 was measured and was reasonably measured and -- and
20 we're using it for our particular analysis.
21    Q   Okay.  Tuning is just to that one
22 number --
23    A   Yes.
24    Q   -- that one coefficient of restitution
25 that represents the accident as a whole?

Page 177

1    A   Yes.
2    Q   And so, why did you have to go to Neptune
3 Engineering to get the stiffness coefficient for
4 the F250 -- go ahead.
5    A   Yeah, because that's an input.  It needs
6 to know a reasonable strength of the vehicles.  It
7 -- some vehicles like the Escape, it already had a
8 strength in, but the F250 it didn't.  And when I
9 say strength, I mean, coefficient -- crush
10 coefficients.
11    So, therefore, we told it a reasonable
12 value from Neptune Engineering to use.
13    Q   Right.  So that there is a component of
14 the crush coefficient of each vehicle that HVE
15 uses?
16    A   Oh, absolutely.  Yes, sir.  Yes, sir.
17    Q   That was what was confusing me.
18    MS. CANNELLA:  I think we might --
19 Mr. Hill, I'm sorry to interrupt you, but I think
20 you guys might be getting your wires crossed on the
21 terms, and I could be wrong, about the coefficient
22 of restitution and the crush coefficient.  They're
23 different things, I think.
24    A   If -- I might have heard the question
25 wrong.

45 (Pages 174 - 177)

G. Bryant Buchner , P.E.                                January 23, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 178

1      MS. CANNELLA:  Okay.
2    A   So --
3      MS. CANNELLA:  I don't know.
4    A   Let's just -- let me make sure to listen
5 to the question.  I thank you.  If we could try
6 that last one again because I might have heard it
7 wrong.
8      MR. HILL:  Well, that's something we need
9 to clear up.
10      Thank you, Tedra.
11 BY MR. HILL:
12    Q   Is there a difference between crush
13 stiffness coefficient and coefficient of
14 restitution?
15    A   There absolutely is.
16    Q   Okay.
17    A   So the crush stiffness coefficients have
18 to do with the inherent strength of the vehicle.
19      And then the coefficient of restitution
20 has to do with the rebound or somewhat -- or the --
21 more or less a way -- the plasticity or elasticity
22 of the vehicles as they combine and hit each other.
23      So one is -- one is kind of the
24 springiness and the other is the strength.
25    Q   So when we're talking about stiffness

Page 179

1 coefficients, we're talking about strength?
2    A   Yes.
3    Q   Okay.  And what version of HVE did you
4 use, do you know?
5    A   It's a -- it's a recent -- I think the
6 purchase of this was last year, so it's a recent --
7 if the output doesn't tell it to us on top, I don't
8 know off the top of my head.  Let me look and see.
9    Q   17.00.
10    A   That looks right.
11    Q   And that's from 2021?
12    A   Yes, sir.
13    Q   All right.  And are there any new
14 versions of it come out since 2021 that you're
15 aware of?
16    A   Not that I'm aware of.
17    Q   Okay.  And are you saying that there was
18 no like database of stiffness coefficients for a
19 2016 F250 contained within the HVE database?
20    A   We didn't find one when we looked, no.
21    Q   When you -- so you inputted the
22 one you got from Neptune.  And was that stiffness
23 coefficient specific to any side of the F250?
24    A   It -- it was a frontal, yes.
25    Q   Okay.  So you used the frontal one from

Page 180

1 Neptune?
2    A   (Nodding head.)
3    Q   And then the stiffness coefficient used
4 for the Escape was contained within the database
5 already or within the program for the rear?
6    A   Yes.
7    Q   Okay.  And then the program then
8 generated its own coefficient of restitution to
9 cover the entire accident?
10    A   No.  It had a value that was just in it
11 by default.
12    Q   Okay.
13    A   Not -- not knowing about this crash at
14 all.
15    Q   Okay.
16    A   And then we tuned it to match the known
17 data in this crash.
18    Q   Right.  And so, the only thing you tuned
19 was that the default coefficient of restitution you
20 didn't change the stiffness coefficients for the
21 two vehicles?
22    A   Correct.
23    Q   That's what I'm just trying to clear up.
24    A   And it's good to get it cleared up.
25    Q   Yeah.  This is not the simplest stuff, so

Page 181

1 I appreciate your helping me.
2      Now, does the -- does the center of
3 gravity play any role?  Is that something you have
4 to input for each vehicle?
5    A   The center of gravity is input and it
6 plays a very minor role.  As long as you're even
7 reasonably close, it -- it doesn't have an effect.
8      Now, in this particular crash.  In
9 others, it can.  Let's say you've got really an
10 angled crash way off and it went in.
11      So in this case it is put in and then
12 it's -- it's left where it is in the -- in the
13 stock vehicles.
14    Q   Okay.  So -- so when you say it -- it is
15 put in, is it put in by you, the user?
16    A   Yes, based on those weights or the specs
17 that you have that we looked at earlier, that's --
18 the CG is determined by those weights and its
19 location and that's what's in the program after we
20 put it in.
21    Q   Right.  And that's -- that's kind of my
22 question, because in the HVE simulation the Escape
23 had a distribution of 60.6 percent to the front and
24 39.4 percent to the rear.
25      Is that something that HVE automatically

46 (Pages 178 - 181)

Case 2:22-cv-00017-RWS    Document 119-4    Filed 01/20/25    Page 47 of 129
G. Bryant Buchner , P.E.                                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 182

1 input or is that something that you guys input?
2     A   I'd have to go back and look on this
3 particular run.  You can put occupants in and then
4 it'll make the adjustments which is fine.
5 Sometimes we put it in ahead of time.
6         With those numbers you're telling me, it
7 looks like we were accounting for occupants near --
8 near the front wheels and the rear wheels.
9         So my memory isn't perfect on that, so
10 you -- but if -- even if we left it at the original
11 57/43, it would not change the answer in this
12 particular case.
13         But it does look like -- the numbers
14 being a little bit different, it looks like that --
15 that either we or the program actually put the
16 people in the front seat.  So it -- you have a
17 little more weight on the front.
18     Q   And so that 3 percent extra you would
19 attribute to the front seat occupants?
20     A   Yes, because they're -- they're sitting
21 closer to the front wheel so it adds a little bit
22 of weight towards the front.
23     Q   Right.  And how did you determine the
24 weight of the front seat occupants?  Did you have
25 medical records or something from them or what?

Page 183

1     A   It's included in our -- in our materials
2 here.  Take a minute to find it, but we do have
3 reference weights for all the people that were in
4 the vehicle, either with their driver's license,
5 where they often get it.  Medical records is where
6 we often get it.  Or even in the depositions.
7         But if we -- if you go look, there's a
8 sheet in here that tallies and -- and has the
9 references behind it.  I think I have a tab called
10 Weights.  Yeah, I do.
11         I have a weight sheet and behind the
12 weight sheet is the weights of the vehicles, Hunter
13 Elliott's weight.  The Ford Escape, we have its
14 weight.  We have the weight of Santana Bryson and
15 Joshua Bryson from their medical records.  And of
16 course, Cohen Bryson.
17         So that's where we got them from.
18 Medical records of all the people.
19     Q   Is this what I put on the screen, what
20 you're referring to?
21     A   Yes, sir, that's the Result and behind it
22 should be the medical records that we used.
23     Q   Right.  And the weights for the F250, you
24 have weights for the chainsaw, storage box and
25 tools.  How did you come up with those weights?

Page 184

1     A   Well, the chainsaw and the storage box
2 are just internet searches for those objects.  And
3 then the tools is an estimate by -- by me.  You got
4 a storage box, some tools in it and we needed a
5 weight.  I chose a hundred pounds based on all the
6 tool boxes I have.
7     Q   Okay.  And with regard to the Escape, the
8 only thing that wasn't included would have been the
9 spare tire and rim in the weight calculation?
10     A   No, it was in there, but it was
11 probably -- I can't tell you it was at the back or
12 in the middle seat or the front seat.  It could
13 have been moved around, but it -- it was in there.
14     Q   It was in there, you just don't know
15 which wheel it would have registered on more than
16 the -- the others?
17     A   Right.  Yes, sir.
18     Q   I understand.
19         The fact that the increase of that
20 3 percent of weight distribution to the front in
21 the Escape in your model, which by my calculations
22 would have moved the center of gravity 4 inches
23 forward, does that have any impact on your
24 simulation in your opinion?
25     A   Not in this case, it will not.  I mean,

Page 185

1 it's -- it just won't have -- it just won't have an
2 effect.
3         I mean, if you're talking about, you
4 know, .01 something somewhere, which is not an
5 effect in my mind, but the -- the final answer is
6 going to be the -- the same answer.
7     Q   So the exact location of the CG is not
8 important to the HVE model in this case?
9     A   A reasonable CG location is important,
10 but moving it forward a few inches is not going to
11 change anything in this case, no, sir.
12     Q   All right.  When you adjusted the -- the
13 weights -- because I guess it pulls up a generic
14 curb weight for the vehicle.  Once you've input the
15 vehicle, then you have to adjust it to add for the
16 cargo and the people?  Is that how it --
17     A   Yes.  Yes.
18     Q   Okay.  And so when you adjusted those
19 weights, do you know whether you're in total mass
20 mode or spring mass mode?
21     A   I think it's in spring mass mode.  But
22 when you say mass mode, it's a spring mass, but
23 where -- where -- it doesn't matter whether we
24 change the total weight of the vehicle or we add
25 the occupants.  They are a part of the sprung mass,

47 (Pages 182 - 185)

G. Bryant Buchner , P.E.                      January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 186

1 so that's where the program is going to put it.
2    Q   So it doesn't make any difference what
3 mode you're in, it's going to put it in the sprung
4 mass -- enter the sprung mass is what you're
5 saying?
6    A   The way we would view it, yes.  I'm not
7 saying somebody can't do it a different way, but,
8 you know, we're -- we're looking at the -- at the
9 sprung mass of the vehicle.
10       You know, it doesn't -- just for what
11 it's worth, it's -- there are a lot of ways you can
12 hit a putt and have it go in the hole.  Whether it
13 goes in the right side or left side, that's what
14 we're looking at here.
15       We're -- there are things that definitely
16 matter.  The speeds definitely matter.  The overall
17 weights, you know, within reason, you know, matter.
18       But we're not trying to say it's an
19 exact, precise, 100 percent answer.  We're trying
20 to look at two independent ways to get it.  We get
21 the same answer for both.  It would have been less
22 -- 2 feet less crush or more.
23       But we can play with it and the answer
24 might be 2.2 or 2.1 or 2.3, but it's -- what we're
25 -- just to be clear, these things are considered

Page 187

1 when we run the program, but we don't -- it's not a
2 critical factor.
3    Q   Going back real quick to the stiffness
4 coefficient.  And you've already said you used the
5 input -- the front stiffness coefficient for the
6 F250 from Neptune Engineering.  And the program
7 already had the rear stiffness coefficient for the
8 Escape.
9        Did the program consider the stiffness
10 coefficients for any other side of any of the
11 vehicle?
12    A   No.
13    Q   Okay.  Is that something that the program
14 allowed you to input as well?
15    A   Okay, yes, the program has those values
16 in it already.  If it wants them, it can use them
17 for the Escape.  For the truck, we only gave it the
18 frontals.
19        So if it wanted -- if it wanted something
20 beside, it would have to do a -- it would have to
21 do a ratio off of that or something.  But it -- it
22 only required us to give it the frontals.
23    Q   So you're saying required meaning the
24 occupant, the input, the other side, if you wanted
25 to, but it wasn't required for the simulation to

Page 188

1 run?
2    A   That's my recollection, yes, sir.
3    Q   But it's your understanding -- since we
4 don't have the Neptune for the other side, it's
5 your understanding that the program did consider
6 the stiffness for the other three sides of the
7 F250?
8    A   Right.
9    Q   Okay.
10    A   It already had them loaded for the -- for
11 the Escape.  If it wanted them, they could use
12 them, but I don't think it used them.
13    Q   Are there sources for the stiffness
14 coefficient of the F250 other than like Neptune
15 Engineering?
16       I mean, isn't there NHTSA crash data and
17 other sources that you could use to determine those
18 -- those coefficients?
19    A   In a sense, but Nep -- the government
20 crash test, NHTSA, that's what Neptune uses.  The
21 government does not give you the stiffness values,
22 you have to calculate them.  We can calculate them.
23       We prefer to use Neptune for consistency.
24 Everybody else in the industry can get to it.  And
25 in my mind it's generally accepted.

Page 189

1        I've known Mr. Neptune and his business
2 and -- for 30 years.  Hence, I'm very comfortable
3 with -- with his process.  It's -- it's a
4 standardized process.
5        There -- there are other clearinghouses
6 you could probably go to at this point in time.  I
7 don't use any of the others.  If I don't have -- if
8 Mr. Neptune doesn't have what I need we recalculate
9 it ourselves.
10    Q   All right.  Speaking of that, were you
11 provided crash testing that was performed by Ford
12 in this case?
13    A   No.
14    Q   Okay.
15    A   Or if I did, I didn't see it.
16    Q   So you're not relying upon any crash
17 testing performed by Ford in your -- to give your
18 opinions in this case?
19    A   Well, ultimately, the -- the NHTSA test,
20 sometimes I -- so if -- if we take that out, I've
21 gotten no other crash tests that I'm looking at by
22 Ford.
23    Q   All right.  And you didn't use the NHTSA
24 crash testing of Ford to calculate the stiffness
25 coefficient in this case, you -- you used the

48 (Pages 186 - 189)

G. Bryant Buchner , P.E.                                January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 190

1 Neptune Engineering number?
2    A    Yes.  For the F250, yes.  And Neptune
3 used the NHTSA data.
4    Q    Just to cover everything with HVE so I
5 don't get yelled at by my people.  What environment
6 was used for the collision?
7    A    The HVE environment.  There isn't -- in
8 our case we're just using a flat level plane.
9    Q    Right.
10    A    So we're -- we're really interested in
11 the crush phase which lasts, you know, a quarter
12 second.  After that, nothing.  We're not interested
13 in that because we're interested in the crush.
14    Q    Understood.  Was the coefficient of
15 friction of the roadway involved in the simulation?
16    A    It's probably in there, but it's -- you
17 know, it's -- it's irrelevant.
18    Q    It's going to be a default value or
19 something that the program generates itself?
20    A    Yes.
21    Q    And you didn't measure the coefficient of
22 the roadway and provide that as input in the
23 simulation?
24    A    No.
25    Q    In the crush calculations that you did,

Page 191

1 we talked about your coefficient of restitution
2 that you used for those calculations, and I believe
3 you testified it was your best estimate of an
4 appropriate coefficient of restitution of 1.1?
5    A    0.1.
6    Q    I'm sorry?
7    A    0.1.
8    Q    Yeah, I'm sorry, 0.1.
9        Did you ever tune the HVE simulation
10 using that same coefficient of restitution you can
11 use in the crush analysis?
12    A    I'm sure.  We tried .1 and we didn't get
13 the -- the -- the data that had been measured by
14 the truck when we did that.  So the .1's a pretty
15 easy number put in.
16        So .1 or something essentially .1, but,
17 you know, it didn't -- didn't match the input and
18 output data.
19    Q    Did you in performing your crush
20 calculations ever use the 1.4, that approximate
21 number of coefficient of restitution, that was used
22 in the HVE simulation?
23    A    No.  HVE didn't use .14.  Point 1 --
24 well, let me check that.  I might be wrong.  Thank
25 you for letting me clarify.

Page 192

1    Q    Yeah, I can't give you the exact number,
2 I'm sorry.
3    A    Yeah, we'll get it.  I'm just kind of
4 slow at flipping pages sometimes.
5        It used a .11.  So HVE used a .11.  In
6 our calculations we used a 0.1 for the
7 bumper-to-bumper hit which are going to be, of
8 course, different from the accident because you had
9 a bumper to tailgate hit.
10        So we -- we didn't use -- we used .1,
11 which was my judgment, and HVE we had to use a .11
12 to get it to match.
13    Q    What did you just reference to find the
14 .11 coefficient for the HVE?
15    A    You asked for the HVE reports over the
16 weekend and they were sent to you, so I'm looking
17 at the inter-vehicle collision data page.
18 Inter-vehicle collision data page.
19    Q    And are you pointing out from .113 where
20 it says "Restitution Coefficient" on the right
21 side --
22    A    Yes.
23    Q    -- here?
24        All right.  And this is just reflecting
25 the final, I guess, say input that you guys put in

Page 193

1 as the coefficient that you actually use the input
2 and output speed values that you observed from the
3 download?
4    A    Yes, those are -- those are input and
5 output speeds we were targeting, and the .11 is
6 what hit the targets.
7    Q    Gotcha.
8        And you don't know what that started out
9 as from a default perspective?
10    A    I don't remember, no, sir.
11    Q    And you don't remember how many
12 variations or tuning to that you guys had to do
13 before you got the output that you expected?
14    A    No.  But not -- not that we expected,
15 that we targeted.  We -- we targeted specific
16 values from the download.
17    Q    Yeah, you say targeted.  It's -- you're
18 just trying to match the download?
19    A    Yes.
20    Q    You're not targeting something out of the
21 blue?
22    A    Correct.  Thank you.
23    Q    In your inspections of the vehicle by
24 your team, did you guys ever remove the seat covers
25 from the front seats of the Escape?

49 (Pages 190 - 193)

G. Bryant Buchner , P.E.                         January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 194

1    A    Talking about the little fabric covers?
2  Yes, I think we did.
3    Q    And what was the purpose of doing that?
4    A    Oh, when we were scanning it, I think --
5  I thought it would show up better or something like
6  that.  It didn't -- it wasn't really part of an
7  inspection of the seat, it was just to, you know,
8  work on appearance.  Or photo.
9    Q    Make the scan more accurate; is that --
10    A    Yeah, like a color variation.  I don't
11  remember the color of them as I sit here, but I do
12  remember looking at that.  And maybe they were
13  crumpled up in some way, but I do remember
14  adjusting that.
15        I think we did -- I think I kind of
16  removed them, but it's not a critical point.  We
17  can look at the photo some, but I think we did.
18    Q    Did your team uncover any evidence that
19  the driver's seat was impacted by anything?
20    A    Oh, I wasn't looking for that.
21    Q    Okay.  And again, I think we've discussed
22  that you don't intend to give any opinions as to
23  whether the child impacted the front driver seat?
24    A    That's beyond my area of expertise.
25    Q    Now, I think you've acknowledged that

Page 195

1  there can be intrusion into the occupant space in
2  collisions that don't involve lifted vehicles; is
3  that a fair statement?
4    A    I don't think so, but maybe we can
5  clarify.
6    Q    Okay.  So you -- when you say you don't
7  think so, do you think it's impossible for there to
8  be intrusion into the passenger occupant space in a
9  collision that does not involve lifted vehicles?
10    A    I didn't fully follow the question.  I --
11  I think the answer, though, is, yes, a nonlifted
12  vehicle can sometimes intrude the occupant space
13  of -- of a -- the bullet vehicle that's nonlifted
14  can sometimes include the occupant space of a
15  target vehicle.
16    Q    That's all.  Thank you for clarifying my
17  question, yeah.
18    A    Thank you.
19    Q    Have you ever been involved in a case
20  where there is a rear-end collision with nonlift --
21  involving -- you know, neither vehicle was lifted
22  where you observed intrusion into the occupant
23  space?
24    A    The ones I think of are commercial motor
25  vehicles.  I mean, I've had them literally go all

Page 196

1  the way over the top of a vehicle.
2        But as far as passenger cars, which we're
3  talking about here, I don't know off the top of my
4  head.  I'm not agreeing or disagreeing, I just
5  don't know.
6        It's -- you know, maybe at extreme speeds
7  or something like that, but -- but I don't have any
8  that I'm thinking about as I sit here.
9    Q    And how would you define "extreme
10  speeds"?
11    A    We -- we've seen hundred mile per hour
12  collisions.  That's extreme.  I wouldn't think of
13  an exact number.  I was just thinking of something
14  that's just...
15    Q    Why is there any threshold speed where
16  you would expect there to be override and intrusion
17  into the occupant space?  Is there a way for you to
18  put a number on that?
19    A    No.  It -- it depends on the accident.
20  I'm not trying to judge cars as a -- you know, as a
21  group, I'm looking -- I look at specific accidents.
22        But you ask me have I seen it, I don't
23  remember any, but, you know, we do -- we do see a
24  fair number of hundred-mile-per-hour vehicles out
25  there.  And, you know -- you know, that's where I

Page 197

1  would start looking.
2    Q    Right.  So you acknowledge it's possible,
3  you just can't remember a specific situation that
4  -- that you're involved in as you sit here today?
5    A    Yes, sir.  And my apologies, I'm not here
6  today to remember other accidents and I have a
7  terrible memory of other accidents where I'm this
8  focused on -- on a particular problem.
9    Q    Sure.  I guess on this same line, would
10  you agree that there are accidents where the speed
11  can be so severe that bumper height is not really
12  relevant to whether a person can be injured in the
13  accident?
14        MS. CANNELLA:  Object to that question as
15  vague and an incomplete hypothetical.
16    A    Bumper height would still be important.
17  Bumper height could in -- in many accidents could
18  change the outcome.
19        So I -- as a -- as a general statement,
20  I -- I can't agree or disagree, we'd have to look
21  at specific events.
22  BY MR. HILL:
23    Q    I understand.
24        So you would have to be presented with a
25  specific scenario in order to give an answer to

50 (Pages 194 - 197)

G. Bryant Buchner , P.E.                              January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 198

1 that question?
2     A    The way I heard it.  I -- I don't want to
3 give a generalization.  I'd rather talk about
4 specifics.
5     Q    Give me one second here.
6         One of the items in the material you
7 provided to us is Georgia Code Section 40-8-6.
8     Did you rely upon that code section in
9 formulating any of your opinions in this case?
10     A    I don't believe I did.  It's a piece of
11 background information.
12         And if the question is, was the vehicle
13 lifted more than 2 inches, yes.  I think that's the
14 code you were referring to.
15         But it doesn't affect my opinion that if
16 the vehicle hadn't been lifted, you know, the --
17 the crush would have been less and all of that.
18         It's just a piece of background
19 information that I'm aware of if -- if you want to
20 compare it to the 2 inches, but I don't have a --
21 it's not there for me to give an opinion off of.
22     Q    And that's what I meant.  You don't plan
23 to give any opinions on whether Mr. Elliott
24 violated that statute or not in this case?
25     A    Only -- only if I'm asked was the vehicle

Page 199

1 lifted more than 2 inches, I will say, yes, but I'm
2 -- so I -- I have data that can help, but I'm not
3 here to say whether he violated it or not.
4         But he -- if -- if -- if the -- if the
5 hypothetical or if the ques- -- I can't use that
6 word because I don't know what it means.
7         If the question is was it lifted more
8 than 2 inches, the answer is yes.  But if the
9 standard is 2 inches, then he violated the
10 standard.
11         But I'm not here to say what the standard
12 for passenger cars are specifically.  I'm just --
13 it's in my file and I'm aware of it.
14     Q    Okay.  You don't know how that statute's
15 interpreted, what it's -- you know, what the
16 baseline for that statute is, any of those that you
17 haven't looked into that issue?
18     A    No, sir, it's a piece of data for me.
19     Q    Okay.
20         MR. HILL:  All right.  Let's take just
21 another five-minute break and make sure I haven't
22 missed anything.
23 BY MR. HILL:
24     Q    If I can ask you this question, it might
25 help, but are there -- I know this is a difficult

Page 200

1 question, but maybe you can help point me in the
2 right direction.
3         But are there any topics or areas that
4 you plan to give testimony on that we haven't
5 covered today?  What am I missing?
6         MS. CANNELLA:  Object to the form of the
7 question as vague, but you can answer.
8     A    In my mind, you're not missing anything.
9 We have the -- the -- you know, the support, which
10 you've gone through in the drawings.  And then the
11 calculations that -- and we've talked about the
12 heights and the intrusion.
13         So I believe -- I believe we have touched
14 on all of the subjects.  And you've been presented
15 with the file materials.
16         So when I'm sitting here, I'm not
17 thinking about anything that I'm waiting on you to
18 ask me about.  If I did, I would tell you.
19 BY MR. HILL:
20     Q    Well, that's why I ask the question.  I
21 know it's a bad question and that was a valid
22 objection, but I'll subscribe to have you point me
23 to something that I'll miss that's important to
24 your opinions.
25         MR. HILL:  So let's take just a quick

Page 201

1 10-minute break and make sure I've covered
2 everything and then we can be done.
3         THE WITNESS:  See you in five minutes.
4 Thank you.
5         VIDEO TECHNICIAN:  The time is 4:07.
6 We're off the record.
7         (Recess taken.)
8         VIDEO TECHNICIAN:  The time is 4:22.  We
9 are back on the record.
10         MR. HILL:  Thanks.
11 BY MR. HILL:
12     Q    Let me share my screen here.  Just a few
13 follow-up questions.
14         What I just put on the screen is 1362
15 through 1374.  This is what I think we've
16 identified as the support to your report.  I'm not
17 sure whether we attached this as an exhibit to the
18 report.
19     A    You did.  You labeled the support as an
20 exhibit.  I don't mind you doing it again, but I
21 remember you saying --
22         THE COURT REPORTER:  I think it was No.
23 7, support.
24         MR. HILL:  Okay.  Thank you.
25 BY MR. HILL:

51 (Pages 198 - 201)

G. Bryant Buchner , P.E.                          January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 202

1    Q    Now, if you open this page, you have some
2  handwriting there that says: "Exemplar scan raised
3  .04 inches to account for stock tire differences."
4         And I guess that's where you're
5  indicating that your exemplar placarded car size
6  were different than the placard tire size on the
7  subject F250?
8    A    Yes.
9    Q    And -- and you have accounted for that
10  .04 -- that .04 feet.  Sorry, I think I said
11  inches.  The .04 feet is what that meant, is that
12  the same height?
13   A    Yes.
14   Q    Okay.  And you accounted for that in all
15  of your simulations, that difference in that
16  placarded tire size between a 2015 and a 2016 F250?
17   A    Right.  The simulations use the accident
18  truck stock tire size, not the exemplar.  The
19  exemplar tire size wasn't -- wasn't used in a
20  simulation.
21   Q    Well, so you're saying that the
22  simulation, the HVE simulation of a nonlifted
23  version of the 2016 F250 used the tire size on --
24  that was on the subject vehicle at the time of the
25  crash?

Page 203

1    A    No, that it came with.  That it was
2  originally provided with.
3    Q    Right.  And that's what I mean, is
4  that -- and it was .04 feet taller, for lack of a
5  better word, than the tires that were on your
6  subject -- on your exemplar vehicle?
7    A    Yes.
8    Q    Okay.  We're on the same page.
9         When you did the crush calculations,
10  which I put up here as 3992 through 3993, help me
11  understand, is -- there's a coefficient of
12  restitution on 3993.  And that would correlate with
13  the overall coefficient of restitution for the
14  accident we've been discussing in the context of
15  the HVE simulation and other (inaudible), right?
16        MS. CANNELLA:  Object to the form of the
17  question as vague.
18        MR. HILL:  I don't know how I could make
19  it more specific.
20        MS. CANNELLA:  Which -- which accident
21  are we looking about here?
22        MR. HILL:  We're talking about his
23  simulation had a coefficient of restitution that
24  was used to make each simulation.
25  BY MR. HILL:

Page 204

1    Q    Those momentum calculations have a
2  coefficient of restitution.  And I'm trying to
3  match all of those up.  And does this coefficient
4  of restitution on 3993 correlate with those other
5  two coefficients of restitutions I've just
6  mentioned?
7         And when I say "correlate," I don't mean
8  are they the exact value, I'm just saying are we
9  talking about the same thing.
10   A    Actually, there's some differences there.
11  This coefficient of restitution is for a reasonable
12  value for the bumper-to-bumper collision as -- as I
13  calculated it.
14   Q    Right.
15   A    There's a value that was derived through
16  the use of the HVE program which is .11 or .118,
17  eventually the same -- essentially the same thing,
18  or .113, essentially the same as this.  Both of
19  those have to do with a bumper-to-bumper crash
20  struck by the limited -- lifted.
21        But the other was an attempt to derive a
22  coefficient of restitution for the accident, but we
23  really don't need it at all because it's -- you
24  know, that accident is that accident.
25        In other words, we -- we see the crush

Page 205

1  and everything from it.
2         But -- so that's how they correlate.
3  They're different accidents, but two of them, the
4  .1 and the .11 plus are -- are for the
5  bumper-to-bumper crash.
6    Q    I understand.  So -- and the momentum
7  calculation, the restitution value there is for the
8  actual crash?
9    A    Didn't hear the question.
10   Q    Okay.  So I just put up the momentum
11  sheet.
12   A    Yes.
13   Q    4000.  And I think that's what you were
14  saying that restitution value on this page
15  correlates with the actual accident?
16   A    It's a -- yes, it's an attempt to get the
17  accident value for -- for the tailgate and all
18  that.
19   Q    And is that restitution value, .148, is
20  that derived from these calculations on this page?
21   A    Yes, it's -- in order to get the final
22  answers at the bottom.  The V1 -- the -- the --
23  yeah, it's -- it's part of the calculation.
24        It's -- it's used to -- to make the data
25  -- the 51 and the 17.92 and the 33.08 match the

52 (Pages 202 - 205)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 206

1  accident.
2     Q   Gotcha.
3        So you can put in different values for
4  that restitution to make it output and match the
5  output you just mentioned on the bottom?
6     A   Yes.
7     Q   Okay.  For these -- the crush analysis
8  using the mathematics on 3992, are the stiffness
9  coefficients of each vehicle a part of this
10 calculation?
11    A   Yes.
12    Q   Okay.  And I -- I figured the answer was
13 yes.  Where on these pages exactly do they factor
14 in?
15    A   Well, the -- in the highlighted section
16 in green at the top, the third -- I'm sorry, the
17 second and third lines are the A and B values, the
18 crush stiffness coefficients, for the F250 and the
19 Escape respectively.
20       And then down throughout the calculation,
21 those are referenced as capital A's and capital B's
22 with a standard set of calculations, if that
23 answers your question.
24    Q   It does exactly.  And the AA and AB
25 stiffness coefficient, what side of the vehicle do

Page 207

1  they represent?
2     A   The AA is for the front of the F250.  And
3  the AB and BB are for the rear of the Ford Escape.
4     Q   Right.  So explain again real quick
5  what's -- if the AA and BA for the F250 both relate
6  to the front of the F250, why is there two there?
7     A   It's the way strength is expressed.
8        We have an A coefficient which has to do
9  with the amount of force it takes to start doing
10 damage on the vehicle.
11       And the B coefficient helps assign energy
12 or crush stiffness as the crush progresses
13 throughout the vehicle.
14       So the -- so the -- the depth of crush is
15 looking at the B value to calculate energy or force
16 which ultimately calculates energy.
17    Q   And how did you come up with these
18 values, the AA and BA for the F250?
19    A   Well, there's a report right after this
20 from Neptune Engineering where they used a
21 government crash test.
22       Yeah, that -- that's it.  It's listed
23 there.
24       And it gives you the date on the vehicle.
25 It was going 35 miles an hour on the front.  That's

Page 208

1  in the very middle under the word Stiffness
2  Coefficients.
3        It ran straight into a barrier.  And then
4  from the -- the damage they calculated it an A
5  value and a B value right there.
6     Q   And that's what's highlighted?
7     A   Sir?
8     Q   And that's what's highlighted on this
9  page?
10    A   I still couldn't understand you, I'm so
11 sorry.
12    Q   Don't worry.  It was a dumb question
13 anyways.  Glad you couldn't hear it.
14    A   Okay.
15       THE WITNESS:  I think he did say,
16 Ms. Court Reporter, what you thought he said.
17 BY MR. HILL:
18    Q   The values on this page 3992 for AB and
19 BB stiffness coefficients for the Escape, are those
20 the ones that were generated by HVE when you input
21 that was the vehicle or where did you derive those
22 numbers?
23    A   Those are from an SAE paper, Society of
24 Automotive Engineers paper, that should be a few
25 pages down from here.

