Case 2:22-cv-00017-RWS    Document 119-6    Filed 01/20/25    Page 1 of 153
G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF GEORGIA

3                 GAINESVILLE DIVISION

4

5    CASE NUMBER:  2:22-CV-017-RWS

6

7    SANTANA BRYSON, et al.,

8          Plaintiffs,

9          vs.

10   ROUGH COUNTRY, LLC,

11         Defendant.

12

13         * * * * * * * * * * * * *

14

15

16         THE ORAL PROCEEDINGS

17   OF THE DEPOSITION OF G. BRYANT BUCHNER

18              JULY 11, 2024

19

20

21   REPORTER:  Paul Morse

22              Certified Court Reporter

23              and Notary Public

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 2

1        IT IS FURTHER STIPULATED AND AGREED
2   that the signature to and the reading of the
3   deposition by the witness is not waived, the
4   deposition to have the same force and effect as
5   if full compliance had been had with all laws
6   and rules of Court relating to the taking of
7   depositions.
8        IT IS FURTHER STIPULATED AND AGREED
9   that it shall not be necessary for any
10  objections to be made by counsel to any
11  questions except as to form or leading
12  questions, and that counsel for the parties may
13  make objections and assign grounds at the time
14  of the trial, or at the time said deposition is
15  offered in evidence, or prior thereto.
16       IT IS FURTHER STIPULATED AND AGREED
17  that the notice of filing of the deposition by
18  the Commissioner is waived.
19
20
21       * * * * * * * * * * * * *
22
23

Page 3

1              I N D E X
2
3          EXAMINATION
4                    PAGE
5   By Mr. Hill............................. 6
6   By Ms. Cannella........................ 296
7   By Mr. Hill............................ 304
8
9
10
11      EXHIBITS FOR THE DEPOSITION
12                    PAGE
13  Exhibit 1, Mr. Buchner's Report......... 7
14  Exhibit 2, Rebuttal Report.............. 178
15  Exhibit 3, PowerPoint................... 186
16  Exhibit 4, PowerPoint................... 251
17  Exhibit P1, Example Image................ 303
18
19
20      * * * * * * * * * * * * * * * *
21
22
23

Page 4

1        IN THE UNITED STATES DISTRICT COURT
2      FOR THE NORTHERN DISTRICT OF GEORGIA
3            GAINESVILLE DIVISION
4
5
6   BEFORE:
7        Paul Morse, Commissioner.
8
9   APPEARANCES:
10       RICHARD HILL, ESQUIRE, of WEINBERG,
11  WHEELER, HUDGINS, GUNN & DIAL, 3344 Peachtree
12  Road, Suite 2400, Atlanta, Georgia 30326,
13  appearing on behalf of the Defendant.
14       TEDRA CANNELLA, ESQUIRE, of CANNELLA
15  SNYDER, LLC, 315 West Ponce de Leon Avenue,
16  Suite 885, Decatur, Georgia 30030, appearing on
17  behalf of the Plaintiff.
18       DEVIN MASHMAN, ESQUIRE, of CANNELLA
19  SNYDER, LLC, 315 West Ponce de Leon Avenue,
20  Suite 885, Decatur, Georgia 30030, appearing on
21  behalf of the Plaintiff.
22       ALSO PRESENT: Jess Wiggins, Video
23       * * * * * *

Page 5

1        I, Paul Morse, CCR, a Court Reporter of
2   Mobile, Alabama, acting as Commissioner,
3   certify that on this date, as provided by the
4   Federal Rules of Civil Procedure and the
5   foregoing stipulation of counsel, there came
6   before me via Remote Videoconference, beginning
7   at 10:00 a.m., G. Bryant Buchner, witness in
8   the above cause, for oral examination,
9   whereupon the following proceedings were had:
10
11       THE VIDEOGRAPHER: Today's date is
12  July 11, 2024. And the time is 10:15 a.m.
13  This will be the videotaped deposition of
14  George Bryant Buchner.
15    Would counsel present please identify
16  themselves for the record, starting with the
17  taking attorney.
18       MR. HILL: This is Rick Hill on
19  behalf of Defendant Rough Country.
20       MS. CANNELLA: Tedra Cannella and
21  Devin Mashman on behalf of the Plaintiffs, the
22  Bryson family.
23       THE VIDEOGRAPHER: Thank you.

2 (Pages 2 - 5)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 6

1  Would the Court Reporter please swear in the
2  witness.
3
4          G. BRYANT BUCHNER,
5  having first been duly sworn, testified as
6  follows:
7
8          EXAMINATION
9  BY MR. HILL:
10     Q.   Thank you, Mr. Buchner.  I'm going
11  to start with your May 8, 2024 letter to
12  Ms. Cannella.  And I will share my screen or at
13  least attempt to share it --
14     A.   Okay.
15     Q.   -- and put that letter up.  I'm
16  sure you probably have it there in front of
17  you.
18     A.   I'm really bad on dates.  So I'll
19  look at it and see what we're -- what we're
20  talking about when you pull it up.
21     Q.   All right.  Are you able to see
22  the screen now?
23     A.   Yes, sir.

Page 7

1      Q.   All right.  This is a letter from
2  you to Ms. Cannella dated May 8, 2024.  It's
3  bates labeled Bryson 09348 through 09377.  And
4  I'd like to mark this as Exhibit 1 to your
5  deposition.
6          (Defendant's Exhibit Number 1
7           is marked for identification.)
8      A.   Can we call it the FR26 amended
9  report?  Because that's -- that's why I didn't
10  know what you were talking about.  I'm okay if
11  you call it a letter.  But I'd rather call it
12  the amended report.
13     Q.   Sure.  The Re line says FR26
14  amended report.  And so I'll reference it by
15  that name.
16     A.   Thank you kindly.
17     Q.   Sure.  In the first paragraph
18  you'll see that you use -- you state that an
19  unforeseen technical issue resulted in the loss
20  of the original simulation file.  Just so we're
21  clear, what do you mean by an unforeseen
22  technical issue?
23     A.   Well, I think that the simulation

Page 8

1  was run in October-ish of '23.  The depo was in
2  January.  And I hadn't opened the file or
3  looked at it.  And when we went to retrieve it,
4  it basically didn't exist.  The run file did
5  not exist.  And so we could not -- we did
6  everything we could to try to locate it and
7  find it.  And all that we can think of is that
8  something happened during the save process.
9      And so I had -- just had no idea that that
10  thing wasn't there.  I hadn't looked for it in
11  months.  So that's -- that's the unforeseen
12  technical issue.  It happens to, you know, all
13  of us at times when you think you've saved
14  something and it didn't get saved properly or
15  maybe there was a corruption in the -- you
16  know, on the computer disc somewhere.  I don't
17  know.
18     Maybe somebody opened it later on and
19  thought it was something else and moved it to a
20  folder and we can't find it.  I don't know.
21     Q.   What is the process after you run
22  an HVE simulation to save the files associated
23  with that simulation?

Page 9

1      A.   Well, it -- it really ought to be
2  saved and moved into the -- you know, into the
3  job file and put into engineering analysis,
4  which you've probably seen my EA folders,
5  engineering analysis folders.  It wasn't --
6  that -- that final step apparently didn't
7  happen.  It was still on the simulation
8  computer.  At least that's where we thought it
9  was.  And it didn't -- it just wasn't in
10  any other place.  I don't think it ever got
11  moved was the problem.  That's the reason I --
12  I needed to go get a copy of it.
13     Q.   And when you say later on in
14  this -- on this page that -- at the bottom you
15  said since the simulation had been corrupted,
16  what do you mean by the term corrupted?
17     A.   Well, whatever we found did not --
18  we went back to the archives and everything.
19  We never found anything that looked like the
20  accident one.  And it's even suspect that the
21  printout that I was using was -- was from the
22  one that I had looked at back in October.
23     So the word corrupted is kind of a general

3 (Pages 6 - 9)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 10

1 term between losing it, between, you know,
2 not -- not having the right data. It's just --
3 it was meant to be a -- I think originally we
4 thought maybe it had been corrupted. But in
5 the end I think it's -- corrupted, the term
6 changed or something. But it couldn't be
7 opened.
8    But in the end, we -- we've never found one
9 that we think was it, period.
10    Q.   So when you produced the printouts
11 prior to your deposition in January that
12 related to this original simulation, are you
13 saying that you are not sure whether those
14 printouts were the same printouts or data that
15 you were looking at when you ran the original
16 simulation in October?  Explain that to me.
17    A.   Yeah.  That -- that's true.  Back
18 in October I looked at the data.  I looked at
19 the answers.  They were printed -- or at least
20 I asked for them to be printed.  I don't -- you
21 know, I'm not the printer guy or the filer guy.
22 And it's almost as if what was picked up was an
23 early iteration or something because some of

Page 11

1 the data was just wrong.
2    And so I -- you know, it was months before,
3 but I thought that we had had -- that we had
4 all of that.  And during the deposition, I
5 clearly said, no, these are all of the reports
6 that are there.  I hadn't gone back and
7 checked.  They clearly weren't all of the
8 reports.  And so we went and just did
9 everything we could, and we could not resurrect
10 anything that I can be confident was what I had
11 looked at back in October.
12    So we can make some guesses.  But I can't
13 make -- I can't know.  So my opinions are --
14 you know, were well recorded in my depo and,
15 you know, the opinions haven't changed.  But we
16 really just had to re-enter the data.  And we
17 made an improvement or two, you know, that --
18 you know, to make sure that we had it right
19 like the 0.04 inches on the tire or something
20 like that, whatever it was.  But you know, so
21 at the end of the day, we don't have anything
22 that survived that I can validate as being what
23 I looked at back in October.

Page 12

1    But what we have now is -- is a
2 representation of everything I said in my -- in
3 my deposition.  And it gives the right answers.
4 It gives the same answers that I thought I had
5 at the time of the depo.
6    Q.   When did you discover that the
7 printouts that you provided to us related to
8 the original simulation that were provided a
9 week before your deposition in January, when
10 did you discover that those were not correct or
11 did not have the, you know, appropriate data
12 reflecting the simulation that you produced
13 that we discussed in your first deposition?
14    A.   Well, it -- I mean, it may have
15 been a couple of months.  We were under the
16 mistaken belief that we were just looking for a
17 file.  And then as time went on and we kept
18 pealing back, looking and thinking, we went all
19 the way back and finally opened that up and
20 looked and said, okay, let's try to rerun with
21 this data.  And then we started trying to do
22 the rerun and we realized things weren't -- I'm
23 going to use the -- things were consistent with

Page 13

1 what I'd said in my deposition.  So I mean, it
2 was -- and we had other work that was going on.
3 We had prepared for the depo, and we were busy
4 with other things.
5    And so what I thought was a simple, hey, go
6 find the file and present it kept getting
7 harder and more complicated and more
8 complicated.  And we kept realizing that we had
9 a bad concept, which is that we were just
10 looking for a missing file.  What we were
11 looking for was something that probably didn't
12 exist.
13    Q.   So just to be clear, when you run
14 an HV simulation, it produces a graphical
15 depiction of the crush --
16    A.   Yes.
17    Q.   -- based on the simulation.
18 Correct?
19    A.   Yes.  If you -- if you ask it to,
20 it will.
21    Q.   Right.  It can do that?
22    A.   Yes.
23    Q.   And that was produced with regard

4 (Pages 10 - 13)

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 14

1  to your original simulation prior to your first
2  deposition?
3      A.   Yes.
4      Q.   And was that graphical
5  representation of the crush with the other data
6  that's on there, was that consistent with the
7  HV simulation that you actually ran in October,
8  or was that also corrupted as well?
9      A.   I -- all I have is the images.
10 I -- I can't tell.  That's part of the problem.
11 So we've generated new images.  You can't tell
12 the difference in the new images and the old
13 images, at least I can't visually looking at
14 them because the -- the crush is very similar.
15     In other words, it would take -- you know,
16 you'd have to make some pretty fine
17 measurements to see if there's differences.
18 But so I don't know.  What I know is that what
19 we've -- what we have provided in this
20 supplemental report is consistent with what
21 I've said in the deposition.  And it's -- and
22 we have made sure as best of our ability to get
23 the numbers that I used in my deposition the

Page 15

1  way I said I thought we had run it correct
2  here.
3      Q.   All right.  I appreciate that.
4  But I'd like to just first talk about the
5  original simulation.  We'll get to the rerun or
6  amended simulation.  But with regard to the
7  original simulation that was produced to us in
8  October of 2023 and upon which your initial
9  deposition was based and upon which your report
10 was based, I want to make sure I'm
11 understanding.  What you produced to us in
12 January that related to that original
13 simulation, not just the backup files but also
14 the results of the simulation, are you saying
15 that you can't confirm that anything related to
16 the simulation that was produced to us prior to
17 your deposition was actually representative of
18 the October simulation that you ran that you
19 based your opinions on?
20     A.   Okay.  Really long question.  Ask
21 the last part of it so I know the crux of the
22 question.  I heard every -- I heard the lead-in
23 really well.  I didn't hear the question really

Page 16

1  well.
2      Q.   Sure.  Sorry if it wasn't crafted
3  very artfully.  Let me try to make it simpler.
4      So you just said that the graphical
5  representation of the crush and the data on
6  that that was produced to us prior to your
7  deposition, that it -- you can't confirm
8  whether it actually is representative of the
9  simulation you ran in October of 2023?
10     A.   Not exactly.  It is -- it is
11 representative in that I can't tell the
12 difference between it and what we ran.  In
13 other words, it looks -- it looks like what I
14 remember.  It looks like what our results are
15 today.  But I can't tell you if it actually was
16 the printout from it.  But the crush that's
17 shown there is -- is representative because
18 it's indiscernible from the crush that we know
19 is reasonable and accurate in the rerun.
20     Q.   Right.  When you --
21     A.   Yeah.  So thank you.
22     Q.   Well, that's a -- that's a good
23 answer.  But even though it may be similar or

Page 17

1  representative, you can't verify that it's the
2  actual result of the -- the original
3  simulation?
4      A.   Right.  It was indiscernible to me
5  from the actual result.
6      Q.   Right.
7      A.   But I can't tell you if that was
8  actually printed from the actual result.  But I
9  can tell you that it was good enough that it --
10 that I did not detect it when I was using it
11 for the deposition.
12     Q.   Right.  And the same question with
13 regard to all of the backup files that related
14 to that original.  I don't want to go through
15 every one individually, so we'll start it with
16 a broad question.
17     You have a certain number of backup files,
18 an environment file, this file, that file.  Is
19 the same true that all of those files that
20 were -- that were printed and produced to us,
21 the ones you could find prior to your
22 deposition, you can't verify if those were the
23 actual files that were generated when you ran

Veritext Legal Solutions
800.808.4958                                                    770.343.9696

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 18

1 the original simulation?
2      A.   I don't -- I don't think at the
3 end of the day they were.  I mean, that's part
4 of my problem that, you know, that work had
5 been done back in October.  Somehow in the
6 saving and filing process, what we -- what I
7 was looking at and what I did, did not make it
8 into the file.
9      Q.   Okay.  And so another way maybe to
10 put it would be the October simulation upon
11 which you base your report was not saved and
12 put aside in the file in the form that it
13 existed when the original simulation was run?
14      A.   Yes.
15      Q.   And then when you went to produce
16 it prior to your deposition, you went back in,
17 and it had been changed or corrupted or
18 something was different about it when you went
19 back in to produce it to us prior to your
20 deposition?
21      A.   Right.  We could never find a file
22 that we had any confidence -- or that was the
23 file that we had used in October.  It just --

Page 19

1 just we could not in any shape, form, or
2 fashion locate that.  So we had to redo it.
3      Q.   Okay.  And so none of the data
4 files, whatever, related to the original
5 simulation upon which you based your -- your
6 initial report in October exist as this -- as
7 of this time, at least that you can find?
8      A.   That is true.
9      Q.   Okay.  And when did you discover
10 that all of the data and all of the files
11 related to that original simulation no longer
12 existed?
13      A.   Like I said, it took a couple of
14 months.  We were working on other things.  I
15 thought it was a simple procedure.  It happens
16 commonly that a file gets left on another
17 computer, doesn't make it in, or a miscopy is
18 put in.  And we were doing other work that was
19 scheduled.  And every time I inquired, we're
20 working on it and we thought somebody would say
21 they -- they did something.  And when I
22 investigated, I said no, this isn't it; you've
23 got to keep looking.  And then eventually, you

Page 20

1 know, we -- it took a couple of months.  I
2 don't know the exact time.  But it wasn't a
3 week for sure.  It was unfortunately an
4 extended period of time because I was -- I
5 thought it was going to be an easy process, and
6 it wasn't.  And then in the end, you know, it
7 took more -- a couple months or more.
8      Q.   And when you say it took a couple
9 months or more, you mean from when?  From the
10 time of your deposition?
11      A.   Oh yeah.  It was months after the
12 deposition.
13      Q.   That's what I'm trying to clarify.
14      A.   Yes.  But I don't know how long.
15 I'm just trying to give you an approximate
16 feeling for the timeframe.  It wasn't days or
17 weeks.  It was months.  I don't know how long.
18      Q.   And so you don't know an exact
19 date that you finally realized, hey, not only
20 can we not find the missing files, but the
21 files that we produced during the deposition
22 were not connected with the initial simulation.
23 You -- those were two different discoveries.

Page 21

1 Right?
2      A.   Ask that question again.
3      Q.   Sure.  So there were certain
4 backup files that were missing at the time of
5 your deposition.  There was -- there was no
6 data produced of any type at your deposition.
7 Correct?
8      A.   No.  You're --
9           MS. CANNELLA:  Object to the form
10 of the question as vague.
11      A.   The -- the HVE run files were not
12 produced at the time of the deposition.
13      Q.   Right.
14      A.   Some printout reports -- some
15 printout reports were produced.  Thank you.
16      Q.   Right.  And so you thought you
17 were just looking for the missing HVE run file
18 at the time after --
19      A.   After -- when I -- when I walked
20 out of my deposition, I thought I was missing
21 whatever HVE files were used to generate the
22 reports that I -- that were in the book in the
23 deposition.  Yes.

6 (Pages 18 - 21)

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 22

1    Q.   Right.  But you believed the files
2  that you did print and produce were actually
3  accurate and associated with the original
4  simulation?
5    A.   Yes.
6    Q.   Okay.  And so that's two different
7  discoveries.  One is we can't find the HVE run
8  file.  Right?
9    A.   Yes.
10    Q.   And two is, oh, the files we did
11  produce were not associated with the original
12  simulation?
13    A.   Well, the reports we did produce,
14  yes.
15    Q.   Right.  And so when did you
16  discover that the reports that you produced
17  were not associated with the original
18  simulation?
19    A.   Well, that took a long time, as I
20  said earlier, because we thought we were just
21  looking for a missing electronic copy.  When we
22  couldn't find that, then we said, okay, we need
23  to reproduce a reasonable electronic copy.

Page 23

1  We started trying to use the reports, and I
2  found some things that -- that were
3  inconsistent with what my memory was as to what
4  should have been there.  So suddenly we started
5  looking at those reports and we realized, hey,
6  something -- something looks like it happened
7  on that level as well.  So that took a while.
8  It was -- it was not weeks or days.  It was --
9  it was, you know, over a month for sure.
10    Q.   How did the reports survive but
11  the HVE run files did not?
12    A.   Okay.  Well, and that's -- I've
13  already alluded to that.  But at the time of my
14  deposition, I thought all of the reports had
15  been printed and that's what I testified to.  I
16  thought they had just been printed and put in
17  the file.  That's what me belief was back in
18  October when we did it.  But what was there was
19  only partial reports.
20    And so somehow in the printing process --
21  and whoever was getting them or whoever was
22  filing them, what -- what I was using back in
23  October did not end up in the file.

Page 24

1  Something -- something from another preliminary
2  effort, you know, made it in there.  That's --
3  so it's a filing error.  That's -- that's all
4  that happened.  I don't know what it was.  I
5  had no idea other than when I tried to
6  validate what I testified to, what I had
7  recorded as, you know, what the runs showed me
8  and what I tried to testify to, it didn't -- it
9  was inconsistent with what I had that was in
10  the file.
11    Q.   And you just alluded to you think
12  those were preliminary runs, meaning runs done
13  prior to your original simulation?
14    A.   Right.  The -- all simulations are
15  iterative.  All calculations are iterative.
16  You have to start building it and work on it.
17  But there were -- yeah, so it's just -- this --
18  that was not the final work that was there
19  and -- period.
20    Q.   But it existed in January.  And
21  you went to print them out to produce them for
22  your deposition?
23    A.   No.  No.  They had been printed

Page 25

1  way back in October.  And I hadn't touched them
2  for months.  I didn't even -- I didn't even
3  look at them getting ready for the deposition
4  because they -- all of that work had been
5  finished in October, to my knowledge, and it
6  had been put in the file.  And we had
7  summarized the results in I think the -- the
8  FR26 report we did, and that's what I was
9  using.
10    Q.   Okay.  So that's what I want to
11  make sure I understood.  So the printouts of
12  the reports that were produced, including the
13  results of the simulation, you're -- you're
14  saying those were printed out back in October
15  contemporaneous with the running of the
16  original simulation?
17    A.   Well, that's -- that's the problem
18  is I don't know because the -- my -- look, my
19  intent is to do the work and then file the
20  work.  Do the work, file the work, use the
21  work.  I -- something happened between when I
22  did that and wrote the report.  I don't
23  remember the date of the report.  Does anybody

7 (Pages 22 - 25)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 26

1  remember the original report? Because it will
2  help me.
3      Q.    October 13, I believe.
4      A.    Okay. So that's why I keep saying
5  I didn't -- as we were writing that report, I'm
6  using -- I'm looking at something on a computer
7  screen, and I'm doing my work. I'm getting my
8  report done. Then months later I -- you know,
9  I believe that that stuff has been properly
10 filed by my staff. And -- and you know, I
11 mean, heck, it could be that didn't hand the
12 right document. I thought something had been
13 printed.
14    I'm not blaming anybody. I'm just saying
15 something happened with whatever I was using in
16 October that I relied on that was still there
17 in January. I testified using my final report.
18 And then when I tried to give it to you or
19 referenced it, it -- the documents that I
20 thought were there weren't there. That's --
21 that's what happened.
22    I -- if I had known there was a mistake in
23 October, I would have -- gladly would have

Page 27

1  fixed it, you know, before the deposition or
2  would have, you know, reproduced that work.
3  I -- I just didn't know. We had too many other
4  things we were working on in this case and
5  other cases that -- I had confidence in my
6  filing process. And anybody that's ever tried
7  to file anything knows that that happens from
8  time to time.
9      Q.    All right. Well, whatever reports
10 are associated with your original simulation --
11     A.    Uh-huh.
12     Q.    -- or let me -- or scratch that.
13 I'll ask it a different way.
14    The reports related to an -- no. Scratch
15 that. Let me think through this a second.
16 Hold on.
17    You -- your office produced to us prior to
18 your deposition in January of 2024 reports
19 related to an HVE simulation. And are you
20 telling me that you can't identify when those
21 documents were printed that were produced to us
22 prior to your deposition?
23     A.    No, I didn't -- I don't know. I

Page 28

1  know what my intent was with what I was using.
2  But as I sit here, I -- I don't know. That was
3  a -- that was some kind of a problem that
4  happened. And I don't know when it happened
5  exactly. But I do know that when I wrote my
6  report in October 12, I think is what you told
7  me, 2023, I had data that I was using. And
8  I -- you know, it's not uncommon for me to have
9  my working copy that I'm using to type the
10 report, and then my work copy goes in the trash
11 can.
12    And the file copy is supposed to be in the
13 file. Well, that file copy wasn't what I used
14 to do my FR26 report. I mean, that's just --
15 and then the electronic file was supposed to be
16 there to go back and resurrect. It -- it's not
17 there.
18     Q.    So you don't know when the file
19 copy was printed that was produced to us? That
20 was my question.
21     A.    My -- my belief was it would have
22 been done back in August. But I mean, it's
23 possible someone, you know -- I said August.

Page 29

1  In October is what I meant. I don't -- I don't
2  know.
3     When I started this conversation, I would
4  have said it was in October because that's when
5  it was supposed to have been. But as I sit
6  here, I didn't do the printing of that
7  document. And I didn't do the filing of that
8  document to the best of my knowledge. And it's
9  not the same document I was using when I did my
10 October letter.
11     Q.    Prior to -- sorry. Go ahead. I
12 didn't mean to --
13     A.    So the answer is I don't know.
14 Thank you.
15     Q.    And prior to your deposition, you
16 also produced some digital files related to the
17 HVE simulation. Correct?
18     A.    I don't remember that.
19     Q.    Okay. We asked for you to produce
20 the actual digital files that related to your
21 HVE simulation. And my understanding is that
22 you produced to us the digital files you could
23 find, but you couldn't find the HVE run file.

8 (Pages 26 - 29)

G. Bryant Buchner                                 July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 30

1  Is that your understanding?
2       A.   I don't -- I don't remember that.
3  My memory is just not -- it's just blank on
4  that. I don't know. If you have those files,
5  that's great. If you don't, I don't -- I don't
6  know the answer to the question.
7       Q.   Well, they would obviously
8  represent the printouts. And so if those files
9  were actually produced, you don't know, you
10 know, if they relate to the original simulation
11 or not. Right?
12      A.   Because I don't know what files
13 you're talking about. I can't even answer the
14 question.
15      Q.   Okay. When you did the rerun,
16 you -- you did properly save the HVE files
17 related to the rerun. Right?
18      A.   And those were -- and those were
19 sent out with the amended report. My
20 understanding is you should have those, yes.
21      Q.   Right. And what was the process
22 used to save those files?
23      A.   I don't know. I didn't do that.

Page 31

1  It was -- it was done by the gentleman that
2  input the data. And I haven't actually opened
3  that file myself. I said -- I verified that
4  that file is this file that I have these
5  reports from. He said he did that. And then
6  that was sent to you.
7       Q.   Okay. So explain that to me. So
8  you don't actually run the simulation. You
9  just provide instructions for someone else to
10 run the simulation?
11      A.   No, I'll never open it and I'll
12 never save it. I'll go -- I will go make
13 adjustments to it or look at it and I will sit
14 with him when he does that as needed. Yes.
15 But I'm not the -- I don't open/take care of
16 the HVE software suite. All of that is done by
17 someone else. I'm a user of it. And I don't
18 end up saving it because we -- I don't want to
19 make a mistake on it. I want the person who's
20 running that to -- to do that job.
21      Q.   Who is --
22      A.   And I can't run them on my
23 computer in here because I don't have the right

Page 32

1  licenses. That's on another computer.
2       Q.   Who was the person that performed
3  that job with regard to the original
4  simulation?
5       A.   Jacob Brennan.
6       Q.   All right. And so who performed
7  that job with regard to the rerun?
8       A.   Jacob Brennan.
9       Q.   Okay. And you're saying that you
10 don't know the process for saving and
11 preserving the HVE files, that I would have to
12 have -- ask Jacob about that process?
13      A.   No. You click save, and it goes
14 on that computer. And then you take a copy of
15 that, and you put it, you know, on the server
16 where it could be provided to people like you.
17 That's -- I don't -- you know, that's the same
18 for every single file. Everybody in the
19 building has their own work and they save it
20 how they want to under what name they want and
21 just put it on the server. And then I -- you
22 know, if I want to change the name of it or
23 something, I can. But it's the same -- I don't

Page 33

1  know what -- I mean, I wasn't there when he
2  clicked the button. But we all know how to
3  save a file.
4       Q.   Okay. And how do you review it
5  once he runs the report? Does he print it out
6  for you? Do you click on the report on a
7  computer? How do you review it once it's been
8  run?
9       A.   All of the above. I mean, it
10 depends on how I want to do it that day.
11      Q.   Okay. And so you might actually
12 access the actual file on your computer and
13 look at it in digital form?
14      A.   You may be misleading there.
15      Q.   Okay.
16      A.   If it's -- if it's saved as a
17 PDF --
18      Q.   Okay.
19      A.   -- I can access it and read it at
20 my computer. But I can also print it and then
21 just look at it in hard copy form. However I
22 want to do it on that day depending on what my
23 schedule is and what I'm -- you know, what my

9 (Pages 30 - 33)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 34

1  needs are. I mean, someone else may be -- you
2  know, it may be better for me to go to a
3  conference room where I can spread out. It
4  depends on what I'm -- on what's convenient for
5  me on that day.
6      Q.   Right. I guess what I'm trying to
7  clarify is you're not actually going into the
8  HVE software and opening up that. You're
9  looking at it either in a PDF of the results or
10 a printed version of the results?
11     A.   Right. Of the report. And but --
12 but when he's running it, I have the option to
13 go back in sitting with him. And you know, if
14 he has a question, I'll drop in and -- and, you
15 know, talk about what's going on and where he
16 is or he can come and, you know, make a choice
17 for him. Or if he wants he'll come down here
18 and ask me a question when he's doing it.
19     So you know, it's all of the above. It's,
20 you know, pretty normal stuff. It's the way
21 all of our technical programs work.
22     Q.   Right. So -- so you might sit
23 there and advise him at his computer station

Page 35

1  with regard to modifications or inputs into the
2  software?
3      A.   Sure.
4      Q.   Right. But then when you go to
5  review the results, you're going to look at the
6  results that have been generated and converted
7  to a PDF file?
8      A.   Well, I can -- I can look at them
9  on his computer as well over his shoulder
10 before he saves them as well.
11     Q.   Right. Which did you do in
12 preparing your October 2023 report?
13     A.   I would have had something I could
14 work from. I mean, as I told you earlier, I
15 mean, I would have had a working copy for me
16 that's just a working copy. If I want to edit
17 a report, I'll print it out and I'll edit it
18 and I'll get on the computer and make the
19 changes and then I'll throw the working copy
20 away --
21     Q.   Right.
22     A.   -- because it's just a working
23 copy. So I don't remember at this time exactly

Page 36

1  how I did that. But I do know that when I
2  wrote the report, I was looking at outputs that
3  I was confident from a -- were the
4  representative simulation run that I was
5  intending to run at that time.
6      Q.   And those outputs would have been
7  either a printed format or a PDF file?
8      A.   Potentially, yes. I don't know.
9      Q.   And in order to print them, you
10 have to convert them to a PDF file. Correct?
11     A.   Usually, yes.
12     Q.   Okay.
13     A.   But I'm not -- you know, he can --
14 he can probably print them directly. I don't
15 know. I have not done the printing out of the
16 program. I'd have to go see. I don't know if
17 he can print just directly from
18 Engineering Dynamics HVE Suite. I don't know
19 the answer.
20     Q.   Well, with regard to the rerun,
21 after he ran the report, he created a PDF file
22 which you then used to produce to us prior to
23 this deposition.

Page 37

1      A.   Yes.
2      Q.   Correct?
3      A.   Yes. And that's what -- that's
4  what I thought had been done in a proper
5  fashion before the first deposition. I thought
6  I was using -- I thought I had in the file a
7  complete file of what was then printed because
8  that's what I testified to. That's what was my
9  understanding. But it wasn't -- it wasn't
10 accurate.
11     Q.   The actual HVE files are different
12 obviously from the PDF file that is just a -- a
13 collection of the results. Those are two
14 different types of files. Correct?
15     A.   Yes.
16     Q.   All right. And -- well, scratch
17 that. That's enough. On the second page of
18 what I have up on the screen bates labeled
19 9349 --
20     A.   Yes, sir.
21     Q.   -- second paragraph you say our
22 attempts to precisely reproduce the simulation
23 discussed in your October 12, 2023 report were

10 (Pages 34 - 37)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 38

1 unsuccessful because data used in that
2 simulation was lost.
3   Did I read that correctly?
4     A.  Yes.
5     Q.  And my question is, there were
6 printouts and data from -- that were produced
7 to us that were believed to be from the
8 original simulation.  And so when you say the
9 data was lost, what do you mean by that?
10    A.  Two fold.  Potential answers and
11 then you can choose what's relevant to your
12 question.  I've already told you that the run
13 files were lost and -- and the -- whatever
14 files were used to generate the documents that
15 I used to do my initial report as far as the
16 electronic copies were not present.
17   The second thing is, in the reports that
18 were printed out, HVE does surrounding and
19 doesn't report all of the input data
20 necessarily.  So -- so numbers can have
21 extended decimal places beyond what the report
22 shows.  So let's say a 0.8 might show up as a
23 one because of rounding.  Because of that

Page 39

1 it's -- when we tried to use the data that was
2 shown, we just did not -- we knew that -- that
3 that was not accurate to what had been used
4 because it didn't produce the right result.  So
5 the -- I think it's a 17.92 mile per hour
6 delta-V for the F-250 wasn't working.  So what
7 it means is the reported -- the reports are
8 incomplete as far as to the level of detail
9 that's needed sometimes to regenerate the --
10 the run.
11   So on two levels, we just could not -- we
12 could not use what we had to reproduce the
13 simulation run.  So we just -- like I said, it
14 took a couple of months to figure out that it
15 wasn't going to work.  And then we just said,
16 okay, let's just rerun with the input data that
17 we know is accurate, the weights, the
18 delta-V's, everything, and you know, just do it
19 the way that I said in the deposition.  And
20 that's what we have today.
21    Q.  When you first attempted to
22 reproduce the original simulation with the data
23 that you had, did you save that simulation run?

Page 40

1     A.  Well, no because we were still
2 under the confusion that we could do that.  In
3 other words, we didn't -- basically if someone
4 wanted to try to reproduce -- wanted to put the
5 data we have in, I mean, they could do it and
6 they'd get the same answer we'd get.  But we
7 didn't understand the problem fully.  It took a
8 while to discover all of the problems.  So no,
9 we weren't -- we didn't even know what problem
10 we were solving at that time.
11    Q.  All right.  Did you -- I know
12 you're saying the data that you used from the
13 printouts you produced to us did not create the
14 result that you expected.  Was there any
15 missing data or was it just you had all of the
16 data but it didn't -- it wasn't correct?
17    A.  There's missing data as well.  The
18 reports -- remember, not all of the reports
19 were printed.  I told you that.  There just --
20 there was missing data.  And we couldn't -- we
21 realized we were going to have to start adding
22 to those reports.  And then we also knew that
23 the report numbers weren't precise.  So you

Page 41

1 couldn't just input the report numbers.  You
2 wouldn't get a robust answer.  I mean, you'd
3 probably get, you know, an approximate answer.
4 But we wanted the right answer, similar to what
5 was in my FR26 report.
6     Q.  All right.  So obviously if you're
7 not able to reproduce the original simulation
8 based upon the data you have, you wouldn't
9 expect anyone else to be able to reproduce your
10 original simulation because the only data they
11 would have would be the same data that you had?
12    A.  Well, they could use my deposition
13 and -- and the file materials that I had and
14 pluck the data out of my deposition and the
15 file materials and input it, and they would get
16 a very similar result to what we have, yes.
17 They could do it that way.  But you could not
18 use the reports, just like I couldn't use the
19 reports.  Nobody could use those reports to get
20 it as accurate as it should be.
21    Q.  How many simulations have you run
22 beyond the original simulation and the rerun
23 simulation?

11 (Pages 38 - 41)

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 42

1    A.    I don't -- I don't know.
2    Q.    You haven't saved any other than
3  the rerun simulation.  Correct?
4    A.    Now, there will be -- some of our
5  attempts are archived.  In other words, some of
6  the process that we used is archived.  It's not
7  relevant though to my final opinions if you
8  want to do a forensic examination of the
9  process.  You know, I mean, there's something
10 around you could use for that.  But I'm here to
11 give opinions about a particular accident.  And
12 so I'm confident in what we have given you.
13 But yeah, some of that process is saved.  But
14 it's -- it was basically put aside because we
15 realized that we didn't have the files to do
16 it.  And then we just redid it per my
17 deposition, per the data in the file, per the
18 right everything and -- and ran it.
19    Q.    And those archived files related
20 to your other run simulations, they've not been
21 produced to Ms. Cannella.  Correct?
22    A.    No.  Because they're not relevant
23 to my opinions.

Page 43

1    Q.    They relate to your work in this
2  case though.  Correct?
3    A.    But not work to give my opinions
4  in the -- in what happened in the accident.
5  They only relate to us trying to find a missing
6  file and missing data.  So we worked really
7  hard, but that was -- and that's -- that's just
8  bonus -- that's a bad word to use.  That's --
9  that's work that we did trying to fix a
10 problem.
11   But as far as my -- and that had nothing to
12 do with my analysis of this accident.  That
13 just had to do with trying to -- trying to
14 resurrect information.  So practically you have
15 everything that we did to fix the simulation
16 run to be accurate for the use of engineering
17 on this file.  If there's some in between
18 that's unrelated -- and that's what I'm telling
19 you about in our efforts to resurrect it -- we
20 do have some stuff for that.  But no, that
21 hasn't been given to anybody because it's not
22 worth anything as an engineering opinion.
23    Q.    Are there any other archived files

Page 44

1  other than what you've described that you
2  haven't produced to Ms. Cannella that relate to
3  your work in this case?
4    A.    Oh, they don't relate to my work
5  in this case.  They relate to my work to try to
6  find the file and try to -- try to use a file
7  that, you know, was corrupt.  But no, there's
8  nothing -- you have everything I'm using for my
9  opinions.  You have everything that I have done
10 in this simulation to try to -- well, to
11 reproduce the work and even, you know, slightly
12 improve the work, consistent with my
13 deposition.  You have that.
14    Q.    All right.  When did you first
15 become aware of the date of Wes Grimes's
16 deposition, your counterpart for the Defense?
17    A.    I knew of it.  I'm guessing, but
18 it's, you know, a few weeks at most before
19 that.
20    Q.    Okay.  So --
21    A.    His deposition date is not
22 particularly an issue for me.
23    Q.    Right.  But I'm -- I'm curious

Page 45

1  when were you told about his deposition date.
2  Do you recall?
3    A.    I don't.
4    Q.    All right.  Did you -- did you
5  talk with Ms. Cannella and help her to prepare
6  for that deposition?
7    A.    If anybody remembers when Wes
8  Grimes's materials were produced, that -- I'm
9  sure I looked at those and told her what we
10 saw.  And I remember one thing very
11 specifically.  So yes, I did help her in some
12 way.  Yes, I did.
13    Q.    All right.  And what was the
14 date -- the date that you ran the rerun
15 simulation, or at least when you finalized it?
16 We know that you did some preliminary runs that
17 haven't been produced that weren't the final
18 run that you're relying upon.  But when did you
19 produce the final simulation run that you've
20 produced to us and that you're relying upon in
21 this case?
22    A.    Yeah, I disagree with your
23 characterization.  But I understand the

12 (Pages 42 - 45)

G. Bryant Buchner                                 July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 46

1  question. So when was it run? I don't know
2  off the top of my head. There may be a date on
3  it if I can find it here. This is the FR26.
4  You've got it up right there. All you have to
5  do is look at the top and see if there's a
6  date.
7      Q. I don't whether it's when it was
8  printed or when it was run. But if you look at
9  appendix B that I have up on the screen -- it's
10 not showing up for some reason. I don't know.
11 I want you to verify, it has a date on what you
12 produced as appendix B of May 8, 2024, 17:10.
13 Is that the date that you ran the simulation?
14     A. That -- I don't know. It could
15 just be -- the simulation can be run on that
16 date to generate all of the reports and printed
17 on that date. Yes, sir. I don't know if
18 that's the exact date it was originally run.
19 But it was probably rerun on that date to make
20 sure we had the right copies printed out so
21 that whatever adjustments or whatever inputs
22 had been refined for the report were accurate
23 to the report.

Page 47

1      Q. Is there a way to determine the
2  date the report was actually run?
3      A. I don't know. But I think it was
4  run on that date.
5      Q. All right. So you believe that at
6  least it was run for the purposes of producing
7  a PDF file to produce to us?
8      A. That's my belief. But -- that's
9  my belief, yes. But I'm just giving you the
10 best answer I can.
11     Q. Right. But it could have been run
12 any time before that date, original?
13     A. Well, not any time. Approximate
14 of that, yes. I understood that I needed to
15 write a report. And we were -- what was -- the
16 report was about this simulation. And the
17 simulation was run proximally doing the report.
18 I would have done the report at the time we
19 were finishing the simulation, yes. But it's
20 proximal to that. It takes a while to write a
21 report though, so you know, it could have been
22 a week before.
23     Q. Right. So the report is dated

Page 48

1  May 8, the same day as this. And you would
2  have needed this prior to preparing your
3  report, I believe is what you just said, in
4  order to prepare the report?
5      A. Right. So I had some working copy
6  printouts we would have used. And then we
7  would have tried to run and save and get
8  everything compiled to go with this for whoever
9  wanted it.
10     Q. Now, you verified that others
11 could not have used the original HVE data used
12 by -- in order to reproduce your simulation or
13 to test your simulation?
14     A. I didn't hear a word you said -- I
15 missed a couple of your words, please, if you
16 could help me.
17     Q. All right. Sorry. Can you hear
18 me now?
19     A. I can hear you. Just a couple of
20 them were garbled.
21     Q. Okay. I believe what you
22 testified to is that in order for someone to
23 attempt to simulate your original simulation or

Page 49

1  to test it, they would have had to have ignored
2  the HVE data that you produced originally and
3  have relied solely upon your deposition
4  testimony and disregarded the actual HVE data
5  in order to try to reproduce your original
6  simulation. Is that fair?
7          MS. CANNELLA: Object to the form
8  of the question. Misstates his testimony.
9      Q. Well, you can correct me if it's
10 wrong.
11     A. I didn't feel like that was fair.
12 No, sir. I...
13     Q. Well, what's the answer to the
14 question?
15     A. You asked me was it fair.
16     Q. No. No. I didn't ask you -- I
17 asked you to answer the question if you can.
18         MS. CANNELLA: The question was,
19 is that fair, I think is what Mr. Buchner's
20 saying.
21     Q. Is that a fair characterization of
22 your testimony?
23     A. What?

13 (Pages 46 - 49)

Veritext Legal Solutions
800.808.4958                                      770.343.9696

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 50

1     Q.   I'll re-ask it.
2     A.   Yeah.
3     Q.   So we've already agreed that
4  another expert could not use your HVE data that
5  you produced to re-create or test your original
6  simulation?
7     A.   No, we have not.
8     Q.   Okay.  But then you alluded to,
9  well, they could have read my deposition and
10 ignored the HVE data and just listened to what
11 I said in the deposition and they could have
12 reproduced it or tested it that way?
13    A.   I'm sorry, sir.  The answer to the
14 previous question was no, we have not agreed to
15 that.  You could --
16    Q.   Okay.
17    A.   Yeah.  You could do a reasonable
18 rerun of the data we gave and understand you're
19 going to get a very similar answer to what we
20 got.  But they're not going to be as accurate
21 as they need to be so that what's in my report
22 would be precisely produced.  But you could get
23 a very similar answer.  If you wanted to do it

Page 51

1  as precise as I would like to have it done, you
2  would want to read the deposition and use what
3  I said in the deposition, yes.
4     We'd like to be accurate.  We'd like to have
5  the right amount of detail.  But someone could
6  put in the data we have and they would -- they
7  would get a reasonable result of what we got.
8  It just wouldn't be the same results that were
9  in my FR26 report.  But they would be close.
10 So as I said earlier, to do what we did, anyone
11 else who wanted to do it would have to -- to
12 get it as accurate as we would like for it to
13 be, not just accurate enough to understand the
14 work, but accurate so that my FR26 report in my
15 deposition was accurate, you'd need to use --
16 use what I said I did in my deposition and the
17 supporting data.
18    Q.   All right.  And you would need the
19 supporting data that you produced with your
20 FR26 amended report --
21    A.   No.
22    Q.   -- to get it as accurately as you
23 wanted to do it?

Page 52

1     A.   No.  The -- all of the data was
2  already in my deposition and in my files.
3  There really isn't anything -- I did exactly
4  what I said in the -- in the amended, I did
5  what I said I had done or would do in my
6  deposition to run a simulation.  So we followed
7  what I said in my deposition as -- as the way,
8  you know, that we wanted to do the work.  And
9  then we followed that script to produce this.
10    We did make -- as I already said, there was
11 a 0.04 inches or something tire diameter
12 discrepancy or maybe 0.45 inches that we did
13 correct.
14    Q.   Well, we'll talk about your
15 changes to -- in your amended simulation in a
16 minute.  With regard to your original HVE
17 simulation, what version of the HVE software
18 did you use?  Do you know?
19    A.   Yeah.  17, I believe.  Let me look
20 and see.  I don't -- I don't have the original
21 report.  Let me see if I can find that.  Yeah.
22 17 on both of them.
23    Q.   And when you say both of them, you

Page 53

1  mean the rerun report, which is reflected in
2  your -- the May 8 printout of 2024?
3     A.   Right.
4     Q.   Okay.  You don't know when that
5  was run, but you know it was -- it was run
6  using the 17.00 version of the software?
7     A.   Right.  Because it says that at
8  the top.
9     Q.   Right.  And it says 2021.  Is that
10 the year that that version came out?
11    A.   Yes.
12    Q.   Okay.  And do you know whether
13 there's been any updates or new versions to the
14 HVE software since?
15    A.   Yes.  Yeah.  There was -- there
16 have been updates.  We actually have a more
17 current version.  We're trying to stick with
18 the version when we started working on the file
19 that we had opened.  So we -- it can be rerun
20 on a new version if somebody wants to.
21    Q.   All right.  So you actually
22 possess a more current version than version
23 17.00?

14 (Pages 50 - 53)

G. Bryant Buchner                                   July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 54

1    A.  Yes.  Our --
2    Q.  What is the -- sorry.
3    A.  We -- we get subscription updates
4  from HVE, yes.  We have a more current version.
5    Q.  What's the most current version
6  that you have now?  Do you know?
7    A.  I don't know the number on it.
8  No, sir.
9    Q.  All right.  When you ran the
10  original simulation, do you know the date that
11  it was run?
12    A.  On or about October 12, a little
13  bit before.
14    Q.  Of 2023.  Correct?
15    A.  Yes.
16    Q.  And do you know whether at that
17  time the most current version of HVE was
18  version 17.00?
19    A.  It was not.  We had started on
20  version 17.  We -- we got an update.  As I went
21  back and figured out through this process, we
22  had a more current version.  But we had started
23  the process with 17, and we -- we kept it on 17

Page 55

1  just for consistency.  But yeah, we did have a
2  more current version at the time.  I think I
3  misspoke in my depo on that.
4    Q.  You misspoke in your prior
5  deposition about that.  Is that what you said?
6    A.  Yes.
7    Q.  All right.  And so when you say
8  you started the process, what do you mean by
9  that?
10    A.  Well, it takes a while to do a
11  simulation.  So whatever -- when we -- when
12  the -- when the work was started, 17 was open.
13  Whether -- why it was open, I don't know.  But
14  that was the one that we started the process
15  with.  And once we start a version, we tend to
16  stay with that version.  And that's what
17  happened here.
18    It doesn't mean that there weren't more
19  available versions.  But that one -- that was
20  the one that was used.  And so we just stayed
21  consistent with it.  So we're consistent with
22  it to this day.
23    Q.  Why would you not run the rerun on

Page 56

1  the most current version of the software that
2  you possess?
3    A.  Probably because we were trying to
4  reproduce the prior work.  And that was the
5  version we -- we had up and were using.  If
6  someone wants to do it on a later version, I'm
7  happy to go do it.  But I don't -- it's not
8  going to change any of the answers -- any of
9  the opinions because there haven't been any --
10  but that was -- we were just trying to be
11  consistent.
12    We always try to be consistent when we start
13  a project because when you adjust the versions,
14  some program may adjust some of your data.  And
15  that can cause some issues.  So it's just an
16  engineering habit we have, and we stayed with
17  it.
18    Q.  Wouldn't the most current version
19  of the software have included improvements in
20  the software that would give you the most
21  reliable result?
22    A.  Well, that's wishful thinking.  We
23  don't know.  It's not -- not necessarily known.

Page 57

1  If the program wasn't good enough in version
2  17, they would have let us know that version
3  17, don't use it.  But -- and you don't even
4  know -- it's got so many manuals, you don't
5  know what the changes were.  I'm don't -- I'm
6  not -- I can't agree with that as we sit here.
7  No, sir.
8    Q.  Well, do you -- when you say --
9  when did the process start prior to October of
10  2023?  You say it takes a long time.  How long?
11  How long were you working on this before you
12  created the simulation -- the original
13  simulation?
14    A.  I don't know.  I don't know.  And
15  I don't know that version 17 was the most
16  updated one when we started.  But once we
17  start, we stay with it.
18    Q.  Well, you said you had to start
19  the rerun from scratch basically because the
20  old data was not the correct data.  Right?
21    A.  Right.  We -- right.  We basically
22  had to reenter it.  Yes, sir.
23    Q.  All right.  And you didn't start

15 (Pages 54 - 57)

G. Bryant Buchner                               July 11, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 58

1  that rerun process for, you said months after
2  your deposition?
3      A.  Yes.
4      Q.  All right.  So your deposition was
5  at the end of January.  So you have February
6  and March.  As best you can recall, you haven't
7  discovered the problem with the original
8  simulation.  And then sometime after those two
9  months between then and May 8, you run the
10  rerun.  Correct?
11      A.  Similar, yes, sir.
12      Q.  And you run it from scratch?
13      A.  Yes.
14      Q.  All right.  So that's a month to
15  six weeks worth of time to run a simulation
16  from scratch.  Correct?
17      A.  I can't agree on the dates.  I've
18  already told you that.  But yeah, there was
19  time to run it from scratch.
20      Q.  All right.  And are you aware that
21  between August of 2021 when version 17 came out
22  and February of 2023, which was seven months
23  prior to your original simulation, there had

Page 59

1  been -- three new versions of HVE had come out?
2      A.  I don't know the number.  No, sir.
3      Q.  All right.  You can't dispute that
4  though?
5      A.  I'm not trying to dispute it.  No,
6  sir.
7      Q.  All right.  And since February of
8  2023 up until the time of your running of the
9  rerun, there is an additional version of HVE
10  that's come out.  Were you aware of that?
11      A.  Well, I know we have -- I know
12  there -- I know there is a version that we
13  could have used as the new version, yes.  I
14  don't know the dates of all the versions.  No,
15  sir.
16      Q.  All right.  When you start a case
17  from scratch now that you want to use HVE,
18  which -- which version do you use?
19      A.  17.
20      Q.  So you're still using 17 for all
21  your cases even though you possess a more
22  current version of HVE?
23      A.  No.  If we opened a case today, we

Page 60

1  would be using the latest version because we --
2  we have the latest version.
3      Q.  Well, that was my question.  That
4  was exactly my question.  If you opened a
5  case -- a new case today, what version of HVE
6  would you use?
7      A.  Well, we'd probably use whatever
8  version was opening at that time on that
9  computer.  I would anticipate we would use the
10  latest version, just like I said in my
11  deposition.
12      Q.  All right.
13      A.  But if -- if the file was already
14  functioning, we would -- you know, we'd make a
15  decision based on the situation of the file.
16  But I was -- I was trying to stay with what we
17  had originally done to be as consistent as
18  possible with what we had originally done.  I
19  understand you want to argue there's a
20  different idea.
21      I don't have any problem with it.  Somebody
22  can take our data and rerun it on version --
23  whatever they want.  12 if they want.

Page 61

1      Q.  All right.
2          MR. HILL:  We've been going a
3  little over an hour.  Want to take a -- I need
4  a restroom break.  And please let me know if
5  you need a break obviously.
6          THE WITNESS:  Yeah.
7          MR. HILL:  This would be a good
8  time.
9          THE VIDEOGRAPHER:  The time -- the
10  time is 11:13 a.m.  We're off the video record.
11          (A break was taken.)
12          THE VIDEOGRAPHER:  The time is
13  11:28 a.m.  We're back on the video record.
14          MR. HILL:  Thanks.
15      Q.  (Mr. Hill)  Hold on.  I'm having an
16  issue sharing my screen.
17      A.  I can see your screen.  Yes, sir.
18      Q.  Okay.  Great.  All right.  Up on
19  the screen is that FR26 amended report.  And I
20  want to move now to the sections where you
21  discuss the comparison between the initial
22  simulation and the rerun simulation.  And as I
23  understand your report, with the rerun you

16 (Pages 58 - 61)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 62

1 were -- you used for the F-250, the default
2 properties for -- for stiffness coefficients
3 that were within the software, the
4 Vehiclemetrics database. Is that correct?
5     A.   Yes.
6     Q.   And is the Vehiclemetrics database
7 part of the HVE software?
8     A.   No. Vehiclemetrics is an approved
9 vendor to do things like make vehicles for the
10 HVE software.
11    Q.   How is the different from the
12 Neptune data that you used with the original
13 simulation?
14    A.   You mean for crush stiffness?
15    Q.   No. I don't mean the actual. How
16 is using Vehiclemetrics -- in other words, you
17 just said it was approved by HVE for use as a
18 method for determining the stiffness
19 coefficients. Is -- is Neptune not approved?
20 I'm trying to understand that. I thought
21 Vehiclemetrics was contained within the HVE
22 software.
23    A.   Okay. HVE has vehicles that come

Page 63

1 in it.
2     Q.   Right.
3     A.   HVE had an F-250, but it was not
4 the Crew Cab. It was an Extended Cab, I
5 believe. So it's essentially the same vehicle,
6 but a little bit -- the weight is going to be a
7 little bit different. The length will be a
8 little bit different. And we wanted a
9 Crew Cab.
10    So Vehiclemetrics is a vendor for HVE that
11 we contracted with to make us the right shape
12 Crew Cab from our scans. We gave them the
13 scan, and they made the right shape Crew Cab.
14 And -- and with that vehicle from came
15 crush stiffness coefficients.
16    Their crush stiffness coefficients were
17 higher than Neptune's. I think Neptune's were
18 reasonable. Vehiclemetrics, because they
19 provided some -- I didn't realize they had --
20 that's closer to using the defaults of HVE than
21 Neptune. So I -- in the update we used them.
22 And to be clear, they're higher crush stiffness
23 coefficients. So the F-250 in the rerun was

Page 64

1 stronger and stiffer.
2     So you know, that would be to the Escape's
3 disadvantage. We hit it the a stronger truck
4 in the rerun -- I mean a stronger simulated
5 truck.
6     So that's -- that's -- I thought that would
7 be most consistent with my deposition and the
8 most consistent with my intent, especially
9 because we had done the calculations of crush
10 originally with the hand calculations or the
11 computer calculations with -- with Neptune's
12 data. Now we were going to use the pure
13 simulation data or as pure as we could get.
14    Q.   And why didn't you follow that
15 same process with the original simulation?
16    A.   Because I asked if we had crush
17 stiffness coefficients for the Crew Cab. And
18 the answer was no. And I didn't realize when
19 Vehiclemetrics provided a vehicle, they -- they
20 provided stiffness coefficients as well, the
21 numbers side.
22    So in the rerun when we were making sure to
23 do things per my deposition, we went through it

Page 65

1 and said, okay, I would use defaults if they
2 were there. This vehicle has defaults. We're
3 going to use those because that's what I said
4 we would do.
5     Q.   So were you told by Jacob or
6 whoever was running the test the first time
7 that there was -- there were no default values
8 for an F-250 in the HVE system?
9     A.   To an extent, yes. I asked for
10 the Crew Cab, and he said no. So I didn't
11 think there were. I didn't ask for Vehicle --
12 Vehiclemetrics to ultimately provide it. I
13 asked the question -- I think I got the
14 question -- the correct answer to my question.
15 I think I just misunderstood that it applied --
16 that it only applied to -- the HVE has we
17 opened it, it didn't have them.
18    I don't think that I asked the question did
19 it come with Vehiclemetrics. So just a
20 communication error.
21    Q.   All right. So back when you ran
22 the original simulation, you could have
23 followed the process that you followed with the

17 (Pages 62 - 65)

G. Bryant Buchner                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 66

1  rerun?  There's nothing new about that.  It's
2  just you didn't recognize that that was a
3  possibility when you did the original run?
4      A.  Right.  Right.
5      Q.  Vehiclemetrics and the process you
6  followed was available back in October of 2023?
7      A.  Yes.  Yes.  And we had it.  We had
8  the vehicle.  We had it in there.  We just
9  didn't use the AV values that came with the
10  truck because I mistakenly didn't think they'd
11  come with some.
12      Q.  All right.  It appears another
13  change that was made is to the tire sizes on
14  the F-250.  Explain the change you made between
15  the original run and the amended run with
16  regard to the tire sizes on the F-250.
17      A.  Sure.  We have the tire sizes
18  right in the file as a whole.  But when we ran
19  the simulation, the tire size -- I don't see
20  the paragraph in there.  Can you -- do you have
21  it?
22      Q.  It's --
23      A.  Oh, yeah.  Yeah.  So there was a

Page 67

1  point -- a 0.35 inches difference in the tire
2  size that -- 0.7 in the diameter and 0.35
3  inches in the -- in the radius.  So we were off
4  by, you know, a third of an inch in height.
5  And I think that was corrected.  In fact, I
6  know it was corrected.
7      Q.  And that's not based on any new
8  information.  Right?  I mean, the tire size on
9  the subject F-250 was known at the time you ran
10  your original simulation?
11      A.  Right.  We -- we had done it -- we
12  used the right tire size throughout most of the
13  file, but just in inputting the data in the
14  simulation, it didn't -- we didn't catch that
15  we should change the size of the tire by
16  that -- you know, by that much.
17      Q.  If you don't know what original
18  data was used for the original simulation
19  because you don't have it anymore, how do --
20  how do you know what was or wasn't used with
21  the original simulation?
22      A.  Well, I don't remember where it
23  is.  But Mr. Grimes is the one that located it

Page 68

1  and pointed it out.  So it was in the data that
2  we provided.  I don't know where it is in
3  the -- in the data as we sit here.  My memory
4  doesn't go back that far.  But the -- so it's
5  in the data we provided, whether it's in one of
6  the reports or printouts.
7      Q.  But we've -- we've already
8  established that the data you provided, you
9  can't verify whether it correlates to your
10  simulation -- original simulation or not.
11      A.  You could be right on that.  The
12  one that -- the one that I wrote the report on
13  may have actually had the right size in it.
14  But in the -- in what we provided, it looked
15  wrong.  So we made sure it was right in the
16  rerun.
17      Whether or not the data we provided was
18  actually about the simulation that I used to
19  right the report or not, well, that's a great
20  point you made.  But whatever data we had
21  available, it looked like the tire size was
22  wrong.  So we made sure we got the tire size
23  right in the rerun because that was our whole

Page 69

1  intent.  We just wanted to get it right.
2      Q.  Hold on one second.  Just real
3  quickly while we're talking about HVE data
4  reports, have you seen a screen like what's up
5  there now from HVE?
6      A.  I -- I can't read it.  It's small.
7      Q.  All right.  This is a graphical
8  representation of crush from an HVE run.  Have
9  you --
10      A.  No.  We -- we only see a list of
11  files.  At least I only see a list of files.
12      Q.  So you've never seen a
13  depiction --
14      MS. CANNELLA:  Rick, we see your
15  e-mail, I think.
16      MR. HILL:  You see my e-mail?
17      MS. CANNELLA:  Yeah.
18      MR. HILL:  I think I shared the
19  wrong screen.
20      MS. CANNELLA:  Yeah.
21      A.  I couldn't read it, so there's,
22  you know, no harm no foul.
23      Q.  There's nothing in there important

18 (Pages 66 - 69)

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 70

1  anyways. All right. How about now?
2      A.  Yes.
3      Q.  All right. So have you seen this
4  type of output from an HVE simulation?
5      A.  I don't know if I've seen it
6  exactly like that. But I've seen something
7  similar.
8      Q.  All right. And did you create
9  anything like this based upon your rerun
10  simulation?
11      A.  No. Yeah, we have the image of
12  the vehicle. And we also have the crush. But
13  it's not compiled like that, no. But we
14  have -- we have the same information in --
15  in -- compartmentalized though.
16          MS. CANNELLA: One moment. What
17  are we looking at right now? Is this from our
18  wreck?
19          MR. HILL: No. This is a
20  representative of -- of an HVE output, a form
21  of HVE showing the data from a simulation. So
22  I'm just asking him generically has he seen
23  something like this for any of the simulations

Page 71

1  he's run.
2          MS. CANNELLA: This is -- we
3  haven't produced this. No simulation has been
4  produced to us of our wreck. This is our Ford
5  Escape with a similar crush profile. So why
6  haven't we seen this before?
7          MR. HILL: This is just a sample.
8  This is not -- this is a sample HVE output from
9  just a random run. I'm just asking if he's
10  seen this type of presentation. That's it.
11          MS. CANNELLA: But this is -- no,
12  this is -- this is our crash. This is our
13  crash right here.
14          MR. HILL: Right. This is just a
15  sample. This is not our crash. I can
16  represent that to you. It's not our crash.
17  It's nothing -- it is nothing. It's just a
18  sample. I'm just saying if he's ever had a
19  representation or seen this type of
20  information. Because if you look at --
21          MS. CANNELLA: Has somebody done a
22  simulation of our crash --
23          MR. HILL: No.

Page 72

1          MS. CANNELLA: -- for Defense?
2          MR. HILL: No. That's just a
3  random simulation showing a type of data. And
4  certainly if I want to just get a sample of
5  what HVE outputs are like, I can do that.
6  That's all that is. It's a representation
7  sample of the type of data HVE can put out.
8          MS. CANNELLA: Okay. Well, we
9  want to get whatever communication that came
10  from and whatever file that came from as well.
11          MR. HILL: Sure. All right.
12      Q.  (Mr. Hill) You produced what's on
13  the screen now as 9376. It's a graphical
14  representation of the crush on the Escape in
15  your rerun simulation. Is that what's depicted
16  on 9376?
17      A.  That's part of it, yes.
18      Q.  Okay. And was that generated by
19  HVE or was that generated by you using the HVE
20  data?
21      A.  That's HVE.
22      Q.  Okay. So HVE creates this --
23      A.  Yes.

Page 73

1      Q.  -- from the simulation?
2      A.  Yes.
3      Q.  Okay. And are you aware of
4  whether it can create any other graphical
5  depictions of crush from a simulation?
6      A.  Well, you can rotate it and look
7  at it in different ways, yes. That was -- we
8  wanted a representative one. If somebody wants
9  more, I guess they can rerun it and do it. But
10  this is -- we wanted an output so you could see
11  what the car looked like. And the best way to
12  do it is this.
13      Q.  Right. All right. Do you choose
14  like what, like, HVE is going to -- what side
15  it's going to show or how it's going to display
16  this? I mean, is there other options? How
17  does it work?
18      A.  I think you can rotate it and
19  choose the image you want, yes. So this is --
20  this is -- I like a perspective, a 3D
21  perspective so you can see it. It's
22  representative of the numbers that are in the
23  reports above this. So this is the one that I

19 (Pages 70 - 73)

G. Bryant Buchner                           July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 74

1  chose, yes.
2      Q.   Right.  All right.  The documents
3  in appendix B, do they contain all of the HVE
4  files that were generated when you ran the
5  rerun simulation?
6      A.   They were -- they're the reports
7  that HVE provided for the rerun simulation.
8  The file is a -- this is a PDF.  The file is an
9  electronic copy of the file that was provided
10 with the report.
11     Q.   Right.  So this is a printout of
12 the PDF of the results from the test, the
13 reports?
14     A.   Yes.
15     Q.   And you have the electronic files
16 used to generate this -- these reports?
17     A.   Yes.  It was provided with the
18 report.
19     Q.   Okay.  All right.  Going back to
20 the vehicles used in the simulation, you talk
21 about the F-250 that was in the volume
22 metrics -- the Vehiclemetrics database was a
23 regular cab body style.  Our subject truck was

Page 75

1  a Crew Cab.  And so you used a modeling partner
2  to convert to a Crew Cab.  Is that a
3  layperson's way to describe that?
4      A.   Yes.  The modeling partner we used
5  was Vehiclemetrics.  It's a typo and it says
6  Baker Sneddon.  That was -- that was -- it was
7  Vehiclemetrics.  Everything came from
8  Vehiclemetrics in the first part of this
9  section.  I don't know why it was typed
10 Baker Sneddon.  That's a mistake.
11     Q.   That was my question.  I didn't
12 understand what that -- so that sentence
13 shouldn't be in this?
14     A.   The sentence should be.  But the
15 modeling partner should be Vehiclemetrics.
16     Q.   All right.  Gotcha.  And when you
17 did the original simulation, was there a
18 transfer from -- I mean, how did you account
19 for it being a Crew Cab in the actual accident?
20     A.   Well, the original we used
21 Vehiclemetrics.  We had them do exactly what
22 was said here.  Regular cab geometry was
23 replaced with a scan-based Crew Cab geometry.

Page 76

1  So we've had that since, you know, October of
2  last year, and that's what we used.
3      Q.   I'm saying you used the Neptune
4  data in the original simulation.  So was it for
5  a Crew Cab or a cab body style?
6      A.   I'd have to look and see.  I
7  didn't understand that that's what you were
8  asking about.  We have that in the
9  calculations.  We have the printout right here
10 if I can take a minute to find it.
11     All right.  It's a Super Crew four-door.  So
12 we had a Crew -- the Neptune data that was
13 used in our crush calculations -- because we've
14 done two things, crush calculations and a crush
15 simulation.  The crush calculations were a
16 Super Duty Crew.  And the original one was the
17 Super Duty Crew with Neptune.
18     Q.   Okay.  And we have a Super Duty
19 Crew in the accident?
20     A.   Yes.
21     Q.   Yeah.  Okay.  All right.  On this
22 page I have up here, you're talking about the
23 bumper height that you used for the F-250 in

Page 77

1  the rerun simulation.  And I believe you agree
2  that it was 29 inches and that that was
3  verified through measuring both the exemplar
4  truck that you had and the measurement of the
5  crash test F-250 used in the Defense crash
6  testing and that they were all consistent.  Is
7  that correct?
8      A.   Reasonably.  They're never
9  perfect.  But yeah, they're all approximately
10 29 inches.
11     Q.   Okay.  So you don't have any issue
12 with the height of the crash test F-250 as
13 tested?
14     A.   No.
15     Q.   Okay.  The vehicle you used in the
16 rerun simulation for the Escape, it doesn't
17 appear like you made any changes to that in
18 comparison to your original run.  Is that
19 correct?
20     A.   Correct.
21     Q.   Okay.  And so the only
22 modifications we have to either vehicle are
23 what we've already talked about for the F-250.

20 (Pages 74 - 77)

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 78

1  You used a different default coefficient
2  stiffness because you used the Vehiclemetrics
3  instead of Neptune. Right?
4      A.  Yes.
5      Q.  You changed the tire sizes to
6  mirror the subject F-250. For the Escape you
7  didn't make any changes compared to the
8  original run?
9      A.  Correct.
10     Q.  All right. And so the only real
11  modifications beyond those would be to the
12  weight of the vehicle. Right?
13     A.  Seemingly.
14     Q.  Right. And so here we have
15  appendix A, which I believe is your -- showing
16  how you determined the weight used in the
17  simulation for both vehicles?
18     A.  Yes.
19     Q.  Okay. Here is the F-250 first.
20  And the first weight I see here, weight 250
21  equals 8,040 pounds. I'm assuming that is the
22  weight of the crash vehicle that you weighed
23  after the crash?

Page 79

1      A.  Yes.
2      Q.  Okay. And then you added weight
3  for the driver and certain items that were on
4  the F-250?
5      A.  Yes.
6      Q.  Okay. And that gave you a total
7  weight that's highlighted here that was used
8  for the total weight in the simulation?
9      A.  Yes.
10     Q.  Okay. Does HVE allow you to
11  account for the position of these additional
12  weights? In other words, does it -- do you put
13  in the location of the driver and add 170
14  pounds in the driver's seat or is it just a
15  total weight that's input into the software?
16     A.  You can do it either way.
17     Q.  Okay. So it does allow you to
18  actually position weight within the vehicle in
19  a specific location?
20     A.  Well, generally the way we do it
21  is we would redistribute the weight ratios. So
22  I believe in the past we've actually put actual
23  weights in like occupants and things. But we

Page 80

1  normally just redistribute the weight ratios,
2  if we do it at all.
3      Q.  Okay. In this case did you
4  redistribute the weight ratios?
5      A.  No, we did not. We just added the
6  weights to the vehicle at the CG.
7      Q.  All right. So there was no
8  factoring in the specific location of the items
9  in the truck; it was -- you didn't use that as
10  part of your rerun simulation?
11     A.  Correct.
12     Q.  Okay. Did you account for any
13  loss of fluids that the F-250 may have suffered
14  in the crash?
15     A.  No.
16     Q.  Okay. Do you know the level of
17  fuel in the gas tank of the F-250 at the time
18  it was measured?
19     A.  Not specifically. Just what was
20  in there. It's part of the 8,040. We know the
21  weight of it. But you know, not an exact
22  amount.
23     Q.  You don't know if the tank was

Page 81

1  full, empty? You don't know what fuel level
2  was in the tank at the time it was weighed?
3      A.  Just what it was after the
4  accident. There's no evidence it leaked out.
5      Q.  And the same with regard to
6  whatever fluid was in the radiator, that wasn't
7  accounted for?
8      A.  Yeah, the radiator did leak some
9  out. We know that. But no, we did not think
10  that was --
11     Q.  (Inaudible) fluids contained
12  within the vehicle?
13     A.  Pardon?
14     Q.  And you didn't account for any
15  other loss of fluids from the vehicle?
16     A.  No. We knew some radiator fluid
17  had leaked out. We weren't worried about that.
18  The rest of the fluid should have been the same
19  at the time of the accident.
20     Q.  All right. And the weight for the
21  chainsaw, did you actually measure the
22  chainsaw? Did you weigh it?
23     A.  No. We didn't have the chainsaw.

21 (Pages 78 - 81)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 82

1  So you had to look something up. It's an Stihl
2  chainsaw, so you had to look something up for
3  the original.
4      Q.   Same -- same question for the
5  tools. Is that based upon measuring the weight
6  of the tools, or is that just an estimation?
7      A.   Nobody knows what was in the
8  toolbox. We needed a weight to put in. So we
9  thought 100 would be reasonable. We don't know
10 exactly what it is. Nobody has ever seen
11 inside the toolbox.
12     Q.   And what about the storage box, is
13 that an estimation or is that -- you didn't
14 actually weigh the storage box, did you?
15     A.   No. It was missing. So I think
16 we did some internet research to come up with a
17 reasonable weight, just like Mr. Grimes did.
18     Q.   All right. The bottom of the page
19 is the weight you used for the Ford Escape. In
20 your simulation, again I'm assuming that your
21 weight 3,410 is the measured weight of the
22 vehicle after the crash?
23     A.   Yes, it is.

Page 83

1      Q.   All right. And with the Escape,
2  did you add any weight for the cargo that was
3  behind the second row seat?
4      A.   Well, it was already in the
5  vehicle when we weighed it, so --
6      Q.   All right. That --
7      A.   -- yes, it's in the weight.
8      Q.   That's my question. So there
9  was -- the cargo was still in the back of the
10 Ford Escape at the time you weighed it?
11     A.   Yes.
12     Q.   Okay. Do you know the level of
13 the fuel tank in the Escape at the time you
14 weighed it?
15     A.   Well, nothing leaked out at the
16 scene. So it was whatever it was at the time
17 of the accident. That's all we were concerned
18 about.
19         MS. CANNELLA: Mr. Hill, I'm
20 trying to give you some leeway here, but this
21 is not new information. And this is a
22 deposition on his supplemental report. So
23 we're not -- we're going to object to a bunch

Page 84

1  of questions about work that -- that could have
2  been discussed at his first deposition.
3         MR. HILL: That's fine. You can
4  lodge that -- lodge that objection. But this
5  was produced as part of his amended report.
6         MS. CANNELLA: I understand that.
7  But my -- my statement stands.
8         MR. HILL: All right. Well, I
9  disagree with your objection.
10     Q.   (By Hill) The Escape in the
11 accident suffered quite a bit of broken glass.
12 You would agree with that?
13     A.   Yes.
14     Q.   All right. Did you account for
15 the weight of the glass that was missing when
16 you weighed the crashed Escape?
17     A.   Whatever glass -- normally it's
18 all shoveled up and thrown in the vehicle or it
19 falls in the vehicle. Whatever glass was in
20 there, it got accounted for. Whatever glass
21 wasn't in there didn't get accounted for.
22     Q.   Okay. And do you know whether the
23 glass was actually -- the shards of glass was

Page 85

1  put in the vehicle at the time you weighed it?
2      A.   Well, some of it was. But I
3  don't -- I didn't account -- try and account
4  for each shard of glass. No, sir. It's -- the
5  weight of the vehicle is a reasonable
6  approximation in the condition it's shown in at
7  the time of our photographs. And we think
8  that's reasonable for the accident, plus the
9  occupants the car seats.
10     Q.   And the same question with regard
11 to the placement of the weight. Just to be
12 clear, similar to the F-250 you didn't account
13 for the location of the occupants in the
14 vehicle when you ran the simulation?
15     A.   Well, they're near the CG. But
16 no, we didn't. We just added their weight to
17 the total vehicle, yes.
18     Q.   Okay. All right. Now we can --
19 let's just confirm a few things that were not
20 changed between the original simulation and the
21 amended simulation.
22     Just to be clear, the offset that you used
23 in both simulations was twelve inches. Is that

22 (Pages 82 - 85)

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 86

1  correct?
2      A.   Yes.
3      Q.   All right.  And the speed --
4      A.   Time out.  Pardon me.  Pardon me.
5      Q.   Sure.
6      A.   You've actually made a really good
7  point.  And you did it a little while ago.
8  I -- we know the offset is eleven inches
9  from -- or approximately a foot.  That's what I
10 said in my first depo.  But it's eleven from
11 the Ford emblem marks on the tailgate.
12     So in the original simulation, I don't
13 know -- I believe it was -- I don't know if it
14 was eleven inches or one foot.  But in my depo
15 I was asked what the offset was.  I said, well,
16 I haven't exactly measured it.  And I made a
17 measurement on a drawing, and it said one foot.
18 So I'm going to use one foot because that's
19 consistent with my deposition.  But the
20 precise -- you made a good point earlier.  I
21 don't know the precise offset that was used
22 other than from my memory it could have been
23 eleven inches or a foot.

Page 87

1      But it was -- it was -- it was done from the
2  scan data we had and everything.  And so it's
3  approximately a foot.  And that's what we used.
4  I don't know why I thought I needed to clarify
5  all of that.  But thank you for listening.
6      Q.   Sure.  But regardless, the offset
7  you used in the rerun was twelve inches to the
8  left of the Escape?
9      A.   Thank you.  Yes.
10     Q.   Right.  And -- and there's no
11 dispute that that's the offset that you believe
12 occurred, in fact?
13     A.   Well, I actually think it's eleven
14 from the -- in the depo I did an approximate
15 using a -- a manual scale.  But we know where
16 the -- we know it's precisely eleven if we go
17 to the best data we have.
18     Q.   All right.  So why did you use
19 twelve if you now have determined that it was
20 eleven?
21     A.   Because I -- earlier we were using
22 the orientation from the scans, which was
23 eleven.  But in the depo I said one foot, so we

Page 88

1  used a foot because I -- wanted to do it
2  exactly from my depo.  And that's a -- that's
3  an advantage to the F-250.  That would produce
4  more crush.
5      So it keeps my analysis conservative, which
6  is fine.  And I'm not worried about an inch
7  left or right, up or down.
8      Q.   All right.  And you used a speed
9  of 51 miles per hour for the F-250?
10     A.   Yes.
11     Q.   And you have said repeatedly
12 throughout your initial deposition and then now
13 in this report that the speed of the F-250 at
14 the time of the accident was 51 miles per hour.
15 Correct?
16     A.   That's my best number.  Yes, sir.
17     Q.   All right.  I know it hasn't been
18 a full hour, but I need another break.  So
19 let's just take a five-minute break.  What do
20 you want to do about lunch, Mr. Buchner?  I
21 don't want to make you work through lunch, but
22 it's up to you.
23     A.   I'll cry when I need lunch.  Right

Page 89

1  now I don't need lunch.
2      Q.   All right.
3          MR. HILL:  Well, let's just take a
4  quick five-minute break.
5          THE WITNESS:  Thank you.
6          MS. CANNELLA:  Okay.
7          THE VIDEOGRAPHER:  The time -- the
8  time is 12 o'clock p.m.  We're off the video
9  record.
10         (A break was taken.)
11         THE VIDEOGRAPHER:  The time is
12 12:15 p.m.  We're back on the video record.
13         MR. HILL:  Thanks.
14     Q.   (Mr. Hill) The HVE parameters for
15 the Escape that you used in the rerun
16 simulation, they don't differentiate with
17 regard to whether the Escape has a sunroof or
18 doesn't have a sunroof.  Correct?
19     A.   What are you asking?
20     Q.   Yeah.  So you used a vehicle in
21 your simulation for the Escape that you got
22 from the Volume Metric's (sic) database.
23 Correct?

23 (Pages 86 - 89)

G. Bryant Buchner                         July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 90

1    A.    Well, from Engineering Dynamics.
2  It was in their database originally, yes.
3    Q.    Right.  In HVE's database?
4    A.    Yes.
5    Q.    And did that vehicle have a
6  sunroof that you used in your simulation?
7    A.    It doesn't show a sunroof.
8    Q.    Okay.  And it doesn't
9  differentiate.  You can't choose Escape with a
10  sunroof or Escape without a sunroof within the
11  HVE software?
12    A.    HVE doesn't have a choice for with
13  or without sunroof.  No.
14    Q.    Okay.  And so it doesn't consider
15  whether it has a sunroof or not in determining
16  its prediction of crush?
17    A.    That would be up to the user to
18  consider whether or not, you know, that should
19  be included more than likely.  But where the
20  crush is in the simulation we ran is the bumper
21  level.  So as long as you go to bumper level
22  crush, I would say the sunroof would be not a
23  particular factor that the simulation could or

Page 91

1  could not include.  But it doesn't mean that if
2  you were to -- in other words, say Mr. Grimes's
3  crash test, you would want to use the most
4  representative vehicle.  In the HVE we use the
5  most representative vehicle.  And sunroofs --
6  I've never investigated presence or
7  non-presence on other vehicles.
8    But yeah, as far as HVE goes, it doesn't --
9  to my knowledge, it's not including sunroofs in
10  its -- in what it has.
11    Q.    And you did not modify the Escape
12  vehicle in your simulation to account for the
13  sunroof?
14    A.    No.  We were not modifying it, no.
15  We were attempting to use it, you know, as --
16  as their default vehicle.  That is correct.
17    Q.    Okay.  And the simulation also
18  does not allow you to place cargo within the
19  hatch of the Escape to determine whether that
20  will have any impact on the crush.  Correct?
21    A.    We don't think it has any impact.
22  No, sir.  But if -- we don't think it did.  The
23  intent wasn't to put it in there.  But what it

Page 92

1  clearly shows is that the structure of the
2  vehicle itself would have produced less crush
3  if it were hit at the bumper level, which was
4  the intent of the run.
5    Q.    Right.  I'm just trying to
6  establish that in your simulation, you didn't
7  place any cargo in the back of the Escape used
8  in the simulation?
9    A.    No, we did not.
10    Q.    All right.  Likewise you didn't
11  place a car seat in the Escape in the
12  simulation?
13    A.    No.  We were studying how the
14  Escape performed relative to a bumper level
15  contact.  We wanted to study the structure of
16  the Escape.
17    Q.    You're aware obviously that the
18  Defense performed a real-world crash test back
19  in May of 2023, and the crush that is seen on
20  the Escape in the real-world crash test is very
21  different from the crush seen in your rerun
22  simulation.  You would agree with that?
23    A.    No.  Both produced what we -- what

Page 93

1  is the critical factor in this case is that
2  they both produced -- demonstrated that
3  bumper-level impacts produce less crush than
4  override impacts.  So we do have -- that's
5  really the only value of the test is to
6  demonstrate that there would not be any
7  override.  That's what we're trying to do with
8  our simulation is that if you can hit the
9  bumper of a vehicle, then you -- then you end
10  up producing a much more favorable result as
11  far as the, you know, increasing forces and
12  able to decrease crush.  But there are a lot of
13  differences beyond that that makes the crash
14  test not representative of our accident.
15    Q.    Well, that's a separate question.
16  But let me start with this.  How do you define
17  override?  Let's make sure we understand that.
18  Do you define it as the bumper completely
19  misses the other bumper?  Is that your
20  definition?
21    A.    I don't have a definition.
22  There's an understanding -- there can be -- the
23  term doesn't have the exact definition in every

24 (Pages 90 - 93)

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 94

1 crash. Every crash is slightly different. But
2 override typically discusses that the -- that
3 some part of one vehicle that's like the bumper
4 is overriding some part of the other vehicle.
5 In this case we're talking about the bumpers or
6 the bumper-level frames.
7    So yeah, that's -- that's what we're using
8 here. But it's -- you know, it needs to be
9 discussed openly, not -- it's not just one
10 definition that can be perfectly applied to
11 everything.
12    Q.   Okay. So there's no one
13 definition of override in your opinion?
14    A.   Well, there's one understanding of
15 it. But there's no one exact definition. If
16 you're teaching a class, you'd say it's when
17 one bumper goes over the top of another to get
18 the concept across. But we have a lot of
19 different vehicles that hit a lot of different
20 ways. So you have to look at each accident
21 somewhat uniquely.
22    Q.    So when you say there was no
23 override in the exponent crash test, what --

Page 95

1       MS. CANNELLA: Sorry.
2 Mr. Buchner, were you done with your answer?
3       THE WITNESS: I was. Thank you.
4    Q.   So when you say that there was no
5 override in the exponent crash testing, what do
6 you mean by that statement?
7    A.   Well, the bumper -- the rear
8 bumper of the -- and the structure supporting
9 it specifically because the rear bumper did
10 shift some. But the frame rails of the unibody
11 of the Escape and -- on one side went into the
12 center of the bumper and stayed there
13 throughout the entire crash test. So we had
14 that bumper level was secure and the strong
15 structures were secure on the bumper of the
16 F-250 on the driver's side. And on the
17 passenger side F-250, the tow hook went into
18 the bumper and pushed it in.
19    So we maintained bumper-level, frame-level
20 engagement between the two vehicles throughout
21 the entirety of the crash pulse phase of the
22 accident. And the physical evidence concretely
23 shows that.

Page 96

1    Q.   The measured crush in your
2 simulation is over 20 inches short of the
3 observed crush in the crash test. Would you
4 agree with that?
5    A.   Well, are you saying someone
6 measured the crush in the crash test like
7 Mr. Grimes and published that? Because I
8 haven't seen that if he did.
9    Q.   No. You overlaid it yourself in
10 comparing the two crushes.
11    A.   Well, my intent wasn't to do
12 Grimes's work and provide measurements and
13 things. He didn't measure it. I'm just trying
14 to show that there's less crush visually
15 obviously between the crash test. So his
16 representation of the crash test is inaccurate.
17    Q.   What about his representation of
18 the crash test is inaccurate?
19    A.   Well, he claims there was more
20 crush. And then he changes that to the same
21 crush in his depo. So that's -- in our report
22 we just showed the two vehicles overlaid so
23 that anyone can make their own determination as

Page 97

1 to the crush.
2    Q.   All right.
3    A.   He didn't -- he didn't do that.
4 He said he visually saw it. But he didn't
5 provide any evidence of it. So we just
6 provided visual evidence of it.
7    Q.   Well, we have photographs of the
8 crash test vehicles.
9    A.   Visual evidence.
10    Q.   Right. And have you requested to
11 inspect the crash test vehicles?
12    A.   No.
13    Q.   Has anyone from Rough Country ever
14 prevented you from inspecting the crash test
15 vehicles?
16    A.   I mean, I've never talked to
17 Rough Country, so I don't know.
18    Q.   Any lawyer on behalf of
19 Rough Country said that you -- you are not
20 allowed to inspect the crash test vehicles?
21    A.   You know every time I've ever
22 talked to a Rough Country lawyer because it's
23 been you. And so --

25 (Pages 94 - 97)

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 98

1   Q.   Okay.
2   A.   -- you haven't ever talked about
3  it, so no.
4   Q.   Have you ever --
5   A.   If the crash test is provided and
6  documented, I'm using what was provided and
7  documented.  And I think -- and that's --
8  that's all I've used.  If someone wants me to
9  inspect the vehicles, I -- I haven't done that.
10  No.
11   Q.   Have you ever asked Ms. Cannella
12  for permission to inspect the vehicles?
13   A.   I don't know.  I don't remember.
14   Q.   Okay.  And you know from reading
15  Mr. Crosby's deposition that those vehicles
16  have been preserved and are available at the
17  Exponent location in Phoenix.  Correct?
18   A.   That's what he said.
19   Q.   All right.  Do you have any reason
20  to dispute that?
21   A.   No.
22   Q.   Okay.  Let's talk about comparing
23  your rerun simulation to the real-world crash

Page 99

1  test performed by the Defense.  And I just want
2  to make sure we're clear on what's the same and
3  what's different among those two.  Okay?  The
4  height of the F-250 is the same in both the
5  simulation and the crash test.  We can agree on
6  that?
7   A.   Reasonably, yes, sir.
8   Q.   And same with the -- with regard
9  to the Escape.  Correct?
10   A.   Reasonably, yes, sir.
11   Q.   All right.  And in both there --
12  in neither the simulation nor the crash test
13  were the -- was cargo placed in the rear of the
14  Escape.
15   A.   Right.
16   Q.   We can agree on that?
17   A.   Correct.
18   Q.   Okay.  There was no sunroof
19  involved in either your simulation or the crash
20  testing for the Escape?
21   A.   Correct.  Correct.
22   Q.   There was no child seat placed in
23  the rear position where Cohen is in either your

Page 100

1  simulation or the crash testing?
2   A.   Correct.
3   Q.   The speed of the crash test was
4  49.9 miles per hour.  And the speed you ran
5  your simulation was 51.  So we have a slight
6  differentiation there.  The crash test was 1.1
7  mile an hour slower than your simulation.  Do
8  you agree with that?
9   A.   Yes.
10   Q.   Okay.  And at a slower speed,
11  you're going to have less crush indicated on
12  the Escape the lower the speed with all other
13  variables being equal.  Would you agree with
14  that?
15   A.   Not in the context of your line of
16  questions, no, because we know that the crash
17  test was -- missed to the left by 45 percent --
18  at 45 percent more offset.  So that's an apples
19  and oranges problem.  So no, you can't say
20  that.
21   Q.   Well, I'm not talking about the
22  offset variable.  I'm talking about whatever
23  test you run at any offset.

Page 101

1   A.   Well, then you need to start a new
2  line of questions because basically you're
3  saying let's compare my simulation to a
4  real-world crash test.  Well, my simulation
5  compared it to the real-world accident.  Your
6  crash test is not the real-world accident.
7  Your crash test -- if I say it that way, I
8  apologize.  Exponent's crash test had 45
9  percent more offset, which changes an unknown
10  number of things.
11   Q.   Okay.  Let's --
12   A.   Certainly -- but it certainly
13  will, as a minimum, disadvantage the Escape.
14   Q.   Okay.  Let's say that there was,
15  in the crash testing, the identical offset as
16  what you simulated.  Let's assume that.
17   A.   Okay.  So we're not talking about
18  the Exponent crash test at all now?
19   Q.   Right.  We're talking about -- in
20  your opinion we're talking about a hypothetical
21  real-world crash test.  Would it be appropriate
22  to run that real-world crash test at 49.9 miles
23  per hour to compare it to your simulation

26 (Pages 98 - 101)

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 102

1 assuming all other variables were the same?
2        MS. CANNELLA:  Object to the form
3 of the question.  It's confusing.
4        A.   Yeah, that's -- that's an
5 engineering problem.
6        Q.   Well, what speeds -- go ahead.
7        A.   It's using information that we
8 haven't -- that no one has ever done, you know.
9 So you know, normally I'm not worried about a
10 mile per hour.  But sometimes I'm very worried
11 about a mile per hour.  So that's -- I don't --
12 so that's actually a new analysis that I
13 haven't done before now.  So I'm -- I'm not
14 comfortable in doing that.  But I'll try to
15 answer your questions.
16        Q.   Let me ask it this way.  Do you
17 have any criticism of the speed of the impact
18 in the crash test?
19        A.   In a sense, I do because he
20 reported that the accident speed of the truck
21 could have been down in the forties.  That's
22 part of his opinions.  So I was confused as to
23 why he -- why he chose the speed he chose.  I

Page 103

1 know why I chose 51 because I wanted a worst
2 case scenario.  But I'm not sure -- if he's
3 trying to work in favor of, you know, proving
4 his opinion, is why he said he needed the
5 crash test so he could say that, you know,
6 override doesn't -- not override, but that
7 lift kits don't matter, well, he needs to do a
8 study to show that.  So there's a whole lot
9 involved in this line of questions that goes
10 way beyond just what you're saying.
11        Q.   Well, if you -- if you're going to
12 compare the real-world crash test to your
13 simulation, you would need to run them at
14 approximately the same a speed to be able to do
15 an apples-to-apples comparison between the two.
16 Correct?
17        A.   Generically, yes.
18        Q.   Okay.  That's all.  So let's talk
19 now about the differences between the crash
20 testing done by Exponent and your simulation.
21 You've brought up -- you've brought up the
22 offset.
23        A.   Yeah.  The primary difference that

Page 104

1 causes -- first, the simulation is -- is one
2 tool.  The crash test is another tool.  The
3 primary difference between these two tools that
4 is the most significant is the excessive offset
5 of the crash test.  Thank you for listening.  I
6 don't know why I felt a need to point that out.
7 Thank you.
8        Q.   Sure.  And the weights of the
9 vehicles, when you compared the weights that
10 you used in your simulation to the weights of
11 the vehicles in the crash test, that's another
12 difference between the two tests -- or between
13 the two pools, as you describe them?
14        A.   Well, I don't remember what the
15 weights were.  But he said he used full gas
16 tanks.  I -- so I'm thinking why are you using
17 full gas tanks.  You're pumping the weight up
18 on the F-250.  But I didn't look at his weight
19 compared to what my weight -- what my measured
20 weight was.
21        Q.   Okay.
22        A.   I'm wondering why he's not using
23 the measured weight of the vehicle as a

Page 105

1 foundation.  So yeah, there are -- so that is
2 something that could be looked at.
3        Q.   All right.  Are there any other --
4 other than the offset, which you said is the
5 primary difference, what are -- what are the
6 other differences between the crash test and
7 your simulation?
8        A.   I think we discussed things to be
9 considered.  I haven't tried to see the
10 differences between the two.  That's not been a
11 concern of mine.  I tried to look at his crash
12 test as to what he represented it to be.  My
13 simulation was not done for his crash test.
14 Mine was another methodology.  So I don't -- I
15 don't know the answer to the question off the
16 top of my head.
17        MS. CANNELLA:  Mr. Hill, what --
18 what in his supplemental reports are we
19 referring to here?
20        MR. HILL:  We're referring to his
21 criticisms of the crash test in his June 14
22 supplemental report.
23        A.   Well, I can do that.  But that's

27 (Pages 102 - 105)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 106

1 different than comparing it to the simulation.
2     Q.    Well, it's -- it's within the same
3 realm.  You've made an allegation that the
4 crash test is invalid because the offset was
5 improper.  And so I'm trying to establish how
6 that compares to your simulation -- your rerun
7 simulation that I've never had a chance to ask
8 you the first question about.
9         MR. HILL:  So I think this is well
10 within the scope of his -- both of his reports.
11    Q.    And so this leads to the question
12 of, with HVE, right, you could change the
13 parameters within your simulation to match the
14 parameters that were found in the crash
15 testing.  Correct?
16    A.    No.
17    Q.    And why not?
18    A.    Because I'm not -- I'm not trying
19 to re-create his crash test.  I'm -- I'm trying
20 to understand the effect of -- on the subject
21 accident of lowering the truck and to
22 demonstrate what is intuitively obvious and has
23 been in the business as engineers using physics

Page 107

1 and Newton's laws that when you strike the
2 structure of a vehicle, the frame of the
3 vehicle, you get less crush.  And when you
4 don't strike those and hit tailgates, you get
5 more crush.  That was the purpose of it.
6     I'm criticizing his crash test just purely
7 based on his crash test compared to the
8 accident.  You're asking for another -- you're
9 asking me to do an analysis I haven't done.
10    Q.    I'm asking you is it possible to
11 do that if you wanted to.  Could you change the
12 offset in your simulation to the offset that
13 you claim existed in the crash testing?  Is
14 that even possible within the HVE software?
15    A.    Not in the line of the way I think
16 you're asking the questions.  No.  I mean,
17 somebody could go put in some numbers if they
18 want.  But I wouldn't -- I don't know that I
19 would -- I don't know that I would compare
20 those two.  But I'd certainly know that I would
21 compare my simulation to the accident.
22    Q.    So you'd compare your simulation
23 to the accident --

Page 108

1     A.    His crash test --
2     Q.    Go ahead.
3     A.    The problem is his crash test is
4 not this accident.  So if -- but I know what
5 the accident was.  And I did a simulation for
6 that.  But to just start doing a simulation to
7 compare to his crash test, I would have to
8 start the whole process over.  And I don't know
9 where that would lead me.  Certainly I'm -- I'm
10 not going to agree that I would even use a
11 simulation to analyze this crash test.  I'd
12 have to do that analysis, and that hasn't been
13 done.
14    Q.    Well, your simulation does not
15 analyze the actual subject crash in this case?
16    A.    Sure, it does.  It's a
17 representation of the subject crash with the
18 vehicles lower.  It's -- it's not analyzing the
19 accident.  But it's used to study the accident.
20 And I've determined that it's reasonable to do
21 it the way that we've done it, yes.  But that
22 takes work to do.  You can't just do that with
23 his crash test because that's -- he -- that's a

Page 109

1 new accident.  That's a different animal.  I
2 can't -- I can't study raccoons as a zoologist
3 and then turn around and say I'm going to study
4 opossums, you know, the same way.  You've got
5 to take the work -- you've got to do the work
6 and see if the methodologies you were using to
7 study it are going to -- are going to be
8 reasonable.
9     Q.    That's exactly what I'm getting
10 at.  To the determine whether the methodology
11 you used is reasonable, what have you done to
12 verify that HVE is a scientifically reliable
13 methodology for predicting crush in a
14 hypothetical accident like you've used it in
15 this case?
16    A.    Well, that's -- I mean, I've seen
17 HVE used many, many times to study potential
18 accidents.  You know, that's a use of it.  I
19 mean, I've seen, you know, companies -- I mean,
20 I'm even sure I've seen auto manufacturers use
21 it, but the -- to study events that may or may
22 not happen.  But in this case HVE was
23 specifically designed for crash reconstruction

28 (Pages 106 - 109)

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 110

1  using the -- the stock vehicles that hit frame
2  to frame like they -- like at levels that are
3  absorbing the energy, where the AV stiffness
4  coefficients are generated.
5     And therefore because in the simulation we
6  ran we did hit the vehicles bumper to bumper,
7  it means that it's a -- and it calculates it
8  using a methodology that's been well
9  established in the industry.  And there's
10  papers that say that it's valid for this type
11  of study.  That's why HVE sells it, is for us
12  to be able to do this.  So we -- and in this
13  case we also have a treasure-trove of data in
14  the black box from the truck.  We know the
15  delta-V's.  We know the -- the -- you know, the
16  speed of the truck at impact.  So therefore we
17  have reasonable constraints.
18     We have given stress test coefficients.  We
19  have given geometries.  We know we're hitting
20  bumper to bumper.  We know we're engaging the
21  two structures of the two vehicles.  We know
22  we're looking for an impact speed of X and a
23  delta-V of X.  And we're using it to predict,

Page 111

1  using Newton's laws, what the crush would be.
2     Q.   What article -- you just mentioned
3  there are papers that said you could use HVE in
4  this context.  Can you cite to any of them in
5  this deposition?
6     A.   I don't have them memorized off
7  the top of my head.  But I mean they
8  certainly --
9     Q.   Okay.
10     A.   -- are out there.
11     Q.   All right.  Have you done
12  anything -- my question -- my original
13  question -- and I move to strike your answer.
14     My original question is, have you performed
15  any testing or any analysis to validate that
16  your use of HVE in this case was a
17  scientifically reliable methodology?
18          MS. CANNELLA:  Object to the form.
19  Asked and answered.  Misstates the prior
20  question.
21     Q.   Go ahead.  It's a yes-or-no
22  question.  Have you personally done anything to
23  validate that your simulation is a

Page 112

1  scientifically reliable methodology?
2          MS. CANNELLA:  Asked and answered.
3     Q.   Go ahead.
4     A.   I think that's what I described a
5  minute ago.  I've been using the program for a
6  long time.  My understanding that this is -- we
7  have plenty of data to -- that we're targeting
8  for, that we're given.  We have crush stiffness
9  that are available from the program itself.  So
10  literally purely within the program, it will
11  predict crush based on the impact speed that
12  we're given from the black box.  And so we can
13  use that and match the delta-V's.  And then the
14  program is designed to report what the crush
15  would be.
16     That is clearly a proper use of the program
17  based on my experience, my training, and the
18  literature that's out there in the industry.
19  This is -- this is -- is an engineer, I have no
20  concerns about that at all.  We're not doing
21  anything new or novel with the program.  This
22  is what we buy it for.
23     Q.   Okay.  You mentioned all of the

Page 113

1  knowns -- all of the known information that you
2  use, which you say supports the use of HVE such
3  as all those things you just mentioned, the
4  block box data, the delta-V's, the speeds, and
5  so forth.  All of that applies to the -- to the
6  actual crash testing as well, like the crash
7  testing has the benefit of all of those same
8  known data points.  Correct?
9     A.   I disagree.  I don't -- that is a
10  huge broad question.  You just went from asking
11  me what I did to about Grimes.  I think that
12  that same black box data is available.  But to
13  just blanket somehow how that relates to the
14  crash test, I need something specific about the
15  crash test.  I can't just -- I don't know what
16  the -- what I'm being asked, it's just too
17  broad of a -- of a potential here.
18     Q.   It's pretty simple.  Other than
19  the offset, okay, what other data point did the
20  crash test not follow?
21          MS. CANNELLA:  Object to the form
22  of the question.  I think -- I think this is
23  outside the scope of his report.

29 (Pages 110 - 113)

G. Bryant Buchner                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 114

1    MR. HILL:  Not even close to being
2 outside the scope.
3    Q.   But go ahead.
4    MS. CANNELLA:  Which -- which part
5 of the report are you asking about, the
6 supplemental --
7    MR. HILL:  He is -- he is
8 critical -- the entire report is critical of
9 the crash testing.  And I'm asking him a
10 specific question about what part of the crash
11 testing other than the offset was incorrect.
12    A.   Well, we've said the offset is the
13 thing that really invalidates it because it's a
14 completely different crash to the accident.
15 And then after that Grimes -- most of my report
16 is about Grimes's characterization of it
17 without actually having any data that he used.
18 He wants to say it was a visual.  And so we
19 tried to provide in the report things that
20 demonstrated those things.  So the first part
21 of it is the crash test is not valid because
22 it's not a reasonable representation of the
23 accident.  And Grimes himself admits that in

Page 115

1 his deposition.
2    And then the second part of the report has
3 to do with basically you can -- basic
4 misrepresentations Mr. Grimes makes about
5 conclusions.  As far as differences, I don't
6 know that I have any cataloged.  The offset is
7 the thing that has been most foremost in my
8 mind.  I think that -- I think that we have to
9 go to the results and, you know, after that
10 look at the results as -- as issues such as
11 that, you know, the impact wasn't in the right
12 location, that type of stuff.
13    Q.   Okay.  So what does it take in the
14 HVE software to change the impact location, the
15 offset?  How would you do that if you wanted to
16 do it?
17    A.   We just change the position of the
18 vehicles.
19    Q.   Okay.  If you were to be asked by
20 Ms. Cannella to run an HVE simulation that
21 would replicate the crash testing, what would
22 you need to do other than what you just
23 described, which is change the offset or impact

Page 116

1 location to what you believe it was in the
2 crash test?
3    MS. CANNELLA:  Object to the form
4 of the question.  Goes outside his supplemental
5 report.
6    Q.   Go ahead.
7    A.   I -- I'd take time to study before
8 I even tried to do anything.  I would have to
9 look at the crash test from that perspective,
10 which I haven't done.  I've literally just used
11 his data and his answers.  You're asking me to
12 do a separate engineering analysis.  I'm not --
13 I'm not willing to tell you what I can do or
14 how I would do it or discuss even concepts of
15 it until I take the time to look at it from
16 that perspective.  I know it sounds simple to
17 you, but it's not.  That's -- that's how
18 mistakes are made.  I mean, it needs to -- it's
19 an engineering problem that needs its due time
20 and effort before I can start answering those
21 questions.
22    Q.   But as you sit here today, you
23 can't identify what you would need to do as

Page 117

1 part of that engineering effort in order to
2 simulate the crash test?
3    A.   I wouldn't start until I took the
4 time to answer that question.  And I would
5 start -- I would open that concept up.  And I
6 would arrange my file materials, and I would
7 start looking at it, and I would start asking
8 the questions.  I'm not arrogant enough to
9 think that I know the answer before I do the
10 work.  I would do some work to prepare myself
11 to answer that question, and I have not done
12 that.
13    Q.   But it would be possible to do
14 that?
15    MS. CANNELLA:  Objection to the
16 form of the question.  Goes outside the
17 supplemental report.
18    Q.   Go ahead.
19    A.   No.  We don't know if it's
20 possible or not.  We have to -- we have to
21 start looking at that.
22    Q.   What about if it's possible to
23 compare your simulation to the actual crash,

30 (Pages 114 - 117)

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 118

1  how is it not possible to compare your
2  simulation to the crash testing?
3      A.   Well, because we haven't done the
4  work.  You have to sit down and look at the
5  crash test and then understand it and then
6  start from a simulation standpoint, is this
7  something that we should or should not be
8  seeing.  See, Grimes's whole ridiculous
9  argument is that because -- is that there was
10  some kind of an offset that renders the
11  simulation useless.  This is not an offset --
12  not an offset.  Excuse me -- an override crash.
13  It's not an override.  If his crash test proved
14  anything, it's that if you lower the bumpers,
15  you lose the override component of this
16  accident.
17      And so if his argument is you can't use the
18  simulation because there is override, then we
19  have to do the same thing when we start moving
20  the impact location.  We have to stop and look
21  at that and see if it affects something like
22  that.  So I'm just saying I can't answer your
23  questions about trying to simulate the crash

Page 119

1  test because I have to take the time to look at
2  it and -- and consider that as an engineer.  I
3  shouldn't answer questions I haven't looked at
4  and considered because there's reasons as to --
5  that might come into play.  And I don't presume
6  to know all of those things off the top of my
7  head for something I have not analyzed from
8  that perspective.
9      I have looked at his crash test relative to
10  the accident.  I've looked at my simulation
11  relative to the accident.  You're asking for a
12  whole other piece of analysis.  I'm not -- I'm
13  not prepared to do the analysis sitting here on
14  a new problem.  It's a whole new problem.
15      Q.   I appreciate your answer,
16  Mr. Buchner.  We're going to be here all day.
17          MR. HILL:  I move to strike the
18  response.
19      Q.   It was a simple question.  I said
20  is it possible.  And then you went on to --
21  your response was, well, I haven't started that
22  yet.
23      A.   Well, I can't answer if it's

Page 120

1  possible.  An engineer should not answer if
2  it's possible unless he can reasonably know if
3  it's possible.  I can't reasonably know that
4  until I do the work.  And that's -- I mean, and
5  that's the difference between you and me.  I'm
6  an engineer.  I actually know that there's a
7  reason you have to go do the work.  You just
8  think it's, hey, just, you know, change the
9  number and put it in and it magically -- that's
10  not -- that's not a reasonable response to me
11  as a professional engineer.  I can't answer
12  your question because I don't know enough to
13  answer it.
14      Q.   Let me ask it this way.  Do you
15  have any reason to believe that it would not be
16  possible?
17          MS. CANNELLA:  Objection.  Asked
18  and answered.
19      Q.   Go ahead.
20          MS. CANNELLA:  And confusing.
21      A.   I'd have to -- I'd have to look at
22  that question from an engineering perspective
23  and take tame to look at it.  I don't -- I have

Page 121

1  not done that.  I cannot do a completely brand
2  new complete accident investigation or a
3  complete test versus simulation investigation
4  in a casual conversation where you just bring
5  it up for the first time.  No.  I -- that would
6  be inappropriate.
7          MR. HILL:  Move to strike as
8  unresponsive.
9      A.   Excuse me.  I'm going to respond
10  to that.  Just because you don't understand
11  what I'm saying, don't say it's not responsive.
12  I'm giving you the exact right answer as an
13  engineer.  Professionally this is the right
14  answer.  Just because you don't appreciate it,
15  I'm sorry.
16      It's the right answer.  It's not as easy as
17  you want it to be.  And it's not that simple
18  answer that you want.  The answer is, we don't
19  know until we do it, so I can't tell you the
20  answer.
21      Q.   Let's --
22      A.   I can't speculate the answer.
23      Q.   Let's approach it this way.  In

31 (Pages 118 - 121)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 122

1  your prior deposition when talking about this,
2  you said that HVE is a robust program for
3  analyzing bumper-to-bumper or
4  structure-to-structure crashes.
5      A.   Yes, sir.
6      Q.   We can agree?
7      A.   Yes.
8      Q.   The crash testing was a
9  bumper-to-bumper, structure-to-structure crash?
10     A.   Actually no.  They missed some of
11 the structure in the way they did it.  They
12 moved the -- they moved the tow hook, which is
13 the tip of the frame, outside the main
14 structure of the Escape.  They moved it so far
15 to the left that it's not actually -- there's
16 some -- there's some worry about how -- the
17 effect of that.  It obviously over -- it
18 disadvantaged the Escape and made the crush
19 more than it would have been had that not
20 happened.
21    In the accident, that frame horn, that tow
22 hook, the tip of the frame, that bumper area
23 did hit on the rear of the Escape and left a

Page 123

1  really nice mark that we can see on that rear
2  structure area.  So if we -- if we just lower
3  it, well, we're getting good engagement.  But
4  as far as move to the outside, you're now
5  starting to mess with that thing that you just
6  asked about or that you said I told you about
7  previously.  That was a -- that was very
8  accurate, what I said previously.  Those are
9  the types of things that have to be gone
10 through.
11    That's just an example of the types of
12 things.  It doesn't mean it's all the things.
13 And I don't know what all the things are.  So I
14 can't answer the question until we do the work.
15 That's just a good example of the type of thing
16 that ought to be considered.
17     Q.   I did not ask you whether the
18 crash test was representative of the accident.
19 I didn't ask you about whether it properly
20 represented the offset.  This question was
21 simple.  Regardless of the offset, regardless
22 of the positioning, do you agree it was a
23 bumper-to-bumper and structure-to-structure

Page 124

1  accident in the crash test?
2          MS. CANNELLA:  Objection.  Asked
3  and answered.
4      Q.   That's a yes-or-no question.
5          MS. CANNELLA:  Asked and answered.
6      A.   I explained it very well in the
7  last answer.
8      Q.   You have testified in your report
9  that this was not an override.  It was a
10 bumper-to-bumper, structure-to-structure crash
11 test.  Are you now saying that you don't --
12         MS. CANNELLA:  Objection.
13     Q.   -- believe that?
14         MS. CANNELLA:  Objection.  You
15 mis-testified -- you mischaracterized his
16 testimony and report.  And asked and answered.
17     Q.   Go ahead.
18     A.   I'm not a hundred percent sure
19 what you were asking.
20     Q.   It's very simple.  You put in your
21 report that --
22     A.   I'm sorry.  I'm sorry.  We've
23 already -- I don't -- the very simple part of

Page 125

1  the question is your perspective.  That doesn't
2  mean I can answer -- it doesn't mean it's going
3  to be a simple question from my perspective
4  because you don't -- you don't have all of the
5  perspective I have.  We cannot say very simple
6  before the question.  I wouldn't have to answer
7  to something and agree to something that may or
8  may not be true.
9      Q.   Well, wait a second now.  I can --
10 I'm not asking a complicated question.
11     A.   You are.  That's the problem.
12 Just don't say very simple and insinuate it's a
13 simple question.  Just please, very simple is a
14 statement followed by a question.  If we could
15 just have the question and let me determine
16 whether --
17     Q.   I don't need to be lectured about
18 how I ask my questions.  If you disagree with
19 my characterization of the question, that's
20 fine.  I'm trying to make the question --
21         MS. CANNELLA:  Mr. Hill, calm
22 down.  Calm down.  Don't be yelling at the
23 witness.  He's trying to explain to you his

32 (Pages 122 - 125)

G. Bryant Buchner    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 126

1  answer. You don't like it. You want it to be
2  yes or no. And he doesn't have a yes or no
3  answer.
4       MR. HILL: No. He's criticizing
5  the form of my question, which I can use the
6  word --
7       Q. If you don't like very simple,
8  then explain that it's not a very simple
9  question.
10      MS. CANNELLA: That's what he just
11  did.
12      Q. I'm trying to make the question
13  as -- as limited as possible so that it doesn't
14  bring in all of these other variables that
15  you're bringing up. I'm trying to establish
16  that HVE, if you can use it to simulate a
17  bumper-to-bumper crash like you did, you could
18  use it to simulate a bumper-to-bumper crash
19  like the crash test by just simply changing the
20  offset because that's the one thing you've
21  identified that's different between the crash
22  test and your simulation?
23      MS. CANNELLA: Asked and answered.

Page 127

1       Q. And you're denying that that's
2  true?
3       A. I'm not denying anything. I'm
4  telling you, you can't just blanket say that's
5  true. You've got to --
6       Q. So you --
7       A. -- go do the work --
8       Q. No. You --
9       A. Can I answer?
10      Q. Sure.
11      A. For the reasons I explained, it's
12  a very -- I have concerns over answering the
13  question at all. And that's what I'm telling
14  you. It -- it takes some effort. And that's
15  an analysis that hasn't been done. And so it's
16  not a simple question at all. It's an
17  incredibly complex question.
18      Q. All right. If you ran an HVE
19  simulation mirroring yours in this case exactly
20  except you changed the offset --
21      A. Let me turn the volume down.
22  You're -- you're -- I mean, literally it's
23  hurting my ears. Let me just --

Page 128

1       Q. Sorry. I've had trouble in the
2  past with people hearing me. So I'll turn it
3  down myself. I apologize. I've had multiple
4  instances in this very case where they said my
5  speaker doesn't work.
6       A. And I remember that from the last
7  depo. I mean, that's -- that's a hundred
8  percent fair. Thank you. We're good.
9       Q. Yeah. So my question is, could
10  you -- is it possible -- not have you done it.
11  Is it possible to take your exact HVE
12  simulation that you ran in this case and change
13  the offset to match the crash testing offset as
14  you've determined that offset to be? Is that
15  even -- is that possible?
16      A. For the reasons we've talked
17  about, I don't know.
18      Q. Okay.
19      A. I don't know if it would be
20  representative or not. I have great concerns
21  if it would work. So we don't know.
22      Q. Well, I'm not asking you if it
23  would be representative. I'm asking is it

Page 129

1  possible to run that type of simulation?
2       A. Well, I already told you anybody
3  can go in and change a number and run
4  something. It doesn't mean that it's valid or
5  that it's good or anything like that. I mean,
6  you can -- so I mean, is it possible to move
7  the positions? Yes. Is it reasonable, will
8  you get any value from it? I don't know.
9  That's -- the analysis has to be done. You
10  can't -- but yeah, people can make -- I mean, I
11  can make it fly out of the air and land on top,
12  I mean, if I want to. But that doesn't mean
13  that's representative or reasonable or a good
14  use of the program or that it would be
15  accurate.
16      Q. What can you cite to as we sit
17  here today that would cause that HVE run I've
18  just proposed, your exact run but with a
19  different offset to all of a sudden be
20  unrepresentative or unreliable?
21      A. Well, I've explained, you have to
22  do an analysis to think about this. That is a
23  complete separate engineering analysis than

33 (Pages 126 - 129)

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 130

1  what we're dealing with here. We're using a
2  simulation to look at the accident, which we
3  decided is reasonable and appropriate. It's
4  just part of our range. Remember, we did it
5  hand calculations or standard crush
6  calculations. We wanted to do it a different
7  way, and we found the simulation. The one that
8  gave the worst results, we're reporting as our
9  answers, which is the simulation. So it's just
10  our attempt to get a range. If we go try to
11  model the crash test with a simulation, we have
12  to go -- we have to go do the same thing again.
13  We have to go through all of that stuff again,
14  and nobody has done that. So I don't know how
15  to answer the question. You're asking me to do
16  a whole test reconstruction as I'm sitting
17  here. And we've got, you know, hundreds of
18  hours of engineering in on -- on these things
19  we have done.
20     You're asking me to do all -- to answer
21  questions about something we haven't done. And
22  I'm not comfortable doing that. And there are
23  concerns. I gave you one big example is that

Page 131

1  they moved the tow hook and the frame outside
2  the back of the vehicle. That -- you know, and
3  that's -- that's an issue. That would be
4  one -- an example of an issue that would have
5  to be looked at.
6     Q.  How would you look at that issue
7  other than changing the offset?
8     A.  I don't know. I haven't done the
9  work. That's the thing about it. You have to
10  do the work. I have to sit down and say, okay,
11  we're going to prepare ourselves to look at
12  this. That's -- you think I'm -- I'm not
13  omnipotent. I have to do the work.
14     Q.  What work are you referring to?
15  You just said the tow hook is outside of where
16  it was in the crash. That relates solely to
17  the offset. What work would you need to
18  determine how to deal with that?
19     MS. CANNELLA:  Objection. Outside
20  the scope of his supplemental reports.
21     Q.  Go ahead.
22     A.  How does that affect the -- what
23  we call the frame level impact? You've

Page 132

1  actually moved a good part of the truck
2  outside the -- outside the -- where it was in
3  the accident. Well, we've got good overlap in
4  the accident. You increased the offset by 45
5  percent.
6     I don't know as I sit here the answer to
7  that question. I'm not smart enough. I have
8  to do the work, just like I did in this one. I
9  have to -- I have to -- I have to sit and study
10  that. I don't know.
11     Q.  Well, I'm not asking --
12     A.  I can't give you the answer.
13     Q.  I'm not asking --
14     A.  Go ahead.
15     Q.  I'm not asking what the result of
16  an HVE simulation with those parameters would
17  be. I know you can't answer that.
18     A.  No, I'm not even pretending to
19  tell you a result. I've never even mentioned
20  result today. I'm saying I don't know that I
21  can use it for that. It takes work to look at
22  that because there's going to be -- that's a
23  new analysis. I can't tell you how your house

Page 133

1  is going to look until I draw it and design it.
2  I can't tell you if it's a good house. I have
3  to do actually do the work if I'm an architect.
4  You're asking me to tell you an answer that --
5  that I can't know.
6     Q.  I'm asking you, are you saying
7  that you can't answer the question as to
8  whether HVE is capable of simulating the crash
9  test?
10     MS. CANNELLA:  Asked and answered
11  many times.
12     Q.  Is that your answer, that without
13  doing work, without doing an investigation,
14  without -- you can't answer here today whether
15  HVE is even capable of simulating an accident
16  like the crash test?
17     MS. CANNELLA:  Same objection.
18     A.  Yes. For all of the things I've
19  talked about.
20     Q.  Okay.
21     A.  That can't be given today.
22     Q.  All right. And you've explained
23  all of the reasons already why you can't answer

34 (Pages 130 - 133)

G. Bryant Buchner                                 July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 134

1 the question as to whether HVE is capable of
2 simulating the crash test?
3        MS. CANNELLA: Objection.
4    Q.   You've given us all the reasons
5 for why you can't answer that question?
6        MS. CANNELLA: Objection. Asked
7 and answered.
8    Q.   Okay. Asked and answered. So
9 it's been answered. That's what I want to
10 confirm.
11   A.   Well, we don't know the -- we
12 don't -- we have to do the analysis before we
13 can give all the answers. We can give you an
14 example of an answer. But we don't know. So
15 no, the analysis has to be done before the
16 question can be answered. That's -- that's my
17 answer is you don't know until you do the
18 analysis. And -- and that's what you're
19 saying.
20   So no, we don't know. And I've given you
21 examples of why and tried to explain why -- why
22 it's not simple at all. That's the -- that's
23 the correct answer. And it's the same thing

Page 135

1 I've been trying to say for the last half hour.
2    Q.   Is it possible to run the HVE --
3 you ran it at twelve inches offset. Can you
4 run it at 13?
5    A.   We've answered this question.
6    Q.   So the answer is yes? I want to
7 make sure it's clear.
8    A.   No. No.
9    Q.   You can run it at 13?
10   A.   No. You're wrong. We've told you
11 that when -- that you can make it do any -- you
12 can put the number in and run it. But it's not
13 necessarily going to be valuable or
14 representative, just like the dropping the car
15 from the moon.
16   Q.   That's -- but that's not my point.
17   A.   But no, it is your point.
18   Q.   Okay.
19   A.   And you're not listening to my
20 point. My point is, we don't -- we cannot
21 change those things until we do an analysis
22 about them. I would not do it at 13 and say it
23 had any use for analyzing this subject accident

Page 136

1 at all, period. To go to 13 means we're now
2 studying other accidents.
3    At twelve I know I'm conservative, and I
4 know I'm consistent with my deposition, and I
5 know that it allows me to give my opinions. It
6 doesn't mean we couldn't use 13, but I have to
7 sit and decide if it would be appropriate to do
8 that.
9    I've done that at twelve. You keep wanting
10 me to answer questions that haven't been
11 engineering processed as a -- as a responsible
12 engineer. I can't answer the question because
13 we haven't -- that's outside the scope of what
14 we've done in the past.
15   Q.   I haven't asked you whether that
16 type of test would be relevant to this case. I
17 didn't ask you whether it was relevant to the
18 subject accident.
19   A.   I need a restroom break. I need a
20 restroom break.
21   Q.   The question was only, can you run
22 the --
23       THE WITNESS: Can I take a

Page 137

1 restroom break?
2        MR. HILL: Sure.
3        THE WITNESS: Okay. Thanks.
4        THE VIDEOGRAPHER: The time is
5 1:03 p.m. We are off the video record.
6    (A break was taken.)
7        THE VIDEOGRAPHER: The time is
8 1:13 p.m. We're back on the video record.
9        MR. HILL: Thanks.
10   Q.   (Mr. Hill) Mr. Buchner, I'm sorry
11 if we got a little sideways there. I -- I was
12 only trying to speak loudly so that you could
13 hear me because I know we had problems the last
14 time. And I apologize about the frustration of
15 us misfiring. And I'm trying to ask you as --
16 as direct and as, you know, intelligent
17 questions as I can. And so I appreciate your
18 attempts to answer. But I think we've
19 established a record now of what you can and
20 can't answer. And I'm glad to revisit that --
21 any of that if you would like, but I don't
22 intend to.
23       MS. CANNELLA: I would like to say

35 (Pages 134 - 137)

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 138

1 for the record that the volume of your voice
2 and the aggressiveness with your questioning
3 was not related to the -- to the technical
4 difficulties and it goes up the more irritated
5 you are with him. So if you could please lay
6 off of that, we would appreciate that.
7          MR. HILL: I'm fine with that. I
8 will note that he was irritated with me as
9 well.
10     A.   I'm happy to proceed, sir. Thank
11 you.
12     Q.   All right.
13     A.   And I did need the break.
14     Q.   Yeah, I understand. And I'm happy
15 to take a break at any time. And I'll admit, I
16 needed a break as well. So can you cite to any
17 instance that you're aware of where an HVE
18 simulation was found admissible in court to
19 support opinions regarding the level of crush
20 that would be predicted in a hypothetical
21 crash?
22     A.   I've never tried to do that. No,
23 sir. I would imagine that we've used it to

Page 139

1 demonstrate before. But I've never even
2 thought about that question before now. I
3 don't know.
4     Q.   But you're not aware of any
5 instances where that's actually happened?
6     A.   I might be. I -- that's a big
7 question.
8     Q.   And you have never in your career
9 attempted to use an HVE simulation like this
10 one as admissible evidence in court to support
11 opinions regarding the predicted level of crush
12 in a hypothetical crash before this case?
13     A.   I can't say I haven't. I mean,
14 we -- we use it to study accidents all the
15 time. I mean, that's -- that's what it's there
16 for. And I've seen other people, you know, use
17 it. I think I've even seen the auto
18 manufacturers use it to study what happens in
19 crashes so they don't have to crash cars, which
20 is exactly what we're doing here. So I think
21 we've done this many times, just not here
22 knowing any examples of it. I'm here to look
23 at this case.

Page 140

1     Q.   Well, that wasn't my question.
2 Can you cite to an example where you've given
3 testimony like this using HVE before where it
4 was found admissible in court?
5     A.   Yeah, I don't know. That's too
6 big a question for me to know the answer to
7 here today. I don't know.
8     Q.   Okay. I think I already know how
9 you're going to answer this, but I feel like I
10 have to ask the question. If the HVE software
11 that you use is accurate in predicting crush
12 and intrusion, would you agree that it should
13 be able to predict the levels of crush and
14 intrusion that were seen in the crash test if
15 the proper parameters that were involved with
16 the crash test are input into the software?
17          MS. CANNELLA: Object to the form
18 of the question. Goes outside the scope of his
19 supplemental testimony. And asked and
20 answered.
21     Q.   Go ahead.
22     A.   The answer to that is the same as
23 the other questions. I don't know. I can't

Page 141

1 agree to that at all as I sit here for the same
2 reasons we've been talking about.
3     Q.   And I don't want to revisit that.
4 But one of the main reasons is that you haven't
5 tried that and haven't done the work. Is that
6 fair?
7          MS. CANNELLA: I object to the
8 form of the question. Asked and answered.
9 Mis-summarizes his testimony.
10         MR. HILL: That's why I'm asking.
11         MS. CANNELLA: Mr. Hill, if we're
12 going to keep going on this line of
13 questioning, I need you to explain to me why
14 questions about whether Mr. Buchner used HVE to
15 re-create Mr. Grimes's crash test are relevant
16 to his report -- his supplemental report. I
17 don't -- he did not do it. And you've been
18 asking him questions about if he could do it
19 for probably close to an hour now. So if it's
20 not work he did, I don't understand how this is
21 relevant to his supplemental reports.
22         MR. HILL: It's relevant to his
23 supplemental report of May 8 of 2024 where for

36 (Pages 138 - 141)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 142

1  the first time he actually provided legitimate
2  HVE data and produced a simulation that
3  included the axle of data upon which that
4  simulation was based. And so well within the
5  scope of this deposition is the reliability of
6  the HVE methodology that he used in generating
7  his FR26 amended report.
8        MS. CANNELLA: And -- and those
9  questions are fine. But the questions you've
10  been asking him are about could he use HVE to
11  re-create a Defense expert -- Exponent crash
12  test, which is not -- not in his report. It's
13  not work he did. It's not work he was asked to
14  do or tried to do. It's not work that the
15  Defense did. So it's not an issue here.
16  And you know, if you want to ask him about
17  his data that he produced with his May report
18  or reliability of HVE in general, that's fine.
19  But the questions about whether he could do
20  work that he didn't do for the Defense side is
21  not -- it's not in his report. It's not
22  relevant to his report. And I'm going to
23  object to any more of that.

Page 143

1        MR. HILL: It relates to the
2  reliability of HVE.
3        MS. CANNELLA: It doesn't. It
4  doesn't. It relates to the reliability of HVE
5  in a crash test that he did not analyze. That
6  he didn't -- he did analyze it, but he didn't
7  use HVE to create it.
8        MR. HILL: All right. I'm not
9  going to sit here and argue with you. I'll ask
10  my questions. You can object, and we can take
11  it up with the --
12        MS. CANNELLA: Well, I'm getting
13  real close to telling him not to answer things.
14  So that's why I understand what your argument
15  is. So if we have to call the Court, I want to
16  understand what your argument is. So I'll
17  agree to it if it's reasonable. But it doesn't
18  seem reasonable to me at this point.
19        MR. HILL: The argument is that
20  HVE, if it's reliable, it should be reliable
21  across simulation of all accidents.
22        MS. CANNELLA: That's absolutely
23  not true. That's actually opposite of what

Page 144

1  Mr. Grimes even said.
2        MR. HILL: Well, that's the point
3  I'm trying to make. So if you disagree with
4  it, that's fine. But in analyzing whether HVE
5  is reliable in the way he used it, I can ask
6  questions about what situations it is and what
7  situations it's not reliable.
8        MS. CANNELLA: And he's answered
9  that question a hundred times.
10        MR. HILL: He's never even
11  answered the question about whether it's
12  reliable in predicting the results of the crash
13  test. That's the question he won't answer.
14        MS. CANNELLA: He -- he has
15  answered that many times. He said it's
16  reliable in ours. And he would have to study
17  it to know if it's reliable in a crash -- in
18  the Exponent test. That's what he said for the
19  last 45 minutes. So you know, that's -- those
20  questions -- that line of questions, unless
21  there's something else you haven't told me
22  about why it would be permissible to go into
23  this stuff for so long, I'm going to object to

Page 145

1  that. Just when you ask --
2        MR. HILL: He can't answer the
3  question or doesn't have the ability to answer
4  doing future work as to whether HVE could
5  reliably predict the crash test if the proper
6  inputs were put into the software.
7        MS. CANNELLA: You're talking
8  about the crash test again. He didn't do that.
9        MR. HILL: I'm not asking whether
10  he's done it. I'm saying with his knowledge
11  and expertise and his -- you know, he says he
12  knows all about HVE and how it's reliable and
13  how it's used in the industry and all its
14  applications. And so based upon all that, he
15  chose to use it in this case. And I'm asking
16  based upon all of that knowledge and
17  information and, you know, experience with HVE,
18  should it be able to predict the crash test
19  results if the proper inputs are put into the
20  software.
21        MS. CANNELLA: And he said he
22  doesn't know. I mean, he's literally said that
23  probably about twenty times.

37 (Pages 142 - 145)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 146

1      MR. HILL: Okay. Great. Then
2  that's good. If he can't answer that question,
3  that's fine.
4      MS. CANNELLA: Can we move on?
5      MR. HILL: Yeah. That was the
6  last question I was asking on the issue, and
7  he's answered it.
8      MS. CANNELLA: Great.
9      Q.  (Mr. Hill) Hold on. Let me share
10  my screen. Can you see my screen?
11      A.  Yes, sir.
12      Q.  All right. This is your June 14,
13  2024 letter to Ms. Cannella that's titled
14  rebuttal report. Is that okay if we call it
15  rebuttal report?
16      A.  Yes, sir. Thank you.
17      Q.  All right. And in connection with
18  preparing this report, the additional material
19  you received was the report and deposition of
20  Mr. Grimes and Mr. Crosby, their file --
21  Grimes's file material, and the scanned data
22  photos and video data from the crash test. Is
23  that the full list of material that was new

Page 147

1  that you used in generating this rebuttal
2  report?
3      A.  Yes, sir.
4      Q.  Okay.
5      A.  It says Grimes's file materials
6  too. I don't know if you listed that. But
7  that -- that lists everything.
8      Q.  I did. I meant to if I didn't.
9      A.  All right. We're good.
10      Q.  All right. Under your observation
11  section, your first point is the total crush on
12  the test Escape is significantly less than in
13  the accident. How do you define total crush?
14      A.  We did a PowerPoint based on that.
15  In other words, you'd look at the -- I mean,
16  clearly the crush at the bumper level in the
17  crash test is going to be more than in the
18  accident because there was bumper-to-bumper
19  contact. So you know, at the -- at the
20  critical level, which is the frame level,
21  there's more crush. But if you look at the
22  whole car, there's -- there's more crush in the
23  accident because the frame wasn't engaged.

Page 148

1      Q.  And I'm just asking how you -- how
2  do you quantify that? What do you mean by
3  total crush, and how did you make that
4  determination?
5      A.  This PowerPoint that goes through,
6  we went level by level and sliced the -- sliced
7  the car into levels. And we actually
8  quantified it at each level. And at every
9  level there was more crush except for, you
10  know, at that frame level.
11      Q.  Right. And so that's just a
12  summation of your level-by-level analysis of
13  the two crushes.
14      A.  Yep.
15      Q.  That's what I'm trying to get.
16      A.  Yes, sir. Thank you.
17      Q.  All right. And did you quantify
18  an actual amount -- or you call it
19  significantly less. Did you actually come up
20  with a number?
21      A.  No. Remember, Grimes didn't make
22  any measurements. We didn't either. We did a
23  visual comparison at the levels, and we did it

Page 149

1  so everybody could see it. So no, I -- I don't
2  know that I've done a number. I don't remember
3  a number. If I did, it would be in here
4  somewhere.
5      Q.  And that same applies to item
6  number two, you don't know if -- is that right?
7      A.  Right. We did the drawings. We
8  can see it in the drawings. Yeah. Let me --
9  let me go down here and look at the drawings.
10  Maybe we did quantify it on the drawings. So
11  I'm running down in the report. Yeah. Sorry.
12  Let me make it so I can move it a little
13  quicker.
14      Nope. I don't think we did a number unless
15  it's stated in a paragraph somewhere.
16      Q.  All right. Item number three
17  states, the slope of the crash pulse was
18  greater in the test vehicles than the accident
19  vehicles. That's also true of your HVE
20  simulation. Correct?
21      A.  Well, yeah. Because the vehicle
22  is stronger. The -- the Escape is stronger at
23  the frame level.

38 (Pages 146 - 149)

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 150

1    Q.   And the fact that there is -- the
2  slope of the crash pulse was different -- was
3  different between your simulation and the
4  accident vehicles doesn't invalidate your
5  simulation, does it?
6    A.   No.  Because he -- he simulated
7  it -- he did a crash test for a different
8  accident than our accident.  In other words,
9  they're different accidents.  He did one with
10 the truck going too far to the left.  And we
11 did one that represents the subject accident.
12   Q.   Right.  But in both instances, the
13 slope of the crash pulse was greater than the
14 accident vehicles.  And that fact did not make
15 your simulation invalid?
16   A.   No.  No, it doesn't.  That -- that
17 fact alone just tells you that the Escape is
18 stronger, that the Escape at the bumper
19 level -- even with this advantage by moving the
20 vehicles 45 percent further to the left, the
21 Escape still is stronger and resists crushing
22 more.
23   Q.   Right.  So there's nothing

Page 151

1  unexpected about item number three with either
2  test?
3    A.   There's nothing what?
4        MS. CANNELLA:  There's nothing
5  what?
6        MR. HILL:  Unexpected.
7        MS. CANNELLA:  I object to the
8  form of the question as vague.
9    Q.   I think you already answered it.
10 Right?
11   A.   Okay.
12   Q.   All right.  Item number four, when
13 comparing the crash test to the accident, you
14 said the vehicle-to-vehicle force was greater
15 in the test than in the accident.
16   A.   Yes.
17   Q.   Okay.  Is that also true about
18 your HVE simulation?
19   A.   Yes.
20   Q.   Okay.  We -- and I think we've
21 covered this.  But item five, the basis of your
22 opinion that the F-250 did not override in the
23 test is because there was bumper-to-bumper

Page 152

1  contact?
2    A.   Well, there was full
3  bumper-to-bumper -- there was bumper-to-bumper
4  contact.  And the frame level structure of the
5  Escape remained in contact with the frame level
6  bumper level of the F-250 the whole time.  I
7  show it in photographs and PowerPoints.
8    Q.   Was there any point where the
9  F-250 bumper was on top of or beyond the level
10 of the bumper of the -- of the Escape in the
11 test?
12   A.   Well, we're now getting into --
13 because of the way the test was run, there's --
14 there's problems with it.  But when we look at
15 the structure, I would say no.  If you want to
16 argue about the bumper, where the bumper was
17 able to engage the -- the -- the tow hook of
18 the F-250, it stayed engaged the whole time.
19 And where the frame was able -- of the Escape
20 was able to engage the bumper, it stayed
21 engaged the whole time.
22   Q.   All right.  And item number six,
23 when you talk about the F-250's bumper striking

Page 153

1  the test Escape's bumper flush, was the impact
2  from the F-250, was it the secondary energy
3  absorption brackets that impacted the Escape's
4  bumper or was it actually the F-250 bumper?
5    A.   It was the -- it was -- the bumper
6  was flush to -- the two bumpers were flush to
7  each other.  You know, the tow hook sticks out
8  a little bit.  But no, we're not talking about
9  the seize brackets engaging that level -- that
10 frame level.  They were down below that.  It
11 was the bumper-to-bumper level that was flush.
12   Q.   Right.  And so that's what I
13 wanted to clarify.  In the test the seize
14 brackets didn't have any impact on the
15 accident -- on the crash test.  Is that true?
16   A.   Well, leaving the offset problem
17 out, the seize brackets were not called upon
18 in the test -- yeah, they were kind of called upon
19 because of the offset, so I can't say that.
20 Yeah.  Because of the offset, they were called
21 upon on the driver side.
22   Q.   All right.  Number seven says the
23 test resulted in less rear seat deflection and

39 (Pages 150 - 153)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 154

1  movement than in the accident. Do you agree
2  that there was rear seat deflection in the
3  crash test?
4      MS. CANNELLA: Objection.
5  Which -- which seat are we talking about?
6      MR. HILL: Well, I'm using what he
7  says up here, less rear seat deflection. So
8  I'm talking about whatever he's talking about.
9  He -- you tell me.
10     A.  Well -- well, less doesn't mean
11  there was some.
12     Q.  And that's what I'm getting at.
13     A.  Well, let me answer. Grimes
14  agrees with this. I think from my memory there
15  was some. But he didn't measure the position
16  of the seat and report the relative positions
17  of the seat start to finish of his crash test.
18  So my memory is that there was -- that I think
19  there was some, but it was remarkably less than
20  in the accident. But I don't know. So that's
21  my memory right now. But the photos show what
22  they show.
23     Q.  Okay. And you haven't examined

Page 155

1  the crash test to determine whether there was
2  seat deflection in the crash test or how much
3  seat deflection per, if there was?
4      A.  Well, if the floor pane moves, it
5  would be some movement. So maybe I can say
6  there was some movement in the seat. But I
7  don't remember if there was deflection in the
8  seat relative to the attachment points and
9  whatnot. But it certainly wasn't -- I mean, in
10  the accident the rear seat is tilted way
11  forward. And in the crash test, it's still
12  reasonably the same reclined level and that
13  type of stuff. So the items will speak for
14  itself.
15     But you know, there -- there probably was
16  some shifting where the seat is just due to the
17  crush at the floor pan level and other -- other
18  things. Regardless of the reasons why, there
19  was less in the crash test than in the
20  accident. And that's what this says.
21     Q.  All right. A related question you
22  mentioned the deformation of the floor pan. Do
23  you know whether the rear hatch of the Escape

Page 156

1  was pushed in enough to actually impact the
2  rear seat in the crash?
3      A.  Yeah. Well, the cameras that were
4  supposed to show that didn't function in the
5  crash test. You know, the cameras moved. So
6  we don't -- we're kind of deprived of some of
7  the information that could have been had. I
8  haven't thought to -- I don't believe they did,
9  but I don't -- as I sit here, I haven't been
10  able to do that analysis either.
11     Q.  Okay. So as we sit here today, if
12  I understand you, you don't know whether the
13  rear hatch of the Escape impacted the second
14  row seat back in the crash test?
15     A.  In the crash test, no. What I
16  tried to use to look for that type of stuff, I
17  think there's two video cameras, and neither
18  one of them functioned.
19     Q.  Do you know whether there was any
20  gap after the crash test between the rear hatch
21  and the rear seat?
22     A.  My recollection is there is, yes,
23  sir.

Page 157

1      Q.  All right. Did you -- do you have
2  a photograph or whatever that shows that? Do
3  you -- what proof do you have that there was a
4  gap between the hatch and the rear seat?
5      A.  Well, when we did the slice, there
6  was a gap, a space between the hatch and the
7  rear seat.
8      Q.  Was there a space between the
9  hatch and the rear seat in the subject Escape
10  after the accident?
11     A.  Yes.
12     Q.  And did you compare the size of
13  that space from the subject accident to
14  whatever space that you say existed in the
15  crash Escape -- in the crash test Escape?
16  Sorry.
17     A.  No, I haven't -- I haven't done
18  that.
19     Q.  Okay. Do you have any opinions
20  with regard to whether the crash test could
21  have resulted in injury to Cohen Bryson if he
22  had been in that vehicle at the time of the
23  test?

40 (Pages 154 - 157)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 158

1        MS. CANNELLA: Objection. Outside
2    the scope of his expertise and testimony.
3        MR. HILL: Well, that's exactly
4    what I'm trying to establish.
5    Q.    That's outside of your expertise.
6    Right?
7    A.    Yes. I'm not talking about
8    injuries in the crash test. No, sir.
9    Q.    Right. That's all I was trying to
10   establish is that you're not an expert in
11   biomechanics. And you don't intend to give any
12   opinions as to whether the intrusion, crush,
13   however you want to describe it that occurred
14   in the crash test, would or would not have
15   caused an injury to Cohen Bryson?
16   A.    Right.
17   Q.    Okay. If we go down in this
18   report a little bit -- let's see here -- give
19   me one second. Sorry. Item number two on the
20   page right now, you talk about test did not
21   provide markers to record what the test vehicle
22   offset was. What type of markers would you
23   have expected to be on the vehicle?

Page 159

1    A.    Crosby describes what he typically
2    does to document it. He didn't show a photo of
3    it, but he could have used whatever he used
4    because I'm sure it would have been good
5    enough. In the past we've put a stick or
6    something coming out the front, something that
7    is brittle and will break and, you know, that
8    will leave a mark. We've -- we've put paint on
9    the vehicles. One of the easiest things to do
10   is put -- put marks on the ground so that the
11   overhead camera and the other cameras can see
12   if the vehicle goes along those marks. And if
13   it doesn't it can easily tell how far off the
14   mark it is. So it basically uses a simple
15   series of targets, markers, indentures, paint
16   transfer, things like that. Even tape -- even
17   tape will -- will transfer so you can tell
18   where it is, any one of those. Or put the
19   cameras where you can do the work.
20   Q.    And when you say tape, you're not
21   talking about the centerline tape. You're
22   talking about a tape that would leave a mark
23   that would be on the edge of -- the front of

Page 160

1    the vehicle?
2    A.    Right. Put a piece of tape where
3    it's likely to leave a mark or put a piece of
4    tape, you know, so that you get good transfer
5    of the color and that type of stuff.
6    Q.    Okay.
7    A.    All kinds of ways to do it. But
8    the best is a pointer type device that -- that
9    leads. Then you can see in the video -- you'd
10   put a target on the Escape. You'd put a
11   pointer on the -- on the F-250. And in the
12   video you -- and it's scale, so when it
13   touches, you know -- and that's before anything
14   else touches. You know exactly the
15   orientation.
16   Q.    Right. Well, item number three
17   you talk about Grimes, you know, he testified
18   he didn't put the centerline tape on. But you
19   did read Mr. Crosby's deposition, right, where
20   he described that it was on the center of the
21   vehicle?
22   A.    Yes.
23   Q.    And you have no reason to dispute

Page 161

1    that the centerline tape was not on the
2    centerline of the test vehicle?
3    A.    That's agreed.
4    Q.    Okay. On the next pages, which is
5    bates 9401, the paragraph beginning on based on
6    Grimes's deposition, you make the point that in
7    your opinion that Mr. Grimes should have
8    crashed a lifted Escape -- a lifted truck into
9    an Escape in order to establish the speed of
10   the truck in the accident. Can you explain
11   that opinion? How could Mr. Grimes have
12   established the speed of the truck in the
13   accident by running a crash test with a lifted
14   F-250?
15   A.    He gives -- this is -- he gives
16   his speed range of 43.9 to -- into the low 50s
17   based on potential for braking and whatnot. I
18   mean, it seems like he's uncertain about the
19   speed. If he doesn't know the speed, he ought
20   to establish his own speed.
21   Q.    Okay. Well, that's -- I'll go
22   back to my question. But let's talk about
23   that. Do you recall in his deposition that he

41 (Pages 158 - 161)

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 162

1   stated that the extremes using the potential
2   braking at 0.5 seconds would be 43.9 at the
3   lowest end if you have assumed full braking
4   power at exactly 0.5 seconds.  And then he had
5   a high-end range that would assume that you
6   didn't have full braking and you had braking
7   just minimal right before the impact, and it
8   just provided him a preliminary range depending
9   upon various hypothetical braking situations.
10  Is that a fair description of his testimony as
11  you understand it?
12      A.   That's a good start for a
13  conversation.  Yes, sir.
14      Q.   Right.  But we know -- and you
15  agree that -- and he even said he didn't
16  believe that braking occurred.  And that he
17  believed that that accident occurred at 50 or
18  51 miles an hour, which is consistent with your
19  belief as to what the speed of the F-250 was at
20  the time of the impact.  Is that correct?
21      A.   I think so.  There's a lot in it.
22  Can you make sure I've got it all?
23      Q.   Sure.  Well, we don't have a

Page 163

1   dispute here.  You used 51 miles per hour as
2   the impact speed in every one of your
3   simulations.
4       A.   Uh-huh.
5       Q.   Correct?
6       A.   Yes.
7       Q.   All right.  And so you don't have
8   any criticism of his using 49.9 in the crash
9   test?
10      A.   I actually -- based on his work,
11  yes.  I'm looking -- I'm using 51 and getting
12  more crush.  If -- if the -- if the vehicle was
13  really going 44, then I'm -- I'm using a worst
14  case scenario in my simulation.  But if his
15  opinion is that the lifted truck -- that an
16  unlifted truck produces the same amount of
17  crush as a lifted truck -- or even more is
18  actually what his opinion is -- then he needs
19  to make sure he's got the speeds right.
20      See, because what if the -- what if
21  according to him the accident was 44 miles an
22  hour.  And is it fair to really compare it to a
23  crash test that he ran at 49.9 miles an hour?

Page 164

1   He is disadvantaging --
2       Q.   And --
3       A.   He --
4       Q.   Oh, sorry.
5       A.   He is disadvantaging the Escape by
6   a full five miles per hour.  So that's what
7   this is saying here.  If -- if his range was
8   43.9 to 49.9 or 43.9 to 50 or whatever it is,
9   he can't compare a 43.9 mile per accident to a
10  51 mile per hour crash test if he's doing -- if
11  he's trying to seek the equation -- the answer
12  he says he's trying to seek which is, as he
13  says, clearly I'm trying to seek to show that a
14  lifted vehicle doesn't provide more crush than
15  an unlifted vehicle.  Well, we use 51 in the
16  simulation, which is conservatively high
17  because we know the driver was on the brakes.
18  I think 51 is probably a good number though.
19  But if his -- if his opinion is that it may
20  have been as slow as 44, then he needs to -- or
21  43.9 -- if he's --
22      Q.   Did he ever give the opinion --
23      A.   -- going to compare -- if he's

Page 165

1   going to compare apples and apples, he just
2   ought to compare apples and apples.
3       Q.   Did he ever give the opinion that
4   he thought the accident occurred at 44 miles
5   per hour?
6       A.   Well, I thought he said the
7   accident may have been as low as 44 based on
8   one of his calculations.  But you know, if I
9   misread that, I misread that.
10      Q.   Okay.  Well, back to my other
11  question, and that is about your statement that
12  he could have established the speed of the
13  truck in the accident by crashing a lifted
14  truck.  So I don't understand that.  How could
15  he establish the speed of the truck in the
16  accident by first testing a lifted truck?
17      A.   Okay.  Well, he's the one trying
18  to compare -- try to say that lifted versus
19  unlifted doesn't matter.  The way to do that is
20  you do two tests at the same speed, lifted and
21  unlifted so you only have one variable that's
22  changing, and you can answer that question.
23  He -- he is comparing his crash test to the

42 (Pages 162 - 165)

G. Bryant Buchner                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 166

1  accident under the belief that he's hitting
2  them at the same speed, which he -- the way I
3  read his work or looked at his work, he didn't
4  fully establish that.
5      Q.   So he would not -- and again, if I
6  understand your answer, it's based upon your
7  assumption as to the purpose of his test. I'm
8  trying to figure out -- so he couldn't
9  establish the actual speed that the accident
10  truck was traveling by running any type of
11  test. He can't actually establish that speed?
12      A.   Sure, he can. He can -- if he
13  wants to do a crash test with a lifted truck,
14  he can demonstrate at 51 miles an hour. He can
15  demonstrate that that matches the crash pulses
16  and everything and then he can lower the truck
17  and run the same impact again. And then he'll
18  have a direct comparison as long as he gets the
19  offset right.
20      Q.   So you're saying that he should
21  have run the accident with a lifted truck at 51
22  miles per hour and then compared those results
23  to the black box data in the actual accident.

Page 167

1  Is that what you're saying?
2      A.   Well, he could have done that to
3  know the exact speed. But if he -- if he did
4  both at 51, both the lifted truck and the
5  unlifted truck and the only thing he varied was
6  the lift, then we would know the effect of the
7  lift. He says very clearly in his
8  deposition -- and I'm working off of memory
9  here. But it basically says, hey, I did this
10  to show that a lifted truck doesn't do any more
11  damage than an unlifted truck or whatever he
12  said; it doesn't have more crush or -- and so I
13  remember that quote in there. My words aren't
14  going to be right, but I'm really close.
15      So he's actually -- in order to do that,
16  he's got to -- in order to say that an unlifted
17  truck produces the same or more crush than a
18  lifted truck, he needs to make sure that he's
19  got the speed of the two trucks the same. And
20  I will point here that regardless of the
21  offset, he -- he didn't seem to do that.
22      Q.   Wouldn't that same theory apply to
23  your simulation, in order for the simulation to

Page 168

1  show whether -- or what the difference in crush
2  would be between the actual accident and your
3  simulation, you have to run them both at the
4  same speed?
5      A.   Well, not necessarily because
6  we -- we -- we know the driver of the truck was
7  on his brakes at impact because I think we have
8  that indicated. So he's not going to speed up.
9  And when we ran our simulation, when we dropped
10  it, we weren't even close. In other words,
11  there was a big discrepancy there in the amount
12  of crush. So within the level of braking, all
13  that would do is -- if we reduce the speed
14  below 51, that would just reduce the amount of
15  crush. So it wouldn't change any of my
16  opinions. My opinions would be -- my opinions
17  are robust. But my opinions are different
18  slightly than his.
19      The way he's going about it, his opinion
20  is -- maybe we just ought to find it in his
21  depo. I wrote it down where he gives the
22  purpose of it was to show that an unlifted
23  truck has the -- that the lift doesn't increase

Page 169

1  or decrease or doesn't change the crush on a
2  car. Well, to do that, he's -- he's got to
3  have both pieces of test data to do it. He's
4  only got one.
5      Q.   And that's based upon your
6  interpretation or your quote of what he -- you
7  say he's trying to do?
8      A.   Well, it's -- let me find the
9  quote. Yes. Yes, you're right. If you don't
10  want me to find it, I won't. But yes.
11      Q.   I'm not asking you to find it.
12  I'm just saying your opinion is based upon that
13  interpretation of the purpose of the test?
14      A.   It's based on what he said, yes.
15  I -- yes.
16      Q.   And I think this relates to this
17  opinion. And I want to make sure that I
18  understand it. The reason that you didn't do
19  what you're saying he should have done, which
20  is run an HVE simulation of the actual accident
21  to compare it to the black box data is because
22  you don't believe HVE is robust enough to
23  properly model if it's not a bumper-to-bumper,

43 (Pages 166 - 169)

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 170

1  structure-to-structure accident.
2      A.   Okay.
3      Q.   Is that fair?
4      A.   I heard the last part of your
5  question. So I really understand it now. I
6  think what you're asking is -- ask it again
7  because I'm -- the first part was confusing,
8  and the last part I thought clarified it.
9  Please ask it again.
10     Q.   Okay. Sure. The -- you're saying
11 that one way that he could compare apples to
12 apples is to first run a lifted test and
13 compare the delta-V's and the crush or whatever
14 to the actual accident. And it would tell him
15 whether he's got the speed right to compare it
16 to the real accident. Is that -- is that --
17 that would be one thing you would benefit from
18 by running an actual crash test with a lifted
19 vehicle in the same configuration as the actual
20 crash. Right?
21     A.   Well, you're putting me in an
22 equation and the use -- I'm using his file. He
23 calculated 43.9. If his -- if the potential

Page 171

1  accident speed is as low as 44 in his work and
2  then he's going to go crash it at 49.9, then
3  that's -- then that's not reasonable. That's
4  his work. Not mine.
5      Q.   I'm just -- I'm not going into
6  that.
7      A.   Okay.
8      Q.   I'm saying that you're critical of
9  him for not running first a crash with a lifted
10 truck. Right?
11     A.   The way he opines, yes.
12     Q.   Right. And you also didn't run a
13 simulation with a lifted truck in it. Right?
14 You've never run a simulation with a lifted
15 truck. Correct?
16     A.   That's correct. That's correct.
17     Q.   And I would think there's two
18 reasons. One would be that you don't need it
19 because you used 51, which is kind of like the
20 maximum speed in your opinion. So you don't
21 need to determine the actual speed because
22 that's worst case scenario or the most
23 conservative approach?

Page 172

1      A.   Yes. That's one of the things.
2      Q.   Right. And another reason would
3  be -- I want to make sure I understand it -- is
4  that HVE would not be appropriate for a lifted
5  accident because HVE is designed to study
6  bumper-to-bumper, structure-to-structure type
7  incidents. And that would be another reason
8  why you wouldn't use HVE to simulate the actual
9  accident?
10     A.   It means you'd have to do some
11 more work. It doesn't -- I think that there's
12 justification for trying to use it. But it
13 would be -- it would be -- you would have to
14 start that whole process and do that. And you
15 know, that would -- that would be a -- I don't
16 know what the value would show anyways. I
17 don't know what the value would show because we
18 have the -- we have the accident. But I don't
19 know -- I don't know that we could use HVE for
20 that, for the subject accident the way it was
21 hit.
22     We can use it to study a frame -- a bumper
23 level hit. But you would have to do a lot of

Page 173

1  work to see if you wanted to or could simulate
2  the actual accident because of the difference
3  in elevations. But there's papers out there
4  that says it's -- you know, that -- that it
5  could be done for that. But it's just -- it
6  wouldn't be -- I wouldn't use the stock stuff
7  out of the -- the default stuff out of the
8  program.
9      Q.   And you can't cite to me any of
10 those papers that say it would be appropriate
11 to use in a lifted truck situation as we sit
12 here today?
13     A.   No. I'm saying I think he said
14 you could do it. But you couldn't do it in the
15 stock condition. You would have to -- I mean,
16 stock meaning the default conditions. You
17 would have to start manipulating the program to
18 make it perfect. And we didn't -- you know,
19 that's a whole new problem.
20     Q.   Right. But you can't cite to any
21 of those papers that say that?
22     A.   No. That's knowledge I have in
23 my -- in my past.

44 (Pages 170 - 173)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 174

1    Q.   Yeah.
2    A.   But no, I didn't bring those
3  papers.
4    Q.   All right.  Do you know what type
5  of modifications you would have to make in
6  order to run -- modifications from the stock
7  vehicles in order to run that type of
8  simulation in HVE?
9    A.   I used the word stock.  That was
10  my mistake.  Default.  Yeah, you're now --
11  you're -- that would take some real work to do.
12    Q.   Right.
13    A.   But I don't -- you know, as I sit
14  here, I'm not -- I'm not saying you can do it.
15  I'm not saying absolutely the papers say you
16  can do it.  I'm saying I think there's papers
17  out there that indicate it can be done.  But it
18  would not -- it would be -- it would be quite
19  an effort.
20    Q.   Would -- do you -- would you know
21  how to do it?
22    A.   I'm actually sure that if it could
23  be done, I could.  But I'm not -- I don't know

Page 175

1  that it can be done.  I mean, in other words,
2  it's not -- it's just a -- it's just a physics
3  problem.  But I don't know -- I mean, I think
4  I'm -- but that work hasn't been done, just
5  like the other thing you asked me about.  I
6  can't even talk about starting it right now.
7    Q.   Yeah.  I'm not talking about
8  how -- I'm just saying do you know how to do it
9  without having to --
10    A.   Well, it hasn't -- it hasn't been
11  done yet.  So I can't say I know how to do it.
12    Q.   Okay.  Would it involve modifying
13  the stiffness coefficient for the different
14  areas of the rear of the Escape, meaning you'd
15  have to input a different stiffness coefficient
16  for the rear hatch versus the window versus the
17  bumper?  Is that kind of the process it would
18  take?
19    A.   I don't know.  I'd have to -- I
20  haven't done it yet.
21    Q.   All right.
22       THE WITNESS:  I do hate to ask,
23  but I need to run down the hall and run back.

Page 176

1  You don't --
2       MR. HILL:  Oh, no problem.  We can
3  take a break at any time.
4       THE WITNESS:  Okay.  I apologize.
5       MR. HILL:  We're getting through
6  it now.  We're -- we're on the same page now.
7  We're doing better.
8       THE WITNESS:  Okay.  I agree.
9       THE VIDEOGRAPHER:  The time is
10  1:57 p.m.  We are off the video record.
11       (A break was taken.)
12       THE VIDEOGRAPHER:  The time is
13  2:07 p.m.  We are back on the video record.
14    Q.   (Mr. Hill) All right.  Moving
15  ahead to the offset portion of your -- what did
16  you call it again -- rebuttal report.  All
17  right.  So that I can understand this, you
18  indicate that you used three methods to
19  determine the offset in the crash.  Two of them
20  are based upon the Ford logo imprints, and one
21  of them is based on the crash testing.  Is that
22  fair?  Is that correct?
23    A.   Those are the three methods that

Page 177

1  we did independent of Grimes's work.  Grimes
2  actually has work that shows the offset as
3  well.  It doesn't require any rebuttal.  It
4  just requires showing it.  So yes, as far as
5  our work, that's what this shows.
6    Q.   And I was just reading straight
7  from the paragraphs here that begins with of
8  the three methods.
9    A.   Yeah.
10    Q.   Yeah.
11    A.   I'm clarifying to make sure that
12  everything is understood.
13    Q.   Right.  And the first method
14  involves producing a photomodel of the test
15  vehicle and the accident vehicle, using a photo
16  where the logo imprint is visible.  And then
17  you show in figure 3A a crash test photo of --
18  with a yellow line around the logo area -- the
19  logo imprint area.  Is that fair?
20    A.   Yes.
21    Q.   And while Ms. Cannella was
22  mentioning exhibits, I would like to attach --
23  and I should have done this at the beginning --

45 (Pages 174 - 177)

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 178

1  as I think Exhibit 2 this June 14, 2024
2  rebuttal report.
3      All right.  And then figure 3B is from Jeff
4  Kidd's inspection after the incident where
5  again you've sort of outlined what you believe
6  shows the logo imprint from the Ford logo on
7  the F-250?
8          (Defendant's Exhibit Number 2
9          is marked for identification.)
10     A.   Yes.
11     Q.   All right.  And figure four is
12  where you used photomodels where you -- and
13  correct me if I'm wrong.  You indicate a point
14  on the photo, and then the PhotoModeler uses
15  its magic to determine a 3D distance between
16  those two points?
17     A.   Yes.
18     Q.   Okay.  And so the distance it
19  calculates depends upon the start and endpoints
20  that you indicate on the photo?
21     A.   Right.
22     Q.   Okay.  And figure 5B, same thing,
23  that's PhotoModeler Premium showing the

Page 179

1  distance between the two points that you marked
2  on the test Escape.
3      A.   Yes.
4      Q.   Is that correct?
5      A.   Yes.
6      Q.   And again, that's figure, you
7  know, 5A and 5B showing those distances on the
8  subject Escape and the crash Escape.  Those
9  measurements are dependent upon the points you
10  indicate you want the software to measure to
11  and from?
12     A.   Correct.
13     Q.   Okay.  Now, the Ford logo on the
14  F-250, you would agree, was not the first part
15  of the F-250 to impact the Escape in the
16  subject accident?
17     A.   I do.  It was really, really -- it
18  was really, really close though because, you
19  know --
20     Q.   Yeah.
21     A.   -- it was definitely not the first
22  point of contact.
23     Q.   I agree.  But the bumper or the

Page 180

1  tow hooks, there are other items that stuck out
2  farther than the logo on the front rail?
3      A.   Forgive me.  I was answering with
4  respect to the accident.  You may have asked
5  about the test.  I -- I don't know.  I mean --
6      Q.   I started with the accident.  But
7  wouldn't the same thing be true of the crash
8  test?
9      A.   Well, the crash test is a little
10  further because you've actually got bumper to
11  bumper.
12     Q.   Right.
13     A.   But in the accident -- in the
14  accident you're -- I mean, you're not hitting
15  bumper to bumper, so the logo is -- is, you
16  know, twice as close -- let's put it that
17  way -- as in the test.  Thanks.
18     Q.   Right.  But either way though,
19  it's -- the logo is not the first thing to
20  impact the Escape?
21     A.   Yes.
22     Q.   That's all I was trying to
23  establish.

Page 181

1      A.   Right.
2      Q.   And the logo itself is -- is not
3  flat.  Do you agree with that?
4      A.   Yeah.  It's got a little convex to
5  it.
6      Q.   Right.  It's a little -- right.
7  So the -- like the center of the logo is going
8  to stick out a little bit more than the edges?
9      A.   Correct.
10     Q.   Right.  And so if you look at --
11  I'll use one of your photos here if I can find
12  one that's clear.  I don't seem to have a large
13  picture.
14     A.   We do.  There you go.
15     Q.   This is the logo on the Escape,
16  which you agree is a different size than the
17  logo on the F-250?
18     A.   It is.
19     Q.   But it has the similar concave
20  shape -- or convex shape you just mentioned.
21  Right?
22     A.   Yes, sir.
23     Q.   And so you wold agree that the O

46 (Pages 178 - 181)

G. Bryant Buchner                                      July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 182

1 and the R in Ford are -- I'm not making you --
2 asking you to be exact. But they're towards
3 the middle of the logo?
4     A.   Yes.
5     Q.   And so they would be sticking out
6 more than the edges of the logo?
7     A.   At first contact, yes.
8     Q.   Yes. Sure. All right. Basically
9 the closer you get to the center of the logo,
10 the more convex the logo is. Is that true?
11     A.   I think I know what you mean.
12 Yes.
13     Q.   Okay. All right. Let me stop
14 sharing for a second and see if I can find
15 something here.
16         MR. HILL: Okay. We need to take
17 like a one-minute break. Don't leave your
18 seat. I just -- I'm having some technical
19 difficulties accepting my files. Can we just
20 go off the record for -- it won't take more
21 than a minute.
22         THE WITNESS: That will work.
23         THE VIDEOGRAPHER: The time is

Page 183

1 2:15 p.m. We're off the video record.
2         (A break was taken.)
3         THE VIDEOGRAPHER: The time is
4 2:18 p.m. We're back on the video record.
5     Q.   (Mr. Hill) All right. I have up
6 on the screen here the photograph that's on
7 page 9404 of your rebuttal report. And it is a
8 photograph of the test Escape after the test.
9 Correct?
10     A.   Yes, sir.
11     Q.   And can you see on this photo, can
12 you point out where the imprint of the D is
13 from the Ford logo?
14     A.   I don't know that I -- it would be
15 on the left side if it was there. I'm not a
16 hundred percent sure it's there.
17     Q.   So in analyzing this logo, you
18 didn't look for or notice the imprints of the
19 letters from the word Ford on -- on the Escape?
20     A.   Well, no. There are some. But I
21 don't know that the D showed up looking at it
22 on that particular slide. Let me see.
23     Q.   Did you, in reviewing any of the

Page 184

1 photos of the crash test Escape, locate the --
2 the location of any of the letters in the word
3 Ford as part of your analysis?
4     A.   A is always the easiest to find.
5     Q.   The what? I'm sorry.
6     A.   The A is the easiest to see
7 because it's got a little tail on it. So the
8 D -- the D is kind of off on the edge. The A
9 sticks out. The A and the R stick out the
10 furthest. But we have a -- part of what I sent
11 you was an overlay of the Ford emblem on top of
12 this.
13     Q.   I'm confused about the A. What --
14 do you mean the O?
15     A.   Yeah. I'm sorry. The O, it's got
16 a tail on it like an A. I apologize.
17     Q.   All right.
18     A.   I'm an engineer -- I'm an engineer
19 looking at a letter backwards. But the way
20 they wrote it, it looks like a cursive A.
21 Excuse me.
22     Q.   Right.
23     A.   Fixing it...

Page 185

1     Q.   Did you use the cursive A (sic) to
2 overlay the logo on the crash test Escape?
3         MS. CANNELLA: Objection. Can we
4 be -- can we not use the cursive A since there
5 is no cursive A? Are we talking about the O or
6 the D? What are we talking about?
7         MR. HILL: I'm talking about the
8 O, the R, the D, any of the letters.
9         MS. CANNELLA: Yeah.
10     A.   It's in the -- in the PowerPoint
11 we sent, there's an overlay on top of it that
12 we sent. But if you'll go back to that image,
13 it was just -- you're doing -- the image we had
14 up, the left edge is very visible. And so we
15 used the left edge of the emblem over there
16 because you can see where it comes to a point
17 at the edge of the oval. And so we were able
18 to measure to that point between the crash test
19 vehicle and the accident vehicle because the
20 letters are a little smeared and somebody might
21 have a different interpretation as to what
22 letter is what letter. But yes, I have
23 overlaid them, and I have looked at them. And

47 (Pages 182 - 185)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 186

1  it's in my PowerPoint.
2      Q.   Let me see here.  I've found what
3  I think you were talking about.
4      A.   All right.
5      Q.   This is from your PowerPoint,
6  which we'll -- I'll go back up.  We'll mark
7  this as Exhibit 3.  This is the PowerPoint you
8  were referencing with the crash test offset?
9          (Defendant's Exhibit Number 3
10         is marked for identification.)
11     A.   Yes.
12     Q.   All right.  And so if you could go
13  down here, here are photographs of the back of
14  the subject Escape and the crash test Escape.
15  And I think what you're saying here is that in
16  analyzing the position of the crash test Escape
17  logo imprint that you used what you perceive as
18  the edge of the logo, you didn't reference any
19  imprints on the letters in the word Ford?
20     A.   Right.  But we did provide visual
21  aid so people could understand it.
22     Q.   Right.  And I'm going to go down
23  to that.

Page 187

1      A.   Okay.
2      Q.   But is it your testimony that in
3  this photo right here, that you're not able to
4  see the image of any of the letters in the word
5  Ford?
6      A.   No.  You can see the O and the R.
7  You know, we know where the D is, but I can't
8  say we can see the D.  But the O is the best
9  one.
10     Q.   Can you in some way -- if I give
11  you the screen, can you point to where you can
12  see the O on this image that I have up on the
13  screen?
14     A.   Yes.  I can tell you where it is.
15     Q.   All right.
16     A.   If you see the Escape emblem at
17  the bottom --
18     Q.   Uh-huh.
19     A.   -- the Escape XLT, from the right
20  side of the Escape emblem, come straight up and
21  you run into -- keep coming up a little bit
22  higher, a little higher and go left some.
23  Right there.  You're -- you're covering the

Page 188

1  part of the O with your hand right now.
2      Q.   Okay.
3          MR. HILL:  Do y'all know how to
4  write on this?
5      A.   Yeah.  But it won't come off my
6  computer screen.  I'm sorry.  That was a joke.
7  I'm sorry.  Jokes don't come off.  I don't know
8  how to write on that.
9          MR. HILL:  Tedra, do you know how
10  to mark on this?  I guess not.
11     Q.   All right.  But anyways --
12     A.   Hey, if you go down in the
13  slide --
14     Q.   Right.
15     A.   -- a few slides, it will -- it
16  will show an overlay, I believe.  It's above
17  that.
18     Q.   All right.  Well, let's look at
19  this picture here.  This is on page 9459.  And
20  this shows you indicating that your belief that
21  the Ford logo edge is over here at the far left
22  of the pink line above the edge of the S in
23  Escape?

Page 189

1      A.   Correct.
2      Q.   And that's the reference point you
3  used to determine where the logo impacted the
4  crash Escape?
5      A.   For this particular method, yes.
6      Q.   Right.  And so your reference
7  point is not from any of the letters; it's from
8  what you believe to be the edge?
9      A.   Yes.
10     Q.   Okay.  And there's what you're
11  talking about as your overlay?
12     A.   Right.
13     Q.   Right?
14     A.   It needs -- it needs to be tweaked
15  a little bit.  But it's just for visual
16  explanation, yes.
17     Q.   Right.  And again, you're not
18  matching up the letters here.  You're matching
19  up the logo with what you believe to be the
20  mark from the far left edge?
21     A.   Right.
22     Q.   Right.  And at no time did you use
23  the imprints of the word Ford as your reference

48 (Pages 186 - 189)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 190

1  point?
2      A.   No.  We always use the center of
3  the logo or the edge of the logo.
4      Q.   Right.  But you couldn't
5  compare -- you don't know where the center of
6  the logo is in this instance.  Correct?
7      A.   Well, in this one, no.  But in
8  others, we do.  But yeah, in this one, no.  So
9  that's why we use the edge because we know
10 where the edge is of that logo.  And of the
11 Escape logo, we know where the center is.
12     Q.   Right.  And so when you say in
13 this one, you mean in this case.  Like you
14 don't -- you didn't use the center of the logo
15 at all in this case.  You just used what you
16 believe to be the left edge?
17     A.   In Grimes's work that he provided
18 in his file, you can see the center of the
19 logo.  We use the center of the logo versus the
20 center of the logo on his.  But when we were
21 using the stamp marks, we went to the edge of
22 the stamp because that's what we thought was
23 the most reliable for comparison purposes.

Page 191

1      Q.   Well, the difference from the end
2  of the D in the word Ford and the edge of the
3  logo is a known distance.  Right?  I mean,
4  that's something that can be measured.  Do you
5  agree with that?
6      A.   Not in this photo because you
7  can't -- don't really know where the D is.
8      Q.   All right.  So but I'm saying in
9  general, you could measure -- we know the
10 distance between a point on the D and the edge
11 of the logo.  That could be measured?
12     A.   If you're just asking can somebody
13 take a logo and measure the distances on the
14 logo itself, absolutely.  A hundred percent.
15     Q.   Right.  Right.  And so you didn't
16 attempt to measure what you believed to be the
17 edge of the logo in connection with any of the
18 imprints of the letter Ford.  Did you -- did
19 you undertake an effort to verify whether this
20 edge is the proper distance from any of the
21 letter imprints that you may or may not be able
22 to see on the Escape?
23     A.   Nothing -- no.  Nothing more than

Page 192

1  the overlay we showed you a minute ago just to
2  give perspective.  No, sir.
3      Q.   All right.  But the overlay was
4  based on your belief of the location of the
5  edge, not the location of any of the letters.
6  Right?
7      A.   Well, you -- you keep using the
8  edge.  And I heard that a long time ago, and I
9  thought what does he really mean by edge.
10 There's some marks on the outside of the logo
11 that are in an oval.
12     Q.   Right.
13     A.   We're using that mark there as if
14 it's the edge.  If it's really not on the edge,
15 then the measurement gets a little bit bigger
16 than what we get.  So we're trying to do
17 something that's conservative.  And we're
18 trying to do something that's repeatable and
19 something that's not up to interpretation as to
20 what letter you're looking at.
21    We think that that green arc up there can
22 only be the edge or something inboard of the
23 edge of the logo.  So that's what we used

Page 193

1  because we think it's reproducible, repeatable,
2  and really doesn't -- you know, isn't subject
3  to interpretation.  If someone wants to use the
4  letters, that's fine.  We didn't use the
5  letters though.
6      Q.   And that's all I'm trying to
7  establish is that all of your measurements are
8  dependent upon this green arc here being the
9  edge or slightly inside the edge of the logo?
10     A.   Thank you.  Yes, sir.
11     Q.   Okay.  And the same I guess --
12 here's a picture of the accident Escape.  And
13 you have red markings here.  This is 9454.
14 Explain -- you've got what appears to be a
15 similar mark on what would be the edge of the
16 logo.  But then you also have some marks that
17 it looks like would be the letters of the logo.
18 Is that right?  Or what do the lines represent
19 on this page?
20     A.   Well, I think that the F and the O
21 are visible, the swoop to the F and then the
22 bottom of the O.  So the -- we just did it
23 different ways.  Here we added those.  I think

G. Bryant Buchner                           July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 194

1  there's an overlay of that logo somewhere else
2  in this same PowerPoint. But there we are
3  marking some letters. But we're still not
4  using those letters other than for our
5  understanding.
6      Q.   Okay. So even in this instance,
7  you didn't use the letters to perform the
8  overlay. You used the markings of what you
9  perceive are the edge of the logo?
10     A.   Right. You've actually presented
11 my PowerPoint, not in the order we did it. We
12 started with something to help everyone
13 visualize the logo on the blue vehicle, and
14 then we ended with the silver vehicle -- or the
15 gold vehicle, whichever one it is. So yeah,
16 that's all we're doing is we're trying to give
17 context so that people can see that that is a
18 Ford logo stamp mark for that, for those images
19 you're showing. And then later on we show the
20 measurements.
21     Q.   Right. All right. I didn't mean
22 to take it out of order. I'm just trying to
23 understand it and make sure I understand the

Page 195

1  reference point. And in both cases the
2  reference point is, based on this overlay, what
3  is perceived as the edge or just inside the
4  edge of the logo?
5      A.   Yes. For those measurements.
6      Q.   All right. And they're not
7  dependent upon the imprint of the letters?
8      A.   Correct. For that -- for those
9  measurements.
10     Q.   Okay. All right. My screen froze
11 again.
12         MR. HILL: Can y'all -- I hate to
13 do this, but can y'all give me like a
14 five-minute break so I can -- if I can get this
15 fixed, then I won't hold it up, and it will go
16 much faster.
17         THE VIDEOGRAPHER: The time is
18 2:33 p.m. We're off the video record.
19     (A break was taken.)
20         THE VIDEOGRAPHER: The time is
21 2:56 p.m. We are back on video record.
22     Q.   (Mr. Hill) All right. I'm going
23 to begin to share my screen. And I hope it

Page 196

1  doesn't cause everything to crash.
2      All right. Can you see that this is from
3  your rebuttal report, figure 3A on the screen?
4      A.   Yes.
5      Q.   Okay. Great. And we're talking
6  about this marking here above the E that you
7  believe is the O in Ford. Is that correct?
8      A.   No. I was talking about the one
9  just above that.
10     Q.   Where?
11     A.   Right there. Left a little.
12 Right there.
13     Q.   Right there (indicating)?
14     A.   That is an O in Ford, yes.
15     Q.   Okay. And if someone were to have
16 the opinion that that is the curve in the D --
17 you can see the shape of the D right here --
18     A.   Right.
19     Q.   -- not the O, that would change
20 the location of the overlay of the logo.
21 Correct?
22     A.   If someone has a different opinion
23 of a different impact point, it would change

Page 197

1  the overlay, yes. But there's a lot of reasons
2  why that's not true.
3      Q.   All right. And what are the
4  reasons that that is not the D and has to be
5  the O?
6      A.   Well, you see the -- to the left
7  over there you have the edge that we've already
8  talked about. But in the lower right, you can
9  see the tow hook, which is the first thing to
10 hit. And it's under -- it's -- it's -- we --
11 we deal with that in a minute in the PowerPoint
12 where the tow hook has also been shifted left
13 considerably. So I mean, that -- that's why
14 you don't use the letters because there can be
15 different interpretations with the curves.
16 They're all curves. But it wouldn't fit with
17 the rest of the damage on the vehicle if that
18 were true. So you can have the opinion. It
19 will change it if you move it, but it won't
20 change my opinion because I think there's too
21 many other factors.
22     Q.   Have you determined or measured
23 the distance from the edge here that you say,

50 (Pages 194 - 197)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 198

1 the edge of the logo, to where you say the tow
2 hook is to verify whether that's the proper
3 distance between the tow hook and the edge of
4 the logo?
5      A.   Yeah.  I did look at that, yes.
6 Not so much in distance, but Grimes did this --
7 Grimes lined up the tow hook in that hole there
8 and he got the Escape logo to hit where I'm
9 saying it hit and not where you said it just
10 hit.  That's in -- that's in his file.  I don't
11 know if he knows it's in his file, but it's in
12 his file.  I looked at his work that's in his
13 file that -- that shows where it matched.
14      Q.   What specifically in his file
15 matches the overlay of the logo from the Ford
16 with where you say the left edge of the logo
17 hit?  What specifically in his file matches
18 that?
19      A.   He's got a scan of the two
20 vehicles that he -- it looks like he colorized
21 and -- and made 3D models of a mesh, and
22 then -- we'll just call it a scan, a 3D point
23 cloud of the two vehicles fit together at

Page 199

1 maximum engagement.  And they're -- they're fit
2 together at maximum engagement with 16 inches
3 between the Ford logo on the Escape and the
4 Ford logo on the front of the truck.  That's it
5 the only place he actually shows those logos
6 and things.  And they match exactly what I'm
7 showing you here with our work.  Remember we
8 had four to six inches with -- with a probable
9 five.  He just gives it, you know, five exactly
10 in his work.  And I have a PowerPoint of that
11 in this folder.
12      Q.   All right.  Is that part of this
13 report or is that separate?
14      A.   It's not part of the report
15 just -- because it's just -- it's just using
16 his work.  Before we could use his work, we --
17 we did all of our work independently from the
18 raw data that happens to match his data.  So
19 it's the five inches that I gave as my opinion
20 as -- as a composite of his file and my file,
21 and -- and the models that we built from his
22 file.
23      Q.   All right.  Looking now at page --

Page 200

1 and we'll get to that in a second -- 9406
2 figure 5B, the left side photograph is the
3 crash test Escape after the test obviously.
4 Correct?
5      A.   Yes.
6      Q.   And did you notice that the Ford
7 emblem on the Escape is not lined up with the
8 center line tape on the roof of the vehicle?
9      A.   Well, that's the beauty of it is
10 the -- before the vehicle crushed to where it
11 is now, the two logos already hit.  In other
12 words, the logos are hitting very quickly and
13 they're comparative.  From the two crashes
14 whatever -- you know, they -- they hit and the
15 logos left their stamp marks.  So if the test
16 is actually representative of the accident,
17 then of course the -- the logo should be in the
18 same place except for vertically.  But they're
19 not.  They're off vertically, you know, and
20 laterally.
21      Q.   Well, the -- the actual crash you
22 have a different endpoint -- impact point
23 vertically on the Escape.  So I don't

Page 201

1 understand your -- your point.  You're --
2 you're going to have a different crush pattern
3 between the subject accident and the crash test
4 regardless because they're impacting at
5 different points on the back of the Escape.
6      A.   Well, that's the point.  You can
7 see the change of height, you know, which we
8 all know is supposed to be there.  But there
9 should be alignment -- the logo should be in
10 the same place, and it's -- it's way off.  I
11 mean, because this is one of the earliest
12 things that contacted.  And this truck is, you
13 know, how many thousand pounds.  You can't get
14 this truck to move over in that amount of time.
15 You're talking almost -- we're talking about 75
16 feet per second.  You're talking about moving a
17 foot.  You're talking about a 75th of a second
18 until this thing hits.  You know, as an
19 approximation, you know, that's -- that's
20 before -- I mean, that's -- that's a very small
21 amount of time to do that, 75, 1 over X, that's
22 a hundredth of a second approximately if you
23 round it.  And we're -- so we're usually

51 (Pages 198 - 201)

G. Bryant Buchner                                      July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 202

1  looking at crashes that are a 150 milliseconds
2  or 1.5 hundredths. So that's a big difference.
3     If -- one is called a bullet and one is
4  called a target. The bullet vehicle is -- is
5  going to crush in and align on a path that the
6  front logo is not. It's going to be very
7  representative when it hits. And -- both
8  experts said they used a crush pattern to
9  determine the impact pattern. And -- and
10 grimes got 10.9 and I got 11. So we're off by
11 a tenth of an inch. But the -- the logo is
12 going to be part of that match that he's using.
13    In other words, he can't -- he can't somehow
14 say -- none of us can say that, oh, you know,
15 these -- we're going to use these parts at
16 maximum engagement to determine first contact,
17 but we're not going to use these parts. We're
18 going to say these parts didn't follow the same
19 physics. I didn't expect this argument. But
20 the bottom line is, that logo imprint, there's
21 only one in both of them -- or one very
22 specific spot. It has to represent impact
23 because that logo is going to hit before your

Page 203

1  crush happens to any great extent.
2     Q.   Right. And I -- I wasn't talking
3  about the striking bullet vehicle's logo. I
4  was talking about the logo on the Escape.
5     A.   Right. But they're relative to
6  each other. The relative position -- we don't
7  mind it moving eventually. I mean, look at
8  where the bumper on the truck -- on the car is.
9  We're using -- in fact, Grimes said he used the
10 tow hook location mark to put the vehicles
11 together at -- at impact. Well, that tow hook
12 mark is, you know, three feet forward of where
13 the bumper started, but he's still using that
14 as his mark. That's the way it's done because
15 physics dictates that the crush will be along
16 the line of force. And then we can look at
17 where the contact is and then un-crush the
18 vehicles and use that contact.
19    Q.   Right. But this is what I was
20 trying to get at.
21    A.   Sure.
22    Q.   Are you -- are you saying that
23 because the logo on the Escape in the crash

Page 204

1  test after the test is not aligned with the
2  center line of the roof of the Escape, that
3  that is somehow evidence that the vehicle
4  offset was -- was improper?
5     A.   No, I'm not -- forgive me. I was
6  accepting your premise as true in trying to
7  answer the questions. Just because you're
8  looking at a photo that's taken here, it
9  doesn't mean that those things aren't lined up.
10 They're not in plane with each other, so the
11 perspective of the photo may be what's causing
12 it. That was a mistake on my part. We
13 haven't -- we haven't established that logo --
14 that that logo isn't lined up with the accident
15 of the vehicle. It just looks that way because
16 it just might be the perspective of the photo.
17    Q.   Okay. Well, that's what I was
18 trying to get. That's not the basis of your
19 offset argument --
20    A.   No.
21    Q.   -- your offset argument is limited
22 to the location of the left edge of the logo
23 imprint on the Escape and then the tow hook

Page 205

1  impact that you interpret?
2     A.   Yes. They both -- those are
3  the -- those are the two strongest indicators
4  is the tow hook impact and the logo impact,
5  they're the simplest to see and understand,
6  although there is other crush profiles and
7  things that could be used, those are the ones
8  that are, you know, rock solid if you choose to
9  use them, and those are the ones that I used.
10    Q.   Gotcha. And then you add the
11 overhead photograph as your third method. And
12 I just want to make sure I understand all of
13 the methods that you used to calculate the
14 offset in the crash test.
15    A.   Yeah.
16    Q.   Would those be the main three?
17 The location of the tow hook impact, the left
18 edge of the logo imprint, and then the overhead
19 video. Does that cover the gamut of what
20 you're relying upon to establish the offsetting
21 in the crash test?
22    A.   Logo, tow hook, overhead, yes.
23    Q.   Okay. That's -- that's all I'm

52 (Pages 202 - 205)

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 206

1  getting at with this.  All right.  This is
2  figure 6 on page 9407.  And this is in
3  reference to what I believe you described as
4  your third method on page 9406 at the top-down
5  crash test video and frames.
6      A.   Yes.
7      Q.   Right.  And then you are using
8  this still photograph from the crash test video
9  to analyze the offset based upon this topdown
10  view?
11     A.   Yes.
12     Q.   All right.  And kind of explain
13  for me, if you can, what the different lines
14  that you've added to this still represent.
15  There's green lines and there's a red dash.
16  What do those represent?
17     A.   The green line is a projection of
18  a center line of the roof of the F-250.  The
19  red line is a projection of the hood of the
20  F-250 so that we get a range of offset between
21  the center line of the Escape, which we can use
22  one line that goes through the hood and the
23  roof of the Escape.  So those are about 1.42

Page 207

1  from the center of the Escape over and 1.25 to
2  get a range.  So that's going to be plus or
3  minus 16 inches, something like that.
4      Q.   And that's 1.42 feet?
5      A.   Yes.
6      Q.   And 1.25 feet?
7      A.   Yes.
8      Q.   And how did you conduct those
9  measurements between the lines?
10     A.   Well, the 5.92 is the width of the
11  Escape.  So we can calibrate the image
12  approximately and make measurements on it by
13  knowing a known width.  And then we can try to
14  measure other objects in the -- in the image.
15     Q.   So that 1.42 and 1.25 depend upon
16  your reference of the overall width of the
17  Escape?
18     A.   Partially, yes.  Yes.
19     Q.   All right.  And does this account
20  in any way for the parallax in this photograph?
21     A.   That's why we're giving it a
22  range.  Clearly, you know, according to Crosby
23  the test was not set up to allow measurements

Page 208

1  from the photo.  So we're disadvantaged.  It
2  could have been.  It didn't even get the camera
3  directly over the rail according to him.  But
4  you know, within reason -- within range, we --
5  based on the other work, this is consistent
6  with the other work.  And we believe it's --
7  it's clearly demonstrates, you know, that the
8  offset is approximately five inches plus or
9  minus as the report says.
10     Q.   Do you know the height off the
11  ground of the roof of the F-250?
12     A.   It's in the specs, yes.  I don't
13  know off the top of my head.  But it's a little
14  over six feet probably.
15     Q.   All right.  And do you know the
16  height of the hood of the F-250?
17     A.   It's in the specs.  I don't know
18  it exactly, no, sir.
19     Q.   All right.  And do you know the
20  height of -- you see on this photograph there's
21  a hinge right here and right (indicating) here
22  for the rear window of the Escape?  Do you see
23  those hinges?

Page 209

1      A.   I don't know as I sit here, no.
2      Q.   You don't know if there's hinges
3  on the Escape?
4      A.   I don't know the height of it, but
5  I do see the hinges.
6      Q.   Right.  And so you don't know the
7  height of the hinges?
8      A.   Not as I sit here, no.
9      Q.   Okay.  And you didn't factor in
10  any of those heights in analyzing the photo
11  parallax here with this --
12     A.   Of course I did.  I used -- I used
13  something that was higher than the roof of the
14  Escape and something that was lower than the
15  roof of the Escape to get a range.  We know
16  that the roof of the Escape is above the hood
17  of the F-250.  But the roof of the Escape is
18  below the roof of the F-250.
19     Q.   Right.  So the impact -- the
20  center line impact then following that logic
21  would be somewhere between the red dotted line
22  and the green dotted line?
23     A.   Yes.

53 (Pages 206 - 209)

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 210

1    Q.   Okay.  And you see that the
2  hinge --
3    A.   Yeah.  But you're not -- no.
4  You're -- for a measurement, that's what we're
5  using.  You know, the -- the impact -- you may
6  be bringing in other things in that.  But for
7  scaling, that's what we're doing.  We need
8  something higher and lower.  I'm not talking
9  about anything but the center lines of the
10  vehicles there because whatever problems there
11  are with these cameras, I know I can track the
12  center lines because he's got tape on it.  The
13  rest of the things are different elevations.
14    Q.   Right.  Well, I'm just talking
15  about in reference to the center line.
16    A.   Okay.  That's what I'm talking
17  about.
18    Q.   Right.  You've got a green center
19  line that's higher than the Escape.  You've got
20  a red center line that's lower.  And so the
21  center line impact would be, according to your
22  analysis, somewhere between the red line and
23  the green one?

Page 211

1    A.   For the -- for the purposes of the
2  analysis, yes.
3    Q.   Right.  And do you see the hinge
4  there is between the red line and the green
5  line?
6    A.   Well, I -- I can't see it.  But --
7    Q.   All right.  Well, hold on a
8  second.  Would it help if I pulled up the
9  actual video from the crash test, if I can do
10  that?
11       MS. CANNELLA:  How is he suppose
12  to know if that helps or not?  I object to the
13  question.
14       MR. HILL:  I'm just saying --
15    Q.   Okay.  Can you see on the screen
16  now the video from the crash test?
17    A.   Sure.
18    Q.   All right.  And so this is right
19  before impact.  And if I take it to the point
20  of impact, all right, we now have, as you can
21  see, the center lines for the hood and the
22  roof.  This is basically the same picture you
23  had except I don't know why yours was flipped

Page 212

1  in the other direction.  But can you see the
2  hinge clearly in this, the actual crash video?
3    A.   I can.
4    Q.   Okay.  And you would agree that
5  the center line on the hood is to the front --
6  the inside edge of that hinge?
7    A.   Yes.
8    Q.   And then if you extrapolated the
9  hood, it's naturally due to photo parallax,
10  going to be lower because it's higher than the
11  Escape, and so it's going to impact somewhere
12  around the other edge of the hinge?
13    A.   Close.
14    Q.   Close.  Right.  So this is what I
15  was -- the point I was trying to make before is
16  that according to this analysis, using the
17  overhead, the center of the F-250 would be
18  somewhere between the right edge of that hinge
19  or the top edge and then somewhere along the
20  hinge.  Correct?
21    A.   Well, you're -- you're adding a
22  point that we -- the problem is you can -- you
23  can find a large number of points and do a

Page 213

1  large number of analyses, and the cameras
2  weren't set up well to do that.  We're using
3  this as best we can.  And I'm not saying it's
4  relative to the hinge.  I'm saying based on the
5  way we scale, the way we did it, you're looking
6  at the measurements I gave you.
7      What is true is the impact was -- was under
8  that hinge.  The logo was under that hinge at
9  impact, and we know that.  And so generally
10  speaking your analysis is good.  But I'm -- you
11  know, I'm not saying it's to the level I think
12  you're trying to point out there.  But I do
13  agree that the -- that the logo was below the
14  hinge at impact.
15    Q.   Right.  Do you know if distance
16  from the inside of this hinge to the center of
17  the Escape?  Have you measured that?
18    A.   I haven't.  But it's going to be
19  close to 18 inches.
20    Q.   Okay.  And that's from the edge of
21  the hinge -- on this photograph, it would be
22  the -- let's use it from the perspective of the
23  F-250.  So you're looking at it from the back.

54 (Pages 210 - 213)

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 214

1  It would be the right edge of the left hinge.
2  You're saying the distance from that -- sorry?
3      A.   My report gives a spacing between
4  the hinges.  And we can just take -- take half
5  of that.  It's -- it's in the original FR26
6  report.
7      Q.   Okay.  And in order for your
8  analysis of the F-250 logo imprint to be
9  correct, you're saying the distance between the
10  hinge and the center of the Escape is 18
11  inches?
12      A.   No.  I was giving an estimate.
13  Let's -- let's open up a -- open up a -- we're
14  doing an analysis based on the center lines we
15  were provided.  The hinge itself is where the
16  hinge itself.  I'm not trying to measure the
17  hinge.  I'm doing an offset between the dotted
18  center lines that he gave us.  Okay?  And it's
19  just a technique that we can use.  It gives a
20  range.  The hinges are however far the hinges
21  are.  I'm not trying to estimate that.  But
22  wherever they are, they are.  And I know the
23  measurement because I've got it in my first

Page 215

1  report.  I just would have to take time to open
2  up the report if you want me to do it.
3      Q.   But are you saying that you can't
4  use the hinge as a reference point to determine
5  the impact point of the F-250?  I mean, it's --
6  it's no different than using the center lines.
7  It's just another reference point.  Correct?
8      A.   That's false.
9      Q.   Okay.  What's false about that?
10      A.   Remember, Crosby has routinely
11  marked the impact point with markers.  He has
12  routinely set up cameras to allow measurements
13  to be made.  He did take photographs of his
14  intended impact quite accurately.  But he did
15  not document the impact.  In fact, his report
16  is false.  When it shows the impact
17  orientation, we know it's wrong and that his
18  report is misleading.  He gave an impact
19  location that is one hundred percent not
20  represented by his video.  And he -- but he
21  reported it as an impact location.  The only --
22  so we have limited tools because he left out
23  those tools.  Apparently, at someone's

Page 216

1  direction or because someone didn't ask him to
2  allow measurements to be made.  I don't know
3  which one.  You can read his depo and see which
4  one.
5      But what we're doing here is one -- I
6  wouldn't even know where the center lines of
7  the vehicles are if he didn't put the tape on,
8  I'd have to be estimating that.  But he did --
9  Grimes didn't know the tape was on the center
10  line.  Okay?  In his deposition, he didn't know
11  it.  Crosby confirms it's on the center line.
12  Thank you, Mr. Crosby.  I appreciate having
13  something I can measure to.  And so we are
14  using those center lines because it's what was
15  provided.  You are now trying to do an analysis
16  based on hinge, which I have no problem doing.
17  The impact was under the hinge.  The logo was
18  under the hinge.  But we would do that looking
19  at the rear of the vehicle where we wouldn't
20  have depth problems and scaling problems.
21  The -- the problem is that Crosby didn't do it
22  in a way to facilitate this.  So we -- we have
23  to find reasonably reliable ways.  I'm not

Page 217

1  going to profess to know where the hinge is
2  based off of this photo.  I'm going to profess
3  to know where the hinge is because I can
4  measure the hinge.  It's been documented and we
5  know where it is.  I'm only able to use what --
6  because it wasn't properly documented, all
7  someone had to do was take a tape measurer and
8  hold it up where the logo imprint is and take a
9  photo of it.  Crosby said he went out there and
10  looked at it and held a measure -- the tape up
11  to it and says it's offset by an inch, but he
12  didn't do it.  So now I'm left using these
13  methods from my own independent analysis, and I
14  get five inches.
15      But remember, Grimes did do a point cloud
16  match when he got the same answer, and I have
17  that to show you.  So that's his work that we
18  can also use.  We don't even have to do this.
19  But when we did it to make sure of where it
20  was, we got five inches using these methods.
21  But I'm not here to measure a hinge this way.
22  This is not the right way to do it.  We're only
23  stuck doing it this way because someone didn't

55 (Pages 214 - 217)

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 218

1  do it reasonably well in the crash test.
2      Q.   Let's go back.  Again, I'm
3  simply -- the question was, if you can measure
4  the center line that's referenced in this photo
5  that -- you're saying but you can't reliably
6  refer to the hinge in this photo.  What's the
7  basis of that?
8          MS. CANNELLA:  Asked and answered.
9      A.   I didn't do it to measure the
10 hinges.  I -- I used it to measure the distance
11 between the two yellow lines.
12     Q.   Right.
13     A.   That's why I did it.  I don't like
14 the method.  I -- I'm stuck with the method
15 because the cameras, you know, as Crosby went
16 through, the camera was -- was improperly
17 positioned.  So it's an imperfect method.  If I
18 know where something is, I'm going to measure
19 it in the proper way.  If I don't know where it
20 is and I have to do this type work and do it
21 multiple ways, that's why we have a range of
22 four to six inches.  There's some error
23 involved in this.  So I'm -- the hinge, I know

Page 219

1  where it is and I can measure it.  And we can
2  look at the back of the car and tell the logo
3  mark is under the hinge just like what we see
4  right here.  So if we know where the hinge is,
5  we can come down and know where the logo is.
6  But I don't need to estimate where the hinge
7  is.  I know where the hinge is.  It's the logo
8  mark I need.
9      Q.   Right.  But the logo mark is
10 dependent upon your conclusion that the left
11 edge of the logo mark is, indeed, a
12 representation of the left edge of the logo.
13 All of your opinions depend upon that being
14 accurate?
15         MS. CANNELLA:  Object to the form
16 of the question.  Misstates his testimony.
17     A.   Well, the logo mark that I see
18 needs to be understood as a logo mark.  You're
19 correct.  But the tow hook mark needs to be
20 understood as a tow hook.  And by the way,
21 Grimes -- excuse me, Crosby said that he didn't
22 put any marking tape or put any marks on there
23 so we could tell where the impact was.  And

Page 220

1  I've already told you that his report is
2  erroneous as to where the impact was.  His
3  drawings are wrong.  We do have one very small
4  fortunate piece of luck, and that is that the
5  tape that someone put on the tow hook to hold
6  the trigger or the light trigger on, that tape
7  did leave a white mark on the rear of the
8  Escape so we can actually use it.  Obviously
9  Grimes doesn't know it, and Crosby doesn't know
10 it, but if you look at the photos, you can see
11 it.  And then if we go to Grimes's own crush
12 match, we can measure 16 inches, just like I've
13 been telling you all along.  There's -- there's
14 45 percent more offset, 16 inches logo to logo
15 that's in his work in his file.  But he didn't
16 testify about it in his deposition and, in
17 fact, claimed that he hadn't done it.
18     Q.   What is erroneous about Crosby's
19 report?  What specifically did he put in there
20 that you say is an error?
21     A.   Well, if you look at this image
22 right here -- well, if you back up the video
23 one frame, you'll see that the truck isn't

Page 221

1  centered over the rail.  And he shows it
2  centered over the rail.  And then if you look
3  at where -- yeah, and then if you look at where
4  the impact is on the car, the impact is in a
5  different spot.  That truck is not centered on
6  that rail.
7      Q.   Well, he did not, in his report,
8  indicate anything about the location of the --
9  the F-250 at the time of impact.  Correct?
10     A.   Oh, of course he did.  He drew it
11 and he stated it was centered over the rail.
12 It says it verbally -- it says it verbally on
13 page two or three or four and shows a diagram
14 on page three or four or five.  And it's --
15 it's wrong.  It is -- it is wrong.  It is a
16 misstatement of what he did in his crash test.
17 And he knew it, and he left it in there.
18     Q.   Well, he stated that the center
19 line was above the center of the truck at the
20 time the test was initiated?
21     A.   No.  Let's -- let's go back and
22 read it.  Let's not argue.  Let's just go --
23 let's go look at the diagram.  That's the best

56 (Pages 218 - 221)

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 222

1  one. He actually has the rail labeled.
2      Q.   Right. And all of those diagrams
3  are running the test. Correct?
4      A.   He labels it impact. He labels it
5  impact.
6      Q.   All right. What else do you claim
7  is erroneous about his report?
8      A.   Well, let me -- let me show you
9  that first. I -- I want to show you here.
10  Okay. So it will take a minute. I don't know
11  where his report is. In fact, it's -- in fact,
12  I didn't include the report in what I sent you.
13  Can you pull it up and let's go to page three
14  or four? Just because I didn't want to resend
15  all of Grimes's stuff. You have it in his
16  stuff.
17      Q.   You want Grimes's report or
18  Crosby's report?
19      A.   Let's go with -- excuse me --
20  Crosby's. I didn't send it back to you, but in
21  his file something says report and on page five
22  he labels impact configuration and draws the
23  rail down the center of the vehicle, which is

Page 223

1  false. And then --
2      Q.   Let me see if I can find it.
3      A.   Sure.
4      MS. CANNELLA: I believe we're
5  talking about the Exponent report?
6      THE WITNESS: Is that Crosby?
7      MS. CANNELLA: Yeah. He had a
8  letter report too.
9      THE WITNESS: Oh. I'm talking --
10      MS. CANNELLA: You're talking
11  about the crash test report?
12      THE WITNESS: Yeah. Yep.
13      A.   So on page four he states it
14  verbally. On page five he does it with the
15  drawing. The drawing is the proper way to
16  communicate it clearly and he labels it impact.
17  He uses the words and gets the same inclusion,
18  and it's a misstatement of what happened.
19      Q.   Okay. Here's page four of his
20  report.
21      A.   All right. Last paragraph. And
22  it says in this orientation the front of the
23  F-250 struck the rear of the Escape. And

Page 224

1  that's the third line from the bottom. In this
2  orientation the front of the F-250 struck the
3  rear of the Escape. And above that it
4  describes the orientation with -- it says the
5  F-250 was towed into the impact rolling
6  straight ahead with it's longitudinal center
7  line collinear with the center line of the
8  exponent crash rail. There's only one
9  interpretation of those two sentences. He
10  intended to have it collinear with the crash
11  rail, and it was collinear with the crash rail.
12  It was not. Although, I fully believe that was
13  his intent.
14      Q.   Right. But that -- and that's the
15  entire basis of your argument that he has
16  testified that at impact the F-250 was exactly
17  collinear to the center line of the tape.
18  That's the entire basis of that opinion?
19      MS. CANNELLA: Object to the form
20  of the question.
21      Q.   What you decided?
22      A.   Yes. First, the report is wrong.
23  And then -- and the basis is the work I've

Page 225

1  shown you and Grimes's work, which I need to
2  show you, and then the second page of this
3  gives the drawing, if you just flip to it,
4  which is page five, it shows it unequivocally
5  the offset is supposed to be 10.9. The vehicle
6  is supposed to be center line both of which are
7  false and this is labeled impact configuration.
8  And then there's one other page in this report
9  that was wrong. Just on this one topic.
10      Q.   All right. Anything else that --
11      A.   Well, we've kind of --
12      MS. CANNELLA: The basis of what?
13  Object to the form of the question.
14      MR. HILL: The basis of his
15  statement that Crosby's report was wrong.
16      A.   Well, we're talking about just
17  with respect to the offset. If you go to
18  page 94 of the report, he reports to a tenth of
19  the inch the impact, which he's off by, you
20  know, five inches which is, you know, erroneous
21  to the reported impact, but it wasn't.
22      Q.   And again, that's dependent upon
23  your evaluation of the -- where the logo impact

57 (Pages 222 - 225)

G. Bryant Buchner                    July 11, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 226

1  is on the Escape --
2      A.  No.  That's -- that's Grimes's.  I
3  didn't need to show you Grimes's.  I guess I
4  need to show you Grimes's.  Grimes's own work
5  shows that.  He doesn't -- he doesn't discuss
6  it in his depo.  But let me just show you his
7  point cloud that has the vehicles center line
8  16 inches apart.
9      Q.  All right.  Did you produce that
10 with your files related to the -- your -- what
11 did you call it, rebuttal report?
12     A.  No.  No.  That's his file.  I --
13 that is his file.
14     Q.  All right.
15     A.  That's his cloud -- all I did is
16 view it the way I normally would viewing my own
17 work.  I sat this morning and worked on cloud
18 for other things.  I can view it.  I can open
19 windows.  I can close windows.  Turn vehicles
20 on and turn vehicles off and I can show you how
21 -- what we did.  I saved the viewing of it to
22 present to you today to make it easy.  But I
23 can open up cloud compare if you want.

Page 227

1      Q.  Whatever you want to do to
2  illustrate the point.  I didn't know if you
3  needed me to could open it or if you could open
4  it.
5      A.  Sure.  I can open it.
6      Q.  All right.
7      A.  Okay.  So I'm going to share
8  screen.  And that's going to work today.
9  Share.  I'm going to open up a PowerPoint that
10 I -- I did so I didn't have to open up cloud
11 compare today because it's very hard to open up
12 on Zoom.  And this is it.
13     So it's Grimes's offset.  I added those
14 words.  The rest of this is -- is his title
15 from his file, test MMC both vehicles.  And the
16 first page here is an image of his file that he
17 gave me.  So it's in the testing folder.  Open
18 up the testing folder, page two, it's in the
19 point clouds.  In the point clouds, this is his
20 cloud compare file and it's titled test MMC
21 both vehicles.  And all I do is I open that.
22     And when I open it, this is what I see.  So
23 this is -- this is what he -- the only place

Page 228

1  I've found a point cloud or any work that shows
2  the vehicles put together in the point cloud
3  with this original document, and then I zoomed
4  down on it.  And then I look at it from the
5  front.  So now I can look at the alignment of
6  the two vehicles.  This is his work.  And in
7  cloud compare I can -- I can turn the top off.
8    So now I turn the top off, and I can see the
9  Ford logo.  And the first thing you notice is
10 the front of this inside the Escape.
11 You don't see any hash on the Escape.  He has
12 the vehicle's position forward so that the
13 truck is inside the Escape, which of course
14 isn't a good match when that happens, but he
15 does have the logo.  And then here we kind of
16 hold in the front of the Ford so we can see
17 where the Escape logo is inside of the Ford.
18 And then we just measure the distance between
19 the two, and it's 16 inches.  So his -- this is
20 his original work that was provided with his
21 deposition.  This is his file.
22     Q.  Can you leave that up, please.
23     A.  Sure.  I'm -- yeah, there we go.

Page 229

1  That was -- my computer is glitchy today too.
2  So that's --
3      Q.  Go ahead.  Sorry.
4      A.  Let me just finish.  That --
5  the -- the left is the center of the Ford logo.
6  In his cloud compare, the right is the center
7  of the Ford logo of the truck in his cloud
8  compare and the measurements at the top are
9  what's important.  The key to the measurements,
10 is in the lower right, it gives you the X, Y
11 and Z orientations.  So the delta-Y is the
12 number to look at.  It's 16 inches logo to logo
13 in the work that he did.
14     Q.  Okay.  And now you just explained
15 that this cloud point is not representing the
16 vehicles at the point of impact.  Correct?
17     A.  Right.  This is his -- this is a
18 representation of where they -- where they are.
19 And because he said it was a twelve o'clock
20 impact, those are 16 inches apart.
21     Q.  Right.  That's not my question.
22 Is -- you said like the front of the F-250 in
23 this comparison that you're using is already

Veritext Legal Solutions

800.808.4958                                    770.343.9696

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 230

1  well past impact. It's not -- this is not
2  representative of the point of impact?
3       A.   Oh, it is very representative.
4  But this is his maximum -- this is worse than
5  maximum engagement. He's actually pushed the
6  Ford too far into the Escape. But his
7  alignment -- this is the only place in the file
8  that the impact alignment is documented where
9  it can directly be measured without the effort
10 that we had to put into it. This file is the
11 only one we can measure, it's the only one of
12 proof of where the center of the vehicles are,
13 and he -- he has it at 16 inches, which is the
14 impact orientation.
15      Q.   Well, let's -- let's back up now.
16 You said this represents the point of maximum
17 impact from -- from Grimes perspective.
18 Correct?
19      A.   Yes. This seems -- this is what
20 he's been using to give his opinions off of,
21 but not -- I don't know why he didn't show it,
22 but it's buried in his file. Yeah. It's -- he
23 still met the length of the vehicles and

Page 231

1  everything, and this is why the length has an
2  issue, but yeah this is much closer to maximum
3  engagement than it is first contact.
4       Q.   All right. So this is
5  representing the -- the location of the logos
6  at maximum impact, maximum crush, not at the
7  point of impact between the two vehicles?
8       A.   Right. The drawing is near
9  maximum. But because it's a collinear impact
10 it does -- it is -- it is the most represented
11 of the first point of contact that exists
12 that -- that we can do. In other words,
13 he's -- he cannot get a five -- a 10.9 inch
14 offset from this rest or this maximum contact
15 point. These points should still be 11 inches
16 apart because it's a collinear -- excuse me,
17 it's a -- it's a six o'clock PDOF. The truck
18 should push in with five inches -- eleven
19 inches of offset, not 16 inches of offset
20 that's shown here.
21      Q.   So your opinion depends upon the
22 crush being perfectly linear with the center
23 line of both vehicles at maximum crush?

Page 232

1       A.   No. Because we have the stamp at
2  near first contact that matches this
3  measurement. So we get the Ford emblem stamp
4  at first contact about 16 inches over that
5  matches this. And then we have his work that
6  shows they're still 16 inches apart, what he's
7  calling maximum engagement. And that's
8  consistent with a straight rear end impact of
9  zero degrees by the -- as -- as the Crosby
10 report says Grimes had him lined up. So we
11 have a record very near first contact. We have
12 a record at maximum contact. And Grimes never
13 showed any of this and -- and -- or revealed
14 this in his deposition, but his file does
15 reveal it.
16      Q.   Well, he wasn't asked in his
17 deposition about comparing the Ford logos at
18 maximum crush depth, which is the only thing
19 this shows. And this was produced in his
20 deposition and was part of the basis of his
21 opinion with regard to the maximum depth. So
22 if he didn't feel like the maximum crush depth,
23 which is several feet into the vehicles, was

Page 233

1  representative of impact point, then it's not
2  like he's hiding anything; he just didn't think
3  they had anything to do with each other.
4            MS. CANNELLA: Object to whatever
5  that was. Not a question.
6       Q.   Do you agree with that?
7       A.   As long as we don't have physics
8  and Newton's laws and the other evidence, I
9  could agree with you. But we -- we actually
10 have the problem of science and engineering and
11 the ability to calculate, and even know that
12 this truck didn't move sideways. We have a
13 record of this truck on the video where it's
14 not moving sideways during this. For your
15 statement to be true, we would have to throw
16 out everything else we know about this and we
17 would have to have a video of the truck coming
18 in and dancing, you know, as it comes in.
19 And -- and that didn't happen. And so in a
20 vacuum of uneducated persons, yes. But if
21 we're going to do engineering and science and
22 physics, we -- we know that this is
23 representative of first contact. And so I

59 (Pages 230 - 233)

G. Bryant Buchner                      July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 234

1 disagree with the statement you make
2 wholeheartedly.
3       Q.   Well, even in this -- this scan
4 that you have up here, the Ford logo of the
5 Escape is not lined up with the center line of
6 the Escape. Correct?
7       A.   Oh, it is. It is.
8       Q.   Well, if you look at the bottom of
9 this image, if you would leave it up there,
10 please.
11      A.   I'm doing everything I can. The
12 computer doesn't want to cooperate. I
13 apologize. It has -- it has went black and
14 it's freezing. It's why I can't open the
15 original files. Just give it a second and see
16 if it -- let me see if I can stop sharing and
17 if it will come back. With the video image and
18 all this, it's -- I don't know if you can see
19 me. I can't even see you.
20      Q.   I can see you. I can't see
21 anything being shared.
22      A.   Yeah, I've got a -- I've got a
23 black screen. There we go. Okay. It says the

Page 235

1 picture can't be displayed, so something has
2 happened to the PowerPoint. It's one of those
3 things that happens with computers. Let me try
4 to close it and reopen it. Yeah. We're
5 catching some grief here. Okay. Yeah.
6 This -- okay. That's -- that's where we are.
7 Thank you.
8       Q.   Do we need a break for you to try
9 to get it up there?
10      A.   Well, I -- I thought it was up
11 there.
12      Q.   I can't see it.
13      A.   Here, try that. How about that?
14 How about that?
15      Q.   Right. Okay. If you'd look at
16 the bottom of the screen, you have a yellow
17 tape there in the scan that indicates the
18 center line on the hood of the Escape.
19 Correct?
20      A.   Yes.
21      Q.   All right. And you're saying that
22 that is aligned with the Ford logo on the back
23 of the Escape in this scan?

Page 236

1       A.   I'm -- I'm not --
2            MS. CANNELLA: Object to the form
3 of the question. Mischaracterizes his
4 testimony.
5       A.   I'm saying his logos -- his logos
6 are 16 inches apart, which is the same distance
7 they were apart at impact.
8       Q.   Right.
9       A.   And we can make measurement of
10 that. We don't have to -- we -- we don't have
11 to try to visualize it. We have an exact
12 measurement of it two different ways. That's
13 what I'm saying.
14      Q.   Well, my question is at this point
15 in the crash sequence, what evidence do you
16 have that the Ford Escape logo is still aligned
17 with the center of the Ford Escape?
18      A.   Well, it -- well, this is -- it's
19 been pinned and caught by the front of the
20 vehicle. It may not be aligned with the
21 center, but it is definitely -- the
22 relationship between these two is -- is -- has
23 been anchored in the impact. And that's why we

Page 237

1 have this imprint and we have this -- and them
2 coming in and that's why they're here with the
3 crushed vehicles. That's the reason everything
4 lined up, that's the way Grimes lined it up.
5 It doesn't mean you didn't -- the car was bent.
6 But it's aligned with essentially where it was
7 at the beginning of the impact. But where the
8 front is now, we would have to go look at the
9 video and see what shifting it did. But we
10 don't see the F-250 coming in and going
11 sideways. We don't see the back of the car
12 going sideways to this level. This is --
13 Grimes said to 10.9 inches, and he got it from
14 this, by the way. This is how he got 10.9. He
15 didn't see the crash happen. He used this type
16 of analysis to get 10.9. And he measured
17 between where they were now and projected back
18 to where they were at the time. And he was
19 able to say 10.9. I'm doing in reverse exactly
20 what he did with this crash test, and this is
21 16.
22      Q.   So your opinion depends upon the
23 position of the logo as being anchored

60 (Pages 234 - 237)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 238

1  permanently throughout the crash scene?
2         MS. CANNELLA: Object to the form
3  of the question. Misstates his testimony.
4      A.  Look, I change height throughout
5  the day. The more I stand up, the shorter I
6  get. When I lay down at night, I get a little
7  bit longer. But I'm always 6' 2, you know,
8  within reason. Yeah. There -- this is -- this
9  is a really good -- this is the best
10 representation that whatever exists for how the
11 vehicles were at maximum engagement and also at
12 initial contact, and it's the same method
13 Grimes used to get 10.9 inches of offset and I
14 used to get 11 inches of offset, and yes. But
15 perfect within a millionth of an inch, no. But
16 certainly within an inch.
17     Q.  All right. And how did you
18 measure the points here between these two
19 edges?
20     A.  I just opened up his file and
21 clicked measure between here and here. And it
22 gives me the lateral measurement of 16 inches.
23 It's -- it's -- it is literally the

Page 239

1  measurements of all of these points that are
2  embedded in his file. I just have to ask the
3  computer to display it.
4      Q.  All right. And this measurement
5  scan here was not produced to us prior to the
6  deposition. Correct?
7      A.  It was in Grimes's file.
8      Q.  Well, not your input of the points
9  and the measurement between the two points.
10 That's not in Grimes's file.
11     A.  Yes, it is. All of these
12 measurements are embedded. That's how it
13 generates the images, it knows the measurement
14 between each point. I'm just showing -- I'm
15 just exposing it. That's all I did.
16     Q.  Right. But Grimes's scan doesn't
17 contain this pink line and the distance window
18 up there that you've inputted into this, does
19 it?
20        MS. CANNELLA: I'm just going to
21 object to the suggestion that something --
22 something was not produced. That's ridiculous.
23 This is Grimes's data we're looking at right

Page 240

1  now.
2      Q.  That -- you have on the screen
3  right now -- if you back up -- that is
4  contained within Grimes's file, that image
5  right there (indicating). Is that correct?
6         MS. CANNELLA: All of this data is
7  from -- from Grimes's file, Rick. This is --
8  he's just -- he's showing us the file that
9  Grimes produced. That's what we're looking at.
10        MR. HILL: Right.
11     Q.  But the image that you just had on
12 the screen with the pink lines and the
13 measurement box, that's not in Grimes's file?
14        MS. CANNELLA: You asked him to
15 create that for you. You asked him to show it
16 to you.
17        MR. HILL: Right. But he created
18 that prior to the deposition. Correct?
19        MS. CANNELLA: No. He did it
20 right in front of us. Sorry. Go ahead,
21 Bryant.
22     A.  I -- I did not. I can do it right
23 in front of you if I open cloud compare. These

Page 241

1  are scaled vehicles all of these measurements
2  are embedded in his file. That's how it knows
3  where all these things are. That's what we do
4  with a scale drawing. When we do a scale
5  drawing, we can take a scale and the scale, it
6  has an infinite number of measurements on it
7  that we just read off. You asked me for the
8  distance between these two points, I put the
9  scale on it. Now, the computers it's AutoCAD
10 so you want the distance between two points, we
11 just put it up and measure them. In this 3D
12 point cloud, all of these measurements are
13 already in there. I'm just going to expose the
14 ones I want to see. So I don't have to make
15 that pink line. I did that to demonstrate how
16 we can use it to show the measurements that are
17 in his file already. I'm just exposing them.
18 It -- because -- because I have to open the
19 cloud compare file, I don't even have the cloud
20 compare file on my laptop that I use for Zoom.
21 It's on a bigger, stronger computer. All we
22 have to do is open his file and say -- and we
23 can get any -- we can get millions of

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 242

1   measurements from his file just by telling the
2   computer, show us -- show us these scale
3   measurements it already has in it. We're just
4   exposing it. If it had all the measurements
5   showing, you wouldn't even know what it was
6   because it would just be a cloud of millions of
7   numbers. So this is how builders build houses.
8   This is how re-constructionists draw a scene.
9   This is how re-constructionists look at cars
10  that are stuck together. We use a computer
11  program to open it up. And if I open it up, I
12  can spin it around and look at it and show his
13  work, and I can measure any point that I want
14  to measure and demonstrate it. I'm not really
15  measuring. I'm just exposing the measurement
16  that's in there. So what I did was when I
17  opened the -- the cloud compare, I was going to
18  open it and just show it to you in the depo and
19  then I realized I'm using a non-cloud compare
20  computer and it will also probably kill my
21  video link. I said, okay, let me show them how
22  I would do it if I had the opportunity to show
23  them. It's just -- I'm -- I'm just showing

Page 243

1   you -- I'm just zooming up a photo is all I'm
2   doing.
3       Q.   Right. Well, let me ask this way.
4   Is there any mention in your rebuttal report of
5   your reliance upon Mr. Grimes's point cloud
6   images that you've just shown me as a basis for
7   your opinion regarding the offset in the crash
8   test?
9       A.   No. That was his work. He
10  already provided the measurements. I'm just
11  showing you his measurements to support that my
12  work, you know, is accurate. We didn't -- we
13  knew that the videos and whatnot showed it
14  being off. So we went through the upwards.
15  And Mr. Grimes didn't even understand there was
16  a stamp there. So I thought that would be the
17  easiest way for someone to understand it.
18  You're obviously having trouble understanding
19  this cloud compare file and how it functions.
20  But if I just open up his own file and show you
21  this drawing, I mean, that's all I'm doing
22  here.
23      Q.   I -- I totally understand the

Page 244

1   cloud drawings. I'm saying there's no mention
2   in your report that you will be relying upon
3   Grimes's cloud drawings in -- regarding the
4   offset.
5       A.   Yeah. I -- I said I used his
6   file. I mean, that's what we used. That's
7   what we used was Crosby's file and Grimes's
8   file and Crosby's depo and Grimes's depo.
9       Q.   All right. Well, I think it's
10  pretty clear you said there's three methods
11  that you used to determine the offset --
12      A.   My work. This is his work.
13      Q.   If you'll let me finish. But if
14  you're going to rely upon his work --
15      A.   Sir -- sir, I can't see you the
16  way we're doing this. Can I go back to where I
17  can use the camera to see you?
18      Q.   Sure.
19      A.   That's why I'm interrupting you.
20  Thanks.
21      Q.   Can you see me now?
22      A.   Nope. Not yet. I'm trying. I
23  can see you now.

Page 245

1       Q.   Okay. All I'm trying to establish
2   is, can you point to where in your rebuttal
3   report you indicate that you intend to rely
4   upon the cloud scans done by Mr. Grimes to give
5   opinions regarding the offset in the crash
6   test?
7       A.   I would -- I think it's in the
8   file materials I listed. This is just one of
9   his file materials. He didn't -- remember, the
10  photos we're using, you know, are his photos.
11  I've got hundreds of photos I didn't show you,
12  but I'm using all of those. So this is just
13  part of his file. I think I said file. Let
14  me -- let me -- let me open up -- let me open
15  up my report if I could find it.
16      Q.   Sure.
17      A.   Man, yeah, it says I have reviewed
18  and analyzed report and deposition of Grimes,
19  report and deposition of Crosby, scan data,
20  which is what we're looking at, and photos and
21  video data from the crash test performed by
22  Grimes and Crosby. And then I -- I go on to
23  say one more time to say Grimes's file

62 (Pages 242 - 245)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 246

1  materials.  And I say based on the above, and
2  then -- then I used it.  And then the other is
3  my own work.  But if -- if Grimes had a photo,
4  I would expect that I could use it.
5      Q.   Well, I'm saying you specifically
6  delineate in your report that you use three
7  methods -- three methods to determine the crash
8  test offset.
9      A.   That's my independent --
10     Q.   Let me finish my question.  Was
11  this method of using Grimes's scan data listed
12  as one of the methods that you used to
13  determine the test offset?
14     A.   No.  Because my methods were
15  independent of this.  This is just his data
16  that's in his file that follows the same
17  methodology that he did to reconstruct the
18  accident and that I used to reconstruct the
19  accident.  He's presented it for us just like
20  he did all of his other data, just like he
21  presented scanned images of how the accident
22  vehicles hit.  I'm just using his presentation
23  to point out what the measurements actually are

Page 247

1  in his work because he didn't know.  But it is
2  in there just to be -- just to be measured.  So
3  no, I'm -- I'm just -- I was just going over my
4  work.  This is his work.
5      Q.   Are there any other methods,
6  whether it's based upon your work or
7  Mr. Grimes's work or Mr. Crosby's work, that
8  you're going to rely upon to give testimony
9  regarding the offset in the crash test?
10     A.   In the -- in the PowerPoint we
11  show where his tow hook hit the crash test
12  versus where it hit in the accident.  That's
13  just using the photos.  I put them in here.  I
14  don't need the PowerPoint.  I can show you the
15  photos.  But I did put you some photos in what
16  we did yesterday to show the tow hook.  If you
17  want me to use the original photos, I'll use
18  the original photos.  And we don't get a
19  measurement out of it, per se, unless we use
20  Grimes's work.  Then -- then you can measure
21  it.  But you can see the tow hook really well
22  in some of the photos.
23     Q.   I just want to make sure I've

Page 248

1  covered every basis for your -- or all of the
2  information you're relying upon to give
3  opinions regarding the offset in the crash
4  test.  We've --
5      A.   I'd like to show a photo then.
6      Q.   Sure.
7      A.   Share screen.  Let me find which
8  photo it is.  Come on, computer.  It's -- it's
9  refusing to open.
10         MS. CANNELLA:  We can see the
11  PowerPoint, Bryant.  We just -- probably like
12  you, it's just blank.
13         THE WITNESS:  Yes.
14     A.   The image on the left, slide 16 in
15  what I've given -- maybe the attorney can open
16  up slide 16 in -- in what we gave you.
17     Q.   All right.  Let me look.
18     A.   I've got to stop sharing and try
19  to get this off my screen.  Apparently, when I
20  share it, it locks me up.
21     Q.   Yeah.  I've been having the same
22  issue.
23     A.   You know, the bigger the computer

Page 249

1  gets, the -- the files seem to always stay in
2  front of them.
3      Q.   So you need slide 16 from -- from
4  which document?
5      A.   Intended impact versus actual
6  impact.
7      Q.   And this is from your file that
8  you produced in association with this report?
9      A.   Yes.
10     Q.   The rebuttal report?
11     A.   It's in the GBB Post Depo Plus.
12     Q.   What did you call that again?
13     A.   I have a folder called GBB Post
14  Depo Plus.  I assume it's -- yeah.  It's --
15     Q.   I don't have such a folder.
16     A.   The -- the PowerPoints I've been
17  showing you and my amended report were in that
18  folder.
19     Q.   And the title again is what?  I'm
20  sorry.
21     A.   10519 -- this says it's Quest Post
22  Depo.
23         MS. CANNELLA:  Yeah, that's what

63 (Pages 246 - 249)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 250

1  we sent -- that's the -- that's what we sent
2  you. That was their name of the file.
3         THE WITNESS: Yep. If I said GBB,
4  I meant Quest. 10519 Quest Post Depo.
5         MS. CANNELLA: And then aside of
6  that is, approach angle plus, photomodels plus,
7  and then a whole bunch -- not a whole bunch,
8  but a number -- a dozen or so or less PDFs.
9      Q. I don't see that file. Sorry.
10        MS. CANNELLA: What's the name of
11 it, Bryant, did you say?
12        THE WITNESS: It is 10519 Quest
13 Post Depo Plus.
14        MS. CANNELLA: Yeah. But what
15 inside of that file did you want?
16        THE WITNESS: Let me verify.
17 Intended versus actual impact.
18        MS. CANNELLA: Intended impact
19 versus actual impact?
20        THE WITNESS: Yes.
21        MS. CANNELLA: If you need me to
22 get that --
23        MR. HILL: No, I have that once

Page 251

1  you explained it that way.
2         THE WITNESS: Yeah.
3         MS. CANNELLA: All right.
4      Q. Is that it (indicating)?
5      A. Yes, sir. Slide 16.
6      Q. Let's go ahead and mark this
7  document, intended impact versus actual impact.
8  It's Bryson 09487 through 9508 as whatever the
9  next exhibit is.
10        (Defendant's Exhibit Number 4
11        is marked for identification.)
12     Q. Okay. That slide appears to be
13 elite page 16, although you call it slide 16.
14     A. That's it.
15     Q. All right.
16     A. Okay.
17     Q. And what did you want to -- you
18 said you wanted to refer to this photo as
19 additional support for your offset opinions?
20     A. Yes. If you go down one slide --
21     Q. Slide 17?
22     A. Yeah. 17, the red arrow shows
23 where the tow hook hit in the accident. And

Page 252

1  slide 17 shows where the tow hook hit in the
2  crash test. And there's an orange line dropped
3  down from the bolt poles on the tailgate of
4  where the license plate is. It's one foot
5  across. And we can clearly see that the tow
6  hook imprint in the accident is to the right of
7  those bolt holes. And in the crash test the
8  tow hook imprint is to the left of those bolt
9  holes.
10     Q. Right. And this is the position
11 after both crashes, not at the point of initial
12 impact?
13     A. Well, no. The one on the right is
14 initial impact because that tow hook is -- left
15 a dent in the tailgate right there. I mean,
16 that's -- the tow hook sticks out the furthest
17 in the front of the truck. And on the left,
18 that dent in the bumper is from the tow hook.
19 And if we go on to zoom up on it, it's got a
20 little bit of white paint on it from the tape
21 on the front of the tow hook. And that's what
22 bent the bumper the way it is. So that's where
23 the tow hook hit there as well. So that's --

Page 253

1  those represent as good as accident
2  re-constructionists can do in an initial impact
3  because of the -- the orientation of the impact
4  and everything. So yeah, that's -- that's --
5  that's where it was pushed to. But it's also
6  the piece of metal where it started. And it
7  also proves it's not an override because that
8  tow hook is stuck on that bumper all the way to
9  maximum engagement. If it was an override,
10 then that tow hook which is located on the
11 bumper of the truck wouldn't still be pushing
12 on the bumper of the car.
13     Q. And do you have a photograph that
14 shows the white tape that you mentioned?
15     A. Go to the next slide.
16     Q. Yeah. And that's --
17     A. And -- sorry.
18     Q. Is that correct?
19     A. Go down a slide or two in this
20 presentation and we'll get up close on it.
21     Q. All right.
22     A. Keep going. There we go. Okay.
23 That slide right there (indicating), we can see

64 (Pages 250 - 253)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 254

1 the white on the bumper in the top image. And
2 we see the bumper is caved in because the tow
3 hook hit it in the crash test. But in the
4 bottom half of this slide, that's the bumper
5 from the accident vehicle. And it -- you know,
6 it's still got its original shape for the most
7 part. But you can see the tape marks up in
8 that hole a lot better in that photo.
9     Q.    All right. Where exactly are the
10 tape marks on the photo on the top?
11     A.    If you follow the bumper in, at
12 the maximum point of the bumper. So right
13 there (indicating). Yep. Right there. Those
14 white marks are from the tape. I need to --
15 let me see if I can find the image. This is --
16 give me just a second. Oh, okay. Go to slide
17 13. There we go. There's a close-up of the
18 tow hook, a little bit of black on the end on
19 top of the white tape. And there's the white
20 tape mark up on the bumper of the Escape.
21     Q.    Gotcha. And that's Bryson 9499.
22     A.    Oh good.
23     Q.    All right. Anything else about

Page 255

1 this photograph that you're relying upon or
2 these photographs or this presentation with
3 regard to the offset?
4     A.    Yes. Go to slide 20. Slide 20 is
5 not the -- not the same one I was looking at.
6 15 would be it. I'm sorry. 15 is kind of a
7 comparison of the one we just looked at to show
8 where the frame horn hit in the accident
9 compared to where the frame horn hit on slide
10 13 that we were just talking about. And I say
11 the frame horn. I actually mean the tow hook.
12 I apologize.
13     Q.    So slide 15, which is Bryson 9501,
14 you're matching up the tow hook in the accident
15 F-250 on where you think the tow hook impacted
16 the accident Escape? That's the premise of the
17 red area?
18     A.    Yes, and that gives eleven inches
19 of offset.
20     Q.    And what basis do you have to
21 conclude that the point of the red arrow is
22 indicative of the point where the tow hook
23 impacted the accident Escape? Like what's --

Page 256

1 what all supports that opinion?
2     A.    Well, physics, accident
3 reconstruction experience, and both Grimes and
4 Buchner did it exactly the same way. We used
5 the tow hooks. He says, he used the tow hooks
6 to match them together. That's how he got his
7 10.9 and, you know, we got our approximately a
8 foot, which is, you know, 11. We're -- we're
9 both using the same methodology to match the
10 damage profile. That's how it's taught in the
11 accident reconstruction books. You -- you
12 match up the damage profiles on to the known
13 areas. And then you know where those known
14 areas were, you know, before they were
15 undamaged, and that gives you your
16 measurements. It's -- it's -- that's accident
17 reconstruction 101. How else could you do it?
18     Q.    And you used a similar indication
19 of the tow hook impact location on the bumper
20 cover of the crash test Escape to analyze the
21 offset?
22     A.    We did. In my photos of the seize
23 bracket, we located the seize bracket on the

Page 257

1 bumper. If you go down to -- what was it?
2 Slide 21. In my report, in my work, in my
3 depo, there's a dent on the -- on the bumper
4 there at the bottom that corresponds to the
5 four and a half inches wide seize bracket.
6 That's working out of memory, four and a half
7 inches. But there is a dent on the right
8 center of that, that corresponds to that seize
9 bracket as well.
10     Q.    Right. So that shows you that the
11 C's bracket impacted the bumper in the actual
12 subject accident?
13     A.    Yep. As an override. So it went
14 up and over it and kept going. And the bumper
15 went out of the way and that's why it was --
16 you know, it was already compromised by that
17 point in time.
18     Q.    Right. But the seize bracket did
19 at least impact the bumper in the actual
20 accident?
21         MS. CANNELLA: Asked and answered.
22     A.    Yeah. But in the crash test the
23 seize bracket did not hit the bumper. Only the

65 (Pages 254 - 257)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 258

1  tow hook hit it, and that's why it's not an
2  override.
3      Q.   And so my question was did you --
4  you see here -- and this is slide 20, Bryson
5  9506. And you see here there is the bumper
6  cover hanging down on the bottom right of the
7  crash Escape. Did you reference any tow hook
8  marks on the bumper cover to determine the
9  offset in the crash deck?
10     A.   I don't -- I don't have enough to
11 do that with. No, sir. I just have the photos
12 that were provided. I have a better record of
13 it. I have a permanent record in the bumper
14 that I can see, so I'm happy with that. No, I
15 haven't used the bumper cover of the crash
16 test.
17     Q.   That was my only question. Okay.
18     A.   Sorry.
19     Q.   All right. Looking here at the
20 slide we have up, slide 20, it's a rear view of
21 the accident -- I'm sorry, the crash test
22 Escape on the left. And looking at that
23 photograph, can you tell whether the rear seat

Page 259

1  was deflected by the hatch on the Escape?
2      A.   No.
3      Q.   Okay. What would you need to look
4  at in order to determine that?
5      A.   We've talked about that already.
6  I thought there was some motion of it. But I
7  wasn't sure if it was the floor pan or the
8  hatch or what. I didn't have -- you know,
9  Grimes didn't measure or scan it.
10     Q.   Yeah.
11     A.   I don't know. It's irrelevant to
12 me because this crash test is not relevant --
13 not representative of the accident. But I
14 think -- I said I think it was displaced some,
15 but I don't know why.
16     Q.   Yeah. I was just asking what
17 would you need to look at to -- to confirm the
18 source of the displacement in the crash test.
19 Whether you think it's relevant or not, what
20 would you need to do to do that?
21     A.   I'd have to start working to see
22 if I could figure it out. But of course I'd
23 need to see the inside of the vehicle, which

Page 260

1  I -- I haven't seen.
2      Q.   Right. All right.
3          MR. HILL: Let's take about
4  another four-minute break.
5          MS. CANNELLA: Before we go off
6  the record -- just before we go off the record,
7  Rick, can you send me that -- that image that
8  you put on the screen with the HVE of the wreck
9  Escape?
10         MR. HILL: Sure. I'm going to
11 have to find it. I'll do it when we go off the
12 record at the end.
13         MS. CANNELLA: Thank you.
14         MR. HILL: All right.
15         THE VIDEOGRAPHER: The time is
16 4:11 p.m. We're now off the record.
17         (A break was taken.)
18         THE VIDEOGRAPHER: The time is
19 4:39 p.m. We're back on the record.
20         MR. HILL: Thanks.
21     Q.   (Mr. Hill) Mr. Buchner, what
22 evidence do you have or that you intend to cite
23 to that Mr. Grimes used the distance between

Page 261

1  the logos in his point -- in his cloud scans of
2  the subject accident to determine the offset in
3  the subject accident?
4      A.   I'm not saying he did because he
5  didn't even notice the logos according to his
6  depo. I'm just using his work. That was the
7  easiest way I thought I could demonstrate it
8  because it's the easiest way to find the center
9  of the vehicle in his -- in his -- the scan he
10 gave us. But we could probably, you know, use
11 the center line markings or some other things.
12 But the logos are -- just were the simplest to
13 me because I knew where the logos were at first
14 contact -- or represented at first contact.
15 And I also knew that we had used -- he had used
16 things like a tow hook to back it up at the
17 crash. So this is just the same methodology.
18 So no, he's -- he's free to use whatever he
19 wants. He -- he basically -- I don't think
20 he -- he even opined to what the offset was
21 unless he said 10.9 inches in the crash test.
22     Q.   Okay. I think -- I think we
23 misfired there. I was asking about the subject

66 (Pages 258 - 261)

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 262

1  crash.
2      A.   Oh.
3      Q.   Not -- not the crash test. So it
4  was the subject crash. What evidence do you
5  have that Mr. Grimes used the distance between
6  the logos at maximum crush to determine the
7  offset in the actual crash?
8      A.   Well, that's -- it was 10.9 inches
9  according to him because that is -- would be
10 the offset. I don't know if he used that or
11 whether he used other things. I don't think he
12 had ever seen the logo imprints if he was -- in
13 his depo. He was probably using the tow hooks
14 or something similar. But you know, they're
15 all geometrically tied together. So whether he
16 is using it or not, that's the answer. I'm not
17 saying he did use it. I'm saying that's --
18 that's something I can use to easily show some
19 additional work within the accident. I
20 don't -- I think he was probably using the tow
21 hooks.
22     Q.   Okay. So if we read your
23 deposition transcript from earlier today and it

Page 263

1  says that you opined that Mr. Grimes used the
2  distance between the logos and his scans of the
3  actual subject vehicles to determine the offset
4  in the actual crash, that would be a misreading
5  or a misinterpretation of your testimony?
6  You -- you don't know whether he used that or
7  not to come up with the 10.9 number that he
8  decided was the offset in the subject crash?
9      A.   I can look at it both ways. Yes,
10 that is a good accurate statement I made. And
11 we can also look at it where it is inaccurate.
12 The bottom line is the only point cloud match
13 that he provided that could be opened and used
14 shows 16 inches between the logos. There isn't
15 one that shows 10.9 and there's nothing in his
16 file that's a point cloud where they match that
17 he provided that can show 10.9. Every -- every
18 reference that we use would give 16. I just
19 use those. And they are his measurements
20 because they're part of the point cloud. But
21 he didn't reference them. So I agree he didn't
22 reference them, and I'm not saying he said he
23 referenced them. I'm saying, in what he

Page 264

1  provided, he provided that measurement.
2      Q.   Right. You keep switching back
3  between the crash test and the subject
4  accident. I'm not talking about the crash
5  test. I'm talking about the subject accident.
6  In Mr. Grimes's analysis of the subject
7  accident. You testified earlier today that you
8  believed his methodology for coming up with
9  10.9 in the subject crash was based upon his
10 point cloud scans of the subject vehicles and
11 the measurement of the distance between the
12 logos in those scans. And I'm saying, do you
13 have any basis to believe that he used the
14 distance between the logos and the point scans
15 of the actual vehicles to come up with the
16 offset in the actual crash?
17     A.   In the actual crash, whether he
18 clicked on the logos or not, they're in his
19 point cloud. Similarly, you can measure
20 between them. I'm not saying he used those.
21 I'm not even saying he looked at those. He
22 might have just been using the -- the tow hooks
23 and things that he testified to. But as I sit

Page 265

1  here, I haven't -- to my knowledge, I haven't
2  seen his point cloud match for the accident.
3      Q.   Okay.
4      A.   If I can find it though, I could
5  do a better job of answering the question.
6      Q.   Sure. Did you use your scans --
7  your point cloud data from the actual crash to
8  measure the distance between the logos at
9  maximum crush to calculate your offset in the
10 subject crash?
11     A.   No. We -- we didn't calculate the
12 offset. We matched the vehicles together to
13 demonstrate the offset.
14     Q.   Right.
15     A.   And then -- then of course we can
16 measure between any references on the vehicle
17 we want to get it. When we actually went back
18 and did the eleven inches, I don't -- I don't
19 remember if we were -- I'm pretty sure we were
20 using the logos before that. But we could have
21 done it two or three other ways. But -- but
22 because you want to check it a few times, a few
23 different ways. I don't remember exactly what

67 (Pages 262 - 265)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 266

1  the process was.  But we got, you know, eleven.
2  I think there's something -- I think there's
3  even something -- I think we are measuring the
4  logos for the eleven.
5      Q.   Can you say for certain how you --
6  first of all, it's my understanding in your
7  original report and your original deposition
8  and in your original simulation you determined
9  the offset was twelve inches.  And you indicate
10  that you actually determined the offset in the
11  subject crash to be eleven.
12      A.   Okay.  It's almost an
13  understanding or a semantics issue.  In my
14  deposition I didn't have the offset recorded or
15  written down.  I was asked so I took a ruler to
16  our scale drawings and -- and said, hey, it's
17  approximately a foot.  You know, it's very hard
18  on those drawings to see an inch at the size
19  they were printed out for.  So once I said a
20  foot, I've been true to a foot.  But I know
21  that Grimes said 10.9.  And I've checked our
22  work since then, and I'm like, okay, if we
23  really push our work and our clouds and

Page 267

1  everything, 11 inches is the right number.
2  So -- so I'm not changing, I'm just able to be
3  more accurate because I went back and did it
4  more precisely with a better tool.
5      To be clear, the offset is determined by the
6  damage match on the vehicles.  I don't measure
7  it and then decide how to put the vehicles
8  together.  I put the vehicles together.  And
9  then if I want it, I open up the file and I
10  measure it.  In other words, the -- the
11  physics, the geometry of the vehicles
12  determines it.  So it's -- it's an oversight on
13  my part not to have recorded it, written it
14  down or saved that measurement, but it's a
15  product of the -- of the work we do.  It's --
16  and it's contained in the work with all the
17  millions of other measurements that are in
18  there.  I just had not formally presented it.
19  And I did the best I could in the depo to give
20  a good answer, which was twelve.
21      Q.   Okay.  You had to have done that
22  work you just described in order to decide what
23  offset to use in your original simulation.

Page 268

1      A.   Right.  At -- at the time the
2  simulation was set up, I could have opened it,
3  measured it or Ms. Porter could have done that
4  and then put it in the simulation.  In other
5  words, that's the way it would have worked
6  because we have the measurement contained --
7  not in a contained simulation, but contained in
8  the point clouds.
9      Q.   Right.  So you -- at the time you
10  ran the original simulation, you went through
11  that process and you decided to input twelve
12  inches as the offset in the original
13  simulation?
14      A.   I think we probably put in eleven.
15  But like I said, I don't have that file
16  anymore.  Now, since -- since we redid it, I
17  said I want to be true to what I said in the
18  depo.  And that errs in the favor of -- of
19  producing more crush.
20      Q.   Yep.
21      A.   So I gone with the twelve because
22  that's what I said in my depo, but if you --
23  you want to know what I believe it is in my

Page 269

1  heart, I believe it's 11.  But both of them are
2  approximately 11, approximately 12.  Either one
3  is fine.
4      Q.   Right.  But you don't know as we
5  sit here today what offset you used in your
6  original simulation that formed the basis of
7  your -- your -- your report in this case?
8      A.   That's right.  I would say 0.9
9  plus or minus 0.1 in there depending on
10  what we measured that day.
11      Q.   Okay.  Right.  And now that you
12  say that you've looked at it closer after your
13  deposition and you think it's closer to eleven,
14  what -- how did you come to that conclusion?
15  What -- what was the methodology you used to
16  come to that conclusion?
17      A.   Well, I'll give you -- I've
18  provided you an image of it, of one of them and
19  one that's easy for the jury and everybody to
20  understand.  It's in the crash test offset
21  PowerPoint, if you'd like to open it or I'll
22  try to open it.
23      Q.   I can do it.  Hold on.

68 (Pages 266 - 269)

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 270

1    A.   I -- I produced something that was
2    simple.
3        Q.   Yeah.  All right.  Can you see
4    the -- this is the -- we've marked this as an
5    exhibit somewhere along the lines.  This is
6    crash test offset, that's what you're referring
7    to?
8        A.   Yeah.  Slide two.
9        Q.   All right.  Slide two.  This slide
10   here?
11       A.   Yes.
12       Q.   All right.  And so this appears to
13   be a measurement of a photograph -- or is this
14   a scan of the subject, Escape?
15       A.   This is a -- this is a photomodel
16   of the Escape, the accident Escape where we can
17   see the logo imprint of the Ford on it, of the
18   Ford F-250 on it.  So in the -- in the process
19   of doing our work for the rebuttal, we had to
20   make a photomodel of the Ford with a logo on
21   it.  We've already talked about that.
22       Q.   Right.
23       A.   And so then we made a measurement

Page 271

1    on here, and we got a little less than eleven
2    inches.
3        Q.   All right.  And is this the --
4    it's not a photograph that you put in the
5    photomodel.  It's a -- it's a point cloud,
6    correct, scan?
7        A.   You use the scan.  But you also
8    put in hundreds of photos.  And the --
9        Q.   Okay.
10       A.   If your scan is accurate and your
11   photos are decent, it can -- it can create a
12   photomodel, which is more than just a point
13   cloud.
14       Q.   I got you.  So it uses both the
15   point cloud and the photographs and all of that
16   combined?
17       A.   Yes.
18       Q.   Okay.  And then the software then
19   based upon you indicating the points will tell
20   you the 3D distance between the two points?
21       A.   Right.
22       Q.   And that's what the pink line
23   is -- is represents?

Page 272

1        A.   Yes.
2        Q.   On page two of the crash test
3    offset.
4        A.   Yes.
5        Q.   How did you determine the midpoint
6    of the Ford logo you can see in this
7    photograph?
8        A.   It's visually.  It could be a
9    little bit to the left of where it is.  But if
10   I missed it, I wanted to miss it a little bit,
11   you know, to the right.  So it's -- it's a
12   visual determination.  Trying to -- the bottom
13   of the arc in the left and the center of the
14   logo in the right because they are about the
15   same level and measure it.
16       Q.   Okay.  So -- so you didn't measure
17   the width of the Ford logo here and determine
18   the exact midpoint of the logo when you input
19   the points for the photomodel to do the
20   measure.  You just eyeballed it?
21       A.   Right.  I just clicked on the
22   center and then clicked on the bottom of the
23   arc on the left.  If somebody wants to do it

Page 273

1    again and come up with a little bit different
2    number, I'm okay with that.
3        Q.   Sure.  And then as far as the
4    bottom of the arc, you just eyeballed that.
5    That's in your mind an approximate bottom of
6    the middle of the arc of the F-250?
7        A.   Right.  If I were going to do it
8    again, I might move them both left about a
9    quarter of an inch, but it's still going to be
10   eleven inches.  Well, this is actually a little
11   less than eleven inches.  So it's going to be
12   right at eleven.
13       Q.   All right.  Did you undertake any
14   other methodology to determine the offset in
15   the subject crash?
16       A.   Other than using our scan, no.
17   But it's not written down or recorded.  It's
18   just clicking on a scan.  I used the scan of a
19   depo, say a twelve, and then I'm using this to
20   get a little less than eleven.  I'm -- I'm
21   convinced eleven is the right number.
22       Q.   All right.  What is the relevance
23   of the crash test offset not matching the

69 (Pages 270 - 273)

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 274

1  subject crash offset? Why is that relevant to
2  you?
3      A.    You're engaging less of the back
4  of the Escape, so you're still -- you're still
5  hitting, you know, at the frame level. But
6  you're engaging less of the back of the Escape.
7  So you know, it's -- it -- it probably
8  overstates the crush from that, just one
9  observation. And what we'd like to see is a --
10  is something that doesn't have unnecessary
11  variables. We have a lot of variables in the
12  crash test, too many to actually get a final
13  opinion out of anything other than that, hey,
14  it didn't override, which we already knew it
15  wasn't going to override, you know, just based
16  on the structure of the vehicles and their
17  original design. We didn't need a crash test
18  for that, but other -- that's -- that's what it
19  provides. Beyond that, I don't know that it
20  provides information.
21      Q.    Okay. And when you say it
22  probably overstates the crush, have you
23  undertaken any work to determine whether it

Page 275

1  does overstate the crush?
2      A.    Well, logic would say that it
3  would. But since we don't have a crash that
4  represents, you know, the proper elevation, the
5  proper over -- over -- overlap, all we can say
6  is that it probably does because as Mr. Grimes,
7  he confirmed that in his deposition. We know
8  that -- we know historically that the less
9  overlap we have, the more crush we have because
10  the width and the depth are the two things that
11  develop crush -- that determine crush. If we
12  have less width, we have more crush, because
13  they're mathematically related in the physics,
14  in the calculations that we -- we use in
15  accident reconstruction. So the formulas we
16  have state that there will be less -- will be
17  more crush in the test because it has less
18  offset or more offset.
19      Q.    And did you make any effort to
20  calculate the -- the increase in crush that you
21  say would be attributed to an increase in
22  offset?
23      A.    No, I have not.

Page 276

1      Q.    Okay. And so you're not able to
2  quantify the difference in crush that would be
3  caused by the alleged five plus or minus one
4  inch additional offset that occurred in the
5  crash test?
6      A.    No.
7      Q.    Okay. Hold on one second. I
8  thought somebody on here was sending me a chat.
9  So -- apparently not. So I'm sorry.
10      Is one way that you could make an effort to
11  quantify the difference in crush that would be
12  attributed to an increase in offset would be to
13  run an HVE simulation, use your exact
14  parameters that you used in your simulation,
15  and increase the offset and then see what the
16  program spit out as far as an increase in
17  crush?
18      A.    I don't know.
19      Q.    So you dont know if the software
20  would be able to tell you the difference in
21  crush based upon a difference in offset?
22      A.    Not to the level the crash test
23  would have done with accuracy. I think

Page 277

1  intuitively we all know there would be more
2  crush. But we don't know if it would be
3  representative. And we don't know if it would
4  be a reliable methodology because we've been
5  through that already. That's -- that's a -- a
6  simulation compared to a crash test. Grimes
7  used a crash test to try to compare the
8  accident. And now you're going to do a
9  complete new analysis to compare a simulation
10  to a crash test. That's -- that's not possible
11  to do sitting here. We've been through this.
12      Q.    Well, I'm not asking you about
13  that. I'm asking you, you could run an HVE
14  simulation with increased offset and compare
15  that to your other simulation, and so you'd be
16  comparing the exact identical simulations with
17  the only change being the offset. That's
18  possible. Correct?
19      A.    Nope. For the reasons we talked
20  about, I cannot agree with you on that.
21      Q.    Okay.
22      A.    Thank you.
23      Q.    Yeah. So it's not possible to run

70 (Pages 274 - 277)

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 278

1  your exact same simulation, but increase the
2  offset to 17 inches. That's not --
3        MS. CANNELLA: Objection. Asked
4  and answered multiple times for hours on end.
5        Q.  You can explain.
6        A.  I've answered that as good as I
7  can. I don't have any more to say. I mean --
8  I -- I do not -- I cannot say that we can do
9  that, no, for all of the reasons I've been
10 going over.
11       Q.  And therefore you cannot say
12 whether that would be an appropriate
13 methodology for verifying whether the HVE
14 software is a scientifically reliable
15 methodology for predicting crush?
16       A.  Pardon?
17       Q.  Yeah. If you can't say that any
18 variation in offset is necessarily going to be
19 a reliable HVE test, that's what you're saying
20 is that the only reliable HVE test you know of
21 or simulation you know of is the one you ran.
22 And if you change the offset, you can't verify
23 whether that simulation would be a reliable and

Page 279

1  accurate simulation?
2        MS. CANNELLA: Objection. He did
3  not say that the only reliable HVE he's ever
4  seen is the one that he ran.
5        Q.  All right. You can explain it.
6        MS. CANNELLA: What's the
7  question? I mean, object to the form of the
8  question. Misstates his testimony.
9        Q.  Go ahead. Answer it if you can.
10       MS. CANNELLA: No. Don't answer
11 it, Bryant. It doesn't -- it's not a
12 question -- it's not a question that makes any
13 sense because he never said that. So how can
14 he answer that if you're saying he said that
15 and he didn't say that.
16       MR. HILL: Are you instructing him
17 not to answer?
18       MS. CANNELLA: Yes, I'm
19 instructing him not to answer because it's
20 getting crazy. You keep telling him your --
21 it's your testimony that X, Y, Z and he doesn't
22 testify to those things. So ask him whatever
23 question you want to ask him without

Page 280

1  characterizing his testimony -- or
2  mischaracterizing it.
3        MR. HILL: I've asked him that.
4        Q.  Would a -- do you have an opinion
5  as to whether an HVE simulation run exactly the
6  way you ran the simulation in this case, your
7  amended simulation, with the only change being
8  to increase the offset to the offset that you
9  said occurred in the crash test, do you have an
10 opinion as to whether that simulation would be
11 a proper scientific methodology to evaluate
12 what the simulation would produce at that
13 different offset?
14       MS. CANNELLA: Object to the form
15 of the question. Asked and answered. Outside
16 the form -- the scope of his supplemental
17 testimony. He did not run an HVE on the
18 Exponent crash test, and he has explained
19 multiple times why he cannot tell you whether
20 it would be an accurate methodology as he sits
21 here today. This is a conversation we already
22 had, and you said you were done with this line.
23       MR. HILL: Yeah, I'm asking in a

Page 281

1  different way now. I'm -- I'm not talking
2  about comparing it to the crash test. All
3  right? I'm saying -- he says that there is a
4  differentiation in crush that occurs based upon
5  the level of offset. And I'm asking him, is it
6  his opinion that it's impossible to use HVE to
7  determine how much additional crush occurs per
8  a set distance of offset.
9        Q.  Is it your opinion that that's
10 impossible to use HVE for that type of
11 determination?
12       MS. CANNELLA: Same objections.
13       Q.  Go ahead.
14       A.  I answered the question. It's not
15 using HVE. I just used standard accident
16 reconstruction calculation methodologies for
17 crush and width. There is a relationship
18 between the two. And when width is decreased,
19 crush goes up by every formula that I've ever
20 seen written in accident reconstruction.
21    As for as using the simulation, I haven't
22 done that analysis and I'm totally
23 uncomfortable for the reasons we've been over

71 (Pages 278 - 281)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 282

1  many times already.  I cannot tell you that we
2  could use the simulation for that, the way
3  you're asking and I don't -- because that's
4  a -- that's a new analysis, and I'm not willing
5  to -- to state we can.  I'm not even willing to
6  start doing the analysis here.  But I did try
7  to give you some examples earlier, my concerns.
8    But no, I don't have an opinion about that.
9  And -- but I do have an opinion that decreasing
10  width -- increased width of overlap increases
11  crush.  And we know that because every single
12  crush formula that's ever been written that I'm
13  aware of that we use our calculators for,
14  would -- would show that there is a
15  relationship that when the width is -- is
16  decreased, the crush increases.
17    Q.    Would you agree that in order for
18  the HVE simulation to be a reliable methodology
19  as you've used in this case, that software
20  would need to follow that same relationship you
21  just mentioned that the calculations show as a
22  part of science, it would need to follow that
23  same methodology in order to mirror the actual

Page 283

1  science that you know of with regards to the
2  truck?
3    MS. CANNELLA:  Object to the form
4  of the question as vague and confusing.
5    Q.    Go ahead.
6    A.    In general we know that we'll
7  follow that generic methodology, but that's
8  generic.  In other words, but to apply it to a
9  particular crash test, which is what you're
10  asking me to do, you would have to go through a
11  whole process to see whether it was applicable
12  and reasonable.
13    Q.    I'm not --
14    A.    I'm sorry.  I haven't done that.
15  And so the answers I've given have been true
16  and accurate today.  We're not -- we understand
17  how the simulation works.  We understand how
18  the calculations work.  That's fine.  We just
19  can't make the leap -- and is it a leap you're
20  asking.
21    Q.    Well, I'm not asking you to
22  compare it to the crash test.  I'm asking a
23  simple -- I won't use the term simple, but

Page 284

1  could there be a scenario where HVE, as you
2  increase the offset, it doesn't match the
3  mathematics that show how much crush should
4  increase as you increase the offsets?
5    A.    You're asking a blind question
6  with information that I don't know what you're
7  asking about.  You won't even let me relate it
8  to the crash test.  So you know, we've -- we've
9  used it to change one variable, the height, so
10  that we got contact.  And I think it's very
11  robust for that near -- with -- with lots of
12  overlap between the vehicles.  That's what we
13  use it for.  Beyond that, all of these other
14  things, I -- I don't have any opinions about
15  those.  I can't help you.
16    Q.    Okay.
17    A.    But I can tell you that --  that,
18  you know, there is a relationship between crush
19  and width and the program will generally follow
20  that.  But there are other concerns that have
21  to be all addressed before we can start
22  agreeing to -- to what you're asking me to
23  agree to.  I can't do that.

Page 285

1    Q.    What is your basis for your
2  opinion that changing the height of the vehicle
3  allows HVE to be a robust simulation program
4  and to properly simulate the hypothetical crash
5  with the height being changed?  What's your
6  basis for that opinion?
7    MS. CANNELLA:  Object to the form
8  of the question as vague, confusing.
9    Q.    Go ahead.
10    A.    Because we now -- once we remove
11  the lift kit, we've got now a bumper level,
12  frame level to frame level, bumper level
13  impact.  The simulation program, I've been
14  using it since 19 -- 1991, so over 30 years for
15  things like this, and it's been acceptable
16  since for that period of time.  There's been
17  plenty of papers written to validate its
18  reasonableness.  It came with the crush
19  stiffness coefficients that were needed to do
20  it.  All I had to do was tell it the speed at
21  impact and I could verify that those speeds we
22  got delta-V's.  So -- so I have -- I'm
23  using it well within its constraints.  And I

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 286

1 don't have any concerns about how the vehicle
2 was contacted because I'm getting that good --
3 that good match up that I think would have
4 happened in the accident had it not been a --
5 not jacked up, but raised, lifted. So I think
6 I'm using the program exactly as it's supposed
7 to be used for -- for this particular purpose
8 and how I've seen it used before.
9      Q.   And if you change the offset, you
10 don't have an opinion as to whether you'd be
11 using the program exactly as it's designed to
12 be used?
13     A.   You'd have to go through the
14 analysis before you used it. It wouldn't be
15 right just to say, yeah, let's just go use it
16 for whatever -- you know, someone can ask a
17 question about it. I'd need to take the time
18 to look at it as an engineer. I mean, that's
19 the truth.
20     Q.   So if you changed the offset and
21 ran it, what would -- what kind of result would
22 you need to analyze or look at to decide as an
23 engineer whether it was still valid at the

Page 287

1 different offset level?
2          MS. CANNELLA: Objection. I'm
3 sorry, I feel like you're drawing this
4 objection, but don't answer it anymore. We're
5 done with this. I can point to the Court to
6 hours of this question over and over again.
7 And we're not doing it anymore.
8          MR. HILL: Are you instructing him
9 not to answer?
10         MS. CANNELLA: Yes, I am. It's
11 five o'clock. We've been going for -- since
12 ten o'clock this morning and we've had many,
13 many discussions about this exact topic.
14         MR. HILL: That's great. We'll
15 take it up with the Court. We've had hours of
16 discussions about it because he refuses to
17 answer the question, but that's fine.
18         MS. CANNELLA: I've even answered
19 it for you. I've rephrased -- rephrased what
20 he said. So I don't know what else you want,
21 Mr. Hill. This is a wild experience.
22         MR. HILL: It's...
23     Q.   How can you independently verify

Page 288

1 that HVE -- that your HVE simulation in this
2 case is accurate? Is there any way you know of
3 other than citing to the fact that you believe
4 there's articles that say it's a proper
5 software for this application? Is there
6 anything you can do beyond what you've read or
7 what others have said in order to test or
8 verify that your simulation was accurate?
9      A.   This is a tool that we commonly
10 use. It's generally accepted in the industry.
11 I'm using it simply as it would normally be
12 used in accident reconstruction to demonstrate
13 a -- a crash, to simulate a crash. There is
14 nothing special about what I'm doing. I've got
15 the shape of the vehicles. I have the crush
16 stiffness for the vehicles that came with the
17 program. I'm hitting it at a known speed. And
18 i'm producing a known delta-V. It is -- unless
19 you call into question the whole program, which
20 it's been used for -- I've been using it for 30
21 years and never had a problem using it or
22 having it utilized. I did vet it before I used
23 it. I made sure it was appropriate. There's

Page 289

1 other programs that I might use for other types
2 of things. You know, you're -- it's kind of
3 like what you did earlier when we were asked
4 about how can you tell where an impact was.
5 You look at maximum engagement crush. Well,
6 that's what we use. We don't get to the
7 vehicle's hit. We use maximum engagement crush
8 and we follow generally accepted principles.
9 It's generally accepted to use computer
10 simulations like HVE, S-Mac, SIMON in the
11 industry. It's one of our normal calculation
12 tools just like a calculator is a normal
13 calculation tool. If it had not been generally
14 accepted, then I wouldn't be using it. But we
15 did it by hand or on a calculator. We got a
16 crush level. Then we did it with a simulation
17 program. We got different results. And for
18 mine I'm using the higher of the two. I'm
19 using it as just an alternative calculation
20 methodology, which is appropriate. So I
21 believe it's reasonably accurate. Not
22 perfectly, but I believe it's reasonably
23 accurate for what it was designed to be used

73 (Pages 286 - 289)

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 290

1  for. And I think that if we -- if I go do the
2  research, I'll find plenty of papers that show
3  that to you. I've been using it for 30 years.
4      Q.   Are there any other simulation
5  software programs you could use other than HVE?
6      A.   Let's do something else.
7  Mr. Grimes, I think, claims to be an instructor
8  in it. Who is he instructing -- if it's -- if
9  it's not a valid tool for accident
10 reconstruction, why is he using it? Why is he
11 instructing it? It's -- he's used it. He
12 knows it's valid. It's a good tool for the
13 purpose. His only complaint was that it was an
14 override. I can show you why it's not an
15 override. It's clearly not an override. And
16 if -- if you take his objection away that it's
17 an override, then he is as far as I can tell
18 agreeing to use it because he had no other
19 objection in his deposition to it.
20     Q.   All right. Did you see his
21 testimony where he unequivocally testified that
22 HVE is not an appropriate software to use in a
23 situation like this where you have a complex

Page 291

1  crush situation? He clearly gave the opinion
2  that when he teaches classes on this, he
3  instructs people not to use it in this
4  environment?
5      A.   Well, that's a conversation you
6  and him had because he didn't say that under
7  oath in the deposition.
8      Q.   I would ask you to go back and
9  read it. Are you aware of any other simulation
10 software that you could have used to run your
11 simulations in this case?
12     A.   No.
13     Q.   Okay. And I want to go back to my
14 question, and this is different. It's -- I
15 understand all of your basis to believe that
16 HVE is an appropriate simulation tool for you
17 to use to test your hypothetical crash at a
18 different height. I understand all of that.
19 My question is, is there any independent way
20 for you to verify that your simulation in this
21 case was accurate?
22     A.   Well, is there an independent way
23 for me to verify that the hand calculations we

Page 292

1  do every day that are based on the works of
2  Campbell and others in the past, well, I'd have
3  to go back and do all of the work. That --
4  that groundwork has been laid by others,
5  otherwise this simulation program wouldn't
6  be -- having been used by me for 30 years and
7  others in the industry, like Mr. Grimes. I'm
8  not going to go back and redo all of the
9  validation of the program. That's been done
10 by others. Just like the crush calculations
11 that we normally do are and the methodologies
12 that we use in the book over there. The book
13 behind me says HVE is a robust method. You
14 know, I'm -- I'm using a tool that's generally
15 accepted in the industry in a way that's
16 generally accepted in the industry. I don't
17 know what else I -- I mean, I'm not going to go
18 back and -- and redo all of that history of
19 work and research. And I've paid people to
20 train me in using it.
21     Q.   Do you know whether you can run
22 a -- other HVE simulation and compare it to
23 yours and use that as a way to validate the

Page 293

1  accuracy of your simulation?
2      A.   Oh, that's -- that's like --
3  that's a broad, broad can of worms. You know,
4  I -- there's -- there's about 400 answers to
5  that question. I'm not sure what you're --
6  what you're poking at.
7      Q.   All right. I'll put it this way.
8  If we ran an actual crash test and we ran it
9  identical to your simulation in this case where
10 the speeds were identical to your simulation,
11 the weights, everything was identical, the
12 impact point offset identical, what should the
13 result of that actual crash test be? Should it
14 mirror your simulation?
15     A.   It should be whatever the answer
16 is.
17     Q.   So you can't --
18     A.   The simulation --
19     Q.   -- state whether -- I'm sorry. I
20 thought you finished.
21     A.   The simulations is -- all
22 calculations are simulations. All simulations
23 are approximations of reality. The -- the

74 (Pages 290 - 293)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 294

1  results of the test would be the results of the
2  test if someone would do it that way.  And then
3  you'd have those results, and you wouldn't need
4  the simulation.
5      Q.   Okay.  And so if the results of
6  that actual crash test were different than the
7  simulation, you would defer to the actual crash
8  test, and you wouldn't need the simulator?
9      A.   If it was as you said, yes.
10     Q.   Okay.  And if it varied from the
11 actual crash test, would that be evidence to
12 you that the simulation was not scientifically
13 reliable in predicting the real world crash?
14     A.   No.  A simulation is exactly that.
15 It's a simulation.  It's -- it's not the real
16 world.  If you could actually -- and let's just
17 be clear here, you are not referring to the
18 test run by Grimes and --
19     Q.   No, I'm not.
20     A.   Okay.  So if someone were to
21 actually do one along the certain path, it
22 wouldn't invalidate the simulation because the
23 simulation is -- is what it is.  It's an

Page 295

1  approximation of reality.  It's not reality.
2  But if you had reality, you would use reality.
3      Q.   Okay.
4          MR. HILL:  All right.  I believe
5  that's all I have.  Thank you, Mr. Buchner.
6  Sorry if we got a little testy there.  That's
7  normally not my style.  But I -- I apologize
8  for that.  And I -- I know in the future I will
9  try to avoid that.  It was a little bit of
10 making sure you heard me and a little bit of
11 frustration.  I appreciate your time, and --
12 and thank you.
13         THE WITNESS:  Wimbledon is going
14 on right now, and those -- those competitors
15 are intense and they do their job well and then
16 they shake hands at the end.  I'm -- I'm more
17 than happy to have talked to you today.
18         MS. CANNELLA:  Can we take a break
19 and let me just see if I have anything?
20         MR. HILL:  Sure.  I need to use
21 the restroom anyway.  So...
22         THE VIDEOGRAPHER:  The time is
23 5:19 p.m.  We're now off the record.

Page 296

1      (A break was taken.)
2          THE VIDEOGRAPHER:  The time is
3  5:34 p.m.  We're back on the record.
4
5          EXAMINATION
6  BY MS. CANNELLA:
7      Q.   Mr. Buchner, did you do the work
8  that's reflected in your May 2024 report to
9  formulate new opinions or to show the work and
10 how you developed opinions in your original
11 report?
12     A.   Our amended report was just to
13 provide the basis for the opinions that were
14 already given.  There aren't any new opinions
15 in there.  It was just -- just trying to make
16 sure we had the supporting materials.
17     Q.   And did your opinions base -- did
18 your opinions change based on what was
19 disclosed in May?
20     A.   No.
21     Q.   All right.  When you were talking
22 about working in the simulation files, can you
23 explain when you run a simulation and you run

Page 297

1  different iterations of it, is that akin to,
2  like, editing in a document?  Like, in other
3  words, when you run a simulation, do you create
4  a new -- well, strike that.  That's a bad
5  question.
6   When you run a simulation, are you creating
7  a new thing or are you just editing the -- the
8  inputs that are on the program?
9      A.   Well, you have to open it.  And
10 then once you open it, if you're typing a
11 letter, every paragraph you type is new.  It's
12 not -- it's -- just every keystroke is new.
13 You have to build it and work through it.  Same
14 thing with simulation.  You have to start with,
15 you know, opening it up, getting the vehicles
16 imported, positioning the vehicles, telling the
17 program what speeds to use, updating the --
18 it's just an ongoing typing process, you know,
19 that doesn't -- you know, you just keep -- keep
20 inputting the data until you get it all in
21 there.  And it runs using the proper data, and
22 then you save it.
23     Q.   So if we were to equate it to

75 (Pages 294 - 297)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 298

1  using a Word software and, you know, we were
2  editing a document as we go along, we could
3  just delete a paragraph or rewrite a paragraph,
4  for example, we haven't created an entirely new
5  document when we do that; we're just editing
6  that document?
7      A.  Right.  That's the way it works.
8      Q.  Okay.  So you're kind of inputting
9  different data points or assumptions and then
10 seeing what happens in the outcome?
11     A.  Well, right.  You're -- you're not
12 necessarily putting in different assumptions.
13 You're -- you're trying to get the data
14 properly input, but it takes time to do that.
15 You do make mistakes too.  I mean sometimes the
16 car goes backwards because you've got the
17 velocity stuck in the wrong way.  So you got to
18 fix that problem.
19     Q.  Were any files deleted that you
20 know of?
21     A.  No.  Other than the -- somehow
22 the -- the original run file or the final run
23 file, I can't get it.  I don't know where it

Page 299

1  is.  But there's no intent to delete any files.
2  It's just updating and keep running.  Every now
3  and then a backup will get made or something
4  like that.  We're still just working on the
5  same file.
6      Q.  Right.  Okay.  The -- there was
7  some discussion about how much -- or that the
8  fluid had leaked out of the radiator in the
9  subject -- in the subject F-250 when you
10 weighed it, and the weight of the glass that
11 was broken, and so there was some broken shards
12 in the car and some broken shards out of the
13 car.  Can you talk a little bit about
14 differences in weight and when there's kind of
15 a tipping point of -- of how much weight
16 matters when there's variations like that?
17     A.  Well, the vehicles weigh thousands
18 of pounds.  You know, we normally don't even
19 consider the -- the change of weight in a gas
20 tank to be particularly critical.  And but as
21 far as glass and, you know, radiator fluid,
22 that's -- I don't know that I've ever added
23 water in for a leaking radiator fluid because

Page 300

1  it's -- it's, you know, 20 to 30 pounds worth
2  of fluid usually.  To a big F-250, maybe it's a
3  hair more.  But our calculations are not that
4  precise.  We're -- we're looking, you know, for
5  a reasonable answer.
6      Now, we did weigh the vehicles, so it means
7  we are very close to the weight of the
8  vehicles.  It's much better than using
9  specifications.  When you use specifications
10 they have one weight for virtually every
11 vehicle that was made that year, you know.
12 So -- it's -- it's -- we've already started out
13 being more accurate because we actually have
14 the vehicles with the various -- the type of
15 battery.  The type of battery can change the
16 weight of a car.  We don't ever change the type
17 of battery.  But we weigh the car with the
18 battery that's in it, in it.  So you know,
19 changes of a few hundred pounds usually are
20 inconsequential.  If we think they are
21 consequential, then we'll be, you know, will be
22 more robust.  Usually a few hundred pounds is
23 -- is inconsequential.

Page 301

1      Q.  The differences that the
2  Rough Country lawyer asked you about between
3  the HVE and the subject wreck or subject
4  vehicles include the fact that the HVE didn't
5  have a sunroof in that design using -- and I
6  think you spoke to this to some degree, but
7  using the sunroof or the -- the vehicle without
8  the sunroof would actually make the results of
9  your analysis less favorable to Plaintiffs.
10 Correct?  In other words, it would mean -- it
11 would mean that there would be more crush in
12 the HVE than if you used a structure that had
13 that extra support in it?
14     A.  Well, HVE does not have the
15 capability to include or exclude a sunroof
16 specifically.  What it -- the way it's included
17 is with the crush stiffness coefficients.  So
18 you know, we would -- so that's actually a
19 user -- we can put one in that looks like it's
20 got a sunroof.  But HVE is really using the
21 data from crash tests or the crush stiffness
22 coefficients derived from past accidents or
23 crash tests to -- to -- to do a calculation

76 (Pages 298 - 301)

G. Bryant Buchner                      July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 302

1  model.  It doesn't -- we tell it about those
2  things.  The program doesn't know about those
3  things.  But to know whether or not our data
4  included a sunroof or not specifically, we'd
5  need to go back -- you'd have to go back to the
6  original crash tests and things.  But in this
7  case, HVE has the number in there.  It's robust
8  enough for what we were doing with or without.
9  But if I were going to run a crash test, I
10 would try to get the same vehicle and use it
11 because the roof does get involved in a crash
12 test.
13     Q.   The -- I was sitting here trying
14 to think when I've seen HVE used by automakers.
15 And have you seen automakers use HVE to
16 simulate NTSA, federal FMVSS testing, dynamic
17 testing?
18     A.   Yes.  Yes, I've seen studies done
19 using it to try to predict what will happen
20 in -- in accidents or crashes of -- of designed
21 like various crash test and whatnot.
22     Q.   Okay.  And the government
23 accepts -- accepts the certifications based on

Page 303

1  HVE-type testing?
2      A.   Right.  The government doesn't
3  require a crash test.  They just require the
4  manufacturer to certify that if they do, do the
5  crash test, it will pass it.  And the
6  manufacturers have lots of tools at that.  And
7  HVE is one of those types of tools, just like
8  the government has HVE available to do a study
9  if they want to avoid all of the expenses of
10 doing actual crash testing.  So I'm pretty sure
11 all of that is common in the industry.  I
12 didn't pull any reference to that.  I didn't
13 expect that to be an issue here.  But yes, it
14 can be used for those types of things.  And in
15 my opinion, it has.
16     Q.   Okay.  And I'm going to mark the
17 visual that Rough Country showed you as
18 Plaintiff's Exhibit 1 to your deposition.  I
19 can share my screen and pull that up.  One
20 second.  Okay.  Can you see that?
21         (Plaintiff's Exhibit Number 1
22          is marked for identification.)
23     A.   I can.

Page 304

1      Q.   All right.  And so we'll mark that
2  as Plaintiff's Exhibit 1.
3          MS. CANNELLA:  That's all I have.
4          MR. HILL:  That's all the
5  questions you have, you said?
6          MS. CANNELLA:  Yes.
7          MR. HILL:  All right.  I've just
8  got one quick follow-up based upon what you
9  just asked.
10
11         EXAMINATION CONTINUED
12 BY MR. HILL:
13     Q.   In this case, Mr. Buchner, do you
14 intend to give any opinion as to whether
15 Rough Country could have used HVE prior to this
16 incident to simulate crashes involving vehicles
17 with their lift kits in place?
18     A.   I know they could have considered
19 it.  I don't know if they could have.  I'd have
20 to do a little consideration and come up with
21 an exact answer.  But it's one of the tools
22 that is available for consideration, yes.
23     Q.   I believe you've testified that

Page 305

1  you did not use HVE to simulate the actual
2  crash in this case because the override would
3  prevent the program from being designed as
4  used, which is when there's bumper-to-bumper or
5  structure-to-structure impact.
6          MS. CANNELLA:  This is outside the
7  scope of the supplemental report.
8      Q.   Go ahead.
9      A.   That's not exactly --
10         MS. CANNELLA:  There's no
11 question.
12     A.   Okay.  I don't think that that's
13 what I said, but thank you.
14     Q.   Well, was there any testimony that
15 you gave in your original deposition regarding
16 the usage of HVE that you intend to change
17 based upon your supplemental work in this case
18 and since the time of your first deposition?
19         MS. CANNELLA:  Object to the form
20 of the question.  It's vague.
21     A.   Yeah, I -- I actually haven't -- I
22 can't tell you exactly what I said in the first
23 deposition.

77 (Pages 302 - 305)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 306

1    Q.   Right.  But as we -- go ahead.
2    Sorry.  I thought you were finished.
3        A.   I did the best I could to answer
4    the questions at the time.  But I don't -- I
5    don't have any comments one way or the other as
6    I sit here.
7        Q.   Okay.  And how -- how do you
8    define a couple hundred pounds?  Just to make
9    sure there's no discrepancy there, in answering
10   those -- in all those questions, I believe you
11   said a couple hundred pounds this way or that
12   way is not a weight that would concern you.
13      What -- what is a couple hundred pounds?
14       A.   I thought I actually said a few
15   hundred pounds.
16       Q.   Yeah.  So what's a few.  Yep.
17   Thank you for correcting me.
18       A.   Just starting out for vehicles of
19   this size, you know, 300 pounds -- if it was
20   getting close to 300 pounds, I might start
21   worrying about it.  But you know, I don't -- in
22   this case we tried to get the -- the weights
23   more accurate.  That's why we weighed it.  I

Page 307

1    had those vehicles weighed.  I made sure they
2    were weighed so we had the best starting point
3    we could.  So little things like a lit bit of
4    radiator fluid is -- is inconsequential.
5    Because if you just use the specs, you don't
6    know how far off you are when you're starting.
7    The specs are -- in my experience, with all the
8    number of vehicles that I have weighed, I've
9    had them off over a thousand pounds.  So you
10   know, in this case I wanted it close.  I wanted
11   it within, you know, one or two hundred pounds
12   for sure.  So we -- we weighed them and then
13   added in reasonable weights.
14       Q.   Sure.
15       A.   But I don't have an exact number.
16   But we're -- we're close enough for what I've
17   done it -- for the work that I've done.  I'm
18   sure of that.
19       Q.   Sure.  So if the weights are
20   within 200 pounds, you would consider that to
21   be accurate enough -- accurate enough from a
22   weight perspective to properly test the
23   vehicles?

Page 308

1        A.   Yeah.  But there's no -- there's
2    no one exact right answer.  I mean, if it's
3    a -- if it's a motor scooter off by 200 pounds,
4    we've got a real problem.  If it's a tractor
5    trailer off by 200 pounds, it's more than
6    irrelevant --
7        Q.   Well, I'm talking about vehicles
8    in this case.
9        A.   I know.  I know.  But we've got
10   one really big vehicle and one smaller vehicle.
11   So you know, the big vehicle, you can have much
12   larger discrepancies and it's irrelevant than
13   the smaller vehicle.  So there isn't one answer
14   for this.  We want to be close.  We like to
15   be -- a hundred pounds I'm not even going to
16   bat an eye at.  Two hundred pounds, that's
17   normal between experts to be off a couple
18   hundred pounds.  I'm not arguing about that.  I
19   don't think Mr. Grimes is either.  He says our
20   weights are different but our weight ratios
21   are, you know, very close to the same.  You
22   know, we have a depth of knowledge that's
23   greater than just 200 pounds is the go or

Page 309

1    no-go.  It's not a pass/fail.  Get it
2    reasonably close.  And at a few hundred pounds,
3    that's generally always reasonably close.
4        Q.   Okay.  Great.
5            MR. HILL:  Thank you for your
6    time.  That's all I have.
7            THE WITNESS:  Okay.
8            THE VIDEOGRAPHER:  Anything
9    further?
10           MS. CANNELLA:  No.
11           THE VIDEOGRAPHER:  All right.
12   This concludes the videotaped deposition.
13   We're off the record at 5:48 p.m.
14           MS. CANNELLA:  Do you want to read
15   and sign?
16           THE WITNESS:  I want to read.
17
18
19    (The deposition ended at 5:50 p.m. EST.)
20
21
22
23

78 (Pages 306 - 309)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 310

1           REPORTER'S CERTIFICATE
2    STATE OF ALABAMA,
3    BALDWIN COUNTY,
4           I, Paul Morse, Certified Court Reporter
5    and Commissioner for the State of Alabama at
6    Large, do hereby certify that the above and
7    foregoing proceedings was taken down by me by
8    stenographic means, and that the content herein
9    was produced in transcript form by computer aid
10   under my supervision, and that the foregoing
11   represents, to the best of my ability, a true
12   and correct transcript of the proceedings
13   occurring on said date and at said time.
14          I further certify that I am neither of
15   kin nor of counsel to the parties to the action
16   nor in any manner interested in the result of
17   said case.
18
19
20
21
22        Paul Morse, CCR
23        ACCR #588 Expires 9/30/24

Page 311

1    Tedra L. Cannella
2    tedra@cannellasnyder.com
3               August 2, 2024
4    RE: Bryson, Santana And Joshua v. Rough Country, LLC
5    7/11/2024, G. Bryant Buchner (#6793607)
6       The above-referenced transcript is available for
7    review.
8       Within the applicable timeframe, the witness should
9    read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   cs-southeast@veritext.com.
16      Return completed errata within 30 days from
17   receipt of testimony.
18      If the witness fails to do so within the time
19   allotted, the transcript may be used as if signed.
20
21
22          Yours,
23          Veritext Legal Solutions
24
25

Page 312

1    Bryson, Santana And Joshua v. Rough Country, LLC
2    G. Bryant Buchner (#6793607)
3            E R R A T A  S H E E T
4    PAGE_____ LINE_____ CHANGE_____
5    _____
6    REASON_____
7    PAGE_____ LINE_____ CHANGE_____
8    _____
9    REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____     _____
24   G. Bryant Buchner         Date
25

Page 313

1    Bryson, Santana And Joshua v. Rough Country, LLC
2    G. Bryant Buchner (#6793607)
3         ACKNOWLEDGEMENT OF DEPONENT
4       I, G. Bryant Buchner, do hereby declare that I
5    have read the foregoing transcript, I have made any
6    corrections, additions, or changes I deemed necessary as
7    noted above to be appended hereto, and that the same is
8    a true, correct and complete transcript of the testimony
9    given by me.
10
11   _____     _____
12   G. Bryant Buchner         Date
13   *If notary is required
14       SUBSCRIBED AND SWORN TO BEFORE ME THIS
15       _____ DAY OF _____, 20___.
16
17
18       _____
19       NOTARY PUBLIC
20
21
22
23
24
25

79 (Pages 310 - 313)

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[& - 250]**                                                        Page 1

**&**

**&**   4:11

**0**

**0.04**   11:19
    52:11
**0.1**   269:9
**0.35**   67:1,2
**0.45**   52:12
**0.5**   162:2,4
**0.7**   67:2
**0.8**   38:22
**0.9**   269:8
**017**   1:5
**09348**   7:3
**09377**   7:3
**09487**   251:8

**1**

**1**   3:13 7:4,6
    201:21 303:18
    303:21 304:2
**1.1**   100:6
**1.25**   207:1,6,15
**1.42**   206:23
    207:4,15
**1.5**   202:2
**10.9**   202:10
    231:13 237:13
    238:13 256:7
    261:21 262:8
    263:7,15 264:9
**10.9.**   225:5
    237:14,16,19
    263:17 266:21

**100**   82:9
**101**   256:17
**10519**   249:21
    250:4,12
**10:00**   5:7
**10:15**   5:12
**11**   1:18 5:12
    202:10 231:15
    238:14 256:8
    267:1 269:1,2
**11:13**   61:10
**11:28**   61:13
**12**   28:6 37:23
    54:12 60:23
    89:8 269:2
**12:15**   89:12
**13**   26:3 135:4,9
    135:22 136:1,6
    254:17 255:10
**14**   105:21
    146:12 178:1
**15**   255:6,6,13
**150**   202:1
**16**   199:2 207:3
    220:12,14
    226:8 228:19
    229:12,20
    230:13 231:19
    232:4,6 236:6
    237:21 238:22
    248:14,16
    249:3 251:5,13
    251:13 263:14
    263:18

**17**   52:19,22
    54:20,23,23
    55:12 57:2,3
    57:15 58:21
    59:19,20
    251:21,22
    252:1 278:2
**17.00**   53:6,23
    54:18
**17.92**   39:5
**170**   79:13
**178**   3:14
**17:10**   46:12
**18**   213:19
    214:10
**18378**   310:21
**186**   3:15
**19**   285:14
**1991**   285:14
**1:03**   137:5
**1:13**   137:8
**1:57**   176:10

**2**

**2**   3:14 178:1,8
    238:7 311:3
**20**   96:2 255:4,4
    258:4,20 300:1
    313:15
**200**   307:20
    308:3,5,23
**2021**   53:9
    58:21
**2023**   15:8 16:9
    28:7 35:12
    37:23 54:14

**57:10 58:22
    59:8 66:6
    92:19
**2024**   1:18 5:12
    6:11 7:2 27:18
    46:12 53:2
    141:23 146:13
    178:1 296:8
    311:3
**21**   257:2
**23**   8:1
**2400**   4:12
**250**   39:6 62:1
    63:3,23 65:8
    66:14,16 67:9
    74:21 76:23
    77:5,12,23
    78:6,19,20
    79:4 80:13,17
    85:12 88:3,9
    88:13 95:16,17
    99:4 104:18
    151:22 152:6,9
    152:18 153:2,4
    160:11 161:14
    162:19 178:7
    179:14,15
    181:17 206:18
    206:20 208:11
    208:16 209:17
    209:18 212:17
    213:23 214:8
    215:5 221:9
    223:23 224:2,5
    224:16 229:22

G. Bryant Buchner
Bryson, Santana and Joshua v. Rough Country, LLC

July 11, 2024

**[250 - absolutely]**

Page 2

237:10 255:15
270:18 273:6
299:9 300:2
**250's**  152:23
**251**  3:16
**29**  77:2,10
**296**  3:6
**2:07**  176:13
**2:15**  183:1
**2:18**  183:4
**2:22**  1:5
**2:33**  195:18
**2:56**  195:21

**3**

**3**  3:15 186:7,9
**3,410**  82:21
**30**  285:14
288:20 290:3
292:6 300:1
311:16
**300**  306:19,20
**30030**  4:16,20
**303**  3:17
**30326**  4:12
**304**  3:7
**315**  4:15,19
**3344**  4:11
**3a**  177:17
196:3
**3b**  178:3
**3d**  73:20
178:15 198:21
198:22 241:11
271:20

**4**

**4**  3:16 251:10
**400**  293:4
**43.9**  161:16
162:2 164:8,8
164:9,21
**43.9.**  170:23
**44**  163:13,21
164:20 165:4,7
171:1
**45**  100:17,18
101:8 132:4
144:19 150:20
220:14
**49.9**  100:4
101:22 163:8
163:23 164:8
171:2
**4:11**  260:16
**4:39**  260:19

**5**

**5.92**  207:10
**50**  162:17
164:8
**50s**  161:16
**51**  88:9,14
100:5 103:1
162:18 163:1
163:11 164:10
164:15,18
166:14,21
167:4 168:14
171:19
**588**  310:23

**5:19**  295:23
**5:34**  296:3
**5:48**  309:13
**5:50**  309:19
**5a**  179:7
**5b**  178:22
179:7 200:2

**6**

**6**  3:5 206:2
238:7
**6793607**  311:5
312:2 313:2

**7**

**7**  3:13
**7/11/2024**
311:5
**75**  201:15,21
**75th**  201:17

**8**

**8**  6:11 7:2
46:12 48:1
53:2 58:9
141:23
**8,040**  78:21
80:20
**885**  4:16,20

**9**

**9/30/24**  310:23
**9349**  37:19
**9376**  72:13,16
**94**  225:18
**9401**  161:5
**9404**  183:7

**9406**  200:1
206:4
**9407**  206:2
**9454**  193:13
**9459**  188:19
**9499**  254:21
**9501**  255:13
**9506**  258:5
**9508**  251:8

**a**

**a.m.**  5:7,12
61:10,13
**ability**  14:22
145:3 233:11
310:11
**able**  6:21 41:7
41:9 93:12
103:14 110:12
140:13 145:18
152:17,19,20
156:10 185:17
187:3 191:21
217:5 237:19
267:2 276:1,20
**above**  5:8 33:9
34:19 73:23
188:16,22
196:6,9 209:16
221:19 224:3
246:1 310:6
311:6 313:7
**absolutely**
143:22 174:15
191:14

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[absorbing - actually]**                          Page 3

| | | | |
|---|---|---|---|
| **absorbing** | 149:18 150:4,8 | 290:9 | **acknowledge...** |
| 110:3 | 150:8,11,14 | **accidents** | 313:3 |
| **absorption** | 151:13,15 | 109:18 136:2 | **acknowledg...** |
| 153:3 | 153:15 154:1 | 139:14 143:21 | 311:12 |
| **acceptable** | 154:20 155:10 | 150:9 301:22 | **acting** 5:2 |
| 285:15 | 155:20 157:10 | 302:20 | **action** 310:15 |
| **accepted** | 157:13 161:10 | **account** 75:18 | **actual** 17:2,5,8 |
| 288:10 289:8,9 | 161:13 162:17 | 79:11 80:12 | 17:23 29:20 |
| 289:14 292:15 | 163:21 164:9 | 81:14 84:14 | 33:12 37:11 |
| 292:16 | 165:4,7,13,16 | 85:3,3,12 | 49:4 62:15 |
| **accepting** | 166:1,9,21,23 | 91:12 207:19 | 75:19 79:22 |
| 182:19 204:6 | 168:2 169:20 | **accounted** 81:7 | 108:15 113:6 |
| **accepts** 302:23 | 170:1,14,16 | 84:20,21 | 117:23 148:18 |
| 302:23 | 171:1 172:5,9 | **accr** 310:23 | 166:9,23 168:2 |
| **access** 33:12,19 | 172:18,20 | **accuracy** | 169:20 170:14 |
| **accident** 9:20 | 173:2 177:15 | 276:23 293:1 | 170:18,19 |
| 42:11 43:4,12 | 179:16 180:4,6 | 311:9 | 171:21 172:8 |
| 75:19 76:19 | 180:13,14 | **accurate** 16:19 | 173:2 200:21 |
| 81:4,19 83:17 | 185:19 193:12 | 22:3 37:10 | 211:9 212:2 |
| 84:11 85:8 | 200:16 201:3 | 39:3,17 41:20 | 249:5 250:17 |
| 88:14 93:14 | 204:14 246:18 | 43:16 46:22 | 250:19 251:7 |
| 94:20 95:22 | 246:19,21 | 50:20 51:4,12 | 257:11,19 |
| 101:5,6 102:20 | 247:12 251:23 | 51:13,14,15 | 262:7 263:3,4 |
| 106:21 107:8 | 252:6 253:1 | 123:8 129:15 | 264:15,16,17 |
| 107:21,23 | 254:5 255:8,14 | 140:11 219:14 | 265:7 282:23 |
| 108:4,5,19,19 | 255:16,23 | 243:12 263:10 | 293:8,13 294:6 |
| 109:1,14 | 256:2,11,16 | 267:3 271:10 | 294:7,11 |
| 114:14,23 | 257:12,20 | 279:1 280:20 | 303:10 305:1 |
| 118:16 119:10 | 258:21 259:13 | 283:16 288:2,8 | **actually** 14:7 |
| 119:11 121:2 | 261:2,3 262:19 | 289:21,23 | 15:17 16:8,15 |
| 122:21 123:18 | 264:4,5,7 | 291:21 300:13 | 17:8 22:2 30:9 |
| 124:1 130:2 | 265:2 270:16 | 306:23 307:21 | 31:2,8 33:11 |
| 132:3,4 133:15 | 275:15 277:8 | 307:21 | 34:7 47:2 |
| 135:23 136:18 | 281:15,20 | **accurately** | 53:16,21 68:13 |
| 147:13,18,23 | 286:4 288:12 | 51:22 215:14 | 68:18 79:18,22 |

**[actually - analysis]**                                              Page 4

| | | | |
|---|---|---|---|
| 81:21 82:14 | 276:4 281:7 | 263:21 277:20 | **allegation** |
| 84:23 86:6 | **additions** 313:6 | 282:17 284:23 | 106:3 |
| 87:13 102:12 | **addressed** | **agreed** 2:1,8,16 | **alleged** 276:3 |
| 114:17 120:6 | 284:21 | 50:3,14 161:3 | **allotted** 311:19 |
| 122:10,15 | **adjust** 56:13,14 | **agreeing** | **allow** 79:10,17 |
| 132:1 133:3 | **adjustments** | 284:22 290:18 | 91:18 207:23 |
| 139:5 142:1 | 31:13 46:21 | **agrees** 154:14 | 215:12 216:2 |
| 143:23 148:7 | **admissible** | **ahead** 29:11 | **allowed** 97:20 |
| 148:19 153:4 | 138:18 139:10 | 102:6 108:2 | **allows** 136:5 |
| 156:1 163:10 | 140:4 | 111:21 112:3 | 285:3 |
| 163:18 166:11 | **admit** 138:15 | 114:3 116:6 | **alluded** 23:13 |
| 167:15 174:22 | **admits** 114:23 | 117:18 120:19 | 24:11 50:8 |
| 177:2 180:10 | **advantage** 88:3 | 124:17 131:21 | **alternative** |
| 194:10 199:5 | 150:19 | 132:14 140:21 | 289:19 |
| 200:16 220:8 | **advise** 34:23 | 176:15 224:6 | **amended** 7:8 |
| 222:1 230:5 | **affect** 131:22 | 229:3 240:20 | 7:12,14 15:6 |
| 233:9 246:23 | **affects** 118:21 | 251:6 279:9 | 30:19 51:20 |
| 255:11 265:17 | **aggressiveness** | 281:13 283:5 | 52:4,15 61:19 |
| 266:10 273:10 | 138:2 | 285:9 305:8 | 66:15 84:5 |
| 274:12 294:16 | **ago** 86:7 112:5 | 306:1 | 85:21 142:7 |
| 294:21 300:13 | 192:1,8 | **aid** 186:21 | 249:17 280:7 |
| 301:8,18 | **agree** 57:6 | 310:9 | 296:12 |
| 305:21 306:14 | 58:17 77:1 | **air** 129:11 | **amount** 51:5 |
| **add** 79:13 83:2 | 84:12 92:22 | **akin** 297:1 | 80:22 148:18 |
| 205:10 | 96:4 99:5,16 | **al** 1:7 | 163:16 168:11 |
| **added** 79:2 | 100:8,13 | **alabama** 5:2 | 168:14 201:14 |
| 80:5 85:16 | 108:10 122:6 | 310:2,5 | 201:21 |
| 193:23 206:14 | 123:22 125:7 | **align** 202:5 | **analyses** 213:1 |
| 227:13 299:22 | 140:12 141:1 | **aligned** 204:1 | **analysis** 9:3,5 |
| 307:13 | 143:17 154:1 | 235:22 236:16 | 43:12 88:5 |
| **adding** 40:21 | 162:15 176:8 | 236:20 237:6 | 102:12 107:9 |
| 212:21 | 179:14,23 | **alignment** | 108:12 111:15 |
| **additional** 59:9 | 181:3,16,23 | 201:9 228:5 | 116:12 119:12 |
| 79:11 146:18 | 191:5 212:4 | 230:7,8 | 119:13 127:15 |
| 251:19 262:19 | 213:13 233:6,9 | | 129:9,22,23 |

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[analysis - appreciate]**                                    Page 5

132:23 134:12
134:15,18
135:21 148:12
156:10 184:3
210:22 211:2
212:16 213:10
214:8,14
216:15 217:13
237:16 264:6
277:9 281:22
282:4,6 286:14
301:9
**analyze**  108:11
108:15 143:5,6
206:9 256:20
286:22
**analyzed**  119:7
245:18
**analyzing**
108:18 122:3
135:23 144:4
183:17 186:16
209:10
**anchored**
236:23 237:23
**angle**  250:6
**animal**  109:1
**answer**  16:23
29:13 30:6,13
36:19 40:6
41:2,3,4 47:10
49:13,17 50:13
50:19,23 64:18
65:14 95:2
102:15 105:15

111:13 117:4,9
117:11 118:22
119:3,15,23
120:1,11,13
121:12,14,16
121:18,18,20
121:22 123:14
124:7 125:2,6
126:1,3 127:9
130:15,20
132:6,12,17
133:4,7,12,14
133:23 134:5
134:14,17,23
135:6 136:10
136:12 137:18
137:20 140:6,9
140:22 143:13
144:13 145:2,3
146:2 154:13
164:11 165:22
166:6 204:7
217:16 262:16
267:20 278:5
279:9,10,14,17
279:19 287:4,9
287:17 293:15
300:5 304:21
306:3 308:2,13
**answered**
111:19 112:2
120:18 124:3,5
124:16 126:23
133:10 134:7,8
134:9,16 135:5

140:20 141:8
144:8,11,15
146:7 151:9
218:8 257:21
278:4,6 280:15
281:14 287:18
**answering**
116:20 127:12
180:3 265:5
306:9
**answers**  10:19
12:3,4 38:10
56:8 116:11
130:9 134:13
283:15 293:4
**anticipate**  60:9
**anybody**  25:23
26:14 27:6
43:21 45:7
129:2
**anymore**  67:19
268:16 287:4,7
**anyway**  295:21
**anyways**  70:1
172:16 188:11
**apart**  226:8
229:20 231:16
232:6 236:6,7
**apologize**  101:8
128:3 137:14
176:4 184:16
234:13 255:12
295:7
**apparently**  9:6
215:23 248:19

276:9
**appear**  77:17
**appearances**
4:9
**appearing**  4:13
4:16,20
**appears**  66:12
193:14 251:12
270:12
**appended**
313:7
**appendix**  46:9
46:12 74:3
78:15
**apples**  100:18
103:15,15
165:1,1,2,2
170:11,12
**applicable**
283:11 311:8
**application**
288:5
**applications**
145:14
**applied**  65:15
65:16 94:10
**applies**  113:5
149:5
**apply**  167:22
283:8
**appreciate**  15:3
119:15 121:14
137:17 138:6
216:12 295:11

G. Bryant Buchner
Bryson, Santana and Joshua v. Rough Country, LLC

July 11, 2024

**[approach - auto]**

Page 6

**approach**
121:23 171:23
250:6
**appropriate**
12:11 101:21
130:3 136:7
172:4 173:10
278:12 288:23
289:20 290:22
291:16
**approved** 62:8
62:17,19
**approximate**
20:15 41:3
47:13 87:14
273:5
**approximately**
77:9 86:9 87:3
103:14 201:22
207:12 208:8
256:7 266:17
269:2,2
**approximation**
85:6 201:19
295:1
**approximatio...**
293:23
**arc** 192:21
193:8 272:13
272:23 273:4,6
**architect** 133:3
**archived** 42:5,6
42:19 43:23
**archives** 9:18

**area** 122:22
123:2 177:18
177:19 255:17
**areas** 175:14
256:13,14
**argue** 60:19
143:9 152:16
221:22
**arguing** 308:18
**argument**
118:9,17
143:14,16,19
202:19 204:19
204:21 224:15
**arrange** 117:6
**arrogant** 117:8
**arrow** 251:22
255:21
**artfully** 16:3
**article** 111:2
**articles** 288:4
**aside** 18:12
42:14 250:5
**asked** 10:20
29:19 49:15,17
64:16 65:9,13
65:18 86:15
98:11 111:19
112:2 113:16
115:19 120:17
123:6 124:2,5
124:16 126:23
133:10 134:6,8
136:15 140:19
141:8 142:13

175:5 180:4
218:8 232:16
240:14,15
241:7 257:21
266:15 278:3
280:3,15 289:3
301:2 304:9
**asking** 70:22
71:9 76:8
89:19 107:8,9
107:10,16
113:10 114:5,9
116:11 117:7
119:11 124:19
125:10 128:22
128:23 130:15
130:20 132:11
132:13,15
133:4,6 141:10
141:18 142:10
145:9,15 146:6
148:1 169:11
170:6 182:2
191:12 259:16
261:23 277:12
277:13 280:23
281:5 282:3
283:10,20,21
283:22 284:5,7
284:22
**assign** 2:13
**associated** 8:22
22:3,11,17
27:10

**association**
249:8
**assume** 101:16
162:5 249:14
**assumed** 162:3
**assuming** 78:21
82:20 102:1
**assumption**
166:7
**assumptions**
298:9,12
**atlanta** 4:12
**attach** 177:22
**attached**
311:11
**attachment**
155:8
**attempt** 6:13
48:23 130:10
191:16
**attempted**
39:21 139:9
**attempting**
91:15
**attempts** 37:22
42:5 137:18
**attorney** 5:17
248:15 311:13
**attributed**
275:21 276:12
**august** 28:22
28:23 58:21
311:3
**auto** 109:20
139:17

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[autocad - believe]**                                       Page 7

**autocad** 241:9
**automakers**
  302:14,15
**av** 66:9 110:3
**available** 55:19
  66:6 68:21
  98:16 112:9
  113:12 303:8
  304:22 311:6
**avenue** 4:15,19
**avoid** 295:9
  303:9
**aware** 44:15
  58:20 59:10
  73:3 92:17
  138:17 139:4
  282:13 291:9
**axle** 142:3

**b**

**b** 46:9,12 74:3
**back** 9:18,22
  10:17 11:6,11
  11:23 12:18,19
  18:5,16,19
  23:17,22 25:1
  25:14 28:16,22
  34:13 54:21
  61:13 65:21
  66:6 68:4
  74:19 83:9
  89:12 92:7,18
  131:2 137:8
  156:14 161:22
  165:10 175:23
  176:13 183:4

185:12 186:6
186:13 195:21
201:5 213:23
218:2 219:2
220:22 221:21
222:20 230:15
234:17 235:22
237:11,17
240:3 244:16
260:19 261:16
264:2 265:17
267:3 274:3,6
291:8,13 292:3
292:8,18 296:3
302:5,5
**backup** 15:13
  17:13,17 21:4
  299:3
**backwards**
  184:19 298:16
**bad** 6:18 13:9
  43:8 297:4
**baker** 75:6,10
**baldwin** 310:3
**base** 18:11
  296:17
**based** 13:17
  15:9,10,19
  19:5 41:8
  60:15 67:7
  70:9 75:23
  82:5 107:7
  112:11,17
  142:4 145:14
  145:16 147:14

161:5,17
163:10 165:7
166:6 169:5,12
169:14 176:20
176:21 192:4
195:2 206:9
208:5 213:4
214:14 216:16
217:2 246:1
247:6 264:9
271:19 274:15
276:21 281:4
292:1 296:18
302:23 304:8
305:17
**basic** 115:3
**basically** 8:4
  40:3 42:14
  57:19,21 101:2
  115:3 159:14
  167:9 182:8
  211:22 261:19
**basis** 151:21
  204:18 218:7
  224:15,18,23
  225:12,14
  232:20 243:6
  248:1 255:20
  264:13 269:6
  285:1,6 291:15
  296:13
**bat** 308:16
**bates** 7:3 37:18
  161:5

**battery** 300:15
  300:15,17,18
**beauty** 200:9
**beginning** 5:6
  161:5 177:23
  237:7
**begins** 177:7
**behalf** 4:13,17
  4:21 5:19,21
  97:18
**belief** 12:16
  23:17 28:21
  47:8,9 162:19
  166:1 188:20
  192:4
**believe** 26:3,9
  47:5 48:3,21
  52:19 63:5
  77:1 78:15
  79:22 86:13
  87:11 116:1
  120:15 124:13
  156:8 162:16
  169:22 178:5
  188:16 189:8
  189:19 190:16
  196:7 206:3
  208:6 223:4
  224:12 264:13
  268:23 269:1
  288:3 289:21
  289:22 291:15
  295:4 304:23
  306:10

G. Bryant Buchner
July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[believed - built]**

Page 8

| | | | |
|---|---|---|---|
| **believed** 22:1 38:7 162:17 191:16 264:8 | 153:8 158:18 181:8 187:21 189:15 192:15 | 272:22 273:4,5 **box** 82:12,14 110:14 112:12 | 293:3,3 **broken** 84:11 299:11,11,12 |

believed 22:1
38:7 162:17
191:16 264:8
**benefit** 113:7
170:17
**bent** 237:5
252:22
**best** 14:22 29:8
47:10 58:6
73:11 87:17
88:16 160:8
187:8 213:3
221:23 238:9
267:19 306:3
307:2 310:11
**better** 34:2
176:7 254:8
258:12 265:5
267:4 300:8
**beyond** 38:21
41:22 78:11
93:13 103:10
152:9 274:19
284:13 288:6
**big** 130:23
139:6 140:6
168:11 202:2
300:2 308:10
308:11
**bigger** 192:15
241:21 248:23
**biomechanics**
158:11
**bit** 54:13 63:6,7
63:8 84:11

153:8 158:18
181:8 187:21
189:15 192:15
238:7 252:20
254:18 272:9
272:10 273:1
295:9,10
299:13 307:3
**black** 110:14
112:12 113:12
166:23 169:21
234:13,23
254:18
**blaming** 26:14
**blank** 30:3
248:12
**blanket** 113:13
127:4
**blind** 284:5
**block** 113:4
**blue** 194:13
**body** 74:23
76:5
**bolt** 252:3,7,8
**bonus** 43:8
**book** 21:22
292:12,12
**books** 256:11
**bottom** 9:14
82:18 187:17
193:22 202:20
224:1 234:8
235:16 254:4
257:4 258:6
263:12 272:12

272:22 273:4,5
**box** 82:12,14
110:14 112:12
113:4,12
166:23 169:21
240:13
**bracket** 256:23
256:23 257:5,9
257:11,18,23
**brackets** 153:3
153:9,14,17
**brakes** 164:17
168:7
**braking** 161:17
162:2,3,6,6,9
162:16 168:12
**brand** 121:1
**break** 61:4,5,11
88:18,19 89:4
89:10 136:19
136:20 137:1,6
138:13,15,16
159:7 176:3,11
182:17 183:2
195:14,19
235:8 260:4,17
295:18 296:1
**brennan** 32:5,8
**bring** 121:4
126:14 174:2
**bringing**
126:15 210:6
**brittle** 159:7
**broad** 17:16
113:10,17

293:3,3
**broken** 84:11
299:11,11,12
**brought** 103:21
103:21
**bryant** 1:17 5:7
5:14 6:4
240:21 248:11
250:11 279:11
311:5 312:2,24
313:2,4,12
**bryson** 1:7 5:22
7:3 157:21
158:15 251:8
254:21 255:13
258:4 311:4
312:1 313:1
**buchner** 1:17
5:7,14 6:4,10
88:20 95:2
119:16 137:10
141:14 256:4
260:21 295:5
296:7 304:13
311:5 312:2,24
313:2,4,12
**buchner's** 3:13
49:19
**build** 242:7
297:13
**builders** 242:7
**building** 24:16
32:19
**built** 199:21

**bullet** 202:3,4
203:3
**bumper** 76:23
90:20,21 92:3
92:14 93:3,9
93:18,19 94:3
94:6,17 95:7,8
95:9,12,14,15
95:18,19 110:6
110:6,20,20
122:3,3,9,9,22
123:23,23
124:10,10
126:17,17,18
126:18 147:16
147:18,18
150:18 151:23
151:23 152:3,3
152:3,3,6,9,10
152:16,16,20
152:23 153:1,4
153:4,5,11,11
169:23,23
172:6,6,22
175:17 179:23
180:10,11,15
180:15 203:8
203:13 252:18
252:22 253:8
253:11,12
254:1,2,4,11,12
254:20 256:19
257:1,3,11,14
257:19,23
258:5,8,13,15

**bumpers** 94:5
118:14 153:6
**bunch** 83:23
250:7,7
**buried** 230:22
**business**
106:23
**busy** 13:3
**button** 33:2
**buy** 112:22

**c**

**c's** 257:11
**cab** 63:4,4,9,12
63:13 64:17
65:10 74:23
75:1,2,19,22,23
76:5,5
**calculate**
205:13 233:11
265:9,11
275:20
**calculated**
170:23
**calculates**
110:7 178:19
**calculation**
281:16 289:11
289:13,19
301:23
**calculations**
24:15 64:9,10
64:11 76:9,13
76:14,15 130:5

130:6 165:8
275:14 282:21
283:18 291:23
292:10 293:22
300:3
**calculator**
289:12,15
**calculators**
282:13
**calibrate**
207:11
**call** 7:8,11,11
131:23 143:15
146:14 148:18
176:16 198:22
226:11 249:12
251:13 288:19
**called** 153:17
153:18,20
202:3,4 249:13
**calling** 232:7
**calm** 125:21,22
**camera** 159:11
208:2 218:16
244:17
**cameras** 156:3
156:5,17
159:11,19
210:11 213:1
215:12 218:15
**campbell** 292:2
**cannella** 3:6
4:14,14,18
5:20,20 6:12
7:2 21:9 42:21

44:2 45:5 49:7
49:18 69:14,17
69:20 70:16
71:2,11,21
72:1,8 83:19
84:6 89:6 95:1
98:11 102:2
105:17 111:18
112:2 113:21
114:4 115:20
116:3 117:15
120:17,20
124:2,5,12,14
125:21 126:10
126:23 131:19
133:10,17
134:3,6 137:23
140:17 141:7
141:11 142:8
143:3,12,22
144:8,14 145:7
145:21 146:4,8
146:13 151:4,7
154:4 158:1
177:21 185:3,9
211:11 218:8
219:15 223:4,7
223:10 224:19
225:12 233:4
236:2 238:2
239:20 240:6
240:14,19
248:10 249:23
250:5,10,14,18
250:21 251:3

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[cannella - change]**                                      Page 10

257:21 260:5
260:13 278:3
279:2,6,10,18
280:14 281:12
283:3 285:7
287:2,10,18
295:18 296:6
304:3,6 305:6
305:10,19
309:10,14
311:1
**cannellasnyd...**
311:2
**capability**
301:15
**capable**  133:8
133:15 134:1
**car**  73:11 85:9
92:11 135:14
147:22 148:7
169:2 203:8
219:2 221:4
237:5,11
253:12 298:16
299:12,13
300:16,17
**care**  31:15
**career**  139:8
**cargo**  83:2,9
91:18 92:7
99:13
**cars**  139:19
242:9
**case**  1:5 27:4
43:2 44:3,5

45:21 59:16,23
60:5,5 80:3
93:1 94:5
103:2 108:15
109:15,22
110:13 111:16
127:19 128:4
128:12 136:16
139:12,23
145:15 163:14
171:22 190:13
190:15 269:7
280:6 282:19
288:2 291:11
291:21 293:9
302:7 304:13
305:2,17
306:22 307:10
308:8 310:17
**cases**  27:5
59:21 195:1
**casual**  121:4
**cataloged**
115:6
**catch**  67:14
**catching**  235:5
**caught**  236:19
**cause**  5:8 56:15
129:17 196:1
**caused**  158:15
276:3
**causes**  104:1
**causing**  204:11
**caved**  254:2

**ccr**  5:1 310:22
**center**  95:12
160:20 181:7
182:9 190:2,5
190:11,14,18
190:19,20
200:8 204:2
206:18,21
207:1 209:20
210:9,12,15,18
210:20,21
211:21 212:5
212:17 213:16
214:10,14,18
215:6 216:6,9
216:11,14
218:4 221:18
221:19 222:23
224:6,7,17
225:6 226:7
229:5,6 230:12
231:22 234:5
235:18 236:17
236:21 257:8
261:8,11
272:13,22
**centered**  221:1
221:2,5,11
**centerline**
159:21 160:18
161:1,2
**certain**  17:17
21:3 79:3
266:5 294:21

**certainly**  72:4
101:12,12
107:20 108:9
111:8 155:9
238:16
**certificate**
310:1
**certifications**
302:23
**certified**  1:22
310:4
**certify**  5:3
303:4 310:6,14
**cg**  80:6 85:15
**chainsaw**  81:21
81:22,23 82:2
**chance**  106:7
**change**  32:22
56:8 66:13,14
67:15 106:12
107:11 115:14
115:17,23
120:8 128:12
129:3 135:21
168:15 169:1
196:19,23
197:19,20
201:7 238:4
277:17 278:22
280:7 284:9
286:9 296:18
299:19 300:15
300:16 305:16
312:4,7,10,13
312:16,19

G. Bryant Buchner                                      July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[changed - comfortable]**                                    Page 11

**changed**  10:6
  11:15 18:17
  78:5 85:20
  127:20 285:5
  286:20
**changes**  35:19
  52:15 57:5
  77:17 78:7
  96:20 101:9
  300:19 311:10
  313:6
**changing**
  126:19 131:7
  165:22 267:2
  285:2
**characterizati...**
  45:23 49:21
  114:16 125:19
**characterizing**
  280:1
**chat**  276:8
**check**  265:22
**checked**  11:7
  266:21
**child**  99:22
**choice**  34:16
  90:12
**choose**  38:11
  73:13,19 90:9
  205:8
**chose**  74:1
  102:23,23
  103:1 145:15
**cite**  111:4
  129:16 138:16

  140:2 173:9,20
  260:22
**citing**  288:3
**civil**  5:4
**claim**  107:13
  222:6
**claimed**  220:17
**claims**  96:19
  290:7
**clarified**  170:8
**clarify**  20:13
  34:7 87:4
  153:13
**clarifying**
  177:11
**class**  94:16
**classes**  291:2
**clear**  7:21
  13:13 63:22
  85:12,22 99:2
  135:7 181:12
  244:10 267:5
  294:17
**clearly**  11:5,7
  92:1 112:16
  147:16 164:13
  167:7 207:22
  208:7 212:2
  223:16 252:5
  290:15 291:1
**click**  32:13 33:6
**clicked**  33:2
  238:21 264:18
  272:21,22

**clicking**  273:18
**close**  51:9
  114:1 141:19
  143:13 167:14
  168:10 179:18
  180:16 212:13
  212:14 213:19
  226:19 235:4
  253:20 254:17
  300:7 306:20
  307:10,16
  308:14,21
  309:2,3
**closer**  63:20
  182:9 231:2
  269:12,13
**cloud**  198:23
  217:15 226:7
  226:15,17,23
  227:10,20
  228:1,2,7
  229:6,7,15
  240:23 241:12
  241:19,19
  242:6,17,19
  243:5,19 244:1
  244:3 245:4
  261:1 263:12
  263:16,20
  264:10,19
  265:2,7 271:5
  271:13,15
**clouds**  227:19
  227:19 266:23
  268:8

**coefficient**  78:1
  175:13,15
**coefficients**
  62:2,19 63:15
  63:16,23 64:17
  64:20 110:4,18
  285:19 301:17
  301:22
**cohen**  99:23
  157:21 158:15
**collection**
  37:13
**collinear**  224:7
  224:10,11,17
  231:9,16
**color**  160:5
**colorized**
  198:20
**combined**
  271:16
**come**  34:16,17
  59:1,10 62:23
  65:19 66:11
  82:16 119:5
  148:19 187:20
  188:5,7 219:5
  234:17 248:8
  263:7 264:15
  269:14,16
  273:1 304:20
**comes**  185:16
  233:18
**comfortable**
  102:14 130:22

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[coming - confirmed]**                                        Page 12

| | | | |
|---|---|---|---|
| **coming** 159:6 | 277:7,9,14 | **complex** | **concerns** |
| 187:21 233:17 | 283:22 292:22 | 127:17 290:23 | 112:20 127:12 |
| 237:2,10 264:8 | **compared** 78:7 | **compliance** 2:5 | 128:20 130:23 |
| **comments** | 101:5 104:9,19 | **complicated** | 282:7 284:20 |
| 306:5 | 107:7 166:22 | 13:7,8 125:10 | 286:1 |
| **commissioner** | 255:9 277:6 | **component** | **conclude** |
| 2:18 4:7 5:2 | **compares** | 118:15 | 255:21 |
| 310:5 | 106:6 | **composite** | **concludes** |
| **common** | **comparing** | 199:20 | 309:12 |
| 303:11 | 96:10 98:22 | **compromised** | **conclusion** |
| **commonly** | 106:1 151:13 | 257:16 | 219:10 269:14 |
| 19:16 288:9 | 165:23 232:17 | **computer** 8:16 | 269:16 |
| **communicate** | 277:16 281:2 | 9:8 19:17 26:6 | **conclusions** |
| 223:16 | **comparison** | 31:23 32:1,14 | 115:5 |
| **communication** | 61:21 77:18 | 33:7,12,20 | **concretely** |
| 65:20 72:9 | 103:15 148:23 | 34:23 35:9,18 | 95:22 |
| **companies** | 166:18 190:23 | 60:9 64:11 | **condition** 85:6 |
| 109:19 | 229:23 255:7 | 188:6 229:1 | 173:15 |
| **comparative** | **compartment...** | 234:12 239:3 | **conditions** |
| 200:13 | 70:15 | 241:21 242:2 | 173:16 |
| **compare** 101:3 | **competitors** | 242:10,20 | **conduct** 207:8 |
| 101:23 103:12 | 295:14 | 248:8,23 289:9 | **conference** |
| 107:19,21,22 | **compiled** 48:8 | 310:9 | 34:3 |
| 108:7 117:23 | 70:13 | **computers** | **confidence** |
| 118:1 157:12 | **complaint** | 235:3 241:9 | 18:22 27:5 |
| 163:22 164:9 | 290:13 | **concave** 181:19 | **confident** 11:10 |
| 164:23 165:1,2 | **complete** 37:7 | **concept** 13:9 | 36:3 42:12 |
| 165:18 169:21 | 121:2,3 129:23 | 94:18 117:5 | **configuration** |
| 170:11,13,15 | 277:9 313:8 | **concepts** | 170:19 222:22 |
| 190:5 226:23 | **completed** | 116:14 | 225:7 |
| 227:11,20 | 311:16 | **concern** 105:11 | **confirm** 15:15 |
| 228:7 229:6,8 | **completely** | 306:12 | 16:7 85:19 |
| 240:23 241:19 | 93:18 114:14 | **concerned** | 134:10 259:17 |
| 241:20 242:17 | 121:1 | 83:17 | **confirmed** |
| 242:19 243:19 | | | 275:7 |

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[confirms - corresponds]**                                  Page 13

**confirms**
  216:11
**confused**
  102:22 184:13
**confusing**
  102:3 120:20
  170:7 283:4
  285:8
**confusion**  40:2
**connected**
  20:22
**connection**
  146:17 191:17
**consequential**
  300:21
**conservative**
  88:5 136:3
  171:23 192:17
**conservatively**
  164:16
**consider**  90:14
  90:18 119:2
  299:19 307:20
**considerably**
  197:13
**consideration**
  304:20,22
**considered**
  105:9 119:4
  123:16 304:18
**consistency**
  55:1
**consistent**
  12:23 14:6,20
  44:12 55:21,21

56:11,12 60:17
64:7,8 77:6
86:19 136:4
162:18 208:5
232:8
**constraints**
  110:17 285:23
**constructioni...**
  242:8,9 253:2
**contact**  92:15
  147:19 152:1,4
  152:5 179:22
  182:7 202:16
  203:17,18
  231:3,11,14
  232:2,4,11,12
  233:23 238:12
  261:14,14
  284:10
**contacted**
  201:12 286:2
**contain**  74:3
  239:17
**contained**
  62:21 81:11
  240:4 267:16
  268:6,7,7
**contempora...**
  25:15
**content**  310:8
**context**  100:15
  111:4 194:17
**continued**
  304:11

**contracted**
  63:11
**convenient**
  34:4
**conversation**
  29:3 121:4
  162:13 280:21
  291:5
**convert**  36:10
  75:2
**converted**  35:6
**convex**  181:4
  181:20 182:10
**convinced**
  273:21
**cooperate**
  234:12
**copies**  38:16
  46:20 311:14
**copy**  9:12
  22:21,23 28:9
  28:10,12,13,19
  32:14 33:21
  35:15,16,19,23
  48:5 74:9
**correct**  12:10
  13:18 15:1
  21:7 29:17
  36:10 37:2,14
  40:16 42:3,21
  43:2 49:9
  52:13 54:14
  57:20 58:10,16
  62:4 65:14
  77:7,19,20

78:9 80:11
86:1 88:15
89:18,23 91:16
91:20 98:17
99:9,17,21,21
100:2 103:16
106:15 113:8
134:23 149:20
162:20 163:5
171:15,16,16
176:22 178:13
179:4,12 181:9
183:9 189:1
190:6 195:8
196:7,21 200:4
212:20 214:9
215:7 219:19
221:9 222:3
229:16 230:18
234:6 235:19
239:6 240:5,18
253:18 271:6
277:18 301:10
310:12 313:8
**corrected**  67:5
  67:6
**correcting**
  306:17
**corrections**
  313:6
**correctly**  38:3
**correlates**  68:9
**corresponds**
  257:4,8

G. Bryant Buchner

July 11, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[corrupt - crash]**

Page 14

| | | | |
|---|---|---|---|
| **corrupt** 44:7 | **covered** 151:21 | 123:18 124:1 | 205:21 206:5,8 |
| **corrupted** 9:15 | 248:1 | 124:10 126:17 | 211:9,16 212:2 |
| 9:16,23 10:4,5 | **covering** | 126:18,19,21 | 218:1 221:16 |
| 14:8 18:17 | 187:23 | 128:13 130:11 | 223:11 224:8 |
| **corruption** | **crafted** 16:2 | 131:16 133:8 | 224:10,11 |
| 8:15 | **crash** 71:12,13 | 133:16 134:2 | 236:15 237:15 |
| **counsel** 2:10,12 | 71:15,16,22 | 138:21 139:12 | 237:20 238:1 |
| 5:5,15 310:15 | 77:5,5,12 | 139:19 140:14 | 243:7 245:5,21 |
| 311:14 | 78:22,23 80:14 | 140:16 141:15 | 246:7 247:9,11 |
| **counterpart** | 82:22 91:3 | 142:11 143:5 | 248:3 252:2,7 |
| 44:16 | 92:18,20 93:13 | 144:12,17 | 254:3 256:20 |
| **country** 1:10 | 94:1,1,23 95:5 | 145:5,8,18 | 257:22 258:7,9 |
| 5:19 97:13,17 | 95:13,21 96:3 | 146:22 147:17 | 258:15,21 |
| 97:19,22 301:2 | 96:6,15,16,18 | 149:17 150:2,7 | 259:12,18 |
| 303:17 304:15 | 97:8,11,14,20 | 150:13 151:13 | 261:17,21 |
| 311:4 312:1 | 98:5,23 99:5 | 153:15 154:3 | 262:1,3,4,7 |
| 313:1 | 99:12,19 100:1 | 154:17 155:1,2 | 263:4,8 264:3 |
| **county** 310:3 | 100:3,6,16 | 155:11,19 | 264:4,9,16,17 |
| **couple** 12:15 | 101:4,6,7,8,15 | 156:2,5,14,15 | 265:7,10 |
| 19:13 20:1,7,8 | 101:18,21,22 | 156:20 157:15 | 266:11 269:20 |
| 39:14 48:15,19 | 102:18 103:5 | 157:15,20 | 270:6 272:2 |
| 306:8,11,13 | 103:12,19 | 158:8,14 | 273:15,23 |
| 308:17 | 104:2,5,11 | 161:13 163:8 | 274:1,12,17 |
| **course** 200:17 | 105:6,11,13,21 | 163:23 164:10 | 275:3 276:5,22 |
| 209:12 221:10 | 106:4,14,19 | 165:23 166:13 | 277:6,7,10 |
| 228:13 259:22 | 107:6,7,13 | 166:15 170:18 | 280:9,18 281:2 |
| 265:15 | 108:1,3,7,11,15 | 170:20 171:2,9 | 283:9,22 284:8 |
| **court** 1:1,22 | 108:17,23 | 176:19,21 | 285:4 288:13 |
| 2:6 4:1 5:1 6:1 | 109:23 113:6,6 | 177:17 179:8 | 288:13 291:17 |
| 138:18 139:10 | 113:14,15,20 | 180:7,9 184:1 | 293:8,13 294:6 |
| 140:4 143:15 | 114:9,10,14,21 | 185:2,18 186:8 | 294:7,11,13 |
| 287:5,15 310:4 | 115:21 116:2,9 | 186:14,16 | 301:21,23 |
| **cover** 205:19 | 117:2,23 118:2 | 189:4 196:1 | 302:6,9,11,21 |
| 256:20 258:6,8 | 118:5,12,13,23 | 200:3,21 201:3 | 303:3,5,10 |
| 258:15 | 119:9 122:8,9 | 203:23 205:14 | 305:2 |

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[crashed - data]                                              Page 15

| | | | |
|---|---|---|---|
| **crashed** 84:16 161:8 | **crosby** 146:20 159:1 207:22 | 155:17 158:12 163:12,17 | **curious** 44:23 **current** 53:17 |
| **crashes** 122:4 139:19 200:13 202:1 252:11 302:20 304:16 | 215:10 216:11 216:12,21 217:9 218:15 219:21 220:9 | 164:14 167:12 167:17 168:1 168:12,15 169:1 170:13 | 53:22 54:4,5 54:17,22 55:2 56:1,18 59:22 **cursive** 184:20 |
| **crashing** 165:13 | 223:6 232:9 245:19,22 | 201:2 202:5,8 203:1,15,17 | 185:1,4,5 **curve** 196:16 |
| **crazy** 279:20 **create** 40:13 | **crosby's** 98:15 160:19 220:18 | 205:6 220:11 231:6,22,23 | **curves** 197:15 197:16 |
| 50:5 70:8 73:4 106:19 141:15 142:11 143:7 240:15 271:11 297:3 | 222:18,20 225:15 244:7,8 247:7 **crush** 13:15 | 232:18,22 262:6 265:9 268:19 274:8 274:22 275:1,9 275:11,11,12 | **cv** 1:5 |

| d |
|---|

| | | | |
|---|---|---|---|
| **created** 36:21 57:12 240:17 298:4 | 14:5,14 16:5 16:16,18 62:14 63:15,16,22 64:9,16 69:8 | 275:17,20 276:2,11,17,21 277:2 278:15 281:4,7,17,19 | **d** 3:1 183:12,21 184:8,8 185:6 185:8 187:7,8 191:2,7,10 196:16,17 |
| **creates** 72:22 **creating** 297:6 **crew** 63:4,9,12 | 70:12 71:5 72:14 73:5 76:13,14,14,15 | 282:11,12,16 284:3,18 285:18 288:15 | 197:4 **damage** 167:11 197:17 256:10 |
| 63:13 64:17 65:10 75:1,2 75:19,23 76:5 76:11,12,16,17 76:19 | 88:4 90:16,20 90:22 91:20 92:2,19,21 93:3,12 96:1,3 96:6,14,20,21 | 289:5,7,16 291:1 292:10 301:11,17,21 **crushed** 200:10 237:3 | 256:12 267:6 **dancing** 233:18 **dash** 206:15 **data** 10:2,14,18 |
| **critical** 93:1 114:8,8 147:20 171:8 299:20 | 97:1 100:11 107:3,5 109:13 111:1 112:8,11 | **crushes** 96:10 148:13 **crushing** | 11:1,16 12:11 12:21 14:5 16:5 19:3,10 21:6 28:7 31:2 |
| **criticism** 102:17 163:8 | 112:14 122:18 130:5 138:19 139:11 140:11 | 150:21 **crux** 15:21 **cry** 88:23 | 38:1,6,9,19 39:1,16,22 40:5,12,15,16 |
| **criticisms** 105:21 | 140:13 147:11 147:13,16,21 | **cs** 311:15 | 40:17,20 41:8 41:10,11,14 42:17 43:6 |
| **criticizing** 107:6 126:4 | 147:22 148:3,9 | | 48:11 49:2,4 |

G. Bryant Buchner    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[data - depicted]    Page 16

50:4,10,18
51:6,17,19
52:1 56:14
57:20,20 60:22
62:12 64:12,13
67:13,18 68:1
68:3,5,8,17,20
69:3 70:21
72:3,7,20 76:4
76:12 87:2,17
110:13 112:7
113:4,8,12,19
114:17 116:11
142:2,3,17
146:21,22
166:23 169:3
169:21 199:18
199:18 239:23
240:6 245:19
245:21 246:11
246:15,20
265:7 297:20
297:21 298:9
298:13 301:21
302:3
**database**  62:4
62:6 74:22
89:22 90:2,3
**date**  5:3,11
20:19 25:23
44:15,21 45:1
45:14,14 46:2
46:6,11,13,16
46:17,18,19
47:2,4,12

54:10 310:13
312:24 313:12
**dated**  7:2 47:23
**dates**  6:18
58:17 59:14
**day**  11:21 18:3
33:10,22 34:5
48:1 55:22
119:16 238:5
269:10 292:1
313:15
**days**  20:16 23:8
311:16
**de**  4:15,19
**deal**  131:18
197:11
**dealing**  130:1
**decatur**  4:16,20
**decent**  271:11
**decide**  136:7
267:7,22
286:22
**decided**  130:3
224:21 263:8
268:11
**decimal**  38:21
**decision**  60:15
**deck**  258:9
**declare**  313:4
**decrease**  93:12
169:1
**decreased**
281:18 282:16
**decreasing**
282:9

**deemed**  313:6
**default**  62:1
65:7 78:1
91:16 173:7,16
174:10
**defaults**  63:20
65:1,2
**defendant**  1:11
4:13 5:19
**defendant's**  7:6
178:8 186:9
251:10
**defense**  44:16
72:1 77:5
92:18 99:1
142:11,15,20
**defer**  294:7
**define**  93:16,18
147:13 306:8
**definitely**
179:21 236:21
**definition**
93:20,21,23
94:10,13,15
**deflected**  259:1
**deflection**
153:23 154:2,7
155:2,3,7
**deformation**
155:22
**degree**  301:6
**degrees**  232:9
**delete**  298:3
299:1

**deleted**  298:19
**delineate**  246:6
**delta**  39:6,18
110:15,23
112:13 113:4
170:13 229:11
285:22 288:18
**demonstrate**
93:6 106:22
139:1 166:14
166:15 241:15
242:14 261:7
265:13 288:12
**demonstrated**
93:2 114:20
**demonstrates**
208:7
**dent**  252:15,18
257:3,7
**denying**  127:1
127:3
**depend**  207:15
219:13
**dependent**
179:9 193:8
195:7 219:10
225:22
**depending**
33:22 162:8
269:9
**depends**  33:10
34:4 178:19
231:21 237:22
**depicted**  72:15

**[depiction - different]**                                      Page 17

**depiction**  13:15
69:13
**depictions**  73:5
**depo**  8:1 11:14
12:5 13:3 55:3
86:10,14 87:14
87:23 88:2
96:21 128:7
168:21 216:3
226:6 242:18
244:8,8 249:11
249:14,22
250:4,13 257:3
261:6 262:13
267:19 268:18
268:22 273:19
**deponent**
311:13 313:3
**deposing**
311:13
**deposition**  1:17
2:3,4,14,17
3:11 5:13 7:5
10:11 11:4
12:3,9,13 13:1
14:2,21,23
15:9,17 16:7
17:11,22 18:16
18:20 20:10,12
20:21 21:5,6
21:12,20,23
23:14 24:22
25:3 27:1,18
27:22 29:15
36:23 37:5

39:19 41:12,14
42:17 44:13,16
44:21 45:1,6
49:3 50:9,11
51:2,3,15,16
52:2,6,7 55:5
58:2,4 60:11
64:7,23 83:22
84:2 86:19
88:12 98:15
111:5 115:1
122:1 136:4
142:5 146:19
160:19 161:6
161:23 167:8
216:10 220:16
228:21 232:14
232:17,20
239:6 240:18
245:18,19
262:23 266:7
266:14 269:13
275:7 290:19
291:7 303:18
305:15,18,23
309:12,19
**depositions**  2:7
**deprived**  156:6
**depth**  216:20
232:18,21,22
275:10 308:22
**derived**  301:22
**describe**  75:3
104:13 158:13

**described**  44:1
112:4 115:23
160:20 206:3
267:22
**describes**  159:1
224:4
**description**
162:10
**design**  133:1
274:17 301:5
**designed**
109:23 112:14
172:5 286:11
289:23 302:20
305:3
**detail**  39:8 51:5
**detect**  17:10
**determination**
96:23 148:4
272:12 281:11
**determine**  47:1
91:19 109:10
125:15 131:18
155:1 171:21
176:19 178:15
189:3 202:9,16
215:4 244:11
246:7,13 258:8
259:4 261:2
262:6 263:3
272:5,17
273:14 274:23
275:11 281:7
**determined**
78:16 87:19

108:20 128:14
197:22 266:8
266:10 267:5
**determines**
267:12
**determining**
62:18 90:15
**develop**  275:11
**developed**
296:10
**device**  160:8
**devin**  4:18 5:21
**diagram**
221:13,23
**diagrams**  222:2
**dial**  4:11
**diameter**  52:11
67:2
**dictates**  203:15
**difference**
14:12 16:12
67:1 103:23
104:3,12 105:5
120:5 168:1
173:2 191:1
202:2 276:2,11
276:20,21
**differences**
14:17 93:13
103:19 105:6
105:10 115:5
299:14 301:1
**different**  18:18
20:23 22:6
27:13 37:11,14

G. Bryant Buchner
July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[different - draw]                                                    Page 18

| | | | |
|---|---|---|---|
| 60:20 62:11 | **directly** 36:14 | **discussion** | **document** |
| 63:7,8 73:7 | 36:17 208:3 | 299:7 | 26:12 29:7,8,9 |
| 78:1 92:21 | 230:9 | **discussions** | 159:2 215:15 |
| 94:1,19,19 | **disadvantage** | 287:13,16 | 228:3 249:4 |
| 99:3 106:1 | 64:3 101:13 | **displaced** | 251:7 297:2 |
| 109:1 114:14 | **disadvantaged** | 259:14 | 298:2,5,6 |
| 126:21 129:19 | 122:18 208:1 | **displacement** | **documented** |
| 130:6 150:2,3 | **disadvantaging** | 259:18 | 98:6,7 217:4,6 |
| 150:7,9 168:17 | 164:1,5 | **display** 73:15 | 230:8 |
| 175:13,15 | **disagree** 45:22 | 239:3 | **documents** |
| 181:16 185:21 | 84:9 113:9 | **displayed** | 26:19 27:21 |
| 193:23 196:22 | 125:18 144:3 | 235:1 | 38:14 74:2 |
| 196:23 197:15 | 234:1 | **dispute** 59:3,5 | **doing** 19:18 |
| 200:22 201:2,5 | **disc** 8:16 | 87:11 98:20 | 26:7 34:18 |
| 206:13 210:13 | **disclosed** | 160:23 163:1 | 47:17 102:14 |
| 215:6 221:5 | 296:19 | **disregarded** | 108:6 112:20 |
| 236:12 265:23 | **discover** 12:6 | 49:4 | 130:22 133:13 |
| 273:1 280:13 | 12:10 19:9 | **distance** 178:15 | 133:13 139:20 |
| 281:1 287:1 | 22:16 40:8 | 178:18 179:1 | 145:4 164:10 |
| 289:17 291:14 | **discovered** | 191:3,10,20 | 176:7 185:13 |
| 291:18 294:6 | 58:7 | 197:23 198:3,6 | 194:16 210:7 |
| 297:1 298:9,12 | **discoveries** | 213:15 214:2,9 | 214:14,17 |
| 308:20 | 20:23 22:7 | 218:10 228:18 | 216:5,16 |
| **differentiate** | **discrepancies** | 236:6 239:17 | 217:23 234:11 |
| 89:16 90:9 | 308:12 | 241:8,10 | 237:19 243:2 |
| **differentiation** | **discrepancy** | 260:23 262:5 | 243:21 244:16 |
| 100:6 281:4 | 52:12 168:11 | 263:2 264:11 | 270:19 282:6 |
| **difficulties** | 306:9 | 264:14 265:8 | 287:7 288:14 |
| 138:4 182:19 | **discuss** 61:21 | 271:20 281:8 | 302:8 303:10 |
| **digital** 29:16,20 | 116:14 226:5 | **distances** 179:7 | **door** 76:11 |
| 29:22 33:13 | **discussed** 12:13 | 191:13 | **dotted** 209:21 |
| **direct** 137:16 | 37:23 84:2 | **district** 1:1,2 | 209:22 214:17 |
| 166:18 | 94:9 105:8 | 4:1,2 | **dozen** 250:8 |
| **direction** 212:1 | **discusses** 94:2 | **division** 1:3 4:3 | **draw** 133:1 |
| 216:1 | | | 242:8 |

Case 2:22-cv-00017-RWS    Document 119-6    Filed 01/20/25    Page 98 of 153
G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[drawing - engineer]**                                Page 19

| | | | |
|---|---|---|---|
| **drawing** 86:17 223:15,15 225:3 231:8 241:4,5 243:21 287:3 | **ea** 9:4 | **edges** 181:8 182:6 238:19 | **elite** 251:13 |
| **drawings** 149:7 149:8,9,10 220:3 244:1,3 266:16,18 | **earlier** 22:20 35:14 51:10 86:20 87:21 262:23 264:7 282:7 289:3 | **edit** 35:16,17 | **embedded** 239:2,12 241:2 |
| **draws** 222:22 | **earliest** 201:11 | **editing** 297:2,7 298:2,5 | **emblem** 86:11 184:11 185:15 187:16,20 200:7 232:3 |
| **drew** 221:10 | **early** 10:23 | **effect** 2:4 106:20 122:17 167:6 | |
| **driver** 79:3,13 153:21 164:17 168:6 | **ears** 127:23 | | **empty** 81:1 |
| **driver's** 79:14 95:16 | **easiest** 159:9 184:4,6 243:17 261:7,8 | **effort** 24:2 116:20 117:1 127:14 174:19 191:19 230:9 275:19 276:10 | **ended** 194:14 309:19 |
| **drop** 34:14 | **easily** 159:13 262:18 | | **endpoint** 200:22 |
| **dropped** 168:9 252:2 | **easy** 20:5 121:16 226:22 269:19 | **efforts** 43:19 | **endpoints** 178:19 |
| **dropping** 135:14 | **edge** 159:23 184:8 185:14 185:15,17 186:18 188:21 188:22 189:8 189:20 190:3,9 190:10,16,21 191:2,10,17,20 192:5,8,9,14,14 192:22,23 193:9,9,15 194:9 195:3,4 197:7,23 198:1 198:3,16 204:22 205:18 212:6,12,18,19 213:20 214:1 219:11,12 | **either** 34:9 36:7 77:22 79:16 99:19,23 148:22 151:1 156:10 180:18 269:2 308:19 | **energy** 110:3 153:2 |
| **due** 116:19 155:16 212:9 | | **electronic** 22:21,23 28:15 38:16 74:9,15 | **engage** 152:17 152:20 |
| **duly** 6:5 | | **elevation** 275:4 | **engaged** 147:23 152:18,21 |
| **duty** 76:16,17 76:18 | | **elevations** 173:3 210:13 | **engagement** 95:20 123:3 199:1,2 202:16 230:5 231:3 232:7 238:11 253:9 289:5,7 |
| **dynamic** 302:16 | | **eleven** 86:8,10 86:14,23 87:13 87:16,20,23 231:18 255:18 265:18 266:1,4 266:11 268:14 269:13 271:1 273:10,11,12 273:20,21 | **engaging** 110:20 153:9 274:3,6 |
| **dynamics** 36:18 90:1 | | | **engineer** 112:19 119:2 120:1,6,11 121:13 136:12 184:18,18 286:18,23 |

**e**

**e** 3:1 69:15,16 196:6 312:3,3 312:3

Case 2:22-cv-00017-RWS    Document 119-6    Filed 01/20/25    Page 99 of 153
G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[engineering - exact]**                                          Page 20

| | | | |
|---|---|---|---|
| **engineering**  9:3 | 78:6 82:19 | 209:17 210:19 | **estimate** |
| 9:5 36:18 | 83:1,10,13 | 212:11 213:17 | 214:12,21 |
| 43:16,22 56:16 | 84:10,16 87:8 | 214:10 220:8 | 219:6 |
| 90:1 102:5 | 89:15,17,21 | 223:23 224:3 | **estimating** |
| 116:12,19 | 90:9,10 91:11 | 226:1 228:10 | 216:8 |
| 117:1 120:22 | 91:19 92:7,11 | 228:11,13,17 | **estimation**  82:6 |
| 129:23 130:18 | 92:14,16,20 | 230:6 234:5,6 | 82:13 |
| 136:11 233:10 | 95:11 99:9,14 | 235:18,23 | **et**  1:7 |
| 233:21 | 99:20 100:12 | 236:16,17 | **evaluate** |
| **engineers** | 101:13 122:14 | 254:20 255:16 | 280:11 |
| 106:23 | 122:18,23 | 255:23 256:20 | **evaluation** |
| **enter**  11:16 | 147:12 149:22 | 258:7,22 259:1 | 225:23 |
| **entire**  95:13 | 150:17,18,21 | 260:9 270:14 | **events**  109:21 |
| 114:8 224:15 | 152:5,10,19 | 270:16,16 | **eventually** |
| 224:18 | 155:23 156:13 | 274:4,6 | 19:23 203:7 |
| **entirely**  298:4 | 157:9,15,15 | **escape's**  64:2 | **everybody** |
| **entirety**  95:21 | 160:10 161:8,9 | 153:1,3 | 32:18 149:1 |
| **environment** | 164:5 175:14 | **especially**  64:8 | 269:19 |
| 17:18 291:4 | 179:2,8,8,15 | **esquire**  4:10,14 | **evidence**  2:15 |
| **equal**  100:13 | 180:20 181:15 | 4:18 | 81:4 95:22 |
| **equals**  78:21 | 183:8,19 184:1 | **essentially**  63:5 | 97:5,6,9 |
| **equate**  297:23 | 185:2 186:14 | 237:6 | 139:10 204:3 |
| **equation** | 186:14,16 | **est**  309:19 | 233:8 236:15 |
| 164:11 170:22 | 187:16,19,20 | **establish**  92:6 | 260:22 262:4 |
| **errata**  311:11 | 188:23 189:4 | 106:5 126:15 | 294:11 |
| 311:13,16 | 190:11 191:22 | 158:4,10 161:9 | **exact**  20:2,18 |
| **erroneous** | 193:12 198:8 | 161:20 165:15 | 46:18 80:21 |
| 220:2,18 222:7 | 199:3 200:3,7 | 166:4,9,11 | 93:23 94:15 |
| 225:20 | 200:23 201:5 | 180:23 193:7 | 121:12 128:11 |
| **error**  24:3 | 203:4,23 204:2 | 205:20 245:1 | 129:18 167:3 |
| 65:20 218:22 | 204:23 206:21 | **established** | 182:2 236:11 |
| 220:20 | 206:23 207:1 | 68:8 110:9 | 272:18 276:13 |
| **errs**  268:18 | 207:11,17 | 137:19 161:12 | 277:16 278:1 |
| **escape**  71:5 | 208:22 209:3 | 165:12 204:13 | 287:13 304:21 |
| 72:14 77:16 | 209:14,15,16 | | 307:15 308:2 |

G. Bryant Buchner                                      July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[exactly - f]**                                              Page 21

| | | | |
|---|---|---|---|
| **exactly** 16:10 28:5 35:23 52:3 60:4 70:6 75:21 82:10 86:16 88:2 109:9 127:19 139:20 158:3 160:14 162:4 199:6,9 208:18 224:16 237:19 254:9 256:4 265:23 280:5 286:6,11 294:14 305:9 305:22 **examination** 3:3 5:8 6:8 42:8 296:5 304:11 **examined** 154:23 **example** 3:17 123:11,15 130:23 131:4 134:14 140:2 298:4 **examples** 134:21 139:22 282:7 **except** 2:11 127:20 148:9 200:18 211:23 **excessive** 104:4 **exclude** 301:15 | **excuse** 118:12 121:9 184:21 219:21 222:19 231:16 **exemplar** 77:3 **exhibit** 3:13,14 3:15,16,17 7:4 7:6 178:1,8 186:7,9 251:9 251:10 270:5 303:18,21 304:2 **exhibits** 3:11 177:22 **exist** 8:4,5 13:12 19:6 **existed** 18:13 19:12 24:20 107:13 157:14 **exists** 231:11 238:10 **expect** 41:9 202:19 246:4 303:13 **expected** 40:14 158:23 **expenses** 303:9 **experience** 112:17 145:17 256:3 287:21 307:7 **expert** 50:4 142:11 158:10 **expertise** 145:11 158:2,5 | **experts** 202:8 308:17 **expires** 310:23 **explain** 10:16 31:7 66:14 125:23 126:8 134:21 141:13 161:10 193:14 206:12 279:5 296:23 **explained** 124:6 127:11 129:21 133:22 229:14 251:1 280:18 **explanation** 189:16 **exponent** 94:23 95:5 98:17 101:18 103:20 142:11 144:18 223:5 224:8 280:18 **exponent's** 101:8 **expose** 241:13 **exposing** 239:15 241:17 242:4,15 **extended** 20:4 38:21 63:4 **extent** 65:9 203:1 **extra** 301:13 | **extrapolated** 212:8 **extremes** 162:1 **eye** 308:16 **eyeballed** 272:20 273:4 |
| | | | **f** |
| | | | **f** 39:6 62:1 63:3 63:23 65:8 66:14,16 67:9 74:21 76:23 77:5,12,23 78:6,19 79:4 80:13,17 85:12 88:3,9,13 95:16,17 99:4 104:18 151:22 152:6,9,18,23 153:2,4 160:11 161:14 162:19 178:7 179:14 179:15 181:17 193:20,21 206:18,20 208:11,16 209:17,18 212:17 213:23 214:8 215:5 221:9 223:23 224:2,5,16 229:22 237:10 255:15 270:18 273:6 299:9 300:2 |

**[facilitate - find]**    Page 22

**facilitate**
216:22
**fact**  67:5 87:12
150:1,14,17
203:9 215:15
220:17 222:11
222:11 288:3
301:4
**factor**  90:23
93:1 209:9
**factoring**  80:8
**factors**  197:21
**fail**  309:1
**fails**  311:18
**fair**  49:6,11,15
49:19,21 128:8
141:6 162:10
163:22 170:3
176:22 177:19
**falls**  84:19
**false**  215:8,9,16
223:1 225:7
**family**  5:22
**far**  38:15 39:8
43:11 68:4
91:8 93:11
115:5 122:14
123:4 150:10
159:13 177:4
188:21 189:20
214:20 230:6
273:3 276:16
290:17 299:21
307:6

**farther**  180:2
**fashion**  19:2
37:5
**faster**  195:16
**favor**  103:3
268:18
**favorable**
93:10 301:9
**february**  58:5
58:22 59:7
**federal**  5:4
302:16
**feel**  49:11 140:9
232:22 287:3
**feeling**  20:16
**feet**  201:16
203:12 207:4,6
208:14 232:23
**felt**  104:6
**figure**  39:14
166:8 177:17
178:3,11,22
179:6 196:3
200:2 206:2
259:22
**figured**  54:21
**file**  7:20 8:2,4
9:3 12:17 13:6
13:10 17:18,18
17:18 18:8,12
18:21,23 19:16
21:17 22:8
23:17,23 24:10
25:6,19,20
27:7 28:12,13

28:13,15,18
29:23 31:3,4,4
32:18 33:3,12
35:7 36:7,10
36:21 37:6,7
37:12 41:13,15
42:17 43:6,17
44:6,6 47:7
53:18 60:13,15
66:18 67:13
72:10 74:8,8,9
117:6 146:20
146:21 147:5
170:22 190:18
198:10,11,12
198:13,14,17
199:20,20,22
220:15 222:21
226:12,13
227:15,16,20
228:21 230:7
230:10,22
232:14 238:20
239:2,7,10
240:4,7,8,13
241:2,17,19,20
241:22 242:1
243:19,20
244:6,7,8
245:8,9,13,13
245:23 246:16
249:7 250:2,9
250:15 263:16
267:9 268:15
298:22,23

299:5
**filed**  26:10
**filer**  10:21
**files**  8:22 15:13
17:13,17,19,23
19:4,10 20:20
20:21 21:4,11
21:21 22:1,10
23:11 29:16,20
29:22 30:4,8
30:12,16,22
32:11 37:11,14
38:13,14 42:15
42:19 43:23
52:2 69:11,11
74:4,15 182:19
226:10 234:15
249:1 296:22
298:19 299:1
**filing**  2:17 18:6
23:22 24:3
27:6 29:7
**final**  9:6 24:18
26:17 42:7
45:17,19
274:12 298:22
**finalized**  45:15
**finally**  12:19
20:19
**find**  8:7,20 13:6
17:21 18:21
19:7 20:20
22:7,22 29:23
29:23 43:5
44:6 46:3

**[find - form]**                                                    Page 23

52:21 76:10
168:20 169:8
169:10,11
181:11 182:14
184:4 212:23
216:23 223:2
245:15 248:7
254:15 260:11
261:8 265:4
290:2
**fine**  14:16 84:3
88:6 125:20
138:7 142:9,18
144:4 146:3
193:4 269:3
283:18 287:17
**finish**  154:17
229:4 244:13
246:10
**finished**  25:5
293:20 306:2
**finishing**  47:19
**first**  6:5 7:17
12:13 14:1
15:4 37:5
39:21 44:14
65:6 75:8
78:19,20 84:2
86:10 104:1
106:8 114:20
121:5 142:1
147:11 165:16
170:7,12 171:9
177:13 179:14
179:21 180:19

182:7 197:9
202:16 214:23
222:9 224:22
227:16 228:9
231:3,11 232:2
232:4,11
233:23 261:13
261:14 266:6
305:18,22
**fit**  197:16
198:23 199:1
**five**  88:19 89:4
151:21 164:6
195:14 199:9,9
199:19 208:8
217:14,20
221:14 222:21
223:14 225:4
225:20 231:13
231:18 276:3
287:11
**fix**  43:9,15
298:18
**fixed**  27:1
195:15
**fixing**  184:23
**flat**  181:3
**flip**  225:3
**flipped**  211:23
**floor**  155:4,17
155:22 259:7
**fluid**  81:6,16,18
299:8,21,23
300:2 307:4

**fluids**  80:13
81:11,15
**flush**  153:1,6,6
153:11
**fly**  129:11
**fmvss**  302:16
**fold**  38:10
**folder**  8:20
199:11 227:17
227:18 249:13
249:15,18
**folders**  9:4,5
**follow**  64:14
113:20 202:18
254:11 282:20
282:22 283:7
284:19 289:8
304:8
**followed**  52:6,9
65:23,23 66:6
125:14
**following**  5:9
209:20
**follows**  6:6
246:16
**foot**  86:9,14,17
86:18,23 87:3
87:23 88:1
201:17 252:4
256:8 266:17
266:20,20
**force**  2:4
151:14 203:16
**forces**  93:11

**ford**  71:4 82:19
83:10 86:11
176:20 178:6
179:13 182:1
183:13,19
184:3,11
186:19 187:5
188:21 189:23
191:2,18
194:18 196:7
196:14 198:15
199:3,4 200:6
228:9,16,17
229:5,7 230:6
232:3,17 234:4
235:22 236:16
236:17 270:17
270:18,20
272:6,17
**foregoing**  5:5
310:7,10 313:5
**foremost**  115:7
**forensic**  42:8
**forgive**  180:3
204:5
**form**  2:11
18:12 19:1
21:9 33:13,21
49:7 70:20
102:2 111:18
113:21 116:3
117:16 126:5
140:17 141:8
151:8 219:15
224:19 225:13

G. Bryant Buchner
July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[form - georgia]**

Page 24

236:2 238:2
279:7 280:14
280:16 283:3
285:7 305:19
310:9
**formally**
267:18
**format** 36:7
**formed** 269:6
**formula** 281:19
282:12
**formulas**
275:15
**formulate**
296:9
**forth** 113:5
**forties** 102:21
**fortunate** 220:4
**forward** 155:11
203:12 228:12
**foul** 69:22
**found** 9:17,19
10:8 23:2
106:14 130:7
138:18 140:4
186:2 228:1
**foundation**
105:1
**four** 76:11
151:12 178:11
199:8 218:22
221:13,14
222:14 223:13
223:19 257:5,6
260:4

**fr26** 7:8,13
25:8 28:14
41:5 46:3 51:9
51:14,20 61:19
142:7 214:5
**frame** 95:10,19
107:2 110:1,2
122:13,21,22
131:1,23
147:20,23
148:10 149:23
152:4,5,19
153:10 172:22
220:23 255:8,9
255:11 274:5
285:12,12
**frames** 94:6
206:5
**free** 261:18
**freezing** 234:14
**front** 6:16
159:6,23 180:2
199:4 202:6
212:5 223:22
224:2 228:5,10
228:16 229:22
236:19 237:8
240:20,23
249:2 252:17
252:21
**froze** 195:10
**frustration**
137:14 295:11
**fuel** 80:17 81:1
83:13

**full** 2:5 81:1
88:18 104:15
104:17 146:23
152:2 162:3,6
164:6
**fully** 40:7 166:4
224:12
**function** 156:4
**functioned**
156:18
**functioning**
60:14
**functions**
243:19
**further** 2:1,8
2:16 150:20
180:10 309:9
310:14
**furthest** 184:10
252:16
**future** 145:4
295:8

**g**

**g** 1:17 5:7 6:4
311:5 312:2,24
313:2,4,12
**gainesville** 1:3
4:3
**gamut** 205:19
**gap** 156:20
157:4,6
**garbled** 48:20
**gas** 80:17
104:15,17
299:19

**gbb** 249:11,13
250:3
**general** 9:23
142:18 191:9
283:6
**generally** 79:20
213:9 284:19
288:10 289:8,9
289:13 292:14
292:16 309:3
**generate** 21:21
38:14 46:16
74:16
**generated**
14:11 17:23
35:6 72:18,19
74:4 110:4
**generates**
239:13
**generating**
142:6 147:1
**generic** 283:7,8
**generically**
70:22 103:17
**gentleman** 31:1
**geometrically**
262:15
**geometries**
110:19
**geometry** 75:22
75:23 267:11
**george** 5:14
**georgia** 1:2 4:2
4:12,16,20

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[getting - going]**                                    Page 25

| | | | |
|---|---|---|---|
| **getting**  13:6 | 229:10 238:22 | 187:22 188:12 | 40:21 50:19,20 |
| 23:21 25:3 | 255:18 256:15 | 195:15 218:2 | 56:8 61:2 63:6 |
| 26:7 109:9 | **giving**  47:9 | 220:11 221:21 | 64:12 65:3 |
| 123:3 143:12 | 121:12 207:21 | 221:22,23 | 73:14,15,15 |
| 152:12 154:12 | 214:12 | 222:13,19 | 74:19 83:23 |
| 163:11 176:5 | **glad**  137:20 | 225:17 228:23 | 86:18 100:11 |
| 206:1 279:20 | **gladly**  26:23 | 229:3 234:23 | 103:11 108:10 |
| 286:2 297:15 | **glass**  84:11,15 | 237:8 240:20 | 109:3,7,7 |
| 306:20 | 84:17,19,20,23 | 244:16 245:22 | 119:16 121:9 |
| **give**  20:15 | 84:23 85:4 | 251:6,20 | 125:2 131:11 |
| 26:18 42:11 | 299:10,21 | 252:19 253:15 | 132:22 133:1 |
| 43:3 56:20 | **glitchy**  229:1 | 253:19,22 | 135:13 140:9 |
| 83:20 132:12 | **go**  9:12 13:5 | 254:16,17 | 141:12,12 |
| 134:13,13 | 17:14 28:16 | 255:4 257:1 | 142:22 143:9 |
| 136:5 158:11 | 29:11 31:12,12 | 260:5,6,11 | 144:23 147:17 |
| 158:18 164:22 | 34:2,13 35:4 | 279:9 281:13 | 150:10 163:13 |
| 165:3 187:10 | 36:16 48:8 | 283:5,10 285:9 | 164:23 165:1 |
| 192:2 194:16 | 56:7 68:4 | 286:13,15 | 167:14 168:8 |
| 195:13 230:20 | 87:16 90:21 | 290:1 291:8,13 | 168:19 171:2,5 |
| 234:15 245:4 | 102:6 107:17 | 292:3,8,17 | 181:7 186:22 |
| 247:8 248:2 | 108:2 111:21 | 298:2 302:5,5 | 195:22 201:2 |
| 254:16 263:18 | 112:3 114:3 | 305:8 306:1 | 202:5,6,12,15 |
| 267:19 269:17 | 115:9 116:6 | 308:23 309:1 | 202:17,18,23 |
| 282:7 304:14 | 117:18 120:7 | **goes**  28:10 | 207:2 212:10 |
| **given**  42:12 | 120:19 124:17 | 32:13 91:8 | 212:11 213:18 |
| 43:21 110:18 | 127:7 129:3 | 94:17 103:9 | 217:1,2 218:18 |
| 110:19 112:8 | 130:10,12,12 | 116:4 117:16 | 227:7,8,9 |
| 112:12 133:21 | 130:13 131:21 | 138:4 140:18 | 233:21 237:10 |
| 134:4,20 140:2 | 132:14 136:1 | 148:5 159:12 | 237:12 239:20 |
| 248:15 283:15 | 140:21 144:22 | 206:22 281:19 | 241:13 242:17 |
| 296:14 313:9 | 149:9 158:17 | 298:16 | 244:14 247:3,8 |
| **gives**  12:3,4 | 161:21 171:2 | **going**  6:10 | 253:22 257:14 |
| 161:15,15 | 181:14 182:20 | 12:23 13:2 | 260:10 273:7,9 |
| 168:21 199:9 | 185:12 186:6 | 20:5 34:7,15 | 273:11 274:15 |
| 214:3,19 225:3 | 186:12,22 | 35:5 39:15 | 277:8 278:10 |

Case 2:22-cv-00017-RWS    Document 119-6    Filed 01/20/25    Page 105 of 153
G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[going - he'll]                                              Page 26

278:18 287:11
292:8,17
295:13 302:9
303:16 308:15
**gold**  194:15
**good**  16:22
  17:9 57:1 61:7
  86:6,20 123:3
  123:15 128:8
  129:5,13 132:1
  132:3 133:2
  146:2 147:9
  159:4 160:4
  162:12 164:18
  213:10 228:14
  238:9 253:1
  254:22 263:10
  267:20 278:6
  286:2,3 290:12
**gotcha**  75:16
  205:10 254:21
**government**
  302:22 303:2,8
**graphical**
  13:14 14:4
  16:4 69:7
  72:13 73:4
**great**  30:5
  61:18 68:19
  128:20 146:1,8
  196:5 203:1
  287:14 309:4
**greater**  149:18
  150:13 151:14
  308:23

**green**  192:21
  193:8 206:15
  206:17 209:22
  210:18,23
  211:4
**grief**  235:5
**grimes**  67:23
  82:17 96:7
  113:11 114:15
  114:23 115:4
  144:1 146:20
  148:21 154:13
  160:17 161:7
  161:11 177:1
  198:6,7 202:10
  203:9 216:9
  217:15 219:21
  220:9 230:17
  232:10,12
  237:4,13
  238:13 240:9
  243:15 245:4
  245:18,22
  246:3 256:3
  259:9 260:23
  262:5 263:1
  266:21 275:6
  277:6 290:7
  292:7 294:18
  308:19
**grimes's**  44:15
  45:8 91:2
  96:12 114:16
  118:8 141:15
  146:21 147:5

161:6 177:1
190:17 220:11
222:15,17
225:1 226:2,3
226:4,4 227:13
239:7,10,16,23
240:4,7,13
243:5 244:3,7
244:8 245:23
246:11 247:7
247:20 264:6
**ground**  159:10
  208:11
**grounds**  2:13
**groundwork**
  292:4
**guess**  34:6 73:9
  188:10 193:11
  226:3
**guesses**  11:12
**guessing**  44:17
**gunn**  4:11
**guy**  10:21,21

| h |
| --- |

**h**  312:3
**habit**  56:16
**hair**  300:3
**half**  135:1
  214:4 254:4
  257:5,6
**hall**  175:23
**hand**  26:11
  64:10 130:5
  188:1 289:15
  291:23

**hands**  295:16
**hanging**  258:6
**happen**  9:7
  109:22 233:19
  237:15 302:19
**happened**  8:8
  23:6 24:4
  25:21 26:15,21
  28:4,4 43:4
  55:17 122:20
  139:5 223:18
  235:2 286:4
**happens**  8:12
  19:15 27:7
  139:18 199:18
  203:1 228:14
  235:3 298:10
**happy**  56:7
  138:10,14
  258:14 295:17
**hard**  33:21
  43:7 227:11
  266:17
**harder**  13:7
**harm**  69:22
**hash**  228:11
**hatch**  91:19
  155:23 156:13
  156:20 157:4,6
  157:9 175:16
  259:1,8
**hate**  175:22
  195:12
**he'll**  34:17
  166:17

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[head - hook]**                                                Page 27

**head** 46:2
  105:16 111:7
  119:7 208:13
**hear** 15:23
  48:14,17,19
  137:13
**heard** 15:22,22
  170:4 192:8
  295:10
**hearing** 128:2
**heart** 269:1
**heck** 26:11
**height** 67:4
  76:23 77:12
  99:4 201:7
  208:10,16,20
  209:4,7 238:4
  284:9 285:2,5
  291:18
**heights** 209:10
**held** 217:10
**help** 26:2 45:5
  45:11 48:16
  194:12 211:8
  284:15
**helps** 211:12
**hereto** 313:7
**hey** 13:5 20:19
  23:5 120:8
  167:9 188:12
  266:16 274:13
**hiding** 233:2
**high** 162:5
  164:16

**higher** 63:17,22
  187:22,22
  209:13 210:8
  210:19 212:10
  289:18
**highlighted**
  79:7
**hill** 3:5,7 4:10
  5:18,18 6:9
  61:2,7,14,15
  69:16,18 70:19
  71:7,14,23
  72:2,11,12
  83:19 84:3,8
  84:10 89:3,13
  89:14 105:17
  105:20 106:9
  114:1,7 119:17
  121:7 125:21
  126:4 137:2,9
  137:10 138:7
  141:10,11,22
  143:1,8,19
  144:2,10 145:2
  145:9 146:1,5
  146:9 151:6
  154:6 158:3
  176:2,5,14
  182:16 183:5
  185:7 188:3,9
  195:12,22
  211:14 225:14
  240:10,17
  250:23 260:3
  260:10,14,20

  260:21 279:16
  280:3,23 287:8
  287:14,21,22
  295:4,20 304:4
  304:7,12 309:5
**hinge** 208:21
  210:2 211:3
  212:2,6,12,18
  212:20 213:4,8
  213:8,14,16,21
  214:1,10,15,16
  214:17 215:4
  216:16,17,18
  217:1,3,4,21
  218:6,23 219:3
  219:4,6,7
**hinges** 208:23
  209:2,5,7
  214:4,20,20
  218:10
**historically**
  275:8
**history** 292:18
**hit** 64:3 92:3
  93:8 94:19
  107:4 110:1,6
  122:23 172:21
  172:23 197:10
  198:8,9,10,17
  200:11,14
  202:23 246:22
  247:11,12
  251:23 252:1
  252:23 254:3
  255:8,9 257:23

  258:1 289:7
**hits** 201:18
  202:7
**hitting** 110:19
  166:1 180:14
  200:12 274:5
  288:17
**hold** 27:16
  61:15 69:2
  146:9 195:15
  211:7 217:8
  220:5 228:16
  269:23 276:7
**hole** 198:7
  254:8
**holes** 252:7,9
**hood** 206:19,22
  208:16 209:16
  211:21 212:5,9
  235:18
**hook** 95:17
  122:12,22
  131:1,15
  152:17 153:7
  197:9,12 198:2
  198:3,7 203:10
  203:11 204:23
  205:4,17,22
  219:19,20
  220:5 247:11
  247:16,21
  251:23 252:1,6
  252:8,14,16,18
  252:21,23
  253:8,10 254:3

**[hook - images]**    Page 28

254:18 255:11
255:14,15,22
256:19 258:1,7
261:16
**hooks** 180:1
256:5,5 262:13
262:21 264:22
**hope** 195:23
**horn** 122:21
255:8,9,11
**hour** 39:5 61:3
88:9,14,18
100:4,7 101:23
102:10,11
135:1 141:19
162:18 163:1
163:22,23
164:6,10 165:5
166:14,22
**hours** 130:18
278:4 287:6,15
**house** 132:23
133:2
**houses** 242:7
**hudgins** 4:11
**huge** 113:10
**huh** 27:11
163:4 187:18
**hundred**
124:18 128:7
144:9 183:16
191:14 215:19
300:19,22
306:8,11,13,15
307:11 308:15

308:16,18
309:2
**hundreds**
130:17 245:11
271:8
**hundredth**
201:22
**hundredths**
202:2
**hurting** 127:23
**hv** 13:14 14:7
**hve** 8:22 21:11
21:17,21 22:7
23:11 27:19
29:17,21,23
30:16 31:16
32:11 34:8
36:18 37:11
38:18 48:11
49:2,4 50:4,10
52:16,17 53:14
54:4,17 59:1,9
59:17,22 60:5
62:7,10,17,21
62:23 63:3,10
63:20 65:8,16
69:3,5,8 70:4
70:20,21 71:8
72:5,7,19,19,21
72:22 73:14
74:3,7 79:10
89:14 90:11,12
91:4,8 106:12
107:14 109:12
109:17,22

110:11 111:3
111:16 113:2
115:14,20
122:2 126:16
127:18 128:11
129:17 132:16
133:8,15 134:1
135:2 138:17
139:9 140:3,10
141:14 142:2,6
142:10,18
143:2,4,7,20
144:4 145:4,12
145:17 149:19
151:18 169:20
169:22 172:4,5
172:8,19 174:8
260:8 276:13
277:13 278:13
278:19,20
279:3 280:5,17
281:6,10,15
282:18 284:1
285:3 288:1,1
289:10 290:5
290:22 291:16
292:13,22
301:3,4,12,14
301:20 302:7
302:14,15
303:1,7,8
304:15 305:1
305:16
**hve's** 90:3

**hypothetical**
101:20 109:14
138:20 139:12
162:9 285:4
291:17

**i**

**idea** 8:9 24:5
60:20
**identical**
101:15 277:16
293:9,10,11,12
**identification**
7:7 178:9
186:10 251:11
303:22
**identified**
126:21
**identify** 5:15
27:20 116:23
**ignored** 49:1
50:10
**illustrate** 227:2
**image** 3:17
70:11 73:19
185:12,13
187:4,12
207:11,14
220:21 227:16
234:9,17 240:4
240:11 248:14
254:1,15 260:7
269:18
**images** 14:9,11
14:12,13
194:18 239:13

Case 2:22-cv-00017-RWS    Document 119-6    Filed 01/20/25    Page 108 of 153
G. Bryant Buchner    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[images - incorrect]**                                          Page 29

243:6 246:21
**imagine**  138:23
**impact**  91:20
  91:21 102:17
  110:16,22
  112:11 115:11
  115:14,23
  118:20 131:23
  153:1,14 156:1
  162:7,20 163:2
  166:17 168:7
  179:15 180:20
  196:23 200:22
  202:9,22
  203:11 205:1,4
  205:4,17
  209:19,20
  210:5,21
  211:19,20
  212:11 213:7,9
  213:14 215:5
  215:11,14,15
  215:16,18,21
  216:17 219:23
  220:2 221:4,4
  221:9 222:4,5
  222:22 223:16
  224:5,16 225:7
  225:19,21,23
  229:16,20
  230:1,2,8,14,17
  231:6,7,9
  232:8 233:1
  236:7,23 237:7
  249:5,6 250:17

250:18,19
  251:7,7 252:12
  252:14 253:2,3
  256:19 257:19
  285:13,21
  289:4 293:12
  305:5
**impacted**  153:3
  156:13 189:3
  255:15,23
  257:11
**impacting**
  201:4
**impacts**  93:3,4
**imperfect**
  218:17
**important**
  69:23 229:9
**imported**
  297:16
**impossible**
  281:6,10
**imprint**  177:16
  177:19 178:6
  183:12 186:17
  195:7 202:20
  204:23 205:18
  214:8 217:8
  237:1 252:6,8
  270:17
**imprints**
  176:20 183:18
  186:19 189:23
  191:18,21
  262:12

**improper**  106:5
  204:4
**improperly**
  218:16
**improve**  44:12
**improvement**
  11:17
**improvements**
  56:19
**inaccurate**
  96:16,18
  263:11
**inappropriate**
  121:6
**inaudible**  81:11
**inboard**  192:22
**inch**  67:4 88:6
  202:11 217:11
  225:19 231:13
  238:15,16
  266:18 273:9
  276:4
**inches**  11:19
  52:11,12 67:1
  67:3 77:2,10
  85:23 86:8,14
  86:23 87:7
  96:2 135:3
  199:2,8,19
  207:3 208:8
  213:19 214:11
  217:14,20
  218:22 220:12
  220:14 225:20
  226:8 228:19

229:12,20
  230:13 231:15
  231:18,19,19
  232:4,6 236:6
  237:13 238:13
  238:14,22
  255:18 257:5,7
  261:21 262:8
  263:14 265:18
  266:9 267:1
  268:12 271:2
  273:10,11
  278:2
**incident**  178:4
  304:16
**incidents**  172:7
**include**  91:1
  222:12 301:4
  301:15
**included**  56:19
  90:19 142:3
  301:16 302:4
**including**  25:12
  91:9
**inclusion**
  223:17
**incomplete**
  39:8
**inconsequent...**
  300:20,23
  307:4
**inconsistent**
  23:3 24:9
**incorrect**
  114:11

**[increase - interrupting]**                                Page 30

| | | | |
|---|---|---|---|
| **increase** 168:23 | 254:13 271:19 | **input** 31:2 | **instructions** |
| 275:20,21 | **indication** | 38:19 39:16 | 31:9 |
| 276:12,15,16 | 256:18 | 41:1,15 79:15 | **instructor** |
| 278:1 280:8 | **indicative** | 140:16 175:15 | 290:7 |
| 284:2,4,4 | 255:22 | 239:8 268:11 | **instructs** 291:3 |
| **increased** | **indicators** | 272:18 298:14 | **intelligent** |
| 132:4 277:14 | 205:3 | **inputs** 35:1 | 137:16 |
| 282:10 | **indiscernible** | 46:21 145:6,19 | **intend** 137:22 |
| **increases** | 16:18 17:4 | 297:8 | 158:11 245:3 |
| 282:10,16 | **individually** | **inputted** | 260:22 304:14 |
| **increasing** | 17:15 | 239:18 | 305:16 |
| 93:11 | **industry** 110:9 | **inputting** 67:13 | **intended** |
| **incredibly** | 112:18 145:13 | 297:20 298:8 | 215:14 224:10 |
| 127:17 | 288:10 289:11 | **inquired** 19:19 | 249:5 250:17 |
| **indentures** | 292:7,15,16 | **inside** 82:11 | 250:18 251:7 |
| 159:15 | 303:11 | 193:9 195:3 | **intending** 36:5 |
| **independent** | **infinite** 241:6 | 212:6 213:16 | **intense** 295:15 |
| 177:1 217:13 | **information** | 228:10,13,17 | **intent** 25:19 |
| 246:9,15 | 43:14 67:8 | 250:15 259:23 | 28:1 64:8 69:1 |
| 291:19,22 | 70:14 71:20 | **insinuate** | 91:23 92:4 |
| **independently** | 83:21 102:7 | 125:12 | 96:11 224:13 |
| 199:17 287:23 | 113:1 145:17 | **inspect** 97:11 | 299:1 |
| **indicate** 174:17 | 156:7 248:2 | 97:20 98:9,12 | **interested** |
| 176:18 178:13 | 274:20 284:6 | **inspecting** | 310:16 |
| 178:20 179:10 | **initial** 15:8 | 97:14 | **internet** 82:16 |
| 221:8 245:3 | 19:6 20:22 | **inspection** | **interpret** 205:1 |
| 266:9 | 38:15 61:21 | 178:4 | **interpretation** |
| **indicated** | 88:12 238:12 | **instance** 138:17 | 169:6,13 |
| 100:11 168:8 | 252:11,14 | 190:6 194:6 | 185:21 192:19 |
| **indicates** | 253:2 | **instances** 128:4 | 193:3 224:9 |
| 235:17 | **initiated** | 139:5 150:12 | **interpretations** |
| **indicating** | 221:20 | **instructing** | 197:15 |
| 188:20 196:13 | **injuries** 158:8 | 279:16,19 | **interrupting** |
| 208:21 240:5 | **injury** 157:21 | 287:8 290:8,11 | 244:19 |
| 251:4 253:23 | 158:15 | | |

G. Bryant Buchner

July 11, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**intrusion**
140:12,14
158:12
**intuitively**
106:22 277:1
**invalid** 106:4
150:15
**invalidate**
150:4 294:22
**invalidates**
114:13
**investigated**
19:22 91:6
**investigation**
121:2,3 133:13
**involve** 175:12
**involved** 99:19
103:9 140:15
218:23 302:11
**involves** 177:14
**involving**
304:16
**irrelevant**
259:11 308:6
308:12
**irritated** 138:4
138:8
**ish** 8:1
**issue** 7:19,22
8:12 44:22
61:16 77:11
131:3,4,6
142:15 146:6
231:2 248:22
266:13 303:13

**issues** 56:15
115:10
**item** 149:5,16
151:1,12,21
152:22 158:19
160:16
**items** 79:3 80:8
155:13 180:1
**iteration** 10:23
**iterations**
297:1
**iterative** 24:15
24:15

**j**

**jacked** 286:5
**jacob** 32:5,8,12
65:5
**january** 8:2
10:11 12:9
15:12 24:20
26:17 27:18
58:5
**jeff** 178:3
**jess** 4:22
**job** 9:3 31:20
32:3,7 265:5
295:15
**joke** 188:6
**jokes** 188:7
**joshua** 311:4
312:1 313:1
**july** 1:18 5:12
**june** 105:21
146:12 178:1

**jury** 269:19
**justification**
172:12

**k**

**keep** 19:23 26:4
136:9 141:12
187:21 192:7
253:22 264:2
279:20 297:19
297:19 299:2
**keeps** 88:5
**kept** 12:17 13:6
13:8 54:23
257:14
**key** 229:9
**keystroke**
297:12
**kidd's** 178:4
**kill** 242:20
**kin** 310:15
**kind** 9:23 28:3
118:10 153:18
156:6 171:19
175:17 184:8
206:12 225:11
228:15 255:6
286:21 289:2
298:8 299:14
**kindly** 7:16
**kinds** 160:7
**kit** 285:11
**kits** 103:7
304:17
**knew** 39:2
40:22 44:17

81:16 221:17
243:13 261:13
261:15 274:14
**know** 7:10 8:12
8:16,17,20 9:2
10:1,21 11:2
11:13,14,15,17
11:18,20 12:11
14:15,18,18
15:21 16:18
18:4 20:1,2,6
20:14,17,18
23:9 24:2,4,7
25:18 26:8,10
27:1,2,3,23
28:1,2,4,5,8,18
28:23 29:2,13
30:4,6,9,10,12
30:23 32:10,15
32:17,22 33:1
33:2,23 34:2
34:13,15,16,19
34:20 36:1,8
36:13,15,16,18
39:17,18 40:9
40:11 41:3
42:1,9 44:7,11
44:18 45:16
46:1,10,14,17
47:3,21 52:8
52:18 53:4,5
53:12 54:6,7
54:10,16 55:13
56:23 57:2,4,5
57:14,14,15

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[know - knows]**                                              Page 32

| | | | |
|---|---|---|---|
| 59:2,11,11,12 | 137:13,16 | 208:17,19 | 288:2 289:2 |
| 59:14 60:14 | 139:3,16 140:5 | 209:1,2,4,6,15 | 292:14,17,21 |
| 61:4 64:2 67:4 | 140:6,7,8,23 | 210:5,11 | 293:3 295:8 |
| 67:6,16,17,20 | 142:16 144:17 | 211:12,23 | 297:15,18,19 |
| 68:2 69:22 | 144:19 145:11 | 213:9,11,15 | 298:1,20,23 |
| 70:5 75:9 76:1 | 145:17,22 | 214:22 215:17 | 299:18,21,22 |
| 80:16,20,21,23 | 147:6,19 | 216:2,6,9,10 | 300:1,4,11,18 |
| 81:1,9 82:9 | 148:10 149:2,6 | 217:1,3,5 | 300:21 301:18 |
| 83:12 84:22 | 153:7 154:20 | 218:15,18,19 | 302:2,3 304:18 |
| 86:8,13,13,21 | 155:15,23 | 218:23 219:4,5 | 304:19 306:19 |
| 87:4,15,16 | 156:5,12,19 | 219:7 220:9,9 | 306:21 307:6 |
| 88:17 90:18 | 159:7 160:4,13 | 222:10 225:20 | 307:10,11 |
| 91:15 93:11 | 160:14,17 | 225:20 227:2 | 308:9,9,11,21 |
| 94:8 97:17,21 | 161:19 162:14 | 230:21 233:11 | 308:22 |
| 98:13,14 | 164:17 165:8 | 233:16,18,22 | **knowing** |
| 100:16 102:8,9 | 167:3,6 168:6 | 234:18 238:7 | 139:22 207:13 |
| 103:1,3,5 | 172:15,16,17 | 242:5 243:12 | **knowledge** |
| 104:6 105:15 | 172:19,19 | 245:10 247:1 | 25:5 29:8 91:9 |
| 107:18,19,20 | 173:4,18 174:4 | 248:23 254:5 | 145:10,16 |
| 108:4,8 109:4 | 174:13,20,23 | 256:7,8,13,14 | 173:22 265:1 |
| 109:18,19 | 175:3,8,11,19 | 257:16 259:8 | 308:22 |
| 110:14,15,15 | 179:7,19 180:5 | 259:11,15 | **known**  26:22 |
| 110:19,20,21 | 180:16 182:11 | 261:10 262:10 | 56:23 67:9 |
| 113:15 115:6,9 | 183:14,21 | 262:14 263:6 | 113:1,8 191:3 |
| 115:11 116:16 | 187:7,7 188:3 | 266:1,17,20 | 207:13 256:12 |
| 117:9,19 119:6 | 188:7,9 190:5 | 268:23 269:4 | 256:13 288:17 |
| 120:2,3,6,8,12 | 190:9,11 191:7 | 272:11 274:5,7 | 288:18 |
| 121:19 123:13 | 191:9 193:2 | 274:15,19 | **knowns**  113:1 |
| 128:17,19,21 | 198:11 199:9 | 275:4,7,8 | **knows**  27:7 |
| 129:8 130:14 | 200:14,19 | 276:18,19 | 82:7 145:12 |
| 130:17 131:2,8 | 201:7,8,13,18 | 277:1,2,3 | 198:11 239:13 |
| 132:6,10,17,20 | 201:19 202:14 | 278:20,21 | 241:2 290:12 |
| 133:5 134:11 | 203:12 205:8 | 282:11 283:1,6 | |
| 134:14,17,20 | 207:22 208:4,7 | 284:6,8,18 | |
| 136:3,4,5 | 208:10,13,15 | 286:16 287:20 | |

Case 2:22-cv-00017-RWS    Document 119-6    Filed 01/20/25    Page 112 of 153
G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[l - line]                                                              Page 33

| l | | | |
|---|---|---|---|
| **l**  311:1 | **leap**  283:19,19 | **letter**  6:11,15 | **levels**  39:11 |
| **labeled**  7:3 | **leave**  159:8,22 | 7:1,11 29:10 | 110:2 140:13 |
| 37:18 222:1 | 160:3 182:17 | 146:13 184:19 | 148:7,23 |
| 225:7 | 220:7 228:22 | 185:22,22 | **license**  252:4 |
| **labels**  222:4,4 | 234:9 | 191:18,21 | **licenses**  32:1 |
| 222:22 223:16 | **leaving**  153:16 | 192:20 223:8 | **lift**  103:7 167:6 |
| **laid**  292:4 | **lectured**  125:17 | 297:11 | 167:7 168:23 |
| **land**  129:11 | **leeway**  83:20 | **letters**  183:19 | 285:11 304:17 |
| **laptop**  241:20 | **left**  19:16 87:8 | 184:2 185:8,20 | **lifted**  161:8,8 |
| **large**  181:12 | 88:7 100:17 | 186:19 187:4 | 161:13 163:15 |
| 212:23 213:1 | 122:15,23 | 189:7,18 192:5 | 163:17 164:14 |
| 310:6 | 150:10,20 | 193:4,5,17 | 165:13,16,18 |
| **larger**  308:12 | 183:15 185:14 | 194:3,4,7 | 165:20 166:13 |
| **lateral**  238:22 | 185:15 187:22 | 195:7 197:14 | 166:21 167:4 |
| **laterally** | 188:21 189:20 | **level**  23:7 39:8 | 167:10,18 |
| 200:20 | 190:16 196:11 | 80:16 81:1 | 170:12,18 |
| **latest**  60:1,2,10 | 197:6,12 | 83:12 90:21,21 | 171:9,13,14 |
| **laws**  2:5 107:1 | 198:16 200:2 | 92:3,14 93:3 | 172:4 173:11 |
| 111:1 233:8 | 200:15 204:22 | 94:6 95:14,19 | 286:5 |
| **lawyer**  97:18 | 205:17 214:1 | 95:19 131:23 | **light**  220:6 |
| 97:22 301:2 | 215:22 217:12 | 138:19 139:11 | **likely**  90:19 |
| **lay**  138:5 238:6 | 219:10,12 | 147:16,20,20 | 160:3 |
| **layperson's** | 221:17 229:5 | 148:6,6,8,9,10 | **likewise**  92:10 |
| 75:3 | 248:14 252:8 | 148:12,12 | **limited**  126:13 |
| **lead**  15:22 | 252:14,17 | 149:23 150:19 | 204:21 215:22 |
| 108:9 | 258:22 272:9 | 152:4,5,6,9 | **line**  7:13 |
| **leading**  2:11 | 272:13,23 | 153:9,10,11 | 100:15 101:2 |
| **leads**  106:11 | 273:8 | 155:12,17 | 103:9 107:15 |
| 160:9 | **legal**  311:23 | 168:12 172:23 | 141:12 144:20 |
| **leak**  81:8 | **legitimate** | 213:11 237:12 | 177:18 188:22 |
| **leaked**  81:4,17 | 142:1 | 272:15 274:5 | 200:8 202:20 |
| 83:15 299:8 | **length**  63:7 | 276:22 281:5 | 203:16 204:2 |
| **leaking**  299:23 | 230:23 231:1 | 285:11,12,12 | 206:17,18,19 |
| | **leon**  4:15,19 | 285:12 287:1 | 206:21,22 |
| | | 289:16 | 209:20,21,22 |

[line - look]                                                      Page 34

210:15,19,20
210:21,22
211:4,5 212:5
216:10,11
218:4 221:19
224:1,7,7,17
225:6 226:7
231:23 234:5
235:18 239:17
241:15 252:2
261:11 263:12
271:22 280:22
312:4,7,10,13
312:16,19
**linear** 231:22
**lined** 198:7
   200:7 204:9,14
   232:10 234:5
   237:4,4
**lines** 193:18
   206:13,15
   207:9 210:9,12
   211:21 214:14
   214:18 215:6
   216:6,14
   218:11 240:12
   270:5
**link** 242:21
**list** 69:10,11
   146:23
**listed** 147:6
   245:8 246:11
**listened** 50:10
**listening** 87:5
   104:5 135:19

**lists** 147:7
**lit** 307:3
**literally** 112:10
   116:10 127:22
   145:22 238:23
**literature**
   112:18
**little** 54:12 61:3
   63:6,7,8 86:7
   137:11 149:12
   153:8 158:18
   180:9 181:4,6
   181:8 184:7
   185:20 187:21
   187:22 189:15
   192:15 196:11
   208:13 238:6
   252:20 254:18
   271:1 272:9,10
   273:1,10,20
   295:6,9,10
   299:13 304:20
   307:3
**llc** 1:10 4:15,19
   311:4 312:1
   313:1
**locate** 8:6 19:2
   184:1
**located** 67:23
   253:10 256:23
**location** 79:13
   79:19 80:8
   85:13 98:17
   115:12,14
   116:1 118:20

184:2 192:4,5
196:20 203:10
204:22 205:17
215:19,21
221:8 231:5
256:19
**locks** 248:20
**lodge** 84:4,4
**logic** 209:20
   275:2
**logo** 176:20
   177:16,18,19
   178:6,6 179:13
   180:2,15,19
   181:2,7,15,17
   182:3,6,9,10
   183:13,17
   185:2 186:17
   186:18 188:21
   189:3,19 190:3
   190:3,6,10,11
   190:14,19,19
   190:20 191:3
   191:11,13,14
   191:17 192:10
   192:23 193:9
   193:16,17
   194:1,9,13,18
   195:4 196:20
   198:1,4,8,15,16
   199:3,4 200:17
   201:9 202:6,11
   202:20,23
   203:3,4,23
   204:13,14,22

205:4,18,22
213:8,13 214:8
216:17 217:8
219:2,5,7,9,11
219:12,17,18
220:14,14
225:23 228:9
228:15,17
229:5,7,12,12
234:4 235:22
236:16 237:23
262:12 270:17
270:20 272:6
272:14,17,18
**logos** 199:5
   200:11,12,15
   231:5 232:17
   236:5,5 261:1
   261:5,12,13
   262:6 263:2,14
   264:12,14,18
   265:8,20 266:4
**long** 15:20
   20:14,17 22:19
   57:10,10,11
   90:21 112:6
   144:23 166:18
   192:8 233:7
**longer** 19:11
   238:7
**longitudinal**
   224:6
**look** 6:19 25:3
   25:18 31:13
   33:13,21 35:5

Case 2:22-cv-00017-RWS    Document 119-6    Filed 01/20/25    Page 114 of 153
G. Bryant Buchner                                        July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[look - make]**                                                        Page 35

35:8 46:5,8
52:19 71:20
73:6 76:6 82:1
82:2 94:20
104:18 105:11
115:10 116:9
116:15 118:4
118:20 119:1
120:21,23
130:2 131:6,11
132:21 133:1
139:22 147:15
147:21 149:9
152:14 156:16
181:10 183:18
188:18 198:5
203:7,16 219:2
220:10,21
221:2,3,23
228:4,5 229:12
234:8 235:15
237:8 238:4
242:9,12
248:17 259:3
259:17 263:9
263:11 286:18
286:22 289:5
**looked**  8:3,10
9:19,22 10:18
10:18 11:11,23
12:20 45:9
68:14,21 73:11
105:2 119:3,9
119:10 131:5
166:3 185:23

198:12 217:10
255:7 264:21
269:12
**looking**  10:15
12:16,18 13:10
13:11 14:13
18:7 19:23
21:17 22:21
23:5 26:6 34:9
36:2 70:17
110:22 117:7
117:21 163:11
183:21 184:19
192:20 199:23
202:1 204:8
213:5,23
216:18 239:23
240:9 245:20
255:5 258:19
258:22 300:4
**looks**  16:13,13
16:14 23:6
184:20 193:17
198:20 204:15
301:19
**lose**  118:15
**losing**  10:1
**loss**  7:19 80:13
81:15
**lost**  38:2,9,13
**lot**  93:12 94:18
94:19 103:8
162:21 172:23
197:1 254:8
274:11

**lots**  284:11
303:6
**loudly**  137:12
**low**  161:16
165:7 171:1
**lower**  100:12
108:18 118:14
123:2 166:16
197:8 209:14
210:8,20
212:10 229:10
**lowering**
106:21
**lowest**  162:3
**luck**  220:4
**lunch**  88:20,21
88:23 89:1

**m**

**mac**  289:10
**made**  2:10
11:17 14:22
24:2 63:13
66:13,14 68:15
68:20,22 77:17
86:6,16,20
106:3 116:18
122:18 198:21
215:13 216:2
263:10 270:23
288:23 299:3
300:11 307:1
313:5
**magic**  178:15
**magically**
120:9

**mail**  69:15,16
**main**  122:13
141:4 205:16
**maintained**
95:19
**make**  2:13
11:12,13,18
14:16 15:10
16:3 18:7
19:17 25:11
31:12,19 34:16
35:18 46:19
52:10 60:14
62:9 63:11
78:7 88:21
93:17 96:23
99:2 125:20
126:12 129:10
129:11 135:7
135:11 144:3
148:3,21
149:12 150:14
161:6 162:22
163:19 167:18
169:17 172:3
173:18 174:5
177:11 194:23
205:12 207:12
212:15 217:19
226:22 234:1
236:9 241:14
247:23 270:20
275:19 276:10
283:19 296:15
298:15 301:8

Case 2:22-cv-00017-RWS    Document 119-6    Filed 01/20/25    Page 115 of 153
G. Bryant Buchner
July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[make - meant]**                                                                          Page 36

306:8
**makes** 93:13
115:4 279:12
**making** 64:22
182:1 295:10
**man** 245:17
**manipulating**
173:17
**manner** 310:16
**manual** 87:15
**manuals** 57:4
**manufacturer**
303:4
**manufacturers**
109:20 139:18
303:6
**march** 58:6
**mark** 7:4 123:1
159:8,14,22
160:3 186:6
188:10 189:20
192:13 193:15
194:18 203:10
203:12,14
219:3,8,9,11,17
219:18,19
220:7 251:6
254:20 303:16
304:1
**marked** 7:7
178:9 179:1
186:10 215:11
251:11 270:4
303:22

**markers**
158:21,22
159:15 215:11
**marking** 194:3
196:6 219:22
**markings**
193:13 194:8
261:11
**marks** 86:11
159:10,12
190:21 192:10
193:16 200:15
219:22 254:7
254:10,14
258:8
**mashman** 4:18
5:21
**match** 106:13
112:13 128:13
199:6,18
202:12 217:16
220:12 228:14
256:6,9,12
263:12,16
265:2 267:6
284:2 286:3
**matched**
198:13 265:12
**matches** 166:15
198:15,17
232:2,5
**matching**
189:18,18
255:14 273:23

**material**
146:18,21,23
**materials** 41:13
41:15 45:8
117:6 147:5
245:8,9 246:1
296:16
**mathematically**
275:13
**mathematics**
284:3
**matter** 103:7
165:19
**matters** 299:16
**maximum**
171:20 199:1,2
202:16 230:4,5
230:16 231:2,6
231:6,9,14,23
232:7,12,18,21
232:22 238:11
253:9 254:12
262:6 265:9
289:5,7
**mean** 7:21 9:16
12:14 13:1
18:3 20:9
26:11 28:14,22
29:12 33:1,9
34:1 35:14,15
38:9 40:5 41:2
42:9 53:1 55:8
55:18 62:14,15
64:4 67:8
73:16 75:18

91:1 95:6
97:16 107:16
109:16,19,19
111:7 116:18
120:4 123:12
125:2,2 127:22
128:7 129:4,5
129:6,10,12,12
136:6 139:13
139:15 145:22
147:15 148:2
154:10 155:9
161:18 173:15
175:1,3 180:5
180:14 182:11
184:14 190:13
191:3 192:9
194:21 197:13
201:11,20
203:7 204:9
215:5 237:5
243:21 244:6
252:15 255:11
278:7 279:7
286:18 292:17
298:15 301:10
301:11 308:2
**meaning** 24:12
173:16 175:14
**means** 39:7
110:7 136:1
172:10 300:6
310:8
**meant** 10:3
29:1 147:8

G. Bryant Buchner                                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[meant - minute]**                                                Page 37

250:4
**measure** 81:21
96:13 154:15
179:10 185:18
191:9,13,16
207:14 214:16
216:13 217:4
217:10,21
218:3,9,10,18
219:1 220:12
228:18 230:11
238:18,21
241:11 242:13
242:14 247:20
259:9 264:19
265:8,16 267:6
267:10 272:15
272:16,20
**measured**
80:18 82:21
86:16 96:1,6
104:19,23
191:4,11
197:22 213:17
230:9 237:16
247:2 268:3
269:10
**measurement**
77:4 86:17
192:15 210:4
214:23 232:3
236:9,12
238:22 239:4,9
239:13 240:13
242:15 247:19

264:1,11
267:14 268:6
270:13,23
**measurements**
14:17 96:12
148:22 179:9
193:7 194:20
195:5,9 207:9
207:12,23
213:6 215:12
216:2 229:8,9
239:1,12 241:1
241:6,12,16
242:1,3,4
243:10,11
246:23 256:16
263:19 267:17
**measurer** 217:7
**measuring** 77:3
82:5 242:15
266:3
**memorized**
111:6
**memory** 23:3
30:3 68:3
86:22 154:14
154:18,21
167:8 257:6
**mention** 243:4
244:1
**mentioned**
111:2 112:23
113:3 132:19
155:22 181:20
253:14 282:21

**mentioning**
177:22
**mesh** 198:21
**mess** 123:5
**met** 230:23
**metal** 253:6
**method** 62:18
177:13 189:5
205:11 206:4
218:14,14,17
238:12 246:11
292:13
**methodologies**
109:6 281:16
292:11
**methodology**
105:14 109:10
109:13 110:8
111:17 112:1
142:6 246:17
256:9 261:17
264:8 269:15
273:14 277:4
278:13,15
280:11,20
282:18,23
283:7 289:20
**methods**
176:18,23
177:8 205:13
217:13,20
244:10 246:7,7
246:12,14
247:5

**metric's** 89:22
**metrics** 74:22
**middle** 182:3
273:6
**midpoint** 272:5
272:18
**mile** 39:5 100:7
102:10,11
164:9,10
**miles** 88:9,14
100:4 101:22
162:18 163:1
163:21,23
164:6 165:4
166:14,22
**millions** 241:23
242:6 267:17
**millionth**
238:15
**milliseconds**
202:1
**mind** 115:8
203:7 273:5
**mine** 105:11,14
171:4 289:18
**minimal** 162:7
**minimum**
101:13
**minus** 207:3
208:9 269:9
276:3
**minute** 52:16
76:10 88:19
89:4 112:5
182:17,21

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[minute - need]**                                            Page 38

192:1 195:14
197:11 222:10
260:4
**minutes** 144:19
**mirror** 78:6
282:23 293:14
**mirroring**
127:19
**mis** 124:15
141:9
**mischaracteri...**
124:15
**mischaracteri...**
236:3
**mischaracteri...**
280:2
**miscopy** 19:17
**misfired**
261:23
**misfiring**
137:15
**misinterpreta...**
263:5
**misleading**
33:14 215:18
**misread** 165:9
165:9
**misreading**
263:4
**misrepresent...**
115:4
**missed** 48:15
100:17 122:10
272:10

**misses** 93:19
**missing** 13:10
20:20 21:4,17
21:20 22:21
40:15,17,20
43:5,6 82:15
84:15
**misspoke** 55:3
55:4
**misstatement**
221:16 223:18
**misstates** 49:8
111:19 219:16
238:3 279:8
**mistake** 26:22
31:19 75:10
174:10 204:12
**mistaken** 12:16
**mistakenly**
66:10
**mistakes**
116:18 298:15
**misunderstood**
65:15
**mmc** 227:15,20
**mobile** 5:2
**model** 130:11
169:23 302:1
**modeling** 75:1
75:4,15
**models** 198:21
199:21
**modifications**
35:1 77:22
78:11 174:5,6

**modify** 91:11
**modifying**
91:14 175:12
**moment** 70:16
**month** 23:9
58:14
**months** 8:11
11:2 12:15
19:14 20:1,7,9
20:11,17 25:2
26:8 39:14
58:1,9,22
**moon** 135:15
**morning**
226:17 287:12
**morse** 1:21 4:7
5:1 310:4,22
**motion** 259:6
**motor** 308:3
**move** 61:20
111:13 119:17
121:7 123:4
129:6 146:4
149:12 197:19
201:14 233:12
273:8
**moved** 8:19 9:2
9:11 122:12,12
122:14 131:1
132:1 156:5
**movement**
154:1 155:5,6
**moves** 155:4
**moving** 118:19
150:19 176:14

201:16 203:7
233:14
**multiple** 128:3
218:21 278:4
280:19

**n**

**n** 3:1
**name** 7:15
32:20,22 250:2
250:10
**naturally** 212:9
**near** 85:15
231:8 232:2,11
284:11
**necessarily**
38:20 56:23
135:13 168:5
278:18 298:12
**necessary** 2:9
313:6
**need** 22:22
50:21 51:15,18
61:3,5 88:18
88:23 89:1
101:1 103:13
104:6 113:14
115:22 116:23
125:17 131:17
136:19,19
138:13 141:13
171:18,21
175:23 182:16
210:7 219:6,8
225:1 226:3,4
235:8 247:14

249:3 250:21
254:14 259:3
259:17,20,23
274:17 282:20
282:22 286:17
286:22 294:3,8
295:20 302:5
**needed** 9:12
31:14 39:9
47:14 48:2
82:8 87:4
103:4 138:16
227:3 285:19
**needs** 34:1 94:8
103:7 116:18
116:19 163:18
164:20 167:18
189:14,14
219:18,19
**neither** 99:12
156:17 310:14
**neptune** 62:12
62:19 63:21
76:3,12,17
78:3
**neptune's**
63:17,17 64:11
**never** 9:19 10:8
18:21 31:11,12
69:12 77:8
91:6 97:16
106:7 132:19
138:22 139:1,8
144:10 171:14
232:12 279:13

288:21
**new** 14:11,12
53:13,20 59:1
59:13 60:5
66:1 67:7
83:21 101:1
102:12 109:1
112:21 119:14
119:14 121:2
132:23 146:23
173:19 277:9
282:4 296:9,14
297:4,7,11,12
298:4
**newton's** 107:1
111:1 233:8
**nice** 123:1
**night** 238:6
**non** 91:7
242:19
**nope** 149:14
244:22 277:19
**normal** 34:20
289:11,12
308:17
**normally** 80:1
84:17 102:9
226:16 288:11
292:11 295:7
299:18
**northern** 1:2
4:2
**notary** 1:23
313:13,19

**note** 138:8
311:10
**noted** 313:7
**notice** 2:17
183:18 200:6
228:9 261:5
**novel** 112:21
**ntsa** 302:16
**number** 1:5 7:6
17:17 54:7
59:2 88:16
101:10 120:9
129:3 135:12
148:20 149:2,3
149:6,14,16
151:1,12
152:22 153:22
158:19 160:16
164:18 178:8
186:9 212:23
213:1 229:12
241:6 250:8
251:10 263:7
267:1 273:2,21
302:7 303:21
307:8,15
**numbers** 14:23
38:20 40:23
41:1 64:21
73:22 107:17
242:7

**o**

**o** 181:23
184:14,15
185:5,8 187:6

187:8,12 188:1
193:20,22
196:7,14,19
197:5
**o'clock** 89:8
229:19 231:17
287:11,12
**oath** 291:7
**object** 21:9
49:7 83:23
102:2 111:18
113:21 116:3
140:17 141:7
142:23 143:10
144:23 151:7
211:12 219:15
224:19 225:13
233:4 236:2
238:2 239:21
279:7 280:14
283:3 285:7
305:19
**objection** 84:4
84:9 117:15
120:17 124:2
124:12,14
131:19 133:17
134:3,6 154:4
158:1 185:3
278:3 279:2
287:2,4 290:16
290:19
**objections** 2:10
2:13 281:12

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[objects - okay]**                                                Page 40

| | | | |
|---|---|---|---|
| **objects** 207:14 | **offset** 85:22 | 258:9 261:2,20 | 31:7 32:9 33:4 |
| **observation** | 86:8,15,21 | 262:7,10 263:3 | 33:11,15,18 |
| 147:10 274:9 | 87:6,11 100:18 | 263:8 264:16 | 36:12 39:16 |
| **observed** 96:3 | 100:22,23 | 265:9,12,13 | 44:20 48:21 |
| **obvious** 106:22 | 101:9,15 | 266:9,10,14 | 50:8,16 53:4 |
| **obviously** 30:7 | 103:22 104:4 | 267:5,23 | 53:12 61:18 |
| 37:12 41:6 | 105:4 106:4 | 268:12 269:5 | 62:23 65:1 |
| 61:5 92:17 | 107:12,12 | 269:20 270:6 | 72:8,18,22 |
| 96:15 122:17 | 113:19 114:11 | 272:3 273:14 | 73:3 74:19 |
| 200:3 220:8 | 114:12 115:6 | 273:23 274:1 | 76:18,21 77:11 |
| 243:18 | 115:15,23 | 275:18,18,22 | 77:15,21 78:19 |
| **occupants** | 118:10,11,12 | 276:4,12,15,21 | 79:2,6,10,17 |
| 79:23 85:9,13 | 123:20,21 | 277:14,17 | 80:3,12,16 |
| **occurred** 87:12 | 126:20 127:20 | 278:2,18,22 | 83:12 84:22 |
| 158:13 162:16 | 128:13,13,14 | 280:8,8,13 | 85:18 89:6 |
| 162:17 165:4 | 129:19 131:7 | 281:5,8 284:2 | 90:8,14 91:17 |
| 276:4 280:9 | 131:17 132:4 | 286:9,20 287:1 | 94:12 98:1,14 |
| **occurring** | 135:3 153:16 | 293:12 | 98:22 99:3,18 |
| 310:13 | 153:19,20 | **offsets** 284:4 | 100:10 101:11 |
| **occurs** 281:4,7 | 158:22 166:19 | **offsetting** | 101:14,17 |
| **october** 8:1 | 167:21 176:15 | 205:20 | 103:18 104:21 |
| 9:22 10:16,18 | 176:19 177:2 | **oh** 20:11 22:10 | 111:9 112:23 |
| 11:11,23 14:7 | 186:8 204:4,19 | 44:4 66:23 | 113:19 115:13 |
| 15:8,18 16:9 | 204:21 205:14 | 164:4 176:2 | 115:19 128:18 |
| 18:5,10,23 | 206:9,20 208:8 | 202:14 221:10 | 131:10 133:20 |
| 19:6 23:18,23 | 214:17 217:11 | 223:9 230:3 | 134:8 135:18 |
| 25:1,5,14 26:3 | 220:14 225:5 | 234:7 254:16 | 137:3 140:8 |
| 26:16,23 28:6 | 225:17 227:13 | 254:22 262:2 | 146:1,14 147:4 |
| 29:1,4,10 | 231:14,19,19 | 293:2 | 151:11,17,20 |
| 35:12 37:23 | 238:13,14 | **okay** 6:14 7:10 | 154:23 156:11 |
| 54:12 57:9 | 243:7 244:4,11 | 12:20 15:20 | 157:19 158:17 |
| 66:6 76:1 | 245:5 246:8,13 | 18:9 19:3,9 | 160:6 161:4,21 |
| **offered** 2:15 | 247:9 248:3 | 22:6,22 23:12 | 165:10,17 |
| **office** 27:17 | 251:19 255:3 | 25:10 26:4 | 170:2,10 171:7 |
| | 255:19 256:21 | 29:19 30:15 | 175:12 176:4,8 |

| | | | |
|---|---|---|---|
| 178:18,22 | **old** 14:12 57:20 | **openly** 94:9 | 284:14 296:9 |
| 179:13 182:13 | **omnipotent** | **opined** 261:20 | 296:10,13,14 |
| 182:16 187:1 | 131:13 | 263:1 | 296:17,18 |
| 188:2 189:10 | **once** 33:5,7 | **opines** 171:11 | **opossums** |
| 193:11 194:6 | 55:15 57:16 | **opinion** 43:22 | 109:4 |
| 195:10 196:5 | 250:23 266:19 | 94:13 101:20 | **opportunity** |
| 196:15 204:17 | 285:10 297:10 | 103:4 151:22 | 242:22 |
| 205:23 209:9 | **ones** 17:21 | 161:7,11 | **opposite** |
| 210:1,16 | 205:7,9 241:14 | 163:15,18 | 143:23 |
| 211:15 212:4 | **ongoing** 297:18 | 164:19,22 | **option** 34:12 |
| 213:20 214:7 | **open** 31:11,15 | 165:3 168:19 | **options** 73:16 |
| 214:18 215:9 | 55:12,13 117:5 | 169:12,17 | **oral** 1:16 5:8 |
| 216:10 222:10 | 214:13,13 | 171:20 196:16 | **orange** 252:2 |
| 223:19 227:7 | 215:1 226:18 | 196:22 197:18 | **oranges** 100:19 |
| 229:14 234:23 | 226:23 227:3,3 | 197:20 199:19 | **order** 36:9 48:4 |
| 235:5,6,15 | 227:5,9,10,11 | 224:18 231:21 | 48:12,22 49:5 |
| 242:21 245:1 | 227:17,21,22 | 232:21 237:22 | 117:1 161:9 |
| 251:12,16 | 234:14 240:23 | 243:7 256:1 | 167:15,16,23 |
| 253:22 254:16 | 241:18,22 | 274:13 280:4 | 174:6,7 194:11 |
| 258:17 259:3 | 242:11,11,18 | 280:10 281:6,9 | 194:22 214:7 |
| 261:22 262:22 | 243:20 245:14 | 282:8,9 285:2 | 259:4 267:22 |
| 265:3 266:12 | 245:14 248:9 | 285:6 286:10 | 282:17,23 |
| 266:22 267:21 | 248:15 267:9 | 291:1 303:15 | 288:7 |
| 269:11 271:9 | 269:21,22 | 304:14 | **orientation** |
| 271:18 272:16 | 297:9,10 | **opinions** 11:13 | 87:22 160:15 |
| 273:2 274:21 | **opened** 8:2,18 | 11:15 15:19 | 215:17 223:22 |
| 276:1,7 277:21 | 10:7 12:19 | 42:7,11,23 | 224:2,4 230:14 |
| 284:16 291:13 | 31:2 53:19 | 43:3 44:9 56:9 | 253:3 |
| 294:5,10,20 | 59:23 60:4 | 102:22 136:5 | **orientations** |
| 295:3 298:8 | 65:17 238:20 | 138:19 139:11 | 229:11 |
| 299:6 302:22 | 242:17 263:13 | 157:19 158:12 | **original** 7:20 |
| 303:16,20 | 268:2 | 168:16,16,16 | 10:12,15 12:8 |
| 305:12 306:7 | **opening** 34:8 | 168:17 219:13 | 14:1 15:5,7,12 |
| 309:4,7 | 60:8 297:15 | 230:20 245:5 | 17:2,14 18:1 |
| | | 248:3 251:19 | 18:13 19:4,11 |

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[original - parameters]**                                    Page 42

22:3,11,17
24:13 25:16
26:1 27:10
30:10 32:3
38:8 39:22
41:7,10,22
47:12 48:11,23
49:5 50:5
52:16,20 54:10
57:12 58:7,23
62:12 64:15
65:22 66:3,15
67:10,17,18,21
68:10 75:17,20
76:4,16 77:18
78:8 82:3
85:20 86:12
111:12,14
214:5 228:3,20
234:15 247:17
247:18 254:6
266:7,7,8
267:23 268:10
268:12 269:6
274:17 296:10
298:22 302:6
305:15
**originally**   10:3
46:18 49:2
60:17,18 64:10
90:2
**ought**   9:1
123:16 161:19
165:2 168:20

**outcome**
298:10
**outlined**   178:5
**output**   70:4,20
71:8 73:10
**outputs**   36:2,6
72:5
**outside**   113:23
114:2 116:4
117:16 122:13
123:4 131:1,15
131:19 132:2,2
136:13 140:18
158:1,5 192:10
280:15 305:6
**oval**   185:17
192:11
**overall**   207:16
**overhead**
159:11 205:11
205:18,22
212:17
**overlaid**   96:9
96:22 185:23
**overlap**   132:3
275:5,9 282:10
284:12
**overlay**   184:11
185:2,11
188:16 189:11
192:1,3 194:1
194:8 195:2
196:20 197:1
198:15

**override**   93:4,7
93:17 94:2,13
94:23 95:5
103:6,6 118:12
118:13,15,18
124:9 151:22
253:7,9 257:13
258:2 274:14
274:15 290:14
290:15,15,17
305:2
**overriding**   94:4
**oversight**
267:12
**overstate**   275:1
**overstates**
274:8,22
**own**   32:19
96:23 161:20
217:13 220:11
226:4,16
243:20 246:3

**p**

**p.m.**   89:8,12
137:5,8 176:10
176:13 183:1,4
195:18,21
260:16,19
295:23 296:3
309:13,19
**p1**   3:17
**page**   3:4,12
9:14 37:17
76:22 82:18
158:20 176:6

183:7 188:19
193:19 199:23
206:2,4 221:13
221:14 222:13
222:21 223:13
223:14,19
225:2,4,8,18
227:16,18
251:13 272:2
312:4,7,10,13
312:16,19
**pages**   161:4
**paid**   292:19
**paint**   159:8,15
252:20
**pan**   155:17,22
259:7
**pane**   155:4
**papers**   110:10
111:3 173:3,10
173:21 174:3
174:15,16
285:17 290:2
**paragraph**
7:17 37:21
66:20 149:15
161:5 223:21
297:11 298:3,3
**paragraphs**
177:7
**parallax**
207:20 209:11
212:9
**parameters**
89:14 106:13

G. Bryant Buchner                                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[parameters - photomodel]**                                    Page 43

106:14 132:16
140:15 276:14
**pardon**  81:13
86:4,4 278:16
**part**  14:10
15:21 18:3
62:7 72:17
75:8 80:10,20
84:5 94:3,4
102:22 114:4
114:10,20
115:2 117:1
124:23 130:4
132:1 170:4,7
170:8 179:14
184:3,10 188:1
199:12,14
202:12 204:12
232:20 245:13
254:7 263:20
267:13 282:22
**partial**  23:19
**partially**
207:18
**particular**
42:11 90:23
183:22 189:5
283:9 286:7
**particularly**
44:22 299:20
**parties**  2:12
310:15
**partner**  75:1,4
75:15

**parts**  202:15,17
202:18
**pass**  303:5
309:1
**passenger**
95:17
**past**  79:22
128:2 136:14
159:5 173:23
230:1 292:2
301:22
**path**  202:5
294:21
**pattern**  201:2
202:8,9
**paul**  1:21 4:7
5:1 310:4,22
**pdf**  33:17 34:9
35:7 36:7,10
36:21 37:12
47:7 74:8,12
**pdfs**  250:8
**pdof**  231:17
**peachtree**  4:11
**pealing**  12:18
**people**  32:16
128:2 129:10
139:16 186:21
194:17 291:3
292:19
**perceive**
186:17 194:9
**perceived**
195:3

**percent**  100:17
100:18 101:9
124:18 128:8
132:5 150:20
183:16 191:14
215:19 220:14
**perfect**  77:9
173:18 238:15
**perfectly**  94:10
231:22 289:22
**perform**  194:7
**performed**  32:2
32:6 92:14,18
99:1 111:14
245:21
**period**  10:9
20:4 24:19
136:1 285:16
**permanent**
258:13
**permanently**
238:1
**permissible**
144:22
**permission**
98:12
**person**  31:19
32:2
**personally**
111:22
**persons**  233:20
**perspective**
73:20,21 116:9
116:16 119:8
120:22 125:1,3

125:5 192:2
204:11,16
213:22 230:17
307:22
**phase**  95:21
**phoenix**  98:17
**photo**  159:2
177:15,17
178:14,20
183:11 187:3
191:6 204:8,11
204:16 208:1
209:10 212:9
217:2,9 218:4
218:6 243:1
246:3 248:5,8
251:18 254:8
254:10
**photograph**
157:2 183:6,8
200:2 205:11
206:8 207:20
208:20 213:21
253:13 255:1
258:23 270:13
271:4 272:7
**photographs**
85:7 97:7
152:7 186:13
215:13 255:2
271:15
**photomodel**
177:14 270:15
270:20 271:5
271:12 272:19

G. Bryant Buchner
July 11, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[photomodeler - possible]**

Page 44

| | | | |
|---|---|---|---|
| **photomodeler** 178:14,23 | 230:7 304:17 | 167:20 178:13 | 179:1,9 201:5 |
| **photomodels** 178:12 250:6 | **placed** 99:13,22 | 179:22 183:12 | 212:23 231:15 |
| **photos** 146:22 | **placement** 85:11 | 185:16,18 | 238:18 239:1,8 |
| 154:21 181:11 | **places** 38:21 | 187:11 189:2,7 | 239:9 241:8,10 |
| 184:1 220:10 | **plaintiff** 4:17 | 190:1 191:10 | 271:19,20 |
| 245:10,10,11 | 4:21 | 195:1,2 196:23 | 272:19 298:9 |
| 245:20 247:13 | **plaintiff's** | 198:22 200:22 | **poking** 293:6 |
| 247:15,15,17 | 303:18,21 | 201:1,6 211:19 | **poles** 252:3 |
| 247:18,22 | 304:2 | 212:15,22 | **ponce** 4:15,19 |
| 256:22 258:11 | **plaintiffs** 1:8 | 213:12 215:4,5 | **pools** 104:13 |
| 271:8,11 | 5:21 301:9 | 215:7,11 | **porter** 268:3 |
| **physical** 95:22 | **plane** 204:10 | 217:15 226:7 | **portion** 176:15 |
| **physics** 106:23 | **plate** 252:4 | 227:2,19,19 | **position** 79:11 |
| 175:2 202:19 | **play** 119:5 | 228:1,2 229:15 | 79:18 99:23 |
| 203:15 233:7 | **please** 5:15 6:1 | 229:16 230:2 | 115:17 154:15 |
| 233:22 256:2 | 48:15 61:4 | 230:16 231:7 | 186:16 203:6 |
| 267:11 275:13 | 125:13 138:5 | 231:11,15 | 228:12 237:23 |
| **picked** 10:22 | 170:9 228:22 | 233:1 236:14 | 252:10 |
| **picture** 181:13 | 234:10 | 239:14 241:12 | **positioned** |
| 188:19 193:12 | **plenty** 112:7 | 242:13 243:5 | 218:17 |
| 211:22 235:1 | 285:17 290:2 | 245:2 246:23 | **positioning** |
| **piece** 119:12 | **pluck** 41:14 | 252:11 254:12 | 123:22 297:16 |
| 160:2,3 220:4 | **plus** 85:8 207:2 | 255:21,22 | **positions** 129:7 |
| 253:6 | 208:8 249:11 | 257:17 261:1 | 154:16 |
| **pieces** 169:3 | 249:14 250:6,6 | 263:12,16,20 | **possess** 53:22 |
| **pink** 188:22 | 250:13 269:9 | 264:10,14,19 | 56:2 59:21 |
| 239:17 240:12 | 276:3 | 265:2,7 268:8 | **possibility** 66:3 |
| 241:15 271:22 | **point** 67:1 | 271:5,12,15 | **possible** 28:23 |
| **pinned** 236:19 | 68:20 86:7,20 | 287:5 293:12 | 60:18 107:10 |
| **place** 9:10 | 104:6 113:19 | 299:15 307:2 | 107:14 117:13 |
| 91:18 92:7,11 | 135:16,17,20 | **pointed** 68:1 | 117:20,22 |
| 199:5 200:18 | 135:20 143:18 | **pointer** 160:8 | 118:1 119:20 |
| 201:10 227:23 | 144:2 147:11 | 160:11 | 120:1,2,3,16 |
| | 152:8 161:6 | **points** 113:8 | 126:13 128:10 |
| | | 155:8 178:16 | 128:11,15 |

G. Bryant Buchner                                           July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[possible - probably]**                                      Page 45

129:1,6 135:2
277:10,18,23
**post** 249:11,13
  249:21 250:4
  250:13
**potential** 38:10
  109:17 113:17
  161:17 162:1
  170:23
**potentially**
  36:8
**pounds** 78:21
  79:14 201:13
  299:18 300:1
  300:19,22
  306:8,11,13,15
  306:19,20
  307:9,11,20
  308:3,5,15,16
  308:18,23
  309:2
**power** 162:4
**powerpoint**
  3:15,16 147:14
  148:5 185:10
  186:1,5,7
  194:2,11
  197:11 199:10
  227:9 235:2
  247:10,14
  248:11 269:21
**powerpoints**
  152:7 249:16
**practically**
  43:14

**precise** 40:23
  51:1 86:20,21
  300:4
**precisely** 37:22
  50:22 87:16
  267:4
**predict** 110:23
  112:11 140:13
  145:5,18
  302:19
**predicted**
  138:20 139:11
**predicting**
  109:13 140:11
  144:12 278:15
  294:13
**prediction**
  90:16
**preliminary**
  24:1,12 45:16
  162:8
**premise** 204:6
  255:16
**premium**
  178:23
**prepare** 45:5
  48:4 117:10
  131:11
**prepared** 13:3
  119:13
**preparing**
  35:12 48:2
  146:18
**presence** 91:6,7

**present** 4:22
  5:15 13:6
  38:16 226:22
**presentation**
  71:10 246:22
  253:20 255:2
**presented**
  194:10 246:19
  246:21 267:18
**preserved**
  98:16
**preserving**
  32:11
**presume** 119:5
**pretending**
  132:18
**pretty** 14:16
  34:20 113:18
  244:10 265:19
  303:10
**prevent** 305:3
**prevented**
  97:14
**previous** 50:14
**previously**
  123:7,8
**primary**
  103:23 104:3
  105:5
**principles**
  289:8
**print** 22:2
  24:21 33:5,20
  35:17 36:9,14
  36:17

**printed** 10:19
  10:20 17:8,20
  23:15,16 24:23
  25:14 26:13
  27:21 28:19
  34:10 36:7
  37:7 38:18
  40:19 46:8,16
  46:20 266:19
**printer** 10:21
**printing** 23:20
  29:6 36:15
**printout** 9:21
  16:16 21:14,15
  53:2 74:11
  76:9
**printouts** 10:10
  10:14,14 12:7
  25:11 30:8
  38:6 40:13
  48:6 68:6
**prior** 2:15
  10:11 14:1
  15:16 16:6
  17:21 18:16,19
  24:13 27:17,22
  29:11,15 36:22
  48:2 55:4 56:4
  57:9 58:23
  111:19 122:1
  239:5 240:18
  304:15
**probable** 199:8
**probably** 6:16
  9:4 13:11

36:14 41:3
46:19 56:3
60:7 141:19
145:23 155:15
164:18 208:14
242:20 248:11
261:10 262:13
262:20 268:14
274:7,22 275:6
**problem** 9:11
14:10 18:4
25:17 28:3
40:7,9 43:10
58:7 60:21
100:19 102:5
108:3 116:19
119:14,14
125:11 153:16
173:19 175:3
176:2 212:22
216:16,21
233:10 288:21
298:18 308:4
**problems** 40:8
137:13 152:14
210:10 216:20
216:20
**procedure** 5:4
19:15
**proceed** 138:10
**proceedings**
1:16 5:9 310:7
310:12
**process** 8:8,21
18:6 20:5

23:20 27:6
30:21 32:10,12
42:6,9,13
54:21,23 55:8
55:14 57:9
58:1 64:15
65:23 66:5
108:8 172:14
175:17 266:1
268:11 270:18
283:11 297:18
**processed**
136:11
**produce** 18:15
18:19 22:2,11
22:13 24:21
29:19 36:22
39:4 45:19
47:7 52:9 88:3
93:3 226:9
280:12
**produced**
10:10 12:12
13:23 15:7,11
15:16 16:6
17:20 20:21
21:6,12,15
22:16 25:12
27:17,21 28:19
29:16,22 30:9
38:6 40:13
42:21 44:2
45:8,17,20
46:12 49:2
50:5,22 51:19

71:3,4 72:12
84:5 92:2,23
93:2 142:2,17
232:19 239:5
239:22 240:9
249:8 270:1
310:9
**produces** 13:14
163:16 167:17
**producing** 47:6
93:10 177:14
268:19 288:18
**product** 267:15
**profess** 217:1,2
**professional**
120:11
**professionally**
121:13
**profile** 71:5
256:10
**profiles** 205:6
256:12
**program** 36:16
56:14 57:1
112:5,9,10,14
112:16,21
122:2 129:14
173:8,17
242:11 276:16
284:19 285:3
285:13 286:6
286:11 288:17
288:19 289:17
292:5,9 297:8
297:17 302:2

305:3
**programs**
34:21 289:1
290:5
**project** 56:13
**projected**
237:17
**projection**
206:17,19
**proof** 157:3
230:12
**proper** 37:4
112:16 140:15
145:5,19
191:20 198:2
218:19 223:15
275:4,5 280:11
288:4 297:21
**properly** 8:14
26:9 30:16
123:19 169:23
217:6 285:4
298:14 307:22
**properties** 62:2
**proposed**
129:18
**proved** 118:13
**proves** 253:7
**provide** 31:9
65:12 96:12
97:5 114:19
158:21 164:14
186:20 296:13
**provided** 5:3
12:7,8 14:19

Case 2:22-cv-00017-RWS    Document 119-6    Filed 01/20/25    Page 126 of 153
G. Bryant Buchner                           July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[provided - questions]                                    Page 47

32:16 63:19
64:19,20 68:2
68:5,8,14,17
74:7,9,17 97:6
98:5,6 142:1
162:8 190:17
214:15 216:15
228:20 243:10
258:12 263:13
263:17 264:1,1
269:18
**provides**
274:19,20
**proving** 103:3
**proximal** 47:20
**proximally**
47:17
**public** 1:23
313:19
**published** 96:7
**pull** 6:20
222:13 303:12
303:19
**pulled** 211:8
**pulse** 95:21
149:17 150:2
150:13
**pulses** 166:15
**pumping**
104:17
**pure** 64:12,13
**purely** 107:6
112:10
**purpose** 107:5
166:7 168:22

169:13 286:7
290:13
**purposes** 47:6
190:23 211:1
**push** 231:18
266:23
**pushed** 95:18
156:1 230:5
253:5
**pushing** 253:11
**put** 6:15 9:3
18:10,12 19:18
23:16 25:6
32:15,21 40:4
42:14 51:6
72:7 79:12,22
82:8 85:1
91:23 107:17
120:9 124:20
135:12 145:6
145:19 159:5,8
159:10,10,18
160:2,3,10,10
160:18 180:16
203:10 216:7
219:22,22
220:5,19 228:2
230:10 241:8
241:11 247:13
247:15 260:8
267:7,8 268:4
268:14 271:4,8
293:7 301:19
**putting** 170:21
298:12

## q

**quantified**
148:8
**quantify** 148:2
148:17 149:10
276:2,11
**quarter** 273:9
**quest** 249:21
250:4,4,12
**question** 15:20
15:22,23 17:12
17:16 21:2,10
28:20 30:6,14
34:14,18 38:5
38:12 46:1
49:8,14,17,18
50:14 60:3,4
65:13,14,14,18
75:11 82:4
83:8 85:10
93:15 102:3
105:15 106:8
106:11 111:12
111:13,14,20
111:22 113:10
113:22 114:10
116:4 117:4,11
117:16 119:19
120:12,22
123:14,20
124:4 125:1,3
125:6,10,13,14
125:15,19,20
126:5,9,12
127:13,16,17

128:9 130:15
132:7 133:7
134:1,5,16
135:5 136:12
136:21 139:2,7
140:1,6,10,18
141:8 144:9,11
144:13 145:3
146:2,6 151:8
155:21 161:22
165:11,22
170:5 211:13
218:3 219:16
224:20 225:13
229:21 233:5
236:3,14 238:3
246:10 258:3
258:17 265:5
279:7,8,12,12
279:23 280:15
281:14 283:4
284:5 285:8
286:17 287:6
287:17 288:19
291:14,19
293:5 297:5
305:11,20
**questioning**
138:2 141:13
**questions** 2:11
2:12 84:1
100:16 101:2
102:15 103:9
107:16 116:21
117:8 118:23

G. Bryant Buchner
July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[questions - reasonableness]**                    Page 48

119:3 125:18
130:21 136:10
137:17 140:23
141:14,18
142:9,9,19
143:10 144:6
144:20,20
204:7 304:5
306:4,10
**quick** 89:4
304:8
**quicker** 149:13
**quickly** 69:3
200:12
**quite** 84:11
174:18 215:14
**quote** 167:13
169:6,9

**r**

**r** 182:1 184:9
185:8 187:6
312:3,3
**raccoons** 109:2
**radiator** 81:6,8
81:16 299:8,21
299:23 307:4
**radius** 67:3
**rail** 180:2
208:3 221:1,2
221:6,11 222:1
222:23 224:8
224:11,11
**rails** 95:10
**raised** 286:5

**ran** 10:15 14:7
15:18 16:9,12
17:23 36:21
42:18 45:14
46:13 54:9
65:21 66:18
67:9 74:4
85:14 90:20
100:4 110:6
127:18 128:12
135:3 163:23
168:9 268:10
278:21 279:4
280:6 286:21
293:8,8
**random** 71:9
72:3
**range** 130:4,10
161:16 162:5,8
164:7 206:20
207:2,22 208:4
209:15 214:20
218:21
**rather** 7:11
**ratios** 79:21
80:1,4 308:20
**raw** 199:18
**read** 33:19 38:3
50:9 51:2 69:6
69:21 160:19
166:3 216:3
221:22 241:7
262:22 288:6
291:9 309:14
309:16 311:9

313:5
**reading** 2:2
98:14 177:6
**ready** 25:3
**real** 69:2 78:10
92:18,20 98:23
101:4,5,6,21,22
103:12 143:13
170:16 174:11
294:13,15
308:4
**reality** 293:23
295:1,1,2,2
**realize** 63:19
64:18
**realized** 12:22
20:19 23:5
40:21 42:15
242:19
**realizing** 13:8
**really** 6:18 9:1
11:16 15:20,23
15:23 43:6
52:3 86:6 93:5
114:13 123:1
163:13,22
167:14 170:5
179:17,17,18
179:18 191:7
192:9,14 193:2
238:9 242:14
247:21 266:23
301:20 308:10
**realm** 106:3

**rear** 95:7,9
99:13,23
122:23 123:1
153:23 154:2,7
155:10,23
156:2,13,20,21
157:4,7,9
175:14,16
208:22 216:19
220:7 223:23
224:3 232:8
258:20,23
**reason** 9:11
46:10 98:19
120:7,15
160:23 169:18
172:2,7 208:4
237:3 238:8
311:11 312:6,9
312:12,15,18
312:21
**reasonable**
16:19 22:23
50:17 51:7
63:18 82:9,17
85:5,8 108:20
109:8,11
110:17 114:22
120:10 129:7
129:13 130:3
143:17,18
171:3 283:12
300:5 307:13
**reasonableness**
285:18

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[reasonably - relative]**                              Page 49

**reasonably**
  77:8 99:7,10
  120:2,3 155:12
  216:23 218:1
  289:21,22
  309:2,3
**reasons**  119:4
  127:11 128:16
  133:23 134:4
  141:2,4 155:18
  171:18 197:1,4
  277:19 278:9
  281:23
**rebuttal**  3:14
  146:14,15
  147:1 176:16
  177:3 178:2
  183:7 196:3
  226:11 243:4
  245:2 249:10
  270:19
**recall**  45:2 58:6
  161:23
**receipt**  311:17
**received**
  146:19
**reclined**  155:12
**recognize**  66:2
**recollection**
  156:22
**reconstruct**
  246:17,18
**reconstruction**
  109:23 130:16
  256:3,11,17

275:15 281:16
281:20 288:12
290:10
**record**  5:16
  61:10,13 89:9
  89:12 137:5,8
  137:19 138:1
  158:21 176:10
  176:13 182:20
  183:1,4 195:18
  195:21 232:11
  232:12 233:13
  258:12,13
  260:6,6,12,16
  260:19 295:23
  296:3 309:13
**recorded**  11:14
  24:7 266:14
  267:13 273:17
**red**  193:13
  206:15,19
  209:21 210:20
  210:22 211:4
  251:22 255:17
  255:21
**redid**  42:16
  268:16
**redistribute**
  79:21 80:1,4
**redo**  19:2 292:8
  292:18
**reduce**  168:13
  168:14
**reenter**  57:22

**refer**  218:6
  251:18
**reference**  7:14
  186:18 189:2,6
  189:23 195:1,2
  206:3 207:16
  210:15 215:4,7
  258:7 263:18
  263:21,22
  303:12
**referenced**
  26:19 218:4
  263:23 311:6
**references**
  265:16
**referencing**
  186:8
**referring**
  105:19,20
  131:14 270:6
  294:17
**refined**  46:22
**reflected**  53:1
  296:8
**reflecting**
  12:12
**refuses**  287:16
**refusing**  248:9
**regard**  13:23
  15:6 17:13
  32:3,7 35:1
  36:20 52:16
  66:16 81:5
  85:10 89:17
  99:8 157:20

232:21 255:3
**regarding**
  138:19 139:11
  243:7 244:3
  245:5 247:9
  248:3 305:15
**regardless**  87:6
  123:21,21
  155:18 167:20
  201:4
**regards**  283:1
**regenerate**  39:9
**regular**  74:23
  75:22
**relate**  30:10
  43:1,5 44:2,4,5
  284:7
**related**  10:12
  12:7 15:12,15
  17:13 19:4,11
  27:14,19 29:16
  29:20 30:17
  42:19 138:3
  155:21 226:10
  275:13
**relates**  113:13
  131:16 143:1,4
  169:16
**relating**  2:6
**relationship**
  236:22 281:17
  282:15,20
  284:18
**relative**  92:14
  119:9,11

Veritext Legal Solutions

Case 2:22-cv-00017-RWS    Document 119-6    Filed 01/20/25    Page 129 of 153
G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[relative - reports]**                                                    Page 50

154:16 155:8
203:5,6 213:4
**relevance**
273:22
**relevant** 38:11
42:7,22 136:16
136:17 141:15
141:21,22
142:22 259:12
259:19 274:1
**reliability**
142:5,18 143:2
143:4
**reliable** 56:21
109:12 111:17
112:1 143:20
143:20 144:5,7
144:12,16,17
145:12 190:23
216:23 277:4
278:14,19,20
278:23 279:3
282:18 294:13
**reliably** 145:5
218:5
**reliance** 243:5
**relied** 26:16
49:3
**rely** 244:14
245:3 247:8
**relying** 45:18
45:20 205:20
244:2 248:2
255:1

**remained** 152:5
**remarkably**
154:19
**remember**
16:14 25:23
26:1 29:18
30:2 35:23
40:18 45:10
67:22 98:13
104:14 128:6
130:4 148:21
149:2 155:7
167:13 199:7
215:10 217:15
245:9 265:19
265:23
**remembers**
45:7
**remote** 5:6
**remove** 285:10
**renders** 118:10
**reopen** 235:4
**repeatable**
192:18 193:1
**repeatedly**
88:11
**rephrased**
287:19,19
**replaced** 75:23
**replicate**
115:21
**report** 3:13,14
7:9,12,14
14:20 15:9
18:11 19:6

25:8,22,23
26:1,5,8,17
28:6,10,14
30:19 33:5,6
34:11 35:12,17
36:2,21 37:23
38:15,19,21
40:23 41:1,5
46:22,23 47:2
47:15,16,17,18
47:21,23 48:3
48:4 50:21
51:9,14,20
52:21 53:1
61:19,23 68:12
68:19 74:10,18
83:22 84:5
88:13 96:21
105:22 112:14
113:23 114:5,8
114:15,19
115:2 116:5
117:17 124:8
124:16,21
141:16,16,23
142:7,12,17,21
142:22 146:14
146:15,18,19
147:2 149:11
154:16 158:18
176:16 178:2
183:7 196:3
199:13,14
208:9 214:3,6
215:1,2,15,18

220:1,19 221:7
222:7,11,12,17
222:18,21
223:5,8,11,20
224:22 225:8
225:15,18
226:11 232:10
243:4 244:2
245:3,15,18,19
246:6 249:8,10
249:17 257:2
266:7 269:7
296:8,11,12
305:7
**reported** 39:7
102:20 215:21
225:21
**reporter** 1:21
1:22 5:1 6:1
310:4
**reporter's**
310:1
**reporting**
130:8
**reports** 11:5,8
21:14,15,22
22:13,16 23:1
23:5,10,14,19
25:12 27:9,14
27:18 31:5
38:17 39:7
40:18,18,22
41:18,19,19
46:16 68:6
69:4 73:23

**[reports - right]**                                              Page 51

74:6,13,16
105:18 106:10
131:20 141:21
225:18
**represent**  30:8
71:16 193:18
202:22 206:14
206:16 253:1
**representation**
12:2 14:5 16:5
69:8 71:19
72:6,14 96:16
96:17 108:17
114:22 219:12
229:18 238:10
**representative**
15:17 16:8,11
16:17 17:1
36:4 70:20
73:8,22 91:4,5
93:14 123:18
128:20,23
129:13 135:14
200:16 202:7
230:2,3 233:1
233:23 259:13
277:3
**represented**
105:12 123:20
215:20 231:10
261:14
**representing**
229:15 231:5
**represents**
150:11 230:16

271:23 275:4
310:11
**reproduce**
22:23 37:22
39:12,22 40:4
41:7,9 44:11
48:12 49:5
56:4
**reproduced**
27:2 50:12
**reproducible**
193:1
**requested**
97:10
**require**  177:3
303:3,3
**required**
313:13
**requires**  177:4
**rerun**  12:20,22
15:5 16:19
30:15,17 32:7
36:20 39:16
41:22 42:3
45:14 46:19
50:18 53:1,19
55:23 57:19
58:1,10 59:9
60:22 61:22,23
63:23 64:4,22
66:1 68:16,23
70:9 72:15
73:9 74:5,7
77:1,16 80:10
87:7 89:15

92:21 98:23
106:6
**research**  82:16
290:2 292:19
**resend**  222:14
**resists**  150:21
**respect**  180:4
225:17
**respond**  121:9
**response**
119:18,21
120:10
**responsible**
136:11
**responsive**
121:11
**rest**  81:18
197:17 210:13
227:14 231:14
**restroom**  61:4
136:19,20
137:1 295:21
**result**  17:2,5,8
39:4 40:14
41:16 51:7
56:21 93:10
132:15,19,20
286:21 293:13
310:16
**resulted**  7:19
153:23 157:21
**results**  15:14
16:14 25:7,13
34:9,10 35:5,6
37:13 51:8

74:12 115:9,10
130:8 144:12
145:19 166:22
289:17 294:1,1
294:3,5 301:8
**resurrect**  11:9
28:16 43:14,19
**retrieve**  8:3
**return**  311:13
311:16
**reveal**  232:15
**revealed**
232:13
**reverse**  237:19
**review**  33:4,7
35:5 311:7
**reviewed**
245:17
**reviewing**
183:23
**revisit**  137:20
141:3
**rewrite**  298:3
**richard**  4:10
**rick**  5:18 69:14
240:7 260:7
**ridiculous**
118:8 239:22
**right**  6:21 7:1
10:2 11:18
12:3 13:21
15:3 16:20
17:4,6,12
18:21 21:1,13
21:16 22:1,8

G. Bryant Buchner                                                  July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[right - rolling]**                                                 Page 52

| | | | |
|---|---|---|---|
| 22:15 24:14 | 88:8,17,23 | 186:4,12,20,22 | 240:20,22 |
| 26:12 27:9 | 89:2 90:3 92:5 | 187:3,15,19,23 | 243:3 244:9 |
| 30:11,17,21 | 92:10 97:2,10 | 188:1,11,14,18 | 248:17 251:3 |
| 31:23 32:6 | 98:19 99:11,15 | 189:6,12,13,17 | 251:15 252:6 |
| 34:6,11,22 | 101:19 105:3 | 189:21,22 | 252:10,13,15 |
| 35:4,11,21 | 106:12 111:11 | 190:4,12 191:3 | 253:21,23 |
| 37:16 39:4 | 115:11 121:12 | 191:8,15,15 | 254:9,12,13,23 |
| 40:11 41:4,6 | 121:13,16 | 192:3,6,12 | 257:7,10,18 |
| 42:18 44:14,23 | 127:18 133:22 | 193:18 194:10 | 258:6,19 260:2 |
| 45:4,13 46:4 | 138:12 143:8 | 194:21,21 | 260:2,14 264:2 |
| 46:20 47:5,11 | 146:12,17 | 195:6,10,22 | 265:14 267:1 |
| 47:23 48:5,17 | 147:9,10 | 196:2,11,12,13 | 268:1,9 269:4 |
| 51:5,18 53:3,7 | 148:11,17 | 196:17,18 | 269:8,11 270:3 |
| 53:9,21 54:9 | 149:6,7,16 | 197:3,8 199:12 | 270:9,12,22 |
| 55:7 57:20,21 | 150:12,23 | 199:23 203:2,5 | 271:3,21 |
| 57:21,23 58:4 | 151:10,12 | 203:19 206:1,7 | 272:11,14,21 |
| 58:14,20 59:3 | 152:22 153:12 | 206:12 207:19 | 273:7,12,13,21 |
| 59:7,16 60:12 | 153:22 154:21 | 208:15,19,21 | 273:22 279:5 |
| 61:1,18 63:2 | 155:21 157:1 | 208:21 209:6 | 281:3 286:15 |
| 63:11,13 65:21 | 158:6,9,16,20 | 209:19 210:14 | 290:20 293:7 |
| 66:4,4,12,18 | 160:2,16,19 | 210:18 211:3,7 | 295:4,14 |
| 67:8,11,12 | 162:7,14 163:7 | 211:18,18,20 | 296:21 298:7 |
| 68:11,13,15,19 | 163:19 166:19 | 212:14,18 | 298:11 299:6 |
| 68:23 69:1,7 | 167:14 169:9 | 213:15 214:1 | 303:2 304:1,7 |
| 70:1,3,8,17 | 170:15,20 | 217:22 218:12 | 306:1 308:2 |
| 71:13,14 72:11 | 171:10,12,13 | 219:4,9 220:22 | 309:11 |
| 73:13,13 74:2 | 172:2 173:20 | 222:2,6 223:21 | **road**   4:12 |
| 74:2,11,19 | 174:4,12 175:6 | 224:14 225:10 | **robust**   41:2 |
| 75:16 76:9,11 | 175:21 176:14 | 226:9,14 227:6 | 122:2 168:17 |
| 76:21 78:3,10 | 176:17 177:13 | 229:6,10,17,21 | 169:22 284:11 |
| 78:12,14 80:7 | 178:3,11,21 | 231:4,8 235:15 | 285:3 292:13 |
| 81:20 82:18 | 180:12,18 | 235:21 236:8 | 300:22 302:7 |
| 83:1,6 84:8,14 | 181:1,6,6,10,21 | 238:17 239:4 | **rock**   205:8 |
| 85:18 86:3 | 182:8,13 183:5 | 239:16,23 | **rolling**   224:5 |
| 87:10,18 88:7 | 184:17,22 | 240:3,5,10,17 | |

G. Bryant Buchner
Bryson, Santana and Joshua v. Rough Country, LLC                    July 11, 2024

**[roof - scale]**                                                    Page 53

| | | | |
|---|---|---|---|
| **roof**  200:8 | 53:5 54:11 | **rws**   1:5 | 167:1 169:12 |
| 204:2 206:18 | 55:23 58:9,12 | **s** | 169:19 170:10 |
| 206:23 208:11 | 58:15,19 66:3 | **s**  188:22 289:10 | 171:8 173:13 |
| 209:13,15,16 | 66:15,15 69:8 | 312:3 | 174:14,15,16 |
| 209:17,18 | 71:1,9 77:18 | **sample**  71:7,8 | 175:8 186:15 |
| 211:22 302:11 | 78:8 92:4 | 71:15,18 72:4 | 191:8 198:9 |
| **room**  34:3 | 100:23 101:22 | 72:7 | 203:22 211:14 |
| **rotate**  73:6,18 | 103:13 115:20 | **santana**  1:7 | 213:3,4,11 |
| **rough**  1:10 | 129:1,3,17,18 | 311:4 312:1 | 214:2,9 215:3 |
| 5:19 97:13,17 | 135:2,4,9,12 | 313:1 | 218:5 235:21 |
| 97:19,22 301:2 | 136:21 152:13 | **sat**  226:17 | 236:5,13 244:1 |
| 303:17 304:15 | 166:17,21 | **save**  8:8,22 | 246:5 261:4 |
| 311:4 312:1 | 168:3 169:20 | 30:16,22 31:12 | 262:17,17 |
| 313:1 | 170:12 171:12 | 32:13,19 33:3 | 263:22,23 |
| **round**  201:23 | 171:14 174:6,7 | 39:23 48:7 | 264:12,20,21 |
| **rounding**  38:23 | 175:23,23 | 297:22 | 278:19 279:14 |
| **routinely** | 187:21 276:13 | **saved**  8:13,14 | 281:3 |
| 215:10,12 | 277:13,23 | 9:2 18:11 | **says**  7:13 53:7 |
| **row**  83:3 | 280:5,17 | 33:16 42:2,13 | 53:9 75:5 |
| 156:14 | 291:10 292:21 | 226:21 267:14 | 145:11 147:5 |
| **ruler**  266:15 | 294:18 296:23 | **saves**  35:10 | 153:22 154:7 |
| **rules**  2:6 5:4 | 296:23 297:3,6 | **saving**  18:6 | 155:20 164:12 |
| **run**  8:1,4,21 | 298:22,22 | 31:18 32:10 | 164:13 167:7,9 |
| 13:13 15:1 | 302:9 | **saw**  45:10 97:4 | 173:4 208:9 |
| 18:13 21:11,17 | **running**  25:15 | **saying**  10:13 | 217:11 221:12 |
| 22:7 23:11 | 31:20 34:12 | 15:14 25:14 | 221:12 222:21 |
| 29:23 31:8,10 | 59:8 65:6 | 26:4,14 32:9 | 223:22 224:4 |
| 31:22 33:8 | 149:11 161:13 | 40:12 49:20 | 232:10 234:23 |
| 36:4,5 38:12 | 166:10 170:18 | 71:18 76:3 | 245:17 249:21 |
| 39:10,13,23 | 171:9 222:3 | 96:5 101:3 | 256:5 263:1 |
| 41:21 42:20 | 299:2 | 103:10 118:22 | 281:3 292:13 |
| 43:16 45:18,19 | **runs**  24:7,12,12 | 121:11 124:11 | 308:19 |
| 46:1,8,15,18 | 33:5 45:16 | 132:20 133:6 | **scale**  87:15 |
| 47:2,4,6,11,17 | 297:21 | 134:19 145:10 | 160:12 213:5 |
| 48:7 52:6 53:5 | | 164:7 166:20 | 241:4,4,5,5,9 |

G. Bryant Buchner                                     July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[scale - seeing]**                                          Page 54

scale - seeing

242:2 266:16
**scaled** 241:1
**scaling** 210:7
  216:20
**scan** 63:13
  75:23 87:2
  198:19,22
  234:3 235:17
  235:23 239:5
  239:16 245:19
  246:11 259:9
  261:9 270:14
  271:6,7,10
  273:16,18,18
**scanned** 146:21
  246:21
**scans** 63:12
  87:22 245:4
  261:1 263:2
  264:10,12,14
  265:6
**scenario** 103:2
  163:14 171:22
  284:1
**scene** 83:16
  238:1 242:8
**schedule** 33:23
**scheduled**
  19:19
**science** 233:10
  233:21 282:22
  283:1
**scientific**
  280:11

**scientifically**
  109:12 111:17
  112:1 278:14
  294:12
**scooter** 308:3
**scope** 106:10
  113:23 114:2
  131:20 136:13
  140:18 142:5
  158:2 280:16
  305:7
**scratch** 27:12
  27:14 37:16
  57:19 58:12,16
  58:19 59:17
**screen** 6:12,22
  26:7 37:18
  46:9 61:16,17
  61:19 69:4,19
  72:13 146:10
  146:10 183:6
  187:11,13
  188:6 195:10
  195:23 196:3
  211:15 227:8
  234:23 235:16
  240:2,12 248:7
  248:19 260:8
  303:19
**script** 52:9
**se** 247:19
**seat** 79:14 83:3
  92:11 99:22
  153:23 154:2,5
  154:7,16,17

155:2,3,6,8,10
155:16 156:2
156:14,21
157:4,7,9
182:18 258:23
**seats** 85:9
**second** 27:15
  37:17,21 38:17
  69:2 83:3
  115:2 125:9
  156:13 158:19
  182:14 200:1
  201:16,17,22
  211:8 225:2
  234:15 254:16
  276:7 303:20
**secondary**
  153:2
**seconds** 162:2,4
**section** 75:9
  147:11
**sections** 61:20
**secure** 95:14,15
**see** 6:19,21
  7:18 14:17
  36:16 46:5
  52:20,21 61:17
  66:19 69:10,11
  69:14,16 73:10
  73:21 76:6
  78:20 105:9
  109:6 118:8,21
  123:1 146:10
  149:1,8 158:18
  159:11 160:9

163:20 173:1
182:14 183:11
183:22 184:6
185:16 186:2
187:4,6,8,12,16
190:18 191:22
194:17 196:2
196:17 197:6,9
201:7 205:5
208:20,22
209:5 210:1
211:3,6,15,21
212:1 216:3
219:3,17
220:10,23
223:2 227:22
228:8,11,16
234:15,16,18
234:19,20,20
235:12 237:9
237:10,11,15
241:14 244:15
244:17,21,23
247:21 248:10
250:9 252:5
253:23 254:2,7
254:15 258:4,5
258:14 259:21
259:23 266:18
270:3,17 272:6
274:9 276:15
283:11 290:20
295:19 303:20
**seeing** 118:8
  298:10

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[seek - side]**                                                    Page 55

seek   164:11,12
  164:13
seem   143:18
  167:21 181:12
  249:1
seemingly
  78:13
seems   161:18
  230:19
seen   9:4 69:4
  69:12 70:3,5,6
  70:22 71:6,10
  71:19 82:10
  92:19,21 96:8
  109:16,19,20
  139:16,17
  140:14 260:1
  262:12 265:2
  279:4 281:20
  286:8 302:14
  302:15,18
seize   153:9,13
  153:17 256:22
  256:23 257:5,8
  257:18,23
sells   110:11
semantics
  266:13
send   222:20
  260:7
sending   276:8
sense   102:19
  279:13
sent   30:19 31:6
  184:10 185:11

185:12 222:12
  250:1,1 311:14
sentence   75:12
  75:14
sentences   224:9
separate   93:15
  116:12 129:23
  199:13
sequence
  236:15
series   159:15
server   32:15,21
set   207:23
  213:2 215:12
  268:2 281:8
seven   58:22
  153:22
several   232:23
shake   295:16
shape   19:1
  63:11,13
  181:20,20
  196:17 254:6
  288:15
shard   85:4
shards   84:23
  299:11,12
share   6:12,13
  146:9 195:23
  227:7,9 248:7
  248:20 303:19
shared   69:18
  234:21
sharing   61:16
  182:14 234:16

248:18
sheet   311:11
shift   95:10
shifted   197:12
shifting   155:16
  237:9
short   96:2
shorter   238:5
shoulder   35:9
shoveled   84:18
show   38:22
  73:15 90:7
  96:14 103:8
  152:7 154:21
  154:22 156:4
  159:2 164:13
  167:10 168:1
  168:22 172:16
  172:17 177:17
  188:16 194:19
  217:17 222:8,9
  225:2 226:3,4
  226:6,20
  230:21 240:15
  241:16 242:2,2
  242:12,18,21
  242:22 243:20
  245:11 247:11
  247:14,16
  248:5 255:7
  262:18 263:17
  282:14,21
  284:3 290:2,14
  296:9

showed   24:7
  96:22 183:21
  192:1 232:13
  243:13 303:17
showing   46:10
  70:21 72:3
  78:15 177:4
  178:23 179:7
  194:19 199:7
  239:14 240:8
  242:5,23
  243:11 249:17
shown   16:17
  39:2 85:6
  225:1 231:20
  243:6
shows   38:22
  92:1 95:23
  157:2 177:2,5
  178:6 188:20
  198:13 199:5
  215:16 221:1
  221:13 225:4
  226:5 228:1
  232:6,19
  251:22 252:1
  253:14 257:10
  263:14,15
sic   89:22 185:1
side   64:21
  73:14 95:11,16
  95:17 142:20
  153:21 183:15
  187:20 200:2

**sideways**
  137:11 233:12
  233:14 237:11
  237:12
**sign**  309:15
  311:12
**signature**  2:2
  310:21
**signed**  311:19
**significant**
  104:4
**significantly**
  147:12 148:19
**silver**  194:14
**similar**  14:14
  16:23 41:4,16
  50:19,23 58:11
  70:7 71:5
  85:12 181:19
  193:15 256:18
  262:14
**similarly**
  264:19
**simon**  289:10
**simple**  13:5
  19:15 113:18
  116:16 119:19
  121:17 123:21
  124:20,23
  125:3,5,12,13
  125:13 126:7,8
  127:16 134:22
  159:14 270:2
  283:23,23

**simpler**  16:3
**simplest**  205:5
  261:12
**simply**  126:19
  218:3 288:11
**simulate**  48:23
  117:2 118:23
  126:16,18
  172:8 173:1
  285:4 288:13
  302:16 304:16
  305:1
**simulated**  64:4
  101:16 150:6
**simulating**
  133:8,15 134:2
**simulation**  7:20
  7:23 8:22,23
  9:7,15 10:12
  10:16 12:8,12
  13:14,17 14:1
  14:7 15:5,6,7
  15:13,14,16,18
  16:9 17:3 18:1
  18:10,13 19:5
  19:11 20:22
  22:4,12,18
  24:13 25:13,16
  27:10,19 29:17
  29:21 30:10
  31:8,10 32:4
  36:4 37:22
  38:2,8 39:13
  39:22,23 41:7
  41:10,22,23

42:3 43:15
44:10 45:15,19
46:13,15 47:16
47:17,19 48:12
48:13,23 49:6
50:6 52:6,15
52:17 54:10
55:11 57:12,13
58:8,15,23
61:22,22 62:13
64:13,15 65:22
66:19 67:10,14
67:18,21 68:10
68:10,18 70:4
70:10,21 71:3
71:22 72:3,15
73:1,5 74:5,7
74:20 75:17
76:4,15 77:1
77:16 78:17
79:8 80:10
82:20 85:14,20
85:21 86:12
89:16,21 90:6
90:20,23 91:12
91:17 92:6,8
92:12,22 93:8
96:2 98:23
99:5,12,19
100:1,5,7
101:3,4,23
103:13,20
104:1,10 105:7
105:13 106:1,6
106:7,13

107:12,21,22
108:5,6,11,14
110:5 111:23
115:20 117:23
118:2,6,11,18
119:10 121:3
126:22 127:19
128:12 129:1
130:2,7,9,11
132:16 138:18
139:9 142:2,4
143:21 149:20
150:3,5,15
151:18 163:14
164:16 167:23
167:23 168:3,9
169:20 171:13
171:14 174:8
266:8 267:23
268:2,4,7,10,13
269:6 276:13
276:14 277:6,9
277:14,15
278:1,21,23
279:1 280:5,6
280:7,10,12
281:21 282:2
282:18 283:17
285:3,13 288:1
288:8 289:16
290:4 291:9,16
291:20 292:5
292:22 293:1,9
293:10,14,18
294:4,7,12,14

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[simulation - sorry]**                                    Page 57

| | | | |
|---|---|---|---|
| 294:15,22,23 | 129:16 131:10 | 254:4,16 255:4 | 276:19 278:14 |
| 296:22,23 | 132:6,9 136:7 | 255:4,9,13 | 282:19 288:5 |
| 297:3,6,14 | 141:1 143:9 | 257:2 258:4,20 | 290:5,22 |
| **simulations** | 156:9,11 | 258:20 270:8,9 | 291:10 298:1 |
| 24:14 41:21 | 173:11 174:13 | 270:9 | **solely** 49:3 |
| 42:20 70:23 | 209:1,8 264:23 | **slides** 188:15 | 131:16 |
| 85:23 163:3 | 269:5 306:6 | **slight** 100:5 | **solid** 205:8 |
| 277:16 289:10 | **sits** 280:20 | **slightly** 44:11 | **solutions** |
| 291:11 293:21 | **sitting** 34:13 | 94:1 168:18 | 311:23 |
| 293:22,22 | 119:13 130:16 | 193:9 | **solving** 40:10 |
| **simulator** | 277:11 302:13 | **slope** 149:17 | **somebody** 8:18 |
| 294:8 | **situation** 60:15 | 150:2,13 | 19:20 53:20 |
| **single** 32:18 | 173:11 290:23 | **slow** 164:20 | 60:21 71:21 |
| 282:11 | 291:1 | **slower** 100:7 | 73:8 107:17 |
| **sir** 6:23 37:20 | **situations** | 100:10 | 185:20 191:12 |
| 46:17 49:12 | 144:6,7 162:9 | **small** 69:6 | 272:23 276:8 |
| 50:13 54:8 | **six** 58:15 | 201:20 220:3 | **someone's** |
| 57:7,22 58:11 | 152:22 199:8 | **smaller** 308:10 | 215:23 |
| 59:2,6,15 | 208:14 218:22 | 308:13 | **somewhat** |
| 61:17 85:4 | 231:17 | **smart** 132:7 | 94:21 |
| 88:16 91:22 | **size** 66:19 67:2 | **smeared** | **sorry** 16:2 |
| 99:7,10 122:5 | 67:8,12,15 | 185:20 | 29:11 48:17 |
| 138:10,23 | 68:13,21,22 | **sneddon** 75:6 | 50:13 54:2 |
| 146:11,16 | 157:12 181:16 | 75:10 | 95:1 121:15 |
| 147:3 148:16 | 266:18 306:19 | **snyder** 4:15,19 | 124:22,22 |
| 156:23 158:8 | **sizes** 66:13,16 | **software** 31:16 | 128:1 137:10 |
| 162:13 181:22 | 66:17 78:5 | 34:8 35:2 | 149:11 157:16 |
| 183:10 192:2 | **slice** 157:5 | 52:17 53:6,14 | 158:19 164:4 |
| 193:10 208:18 | **sliced** 148:6,6 | 56:1,19,20 | 184:5,15 188:6 |
| 244:15,15 | **slide** 183:22 | 62:3,7,10,22 | 188:7 214:2 |
| 251:5 258:11 | 188:13 248:14 | 79:15 90:11 | 229:3 240:20 |
| **sit** 28:2 29:5 | 248:16 249:3 | 107:14 115:14 | 249:20 250:9 |
| 31:13 34:22 | 251:5,12,13,20 | 140:10,16 | 253:17 255:6 |
| 57:6 68:3 | 251:21 252:1 | 145:6,20 | 258:18,21 |
| 116:22 118:4 | 253:15,19,23 | 179:10 271:18 | 276:9 283:14 |

**[sorry - stock]**                                                    Page 58

287:3 293:19
295:6 306:2
**sort** 178:5
**sounds** 116:16
**source** 259:18
**southeast**
311:15
**space** 157:6,8
157:13,14
**spacing** 214:3
**speak** 137:12
155:13
**speaker** 128:5
**speaking**
213:10
**special** 288:14
**specific** 79:19
80:8 113:14
114:10 202:22
**specifically**
45:11 80:19
95:9 109:23
198:14,17
220:19 246:5
301:16 302:4
**specifications**
300:9,9
**specs** 208:12,17
307:5,7
**speculate**
121:22
**speed** 86:3 88:8
88:13 100:3,4
100:10,12
102:17,20,23

103:14 110:16
110:22 112:11
161:9,12,16,19
161:19,20
162:19 163:2
165:12,15,20
166:2,9,11
167:3,19 168:4
168:8,13
170:15 171:1
171:20,21
285:20 288:17
**speeds** 102:6
113:4 163:19
285:21 293:10
297:17
**spin** 242:12
**spit** 276:16
**spoke** 301:6
**spot** 202:22
221:5
**spread** 34:3
**staff** 26:10
**stamp** 190:21
190:22 194:18
200:15 232:1,3
243:16
**stand** 238:5
**standard** 130:5
281:15
**standpoint**
118:6
**stands** 84:7
**start** 6:11
17:15 24:16

40:21 55:15
56:12 57:9,17
57:18,23 59:16
93:16 101:1
108:6,8 116:20
117:3,5,7,7,21
118:6,19
154:17 162:12
172:14 173:17
178:19 259:21
282:6 284:21
297:14 306:20
**started** 12:21
23:1,4 29:3
53:18 54:19,22
55:8,12,14
57:16 119:21
180:6 194:12
203:13 253:6
300:12
**starting** 5:16
123:5 175:6
306:18 307:2,6
**state** 7:18
275:16 282:5
293:19 310:2,5
**stated** 149:15
162:1 221:11
221:18
**statement** 84:7
95:6 125:14
165:11 225:15
233:15 234:1
263:10

**states** 1:1 4:1
149:17 223:13
**station** 34:23
**stay** 55:16
57:17 60:16
249:1
**stayed** 55:20
56:16 95:12
152:18,20
**stenographic**
310:8
**step** 9:6
**stick** 53:17
159:5 181:8
184:9
**sticking** 182:5
**sticks** 153:7
184:9 252:16
**stiffer** 64:1
**stiffness** 62:2
62:14,18 63:15
63:16,22 64:17
64:20 78:2
110:3 112:8
175:13,15
285:19 288:16
301:17,21
**stihl** 82:1
**stipulated** 2:1,8
2:16
**stipulation** 5:5
**stock** 110:1
173:6,15,16
174:6,9

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[stop - sure]**                                              Page 59

**stop**  118:20
  182:13 234:16
  248:18
**storage**  82:12
  82:14
**straight**  177:6
  187:20 224:6
  232:8
**stress**  110:18
**strike**  107:1,4
  111:13 119:17
  121:7 297:4
**striking**  152:23
  203:3
**strong**  95:14
**stronger**  64:1,3
  64:4 149:22,22
  150:18,21
  241:21
**strongest**  205:3
**struck**  223:23
  224:2
**structure**  92:1
  92:15 95:8
  107:2 122:4,4
  122:9,9,11,14
  123:2,23,23
  124:10,10
  152:4,15 170:1
  170:1 172:6,6
  274:16 301:12
  305:5,5
**structures**
  95:15 110:21

**stuck**  180:1
  217:23 218:14
  242:10 253:8
  298:17
**studies**  302:18
**study**  92:15
  103:8 108:19
  109:2,3,7,17,21
  110:11 116:7
  132:9 139:14
  139:18 144:16
  172:5,22 303:8
**studying**  92:13
  136:2
**stuff**  26:9 34:20
  43:20 115:12
  130:13 144:23
  155:13 156:16
  160:5 173:6,7
  222:15,16
**style**  74:23 76:5
  295:7
**subject**  67:9
  74:23 78:6
  106:20 108:15
  108:17 135:23
  136:18 150:11
  157:9,13
  172:20 179:8
  179:16 186:14
  193:2 201:3
  257:12 261:2,3
  261:23 262:4
  263:3,8 264:3
  264:5,6,9,10

265:10 266:11
  270:14 273:15
  274:1 299:9,9
  301:3,3
**subscribed**
  313:14
**subscription**
  54:3
**sudden**  129:19
**suddenly**  23:4
**suffered**  80:13
  84:11
**suggestion**
  239:21
**suite**  4:12,16,20
  31:16 36:18
**summarized**
  25:7
**summarizes**
  141:9
**summation**
  148:12
**sunroof**  89:17
  89:18 90:6,7
  90:10,10,13,15
  90:22 91:13
  99:18 301:5,7
  301:8,15,20
  302:4
**sunroofs**  91:5,9
**super**  76:11,16
  76:17,18
**supervision**
  310:10

**supplemental**
  14:20 83:22
  105:18,22
  114:6 116:4
  117:17 131:20
  140:19 141:16
  141:21,23
  280:16 305:7
  305:17
**support**  138:19
  139:10 243:11
  251:19 301:13
**supporting**
  51:17,19 95:8
  296:16
**supports**  113:2
  256:1
**suppose**  211:11
**supposed**  28:12
  28:15 29:5
  156:4 201:8
  225:5,6 286:6
**sure**  6:16 7:13
  7:17 10:13
  11:18 14:22
  15:10 16:2
  20:3 21:3 23:9
  25:11 35:3
  45:9 46:20
  64:22 66:17
  68:15,22 72:11
  86:5 87:6
  93:17 99:2
  103:2 104:8
  108:16 109:20

G. Bryant Buchner                                        July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[sure - tell]**                                                    Page 60

|  |  |  |  |
|---|---|---|---|
| 124:18 127:10 | **t** | **talk** 15:4 34:15 | **tank** 80:17,23 |
| 135:7 137:2 | **t** 312:3,3 | 45:5 52:14 | 81:2 83:13 |
| 159:4 162:22 | **tail** 184:7,16 | 74:20 98:22 | 299:20 |
| 162:23 163:19 | **tailgate** 86:11 | 103:18 152:23 | **tanks** 104:16 |
| 166:12 167:18 | 252:3,15 | 158:20 160:17 | 104:17 |
| 169:17 170:10 | **tailgates** 107:4 | 161:22 175:6 | **tape** 159:16,17 |
| 172:3 174:22 | **take** 14:15 | 299:13 | 159:20,21,22 |
| 177:11 182:8 | 31:15 32:14 | **talked** 77:23 | 160:2,4,18 |
| 183:16 194:23 | 60:22 61:3 | 97:16,22 98:2 | 161:1 200:8 |
| 203:21 205:12 | 76:10 88:19 | 128:16 133:19 | 210:12 216:7,9 |
| 211:17 217:19 | 89:3 109:5 | 197:8 259:5 | 217:7,10 |
| 223:3 227:5 | 115:13 116:7 | 270:21 277:19 | 219:22 220:5,6 |
| 228:23 244:18 | 116:15 119:1 | 295:17 | 224:17 235:17 |
| 245:16 247:23 | 120:23 128:11 | **talking** 6:20 | 252:20 253:14 |
| 248:6 259:7 | 136:23 138:15 | 7:10 30:13 | 254:7,10,14,19 |
| 260:10 265:6 | 143:10 174:11 | 69:3 76:22 | 254:20 |
| 265:19 273:3 | 175:18 176:3 | 94:5 100:21,22 | **target** 160:10 |
| 288:23 293:5 | 182:16,20 | 101:17,19,20 | 202:4 |
| 295:10,20 | 191:13 194:22 | 122:1 141:2 | **targeting** 112:7 |
| 296:16 303:10 | 211:19 214:4,4 | 145:7 153:8 | **targets** 159:15 |
| 306:9 307:1,12 | 215:1,13 217:7 | 154:5,8,8 | **taught** 256:10 |
| 307:14,18,19 | 217:8 222:10 | 158:7 159:21 | **teaches** 291:2 |
| **surrounding** | 241:5 260:3 | 159:22 175:7 | **teaching** 94:16 |
| 38:18 | 286:17 287:15 | 185:5,6,7 | **technical** 7:19 |
| **survive** 23:10 | 290:16 295:18 | 186:3 189:11 | 7:22 8:12 |
| **survived** 11:22 | **taken** 61:11 | 196:5,8 201:15 | 34:21 138:3 |
| **suspect** 9:20 | 89:10 137:6 | 201:15,16,17 | 182:18 |
| **swear** 6:1 | 176:11 183:2 | 203:2,4 210:8 | **technique** |
| **switching** | 195:19 204:8 | 210:14,16 | 214:19 |
| 264:2 | 260:17 296:1 | 223:5,9,10 | **tedra** 4:14 5:20 |
| **swoop** 193:21 | 310:7 | 225:16 255:10 | 188:9 311:1,2 |
| **sworn** 6:5 | **takes** 47:20 | 264:4,5 281:1 | **tell** 14:10,11 |
| 313:14 | 55:10 57:10 | 296:21 308:7 | 16:11,15 17:7 |
| **system** 65:8 | 108:22 127:14 | **tame** 120:23 | 17:9 116:13 |
|  | 132:21 298:14 |  | 121:19 132:19 |

G. Bryant Buchner                                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[tell - testing]**                                          Page 61

| | | | |
|---|---|---|---|
| 132:23 133:2,4 | 102:18 103:5 | 163:23 164:10 | 280:9,18 281:2 |
| 154:9 159:13 | 103:12 104:2,5 | 165:23 166:7 | 283:9,22 284:8 |
| 159:17 170:14 | 104:11 105:6 | 166:11,13 | 288:7 291:17 |
| 187:14 219:2 | 105:12,13,21 | 169:3,13 | 293:8,13 294:1 |
| 219:23 258:23 | 106:4,19 107:6 | 170:12,18 | 294:2,6,8,11,18 |
| 271:19 276:20 | 107:7 108:1,3 | 177:14,17 | 302:9,12,21 |
| 280:19 282:1 | 108:7,11,23 | 179:2 180:5,8 | 303:3,5 307:22 |
| 284:17 285:20 | 110:18 113:14 | 180:9,17 183:8 | **tested** 50:12 |
| 289:4 290:17 | 113:15,20 | 183:8 184:1 | 77:13 |
| 302:1 305:22 | 114:21 116:2,9 | 185:2,18 186:8 | **testified** 6:5 |
| **telling** 27:20 | 117:2 118:5,13 | 186:14,16 | 23:15 24:6 |
| 43:18 127:4,13 | 119:1,9 121:3 | 200:3,3,15 | 26:17 37:8 |
| 143:13 220:13 | 123:18 124:1 | 201:3 204:1,1 | 48:22 124:8,15 |
| 242:1 279:20 | 124:11 126:19 | 205:14,21 | 160:17 224:16 |
| 297:16 | 126:22 130:11 | 206:5,8 207:23 | 264:7,23 |
| **tells** 150:17 | 130:16 133:9 | 211:9,16 218:1 | 290:21 304:23 |
| **ten** 287:12 | 133:16 134:2 | 221:16,20 | **testify** 24:8 |
| **tend** 55:15 | 136:16 140:14 | 222:3 223:11 | 220:16 279:22 |
| **tenth** 202:11 | 140:16 141:15 | 227:15,20 | **testimony** 49:4 |
| 225:18 | 142:12 143:5 | 237:20 243:8 | 49:8,22 124:16 |
| **term** 9:16 10:1 | 144:13,18 | 245:6,21 246:8 | 140:3,19 141:9 |
| 10:5 93:23 | 145:5,8,18 | 246:13 247:9 | 158:2 162:10 |
| 283:23 | 146:22 147:12 | 247:11 248:4 | 187:2 219:16 |
| **test** 48:13 49:1 | 147:17 149:18 | 252:2,7 254:3 | 236:4 238:3 |
| 50:5 65:6 | 150:7 151:2,13 | 256:20 257:22 | 247:8 263:5 |
| 74:12 77:5,12 | 151:15,23 | 258:16,21 | 279:8,21 280:1 |
| 91:3 92:18,20 | 152:11,13 | 259:12,18 | 280:17 290:21 |
| 93:5,14 94:23 | 153:1,13,15,18 | 261:21 262:3 | 305:14 311:9 |
| 95:13 96:3,6 | 153:23 154:3 | 264:3,5 269:20 | 311:17 313:8 |
| 96:15,16,18 | 154:17 155:1,2 | 270:6 272:2 | **testing** 77:6 |
| 97:8,11,14,20 | 155:11,19 | 273:23 274:12 | 95:5 99:20 |
| 98:5 99:1,5,12 | 156:5,14,15,20 | 274:17 275:17 | 100:1 101:15 |
| 100:3,6,17,23 | 157:15,20,23 | 276:5,22 277:6 | 103:20 106:15 |
| 101:4,6,7,8,18 | 158:8,14,20,21 | 277:7,10 | 107:13 111:15 |
| 101:21,22 | 161:2,13 163:9 | 278:19,20 | 113:6,7 114:9 |

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[testing - thousands]**                                    Page 62

| | | | |
|---|---|---|---|
| 114:11 115:21 | 134:23 167:5 | 24:11 25:7 | 261:19,22,22 |
| 118:2 122:8 | 170:17 175:5 | 27:15 28:6 | 262:11,20 |
| 128:13 165:16 | 178:22 180:7 | 39:5 47:3 | 266:2,2,3 |
| 176:21 227:17 | 180:19 197:9 | 49:19 55:2 | 268:14 269:13 |
| 227:18 302:16 | 201:18 228:9 | 63:17 65:11,13 | 276:23 284:10 |
| 302:17 303:1 | 232:18 297:7 | 65:15,18 66:10 | 286:3,5 290:1 |
| 303:10 | 297:14 | 67:5 69:15,18 | 290:7 300:20 |
| **tests** 104:12 | **things** 12:22,23 | 73:18 81:9 | 301:6 302:14 |
| 165:20 301:21 | 13:4 19:14 | 82:15 85:7 | 305:12 308:19 |
| 301:23 302:6 | 23:2 27:4 62:9 | 87:13 91:21,22 | **thinking** 12:18 |
| **testy** 295:6 | 64:23 76:14 | 98:7 105:8 | 56:22 104:16 |
| **thank** 5:23 6:10 | 79:23 85:19 | 106:9 107:15 | **third** 67:4 |
| 7:16 16:21 | 96:13 101:10 | 112:4 113:11 | 205:11 206:4 |
| 21:15 29:14 | 105:8 113:3 | 113:22,22 | 224:1 |
| 87:5,9 89:5 | 114:19,20 | 115:8,8 117:9 | **thought** 8:19 |
| 95:3 104:5,7 | 119:6 123:9,12 | 120:8 129:22 | 9:8 10:4 11:3 |
| 128:8 138:10 | 123:12,13 | 131:12 137:18 | 12:4 13:5 15:1 |
| 146:16 148:16 | 130:18 133:18 | 139:17,20 | 19:15,20 20:5 |
| 193:10 216:12 | 135:21 143:13 | 140:8 149:14 | 21:16,20 22:20 |
| 235:7 260:13 | 155:18 159:9 | 151:9,20 | 23:14,16 26:12 |
| 277:22 295:5 | 159:16 172:1 | 154:14,18 | 26:20 37:4,5,6 |
| 295:12 305:13 | 199:6 201:12 | 156:17 162:21 | 62:20 64:6 |
| 306:17 309:5 | 204:9 205:7 | 164:18 168:7 | 82:9 87:4 |
| **thanks** 61:14 | 210:6,13 | 169:16 170:6 | 139:2 156:8 |
| 89:13 137:3,9 | 226:18 235:3 | 171:17 172:11 | 165:4,6 170:8 |
| 180:17 244:20 | 241:3 261:11 | 173:13 174:16 | 190:22 192:9 |
| 260:20 | 261:16 262:11 | 175:3 178:1 | 235:10 243:16 |
| **theory** 167:22 | 264:23 275:10 | 182:11 186:3 | 259:6 261:7 |
| **thereto** 2:15 | 279:22 284:14 | 186:15 192:21 | 276:8 293:20 |
| **thing** 8:10 | 285:15 289:2 | 193:1,20,23 | 306:2,14 |
| 38:17 45:10 | 302:2,3,6 | 197:20 213:11 | **thousand** |
| 114:13 115:7 | 303:14 307:3 | 233:2 244:9 | 201:13 307:9 |
| 118:19 123:5 | **think** 7:23 8:7 | 245:7,13 | **thousands** |
| 123:15 126:20 | 8:13 9:10 10:3 | 255:15 259:14 | 299:17 |
| 130:12 131:9 | 10:5,9 18:2 | 259:14,19 | |

**three** 59:1
149:16 151:1
160:16 176:18
176:23 177:8
203:12 205:16
221:13,14
222:13 244:10
246:6,7 265:21
**throw** 35:19
233:15
**thrown** 84:18
**tied** 262:15
**tilted** 155:10
**time** 2:13,14
5:12 12:5,17
19:7,19 20:2,4
20:10 21:4,12
21:18 22:19
23:13 27:8,8
35:23 36:5
40:10 47:12,13
47:18 54:17
55:2 57:10
58:15,19 59:8
60:8 61:8,9,10
61:12 65:6
67:9 80:17
81:2,19 83:10
83:13,16 85:1
85:7 86:4
88:14 89:7,8
89:11 97:21
112:6 116:7,15
116:19 117:4
119:1 121:5

137:4,7,14
138:15 139:15
142:1 152:6,18
152:21 157:22
162:20 176:3,9
176:12 182:23
183:3 189:22
192:8 195:17
195:20 201:14
201:21 215:1
221:9,20
237:18 245:23
257:17 260:15
260:18 268:1,9
285:16 286:17
295:11,22
296:2 298:14
305:18 306:4
309:6 310:13
311:18
**timeframe**
20:16 311:8
**times** 8:13
109:17 133:11
139:21 144:9
144:15 145:23
265:22 278:4
280:19 282:1
**tip** 122:13,22
**tipping** 299:15
**tire** 11:19 52:11
66:13,16,17,19
67:1,8,12,15
68:21,22 78:5

**title** 227:14
249:19
**titled** 146:13
227:20
**today** 16:15
39:20 59:23
60:5 116:22
129:17 132:20
133:14,21
140:7 156:11
173:12 226:22
227:8,11 229:1
262:23 264:7
269:5 280:21
283:16 295:17
**today's** 5:11
**together**
198:23 199:2
203:11 228:2
242:10 256:6
262:15 265:12
267:8,8
**told** 28:6 35:14
38:12 40:19
45:1,9 58:18
65:5 123:6
129:2 135:10
144:21 220:1
**took** 19:13 20:1
20:7,8 22:19
23:7 39:14
40:7 117:3
266:15
**tool** 104:2,2
267:4 288:9

289:13 290:9
290:12 291:16
292:14
**toolbox** 82:8,11
**tools** 82:5,6
104:3 215:22
215:23 289:12
303:6,7 304:21
**top** 46:2,5 53:8
94:17 105:16
111:7 119:6
129:11 152:9
184:11 185:11
206:4 208:13
212:19 228:7,8
229:8 254:1,10
254:19
**topdown** 206:9
**topic** 225:9
287:13
**total** 79:6,8,15
85:17 147:11
147:13 148:3
**totally** 243:23
281:22
**touched** 25:1
**touches** 160:13
160:14
**tow** 95:17
122:12,21
131:1,15
152:17 153:7
180:1 197:9,12
198:1,3,7
203:10,11

204:23 205:4
205:17,22
219:19,20
220:5 247:11
247:16,21
251:23 252:1,5
252:8,14,16,18
252:21,23
253:8,10 254:2
254:18 255:11
255:14,15,22
256:5,5,19
258:1,7 261:16
262:13,20
264:22
**towards** 182:2
**towed** 224:5
**track** 210:11
**tractor** 308:4
**trailer** 308:5
**train** 292:20
**training** 112:17
**transcript**
  262:23 310:9
  310:12 311:6
  311:19 313:5,8
**transfer** 75:18
  159:16,17
  160:4
**trash** 28:10
**traveling**
  166:10
**treasure**
  110:13

**trial** 2:14
**tried** 24:5,8
  26:18 27:6
  39:1 48:7
  105:9,11
  114:19 116:8
  134:21 138:22
  141:5 142:14
  156:16 306:22
**trigger** 220:6,6
**trouble** 128:1
  243:18
**trove** 110:13
**truck** 64:3,5
  66:10 74:23
  77:4 80:9
  102:20 106:21
  110:14,16
  132:1 150:10
  161:8,10,12
  163:15,16,17
  165:13,14,15
  165:16 166:10
  166:13,16,21
  167:4,5,10,11
  167:17,18
  168:6,23
  171:10,13,15
  173:11 199:4
  201:12,14
  203:8 220:23
  221:5,19
  228:10,13
  229:7 231:17
  233:12,13,17

252:17 253:11
  283:2
**trucks** 167:19
**true** 10:17
  17:19 19:8
  125:8 127:2,5
  143:23 149:19
  151:17 153:15
  180:7 182:10
  197:2,18 204:6
  213:7 233:15
  266:20 268:17
  283:15 310:11
  313:8
**truth** 286:19
**try** 8:6 12:20
  16:3 40:4 44:5
  44:6,6,10 49:5
  56:12 85:3
  102:14 130:10
  165:18 207:13
  235:3,8,13
  236:11 248:18
  269:22 277:7
  282:6 295:9
  302:10,19
**trying** 12:21
  20:13,15 23:1
  34:6 43:5,9,13
  43:13 53:17
  56:3,10 59:5
  60:16 62:20
  83:20 92:5
  93:7 96:13
  103:3 106:5,18

106:19 118:23
  125:20,23
  126:12,15
  135:1 137:12
  137:15 144:3
  148:15 158:4,9
  164:11,12,13
  165:17 166:8
  169:7 172:12
  180:22 192:16
  192:18 193:6
  194:16,22
  203:20 204:6
  204:18 212:15
  213:12 214:16
  214:21 216:15
  244:22 245:1
  272:12 296:15
  298:13 302:13
**turn** 109:3
  127:21 128:2
  226:19,20
  228:7,8
**tweaked**
  189:14
**twelve** 85:23
  87:7,19 135:3
  136:3,9 229:19
  266:9 267:20
  268:11,21
  273:19
**twenty** 145:23
**twice** 180:16
**two** 11:17
  20:23 22:6,10

Case 2:22-cv-00017-RWS   Document 119-6   Filed 01/20/25   Page 144 of 153
G. Bryant Buchner
July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[two - update]**                                                    Page 65

37:13 38:10
39:11 58:8
76:14 95:20
96:10,22 99:3
103:15 104:3
104:12,13
105:10 107:20
110:21,21
148:13 149:6
153:6 156:17
158:19 165:20
167:19 171:17
176:19 178:16
179:1 198:19
198:23 200:11
200:13 205:3
218:11 221:13
224:9 227:18
228:6,19 231:7
236:12,22
238:18 239:9
241:8,10
253:19 265:21
270:8,9 271:20
272:2 275:10
281:18 289:18
307:11 308:16
**type**   21:6 28:9
70:4 71:10,19
72:3,7 110:10
115:12 123:15
129:1 136:16
155:13 156:16
158:22 160:5,8
166:10 172:6

174:4,7 218:20
237:15 281:10
297:11 300:14
300:15,16
303:1
**typed**   75:9
**types**   37:14
123:9,11 289:1
303:7,14
**typically**   94:2
159:1
**typing**   297:10
297:18
**typo**   75:5

**u**

**uh**   27:11 163:4
187:18
**ultimately**
65:12
**un**   203:17
**uncertain**
161:18
**uncomfortable**
281:23
**uncommon**
28:8
**undamaged**
256:15
**under**   12:15
32:20 40:2
147:10 166:1
197:10 213:7,8
216:17,18
219:3 291:6
310:10

**understand**
40:7 45:23
50:18 51:13
60:19 61:23
62:20 75:12
76:7 84:6
93:17 106:20
118:5 121:10
138:14 141:20
143:14,16
156:12 162:11
165:14 166:6
169:18 170:5
172:3 176:17
186:21 194:23
194:23 201:1
205:5,12
243:15,17,23
269:20 283:16
283:17 291:15
291:18
**understanding**
15:11 29:21
30:1,20 37:9
93:22 94:14
112:6 194:5
243:18 266:6
266:13
**understood**
25:11 47:14
177:12 219:18
219:20
**undertake**
191:19 273:13

**undertaken**
274:23
**uneducated**
233:20
**unequivocally**
225:4 290:21
**unexpected**
151:1,6
**unforeseen**
7:19,21 8:11
**unfortunately**
20:3
**unibody**   95:10
**uniquely**   94:21
**united**   1:1 4:1
**unknown**   101:9
**unlifted**   163:16
164:15 165:19
165:21 167:5
167:11,16
168:22
**unnecessary**
274:10
**unrelated**
43:18
**unreliable**
129:20
**unrepresentat...**
129:20
**unresponsive**
121:8
**unsuccessful**
38:1
**update**   54:20
63:21

| | | | |
|---|---|---|---|
| **updated** 57:16 | 173:6,11 | 28:13 30:22 | 238:13,14 |
| **updates** 53:13 | 181:11 185:1,4 | 36:22 38:1,14 | 244:5,6,7,11 |
| 53:16 54:3 | 189:22 190:2,9 | 38:15 39:3 | 246:2,12,18 |
| **updating** | 190:14,19 | 40:12 42:6 | 256:4,5,18 |
| 297:17 299:2 | 193:3,4 194:7 | 48:6,11,11 | 258:15 260:23 |
| **upwards** | 197:14 199:16 | 55:20 59:13 | 261:15,15 |
| 243:14 | 202:15,17 | 62:1,12 63:21 | 262:5,10,11 |
| **usage** 305:16 | 203:18 205:9 | 67:12,18,20 | 263:1,6,13 |
| **use** 7:18 12:23 | 206:21 213:22 | 68:18 74:16,20 | 264:13,20 |
| 23:1 25:20 | 214:19 215:4 | 75:1,4,20 76:2 | 269:5,15 |
| 39:1,12 41:12 | 217:5,18 220:8 | 76:3,13,23 | 273:18 276:14 |
| 41:18,18,19 | 241:16,20 | 77:5,15 78:1,2 | 277:7 281:15 |
| 42:10 43:8,16 | 242:10 244:17 | 78:16 79:7 | 282:19 284:9 |
| 44:6 50:4 51:2 | 246:4,6 247:17 | 82:19 85:22 | 286:7,8,12,14 |
| 51:15,16 52:18 | 247:17,19 | 86:21 87:3,7 | 288:12,20,22 |
| 57:3 59:17,18 | 261:10,18 | 88:1,8 89:15 | 289:23 290:11 |
| 60:6,7,9 62:17 | 262:17,18 | 89:20 90:6 | 291:10 292:6 |
| 64:12 65:1,3 | 263:18,19 | 92:7 98:8 | 301:12 302:14 |
| 66:9 80:9 | 265:6 267:23 | 104:10,15 | 303:14 304:15 |
| 86:18 87:18 | 271:7 275:14 | 108:19 109:11 | 305:4 311:19 |
| 91:3,4,15 | 276:13 281:6 | 109:14,17 | **useless** 118:11 |
| 108:10 109:18 | 281:10 282:2 | 114:17 116:10 | **user** 31:17 |
| 109:20 111:3 | 282:13 283:23 | 138:23 141:14 | 90:17 301:19 |
| 111:16 112:13 | 284:13 286:15 | 142:6 144:5 | **uses** 159:14 |
| 112:16 113:2,2 | 288:10 289:1,6 | 145:13 147:1 | 178:14 223:17 |
| 118:17 126:5 | 289:7,9 290:5 | 159:3,3 163:1 | 271:14 |
| 126:16,18 | 290:18,22 | 171:19 174:9 | **using** 9:21 |
| 129:14 132:21 | 291:3,17 | 176:18 178:12 | 17:10 23:22 |
| 135:23 136:6 | 292:12,23 | 185:15 186:17 | 25:9 26:6,15 |
| 139:9,14,16,18 | 295:2,20 | 189:3 190:15 | 26:17 28:1,7,9 |
| 140:11 142:10 | 297:17 300:9 | 192:23 194:8 | 29:9 37:6 44:8 |
| 143:7 145:15 | 302:10,15 | 202:8 203:9 | 53:6 56:5 |
| 156:16 164:15 | 305:1 307:5 | 205:7,9,13 | 59:20 60:1 |
| 170:22 172:8 | **used** 14:23 | 209:12,12 | 62:16 63:20 |
| 172:12,19,22 | 18:23 21:21 | 218:10 237:15 | 72:19 87:15,21 |

G. Bryant Buchner
July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[using - vehicles]**

Page 67

| | | | |
|---|---|---|---|
| 94:7 98:6 | **usually** 36:11 | **variables** | 194:13,14,15 |
| 102:7 104:16 | 201:23 300:2 | 100:13 102:1 | 197:17 200:8 |
| 104:22 106:23 | 300:19,22 | 126:14 274:11 | 200:10 202:4 |
| 109:6 110:1,8 | **utilized** 288:22 | 274:11 | 204:3,15 |
| 110:23 111:1 | **v** | **variation** | 216:19 222:23 |
| 112:5 130:1 | | 278:18 | 225:5 236:20 |
| 140:3 154:6 | **v** 39:6 110:23 | **variations** | 254:5 259:23 |
| 162:1 163:8,11 | 288:18 311:4 | 299:16 | 261:9 265:16 |
| 163:13 170:22 | 312:1 313:1 | **varied** 167:5 | 285:2 286:1 |
| 177:15 190:21 | **v's** 39:18 | 294:10 | 300:11 301:7 |
| 192:7,13 194:4 | 110:15 112:13 | **various** 162:9 | 302:10 308:10 |
| 199:15 202:12 | 113:4 170:13 | 300:14 302:21 | 308:10,11,13 |
| 203:9,13 206:7 | 285:22 | **vehicle** 63:5,14 | **vehicle's** 203:3 |
| 210:5 212:16 | **vacuum** 233:20 | 64:19 65:2,11 | 228:12 289:7 |
| 213:2 215:6 | **vague** 21:10 | 66:8 70:12 | **vehiclemetrics** |
| 216:14 217:12 | 151:8 283:4 | 77:15,22 78:12 | 62:4,6,8,16,21 |
| 217:20 229:23 | 285:8 305:20 | 78:22 79:18 | 63:10,18 64:19 |
| 230:20 242:19 | **valid** 110:10 | 80:6 81:12,15 | 65:12,19 66:5 |
| 245:10,12 | 114:21 129:4 | 82:22 83:5 | 74:22 75:5,7,8 |
| 246:11,22 | 286:23 290:9 | 84:18,19 85:1 | 75:15,21 78:2 |
| 247:13 256:9 | 290:12 | 85:5,14,17 | **vehicles** 62:9 |
| 261:6 262:13 | **validate** 11:22 | 89:20 90:5 | 62:23 74:20 |
| 262:16,20 | 24:6 111:15,23 | 91:4,5,12,16 | 78:17 91:7 |
| 264:22 265:20 | 285:17 292:23 | 92:2 93:9 94:3 | 94:19 95:20 |
| 273:16,19 | **validation** | 94:4 104:23 | 96:22 97:8,11 |
| 281:15,21 | 292:9 | 107:2,3 131:2 | 97:15,20 98:9 |
| 285:14,23 | **valuable** | 149:21 151:14 | 98:12,15 104:9 |
| 286:6,11 | 135:13 | 151:14 157:22 | 104:11 108:18 |
| 288:11,20,21 | **value** 93:5 | 158:21,23 | 110:1,6,21 |
| 289:14,18,19 | 129:8 172:16 | 159:12 160:1 | 115:18 149:18 |
| 290:3,10 | 172:17 | 160:21 161:2 | 149:19 150:4 |
| 292:14,20 | **values** 65:7 | 163:12 164:14 | 150:14,20 |
| 297:21 298:1 | 66:9 | 164:15 170:19 | 159:9 174:7 |
| 300:8 301:5,7 | **variable** 100:22 | 177:15,15 | 198:20,23 |
| 301:20 302:19 | 165:21 284:9 | 185:19,19 | 203:10,18 |

**[vehicles - want]**    Page 68

210:10 216:7
226:7,19,20
227:15,21
228:2,6 229:16
230:12,23
231:7,23
232:23 237:3
238:11 241:1
246:22 263:3
264:10,15
265:12 267:6,7
267:8,11
274:16 284:12
288:15,16
297:15,16
299:17 300:6,8
300:14 301:4
304:16 306:18
307:1,8,23
308:7
**velocity**   298:17
**vendor**   62:9
63:10
**verbally**   221:12
221:12 223:14
**verified**   31:3
48:10 77:3
**verify**   17:1,22
46:11 68:9
109:12 191:19
198:2 250:16
278:22 285:21
287:23 288:8
291:20,23
311:9

**verifying**
278:13
**veritext**   311:14
311:23
**veritext.com.**
311:15
**version**   34:10
52:17 53:6,10
53:17,18,20,22
53:22 54:4,5
54:17,18,20,22
55:2,15,16
56:1,5,6,18
57:1,2,15
58:21 59:9,12
59:13,18,22
60:1,2,5,8,10
60:22
**versions**   53:13
55:19 56:13
59:1,14
**versus**   121:3
165:18 175:16
175:16 190:19
247:12 249:5
250:17,19
251:7
**vertically**
200:18,19,23
**vet**   288:22
**video**   4:22
61:10,13 89:8
89:12 137:5,8
146:22 156:17
160:9,12

176:10,13
183:1,4 195:18
195:21 205:19
206:5,8 211:9
211:16 212:2
215:20 220:22
233:13,17
234:17 237:9
242:21 245:21
**videoconfere...**
5:6
**videographer**
5:11,23 61:9
61:12 89:7,11
137:4,7 176:9
176:12 182:23
183:3 195:17
195:20 260:15
260:18 295:22
296:2 309:8,11
**videos**   243:13
**videotaped**
5:13 309:12
**view**   206:10
226:16,18
258:20
**viewing**   226:16
226:21
**virtually**
300:10
**visible**   177:16
185:14 193:21
**visual**   97:6,9
114:18 148:23
186:20 189:15

272:12 303:17
**visualize**
194:13 236:11
**visually**   14:13
96:14 97:4
272:8
**voice**   138:1
**volume**   74:21
89:22 127:21
138:1
**vs**   1:9

**w**

**wait**   125:9
**waived**   2:3,18
**walked**   21:19
**want**   15:10
17:14 25:10
31:18,19 32:20
32:20,22 33:10
33:22 35:16
42:8 46:11
51:2 59:17
60:19,23,23
61:3,20 72:4,9
73:19 88:20,21
91:3 99:1
107:18 121:17
121:18 126:1
129:12 134:9
135:6 141:3
142:16 143:15
152:15 158:13
169:10,17
172:3 179:10
205:12 215:2

**[want - went]**

Page 69

222:9,14,17
226:23 227:1
234:12 241:10
241:14 242:13
247:17,23
250:15 251:17
265:17,22
267:9 268:17
268:23 279:23
287:20 291:13
303:9 308:14
309:14,16
**wanted** 40:4,4
41:4 48:9
50:23 51:11,23
52:8 63:8 69:1
73:8,10 88:1
92:15 103:1
107:11 115:15
130:6 153:13
173:1 251:18
272:10 307:10
307:10
**wanting** 136:9
**wants** 34:17
53:20 56:6
73:8 98:8
114:18 166:13
193:3 261:19
272:23
**water** 299:23
**way** 12:19 15:1
18:9 25:1
27:13 34:20
39:19 41:17

45:12 47:1
50:12 52:7
73:11 75:3
79:16,20 101:7
102:16 103:10
107:15 108:21
109:4 120:14
121:23 122:11
130:7 144:5
152:13 155:10
165:19 166:2
168:19 170:11
171:11 172:20
180:17,18
184:19 187:10
201:10 203:14
204:15 207:20
213:5,5 216:22
217:21,22,23
218:19 219:20
223:15 226:16
237:4,14 243:3
243:17 244:16
251:1 252:22
253:8 256:4
257:15 261:7,8
268:5 276:10
280:6 281:1
282:2 288:2
291:19,22
292:15,23
293:7 294:2
298:7,17
301:16 306:5
306:11,12

**ways** 73:7
94:20 160:7
193:23 216:23
218:21 236:12
263:9 265:21
265:23
**we've** 10:8
14:11,19 50:3
61:2 68:7,7
76:1,13 77:23
79:22 108:21
114:12 124:22
128:16 130:17
132:3 135:5,10
136:14 137:18
138:23 139:21
141:2 151:20
159:5,8,8
197:7 225:11
248:4 259:5
270:4,21 277:4
277:11 281:23
284:8,8 285:11
287:11,12,15
300:12 308:4,9
**week** 12:9 20:3
47:22
**weeks** 20:17
23:8 44:18
58:15
**weigh** 81:22
82:14 299:17
300:6,17
**weighed** 78:22
81:2 83:5,10

83:14 84:16
85:1 299:10
306:23 307:1,2
307:8,12
**weight** 63:6
78:12,16,20,20
78:22 79:2,7,8
79:15,18,21
80:1,4,21
81:20 82:5,8
82:17,19,21,21
83:2,7 84:15
85:5,11,16
104:17,18,19
104:20,23
299:10,14,15
299:19 300:7
300:10,16
306:12 307:22
308:20
**weights** 39:17
79:12,23 80:6
104:8,9,10,15
293:11 306:22
307:13,19
308:20
**weinberg** 4:10
**went** 8:3 9:18
11:8 12:17,18
18:15,16,18
24:21 54:20
64:23 95:11,17
113:10 119:20
148:6 190:21
217:9 218:15

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[went - worried]**                                    Page 70

| | | | |
|---|---|---|---|
| 234:13 243:14 | **wishful** 56:22 | 25:4,19,20,20 | 228:20 229:13 |
| 257:13,15 | **witness** 2:3 5:7 | 25:20,21 26:7 | 232:5 242:13 |
| 265:17 267:3 | 6:2 61:6 89:5 | 27:2 28:10 | 243:9,12 |
| 268:10 | 95:3 125:23 | 32:19 34:21 | 244:12,12,14 |
| **wes** 44:15 45:7 | 136:23 137:3 | 35:14 39:15 | 246:3 247:1,4 |
| **west** 4:15,19 | 175:22 176:4,8 | 43:1,3,9 44:3,4 | 247:4,6,7,7,20 |
| **whatnot** 155:9 | 182:22 223:6,9 | 44:5,11,12 | 257:2 261:6 |
| 161:17 243:13 | 223:12 248:13 | 51:14 52:8 | 262:19 266:22 |
| 302:21 | 250:3,12,16,20 | 55:12 56:4 | 266:23 267:15 |
| **wheeler** 4:11 | 251:2 295:13 | 73:17 84:1 | 267:16,22 |
| **whichever** | 309:7,16 311:8 | 88:21 96:12 | 270:19 274:23 |
| 194:15 | 311:10,12,18 | 103:3 108:22 | 283:18 292:3 |
| **white** 220:7 | **wold** 181:23 | 109:5,5 117:10 | 292:19 296:7,9 |
| 252:20 253:14 | **wondering** | 117:10 118:4 | 297:13 305:17 |
| 254:1,14,19,19 | 104:22 | 120:4,7 123:14 | 307:17 |
| **wholeheartedly** | **word** 9:23 43:8 | 127:7 128:5,21 | **worked** 43:6 |
| 234:2 | 48:14 126:6 | 131:9,10,13,14 | 226:17 268:5 |
| **wide** 257:5 | 174:9 183:19 | 131:17 132:8 | **working** 19:14 |
| **width** 207:10 | 184:2 186:19 | 132:21 133:3 | 19:20 27:4 |
| 207:13,16 | 187:4 189:23 | 133:13 141:5 | 28:9 35:15,16 |
| 272:17 275:10 | 191:2 298:1 | 141:20 142:13 | 35:19,22 39:6 |
| 275:12 281:17 | **words** 14:15 | 142:13,14,20 | 48:5 53:18 |
| 281:18 282:10 | 16:13 40:3 | 145:4 159:19 | 57:11 167:8 |
| 282:10,15 | 42:5 48:15 | 163:10 166:3,3 | 257:6 259:21 |
| 284:19 | 62:16 79:12 | 171:1,4 172:11 | 296:22 299:4 |
| **wiggins** 4:22 | 91:2 147:15 | 173:1 174:11 | **works** 283:17 |
| **wild** 287:21 | 150:8 167:13 | 175:4 177:1,2 | 292:1 298:7 |
| **willing** 116:13 | 168:10 175:1 | 177:5 182:22 | **world** 92:18,20 |
| 282:4,5 | 200:12 202:13 | 190:17 198:12 | 98:23 101:4,5 |
| **wimbledon** | 223:17 227:14 | 199:7,10,16,16 | 101:6,21,22 |
| 295:13 | 231:12 267:10 | 199:17 208:5,6 | 103:12 294:13 |
| **window** 175:16 | 268:5 283:8 | 217:17 218:20 | 294:16 |
| 208:22 239:17 | 297:3 301:10 | 220:15 224:23 | **worms** 293:3 |
| **windows** | **work** 13:2 18:4 | 225:1 226:4,17 | **worried** 81:17 |
| 226:19,19 | 19:18 24:16,18 | 227:8 228:1,6 | 88:6 102:9,10 |

**[worry - zooming]**

**worry** 122:16

**worrying**
306:21

**worse** 230:4

**worst** 103:1
130:8 163:13
171:22

**worth** 43:22
58:15 300:1

**wreck** 70:18
71:4 260:8
301:3

**write** 47:15,20
188:4,8

**writing** 26:5

**written** 266:15
267:13 273:17
281:20 282:12
285:17

**wrong** 11:1
49:10 68:15,22
69:19 135:10
178:13 215:17
220:3 221:15
221:15 224:22
225:9,15
298:17

**wrote** 25:22
28:5 36:2
68:12 168:21
184:20

**x**

**x** 3:1 110:22,23
201:21 229:10
279:21

**xlt** 187:19

**y**

**y** 229:10,11
279:21

**y'all** 188:3
195:12,13

**yeah** 10:17
16:21 20:11
24:17 42:13
45:22 50:2,17
52:19,21 53:15
55:1 58:18
61:6 66:23,23
69:17,20 70:11
76:21 77:9
81:8 89:20
91:8 94:7
102:4 103:23
105:1 128:9
129:10 138:14
140:5 146:5
149:8,11,21
153:18,20
156:3 174:1,10
175:7 177:9,10
179:20 181:4
184:15 185:9
188:5 190:8
194:15 198:5
205:15 210:3
221:3 223:7,12
228:23 230:22
231:2 234:22
235:4,5 238:8
244:5 245:17

248:21 249:14
249:23 250:14
251:2,22 253:4
253:16 257:22
259:10,16
270:3,8 277:23
278:17 280:23
286:15 305:21
306:16 308:1

**year** 53:10 76:2
300:11

**years** 285:14
288:21 290:3
292:6

**yelling** 125:22

**yellow** 177:18
218:11 235:16

**yep** 148:14
223:12 250:3
254:13 257:13
268:20 306:16

**yesterday**
247:16

**z**

**z** 229:11 279:21

**zero** 232:9

**zoologist** 109:2

**zoom** 227:12
241:20 252:19

**zoomed** 228:3

**zooming** 243:1

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.