# ATTACHMENT C
# PLAINTIFFS' OUTLINE OF THE CASE

**ATTACHMENT C**
**PLAINTIFFS' OUTLINE OF THE CASE**

**A. Factual summary of Plaintiffs' causes of action.**

The Plaintiffs in this case are Joshua and Santana Bryson, the parents of two-year-old Cohen Bryson, who was killed when their family car was rear-ended by a pickup truck equipped with a Rough Country lift kit on March 15, 2020. The defendant in this case, Rough Country, is a manufacturer and designer of aftermarket suspension lifts, which raise the suspension height of pickup trucks. Rough Country's lift kit turned what should have been a survivable collision into a fatal one.

Although the Rough Country lift at issue was marketed as a "4.5-inch" lift, it raised the truck that hit the Bryson family's SUV roughly six-inches. At that height, the truck was tall enough to bypass the SUV's structural crash protections, including the protective bumper and frame rails. Instead of colliding with the reinforced protective bumper, the F-250 crushed more than *four feet* into the Brysons' SUV and killed their two-year-old son, who was properly buckled into his car seat in the second row.

For decades, Rough Country and other manufacturers in the auto industry have known that designing pickup trucks with taller bumpers than passenger cars creates a serious safety risk. Established industry safety research has shown for years that raising the height of vehicles causes potentially fatal intrusion levels

1

during crashes. The risk is so severe that automakers did not wait for federal regulations—in 2005, every major manufacturer of pickup trucks and SUVs in the United States *voluntarily agreed* to design their fleet to prevent height mismatches with other cars on the road. By 2009, they had all designed their pickup trucks to be within a permitted bumper height. That Agreement, referred to as the Vehicle Compatibility Agreement, exists to prevent pickup trucks from overriding smaller vehicles' crash protection features and intruding into their occupant space—exactly what happened in this case.

Rough Country knew about the Vehicle Compatibility Agreement years before it sold the lift kit involved in the crash. Rough Country also knew about the extensive safety research showing that raising the height of pickup trucks could have deadly consequences. Despite that knowledge, Rough Country sold lift kits that raise the height of pickup trucks above the level permitted by the Vehicle Compatibility Agreement. Rough Country sold those lift kits without performing any crash tests or engineering analysis to determine whether its lift kits increase the risk of injuries or deaths during collisions. It never warned the public or its users of the danger.

Studies performed by Ford, who designed the F-250 involved in this crash, confirm that raising the height of its pickup trucks by less than four inches causes a significantly increased danger to the occupants of other vehicles. Rough Country's

2

lift kit raised the Ford F-250 involved in this crash by even more than four inches—it raised it by six inches.

Rough Country has been sued twice before in cases with the same allegations that the Bryson family makes in this case: Rough Country lifts are defective and dangerous because they cause the lifted vehicle to bypass the structural crash protections of the vehicle it hits, and increase the risk of injuries and death to the public. In 2010, Rough Country was informed through a lawsuit that a Rough Country lift kit caused a pickup truck to pass over a Ford Mustang's bumper and directly contact the driver's head, leaving her with permanent brain damage. Four years later, Rough Country was sued again, this time because its lift kit caused a pickup truck to bypass a minivan's crash protection features and intrude into the back seat, killing a nine-year-old girl.

After these tragedies, Rough Country *still* did not perform any crash tests or engineering analysis to determine whether its lift kits increase the chances of a fatality during foreseeable crashes.

Rough Country's corporate representative testified that Rough Country's only method of assessing the safety of its products is to wait for "customer feedback." However, the "customer feedback" Rough Country received that its lift kits have caused preventable brain injuries and the death of a nine-year-old girl was not enough to make it change any of its practices. In fact, it was not enough

3

"feedback" to make Rough Country even *investigate* the danger its lift kits pose to the public.

Rough Country has an internal Development Protocol for designing new products. That protocol does not include a single safety assessment of its lift kits before releasing them for public sale.

Rough Country's lift kit also violated a Georgia safety law, which made it a crime to operate a motor vehicle with its suspension raised by more than two inches. Rough Country was aware of that law—its website includes a link to Georgia's two-inch lift kit limitation. Despite knowing its six-inch lift kit violated a Georgia law designed to protect Georgia citizens, Rough Country shipped it directly to a Georgia customer.

Rough Country even misrepresented how much the lift kit in this case alters the Ford F-250's suspension. Although Rough Country marketed the subject lift kit as a 4.5-inch lift kit, it is undisputed that it raised the front suspension of the subject F-250 by *six* inches. Rough Country sold these very high lift knowing that the vast majority of its users do not need lifted suspension for any utility purpose— the product is primarily purchased to change the cosmetic look of trucks.

Rough Country had several feasible, safer alternative designs available to it. For example, Rough Country could have provided an additional "secondary energy absorption system" bracket that is big enough to account for the height of the lift,

4

and which would help increase engagement between vehicles in a crash. Ford sells

a similar design, which *retails* for $25 each. Rough Country never even considered

to include that safety device with its lift kits.

