**ATTACHMENT H-1**
**PLAINTIFFS' TRIAL BRIEFS**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| Santana Bryson and Joshua Bryson, | * | |
| as Administrators of the | * | |
| Estate of C.Z.B., and as surviving | * | |
| parents of C.Z.B., a deceased minor, | * | |
| | * | Civil Action File |
| Plaintiffs, | * | |
| | * | No. 2:22-cv-17-RWS |
| v. | * | |
| | * | |
| Rough Country, LLC | * | |
| | * | |
| Defendant. | * | |

**PLAINTIFFS' TRIAL BRIEF: PLAYING VIDEO DEPOSITIONS OF ROUGH COUNTRY WITNESSES EVEN IF THOSE WITNESSES SHOW <u>UP LIVE AT TRIAL</u>**

Rough Country may protest against Plaintiffs 'playing' the video of a videotaped trial deposition taken by Plaintiffs for use at trial, arguing that it will bring the witness 'live' to trial.  That may seem surprising, but defendants in other auto products liability cases have done that in the past.  Such a protestation is without merit.

Such a protestation is, of course, an attempt to gouge advantage.  Having heard and seen Plaintiff's cross-examination of Rough Country's witnesses, Rough Country may try to neuter the entire exercise by arguing the trial depositions may not be played at trial because Rough Country will 'voluntarily' bring the witness(es) to the courthouse.  Of course, by then, Rough Country will have had a

chance to fully 'prepare' the witness(es) for the cross-examination that Rough

Country and its lawyers have both already seen and had time to prepare for.

Under Federal Rule of Civil Procedure 32(a)(4)(D), a "party may use for ***any***

***purpose*** the deposition of a witness, whether or not a party, if the court finds . . .

that ***the party offering the deposition*** could not procure the witness's attendance by

subpoena" (emphasis added).[1]  Joshua and Santana Bryson, the parties offering the

deposition, could not, and cannot, secure the attendance at trial by subpoena of

Rough Country witnesses who live outside the state of Georgia.[2]  "[T]he ***extent*** of

the Court's subpoena power is, in fact, grounds for unavailability under Rule

32(a)(4)(D)."  *Saget v. Trump*, No. 18-CV-1599(WFK) (ST), 2019 WL 168559, at

*2 (E.D.N.Y. Jan. 10, 2019) (emphasis added).  Plaintiff may therefore play at trial

videotaped depositions of any witness who is not subject to the Court's subpoena

---

[1] The videotaped depositions satisfy the elements of Rule 32(a)(1) because Rought Country was present and represented at the depositions and the depositions are to be used to the same extent that they would be admissible if the witnesses were testifying live.  Fed. R. Civ. P. 32(a)(1)–(2).

[2] Federal Rule of Civil Procedure Rule 45 regulates the Court's subpoena power:

> A subpoena may command a person to attend a trial, hearing, or deposition only as follows: (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person: (i) is a party or party's officer; or (ii) is commanded to attend a trial and would not incur substantial expense.

Fed. R. Civ. P. 45(c)(1).

power.

Rough Country has always known that Plaintiffs intended to play their video depositions of Rough Country witnesses at trial. *See* Doc. 28, Dec. 12, 2022 Order at 2 ("Trial depositions for the preservation of evidence may be taken up to 30 days before trial without leave of Court."). Once Rough Country knows the entire content of Plaintiffs' for-trial cross-examinations, it should not have the advantage of forcing Plaintiffs to repeat the cross-examinations and of preparing those witnesses based on what it learned about Plaintiffs' trial strategy during those depositions. Having had time to consider the effect of the testimony, Rough Country cannot unilaterally grant itself a 'do-over.'

Plaintiffs, however, do not object to Rough Country calling a witness who was deposed by Plaintiffs in a trial video deposition to testify live ***during Rough Country's case-in-chief***. Plaintiffs encourage Rough Country to and hopes that it will do just that. Other defendants in auto products liability cases have done that—e.g., *Andrews v. Autoliv*, Case No. 1:14-cv-3432 (N.D. Ga. 2021) (Jones, J.) (Autoliv's 30(b)(6) designee David Prentkowski was crossed during Plaintiffs' case in chief, then the Court required Autoliv to wait until its own case in chief to call him on direct examination).

Respectfully submitted this 21st day of January, 2025.

