# EXHIBIT A

Case 2:22-cv-00017-RWS    Document 125-1    Filed 02/12/25    Page 2 of 27
G. Bryant Buchner                            July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 1

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF GEORGIA

3              GAINESVILLE DIVISION

4

5   CASE NUMBER:  2:22-CV-017-RWS

6

7   SANTANA BRYSON, et al.,

8          Plaintiffs,

9          vs.

10  ROUGH COUNTRY, LLC,

11         Defendant.

12

13          *  *  *  *  *  *  *  *  *  *  *  *  *

14

15

16              THE ORAL PROCEEDINGS

17      OF THE DEPOSITION OF G. BRYANT BUCHNER

18             JULY 11, 2024

19

20

21  REPORTER:  Paul Morse

22          Certified Court Reporter

23          and Notary Public

G. Bryant Buchner                                      July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 7

1          Q.    All right.  This is a letter from
2    you to Ms. Cannella dated May 8, 2024.  It's
3    bates labeled Bryson 09348 through 09377.  And
4    I'd like to mark this as Exhibit 1 to your
5    deposition.
6               (Defendant's Exhibit Number 1
7               is marked for identification.)
8          A.    Can we call it the FR26 amended
9    report?  Because that's -- that's why I didn't
10   know what you were talking about.  I'm okay if
11   you call it a letter.  But I'd rather call it
12   the amended report.
13         Q.    Sure.  The Re line says FR26
14   amended report.  And so I'll reference it by
15   that name.
16         A.    Thank you kindly.
17         Q.    Sure.  In the first paragraph
18   you'll see that you use -- you state that an
19   unforeseen technical issue resulted in the loss
20   of the original simulation file.  Just so we're
21   clear, what do you mean by an unforeseen
22   technical issue?
23         A.    Well, I think that the simulation

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 8

1    was run in October-ish of '23.  The depo was in

2    January.  And I hadn't opened the file or

3    looked at it.  And when we went to retrieve it,

4    it basically didn't exist.  The run file did

5    not exist.  And so we could not -- we did

6    everything we could to try to locate it and

7    find it.  And all that we can think of is that

8    something happened during the save process.

9        And so I had -- just had no idea that that

10   thing wasn't there.  I hadn't looked for it in

11   months.  So that's -- that's the unforeseen

12   technical issue.  It happens to, you know, all

13   of us at times when you think you've saved

14   something and it didn't get saved properly or

15   maybe there was a corruption in the -- you

16   know, on the computer disc somewhere.  I don't

17   know.

18       Maybe somebody opened it later on and

19   thought it was something else and moved it to a

20   folder and we can't find it.  I don't know.

21            Q.    What is the process after you run

22   an HVE simulation to save the files associated

23   with that simulation?

G. Bryant Buchner                     July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 9

1        A.     Well, it -- it really ought to be
2    saved and moved into the -- you know, into the
3    job file and put into engineering analysis,
4    which you've probably seen my EA folders,
5    engineering analysis folders.  It wasn't --
6    that -- that final step apparently didn't
7    happen.  It was still on the simulation
8    computer.  At least that's where we thought it
9    was.  And but it didn't -- it just wasn't in
10    any other place.  I don't think it ever got
11    moved was the problem.  That's the reason I --
12    I needed to go get a copy of it.
13        Q.     And when you say later on in
14    this -- on this page that -- at the bottom you
15    said since the simulation had been corrupted,
16    what do you mean by the term corrupted?
17        A.     Well, whatever we found did not --
18    we went back to the archives and everything.
19    We never found anything that looked like the
20    accident one.  And it's even suspect that the
21    printout that I was using was -- was from the
22    one that I had looked at back in October.
23        So the word corrupted is kind of a general

Case 2:22-cv-00017-RWS    Document 125-1    Filed 02/12/25    Page 6 of 27
G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 10

1    term between losing it, between, you know,

2    not -- not having the right data.  It's just --

3    it was meant to be a -- I think originally we

4    thought maybe it had been corrupted.  But in

5    the end I think it's -- corrupted, the term

6    changed or something.  But it couldn't be

7    opened.

8        But in the end, we -- we've never found one

9    that we think was it, period.

