## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | |
|---|---|
| Santana Bryson and Joshua Bryson, as Administrators of the Estate of C.Z.B., and as surviving parents of C.Z.B., a deceased minor, | |
| Plaintiffs, | Civil Action File |
| | No. 2:22-CV-017-RWS |
| v. | |
| Rough Country, LLC, | |
| Defendant. | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' *DAUBERT* MOTION TO EXCLUDE UNREPRESENTATIVE CRASH TEST

To demonstrate that its lift kit was not the cause of C.Z.B.'s enhanced injury (*i.e.*, death), Rough Country took the common sense step of conducting a real, live crash test ("the Crash Test") of an *unlifted* 2016 Ford F-250 truck into a 2008 Ford Escape. By comparing the results of the Crash Test to the accident at issue, the jury would plainly see that Rough Country's lift kit did not cause C.Z.B.'s death. And the Crash Test unequivocally does this.[1]

---

[1] Video of the Crash Test has been submitted to the Court via flash drive. (Doc. 123.) Photographs from the Crash Test are included in report related to the Crash Test, which was previously filed with the Court as Docs. 115-7 and 115-8 ("the Crash

Because the Crash Test is so effective at demonstrating that Plaintiffs' claims are without merit, Plaintiffs filed a *Daubert* motion[2] (Doc. 115) to exclude the Crash Test by claiming that it is not representative, or substantially similar, to Plaintiffs' actual collision. Plaintiff's effort is misplaced, as demonstrated by the simple fact that Plaintiffs' own expert's computer HVE simulations used the same characteristics now contested in the motion. Moreover, it is well-established that Plaintiffs' purported criticisms are properly dealt with during cross-examination, not by striking the Crash Test. Accordingly, the Motion should be DENIED.

I.    STATEMENT OF PERTINENT FACTS AND TESTIMONY

A.    Summary of Plaintiffs' Claims and Argument

This case arises from a collision ("the Collision") in which a 2016 Ford F-250 truck driven by Hunter Elliott slammed into the rear of Plaintiffs' 2008 Ford Escape while it was stopped at a red light. [Doc. 109 (Order on Rough Country's Motion for

---

Test Report" or "CTR"). The Crash Test Report was included as Appendix A to the Rule 26 expert report of Charles Crosby, P.E., issued on March 29, 2024.

[2] Rough Country notes that Plaintiffs' motion – had it been properly formatted – would significantly exceed the Court's 25-page limit. The Motion contains 55 footnotes, each of which is single spaced. *See, e.g.*, *Moore v. Georgia Aquarium, Inc.*, No. 1:16-CV-3594-AT-JSA, 2018 WL 11148532, at *18 (N.D. Ga. July 20, 2018), report and recommendation adopted, No. 1:16:CV-3594-AT, 2018 WL 11148533 (N.D. Ga. Sept. 26, 2018) ("Defendant's excessive use of single-spaced footnotes (94 total in its 25-page brief) in an extremely small typeface is clearly intended to circumvent the page limitations of the Local Rules, and the Court could exclude consideration of the Defendant's footnotes on that basis.").

Summary Judgment), at 2.] Mr. Elliott's F-250 truck had a Rough Country lift installed on it. The 2016 Ford F-250 was travelling at 51 miles per hour, and it significantly damaged the 2008 Ford Escape, "as Mr. Elliott's truck intruded far into the smaller vehicle's passenger compartment." (*Id.*) C.Z.B. was killed as a result of the Collision.

The crux of Plaintiffs' case is their allegation that Rough Country's lift kit caused Mr. Elliott's F-250 truck to bypass certain "frame and crash protections" of Plaintiffs' Escape and that, but for the lift kit, "Mr. Elliott's F-250 would not have intruded so far into their Escape," (*Id.*) Plaintiffs are therefore asserting a claim for "enhanced injury," arguing that an unlifted 2016 Ford F-250 truck would not have caused such a significant intrusion into Plaintiffs' Escape, and C.Z.B. would not have been killed. (*See, e.g.*, Doc. 109, at 14.)

