Charles Crosby , PE
May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 1

1                    UNITED STATES DISTRICT COURT
2                    NORTHERN DISTRICT OF GEORGIA
3                      GAINESVILLE DIVISION
4
5       SANTANA BRYSON and JOSHUA BRYSON,    )
        as Administrators of the Estate     )
6       of C.Z.B., and as surviving         )
        parents of C.Z.B., a deceased       )
7       minor,                              )
                                            )
8            Plaintiffs,                     ) No.
                                            ) 2:22-cv-17-RWS
9       vs.                                 )
                                            )
10      ROUGH COUNTRY, LLC,                 )
                                            )
11           Defendant.                      )
                                            )
12
13
14       VIDEOTAPED DEPOSITION OF CHARLES CROSBY, P.E.
15                       Phoenix, Arizona
                         May 14, 2024
16                       9:00 a.m.
17
18
19
20
21
22
        REPORTED BY:
23      Robin L. B. Osterode, CSR, RPR
        CA Certified Shorthand Reporter No. 7750
24      AZ Certified Reporter No. 50695
25

Charles Crosby , PE    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 2

```
1        VIDEOTAPED DEPOSITION OF CHARLES CROSBY
2    commenced at 9:00 a.m. on May 14, 2024, at Phoenix,
3    Arizona, before Robin L. B. Osterode, CSR, RPR,
4    California Shorthand Reporter No. 7750 and Arizona
5    Certified Reporter No. 50695.
6
7
8                         * * *
9
10   APPEARANCES:
11    For Plaintiffs:
12       CANNELLA & SNYDER
         By: Tedra L. Cannella
13       By: Devin Mashman (Via Zoom Videoconference)
         315 West Ponce de Leon Avenue, Suite 885
14       Decatur, Georgia 30030
         (404) 800-4828
15       tedra@cannellasnyder.com
16    For Defendants:
17       WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
         By: Richard H. Hill
18       3344 Peachtree Road NE, Suite 2400
         Atlanta, Georgia 30326
19       (404) 876-2700
         rhill@wwhgd.com
20
     The Videographer:
21
         John Maniscalco
22
23
24
25
```

Page 3

```
1              I N D E X
2    EXAMINATION BY                    PAGE
3    Ms. Cannella....................... 6
4
5
6
7    EXHIBITS       DESCRIPTION        PAGE
8    Exhibit 103  Exponent Press Release entitled    7
                  "Exponent Reports Fourth Quarter
9                 and Fiscal Year 2023 Financial
                  Results"; 12 pages
10
     Exhibit 104  Partial transcript of jury     14
11                trial, dated April 6, 2016;
                  3 pages
12
     Exhibit 105  Preliminary Statement in Hill    9
13                v. Ford Motor; 5 pages
14   Exhibit 106  Business Ethics article,       20
                  entitled "Legal Scrapes Turn
15                to Science-for-Hire Giant
                  Exponent"; 23 pages
16
     Exhibit 107  Testimony List of Charles     30
17                Crosby, P.E.; 1 page
18   Exhibit 108  Letter to Richard H. Hill,     31
                  III from Charles Crosby,
19                P.E., dated March 29, 2024;
                  2 pages
20
     Exhibit 109  Document entitled "Injury     35
21                Patterns and Effective
                  Countermeasures for Vehicle
22                Collision Compatibility";
                  8 pages
23
     Exhibit 110  Text message exchanges;     39
24                10 pages
25
```

Page 4

```
1    INDEX (Continued):
2    EXHIBITS       DESCRIPTION        PAGE
3    Exhibit 111  Color photocopy of       46
                  photograph; 1 page
4
     Exhibit 113  Curriculum vitae of Charles    121
5                 E. Crosby, P.E.; 2 pages
6    Exhibit 118  Document on Exponent letterhead  107
                  entitled "Single-Moving-Vehicle
7                 Crash Test 2016 F-250 into a
                  2008 Ford Escape," dated May
8                 15, 2023; 213 pages
9    Exhibit 119  Defendant Rough Country's     87
                  Supplement to its Initial
10                Disclosures; 4 pages
11   Exhibit 120  Notice of Videotaped Deposition  163
                  of Charles Crosby; 8 pages
12
     Exhibit 121  E-mail to Charles Crosby from    164
13                Ann Grimes, dated March 28,
                  2023 with attachments; 22 pages
14
     Exhibit 122  Vehicle Purchase Order for a    91
15                Ford F250 Super Duty Crew Cab;
                  2 pages
16
     Exhibit 123  Exponent invoices; 31 pages    56
17
     Exhibit 124  Screenshot of crash test video   161
18                with annotations; 1 page
19
20
21
22
23
24
25
```

Page 5

```
1                Phoenix, Arizona
                  May 14, 2024
2                9:00 a.m.
3         THE VIDEOGRAPHER:  We are going on the
4    record at 9:11 a.m.  This is the video recorded
5    deposition of Charles Crosby, taken by the plaintiffs
6    in the matter of Santana Bryson and Joshua Bryson, et
7    al., versus Rough Country, LLC, case number
8    2:22-CV-17-RWS, held in the offices of Glennie
9    Reporting Services, 1555 East Orangewood Avenue,
10   Phoenix, Arizona, on May 14th, 2024.
11        The court reporter is Robin Osterode from
12   the firm of Glennie Reporting Services.  The
13   certified legal video specialist is John Maniscalco,
14   in association with Forensic Video Deposition
15   Services, Inc., 11111 North Scottsdale Road,
16   Suite 205, Scottsdale, Arizona 85254.
17        Will the attorneys please introduce
18   themselves, plaintiffs first.
19        MS. CANNELLA:  Tedra Cannella and Devin
20   Mashman for the plaintiffs.
21        MR. HILL:  Rick Hill for Rough Country.
22        THE VIDEOGRAPHER:  Thank you.
23        Will the court reporter please swear in the
24   witness and then we may proceed.
25   //
```

2 (Pages 2 - 5)

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 6

1         CHARLES CROSBY,
2   called as a witness herein, having been first duly
3   sworn, was examined and testified as follows:
4
5         MS. CANNELLA:  I just wanted to tell you,
6   Rick, that I don't have extra copies, because I was
7   traveling, so everything's double-sided, and I have
8   two copies of everything and you can see whatever it
9   is.
10        MR. HILL:  That's fine.
11
12        E X A M I N A T I O N
13  BY MS. CANNELLA:
14     Q.   Okay.  Good morning, Mr. Crosby.  How are
15  you doing?
16     A.   Good morning.  I'm great.
17     Q.   Exponent is your employer, correct?
18     A.   That's correct.
19     Q.   And Exponent has 30 -- over 30 offices
20  worldwide?
21     A.   Yes.
22     Q.   And it has about a thousand consultants; is
23  that correct?
24     A.   That's my understanding, yes.
25     Q.   And Exponent's revenues are over half a

Page 7

1   billion dollars a year.
2         Do you agree with that?
3      A.   I -- I don't keep up on the exact revenues
4   of the company, but it is publicly traded, so that's
5   all knowledge that can be Google searched.
6      Q.   Okay.  I'm going to hand you what I've
7   previously marked as Plaintiffs' Exhibit 102.  I'll
8   give it to your lawyer first.
9         Oh, you know what, I gave you the wrong
10  thing, Rick.  Sorry.  Let me give you what I
11  previously marked as Plaintiffs' Exhibit 103.
12        MR. HILL:  Here you go.
13        (Marked for identification Exhibit 103.)
14  BY MS. CANNELLA:
15     Q.   Okay.  This is a printout of the Exponent
16  website.
17        Do you see that on the bottom lower corner
18  with the Exponent website address there?
19     A.   Yes.
20     Q.   Can you turn to page 4 with me.
21     A.   Yes.
22     Q.   And that first highlighted sentence there
23  says, "Total revenues increased to 4.6 percent to
24  $536.8 million for fiscal year 2023," correct?
25     A.   Yeah.

Page 8

1      Q.   Okay.  And Exponent is a public company, as
2   you mentioned, correct?
3      A.   That's correct.
4      Q.   And its shares are sold and traded on the
5   stock market?
6      A.   Yes.
7      Q.   So one of Exponent's goals is to deliver
8   growth and profits to its shareholders.
9         Do you agree?
10     A.   As any company, it's trying to make money,
11  so yeah.
12     Q.   Okay.  And Exponent CEO and president is
13  Dr. Catherine Corrigan, correct?
14     A.   Yes.
15     Q.   She's been testifying for the auto industry
16  for decades; you're aware of that, correct?
17        MR. HILL:  Object to the form.
18        Go ahead.
19        THE WITNESS:  Yes.
20  BY MS. CANNELLA:
21     Q.   And isn't it true Exponent was formally
22  called Failure Analysis Associates?
23     A.   Yes.
24     Q.   And do you agree that FAA's main clients
25  and Exponent's main clients have always been auto

Page 9

1   manufacturers?
2      A.   No.
3      Q.   Do you agree that Exponent's work for the
4   auto industry is one of its main sources of revenue?
5      A.   No.
6      Q.   Okay.  Can you turn with me to -- on
7   Plaintiffs' Exhibit 103, at page 5.  And that
8   highlighted sentence there says, "Growth during the
9   quarter and full year was driven by demand for
10  Exponent services across the transportation and
11  energy sectors."
12        Did I read that correctly?
13     A.   Yes.
14     Q.   Isn't it true that Ford paid Exponent over
15  $155 million in about 10 years?
16        MR. HILL:  Object to the form.
17        Go ahead.
18        THE WITNESS:  I don't know that answer, no.
19        MS. CANNELLA:  Okay.  I'm going to hand you
20  what I previously marked as Plaintiffs' Exhibit 105.
21        (Marked for identification Exhibit 105.)
22  BY MS. CANNELLA:
23     Q.   And these are verified interrogatory
24  responses.  If you could turn to page 3 of those.
25        You see that highlighted sentence there?

3 (Pages 6 - 9)

Charles Crosby , PE                           May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 10

1    A.   Yes.
2    Q.   And it says that Ford has paid Exponent
3  from, I believe it was 2006 to 2017, $155 million and
4  change; is that correct?
5    A.   No.
6        MR. HILL:  Object to the form.
7        Go ahead.
8  BY MS. CANNELLA:
9    Q.   Go ahead.
10    A.   The paper here says 1996 to 2017.
11    Q.   1996 to 2017 is $155 million and change,
12  correct?
13    A.   Yes.
14    Q.   And isn't it true Exponent has defended
15  corporations in all kinds of cases?
16        MR. HILL:  Object to the form.
17        THE WITNESS:  Yes.
18  BY MS. CANNELLA:
19    Q.   Exponent spoke for Exxon Valdez
20  regarding the -- strike that, sorry.
21        Exponent testified on behalf of Exxon
22  regarding the Valdez oil spill, correct?
23        MR. HILL:  Object to the form.
24        But go ahead.
25        THE WITNESS:  I don't know the -- the full

Page 11

1  history of every project and case that Exponent's
2  worked on over the years.
3        MS. CANNELLA:  Move to strike as
4  nonresponsive.
5    Q.   Did Exxon -- did -- did Exponent work for
6  Exxon in the Valdez oil spill case?
7    A.   So I'm not aware of every project that
8  Exponent's worked on over the years so I don't know
9  if they've testified on behalf of any particular
10  client or not, whether Exxon or anyone else.
11    Q.   And Exxon -- excuse me, sorry, Exponent has
12  testified on behalf of corporations in all kind of
13  pollution cases as well, correct?
14        MR. HILL:  Object to the form.
15        Go ahead.
16        THE WITNESS:  Again, I don't know of every
17  company that Exponent's ever worked for.  I'm not
18  involved in every single project that Exponent works
19  on, so I don't know which industries they've --
20  they've worked in.  I know we have consultants who
21  work across all sorts of different industries, could
22  easily have testified on pollution cases, energy
23  cases, so I'm sure there's documentation out there
24  that -- that would verify who Exponent has worked for
25  in the past.  I'm just not personally aware of every

Page 12

1  single client that Exponent has.
2  BY MS. CANNELLA:
3    Q.   Have you been told to answer a question
4  about specific cases that you don't know every single
5  case Exponent has ever worked on?
6    A.   No.
7    Q.   And Exponent has worked on the Deep Water
8  Horizon case denying that the disaster damaged coral
9  reefs, claiming the so-called natural oil seeps were
10  the cause of the damage to the reefs; isn't that
11  true?
12        MR. HILL:  Object to the form.
13        THE WITNESS:  Again, not really what I've
14  worked on in the past.  That's not my area of
15  expertise.  So I'm not aware of everything that
16  Exponent's ever worked on in the entire history of
17  the company.
18  BY MS. CANNELLA:
19    Q.   My question for you is about specifically
20  not every project that Exponent has worked on it's
21  about the Deep Water Horizon case.  Are you aware of
22  Exponent's position in that case that the Deep Water
23  Horizon did not cause damage to the coral reefs, and
24  instead, it was caused by natural oil seeps?
25        MR. HILL:  Object to the form.

Page 13

1        THE WITNESS:  No, I'm not aware of
2  Exponent's testimony in that case.
3  BY MS. CANNELLA:
4    Q.   Okay.  And are you aware that Exponent has
5  testified on behalf of cigarette manufacturers in
6  tobacco cases?
7        MR. HILL:  Same objection.
8        THE WITNESS:  Similar answer to before.  I
9  don't know the full history of the company and what
10  everyone else has testified about.
11  BY MS. CANNELLA:
12    Q.   Do you know the fact that Exponent has
13  worked on behalf of cigarette manufacturers to defend
14  them in tobacco cases?
15        Do you know that specific fact?
16        MR. HILL:  Object to the form.
17        Go ahead.
18        THE WITNESS:  I'm not aware of that --
19  those clients or those specific facts that they've
20  talked about.
21  BY MS. CANNELLA:
22    Q.   I'm not asking if you know the specific
23  facts they talked about, I'm asking if you knew that
24  Exponent had worked on behalf of cigarette
25  manufacturers in tobacco cases?

4 (Pages 10 - 13)

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 14

1          MR. HILL:  Same objection.
2          THE WITNESS:  I did not.
3     BY MS. CANNELLA:
4          Q.   Okay.  I'm going to -- let me ask you
5     first, do you know a gentleman named Mr. Croteau that
6     works at Exponent?
7          A.   Yes.
8          Q.   Okay.  And he's the head of their
9     automobile division; is that correct?
10         A.   He's the vehicle engineering practice
11    director, that's correct, pronounced "Croteau."
12         Q.   Croteau.  Thank you.
13              I'm going to hand you what I've marked as
14    Plaintiffs' Exhibit 104.
15         (Marked for identification Exhibit 104.)
16         MR. HILL:  Go ahead.  We didn't state this,
17    but obviously I reserve all objections regarding the
18    admissibility of these exhibits.  That goes without
19    saying, but I'll just put it on the record.
20    BY MS. CANNELLA:
21         Q.   Okay.  And if you would go to page 50,
22    please, at line 6.
23         A.   Okay.
24         Q.   Mr. Croteau testifies that Exponent has
25    defended lawsuits for tobacco companies; is that

Page 15

1     correct?
2          MR. HILL:  Object to the form.
3          Go ahead.
4          THE WITNESS:  Give me a moment to look
5     through it.
6          MS. CANNELLA:  Yes, sir.
7          THE WITNESS:  Okay.  I'm sorry, what was
8     your question?
9     BY MS. CANNELLA:
10         Q.   Mr. Croteau --
11         A.   Croteau.
12         Q.   -- Croteau testified that Exponent has
13    defended cigarette manufacturers in litigation,
14    correct?
15         MR. HILL:  Same objection.
16         THE WITNESS:  Yes, that was his testimony.
17    BY MS. CANNELLA:
18         Q.   All right.  Do you have any reason to
19    disagree with him?
20         A.   No.
21         Q.   And has Exponent worked to defend the
22    asbestos industry in litigation?
23         MR. HILL:  Object to the form.
24         THE WITNESS:  It appears so, yes.
25    BY MS. CANNELLA:

Page 16

1          Q.   And the chemical industry?
2          MR. HILL:  Same objection.
3          THE WITNESS:  Yes.
4     BY MS. CANNELLA:
5          Q.   And when European regulatory authorities
6     banned a pesticide because it was killing bees,
7     Exponent did studies claiming that it wasn't?
8          MR. HILL:  Same objection.
9     BY MS. CANNELLA:
10         Q.   Are you aware of that?
11         A.   I'm not.
12         Q.   Okay.  Exponent has defended the petroleum
13    industry as well, correct?
14         A.   Yes.
15         Q.   And Exponent has defended nearly every auto
16    manufacturer there is.
17              Do you agree with that?
18         MR. HILL:  Object to the form.
19         Go ahead.
20         THE WITNESS:  We have worked for them, yes.
21    BY MS. CANNELLA:
22         Q.   And General Motors, when it was accused of
23    making defective pickup trucks because the gas tank
24    was outside the frame rails, Exponent also defended
25    GM in those cases, correct?

Page 17

1          MR. HILL:  Object to the form.
2          THE WITNESS:  I believe we did some work in
3     those projects, yes.
4     BY MS. CANNELLA:
5          Q.   Okay.  And every rollover-prone vehicle
6     ever sold in this country has hired Exponent to
7     defend it as well, correct?
8          MR. HILL:  Object to the form.
9          THE WITNESS:  I can't say every single
10    company or every single rollover, but we've been
11    hired to reconstruct and work on numerous cases,
12    including rollover projects, yes.
13    BY MS. CANNELLA:
14         Q.   On behalf of auto manufacturers, correct?
15         A.   Yes.
16         MR. HILL:  Object to the form.
17         Go ahead.
18    BY MS. CANNELLA:
19         Q.   And Exponent has been hired by Toyota in
20    the unintended acceleration cases, correct?
21         MR. HILL:  Object to the form.
22         THE WITNESS:  Yes.
23    BY MS. CANNELLA:
24         Q.   And Exponent has been hired by GM to defend
25    it in the ignition switch cases, correct?

5 (Pages 14 - 17)

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 18

1      MR. HILL: Same objection.
2      THE WITNESS: Yes.
3   BY MS. CANNELLA:
4      Q.   And isn't it true that General Motors pled
5   guilty to criminal offenses in the ignition switch
6   case, but Exponent's testifiers defended the design
7   for General Motors in those cases?
8      MR. HILL: Object to the form.
9      Go ahead.
10      THE WITNESS: I don't know the specifics of
11   any of the outcomes for that project or what happened
12   in public in the criminal cases, so I can't answer
13   yes or no to that question.
14   BY MS. CANNELLA:
15      Q.   Are you aware that General Motors pled
16   guilty to a criminal offense in the ignition switch
17   cases?
18      MR. HILL: Same objection.
19      THE WITNESS: I was not.
20   BY MS. CANNELLA:
21      Q.   Isn't it true that Exponent handles over
22   6,000 cases a year?
23      MR. HILL: Object to the form.
24      Go ahead.
25      THE WITNESS: That would be my

Page 19

1   understanding, yes.
2   BY MS. CANNELLA:
3      Q.   And isn't it true that Exponent never
4   represents a plaintiff against one of the industries
5   it defends?
6      MR. HILL: Object to the form.
7      Go ahead.
8      THE WITNESS: We do quite a bit of
9   plaintiffs' work as well, so whether -- I don't know
10   exactly who the opposing entities are, but we do a
11   mixture of plaintiffs' work, defense work, insurance
12   work. So we get contacted by a lot of different
13   companies, a lot of different entities, a lot of
14   different parties to do work on their behalf.
15   BY MS. CANNELLA:
16      Q.   Well, isn't it true that Exponent has never
17   sent one of its witnesses to testify for an
18   individual against an auto manufacturer?
19      MR. HILL: Object to the form.
20      THE WITNESS: I don't know the full history
21   of the company, so I can't answer yes or no on that.
22   BY MS. CANNELLA:
23      Q.   Are you aware that in 1992, FAA, the former
24   Exponent, published an article for automakers
25   challenging the value of shoulder belts, seatbelts

Page 20

1   with shoulder belts, claiming they make no measurable
2   difference in reducing injuries or death?
3      MR. HILL: Object to the form.
4      Go ahead.
5      THE WITNESS: I'm not aware of that.
6      MS. CANNELLA: Okay. I'm going to show you
7   what I've marked as Plaintiffs' Exhibit 106.
8      THE WITNESS: I would have been 10 years
9   old in 1992.
10      (Marked for identification Exhibit 106.)
11   BY MS. CANNELLA:
12      Q.   If you can turn with me to page 16, please.
13   And if you'll look at the highlighted sentence with
14   me, it says, "In 1992, while helping defend a lawsuit
15   involving a catastrophic injury to a backseat
16   passenger, Failure Analysis engineers published a
17   paper challenging the value of shoulder belts,
18   claiming they appeared to make no, 'measurable
19   difference,' in reducing injuries and death."
20      Did I read that correctly?
21      A.   Yes.
22      MR. HILL: Object to the form.
23      But go ahead.
24   BY MS. CANNELLA:
25      Q.   And this is an article from Business

Page 21

1   Ethics, correct?
2      MR. HILL: Same objection.
3      Can I have a standing objection regarding
4   the form regarding all the questions relating to
5   these exhibits?
6      MS. CANNELLA: I'd like to fix them if
7   there's a form objection. I understand --
8      MR. HILL: I'll make the objection to each
9   question.
10   BY MS. CANNELLA:
11      Q.   Isn't it true that when General Motors C/K
12   pickup trucks were discovered to be prone to catching
13   on fire in crashes, Exponent produced a report that
14   found they were actually safer than trucks that
15   weren't susceptible to catching on fire?
16      MR. HILL: Object to the form.
17      THE WITNESS: I'm not aware of that --
18   those findings.
19   BY MS. CANNELLA:
20      Q.   Okay. Okay. If you can look at that same
21   page, page 16 of Plaintiffs' Exhibit 106. The
22   second -- second-to-last paragraph that starts "that
23   same year," if you look at that second sentence in
24   that paragraph, please. "Although hundreds of people
25   had survived crashes of the pickups only to be burned

Charles Crosby , PE                                      May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 22

1  to death in resulting fires, Failure Analysis
2  produced a report showing lower overall death rates
3  in crashes of the GM trucks than for competing Ford
4  and Dodge models. In fact, the fatality risk of the
5  GM trucks was somewhat higher than that of their
6  full-sized rival."
7           Did I read that correctly?
8           MR. HILL: Object to the form.
9           THE WITNESS: Yes.
10  BY MS. CANNELLA:
11    Q.   Okay. Gas tanks that are located -- or
12  excuse me, strike that.
13           Gas tanks are located inside frame rails so
14  that they're protected from crush in crashes; isn't
15  that right?
16           MR. HILL: Object to the form.
17           THE WITNESS: Not necessarily.
18  BY MS. CANNELLA:
19    Q.   That's how most designs in passenger cars
20  are, correct?
21           MR. HILL: Same objection.
22           THE WITNESS: I've seen all sorts of
23  different designs in working with vehicles over the
24  years.
25  BY MS. CANNELLA:

Page 23

1    Q.   You know that it's a bad idea to have a gas
2  tank outside the frame rails of a vehicle, correct?
3           MR. HILL: Same objection.
4           THE WITNESS: I'm not in gas tank design.
5  There's a lots of different reasons to place a gas
6  tank in different places in the vehicle. One of the
7  objectives for placing a gas tank would be to keep it
8  safe. I -- I'm sure there's many ways you can do
9  that.
10  BY MS. CANNELLA:
11    Q.   Does it surprise you that Exponent did a
12  study that found a truck with its gas tank outside
13  the frame rails to be safer than trucks with gas
14  tanks inside the frame rails?
15           MR. HILL: Same objection.
16           THE WITNESS: I wasn't involved in the
17  study, so I can't really comment on the results of
18  that.
19  BY MS. CANNELLA:
20    Q.   Are you aware that Exponent has helped auto
21  industry companies fight against federal regulations?
22           MR. HILL: Same objection.
23           THE WITNESS: I'm not aware of everything
24  again that Exponent does every -- every day, so I've
25  not been involved in working with the regulators, so

Page 24

1  I can't answer yes or no to that question.
2           MS. CANNELLA: Move to strike as
3  nonresponsive.
4    Q.   Are you aware that Exponent has helped the
5  auto industry fight against regulations for vehicle
6  stability?
7           MR. HILL: Same objection.
8           THE WITNESS: Again, similar answers. And
9  I would disagree with your word "fight." Exponent
10  consults quite a bit with car manufacturers who work
11  with regulators to come up with regulations that are
12  in the best interests of the public to keep everybody
13  safe. So the word "fight against" is probably not
14  the best word to use. We work together with
15  regulators and with car manufacturers to try and help
16  determine what's going to be the best for -- for
17  vehicle safety.
18  BY MS. CANNELLA:
19    Q.   So you are aware that Exponent has helped
20  the auto industry with regard to federal auto
21  regulations, correct?
22           MR. HILL: Same objection.
23           THE WITNESS: I know we had -- some people
24  in the company have projects where they work together
25  to do some of those things.

Page 25

1  BY MS. CANNELLA:
2    Q.   And Exponent, in addition to vehicle
3  manufacturers, fought against regulations for greater
4  roof strength for decades.
5           Are you aware of that?
6           MR. HILL: Object to the form.
7           THE WITNESS: Again, when you use the term
8  "fight against," I'm not aware that -- which side or
9  what position we took in any work that we've been
10  doing. Again, I know we work with vehicle
11  manufacturers. We help them to test vehicles and
12  they work with the government regulators to try and
13  determine what's going to be the best for the public
14  safety.
15  BY MS. CANNELLA:
16    Q.   Isn't it true that Exponent engineers
17  repeatedly claim that head and neck injuries to
18  occupants of vehicles with collapsed roofs were
19  caused by the occupants diving into the roof before
20  it crushed flat?
21           MR. HILL: Object to the form.
22           THE WITNESS: In some situations, that
23  would be true, yes.
24  BY MS. CANNELLA:
25    Q.   And if you look with me at Plaintiffs'

7 (Pages 22 - 25)

Charles Crosby , PE                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 26

1  Exhibit 106, do you know Brian O'Neill, the former
2  president of the Insurance Institute for Highway
3  Safety?
4      A.  I do not.
5      Q.  Are you aware of what the Insurance
6  Institute for Highway Safety is?
7      A.  My understanding is it's a testing company
8  that runs a lot of vehicle crash testing.
9      Q.  And it's run by the insurance company,
10  correct -- insurance industry?
11      MR. HILL:  Object to the form.
12      Go ahead.
13      THE WITNESS:  I actually don't know who
14  runs it.  It's in the name, but I don't know who owns
15  the company or who is in charge of the company.
16  BY MS. CANNELLA:
17      Q.  Are you aware that it's not beholden to the
18  auto industry or run by the auto industry?
19      A.  That's my understanding.
20      Q.  And Brian O'Neill, who was the president,
21  called the argument, according to this business
22  ethics article, "patently nonsense," correct?
23      MR. HILL:  Object to the form.
24      THE WITNESS:  Which page are you on?
25  BY MS. CANNELLA:

Page 27

1      Q.  20.
2      A.  I'm sorry, what was the -- what was the
3  question again?
4      Q.  The highlighted sentence there says, "Brian
5  O'Neill, former president of the Insurance Institute
6  for Highway Safety, called the argument patently
7  nonsense."
8      Did I read that correctly?
9      A.  Yes.
10      MR. HILL:  Object to the form.
11  BY MS. CANNELLA:
12      Q.  And that's under the title -- that's under
13  the section of the article called, "In defense of
14  weak roofs," correct?
15      MR. HILL:  Same objection.
16      THE WITNESS:  Yes.
17  BY MS. CANNELLA:
18      Q.  Do you know Allen C. Donaldson, a former
19  Exponent employee?
20      A.  I do not.
21      Q.  Are you aware he has said to the press that
22  because he worked for Exponent he could never accept
23  a case for a plaintiff?
24      MR. HILL:  Object to the form.
25      Go ahead.

Page 28

1      THE WITNESS:  I'm not aware of that.
2  BY MS. CANNELLA:
3      Q.  Are you aware that Mr. Croteau has
4  testified under oath at trial in the U.S. District
5  Court for the Eastern District of Missouri that he
6  would never take a case against a car company,
7  because "that would be a business conflict"?
8      MR. HILL:  Object to the form.
9      Go ahead.
10      THE WITNESS:  I'm not aware of that
11  testimony.
12  BY MS. CANNELLA:
13      Q.  Do you agree that Exponent could not take a
14  case against a car company because that would be a
15  business conflict?
16      MR. HILL:  Object to the form.
17      THE WITNESS:  A conflict could generally
18  arise in that case, yes.
19  BY MS. CANNELLA:
20      Q.  Have you ever heard of an Exponent employee
21  testifying against a car company?
22      MR. HILL:  Same objection.
23      THE WITNESS:  Not that I know of.
24  BY MS. CANNELLA:
25      Q.  Do you agree that you are not the person

Page 29

1  companies usually call to testify in litigation?
2      MR. HILL:  Object to the form.
3      Go ahead.
4      THE WITNESS:  No, I would not agree with
5  that.
6  BY MS. CANNELLA:
7      Q.  You read the report of Dr. Gwin in this
8  case, correct?
9      A.  No, I have not.
10      Q.  You received the report, correct?
11      A.  I have not.
12      Q.  And you received her deposition?
13      A.  I have not.
14      Q.  Okay.  Well, we can get into that later,
15  but Mrs. Gwin -- or, excuse me, strike that.
16      Dr. Gwin has testified 54 times in the last
17  year.  Is that consistent with the experts -- some of
18  the experts -- testifying experts that you work with
19  at Exponent?
20      MR. HILL:  Object to the form.
21      Go ahead.
22      THE WITNESS:  I would guess so, yeah.
23  BY MS. CANNELLA:
24      Q.  And you know Dr. Carhart, correct?
25      A.  I do.

8 (Pages 26 - 29)

Charles Crosby , PE                              May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 30

1    Q.   He's an Exponent employee that works on
2  automotive cases and testifies?
3    A.   Yes.
4    Q.    The last list I saw for him, he had over
5  140 cases in which he had testified in the course of
6  10 years.
7       Does that surprise you?
8       MR. HILL:  Object to the form.
9       THE WITNESS:  It does not.
10      MS. CANNELLA:  And Plaintiffs' Exhibit 107
11 is your testimony list that we received in this case.
12      (Marked for identification Exhibit 107.)
13 BY MS. CANNELLA:
14   Q.   In the last 10 years you've testified nine
15 times, correct?
16   A.   That's correct.
17   Q.    So in 10 years at Exponent you've testified
18 nine times, while in 10 years Dr. Carhart has
19 testified about 10 times that much, would you agree
20 with that statement?
21      MR. HILL:  Object to the form.
22      THE WITNESS:  Yes.
23      MS. CANNELLA:  I'm going to hand you what
24 I've marked as Plaintiffs' Exhibit 108.  That's your
25 report in this case that we received.

Page 31

1       (Marked for identification Exhibit 108.)
2  BY MS. CANNELLA:
3    Q.    And in this it says that your billing rate
4  is $335 an hour in 2024 and 310 hours [sic] in 2023;
5  is that correct?
6       MR. HILL:  Object to the form.
7       Go ahead.
8       THE WITNESS:  That's correct.
9  BY MS. CANNELLA:
10   Q.   And do you agree that your rate is
11 relatively low for an Exponent employee in the
12 automotive field?
13      MR. HILL:  Object to the form.
14      THE WITNESS:  It's probably about average.
15 BY MS. CANNELLA:
16   Q.   Dr. Carhart, does he testify about $310 an
17 hour?
18   A.   He does not.
19      MR. HILL:  Object to the form.
20      Go ahead.
21 BY MS. CANNELLA:
22   Q.   Is he closer to a thousand dollars an hour?
23      MR. HILL:  Same objection.
24      THE WITNESS:  I don't know what his bill
25 rate is.

Page 32

1  BY MS. CANNELLA:
2    Q.   It's quite significantly higher than yours,
3  correct?
4       MR. HILL:  Same objection.
5       THE WITNESS:  My understanding is it is
6  higher than mine, yes.
7  BY MS. CANNELLA:
8    Q.   You're not offering an opinion in this case
9  regarding whether or not the lift kit is defective;
10 is that right?
11   A.   That's correct.
12   Q.   You know a gentleman named Bob Lang at
13 Exponent, correct?
14   A.   I know the name, yes.
15   Q.   And he's a former General Motors employee,
16 are you aware of that?
17   A.   I believe so, yes.
18   Q.   And he works for Exponent now?
19   A.   Yes.
20   Q.   Would it be fair to characterize Mr. Lang
21 as the grandfather of automotive expert testifiers?
22      MR. HILL:  Object to the form.
23      Go ahead.
24      THE WITNESS:  I don't know that I could
25 characterize him as that.

Page 33

1  BY MS. CANNELLA:
2    Q.   He's been around since -- for decades,
3  would you agree with that?
4    A.   He's a lot older than I am.
5    Q.   Yes.  And he's been testifying for a long
6  time, correct?
7    A.   That would be my understanding, yeah.
8    Q.   Is he a mentor to you or has he trained you
9  at all?
10   A.   He has not.
11   Q.   He became a testifying expert after leaving
12 a career at General Motors, do you agree with that?
13      MR. HILL:  Object to the form.
14      But go ahead.
15      THE WITNESS:  I believe that's his
16 background, yes.
17 BY MS. CANNELLA:
18   Q.   And he has helped to defend numerous
19 General Motors products, do you agree?
20      MR. HILL:  Same objection.
21      THE WITNESS:  I don't know what his typical
22 project or workload is.
23 BY MS. CANNELLA:
24   Q.   Okay.  Are you aware that he helped defend
25 the C/K side saddle pickup trucks?

9 (Pages 30 - 33)

Charles Crosby , PE                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 34

1        MR. HILL: Same objection.
2        THE WITNESS: I am not.
3    BY MS. CANNELLA:
4        Q.   Are you aware that when he was at General
5    Motors, he worked on analyzing the voluntary
6    compatibility agreement?
7        MR. HILL: Same objection.
8        THE WITNESS: I'm not aware of that.
9    BY MS. CANNELLA:
10       Q.   And you know the voluntary compatibility
11   agreement is the agreement that major auto
12   manufacturers entered into to keep their bumpers
13   within a certain range in order to increase crash
14   compatibility --
15       MR. HILL: Object to the form.
16   BY MS. CANNELLA:
17       Q.   -- correct?
18       A.   I'm not familiar with that, no.
19       Q.   Okay. Are you aware that Mr. Lang
20   advocated to use a secondary energy absorption device
21   to make people like the Brysons safer in crashes?
22       MR. HILL: Object to the form.
23       THE WITNESS: I'm not aware of that.
24   BY MS. CANNELLA:
25       Q.   In your opinion, does Mr. Lang know what

Page 35

1    he's talking about when it comes to vehicle
2    compatibility?
3        MR. HILL: Same objection.
4        THE WITNESS: I would assume so.
5    BY MS. CANNELLA:
6        Q.   Are you aware that Mr. Lang has written a
7    paper finding evidence that the secondary energy
8    absorption structure, or the SEAS, is effective at
9    reducing crush and reducing occupant injuries?
10       MR. HILL: Object to the form.
11       THE WITNESS: I am not aware of that.
12       MS. CANNELLA: I'm going to hand you what
13   I've marked as Plaintiffs' Exhibit 109.
14       (Marked for identification Exhibit 109.)
15   BY MS. CANNELLA:
16       Q.   Can you turn to the first written text
17   page, if you flip that first page over.
18       A.   Yeah, give me one -- give me one moment.
19   You said page 1?
20       Q.   That first written page with the
21   highlighting on it.
22       Okay. Mr. Lang's paper says, "The addition
23   of" second -- "of a secondary structure to light
24   trucks and vans for the purpose of increasing
25   structural interaction is also investigated and is

Page 36

1    shown that the effectiveness in the studied cases is
2    to reduce the calculated intrusion in the smaller
3    vehicle."
4        Did I read that correctly?
5        MR. HILL: Object to the form.
6        Go ahead.
7        THE WITNESS: Yes.
8    BY MS. CANNELLA:
9        Q.   Do you agree that the secondary energy
10   absorption structure, the SEAS, is effective at
11   reducing crush in an occupant space?
12       MR. HILL: Object to form.
13       THE WITNESS: I haven't analyzed it, so I
14   couldn't answer that question.
15   BY MS. CANNELLA:
16       Q.   Did Exponent make any determination
17   regarding whether adding a lift kit increases the
18   danger to people in a crash?
19       MR. HILL: Object to the form.
20       THE WITNESS: I did not.
21   BY MS. CANNELLA:
22       Q.   Did Exponent?
23       MR. HILL: Same objection.
24       THE WITNESS: Not that I'm aware of.
25   BY MS. CANNELLA:

Page 37

1        Q.   Did Exponent suggest any way to make the
2    lift safer to Rough Country?
3        MR. HILL: Object to the form.
4        THE WITNESS: Not that I'm aware of.
5    BY MS. CANNELLA:
6        Q.   Did Rough Country ask Exponent to analyze
7    how to make the lift kit safer to avoid future
8    injuries?
9        MR. HILL: Object to form.
10       THE WITNESS: Not that I'm aware of.
11   BY MS. CANNELLA:
12       Q.   How many lawyer engineering conferences did
13   you attend?
14       A.   For this particular case?
15       Q.   Yes, sir.
16       A.   Two or three. It's probably reflected in
17   my invoices that we sent out with the timesheets.
18       Q.   And did you make any notes at any of those
19   lawyer engineering conferences?
20       A.   Any notes I would have made would have
21   likely been based on the parameters that we have for
22   the crash testing and all of those would have been
23   transcribed and included in my test report.
24       Q.   Did you do a presentation at the lawyer
25   engineering conference?

10 (Pages 34 - 37)

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 38

1    A.   I did not.
2    Q.   Did anyone else?
3    A.   Not that I remember.
4    Q.   Do Exponent employees communicate
5   internally via instant messaging?
6    A.   Yes.
7    Q.   Okay.  And they use chatting, Slack, Teams,
8   what kind of software do they use?
9    A.   We've had several across the years.  We
10  used, several years ago, a Cisco product.  I can't
11  remember what it was called.  We're currently using
12  Microsoft Teams.
13   Q.   Do you know an Exponent employee who does
14  IT, named Jim Dewell?
15   A.   The name sounds familiar.  Probably gets
16  e-mails from him.
17   Q.   Has he or anyone else ever told you about
18  an app called Greenshot?
19   A.   No.
20   Q.   Have you ever used it, Greenshot?
21   A.   No.
22   Q.   Have you ever told anyone to take
23  screenshots during a LEC, but not to save them to the
24  file?
25   A.   No.

Page 39

1    Q.   Have -- has anyone ever told you to do
2   that?
3    A.   No.
4    Q.   Have you ever done that?
5    A.   I've taken screenshots of presentations
6   before, and I keep them with my file material if I
7   do.
8    Q.   Okay.  And does that exist in this case?
9    A.   No.
10       MS. CANNELLA:  I'm going to show you
11  Plaintiffs' Exhibit 110.
12       (Marked for identification Exhibit 110.)
13  BY MS. CANNELLA:
14   Q.   Do you know a gentleman named Dr. Cades at
15  Exponent?
16   A.   I do.
17   Q.   And he works in the vehicle team?
18   A.   He's actually in our human factors
19  practice, so I believe his background is in human
20  psychology, interacting -- he does different stuff
21  than what I do.
22   Q.   So he does -- but he does like warnings for
23  cars and that kind of thing?
24   A.   I think part of his stuff he does look at
25  warnings and labels and -- and those things and how

Page 40

1   people interact with those.
2    Q.   Do you know an engineer named Dr. Shane
3   Davis?
4    A.   Yeah.  Why is that name familiar?  I
5   believe he worked at Exponent kind of right as I was
6   starting, maybe a decade ago.
7    Q.   All right.  Plaintiffs' Exhibit 110, I'll
8   represent to you, has been produced to us from
9   Exponent in a different case, and it's a string of
10  text messages or instant messages between Dr. Davis
11  and Dr. Cades.
12       Do you see that?
13   A.   Yes.
14   Q.   Okay.  If you can turn with me to the
15  second page.  In the highlighted area, Dr. Cades
16  says, this is in advance of a LEC, lawyer engineering
17  conference, "Also for this meeting you know how to
18  take screenshots and notes of the slides that others
19  present," Dr. Cade says, and there's some unrelated
20  discussion about Dr. Davis's computer and -- and
21  family.  And then Dr. Davis says, "I am prepared to
22  take notes during the meeting.  I will take
23  screenshots as well.  I usually use the print screen
24  key."  And then on the next page Dr. Cades says,
25  "There's an app that Jim told me about called

Page 41

1   Greenshot for screenshots that's really nice."
2       One moment.  Oh, if you'll back up with me
3   to page 3, please.  After Dr. Cades says, "For this
4   meeting you know how to take screenshots and notes of
5   the slides that others present."  He then says, "And
6   then e-mail those to Christian," in all caps, "do
7   not," end all caps, "save them in the project file."
8       Did I read that correctly?
9       MR. HILL:  Object to the form.
10      Go ahead.
11      THE WITNESS:  Which page are you on?
12  BY MS. CANNELLA:
13   Q.   I'm sorry, let me start again.
14      On Plaintiffs' Exhibit 110, this is an
15  exchange between Dr. Davis at Exponent and Dr. Cades
16  at Exponent and on page 2 with the highlighting --
17  highlighted messages Dr. Cades says, "Also for this
18  meeting you know how to take screenshots and notes of
19  the slides that others present."  And then on the
20  next page, "And then e-mail those to Christian," in
21  all caps, "do not," end caps, "save them in the
22  project file."
23      Did I read that correctly?
24      MR. HILL:  Object to the form.
25      THE WITNESS:  Yes.

11 (Pages 38 - 41)

Charles Crosby , PE                      May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 42

1   BY MS. CANNELLA:
2      Q.   Okay.  And then on the last page of
3   Plaintiffs' Exhibit 106 -- or 110, I'm sorry, the
4   second-to-last message Dr. Davis says, "Going to
5   clean up my notes and send to Christian this
6   evening," and Dr. Cades says, "Thanks, Shane,"
7   correct?
8      MR. HILL:  Object.
9   BY MS. CANNELLA:
10     Q.   Did I read that correctly?
11     MR. HILL:  Object to the form.
12     THE WITNESS:  Yes.
13  BY MS. CANNELLA:
14     Q.   Okay.  Did you ever hear anything about
15  this at Exponent --
16     MR. HILL:  Same objection.
17  BY MS. CANNELLA:
18     Q.   -- this incident?
19     MR. HILL:  You're talking about -- what
20  incident?
21     MS. CANNELLA:  This incident reflected in
22  Exhibit 110, where Dr. Cades at Exponent told
23  Dr. Davis at Exponent to take screenshots of a lawyer
24  engineering conference and do not save them to the
25  file.

Page 43

1      MR. HILL:  Object to the form.
2      THE WITNESS:  I did not hear about it, no.
3   BY MS. CANNELLA:
4      Q.   So did Exponent do a companywide training
5   for employees on not hiding evidence after this
6   happened in August of 2022?
7      MR. HILL:  Object to the form.
8      THE WITNESS:  No.
9   BY MS. CANNELLA:
10     Q.   Did Exponent send an e-mail to everyone and
11  tell them do not do anything like this?
12     MR. HILL:  Same objection.
13     THE WITNESS:  No.
14  BY MS. CANNELLA:
15     Q.   Is this kind of thing condoned at Exponent?
16     MR. HILL:  Object to the form.
17     THE WITNESS:  I personally don't do that,
18  so I can't speak for everyone else at Exponent.
19  BY MS. CANNELLA:
20     Q.   Do you agree that Exponent has run crash
21  tests with crash test dummies in them?
22     A.   Yes.
23     Q.   And do you agree that Exponent has run lots
24  of crash tests with crash test dummies in them?
25     MR. HILL:  Object to the form.

Page 44

1      THE WITNESS:  Yes.
2   BY MS. CANNELLA:
3      Q.   It's run thousands of crash tests with
4   crash test dummies in them.
5           Do you agree with that?
6      A.   Yes.
7      Q.   Does Exponent own crash test dummies or
8   ATDs, as they're called, or does it rent them?
9      A.   We own -- we own some of them and we rent
10  some of them, depending on the project.
11     Q.   Does Exponent own child dummies?
12     A.   We do.
13     Q.   Does Exponent own 5 percent female dummies?
14     A.   We do.
15     Q.   Have you run -- personally run crash tests
16  with dummies in them?
17     A.   I have.
18     Q.   Have you run crash tests with instrumented
19  dummies in them?
20     A.   Yes.
21     Q.   In the cars?  Okay.
22          And what do you do if the dummy is a number
23  of fewer pounds than the person in the crash?
24     A.   Depending on the parameters requested, we
25  can either lighten the dummy up or we can add ballast

Page 45

1   weight and make the dummy heavier.
2      Q.   And did anyone ask you to put dummies in
3   the Escape for the crash test you did in this case?
4      A.   They did not.
5      MS. CANNELLA:  Can you let Devin in the
6   wait -- or out of the waiting room.
7      THE VIDEOGRAPHER:  Oh, is he in there?
8      MS. CANNELLA:  Yeah.
9      THE VIDEOGRAPHER:  Can we go off the record
10  for a moment?  I don't know.  I don't have it on my
11  side.  Let me see.
12     MS. CANNELLA:  Okay.
13     THE VIDEOGRAPHER:  I didn't see it in
14  there.  I don't have it on my computer.  She's got
15  it.  Let's go off the record, if that's okay.
16     MS. CANNELLA:  Yeah, that's fine.
17     THE VIDEOGRAPHER:  Okay.  We're going off
18  the record.  The time is 9:49.
19          (Recessed from 9:49 a.m. until 9:52 a.m.)
20     THE VIDEOGRAPHER:  We're back on the
21  record.  The time is 9:52.
22  BY MS. CANNELLA:
23     Q.   Okay.  Mr. Crosby, Wesley Grimes and
24  Dr. Lisa Gwin have both testified in this case.  Are
25  you going to refute anything that they are going to

12 (Pages 42 - 45)

Charles Crosby , PE                                      May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 46

1  testify about?
2      A.  No.
3          MR. HILL:  Object to the form.
4      But go ahead.
5          THE WITNESS:  No.
6          MS. CANNELLA:  I'm going to hand you what
7  I've marked as Plaintiffs' Exhibit 111, and I'll just
8  tell you now, this is a document I created, so keep
9  that in mind.
10         MR. HILL:  It's 111?
11         MS. CANNELLA:  Yes, sir.  And I do have an
12 extra one of that.
13         (Marked for identification Exhibit 111.)
14 BY MS. CANNELLA:
15     Q.  Okay.  This is a picture of the crash test
16 Escape, the rear of it.  And then I've taken the Ford
17 front of the F250 from the crash test and inverted it
18 for a mirror image.
19         Do you see that, above it?
20     A.  Yes.
21     Q.  Okay.  And what I want to ask you about is
22 whether you see the Ford cursive on -- from the F250
23 right above the Escape label.  Can you see that
24 there?  There's a -- it's the D and it's a loop,
25 there's a loop there.  And then the D, stem of the D

Page 47

1  and right before that there's the loop of the R.
2          Do you recognize that?
3          MR. HILL:  Object to the form.
4      But go ahead.
5          THE WITNESS:  I do.
6  BY MS. CANNELLA:
7      Q.  Okay.  Did anyone ask you to look at this
8  evidence after the Grimes deposition?
9          MR. HILL:  Object to the form.  What is
10 "this evidence"?
11 BY MS. CANNELLA:
12     Q.  Did anyone ask you to look at evidence of
13 the Ford emblem on the back of the Escape after
14 Wesley Grimes was deposed?
15     A.  Not specifically.
16     Q.  Okay.  How about generally?
17     A.  After -- I believe it was after his
18 deposition, Wes called me up, had a couple of
19 questions about the crash testing, one of which was
20 the general alignment for the Ford -- or they're both
21 Fords -- for the F250 into the back of the Escape.
22     Q.  Okay.  And what was his question?
23     A.  He was just asking what -- what ended up
24 being the actual crash test alignment.
25     Q.  And what did you tell him?

Page 48

1      A.  I told him I would have to go look at it,
2  and get back to him.  I went out and took a look at
3  the crash test vehicles, and it appeared to me that
4  the alignment was generally about what we lined up,
5  it could have shifted maybe an inch or two, from what
6  we had initially set up.
7      Q.  Okay.  And you initially set up what
8  alignment?
9      A.  If you look at my test report there's a
10 diagram in the test report, I'm going to take a look
11 at it so I can get you the right number here.  In my
12 test report I've got 10.9 inches of offset.
13     Q.  And how many inches of offset did you have
14 in reality?
15     A.  I haven't measured it exactly, but just
16 some quick estimations looks like maybe closer to
17 12 inches.
18     Q.  And how did you make that estimation?
19     A.  If you look at this Ford emblem where it
20 shows up here, in fact, on this picture that you've
21 got and you kind of line up that D with the Ford
22 Escape, and you make some estimates of where the
23 center line of the vehicle is, relative to where the
24 Escape emblem is and then relative to where the Ford
25 emblem imprinted on that, you can measure

Page 49

1  approximately an inch or two more than that 10.9
2  inches, which puts you right at 12, 12 1/2 inches or
3  so.
4      Q.  Okay.  And did you do this with, like, a
5  measuring tape or with computer analysis or eyeball
6  it, how did you figure this out?
7      A.  I went out there and took a quick tape
8  measure and just did some quick estimates on
9  approximately where things were.
10     Q.  Okay.  If you wanted to drill down to
11 specifics, what would you do?
12     A.  I'd have to look at -- probably look at
13 some scan data, either pre-test scan data, post-test
14 scan data or get some models of some vehicles and
15 really figure out exactly where this is, and line up
16 the Ford emblem with that and then see what that
17 overall alignment would be.
18     Q.  But you have not done that yet, correct?
19     A.  I have not done that, no.
20     Q.  Are you going to do that?
21     A.  I'm not planning on it, no.
22     Q.  Okay.  The -- strike that, I'm sorry.
23         Would you characterize the crash test that
24 you did as an override crash?
25     A.  Looking at the video there appeared to be

13 (Pages 46 - 49)

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 50

1    some override components of the crash test that we
2    ended up running, yes.
3        Q.   Okay.  So would you -- would you call it an
4    override?
5        A.   Yes.
6        Q.   Okay.  And why?
7        A.   When you look at the rear structure of the
8    Escape and the front structure of the Ford and you
9    watch the crash test video, it looks like the bumper
10   of the F250 -- sorry, I keep using "Ford," when
11   they're both Fords -- the front bumper of the F250
12   went above the rear bumper of the Ford Escape.
13       Q.   So they were lined up before the crash and
14   they overlapped, correct?
15       A.   I don't know the exact height of the
16   bumper, I've got some photographs of that vertical
17   alignment.
18       Q.   Okay.
19       A.   Sitting here I don't remember exactly what
20   they were.
21       Q.   Yes, you can take a look at your
22   photographs to answer the question, and the question
23   is before the crash the bumpers overlapped each
24   other?
25       A.   I'm looking at picture 263 from my test

Page 51

1    report and it looks like there are portions of the
2    two bumpers that align and there are also portions of
3    the F250 bumper that are above the bumper structure
4    of the Escape.
5        Q.   So it's your testimony that Ford
6    manufactured the F250 and the Escape and these were
7    run as factory production vehicles, correct, just as
8    Ford made them?
9        A.   That's correct.
10       Q.   So Ford manufactured these two vehicles
11   that in a crash with each other the F250 would
12   override the Escape, correct?
13       A.   In this particular set of circumstances,
14   portions of the F250 bumper overrode the bumper of
15   the Escape.
16       Q.   Did Exponent tell Ford that the F250 is
17   overriding the Ford Escape?
18           MR. HILL:  Object to the form.
19           Go ahead.
20           THE WITNESS:  I did not.
21   BY MS. CANNELLA:
22       Q.   Okay.  How many crash testing sites does
23   Exponent have?
24       A.   For vehicle crash testing?
25       Q.   Yes, sir.

Page 52

1        A.   Our Phoenix office is where our vehicle
2    crash testing happens.
3        Q.   All of them?
4        A.   Yes.
5        Q.   And does Exponent have sled test sites?
6        A.   Yes.
7        Q.   And where are those?
8        A.   Also in Phoenix.
9        Q.   All of them?
10       A.   We just have the one.
11       Q.   Okay.  Does Exponent do what's called
12   static testing of automotive parts, like seat
13   stability or roof crush testing?
14       A.   Yes.
15       Q.   And do those happen at Phoenix as well?
16       A.   Yes.
17       Q.   How many crash tests does Exponent run in a
18   year?
19       A.   That's a great question.  I would estimate
20   we run well over 100 crash tests in a year.
21       Q.   And how many crash tests are you involved
22   in in a year?
23       A.   I'm probably involved in 25 to 50 percent
24   of those.
25       Q.   How far down the line did planning for the

Page 53

1    second crash test go?
2           MR. HILL:  Object to the form.
3           THE WITNESS:  So the second crash test,
4    those vehicles were prepped in the exact same manner
5    as the first one.  So as far as how far down the line
6    we got in that prep, we were following the same
7    blueprint as the first ones.  We were ready to swap
8    out any instrumentation and our tow equipment and
9    everything else that was on the first set of
10   vehicles.
11   BY MS. CANNELLA:
12       Q.   Okay.  So all the instrumentation you see
13   in the vehicles and the crash test in your report,
14   that was done to all the -- to the other two vehicles
15   that were purchased but not crashed?
16       A.   The mounts for that instrumentation was
17   installed.
18       Q.   And the -- Mr. Grimes testified that larger
19   tires were purchased for the F250 that would be
20   used -- could only be used with a lift.
21           Are you aware of those tires and wheels
22   being purchased?
23       A.   Yes.
24       Q.   And were those going to be put on the
25   second F250?

14 (Pages 50 - 53)

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 54

1    A.  Not that I know of.
2    Q.  All right.  And so what was the second
3    crash test going to consist of?
4    A.  My understanding with the discussions we
5    had with everyone was the second crash test was going
6    to be identical to the first, in case we had any
7    issues with the first one.
8    Q.  Okay.  So no parameters were going to
9    change in the second crash test?
10   A.  Not that I'm aware of.
11   Q.  And how often do you buy a second set of
12   vehicles for a crash test in case the first set
13   doesn't -- something goes wrong in the first crash
14   test?
15   A.  It's -- we do that occasionally.  It
16   typically depends on the project and timing and
17   deadlines.
18   Q.  Okay.  Was there some deadline in this case
19   that was a concern?
20   A.  I don't remember if there was a deadline.
21   I was just told that we had a very small window to
22   run the tests in, and if I recall last year our test
23   facility was incredibly busy, and so if we needed to
24   run a second test we MAY have been two, three,
25   four months out to get a second test scheduled.

Page 55

1    Q.  So the day that the first crash -- well,
2    strike that.
3        This crash test was run May 15th, 2023?
4    A.  That's correct.
5    Q.  And so the second set of crash test
6    vehicles were prepped to run the second crash test on
7    the same day, if needed?
8    A.  It would have been May 16th.
9    Q.  Okay.  The next day?
10   A.  Yeah.
11   Q.  Okay.  And does it take the whole day to
12   run the crash test, in other words, can Exponent only
13   run -- run one crash test per day?
14   A.  It depends on the parameters, so for
15   instance, this crash test we ran it just before
16   lunchtime, if we had everything ready to go
17   completely on the other set of vehicles, we could
18   have run the second test that day.  We hadn't planned
19   on doing that, we were going to have to swap the
20   instrumentation and the ballasts and everything over,
21   and that would have taken us most of the afternoon.
22   And so we had planned on if we needed to run the
23   second test if something went wrong on the first one,
24   we could have run it the second day, the May 16th.
25   Q.  And so does the client have to pay for both

Page 56

1    days in that instance where you don't need the second
2    day, but you're reserving it?
3    A.  So we don't charge per day, we just charge
4    per test.  So if we had run the second test, we would
5    have charged for the second test.  In this case we
6    did not, so we didn't charge the full amount for the
7    second test.
8    Q.  How much would the second test have been?
9    A.  I believe it's in the invoices there.
10   There's a line item for both the tests -- both tests
11   to -- to be executed.
12       MS. CANNELLA:  And I'll hand you what I
13   marked as Plaintiffs' Exhibit Number 123, which is
14   your invoices.
15       (Marked for identification Exhibit 123.)
16   BY MS. CANNELLA:
17   Q.  If you can take a look and see if you see
18   that answer in there, that would be helpful.
19   A.  Yes, we have the first crash test cost for
20   the test was $68,000.  And if we did end up running
21   an additional test, the second test would have cost
22   $58,000.
23   Q.  So $10,000 less, is that just because of
24   economies of scale?
25   A.  Yeah, certain things would have already

Page 57

1    been set up for the first test, and so they don't
2    need to pay for it a second time, it's already set
3    up.
4    Q.  Okay.  Was there any discussion about
5    running a second crash test with a lifted F250?
6    A.  Not that I remember.
7    Q.  If you were going to help design a crash
8    test that determined how much intrusion is
9    attributable only to the lift kit, how would you
10   design that crash test or set of crash tests?
11   A.  Well, it depends on the data that I've
12   already got presented to me.  So in this case, we had
13   an, essentially, a crash, with a lifted F250, which
14   was the subject crash, and so that information's
15   already known, and so we wanted -- if you were -- if
16   I was designing a test series, I would want to try
17   and figure out what are my unknowns.  And so in this
18   particular case the unknown would be, okay, we know
19   what the -- what the values are, what the information
20   is for a lifted truck, what are the values for a
21   non-lifted truck.
22   Q.  Uh-huh.  And so, in your opinion, the only
23   difference between the two crashes being one is the
24   subject crash and one is the crash test, it's just
25   the lift or no lift, correct?

15 (Pages 54 - 57)

Charles Crosby , PE                              May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 58

1  A.  That's my understanding.
2  Q.  Okay.  So your -- your opinion the cargo
3  doesn't make a difference that was in the subject
4  crash?  Are you aware of the cargo?
5  A.  There was discussions about the cargo when
6  we had our -- our -- our phone conferences, and the
7  information that was given to me that -- was that we
8  weren't going to run with the cargo in there, because
9  of the unknowns of the cargo.
10  Q.  Okay.  So let me just make sure I
11  understand correctly, because I'm -- I'm looking for
12  an answer on how you isolate just what is the lift
13  responsible, how does the lift change the crush
14  profile.  So in order to isolate all the variables
15  except for the lift, how do you design a set of tests
16  for that answer?
17  A.  Right.  So in that case, we would want to
18  do as much as we could to duplicate the vehicles.
19  Sometimes it's not 100 percent possible to duplicate
20  every single aspect, and so when we're working
21  just -- if I'm -- if I'm answering generally how you
22  would run a test or set something up, you want to
23  duplicate everything as much as you can.  Not
24  everything is -- you're not able to duplicate
25  everything perfectly in the real world, and so you

Page 59

1  have to determine what's going to be significant
2  factors, what's not significant factors, what's going
3  to make -- what's going to actually make a difference
4  and what's not necessarily going to make a
5  difference.  And then the things that you duplicate
6  are the things that you know are absolutely going to
7  make a difference.  And if you can't duplicate
8  something, then you have to decide is that really
9  absolutely necessary or is it really going to change
10  the potential outcome at all.  And then you work
11  basically specifics by specifics and go through and
12  figure out what you need to duplicate and what you
13  don't.
14  Q.  So was that analysis done for the cargo,
15  the analysis of whether it's going to make a
16  difference?  Do you know?
17  A.  So in this particular case, that -- those
18  decisions were left up to Mr. Grimes and Dr. Gwin.
19  Q.  Okay.  So you don't have an opinion whether
20  the cargo is going to make a difference?
21  A.  I do not.
22  Q.  Okay.  If you ran a crash test just like
23  the one that you guys ran --
24  A.  Uh-huh.
25  Q.  -- but put a lift on the F250 that was

Page 60

1  prepped and ready to go with the wheels that were
2  purchased for use with the lift, and then you ran the
3  exact same crash test, would you be able to isolate
4  how much of the deformation is due to the lift?
5  MR. HILL:  Object to the form.
6  But go ahead.
7  THE WITNESS:  So your question is if we run
8  one with the lift and then one without the lift --
9  BY MS. CANNELLA:
10  Q.  Yes.
11  A.  -- to isolate that?
12  Well -- so, in this particular case we
13  essentially have a crash test with the lift on it
14  already.  It's the subject crash.
15  Q.  But it has the cargo, right?
16  A.  It does have the cargo.
17  Q.  So if you just wanted to isolate the effect
18  of the lift, could you run the same crash test that
19  you actually ran, but put the lift and the wheels
20  that were purchased for use with the lift, and then
21  do the same thing.  And then you would get just a
22  straight comparison of crush, correct?
23  MR. HILL:  Same objection.
24  But go ahead.
25  THE WITNESS:  Well, so -- so that -- adding

Page 61

1  the lift, it all depends on whether the cargo is
2  deemed to really change anything or not.
3  BY MS. CANNELLA:
4  Q.  Yeah.
5  A.  And that was something that I believe
6  Mr. Grimes looked at --
7  Q.  Did you decide --
8  A.  -- or maybe Dr. Gwin.
9  Q.  Did either Mr. Grimes or Dr. Gwin decide
10  whether the cargo would be a significant factor?
11  A.  You'd have to ask them.  I believe
12  the -- the consensus was it would not affect the
13  deformation significantly, which is why they
14  requested that I not run any cargo in the rear.
15  Q.  And did they talk to you about the reason
16  for not putting crash test dummies in the vehicle?
17  A.  There was discussion about crash test
18  dummies, and at the end of the day the request was to
19  run without crash test dummies.
20  Q.  Do you know why that was the decision?
21  A.  I don't.
22  Q.  And in your experience doing all these
23  crash tests, if you put a dummy in the front seat,
24  the front seat's designed to yield backwards in a
25  rear impact, correct?

16 (Pages 58 - 61)

Charles Crosby , PE                                          May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 62

1    MR. HILL: Object to the form.
2    But go ahead.
3    THE WITNESS: Yes, in a high-speed rear
4  impact like this, usually we see some -- some
5  deformation of the rear seat.
6  BY MS. CANNELLA:
7    Q.   And in your experience, the bigger the
8  dummy, the more deformation, correct?
9    A.   Typically.
10   Q.   Okay.  And so would you expect the front
11  seat to have behaved differently if there had been a
12  crash test dummy in the driver's seat?
13   MR. HILL: Object to the form.
14   Go ahead.
15   THE WITNESS: We could have gotten
16  different results on the -- the front seats.
17  BY MS. CANNELLA:
18   Q.   Okay.  What experts do you usually work
19  with when you're designing crash tests?
20   A.   I get calls from lots of different firms.
21  Sometimes it's other Exponent employees who are
22  working on projects and going to be testifying and
23  want to run a crash test to determine some parameters
24  or -- or trying to figure out an answer to a
25  question.  I've worked with lots of law firms and

Page 63

1  experts outside of Exponent as well.  It's a pretty
2  large number.
3    Q.   Let me reframe my question, then.
4    How about inside of Exponent, who are the
5  experts that you work with the most?
6    A.   The most?  It's a pretty good mix.  I've
7  worked with Dr. Carhart.  I've worked with
8  Mr. Croteau.  I've worked with -- see who else gives
9  me a call.  I've worked with Dr. Rapp van Roden.  Now
10  you're putting me on the spot to try and remember all
11  the names now.  There's a significant -- because the
12  Phoenix office is where we do all of our testing, we
13  get calls from all of our other offices when they
14  want to do large testing.  And so I get calls from a
15  lot of different experts.
16   Q.   Let's see, were there any conversations
17  about whether to install a car seat in the second row
18  of the Escape for your crash test?
19   A.   There -- there could have been.  Trying to
20  remember all the discussions from our -- from our
21  phone calls.  There may have been some discussion
22  around car seat, it would have been similar
23  discussion as with the dummies.  Ultimately the
24  parameter that they -- that Dr. Gwin and Mr. Grimes
25  gave me was to run without an ATD and run without a

Page 64

1  car seat in it.
2    Q.   The $68,000 estimate or I guess you would
3  call it a budget for the crash test --
4    A.   Uh-huh.
5    Q.   -- did that include your time or is your
6  time billed separately?
7    A.   No, that -- that includes my time.
8    Q.   Did you go over that budget at all and have
9  to charge additional hourlies?
10   A.   No.  So -- and, sorry, just to be clear, so
11  that's -- that -- that budget, that $68,000 is for
12  the actual crash test activity.  So when I'm putting
13  the report together, taking the photographs, getting
14  the vehicle set up, that's included in that.  Any --
15  any consulting time or any discussion of parameters
16  is outside of that.  So that assumes I've got all the
17  parameters and I'm just going to execute that test
18  with parameters ABC.  If we're discussing what those
19  parameters are, that's additional time that gets
20  billed on top of it.
21   Q.   Does Exponent have like a form people fill
22  out for parameters so that you know what they are?
23   A.   No.
24   Q.   Just -- how do you get that information?
25   A.   So through -- through our phone calls we

Page 65

1  discuss the parameters.  They're given to me.  I pass
2  that to my team, usually verbally, we're -- we've got
3  the vehicles, I tell them, hey, this is -- I can
4  point to the vehicle, this is where I want the
5  instrumentation.  This is where I want the ballast
6  weights to be.  And we get that set up, and then all
7  of that gets documented in the test report.  So we
8  have all those parameters that we can look back on.
9    Q.   So you get the parameters verbally and then
10  you transmit them verbally to the crash test team?
11   A.   Yes.  And I -- and I -- I do take notes of
12  what those parameters are, and then I transcribe my
13  notes into my test report.  So essentially my test
14  report is my set of notes for those parameters.
15   Q.   Okay.  There's no transcription separate
16  from the report?
17   A.   No.
18   Q.   And so you speak them -- I'm sorry, can you
19  repeat that process again?
20   A.   Sorry, I -- yeah, I jot them -- I jot them
21  down when I have my test parameters, so for instance
22  this 10.9-inch offset, you know, I make a note of
23  10.9-inch offset and then when I -- when I put my
24  report together, that 10.9-inch note goes right in
25  here, and that's essentially my notes now is my test

17 (Pages 62 - 65)

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 66

1  report.
2      Q.   And then what happens to the handwritten
3  notes?
4      A.   I don't keep those, because everything's in
5  my test report.
6      Q.   So you just toss those?
7      A.   Yeah, I don't keep them.
8      Q.   Okay.  Have you ever done offset crash
9  testing before?
10     A.   Yes.
11     Q.   Have you ever done any testing for IIHS?
12     A.   Directly for them?
13     Q.   Yes, sir.
14     A.   No.
15     Q.   Have you ever done any development testing
16  for auto manufacturers, in other words, testing that
17  they use to develop their designs?
18     A.   Not that I'm aware of.
19     Q.   Okay.  Is the testing that you do for
20  automakers all related to litigation?
21     A.   Most of it, but not all of it.
22     Q.   Okay.  What -- what testing have you done
23  for automakers that's not related to litigation?
24     A.   We've done some investigatory work that are
25  not necessarily tied to litigation.

Page 67

1      Q.   Like what?
2      A.   I'm trying to remember what the work
3  actually was.  But I knew it wasn't tied to
4  litigation, it was just they had some questions about
5  something, I -- I can't remember off the top of my
6  head.
7      Q.   Okay.  Not much of that, then, it sounds
8  like?
9      A.   It's not a majority of our work, no.
10     Q.   Okay.  And is it related to potential
11  problems with the car that they're trying to figure
12  out?
13     A.   Again, I don't remember.  I don't know if
14  it was a problem or if they were trying to figure out
15  a better way that it -- if something was interfering
16  with something else, I don't remember.
17     Q.   All right.  When you do an offset crash
18  test, do you follow a methodology?  There's a -- do
19  you follow a test procedure that's standard?
20     A.   As far as any standards we do, we
21  follow -- so the SAE, which stands for Society of
22  Automotive Engineers, they publish a lot of standards
23  and recommended practices, and the one that we follow
24  for our vehicle crash testing is SAE Standard J211,
25  and that's a best practices for -- for running crash

Page 68

1  tests.
2      Q.   Did you bring a copy of that with you
3  today?
4      A.   I did not.
5      Q.   Do you have access to a copy?
6      A.   It's publicly available on the SAE website,
7  so yes, I do have access to -- to get that.
8      Q.   Okay.  And it wasn't included in your
9  report or mentioned in your report, correct?
10     A.   It was not.
11     Q.   Is there a reason for that?
12     A.   That's just a standard practice that we run
13  most of our crash testing to.
14     Q.   Does it address offset?
15     A.   It does not.
16     Q.   Does it address camera positioning?
17     A.   It has some best practices for, I don't
18  believe exact camera positioning, but just some
19  camera speeds, depending on the test, it makes
20  recommendations such as if it's a high-speed test you
21  want to run your cameras at a higher frame rate,
22  lower speed tests you may run at a lower frame rate,
23  fairly basic stuff like that.
24     Q.   Does it address how to ballast vehicles?
25     A.   It does not.

Page 69

1      Q.   So what does it address?
2      A.   Like I said, it addresses some of the
3  general camera specifications.  It addresses data
4  collection and data filtering and data processing.
5  I'm sure it addresses some other things that I can't
6  remember off the top of my head right now.
7      Q.   Are there any other standards that you use
8  for crash testing?
9      A.   For crash testing in general?
10     Q.   Uh-huh.
11     A.   Again, it depends on the crash test.  We
12  have run crash tests to standards.  So if you want to
13  run an actual NHTSA crash test or an IIHS crash test,
14  there are printed protocols that we would print up
15  and follow for that particular test.  In this case,
16  this is not a standard test, it's not matching any
17  government testing that's out there.  We're matching,
18  from my understanding from what Mr. Grimes and
19  Dr. Gwin gave me, we're matching the subject vehicle
20  parameters.
21     Q.   Okay.  The NHTSA and IIHS protocols, did
22  those exist for offset crash tests as well?
23     A.   There are offset crash tests that are
24  prescribed by both NHTSA and IIHS.
25     Q.   Okay.  And how many inches of offset in

18 (Pages 66 - 69)

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 70

1    those -- in the NHTSA crash test -- offset crash
2    tests?
3         A.   I don't remember off the top of my head.
4         Q.   How about IIHS?
5         A.   IIHS has two different offset tests that
6    are frontal offsets.  I don't know if their rear
7    impact is an offset test.  I'd have to go and look at
8    their -- their testing protocols to see if they have
9    a rear impact offset test.
10        Q.   Well, wouldn't a rear impact be a frontal
11   impact for the car hitting the -- I mean --
12        A.   Correct.
13        Q.   -- it's rear in one car, but frontal to the
14   other?
15        A.   Correct.
16        Q.   Okay.
17        A.   But their -- their frontal tests are not
18   into vehicles, they're into barriers.
19        Q.   Ah, okay.
20        A.   So in this case it would be relevant
21   potentially for the F250, but a frontal offset would
22   not be relevant for the Ford Escape.
23        Q.   So for the offset amounts in those crash
24   tests, do you know if it's a specific number or a
25   range?

Page 71

1         A.   Those -- those are typically a percentage
2    and so it's not a specific number, because it's a
3    percentage of the width of the vehicle.  So a vehicle
4    that's 60 inches wide, for example, I -- I -- if it's
5    a 50 percent offset, and it's a 60-inch wide vehicle,
6    then you're going to offset at 30 inches.  If it's an
7    80-inch-wide vehicle and you offset it 50 percent,
8    it's going to be a 40-inch offset, so those offsets
9    are typically given by percentage not by a specific
10   number.
11        Q.   And under those test protocols, how -- how
12   do they ensure that they've hit the offset mark?
13        A.   It depends on the protocol.  There
14   are -- in one of the protocols they actually put a,
15   for lack of a better term, a marker pin on the front
16   of the vehicle that they have set up pointing at a
17   target and the target gives you a window that that
18   marker pin has to be in in order for that to be
19   considered a successful test.
20        Q.   And did you do that with your crash test?
21        A.   We did not.
22        Q.   And why not?
23        A.   It -- one, it's not following that specific
24   protocol, and so that reference window would not
25   necessarily mean anything in this particular case.

Page 72

1         Q.   Any other reason?
2         A.   I wasn't requested to -- to verify it in
3    that particular way.
4         Q.   Were you requested to verify it in any way?
5         A.   After the test, we looked at the vehicle,
6    generally, and -- and the offset appeared to be
7    correct.  So it was a visual inspection post test.
8    Mr. Grimes and Dr. Gwin both looked at it and
9    basically said that's what they expected with the
10   offset that they had given me.
11        Q.   Do you know of any standardized offset
12   crash procedure that allows the people doing the
13   crash test to visually determine without any kind of
14   measurements whether the offset hit its goal?
15        A.   So the one method I discussed where you
16   kind of have that marker pin on the front, it -- when
17   it hits the -- I'm trying to remember if it hits a
18   barrier or if it's hitting another vehicle, but the
19   marker pin makes a mark, and so then you can visually
20   see where that mark was made and where your offset
21   actually ended up.
22        Q.   I guess -- I guess I didn't ask the
23   question right.  But my question is whether there's
24   any test procedure that allows the people performing
25   the procedure to essentially eyeball it without a

Page 73

1    physical visual mark or forensic piece of evidence or
2    a measurement?
3              MR. HILL:  Object to the form.
4              But go ahead.
5              THE WITNESS:  Yeah, so that -- that
6    marker's only in the one protocol that I can
7    remember.  So there's other protocols that don't have
8    that marker that you would just visually look at to
9    make sure that you've got your alignment correct that
10   you hit the target the way you needed to.
11   BY MS. CANNELLA:
12        Q.   Okay.  Which protocols are those?
13        A.   I don't know off the top of my head, but, I
14   mean, a lot of the frontal impacts are into barriers
15   where you're looking at the damage to the vehicle to
16   see if your alignment was correct.
17        Q.   And there's no measurement to make sure
18   that the alignment was correct?
19        A.   Not that I recall in the protocols
20   themselves, where it says you have to measure this
21   specific distance or these points or something to
22   verify that your -- your alignment was correct.
23        Q.   As you're sitting here today, can you tell
24   me any of those that you're talking about?
25        A.   I'm -- I'm trying to think to some of the

19 (Pages 70 - 73)

Charles Crosby , PE                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 74

1    IIHS protocols that I've run.  It's been a while
2    since I've run one of those, so I don't know all the
3    details of any of those protocols, but some of the
4    IIHS offset tests have just a visual marker where you
5    just look at it and see if it impacted in that area.
6        Q.   Okay.  But those -- let's set those
7    aside --
8        A.   Okay.
9        Q.   -- because that has, like, a piece of
10   forensic evidence that you can use to confirm whether
11   you hit your mark.  So what I'm looking for is what
12   was done in this case.  In other words, no forensic
13   piece of evidence, just a couple of experts looking
14   at it and saying that looks about right?
15        MR. HILL:  Object to the form.
16        Go ahead.
17        THE WITNESS:  So I guess I don't quite
18   understand what you mean by "forensic evidence."
19   BY MS. CANNELLA:
20        Q.   Well, the match point between the marker,
21   the piece of metal you're talking about and what it
22   hits, that gives you forensic evidence you can
23   look at --
24        A.   Correct.
25        Q.   -- right?

Page 75

1        So what I'm looking for is whether there is
2    any test procedure that is just take a look at it and
3    see if it looks right for the offset?
4        MR. HILL:  Object to the form.
5        But go ahead.
6        THE WITNESS:  So -- so in this case we do
7    have forensic evidence that lines up.  I mean, you
8    showed me in Plaintiffs' Exhibit --
9    BY MS. CANNELLA:
10        Q.   I'm not talking about --
11        MR. HILL:  Let him finish.  He needs to
12   finish.
13   BY MS. CANNELLA:
14        Q.   You're answering a different question,
15   so --
16        MR. HILL:  I don't think he is.  Let him
17   answer the question.
18   BY MS. CANNELLA:
19        Q.   -- a test procedure -- just a test
20   procedure, like, NHTSA, IIHS, SAE, like, whatever
21   kind of organization that has a procedure that we can
22   go look at and say, you know, after you're done with
23   your offset, in order to make sure that you hit your
24   mark, just look at it so there's no point, match
25   point requirement, there's no measurement

Page 76

1    requirement, there's nothing like that.
2        Do you know of any test procedure like
3    that?
4        MR. HILL:  Object to the form.
5        THE WITNESS:  So that's what I was
6    answering before.  So we talked about the pointer,
7    and I'm not talking about that pointer, there is, in
8    some of the offset tests, there is just a piece of --
9    you've got your pre-test measurement with your
10   offset, and then you look at the -- the vehicle post
11   test and you can see where the damage pattern starts.
12   And if it's where you've got that offset mark at,
13   then you're within your -- your test parameters, and
14   you've offset the vehicle the correct amount.
15   BY MS. CANNELLA:
16        Q.   So what I'd like to do is be able to go
17   look at those procedures so that we can see.
18        A.   Uh-huh.
19        Q.   What are they?
20        A.   I would look at the IIHS offset frontal
21   tests.
22        Q.   Okay.  Any others?
23        A.   You can look at the -- probably the NHTSA
24   or NCAP frontal tests to see -- I don't believe there
25   is any procedure or protocol in there that has a

Page 77

1    specific measurement like you have to go and put a
2    tape measure on it to make sure your offset's the
3    correct way, it would just be a post-test visual.
4        Q.   Okay.  All right.  And do you know the name
5    of those tests, like for NHTSA, FMVSS number, number,
6    number?
7        A.   Yeah, so your FMVSS tests, you can run
8    several of those with a single crash test, so you can
9    go and look at your 35-mile-an-hour frontal barrier
10   NCAP test, trying to think of what other NHTSA
11   testing you could go and look at.  Maybe some of the
12   side impact testing that NHTSA runs.
13        Q.   Is that offset?
14        A.   Those are full overlap, but they are
15   crabbed, meaning that the -- the vehicle coming in is
16   actually coming in at an angle.
17        Q.   Okay.  I'm looking for offset ones, though.
18        A.   Okay.
19        Q.   Any offset ones?
20        A.   I can't remember any more.
21        Q.   Okay.  That's a fine answer.  I'm just
22   trying to make sure.
23        THE REPORTER:  Is this a good time for a
24   restroom break?
25        MS. CANNELLA:  Yes, ma'am.

20 (Pages 74 - 77)

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 78

1        MR. HILL: Yeah, we've been going an hour
2    and a half, I was going to suggest that too.
3        THE VIDEOGRAPHER: We're going off the
4    record. The time is 10:31.
5        (Recessed from 10:31 a.m. until 10:40 a.m.)
6        THE VIDEOGRAPHER: We're back on the
7    record. The time is 10:40.
8    BY MS. CANNELLA:
9        Q. All right. I got kind of a lot of boring
10   stuff to go through, so bear with me.
11       You've never had experience working for
12   automotive manufacturers, correct?
13       A. In -- actually in the industry, so working
14   for a, like, they were my employer?
15       Q. I'll rephrase. You've never been an
16   employee of an automotive manufacturer, correct?
17       A. Correct.
18       Q. And you've never been an employee of a
19   component manufacturer?
20       A. Correct.
21       Q. You've never designed a suspension,
22   correct?
23       A. Correct.
24       Q. You've never created specifications for
25   suspensions?

Page 79

1        A. No.
2        Q. Have you ever created specifications for
3    lift kits?
4        A. No.
5        Q. Have you ever been hired by an automotive
6    component manufacturer to run testing as part of that
7    manufacturer's development process?
8        A. Not that I'm aware of.
9        Q. Have you ever been hired by a safety
10   organization?
11       MR. HILL: Object to the form.
12       But go ahead.
13       THE WITNESS: Not that I'm aware of.
14   BY MS. CANNELLA:
15       Q. Did any other Exponent testifiers work on
16   this case?
17       A. Not that I'm aware of, no.
18       Q. Nobody that does defect testimony?
19       A. No.
20       Q. And nobody who does biomechanic testimony?
21       A. No.
22       Q. Do you agree that your report does not
23   contain opinions?
24       A. To the extent of I don't have any opinions
25   about reconstruction or biomechanics or anything like

Page 80

1    that, I would agree with that.
2        Q. Do you agree that your report only contains
3    the facts of the crash test but no expert opinions?
4        MR. HILL: Object to the form.
5        But go ahead.
6        THE WITNESS: Well, it has my test report,
7    I would say that my report contains my opinions that
8    I ran the crash test to the parameters that I was
9    given. To that extent I would say yes, it does have
10   some opinions in it. But beyond that scope, I would
11   say no.
12   BY MS. CANNELLA:
13       Q. Okay. Are you drawing any conclusions
14   based on the testing done on this case?
15       A. No.
16       Q. Have you drawn any conclusions otherwise in
17   this case?
18       A. As to specifically to the crash test or to
19   something else?
20       Q. Just in general, anything that's not
21   covered in the crash test materials here, have you
22   drawn any conclusions?
23       A. Other than that the crash test was run
24   appropriate to the parameters I was given. Outside
25   of that, I don't.

Page 81

1        Q. Do you hold any opinions in the case that's
2    not covered in the report?
3        A. No.
4        Q. Is there any other work you're planning on
5    doing in the case?
6        A. Not at this time.
7        Q. Have you written a report for federal court
8    before?
9        A. Yes.
10       Q. And you're familiar with the fact that the
11   report has to contain a complete statement of all
12   opinions the witness will express and the basis and
13   reasons for them?
14       A. Yes.
15       Q. And does your report contain that?
16       A. Yes.
17       Q. And, in addition, under the federal rules,
18   the report has to contain the facts or data
19   considered by the witness informing his opinions.
20       Does your report contain those?
21       A. Yes.
22       Q. Any others that are not in the report?
23       A. Not that I'm aware of.
24       Q. And, in addition, the federal rule requires
25   that your report contain any exhibits that will be

21 (Pages 78 - 81)

Charles Crosby , PE                                            May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 82

1   used to summarize or support your opinions.
2          Does your report contain those items?
3      A.  Yes.
4      Q.  Are there any other of those items that you
5   intend to add?
6      A.  Not that I'm aware of.
7      Q.  Okay.  And your report also has to contain
8   your qualifications, including a list of all
9   publications authored in the previous 10 years.
10         Does your report contain that?
11     A.  Yes.
12     Q.  Is anything missing?
13     A.  No.
14     Q.  Your report's supposed to contain --
15     A.  Sorry.
16     Q.  Sorry, go ahead.
17     A.  To the extent of I did just have a new
18   paper published just last month, and so that may not
19   be included in that list.  Sorry, I apologize.
20     Q.  That's okay.  That's why I ask, because
21   it's hard to think of stuff otherwise.  But is
22   the --
23     A.  In fact, my testimony list doesn't have a
24   deposition that I just gave last week as well, now
25   that I'm thinking about it.

Page 83

1      Q.  Okay.  And what is the article that you
2   just got published?
3      A.  It's a really long title, so I'd have to go
4   back and look it up, but it was a -- general gist of
5   it was some sled testing we were doing with airbag
6   deployments and looking at the efficacy of airbag
7   deployments in different Delta-v speeds.
8      Q.  Okay.  And what did you find?
9      A.  The findings for that paper were it really
10  was dependent on the speeds as to whether the airbag
11  was truly effective or not in preventing injury.  And
12  it was looking at kind of twofold, does the airbag
13  help prevent injury and/or does the airbag itself
14  cause injury.  And so the results were the airbag is
15  helpful at preventing injury in higher speed stuff,
16  it may not be helpful in preventing injury in lower
17  speed, but it did not cause additional injury in
18  lower speed incidents.
19     Q.  Okay.  And did somebody hire you to do that
20  paper or was that just something you did on your own?
21     A.  That was -- that was something that myself,
22  a couple of colleagues, we did on our own as part of
23  some ongoing safety research.
24     Q.  Does Exponent pay you to do that or
25  somebody else or did you just do it on your own?

Page 84

1      A.  We do it as part of our employment, so
2   Exponent doesn't directly pay me to do it, but I can
3   do it during work hours, and so as part of my general
4   work duties, I am getting paid to -- to
5   be at Exponent.
6      Q.  All right.  And then the other testimony
7   that you gave, what case was that or do you remember
8   the name of it?
9      A.  The case is Alailefaleula -- I apologize, I
10  am not going to be able to spell that -- I'm going to
11  have to go look that up to do that, but it was
12  Alailefaleula v. FCA.
13     Q.  And FCA is Chrysler, correct?
14     A.  Correct.
15     Q.  And were you on the side of Alailefaleula
16  or FCA?
17     A.  I was running some crash testing for FCA.
18     Q.  And what is the issue in that case?
19     A.  That case, my understanding is a -- I
20  believe it's a fire case.  Again, I don't know all
21  the details of the subject incident itself.  I was
22  contacted in that case to run some crash testing.
23  They provided me with the parameters they -- they
24  wanted to run.
25     Q.  What's the vehicle?

Page 85

1      A.  So the vehicles I was crash testing was a
2   Lexus into the rear of a Ford Explorer.
3      Q.  And what did you find in your crash tests?
4      A.  In that particular case, the Ford Explorer
5   fuel tank was filled with Stoddard, which is a
6   solution that is similar to gasoline, but just less
7   flammable, so that we don't cause a fire.  And we
8   were testing whether the tank, in an incredibly
9   high-speed rear impact, would potentially rupture and
10  spill fluid.
11     Q.  And did the tank rupture in that crash
12  test?
13     A.  It did.
14     Q.  Do you know who the plaintiff's lawyer in
15  that case was?
16     A.  I don't.
17     Q.  And do you know where it's pending?
18     A.  I believe that one is in Las Vegas.
19     Q.  Do you know who the defense lawyers are in
20  the case?
21     A.  The defense lawyers were lawyers for the
22  firm Klein Thomas.
23     Q.  Thomas Klein?
24     A.  Thomas Klein.  Well, but I wasn't working
25  with Mr. Klein directly.  I was working with -- oh,

22 (Pages 82 - 85)

Charles Crosby , PE                                      May 14, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 86

1    what was his name -- Derek Swanson.
2        Q.   Okay.  All right.  Anything else that you
3    can think of as far as depositions or trial testimony
4    or other articles?
5        A.   No, those would be the -- those would be
6    the updates.
7        Q.   Okay.  And then your report must also
8    contain a statement of the compensation to be paid
9    for the study and testimony in the case, and I know
10   you've got your fee, your hourly fee in your report,
11   and then would the invoices that were provided today
12   constitute a full disclosure of the compensation to
13   be paid in the case?
14       A.   Yes.
15       Q.   Okay.  Excuse me.
16           All right.  The testing in the case was May
17   15th, 2023, and your report was finished about a year
18   later, March 29th, 2024, what happened in between
19   those days, anything?
20       A.   No.
21       Q.   Okay.  Did you just wait to sign and
22   complete the report for when it was needed?
23       A.   Correct.  Yes.
24       Q.   Okay.  And does your report contain all the
25   factual details of the May 15th, 2023, testing,

Page 87

1    including the testing setup and testing results?
2        A.   Yes.
3        Q.   Does it contain all measurements you took?
4        A.   Yes.
5        Q.   Does it contain all the parameters of the
6    test?
7        A.   Yes.
8        Q.   And does it include all the details of the
9    test setup?
10       A.   Yes.
11           MS. CANNELLA:  I want to show you what I've
12   marked as Plaintiffs' Exhibit 119.  Oh, wait -- yes,
13   119 -- which is an excerpt of the disclosures in the
14   case, disclosing your testimony.
15           (Marked for identification Exhibit 119.)
16   BY MS. CANNELLA:
17       Q.   If you will turn to -- turn one page to the
18   section with your name on it.
19       A.   Okay.
20       Q.   Have you seen this before, this disclosure?
21       A.   I have not.
22       Q.   Okay.  It says, the first sentence under
23   your name, that you're a professional engineer and an
24   expert in the fields of accident reconstruction and
25   vehicle crash analysis.  You're an expert in the

Page 88

1    evaluation of vehicle simulation and accident
2    reconstruction computer software.
3            Did you do any evaluation of vehicle
4    simulation or computerized accident reconstruction in
5    this case?
6        A.   In this case, no.
7        Q.   Did Rough Country ask you to do any vehicle
8    simulation or computerized accident reconstruction in
9    the case?
10       A.   They did not.
11       Q.   And it says that "You're expected to
12   testify as to the parameters, measurements, and
13   results of the crash" -- I assume that's the crash
14   test -- "as documented in your extensive crash report
15   attached hereto."
16           And we've already said that there's no
17   other parameters, measurements, or results besides
18   what's in your report, correct?
19       A.   Correct.
20       Q.   Okay.  The next thing it says is that you
21   will testify as to the specific details of the
22   vehicles involved in the exemplar crash testing.  The
23   details regarding procedure and parameters for the
24   test.  His recordings of the test and his photographs
25   and recordings of the exemplar vehicles following the

Page 89

1    test.
2            Can you tell me what you're going to
3    testify about regarding the specific details of the
4    vehicles?
5        A.   So I will be going through my test report.
6    The vehicle details are contained in the test report,
7    so that's what I would be talking about and going
8    through.
9        Q.   Okay.  So that captures -- the test report
10   captures all the things that that sentence refers to?
11       A.   Yes.
12       Q.   All right.  On the -- I'm going to get back
13   to the recordings and the photographs, but let me ask
14   you this first, just for the record, you didn't do an
15   inspection of the subject vehicles in this case,
16   correct?
17       A.   I did not.
18       Q.   And you didn't review any of the document
19   productions in the case?
20       A.   No.
21       Q.   In the correspondence there's some
22   documents that were transmitted to you as far as
23   depositions and Ford documents and that kind of
24   thing, you didn't review those?
25       A.   No.

23 (Pages 86 - 89)

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 90

1    Q.   So you're not relying on them, obviously?
2    A.   No.
3    Q.   Okay.  Do you know why they were sent to
4    you?
5    A.   I was probably included on an e-mail list,
6    but that's just a guess.
7    Q.   Okay.  That's fine if you don't know, I was
8    just wondering.
9         All right.  Okay.  So let's talk about the
10   crash test.  Do you agree that you relied on
11   Mr. Grimes for the vehicle selection as far as what
12   parameters you needed the vehicles to meet?
13   A.   Yes.
14   Q.   And what did he tell you?
15   A.   I was told to get a 2008 Ford Escape, a
16   2016 Ford F250.  I have a document that his
17   associate, Ann Grimes, sent over to me that gave, I
18   think the subject vehicle VIN numbers.  And so we
19   used that to kind of look up parameters of the
20   vehicles to match those as best we can.  And then as
21   we find vehicles to purchase, we will make sure that
22   those parameters match.
23   Q.   Did the parameters include whether the
24   vehicles should have sunroofs or not?
25   A.   The sunroof was a request, but not a

Page 91

1    requirement.
2    Q.   For which vehicle?
3    A.   For the Ford Escape.
4    Q.   Okay.  And the other Escape that Exponent
5    purchased did have a sunroof, correct?
6    A.   That's correct.
7    Q.   And why wasn't that Escape used in the
8    crash test?
9    A.   I think that Escape was the second one that
10   we purchased, so we started prepping the first one.
11   The first Escape that we started prepping is the one
12   we used for the first test.
13        MS. CANNELLA:  Okay.  I'm going to hand you
14   what I've marked as Plaintiffs' Exhibit 122, which is
15   the vehicle purchase orders for the vehicles that
16   Exponent purchased for the case.
17        (Marked for identification Exhibit 122.)
18   BY MS. CANNELLA:
19   Q.   The first two invoices here are the
20   vehicles that were used, as far as I can tell.  The
21   VINs match the VIN numbers in your report, you're
22   welcome to confirm, I'm sure that's right.
23   A.   Yeah, I'd have to double-check.  Yeah, the
24   first two -- the first two pages here are the F250
25   and the Escape that were used in the test.

Page 92

1    Q.   Okay.  And what was the date that the
2    Escape used in the test was purchased?
3    A.   The Escape?
4    Q.   Yes, sir.
5    A.   It was 4/11.
6    Q.   Okay.  And what was the date of the other
7    Escape purchased?
8    A.   It would have been 4/13.
9    Q.   So it's your testimony that Exponent used
10   the Escape without the sunroof, even though it had an
11   Escape with a sunroof, because it bought the Escape
12   without the sun roof two days earlier?
13   A.   Correct.
14   Q.   Okay.  You also testified earlier that
15   Exponent prepared both sets of vehicles for the crash
16   test, correct?
17   A.   Yes.
18   Q.   Okay.  So if both sets of vehicles were
19   prepared for the crash test, which didn't take place
20   until a month after these vehicles were purchased,
21   why didn't Exponent use the Escape with the sunroof?
22   A.   We prepped both.  We could have used either
23   for the -- the test.  We had prepped the first
24   vehicle further along, so it had the actual
25   instrumentation and the ballast in it and it was just

Page 93

1    further along in its preparation.
2    Q.   So you got the vehicle in -- the Escape in
3    on April 10th and you had it completely prepped by
4    April 13th?
5    A.   Not completely, no.
6    Q.   Well, how far along were you in the prep?
7    A.   I don't remember.
8    Q.   Okay.  But it's your testimony that that's
9    why the sunroof vehicle, which is the same kind of
10   vehicle that the Brysons were in wasn't used because
11   it was bought two days later?
12   A.   That's correct.
13   Q.   Okay.  Are you aware that roof structures
14   on vehicles with sunroofs can be different than those
15   without sunroofs?
16   A.   Yes.
17   Q.   Do you agree that sometimes additional roof
18   bows are added to vehicles with sunroofs?
19   A.   Yes.
20   Q.   Do you agree that the roof rails can be
21   strengthened?
22   A.   Typically I don't see roof rails changed
23   just by adding a sunroof.
24   Q.   How about the pillars, A, B, or C pillars
25   or D?

24 (Pages 90 - 93)

Charles Crosby , PE                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 94

1    A.   Typically don't see any changes in those
2  pillars just with the addition of a sunroof.
3    Q.   What did you do to ensure the structures of
4  the vehicles in the crash test were the same as the
5  structures of the vehicles in the Brysons' crash?
6    A.   So in this particular case, the first
7  vehicle that -- the vehicle that we actually tested
8  showed up with a trailer hitch on it.  And the Bryson
9  vehicle, my understanding was it didn't have one on
10 it, at least that we were requested to remove the
11 trailer hitch, and so we did.
12   Q.   Okay.  How about the roof structure, what
13 did you do to make sure that the roof structure on
14 the test vehicle was the same as the Brysons' roof
15 structure on their Escape?
16   A.   So the rear area of the roof structure is,
17 to my understanding, identical in both vehicles.
18   Q.   How do you have that understanding?
19   A.   Probably a conversation with Mr. Grimes.
20 He would have -- I'm sure I would have asked the
21 question and it may not have been something that was
22 concerning to him since the sunroof's towards the
23 front of the vehicle, and this test that we're
24 running is an impact to the rear of the vehicle.
25   Q.   Okay.  So you personally didn't do anything

Page 95

1  to make sure that the roof structures were the same,
2  is that fair, you were relying on Mr. Grimes?
3    A.   Yes.
4         MR. HILL:  Object to the form.
5         But go ahead.
6         THE WITNESS:  Yes.
7  BY MS. CANNELLA:
8    Q.   Okay.  The -- the -- did the F250, the
9  crashed F250 have a sunroof?  I'm sorry, the crash
10 test F250.
11   A.   I don't remember off the top of my head.
12 Would you like me to go through the test report?
13   Q.   Go for it.  Yes, sir.
14   A.   The F250 -- the crash test F250 does have a
15 sunroof.
16   Q.   Okay.  And do you know whether the F250 in
17 our case had a sunroof?
18   A.   I do not remember off the top of my head,
19 no.
20   Q.   And same question for the F250, was
21 anything done to make sure that the structure of the
22 F250 in the crash vehicle was the same as the
23 structure in the F250 in the wreck -- in the subject
24 wreck?
25   A.   Other than matching VIN numbers, making

Page 96

1  sure we had the same specifications on that, I didn't
2  specifically look at the structures themselves.
3    Q.   Okay.  All right.  Do you agree that the
4  purpose of taking photographs before the crash test
5  is to show the state of the vehicle before the test?
6    A.   Yes.
7    Q.   And you're trying to document the condition
8  it was in when the crash was run?
9    A.   To the best we can, yes.
10   Q.   Is there a way to account for the striking
11 vehicle breaking in the actual crash when you're
12 running a crash test?
13   A.   Sorry, I don't quite understand the
14 question there.
15   Q.   Well, when you run a crash test, if you're
16 simulating a real-life crash and there was braking in
17 the real-life crash, is there a way to recreate that
18 braking in the crash test?
19   A.   Yes.
20   Q.   How do you do that?
21   A.   We can do it a number of different ways.
22 Occasionally we will use activate the brakes on
23 a vehicle so that the brakes themselves are working
24 prior to impact.  More often than not, though, we
25 will make suspension adjustments to adjust bumper

Page 97

1  heights, based on what -- how much braking there may
2  or may not be.
3    Q.   Okay.  So for the -- for the first one, can
4  you explain how that works?
5    A.   For the first one, sorry?
6    Q.   You said you could either actually activate
7  the brake or you could adjust the height of the
8  bumper, so how does activating the brake work?
9    A.   We would install a remote system that we
10 have that would actually activate the braking system
11 on the vehicle.
12   Q.   And how accurate is that down -- is it
13 accurate down to a millisecond or what?
14   A.   As to when it activates or how it
15 activates?
16   Q.   Yeah.
17   A.   I'm sorry, I don't quite understand.
18   Q.   For example, in this case we had braking in
19 the last second-ish of the wreck.
20   A.   Okay.
21   Q.   So would you be able to activate it to a
22 second accuracy or is it harder to get it that close
23 to the specific?
24        MR. HILL:  Object to the form.
25        But go ahead.

25 (Pages 94 - 97)

Charles Crosby , PE                                            May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 98

1      THE WITNESS: So when we're -- when we're
2  manually activating the brake like that, it is a
3  little more difficult because you have a lot of
4  physics that go into that calculation. So you have
5  to start the braking at a very precise point, but
6  everything's a little bit different. If you don't
7  know the absolute exact amount of braking that got
8  put in then you are just kind of estimating, so for
9  instance, just because you have a second of braking
10  was that a second of soft braking, was that a second
11  of fairly aggressive braking, or is that a second of
12  absolute emergency panic braking? And those are
13  three very different parameters that completely
14  change how you would input that.
15  BY MS. CANNELLA:
16      Q.  How would you normally figure out the
17  answer to that question?
18      A.  Well, typically, like I said, normally we
19  don't do that because of the amount of parameters
20  that have to go in that and the amount of knowledge
21  you have to have about something beforehand. So
22  typically it's done, if we're adjusting for braking,
23  we go with the second method, which is adjusting the
24  bumper heights.
25      Q.  Okay. And how do you know how much to

Page 99

1  adjust the bumper heights?
2      A.  We can be given a number. You can do
3  testing that measures the bumper height during
4  braking, and you can record that number.
5      Q.  Was that done in this case?
6      A.  It was not.
7      Q.  And why not?
8      A.  I was not asked to do it.
9      Q.  Okay. Is there a way to account for the
10  driver having her foot on the brake pedal in the
11  Escape? So in our case, the driver had her foot on
12  the brake pedal at the stoplight, and then the wreck
13  happened, how do you recreate that condition in a
14  crash test?
15      A.  In general --
16      Q.  Uh-huh.
17      A.  -- or for a specific -- for a specific
18  case?
19      Q.  In this case.
20      A.  In this case, because it's a rear impact,
21  generally, even if your foot is on the brake, an
22  occupant is going to move rearward in the vehicle and
23  their feet tend to leave the pedals, whether that's
24  the brake pedal or the accelerator. So typically for
25  rear impacts, even if someone was on the brakes and

Page 100

1  stopped, we typically don't lock the brakes up,
2  because it is highly likely that they are going to
3  come off the brake as part of the impact sequence.
4      Q.  So do you just leave it in neutral or how
5  do you hold it still?
6      A.  We -- we leave it in neutral, and it's
7  allowed to roll freely on its own.
8      Q.  So how do you hold it in place before the
9  crash begins?
10      A.  So our -- our crash test site is very
11  level, as long as we don't lean on the vehicle or do
12  anything, we can park it and it's not going to roll
13  anywhere. Generally, while we're working around the
14  vehicle, we'll have the -- either the emergency brake
15  or the parking brake engaged so that we don't
16  accidentally bump it and move it, and then we'll
17  disengage those brakes right before we run the tests
18  so that everybody's clear, everybody's done working
19  in the vehicle, we'll release the brakes, and it will
20  stay stationary until the impact.
21      Q.  So if I were to look at another Exponent
22  test with photos documenting the condition of the
23  vehicle before the crash test, it would also show
24  struck vehicle in neutral with the E-brake on,
25  correct?

Page 101

1      A.  You mean like any other Exponent crash
2  testing?
3      Q.  Uh-huh.
4      A.  If the parameters call for it to be in
5  neutral then yeah it would be in neutral. We do run
6  cases of vehicles in park. We'll put it in drive.
7  It all depends on the parameters we are testing for
8  that particular case.
9      Q.  The Escape in this crash test had the
10  emergency brake on, correct?
11      A.  During the impact it did not.
12      Q.  Okay. And so the pictures show it with the
13  emergency brake on, correct?
14      A.  Correct.
15      Q.  Why was it photographed with the emergency
16  brake on?
17      A.  Because, again, to take those photographs,
18  you've kind of got to get inside and around the
19  vehicle, and so like I said we leave the parking
20  brake or emergency brake on, whatever you would like
21  to call it, and so that as we're working inside the
22  vehicle or around the vehicle, setting up the
23  cameras, setting up the instrumentation, we don't
24  accidentally bump it and move the vehicle away from
25  where we set it up.

26 (Pages 98 - 101)

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 102

1    Q.   Do you take a photograph after you release
2    the E-brake to confirm that it was released?
3       A.   I do not.
4       Q.   Why not?
5       A.   Because that would require me being inside
6    the vehicle.  Once we release the parking brake, we
7    want to have as minimal interaction with the vehicle
8    as we can.
9       Q.   Well, you have to get in to release it,
10   right?
11      A.   Depends on where it's at, but yeah, so
12   we've got to get in to release it and that's the last
13   thing we do and close it up.  The longer -- the
14   longer you linger around in there and move around and
15   try and do stuff, the more likely it is you might
16   move the vehicle away from where you want it to
17   impact.
18      Q.   So it's your testimony, then, that you
19   can't, just before you shut the door, take a picture
20   to confirm that the E-brake was released?
21      A.   I could have taken that picture, yes, but I
22   did not in this case.
23      Q.   Let's see -- all right.  You have compared
24   the amount of crash in one crash versus another as
25   part of your work in other cases, correct?

Page 103

1       A.   In other cases, yes.
2       Q.   And how do you do that?
3       A.   Several different methods.  Sometimes
4    it's -- it depends on all the information that I
5    have.  Best way to go is either scan data or really
6    detailed photographs, so that I can compare crush
7    from one vehicle to another vehicle.  You can bring
8    that into our computer software so that we can
9    measure that crush and make those comparisons.
10           Sometimes, depending on how many
11   photographs or the information we have, sometimes
12   it's just a visual -- excuse me -- a visual
13   comparison.  It all just depends on the amount of
14   information that's given.
15      Q.   Okay.  How about in this case, where
16   there's scan data of both sets of crash vehicles, how
17   would you compare the scan data to obtain the
18   measurement?
19      A.   How would I do it?
20      Q.   Yes, sir.
21      A.   You could take the scan data and do what's
22   called overlaying, so find common points, and then
23   compare the damage from one set of scans to the
24   other.
25      Q.   Do you use predetermined slices on the car?

Page 104

1    For example, what I'm trying to get at here, and my
2    question's not going to be artful, but is there a
3    methodology that says, okay, 25 percent in the car,
4    take a measurement, 50 percent through the width take
5    a measurement, 75 and then 100, take a measurement,
6    are those predetermined spots or are you as an
7    engineer just choosing spots to compare?
8       A.   It -- it kind of depends.  There are some
9    papers out there that give a methodology on measuring
10   crush, and the methodology isn't this is the only way
11   to do it or the best way to do it, it's just here's a
12   way to get consistent results.  But, ultimately, it's
13   up to the engineer trying to determine the best way
14   to quantify the crush that you're looking at, because
15   every -- every crash is different, every crush
16   structure is going to be different, so you can't
17   necessarily set a single set of parameters or a
18   single methodology for every case that's going to
19   work, so it just depends on what it looks like.
20      Q.   Do you have one that you default to and
21   then if that doesn't -- if that doesn't seem
22   appropriate use a different one?
23      A.   No.  Not necessarily, no.
24      Q.   So some of these software programs
25   have -- have a built-in methodology for comparing

Page 105

1    crash measurements, correct?
2       A.   Which softwares are you talking about?  Are
3    you --
4       Q.   My understanding was that with the scan
5    data you could do the overlay that you talked
6    about --
7       A.   Uh-huh.
8       Q.   -- and then the software will say, okay,
9    we're going to take this many measurements
10   equidistant from each other and that's just part of
11   the software default?
12      A.   The software I use doesn't do that.
13      Q.   Okay.  Gotcha.
14           So you don't -- you don't go in and try to
15   do it in a uniform way, you just look at it and
16   decide?
17      A.   I may divide it up uniformly.
18      Q.   Okay.
19      A.   But I go in and make those uniform
20   measurements or cuts, you know, whatever terminology
21   you want to use, of comparison.
22      Q.   Okay.  Do you have a certain number of cuts
23   you like to use?
24      A.   So if I'm going through and measuring that,
25   I'm probably comparing two NHTSA crash tests or an

27 (Pages 102 - 105)

Charles Crosby , PE　　　　　　　May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 106

1　IIH crash test and so I will try and duplicate -- if
2　they made any crush measurements in that report, I
3　may try and duplicate those crush measurements on
4　what I'm working on just so you have similar
5　measurements; however, that doesn't always work,
6　again, because every crash is different, so you can't
7　always do an exact, okay, I'm going to slice it at 10
8　inches from the right and 20 -- you know, you can't
9　always do that. So, again, it really depends on what
10　you're looking at and how you're trying to make that
11　comparison.
12　　Q.　How many cuts does NHTSA use in its crash
13　test?
14　　A.　Their typical frontal crash test makes
15　six -- I believe it is six measurements.
16　　Q.　How about IIHS?
17　　A.　I don't remember off the top of my head.
18　　Q.　Okay. Okay. For the crash test setup,
19　the -- if you could get your report with all the
20　pictures in it, just so you've got that in front of
21　you.
22　　A.　Yup.
23　　Q.　And I'll look at it with you. And I'm
24　going to mark it as Plaintiffs' Exhibit 118.
25　　　I'll give you a label.

Page 107

1　　　(Marked for identification Exhibit 118.)
2　BY MS. CANNELLA:
3　　Q.　Okay. Can you go to the pictures that show
4　the crash setup before the vehicles are crashed. So
5　it looks like --
6　　A.　So I'm starting at photograph 45.
7　　Q.　Okay. Is that a shortened version of
8　something? Oh, I'm at 226.
9　　A.　Oh, okay. Sorry, my complete setup
10　photographs start at 45, and that shows the
11　individual vehicles and everything we did, under-body
12　photographs and everything else, so --
13　　Q.　Gotcha.
14　　　Okay. Can we fast-forward to 226 and look
15　at the lineup.
16　　　Okay. So if we're correct in understanding
17　the pictures, the intention was for the F250 to be
18　centered over the rail that it's sitting on, correct?
19　　A.　That's correct.
20　　Q.　And then the Ford Escape is supposed to be
21　10.9 inches to the right of center, correct?
22　　A.　That's correct.
23　　Q.　All right. And then the F250 is drug by
24　what into the -- or strike that, I'm sorry.
25　　　What is the F250 moving -- how -- sorry.

Page 108

1　　　What is it that causes the F250 to run into
2　the Ford Escape?
3　　A.　So if you notice the rail running right
4　down the middle there, we have a, what we call a tow
5　shoe. It's essentially a trolley that clamps to the
6　rail and moves down the rail that's driven by a
7　cable. The Ford F250 is then attached to that tow
8　shoe with chains. If you actually look at
9　photograph 227 shows a picture of that setup.
10　　Q.　Okay. We talked about a lot of this with
11　Mr. Grimes, so I'm trying not to -- not to repeat
12　ourselves. The photo 283, if you can look at that
13　with me.
14　　　What is that at the floorboard there?
15　　A.　So that -- that's our brake system. So
16　that is our remote control that we can throw the
17　switch and activate the brakes.
18　　Q.　And was that done in this case?
19　　A.　Post collision it was.
20　　Q.　Post collision?
21　　A.　Correct.
22　　Q.　Why post collision?
23　　A.　Because I've got a vehicle that after the
24　collision is still traveling at a significant rate of
25　speed and I'd like to bring it to a stop before it

Page 109

1　runs into something else.
2　　Q.　Okay. So in the real collision you
3　wouldn't have as much -- you would have more movement
4　than we saw in the crash test after impact, correct?
5　　A.　Sorry, what do you mean by "movement"?
6　　Q.　Well, in the real collision the driver's
7　foot wouldn't be on the brake after the impact, most
8　likely, correct? We talked about that earlier.
9　　A.　For the Escape or the F250?
10　　Q.　For the Escape.
11　　A.　For the Escape, potentially no.
12　　Q.　And this is the Escape we're looking at,
13　correct?
14　　A.　Correct.
15　　Q.　All right. So in the crash test, the
16　vehicle, the Escape, comes to a stop before you would
17　expect it in the real crash?
18　　　MR. HILL:　Object to the form.
19　　　But go ahead.
20　　　THE WITNESS:　Not necessarily. I don't
21　know the -- I don't know exactly when the vehicle
22　came to rest in the subject incident, so I can't tell
23　you whether this one came to a stop earlier or later.
24　Did -- did it hit something else after the initial
25　impact that would have stopped the vehicle?

28 (Pages 106 - 109)

Charles Crosby , PE                              May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 110

1    BY MS. CANNELLA:
2       Q.   No.
3       A.   Okay.
4       Q.   I guess I'm not trying to be controversial,
5    I'm just saying you guys applied the brakes after
6    impact in the Ford Escape, correct?
7       A.   Right.
8       Q.   Okay.  And if there's no braking in our
9    Ford Escape, then the movement after impact would be
10   different in our crash?
11      A.   Potentially.
12      Q.   Okay.  All right.  The yellow and black
13   tape on the hood of the F250 and Escape, those are
14   supposed to indicate center line, correct?
15      A.   Yes.
16      Q.   How do you keep the F250 moving in a
17   straight line during the crash test?
18      A.   Yeah, so like I was saying earlier, it's
19   attached to the -- it's essentially attached to that
20   rail with a set of chains, and they are -- we tighten
21   those down as much as we can without constraining the
22   vehicle too much, meaning we're not trying to yank
23   down on the vehicle, but we want to keep it so that
24   it's not moving side to side, and then vehicles
25   will -- if you don't put any steering input in a

Page 111

1    vehicle, it will drive straight down the road so you
2    can let go of your steering wheel and it will travel
3    in a straight direction.  So we rely on the alignment
4    of the vehicle to be able to bring it down in a
5    straight line.
6       Q.   Do you do any work on the alignment before
7    the crash test?
8       A.   We check it to make sure that it's not
9    pulling left or right prior to that.  If it does pull
10   left or right we will make some alignment
11   adjustments, but in this case, it didn't.
12      Q.   Where is that paperwork with that analysis
13   or that test?
14      A.   It's not an analysis, it's just a -- it's a
15   general -- as we -- when we get the vehicle and we
16   check over it, and we take all those -- the receiving
17   photographs that we've got in the test report, part
18   of that is to -- we move the vehicle to another spot
19   on our property out there so that we have a nice
20   clean area to take photographs in, and whoever's
21   happening to do that driving and take those
22   photographs are also checking and feeling to make
23   sure the alignment is -- is -- is straight and not
24   pulling one way or the other.
25      Q.   Is there some paperwork they do to say that

Page 112

1    it was checked and the answer is it's fine?
2       A.   No.
3       Q.   So how do we know -- who did that in this
4    case?
5       A.   I can look at the initials of who received
6    the F250.  So photograph -- photograph 1 of my report
7    is documenting the date that the F250 was received,
8    and the photographer is "F.S." and that's one of my
9    technicians who would have taken this vehicle and
10   driven it and photographed it.
11      Q.   Okay.  And is there any video of the
12   alignment procedure check?
13      A.   No.  No.
14      Q.   Okay.  Would there any be any documentation
15   if you guys did have to do any alignment adjustment?
16      A.   Yes, if we -- if the alignment needed to be
17   changed or adjusted, we would have documentation on
18   that.
19      Q.   Okay.  And so we know that it wasn't done
20   here because we don't have that documentation; is
21   that fair?
22      A.   That's correct.
23      Q.   And is there any kind of device you could
24   put on the steering wheel to hold it straight?
25      A.   We could -- we could tie the steering wheel

Page 113

1    down to hold it from moving.  That tends to -- we
2    don't do that when we're rolling a vehicle straight
3    ahead, because if you try and constrain the steering
4    wheel perfectly straight, you end up not actually
5    constraining it perfectly straight, and then you are
6    inducing a steer, potentially minimal, but a minimal
7    steer would still be a steer nonetheless.
8       Q.   What was used to create the added weights
9    of the vehicles?
10      A.   It was a combination of bags full of sand
11   and lead bars.
12      Q.   And are the bags full of sand, like a
13   uniform measurement or do you fill them up, weigh
14   them, and put them in the car?
15      A.   We weigh them prior to putting them in the
16   car.
17      Q.   And how much do they each weigh?  Is it
18   different?
19      A.   They -- generally, we try and make the bags
20   weigh about 50 pounds, but I do have some that are
21   55 pounds.  I do have some that are 25 pounds.  It
22   all depends on the amount of ballasts I'm putting in.
23   I'll find the right sandbags to fit the amount of
24   ballasts that I need.
25      Q.   And are there any pictures showing them

29 (Pages 110 - 113)

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 114

1    being weighed to confirm how much they weigh?
2        A.   No.
3        Q.   Is there any way to confirm what the report
4    says about the amount of ballasts and where?
5        A.   Yeah, you can ask me about it and I'll
6    confirm it for you.
7        Q.   Okay.  Is there any documentary evidence,
8    aside from your testimony?
9        A.   We've got the -- in the report there's the
10   setup photo sheet where we've documented where the
11   ballast was placed inside of both vehicles and the
12   amount of ballasts at those locations.
13       Q.   Okay.  Can you point me to that picture,
14   please?
15       A.   Sure.
16            It's part of the test setup tab, and you're
17   looking at what's called the test vehicle ballast
18   record.  So there's one of those for each vehicle.
19       Q.   Okay.  So the crash test F250 was ballasted
20   to get it to 8,533 pounds for the crash test,
21   correct?
22       A.   That's correct.
23       Q.   And where did you get that number from?
24       A.   Mr. Grimes gave me that.
25       Q.   So did you have anything to do with coming

Page 115

1    up with that number?
2        A.   I did not.
3        Q.   And in the crash test, the Escape was
4    ballasted up to 9 -- I'm sorry, up to 3,940 pounds
5    for the test, correct?
6        A.   I have 3,941.
7        Q.   41.
8            Okay.  And did you do anything to come up
9    with that number?
10       A.   No.
11       Q.   Those are from Mr. Grimes too?
12       A.   Correct.
13       Q.   One moment.
14            Is the crash test in the report that you
15   did the only crash test run in the case?
16       A.   Yes.
17       Q.   And you're not aware of any other crash
18   tests being run?
19       A.   No.
20       Q.   How about any computer simulations done by
21   Rough Country?
22       A.   I don't have any knowledge of any other
23   simulations.
24       Q.   And no testing of any kind on behalf of
25   Exponent or other parties to the case?

Page 116

1        A.   Not that I'm aware of.
2        Q.   Has the second set of vehicles that were
3    purchased been preserved?
4        A.   Yes.
5        Q.   Have you discussed doing any additional
6    testing with Rough Country's lawyers or other
7    experts?
8        A.   No.
9        Q.   And we have all your communications from
10   Rough Country's lawyers, from the experts, and
11   internal communications regarding the facts of the
12   case, any assumptions you made, and any amounts you
13   were paid in the case?
14       A.   Yeah, I provided everything -- everything
15   that I had for it, yes.
16       Q.   Are there some things that you would --
17   that you used to have that you don't currently have?
18       A.   No.
19       Q.   Can you grab your invoices?
20       A.   Yes.
21       Q.   Plaintiffs' Exhibit -- what number is it?
22       A.   123.
23       Q.   Thank you.
24            And can you take a look at those and see
25   the dates -- let us know the dates of the LECs in the

Page 117

1    case, you mentioned two or three.
2        A.   Yeah, so I have a phone call listed on
3    3/27/2023.
4        Q.   And that was two hours, according to your
5    notes or your bills?
6        A.   Sorry, I skipped past it.  Give me a
7    second.
8            Yes, two hours.
9            Then I have 4/27/2023.
10       Q.   And how long was that one?
11       A.   An hour and a half.
12       Q.   Okay.  And who was on that one?
13       A.   I don't remember specifically.  I think all
14   of -- I think Doc-- -- or, sorry, Mr. Grimes and
15   Dr. Gwin were on it, along with some of the
16   attorneys.
17       Q.   Okay.  Any others?
18       A.   Not that I recall.
19       Q.   Okay.  You didn't have one after the crash
20   test was done?
21       A.   Oh, in -- sorry, any other conference
22   calls?
23       Q.   Yes, sir.
24       A.   Sorry, I thought you meant I any other --
25   any other parties on the call.

30 (Pages 114 - 117)

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 118

1      Q.   That's okay.
2      A.   So I have another conference call on
3  5/5/2023.
4      Q.   And who was on that one?
5      A.   I believe the same people.
6      Q.   After the crash test was done on the 15th,
7  did everybody sit down and talk about it?
8      A.   On a conference call?
9      Q.   On-site in person.
10     A.   I don't remember if anyone sat down and had
11 a discussion about it. I get very busy right after a
12 crash test, because I'm documenting and trying to
13 collect almost 500 photographs and get everything
14 together. So I was not part of any sit-down
15 discussion post test.
16     Q.   How quickly does everybody get the results
17 from the crash test?
18     A.   So the official report?
19     Q.   No, like the charts from your report and
20 photographs and videos, how long does it take to get
21 that stuff?
22     A.   So we put together -- we try and put that
23 together same day for a review, but it's not
24 finalized on that same day until I have a chance to
25 review everything.

Page 119

1      Q.   Could you have done the crash test that you
2  did in this case using a computer simulation?
3      A.   Potentially.
4      Q.   Why do you say "potentially" and not
5  definitely?
6      A.   Because I -- if you wanted to do something
7  like this, it would probably take a pretty detailed,
8  in-depth, finite element analysis, and that's not
9  something that -- I've done some finite element work
10 back in school, but nothing to the level of the
11 detail that would be required to run this type of
12 simulation.
13     Q.   So in the computer programs that have
14 computer models of vehicles --
15     A.   Uh-huh.
16     Q.   -- sometimes they have the F250 --
17     A.   Right.
18     Q.   -- sometimes they have the Escape --
19     A.   Uh-huh.
20     Q.   -- if you had those computer models, could
21 you run this crash test in the computer?
22        MR. HILL: Object to the form.
23        But go ahead.
24        THE WITNESS: You could set up the crash in
25 the computer model -- in the computer software, yes.

Page 120

1  BY MS. CANNELLA:
2      Q.   Was that discussed for this case?
3      A.   Not that I'm aware of.
4      Q.   Do you know why you were chosen for the
5  project?
6      A.   I don't know exactly where the
7  recommendation came from.
8      Q.   Did the -- did you ever work with the
9  lawyers in the case before this?
10     A.   I have not.
11     Q.   Do you do reconstruction testimony?
12     A.   I do.
13     Q.   Do you have any idea why you did the crash
14 testing in this case, but not the reconstruction?
15     A.   My understanding is Mr. Grimes was already
16 working on the reconstruction side of things.
17     Q.   Have you ever had a case in Georgia before?
18     A.   Not that I specifically recall.
19     Q.   Looked like --
20     A.   That doesn't mean that I -- doesn't mean
21 that I haven't had one before.
22     Q.   The testimony list you gave looks like it
23 was primarily clustered in kind of Arizona, Texas,
24 type areas in the western part of the country; is
25 that fair?

Page 121

1      A.   Correct.
2      Q.   Is that where most of your work is?
3      A.   A lot of my reconstruction work, that's
4  where it kind of ends up, but my testing work is all
5  over. I just happen -- I haven't testified in a
6  Georgia case yet.
7      Q.   Okay. Did you do any videoconferences or
8  phone calls with the other experts in the case
9  without Rough Country's lawyers present?
10     A.   No.
11     Q.   You've worked at Exponent since 2009,
12 correct?
13     A.   2010.
14     Q.   2010.
15        All right. Let's put your CV in the
16 record. I've marked it as Plaintiffs' Exhibit 113.
17        (Marked for identification Exhibit 113.)
18 BY MS. CANNELLA:
19     Q.   Okay. So you left Collision Safety
20 Engineering in 2009, and then came to Exponent in
21 2010?
22     A.   That's correct.
23     Q.   Did you get your master's in mechanical
24 engineering while you were working at Exponent?
25     A.   No, while I was working at Collision

31 (Pages 118 - 121)

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 122

1   Safety.
2        Q.   And how long did it take you to get your
3   master's?
4        A.   About two years.
5        Q.   Did you pay for it yourself or did somebody
6   else?
7        A.   I received some scholarships and Collision
8   Safety sponsored me.  I believe the agreement was
9   50/50.
10       Q.   How many employees did Collision Safety
11  have when you left it?
12       A.   I believe they were 15 or 20 individuals,
13  between engineers and support staff.
14       Q.   And Collision Safety is a company that
15  provides expert testifiers in the field of accident
16  reconstruction, correct?
17       A.   Correct.
18       Q.   Did you work for automakers when you were
19  at CSE?
20       A.   Yes.
21       Q.   And did you do mostly plaintiffs or defense
22  work?
23       A.   It would be mostly defense work, but we did
24  have some plaintiff cases as well.
25       Q.   And what was the breakdown percentagewise?

Page 123

1        A.   Oh, I don't -- I don't remember, I wasn't
2   one of the testifiers at the time.  I was one of the
3   support engineers.
4        Q.   And when CSE performed crash tests, what
5   facilities did it use?
6        A.   So they have a -- they have a small crash
7   test facility similar to our crash rail, but much
8   shorter and narrower.  So the capabilities that they
9   have were much -- much more narrow.  But they do have
10  a test facility that we would perform testing at.
11       Q.   So if you needed something bigger, would
12  you go somewhere else?
13       A.   Yes.
14       Q.   And where did CSE experts usually go to?
15       A.   We typically went to Exponent or Calspan or
16  MGA.
17       Q.   Calspan's in New York, correct?
18       A.   They've got -- yes, I think their main
19  office is in Buffalo, maybe, but they've got a few
20  others, I believe.
21       Q.   Not in California, as one might think?
22       A.   Not in California, as one might think.
23  Unless they've purchased something recently.
24       Q.   Not to my knowledge.
25       A.   I don't think so.

Page 124

1        Q.   Why did you leave CSE and go to work at
2   Exponent?
3        A.   Couple of factors: The economy at that time
4   was low and so the amount of work that Collision
5   Safety had was decreasing.  So I was concentrating on
6   finishing up my master's, and when I completed my
7   master's, I was looking for other employment to make
8   sure that I would have a job.
9        Q.   And then any other factors?
10       A.   No, that's really the main one.  The
11  economy kind of slowing down I think hurt a lot of
12  people; me included.
13       Q.   Did somebody recruit you?
14       A.   No, I reached out to Exponent.
15       Q.   And who did you know at Exponent before you
16  started working there?
17       A.   So one of the other engineers at Collision
18  Safety had worked at Exponent prior to working there,
19  and he recommended that I reach out to Exponent to
20  see if they were hiring at all.
21       Q.   Did you do a scan of the crash test
22  vehicles before or after the test?
23       A.   I did not.
24       Q.   Did anybody?
25       A.   I believe Ann Grimes -- I know she scanned

Page 125

1   post test, I can't remember off the top of my head if
2   she also scanned the vehicles pre test.
3        Q.   Is that normally something other experts
4   will do or that you will do?
5        A.   It's a mix.  It depends on what we're
6   requested.  Sometimes I'll do it as part of the test,
7   and sometimes they'll want the actual experts who are
8   going to be testifying about it to come in and do
9   their own scans.
10       Q.   Okay.  Do you agree -- or strike that.
11            Let's look back at the report.  When you
12  get a vehicle in -- when Exponent receives a vehicle,
13  walk me through that process.  It comes in and then
14  what happens?
15       A.   It comes in -- so depends on where we
16  bought it from or how it gets delivered to our
17  facility.  Usually it comes in on either a tow truck
18  or a car hauler, depending on where we had to
19  purchase it from and get delivered.  It gets dropped
20  off.  We verify, first of all, that it is the car
21  that we purchased because I'd hate to receive a
22  vehicle that we didn't buy.
23            So we verify VIN.  We verify that it is in
24  the condition that we expected it to be in.  It's
25  good, there's no -- there's no damage.  There's no

32 (Pages 122 - 125)

Charles Crosby , PE                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 126

1    significant rust or anything else that's going to
2    affect the structure of the vehicle.
3         We then take the photographs, fill out that
4    receiving form as part of the test documentation that
5    grabs the weights and -- and all of the other
6    information we get on the receiving form itself.
7    Once that's complete, then my technicians are looking
8    to me to guide them as to where to start in their
9    vehicle preparations.
10        Q.  Okay.  And when is the vehicle weighed?
11        A.  Which time?
12        Q.  Like when you first get it, it's weighed,
13   correct?
14        A.  Correct.
15        Q.  And then when is the next time you weigh
16   it?
17        A.  The next time we weigh it is when it's got
18   everything on it, it's completely ready to test.  So
19   typically that's a day, maybe two or three, before
20   the test is actually run.  It just depends on when
21   the test preparation is complete.
22        Q.  Okay.  And the first time you weigh it do
23   you take pictures of the scale and the car on -- on
24   the scale?
25        A.  We don't.

Page 127

1        Q.  Okay.  Do you do it the second time?
2        A.  No.
3        Q.  And why not?
4        A.  It's documented in the test report.  I
5    won't say I haven't done it before, it just depends
6    on requests from experts or the client as to whether
7    they want an actual picture of the scale.  Some
8    people are picky about it, some people don't --
9    the -- so whether there's a picture of it or not it
10   kind of just depends, but the weights are recorded in
11   the test report, both the received weights and the
12   as-tested weights.
13        Q.  Did anybody tell you to photograph the
14   weights in this case?
15        A.  No.
16        Q.  Did anybody tell you not to photograph the
17   weights in this case?
18        A.  No.
19        Q.  Okay.  So getting into your report, it's
20   not -- pages are not numbered, so bear with me.  The
21   impact configuration, did you draw this?
22        A.  I did.
23        Q.  And that shows the F250 center-lined with
24   the rail?
25        A.  Correct.

Page 128

1        Q.  All right.  And then the vehicle receiving
2    summary, I wanted to go through that for the F250.
3    The GVWR, that's -- is it the maximum weight that the
4    vehicle's supposed to operate at?
5        A.  Gross vehicle weight rating, yes.
6        Q.  Okay.  And then what's the front GAWR?
7        A.  That's the gross axle weight rating.
8        Q.  And then the rear?
9        A.  Same thing.  Gross axle weight rating,
10   GAWR.
11        Q.  So if you add those together, it's more
12   than a thousand -- 10,000 -- or it's more than 10,000
13   pounds, correct?
14        A.  Correct.
15        Q.  So how does that work?
16        A.  That's -- that's from the manufacturer, so
17   you can load -- you can load either axle up to their
18   axle weight rating or you can load the total vehicle
19   up to the total vehicle weight rating.  But you can't
20   exceed any of those numbers.  So in this case, with
21   this rating, you can't load both the front and rear
22   axle up to their maximum weights because that would
23   exceed the maximum weight of the vehicle overall.
24        Q.  And then it says that the running boards
25   were removed, did you replace them with OEM equipment

Page 129

1    or just remove them or how does that work?
2        A.  They were aftermarket running boards, so we
3    just removed them.
4        Q.  And there was nothing then that would
5    normally go in their place?
6        A.  No.
7        Q.  Okay.  So the vehicle was as it is,
8    standard?
9        A.  Correct.
10        Q.  Okay.  And then do you know if the subject
11   vehicle in the subject wreck had running boards, the
12   F250?
13        A.  I don't recall specifically.
14        Q.  Okay.  I don't either.  I'm just asking.
15        All right.  Now, vehicle weights as
16   received with max fluids.
17        What is "max fluids"?
18        A.  So we'll make sure that -- we'll make sure
19   that it's got all its engine oil, it's got washer
20   fluid, the gas tank is full, radiator is full, so
21   that you get, essentially, the vehicle weighed in an
22   as-operating condition.
23        Q.  Okay.  So this is after you've taken all
24   the fluids out and then put in the Stoddard fluid?
25        A.  No.  So this -- this is before we remove

33 (Pages 126 - 129)

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 130

1   anything or start anything, we make sure all the
2   fluids -- this is part of our just receiving as it
3   comes in. We make sure all the fluids are topped
4   off, that it's not low on something. Typically these
5   are not going to show up with a full tank of gas.
6   Most dealerships aren't going to give you $200 worth
7   of gas. I don't know why. They want to make as much
8   money as they can.
9        So we typically have to, then, fill the gas
10  tank up. So we'll fill it up, make sure all the
11  fluids are full, put it on the scales, weigh it as
12  is.
13      Q.   What's the purpose of that?
14      A.   So that we have documented exactly how we
15  received it with the -- with the accessories that may
16  or may not be on it, the exact trim level that was
17  purchased. The wheels and tires, if it happened to
18  come with different wheels and tires on it and not
19  the OE ones, we would have a documentation of
20  everything that's on there.
21      Q.   Then do you take all those fluids out?
22      A.   We do.
23      Q.   Okay. Do you reuse them?
24      A.   We don't. We recycle.
25      Q.   Oh, that's good.

Page 131

1        How do you do that?
2        A.   So we have recycle bin for, and it's a
3   liquid storage bin for oil and radiator fluid. We
4   store the fuel separately, so that, for instance,
5   when we do need to fill it up, we don't put brand-new
6   fresh gas in if we know we're just going to drain it
7   right back out, we'll put old, recycled gas in there.
8        Q.   Got it.
9        A.   So that we're not -- we try to be as -- and
10  we try to not waste as much as we can.
11      Q.   What are the vehicle attitude measurements?
12      A.   So that's -- that's as it sits in its
13  as-received condition, we go along and we measure the
14  height of the wheel well at every single wheel. So
15  that's why it's listed as "left front," "left rear,"
16  "right front," "right rear," and that's a measurement
17  from the top of the wheel well down to the ground.
18      Q.   Okay. And then these front bumper height
19  measurements, where are those taken from for each
20  item?
21      A.   So those are -- those are taken right at
22  the top of the front bumper. As it, again, similarly
23  as it -- as it sits with its full fluids.
24      Q.   Okay. And so then the top of the rear
25  bumper and then how about the rear track and front

Page 132

1   track?
2        A.   So rear track and front track is
3   referencing the spacing between the left and the
4   right rear -- right -- excuse me, the left and the
5   rights wheels, and that's measured at the center line
6   of the wheels.
7        Q.   Okay. So those weights that we just looked
8   at with the max fluids don't really have anything to
9   do with the weight of the test vehicle right before
10  the test?
11      A.   Correct.
12      Q.   Okay. Let's go to the test setup page.
13      Okay. So we've got the vehicle crash test
14  condition for the F250 and the modifications here.
15  Can you walk us through these, the left and right
16  lower sub-frame, what is that?
17      A.   Yeah, so that -- the category that we're
18  listing there is the tow shoe location. As we -- as
19  I kind of described earlier, our tow system involves
20  that tow shoe. And that's where we're going to
21  attach the tow shoe to the vehicle is the left and
22  the right lower sub-frame or the engine cradle.
23  There are several different names you could go with,
24  but that's the attachment of the vehicle down to the
25  crash rail.

Page 133

1        Q.   Is the vehicle weight on this page?
2        A.   Yes.
3        Q.   And where is that?
4        A.   It's just up above it, kind of second
5   section it says, "Vehicle test weight."
6        Q.   Okay. And when do you take that test
7   weight?
8        A.   Again, this weight is taken after
9   everything, all the test preparations are completed,
10  it's ballasted, it's instrumentation, it's got the
11  tow system on it. We then take a final test weight
12  just before we test it.
13      Q.   Okay. So it would reflect all the, like
14  you said, the tow shoe and the instrumentation?
15      A.   Correct.
16      Q.   Okay. And you -- that 8533, that was the
17  goal weight that Mr. Grimes gave you?
18      A.   That would have been the weight that
19  Mr. Grimes gave me, yes.
20      Q.   Okay. All right. What are the event flash
21  locations?
22      A.   So event flash is for the videos. We put
23  some very bright strobe flash bulbs on the vehicle
24  that will flash at the point of contact between the
25  vehicles. And that helps to synch up the cameras.

34 (Pages 130 - 133)

Charles Crosby , PE                          May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 134

1    Q.   I assume that when you're figuring out how
2  many sandbags to use you have an idea of how heavy
3  all the instrumentation is, correct?
4    A.   Correct.
5    Q.   And so what do you -- how many pounds does
6  the instrumention account for generally?
7    A.   Off the top of my head, I'm not quite sure.
8  So when we -- when we do the ballasting, maybe this
9  will help answer the question, when we do the
10  ballasting the instrumentation is on there already.
11  So ballasting is usually one of the last things we
12  do.  We've got instrumentation on it, we've got the
13  tow system on it, we've got the braking system
14  already installed, so that I already know that
15  weight's accounted for and then I just need to add
16  the proper ballast in the proper locations in order
17  to get up to the -- to the requested weight.
18    Q.   How many different sets of these -- of
19  equipment do you have for different cars?  So does
20  Exponent have like a bunch of transducers, a bunch of
21  the cameras, a bunch of the flash devices?
22    A.   We do.
23    Q.   Okay.  So this is all set up, like, a month
24  before the test is run?
25    A.   It's usually just a couple of days before

Page 135

1  the test is run.  But it depends on our schedule, and
2  when my guys have time.  Because we are running
3  testing kind of continuously.  And every test
4  requires a different set of instrumentation.  So they
5  may have a free couple of hours the week before, and
6  so they'll start setting it up, if they have the
7  information from me to be able to do that.
8    Q.   Okay.  Can we tell from the documents here
9  when they did all the -- all the setup for this?
10    A.   No, the exact date of when a specific
11  accelerometer was installed in the vehicle is not
12  recorded, no.
13    Q.   Or when they finished, for example?
14    A.   No.
15    Q.   Okay.  But it's your testimony that this
16  was mostly done by the time the second set of
17  vehicles was purchased on April 13th, correct?
18      MR. HILL:  Object to the form.
19      THE WITNESS:  No, not necessarily.
20  BY MS. CANNELLA:
21    Q.   Oh, that's what I understood you to say
22  earlier.  No?
23    A.   No, we started the prep on it and we would
24  have gotten as far as we could depending on their
25  time frame and their availability, but I can't tell

Page 136

1  you that they were almost done with the test -- with
2  the test setup.
3    Q.   Okay.  The -- I want to be clear on this --
4  the second -- the first set of vehicles -- strike
5  that.
6        The Escape was purchased, one on April 10th
7  and one on April 13th.  The one purchased on
8  April 13th has a sunroof.  The one purchased on
9  April 10th does not; is that correct?
10    A.   Correct.
11    Q.   Okay.  And so my question to you earlier
12  was why not use the Escape with the sunroof for the
13  crash test, and I thought your response was because
14  the one without the sunroof was mostly prepped by the
15  time we bought the second Escape.
16    A.   No.  Sorry.
17    Q.   Okay.  Can you explain that to me?
18    A.   Yeah.  No, so -- so what I was trying to
19  explain earlier was that the first vehicle we
20  purchased, we started on that prep work, and so we
21  were further along on that prep than when we
22  purchased the second one.  How far along in those
23  three or four days before we got the next vehicle, I
24  don't know exactly where we would have been at in the
25  preparation, but we started with that vehicle as our

Page 137

1  number one vehicle, and so that was the vehicle we
2  just continued on through as our first
3  crash -- excuse me -- our first crash test vehicle.
4    Q.   But both vehicles were fully prepped by the
5  date -- by 5/15, correct, except for instrumentation
6  was in one?
7    A.   The Escape was prepped, ready to receive
8  the instrumentation and the brake system and that
9  stuff, but it was not on the vehicle, it hadn't been
10  ballasted yet, because we hadn't been able to
11  transfer that equipment.
12    Q.   So I guess that's what I'm getting at,
13  if -- what's the -- what's the difference in the prep
14  by April 13th that's so compelling that you would use
15  an Escape without the sunroof instead of the one
16  that's like the crash -- the subject vehicle?
17      MR. HILL:  Object to the form.
18      But go ahead.
19      THE WITNESS:  I don't know that it was so
20  compelling that we were limited from using that --
21  that vehicle.  It was a -- we received one vehicle
22  first, we prepped that, that was our first test
23  vehicle.  When we got the second one, we started
24  partially prepping that one so that we were ready to
25  run that as a second test.  From my understanding

35 (Pages 134 - 137)

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 138

1   from Mr. Grimes, the sunroof was not an issue one way
2   or the other in this particular case, because of the
3   rear impact nature of the test.
4   BY MS. CANNELLA:
5        Q.   Was there ever a conversation with
6   Mr. Grimes or anyone else in which you said we've got
7   these two vehicles, one with the sunroof, one
8   without, do you have a preference of which one we use
9   first?
10       A.   That may have been a discussion during some
11  of our phone calls.  I don't specifically recall
12  that -- that portion of the conversation.
13       Q.   Has anyone expressed confusion about why
14  the Escape was used that didn't have the sunroof?
15       A.   What do you mean by "confusion," I guess?
16       Q.   I mean, has anybody been irritated with
17  Exponent for using a vehicle that's not like the one
18  in the crash test when they had one like the crash --
19  I'm sorry, strike that.
20            Has anyone been irritated with Exponent for
21  using the vehicle without the sunroof when the
22  subject vehicle did have a sunroof and Exponent had
23  access to one with a sunroof?
24       A.   Yeah, not that I know of.
25       Q.   Okay.  So do you know how heavy the

Page 139

1   transducers are off the top of your head, roughly?
2        A.   The accelerometers are fairly light.
3   They're pretty small.  There are some photographs in
4   the test report.  My estimate would be maybe a pound
5   or two.
6        Q.   Oh.  And the cameras and the flashes,
7   probably similar?
8        A.   Yeah.
9        Q.   The tow shoes, how heavy are those?
10       A.   So it's not the tow shoe itself, but the
11  chains and stuff that are on there.  I don't
12  specifically recall how much we had to add as far as
13  the structure there and then the chains, but I mean,
14  it's a typical chain, maybe 10, 20 pounds.
15       Q.   Okay.  And then it says the fuel tank level
16  is empty when you run the test; is that right?
17       A.   Uh-huh.
18       Q.   You don't put that fake fluid in it?
19       A.   In this case, no.
20       Q.   And why is that?
21       A.   Because we weren't -- this wasn't a fuel
22  system test.  We try and spill as little as possible
23  if it's not important for the --
24       Q.   Okay.
25       A.   -- the testing that we are running.

Page 140

1        Q.   All right.  And then the seatback angles,
2   were those given to you by Mr. Grimes?
3        A.   So those would have just been -- the
4   request was to just place them in a, for lack of a
5   better term, a normal position, you know, not leaned
6   back, not way upright, because there were no
7   occupants in the vehicle, so we set the fore/aft at
8   just middle position, and then set the seatback angle
9   at something that generally looked like a normal
10  seating position.
11       Q.   So you don't have a standard for normal
12  seating positions at Exponent?
13       A.   Not for -- not for something like this, no.
14       Q.   For anything?
15       A.   Well, there's protocols that do call for
16  specific seating positions, and that's usually me
17  provide the seating position from the -- it's what's
18  called the manufacturer's recommended seat position.
19       Q.   Okay.  And was that used here?
20       A.   It was not.
21       Q.   Okay.  All right.  The ballast record for
22  the F250, there's 155 pounds on the front floorboard,
23  correct, between the two sides?
24       A.   So between left and right?
25       Q.   Yes, sir.

Page 141

1        A.   Yes.
2        Q.   And why is there a difference between left
3   and right like that?
4        A.   To try and match not only front to rear,
5   but your left-to-right distribution to try and make
6   things as uniform as possible.  And I've got to look
7   at the photographs to see, I can't remember if we put
8   the braking system in our left front floor or if we
9   put it somewhere else in the vehicle, but that can
10  sometimes dictate how much ballast we add to an area,
11  because there's already some equipment there so that
12  kind of accounts for some weight and some space
13  that's taken up.
14       Q.   How much does the -- does the braking
15  system weigh?
16       A.   Between the canister and the solenoid
17  valves, maybe -- maybe 20 pounds.
18       Q.   And then you've also got weights on the
19  seats, correct?
20       A.   Yes.
21       Q.   Okay.  There's more weight on the passenger
22  side than the driver's side, correct, if you add the
23  floor and the seat?
24       A.   Of just the front area?
25       Q.   Yes, sir.

36 (Pages 138 - 141)

Charles Crosby , PE                                May 14, 2024
**Bryson, Santana and Joshua v. Rough Country, LLC**

Page 142

1    A.   Yes.
2    Q.   Why is that?
3    A.   Off the top of my head, I don't -- I don't
4  know.
5    Q.   Okay.  Did these numbers come from
6  Mr. Grimes or are these numbers that you decided on
7  or --
8    A.   These specific numbers are ones that I
9  worked on to match the numbers that would have been
10  given to me by Mr. Grimes, which is not the specific
11  ballast number and location, but the overall test
12  weight.
13    Q.   Okay.  So he gave up the 8,533?
14    A.   Correct.
15    Q.   And you figured out where to put
16  everything?
17    A.   And the distribution number.  So the fact
18  that is -- so if you look at -- back to the vehicle
19  crash test condition --
20    Q.   Uh-huh.
21    A.   -- the 8,533, and then that distribution
22  percentage of 5,842, so you've got a certain amount
23  in the front area and a certain amount in the back,
24  those would have been numbers that Mr. Grimes would
25  have given me and then I try and match that as best I

Page 143

1  can.
2    Q.   Is it odd to put more weight on the
3  passenger side, when there was no passenger in the
4  wreck?
5    A.   Not necessarily.  That could have been
6  where the fuel tank was, and if you've got
7  30-something, I can't remember how big the fuel tank
8  was on this, but I believe it was 30-something
9  gallons of fuel.  If that's on the left side of the
10  vehicle, you may want to kind of bias that way as if
11  the fuel tank was full, because it's now empty or if
12  it's on the right side, we would maybe bias that way.
13  Essentially trying to account for the fact that you
14  can't drive down the road with a tank that's drained.
15  It wouldn't get very far.
16    Q.   Do you -- do you know what your thinking
17  was, sitting here today, on the division of left or
18  right ballast?
19    A.   I don't remember exactly, no.
20    Q.   Okay.  All right.  You had about -- you had
21  exactly 700 pounds in the truck bed, correct?
22    A.   Uh-huh.  Yes.
23    Q.   And how did you come up with that, is that
24  just to get to the right percentage?
25    A.   That would be to get to the right

Page 144

1  percentage and the right total weight.
2    Q.   Do you agree that heavier cars cost
3  more -- sorry, strike that.
4       Do you agree that heavier cars cause more
5  crash damage, all things being equal?
6       MR. HILL:  Object to the form.
7       Go ahead.
8       THE WITNESS:  Potentially, yes.
9  BY MS. CANNELLA:
10    Q.   I want to talk about the camera setup.
11       Okay.  Did you bring with you today
12  Exponent's training or guidance on setting up
13  cameras?
14    A.   We don't have any written training or
15  guidance on that.
16    Q.   And do you use any established methodology
17  when you set up cameras?
18    A.   I mean, we generally set them up how crash
19  tests have been set up for decades.  Typically you
20  want to have an array of cameras covering as many
21  angles as you can so that you can record the crash
22  from as many angles as you can.
23    Q.   And are the photos and videos that you
24  generated reliable for the jury to rely upon?
25    A.   Yes.

Page 145

1       MR. HILL:  Object to the form.
2       But go ahead.
3       THE WITNESS:  Yes, to -- to the degree of
4  which they were set up for, you can rely on them for
5  their -- their designated purpose.
6  BY MS. CANNELLA:
7    Q.   Which is?
8    A.   A visual representation of -- of the
9  interaction between the vehicles.
10    Q.   Okay.  Is that -- is that narrower than
11  just relying on them?
12    A.   Well, in some cases we will specifically
13  set up cameras to then do not just a visual, we want
14  to see what happened, we may actually do some video
15  analysis with the cameras where you can actually take
16  the video and make certain measurements or estimates
17  of deformations or speeds or angles or anything like
18  that.
19    Q.   With photogrammetry you're talking about?
20    A.   Photogrammetry or -- or some video tracking
21  software that's available.
22    Q.   Did you set up videos in this crash test to
23  be able to take measurements?
24    A.   These videos were not specifically set up
25  for -- to do those measurements in this case.

37 (Pages 142 - 145)

Charles Crosby , PE                          May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 146

1    Q.   And why not?
2    A.   The cameras were requested to be put there
3    as a -- as a visual only.
4    Q.   Okay.  And what would you have done
5    differently to be able to take measurements?
6    A.   There's a couple of things.  We do
7    not -- we don't do them all every time, it just
8    depends.  But we may have had different marker boards
9    on the ground.  We may have also done what's called a
10   camera calibration where you take a known grid or
11   kind of photo set and you record that and then you
12   can use that in the software to understand your
13   distortion in the camera.  All lenses, you know, have
14   some distortion, because we're trying to make a
15   square image with a round lens, so you can get some
16   lens distortion, and if you set it up correctly and
17   do some stuff preliminarily you can eliminate that or
18   reduce that distortion, I should say.
19   Q.   Okay.  And so is there distortion in the
20   photos and videos that you took?
21   A.   Yes.
22   Q.   Okay.  So how can the jury know how to
23   assess that distortion?
24   A.   So specifically for -- for, like, the
25   photos that I take, even on a still camera there's

Page 147

1    some lens distortion that's in all cameras.  So
2    that's why specifically in some of the important
3    measurements that we've got there's an actual tape
4    measure in the photograph, because the tape measure
5    is the tape measure, so we'll take that.  As far as
6    the video cameras in this case go, we didn't -- we
7    weren't planning on using those to try and do any
8    type of measurement work, and so there was no
9    calibration performed on those cameras.
10   Q.   The yellow and black tape on the
11   vehicles --
12   A.   Uh-huh.
13   Q.   -- can act as a measuring stick, correct?
14   A.   It can, yes.
15   Q.   Okay.  The -- let's see, one of the reasons
16   to take pictures and videos is so that someone else
17   can repeat the test if they want to, correct?
18   A.   That would be correct.
19   Q.   All right.  And would you agree that if you
20   have a question of a vehicle on a scale and you take
21   a -- sorry, strike that.
22        Would you agree there's no question of how
23   much a vehicle weighs if there's a picture of the
24   vehicle on the scale and a picture of the scale?
25        MR. HILL:  Object to the form.

Page 148

1        But go ahead.
2        THE WITNESS:  It may reduce some of the
3    unknowns, but you'd have to still trust that the
4    scale is calibrated or not.
5    BY MS. CANNELLA:
6    Q.   Do you use photographs to draw conclusions?
7    A.   I do sometimes, yes.
8    Q.   And do you agree that the experts in this
9    case used the photographs and the videos to draw
10   conclusions, correct?
11       MR. HILL:  Object to the form.
12       Go ahead.
13       THE WITNESS:  I provided them with the
14   photos and the video.  I'm assuming they're going to
15   use it to -- in their reports and analysis.
16   BY MS. CANNELLA:
17   Q.   And that's the purpose of taking the
18   photos, so that everybody can rely on them, correct?
19   A.   That is correct.
20   Q.   Was a receiver hitch removed on the Escape?
21   A.   Yes.
22   Q.   Do you have photos of the starting
23   condition of that Escape?
24   A.   Yes.
25   Q.   Okay.  And where are those?

Page 149

1    A.   They would be in the receiving photographs
2    here at the front.  So photographs 24 through 44
3    would be the as-received photographs.
4    Q.   Okay.  So those are the as-received photographs.
5    have of the tow hitch?
6    A.   Correct.
7    Q.   Okay.  All right.  Back to the camera
8    setup.
9    A.   Okay.  Let me see if I can find it.  Before
10   those.
11   Q.   Before these?
12   A.   Before those.
13   Q.   Is there a reason you guys don't number
14   these things?
15   A.   Well, we rarely look at them printed out.
16   It's usually electronic, which has the page number at
17   the top of your Adobe reader.
18   Q.   Okay.
19   A.   So, yes, it does make it less convenient
20   when we print out hundreds of pages.
21   Q.   That's all right.
22        Okay.  So the camera setup, we've got one
23   directly at center line above the vehicles and 3 feet
24   before impact, correct?
25   A.   Correct.

38 (Pages 146 - 149)

Charles Crosby , PE                                May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 150

1    Q.   That's the video or the camera, what is
2  that?
3    A.   You're talking about the overhead camera?
4    Q.   Yes, sir.
5    A.   Camera number six?
6    Q.   Yes, sir.
7    A.   So, yeah -- so that is an overhead camera
8  that we've got up on a boom that's looking down at
9  the vehicles, and the measurements that we give those
10  are, in this particular instance, an approximation of
11  where the location of that camera is when we set it
12  up.
13    Q.   What is HSV?
14    A.   High-speed video.
15    Q.   And when you say "approximation," what do
16  you mean by that?
17    A.   Well, so for the other cameras that are on
18  the ground, we can actually take a tape measure out
19  there and very nicely measure the location of that.
20  When we've got a camera that is 25 feet in the air,
21  we do our best estimate as to determine the location
22  of that camera relative to the impact location.
23    Q.   Okay.  So as far as -- the best that you
24  guys could tell, the wide overhead view, camera
25  number 6, was directly at center line, but 3 feet --

Page 151

1  3 feet after impact, correct?
2    A.   Correct.  3 feet over top of the Escape.
3    Q.   Okay.  Wait, let me make sure I understand.
4  So from the ground, 3 feet from the ground?
5    A.   No, no, no.  So if you -- so if you -- if
6  your zero reference is at the point of where the F250
7  and the Escape are going to make first contact and
8  center line of the rail, then that camera was 3
9  feet -- approximately 3 feet, what I'll call
10  downstream, which is going to put it over the top of
11  the Ford Escape, because the zero is the Ford
12  Escape's bumper.
13    Q.   Got it.
14    A.   I will say after looking at the video, it
15  does appear that we probably weren't directly over
16  the rail left to right.  So we did the our best to
17  center the camera over the center of the rail, but
18  we're not likely directly over that.
19    Q.   And why do you say that?
20    A.   Because there's a little bit of distortion
21  and you can kind of look at the overhead video and
22  you can start to tell which direction the camera may
23  have been slightly moved or which direction the
24  camera was angled.
25    Q.   And tell me everything that that opinion is

Page 152

1  based on.  Like, I don't see that in the video, so
2  how can we know that that is the case?
3    A.   So if you look at the video and you look at
4  some of the different levels of vehicle structures,
5  and you look at the different levels of the tape, so
6  for instance, the -- like you had talked about, the
7  yellow and black tape that's along the center line of
8  the vehicle, if you look at the center line of the
9  hood of the F250 and then the center line of the roof
10  of the F250, which are now at different height
11  elevations, those two lines do not line up.
12       But the pre-test photographs -- excuse
13  me -- pre-test photographs from the ground you can
14  clearly see that those tape lines do line up
15  physically on the vehicle, therefore, in order to do
16  that, it means that our camera induced, likely some
17  what's called parallax, which is the as items in a
18  field of view are at different distances from the
19  lens or from the camera, they can appear to be either
20  misaligned or they can appear to be aligned when in
21  reality they are not.
22    Q.   And there's no way to quantify how much
23  misalignment there is, correct?
24    A.   Not based on the camera as it currently
25  sits.

Page 153

1       MS. CANNELLA:  Okay.  Can we go off the
2  record?
3       THE VIDEOGRAPHER:  Sure.  We're going off
4  the record.  The time is 12:14.
5       (Recessed from 12:14 p.m. until 12:33 p.m.)
6       THE VIDEOGRAPHER:  We're back on the
7  record.  The time is 12:33.
8  BY MS. CANNELLA:
9    Q.   Okay.  Mr. Crosby, we're going to look at
10  the crash test -- oh, thank you.  I'll try that
11  again.
12       Okay.  Mr. Crosby we're going to look at
13  the crash test that you did, and it's going to be on
14  the screen in front of you, and I will hand you my
15  computer so you can make annotations on it.  And let
16  me just show you how to do that.
17       So this is -- you can hit the space button
18  to play or pause and if you want to annotate you can
19  click on wherever the little annotate button is over
20  here, you see the little editor?
21    A.   That guy with the draw?
22    Q.   Yeah, let's do this, though, so you can
23  actually see it.
24       Okay.  So you can just go ahead and hit
25  play with the space button and we can -- I think it

39 (Pages 150 - 153)

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 154

1  will get to that overhead.
2        Did space not work? No?
3        MR. HILL: Click the play button, maybe.
4        THE VIDEOGRAPHER: There we go.
5  BY MS. CANNELLA:
6     Q.   It's just kind of hard to navigate with
7  that Zoom in play. There you go. You can pause it
8  with the space button. It should work now?
9     A.   There, it did work.
10    Q.   Great.
11       Okay. So that's the side view. I think
12 the next one is an overhead, I'm hoping. No.
13       Okay. Have you looked to see if there's
14 any distortions in any of the other views?
15    A.   Yes, but generally all -- all of the videos
16 are going to have some distortion, whether it's
17 noticeable or not is kind of depends on where you're
18 looking at in the video.
19    Q.   Have you looked at any of the other views
20 to see if there's a significant distortion that would
21 make a difference for the case?
22       MR. HILL: Object to the form.
23       Go ahead.
24       THE WITNESS: Yes, I've looked at all
25 the -- all the views, and there are small distortions

Page 155

1  usually around the edge of the -- the camera lines
2  are not always perfectly straight or line up. But
3  again, these views were generally showing the overall
4  visual of the crash test and not necessarily set up
5  to do any specific analysis.
6  BY MS. CANNELLA:
7     Q.   Okay. So like in that one, do you see any
8  distortions?
9        MR. HILL: Object to the form.
10       THE WITNESS: Specifically, no, in the
11 impact area, I don't.
12 BY MS. CANNELLA:
13    Q.   Okay. Yeah, if you want to click around
14 and get to the overhead, that's fine by me.
15    A.   Okay. Yeah, we can move to the other one,
16 so --
17    Q.   There we go.
18       Okay. Can you pause it?
19       Okay. So, like, right there you would
20 agree that there appears to be -- the F250 appears to
21 be off-center from the center of the rail, correct?
22       MR. HILL: Object to the form.
23       THE WITNESS: In this case, visually, yes.
24 BY MS. CANNELLA:
25    Q.   Okay. And do I understand your testimony

Page 156

1  to be that the reason it looks that way is because
2  the camera is not directly over the center of the
3  rail?
4     A.   Likely, yes.
5     Q.   All right. And can you tell us how -- what
6  that opinion's based on?
7     A.   So if you take a look at, as I was
8  explaining before --
9     Q.   Uh-huh.
10    A.   -- the line that you can see on the F250
11 hood versus the line that you can see on the roof of
12 the vehicle. In this view, with where the camera's
13 set up, those two lines are not lined up. They are
14 offset from each other. So if we assume -- if we're
15 going to try and draw a conclusion based on an offset
16 nature, that would say that the roof of my vehicle is
17 now offset from the hood of my vehicle, which is not
18 true, because the hood and the roof are aligned.
19       We didn't make any changes to the hood or
20 the roof prior to the test. So if we just do -- if
21 we try and do that analysis with this video as it
22 sits, we would come up with a conclusion that's not
23 correct. So -- and in the same way, you can't look
24 at the line on the -- the roof of the vehicle or the
25 line on the hood of the vehicle and try and line that

Page 157

1  up with the rail, because again, they're at different
2  elevations and as you get different elevations in
3  height, the angle of the camera becomes very
4  important as to whether those line up or not.
5     Q.   Okay. You're talking about the line on the
6  hood of the F250 and then the line on the roof of the
7  F250, correct?
8     A.   That's correct.
9     Q.   And those two lines don't appear to be
10 lined up to you?
11    A.   That's correct.
12    Q.   Okay. Have you done any kind of
13 measurement analysis or tried to draw a line from one
14 to the other?
15    A.   I've held a piece of paper up to it and
16 it's pretty obvious when you line up -- if you put a
17 piece of paper up to one of the lines, it doesn't
18 line up with the other line.
19    Q.   Okay. What time of day did this test
20 happen?
21    A.   It would have been right before lunchtime.
22 Probably 11:00, 11:30 maybe.
23    Q.   Okay. So that shadow that we see, that's
24 the shadow of the crane over the car?
25    A.   That's correct.

40 (Pages 154 - 157)

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 158

1    Q.  Okay.  So is it fair to say then that the
2    camera's at the edge of that crane?
3    A.  Yes.
4    Q.  Okay.  Does that appear to you to be far
5    off from center?
6    A.  Again, visually I can't make an assessment
7    on that.  You're asking about shadows and sun
8    position and whether a shadow cast by something is
9    going to dictate its location in space.
10   Q.  Well, we weren't there, so we don't really
11   know.
12   A.  Right.
13   Q.  Is there a way to look at the difference
14   that you're saying there is between the roof line and
15   the hood line and use that to estimate how much
16   distortion there is?
17   A.  You could take this video and do some
18   additional analysis and try and make an estimate of
19   where that camera is overhead in space, yes, that can
20   be done.
21   Q.  Okay.  Has anyone asked you to do that?
22   A.  No.
23   Q.  All right.  Okay.  Can you see if you can
24   get it stopped right before impact?
25   Nice.

Page 159

1    All right.  So, again, can you circle the
2    two lines you're talking about?  I don't want to make
3    you draw the line from one to the other, because I
4    know your hand's not going to be steady.  But just so
5    we can analyze it later.
6    Okay.
7    A.  And that's where maybe if -- if -- I mean,
8    we can take it around like this, and if we take a
9    piece of paper --
10   Q.  Okay.
11   A.  -- and you line that up like that --
12   Q.  Uh-huh.
13   A.  -- you've got greater space there.
14   Q.  Let's see if we can get a close-up on it.
15   Can you maybe scoot your hands over a little?
16   THE VIDEOGRAPHER:  Also, I'm sorry, your
17   laptop is in the shot.
18   THE WITNESS:  It's difficult to do looking
19   over the back.
20   BY MS. CANNELLA:
21   Q.  I see that, yeah.
22   A.  But essentially this is the concept we're
23   looking at, where if you take this line here, and I
24   can't see if I'm --
25   Q.  You've got it.

Page 160

1    A.  -- lining it up perfectly there.  So I'm on
2    the line of the roof, but I'm not on the line of the
3    hood.
4    Q.  Okay.  Got it.  Whoops.
5    All right.  I'm going to take that back
6    from you, and screenshot that picture that you just
7    drew on.  Thank you.  So that we can make it part of
8    the record.  Stop sharing.
9    Oh, shoot.  Did I do it?  Did I mess it up?
10   Hold on.  I messed it up, I'm sorry.  Can you circle
11   one more time?  This time it was my fault.  Let me
12   change here.
13   Okay.  Thank you.
14   A.  The annotation tool bar disappeared.
15   Q.  Let's see --
16   A.  Technology's supposed to make our lives
17   easier, right?
18   Q.  That's what they say.
19   Beautiful.
20   All right.  Now I'm going to take it
21   without stopping the screen share.
22   Okay.  Did it work?
23   Okay.  We got it.
24   THE VIDEOGRAPHER:  I backed it up too.
25   MS. CANNELLA:  Thank you.  All right.  And

Page 161

1    then we'll mark that as Plaintiffs' Exhibit 122.
2    THE REPORTER:  We already have a 122.
3    MS. CANNELLA:  123.
4    THE REPORTER:  We already have a 123.
5    MS. CANNELLA:  124.  Okay.  I tried.  I
6    failed.
7    THE REPORTER:  That's okay.
8    (Marked for identification Exhibit 124.)
9    MS. CANNELLA:  All right.  Moving on.
10   MR. HILL:  And that was just a screen
11   capture of where he circled the lines?
12   MS. CANNELLA:  Yes.
13   Q.  Okay.  Can we agree that the F250 got off
14   course, to some degree?
15   A.  Yes.
16   Q.  Okay.  And do we have any other way to
17   measure how much it got off course aside from the
18   video?
19   A.  Yes.
20   Q.  And that would be using the physical Ford
21   emblem, correct?
22   A.  That would be one of the things we can look
23   at, yeah.
24   Q.  And what else, scan data?
25   A.  Scan data.  There is evidence from the tow

41 (Pages 158 - 161)

Charles Crosby , PE    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 162

1    hook on the F250 into the bumper cover of the Ford
2    Escape. You can look at the damage pattern of the
3    Ford Escape and align the -- kind of the right edge
4    of the F250 up with the damage of the Ford Escape.
5    So there's several bits of physical evidence that
6    could be looked at and measured and scrutinized a
7    little bit more to determine what the exact offset
8    was for the crash.
9        Q. And no one's asked you to do that at this
10   point?
11       A. No.
12       Q. The tow hook physical evidence --
13       A. Yes.
14       Q. -- is that in your photos?
15       A. Yes.
16       Q. All right. Where in your photos?
17       A. So it's in the post-test photographs or the
18   test results section of the report. Let me see if I
19   can find you a photograph number. It shows up in
20   several photographs, because it is the bumper cover,
21   so you can kind of see the bumper cover in
22   photograph 404, 405. You can also see it when we
23   have it inside 422, 423, maybe 424.
24          There's probably more photographs. I
25   haven't -- I haven't looked through it in detail to

Page 163

1    determine every photo that the bumper cover, the
2    Escape shows up in, but --
3        Q. Can you do me a favor and see if you can
4    find what you think might be one of the best ones and
5    circle it for us?
6        A. So I think 422 probably gives a pretty good
7    view of it, whether it's the best or not. Maybe 404
8    also -- do you want me to circle it in both of them?
9        Q. Yes, please.
10       A. And the -- just the photo number or do you
11   want me to circle the tow hook --
12       Q. The tow hook.
13       A. -- location?
14          Okay.
15       Q. Great.
16          I'm going to enter the Notice of Videotaped
17   Deposition as Plaintiffs' Exhibit 120.
18          (Marked for identification Exhibit 120.)
19   BY MS. CANNELLA:
20       Q. And you've looked through this, correct?
21       A. Sorry, give me one moment.
22          Oh, sorry.
23       A. There we go.
24       Q. Okay. Have you seen that document before?
25       A. Yes.

Page 164

1        Q. And you looked at the documents that are
2    requested in the notice of deposition?
3        A. Yes.
4        Q. And you produced everything you had?
5        A. Yes.
6          MS. CANNELLA: Okay. Then I'm going to
7    hand you Plaintiffs' Exhibit 121.
8          (Marked for identification Exhibit 121.)
9    BY MS. CANNELLA:
10       Q. Is this your complete correspondence --
11       A. Yes.
12       Q. -- on the case?
13          And your first contact about the case, do
14   you know when that was?
15       A. Absolute first contact --
16       Q. Yes, sir.
17       A. -- would have been back in November of '22.
18   It would have been -- there's a retention letter,
19   dated back in November.
20       Q. And was it Mr. Grimes that reached out to
21   you or a lawyer?
22       A. It would have been an attorney.
23       Q. Okay. On your invoices I want to go
24   through and make sure I understand those charges.
25          Do you have those in front of you?

Page 165

1        A. Yes.
2        Q. All right. So the total fee for the crash
3    test was 68,000, correct?
4        A. For the first test, yes.
5        Q. All right. And the second test would have
6    been 58,000, but that was not charged, correct?
7        A. A portion of that was charged for that
8    preliminary setup, but we didn't charge the full
9    amount, no, because we didn't run the test.
10       Q. Okay. Well, let's get to that, then. That
11   will be in the documents?
12       A. Yes.
13       Q. Okay. So this first invoice, the first
14   page on it, it says 7,420, is that just charged
15   against the 68,000?
16       A. No. So that is total for both the crash
17   testing portion and the phone conference that we had.
18       Q. Okay. So, so far we've got 68,000 plus
19   620?
20       A. So we've only charged 6,800 for this
21   portion, because we hadn't completed the test at that
22   point.
23       Q. Okay. I'm not going to add up all the
24   little test pieces as we go --
25       A. Okay.

42 (Pages 162 - 165)

Charles Crosby , PE                                          May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 166

1    Q.  -- so we'll just not -- we'll give freebies
2  for the rest of those.
3        Okay.  So 620 for your hours there.  And
4  then it looks like page 3, is that the same, 620?
5    A.  Yes.
6    Q.  Okay.  All right.  Page 4, the May 24th
7  invoice -- oh, it looks like the rest of the crash
8  test is done there -- so at that point we have the
9  full 68,000 charge?
10    A.  Correct.
11    Q.  And then was this second section down here
12  where it says, "Task, additional testing"?
13    A.  Yes.  So that would have been for the
14  second test.
15    Q.  All right.  And instead of charging the
16  full 58,000, Exponent charged 10,250, correct?
17    A.  Correct.
18    Q.  Okay.  And that's because it was 17.6724
19  percent completed?
20    A.  Yes.
21    Q.  Where does that number come from?
22    A.  It comes from taking $10,250 and dividing
23  it into 58,000.
24    Q.  Fair enough.
25        Okay.  And then the next page we've got

Page 167

1  $930 for your hours, correct?
2    A.  Yes.
3    Q.  You may want to write this down, because
4  I'm going to ask you if my math is correct at the
5  end.
6        Do you want a piece of paper?
7    A.  Yes, please.
8    Q.  Okay.
9        MR. HILL:  Here, I can give it to him.
10        MS. CANNELLA:  Oh, good.
11    Q.  All right.  So to recap, we've got 68,000
12  for the then-completed crash test, 10,250 for the
13  uncompleted crash test, 620 for your hours on the
14  first invoice, and 930 on this present invoice.
15        And then, moving on, we have the May 24th
16  invoice has a professional personnel section?
17    A.  Yes.
18    Q.  Okay.  So Paul Terry is charging $2,310,
19  correct?
20    A.  Yes.
21    Q.  And then we've got some reimbursable
22  supplies down here, is that the vehicles, in addition
23  to other things?
24    A.  Yes.
25    Q.  Okay.  What else besides the vehicles is

Page 168

1  represented in the reimbursables?
2    A.  So tires and wheels and other supplies as
3  needed, they would -- and probably tow -- I think
4  this includes tow charges for getting the vehicles to
5  our facility and shipping charges if we had any of
6  those, so it's lumped into stuff we had to pay out of
7  pocket that we are getting reimbursed for.
8    Q.  And the total reimbursables is $136,824.13?
9    A.  Yes.
10    Q.  And what's "unit billing"?
11    A.  So unit billing would be we have certain
12  pieces of equipment or other things that we charge
13  out that we don't have a necessarily -- we're not
14  buying it, but we're using it and it's not part of
15  the crash test entity.  Let me look further through
16  here to see what the unit's charging would be here.
17    Q.  It looks like it's vehicle titles?
18    A.  Okay.  It's vehicle titling fee to get the
19  title from wherever we purchased it from and
20  transferred to us.
21    Q.  All right.  And then this page 4 of this
22  invoice shows the itemized for all those
23  reimbursables, correct?
24    A.  Yes.
25    Q.  All right.  And it's got the itemized for

Page 169

1  Mr. Terry's time, but we've already taken that into
2  account.  So then we've got the July 25th, 2023
3  invoice, and it's $300 for vehicle storage, correct?
4    A.  Sorry, give me a moment to catch up, you're
5  on the June 30 invoice?
6    Q.  Oh, did I skip one?  I think we --
7        MR. HILL:  It's services through June 30th,
8  but the date --
9        MS. CANNELLA:  Oh, I got it.
10        THE WITNESS:  Sorry, did I --
11  BY MS. CANNELLA:
12    Q.  I was looking at the date of the actual
13  invoice.
14    A.  Gotcha.
15    Q.  It's July 25th, '23.  So that has the $300
16  in storage.  Is that for all four vehicles?
17    A.  That's actually for just the two tested
18  vehicles.
19    Q.  Okay.  Where are the other two vehicles?
20    A.  They're also at our facility, but because
21  we haven't tested them yet, it's kind of up to the
22  test engineer as to when we want to start testing
23  storage, if we want to test storage -- or, sorry, if
24  we want to charge storage.  We charge storage
25  immediately after a crash test is done, because the

43 (Pages 166 - 169)

Charles Crosby , PE                                                May 14, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 170

1  vehicles aren't going anywhere.  There's not going to
2  be any additional use for them.
3      Q.  So right now Exponent's not charging Rough
4  Country for storing the two untested vehicles?
5      A.  That's correct.
6      Q.  But it does have all four vehicles on its
7  property?
8      A.  That's correct.
9      Q.  Okay.  Got it.
10         Okay.  And then the next invoice is
11  August 24th, 2023, and we've got the $300 storage fee
12  again; is that right?
13     A.  You said August 24?
14     Q.  Yes, sir.
15     A.  Yes.
16     Q.  All right.  And then it looks like we've
17  got that -- that's the only charge on September 27th,
18  2023, as well?
19     A.  Yes.
20     Q.  And October 25th, 2023?
21     A.  Yes.
22     Q.  And November 21st, 2023?
23     A.  Yes.
24     Q.  And December 28th, 2023?
25     A.  Yes.

Page 171

1      Q.  And January 11th, 2023?
2         I'll let you go through this, because it
3  looks like that's what we've got for February as
4  well, and March.
5      A.  Did we go up through March?
6      Q.  Yeah, so if you want to go ahead and add
7  those instead of me reading them all to you, that
8  would be great.
9      A.  I've got my phone off, if someone has a
10  calculator I can borrow.
11         MS. CANNELLA:  Can you share your phone
12  with him so I don't hand over mine.
13         Thank you.
14     Q.  Do you have it?
15     A.  Yes.
16     Q.  What's the total?
17     A.  So I have a total through March of
18  $222,634.13.
19     Q.  222,600 and --
20     A.  34.
21     Q.  And that's how much RC paid to Exponent for
22  crash testing, including your services, correct?
23         MR. HILL:  Object to the form.
24         But go ahead.
25         THE WITNESS:  Correct.

Page 172

1  BY MS. CANNELLA:
2      Q.  And it would have cost $47,750 to do the
3  second crash test, right?
4      A.  Yeah, approximately, additional.  Based on
5  what would have been left to charge on that, yeah.
6      Q.  All right.  And the storage fees are $300 a
7  month; is that right?
8      A.  Correct.
9      Q.  All right.  I think I'm almost done or am
10  done.  Let me see.
11         Oh, does it -- does a diesel fuel vehicle
12  have a different -- like, does the engine weigh a
13  different amount?
14     A.  Yes, they typically do.
15     Q.  And the F250 in this case was a diesel?
16     A.  I believe so.  I can check for you.
17         Yes, it was.
18     Q.  And would that matter or does the
19  ballasting account for that, if the subject vehicle
20  was a diesel, would the ballasting account for that
21  difference?
22     A.  We can ballast for differences like that --
23     Q.  Okay.
24     A.  -- if we need to.
25     Q.  Was that done here?

Page 173

1      A.  No.
2      Q.  Okay.  And did you take any measurements of
3  the displacement of the second row seat after the
4  crash was -- crash test was completed?
5      A.  No.
6      Q.  Did you see anybody else take those
7  measurements?
8      A.  Other than the scans of the vehicle, which
9  does kind of measure in kind of a round-about way,
10  other than that, not that I saw.
11     Q.  Do you know if a scan of the inside of the
12  vehicle was taken?
13     A.  I don't.
14     Q.  And do you know if any measurements were
15  taken before the crash test of the distance of the
16  location of the seat from any particular place?
17     A.  I don't recall if Ms. Grimes did a pre-test
18  scan of our particular vehicle.  I know, like I said,
19  I know she did a post test, but I don't remember if
20  she did anything pre test.
21     Q.  But you didn't see any expert in there with
22  a measuring tape, correct?
23     A.  I don't remember any, no.
24         MS. CANNELLA:  Okay.  That's all I have.
25         MR. HILL:  All right.  Thank you.

44 (Pages 170 - 173)

Charles Crosby , PE                          May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

---

Page 174

1    Do you want to read and sign?
2    THE WITNESS:  (No audible response.)
3    MR. HILL:  Yes.
4    THE VIDEOGRAPHER:  This concludes today's
5  deposition.  We're going off the record.  The time is
6  1:04.
7    (Off the videotaped record.)
8    THE REPORTER:  Mr. Hill, do you want a copy
9  of the transcript?
10    MR. HILL:  I do.
11    THE REPORTER:  And do you want the
12  transcript as well?
13    MS. CANNELLA:  Yes, ma'am.  I'll take a
14  synched video as well, please.  Thank you.
15    (Proceedings concluded at 1:05 p.m.)
16
17
18
19
20
21
22
23
24
25

---

Page 175

1  STATE OF ARIZONA     )
   COUNTY OF MARICOPA    )
2
3        CERTIFICATE
4    I, ROBIN L. B. OSTERODE, Certified Shorthand
5  Reporter for the State of California and Certified
6  Reporter for the State of Arizona certify:
7    That the foregoing proceeding was taken by
8  me; that I am authorized to administer an oath; that
9  any witness, before testifying, was duly sworn to
10  testify to the whole truth; that the questions and
11  answers were taken down by me in shorthand and
12  thereafter reduced to print by computer-aided
13  transcription under my direction; that review and
14  signature was requested; that the foregoing pages are
15  a full, true, and accurate transcript of all
16  proceedings, to the best of my skill and ability.
17    I FURTHER CERTIFY that I am in no way
18  related to nor employed by any of the parties hereto,
19  nor am I in any way interested in the outcome hereof.
20    DATED this 28th day of May, 2024.
21
22
23
                _Robin L B Osterode_
24    ROBIN L. B. OSTERODE, CSR, RPR
      CA CSR No. 7750
25    AZ CR No. 50695

---

Page 176

1  Richard H. Hill
2  rhill@wwhgd.com
3        May 31, 2024
4  RE: Bryson, Santana And Joshua v. Rough Country, LLC
5    5/14/2024, Charles Crosby, PE (#6696090)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-southeast@veritext.com.
16    Return completed errata within 30 days from
17  receipt of testimony.
18    If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22        Yours,
23        Veritext Legal Solutions
24
25

---

Page 177

1  Bryson, Santana And Joshua v. Rough Country, LLC
2  Charles Crosby, PE (#6696090)
3    E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22  _____
23  _____  _____
24  Charles Crosby, PE          Date
25

---

45 (Pages 174 - 177)

Charles Crosby , PE                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 178

1   Bryson, Santana And Joshua v. Rough Country, LLC

2   Charles Crosby, PE (#6696090)

3          ACKNOWLEDGEMENT OF DEPONENT

4     I, Charles Crosby, PE, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11  _____   _____

12  Charles Crosby, PE          Date

13  *If notary is required

14          SUBSCRIBED AND SWORN TO BEFORE ME THIS

15          _____ DAY OF _____, 20___.

16

17

18          _____

19          NOTARY PUBLIC

20

21

22

23

24

25

46 (Page 178)

Charles Crosby , PE
May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[& - 24]**

Page 1

| **&** | **109** 3:20 35:13 | **12:14** 153:4,5 | 139:14 141:17 |
|---|---|---|---|

**&** 2:12,17

**1**

**1** 3:17 4:3,18
35:19 112:6
**1/2** 49:2
**10** 3:24 9:15
20:8 30:6,14
30:17,18,19
82:9 106:7
139:14
**10,000** 56:23
128:12,12
**10,250** 166:16
166:22 167:12
**10.9** 48:12 49:1
65:22,23,24
107:21
**100** 52:20
58:19 104:5
**102** 7:7
**103** 3:8 7:11,13
9:7
**104** 3:10 14:14
14:15
**105** 3:12 9:20
9:21
**106** 3:14 20:7
20:10 21:21
26:1 42:3
**107** 3:16 4:6
30:10,12
**108** 3:18 30:24
31:1

**109** 3:20 35:13
35:14
**10:31** 78:4,5
**10:40** 78:5,7
**10th** 93:3 136:6
136:9
**110** 3:23 39:11
39:12 40:7
41:14 42:3,22
**111** 4:3 46:7,10
46:13
**11111** 5:15
**113** 4:4 121:16
121:17
**118** 4:6 106:24
107:1
**119** 4:9 87:12
87:13,15
**11:00** 157:22
**11:30** 157:22
**11th** 171:1
**12** 3:9 48:17
49:2,2
**120** 4:11
163:17,18
**121** 4:4,12
164:7,8
**122** 4:14 91:14
91:17 161:1,2
**123** 4:16 56:13
56:15 116:22
161:3,4
**124** 4:17 161:5
161:8

**12:14** 153:4,5
**12:33** 153:5,7
**136,824.13**
168:8
**13th** 93:4
135:17 136:7,8
137:14
**14** 1:15 2:2
3:10 5:1
**140** 30:5
**14th** 5:10
**15** 4:8 122:12
**155** 9:15 10:3
10:11 140:22
**1555** 5:9
**15th** 55:3 86:17
86:25 118:6
**16** 20:12 21:21
**161** 4:17
**163** 4:11
**164** 4:12
**16th** 55:8,24
**17** 1:8 5:8
**17.6724** 166:18
**1992** 19:23
20:9,14
**1996** 10:10,11
**1:04** 174:6
**1:05** 174:15

| **2** |
|---|

**2** 3:19 4:5,15
41:16
**2,310** 167:18
**20** 3:14 27:1
106:8 122:12

139:14 141:17
178:15
**200** 130:6
**2006** 10:3
**2008** 4:7 90:15
**2009** 121:11,20
**2010** 121:13,14
121:21
**2016** 3:11 4:7
90:16
**2017** 10:3,10,11
**2022** 43:6
**2023** 3:9 4:8,13
7:24 31:4 55:3
86:17,25 169:2
170:11,18,20
170:22,24
171:1
**2024** 1:15 2:2
3:19 5:1,10
31:4 86:18
175:20 176:3
**205** 5:16
**213** 4:8
**21st** 170:22
**22** 4:13 164:17
**222,600** 171:19
**222,634.13.**
171:18
**226** 107:8,14
**227** 108:9
**23** 3:15 169:15
**24** 149:2
170:13

Charles Crosby , PE
May 14, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[2400 - abc]**

Page 2

**2400** 2:18
**24th** 166:6
  167:15 170:11
**25** 52:23 104:3
  113:21 150:20
**250** 4:7
**25th** 169:2,15
  170:20
**263** 50:25
**27th** 170:17
**28** 4:13
**283** 108:12
**28th** 170:24
  175:20
**29** 3:19
**29th** 86:18
**2:22** 1:8 5:8

**3**

**3** 3:11 9:24
  41:3 149:23
  150:25 151:1,2
  151:4,8,9
  166:4
**3,940** 115:4
**3,941** 115:6
**3/27/2023**
  117:3
**30** 3:16 6:19,19
  71:6 143:7,8
  169:5 176:16
**300** 169:3,15
  170:11 172:6
**30030** 2:14
**30326** 2:18

**30th** 169:7
**31** 3:18 4:16
  176:3
**310** 31:4,16
**315** 2:13
**3344** 2:18
**335** 31:4
**34** 171:20
**35** 3:20 77:9
**39** 3:23

**4**

**4** 4:10 7:20
  166:6 168:21
**4.6** 7:23
**4/11** 92:5
**4/13** 92:8
**4/27/2023**
  117:9
**40** 71:8
**404** 2:14,19
  162:22 163:7
**405** 162:22
**41** 115:7
**422** 162:23
  163:6
**423** 162:23
**424** 162:23
**44** 149:2
**45** 107:6,10
**46** 4:3
**47,750** 172:2
**4925** 175:23

**5**

**5** 3:13 9:7
  44:13
**5,842** 142:22
**5/14/2024**
  176:5
**5/15** 137:5
**5/5/2023** 118:3
**50** 14:21 52:23
  71:5,7 104:4
  113:20
**50/50** 122:9
**500** 118:13
**50695** 1:24 2:5
  175:25
**536.8** 7:24
**54** 29:16
**55** 113:21
**56** 4:16
**58,000** 56:22
  165:6 166:16
  166:23

**6**

**6** 3:3,11 14:22
  150:25
**6,000** 18:22
**6,800** 165:20
**60** 71:4,5
**620** 165:19
  166:3,4 167:13
**6696090** 176:5
  177:2 178:2
**68,000** 56:20
  64:2,11 165:3
  165:15,18

**5**

166:9 167:11

**7**

**7** 3:8
**7,420** 165:14
**700** 143:21
**75** 104:5
**7750** 1:23 2:4
  175:24

**8**

**8** 3:22 4:11
**8,533** 114:20
  142:13,21
**80** 71:7
**800-4828** 2:14
**85254** 5:16
**8533** 133:16
**87** 4:9
**876-2700** 2:19
**885** 2:13

**9**

**9** 3:12 115:4
**91** 4:14
**930** 167:1,14
**9:00** 1:16 2:2
  5:2
**9:11** 5:4
**9:49** 45:18,19
**9:52** 45:19,21

**a**

**a.m.** 1:16 2:2
  5:2,4 45:19,19
  78:5,5
**abc** 64:18

Charles Crosby , PE
Bryson, Santana and Joshua v. Rough Country, LLC
May 14, 2024

**[ability - agree]**

Page 3

**ability** 175:16
**able** 58:24 60:3
  76:16 84:10
  97:21 111:4
  135:7 137:10
  145:23 146:5
**above** 46:19,23
  50:12 51:3
  133:4 149:23
  176:6 178:7
**absolute** 98:7
  98:12 164:15
**absolutely** 59:6
  59:9
**absorption**
  34:20 35:8
  36:10
**acceleration**
  17:20
**accelerator**
  99:24
**accelerometer**
  135:11
**accelerometers**
  139:2
**accept** 27:22
**access** 68:5,7
  138:23
**accessories**
  130:15
**accident** 87:24
  88:1,4,8
  122:15
**accidentally**
  100:16 101:24

**account** 96:10
  99:9 134:6
  143:13 169:2
  172:19,20
**accounted**
  134:15
**accounts**
  141:12
**accuracy** 97:22
  176:9
**accurate** 97:12
  97:13 175:15
**accused** 16:22
**acknowledge...**
  178:3
**acknowledg...**
  176:12
**act** 147:13
**activate** 96:22
  97:6,10,21
  108:17
**activates** 97:14
  97:15
**activating** 97:8
  98:2
**activity** 64:12
**actual** 47:24
  64:12 69:13
  92:24 96:11
  125:7 127:7
  147:3 169:12
**actually** 21:14
  26:13 39:18
  59:3 60:19
  67:3 71:14

72:21 77:16
78:13 94:7
96:22 97:6,10
108:8 113:4
126:20 145:14
145:15 150:18
153:23 169:17
**add** 44:25 82:5
  128:11 134:15
  139:12 141:10
  141:22 165:23
  171:6
**added** 93:18
  113:8
**adding** 36:17
  60:25 93:23
**addition** 25:2
  35:22 81:17,24
  94:2 167:22
**additional**
  56:21 64:9,19
  83:17 93:17
  116:5 158:18
  166:12 170:2
  172:4
**additions** 178:6
**address** 7:18
  68:14,16,24
  69:1
**addresses** 69:2
  69:3,5
**adjust** 96:25
  97:7 99:1
**adjusted**
  112:17

**adjusting** 98:22
  98:23
**adjustment**
  112:15
**adjustments**
  96:25 111:11
**administer**
  175:8
**administrators**
  1:5
**admissibility**
  14:18
**adobe** 149:17
**advance** 40:16
**advocated**
  34:20
**affect** 61:12
  126:2
**aft** 140:7
**aftermarket**
  129:2
**afternoon**
  55:21
**aggressive**
  98:11
**ago** 38:10 40:6
**agree** 7:2 8:9
  8:24 9:3 16:17
  28:13,25 29:4
  30:19 31:10
  33:3,12,19
  36:9 43:20,23
  44:5 79:22
  80:1,2 90:10
  93:17,20 96:3

Charles Crosby , PE
Bryson, Santana and Joshua v. Rough Country, LLC
May 14, 2024

[agree - area]                                                                                          Page 4

125:10 144:2,4
147:19,22
148:8 155:20
161:13
**agreement**  34:6
34:11,11 122:8
**ah**  70:19
**ahead**  8:18
9:17 10:7,9,24
11:15 13:17
14:16 15:3
16:19 17:17
18:9,24 19:7
20:4,23 26:12
27:25 28:9
29:3,21 31:7
31:20 32:23
33:14 36:6
41:10 46:4
47:4 51:19
60:6,24 62:2
62:14 73:4
74:16 75:5
79:12 80:5
82:16 95:5
97:25 109:19
113:3 119:23
137:18 144:7
145:2 148:1,12
153:24 154:23
171:6,24
**aided**  175:12
**air**  150:20
**airbag**  83:5,6
83:10,12,13,14

**al**  5:7
**alailefaleula**
84:9,12,15
**align**  51:2
162:3
**aligned**  152:20
156:18
**alignment**
47:20,24 48:4
48:8 49:17
50:17 73:9,16
73:18,22 111:3
111:6,10,23
112:12,15,16
**allen**  27:18
**allotted**  176:19
**allowed**  100:7
**allows**  72:12,24
**amount**  56:6
76:14 98:7,19
98:20 102:24
103:13 113:22
113:23 114:4
114:12 124:4
142:22,23
165:9 172:13
**amounts**  70:23
116:12
**analysis**  8:22
20:16 22:1
49:5 59:14,15
87:25 111:12
111:14 119:8
145:15 148:15
155:5 156:21

157:13 158:18
**analyze**  37:6
159:5
**analyzed**  36:13
**analyzing**  34:5
**angle**  77:16
140:8 157:3
**angled**  151:24
**angles**  140:1
144:21,22
145:17
**ann**  4:13 90:17
124:25
**annotate**
153:18,19
**annotation**
160:14
**annotations**
4:18 153:15
**answer**  9:18
12:3 13:8
18:12 19:21
24:1 36:14
50:22 56:18
58:12,16 62:24
75:17 77:21
98:17 112:1
134:9
**answering**
58:21 75:14
76:6
**answers**  24:8
175:11
**anybody**
124:24 127:13

127:16 138:16
173:6
**apologize**  82:19
84:9
**app**  38:18
40:25
**appear**  151:15
152:19,20
157:9 158:4
**appearances**
2:10
**appeared**  20:18
48:3 49:25
72:6
**appears**  15:24
155:20,20
**appended**
178:7
**applicable**
176:8
**applied**  110:5
**appropriate**
80:24 104:22
**approximately**
49:1,9 151:9
172:4
**approximation**
150:10,15
**april**  3:11 93:3
93:4 135:17
136:6,7,8,9
137:14
**area**  12:14
40:15 74:5
94:16 111:20

Charles Crosby , PE

May 14, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[area - ballast]**

Page 5

141:10,24
142:23 155:11
**areas** 120:24
**argument**
26:21 27:6
**arizona** 1:15
2:3,4 5:1,10,16
120:23 175:1,6
**array** 144:20
**artful** 104:2
**article** 3:14
19:24 20:25
26:22 27:13
83:1
**articles** 86:4
**asbestos** 15:22
**aside** 74:7
114:8 161:17
**asked** 94:20
99:8 158:21
162:9
**asking** 13:22,23
47:23 129:14
158:7
**aspect** 58:20
**assess** 146:23
**assessment**
158:6
**associate** 90:17
**associates** 8:22
**association**
5:14
**assume** 35:4
88:13 134:1
156:14

**assumes** 64:16
**assuming**
148:14
**assumptions**
116:12
**atd** 63:25
**atds** 44:8
**atlanta** 2:18
**attach** 132:21
**attached** 88:15
108:7 110:19
110:19 176:11
**attachment**
132:24
**attachments**
4:13
**attend** 37:13
**attitude** 131:11
**attorney**
164:22 176:13
**attorneys** 5:17
117:16
**attributable**
57:9
**audible** 174:2
**august** 43:6
170:11,13
**authored** 82:9
**authorities**
16:5
**authorized**
175:8
**auto** 8:15,25
9:4 16:15
17:14 19:18

23:20 24:5,20
24:20 26:18,18
34:11 66:16
**automakers**
19:24 66:20,23
122:18
**automobile**
14:9
**automotive**
30:2 31:12
32:21 52:12
67:22 78:12,16
79:5
**availability**
135:25
**available** 68:6
145:21 176:6
**avenue** 2:13 5:9
**average** 31:14
**avoid** 37:7
**aware** 8:16
11:7,25 12:15
12:21 13:1,4
13:18 16:10
18:15 19:23
20:5 21:17
23:20,23 24:4
24:19 25:5,8
26:5,17 27:21
28:1,3,10
32:16 33:24
34:4,8,19,23
35:6,11 36:24
37:4,10 53:21
54:10 58:4

66:18 79:8,13
79:17 81:23
82:6 93:13
115:17 116:1
120:3
**axle** 128:7,9,17
128:18,22
**az** 1:24 175:25

**b**

**b** 1:23 2:3
93:24 175:4,24
**back** 41:2
45:20 47:13,21
48:2 65:8 78:6
83:4 89:12
119:10 125:11
131:7 140:6
142:18,23
149:7 153:6
159:19 160:5
164:17,19
**backed** 160:24
**background**
33:16 39:19
**backseat** 20:15
**backwards**
61:24
**bad** 23:1
**bags** 113:10,12
113:19
**ballast** 44:25
65:5 68:24
92:25 114:11
114:17 134:16
140:21 141:10

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[ballast - buffalo]**                                              Page 6

142:11 143:18
172:22
**ballasted**
114:19 115:4
133:10 137:10
**ballasting**
134:8,10,11
172:19,20
**ballasts**  55:20
113:22,24
114:4,12
**banned**  16:6
**bar**  160:14
**barrier**  72:18
77:9
**barriers**  70:18
73:14
**bars**  113:11
**based**  37:21
80:14 97:1
152:1,24 156:6
156:15 172:4
**basic**  68:23
**basically**  59:11
72:9
**basis**  81:12
**bear**  78:10
127:20
**beautiful**
160:19
**bed**  143:21
**bees**  16:6
**begins**  100:9
**behalf**  10:21
11:9,12 13:5

13:13,24 17:14
19:14 115:24
**behaved**  62:11
**beholden**  26:17
**believe**  10:3
17:2 32:17
33:15 39:19
40:5 47:17
56:9 61:5,11
68:18 76:24
84:20 85:18
106:15 118:5
122:8,12
123:20 124:25
143:8 172:16
**belts**  19:25
20:1,17
**best**  24:12,14
24:16 25:13
67:25 68:17
90:20 96:9
103:5 104:11
104:13 142:25
149:4 150:21
150:23 151:16
163:4,7 175:16
**better**  67:15
71:15 140:5
**beyond**  80:10
**bias**  143:10,12
**big**  143:7
**bigger**  62:7
123:11
**bill**  31:24

**billed**  64:6,20
**billing**  31:3
168:10,11
**billion**  7:1
**bills**  117:5
**bin**  131:2,3
**biomechanic**
79:20
**biomechanics**
79:25
**bit**  19:8 24:10
98:6 151:20
162:7
**bits**  162:5
**black**  110:12
147:10 152:7
**blueprint**  53:7
**boards**  128:24
129:2,11 146:8
**bob**  32:12
**body**  107:11
**boom**  150:8
**boring**  78:9
**borrow**  171:10
**bottom**  7:17
**bought**  92:11
93:11 125:16
136:15
**bows**  93:18
**brake**  97:7,8
98:2 99:10,12
99:21,24 100:3
100:14,15,24
101:10,13,16
101:20,20

102:2,6,20
108:15 109:7
137:8
**brakes**  96:22
96:23 99:25
100:1,17,19
108:17 110:5
**braking**  96:16
96:18 97:1,10
97:18 98:5,7,9
98:10,11,12,22
99:4 110:8
134:13 141:8
141:14
**brand**  131:5
**break**  77:24
**breakdown**
122:25
**breaking**  96:11
**brian**  26:1,20
27:4
**bright**  133:23
**bring**  68:2
103:7 108:25
111:4 144:11
**bryson**  1:5,5
5:6,6 94:8
176:4 177:1
178:1
**brysons**  34:21
93:10 94:5,14
**budget**  64:3,8
64:11
**buffalo**  123:19

Charles Crosby , PE                          May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[built - cannella]**                                Page 7

**built** 104:25
**bulbs** 133:23
**bump** 100:16
  101:24
**bumper** 50:9
  50:11,12,16
  51:3,3,14,14
  96:25 97:8
  98:24 99:1,3
  131:18,22,25
  151:12 162:1
  162:20,21
  163:1
**bumpers** 34:12
  50:23 51:2
**bunch** 134:20
  134:20,21
**burned** 21:25
**business** 3:14
  20:25 26:21
  28:7,15
**busy** 54:23
  118:11
**button** 153:17
  153:19,25
  154:3,8
**buy** 54:11
  125:22
**buying** 168:14

**c**

**c** 21:11 27:18
  33:25 93:24
**c.z.b.** 1:6,6
**ca** 1:23 175:24

**cab** 4:15
**cable** 108:7
**cade** 40:19
**cades** 39:14
  40:11,15,24
  41:3,15,17
  42:6,22
**calculated** 36:2
**calculation**
  98:4
**calculator**
  171:10
**calibrated**
  148:4
**calibration**
  146:10 147:9
**california** 2:4
  123:21,22
  175:5
**call** 29:1 50:3
  63:9 64:3
  101:4,21 108:4
  117:2,25 118:2
  118:8 140:15
  151:9
**called** 6:2 8:22
  12:9 26:21
  27:6,13 38:11
  38:18 40:25
  44:8 47:18
  52:11 103:22
  114:17 140:18
  146:9 152:17
**calls** 62:20
  63:13,14,21

64:25 117:22
  121:8 138:11
**calspan** 123:15
**calspan's**
  123:17
**camera** 68:16
  68:18,19 69:3
  144:10 146:10
  146:13,25
  149:7,22 150:1
  150:3,5,7,11,20
  150:22,24
  151:8,17,22,24
  152:16,19,24
  155:1 156:2
  157:3 158:19
**camera's**
  156:12 158:2
**cameras** 68:21
  101:23 133:25
  134:21 139:6
  144:13,17,20
  145:13,15
  146:2 147:1,6
  147:9 150:17
**canister** 141:16
**cannella** 2:12
  2:12 3:3 5:19
  5:19 6:5,13
  7:14 8:20 9:19
  9:22 10:8,18
  11:3 12:2,18
  13:3,11,21
  14:3,20 15:6,9
  15:17,25 16:4

16:9,21 17:4
  17:13,18,23
  18:3,14,20
  19:2,15,22
  20:6,11,24
  21:6,10,19
  22:10,18,25
  23:10,19 24:2
  24:18 25:1,15
  25:24 26:16,25
  27:11,17 28:2
  28:12,19,24
  29:6,23 30:10
  30:13,23 31:2
  31:9,15,21
  32:1,7 33:1,17
  33:23 34:3,9
  34:16,24 35:5
  35:12,15 36:8
  36:15,21,25
  37:5,11 39:10
  39:13 41:12
  42:1,9,13,17,21
  43:3,9,14,19
  44:2 45:5,8,12
  45:16,22 46:6
  46:11,14 47:6
  47:11 51:21
  53:11 56:12,16
  60:9 61:3 62:6
  62:17 73:11
  74:19 75:9,13
  75:18 76:15
  77:25 78:8
  79:14 80:12

Charles Crosby , PE                                      May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[cannella - chance]**                                         Page 8

87:11,16 91:13
91:18 95:7
98:15 107:2
110:1 120:1
121:18 135:20
138:4 144:9
145:6 148:5,16
153:1,8 154:5
155:6,12,24
159:20 160:25
161:3,5,9,12
163:19 164:6,9
167:10 169:9
169:11 171:11
172:1 173:24
174:13
**cannellasnyd...**
2:15
**capabilities**
123:8
**caps** 41:6,7,21
41:21
**capture** 161:11
**captures** 89:9
89:10
**car** 24:10,15
28:6,14,21
63:17,22 64:1
67:11 70:11,13
103:25 104:3
113:14,16
125:18,20
126:23 157:24
**career** 33:12

**cargo** 58:2,4,5
58:8,9 59:14
59:20 60:15,16
61:1,10,14
**carhart** 29:24
30:18 31:16
63:7
**cars** 22:19
39:23 44:21
134:19 144:2,4
**case** 5:7 11:1,6
12:5,8,21,22
13:2 18:6
27:23 28:6,14
28:18 29:8
30:11,25 32:8
37:14 39:8
40:9 45:3,24
54:6,12,18
56:5 57:12,18
58:17 59:17
60:12 69:15
70:20 71:25
74:12 75:6
79:16 80:14,17
81:1,5 84:7,9
84:18,19,20,22
85:4,15,20
86:9,13,16
87:14 88:5,6,9
89:15,19 91:16
94:6 95:17
97:18 99:5,11
99:18,19,20
101:8 102:22

103:15 104:18
108:18 111:11
112:4 115:15
115:25 116:12
116:13 117:1
119:2 120:2,9
120:14,17
121:6,8 127:14
127:17 128:20
138:2 139:19
145:25 147:6
148:9 152:2
154:21 155:23
164:12,13
172:15
**cases** 10:15
11:13,22,23
12:4 13:6,14
13:25 16:25
17:11,20,25
18:7,12,17,22
30:2,5 36:1
101:6 102:25
103:1 122:24
145:12
**cast** 158:8
**catastrophic**
20:15
**catch** 169:4
**catching** 21:12
21:15
**category**
132:17
**catherine** 8:13

**cause** 12:10,23
83:14,17 85:7
144:4
**caused** 12:24
25:19
**causes** 108:1
**center** 48:23
107:21 110:14
127:23 132:5
149:23 150:25
151:8,17,17
152:7,8,9
155:21,21
156:2 158:5
**centered**
107:18
**ceo** 8:12
**certain** 34:13
56:25 105:22
142:22,23
145:16 168:11
**certificate**
175:3
**certified** 1:23
1:24 2:5 5:13
175:4,5
**certify** 175:6,17
**chain** 139:14
**chains** 108:8
110:20 139:11
139:13
**challenging**
19:25 20:17
**chance** 118:24

Charles Crosby , PE
Bryson, Santana and Joshua v. Rough Country, LLC
May 14, 2024

[change - compatibility]
Page 9

change   10:4,11
  54:9 58:13
  59:9 61:2
  98:14 160:12
  177:4,7,10,13
  177:16,19
changed   93:22
  112:17
changes   94:1
  156:19 176:10
  178:6
characterize
  32:20,25 49:23
charge   26:15
  56:3,3,6 64:9
  165:8 166:9
  168:12 169:24
  169:24 170:17
  172:5
charged   56:5
  165:6,7,14,20
  166:16
charges   164:24
  168:4,5
charging
  166:15 167:18
  168:16 170:3
charles   1:14
  2:1 3:16,18 4:4
  4:11,12 5:5 6:1
  176:5 177:2,24
  178:2,4,12
charts   118:19
chatting   38:7

check   91:23
  111:8,16
  112:12 172:16
checked   112:1
checking
  111:22
chemical   16:1
child   44:11
choosing   104:7
chosen   120:4
christian   41:6
  41:20 42:5
chrysler   84:13
cigarette   13:5
  13:13,24 15:13
circle   159:1
  160:10 163:5,8
  163:11
circled   161:11
circumstances
  51:13
cisco   38:10
claim   25:17
claiming   12:9
  16:7 20:1,18
clamps   108:5
clean   42:5
  111:20
clear   64:10
  100:18 136:3
clearly   152:14
click   153:19
  154:3 155:13
client   11:10
  12:1 55:25

127:6
clients   8:24,25
  13:19
close   97:22
  102:13 159:14
closer   31:22
  48:16
clustered
  120:23
collapsed   25:18
colleagues
  83:22
collect   118:13
collection   69:4
collision   3:22
  108:19,20,22
  108:24 109:2,6
  121:19,25
  122:7,10,14
  124:4,17
color   4:3
combination
  113:10
come   24:11
  100:3 115:8
  125:8 130:18
  142:5 143:23
  156:22 166:21
comes   35:1
  109:16 125:13
  125:15,17
  130:3 166:22
coming   77:15
  77:16 114:25

commenced   2:2
comment   23:17
common
  103:22
communicate
  38:4
communicati...
  116:9,11
companies
  14:25 19:13
  23:21 29:1
company   7:4
  8:1,10 11:17
  12:17 13:9
  17:10 19:21
  24:24 26:7,9
  26:15,15 28:6
  28:14,21
  122:14
companywide
  43:4
compare   103:6
  103:17,23
  104:7
compared
  102:23
comparing
  104:25 105:25
comparison
  60:22 103:13
  105:21 106:11
comparisons
  103:9
compatibility
  3:22 34:6,10

Charles Crosby , PE                                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[compatibility - correct]**                                              Page 10

34:14 35:2
**compelling**
  137:14,20
**compensation**
  86:8,12
**competing**  22:3
**complete**  81:11
  86:22 107:9
  126:7,21
  164:10 178:8
**completed**
  124:6 133:9
  165:21 166:19
  167:12 173:4
  176:16
**completely**
  55:17 93:3,5
  98:13 126:18
**component**
  78:19 79:6
**components**
  50:1
**computer**
  40:20 45:14
  49:5 88:2
  103:8 115:20
  119:2,13,14,20
  119:21,25,25
  153:15 175:12
**computerized**
  88:4,8
**concentrating**
  124:5
**concept**  159:22

**concern**  54:19
**concerning**
  94:22
**concluded**
  174:15
**concludes**
  174:4
**conclusion**
  156:15,22
**conclusions**
  80:13,16,22
  148:6,10
**condition**  96:7
  99:13 100:22
  125:24 129:22
  131:13 132:14
  142:19 148:23
**condoned**
  43:15
**conference**
  37:25 40:17
  42:24 117:21
  118:2,8 165:17
**conferences**
  37:12,19 58:6
**configuration**
  127:21
**confirm**  74:10
  91:22 102:2,20
  114:1,3,6
**conflict**  28:7,15
  28:17
**confusion**
  138:13,15

**consensus**
  61:12
**considered**
  71:19 81:19
**consist**  54:3
**consistent**
  29:17 104:12
**constitute**
  86:12
**constrain**  113:3
**constraining**
  110:21 113:5
**consultants**
  6:22 11:20
**consulting**
  64:15
**consults**  24:10
**contact**  133:24
  151:7 164:13
  164:15
**contacted**
  19:12 84:22
**contain**  79:23
  81:11,15,18,20
  81:25 82:2,7
  82:10,14 86:8
  86:24 87:3,5
**contained**  89:6
**contains**  80:2,7
**continued**  4:1
  137:2
**continuously**
  135:3
**control**  108:16

**controversial**
  110:4
**convenient**
  149:19
**conversation**
  94:19 138:5,12
**conversations**
  63:16
**copies**  6:6,8
  176:14
**copy**  68:2,5
  174:8
**coral**  12:8,23
**corner**  7:17
**corporations**
  10:15 11:12
**correct**  6:17,18
  6:23 7:24 8:2,3
  8:13,16 10:4
  10:12,22 11:13
  14:9,11 15:1
  15:14 16:13,25
  17:7,14,20,25
  21:1 22:20
  23:2 24:21
  26:10,22 27:14
  29:8,10,24
  30:15,16 31:5
  31:8 32:3,11
  32:13 33:6
  34:17 42:7
  49:18 50:14
  51:7,9,12 55:4
  57:25 60:22
  61:25 62:8

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[correct - crash]                                          Page 11

| | | | |
|---|---|---|---|
| 68:9 70:12,15 | 149:6,24,25 | **county**   175:1 | 55:13,15 56:19 |
| 72:7 73:9,16 | 151:1,2 152:23 | **couple**   47:18 | 57:5,7,10,10,13 |
| 73:18,22 74:24 | 155:21 156:23 | 74:13 83:22 | 57:14,24,24 |
| 76:14 77:3 | 157:7,8,11,25 | 124:3 134:25 | 58:4 59:22 |
| 78:12,16,17,20 | 161:21 163:20 | 135:5 146:6 | 60:3,13,14,18 |
| 78:22,23 84:13 | 165:3,6 166:10 | **course**   30:5 | 61:16,17,19,23 |
| 84:14 86:23 | 166:16,17 | 161:14,17 | 62:12,19,23 |
| 88:18,19 89:16 | 167:1,4,19 | **court**   1:1 5:11 | 63:18 64:3,12 |
| 91:5,6 92:13 | 168:23 169:3 | 5:23 28:5 81:7 | 65:10 66:8 |
| 92:16 93:12 | 170:5,8 171:22 | **cover**   162:1,20 | 67:17,24,25 |
| 100:25 101:10 | 171:25 172:8 | 162:21 163:1 | 68:13 69:8,9 |
| 101:13,14 | 173:22 178:8 | **covered**   80:21 | 69:11,12,13,13 |
| 102:25 105:1 | **corrections** | 81:2 | 69:22,23 70:1 |
| 107:16,18,19 | 178:6 | **covering** | 70:1,23 71:20 |
| 107:21,22 | **correctly**   9:12 | 144:20 | 72:12,13 77:8 |
| 108:21 109:4,8 | 20:20 22:7 | **cr**   175:25 | 80:3,8,18,21,23 |
| 109:13,14 | 27:8 36:4 41:8 | **crabbed**   77:15 | 84:17,22 85:1 |
| 110:6,14 | 41:23 42:10 | **cradle**   132:22 | 85:3,11 87:25 |
| 112:22 114:21 | 58:11 146:16 | **crane**   157:24 | 88:13,13,14,22 |
| 114:22 115:5 | **corresponden...** | 158:2 | 90:10 91:8 |
| 115:12 121:1 | 89:21 164:10 | **crash**   4:7,17 | 92:15,19 94:4 |
| 121:12,22 | **corrigan**   8:13 | 26:8 34:13 | 94:5 95:9,14 |
| 122:16,17 | **cost**   56:19,21 | 36:18 37:22 | 95:22 96:4,8 |
| 123:17 126:13 | 144:2 172:2 | 43:20,21,24,24 | 96:11,12,15,16 |
| 126:14 127:25 | **counsel**   176:14 | 44:3,4,7,15,18 | 96:17,18 99:14 |
| 128:13,14 | **countermeas...** | 44:23 45:3 | 100:9,10,23 |
| 129:9 132:11 | 3:21 | 46:15,17 47:19 | 101:1,9 102:24 |
| 133:15 134:3,4 | **country**   1:10 | 47:24 48:3 | 102:24 103:16 |
| 135:17 136:9 | 5:7,21 17:6 | 49:23,24 50:1 | 104:15 105:1 |
| 136:10 137:5 | 37:2,6 88:7 | 50:9,13,23 | 105:25 106:1,6 |
| 140:23 141:19 | 115:21 120:24 | 51:11,22,24 | 106:12,14,18 |
| 141:22 142:14 | 170:4 176:4 | 52:2,17,20,21 | 107:4 109:4,15 |
| 143:21 147:13 | 177:1 178:1 | 53:1,3,13 54:3 | 109:17 110:10 |
| 147:17,18 | **country's**   4:9 | 54:5,9,12,13 | 110:17 111:7 |
| 148:10,18,19 | 116:6,10 121:9 | 55:1,3,5,6,12 | 114:19,20 |

Charles Crosby , PE
May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[crash - defendant]**
Page 12

115:3,14,15,17
117:19 118:6
118:12,17
119:1,21,24
120:13 123:4,6
123:7 124:21
132:13,25
136:13 137:3,3
137:16 138:18
138:18 142:19
144:5,18,21
145:22 153:10
153:13 155:4
162:8 165:2,16
166:7 167:12
167:13 168:15
169:25 171:22
172:3 173:4,4
173:15
**crashed** 53:15
95:9 107:4
**crashes** 21:13
21:25 22:3,14
34:21 57:23
**create** 113:8
**created** 46:8
78:24 79:2
**crew** 4:15
**criminal** 18:5
18:12,16
**crosby** 1:14 2:1
3:17,18 4:5,11
4:12 5:5 6:1,14
45:23 153:9,12
176:5 177:2,24

178:2,4,12
**croteau** 14:5,11
14:12,24 15:10
15:11,12 28:3
63:8
**crush** 22:14
35:9 36:11
52:13 58:13
60:22 103:6,9
104:10,14,15
106:2,3
**crushed** 25:20
**cs** 176:15
**cse** 122:19
123:4,14 124:1
**csr** 1:23 2:3
175:24,24
**currently** 38:11
116:17 152:24
**curriculum** 4:4
**cursive** 46:22
**cuts** 105:20,22
106:12
**cv** 1:8 5:8
121:15

**d**

**d** 3:1 46:24,25
46:25 48:21
93:25
**damage** 12:10
12:23 73:15
76:11 103:23
125:25 144:5
162:2,4

**damaged** 12:8
**danger** 36:18
**data** 49:13,13
49:14 57:11
69:3,4,4 81:18
103:5,16,17,21
105:5 161:24
161:25
**date** 92:1,6
112:7 135:10
137:5 169:8,12
177:24 178:12
**dated** 3:11,19
4:7,13 164:19
175:20
**dates** 116:25,25
**davis** 40:3,10
40:21 41:15
42:4,23
**davis's** 40:20
**day** 23:24 55:1
55:7,9,11,13,18
55:24 56:2,3
61:18 118:23
118:24 126:19
157:19 175:20
178:15
**days** 56:1 86:19
92:12 93:11
134:25 136:23
176:16
**de** 2:13
**deadline** 54:18
54:20

**deadlines** 54:17
**dealerships**
130:6
**death** 20:2,19
22:1,2
**decade** 40:6
**decades** 8:16
25:4 33:2
144:19
**decatur** 2:14
**deceased** 1:6
**december**
170:24
**decide** 59:8
61:7,9 105:16
**decided** 142:6
**decision** 61:20
**decisions** 59:18
**declare** 178:4
**decreasing**
124:5
**deemed** 61:2
178:6
**deep** 12:7,21,22
**default** 104:20
105:11
**defect** 79:18
**defective** 16:23
32:9
**defend** 13:13
15:21 17:7,24
20:14 33:18,24
**defendant** 1:11
4:9

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[defendants - direction]**                                    Page 13

**defendants**
  2:16
**defended**  10:14
  14:25 15:13
  16:12,15,24
  18:6
**defends**  19:5
**defense**  19:11
  27:13 85:19,21
  122:21,23
**definitely**  119:5
**deformation**
  60:4 61:13
  62:5,8
**deformations**
  145:17
**degree**  145:3
  161:14
**deliver**  8:7
**delivered**
  125:16,19
**delta**  83:7
**demand**  9:9
**denying**  12:8
**dependent**
  83:10
**depending**
  44:10,24 68:19
  103:10 125:18
  135:24
**depends**  54:16
  55:14 57:11
  61:1 69:11
  71:13 101:7
  102:11 103:4

103:13 104:8
104:19 106:9
113:22 125:5
125:15 126:20
127:5,10 135:1
146:8 154:17
**deployments**
  83:6,7
**deponent**
  176:13 178:3
**deposed**  47:14
**deposing**
  176:13
**deposition**  1:14
  2:1 4:11 5:5,14
  29:12 47:8,18
  82:24 163:17
  164:2 174:5
**depositions**
  86:3 89:23
**depth**  119:8
**derek**  86:1
**described**
  132:19
**description**  3:7
  4:2
**design**  18:6
  23:4 57:7,10
  58:15
**designated**
  145:5
**designed**  61:24
  78:21
**designing**
  57:16 62:19

**designs**  22:19
  22:23 66:17
**detail**  119:11
  162:25
**detailed**  103:6
  119:7
**details**  74:3
  84:21 86:25
  87:8 88:21,23
  89:3,6
**determination**
  36:16
**determine**
  24:16 25:13
  59:1 62:23
  72:13 104:13
  150:21 162:7
  163:1
**determined**
  57:8
**develop**  66:17
**development**
  66:15 79:7
**device**  34:20
  112:23
**devices**  134:21
**devin**  2:13 5:19
  45:5
**dewell**  38:14
**diagram**  48:10
**dial**  2:17
**dictate**  141:10
  158:9
**diesel**  172:11
  172:15,20

**difference**  20:2
  20:19 57:23
  58:3 59:3,5,7
  59:16,20
  137:13 141:2
  154:21 158:13
  172:21
**differences**
  172:22
**different**  11:21
  19:12,13,14
  22:23 23:5,6
  39:20 40:9
  62:16,20 63:15
  70:5 75:14
  83:7 93:14
  96:21 98:6,13
  103:3 104:15
  104:16,22
  106:6 110:10
  113:18 130:18
  132:23 134:18
  134:19 135:4
  146:8 152:4,5
  152:10,18
  157:1,2 172:12
  172:13
**differently**
  62:11 146:5
**difficult**  98:3
  159:18
**direction**  111:3
  151:22,23
  175:13

Charles Crosby , PE                                          May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[directly - dummy]**                                        Page 14

**directly** 66:12
  84:2 85:25
  149:23 150:25
  151:15,18
  156:2
**director** 14:11
**disagree** 15:19
  24:9
**disappeared**
  160:14
**disaster** 12:8
**disclosing**
  87:14
**disclosure**
  86:12 87:20
**disclosures**
  4:10 87:13
**discovered**
  21:12
**discuss** 65:1
**discussed** 72:15
  116:5 120:2
**discussing**
  64:18
**discussion**
  40:20 57:4
  61:17 63:21,23
  64:15 118:11
  118:15 138:10
**discussions**
  54:4 58:5
  63:20
**disengage**
  100:17

**displacement**
  173:3
**distance** 73:21
  173:15
**distances**
  152:18
**distortion**
  146:13,14,16
  146:18,19,23
  147:1 151:20
  154:16,20
  158:16
**distortions**
  154:14,25
  155:8
**distribution**
  141:5 142:17
  142:21
**district** 1:1,2
  28:4,5
**divide** 105:17
**dividing** 166:22
**diving** 25:19
**division** 1:3
  14:9 143:17
**doc** 117:14
**document** 3:20
  4:6 46:8 89:18
  90:16 96:7
  163:24
**documentary**
  114:7
**documentation**
  11:23 112:14
  112:17,20

  126:4 130:19
**documented**
  65:7 88:14
  114:10 127:4
  130:14
**documenting**
  100:22 112:7
  118:12
**documents**
  89:22,23 135:8
  164:1 165:11
**dodge** 22:4
**doing** 6:15
  25:10 55:19
  61:22 72:12
  81:5 83:5
  116:5
**dollars** 7:1
  31:22
**donaldson**
  27:18
**door** 102:19
**double** 6:7
  91:23
**downstream**
  151:10
**dr** 8:13 29:7,16
  29:24 30:18
  31:16 39:14
  40:2,10,11,15
  40:19,20,21,24
  41:3,15,15,17
  42:4,6,22,23
  45:24 59:18
  61:8,9 63:7,9

  63:24 69:19
  72:8 117:15
**drain** 131:6
**drained** 143:14
**draw** 127:21
  148:6,9 153:21
  156:15 157:13
  159:3
**drawing** 80:13
**drawn** 80:16
  80:22
**drew** 160:7
**drill** 49:10
**drive** 101:6
  111:1 143:14
**driven** 9:9
  108:6 112:10
**driver** 99:10,11
**driver's** 62:12
  109:6 141:22
**driving** 111:21
**dropped**
  125:19
**drug** 107:23
**due** 60:4
**duly** 6:2 175:9
**dummies** 43:21
  43:24 44:4,7
  44:11,13,16,19
  45:2 61:16,18
  61:19 63:23
**dummy** 44:22
  44:25 45:1
  61:23 62:8,12

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[duplicate - essentially]**                              Page 15

**duplicate** 58:18
58:19,23,24
59:5,7,12
106:1,3
**duties** 84:4
**duty** 4:15

**e**

**e** 3:1 4:5,12
6:12 38:16
41:6,20 43:10
90:5 100:24
102:2,20 177:3
177:3,3
**earlier** 92:12
92:14 109:8,23
110:18 132:19
135:22 136:11
136:19
**easier** 160:17
**easily** 11:22
**east** 5:9
**eastern** 28:5
**economies**
56:24
**economy** 124:3
124:11
**edge** 155:1
158:2 162:3
**editor** 153:20
**effect** 60:17
**effective** 3:21
35:8 36:10
83:11
**effectiveness**
36:1

**efficacy** 83:6
**either** 44:25
49:13 61:9
92:22 97:6
100:14 103:5
125:17 128:17
129:14 152:19
**electronic**
149:16
**element** 119:8
119:9
**elevations**
152:11 157:2,2
**eliminate**
146:17
**emblem** 47:13
48:19,24,25
49:16 161:21
**emergency**
98:12 100:14
101:10,13,15
101:20
**employed**
175:18
**employee** 27:19
28:20 30:1
31:11 32:15
38:13 78:16,18
**employees** 38:4
43:5 62:21
122:10
**employer** 6:17
78:14
**employment**
84:1 124:7

**empty** 139:16
143:11
**ended** 47:23
50:2 72:21
**ends** 121:4
**energy** 9:11
11:22 34:20
35:7 36:9
**engaged** 100:15
**engine** 129:19
132:22 172:12
**engineer** 40:2
87:23 104:7,13
169:22
**engineering**
14:10 37:12,19
37:25 40:16
42:24 121:20
121:24
**engineers**
20:16 25:16
67:22 122:13
123:3 124:17
**ensure** 71:12
94:3
**enter** 163:16
**entered** 34:12
**entire** 12:16
**entities** 19:10
19:13
**entitled** 3:8,14
3:20 4:6
**entity** 168:15
**equal** 144:5

**equidistant**
105:10
**equipment**
53:8 128:25
134:19 137:11
141:11 168:12
**errata** 176:11
176:13,16
**escape** 4:7 45:3
46:16,23 47:13
47:21 48:22,24
50:8,12 51:4,6
51:12,15,17
63:18 70:22
90:15 91:3,4,7
91:9,11,25
92:2,3,7,10,11
92:11,21 93:2
94:15 99:11
101:9 107:20
108:2 109:9,10
109:11,12,16
110:6,9,13
115:3 119:18
136:6,12,15
137:7,15
138:14 148:20
148:23 151:2,7
151:11 162:2,3
162:4 163:2
**escape's** 151:12
**essentially**
57:13 60:13
65:13,25 72:25
108:5 110:19

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[essentially - exponent]                                      Page 16

129:21 143:13
159:22
**established**
144:16
**estate** 1:5
**estimate** 52:19
64:2 139:4
150:21 158:15
158:18
**estimates** 48:22
49:8 145:16
**estimating** 98:8
**estimation**
48:18
**estimations**
48:16
**et** 5:6
**ethics** 3:14 21:1
26:22
**european** 16:5
**evaluation** 88:1
88:3
**evening** 42:6
**event** 133:20,22
**everybody**
24:12 118:7,16
148:18
**everybody's**
100:18,18
**everything's**
6:7 66:4 98:6
**evidence** 35:7
43:5 47:8,10
47:12 73:1
74:10,13,18,22

75:7 114:7
161:25 162:5
162:12
**exact** 7:3 50:15
53:4 60:3
68:18 98:7
106:7 130:16
135:10 162:7
**exactly** 19:10
48:15 49:15
50:19 109:21
120:6 130:14
136:24 143:19
143:21
**examination**
3:2
**examined** 6:3
**example** 71:4
97:18 104:1
135:13
**exceed** 128:20
128:23
**except** 58:15
137:5
**excerpt** 87:13
**exchange** 41:15
**exchanges** 3:23
**excuse** 11:11
22:12 29:15
86:15 103:12
132:4 137:3
152:12
**execute** 64:17
**executed** 56:11

**exemplar** 88:22
88:25
**exhibit** 3:8,10
3:12,14,16,18
3:20,23 4:3,4,6
4:9,11,12,14,16
4:17 7:7,11,13
9:7,20,21
14:14,15 20:7
20:10 21:21
26:1 30:10,12
30:24 31:1
35:13,14 39:11
39:12 40:7
41:14 42:3,22
46:7,13 56:13
56:15 75:8
87:12,15 91:14
91:17 106:24
107:1 116:21
121:16,17
161:1,8 163:17
163:18 164:7,8
**exhibits** 3:7 4:2
14:18 21:5
81:25
**exist** 39:8 69:22
**expect** 62:10
109:17
**expected** 72:9
88:11 125:24
**experience**
61:22 62:7
78:11

**expert** 32:21
33:11 80:3
87:24,25
122:15 173:21
**expertise** 12:15
**experts** 29:17
29:18,18 62:18
63:1,5,15
74:13 116:7,10
121:8 123:14
125:3,7 127:6
148:8
**explain** 97:4
136:17,19
**explaining**
156:8
**explorer** 85:2,4
**exponent** 3:8,8
3:15 4:6,16
6:17,19 7:15
7:18 8:1,12,21
9:10,14 10:2
10:14,19,21
11:5,11,18,24
12:1,5,7,20
13:4,12,24
14:6,24 15:12
15:21 16:7,12
16:15,24 17:6
17:19,24 18:21
19:3,16,24
21:13 23:11,20
23:24 24:4,9
24:19 25:2,16
27:19,22 28:13

Charles Crosby , PE                                                  May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[exponent - figure]**                                              Page 17

28:20 29:19
30:1,17 31:11
32:13,18 36:16
36:22 37:1,6
38:4,13 39:15
40:5,9 41:15
41:16 42:15,22
42:23 43:4,10
43:15,18,20,23
44:7,11,13
51:16,23 52:5
52:11,17 55:12
62:21 63:1,4
64:21 79:15
83:24 84:2,5
91:4,16 92:9
92:15,21
100:21 101:1
115:25 121:11
121:20,24
123:15 124:2
124:14,15,18
124:19 125:12
134:20 138:17
138:20,22
140:12 166:16
171:21
**exponent's**
6:25 8:7,25 9:3
11:1,8,17
12:16,22 13:2
18:6 144:12
170:3
**express** 81:12

**expressed**
138:13
**extensive** 88:14
**extent** 79:24
80:9 82:17
**extra** 6:6 46:12
**exxon** 10:19,21
11:5,6,10,11
**eyeball** 49:5
72:25

**f**

**f** 4:7
**f.s.** 112:8
**f250** 4:15 46:17
46:22 47:21
50:10,11 51:3
51:6,11,14,16
53:19,25 57:5
57:13 59:25
70:21 90:16
91:24 95:8,9
95:10,14,14,16
95:20,22,23
107:17,23,25
108:1,7 109:9
110:13,16
112:6,7 114:19
119:16 127:23
128:2 129:12
132:14 140:22
151:6 152:9,10
155:20 156:10
157:6,7 161:13
162:1,4 172:15

**faa** 19:23
**faa's** 8:24
**facilities** 123:5
**facility** 54:23
123:7,10
125:17 168:5
169:20
**fact** 13:12,15
22:4 48:20
81:10 82:23
142:17 143:13
**factor** 61:10
**factors** 39:18
59:2,2 124:3,9
**factory** 51:7
**facts** 13:19,23
80:3 81:18
116:11
**factual** 86:25
**failed** 161:6
**fails** 176:18
**failure** 8:22
20:16 22:1
**fair** 32:20 95:2
112:21 120:25
158:1 166:24
**fairly** 68:23
98:11 139:2
**fake** 139:18
**familiar** 34:18
38:15 40:4
81:10
**family** 40:21
**far** 52:25 53:5
53:5 67:20

86:3 89:22
90:11 91:20
93:6 135:24
136:22 139:12
143:15 147:5
150:23 158:4
165:18
**fast** 107:14
**fatality** 22:4
**fault** 160:11
**favor** 163:3
**fca** 84:12,13,16
84:17
**february** 171:3
**federal** 23:21
24:20 81:7,17
81:24
**fee** 86:10,10
165:2 168:18
170:11
**feeling** 111:22
**fees** 172:6
**feet** 99:23
149:23 150:20
150:25 151:1,2
151:4,9,9
**female** 44:13
**fewer** 44:23
**field** 31:12
122:15 152:18
**fields** 87:24
**fight** 23:21
24:5,9,13 25:8
**figure** 49:6,15
57:17 59:12

Charles Crosby , PE

Bryson, Santana and Joshua v. Rough Country, LLC

May 14, 2024

**[figure - form]**

Page 18

62:24 67:11,14
98:16
**figured** 142:15
**figuring** 134:1
**file** 38:24 39:6
41:7,22 42:25
**fill** 64:21
113:13 126:3
130:9,10 131:5
**filled** 85:5
**filtering** 69:4
**final** 133:11
**finalized**
118:24
**financial** 3:9
**find** 83:8 85:3
90:21 103:22
113:23 149:9
162:19 163:4
**finding** 35:7
**findings** 21:18
83:9
**fine** 6:10 45:16
77:21 90:7
112:1 155:14
**finish** 75:11,12
**finished** 86:17
135:13
**finishing** 124:6
**finite** 119:8,9
**fire** 21:13,15
84:20 85:7
**fires** 22:1
**firm** 5:12 85:22

**firms** 62:20,25
**first** 5:18 6:2
7:8,22 14:5
35:16,17,20
53:5,7,9 54:6,7
54:12,13 55:1
55:23 56:19
57:1 87:22
89:14 91:10,11
91:12,19,24,24
92:23 94:6
97:3,5 125:20
126:12,22
136:4,19 137:2
137:3,22,22
138:9 151:7
164:13,15
165:4,13,13
167:14
**fiscal** 3:9 7:24
**fit** 113:23
**fix** 21:6
**flammable** 85:7
**flash** 133:20,22
133:23,24
134:21
**flashes** 139:6
**flat** 25:20
**flip** 35:17
**floor** 141:8,23
**floorboard**
108:14 140:22
**fluid** 85:10
129:20,24
131:3 139:18

**fluids** 129:16
129:17,24
130:2,3,11,21
131:23 132:8
**fmvss** 77:5,7
**follow** 67:18,19
67:21,23 69:15
**following** 53:6
71:23 88:25
**follows** 6:3
**foot** 99:10,11
99:21 109:7
**ford** 3:13 4:7
4:15 9:14 10:2
22:3 46:16,22
47:13,20 48:19
48:21,24 49:16
50:8,10,12
51:5,8,10,16,17
70:22 85:2,4
89:23 90:15,16
91:3 107:20
108:2,7 110:6
110:9 151:11
151:11 161:20
162:1,3,4
**fords** 47:21
50:11
**fore** 140:7
**foregoing**
175:7,14 178:5
**forensic** 5:14
73:1 74:10,12
74:18,22 75:7

**form** 8:17 9:16
10:6,16,23
11:14 12:12,25
13:16 15:2,23
16:18 17:1,8
17:16,21 18:8
18:23 19:6,19
20:3,22 21:4,7
21:16 22:8,16
25:6,21 26:11
26:23 27:10,24
28:8,16 29:2
29:20 30:8,21
31:6,13,19
32:22 33:13
34:15,22 35:10
36:5,12,19
37:3,9 41:9,24
42:11 43:1,7
43:16,25 46:3
47:3,9 51:18
53:2 60:5 62:1
62:13 64:21
73:3 74:15
75:4 76:4
79:11 80:4
95:4 97:24
109:18 119:22
126:4,6 135:18
137:17 144:6
145:1 147:25
148:11 154:22
155:9,22
171:23

Charles Crosby , PE                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[formally - go]**                                              Page 19

| | | | |
|---|---|---|---|
| **formally** 8:21 | 73:14 76:20,24 | 47:20 69:3,9 | **gives** 63:8 |
| **former** 19:23 | 77:9 106:14 | 80:20 83:4 | 71:17 74:22 |
| 26:1 27:5,18 | **fuel** 85:5 131:4 | 84:3 99:15 | 163:6 |
| 32:15 | 139:15,21 | 111:15 | **glennie** 5:8,12 |
| **forward** 107:14 | 143:6,7,9,11 | **generally** 28:17 | **gm** 16:25 17:24 |
| **fought** 25:3 | 172:11 | 47:16 48:4 | 22:3,5 |
| **found** 21:14 | **full** 9:9 10:25 | 58:21 72:6 | **go** 7:12 8:18 |
| 23:12 | 13:9 19:20 | 99:21 100:13 | 9:17 10:7,9,24 |
| **four** 54:25 | 22:6 56:6 | 113:19 134:6 | 11:15 13:17 |
| 136:23 169:16 | 77:14 86:12 | 140:9 144:18 | 14:16,21 15:3 |
| 170:6 | 113:10,12 | 154:15 155:3 | 16:19 17:17 |
| **fourth** 3:8 | 129:20,20 | **generated** | 18:9,24 19:7 |
| **frame** 16:24 | 130:5,11 | 144:24 | 20:4,23 26:12 |
| 22:13 23:2,13 | 131:23 143:11 | **gentleman** 14:5 | 27:25 28:9 |
| 23:14 68:21,22 | 165:8 166:9,16 | 32:12 39:14 | 29:3,21 31:7 |
| 132:16,22 | 175:15 | **georgia** 1:2 | 31:20 32:23 |
| 135:25 | **fully** 137:4 | 2:14,18 120:17 | 33:14 36:6 |
| **free** 135:5 | **further** 92:24 | 121:6 | 41:10 45:9,15 |
| **freebies** 166:1 | 93:1 136:21 | **getting** 64:13 | 46:4 47:4 48:1 |
| **freely** 100:7 | 168:15 175:17 | 84:4 127:19 | 51:19 53:1 |
| **fresh** 131:6 | **future** 37:7 | 137:12 168:4,7 | 55:16 59:11 |
| **front** 46:17 | **g** | **giant** 3:15 | 60:1,6,24 62:2 |
| 50:8,11 61:23 | | **gist** 83:4 | 62:14 64:8 |
| 61:24 62:10,16 | **gainesville** 1:3 | **give** 7:8,10 15:4 | 70:7 73:4 |
| 71:15 72:16 | **gallons** 143:9 | 35:18,18 104:9 | 74:16 75:5,22 |
| 94:23 106:20 | **gas** 16:23 22:11 | 106:25 117:6 | 76:16 77:1,9 |
| 128:6,21 | 22:13 23:1,4,5 | 130:6 150:9 | 77:11 78:10 |
| 131:15,16,18 | 23:7,12,13 | 163:21 166:1 | 79:12 80:5 |
| 131:22,25 | 129:20 130:5,7 | 167:9 169:4 | 82:16 83:3 |
| 132:2 140:22 | 130:9 131:6,7 | **given** 58:7 65:1 | 84:11 95:5,12 |
| 141:4,8,24 | **gasoline** 85:6 | 71:9 72:10 | 95:13 97:25 |
| 142:23 149:2 | **gawr** 128:6,10 | 80:9,24 99:2 | 98:4,20,23 |
| 153:14 164:25 | **general** 16:22 | 103:14 140:2 | 103:5 105:14 |
| **frontal** 70:6,10 | 18:4,7,15 | 142:10,25 | 105:19 107:3 |
| 70:13,17,21 | 21:11 32:15 | 178:9 | 109:19 111:2 |
| | 33:12,19 34:4 | | |

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[go - happens]**                                                Page 20

| | | | |
|---|---|---|---|
| 119:23 123:12 | 104:16,18 | **greenshot** | 135:2 149:13 |
| 123:14 124:1 | 105:9,24 106:7 | 38:18,20 41:1 | 150:24 |
| 128:2 129:5 | 106:24 125:8 | **grid** 146:10 | **gvwr** 128:3 |
| 131:13 132:12 | 126:1 130:5,6 | **grimes** 4:13 | **gwin** 29:7,15 |
| 132:23 137:18 | 131:6 132:20 | 45:23 47:8,14 | 29:16 45:24 |
| 144:7 145:2 | 148:14 151:7 | 53:18 59:18 | 59:18 61:8,9 |
| 147:6 148:1,12 | 151:10 153:3,9 | 61:6,9 63:24 | 63:24 69:19 |
| 153:1,24 154:4 | 153:12,13 | 69:18 72:8 | 72:8 117:15 |
| 154:7,23 | 154:16 156:15 | 90:11,17 94:19 | |
| 155:17 163:23 | 158:9 159:4 | 95:2 108:11 | **h** |
| 164:23 165:24 | 160:5,20 | 114:24 115:11 | **h** 2:17 3:18 |
| 171:2,5,6,24 | 163:16 164:6 | 117:14 120:15 | 176:1 177:3 |
| **goal** 72:14 | 165:23 167:4 | 124:25 133:17 | **half** 6:25 78:2 |
| 133:17 | 170:1,1 174:5 | 133:19 138:1,6 | 117:11 |
| **goals** 8:7 | **good** 6:14,16 | 140:2 142:6,10 | **hand** 7:6 9:19 |
| **goes** 14:18 | 63:6 77:23 | 142:24 164:20 | 14:13 30:23 |
| 54:13 65:24 | 125:25 130:25 | 173:17 | 35:12 46:6 |
| **going** 5:3 7:6 | 163:6 167:10 | **gross** 128:5,7,9 | 56:12 91:13 |
| 9:19 14:4,13 | **google** 7:5 | **ground** 131:17 | 153:14 164:7 |
| 20:6 24:16 | **gotcha** 105:13 | 146:9 150:18 | 171:12 |
| 25:13 30:23 | 107:13 169:14 | 151:4,4 152:13 | **hand's** 159:4 |
| 35:12 39:10 | **gotten** 62:15 | **growth** 8:8 9:8 | **handles** 18:21 |
| 42:4 45:17,25 | 135:24 | **guess** 29:22 | **hands** 159:15 |
| 45:25 46:6 | **government** | 64:2 72:22,22 | **handwritten** |
| 48:10 49:20 | 25:12 69:17 | 74:17 90:6 | 66:2 |
| 53:24 54:3,5,8 | **grab** 116:19 | 110:4 137:12 | **happen** 52:15 |
| 55:19 57:7 | **grabs** 126:5 | 138:15 | 121:5 157:20 |
| 58:8 59:1,2,3,4 | **grandfather** | **guidance** | **happened** |
| 59:6,9,15,20 | 32:21 | 144:12,15 | 18:11 43:6 |
| 62:22 64:17 | **great** 6:16 | **guide** 126:8 | 86:18 99:13 |
| 71:6,8 78:1,2,3 | 52:19 154:10 | **guilty** 18:5,16 | 130:17 145:14 |
| 84:10,10 89:2 | 163:15 171:8 | **gunn** 2:17 | **happening** |
| 89:5,7,12 | **greater** 25:3 | **guy** 153:21 | 111:21 |
| 91:13 99:22 | 159:13 | **guys** 59:23 | **happens** 52:2 |
| 100:2,12 104:2 | | 110:5 112:15 | 66:2 125:14 |

Charles Crosby , PE                                      May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[hard - hour]**                                                    Page 21

**hard**  82:21
  154:6
**harder**  97:22
**hate**  125:21
**hauler**  125:18
**head**  14:8
  25:17 67:6
  69:6 70:3
  73:13 95:11,18
  106:17 125:1
  134:7 139:1
  142:3
**hear**  42:14 43:2
**heard**  28:20
**heavier**  45:1
  144:2,4
**heavy**  134:2
  138:25 139:9
**height**  50:15
  97:7 99:3
  131:14,18
  152:10 157:3
**heights**  97:1
  98:24 99:1
**held**  5:8 157:15
**help**  24:15
  25:11 57:7
  83:13 134:9
**helped**  23:20
  24:4,19 33:18
  33:24
**helpful**  56:18
  83:15,16
**helping**  20:14

**helps**  133:25
**hereof**  175:19
**hereto**  88:15
  175:18 178:7
**hey**  65:3
**hiding**  43:5
**high**  62:3 68:20
  85:9 150:14
**higher**  22:5
  32:2,6 68:21
  83:15
**highlighted**
  7:22 9:8,25
  20:13 27:4
  40:15 41:17
**highlighting**
  35:21 41:16
**highly**  100:2
**highway**  26:2,6
  27:6
**hill**  2:17 3:12
  3:18 5:21,21
  6:10 7:12 8:17
  9:16 10:6,16
  10:23 11:14
  12:12,25 13:7
  13:16 14:1,16
  15:2,15,23
  16:2,8,18 17:1
  17:8,16,21
  18:1,8,18,23
  19:6,19 20:3
  20:22 21:2,8
  21:16 22:8,16
  22:21 23:3,15

23:22 24:7,22
25:6,21 26:11
26:23 27:10,15
27:24 28:8,16
28:22 29:2,20
30:8,21 31:6
31:13,19,23
32:4,22 33:13
33:20 34:1,7
34:15,22 35:3
35:10 36:5,12
36:19,23 37:3
37:9 41:9,24
42:8,11,16,19
43:1,7,12,16,25
46:3,10 47:3,9
51:18 53:2
60:5,23 62:1
62:13 73:3
74:15 75:4,11
75:16 76:4
78:1 79:11
80:4 95:4
97:24 109:18
119:22 135:18
137:17 144:6
145:1 147:25
148:11 154:3
154:22 155:9
155:22 161:10
167:9 169:7
171:23 173:25
174:3,8,10
176:1

**hire**  3:15 83:19
**hired**  17:6,11
  17:19,24 79:5
  79:9
**hiring**  124:20
**history**  11:1
  12:16 13:9
  19:20
**hit**  71:12 72:14
  73:10 74:11
  75:23 109:24
  153:17,24
**hitch**  94:8,11
  148:20 149:5
**hits**  72:17,17
  74:22
**hitting**  70:11
  72:18
**hold**  81:1 100:5
  100:8 112:24
  113:1 160:10
**hood**  110:13
  152:9 156:11
  156:17,18,19
  156:25 157:6
  158:15 160:3
**hook**  162:1,12
  163:11,12
**hoping**  154:12
**horizon**  12:8
  12:21,23
**hour**  31:4,17
  31:22 77:9
  78:1 117:11

Charles Crosby , PE                                          May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[hourlies - inside]**                                                        Page 22

hourlies  64:9
hourly  86:10
hours  31:4 84:3
  117:4,8 135:5
  166:3 167:1,13
hsv  150:13
hudgins  2:17
huh  57:22
  59:24 64:4
  69:10 76:18
  99:16 101:3
  105:7 119:15
  119:19 139:17
  142:20 143:22
  147:12 156:9
  159:12
human  39:18
  39:19
hundreds
  21:24 149:20
hurt  124:11

**i**

idea  23:1
  120:13 134:2
identical  54:6
  94:17
identification
  7:13 9:21
  14:15 20:10
  30:12 31:1
  35:14 39:12
  46:13 56:15
  87:15 91:17
  107:1 121:17
  161:8 163:18

  164:8
ignition  17:25
  18:5,16
iih  106:1
iihs  66:11
  69:13,21,24
  70:4,5 74:1,4
  75:20 76:20
  106:16
iii  3:18
image  46:18
  146:15
immediately
  169:25
impact  61:25
  62:4 70:7,9,10
  70:11 77:12
  85:9 94:24
  96:24 99:20
  100:3,20
  101:11 102:17
  109:4,7,25
  110:6,9 127:21
  138:3 149:24
  150:22 151:1
  155:11 158:24
impacted  74:5
impacts  73:14
  99:25
important
  139:23 147:2
  157:4
imprinted
  48:25

inch  48:5 49:1
  65:22,23,24
  71:5,7,8
inches  48:12,13
  48:17 49:2,2
  69:25 71:4,6
  106:8 107:21
incident  42:18
  42:20,21 84:21
  109:22
incidents  83:18
include  64:5
  87:8 90:23
included  37:23
  64:14 68:8
  82:19 90:5
  124:12
includes  64:7
  168:4
including  17:12
  82:8 87:1
  171:22
increase  34:13
increased  7:23
increases  36:17
increasing
  35:24
incredibly
  54:23 85:8
index  4:1
indicate  110:14
individual
  19:18 107:11
individuals
  122:12

induced  152:16
inducing  113:6
industries
  11:19,21 19:4
industry  8:15
  9:4 15:22 16:1
  16:13 23:21
  24:5,20 26:10
  26:18,18 78:13
information
  57:19 58:7
  64:24 103:4,11
  103:14 126:6
  135:7
information's
  57:14
informing
  81:19
initial  4:9
  109:24
initially  48:6,7
initials  112:5
injuries  20:2,19
  25:17 35:9
  37:8
injury  3:20
  20:15 83:11,13
  83:14,15,16,17
input  98:14
  110:25
inside  22:13
  23:14 63:4
  101:18,21
  102:5 114:11
  162:23 173:11

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[inspection - know]**                                            Page 23

| | | | |
|---|---|---|---|
| **inspection** 72:7 | **interaction** | **irritated** | 110:16,23 |
| 89:15 | 35:25 102:7 | 138:16,20 | **key** 40:24 |
| **install** 63:17 | 145:9 | **ish** 97:19 | **killing** 16:6 |
| 97:9 | **interested** | **isolate** 58:12,14 | **kind** 11:12 38:8 |
| **installed** 53:17 | 175:19 | 60:3,11,17 | 39:23 40:5 |
| 134:14 135:11 | **interests** 24:12 | **issue** 84:18 | 43:15 48:21 |
| **instance** 55:15 | **interfering** | 138:1 | 72:13,16 75:21 |
| 56:1 65:21 | 67:15 | **issues** 54:7 | 78:9 83:12 |
| 98:9 131:4 | **internal** 116:11 | **item** 56:10 | 89:23 90:19 |
| 150:10 152:6 | **internally** 38:5 | 131:20 | 93:9 98:8 |
| **instant** 38:5 | **interrogatory** | **itemized** | 101:18 104:8 |
| 40:10 | 9:23 | 168:22,25 | 112:23 115:24 |
| **institute** 26:2,6 | **introduce** 5:17 | **items** 82:2,4 | 120:23 121:4 |
| 27:5 | **intrusion** 36:2 | 152:17 | 124:11 127:10 |
| **instrumentati...** | 57:8 | | 132:19 133:4 |
| 53:8,12,16 | **inverted** 46:17 | **j** | 135:3 141:12 |
| 55:20 65:5 | **investigated** | | 143:10 146:11 |
| 92:25 101:23 | 35:25 | **j211** 67:24 | 151:21 154:6 |
| 133:10,14 | **investigatory** | **january** 171:1 | 154:17 157:12 |
| 134:3,10,12 | 66:24 | **jim** 38:14 40:25 | 162:3,21 |
| 135:4 137:5,8 | **invoice** 165:13 | **job** 124:8 | 169:21 173:9,9 |
| **instrumented** | 166:7 167:14 | **john** 2:21 5:13 | **kinds** 10:15 |
| 44:18 | 167:14,16 | **joshua** 1:5 5:6 | **kit** 32:9 36:17 |
| **instrumention** | 168:22 169:3,5 | 176:4 177:1 | 37:7 57:9 |
| 134:6 | 169:13 170:10 | 178:1 | **kits** 79:3 |
| **insurance** | **invoices** 4:16 | **jot** 65:20,20 | **klein** 85:22,23 |
| 19:11 26:2,5,9 | 37:17 56:9,14 | **july** 169:2,15 | 85:24,25 |
| 26:10 27:5 | 86:11 91:19 | **june** 169:5,7 | **knew** 13:23 |
| **intend** 82:5 | 116:19 164:23 | **jury** 3:10 | 67:3 |
| **intention** | **involved** 11:18 | 144:24 146:22 | **know** 7:9 9:18 |
| 107:17 | 23:16,25 52:21 | **k** | 10:25 11:8,16 |
| **interact** 40:1 | 52:23 88:22 | | 11:19,20 12:4 |
| **interacting** | **involves** 132:19 | **k** 21:11 33:25 | 13:9,12,15,22 |
| 39:20 | **involving** 20:15 | **keep** 7:3 23:7 | 14:5 18:10 |
| | | 24:12 34:12 | 19:9,20 23:1 |
| | | 39:6 46:8 | |
| | | 50:10 66:4,7 | |

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[know - lines]**                                              Page 24

24:23 25:10
26:1,13,14
27:18 28:23
29:24 31:24
32:12,14,24
33:21 34:10,25
38:13 39:14
40:2,17 41:4
41:18 45:10
50:15 54:1
57:18 59:6,16
61:20 64:22
65:22 67:13
70:6,24 72:11
73:13 74:2
75:22 76:2
77:4 84:20
85:14,17,19
86:9 90:3,7
95:16 98:7,25
105:20 106:8
109:21,21
112:3,19
116:25 120:4,6
124:15,25
129:10 130:7
131:6 134:14
136:24 137:19
138:24,25
140:5 142:4
143:16 146:13
146:22 152:2
158:11 159:4
164:14 173:11
173:14,18,19

**knowledge**  7:5
98:20 115:22
123:24
**known**  57:15
146:10

**l**

**l**  1:23 2:3,12
175:4,24
**label**  46:23
106:25
**labels**  39:25
**lack**  71:15
140:4
**lang**  32:12,20
34:19,25 35:6
**lang's**  35:22
**laptop**  159:17
**large**  63:2,14
**larger**  53:18
**las**  85:18
**law**  62:25
**lawsuit**  20:14
**lawsuits**  14:25
**lawyer**  7:8
37:12,19,24
40:16 42:23
85:14 164:21
**lawyers**  85:19
85:21,21 116:6
116:10 120:9
121:9
**lead**  113:11
**lean**  100:11
**leaned**  140:5

**leave**  99:23
100:4,6 101:19
124:1
**leaving**  33:11
**lec**  38:23 40:16
**lecs**  116:25
**left**  59:18 111:9
111:10 121:19
122:11 131:15
131:15 132:3,4
132:15,21
140:24 141:2,5
141:8 143:9,17
151:16 172:5
**legal**  3:14 5:13
176:23
**lens**  146:15,16
147:1 152:19
**lenses**  146:13
**leon**  2:13
**letter**  3:18
164:18
**letterhead**  4:6
**level**  100:11
119:10 130:16
139:15
**levels**  152:4,5
**lexus**  85:2
**life**  96:16,17
**lift**  32:9 36:17
37:2,7 53:20
57:9,25,25
58:12,13,15
59:25 60:2,4,8
60:8,13,18,19

60:20 61:1
79:3
**lifted**  57:5,13
57:20,21
**light**  35:23
139:2
**lighten**  44:25
**likely**  37:21
100:2 102:15
109:8 151:18
152:16 156:4
**limited**  137:20
**line**  14:22
48:21,23 49:15
52:25 53:5
56:10 110:14
110:17 111:5
132:5 149:23
150:25 151:8
152:7,8,9,11,14
155:2 156:10
156:11,24,25
156:25 157:4,5
157:6,13,16,18
157:18 158:14
158:15 159:3
159:11,23
160:2,2 177:4
177:7,10,13,16
177:19
**lined**  48:4
50:13 127:23
156:13 157:10
**lines**  75:7
152:11,14

Charles Crosby , PE                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[lines - make]**                                                    Page 25

155:1 156:13
157:9,17 159:2
161:11
**lineup**   107:15
**linger**   102:14
**lining**   160:1
**liquid**   131:3
**lisa**   45:24
**list**   3:16 30:4
30:11 82:8,19
82:23 90:5
120:22
**listed**   117:2
131:15
**listing**   132:18
**litigation**   15:13
15:22 29:1
66:20,23,25
67:4
**little**   98:3,6
139:22 151:20
153:19,20
159:15 162:7
165:24
**lives**   160:16
**llc**   1:10 2:17
5:7 176:4
177:1 178:1
**load**   128:17,17
128:18,21
**located**   22:11
22:13
**location**   132:18
142:11 150:11
150:19,21,22

158:9 163:13
173:16
**locations**
114:12 133:21
134:16
**lock**   100:1
**long**   33:5 83:3
100:11 117:10
118:20 122:2
**longer**   102:13
102:14
**look**   15:4 20:13
21:20,23 25:25
39:24 47:7,12
48:1,2,9,10,19
49:12,12 50:7
50:21 56:17
65:8 70:7 73:8
74:5,23 75:2
75:22,24 76:10
76:17,20,23
77:9,11 83:4
84:11 90:19
96:2 100:21
105:15 106:23
107:14 108:8
108:12 112:5
116:24 125:11
141:6 142:18
149:15 151:21
152:3,3,5,8
153:9,12 156:7
156:23 158:13
161:22 162:2
168:15

**looked**   61:6
72:5,8 120:19
132:7 140:9
154:13,19,24
162:6,25
163:20 164:1
**looking**   49:25
50:25 58:11
73:15 74:11,13
75:1 77:17
83:6,12 104:14
106:10 109:12
114:17 124:7
126:7 150:8
151:14 154:18
159:18,23
169:12
**looks**   48:16
50:9 51:1
74:14 75:3
104:19 107:5
120:22 156:1
166:4,7 168:17
170:16 171:3
**loop**   46:24,25
47:1
**lot**   19:12,13,13
26:8 33:4
63:15 67:22
73:14 78:9
98:3 108:10
121:3 124:11
**lots**   23:5 43:23
62:20,25

**low**   31:11
124:4 130:4
**lower**   7:17 22:2
68:22,22 83:16
83:18 132:16
132:22
**lumped**   168:6
**lunchtime**
55:16 157:21

**m**

**m**   6:12
**ma'am**   77:25
174:13
**made**   37:20
51:8 72:20
106:2 116:12
178:5
**mail**   4:12 41:6
41:20 43:10
90:5
**mails**   38:16
**main**   8:24,25
9:4 123:18
124:10
**major**   34:11
**majority**   67:9
**make**   8:10 20:1
20:18 21:8
34:21 36:16
37:1,7,18 45:1
48:18,22 58:3
58:10 59:3,3,4
59:7,15,20
65:22 73:9,17
75:23 77:2,22

Charles Crosby , PE                                      May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[make - mess]**                                                    Page 26

90:21 94:13
95:1,21 96:25
103:9 105:19
106:10 111:8
111:10,22
113:19 124:7
129:18,18
130:1,3,7,10
141:5 145:16
146:14 149:19
151:3,7 153:15
154:21 156:19
158:6,18 159:2
160:7,16
164:24
**makes** 68:19
72:19 106:14
**making** 16:23
95:25
**maniscalco**
2:21 5:13
**manner** 53:4
**manually** 98:2
**manufactured**
51:6,10
**manufacturer**
16:16 19:18
78:16,19 79:6
128:16
**manufacturer's**
79:7 140:18
**manufacturers**
9:1 13:5,13,25
15:13 17:14
24:10,15 25:3

25:11 34:12
66:16 78:12
**march** 3:19
4:13 86:18
171:4,5,17
**maricopa**
175:1
**mark** 71:12
72:19,20 73:1
74:11 75:24
76:12 106:24
161:1
**marked** 7:7,11
7:13 9:20,21
14:13,15 20:7
20:10 30:12,24
31:1 35:13,14
39:12 46:7,13
56:13,15 87:12
87:15 91:14,17
107:1 121:16
121:17 161:8
163:18 164:8
**marker** 71:15
71:18 72:16,19
73:8 74:4,20
146:8
**marker's** 73:6
**market** 8:5
**mashman** 2:13
5:20
**master's**
121:23 122:3
124:6,7

**match** 74:20
75:24 90:20,22
91:21 141:4
142:9,25
**matching** 69:16
69:17,19 95:25
**material** 39:6
**materials** 80:21
**math** 167:4
**matter** 5:6
172:18
**max** 129:16,17
132:8
**maximum**
128:3,22,23
**mean** 70:11
71:25 73:14
74:18 75:7
101:1 109:5
120:20,20
138:15,16
139:13 144:18
150:16 159:7
**meaning** 77:15
110:22
**means** 152:16
**meant** 117:24
**measurable**
20:1,18
**measure** 48:25
49:8 73:20
77:2 103:9
131:13 147:4,4
147:5 150:18
150:19 161:17

173:9
**measured**
48:15 132:5
162:6
**measurement**
73:2,17 75:25
76:9 77:1
103:18 104:4,5
104:5 113:13
131:16 147:8
157:13
**measurements**
72:14 87:3
88:12,17 105:1
105:9,20 106:2
106:3,5,15
131:11,19
145:16,23,25
146:5 147:3
150:9 173:2,7
173:14
**measures** 99:3
**measuring** 49:5
104:9 105:24
147:13 173:22
**mechanical**
121:23
**meet** 90:12
**meeting** 40:17
40:22 41:4,18
**mentioned** 8:2
68:9 117:1
**mentor** 33:8
**mess** 160:9

Charles Crosby , PE                                      May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[message - nonresponsive]**                                    Page 27

| | | | |
|---|---|---|---|
| **message** 3:23 42:4 | **missing** 82:12 | **movement** 109:3,5 110:9 | 168:13 |
| **messages** 40:10 40:10 41:17 | **missouri** 28:5 | **moves** 108:6 | **necessary** 59:9 178:6 |
| **messaging** 38:5 | **mix** 63:6 125:5 | **moving** 4:6 | **neck** 25:17 |
| **messed** 160:10 | **mixture** 19:11 | 107:25 110:16 | **need** 56:1 57:2 |
| **metal** 74:21 | **model** 119:25 | 110:24 113:1 | 59:12 113:24 |
| **method** 72:15 | **models** 22:4 | 161:9 167:15 | 131:5 134:15 |
| 98:23 | 49:14 119:14 | | 172:24 |
| **methodology** | 119:20 | **n** | **needed** 54:23 |
| 67:18 104:3,9 | **modifications** | | 55:7,22 73:10 |
| 104:10,18,25 | 132:14 | **n** 3:1 6:12,12 | 86:22 90:12 |
| 144:16 | **moment** 15:4 | **name** 26:14 | 112:16 123:11 |
| **methods** 103:3 | 35:18 41:2 | 32:14 38:15 | 168:3 |
| **mga** 123:16 | 45:10 115:13 | 40:4 77:4 84:8 | **needs** 75:11 |
| **microsoft** | 163:21 169:4 | 86:1 87:18,23 | **neutral** 100:4,6 |
| 38:12 | **money** 8:10 | **named** 14:5 | 100:24 101:5,5 |
| **middle** 108:4 | 130:8 | 32:12 38:14 | **never** 19:3,16 |
| 140:8 | **month** 82:18 | 39:14 40:2 | 27:22 28:6 |
| **mile** 77:9 | 92:20 134:23 | **names** 63:11 | 78:11,15,18,21 |
| **million** 7:24 | 172:7 | 132:23 | 78:24 |
| 9:15 10:3,11 | **months** 54:25 | **narrow** 123:9 | **new** 82:17 |
| **millisecond** | **morning** 6:14 | **narrower** | 123:17 131:5 |
| 97:13 | 6:16 | 123:8 145:10 | **nhtsa** 69:13,21 |
| **mind** 46:9 | **motor** 3:13 | **natural** 12:9,24 | 69:24 70:1 |
| **mine** 32:6 | **motors** 16:22 | **nature** 138:3 | 75:20 76:23 |
| 171:12 | 18:4,7,15 | 156:16 | 77:5,10,12 |
| **minimal** 102:7 | 21:11 32:15 | **navigate** 154:6 | 105:25 106:12 |
| 113:6,6 | 33:12,19 34:5 | **ncap** 76:24 | **nice** 41:1 |
| **minor** 1:7 | **mounts** 53:16 | 77:10 | 111:19 158:25 |
| **mirror** 46:18 | **move** 11:3 24:2 | **ne** 2:18 | **nicely** 150:19 |
| **misaligned** | 99:22 100:16 | **nearly** 16:15 | **nine** 30:14,18 |
| 152:20 | 101:24 102:14 | **necessarily** | **non** 57:21 |
| **misalignment** | 102:16 111:18 | 22:17 59:4 | **nonresponsive** |
| 152:23 | 155:15 | 66:25 71:25 | 11:4 24:3 |
| | **moved** 151:23 | 104:17,23 | |
| | | 109:20 135:19 | |
| | | 143:5 155:4 | |

Charles Crosby , PE                                May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[nonsense - offsets]**                                          Page 28

| | | | |
|---|---|---|---|
| **nonsense** 26:22 | 142:11,17 | 37:3,9 41:9,24 | **occasionally** |
| 27:7 | 149:13,16 | 42:8,11 43:1,7 | 54:15 96:22 |
| **normal** 140:5,9 | 150:5,25 | 43:16,25 46:3 | **occupant** 35:9 |
| 140:11 | 162:19 163:10 | 47:3,9 51:18 | 36:11 99:22 |
| **normally** 98:16 | 166:21 | 53:2 60:5 62:1 | **occupants** |
| 98:18 125:3 | **numbered** | 62:13 73:3 | 25:18,19 140:7 |
| 129:5 | 127:20 | 74:15 75:4 | **october** 170:20 |
| **north** 5:15 | **numbers** 90:18 | 76:4 79:11 | **odd** 143:2 |
| **northern** 1:2 | 91:21 95:25 | 80:4 95:4 | **oe** 130:19 |
| **notary** 178:13 | 128:20 142:5,6 | 97:24 109:18 | **oem** 128:25 |
| 178:19 | 142:8,9,24 | 119:22 135:18 | **offense** 18:16 |
| **note** 65:22,24 | **numerous** | 137:17 144:6 | **offenses** 18:5 |
| 176:10 | 17:11 33:18 | 145:1 147:25 | **offering** 32:8 |
| **noted** 178:7 | **o** | 148:11 154:22 | **office** 52:1 |
| **notes** 37:18,20 | | 155:9,22 | 63:12 123:19 |
| 40:18,22 41:4 | **o** 6:12 | 171:23 | **offices** 5:8 6:19 |
| 41:18 42:5 | **o'neill** 26:1,20 | **objection** 13:7 | 63:13 |
| 65:11,13,14,25 | 27:5 | 14:1 15:15 | **official** 118:18 |
| 66:3 117:5 | **oath** 28:4 175:8 | 16:2,8 18:1,18 | **offset** 48:12,13 |
| **notice** 4:11 | **object** 8:17 | 21:2,3,7,8 | 65:22,23 66:8 |
| 108:3 163:16 | 9:16 10:6,16 | 22:21 23:3,15 | 67:17 68:14 |
| 164:2 | 10:23 11:14 | 23:22 24:7,22 | 69:22,23,25 |
| **noticeable** | 12:12,25 13:16 | 27:15 28:22 | 70:1,5,7,9,21 |
| 154:17 | 15:2,23 16:18 | 31:23 32:4 | 70:23 71:5,6,7 |
| **november** | 17:1,8,16,21 | 33:20 34:1,7 | 71:8,12 72:6 |
| 164:17,19 | 18:8,23 19:6 | 35:3 36:23 | 72:10,11,14,20 |
| 170:22 | 19:19 20:3,22 | 42:16 43:12 | 74:4 75:3,23 |
| **number** 5:7 | 21:16 22:8,16 | 60:23 | 76:8,10,12,14 |
| 44:22 48:11 | 25:6,21 26:11 | **objections** | 76:20 77:13,17 |
| 56:13 63:2 | 26:23 27:10,24 | 14:17 | 77:19 156:14 |
| 70:24 71:2,10 | 28:8,16 29:2 | **objectives** 23:7 | 156:15,17 |
| 77:5,5,6 96:21 | 29:20 30:8,21 | **obtain** 103:17 | 162:7 |
| 99:2,4 105:22 | 31:6,13,19 | **obvious** 157:16 | **offset's** 77:2 |
| 114:23 115:1,9 | 32:22 33:13 | **obviously** | **offsets** 70:6 |
| 116:21 137:1 | 34:15,22 35:10 | 14:17 90:1 | 71:8 |
| | 36:5,12,19 | | |

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[oh - outcome]**                                                 Page 29

| | | | |
|---|---|---|---|
| **oh** 7:9 41:2 | 66:8,19,22 | 133:6,13,16,20 | **older** 33:4 |
| 45:7 85:25 | 67:7,10 68:8 | 134:23 135:8 | **once** 102:6 |
| 87:12 107:8,9 | 69:21,25 70:16 | 135:15 136:3 | 126:7 |
| 117:21 123:1 | 70:19 73:12 | 136:11,17 | **one's** 162:9 |
| 130:25 135:21 | 74:6,8 76:22 | 138:25 139:15 | **ones** 53:7 77:17 |
| 139:6 153:10 | 77:4,17,18,21 | 139:24 140:19 | 77:19 130:19 |
| 160:9 163:22 | 80:13 82:7,20 | 140:21 141:21 | 142:8 163:4 |
| 166:7 167:10 | 83:1,8,19 86:2 | 142:5,13 | **ongoing** 83:23 |
| 169:6,9 172:11 | 86:7,15,21,24 | 143:20 144:11 | **operate** 128:4 |
| **oil** 10:22 11:6 | 87:19,22 88:20 | 145:10 146:4 | **operating** |
| 12:9,24 129:19 | 89:9 90:3,7,9 | 146:19,22 | 129:22 |
| 131:3 | 91:4,13 92:1,6 | 147:15 148:25 | **opinion** 32:8 |
| **okay** 6:14 7:6 | 92:14,18 93:8 | 149:4,7,9,18,22 | 34:25 57:22 |
| 7:15 8:1,12 9:6 | 93:13 94:12,25 | 150:23 151:3 | 58:2 59:19 |
| 9:19 13:4 14:4 | 95:8,16 96:3 | 153:1,9,12,24 | 151:25 |
| 14:8,21,23 | 97:3,20 98:25 | 154:11,13 | **opinion's** 156:6 |
| 15:7 16:12 | 99:9 101:12 | 155:7,13,15,18 | **opinions** 79:23 |
| 17:5 20:6 | 103:15 104:3 | 155:19,25 | 79:24 80:3,7 |
| 21:20,20 22:11 | 105:8,13,18,22 | 157:5,12,19,23 | 80:10 81:1,12 |
| 29:14 33:24 | 106:7,18,18 | 158:1,4,21,23 | 81:19 82:1 |
| 34:19 35:22 | 107:3,7,9,14,16 | 159:6,10 160:4 | **opposing** 19:10 |
| 38:7 39:8 | 108:10 109:2 | 160:13,22,23 | **orangewood** |
| 40:14 42:2,14 | 110:3,8,12 | 161:5,7,13,16 | 5:9 |
| 44:21 45:12,15 | 112:11,14,19 | 163:14,24 | **order** 4:14 |
| 45:17,23 46:15 | 114:7,13,19 | 164:6,23 | 34:13 58:14 |
| 46:21 47:7,16 | 115:8 117:12 | 165:10,13,18 | 71:18 75:23 |
| 47:22 48:7 | 117:17,19 | 165:23,25 | 134:16 152:15 |
| 49:4,10,22 | 118:1 121:7,19 | 166:3,6,18,25 | **orders** 91:15 |
| 50:3,6,18 | 125:10 126:10 | 167:8,18,25 | **organization** |
| 51:22 52:11 | 126:22 127:1 | 168:18 169:19 | 75:21 79:10 |
| 53:12 54:8,18 | 127:19 128:6 | 170:9,10 | **osterode** 1:23 |
| 55:9,11 57:4 | 129:7,10,14,23 | 172:23 173:2 | 2:3 5:11 175:4 |
| 57:18 58:2,10 | 130:23 131:18 | 173:24 | 175:24 |
| 59:19,22 62:10 | 131:24 132:7 | **old** 20:9 131:7 | **outcome** 59:10 |
| 62:18 65:15 | 132:12,13 | | 175:19 |

Charles Crosby , PE                                        May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[outcomes - pending]**                                        Page 30

| | | | |
|---|---|---|---|
| **outcomes** 18:11 | 9:7,24 14:21 | **parameter** | 71:25 72:3 |
| **outside** 16:24 | 20:12 21:21,21 | 63:24 | 85:4 94:6 |
| 23:2,12 63:1 | 26:24 35:17,17 | **parameters** | 101:8 138:2 |
| 64:16 80:24 | 35:19,20 40:15 | 37:21 44:24 | 150:10 173:16 |
| **overall** 22:2 | 40:24 41:3,11 | 54:8 55:14 | 173:18 |
| 49:17 128:23 | 41:16,20 42:2 | 62:23 64:15,17 | **parties** 19:14 |
| 142:11 155:3 | 87:17 132:12 | 64:18,19,22 | 115:25 117:25 |
| **overhead** 150:3 | 133:1 149:16 | 65:1,8,9,12,14 | 175:18 |
| 150:7,24 | 165:14 166:4,6 | 65:21 69:20 | **parts** 52:12 |
| 151:21 154:1 | 166:25 168:21 | 76:13 80:8,24 | **pass** 65:1 |
| 154:12 155:14 | 177:4,7,10,13 | 84:23 87:5 | **passenger** |
| 158:19 | 177:16,19 | 88:12,17,23 | 20:16 22:19 |
| **overlap** 77:14 | **pages** 3:9,11,13 | 90:12,19,22,23 | 141:21 143:3,3 |
| **overlapped** | 3:15,19,22,24 | 98:13,19 101:4 | **past** 11:25 |
| 50:14,23 | 4:5,8,10,11,13 | 101:7 104:17 | 12:14 117:6 |
| **overlay** 105:5 | 4:15,16 91:24 | **parents** 1:6 | **patently** 26:22 |
| **overlaying** | 127:20 149:20 | **park** 100:12 | 27:6 |
| 103:22 | 175:14 | 101:6 | **pattern** 76:11 |
| **override** 49:24 | **paid** 9:14 10:2 | **parking** 100:15 | 162:2 |
| 50:1,4 51:12 | 84:4 86:8,13 | 101:19 102:6 | **patterns** 3:21 |
| **overriding** | 116:13 171:21 | **part** 39:24 79:6 | **paul** 167:18 |
| 51:17 | **panic** 98:12 | 83:22 84:1,3 | **pause** 153:18 |
| **overrode** 51:14 | **paper** 10:10 | 100:3 102:25 | 154:7 155:18 |
| **own** 44:7,9,9 | 20:17 35:7,22 | 105:10 111:17 | **pay** 55:25 57:2 |
| 44:11,13 83:20 | 82:18 83:9,20 | 114:16 118:14 | 83:24 84:2 |
| 83:22,25 100:7 | 157:15,17 | 120:24 125:6 | 122:5 168:6 |
| 125:9 | 159:9 167:6 | 126:4 130:2 | **pe** 176:5 177:2 |
| **owns** 26:14 | **papers** 104:9 | 160:7 168:14 | 177:24 178:2,4 |
| **p** | **paperwork** | **partial** 3:10 | 178:12 |
| **p.e.** 1:14 3:17 | 111:12,25 | **partially** | **peachtree** 2:18 |
| 3:19 4:5 | **paragraph** | 137:24 | **pedal** 99:10,12 |
| **p.m.** 153:5,5 | 21:22,24 | **particular** 11:9 | 99:24 |
| 174:15 | **parallax** | 37:14 51:13 | **pedals** 99:23 |
| **page** 3:2,7,17 | 152:17 | 57:18 59:17 | **pending** 85:17 |
| 4:2,3,18 7:20 | | 60:12 69:15 | |

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[people - planning]                                                    Page 31

**people**  21:24
24:23 34:21
36:18 40:1
64:21 72:12,24
118:5 124:12
127:8,8
**percent**  7:23
44:13 52:23
58:19 71:5,7
104:3,4 166:19
**percentage**
71:1,3,9
142:22 143:24
144:1
**percentagewise**
122:25
**perfectly**  58:25
113:4,5 155:2
160:1
**perform**  123:10
**performed**
123:4 147:9
**performing**
72:24
**person**  28:25
44:23 118:9
**personally**
11:25 43:17
44:15 94:25
**personnel**
167:16
**pesticide**  16:6
**petroleum**
16:12

**phoenix**  1:15
2:2 5:1,10 52:1
52:8,15 63:12
**phone**  58:6
63:21 64:25
117:2 121:8
138:11 165:17
171:9,11
**photo**  108:12
114:10 146:11
163:1,10
**photocopy**  4:3
**photogramm...**
145:19,20
**photograph**  4:3
102:1 107:6
108:9 112:6,6
127:13,16
147:4 162:19
162:22
**photographed**
101:15 112:10
**photographer**
112:8
**photographs**
50:16,22 64:13
88:24 89:13
96:4 101:17
103:6,11
107:10,12
111:17,20,22
118:13,20
126:3 139:3
141:7 148:6,9
149:1,2,3

152:12,13
162:17,20,24
**photos**  100:22
144:23 146:20
146:25 148:14
148:18,22
162:14,16
**physical**  73:1
161:20 162:5
162:12
**physically**
152:15
**physics**  98:4
**pickup**  16:23
21:12 33:25
**pickups**  21:25
**picky**  127:8
**picture**  46:15
48:20 50:25
102:19,21
108:9 114:13
127:7,9 147:23
147:24 160:6
**pictures**  101:12
106:20 107:3
107:17 113:25
126:23 147:16
149:4
**piece**  73:1 74:9
74:13,21 76:8
157:15,17
159:9 167:6
**pieces**  165:24
168:12

**pillars**  93:24,24
94:2
**pin**  71:15,18
72:16,19
**place**  23:5
92:19 100:8
129:5 140:4
173:16
**placed**  114:11
**places**  23:6
**placing**  23:7
**plaintiff**  19:4
27:23 122:24
**plaintiff's**
85:14
**plaintiffs**  1:8
2:11 5:5,18,20
7:7,11 9:7,20
14:14 19:9,11
20:7 21:21
25:25 30:10,24
35:13 39:11
40:7 41:14
42:3 46:7
56:13 75:8
87:12 91:14
106:24 116:21
121:16 122:21
161:1 163:17
164:7
**planned**  55:18
55:22
**planning**  49:21
52:25 81:4
147:7

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[play - problems]**                                              Page 32

**play** 153:18,25
154:3,7
**please** 5:17,23
14:22 20:12
21:24 41:3
114:14 163:9
167:7 174:14
**pled** 18:4,15
**plus** 165:18
**pocket** 168:7
**point** 65:4
74:20 75:24,25
98:5 114:13
133:24 151:6
162:10 165:22
166:8
**pointer** 76:6,7
**pointing** 71:16
**points** 73:21
103:22
**pollution** 11:13
11:22
**ponce** 2:13
**portion** 138:12
165:7,17,21
**portions** 51:1,2
51:14
**position** 12:22
25:9 140:5,8
140:10,17,18
158:8
**positioning**
68:16,18
**positions**
140:12,16

**possible** 58:19
139:22 141:6
**post** 49:13 72:7
76:10 77:3
108:19,20,22
118:15 125:1
162:17 173:19
**potential** 59:10
67:10
**potentially**
70:21 85:9
109:11 110:11
113:6 119:3,4
144:8
**pound** 139:4
**pounds** 44:23
113:20,21,21
114:20 115:4
128:13 134:5
139:14 140:22
141:17 143:21
**practice** 14:10
39:19 68:12
**practices** 67:23
67:25 68:17
**pre** 49:13 76:9
125:2 152:12
152:13 173:17
173:20
**precise** 98:5
**predetermined**
103:25 104:6
**preference**
138:8

**preliminarily**
146:17
**preliminary**
3:12 165:8
**prep** 53:6 93:6
135:23 136:20
136:21 137:13
**preparation**
93:1 126:21
136:25
**preparations**
126:9 133:9
**prepared** 40:21
92:15,19
**prepped** 53:4
55:6 60:1
92:22,23 93:3
136:14 137:4,7
137:22
**prepping** 91:10
91:11 137:24
**prescribed**
69:24
**present** 40:19
41:5,19 121:9
167:14
**presentation**
37:24
**presentations**
39:5
**presented**
57:12
**preserved**
116:3

**president** 8:12
26:2,20 27:5
**press** 3:8 27:21
**pretty** 63:1,6
119:7 139:3
157:16 163:6
**prevent** 83:13
**preventing**
83:11,15,16
**previous** 82:9
**previously** 7:7
7:11 9:20
**primarily**
120:23
**print** 40:23
69:14 149:20
175:12
**printed** 69:14
149:15
**printout** 7:15
**prior** 96:24
111:9 113:15
124:18 156:20
**probably** 24:13
31:14 37:16
38:15 49:12
52:23 76:23
90:5 94:19
105:25 119:7
139:7 151:15
157:22 162:24
163:6 168:3
**problem** 67:14
**problems** 67:11

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[procedure - quickly]**                                Page 33

procedure
  67:19 72:12,24
  72:25 75:2,19
  75:20,21 76:2
  76:25 88:23
  112:12
procedures
  76:17
proceed  5:24
proceeding
  175:7
proceedings
  174:15 175:16
process  65:19
  79:7 125:13
processing  69:4
produced
  21:13 22:2
  40:8 164:4
product  38:10
production
  51:7
productions
  89:19
products  33:19
professional
  87:23 167:16
profile  58:14
profits  8:8
programs
  104:24 119:13
project  11:1,7
  11:18 12:20
  18:11 33:22
  41:7,22 44:10

  54:16 120:5
projects  17:3
  17:12 24:24
  62:22
prone  17:5
  21:12
pronounced
  14:11
proper  134:16
  134:16
property
  111:19 170:7
protected
  22:14
protocol  71:13
  71:24 73:6
  76:25
protocols  69:14
  69:21 70:8
  71:11,14 73:7
  73:12,19 74:1
  74:3 140:15
provide  140:17
provided  84:23
  86:11 116:14
  148:13
provides
  122:15
psychology
  39:20
public  8:1
  18:12 24:12
  25:13 178:19
publications
  82:9

publicly  7:4
  68:6
publish  67:22
published
  19:24 20:16
  82:18 83:2
pull  111:9
pulling  111:9
  111:24
purchase  4:14
  90:21 91:15
  125:19
purchased
  53:15,19,22
  60:2,20 91:5
  91:10,16 92:2
  92:7,20 116:3
  123:23 125:21
  130:17 135:17
  136:6,7,8,20,22
  168:19
purpose  35:24
  96:4 130:13
  145:5 148:17
put  14:19 45:2
  53:24 59:25
  60:19 61:23
  65:23 71:14
  77:1 98:8
  101:6 110:25
  112:24 113:14
  118:22,22
  121:15 129:24
  130:11 131:5,7
  133:22 139:18

  141:7,9 142:15
  143:2 146:2
  151:10 157:16
puts  49:2
putting  61:16
  63:10 64:12
  113:15,22

q

qualifications
  82:8
quantify
  104:14 152:22
quarter  3:8 9:9
question  12:3
  12:19 15:8
  18:13 21:9
  24:1 27:3
  36:14 47:22
  50:22,22 52:19
  60:7 62:25
  63:3 72:23,23
  75:14,17 94:21
  95:20 96:14
  98:17 134:9
  136:11 147:20
  147:22
question's
  104:2
questions  21:4
  47:19 67:4
  175:10
quick  48:16
  49:7,8
quickly  118:16

Charles Crosby , PE
May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[quite - reduced]**

Page 34

| | | | |
|---|---|---|---|
| **quite** 19:8 | **read** 9:12 20:20 | **reason** 15:18 | **recommendat...** |
| 24:10 32:2 | 22:7 27:8 29:7 | 61:15 68:11 | 68:20 |
| 74:17 96:13 | 36:4 41:8,23 | 72:1 149:13 | **recommended** |
| 97:17 134:7 | 42:10 174:1 | 156:1 176:11 | 67:23 124:19 |
| **r** | 176:9 178:5 | 177:6,9,12,15 | 140:18 |
| | **reader** 149:17 | 177:18,21 | **reconstruct** |
| **r** 47:1 177:3,3 | **reading** 171:7 | **reasons** 23:5 | 17:11 |
| **radiator** | **ready** 53:7 | 81:13 147:15 | **reconstruction** |
| 129:20 131:3 | 55:16 60:1 | **recall** 54:22 | 79:25 87:24 |
| **rail** 107:18 | 126:18 137:7 | 73:19 117:18 | 88:2,4,8 |
| 108:3,6,6 | 137:24 | 120:18 129:13 | 120:11,14,16 |
| 110:20 123:7 | **real** 58:25 | 138:11 139:12 | 121:3 122:16 |
| 127:24 132:25 | 96:16,17 109:2 | 173:17 | **record** 5:4 |
| 151:8,16,17 | 109:6,17 | **recap** 167:11 | 14:19 45:9,15 |
| 155:21 156:3 | **reality** 48:14 | **receipt** 176:17 | 45:18,21 78:4 |
| 157:1 | 152:21 | **receive** 125:21 | 78:7 89:14 |
| **rails** 16:24 | **really** 12:13 | 137:7 | 99:4 114:18 |
| 22:13 23:2,13 | 23:17 41:1 | **received** 29:10 | 121:16 140:21 |
| 23:14 93:20,22 | 49:15 59:8,9 | 29:12 30:11,25 | 144:21 146:11 |
| **ran** 55:15 | 61:2 83:3,9 | 112:5,7 122:7 | 153:2,4,7 |
| 59:22,23 60:2 | 103:5 106:9 | 127:11 129:16 | 160:8 174:5,7 |
| 60:19 80:8 | 124:10 132:8 | 130:15 131:13 | **recorded** 5:4 |
| **range** 34:13 | 158:10 | 137:21 149:3 | 127:10 135:12 |
| 70:25 | **rear** 46:16 50:7 | **receiver** 148:20 | **recordings** |
| **rapp** 63:9 | 50:12 61:14,25 | **receives** 125:12 | 88:24,25 89:13 |
| **rarely** 149:15 | 62:3,5 70:6,9 | **receiving** | **recreate** 96:17 |
| **rate** 31:3,10,25 | 70:10,13 85:2 | 111:16 126:4,6 | 99:13 |
| 68:21,22 | 85:9 94:16,24 | 128:1 130:2 | **recruit** 124:13 |
| 108:24 | 99:20,25 128:8 | 149:1 | **recycle** 130:24 |
| **rates** 22:2 | 128:21 131:15 | **recently** 123:23 | 131:2 |
| **rating** 128:5,7 | 131:16,24,25 | **recessed** 45:19 | **recycled** 131:7 |
| 128:9,18,19,21 | 132:2,4 138:3 | 78:5 153:5 | **reduce** 36:2 |
| **rc** 171:21 | 141:4 | **recognize** 47:2 | 146:18 148:2 |
| **reach** 124:19 | **rearward** | **recommendat...** | **reduced** 175:12 |
| **reached** 124:14 | 99:22 | 120:7 | |
| 164:20 | | | |

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[reducing - requirement]**                                    Page 35

**reducing** 20:2
20:19 35:9,9
36:11
**reefs** 12:9,10
12:23
**reference** 71:24
151:6
**referenced**
176:6
**referencing**
132:3
**refers** 89:10
**reflect** 133:13
**reflected** 37:16
42:21
**reframe** 63:3
**refute** 45:25
**regard** 24:20
**regarding**
10:20,22 14:17
21:3,4 32:9
36:17 88:23
89:3 116:11
**regulations**
23:21 24:5,11
24:21 25:3
**regulators**
23:25 24:11,15
25:12
**regulatory** 16:5
**reimbursable**
167:21
**reimbursables**
168:1,8,23

**reimbursed**
168:7
**related** 66:20
66:23 67:10
175:18
**relating** 21:4
**relative** 48:23
48:24 150:22
**relatively** 31:11
**release** 3:8
100:19 102:1,6
102:9,12
**released** 102:2
102:20
**relevant** 70:20
70:22
**reliable** 144:24
**relied** 90:10
**rely** 111:3
144:24 145:4
148:18
**relying** 90:1
95:2 145:11
**remember** 38:3
38:11 50:19
54:20 57:6
63:10,20 67:2
67:5,13,16
69:6 70:3
72:17 73:7
77:20 84:7
93:7 95:11,18
106:17 117:13
118:10 123:1
125:1 141:7

143:7,19
173:19,23
**remote** 97:9
108:16
**remove** 94:10
129:1,25
**removed**
128:25 129:3
148:20
**rent** 44:8,9
**repeat** 65:19
108:11 147:17
**repeatedly**
25:17
**rephrase** 78:15
**replace** 128:25
**report** 21:13
22:2 29:7,10
30:25 37:23
48:9,10,12
51:1 53:13
64:13 65:7,13
65:14,16,24
66:1,5 68:9,9
79:22 80:2,6,7
81:2,7,11,15,18
81:20,22,25
82:2,7,10 86:7
86:10,17,22,24
88:14,18 89:5
89:6,9 91:21
95:12 106:2,19
111:17 112:6
114:3,9 115:14
118:18,19

125:11 127:4
127:11,19
139:4 162:18
**report's** 82:14
**reported** 1:22
**reporter** 1:23
1:24 2:4,5 5:11
5:23 77:23
161:2,4,7
174:8,11 175:5
175:6
**reporting** 5:9
5:12
**reports** 3:8
148:15
**represent** 40:8
**representation**
145:8
**represented**
168:1
**represents** 19:4
**request** 61:18
90:25 140:4
**requested**
44:24 61:14
72:2,4 94:10
125:6 134:17
146:2 164:2
175:14
**requests** 127:6
**require** 102:5
**required**
119:11 178:13
**requirement**
75:25 76:1

Charles Crosby , PE
May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[requirement - run]**

Page 36

| | | | |
|---|---|---|---|
| 91:1 | **richard**   2:17 | 155:19 156:5 | **room**   45:6 |
| **requires**   81:24 | 3:18 176:1 | 157:21 158:12 | **rough**   1:10 4:9 |
| 135:4 | **rick**   5:21 6:6 | 158:23,24 | 5:7,21 37:2,6 |
| **research**   83:23 | 7:10 | 159:1 160:5,17 | 88:7 115:21 |
| **reserve**   14:17 | **right**   15:18 | 160:20,25 | 116:6,10 121:9 |
| **reserving**   56:2 | 22:15 32:10 | 161:9 162:3,16 | 170:3 176:4 |
| **response** | 40:5,7 46:23 | 165:2,5 166:6 | 177:1 178:1 |
| 136:13 174:2 | 47:1 48:11 | 166:15 167:11 | **roughly**   139:1 |
| **responses**   9:24 | 49:2 54:2 | 168:21,25 | **round**   146:15 |
| **responsible** | 58:17 60:15 | 170:3,12,16 | 173:9 |
| 58:13 | 65:24 67:17 | 172:3,6,7,9 | **row**   63:17 |
| **rest**   109:22 | 69:6 72:23 | 173:25 | 173:3 |
| 166:2,7 | 74:14,25 75:3 | **rights**   132:5 | **rpr**   1:23 2:3 |
| **restroom**   77:24 | 77:4 78:9 84:6 | **risk**   22:4 | 175:24 |
| **resulting**   22:1 | 86:2,16 89:12 | **rival**   22:6 | **rule**   81:24 |
| **results**   3:9 | 90:9 91:22 | **road**   2:18 5:15 | **rules**   81:17 |
| 23:17 62:16 | 96:3 100:17 | 111:1 143:14 | **run**   26:9,18 |
| 83:14 87:1 | 102:10,23 | **robin**   1:23 2:3 | 43:20,23 44:3 |
| 88:13,17 | 106:8 107:21 | 5:11 175:4,24 | 44:15,15,18 |
| 104:12 118:16 | 107:23 108:3 | **roden**   63:9 | 51:7 52:17,20 |
| 162:18 | 109:15 110:7 | **roll**   100:7,12 | 54:22,24 55:3 |
| **retention** | 110:12 111:9 | **rolling**   113:2 | 55:6,12,13,13 |
| 164:18 | 111:10 113:23 | **rollover**   17:5 | 55:18,22,24 |
| **return**   176:13 | 118:11 119:17 | 17:10,12 | 56:4 58:8,22 |
| 176:16 | 121:15 128:1 | **roof**   25:4,19 | 60:7,18 61:14 |
| **reuse**   130:23 | 129:15 131:7 | 52:13 92:12 | 61:19 62:23 |
| **revenue**   9:4 | 131:16,16,21 | 93:13,17,20,22 | 63:25,25 68:12 |
| **revenues**   6:25 | 132:4,4,9,15,22 | 94:12,13,14,16 | 68:21,22 69:12 |
| 7:3,23 | 133:20 139:16 | 95:1 152:9 | 69:13 74:1,2 |
| **review**   89:18 | 140:1,21,24 | 156:11,16,18 | 77:7 79:6 |
| 89:24 118:23 | 141:3,5 143:12 | 156:20,24 | 80:23 84:22,24 |
| 118:25 175:13 | 143:18,20,24 | 157:6 158:14 | 96:8,15 100:17 |
| 176:7 | 143:25 144:1 | 160:2 | 101:5 108:1 |
| **rhill**   2:19 176:2 | 147:19 149:7 | **roofs**   25:18 | 115:15,18 |
| | 149:21 151:16 | 27:14 | 119:11,21 |

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[run - sectors]**                                                Page 37

126:20 134:24
135:1 137:25
139:16 165:9
**running**  50:2
56:20 57:5
67:25 84:17
94:24 96:12
108:3 128:24
129:2,11 135:2
139:25
**runs**  26:8,14
77:12 109:1
**rupture**  85:9
85:11
**rust**  126:1
**rws**  1:8 5:8

**s**

**s**  177:3
**saddle**  33:25
**sae**  67:21,24
68:6 75:20
**safe**  23:8 24:13
**safer**  21:14
23:13 34:21
37:2,7
**safety**  24:17
25:14 26:3,6
27:6 79:9
83:23 121:19
122:1,8,10,14
124:5,18
**sand**  113:10,12
**sandbags**
113:23 134:2

**santana**  1:5 5:6
176:4 177:1
178:1
**sat**  118:10
**save**  38:23 41:7
41:21 42:24
**saw**  30:4 109:4
173:10
**saying**  14:19
74:14 110:5,18
158:14
**says**  7:23 9:8
10:2,10 20:14
27:4 31:3
35:22 40:16,19
40:21,24 41:3
41:5,17 42:4,6
73:20 87:22
88:11,20 104:3
114:4 128:24
133:5 139:15
165:14 166:12
**scale**  56:24
126:23,24
127:7 147:20
147:24,24
148:4
**scales**  130:11
**scan**  49:13,13
49:14 103:5,16
103:17,21
105:4 124:21
161:24,25
173:11,18

**scanned**  124:25
125:2
**scans**  103:23
125:9 173:8
**schedule**  135:1
**scheduled**
54:25
**scholarships**
122:7
**school**  119:10
**science**  3:15
**scoot**  159:15
**scope**  80:10
**scottsdale**  5:15
5:16
**scrapes**  3:14
**screen**  40:23
153:14 160:21
161:10
**screenshot**  4:17
160:6
**screenshots**
38:23 39:5
40:18,23 41:1
41:4,18 42:23
**scrutinized**
162:6
**searched**  7:5
**seas**  35:8 36:10
**seat**  52:12
61:23 62:5,11
62:12 63:17,22
64:1 140:18
141:23 173:3
173:16

**seat's**  61:24
**seatback**  140:1
140:8
**seatbelts**  19:25
**seating**  140:10
140:12,16,17
**seats**  62:16
141:19
**second**  21:22
21:22,23 35:23
40:15 42:4
53:1,3,25 54:2
54:5,9,11,24,25
55:5,6,18,23,24
56:1,4,5,7,8,21
57:2,5 63:17
91:9 97:19,22
98:9,10,10,11
98:23 116:2
117:7 127:1
133:4 135:16
136:4,15,22
137:23,25
165:5 166:11
166:14 172:3
173:3
**secondary**
34:20 35:7,23
36:9
**section**  27:13
87:18 133:5
162:18 166:11
167:16
**sectors**  9:11

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[see - signature]**                                              Page 38

**see** 6:8 7:17
  9:25 40:12
  45:11,13 46:19
  46:22,23 49:16
  53:12 56:17,17
  62:4 63:8,16
  70:8 72:20
  73:16 74:5
  75:3 76:11,17
  76:24 93:22
  94:1 102:23
  116:24 124:20
  141:7 145:14
  147:15 149:9
  152:1,14
  153:20,23
  154:13,20
  155:7 156:10
  156:11 157:23
  158:23 159:14
  159:21,24
  160:15 162:18
  162:21,22
  163:3 168:16
  172:10 173:6
  173:21
**seem** 104:21
**seen** 22:22
  87:20 163:24
**seeps** 12:9,24
**selection** 90:11
**send** 42:5 43:10
**sent** 19:17
  37:17 90:3,17
  176:14

**sentence** 7:22
  9:8,25 20:13
  21:23 27:4
  87:22 89:10
**separate** 65:15
**separately** 64:6
  131:4
**september**
  170:17
**sequence** 100:3
**series** 57:16
**services** 5:9,12
  5:15 9:10
  169:7 171:22
**set** 48:6,7 51:13
  53:9 54:11,12
  55:5,17 57:1,2
  57:10 58:15,22
  64:14 65:6,14
  71:16 74:6
  101:25 103:23
  104:17,17
  110:20 116:2
  119:24 134:23
  135:4,16 136:4
  140:7,8 144:17
  144:18,19
  145:4,13,22,24
  146:11,16
  150:11 155:4
  156:13
**sets** 92:15,18
  103:16 134:18
**setting** 101:22
  101:23 135:6

  144:12
**setup** 87:1,9
  106:18 107:4,9
  108:9 114:10
  114:16 132:12
  135:9 136:2
  144:10 149:8
  149:22 165:8
**several** 38:9,10
  77:8 103:3
  132:23 162:5
  162:20
**shadow** 157:23
  157:24 158:8
**shadows** 158:7
**shane** 40:2 42:6
**share** 160:21
  171:11
**shareholders**
  8:8
**shares** 8:4
**sharing** 160:8
**sheet** 114:10
  176:11
**shifted** 48:5
**shipping** 168:5
**shoe** 108:5,8
  132:18,20,21
  133:14 139:10
**shoes** 139:9
**shoot** 160:9
**shortened**
  107:7
**shorter** 123:8

**shorthand** 1:23
  2:4 175:4,11
**shot** 159:17
**shoulder** 19:25
  20:1,17
**show** 20:6
  39:10 87:11
  96:5 100:23
  101:12 107:3
  130:5 153:16
**showed** 75:8
  94:8
**showing** 22:2
  113:25 155:3
**shown** 36:1
**shows** 48:20
  107:10 108:9
  127:23 162:19
  163:2 168:22
**shut** 102:19
**sic** 31:4
**side** 25:8 33:25
  45:11 77:12
  84:15 110:24
  110:24 120:16
  141:22,22
  143:3,9,12
  154:11
**sided** 6:7
**sides** 140:23
**sign** 86:21
  174:1 176:12
**signature**
  175:14,23

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[signed - speed]**                                              Page 39

| | | | |
|---|---|---|---|
| **signed**  176:19 | **sites**  51:22 52:5 | **softwares** | **space**  36:11 |
| **significant**  59:1 | **sits**  131:12,23 | 105:2 | 141:12 153:17 |
| 59:2 61:10 | 152:25 156:22 | **sold**  8:4 17:6 | 153:25 154:2,8 |
| 63:11 108:24 | **sitting**  50:19 | **solenoid**  141:16 | 158:9,19 |
| 126:1 154:20 | 73:23 107:18 | **solution**  85:6 | 159:13 |
| **significantly** | 143:17 | **solutions** | **spacing**  132:3 |
| 32:2 61:13 | **situations** | 176:23 | **speak**  43:18 |
| **similar**  13:8 | 25:22 | **somebody** | 65:18 |
| 24:8 63:22 | **six**  106:15,15 | 83:19,25 122:5 | **specialist**  5:13 |
| 85:6 106:4 | 150:5 | 124:13 | **specific**  12:4 |
| 123:7 139:7 | **sized**  22:6 | **somewhat**  22:5 | 13:15,19,22 |
| **similarly** | **skill**  175:16 | **sorry**  7:10 | 70:24 71:2,9 |
| 131:22 | **skip**  169:6 | 10:20 11:11 | 71:23 73:21 |
| **simulating** | **skipped**  117:6 | 15:7 27:2 | 77:1 88:21 |
| 96:16 | **slack**  38:7 | 41:13 42:3 | 89:3 97:23 |
| **simulation**  88:1 | **sled**  52:5 83:5 | 49:22 50:10 | 99:17,17 |
| 88:4,8 119:2 | **slice**  106:7 | 64:10 65:18,20 | 135:10 140:16 |
| 119:12 | **slices**  103:25 | 82:15,16,19 | 142:8,10 155:5 |
| **simulations** | **slides**  40:18 | 95:9 96:13 | **specifically** |
| 115:20,23 | 41:5,19 | 97:5,17 107:9 | 12:19 47:15 |
| **single**  4:6 11:18 | **slightly**  151:23 | 107:24,25 | 80:18 96:2 |
| 12:1,4 17:9,10 | **slowing**  124:11 | 109:5 115:4 | 117:13 120:18 |
| 58:20 77:8 | **small**  54:21 | 117:6,14,21,24 | 129:13 138:11 |
| 104:17,18 | 123:6 139:3 | 136:16 138:19 | 139:12 145:12 |
| 131:14 | 154:25 | 144:3 147:21 | 145:24 146:24 |
| **sir**  15:6 37:15 | **smaller**  36:2 | 159:16 160:10 | 147:2 155:10 |
| 46:11 51:25 | **snyder**  2:12 | 163:21,22 | **specifications** |
| 66:13 92:4 | **society**  67:21 | 169:4,10,23 | 69:3 78:24 |
| 95:13 103:20 | **soft**  98:10 | **sorts**  11:21 | 79:2 96:1 |
| 117:23 140:25 | **software**  38:8 | 22:22 | **specifics**  18:10 |
| 141:25 150:4,6 | 88:2 103:8 | **sounds**  38:15 | 49:11 59:11,11 |
| 164:16 170:14 | 104:24 105:8 | 67:7 | **speed**  62:3 |
| **sit**  118:7,14 | 105:11,12 | **sources**  9:4 | 68:20,22 83:15 |
| **site**  100:10 | 119:25 145:21 | **southeast** | 83:17,18 85:9 |
| 118:9 | 146:12 | 176:15 | 108:25 150:14 |

Charles Crosby , PE

Bryson, Santana and Joshua v. Rough Country, LLC

May 14, 2024

**[speeds - sunroof]**                                              Page 40

**speeds** 68:19
  83:7,10 145:17
**spell** 84:10
**spill** 10:22 11:6
  85:10 139:22
**spoke** 10:19
**sponsored**
  122:8
**spot** 63:10
  111:18
**spots** 104:6,7
**square** 146:15
**stability** 24:6
  52:13
**staff** 122:13
**standard** 67:19
  67:24 68:12
  69:16 129:8
  140:11
**standardized**
  72:11
**standards**
  67:20,22 69:7
  69:12
**standing** 21:3
**stands** 67:21
**start** 41:13
  98:5 107:10
  126:8 130:1
  135:6 151:22
  169:22
**started** 91:10
  91:11 124:16
  135:23 136:20
  136:25 137:23

**starting** 40:6
  107:6 148:22
**starts** 21:22
  76:11
**state** 14:16
  96:5 175:1,5,6
**statement** 3:12
  30:20 81:11
  86:8
**states** 1:1
**static** 52:12
**stationary**
  100:20
**stay** 100:20
**steady** 159:4
**steer** 113:6,7,7
**steering** 110:25
  111:2 112:24
  112:25 113:3
**stem** 46:25
**stick** 147:13
**stock** 8:5
**stoddard** 85:5
  129:24
**stop** 108:25
  109:16,23
  160:8
**stoplight** 99:12
**stopped** 100:1
  109:25 158:24
**stopping**
  160:21
**storage** 131:3
  169:3,16,23,23
  169:24,24

170:11 172:6
**store** 131:4
**storing** 170:4
**straight** 60:22
  110:17 111:1,3
  111:5,23
  112:24 113:2,4
  113:5 155:2
**strength** 25:4
**strengthened**
  93:21
**strike** 10:20
  11:3 22:12
  24:2 29:15
  49:22 55:2
  107:24 125:10
  136:4 138:19
  144:3 147:21
**striking** 96:10
**string** 40:9
**strobe** 133:23
**struck** 100:24
**structural**
  35:25
**structure** 35:8
  35:23 36:10
  50:7,8 51:3
  94:12,13,15,16
  95:21,23
  104:16 126:2
  139:13
**structures**
  93:13 94:3,5
  95:1 96:2
  152:4

**studied** 36:1
**studies** 16:7
**study** 23:12,17
  86:9
**stuff** 39:20,24
  68:23 78:10
  82:21 83:15
  102:15 118:21
  137:9 139:11
  146:17 168:6
**sub** 132:16,22
**subject** 57:14
  57:24 58:3
  60:14 69:19
  84:21 89:15
  90:18 95:23
  109:22 129:10
  129:11 137:16
  138:22 172:19
**subscribed**
  178:14
**successful**
  71:19
**suggest** 37:1
  78:2
**suite** 2:13,18
  5:16
**summarize**
  82:1
**summary** 128:2
**sun** 92:12
  158:7
**sunroof** 90:25
  91:5 92:10,11
  92:21 93:9,23

Charles Crosby , PE

May 14, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[sunroof - tell]**

Page 41

94:2 95:9,15
95:17 136:8,12
136:14 137:15
138:1,7,14,21
138:22,23
**sunroof's** 94:22
**sunroofs** 90:24
93:14,15,18
**super** 4:15
**supplement** 4:9
**supplies** 167:22
168:2
**support** 82:1
122:13 123:3
**supposed** 82:14
107:20 110:14
128:4 160:16
**sure** 11:23 23:8
58:10 69:5
73:9,17 75:23
77:2,22 90:21
91:22 94:13,20
95:1,21 96:1
111:8,23
114:15 124:8
129:18,18
130:1,3,10
134:7 151:3
153:3 164:24
**surprise** 23:11
30:7
**survived** 21:25
**surviving** 1:6
**susceptible**
21:15

**suspension**
78:21 96:25
**suspensions**
78:25
**swanson** 86:1
**swap** 53:7
55:19
**swear** 5:23
**switch** 17:25
18:5,16 108:17
**sworn** 6:3
175:9 178:14
**synch** 133:25
**synched** 174:14
**system** 97:9,10
108:15 132:19
133:11 134:13
134:13 137:8
139:22 141:8
141:15

**t**

**t** 6:12 177:3,3
**tab** 114:16
**take** 28:6,13
38:22 40:18,22
40:22 41:4,18
42:23 48:10
50:21 55:11
56:17 65:11
75:2 92:19
101:17 102:1
102:19 103:21
104:4,4,5
105:9 111:16
111:20,21

116:24 118:20
119:7 122:2
126:3,23
130:21 133:6
133:11 145:15
145:23 146:5
146:10,25
147:5,16,20
150:18 156:7
158:17 159:8,8
159:23 160:5
160:20 173:2,6
174:13
**taken** 5:5 39:5
46:16 55:21
102:21 112:9
129:23 131:19
131:21 133:8
141:13 169:1
173:12,15
175:7,11
**talk** 61:15 90:9
118:7 144:10
**talked** 13:20,23
76:6 105:5
108:10 109:8
152:6
**talking** 35:1
42:19 73:24
74:21 75:10
76:7 89:7
105:2 145:19
150:3 157:5
159:2

**tank** 16:23 23:2
23:4,6,7,12
85:5,8,11
129:20 130:5
130:10 139:15
143:6,7,11,14
**tanks** 22:11,13
23:14
**tape** 49:5,7
77:2 110:13
147:3,4,5,10
150:18 152:5,7
152:14 173:22
**target** 71:17,17
73:10
**task** 166:12
**team** 39:17
65:2,10
**teams** 38:7,12
**technicians**
112:9 126:7
**technology's**
160:16
**tedra** 2:12,15
5:19
**tell** 6:5 43:11
46:8 47:25
51:16 65:3
73:23 89:2
90:14 91:20
109:22 127:13
127:16 135:8
135:25 150:24
151:22,25
156:5

Charles Crosby , PE                                      May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[tend - testing]**                                          Page 42

| | | | |
|---|---|---|---|
| **tend**  99:23 | 71:19,20 72:5 | 134:24 135:1,3 | **testify**  19:17 |
| **tends**  113:1 | 72:7,13,24 | 136:1,2,13 | 29:1 31:16 |
| **term**  25:7 | 75:2,19,19 | 137:3,22,25 | 46:1 88:12,21 |
| 71:15 140:5 | 76:2,9,11,13 | 138:3,18 139:4 | 89:3 175:10 |
| **terminology** | 77:3,8,10 80:3 | 139:16,22 | **testifying**  8:15 |
| 105:20 | 80:6,8,18,21,23 | 142:11,19 | 28:21 29:18 |
| **terry**  167:18 | 85:12 87:6,9 | 145:22 147:17 | 33:5,11 62:22 |
| **terry's**  169:1 | 88:14,24,24 | 152:12,13 | 125:8 175:9 |
| **test**  4:7,17 | 89:1,5,6,9 | 153:10,13 | **testimony**  3:16 |
| 25:11 37:23 | 90:10 91:8,12 | 155:4 156:20 | 13:2 15:16 |
| 43:21,24 44:4 | 91:25 92:2,16 | 157:19 162:17 | 28:11 30:11 |
| 44:7 45:3 | 92:19,23 94:4 | 162:18 165:3,4 | 51:5 79:18,20 |
| 46:15,17 47:24 | 94:14,23 95:10 | 165:5,9,21,24 | 82:23 84:6 |
| 48:3,9,10,12 | 95:12,14 96:4 | 166:8,14 | 86:3,9 87:14 |
| 49:13,13,23 | 96:5,12,15,18 | 167:12,13 | 92:9 93:8 |
| 50:1,9,25 52:5 | 99:14 100:10 | 168:15 169:22 | 102:18 114:8 |
| 53:1,3,13 54:3 | 100:22,23 | 169:23,25 | 120:11,22 |
| 54:5,9,12,14,22 | 101:9 106:1,13 | 172:3 173:4,15 | 135:15 155:25 |
| 54:24,25 55:3 | 106:14,18 | 173:17,19,20 | 176:9,17 178:8 |
| 55:5,6,12,13,15 | 109:4,15 | **tested**  94:7 | **testing**  26:7,8 |
| 55:18,23 56:4 | 110:17 111:7 | 127:12 169:17 | 37:22 47:19 |
| 56:4,5,7,8,19 | 111:13,17 | 169:21 | 51:22,24 52:2 |
| 56:20,21,21 | 114:16,17,19 | **testified**  6:3 | 52:12,13 63:12 |
| 57:1,5,8,10,16 | 114:20 115:3,5 | 10:21 11:9,12 | 63:14 66:9,11 |
| 57:24 58:22 | 115:14,15 | 11:22 13:5,10 | 66:15,16,19,22 |
| 59:22 60:3,13 | 117:20 118:6 | 15:12 28:4 | 67:24 68:13 |
| 60:18 61:16,17 | 118:12,15,17 | 29:16 30:5,14 | 69:8,9,17 70:8 |
| 61:19 62:12,23 | 119:1,21 123:7 | 30:17,19 45:24 | 77:11,12 79:6 |
| 63:18 64:3,12 | 123:10 124:21 | 53:18 92:14 | 80:14 83:5 |
| 64:17 65:7,10 | 124:22 125:1,2 | 121:5 | 84:17,22 85:1 |
| 65:13,13,21,25 | 125:6 126:4,18 | **testifiers**  18:6 | 85:8 86:16,25 |
| 66:5 67:18,19 | 126:20,21 | 32:21 79:15 | 87:1,1 88:22 |
| 68:19,20 69:11 | 127:4,11 132:9 | 122:15 123:2 | 99:3 101:2,7 |
| 69:13,13,15,16 | 132:10,12,13 | **testifies**  14:24 | 115:24 116:6 |
| 70:1,7,9 71:11 | 133:5,6,9,11,12 | 30:2 | 120:14 121:4 |

Charles Crosby , PE                                     May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[testing - tow]**                                              Page 43

123:10 135:3
139:25 165:17
166:12 169:22
171:22
**tests** 43:21,24
44:3,15,18
52:17,20,21
54:22 56:10,10
57:10 58:15
61:23 62:19
68:1,22 69:12
69:22,23 70:2
70:5,17,24
74:4 76:8,21
76:24 77:5,7
85:3 100:17
105:25 115:18
123:4 144:19
**texas** 120:23
**text** 3:23 35:16
40:10
**thank** 5:22
14:12 116:23
153:10 160:7
160:13,25
171:13 173:25
174:14
**thanks** 42:6
**thing** 7:10
39:23 43:15
60:21 88:20
89:24 102:13
128:9
**things** 24:25
39:25 49:9

56:25 59:5,6
69:5 89:10
116:16 120:16
134:11 141:6
144:5 146:6
149:14 161:22
167:23 168:12
**think** 39:24
73:25 75:16
77:10 82:21
86:3 90:18
91:9 117:13,14
123:18,21,22
123:25 124:11
153:25 154:11
163:4,6 168:3
169:6 172:9
**thinking** 82:25
143:16
**thomas** 85:22
85:23,24
**thought** 117:24
136:13
**thousand** 6:22
31:22 128:12
**thousands** 44:3
**three** 37:16
54:24 98:13
117:1 126:19
136:23
**throw** 108:16
**tie** 112:25
**tied** 66:25 67:3
**tighten** 110:20

**time** 33:6 45:18
45:21 57:2
64:5,6,7,15,19
77:23 78:4,7
81:6 123:2
124:3 126:11
126:15,17,22
127:1 135:2,16
135:25 136:15
146:7 153:4,7
157:19 160:11
160:11 169:1
174:5 176:18
**timeframe**
176:8
**times** 29:16
30:15,18,19
**timesheets**
37:17
**timing** 54:16
**tires** 53:19,21
130:17,18
168:2
**title** 27:12 83:3
168:19
**titles** 168:17
**titling** 168:18
**tobacco** 13:6,14
13:25 14:25
**today** 68:3
73:23 86:11
143:17 144:11
**today's** 174:4
**together** 24:14
24:24 64:13

65:24 118:14
118:22,23
128:11
**told** 12:3 38:17
38:22 39:1
40:25 42:22
48:1 54:21
90:15
**took** 25:9 48:2
49:7 87:3
146:20
**tool** 160:14
**top** 64:20 67:5
69:6 70:3
73:13 95:11,18
106:17 125:1
131:17,22,24
134:7 139:1
142:3 149:17
151:2,10
**topped** 130:3
**toss** 66:6
**total** 7:23
128:18,19
144:1 165:2,16
168:8 171:16
171:17
**tow** 53:8 108:4
108:7 125:17
132:18,19,20
132:21 133:11
133:14 134:13
139:9,10 149:5
161:25 162:12
163:11,12

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[tow - understanding]**                                          Page 44

168:3,4
**towards** 94:22
**toyota** 17:19
**track** 131:25
132:1,2,2
**tracking**
145:20
**traded** 7:4 8:4
**trailer** 94:8,11
**trained** 33:8
**training** 43:4
144:12,14
**transcribe**
65:12
**transcribed**
37:23
**transcript** 3:10
174:9,12
175:15 176:6
176:19 178:5,8
**transcription**
65:15 175:13
**transducers**
134:20 139:1
**transfer** 137:11
**transferred**
168:20
**transmit** 65:10
**transmitted**
89:22
**transportation**
9:10
**travel** 111:2
**traveling** 6:7
108:24

**trial** 3:11 28:4
86:3
**tried** 157:13
161:5
**trim** 130:16
**trolley** 108:5
**truck** 23:12
57:20,21
125:17 143:21
**trucks** 16:23
21:12,14 22:3
22:5 23:13
33:25 35:24
**true** 8:21 9:14
10:14 12:11
18:4,21 19:3
19:16 21:11
25:16,23
156:18 175:15
178:8
**truly** 83:11
**trust** 148:3
**truth** 175:10
**try** 24:15 25:12
57:16 63:10
102:15 105:14
106:1,3 113:3
113:19 118:22
131:9,10
139:22 141:4,5
142:25 147:7
153:10 156:15
156:21,25
158:18

**trying** 8:10
62:24 63:19
67:2,11,14
72:17 73:25
77:10,22 96:7
104:1,13
106:10 108:11
110:4,22
118:12 136:18
143:13 146:14
**turn** 3:14 7:20
9:6,24 20:12
35:16 40:14
87:17,17
**two** 6:8 37:16
48:5 49:1 51:2
51:10 53:14
54:24 57:23
70:5 91:19,24
91:24 92:12
93:11 105:25
117:1,4,8
122:4 126:19
138:7 139:5
140:23 152:11
156:13 157:9
159:2 169:17
169:19 170:4
**twofold** 83:12
**type** 119:11
120:24 147:8
**typical** 33:21
106:14 139:14
**typically** 54:16
62:9 71:1,9

93:22 94:1
98:18,22 99:24
100:1 123:15
126:19 130:4,9
144:19 172:14

**u**

**u.s.** 28:4
**uh** 57:22 59:24
64:4 69:10
76:18 99:16
101:3 105:7
119:15,19
139:17 142:20
143:22 147:12
156:9 159:12
**ultimately**
63:23 104:12
**uncompleted**
167:13
**under** 27:12,12
28:4 71:11
81:17 87:22
107:11 175:13
**understand**
21:7 58:11
74:18 96:13
97:17 146:12
151:3 155:25
164:24
**understanding**
6:24 19:1 26:7
26:19 32:5
33:7 54:4 58:1
69:18 84:19
94:9,17,18

Charles Crosby , PE                                                          May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[understanding - vehicles]**                                                Page 45

| | | | |
|---|---|---|---|
| 105:4 107:16 | 158:15 170:2 | **vehicle** 3:21 4:6 | 128:1,5,18,19 |
| 120:15 137:25 | **used** 38:10,20 | 4:14 14:10 | 128:23 129:7 |
| **understood** | 53:20,20 82:1 | 17:5 23:2,6 | 129:11,15,21 |
| 135:21 | 90:19 91:7,12 | 24:5,17 25:2 | 131:11 132:9 |
| **uniform** 105:15 | 91:20,25 92:2 | 25:10 26:8 | 132:13,21,24 |
| 105:19 113:13 | 92:9,22 93:10 | 35:1 36:3 | 133:1,5,23 |
| 141:6 | 113:8 116:17 | 39:17 48:23 | 135:11 136:19 |
| **uniformly** | 138:14 140:19 | 51:24 52:1 | 136:23,25 |
| 105:17 | 148:9 176:19 | 61:16 64:14 | 137:1,1,3,9,16 |
| **unintended** | **using** 38:11 | 65:4 67:24 | 137:21,21,23 |
| 17:20 | 50:10 119:2 | 69:19 71:3,3,5 | 138:17,21,22 |
| **unit** 168:10,11 | 137:20 138:17 | 71:7,16 72:5 | 140:7 141:9 |
| **unit's** 168:16 | 138:21 147:7 | 72:18 73:15 | 142:18 143:10 |
| **united** 1:1 | 161:20 168:14 | 76:10,14 77:15 | 147:20,23,24 |
| **unknown** 57:18 | **usually** 29:1 | 84:25 87:25 | 152:4,8,15 |
| **unknowns** | 40:23 62:4,18 | 88:1,3,7 89:6 | 156:12,16,17 |
| 57:17 58:9 | 65:2 123:14 | 90:11,18 91:2 | 156:24,25 |
| 148:3 | 125:17 134:11 | 91:15 92:24 | 168:17,18 |
| **unrelated** | 134:25 140:16 | 93:2,9,10 94:7 | 169:3 172:11 |
| 40:19 | 149:16 155:1 | 94:7,9,14,23,24 | 172:19 173:8 |
| **untested** 170:4 | **v** | 95:22 96:5,11 | 173:12,18 |
| **updates** 86:6 | | 96:23 97:11 | **vehicle's** 128:4 |
| **upright** 140:6 | **v** 3:13 83:7 | 99:22 100:11 | **vehicles** 22:23 |
| **use** 24:14 25:7 | 84:12 176:4 | 100:14,19,23 | 25:11,18 48:3 |
| 34:20 38:7,8 | 177:1 178:1 | 100:24 101:19 | 49:14 51:7,10 |
| 40:23 60:2,20 | **valdez** 10:19,22 | 101:22,22,24 | 53:4,10,13,14 |
| 66:17 69:7 | 11:6 | 102:6,7,16 | 54:12 55:6,17 |
| 74:10 92:21 | **value** 19:25 | 103:7,7 108:23 | 58:18 65:3 |
| 103:25 104:22 | 20:17 | 109:16,21,25 | 68:24 70:18 |
| 105:12,21,23 | **values** 57:19,20 | 110:22,23 | 85:1 88:22,25 |
| 106:12 123:5 | **valves** 141:17 | 111:1,4,15,18 | 89:4,15 90:12 |
| 134:2 136:12 | **van** 63:9 | 112:9 113:2 | 90:20,21,24 |
| 137:14 138:8 | **vans** 35:24 | 114:17,18 | 91:15,20 92:15 |
| 144:16 146:12 | **variables** 58:14 | 125:12,12,22 | 92:18,20 93:14 |
| 148:6,15 | **vegas** 85:18 | 126:2,9,10 | 93:18 94:4,5 |

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[vehicles - we've]                                        Page 46

94:17 101:6
103:16 107:4
107:11 110:24
113:9 114:11
116:2 119:14
124:22 125:2
133:25 135:17
136:4 137:4
138:7 145:9
147:11 149:23
150:9 167:22
167:25 168:4
169:16,18,19
170:1,4,6
**verbally** 65:2,9
65:10
**verified** 9:23
**verify** 11:24
72:2,4 73:22
125:20,23,23
176:9
**veritext** 176:14
176:23
**veritext.com.**
176:15
**version** 107:7
**versus** 5:7
102:24 156:11
**vertical** 50:16
**video** 4:17 5:4
5:13,14 49:25
50:9 112:11
145:14,16,20
147:6 148:14
150:1,14

151:14,21
152:1,3 154:18
156:21 158:17
161:18 174:14
**videoconfere...**
2:13
**videoconfere...**
121:7
**videographer**
2:20 5:3,22
45:7,9,13,17,20
78:3,6 153:3,6
154:4 159:16
160:24 174:4
**videos** 118:20
133:22 144:23
145:22,24
146:20 147:16
148:9 154:15
**videotaped**
1:14 2:1 4:11
163:16 174:7
**view** 150:24
152:18 154:11
156:12 163:7
**views** 154:14
154:19,25
155:3
**vin** 90:18 91:21
95:25 125:23
**vins** 91:21
**visual** 72:7
73:1 74:4 77:3
103:12,12
145:8,13 146:3

155:4
**visually** 72:13
72:19 73:8
155:23 158:6
**vitae** 4:4
**voluntary** 34:5
34:10
**vs** 1:9

**w**

**wait** 45:6 86:21
87:12 151:3
**waiting** 45:6
**walk** 125:13
132:15
**want** 46:21
57:16 58:17,22
62:23 63:14
65:4,5 68:21
69:12 87:11
102:7,16
105:21 110:23
125:7 127:7
130:7 136:3
143:10 144:10
144:20 145:13
147:17 153:18
155:13 159:2
163:8,11
164:23 167:3,6
169:22,23,24
171:6 174:1,8
174:11
**wanted** 6:5
49:10 57:15
60:17 84:24

119:6 128:2
**warnings** 39:22
39:25
**washer** 129:19
**waste** 131:10
**watch** 50:9
**water** 12:7,21
12:22
**way** 37:1 67:15
72:3,4 73:10
77:3 96:10,17
99:9 103:5
104:10,11,12
104:13 105:15
111:24 114:3
138:1 140:6
143:10,12
152:22 156:1
156:23 158:13
161:16 173:9
175:17,19
**ways** 23:8
96:21
**we've** 17:10
25:9 38:9 65:2
66:24 78:1
88:16 102:12
111:17 114:9
114:10 132:13
134:12,12,13
138:6 147:3
149:22 150:8
150:20 165:18
165:20 166:25
167:11,21

Charles Crosby , PE                                    May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

| | | | |
|---|---|---|---|
| 169:1,2 170:11 | **welcome** 91:22 | 18:19,25 19:8 | **witnesses** 19:17 |
| 170:16 171:3 | **went** 48:2 49:7 | 19:20 20:5,8 | **wondering** |
| **weak** 27:14 | 50:12 55:23 | 21:17 22:9,17 | 90:8 |
| **website** 7:16,18 | 123:15 | 22:22 23:4,16 | **word** 24:9,13 |
| 68:6 | **wes** 47:18 | 23:23 24:8,23 | 24:14 |
| **week** 82:24 | **wesley** 45:23 | 25:7,22 26:13 | **words** 55:12 |
| 135:5 | 47:14 | 26:24 27:16 | 66:16 74:12 |
| **weigh** 113:13 | **west** 2:13 | 28:1,10,17,23 | **work** 9:3 11:5 |
| 113:15,17,20 | **western** 120:24 | 29:4,22 30:9 | 11:21 17:2,11 |
| 114:1 126:15 | **wheel** 111:2 | 30:22 31:8,14 | 19:9,11,11,12 |
| 126:17,22 | 112:24,25 | 31:24 32:5,24 | 19:14 24:10,14 |
| 130:11 141:15 | 113:4 131:14 | 33:15,21 34:2 | 24:24 25:9,10 |
| 172:12 | 131:14,17 | 34:8,23 35:4 | 25:12 29:18 |
| **weighed** 114:1 | **wheeler** 2:17 | 35:11 36:7,13 | 59:10 62:18 |
| 126:10,12 | **wheels** 53:21 | 36:20,24 37:4 | 63:5 66:24 |
| 129:21 | 60:1,19 130:17 | 37:10 41:11,25 | 67:2,9 79:15 |
| **weighs** 147:23 | 130:18 132:5,6 | 42:12 43:2,8 | 81:4 84:3,4 |
| **weight** 45:1 | 168:2 | 43:13,17 44:1 | 97:8 102:25 |
| 128:3,5,7,9,18 | **whoever's** | 46:5 47:5 | 104:19 106:5 |
| 128:19,23 | 111:20 | 51:20 53:3 | 111:6 119:9 |
| 132:9 133:1,5 | **whoops** 160:4 | 60:7,25 62:3 | 120:8 121:2,3 |
| 133:7,8,11,17 | **wide** 71:4,5,7 | 62:15 73:5 | 121:4 122:18 |
| 133:18 134:17 | 150:24 | 74:17 75:6 | 122:22,23 |
| 141:12,21 | **width** 71:3 | 76:5 79:13 | 124:1,4 128:15 |
| 142:12 143:2 | 104:4 | 80:6 81:12,19 | 129:1 136:20 |
| 144:1 | **window** 54:21 | 95:6 98:1 | 147:8 154:2,8 |
| **weight's** 134:15 | 71:17,24 | 109:20 119:24 | 154:9 160:22 |
| **weights** 65:6 | **witness** 5:24 | 135:19 137:19 | **worked** 11:2,8 |
| 113:8 126:5 | 6:2 8:19 9:18 | 144:8 145:3 | 11:17,20,24 |
| 127:10,11,12 | 10:17,25 11:16 | 148:2,13 | 12:5,7,14,16,20 |
| 127:14,17 | 12:13 13:1,8 | 154:24 155:10 | 13:13,24 15:21 |
| 128:22 129:15 | 13:18 14:2 | 155:23 159:18 | 16:20 27:22 |
| 132:7 141:18 | 15:4,7,16,24 | 169:10 171:25 | 34:5 40:5 |
| **weinberg** 2:17 | 16:3,20 17:2,9 | 174:2 175:9 | 62:25 63:7,7,8 |
| | 17:22 18:2,10 | 176:8,10,12,18 | 63:9 121:11 |

Charles Crosby , PE
May 14, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[worked - zoom]**

Page 48

| | | |
|---|---|---|
| 124:18 142:9 | **y** | **yup**   106:22 |
| **working**   22:23 | **yank**   110:22 | **z** |
| 23:25 58:20 | **yeah**   7:25 8:11 | **zero**   151:6,11 |
| 62:22 78:11,13 | 29:22 33:7 | **zoom**   2:13 |
| 85:24,25 96:23 | 35:18 40:4 | 154:7 |
| 100:13,18 | 45:8,16 55:10 | |
| 101:21 106:4 | 56:25 61:4 | |
| 120:16 121:24 | 65:20 66:7 | |
| 121:25 124:16 | 73:5 77:7 78:1 | |
| 124:18 | 91:23,23 97:16 | |
| **workload** | 101:5 102:11 | |
| 33:22 | 110:18 114:5 | |
| **works**   11:18 | 116:14 117:2 | |
| 14:6 30:1 | 132:17 136:18 | |
| 32:18 39:17 | 138:24 139:8 | |
| 97:4 | 150:7 153:22 | |
| **world**   58:25 | 155:13,15 | |
| **worldwide**   6:20 | 159:21 161:23 | |
| **worth**   130:6 | 171:6 172:4,5 | |
| **wreck**   95:23,24 | **year**   3:9 7:1,24 | |
| 97:19 99:12 | 9:9 18:22 | |
| 129:11 143:4 | 21:23 29:17 | |
| **write**   167:3 | 52:18,20,22 | |
| **written**   35:6,16 | 54:22 86:17 | |
| 35:20 81:7 | **years**   9:15 11:2 | |
| 144:14 | 11:8 20:8 | |
| **wrong**   7:9 | 22:24 30:6,14 | |
| 54:13 55:23 | 30:17,18 38:9 | |
| **wwhgd.com** | 38:10 82:9 | |
| 2:19 176:2 | 122:4 | |
| **x** | **yellow**   110:12 | |
| **x**   3:1 6:12 | 147:10 152:7 | |
| | **yield**   61:24 | |
| | **york**   123:17 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.