# EXHIBIT E

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 1

1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF GEORGIA
2                         GAINESVILLE DIVISION
3
4     SANTANA BRYSON AND JOSHUA BRYSON,
      AS ADMINISTRATORS OF THE ESTATE OF
5     C.Z.B., AND AS SURVIVING PARENTS OF
      C.Z.B., A DECEASED MINOR,
6
           Plaintiffs,
7     v.                        CASE NO. 2:22-CV-017-RWS
8     ROUGH COUNTRY, LLC,
9          Defendant.
10
11
12
              The videotaped deposition of PAUL LEWIS,
13
          JR., M.S., BME, taken on behalf of the Defendant,
14
          taken pursuant to agreement of counsel, taken for
15
          all purposes authorized by the Federal Rules
16
          of Civil Procedure; the reading and signing
17
          of the deposition being waived; taken before
18
          Leita J. Seaborn, Certified Court Reporter,
19
          commencing at 10:38 a.m., on this the 18th day
20
          of March 2024, at the law offices of Cannella
21
          Snyder, LLC, 315 W Ponce de Leon Ave, Suite 885
22
          Decatur, Georgia.
23
24
25

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 145

1      Q.  I think my question was very clear.  I'm not

2   talking about your summary of any information.  I'm

3   talking about the actual information itself.  The

4   depositions, the expert reports, the documents you

5   reviewed -- those -- that material has not been

6   produced to us in this case to enable us to see what

7   you based your opinions in both Bacho and Mendoza on.

8           MS. CANNELLA:  Objection to the form of the

9        question.  Misstates the reality.

10      Q.  Go ahead answer.

11      A.  Well, this does produce the basis of what I

12   wrote the report on and the material that I relied on.

13      Q.  I'm not saying -- I'm saying the actual

14   material.  None of the actual material you relied upon

15   was produced by you to us in this case from your

16   opinions in Bacho and Mendoza.

17      A.  Well, I would agree that probably the

18   depositions are not in there.  I'm pretty sure reports

19   are, but, yeah, I didn't individually produce a medical

20   record or a deposition.

21      Q.  Let's talk about -- you say on page 2 of this

22   report, you admit that the details of Mendoza and Bacho

23   are different from Bryson.  Let's talk about what is

24   the same from Bryson.  In Mendoza and Bacho the vehicle

25   was involved in the accident was equipped with a Rough

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 146

1    Country lift kit.  We can agree on that?

2         A.  Yes, sir.

3         Q.  Were the vehicles involved in Mendoza or Bacho

4    the same as the vehicles involved in this case?

5         A.  I think they both dealt with 2500 pickup

6    trucks, but the struck vehicle was -- one was a Mustang

7    and one was a Sienna minivan.  But in all the cases,

8    basically the impacts were above where the expected

9    vehicle structures were that were meant to carry loads.

10        Q.  Well, let's talk about that.  When you say a

11   2500 pickup, are you saying that that's what was

12   involved in this case?

13        A.  A 250, yes.

14        Q.  Okay.  And so in what other case between

15   Mendoza and Bacho was a Ford F250 involved?

16        A.  Oh, I didn't say a Ford.  One was a dodge and

17   one was a Chevrolet.

18        Q.  All right.  So a Dodge 2500, RAM 2500 is not

19   the same vehicle as a Ford F250, is it?

20        A.  It's still a three-quarter ton pickup truck.

21        Q.  But that's the only similarity between those

22   two.  You don't know the -- whether they're the same

23   height, whether they're the same weight, whether they

24   have the same coefficient of restitution and stiffness.

25        A.  Well, I certainly -- some of that I would

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 147

1  never know to begin with, but I -- I don't have that

2  kind of detail memorized, no, sir.

3       Q.  Okay.  The incident that occurred in Bacho,

4  was it a rear-end collision?

