# EXHIBIT 3

Case 2:22-cv-00017-RWS   Document 131-3   Filed 02/25/25   Page 2 of 8
Wesley Grimes                                                May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 1

```
 1                UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF GEORGIA
 2                    GAINESVILLE DIVISION
 3
        SANTANA BRYSON and JOSHUA   )
 4      BRYSON, as Administrators of)
        the Estate of C.Z.B., and   )
 5      as surviving parents of     )
        C.Z.B., a deceased minor,   )
 6                                  )
                 Plaintiffs,        )
 7                                  )   CIVIL ACTION FILE
        vs.                         )
 8                                  )   NO. 2:22-cv-17-RWS
        ROUGH COUNTRY, LLC,         )
 9                                  )
                 Defendant.         )
10      _____
11
12              VIDEOTAPED DEPOSITION OF
13                  WESLEY D. GRIMES
14                    May 9, 2024
15                    10:17 a.m.
16
17         Weinberg Wheeler Hudgins Gunn & Dial
18               3344 Peachtree Road, NE
19                     Suite 2400
20
21                  Atlanta, Georgia
22
23
24
25        Reported by:  Marsi Koehl, CCR-B-2424
```

1  A. So this is -- it's showing 50 miles an hour
2  at times zero. So times zero in this case is
3  basically algorithm enabled, but it could have
4  occurred shortly after this. Okay? We don't know
5  exactly when it occurred.
6      So back to Exhibit 69, what -- what we're
7  doing here is taking the absolute extreme and saying,
8  well, could there be a little bit more braking during
9  that time? And that gives us the absolute low end
10 here of the 43.9 and then assuming the high end would
11 be, what, 55.6, I think.
12     Q. And that's the low and high end of the speed
13 of the F-250 at the time of impact?
14     A. Yes. Assuming those types of things, which
15 I don't believe are true. I don't think there was
16 significant braking effort, but this was the extreme
17 that we did early on to get a feel for all the
18 numbers that we were dealing with.
19     Q. So the braking we're talking about is that
20 the CDR indicates that Mr. Elliott applied his brakes
21 sometime in the last .5 seconds before impact; is
22 that correct?
23     A. Yes.
24     Q. And --
25     A. And we don't know -- I'm sorry. We don't

1    know two things.  We don't know when and we don't
2    know how much.
3         Q.  You have your second row in the speed at
4    impact chart.  It says:  Correction for braking,
5    miles per hour?
6         A.  Yes.
7         Q.  And that's based on .5 seconds of braking I
8    assume; is that right?
9         A.  No.  Well, you see it's a percent.  It's a
10   slip.
11        Q.  Okay.
12        A.  So what we're assuming is that the speed
13   being shown is -- do you know how ABS works.
14        Q.  Why don't you remind me?
15        A.  ABS anti-brake -- antilock braking system
16   slows the wheel.  And so as the vehicle is going down
17   the road under hard braking, the wheel is going
18   slightly slower over the ground than the vehicle is.
19             Research has shown that a reasonable loss on
20   passenger cars is about five percent.  So what this
21   does is, say, if the vehicle speed was 50 miles an
22   hour, if there was a lot of slip going on there, it
23   actually could be 50 plus five percent of that which
24   would have -- so it could be 52.5.
25        Q.  Is that the third row of this chart, the

1     correction for ABS braking?
2          A.   Yeah.  Isn't that what we're talking about?
3          Q.   I was asking about the second row.
4          A.   I apologize.
5          Q.   So correction for braking and it says
6     .5 seconds next to time --
7          A.   Yes.
8          Q.   -- is that correct?
9          A.   Yes.
10         Q.   And it says .7 next to braking, parenthesis,
11    G.   What is that?
12         A.   Deceleration rate.  An estimated
13    deceleration rate.
14              I apologize.  I misunderstood your question.
15         Q.   So that estimates that given a half second
16    of braking and .7 Gs of braking, the speed would have
17    been reduced by 7.7 miles per hour; is that right?
18         A.   It could have been at the maximum.  Yes,
19    sir.
20         Q.   And that reduction of speed wasn't applied
21    to the crash test; is that correct?
22         A.   It was not.  No.
23         Q.   And the crash test, there was no braking
24    applied to that 250, right?
25         A.   After the crash there was, it was not

Page 201

1    the second row seat in the test Escape would have
2    been deformed if you had loaded the same cargo into
3    it that was in the subject wreck?
4         A.   No.
5              MR. MASHMAN:  I'm going to show you
6         Plaintiff's Exhibit 79.
7              (Plaintiff's Exhibit 79 was marked for
8         identification.)
9    BY MR. MASHMAN:
10        Q.   This is an interrogatory that the
11   plaintiff's responded to in this case.
12             Did Rough Country provide this to you before
13   the crash test?
14        A.   I don't remember seeing this, but we may
15   have seen it.
16        Q.   Do you agree that this itemizes what was in
17   the back seat of -- strike that.
18             Do you agree that this itemizes what was in
19   the rear compartment of the Bryson's Escape?
20        A.   That's what it says it does.  Yes.
21        Q.   Did you rely on this in any way when you
22   decided on how to configure the crash test?
23        A.   No.  Because we weren't putting cargo back
24   there.
25        Q.   Do you agree that if you had made the

Page 202

1    decision of what to put in the rear, this would have
2    told you?
3         A.   It would have told us what to put there.  It
4    wouldn't have told us where to put it.
5         Q.   What's the difference between static
6    deformation and dynamic deformation?
7         A.   A dynamic deformation occurs during force
8    application.  As the forces are removed, the system
9    material relaxes and restores some of its original
10   shape.
11        Q.   Did you analyze the amount of dynamic
12   deformation in the subject Escape's second row seat?
13        A.   No.
14        Q.   Did you analyze the amount of dynamic
15   deformation in the test Escape's second row seat?
16        A.   No.
17        Q.   Did you see any physical evidence showing
18   that the second row seat in the test Escape
19   dynamically deformed past where it had deformed
20   statically?
21        A.   I didn't look for it.  So, no, I didn't.
22        Q.   I asked a similar question, not this exact
23   question:  Did you measure the amount of dynamic
24   deformation in the subject Escape?
25        A.   No.

```
 1                        CERTIFICATE

 2

 3      STATE OF GEORGIA:

 4      COUNTY OF FULTON:

 5

 6             I hereby certify that the foregoing

 7      transcript was taken down, as stated in the caption,

 8      and the colloquies, questions, and answers were

 9      reduced to typewriting under my direction; that the

10      transcript is a true and correct record of the

11      evidence given upon said proceeding.

12             I further certify that I am not a relative

13      or employee or attorney of any party, nor am I

14      financially interested in the outcome of this action.

15             This the 5th day of June, 2024.

16

17

18             [signature: Marsi Koehl]

19      _____

20             Marsi Koehl, CCR-B-2424

21

22

23

24

25
```