## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

|  |  |
|---|---|
| SANTANA BRYSON and JOSHUA BRYSON, as Administrators of the Estate of C.Z.B., and as surviving parents of a deceased minor, C.Z.B.,<br><br>    Plaintiffs,<br><br>v.<br><br>ROUGH COUNTRY, LLC,<br><br>    Defendant. | Civil Action No.<br><br>2:22-CV-17-RWS |

## DEFENDANT ROUGH COUNTRY'S *DAUBERT* MOTION TO EXCLUDE CHRISTOPHER D. ROCHE AND HIS OPINIONS

COMES NOW Defendant Rough Country, LLC, and hereby moves this Court, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Federal Rules of Evidence 403, 702 and 703, to exclude any opinions, testimony, or evidence by or from Christopher D. Roche. Alternatively, Rough Country moves this Court to exclude any opinions, testimony, or evidence from Roche that relates to: (1) Rough Country's failure to warn; (2) possible alternative designs; (3) the "Ford testing;" (4) numerous aspects of Rough Country's test crash; or (5) from any other of Plaintiffs' experts that is based on any of the foregoing.

I.    STATEMENT OF PERTINENT FACTS AND BACKGROUND

A. Plaintiffs' Claims and Allegations

This case arises from a collision ("the Accident") in which a 2016 Ford F-250 truck driven by Hunter Elliott slammed into the rear of Plaintiffs' 2008 Ford Escape at 51 miles per hour. [Doc. 109 (Order on RC's Motion for Summary Judgment), at 2.] Mr. Elliott's F-250 truck had an RC lift kit installed on it. The crux of Plaintiffs' case is their allegation that RC's lift kit caused Mr. Elliott's F-250 truck to bypass certain "frame and crash protections" of their Escape and that, but for the lift kit, "Mr. Elliott's F-250 would not have intruded so far into their Escape," (*Id.*) Plaintiffs are therefore asserting a claim for "enhanced injury," arguing that an unlifted 2016 Ford F-250 truck would not have caused such a significant intrusion into Plaintiffs' Escape, and C.Z.B. would not have been killed. (*See, e.g.*, *id.*, at 14.)

This case also involves Plaintiff's contention that Rough Country should have provided a Secondary Energy Absorbing Structure ("SEAS") with its lift kit to replace the SEAS provided by the original manufacturer. This is based on a voluntary Enhanced Vehicle Compatibility Agreement ("EVC") between certain automotive manufacturers which contemplated compliance with either an Option 1's use of a Primary Energy Absorption Structure ("PEAS") or an Option 2's use of a SEAS.

A. <u>Roche's Various Opinions and Testimony</u>

Roche issued his initial report on October 12 ("<u>the Initial Report</u>"), a supplemental report on November 17, 2023 ("<u>the Supplemental Report</u>"), and a rebuttal report on June 14, 2024 ("<u>the Rebuttal Report</u>").[1] Similarly, Mr. Roche was deposed on February 1, 2024 ("<u>the Initial Depo.</u>") and on July 17, 2024 ("<u>the Rebuttal Depo.</u>").[2]

The Initial Report sets forth five different opinions, including that "Rough Country violated the standard of care for LTV compatibility by providing lift kits that rendered the OEM's compatibility designs ineffective, without warning the owner of the vehicle or providing a way to maintain the vehicle's compatibility with the lift kit," [Ex. 1 (Initial Report), at 30, ¶ 4.]

In his Supplemental Report, Roche offered two additional opinions, including one related to certain tests that were performed by Ford Motor Co, [Ex. 2 (Supplemental Report), at 8].

Finally, Roche's Rebuttal Report focused on Rough Country's test crash, including certain observed differences between the test crash and the actual crash involving Plaintiffs. [Ex. 3 (Rebuttal Report), at 15.]

---

[1] The Initial Report accompanies this motion as Exhibit 1; the Supplemental Report is Exhibit 2; and the Rebuttal Report is Exhibit 3.

[2] The Initial Depo. accompanies this motion as Exhibit 4, and the Rebuttal Depo. was previously filed with the Court at Doc. 127-2.

B. <u>Roche's Experience</u>

This case involves the use of an after-market part – Rough Country's lift kit – and a high-speed collision into the rear of Plaintiffs' Escape. A critical part of Roche's anticipated testimony relates to whether the lift kit increased the amount of damage, or crush, incurred by Plaintiffs' Escape and the potential use of a SEAS to minimize such damage.