Page 209

1        Right there.
2     Q   And that's 3998?
3     A   Yes.  And the title of the paper will be
4  the next page, I hope.
5        Yes.  It's -- yeah, so there's the SAE
6  paper number in the upper right.
7     Q   All right.  And again, that's why you've
8  highlighted that.  Is that the only use you've had
9  for this appendix is the highlighted numbers?
10    A   Yes.
11    Q   Okay.  And do those numbers match up the
12 stiffness coefficients that were used in the HVE
13 simulation?
14    A   They're not the same.
15    Q   And again, the numbers used in the HVE
16 simulation were generated by the software because
17 it had a database for a 2008 Escape?
18    A   Yes, when we used that model car it gave
19 us AB values, so we used them as an alternative to
20 these.
21    Q   And that's what I was trying to get to,
22 is that you did use the same stiffness coefficients
23 for the F250 in both the crush analysis and in the
24 HVE simulation, but you had different stiffness of
25 coefficients for the Escape as we've just talked

53 (Pages 206 - 209)

G. Bryant Buchner , P.E.                          January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 210

1 about between the two analyses?

2    A   Yes.

3    Q   Okay.  Does the HVE program allow you to
4 input the values on this appendix 3998 as the
5 stiffness coefficient instead of what's in the
6 database?

7    A   Sure.

8    Q   And likewise, in you doing the crush
9 analysis, you could have used the numbers generated
10 by HVE instead of the numbers in this opinion?

11    A   Yes.

12    Q   Okay.  Why did you not use the same
13 numbers for the Escape in both analyses?

14    A   We were trying to produce a range of
15 values.  We were doing -- trying to do a very
16 straightforward standard calculation that we do
17 using, you know, math formulas.  And then we were
18 trying to do a more sophisticated computer
19 simulation.

20        And so we followed the -- you know, if we
21 do it by hand, we don't pull values out of SAE when
22 we -- I mean, out of engineering dynamics.

23        If we use the engineering dynamics, we'd
24 like to use the values they have in there.

25        So it was a way to get a range.  And the

Page 211

1 range is really tight, 2.1 to 2.3 feet less crush.

2        And we say more than 2 feet in the
3 report.  So it was just -- we -- we could do more
4 work to -- you know, and put in more numbers, but
5 it's not going to change the answer we got.

6    Q   So it was just a purposeful range of the
7 parameters you used across the two analyses?

8    A   Yes.

9    Q   Okay.  And is there in your opinion a way
10 to determine the potential degree of error in
11 either analysis?  You know, lots of these analyses
12 say it's within a .5 percent or 5 percent de --
13 standard deviation in either direction.

14        Is there a way to establish a standard of
15 deviation in either of these analyses?

16    A   Sure.  If one wanted to, one could --
17 could do something along those lines.  We -- we
18 have effectively done it by using two independent
19 methods.  And we're looking at where those values
20 overlap.

21        If we did the ranges, then, obviously,
22 they would -- they would overlap between them.  And
23 so we feel comfortable in this methodology for --
24 for establishing a range.  Other people could have
25 other ways they want to do it.

Page 212

1        And -- and as -- as you suggested,
2 someone could -- could go about it in a different
3 way.

4        If we only had one of these methods, we'd
5 probably be doing something like what you're
6 talking about, but we had two independent methods
7 and used basic, different fundamental data in the
8 two methods, so -- and we got a range and we're --
9 we're comfortable that the -- that that brackets
10 the -- the reasonable range of answers.

11    Q   Is there any way for you to put a value
12 on the potential for error in either -- either
13 analysis?

14    A   Well, yes, but that would be a different
15 technique that we didn't use.  When you have
16 multiple techniques, it's kind of like a VENN
17 diagram, you're -- you're looking at the overlaps
18 areas.

19        So we use multi -- independent
20 techniques.  If you only had one technique, you
21 know, then -- then you'd have to do -- or one
22 calculation methodology, you'd have to use a
23 different technique to do the ranges.

24        But right now we have a range of 10
25 percent that ranges from 2.1 to 2.3 in that -- in

Page 213

1 the reduced crush.

2        So, you know, we -- we've got a range of
3 10 percent between 2.1 and 2.3 and we're -- we're
4 comfortable with that.

5    Q   Understood.  This is a page from the
6 support document 1367.  That is a graph of the
7 simulated damage from the HVE simulation.

8        HVE did not generate this document, this
9 is something you generated separate from that
10 software, correct?

11    A   The software gives the numbers, all we
12 did is plot the numbers.

13    Q   Right.  So the numbers from the software
14 would be the numbers in blue?

15    A   Yes.

16    Q   All right.  And you just plotted that on
17 this.  And then noted 2.1 in the red you generated
18 that -- that's the difference between the two, but
19 the red line is from your physical examination of
20 the accident vehicle?

21    A   Yes.

22    Q   Okay.  Why are the values zero on the
23 ends on the blue line?

24    A   Because that's the way HVE does it.

25 It's -- it's at the end, it says there's zero

54 (Pages 210 - 213)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 214

1  crush.  It -- it's just -- it's just the way they
2  report it, that's all it is.
3       Because there's nothing to measure from
4  that far out on the vehicle.  You know, where the
5  bumper -- if it's in front of the bumper, then it
6  measures to the bumper.  It's just the way it's
7  reported.
8       But I'm not -- I'm not interested in
9  their reporting necessarily or the -- I am in their
10 answer.  Their answer is the line -- at least
11 that's my representation of their answer.
12      So it -- you know, one could argue there
13 is crush over there and -- and I've got no problem
14 because you can see it, but way out on the ends
15 it's technically zero.
16      Q   Now, when you created the blue line, you
17 used your own judgment as to where that would
18 actually -- how far that would actually crush in
19 even though technically HVE is going to give you a
20 value of zero?
21      A   Well, no, it -- it also gives you a
22 graphical result -- I mean, a -- a 3D result you
23 can look at.
24      So you get a visualization of it.  We
25 just simplified it down to a -- an elevation that

Page 215

1  corresponds, you know, to the bumper area of the
2  vehicle.
3       Q   And again, when you mentioned elevation,
4  you're referring to that line up above 2.2 feet
5  above ground?
6       A   Yes.
7       Q   And that's the bumper height?
8       A   Well, yeah, it's within the bumper
9  height, yes.
10      Q   Yeah, to the center of the bumper height
11 or what -- how -- how is that calculated?
12      A   No, it's -- HVE has its own reporting
13 levels.  This is the level that corresponds to the
14 elevation of the bumper.  I don't think it's in the
15 dead center of the bumper.  It's not trying to do
16 that.  It's saying based on the geometry of the
17 cars that we had, this is the crush at that level.
18      Q   And does it pick that level or did you
19 input that level?
20      A   No, it picks it.  It -- it -- based on
21 the geometry of the car you give it, it reports a
22 certain -- it -- it reports levels of crush.
23      And this is the one that's at the same
24 level as that red line.  Or reasonably it's at the
25 level where the -- the -- the truck hit and where

Page 216

1  the truck pushed in with its bumper.
2       So we're comparing where the truck did
3  push the hatch to where the truck would have pushed
4  the bumper to on the Escape.
5       Q   Gotcha.
6       So the red line is going to be at a
7  higher level than the blue line?
8       A   Yes.
9       Q   And how did you determine the height to
10 use for the red line?
11      A   I just look at the car.  There's a huge
12 bumper imprinted on the tailgate of the car.
13      Q   And you just matched it up with the
14 anticipated bumper height in the subject vehicle?
15      A   No, you just measure the -- where the
16 bumper hit.  It's not anticipated.  You can look at
17 it and see the bumper.  I mean, it's like -- I
18 mean, you can see the shape of the bumper in
19 the tail -- in the tailgate, so you just measure
20 that.
21      Q   All right.  Do you have in here any --
22 indicated anywhere what height that was, that --
23 that you determined the bumper impacted the Escape
24 in the actual accident?
25      A   Okay.  Well, it's at the height it's at

Page 217

1  on the car.  Remember the car has changed shape
2  quite a bit.  It's been exploded is what I said.
3       So the height it's at now -- like the tow
4  hooks are a couple of inches higher than the bottom
5  of the -- of the lift gate or the -- yeah, I -- I
6  measured that.
7       So the -- the photos show the height, but
8  what's really important is the level of the height.
9       In other words, and we -- we know that
10 the -- there's an imprint of the top of the bumper
11 of the Escape on the bottom of the truck's bumper.
12      So we found the -- the tread on the --
13 that 5-inch wide bumper on the Escape made an
14 imprint on the bottom of the bumper of the truck.
15 So we know the bumper of the truck went -- went
16 over that.
17      So I can -- I can go -- we know the top
18 of the bumper was 28 inches on the Escape.  So, you
19 know, we can give you all of those numbers, but --
20 but the height of the bumper -- height of the
21 damage on the car now is completely different than
22 what it was before it got exploded because the --
23 the car's been so badly damaged.
24      So the -- a lot of ways to answer it, but
25 the answer really is, is the tailgate above the

55 (Pages 214 - 217)

G. Bryant Buchner , P.E.                                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 218

1 bumper where the dent is it started out being more
2 than 28 inches and now it's just at whatever height
3 the poor crushed vehicle is sitting at with flat
4 tires and everything else.
5    Q   Understood.  When HVE comes up with the
6 simulation height, does it use the vehicle that's
7 struck or does it use the striking vehicle?
8    A   Well, it uses both of them.  It knows the
9 shapes of the vehicle.  So it knows that the bumper
10 sticks out.  It knows, you know, what's going to
11 hit first.  And then it runs its calculations.  And
12 then when it gets done, it gives you an array of
13 heights.
14       And then as an investigator on my part, I
15 look at those and I choose which height I -- I want
16 to discuss out of all of those.
17       But it also gives you a visualization of
18 it, which you can see.  And what I reported here
19 was the height, the effective height at -- at a --
20 in that 20- to 30-inch range where all the bumpers
21 are.
22    Q   Gotcha.
23       And that's what I was getting at is, it's
24 my understanding that HVE is going to give you a
25 range of heights.  And you're saying you received

Page 219

1 that, but you really are only interested in or
2 commenting on the one height you selected and
3 that's the 2.2 feet?
4    A   Yeah, because that represents the maximum
5 crush.
6    Q   Right.  So the other heights would have
7 less crush?
8    A   Well, technically, yes, because they
9 don't stick out as far as the bumper.
10    Q   Less crush from the end of the bumper,
11 but would they have less crush from their starting
12 point?
13    A   Yes, because your -- the bumpers have a
14 5-inch lead on everything else.  And that 5-inch
15 lead effectively in the calculation makes them
16 stronger.  They get -- they're already stronger,
17 but they get -- by the measure of crushing.  So
18 they're going to -- they're going to -- we can go
19 plot it, but nothing's going to stick out past the
20 bumper from a practical standpoint.
21    Q   Yeah, I understand that.  I'm just trying
22 to get -- let's say HVE gave you crush data for the
23 hatch in the simulation, higher than the bumper,
24 right?  That data was provided by the simulation;
25 is that correct?

Page 220

1    A   I didn't understand your question.  I --
2 I was -- I didn't know what you were saying coming
3 in.  I heard the end but not the beginning.
4    Q   Sorry.  Can you hear me now?
5    A   Yes, sir.
6    Q   All right.  So even in the simulation
7 where there's bumper-to-bumper contact, there's
8 still going to be crush experienced by the hatch;
9 is that fair?
10    A   Yes.
11    Q   And there's going to be a distance of
12 that crush from the point where the hatch started
13 to the point where it ends?
14    A   Yes.
15    Q   All right.  And so I'm asking about that
16 crush, that value, not from the bumpers -- the end
17 of the bumper but from the end of where the hatch
18 is?
19    A   Okay.
20    Q   Does HVE provide you that measurement of
21 crush?
22    A   It -- it does.  And we can go plot it,
23 but it won't -- it'll be comparable to the blue
24 line there.
25       It won't be an effective difference that

Page 221

1 we're -- from what we looked at in the data when we
2 got it because you can visualize it.
3       So we can actually -- instead of
4 discussing it, we can pull it up and look at it,
5 but it's all going to be very well represented --
6 yeah, there's one.
7    Q   Yeah.
8    A   There should be an angle view of that as
9 well.
10       Yeah, there you go.
11       So, you know, basically made the back of
12 a vehicle relatively flat.
13       The blue line, I think, is drawn for on
14 the bumper, but it also represents a little bit
15 above the bumper as well.
16       As you get up into the roof, the roof
17 isn't crushed at all.
18    Q   This picture on 1368, is that generated
19 solely by HVE?
20    A   Solely by HVE.
21    Q   All right.  Same for 1369?
22    A   Yes.
23    Q   And then what's shown on 1370 and 1371,
24 that was generated by you using the overlays?
25    A   Yes, that's -- that's our 3-D models

56 (Pages 218 - 221)

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 222

1 stuck together.
2    Q    And that's --
3    A    And that -- yeah, and the red car there
4 is an uncrushed vehicle.  That's a -- the exemplar.
5        And then the next slide, I think you
6 flipped to, with the blue vehicle is the -- that's
7 the uncrushed.  Yeah, the blue vehicle or what
8 looks almost black here is the actual accident
9 vehicle.
10   Q    And that's 1372 you're referring to?
11   A    Thank you.
12   Q    And this is just your overlay of an
13 undamaged Escape illustrating the, I guess, level
14 of crush in the subject accident?
15   A    Yes.  Relative to an undamaged Escape.
16   Q    All right.  And then 1373, what does it
17 represent?
18   A    That's just another view of the same
19 thing you were looking at.  It's the -- it's how
20 far the truck penetrated relative to an undamaged
21 Escape.
22   Q    What's the difference between 1372 and
23 1374?
24   A    Well, 1372 is the damaged Escape.  1374
25 is the damaged Escape and the exemplar undamaged

Page 223

1 Escape occupying the exact same space.
2        And so you can -- you can see the
3 undamaged one in the red.  And then, of course, you
4 can see the deformed metal of -- of blue or what
5 appears black here of the damaged one.
6        So you can see how much of the red Escape
7 had to be moved forward to produce the -- the black
8 or blue Escape.
9    Q    Gotcha.
10        All right.  I'm just checking to make
11 sure I marked everything and then I'll be finished.
12   A    Okay.  I'm going to stand up again,
13 please.
14        MR. HILL:  And we can go off the record
15 for a second.
16        VIDEO TECHNICIAN:  The time is 4:51.  We
17 are off the record.
18        (Off the record.)
19        VIDEO TECHNICIAN:  The time is 4:55.
20 We're back on the record.
21        MR. HILL:  Thank you, Mr. Buchner, I
22 appreciate your time today.  That's all that I
23 have.
24        THE WITNESS:  I have a correction to a
25 mistake I made.

Page 224

1        MR. HILL:  Okay, always welcome those.
2    A    Okay.  I did math.  You asked me had I
3 done the calculation?  I said, "No, I did it in my
4 head."  And -- and I saw the amount of body lift
5 and I made a mistake.
6        We have the total lift to be 6.1 to
7 6.6 inches.  And then the tires make up about half
8 an inch of that.  So, therefore you're left with a
9 body lift of 6 to 6 1/2 inches.
10        So .04 feet times 12 is half an inch.  So
11 effectively we still have a 6-inch -- we still have
12 a 6-inch lift, body lift within a range.
13        So I had done the math poorly earlier
14 when I said 5 1/2.  I had -- I had mis --
15 misexpressed it.
16 BY MR. HILL:
17   Q    And the difference is the increase in
18 height from the non-OEM tires that were on the
19 subject F250?
20   A    Yes, that is only .04 feet.
21   Q    Right.
22   A    It's only .04 feet.  And -- and so I -- I
23 did the math wrong.  I used it as a .4.  So that
24 was my mistake.
25   Q    And there was also a .04 difference in

Page 225

1 feet between the 2015 tires on the -- your exemplar
2 model and the 2016 placard size?
3    A    Yeah, that's what we're taking out there.
4        We're saying the total lift on the
5 vehicle was -- I think we say 6.1 -- in the report
6 we say 6.1 inches.  The effective total body lift
7 was 6.1 inches.
8        In my calculations we have it up to
9 .55 feet, which is 6.6 inches.  And then we're
10 going to end up substracting .04 feet off of that
11 which is half an inch -- let me do that again.
12        12 times -- oh, no, it's not -- yeah,
13 never do calculations in a deposition.  Yeah.
14        So let me -- can you go to the base data
15 summary?
16   Q    The -- the what?
17   A    It's this sheet here.  It's very early in
18 the engineering analysis.
19   Q    All right.  Let me see if I can find it.
20   A    Okay.
21   Q    There you go.
22   A    Okay.  So the second and third boxes show
23 that the difference in height between the accident
24 and the exemplar vehicle was .55 feet.
25        And then if we come down just a little

Veritext Legal Solutions
800.808.4958                                              770.343.9696

G. Bryant Buchner, P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 226

1  bit, we want to take the tires out of that, the
2  .35 inches, which is in the fourth box down, is
3  only .03 feet.
4       So if we do .55 minus .03 we get .52.
5  And that's .52 feet, multiply that by 12, we get 6
6  1/4 inches.
7       So effectively the total lift was closer
8  to 6 1/2 and the body lift was a little over 6.
9  Just to clarify.
10      And so 6.1 that I put in the report was
11 the body lift. It was intended to be the body
12 lift. So the body lift really is a little over 6
13 inches. When you add the tires in you're closer to
14 the 6 1/2 inches.
15      So I -- I was mistaken when I said 5 1/2
16 earlier. I missed my decimal points. And I -- I
17 thought the .35 or the .7 that's right there was in
18 feet. It's not. It's -- I thought it was at
19 .07 feet, it's not, it's .07 inches, and so I made
20 a mistake. So body lift is more than 6 inches.
21   Q   The third box that has the bracket
22 height, how did you come up with those numbers,
23 those values?
24   A   Well, I laid on the ground under both
25 vehicles and measured the height off the ground.

Page 227

1       And then, you know, we, of course, check
2  the scans as best we can as well and, you know --
3  so we have two competing methods. And then --
4    Q   When you measured --
5    A   But if you look in the -- in my
6  engineering analysis, both the photos I used are in
7  there.
8    Q   All right.
9    A   With tape measures on them.
10   Q   When you measured the bracket height on
11 the exemplar and you came up with a number
12 1.05 feet, do you see that in the third box?
13   A   Yes.
14   Q   Did that take into account the
15 approximately half-inch lower the exemplar was from
16 a stock 2016 F250?
17   A   No, that's going to be taken up in the
18 tire size down below it.
19   Q   All right. So that difference does not
20 reflect the true difference between a stock and the
21 accident?
22   A   That's my recollection, yes.
23   Q   Okay. So the real difference is when you
24 have the tire size, that's taking into account the
25 fact that your exemplar was half an inch low and

Page 228

1  that's where you get a difference of .35 inches; is
2  that -- am I reading that right?
3    A   Yeah, it's really point -- it's not quite
4  half inch, more like a third of an inch. But yeah,
5  .35 inches is the difference in your tires.
6    Q   Do you have an explanation for why a
7  4 1/2-inch lift would raise the height of the
8  vehicle 6.1 or -- or that range? What is the
9  explanation there?
10   A   Yes, I do have an explanation. What
11 they're doing -- I believe it's -- they're leveling
12 it which requires lifting the front and then
13 they're lifting.
14      So it's a combination of the leveling
15 effect and the lift effect. So at the back we're
16 lifting it more like 4 1/2 inches but at the front
17 we're lifting it more like 6, 6 1/2 inches or let's
18 just say 6 or a little more.
19   Q   And that's because from your manufacturer
20 there's a -- I don't know if the proper word, if
21 it's camber or slant, where the rear of the vehicle
22 is slightly higher than the front?
23   A   Yes. And -- yes, and that's my belief.
24 That's how the math works. That's what I look at.
25 That's what I think when I see it.

Page 229

1       But practically the only thing I'm -- I'm
2  concerned about is how much did the front go up,
3  and the answer is a little over 6 inches.
4    Q   Did you measure how far the back went up?
5    A   Not specifically, but I remember
6  measuring the spacers that were put in and it --
7  thinking, well, that's effectively 4 1/2 inches at
8  the back. So it's very close to 4 1/2 inches.
9    Q   So you -- you suspect that the -- the
10 back was an inch and a half higher than the front
11 from its original configuration approximate?
12   A   I don't suspect one way or the other,
13 I'm -- I'm --
14   Q   Okay.
15   A   That's a good -- that's a good theory
16 from the data I've given you and I don't -- I'm not
17 going to argue about it.
18      I'm just -- from a practical standpoint I
19 just want to know how much the front went up, and,
20 you know, it's 6 inches or a little more.
21   Q   And this, while we have it up, 3970, the
22 last column just so that I make sure because that's
23 what I was asking you about before, the crush
24 analysis Escape stiffness coefficients came from
25 SAE and then the value you see under Simulation

58 (Pages 226 - 229)

G. Bryant Buchner , P.E.                                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 230

1 were generated without your input by HVE?
2    A   Yes.
3    Q   Okay.  Do you know how HVE comes to the
4 determination of the stiffness coefficient for the
5 Escape?
6    A   I'm pretty sure Terry Day that's been
7 part of HVE and one of the authors of the whole
8 program, I believe he determined that years ago.
9        I think if you go back through the
10 historical documents, he -- he has papers that he
11 was offering about what the crush stiffness of
12 various vehicles are.  And I believe that's from
13 one of his earlier papers.
14   Q   Gotcha.
15       Do you know whether he based that on
16 actual crash testing or how he calculated that?
17   A   He -- based on his vast experience.  I
18 mean, he's -- that's what he's doing with the
19 program is comparing it to crash test and staging
20 accidents and everything else.
21       So you're asking -- it's in the program,
22 it's what they're -- what you get when you pay for
23 the program.  And it's -- it's a reasonable
24 representation.
25       You asked me my judgment a little bit on

Page 231

1 where it came from and I -- I believe that if you
2 go look through everything, you'll find that Terry
3 Day was part of establishing those values because I
4 think those values show up in some of his earlier
5 papers.
6        But just to point out they're
7 conservative for this crash.  In other words,
8 they're going to show -- they're -- they're --
9 they're the lowest values that we could find and so
10 they're going to overreport crush.
11       Whereas, the more -- what I believe are
12 probably more current values are going to
13 underreport crush and that's where 2.1 to 2.3 is
14 coming from.
15   Q   The same would be true for the F250, if
16 the simulation stiffness coefficients were lower,
17 how would that impact the simulation?
18   A   Well, it would shift crush to the F250.
19 So the F250 would absorb it so the Escape wouldn't
20 have to absorb it.
21   Q   And it would effectively produce crush
22 into the Escape as well?
23   A   Yes, and vice versa, of course.
24   Q   All right.  And it's -- and it's your
25 belief that the simulation program does not contain

Page 232

1 values within the program for the F250?
2    A   We didn't find them, no, sir.
3    Q   If you had found them, would you have
4 used them in the F -- in the HVE simulation?
5    A   Yes.
6    Q   Give me one second.
7        So, again, on this if the simulation
8 thickness coefficient for the F250, if the A value
9 went up, that would result in it being stiffer.
10 And you're saying it would cause more crush on the
11 Escape than what the 520 value would represent; is
12 that fair?
13   A   Possibly, depending on how much it went
14 up, yes.  That would be the trend.
15   Q   And would the same be true for B?
16   A   Yes, that would be the trend.
17   Q   How much would the constant A have to go
18 up for it to increase the crush level in the
19 simulation, do you know?
20   A   It's -- no.  You know the trend, of
21 course, but it's -- it's not likely to be highly
22 sensitive to it, but it will definitely trend up.
23       But I didn't -- I don't have a
24 correlation I can tell you off the top of my head.
25   Q   And if you used higher values in your

Page 233

1 crush analysis, is the same true, same trend?
2    A   Yes.
3        MR. HILL:  All right.  Thank you for
4 clarifying that.
5        I don't think I have any other questions.
6        MS. CANNELLA:  All right.  So we're done.
7 I don't have any.
8        THE WITNESS:  I'll read.
9        VIDEO TECHNICIAN:  This concludes the
10 videotape deposition.  The time is 5:11 p.m.  We
11 are off the record.
12       (Deposition concluded at 5:11 p.m.)
13       (Signature requested.)
14
15             * * * * *
16
17
18
19
20
21
22
23
24
25

59 (Pages 230 - 233)

G. Bryant Buchner , P.E.                          January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 234

1    The following reporter and firm
disclosures were presented by me at this proceeding
2 for review by counsel:
        REPORTER DISCLOSURES
3    The following representations and
disclosures are made in compliance with Georgia
4 Law, more specifically:
        Article 10 (B) of the Rules and
5 Regulations of the Board of Court Reporting
(disclosure forms).
6    OCGA Sections 9-11-28 (c)
(disqualification of reporter for financial
7 interest).
        OCGA Sections 15-14-37 (a) and (b)
8 (prohibitions against contracts except on a
case-by-case basis).
9 - I am a certified court reporter in the state of
Georgia.
10 - I am a subcontractor for Veritext.
    - I have been assigned to make a complete and
11 accurate record of these proceedings.
    - I have no relationship or interest in the matter
12 on which I am about to report which would
disqualify me from making a verbatim record or
13 maintaining my obligation of impartiality in
compliance with the Code of Professional Ethics.
14 - I have no direct contract with any party in this
action, and my compensation is determined solely by
15 the terms of my subcontractor agreement.
        FIRM DISCLOSURES
16 - Veritext was contacted to provide reporting
services by the noticing or taking attorney in this
17 matter.
    - There is no agreement in place that is prohibited
18 by OCGA 15-14-37(a) and (b).  Any case-specific
discounts are automatically applied to all parties,
19 at such time as any party receives a discount.
    - Transcripts:  The transcript of this proceeding
20 as produced will be a true, correct, and complete
record of the colloquies, questions, and answers as
21 submitted by the certified court reporter.
    - Exhibits:  No changes will be made to the
22 exhibits as submitted by the reporter, attorneys,
or witnesses.
23 - Password-Protected Access:  Transcripts and
exhibits relating to this proceeding will be
24 uploaded to a password-protected repository, to
which all ordering parties will have access.
25

Page 235

1        C E R T I F I C A T E
2    Deposition of: G. BRYANT BUCHNER, PE
    Date of Deposition: JANUARY 23, 2024
3
4 STATE OF GEORGIA:
5
6        I hereby certify that the foregoing
7 transcript was stenographically recorded by me
8 via Zoom as stated in the caption.  The deponent
9 was duly sworn to tell the truth, the whole truth,
10 and nothing but the truth.  And the colloquies,
11 statements, questions and answers thereto were
12 reduced to typewriting under my direction and
13 supervision and the deposition is a true and
14 correct record, to the best of my ability, of
15 the testimony/evidence given by the deponent.
16        I further certify that I am not a
17 relative or employee or attorney or counsel to
18 any of the parties in the case, nor am I a
19 relative or employee of such attorney or counsel,
20 nor am I financially interested in the action.
21        This, the 1st day of February 2024.
22
23
24    Judith L. Leitz Moran, CCR-B-2312
    Registered Professional Reporter
25

Page 236

1    FIRM CERTIFICATE AND DISCLOSURE
2
3 Veritext represents that the foregoing transcript
as produced by our Production Coordinators, Georgia
4 Certified Notaries, is a true, correct and complete
transcript of the colloquies, questions and answers
5 as submitted by the certified court reporter in
this case.  Veritext further represents that the
6 attached exhibits, if any, are a true, correct and
complete copy as submitted by the certified
7 reporter, attorneys or witness in this case; and
that the exhibits were handled and produced
8 exclusively through our Production Coordinators,
Georgia Certified Notaries.  Copies of notarized
9 production certificates related to this proceeding
are available upon request to
10 production@veritext.com
11 Veritext is not taking this deposition under any
relationship that is prohibited by OCGA 15-14-37
12 (a) and (b).  Case-specific discounts are
automatically applied to all parties, at such time
13 as any party receives a discount.  Ancillary
services such as calendar and financial reports are
14 available to all parties upon request.
15
16
17
18
19
20
21
22
23
24
25

Page 237

1 TO:  Tedra L. Cannella, Esq.  tedra@cannellasnyder.com
2 Re:  Signature of Deponent G. Bryant Buchner, PE
3 Date Errata due back at our offices: 30 days
4
5 Greetings:
6 The Deponent has reserved the right to read and
sign.  Please have the deponent review the attached
7 PDF transcript, noting any changes or corrections
on the attached PDF Errata.  The deponent may fill
8 out the Errata electronically or print and fill out
manually.
9
    Once the Errata is signed by the Deponent and
10 notarized, please mail it to the offices of
Veritext (below).
11
    When the signed Errata is returned to us, we will
12 seal and forward to the taking attorney to file
with the original transcript.  We will also send
13 copies of the Errata to all ordering parties.
14 If the signed Errata is not returned within the
time above, the original transcript may be filed
15 with the court without the signature of the
Deponent.
16
17 Please send completed Errata to:
    Veritext Production Facility
18 20 Mansell Court E, Suite 300
    Roswell, Georgia  30076
19 (770) 343-9696
    cs-southeast@veritext.com
20
21
22
23
24
25

60 (Pages 234 - 237)

G. Bryant Buchner , P.E.                                        January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 238

1 ERRATA FOR ASSIGNMENT NO. 6395968
2 I, the undersigned, do hereby certify that I have
3 read the transcript of my testimony, and that
4
5 _____ There are no changes noted.
6 _____ The following changes are noted:
7
8 Pursuant to Rule 30(7)(e) of the Federal Rules of
9 Civil Procedure and/or OCGA 9-11-30(e), any changes
10 in form or substance which you desire to make to
11 your deposition testimony shall be entered upon the
12 deposition with a statement of the reasons given
13 for making them.  To assist you in making any such
14 corrections, please use the form below.  If
15 supplemental or additional pages are necessary,
16 please finish same and attach them to this errata
17 sheet.
18
19 Page/Line/   Change   /   Reason
20 _____/_____/_____/_____
21 _____/_____/_____/_____
22 _____/_____/_____/_____
23 _____/_____/_____/_____
24 _____/_____/_____/_____
25 _____/_____/_____/_____

Page 239

1 Page/Line/   Change   /   Reason
2 _____/_____/_____/_____
3 _____/_____/_____/_____
4 _____/_____/_____/_____
5 _____/_____/_____/_____
6 _____/_____/_____/_____
7 _____/_____/_____/_____
8 _____/_____/_____/_____
9 _____/_____/_____/_____
10 _____/_____/_____/_____
11 _____/_____/_____/_____
12 _____/_____/_____/_____
13 _____/_____/_____/_____
14 _____/_____/_____/_____
15 _____/_____/_____/_____
16
17
18 _____
19         G. BRYANT BUCHNER, PE
20
21 Sworn to and subscribed before me
   this _____ day of _____, 20__.
22
23 _____
24 Notary Public.
25 My Commission Expires _____.