Rough Country knew of the danger, ignored the danger, refused to study the

safety of its products or attempt to prevent the danger, and did not try to reduce the

harm by issuing warnings about the product. It did not spend the nominal money

to employ a safer alternative design. It acted in recklessly and with conscious

disregard for the safety of the public.

It is undisputed that the Bryson family did nothing to cause the crash. They

were completely stopped at a red light when they were rear-ended. The Bryson

family had no way to avoid the collision, and no way to control whether the pickup

truck that rear-ended them had a Rough Country lift kit installed on it.

Rough Country sold a product it knew would turn survivable crashes deadly.

Cohen Bryson's death is the direct result of that decision.

5

## B. Legal authority creating the specific legal duties relied upon by Plaintiff.

*Duty to design nondefective products*

- Georgia strict products liability statute: O.C.G.A. § 51-1-11(b)(1).

- Defining elements of design defect claim: *Chi. Hardware & Fixture Co. v. Letterman*, 510 S.E.2d 875, 877-78 (Ga. Ct. App. 1999).

- Defining design defect: *Banks v. ICI Ams., Inc.*, 450 S.E.2d 671 (Ga. 1994).

  o *Banks* provides a *nonexhaustive* list of factors the jury can consider in deciding whether the Rough Country lift kit is defectively designed, such as:

    > "the usefulness of the product, the gravity and severity of the danger posed by the design; the likelihood of that danger; the avoidability of the danger, i.e., the user's knowledge of the product, publicity surrounding the danger, or the efficacy of warnings, as well as common knowledge and the expectation of danger; the user's ability to avoid danger; the state of the art at the time the product is manufactured; the ability to eliminate danger without impairing the usefulness of the product or making it too expensive; and the feasibility of spreading the loss in the setting of the product's price or by purchasing insurance."

  *Id.* at 675 n.6.

  o Compliance with the Federal Motor Vehicle Safety Standards does not mean a product is safe or non defective and it does not absolve a manufacturer from liability: 49 U.S.C. § 30103(e); *Banks*, 450 S.E.2d at 675 n.6.

6

- o The Federal Motor Vehicle Safety Standards are "minimum

   standards." 49 U.S.C. § 30102(a)(10).

*Duty to act in a manner that does not show that entire want of care which would*

*raise the presumption of conscious indifference to the consequences*

- Punitive damages statute: O.C.G.A. § 51-12-5.1.

- Punitive damages are available for design defects: *Banks v. ICI Ams., Inc.*,

   469 S.E.2d 171 (Ga. 1996).

**C. Acts of negligence of Rough Country.**

- Rough Country acted negligently with respect to the design, testing, and manufacture of the lift kit installed on the subject Ford F-250, Model No. 567.20.

- Rough Country acted wantonly with respect to the design, testing, and manufacture of the lift kit installed on the subject Ford F-250, Model No. 567.20.

- Rough Country acted recklessly with respect to the design, testing, and manufacture of the lift kit installed on the subject Ford F-250, Model No. 567.20.

**D. Each item of damage claimed, the dollar amount claimed, and citation of authority authorizing a recovery for that particular item of damage.**

*Damages related to the wrongful death of C.Z.B.*

- The full value of C.Z.B.'s life to C.Z.B., the value of which shall be determined by a fair and impartial jury. O.C.G.A. § 51-4-2. The full value of C.Z.B.'s life has two elements: the economic value of his normal life expectancy and the intangible element incapable of exact proof. *Miller v. Jenkins*, 412 S.E.2d 555, 556 (Ga. Ct. App. 1991).

  o *Intangible component.* This loss is considered from C.Z.B.'s standpoint—the full value of his life to himself as though he had

lived.  The precise factors relevant to this component of full value of

the life damages "elude precise definition" but include C.Z.B.'s loss

of his relationship with his parents, his sibling, and others along with

the associated factors such as society, advice, counsel, and

companionship with his family and others as well as all other facts

and circumstances that shed life on the value of C.Z.B.'s life.  *Miller*,

412 S.E.2d at 556; *TGM Ashley Lakes, Inc. v. Jennings*, 590 S.E.2d

807, 819-20 (Ga. Ct. App. 2003).

*Damages for the Estate of C.Z.B.*

- Medical expenses.  The value of medical expenses is $2,144.40.  O.C.G.A.

  §§ 9-2-41; 51-4-5(b).

- Funeral expenses.  The value of funeral expenses is $3,998.03.  O.C.G.A. §§

  9-2-41; 51-4-5(b).

- Punitive damages in a reasonably sufficient amount to adequately punish

  and deter future conduct like that of Rough Country, the value of which shall

  be determined by a fair and impartial jury.  O.C.G.A. § 51-12-5.1; *Brown &*

  *Williamson Tobacco Corp. v. Gault*, 627 S.E.2d 549, 552 (Ga. 2006);

  *Baumann v. Snider*, 532 S.E.2d 468, 474 (Ga. Ct. App. 2000).