*[signatures on following page]*

4

CANNELLA SNYDER LLC

*/s/ Tedra L. Cannella*

TEDRA L. CANNELLA
  Georgia Bar No. 881085
  tedra@cannellasnyder.com
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
  rob@cannellasnyder.com
DEVIN L. MASHMAN
  Georgia Bar No. 257588
  devin@cannellasnyder.com

315 W. Ponce de Leon Ave.
Suite 885
Decatur, GA 30030
(404) 800-4828
(404) 393-0365 (fax)
***Attorneys for Plaintiffs***

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| Santana Bryson and Joshua Bryson, | * | |
| as Administrators of the | * | |
| Estate of C.Z.B., and as surviving | * | |
| parents of C.Z.B., a deceased minor, | * | |
| | * | Civil Action File |
|       Plaintiffs, | * | |
| | * | No. 2:22-cv-17-RWS |
| v. | * | |
| | * | |
| Rough Country, LLC | * | |
| | * | |
|       Defendant. | * | |

## PLAINTIFFS' TRIAL BRIEF: ROUGH COUNTRY SOLD A LIFT KIT THAT VIOLATED GEORGIA LAW

Rough Country knew the six-inch lift kit it sold exceeded Georgia's two-inch legal limit imposed by O.C.G.A. § 40-8-6.[3]  The purpose of that statute was to ensure the products used on public roads do not "endanger the driver or any other occupant or any person upon the highway."  O.C.G.A. § 40-8-7(a).  Rough Country was aware of Georgia's two-inch lift limit when it shipped the subject lift kit directly to its Georgia customer—its website directly links to a "know your local laws" page about the various legal prohibitions on lifting a vehicle's

---

[3] Although O.C.G.A. § 40-8-6 has subsequently been repealed, its two-inch limitation on lift kits used in Georgia applied as of the date Rough Country sold its lift kit.  The Purchase Order for the sale of the subject lift kit is dated June 21, 2016.  O.C.G.A. § 40-8-6 remained in effect until June 30, 2024.

suspension.  The website that Rough Country tells its customers to visit explicitly states that Georgia prohibits lifts over two inches, and cites O.C.G.A. § 40-8-6.

### A.    The two-inch limitation in O.C.G.A. § 40-8-6 applies to Rough Country's lift kit.

To prevent Plaintiffs from discussing Rough Country's decision to sell a product that violated Georgia safety laws, Rough Country has advanced the argument that its lift kit was not subject to O.C.G.A. § 40-8-6.  *See* Doc. 95-1, at 15.  That argument fails.

As Rough Country acknowledges, O.C.G.A. § 40-8-6 applies to any lift kit installed on a "private passenger vehicle."  Because Mr. Elliott's Ford F-250 meets the statutory definition of a "private passenger vehicle," the two-inch limitation contained in O.C.G.A. § 40-8-6 applies to the lift kit Rough Country sold.[4]

Section § 40-1-1(41)[5] defines a "passenger car" as "every motor vehicle, except [a series of inapplicable exceptions], designed for carrying ten passengers or less and used for the transportation of persons."  The Ford F-250 is designed to carry significantly fewer than ten passengers—it has only five seats.[6]  Because one

---

[4] Rough Country's Product Catalogue and Purchase Order show this lift kit was *specifically designed* for Ford F-250s.

[5] The definitions contained in O.C.G.A. § 40-1-1 apply to every statute in Title 40 of the Georgia code, including O.C.G.A. §§ 40-8-6 and 40-8-6.1.  *See* O.C.G.A. § 40-1-1 (defining terms "as used in this title").

[6] The Owner's Manual for the 2016 Ford F-250 confirms that occupants should not ride in the cargo space of the vehicle or with more than one occupant in a single seat.

of the uses of a Ford F-250 is to transport people,[7] and it does not fall under any statutory exception, the F-250 qualifies as a "private passenger vehicle" subject to the requirements of O.C.G.A. § 40-8-6.[8]

Defendant's argument that the Court should instead apply O.C.G.A. § 40-8-6.1 equally fails. That statute only applies to "trucks," and Mr. Elliott's F-250 does not meet the statutory definition of a "truck." O.C.G.A. § 40-1-1(70) defines a "truck" as "every motor vehicle designed, used, or maintained ***primarily*** for the transportation of property." (emphasis added). Although the bed of an F-250 *can* transport property (much like a minivan or SUV), its primary purpose is to transport people. Rough Country's own expert confirmed that fact—unlike commercial tractor-trailers, Ford F-250s are ***primarily*** designed to transport people, not property.[9]

The colloquial use of the word "truck" or "pickup truck" to refer to Ford F-250s does nothing to change the analysis. The General Assembly specifically included a statutory definition of the term "truck" as applicable to Title 40 of the

---

[7] Unlike the definition of a "truck" in O.C.G.A. § 40-1-1(70), there is no requirement that the F-250 be used *primarily* for the transportation of persons to qualify as a "private passenger vehicle." Additionally, Rough Country's expert accident reconstructionist admitted the primary purpose of F-250s is to transport people, not property. *See* Ex. 1, Grimes Dep., at 13:4-17.