10           Q.    So when you produced the printouts

11    prior to your deposition in January that

12    related to this original simulation, are you

13    saying that you are not sure whether those

14    printouts were the same printouts or data that

15    you were looking at when you ran the original

16    simulation in October?  Explain that to me.

17           A.    Yeah.  That -- that's true.  Back

18    in October I looked at the data.  I looked at

19    the answers.  They were printed -- or at least

20    I asked for them to be printed.  I don't -- you

21    know, I'm not the printer guy or the filer guy.

22    And it's almost as if what was picked up was an

23    early iteration or something because some of

G. Bryant Buchner                            July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 11

1    the data was just wrong.

2        And so I -- you know, it was months before,

3    but I thought that we had had -- that we had

4    all of that.  And during the deposition, I

5    clearly said, no, these are all of the reports

6    that are there.  I hadn't gone back and

7    checked.  They clearly weren't all of the

8    reports.  And so we went and just did

9    everything we could, and we could not resurrect

10   anything that I can be confident was what I had

11   looked at back in October.

12       So we can make some guesses.  But I can't

13   make -- I can't know.  So my opinions are --

14   you know, were well recorded in my depo and,

15   you know, the opinions haven't changed.  But we

16   really just had to re-enter the data.  And we

17   made an improvement or two, you know, that --

18   you know, to make sure that we had it right

19   like the 0.04 inches on the tire or something

20   like that, whatever it was.  But you know, so

21   at the end of the day, we don't have anything

22   that survived that I can validate as being what

23   I looked at back in October.

G. Bryant Buchner                                            July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 16

1    well.

2         Q.    Sure.  Sorry if it wasn't crafted

3    very artfully.  Let me try to make it simpler.

4       So you just said that the graphical

5    representation of the crush and the data on

6    that that was produced to us prior to your

7    deposition, that it -- you can't confirm

8    whether it actually is representative of the

9    simulation you ran in October of 2023?

10        A.    Not exactly.  It is -- it is

11   representative in that I can't tell the

12   difference between it and what we ran.  In

13   other words, it looks -- it looks like what I

14   remember.  It looks like what our results are

15   today.  But I can't tell you if it actually was

16   the printout from it.  But the crush that's

17   shown there is -- is representative because

18   it's indiscernible from the crush that we know

19   is reasonable and accurate in the rerun.

20        Q.    Right.  When you --

21        A.    Yeah.  So thank you.

22        Q.    Well, that's a -- that's a good

23   answer.  But even though it may be similar or

Page 17

1    representative, you can't verify that it's the

2    actual result of the -- the original

3    simulation?

4            A.    Right.  It was indiscernible to me

5    from the actual result.

6            Q.    Right.

7            A.    But I can't tell you if that was

8    actually printed from the actual result.  But I

9    can tell you that it was good enough that it --

10   that I did not detect it when I was using it

11   for the deposition.

12           Q.    Right.  And the same question with

13   regard to all of the backup files that related

14   to that original.  I don't want to go through

15   every one individually, so we'll start it with

16   a broad question.

17      You have a certain number of backup files,

18   an environment file, this file, that file.  Is

19   the same true that all of those files that

20   were -- that were printed and produced to us,

21   the ones you could find prior to your

22   deposition, you can't verify if those were the

23   actual files that were generated when you ran

G. Bryant Buchner

Bryson, Santana and Joshua v. Rough Country, LLC

Page 62

```
 1    were -- you used for the F-250, the default

 2    properties for -- for stiffness coefficients

 3    that were within the software, the

 4    Vehiclemetrics database.  Is that correct?

 5            A.    Yes.

 6            Q.    And is the Vehiclemetrics database

 7    part of the HVE software?

 8            A.    No.  Vehiclemetrics is an approved

 9    vendor to do things like make vehicles for the

10    HVE software.

11            Q.    How is the different from the

12    Neptune data that you used with the original

13    simulation?

14            A.    You mean for crush stiffness?

15            Q.    No.  I don't mean the actual.  How

16    is using Vehiclemetrics -- in other words, you

17    just said it was approved by HVE for use as a

18    method for determining the stiffness

19    coefficients.  Is -- is Neptune not approved?

20    I'm trying to understand that.  I thought

21    Vehiclemetrics was contained within the HVE

22    software.

23            A.    Okay.  HVE has vehicles that come
```

G. Bryant Buchner

Bryson, Santana and Joshua v. Rough Country, LLC

July 11, 2024

Page 63

1    in it.