  B. <u>The Crash Test</u>

In an effort to examine Plaintiffs' theory, Rough Country retained experts to prepare and run the Crash Test, a live test in which an *unlifted* 2016 Ford F-250 truck was crashed into a 2008 Ford Escape at 49.9 miles per hour. [Doc. 115-7 (CTR), at 5.] The Crash Test took place on May 15, 2023. (*Id.*) The Crash Test was conducted by having the F-250 truck placed onto a "crash rail," which accelerated the F-250 truck "to test speed and [then] released [the F-250 truck] from the tow system just prior to impact with the stationary Escape." (*Id.*) The Crash Test was set up so that

the test F-250 truck would impact the test Escape at an offset of 10.9 inches. (*Id.*) To preserve this offset, the test F-250 was not released from the tow system until "right before impact." [Doc. 102-3 (Grimes Depo.), at 188:13-14.]

The following images are from the Crash Test Report, and they are representative of the Crash Test's outcome:



12327PH_0293

[Doc. 115-8 (CTR), at 54.]



12327PH_0294

[Doc. 115-8 (CTR), at 54.]



12327PH_0313

[Doc. 115-8 (CTR), at 59.]



12327PH_0352

[Doc. 115-8 (CTR), at 69.]



12327PH_0364



12327PH_0371

[Doc. 115-8 (CTR), at 72.]                 [Doc. 115-8 (CTR), at 73.]

The destructive impact of the F-250 on the Escape is obvious, and it is readily apparent why Plaintiffs are so desperate to exclude the Crash Test.

### C. Plaintiffs' Complaints and Their Expert's Own Simulations

In support of their motion, Plaintiffs invoke four complaints: (1) that the Crash Test had "more lateral offset than the subject collision," (Motion, at 6); (2) that the test Escape lacked a sunroof, (*id.*, at 12); (3) that the test Escape lacked "cargo in the trunk," (*id.*, at 14); and (4) that the Crash Test allegedly "did not account for Mr. Elliott's pre-impact braking," (*id.*, at 17). None of these are viable or sufficient to exclude the Crash Test.

Plaintiffs retained G. Bryant Buchner, P.E. to perform computerized HVE simulations.[3] Mr. Buchner attempted to predict through his HVE simulations what

---

[3] Mr. Buchner's computerized HVE simulations are currently subject to a motion to strike because they were untimely produced to Rough Country. (Doc. 119.)

effect, if any, Rough Country's lift kit had on the Collision the same way that Rough Country's experts did: he "crashed" a digital unlifted 2016 Ford F-250 truck into a digital 2008 Ford Escape. When Mr. Buchner programmed his HVE simulations, he was required to give the computer software certain defaults or variables that would impact the software's simulations. Tellingly, when Mr. Buchner set up his own HVE simulations, he used the many of the same variables as Rough Country and which Plaintiffs now contest:

*First*, Mr. Buchner used an offset of 12 inches, similar to the offset of the Crash Test. [*See, e.g.*, Doc. 119-2 (Buchner's amended report), at 3.]

*Second*, Mr. Buchner admitted that his digital Escape, like the test Escape in the Crash Test, did not include a sunroof. [*See, e.g.*, Doc. 119-6 (Second Buchner Depo.), at 26 (99:18-21) ("There was no sunroof involved in either your simulation or the crash testing for the Escape? Correct. Correct.").]

*Third*, Mr. Buchner's HVE simulations excluded cargo from the test Escape. [*See, e.g.*, Doc. 119-6 (Second Buchner Depo.), at 26 (99:12-15) ("in neither the simulation nor the crash test were the – was the cargo placed in the rear of the Escape.").]

*Fourth*, Mr. Buchner did not include any pre-impact breaking of the digital F-250 either. [*See, e.g.*, Doc. 119-2 (Buchner's amended report), at 2 ("The amended simulation includes no braking on either vehicle.").] Moreover, Mr. Buchner's own

report states that there was *no* pre-impact braking, as Plaintiffs now contend. According to Mr. Buchner, "[t]he F250's speed *at impact* was near 51 mph with a 17.93 mph Delta-V." [Doc. 119-1(Buchner's initial report), at 11 (emphasis added).]

*Fifth*, Mr. Buchner's HVE simulations were run at a similar speed as the Crash Test. The Crash Test was performed at 49.9 miles per hour while Mr. Buchner's HVE simulation was set to 51 miles per hour. [*See, e.g.*, Doc. 119-6 (Second Buchner Depo.), at 23 (88:8-10); *id.*, at 26 (100:6-9) ("The crash test was 1.1 mile per hour slower than your simulation. Do you agree with that? Yes.").]