5       A.  No, sir.

6       Q.  It was a side-swipe collision; correct?

7       A.  It wasn't a side swipe.  It was a side impact.

8  It was a T-bone.

9       Q.  Well, that's what I meant to say.  I'm talking

10  about a T-bone, a side-impact collision.

11      A.  Yes, sir.

12      Q.  And the collision in Mendoza was a frontal

13  impact collision.

14      A.  It's kind of an offset frontal, yes, sir.

15      Q.  Neither of them were a rear-end collision.

16      A.  They were not.

17      Q.  You would admit that the speeds of the

18  vehicles involved in those two incidents are not the

19  same as the speeds involved in the Bryson matter.

20      A.  The Delta-v's were -- were different.

21      Q.  All right.  Do you know the size of the lift

22  kit in the Bacho case?

23      A.  I -- I don't recall offhand, no, sir.

24      Q.  Do you know the size of the lift kit in the

25  Mendoza case?

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 148

1        A.   Not without going back and look.

2        Q.   Do you know the height of the bumpers of any

3   of the vehicles if any of those cases?

4        A.   If I go through the materials that I've

5   provided you I could find that.

6        Q.   Well, if you'd like to.  But you would agree

7   that they're not identical.  Would you agree to that,

8   to the Bryson vehicles?

9        A.   Without looking back, I -- I don't know for

10  sure.

11       Q.   Okay.  Well, you -- are you intending to give

12  any opinions that relate to Mendoza and Bacho other

13  than what's listed and described in your supplemental

14  report?

15       A.   No.

16       Q.   Okay.  So let's talk about what your opinions

17  are that you intend to give in this case that relate to

18  Bacho and Mendoza.  So what are they?  I'm not sure I

19  understand this disclosure because it seems to cite

20  conclusions of experts in other cases.  What exactly

21  are you intending to testify about in this case that

22  relate to Bacho and Mendoza?

23       A.   That they are other examples of what --

24  exactly what we have here based upon the lifting of the

25  vehicle or the application of the Rough Country lift,

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 149

 1   that you had created a significantly incompatible

 2   vehicle-to-vehicle situation where you cause much more

 3   catastrophic deformation of the occupant's survival

 4   space for the individuals in the struck vehicle by

 5   that; and thus you've also rendered that vehicle not

 6   capable to utilize the as-designed safety features of

 7   the cage and all to manage the energy to crumple zones

 8   to help with the deformation and dissipation of the

 9   energy.  Rather you basically just have catastrophic

10   intrusion into the occupant survival space that

11   ultimately becomes catastrophically as far as

12   injuries -- sorry -- injury causation.

13       Q.  You've testified multiple times today that

14   you're not qualified to give accident reconstruction

15   opinions.  And you just said that you intend to give

16   opinions in this case related to accident

17   reconstruction issues in Bacho and Mendoza.

18           MS. CANNELLA:  Objection to the form --

19       Q.  Do you agree with that?

20           MS. CANNELLA:  Objection to the form of the

21           question.  Misstates his testimony.

22       A.  Those words never even came out of my mouth,

23   so that's an absolutely mischaracterization of what i

24   just said.  I'm basically talking about the actual

25   physical evidence of what the defamation profile is to

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 151

1   extensive knowledge of vehicles and looking at it.

2   Now, I'm not saying how the car was designed

3   differently or anything of that nature.  I'm just

4   saying it's obvious that the deformation profile is

5   much greater because of the incompatibility of how

6   they're supposed to line up.  I mean there's been a lot

7   of literature written about this especially from IIHS

8   and NHTSA about vehicle compatibility.

9       Q.  Are you able to give testimony about vehicle

10  compatibility and the IHS comments about that?  What --

11  what qualifies you to even talk about vehicle

12  compatibility?

13      A.  From a performance standpoint and injury

14  causation standpoint.  I'm not getting down into the

15  intricacies of the design itself, but certainly I don't

16  design a seat, but I certainly can talk about the

17  performance of a seat and how that may lead to injury,

18  just like whether an air bag does or doesn't go off an

19  how that may affect it.  Certainly I'm not an air bag

20  designer either, but, you know, I don't know need to

21  know how to design the bag.  I know what the purpose is

22  and how that may play a role in protecting or not being

23  able to protect an occupant.