Roche, however, lacks experience in these areas. For example, Roche was involved in the design of multiple cars, but when he "had responsibility for all structural requirements," that vehicle "did not require a [SEAS] because it satisfied Option 1 under the EVC."[3] [Ex. 4 (Initial Depo.), at 7 (21:13-20); *see also id.*, at 8 (23:7-9) (work for another Rover vehicle "was unrelated to this type of requirement"); *id.*, at 8 (25:12-15) (work for a Jeep vehicle that "did not require a SEAS").] Similarly, Roche subsequently worked with Hyundai in connection with its Sorrento; but his work with the Sorrento "didn't cover" the "design and/or testing of a [SEAS] in order to evaluate or meet the criteria in the EVC." [Ex. 4 (Initial Depo.), at 8 (22:13-18).]

---

[3] Roche was involved in work technically related to a SEAS for another vehicle, but that vehicle "was never launched," and was simply related to "design concepts," [Ex. 4 (Initial Depo.), at 7 (20:2).] Further, it "utilized some of the lower frame structure" and "[i]t wasn't a separate" SEAS, [*id.*, at 7 (20:25-21:2)]. This case involves the potential use of a "separate" SEAS.

Roche only recently began to hold himself out as an expert witness. This case is the third case in which Roche has attempted to offer expert opinions. [Ex. 4 (Initial Depo.), at 9 (28:22-29:16).] In each of these cases, Roche was "on the plaintiff's side." (*Id.*)

## II.    ARGUMENT AND CITATIONS OF LEGAL AUTHORITY

The standards applicable to *Daubert* motions are well-established. "District courts are charged with this gatekeeping function 'to ensure that speculative, unreliable expert testimony does not reach the jury' under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Ultimately, the Court must determine if expert testimony is admissible, and a three-part inquiry is conducted to determine whether:

> [t]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340–41 (11th Cir. 2003). Roche's proposed testimony should be excluded under the first two prongs.

As the party proffering Roche as an expert, Plaintiffs have "the burden of satisfying each of these three elements by a preponderance of the evidence." *Rink*, 400 F.3d at 1292.

Further, when determining if a particular opinion is reliable, the Court should consider:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341. "Proposed testimony must be supported by appropriate validation - *i.e.,* 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590; *see also McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005) ("The proposed testimony must derive from the scientific method; good grounds and appropriate validation must support it.").

Ultimately, Plaintiffs' efforts to bolster their case through Roche's (tenuous, at best) testimony should be rejected by this Court "[b]ecause of the powerful and potentially misleading effect of [his] expert evidence," *U.S. v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004). Much of what Roche purports to offer is his *ipse dixit* about what he thinks Rough Country could do. But his opinions are not based on any sustainable methodologies. "'[N]either *Daubert* nor Federal Rule of Evidence 702 requires a trial judge to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.' [Cit omitted.] Instead, the judge 'is free to conclude that there is simply too great an analytical gap between the data and the

opinion proffered.'" *Nat'l Sur. Corp. v. Georgia Power Co.*, No. 2:17-CV-68-RWS, 2019 WL 4394403, at *5 (N.D. Ga. Sept. 12, 2019).

A. Roche Lacks the Necessary Experience to Testify in this Case as an Expert

Rule 702 is clear that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" at trial. While Roche's proffered testimony may "relate" to his areas of expertise, it falls "outside" of "the reasonable confines of his subject area." *See, e.g., Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F.Supp.2d 1293, 1304 (N.D. Ga. 2008); *see also American Pegasus SPC v. Clear Skies Holding Co., LLC*, 1:13-CV-03035-ELR, 2016 WL 1170067, *3 (N.D. Ga. Jan. 14, 2016) ("[e]xpert testimony regarding matters outside of the witness's expertise is inadmissible, even if the expert is qualified to testify about other matters").

Although Roche worked in the automotive industry before recently holding himself out as an expert witness, his experience was not related to the matters at issue in this case. Specifically, this case involves the installation of an after-market part – Rough Country's lift kit – onto a Ford F-250 truck, thereby "lifting" the truck. It also involves setting up a vehicular test crash. Roche has no experience in the after-market part industry, and he has no experience working with lifted vehicles. [*See, e.g.*, Ex. 4 (Initial Depo.), at 42 (158:1-5) ("In terms of interactions with

7

companies that fit lift kits, such as the one that Rough Country produces, I have no direct experience with that and I did not investigate that as part of this – this study.").]