61 (Pages 238 - 239)

G. Bryant Buchner , P.E.                                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[& - 1st]**                                                      Page 1

| & |
|---|
| **&**   2:14 |

| **0** |
|---|
| **0**   111:22 |
| **0.1**   192:6 |
| **0.1.**   119:9 |
| 191:5,7,8 |
| **0.148**   112:18 |
| **0.4**   129:20 |
| 138:9 |
| **0.7**   138:10 |
| 139:22,25 |
| **001350**   3:20 |
| **001361**   3:20 |
| **001362**   3:22 |
| **003990**   3:25 |
| **003995**   129:19 |
| **003999**   3:25 |
| **01**   185:4 |
| **017**   1:8 |
| **03**   226:3,4 |
| **04**   97:1,2 98:1 |
| 98:11 202:3,10 |
| 202:10,11 |
| 203:4 224:10 |
| 224:20,22,25 |
| 225:10 |
| **07**   226:19,19 |
| **08**   127:14 |

| **1** |
|---|
| **1**   3:8 10:16,19 |
| 19:4 76:3 |
| 119:16 120:10 |
| 120:15 130:21 |

170:19 191:12
191:16,16,23
192:10 205:4
**1's**   191:14
**1,800**   50:18
**1.05**   227:12
**1.1**   191:4
**1.4**   191:20
**1/2**   57:22 58:1
58:4,11 59:3
59:13,22 138:6
138:7,12,13,20
138:22,23
148:18 224:9
224:14 226:8
226:14,15
228:7,16,17
229:7,8
**1/4**   226:6
**10**   3:8 15:2
79:19,20 80:25
80:25 86:15
116:9 117:15
137:21 148:9
201:1 212:24
213:3 234:4
**10.4**   151:11
**10/12**   71:19
**10/12/2023**
3:19
**10/13**   71:7,18
**100**   52:18
186:19
**105**   52:18

**11**   3:16 137:20
148:16 149:11
150:22 153:2
192:5,5,11,14
193:5 204:16
205:4
**11/20/22**   12:21
**1125.jpg.**   149:6
**113**   192:19
204:18
**117**   3:23
**118**   204:16
**11:13**   1:18 4:2
4:5
**11:21**   11:24
**11:24**   12:2
**12**   3:13 224:10
225:12 226:5
**1278**   235:23
**12:32**   70:13
**12:48**   70:16
**12th**   73:20 74:1
**1350**   73:23
**1359**   137:21
**1361**   73:24
**1362**   74:23
75:12 201:14
**1367**   213:6
**1368**   221:18
**1369**   221:21
**1370**   221:23
**1371**   221:23
**1372**   222:10,22
222:24

**1373**   222:16
**1374**   3:22
74:23 75:12
201:15 222:23
222:24
**14**   64:15 90:13
191:23
**14.75**   64:4,16
65:7
**148**   114:4
119:21,24
205:19
**14th**   69:6
**15-14-37**   234:7
234:18 236:11
**150**   52:3,14
**16th**   51:13
**17**   3:15
**17.00.**   179:9
**17.92**   90:12
113:23 155:24
205:25
**17.93.**   155:25
**17th**   53:24
**18**   45:20,21,22
140:11
**19.3**   107:5
**1:25**   99:24
**1:28**   100:3
**1:49**   116:2
**1:58**   116:5
**1st**   235:21

G. Bryant Buchner , P.E.
January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[2 - 4]**

Page 2

| 2 |
|---|

**2**  3:13 12:14,19
76:16 79:19,20
148:19 186:22
198:13,20
199:1,8,9
211:2
**2.1**  170:19
186:24 211:1
212:25 213:3
213:17 231:13
**2.2**  186:24
215:4 219:3
**2.3**  118:1
170:19 186:24
211:1 212:25
213:3 231:13
**2.5**  55:10
**2/22**  56:2
**20**  13:24 14:12
80:22 81:1
96:9,25 218:20
237:18 239:21
**2008**  77:2
127:19 131:1
171:7 209:17
**2010**  62:17
77:6 79:20
127:13,19
**2015**  27:17
37:19 62:17
95:7 96:1,7,11
96:18,19 97:3
97:21 98:1,19
101:24 202:16

225:1
**2016**  96:1,8,18
97:20 98:8,24
99:15 108:19
116:24 171:6
179:19 202:16
202:23 225:2
227:16
**2020**  3:15
43:13
**2021**  51:13
52:1 53:22
76:19 179:11
179:14
**2022**  12:24
55:19,25 60:5
61:8 76:22
80:5 82:3
84:10
**2023**  3:16 64:2
64:6 68:10,12
69:6 70:6
73:20 74:1
76:19
**2024**  1:17 4:2,5
67:18 235:2,21
**21st**  52:1,5
53:25
**22nd**  80:4 82:3
**23**  1:17 4:2
71:7,18,19
235:2
**23.2**  151:14
**23.6**  151:6

**23.6.**  151:13
**23.8**  151:14
**2312**  1:23
235:24
**23rd**  4:5
**2400**  2:16
**250**  40:24
141:22
**26196**  51:8
**26627**  57:16
**27114**  60:4
**27394**  61:24
**28**  217:18
218:2
**29108**  64:2
**29th**  60:5
**2:22**  1:8

| 3 |
|---|

**3**  3:14 43:8,10
50:1 77:20
80:2 169:21
182:18 184:20
221:25
**3,410**  80:4
**3.35**  129:18,19
**30**  13:22
165:14,14
166:20 170:3
189:2 218:20
237:3 238:8
**300**  237:18
**30030**  2:9
**30076**  237:18
**30326**  2:17

**30th**  64:2
**315**  2:7
**33.08**  205:25
**3344**  2:15
**34**  99:8,9
**343-9696**
237:19
**35**  207:25
226:2,17 228:1
228:5
**39**  117:11
**39.4**  181:24
**3970**  229:21
**3990**  117:10
**3991**  118:19
**3992**  119:4
203:10 206:8
208:18
**3993**  119:5,9
203:10,12
204:4
**3994**  126:22
**3997**  130:1
**3998**  209:2
210:4
**3:10**  173:17
**3:32**  173:20
**3d**  103:21
106:21 147:9,9
214:22

| 4 |
|---|

**4**  3:17 50:3,6
50:21 51:3
57:22 58:1,4
58:11,11 59:3

Case 2:22-cv-00017-RWS    Document 119-4    Filed 01/20/25    Page 64 of 129
G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[4 - access]**                                    Page 3

59:13,22 85:21
85:24 86:6
184:22 224:23
228:7,16 229:7
229:8
**4.36** 148:10
**40** 115:2
**40-8-6** 198:7
**40.6** 111:13
**40.6.** 111:20
**400** 52:15
**4000** 112:14
205:13
**43** 3:14 127:21
128:2
**45** 38:22 76:8
**450** 64:5
**48** 98:17
**49** 93:16
**4:07** 201:5
**4:22** 201:8
**4:51** 223:16
**4:55** 223:19

**5**

**5** 3:3,18 50:22
51:3 102:19
127:6,8,10
128:18,25
129:2,11
138:12,13,20
138:22,23
211:12,12
217:13 219:14
219:14 224:14
226:15

**50** 3:17,18
46:23,24
**50/50** 46:17
47:13,20
**51** 113:23
205:25
**52** 168:18
226:4,5
**520** 232:11
**55** 76:4,9 225:9
225:24 226:4
**563** 93:16
**57** 127:21
128:1
**57/43** 182:11
**5:11** 233:10,12

**6**

**6** 3:19 57:23
58:1,3,9 59:3
59:13 73:13,15
94:21 101:6,7
101:7 102:16
106:3 137:24
138:6,6,6,7
146:21,22,23
147:1,5 224:9
224:9,11,12
226:5,8,8,12,14
226:20 228:17
228:17,18
229:3,20
**6.1** 101:8 224:6
225:5,6,7
226:10 228:8

**6.6** 224:7 225:9
**60.6** 181:23
**6395968** 238:1
**65,000** 70:1
**6th** 64:5

**7**

**7** 3:21 75:12,14
99:17 100:5
103:19 201:23
226:17 238:8
**73** 3:19
**75** 3:21 86:14
87:4
**770** 237:19

**8**

**8** 3:23 103:19
105:5,15 117:6
**8,040** 88:23
**885** 2:8

**9**

**9** 108:4
**9-11-28** 234:6
**9-11-30** 238:9
**9/6** 66:10
**999** 117:11

**a**

**a.m.** 1:18 4:2,5
**aa** 206:24
207:2,5,18
**ab** 206:24
207:3 208:18
209:19
**abilities** 5:24
8:25

**ability** 235:14
**able** 6:12,23
7:20 12:6
31:21 44:16
58:16 59:5,12
63:13 72:15
124:1
**abnormal**
136:19,25
137:4 161:22
**above** 33:15
34:9 114:21
131:20 132:6
132:10 133:5
133:23 138:12
215:4,5 217:25
221:15 237:14
**abreast** 14:23
**abs** 109:11
**absent** 140:4
**absolutely**
177:16 178:15
**absolutism**
30:5 31:13
**absorb** 33:7
150:12 231:19
231:20
**accelerations**
21:6
**accept** 51:24
**acceptable** 97:3
**accepted**
188:25
**access** 234:23
234:24

G. Bryant Buchner , P.E.                                January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[accident - additional]**                                              Page 4

| | | | |
|---|---|---|---|
| **accident**  9:3 | 197:13 202:17 | **acms**  108:1 | 26:21,22 27:13 |
| 16:5 17:13 | 203:14,20 | **act**  27:2 35:3 | 30:19 34:23 |
| 18:5,8,9,11,16 | 204:22,24,24 | **acting**  36:8 | 38:9 47:11 |
| 18:18,19,25 | 205:15,17 | **action**  52:12 | 56:20,23 57:5 |
| 19:3,6,8,10 | 206:1 213:20 | 86:9 234:14 | 57:12 64:7,10 |
| 20:5,18,22,25 | 216:24 222:8 | 235:20 | 64:13 77:5,16 |
| 21:2,4 24:2 | 222:14 225:23 | **activities**  53:22 | 79:19 87:7 |
| 26:11 27:6,10 | 227:21 | 67:4 | 89:11 95:19 |
| 27:16,23 32:8 | **accidents**  44:9 | **actual**  6:3 | 101:23 102:1 |
| 33:5 36:14 | 196:21 197:6,7 | 18:11,15,18 | 103:3 104:1 |
| 37:9,18,20 | 197:10,17 | 19:8,8,10 | 107:13 110:9 |
| 38:18 42:8 | 205:3 230:20 | 20:17 21:2,4 | 111:25 112:20 |
| 44:5,12 53:15 | **account**  82:21 | 26:6,8,11 | 121:16,17 |
| 64:8 65:25 | 97:21 100:22 | 27:16,22 28:22 | 122:12 131:3 |
| 66:10,24 69:8 | 102:8 134:11 | 28:25 31:2,6 | 138:24 140:10 |
| 69:11,14 78:17 | 156:15 171:12 | 32:24 37:8 | 156:17 157:4 |
| 86:10 89:21 | 202:3 227:14 | 39:2 52:8,25 | 163:18 165:4 |
| 95:1 96:9 97:1 | 227:24 | 66:24 84:20 | 171:5 182:15 |
| 97:25 98:4,25 | **accounted** | 86:3 90:22 | 193:1 204:10 |
| 100:17,25 | 110:22 111:6 | 94:25 107:10 | 214:18,18 |
| 102:6 110:3 | 171:20 202:9 | 107:15 110:3 | 221:3 |
| 114:4 116:16 | 202:14 | 118:10 140:3 | **adapt**  132:24 |
| 117:18 118:3 | **accounting** | 145:24 151:7 | 134:2 |
| 118:13,21 | 182:7 | 155:2 167:21 | **add**  28:13 |
| 119:24 120:1,5 | **accurate**  69:17 | 172:3,16,19,22 | 38:18,18 82:14 |
| 120:22 121:13 | 77:7,17 143:14 | 205:8,15 | 129:10,20 |
| 122:11,24 | 157:3 194:9 | 216:24 222:8 | 138:14 185:15 |
| 125:4,4,6,8,9 | 234:11 | 230:16 | 185:24 226:13 |
| 125:14 138:17 | **acknowledge** | **actuality** | **added**  110:11 |
| 146:15 152:13 | 197:2 | 107:24 | **adding**  28:14 |
| 152:15,24,25 | **acknowledged** | **actually**  8:20 | 89:17 134:22 |
| 153:21 160:21 | 194:25 | 11:21 13:25 | **additional** |
| 174:22,23 | **acm**  106:24,25 | 14:25 16:20 | 14:15 55:13 |
| 176:9,25 180:9 | 107:12,16 | 18:19 19:1 | 68:5,24,25 |
| 192:8 196:19 | 108:5,17 | 20:23,23 24:13 | 106:4 146:23 |

G. Bryant Buchner , P.E.                      January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[additional - answer]**                                                    Page 5

| | | | |
|---|---|---|---|
| 238:15 | **aftermarket** | **allowed**  79:1 | 176:20 191:11 |
| **address**  166:24 | 97:17 | 187:14 | 206:7 209:23 |
| **adds**  182:21 | **age**  26:3 | **alluded**  49:15 | 210:9 211:11 |
| **adjust**  32:14 | **ago**  7:2 9:4,4 | 66:1 145:4 | 212:13 225:18 |
| 98:20 159:11 | 13:24 14:12 | **alternative** | 227:6 229:24 |
| 185:15 | 66:1 111:21 | 209:19 | 233:1 |
| **adjusted** | 112:5 163:7 | **amended**  3:9 | **analyze**  30:19 |
| 185:12,18 | 230:8 | 73:25 | 37:2 38:5 |
| **adjusting**  17:18 | **agree**  31:4 | **amount**  26:16 | 116:23 137:7 |
| 17:24 194:14 | 32:12 40:10,23 | 29:24 46:3 | 164:23 165:3 |
| **adjustment** | 91:9 145:12,14 | 66:9 70:3 78:2 | 167:12 169:6 |
| 99:14 | 145:20 161:8 | 78:11 116:14 | **analyzing** |
| **adjustments** | 170:11 171:7 | 116:23 207:9 | 40:12 125:12 |
| 16:3 17:6,7 | 171:13 197:10 | 224:4 | 158:17 167:3 |
| 182:4 | 197:20 | **anal**  40:14 | 167:18 |
| **administrators** | **agreed**  10:11 | **analyses**  210:1 | **ancillary** |
| 1:4 | **agreeing**  196:4 | 210:13 211:7 | 236:13 |
| **admissible** | **agreement** | 211:11,15 | **angle**  221:8 |
| 165:4 | 234:15,17 | **analysis**  18:25 | **angled**  181:10 |
| **admittedly** | **ahead**  60:4 | 24:21 44:5 | **ans**  37:13 |
| 22:5 | 89:8 134:19 | 53:24 54:6 | **answer**  18:16 |
| **adr**  107:6 | 157:7 177:4 | 55:11 66:18 | 24:7 25:1 27:7 |
| **advantages** | 182:5 | 79:24 84:3,18 | 30:7 35:11,12 |
| 21:20 | **aiding**  55:2 | 84:23 85:19 | 36:6 38:24 |
| **aerial**  53:14 | **airbag**  91:22 | 106:24 115:4 | 49:19 77:9 |
| 61:22 | 92:1,4,9,15 | 116:10 117:10 | 88:19 96:19 |
| **aerials**  61:17 | **airbags**  74:5 | 117:14 125:12 | 97:24 101:5 |
| **affect**  133:20 | 107:13,18 | 126:24 128:13 | 104:3 109:8 |
| 198:15 | **algorithm** | 128:16 130:9 | 113:2 132:23 |
| **affected**  135:22 | 156:4,8,13 | 130:13 134:13 | 138:22 139:9,9 |
| 159:24 | 158:8,10,12,14 | 135:16 137:22 | 144:15 154:25 |
| **affects**  154:16 | 158:15 | 138:4 140:17 | 157:13 162:8 |
| **afield**  159:7 | **allow**  25:17 | 145:5 151:17 | 165:19 176:13 |
| **afraid**  93:6 | 79:4 159:10 | 151:18 153:5,8 | 182:11 185:5,6 |
| | 210:3 | 163:13 164:11 | 186:19,21,23 |

G. Bryant Buchner , P.E.    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[answer - assigns]**    Page 6

195:11 197:25
199:8 200:7
206:12 211:5
214:10,10,11
217:24,25
229:3
**answered**
31:18 37:4
40:2 92:18
112:7 137:11
**answering**
38:12,14 49:18
**answers** 38:15
114:22 115:1,2
173:6 205:22
206:23 212:10
234:20 235:11
236:4
**anticipated**
37:18 216:14
216:16
**anticipation**
11:1
**anybody** 7:8
9:25 160:11
166:23
**anymore** 36:21
39:2 164:18
**anyway** 111:22
**anyways** 26:14
81:20 91:14
208:13
**apart** 36:22
79:4 170:18

**apologies** 157:8
197:5
**apologize** 63:17
66:16 105:12
113:15 149:1
175:25
**apparent**
121:11
**apparently**
71:20 89:24
**appear** 55:20
56:1
**appearance**
194:8
**appearances**
2:1
**appeared** 4:1
**appearing** 1:14
**appears** 12:20
51:12,12 53:23
56:1 64:3 66:9
223:5
**appendix** 209:9
210:4
**apples** 33:3
136:9 171:15
**applied** 90:19
234:18 236:12
**apply** 148:22
167:2
**appreciate** 30:7
70:10 75:23
158:9 181:1
223:22

**appreciated**
36:11
**approach**
28:20 30:4
102:3
**appropriate**
25:6 32:23
33:20 34:7
39:4,6,11,14
165:20 174:18
191:4
**appropriately**
37:14
**approximate**
191:20 229:11
**approximately**
4:5 14:11 70:1
111:15 117:25
227:15
**archive** 6:24
**archived** 6:18
6:20
**area** 83:11
84:25 85:3,10
89:2 92:3
102:18,21
103:4,5,6
121:16 123:22
133:3,17
134:22 135:13
140:24 142:7
145:25 147:13
158:4 194:24
215:1

**areas** 35:16
148:11 158:25
200:3 212:18
**argue** 214:12
229:17
**argument**
126:14,18
166:3
**arms** 135:2
**array** 218:12
**article** 234:4
**articles** 166:2
167:11
**asked** 34:16
45:10 46:11
47:22 49:14
87:13 92:17
104:1 107:21
192:15 198:25
224:2 230:25
**asking** 37:7,13
38:13 59:25
100:5 105:17
112:11 142:17
167:22 220:15
229:23 230:21
**asks** 47:10
**aspect** 22:19
**assign** 207:11
**assigned**
234:10
**assignment**
238:1
**assigns** 158:15

G. Bryant Buchner , P.E.                January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**assist** 40:16 238:13

**associated** 23:22 49:7 93:24

**association** 50:14

**assume** 30:20 52:16 64:5 65:11

**assumed** 161:2

**assumes** 29:2

**assuming** 11:7 13:18 69:7 74:14 88:23 120:18,20 164:22

**atlanta** 2:17 56:17

**attach** 10:18 238:16

**attached** 10:20 75:8 79:2 95:19 201:17 236:6 237:6,7

**attachment** 75:1

**attempt** 10:8 204:21 205:16

**attention** 48:17

**attorney** 234:16 235:17 235:19 237:12

**attorneys** 234:22 236:7

**attribute** 182:19

**attributes** 145:23

**audio** 11:22 63:17 99:19 103:16

**authors** 230:7

**automatically** 181:25 234:18 236:12

**automotive** 208:24

**autostat** 127:13

**autostats** 126:23

**av** 156:17,24

**available** 31:17 61:21 63:8 96:11 166:19 236:9,14

**avenue** 2:7

**aware** 6:11 11:16 43:14 49:11 68:24 76:8 160:2 179:15,16 198:19 199:13

**axis** 127:25

**axle** 128:2,3

**b**

**b** 1:23 3:5 45:7 206:17 207:11 207:15 208:5 232:15 234:4,7

234:18 235:24 236:12

**b's** 206:21

**ba** 207:5,18

**back** 12:3 15:13 27:4 30:13 34:20,21 41:12 43:12 47:18 53:7 54:19,20,21 61:3 63:7 65:8 67:23 70:12,17 74:9 76:7,10 79:9 81:2 82:17 83:17 85:16 87:15,16 87:18,23 88:7 88:9 89:5 90:1 92:16,23 100:3 107:23 112:21 112:21 116:6,9 122:2 125:1 127:2,6,22 138:14 141:13 143:25 146:7 150:20 154:18 154:18 156:20 167:2 170:3 173:21 182:2 184:11 187:3 201:9 221:11 223:20 228:15 229:4,8,10 230:9 237:3

**background** 60:21 198:11 198:18

**backseat** 33:6 82:18 83:9,9 83:10 88:13

**bad** 89:9 151:2 200:21

**badly** 78:5 217:23

**balance** 47:19 112:2 113:22 114:3,24 119:25

**balanced** 156:22

**bar** 34:17 121:17 123:21 124:6,8,10 126:7 129:23

**barrier** 23:23 208:3

**base** 60:6,8,8,9 60:12 61:10 103:6,7 225:14

**based** 10:25 87:21 90:11 92:5 103:24 119:11 120:21 120:24,25 123:16 131:3 131:19 139:3 140:8 141:21 141:23 144:1,6 144:10 145:19

G. Bryant Buchner , P.E.                                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[based - body]                                                      Page 8

| | | | |
|---|---|---|---|
| 150:5,8,9 | **bearing** 171:15 | **bends** 24:15 | **bills** 63:19,23 |
| 151:11,12 | **beginning** | **beneficial** | 67:22 69:2 |
| 152:5,8,15 | 12:11 22:11 | 19:18 | **biomechanic** |
| 156:10 158:20 | 25:13,14 119:5 | **benefit** 75:9 | 84:22 |
| 161:3 162:16 | 169:20 220:3 | **bent** 77:24 78:1 | **biomechanical** |
| 164:11 165:11 | **begins** 105:16 | 78:4 127:4 | 85:12 |
| 175:16 181:16 | **behalf** 2:3,11 | **best** 5:23 8:24 | **bit** 17:11,24 |
| 184:5 215:16 | 4:18 46:24,25 | 27:7 49:19 | 22:10 24:15,16 |
| 215:20 230:15 | **belief** 71:12 | 88:13 151:16 | 55:16 88:15 |
| 230:17 | 84:6 123:17 | 165:19 191:3 | 113:10 134:21 |
| **baseline** 18:10 | 228:23 231:25 | 227:2 235:14 | 141:12 145:15 |
| 28:23 31:5 | **believe** 6:3 9:2 | **better** 29:25 | 146:7 152:4 |
| 199:16 | 13:14 21:22 | 30:1 32:3,5 | 154:3 156:2 |
| **basic** 212:7 | 22:25 30:10 | 55:1 97:20,24 | 175:8 182:14 |
| **basically** 11:12 | 39:4,10 50:1 | 102:14 141:18 | 182:21 217:2 |
| 15:17 28:14 | 51:3,8 52:2 | 145:15 176:8 | 221:14 226:1 |
| 36:18 39:16,16 | 58:10 72:1,5 | 176:13 194:5 | 230:25 |
| 45:2 66:15 | 73:8 84:16 | 203:5 | **bites** 15:18 |
| 79:10 82:14 | 94:22 108:11 | **beyond** 127:10 | **black** 93:23 |
| 111:5 113:19 | 113:24 117:21 | 147:24 159:18 | 222:8 223:5,7 |
| 124:12 131:23 | 120:22 130:22 | 194:24 | **blah** 56:24 |
| 132:21 140:18 | 151:25 155:24 | **big** 18:13 125:5 | **blame** 171:15 |
| 147:13 151:21 | 165:22 176:18 | **bill** 54:10 55:8 | **blanks** 20:12 |
| 154:17,23 | 191:2 198:10 | 64:3 65:10,13 | 21:12 |
| 155:9 158:15 | 200:13,13 | 69:4,5 | **blue** 117:19,21 |
| 221:11 | 228:11 230:8 | **billboard** | 118:8,15 |
| **basis** 81:18 | 230:12 231:1 | 122:25 126:9 | 193:21 213:14 |
| 140:9 141:8 | 231:11 | **billed** 51:23 | 213:23 214:16 |
| 234:8 | **believed** 39:8 | 54:24 55:4,10 | 216:7 220:23 |
| **bate** 68:17 | 50:25 114:3 | 55:17,20 56:2 | 221:13 222:6,7 |
| 129:19 | **believing** 44:8 | 66:9 | 223:4,8 |
| **bates** 73:23 | **bend** 24:13,14 | **billing** 53:6,7 | **board** 234:5 |
| 117:10 149:8 | 26:19 122:14 | 68:1 70:5,24 | **body** 96:14 |
| **bb** 207:3 | 135:1 | **billings** 70:1 | 224:4,9,12 |
| 208:19 | | | 225:6 226:8,11 |

G. Bryant Buchner , P.E.

January 23, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[body - c.f.r.]**

Page 9

| | | | |
|---|---|---|---|
| 226:11,12,20 | **briefly** 11:21 | 33:15 34:9,10 | 148:10 149:12 |
| **boils** 18:14 | **bring** 5:16 | 34:17,17 36:3 | 149:16 150:3 |
| **bolted** 79:2 | 12:25 | 36:3 39:7,7,22 | 156:11 157:5 |
| **book** 41:19 | **brock** 163:24 | 39:22 77:23 | 157:18,25,25 |
| 42:3 | 164:6 | 78:7,8,13,21,22 | 158:9 160:6 |
| **books** 41:12,15 | **brothers** | 79:1,1,3 88:1 | 168:14,14 |
| **bottom** 66:8 | 163:24 164:7 | 105:25 120:7,7 | 192:7,7,9 |
| 102:16,18,22 | **brought** 5:11 | 120:10,14,18 | 197:11,16,17 |
| 102:23,24,25 | 11:11,12 | 121:7,16,17 | 204:12,12,19 |
| 103:2 205:22 | **bryant** 1:13 | 122:1,2,7,7,12 | 204:19 205:5,5 |
| 206:5 217:4,11 | 3:12,14 4:8 5:1 | 122:13,14 | 214:5,5,6 |
| 217:14 | 161:18 235:2 | 123:15,18,19 | 215:1,7,8,10,14 |
| **bought** 57:21 | 237:2 239:19 | 123:20,21,22 | 215:15 216:1,4 |
| 57:22 | **bryson** 1:4,4 | 124:3,3,6,7,10 | 216:12,14,16 |
| **bounces** 78:9 | 3:20,22,25 | 124:19 126:7 | 216:17,18,23 |
| **box** 32:3 43:5 | 73:23 74:23 | 126:15,16 | 217:10,11,13 |
| 93:2,23 183:24 | 112:14 137:21 | 127:3,6,9 | 217:14,15,18 |
| 184:1,4 226:2 | 183:14,15,16 | 128:20 129:3 | 217:20 218:1,9 |
| 226:21 227:12 | **buchner** 1:13 | 129:11 130:15 | 219:9,10,20,23 |
| **boxes** 184:6 | 3:12,15 4:8,22 | 130:17,19 | 220:7,7,17 |
| 225:22 | 5:1,3,6 73:18 | 131:5,13,19,21 | 221:14,15 |
| **bracket** 226:21 | 161:18 223:21 | 131:24 132:8 | **bumpers** 78:4 |
| 227:10 | 235:2 237:2 | 132:11,11,12 | 120:25 124:13 |
| **brackets** 78:20 | 239:19 | 132:16,21,23 | 124:13 161:19 |
| 79:5 212:9 | **built** 33:13 | 133:1,22 136:7 | 218:20 219:13 |
| **brain** 21:19 | **bullet** 13:16 | 136:8,16,18,20 | 220:16 |
| **break** 63:11,13 | 77:22 80:2 | 136:23 137:6,6 | **business** 189:1 |
| 63:15,19,21 | 88:22 137:22 | 137:13,13 | **busy** 53:12 |
| 67:19,21 70:9 | 140:6 148:16 | 140:6,10,13,18 | **butler** 47:25 |
| 90:8 113:13 | 148:20 153:1,4 | 140:21,23 | **buy** 96:23 |
| 115:24 173:10 | 153:12 195:13 | 141:4 142:1,18 | |
| 173:12,15 | **bump** 149:24 | 143:5,11,18,21 | **c** |
| 199:21 201:1 | **bumper** 28:3,3 | 144:9,23,25 | **c** 33:6 234:6 |
| **breakdown** | 29:20,20 30:16 | 145:3,18 146:7 | 235:1,1 |
| 46:10,17 | 30:16,22,23,23 | 146:9,11 | **c.f.r.** 93:16,18 |

G. Bryant Buchner , P.E.    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[c.z.b. - car's]**    Page 10

**c.z.b.**  1:5,6
**cad**  101:17,18
  101:25 105:5
  105:16
**cake**  125:22
  154:14
**calculate**  21:7
  24:23 41:10
  109:7 111:2
  132:9 137:2,5
  152:8 161:20
  170:1 188:22
  188:22 189:24
  207:15
**calculated**  3:23
  112:18 117:19
  117:20 118:9
  119:10,20
  139:2,5,22,24
  144:6,9 204:13
  208:4 215:11
  230:16
**calculates**
  117:24 207:16
**calculating**
  109:20 118:22
  131:13 135:25
  136:12 152:22
**calculation**
  29:11 106:7
  111:13 112:7
  112:22 114:18
  115:17,18,20
  118:25 120:4
  132:13,14

  151:7,13 152:5
  155:17 157:11
  157:12,23
  159:5 160:18
  163:25 170:8
  170:17 184:9
  205:7,23
  206:10,20
  210:16 212:22
  219:15 224:3
**calculations**
  21:9,16 67:9
  84:5 87:8
  109:25 110:9
  110:18 111:9
  115:19 116:14
  118:11 119:11
  119:12,13,21
  120:6,17
  130:12 132:21
  133:2,5 138:25
  139:3,12,17
  151:18 152:13
  153:3,5,7,8,11
  171:12 172:5
  172:20,25
  173:5 184:21
  190:25 191:2
  191:20 192:6
  200:11 203:9
  204:1 205:20
  206:22 218:11
  225:8,13
**calculator**
  157:15 170:6

**calendar**
  236:13
**calibrate**  32:10
  81:11
**calibrated**  82:2
  82:8 109:7
**calibration**
  81:15,15,21,22
  82:5
**calibrations**
  81:23
**call**  7:3 15:12
  19:5 26:16
  51:24 54:9
  75:10 79:10,11
  94:10 98:24
  103:4 123:20
  136:21 147:19
  175:14
**called**  32:18
  123:22 155:22
  163:12 176:17
  183:9
**calls**  47:10,14
**camber**  228:21
**campbell**
  133:24
**campbell's**
  152:6
**cannella**  2:4,6
  4:12,12,16,16
  8:1 29:1 48:2
  49:7 99:23
  105:9 134:16
  141:10 167:5

  167:13,22
  168:5 174:12
  174:16 177:18
  178:1,3 197:14
  200:6 203:16
  203:20 233:6
  237:1
**cannella's**
  47:24 48:13
  49:15
**cannellasnyd...**
  237:1
**capable**  162:21
**capacity**  80:23
**capital**  206:21
  206:21
**caption**  235:8
**captured**  55:1
**car**  24:4 26:17
  33:6 34:18,23
  36:15,19,20,21
  36:23,25 37:2
  45:7,7 61:25
  65:24 82:23,25
  83:5 85:4
  87:14 102:24
  102:25 103:1,2
  103:3,7 118:13
  150:16 168:17
  202:5 209:18
  215:21 216:11
  216:12 217:1,1
  217:21 222:3
**car's**  217:23

G. Bryant Buchner , P.E.                                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[card - child]**                                                      Page 11

card  87:20
careful  158:24
carefully
  112:22
cargo  82:18,22
  83:5,5,17 89:1
  133:3,12
  134:12,22
  135:13,17
  144:22 145:2
  145:10,25
  185:16
carlo  151:18,24
carry  80:9 81:5
cars  24:5 39:17
  39:18 40:6
  78:3 196:2,20
  199:12 215:17
case  1:7 6:4,11
  6:22 7:1,3 11:5
  11:13 13:5
  17:7,15,20,24
  18:5 19:22
  20:4 22:2
  25:11 26:7,9
  30:21 33:2
  39:12 40:3,5
  40:16 44:11,18
  50:12,15 51:1
  51:10,15 53:1
  54:16,22 55:14
  55:21 59:20
  65:15 68:10,14
  69:2 81:4
  85:14 91:6,6

96:6 107:2
113:6 134:23
136:10 151:24
159:3 161:18
163:19 165:10
165:11 166:6
167:2,12,14,18
168:2,4 169:13
170:9 172:21
181:11 182:12
184:25 185:8
185:11 189:12
189:18,25
190:8 195:19
198:9,24 234:8
234:8,18
235:18 236:5,7
236:12
cases  43:14,15
  43:19 44:2,4
  45:12,16 46:12
  46:15,18,23
  47:3,11,23
  48:14 163:20
  172:19
catch  4:15
categorize
  39:22
cause  45:23
  232:10
caved  26:21
ccr  1:23 235:24
cdr  56:21,25
  57:3

center  103:25
  181:2,5 184:22
  215:10,15
certain  65:4
  162:1 215:22
certainly  84:11
  84:23 150:15
certainty  28:15
certificate
  236:1
certificates
  236:9
certified  234:9
  234:21 236:4,5
  236:6,8
certify  235:6,16
  238:2
cg  181:18 185:7
  185:9
cg's  16:17
chainsaw
  183:24 184:1
challenge  166:1
challenged
  165:11
chance  88:12
  126:2,4
change  16:18
  17:12 30:21
  42:25 84:2
  97:8 98:22
  101:8 115:10
  118:20 125:14
  155:9 158:19
  175:6 180:20