[8] Of course, a privately owned "passenger car" qualifies as a "private passenger vehicle." *See* O.C.G.A. 40-1-1(41) (defining a "passenger car" as "every *motor vehicle*" that otherwise meets the definition) (emphasis added).

[9] *See* Ex. 1, Grimes Dep., at 13:4-17.

Georgia Code—that definition supersedes common parlance. *See Ruiz v. Wing*, 991 F.3d 1130, 1138 (11th Cir. 2021) ("Thus, we begin our analysis by looking at the language of the rule, and, *absent a definition of a term contained in the rule*, we look to the common usage of words for their meaning.") (emphasis added) (citing *People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 879 F.3d 1142, 1146 (11th Cir. 2018) (articulating the same principle applied to interpreting statutory text)).  Because the Ford F-250 does not meet the binding statutory definition of a "truck" contained in O.C.G.A § 40-1-1(70), Rough Country cannot bypass that definition by pointing to examples of common usage.

Rough Country's lift kit was designed for and installed on a Ford F-250. Because a Ford F-250 meets the statutory definition of a "private passenger vehicle" and not a "truck," O.C.G.A. § 40-8-6 applies.

### B. Rough Country does not have standing to challenge the constitutionality of O.C.G.A. § 40-8-6.

Rough Country has never been prosecuted under O.C.G.A. § 40-8-6.  Only Rough Country's *customer*, Hunter Elliott, faced prosecution and pled guilty for using Rough Country's illegal lift kit.[10]  Because Rough Country has never been prosecuted under that provision, it has not suffered an "injury in fact" sufficient to confer standing to challenge the statute. *See Harrell v. The Florida Bar*, 608 F.3d

---

[10] *See* Ex. 2, Elliott Plea Agreement (one year of Mr. Elliott's sentence was for his violation of O.C.G.A. § 40-8-6).

1241, 1253 (11th Cir. 2010).  Rough Country does not even *attempt* to cite an instance where O.C.G.A. § 40-8-6 has been applied to it—its brief ignores the standing requirement altogether.

Parties may only raise constitutional vagueness challenges to statutes that have been applied _to them_.[11]  *See Mann v. State*, 603 S.E.2d 283, 286 (Ga. 2004) (holding defendant did not have standing to challenge a provision in the sex offender statute as vague because it "was not applied to him"); *State v. Shepherd Const. Co., Inc.*, 281 S.E.2d 151, 155 (Ga. 1981) (holding a defendant does not have standing to challenge the vagueness of a statute applied to someone else except for First Amendment challenges).

In *Bankshot Billiards, Inc. v. City of Ocala*, the Eleventh Circuit explained the standing requirement for constitutional vagueness challenges.  634 F.3d 1340 (11th Cir. 2011).  A court may review "statutes for vagueness concerns only when a litigant alleges a constitutional harm."  *Id.* at 1349.  "The harms—or injury, if you like—come in two forms."  *Id.*  A litigant has only suffered sufficient "constitutional harm" to provide standing when (1) the litigant "violates the vague law, is indicted, and then moves the trial court to dismiss the indictment [] or reverse a conviction," or (2) "the litigant is chilled from engaging in

---

[11] Although there is a limited exception to this rule for First Amendment cases, that exception does not apply here.

constitutionally protected activity" such as free speech. *Id.* at 1349-50. In the second scenario, a business does not have standing merely because it was chilled from engaging in "normal business activity." *Id.* Applying that framework, the *Bankshot* court held that a pool hall did not have standing to challenge a statute because it was "simply unsure whether it may simultaneously serve alcohol and permit entry to persons under twenty-one." *Id.*

As in *Bankshot*, Rough Country has not suffered an injury that permits it to challenge O.C.G.A. § 40-8-6. Rough Country has not faced any indictment, conviction, fine, or other state action. Rough Country has not been "chilled" from engaging in any constitutionally protected activity—Rough Country does not even attempt to cite an instance where Georgia's lift kit statute prevented it from engaging in protected conduct. In fact, Rough Country has not been "chilled" from any activity at all—it continued selling its illegal lift kits directly to Georgia customers despite its awareness of Georgia's two-inch limit.[12]

Rough Country has not suffered any "injury in fact" sufficient to give it standing to challenge the constitutionality of Georgia's lift kit statute. The Court should reject Rough Country's constitutional challenge to O.C.G.A. § 40-8-6.