2          Q.    Right.

3          A.    HVE had an F-250, but it was not

4    the Crew Cab.  It was an Extended Cab, I

5    believe.  So it's essentially the same vehicle,

6    but a little bit -- the weight is going to be a

7    little bit different.  The length will be a

8    little bit different.  And we wanted a

9    Crew Cab.

10       So Vehiclemetrics is a vendor for HVE that

11   we contracted with to make us the right shape

12   Crew Cab from our scans.  We gave them the

13   scan, and they made the right shape Crew Cab.

14   And -- and with that vehicle from them came

15   crush stiffness coefficients.

16       Their crush stiffness coefficients were

17   higher than Neptune's.  I think Neptune's were

18   reasonable.  Vehiclemetrics, because they

19   provided some -- I didn't realize they had --

20   that's closer to using the defaults of HVE than

21   Neptune.  So I -- in the update we used them.

22   And to be clear, they're higher crush stiffness

23   coefficients.  So the F-250 in the rerun was

G. Bryant Buchner                        July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 64

1    stronger and stiffer.

2        So you know, that would be to the Escape's

3    disadvantage.  We hit it the a stronger truck

4    in the rerun -- I mean a stronger simulated

5    truck.

6        So that's -- that's -- I thought that would

7    be most consistent with my deposition and the

8    most consistent with my intent, especially

9    because we had done the calculations of crush

10   originally with the hand calculations or the

11   computer calculations with -- with Neptune's

12   data.  Now we were going to use the pure

13   simulation data or as pure as we could get.

14        Q.    And why didn't you follow that

15   same process with the original simulation?

16        A.    Because I asked if we had crush

17   stiffness coefficients for the Crew Cab.  And

18   the answer was no.  And I didn't realize when

19   Vehiclemetrics provided a vehicle, they -- they

20   provided stiffness coefficients as well, the

21   numbers side.

22        So in the rerun when we were making sure to

23   do things per my deposition, we went through it

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 66

1    rerun?  There's nothing new about that.  It's

2    just you didn't recognize that that was a

3    possibility when you did the original run?

4            A.    Right.  Right.

5            Q.    Vehiclemetrics and the process you

6    followed was available back in October of 2023?

7            A.    Yes.  Yes.  And we had it.  We had

8    the vehicle.  We had it in there.  We just

9    didn't use the AV values that came with the

10   truck because I mistakenly didn't think they'd

11   come with some.

12           Q.    All right.  It appears another

13   change that was made is to the tire sizes on

14   the F-250.  Explain the change you made between

15   the original run and the amended run with

16   regard to the tire sizes on the F-250.

17           A.    Sure.  We have the tire sizes

18   right in the file as a whole.  But when we ran

19   the simulation, the tire size -- I don't see

20   the paragraph in there.  Can you -- do you have

21   it?

22           Q.    It's --

23           A.    Oh, yeah.  Yeah.  So there was a

G. Bryant Buchner
Bryson, Santana and Joshua v. Rough Country, LLC
July 11, 2024

Page 67

1   point -- a 0.35 inches difference in the tire

2   size that -- 0.7 in the diameter and 0.35

3   inches in the -- in the radius.  So we were off

4   by, you know, a third of an inch in height.

5   And I think that was corrected.  In fact, I

6   know it was corrected.

7          Q.    And that's not based on any new

8   information.  Right?  I mean, the tire size on

9   the subject F-250 was known at the time you ran

10  your original simulation?

11         A.    Right.  We -- we had done it -- we

12  used the right tire size throughout most of the

13  file, but just in inputting the data in the

14  simulation, it didn't -- we didn't catch that

15  we should change the size of the tire by

16  that -- you know, by that much.

17         Q.    If you don't know what original

18  data was used for the original simulation

19  because you don't have it anymore, how do --

20  how do you know what was or wasn't used with

21  the original simulation?