Given all of the similarities between the Crash Test and Mr. Buchner's HVE simulations, Plaintiffs' arguments are quixotic. They are neither realistic nor practical. Indeed, if the Court concurs with Plaintiffs about the lack of a sunroof, the lack of cargo in the test Escape, or that the Crash Test was performed at too high a speed, then Mr. Buchner's HVE simulations would not be "substantially similar" to the Collision, and they should be stricken as well.[4]

II.    ARGUMENT AND CITATIONS OF LEGAL AUTHORITY

For the Crash Test to be admissible, it should be "conducted under substantially similar conditions." *Burchfield v. CSX Transp., Inc.*, 636 F.3d 1330,

---

[4] To the extent that Mr. Buchner's computerized HVE simulations are not stricken for being untimely, Rough Country reserves the right to file a motion to exclude Mr. Buchner's opinions under *Daubert*.

1336 (11th Cir. 2011). The goal of the "substantially similar" standard is "[t]o avoid unfair prejudice and confusion of the issues," *McHale v. Crown Equipment Corp.*, 2022 WL 4350702, at *2 (11th Cir. Sept. 20, 2022); *see also Tran v. Toyota Motor Corp.*, 420 F.3d 1310, 1316 (11th Cir. 2005).

But this does not mean that the Crash Test must be identical to the Collision. "[I]t is not required that all the conditions shall be precisely reproduced, but they must . . . afford a fair comparison in respect to the particular issue to which the test is directed." *Burchfield*, at 1336-37. The Crash Test easily meets this standard, and it is admissible.

When there is a dispute as to the pertinent facts or conditions, then alleged issues with the test should be dealt with on cross-examination. "When specific conditions are disputed, however, courts have held that the reenactment is admissible but that an instruction to the jury, that the reenactment depicts only one party's version of events, is appropriate." *Lewis v. New Prime Inc.*, No. 1:10-CV-1228-WSD, 2013 WL 6097568, at *7 (N.D. Ga. Nov. 20, 2013).

   A. <u>The Crash Test is Substantially Similar to the Collision (and Mr. Buchner's HVE Simulations)</u>

Contrary to Plaintiffs' protestations, the Crash Test meets all of the applicable standards, and it is substantially similar to the Collision.

    *1. The Crash Test's Offset was Substantially Similar to the Collision's Offset.*

The problem with Plaintiffs' argument that the Crash Test had an excessive amount of "lateral offset" is that it is wrong or, at least, heavily disputed. Plaintiffs conclude, based on their experts' opinions, that the Crash Test "had 5 inches more lateral offset than the" Collision. (Motion at 6.) Rough Country disputes that the Crash Test's "offset" was excessive or that it otherwise rendered the Crash Test dissimilar to the Collision. For the Court to exclude the Crash Test on this ground, it must first make a factual determination that Plaintiffs' suggested offset for the Crash Test is correct, while Rough Country's calculated offset for the Crash Test is incorrect.[5]

According to both Mr. Crosby and Mr. Grimes, the Crash Test's *offset deviated by only approximately 1 inch*.[6] [Ex. 1 (Crosby Depo.), at 48:13-17 (offset was "closer to 12 inches"); Doc. 102-3 (Grimes Depo.), at 184:21 ("it's about 12 inches").] Mr. Crosby personally validated his determination by physically inspecting the test vehicles.

---

[5] This demonstrates why Plaintiffs' motion to strike Mr. Grimes's November 2024 report (Doc. 116) should be denied. This is the only opportunity that Rough Country has to respond to Plaintiffs' newly asserted arguments that the Crash Test was not "substantially similar" to the Collision.

[6] Mr. Crosby's deposition accompanies this Response as Exhibit 1.

If you look at this Ford emblem where it shows up here, in fact, on this picture that you've got and you kind of line up that D with the Ford Escape, and you make some estimates of where the center line of the vehicle is, relative to where the Escape emblem is and then relative to where the Ford emblem imprinted on that, you can measure approximately one inch or two more than that 10.9 inches, which puts you right at 12, 12 ½ inches or so.

[Ex. 1 (Crosby Depo.), at 48:19-49:3; *see also id.*, at 49:7-9; *id.*, at 72:5-7 ("After the test, we looked at the vehicle . . . and the offset appeared to be correct"); *id.*, at 76:10-11 ("you look at the – the vehicle post test and you can see where the damage pattern starts").]

Mr. Grimes took his examination further. He looked at where the oval Ford logo imprinted on the test and subject Escapes.

There were impressions, or scuffs, from a Ford F-250 logo on the Ford Escape from the subject crash as well as the Ford Escape used in the crash test. There was a trim panel on each Ford Escape located in the middle of the hatchback at the glass line, and the lower-left corner of this panel was used as a reference point on each vehicle to identify where the logo scuff was located.