24      Q.  Well, your opinion basically is that in those

25  other two cases that the intrusion would have been

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 152

1    significantly lessened in the hypothetical situation of

2    those vehicles not having a Rough Country lift kit;

3    correct?

4         A.  Yes, sir.

5         Q.  And in order to give any opinion regarding

6    what intrusion may or may not have occurred in a

7    hypothetical crash, you would have to rely upon

8    accident reconstructionist's estimation or simulation

9    or testing with regard to what would happen in that

10   hypothetical crash; correct?

11        A.  I did, and that information is contained in

12   the documents that I produced.

13        Q.  Right.  And I'm saying that you would have to

14   rely upon their opinions to make this conclusion.

15   They're not opinions that you yourself are qualified to

16   give.

17        A.  I'm sorry.  What -- what opinions am I not

18   qualified to give?

19        Q.  The opinion that the intrusion in Mendoza and

20   Bacho would have been significantly lessened, the

21   safety features of the struck vehicles would have been

22   allowed to function as designed if there had not been a

23   lift in either Bacho or Mendoza.  That specific opinion

24   on page 2 of your report.

25        A.  No, that's from using other experts just like

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 159

1      Q.  So that's your personal interpretation of the

2   testimony in this case from Mr. Hunsley, but you can't

3   cite to any specific place in his deposition where he

4   made this statement that you have on page 2.

5      A.  I don't have the page or line right now, no,

6   sir.

7      Q.  Okay.  All right.  Just real quick so I make

8   sure I understand this.

9      A.  Okay.

10      Q.  These stated similarities that you have in

11   this supplemental report related to Bacho and Mendoza

12   when compared to this case are that even striking

13   vehicle was equipped with a Rough County lift kit and

14   that the lift kits elevated the striking vehicles such

15   that there was structural intrusion that was

16   catastrophic.  Did I fairly state your -- where you've

17   said the similarities between the cases?

18      A.  Yes.

19      Q.  Can you cite to any other similarities between

20   Bacho and Mendez -- and Mendoza -- sorry -- in this

21   case?

22      A.  Well, Mendoza had a fatal head injury.  And

23   Bacho also had a fatal head injury as well.

24      Q.  Any other similarities?

25      A.  I mean I think that's it.  There was

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 160

1    significant intrusion into the occupants' survival

2    space, and they all received fatal blows to their head,

3    some directly from the actual lifted vehicle and some

4    from the structural intrusion (indicating).

5         Q.   Right.  So we -- we talked about that.  Three

6    similarities.

7         A.   Yeah.

8         Q.   Rough Country lift kit; intrusion;

9    catastrophic injury to the head.

10        A.   And three-quarter-ton trucks.

11        Q.   All right.  And -- among two of them?  Or all

12   three or just two of them?

13        A.   I thought the Chevrolet was as well.

14        Q.   All right.  Any other -- and that's -- that's

15   the full extent of the similarities between those two

16   cases and our case that you can cite to today.

17        A.   Yes.

18        Q.   Okay.

19             MR. HILL:  Why don't we just take a five-

20        minute break and hopefully we'll be on to the last

21        subject or two.

22             THE VIDEOGRAPHER:  The time is 3:19 p.m.

23        We're off video record.

24             (Video On)

25             (Recess taken)

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 161

1          (Video on)

2          THE VIDEOGRAPHER:  The time is 3:33 p.m.

3      We're back on video record.

4  BY MR. HILL:

5      Q.  Thank you.

6      Going back to the -- again, the report dated March

7  15 on the last page.  You mention that, Since my

8  opinion report in this case I've received testing data

9  for two sets of testing that support my opinions in

10 this case.

11     I think we talked about this a little bit earlier.

12 What was the source of these two sets of tests?  How --

13 how did you come to have them?