Similarly, Roche has never been involved in "a case where crash testing . . . actually went forward." [Doc. 127-2 (Rebuttal Depo.), at 5 (14:1-6).] As a result, all of Roche's opinions are based on his review of other persons' data; because he has never worked with lifted vehicles, he has never developed his own personal experience in these areas.

For example, Roche proffers the "opinion that when vehicles are lifted, based on the available test data, they become less safe for other passenger vehicles," [Ex. 4 (Initial Depo.), at 26 (97:24-98:2)]. Roche, however, has never personally attempted to quantify that danger. [*Id.*, at 27 (98:14-21); *see also id.*, at 45 (172:16-173:7) (Roche has no "statistics that indicate actual fatalities involving lifted LTVs").] Roche lacks other real world experience to support his opinions.

Further, Roche asserts that a SEAS bracket larger than the original bracket provided by the original manufacturer would be a viable alternative design. None of the vehicles that Roche worked on, however, required or utilized a SEAS bracket of any type, much less an "enhanced" SEAS bracket that he postulates in this case. Roche has also neither personally installed nor removed a SEAS bracket nor seen anyone else do it. [*See id.*, at 51 (196:4-14).]

Roche's prior experience in the automotive industry is not sufficient to qualify him as an expert witness in this case.

### B. Certain of Roche's Individual Opinions Should be Excluded

#### 1. *Opinion 1 Regarding Rough Country's Failure to Warn*

Roche intends to opine that Rough Country "violated the standard of care for LTV compatibility by providing lift kits that rendered the OEM's compatibility designs ineffective, *without warning the owner* of the vehicle," [Ex. 1 (Initial Report), at 30, ¶ 4 (italics added).] The Court previously granted summary judgment to Rough Country as to Plaintiffs' failure to warn claim. [Doc. 109, at 6 ("as it relates to the failure to warn claim, . . . the Brysons have not raised a genuine dispute of fact").] In light of the Court's summary judgment, there is no issue for the jury to consider about whether Rough Country should have warned a vehicle owner about anything. As such, Roche's opinion on this issue is not relevant. Alternatively, it should be excluded under Rule 403 because any extraneous opinions or testimony by Roche would mislead the jury, who might think that a failure to warn issue is somehow important or supportive of Roche's other opinions, and this would be prejudicial to Rough Country. Accordingly, any opinions that Roche might have about Rough Country's failure to warn the owner of the vehicle should be excluded.

2.  *Opinion 2 Regarding Possible Alternative Designs*

During his initial deposition and elsewhere, Roche offered the opinion that Rough Country could have used an alternative design "that would have maintained the safety of the vehicle despite the lift kit." [Ex. 4 (Initial Depo.), at 16 (55:6-24).] Roche even proposes that a "modified SEAS seems to be the most logical and possibly the most cost effective." [*Id.*, at 16 (55:22-24); *see also id.*, at 16 (56:11-12) ("there are many SEAS designs out there" and Rough Country "could have taken inspiration from any number of SEAS designs").]

Roche's opinion testimony on this matter is excludable because it lacks any sufficient indicia of reliability to be admitted into evidence. Roche never verified or validated an alternative design, such as a SEAS. While the SEAS designs may be consistent with the EVC, Roche did nothing to "actually quantify [his] belief that the intrusion would have been less" if "Mr. Elliott's truck had met the EVC requirements." [Ex. 4 (Initial Depo.), at 31 (116:15-117:4); *see also id.*, at 51 (196:2-3) (Roche does not "know of an alternative SEAS bracket that's EVC compliant of any description").]

Instead, Roche relied on his "education, experience, and training relative to developing vehicle structures . . . and understanding how those structures are developed and how they are supposed to work" when he opined that there would have been a "significant reduction in crush had the vehicle complied with the EVC,"

*i.e.*, had an extended or larger SEAS. [*Id.*, at 31 (116:2-9).] In other words, Roche got his "alternative design idea from" his looking at "the subject vehicle and [his] design and engineering experience." [*Id.*, at 57 (219:8-11).) This is wholly insufficient.

"Without grounding in a reliable methodology," Roche's opinion "must be excluded." *Bolt v. Ford Motor Co.*, 1:16-cv-00447-SGC, 2019 WL 1254662, *6 (N.D. Ala. March 19, 2019) (gathering cases where expert alternative design opinions are excluded due to lack of "support, analysis, or testing").