182:11 185:11
185:24 197:18
211:5 238:19
239:1
changed  31:3
  45:25 67:19
  73:25 74:10
  144:12,13
  154:15 169:16
  217:1
changes  159:10
  234:21 237:7
  238:5,6,9
changing
  154:17
channel  109:16
charge  57:17
  60:5
charged  50:12
charges  60:8
charging  50:14
  52:2
check  16:1,17
  21:18 61:18
  76:11 81:13,15
  151:18 191:24
  227:1
checked  109:11
checking  81:22
  223:10
checks  82:5
chief  52:15
  55:3
child  140:11
  146:1 194:23

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[child's - come]**                                                    Page 12

| | | | |
|---|---|---|---|
| **child's** 84:19 | 178:9 180:23 | 158:16 159:11 | **collected** 166:2 |
| 84:24 85:3,8 | 186:25 | 169:17 174:2,5 | **collecting** |
| 102:21 147:14 | **clearance** | 176:3,4,8,24 | 71:21 |
| **choice** 35:23 | 86:12,13 87:4 | 177:3,9,14,21 | **collision** 23:12 |
| 39:20 | **cleared** 180:24 | 177:22 178:13 | 23:16,20 29:20 |
| **choose** 39:21 | **clearinghouses** | 178:13,19 | 30:17 36:8,12 |
| 99:6 132:5,8 | 189:5 | 179:23 180:3,8 | 90:22 91:3 |
| 172:13,14 | **clearly** 28:5 | 180:19 187:4,5 | 94:14,14 |
| 218:15 | 29:19 58:24 | 187:7 188:14 | 108:12 123:8 |
| **chose** 151:20 | 135:22 | 189:25 190:14 | 150:5 160:24 |
| 163:6 184:5 | **client** 51:19,19 | 190:21 191:1,4 | 161:21,22 |
| **chronologica...** | 52:4 54:9,17 | 191:10,21 | 190:6 192:17 |
| 51:9 | **clip** 24:14 | 192:14,20 | 192:18 195:9 |
| **circumstances** | **close** 29:7 | 193:1 203:11 | 195:20 204:12 |
| 14:7 39:6 | 98:15 138:7 | 203:13,23 | **collisions** 78:4 |
| **cite** 41:9 167:10 | 175:15 181:7 | 204:2,3,11,22 | 150:18 170:1 |
| **civil** 238:9 | 229:8 | 206:25 207:8 | 195:2 196:12 |
| **claiming** | **closer** 105:12 | 207:11 210:5 | **colloquies** |
| 144:13 | 182:21 226:7 | 230:4 232:8 | 234:20 235:10 |
| **clarify** 54:12 | 226:13 | **coefficients** | 236:4 |
| 90:18 103:9 | **closest** 149:19 | 22:23 132:9 | **color** 194:10,11 |
| 191:25 195:5 | 149:22 | 133:19,20 | **column** 229:22 |
| 226:9 | **code** 92:9,12 | 155:19 156:10 | **combination** |
| **clarifying** | 93:17 107:22 | 177:10 178:17 | 228:14 |
| 173:24 195:16 | 198:7,8,14 | 179:1,18 | **combine** |
| 233:4 | 234:13 | 180:20 187:10 | 178:22 |
| **class** 130:22 | **coefficient** | 188:18 204:5 | **combined** |
| **classes** 42:21 | 17:25 22:15 | 206:9,18 208:2 | 24:24 25:4 |
| **classical** 157:15 | 23:8,11 24:24 | 208:19 209:12 | 176:7 |
| **cleaner** 82:19 | 25:4 26:10 | 209:22,25 | **combo** 103:24 |
| 84:4 | 110:17,20 | 229:24 231:16 | **come** 15:8 |
| **clear** 77:9,15 | 112:1 114:8 | **cohen** 183:16 | 41:14 45:6 |
| 77:19 93:12 | 115:3,8,11 | **collapse** 162:25 | 54:25 78:18 |
| 100:14,15 | 119:16 120:9 | **collapsing** | 79:1 90:1 93:7 |
| 102:20 116:12 | 130:5 155:10 | 162:5 | 99:14 119:6 |

Case 2:22-cv-00017-RWS    Document 119-4    Filed 01/20/25    Page 74 of 129
G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[come - considerations]**                                    Page 13

122:2 173:6
175:3 179:14
183:25 207:17
225:25 226:22
**comes** 22:9
47:7,8 166:17
218:5 230:3
**comfortable**
28:6 35:16
148:25 189:2
211:23 212:9
213:4
**coming** 122:5
220:2 231:14
**comment** 140:5
**commenting**
86:3 219:2
**comments**
85:25
**commercial**
195:24
**commission**
239:25
**committed**
104:10
**common** 80:16
**communicati...**
10:25 11:3
51:18 54:17
**company's**
51:15
**comparable**
220:23
**compare** 97:19
140:22 143:9

198:20
**compared**
100:11,12,14
102:18 138:1
150:17
**comparing**
97:15 105:22
106:8 142:21
216:2 230:19
**comparison**
33:4 95:25
102:22 105:6
105:16 141:8
**comparisons**
106:13
**compensation**
234:14
**competing**
227:3
**complaint** 35:4
**complete** 145:6
234:10,20
236:4,6
**completed**
237:17
**completely**
78:18 217:21
**complex** 40:11
40:24 41:1,3,7
42:4 143:15
145:5 167:18
167:24 168:9
169:5
**compliance**
234:3,13

**complicated**
157:10,11
**component**
9:18 177:13
**components**
42:10 58:25
141:5 162:6,24
163:3
**compound** 48:3
**computer** 7:8
34:25 37:1
159:23 210:18
**computers**
89:24
**concern** 92:17
**concerned**
27:13 163:23
229:2
**conclude** 121:6
162:15
**concluded**
106:6 233:12
**concludes**
233:9
**concluding**
120:21,24
**conclusion**
140:9
**conclusions**
119:6 137:23
**condition** 120:5
140:19 145:19
146:5 160:8
**conditions** 31:3
124:23

**conference**
14:6 52:3 54:5
54:8
**confidence**
155:11
**configuration**
96:2 117:22
126:2,18
148:17 153:20
161:6 229:11
**confining**
132:15
**confirm** 51:10
76:6 99:15
**confirmation**
102:12
**confirmed**
69:15
**confused** 18:21
98:8,10 152:3
**confusing**
177:17
**confusion**
58:18
**connected**
116:19
**conservative**
231:7
**consider**
160:24 187:9
188:5
**consideration**
35:1
**considerations**
159:8

G. Bryant Buchner , P.E.                                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[considered - crash]**                                                    Page 14

considered
  186:25
consistency
  188:23
consistent
  26:11 28:25
constant
  232:17
consulting
  43:18
contact  9:22
  16:23 39:7
  42:23 122:8,9
  157:4 158:5
  220:7
contacted
  234:16
contacts  56:12
contain  7:21
  8:3 231:25
contained
  104:24 179:19
  180:4
contemplated
  28:6
context  94:3
  203:14
contract
  234:14
contracts  234:8
contributed
  22:20 44:24
control  24:20
  47:10

controlling
  159:2
controls  9:10
convenient
  21:11 56:15
convention
  91:16
conversation
  38:8 94:12
  129:14
convert  109:4
coordinators
  236:3,8
copies  7:6,16
  71:2 73:1
  236:8 237:13
copy  6:8,9,12
  12:25 73:4,4
  73:17,20 236:6
corner  43:5
corporation
  13:17
correct  19:3
  22:25 30:23
  33:1 43:16
  52:16 54:2
  55:21,22 56:25
  61:8,9 68:10
  69:3 73:14
  75:13 86:4
  105:25 110:5
  112:19 114:6
  115:5 119:8
  120:12 127:22
  132:22 153:9

153:15 158:17
159:12 164:24
164:25,25
166:8 180:22
193:22 213:10
219:25 234:20
235:14 236:4,6
correction
  223:24
corrections
  237:7 238:14
correctly  37:25
  93:6
correlate
  203:12 204:4,7
  205:2
correlates
  205:15
correlation
  232:24
corresponds
  215:1,13
coughed  62:6
counsel  2:1 4:9
  5:14,17 6:5
  10:25 11:20
  99:22 234:2
  235:17,19
country  1:9 3:8
  57:19,23 59:1
couple  5:7
  68:19 85:25
  93:13 108:5
  173:24 217:4

course  15:18
  158:9 183:16
  192:8 223:3
  227:1 231:23
  232:21
courses  152:7,7
court  1:1 4:15
  4:20,22 49:25
  73:14 99:18
  141:14,15
  164:24 201:22
  208:16 234:5,9
  234:21 236:5
  237:15,18
cover  78:8,8
  89:1,6,10,13,15
  89:18,18 92:25
  180:9 190:4
covered  200:5
  201:1
covers  193:24
  194:1
crash  9:18 24:4
  24:4,18 25:24
  26:7,15 28:5
  28:22,25,25
  30:19 31:2,3,6
  31:8,10,19
  32:25 33:12,13
  35:21 36:24
  37:24 38:3
  39:2 41:16
  62:25 78:12
  82:12,21 83:7
  83:19,24 84:2

G. Bryant Buchner , P.E.                January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[crash - d]**                                                          Page 15

| | | | |
|---|---|---|---|
| 105:6,16 107:4 | **created**  214:16 | 131:12,17,20 | 219:5,7,10,11 |
| 115:17,21 | **creates**  34:11 | 132:6,6,10,13 | 219:22 220:8 |
| 117:4 121:4 | 37:23 | 132:20 133:1,4 | 220:12,16,21 |
| 122:7 131:14 | **creating**  125:3 | 133:19,22,23 | 222:14 229:23 |
| 135:23 136:2,3 | 125:4 | 134:12 141:3 | 230:11 231:10 |
| 136:14,22 | **crescent**  32:4,4 | 141:21 142:5 | 231:13,18,21 |
| 137:17 143:5,8 | 32:13 35:7,8 | 143:17 146:14 | 232:10,18 |
| 162:2,25 | **critical**  28:20 | 146:22,25 | 233:1 |
| 163:24 164:6 | 187:2 194:16 | 147:2,16,18,24 | **crushed**  127:2 |
| 164:10 167:21 | **crossed**  5:24 | 147:24 148:1 | 129:6 135:24 |
| 167:24 168:15 | 177:20 | 148:18,20 | 146:6 218:3 |
| 168:17,25 | **crowbar**  63:7 | 150:4 152:9,24 | 221:17 |
| 169:5,7,18 | **crumpled** | 153:4,7 155:18 | **crushing** |
| 171:6,10,20 | 194:13 | 156:10 161:11 | 219:17 |
| 172:4,7,13,16 | **crush**  3:24 | 163:5,7,8,9,20 | **cs**  237:19 |
| 172:20,23,25 | 39:18 40:11,17 | 163:23,23 | **curb**  127:25 |
| 173:1,2,4 | 40:21,24,24 | 164:2,4,5,7,17 | 128:1 185:14 |
| 176:11,14 | 41:11,22 42:4 | 164:19,21,23 | **curious**  68:4 |
| 180:13,17 | 42:8 44:25 | 165:3 166:4,5 | 77:15 105:20 |
| 181:8,10 | 45:7 85:19 | 167:4,12,19 | **current**  12:21 |
| 188:16,20 | 94:24,25 106:4 | 170:1,19,20 | 12:25 13:2 |
| 189:11,16,21 | 106:6,22 | 172:20 177:9 | 50:9 74:2,4 |
| 189:24 202:25 | 114:25,25 | 177:14,22 | 231:12 |
| 204:19 205:5,8 | 115:4 116:10 | 178:12,17 | **currently**  48:25 |
| 207:21 230:16 | 116:14,23 | 186:22 190:11 | 49:10,20 50:13 |
| 230:19 231:7 | 117:10,14,21 | 190:13,25 | **curriculum** |
| **crashed**  146:6 | 118:3,4,5,12,21 | 191:11,19 | 3:13 |
| **crashes**  20:11 | 118:22 119:2 | 198:17 203:9 | **cursor**  86:8 |
| 20:13 37:2 | 125:12 126:24 | 204:25 206:7 | **cut**  141:11 |
| 39:22 133:16 | 126:25 127:1 | 206:18 207:12 | **cv**  1:8 12:19,22 |
| **crashing**  35:2 | 128:13,16 | 207:12,14 | 13:1,3,9,14 |
| **crazy**  29:8 | 129:7,10,14,21 | 209:23 210:8 | |
| **create**  28:23 | 129:22 130:4,9 | 211:1 213:1 | **d** |
| 115:9,12,14 | 130:10,11,14 | 214:1,13,18 | **d**  3:1 33:7 |
| | 130:18 131:7 | 215:17,22 | 221:25 |

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[damage - depiction]**                                    Page 16

**damage** 9:2
27:4,10 78:3,8
78:12,25 94:24
94:25 117:18
117:19,20
118:21 133:17
143:4 144:1,10
144:16 146:11
156:11 207:10
208:4 213:7
217:21
**damaged** 27:6
79:14 86:18
140:19 142:5
217:23 222:24
222:25 223:5
**danger** 34:3
**data** 6:18 8:5
9:2,7,7,10
19:24 20:18
23:6 31:20
33:18,24 60:12
93:23 106:24
107:4 108:5
127:15 131:16
152:19,20
154:1 155:2,6
162:16 169:17
174:23 176:18
180:17 188:16
190:3 191:13
191:18 192:17
192:18 199:2
199:18 205:24
212:7 219:22

219:24 221:1
225:14 229:16
**database**
179:18,19
180:4 209:17
210:6
**date** 62:4,7
67:17 71:9,19
72:5,6,18 77:9
89:21 107:1
166:11 207:24
235:2 237:3
**dated** 12:21
**daubert** 165:12
**day** 14:9 15:13
26:3 41:2,6
55:24 56:21
65:1,7 69:20
71:23,24 72:2
72:3,6,11,13
80:8 82:10
171:22 230:6
231:3 235:21
239:21
**days** 237:3
**de** 2:7 211:12
**dead** 215:15
**deal** 46:2
**dealing** 116:20
**debate** 38:21
**debating** 38:25
**decatur** 2:9
**deceased** 1:6
**deceleration**
92:5,6

**december**
51:13 52:1,5
53:22 55:10
**decimal** 226:16
**decision** 40:7
**decisions** 31:23
31:24
**deep** 75:5
**default** 22:15
25:10 115:8
175:14,16,18
180:11,19
190:18 193:9
**defaults** 22:9
**defeated** 26:22
36:18
**defend** 150:12
150:19
**defendant** 1:10
2:11 3:8 4:19
**defending**
136:7
**defense** 46:16
46:18,24 47:17
**deference**
29:24
**define** 93:13
94:11 167:21
196:9
**definitely** 72:9
93:3 186:15,16
232:22
**definition**
93:19

**deflection**
142:13,15
**deformation**
132:21 135:12
135:17 140:8
**deformed** 79:6
142:22,23
223:4
**degree** 211:10
**delta** 17:9 22:6
22:17 25:6,8
25:15 90:12,16
90:16,18,20,22
91:7,7,9 108:8
108:12 110:22
110:24 111:14
111:18 115:2
118:2 152:14
152:15 155:24
174:21
**demand** 97:6
**dent** 218:1
**dependent**
35:25 36:2
170:12
**depending**
21:20 67:1
94:3 123:20
162:9 175:6
232:13
**depends** 172:8
196:19
**depiction**
117:18

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[deploy - difficult]                                        Page 17

**deploy**  92:1,15
107:14,18
**deployed**  74:6
**deployment**
91:22 92:4
107:13
**depo's**  68:18
**deponent**  149:3
235:8,15 237:2
237:6,6,7,9,15
**deposition**  1:13
3:11 4:7 5:12
5:15,18 10:16
10:20 12:14
43:10,16,20,24
44:2,19 46:12
50:3,18,19,22
73:15 74:12
75:14 117:6
139:6,18 149:3
225:13 233:10
233:12 235:2,2
235:13 236:11
238:11,12
**depositions**
183:6
**depth**  207:14
**derive**  152:20
204:21 208:21
**derived**  156:11
204:15 205:20
**describe**  16:9
34:14 75:2
79:7 94:23
152:2

**described**
30:17 39:5
45:18 96:20
**describing**
37:19
**description**
95:2
**design**  34:24
**designed**  35:4
131:14 158:25
159:4 161:9,11
168:21 169:22
**designing**
133:15
**desire**  238:10
**detail**  18:3
37:16 60:21
**determination**
230:4
**determine**  25:3
41:10 53:4,8
58:17 94:24
105:21 130:4
130:18 133:4
139:1 141:24
147:23 148:1
156:23 160:7
164:7 182:23
188:17 211:10
216:9
**determined**
57:25 100:8
105:24 140:13
181:18 216:23
230:8 234:14

**determining**
20:15 40:16
115:4
**develop**  158:10
171:5
**developing**
133:25
**development**
28:4
**deviation**
211:13,15
**device**  56:10
**devin**  2:5 4:12
4:17
**diagram**  61:15
61:16 212:17
**diagrams**  59:1
**dial**  2:14
**diameter**  99:6
99:9
**difference**
27:23 59:5
76:12,13 90:15
91:1,6 96:3,16
97:21 100:8
118:2 120:8
128:17 158:5
178:12 186:2
202:15 213:18
220:25 222:22
224:17,25
225:23 227:19
227:20,23
228:1,5

**differences**
87:6 202:3
204:10
**different**  14:20
16:14 18:9
19:18 20:8
21:6 24:6,7
32:1 37:4 46:7
73:9 89:20
93:7 94:4,6,8
96:5,10,23
97:11,12,13
101:5 114:10
114:15,17
119:19 131:4
134:3 138:3
151:20,21,25
152:22 163:15
171:14,21
172:24 173:7
175:9 177:23
182:14 186:7
192:8 202:6
205:3 206:3
209:24 212:2,7
212:14,23
217:21
**differentiate**
67:3,5
**differentiates**
27:15
**differently**
175:8
**difficult**  199:25

G. Bryant Buchner , P.E.                              January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[dig - e]**                                                      Page 18

| | | | |
|---|---|---|---|
| **dig**  75:5 | **disqualify** | 143:12 148:8 | **dropped**  78:16 |
| **digital**  6:3,22 | 234:12 | 155:25 158:3,8 | **drove**  80:10 |
| 7:22 72:21 | **distance**  140:3 | 159:15,21 | **duces**  3:11 |
| 74:23 | 220:11 | 160:2 162:21 | **due**  237:3 |
| **digitally**  6:25 | **distinction**  34:8 | 194:3 201:20 | **duly**  5:2 235:9 |
| **direct**  234:14 | 37:17 | 207:9 210:8,15 | **dumb**  208:12 |
| **direction**  200:2 | **distort**  162:19 | 212:5 228:11 | **dumbest** |
| 211:13 235:12 | **distorted**  168:7 | 230:18 | 101:20 |
| **directly**  55:5 | **distribution** | **door**  29:7 97:4 | **dutifully**  36:5 |
| **disagree**  30:2 | 127:20 128:4 | **download** | **dymesh**  42:15 |
| 93:20 145:7 | 181:23 184:20 | 25:21 56:21,25 | 42:19 156:4 |
| 197:20 | **district**  1:1,1 | 57:3 92:8,10 | 157:1,16 |
| **disagreeing** | **division**  1:2 | 93:22 154:25 | 158:11 161:20 |
| 196:4 | **doctor's**  134:8 | 155:1,3 193:3 | 161:20 162:4 |
| **disclosure** | **document**  6:17 | 193:16,18 | 162:19 163:1 |
| 234:5 236:1 | 6:18,21 66:10 | **draw**  61:16 | **dynam**  106:5 |
| **disclosures** | 75:2 84:15 | 147:3 | **dynamic**  105:7 |
| 234:1,2,3,15 | 130:1 213:6,8 | **drawing**  60:8,9 | 105:18,21 |
| **discount** | **documentation** | 60:9 61:6,10 | 106:6,22 147:2 |
| 234:19 236:13 | 58:11 59:22 | 101:25 105:1 | 147:6,9,23 |
| **discounts** | 62:21 63:4 | 129:2 | 163:17 |
| 156:17 234:18 | **documented** | **drawings**  60:18 | **dynamically** |
| 236:12 | 69:23 76:18 | 69:16,16 | 143:8 144:18 |
| **discuss**  218:16 | 84:16 106:20 | 101:17 104:17 | 147:10 |
| **discussed**  95:3 | **documents** | 104:25 121:12 | **dynamics** |
| 194:21 | 3:21 77:15 | 129:1 200:10 | 13:17 120:3 |
| **discussing** | 230:10 | **drawn**  221:13 | 130:25 158:7 |
| 203:14 221:4 | **doing**  7:9 8:11 | **drive**  35:6 65:7 | 160:18 161:21 |
| **discussion** | 16:6 17:20 | **driver**  9:9 | 164:10 165:14 |
| 108:14 109:24 | 21:13 28:17 | 104:9 194:23 | 169:25 210:22 |
| **dislodge**  79:4 | 32:19 34:6 | **driver's**  183:4 | 210:23 |
| **displacement** | 54:23 61:14 | 194:19 | |
| 129:7 | 101:1 102:2 | **drives**  78:6 | **e** |
| **disqualificati...** | 112:16 128:16 | **driving**  35:8 | **e**  3:1,5 56:9 |
| 234:6 | 133:2,15 | | 65:18 235:1,1 |
| | | | 237:18 238:8,9 |

G. Bryant Buchner , P.E.
January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[earlier - errata]**

Page 19

| | | | |
|---|---|---|---|
| **earlier** 33:16 | 137:23 162:11 | **elongated** 79:6 | 161:20 163:17 |
| 34:15 87:13 | 211:18 219:15 | **emblem** 145:24 | 165:14 169:25 |
| 101:11 107:21 | 224:11 226:7 | **employed** | 177:3,12 187:6 |
| 114:12 119:23 | 229:7 231:21 | 171:5 | 188:15 190:1 |
| 123:5 144:5 | **efficient** 22:8 | **employee** | 207:20 210:22 |
| 156:9 157:10 | **eight** 64:19 | 235:17,19 | 210:23 225:18 |
| 181:17 224:13 | 65:1 | **endeavor** 34:2 | 227:6 |
| 226:16 230:13 | **either** 87:8 | **ended** 93:25 | **engineers** |
| 231:4 | 88:11 143:8 | 169:9 | 14:21 52:11,25 |
| **early** 57:22 | 145:14 160:7 | **ends** 93:23 | 65:14 115:22 |
| 225:17 | 162:21 182:15 | 213:23 214:14 | 208:24 |
| **easier** 51:6 | 183:4 211:11 | 220:13 | **enter** 8:10,16 |
| 73:19 126:16 | 211:13,15 | **energy** 33:8 | 8:19 171:25 |
| **easiest** 148:6 | 212:12,12 | 207:11,15,16 | 186:4 |
| **eastern** 4:6 | **elasticity** | **enforcement** | **entered** 238:11 |
| **easy** 74:17 | 178:21 | 107:1 | **entire** 158:16 |
| 126:21 154:13 | **electronic** 5:20 | **engaged** 121:18 | 180:9 |
| 191:15 | 5:23 6:1,3,9,12 | 124:14 | **entitled** 74:24 |
| **eating** 15:17 | 8:14 19:24 | **engagement** | 77:21 90:10 |
| **economies** | 92:13 | 103:20 105:23 | 116:10 |
| 97:10 | **electronically** | 105:24 123:9 | **entries** 53:23 |
| **edc** 13:19 | 3:6 237:8 | **engine** 120:3 | 66:20 |
| **edcrash** 15:12 | **element** 126:17 | **engineer** 15:7 | **entry** 54:10 |
| **edr** 23:5 90:11 | 163:13 | 16:6 38:16 | 174:10,12 |
| **edsmac** 15:12 | **elephant** 15:17 | 52:14,15,20,23 | **environment** |
| 120:3 152:11 | **elevation** 101:8 | 54:7 55:3 | 9:10 30:9 |
| **education** 13:8 | 122:10 126:12 | 65:15 120:21 | 190:5,7 |
| **effect** 135:17 | 132:6 161:12 | 121:24 127:18 | **equations** |
| 181:7 185:2,5 | 214:25 215:3 | **engineering** | 22:11 111:23 |
| 228:15,15 | 215:14 | 11:11 13:17 | 113:21 |
| **effective** 32:11 | **elevations** | 16:22 23:1 | **errata** 237:3,7 |
| 112:23 218:19 | 131:15 | 53:24 54:6,20 | 237:8,9,11,13 |
| 220:25 225:6 | **elliott** 198:23 | 55:11 66:18 | 237:14,17 |
| **effectively** 23:7 | **elliott's** 183:13 | 73:8 130:3,24 | 238:1,16 |
| 108:13 134:24 | | 158:7 160:18 | |

**error**  92:9,13
  107:22 211:10
  212:12
**escape**  26:23
  27:4 62:18
  77:2,6,23,23
  78:13 79:23
  80:8 82:11,12
  87:24,24 92:3
  111:7,12,14,19
  118:13 120:16
  121:14 122:13
  123:15,18
  125:2 127:1,21
  128:9 129:4
  130:19 131:6
  131:18 140:7
  140:23,25
  141:6 145:19
  145:23 146:2
  146:17,24
  147:3,25
  149:12 150:24
  151:5 152:17
  156:20 171:7
  175:2,4 177:7
  180:4 181:22
  183:13 184:7
  184:21 187:8
  187:17 188:11
  193:25 206:19
  207:3 208:19
  209:17,25
  210:13 216:4
  216:23 217:11

  217:13,18
  222:13,15,21
  222:24,25
  223:1,6,8
  229:24 230:5
  231:19,22
  232:11
**escape's**  80:3
  151:12
**escapes**  131:1
**especially**
  45:20
**esq**  237:1
**esquire**  2:4,5
  2:12
**essay**  130:21
**essence**  98:6
**essentially**
  22:18 191:16
  204:17,18
**establish**
  147:17 167:17
  211:14
**establishing**
  211:24 231:3
**estate**  1:5
**estimate**  46:23
  64:23 65:2
  116:14 120:8
  139:1 184:3
  191:3
**estimating**
  82:20
**ethics**  234:13

**euler**  21:8
**evaluate**  173:2
**event**  9:7 93:14
  93:21,22,23,25
  107:17,20
  136:13,15,17
  136:19 137:1,4
  137:6,12
**events**  108:1
  197:21
**eventually**
  204:17
**everybody**
  128:20 133:25
  188:24
**everybody's**
  146:6
**evidence**  19:8
  19:13,19 21:17
  29:2,16 31:14
  33:25 124:15
  165:4,10
  194:18 235:15
**exact**  6:17 47:1
  58:6 65:5
  81:21 96:8
  104:9 109:13
  175:7 185:7
  186:19 192:1
  196:13 204:8
  223:1
**exactly**  17:5
  24:18 56:6,21
  64:18 65:3
  89:11 105:20

  106:10 142:12
  147:15 157:20
  159:4 168:10
  206:13,24
**examination**
  3:2 5:4 213:19
**examined**  5:2
**example**  54:4
**examples**  35:5
**except**  234:8
**exclude**  57:8
**excluded**
  164:24
**exclusively**
  236:8
**excuse**  62:6
  157:6 165:8
**exemplar**  58:22
  59:19 61:25
  62:1,5,17,17
  77:2,3,5,13
  79:18,23 94:23
  95:6 97:16
  100:9,11,13,18
  101:24 102:5
  110:4 121:1
  142:3 171:6
  202:2,5,18,19
  203:6 222:4,25
  225:1,24
  227:11,15,25
**exemplars**
  57:24
**exhibit**  3:7,8,13
  3:14,17,18,19

G. Bryant Buchner , P.E.                January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[exhibit - far]**                                                      Page 21

| | | f | |
|---|---|---|---|
| 3:21,23 10:16 | expertise 84:25 | | 232:1,8 |
| 10:19,22 11:5 | 85:10 176:1 | **f** 56:9 232:4 | **fabric** 194:1 |
| 12:14,19 43:7 | 194:24 | 235:1 | **faced** 165:25 |
| 43:10 50:1,3,6 | **expires** 239:25 | **f2** 100:9 | **facility** 237:17 |
| 50:21,22 51:2 | **explain** 57:18 | **f250** 27:17 | **fact** 38:17 |
| 73:13,15 75:12 | 107:12 127:8 | 37:19,21 40:19 | 76:23 78:7 |
| 75:14 117:6 | 130:2 156:5,6 | 40:21 74:6 | 184:19 227:25 |
| 201:17,20 | 173:4 207:4 | 85:25 86:1 | **factor** 121:11 |
| **exhibits** 3:6 | **explained** | 88:22 89:2 | 122:20 126:23 |
| 234:21,22,23 | 148:13 | 90:11 92:1 | 133:3 135:15 |
| 236:6,7 | **explanation** | 95:6 96:1,1,18 | 187:2 206:13 |
| **exists** 53:9 | 24:22 87:2 | 99:15 100:9,10 | **factoring** 145:1 |
| **exit** 155:5 | 92:14 148:6 | 100:11,13,25 | **factors** 28:10 |
| 174:10,12,20 | 154:9 156:7 | 108:19 116:15 | 121:6 |
| 176:16 | 228:6,9,10 | 116:24 117:4 | **factory** 138:2 |
| **expect** 36:25 | **exploded** 26:16 | 117:23 118:24 | **facts** 29:2 45:4 |
| 37:1,24 39:8 | 217:2,22 | 119:1 122:12 | **fair** 22:1 25:7 |
| 70:2 115:20 | **explore** 18:8 | 125:1,1 128:10 | 39:9 46:2 |
| 150:5,9 166:23 | 164:17 | 130:15,16 | 50:15 51:14 |
| 175:12 196:16 | **exploring** | 137:23 138:2 | 53:20 55:9 |
| **expected** 17:5 | 164:5 | 140:5 141:5 | 70:4 95:2 |
| 36:24 115:10 | **express** 129:21 | 145:25 147:23 | 115:13 116:16 |
| 115:12 193:13 | **expressed** | 148:2 150:24 | 116:25 133:6 |
| 193:14 | 129:25 130:17 | 151:11 153:20 | 139:20 195:3 |
| **experience** 13:7 | 207:7 | 154:1 155:3 | 196:24 220:9 |
| 46:10 121:4 | **expressing** | 161:5 171:6 | 232:12 |
| 150:6,10 | 132:12 | 177:4,8 179:19 | **fairly** 36:8 |
| 230:17 | **extends** 131:20 | 179:23 183:23 | 160:24 |
| **experienced** | **extent** 141:25 | 187:6 188:7,14 | **falls** 36:23 |
| 40:17 220:8 | 147:17 148:1 | 190:2 202:7,16 | **far** 14:24 35:21 |
| **experimenting** | **extra** 182:18 | 202:23 206:18 | 62:8 131:24 |
| 16:3 | **extreme** 124:2 | 207:2,5,6,18 | 135:25 136:11 |
| **expert** 13:5 | 196:6,9,12 | 209:23 224:19 | 137:25 140:6 |
| 43:19 85:12 | | 227:16 231:15 | 140:10 142:5 |
| | | 231:18,19 | 142:17,24 |

G. Bryant Buchner , P.E.                January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[far - fooled]**                                                    Page 22