---

[12] According to Rough Country's discovery responses, it sold 6,205 lift kits in Georgia from 2018-2022 that were designed to raise the suspension of Ford F-250s by more than two inches.

### C.     O.C.G.A. § 40-8-6 is not unconstitutionally vague.

Even if Rough Country could bring a void-for-vagueness challenge, it would not succeed.  Statutes overcome constitutional vagueness challenges when they "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly[.]"  *Leib v. Hillsborough County Pub. Transp. Comm'n*, 558 G.3d 1301, 1310 (11th Cir. 2009) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).  O.C.G.A. § 40-8-6 plainly spells out the conduct it prohibits in clear terms—"[i]t shall be unlawful to alter the suspension system of any private passenger vehicle which may be operated on any public street or highway more than two inches above or below the factory recommendation for any such vehicle."[13]

Rough Country's vagueness challenge centers on the statute's use of the phrase "factory recommendation."  Although the statute does not specifically define the phrase "factory recommendation," the ordinary meaning of the phrase is more than clear.  *See Ruiz*, 991 F.3d at 1138 (courts interpret undefined terms in statutes according to their ordinary meaning).  According to the plain definition of "recommendation," the ordinary meaning of "factory recommendation" refers to the manufacturer's suggestion of the advisable suspension height of its vehicle.[14]

---

[13] O.C.G.A. § 40-8-6(b) makes it unlawful to "operate" such a vehicle upon any highway, roadway, or street.

[14] *See* Merriam Webster's Online Dictionary, https://www.merriam-

12

As applied in this case, Ford's "factory recommendation" for the F-250's suspension height is unambiguous—the Owner's Manual for the F-250 "strongly ***recommends*** that you do not make modifications such as adding or removing parts (i.e. lift kits or stabilizer bars) . . . ."[15]  Ford reiterated its factory recommendation against changing the default suspension height with several warnings, including that aftermarket lift kits (1) increase the chances of vehicle rollovers,[16] (2) adversely affect the performance of Ford's Advance Trac safety system, causing "an increased risk of loss of vehicle control, vehicle rollover, personal injury and death[,]"[17] and (3) result in "wheel shimmy" while driving.[18]

Rough Country's lift kit plainly altered the F-250's suspension by more than two inches above the "factory recommendation."  Rough Country advertised its lift kit as a "4.5 [inch] suspension lift."[19]  Because Ford's factory recommendation prohibits lifting the suspension of its vehicles *at all*, Rough Country's advertised 4.5-inch lift kit (which *actually* lifted the F-250's suspension by 6 inches) plainly raised Mr. Elliott's suspension by more than two inches above any interpretation of

---

webster.com/dictionary/recommending (last visited August 27, 2024) (defining "recommend" as "to suggest (an act or course of action) as advisable").

[15] *See* Ex. 3, Ford F-250 Owner's Manual Excerpts, at BRYSON002529 (emphasis added).

[16] *Id.*

[17] *Id.* at BRYSON002537.

[18] *Id.* at BRYSON002640.

[19] *See* Doc. 95-10, Rough Country's Order Confirmation for the subject lift kit.

Ford's "factory recommendation."  It therefore plainly violated O.C.G.A. § 40-8-6.

Because a party "who engages in some conduct that is clearly proscribed cannot

complain of the vagueness of the law as applied to the conduct of others[,]" Rough

Country cannot raise theoretical challenges to the term "factory recommendation"

where its lift kit plainly violated the factory recommendation in this case.  *Holder*

*v. Humanitarian L. Project*, 561 U.S. 1, 18-19 (2010); *see also Harrell*, 608 F.3d at

1254 ("One may not challenge the vagueness of rules as they might hypothetically

be applied to others if one's actions fall squarely within the ambit of the

prohibitions.").

Rough Country knowingly sold a lift kit that violated O.C.G.A. § 40-8-6.

The Court should reject Rough Country's attempts to avoid that fact for the reasons

enumerated above.