22         A.    Well, I don't remember where it

23  is.  But Mr. Grimes is the one that located it

Page 78

1    You used a different default coefficient

2    stiffness because you used the Vehiclemetrics

3    instead of Neptune.  Right?

4            A.    Yes.

5            Q.    You changed the tire sizes to

6    mirror the subject F-250.  For the Escape you

7    didn't make any changes compared to the

8    original run?

9            A.    Correct.

10           Q.    All right.  And so the only real

11   modifications beyond those would be to the

12   weight of the vehicle.  Right?

13           A.    Seemingly.

14           Q.    Right.  And so here we have

15   appendix A, which I believe is your -- showing

16   how you determined the weight used in the

17   simulation for both vehicles?

18           A.    Yes.

19           Q.    Okay.  Here is the F-250 first.

20   And the first weight I see here, weight 250

21   equals 8,040 pounds.  I'm assuming that is the

22   weight of the crash vehicle that you weighed

23   after the crash?

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 79

1          A.    Yes.

2          Q.    Okay.  And then you added weight

3    for the driver and certain items that were on

4    the F-250?

5          A.    Yes.

6          Q.    Okay.  And that gave you a total

7    weight that's highlighted here that was used

8    for the total weight in the simulation?

9          A.    Yes.

10         Q.    Okay.  Does HVE allow you to

11   account for the position of these additional

12   weights?  In other words, does it -- do you put

13   in the location of the driver and add 170

14   pounds in the driver's seat or is it just a

15   total weight that's input into the software?

16         A.    You can do it either way.

17         Q.    Okay.  So it does allow you to

18   actually position weight within the vehicle in

19   a specific location?

20         A.    Well, generally the way we do it

21   is we would redistribute the weight ratios.  So

22   I believe in the past we've actually put actual

23   weights in like occupants and things.  But we

Case 2:22-cv-00017-RWS    Document 125-1    Filed 02/12/25    Page 17 of 27
G. Bryant Buchner
Bryson, Santana and Joshua v. Rough Country, LLC
July 11, 2024

Page 80

1    normally just redistribute the weight ratios,

2    if we do it at all.

3         Q.    Okay.  In this case did you

4    redistribute the weight ratios?

5         A.    No, we did not.  We just added the

6    weights to the vehicle at the CG.

7         Q.    All right.  So there was no

8    factoring in the specific location of the items

9    in the truck; it was -- you didn't use that as

10   part of your rerun simulation?

11        A.    Correct.

12        Q.    Okay.  Did you account for any

13   loss of fluids that the F-250 may have suffered

14   in the crash?

15        A.    No.

16        Q.    Okay.  Do you know the level of

17   fuel in the gas tank of the F-250 at the time

18   it was measured?

19        A.    Not specifically.  Just what was

20   in there.  It's part of the 8,040.  We know the

21   weight of it.  But you know, not an exact

22   amount.

23        Q.    You don't know if the tank was

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 81

1    full, empty?  You don't know what fuel level

2    was in the tank at the time it was weighed?

3         A.    Just what it was after the

4    accident.  There's no evidence it leaked out.

5         Q.    And the same with regard to

6    whatever fluid was in the radiator, that wasn't

7    accounted for?

8         A.    Yeah, the radiator did leak some

9    out.  We know that.  But no, we did not think

10   that was --

11        Q.    (Inaudible) fluids contained

12   within the vehicle?

13        A.    Pardon?

14        Q.    And you didn't account for any

15   other loss of fluids from the vehicle?

16        A.    No.  We knew some radiator fluid

17   had leaked out.  We weren't worried about that.

18   The rest of the fluid should have been the same

19   at the time of the accident.

20        Q.    All right.  And the weight for the

21   chainsaw, did you actually measure the

22   chainsaw?  Did you weigh it?

23        A.    No.  We didn't have the chainsaw.

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 82

1  So you had to look something up.  It's an Stihl

2  chainsaw, so you had to look something up for

3  the original.

4        Q.    Same -- same question for the

5  tools.  Is that based upon measuring the weight

6  of the tools, or is that just an estimation?