[Doc. 116-4 (Grimes supplemental report), at 16.] The "scuffs" are reflected in Figure 59 of Doc. 116-4, reproduced below:

**Figure 59** continues the progression of images from **Figure 58**, including the following:

- Red 'index' lines were placed on the images referencing the lower left corner of the trim panel.
- A close-up of the image with the red index lines.
- The mirror image of the Ford F-250 logo was removed, leaving the red index lines.



| F-250 Logo Scuff on Subject Ford Escape | F-250 Logo Scuff on Test Ford Escape |
|---|---|

*Figure 59: Image overlays depicting F-250 logo scuff on Ford Escape with index marks.*

From these photographs, "the logo scuff on the crash test Ford Escape was approximately 1 inch to 1.25 inches farther left from the longitudinal centerline than

was the logo scuff on the subject crash Ford Escape." [Doc. 116-4 (Grimes supplemental report), at 19.) The Crash Test was set up to imitate the Collision's offset by lining the test vehicles up with a pre-test offset of 10.9 inches. Ultimately, the Crash Test's ultimate offset was approximately 12 inches (10.9" + 1"), the offset used by Mr. Buchner, Plaintiffs' expert, in his own HVE simulations. [Doc. 119-6 (Second Buchner Depo.), at 22 (85:22-86:2).]

Finally, Plaintiffs rely on various photographs taken from above the test vehicles, looking down, in an attempt to corroborate their position. But Mr. Crosby and Mr. Grimes directly refute this argument by explaining that the photographs suffered from parallax. [Doc. 116-4 (Grimes supplemental report), at 8 ("As can be seen in the [Mr. Buchner's rebuttal report] Figure 6, the overhead camera was not centered over the crash rail, but more centered over the Escape").] Mr. Crosby confirmed that the test vehicles' "tape lines do line up physically," which

> means that [the overhead] camera induced, likely some what's called parallax, which is the as items in a field of view are at different distances from the lens or from the camera, they can appear to be either misaligned or they can appear to be aligned when in reality they are not.

[Ex. 1 (Crosby Depo.), at 152:13-21; *see also* Doc. 102-3 (Grimes Depo.), at 212:24-213:1 (parallax is "distortion of the image because of photography and lenses where things don't line up the way you think they do").] Mr. Grimes further explained the error of Mr. Buchner's analysis:

> With the overhead camera in a similar position, it can be seen that even though F250's longitudinal center line is over the center of the crash rail, it appears that it is to the left of the rail three inches or more. This is due to the parallax of the camera. This can also be observed at the bottom of the overhead camera photography where the concrete edge appears curved.

[Doc. 116-4 (Grimes supplemental report), at 11.] Ultimately, Mr. Buchner recognizes the fundamental flaw with his effort to determine the offset using photographs from the Crash Test. "Clearly, you know, according to Crosby the [Crash T]est was not set up to allow measurements  from the photo. So we're disadvantaged." [Doc. 119-6 (Second Buchner Depo.), at 53 (207:22-208:1).] Mr. Buchner's measurements all start from a fundamentally flawed starting point.

Plaintiffs also cite to the opinion of another expert, Christopher Roche. But Mr. Roche's opinion is based on a more subjective visual examination: he simply "looked at the damage pattern and compared the damage pattern of both the crash test vehicle and the subject crash vehicle," and from this, he determined that the offset was allegedly off by "an additional four inches."[7] [Ex. 2 (Second Roche Depo.), at 30:14-21.]

Ultimately, Plaintiffs' argument about offset is unsupported. Mr. Buchner, who claims that the Crash Test's offset was off significantly, admits that he never actually examined what effect – if any – an increase in offset might have on the

---

[7] Mr. Roche's second deposition accompanies this Response as Exhibit 2.

"crush." [Doc. 119-6 (Second Buchner Depo.), at 70 (275:19-276:6) (admitting that he did not "calculate the – the increase in crush" and he cannot "quantify the difference in crush that would be caused by the alleged five plus or minus one inch additional offset that occurred in the crash test").]

>2. *The Lack of a Sunroof Was Immaterial and Does Not Render the Crash Test Dissimilar.*

Plaintiffs contend that the test Escape's failure to have a sunroof *could* have impacted the outcome of the Crash Test. (Motion, at 13.) But as with many of Plaintiffs' other arguments, their own expert's conduct belies their position and contention.