14          MS. CANNELLA:  Asked and answered.

15     A.  Ms. Cannella.

16     Q.  All right.  And did you ask her to go find any

17 testing that might support your opinions in this case?

18     A.  No, I didn't.  And really it's not necessarily

19 support per se, but it just shows some of the effects

20 of some of the accelerations on the head and the

21 expectation of no injuries.

22     Q.  Right.  But did you need either of those

23 reports in order to give your opinions that you've

24 listed in your October 16th report?

25     A.  Not really no.

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 162

1      Q.  Okay.  And do you need them in this case in

2    order to give the opinions you intend to give in this

3    case?

4      A.  No, not specifically, but, again, they just --

5    part of it talks about accelerations on the head and

6    obviously the lack of injuries.

7      Q.  All right.  But for Ms. Cannella sending these

8    to you, you would not have rely -- relied upon them

9    anyway in giving your opinions in this case.

10     A.  Probably not.

11     Q.  Okay.  Let me mark, I guess -- the first one

12   referenced is -- doesn't have a title to it.  It's

13   testing regarding a Chevy Astro and a Mercedes-Benz

14   van -- or a Chevy Astro van versus a Mercedes Benz

15   sedan.  I'm going to mark, I guess, as this test -- and

16   you can confirm whether I'm right or not -- I believe

17   it's been produced as Bryson 9070 through 09118.  Here,

18   you can look at that first.  The last couple of pages

19   look like a summary; is that right?

20     A.  Yes.

21     Q.  All right.  And then this -- the first part of

22   it is -- when I say first part whatever it is 9070

23   through 9114.

24     A.  It's like the acceleration pulses like on the

25   head.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 163

1      Q.  Right.

2      A.  And then what they used to ultimately look at

3  the HIC -- and that's all caps, HIC -- HIC values.

4      Q.  Right.  And when I'm marking this as this --

5  as whatever exhibit we're on --

6          MS. CANNELLA:  Eight.

7          (Defendant's Exhibit No. 8 was marked for

8          identification.)

9      Q.  Eight, is that the full extent of the testing

10 data set for the first test you reference in your -- in

11 your report of March 15th?

12     A.  Yes.

13     Q.  Okay.  Tell me how that test shows that when

14 the intrusion is tempered -- scratch that.

15     Why don't you just explain to me in your own words

16 how this test in any way relates to this case so I can

17 understand?

18     A.  If you look at the accelerations on the head,

19 the head acceleration and the X are basically the

20 direction that this crash is in.  It was around 50 G's,

21 and ultimately the HIC value was a very low score.  I

22 don't have it memorized, but I want to say in the

23 200's, so no expected probability of a fatal head

24 injury.

25     Q.  All right.  Well, tell me about how was this

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 164

1    test set up?  What -- what vehicles were involved in

2    this test?

3         A.  It was a Mercedes sedan that was offset left

4    rear impact into the back of a Chevrolet Astro van.

5         Q.  All right.  So this -- and so each of these

6    tests involved a Mercedes hitting the back of the Astro

7    van?

8         A.  No.  This is just --

9         Q.  I was confused.

10        A.  -- it's just one test with a Mercedes hitting

11   the back of an Astro van.

12        Q.  Okay.  So one test run at 59 miles per hour;

13   is that correct?

14        A.  Yes, sir.

15        Q.  All right.

16        A.  So, you know, about roughly same impact speed

17   or close.  So it's 59 and then, again, I was just

18   looking at the accelerations on the head.

19        Q.  All right.  And do you know what it means to

20   say Tracy Law Test at the top of the summary page 9115.

21             MR. HILL:  Have you got -- I may have a

22        another copy if you need one.  There's the

23        summary.  And here, here's the other part.