> [W]hen the expert did not conduct any experiments to test the feasibility or capabilities of the alternative designs he proposes but cites as the basis for the lack of testing his years of experience in the broader field, *his opinions regarding alternative designs are excludable.*

*Ahmed v. Johnson & Johnson Healthcare Systems, Inc.*, 1:22-00190-KD-N, 2024 WL 693078, *8 (S.D. Ala. Feb. 20, 2024) (italics added); *see also Wright v. Case Corp.*, 1:03CV1618-JEC, 2006 WL 278384, *4 (N.D. Ga. Feb. 1, 2006) (excluding expert where "he concede[d] . . . that he has not done any testing on either [alternative design] recommended in his report").

Ultimately, Roche simply "spent time thinking about" it. [Ex. 4 (Initial Depo.), at 17 ( 60:17-18); *see also id.*, at 51 (195:16-19) ("you can *conceive* of other solutions that are more complicated, are more expensive, where you *may be able to* design a EVC-compliant SEAS") (italics added).] Roche's alternative design SEAS

suggestions "are things that could be considered and developed by a company such as Rough Country." [*Id.*, at 52 (198:21-23); *see also* Ex. 1 (Initial Report), at 29 ("Rough Country could have developed components to maintain vehicle compatibility")] "This is fatal to [Roche]'s alternative designs opinion as 'the proper methodology for proposing alternative designs includes more than just conceptualizing possibilities.'" *Thurmond v. Federal Signal Corp.*, 1:16-CV-01520-ELR, 2018 WL 9490352, *4 (N.D. Ga. Aug. 30, 2018); *see also Wright*, 2006 WL at *5 (excluded expert "characterize[d] his proposed alternative designs as simply 'suggestions . . . to give somebody an idea' of how the [product] could be improved"). "Daubert's reliability prong requires more than 'conceptualizing possibilities.'" *Wright*, 2006 WL at 5. And "[t]he Eleventh Circuit [has] reminded district courts that scientific (hence, engineering) opinions premised on theorizations without associated testing simply will not suffice." *Sanders v. Lull International, Inc.*, 402CV141, 2005 WL 8156144, *9 (S.D. Ga. Sept. 12, 2005) (citing *McLain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1251-52 (11th Cir. 2005)).

Roche should be "excluded from testifying at trial regarding any alternative design proposals that may have been available to" Rough Country because "there is insufficient evidence that [his] theories on alternative design have been tested and succeeded." *Bolt*, 2019 WL at *9.

### 3. *Opinion 3 Regarding the Ford Testing*

Roche's opinion that the Ford tests "show[] that just by raising the ride height of a pickup truck, the compatibility of the vehicle is significantly degraded and so it represents a much greater danger to other vehicles in a crash" should be excluded. The testing performed by Ford was not substantially similar to the accident in this case, as required by *Burchfield v. CSX Transp., Inc.*, 636 F.3d 1330 (11th Cir. 2011). This case involves a front-to-rear collision, but the Ford tests related to crashing trucks "into a full width rigid barrier," [Ex. 2 (Supplemental Report), at 4], and also "front-to-front vehicle compatibility," (*id.*, at 6). Further, because the front hood of a 2008 Ford Escape is substantially lower than its rear, it necessarily involves different structural components and the damage incurred by the front end during Ford's testing is not indicative of the damage that the rear end of the Escape might incur. The Ford tests are therefore not substantially similar, and any opinions based on Ford's testing should be excluded.

Alternatively, any opinions that Roche may offer based on the Ford testing would mislead or confuse the jury because of their material differences with the Accident, and they would be unduly prejudicial to Rough Country. They should be excluded under Rule 403.

4. *Opinion 4 Regarding Rough Country's Test Crash*

As noted above, "[t]he Eleventh Circuit [has] reminded district courts that scientific (hence, engineering) opinions premised on theorizations without associated testing simply will not suffice." *Sanders*, 2005 WL at *9. This matters with regard to Roche's complaints with the test crash because he did nothing whatsoever to validate or test whether his criticisms had any effect on the crush incurred by the test Escape as a result of the test crash. Any such testimony by Roche about matters that he has never validated would be misleading to the jury because Roche's testimony would implicitly convey the idea to the jury when they consider Rough Country's test crash that his identified differences actually matter when Roche has no evidence or testing that they do, in fact, matter. Such opinion testimony should be excluded under the Federal Rules of Evidence, including Rule 403.