143:13,13
159:7 169:19
170:18 196:2
214:4,18 219:9
222:20 229:4
**farther** 103:1,6
**fascia** 121:16
**fashion** 46:2
161:23
**fast** 10:21
11:22 63:10
108:24 109:3
**faster** 76:1
**fault** 92:12
**february** 55:25
56:23 58:13
61:4 76:18,22
80:4 82:3
84:10 235:21
**federal** 238:8
**fee** 3:17 50:5,9
50:18
**feel** 27:22 28:6
30:18,24
166:12 211:23
**fees** 50:10,11
50:13
**feet** 97:2 98:11
101:7,7 118:1
129:20 148:10
148:19 170:19
170:19,19
186:22 202:10
202:11 203:4
211:1,2 215:4

219:3 224:10
224:20,22
225:1,9,10,24
226:3,5,18,19
227:12
**field** 28:21
80:10
**figure** 10:9
90:7 102:19
103:19 108:7
**figured** 206:12
**file** 5:13 6:4,23
7:1,2,3,4,21 8:3
9:5 11:13 13:3
51:12 62:21
63:7 66:18
72:22 73:1
101:4 110:13
113:2,6 128:15
128:22 149:8
199:13 200:15
237:12
**filed** 237:14
**files** 9:8 74:24
**filing** 8:14
71:25
**fill** 20:12 21:12
237:7,8
**fillers** 133:18
**final** 109:8
154:8 185:5
192:25 205:21
**financial** 234:6
236:13

**financially**
235:20
**find** 6:12 7:12
8:13 37:14
59:5,12 81:16
101:4 117:9
148:23 179:20
183:2 192:13
225:19 231:2,9
232:2
**fine** 12:9 69:24
72:9 87:9
91:16 113:18
137:8 182:4
**finish** 47:18
63:18 67:23
238:16
**finished** 171:2
223:11
**finite** 163:13
**firm** 47:24,25
48:14,14 81:24
234:1,15 236:1
**first** 5:2 16:22
26:6,14 27:25
28:22 29:5
34:16,17 41:19
51:8,15 57:11
64:10,14 66:6
69:7,10 86:1
100:17 115:9
133:12 137:22
154:2 160:9
168:7 172:15
218:11

**fit** 32:14 140:15
140:18,20
142:8
**fitting** 142:20
**five** 65:4
113:13 199:21
201:3
**fix** 11:21
103:16
**fl** 4:1
**flashing** 122:25
**flat** 17:16 190:8
218:3 221:12
**flattened**
145:11
**flipped** 222:6
**flipping** 192:4
**floating** 88:11
**floats** 94:9
**florida** 1:15
**fluke** 174:25
**flush** 123:6
**focused** 44:18
44:20 197:8
**follow** 15:10
27:1 195:10
201:13
**followed**
126:23 210:20
**following** 26:24
118:7 234:1,3
238:6
**follows** 5:2
**fooled** 59:8,9
59:10

G. Bryant Buchner , P.E.
Bryson, Santana and Joshua v. Rough Country, LLC
January 23, 2024

**[foolish - generating]**

Page 23

**foolish** 93:8
**foot** 85:1,2,4,17
  104:8,8 105:7
  105:18,21
  169:21
**force** 207:9,15
**forces** 122:6
  123:6 150:13
  156:16,20,22
  156:23
**ford** 62:17 77:2
  77:6 79:23
  80:12 96:1,1
  118:24 119:1
  122:12 145:24
  147:12 171:7
  175:2,4 183:13
  189:11,17,22
  189:24 207:3
**foregoing**
  235:6 236:3
**forget** 101:9
**forgot** 88:18
  104:3
**forgotten** 114:1
**form** 27:10
  29:1 46:2 48:2
  134:17 161:4
  161:23 167:13
  168:5 200:6
  203:16 238:10
  238:14
**formal** 51:21
**formally** 75:7

**format** 5:21,21
  5:22,23 7:22
**former** 47:25
**forms** 234:5
**formula** 106:8
**formulas** 152:6
  210:17
**formulating**
  198:9
**forth** 76:15
  121:2
**forums** 14:20
  14:21
**forward** 10:21
  61:24 103:1,6
  129:6 135:21
  140:11 142:5
  146:10,23
  150:4,8 184:23
  185:10 223:7
  237:12
**found** 139:13
  217:12 232:3
**foundation**
  69:23 110:16
**foundational**
  60:22
**four** 37:4 48:8
  48:11
**fourth** 226:2
**frame** 33:8
  36:3,3 78:23
  78:24 79:10,11
  137:25 138:4
  138:20 140:2,3

  157:17 162:13
**fraught** 34:2,2
**fricke** 41:17
**friction** 190:15
**fries** 56:8 58:13
  58:15 61:3
**front** 11:8 58:2
  73:18 74:15
  83:11 84:4
  85:2,5,17
  127:21 128:2
  130:15,16
  131:11 140:21
  143:18 146:9
  156:14,18,21
  158:16 181:23
  182:8,16,17,19
  182:21,22,24
  184:12,20
  187:5 193:25
  194:23 207:2,6
  207:25 214:5
  228:12,16,22
  229:2,10,19
**frontal** 179:24
  179:25
**frontals** 187:18
  187:22
**full** 141:25
  144:25 148:1
**fully** 58:2
  104:24 107:19
  145:8 195:10
**fundamental**
  169:24 212:7

**fundamentally**
  152:19 161:9
**further** 105:4
  170:24 235:16
  236:5

## g

**g** 1:13 3:12,14
  5:1 235:2
  237:2 239:19
**g's** 150:23
  151:6
**gainsville** 1:2
**gate** 217:5
**gears** 67:24
**general** 16:13
  46:10 197:19
**generalization**
  198:3
**generally** 15:23
  15:25 130:16
  188:25
**generate** 26:10
  72:14 213:8
**generated** 7:16
  8:5,7 71:2
  180:8 208:20
  209:16 210:9
  213:9,17
  221:18,24
  230:1
**generates** 7:17
  190:19
**generating**
  176:7

Case 2:22-cv-00017-RWS    Document 119-4    Filed 01/20/25    Page 85 of 129
G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[generic - good]**                                        Page 24

| | | | |
|---|---|---|---|
| **generic** 90:18 | 169:21 174:20 | 79:8 81:2 | 61:18,19,23 |
| 109:15 185:13 | 187:22 188:21 | 84:13 89:5,8 | 62:13,14 75:24 |
| **generically** | 189:17 192:1 | 92:16,23 97:10 | 85:12 87:23 |
| 90:19 | 194:22 197:25 | 99:5,21 100:24 | 92:6 93:7 |
| **geometric** | 198:3,5,21,23 | 101:3 102:5 | 100:16 102:1,3 |
| 85:18 141:2 | 200:4 214:19 | 104:3 107:23 | 102:3,5 103:4 |
| **geometry** 9:8 | 215:21 217:19 | 112:21,21 | 109:1,2,3 |
| 62:14 142:3 | 218:24 232:6 | 118:18 121:19 | 120:23 122:6,8 |
| 155:15 156:25 | **given** 35:5 | 122:2 134:19 | 122:8 124:24 |
| 157:3 215:16 | 37:10 43:15 | 137:8 149:24 | 125:2,18,22 |
| 215:21 | 82:9 86:22 | 157:7 159:6 | 126:6,6,7 |
| **george** 4:8 | 132:23 229:16 | 168:22 177:2,4 | 131:18 132:12 |
| **georgia** 1:1 2:9 | 235:15 238:12 | 182:2 183:7 | 133:3,23 |
| 2:17 198:7 | **gives** 130:22 | 186:12 189:6 | 144:22 148:24 |
| 234:3,9 235:4 | 151:25 155:11 | 195:25 212:2 | 149:1 150:20 |
| 236:3,8 237:18 | 157:13 207:24 | 217:17 219:18 | 156:19,21,23 |
| **getting** 12:8 | 213:11 214:21 | 220:22 221:10 | 156:25 162:16 |
| 44:1 53:14 | 218:12,17 | 223:14 225:14 | 163:11 166:11 |
| 64:22 68:23 | **giving** 13:9 | 225:21 229:2 | 166:16 168:10 |
| 81:24 84:17 | 63:20 156:2 | 230:9 231:2 | 170:23 185:6 |
| 97:23 109:13 | 157:23 | 232:17 | 185:10 186:1,3 |
| 121:21 142:12 | **glad** 93:5 | **goes** 35:7 43:12 | 187:3 190:18 |
| 143:25 147:16 | 208:13 | 47:7 54:20 | 192:7 207:25 |
| 165:25 167:9 | **glean** 21:3 | 78:9 170:3 | 211:5 214:19 |
| 173:12 177:20 | **glitches** 12:10 | 186:13 | 216:6 218:10 |
| 218:23 | **go** 9:19 11:21 | **going** 10:18 | 218:24 219:18 |
| **giant** 122:25 | 13:25 14:21 | 12:5,9,18 15:6 | 219:18,19 |
| **give** 8:17 10:9 | 15:9 16:1,19 | 15:18 16:4,15 | 220:8,11 221:5 |
| 21:18 29:23 | 18:2 24:14 | 27:18 29:6 | 223:12 225:10 |
| 32:20 41:13 | 30:13 35:6 | 32:3,7,15,17 | 227:17 229:17 |
| 46:10 47:25 | 36:5 39:24 | 35:2,10 38:22 | 231:8,10,12 |
| 59:19 73:3 | 41:20 54:21 | 40:14 42:3 | **good** 5:8 21:23 |
| 77:8 85:15,22 | 55:23 63:7,20 | 52:14,15 54:23 | 29:9 35:13,23 |
| 105:3 106:1 | 67:23 75:25 | 55:15 56:13 | 41:20 54:3 |
| 140:2 164:20 | 76:7,10 77:14 | 57:15 60:11,23 | 55:17 113:25 |

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[good - head]**                                             Page 25

122:7 132:3
133:15 168:25
170:7 171:3
173:8 180:24
229:15,15
**google** 53:14
61:21
**gotcha** 25:20
79:5 95:24
98:3 99:1,12
107:11 115:23
123:11 124:16
193:7 206:2
216:5 218:22
223:9 230:14
**gotten** 59:1
189:21
**government**
188:19,21
207:21
**grab** 135:1
**graph** 213:6
**graphical**
214:22
**gravity** 181:3,5
184:22
**gray** 94:2
149:18
**great** 10:15
56:19 60:16
63:23,25 71:13
74:20 93:5
**green** 206:16
**greetings** 237:5

**gross** 96:4
**ground** 86:12
86:13,16 87:3
215:5 226:24
226:25
**group** 48:18
76:17 196:21
**grouped** 48:18
**guess** 9:12 16:3
30:7 37:16
43:8 48:8,11
53:6 56:21
64:4 80:15
98:14 103:22
106:12,25
108:18 112:14
130:4 138:22
139:15 164:15
168:12 185:13
192:25 197:9
202:4 222:13
**guidance** 22:13
156:2
**gunn** 2:14
**guy** 45:4
171:21
**guys** 39:17 61:7
106:18 177:20
182:1 192:25
193:12,24

**h**

**h** 2:12 3:5
165:13
**half** 13:15
55:16,17 86:2

87:2 98:13,17
98:21 105:7,18
105:21 224:7
224:10 225:11
227:15,25
228:4 229:10
**hand** 4:23 21:7
210:21
**handle** 29:17
29:18 34:13
36:12 37:2
47:15
**handled** 236:7
**hands** 162:3
**handwriting**
202:2
**hang** 78:16
**hanging** 36:22
78:17
**happen** 6:10
20:7 33:12
45:19 46:4
91:2 102:15
118:14 119:25
128:22 168:10
172:6
**happened** 18:5
18:19 31:7
38:3,6,20 45:5
48:19 56:17
68:22 96:6,25
115:21 118:16
127:17,18
137:16

**happening**
163:9,10
**happens** 17:2
**happy** 34:5
69:22 81:25
94:11,19
**hard** 7:16 21:5
21:7 44:8
63:14 71:2
73:20 87:17,18
**hatch** 26:21
83:11,11
119:24 121:14
121:22 122:15
127:2,6,10
129:3,5,8,20
131:6 133:17
143:17 144:2,2
144:10,11
146:8,11,19
147:17,22
148:11 216:3
219:23 220:8
220:12,17
**hatches** 147:19
**head** 36:17
44:8 49:1
67:15 70:3
81:6 84:20,21
84:24 85:8
103:4 104:6
145:25 179:8
180:2 196:4
224:4 232:24

G. Bryant Buchner , P.E.

January 23, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[headrest - hooks]**

Page 26

| | | | |
|---|---|---|---|
| **headrest** 85:3 | 219:6 | 43:11 48:4 | 28:1 45:1,7 |
| 85:16 102:17 | **held** 136:4 | 49:24 50:4,21 | 84:24 85:8,8 |
| 102:21 103:4,5 | **help** 47:11 | 50:23 70:9,12 | 92:2 119:24 |
| 147:13 | 60:21 65:9 | 70:18,19 73:11 | 120:7,15 |
| **hear** 8:2 12:6 | 75:4 77:18 | 73:16 75:11,15 | 122:12 125:6 |
| 30:12 49:5 | 124:13 152:14 | 99:18,20 100:4 | 126:7,15 137:2 |
| 141:10,11,14 | 199:2,25 200:1 | 105:11,14 | 137:6 146:19 |
| 156:7 167:6 | 203:10 | 113:12,17 | 161:12,19 |
| 205:9 208:13 | **helped** 122:13 | 114:5 115:24 | 175:6,8,8 |
| 220:4 | **helpful** 20:2,9 | 116:7 117:7 | 178:22 186:12 |
| **heard** 20:20 | 85:7 112:6 | 134:18 141:16 | 192:7,9 193:6 |
| 90:17 177:24 | **helping** 146:13 | 141:17,19 | 215:25 216:16 |
| 178:6 198:2 | 150:18 181:1 | 167:7,8,16 | 218:11 |
| 220:3 | **helps** 54:13 | 168:1 170:10 | **hits** 17:1 |
| **hearing** 144:8 | 167:21 207:11 | 173:11,15,22 | 125:15 |
| **height** 30:22 | **hfe** 35:24 | 173:23 174:14 | **hitting** 120:16 |
| 36:9 95:25 | **high** 33:15 | 174:17 177:19 | **hmm** 30:3 |
| 99:2 100:8 | 36:17 114:13 | 178:8,11 | **ho** 41:5 168:16 |
| 121:5 123:16 | **higher** 125:9 | 197:22 199:20 | **hold** 43:1 74:20 |
| 131:23,24 | 172:4 216:7 | 199:23 200:19 | 82:22 83:5 |
| 132:20 133:5 | 217:4 219:23 | 200:25 201:10 | 121:21 134:16 |
| 157:24 197:11 | 228:22 229:10 | 201:11,24,25 | **holding** 47:1 |
| 197:16,17 | 232:25 | 203:18,22,25 | 126:11 |
| 202:12 215:7,9 | **highlighted** | 208:17 223:14 | **hole** 186:12 |
| 215:10 216:9 | 106:16 128:18 | 223:21 224:1 | **holes** 79:5,14 |
| 216:14,22,25 | 130:8 206:15 | 224:16 233:3 | 146:17,20 |
| 217:3,7,8,20,20 | 208:6,8 209:8 | **hinges** 146:18 | **honestly** 38:15 |
| 218:2,6,15,19 | 209:9 | 147:21,21,22 | **hood** 146:17 |
| 218:19 219:2 | **highly** 232:21 | **historical** | 147:23 |
| 224:18 225:23 | **hill** 2:12 3:3 | 230:10 | **hooks** 121:13 |
| 226:22,25 | 4:11,11,14,18 | **history** 9:3 | 121:15 122:20 |
| 227:10 228:7 | 4:18 5:5,7 8:1 | 50:12 | 123:4,13,16 |
| **heights** 120:25 | 8:4,18 10:17 | **hit** 8:13 17:22 | 124:6,19 |
| 121:8 200:12 | 11:23 12:4,10 | 17:23 19:14,16 | 125:19,21 |
| 218:13,25 | 12:15 30:6 | 23:24 24:5 | 126:2,6,19 |

Case 2:22-cv-00017-RWS    Document 119-4    Filed 01/20/25    Page 88 of 129

G. Bryant Buchner , P.E.

January 23, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

[hooks - import]

Page 27

146:12 217:4

**hope** 54:13
116:9 149:1
209:4

**hopefully** 10:10
10:21 75:25
141:17 173:12

**hoping** 59:24

**hour** 56:2 76:4
111:13,22
115:2 168:18
196:11,24
207:25

**hours** 55:10
64:4,19 65:1

**house** 61:20

**hudgins** 2:13

**huge** 216:11

**hum** 41:5
168:16

**humidity**
171:21,23

**hundred** 184:5
196:11,24

**hunter** 183:12

**hve** 6:4 7:2,3,4
7:21 8:3,6 10:4
13:16,19,22
14:9,15 15:20
16:10 18:4,8
18:10,15,18
19:9,17 20:2,6
20:9,12,13,17
20:22 21:2,18
26:1,6,14,25

27:5,12,15,16
27:19,25 28:15
28:22 29:6,9
29:15,25 30:1
30:10,18,25
31:5,16,23,24
33:11 34:11
35:12,24 37:8
37:23 38:2,5
38:13,17,19
39:1,4,5,19,22
39:24 40:6,14
41:10,21 42:4
42:11 66:24
67:6,8,12,14
70:25 98:20,22
99:2 104:12
114:7,24,24
115:3,12,16
116:21 128:5
153:15 155:4
155:12 163:19
163:22 164:15
164:20,23
165:3,10 166:4
167:12,23
168:19 173:25
174:3 176:2
177:14 179:3
179:19 181:22
181:25 185:8
190:4,7 191:9
191:22,23
192:5,11,14,15
202:22 203:15

204:16 208:20
209:12,15,24
210:3,10 213:7
213:8,24
214:19 215:12
218:5,24
219:22 220:20
221:19,20
230:1,3,7
232:4

**hve's** 15:11
26:24

**hves** 33:19

**hypothetical**
18:8 27:20
28:24 31:3,8
37:7 40:18
41:11 116:15
116:24 120:19
121:9 125:11
153:19 166:6
167:19 172:6
197:15 199:5

---

**i**

---

**icing** 125:22

**idea** 63:24

**identified**
149:10 201:16

**identify** 4:9

**identifying**
5:10

**illustrates**
119:5

**illustrating**
222:13

**image** 59:13

**images** 59:5,12

**imagined** 34:23

**imaging** 106:24

**imbalance**
47:15

**img** 149:6

**immovable**
23:23

**impact** 17:8
30:23 34:9
36:4 90:12,16
90:20 91:7
94:11 110:23
110:24 111:6
111:11 120:19
123:6 134:12
136:8 137:13
155:5,21
158:20 174:10
184:23 231:17

**impacted** 84:19
84:21 120:10
123:17 135:13
144:22 147:22
194:19,23
216:23

**impacting**
144:25

**impacts** 16:20
45:24

**impartiality**
234:13

**import** 61:16

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[important - initial]**                                        Page 28

**important**
92:21,22
126:13 128:19
185:8,9 197:16
200:23 217:8
**impossible**
121:19 124:18
195:7
**imprint** 146:7
146:11 217:10
217:14
**imprinted**
216:12
**imprints**
147:18
**inaudible** 141:4
141:5,9 145:17
203:15
**inch** 57:22,23
58:1,4,9,11
59:3,13,22
86:2,24 87:2
98:13,17,21
99:9 101:10
114:14 217:13
218:20 219:14
219:14 224:8
224:10,11,12
225:11 227:15
227:25 228:4,4
228:7 229:10
**inches** 58:3
86:14,15 87:9
97:1 98:1,17
101:7 102:8

106:3 127:6,8
127:10 128:18
128:25 129:2
129:11,18
137:24 138:9
138:10,12
139:22,25
140:11 146:21
146:22,23
147:1,5 184:22
185:10 198:13
198:20 199:1,8
199:9 202:3,11
217:4,18 218:2
224:7,9 225:6
225:7,9 226:2
226:6,13,14,19
226:20 228:1,5
228:16,17
229:3,7,8,20
**incident** 27:20
41:11 57:13
76:4 82:10
86:4 116:15
**include** 50:17
64:16 114:1
133:12 135:3,7
135:9 195:14
**included** 56:10
88:5 90:3
128:13 133:18
135:8 183:1
184:8
**including**
158:13

**incomplete**
197:15
**incorrect**
133:10
**increase** 184:19
224:17 232:18
**increased**
44:25
**independent**
170:25 186:20
211:18 212:6
212:19
**independently**
23:21 114:22
**indexing**
126:11
**indicate** 51:14
51:18 52:7
71:9 80:3
**indicated** 20:21
21:22 32:9
52:4 53:6
70:23 108:16
216:22
**indicates** 52:3
167:2
**indicating**
92:13 149:21
202:5
**indication**
108:15
**indications**
58:4
**indirectly**
163:2

**individual**
23:25 40:3
53:7 58:25
96:4 175:17
176:6
**individually**
48:6
**individuals**
52:11 53:1
**industry** 95:16
166:21 188:24
**infer** 68:19
**influence**
159:17
**informal** 54:22
**information**
11:4 14:19
19:3 20:3,5
21:3 32:21
33:19 34:4
58:24 59:15
61:20 69:19
72:15 75:8
85:6 94:1
110:21 127:13
127:19 128:8,9
164:21 198:11
198:19
**inherent**
178:18
**initial** 22:19
53:10,15
103:22 174:1,8
175:2

Case 2:22-cv-00017-RWS    Document 119-4    Filed 01/20/25    Page 90 of 129
G. Bryant Buchner , P.E.    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[initially - issue]    Page 29

**initially** 37:12
**injured** 197:12
**injury** 85:13
**input** 15:21
  21:23 22:5,16
  25:6 98:20
  99:3 104:11
  111:21 114:8
  114:11 119:12
  119:13,14,16
  171:11 176:15
  177:5 181:4,5
  182:1,1 185:14
  187:5,14,24
  190:22 191:17
  192:25 193:1,4
  208:20 210:4
  215:19 230:1
**inputs** 16:12
  21:25 22:4,20
  26:12 28:24
  114:3 155:12
**inputted**
  179:21
**inputting** 176:2
  176:5
**insert** 161:7
**inside** 123:22
**inspected** 64:23
  76:17 78:14
  84:9
**inspection** 56:5
  56:7,24 57:2
  58:12,17 59:18
  80:4 89:5

  142:3 194:7
**inspections**
  56:11 64:13
  193:23
**installed** 46:6
  97:17
**instance** 153:20
**institute** 41:18
**intact** 149:13
  149:17 150:7
  150:17
**intake** 47:20
  51:13
**intend** 58:23
  160:19 161:21
  194:22
**intended** 36:17
  226:11
**inter** 175:5
  192:17,18
**interest** 234:7
  234:11
**interested**
  164:4,5 190:10
  190:12,13
  214:8 219:1
  235:20
**interlocking**
  121:21
**internet** 59:2
  184:2
**interpret** 75:4
**interpreted**
  199:15

**interrupt** 67:24
  79:16 87:11
  177:19
**introductory**
  75:24
**intrude** 195:12
**intruding**
  140:14
**intrusion** 44:25
  141:23,25
  144:9,25
  145:18 195:1,8
  195:22 196:16
  200:12
**invaded** 143:23
**invading** 142:7
**invalidate**
  163:16
**investigate**
  15:10 17:14
  89:16 173:5
**investigated**
  45:17
**investigating**
  18:10 21:4
**investigation**
  92:19
**investigator**
  218:14
**invoice** 51:8,9
  55:23 57:16
  60:4,7 61:24
  64:1 66:5,15
  66:17 70:2

**invoiced** 50:25
**invoices** 3:18
  50:25 51:18
  65:23 67:6
  69:25
**invoicing** 68:5
**involve** 44:5,12
  56:16 171:10
  195:2,9
**involved** 11:10
  16:10 19:2
  26:9 32:25
  37:20 45:17
  53:5,8 54:4
  57:13 62:24
  86:4 107:2
  110:3 116:16
  136:2,14
  153:21 167:20
  175:17 176:6
  190:15 195:19
  197:4
**involvement**
  51:15
**involves** 163:10
**involving** 44:6
  167:20 171:6
  195:21
**irrelevant**
  190:17
**issuance** 68:13
**issue** 8:15
  11:22 37:3
  81:16 86:25
  165:21 166:14

G. Bryant Buchner , P.E.

January 23, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[issue - know]**

Page 30

166:17 199:17

**issues** 10:8
13:11 105:13

**it'll** 55:1,1
103:13 148:22
176:12 182:4
220:23

**item** 84:21 88:3

**items** 10:23
82:21 83:6,22
84:9 133:3
135:13 198:6

**iteration** 170:4

**iterative** 15:14
154:24,24

**j**

**james** 56:8

**january** 1:17
4:2,5 55:19,25
235:2

**job** 55:3 60:16
69:24 93:1
133:15

**joke** 12:5

**jonathan** 2:20

**joshua** 1:4
183:15

**judge** 196:20

**judgment**
16:22 192:11
214:17 230:25

**judgments** 40:4

**judith** 1:22
235:24

**july** 69:6

**junior** 14:20
16:6 52:22,22
54:7

**jury** 16:10
126:5 156:6

**k**

**keep** 6:15 15:15
15:16,16 41:12
47:13 124:12
124:13 154:20

**kept** 7:17

**key** 7:8

**keystrokes**
16:24 17:11

**keystroking**
16:7,9

**kind** 16:10 20:6
21:15 30:10
34:13 37:22
43:25 52:4
60:10 70:20
73:5 84:17
93:16 94:2
97:10 98:10
113:14 114:12
120:13 121:23
122:25 146:6
149:18 170:6
178:23 181:21
192:3 194:15
212:16

**kit** 46:6 57:18
57:23 58:17
59:3,3,13,17,22

138:15,21

**kits** 57:19,21
58:22 59:19

**knew** 17:8,8
22:3,3 25:11
25:11,12,12,14
25:21 40:5
58:2 104:2
161:13 169:13
174:25

**knocked** 87:14
88:16

**know** 5:13 7:9
8:16 10:22
11:9 13:7 14:9
14:22 15:7,14
15:17 16:6,15
17:19 18:19
19:20,22 20:6
20:16,24 21:22
25:8,9,15 28:4
29:15 31:7,9
31:14,19 32:1
32:2,6,7,8,20
33:18,23 34:25
35:6,12,14
36:18 38:22
39:20,25 42:1
42:10 44:7
45:3,6,19,24
46:1,11 48:10
48:16,19,21,24
49:5,6 50:11
51:5 52:13
53:9,11,15,17

53:18 54:17,22
54:24 55:2,6
55:16 57:7,22
58:8 59:7
60:18,20 61:20
61:21 64:24
65:5,10 67:10
67:13,16 68:18
68:21 70:2
72:3,16 73:6
75:3,9,10 77:7
78:5 80:19,23
81:10,14 82:4
82:7 83:4,16
83:21 86:8
87:7,8 88:16
89:10,10 90:13
96:6 97:9,17
100:22 101:11
102:6,11
103:24 104:8
104:21 106:2
106:17 107:5
108:18 109:9
109:17 111:3
112:15 114:3
115:20 118:19
120:4,21
121:10,25
122:4,7,11
123:2 124:3,25
125:9,22 126:5
131:19 133:14
133:22 134:5
135:5,6,6,11,22

G. Bryant Buchner , P.E.                           January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[know - lift]**                                                    Page 31

136:9 137:25
138:15,18
140:24 142:2,4
142:4,17 143:6
143:19,21,23
145:10,11,11
146:16 147:13
149:2,24 150:6
151:9,14,23
152:13 155:14
156:5 157:9,16
157:20 158:22
159:16,23,24
160:6,23
162:23 163:14
163:18 164:13
164:24 166:5
166:18 168:10
169:1 170:7,15
170:22 171:24
171:25 172:9
172:11,12,15
173:1,3,3
174:10,19
176:13,13
177:6 178:3
179:4,8 184:14
185:4,19 186:8
186:10,17,17
190:11,17
191:17 193:8
194:7 195:21
196:3,5,6,20,23
196:25,25
198:16 199:6

199:14,15,25
200:9,21
203:18 204:24
210:17,20
211:4,11
212:21 213:2
214:4,12 215:1
217:9,15,17,19
218:10 220:2
221:11 227:1,2
228:20 229:19
229:20 230:3
230:15 232:19
232:20
**knowing**
164:18 180:13
**knowledge**
28:13,14
**known**  152:20
174:9 180:16
189:1
**knows**  24:18
29:25 30:1
109:3 218:8,9
218:10

**l**

**l**  1:22 2:4,5
235:24 237:1
**label**  149:8
**labeled**  73:23
117:10 130:1
201:19
**lack**  97:20
176:7 203:4

**laid**  226:24
**large**  170:22
**largely**  92:5
149:13,17
150:7
**larger**  14:5
86:2 87:3 98:5
138:16
**lasts**  190:11
**lateral**  90:14
103:23
**latest**  170:4
**law**  106:25
234:4
**lawyers**  46:14
46:15 51:19
**lay**  40:25
**laying**  86:16
**lead**  219:14,15
**lean**  105:11
**learn**  15:5,9
32:22 33:22,23
134:6
**leave**  63:12
66:13 74:18
**led**  121:6
**left**  146:17,24
149:20,22
181:12 182:10
186:13 224:8
**legos**  142:8
**leitz**  1:22
235:24
**leon**  2:7

**letting**  92:24
156:1 161:19
161:19 191:25
**level**  100:22
124:9 130:17
131:13,19,21
132:8,11,13,16
132:22,24
133:1,22
140:14 149:12
149:16 156:12
157:5,25 158:1
158:9 190:8
215:13,17,18
215:19,24,25
216:7 217:8
222:13 232:18
**leveling**  228:11
228:14
**levels**  132:24
215:13,22
**license**  183:4
**life**  15:8
**lift**  44:24 46:6
57:17,19,21,23
58:1,4,9,11,17
58:22 59:13,19
59:22 138:15
138:21 139:21
217:5 224:4,6
224:9,12,12
225:4,6 226:7
226:8,11,12,12
226:20 228:7
228:15

G. Bryant Buchner , P.E.                                           January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[lifted - looked]**                                                      Page 32

**lifted**  38:6 44:6
  44:9,12,24
  98:5 117:3,4
  118:17 121:15
  125:16 137:23
  138:1,5 195:2
  195:9,21
  198:13,16
  199:1,7 204:20
**lifting**  228:12
  228:13,16,17
**likely**  54:4
  232:21
**likewise**  210:8
**limit**  47:11 76:4
**limited**  30:11
  44:2 204:20
**line**  86:5 118:8
  118:9,14,15
  146:13 158:5
  197:9 213:19
  213:23 214:10
  214:16 215:4
  215:24 216:6,7
  216:10 220:24
  221:13 238:19
  239:1
**lines**  103:25
  118:7 206:17
  211:17
**link**  174:4
**list**  3:14 43:7
  43:21 44:3,4
  46:9,22,24
  47:24 50:2

  52:24
**listed**  43:24
  56:5 91:10
  117:9 207:22
**listen**  178:4
**listing**  77:1
  150:23
**literally**  140:22
  140:23 146:19
  195:25
**literature**
  168:23
**little**  17:11,24
  22:10,12 24:15
  24:16 43:4
  55:16 77:10
  88:15 105:4
  109:2 113:10
  134:21 141:11
  145:15 146:7
  146:22 147:1
  152:4 154:3
  156:2 168:9
  175:8 182:14
  182:17,21
  194:1 221:14
  225:25 226:8
  226:12 228:18
  229:3,20
  230:25
**llc**  1:9 2:6,14
**llc's**  3:9
**loaded**  56:22
  188:10

**local**  81:5
**locate**  6:23 7:20
  143:5,7
**located**  83:23
  142:4 160:7
**location**  16:18
  83:22 84:8
  140:13 144:2,3
  144:10 145:1
  157:16 158:20
  181:19 185:7,9
**locations**  84:7
**lock**  7:8 126:8
**logical**  85:9
**logo**  147:12
**long**  15:15
  64:21 80:21
  81:24 163:6
  166:10 181:6
**longer**  34:11
  36:20 103:12
**longitudinal**
  90:13,13
  103:25
**look**  13:3 17:2
  19:1,2,13
  22:25 31:10
  32:6,7 33:3
  35:19 40:2
  43:4 45:11
  51:6 53:7
  56:12,12 57:24
  62:14 64:25
  66:4 69:18
  72:16 76:7