Respectfully submitted this 21st day of January, 2025.

CANNELLA SNYDER LLC

*/s/ Tedra L. Cannella*

TEDRA L. CANNELLA
 Georgia Bar No. 881085
 tedra@cannellasnyder.com
ROBERT H. SNYDER, JR.
 Georgia Bar No. 404522
 rob@cannellasnyder.com
DEVIN L. MASHMAN
 Georgia Bar No. 257588

devin@cannellasnyder.com

14

315 W. Ponce de Leon Ave.
Suite 885
Decatur, GA 30030
(404) 800-4828
(404) 393-0365 (fax)
***Attorneys for Plaintiffs***

# EXHIBIT 1

Page 1

1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF GEORGIA
2                       GAINESVILLE DIVISION
3
         SANTANA BRYSON and JOSHUA     )
4        BRYSON, as Administrators of )
         the Estate of C.Z.B., and    )
5        as surviving parents of      )
         C.Z.B., a deceased minor,    )
6                                      )
                    Plaintiffs,        )
7                                      )   CIVIL ACTION FILE
         vs.                           )
8                                      )   NO. 2:22-cv-17-RWS
         ROUGH COUNTRY, LLC,           )
9                                      )
                    Defendant.         )
10       _____
11
12                    VIDEOTAPED DEPOSITION OF
13                       WESLEY D. GRIMES
14                         May 9, 2024
15                         10:17 a.m.
16
17            Weinberg Wheeler Hudgins Gunn & Dial
18                   3344 Peachtree Road, NE
19                         Suite 2400
20
21                       Atlanta, Georgia
22
23
24
25            Reported by:  Marsi Koehl, CCR-B-2424

Wesley Grimes                                May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 13

1    different types of things of -- a lot of heavy truck

2    crash analysis and data retrieval and analysis and

3    accident reconstruction.

4        Q.  And you mentioned the phrase "heavy truck."

5            How do you define a heavy truck crash?

6        A.  Well, a crash involving a heavy truck.

7        Q.  What --

8        A.  Like a tractor-trailer, a tractor

9    semitrailer, commercial heavy truck:  A Freightliner,

10   a Peterbilt.

11       Q.  So you're talking about something like an

12   18-wheeler where the primary purpose of it is to

13   transport commercial property --

14       A.  Yes, sir.

15       Q.  -- as opposed to this case, an F-250, the

16   primary purpose is to transport people, right --

17       A.  That's a fair breakdown.  Yes, sir.

18           THE REPORTER:  If I can remind you-all

19       to speak one at a time.  Thank you.

20           (Discussion ensued off the record.)

21   BY MR. MASHMAN:

22       Q.  What is your current title at Mecanica

23   Scientific Services?

24       A.  I think I'm listed as Director of Forensic

25   Services.

Wesley Grimes                                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 234

1                              CERTIFICATE

2

3       STATE OF GEORGIA:

4       COUNTY OF FULTON:

5

6               I hereby certify that the foregoing

7       transcript was taken down, as stated in the caption,

8       and the colloquies, questions, and answers were

9       reduced to typewriting under my direction; that the

10      transcript is a true and correct record of the

11      evidence given upon said proceeding.

12              I further certify that I am not a relative

13      or employee or attorney of any party, nor am I

14      financially interested in the outcome of this action.