7        A.    Nobody knows what was in the

8  toolbox.  We needed a weight to put in.  So we

9  thought 100 would be reasonable.  We don't know

10  exactly what it is.  Nobody has ever seen

11  inside the toolbox.

12        Q.    And what about the storage box, is

13  that an estimation or is that -- you didn't

14  actually weigh the storage box, did you?

15        A.    No.  It was missing.  So I think

16  we did some internet research to come up with a

17  reasonable weight, just like Mr. Grimes did.

18        Q.    All right.  The bottom of the page

19  is the weight you used for the Ford Escape.  In

20  your simulation, again I'm assuming that your

21  weight 3,410 is the measured weight of the

22  vehicle after the crash?

23        A.    Yes, it is.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 83

1          Q.    All right.  And with the Escape,

2    did you add any weight for the cargo that was

3    behind the second row seat?

4          A.    Well, it was already in the

5    vehicle when we weighed it, so --

6          Q.    All right.  That --

7          A.    -- yes, it's in the weight.

8          Q.    That's my question.  So there

9    was -- the cargo was still in the back of the

10   Ford Escape at the time you weighed it?

11         A.    Yes.

12         Q.    Okay.  Do you know the level of

13   the fuel tank in the Escape at the time you

14   weighed it?

15         A.    Well, nothing leaked out at the

16   scene.  So it was whatever it was at the time

17   of the accident.  That's all we were concerned

18   about.

19             MS. CANNELLA:  Mr. Hill, I'm

20   trying to give you some leeway here, but this

21   is not new information.  And this is a

22   deposition on his supplemental report.  So

23   we're not -- we're going to object to a bunch

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 84

1    of questions about work that -- that could have

2    been discussed at his first deposition.

3              MR. HILL:  That's fine.  You can

4    lodge that -- lodge that objection.  But this

5    was produced as part of his amended report.

6              MS. CANNELLA:  I understand that.

7    But my -- my statement stands.

8              MR. HILL:  All right.  Well, I

9    disagree with your objection.

10        Q.    (Mr. Hill) The Escape in the

11   accident suffered quite a bit of broken glass.

12   You would agree with that?

13        A.    Yes.

14        Q.    All right.  Did you account for

15   the weight of the glass that was missing when

16   you weighed the crashed Escape?

17        A.    Whatever glass -- normally it's

18   all shoveled up and thrown in the vehicle or it

19   falls in the vehicle.  Whatever glass was in

20   there, it got accounted for.  Whatever glass

21   wasn't in there didn't get accounted for.

22        Q.    Okay.  And do you know whether the

23   glass was actually -- the shards of glass was

G. Bryant Buchner                                      July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 85

1    put in the vehicle at the time you weighed it?

2            A.    Well, some of it was.  But I

3    don't -- I didn't account -- try and account

4    for each shard of glass.  No, sir.  It's -- the

5    weight of the vehicle is a reasonable

6    approximation in the condition it's shown in at

7    the time of our photographs.  And we think

8    that's reasonable for the accident, plus the

9    occupants the car seats.

10           Q.    And the same question with regard

11   to the placement of the weight.  Just to be

12   clear, similar to the F-250 you didn't account

13   for the location of the occupants in the

14   vehicle when you ran the simulation?

15           A.    Well, they're near the CG.  But

16   no, we didn't.  We just added their weight to

17   the total vehicle, yes.

18           Q.    Okay.  All right.  Now we can --

19   let's just confirm a few things that were not

20   changed between the original simulation and the

21   amended simulation.

22       Just to be clear, the offset that you used

23   in both simulations was twelve inches.  Is that

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 86

1    correct?

2              A.    Yes.

3              Q.    All right.  And the speed --

4              A.    Time out.  Pardon me.  Pardon me.

5              Q.    Sure.

6              A.    You've actually made a really good

7    point.  And you did it a little while ago.

8    I -- we know the offset is eleven inches

9    from -- or approximately a foot.  That's what I

10   said in my first depo.  But it's eleven from

11   the Ford emblem marks on the tailgate.