The actual evidence shows that that the addition of a sunroof does not materially alter the structure of a vehicle. It does not change the vehicle's roof rails, and it does not alter the vehicle's support (identified as A, B, or C) pillars. [Ex. 1 (Crosby Depo.), at 93:22-94:2.] And, regardless of whether a sunroof is present, the rear area of the roof structure was identical for both the test and subject Escape, and "th[e] test that we [were] running is an impact to the rear of the vehicle." [Ex. 1 (Crosby Depo.), at 94:16-24; *see also id.*, at 138:1-3 ("the sunroof was not an issue one way or the other in this particular case, because of the rear impact nature of the test").] As Mr. Grimes further explained: "the sunroof had no effect on the strength of the roof structure between the subject Escape and the test Escape" because "the

sunroof would be forward some distance from where the crush is actually occurring." [Doc. 102-3 (Grimes Depo.), at 231:14-20.]

Critically, Mr. Buchner, Plaintiff's comparative expert, agreed with Mr. Grimes: "[W]here the crush is in the simulation we ran is the bumper level. So long as you go to bumper level crush, *I would say the sunroof would be not a particular factor that the simulation could or could not include*." [Doc. 119-6 (Second Buchner Depo.), at 24 (90:19-91:1) (italics added).] And consistent with this, Mr. Buchner, Plaintiffs' own accident reconstructionist, did not include a sunroof on his HVE simulation's digital Escape. In fact, the HVE software that Plaintiffs attempt to rely on does not differentiate between an Escape with or without a sunroof during its simulations.

| | |
|---|---|
| Counsel: | And did that vehicle have a sunroof that you used in your simulation? |
| Mr. Buchner: | It doesn't show a sunroof. |
| Counsel: | Okay. And it doesn't differentiate. You can't choose an Escape with a sunroof or Escape without a sunroof within the HVE software? |
| Mr. Buchner: | HVE doesn't have a choice for with or without sunroof. No. |

[Doc. 119-6 (Second Buchner Depo.), at 24 (90:5-13); *see also id.*, at 24 (91:8-10) ("But yeah, as far as HVE goes, it doesn't – to my knowledge, it's not including

sunroofs in its – in what it has"); *id.*, 91:11-16 (Mr. Buchner "did not modify the Escape vehicle in [his] simulation to account for the sunroof").]

Conversely, Plaintiffs present *no* evidence to support their theory that the presence of a sunroof had any impact on the Escape's "crush" and rear deformation. They cite to testimony from Christopher Roche, one of Plaintiffs' experts. (Motion, at 13.) But Mr. Roche freely admits that he did no testing, analysis, calculations, or any other work to determine the impact that the lack of a sunroof might have on the test Escape.[8]

| | |
|---|---|
| Counsel: | Have you done -- expanding on the answer you just gave. Have you done any work, whether it be testing, calculations, simulations, analysis, to isolate the variable of a sunroof versus not having a sunroof on the results of the crash test? |
| Mr. Roche: | . . . And I've not attempted to understand any contribution that may have arisen from that variable being changed. |

[Ex. 2 (Second Roche Depo.), at 65:24-10.] Stated another way, Mr. Roche never "attempted to understand any contribution that may have arisen from that variable [the sunroof] being changed." (*Id.*, at 68:8-10.) And when further asked about the

---

[8] Tellingly, Mr. Roche did "not spend a great deal of time understanding the simulation that Mr. Buchner was performing." [Ex. 2 (Second Roche Depo.), at 61:16-18.] As a result, Mr. Roche's opinion is in direct conflict with Mr. Buchner, both of whom were retained by Plaintiffs.

actual difference that presence of a sunroof might have, Mr. Roche was unable to provide an answer.

> Counsel:          Have you done anything to quantify whether the lack of a . . . sunroof increased the crush in the test?
>
> Mr. Roche:      I am simply providing the opinion that sunroof roof structures are stiffer and stronger than nonsunroof roof structures.

[Ex. 2 (Second Roche Depo.), at 67:22-68:2.] In sum, Mr. Roche specifically states that he is not expressing an opinion as to whether the presence (or lack) of a sunroof would have affected the crush suffered by either the test Escape or the subject Escape. He simply opines that one structure is different than the other. Mr. Roche's opinion is unsupported, is conjecture and speculation, and it does not meet the *Daubert* standard. *See, e.g.*, *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988) ("[i]t is true that relevant testimony from a qualified expert is admissible only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation").