24             MS. CANNELLA:  Thank you.

25        Q.  If you look at 09115 through 09118 it says,

Paul Lewis , Jr., M.S., BME                 March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 165

1    Injury Summary.

2         A.  Yes, sir.

3         Q.  All right.  And we have an injury summary for

4    the driver of the Astro van, that's 9115; the driver of

5    the Mercedes 9116; the right rear passenger in the

6    Mercedes is 9117; and the left rear passenger in the

7    Mercedes 9118; is that correct?  Is that what this

8    injury summary's showing?

9         A.  Yes.

10        Q.  All right.  And it says under, Test vehicle

11   CAL 3490 Tracy Law Test 6.  Do you know what Tracy Law,

12   what's that referencing?

13        A.  I don't.

14        Q.  Do you know if these tests were performed in

15   connection with any kind of lawsuit?

16        A.  I -- I don't know one way or the other.

17        Q.  Do you know who performed this test?

18        A.  Looks like Calspan.

19        Q.  Who?  I'm sorry?

20        A.  Calspan (indicating).

21        Q.  All right.  And that's -- you're getting that

22   just from the test data sheet?

23        A.  Yeah, they're -- it's a test facility.

24        Q.  Okay.  The test date is April 1, 2019.

25        A.  Yes, it looks like.

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 166

1        Q.  All right.  At the top of the -- of 9115 it

2    says, Driver H3 (50th male), Serial Number 143 Injury

3    Summary.

4        What -- what does the H3 stand for?  Do you know?

5        A.  Hybrid III.

6        Q.  And what does that mean?  Is that the dummy

7    that was used in the test?

8        A.  Correct.

9        Q.  And 50th male, that means 50th percentile

10   of -- of male adult?

11       A.  Correct.

12       Q.  All right.  And then what is the serial number

13   reference?

14       A.  I guess the serial number of that particular

15   dummy.

16       Q.  Okay.  And so that's all referring to the

17   dummy used -- used in the test.

18       A.  Yes.

19       Q.  At least in that position in that vehicle.

20       A.  Right.  Because as you go through, each dummy

21   has a different serial number.

22       Q.  All right.  Great.  And so similarly when you

23   look at 9116, the driver, HM -- so is that -- what does

24   that mean?

25       A.  I'm sorry, which page?

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 167

1        Q.   9116.

2        A.   Oh.  Again, it's a hybrid III male.

3        Q.   So if they're the same, why does one say H3

4    and one say HM?

5        A.   I have no idea.

6        Q.   And this one is the -- is a 95th percentile of

7    an adult male --

8        A.   Right.

9        Q.   Correct.

10       A.   About 6-2, 220.

11       Q.   Okay.  And then I guess just to be consistent,

12   9117, the right rear passenger in the Mercedes Benz,

13   was a hybrid female 5th percentile adult?

14       A.   Yeah, 5th percentile female, correct.

15       Q.   All right.  And then the left rear passenger

16   in the Mercedes was a Q10 dummy.  Do you know what that

17   stands for?

18       A.   I -- I don't.  Let's see... I don't.

19       Q.   That -- you're assuming that refers to the

20   type of dummy used; correct?

21       A.   Yes.

22       Q.   And we don't know anything about the

23   male/female percentile, adult/child.  We can't tell

24   from the test; right?

25       A.   No.

Paul Lewis , Jr., M.S., BME         March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 168

1      Q.  All right.  And do we know whether either of

2    these vehicles had a lift kit installed?

3      A.  They did not.

4      Q.  Do we know anything about the height of the

5    bumpers of either of these vehicles?

6      A.  Standard of whatever the -- they're

7    manufactured as.

8      Q.  Right.  But we --

9      A.  Probably 22 inches somewhere, but I don't know

10   specifically.

11     Q.  Okay.  You made a reference to the HIC values

12   and that's the head injury criterion?

13     A.  Yes, sir.

14     Q.  And so -- like, let's use 9115.  This is a

15   measurement of the dummy in the Astro van that was

16   struck by the Mercedes in the test.  Is that your

17   understanding?