a. *Roche's Offset Opinion*

Roche's primary complaint is that the offset of the test crash was "at least an additional four inches" off target. [Doc. 127-2 (Rebuttal Depo.), at 9 (30:14-15).] Roche reached this conclusion by "look[ing] at the damage pattern," [*id.* (Rebuttal Depo.), at 9 (30:17)]. *But Rocher never actually inspected either the test crash vehicles or the actual crash vehicles.* He merely looked at photographs and videos. [*Id.* (Rebuttal Depo.), at 9 (30:20-21); 10 (35:4) ("when I compared these images"); and 10 (35:18-19) ("it's a combination of looking at the photographs and some of

the films available").] This is insufficient. *See, e.g., Dragos v. Cornea*, No. C19-1338 JCC-TLF, 2021 WL 3540601, at *7 (W.D. Wash. July 14, 2021), *objections overruled,* ("Using vehicle damage determined from photographs . . . in an analysis that is susceptible to variances based on imprecise damage determinations is not a tested, peer reviewed, or generally accepted method nor is there a known or calculable error rate.").

Similarly, Roche has no baseline from which to begin his photographic comparison because Roche never "used any scientific methodology to determine the [actual] offset in the subject crash," [*Id.* (Rebuttal Depo.), at 9 (33:22-4) and 10 (34:25-35:2) ("I have not attempted, during the course of my work in this case, to do reconstruction").] Because Roche's opinion about the amount of offset is based on speculation as to the Accident's offset followed by more speculation about the offset variance, based on his review of imagery (which the jury can do themselves), any opinions that Roche may offer about the amount of offset would not assist the jury in a scientific, technical, or specialized manner, it would mislead or confuse the jury by artificially bolstering Roche's offset calculation by virtue of his "expert" status, and Roche's offset opinions would be unduly prejudicial to Rough Country. They should be excluded under Rule 403.

Also, as with his other criticisms, Roch never validated his opinions. Roche did not determine whether the test crash's alleged difference in offset had any effect

on the test crash's outcome. [Doc. 127-2 (Rebuttal Depo.), at 11 (38:4-19).]
Critically, when asked if he had "determined how much those greater forces
increased intrusion or crush in the crash test," Roche responded: "No." [*Id.* (Rebuttal
Depo.), at 11 (38:16-19).] When Roche was asked, point blank, if he had "done any
testing to determine the impact of the difference in offset on the results of the crash
test," he simply stated "No, I haven't." [*Id.* (Rebuttal Depo.), at 11 (40:11-17).]
Roche did no "work to determine whether this example of where the test crash did
not replicate the subject crash [*i.e.*, offset] had any impact to – on the crash test," [*Id.*
(Rebuttal Depo.), at 11 (38:23-39:10) ("No, I haven't tried to quantify difference in
intrusion levels").]

Ultimately, Roche confirmed that he did nothing whatsoever to determine
whether any of his criticisms of the crash test were of any significant effect.

### b. *Roche's Cargo and Ballast Opinions*

Roche further opines that the test crash erred in "omitting cargo" from the
testing. [Ex. 3 (Rebuttal Report), at 15, ¶ 6.] Similarly, Roche claims that the test
crash's "ballasting was unrepresentative of the subject crash," [Doc. 127-2 (Rebuttal
Depo.), at 8 (29:25-30:1); Ex. 3 (Rebuttal Report), at 15, ¶ 1.]. But Roche cannot
"state any industry standard or federal standard that [he] know[s] that applies to
ballasting a vehicle to act to the condition, when no test dummies are used in a
crash." [Doc. 127-2 (Rebuttal Depo.), at 6 (20:12-21:11) ("as I sit here today I cannot

give you one").] Ultimately, Roche does not know whether the "difference between the weight in the subject crash and the crash test resulted in any increased crush or intrusion in the test." [*Id.* (Rebuttal Depo.), at 8 (27:21-28:1) ("I'm not saying one way or the other, if that's the case").] This is because Roche never "quantified the impact of this difference in ballasting between the subject crash and the test crash." [*Id.* (Rebuttal Depo.), at 8 (28:5-9).] As with his other complaints, Roche did "not conduct[] any testing related to" "the impact of the ballasting issue," [*Id.* (Rebuttal Depo.), at 8 (28:10-14).] Nor has he performed any "calculations related to [the ballasting] issue." [*Id.* (Rebuttal Depo.), at 8 (28:15-17).] Finally, Mr. Roche has not "run any simulations to determine the impact of the difference in the weight ballasting between the crash test and subject crash," [*Id.* (Rebuttal Depo.), at 8 (28:22-25).] Any opinion that Roche might offer about the cargo or ballasting issue should be excluded because it is not properly validated.