  77:1,14 78:7
  78:20 79:9,13
  81:2 84:13
  89:5,19,20,21
  92:16 93:8
  97:4 99:17
  104:4 105:2
  107:23 113:9
  113:13 121:12
  131:16 138:9
  139:16,21
  142:22 144:16
  144:18,18
  147:10,11
  148:5 157:4
  159:15 163:22
  164:19 166:17
  168:22 170:1
  179:8 182:2,13
  183:7 186:20
  194:17 196:21
  197:20 214:23
  216:11,16
  218:15 221:4
  227:5 228:24
  231:2
**looked**  7:5,12
  20:8 39:16
  56:9 58:4 65:6
  78:10 83:20
  112:7 153:5
  170:23 179:20
  181:17 199:17
  221:1

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[looking - marked]**                                    Page 33

**looking** 6:16
21:25 29:16
31:20 54:9
60:23 63:1
65:6 67:20
71:18 86:5
92:8 95:13,18
95:22 99:8
101:13 102:11
105:1 109:14
113:8 114:25
114:25 122:23
129:1 133:1
137:9 139:11
158:4 160:19
160:22 163:3
186:8,14
189:21 192:16
194:12,20
196:21 197:1
207:15 211:19
212:17 222:19
**looks** 65:7
102:7 156:13
179:10 182:7
182:14 222:8
**lost** 34:19
99:18
**lot** 15:11 16:14
17:4,17 26:1
32:3 34:19
37:10 45:10
46:6 48:17
53:11 55:1
75:25 89:20

138:3 169:23
186:11 217:24
**lots** 211:11
**love** 156:6
**low** 227:25
**lower** 227:15
231:16
**lowest** 231:9
**luggage** 82:17
82:18
**lynn** 41:17

**m**

**macro** 144:16
**madam** 141:13
**made** 36:11,12
37:17 61:15
136:21 146:20
217:13 221:11
223:25 224:5
226:19 234:3
234:21
**magnitude**
91:18
**mail** 237:10
**main** 122:17
**maintain** 7:6
46:19
**maintaining**
234:13
**majority** 16:7
43:22,23
**make** 12:7 16:2
17:10 22:14
27:4 28:23
31:6,23,24

32:14 40:3,7,8
48:5 50:6 51:2
59:7 60:19,25
63:8,12 69:18
75:25 76:12,14
85:22,24 86:18
91:5 93:8
94:16 95:18,20
95:21,25 98:7
99:13 100:19
101:21 106:13
108:5 110:7
115:12 116:12
122:18 123:11
134:9 146:3
151:7 159:8,10
178:4 182:4
186:2 194:9
199:21 201:1
203:18,24
205:24 206:4
223:10 224:7
229:22 234:10
238:10
**makes** 54:14
76:13 91:1
132:17 219:15
**making** 17:6
33:12 60:17
64:7 90:20
113:1 159:19
234:12 238:13
238:13
**manage** 47:7,9

**management**
52:21
**manager** 52:19
52:23
**managers**
52:25
**managing**
133:16
**manipulate**
115:11 161:25
**manipulates**
174:5
**manipulating**
25:4
**mansell** 237:18
**manual** 101:1
**manually** 237:8
**manufacture**
62:5,8
**manufactured**
62:23 79:18
80:18
**manufacturer**
80:21 81:17
96:18 97:8
228:19
**mark** 12:18
43:7 73:12
75:11
**marked** 10:16
12:14 43:10
50:3,22 73:15
75:14 106:20
117:6 149:5
223:11

G. Bryant Buchner , P.E.                         January 23, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[marks - measurement]**                              Page 34

| | | | |
|---|---|---|---|
| **marks** 146:20 | 117:10 139:12 | 53:5 56:6 57:5 | **meant** 24:25 |
| 146:24 | 183:1 200:15 | 57:8 59:11 | 76:21 198:22 |
| **married** 122:9 | **math** 106:12 | 61:11 63:20 | 202:11 |
| **marries** 146:10 | 210:17 224:2 | 67:23 68:19 | **measure** 27:8 |
| **mashman** 2:5 | 224:13,23 | 78:1 83:9 | 80:7 86:16 |
| 4:13,17 | 228:24 | 88:12 95:9,14 | 100:24 101:14 |
| **mass** 185:19,20 | **mathematical** | 96:13 103:17 | 104:5,14 |
| 185:21,22,22 | 22:10 116:13 | 108:21 117:5 | 129:11 131:12 |
| 185:25 186:4,4 | 126:24 | 122:24 124:21 | 132:5,8,11 |
| 186:9 | **mathematically** | 125:9 126:10 | 133:21 135:20 |
| **match** 19:19,20 | 119:6 | 126:14 127:9 | 136:10 139:25 |
| 22:5,17 23:9 | **mathematics** | 134:13,25 | 144:24 163:7 |
| 25:18 94:24 | 206:8 | 136:15,17 | 190:21 214:3 |
| 106:15,18,18 | **matter** 43:5 | 137:12 140:25 | 216:15,19 |
| 113:23 143:18 | 52:12 76:23 | 141:7 142:9 | 219:17 229:4 |
| 144:17 154:25 | 91:12 114:14 | 151:6 154:13 | **measured** |
| 155:1,3,7 | 114:16 144:14 | 160:3 163:21 | 25:23 80:3 |
| 174:9 176:18 | 185:23 186:16 | 166:12 167:15 | 82:9 101:15 |
| 180:16 191:17 | 186:16,17 | 168:20,23 | 103:5,24 |
| 192:12 193:18 | 234:11,17 | 171:8 172:9 | 105:23 110:10 |
| 204:3 205:25 | **matters** 171:23 | 177:9 184:25 | 110:11 115:14 |
| 206:4 209:11 | **max** 155:10 | 185:3 188:16 | 129:19 134:7 |
| **matched** 62:15 | **maximum** | 195:25 203:3 | 138:5 152:15 |
| 147:4 154:1 | 103:20 105:22 | 204:7 210:22 | 176:19,19 |
| 216:13 | 118:3 140:14 | 214:22 216:17 | 191:13 217:6 |
| **matches** 169:18 | 141:22 145:18 | 216:18 230:18 | 226:25 227:4 |
| **matching** 22:21 | 150:23,24 | **meaning** 28:3 | 227:10 |
| 23:5 141:2 | 219:4 | 118:2 131:20 | **measurement** |
| **material** 5:13 | **mean** 7:11 | 146:18 168:2 | 85:15 86:18 |
| 76:25 99:10 | 14:23 15:2 | 187:23 | 88:5,10 90:3 |
| 166:3 167:1 | 17:21 21:8 | **meanings** 94:4 | 104:10 106:1 |
| 198:6 | 23:17 31:12 | **means** 11:14 | 110:15 121:8 |
| **materials** 54:8 | 35:8,19 38:25 | 21:17 117:20 | 142:13,20 |
| 71:21 75:4,6 | 43:2 44:14,16 | 133:14 161:14 | 148:20 220:20 |
| 82:13 107:8,9 | 47:9 49:10,12 | 199:6 | |

Case 2:22-cv-00017-RWS    Document 119-4    Filed 01/20/25    Page 96 of 129
G. Bryant Buchner , P.E.    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[measurements - model]**    Page 35

**measurements**
60:14,19,25
80:12 100:6,10
100:13,19
102:4,7 106:8
118:10 121:1
131:21 138:25
157:24 168:11
**measures** 26:4
101:14 214:6
227:9
**measuring**
101:16,23
102:1 114:13
129:7,7 142:24
143:3 144:1
152:23 156:11
229:6
**mechanical**
121:20
**mechanics** 21:9
**mechanism**
99:1 162:18
**mechanisms**
85:13
**medical** 182:25
183:5,15,18,22
**meeting** 51:22
54:23
**melanie** 65:18
65:20
**memorialize**
104:17
**memorialized**
104:25

**memory** 14:2
64:19 67:17
104:10 182:9
197:7
**mention** 49:25
88:18 90:5
**mentioned**
70:25 75:12
86:12 109:10
115:7 117:15
141:20 170:13
204:6 206:5
215:3
**mentioning**
73:21
**mentions** 169:1
**messages** 9:11
**messy** 73:5
**met** 5:7
**metal** 24:15
26:20 79:2,3
163:10 223:4
**method** 114:17
114:18 117:24
118:6,9,11
119:6 151:20
166:5 168:3
**methodologies**
114:11 132:14
152:22 170:18
170:25
**methodology**
118:16,22
119:1 134:1
163:15 167:3

171:4 211:23
212:22
**methods**
102:13 114:15
114:20 151:21
151:22,25
152:3 211:19
212:4,6,8
227:3
**miami** 14:3,3,4
14:6
**middle** 184:12
208:1
**mile** 196:11,24
**miles** 76:4
111:13,22
115:2 168:18
207:25
**miller** 2:20
**millionth** 176:1
**mind** 15:18
44:19 48:18
185:5 188:25
200:8 201:20
**mine** 38:12
73:2 92:17
162:3
**minor** 1:6 78:4
108:5 170:16
181:6
**minus** 80:25
81:1 226:4
**minute** 7:2
105:3 111:21
112:5 113:13

183:2 199:21
201:1
**minutes** 38:22
66:1 201:3
**mis** 224:14
**misexpressed**
224:15
**misfiring** 37:11
**misrepresent**
91:19
**missed** 108:19
199:22 226:16
**missing** 20:3,5
69:19 104:21
128:14 200:5,8
**misspoke**
111:21 112:4
**mistake** 223:25
224:5,24
226:20
**mistaken**
226:15
**misunderstan...**
30:3 131:25
**misunderstood**
139:14
**mix** 114:20
**mixing** 136:9
**mockup** 62:14
**mode** 185:20
185:20,21,22
186:3
**model** 27:1,17
27:22 31:2
42:4,15 62:18

G. Bryant Buchner , P.E.                                January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[model - normal]**                                                    Page 36

95:21 96:22,22
99:4,12 113:25
120:6,7 151:8
157:5 163:13
184:21 185:8
209:18 225:2
**modeled**
103:20
**modeling** 41:22
**models** 97:22
110:5 221:25
**modify** 16:17
158:19 175:13
**module** 92:13
174:7
**modules** 16:14
**moment** 56:18
70:12
**momentum**
35:19 109:24
110:9,19
113:25 119:20
119:22 164:11
204:1 205:6,10
**monte** 151:18
151:24
**month** 47:17,18
53:22
**moran** 1:22
235:24
**morning** 104:2
**mosaics** 60:17
**motor** 195:24
**move** 7:9 19:15
37:15 145:16

146:23 147:5,7
147:10
**moved** 103:1,6
114:13 140:4
143:6,13,17,24
184:13,22
223:7
**movement**
102:17,21
144:6
**moving** 60:4
61:24 185:10
**muffler** 149:25
**multi** 212:19
**multiple** 45:23
57:18 167:17
212:16
**multiply** 98:16
226:5
**mushy** 92:7

**n**

**n** 3:1
**n.e.** 2:15
**nail** 35:6
145:22
**nails** 35:8
**name** 5:6 49:6
49:14 52:8
58:14 65:17
**names** 49:17
**nature** 69:1
**near** 33:23 58:9
138:12 151:6
151:13 182:7,8

**nearly** 148:18
**necessarily**
72:22 96:20
97:12 214:9
**necessary**
238:15
**necessity** 46:5
**need** 8:8,8,20
14:18 15:24
19:9,25 20:6
20:12,13 21:24
27:8,9 28:11
28:18 35:15,22
38:2,2,4,13,17
42:14,23 63:16
111:4 113:1,14
122:18 129:10
129:20 141:15
178:8 189:8
204:23
**needed** 15:19
16:12 26:2,3
38:19 69:19,21
72:15,23 81:18
130:12 153:25
184:4
**needing** 17:21
**needs** 63:6
176:10 177:5
**negative** 91:10
91:11,15
**negatives** 91:13
**neither** 195:21
**nep** 188:19

**nearly** 148:18
**neptune** 23:1
130:2 131:16
177:2,12
179:22 180:1
187:6 188:4,14
188:20,23
189:1,8 190:1
190:2 207:20
**nervous** 10:12
**never** 9:22
33:23 38:9,14
49:17 115:16
115:20 134:15
164:22 225:13
**new** 48:14
51:12 125:3,4
150:16 179:13
**nhtsa** 188:16
188:20 189:19
189:23 190:3
**nodding** 180:2
**non** 224:18
**nondeployme...**
107:20,24
108:1
**nonlift** 195:20
**nonlifted**
116:24 195:11
195:13 202:22
**normal** 36:7,8
37:18 124:3
136:1,3,13,15
136:17 137:1,5
137:6,12,16
160:24 161:21

Case 2:22-cv-00017-RWS    Document 119-4    Filed 01/20/25    Page 98 of 129
G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[normal - oh]**                                                        Page 37

168:15
**normally** 26:2
45:13 51:17,23
55:15 93:21
94:10,13
123:22 129:24
158:3 161:14
163:22 164:3
172:24
**northern** 1:1
**northwestern**
41:17 152:7
168:24,24
**notaries** 236:4
236:8
**notarized**
236:8 237:10
**notary** 239:24
**note** 12:20 76:3
92:8
**noted** 213:17
238:5,6
**nothing's**
219:19
**notice** 3:9
10:19 11:7
52:7
**noticed** 74:11
**noticing** 234:16
**notification**
77:4
**noting** 237:7
**number** 46:14
47:11 55:17
66:5,19 95:10

95:17,19,20
104:19,20,25
105:3 119:15
129:15,16
148:14 149:9
149:10 151:16
154:15 176:22
190:1 191:15
191:21 192:1
196:13,18,24
209:6 227:11
**numbers** 25:18
151:8 152:22
182:6,13
208:22 209:9
209:11,15
210:9,10,13
211:4 213:11
213:12,13,14
217:19 226:22
**nut** 32:2,6,15

**o**

**o** 65:18
**object** 29:1
48:2 134:16
167:13 168:5
197:14 200:6
203:16
**objection** 10:24
200:22
**objections**
10:23
**objective** 60:12
**objects** 45:22
184:2

**obligation**
234:13
**observation**
58:8 122:18
135:21 159:18
**observations**
77:21,22 80:2
**observe** 137:4
161:16 162:9
162:11
**observed**
141:21 193:2
195:22
**obtaining**
58:22
**obvious** 123:3
**obviously** 7:7
21:23 27:18
44:22 68:9
118:8 144:21
149:9 162:23
170:11 171:9
211:21
**occupant**
110:12 135:24
136:5,24
187:24 195:1,8
195:12,14,22
196:17
**occupant's**
142:7
**occupants**
82:14 135:23
182:3,7,19,24
185:25

**occupying**
223:1
**occurred** 20:23
51:13 69:1
94:25 105:8
**occurring**
57:20
**ocga** 234:6,7,18
236:11 238:9
**october** 3:16
60:8 61:7
68:12 73:20
74:1
**oem** 97:20
224:18
**offering** 230:11
**office** 41:20
51:22 52:2
54:21 56:8
57:12 69:11
134:8
**officer's** 69:22
**officers** 60:16
61:15 69:15
76:8 107:9
**offices** 237:3,10
**offset** 103:23
104:11
**oh** 4:16 13:22
29:25 31:13
70:7 108:3
151:1 158:22
177:16 194:4
194:20 225:12

Case 2:22-cv-00017-RWS    Document 119-4    Filed 01/20/25    Page 99 of 129
G. Bryant Buchner , P.E.                January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[okay - overlaps]**                                               Page 38

| | | | |
|---|---|---|---|
| **okay** 5:20 6:20 | 165:7 168:5,7 | **opining** 84:24 | **orientations** |
| 7:24 10:3,6,13 | 173:14 175:22 | **opinion** 34:25 | 16:23 |
| 10:15 11:19 | 176:21 178:1 | 82:11 91:25 | **original** 6:12 |
| 12:18 13:13 | 178:16 179:3 | 118:15 123:13 | 6:22 7:4,21 8:3 |
| 15:20 16:9 | 179:17,21,25 | 124:17 126:1 | 9:4 48:17 |
| 18:7 19:11 | 180:7,12,15 | 134:14 161:4 | 86:12 122:9 |
| 21:16 22:23 | 181:14 184:7 | 172:3 184:24 | 142:2 152:6 |
| 27:25 31:13 | 185:18 187:13 | 198:15,21 | 182:10 229:11 |
| 37:22 39:15 | 187:15 188:9 | 210:10 211:9 | 237:12,14 |
| 42:21 47:5 | 189:14 194:21 | **opinions** 13:10 | **originally** 7:15 |
| 49:22 53:4 | 195:6 199:14 | 59:19 76:12 | 9:14 203:2 |
| 57:10,15 59:16 | 199:19 201:24 | 168:4 189:18 | **outcome** |
| 59:24 61:24 | 202:14 203:8 | 194:22 198:9 | 197:18 |
| 63:11,18,25 | 205:10 206:7 | 198:23 200:24 | **outline** 60:14 |
| 68:3 69:4 | 206:12 208:14 | **opportunity** | **output** 22:6,16 |
| 71:16 74:14,20 | 209:11 210:3 | 63:21 | 25:6 154:1 |
| 75:16 76:2 | 210:12 211:9 | **opposed** 158:4 | 179:7 191:18 |
| 77:12 81:7 | 213:22 216:25 | **options** 169:2 | 193:2,5,13 |
| 83:4 90:6 93:5 | 220:19 223:12 | **orange** 171:15 | 206:4,5 |
| 95:17 97:24 | 224:1,2 225:20 | 171:16 | **outputs** 17:3,4 |
| 99:7 100:5,16 | 225:22 227:23 | **oranges** 33:4 | 22:4,21 23:5 |
| 102:7 104:14 | 229:14 230:3 | 136:10 | 25:5 26:12 |
| 106:11,23 | **once** 16:25,25 | **order** 16:12 | **outside** 34:24 |
| 108:4 111:14 | 23:4 65:16 | 31:6 32:11 | 35:15 36:6,23 |
| 117:2 118:25 | 101:17 108:11 | 36:1 47:12 | 38:23 130:3 |
| 119:8 121:10 | 121:18 147:7,7 | 59:7,17 197:25 | 136:7 158:25 |
| 127:12 128:24 | 185:14 237:9 | 205:21 | 160:23 |
| 132:19 133:8 | **one's** 81:14 | **ordered** 60:1,1 | **overall** 91:18 |
| 134:8 139:8 | 102:14 152:5 | 96:9 | 127:24 157:4 |
| 143:2,25 | **ones** 81:5 | **ordering** | 186:16 203:13 |
| 144:14,21 | 108:10 110:9 | 234:24 237:13 | **overlap** 211:20 |
| 146:5 147:15 | 195:24 208:20 | **organization** | 211:22 |
| 148:4,16 149:2 | **open** 8:12 | 41:25 | **overlaps** |
| 153:14 155:9 | 24:15 93:1 | **orientation** | 212:17 |
| 156:9 162:2,18 | 202:1 | 24:6 | |

G. Bryant Buchner , P.E.    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[overlay - penetrated]**    Page 39

**overlay** 141:20
141:23,25
144:6 145:24
146:3 222:12
**overlays**
221:24
**overreport**
231:10
**overridden**
124:19
**override** 34:9
45:10,17,19,23
46:1,6 120:19
121:7 122:22
125:2,10,18
126:3,12,19
136:16 160:8
160:10,10,17
160:19,20,21
161:1,3,5,10,13
168:8 196:16
**overriding**
124:7
**overvalue**
114:21
**own** 41:14 81:7
81:8 158:7
180:8 214:17
215:12

**p**

**p** 65:18
**p.e.** 1:13 3:12
5:1
**p.m.** 233:10,12

**page** 3:2,7
12:22 13:13,14
55:19 66:7
75:20 76:3,14
76:16,16 77:20
80:2 85:21,22
85:24 86:6
94:17,21 95:4
99:17 100:5
102:16 103:19
105:5,5,15
108:4 113:10
116:9 117:15
118:19 126:22
128:8,14,23
129:19 137:20
137:21 148:9
148:16 149:11
150:22 153:1,2
192:17,18
202:1 203:8
205:14,20
208:9,18 209:4
213:5 238:19
239:1
**pages** 94:20
118:23 192:4
206:13 208:25
238:15
**paper** 5:21,22
7:6 24:14
130:21 208:23
208:24 209:3,6
**papers** 131:17
167:23 230:10

230:13 231:5
**paragraph**
105:4,15
108:15 153:4
**parameters**
17:12 39:3
211:7
**pardon** 113:4
133:9,9
**parents** 1:5
**part** 14:5 18:25
24:17 40:13
49:9 55:3 67:8
74:25 85:18
88:10 95:5
113:2 119:12
119:13 121:4
128:22 129:13
130:8 131:14
131:22 132:4
132:16 133:13
135:10,16
136:5,6,6
152:23 163:1
165:15 171:13
173:2 185:25
194:6 205:23
206:9 218:14
230:7 231:3
**particular** 13:7
16:5 84:13
95:15 122:23
155:23 156:13
158:20 159:12
174:7,22

176:20 181:8
182:3,12 197:8
**particularly**
41:3
**parties** 234:18
234:24 235:18
236:12,14
237:13
**parts** 21:6 38:1
106:2 146:2
148:5 162:20
**party** 234:14
234:19 236:13
**passenger**
195:8 196:2
199:12
**password**
234:23,24
**past** 5:8 18:7
44:23 172:17
219:19
**patience** 75:24
**pay** 48:16
230:22
**pc** 163:24
164:6,10
**pdf** 237:7,7
**pe** 235:2 237:2
239:19
**peachtree** 2:15
**peer** 166:2
167:10
**penetrated**
122:1 140:7
148:10 222:20

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[people - point]                                              Page 40

| | | | |
|---|---|---|---|
| **people** 53:8 | 55:21,24 | **physical** 19:8 | 141:4 145:18 |
| 67:18 90:19 | **periodically** | 19:13,19 33:25 | 234:17 |
| 182:16 183:3 | 81:19 | 56:24 84:21 | **placed** 141:21 |
| 183:18 185:16 | **person** 14:1 | 145:19,22 | **plaintiff** 46:14 |
| 190:5 211:24 | 52:8,20,22 | 172:23 213:19 | 46:18,25 |
| **percent** 46:23 | 64:8,11,13 | **physically** 19:1 | **plaintiff's** 5:17 |
| 46:25 127:21 | 65:21 136:24 | 57:12 101:14 | **plaintiffs** 1:7 |
| 127:21 128:1,2 | 197:12 | 101:15,23 | 2:3 4:13,17 |
| 181:23,24 | **person's** 65:12 | 102:1 | 5:14 6:6 11:14 |
| 182:18 184:20 | **personally** | **physics** 15:10 | **plan** 198:22 |
| 186:19 211:12 | 14:25 69:18 | 29:25,25 | 200:4 |
| 211:12 212:25 | **perspective** | 152:13,19 | **plane** 190:8 |
| 213:3 | 155:17 193:9 | **pick** 134:25 | **plasticity** |
| **percentage** | **phase** 9:22 | 215:18 | 178:21 |
| 46:12 47:2 | 123:8 190:11 | **picks** 215:20 | **platform** 28:7 |
| **percentages** | **phone** 51:24 | **pickup** 19:24 | **play** 126:19 |
| 128:21 | **photo** 60:17 | 89:2 130:10 | 181:3 186:23 |
| **perfect** 87:7 | 84:13 89:22 | **picture** 59:8,9 | **played** 123:14 |
| 94:15 162:4 | 194:8,17 | 59:11 221:18 | **plays** 181:6 |
| 172:1,11 182:9 | **photograph** | **pictures** 59:2 | **please** 4:9,21 |
| **perfectly** 19:20 | 84:8 149:5,10 | **piece** 154:14 | 4:22 89:22 |
| 24:12 62:15 | 149:15 | 198:10,18 | 93:15 150:25 |
| 151:9 169:9 | **photographed** | 199:18 | 223:13 237:6 |
| **perform** 34:23 | 80:11 | **piecemeal** | 237:10,17 |
| 36:15 138:25 | **photographing** | 36:21 | 238:14,16 |
| 145:24 150:18 | 60:17 | **pieces** 36:22 | **plot** 213:12 |
| 151:17 165:24 | **photographs** | 142:20 | 219:19 220:22 |
| **performed** | 61:12 69:22 | **pillars** 33:6,7,7 | **plotted** 213:16 |
| 56:23 67:16 | 149:7 | **placard** 202:6 | **plural** 153:17 |
| 76:17 189:11 | **photos** 78:10 | 225:2 | **plus** 80:25 81:1 |
| 189:17 | 79:13 84:12 | **placarded** | 146:25 205:4 |
| **performing** | 89:5 217:7 | 202:5,16 | **point** 6:16 |
| 34:22 191:19 | 227:6 | **place** 62:16 | 13:16 53:18 |
| **period** 38:20 | **phrased** 30:8 | 76:8,9,25 | 56:1 57:25 |
| 44:4 45:16 | | 101:8 114:8 | 73:7 77:22 |

Case 2:22-cv-00017-RWS    Document 119-4    Filed 01/20/25    Page 102 of 129
G. Bryant Buchner , P.E.
January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[point - problem]                                                    Page 41

80:2 98:11
119:23,23
122:17 126:24
137:22 138:8
140:6 144:24
148:17,20
149:15 153:1,4
153:12 159:12
173:9 189:6
191:23 194:16
200:1,22
219:12 220:12
220:13 228:3
231:6
**point's** 88:22
**pointed** 168:23
**pointing** 74:11
87:19 88:17
122:24 192:19
**points** 106:12
106:16,18,19
106:21 108:5
226:16
**poked** 123:24
146:20
**poking** 123:24
**police** 61:13
**ponce** 2:7
**poor** 63:17
218:3
**poorly** 30:8
224:13
**pops** 175:11,14
175:20

**porter** 65:18
66:2
**position** 16:21
83:6 141:22
148:11
**positioned** 84:1
**positive** 91:11
**positives** 91:13
**possibility**
125:17
**possible** 125:7
171:8 197:2
**possibly** 8:8
58:20 232:13
**post** 82:10
105:6,16
110:24 111:11
**posted** 76:3
**potential**
211:10 212:12
**potentially**
54:16 97:2
111:3
**pounds** 80:4
88:23 184:5
**practical**
219:20 229:18
**practically**
68:21 229:1
**practice** 6:7
**pre** 110:23
111:6 117:3,4
**precise** 186:19
**precisely** 23:5
24:19

**predict** 40:20
161:1 162:4
**predicting**
172:6
**predicts** 118:6
**prefer** 164:12
188:23
**preliminary**
56:11 71:11
**premier** 41:25
**preparation**
11:1
**prepare** 44:14
**preparing**
68:14 72:22
**present** 2:19
57:12
**presented**
108:9 197:24
200:14 234:1
**pretty** 15:4
21:10 45:4
98:15 154:13
170:7 175:15
191:14 230:6
**prevent** 121:21
**prevented**
123:25 124:7
**preventing**
26:5
**previous** 86:11
88:18
**previously** 5:17
**primarily**
146:8

**primary**
164:16
**primer** 41:20
**print** 8:13 9:13
71:1,19 72:25
127:18 237:8
**printed** 6:8
7:16 8:7 9:22
71:5,22,24
72:6,17,23,24
73:2
**printing** 72:11
72:18 73:7
**printout**
107:10
**printouts** 10:4
**prior** 5:15
65:21 82:2
139:18 154:10
154:21 163:19
**probably** 24:7
45:2 47:2
51:24 53:11
56:22 64:20
73:19 79:20
92:2 109:9
115:1 121:10
138:6,12
158:24 160:15
184:11 189:6
190:16 212:5
231:12
**problem** 8:11
8:17 76:24
82:6 90:9 97:6

G. Bryant Buchner , P.E.
January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[problem - pure]**

Page 42

103:16 107:19
142:8 165:16
166:22 172:2
197:8 214:13
**problems**
165:17,18
**procedure**
238:9
**proceeding**
234:1,19,23
236:9
**proceedings**
234:11
**proceeds**  56:14
**process**  15:15
26:24 58:6,7
60:24 154:24
154:24 189:3,4
**processing**  60:6
61:3
**produce**  154:1
155:24 210:14
223:7 231:21
**produced**  5:17
9:3 10:3 11:14
13:5 234:20
236:3,7
**producing**
11:17
**product**  23:20
**production**
236:3,8,9,10
237:17
**professional**
234:13 235:24

**profiles**  106:1,1
**program**  10:2
15:4 19:25
22:5,7 23:4
25:5,10 28:5
29:9 30:18
32:17 34:25
36:11 37:1,24
39:8 131:1
155:23 156:1,3
158:25 159:9
159:14,24
160:6,23
163:25 166:19
168:25 169:22
171:12 175:11
175:20 180:5,7
181:19 182:15
186:1 187:1,6
187:9,13,15
188:5 190:19
204:16 210:3
230:8,19,21,23
231:25 232:1
**program's**
161:9 169:10
**programs**  15:8
42:9 130:25
159:17 163:17
165:14,21
**progresses**
207:12
**prohibited**
234:17 236:11

**prohibitions**
234:8
**project**  47:21
48:21 49:4,6
52:10,14,18,21
52:23,25,25
65:14,15
**projects**  46:18
47:17 48:19
49:15
**pronounce**
58:13 89:11
**pronounced**
93:6
**pronunciation**
58:15 93:8
**proper**  30:10
32:23 79:7
84:7 154:4
155:12 174:20
176:15,16
228:20
**properly**  6:9
22:12 31:2,7
32:11,24
**property**  23:18
23:19
**protected**
234:23,24
**protecting**
136:4
**protocol**
131:22 132:25
133:21,24

**protocols**
132:16
**protrudes**
127:9
**provide**  15:21
20:18 63:5
85:13 190:22
220:20 234:16
**provided**  5:13
5:14 6:5
189:11 198:7
203:2 219:24
**providing**
85:12
**public**  239:24
**publication**
169:3
**published**
12:24 86:21
**pull**  95:11
117:8 137:18
162:20 210:21
221:4
**pulled**  162:24
**pulling**  53:13
**pulls**  185:13
**pulse**  169:18
**purchase**  179:6
**purchased**
57:19 62:2,22
62:22
**purchasing**
97:9
**pure**  102:4
123:16 142:19

G. Bryant Buchner , P.E.
Bryson, Santana and Joshua v. Rough Country, LLC
January 23, 2024

**[purely - ranges]**

Page 43

purely 121:8
purpose 58:21
69:13 72:18
94:12 169:25
194:3
purposeful
211:6
purposes 28:13
pursuant 238:8
push 122:13
216:3
pushed 85:1,4
135:21 140:11
142:25 150:2,8
216:1,3
pushing 123:6
put 7:7 16:24
21:23 25:7
41:8 54:15
64:1 65:25
67:2 68:7 73:1
74:22 82:7
83:17 84:4,18
88:2 98:23
101:17 102:5
106:18,21
112:23 114:23
138:19 145:24
154:2 155:18
155:21 181:11
181:15,15,20
182:3,5,15
183:19 186:1,3
191:15 192:25
196:18 201:14

203:10 205:10
206:3 211:4
212:11 226:10
229:6
putt 169:22
186:12
putting 35:1
81:13

**q**

qualification
124:22
quarter 86:24
87:9 101:10
114:14 190:11
ques 199:5
question 8:2
18:13,21 19:12
20:20 27:7,11
29:2,24 30:8
31:18 34:16
46:11 48:3,3,6
49:18 50:8
67:25 70:20
88:21 92:18
97:25 101:21
103:22 104:2
108:18 111:17
112:8 113:3
125:5 134:17
139:10 141:11
141:13,24
144:13 145:12
167:14 168:6
177:24 178:5
181:22 195:10

195:17 197:14
198:1,12 199:7
199:24 200:1,7
200:20,21
203:17 205:9
206:23 208:12
220:1
questions 12:6
12:6 26:13
29:4 38:12,24
44:1 51:4
59:25 109:25
138:3 173:24
201:13 233:5
234:20 235:11
236:4
quick 21:18
67:21 89:22
106:23 113:13
115:25 187:3
200:25 207:4
quicker 103:13
quickly 12:13
44:17 57:15
104:5
quite 22:8
26:14 58:20
66:19 114:24
176:10 217:2
228:3
quote 117:22