15              This the 5th day of June, 2024.

16

17

18

19      _____

20              Marsi Koehl, CCR-B-2424

21

22

23

24

25

# EXHIBIT 2

SC-6.5 Final Disposition Continuation of Sentence

## IN THE **SUPERIOR** COURT OF **FANNIN** COUNTY, STATE OF GEORGIA

**STATE OF GEORGIA versus**

**Hunter Ethan Elliott**

| CRIMINAL ACTION #: | Final Disposition: |
| --- | --- |

**2020R348**
**November Term of 2020**

**Final Disposition:**
**CONTINUATION OF SENTENCE**

**The Court enters the following judgment:**

| Count | Charge (as indicted or accused) | Disposition (Guilty, Not Guilty, Guilty-Alford, Guilty-Lesser Incl, Nolo, Nol Pros, Dead Docket) | Sentence | Fine | Concurrent/ Consecutive, Merged, Suspended |
| --- | --- | --- | --- | --- | --- |
| 5 | Serious Injury by Vehicle | Guilty | 15 years serve 10 years | 6430.00 | Consecutive to Ct. 2 |
| 6 | Serious Injury by Vehicle | Nol Pros | | | |
| 7 | Serious Injury by Vehicle | Nol Pros | | | |
| 8 | Serious Injury by Vehicle | Nol Pros | | | |
| 9 | Serious Injury by Vehicle | Nol Pros | | | |
| 10 | Serious Injury by Vehicle | Nol Pros | | | |
| 11 | Serious Injury by Vehicle | Guilty | 15 years probation | | Consecutive to Ct. 5 |
| 12 | Serious Injury by Vehicle | Nol Pros | | | |
| 13 | Serious Injury by Vehicle | Nol Pros | | | |
| 14 | Serious Injury by Vehicle | Nol Pros | | | |
| 15 | Serious Injury by Vehicle | Nol Pros | | | |
| 16 | Driving Under the Influence(Per Se) | Nol Pros | | | |
| 17 | Driving Under the Influence(Less Safe) (Alcohol) | 12 months to serve | | | Concurrent to Ct. 2 |
| 18 | Reckless Driving | Nol Pros | | | |
| 19 | Hit and Run | Nol Pros | | | |
| 20 | Hit and Run | Nol Pros | | | |
| 21 | Hit and Run | Nol Pros | | | |
| 22 | Hit and Run | Nol Pros | | | |
| 23 | Hit and Run | Nol Pros | | | |
| 24 | Hit and Run | Nol Pros | | | |
| 25 | Driving While License Suspended | Nol Pros | | | |
| 26 | Distracted Driving | Nol Pros | | | |
| 27 | Open Container | Nol Pros | | | |

SC-6.5  Final Disposition Continuation of Sentence

| . 28 | **Following Too Closely** | No l Pros | | | |
|------|--------------------------|-----------|--|--|--|
| 29 | **Window Tint Violation** | Nol Pros | | | |
| 30 | **Window Tint Violation** | Nol Pros | | | |
| 31 | **Improper Suspension System** | **Guilty** | **12 months to serve** | | **Concurrent with Ct.2** |
| 32 | **Improper Muffler Exhaust System** | Nol Pros | | | |

**SO ORDERED** this **6th** day of **May, 2021.**

Judge of **Superior** Court
**Appalachian** Judicial Circuit
**Brenda S. Weaver**
*(print or stamp Judge's name)*

# EXHIBIT 3

2016 **SUPER DUTY** Owner's Manual

2016 **SUPER DUTY** Owner's Manual



owner.ford.com



ford.ca

August 2015
Second Printing
Owner's Manual
Super Duty
Litho in U.S.A.



GC3J 19A321 AA



# Four-Wheel Drive (If Equipped)

On some four-wheel drive vehicles, when the transfer case is in the N (Neutral) position, the engine and transmission are disconnected from the rest of the driveline. Therefore, the vehicle is free to roll even if the automatic transmission is in P (Park) or the manual transmission is in gear. Do not leave the vehicle unattended with the transfer case in the N (Neutral) position. Always set the parking brake fully and turn off the ignition when leaving the vehicle.

**Maintenance and Modifications**

The suspension and steering systems on your vehicle have been designed and tested to provide predictable performance whether loaded or empty. For this reason, we strongly recommend that you do not make modifications such as adding or removing parts (i.e. lift kits or stabilizer bars) or by using replacement parts not equivalent to the original factory equipment.

We recommend that you use caution when your vehicle has either a high load or device (i.e. ladder or luggage racks). Any modifications to your vehicle that raise the center of gravity may cause your vehicle to roll over when there is a loss of vehicle control.

Failure to maintain your vehicle correctly may void the warranty, increase your repair cost, reduce vehicle performance and operational capabilities and adversely affect you and your passenger's safety. We recommend you frequently inspect your vehicle's chassis components when your vehicle is subject to off road usage.

164

BRYSON 002529

# Stability Control

## PRINCIPLE OF OPERATION

### WARNINGS

⚠️ Vehicle modifications involving braking system, aftermarket roof racks, suspension, steering system, tire construction and wheel and tire size may change the handling characteristics of your vehicle and may adversely affect the performance of the AdvanceTrac system. In addition, installing any stereo loudspeakers may interfere with and adversely affect the AdvanceTrac system. Install any aftermarket stereo loudspeaker as far as possible from the front center console, the tunnel, and the front seats in order to minimize the risk of interfering with the AdvanceTrac sensors. Reducing the effectiveness of the AdvanceTrac system could lead to an increased risk of loss of vehicle control, vehicle rollover, personal injury and death.