12      So in the original simulation, I don't

13   know -- I believe it was -- I don't know if it

14   was eleven inches or one foot.  But in my depo

15   I was asked what the offset was.  I said, well,

16   I haven't exactly measured it.  And I made a

17   measurement on a drawing, and it said one foot.

18   So I'm going to use one foot because that's

19   consistent with my deposition.  But the

20   precise -- you made a good point earlier.  I

21   don't know the precise offset that was used

22   other than from my memory it could have been

23   eleven inches or a foot.

G. Bryant Buchner                                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 87

1      But it was -- it was -- it was done from the

2    scan data we had and everything.  And so it's

3    approximately a foot.  And that's what we used.

4    I don't know why I thought I needed to clarify

5    all of that.  But thank you for listening.

6            Q.    Sure.  But regardless, the offset

7    you used in the rerun was twelve inches to the

8    left of the Escape?

9            A.    Thank you.  Yes.

10           Q.    Right.  And -- and there's no

11   dispute that that's the offset that you believe

12   occurred, in fact?

13           A.    Well, I actually think it's eleven

14   from the -- in the depo I did an approximate

15   using a -- a manual scale.  But we know where

16   the -- we know it's precisely eleven if we go

17   to the best data we have.

18           Q.    All right.  So why did you use

19   twelve if you now have determined that it was

20   eleven?

21           A.    Because I -- earlier we were using

22   the orientation from the scans, which was

23   eleven.  But in the depo I said one foot, so we

Page 162

1    stated that the extremes using the potential

2    braking at 0.5 seconds would be 43.9 at the

3    lowest end if you have assumed full braking

4    power at exactly 0.5 seconds.  And then he had

5    a high-end range that would assume that you

6    didn't have full braking and you had braking

7    just minimal right before the impact, and it

8    just provided him a preliminary range depending

9    upon various hypothetical braking situations.

10   Is that a fair description of his testimony as

11   you understand it?

12        A.    That's a good start for a

13   conversation.  Yes, sir.

14        Q.    Right.  But we know -- and you

15   agree that -- and he even said he didn't

16   believe that braking occurred.  And that he

17   believed that that accident occurred at 50 or

18   51 miles an hour, which is consistent with your

19   belief as to what the speed of the F-250 was at

20   the time of the impact.  Is that correct?

21        A.    I think so.  There's a lot in it.

22   Can you make sure I've got it all?

23        Q.    Sure.  Well, we don't have a

G. Bryant Buchner

Bryson, Santana and Joshua v. Rough Country, LLC

Page 163

1    dispute here.  You used 51 miles per hour as

2    the impact speed in every one of your

3    simulations.

4              A.    Uh-huh.

5              Q.    Correct?

6              A.    Yes.

7              Q.    All right.  And so you don't have

8    any criticism of his using 49.9 in the crash

9    test?

10             A.    I actually -- based on his work,

11   yes.  I'm looking -- I'm using 51 and getting

12   more crush.  If -- if the -- if the vehicle was

13   really going 44, then I'm -- I'm using a worst

14   case scenario in my simulation.  But if his

15   opinion is that the lifted truck -- that an

16   unlifted truck produces the same amount of

17   crush as a lifted truck -- or even more is

18   actually what his opinion is -- then he needs

19   to make sure he's got the speeds right.

20        See, because what if the -- what if

21   according to him the accident was 44 miles an

22   hour.  And is it fair to really compare it to a

23   crash test that he ran at 49.9 miles an hour?

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                    Page 310

1                    REPORTER'S CERTIFICATE

2       STATE OF ALABAMA,

3       BALDWIN COUNTY,

4            I, Paul Morse, Certified Court Reporter

5       and Commissioner for the State of Alabama at

6       Large, do hereby certify that the above and

7       foregoing proceedings was taken down by me by

8       stenographic means, and that the content herein

9       was produced in transcript form by computer aid

10      under my supervision, and that the foregoing

11      represents, to the best of my ability, a true

12      and correct transcript of the proceedings

13      occurring on said date and at said time.

14           I further certify that I am neither of

15      kin nor of counsel to the parties to the action

16      nor in any manner interested in the result of

17      said case.

18

19

20

21

22           Paul Morse, CCR

23           ACCR #588 Expires 9/30/24