To the contrary, the evidence and testimony is that the presence (or lack) of a sunroof was inconsequential to the Crash Test's outcome.

> 3.  *The Lack of Cargo was Immaterial to the Crash Test (or Mr. Buchner's HVE Simulations).*

Plaintiffs' complaint that the test Escape lacked the appropriate amount of cargo in its trunk is unsustainable.

It is undisputed that the location and nature of the "cargo" in the back of Plaintiffs' Escape was neither preserved nor known. In fact, both Plaintiffs testified that they did not know what exactly was in their Escape's trunk or where it was located. [*See* Doc. 98 (Santana Bryson Depo.), at 10 (35-36); Doc. 99 (Joshua Bryson Dep.), at 15 (54-55).] Similarly, there were no photographs from the scene of the Collision that indicated the location of the Escape's cargo. Any argument by Plaintiffs that is based on the location of cargo in the rear of Plaintiffs' Escape is based on speculation and supposition. Plaintiffs' purported reliance on an interrogatory response is misplaced and is misrepresentation by omission. (*See* Motion, at 15 n. 40.) As Plaintiffs' admit in their actual interrogatory response: "Plaintiffs note that they underwent significant trauma, both physical and emotional, on March 15, 2020. That trauma paired with the passage of time has hampered their independent recollection of details such as the precise contents of their trunk." [Doc. 115-15, at 2-3.] Given this uncertainty, it would have been improper to include cargo in the Crash Test's test Escape. [Ex. 1 (Crosby Depo.), at 58:7-9 ("we weren't going to run with the cargo in there, because of the unknowns of the cargo").]

Again, however, Plaintiffs' argument is belied by Mr. Buchner's own HVE simulations and testimony. Mr. Buchner testified expressly and unambiguously that he did not think the presence of any "cargo within the hatch of the Escape" would have "any impact" on his simulation or analysis.

| Counsel: | . . . And the simulation also does not allow you to place cargo within the hatch of the Escape to determine whether that will have any impact on the crush. Correct? |
| Mr. Buchner: | *We don't think it has any impact.* No, sir. But if – we don't think it did. The intent wasn't to put it in there. . . . |

[Doc. 119-6 (Second Buchner Depo.), at 24 (91:17-23) (italics added).] And there is no dispute that Mr. Buchner did not "place any cargo in the back of the Escape used in the simulation," [*id.*, at 24 (92:6-9).]

Further, any cargo in the rear of Plaintiffs' Escape would have been compressed, or "sandwiched," between the hatch and the rear seat back. This would have pushed against the rear seat, displacing it forward.

> The test Escape would have sustained more seat deformation had exemplar cargo been placed in the rear cargo area since the rear hatch of the test vehicle had to be displaced through the entire rear cargo area to contact the rear seat back. *Had exemplar cargo been identified and placed in the cargo area, the cargo would have been sandwiched between the rear seat and the rear hatch and subsequently applied a force to the back of the rear seat as it was displaced forward.*

[Doc. 119-3 (Grimes initial report), at 34 (italics added).] But the absence of cargo would result in a situation more favorable to Plaintiffs because there would be no cargo to push the rear seat forward. Yet, the Crash Test affirmatively showed that the rear seat would still have been displaced forward enough to kill C.Z.B., even without the cargo. The Crash Test showed forward deflection by the rear seat without the

presence of cargo, thereby confirming that any cargo in Plaintiffs' Escape was not a determinative factor in either the Collision or the Crash Test.

### 4. *The Crash Test Was Set to the Appropriate Speed.*

Plaintiffs' argument that the Crash Test occurred at the wrong speed is baseless and based on pure speculation. In the Motion, Plaintiffs argue that "Mr. Elliott applied brakes in the last half-second before impact," but the effect of this is unknown. Mr. Grimes actually testified that he did not think that there was any substantial braking by Mr. Elliott prior to impact. [Doc. 102-3 (Grimes Depo.), at 147:14-18 ("Assuming those types of things, which I don't believe are true. I don't think there was significant braking effort, but this was the extreme that we did early on to get a feel for all the numbers that we were dealing with.").]

| Counsel: | So the braking we're talking about is that the CDR indicates that Mr. Elliott applied his brakes sometime in the last .5 seconds before impact; is that correct? |
| --- | --- |
| Mr. Grimes: | Yes. |
| Counsel: | And – |
| Mr. Grimes: | And we don't know -- I'm sorry. We don't know two things. *We don't know when and we don't know how much.* |