18     A.  You said 115?

19     Q.  Yes.

20     A.  Okay.

21     Q.  The first page of the injury summary.

22     A.  Yes.

23     Q.  And that was a -- he was in a 1999 Chevrolet

24   Astro van.

25     A.  Correct.

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 169

1        Q.   Okay.  and the HIC values appear to be under

2    the head criteria here, and there's two different

3    values.  There's one says 36 MS.  Is that 36

4    milliseconds?

5        A.   It is.

6        Q.   And is that is after impact?

7        A.   It's during the crash because they integrate

8    over time the accelerations and then they take the

9    largest integral where you have the largest number.

10       Q.   And so just so I understand it, so I

11   understand the crash goes longer than 36 milliseconds,

12   but is that a measurement of that value at 36

13   milliseconds into the crash, or is it the -- explain

14   that to me.  Sorry.

15       A.   So these are both what they call HIC 36 and

16   HIC 15.  They're the eclipse.  So what it's doing is,

17   in order to calculate HIC, it's an integration over

18   time.  So it -- for -- if you're looking at 36, it's

19   iterating over looking at a 36 millisecond window

20   throughout the crash, and ultimately it takes the

21   largest one to create, and then it calculates out what

22   the HIC is, which then that gives you -- for the HIC 36

23   that gives you a 382 and then -- and that's the score

24   that you're looking at is to be under a thousand.  So

25   that's significantly under a thousand, so there's a

Paul Lewis , Jr., M.S., BME                March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 170

1    very low expectation of any type of head injury.

2        And then if you look at the HIC 15, that's 218.

3    So, again, even lower and pretty much nowadays we

4    usually use the HIC 15.

5        Q.  And that 15 is the same thing.  It takes a 15

6    millisecond bracket within the accident sequence that

7    is the highest average level during that 15 millisecond

8    bracket.

9        A.  Correct.

10       Q.  Okay.  And so, again, do you know anything

11   about the vehicle compatibility between a 2014 Mercedes

12   Benz E350 and a 1999 Chevrolet Astro van?

13       A.  No, other than they're basically under the

14   standard lumbar heights that a -- regular vehicles are

15   manufactured at.

16       Q.  That's all you know about the heights of those

17   vehicles.

18       A.  Correct.

19       Q.  And that's all you know about the

20   compatibility between the two vehicles.

21       A.  Oh, yeah.

22       Q.  Okay.  And --

23       A.  And I'm not really looking at that part.  I'm

24   basically just looking at some accelerations on the

25   head.

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 171

1      Q.  I understand.  But you -- in order to evaluate

2    that with relation to this case you would need to know

3    whether the two vehicles are actually striking frame to

4    frame or not or whether there's override or underride.

5      A.  Well, not really.  I'm just looking at

6    accelerations and seeing whether they may or may not be

7    injurious.

8      Q.  Okay.  For the per -- for the dummy in the

9    particular passenger position of the type of dummy

10   used, that's what applies to each of these tests.

11     A.  Right.  Well, they -- they all have -- they

12   all have the same accelerometer in the head, it's just

13   they -- they're a different height and a different

14   weight.  That's -- that's really the only difference.

15   The accelerometers are the same.

16     Q.  Right.  But the impact on the accelerometer

17   may be impacted by which type of dummy it's installed

18   into.

19     A.  I don't know that that's necessarily for that

20   portion.  Now the chest acceleration certainly could be

21   different based on the size dummy.

22     Q.  Well, why would you need to vary the type and

23   size of dummy if it doesn't impact the accelerometer

24   measurements of the head?

25     A.  Well, it could be affecting other body

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 172

1    portions.

2         Q.  But you said in no way would it affect the

3    measurements of the H-I-C related to the head.

4         A.  Unless -- not unless there's a significant

5    impact, I mean depending on how much weight you have.

6    But in general if you're just looking at the

7    accelerations -- because the heads weigh the same

8    between all of them.

9         Q.  All right.  Any aspect of this -- this testing

10   other than the head injury criteria that you rely upon

11   at all in your opinions in this case?