### c. *Roche's Sunroof Opinion*

Roche also notes that the test Escape did not have a sunroof, while Plaintiff's Escape did. [Ex. 3 (Rebuttal Report), at 14, ¶ 2.] But again, Roche has "not attempted to understand any contribution that may have arisen from that variable being changed." [Doc. 127-2 (Rebuttal Depo.), at 18 (66:8-10).] Any opinion that Roche might offer about sunroof issue should be excluded because it is not properly validated.

d. *Roche's Parking Brake Opinion*

Finally, Roche complains that there was "possible park brake engagement" during the test crash. [Ex. 3 (Rebuttal Report), at 15, ¶ 2.] Roche admits that he has no idea whatsoever if the parking brake was, in fact, engaged during the test crash. [Doc. 127-2 (Rebuttal Depo.), at 15 (55:21-12).] Because Roche has no knowledge whatsoever about the parking brake, he should be excluded from offering any opinions about it. Any such opinions about the parking brake by Roche would be rank speculation, and allowing such speculative testimony at trial would be prejudicial to Rough Country.

C. <u>If Roche's Opinions are Excluded, Then Any Expert Opinion Based on Them Should Also be Excluded</u>

To the extent that any of Plaintiffs' other experts base their opinions on Roche's excluded opinions or proposed testimony, then the absence of his opinions as a foundation would render their opinions inadmissible. *See Cosper v. Ford Motor Co.*, No. 2:18-CV-189-RWS, 2022 WL 17908815, at *6 (N.D. Ga. Oct. 17, 2022) ("experts may rely on the opinion of another expert so long as there is a reasonable belief that the other expert's opinion is reliable").

III.   CONCLUSION

For the foregoing reasons, Rough Country shows that this Motion should be GRANTED and that Roche should be excluded as an expert witness because he lacks

the necessary experience. Alternatively, the Court should exclude any opinions, testimony, or evidence from Roche that relates to: (1) Rough Country's failure to warn; (2) possible alternative designs; (3) the "Ford testing;" (4) numerous aspects of Rough Country's test crash; or (5) from any other of Plaintiffs' experts that is based on any of the foregoing.

This 10th day of March, 2025.

WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC

3344 Peachtree Road, N.E.
Suite 2400
Atlanta, GA 30326
Phone:  404-876-2700
Fax:   404-875-9433
rhill@wwhgd.com
achausmer@wwhgd.com

*/s/ Aaron Chausmer*
Richard H. Hill, II
Georgia Bar No. 354425
Aaron B. Chausmer
Georgia Bar No. 119998
*Attorneys for Defendant Rough Country, LLC*

## **RULE 7.1D CERTIFICATE OF TYPE, FORMAT AND FONT SIZE**

Pursuant to Local Rule 7.1D of the United States District Court of the Northern District of Georgia, the undersigned certifies that the foregoing submission to the Court complies with Local Rule 5.1 in that it was computer-processed, double-spaced between lines, and used Times New Roman font of 14 point size.

WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC

*/s/ Aaron Chausmer*

3344 Peachtree Road, N.E.
Suite 2400
Atlanta, GA 30326
Phone:  404-876-2700
Fax:   404-875-9433
rhill@wwhgd.com
achausmer@wwhgd.com

Richard H. Hill, II
Georgia Bar No. 354425
Aaron B. Chausmer
Georgia Bar No. 119998
*Attorneys for Defendant Rough Country, LLC*

## **CERTIFICATE OF SERVICE**

This is to certify that I have electronically served the foregoing filing with the

Clerk of Court via CM/ECF, which will send a copy to the following attorneys of

record:

Tedra L. Cannella
Robert H. Snyder, Jr.
Devin Mashman
CANNELLA SNYDER LLC
315 W Ponce de Leon Ave
Suite 885
Decatur, GA 30030

***ATTORNEYS FOR PLAINTIFFS***

This 10th day of March, 2025.

/s/ Aaron Chausmer
Aaron B. Chausmer
Georgia Bar No. 119998