**r**

r 56:9 65:18,18
235:1

radius 86:2,20
87:3
radiuses 87:7
rail 138:4
157:17
rails 26:19 33:9
34:19 78:23,24
79:10,11,12
137:25 150:2
157:20 162:14
raise 4:23
228:7
raised 202:2
ran 23:22
27:17,19 35:25
39:5 40:18
67:9 71:10
99:13 115:9
130:24 153:19
154:11 208:3
range 25:11
96:23 127:16
151:15,22
152:1 210:14
210:25 211:1,6
211:24 212:8
212:10,24
213:2 218:20
218:25 224:12
228:8
ranged 131:3
ranges 139:4
211:21 212:23
212:25

Case 2:22-cv-00017-RWS   Document 119-4   Filed 01/20/25   Page 105 of 129

G. Bryant Buchner , P.E.
January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[rate - reconstruct]
Page 44

**rate**  52:3,9,13
   52:14,15 64:4
   92:5 172:3
**rates**  21:5
**rather**  198:3
**ratio**  47:13
   187:21
**ratios**  152:16
**read**  74:18
   140:15 141:13
   233:8 237:6
   238:3
**readability**
   80:23
**reader's**  75:9
**reading**  53:15
   81:25 103:14
   228:2
**readout**  107:6
**reads**  100:7
**real**  11:22
   12:12 37:3
   67:20,25 68:21
   89:22 106:23
   115:24 171:10
   171:10 187:3
   207:4 227:23
**reality**  30:1,1
   115:20 151:8
**realize**  66:14
**realized**  59:14
**really**  14:17
   15:3 17:17,21
   18:20 20:4
   24:18,23 26:1

33:13 35:4
36:11 38:9
45:4 50:8
62:11 63:14
67:8 73:6
87:17 92:22
114:12,15
115:21 116:19
133:15 152:21
154:6,15 158:2
158:5 166:9
170:20 181:9
190:10 194:6
197:11 204:23
211:1 217:8,25
219:1 226:12
228:3
**rear**  26:17
29:19 30:17
45:21 77:23
78:21 84:20
85:1 121:16
128:3 130:19
131:5,6,7,11
135:12,17,20
136:7,8,23
140:7,9,24
142:7 143:17
143:20,20,23
144:2,2 146:8
146:11,18
148:11,11
150:5,17
158:16 169:9
180:5 181:24

182:8 187:7
195:20 207:3
228:21
**reason**  19:21
   20:21 22:16
   32:6 40:15
   84:3 124:14
   126:4 154:5
   165:12 170:14
   186:17 238:19
   239:1
**reasonable**
   36:13,14 39:17
   40:6 119:18
   120:13 125:17
   135:9 151:9
   152:1 154:9
   165:23 177:6
   177:11 185:9
   204:11 212:10
   230:23
**reasonably**
   19:5,5 28:2
   36:16,23,25
   83:8 84:1
   124:20,22
   125:7 135:3
   171:1 176:19
   181:7 215:24
**reasoning**
   18:17
**reasons**  21:1
   37:10 161:3
   164:3 238:12

**rebound**  24:10
   105:7,19,22
   178:20
**rebounded**
   140:20
**recalculate**
   189:8
**recalibrated**
   81:17
**recall**  44:11,13
   44:17,22 45:16
   47:3 48:1
   52:10 92:10
   165:2,9
**received**  9:2,6
   14:14 218:25
**receives**  234:19
   236:13
**recent**  179:5,6
**recently**  49:6,9
**recess**  70:15
   116:4 173:19
   201:7
**recognize**
   49:13
**recollection**
   83:12,14,25
   175:19 188:2
   227:22
**recommend**
   42:2
**recommended**
   97:22 138:16
**reconstruct**
   19:6 20:1

Case 2:22-cv-00017-RWS    Document 119-4    Filed 01/20/25    Page 106 of 129
G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[reconstruct - remember]                                    Page 45

26:15
**reconstruction**
41:16 42:8
60:22 66:19,21
66:23,25
152:14 169:1
**record**  4:4,10
6:8 11:21,25
12:1,3 70:14
70:17 99:22,25
100:1,3 108:1
116:3,6 124:11
173:18,21
201:6,9 223:14
223:17,18,20
233:11 234:11
234:12,20
235:14
**recorded**  19:24
51:25 107:12
107:16 169:19
235:7
**recording**
108:10 127:1
**records**  53:8
70:24 77:5
108:8 182:25
183:5,15,18,22
**recreate**  9:24
9:25 19:3
**red**  117:18
118:9,14
213:17,19
215:24 216:6
216:10 222:3

223:3,6
**reduced**  148:18
213:1 235:12
**redundancy**
102:12
**refer**  73:19
117:13 153:3
**reference**  42:1
49:5 61:25
66:18,21 75:5
108:21 183:3
192:13
**referenced**
61:13 71:20
72:21 169:3
206:21
**references**  42:9
147:25 183:9
**referencing**
66:22,23,24
95:15 107:6
146:3
**referring**
183:20 198:14
215:4 222:10
**refers**  60:12
116:13
**refine**  24:20
153:25
**reflect**  50:11
64:7 66:20
227:20
**reflected**  13:8
13:18 65:13,22
70:1

**reflecting**
192:24
**reflects**  50:10
50:13
**regard**  53:21
94:5 172:5
184:7
**regarding**
173:25
**registered**
184:15 235:24
**regular**  165:15
**regularly**  82:5
**regulations**
234:5
**reiterate**  38:2
**relate**  152:14
207:5
**related**  42:22
50:18 51:9
67:12 74:21
77:22 109:17
174:23 236:9
**relates**  11:5,13
70:20 127:24
**relating**  234:23
**relation**  83:23
129:22
**relationship**
234:11 236:11
**relationships**
152:19
**relative**  78:12
91:14 150:13
222:15,20

235:17,19
**relatively**
150:11,16
221:12
**relaxation**
154:16 155:23
169:16 174:2,4
174:9 175:1
176:2
**relevant**  9:17
197:12
**reliability**
172:5
**reliable**  27:20
36:1 59:16
166:4 167:3
168:3
**reliably**  35:17
**rely**  34:12
37:23 99:13
172:22 198:8
**relying**  13:9
59:18 122:21
145:23 189:16
**remarkably**
123:8
**remember**
13:23 14:6,17
44:15 45:9,12
49:17 58:6
62:3,4,7,10
64:18 65:3
69:20 75:7,10
77:9 79:8,9,14
80:20 81:6,21

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[remember - restitution]**                                     Page 46

84:13 89:14,17
92:11 107:17
107:21 119:22
129:16 153:24
163:21 164:2
165:6,16,17
166:13,14
175:13 193:10
193:11 194:11
194:12,13
196:23 197:3,6
201:21 217:1
229:5
**remind**  128:17
129:9
**reminding**
127:5 128:25
**remote**  1:14 2:1
**remotely**  1:21
4:1
**remove**  193:24
**removed**
194:16
**repeat**  141:17
167:5
**repeated**
141:15
**rephrase**  18:23
**report**  3:19 9:2
9:3,7,7,10,11
13:6 28:23
53:16 68:12,13
71:19,21,25
72:10,12,16,22
73:21 74:1,3,5

74:7,10,24
75:1,2,5,17,19
75:22 94:22
116:8 137:18
137:21 149:12
150:21,23
201:16,18
207:19 211:3
214:2 225:5
226:10 234:12
**reported**  1:21
107:9 151:11
214:7 218:18
**reporter**  4:15
4:21,22 49:25
73:14 99:18
141:14,15
201:22 208:16
234:1,2,6,9,21
234:22 235:24
236:5,7
**reporting**  94:1
126:25 129:10
214:9 215:12
234:5,16
**reports**  7:17,22
8:5 9:13 71:1
71:24 72:14
192:15 215:21
215:22 236:13
**repository**
234:24
**represent**  4:10
60:11 174:22
207:1 222:17

232:11
**representation**
70:5 165:23
214:11 230:24
**representations**
234:3
**representative**
27:14 29:15
120:2 132:10
**represented**
221:5
**representing**
163:5,7
**represents**
17:13 130:14
176:25 219:4
221:14 236:3,5
**request**  236:9
236:14
**requested**
10:23 11:4
233:13
**require**  43:23
106:3
**required**
187:22,23,25
**requirement**
149:3
**requires**  55:6
228:12
**rerun**  8:10,20
8:23,24 72:13
72:18 154:12
**research**  14:19
77:10

**researched**
107:20
**reservation**
160:12
**reserved**  237:6
**respect**  22:4
30:4
**respected**
166:20
**respectively**
206:19
**responsibility**
159:2
**responsible**
159:22 160:13
**rest**  9:19 113:5
**restitution**
17:25 22:8,24
23:8,11,22
24:1,24 25:5
25:19 26:10
110:18,20
111:24 112:1
112:18,24
113:22 114:2,9
115:4,8,11
119:9,17 120:9
154:16,17
155:10,22
169:17 174:6
176:3,4,4,8,24
177:22 178:14
178:19 180:8
180:19 191:1,4
191:10,21

Case 2:22-cv-00017-RWS    Document 119-4    Filed 01/20/25    Page 108 of 129

G. Bryant Buchner , P.E.

January 23, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

[restitution - robust]

Page 47

192:20 203:12
203:13,23
204:2,4,11,22
205:7,14,19
206:4
**restitutions**
22:15 23:25
154:21 204:5
**restroom**
113:14
**result**  21:25
170:25 183:21
214:22,22
232:9
**results**  115:10
115:12,14
170:12
**retained**  46:13
46:15 47:24
51:20
**retainer**  50:18
**retrieval**  107:5
**returned**
237:11,14
**revealed**  105:7
105:18
**review**  66:18
234:2 237:6
**reviewed**  54:7
166:2 167:10
**reviewing**
74:11
**richard**  2:12
**rick**  4:11,18 5:6
70:12 105:10

**ride**  96:15
**right**  4:23 7:19
8:22 9:1,16
10:6 11:12,18
12:12,16,25
13:13,25 14:5
14:14 16:18
18:1,22 22:8
23:14,19 25:8
25:25 30:20
32:16,22 35:24
40:19,23 42:7
43:6,6,25 46:9
46:21 47:14,23
48:10,13 49:2
49:24 50:5,17
50:21,24 51:17
52:24 53:9
54:18 55:9,15
55:18 56:4
57:15,21 58:19
61:6 62:4,20
64:1,12 65:14
65:19 66:4,11
67:8,13 68:7
69:25 70:8,11
71:4,5,8,13,14
71:17 72:1,5
74:9,22 75:11
75:18,19,20
77:20 79:15,22
80:1,1,13,15
81:8,11,25
82:1,4,9,16,24
84:5 85:15,21

85:21,22 86:11
87:10 88:8,11
89:25 90:10
91:5,25 93:10
93:12 94:19,21
95:6,21 98:7
98:23 99:6,11
99:11 101:19
101:25 103:19
104:1,15
106:15 107:7
108:7,14
109:20,22
110:1,7,14
111:1,5,15
112:11 114:6
115:3,7 116:8
117:1,8,13,17
117:25 118:18
118:20,23
119:4,19
125:14,21
126:4,22 128:7
128:12 129:15
129:18,24
130:1,7 131:25
135:11,15
137:20 138:24
139:23 142:23
145:20 148:21
148:23 149:4
149:23,23
150:20,22
151:3,5 154:10
155:6,20

160:25 166:15
168:1,13 169:3
173:11 174:8
174:19 177:13
179:10,13
180:18 181:21
182:23 183:23
184:17 185:12
186:13 188:8
189:10,23
190:9 192:20
192:24 197:2
199:20 200:2
202:17 203:3
203:15 204:14
207:4,19 208:5
209:1,6,7
212:24 213:13
213:16 216:21
219:6,24 220:6
220:15 221:21
222:16 223:10
224:21 225:19
226:17 227:8
227:19 228:2
231:24 233:3,6
237:6
**rim**  88:8 184:9
**ripped**  79:3
**rise**  124:1
**road**  2:15
**roadway**  23:13
190:15,22
**robust**  27:5
28:7 114:19

G. Bryant Buchner , P.E.
January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[robust - seat]**    Page 48

163:18
**robustness**
41:21
**role** 47:3
123:14 126:20
181:3,6
**roof** 146:16,19
221:16,16
**roswell** 237:18
**rotate** 147:10
147:11 162:25
**rotated** 103:3
**rotation** 21:5
82:7,8
**rough** 1:9 3:8
10:12 57:19,23
59:1
**rpr** 1:23
**rsa** 1:23
**rule** 238:8
**rulers** 100:25
**rules** 234:4
238:8
**run** 9:14,18
15:20 16:12
17:1 18:10
19:9 20:22
21:1,17 22:20
23:4 38:19
40:6 45:20,22
70:25 71:1,6
71:23 72:2,7
72:10,17 92:7
125:1 159:7,13
176:11 182:3

187:1 188:1
**running** 16:1
16:20 155:3
**runs** 168:18
218:11
**rws** 1:8

**s**

**s** 3:5 56:9 154:6
**sae** 152:6
208:23 209:5
210:21 229:25
**safe** 135:6
**santana** 1:4
183:14
**saved** 6:10
154:11
**saw** 64:11
65:20 78:18
79:18 83:13,22
89:15 111:24
224:4
**saying** 7:11,12
9:12 33:21
34:10 36:2
39:10 42:3
63:18 65:21
82:24 88:23
102:20 118:1
124:5 126:17
126:20 137:12
139:15 144:8
159:20,25
160:1 163:4
164:9,13,16
171:23 179:17

186:5,7 187:23
201:21 202:21
204:8 205:14
215:16 218:25
220:2 225:4
232:10
**says** 29:5 54:5
71:7,19 164:4
171:21 192:20
202:2 213:25
**scale** 61:15,16
82:6 88:2
**scales** 80:9,11
80:15,19,24
81:7 88:24
**scan** 60:6 69:13
98:19 100:8,17
194:9 202:2
**scanned** 66:1
94:24 99:3
**scanning** 69:20
194:4
**scans** 57:7
60:24,25 61:3
100:18,21
101:16,16
102:10 227:2
**scenario**
197:25
**scene** 17:16,16
17:17,18 19:2
60:8,9,15 61:6
61:7,10 69:1,5
69:8,11,14,17
76:6,6,11

83:20
**schedule** 3:17
50:6,9 54:25
55:7 81:21
**scheduled**
68:18
**scientific** 166:4
168:3
**screen** 10:7,13
12:12,16 42:25
68:2 71:15
73:11 74:16,22
149:4 183:19
201:12,14
**seal** 237:12
**searches** 184:2
**seat** 62:1,5,8,15
62:24 63:4,8
65:24 84:4,20
85:1,2,4,5,16
85:17 102:18
102:22,22,24
102:25 103:1,2
103:3,7,7
133:18 135:12
135:18,21
136:1,4,13,24
140:9,11,24
141:6 142:2,7
142:14,16,24
142:24 143:3
143:10,10,13
143:20,20,22
143:23 144:3,7
144:19,19,21

G. Bryant Buchner , P.E.

January 23, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[seat - show]**

Page 49

144:23 145:1,3
146:1 147:14
148:11 182:16
182:19,24
184:12,12
193:24 194:7
194:19,23
**seat's**  143:6
**seats**  61:25
147:19 193:25
**second**  3:9 10:9
35:15 74:21
80:1 85:23
140:6 148:24
190:12 198:5
206:17 223:15
225:22 232:6
**section**  77:21
90:10 93:17
106:23 110:2
116:10,13,20
198:7,8 206:15
**sections**  234:6
234:7
**see**  5:8 9:19
10:13 12:16
16:4 17:13
19:18 23:18
31:14,14,15,19
33:25 52:5
58:25 64:8
66:8 71:14,18
76:11 77:8
78:8 83:19
86:8 89:19

93:18 97:5
104:20 105:1
113:1 114:22
116:9 128:12
129:18 131:18
142:6 143:2
147:12 150:5
150:17 151:3
172:10,15
179:8 189:15
196:23 201:3
204:25 214:14
216:17,18
218:18 223:2,4
223:6 225:19
227:12 228:25
229:25
**seeing**  107:19
**seem**  12:23
108:21
**seemed**  85:9
**seen**  9:9 65:16
66:2 78:3
115:16 196:11
196:22
**select**  16:16
99:10
**selected**  167:1
219:2
**selection**  99:5
**self**  81:13
**seminar**  15:3
**seminars**  14:25
15:9

**send**  81:20
237:12,17
**sense**  12:7
54:14 132:18
188:19
**sensing**  109:17
**sensitive**
232:22
**sensors**  109:11
**sent**  75:8
192:16
**sentence**
102:17 108:7
**sentences**
144:20
**separate**
116:22 213:9
**september**  3:15
43:12 60:5
64:2,5 68:10
70:6 76:19
**series**  111:23
113:21
**serve**  124:12,13
**services**  61:22
234:16 236:13
**set**  15:25 51:22
53:14 88:6,9
111:23 113:19
172:25 206:22
**setup**  51:13
53:10
**seven**  64:19,25
**several**  32:1

**severe**  197:11
**severity**  78:12
**shape**  46:2
60:13,14 62:12
161:23 162:10
216:18 217:1
**shapes**  218:9
**share**  10:7
12:12 71:14
103:13,15
150:25 201:12
**shared**  43:6
50:5,24
**sharing**  43:2
68:8 73:11
103:12 149:4
151:1
**sheet**  67:2
110:12 139:16
183:8,11,12
205:11 225:17
238:17
**shell**  162:19
**shift**  87:21
231:18
**shifting**  67:24
**shiny**  106:17
**shoes**  134:6,7
**shop**  134:25
**short**  65:7
115:25
**show**  15:24
54:10 55:8
78:10 113:5
126:6 135:20

G. Bryant Buchner , P.E.
January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[show - situations]**                                                Page 50

| | | | |
|---|---|---|---|
| 135:20 136:11 | **simple** 17:16 | 155:13 159:14 | 87:25 92:11 |
| 147:6 194:5 | 48:5 142:8 | 161:2 163:17 | 93:15 95:5 |
| 217:7 225:22 | 169:7 | 163:25 164:16 | 98:18 110:6 |
| 231:4,8 | **simplest** 138:4 | 167:19 173:3 | 112:10 121:5 |
| **showed** 31:10 | 168:17 180:25 | 173:25 175:17 | 137:19 151:4 |
| 59:2 | **simplified** | 176:6,7,9 | 171:8 177:16 |
| **showing** 51:7 | 18:14 159:18 | 181:22 184:24 | 177:16 179:12 |
| 103:20 118:20 | 214:25 | 187:25 190:15 | 183:21 184:17 |
| 126:5 149:5 | **simply** 9:21 | 190:23 191:9 | 185:11 188:2 |
| **shown** 66:6 | 108:8 143:16 | 191:22 202:20 | 193:10 197:5 |
| 104:7,7 148:9 | **simulate** 18:4 | 202:22,22 | 199:18 208:7 |
| 163:18 221:23 | 18:11,15 26:6 | 203:15,23,24 | 220:5 232:2 |
| **shows** 89:4 | 28:22 31:7,8 | 209:13,16,24 | **sit** 16:2 44:10 |
| 112:24 139:16 | 39:2 163:20 | 210:19 213:7 | 44:17 55:6 |
| **side** 45:21 | 167:23 | 218:6 219:23 | 149:3 165:6 |
| 47:12,20 104:9 | **simulated** 39:5 | 219:24 220:6 | 166:25 167:9 |
| 131:9,10 135:1 | 176:11 213:7 | 229:25 231:16 | 194:11 196:8 |
| 179:23 186:13 | **simulates** 32:24 | 231:17,25 | 197:4 |
| 186:13 187:10 | **simulating** 9:17 | 232:4,7,19 | **site** 76:5 |
| 187:24 188:4 | 18:18 20:17 | **simulations** | **sitting** 44:15 |
| 192:21 206:25 | 166:5 | 15:21 68:24 | 88:14 136:19 |
| **sides** 188:6 | **simulation** 10:4 | 115:19 153:14 | 136:25 143:19 |
| **sign** 237:6 | 16:13 17:1 | 154:10 172:4 | 143:22 147:12 |
| **signature** | 19:9,25 20:22 | 172:22 175:3 | 169:8 182:20 |
| 233:13 235:23 | 27:5,16,19 | 202:15,17 | 200:16 218:3 |
| 237:2,15 | 31:5 32:19 | **simulator** | **situation** 21:21 |
| **signed** 237:9,11 | 35:25 37:19 | 67:14 116:21 | 30:24 31:1,4 |
| 237:14 | 39:11 40:18 | 154:22 158:21 | 34:11,13 40:11 |
| **significance** | 66:25 67:7 | **single** 41:2,6 | 121:9 125:18 |
| 128:24 | 70:24 71:6,10 | **sir** 7:23 12:17 | 135:10 161:15 |
| **significant** | 72:2 104:12 | 14:13 42:20 | 164:22 167:19 |
| 79:10 | 114:7 115:9 | 50:16 54:1 | 167:24 197:3 |
| **similar** 60:7 | 116:20 128:5 | 67:15 70:7 | **situations** 42:5 |
| **simon** 42:11,14 | 152:10 153:19 | 71:3,12 72:4 | 46:7 94:8 |
| 42:19 | 153:23 154:4 | 74:8 79:25 | 165:1,2 |

G. Bryant Buchner , P.E.                                January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[six - spring]**                                                    Page 51

| | | | |
|---|---|---|---|
| **six**  139:2 | **software**  8:6 | **sounds**  166:7 | **specifications** |
| **size**  16:18 | 13:16 22:16 | **source**  109:18 | 53:14 |
| 17:22 58:17 | 42:12,22 | 119:15 130:3 | **specifics**  198:4 |
| 86:22 96:17,24 | 209:16 213:10 | 130:13 | **specs**  95:11 |
| 98:22 99:11 | 213:11,13 | **sources**  131:4 | 101:24 128:15 |
| 100:23 102:9 | **solely**  110:2 | 167:11 188:13 | 181:16 |
| 140:1 202:5,6 | 221:19,20 | 188:17 | **speed**  17:8 |
| 202:16,18,19 | 234:14 | **southeast** | 19:15 20:15 |
| 202:23 225:2 | **solve**  112:20 | 237:19 | 22:4,5,6 25:14 |
| 227:18,24 | **somebody** | **space**  135:24 | 25:16 68:17 |
| **sizes**  97:22 | 54:21 134:6 | 136:24 195:1,8 | 76:4 108:15,16 |
| **skipped**  94:19 | 186:7 | 195:12,14,23 | 108:20,20,21 |
| **sky**  123:1 126:9 | **somebody's** | 196:17 223:1 | 108:22,23 |
| **slant**  228:21 | 9:23 | **spacers**  229:6 | 109:4,6,7,14,17 |
| **slide**  86:11 | **somewhat**  35:3 | **spare**  87:14,22 | 109:19,21 |
| 123:21 146:10 | 178:20 | 88:8 184:9 | 111:6,11 155:5 |
| 222:5 | **sophisticated** | **speaker**  105:12 | 155:5,21 |
| **slight**  99:13 | 157:11 210:18 | **speaking**  45:15 | 169:20 193:2 |
| 101:12 | **sorry**  4:16 12:4 | 88:21 150:11 | 196:15 197:10 |
| **slightly**  24:7 | 12:10 18:23 | 189:10 | **speedometer** |
| 77:24 78:1 | 20:19 35:24 | **specific**  42:18 | 109:4 |
| 94:4 96:10 | 37:11 43:2 | 44:11 55:5 | **speeds**  16:23 |
| 98:1,5 101:5 | 62:17 63:17 | 77:13 93:19,25 | 19:18,19,23,23 |
| 119:2 228:22 | 103:16 105:11 | 106:12 129:2 | 20:1,24,25 |
| **slopes**  17:18 | 137:21 142:9 | 146:2,20 | 110:24 155:11 |
| **slow**  113:11 | 151:1 167:5 | 179:23 193:15 | 176:16 186:16 |
| 192:4 | 171:2 177:19 | 196:21 197:3 | 193:5 196:6,10 |
| **slowing**  91:19 | 191:6,8 192:2 | 197:21,25 | **spent**  67:6,14 |
| **small**  15:17 | 202:10 206:16 | 203:19 234:18 | **spit**  104:18 |
| 67:8 170:21 | 208:11 220:4 | 236:12 | **split**  48:20 |
| **smart**  31:5 | **sort**  19:4 83:19 | **specifically** | **spoke**  4:14 |
| **snyder**  2:6 | 141:22 | 22:2 44:13 | 20:19 |
| **society**  208:23 | **sound**  70:4 | 45:9 48:10 | **spreads**  156:18 |
| **soft**  92:3,7 | 101:20 | 165:2 199:12 | **spring**  24:11,16 |
| | | 229:5 234:4 | 160:6 185:20 |

G. Bryant Buchner , P.E.
January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[spring - stopping]**                                                        Page 52

| | | | |
|---|---|---|---|
| 185:21,22 | 229:18 | **statute** 198:24 | 209:22,24 |
| **springiness** | **start** 5:10 | 199:16 | 210:5 229:24 |
| 178:24 | 10:12 16:16,19 | **statute's** | 230:4,11 |
| **springs** 24:15 | 17:6 29:16 | 199:14 | 231:16 |
| **sprung** 146:6 | 70:22 94:22 | **stay** 14:18 36:9 | **stiffnesses** |
| 185:25 186:3,4 | 176:12 197:1 | 68:16 122:9 | 130:25 |
| 186:9 | 207:9 | 166:10 | **stimulate** 37:8 |
| **staff** 14:19 | **started** 143:10 | **stayed** 14:23 | **stimulator** |
| 15:22,23 41:13 | 143:10 153:25 | **stenographic...** | 155:4 |
| 52:20,23 55:2 | 193:8 218:1 | 235:7 | **stock** 3:23 |
| 72:25 127:18 | 220:12 | **step** 19:4 | 27:17 36:9 |
| **staging** 230:19 | **starting** 26:14 | **stick** 24:12 | 37:19,23 39:17 |
| **stamped** | 71:11 219:11 | 219:9,19 | 40:6,18,21,24 |
| 129:19 | **starts** 105:5 | **sticking** 149:19 | 86:2,10 87:3 |
| **stamping** 68:17 | 117:17 175:21 | **sticks** 218:10 | 96:2,17 97:19 |
| **stand** 148:24 | **state** 234:9 | **stiffer** 232:9 | 97:25 98:2,4,8 |
| 165:8 223:12 | 235:4 | **stiffness** 130:4 | 98:24 99:14 |
| **standard** 41:5 | **stated** 37:25 | 130:10,11,14 | 116:15,24 |
| 81:9 95:15 | 38:1 235:8 | 130:19 131:8 | 117:22 118:4 |
| 132:25 134:3 | **statement** | 131:10,11,11 | 120:16,16,18 |
| 152:12 157:22 | 133:11 145:12 | 131:13,17 | 123:10 124:18 |
| 175:18,20 | 195:3 197:19 | 132:9 133:19 | 125:1,13,15 |
| 199:9,10,11 | 238:12 | 134:12 155:18 | 126:2,18 137:1 |
| 206:22 210:16 | **statements** | 156:10 158:16 | 137:14,17 |
| 211:13,14 | 235:11 | 159:11 176:3 | 138:19 140:1,3 |
| **standardized** | **states** 1:1 | 177:3 178:13 | 148:17 153:20 |
| 189:4 | **static** 94:25 | 178:17,25 | 161:2,5 168:15 |
| **standardly** | 105:24,25 | 179:18,22 | 181:13 202:3 |
| 156:11 | 106:5,22 | 180:3,20 187:3 | 202:18 227:16 |
| **standards** | 133:21 140:17 | 187:5,7,9 | 227:20 |
| 141:4 | 146:5,14,22,25 | 188:6,13,21 | **stop** 121:23 |
| **standing** | 147:17,24 | 189:24 206:8 | **stopped** 127:3 |
| 148:25 | 148:19 152:8,9 | 206:18,25 | 168:18 |
| **standpoint** | **statically** 143:8 | 207:12 208:1 | **stopping** 173:9 |
| 96:4 219:20 | 144:17 147:4 | 208:19 209:12 | |

G. Bryant Buchner , P.E.
Bryson, Santana and Joshua v. Rough Country, LLC
January 23, 2024

**[storage - sure]**

Page 53

| | | | |
|---|---|---|---|
| **storage**  183:24 | 165:23 166:4 | **sufficient**  30:18 | 44:17,22 45:8 |
| 184:1,4 | **stuff**  11:11 | **suggested** | 45:9 46:4 49:2 |
| **straight**  29:19 | 15:24 60:2 | 212:1 | 49:23 50:20 |
| 208:3 | 61:1,23 75:25 | **suite**  2:8,16 | 54:14 55:14 |
| **straightened** | 163:11 170:2 | 237:18 | 56:8 59:7 60:3 |
| 12:9 | 180:25 | **summary** | 60:12 63:3,9 |
| **straightforward** | **style**  49:13 | 225:15 | 64:15 69:18 |
| 15:4 148:7 | **subcontractor** | **supervision** | 73:10,17 75:17 |
| 166:19 210:16 | 234:10,15 | 235:13 | 75:18 76:13,14 |
| **strange**  124:14 | **subject**  37:21 | **supplemental** | 78:20 79:17 |
| **strength** | 62:25 86:13 | 238:15 | 80:17 81:3 |
| 133:13,19 | 87:24 97:16,18 | **supply**  97:6 | 84:17 85:22 |
| 134:23 135:25 | 100:9,10 | **support**  3:21 | 87:1,10,12,23 |
| 136:3 156:24 | 110:10 125:9 | 40:10 41:9 | 88:20 89:23 |
| 169:12,14,15 | 125:16 138:1 | 74:24 75:8,16 | 90:9,21 91:5,8 |
| 177:6,8,9 | 171:11 202:7 | 75:17 78:21 | 91:21 92:20 |
| 178:18,24 | 202:24 203:6 | 149:12,16,16 | 94:5,16,18 |
| 179:1 207:7 | 216:14 222:14 | 153:12 166:3 | 95:5,18,20 |
| **strike**  28:2 | 224:19 | 167:1,11 168:2 | 98:7 101:21 |
| **striking**  218:7 | **subjects**  200:14 | 168:3 200:9 | 103:10 108:3,6 |
| **strong**  136:13 | **submitted**  3:6 | 201:16,19,23 | 110:7 113:1,16 |
| **stronger** | 234:21,22 | 213:6 | 116:12 122:19 |
| 219:16,16 | 236:5,6 | **supposed**  73:3 | 123:11 125:5 |
| **struck**  204:20 | **subscribe** | 84:14 86:23 | 126:22 134:9 |
| 218:7 | 200:22 | 91:15 | 134:23 145:21 |
| **structure**  26:22 | **subscribed** | **sure**  6:2 8:19 | 149:18 152:5 |
| 28:3,3 34:21 | 239:21 | 9:14 10:1 | 154:20 164:15 |
| 36:15,18 | **substance** | 11:23 13:4 | 167:7 172:2 |
| **structures**  35:3 | 238:10 | 14:11 15:5 | 175:1 178:4 |
| 149:13,16 | **substracting** | 18:24 20:21 | 191:12 197:9 |
| 157:17 | 225:10 | 22:14 24:19 | 199:21 201:1 |
| **stuck**  222:1 | **subtle**  21:12 | 26:5 27:3 | 201:17 210:7 |
| **studies**  166:2 | **subtract** | 28:23 31:6 | 211:16 223:11 |
| **study**  95:22 | 139:22,25 | 40:9 41:12 | 229:22 230:6 |
| 121:3 161:16 | | 42:10,25 43:22 | |

Case 2:22-cv-00017-RWS    Document 119-4    Filed 01/20/25    Page 115 of 129
G. Bryant Buchner , P.E.
Bryson, Santana and Joshua v. Rough Country, LLC