⚠️ Remember that even advanced technology cannot defy the laws of physics. It's always possible to lose control of a vehicle due to inappropriate driver input for the conditions. Aggressive driving on any road condition can cause you to lose control of your vehicle increasing the risk of personal injury or property damage. Activation of the AdvanceTrac system is an indication that at least some of the tires have exceeded their ability to grip the road; this could reduce the operator's ability to control the vehicle potentially resulting in a loss of vehicle control, vehicle rollover, personal injury and death. If your AdvanceTrac system activates, SLOW DOWN.

The AdvanceTrac with Roll Stability Control system helps you keep control of your vehicle when on a slippery surface. The electronic stability control portion of the system helps avoid skids and lateral slides and roll stability control helps avoid a vehicle rollover. The traction control system helps avoid drive wheel spin and loss of traction.  See **Using Traction Control** (page 170).



E72903

A    Vehicle without AdvanceTrac with RSC skidding off its intended route.

B    Vehicle with AdvanceTrac with RSC maintaining control on a slippery surface.

## USING STABILITY CONTROL

### AdvanceTrac® with Roll Stability Control™ (RSC®)

**(Single rear wheel vehicles only)**

BRYSON 002537

Super Duty (TFA) Canada/United States of America, enUSA, Second Printing

# Wheels and Tires

**Note:** *Do not reduce tire pressure to change the ride characteristics of the vehicle. If you do not maintain the inflation pressure at the levels specified by Ford, your vehicle may experience a condition known as shimmy. Shimmy is a severe vibration and oscillation in the steering wheel after the vehicle travels over a bump or dip in the road that does not dampen out by itself. Shimmy may result from significant under-inflation of the tires, improper tires (load range, size, or type), or vehicle modifications such as lift-kits. In the event that your vehicle experiences shimmy, you should slowly reduce speed by either lifting off the accelerator pedal or lightly applying the brakes. The shimmy will cease as the vehicle speed decreases.*

**Maximum Inflation Pressure** is the tire manufacturer's maximum permissible pressure and the pressure at which the maximum load can be carried by the tire. This pressure is normally higher than the manufacturer's recommended cold inflation pressure which can be found on the Safety Compliance Certification Label (affixed to either the door hinge pillar, door-latch post, or the door edge that meets the door-latch post, next to the driver's seating position), or Tire Label located on the B-pillar or the edge of the driver's door. The cold inflation pressure should never be set lower than the recommended pressure on the Safety Compliance Certification Label or Tire Label.

When weather temperature changes occur, tire inflation pressures also change. A 10°F (6°C) temperature drop can cause a corresponding drop of 1 psi (7 kPa) in inflation pressure. Check your tire pressures frequently and adjust them to the proper pressure which can be found on the Safety Compliance Certification Label or Tire Label.

To check the pressure in your tire(s):

1. Make sure the tires are cool, meaning they are not hot from driving even a mile.

**Note:** *If you are checking tire pressure when the tire is hot, (for example, driven more than 1 mile [1.6 kilometers]), never bleed or reduce air pressure. The tires are hot from driving and it is normal for pressures to increase above recommended cold pressures. A hot tire at or below recommended cold inflation pressure could be significantly under-inflated.*

BRYSON 002640

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| Santana Bryson and Joshua Bryson, | * | |
| as Administrators of the | * | |
| Estate of C.Z.B., and as surviving | * | |
| parents of C.Z.B., a deceased minor, | * | |
| | * | Civil Action File |
| Plaintiffs, | * | |
| | * | No. 2:22-cv-17-RWS |
| v. | * | |
| | * | |
| Rough Country, LLC | * | |
| | * | |
| Defendant. | * | |

**PLAINTIFFS' TRIAL BRIEF REGARDING THE ADMISSIBILITY OF
ADMISSIONS IN PLEADINGS, INCLUDING DISCOVERY RESPONSES**

Plaintiff may cross-examine Rough Country employees about Rough Country's own statements in Rough Country's briefing, at hearings, and in its discovery responses because (1) statements made in discovery responses, briefs, or during court proceedings are deemed *admissions in judicio*; (2) any statements made by Rough Country directly or through its counsel constitute an admission of a party opponent under Fed. R. Evid. 801(d)(2)(A), (D), and (3). Fed. R. Civ. P 33(b)(3) specifically contemplates that interrogatory responses may be used "to the extent allowed by the Federal Rules of Evidence."