[Doc. 102-3 (Grimes Depo.), at 147:19-148:2 (italics added).] Any supposition that the Mr. Elliott's F-250 truck decelerated 7.7 mph was the result of artful questioning

by Plaintiffs' counsel, was hypothetical in nature, and is not indicative of Mr. Grimes's actual testimony.[9]

Indeed, the lack of such evidence about Mr. Elliott's hypothetical braking would render it speculative for Mr. Crosby to have included pre-impact braking during the Crash Test. As Mr. Crosby explained:

> If you don't know the absolute exact amount of braking that got put in then you are just kind of estimating, so for instance, just because you have a second of braking was that a second of soft braking, was that a second of fairly aggressive braking, or is that a second of absolute emergency panic braking? And those are three very different parameters that completely change how you would input that.

[Ex. 1 (Crosby Depo.), at 98:6-14.]

In fact, Plaintiffs' own expert looked at the same data, and *Mr. Buchner determined that there was no pre-impact braking* by Mr. Elliott. Mr. Buchner specifically determined that Mr. Elliott's F-250  truck was moving at 51 miles per hour *at the time of impact*, and not 43.9 miles per hour as suggested by Plaintiffs in their motion, as he stated repeatedly throughout his reports:

- "For the subject F250, the speed adjustment factor is found to be 1.02, which means that the indicated *pre-impact speed of 50 mph is actually*

---

[9] There is no evidence that Mr. Elliott's F-250 truck *actually* slowed down 7.7 miles per hour prior to impact. Rather, through creative drafting, Plaintiffs simply hypothesize that "Mr. Elliott's braking *could have slowed* the subject F-250 *by as much as 7.7 miles per hour* before impact." [Motion, at 17-18 (italics added).]

*51 mph* (50 mph x 1.02 = 51 mph)," [Doc. 119-1 (Buchner's initial report), at 9 (italics added)];

- "The F250's speed *at impact* was near 51 mph with a 17.93 mph Delta-V," [*id.*,. at 11 (italics added)]; and

- "The amended simulation *includes no braking* on either vehicle," [Doc. 119-2 (Buchner's amended report), at 2 (italics added)].

The argument that Plaintiffs make to the Court has no basis in fact or evidence, and it is disingenuous.

### B. Plaintiffs' Expert's Computer HVE Simulations Suffer from the Same Alleged Defects

As demonstrated and explained above, Plaintiffs' expert, Mr. Buchner, used the same variables and conditions that Plaintiffs now contest. The fact that both sets of experts used similar variables and conditions demonstrates that the Crash Test is substantially similar to the Collision. But if the Court finds otherwise, then Mr. Buchner's HVE simulations would also not be substantially similar.

It is anticipated that Plaintiffs may argue that it is perfectly acceptable for their experts to use incorrect variables or conditions that vary from the actual Collision because such deviations may inure to Rough Country's benefit by increasing the "crush," or damage, to Mr. Buchner's digital Escape. But that argument is erroneous because it is based on the fundamentally unfair premise that it is acceptable for one party's recreation to be admissible while not being substantially similar even though

the other party's recreation is excluded for the same reason. Such a skewed interpretation of *Burchfield* and similar case law is not sustainable or justifiable.

C.  Plaintiffs' Proper Recourse is to Address Their Concerns During Cross-Examination

It is well-established that Plaintiffs' concerns with the Crash Test do not warrant the exclusion of the Crash Test. Rather, the proper recourse is for Plaintiffs to attempt to respond to the Crash Test during cross-examination. As the Eleventh Circuit reiterated in *Rosenfeld v. Oceania Cruises, Inc.*:

> Further, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.,* 326 F.3d 1333, 1341 (11th Cir. 2003); *Maiz,* 253 F.3d at 666 ("A district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury." (internal quotation marks omitted)). "Quite the contrary, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Quiet Tech.,* 326 F.3d at 1341 (quoting *Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798). Indeed, "in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1188 (9th Cir. 2002). *See also Quiet Tech.,* 326 F.3d at 1345 (noting that, "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility" (quoting *Bazemore v. Friday,* 478 U.S. 385, 400, 106 S.Ct. 3000, 3009, 92 L.Ed.2d 315 (1986))).

654 F.3d 1190, 1193 (11th Cir. 2011); *see also Tucker v. Evenflo Co., Inc.*, No. 6:20-CV-2-PGB-GJK, 2021 WL 4949122, at *7 (M.D. Fla. July 12, 2021) (applying same

analysis and consideration to whether an expert "rigged" a testing setup or whether deviation from "standard setup" had "any significant effect on the test outcome").