12        A.  Well, again, I'm not necessarily relying on.

13   It's just some other data I looked at for accelerations

14   to the head and whether they may be potentially

15   injurious, assuming that we're going to have from the

16   hypothetical situation, you know, higher G's.

17        Q.  And let's look at, let's say, the 9118.  So

18   you've got a -- the 36th and 15 millisecond HIC values

19   are both 410.92.

20        A.  Correct.

21        Q.  All right.  What is that value?  Is that

22   acceleration?  Is that -- I mean that's not G's.  What

23   is it?

24        A.  So what you're looking at is you've got G's on

25   the head of a 115 G's.  So from that 115 G's that's

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 173

 1    acting on the head, which is certainly way more than
 2    45, that you've still only got a HIC value of 410.  So
 3    internally manufacturers typically use 700 as their
 4    bogey value, but according to the standard, a thousand
 5    is all you have to comply or be below.
 6         Q.  But what is that unit?  What's the unit under
 7    the column max?
 8         A.  That is the -- there's not a unit per se.
 9    It's HIC, so it's head injury criteria.  So it just
10    comes out as a number like that.
11         Q.  I understand.
12         A.  It doesn't have G's or pounds force or
13    anything of that nature.
14         Q.  So it's not related to acceleration speed
15    or --
16         A.  It is related to acceleration.  Because you're
17    integrating the acceleration to come up with this
18    number.  It's a big, long formula that basically the
19    computer does that.
20         Q.  I understand that.  So there's a HIC formula
21    that the computer calculates this number.  It's
22    computed.  That's where that source is computed --
23         A.  Yes, sir.
24         Q.  -- on this column.  And it computes that based
25    upon the accelerometer in the head in the dummy.

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 174

1      A.  Yes, sir.

2      Q.  Okay.  And it uses, obviously, those two

3  different time frame values maximum, puts it in the

4  formula and kicks out the number.

5      A.  Right.

6      Q.  I understand.

7      All right.  All of these other values under --

8  under the head portion that talk about CG, X, Y, and Z

9  acceleration, head resultant acceleration.  Are you

10 relying upon any of those to give any opinions in this

11 case?

12     A.  Well, so those are the different vectors, and

13 so X is really the one that's going longitudinally, so

14 to speak, that's why we're seeing the highest because

15 obviously the accelerations are going planar along the

16 X axis, but you still combine all of them to get the

17 resultant that's on there.  So, again, for this one

18 with everything combined, the brain -- we're still

19 seeing accelerations of a hundred and fifteen G's.

20     Q.  And where do you get the 115 G's as the --

21 where is that from?

22     A.  Head -- Under the CG Z, the head resultant

23 acceleration.

24     Q.  Right.  So which -- which value are you

25 looking at?

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 175

1          A.   Oh.  Well, we're on 118.

2          Q.   You're -- I'm talking about on 118.

3          A.   Right.

4          Q.   So that -- that's not -- that max number head

5     resultant acceleration, you're saying that's in actual

6     G's because it says unit G's.

7          A.   All -- all four of those measures right there

8     are in G's, correct?

9          Q.   Okay.  It says that head resulting

10    acceleration is computed.

11         A.   It is.

12         Q.   Okay.

13         A.   Because that's square the sum of all three.

14         Q.   All three of the X, Y, and Z?

15         A.   Correct.  But you can see the X's obviously

16    the -- significantly greater than -- than the other two

17    like going vertically or laterally.

18         Q.   And that's true for the left rear passenger in

19    the Mercedes-Benz.

20         A.   Correct.

21         Q.   Right.  If you look at the head acceleration

22    for the driver of the Astro van, the X acceleration is

23    minimal and the Z acceleration framework is higher.

24         A.   It is, but it's still a total of 52 or almost

25    53 G's on the head.

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 176

1        Q.  Again, we've talked about -- you -- you made

2    reference just a second ago to the 45 G calculation

3    from Mr. Buchner.  And I think you've testified that --

4    that that -- you don't know where that's calculated.