[surface - tell]                                                          Page 54

| | | | |
|---|---|---|---|
| **surface** 156:14 | 67:19,21 68:7 | 91:3,17 96:13 | **targets** 193:6 |
| **surfaces** 157:5 | 70:9 82:6 90:7 | 96:14 98:8 | **teaches** 168:24 |
| **surprise** 174:24 | 113:12 115:24 | 106:24 108:23 | **team** 193:24 |
| **surprised** | 131:14 134:6 | 109:5,8 110:2 | 194:18 |
| 166:16 | 138:8,11 | 117:14 119:1 | **technical** 52:22 |
| **surrounding** | 139:24 146:9 | 123:5 125:11 | **technically** |
| 14:7 | 146:25 156:15 | 129:14,22 | 91:15 132:3 |
| **survivability** | 159:1 160:23 | 131:8 136:23 | 214:15,19 |
| 135:23 | 173:10,11,15 | 141:3 145:17 | 219:8 |
| **surviving** 1:5 | 183:2 189:20 | 148:19 153:7 | **technician** 2:20 |
| **suspect** 26:14 | 199:20 200:25 | 153:15 155:16 | 4:4,20 11:20 |
| 28:9,17 33:16 | 226:1 227:14 | 178:25 179:1 | 11:24 12:2 |
| 37:9 229:9,12 | **taken** 28:21 | 185:3 194:1 | 70:13,16 99:21 |
| **sv** 28:1 | 60:24 70:15 | 196:3 203:21 | 99:24 100:2 |
| **swapping** 72:8 | 116:4 149:7 | 203:22 204:9 | 113:20 116:2,5 |
| **swear** 4:21 | 173:19 201:7 | 212:6 | 173:17,20 |
| **sworn** 5:2 | 227:17 | **talks** 41:21,22 | 201:5,8 223:16 |
| 235:9 239:21 | **takes** 154:3 | **tall** 134:6 | 223:19 233:9 |
| **system** 6:22 | 207:9 | **tallahassee** | **technicians** |
| 109:17 | **talk** 14:21 | 1:15 4:1 | 101:15 |
| **t** | 15:23 37:15 | **taller** 97:2 98:1 | **technique** |
| **t** 3:5 65:18 | 39:24 42:24 | 203:4 | 212:15,20,23 |
| 235:1,1 | 54:21 56:13 | **tallies** 183:8 | **techniques** |
| **tab** 183:9 | 85:7 91:21 | **tap** 135:1 | 212:16,20 |
| **table** 138:9 | 105:2 135:11 | **tape** 102:6 | **tecum** 3:11 |
| **tail** 216:19 | 198:3 | 106:17,20 | **tedra** 2:4 4:12 |
| **tailgate** 33:5 | **talked** 153:8 | 227:9 | 4:16 178:10 |
| 122:3 123:24 | 155:19 161:4 | **tapes** 100:25 | 237:1,1 |
| 124:1 140:19 | 191:1 200:11 | **target** 47:20 | **telephone** 52:3 |
| 192:9 205:17 | 209:25 | 195:15 | 54:5,8 |
| 216:12,19 | **talking** 31:11 | **targeted** | **tell** 19:14,14,15 |
| 217:25 | 39:1,3 40:13 | 193:15,15,17 | 20:24 35:17,18 |
| **take** 24:14 | 50:1 70:21 | **targeting** 193:5 | 37:5 38:15 |
| 47:12 51:7 | 78:6 79:22 | 193:20 | 39:18 44:21 |
| 63:11,15,19 | 89:13 90:2 | | 52:13 56:21 |

G. Bryant Buchner , P.E.
January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[tell - think]**

Page 55

59:4 60:10
62:9,11 70:24
75:20 84:25
88:14 112:15
124:23 128:24
157:19 161:10
161:11 162:16
169:11,12
179:7 184:11
200:18 232:24
235:9
**telling**  8:12
21:19 101:10
158:11,12
162:8 182:6
**tend**  55:7,7
164:19 165:16
172:14
**tends**  164:20
**term**  80:16
89:19,20 90:15
90:16,19 94:2
94:5 109:15
136:17 150:14
174:3,18
**terms**  93:17
94:16 177:21
234:15
**terrible**  197:7
**terry**  230:6
231:2
**test**  8:21 18:10
19:18 62:13
171:6,10,20
172:4,13,20,23

172:25 173:1,4
188:20 189:19
207:21 230:19
**testified**  44:23
46:24 174:8
191:3
**testify**  27:19
**testimony**  3:14
11:2 43:7,16
43:20 46:22,22
47:2 50:2
85:13 165:10
200:4 235:15
238:3,11
**testing**  172:16
189:11,17,24
230:16
**tests**  189:21
**thank**  5:6,9
12:4 13:12
60:3 63:16,22
66:11 70:11,18
71:25 76:23
77:18 90:9
92:23 93:4
98:9 103:11
116:1 139:14
173:16,22
178:5,10
191:24 193:22
195:16,18
201:4,24
222:11 223:21
233:3

**thanks**  18:2
24:22 63:9
72:20 88:20
93:5 103:15
201:10
**theory**  229:15
**thereto**  235:11
**thickness**  232:8
**thing**  32:17
69:4 104:24
113:8 118:24
122:6 156:1
162:18 171:16
173:4,5 180:18
184:8 204:9,17
222:19 229:1
**things**  5:24 6:2
7:9 16:15
17:19,24 24:19
29:10,10 35:18
35:20 51:11
57:8 64:24
68:17 82:19
90:2 93:9,13
100:16 109:11
120:15 121:12
122:17 130:20
137:7,9 146:12
149:18 159:17
162:1 165:17
168:12 171:24
175:12 177:23
186:15,25
**think**  5:7 14:2
14:3,24 18:13

18:14 19:11
20:19 21:17
22:20 24:24
27:11,21 29:13
32:9 33:11,12
33:14 34:6,21
35:10,22 41:24
42:16 43:12
44:20 48:21
49:3,3,4,7,16
49:19 57:1,21
58:3 63:23
64:17 66:4,6
68:18 69:21,21
73:12 75:4
81:1 87:15,16
87:16 90:24
91:1 93:2
95:13 97:15
99:9 101:3,8
107:24 109:1,2
112:4,21
122:18 132:3
137:11 138:5,8
142:16 143:2
144:8,12,12
145:4,7,7
147:1 154:5
158:11 160:11
174:2 177:18
177:19,23
179:5 183:9
185:21 188:12
194:2,4,15,15
194:17,21,25

G. Bryant Buchner , P.E.
January 23, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[think - tool]**

Page 56

| | | | |
|---|---|---|---|
| 195:4,7,7,11,24 | **thread** 78:17 | 100:2,3 113:20 | 203:5 218:4 |
| 196:12 198:13 | **three** 9:13 48:8 | 116:2,5 141:18 | 224:7,18 225:1 |
| 201:15,22 | 48:11 49:3,19 | 148:6 163:6 | 226:1,13 228:5 |
| 202:10 205:13 | 49:20,21,22 | 164:2 171:20 | **title** 75:16 |
| 208:15 215:14 | 109:16 122:16 | 173:17,20 | 209:3 |
| 221:13 222:5 | 151:21 152:21 | 182:5 189:6 | **today** 5:18 13:1 |
| 225:5 228:25 | 152:21 188:6 | 201:5,8 202:24 | 13:10 44:10 |
| 230:9 231:4 | **threshold** | 223:16,19,22 | 68:15 82:1 |
| 233:5 | 196:15 | 233:10 234:19 | 166:25 167:10 |
| **thinking** 44:16 | **throw** 73:2 | 236:12 237:14 | 197:4,6 200:5 |
| 77:8 134:21 | **tight** 32:14 | **times** 5:7 17:4 | 223:22 |
| 154:7 196:8,13 | 170:25 211:1 | 17:18 29:15 | **today's** 50:18 |
| 200:17 229:7 | **time** 4:6 6:16 | 68:19 163:22 | **together** 17:2 |
| **thinks** 108:24 | 7:10,10 9:14 | 167:18 224:10 | 24:1,12 93:9 |
| 124:3 | 11:24 12:2 | 225:12 | 106:21 140:20 |
| **third** 13:14,15 | 14:16 16:6 | **tire** 16:18 87:14 | 142:8,21 |
| 171:4 206:16 | 34:16 43:3 | 87:22 88:8 | 143:19 144:17 |
| 206:17 225:22 | 44:4,8,23 | 96:10,17 97:22 | 147:4 222:1 |
| 226:21 227:12 | 45:16 46:20 | 98:22 99:5,6,9 | **told** 33:15 |
| 228:4 | 53:18,19 54:15 | 99:11 100:23 | 34:15 58:10 |
| **thought** 7:2 | 55:1,7,14,20,20 | 102:8 140:1,3 | 153:24 154:14 |
| 8:14 13:2 | 55:24 57:11 | 149:22 184:9 | 169:14 177:11 |
| 26:24 56:19 | 58:7 59:25 | 202:3,6,16,18 | **tonight** 92:21 |
| 58:7 61:2 | 64:10,14,16,21 | 202:19,23 | **tonneau** 89:10 |
| 67:24 69:16 | 65:5,12 66:9 | 227:18,24 | 89:14,18,18 |
| 70:21 76:10 | 67:2,6,13 68:2 | **tires** 80:14 | 92:25 |
| 88:17 90:4 | 69:2,7,10 | 85:25 86:1,2 | **took** 61:3,13 |
| 103:8 104:23 | 70:13,16 73:7 | 86:10,10,20,21 | 69:21 83:16,16 |
| 119:18 144:5 | 75:21,21 78:15 | 86:22 87:3,6 | **tool** 25:17 |
| 151:1 194:5 | 78:18 80:21 | 96:5,24 97:1,7 | 29:21 30:10,25 |
| 208:16 226:17 | 82:2,12,21,25 | 97:9,13,17,25 | 31:16,24 32:10 |
| 226:18 | 83:4,18,23 | 98:6,23,23 | 38:5 40:15 |
| **thousands** | 84:2 93:14,21 | 99:14 138:10 | 67:11 107:5 |
| 84:12 | 94:6,7,7,10,13 | 138:11,16,19 | 115:21 159:5 |
| | 94:14 99:24 | 140:4 149:19 | 164:16 170:8 |

G. Bryant Buchner , P.E.
January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[tool - trying]**                                                                                           Page 57

172:1 176:15
184:6
**tools** 29:11,22
31:17 39:19
40:4,20 116:22
164:1 183:25
184:3,4
**top** 44:7 49:1
61:16 67:15
70:3 81:6
85:24 86:6
103:1 104:6
122:12 136:18
145:25 148:16
179:7,8 196:1
196:3 206:16
217:10,17
232:24
**topics** 200:3
**torn** 26:20
36:22 78:23,24
79:4,12 150:3
**total** 24:1 67:9
70:3 82:11
129:10,21
185:19,24
224:6 225:4,6
226:7
**totaling** 69:25
**totally** 159:21
**touch** 106:4
**touched** 83:18
106:3 200:13
**tough** 21:10

**tow** 121:13,15
122:20 123:4
123:13,16
124:5,19
125:19,21
126:1,6,19
146:12 217:3
**towards** 173:13
182:22
**traffic** 41:16,17
**training** 13:8
13:16,19,21
14:1,7,9,15
15:6 41:25
42:18 121:4
152:6
**transcript**
234:19 235:7
236:3,4 237:7
237:12,14
238:3
**transcripts**
234:19,23
**transmission**
108:20,22
109:10,18
**travel** 56:16
64:16,20 66:10
69:5
**traveled** 56:20
**tread** 87:6
217:12
**tree** 171:15,16
**trend** 232:14
232:16,20,22

233:1
**trial** 11:1 43:16
43:20,24 44:2
165:3
**trick** 33:10
**tricking** 33:11
**tried** 48:5
167:17 191:12
**tries** 156:15
**trim** 96:13
**trip** 64:8
**trips** 68:25,25
**truck** 17:8,9
19:25 20:8
23:6 25:15,15
25:22,23 26:4
26:16 27:10
33:15,25 36:9
38:6 57:3 58:3
86:17,19 89:2
91:18 96:8,10
96:12,14,15,23
97:1,4,16,18,21
97:25 98:2,5
108:24 109:14
114:13 115:15
120:16 121:13
121:14 122:14
123:10,10,25
125:15,16
126:8 127:3
128:19 136:20
136:20 138:5
138:17 140:18
140:21,25

143:11,18,21
146:10,18,23
147:3,5 156:21
168:18 169:19
187:17 191:14
202:18 215:25
216:1,2,3
217:14,15
222:20
**truck's** 104:8
217:11
**trucks** 80:10
97:13
**true** 227:20
231:15 232:15
233:1 234:20
235:13 236:4,6
**trunk** 148:11
**trust** 72:25
**truth** 235:9,9
235:10
**try** 9:24 14:18
18:4,11,22
24:13,20 27:22
31:8 33:16
93:9 116:23
137:8 145:15
151:9 158:22
158:23 162:1
165:22 166:10
178:5
**trying** 9:18
13:10 17:14
26:15 27:1
28:15 36:5

**[trying - understand]**                                                   Page 58

37:14 38:24
39:21,23 45:1
54:12 63:10
68:16 83:15,24
86:16,18 87:1
90:2 91:19
99:15 103:16
113:7,9 119:25
120:6,7 132:17
136:22 140:12
144:4 145:22
146:4 148:23
155:3,6 157:4
159:16 160:22
161:6,7 165:23
174:22 180:23
186:18,19
193:18 196:20
204:2 209:21
210:14,15,18
215:15 219:21
**tune**   17:25
32:24,25 191:9
**tuned**   23:7
180:16,18
**tuning**   17:11
23:4 32:19,23
176:17,18,21
193:12
**turn**   32:2 55:18
157:6 175:10
**turned**   60:18
103:15
**turning**   85:21
108:25 109:1,3

**tweak**   21:24
**tweaking**   22:23
**twist**   39:14
**twisted**   162:17
162:24 163:4
**twisting**   145:8
162:5,11,12
163:10
**two**   16:21
23:21 25:12
26:13 27:24
28:1 29:3,3
41:12 53:23
55:16,17 57:21
67:3 71:23
72:2,3,4 73:8
76:18 91:3
94:19 97:13,22
100:6,16
102:13 103:23
106:8 114:10
114:15 116:22
120:25 130:20
131:3 137:9
140:20 141:2
146:17,20
147:24 149:18
149:23 151:21
151:22,25
152:2 169:11
169:13 170:17
170:25 175:7
180:21 186:20
204:5 205:3
207:6 210:1

211:7,18 212:6
212:8 213:18
227:3
**type**   15:6 16:12
34:13 40:11,16
52:20 56:10
61:1,22 110:21
118:19,20
120:7 128:9
133:1 151:17
159:10,13
**types**   11:3
**typewriting**
235:12
**typical**   129:12
**typically**
131:12 176:12
**typo**   74:5,7
76:21 77:16
91:23 107:15
107:25
**typos**   76:15

**u**

**u3000-49**   92:12
**ultimately**
189:19 207:16
**uncertainty**
28:15
**unclear**   167:14
**uncover**   194:18
**uncrushable**
135:6
**uncrushed**
140:23 222:4,7

**undamaged**
222:13,15,20
222:25 223:3
**under**   7:8 39:3
40:17 76:16
77:20,22 78:7
80:2 90:10
106:23 110:1
120:17 121:17
135:9 137:22
208:1 226:24
229:25 235:12
236:11
**underneath**
86:17 121:25
122:1 123:15
123:19,21
124:10 126:7
**underreport**
231:13
**underride**
161:10
**undersigned**
238:2
**understand**
6:21 7:14 8:20
10:24 16:11,11
19:11 22:14
23:10,17 36:2
48:7 49:22
63:15 72:19
85:11 87:1
90:20,25 91:18
95:3 101:21
108:6 112:17

G. Bryant Buchner , P.E.
January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[understand - uses]**                                                        Page 59

115:22 123:12
125:24 126:16
126:21 140:12
145:9,13,14
153:2 155:2
162:1 175:24
184:18 197:23
203:11 205:6
208:10 219:21
220:1
**understanding**
35:21 71:3
83:21,25 90:21
103:13 122:5
124:11 132:4
153:18 159:9
188:3,5 218:24
**understood**
98:9 103:18
134:10 190:14
213:5 218:5
**unfortunately**
113:8
**unibody**  26:19
33:9 34:18
36:20,21 79:12
150:2
**united**  1:1
**universal**  39:25
**unquote**  117:22
**unremarkable**
78:2,11
**unusual**  134:21
**unzip**  26:20

**update**  14:18
71:16
**updates**  15:11
**updating**  15:15
**uploaded**
234:24
**upper**  209:6
**upset**  123:9
**usable**  150:15
**use**  14:15,17
15:5,9,20
16:21 18:4
19:2 20:14
21:8 22:15
23:19 25:10,10
27:5 28:15,22
29:6,14,21,22
30:19 33:17,19
37:8 39:22,25
40:14,15 41:10
42:14,15 60:25
61:17,22 62:14
81:9 93:22
94:7 95:12,17
95:20 106:12
109:15 110:20
111:25 113:14
115:3,22
116:13,23
119:5 128:4,9
130:4,7 146:7
151:9,22
152:12 155:18
156:25 160:25
161:13,14,16

163:22,24
164:3,7,10,20
164:21,23
165:9,22
166:19 167:23
168:25 169:1
169:10 170:17
174:22 176:15
177:12 179:4
187:16 188:11
188:17,23
189:7,23
191:11,20,23
192:10,11
193:1 199:5
202:17 204:16
209:8,22
210:12,23,24
212:15,19,22
216:10 218:6,7
238:14
**used**  15:8 18:8
18:15 20:9
27:25 28:8,24
29:10 39:19
42:4,9 62:16
62:18 79:23
81:3,23,24
94:15,23 95:7
97:16 98:19
100:21 106:18
107:6 108:19
110:5,8,18
111:23 112:20
115:8 120:8,16

121:1 127:12
128:20 130:9
130:11 131:1
131:18 136:24
142:21 143:20
143:22 144:19
147:14 151:21
151:24 154:21
154:23 157:10
159:1,4 161:24
163:19,22
164:2,14 165:3
165:5,20
171:17 172:1
174:3 175:2
179:25 180:3
183:22 187:4
188:12 189:25
190:3,6 191:2
191:21 192:5,5
192:6,10
202:19,23
203:24 205:24
207:20 209:12
209:15,18,19
210:9 211:7
212:7 214:17
224:23 227:6
232:4,25
**useful**  36:1
**useless**  34:2
**user**  13:16,19
181:15
**uses**  20:16 42:8
93:17 153:17

G. Bryant Buchner , P.E.
January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[uses - vehicle]**

Page 60

157:2 177:15
188:20 218:8
**using**   9:21
13:22 14:24
15:2,16 16:5
18:18 19:7
26:6,8 27:17
28:1 39:1
40:18 42:20
61:12 69:22
70:25 80:21
82:3 90:22
94:3 95:10
100:8,10
101:14,24
113:22 114:4
114:15,17
118:8,10,15
121:3,3 126:24
128:5 131:24
132:13 136:1
141:3 142:14
143:4 147:16
147:25 153:13
154:8 157:15
159:3,5,14
160:9,10
162:14 165:13
165:13 166:4
166:10,22
167:12 169:6
170:4,25 176:9
176:20 190:8
191:10 206:8
210:17 211:18

221:24
**usually**   47:8
157:24 164:9
164:10

**v**

**v**   17:9 22:6
25:15 90:12,16
90:16,18,20,22
91:7,7,9
108:12 110:22
110:24 111:14
111:18 115:2
155:24 174:21
**v1**   205:22
**vac**   134:25
**vacuum**   82:19
84:4
**vagaries**
170:14
**vague**   134:17
167:14 197:15
200:7 203:17
**valid**   27:21
30:25 200:21
**validate**   41:10
62:24
**validated**   63:1
**validating**
160:13 161:23
**value**   86:21
119:18,20
120:13 151:10
151:11 175:1,4
175:9,10,11,14
175:15,16,18

175:20 176:11
176:12 177:12
180:10 190:18
204:8,12,15
205:7,14,17,19
207:15 208:5,5
212:11 214:20
220:16 229:25
232:8,11
**values**   25:12
108:9 130:12
156:17,24
174:9 187:15
188:21 193:2
193:16 206:3
206:17 207:18
208:18 209:19
210:4,15,21,24
211:19 213:22
226:23 231:3,4
231:9,12 232:1
232:25
**variability**
86:24 88:15
101:12
**variables**
170:12,15
171:11,11,19
**variation**   158:3
194:10
**variations**
193:12
**various**   7:17
230:12

**vary**   155:22
**varying**   99:2
**vast**   16:7
230:17
**vectors**   17:23
**vehicle**   3:23 9:7
9:19 16:16,17
21:13 27:1,2
33:8 34:22
36:7,7,12,12
44:6,9,12,24,25
45:20 56:4,7
56:17,25 58:1
58:12 60:6,9,9
60:13 65:16,25
77:3,5,10 78:5
78:6,6,14
79:21 83:2,18
84:9 86:3,13
88:7,9 90:4
92:6 95:13,16
95:18,21,22
96:4,17 98:23
98:25 99:2
105:6 108:16
110:8,10 117:3
118:4,16
121:18 125:15
127:16 130:22
131:9 133:13
134:23 136:7
138:1 142:5
150:12,19
152:25 155:15
156:15 157:17

Case 2:22-cv-00017-RWS    Document 119-4    Filed 01/20/25    Page 122 of 129

G. Bryant Buchner , P.E.

January 23, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

[vehicle - wall]

Page 61

159:12 160:7
162:5,10,20
163:5 168:15
169:9,13 175:5
175:5,5 177:14
178:18 181:4
183:4 185:14
185:15,24
186:9 187:11
192:17,18
193:23 195:12
195:13,15,21
196:1 198:12
198:16,25
202:24 203:6
206:9,25
207:10,13,24
208:21 213:20
214:4 215:2
216:14 218:3,6
218:7,9 221:12
222:4,6,7,9
225:5,24 228:8
228:21
**vehicle's**
162:10 169:8
**vehicles**  16:21
17:2,22 19:1
19:14,15,16
20:16 21:6
23:2,16,21
24:10 26:9
28:1,2 30:22
35:2 36:8
41:22 45:24

46:5 56:9 57:2
57:13 64:8,23
65:20 66:3,10
68:25 76:18
77:2 81:14
85:20 91:4
94:23 95:11
100:7 103:23
105:17 106:2,4
110:3 112:16
126:15 133:16
137:2,14,17
143:4 144:17
147:9 157:1
167:20,24
169:11,13
172:17 175:7,8
175:17 177:6,7
178:22 180:21
181:13 183:12
195:2,9,25
196:24 226:25
230:12
**velocities**
174:10,15
**velocity**  17:23
174:16,21
**venn**  212:16
**verbatim**
234:12
**verified**  95:9
100:6
**verify**  13:10
95:12

**veritext**  234:10
234:16 236:3,5
236:11 237:10
237:17
**veritext.com**
236:10 237:19
**versa**  231:23
**version**  6:4,22
6:24 12:21
18:14 72:23,25
73:2 74:2,4
82:10 97:20
124:18 125:13
179:3 202:23
**versions**  173:7
179:14
**versus**  46:14
86:10 97:20
106:5
**vice**  231:23
**video**  2:20 4:4
4:20 11:20,24
12:2 64:12
70:13,16 89:25
99:21,24 100:2
113:20 116:2,5
147:11 173:17
173:20 201:5,8
223:16,19
233:9
**videotape**  1:13
4:7 233:10
**videotaped**
3:10

**view**  186:6
221:8 222:18
**vin**  95:10,12,17
95:19,20
**violated**  198:24
199:3,9
**virtual**  2:20
56:4,7
**virtually**
157:13
**visible**  60:13
**visit**  69:5,13
76:5,11
**visited**  65:20
69:8,11
**visual**  56:23,24
57:1,4
**visualization**
21:18 214:24
218:17
**visualize**  21:15
221:2
**visually**  64:23
**vitae**  3:13
**vital**  53:13
**vs**  1:8 22:17
25:6,8 108:8
152:14,15

**w**

**w**  2:7
**wait**  173:9
**waiting**  63:22
200:17
**wall**  23:23

Case 2:22-cv-00017-RWS    Document 119-4    Filed 01/20/25    Page 123 of 129
G. Bryant Buchner , P.E.
January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[want - went]**

**want** 10:2 20:7
21:14,15,15
23:19 29:7
33:19 44:1
48:7 51:10
56:12 59:25
63:12 66:13
74:19 75:5
76:14 84:14
93:20 98:7
100:15 101:21
103:12 104:4
107:22 110:7
114:20,21
122:8 123:11
124:14 128:17
129:9,16 134:5
134:9 135:4
136:21 138:15
152:20 164:16
164:19 198:2
198:19 211:25
218:15 226:1
229:19
**wanted** 5:10
17:5 30:21
58:24 63:2
72:15 91:5
94:16 103:8
159:14 161:12
171:18 187:19
187:19,24
188:11 211:16
**wanting** 113:5

**wants** 8:9
24:16 34:5
91:14 137:7
154:12,18
159:24 163:13
187:16
**waste** 59:25
**watch** 77:18
**way** 8:13 13:15
13:15 15:13
21:11 25:3,7
26:18,19,20,20
27:5,22 32:22
32:25 34:10,14
35:22 40:9
41:8 44:25
47:8 51:23,25
53:4 56:15,16
64:20 67:5
79:7 84:19
88:2,9 91:2,20
94:12 95:15
96:20 100:7
101:1,1 102:9
104:14 112:22
116:16 124:6
125:15 134:4
134:11 135:2
145:8 154:11
157:15 160:2,5
171:14 178:21
181:10 186:6,7
194:13 196:1
196:17 198:2
207:7 210:25

211:9,14 212:3
212:11 213:24
214:1,6,14
229:12
**ways** 37:5
89:20 100:21
101:2 102:15
116:22 134:3
160:15 172:24
186:11,20
211:25 217:24
**we've** 5:7 38:21
47:16 67:19
80:20,21 92:22
99:18 106:6
147:8 153:8
155:19 194:21
196:11 200:11
201:15 203:14
209:25 213:2
**week** 9:4,4 72:4
81:10
**weekend** 6:14
6:14 7:13 9:6
192:16
**weigh** 83:17
**weighed** 82:25
83:2,5,14
87:15 88:24
89:3 93:1,3
110:15
**weighing** 87:20
**weight** 80:3,7
82:9,12,14,20
84:5 87:13

88:7,21,22
89:17 110:8
127:20,24,25
128:2,21
151:12 152:16
182:17,22,24
183:11,12,13
183:14,14
184:5,9,20
185:14,24
**weights** 80:12
87:21 90:4
110:12 113:24
151:12 181:16
181:18 183:3
183:10,12,23
183:24,25
185:13,19
186:17
**weinberg** 2:13
**welcome** 224:1
**welds** 34:20
**wells** 26:19
**went** 14:4,8
15:3 34:19,19
62:10 65:15
69:17 71:21
72:10,12
121:13 127:4
140:10 142:5
142:18 181:10
217:15,15
229:4,19 232:9
232:13

G. Bryant Buchner , P.E.
Bryson, Santana and Joshua v. Rough Country, LLC

January 23, 2024

**[whatnot - yeah]**

Page 63

| | | | |
|---|---|---|---|
| **whatnot** 152:16 | **wooten** 47:25 | **work's** 68:21 | **wrote** 80:11 |
| **wheel** 9:24,25 | **word** 23:19 | **worked** 23:25 | 91:20 154:7 |
| 80:15,19 | 89:9 93:6 | 44:11 48:14,22 | **x** |
| 108:19,21,23 | 97:20 118:20 | 52:12 53:1 | **x** 3:1,5 |
| 109:6,7,14,20 | 157:10 176:8 | 55:14 124:4 | **y** |
| 182:21 184:15 | 199:6 203:5 | **working** 15:16 | **yeah** 5:25 7:3,5 |
| **wheeler** 2:13 | 208:1 228:20 | 48:25 49:10,11 | 8:24 11:9 |
| 45:20,21,22 | **words** 28:12 | 49:16,20 52:8 | 12:10 19:7 |
| **wheels** 108:24 | 30:12 45:3 | 54:19 73:2 | 25:23 29:3 |
| 182:8,8 | 59:4 78:3 85:3 | 89:24 | 32:13 54:3 |
| **whoops** 150:20 | 92:4 97:7 | **works** 113:17 | 57:4,7,11 |
| **wide** 217:13 | 115:16 123:23 | 156:8 170:7 | 58:16,18 65:4 |
| **wild** 87:20 | 143:12 161:8 | 228:24 | 65:9 66:12,14 |
| **window** 170:21 | 170:17 204:25 | **world** 106:21 | 67:11,20 68:20 |
| 170:23 | 217:9 231:7 | 147:9 172:11 | 71:7 78:22,25 |
| **wires** 177:20 | **work** 7:9 10:10 | **worlds** 73:9 | 79:20 80:18 |
| **withheld** 11:4,9 | 22:9 24:13 | **worried** 26:23 | 81:9 82:20,23 |
| 11:17 | 32:15 33:4 | 73:6,7 | 83:3,15 86:15 |
| **witness** 4:1,21 | 38:23 39:5 | **worry** 208:12 | 87:5 89:7,12 |
| 12:8 70:11 | 43:18,22,23 | **worth** 186:11 | 91:13 93:11 |
| 99:20 113:16 | 46:13 47:7 | **wreck** 167:25 | 97:11,15 98:13 |
| 113:18 116:1 | 50:14 51:1,10 | **wrench** 31:25 | 98:15 104:16 |
| 173:8,14,16 | 53:10,10,12 | 32:3,4,5,10,13 | 104:20 105:11 |
| 201:3 208:15 | 54:16 55:21 | 35:7 | 106:7 107:15 |
| 223:24 233:8 | 56:2,5,13 | **wrenches** 32:2 | 108:3 109:16 |
| 236:7 | 60:21,22 61:18 | 35:9 | 109:16,23 |
| **witnesses** 12:5 | 67:9 68:9,14 | **write** 91:2 | 110:15 111:18 |
| 234:22 | 69:17 72:24 | 144:20 | 112:13,25 |
| **wondered** | 76:17 80:10 | **written** 37:1 | 113:7 119:22 |
| 94:15 | 81:24 92:22 | 93:15 | 120:14,15,22 |
| **wonderful** | 149:2 154:3,18 | **wrong** 68:22 | 124:12 127:15 |
| 29:21 | 155:14 156:4 | 114:6 129:15 | 129:17 132:23 |
| **wondering** | 160:13,14 | 133:8 177:21 | 135:7,19,19 |
| 106:11 | 165:15 172:17 | 177:25 178:7 | 137:11,15 |
| | 194:8 211:4 | 191:24 224:23 | |

Veritext Legal Solutions

800.808.4958

770.343.9696

G. Bryant Buchner , P.E.                    January 23, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[yeah - zoom]                                                    Page 64

| | z |
|---|---|
| 138:10 139:3,7 | **zero**   94:6,7,10 |
| 139:7,11,19 | 94:13 111:6 |
| 140:15,17 | 213:22,25 |
| 148:6 150:1,11 | 214:15,20 |
| 153:16 154:2 | **zoom**   56:10 |
| 161:7 171:9 | 235:8 |
| 174:4 175:24 | |
| 176:5 177:5 | |
| 180:25 183:10 | |
| 191:8 192:1,3 | |
| 193:17 194:10 | |
| 195:17 205:23 | |
| 207:22 209:5 | |
| 215:8,10 217:5 | |
| 219:4,21 221:6 | |
| 221:7,10 222:3 | |
| 222:7 225:3,12 | |
| 225:13 228:3,4 | |
| **year**   61:4 62:22 | |
| 95:21 97:12 | |
| 127:16 168:17 | |
| 179:6 | |
| **year's**   96:23 | |
| **years**   13:23,24 | |
| 14:12 15:2 | |
| 42:20 46:19 | |
| 80:22 150:6 | |
| 165:14,15 | |
| 166:20 170:3 | |
| 189:2 230:8 | |
| **yelled**   190:5 | |
| **yep**   30:15 | |
| 37:13 | |

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.

If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons
given for the refusal to sign require rejection of
the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.