### A. Statements made in discovery responses, briefs, and at oral argument are *admissions in judicio* and are conclusive against Rough Country.

In the Eleventh Circuit, "the general rule [is] that a party is bound by the admissions in his pleadings." *Best Canvas Prod. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983). Such "clear, deliberate, and unequivocal factual assertions—whether made in pleadings, stipulations, responses to discovery, or orally in trial or court proceedings"—constitute binding *admissions in judicio*. *In re Malia*, No. 09-42273-MGD, 2012 WL 909738, at *2 (Bankr. N.D. Ga. Feb. 8, 2012).

"Indeed, facts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them." *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1178 (11th Cir. 2009) (quoting *Hill v. Federal Trade Comm'n*, 124 F.2d 104, 106 (5th Cir. 1941)); *see also Rahn v. Olens*, No. 1:14-cv-3660-RWS, 2015 WL 4717448, at *3 (N.D. Ga. Aug. 7, 2015) ("Admissions or allegations appearing in pleadings are treated as admissions *in judicio* and, if not withdrawn, are conclusive of the facts contained therein.").

Accordingly, Plaintiff may use Rough Country's admissions in questioning Rough Country's employees.

**B.     Statements made by Rough Country and its counsel are statements of a party opponent and are not hearsay.**

Any statements made by Rough Country or its counsel in its discovery responses or briefing in this or any prior case are also statements of a party opponent because the statements were either (1) made by Rough Country directly, or (2) were made by counsel concerning a matter within the scope of the agency—the relevant representation—and were made during the existence of the relationship.  *See* Fed. R. Evid. 801(d)(2)(A), (D) (A statement is excluded from the rule against hearsay if it (A) "was made by the party in an individual or representative capacity" or (D) "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed"); *see also Hanson v. Waller,* 888 F.2d 806, 814 (11th Cir. 1989) (letter from defense attorney to plaintiff's counsel stating that defendant truck driver would not have been able to see pedestrian plaintiff if plaintiff were directly in front of defendant's truck when traffic light changed was properly admitted as an admission of a party opponent). Thus, beyond being admissions *in judicio*, statements by Rough Country and its counsel are not hearsay because they are statements of a party opponent.

**C.     Rough Country's interrogatory responses may be used as evidence.**

Finally, Rough Country's interrogatory responses may be used as evidence because the Federal Rules of Civil Procedure specifically contemplate such use.

*See* Fed. R. Civ. P. 33(c) ("An answer to an interrogatory may be used to the extent allowed by the Federal Rules of Evidence."); *see also AMCO Ins. Co. v. Inspired Techs., Inc.*, 648 F.3d 875, 881 (8th Cir. 2011) ("[I]nterrogatory answers are sworn statements and 'may be used to the extent allowed by the Federal Rules of Evidence.' Fed. R. Civ. P. 33(c) . . . . Accordingly, the district court did not err in approving AMCO's reliance—and in relying itself—on 3M's interrogatories as a source of actual facts outside the complaint to make coverage determinations."); *Mangual v. Prudential Lines, Inc.*, 53 F.R.D. 301, 302 (E.D. Pa. 1971) ("answers to interrogatories posited to a corporation are admissible where they are based on the statements of corporate agents given within the scope of their authority"); *Evans v. Local Union 2127, Int'l Bhd. of Elec. Workers, AFL-CIO*, 313 F. Supp. 1354, 1361-62 (N.D. Ga. 1969) ("One purpose of Rule 33 is to allow one party to obtain admissions from another, and thereby save time in preparation and ***at trial*** . . . ." (emphasis added)).

Because these statements are admissions *in judicio* or by a party opponent, *see supra*, the interrogatories may be used at trial. Rough Country's interrogatory responses may be used by Plaintiffs in deposition or at trial.

Respectfully submitted this 21st day of January, 2025.

[*signatures on following page*]

19

CANNELLA SNYDER LLC

*/s/ Tedra L. Cannella*

TEDRA L. CANNELLA
 Georgia Bar No. 881085
 tedra@cannellasnyder.com
ROBERT H. SNYDER, JR.
 Georgia Bar No. 404522
 rob@cannellasnyder.com
DEVIN L. MASHMAN
 Georgia Bar No. 257588
 devin@cannellasnyder.com
315 W. Ponce de Leon Ave.
Suite 885
Decatur, GA 30030
(404) 800-4828
(404) 393-0365 (fax)
***Attorneys for Plaintiffs***