### D. The Cases Cited by Plaintiffs are Inapposite.

Many of the cases cite by Plaintiffs are inapposite because they raise different issues and arguments than those relevant to the Crash Test. More specifically, the demonstrative evidence excluded in Plaintiffs' cases were all intended to present "general scientific principles," and not go to the merits of the case. *See Muth v. Ford Motor Co.*, 461 F.3d 557, 567 (2006) (Ford offered the CRIS test "only to show general scientific principles"); *see also Barnes v. General Motors Corp.*, 547 F.2d 275, 277 (5th Cir. 1977) (the excluded test "merely demonstrated well known physical happenings resulting from universally accepted principles disputed by no one" and "this experiment had no probative value whatsoever"). The demonstrative evidence was excluded because of concerns that there would be a prejudicial effect towards the jury. In this case, Rough Country is not presenting the Crash Test to demonstrate "general scientific principles," which is what was argued in the cases cited by Plaintiffs. The issues present in Plaintiffs' cited cases are not present here, and so Plaintiffs' reliance is misplaced.

### E. The Crash Test Should Not Be Excluded Under FRE 403

The Crash Test is presented for the specific purpose of demonstrating to the jury that an unlifted F-250 truck would cause the same or similar amount of "crush"

that a lifted F-250 truck would cause. This is not prejudicial; this is part of the root of Rough Country's defense because what the Crash Test shows aligns directly with Rough Country's theory of the case. The Crash Test is, at its core, probative in Rough Country's favor. It should not be excluded under Rule 403. *See Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1285 (11th Cir. 2015) ("There is a difference between unfairly prejudicial evidence, which may be excluded under Rule 403, and evidence that is "simply adverse to [an] opposing party." [Cit. omitted.] Rule 403 calls for the exclusion of the former, not the latter.").

III.   CONCLUSION

Accordingly, for the reasons set forth above, Rough Country shows that its Crash Test is substantially similar to the Collision, and any purported criticisms that Plaintiffs may have with the Crash Test are properly dealt with on cross-examination. Therefore, the Motion should be DENIED. Alternatively, if the Court grants the Motion, then it should similarly exclude Mr. Buchner's HVE simulations for suffering from the same alleged defects.

This, the 12th day of February, 2025.

WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC

*/s/ Aaron Chausmer*
Richard H. Hill, II
Georgia Bar No. 354425
Aaron B. Chausmer
Georgia Bar No. 119998

3344 Peachtree Road, N.E.
Suite 2400
Atlanta, GA 30326
Phone:  404-876-2700

Fax:   404-875-9433                    *Attorneys for Defendant Rough Country,*
rhill@wwhgd.com                        *LLC*
achausmer@wwhgd.com

## **RULE 7.1D CERTIFICATE OF TYPE, FORMAT AND FONT SIZE**

Pursuant to Local Rule 7.1D of the United States District Court of the Northern District of Georgia, the undersigned certifies that the foregoing submission to the Court complies with Local Rule 5.1 in that it was computer-processed, double-spaced between lines, and used Times New Roman font of 14 point size.

WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC

3344 Peachtree Road, N.E.
Suite 2400
Atlanta, GA 30326
Phone:  404-876-2700
Fax:   404-875-9433
rhill@wwhgd.com
achausmer@wwhgd.com

*/s/ Aaron Chausmer*
Richard H. Hill, II
Georgia Bar No. 354425
Aaron B. Chausmer
Georgia Bar No. 119998
*Attorneys for Defendant Rough Country, LLC*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have electronically served the foregoing filing with the Clerk of Court via CM/ECF, which will send a copy to the following attorneys of record:

Tedra L. Cannella
Robert H. Snyder, Jr.
Devin Mashman
CANNELLA SNYDER LLC
315 W Ponce de Leon Ave, Suite 885
Decatur, GA 30030
***ATTORNEYS FOR PLAINTIFFS***

This 12th day of February, 2025.

WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC

*/s/ Aaron Chausmer*

3344 Peachtree Road, N.E.
Suite 2400
Atlanta, GA 30326
Phone: 404-876-2700
Fax: 404-875-9433
rhill@wwhgd.com
achausmer@wwhgd.com

Richard H. Hill, II
Georgia Bar No. 354425
Aaron B. Chausmer
Georgia Bar No. 119998
*Attorneys for Defendant Rough Country, LLC*