5    That you -- you can't say that that's the G's he

6    simulated for the head that the head would experience

7    in the fourth seated position in -- in the Escape.

8        A.  I think it is for the CG.  I don't think it's

9    specific to the number four position.

10       Q.  Right.  So you think it's for the center of

11   gravity of the vehicle; right?

12       A.  Yes, sir.

13       Q.  And it's certainly not specific to the -- to

14   any of the acceleration axis for the head.

15       A.  No, but it would be what's driving those but

16   -- correct.  It's not specific to that seated position.

17       Q.  Do you know whether Mr. Buchner in any way

18   measured the -- or simulated the head CG, X, Y, Z

19   acceleration values for any position in the Ford

20   Escape?

21       A.  I don't.

22       Q.  Okay.  And does his simulation in any way

23   create a H-I-C value?

24       A.  No.

25       Q.  Okay.  He could have done that with a actual

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 177

1    crash test using a dummy and the vehicles involved in

2    the Bryson incident.

3              MS. CANNELLA:  Object to the form of the

4         question.

5         A.  Well, you could, sure.  I mean you could do --

6    I don't know if a -- maybe -- I don't know if a SLED

7    test necessarily would do that or not, but it's

8    possible.

9         Q.  Right.  So you have a SLED test as an option,

10   but you're not sure, because it's possible.  And then

11   you could also like what was done in this case actually

12   crash the two vehicles involved in the Bryson incident

13   with an accelerometer inside the head of a dummy in the

14   number four position in the Escape.

15        A.  Sure.  Just like, I mean, the defendant could

16   have run some tests as well, right.

17        Q.  I know you said you're not aware of the source

18   of this other than the test was done at Calspan, and

19   you said that was a testing facility you're aware of?

20        A.  It is.

21        Q.  And you don't know whether this involves a

22   particular lawsuit.  I mean you've got very specific

23   types of dummies in specific locations in two specific

24   vehicles.  Is it your understanding that this was

25   performed in connection with an actual case?

Paul Lewis , Jr., M.S., BME          March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 178

1      A.  Like I already said, I don't know.

2      Q.  You don't know?

3      A.  Huh-uh (negative response).

4      Q.  Okay.  And likewise, do you have any

5   information regarding, you know, how this test was

6   performed?  How it was set up?  Who -- you know,

7   anything about it.

8          MS. CANNELLA:  Objection, asked and answered.

9      A.  I mean other that what I previously said, no,

10  I mean I certainly wasn't there or anything.

11     Q.  Right.

12     A.  Is that the piece that goes with this?

13     Q.  It's probably connected to the back of this.

14     A.  Okay.  I just wanted to make sure I didn't

15  somehow get it in my stack.

16     Q.  Anything else I didn't ask you about this test

17  that's relevant to your opinions?

18     A.  No.  And, again, it's not necessarily, you

19  know, that I'm relying on it per se, but it's just

20  looking at some of these accelerations and how they're

21  higher than what may be the expected acceleration and

22  they're not injurious.  That's really the main point.

23     Q.  What do you mean they're higher than expected?

24     A.  Well, if you're only going to get 45 G's on

25  the car, these accelerations are -- some of them are in

Paul Lewis , Jr., M.S., BME                    March 18, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 193

```
1              C E R T I F I C A T E

2

3    (STATE OF GEORGIA)

4    (COUNTY OF GWINNETT)

5         I hereby certify that the foregoing transcript

6    was taken down, as stated in the caption, and the

7    proceedings were reduced to typewriting under my

8    direction and control.

9         I further certify that the transcript is a true

10   and correct record of the evidence given at the said

11   proceedings.

12        I further certify that I am neither a relative

13   or employee or attorney or counsel to any of the

14   parties, nor financially or otherwise interested in

15   this matter.

16             This the 1st day of April 2024.

17

18

19

20

21

          LEITA J. SEABORN, CCR B-1420

22

23

24

25
```