# EXHIBIT 4

Case 2:22-cv-00017-RWS    Document 138-4    Filed 03/10/25    Page 2 of 134
Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF GEORGIA
 3                GAINESVILLE DIVISION
 4
 5
 6    Santana Bryson and Joshua
      Bryson, as Administrators
 7    of the Estate of C.Z.B.,      CIVIL ACTION
      and as surviving parents      FILE NO.
 8    of C.Z.B., a deceased         2:22-CV-017-RWS
      minor,
 9
                  Plaintiffs,
10
              vs.
11
      Rough Country, LLC,
12
                  Defendant.
13    ~~~~~~~~~~~~~~~~~~~~~~~~~~
14
              REMOTE VIDEOTAPED DEPOSITION OF
15
16
              CHRISTOPHER D. ROCHE
17
18
                   10:12 a.m.
19
20
              February 1, 2024
21
22
         Susan M. Pitts, CCR-B-1806, RPR
23
24
25
```

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 2

```
 1        APPEARANCES OF COUNSEL
 2
   On behalf of the Plaintiffs:
 3
   TEDRA L. CANNELLA, ESQ.
 4 DEVIN L. MASHMAN, ESQ.
   CANNELLA SNYDER LLC
 5   315 W Ponce de Leon Ave
     Suite 885
 6   Decatur, Georgia 30030
 7
   On behalf of the Defendant:
 8
   RICHARD H. HILL, ESQ.
 9 WEINBERG, WHEELER, HUDGINS,
     3344 Peachtree Road, N.E.
10   Suite 2400
     Atlanta, Georgia 30326
11   404-876-2700
     404-875-9433 (fax)
12
13
   Also Present:
14
   Mr. Rad Hunsley
15
16 Videographer:
17   Mr. Jonathan Miller
18         - - -
19
20
21
22
23
24
25
```

Page 3

```
 1        INDEX TO EXAMINATIONS
 2
   Examination                     Page
 3
   Examination by Mr. Hill          4
 4
   Examination by Ms. Cannella     218
 5
   Further Examination by Mr. Hill  221
 6
 7       INDEX TO EXHIBITS
 8 Defendant's
   Exhibit     Description     Page
 9
10 Exhibit 1  Defendant Rough Country, LLC'S First
     Amended Notice of Taking Videotaped
11     Deposition Duces Tecum of
       Christopher D. Roche             5
12
   Exhibit 2  Collective exhibits including
13     October 12th report, CV, history of
       testimony, fee schedule          10
14
   Exhibit 3  Disclosures               49
15
   Exhibit 4  Material Received         62
16
   Exhibit 5  Eval of the Enhancing V2V Compatibility
17     Agreement
       Bates Bryson 3506 through 3517   80
18
   Exhibit 6  May 2012 Evaluation of the Enhancing
19     Vehicle-to-Vehicle Crash Compatibility
       Agreement: Effectiveness of the Primary
20     And Secondary Energy-Absorbing
       Structures on Pickup Trucks and
21     SUVs                             101
22
23
24
25
```

Page 4

```
 1 REMOTE VIDEOTAPED DEPOSITION OF CHRISTOPHER D. ROCHE
 2        February 1, 2024
 3
 4 (Reporter disclosure made pursuant to Article 8.B. of
 5 the Rules and Regulations of the Board of Court
 6 Reporting of the Judicial Council of Georgia.)
 7     THE VIDEOGRAPHER:  We are on the record
 8 February 1st, 2024, at approximately 10:12 a.m.
 9 Eastern Time.  This will be the videotaped
10 deposition of Christopher Roche.  Will counsel
11 please identify themselves and who they
12 represent for the record.
13     MS. CANNELLA:  Tedra Cannella and Devin
14 Mashman for the plaintiffs.
15     MR. HILL:  Rick Hill for the defendant
16 Rough Country.
17     THE VIDEOGRAPHER:  Will the court reporter
18 please swear in the witness?
19     CHRISTOPHER D. ROCHE, having been first
20 duly sworn was examined and testified as
21 follows:
22 EXAMINATION
23 BY MR. HILL:
24   Q.  Thank you.  Sorry for that delay on the
25 technical aspect of it.  If there is anytime when you
```

Page 5

```
 1 can't hear me or see me, just let me know.  Hopefully
 2 we won't have that issue again.  I want to try to
 3 share my screen here.  Hopefully that will work.
 4     (Defendant's Exhibit 1 was marked for
 5   identification.)
 6   Q.  (By Mr. Hill)  All right.  Are you able to
 7 see my screen now?
 8   A.  Yes, I can.
 9   Q.  Okay.  Great.  I just put up what is --
10 I'm going to mark as Exhibit 1, which is the first
11 amended notice for your deposition.  And attached to
12 the notice is an exhibit that lists the documents
13 that we requested that you provide with today at the
14 time of your deposition and prior to your deposition.
15 I just want to ask you:  Have you seen this notice
16 and Exhibit A before?
17   A.  Yes, I have.
18   Q.  And did you provide all of the material
19 responsive to the notice to Ms. Cannella prior to the
20 deposition?
21   A.  I believe so.  We provided some
22 correspondence e-mails yesterday.  So I'm not sure if
23 you've received those yet.
24   Q.  Anything else that you just provided
25 yesterday other than e-mail?  And I'm assuming that's
```

2 (Pages 2 - 5)

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 6

1 e-mail correspondence with Ms. Cannella or someone
2 from her office?
3      A.   Correct.
4      Q.   Okay.  Everything else that you have
5 related to your work in this case, have you provided
6 that to Ms. Cannella previously?
7      A.   Yeah.  She has my case file.
8      Q.   Okay.  And have you brought your case file
9 with you today?
10     A.   I have brought some printed copies of
11 my -- parts of my case file.
12     Q.   And do you have an electronic version of
13 your entire case file today if you need to reference
14 it during the deposition?
15     A.   Yes, I do.
16     Q.   Okay.  And so you've printed out some
17 copies that you think you are going to need to
18 reference and then you brought the digital version of
19 your entire file with you as well?
20     A.   Correct.
21     Q.   Okay.  And did you withhold from
22 production to Ms. Cannella anything associated with
23 your work in this case?
24     A.   No, I did not.
25     Q.   Okay.  And looking at the material we

Page 7

1 received a couple of weeks ago prior to the
2 deposition -- and I appreciate you getting that to
3 Ms. Cannella so we could have it in advance -- I did
4 not find any billing records or invoices from you to
5 Ms. Cannella for your work in this case.  Have you
6 billed her for any of your work in this case?
7      A.   Well, that's handled by Robson Forensic,
8 the administrative team.
9      Q.   Okay.  And so you did not bring any
10 invoicing or billing processed by Robson team to the
11 deposition today?
12     A.   No.  You can request that from Robson if
13 you want that.
14     Q.   All right.
15          MS. CANNELLA:  I can --
16          MR. HILL:  Yes.
17          MS. CANNELLA:  I'll get you that.  I
18 apologize.  I thought it was in there.  We
19 will -- we will pull that together and try to
20 get that to you by the end of the depo.
21          MR. HILL:  All right.
22          MS. CANNELLA:  I'm sending you an e-mail
23 now with that additional correspondence.  We
24 didn't have time to Bates number it so if you
25 can -- if you want to mark it as an exhibit, you

Page 8

1      can.
2           MR. HILL:  Okay.  I'll just handle that at
3      a break if --
4           MS. CANNELLA:  Yeah.  That works.
5           MR. HILL:  Yeah.  Sure.
6      Q.   (By Mr. Hill)  All right.  So we have your
7 billing records, that would be your invoicing records
8 that would be maintained by Robson; and then we have
9 the correspondence that Tedra just sent me; and then
10 we have the rest of the material you have associated
11 with this case that you sent to Ms. Cannella a couple
12 of weeks ago.
13          Any other material relevant to your
14 testimony today that you didn't bring or that, you
15 know, relates to your work on this case?
16     A.   I have -- not that I can think of at this
17 time.
18     Q.   Okay, great.  If you think of anything
19 that we may be missing during the deposition, please
20 let me know.
21     A.   Okay.
22     Q.   Is one of the items that you actually
23 printed out a copy of your CV?
24     A.   Yes, it is.
25     Q.   And the one that we received is dated June

Page 9

1 1st of 2023.  Is that the same version that you have
2 with you today?
3      A.   Yes.  Yes, it is.
4      Q.   All right.  So you don't have a more
5 current version; it hasn't updated since June of
6 2023?
7      A.   I don't believe so.
8      Q.   Okay.  And is there any education,
9 training, experience, anything that's not contained
10 on your CV dated 6/1/2023 that you are intending to
11 rely upon in giving your opinions today?
12     A.   No, there isn't.
13     Q.   Okay.  I can try to share my screen again
14 real quick.  Do you see the document on the screen
15 now, Mr. Roche?
16     A.   I can.
17     Q.   This is a document that was provided to us
18 from your files.  It begins with Bryson 1387.  And
19 attached -- it starts with your October 12th report,
20 but it contains within the same file your CV at the
21 end of the report.  Let me get to it.
22          And so we show on your CV beginning with
23 Bryson 1416 and running through Bryson 1422, and you
24 will see it says there it was -- at the bottom of
25 that page on 1422 it says updated 9/25/23.  I just

3 (Pages 6 - 9)

Christopher D. Roche                                February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 10

1  want to clarify that relates solely to this one page
2  which is your history of expert testimony; is that
3  correct?
4       A.   Yeah.  So in my file, that's a separate
5  document.  That is my history of expert testimony.
6  So it's being condensed into one file for you, but
7  it's a separate document, and that explains the
8  different dates.  So I'm keeping track of depositions
9  and trials that I'm involved with.
10      Q.   Perfect.  And that's just what I wanted to
11 clarify since it all came to us in one document.
12           MR. HILL:  I'll go ahead, Madam Court
13      Reporter, and just mark this entire collective
14      exhibit as Exhibit 2.  And for the record, it
15      contains his October 12th report, his CV, his
16      history of testimony.  And then the last page is
17      correspondence with Ms. Cannella regarding his
18      fee schedule and other details.  We can just
19      mark them all as one exhibit as opposed to
20      having to break it down.  All right.
21           (Defendant's Exhibit 2 was marked for
22      identification.)
23           MS. CANNELLA:  The last part of what you
24      said, I couldn't hear, Rick.  You said mark it
25      as an exhibit and not break it down or do break

Page 11

1  it apart?
2           MR. HILL:  No, not break it down.  We can
3      just call this collectively Exhibit 2.
4           MS. CANNELLA:  And -- that sounds good.
5      And I'm looking at Chris's hard copy here
6  and it's got an additional case on it.  Do you
7  want me to scan that and send that to you?
8           MR. HILL:  Sure.  That would be -- that
9  was one of my next questions.  We confirmed that
10 there is no newer version of his CV.  And one of
11 my next questions was going to be is there a new
12 version of his case list that's reflected on
13 Bryson 1422, and it sounds like there is.
14           THE WITNESS:  Yes, there is.
15      Q.   (By Mr. Hill)  Okay.  And it's just the
16 addition of one additional case?
17      A.   Correct, yeah.
18      Q.   All right.  I'll ask you about that after
19 I receive it.  We will start with your CV.  I just
20 want to run through a few questions here.  I know you
21 have it in front of you, but at any time you want me
22 to move this screen share to a different page, let me
23 know.
24           And I'll start with the back of the CV and
25 go from that way forward.  Under the Patents section,

Page 12

1  you have a patent that references front body
2  structure of a vehicle for enhanced crash protection.
3  So I would like to know what is the nature of that
4  patent?  What does it address?  Kind of describe it
5  for me in layman's terms.
6       A.   Sure.  That was some work I did while I
7  was at Hyundai, HATCI, the Hyundai America Technical
8  Center.  That was looking at investigating structural
9  countermeasures for the Insurance Institute for
10 Highway Safety, the IIHS's small overlap rigid
11 barrier test mode.  So we were looking at a vehicle
12 that had not been engineered for that test because it
13 predated the test introduction.  And we were looking
14 at initiatives to improve the structural performance
15 for that test.  And some of the ideas were submitted
16 for patent application and resulted in this patent
17 being issued.
18      Q.   What exactly does the patent cover?
19      A.   It covers structural enablers in the front
20 structure of a small passenger car.  The vehicle was
21 a Hyundai Elantra.  And the SORB test is a 40 mile
22 per hour small overlap into a rigid pole.
23      Q.   And your paper and presentation right
24 below there seems to cover the same topic.  Is that a
25 fair statement?

Page 13

1       A.   It covers the same test mode.  The dual
2  box hinge-pillar is not included in that patent.
3  Some different structural enablers were put in in
4  that patent.  This was a discussion of hinge-pillar
5  design.  So it's related to the same test mode and
6  the same work, but the actual structural features are
7  different between the two.
8       Q.   The patent you said was for a small
9  passenger vehicle.  It does not involve a structure
10 related to the LTVs; is that fair?
11      A.   Correct.  It's a passenger vehicle into a
12 pole, into a rigid barrier.
13      Q.   And it doesn't relate --
14           MS. CANNELLA:  Sorry.  For the court
15      reporter, it's LTV, as in vector.
16           MR. HILL:  Yeah, sorry.  And there will be
17      a bunch of terms at some point.  I guess maybe
18      we can go ahead now for the benefit of the court
19      reporter.  But light trucks and vans I think
20      would be a fair way to -- is a term that's used
21      that's abbreviated LTV.  We will be talking
22      about most of that a lot today.  I don't know if
23      we necessarily need to define that.  It's pretty
24      self-evident.  But when I use the term "LTV,"
25      can we agree that that's the industry term for

4 (Pages 10 - 13)

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 14

1     the light truck vehicles as defined by the --
2     and I'll say the EVC, echo, Victor, C -- can you
3     hear me? Sorry, I broke up there for a second.
4          THE WITNESS: Yes, I can hear you.
5     Q.   (By Mr. Hill) Okay. Great. Can we agree
6     that's a fair way to describe the LTV?
7     A.   Well, so I agree that LTV is light truck
8     and van.
9     Q.   Can we agree that when I use that term
10    LTV, it's the category of light truck and van that is
11    Part 4 of the Enhanced Vehicle Compatibility
12    (inaudible) --
13         THE REPORTER: I'm sorry. I'm sorry. You
14    were muffled. Can you repeat that, please?
15         MR. HILL: Yeah, I'm sorry. I'm having
16    trouble with my microphone. I can't even hear
17    myself.
18    Q.   (By Mr. Hill) We will cover this later,
19    but the point is that it's talking about this patent,
20    it doesn't relate to light trucks and vans or
21    protection against intrusion into vehicles that the
22    vehicle might have struck. I'm just trying to
23    clarify that.
24    A.   Well, I would agree that it doesn't relate
25    to light trucks and vans, but it certainly deals with

Page 15

1     managing intrusion, structural intrusion, into the
2     passenger compartment of the vehicle, so I disagree
3     with your second point.
4     Q.   That would be intrusion into the vehicle
5     itself, not intrusion of that vehicle into the
6     vehicle that it struck?
7     A.   Yeah. So this is a test where a vehicle
8     strikes a barrier, so it's a single vehicle test as
9     opposed to a two- or multi-vehicle test.
10    Q.   Looking into your experience -- now
11    flipping forward with your CV, there is a number of
12    different vehicles listed in your work history that
13    you worked on or were involved in.
14         Can you list for me all of those that you
15    would characterize as an LTV?
16    A.   Certainly. So if we start with my first
17    period of employment with the Rover Group, I worked
18    on some vehicles that -- the 2001 Range Rover, for
19    example. I think that's classified as a light truck.
20         And then at Incat Systems you can see I
21    worked on a Jeep body-on-frame SUV. And that was
22    based on the Ram platform. So that's in here, light
23    truck.
24    Q.   Would that be both the 2005 Grand Cherokee
25    and the 2010 Grand Cherokee?

Page 16

1     A.   Yes, that's -- so that's also correct.
2     The 2005 Grand Cherokee, the code name WK, would be
3     classified as a light truck.
4     Q.   Okay. Any light trucks with your
5     experience with Hyundai from 2008 to 2010?
6     A.   Well, I worked on -- I worked on a couple
7     of vehicles there, so some SUVs, including the Sante
8     Fe and also the Santa Cruz, which I did some initial
9     work on that program. Santa Cruz is the small pickup
10    truck that they recently launched a couple of years
11    ago. I did some initial work on that.
12    Q.   While we are on that topic, I noticed on
13    that that you mentioned the Sante Fe, you say that
14    you designed and released structural body parts and
15    assemblies related to the new IIHS bumper test
16    requirements.
17         Can you expand on that a little bit? What
18    exactly did that work involve?
19    A.   So the IHS attempted to introduce a test
20    and they ran multiple vehicles in this test mode.
21    The test involves low speed vehicle collision with a
22    bumper form. They were running two tests for the
23    front of the vehicle, two tests at the rear of the
24    vehicle. The speeds varied. They were five miles
25    per hour or lower. I'm sorry. I'll correct myself.

Page 17

1     I think they are 10 kilometers per hour, which will
2     be 6.2 miles per hour.
3         And the idea behind their testing was they
4     would look at the accumulated damage and the cost of
5     repair. And their initiative was to try and get
6     manufacturers to develop bumper systems where the
7     repair costs were lower. So part of the work on the
8     Santa Fe was to see how the vehicle performed
9     relative to that test mode and to develop
10    countermeasures to improve its performance and reduce
11    the cost of repair.
12         That test isn't conducted anymore. The
13    IHS basically don't run those tests anymore. And I
14    think some subsequent vehicles were not engineered to
15    satisfy the IHS.
16    Q.   Okay. On the unibody pickup, the Santa
17    Cruz you mentioned, that's another light truck that
18    you worked on. Did any of your work with that
19    vehicle involve the design or testing of the primary
20    energy-absorbing structure and/or any secondary
21    energy-absorbing structure that might have been on
22    that vehicle?
23    A.   The focus of my work was on the rear of
24    the vehicle. That -- the concept of that vehicle was
25    based on an existing crossover utility vehicle. And

5 (Pages 14 - 17)

Christopher D. Roche                                    February 1, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 18

1 the front structure, essentially I would say B-pillar
2 forward, was already -- was already established. And
3 so our work focused on looking at the structural
4 solutions to convert it from a SUV or CUV type body
5 structure to an open bed type structure.
6    Q.   And moving back to your time at Incat
7 Systems, and I guess your time at Incat involved
8 working with Jeep or Daimler-Chrysler as kind of a
9 contractor to Incat Systems, Inc.; is that correct?
10    A.   That's right.
11    Q.   And we mentioned a couple of vehicles that
12 you worked on, Jeep vehicles. Did your work with any
13 of those involve designing and/or testing the primary
14 energy-absorption structures and/or the secondary
15 energy-absorber structure?
16    A.   Yes. The SJ program that I mentioned
17 earlier, my -- part of my responsibility there was
18 developing a front structure that would be considered
19 a secondary EA.
20    Q.   And when you say the SJ, is that the 2005
21 Jeep Grand Cherokee?
22    A.   No, it is not.
23    Q.   Okay.
24    A.   It is the third bullet point at the end,
25 third from last bullet point. So it reads:

Page 19

1 Structural engineer on a Jeep body-on-frame SUV that
2 included performing FEA to meet front impact
3 compatibility requirements.
4    Q.   Got you. And what were the front impact
5 compatibility requirements that you were trying to
6 meet?
7    A.   Those of the EVC. So looking to provide
8 the geometric and loading requirements.
9    Q.   And you kind of broke up. What was the
10 first thing you said? Did you say it was part of the
11 EVC?
12    A.   Right. So meeting the requirements based
13 off of the EVC's stipulation for what a secondary EA
14 structure has to satisfy.
15    Q.   All right. So in that case, the 2005 -- I
16 guess the body-on-frame Jeep, it did not meet Option
17 1 of the EVC, and so you were working on how do you
18 comply with the criteria in Option 2. Is that a fair
19 way to describe that?
20    A.   I don't recall exactly where the primary
21 frame rail lay within Option 1, but the work we were
22 doing was to provide a lower secondary EA
23 specifically.
24    Q.   How did you complete that work; how did
25 you satisfy Option 2?

Page 20

1    A.   Well, so the vehicle in question, SJ
2 program, was never launched, so this was engineering
3 to look at design concepts and simulation of those
4 concepts to whether we could meet the targets that we
5 had established for the front structure. One of
6 those targets was to provide a lower structural
7 enabler for compatibility.
8    Q.   When you say a lower enabler and
9 structural compatibility, are you referring to a --
10 what has been referred to before as a SEAS bracket?
11        MR. HILL:  And SEAS for the court reporter
12    would be S-E-A-S. We are going to use, I guess,
13    that a lot.
14        If the witness agrees, instead of having
15    to say "primary energy-absorption structure" and
16    "secondary energy-absorption structure," can we
17    agree we can use SEAS, S-E-A-S in all caps, as
18    an abbreviation for one, and PEAS, P-E-A-S, as
19    an abbreviation for the other.
20        THE WITNESS:  Yes, I'm fine with that.
21    Q.   (By Mr. Hill)  All right. And so what
22 type of SEAS device or component did you use in
23 mocking up that SJ program in order to get the SEAS
24 to the limits you needed to comply with the EVC?
25    A.   It was a design that was -- utilized some

Page 21

1 of the lower frame structure. It wasn't a separate
2 bracket in that instance. It wasn't equivalent to
3 the blocker beam that Ford had on the Excursion at
4 that time. It was -- it was another part of the
5 frame structure that we were utilizing.
6    Q.   Okay. Jumping up where I got confused,
7 the third bullet point from the top under the Incat
8 Systems section is when there's a discussion of the
9 2005 Jeep Grand Cherokee front-end structure. And
10 with regard to that vehicle, were you involved in
11 designing or testing it to see if it complied with
12 the EVC criteria?
13    A.   Yeah. That vehicle -- so I had
14 responsibility for all structural requirements on the
15 Body-In-White at points during my tenure on that
16 program. And that vehicle satisfied the requirements
17 of the EVC from a PEAS perspective.
18    Q.   So it did not require a secondary
19 energy-absorption structure because it satisfied
20 Option 1 under the EVC?
21    A.   Correct.
22    Q.   Okay. Any other vehicles that you were
23 involved in -- I think you mentioned -- going back to
24 my question as far as listing all the LTVs that you
25 worked on from the designs testing perspective, have

6 (Pages 18 - 21)

Christopher D. Roche                                           February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 22

1 we covered all of them?
2    A.   So while I was at HATCI I had
3 responsibility for the Kia SUV. That was the sister
4 vehicle to the Santa Fe. There were different
5 editions of the Santa Fe as well, two different
6 generations of Santa Fe I worked on. So that's the
7 Sorento. The Kia Sorento is the vehicle I'm
8 referring to.
9        While I was at SF Motors, did some
10 preliminary work looking at a SUV that was an
11 electric vehicle. But that was for quite a brief
12 period of time.
13    Q.   With regard to the Sorento, the work on
14 the Sorento, did it involve the design and/or testing
15 of a secondary energy-absorption structure in order
16 to evaluate or meet the criteria in the EVC?
17    A.   No. My work didn't -- didn't cover that
18 part of the design responsibility.
19    Q.   And your work in that -- would that
20 vehicle have anything to do with analyzing or testing
21 the potential for intrusion of that vehicle into a
22 vehicle that it struck?
23    A.   So my responsibility was -- didn't cover
24 vehicle level simulation or testing but rather
25 specific aspects of the body structure.

Page 23

1    Q.   Okay. And jumping back, I think you
2 mentioned the 2001 Range Rover is another vehicle --
3 light truck that you worked on. Was any aspect of
4 your work on that vehicle related to the issues we
5 are discussing about PEAS and SEAS involving
6 front-end collision?
7    A.   No. I was doing some specific body
8 simulation on that program that was unrelated to this
9 type of requirement.
10    Q.   That vehicle predated the EVC. But do you
11 know whether that vehicle would have met the criteria
12 under the EVC?
13    A.   No, I don't know. I have not looked at
14 that vehicle, specifically the EVC requirement.
15    Q.   Do you know whether you've ever worked on
16 any vehicles that -- any light trucks, the LTVs, that
17 would not have met the criteria under the EVC?
18    A.   Not that I can think of at this time.
19    Q.   Okay. Is there any other work experience
20 that you have that would relate to the design,
21 development, and testing of PEAS and SEAS that we
22 haven't already discussed?
23        MS. CANNELLA: Object. Object to the form
24 of the question as broad.
25    Q.   (By Mr. Hill) You can answer.

Page 24

1        I tried to make it as broad as I could
2 (inaudible.)
3        MS. CANNELLA: What was that?
4        MR. HILL: I tried to make it as broad as
5 possible to avoid a bunch of follow-up
6 questions. Go ahead.
7        THE WITNESS: Yeah, I'm sorry. I didn't
8 catch your question originally, so would you
9 mind repeating it, please?
10    Q.   (By Mr. Hill) Sure. I'm sure you're
11 going to get the question at trial from Ms. Cannella
12 for you to explain to the jury your work experience
13 that qualifies you to talk about the issues in the
14 case. And I'm trying to determine whether there is
15 any relevant work experience that you have that we
16 haven't discussed that relates specifically to the
17 design and development of primary energy-absorption
18 structures and/or secondary energy-absorption
19 structures?
20        MS. CANNELLA: Same objection. You can
21 answer.
22        THE WITNESS: Yeah. So the '05 Grand
23 Cherokee I worked on that program from concept
24 to production and post production. A lot of my
25 work involved the development of the front-end

Page 25

1 sheet metal, including the longitudinal members,
2 the front bumper system, shock towers. That
3 structure was developed to meet the targets that
4 were established by the program for and
5 including all compliance testing, US NCAP and
6 IHS test modes and other due care load cases. I
7 worked on that program from the design
8 simulation, test and compliance phases. So I
9 think that's very relevant from a primary
10 energy-absorbing structure development
11 perspective.
12    Q.   (By Mr. Hill) And that vehicle did not
13 require a SEAS because it met the requirements of
14 Option 1 under the EVC?
15    A.   Correct.
16    Q.   Okay. Anything else that I've missed?
17    A.   Well, we talked a little bit earlier about
18 the SJ program where in that instance I was involved
19 in the development of a secondary energy-absorbing
20 structure.
21    Q.   All right. I think that was covered by --
22 in something we haven't already discussed that would
23 relate to these issues?
24    A.   Okay. So those are the two relevant
25 programs I would highlight.

7 (Pages 22 - 25)

Christopher D. Roche                         February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 26

1    I also -- it wasn't involving a light
2 truck and van, but my time at Hyundai -- some of the
3 work I did was engineering and redeveloping front
4 structural elements that are specifically engineered
5 for front crash performance. So some of the work I
6 did for vehicle optimization looked to re-engineering
7 the longitudinal system and required us to do
8 simulation and testing relative to front
9 crashworthiness.
10    Q.   I'm showing you what you were just
11 discussing is the third bullet point down where I
12 have the cursor here where you discuss using FEA
13 methods to predict structural intrusion performance?
14    A.   Yeah. You are no longer sharing your
15 screen.
16    Q.   Okay. Here you go. Do you see it now?
17    A.   So I'm actually specifically talking about
18 the one above it, so project to develop a new front
19 apron assembly that included the front longitudinal
20 to reduce cost and mass with no loss in structural
21 performance.
22    Q.   And which vehicle -- this was involved
23 with which vehicle?
24    A.   So the development work was done also on
25 the Hyundai Elantra.

Page 27

1    Q.   Is the Elantra an LTV?
2    A.   It is not.
3    Q.   All right. Anything else along
4 these issues that we haven't discussed?
5    A.   Not at this time.
6    Q.   Okay. Just to be clear, there is nothing
7 in your CV that would qualify you to give expert
8 opinions in biomechanics; would you agree with that?
9    A.   Yes. I'm not here to cover the
10 biomechanical aspect of this case.
11    Q.   Okay. And you haven't made any
12 determination as to any cause of death of Cohen
13 Bryson?
14    A.   I've reviewed the autopsy report; but
15 other than that, no.
16    Q.   And you are not qualified to give opinions
17 based on the autopsy report as to the actual cause of
18 death of Cohen Bryson?
19    A.   Sorry. Can you repeat that, please?
20    Q.   Sure. You've reviewed the autopsy report.
21 Why did you review the autopsy report? Is it
22 relevant to your opinions in this case?
23    A.   It's background information related to the
24 case.
25    Q.   Right. But you do not intend to use the

Page 28

1 autopsy report or any of the medical reports to give
2 specific opinions as to the cause of death of Cohen?
3    A.   Well, as you can see from my report, part
4 of my discussion relates to maintenance of the
5 survival space of the Ford Escape.
6    Q.   But beyond giving general opinions about
7 intrusion in the survival space, you do not intend to
8 give any opinions as to what physically struck Cohen
9 to cause his injuries?
10    A.   Correct. I am not planning to do that.
11    Q.   Okay. We will come back to that later.
12 Let's start with, I guess, your consulting work with
13 Robson Forensic. On your CV it lists 2022 to
14 present. Do you know what month in 2022 you started
15 with them?
16    A.   April.
17    Q.   Okay. And this position with Robson that
18 you started in April of 2022, is that your first
19 venture into forensic analysis and/or expert
20 consulting?
21    A.   Yes, it is.
22    Q.   Okay. And since you've been with them,
23 you only testified, as I understand, twice based upon
24 the material we received this morning with your
25 updated case list, which I'm going to pull up here.

Page 29

1 Can you see that on the screen?
2    A.   I can.
3    Q.   All right. And this simply added a second
4 deposition in the Young versus Procomm case in
5 October of 2023?
6    A.   That's correct.
7    Q.   So this that I have on the screen
8 represents the only times you've given a deposition
9 and/or trial testimony in your role as an expert
10 consultant?
11    A.   That's correct.
12    Q.   All right. And did you represent -- or
13 were you retained, I'm sorry, by either the plaintiff
14 or the defendant in these two cases? Do you remember
15 which one?
16    A.   In both cases I'm on the plaintiff's side.
17    Q.   Okay. Did either of these cases involve
18 an LTV?
19    A.   Yes, the second case.
20    Q.   All right. And tell me about the
21 circumstances involved in the second case. And I'm
22 assuming you are referring to the Young versus
23 Procomm Advanced Quality Solutions. What was the
24 nature of that case and what was the nature of your
25 work?

8 (Pages 26 - 29)

Christopher D. Roche                                February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 30

1    A.   I don't think I -- that case is ongoing,
2  and I think I'm not going to describe in detail the
3  nature of that case today.
4    Q.   And what is your reason for refusing to
5  describe the nature of that case?
6    A.   Well, there are -- there is a protective
7  order on that case.  There is confidentiality with my
8  clients on that case.  And the case is still ongoing.
9    Q.   Is the deposition testimony you gave, has
10 it been designated as confidential under a protective
11 order of confidentiality here by a court?
12   A.   I don't know that.
13   Q.   So you don't know that.  What is the
14 reason for you to assert that you cannot describe
15 your testimony that you gave in that case and/or the
16 nature of that accident in that case?
17   A.   Well, just I don't discuss cases with
18 other clients, as a matter of course.  When it's in
19 the public domain, you see that's available to
20 everybody.  But otherwise, I don't discuss cases that
21 are irrelevant to the current case I'm on or distinct
22 from the case I'm on.
23   Q.   So would you agree that what you just said
24 that your work in that case, the Young case, is
25 irrelevant to any of your opinions in this case?

Page 31

1    A.   I would say that the -- my analysis and
2  opinions are being formed independent of each other.
3    Q.   Right.  But if you have performed work
4  similar to the work you performed in this case in the
5  past, we are entitled to know about that experience.
6  And so I'm asking you: Is the nature of that case,
7  the accident in that case, the issues in that case,
8  do they relate in any way to the opinions that you
9  gave in this case?  Not saying for you to formulate
10 your opinions in this case, but do the issues
11 involved in the two cases overlap in any way?
12   A.   The nature of the crash is comparable, but
13 the vehicles involved, the model years involved, and
14 the specifics of the crash events are completely
15 distinct.
16   Q.   You can tell me this: Did the crash in
17 the Young case involve bumper override?
18       THE REPORTER: I'm sorry.  Repeat that,
19   please.
20   Q.   (By Mr. Hill)  Did the crash in the Young
21 case involve bumper override?
22   A.   It did.
23   Q.   I'm sorry.  I couldn't hear you.  Did you
24 say that it did?
25   A.   Yes, it did.

Page 32

1    Q.   And was the LTV involved in that case, was
2  it compliant with the EVC?
3    A.   Yes, it was.
4    Q.   So you admit that a vehicle -- an LTV
5  that's compliant with the EVC can still suffer bumper
6  override in a collision with another vehicle?
7    A.   This particular vehicle and its
8  development history is -- is what is being analyzed
9  and -- in the course of this case.  And what my
10 opinions are based on, it's specific to that vehicle
11 and that vehicle design.
12   Q.   When you say "that vehicle," are you
13 talking about the vehicle in the Young case or are
14 you talking about the vehicle in this case?
15   A.   My answer is related to the vehicle in the
16 Young case.
17   Q.   All right.  And can you tell me the type
18 of vehicle that you are describing, the LTV that was
19 involved in the Young case?
20   A.   Yes.  It's a -- it's a Ford truck.
21   Q.   And what model?
22   A.   It's a 2010 F-350.
23   Q.   And did that vehicle involve secondary
24 energy-absorption structures in its design?
25   A.   No, it didn't.

Page 33

1    Q.   So your analysis of that vehicle concluded
2  that it complied with EVC based upon its primary
3  energy-absorption structure?
4    A.   My opinions are detailed in that matter,
5  and I wouldn't characterize it as simply as that.
6    Q.   Well, you say that the vehicle, the Ford
7  F-350, that case complied with the EVC.  And you said
8  it did not use any SEAS to meet that requirement.  So
9  all I'm getting you to say is that in that case it
10 met the requirements of the EVC via Option 1 through
11 the primary energy-absorption structure.  That's all
12 I'm asking you to confirm.
13   A.   The opinions I've formed are relevant to
14 other Ford trucks that were built prior to the
15 subject truck and the testing that Ford conducted on
16 those trucks.  So again, my opinion is -- is based on
17 the Ford development history of that truck and its
18 predecessors.
19   Q.   You were provided in this case directly
20 from Ford through a third party request from counsel
21 for the Brysons documents that would exhibit testing
22 by Ford that were also produced in the Young case; is
23 that correct?
24   A.   I didn't hear the start of your question
25 there.

9 (Pages 30 - 33)

Christopher D. Roche                                      February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 34

1    Q.   Sorry.  So obviously that Ford produced
2   documents related to testing in the Young case; is
3   that correct?
4    A.   That's correct.
5    Q.   And you were provided those same documents
6   in this case via a third party request for production
7   sent by Ms. Cannella's firm on behalf of the Brysons
8   in this case; is that correct?
9    A.   That's correct.
10   Q.   And you've provided a supplemental report
11  in this case that in November 17th of 2023 that
12  addresses those testing documents that were produced
13  by Ford in the Young case, correct?
14   A.   That's right.  That's right.
15   Q.   And so you are relying upon that same
16  testing in both cases to give your opinions in each
17  case, correct?
18   A.   There is -- no.  There is a lot more
19  material available in the Young case and relevant to
20  different model year trucks.
21       The reason for highlighting some of the
22  Ford testing is Ford was heavily involved in the
23  development of the EVC.  And they did significant
24  amount of testing as did other OEMs to look at the
25  issue of LTV compatibility.  And it's some of that

Page 35

1   testing that I've utilized for the supplemental
2   report in this case.
3    Q.   Are there any documents, beyond the ones
4   produced specifically in this case from Ford, that
5   you obtained or reviewed in connection with your work
6   in the Young case that you are relying upon to give
7   opinions in this case?
8    A.   No.  All the documents that I have
9   utilized for my opinions in the Bryson matter is in
10  my file, which you have.
11   Q.   While we are on that and -- I want to talk
12  briefly about the November 17, 2023 supplemental
13  report.  Do you have it there in front of you?
14   A.   I have the supplemental report, yes.
15   Q.   All right.  In your Findings section,
16  section D on page 7, your point number one is that
17  the Ford tests provide (inaudible) of data that shows
18  that by raising the height of a pickup truck, the
19  compatibility of the vehicle could significantly
20  degrade.
21       What do you mean by the compatibility of
22  the vehicle could significantly degrade?  Can you
23  define that statement for me?
24   A.   Structural compatibility is about trying
25  to align the structures of the LTV with the passenger

Page 36

1   vehicle.  When -- as the Ford test shows, when they
2   raised a pickup truck by four inches without any
3   modification, the passenger car's performance in the
4   crash, in an identical crash, was degraded in terms
5   of there were greater intrusions, occupant injuries
6   were higher, the vehicle deceleration was affected,
7   so that's what I'm referencing.
8    Q.   How do you define "significant" in that
9   sentence?  Meaning, you are saying there was
10  increased intrusion with the higher vehicle so that
11  was degrading.  Did you quantify the amount of
12  increased intrusion?
13   A.   Well, you can see in Image 4 that with the
14  standard pickup there is structural engagement
15  between the truck and the car.  You can see that the
16  front-end structure of the passenger car is crushing
17  in a manner to which it was designed to absorb and
18  dissipate energy and part of the frontal structure of
19  the truck is also crushing.  That's the picture here.
20   Q.   So we have Image 4 on the screen right
21  now.  So your opinion that the compatibility will
22  significantly degrade is based upon this photograph
23  showing the intrusion of the pickup truck into the
24  front of the passenger vehicle?
25   A.   Well, it's based upon information provided

Page 37

1   in the actual report and the body of the report
2   including in some of the text.  But this one picture
3   helps to highlight the differential in intrusions
4   when the vehicle ride height is modified.
5    Q.   (Inaudible.)
6        THE REPORTER:  I'm sorry.  I couldn't
7   understand you.  Please . . .
8    Q.   (By Mr. Hill)  I said did the report
9   actually measure the difference in intrusion levels
10  between the two tests exhibited in Image 4?
11   A.   They have not explicitly provided
12  intrusion to a reference point, no.
13   Q.   We will come back to this later.  Give me
14  a second to pull what I just got today back up on the
15  screen.  Can you see my screen now?
16   A.   Yes.
17   Q.   All right.  Are you providing an opinion
18  in the Young case that the Ford 350 involved in that
19  case was defective based upon the design of its
20  front-end?
21   A.   I am providing the opinion that the Ford
22  overrode the vehicle it crashed into, and that Ford
23  understood from their testing the design weaknesses
24  that they introduced in that truck.
25   Q.   What were the design weaknesses that they

10 (Pages 34 - 37)

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 38

1 introduced into that truck?
2        MS. CANNELLA: What was that?
3    Q.  (By Mr. Hill) What were the design
4 weaknesses that they introduced into that truck?
5    A.  So the previous predecessor had a SEAS
6 that was known as a blocker beam that was removed for
7 the subject truck in this case.
8    Q.  And in that case the SEAS was not
9 necessary in order for the vehicle to comply with the
10 EVC criteria, correct?
11   A.  The question in that case relates to
12 Ford's deeper understanding of front structural
13 compatibility based on their extensive testing.
14   Q.  My question was: That the SEAS was not --
15 was not necessary -- the blocker beams that you
16 mentioned that they removed from that vehicle, they
17 were not necessary in order for that vehicle to
18 comply with the criteria of the EVC? Do you agree
19 with that?
20   A.  The EVC laid out criteria to try to
21 improve in parts compatibility. And there was an
22 ongoing dialogue between Ford and NHTSA regarding
23 Ford's testing results, including Ford's
24 recommendations to what should be in the EVC.
25   Q.  And would you consider Ford, then, to be

Page 39

1 sort of a leader in the secondary energy-absorption
2 structure analysis if they were part of the
3 development of the EVC?
4        MS. CANNELLA: Object to the form of the
5    question, vague.
6    Q.  (By Mr. Hill) Answer if you can.
7    A.  Ford introduced a blocker beam in 2000 --
8 the 2000 model year on the F Series Super GT. They
9 did this to improve that vehicle's compatibility with
10 -- and that was prior to the EVC being formalized.
11 So in that respect, they took the initiative to
12 reduce the aggressivity of their trucks.
13   Q.  Why would they need a SEAS on that vehicle
14 in the Young case if it complied with the EVC without
15 needing a SEAS?
16   A.  Because if you look through the Ford
17 production that you have, you can see that they did a
18 significant amount of testing, both
19 vehicle-to-barrier and vehicle-to-vehicle. And they
20 had a much deeper understanding of the performance of
21 PEAS and SEAS.
22   Q.  Okay. So they have a deep understanding
23 of PEAS and SEAS, but why would that require them to
24 have a SEAS or a blocker beam on the vehicle if the
25 PEAS was sufficient on its own to comply with the EVC

Page 40

1 criteria?
2    A.  Because if you understand -- if your
3 objective is to ultimately provide compatibility to
4 passenger vehicles, which is what the EVC was
5 intended to provide, then they learned through their
6 own testing that in some instances the SEAS can
7 provide greater compatibility than purely by having
8 an overlap with the PEAS.
9    Q.  And when you say an overlap, you don't
10 mean that the SEAS actually overlap the PEAS. I
11 mean, the SEAS would still reach a lower level than
12 the PEAS in order for it to be effective, correct?
13   A.  Yeah, my answer was specific to the Option
14 1 of the EVC where the PEAS overlap to the Part 581
15 zone.
16   Q.  Now, are you saying that Ford's research
17 leads you to the opinion that even if an LTV
18 satisfies the EVC through Option 1, that the
19 manufacturer can still install a SEAS component even
20 though it's not necessary to meet the EVC criteria?
21   A.  So if you are running Ford vehicle crash
22 tests and you have data that shows with the SEAS the
23 vehicle is more compatible and, therefore, presents a
24 higher degree of safety for other road users, then
25 you should act upon that.

Page 41

1    Q.  Well, when the SEAS ever not increase
2 compatibility since it's always a lower -- the
3 lowest point of the energy-absorption structures?
4    A.  I don't understand your question.
5    Q.  Sure. You basically -- I think I just
6 interpreted what you said as to say that if a SEAS
7 can add any added compatibility component, that it
8 should be included in the design of the vehicle. Is
9 that a fair representation of what you just said?
10   A.  No. It depends on -- it depends on the
11 PEAS geometry and design whether or not, you know, a
12 SEAS would be beneficial. And if you run testing
13 that shows you the level of performance with your
14 design, you should act upon it. That's what I'm
15 saying. But different PEAS designs result in
16 different performance levels.
17   Q.  And so there is something unique about the
18 F-350 design and the PEAS design in that case that
19 would require it to also have a SEAS device even
20 though the PEAS comply with the EVC?
21   A.  Yes. In that case, obviously, the Super
22 Duty truck has many -- a variance, whether they're
23 4X2, 4X4, cab configuration, and there is a range of
24 ride heights and frame heights on those vehicles.
25 And in that -- this particular case involving this

11 (Pages 38 - 41)

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 42

1  subject 2010 F-350, the SEAS would have provided a
2  greater level of safety margin and would have
3  provided a greater degree of compatibility than
4  occurred in that particular crash.
5      Q.   And have you quantified the percentage of
6  greater compatibility in that case; can you quantify
7  that?
8      A.   Yeah.  So for compat -- sorry, excuse me.
9  For compatibility, you are looking for engagement of
10 both structures on both vehicles as opposed to one
11 structure overriding the structure of the other
12 vehicle.
13     Q.   So basically you are saying that in that
14 case with that specific vehicle -- in fact, let me
15 start with that.  What was the vehicle that was
16 struck in that case?  What model vehicle was that?
17     A.   It was a Nissan Sentra.
18     Q.   Okay.  And hold on one second.  Can we
19 take a two second break?  I want to make sure I don't
20 have a family emergency going on.  I just got a text.
21 We have been going about an hour without delay.  Can
22 we take about a five minute break?
23         MS. CANNELLA:  Absolutely.
24         MR. HILL:  Thank you.
25         THE VIDEOGRAPHER:  The time is 11:12.  We

Page 43

1  are off the record.
2      (Recess taken from 11:12 a.m. to 11:24 a.m.)
3          THE VIDEOGRAPHER:  The time is 11:24.  We
4  are back on the record.
5      Q.   (By Mr. Hill)  Thank you for allowing that
6  break.  And I should have mentioned at the beginning,
7  Mr. Roche, if at any time you need to take a break
8  for any reason, obviously, just let me know.  And
9  again, I apologize for any technical problems.  If
10 you have trouble hearing me at all, please let me
11 know, and I'll do everything I can to adjust
12 everything to make it clear and easy.  I apologize
13 for that.
14     A.   Thank you.
15         MS. CANNELLA:  Can I ask a question on the
16 record?  I can't remember if, when we all
17 introduced ourselves, we indicated that
18 Mr. Hunsley was on the call for -- or on the
19 deposition for Rough Country.
20         MR. HILL:  Yeah, that's right.  That's my
21 fault.  I think she asked for the lawyers to
22 announce themselves and I wasn't thinking
23 because Rad is not a lawyer.  But, yes, Rad
24 Hunsley is here appearing on behalf of Rough
25 Country as Rough Country's representative.

Page 44

1          MS. CANNELLA:  Okay.  Is there anybody
2  else with Mr. Hunsley?
3          MR. HILL:  I don't believe so.  Rad?
4          MR. HUNSLEY:  Yeah, no, I'm the only one
5  in the room.
6          MS. CANNELLA:  Okay.  Thank you.
7          MR. HILL:  Thank you, Tedra.  I should
8  have mentioned that.  I was just thinking about
9  announcing the lawyers.
10         MS. CANNELLA:  No worries.
11     Q.   (By Mr. Hill)  All right.  We were talking
12 about the Young case.  The lawyers that represent the
13 plaintiff in that case, are they -- is that
14 Ms. Cannella or who are the lawyers that represent
15 the plaintiffs in that case?
16     A.   It's Bruce Petway and Mike Petway.
17     Q.   Right.  And I assume this is the first
18 case that you have been retained by Ms. Cannella's
19 firm to work on?
20     A.   That's correct.
21     Q.   All right.  And the McCarthy case that's
22 on this list here -- well, let me share the screen
23 again -- you said that did not involve an LTV,
24 correct?
25     A.   Yes.  That's -- that involves a Tesla

Page 45

1  Model S.
2      Q.   All right.  And who is the lawyer for the
3  plaintiff in that case that retained you?
4      A.   Donald Slavik.
5      Q.   All right.  And that case does not involve
6  or does it involve vehicle-to-vehicle crash
7  compatibility?
8      A.   No, it doesn't.
9      Q.   Okay.  What is the nature of that case?
10     A.   The subject Tesla struck a tree and it
11 related to the crashworthiness of the Tesla.
12     Q.   So the plaintiff in that case was the
13 driver of the Tesla or a passenger in the Tesla?
14     A.   Yes.  Mr. McCarthy was a passenger.
15     Q.   Okay.  How many cases -- obviously you
16 don't give a deposition in every case you work on.
17 And since you've only given two depositions, I'm
18 trying to get a feel for the other cases that you've
19 worked on since you joined Robson, so I'll start with
20 how many cases are you currently working on for them?
21     A.   I don't have the exact numbers in front of
22 me.  But I think active cases must be somewhere 20,
23 25 cases.
24     Q.   All right.  And what percentage of those
25 are you retained by the lawyers for the plaintiff

12 (Pages 42 - 45)

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 46

1  versus the defendant?
2      A.  I think the last time I did that check, it
3  was somewhere around 60 percent plaintiff, 40 percent
4  defense.
5      Q.  And you've never testified at trial,
6  correct?
7      A.  That's correct.
8      Q.  And the only two depositions you have
9  given have been when you were retained by the
10  plaintiff?
11     A.  That's correct.
12     Q.  All right.  And how are you compensated?
13  Are you compensated on a salary basis or are you
14  compensated based upon the hours you work?  How does
15  that work?
16     A.  Yeah.  I'm an employee of Robson Forensic
17  and I have an annual salary and it's independent of
18  caseload, billing, things of that nature.
19     Q.  Do you have any bonus structure where you
20  can achieve additional income based upon what you
21  just mentioned, the numbers of cases or hours you
22  work?
23     A.  No, no, I don't.
24     Q.  And we only have two times that you've
25  given a deposition that could be challenged by the

Page 47

1  other side with regard to admissibility at trial.  Do
2  you know whether in either of these cases there has
3  been any motions filed challenging the admissibility
4  of your testimony in these two cases?
5      A.  Not that I'm aware of.
6      Q.  Okay.  Going back quickly to the Young
7  case, while I have this up here, you mentioned that
8  there was a protective order of confidentiality
9  that's been entered in that case.  Do you know
10  whether the documents produced by Ford in that case
11  were governed by that protective order of
12  confidentiality?
13     A.  Yes, that's my understanding.
14         MR. HILL:  And so you -- somebody say
15  something?  Sorry.
16         MS. CANNELLA:  That was in another room,
17  Rick.  Sorry.
18         MR. HILL:  No problem.  Just didn't want
19  to talk over him if he was talking.
20     Q.  (By Mr. Hill)  Were you required to sign a
21  declaration in the Young case saying that you would
22  abide by the confidentiality provision with regard to
23  the documents produced by Ford?
24     A.  Yes, I believe so.
25     Q.  Okay.  And so that confidentiality

Page 48

1  provision applied to you, which prevented you from
2  sharing those documents or discussing the contents of
3  those documents with anybody outside the context of
4  that case; is that correct?
5      A.  That's correct.  That's right.
6      Q.  And did you at any time discuss the
7  contents of those documents or share those documents
8  with Ms. Cannella?
9      A.  No, I did not.
10     Q.  All right.  Give me one second.  Sorry for
11  the delays while I manipulate screen sharing.  Can
12  y'all see the screen?
13     A.  Yes, I can.
14     Q.  Okay.  Here we go.  All right.  I've put
15  up on the screen what is described as supplement to
16  plaintiff's initial disclosures.  These are the
17  disclosures where plaintiff has disclosed you as an
18  expert in this case and I move to -- the pages aren't
19  numbered and they are not Bates labeled, but I put up
20  on here the portion that represents your expert
21  disclosure in this case.
22         Have you reviewed this document prior to
23  the deposition?
24     A.  No, I don't think I've seen this document.
25     Q.  Okay.  So this section here under your

Page 49

1  name, it was not drafted by you?
2      A.  No, not directly.
3      Q.  Okay.  Were you involved in any way with
4  drafting this disclosure, to your recollection?
5      A.  No, other than providing my report of
6  which this document may have used that as a basis;
7  but no, not directly.
8      Q.  All right.  Well, the date of this
9  disclosure is October 16th and the date of your
10  report is October 12th, so you recall providing your
11  report to Ms. Cannella, but you don't recall being
12  involved in any way with drafting this document that
13  I have on the screen?
14     A.  That's right.  I issued my report and had
15  no additional involvement.
16         MR. HILL:  All right.  And, Ms. Court
17  Reporter, I don't know what exhibit we are on,
18  but I would like to mark this as the next
19  exhibit.  Is it Exhibit 3?
20         THE REPORTER:  Yes.
21         MR. HILL:  Thank you.
22     (Defendant's Exhibit 3 was marked for
23  identification.)
24     Q.  (By Mr. Hill)  This states that you are
25  expected to testify that Rough Country's lift kit

13 (Pages 46 - 49)

Christopher D. Roche                                        February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 50

1 created an unreasonable risk of injury and/or death
2 in foreseeable collisions by causing excessive
3 override and intrusion.
4        Do you agree with that statement?
5     A.   Well, I would -- I would refer you to my
6 report with my findings.  And the language and the
7 findings are not exactly the same as what's written
8 there.  Certainly the risk of injury was increased
9 because of the violation of the survival space due to
10 the override nature of the crash.
11    Q.   So that is what you are expected to
12 testify what you just said, not that it created an
13 unreasonable risk of injury and/or death?
14    A.   Right.  I would refer you to Bates Number
15 1415 with my findings from my report.  That's what
16 I'm going to testify about.
17    Q.   All right.  It goes on to say that you're
18 further expected to testify that this unreasonable
19 danger was known or should have been known to Rough
20 Country.  Is that reflective of the testimony you are
21 expected to give or should we ignore that and refer
22 to the language in your report?
23    A.   Well, my opinions are in my report, in my
24 own words, and so I didn't write this and there is
25 some difference there, so I would suggest we refer to

Page 51

1 my report.
2     Q.   So would you retract this disclosure
3 because it uses language that's not consistent with
4 your report?
5        MS. CANNELLA:  Object to the form of the
6     question.  He just said he did not draft it, so
7     he cannot retract it.
8     Q.   (By Mr. Hill)  I'll put it another way.
9 Would you agree that it does not reflect -- this
10 disclosure does not reflect the specific opinions
11 that you expect to give in this case?
12       MS. CANNELLA:  Object to the form of the
13    question, asked and answered.
14    Q.   (By Mr. Hill)  Go ahead if you can answer.
15    A.   So my report reflects my opinions and
16 that's what I'll be using for this deposition and in
17 trial.
18    Q.   And is it the term "unreasonable danger"
19 that is inconsistent with your report?
20    A.   Well, I mean, the entire sentence is
21 different to what I've written, so you have my
22 findings from my report and you can see that the
23 language and the findings are different, although
24 related and similar, but they are different.
25    Q.   So to be clear, you are not expected to

Page 52

1 testify that the lift kit caused an unreasonable risk
2 of injury and/or death in this case?
3     A.   So my second finding is that with the
4 vehicle lifted due to the Rough Country lift kit, a
5 hazardous condition was created.  The use of the
6 incompatible vehicle on public roads resulted in a
7 dangerous condition.  That's my finding.
8     Q.   So you would -- you are not expected to
9 testify that it created an unreasonable risk of
10 injury?
11       MS. CANNELLA:  Object to the form of the
12    question, asked and answered.
13    Q.   (By Mr. Hill)  Go ahead.
14    A.   So my third opinion is that the -- the
15 lifted 250 loaded the weaker body structure above the
16 bumper and rails, causing increased intrusions and
17 reduced the amount of energy absorbed by the Escape's
18 underbody structure which significantly increased the
19 risk of injury to the occupants.  That's my language.
20    Q.   Right.  Well, I'm not asking you about the
21 findings in your report.  I mean, those are obvious.
22 What I'm asking is, I want to clarify, that you're
23 only expected to testify consistent with your report
24 and that you are not going to render the opinions in
25 your disclosure as they were drafted?  Is that a fair

Page 53

1 way to say it?
2       MS. CANNELLA:  Object to the form of the
3    question, compound question and confusing.
4     Q.   (By Mr. Hill)  Go ahead.  You can answer.
5     A.   So I didn't write what you have on the
6 screen, and I will be referring to my findings from
7 my report.
8     Q.   Okay.  I think that's fair enough.  Since
9 you've never seen this, can you take a look at it and
10 tell me whether there are any other aspects of this
11 that in any way contradict the opinions that you plan
12 to give in this case?
13       MS. CANNELLA:  Object to the form of the
14    question, the -- mischaracterizes the testimony.
15    Q.   (By Mr. Hill)  Go ahead if you can.  I
16 just want you to take a look at it and tell me if
17 there is anything in there that you disagree with.
18       MS. CANNELLA:  That he disagrees with?
19       MR. HILL:  Right, that's not consistent
20    with the opinions that he plans to give in this
21    case.
22       MS. CANNELLA:  Those are two different
23    questions.  Which one do you want him to answer?
24       MR. HILL:  Well, if anything is in here
25    that is inconsistent with his -- the opinions he

14 (Pages 50 - 53)

Christopher D. Roche                                    February 1, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 54

1 plans to give in this case, I would like to
2 know.
3        MS. CANNELLA: Sorry. Object to the form
4 of the question as vague. You are not asking
5 him -- you are asking him something inconsistent
6 with his opinions, not whether he is going to
7 give it or not?
8        MR. HILL: Right.
9    Q. (By Mr. Hill) You can answer the
10 inconsistent first and then you can answer the second
11 question, if you would like, second. We will break
12 them up.
13    A. So again, the language used is slightly
14 different from the findings in my report. But in
15 terms of should Rough Country have known that this
16 was a foreseeable risk and made the vehicle less
17 safe, yes, I agree with that statement.
18        It appears that Rough Country produced
19 nothing in the way of a safety analysis or a DFMEA,
20 so I would agree that their design process is
21 inadequate. And given the fact that the EVC was
22 processed and studies began as early as 2003 or even
23 sooner than that and this kit was designed for a
24 vehicle that was manufactured in 2016 and the
25 significant amount of papers that cover this issue of

Page 55

1 compatibility, I believe that, yes, they should have
2 known.
3        So yeah, I'm okay with the language, but
4 it is characterized slightly differently from my
5 opinions that I list in my report.
6    Q. Part of this disclosure says that there
7 were safer feasible alternative designs at the time
8 and that uses the plural. In your report, by my
9 interpretation, the only feasible alternative design
10 that you discuss is the use of the SEAS brackets. Is
11 there -- and that's the only one I see in your
12 report. So is that the only alternative feasible
13 design you intend to testify about in this case or
14 are there others?
15    A. So I highlight how Rough Country could
16 have created new SEAS brackets that would have
17 maintained the safety of the vehicle despite the lift
18 kit. But you are talking about sheet metal designs,
19 so Rough Country could also have introduced a blocker
20 beam type design, if they so wished.
21        But in terms of their design and
22 manufacturing capability, modified SEAS seems to be
23 the most logical and possibly the most cost effective
24 solution.
25    Q. So modified SEAS are just two brackets

Page 56

1 that bolt into the PEAS of the vehicle, right?
2 That's what we are talking about?
3    A. We are talking about two brackets bolted
4 to the frame rails of the truck, yes.
5    Q. And so you've now introduced a second
6 alternative design, which is not described in your
7 report, which would be a blocker beam, which, as I
8 understand, would be a piece that would go across the
9 entire front of the PEAS, just at a lower elevation.
10 Is that a fair statement?
11    A. Well, there are many SEAS designs out
12 there. And they could have taken inspiration from
13 any number of SEAS designs. But what I focused on in
14 my report is a modified design that the truck came
15 with.
16    Q. Is there any option other than, as you
17 describe, the various SEAS options that would be an
18 alternative design?
19    A. I'm sorry. I don't understand that
20 question. Can you repeat it, please?
21    Q. Sure. So if I understand your testimony,
22 an alternative design would be to include with the
23 lift kit a SEAS device of some type. And you said
24 there is multiple options under that SEAS category.
25 Is that a fair characterization of your testimony?

Page 57

1    A. Yes. I believe it's possible to engineer
2 a new SEAS bracket that could satisfy the Option 2
3 requirements of the EVC.
4    Q. And while we are on that -- I know we are
5 going to cover this in detail later -- but as you
6 measured the Hunter Elliott's F-250 involved in this
7 accident, you concluded that the SEAS brackets that
8 were on the vehicle only extended down to 18 inches
9 above the ground, approximately. And so that I
10 understand it, in order to comply with Option 2 of
11 the EVC, they would have to have extended down to 16
12 inches. And so your criticism of that is that in
13 order for it to comply with Option 2, the SEAS
14 brackets would have to be two inches longer extending
15 down to 16 inches or below; is that a fair statement?
16    A. No. It's more complicated than that.
17    Q. All right. Tell me how it's more
18 complicated.
19    A. The base vehicle height of the SEAS
20 bracket from ground was about 13 inches based on the
21 exemplar truck I measured. And then in addition to
22 the SEAS bracket distance to ground, it also has to
23 have -- it has to satisfy the load requirements. So
24 you have to develop a SEAS bracket that is
25 consistent, I think, with the original manufacturer

15 (Pages 54 - 57)

Christopher D. Roche                                      February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 58

1  intent. At a minimum, you would be looking at least
2  to satisfy the Option 2 of the EVC, but, ideally, you
3  would maintain the base truck compatibility design.
4      Q.   So what you mean there is that you would
5  ideally have brackets that would extend all the way
6  down to the original height without the lift kit, so
7  down to 13 inches above the ground; is that what you
8  are saying?
9      A.   Yeah. On the basis that Ford developed
10  that design 13 inches off ground to achieve
11  compatibility, if you want to maintain the same level
12  of compatibility performance, that would be where you
13  would engineer to.
14      Q.   Okay. So that's one alternative design,
15  is engineer new bolt-in brackets that would extend
16  down to the 13-inch level and have the same strength
17  and so forth that's required under Option 2 or that
18  was with the original design?
19          MS. CANNELLA: Sorry. Can you repeat that
20  question?
21          MR. HILL: Sure.
22          MS. CANNELLA: I missed it.
23          MR. HILL: I just want to make sure I
24  understand what he just said.
25      Q.   (By Mr. Hill) So one alternative design

Page 59

1  would be to incorporate brackets that would maintain
2  the strength required to fill the criteria of Option
3  2, but ideally, they wouldn't just go down to fit the
4  requirements of Option 2, they would go all the way
5  down to the level of the original design of the
6  non-lifted vehicle; is that fair?
7          MS. CANNELLA: The level of the -- the
8  level of the SEAS or the level of the like
9  primary structure?
10          MR. HILL: The level of the SEAS.
11          MS. CANNELLA: Okay.
12      Q.   (By Mr. Hill) Right?
13      A.   Yeah. Yes, the base vehicle, based on my
14  measurements of an exemplar with the SEAS about 13
15  inches from the ground, would be to maintain that
16  base performance for compatibility, would be -- would
17  be a good target.
18      Q.   Okay. And then you mentioned, I guess,
19  you would, as another alternative, have a blocker
20  beam that went down to that same level, the 13-inch
21  level included in the original design. That's, I
22  guess, Option Number 2?
23      A.   Well, in my report, I talk about one
24  alternative design, and that's based on the original
25  SEAS brackets that Ford produced for that truck.

Page 60

1  Could you imagine, could you engineer, could you
2  think of other alternative designs? Yes, of course,
3  because you just look at the marketplace with the
4  array of different SEAS brackets that exist on trucks
5  over the last 20, 25 years. So to your point about
6  more than one option, that's what I'm interpreting
7  that as.
8      Q.   And what I'm trying to get to beyond that
9  is outside of a different SEAS device, are there any
10  other alternative designs that you would opine that
11  Rough Country should have used in order to eliminate
12  the, quote/unquote, hazardous condition as you've
13  described it?
14          MS. CANNELLA: Objection, asked and
15  answered.
16          THE WITNESS: So I am proposing one
17  alternative design option here that I've spent
18  time thinking about and that's what I've listed
19  in my report.
20      Q.   (By Mr. Hill) It's a simple question.
21  Are there alternatives other than a SEAS device that
22  Rough Country, in your opinion, could have used to
23  eliminate the, quote/unquote, hazardous condition as
24  you've opined in this case? Outside of the SEAS
25  device, what else is an alternative design?

Page 61

1          MS. CANNELLA: Objection, asked and
2  answered.
3          MR. HILL: He hasn't answered that.
4      Q.   (By Mr. Hill) I just want to know: Is
5  there anything outside of SEAS?
6      A.   So the term "SEAS" is essentially
7  describing any structure that is below the frame
8  rail, which is the PEAS, so that covers an awful lot
9  of potential engineering solutions. Given the EVC's
10  language of a PEAS and a SEAS, of course you could
11  modify the frame if you wanted to, but that would be
12  cost prohibitive.
13          So in terms of trying to find a safe
14  alternative design that's economically feasible,
15  re-engineering the frame of the truck probably wasn't
16  one I considered.
17      Q.   Okay. So we have eliminated
18  re-engineering the frame of the truck. And I think
19  we have come to the agreement that there is various
20  options to accomplish it, but the alternative -- all
21  the alternative designs you'd consider would involve
22  lowering a structure to perform as a SEAS with --
23  there is no other alternatives that you can think of,
24  as you sit here today, that would be appropriate in
25  this case?

16 (Pages 58 - 61)

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 62

1    A.   There are, I'm sure, plenty of different
2 SEAS structures you could develop. I'm offering up
3 one simple variation on the production of SEAS that
4 would have improved the compatibility of this vehicle
5 with the lift kit in this crash.
6    Q.   All right. I think that answered it.
7    (Defendant's Exhibit 4 was marked for
8 identification.)
9    Q.   (By Mr. Hill) I put up on the screen a
10 document that we have that says Material Received.
11 This is from your file. I'll mark this as whatever
12 it is, Exhibit 4. This does not appear -- strike
13 that. Sorry.
14    At the bottom of this, there's a reference
15 to Quest Federal Rule 26 Report and the Quest Federal
16 Rule 26 Report Support. Did you review those
17 documents in connection with your work in this case?
18    A.   I reviewed those documents after I had
19 completed my reports and formed my opinions in this
20 case.
21    Q.   So you did not rely upon them in drafting
22 your report or formulating any of the opinions you
23 intend to give in this case?
24    A.   That's correct.
25    Q.   All right. Give me one second. Sorry,

Page 63

1 I'm having a little bit of technical difficulty here.
2    All right. Can you see my screen now?
3    A.   Yes, I can.
4    Q.   All right. This is what we have marked as
5 Exhibit 2. This is the collective exhibit that
6 includes your October 12th report, your CV, and your
7 fee schedule. I'll ask you quickly about the fee
8 schedule. This is Bryson 1423. It's a letter, it
9 appears to be from -- there is really no "from".
10 It's to Ms. Cannella and it sets forth your fee
11 schedule. Is this an accurate representation of the
12 hourly charge that you have charged Ms. Cannella in
13 this case?
14    A.   Yeah, I believe so.
15    Q.   All right. And you don't actually see the
16 invoices, you don't prepare them? Is that how it
17 works? You just submit time sheets and the
18 administrator at Robson sends the invoices?
19    A.   I do see the invoices before they go out.
20 I approve them.
21    Q.   Okay. But you did not bring them to the
22 deposition today?
23    A.   Yeah, as a matter of course, I don't
24 collect client invoicing. I make sure that what we
25 are invoicing our clients is correct, but then I

Page 64

1 leave it to the administration team to take care of
2 that.
3    Q.   All right. Do you know approximately how
4 much you have charged Ms. Cannella to date in this
5 case?
6    A.   I don't know what the current total is,
7 no. I can see that there's a reference to the amount
8 as I was working on this report, but I know that
9 that's no longer valid and no longer up to date.
10    Q.   So what was the amount that you
11 referenced? I was confused by your answer. So you
12 saw an amount that was up to date at some point, but
13 it's not up to date to today?
14    A.   Yeah. I mean, when I was writing the
15 report in October, I think we billed around $23,000
16 and -- but that doesn't represent the current billing
17 status.
18    Q.   Got you. And we are going to get that
19 later today, I hope, from Ms. Cannella.
20    MR. HILL: That's the plan?
21    MS. CANNELLA: Yes, sir.
22    MR. HILL: All right. Thanks.
23    Q.   (By Mr. Hill) All right. Just real quick
24 again, covering the materials that you reviewed, on
25 page 2 through 3 of your October report, you list

Page 65

1 materials available for review. So this would
2 represent all of the material that you had available
3 to you at the time you drafted your October 2023
4 report?
5    A.   That's correct.
6    Q.   Can you think of any documents that are --
7 or materials that you had available to you prior to
8 the report that's not listed on pages 2 and 3?
9    A.   No. I think I captured all the
10 documentation that was available to me at the time.
11    Q.   Great. And since that time, it appears
12 you've been provided the expert report from
13 Mr. Buckner and you've been provided documents that
14 were produced in this case by Ford. Are -- is that
15 true?
16    A.   So the supplemental report does list
17 additional materials. That is obviously from
18 November 17th. And you can see a list of materials
19 available for review, which are in addition to the
20 original report's list.
21    Q.   Right. And that's on page 2 of your
22 November 17 report. Are all the documents listed
23 under Additional Materials Available For Review, were
24 all of those documents produced by Ford in this case?
25    A.   Yes, I believe so.

17 (Pages 62 - 65)

Christopher D. Roche                          February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 66

1    Q.  Right.  So my statement that you have the
2  documents produced by Ford, which were the materials
3  that generated your supplemental report, and then we
4  also know that at some point you were provided
5  Mr. Buckner's Rule 26 report, which you are now
6  relying upon to give your opinions in this case, are
7  there any other documents that you were provided
8  subsequent to either of the reports?
9    A.  Not that I can think of at this time.
10       MS. CANNELLA:  I'll interject, Rick.  I
11   forwarded the Buckner transcript we got this
12   morning to Mr. Roche's e-mail, but I'm sure he
13   hasn't seen that yet because it was this
14   morning.
15       MR. HILL:  Sure.
16   Q.  (By Mr. Hill)  So it's fair to say that
17  you have not reviewed or been provided with the
18  expert reports for any of the other experts
19  identified by the plaintiff other than Mr. Buckner,
20  that you can recall?
21   A.  Well, I think to add to Tedra's point, I
22  think I have been e-mailed the report from the
23  biomechanical expert, but I haven't reviewed that.
24   Q.  All right.  And when did you receive that,
25  do you know?

Page 67

1    A.  Within the last few days.
2    Q.  And so you obviously didn't rely upon --
3  scratch that.  Sorry.
4        Have you reviewed it after you received
5  it?
6    A.  No.
7    Q.  Okay.  The last item on page 3 is you're
8  relying upon your inspection of the vehicles on
9  November 15th, 2022.  Did you ever -- is that the one
10  and only time that you inspected the vehicles
11  involved in this case?
12   A.  Yes, it is.
13   Q.  All right.  And you took photographs of
14  both vehicles and you scanned both vehicles; is that
15  correct?
16   A.  That's right.
17   Q.  And you took measurements of the vehicles?
18   A.  That's true.
19       (Mr. Mashman exits deposition.)
20   Q.  (By Mr. Hill)  All right.  Did you do
21  anything during that inspection on November 15th
22  of 2020 [sic]?
23   A.  I reviewed the conditions of the vehicles
24  and took -- and observations of different aspects
25  to -- for example, the damage of the Escape and the

Page 68

1  Rough Country lift kit, features of the lift kit,
2  things of that nature, but just observations.
3    Q.  Did you disassemble any part of either
4  vehicle?
5    A.  No, I don't believe so.
6    Q.  Did you -- when you first inspected the
7  Ford Escape, was the child seat in the back -- in the
8  rear passenger compartment of the Escape?
9    A.  No, it was not there.
10   Q.  All right.  Did you place it there at any
11  time during your inspection?
12   A.  No, I didn't.
13   Q.  Okay.  Was anyone else there with you when
14  you performed this inspection on November 15th?
15   A.  Yes.  Ms. Cannella was there.  There were
16  some people from the shop that were there.  But that
17  was about it.
18   Q.  Okay.  And you say people from the shop.
19  That's from the location where it was stored?
20   A.  That's right, the facility itself.
21   Q.  And they didn't participate in the
22  inspection; they just granted you access to the
23  vehicles?
24   A.  And helped me when I needed a ladder and
25  things of that nature.

Page 69

1    Q.  Sure.  Were there any representatives of
2  the defendant present at your inspection?
3    A.  No.
4    Q.  Anyone else from your firm present?
5    A.  No.
6    Q.  Has anyone else at Robson assisted you in
7  your work in this case?
8    A.  My work is peer reviewed.
9    Q.  So when you say peer reviewed, so you
10  would create the report on your own, a draft report,
11  without assistance from others, you would do the
12  investigation and all of the lead-up work and
13  research on your own, and the only involvement from
14  anyone else would be to review, I guess, your draft
15  report; is that -- is that what you are trying to
16  say?
17   A.  That's right, just to see if there are any
18  issues.  Could be as simple as misspellings, things
19  that are not clear that I need to change the wording
20  to make it more clear, but that's it.
21   Q.  And who is the person that did the peer
22  review at Robson for you in this case?
23   A.  His name is Marcus Mazza.
24   Q.  And does he peer review all of your work
25  in all of your cases?

18 (Pages 66 - 69)

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 70

1    A.    No.
2    Q.    So do you have different people assigned
3 to you to do peer review work in different cases?
4    A.    Yes.
5    Q.    Okay.  All right.  Did you ever visit the
6 scene of this accident?
7    A.    No, I did not.
8    Q.    Have you talked to any of the other
9 experts retained by Ms. Cannella?
10    A.    (No response heard.)
11    Q.    I'm sorry, I didn't hear a response.
12 Maybe I just missed it.
13    A.    No.  I didn't speak to the other experts
14 Ms. Cannella has retained on this case.
15    Q.    Okay.  And you haven't performed any type
16 of -- or you haven't made an effort to actually
17 reconstruct this accident; is that fair?
18    A.    So the focus of my work was not
19 reconstruction.
20    Q.    Right.  So I -- just make sure I'm not
21 missing any type of calculations, simulations, crash
22 testing, anything like that, that you may have done.
23    A.    Yeah.  My work is summarized in my report
24 and we can go through that in detail, but I didn't
25 perform crash simulations, no.

Page 71

1    Q.    Okay.  All right.  I put up on the
2 screen -- I hope you can still see it -- this is
3 Exhibit 2, your report from October 2023.  Do you
4 recall what trim Hunter Elliott's 250 was that was
5 involved in this accident?
6    A.    Well, the first line of the paragraph that
7 you have on the screen, it says it's a King Ranch.
8    Q.    Okay.  And that's your opinion in this
9 case that this was a -- Hunter Elliott's F-250 was a
10 King Ranch trim?
11    A.    That's correct.
12    Q.    All right.  Hold on one second.
13        Beginning here on page 9 through page 16,
14 there's a series of images.  What is the source of
15 these images?  Are you using a combination of images
16 that you took during your inspection with images,
17 photographs taken by others, or do you know?  Do you
18 recall?
19    A.    Yeah.  So you can see Image 3, 4, and 5
20 are images that were provided to me in the case
21 materials.  That's why they state that it was at Car
22 Crafters Towing Company facility.  So those were in
23 the case materials.  But then Image 6, 7, 8, 9, 10,
24 11, 12, 13, 14, and 15 are my images that I took
25 during my inspection.

Page 72

1    Q.    And that's what I wanted to clear up.  I
2 don't know the exact timing of the location of the
3 vehicle, so where was it located in November of 2022
4 when you inspected it?
5    A.    I don't recall the specific location.  I
6 can try and look it up, but I don't remember the
7 address.  But it wasn't at Car Crafters Towing
8 Company facility, I don't think.
9    Q.    That's what I wanted to verify.  Because I
10 didn't understand that you were never at Car Crafters
11 Towing Company's facility?  That's what you are
12 saying?
13    A.    No.
14    Q.    Okay.  Jumping ahead to page 16, there's a
15 statement here -- or a section called Vehicle
16 Crashworthiness where you describe five, I guess what
17 you would call, goals of vehicle crashworthiness
18 design, and I just want to make sure that you agree
19 that that applies to any and all types of vehicles,
20 it's not unique to LTVs or lifted vehicles?
21    A.    So these are fundamental safety principles
22 that apply to vehicles that -- that are typically
23 used for occupants.  I mean, obviously now these days
24 you have autonomous vehicles; so in that case, these
25 principles wouldn't necessarily apply to autonomous

Page 73

1 vehicles without occupants.
2    Q.    Sure.  But they apply generally to all
3 vehicles that involve occupants; they are not limited
4 to LTVs or lifted vehicles.
5    A.    Yes, I would agree with that.
6    Q.    Okay.  Now, turn on page 17, the bottom
7 paragraph, you begin to describe 49 CFR Part 581, so
8 I want to ask you some questions about that.  You
9 know, this -- in looking at this, Part 581 is the
10 only federal regulation that I see that you have
11 cited in your analysis of this case.  I mean, there
12 is a brief reference to the 301 FMVSS, you know,
13 testing.  But as far as a federal regulation, would
14 you agree that Part 581 is the only one that you cite
15 to or rely upon in this case?
16    A.    Yes.  I discuss Part 581 as it pertains to
17 passenger car bumper systems as is relevant in this
18 matter.  And then I do draw on not just the 301 test,
19 but it's also technically a 305 test, but essentially
20 the same test, the same test mode.
21        This Ford Escape was a hybrid vehicle, so
22 they were looking at the electrical components of it.
23 So it is -- you can consider it as a 301/305 hybrid
24 test essentially.  But those are the two main FMVSS
25 standards that I reference and, of course, the EVC is

19 (Pages 70 - 73)

Christopher D. Roche                              February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 74

1  a voluntary agreement.
2      Q.   Right.  So this is the only federal
3  regulation Part 581 that you cite to in your report?
4          MS. CANNELLA:  Object to the form of the
5      question, asked and answered.
6          THE WITNESS:  Well, 301 or 305, they are
7      both federal regulations.
8      Q.   (By Mr. Hill)  You say they are actually a
9  federal law or regulation, not a FMVSS standard for a
10 test?
11         MS. CANNELLA:  I'll object to the form of
12     the question as vague and confusing.  FMVSS 301
13     is a federal regulation.
14         MR. HILL:  Yeah, I didn't mean to imply
15     that it wasn't.  I'll just scrap that.  We
16     already established what he is relying upon.
17     Q.   (By Mr. Hill)  Going back to Part 581, you
18 would place it does not apply to LTVs in the sense
19 that LTVs are not required to comply with any part of
20 the regulations of 581?
21     A.   That's correct.
22     Q.   And it's never applied to LTVs, correct?
23     A.   That's a broad statement.  And my
24 understanding is certainly for the relevant period of
25 this case, it doesn't apply to LTVs.

Page 75

1      Q.   And 581 requires that the testing for
2  passenger cars at the low speed pendulum test, they
3  must be performed between the heights of 16 and 20
4  inches.  Am I understanding that correctly?
5      A.   That's correct.
6      Q.   But it does not require that passenger
7  cars actually have a bumper height that is
8  specifically between 16 and 20 inches; is that fair?
9      A.   Yeah, it doesn't stipulate the structural
10 solution to satisfy the pendulum test.
11     Q.   So there is no mandate from the federal
12 government that establishes any regulated height for
13 the bumpers on an LTV; is that a fair statement?
14     A.   It's done indirectly through the use of
15 Part 581.
16     Q.   And explain that for me.  There is no
17 specific regulation that says that an LTV bumper
18 height must be between a certain height off the
19 ground and -- there is no minimum or maximum
20 established by 581; is that correct?
21         MS. CANNELLA:  Object to the form of the
22     question as compound, confusing.
23     Q.   (By Mr. Hill)  Answer if you can.
24     A.   581 stipulates a series of tests that the
25 vehicle must satisfy in order to be sold in the U.S.,

Page 76

1  and so manufacturers develop structural solutions to
2  meet those tests and that generally drives structural
3  solutions that have a height of between 16 and 20
4  inches above ground.
5      Q.   I understand for passenger cars they must
6  pass this test and so they must be able to test the
7  bumper between 16 and 20 inches.  I agree with that
8  and I understand that.  My question is:  There is no
9  regulation that says we must test an LTV between this
10 height and this height and, thus, the bumper must be
11 between those minimum and maximum heights; is that
12 fair?
13         MS. CANNELLA:  Object to the form of the
14     question, as vague.
15         THE WITNESS:  Yeah, so my statement is
16     most LTVs are exempt from meeting Part 581, and
17     so their bumper and PEAS heights are not
18     regulated.
19     Q.   (By Mr. Hill)  On page 18, you have an
20 Image Number 16 that I want to understand.  It seems
21 that you are trying to illustrate that on the left is
22 a passenger car with a bumper with a top limit of 20
23 and a bottom of 16 as required by 581, not those
24 specific amounts, but it has to be within that range.
25 And then you've got an illustration of an LTV that

Page 77

1  has a PEAS structure where the bottom of the PEAS
2  structure is above the 20-inch level above the
3  ground.  Have I accurately described that image?
4      A.   Yeah, I think that's reasonable.
5      Q.   And the LTV on the right of the image, is
6  it -- it just represents a generic LTV.  It's not
7  designed or meant to illustrate the vehicle involved
8  in this case; is that correct?
9      A.   Yeah.  These are not representative of any
10 specific vehicle.  It's just a graphic to show what
11 happens when you have structural misalignment and
12 that's what this depicts and specifically the primary
13 energy-absorbing structure, so the longitudinal of
14 the car, the frame rail of the truck.
15     Q.   Right.  And this could represent a
16 non-lifted LTV on the right?  It could still have a
17 PEAS that's above the PEAS level of the passenger
18 car?
19     A.   That's correct.
20         MR. HILL:  Okay.  All right.  We have gone
21     another hour.  I'm about to get into the meat of
22     your report.  I appreciate you being patient
23     with all of my introductory stuff.  So I propose
24     just a quick five-minute break since it's kind
25     of a stopping point and then we will come back

20 (Pages 74 - 77)

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 78

1 and get into the meat of your opinions, if
2 that's okay with everybody.
3         MS. CANNELLA:  Sounds good to us.
4         MR. HILL:  What do you guys want to do
5 about lunch?  I don't want to make the witness,
6 you know, be hungry.  I'm open to whatever you
7 guys want to do.
8         MS. CANNELLA:  How long do you think we
9 have left just to kind of gauge the answer on
10 that?
11        MR. HILL:  Took me a little longer -- took
12 me a little longer to cover some of this
13 introductory.  We can go off the record.
14        MS. CANNELLA:  Yeah, let's do that.
15 Thanks.
16        THE VIDEOGRAPHER:  The time is 12:17.  We
17 are off the record.
18 (Recess taken from 12:17 p.m. to 12:34 p.m.)
19        (Mr. Mashman rejoins deposition.)
20        THE VIDEOGRAPHER:  The time is 12:34.  We
21 are back on the record.
22 Q.   (By Mr. Hill) All right.  Thanks.  We
23 have been talking a lot about the EVC, but we never
24 really -- or haven't yet really discussed what it is.
25 So I want to do that real quickly to make sure we are

Page 79

1 on the same page.
2         EVC, as I've been using it during the
3 deposition, stands for the Enhancing
4 Vehicle-to-Vehicle Crash Compatibility Agreement that
5 was formulated around 2003.  And I understand, and
6 correct me if I'm wrong, Mr. Roche, that it was a
7 voluntary program that certain original equipment
8 manufacturers, which we will call OEMs, agreed to
9 take some voluntary measures to see if they would
10 reduce height mismatches between LTVs and passenger
11 cars.
12        Have I correctly described kind of what
13 the EVC is and what its purpose was?
14 A.   Yeah.  I think that's pretty much what it
15 says in my report, so I agree with that.
16 Q.   Okay.  Great.  And it was a completely
17 voluntary program, correct?  There was no law, rule,
18 or regulation that required the OEMs to participate?
19 A.   Yeah, it was voluntary.  But manufacturers
20 did submit the status of their endurance or
21 compliance to the voluntary agreement to NHTSA.  I
22 think the reason for that was if companies were not
23 volunteering to meet the requirement, then maybe
24 NHTSA would have changed course.
25 Q.   Did every single OEM manufacturer of every

Page 80

1 single LTV on the road voluntarily participate in the
2 EVC?
3 A.   So the EVC asked for -- there was a
4 phase-in period, and it looked for all manufacturers
5 who produce LTVs to satisfy it by September of 2009.
6 I haven't seen any documentation that says that was
7 satisfied or not.  But some of the compliance
8 reporting I've seen indicates that certainly some
9 manufacturers were fully compliant by that date.
10 Q.   I'm sharing my screen right now.  This is
11 a document from your files that's entitled Eval of
12 the Enhancing V2V Compatibility Agreement.  It's
13 Bryson 3506 through 3517.
14 A.   Uh-huh.
15 Q.   I would like to mark this as the next
16 exhibit.  I can never keep track of what number we
17 are on.  I trust the court reporter on that.
18        MS. CANNELLA:  I believe it's 5, maybe.
19        MR. HILL:  I was thinking 5, but I didn't
20 want to guess wrong.
21        MS. CANNELLA:  Okay.
22        (Defendant's Exhibit 5 was marked for
23        identification.)
24 Q.   (By Mr. Hill)  And this appears to be kind
25 of a PowerPoint presentation that you put together

Page 81

1 that discusses the EVC.  Is that a fair
2 characterization of this?
3 A.   Yeah, that's right.
4 Q.   All right.  And on the page 3508, there is
5 a List of Tested Vehicles.  What do you mean by
6 tested vehicles?  Do you mean -- you are not
7 referring to actual crash tests or that -- what does
8 that Table 2, list of tested vehicles mean?
9 A.   So this is an abstract from one of, I
10 believe, NHTSA's documents, so it's from the -- the
11 document is the Evaluation of Enhancing V2V
12 Compatibility Agreement.
13        So my understanding was during the
14 development of the agreement that some vehicles were
15 tested.  And some of the papers I've referenced talk
16 about some of those test results.  But, you know, it
17 just basically says -- it provides a list of the
18 vehicle and how it's meeting EVC, whether it's PEAS
19 or SEAS.
20 Q.   Right.  So it's not your understanding
21 that all of these vehicles were actually crash
22 tested.  When it says "tested vehicles," it's really
23 identifying vehicles that self-certify through one of
24 the two methods?
25 A.   Well, it's not entirely clear.  They don't

21 (Pages 78 - 81)

Christopher D. Roche                February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 82

1  list exactly what they mean by that, as I recall, so
2  I know some of these vehicles on this list were
3  tested.
4       Q.   Right.  But I just mean you are not going
5  to testify that all of these vehicles were tested?
6       A.   That's not the -- that's not the point of
7  highlighting this -- this list.  It's to show that
8  manufacturers in this period were reacting to the
9  EVC.
10      Q.   Right.  And you have the two red where you
11 indicate, I guess, where Ford lists on here the F-250
12 crew cab 4x4 and the Ford Escape for those particular
13 years before and after EVC certification just to
14 indicate that they did self-certify these vehicles as
15 EVC compliant?
16      A.   That's right.  I'm highlighting the
17 relevant -- well, these are different model years, so
18 they are not relevant vehicles, but they are from the
19 relevant manufacturer in this case.
20      Q.   Sure.  And this is not meant to be an
21 exhaustive list of all makes and models that were
22 self-certified under the EVC?
23      A.   No, it's not.
24      Q.   All right.  And do you know anywhere where
25 there is a comprehensive list of all models that were

Page 83

1  self-certified under the EVC?
2       A.   I'm -- I would imagine that NHTSA has such
3  a list, but I haven't seen that in the public domain.
4       Q.   Yeah.  I've looked for it and couldn't
5  find it as well.  So likewise, there is no list of
6  all of the LTVs that would be eligible to
7  self-certify under the EVC that chose not to do that,
8  you know, manufacturers chose not to do that, there
9  is no list that shows that either that you are aware
10 of?
11      A.   Yeah, I would generally agree with that.
12 I know if you look at the automobile alliance, they
13 talked about this initiative.  And it was supported
14 by the -- certainly, if not all, the vast majority of
15 auto manufacturers that operate in the US.
16      Q.   You would agree, though, that, you know,
17 there are -- there were back at the time of the
18 development of the EVC and continuing up to now OEMs
19 have produced LTVs that do not meet the criteria of
20 the EVC?
21      MS. CANNELLA:  During what time frame?
22 I'm sorry, I missed that.
23      Q.   (By Mr. Hill)  We can start with -- we can
24 say at any time frame, but we can start with at the
25 time that the EVC was developed, OEMs were producing

Page 84

1  LTVs that did not comply with the EVC, and that
2  practice has continued up to the present; is that
3  correct?
4       A.   So as I mentioned earlier, there was a
5  phase-in for the EVC.  And so prior to September
6  2009, it's very possible that certain manufacturers
7  and specific models did not satisfy the EVC.  But
8  after that, they should have been.  And I'm not aware
9  of a manufacturer that doesn't satisfy it, but I've
10 not attempted, as part of the course of my work in
11 this, to develop such an extensive list of every
12 manufacturer and their status relative to the EVC.
13      Q.   Well, even to today, even after the EVC
14 was implemented in those phases and it's been studied
15 by NHTSA and others, even to today, there is no rule,
16 law or requirement that any OEM has to comply with
17 the EVC criteria?
18      MS. CANNELLA:  Object to the form of the
19 question as vague.
20      THE WITNESS:  The EVC is a voluntary
21 agreement.  Manufacturers are aware of the risks
22 associated with incompatibility.  The vast
23 majority are addressing that in their vehicle
24 designs.
25      Q.   (By Mr. Hill)  So you, I believe, just

Page 85

1  said that you are not aware of any LTVs sold today
2  that do not comply with the EVC parameters --
3       A.   Yeah.
4       Q.   -- correct?
5       A.   I have not done a survey of every single
6  LTV sold over this time frame and whether or not it
7  complies with the EVC, that is correct.
8       Q.   Are you aware of whether Ford has ever
9  sold a F-250 that did not comply with the EVC?  Have
10 you researched that?
11      MS. CANNELLA:  Object to the form of the
12 question, vague with regard to time period.
13      MR. HILL:  At any time period.
14      MS. CANNELLA:  Oh, okay.
15      THE WITNESS:  Well, Ford has been
16 producing vehicles classified as LTVs for over a
17 century, so --
18      Q.   (By Mr. Hill)  Well, I'll cut you off
19 there.  I'm sorry to cut you off.  I'm talking about
20 since the implication of the EVC program, so we can
21 say since 2009.  There is a reference in here on the
22 first page of Exhibit 5 that said -- you highlighted
23 it in bold.  And under paragraph 1.1, it says:  The
24 measures agreed upon would be achieved with full
25 adherence for all LTVs built after September 2009.

22 (Pages 82 - 85)

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 86

1 Indeed, all LTVs in model year 2010 self-certified to
2 the agreement.
3       So let's start there. This is taken
4 directly from the NHTSA evaluation of the EVC. And
5 do you know what is meant by all LTVs in model year
6 2010 self-certified to the agreement?
7    A.   Yeah, that's a statement by NHTSA
8 commenting on the compliance, but they -- I don't
9 believe they have a list of every single vehicle that
10 they refer to in that sentence, but that's NHTSA's
11 own statement.
12    Q.   Right. So let's say since model year
13 2010, are you aware of any Ford F-250 Super Duties
14 being produced and sold by Ford that did not adhere
15 to the criteria in the EVC?
16    A.   No, I'm not. I'm not aware that Ford had
17 a noncompliant truck, Super Duty truck.
18    Q.   And if they produced a noncompliant F-250
19 since 2010, would you opine that the vehicle is
20 inherently dangerous?
21       MS. CANNELLA: Object to the form of the
22       question. It's an incomplete hypothetical and
23       assumes facts not in evidence.
24    Q.   (By Mr. Hill) Answer it if you can.
25    A.   Ford produced a variety of models in that

Page 87

1 time frame with various designs. Specific to the
2 2016 F-250 Super Duty, which is what we are here to
3 discuss, they implemented a secondary
4 energy-absorbing structure that satisfied the EVC.
5    Q.   All right. Have you investigated all of
6 the trim packages for the 2016 Ford F-250 Super Duty?
7    A.   I have looked at the Ford Body Builders
8 Layout Book, and I have taken time to understand the
9 frame rail heights of different vehicles that Ford
10 produces.
11    Q.   And is that true among the trim levels for
12 the Ford F-250?
13    A.   So Ford in their Body Builder Layout Book
14 don't split it by trim level. They split by drive
15 configuration, cab configuration, larger variables
16 than trim level.
17    Q.   All right. Well, let's get kind of to the
18 meat of your opinions. One of the things that's very
19 obvious is that the fact that Hunter Elliott's
20 vehicle did not meet the EVC criteria is clearly one
21 of your criticisms of the configuration of the
22 vehicle at the time of the accident. We can agree
23 upon that?
24       MS. CANNELLA: Object to form of the
25       question, misstates his -- misstates the

Page 88

1 evidence.
2    Q.   (By Mr. Hill) Answer if you can.
3    A.   It's my opinion that the lift kit
4 undermined the compatibility features that Ford
5 engineered into the truck.
6    Q.   And that compatibility feature you are
7 mentioning is the fact that the SEAS brackets were
8 raised from their original 13 inches above the ground
9 position to a position that you have described as
10 approximately 18 inches above the ground; is that
11 fair?
12    A.   That's right. The SEAS bracket was raised
13 relative to the baseline vehicle by about five
14 inches, yeah.
15    Q.   Would you agree that in all vehicles if
16 the baseline of the SEAS is not below the 16-inch
17 level as outlined in the EVC, that it would create,
18 as you've described in your report -- and I'll use
19 the exact language -- a hazardous condition and/or a
20 dangerous condition, which is how you described the
21 subject vehicle in your findings, paragraph G2? Is
22 that a fair statement?
23    A.   So it becomes a dangerous condition when
24 the vehicle is used on public roads.
25    Q.   Right. And that would apply to any LTV

Page 89

1 that did not meet one of the two criteria under EVC?
2 That would create, as you've described, a dangerous
3 condition or a hazardous condition; can we agree on
4 that?
5    A.   That's --
6       MS. CANNELLA: I'm going to object to the
7       form of the question as outside the scope of the
8       testimony he has been offered to give and an
9       incomplete hypothetical. If there is some
10       specific car you want him to talk about, feel
11       free, but, you know, I object to asking these
12       broad questions.
13    Q.   (By Mr. Hill) Go ahead and answer.
14    A.   That statement is specific to the subject
15 Ford F-250 with the Rough Country lift kit.
16    Q.   So you don't agree that -- let me put it
17 another way. Are you saying that there are
18 potentially vehicles, LTVs, that do not comply with
19 EVC that do not create a dangerous or hazardous
20 condition on the roadways?
21       MS. CANNELLA: Object to form of the
22       question, misstates his prior testimony. He has
23       already said he is not aware of any.
24    Q.   (By Mr. Hill) Go ahead and answer.
25    A.   My opinions are relevant for this case,

23 (Pages 86 - 89)

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 90

1 these vehicles, this lift kit. The supplemental
2 report talks about the influence of ride heights on
3 vehicle safety, and that is more general.
4      Q.   All right. Well, let's get more specific
5 then. If Ford produced a F-250 Super Duty trim
6 package where the SEAS device did not go below 18
7 inches above the ground in this very same model
8 vehicle, would you consider that to be a vehicle that
9 creates or causes a dangerous or hazardous condition
10 specific to this very model?
11          MS. CANNELLA: Object to the form of the
12     question, incomplete hypothetical, facts not in
13     evidence.
14          THE WITNESS: So I would characterize that
15     of the SEAS 18 inches above ground doesn't meet
16     Option 2 of the EVC.
17     Q.   (By Mr. Hill) And, therefore, it would be
18 similar to the accident vehicle in this case and,
19 therefore, it would create a dangerous and hazardous
20 condition; do you agree with that?
21          MS. CANNELLA: Object to the form of the
22     question, same -- same grounds. We don't know
23     what car you are talking about.
24     Q.   (By Mr. Hill) Well, I've just described
25 it. Let's say it's a 2022 Ford F-250 Super Duty

Page 91

1 Tremor package, T-r-e-m-o-r, and that vehicle would
2 have a PEAS that did not qualify under Option 1 and
3 it had a SEAS that would not qualify under Option 2
4 and, in fact, the lower limit of that SEAS would be
5 practically identical to the lower limit of the SEAS
6 on Mr. Hunter Elliott's vehicle, so we have got this
7 same model, just with a different trim, making it
8 similar to the accident vehicle. So let's talk about
9 that specific vehicle. Would that vehicle, when used
10 on the roadway, create a dangerous or hazardous
11 condition?
12          MS. CANNELLA: Object to the form of the
13     question. This is outside the scope of his
14     report. He has not looked at any of this stuff.
15     Incomplete hypothetical.
16     Q.   (By Mr. Hill) Go ahead and answer.
17     A.   Yeah. That's a vehicle I'm not familiar
18 with and I haven't looked at, don't know what
19 features are on the truck. It's beyond the scope of
20 my analysis for this case.
21     Q.   Well, your analysis is that a vehicle --
22 an F-250 that has a SEAS that only goes to 18 inches
23 above the ground creates an inherently dangerous
24 condition. And I've just described a vehicle that is
25 identical to the subject accident vehicle and I'm

Page 92

1 just asking you what would be different about that.
2 What analysis would you need to do in order to
3 distinguish between whether those two vehicles
4 created a hazardous or dangerous condition?
5          MS. CANNELLA: Object to the form of the
6     question, reflects facts not in evidence,
7     incomplete hypothetical. We don't know anything
8     about what this package is, Mr. Hill. We
9     haven't --
10          MR. HILL: Now you are getting into --
11          MS. CANNELLA: Rough Country has never
12     said anything about this for him to analyze
13     whether there are differences. And no offense
14     to you, but you are a lawyer.
15          MR. HILL: I've given him a very specific
16     hypothetical with all of the characteristics
17     between the two vehicles that he needs to
18     analyze it, and so I would like him to answer
19     the question.
20          He said that the only option, the only
21     design option is to have a breaker beam or some
22     type of SEAS that reaches low enough to
23     eliminate the hazard, as he described. And I
24     just described a hypothetical where that design
25     option is not present and the two vehicles are

Page 93

1 practically identical. And I just want to -- he
2 can answer that type of hypothetical.
3          THE WITNESS: So that's six years'
4     difference in model year. It's a later
5     generation truck. It has additional features on
6     that truck that may not have been available or
7     included in 2016. So again, this is about
8     vehicle compatibility. And in the case of a
9     truck such as the one you describe, until it
10     crashes into a vehicle, we really have no
11     material to analyze. It's -- we are looking at
12     a case of a truck hitting a Ford Escape and my
13     opinions are based on this particular crash.
14     Q.   (By Mr. Hill) And your opinion is that in
15 this particular crash, it would -- strike that.
16          What additional features could be on the
17 2022 F-250 that I've just described that would
18 mitigate this alleged hazard that you say was not on
19 the 2016?
20          MS. CANNELLA: Objection, outside the
21     scope of his testimony.
22          THE WITNESS: Well, again, this -- you are
23     describing a truck and a vehicle I haven't
24     looked at, but there are a multitude of features
25     that could have been developed in that vehicle

24 (Pages 90 - 93)

Christopher D. Roche                          February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 94

1    including ADAS systems.
2    Q.   (By Mr. Hill) So you say a radar system,
3    that would be like a collision-avoidance system?
4    You're saying that would avoid the collision
5    altogether; is that what you are referencing?
6    A.   Yeah, trucks. I know Ford fit AEB on many
7    of their trucks today, automatic emergency braking.
8    Q.   So is it your opinion that if the vehicle
9    has automatic emergency braking or other type of
10   collision avoidance, that it does not need to comply
11   with the EVC in order to avoid the alleged hazard or
12   danger?
13   A.   No, it's not my opinion. I'm simply --
14   you asked for examples of other features that could
15   have been fitted. Not knowing the front structure of
16   the vehicle, I can't answer anything specific about
17   the structural enablers that may have allowed it to
18   meet the EVC. But that is an example of a feature
19   that could be fitted to the vehicle that may mitigate
20   the potential of a crash such as the one we are
21   discussing today.
22   Q.   Well, those features can be turned off by
23   the operator, correct?
24   A.   In some vehicles, that's correct.
25   Q.   Right. Well, the EVC voluntary program

Page 95

1    did not analyze any of these additional features that
2    you are talking about, it relied solely upon height.
3    And it basically says you qualify for the EVC based
4    solely upon the height of either your PEAS or your
5    SEAS. Do you agree with that statement?
6    A.   The EVC is focused on structural
7    alignment.
8    Q.   And in the hypothetical I just mentioned
9    involving the other trim package on the very vehicle
10   Mr. Hunter was driving or Mr. Elliott was driving,
11   with regard to that vehicle, height is height, is it
12   not? I mean, what distinguishes it under the EVC
13   with regard to whether it complies with the EVC?
14        MS. CANNELLA: Object to the form of the
15   question. Are we talking about a 2016 Tremor or
16   what are we talking about here?
17        MR. HILL: Sure. Let's go with a 2016
18   Tremor. Let's go with any --
19        MS. CANNELLA: Is that something that
20   exists?
21        MR. HILL: Yes, let's assume it exists.
22   Q.   (By Mr. Hill) How would you answer the
23   question then?
24        MS. CANNELLA: I'm sorry. I don't
25   understand. Can you repeat the question?

Page 96

1        MR. HILL: Sure.
2    Q.   (By Mr. Hill) If we are analyzing a
3    Tremor package, okay -- let's -- we can take 2016 out
4    of it -- and I'll scratch all of that. I'll circle
5    back to this.
6        The question I'm getting at is that EVC
7    compliance is based solely upon the height of the
8    PEAS and the SEAS. It's not based upon any other
9    design features or characteristics of the LTV? We
10   can agree on that?
11   A.   Yeah. The original EVC was designed for
12   structural compatibility.
13   Q.   You say the original. You say -- is there
14   some supplemental program or what's that
15   qualification about?
16   A.   Okay. The EVC as it was written in 2003
17   and implemented by 2009 is for structural
18   compatibility.
19   Q.   Right. So there is no -- you are not
20   making a difference between original and subsequent.
21   You are just saying -- you are just describing the
22   EVC?
23   A.   That's correct.
24   Q.   And it was structural compatibility based
25   solely upon height of the structural aspects of the

Page 97

1    two vehicles involved or of the height of the LTV?
2    A.   So the 2016 F-250 that was involved in
3    this crash when it was originally manufactured
4    complied with the EVC. In fact, it exceeded the EVC
5    because the SEAS bracket was 13 inches from the
6    ground based on looking at an exemplar truck.
7    Q.   Correct. And your criticism of the
8    configuration for Hunter Elliott's vehicle is that it
9    was raised to a point where the structural
10   compatibility based on height no longer complied with
11   the EVC?
12   A.   It no longer complied with the EVC. It no
13   longer matched the baseline vehicle features to
14   provide compatibility in terms of the geometric
15   height of 13 inches.
16   Q.   So is it your opinion that any
17   modification to the vehicle that modifies the
18   original design that complied with EVC, if the
19   modification takes it out of the criteria of EVC,
20   that it is inherently dangerous and creates a hazard
21   and a dangerous condition?
22        MS. CANNELLA: Object to the form of the
23   question, incomplete hypothetical.
24        THE WITNESS: It's my opinion that when
25   vehicles are lifted, based on the available test

25 (Pages 94 - 97)

Christopher D. Roche                                        February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 98

1    data, they become less safe for other passenger
2    vehicles.  And in individual cases where a crash
3    has occurred, an analysis needs to be performed
4    to understand the condition of the crash, the
5    myriad of complexities around that crash, and
6    the baseline vehicles involved; and then an
7    opinion on whether or not that vehicle was
8    dangerous can be formed.
9        Q.    (By Mr. Hill)  The opinion would be
10   whether it was dangerous in that specific incident;
11   is that what you are saying?
12       A.    Yeah.  The -- I'm saying that this vehicle
13   with this lift kit represented a dangerous condition.
14       Q.    How do you quantify that danger?  Is there
15   some percentage increase in risk to passengers in
16   vehicles that the LTV strikes in this instance?
17       A.    Well, you go back to the original EVC
18   document that shows the prevalence of fatalities in
19   vehicle-to-vehicle collisions and that looks at the
20   increased number of fatalities in passenger cars when
21   struck by an LTV.
22       Q.    And that's based solely upon compliance or
23   noncompliance with the EVC height criteria, correct?
24       A.    So the EVC was a voluntary agreement to
25   request manufacturers to make their light trucks and

Page 99

1    vans more compatible.  It can be, like many other
2    FMVSS, be considered the bare minimum.  And as Ford
3    demonstrated in this particular truck, they exceeded
4    that bare minimum, as their SEAS was only 13 inches
5    from the ground as originally produced.
6        Q.    Well, I just turned to page 3507 on the
7    screen and this is part of your PowerPoint
8    presentation and this -- correct me if I'm wrong --
9    but appears to be quotes that you've taken from a
10   2012 NHTSA analysis or evaluation of the EVC.  Is
11   that a fair statement?
12       A.    Yes.
13       Q.    All right.  And in the first paragraph on
14   your slide where I've got the pointer, it says:  The
15   observed fatality reduction for pickup trucks is
16   negative (minus 5 percent) and not statistically
17   significant.
18       All right.  You would agree that that was
19   NHTSA's evaluation of all of the data it had at the
20   time in 2012 regarding the EVC agreement?
21       MS. CANNELLA:  Object to the form of the
22   question, misstates the evidence.
23       MR. HILL:  Go ahead.  Evidence is on
24   the --
25       THE WITNESS:  You are referring to NHTSA's

Page 100

1    own report, so that was their finding as they
2    saw it based on their analysis.
3        Q.    (By Mr. Hill)  And the same goes for the
4    statement that you have in bold that the
5    non-parametric analysis does not show fatality
6    reduction for significantly more than 50 percent of
7    the makes and models.  You would agree that was
8    NHTSA's conclusion?
9        A.    No.  NHTSA's conclusion is further down on
10   that page:  The study is strong evidence that
11   fatality risk to car occupants in impacts by
12   late-model light trucks has declined in absolute
13   terms over the past decade, and, in particular, that
14   pickup trucks and SUVs have become less aggressive
15   over time, relative to cars.  That's their
16   conclusion.
17       Q.    Well, let's talk about that.  Hold on.
18   Let me pull up the document.
19       Share my screen.  This is page 13 of the
20   NHTSA evaluation we have been discussing.  It's from
21   May of 2012.  I can show you the cover page.  Is this
22   the document that you were pulling the conclusions
23   from that we have just been talking about from your
24   PowerPoint presentation?
25       A.    Yeah.  There are some excerpts taken from

Page 101

1    this document.
2        (Defendant's Exhibit 6 was marked for
3        identification.)
4        Q.    (By Mr. Hill)  Okay.  And I'll go ahead
5    and mark this as Exhibit 6.  This is not -- this is
6    not Bates labeled.
7        All right.  If we go to the final page,
8    page 13 under Section 4, Discussion, I think I've
9    found the exact quote you just pulled that you said
10   is NHTSA's conclusion regarding the EVC.  And it
11   starts here where I've got the pointer, and that
12   says:  That study is strong evidence that fatality
13   risk to car occupants in impacts by late-model light
14   trucks has declined in absolute terms, and so forth,
15   as you just quoted.  And I'll put up your PowerPoint
16   presentation, the bottom paragraph on Bryson 3507.
17       So I just want to confirm that what I've
18   just showed you in Exhibit 6 is the source of that
19   statement at the bottom of Bryson 3507; is that
20   correct?
21       A.    Yes, it is.
22       Q.    And you are saying that this is discussing
23   NHTSA's evaluation of EVC as the study referenced in
24   this sentence; is that correct?
25       A.    Well, that sentence is in the document.

26 (Pages 98 - 101)

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 102

1    Q.   Right.  Well, let's look at the previous
2  sentence before that in the document.  It says:
3  Nevertheless, these results can be reconciled with
4  the study recently released by the IIHS.
5         That study would refer to the study
6  released by the IIHS, not to the conclusions reached
7  by NHTSA in studying the EVC; would you agree with
8  that?
9    A.   Yeah, that's true.
10    Q.   Right.  So your sentence there is not
11  NHTSA's position on its own study of the EVC, it's
12  discussing the study done by the IIHS?
13    A.   Yeah.  But -- so this PowerPoint that you
14  are referring to is for my own purposes.  And my
15  report is reflective of my opinions based on
16  reviewing these studies.  And there was a
17  disagreement in both the NHTSA and IHS interpretation
18  of the FARS data and the implications for the EVC.
19  I'm not referencing this in my report.
20    Q.   Right.  But there is no reference in your
21  report or in the PowerPoint to the next qualifying
22  statement that says that:  However, that study, which
23  is the study by the IIHS, did not analytically
24  isolate or quantify specific factors accounting for
25  the decline.  It may be due to a combination of

Page 103

1  compatibility improvements in light trucks;
2  crashworthiness improvements in cars; crash avoidance
3  technologies; changes in vehicle mix, vehicle use,
4  driving patterns or the overall decline in fatality
5  risk for all vehicles.
6         Do you agree that that accurately reflects
7  what NHTSA said in this report with regard to,
8  quote/unquote, that study?
9    A.   I agree with what you just read, yes.
10    Q.   Okay.  So NHTSA's actual conclusion from
11  its 2012 evaluation is found in the end of that
12  sentence that says:  By contrast, our results try to
13  address exclusively the fatality reduction due to
14  compatibility improvements close to the time of
15  self-certification, and it is this limited effect
16  that falls short of being unequivocally significant.
17         Would you agree that that actually
18  reflects NHTSA's conclusions from their May 2012
19  evaluation?
20    A.   That is certainly what they wrote in their
21  report.
22    Q.   And you have no reason to believe that
23  that doesn't accurately reflect NHTSA's opinion or
24  thoughts on the issue after its evaluation was
25  concluded in May of 2012?

Page 104

1    A.   Well, that's one study that was conducted
2  at that time with a certain subset of data.  And as
3  that report talks about, other studies are being
4  performed by including other agencies like the IHS.
5  There are studies that are being conducted by
6  individual manufacturers, such as Ford, who looked at
7  the specific variable of compatibility features on
8  their vehicles.  So there are many studies related to
9  the FARS data that's available over the time period
10  that the EVC has been implemented.
11    Q.   This is the only study that NHTSA
12  performed or evaluation of the effectiveness of EVC,
13  though; is that correct?
14    A.   That -- I couldn't speak to that, but it's
15  certainly the one that I've looked at and reviewed
16  for the basis of this report.
17    Q.   And that's the only government entity or
18  government agency involved with highway safety that's
19  evaluated the EVC; would you agree with that?
20    A.   In terms of government agency, yes, I
21  agree with that.
22    Q.   You mentioned these other studies done by
23  non-governmental agencies.  Can you cite to any study
24  that contradicts NHTSA's finding in its May 2012
25  evaluation of the EVC?

Page 105

1    A.   Yeah.  In the -- so when Ford presented to
2  NHTSA in 2007 -- and you have that presentation
3  available to you in the discovery material that
4  was -- that was provided to us in November -- Ford
5  presented their own analysis of the FARS data.
6    Q.   And so NHTSA had Ford's data prior to
7  issuing its May 2012 evaluation of the EVC, correct?
8    A.   Yes, they did.
9    Q.   Right.  And they, even with the benefit of
10  Ford's data, reached the conclusions we have just
11  discussed, correct?
12    A.   They did not reference the Ford data that
13  was provided to them in that study.  That's true.
14    Q.   And can you point me to any specific
15  findings or data from the Ford test that prove or
16  show that the compliance with the EVC directly led to
17  the reduction in fatalities in LTV accidents?
18    A.   Yes.  Can you pull up the Ford production
19  from the 2007 presentation to NHTSA?
20    Q.   Sure.  Let me stop my screen and find it.
21  It's not included in the -- your supplemental report
22  from November of 2023, correct?
23    A.   That's correct.
24    Q.   Is it referenced in your November 2023
25  report?

27 (Pages 102 - 105)

Christopher D. Roche                                February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 106

1      MS. CANNELLA: I'm sorry, what's "it"?
2      MR. HILL: The NHTSA study -- the Ford
3   study that he just asked me to pull up.
4      MS. CANNELLA: Okay.
5      MR. HILL: The presentation to NHTSA.
6      THE WITNESS: I -- in general terms, I
7   believe so.
8      Q.   (By Mr. Hill) Is it specifically cited in
9   your supplemental report?
10     A.   The specific data that I'm referring to is
11  not -- is not in that supplemental report.
12     Q.   And that supplemental report is supposed
13  to be a reflection of your additional opinions based
14  upon the Ford testing and Ford efforts which would
15  include their presentation to NHTSA, correct?
16     A.   Yeah.  So I'm specifically referring to
17  the Ford presentation to NHTSA December 2007.  So
18  there is some material in there that shows the
19  effectiveness of the Ford compatibility structure.
20  There are other papers, though, that I reference that
21  talk about the, from actual crash tests, the
22  effectiveness of the additional structure to provide
23  compatibility.
24     Q.   All right.  I'm looking for the specific
25  presentation to NHTSA.

Page 107

1      MS. CANNELLA: I believe it's the
2   2007-12-20 Ford presentation that was provided
3   with his supplemental report or -- in the
4   production.
5      THE WITNESS: Yeah.  The specific
6   presentation is -- so Bates number, you are
7   looking for 372022193.
8      MR. HILL: All right.  Give me one second.
9      THE WITNESS: That's the first page of the
10  report, not the actual pages I'm referencing.
11     Q.   (By Mr. Hill) I go through 3517 with
12  regard to the documents we received as part of your
13  file material.
14     MS. CANNELLA: We produced the -- yeah, we
15  produced these via e-mail -- let's see.
16     MR. HILL: I've got the Ford production.
17  I just don't -- I don't have it coming from his
18  file.
19     MS. CANNELLA: Oh, I think I sent an
20  e-mail saying that we sent it to you and we sent
21  it to him.  Let me see if I can find that.
22     MR. HILL: Well, if you can find it and
23  put it up, great.  I'm just having trouble
24  finding it.  It is not within his materials that
25  I had pulled up.  We can find it during a break.

Page 108

1      Q.   (By Mr. Hill) While we are on the
2   subject, you agree that NHTSA had all of the
3   information you are referencing from Ford from the
4   presentation and they still came to the conclusions
5   that we've just discussed that they reached in their
6   May 2012 evaluation?  We can agree on that, correct?
7      A.   So NHTSA found there were benefits,
8   particularly for SUVs, based on that study.  They
9   looked at FARS data.  They analyzed it in a specific
10  way.  They certainly didn't retract the EVC, so they
11  maintained the request for manufacturers to
12  voluntarily meet the EVC.  They also had --
13     Q.   Go ahead.  Sorry.
14     A.   So they were fully aware of the testing
15  and the studies that were being performed by
16  manufacturers, many of which showed significant
17  benefit to having structural compatibility.
18     Q.   When you say significant benefit, though,
19  they concluded that there was no evidence that
20  structural compatibility statistically led to a
21  reduction in fatality risk to car occupants; we can
22  agree that that's part of their conclusions from
23  their evaluation in May of 2012?
24     MS. CANNELLA: Object to the form of the
25     question, misstates the evidence.

Page 109

1      Q.   (By Mr. Hill) Go ahead and answer.
2      A.   Well, assuming what they wrote in that
3   particular report.
4      Q.   Okay.  And that's the only report we have
5   from NHTSA evaluating the EVC that I'm aware of; is
6   that correct?
7      A.   Well, there are papers that describe the
8   testing that was ongoing during the EVC development.
9   And certainly NHTSA had access, reviewed, and can see
10  the benefit of the additional structural
11  compatibility.
12     Q.   Well, if they had discovered a statistical
13  significance showing unequivocal proof that an EVC
14  compliance led to a reduction in fatalities of car
15  occupants, they could have had the option of then
16  developing a federal law mandating compliance with
17  the EVC; is that correct?
18     MS. CANNELLA: Object to the form of the
19     question, outside the scope of his testimony and
20     misrepresents how NHTSA works.
21     Q.   (By Mr. Hill) Well, it's possible they
22  could have recommended that statute be enacted that
23  would mandate compliance with the EVC criteria?
24     MS. CANNELLA: Object to the form of the
25     question, same objections.

28 (Pages 106 - 109)

Christopher D. Roche                                        February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 110

1    THE WITNESS: Based on NHTSA's own
2    statement, the -- all the manufacturers of LTVs
3    in 2010 were already meeting it.
4    Q.   (By Mr. Hill) Now, we have talked about
5    that. That statement, we don't know if that means
6    that NHTSA actually compiled and confirmed that every
7    LTV manufactured beginning model year 2010 in the
8    United States complied with the EVC, correct? You
9    have no evidence that that's what they meant or
10   that's what they concluded when they put that
11   statement in this evaluation? You would agree with
12   that?
13   A.   Well, they made the statement that all
14   manufacturers of LTVs in 2010 were meeting the EVC.
15   Q.   Right. But the statement was
16   referencing -- and I can pull it back up -- those
17   manufacturers who volunteered to participate in the
18   EVC program, correct?
19   A.   Which they said all of them were.
20   Q.   Well, what evidence do you have that this
21   statement -- and I put it back up on the screen --
22   from the evaluation that says "all LTV models in 2010
23   self-certified to the agreement" apply to every LTV
24   on the market as opposed to every LTV among the OEMs
25   participating in the agreement?

Page 111

1    A.   Well, I'm taking that statement at face
2    value that they had evidence from the manufacturers
3    that were part of the automobile alliance because I
4    know manufacturers were submitting compliance
5    reports. They were informing NHTSA of their models
6    in respect to LTVs and how they were meeting the EVC,
7    whether through PEAS or SEAS. So NHTSA was receiving
8    self-compliance documentation from the manufacturers,
9    and so they have used that material to make that
10   statement.
11   Q.   So you have nothing outside of this NHTSA
12   evaluation to support your interpretation that every
13   single LTV model produced in 2010 self-certified to
14   the agreement?
15       MS. CANNELLA: Object to the form of the
16       question. It's confusing.
17   Q.   (By Mr. Hill) I'll make it simple. What
18   source or evidence do you have outside of the May
19   2012 evaluation that would support your conclusion
20   that every single model year 2010 LTV self-certified
21   to the EVC agreement?
22       MS. CANNELLA: Object to the form of the
23       question. Misstates his testimony.
24   Q.   (By Mr. Hill) That's exactly --
25   A.   So there are -- there are a list of

Page 112

1    manufacturers that agreed to meet the EVC and they
2    supported NHTSA by performing either simulation or
3    testing. And these manufacturers were the
4    manufacturers who produce, certainly in terms of
5    large trucks, the vast majority of sales for the
6    United States, so Ford, General Motors, and Chrysler
7    and the various subsidiaries of Chrysler, Ram, so on
8    and so forth.
9        But there were non-U.S. manufacturers in
10   that alliance, and they agreed to meet the EVC and
11   they agreed that it was voluntary and they agreed to
12   certify to NHTSA how they -- how they were meeting
13   it. So it's based on that documentation of NHTSA's
14   own statements and the list of vehicles that they
15   supplied that gives me confidence that that statement
16   is accurate.
17   Q.   Well, they don't have to do any testing to
18   self-certify to the EVC, right? You just mentioned
19   they were testing. You don't need to test in order
20   to self-certify to the EVC, correct?
21   A.   No, you are correct, you don't need to
22   test to meet the EVC. But my point was related to
23   manufacturer efforts to help develop the EVC,
24   particularly with respect to Option 2. So there are
25   a number of meetings between manufacturers and NHTSA

Page 113

1    that talk about their work and effectiveness of
2    different ways of making structural compatibility.
3    We have an example of that from some of the Ford
4    documentation.
5    Q.   Right. Here's the full version of Table 2
6    that was referenced earlier that you pulled a portion
7    from. And would you agree that this is the one and
8    only publicly available document that lists the
9    manufacturer and models that self-certified to the
10   EVC, including the years that they self-certified?
11   A.   It's the most comprehensive list I've seen
12   trying to document EVC compliance. And, of course,
13   most of these models were before the phase-in period
14   was complete.
15   Q.   Right. So you just don't know of any
16   other lists like this that would show which models
17   self-certified to the EVC?
18   A.   This is quite a comprehensive list and it
19   shows the major manufacturers voluntarily complying
20   to the EVC.
21   Q.   My question is just: Is there any list
22   beyond this one that you are aware of?
23   A.   Not at this time.
24   Q.   Do you know of any list that discusses EVC
25   compliance post-2010?

29 (Pages 110 - 113)

Christopher D. Roche                          February 1, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 114

1    A.   Not at this time.

2    Q.   (Inaudible).

3        Can you hear me?

4    MS. CANNELLA:  No.

5    MR. HILL:  Hello?

6    THE WITNESS:  We can hear you now.

7    Q.   (By Mr. Hill)  Can you hear me now?  Okay.

8 Sorry, I think my mic goofed up again or something or

9 I kind of froze on the screen.

10       You would agree based upon your actual

11 involvement in a case -- the Young case that

12 compliance with the EVC does not completely reduce

13 the potential for override in a vehicle-to-vehicle

14 crash, correct?

15    MS. CANNELLA:  Object to the form of the

16    question.  It's confusing.

17    Q.   (By Mr. Hill)  You may answer.

18    A.   There is a lot of specific details in that

19 particular case.  And in that instance, there was

20 override in the crash condition.

21    Q.   And would you agree that even in

22 situations where you have a SEAS device that complies

23 with the EVC, you could still have intrusion into the

24 vehicle struck by the LTV?

25    A.   Well, that's a very broad hypothetical

Page 115

1 question.  Generally what we are talking about here

2 is my opinion that if the compatibility features are

3 being maintained, that the intrusion would have been

4 reduced significantly because the underbody would

5 have been loaded.

6    Q.   Have you quantified "significantly"?

7    MS. CANNELLA:  Object to the form of the

8    question as vague.

9    MR. HILL:  It's based on exactly what he

10    just said, it's based on his terminology.

11    THE WITNESS:  Yeah, if you look at the 301

12    test of the Ford Escape where there was

13    compatibility to the underbody, the survival

14    space was well-maintained.

15    Q.   (By Mr. Hill)  In the 301 test, there was

16 underride of the PEAS in the Escape, correct?

17    A.   In that test, there was loading of the

18 underbody and compatibility between the barrier and

19 the Ford Escape.

20    Q.   But there was also underride of the bumper

21 in that test, correct?

22    A.   There was some -- the loading was very

23 biased to the underbody of the Escape in that test,

24 yes.

25    Q.   Right.  So how does that relate to my

Page 116

1 question, which was that how do you quantify or have

2 you quantified what you describe as significant

3 reduction in crush had the vehicle complied with the

4 EVC at the time of the subject incident?

5    A.   Yeah.  So that statement is based on my

6 education, experience, and training relative to

7 developing vehicle structures over a long period of

8 time and understanding how those structures are

9 developed and how they are supposed to work.

10       So in this particular case, because of the

11 override nature of the crash, the underbody wasn't

12 loaded, and so the weaker of the structure was

13 loaded, it wasn't designed to resist intrusion from

14 impacting vehicles.

15    Q.   And that's exactly what I'm getting at.  I

16 understand that your opinion is that if Mr. Elliott's

17 truck had met the EVC requirements, there would have

18 been less intrusion in that accident, that

19 hypothetical accident.  And you've described it as

20 significant less intrusion.  And I'm trying to

21 understand what you mean by "significant".  Can you

22 put a measure on that?  Amount of inches, amount of

23 feet, what areas of the vehicle?  Have you done

24 anything to actually quantify your belief that the

25 intrusion would have been less?

Page 117

1    A.   So as we discussed earlier, the

2 reconstruction efforts looked to quantify that and

3 has quantified that, so I'll refer you to the

4 reconstruction report.

5    Q.   So you haven't done that, but you would

6 rely solely upon the reconstruction report, but

7 you've described it as significant.  I want to know

8 what you define "significant" as?  Two feet?  One

9 feet?  What is your definition of "significant"?

10    A.   The definition of "significant" is the

11 underbody structures in a vehicle are designed to

12 prevent the survival space from being compromised.

13 So properly engaged, the underbody structure of the

14 Escape would have done -- would have done that as is

15 demonstrated by the 301 test.

16       Now, the crush configuration between the

17 test and this crash are not exactly identical.  But

18 it is indicative of the performance of the vehicle

19 when there is greater loading to the underbody.

20    Q.   Well, now, the 301 test, what speed is

21 that test performed at?

22    A.   About 50 miles an hour.

23    Q.   All right.  And did that test strike the

24 Ford Escape at the same location on the PEAS that

25 your hypothetical accident would have struck the PEAS

30 (Pages 114 - 117)

Christopher D. Roche                                   February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 118

1 involving our case? Meaning, had Mr. Elliott's truck
2 complied with EVC, it would have struck the Escape at
3 a certain place on the PEAS. Do you have any
4 evidence that it would be similar to where the
5 barrier struck on the 301 test?
6    A. Yeah, you can see from the geometrical
7 alignment of the original F-250 before being lifted
8 that, for example, the SEAS structure is actually
9 largely below the rear bumper. And the frame rail
10 and bumper structure is much more aligned with the
11 rear bumper of the Escape, which is more similar in
12 nature to the barrier of the 301 test.
13    Q. So you believe that it's more similar to
14 the 301 test than the simulations -- the simulation
15 that was run by Mr. Buckner?
16       MS. CANNELLA: Sorry. Can you repeat that
17    question? I didn't hear it.
18       MR. HILL: Sure.
19    Q. (By Mr. Hill) Which test or simulation is
20 more representative of a non-lifted crash involving a
21 2016 F-250 in this instance? Are you saying the 301
22 test or Mr. Buckner's simulation?
23    A. I'm not really saying either. I'm saying
24 that both Mr. Buckner's analysis and the 301 test
25 show a performance of the Escape when the underbody

Page 119

1 structure is more directly loaded.
2    Q. Well, those two show very different crush
3 profiles, do they not?
4    A. Well, they both show significantly less
5 crush in the survival space or none in the survival
6 space.
7    Q. Have you looked at the crush profile
8 generated by Mr. Buckner's simulation?
9    A. Yes. I've looked at that briefly.
10    Q. Okay. So you are not saying one or the
11 other is more representative of what might have
12 happened in this hypothetical situation; you are just
13 saying that, well, I don't know which one is more
14 representative of what would have happened, but in
15 either case, neither of them would have intruded as
16 much as what happened in the accident, the subject
17 accident? Is that what you are trying to say?
18    A. So Mr. Buckner has modeled based on the
19 vehicles involved in the crash. The 301 test
20 obviously uses a standard deformable barrier. Its
21 characteristics are distinct from a Ford F-250 even
22 at normal ride height. So I wouldn't expect the 301
23 test to exactly match the condition of this
24 particular impact. For example, the amount of
25 overlap is slightly different between the two

Page 120

1 scenarios. And obviously, the moving deformable
2 barrier, its vertical height is different from even a
3 baseline F-250.
4       But the point I'm trying to make is simply
5 that in both of those cases, the 301 test or the
6 Buckner simulation, the survival space isn't
7 compromised.
8    Q. Would you agree that the best way to test
9 the hypothetical situation of this incident occurring
10 with Mr. Elliott's vehicle not having a lift would be
11 to actually perform a physical crash test?
12    A. There is a variety of evidence we can use
13 to understand how the behavior of the vehicles would
14 have been different if there had been structural
15 alignment and -- including looking at the structural
16 alignment, the other test information that's
17 available of -- from an array of vehicle-to-vehicle
18 crashes and the simulation that he has performed.
19 And that is sufficient in my opinion to render the
20 opinion that there would have been less intrusion if
21 the underbody of the Escape had been actually
22 directly loaded.
23    Q. But again, you haven't quantified how much
24 less intrusion, correct?
25    A. I'm saying that I believe the survival

Page 121

1 space would be maintained if the underbody of the
2 Escape would have been directly loaded.
3    Q. Mr. Buckner testified that in an ideal
4 world, you would want to perform an actual crash test
5 involving the same vehicles and that would be the
6 gold standard. Do you agree with that statement?
7       MS. CANNELLA: Object to the form of the
8    question, misstates his testimony.
9    Q. (By Mr. Hill) Go ahead.
10    A. So in my experience, even in -- even in
11 real test conditions, you still get test-to-test
12 variation.
13       Part of my -- part of my responsibility
14 when I was a CA manager was to look at the
15 correlation of the simulation roles with the test
16 data. And something as complicated as a crash test,
17 there is always some degree of variation specifically
18 from even a base vehicle build can lead to variation
19 in test results.
20    Q. So you would not agree that actual crash
21 testing is the gold standard when it comes to
22 recreating a hypothetical accident?
23    A. So both NHTSA and the IHS use real crash
24 testing to evaluate safety performance of vehicles;
25 so ultimately, that is the standard that the industry

31 (Pages 118 - 121)

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 122

1 uses.
2    Q.   And the industry chooses that standard
3 over, you know, computer simulations and crush
4 analysis calculations?
5    A.   Oh, industry uses a great deal of
6 simulation.  And I think to a large extent, they
7 would prefer to certify the vehicles based on
8 simulation if they could do that, but they know that
9 real world crash testing will ultimately be what is
10 used for compliance or evaluation of the vehicles.
11 But the simulation tools the industry uses are very
12 sophisticated.
13    Q.   So the real world crash testing that they
14 use for actual certification is going to be more
15 accurate than the simulations; would you agree with
16 that?
17        MS. CANNELLA:  Object to the form of the
18    question.  Incomplete question, vague.
19        THE WITNESS:  The crash test result is
20    representative of that specific vehicle.  And if
21    you were to run that vehicle test multiple
22    times, you will get some variation.
23    Q.   (By Mr. Hill)  Is there any way -- well,
24 even though you get some variation, that's still the
25 standard that the vehicle manufacturers use to

Page 123

1 certify compliance, correct?
2    A.   That's right.  That's what they have to
3 do.
4    Q.   And why do they have to do it with the
5 actual crash test as opposed to simulations?
6    A.   Because that's been the industry
7 requirement for decades.
8    Q.   Would you agree that the actual crash test
9 would reduce the largest amount of variables so it
10 would lead to the least amount of variation between
11 crashes?
12        MS. CANNELLA:  Object to the form of the
13    question.  Very unclear question.
14    Q.   (By Mr. Hill)  Go ahead.
15    A.   I don't think I understood your question.
16 Can you please rephrase it?
17    Q.   Sure.  The point of your opinion in this
18 case is based mostly upon the height of the SEAS
19 bracket on Mr. Elliott's vehicle and that because it
20 did not comply with either the EVC or the
21 manufacturer's original height, that that is what
22 contributed to the more significant, as you described
23 it, intrusion in the subject accident.
24        Have I fairly described that?
25    A.   My opinion is that the lift kit resulted

Page 124

1 in override of the Ford Escape's underbody structure
2 and, thus, increased intrusions.
3    Q.   And would you agree that a way to test the
4 difference in the amount of intrusion that was
5 created by that condition you just mentioned would be
6 to simulate this crash with a 2016 F-250 in its
7 original configuration to then determine what the
8 difference in crush or intrusion would be between the
9 two configurations?
10    A.   So that is something that could be done.
11 In this case, I believe it's unnecessary.
12        There's overwhelming amount of evidence
13 that shows that if the Escape's underbody had been
14 loaded, the intrusions would have been significantly
15 reduced.  Mr. Buckner's report indicates it would be
16 about half; therefore, the intrusion would have only
17 extended into the luggage space -- luggage
18 compartment of the vehicle, not the survival space.
19    Q.   Do you think it would be impossible in an
20 actual real world crash, as I've just mentioned,
21 crash test, for the intrusion in that test to go
22 beyond the half of the amount that you just mentioned
23 for Mr. Buckner?  Are you saying that would be
24 impossible?
25        MS. CANNELLA:  I'm sorry.  What is the

Page 125

1    question?
2    Q.   (By Mr. Hill)  Yeah.  The question is:
3 You just said that Mr. Buckner's simulation resulted
4 in about half the level of crush as compared to the
5 subject accident.  Did I hear you correctly?
6    A.   Yeah, that was his finding.
7    Q.   Okay.  And are you saying that the only
8 possible outcome from an actual crash test of, you
9 know, using real vehicles in the same configuration
10 as simulated by Mr. Buckner would be half the amount
11 of intrusion?  Is that the only possible outcome of
12 that type of test?
13        MS. CANNELLA:  Are you assuming it's like
14    a perfectly -- a test that perfectly represents
15    our crash?  Is that what you're asking?
16        MR. HILL:  No.  That represents the
17    hypothetical crash that Mr. Buckner simulated.
18        THE WITNESS:  So it's my opinion that the
19    amount of crush would have been significantly
20    reduced, the survival space would have been
21    maintained, therefore, the risk to the rear
22    occupant would have been significantly reduced.
23    Now, exactly what that intrusion level would be
24    in that hypothetical test is indicative of
25    Mr. Buckner's simulation.

32 (Pages 122 - 125)

Christopher D. Roche                                February 1, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 126

1    Q.   (By Mr. Hill)  Do you have any experience
2   in using the simulation software that Mr. Buckner
3   used to do his simulation?
4    A.   No, I don't.
5    Q.   Do you have any knowledge regarding how
6   that configuration is set up, meaning what inputs he
7   is required to put in, what variables are involved in
8   that simulation?
9    A.   Not specific to the SIMON software, no.
10    Q.   Do you have any knowledge with regard to
11   what variables Mr. Buckner changed in order to get
12   the output he was looking for in the simulation?
13        MS. CANNELLA:  Object to the form of the
14        question.  It's argumentative and misstates the
15        testimony.
16    Q.   (By Mr. Hill) I'll restate it.
17   Mr. Buckner testified that he had to obviously make
18   changes to the inputs in order to get the same inputs
19   and outputs that were seen on the downloads from the
20   subject F-250.  Okay.  So that makes it more clear
21   what I'm talking about with regard to his testimony.
22   Are you aware --
23        MS. CANNELLA:  He hasn't seen his
24        testimony, Rick, so . . .
25        MR. HILL:  Right.  But he has seen his

Page 127

1   report and he has seen the simulation documents,
2   I assume.  If he has seen the report, I assume
3   he has seen the actual supporting documents
4   related to Mr. Buckner's simulation.
5        THE WITNESS:  I've seen the two documents
6        that we talked about at the beginning of the
7        deposition.  So there is the report and there is
8        that support.  That's what I've reviewed.
9    Q.   (By Mr. Hill) So you haven't actually
10   reviewed the printouts from the HVE file generated by
11   the simulation?
12    A.   That is Mr. Buckner's work and I will
13   defer you to him.
14    Q.   Right.  Well, the question is:  You
15   haven't reviewed the HVE files from Mr. Buckner's
16   simulation?
17    A.   Yes, that's correct.
18        MR. HILL:  Okay.  All right.  You guys
19        want to take that quick lunch break now?
20        MS. CANNELLA:  Sure.
21        MR. HILL:  It's a good stopping point.
22        It's about 1:50 my time, so you want to say -- I
23        don't know -- 2:20, 1:20 your time?
24        MS. CANNELLA:  That's more than enough
25        time for us.

Page 128

1        MR. HILL:  Why don't we say 1:15 your
2        time.  Is that good?
3        MS. CANNELLA:  Yeah, that works.
4        THE VIDEOGRAPHER:  The time is 1:50.  We
5   are off the record.
6   (Recess taken from 1:50 p.m. to 2:26 p.m.)
7        THE VIDEOGRAPHER:  The time is 2:26.  We
8   are back on the record.
9    Q.   (By Mr. Hill)  Thanks.  We were talking
10   about the simulation that Mr. Buckner did in this
11   case when we took the break, and I wanted to go into
12   a little bit of your experience with simulations.  I
13   think you said in your work history that you were
14   involved with simulations as part of your employment
15   in the auto industry.  Did you ever use the HVE
16   software in performing simulations?
17    A.   No, we didn't.
18    Q.   So you are not familiar with the SIMON
19   that's part of that software?
20    A.   Not familiar with what, sir?  I didn't
21   catch that.
22    Q.   SIMON.
23    A.   No, we weren't using SIMON.
24    Q.   Right.  And did you perform simulations to
25   analyze crush and intrusion in your career?

Page 129

1    A.   Yes.
2    Q.   And what software did you use to perform
3   those simulations?
4    A.   Mainly something called LS-DYNA.
5    Q.   All right.  And why did you use that
6   instead of using HVE?
7    A.   Well, it's a finer element analysis tool,
8   so it's quite an involved process.  And it's good for
9   simulating dynamic events such as crash events, and
10   you have the ability to model all the characteristics
11   necessary to simulate a Ford vehicle crash.
12    Q.   And HVE is not a finite element analysis
13   tool, correct?
14    A.   So I'm not familiar with HVE's product.
15   Robson -- we -- at Robson, we use something call
16   PC-Crash.
17    Q.   And is PC-Crash a finite element analysis
18   tool?
19    A.   PC-Crash has various capabilities,
20   including an FEA capability.
21    Q.   And so all of the software that you've
22   used to perform simulations to model, like you said,
23   a dynamic situation involving crush or intrusion have
24   been finite element analysis tools?
25    A.   So in my career in the industry, that is a

33 (Pages 126 - 129)

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 130

1 true statement using finite element analysis. I
2 haven't done any sort of simulation of this nature to
3 predict crush characteristics as I've been with
4 Robson.
5    Q.   Is that within your capabilities at
6 Robson? Could you have, if you wanted to, used the
7 PC-Crash to simulate the hypothetical crash in this
8 case that Mr. Buckner simulated?
9    A.   That's an interesting hypothetical
10 question. I haven't really considered it. I don't
11 know. If I was involved in reconstruction, that's
12 something I might have -- I would have considered.
13    Q.   And you consider yourself qualified to
14 perform accident reconstructions, correct?
15    A.   That's correct.
16    Q.   And you were not asked to do one in this
17 case by counsel for the Brysons?
18    A.   That's right.
19    Q.   And I think we -- in your report it says
20 what you were asked to do, and it was -- I'll read it
21 from page 2 of your report. You have a paragraph
22 that says: The purpose of this investigation was to
23 determine whether Rough Country's actions or
24 inactions related to the lift kit fitted to the Ford
25 F-250 were improper and caused or contributed to the

Page 131

1 crash severity and the fatal injuries of Cohen
2 Bryson.
3        Did I properly read that paragraph from
4 page 2 of your report?
5    A.   Yeah, I agree with that.
6    Q.   And did Ms. Cannella provide you with that
7 purpose of your investigation or did you decide on
8 your own that would be the purpose? How did that
9 become the purpose?
10    A.   Well, yes, initially we had a discussion
11 about the case and my experience and how it would
12 best be suited for this particular instance given
13 other experts she either had retained or was
14 considering retaining at that time.
15    Q.   And did she ask you if you had the
16 capability to use PC-Crash there at Robson and to
17 simulate either the subject crash or any other
18 hypothetical crashes?
19    A.   Focus of my investigation was regarding
20 the lift kit, the structural compatibility and how it
21 may have influenced the crash.
22    Q.   Well, one way to determine how it
23 influenced the crash would be to simulate the crash
24 or to run actual crash testing where you eliminate
25 the lift kit from the simulation or from the actual

Page 132

1 crash, correct?
2    A.   So as I mentioned earlier, in this
3 instance I think the evidence is so clear that it
4 wasn't necessary. Of course, Rough Country could
5 have also done their own simulation. They could have
6 done their own analysis. They could have done their
7 own crash testing as they were developing this lift
8 kit for the 2016 F-250 to understand if it might have
9 a detrimental effect in its structural compatibility.
10    Q.   Sure. We will get to that in a minute.
11 Back to your experience with simulations. Did you
12 ever run a simulation of a actual physical real world
13 crash in your experience where you had a car that was
14 crash tested and then you used the simulation
15 software to try to simulate within the software the
16 actual crash that -- the actual crash test that you
17 were given access to?
18    A.   Yes. In my career, we would simulate
19 different crash scenarios based on the program
20 objectives, and we would obviously correlate those
21 crash models to real world test data once it was
22 available, to real world crash test data to be
23 specific.
24    Q.   Right. Did you ever use the real world
25 crash data, did you ever receive that first and use

Page 133

1 that to formulate the inputs for your simulation?
2    A.   So it is an iterative process. So
3 typically early on in the development, you are
4 running simulation to predict performance and how
5 well you are satisfying your targets. And then once
6 you have crash test data, you will react to that and
7 make any -- so sometimes the model needs to be more
8 detailed in certain areas. And so, of course, you
9 look at the crash test, you look at the simulation
10 result, you make sure there is no discrepancy. And
11 if there isn't, you, as an engineering team, react to
12 it.
13    Q.   Have you found times where once you got
14 the actual crash data, that there was a discrepancy
15 between the simulation and the actual crash?
16    A.   There were occasions, usually when we were
17 using a new type of process or technique where it was
18 necessary to make adjustments once the crash test
19 results had been available -- become available.
20    Q.   And so are you saying that that was --
21 only happened when you were using new techniques?
22 And when you say new techniques, do you mean within
23 the simulation software or do you mean within the
24 actual physical crash?
25    A.   Within the design of the vehicle. So if

34 (Pages 130 - 133)

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 134

1  you were using new processes, new materials, things
2  that hadn't been necessarily modeled or run before,
3  occasionally, there was -- it was necessary to make
4  adjustments.
5      Q.   And as I understand it, that would be
6  because materials, like you've mentioned, have
7  certain stiffness coefficients and other properties
8  that may vary if you vary the design or manufacturer
9  or materials used for those components; is that what
10 you are talking about?
11     A.   Yeah.  It is a very complicated subject.
12 But to give you one example, you can have -- well, a
13 good example of recent industry cases looking at
14 mixed metal body construction, so now you have steel
15 and aluminum body structures in some cases versus all
16 steel.  So from a simulation perspective, ensuring
17 that you capture that behavior, the joints between
18 the mixed metals, would be necessary to do some
19 additional work.
20     Q.   And what type of additional work do you
21 mean, like what are you referring to?
22     A.   Well, the appropriate way to model the
23 mechanism for joining the two panels, for example, a
24 self-piercing rivet versus a spot-weld.
25     Q.   So you may have an existing simulation

Page 135

1  that has one type of -- that has an existing grivet
2  [sic] and you have to go in and adjust it if it's a
3  spot-weld on the new design you are testing; am I
4  understanding that correctly?
5      A.   Yes.  The companies will develop
6  procedures to model various aspects of the vehicle.
7  And if the manufacturing process changes, sometimes
8  those procedures don't accommodate all of the
9  variables that you need to consider.
10     Q.   Okay.  Let's say that you have an actual
11 physical crash test that's done and you get the data
12 from that crash test and you want to simulate
13 changes, meaning you want to make changes to the
14 vehicle in this simulator software to see how a
15 change from the actual vehicle that crashed would
16 impact the outcome.  I mean, that's one of the
17 purposes of a simulator is you could have an actual
18 crash and you get this result and you say, okay, we
19 want to change this to get a different result and so
20 you would then use the simulator to see what would
21 happen if you changed some aspect of the vehicle?
22     MS. CANNELLA:  Again, object to the form
23 of the question, I guess.  You are saying
24 changing aspect of the vehicle, not changing
25 aspect of the crash?

Page 136

1      Q.   (By Mr. Hill)  Yeah.  I am saying change a
2  physical aspect of the vehicle, like the height of
3  the vehicle.  You know, let's say -- like you say --
4  you say that Rough Country could have run these types
5  of tests.  Let's say Rough Country ran a physical
6  actual crash test, right, and they got a result and
7  then I guess one of the purposes of simulation
8  software is that you could change some aspect of the
9  vehicle and simulate how that would change the
10 outcome in a crash if you made that change to the
11 vehicle.  Like that's one of the purposes of
12 simulations, correct?
13     MS. CANNELLA:  Objection.  Mr. Hill, are
14 you talking about if the vehicle is hitting like
15 a barrier or you are trying to simulate changing
16 the height with the vehicle hitting another car
17 because --
18     MR. HILL:  Sure, either one.
19     MS. CANNELLA:  Okay.  Which one is your
20 question for?  Could you repeat the question?
21     MR. HILL:  I don't see how that has --
22 that's a distinction without a difference.  But
23 let's say --
24     MS. CANNELLA:  I think it's a huge
25 difference.

Page 137

1      Q.   (By Mr. Hill)  Well, in any situation
2  where you have a real world result, okay?  So we will
3  start with a barrier.  So you do a barrier test, you
4  get a real world result, you have a certain amount of
5  intrusion or crush that occurs in the real world
6  test, and then you can't build ten other physical
7  models of it and crash it ten more times and compare
8  all the results.  But one tool you might have would
9  be, okay, if we want to see if we get a different
10 result if we change some aspect of the vehicle,
11 that's the purpose of simulation software; you could
12 simulate to see what kind of result you would get
13 that would be different based upon the new
14 configuration of the vehicle.  It's that simple.
15     A.   So once you built -- in my experience in
16 the industry, once you build an FEA model for a
17 specific vehicle, then, of course, you can crash it
18 in different test scenarios.  You can alter
19 parameters of the vehicle and understand how that
20 affects its performance.
21     Q.   Right.  And explain building the profile.
22 What do you mean by that?
23     A.   Well, an FEA model is an extremely labor
24 intensive process, so teams of engineers actually are
25 involved in building OEM level crash models.  And so

35 (Pages 134 - 137)

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 138

1  they take the data that is released by the engineers
2  and they use that to feed the data for building their
3  FE model.
4      Q.   And it's F-E-A model, right, or just F-E?
5      A.   Yeah, so it's finite element analysis, so
6  FE is an abbreviation of FEA, same thing.
7      Q.   Right.  If the software you are using,
8  like we just mentioned, doesn't involve finite
9  element analysis, like HVE, how does it simulate a
10 hypothetical crash situation if it doesn't have, like
11 you say, a sophisticated complicated FEA model
12 already built within the software?
13         MS. CANNELLA:  Object to the form of the
14 question, foundation.
15         THE WITNESS:  So a little bit like in
16 reconstruction when we use standardized
17 stiffness values for vehicles, you are using a
18 simplified approach that's able to characterize
19 the crash behavior based on known public data.
20 So using -- using the reference data that's
21 available from real world crash tests, it
22 uses -- it uses that methodology as opposed to
23 the FEA approach.
24     Q.   (By Mr. Hill)  Okay.  And you've never
25 actually used that type of software, you've always

Page 139

1  had software that actually had finite element
2  analysis models built in.
3      A.   So when I was in industry, that's right, I
4  was using an FEA approach.
5      Q.   Hold on.  Give me one second to get your
6  report back up where I want it to be.
7         If you were going to use one of the FEA
8  models you used in your work experience to model a
9  real world vehicle-to-vehicle crash, would you have
10 to build an FEA model for both vehicles involved in
11 the crash?
12     A.   In industry, so typically
13 vehicle-to-vehicle crash simulation isn't performed,
14 but vehicle-to-barrier simulation is.  And in that
15 instance, it's typical to use an FE representation of
16 the barrier.
17     Q.   Are you aware of any instances where the
18 industry used an FEA model to actually model a
19 vehicle-to-vehicle crash?
20     A.   Not in my personal experience, but I'm
21 sure it's been done.
22     Q.   And you say not in your personal
23 experience.  Have you ever heard of a vehicle
24 manufacturer performing an FAE [sic] model simulation
25 of a vehicle-to-vehicle crash?

Page 140

1      A.   Well, to be clear, I'm personally saying
2  that myself, I have not run a vehicle-to-vehicle
3  crash simulation.  And that question covers a variety
4  of OEMs around the world that all have, you know,
5  slightly different ways of achieving the same end
6  goal of developing vehicles.  So I can't speak to
7  that.
8      Q.   Well, that's what I'm saying.  Can you
9  cite to any companies that specifically have run
10 simulations of vehicle-to-vehicle crashes?
11     A.   I can't think of an example at this time.
12     Q.   Okay.  When you are building the FEA model
13 to simulate a vehicle-to-barrier crash, you said it
14 was a very labor intensive process and use data from
15 multiple engineers.  Can you kind of explain a little
16 bit more about how that works?  What is involved in
17 building an FAE [sic] model like you described?
18     A.   Yeah.  So the current terminology FEA is
19 digital twin.  So the design process starts with
20 computer-aided design, so the representation of the
21 vehicle is laid out in CAD.  So the body panels, for
22 example, are all drawn and detailed and
23 three-dimensional data is created of those panels.
24 And similarly for every other component that needs to
25 be designed, the suppliers will build similar models

Page 141

1  of their components.
2         And that is, along with other information,
3  is essentially the virtual creation of the vehicle.
4  And at various points during that development
5  process, because it is a iterative process, the data
6  will be frozen and the CA team start to use it.
7         So going back to the body example, you
8  need to mesh the individual panels, so a meshing
9  process software is used to recreate that CAD data in
10 terms of a mesh that can be used as part of an input
11 deck for a finite element analysis.  And what meshing
12 does is it essentially discretizes the panel into
13 elements with individual nodes, and that's where you
14 can start doing hugely complicated calculations using
15 super computers by applying loads or loading
16 conditions to various parts of the vehicle, and you
17 can represent the FEA mesh with the correct material
18 characteristics, joining characteristics and
19 everything else that's required to represent the
20 structure or the part of the vehicle we are trying to
21 model.
22     Q.   All right.  And the one part you mentioned
23 there about super computing, I kind of missed that
24 point.  Are you saying it would require some type of
25 specialized super computing to accomplish that task?

36 (Pages 138 - 141)

Christopher D. Roche                                February 1, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 142

1    A.    If you are talking about Ford vehicle
2  crash simulation and certainly model automotive
3  models are -- have a lot of what's termed degrees of
4  freedom.  And the more complicated the model gets,
5  the more sophisticated the computing or the more
6  computing power you need to run it in a reasonable
7  amount of time.
8    Q.    So how would -- do the OEMs already
9  possess that type of computing power or do they have
10  to purchase access to other computers?  How does that
11  work?
12    A.    Yeah.  I mean, since I joined the industry
13  in 1995, the OEMs I worked for have all had those
14  resources at their disposal.
15    Q.    And is that because they own it or because
16  they pay for the ability to use others -- other
17  computer power?
18    A.    They invested in the computing resource so
19  they can do this type of work.
20    Q.    Sure.  Well, it sounds like you would
21  agree that it's a very complicated process to set up
22  an FEA model as you just described, and I think you
23  mentioned that that process would need to take place
24  for both vehicles if you were to do a
25  vehicle-to-vehicle crash simulation?

Page 143

1    A.    Well, it depends on what you are trying to
2  get out of the crash simulation.  There are ways to
3  simplify a process, depending on what you're trying
4  to actually capture.
5        So in this particular instance, the amount
6  of deformation to the subject F-250 is relatively
7  small.  There is not a great deal of front-end crush,
8  for example.  So there would be ways to model the
9  F-250 in a way that is more cost effective and
10  quicker but still could be representative for this
11  particular crash scenario.
12    Q.    Well, if you were going to simulate a
13  hypothetical crash where the vehicle did not have a
14  lift kit installed, wouldn't there be the potential
15  for a lot more damage to the front of the F-250 that
16  you would need to model?
17        MS. CANNELLA:  Object to the form of the
18    question.  Can you say that again?  I didn't
19    understand that.
20    Q.    (By Mr. Hill)  Did you understand it,
21  Mr. Roche?
22    A.    Can you please repeat the question?
23    Q.    Yeah.  You indicated that you could
24  simplify the process if you were going to simulate
25  the accident, the subject accident, because of the

Page 144

1  lack of damage to the front of the F-250.  Is that
2  accurate as to what you said?
3    A.    Yeah, that's reasonable.
4    Q.    Yeah.  And, you know, simplifying usually
5  would indicate or lead to less accurate results in a
6  simulation.  Would you agree to that general
7  statement?
8        MS. CANNELLA:  Object to the form of the
9    question.  It's vague.
10        THE WITNESS:  No.  So my opening statement
11    there was, you know, simulation models are
12    typically built with an objective in mind, what
13    is it that you are trying to simulate.  And,
14    therefore, you put the necessary resources to
15    capture the detail in the areas necessary for
16    the overall objective.  So, for example, if you
17    are looking at front-end crash performance, you
18    would put more effort into particularly the
19    front structure, the power train, suspension,
20    wheels and tires.  And then, you know, if you
21    were running something like a 208, you need to
22    capture, obviously, the occupant compartment and
23    the restraint system, but you don't need so much
24    detail at the rear of the vehicle.  It still
25    needs to have a representation, but the detail

Page 145

1    can be, in some cases, reduced.  It depends on
2    what you are trying to model.
3    Q.    (By Mr. Hill)  What would be your -- would
4  you even be able to estimate a cost to run a finite
5  analysis -- or a finite element analysis model of the
6  subject crash?  Let's say Rough Country before the
7  crash happened wanted to run a simulation of this
8  crash using one of the FEA models.  What would that
9  cost?
10        MS. CANNELLA:  Object to the form of the
11    question, no foundation.  You can answer if you
12    know.
13        THE WITNESS:  So to build -- so Rough
14    Country produces lift kits for a variety of
15    OEMs, trucks, and there are some models
16    available.  So NHTSA invested in building some
17    FE -- Ford vehicle FE models.  These are public
18    domain models.  You can download them from
19    NHTSA's Website.
20        So if you were to start with taking the
21    Chevy Silverado model that's available, and I
22    believe they also have a Honda Accord model, you
23    could run some simulations fairly cheaply to
24    look at the baseline behavior and then perform
25    iterations relative to the lift kit design.

37 (Pages 142 - 145)

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 146

1    Q.   (By Mr. Hill)  When you say perform
2  iterations, what do you mean by that?  Do you mean
3  somehow use the result of that one test using those
4  two vehicles to then expand that out to other models
5  and other passenger cars that might be struck?
6    A.   No.  I'm saying that if you wanted to
7  study the effects of ride height and particularly the
8  effects of Rough Country's lift kit system on
9  compatibility performance, you can start with those
10  two vehicles and you can run iterations on those two
11  vehicles.  You would start with the baseline
12  configuration, standard Silverado, standard Accord,
13  and then you would apply and update the model to
14  reflect the lift kit and the adjusted ride heights
15  and then you could re-run the simulations and so on
16  and so forth.
17    Q.   Right.  So the iterations would only be
18  amongst those two vehicles in different
19  configurations?
20    A.   That's correct, because those models are
21  available, so there is no cost to building them.
22    Q.   What about a -- I mean, Rough Country
23  makes 60 different lift kits for a ton of different
24  models from different manufacturers.  What if they
25  wanted to test one of them that did not have a free

Page 147

1  model already available from NHTSA?
2    A.   Well, so based on my understanding of
3  Rough Country's engineering processes, they didn't
4  consider compatibility at all and they didn't
5  consider that testing vehicles with their lift kits
6  was their business.
7         And so to study any vehicle, to start
8  with, would be a step in the right direction.  So a
9  Silverado into an Accord would give them a better
10  understanding of the influence of their lift kit on
11  the behavior of that type of crash.  So start there
12  before you try and model every possible configuration
13  of truck lift kit, so on and so forth.
14    Q.   Well, I'm not asking you about what you
15  would have recommended that Rough Country did.  I'm
16  asking a very simple question.  In your
17  professional -- with your professional knowledge,
18  having done this for years, what would be your
19  estimate of the cost to run these types of FEA models
20  with a vehicle that had not already been built and
21  made available by NHTSA?  Simple question.
22    A.   Well, an FEA, for a company that doesn't
23  have the vehicle data, would be -- would be
24  expensive.
25         There are companies that do help build

Page 148

1  models of vehicles, but, yeah, you are still talking
2  hundreds of thousands of dollars, which is why there
3  are tools that are simplified like PC-Crash, like
4  SIMON that can, although a slightly more course
5  level, give you an idea of the performance, which is
6  what Mr. Buckner did, so that would be an initial
7  approach that would be more cost effective.
8    Q.   And that hundreds of thousands of dollars
9  for each model that's not readily available would
10  apply obviously if you wanted to test -- you know,
11  that applies to each build, meaning you don't get any
12  benefit from using the -- expanding the money to
13  build a particular model, that's not going to help
14  you if you wanted to test another vehicle that was
15  not readily available and free, true?
16    A.   So there might be some common modeling
17  elements you could use.  But, yeah, there is -- you
18  know, if a vehicle has unique characteristics and
19  those characteristics are important to what you are
20  trying to model, then you would have to update the
21  model to reflect that.
22    Q.   You mentioned earlier that you had
23  referenced the -- the build book for the F-250 from
24  Ford.  Do you remember that?
25    A.   That's right, the Body Builder Layout

Page 149

1  Book.  Yeah.
2    Q.   Right, Body Builder Layout Book.  Do you
3  recall whether that book indicated any factory
4  recommended frame height for a 2016 F-250?
5    A.   Well, it doesn't make recommendations.
6    Q.   Okay.  So it doesn't have in it any
7  specific value for the height of the frame on a 2016
8  F-250?
9    A.   Well, it provides reference data, such as
10  dimensions, so it will tell you what the frame height
11  is.
12    Q.   But it doesn't have in it any recommended
13  frame height for operation of the vehicle?
14         MS. CANNELLA:  Object to form of the
15  question, asked and answered.
16         THE WITNESS:  The frame height is what it
17  is.  They are just telling you what it is, how
18  they engineered it to be.
19    Q.   (By Mr. Hill)  Right.  Is there a
20  different body build book for each different trim?
21    A.   So not trim level.  But as I explained
22  earlier, depending on the different cab, bed, drive
23  configuration, it lists -- it lists those.
24  Obviously, the 2016 F-250 owners manual does talk
25  about lift kits specifically and that they shouldn't

38 (Pages 146 - 149)

Christopher D. Roche                                        February 1, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 150

1  be used.
2      Q.   Well, we will skip to that.  Pull up your
3  report here where you mention that.  This is page 24
4  of your report, Bryson 1410, second to last paragraph
5  you quote from the handbook.  And it says:  The
6  suspension and steering systems have been designed
7  and tested to provide predictable performance whether
8  loaded or empty.  For this reason, we strongly
9  recommend you do not make modifications such as lift
10 kits.
11         Is that what you are referring to?
12     A.   Yeah.  You truncated that paragraph, but
13 that's what I'm referring to.
14     Q.   Yeah.  Just trying to catch the essence of
15 it.  I didn't mean -- if you want to quote it in
16 full, you can.
17         Do you know whether you can buy a brand
18 new Ford off of a Ford dealer with a lift kit
19 installed?
20     A.   So the purpose of my study here was to
21 look into the subject 2016 Ford F-250, and I didn't
22 do a survey of what you can and cannot buy from a
23 Ford dealer.
24     Q.   Okay.  Well, you made the comment here
25 that you believe Ford does not authorize the

Page 151

1  installation of lift kits on their vehicles.  So
2  relevant to that opinion would be what knowledge do
3  you have of Ford's interaction with lift kit
4  installers and/or its dealers with regard to lift
5  kits?  So my question is, I guess, the only source
6  you have since you didn't look into it to make the
7  opinion that lift kits are not allowed on Ford
8  vehicles would be this one statement from the owners
9  manual; is that fair?
10         MS. CANNELLA:  Object to the form of the
11     question, misstates his testimony, conflates
12     Ford and Ford dealerships.  It's a compound
13     question, and I object to the colloquy, the
14     prelude.
15         MR. HILL:  Well, I tried to make it
16     simple.  I tried to ask one question.  So answer
17     it if you can.
18         MS. CANNELLA:  What is the question?
19         MR. HILL:  The question is:  Does he have
20     any source for his opinion that Ford does not
21     recommend lift kit installations other than this
22     quote from the owners manual?
23         THE WITNESS:  Yeah.  I mean, Ford told
24     every owner of the 2016 Ford F-250 not to buy a
25     lift kit, so that was provided in the handbook

Page 152

1  to every person that bought the vehicle.
2      Q.   (By Mr. Hill)  Right.  And the only source
3  for your opinion that Ford told customers that is the
4  handbook?
5      A.   That's what I've used for the basis of
6  that statement, yes.
7      Q.   Okay.  And so you are not aware of any
8  Qualified Vehicle Modifier Program that Ford may have
9  had in place that addressed that issue?
10         MS. CANNELLA:  Object to the form of the
11     question.  It's vague and unclear which Ford you
12     are talking about.
13         THE WITNESS:  Yeah, I've not investigated
14     the practices of Ford dealerships or Ford
15     upfitters.
16     Q.   (By Mr. Hill)  Well, I'm not talking about
17 dealerships or upfitters.  I'm talking about Ford
18 itself, the OEM.  As we sit here today, you are not
19 aware that they -- Ford itself had a Qualified
20 Vehicle Modifiers Program that addressed the issues
21 of modifications to their vehicles?
22         MS. CANNELLA:  Object to the form of the
23     question.  Which modifications are you talking
24     about?
25         MR. HILL:  Any modifications.  That's what

Page 153

1  I'm talking about.  It's a Qualified Vehicle
2  Modifiers Program.  It dealt with outside
3  companies that performed modifications to Ford
4  vehicles.
5          THE WITNESS:  Yeah, I'm familiar with QVM.
6      Q.   (By Mr. Hill)  Are you familiar with
7  Ford's QVM program?
8      A.   Yeah, I've -- I've worked on the program
9  that looked at engaging with a Ford product and a
10 modification of it.
11     Q.   And what was that modification?
12     A.   Well, so the idea of that was to take the
13 Ford E-450 and -- as a chassis cab and to build a
14 small shuttle bus, which is typically done by a
15 number of different upfitters.
16     Q.   And what was your interaction with the QVM
17 program in connection with that E450?
18     A.   So we requested to become -- to gain
19 access to the necessary Ford product data to be able
20 to use it as a basis for the vehicle we had in mind.
21 And so there's a process to register and become a
22 recipient of much more detailed engineering data,
23 including Ford vehicle cab data, for example, and so
24 that's -- that's really the interaction I've had with
25 QVM is getting additional data from them in a role

39 (Pages 150 - 153)

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 154

1  that I performed back in -- this was around 2020.
2      Q.   Did any representatives from Ford's QVM
3  program actually visit your manufacturing facilities?
4      A.   Yes.  The work I was doing was at an early
5  stage before we had manufacturing facilities, so it
6  was an engineering office.  And yes, we had some
7  interaction with a representative from QVM because
8  they wanted to understand a little bit what we had in
9  mind for the vehicle and, you know, what their plans
10  were for the platform, things of that nature.
11     Q.   And did you have to actually go through
12  any type of qualifying or certifying process in order
13  to get the assistance from the Ford QVM program?
14     A.   For the initial data access, no, not very
15  much.  It was just a request in telling them who we
16  were and what we intended to do with it.  It was
17  fairly straightforward.
18     Q.   Did you ever go forward with production of
19  that modified E-450?
20     A.   No, not while I was with the company that
21  was working on it.
22     Q.   All right.  And do you know whether after
23  you left, they went forward with production of that
24  vehicle?
25     A.   I don't know what the status is of that

Page 155

1  vehicle at this time.
2      Q.   All right.  Is that your only interaction
3  with the Ford QVM program?
4      A.   Yeah, I think so.
5      Q.   Okay.  Have you ever known about
6  representatives of the Ford QVM program coming to any
7  of the manufacturing facilities of the companies you
8  worked with to audit the manufacturing process?
9      A.   Yeah.  My understanding was that if, you
10  know, I'd still been with the company -- the company
11  in question is Optimal -- if we had got to the stages
12  while I was there establishing a manufacturing line
13  and started actually building vehicles, then there
14  would have been, you know, further stages with the
15  Ford QVM team.
16     Q.   You haven't investigated in this case
17  whether the Ford QVM team interacts at all with
18  either lift kit manufacturers and/or converters or
19  upfitters; is that correct?
20     A.   So the deposition I was provided of a
21  representative from Rough Country stated there had
22  been no communication with the OEM.
23     Q.   And that's for Rough Country.  But I'm
24  curious if you heard of any QVM interactions with,
25  let's say, the converters or upfitters that install

Page 156

1  lift kits?
2      MS. CANNELLA:  Object to the form of the
3  question.  There is no evidence in this case
4  that upfitters installed lift kits.  Is that
5  what you are suggesting, Mr. Hill?
6      MR. HILL:  Yeah.  There is thousands of
7  individual garages -- there is 40 within ten
8  miles of where I'm sitting -- that install lift
9  kits and they are --
10     MS. CANNELLA:  This is -- this is the
11  problem with these questions.  It sounds like
12  you are asking him about qualified QVMs and now
13  you are talking about all lift fit installers.
14  Are you suggesting there is qualified QVMs that
15  install lift kits?
16     MR. HILL:  Your speaking objections are
17  improper, first of all, Tedra.  I've given you a
18  lot of leeway on that.  This is a simple
19  question.  Let me rephrase it.  There is a --
20     MS. CANNELLA:  They are not speaking
21  objections, Mr. Hill.  I'm trying to --
22  struggling to understand what it is you're
23  getting at with him.  And, you know, I'm trying
24  to tell you what the foundation of my objection
25  is so you can fix it.

Page 157

1      MR. HILL:  Well, I haven't asked for that,
2  and we haven't heard the witness say that he
3  didn't understand the question.  So it's very
4  simple.  It's very simple.  He has said that he
5  is aware that QVM representatives from Ford
6  would interact with people within his industry.
7  And he explained his interactions and he
8  explained that he is aware that if he had gone
9  to a manufacturing process, that they would have
10  been involved then.
11     And my question is:  Does he have any
12  knowledge of that same type of interaction
13  between Ford QVM representatives and the
14  companies that serve as converters and upfitters
15  of aftermarket lift kits?
16     MS. CANNELLA:  So representatives who work
17  for Ford or representatives who work for QVM
18  talking to outfitters?
19     MR. HILL:  They are the same thing.  It's
20  Ford's Quality Vehicle Modifier Program.  And I
21  think the witness understands that.
22     Q.   (By Mr. Hill)  So, Mr. Roche, can you
23  answer the question?
24     A.   Yeah, so my experience with QVM was when I
25  was working for an engineering firm and we were

40 (Pages 154 - 157)

Christopher D. Roche                                   February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 158

1 looking at modifying a Ford product. In terms of
2 interactions with companies that fit lift kits, such
3 as the one that Rough Country produces, I have no
4 direct experience with that and I did not investigate
5 that as part of this -- this study.
6   Q.   Thank you.
7       MR. HILL:  See, Tedra, he clearly
8   understood the question.
9       MS. CANNELLA:  I still don't understand
10  because the qualified vehicle modifier, that's
11  another company.  The modifiers are other
12  companies.  They are not Ford.
13      MR. HILL:  No.  I'm talking about the QVM
14  program, not actual certified modifiers.
15      MS. CANNELLA:  That's why I objected to
16  the question because it wasn't clear to me.
17      MR. HILL:  He understood it, so . . .
18      Since you brought it up, I will mention
19  that, okay?
20  Q.   (By Mr. Hill) So have you investigated
21  whether the Ford QVM program ever certified or
22  approved of certain converters or uplifters to be
23  considered a qualified vehicle modifier?
24  A.   In the course of my work on this case, I
25  did not.

Page 159

1   Q.   Okay.  In the example you gave of your
2   interaction with QVM representatives, was it your
3   understanding that those representatives were acting
4   on behalf of Ford and would communicate to Ford the
5   modifications that you were intending to make to that
6   E-350 [sic]?
7       MS. CANNELLA:  Object to the form of the
8   question as vague and unclear.
9   Q.   (By Mr. Hill) Go ahead.
10  A.   The discussions that I mentioned earlier
11  were at an early stage and most of them related to
12  gaining access to Ford data.  And the program was in
13  its infancy when I left, and so more detailed
14  discussions in terms of the interactions between QVM
15  and Optimal were not part of my priority at that
16  time.
17  Q.   Okay.  So if I can sum up your testimony,
18  you are not aware of any Ford QVM-approved converters
19  or uplifters in the lift kit industry, as we sit here
20  today?
21  A.   Yeah, so my experience with vehicles
22  modified and blessed by QVM relates to things like
23  shuttle buses where the fundamental chassis cab was
24  unmodified.
25  Q.   That's the limit of your knowledge

Page 160

1 regarding the QVM program, you are saying, other than
2 what you personally were involved with?
3   A.   As we have this discussion today, yeah,
4 those are the examples I can think of at this time.
5   Q.   All right.  All right.  Let's jump then
6 quickly to what we have just been talking about as
7 far as your knowledge of the lift kit industry.  Did
8 you do any research regarding the number of companies
9 in the U.S. that sell lift kits?
10  A.   I didn't do research related to lift kit
11 providers through the course of this case, no.
12  Q.   So you don't know how many lift kit
13 manufacturers exist in the U.S. market?
14  A.   That wasn't my objective from studying
15 this particular crash.
16  Q.   And what about the companies I was just
17 mentioning that specialize in installing the
18 aftermarket lift kits?  And I've defined them as
19 converters, which are the ones that install these
20 lift kits on a bailment agreement directly from Ford
21 to be sold as new vehicles by Ford dealers.  Did you
22 do any research to gain any knowledge about the
23 numbers of companies that exist in the U.S. that
24 serve as converters?
25      MS. CANNELLA:  Object to the form of the

Page 161

1       question.  Madam Court Reporter, could you read
2       it back, please?
3       (Testimony read.)
4       MS. CANNELLA:  I'll object to the form of
5   the question in that it assumes that lift kit
6   installers have been approved by Ford to the
7   extent it suggests that.
8   Q.   (By Mr. Hill) Go ahead, you can answer.
9       MS. CANNELLA:  Assumes facts not in
10  evidence.
11      THE WITNESS:  The focus of my work was to
12  understand the behavior of the F-250 with the
13  fitted Rough Country lift kit, not how it was
14  fitted.
15  Q.   (By Mr. Hill) Okay.  So you can -- can
16  you name a single converter that installs Rough
17  Country lift kits?
18  A.   I don't think so.
19  Q.   And so you don't have any knowledge as to
20  whether any of those converters have been qualified
21  or approved by Ford's QVM program?
22  A.   That's correct.
23  Q.   Okay.  And can you name a single lift kit
24  manufacturer other than Rough Country?
25  A.   So I did look at some of the manufacturers

41 (Pages 158 - 161)

Christopher D. Roche                                February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 162

1 of lift kits, but -- during an initial survey, but I
2 don't recall their names at this time.
3     Q.    Do you know how many others you've looked
4 at?
5     A.    Yeah. I mean, it was certainly a handful.
6     Q.    And what did you look -- what did you do?
7 When you say you looked into them, tell me what you
8 did to look into them.
9     A.    Just trying to understand who else produce
10 lift kits for the subject truck 2016 F-250.
11     Q.    Did your investigation into these other
12 companies involve looking at the components of their
13 lift kits for the 2016 F-250?
14     A.    Not in particular detail, no.
15     Q.    Is there any lift kit company other than
16 Rough Country where you examined in detail the design
17 and/or component contained in any of their lift kits?
18     A.    The focus of my investigation was Rough
19 Country's design of their lift kits.
20     Q.    So is the answer to the question no, that
21 you didn't look into the specific design of the lift
22 kits produced by any other lift kit manufacturers?
23     A.    Again, so based on my research early on in
24 this case, it was not evident to me that -- I didn't
25 look at the detail of the parts, so I'm going to end

Page 163

1 my answer there.
2     Q.    So the answer is no, that you did not
3 examine in detail the parts or components of any lift
4 kits manufactured by companies other than Rough
5 Country?
6     A.    I looked at different Rough Country kits,
7 but not from, in detail, kits from other
8 manufacturers.
9     Q.    Okay. So you don't know whether any other
10 manufacturers provide SEAS brackets with their lift
11 kits?
12     A.    Those manufacturers didn't produce the kit
13 that was fitted to the subject vehicle.
14     Q.    Well, that's not my question. The
15 question is: Are you aware of any manufacturers of
16 lift kits that provide SEAS brackets in connection
17 with any of their lift kits?
18     A.    As I described, I haven't looked at those
19 components in detail, so the answer is no, I don't
20 know if they produced modified SEAS brackets.
21     Q.    And by extension, you don't know if any of
22 these other manufacturers add any features to their
23 lift kits to ensure compliance with the EVC criteria?
24     A.    Yes. I would have to look at each
25 manufacturer in turn of the kits they produce for a

Page 164

1 2016 F-250 to make that determination.
2     Q.    And you haven't done that in this case?
3     A.    Well, it wasn't necessary to do a survey
4 of every lift kit manufacturer. The lift kit in
5 question is Rough Country and what did Rough Country
6 do in this case.
7     Q.    Well, you are opining regarding the
8 industry standard and whether Rough Country's lift
9 kit violated that standard of care. But you just
10 acknowledged that your inquiry was limited solely to
11 Rough Country's lift kit and that you did not
12 research or make any determination with regard to
13 what the standard of care in the industry is.
14        MS. CANNELLA: Object to form of the
15     question.
16        THE WITNESS: The standard of care I'm
17     referring to is what OEMs do to make their LTVs
18     comply with the EVC or safer for passenger car
19     compatibility.
20     Q.    (By Mr. Hill) So that is the extent of
21 your reference to the standard of care, is that your
22 opinion is that any lift kit produced by Rough
23 Country or any other provider of lift kits must match
24 the SEAS components of the original vehicle?
25        MS. CANNELLA: Object to the form of the

Page 165

1     question. It's confusing, misstates his
2     testimony.
3     Q.    (By Mr. Hill) Go ahead. You can answer.
4     A.    My opinion, as laid out on page 23 and 24,
5 is that a manufacturer of aftermarket parts should
6 perform, yeah, a safety analysis. They should
7 understand the baseline vehicle and its features and
8 whether or not their components will affect the
9 performance of that vehicle and its features,
10 specifically to safety.
11     Q.    Well, I'm not talking about the
12 engineering safety analysis. That's a whole
13 different topic. All right? I'm talking about your
14 knowledge of how the lift kit industry works. And I
15 think what we can conclude is that your knowledge of
16 the lift kit industry and the manufacturing of lift
17 kits is limited to your investigation of Rough
18 Country. Is that a fair statement?
19     A.    I couldn't quite make out the question in
20 that sentence there.
21     Q.    All right. The question is that -- I want
22 to confirm that you only investigated the details of
23 the lift kit in question manufactured by Rough
24 Country. You didn't look at or investigate the
25 details or design of any other lift kits manufactured

42 (Pages 162 - 165)

Christopher D. Roche                         February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 166

1 by other lift kit companies. That's fair, right?
2     A.   So I investigated the subject Ford Escape,
3 the subject Ford F-250, and the subject lift kit in
4 this case.
5     Q.   Right. I didn't ask you all the things
6 that you considered. I just wanted you to confirm
7 that you have not researched the design
8 characteristics of any lift kit other than the lift
9 kit involved in this case?
10    A.   And my response was related to the
11 complexity of three variables, multiple types of cars
12 that can be struck, multiple trucks that can strike
13 them, and then a multitude of aftermarket parts that
14 could be fitted to either.
15    Q.   But only with regard to this specific lift
16 kit involved in this case?
17    A.   I'm focused on the evidence and the
18 relevant vehicles and lift kits.
19    Q.   All right. Here's the question: If an
20 OEM like Ford has a QVM program, right, and that QVM
21 program is aware of converters installing lift kits
22 and actually goes to their facilities and audits
23 their manufacturing process, would you agree aren't
24 they essentially signing off that the standard of
25 care has been met by the lift kit manufacturers?

Page 167

1          MS. CANNELLA: Object to the form of the
2     question, assumes facts not in evidence.
3     Q.   (By Mr. Hill) Go ahead.
4     A.   I think that's an excellent question for
5 Ford if that's actually what's happening.
6     Q.   Let's assume that is what has occurred.
7 Let's just make that assumption. In that instance,
8 would you agree with my question, that the OEM has
9 essentially signed off on the standard of care of the
10 lift kits?
11         MS. CANNELLA: Object to form of the
12    question, incomplete hypothetical, assumes facts
13    not in evidence.
14    Q.   (By Mr. Hill) Go ahead.
15    A.   If I was working on a case where the focus
16 of it was to investigate a lift kit and how it had
17 been installed, then I would investigate the
18 pertinent details and form an opinion on that.
19 That's outside the scope of this particular instance
20 and I really have no opinion on that.
21    Q.   Okay. Because you haven't investigated
22 those issues as part of your involvement in this case
23 because you haven't looked beyond Rough Country's
24 manufacture of the specific lift kit in this case?
25         MS. CANNELLA: Object to the form of the

Page 168

1     question. It's argumentative and doesn't
2     reflect all of the other things he has
3     considered.
4     Q.   (By Mr. Hill) You can answer.
5     A.   I didn't hear a question.
6     Q.   I'll ask it a different way. If you
7 had -- the hypothetical is that if you had
8 investigated the lift kit industry and learned that
9 there is over a dozen lift kit manufacturers, over
10 eight or nine converters, and that the bulk of the
11 converters have been approved by Ford's QVM program,
12 would that change your opinion with regard to whether
13 Rough Country violated the standard of care in this
14 case?
15    A.   As I stated earlier, in my opinion, the
16 standard of care is that LTVs should be designed to
17 be compatible with other road vehicles. And the
18 subject lift kit in this case undermined the features
19 that Ford had applied to the base truck.
20    Q.   So if any lift kit manufactured by any
21 company violated the structural design or -- I can't
22 remember the exact term you used -- the safety
23 features of the original OEM design, then you would
24 consider that product to be defective and creating a
25 hazardous or dangerous condition?

Page 169

1          MS. CANNELLA: Object to the form of the
2     question, asked and answered many times,
3     misstates his testimony.
4          THE WITNESS: It's my opinion that as the
5     test data that Ford produced shows, raising the
6     vehicle ride height can result in the vehicle
7     having less safety for struck vehicles. Beyond
8     that, you need to look at the details of
9     whatever crash event occurs with whatever truck
10    and whatever lift kit is fitted to make a
11    specific decision and opinion.
12    Q.   (By Mr. Hill) Well, I think you just
13 testified that your standard of care analysis relates
14 to whether the lift kit modified the vehicle such
15 that it no longer has the safety characteristics of
16 the original design. That's what you said you used
17 as your analysis for whether the standard of care was
18 violated with the regard to the installation of a
19 lift kit. Have I misunderstood that in any way?
20    A.   Yeah, the standard of care is the baseline
21 vehicle performance having a margin relative to the
22 EVC to provide structural compatibility to passenger
23 cars.
24    Q.   And do you know of -- I'll scratch that.
25 Save that for later.

43 (Pages 166 - 169)

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 170

1      If it's on a case-by-case basis, could
2  there be situations where the modification of
3  installing a lift kit violates the EVC criteria but,
4  yet, the kit does not violate the standard of care?
5         MS. CANNELLA: Object to the form of the
6    question, incomplete hypothetical.
7    Q.   (By Mr. Hill) Go ahead.
8    A.   I would need to look at the details of
9  lift kit design and the baseline vehicle that it's
10 fitted to to form an opinion.
11   Q.   So it would be possible under that
12 scenario that there would be no breach of the
13 standard of care?
14        MS. CANNELLA: Object to the form of the
15   question, incomplete hypothetical.
16   Q.   (By Mr. Hill) Go ahead.
17   A.   Well, given it's a hypothetical, again,
18 you would look at the details of the lift kit, the
19 vehicle, and the distance from ground that the --
20 either the PEAS or the SEAS maintains and how it
21 compares to the EVC or the base vehicle condition.
22   Q.   What if the base vehicle condition did not
23 meet the EVC criteria, does the lift kit designer
24 have any obligation to go beyond the base safety
25 features of the original vehicle?

Page 171

1         MS. CANNELLA: Object to the form of the
2    question, incomplete hypothetical, beyond the
3    scope of his testimony.
4         THE WITNESS: This F-250 in its baseline
5    form met the EVC and exceeded it with the SEAS
6    bracket only 13 inches from the ground. That's
7    what I have to say on that.
8    Q.   (By Mr. Hill) So you are refusing to
9  answer the question, and it's a simple question. It
10 is: If the kit manufacturer is manufacturing a kit
11 for a vehicle that off the assembly line does not
12 meet the EVC requirements, does the kit manufacturer
13 have a duty to make the vehicle comply with EVC after
14 the lift kit is installed?
15        MS. CANNELLA: Object to the form of the
16   question. There is no evidence there is such a
17   truck. It's an incomplete hypothetical. It's
18   beyond the scope of his testimony here and he is
19   not a lawyer and I object.
20        MR. HILL: Well, he is testifying about
21   the standard of care and you don't have to
22   present -- this is a hypothetical, so you can
23   assume --
24        MS. CANNELLA: I'm not arguing with you.
25   I'm just telling you my objections. I'm stating

Page 172

1  for the record.
2    Q.   (By Mr. Hill) All right. Go ahead and
3  answer.
4    A.   The fundamental requirement here is to try
5  and improve vehicle compatibility. As we have
6  discussed, manufacturers, and Ford in this particular
7  case, attempted to make this truck safer for other
8  passenger vehicles.
9         In the case that Rough Country performed
10 its own testing on compatibility, they may conclude
11 that the benefits outweigh any perceived internal
12 costs or risks and they would come to that decision
13 themselves. Ultimately, we are looking to try and
14 improve safety between LTVs and passenger cars.
15   Q.   You keep referencing improving the
16 compatibility between LTVs and passenger cars. Do
17 you have any statistics that indicate actual
18 fatalities involving lifted LTVs?
19   A.   The statistic I can give you is yes in
20 this case.
21   Q.   So this is the one and only fatality that
22 you are aware of in a vehicle-to-vehicle crash
23 involving a lifted vehicle?
24   A.   There are -- there are challenges with
25 analyzing the FARS database in terms of whether or

Page 173

1  not there is accuracy in recording the modifications
2  or condition of the vehicles involved.
3    Q.   Is it true that the FARS database does not
4  track that specific information, meaning it does not
5  have a way to track whether any of the fatalities
6  listed in the database involved a lifted vehicle?
7    A.   I believe that's a correct statement.
8    Q.   Would there be any reason, given that
9  statement, for a lift kit manufacturer to monitor
10 FARS data considering the fact that they would not
11 know whether any of the fatalities in the database
12 involved their lift kits or anyone else's lift kits?
13   A.   Well, I think you need to step back and
14 look at the fundamental basis for the EVC, that the
15 incompatibility and structural alignment, whether
16 it's caused by the inherent OEM design or a lift kit
17 was causing increased fatalities.
18   Q.   But a lift kit manufacturer could not
19 determine from the FARS database, whether its lift
20 kits were contributing to any additional fatalities
21 based on the information in the database. Would you
22 agree with that?
23   A.   I think it's a relatively straightforward
24 deduction that a vehicle ride height can influence
25 safety -- a vehicle ride height of an LTV can

44 (Pages 170 - 173)

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 174

1 influence safety of a passenger car. But if you are
2 providing a kit that raises the ride height of that
3 vehicle, that you are probably contributing to some
4 of those fatalities.
5    Q.  But you say "probably." You won't know
6 for sure whether you are contributing to any of the
7 fatalities in the database?
8    A.  Well, that's where you need to go beyond
9 the database and you need to look at the detailed
10 research, which is -- some of which I reference in my
11 report where vehicle-to-vehicle or vehicle-to-barrier
12 testing was done and shown that ride height is an
13 important factor in LTV to passenger car
14 compatibility.
15    Q.  My question relates solely to the FARS
16 database. It's not going beyond the database, so now
17 you've said they should go beyond the database. I
18 understand that. That's a different point. My
19 question is: Can you cite to any benefit to a lift
20 kit manufacturer monitoring the FARS database when
21 that database does not contain any information
22 related to their lift kits?
23    A.  Well, I would recommend that the lift kit
24 manufacturer look at fatalities involving LTVs and
25 passenger cars and then burrowing down further into

Page 175

1 the data by looking at specific examples.
2    Q.  How would they look at specific examples?
3 What do you mean by that?
4    A.  Well, so, for example, the papers that are
5 being issued and produced related to vehicle
6 compatibility that talk about either
7 vehicle-to-barrier or vehicle-to-vehicle tests.
8    Q.  And we have just talked about earlier in
9 the deposition that none of those papers lead to a
10 specific conclusion that there is statistical proof
11 that lifted vehicles that comply with the EVC have
12 contributed to any increase in the rate of
13 fatalities. We have already established that. You
14 can agree with that, correct?
15    MS. CANNELLA:  Object to the form of the
16    question, misstates the evidence and misstates
17    his prior testimony.
18    Q.  (By Mr. Hill) Go ahead.
19    A.  Well, I would like to still review the
20 presentation that Ford gave to NHTSA in 2007 that
21 shows that there is statistical evidence that the
22 fitment of the blocker beam to their vehicles reduce
23 fatality rates.
24    Q.  Anything beyond that one presentation by
25 Ford to NHTSA that you would agree NHTSA disregarded

Page 176

1 in publishing its evaluation in May 2012 of the EVC
2 program?
3    MS. CANNELLA:  Object to the form of the
4    question. It's compound and misrepresents the
5    evidence.
6    Q.  (By Mr. Hill) Go ahead.
7    A.  Well, there is the IHS findings as well
8 that supported and concluded that the EVC had been
9 beneficial in reducing the aggressivity of LTVs.
10    Q.  What is the specific date of that IHS
11 document you are referring to; do you know?
12    A.  Yeah, let me find it. It is September
13 2011.
14    Q.  All right. So it is prior to the issuance
15 of NHTSA's evaluation of the EVC, correct?
16    A.  There's a disagreement in the assessment
17 between the IHS and NHTSA, that's not uncommon.
18    Q.  Right. This is the same IHA [sic] study
19 that we talked about earlier that NHTSA addressed in
20 their May 2012 evaluation, correct? That's the same
21 one you're talking about?
22    A.  Yes, it was -- it stated that it's likely
23 that a large factor in the reduced aggressivity of
24 light trucks is the increased adherence with the EVC
25 compatibility design guidelines.

Page 177

1    And the IHS does a good job in
2 communicating safety issues to the wider public.
3    Q.  The question was simply, is that -- we are
4 talking about the same report that NHTSA discussed in
5 its paragraph 4 discussion on page 13 of the May 2012
6 evaluation? We are not talking about anything
7 different?
8    A.  That's right. NHTSA touches on the IHS
9 findings, and they clearly disagree.
10    Q.  Right. That's all I was trying to
11 establish, that it was the same findings.
12    A.  Well, the last line in the IHS report is:
13 The result is that lives are being saved through the
14 EVC agreement.
15    Q.  Right. And what statistic did they point
16 to to support that comment?
17    A.  They looked at death rates for passenger
18 vehicles that were between one and four years old
19 between the years of 2000-2001 and 2008-2009.
20    Q.  And they did not in that analysis
21 differentiate in any way vehicles with lift kits
22 versus LTVs without lift kits?
23    A.  No. They are looking at vehicle ride
24 heights and aggressivity rates.
25    Q.  Right. And none of these studies that we

45 (Pages 174 - 177)

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 178

1 talked about, the IHS, NHTSA, any of these studies
2 differentiate or single out LTVs with lift kits
3 installed as part of their analysis; is that fair?
4     A.   They talk about the challenges of
5 dissimilar structural heights, which can occur either
6 through the OEM design or through the fitment of a
7 lift kit, analyzing statistics related to LTVs and
8 passenger cars.
9     Q.   Right.  But they don't differentiate
10 statistics based upon LTVs with lift kits versus LTVs
11 without lift kits?  That's all I'm trying to
12 establish.
13    A.   Yeah.  They don't make that distinction,
14 but clearly they're linking ride heights with or
15 without additional structural features with death
16 rates.
17    Q.   Let's turn now to the Engineering Safety
18 Analysis section of your report.  I can put it up on
19 the screen if you need to see it.  I'm happy to do
20 that.  I believe it starts at the bottom of page 23
21 where you discuss or say that Rough Country should
22 have conducted a thorough engineering safety
23 analysis.
24         Describe for me exactly what you are going
25 to say Rough Country should have done as part of the

Page 179

1 quote, thorough engineering safety analysis?
2     A.   Sir, in my experience as an engineer, new
3 designs are scrutinized using something called a
4 DFMEA process.  Safety analysis is a slight easier
5 term.
6     Q.   Right.
7     A.   DFMEA stands for design failure mode and
8 effects analysis.  So this is where the engineers
9 involved with the design will consider possible
10 failure modes, possible safety issues relative to
11 their design.  And they will go through a structured
12 process of evaluating the failure mode, the severity
13 of it, the likely frequency of it occurring.  And for
14 identified failure modes that are severe based on
15 that criteria, they will look to modify the design to
16 eliminate that failure mode or mitigate against it.
17    Q.   How would they identify that failure mode?
18    A.   You consider the design, its
19 functionality, how it -- so in this particular case,
20 how it modifies the vehicle, how it modifies the
21 vehicle performance, how it might change the way the
22 vehicle interacts with the world around it.
23    Q.   Is there any evidence in this case that
24 the lift kit itself failed to perform as designed,
25 meaning did it impact the performance stability, all

Page 180

1 that, of the F-250?
2         MS. CANNELLA:  Object to the form of the
3     question as vague.
4         THE WITNESS:  I don't think I can say what
5     the lift kit was designed to do based on the
6     documentation that Rough Country provided.
7     Q.   (By Mr. Hill)  So have you determined what
8 the utility aspects of lift kits are, meaning -- you
9 know, you said you don't know what the point of it
10 is.  Have you looked into the utility benefits of
11 lift kits?
12         MS. CANNELLA:  Object to the form of the
13     question, misstates his testimony.
14         THE WITNESS:  Yeah.  My point was that I
15     would have expected Rough Country to develop a
16     document that details the performance objectives
17     of the lift kit, what it's designed to do, how
18     it's supposed to improve the utility of the
19     truck themselves as they developed the design of
20     the lift kit.  I didn't see any such production.
21    Q.   (By Mr. Hill)  So you were saying that you
22 would have expected to receive a document from Rough
23 Country that would detail all of the utility benefits
24 of the subject lift kit?
25         MS. CANNELLA:  Object to the form of the

Page 181

1     question.  That misstates his testimony.
2     Q.   (By Mr. Hill)  Go ahead.
3     A.   So my experience in engineering starts
4 with process for developing a design.  It starts with
5 identifying what it is you are trying to do, who your
6 target customer is, what the performance objectives
7 are, how you are going to manufacture it, what the
8 expected cost of it is going to be, so a high level
9 document that describes what it is you are going to
10 do and how you are going to do it.  And then you
11 would develop target documents relative to that
12 product.  So, for example, in a car, it's my
13 experience that you would develop something called a
14 DVP&R, Design Verification Plan and Report.  These
15 are all of the requirements that the assembly has to
16 satisfy, all the tests, all the performance criteria.
17 And that's documented.  And then you engineer to meet
18 it and test to whether or not you satisfy that.  I
19 don't see either a DFMEA or a DVP&R from Rough
20 Country.
21    Q.   All right.  Your entire DFMEA analysis is
22 dependent upon the identification of a failure mode
23 that needs to be addressed; is that fair?
24    A.   That's right.  I'm sorry.
25         MS. CANNELLA:  Object to the form of the

46 (Pages 178 - 181)

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 182

1    question as vague.
2         MR. HILL:  He said "that's right".
3    Q.  (By Mr. Hill)  In this case, what is the
4    failure mode in your opinion that Rough Country
5    failed to analyze?
6    A.  The failure mode is related to the
7    baseline vehicle, so it's understanding what's being
8    modified with their lift kit.
9    Q.  I'm not sure I understand that.  So the
10   failure mode is that the lift kit did not leave the
11   vehicle in its exact original design, what do you
12   mean by that?
13   A.  I mean that you need to understand the
14   base product you are modifying, what are the features
15   on it, what is the purpose of those features, and how
16   will the lift kit change the performance of those
17   features.  So specifically the SEAS brackets, so what
18   was the -- did Rough Country try to understand what
19   the purpose of the SEAS bracket was, why it had been
20   engineered the way it had been, what its function was
21   and how their lift kit would affect it.
22   Q.  Is there any other -- just so we can rule
23   it out, any other failure mode that you allege Rough
24   Country failed to identify other than what you just
25   described?

Page 183

1    A.  If you follow the process properly with
2    the right engineering team, you would identify many
3    potential failure modes.
4    Q.  Yeah, but I'm talking about were there any
5    other failure modes relevant to this case?
6         MS. CANNELLA:  Object to the form of the
7    question as vague.
8         THE WITNESS:  Yeah.  So on page 24, I do
9    describe another one of those.  So it could have
10   potentially affected the airbag performance of
11   the vehicle.  We know that the driver's airbag
12   didn't deploy.  It wasn't commanded to deploy.
13   The delta-V was about 18 miles per hour
14   unadjusted for the tire size.  And from airbag
15   deployment thresholds, we know that the
16   probability of deployment for that type of
17   delta-V was 80 percent.  So it was more likely
18   than not that it should have deployed.
19   Q.  (By Mr. Hill)  Let's talk about that real
20   quick so we can knock that out.  You are talking
21   about the airbag in the F-250, not the airbag in the
22   Escape, correct?
23   A.  That's right.
24   Q.  So airbag deployment in the F-250 would
25   have no impact whatsoever on the injuries suffered by

Page 184

1    the occupants of the Escape, correct?
2    A.  That's right.  It's only relevant for the
3    driver of the F-250.
4    Q.  Are you aware from the EDR download from
5    the F-250 that there was a fault code attributed to
6    the airbag at the time of the incident?
7    A.  I'm aware there is a fault code.  I didn't
8    see that it was, and my research didn't indicate,
9    that it was specific to the airbag.
10   Q.  But you did research the fault code?
11   A.  Yes, because it was on the EDR report.
12   Q.  And what was it specific to, in your
13   opinion, if not the airbag?
14   A.  An electronic fault of some type.  It was
15   nonspecific.  We can see from the EDR data that
16   the -- that the airbag, the restraint control module,
17   was functioning, was recording data, recorded the
18   pre-crash data, recorded the delta-V and recorded the
19   pulse and it elected not to deploy the airbag.
20        Now, if we -- if we were seeing the report
21   telling us that the airbag should have fired and in
22   which case it didn't, then that would suggest that
23   there was some failure or fault in the system.
24   Q.  All right.  And the statistics you rely
25   upon that come from the NASS data, they do say

Page 185

1    there's a 20 percent chance, even using your
2    statistics, that the airbag would not deploy in this
3    crash and not due to a malfunction, but just a 20
4    percent chance that this crash would not trigger an
5    airbag deployment?
6         MS. CANNELLA:  Object to the form of the
7    question.  Do you mean this delta-V?
8    Q.  (By Mr. Hill)  Right.  Based upon his own
9    analysis, based upon the delta-V of 18 miles per
10   hour, you indicate there would be an 80 percent
11   chance it would deploy, which means there would be a
12   20 percent chance it wouldn't deploy absent a
13   malfunction, correct?
14   A.  Yeah.  I'm saying the probability of
15   deployment, based on that SAE paper, was 80 percent.
16   So eight out of ten times, four out of five times,
17   the bag would have been expected to deploy for that
18   delta-V.
19   Q.  Right.  Do you have any specific evidence
20   that the airbag failed to deploy in the F-250 because
21   of the Rough Country lift kit?
22   A.  We know that the restraint control module
23   did not request deployment based on that delta-V.
24   And 80 percent of similar crashes, deployment is
25   commanded.

47 (Pages 182 - 185)

Christopher D. Roche                February 1, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 186

1    Q.   Right.  So that statistical analysis is
2  the only evidence that you have that the airbag
3  failed to deploy due to the lift kit?
4         MS. CANNELLA:  Object to the form of the
5    question, misstates his opinions.
6    Q.   (By Mr. Hill)  I'm trying to figure it
7  out, so answer if you can.
8    A.   Yeah, I'm not -- my opinion is that it's
9  more probable than not that the bag would have
10 deployed in that type of event, and it did not
11 deploy.  That's my opinion.
12   Q.   That's the extent of your opinion
13 regarding the airbag?
14   A.   At this time, yes.
15        MR. HILL:  Okay.  All right.  I've got to
16   use the restroom.  We have been going a little
17   over an hour.  Let's take a five-minute break.
18   I'll try to be quick when we come back.
19        MS. CANNELLA:  Great.
20        MR. HILL:  Thank you.
21        THE VIDEOGRAPHER:  The time is 3:59 and we
22   are off the record.
23 (Recess taken from 3:59 p.m. to 4:14 p.m.)
24        THE VIDEOGRAPHER:  The time is 4:14.  We
25   are back on the record.

Page 187

1    Q.   (By Mr. Hill)  Thanks.  One thing I want
2  to just clarify because I think you answered it but I
3  wasn't sure, and it's kind of a "yes" or "no"
4  question, and that is:  Did you examine and analyze
5  any lift kits other than the lift kit involved in
6  this accident?  Kind of "yes" or "no".
7    A.   I examined the lift kit in this accident.
8    Q.   So the answer is no, you did not examine
9  any other lift kits other than the one involved in
10 this accident?
11   A.   In this case, that's correct.
12   Q.   Okay.  We were talking about the
13 engineering safety analysis, and I think you said the
14 first step in that is to identify a failure mode?  We
15 talked about the airbag.  Would you agree that the
16 airbag, quote/unquote, failure mode is not relevant
17 to the injuries suffered by Cohen Bryson in this
18 case?
19   A.   Yeah.  I would agree that the airbag in
20 the F-250 would not have influenced the intrusion of
21 the survival space for Cohen Bryson.  That is
22 correct.
23   Q.   Right.  And so the one failure mode that
24 you have described that would affect the intrusion
25 into the passenger space is the -- and I think you

Page 188

1  described it as recognition that the kit modified the
2  SEAS that was installed on the original version of
3  the F-250.  Is that a fair way to describe that?  I
4  was kind of confused when you were describing the
5  failure mode.
6    A.   The failure mode, more succinctly, is that
7  it undermined the safety features of the F-250.
8    Q.   And the way it undermined the safety
9  features is by raising the SEAS above the original 13
10 inches above the ground height of the SEAS.  Is that
11 how it undermined the safety features of the original
12 vehicle?
13   A.   Well, and in context of the EVC saying the
14 SEAS should be no higher than 16 inches.  So not only
15 did it raise it from the original vehicle's height,
16 but it took it beyond the recommended height for a
17 SEAS based on the EVC.
18   Q.   Right.  So it undermined the safety of the
19 original vehicle by raising the SEAS above the
20 16-inch limit required to meet the Option 2 criteria
21 of the EVC.  Is that a good way to describe the
22 failure mode?
23   A.   That's an example of one failure mode that
24 I've given you in response to your question, yes.
25   Q.   Okay.  Is there any other failure modes

Page 189

1  that relate to the intrusion into the occupancy space
2  of the Escape as you've mentioned?  Any other failure
3  modes that relate to that aspect of the case?
4    A.   Well, so the purpose -- the purpose of a
5  failure mode is to -- is to review the design intent
6  with the relevant engineers.  The process doesn't
7  involve doing it on the spot in a deposition.  So I'm
8  not going to try and list all the failure modes.  My
9  point -- my opinion is that Rough Country should have
10 done that.  Rough Country has seemingly not done
11 that, and that's my opinion.
12   Q.   So you haven't performed an engineering
13 safety analysis that would identify any additional
14 failure modes, and you can't do it as we sit here in
15 a deposition, but you are saying that Rough Country
16 might have discovered other failures modes had they
17 done that type of analysis; is that fair?
18        MS. CANNELLA:  Object to the form of the
19   question, misstates his testimony.
20        THE WITNESS:  Yeah, my opinion as laid out
21   in the report is that the developer,
22   manufacturer, and retailer of the lift kit,
23   Rough Country, should have followed a safety
24   analysis process, which is what I've done when
25   I've engineered parts or vehicles in my career.

48 (Pages 186 - 189)

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 190

1    Q.   (By Mr. Hill)  Right.  And I'm trying to
2  get what exactly should -- you said the first step of
3  that would be to identify failure modes?
4    A.   That's correct.
5    Q.   Okay.  What's the next step?  Ask it that
6  way.  Should they then run simulations, run actual
7  crash testing?  You know, what's the next step after
8  they have identified a failure mode?
9    A.   So I think I mentioned earlier, so you
10  identify all the potential failure modes, so it could
11  be related to things that don't have anything to do
12  with this particular crash scenario.  For example,
13  other loads from the suspension to the frame
14  increased and, therefore, could you see a failure at
15  the attachment point, and so on and so forth.  You
16  work through the system that you've developed and how
17  it interacts with the rest of the vehicle and you
18  work through all of the potential failure modes.
19       So to answer what your next steps are, as
20  I described earlier, there's a criticality, so you
21  assign severity, frequency, and you then identify
22  what your highest risk failure modes are, and then
23  you work to either look at design solutions to
24  mitigate them; or if you want to, you could then
25  understand the severity or, if you don't understand

Page 191

1  it, and by testing.
2    Q.   Okay.  One way for a company to become
3  aware of failures like you just mentioned, failure
4  modes, you mentioned a structural integrity of the
5  lift and whether it might break in operation, right?
6  I think that's what you are referring to.  You said
7  that could be a failure mode that would be
8  identified, right?
9    A.   That's an example of one, yes.
10    Q.   Right.  And do you know how long Rough
11  Country has been making lift kits?
12    A.   No, I don't.
13    Q.   Okay.  Do you know how many lift kits
14  Rough Country has sold?
15    A.   I believe I did review that, and I know
16  that Rough Country does a lot of business in lift
17  kits, so I imagine it's many thousands.
18    Q.   Right.  And let's say it's been hundreds
19  of thousands over the 40-year history of the company.
20  Do you have any knowledge that they have ever been
21  notified of any failure -- structural failure in any
22  of their lifts like you just mentioned that would
23  indicate they would have a failure mode to analyze?
24  Are you aware of any time that's ever happened?
25       MS. CANNELLA:  Object to the form of the

Page 192

1  question, foundation and mischaracterizes what
2  he is saying and what a failure DFMEA is.
3    Q.   (By Mr. Hill)  You can answer the
4  question.
5    A.   Yeah.  So what I'm talking about is a
6  process early in the design stage where you try to
7  identify potential failure modes.  What you are
8  talking about is actual field failures where you are
9  responding to issues that are in the marketplace.
10    Q.   Right.  And I'm saying that if you've
11  never had a failure in the marketplace, was there any
12  consequence, assuming that when it was originally
13  designed there was not an analysis to uncover failure
14  modes?
15       MS. CANNELLA:  Object to the form of the
16       question as confusing and not at all what you
17       were saying.
18    Q.   (By Mr. Hill)  Well, explain it to me.
19       MS. CANNELLA:  Explain what to you?  I'm
20       sorry.
21    Q.   (By Mr. Hill)  Explain to me -- you are
22  talking about this hypothetical world where you sit
23  down before you design a product and you try to
24  bullet point any and all possible mythical ways the
25  product could fail and then you have to do this big

Page 193

1  analysis, which might lead to testing.  But if you
2  build the product and you have 40 years of experience
3  with the product and it hasn't failed ever in any way
4  structurally or failed to perform as it is designed,
5  what's the impact or relevance of a failure analysis
6  like you just have described?
7       MS. CANNELLA:  Object to the form of the
8       question as argumentative and -- I'll just leave
9       it there.
10    Q.   (By Mr. Hill)  Answer if you can.
11    A.   The process is very much alive and well in
12  the auto industry.  It's part -- it's something
13  called APQP, advanced product quality planning.
14  Every manufacturer I've worked with/for follows that
15  type of design process.
16    Q.   And so how did Rough Country's alleged
17  failure to follow that design process impact the
18  accident in this case?  That's what I'm trying to get
19  to.
20    A.   So they either didn't understand the
21  purpose of the SEAS brackets or wasn't interested in
22  the purpose of the SEAS brackets, didn't consider how
23  the ride height adjustment would influence the
24  performance of the SEAS brackets.  So really, that's
25  the failure mode we are talking -- at least the

49 (Pages 190 - 193)

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 194

1  primary failure mode of consequence in this case.
2      Q.   Well, we have talked about you have not
3  researched or determined the utility benefits of lift
4  kits and you are critical of Rough Country for not
5  having an outline of those that it produced to you in
6  this case.
7          Are you aware that the whole purpose of a
8  lift kit is to increase the ground clearance, the
9  approach and descent angles and departure angles on a
10 vehicle to increase its utility in situations where
11 those things are required?  Can we at least agree on
12 that?
13     A.   Yeah, I'm very familiar with the approach
14 and departure angles.  And I think in terms of my
15 description of the safer alternative design, I talk
16 about the ease of removal of the SEAS bracket for
17 off-road use when additional utility is necessary.
18     Q.   Right.  And so does that mean that you
19 acknowledge that the utility I just mentioned and
20 that you are very well aware of is lost if you don't
21 remove the SEAS brackets?
22     A.   The base vehicle already has considerable
23 approach angle, that is obviously in Ford's mind more
24 than sufficient for everyday road use.
25     Q.   And we are not talking about everyday road

Page 195

1  use.  We are talking about a customer who purchases a
2  lift kit in order to get the utility benefits not
3  associated with road use, that would be associated
4  with off-road use, farm use, dealing with mud, snow,
5  flooding rains in areas where a significant approach
6  or departure angle is necessary.  All right.  I'm
7  talking about that situation, not road usage.  And
8  you said the solution to that with your alternative
9  design is to remove the modified SEAS brackets
10 whenever those functions are needed; is that fair?
11     A.   No.  My point is that they are relatively
12 easy to remove, so one option would be to advise
13 customers that if they need additional utility, to
14 remove them when off-road; and to maintain them when
15 they are on road.
16         But you can conceive of other solutions
17 that are more complicated, are more expensive, where
18 you may be able to design a EVC-compliant SEAS that
19 doesn't need to unbolted.  It could be hinged or
20 adjusted in a way that gives the utility when the
21 vehicle is off road.  But my example is the cheapest,
22 maybe not the most convenient.
23     Q.   Do you have any knowledge of any
24 alternative design options like you just mentioned
25 employed by any lift kit manufacturers that does not

Page 196

1  involve removal of the brackets?
2      A.   No.  I don't know of an alternative SEAS
3  bracket that's EVC compliant of any description.
4      Q.   Okay.  Have you ever removed, yourself, a
5  SEAS bracket?
6      A.   I have not.  But I do have one here, so
7  I'm quite familiar with what it looks like and its
8  size and weight.
9      Q.   Right.  Have you ever in the field
10 attempted to remove a attached SEAS bracket from an
11 F-250?
12     A.   No, I haven't.
13     Q.   Have you ever seen someone attempt that?
14     A.   No, but it's not particularly challenging.
15     Q.   And what is the basis of your opinion that
16 it's not particularly challenging?
17     A.   It's at the front of the vehicle.  It's
18 accessible.  The tools required are basic socket set
19 or wrench, and it's just two bolts.
20     Q.   And you have to be able to get out up
21 underneath the vehicle to remove the bolts, correct?
22     A.   Well, on a lifted truck, it's quite
23 accessible.
24     Q.   Well, you don't know where that lifted
25 truck is sitting.  It could be, in order to reinstall

Page 197

1  the SEAS brackets, you might have -- before you enter
2  the roadway, you might be in a situation where you
3  don't have access to the SEAS brackets, correct?
4          MS. CANNELLA:  Object to the form of the
5      question as vague and an incomplete
6      hypothetical.
7      Q.   (By Mr. Hill)  Go ahead.
8      A.   Yeah, I think removal and reattachment of
9  the SEAS brackets in order to make the lifted LTV
10 safer for other road users is a relatively basic
11 request.
12     Q.   Well, let's play that out in a
13 hypothetical.  So I have my F-250 at my home.  And my
14 driveway is of such an angle that if I don't -- that
15 if I have the -- the SEAS brackets installed, I'm
16 going to scrape leaving my driveway, so I need that
17 extra clearance that's provided by the SEAS brackets
18 not being on my truck when I exit my driveway.  You
19 would agree that that's a possible scenario that a
20 customer can face?
21         MS. CANNELLA:  Object to the form of the
22     question, hypothetical -- incomplete
23     hypothetical.
24     Q.   (By Mr. Hill)  Go ahead.
25     A.   Yeah, I think we are not -- we are talking

50 (Pages 194 - 197)

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 198

1 about a truck with significant approach angle in a
2 base condition. So unless you have a particularly
3 steep driveway, that is very unlikely to occur.
4    Q.   It's possible, though, correct?
5    A.   I'm just curious about if I have fully --
6 correct approach angle for my records here just so I
7 can reference it. Bear with me.
8         Unfortunately I don't have it. What I was
9 saying is if you have an F-250, such as the subject
10 truck and the SEAS brackets are scraping on the
11 driveway, then pretty much any other vehicle on the
12 road that's smaller than an F-250 is not going to be
13 able to make it up the driveway.
14    Q.   And that may be one of the purposes of
15 installing a lift kit on your F-250, correct? Did
16 you hear me?
17    A.   Yeah, I heard you. So the safer
18 alternative design example I provide is a bolt-off
19 solution. But as I mentioned earlier, there seems to
20 be other credible ideas that can be generated where
21 potentially it doesn't need to be unbolted. These
22 are things that could be considered and developed by
23 a company such as Rough Country.
24    Q.   But you are not aware of any such design
25 actually existing anywhere in the world; is that

Page 199

1 correct?
2    A.   So a design of alternative SEAS bracket
3 for a 2016 F-250, you are right, I don't know of one
4 that exists.
5    Q.   And the only actual design that you've
6 proposed as an alternative is the removable SEAS
7 brackets, correct?
8    A.   That's correct.
9    Q.   And just to be clear because I think it
10 was a little bit fuzzy earlier, in order for Rough
11 Country to have complied with what you consider to be
12 the standard of care, exactly how far off the ground
13 would the SEAS brackets need to be in the lifted
14 configuration of the vehicle? You mentioned that
15 ideally you would want them to match the original 13
16 inches above the ground, but then your report and
17 most of your testimony today has referenced that EVC
18 requirement of 16 inches. So which of the two --
19 would a 16 inches off the ground SEAS with this lift
20 kit be sufficient to meet the standard of care?
21    A.   So the baseline truck, based on my
22 exemplar measurements, had the SEAS bracket 13 inches
23 off the ground. Clearly, Ford engineered it to have
24 additional safety margin over the EVC requirement.
25 I'm aware that Ford had conducted extensive

Page 200

1 testing -- rear testing, vehicle testing -- and that
2 may have driven that engineering decision. So to
3 have similar safety performance to the modified
4 baseline vehicle, 13 inches would be necessary. But
5 to your point, the EVC stipulates 16 inches.
6    Q.   It would be great if you would just
7 directly answer any of my questions. Would a 16-inch
8 SEAS bracket be sufficient for Rough Country to have
9 met the standard of care with regard to the subject
10 F-250, "yes" or "no"?
11    A.   It would have met the EVC, but not Ford's
12 standard of care for that product.
13    Q.   And you are referencing Ford's standard of
14 care, not a specific standard of care that you've
15 identified that applies to the lift kit industry?
16         MS. CANNELLA: Object to the form of the
17    question.
18         THE WITNESS: So the standard of care is
19    based on OEM's design of SEAS brackets to
20    provide vehicle compatibility between an LTV and
21    passenger car.
22    Q.   (By Mr. Hill) You mentioned that it's
23 probable that some information that Ford had was used
24 by them to engineer a 13-inch above the ground SEAS.
25 Do you have any actual evidence of any information

Page 201

1 that Ford had or used to decide to make the SEAS
2 bracket 13 inches above the ground? Any specific
3 information that you know of that you can prove they
4 used to make that decision?
5    A.   That statement stems from some of the
6 papers and research that Ford did on an earlier
7 iteration of truck.
8    Q.   That statement is based upon research, but
9 you don't have any specific knowledge of how Ford
10 used or implemented that research with regard to this
11 particular Ford F-250?
12    A.   Ford ran barrier tests and recorded the
13 forces at different heights on that barrier. And
14 they reached the conclusion at that time that their
15 blocker beam design needed to be at somewhere around
16 13 inches. And they seemed to have maintained that
17 with this generation of SEAS.
18    Q.   So again, if I go back to the original
19 question to make sure I understand it, in order
20 for -- can you hear me? Yeah, sorry. In order for
21 Rough Country to have complied with your view of the
22 standard of care, were they required to have the SEAS
23 brackets go all the way down to 13 inches? I guess
24 "yes" or "no"?
25    A.   It's my opinion that the design should --

51 (Pages 198 - 201)

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 202

1  in order to match the baseline vehicle's performance
2  should try as closely as possible emulate the
3  baseline SEAS position on the vehicle relative to
4  ground.
5      Q.   They should try as much as possible.
6  That's not my question of what they could do. My
7  question is, are they required to do it?
8      MS. CANNELLA: Object to the form of the
9      question. He answered your question. Asked and
10     answered.
11     MR. HILL: I don't believe he has. I
12     would like to try again.
13     Q.   (By Mr. Hill) If Rough Country had placed
14  new bracket SEAS that reduced the height of those
15  SEAS to 15 inches in the subject truck, would they
16  have met the standard of care? Simple, "yes" or
17  "no"?
18     MS. CANNELLA: Asked and answered.
19     THE WITNESS: At 16 inches, they would
20     have satisfied the EVC but not matched the
21     baseline vehicle condition.
22     Q.   (By Mr. Hill) So does that mean they meet
23  the standard of care or not?
24     MS. CANNELLA: Asked and answered.
25     THE WITNESS: So manufacturers are

Page 203

1  putting --
2      Q.   (By Mr. Hill) This is a "yes" or "no"
3  question. I hate to interrupt you, but I've asked it
4  40 different ways. It's a simple "yes" or "no"
5  question.
6      MS. CANNELLA: Mr. Hill, you are not an
7      engineer and engineers don't work like that.
8      You can't beat him up because he is not giving
9      you a "yes" or "no" answer to a question that
10     doesn't have a "yes" or "no" answer.
11     MR. HILL: Well, I believe it does. And
12     so I've been very, very patient for hours and
13     hours, and he keeps regurgitating the same
14     answer that doesn't answer the question.
15     Q.   (By Mr. Hill) Do you have an opinion as
16  to whether a SEAS bracket on this vehicle that was 15
17  inches above the ground would meet your definition of
18  the standard of care on behalf of Rough Country if
19  they installed such a SEAS bracket? If you can't
20  answer that question, then explain it, but it's a
21  "yes" or "no" question. And you can say "yes" or
22  "no" and then you can explain it.
23     MS. CANNELLA: You can answer the question
24     however it needs to be answered.
25     THE WITNESS: The question talked about a

Page 204

1  15-inch clearance. So as I described earlier,
2  my measurements from the exemplar indicate
3  closer to 13 inches, not 15 inches.
4      Q.   (By Mr. Hill) Okay. So in essence, Rough
5  Country was required to place a bracket, SEAS
6  bracket, that went down to the original 13 inches;
7  that's your opinion?
8      MS. CANNELLA: Misstates his testimony.
9      Q.   (By Mr. Hill) Can you answer it?
10     A.   The EVC represents the bare minimum
11  requirement to be compliant with the voluntary
12  agreement. Ford exceeded that for whatever reason.
13  And so to match the safety performance of the base
14  vehicle for vehicle-to-vehicle compatibility, you
15  would want to match the same offset from the bottom
16  of the SEAS to ground.
17     Q.   Are kit manufacturers required to match
18  the safety features of the base vehicle when they
19  design a lift kit?
20     A.   I think aftermarket, as I've stated in my
21  report, they have a responsibility to maintain the
22  base safety features and functionality of the vehicle
23  they are modifying.
24     Q.   So the answer is yes, they are required to
25  maintain the safety features of the vehicle they

Page 205

1  modify?
2      A.   Yes.
3      Q.   Okay. That's -- hooray.
4      Let's go back to our real world
5  application of your suggestion that the utility
6  solution for these brackets is to remove them. We
7  will take out the driveway scenario. But what you
8  are suggesting is, if a consumer starts in an area
9  that requires the utility of a lifted vehicle, such
10  as off road or other applications, and then they are
11  going to -- they start out their trip there, but then
12  they are going to eventually, as part of the same
13  trip, be on a flat road surface, that they would be
14  required to stop the vehicle, get down and reinstall
15  the SEAS brackets, then drive wherever they needed to
16  go on the road surface. And then if that took them
17  to another part of their journey that required the
18  off road utility provided by the lift, that they
19  would be required to remove the brackets, use the
20  vehicle, complete the entire process again in order
21  to drive home on the surface roads. Is that a fair
22  characterization of the solution that you have
23  proposed with regard to removing the SEAS brackets
24  whenever that utility is needed?
25     A.   Yes. In the safer alternative design that

52 (Pages 202 - 205)

Christopher D. Roche                            February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 206

1 I've suggested, that would be necessary.
2   Q.   Okay.  I believe you were critical of
3 Rough Country earlier for not having produced to you
4 a memo that laid out all of the utility benefits for
5 lift kits.
6      MS. CANNELLA:  Object to the form of the
7   question, misstates his testimony.
8   Q.   (By Mr. Hill)  Yeah, I was asking what was
9 that testimony about?  Didn't you say you expected
10 that there would be a document of that nature
11 produced by Rough Country in this case?
12   A.   My description of it was a target
13 document, a design document, when you are trying to
14 design and engineer and the associated
15 specifications, requirements, and targets relative to
16 those.
17   Q.   Okay.  I must have misunderstood you.  So
18 you are not critical of Rough Country for not having
19 a -- produced a document that lays out the utility
20 benefits of lift kits?
21   A.   No.  I think you were the one who brought
22 up utility benefits, not me.
23   Q.   Okay.  Great.  So then perfect.  So you
24 are not critical of them for not having that type of
25 document.  Have you searched Rough Country's Website

Page 207

1 to determine their view of the utility provided by
2 their lift kits?
3   A.   Yeah.  I've reviewed some of their
4 material related to their lift kits, yes.
5   Q.   And do you recall what they list as the
6 utility benefits of a lifted vehicle?
7   A.   Some of the benefits were related to
8 maintaining some of the -- some of the performance
9 characteristics of the baseline vehicle, obviously,
10 you know, things like ground clearance, I think
11 aesthetics I mentioned, so the look of the truck.
12   Q.   So you recall a utility being maintaining
13 the original -- what did you say first -- I didn't
14 understand that -- with regard to maintaining
15 something about the original configuration of the
16 vehicle?
17   A.   Yeah.  So the four-and-a-half inch lift
18 kit is described as being easy to fit, raises the
19 front of the vehicle to be equal height with the rear
20 for a level better-than-stock look, so the aesthetic
21 appeal of the truck, improved ride height and more
22 aggressive appearance.
23   Q.   All right.  And this is from the marketing
24 material related to the specific 4.5-inch lift in
25 this case, or what's the source of that?

Page 208

1   A.   Yeah.  This is for the Rough Country Ford
2 suspension lift kit and it's the four-and-a-half-inch
3 addition.
4   Q.   Right.  Are you aware of any other utility
5 benefits other than what you just mentioned?
6   A.   Well, the other ones listed on this
7 Website include just generally -- again, ride height
8 is reiterated, that ride quality and performance is
9 maintained.  So that's what Rough Country are
10 describing is the benefits from their own kits.
11   Q.   Would you agree there is a benefit with
12 increased approach and departure angles?
13   A.   Yeah.  That's not explicitly stated, but I
14 would suggest that comes under ride height, so
15 approach, departure, breakover angles.
16   Q.   And would you agree that the -- if you
17 have a SEAS bracket on the subject vehicle that
18 extended down to the original 13-inch height above
19 the ground, that it's not possible for the consumer,
20 while those brackets are attached, to reap the
21 benefits of what you just described of an increased
22 ride height and an increased approach and departure
23 angles?
24   A.   The SEAS brackets would only affect the
25 approach angle.

Page 209

1   Q.   Okay.  And what about -- any other utility
2 aspect of the F-250 that's impacted by a SEAS bracket
3 down to 13 inches above the ground?
4   A.   I can see approach angle being the primary
5 issue if you need that particular utility.
6   Q.   All right.  Part of your report is you are
7 critical of Rough Country for not warning consumers
8 about the reduction in the SEAS compatibility with
9 the installation of the lift kit.  My question is:
10 Are you aware of any lift kit manufacturer that
11 issues any warning related to vehicle-to-vehicle
12 compatibility with regard to their lift kits?
13   A.   No.  I'm not aware of the actions of other
14 lift kit manufacturers related to warnings.
15   Q.   And the same goes for the converters and
16 uplifters -- upfitters, I'm sorry, we mentioned
17 earlier.  You are not aware of any of those companies
18 issuing any warnings to consumers regarding
19 vehicle-to-vehicle compatibility; is that true?
20   A.   That's correct.  I'm not aware of those
21 companies warning customers with lift kits.
22   Q.   And are you aware of any lift kit
23 manufacturers that perform the engineering safety
24 analysis as you've described today in your deposition
25 with regard to the design and manufacture of their

53 (Pages 206 - 209)

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 210

1 kits?
2     A.   I'm aware of safety analyses and DFMEA as
3 being standard engineering practice, and I haven't
4 looked specifically as to its use within the lift kit
5 industry.
6     Q.   Great.  And that would apply not just to
7 -- that would apply to all elements of the lift kit
8 industry, which would include the manufacturers and
9 the converters and uplifters, just to be clear?
10    A.   Well, my statement is specific to Rough
11 Country and the manufacture of lift kits.
12    Q.   All right.  So the converters and the
13 uplifters would not have any duty to perform that
14 type of safety analysis because why in your opinion?
15    A.   Well, so it's intended to be an early --
16 or part of the design process, so when you have an
17 opportunity to consider the potential failures of
18 your design and address them as you develop the
19 design.  So if you are an installer, you know, you
20 only install what you are given to install.
21    Q.   Sure.  The Ford testing documents that
22 were the basis of your supplemental report, were
23 those in the public domain prior to Rough Country's
24 manufacture of the subject lift kit?
25    A.   Well, so some of those documents were

Page 211

1 definitely for public domain.  So, for example, if
2 you look at the list of documents there, some are in
3 SAE papers.
4     Q.   Right.  And that's just the -- the
5 production that you got from Ford that included
6 materials beyond their actual testing materials,
7 correct?
8     A.   Yeah, that's right.  So with respect to
9 the Ford presentation to NHTSA in December of 2007,
10 no, I don't believe that specific document was in the
11 public domain other than Ford and NHTSA
12 representatives.
13    Q.   All right.  And would that be true -- so
14 you have those two SAE papers listed at the bottom of
15 your materials review.  Are there -- and then there
16 is some, I guess, public domain documents in there.
17 But the Ford presentation to NHTSA in December 2007,
18 plus the Ford compliance submissions, plus the
19 research and development discussion with NHTSA of
20 April of 2006, all of those documents would be
21 unavailable to or were unavailable to Rough Country
22 at the time it designed and manufactured the subject
23 kit; is that true?
24    A.   No, I don't agree with that.
25    Q.   Okay.  What did I mess up with that one?

Page 212

1     A.   So the Ford -- so some of the protected
2 Ford documentation is summarizing materials that were
3 in the public domain.  So, for example, my reference
4 number three, which is the Status of Enhanced
5 Front-to-Front Vehicle Compatibility Technical
6 Working Group Research and Commitments, which was
7 authored by a Ford employee, discusses at length the
8 work that was done, the history of EVC, and the
9 background on industry agreement and the work that
10 was being done to understand the different options
11 that should be applied and the testing that was being
12 conducted.
13    Q.   Which exact -- you mentioned bullet point.
14 I want to know exactly, what are the Bates numbers of
15 the document that you just referenced?
16    A.   So this is reference 3 from my report.
17    Q.   When you say reference 3, you are talking
18 about from your November 17th report?
19    A.   No.  This is from -- this is earlier.
20 This is from Bates Number 1405 of my original October
21 report.  You can see the reference at the base of
22 that page.
23    Q.   Okay.  Which page are we on in your
24 original report?
25    A.   Bates Number 1405.  And so you have a

Page 213

1 picture Image 17, vehicle compatibility strategies,
2 and you can see at the bottom of that page, it's a
3 reference there.
4     Q.   All right.  Any of the other documents I
5 mentioned that you reference in your November report
6 that you say were in the public domain and available
7 to Rough Country prior to the design and manufacture
8 of the subject kit?
9     A.   Yeah.  There were a number of -- between
10 SAE and NHTSA, there were reports that are readily
11 available in the public domain.  I haven't gone
12 through and identified exactly which ones of those --
13 which ones they are, but I can -- I can do that
14 subsequently.
15         MR. HILL:  Okay.  All right.  Let me take
16 a short break.  Maybe I can look over my notes
17 and be close to being finished.
18         MS. CANNELLA:  Okay.
19         MR. HILL:  Thanks.
20         THE VIDEOGRAPHER:  The time is 4:58 and we
21 are off the record.
22 (Recess taken from 4:58 p.m. to 5:10 p.m.)
23         THE VIDEOGRAPHER:  The time is 5:10.  We
24 are back on the record.
25    Q.   (By Mr. Hill)  Mr. Roche, would you agree

54 (Pages 210 - 213)

Christopher D. Roche                    February 1, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 214

1 that there could be a collision between the original
2 stock version of the 2016 F-250 and the 2008 Escape
3 involved in this accident, a rear-end collision, that
4 could involve intrusion into the rear passenger
5 compartment area? Do you believe that's possible?
6    A.   Well, that's a very broad hypothetical.
7 And, you know, intrusions in a crash are related to
8 obviously the vehicle speeds and the angles of
9 impact. So for example, if the truck struck the
10 Escape in a side impact mode, it got quite a
11 different scenario.
12    Q.   What about in a rear-end collision like
13 the one we had here, is it possible in the original
14 configuration at the speeds involved here for there
15 to be intrusion of the F-250 into the rear passenger
16 compartment?
17    A.   If the baseline vehicle without a lift kit
18 had struck the Ford Escape and there had been
19 structural compatibility at the speeds involved, I
20 believe the occupant survival space would have been
21 maintained.
22    Q.   Did you factor in in making that opinion
23 any cargo that may have been in the back of the
24 Escape?
25    A.   In the hypothetical you just portrayed, I

Page 215

1 did not. I know that in the actual crash scenario,
2 there was some cargo in the luggage compartment. And
3 depending on the nature of that cargo, it is possible
4 for it to cause some stack-up and slightly increased
5 intrusions.
6    Q.   Would it have been possible in that
7 scenario for the cargo to have impacted Cohen and
8 caused his injuries?
9        MS. CANNELLA:  Object to the form of the
10 question, outside the scope of his testimony,
11 foundation.
12    Q.   (By Mr. Hill)  Go ahead.
13    A.   Yeah, I've not tried to look at the cargo
14 position pre-impact and its final location and
15 movement during the crash event.
16    Q.   And that would be true both in analyzing
17 the actual event and analyzing the hypothetical crash
18 involving a stock F-250?  It applies to both
19 analyses; is that correct?
20    A.   So in the scenario with a regular F-250
21 with half the levels of intrusion, there would still
22 be potentially some space for the luggage to reside
23 or there may still be -- may be still luggage space
24 remaining.
25    Q.   Okay. In your Findings section of your

Page 216

1 report, just to be clear as we wrap things up, you
2 said with a vehicle lifted, a hazardous condition was
3 created. Again, define for me what you say is a
4 hazardous condition. I don't think you ever actually
5 defined that specific term.
6    A.   So the hazardous condition is the fact
7 that you now have an incompatible structure of the
8 F-250 relative to passenger vehicles and the subject
9 Ford Escape.
10    Q.   And your definition of incompatible
11 vehicles is following the EVC requirements; is that
12 how you define whether the vehicle is compatible or
13 not?
14    A.   The vehicle's compatibility is based on
15 the structural engagement in the crash. So in this
16 particular crash, we can see that there was minimal
17 structural engagement between the frame rails of the
18 F-250 and the longitudinals of the Escape.
19    Q.   And that's what you are describing as a
20 dangerous condition?
21    A.   That's correct.
22    Q.   Okay. In paragraph 3, your use of the
23 term "increased intrusion," I think we talked about
24 that, but you haven't made any calculations regarding
25 the level of increased intrusion? You are going to

Page 217

1 rely upon the accident reconstruction performed by
2 Mr. Buckner to define what amount of increased
3 intrusion existed because of the existence of the
4 lift kit; is that fair?
5    A.   So that opinion is based on my experience
6 as a body structure engineer for many, many years and
7 understanding how body structures are designed to
8 work and when their load members are loaded directly
9 or not. But I also agree with Buckner's assessment
10 of the half amount or halving of the intrusions based
11 on his work.
12    Q.   So increased intrusion just means based on
13 your experience, there is going to be a higher level
14 of intrusion with a lifted vehicle, but to the extent
15 that you are going to quantify that, that would be
16 relied upon Buckner. That's a better way to say
17 that?
18    A.   Yes, yes. I think Buckner's done a
19 reconstruction and calculated the difference in
20 intrusions whether it was lifted or not. I'm -- that
21 opinion was written using my body engineering and
22 experience.
23    Q.   At the time you wrote this, had you seen
24 Buckner's report?
25    A.   No.

55 (Pages 214 - 217)

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 218

1    Q.   And we didn't discuss your consulting work
2  at this point that -- where it hasn't led to a
3  deposition yet.  But is it fair to say that this is
4  only the second case that you've analyzed a
5  vehicle-to-vehicle crash involving a Ford pickup
6  truck?
7    A.   Well, we discussed the Young matter
8  earlier --
9    Q.   Right.
10    A.   -- which is a vehicle-to-vehicle impact
11  involving a Ford pickup truck, and we have this case,
12  so that makes two.
13    Q.   Yeah.  Any other cases that you worked on
14  on a consulting perspective that involved
15  vehicle-to-vehicle crash analysis related to
16  intrusion?
17    A.   No.
18        MR. HILL:  All right.  I think that's all
19  I have.  Thank you very much, Mr. Roche.
20        MS. CANNELLA:  And I have just a couple of
21  things.  One second.
22    EXAMINATION
23  BY MS. CANNELLA:
24    Q.   Mr. Roche, did you need to look at other
25  lift kits to reach the conclusions in your report?

Page 219

1    A.   No, I didn't.
2    Q.   Did you need to look at other lift kits to
3  know if there is an alternative design, the one that
4  you -- strike that, sorry.
5        Did you need to look at other lift kits to
6  come to your alternative design conclusion?
7    A.   No, I didn't.
8    Q.   Where did you get your alternative design
9  idea from?
10    A.   From the subject vehicle and my design and
11  engineering experience.
12    Q.   And the design that you looked at on the
13  subject vehicle, that is in production?
14    A.   Yes, it is.
15    Q.   And it's used on an F-250?
16    A.   That's correct.
17    Q.   Have you ever used a socket set or a
18  wrench before?
19    A.   Yes, I have.
20    Q.   Have you removed bolts before?
21    A.   Yes, I have.
22    Q.   And we discussed your experience in the
23  auto industry.  How many years have you been in the
24  auto industry?
25    A.   About 27 years.

Page 220

1    Q.   And how many years have you worked
2  specifically in structures in the auto industry?
3    A.   Well, I'll say if I wasn't directly
4  responsible for structures, it was still part of my
5  work, so all 27 years.
6    Q.   And have you done any work in the auto
7  industry that was specific to examining and analyzing
8  ride height?
9    A.   Yes, I have.
10    Q.   Okay.  Can you tell the court a little bit
11  about that?
12    A.   So when I was working at Jeep on the Grand
13  Cherokee program, we were asked to investigate the
14  effects of ride height adjustment from the baseline
15  vehicle for SRT, which was the performance division.
16  So in this case, we are looking at lowering the ride
17  height.  But we did extensive work to understand the
18  implications of the ride height adjustment, how it
19  would affect the performance of the body structure,
20  the restraint system performance, and other aspects
21  of the vehicle.
22    Q.   And DFMEA, you discussed that briefly, is
23  that something that -- well, let me back up.  Is
24  DFMEA something you would learn in engineering
25  school?

Page 221

1    A.   If not the specifics of DFMEA, certainly
2  the concept of a safety analysis would typically be
3  raised.
4    Q.   And is it used only by automakers or is it
5  used by compliant manufacturers in the auto industry?
6    A.   My understanding is it's used in the wider
7  engineering community for all sorts of designs.
8    Q.   So not just auto designs?
9    A.   Not just auto designs.
10    Q.   Okay.  And you started to discuss your
11  support for your opinion that the SEAS reduces
12  fatalities and you guys started looking for a
13  document that you had mentioned but weren't able to
14  find it.  Could you just make sure that's on the
15  record which document you were talking about?
16    A.   Yeah.  Specifically I'm talking about
17  slides from Ford's presentation to NHTSA in December
18  2007, which had the original Bates numbers starting
19  with 372022193.
20        MS. CANNELLA:  That's all I have.
21        MR. HILL:  Quick follow-up.
22    FURTHER EXAMINATION
23  BY MR. HILL:
24    Q.   The SRT performance work that you just
25  mentioned, that was to analyze the performance of

56 (Pages 218 - 221)

Christopher D. Roche                        February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 222

1 the -- the driving performance of the SRT, correct?
2 It was not an analysis as to the impact of a SRT
3 accident with another vehicle; would you agree with
4 that?
5      A.   No, I don't.  The studies included looking
6 at the effects of the ride height adjustment on
7 self-protection, so, for example, the performance of
8 the restraint system.
9      Q.   Right.  That's self-protection and
10 restraint system within the SRT itself?
11     A.   That's correct.
12     Q.   Right.  And did you analyze the danger of
13 lowering the rear of the crash-protection features of
14 that vehicle making it susceptible to a rear-end
15 collision like the one we had in this case?  Was that
16 part of your analysis?
17        MS. CANNELLA:  Object to the form of the
18     question.  It's vague and confusing.
19        THE WITNESS:  So part of the analysis
20     included understanding the nominal vehicle ride
21     heights and assessment of its bumper system and
22     frame rails relative to other road vehicles.
23     Q.   (By Mr. Hill)  So was there analysis as to
24 the potential susceptibility to intrusion into the
25 SRT and impacts with other vehicles?

Page 223

1      A.   Well, the ride height adjustment was
2 relatively small compared to this case.  We are not
3 talking five or six inches.  We are talking, I
4 believe, somewhere around one or two inches.  So the
5 compatibility aspect of it was considered in that
6 context.
7      Q.   And did you also consider the impact of --
8 I guess because the SRT was being lowered, you did
9 not have to analyze the impact of the SRT's potential
10 dangers, as you've said, in impacts where it was the
11 bullet vehicle?
12     A.   That's correct.
13     Q.   Okay.  The December 2007 slides from NHTSA
14 that you identified by Bates number, would you agree
15 that those are documents that were not available in
16 the public domain at the time that Rough Country
17 designed and manufactured the subject kit?
18     A.   I know Ford presented the slides that I'm
19 particularly interested in multiple forums.  And
20 so I can't say definitively whether or not they were
21 in the public domain or not.
22     Q.   Okay.  But they were definitely obviously
23 presented to NHTSA prior to their publishing of their
24 May 2012 evaluation of the EVC?
25     A.   Yes, they were, but they are specific to

Page 224

1 vehicles that are of interest to this particular
2 case, so pickup trucks with and without SEAS.
3      Q.   And in your experience in the auto
4 industry, were there times when you relied upon
5 studies or evaluations from NHTSA?
6      A.   At this time, I can't recall anything
7 specific, no.
8      Q.   So there was never a situation where NHTSA
9 published a paper that related to a design
10 consideration of yours where you were instructed one
11 way or the other by the opinions of NHTSA?
12     A.   Yeah, I believe that's correct.
13     Q.   If you had been presented information from
14 NHTSA directly relevant to a design project you were
15 working on, would you have considered their opinions?
16     A.   Yeah, absolutely.  I've worked with all
17 that, policies of engaging with NHTSA and other
18 agencies.
19     Q.   And NHTSA is the government agency that is
20 charged with evaluating traffic safety in the United
21 States, correct?
22     A.   That's right.  They are the National
23 Highway for Traffic Safety Administration.
24     Q.   And is there any government authority at a
25 greater level than NHTSA with regard to traffic

Page 225

1 safety?
2        MS. CANNELLA:  Object to the form of the
3     question as vague.
4        THE WITNESS:  Not NHTSA responsible for
5     defining Federal Motor Vehicle Safety Standards;
6     however, many of those standards are considered
7     to be the bare minimum performance requirements.
8      Q.   (By Mr. Hill)  Right.  We are not talking
9 about the bare minimum FMVSS standards.  I'm talking
10 about opinions and guidance from NHTSA.  You would
11 agree that it's reasonable for a manufacturing
12 company to rely upon information they received from
13 NHTSA in that context?
14     A.   So in my experience, of course we engaged
15 with NHTSA.  We engaged with other groups, too.  And
16 we also considered, for example, the opinion of the
17 Insurance Institute For Highway Safety.  We also
18 considered our own experience with our vehicles and
19 real world issues that led to the development of due
20 care requirements.  So NHTSA was one -- one voice.
21     Q.   I thought -- maybe I misunderstood you,
22 but I thought you testified earlier that there was
23 never a time in your career where you were presented
24 information from NHTSA that you relied upon in your
25 work?

57 (Pages 222 - 225)

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 226

1    A.    Yeah.  I can't recall a time where
2  anything I was specifically working on was driven by
3  a unique edict by NHTSA.
4    Q.    And so there was never a time when you had
5  to choose between NHTSA's opinion and the opinion of
6  any of those other groups that you mentioned with
7  regard to a particular topic?
8    A.    Well, so NHTSA -- well, the regulations I
9  was engineering vehicles to meet, those regulations
10  were clearly defined.  If they were changing, that
11  was clearly communicated.
12        In NHTSA's report in 2012, nowhere did
13  they talk about changing or revoking the EVC.  They
14  still maintained the Enhancing Vehicle Compatibility
15  Agreement.
16    Q.    Again, it was still a voluntary measure at
17  that time, even in 2012, correct?
18    A.    It was a voluntary agreement that all
19  manufacturers I'm aware of were satisfying.
20    Q.    And again, we have talked about that
21  exhaustively, so I won't ask you any more questions
22  about your knowledge regarding which manufacturers
23  did or did not voluntarily participate in the EVC.
24  That's all I have.
25        MS. CANNELLA:  Great.

Page 227

1        MR. HILL:  All right.
2        THE VIDEOGRAPHER:  Ready to go off the
3  record, counsel?
4        MR. HILL:  Yeah.  Unless we need to talk
5  about exhibits on the record.  We can handle
6  that off the record, I think.  I'd just like a
7  tally from the court reporter as to what I need
8  to send.
9        THE VIDEOGRAPHER:  Yes, sir.  We can do
10  that off the video record, if that is okay.
11        MR. HILL:  Sure.  Yeah.
12        THE VIDEOGRAPHER:  This concludes the
13  videotaped deposition.  The time is 5:32 p.m.
14  We are off the video record.
15        (Deposition concluded at 5:32 p.m.)
16        (Pursuant to Rule 30(e) of the Federal
17  Rules of Civil Procedure and/or OCGA 9-11-30(e),
18  signature of the witness has been reserved.)
19
20
21
22
23
24
25

Page 228

1                C E R T I F I C A T E
2
3  STATE OF GEORGIA:
4  COUNTY OF FULTON:
5
6        I hereby certify that the foregoing
7  transcript was taken down, as stated in the
8  caption, and the questions and answers thereto
9  were reduced to typewriting under my direction;
10  that the foregoing pages 1 through 227 represent
11  a true, complete, and correct transcript of the
12  evidence given upon said hearing, and I further
13  certify that I am not of kin or counsel to the
14  parties in the case; am not in the regular
15  employ of counsel for any of said parties; nor
16  am I in anywise interested in the result of said
17  case.
18        This, the 26th day of February, 2024.
19
20
21        *Susan M. Pitts*
         SUSAN M. PITTS, CCR-B-1806
22
23
24
25

Page 229

1            VERITEXT LEGAL SOLUTIONS
2        FIRM CERTIFICATE AND DISCLOSURE
3
4  Veritext represents that the foregoing transcript as
5  produced by our Production Coordinators, Georgia
6  Certified Notaries, is a true, correct and complete
7  transcript of the colloquies, questions and answers
8  as submitted by the certified court reporter in this
9  case.  Veritext further represents that the attached
10  exhibits, if any, are a true, correct and complete
11  copy as submitted by the certified reporter,
12  attorneys or witness in this case; and that the
13  exhibits were handled and produced exclusively
14  through our Production Coordinators, Georgia
15  Certified Notaries.  Copies of notarized production
16  certificates related to this proceeding are available
17  upon request to litsup-ga@veritext.com.
18
19  Veritext is not taking this deposition under any
20  relationship that is prohibited by OCGA
21  15-14-37(a)and(b).  Case-specific discounts are
22  automatically applied to all parties, at such time as
23  any party receives a discount.  Ancillary services
24  such as calendar and financial reports are available
25  to all parties upon request.

58 (Pages 226 - 229)

Christopher D. Roche                                    February 1, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 230

1  To: Tedra Cannella, Esq.  tedra@cannellasnyder.com
2  Re: Signature of Deponent Christopher D. Roche
3  Completed Errata Due within:  30 days
4
   Greetings:
5
   The deponent has reserved the right to read and sign.
6  Have the deponent review the attached PDF
   transcript, noting any changes or corrections on the
7  PDF errata.  The deponent may fill out the
   errata electronically or print and fill out manually.
8
9  Once the errata is signed by the deponent and
   notarized, please mail it to the offices of Veritext
10 (below).
11
   When the signed errata is returned to us, we will
12 seal and forward to the taking attorney to file with
   the original transcript.  We will also send copies of
13 the errata to all ordering parties.
14
   If the signed errata is not returned within the time
15 above, the original transcript may be filed with the
   court without the signature of the deponent.
16
17
   Please send completed Errata to:
18
   Veritext Production Facility
19 20 Mansell Court
   Suite 300
20 Roswell, Georgia 30076
   770-343-9696
21 cs-southeast@veritext.com
22
23
24
25

Page 232

1  Page No._____Line No._____Change to:_____
2  _____
3  Reason for change:_____
4  Page No._____Line No._____Change to:_____
5  _____
6  Reason for change:_____
7  Page No._____Line No._____Change to:_____
8  _____
9  Reason for change:_____
10 Page No._____Line No._____Change to:_____
11 _____
12 Reason for change:_____
13 Page No._____Line No._____Change to:_____
14 _____
15 Reason for change:_____
16 Page No._____Line No._____Change to:_____
17 _____
18 Reason for change:_____
19
20     _____
       DEPONENT'S SIGNATURE
21
   Sworn to and subscribed before me this ___ day of
22 _____, _____.
23
   _____
24 NOTARY PUBLIC
   My Commission Expires:_____
25

Page 231

1  ERRATA for ASSIGNMENT #6396193
2  I, the undersigned, do hereby certify that I have
   read the transcript of my testimony, and that
3  ___ There are no changes noted.
   ___ The following changes are noted:
4
   Pursuant to Rule 30(7)(e) of the Federal Rules of
5  Civil Procedure and/or OCGA 9-11-30(e), any changes
   in form or substance which you desire to make to your
6  testimony shall be entered upon the deposition with a
   statement of the reasons given for making them.  To
7  assist you in making any such corrections, please use
   the form below.  If additional pages are necessary,
8  please furnish same and attach.
9
10
11 Page No._____Line No._____Change to:_____
12 _____
13 Reason for change:_____
14 Page No._____Line No._____Change to:_____
15 _____
16 Reason for change:_____
17 Page No._____Line No._____Change to:_____
18 _____
19 Reason for change:_____
20 Page No._____Line No._____Change to:_____
21 _____
22 Reason for change:_____
23 Page No._____Line No._____Change to:_____
24 _____
25 Reason for change:_____

59 (Pages 230 - 232)

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[017 - 2016]**                                                    Page 1

| **0** |
| --- |

**017**   1:8
**05**   24:22

| **1** |
| --- |

**1**   1:20 3:10 4:2
  5:4,10 19:17
  19:21 21:20
  25:14 33:10
  40:14,18 91:2
  228:10
**1.1**   85:23
**10**   3:13 17:1
  71:23
**101**   3:21
**10:12**   1:18 4:8
**11**   71:24
**11:12**   42:25
  43:2
**11:24**   43:2,3
**12**   71:24
**12:17**   78:16,18
**12:34**   78:18,20
**12th**   3:13 9:19
  10:15 49:10
  63:6
**13**   57:20 58:7
  58:10,16 59:14
  59:20 71:24
  88:8 97:5,15
  99:4 100:19
  101:8 171:6
  177:5 188:9
  199:15,22
  200:4,24 201:2
  201:16,23

204:3,6 208:18
  209:3
**13532**   228:20
**1387**   9:18
**14**   71:24
**1405**   212:20,25
**1410**   150:4
**1415**   50:15
**1416**   9:23
**1422**   9:23,25
  11:13
**1423**   63:8
**15**   71:24
  202:15 203:16
  204:1,3
**15-14-37**
  229:21
**15th**   67:9,21
  68:14
**16**   57:11,15
  71:13 72:14
  75:3,8 76:3,7
  76:20,23 88:16
  188:14,20
  199:18,19
  200:5,7 202:19
**16th**   49:9
**17**   35:12 65:22
  73:6 213:1
**17th**   34:11
  65:18 212:18
**18**   57:8 76:19
  88:10 90:6,15
  91:22 183:13
  185:9

**1806**   1:22
  228:21
**1995**   142:13
**1387**
**1:15**   128:1
**1:20**   127:23
**1:50**   127:22
  128:4,6
**1st**   4:8 9:1

| **2** |
| --- |

**2**   3:12 10:14,21
  11:3 19:18,25
  57:2,10,13
  58:2,17 59:3,4
  59:22 63:5
  64:25 65:8,21
  71:3 81:8
  90:16 91:3
  112:24 113:5
  130:21 131:4
  188:20
**20**   45:22 60:5
  75:3,8 76:3,7
  76:22 77:2
  185:1,3,12
  230:19
**2000**   39:7,8
**2000-2001**
  177:19
**2001**   15:18
  23:2
**2003**   54:22
  79:5 96:16
**2005**   15:24
  16:2 18:20
  19:15 21:9

**2006**   211:20
**2007**   105:2,19
  106:17 175:20
  211:9,17
  221:18 223:13
**2007-12-20**
  107:2
**2008**   16:5
  214:2
**2008-2009**
  177:19
**2009**   80:5 84:6
  85:21,25 96:17
**2010**   15:25
  16:5 32:22
  42:1 86:1,6,13
  86:19 110:3,7
  110:14,22
  111:13,20
  113:25
**2011**   176:13
**2012**   3:18
  99:10,20
  100:21 103:11
  103:18,25
  104:24 105:7
  108:6,23
  111:19 176:1
  176:20 177:5
  223:24 226:12
  226:17
**2016**   54:24
  87:2,6 93:7,19
  95:15,17 96:3
  97:2 118:21

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[2016 - 5:32]**                                                      Page 2

124:6 132:8
149:4,7,24
150:21 151:24
162:10,13
164:1 199:3
214:2
**2020**  67:22
154:1
**2022**  28:13,14
28:18 67:9
72:3 90:25
93:17
**2023**  9:1,6 29:5
34:11 35:12
65:3 71:3
105:22,24
**2024**  1:20 4:2,8
228:18
**208**  144:21
**218**  3:4
**221**  3:5
**227**  228:10
**23**  165:4
178:20
**23,000**  64:15
**24**  150:3 165:4
183:8
**2400**  2:10
**25**  45:23 60:5
**250**  52:15 57:6
71:4,9 82:11
85:9 86:13,18
87:2,6,12
89:15 90:5,25
91:22 93:17

97:2 118:7,21
119:21 120:3
124:6 126:20
130:25 132:8
143:6,9,15
144:1 148:23
149:4,8,24
150:21 151:24
161:12 162:10
162:13 164:1
166:3 171:4
180:1 183:21
183:24 184:3,5
185:20 187:20
188:3,7 196:11
197:13 198:9
198:12,15
199:3 200:10
201:11 209:2
214:2,15
215:18,20
216:8,18
219:15
**26**  62:15,16
66:5
**26th**  228:18
**27**  219:25
220:5
**2:20**  127:23
**2:22**  1:8
**2:26**  128:6,7

### 3

**3**  3:14 49:19,22
64:25 65:8
67:7 71:19

212:16,17
216:22
**30**  227:16
230:3 231:4
**300**  230:19
**30030**  2:6
**30076**  230:20
**301**  73:12,18
74:6,12 115:11
115:15 117:15
117:20 118:5
118:12,14,21
118:24 119:19
119:22 120:5
**301/305**  73:23
**30326**  2:10
**305**  73:19 74:6
**315**  2:5
**3344**  2:9
**350**  32:22 33:7
37:18 41:18
42:1 159:6
**3506**  3:17
80:13
**3507**  99:6
101:16,19
**3508**  81:4
**3517**  3:17
80:13 107:11
**372022193**
107:7 221:19
**3:59**  186:21,23

### 4

**4**  3:3,15 14:11
36:13,20 37:10
62:7,12 71:19
101:8 177:5
**4.5**  207:24
**40**  12:21 46:3
156:7 191:19
193:2 203:4
**404-875-9433**
2:11
**404-876-2700**
2:11
**450**  153:13
154:19
**49**  3:14 73:7
**4:14**  186:23,24
**4:58**  213:20,22
**4x2**  41:23
**4x4**  41:23
82:12

### 5

**5**  3:11,16 71:19
80:18,19,22
85:22 99:16
**50**  100:6
117:22
**581**  40:14 73:7
73:9,14,16
74:3,17,20
75:1,15,20,24
76:16,23
**5:10**  213:22,23
**5:32**  227:13,15

Christopher D. Roche
February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[6 - actual]**

Page 3

| 6 |
| --- |

**6** 3:18 71:23
101:2,5,18
**6.2** 17:2
**6/1/2023** 9:10
**60** 46:3 146:23
**62** 3:15
**6396193** 231:1

| 7 |
| --- |

**7** 35:16 71:23
231:4
**770-343-9696**
230:20

| 8 |
| --- |

**8** 71:23
**8.b.** 4:4
**80** 3:17 183:17
185:10,15,24
**885** 2:5

| 9 |
| --- |

**9** 71:13,23
**9-11-30** 227:17
231:5
**9/25/23** 9:25

| a |
| --- |

**a.m.** 1:18 4:8
43:2,2
**abbreviated**
13:21
**abbreviation**
20:18,19 138:6
**abide** 47:22

**ability** 129:10
142:16
**able** 5:6 76:6
138:18 145:4
153:19 195:18
196:20 198:13
221:13
**above** 26:18
52:15 57:9
58:7 76:4 77:2
77:2,17 88:8
88:10 90:7,15
91:23 188:9,10
188:19 199:16
200:24 201:2
203:17 208:18
209:3 230:15
**absent** 185:12
**absolute**
100:12 101:14
**absolutely**
42:23 224:16
**absorb** 36:17
**absorbed** 52:17
**absorber** 18:15
**absorbing** 3:20
17:20,21 25:10
25:19 77:13
87:4
**absorption**
18:14 20:15,16
21:19 22:15
24:17,18 32:24
33:3,11 39:1
41:3

**abstract** 81:9
**access** 68:22
109:9 132:17
142:10 153:19
154:14 159:12
197:3
**accessible**
196:18,23
**accident** 30:16
31:7 57:7 70:6
70:17 71:5
87:22 90:18
91:8,25 116:18
116:19 117:25
119:16,17
121:22 123:23
125:5 130:14
143:25,25
187:6,7,10
193:18 214:3
217:1 222:3
**accidents**
105:17
**accommodate**
135:8
**accomplish**
61:20 141:25
**accord** 145:22
146:12 147:9
**accounting**
102:24
**accumulated**
17:4
**accuracy** 173:1

**accurate** 63:11
112:16 122:15
144:2,5
**accurately** 77:3
103:6,23
**achieve** 46:20
58:10
**achieved** 85:24
**achieving**
140:5
**acknowledge**
194:19
**acknowledged**
164:10
**act** 40:25 41:14
**acting** 159:3
**action** 1:7
**actions** 130:23
209:13
**active** 45:22
**actual** 13:6
27:17 37:1
81:7 103:10
106:21 107:10
114:10 121:4
121:20 122:14
123:5,8 124:20
125:8 127:3
131:24,25
132:12,16,16
133:14,15,24
135:10,15,17
136:6 158:14
172:17 190:6
192:8 199:5

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[actual - agreement]**                                    Page 4

200:25 211:6
215:1,17
**actually** 8:22
26:17 37:9
40:10 63:15
70:16 74:8
75:7 81:21
103:17 110:6
116:24 118:8
120:11,21
127:9 137:24
138:25 139:1
139:18 143:4
154:3,11
155:13 166:22
167:5 198:25
216:4
**adas** 94:1
**add** 41:7 66:21
163:22
**added** 29:3
41:7
**addition** 11:16
57:21 65:19
208:3
**additional** 7:23
11:6,16 46:20
49:15 65:17,23
93:5,16 95:1
106:13,22
109:10 134:19
134:20 153:25
173:20 178:15
189:13 194:17
195:13 199:24

231:7
**address** 12:4
72:7 103:13
210:18
**addressed**
152:9,20
176:19 181:23
**addresses**
34:12
**addressing**
84:23
**adhere** 86:14
**adherence**
85:25 176:24
**adjust** 43:11
135:2
**adjusted**
146:14 195:20
**adjustment**
193:23 220:14
220:18 222:6
223:1
**adjustments**
133:18 134:4
**administration**
64:1 224:23
**administrative**
7:8
**administrator**
63:18
**administrators**
1:6
**admissibility**
47:1,3

**admit** 32:4
**advance** 7:3
**advanced**
29:23 193:13
**advise** 195:12
**aeb** 94:6
**aesthetic**
207:20
**aesthetics**
207:11
**affect** 165:8
182:21 187:24
208:24 220:19
**affected** 36:6
183:10
**affects** 137:20
**aftermarket**
157:15 160:18
165:5 166:13
204:20
**agencies** 104:4
104:23 224:18
**agency** 104:18
104:20 224:19
**aggressive**
100:14 207:22
**aggressivity**
39:12 176:9,23
177:24
**ago** 7:1 8:12
16:11
**agree** 13:25
14:5,7,9,24
20:17 27:8
30:23 38:18

50:4 51:9
54:17,20 72:18
73:5,14 74:18
76:7 79:15
83:11,16 87:22
88:15 89:3,16
90:20 95:5
96:10 99:18
100:7 102:7
103:6,9,17
104:19,21
108:2,6,22
110:11 113:7
114:10,21
120:8 121:6,20
122:15 123:8
124:3 131:5
142:21 144:6
166:23 167:8
173:22 175:14
175:25 187:15
187:19 194:11
197:19 208:11
208:16 211:24
213:25 217:9
222:3 223:14
225:11
**agreed** 79:8
85:24 112:1,10
112:11,11
**agreement** 3:17
3:19 61:19
74:1 79:4,21
80:12 81:12,14
84:21 86:2,6

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[agreement - answer]**                                    Page 5

| | | | |
|---|---|---|---|
| 98:24 99:20 | **alive** 193:11 | 123:10 124:4 | 95:1 128:25 |
| 110:23,25 | **allege** 182:23 | 124:12,22 | 182:5 187:4 |
| 111:14,21 | **alleged** 93:18 | 125:10,19 | 191:23 221:25 |
| 160:20 177:14 | 94:11 193:16 | 137:4 142:7 | 222:12 223:9 |
| 204:12 212:9 | **alliance** 83:12 | 143:5 217:2,10 | **analyzed** 32:8 |
| 226:15,18 | 111:3 112:10 | **amounts** 76:24 | 108:9 218:4 |
| **agrees** 20:14 | **allowed** 94:17 | **analyses** 210:2 | **analyzing** |
| **ahead** 10:12 | 151:7 | 215:19 | 22:20 96:2 |
| 13:18 24:6 | **allowing** 43:5 | **analysis** 28:19 | 172:25 178:7 |
| 51:14 52:13 | **alter** 137:18 | 31:1 33:1 39:2 | 215:16,17 |
| 53:4,15 72:14 | **alternative** | 54:19 73:11 | 220:7 |
| 89:13,24 91:16 | 55:7,9,12 56:6 | 91:20,21 92:2 | **ancillary** |
| 99:23 101:4 | 56:18,22 58:14 | 98:3 99:10 | 229:23 |
| 108:13 109:1 | 58:25 59:19,24 | 100:2,5 105:5 | **angle** 194:23 |
| 121:9 123:14 | 60:2,10,17,25 | 118:24 122:4 | 195:6 197:14 |
| 159:9 161:8 | 61:14,20,21 | 129:7,12,17,24 | 198:1,6 208:25 |
| 165:3 167:3,14 | 194:15 195:8 | 130:1 132:6 | 209:4 |
| 170:7,16 172:2 | 195:24 196:2 | 138:5,9 139:2 | **angles** 194:9,9 |
| 175:18 176:6 | 198:18 199:2,6 | 141:11 145:5,5 | 194:14 208:12 |
| 181:2 197:7,24 | 205:25 219:3,6 | 165:6,12 | 208:15,23 |
| 215:12 | 219:8 | 169:13,17 | 214:8 |
| **aided** 140:20 | **alternatives** | 177:20 178:3 | **announce** |
| **airbag** 183:10 | 60:21 61:23 | 178:18,23 | 43:22 |
| 183:11,14,21 | **altogether** 94:5 | 179:1,4,8 | **announcing** |
| 183:21,24 | **aluminum** | 181:21 185:9 | 44:9 |
| 184:6,9,13,16 | 134:15 | 186:1 187:13 | **annual** 46:17 |
| 184:19,21 | **amended** 3:10 | 189:13,17,24 | **answer** 23:25 |
| 185:2,5,20 | 5:11 | 192:13 193:1,5 | 24:21 32:15 |
| 186:2,13 | **america** 12:7 | 209:24 210:14 | 39:6 40:13 |
| 187:15,16,19 | **amount** 34:24 | 218:15 221:2 | 51:14 53:4,23 |
| **align** 35:25 | 36:11 39:18 | 222:2,16,19,23 | 54:9,10 64:11 |
| **aligned** 118:10 | 52:17 54:25 | **analytically** | 75:23 78:9 |
| **alignment** 95:7 | 64:7,10,12 | 102:23 | 86:24 88:2 |
| 118:7 120:15 | 116:22,22 | **analyze** 92:12 | 89:13,24 91:16 |
| 120:16 173:15 | 119:24 123:9 | 92:18 93:11 | 92:18 93:2 |

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[answer - assisted]**                                          Page 6

94:16 95:22
109:1 114:17
145:11 151:16
157:23 161:8
162:20 163:1,2
163:19 165:3
168:4 171:9
172:3 186:7
187:8 190:19
192:3 193:10
200:7 203:9,10
203:14,14,20
203:23 204:9
204:24
**answered**
  51:13 52:12
  60:15 61:2,3
  62:6 74:5
  149:15 169:2
  187:2 202:9,10
  202:18,24
  203:24
**answers**  228:8
  229:7
**anybody**  44:1
  48:3
**anymore**  17:12
  17:13
**anytime**  4:25
**anywise**  228:16
**apart**  11:1
**apologize**  7:18
  43:9,12
**appeal**  207:21

**appear**  62:12
**appearance**
  207:22
**appearances**
  2:1
**appearing**
  43:24
**appears**  54:18
  63:9 65:11
  80:24 99:9
**application**
  12:16 205:5
**applications**
  205:10
**applied**  48:1
  74:22 168:19
  212:11 229:22
**applies**  72:19
  148:11 200:15
  215:18
**apply**  72:22,25
  73:2 74:18,25
  88:25 110:23
  146:13 148:10
  210:6,7
**applying**
  141:15
**appreciate**  7:2
  77:22
**approach**
  138:18,23
  139:4 148:7
  194:9,13,23
  195:5 198:1,6
  208:12,15,22

208:25 209:4
**appropriate**
  61:24 134:22
**approve**  63:20
**approved**
  158:22 159:18
  161:6,21
  168:11
**approximately**
  4:8 57:9 64:3
  88:10
**apqp**  193:13
**april**  28:16,18
  211:20
**apron**  26:19
**area**  205:8
  214:5
**areas**  116:23
  133:8 144:15
  195:5
**arguing**  171:24
**argumentative**
  126:14 168:1
  193:8
**array**  60:4
  120:17
**article**  4:4
**asked**  43:21
  51:13 52:12
  60:14 61:1
  74:5 80:3
  94:14 106:3
  130:16,20
  149:15 157:1
  169:2 202:9,18

202:24 203:3
  220:13
**asking**  31:6
  33:12 52:20,22
  54:4,5 89:11
  92:1 125:15
  147:14,16
  156:12 206:8
**aspect**  4:25
  23:3 27:10
  135:21,24,25
  136:2,8 137:10
  189:3 209:2
  223:5
**aspects**  22:25
  53:10 67:24
  96:25 135:6
  180:8 220:20
**assemblies**
  16:15
**assembly**  26:19
  171:11 181:15
**assert**  30:14
**assessment**
  176:16 217:9
  222:21
**assign**  190:21
**assigned**  70:2
**assignment**
  231:1
**assist**  231:7
**assistance**
  69:11 154:13
**assisted**  69:6

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[associated - base]**                                                      Page 7

associated  6:22
 8:10 84:22
 195:3,3 206:14
assume  44:17
 95:21 127:2,2
 167:6 171:23
assumes  86:23
 161:5,9 167:2
 167:12
assuming  5:25
 29:22 109:2
 125:13 192:12
assumption
 167:7
atlanta  2:10
attach  231:8
attached  5:11
 9:19 196:10
 208:20 229:9
 230:6
attachment
 190:15
attempt  196:13
attempted
 16:19 84:10
 172:7 196:10
attorney
 230:12
attorneys
 229:12
attributed
 184:5
audit  155:8
audits  166:22

authored  212:7
authority
 224:24
authorize
 150:25
auto  83:15
 128:15 193:12
 219:23,24
 220:2,6 221:5
 221:8,9 224:3
automakers
 221:4
automatic  94:7
 94:9
automatically
 229:22
automobile
 83:12 111:3
automotive
 142:2
autonomous
 72:24,25
autopsy  27:14
 27:17,20,21
 28:1
available  30:19
 34:19 65:1,2,7
 65:10,19,23
 93:6 97:25
 104:9 105:3
 113:8 120:17
 132:22 133:19
 133:19 138:21
 145:16,21
 146:21 147:1

147:21 148:9
148:15 213:6
213:11 223:15
229:16,24
ave  2:5
avoid  24:5 94:4
 94:11
avoidance  94:3
 94:10 103:2
aware  47:5
 83:9 84:8,21
 85:1,8 86:13
 86:16 89:23
 108:14 109:5
 113:22 126:22
 139:17 152:7
 152:19 157:5,8
 159:18 163:15
 166:21 172:22
 184:4,7 191:3
 191:24 194:7
 194:20 198:24
 199:25 208:4
 209:10,13,17
 209:20,22
 210:2 226:19
awful  61:8

**b**

b  1:22 18:1
 228:21 229:21
back  11:24
 18:6 21:23
 23:1 28:11
 37:13,14 43:4
 47:6 68:7

74:17 77:25
78:21 83:17
96:5 98:17
110:16,21
128:8 132:11
139:6 141:7
154:1 161:2
173:13 186:18
186:25 201:18
205:4 213:24
214:23 220:23
background
 27:23 212:9
bag  185:17
 186:9
bailment
 160:20
bare  99:2,4
 204:10 225:7,9
barrier  12:11
 13:12 15:8
 39:19 115:18
 118:5,12
 119:20 120:2
 136:15 137:3,3
 139:14,16
 140:13 174:11
 175:7 201:12
 201:13
base  57:19 58:3
 59:13,16
 121:18 168:19
 170:21,22,24
 182:14 194:22
 198:2 204:13

Christopher D. Roche                                February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[base - blocker]**                                              Page 8

204:18,22
212:21
**based**   15:22
17:25 19:12
27:17 28:23
32:10 33:2,16
36:22,25 37:19
38:13 46:14,20
57:20 59:13,24
93:13 95:3
96:7,8,24 97:6
97:10,25 98:22
100:2 102:15
106:13 108:8
110:1 112:13
114:10 115:9
115:10 116:5
119:18 122:7
123:18 132:19
137:13 138:19
147:2 162:23
173:21 178:10
179:14 180:5
185:8,9,15,23
188:17 199:21
200:19 201:8
216:14 217:5
217:10,12
**baseline**   88:13
88:16 97:13
98:6 120:3
145:24 146:11
165:7 169:20
170:9 171:4
182:7 199:21

200:4 202:1,3
202:21 207:9
214:17 220:14
**basic**   196:18
197:10
**basically**   17:13
41:5 42:13
81:17 95:3
**basis**   46:13
49:6 58:9
104:16 152:5
153:20 170:1
173:14 196:15
210:22
**bates**   3:17 7:24
48:19 50:14
101:6 107:6
212:14,20,25
221:18 223:14
**beam**   21:3 38:6
39:7,24 55:20
56:7 59:20
92:21 175:22
201:15
**beams**   38:15
**bear**   198:7
**beat**   203:8
**bed**   18:5
149:22
**began**   54:22
**beginning**   9:22
43:6 71:13
110:7 127:6
**begins**   9:18

**behalf**   2:2,7
34:7 43:24
159:4 203:18
**behavior**
120:13 134:17
138:19 145:24
147:11 161:12
**belief**   116:24
**believe**   5:21 9:7
44:3 47:24
55:1 57:1
63:14 65:25
68:5 80:18
81:10 84:25
86:9 103:22
106:7 107:1
118:13 120:25
124:11 145:22
150:25 173:7
178:20 191:15
202:11 203:11
206:2 211:10
214:5,20 223:4
224:12
**beneficial**
41:12 176:9
**benefit**   13:18
105:9 108:17
108:18 109:10
148:12 174:19
208:11
**benefits**   108:7
172:11 180:10
180:23 194:3
195:2 206:4,20

206:22 207:6,7
208:5,10,21
**best**   120:8
131:12
**better**   147:9
207:20 217:16
**beyond**   28:6
35:3 60:8
91:19 113:22
124:22 167:23
169:7 170:24
171:2,18 174:8
174:16,17
175:24 188:16
211:6
**biased**   115:23
**big**   192:25
**billed**   7:6 64:15
**billing**   7:4,10
8:7 46:18
64:16
**biomechanical**
27:10 66:23
**biomechanics**
27:8
**bit**   16:17 25:17
63:1 128:12
138:15 140:16
154:8 199:10
220:10
**blessed**   159:22
**blocker**   21:3
38:6,15 39:7
39:24 55:19
56:7 59:19

Christopher D. Roche
February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[blocker - bumper]**

Page 9

175:22 201:15
**board**  4:5
**body**  12:1
15:21 16:14
18:4 19:1,16
21:15 22:25
23:7 37:1
52:15 87:7,13
134:14,15
140:21 141:7
148:25 149:2
149:20 217:6,7
217:21 220:19
**bold**  85:23
100:4
**bolt**  56:1 58:15
198:18
**bolted**  56:3
**bolts**  196:19,21
219:20
**bonus**  46:19
**book**  87:8,13
148:23 149:1,2
149:3,20
**bottom**  9:24
62:14 73:6
76:23 77:1
101:16,19
178:20 204:15
211:14 213:2
**bought**  152:1
**box**  13:2
**bracket**  20:10
21:2 57:2,20
57:22,24 88:12

97:5 123:19
171:6 182:19
194:16 196:3,5
196:10 199:2
199:22 200:8
201:2 202:14
203:16,19
204:5,6 208:17
209:2
**brackets**  55:10
55:16,25 56:3
57:7,14 58:5
58:15 59:1,25
60:4 88:7
163:10,16,20
182:17 193:21
193:22,24
194:21 195:9
196:1 197:1,3
197:9,15,17
198:10 199:7
199:13 200:19
201:23 205:6
205:15,19,23
208:20,24
**braking**  94:7,9
**brand**  150:17
**breach**  170:12
**break**  8:3 10:20
10:25,25 11:2
42:19,22 43:6
43:7 54:11
77:24 107:25
127:19 128:11
186:17 191:5

213:16
**breaker**  92:21
**breakover**
208:15
**brief**  22:11
73:12
**briefly**  35:12
119:9 220:22
**bring**  7:9 8:14
63:21
**broad**  23:24
24:1,4 74:23
89:12 114:25
214:6
**broke**  14:3 19:9
**brought**  6:8,10
6:18 158:18
206:21
**bruce**  44:16
**bryson**  1:6,6
3:17 9:18,23
9:23 11:13
27:13,18 35:9
63:8 80:13
101:16,19
131:2 150:4
187:17,21
**brysons**  33:21
34:7 130:17
**buckner**  65:13
66:11,19
118:15 119:18
120:6 121:3
124:23 125:10
125:17 126:2

126:11,17
128:10 130:8
148:6 217:2,16
**buckner's**  66:5
118:22,24
119:8 124:15
125:3,25 127:4
127:12,15
217:9,18,24
**build**  121:18
137:6,16
139:10 140:25
145:13 147:25
148:11,13,23
149:20 153:13
193:2
**builder**  87:13
148:25 149:2
**builders**  87:7
**building**
137:21,25
138:2 140:12
140:17 145:16
146:21 155:13
**built**  33:14
85:25 137:15
138:12 139:2
144:12 147:20
**bulk**  168:10
**bullet**  18:24,25
21:7 26:11
192:24 212:13
223:11
**bumper**  16:15
16:22 17:6

Christopher D. Roche
February 1, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

[bumper - car]                                                    Page 10

25:2 31:17,21
32:5 52:16
73:17 75:7,17
76:7,10,17,22
115:20 118:9
118:10,11
222:21
**bumpers**  75:13
**bunch**  13:17
24:5
**burrowing**
174:25
**bus**  153:14
**buses**  159:23
**business**  147:6
191:16
**buy**  150:17,22
151:24

**c**

**c**  14:2 228:1,1
**c.z.b.**  1:7,8
**ca**  121:14 141:6
**cab**  41:23
82:12 87:15
149:22 153:13
153:23 159:23
**cad**  140:21
141:9
**calculated**
217:19
**calculations**
70:21 122:4
141:14 216:24
**calendar**
229:24

**call**  11:3 43:18
72:17 79:8
129:15
**called**  72:15
129:4 179:3
181:13 193:13
**cannella**  2:3,4
3:4 4:13,13
5:19 6:1,6,22
7:3,5,15,17,22
8:4,11 10:17
10:23 11:4
13:14 23:23
24:3,11,20
38:2 39:4
42:23 43:15
44:1,6,10,14
47:16 48:8
49:11 51:5,12
52:11 53:2,13
53:18,22 54:3
58:19,22 59:7
59:11 60:14
61:1 63:10,12
64:4,19,21
66:10 68:15
70:9,14 74:4
74:11 75:21
76:13 78:3,8
78:14 80:18,21
83:21 84:18
85:11,14 86:21
87:24 89:6,21
90:11,21 91:12
92:5,11 93:20

95:14,19,24
97:22 99:21
106:1,4 107:1
107:14,19
108:24 109:18
109:24 111:15
111:22 114:4
114:15 115:7
118:16 121:7
122:17 123:12
124:25 125:13
126:13,23
127:20,24
128:3 131:6
135:22 136:13
136:19,24
138:13 143:17
144:8 145:10
149:14 151:10
151:18 152:10
152:22 156:2
156:10,20
157:16 158:9
158:15 159:7
160:25 161:4,9
164:14,25
167:1,11,25
169:1 170:5,14
171:1,15,24
175:15 176:3
180:2,12,25
181:25 183:6
185:6 186:4,19
189:18 191:25
192:15,19

193:7 197:4,21
200:16 202:8
202:18,24
203:6,23 204:8
206:6 213:18
215:9 218:20
218:23 221:20
222:17 225:2
226:25 230:1
**cannella's**  34:7
44:18
**cannellasnyd...**
230:1
**capabilities**
129:19 130:5
**capability**
55:22 129:20
131:16
**caps**  20:17
**caption**  228:8
**capture**  134:17
143:4 144:15
144:22
**captured**  65:9
**car**  12:20 36:15
36:16 71:21
72:7,10 73:17
76:22 77:14,18
89:10 90:23
100:11 101:13
108:21 109:14
132:13 136:16
164:18 174:1
174:13 181:12
200:21

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[car's - certified]                                                    Page 11

car's   36:3
care   25:6 64:1
   164:9,13,16,21
   166:25 167:9
   168:13,16
   169:13,17,20
   170:4,13
   171:21 199:12
   199:20 200:9
   200:12,14,14
   200:18 201:22
   202:16,23
   203:18 225:20
career   128:25
   129:25 132:18
   189:25 225:23
cargo   214:23
   215:2,3,7,13
cars   75:2,7
   76:5 79:11
   98:20 100:15
   103:2 146:5
   166:11 169:23
   172:14,16
   174:25 178:8
case   6:5,7,8,11
   6:13,23 7:5,6
   8:11,15 11:6
   11:12,16 19:15
   24:14 27:10,22
   27:24 28:25
   29:4,19,21,24
   30:1,3,5,7,8,8
   30:15,16,21,22
   30:24,24,25

31:4,6,7,7,9,10
31:17,21 32:1
32:9,13,14,16
32:19 33:7,9
33:19,22 34:2
34:6,8,11,13,17
34:19 35:2,4,6
35:7 37:18,19
38:7,8,11
39:14 41:18,21
41:25 42:6,14
42:16 44:12,13
44:15,18,21
45:3,5,9,12,16
47:7,9,10,21
48:4,18,21
51:11 52:2
53:12,21 54:1
55:13 60:24
61:25 62:17,20
62:23 63:13
64:5 65:14,24
66:6 67:11
69:7,22 70:14
71:9,20,23
72:24 73:11,15
74:25 77:8
82:19 89:25
90:18 91:20
93:8,12 114:11
114:11,19
116:10 118:1
119:15 123:18
124:11 128:11
130:8,17

131:11 155:16
156:3 158:24
160:11 162:24
164:2,6 166:4
166:9,16
167:15,22,24
168:14,18
170:1,1 172:7
172:9,20
179:19,23
182:3 183:5
184:22 187:11
187:18 189:3
193:18 194:1,6
206:11 207:25
218:4,11
220:16 222:15
223:2 224:2
228:14,17
229:9,12,21
caseload   46:18
cases   25:6
   29:14,16,17
   30:17,20 31:11
   34:16 45:15,18
   45:20,22,23
   46:21 47:2,4
   69:25 70:3
   98:2 120:5
   134:13,15
   145:1 218:13
catch   24:8
   128:21 150:14
category   14:10
   56:24

cause   27:12,17
   28:2,9 215:4
caused   52:1
   130:25 173:16
   215:8
causes   90:9
causing   50:2
   52:16 173:17
ccr   1:22 228:21
center   12:8
century   85:17
certain   75:18
   79:7 84:6
   104:2 118:3
   133:8 134:7
   137:4 158:22
certainly   14:25
   15:16 50:8
   74:24 80:8
   83:14 103:20
   104:15 108:10
   109:9 112:4
   142:2 162:5
   221:1
certificate
   229:2
certificates
   229:16
certification
   82:13 103:15
   122:14
certified   82:22
   83:1 86:1,6
   110:23 111:13
   111:20 113:9

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[certified - colloquies]**                                    Page 12

113:10,17
158:14,21
229:6,8,11,15
**certify**  81:23
82:14 83:7
112:12,18,20
122:7 123:1
228:6,13 231:2
**certifying**
154:12
**cfr**  73:7
**challenged**
46:25
**challenges**
172:24 178:4
**challenging**
47:3 196:14,16
**chance**  185:1,4
185:11,12
**change**  69:19
135:15,19
136:1,8,9,10
137:10 168:12
179:21 182:16
231:11,13,14
231:16,17,19
231:20,22,23
231:25 232:1,3
232:4,6,7,9,10
232:12,13,15
232:16,18
**changed**  79:24
126:11 135:21
**changes**  103:3
126:18 135:7

135:13,13
230:6 231:3,3
231:5
**changing**
135:24,24
136:15 226:10
226:13
**characteristics**
92:16 96:9
119:21 129:10
130:3 141:18
141:18 148:18
148:19 166:8
169:15 207:9
**characterizati...**
56:25 81:2
205:22
**characterize**
15:15 33:5
90:14 138:18
**characterized**
55:4
**charge**  63:12
**charged**  63:12
64:4 224:20
**chassis**  153:13
159:23
**cheapest**
195:21
**cheaply**  145:23
**check**  46:2
**cherokee**  15:24
15:25 16:2
18:21 21:9
24:23 220:13

**chevy**  145:21
**child**  68:7
**choose**  226:5
**chooses**  122:2
**chose**  83:7,8
**chris's**  11:5
**christopher**
1:16 3:11 4:1
4:10,19 230:2
**chrysler**  18:8
112:6,7
**circle**  96:4
**circumstances**
29:21
**cite**  73:14 74:3
104:23 140:9
174:19
**cited**  73:11
106:8
**civil**  1:7 227:17
231:5
**clarify**  10:1,11
14:23 52:22
187:2
**classified**  15:19
16:3 85:16
**clear**  27:6
43:12 51:25
69:19,20 72:1
81:25 126:20
132:3 140:1
158:16 199:9
210:9 216:1
**clearance**
194:8 197:17

204:1 207:10
**clearly**  87:20
158:7 177:9
178:14 199:23
226:10,11
**client**  63:24
**clients**  30:8,18
63:25
**close**  103:14
213:17
**closely**  202:2
**closer**  204:3
**code**  16:2 184:5
184:7,10
**coefficients**
134:7
**cohen**  27:12,18
28:2,8 131:1
187:17,21
215:7
**collect**  63:24
**collective**  3:12
10:13 63:5
**collectively**
11:3
**collision**  16:21
23:6 32:6 94:3
94:4,10 214:1
214:3,12
222:15
**collisions**  50:2
98:19
**colloquies**
229:7

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[colloquy - complied]**                                    Page 13

| | | | |
|---|---|---|---|
| **colloquy** | **companies** | 35:24 36:21 | 228:11 229:6 |
| 151:13 | 79:22 135:5 | 38:13,21 39:9 | 229:10 |
| **combination** | 140:9 147:25 | 40:3,7 41:2,7 | **completed** |
| 71:15 102:25 | 153:3 155:7 | 42:3,6,9 45:7 | 62:19 230:3,17 |
| **come** 28:11 | 157:14 158:2 | 55:1 58:3,11 | **completely** |
| 37:13 61:19 | 158:12 160:8 | 58:12 59:16 | 31:14 79:16 |
| 77:25 172:12 | 160:16,23 | 62:4 79:4 | 114:12 |
| 184:25 186:18 | 162:12 163:4 | 80:12 81:12 | **complexities** |
| 219:6 | 166:1 209:17 | 88:4,6 93:8 | 98:5 |
| **comes** 121:21 | 209:21 | 96:12,18,24 | **complexity** |
| 208:14 | **company** 71:22 | 97:10,14 103:1 | 166:11 |
| **coming** 107:17 | 72:8 147:22 | 103:14 104:7 | **compliance** |
| 155:6 | 154:20 155:10 | 106:19,23 | 25:5,8 79:21 |
| **commanded** | 155:10 158:11 | 108:17,20 | 80:7 86:8 96:7 |
| 183:12 185:25 | 162:15 168:21 | 109:11 113:2 | 98:22 105:16 |
| **comment** | 191:2,19 | 115:2,13,18 | 109:14,16,23 |
| 150:24 177:16 | 198:23 225:12 | 131:20 132:9 | 111:4,8 113:12 |
| **commenting** | **company's** | 146:9 147:4 | 113:25 114:12 |
| 86:8 | 72:11 | 164:19 169:22 | 122:10 123:1 |
| **commission** | **comparable** | 172:5,10,16 | 163:23 211:18 |
| 232:24 | 31:12 | 174:14 175:6 | **compliant** 32:2 |
| **commitments** | **compare** 137:7 | 176:25 200:20 | 32:5 80:9 |
| 212:6 | **compared** | 204:14 209:8 | 82:15 195:18 |
| **common** | 125:4 223:2 | 209:12,19 | 196:3 204:11 |
| 148:16 | **compares** | 212:5 213:1 | 221:5 |
| **communicate** | 170:21 | 214:19 216:14 | **complicated** |
| 159:4 | **compartment** | 223:5 226:14 | 57:16,18 |
| **communicated** | 15:2 68:8 | **compatible** | 121:16 134:11 |
| 226:11 | 124:18 144:22 | 40:23 99:1 | 138:11 141:14 |
| **communicating** | 214:5,16 215:2 | 168:17 216:12 | 142:4,21 |
| 177:2 | **compat** 42:8 | **compensated** | 195:17 |
| **communication** | **compatibility** | 46:12,13,14 | **complied** 21:11 |
| 155:22 | 3:16,19 14:11 | **compiled** 110:6 | 33:2,7 39:14 |
| **community** | 19:3,5 20:7,9 | **complete** 19:24 | 97:4,10,12,18 |
| 221:7 | 34:25 35:19,21 | 113:14 205:20 | 110:8 116:3 |

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[complied - considered]**                              Page 14

118:2 199:11
201:21
**complies** 85:7
95:13 114:22
**comply** 19:18
20:24 38:9,18
39:25 41:20
57:10,13 74:19
84:1,16 85:2,9
89:18 94:10
123:20 164:18
171:13 175:11
**complying**
113:19
**component**
20:22 40:19
41:7 140:24
162:17
**components**
73:22 134:9
141:1 162:12
163:3,19
164:24 165:8
**compound** 53:3
75:22 151:12
176:4
**comprehensive**
82:25 113:11
113:18
**compromised**
117:12 120:7
**computer**
122:3 140:20
142:17

**computers**
141:15 142:10
**computing**
141:23,25
142:5,6,9,18
**conceive**
195:16
**concept** 17:24
24:23 221:2
**concepts** 20:3,4
**conclude**
165:15 172:10
**concluded** 33:1
57:7 103:25
108:19 110:10
176:8 227:15
**concludes**
227:12
**conclusion**
100:8,9,16
101:10 103:10
111:19 175:10
201:14 219:6
**conclusions**
100:22 102:6
103:18 105:10
108:4,22
218:25
**condensed** 10:6
**condition** 52:5
52:7 60:12,23
88:19,20,23
89:3,3,20 90:9
90:20 91:11,24
92:4 97:21

98:4,13 114:20
119:23 124:5
168:25 170:21
170:22 173:2
198:2 202:21
216:2,4,6,20
**conditions**
67:23 121:11
141:16
**conducted**
17:12 33:15
104:1,5 178:22
199:25 212:12
**confidence**
112:15
**confidential**
30:10
**confidentiality**
30:7,11 47:8
47:12,22,25
**configuration**
41:23 87:15,15
87:21 97:8
117:16 124:7
125:9 126:6
137:14 146:12
147:12 149:23
199:14 207:15
214:14
**configurations**
124:9 146:19
**confirm** 33:12
101:17 165:22
166:6

**confirmed** 11:9
110:6
**conflates**
151:11
**confused** 21:6
64:11 188:4
**confusing** 53:3
74:12 75:22
111:16 114:16
165:1 192:16
222:18
**connection**
35:5 62:17
153:17 163:16
**consequence**
192:12 194:1
**consider** 38:25
61:21 73:23
90:8 130:13
135:9 147:4,5
168:24 179:9
179:18 193:22
199:11 210:17
223:7
**considerable**
194:22
**consideration**
224:10
**considered**
18:18 61:16
99:2 130:10,12
158:23 166:6
168:3 198:22
223:5 224:15
225:6,16,18

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[considering - country]**                                      Page 15

| | | | |
|---|---|---|---|
| **considering** | **contributed** | 46:6,7,11 48:4 | 222:11 223:12 |
| 131:14 173:10 | 123:22 130:25 | 48:5 62:24 | 224:12,21 |
| **consistent** 51:3 | 175:12 | 63:25 65:5 | 226:17 228:11 |
| 52:23 53:19 | **contributing** | 67:15 71:11 | 229:6,10 |
| 57:25 | 173:20 174:3,6 | 74:21,22 75:5 | **corrections** |
| **construction** | **control** 184:16 | 75:20 77:8,19 | 230:6 231:7 |
| 134:14 | 185:22 | 79:6,17 84:3 | **correctly** 75:4 |
| **consultant** | **convenient** | 85:4,7 94:23 | 79:12 125:5 |
| 29:10 | 195:22 | 94:24 96:23 | 135:4 |
| **consulting** | **convert** 18:4 | 97:7 98:23 | **correlate** |
| 28:12,20 218:1 | **converter** | 99:8 101:20,24 | 132:20 |
| 218:14 | 161:16 | 104:13 105:7 | **correlation** |
| **consumer** | **converters** | 105:11,22,23 | 121:15 |
| 205:8 208:19 | 155:18,25 | 106:15 108:6 | **corresponden...** |
| **consumers** | 157:14 158:22 | 109:6,17 110:8 | 5:22 6:1 7:23 |
| 209:7,18 | 159:18 160:19 | 110:18 112:20 | 8:9 10:17 |
| **contain** 174:21 | 160:24 161:20 | 112:21 114:14 | **cost** 17:4,11 |
| **contained** 9:9 | 166:21 168:10 | 115:16,21 | 26:20 55:23 |
| 162:17 | 168:11 209:15 | 120:24 123:1 | 61:12 143:9 |
| **contains** 9:20 | 210:9,12 | 127:17 129:13 | 145:4,9 146:21 |
| 10:15 | **coordinators** | 130:14,15 | 147:19 148:7 |
| **contents** 48:2,7 | 229:5,14 | 132:1 136:12 | 181:8 |
| **context** 48:3 | **copies** 6:10,17 | 141:17 146:20 | **costs** 17:7 |
| 188:13 223:6 | 229:15 230:12 | 155:19 161:22 | 172:12 |
| 225:13 | **copy** 8:23 11:5 | 173:7 175:14 | **council** 4:6 |
| **continued** 84:2 | 229:11 | 176:15,20 | **counsel** 2:1 |
| **continuing** | **correct** 6:3,20 | 183:22 184:1 | 4:10 33:20 |
| 83:18 | 10:3 11:17 | 185:13 187:11 | 130:17 227:3 |
| **contractor** 18:9 | 13:11 16:1,25 | 187:22 190:4 | 228:13,15 |
| **contradict** | 18:9 21:21 | 196:21 197:3 | **countermeas...** |
| 53:11 | 25:15 28:10 | 198:4,6,15 | 12:9 17:10 |
| **contradicts** | 29:6,11 33:23 | 199:1,7,8 | **country** 1:11 |
| 104:24 | 34:3,4,8,9,13 | 209:20 211:7 | 3:10 4:16 |
| **contrast** 103:12 | 34:17 38:10 | 215:19 216:21 | 43:19,25 50:20 |
| | 40:12 44:20,24 | 219:16 222:1 | 52:4 54:15,18 |

Christopher D. Roche                February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[country - creation]**                                              Page 16

| | | | |
|---|---|---|---|
| 55:15,19 60:11 | **county**  228:4 | **crash**  3:19 12:2 | 139:25 140:3 |
| 60:22 68:1 | **couple**  7:1 8:11 | 26:5 31:12,14 | 140:13 142:2 |
| 89:15 92:11 | 16:6,10 18:11 | 31:16,20 36:4 | 142:25 143:2 |
| 132:4 136:4,5 | 218:20 | 36:4 40:21 | 143:11,13 |
| 145:6,14 | **course**  30:18 | 42:4 45:6 | 144:17 145:6,7 |
| 146:22 147:15 | 32:9 60:2 | 50:10 62:5 | 145:8 147:11 |
| 155:21,23 | 61:10 63:23 | 70:21,25 79:4 | 148:3 160:15 |
| 158:3 161:13 | 73:25 79:24 | 81:7,21 93:13 | 169:9 172:22 |
| 161:17,24 | 84:10 113:12 | 93:15 94:20 | 184:18 185:3,4 |
| 162:16 163:5,6 | 132:4 133:8 | 97:3 98:2,4,5 | 190:7,12 214:7 |
| 164:5,5,23 | 137:17 148:4 | 103:2 106:21 | 215:1,15,17 |
| 165:18,24 | 158:24 160:11 | 114:14,20 | 216:15,16 |
| 168:13 172:9 | 225:14 | 116:11 117:17 | 218:5,15 |
| 178:21,25 | **court**  1:1 4:5 | 118:20 119:19 | 222:13 |
| 180:6,15,23 | 4:17 10:12 | 120:11 121:4 | **crashed**  37:22 |
| 181:20 182:4 | 13:14,18 20:11 | 121:16,20,23 | 135:15 |
| 182:18,24 | 30:11 49:16 | 122:9,13,19 | **crashes**  93:10 |
| 185:21 189:9 | 80:17 161:1 | 123:5,8 124:6 | 120:18 123:11 |
| 189:10,15,23 | 220:10 227:7 | 124:20,21 | 131:18 140:10 |
| 191:11,14,16 | 229:8 230:15 | 125:8,15,17 | 185:24 |
| 194:4 198:23 | 230:19 | 129:9,11,16,17 | **crashworthin...** |
| 199:11 200:8 | **cover**  12:18,24 | 129:19 130:7,7 | 26:9 45:11 |
| 201:21 202:13 | 14:18 22:17,23 | 131:1,16,17,21 | 72:16,17 103:2 |
| 203:18 204:5 | 27:9 54:25 | 131:23,23,24 | **create**  69:10 |
| 206:3,11,18 | 57:5 78:12 | 132:1,7,13,14 | 88:17 89:2,19 |
| 208:1,9 209:7 | 100:21 | 132:16,16,19 | 90:19 91:10 |
| 210:11 211:21 | **covered**  22:1 | 132:21,22,25 | **created**  50:1,12 |
| 213:7 223:16 | 25:21 | 133:6,9,14,15 | 52:5,9 55:16 |
| **country's**  43:25 | **covering**  64:24 | 133:18,24 | 92:4 124:5 |
| 49:25 130:23 | **covers**  12:19 | 135:11,12,18 | 140:23 216:3 |
| 146:8 147:3 | 13:1 61:8 | 135:25 136:6 | **creates**  90:9 |
| 162:19 164:8 | 140:3 | 136:10 137:7 | 91:23 97:20 |
| 164:11 167:23 | **crafters**  71:22 | 137:17,25 | **creating**  168:24 |
| 193:16 206:25 | 72:7,10 | 138:10,19,21 | **creation**  141:3 |
| 210:23 | | 139:9,11,13,19 | |

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[credible - decide]                                        Page 17

| | | | |
|---|---|---|---|
| **credible** 198:20 | **cruz** 16:8,9 | **dangerous** 52:7 | **dated** 8:25 9:10 |
| **crew** 82:12 | 17:17 | 86:20 88:20,23 | **dates** 10:8 |
| **criteria** 19:18 | **cs** 230:21 | 89:2,19 90:9 | **day** 228:18 |
| 21:12 22:16 | **curious** 155:24 | 90:19 91:10,23 | 232:21 |
| 23:11,17 38:10 | 198:5 | 92:4 97:20,21 | **days** 67:1 72:23 |
| 38:18,20 40:1 | **current** 9:5 | 98:8,10,13 | 230:3 |
| 40:20 59:2 | 30:21 64:6,16 | 168:25 216:20 | **de** 2:5 |
| 83:19 84:17 | 140:18 | **dangers** 223:10 | **deal** 122:5 |
| 86:15 87:20 | **currently** 45:20 | **data** 35:17 | 143:7 |
| 89:1 97:19 | **cursor** 26:12 | 40:22 98:1 | **dealer** 150:18 |
| 98:23 109:23 | **customer** 181:6 | 99:19 102:18 | 150:23 |
| 163:23 170:3 | 195:1 197:20 | 104:2,9 105:5 | **dealers** 151:4 |
| 170:23 179:15 | **customers** | 105:6,10,12,15 | 160:21 |
| 181:16 188:20 | 152:3 195:13 | 106:10 108:9 | **dealerships** |
| **critical** 194:4 | 209:21 | 121:16 132:21 | 151:12 152:14 |
| 206:2,18,24 | **cut** 85:18,19 | 132:22,25 | 152:17 |
| 209:7 | **cuv** 18:4 | 133:6,14 | **dealing** 195:4 |
| **criticality** | **cv** 1:8 3:13 8:23 | 135:11 138:1,2 | **deals** 14:25 |
| 190:20 | 9:10,20,22 | 138:19,20 | **dealt** 153:2 |
| **criticism** 57:12 | 10:15 11:10,19 | 140:14,23 | **death** 27:12,18 |
| 97:7 | 11:24 15:11 | 141:5,9 147:23 | 28:2 50:1,13 |
| **criticisms** | 27:7 28:13 | 149:9 153:19 | 52:2 177:17 |
| 87:21 | 63:6 | 153:22,23,25 | 178:15 |
| **crossover** | | 154:14 159:12 | **decade** 100:13 |
| 17:25 | **d** | 169:5 173:10 | **decades** 123:7 |
| **crush** 116:3 | | 175:1 184:15 | **decatur** 2:6 |
| 117:16 119:2,5 | **d** 1:16 3:11 4:1 | 184:17,18,25 | **deceased** 1:8 |
| 119:7 122:3 | 4:19 35:16 | **database** | **deceleration** |
| 124:8 125:4,19 | 230:2 | 172:25 173:3,6 | 36:6 |
| 128:25 129:23 | **daimler** 18:8 | 173:11,19,21 | **december** |
| 130:3 137:5 | **damage** 17:4 | 174:7,9,16,16 | 106:17 211:9 |
| 143:7 | 67:25 143:15 | 174:17,20,21 | 211:17 221:17 |
| **crushing** 36:16 | 144:1 | **date** 49:8,9 | 223:13 |
| 36:19 | **danger** 50:19 | 64:4,9,12,13 | **decide** 131:7 |
| | 51:18 94:12 | 80:9 176:10 | 201:1 |
| | 98:14 222:12 | | |

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[decision - description]**                              Page 18

decision   169:11
   172:12 200:2
   201:4
deck   141:11
declaration
   47:21
decline   102:25
   103:4
declined
   100:12 101:14
deduction
   173:24
deep   39:22
deeper   38:12
   39:20
defective   37:19
   168:24
defendant   1:12
   2:7 3:10 4:15
   29:14 46:1
   69:2
defendant's   3:8
   5:4 10:21
   49:22 62:7
   80:22 101:2
defense   46:4
defer   127:13
define   13:23
   35:23 36:8
   117:8 216:3,12
   217:2
defined   14:1
   160:18 216:5
   226:10

defining   225:5
definitely   211:1
   223:22
definition
   117:9,10
   203:17 216:10
definitively
   223:20
deformable
   119:20 120:1
deformation
   143:6
degrade   35:20
   35:22 36:22
degraded   36:4
degrading
   36:11
degree   40:24
   42:3 121:17
degrees   142:3
delay   4:24
   42:21
delays   48:11
delta   183:13,17
   184:18 185:7,9
   185:18,23
demonstrated
   99:3 117:15
departure
   194:9,14 195:6
   208:12,15,22
dependent
   181:22
depending
   143:3 149:22

215:3
depends   41:10
   41:10 143:1
   145:1
depicts   77:12
deploy   183:12
   183:12 184:19
   185:2,11,12,17
   185:20 186:3
   186:11
deployed
   183:18 186:10
deployment
   183:15,16,24
   185:5,15,23,24
depo   7:20
deponent   230:2
   230:5,6,7,9,15
deponent's
   232:20
deposition   1:14
   3:11 4:1,10
   5:11,14,14,20
   6:14 7:2,11
   8:19 29:4,8
   30:9 43:19
   45:16 46:25
   48:23 51:16
   63:22 67:19
   78:19 79:3
   127:7 155:20
   175:9 189:7,15
   209:24 218:3
   227:13,15
   229:19 231:6

depositions
   10:8 45:17
   46:8
descent   194:9
describe   12:4
   14:6 19:19
   30:2,5,14
   56:17 72:16
   73:7 93:9
   109:7 116:2
   178:24 183:9
   188:3,21
described
   48:15 56:6
   60:13 77:3
   79:12 88:9,18
   88:20 89:2
   90:24 91:24
   92:23,24 93:17
   116:19 117:7
   123:22,24
   140:17 142:22
   163:18 182:25
   187:24 188:1
   190:20 193:6
   204:1 207:18
   208:21 209:24
describes   181:9
describing
   32:18 61:7
   93:23 96:21
   188:4 208:10
   216:19
description   3:8
   194:15 196:3

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[description - differences]**                                    Page 19

206:12
**design**  13:5
17:19 20:3,25
22:14,18 23:20
24:17 25:7
32:11,24 37:19
37:23,25 38:3
41:8,11,14,18
41:18 54:20
55:9,13,20,21
56:6,14,18,22
58:3,10,14,18
58:25 59:5,21
59:24 60:17,25
61:14 72:18
92:21,24 96:9
97:18 133:25
134:8 135:3
140:19,20
145:25 162:16
162:19,21
165:25 166:7
168:21,23
169:16 170:9
173:16 176:25
178:6 179:7,9
179:11,15,18
180:19 181:4
181:14 182:11
189:5 190:23
192:6,23
193:15,17
194:15 195:9
195:18,24
198:18,24

199:2,5 200:19
201:15,25
204:19 205:25
206:13,14
209:25 210:16
210:18,19
213:7 219:3,6
219:8,10,12
224:9,14
**designated**
30:10
**designed**  16:14
36:17 54:23
77:7 96:11
116:13 117:11
140:25 150:6
168:16 179:24
180:5,17
192:13 193:4
211:22 217:7
223:17
**designer**
170:23
**designing**
18:13 21:11
**designs**  21:25
41:15 55:7,18
56:11,13 60:2
60:10 61:21
84:24 87:1
179:3 221:7,8
221:9
**desire**  231:5
**despite**  55:17

**detail**  30:2 57:5
70:24 144:15
144:24,25
162:14,16,25
163:3,7,19
180:23
**detailed**  33:4
133:8 140:22
153:22 159:13
174:9
**details**  10:18
114:18 165:22
165:25 167:18
169:8 170:8,18
180:16
**determination**
27:12 164:1,12
**determine**
24:14 124:7
130:23 131:22
173:19 207:1
**determined**
180:7 194:3
**detrimental**
132:9
**develop**  17:6,9
26:18 57:24
62:2 76:1
84:11 112:23
135:5 180:15
181:11,13
210:18
**developed**  25:3
58:9 83:25
93:25 116:9

180:19 190:16
198:22
**developer**
189:21
**developing**
18:18 109:16
116:7 132:7
140:6 181:4
**development**
23:21 24:17,25
25:10,19 26:24
32:8 33:17
34:23 39:3
81:14 83:18
109:8 133:3
141:4 211:19
225:19
**device**  20:22
41:19 56:23
60:9,21,25
90:6 114:22
**devin**  2:4 4:13
**dfmea**  54:19
179:4,7 181:19
181:21 192:2
210:2 220:22
220:24 221:1
**dialogue**  38:22
**difference**  37:9
50:25 93:4
96:20 124:4,8
136:22,25
217:19
**differences**
92:13

Christopher D. Roche                                      February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[different - documents]**                                      Page 20

**different** 10:8
11:22 13:3,7
15:12 22:4,5
34:20 41:15,16
51:21,23,24
53:22 54:14
60:4,9 62:1
67:24 70:2,3
82:17 87:9
91:7 92:1
113:2 119:2,25
120:2,14
132:19 135:19
137:9,13,18
140:5 146:18
146:23,23,24
149:20,20,22
153:15 163:6
165:13 168:6
174:18 177:7
201:13 203:4
212:10 214:11
**differential**
37:3
**differentiate**
177:21 178:2,9
**differently** 55:4
**difficulty** 63:1
**digital** 6:18
140:19
**dimensional**
140:23
**dimensions**
149:10

**direct** 158:4
**direction** 147:8
228:9
**directly** 33:19
49:2,7 86:4
105:16 119:1
120:22 121:2
160:20 200:7
217:8 220:3
224:14
**disagree** 15:2
53:17 177:9
**disagreement**
102:17 176:16
**disagrees** 53:18
**disassemble**
68:3
**disclosed** 48:17
**disclosure** 4:4
48:21 49:4,9
51:2,10 52:25
55:6 229:2
**disclosures**
3:14 48:16,17
**discount**
229:23
**discounts**
229:21
**discovered**
109:12 189:16
**discovery**
105:3
**discrepancy**
133:10,14

**discretizes**
141:12
**discuss** 26:12
30:17,20 48:6
55:10 73:16
87:3 178:21
218:1 221:10
**discussed** 23:22
24:16 25:22
27:4 78:24
105:11 108:5
117:1 172:6
177:4 218:7
219:22 220:22
**discusses** 81:1
113:24 212:7
**discussing** 23:5
26:11 48:2
94:21 100:20
101:22 102:12
**discussion** 13:4
21:8 28:4
101:8 131:10
160:3 177:5
211:19
**discussions**
159:10,14
**disposal** 142:14
**disregarded**
175:25
**dissimilar**
178:5
**dissipate** 36:18
**distance** 57:22
170:19

**distinct** 30:21
31:15 119:21
**distinction**
136:22 178:13
**distinguish**
92:3
**distinguishes**
95:12
**district** 1:1,2
**division** 1:3
220:15
**document** 9:14
9:17 10:5,7,11
48:22,24 49:6
49:12 62:10
80:11 81:11
98:18 100:18
100:22 101:1
101:25 102:2
113:8,12
176:11 180:16
180:22 181:9
206:10,13,13
206:19,25
211:10 212:15
221:13,15
**documentation**
65:10 80:6
111:8 112:13
113:4 180:6
212:2
**documented**
181:17
**documents**
5:12 33:21

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[documents - either]**                                    Page 21

| | | e | echo  14:2 |
|---|---|---|---|
| 34:2,5,12 35:3 | **drawn**  140:22 | | **economically** |
| 35:8 47:10,23 | **drive**  87:14 | **e**  5:22,25 6:1 | 61:14 |
| 48:2,3,7,7 | 149:22 205:15 | 7:22 20:12,17 | **edict**  226:3 |
| 62:17,18 65:6 | 205:21 | 20:18 66:12,22 | **editions**  22:5 |
| 65:13,22,24 | **driven**  200:2 | 91:1 107:15,20 | **edr**  184:4,11,15 |
| 66:2,7 81:10 | 226:2 | 138:4,4 153:13 | **education**  9:8 |
| 107:12 127:1,3 | **driver**  45:13 | 154:19 159:6 | 116:6 |
| 127:5 181:11 | 184:3 | 227:16,17 | **effect**  103:15 |
| 210:21,25 | **driver's**  183:11 | 228:1,1 231:4 | 132:9 |
| 211:2,16,20 | **drives**  76:2 | 231:5 | **effective**  40:12 |
| 213:4 223:15 | **driveway** | **e450**  153:17 | 55:23 143:9 |
| **doing**  19:22 | 197:14,16,18 | **ea**  18:19 19:13 | 148:7 |
| 23:7 141:14 | 198:3,11,13 | 19:22 | **effectiveness** |
| 154:4 189:7 | 205:7 | **earlier**  18:17 | 3:19 104:12 |
| **dollars**  148:2,8 | **driving**  95:10 | 25:17 84:4 | 106:19,22 |
| **domain**  30:19 | 95:10 103:4 | 113:6 117:1 | 113:1 |
| 83:3 145:18 | 222:1 | 132:2 148:22 | **effects**  146:7,8 |
| 210:23 211:1 | **dual**  13:1 | 149:22 159:10 | 179:8 220:14 |
| 211:11,16 | **duces**  3:11 | 168:15 175:8 | 222:6 |
| 212:3 213:6,11 | **due**  25:6 50:9 | 176:19 190:9 | **effort**  70:16 |
| 223:16,21 | 52:4 102:25 | 190:20 198:19 | 144:18 |
| **donald**  45:4 | 103:13 185:3 | 199:10 201:6 | **efforts**  106:14 |
| **download** | 186:3 225:19 | 204:1 206:3 | 112:23 117:2 |
| 145:18 184:4 | 230:3 | 209:17 212:19 | **eight**  168:10 |
| **downloads** | **duly**  4:20 | 218:8 225:22 | 185:16 |
| 126:19 | **duties**  86:13 | **early**  54:22 | **either**  29:13,17 |
| **dozen**  168:9 | **duty**  41:22 | 133:3 154:4 | 47:2 66:8 68:3 |
| **draft**  51:6 | 86:17 87:2,6 | 159:11 162:23 | 83:9 95:4 |
| 69:10,14 | 90:5,25 171:13 | 192:6 210:15 | 112:2 118:23 |
| **drafted**  49:1 | 210:13 | **ease**  194:16 | 119:15 123:20 |
| 52:25 65:3 | **dvp&r**  181:14 | **easier**  179:4 | 131:13,17 |
| **drafting**  49:4 | 181:19 | **eastern**  4:9 | 136:18 155:18 |
| 49:12 62:21 | **dyna**  129:4 | **easy**  43:12 | 166:14 170:20 |
| **draw**  73:18 | **dynamic**  129:9 | 195:12 207:18 | 175:6 178:5 |
| | 129:23 | | |

Christopher D. Roche
February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[either - esq]**

Page 22

181:19 190:23
193:20
**elantra** 12:21
26:25 27:1
**elected** 184:19
**electric** 22:11
**electrical** 73:22
**electronic** 6:12
184:14
**electronically**
230:7
**element** 129:7
129:12,17,24
130:1 138:5,9
139:1 141:11
145:5
**elements** 26:4
141:13 148:17
210:7
**elevation** 56:9
**eligible** 83:6
**eliminate** 60:11
60:23 92:23
131:24 179:16
**eliminated**
61:17
**elliott** 95:10
**elliott's** 57:6
71:4,9 87:19
91:6 97:8
116:16 118:1
120:10 123:19
**else's** 173:12
**emergency**
42:20 94:7,9

**employ** 228:15
**employed**
195:25
**employee** 46:16
212:7
**employment**
15:17 128:14
**empty** 150:8
**emulate** 202:2
**enabler** 20:7,8
**enablers** 12:19
13:3 94:17
**enacted** 109:22
**endurance**
79:20
**energy** 3:20
17:20,21 18:14
18:15 20:15,16
21:19 22:15
24:17,18 25:10
25:19 32:24
33:3,11 36:18
39:1 41:3
52:17 77:13
87:4
**engaged** 117:13
225:14,15
**engagement**
36:14 42:9
216:15,17
**engaging** 153:9
224:17
**engineer** 19:1
57:1 58:13,15
60:1 179:2

181:17 200:24
203:7 206:14
217:6
**engineered**
12:12 17:14
26:4 88:5
149:18 182:20
189:25 199:23
**engineering**
20:2 26:3,6
61:9,15,18
133:11 147:3
153:22 154:6
157:25 165:12
178:17,22
179:1 181:3
183:2 187:13
189:12 200:2
209:23 210:3
217:21 219:11
220:24 221:7
226:9
**engineers**
137:24 138:1
140:15 179:8
189:6 203:7
**enhanced** 12:2
14:11 212:4
**enhancing** 3:16
3:18 79:3
80:12 81:11
226:14
**ensure** 163:23
**ensuring**
134:16

**enter** 197:1
**entered** 47:9
231:6
**entire** 6:13,19
10:13 51:20
56:9 181:21
205:20
**entirely** 81:25
**entitled** 31:5
80:11
**entity** 104:17
**equal** 207:19
**equipment**
79:7
**equivalent** 21:2
**errata** 230:3,7
230:7,9,11,13
230:14,17
231:1
**escape** 28:5
67:25 68:7,8
73:21 82:12
93:12 115:12
115:16,19,23
117:14,24
118:2,11,25
120:21 121:2
166:2 183:22
184:1 189:2
214:2,10,18,24
216:9,18
**escape's** 52:17
124:1,13
**esq** 2:3,4,8
230:1

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[essence - exactly]**                                    Page 23

| | | | |
|---|---|---|---|
| **essence** 150:14 | 111:12,19 | 101:10,23 | **events** 31:14 |
| 204:4 | 122:10 176:1 | 102:7,11,18 | 129:9,9 |
| **essentially** 18:1 | 176:15,20 | 104:10,12,19 | **eventually** |
| 61:6 73:19,24 | 177:6 223:24 | 104:25 105:7 | 205:12 |
| 141:3,12 | **evaluations** | 105:16 108:10 | **everybody** |
| 166:24 167:9 | 224:5 | 108:12 109:5,8 | 30:20 78:2 |
| **establish** | **evc** 14:2 19:7 | 109:13,17,23 | **everyday** |
| 177:11 178:12 | 19:11,17 20:24 | 110:8,14,18 | 194:24,25 |
| **established** | 21:12,17,20 | 111:6,21 112:1 | **evidence** 86:23 |
| 18:2 20:5 25:4 | 22:16 23:10,12 | 112:10,18,20 | 88:1 90:13 |
| 74:16 75:20 | 23:14,17 25:14 | 112:22,23 | 92:6 99:22,23 |
| 175:13 | 32:2,5 33:2,7 | 113:10,12,17 | 100:10 101:12 |
| **establishes** | 33:10 34:23 | 113:20,24 | 108:19,25 |
| 75:12 | 38:10,18,20,24 | 114:12,23 | 110:9,20 111:2 |
| **establishing** | 39:3,10,14,25 | 116:4,17 118:2 | 111:18 118:4 |
| 155:12 | 40:4,14,18,20 | 123:20 163:23 | 120:12 124:12 |
| **estate** 1:7 | 41:20 54:21 | 164:18 169:22 | 132:3 156:3 |
| **estimate** 145:4 | 57:3,11 58:2 | 170:3,21,23 | 161:10 166:17 |
| 147:19 | 73:25 78:23 | 171:5,12,13 | 167:2,13 |
| **eval** 3:16 80:11 | 79:2,13 80:2,3 | 173:14 175:11 | 171:16 175:16 |
| **evaluate** 22:16 | 81:1,18 82:9 | 176:1,8,15,24 | 175:21 176:5 |
| 121:24 | 82:13,15,22 | 177:14 188:13 | 179:23 185:19 |
| **evaluated** | 83:1,7,18,20,25 | 188:17,21 | 186:2 200:25 |
| 104:19 | 84:1,5,7,12,13 | 195:18 196:3 | 228:12 |
| **evaluating** | 84:17,20 85:2 | 199:17,24 | **evident** 13:24 |
| 109:5 179:12 | 85:7,9,20 86:4 | 200:5,11 | 162:24 |
| 224:20 | 86:15 87:4,20 | 202:20 204:10 | **exact** 45:21 |
| **evaluation** 3:18 | 88:17 89:1,19 | 212:8 216:11 | 72:2 88:19 |
| 81:11 86:4 | 90:16 94:11,18 | 223:24 226:13 | 101:9 168:22 |
| 99:10,19 | 94:25 95:3,6 | 226:23 | 182:11 212:13 |
| 100:20 101:23 | 95:12,13 96:6 | **evc's** 19:13 | **exactly** 12:18 |
| 103:11,19,24 | 96:11,16,22 | 61:9 | 16:18 19:20 |
| 104:12,25 | 97:4,4,11,12,18 | **event** 169:9 | 50:7 82:1 |
| 105:7 108:6,23 | 97:19 98:17,23 | 186:10 215:15 | 111:24 115:9 |
| 110:11,22 | 98:24 99:10,20 | 215:17 | 116:15 117:17 |

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[exactly - extent]**                                    Page 24

119:23 125:23
178:24 190:2
199:12 212:14
213:12
**examination**
  3:2,3,4,5 4:22
  218:22 221:22
**examinations**
  3:1
**examine**  163:3
  187:4,8
**examined**  4:20
  162:16 187:7
**examining**
  220:7
**example**  15:19
  67:25 94:18
  113:3 118:8
  119:24 134:12
  134:13,23
  140:11,22
  141:7 143:8
  144:16 153:23
  159:1 175:4
  181:12 188:23
  190:12 191:9
  195:21 198:18
  211:1 212:3
  214:9 222:7
  225:16
**examples**  94:14
  160:4 175:1,2
**exceeded**  97:4
  99:3 171:5
  204:12

**excellent**  167:4
**excerpts**
  100:25
**excessive**  50:2
**exclusively**
  103:13 229:13
**excursion**  21:3
**excuse**  42:8
**exemplar**  57:21
  59:14 97:6
  199:22 204:2
**exempt**  76:16
**exhaustive**
  82:21
**exhaustively**
  226:21
**exhibit**  3:8,10
  3:12,14,15,16
  3:18 5:4,10,12
  5:16 7:25
  10:14,14,19,21
  10:25 11:3
  33:21 49:17,19
  49:19,22 62:7
  62:12 63:5,5
  71:3 80:16,22
  85:22 101:2,5
  101:18
**exhibited**  37:10
**exhibits**  3:7,12
  227:5 229:10
  229:13
**exist**  60:4
  160:13,23

**existed**  217:3
**existence**  217:3
**existing**  17:25
  134:25 135:1
  198:25
**exists**  95:20,21
  199:4
**exit**  197:18
**exits**  67:19
**expand**  16:17
  146:4
**expanding**
  148:12
**expect**  51:11
  119:22
**expected**  49:25
  50:11,18,21
  51:25 52:8,23
  180:15,22
  181:8 185:17
  206:9
**expensive**
  147:24 195:17
**experience**  9:9
  15:10 16:5
  23:19 24:12,15
  31:5 116:6
  121:10 126:1
  128:12 131:11
  132:11,13
  137:15 139:8
  139:20,23
  157:24 158:4
  159:21 179:2
  181:3,13 193:2

217:5,13,22
219:11,22
224:3 225:14
225:18
**expert**  10:2,5
  27:7 28:19
  29:9 48:18,20
  65:12 66:18,23
**experts**  66:18
  70:9,13 131:13
**expires**  232:24
**explain**  24:12
  75:16 137:21
  140:15 192:18
  192:19,21
  203:20,22
**explained**
  149:21 157:7,8
**explains**  10:7
**explicitly**  37:11
  208:13
**extend**  58:5,15
**extended**  57:8
  57:11 124:17
  208:18
**extending**
  57:14
**extension**
  163:21
**extensive**  38:13
  84:11 199:25
  220:17
**extent**  122:6
  161:7 164:20
  186:12 217:14

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[extra - fea]**                                                    Page 25

**extra** 197:17
**extremely**
  137:23

**f**

**f** 32:22 33:7
  39:8 41:18
  42:1 57:6 71:9
  82:11 85:9
  86:13,18 87:2
  87:6,12 89:15
  90:5,25 91:22
  93:17 97:2
  118:7,21
  119:21 120:3
  124:6 126:20
  130:25 132:8
  138:4,4 143:6
  143:9,15 144:1
  148:23 149:4,8
  149:24 150:21
  151:24 161:12
  162:10,13
  164:1 166:3
  171:4 180:1
  183:21,24
  184:3,5 185:20
  187:20 188:3,7
  196:11 197:13
  198:9,12,15
  199:3 200:10
  201:11 209:2
  214:2,15
  215:18,20
  216:8,18
  219:15 228:1

**face** 111:1
  197:20
**facilities** 154:3
  154:5 155:7
  166:22
**facility** 68:20
  71:22 72:8,11
  230:18
**fact** 42:14
  54:21 87:19
  88:7 91:4 97:4
  173:10 216:6
**factor** 174:13
  176:23 214:22
**factors** 102:24
**factory** 149:3
**facts** 86:23
  90:12 92:6
  161:9 167:2,12
**fae** 139:24
  140:17
**fail** 192:25
**failed** 179:24
  182:5,24
  185:20 186:3
  193:3,4
**failure** 179:7
  179:10,12,14
  179:16,17
  181:22 182:4,6
  182:10,23
  183:3,5 184:23
  187:14,16,23
  188:5,6,22,23
  188:25 189:2,5

  189:8,14 190:3
  190:8,10,14,18
  190:22 191:3,7
  191:21,21,23
  192:2,7,11,13
  193:5,17,25
  194:1
**failures** 189:16
  191:3 192:8
  210:17
**fair** 12:25
  13:10,20 14:6
  19:18 41:9
  52:25 53:8
  56:10,25 57:15
  59:6 66:16
  70:17 75:8,13
  76:12 81:1
  88:11,22 99:11
  151:9 165:18
  166:1 178:3
  181:23 188:3
  189:17 195:10
  205:21 217:4
  218:3
**fairly** 123:24
  145:23 154:17
**falls** 103:16
**familiar** 91:17
  128:18,20
  129:14 153:5,6
  194:13 196:7
**family** 42:20
**far** 21:24 73:13
  160:7 199:12

**farm** 195:4
**fars** 102:18
  104:9 105:5
  108:9 172:25
  173:3,10,19
  174:15,20
**fatal** 131:1
**fatalities** 98:18
  98:20 105:17
  109:14 172:18
  173:5,11,17,20
  174:4,7,24
  175:13 221:12
**fatality** 99:15
  100:5,11
  101:12 103:4
  103:13 108:21
  172:21 175:23
**fault** 43:21
  184:5,7,10,14
  184:23
**fax** 2:11
**fe** 16:8,13 17:8
  22:4,5,6 138:3
  138:6 139:15
  145:17,17
**fea** 19:2 26:12
  129:20 137:16
  137:23 138:6
  138:11,23
  139:4,7,10,18
  140:12,18
  141:17 142:22
  145:8 147:19
  147:22

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[feasible - ford]**                                      Page 26

**feasible** 55:7,9
55:12 61:14
**feature** 88:6
94:18
**features** 13:6
68:1 88:4
91:19 93:5,16
93:24 94:14,22
95:1 96:9
97:13 104:7
115:2 163:22
165:7,9 168:18
168:23 170:25
178:15 182:14
182:15,17
188:7,9,11
204:18,22,25
222:13
**february** 1:20
4:2,8 228:18
**federal** 62:15
62:15 73:10,13
74:2,7,9,13
75:11 109:16
225:5 227:16
231:4
**fee** 3:13 10:18
63:7,7,10
**feed** 138:2
**feel** 45:18 89:10
**feet** 116:23
117:8,9
**field** 192:8
196:9

**figure** 186:6
**file** 1:7 6:7,8,11
6:13,19 9:20
10:4,6 35:10
62:11 107:13
107:18 127:10
230:12
**filed** 47:3
230:15
**files** 9:18 80:11
127:15
**fill** 59:2 230:7,7
**final** 101:7
215:14
**financial**
229:24
**find** 7:4 61:13
83:5 105:20
107:21,22,25
176:12 221:14
**finding** 52:3,7
100:1 104:24
107:24 125:6
**findings** 35:15
50:6,7,15
51:22,23 52:21
53:6 54:14
88:21 105:15
176:7 177:9,11
215:25
**fine** 20:20
**finer** 129:7
**finished** 213:17
**finite** 129:12,17
129:24 130:1

138:5,8 139:1
141:11 145:4,5
**fired** 184:21
**firm** 34:7 44:19
69:4 157:25
229:2
**first** 3:10 4:19
5:10 15:16
19:10 28:18
44:17 54:10
68:6 71:6
85:22 99:13
107:9 132:25
156:17 187:14
190:2 207:13
**fit** 59:3 94:6
156:13 158:2
207:18
**fitment** 175:22
178:6
**fitted** 94:15,19
130:24 161:13
161:14 163:13
166:14 169:10
170:10
**five** 16:24
42:22 72:16
77:24 88:13
185:16 186:17
223:3
**fix** 156:25
**flat** 205:13
**flipping** 15:11
**flooding** 195:5

**fmvss** 73:12,24
74:9,12 99:2
225:9
**focus** 17:23
70:18 131:19
161:11 162:18
167:15
**focused** 18:3
56:13 95:6
166:17
**follow** 24:5
183:1 193:17
221:21
**followed**
189:23
**following**
216:11 231:3
**follows** 4:21
193:14
**forces** 201:13
**ford** 21:3 28:5
32:20 33:6,14
33:15,17,20,22
34:1,13,22,22
35:4,17 36:1
37:18,21,22
38:22,25 39:7
39:16 40:21
47:10,23 58:9
59:25 65:14,24
66:2 68:7
73:21 82:11,12
85:8,15 86:13
86:14,16,25
87:6,7,9,12,13

Christopher D. Roche
Bryson, Santana and Joshua v. Rough Country, LLC
February 1, 2024

**[ford - freedom]**                                                      Page 27

| | | | |
|---|---|---|---|
| 88:4 89:15 | 210:21 211:5,9 | 122:17 123:12 | **forth**  58:17 |
| 90:5,25 93:12 | 211:11,17,18 | 126:13 135:22 | 63:10 101:14 |
| 94:6 99:2 | 212:1,2,7 | 138:13 143:17 | 112:8 146:16 |
| 104:6 105:1,4 | 214:18 216:9 | 144:8 145:10 | 147:13 190:15 |
| 105:12,15,18 | 218:5,11 | 149:14 151:10 | **forums**  223:19 |
| 106:2,14,14,17 | 223:18 | 152:10,22 | **forward**  11:25 |
| 106:19 107:2 | **ford's**  38:12,23 | 156:2 159:7 | 15:11 18:2 |
| 107:16 108:3 | 38:23 40:16 | 160:25 161:4 | 154:18,23 |
| 112:6 113:3 | 105:6,10 151:3 | 164:14,25 | 230:12 |
| 115:12,19 | 153:7 154:2 | 167:1,11,18,25 | **forwarded** |
| 117:24 119:21 | 157:20 161:21 | 169:1 170:5,10 | 66:11 |
| 124:1 129:11 | 168:11 194:23 | 170:14 171:1,5 | **found**  101:9 |
| 130:24 142:1 | 200:11,13 | 171:15 175:15 | 103:11 108:7 |
| 145:17 148:24 | 221:17 | 176:3 180:2,12 | 133:13 |
| 150:18,18,21 | **foregoing** | 180:25 181:25 | **foundation** |
| 150:23,25 | 228:6,10 229:4 | 183:6 185:6 | 138:14 145:11 |
| 151:7,12,12,20 | **forensic**  7:7 | 186:4 189:18 | 156:24 192:1 |
| 151:23,24 | 28:13,19 46:16 | 191:25 192:15 | 215:11 |
| 152:3,8,11,14 | **foreseeable** | 193:7 197:4,21 | **four**  36:2 |
| 152:14,17,19 | 50:2 54:16 | 200:16 202:8 | 177:18 185:16 |
| 153:3,9,13,19 | **form**  16:22 | 206:6 215:9 | 207:17 208:2 |
| 153:23 154:13 | 23:23 39:4 | 222:17 225:2 | **frame**  15:21 |
| 155:3,6,15,17 | 51:5,12 52:11 | 231:5,7 | 19:1,16,21 |
| 157:5,13,17 | 53:2,13 54:3 | **formalized** | 21:1,5 41:24 |
| 158:1,12,21 | 74:4,11 75:21 | 39:10 | 56:4 61:7,11 |
| 159:4,4,12,18 | 76:13 84:18 | **formed**  31:2 | 61:15,18 77:14 |
| 160:20,21 | 85:11 86:21 | 33:13 62:19 | 83:21,24 85:6 |
| 161:6 166:2,3 | 87:24 89:7,21 | 98:8 | 87:1,9 118:9 |
| 166:20 167:5 | 90:11,21 91:12 | **formulate**  31:9 | 149:4,7,10,13 |
| 168:19 169:5 | 92:5 95:14 | 133:1 | 149:16 190:13 |
| 172:6 175:20 | 97:22 99:21 | **formulated** | 216:17 222:22 |
| 175:25 199:23 | 108:24 109:18 | 79:5 | **free**  89:11 |
| 199:25 200:23 | 109:24 111:15 | **formulating** | 146:25 148:15 |
| 201:1,6,9,11,12 | 111:22 114:15 | 62:22 | **freedom**  142:4 |
| 204:12 208:1 | 115:7 121:7 | | |

Christopher D. Roche
February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[frequency - going]**

Page 28

**frequency**
179:13 190:21
**front** 11:21
12:1,19 16:23
18:1,18 19:2,4
20:5 21:9 23:6
24:25 25:2
26:3,5,8,18,19
35:13 36:16,24
37:20 38:12
45:21 56:9
94:15 143:7,15
144:1,17,19
196:17 207:19
212:5,5
**frontal** 36:18
**froze** 114:9
**frozen** 141:6
**full** 85:24 113:5
150:16
**fully** 80:9
108:14 198:5
**fulton** 228:4
**function**
182:20
**functionality**
179:19 204:22
**functioning**
184:17
**functions**
195:10
**fundamental**
72:21 159:23
172:4 173:14

**furnish** 231:8
**further** 3:5
50:18 100:9
155:14 174:25
221:22 228:12
229:9
**fuzzy** 199:10

**g**

**g2** 88:21
**ga** 229:17
**gain** 153:18
160:22
**gainesville** 1:3
**gaining** 159:12
**garages** 156:7
**gauge** 78:9
**general** 28:6
90:3 106:6
112:6 144:6
**generally** 73:2
76:2 83:11
115:1 208:7
**generated** 66:3
119:8 127:10
198:20
**generation**
93:5 201:17
**generations**
22:6
**generic** 77:6
**geometric** 19:8
97:14
**geometrical**
118:6

**geometry** 41:11
**georgia** 1:2 2:6
2:10 4:6 228:3
229:5,14
230:20
**getting** 7:2 33:9
92:10 96:6
116:15 153:25
156:23
**give** 27:7,16
28:1,8 34:16
35:6 37:13
45:16 48:10
50:21 51:11
53:12,20 54:1
54:7 62:23,25
66:6 89:8
107:8 134:12
139:5 147:9
148:5 172:19
**given** 29:8
45:17 46:9,25
54:21 61:9
92:15 131:12
132:17 156:17
170:17 173:8
188:24 210:20
228:12 231:6
**gives** 112:15
195:20
**giving** 9:11
28:6 203:8
**go** 10:12 11:25
13:18 24:6
26:16 48:14

51:14 52:13
53:4,15 56:8
59:3,4 63:19
70:24 78:13
89:13,24 90:6
91:16 95:17,18
98:17 99:23
101:4,7 107:11
108:13 109:1
121:9 123:14
124:21 128:11
135:2 154:11
154:18 159:9
161:8 165:3
167:3,14 170:7
170:16,24
172:2 174:8,17
175:18 176:6
179:11 181:2
197:7,24
201:18,23
205:4,16
215:12 227:2
**goal** 140:6
**goals** 72:17
**goes** 50:17
91:22 100:3
166:22 209:15
**going** 5:10 6:17
11:11 20:12
21:23 24:11
28:25 30:2
42:20,21 47:6
50:16 52:24
54:6 57:5

Christopher D. Roche

Bryson, Santana and Joshua v. Rough Country, LLC

February 1, 2024

**[going - height]**

Page 29

64:18 74:17
82:4 89:6
122:14 139:7
141:7 143:12
143:24 148:13
162:25 174:16
178:24 181:7,8
181:9,10
186:16 189:8
197:16 198:12
205:11,12
216:25 217:13
217:15
**gold** 121:6,21
**good** 11:4
59:17 78:3
127:21 128:2
129:8 134:13
177:1 188:21
**goofed** 114:8
**governed** 47:11
**government**
75:12 104:17
104:18,20
224:19,24
**governmental**
104:23
**grand** 15:24,25
16:2 18:21
21:9 24:22
220:12
**granted** 68:22
**graphic** 77:10
**great** 5:9 8:18
14:5 65:11

79:16 107:23
122:5 143:7
186:19 200:6
206:23 210:6
226:25
**greater** 36:5
40:7 42:2,3,6
117:19 224:25
**greetings** 230:4
**grivet** 135:1
**ground** 57:9,20
57:22 58:7,10
59:15 75:19
76:4 77:3 88:8
88:10 90:7,15
91:23 97:6
99:5 170:19
171:6 188:10
194:8 199:12
199:16,19,23
200:24 201:2
202:4 203:17
204:16 207:10
208:19 209:3
**grounds** 90:22
**group** 15:17
212:6
**groups** 225:15
226:6
**gt** 39:8
**guess** 13:17
18:7 19:16
20:12 28:12
59:18,22 69:14
72:16 80:20

82:11 135:23
136:7 151:5
201:23 211:16
223:8
**guidance**
225:10
**guidelines**
176:25
**guys** 78:4,7
127:18 221:12

**h**

**h** 2:8
**half** 124:16,22
125:4,10
207:17 208:2
215:21 217:10
**halving** 217:10
**handbook**
150:5 151:25
152:4
**handful** 162:5
**handle** 8:2
227:5
**handled** 7:7
229:13
**happen** 135:21
**happened**
119:12,14,16
133:21 145:7
191:24
**happening**
167:5
**happens** 77:11
**happy** 178:19

**hard** 11:5
**hatci** 12:7 22:2
**hate** 203:3
**hazard** 92:23
93:18 94:11
97:20
**hazardous** 52:5
60:12,23 88:19
89:3,19 90:9
90:19 91:10
92:4 168:25
216:2,4,6
**hear** 5:1 10:24
14:3,4,16
31:23 33:24
70:11 114:3,6
114:7 118:17
125:5 168:5
198:16 201:20
**heard** 70:10
139:23 155:24
157:2 198:17
**hearing** 43:10
228:12
**heavily** 34:22
**height** 35:18
37:4 57:19
58:6 75:7,12
75:18,18 76:3
76:10,10 79:10
95:2,4,11,11
96:7,25 97:1
97:10,15 98:23
119:22 120:2
123:18,21

Christopher D. Roche
February 1, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

[height - hopefully]                                      Page 30

136:2,16 146:7
149:4,7,10,13
149:16 169:6
173:24,25
174:2,12
188:10,15,16
193:23 202:14
207:19,21
208:7,14,18,22
220:8,14,17,18
222:6 223:1
**heights**   41:24
41:24 75:3
76:11,17 87:9
90:2 146:14
177:24 178:5
178:14 201:13
222:21
**hello**   114:5
**help**   112:23
147:25 148:13
**helped**   68:24
**helps**   37:3
**high**   181:8
**higher**   36:6,10
40:24 188:14
217:13
**highest**   190:22
**highlight**   25:25
37:3 55:15
**highlighted**
85:22
**highlighting**
34:21 82:7,16

**highway**   12:10
104:18 224:23
225:17
**hill**   2:8 3:3,5
4:15,15,23 5:6
7:16,21 8:2,5,6
10:12 11:2,8
11:15 13:16
14:5,15,18
20:11,21 23:25
24:4,10 25:12
31:20 37:8
38:3 39:6
42:24 43:5,20
44:3,7,11
47:14,18,20
49:16,21,24
51:8,14 52:13
53:4,15,19,24
54:8,9 58:21
58:23,25 59:10
59:12 60:20
61:3,4 62:9
64:20,22,23
66:15,16 67:20
74:8,14,17
75:23 76:19
77:20 78:4,11
78:22 80:19,24
83:23 84:25
85:13,18 86:24
88:2 89:13,24
90:17,24 91:16
92:8,10,15
93:14 94:2

95:17,21,22
96:1,2 98:9
99:23 100:3
101:4 106:2,5
106:8 107:8,11
107:16,22
108:1 109:1,21
110:4 111:17
111:24 114:5,7
114:17 115:9
115:15 118:18
118:19 121:9
122:23 123:14
125:2,16 126:1
126:16,25
127:9,18,21
128:1,9 136:1
136:13,18,21
137:1 138:24
143:20 145:3
146:1 149:19
151:15,19
152:2,16,25
153:6 156:5,6
156:16,21
157:1,19,22
158:7,13,17,20
159:9 161:8,15
164:20 165:3
167:3,14 168:4
169:12 170:7
170:16 171:8
171:20 172:2
175:18 176:6
180:7,21 181:2

182:2,3 183:19
185:8 186:6,15
186:20 187:1
190:1 192:3,18
192:21 193:10
197:7,24
200:22 202:11
202:13,22
203:2,6,11,15
204:4,9 206:8
213:15,19,25
215:12 218:18
221:21,23
222:23 225:8
227:1,4,11
**hinge**   13:2,4
**hinged**   195:19
**history**   3:13
10:2,5,16
15:12 32:8
33:17 128:13
191:19 212:8
**hitting**   93:12
136:14,16
**hold**   42:18
71:12 100:17
139:5
**home**   197:13
205:21
**honda**   145:22
**hooray**   205:3
**hope**   64:19
71:2
**hopefully**   5:1,3

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[hour - improved]**                                    Page 31

**hour**  12:22
16:25 17:1,2
42:21 77:21
117:22 183:13
185:10 186:17
**hourly**  63:12
**hours**  46:14,21
203:12,13
**hudgins**  2:9
**huge**  136:24
**hugely**  141:14
**huh**  80:14
**hundreds**
148:2,8 191:18
**hungry**  78:6
**hunsley**  2:14
43:18,24 44:2
44:4
**hunter**  57:6
71:4,9 87:19
91:6 95:10
97:8
**hve**  127:10,15
128:15 129:6
129:12 138:9
**hve's**  129:14
**hybrid**  73:21
73:23
**hypothetical**
86:22 89:9
90:12 91:15
92:7,16,24
93:2 95:8
97:23 114:25
116:19 117:25

119:12 120:9
121:22 125:17
125:24 130:7,9
131:18 138:10
143:13 167:12
168:7 170:6,15
170:17 171:2
171:17,22
192:22 197:6
197:13,22,23
214:6,25
215:17
**hyundai**  12:7,7
12:21 16:5
26:2,25

**i**

**idea**  17:3 148:5
153:12 219:9
**ideal**  121:3
**ideally**  58:2,5
59:3 199:15
**ideas**  12:15
198:20
**identical**  36:4
91:5,25 93:1
117:17
**identification**
5:5 10:22
49:23 62:8
80:23 101:3
181:22
**identified**
66:19 179:14
190:8 191:8
200:15 213:12

223:14
**identify**  4:11
179:17 182:24
183:2 187:14
189:13 190:3
190:10,21
192:7
**identifying**
81:23 181:5
**ignore**  50:21
**iha**  176:18
**ihs**  16:19 17:13
17:15 25:6
102:17 104:4
121:23 176:7
176:10,17
177:1,8,12
178:1
**iihs**  16:15
102:4,6,12,23
**iihs's**  12:10
**illustrate**  76:21
77:7
**illustration**
76:25
**image**  36:13,20
37:10 71:19,23
76:20 77:3,5
213:1
**images**  71:14
71:15,15,16,20
71:24
**imagine**  60:1
83:2 191:17

**impact**  19:2,4
119:24 135:16
179:25 183:25
193:5,17 214:9
214:10 215:14
218:10 222:2
223:7,9
**impacted**  209:2
215:7
**impacting**
116:14
**impacts**  100:11
101:13 222:25
223:10
**implemented**
84:14 87:3
96:17 104:10
201:10
**implication**
85:20
**implications**
102:18 220:18
**imply**  74:14
**important**
148:19 174:13
**impossible**
124:19,24
**improper**
130:25 156:17
**improve**  12:14
17:10 38:21
39:9 172:5,14
180:18
**improved**  62:4
207:21

Christopher D. Roche                                           February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[improvements - inherently]**                                    Page 32

improvements
103:1,2,14
improving
172:15
inactions
130:24
inadequate
54:21
inaudible   14:12
24:2 35:17
37:5 114:2
incat   15:20
18:6,7,9 21:7
inch   58:16
59:20 77:2
88:16 188:20
200:7,24 204:1
207:17,24
208:2,18
inches   36:2
57:8,12,14,15
57:20 58:7,10
59:15 75:4,8
76:4,7 88:8,10
88:14 90:7,15
91:22 97:5,15
99:4 116:22
171:6 188:10
188:14 199:16
199:18,19,22
200:4,5 201:2
201:16,23
202:15,19
203:17 204:3,3
204:6 209:3

223:3,4
incident   98:10
116:4 120:9
184:6
include   56:22
106:15 208:7
210:8
included   13:2
19:2 26:19
41:8 59:21
93:7 105:21
211:5 222:5,20
includes   63:6
including   3:12
16:7 25:1,5
37:2 38:23
94:1 104:4
113:10 120:15
129:20 153:23
income   46:20
incompatibility
84:22 173:15
incompatible
52:6 216:7,10
incomplete
86:22 89:9
90:12 91:15
92:7 97:23
122:18 167:12
170:6,15 171:2
171:17 197:5
197:22
inconsistent
51:19 53:25
54:5,10

incorporate
59:1
increase   41:1
98:15 175:12
194:8,10
increased
36:10,12 50:8
52:16,18 98:20
124:2 173:17
176:24 190:14
208:12,21,22
215:4 216:23
216:25 217:2
217:12
independent
31:2 46:17
index   3:1,7
indicate   82:11
82:14 144:5
172:17 184:8
185:10 191:23
204:2
indicated   43:17
143:23 149:3
indicates   80:8
124:15
indicative
117:18 125:24
indirectly
75:14
individual   98:2
104:6 141:8,13
156:7
industry   13:25
121:25 122:2,5

122:11 123:6
128:15 129:25
134:13 137:16
139:3,12,18
142:12 157:6
159:19 160:7
164:8,13
165:14,16
168:8 193:12
200:15 210:5,8
212:9 219:23
219:24 220:2,7
221:5 224:4
infancy   159:13
influence   90:2
147:10 173:24
174:1 193:23
influenced
131:21,23
187:20
information
27:23 36:25
108:3 120:16
141:2 173:4,21
174:21 200:23
200:25 201:3
224:13 225:12
225:24
informing
111:5
inherent
173:16
inherently
86:20 91:23
97:20

Christopher D. Roche                                February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[initial - intrusions]                                        Page 33

**initial** 16:8,11
    48:16 148:6
    154:14 162:1
**initially** 131:10
**initiative** 17:5
    39:11 83:13
**initiatives**
    12:14
**injuries** 28:9
    36:5 131:1
    183:25 187:17
    215:8
**injury** 50:1,8
    50:13 52:2,10
    52:19
**input** 141:10
**inputs** 126:6,18
    126:18 133:1
**inquiry** 164:10
**inspected** 67:10
    68:6 72:4
**inspection** 67:8
    67:21 68:11,14
    68:22 69:2
    71:16,25
**inspiration**
    56:12
**install** 40:19
    155:25 156:8
    156:15 160:19
    210:20,20
**installation**
    151:1 169:18
    209:9

**installations**
    151:21
**installed**
    143:14 150:19
    156:4 167:17
    171:14 178:3
    188:2 197:15
    203:19
**installer** 210:19
**installers** 151:4
    156:13 161:6
**installing**
    160:17 166:21
    170:3 198:15
**installs** 161:16
**instance** 21:2
    25:18 98:16
    114:19 118:21
    131:12 132:3
    139:15 143:5
    167:7,19
**instances** 40:6
    139:17
**institute** 12:9
    225:17
**instructed**
    224:10
**insurance** 12:9
    225:17
**integrity** 191:4
**intend** 27:25
    28:7 55:13
    62:23
**intended** 40:5
    154:16 210:15

**intending** 9:10
    159:5
**intensive**
    137:24 140:14
**intent** 58:1
    189:5
**interact** 157:6
**interaction**
    151:3 153:16
    153:24 154:7
    155:2 157:12
    159:2
**interactions**
    155:24 157:7
    158:2 159:14
**interacts**
    155:17 179:22
    190:17
**interest** 224:1
**interested**
    193:21 223:19
    228:16
**interesting**
    130:9
**interject** 66:10
**internal** 172:11
**interpretation**
    55:9 102:17
    111:12
**interpreted**
    41:6
**interpreting**
    60:6
**interrupt** 203:3

**introduce**
    16:19
**introduced**
    37:24 38:1,4
    39:7 43:17
    55:19 56:5
**introduction**
    12:13
**introductory**
    77:23 78:13
**intruded**
    119:15
**intrusion** 14:21
    15:1,1,4,5
    22:21 26:13
    28:7 36:10,12
    36:23 37:9,12
    50:3 114:23
    115:3 116:13
    116:18,20,25
    120:20,24
    123:23 124:4,8
    124:16,21
    125:11,23
    128:25 129:23
    137:5 187:20
    187:24 189:1
    214:4,15
    215:21 216:23
    216:25 217:3
    217:12,14
    218:16 222:24
**intrusions** 36:5
    37:3 52:16
    124:2,14 214:7

Christopher D. Roche
Bryson, Santana and Joshua v. Rough Country, LLC

February 1, 2024

**[intrusions - kit]**

Page 34

215:5 217:10
217:20
**invested** 142:18
145:16
**investigate**
158:4 165:24
167:16,17
220:13
**investigated**
87:5 152:13
155:16 158:20
165:22 166:2
167:21 168:8
**investigating**
12:8
**investigation**
69:12 130:22
131:7,19
162:11,18
165:17
**invoices** 7:4
63:16,18,19
**invoicing** 7:10
8:7 63:24,25
**involve** 13:9
16:18 17:19
18:13 22:14
29:17 31:17,21
32:23 44:23
45:5,6 61:21
73:3 138:8
162:12 189:7
196:1 214:4
**involved** 10:9
15:13 18:7

21:10,23 24:25
25:18 26:22
29:21 31:11,13
31:13 32:1,19
34:22 37:18
49:3,12 57:6
67:11 71:5
77:7 97:1,2
98:6 104:18
119:19 126:7
128:14 129:8
130:11 137:25
139:10 140:16
157:10 160:2
166:9,16 173:2
173:6,12 179:9
187:5,9 214:3
214:14,19
218:14
**involvement**
49:15 69:13
114:11 167:22
**involves** 16:21
44:25
**involving** 23:5
26:1 41:25
95:9 118:1,20
121:5 129:23
172:18,23
174:24 215:18
218:5,11
**irrelevant**
30:21,25
**isolate** 102:24

**issuance**
176:14
**issue** 5:2 34:25
54:25 103:24
152:9 209:5
**issued** 12:17
49:14 175:5
**issues** 23:4
24:13 25:23
27:4 31:7,10
69:18 152:20
167:22 177:2
179:10 192:9
209:11 225:19
**issuing** 105:7
209:18
**item** 67:7
**items** 8:22
**iteration** 201:7
**iterations**
145:25 146:2
146:10,17
**iterative** 133:2
141:5

**j**

**jeep** 15:21 18:8
18:12,21 19:1
19:16 21:9
220:12
**job** 177:1
**joined** 45:19
142:12
**joining** 134:23
141:18

**joints** 134:17
**jonathan** 2:17
**joshua** 1:6
**journey** 205:17
**judicial** 4:6
**jump** 160:5
**jumping** 21:6
23:1 72:14
**june** 8:25 9:5
**jury** 24:12

**k**

**keep** 80:16
172:15
**keeping** 10:8
**keeps** 203:13
**kia** 22:3,7
**kilometers** 17:1
**kin** 228:13
**kind** 12:4 18:8
19:9 77:24
78:9 79:12
80:24 87:17
114:9 137:12
140:15 141:23
187:3,6 188:4
**king** 71:7,10
**kit** 49:25 52:1,4
54:23 55:18
56:23 58:6
62:5 68:1,1
88:3 89:15
90:1 98:13
123:25 130:24
131:20,25
132:8 143:14

Christopher D. Roche
Bryson, Santana and Joshua v. Rough Country, LLC
February 1, 2024

**[kit - largely]**                                                          Page 35

145:25 146:8
146:14 147:10
147:13 150:18
151:3,21,25
155:18 159:19
160:7,10,12
161:5,13,23
162:15,22
163:12 164:4,4
164:9,11,22
165:14,16,23
166:1,3,8,9,16
166:25 167:16
167:24 168:8,9
168:18,20
169:10,14,19
170:3,4,9,18,23
171:10,10,12
171:14 173:9
173:16,18
174:2,20,23
178:7 179:24
180:5,17,20,24
182:8,10,16,21
185:21 186:3
187:5,7 188:1
189:22 194:8
195:2,25
198:15 199:20
200:15 204:17
204:19 207:18
208:2 209:9,10
209:14,22
210:4,7,24
211:23 213:8

214:17 217:4
223:17
**kits**  145:14
146:23 147:5
149:25 150:10
151:1,5,7
156:1,4,9,15
157:15 158:2
160:9,18,20
161:17 162:1
162:10,13,17
162:19,22
163:4,6,7,11,16
163:17,23,25
164:23 165:17
165:25 166:18
166:21 167:10
173:12,12,20
174:22 177:21
177:22 178:2
178:10,11
180:8,11 187:5
187:9 191:11
191:13,17
194:4 206:5,20
207:2,4 208:10
209:12,21
210:1,11
218:25 219:2,5
**knock**  183:20
**know**  5:1 8:15
8:20 11:20,23
12:3 13:22
23:11,13,15
28:14 30:12,13

31:5 41:11
43:8,11 47:2,9
49:17 54:2
57:4 61:4 64:3
64:6,8 66:4,25
71:17 72:2
73:9,12 78:6
81:16 82:2,24
83:8,12,16
86:5 89:11
90:22 91:18
92:7 94:6
110:5 111:4
113:15,24
117:7 119:13
122:3,8 125:9
127:23 130:11
136:3 140:4
144:4,11,20
145:12 148:10
148:18 150:17
154:9,22,25
155:10,14
156:23 160:12
162:3 163:9,20
163:21 169:24
173:11 174:5
176:11 180:9,9
183:11,15
185:22 190:7
191:10,13,15
196:2,24 199:3
201:3 207:10
210:19 212:14
214:7 215:1

219:3 223:18
**knowing**  94:15
**knowledge**
126:5,10
147:17 151:2
157:12 159:25
160:7,22
161:19 165:14
165:15 191:20
195:23 201:9
226:22
**known**  38:6
50:19,19 54:15
55:2 138:19
155:5

**l**

**l**  2:3,4
**labeled**  48:19
101:6
**labor**  137:23
140:14
**lack**  144:1
**ladder**  68:24
**laid**  38:20
140:21 165:4
189:20 206:4
**language**  50:6
50:22 51:3,23
52:19 54:13
55:3 61:10
88:19
**large**  112:5
122:6 176:23
**largely**  118:9

Christopher D. Roche

Bryson, Santana and Joshua v. Rough Country, LLC

February 1, 2024

**[larger - likely]**

Page 36

| | | | |
|---|---|---|---|
| **larger** 87:15 | **leeway** 156:18 | 151:4,7,21,25 | 191:11,13,16 |
| **largest** 123:9 | **left** 76:21 78:9 | 155:18 156:1,4 | 194:3,8 195:2 |
| **late** 100:12 | 154:23 159:13 | 156:8,13,15 | 195:25 198:15 |
| 101:13 | **legal** 229:1 | 157:15 158:2 | 199:19 200:15 |
| **launched** 16:10 | **length** 212:7 | 159:19 160:7,9 | 204:19 205:18 |
| 20:2 | **leon** 2:5 | 160:10,12,18 | 206:5,20 207:2 |
| **law** 74:9 79:17 | **letter** 63:8 | 160:20 161:5 | 207:4,17,24 |
| 84:16 109:16 | **level** 22:24 | 161:13,17,23 | 208:2 209:9,10 |
| **lawyer** 43:23 | 40:11 41:13 | 162:1,10,13,15 | 209:12,14,21 |
| 45:2 92:14 | 42:2 58:11,16 | 162:17,19,21 | 209:22 210:4,7 |
| 171:19 | 59:5,7,8,8,10 | 162:22 163:3 | 210:11,24 |
| **lawyers** 43:21 | 59:20,21 77:2 | 163:10,16,17 | 214:17 217:4 |
| 44:9,12,14 | 77:17 87:14,16 | 163:23 164:4,4 | 218:25 219:2,5 |
| 45:25 | 88:17 125:4,23 | 164:8,11,22,23 | **lifted** 52:4,15 |
| **lay** 19:21 | 137:25 148:5 | 165:14,16,16 | 59:6 72:20 |
| **layman's** 12:5 | 149:21 181:8 | 165:23,25 | 73:4 77:16 |
| **layout** 87:8,13 | 207:20 216:25 | 166:1,3,8,8,15 | 97:25 118:7,20 |
| 148:25 149:2 | 217:13 224:25 | 166:18,21,25 | 172:18,23 |
| **lays** 206:19 | **levels** 37:9 | 167:10,16,24 | 173:6 175:11 |
| **lead** 69:12 | 41:16 87:11 | 168:8,9,18,20 | 196:22,24 |
| 121:18 123:10 | 215:21 | 169:10,14,19 | 197:9 199:13 |
| 144:5 175:9 | **lift** 49:25 52:1,4 | 170:3,9,18,23 | 205:9 207:6 |
| 193:1 | 55:17 56:23 | 171:14 173:9 | 216:2 217:14 |
| **leader** 39:1 | 58:6 62:5 68:1 | 173:12,12,16 | 217:20 |
| **leads** 40:17 | 68:1 88:3 | 173:18,19 | **lifts** 191:22 |
| **learn** 220:24 | 89:15 90:1 | 174:19,22,23 | **light** 13:19 14:1 |
| **learned** 40:5 | 98:13 120:10 | 177:21,22 | 14:7,10,20,25 |
| 168:8 | 123:25 130:24 | 178:2,7,10,11 | 15:19,22 16:3 |
| **leave** 64:1 | 131:20,25 | 179:24 180:5,8 | 16:4 17:17 |
| 182:10 193:8 | 132:7 143:14 | 180:11,17,20 | 23:3,16 26:1 |
| **leaving** 197:16 | 145:14,25 | 180:24 182:8 | 98:25 100:12 |
| **led** 105:16 | 146:8,14,23 | 182:10,16,21 | 101:13 103:1 |
| 108:20 109:14 | 147:5,10,13 | 185:21 186:3 | 176:24 |
| 218:2 225:19 | 149:25 150:9 | 187:5,5,7,9 | **likely** 176:22 |
| | 150:18 151:1,3 | 189:22 191:5 | 179:13 183:17 |

Christopher D. Roche                                February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[likewise - lowering]**                                          Page 37

| | | | |
|---|---|---|---|
| **likewise** 83:5 | **litsup** 229:17 | 169:15 | **looking** 6:25 |
| **limit** 76:22 91:4 | **little** 16:17 | **longitudinal** | 11:5 12:8,11 |
| 91:5 159:25 | 25:17 63:1 | 25:1 26:7,19 | 12:13 15:10 |
| 188:20 | 78:11,12 | 77:13 | 18:3 19:7 |
| **limited** 73:3 | 128:12 138:15 | **longitudinals** | 22:10 42:9 |
| 103:15 164:10 | 140:15 154:8 | 216:18 | 58:1 73:9,22 |
| 165:17 | 186:16 199:10 | **look** 17:4 20:3 | 93:11 97:6 |
| **limits** 20:24 | 220:10 | 34:24 39:16 | 106:24 107:7 |
| **line** 71:6 | **lives** 177:13 | 53:9,16 60:3 | 120:15 126:12 |
| 155:12 171:11 | **llc** 1:11 2:4 | 72:6 83:12 | 134:13 144:17 |
| 177:12 231:11 | **llc's** 3:10 | 102:1 115:11 | 158:1 162:12 |
| 231:14,17,20 | **load** 25:6 57:23 | 121:14 133:9,9 | 172:13 175:1 |
| 231:23 232:1,4 | 217:8 | 145:24 150:21 | 177:23 220:16 |
| 232:7,10,13,16 | **loaded** 52:15 | 151:6 161:25 | 221:12 222:5 |
| **linking** 178:14 | 115:5 116:12 | 162:6,8,21,25 | **looks** 98:19 |
| **list** 11:12 15:14 | 116:13 119:1 | 163:24 165:24 | 196:7 |
| 28:25 44:22 | 120:22 121:2 | 169:8 170:8,18 | **loss** 26:20 |
| 55:5 64:25 | 124:14 150:8 | 173:14 174:9 | **lost** 194:20 |
| 65:16,18,20 | 217:8 | 174:24 175:2 | **lot** 13:22 20:13 |
| 81:5,8,17 82:1 | **loading** 19:8 | 179:15 190:23 | 24:24 34:18 |
| 82:2,7,21,25 | 115:17,22 | 207:11,20 | 61:8 78:23 |
| 83:3,5,9 84:11 | 117:19 141:15 | 211:2 213:16 | 114:18 142:3 |
| 86:9 111:25 | **loads** 141:15 | 215:13 218:24 | 143:15 156:18 |
| 112:14 113:11 | 190:13 | 219:2,5 | 191:16 |
| 113:18,21,24 | **located** 72:3 | **looked** 23:13 | **low** 16:21 75:2 |
| 189:8 207:5 | **location** 68:19 | 26:6 80:4 83:4 | 92:22 |
| 211:2 | 72:2,5 117:24 | 87:7 91:14,18 | **lower** 16:25 |
| **listed** 15:12 | 215:14 | 93:24 104:6,15 | 17:7 19:22 |
| 60:18 65:8,22 | **logical** 55:23 | 108:9 117:2 | 20:6,8 21:1 |
| 173:6 208:6 | **long** 78:8 116:7 | 119:7,9 153:9 | 40:11 41:2 |
| 211:14 | 191:10 | 162:3,7 163:6 | 56:9 91:4,5 |
| **listing** 21:24 | **longer** 26:14 | 163:18 167:23 | **lowered** 223:8 |
| **lists** 5:12 28:13 | 57:14 64:9,9 | 177:17 180:10 | **lowering** 61:22 |
| 82:11 113:8,16 | 78:11,12 97:10 | 210:4 219:12 | 220:16 222:13 |
| 149:23,23 | 97:12,13 | | |

Christopher D. Roche
February 1, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[lowest - manufacturer]**

Page 38

**lowest** 41:3
**ls** 129:4
**ltv** 13:15,21,24
  14:6,7,10
  15:15 27:1
  29:18 32:1,4
  32:18 34:25
  35:25 40:17
  44:23 75:13,17
  76:9,25 77:5,6
  77:16 80:1
  85:6 88:25
  96:9 97:1
  98:16,21
  105:17 110:7
  110:22,23,24
  111:13,20
  114:24 173:25
  174:13 197:9
  200:20
**ltvs** 13:10
  21:24 23:16
  72:20 73:4
  74:18,19,22,25
  76:16 79:10
  80:5 83:6,19
  84:1 85:1,16
  85:25 86:1,5
  89:18 110:2,14
  111:6 164:17
  168:16 172:14
  172:16,18
  174:24 176:9
  177:22 178:2,7
  178:10,10

**luggage** 124:17
  124:17 215:2
  215:22,23
**lunch** 78:5
  127:19

**m**

**m** 1:22 91:1
  228:21
**madam** 10:12
  161:1
**made** 4:4 27:11
  54:16 70:16
  110:13 136:10
  147:21 150:24
  216:24
**mail** 5:25 6:1
  7:22 66:12
  107:15,20
  230:9
**mailed** 66:22
**mails** 5:22
**main** 73:24
**maintain** 58:3
  58:11 59:1,15
  195:14 204:21
  204:25
**maintained** 8:8
  55:17 108:11
  115:3,14 121:1
  125:21 201:16
  208:9 214:21
  226:14
**maintaining**
  207:8,12,14

**maintains**
  170:20
**maintenance**
  28:4
**major** 113:19
**majority** 83:14
  84:23 112:5
**make** 24:1,4
  42:19 43:12
  58:23 63:24
  69:20 70:20
  72:18 78:5,25
  98:25 111:9,17
  120:4 126:17
  133:7,10,18
  134:3 135:13
  149:5 150:9
  151:6,15 159:5
  164:1,12,17
  165:19 167:7
  169:10 171:13
  172:7 178:13
  197:9 198:13
  201:1,4,19
  221:14 231:5
**makes** 82:21
  100:7 126:20
  146:23 218:12
**making** 91:7
  96:20 113:2
  191:11 214:22
  222:14 231:6,7
**malfunction**
  185:3,13

**manager**
  121:14
**managing** 15:1
**mandate** 75:11
  109:23
**mandating**
  109:16
**manipulate**
  48:11
**manner** 36:17
**mansell** 230:19
**manual** 149:24
  151:9,22
**manually** 230:7
**manufacture**
  167:24 181:7
  209:25 210:11
  210:24 213:7
**manufactured**
  54:24 97:3
  110:7 163:4
  165:23,25
  168:20 211:22
  223:17
**manufacturer**
  40:19 57:25
  79:25 82:19
  84:9,12 112:23
  113:9 134:8
  139:24 161:24
  163:25 164:4
  165:5 171:10
  171:12 173:9
  173:18 174:20
  174:24 189:22

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[manufacturer - meeting]**                                    Page 39

193:14 209:10
**manufacturer's**
123:21
**manufacturers**
17:6 76:1 79:8
79:19 80:4,9
82:8 83:8,15
84:6,21 98:25
104:6 108:11
108:16 110:2
110:14,17
111:2,4,8
112:1,3,4,9,25
113:19 122:25
146:24 155:18
160:13 161:25
162:22 163:8
163:10,12,15
163:22 166:25
168:9 172:6
195:25 202:25
204:17 209:14
209:23 210:8
221:5 226:19
226:22
**manufacturing**
55:22 135:7
154:3,5 155:7
155:8,12 157:9
165:16 166:23
171:10 225:11
**marcus** 69:23
**margin** 42:2
169:21 199:24

**mark** 5:10 7:25
10:13,19,24
49:18 62:11
80:15 101:5
**marked** 5:4
10:21 49:22
62:7 63:4
80:22 101:2
**market** 110:24
160:13
**marketing**
207:23
**marketplace**
60:3 192:9,11
**mashman** 2:4
4:14 67:19
78:19
**mass** 26:20
**match** 119:23
164:23 199:15
202:1 204:13
204:15,17
**matched** 97:13
202:20
**material** 3:15
5:18 6:25 8:10
8:13 28:24
34:19 62:10
65:2 93:11
105:3 106:18
107:13 111:9
141:17 207:4
207:24
**materials** 64:24
65:1,7,17,18,23

66:2 71:21,23
107:24 134:1,6
134:9 211:6,6
211:15 212:2
**matter** 30:18
33:4 35:9
63:23 73:18
218:7
**maximum**
75:19 76:11
**mazza** 69:23
**mccarthy** 44:21
45:14
**mean** 35:21
40:10,11 51:20
52:21 58:4
64:14 72:23
73:11 74:14
81:5,6,8 82:1,4
95:12 116:21
133:22,23
134:21 135:16
137:22 142:12
146:2,2,22
150:15 151:23
162:5 175:3
182:12,13
185:7 194:18
202:22
**meaning** 36:9
118:1 126:6
135:13 148:11
173:4 179:25
180:8

**means** 110:5
185:11 217:12
**meant** 77:7
82:20 86:5
110:9
**measure** 37:9
116:22 226:16
**measured** 57:6
57:21
**measurements**
59:14 67:17
199:22 204:2
**measures** 79:9
85:24
**meat** 77:21
78:1 87:18
**mechanism**
134:23
**medical** 28:1
**meet** 19:2,6,16
20:4 22:16
25:3 33:8
40:20 76:2
79:23 83:19
87:20 89:1
90:15 94:18
108:12 112:1
112:10,22
170:23 171:12
181:17 188:20
199:20 202:22
203:17 226:9
**meeting** 19:12
76:16 81:18
110:3,14 111:6

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[meeting - model]**                                              Page 40

112:12
**meetings**
  112:25
**members** 25:1
  217:8
**memo** 206:4
**mention** 150:3
  158:18
**mentioned**
  16:13 17:17
  18:11,16 21:23
  23:2 38:16
  43:6 44:8
  46:21 47:7
  59:18 84:4
  95:8 104:22
  112:18 124:5
  124:20,22
  132:2 134:6
  138:8 141:22
  142:23 148:22
  159:10 189:2
  190:9 191:3,4
  191:22 194:19
  195:24 198:19
  199:14 200:22
  207:11 208:5
  209:16 212:13
  213:5 221:13
  221:25 226:6
**mentioning**
  88:7 160:17
**mesh** 141:8,10
  141:17

**meshing** 141:8
  141:11
**mess** 211:25
**met** 23:11,17
  25:13 33:10
  116:17 166:25
  171:5 200:9,11
  202:16
**metal** 25:1
  55:18 134:14
**metals** 134:18
**methodology**
  138:22
**methods** 26:13
  81:24
**mic** 114:8
**microphone**
  14:16
**mike** 44:16
**mile** 12:21
**miles** 16:24
  17:2 117:22
  156:8 183:13
  185:9
**miller** 2:17
**mind** 24:9
  144:12 153:20
  154:9 194:23
**minimal** 216:16
**minimum** 58:1
  75:19 76:11
  99:2,4 204:10
  225:7,9
**minor** 1:8

**minus** 99:16
**minute** 42:22
  77:24 132:10
  186:17
**misalignment**
  77:11
**mischaracteri...**
  53:14 192:1
**mismatches**
  79:10
**misrepresents**
  109:20 176:4
**missed** 25:16
  58:22 70:12
  83:22 141:23
**missing** 8:19
  70:21
**misspellings**
  69:18
**misstates** 87:25
  87:25 89:22
  99:22 108:25
  111:23 121:8
  126:14 151:11
  165:1 169:3
  175:16,16
  180:13 181:1
  186:5 189:19
  204:8 206:7
**misunderstood**
  169:19 206:17
  225:21
**mitigate** 93:18
  94:19 179:16
  190:24

**mix** 103:3
**mixed** 134:14
  134:18
**mocking** 20:23
**mode** 12:11
  13:1,5 16:20
  17:9 73:20
  179:7,12,16,17
  181:22 182:4,6
  182:10,23
  187:14,16,23
  188:5,6,22,23
  189:5 190:8
  191:7,23
  193:25 194:1
  214:10
**model** 31:13
  32:21 34:20
  39:8 42:16
  45:1 82:17
  86:1,5,12 90:7
  90:10 91:7
  93:4 100:12
  101:13 110:7
  111:13,20
  129:10,22
  133:7 134:22
  135:6 137:16
  137:23 138:3,4
  138:11 139:8
  139:10,18,18
  139:24 140:12
  140:17 141:21
  142:2,4,22
  143:8,16 145:2

Christopher D. Roche
February 1, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[model - needing]**                                                    Page 41

145:5,21,22
146:13 147:1
147:12 148:9
148:13,20,21
**modeled**
119:18 134:2
**modeling**
148:16
**models** 82:21
82:25 84:7
86:25 100:7
110:22 111:5
113:9,13,16
132:21 137:7
137:25 139:2,8
140:25 142:3
144:11 145:8
145:15,17,18
146:4,20,24
147:19 148:1
**modes** 25:6
179:10,14
183:3,5 188:25
189:3,8,14,16
190:3,10,18,22
191:4 192:7,14
**modification**
36:3 97:17,19
153:10,11
170:2
**modifications**
150:9 152:21
152:23,25
153:3 159:5
173:1

**modified** 37:4
55:22,25 56:14
154:19 159:22
163:20 169:14
182:8 188:1
195:9 200:3
**modifier** 152:8
157:20 158:10
158:23
**modifiers**
152:20 153:2
158:11,14
**modifies** 97:17
179:20,20
**modify** 61:11
179:15 205:1
**modifying**
158:1 182:14
204:23
**module** 184:16
185:22
**money** 148:12
**monitor** 173:9
**monitoring**
174:20
**month** 28:14
**morning** 28:24
66:12,14
**motions** 47:3
**motor** 225:5
**motors** 22:9
112:6
**move** 11:22
48:18

**movement**
215:15
**moving** 18:6
120:1
**mud** 195:4
**muffled** 14:14
**multi** 15:9
**multiple** 16:20
56:24 122:21
140:15 166:11
166:12 223:19
**multitude**
93:24 166:13
**myriad** 98:5
**mythical**
192:24

**n**

**n.e.** 2:9
**name** 16:2 49:1
69:23 161:16
161:23
**names** 162:2
**nass** 184:25
**national** 224:22
**nature** 12:3
29:24,24 30:3
30:5,16 31:6
31:12 45:9
46:18 50:10
68:2,25 116:11
118:12 130:2
154:10 206:10
215:3
**ncap** 25:5

**necessarily**
13:23 72:25
134:2
**necessary** 38:9
38:15,17 40:20
129:11 132:4
133:18 134:3
134:18 144:14
144:15 153:19
164:3 194:17
195:6 200:4
206:1 231:7
**need** 6:13,17
13:23 39:13
43:7 69:19
92:2 94:10
112:19,21
135:9 141:8
142:6,23
143:16 144:21
144:23 169:8
170:8 173:13
174:8,9 178:19
182:13 195:13
195:19 197:16
198:21 199:13
209:5 218:24
219:2,5 227:4
227:7
**needed** 20:24
68:24 195:10
201:15 205:15
205:24
**needing** 39:15

Christopher D. Roche                                              February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[needs - object]**                                                    Page 42

**needs** 92:17
  98:3 133:7
  140:24 144:25
  181:23 203:24
**negative** 99:16
**neither** 119:15
**never** 20:2 46:5
  53:9 72:10
  74:22 78:23
  80:16 92:11
  138:24 192:11
  224:8 225:23
  226:4
**nevertheless**
  102:3
**new** 11:11
  16:15 26:18
  55:16 57:2
  58:15 133:17
  133:21,22
  134:1,1 135:3
  137:13 150:18
  160:21 179:2
  202:14
**newer** 11:10
**nhtsa** 38:22
  79:21,24 83:2
  84:15 86:4,7
  99:10 100:20
  102:7,17 103:7
  104:11 105:2,6
  105:19 106:2,5
  106:15,17,25
  108:2,7 109:5
  109:9,20 110:6

  111:5,7,11
  112:2,12,25
  121:23 145:16
  147:1,21
  175:20,25,25
  176:17,19
  177:4,8 178:1
  211:9,11,17,19
  213:10 221:17
  223:13,23
  224:5,8,11,14
  224:17,19,25
  225:4,10,13,15
  225:20,24
  226:3,8
**nhtsa's** 81:10
  86:10 99:19,25
  100:8,9 101:10
  101:23 102:11
  103:10,18,23
  104:24 110:1
  112:13 145:19
  176:15 226:5
  226:12
**nine** 168:10
**nissan** 42:17
**nodes** 141:13
**nominal** 222:20
**non** 59:6 77:16
  100:5 104:23
  112:9 118:20
**noncompliance**
  98:23
**noncompliant**
  86:17,18

**nonspecific**
  184:15
**normal** 119:22
**northern** 1:2
**notaries** 229:6
  229:15
**notarized**
  229:15 230:9
**notary** 232:24
**noted** 231:3,3
**notes** 213:16
**notice** 3:10
  5:11,12,15,19
**noticed** 16:12
**notified** 191:21
**noting** 230:6
**november**
  34:11 35:12
  65:18,22 67:9
  67:21 68:14
  72:3 105:4,22
  105:24 212:18
  213:5
**number** 7:24
  15:11 35:16
  50:14 56:13
  59:22 76:20
  80:16 98:20
  107:6 112:25
  153:15 160:8
  212:4,20,25
  213:9 223:14
**numbered**
  48:19

**numbers** 45:21
  46:21 160:23
  212:14 221:18

**o**

**o** 91:1
**object** 23:23,23
  39:4 51:5,12
  52:11 53:2,13
  54:3 74:4,11
  75:21 76:13
  84:18 85:11
  86:21 87:24
  89:6,11,21
  90:11,21 91:12
  92:5 95:14
  97:22 99:21
  108:24 109:18
  109:24 111:15
  111:22 114:15
  115:7 121:7
  122:17 123:12
  126:13 135:22
  138:13 143:17
  144:8 145:10
  149:14 151:10
  151:13 152:10
  152:22 156:2
  159:7 160:25
  161:4 164:14
  164:25 167:1
  167:11,25
  169:1 170:5,14
  171:1,15,19
  175:15 176:3
  180:2,12,25

Christopher D. Roche                                February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[object - okay]**                                                Page 43

| | | | |
|---|---|---|---|
| 181:25 183:6 | 119:20 120:1 | 212:20 | 48:25 49:3 |
| 185:6 186:4 | 126:17 132:20 | **oem** 79:25 | 53:8 55:3 |
| 189:18 191:25 | 144:22 148:10 | 84:16 137:25 | 58:14 59:11,18 |
| 192:15 193:7 | 149:24 194:23 | 152:18 155:22 | 61:17 63:21 |
| 197:4,21 | 207:9 214:8 | 166:20 167:8 | 67:7 68:13,18 |
| 200:16 202:8 | 223:22 | 168:23 173:16 | 70:5,15 71:1,8 |
| 206:6 215:9 | **occasionally** | 178:6 | 72:14 73:6 |
| 222:17 225:2 | 134:3 | **oem's** 200:19 | 77:20 78:2 |
| **objected** | **occasions** | **oems** 34:24 | 79:16 80:21 |
| 158:15 | 133:16 | 79:8,18 83:18 | 85:14 96:3,16 |
| **objection** 24:20 | **occupancy** | 83:25 110:24 | 101:4 103:10 |
| 60:14 61:1 | 189:1 | 140:4 142:8,13 | 106:4 109:4 |
| 93:20 136:13 | **occupant** 36:5 | 145:15 164:17 | 114:7 119:10 |
| 156:24 | 125:22 144:22 | **offense** 92:13 | 125:7 126:20 |
| **objections** | 214:20 | **offered** 89:8 | 127:18 135:10 |
| 109:25 156:16 | **occupants** | **offering** 62:2 | 135:18 136:19 |
| 156:21 171:25 | 52:19 72:23 | **office** 6:2 154:6 | 137:2,9 138:24 |
| **objective** 40:3 | 73:1,3 100:11 | **offices** 230:9 | 140:12 149:6 |
| 144:12,16 | 101:13 108:21 | **offset** 204:15 | 150:24 152:7 |
| 160:14 | 109:15 184:1 | **oh** 85:14 | 155:5 158:19 |
| **objectives** | **occur** 178:5 | 107:19 122:5 | 159:1,17 |
| 132:20 180:16 | 198:3 | **okay** 5:9 6:4,8 | 161:15,23 |
| 181:6 | **occurred** 42:4 | 6:16,21,25 7:9 | 163:9 167:21 |
| **obligation** | 98:3 167:6 | 8:2,18,21 9:8 | 186:15 187:12 |
| 170:24 | **occurring** | 9:13 11:15 | 188:25 190:5 |
| **observations** | 120:9 179:13 | 14:5 16:4 | 191:2,13 196:4 |
| 67:24 68:2 | **occurs** 137:5 | 17:16 18:23 | 204:4 205:3 |
| **observed** 99:15 | 169:9 | 21:6,22 23:1 | 206:2,17,23 |
| **obtained** 35:5 | **ocga** 227:17 | 23:19 25:16,24 | 209:1 211:25 |
| **obvious** 52:21 | 229:20 231:5 | 26:16 27:3,6 | 212:23 213:15 |
| 87:19 | **october** 3:13 | 27:11 28:11,17 | 213:18 215:25 |
| **obviously** 34:1 | 9:19 10:15 | 28:22 29:17 | 216:22 220:10 |
| 41:21 43:8 | 29:5 49:9,10 | 39:22 42:18 | 221:10 223:13 |
| 45:15 65:17 | 63:6 64:15,25 | 44:1,6 45:9,15 | 223:22 227:10 |
| 67:2 72:23 | 65:3 71:3 | 47:6,25 48:14 | |

Case 2:22-cv-00017-RWS    Document 138-4    Filed 03/10/25    Page 104 of 134
Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[old - outweigh]                                                    Page 44

**old** 177:18
**once** 132:21
  133:5,13,18
  137:15,16
  230:9
**ones** 35:3
  160:19 208:6
  213:12,13
**ongoing** 30:1,8
  38:22 109:8
**open** 18:5 78:6
**opening** 144:10
**operate** 83:15
**operation**
  149:13 191:5
**operator** 94:23
**opine** 60:10
  86:19
**opined** 60:24
**opining** 164:7
**opinion** 33:16
  36:21 37:17,21
  40:17 52:14
  60:22 71:8
  88:3 93:14
  94:8,13 97:16
  97:24 98:7,9
  103:23 115:2
  116:16 120:19
  120:20 123:17
  123:25 125:18
  151:2,7,20
  152:3 164:22
  165:4 167:18
  167:20 168:12

168:15 169:4
169:11 170:10
182:4 184:13
186:8,11,12
189:9,11,20
196:15 201:25
203:15 204:7
210:14 214:22
217:5,21
221:11 225:16
226:5,5
**opinions** 9:11
  27:8,16,22
  28:2,6,8 30:25
  31:2,8,10
  32:10 33:4,13
  34:16 35:7,9
  50:23 51:10,15
  52:24 53:11,20
  53:25 54:6
  55:5 62:19,22
  66:6 78:1
  87:18 89:25
  93:13 102:15
  106:13 186:5
  224:11,15
  225:10
**opportunity**
  210:17
**opposed** 10:19
  15:9 42:10
  110:24 123:5
  138:22
**optimal** 155:11
  159:15

**optimization**
  26:6
**option** 19:16,18
  19:21,25 21:20
  25:14 33:10
  40:13,18 56:16
  57:2,10,13
  58:2,17 59:2,4
  59:22 60:6,17
  90:16 91:2,3
  92:20,21,25
  109:15 112:24
  188:20 195:12
**options** 56:17
  56:24 61:20
  195:24 212:10
**order** 20:23
  22:15 30:7,11
  38:9,17 40:12
  47:8,11 57:10
  57:13 60:11
  75:25 92:2
  94:11 112:19
  126:11,18
  154:12 195:2
  196:25 197:9
  199:10 201:19
  201:20 202:1
  205:20
**ordering**
  230:13
**original** 57:25
  58:6,18 59:5
  59:21,24 65:20
  79:7 88:8

96:11,13,20
97:18 98:17
118:7 123:21
124:7 164:24
168:23 169:16
170:25 182:11
188:2,9,11,15
188:19 199:15
201:18 204:6
207:13,15
208:18 212:20
212:24 214:1
214:13 221:18
230:12,15
**originally** 24:8
  97:3 99:5
  192:12
**outcome** 125:8
  125:11 135:16
  136:10
**outfitters**
  157:18
**outline** 194:5
**outlined** 88:17
**output** 126:12
**outputs** 126:19
**outside** 48:3
  60:9,24 61:5
  89:7 91:13
  93:20 109:19
  111:11,18
  153:2 167:19
  215:10
**outweigh**
  172:11

Christopher D. Roche                                February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[overall - parts]                                              Page 45

**overall** 103:4
144:16
**overlap** 12:10
12:22 31:11
40:8,9,10,14
119:25
**override** 31:17
31:21 32:6
50:3,10 114:13
114:20 116:11
124:1
**overriding**
42:11
**overrode** 37:22
**overwhelming**
124:12
**own** 39:25 40:6
50:24 69:10,13
86:11 100:1
102:11,14
105:5 110:1
112:14 131:8
132:5,6,7
142:15 172:10
185:8 208:10
225:18
**owner** 151:24
**owners** 149:24
151:8,22

**p**

**p** 20:18
**p.m.** 78:18,18
128:6,6 186:23
186:23 213:22
213:22 227:13

227:15
**package** 90:6
91:1 92:8 95:9
96:3
**packages** 87:6
**page** 3:2,8 9:25
10:1,16 11:22
35:16 64:25
65:21 67:7
71:13,13 72:14
73:6 76:19
79:1 81:4
85:22 99:6
100:10,19,21
101:7,8 107:9
130:21 131:4
150:3 165:4
177:5 178:20
183:8 212:22
212:23 213:2
231:11,14,17
231:20,23
232:1,4,7,10,13
232:16
**pages** 48:18
65:8 107:10
228:10 231:7
**panel** 141:12
**panels** 134:23
140:21,23
141:8
**paper** 12:23
185:15 224:9
**papers** 54:25
81:15 106:20

109:7 175:4,9
201:6 211:3,14
**paragraph**
71:6 73:7
85:23 88:21
99:13 101:16
130:21 131:3
150:4,12 177:5
216:22
**parameters**
85:2 137:19
**parametric**
100:5
**parents** 1:7
**part** 10:23
14:11 17:7
18:17 19:10
21:4 22:18
28:3 36:18
39:2 40:14
55:6 68:3 73:7
73:9,14,16
74:3,17,19
75:15 76:16
84:10 99:7
107:12 108:22
111:3 121:13
121:13 128:14
128:19 141:10
141:20,22
158:5 159:15
167:22 178:3
178:25 193:12
205:12,17
209:6 210:16

220:4 222:16
222:19
**participate**
68:21 79:18
80:1 110:17
226:23
**participating**
110:25
**particular** 32:7
41:25 42:4
82:12 93:13,15
99:3 100:13
109:3 114:19
116:10 119:24
131:12 143:5
143:11 148:13
160:15 162:14
167:19 172:6
179:19 190:12
201:11 209:5
216:16 224:1
226:7
**particularly**
108:8 112:24
144:18 146:7
196:14,16
198:2 223:19
**parties** 228:14
228:15 229:22
229:25 230:13
**parts** 6:11
16:14 38:21
141:16 162:25
163:3 165:5
166:13 189:25

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[party - physical]**                                    Page 46

| | | | |
|---|---|---|---|
| **party**  33:20 | **peachtree**  2:9 | 121:4 128:24 | 217:1 |
| 34:6 229:23 | **peas**  20:18 | 129:2,22 | **performing** |
| **pass**  76:6 | 21:17 23:5,21 | 130:14 145:24 | 19:2 112:2 |
| **passenger** | 39:21,23,25 | 146:1 165:6 | 128:16 139:24 |
| 12:20 13:9,11 | 40:8,10,12,14 | 179:24 193:4 | **period**  15:17 |
| 15:2 35:25 | 41:11,15,18,20 | 209:23 210:13 | 22:12 74:24 |
| 36:3,16,24 | 56:1,9 61:8,10 | **performance** | 80:4 82:8 |
| 40:4 45:13,14 | 76:17 77:1,1 | 12:14 17:10 | 85:12,13 104:9 |
| 68:8 73:17 | 77:17,17 81:18 | 26:5,13,21 | 113:13 116:7 |
| 75:2,6 76:5,22 | 91:2 95:4 96:8 | 36:3 39:20 | **person**  69:21 |
| 77:17 79:10 | 111:7 115:16 | 41:13,16 58:12 | 152:1 |
| 98:1,20 146:5 | 117:24,25 | 59:16 117:18 | **personal** |
| 164:18 169:22 | 118:3 170:20 | 118:25 121:24 | 139:20,22 |
| 172:8,14,16 | **peer**  69:8,9,21 | 133:4 137:20 | **personally** |
| 174:1,13,25 | 69:24 70:3 | 144:17 146:9 | 140:1 160:2 |
| 177:17 178:8 | **pendulum**  75:2 | 148:5 150:7 | **perspective** |
| 187:25 200:21 | 75:10 | 165:9 169:21 | 21:17,25 25:11 |
| 214:4,15 216:8 | **people**  68:16,18 | 179:21,25 | 134:16 218:14 |
| **passengers** | 70:2 157:6 | 180:16 181:6 | **pertains**  73:16 |
| 98:15 | **perceived** | 181:16 182:16 | **pertinent** |
| **past**  31:5 | 172:11 | 183:10 193:24 | 167:18 |
| 100:13 | **percent**  46:3,3 | 200:3 202:1 | **petway**  44:16 |
| **patent**  12:1,4 | 99:16 100:6 | 204:13 207:8 | 44:16 |
| 12:16,16,18 | 183:17 185:1,4 | 208:8 220:15 | **phase**  80:4 84:5 |
| 13:2,4,8 14:19 | 185:10,12,15 | 220:19,20 | 113:13 |
| **patents**  11:25 | 185:24 | 221:24,25 | **phases**  25:8 |
| **patient**  77:22 | **percentage** | 222:1,7 225:7 | 84:14 |
| 203:12 | 42:5 45:24 | **performed**  17:8 | **photograph** |
| **patterns**  103:4 | 98:15 | 31:3,4 68:14 | 36:22 |
| **pay**  142:16 | **perfect**  10:10 | 70:15 75:3 | **photographs** |
| **pc**  129:16,17,19 | 206:23 | 98:3 104:4,12 | 67:13 71:17 |
| 130:7 131:16 | **perfectly** | 108:15 117:21 | **physical**  120:11 |
| 148:3 | 125:14,14 | 120:18 139:13 | 132:12 133:24 |
| **pdf**  230:6,7 | **perform**  61:22 | 153:3 154:1 | 135:11 136:2,5 |
| | 70:25 120:11 | 172:9 189:12 | 137:6 |

Christopher D. Roche                                      February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[physically - presentation]**                                    Page 47

| | | | |
|---|---|---|---|
| **physically** 28:8 | **play** 197:12 | **policies** 224:17 | **powerpoint** |
| **pickup** 3:20 | **please** 4:11,18 | **ponce** 2:5 | 80:25 99:7 |
| 16:9 17:16 | 8:19 14:14 | **portion** 48:20 | 100:24 101:15 |
| 35:18 36:2,14 | 24:9 27:19 | 113:6 | 102:13,21 |
| 36:23 99:15 | 31:19 37:7 | **portrayed** | **practically** |
| 100:14 218:5 | 43:10 56:20 | 214:25 | 91:5 93:1 |
| 218:11 224:2 | 123:16 143:22 | **position** 28:17 | **practice** 84:2 |
| **picture** 36:19 | 161:2 230:9,17 | 88:9,9 102:11 | 210:3 |
| 37:2 213:1 | 231:7,8 | 202:3 215:14 | **practices** |
| **piece** 56:8 | **plenty** 62:1 | **possess** 142:9 | 152:14 |
| **piercing** 134:24 | **plural** 55:8 | **possible** 24:5 | **pre** 184:18 |
| **pillar** 13:2,4 | **plus** 211:18,18 | 57:1 84:6 | 215:14 |
| 18:1 | **point** 13:17 | 109:21 125:8 | **predated** 12:13 |
| **pitts** 1:22 | 14:19 15:3 | 125:11 147:12 | 23:10 |
| 228:21 | 18:24,25 21:7 | 170:11 179:9 | **predecessor** |
| **place** 68:10 | 26:11 35:16 | 179:10 192:24 | 38:5 |
| 118:3 142:23 | 37:12 41:3 | 197:19 198:4 | **predecessors** |
| 152:9 204:5 | 60:5 64:12 | 202:2,5 208:19 | 33:18 |
| **placed** 202:13 | 66:4,21 77:25 | 214:5,13 215:3 | **predict** 26:13 |
| **plaintiff** 29:13 | 82:6 97:9 | 215:6 | 130:3 133:4 |
| 44:13 45:3,12 | 105:14 112:22 | **possibly** 55:23 | **predictable** |
| 45:25 46:3,10 | 120:4 123:17 | **post** 24:24 | 150:7 |
| 48:17 66:19 | 127:21 141:24 | 113:25 | **prefer** 122:7 |
| **plaintiff's** | 174:18 177:15 | **potential** 22:21 | **preliminary** |
| 29:16 48:16 | 180:9,14 189:9 | 61:9 94:20 | 22:10 |
| **plaintiffs** 1:9 | 190:15 192:24 | 114:13 143:14 | **prelude** 151:14 |
| 2:2 4:14 44:15 | 195:11 200:5 | 183:3 190:10 | **prepare** 63:16 |
| **plan** 53:11 | 212:13 218:2 | 190:18 192:7 | **present** 2:13 |
| 64:20 181:14 | **pointer** 99:14 | 210:17 222:24 | 28:14 69:2,4 |
| **planning** 28:10 | 101:11 | 223:9 | 84:2 92:25 |
| 193:13 | **points** 21:15 | **potentially** | 171:22 |
| **plans** 53:20 | 141:4 | 89:18 183:10 | **presentation** |
| 54:1 154:9 | **pole** 12:22 | 198:21 215:22 | 12:23 80:25 |
| **platform** 15:22 | 13:12 | **power** 142:6,9 | 99:8 100:24 |
| 154:10 | | 142:17 144:19 | 101:16 105:2 |

Christopher D. Roche                                          February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[presentation - program]**                                        Page 48

| | | | |
|---|---|---|---|
| 105:19 106:5 | **prior**  5:14,19 | 183:1 189:6,24 | 192:25 193:2,3 |
| 106:15,17,25 | 7:1 33:14 | 192:6 193:11 | 193:13 200:12 |
| 107:2,6 108:4 | 39:10 48:22 | 193:15,17 | **production** |
| 175:20,24 | 65:7 84:5 | 205:20 210:16 | 6:22 24:24,24 |
| 211:9,17 | 89:22 105:6 | **processed**  7:10 | 34:6 39:17 |
| 221:17 | 175:17 176:14 | 54:22 | 62:3 105:18 |
| **presented** | 210:23 213:7 | **processes**  134:1 | 107:4,16 |
| 105:1,5 223:18 | 223:23 | 147:3 | 154:18,23 |
| 223:23 224:13 | **priority**  159:15 | **procomm**  29:4 | 180:20 211:5 |
| 225:23 | **probability** | 29:23 | 219:13 229:5 |
| **presents**  40:23 | 183:16 185:14 | **produce**  80:5 | 229:14,15 |
| **pretty**  13:23 | **probable**  186:9 | 112:4 162:9 | 230:18 |
| 79:14 198:11 | 200:23 | 163:12,25 | **professional** |
| **prevalence** | **probably**  61:15 | **produced** | 147:17,17 |
| 98:18 | 174:3,5 | 33:22 34:1,12 | **profile**  119:7 |
| **prevent**  117:12 | **problem**  47:18 | 35:4 47:10,23 | 137:21 |
| **prevented**  48:1 | 156:11 | 54:18 59:25 | **profiles**  119:3 |
| **previous**  38:5 | **problems**  43:9 | 65:14,24 66:2 | **program**  16:9 |
| 102:1 | **procedure** | 83:19 86:14,18 | 18:16 20:2,23 |
| **previously**  6:6 | 227:17 231:5 | 86:25 90:5 | 21:16 23:8 |
| **primary**  3:19 | **procedures** | 99:5 107:14,15 | 24:23 25:4,7 |
| 17:19 18:13 | 135:6,8 | 111:13 162:22 | 25:18 79:7,17 |
| 19:20 20:15 | **proceeding** | 163:20 164:22 | 85:20 94:25 |
| 24:17 25:9 | 229:16 | 169:5 175:5 | 96:14 110:18 |
| 33:2,11 59:9 | **process**  54:20 | 194:5 206:3,11 | 132:19 152:8 |
| 77:12 194:1 | 129:8 133:2,17 | 206:19 229:5 | 152:20 153:2,7 |
| 209:4 | 135:7 137:24 | 229:13 | 153:8,17 154:3 |
| **principles** | 140:14,19 | **produces**  87:10 | 154:13 155:3,6 |
| 72:21,25 | 141:5,5,9 | 145:14 158:3 | 157:20 158:14 |
| **print**  230:7 | 142:21,23 | **producing** | 158:21 159:12 |
| **printed**  6:10,16 | 143:3,24 | 83:25 85:16 | 160:1 161:21 |
| 8:23 | 153:21 154:12 | **product**  129:14 | 166:20,21 |
| **printouts** | 155:8 157:9 | 153:9,19 158:1 | 168:11 176:2 |
| 127:10 | 166:23 179:4 | 168:24 181:12 | 220:13 |
| | 179:12 181:4 | 182:14 192:23 | |

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[programs - question]**                                    Page 49

programs
  25:25
prohibited
  229:20
prohibitive
  61:12
project  26:18
  224:14
proof  109:13
  175:10
properly
  117:13 131:3
  183:1
properties
  134:7
propose  77:23
proposed  199:6
  205:23
proposing
  60:16
protected
  212:1
protection  12:2
  14:21 222:7,9
  222:13
protective  30:6
  30:10 47:8,11
prove  105:15
  201:3
provide  5:13,18
  19:7,22 20:6
  35:17 40:3,5,7
  97:14 106:22
  131:6 150:7
  163:10,16

169:22 198:18
200:20
provided  5:21
  5:24 6:5 9:17
  33:19 34:5,10
  36:25 37:11
  42:1,3 65:12
  65:13 66:4,7
  66:17 71:20
  105:4,13 107:2
  151:25 155:20
  180:6 197:17
  205:18 207:1
provider
  164:23
providers
  160:11
provides  81:17
  149:9
providing
  37:17,21 49:5
  49:10 174:2
provision  47:22
  48:1
public  30:19
  52:6 83:3
  88:24 138:19
  145:17 177:2
  210:23 211:1
  211:11,16
  212:3 213:6,11
  223:16,21
  232:24
publicly  113:8

published
  224:9
publishing
  176:1 223:23
pull  7:19 28:25
  37:14 100:18
  105:18 106:3
  110:16 150:2
pulled  101:9
  107:25 113:6
pulling  100:22
pulse  184:19
purchase
  142:10
purchases
  195:1
purely  40:7
purpose  79:13
  130:22 131:7,8
  131:9 137:11
  150:20 182:15
  182:19 189:4,4
  193:21,22
  194:7
purposes
  102:14 135:17
  136:7,11
  198:14
pursuant  4:4
  227:16 231:4
put  5:9 13:3
  48:14,19 51:8
  62:9 71:1
  80:25 89:16
  101:15 107:23

110:10,21
116:22 126:7
144:14,18
178:18
putting  203:1

**q**

qualification
  96:15
qualified  27:16
  130:13 152:8
  152:19 153:1
  156:12,14
  158:10,23
  161:20
qualifies  24:13
qualify  27:7
  91:2,3 95:3
qualifying
  102:21 154:12
quality  29:23
  157:20 193:13
  208:8
quantified  42:5
  115:6 116:2
  117:3 120:23
quantify  36:11
  42:6 98:14
  102:24 116:1
  116:24 117:2
  217:15
quest  62:15,15
question  20:1
  21:24 23:24
  24:8,11 33:24
  38:11,14 39:5

Christopher D. Roche

February 1, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[question - read]**

Page 50

| | | | |
|---|---|---|---|
| 41:4 43:15 | 158:8,16 159:8 | 186:18 221:21 | **rails** 52:16 56:4 |
| 51:6,13 52:12 | 161:1,5 162:20 | **quicker** 143:10 | 216:17 222:22 |
| 53:3,3,14 54:4 | 163:14,15 | **quickly** 47:6 | **rains** 195:5 |
| 54:11 56:20 | 164:5,15 165:1 | 63:7 78:25 | **raise** 188:15 |
| 58:20 60:20 | 165:19,21,23 | 160:6 | **raised** 36:2 |
| 74:5,12 75:22 | 166:19 167:2,4 | **quite** 22:11 | 88:8,12 97:9 |
| 76:8,14 84:19 | 167:8,12 168:1 | 113:18 129:8 | 221:3 |
| 85:12 86:22 | 168:5 169:2 | 165:19 196:7 | **raises** 174:2 |
| 87:25 89:7,22 | 170:6,15 171:2 | 196:22 214:10 | 207:18 |
| 90:12,22 91:13 | 171:9,9,16 | **quote** 60:12,23 | **raising** 35:18 |
| 92:6,19 95:15 | 174:15,19 | 101:9 103:8 | 169:5 188:9,19 |
| 95:23,25 96:6 | 175:16 176:4 | 150:5,15 | **ram** 15:22 |
| 97:23 99:22 | 177:3 180:3,13 | 151:22 179:1 | 112:7 |
| 108:25 109:19 | 181:1 182:1 | 187:16 | **ran** 16:20 |
| 109:25 111:16 | 183:7 185:7 | **quoted** 101:15 | 136:5 201:12 |
| 111:23 113:21 | 186:5 187:4 | **quotes** 99:9 | **ranch** 71:7,10 |
| 114:16 115:1,8 | 188:24 189:19 | **qvm** 153:5,7,16 | **range** 15:18 |
| 116:1 118:17 | 192:1,4,16 | 153:25 154:2,7 | 23:2 41:23 |
| 121:8 122:18 | 193:8 197:5,22 | 154:13 155:3,6 | 76:24 |
| 122:18 123:13 | 200:17 201:19 | 155:15,17,24 | **rate** 175:12 |
| 123:13,15 | 202:6,7,9,9 | 157:5,13,17,24 | **rates** 175:23 |
| 125:1,2 126:14 | 203:3,5,9,14,20 | 158:13,21 | 177:17,24 |
| 127:14 130:10 | 203:21,23,25 | 159:2,14,18,22 | 178:16 |
| 135:23 136:20 | 206:7 209:9 | 160:1 161:21 | **rather** 22:24 |
| 136:20 138:14 | 215:10 222:18 | 166:20,20 | **reach** 40:11 |
| 140:3 143:18 | 225:3 | 168:11 | 218:25 |
| 143:22 144:9 | **questions** 11:9 | **qvms** 156:12,14 | **reached** 102:6 |
| 145:11 147:16 | 11:11,20 24:6 | **r** | 105:10 108:5 |
| 147:21 149:15 | 53:23 73:8 | | 201:14 |
| 151:5,11,13,16 | 89:12 156:11 | **r** 91:1,1 228:1 | **reaches** 92:22 |
| 151:18,19 | 200:7 226:21 | **rad** 2:14 43:23 | **react** 133:6,11 |
| 152:11,23 | 228:8 229:7 | 43:23 44:3 | **reacting** 82:8 |
| 155:11 156:3 | **quick** 9:14 | **radar** 94:2 | **read** 103:9 |
| 156:19 157:3 | 64:23 77:24 | **rail** 19:21 61:8 | 130:20 131:3 |
| 157:11,23 | 127:19 183:20 | 77:14 87:9 | 161:1,3 230:5 |
| | | 118:9 | |

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[read - reference]**                                    Page 51

231:2
**readily** 148:9
148:15 213:10
**reads** 18:25
**ready** 227:2
**real** 9:14 64:23
78:25 121:11
121:23 122:9
122:13 124:20
125:9 132:12
132:21,22,24
137:2,4,5
138:21 139:9
183:19 205:4
225:19
**really** 63:9
78:24,24 81:22
93:10 118:23
130:10 153:24
167:20 193:24
**reap** 208:20
**rear** 16:23
17:23 68:8
118:9,11
125:21 144:24
200:1 207:19
214:3,4,12,15
222:13,14
**reason** 30:4,14
34:21 43:8
79:22 103:22
150:8 173:8
204:12 231:13
231:16,19,22
231:25 232:3,6

232:9,12,15,18
**reasonable**
77:4 142:6
144:3 225:11
**reasons** 231:6
**reattachment**
197:8
**recall** 19:20
49:10,11 66:20
71:4,18 72:5
82:1 149:3
162:2 207:5,12
224:6 226:1
**receive** 11:19
66:24 132:25
180:22
**received** 3:15
5:23 7:1 8:25
28:24 62:10
67:4 107:12
225:12
**receives** 229:23
**receiving** 111:7
**recent** 134:13
**recently** 16:10
102:4
**recess** 43:2
78:18 128:6
186:23 213:22
**recipient**
153:22
**recognition**
188:1
**recollection**
49:4

**recommend**
150:9 151:21
174:23
**recommendat...**
38:24 149:5
**recommended**
109:22 147:15
149:4,12
188:16
**reconciled**
102:3
**reconstruct**
70:17
**reconstruction**
70:19 117:2,4
117:6 130:11
138:16 217:1
217:19
**reconstructions**
130:14
**record** 4:7,12
10:14 43:1,4
43:16 78:13,17
78:21 128:5,8
172:1 186:22
186:25 213:21
213:24 221:15
227:3,5,6,10,14
**recorded**
184:17,18,18
201:12
**recording**
173:1 184:17
**records** 7:4 8:7
8:7 198:6

**recreate** 141:9
**recreating**
121:22
**red** 82:10
**redeveloping**
26:3
**reduce** 17:10
26:20 39:12
79:10 114:12
123:9 175:22
**reduced** 52:17
115:4 124:15
125:20,22
145:1 176:23
202:14 228:9
**reduces** 221:11
**reducing** 176:9
**reduction**
99:15 100:6
103:13 105:17
108:21 109:14
116:3 209:8
**refer** 50:5,14
50:21,25 86:10
102:5 117:3
**reference** 6:13
6:18 37:12
62:14 64:7
73:12,25 85:21
102:20 105:12
106:20 138:20
149:9 164:21
174:10 198:7
212:3,16,17,21
213:3,5

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[referenced - remote]**                                   Page 52

**referenced**
  64:11 81:15
  101:23 105:24
  113:6 148:23
  199:17 212:15
**references** 12:1
**referencing**
  36:7 94:5
  102:19 107:10
  108:3 110:16
  172:15 200:13
**referred** 20:10
**referring** 20:9
  22:8 29:22
  53:6 81:7
  99:25 102:14
  106:10,16
  134:21 150:11
  150:13 164:17
  176:11 191:6
**reflect** 51:9,10
  103:23 146:14
  148:21 168:2
**reflected** 11:12
**reflection**
  106:13
**reflective** 50:20
  102:15
**reflects** 51:15
  92:6 103:6,18
**refusing** 30:4
  171:8
**regard** 21:10
  22:13 47:1,22
  85:12 95:11,13

103:7 107:12
126:10,21
151:4 164:12
166:15 168:12
169:18 200:9
201:10 205:23
207:14 209:12
209:25 224:25
226:7
**regarding**
  10:17 38:22
  99:20 101:10
  126:5 131:19
  160:1,8 164:7
  186:13 209:18
  216:24 226:22
**register** 153:21
**regular** 215:20
  228:14
**regulated**
  75:12 76:18
**regulation**
  73:10,13 74:3
  74:9,13 75:17
  76:9 79:18
**regulations** 4:5
  74:7,20 226:8
  226:9
**regurgitating**
  203:13
**reinstall** 196:25
  205:14
**reiterated**
  208:8

**rejoins** 78:19
**relate** 13:13
  14:20,24 23:20
  25:23 31:8
  115:25 189:1,3
**related** 6:5 13:5
  13:10 16:15
  23:4 27:23
  32:15 34:2
  45:11 51:24
  104:8 112:22
  127:4 130:24
  159:11 160:10
  166:10 174:22
  175:5 178:7
  182:6 190:11
  207:4,7,24
  209:11,14
  214:7 218:15
  224:9 229:16
**relates** 8:15
  10:1 24:16
  28:4 38:11
  159:22 169:13
  174:15
**relationship**
  229:20
**relative** 17:9
  26:8 84:12
  88:13 100:15
  116:6 145:25
  169:21 179:10
  181:11 202:3
  206:15 216:8
  222:22

**relatively** 143:6
  173:23 195:11
  197:10 223:2
**released** 16:14
  102:4,6 138:1
**relevance**
  193:5
**relevant** 8:13
  24:15 25:9,24
  27:22 33:13
  34:19 73:17
  74:24 82:17,18
  82:19 89:25
  151:2 166:18
  183:5 184:2
  187:16 189:6
  224:14
**relied** 95:2
  217:16 224:4
  225:24
**rely** 9:11 62:21
  67:2 73:15
  117:6 184:24
  217:1 225:12
**relying** 34:15
  35:6 66:6 67:8
  74:16
**remaining**
  215:24
**remember**
  29:14 43:16
  72:6 148:24
  168:22
**remote** 1:14 4:1

Case 2:22-cv-00017-RWS    Document 138-4    Filed 03/10/25    Page 113 of 134
Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[removable - requirement]                          Page 53

removable
  199:6
removal  194:16
  196:1 197:8
remove  194:21
  195:9,12,14
  196:10,21
  205:6,19
removed  38:6
  38:16 196:4
  219:20
removing
  205:23
render  52:24
  120:19
repair  17:5,7
  17:11
repeat  14:14
  27:19 31:18
  56:20 58:19
  95:25 118:16
  136:20 143:22
repeating  24:9
rephrase
  123:16 156:19
report  3:13
  9:19,21 10:15
  27:14,17,20,21
  28:1,3 34:10
  35:2,13,14
  37:1,1,8 49:5
  49:10,11,14
  50:6,15,22,23
  51:1,4,15,19,22
  52:21,23 53:7

54:14 55:5,8
55:12 56:7,14
59:23 60:19
62:15,16,22
63:6 64:8,15
64:25 65:4,8
65:12,16,22
66:3,5,22
69:10,10,15
70:23 71:3
74:3 77:22
79:15 88:18
90:2 91:14
100:1 102:15
102:19,21
103:7,21 104:3
104:16 105:21
105:25 106:9
106:11,12
107:3,10 109:3
109:4 117:4,6
124:15 127:1,2
127:7 130:19
130:21 131:4
139:6 150:3,4
174:11 177:4
177:12 178:18
181:14 184:11
184:20 189:21
199:16 204:21
209:6 210:22
212:16,18,21
212:24 213:5
216:1 217:24
218:25 226:12

report's  65:20
reporter  4:4,17
  10:13 13:15,19
  14:13 20:11
  31:18 37:6
  49:17,20 80:17
  161:1 227:7
  229:8,11
reporting  4:6
  80:8
reports  28:1
  62:19 66:8,18
  111:5 213:10
  229:24
represent  4:12
  29:12 44:12,14
  64:16 65:2
  77:15 141:17
  141:19 228:10
representation
  41:9 63:11
  139:15 140:20
  144:25
representative
  43:25 77:9
  118:20 119:11
  119:14 122:20
  143:10 154:7
  155:21
representatives
  69:1 154:2
  155:6 157:5,13
  157:16,17
  159:2,3 211:12

represented
  98:13
represents  29:8
  48:20 77:6
  125:14,16
  204:10 229:4,9
request  7:12
  33:20 34:6
  98:25 108:11
  154:15 185:23
  197:11 229:17
  229:25
requested  5:13
  153:18
require  21:18
  25:13 39:23
  41:19 75:6
  141:24
required  26:7
  47:20 58:17
  59:2 74:19
  76:23 79:18
  126:7 141:19
  188:20 194:11
  196:18 201:22
  202:7 204:5,17
  204:24 205:14
  205:17,19
requirement
  23:9,14 33:8
  79:23 84:16
  123:7 172:4
  199:18,24
  204:11

Christopher D. Roche                                  February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[requirements - right]**                                    Page 54

| | | | |
|---|---|---|---|
| **requirements** | **response** 70:10 | **retailer** 189:22 | **ride** 37:4 41:24 |
| 16:16 19:3,5,8 | 70:11 166:10 | **retained** 29:13 | 90:2 119:22 |
| 19:12 21:14,16 | 188:24 | 44:18 45:3,25 | 146:7,14 169:6 |
| 25:13 33:10 | **responsibility** | 46:9 70:9,14 | 173:24,25 |
| 57:3,23 59:4 | 18:17 21:14 | 131:13 | 174:2,12 |
| 116:17 171:12 | 22:3,18,23 | **retaining** | 177:23 178:14 |
| 181:15 206:15 | 121:13 204:21 | 131:14 | 193:23 207:21 |
| 216:11 225:7 | **responsible** | **retract** 51:2,7 | 208:7,8,14,22 |
| 225:20 | 220:4 225:4 | 108:10 | 220:8,14,16,18 |
| **requires** 75:1 | **responsive** 5:19 | **returned** | 222:6,20 223:1 |
| 205:9 | **rest** 8:10 | 230:11,14 | **right** 5:6 7:14 |
| **research** 40:16 | 190:17 | **review** 27:21 | 7:21 8:6 9:4 |
| 69:13 160:8,10 | **restate** 126:16 | 62:16 65:1,19 | 10:20 11:18 |
| 160:22 162:23 | **restraint** | 65:23 69:14,22 | 12:23 18:10 |
| 164:12 174:10 | 144:23 184:16 | 69:24 70:3 | 19:12,15 20:21 |
| 184:8,10 201:6 | 185:22 220:20 | 175:19 189:5 | 25:21 27:3,25 |
| 201:8,10 | 222:8,10 | 191:15 211:15 | 29:3,12,20 |
| 211:19 212:6 | **restroom** | 230:6 | 31:3 32:17 |
| **researched** | 186:16 | **reviewed** 27:14 | 34:14,14 35:15 |
| 85:10 166:7 | **result** 41:15 | 27:20 35:5 | 36:20 37:17 |
| 194:3 | 122:19 133:10 | 48:22 62:18 | 43:20 44:11,17 |
| **reserved** | 135:18,19 | 64:24 66:17,23 | 44:21 45:2,5 |
| 227:18 230:5 | 136:6 137:2,4 | 67:4,23 69:8,9 | 45:24 46:12 |
| **reside** 215:22 | 137:10,12 | 104:15 109:9 | 48:5,10,14 |
| **resist** 116:13 | 146:3 169:6 | 127:8,10,15 | 49:8,14,16 |
| **resource** | 177:13 228:16 | 207:3 | 50:14,17 52:20 |
| 142:18 | **resulted** 12:16 | **reviewing** | 53:19 54:8 |
| **resources** | 52:6 123:25 | 102:16 | 56:1 57:17 |
| 142:14 144:14 | 125:3 | **revoking** | 59:12 62:6,25 |
| **respect** 39:11 | **results** 38:23 | 226:13 | 63:2,4,15 64:3 |
| 111:6 112:24 | 81:16 102:3 | **richard** 2:8 | 64:22,23 65:21 |
| 211:8 | 103:12 121:19 | **rick** 4:15 10:24 | 66:1,24 67:13 |
| **responding** | 133:19 137:8 | 47:17 66:10 | 67:16,20 68:10 |
| 192:9 | 144:5 | 126:24 | 68:20 69:17 |
| | | | 70:5,20 71:1 |

71:12 74:2
77:5,15,16,20
78:22 80:10
81:3,4,20 82:4
82:10,16,24
86:12 87:5,17
88:12,25 90:4
94:25 96:19
99:13,18 101:7
102:1,10,20
105:9 106:24
107:8 110:15
112:18 113:5
113:15 115:25
117:23 123:2
126:25 127:14
127:18 128:24
129:5 130:18
132:24 136:6
137:21 138:4,7
139:3 141:22
146:17 147:8
148:25 149:2
149:19 152:2
154:22 155:2
160:5,5 165:13
165:21 166:1,5
166:19,20
172:2 176:14
176:18 177:8
177:10,15,25
178:9 179:6
181:21,24
182:2 183:2,23
184:2,24 185:8

185:19 186:1
186:15 187:23
188:18 190:1
191:5,8,10,18
192:10 194:18
195:6 196:9
199:3 207:23
208:4 209:6
210:12 211:4,8
211:13 213:4
213:15 218:9
218:18 222:9
222:12 224:22
225:8 227:1
230:5
**rigid**   12:10,22
13:12
**risk**   50:1,8,13
52:1,9,19
54:16 98:15
100:11 101:13
103:5 108:21
125:21 190:22
**risks**   84:21
172:12
**rivet**   134:24
**road**   2:9 40:24
80:1 168:17
194:17,24,25
195:3,4,7,14,15
195:21 197:10
198:12 205:10
205:13,16,18
222:22

**roads**   52:6
88:24 205:21
**roadway**   91:10
197:2
**roadways**
89:20
**robson**   7:7,10
7:12 8:8 28:13
28:17 45:19
46:16 63:18
69:6,22 129:15
129:15 130:4,6
131:16
**roche**   1:16 3:11
4:1,10,19 9:15
43:7 79:6
143:21 157:22
213:25 218:19
218:24 230:2
**roche's**   66:12
**role**   29:9
153:25
**roles**   121:15
**room**   44:5
47:16
**roswell**   230:20
**rough**   1:11
3:10 4:16
43:19,24,25
49:25 50:19
52:4 54:15,18
55:15,19 60:11
60:22 68:1
89:15 92:11
130:23 132:4

136:4,5 145:6
145:13 146:8
146:22 147:3
147:15 155:21
155:23 158:3
161:13,16,24
162:16,18
163:4,6 164:5
164:5,8,11,22
165:17,23
167:23 168:13
172:9 178:21
178:25 180:6
180:15,22
181:19 182:4
182:18,23
185:21 189:9
189:10,15,23
191:10,14,16
193:16 194:4
198:23 199:10
200:8 201:21
202:13 203:18
204:4 206:3,11
206:18,25
208:1,9 209:7
210:10,23
211:21 213:7
223:16
**rover**   15:17,18
23:2
**rpr**   1:22
**rule**   62:15,16
66:5 79:17
84:15 182:22

Christopher D. Roche                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[rule - screen]**                                    Page 56

| | | | |
|---|---|---|---|
| 227:16 231:4 | 169:15 170:24 | **saved** 177:13 | **scanned** 67:14 |
| **rules** 4:5 | 172:14 173:25 | **saw** 64:12 | **scenario** |
| 227:17 231:4 | 174:1 177:2 | 100:2 | 143:11 170:12 |
| **run** 11:20 | 178:17,22 | **saying** 31:9 | 190:12 197:19 |
| 17:13 41:12 | 179:1,4,10 | 36:9 40:16 | 205:7 214:11 |
| 118:15 122:21 | 187:13 188:7,8 | 41:15 42:13 | 215:1,7,20 |
| 131:24 132:12 | 188:11,18 | 47:21 58:8 | **scenarios** 120:1 |
| 134:2 136:4 | 189:13,23 | 72:12 89:17 | 132:19 137:18 |
| 140:2,9 142:6 | 199:24 200:3 | 94:4 96:21 | **scene** 70:6 |
| 145:4,7,23 | 204:13,18,22 | 98:11,12 | **schedule** 3:13 |
| 146:10,15 | 204:25 209:23 | 101:22 107:20 | 10:18 63:7,8 |
| 147:19 190:6,6 | 210:2,14 221:2 | 118:21,23,23 | 63:11 |
| **running** 9:23 | 224:20,23 | 119:10,13 | **school** 220:25 |
| 16:22 40:21 | 225:1,5,17 | 120:25 124:23 | **scope** 89:7 |
| 133:4 144:21 | **salary** 46:13,17 | 125:7 133:20 | 91:13,19 93:21 |
| **rws** 1:8 | **sales** 112:5 | 135:23 136:1 | 109:19 167:19 |
| | **santa** 16:8,9 | 140:1,8 141:24 | 171:3,18 |
| **s** | 17:8,16 22:4,5 | 146:6 160:1 | 215:10 |
| | 22:6 | 180:21 185:14 | **scrap** 74:15 |
| **s** 20:12,12,17 | **santana** 1:6 | 188:13 189:15 | **scrape** 197:16 |
| 20:17,18 45:1 | **sante** 16:7,13 | 192:2,10,17 | **scraping** |
| **sae** 185:15 | **satisfied** 21:16 | 198:9 | 198:10 |
| 211:3,14 | 21:19 80:7 | **says** 9:24,25 | **scratch** 67:3 |
| 213:10 | 87:4 202:20 | 55:6 62:10 | 96:4 169:24 |
| **safe** 54:17 | **satisfies** 40:18 | 71:7 75:17 | **screen** 5:3,7 |
| 61:13 98:1 | **satisfy** 17:15 | 76:9 79:15 | 9:13,14 11:22 |
| **safer** 55:7 | 19:14,25 57:2 | 80:6 81:17,22 | 26:15 29:1,7 |
| 164:18 172:7 | 57:23 58:2 | 85:23 95:3 | 36:20 37:15,15 |
| 194:15 197:10 | 75:10,25 80:5 | 99:14 101:12 | 44:22 48:11,12 |
| 198:17 205:25 | 84:7,9 181:16 | 102:2,22 | 48:15 49:13 |
| **safety** 12:10 | 181:18 | 103:12 110:22 | 53:6 62:9 63:2 |
| 40:24 42:2 | **satisfying** | 130:19,22 | 71:2,7 80:10 |
| 54:19 55:17 | 133:5 226:19 | 150:5 | 99:7 100:19 |
| 72:21 90:3 | **save** 169:25 | **scan** 11:7 | 105:20 110:21 |
| 104:18 121:24 | | | 114:9 178:19 |
| 165:6,10,12 | | | |
| 168:22 169:7 | | | |

Christopher D. Roche
Bryson, Santana and Joshua v. Rough Country, LLC                    February 1, 2024

[scrutinized - serve]                                                      Page 57

| | | | |
|---|---|---|---|
| **scrutinized** | 193:22,24 | 48:25 72:15 | 113:11 126:19 |
| 179:3 | 194:16,21 | 101:8 178:18 | 126:23,25 |
| **seal** 230:12 | 195:9,18 196:2 | 215:25 | 127:1,2,3,5 |
| **searched** | 196:5,10 197:1 | **see** 5:1,7 9:14 | 196:13 217:23 |
| 206:25 | 197:3,9,15,17 | 9:24 15:20 | **self** 13:24 81:23 |
| **seas** 20:10,11 | 198:10 199:2,6 | 17:8 21:11 | 82:14,22 83:1 |
| 20:17,22,23 | 199:13,19,22 | 26:16 28:3 | 83:7 86:1,6 |
| 23:5,21 25:13 | 200:8,19,24 | 29:1 30:19 | 103:15 110:23 |
| 33:8 38:5,8,14 | 201:1,17,22 | 36:13,15 37:15 | 111:8,13,20 |
| 39:13,15,21,23 | 202:3,14,15 | 39:17 48:12 | 112:18,20 |
| 39:24 40:6,10 | 203:16,19 | 51:22 55:11 | 113:9,10,17 |
| 40:11,19,22 | 204:5,16 | 63:2,15,19 | 134:24 222:7,9 |
| 41:1,6,12,19 | 205:15,23 | 64:7 65:18 | **sell** 160:9 |
| 42:1 55:10,16 | 208:17,24 | 69:17 71:2,19 | **send** 11:7 227:8 |
| 55:22,25 56:11 | 209:2,8 221:11 | 73:10 79:9 | 230:12,17 |
| 56:13,17,23,24 | 224:2 | 107:15,21 | **sending** 7:22 |
| 57:2,7,13,19,22 | **seat** 68:7 | 109:9 118:6 | **sends** 63:18 |
| 57:24 59:8,10 | **second** 14:3 | 135:14,20 | **sense** 74:18 |
| 59:14,25 60:4 | 15:3 29:3,19 | 136:21 137:9 | **sent** 8:9,11 34:7 |
| 60:9,21,24 | 29:21 37:14 | 137:12 158:7 | 107:19,20,20 |
| 61:5,6,10,22 | 42:18,19 48:10 | 178:19 180:20 | **sentence** 36:9 |
| 62:2,3 81:19 | 52:3 54:10,11 | 181:19 184:8 | 51:20 86:10 |
| 88:7,12,16 | 56:5 62:25 | 184:15 190:14 | 101:24,25 |
| 90:6,15 91:3,4 | 71:12 107:8 | 209:4 212:21 | 102:2,10 |
| 91:5,22 92:22 | 139:5 150:4 | 213:2 216:16 | 103:12 165:20 |
| 95:5 96:8 97:5 | 218:4,21 | **seeing** 184:20 | **sentra** 42:17 |
| 99:4 111:7 | **secondary** 3:20 | **seemed** 201:16 | **separate** 10:4,7 |
| 114:22 118:8 | 17:20 18:14,19 | **seemingly** | 21:1 |
| 123:18 163:10 | 19:13,22 20:16 | 189:10 | **september** 80:5 |
| 163:16,20 | 21:18 22:15 | **seems** 12:24 | 84:5 85:25 |
| 164:24 170:20 | 24:18 25:19 | 55:22 76:20 | 176:12 |
| 171:5 182:17 | 32:23 39:1 | 198:19 | **series** 39:8 |
| 182:19 188:2,9 | 87:3 | **seen** 5:15 48:24 | 71:14 75:24 |
| 188:10,14,17 | **section** 11:25 | 53:9 66:13 | **serve** 157:14 |
| 188:19 193:21 | 21:8 35:15,16 | 80:6,8 83:3 | 160:24 |

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[services - simulations]**                                    Page 58

| | | | |
|---|---|---|---|
| **services** 229:23 | 98:18 106:18 | **signing** 166:24 | 136:15 137:12 |
| **set** 126:6 | 113:19 124:13 | **silverado** | 138:9 140:13 |
| 142:21 196:18 | 169:5 175:21 | 145:21 146:12 | 143:12,24 |
| 219:17 | **shuttle** 153:14 | 147:9 | 144:13 |
| **sets** 63:10 | 159:23 | **similar** 31:4 | **simulated** |
| **severe** 179:14 | **sic** 67:22 135:2 | 51:24 90:18 | 125:10,17 |
| **severity** 131:1 | 139:24 140:17 | 91:8 118:4,11 | 130:8 |
| 179:12 190:21 | 159:6 176:18 | 118:13 140:25 | **simulating** |
| 190:25 | **side** 29:16 47:1 | 185:24 200:3 | 129:9 |
| **sf** 22:9 | 214:10 | **similarly** | **simulation** 20:3 |
| **share** 5:3 9:13 | **sign** 47:20 | 140:24 | 22:24 23:8 |
| 11:22 44:22 | 230:5 | **simon** 126:9 | 25:8 26:8 |
| 48:7 100:19 | **signature** | 128:18,22,23 | 112:2 118:14 |
| **sharing** 26:14 | 227:18 228:20 | 148:4 | 118:19,22 |
| 48:2,11 80:10 | 230:2,15 | **simple** 60:20 | 119:8 120:6,18 |
| **sheet** 25:1 | 232:20 | 62:3 69:18 | 121:15 122:6,8 |
| 55:18 | **signed** 167:9 | 111:17 137:14 | 122:11 125:3 |
| **sheets** 63:17 | 230:9,11,14 | 147:16,21 | 125:25 126:2,3 |
| **shock** 25:2 | **significance** | 151:16 156:18 | 126:8,12 127:1 |
| **shop** 68:16,18 | 109:13 | 157:4,4 171:9 | 127:4,11,16 |
| **short** 103:16 | **significant** | 202:16 203:4 | 128:10 130:2 |
| 213:16 | 34:23 36:8 | **simplified** | 131:25 132:5 |
| **show** 9:22 | 39:18 54:25 | 138:18 148:3 | 132:12,14 |
| 77:10 82:7 | 99:17 103:16 | **simplify** 143:3 | 133:1,4,9,15,23 |
| 100:5,21 | 108:16,18 | 143:24 | 134:16,25 |
| 105:16 113:16 | 116:2,20,21 | **simplifying** | 136:7 137:11 |
| 118:25 119:2,4 | 117:7,8,9,10 | 144:4 | 139:13,14,24 |
| **showed** 101:18 | 123:22 195:5 | **simply** 29:3 | 140:3 142:2,25 |
| 108:16 | 198:1 | 33:5 94:13 | 143:2 144:6,11 |
| **showing** 26:10 | **significantly** | 120:4 177:3 | 145:7 |
| 36:23 109:13 | 35:19,22 36:22 | **simulate** 124:6 | **simulations** |
| **shown** 174:12 | 52:18 100:6 | 129:11 130:7 | 70:21,25 |
| **shows** 35:17 | 115:4,6 119:4 | 131:17,23 | 118:14 122:3 |
| 36:1 40:22 | 124:14 125:19 | 132:15,18 | 122:15 123:5 |
| 41:13 83:9 | 125:22 | 135:12 136:9 | 128:12,14,16 |

Christopher D. Roche

February 1, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[simulations - specific]**

Page 59

| | | | |
|---|---|---|---|
| 128:24 129:3 | **skip** 150:2 | **solution** 55:24 | **sort** 39:1 130:2 |
| 129:22 132:11 | **slavik** 45:4 | 75:10 195:8 | **sorts** 221:7 |
| 136:12 140:10 | **slide** 99:14 | 198:19 205:6 | **sounds** 11:4,13 |
| 145:23 146:15 | **slides** 221:17 | 205:22 | 78:3 142:20 |
| 190:6 | 223:13,18 | **solutions** 18:4 | 156:11 |
| **simulator** | **slight** 179:4 | 29:23 61:9 | **source** 71:14 |
| 135:14,17,20 | **slightly** 54:13 | 76:1,3 190:23 | 101:18 111:18 |
| **single** 15:8 | 55:4 119:25 | 195:16 229:1 | 151:5,20 152:2 |
| 79:25 80:1 | 140:5 148:4 | **somebody** | 207:25 |
| 85:5 86:9 | 215:4 | 47:14 | **southeast** |
| 111:13,20 | **small** 12:10,20 | **sooner** 54:23 | 230:21 |
| 161:16,23 | 12:22 13:8 | **sophisticated** | **space** 28:5,7 |
| 178:2 | 16:9 143:7 | 122:12 138:11 | 50:9 115:14 |
| **sir** 64:21 | 153:14 223:2 | 142:5 | 117:12 119:5,6 |
| 128:20 179:2 | **smaller** 198:12 | **sorb** 12:21 | 120:6 121:1 |
| 227:9 | **snow** 195:4 | **sorento** 22:7,7 | 124:17,18 |
| **sister** 22:3 | **snyder** 2:4 | 22:13,14 | 125:20 187:21 |
| **sit** 61:24 | **socket** 196:18 | **sorry** 4:24 | 187:25 189:1 |
| 152:18 159:19 | 219:17 | 13:14,16 14:3 | 214:20 215:22 |
| 189:14 192:22 | **software** 126:2 | 14:13,13,15 | 215:23 |
| **sitting** 156:8 | 126:9 128:16 | 16:25 24:7 | **speak** 70:13 |
| 196:25 | 128:19 129:2 | 27:19 29:13 | 104:14 140:6 |
| **situation** | 129:21 132:15 | 31:18,23 34:1 | **speaking** |
| 119:12 120:9 | 132:15 133:23 | 37:6 42:8 | 156:16,20 |
| 129:23 137:1 | 135:14 136:8 | 47:15,17 48:10 | **specialize** |
| 138:10 195:7 | 137:11 138:7 | 54:3 56:19 | 160:17 |
| 197:2 224:8 | 138:12,25 | 58:19 62:13,25 | **specialized** |
| **situations** | 139:1 141:9 | 67:3 70:11 | 141:25 |
| 114:22 170:2 | **sold** 75:25 85:1 | 83:22 85:19 | **specific** 22:25 |
| 194:10 | 85:6,9 86:14 | 95:24 106:1 | 23:7 28:2 |
| **six** 93:3 223:3 | 160:21 191:14 | 108:13 114:8 | 32:10 40:13 |
| **size** 183:14 | **solely** 10:1 95:2 | 118:16 124:25 | 42:14 51:10 |
| 196:8 | 95:4 96:7,25 | 181:24 192:20 | 72:5 75:17 |
| **sj** 18:16,20 20:1 | 98:22 117:6 | 201:20 209:16 | 76:24 77:10 |
| 20:23 25:18 | 164:10 174:15 | 219:4 | 84:7 87:1 |

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[specific - status]                                              Page 60

| | | | |
|---|---|---|---|
| 89:10,14 90:4 | **speed** 16:21 | 203:18 210:3 | 66:1 72:15 |
| 90:10 91:9 | 75:2 117:20 | **standardized** | 74:23 75:13 |
| 92:15 94:16 | **speeds** 16:24 | 138:16 | 76:15 86:7,11 |
| 98:10 102:24 | 214:8,14,19 | **standards** | 88:22 89:14 |
| 104:7 105:14 | **spent** 60:17 | 73:25 225:5,6 | 95:5 99:11 |
| 106:10,24 | **split** 87:14,14 | 225:9 | 100:4 101:19 |
| 107:5 108:9 | **spot** 134:24 | **stands** 79:3 | 102:22 110:2,5 |
| 114:18 122:20 | 135:3 189:7 | 179:7 | 110:11,13,15 |
| 126:9 132:23 | **srt** 220:15 | **start** 11:19,24 | 110:21 111:1 |
| 137:17 149:7 | 221:24 222:1,2 | 15:16 28:12 | 111:10 112:15 |
| 162:21 166:15 | 222:10,25 | 33:24 42:15 | 116:5 121:6 |
| 167:24 169:11 | 223:8 | 45:19 83:23,24 | 130:1 144:7,10 |
| 173:4 175:1,2 | **srt's** 223:9 | 86:3 137:3 | 151:8 152:6 |
| 175:10 176:10 | **stability** 179:25 | 141:6,14 | 165:18 173:7,9 |
| 184:9,12 | **stack** 215:4 | 145:20 146:9 | 201:5,8 210:10 |
| 185:19 200:14 | **stage** 154:5 | 146:11 147:7 | 231:6 |
| 201:2,9 207:24 | 159:11 192:6 | 147:11 205:11 | **statements** |
| 210:10 211:10 | **stages** 155:11 | **started** 28:14 | 112:14 |
| 216:5 220:7 | 155:14 | 28:18 155:13 | **states** 1:1 49:24 |
| 223:25 224:7 | **standard** 36:14 | 221:10,12 | 110:8 112:6 |
| 229:21 | 74:9 119:20 | **starting** 221:18 | 224:21 |
| **specifically** | 121:6,21,25 | **starts** 9:19 | **stating** 171:25 |
| 19:23 23:14 | 122:2,25 | 101:11 140:19 | **statistic** 172:19 |
| 24:16 26:4,17 | 146:12,12 | 178:20 181:3,4 | 177:15 |
| 35:4 75:8 | 164:8,9,13,16 | 205:8 | **statistical** |
| 77:12 106:8,16 | 164:21 166:24 | **state** 71:21 | 109:12 175:10 |
| 121:17 140:9 | 167:9 168:13 | 228:3 | 175:21 186:1 |
| 149:25 165:10 | 168:16 169:13 | **stated** 155:21 | **statistically** |
| 182:17 210:4 | 169:17,20 | 168:15 176:22 | 99:16 108:20 |
| 220:2 221:16 | 170:4,13 | 204:20 208:13 | **statistics** |
| 226:2 | 171:21 199:12 | 228:7 | 172:17 178:7 |
| **specifications** | 199:20 200:9 | **statement** | 178:10 184:24 |
| 206:15 | 200:12,13,14 | 12:25 35:23 | 185:2 |
| **specifics** 31:14 | 200:18 201:22 | 50:4 54:17 | **status** 64:17 |
| 221:1 | 202:16,23 | 56:10 57:15 | 79:20 84:12 |

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[status - subject]**                                              Page 61

| | | | |
|---|---|---|---|
| 154:25 212:4 | **strong**  100:10 | **structure**  12:2 | 104:8,22 |
| **statute**  109:22 | 101:12 | 12:20 13:9 | 108:15 177:25 |
| **steel**  134:14,16 | **strongly**  150:8 | 17:20,21 18:1 | 178:1 222:5 |
| **steep**  198:3 | **struck**  14:22 | 18:5,5,15,18 | 224:5 |
| **steering**  150:6 | 15:6 22:22 | 19:14 20:5,15 | **study**  100:10 |
| **stems**  201:5 | 28:8 42:16 | 20:16 21:1,5,9 | 101:12,23 |
| **step**  147:8 | 45:10 98:21 | 21:19 22:15,25 | 102:4,5,5,11,12 |
| 173:13 187:14 | 114:24 117:25 | 25:3,10,20 | 102:22,23 |
| 190:2,5,7 | 118:2,5 146:5 | 33:3,11 36:16 | 103:8 104:1,11 |
| **steps**  190:19 | 166:12 169:7 | 36:18 39:2 | 104:23 105:13 |
| **stiffness**  134:7 | 214:9,18 | 42:11,11 46:19 | 106:2,3 108:8 |
| 138:17 | **structural**  12:8 | 52:15,18 59:9 | 146:7 147:7 |
| **stipulate**  75:9 | 12:14,19 13:3 | 61:7,22 77:1,2 | 150:20 158:5 |
| **stipulates** | 13:6 15:1 | 77:13 87:4 | 176:18 |
| 75:24 200:5 | 16:14 18:3 | 94:15 106:19 | **studying**  102:7 |
| **stipulation** | 19:1 20:6,9 | 106:22 116:12 | 160:14 |
| 19:13 | 21:14 26:4,13 | 117:13 118:8 | **stuff**  77:23 |
| **stock**  207:20 | 26:20 35:24 | 118:10 119:1 | 91:14 |
| 214:2 215:18 | 36:14 38:12 | 124:1 141:20 | **subject**  33:15 |
| **stop**  105:20 | 75:9 76:1,2 | 144:19 216:7 | 38:7 42:1 |
| 205:14 | 77:11 94:17 | 217:6 220:19 | 45:10 88:21 |
| **stopping**  77:25 | 95:6 96:12,17 | **structured** | 89:14 91:25 |
| 127:21 | 96:24,25 97:9 | 179:11 | 108:2 116:4 |
| **stored**  68:19 | 108:17,20 | **structures**  3:20 | 119:16 123:23 |
| **straightforward** | 109:10 113:2 | 18:14 24:18,19 | 125:5 126:20 |
| 154:17 173:23 | 120:14,15 | 32:24 35:25 | 131:17 134:11 |
| **strategies** | 131:20 132:9 | 41:3 42:10 | 143:6,25 145:6 |
| 213:1 | 168:21 169:22 | 62:2 116:7,8 | 150:21 162:10 |
| **strength**  58:16 | 173:15 178:5 | 117:11 134:15 | 163:13 166:2,3 |
| 59:2 | 178:15 191:4 | 217:7 220:2,4 | 166:3 168:18 |
| **strike**  62:12 | 191:21 214:19 | **struggling** | 180:24 198:9 |
| 93:15 117:23 | 216:15,17 | 156:22 | 200:9 202:15 |
| 166:12 219:4 | **structurally** | **studied**  84:14 | 208:17 210:24 |
| **strikes**  15:8 | 193:4 | **studies**  54:22 | 211:22 213:8 |
| 98:16 | | 102:16 104:3,5 | 216:8 219:10 |

Christopher D. Roche
February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[subject - take]**

Page 62

219:13 223:17
**submissions**
211:18
**submit** 63:17
79:20
**submitted**
12:15 229:8,11
**submitting**
111:4
**subscribed**
232:21
**subsequent**
17:14 66:8
96:20
**subsequently**
213:14
**subset** 104:2
**subsidiaries**
112:7
**substance**
231:5
**succinctly**
188:6
**suffer** 32:5
**suffered** 183:25
187:17
**sufficient** 39:25
120:19 194:24
199:20 200:8
**suggest** 50:25
184:22 208:14
**suggested**
206:1
**suggesting**
156:5,14 205:8

**suggestion**
205:5
**suggests** 161:7
**suite** 2:5,10
230:19
**suited** 131:12
**sum** 159:17
**summarized**
70:23
**summarizing**
212:2
**super** 39:8
41:21 86:13,17
87:2,6 90:5,25
141:15,23,25
**supplement**
48:15
**supplemental**
34:10 35:1,12
35:14 65:16
66:3 90:1
96:14 105:21
106:9,11,12
107:3 210:22
**supplied**
112:15
**suppliers**
140:25
**support** 62:16
111:12,19
127:8 177:16
221:11
**supported**
83:13 112:2
176:8

**supporting**
127:3
**supposed**
106:12 116:9
180:18
**sure** 5:22 8:5
11:8 12:6
24:10,10 27:20
41:5 42:19
56:21 58:21,23
62:1 63:24
66:12,15 69:1
70:20 72:18
73:2 78:25
82:20 95:17
96:1 105:20
118:18 123:17
127:20 132:10
133:10 136:18
139:21 142:20
174:6 182:9
187:3 201:19
210:21 221:14
227:11
**surface** 205:13
205:16,21
**survey** 85:5
150:22 162:1
164:3
**survival** 28:5,7
50:9 115:13
117:12 119:5,5
120:6,25
124:18 125:20
187:21 214:20

**surviving** 1:7
**susan** 1:22
228:21
**susceptibility**
222:24
**susceptible**
222:14
**suspension**
144:19 150:6
190:13 208:2
**suv** 15:21 18:4
19:1 22:3,10
**suvs** 3:21 16:7
100:14 108:8
**swear** 4:18
**sworn** 4:20
232:21
**system** 25:2
26:7 94:2,3
144:23 146:8
184:23 190:16
220:20 222:8
222:10,21
**systems** 15:20
17:6 18:7,9
21:8 73:17
94:1 150:6

**t**

**t** 91:1 228:1,1
**table** 81:8
113:5
**take** 42:19,22
43:7 53:9,16
64:1 79:9 96:3
127:19 138:1

Christopher D. Roche
Bryson, Santana and Joshua v. Rough Country, LLC                February 1, 2024

[take - test]                                                              Page 63

142:23 153:12
186:17 205:7
213:15
**taken**  43:2
56:12 71:17
78:18 86:3
87:8 99:9
100:25 128:6
186:23 213:22
228:7
**takes**  97:19
**talk**  24:13
35:11 47:19
59:23 81:15
89:10 91:8
100:17 106:21
113:1 149:24
175:6 178:4
183:19 194:15
226:13 227:4
**talked**  25:17
70:8 83:13
110:4 127:6
175:8 176:19
178:1 187:15
194:2 203:25
216:23 226:20
**talking**  13:21
14:19 26:17
32:13,14 44:11
47:19 55:18
56:2,3 78:23
85:19 90:23
95:2,15,16
100:23 115:1

126:21 128:9
134:10 136:14
142:1 148:1
152:12,16,17
152:23 153:1
156:13 157:18
158:13 160:6
165:11,13
176:21 177:4,6
183:4,20
187:12 192:5,8
192:22 193:25
194:25 195:1,7
197:25 212:17
221:15,16
223:3,3 225:8
225:9
**talks**  90:2
104:3
**tally**  227:7
**target**  59:17
181:6,11
206:12
**targets**  20:4,6
25:3 133:5
206:15
**task**  141:25
**team**  7:8,10
64:1 133:11
141:6 155:15
155:17 183:2
**teams**  137:24
**technical**  4:25
12:7 43:9 63:1
212:5

**technically**  
73:19
**technique**  
133:17
**techniques**  
133:21,22
**technologies**  
103:3
**tecum**  3:11
**tedra**  2:3 4:13
8:9 44:7
156:17 158:7
230:1,1
**tedra's**  66:21
**tell**  29:20 31:16
32:17 53:10,16
57:17 149:10
156:24 162:7
220:10
**telling**  149:17
154:15 171:25
184:21
**ten**  137:6,7
156:7 185:16
**tenure**  21:15
**term**  13:20,24
13:25 14:9
51:18 61:6
168:22 179:5
216:5,23
**termed**  142:3
**terminology**  
115:10 140:18
**terms**  12:5
13:17 36:4

54:15 55:21
61:13 97:14
100:13 101:14
104:20 106:6
112:4 141:10
158:1 159:14
172:25 194:14
**tesla**  44:25
45:10,11,13,13
**test**  12:11,12,13
12:15,21 13:1
13:5 15:7,8,9
16:15,19,20,21
17:9,12 25:6,8
36:1 73:18,19
73:20,20,24
74:10 75:2,10
76:6,6,9 81:16
97:25 105:15
112:19,22
115:12,15,17
115:21,23
117:15,17,20
117:21,23
118:5,12,14,19
118:22,24
119:19,23
120:5,8,11,16
121:4,11,11,11
121:15,16,19
122:19,21
123:5,8 124:3
124:21,21
125:8,12,14,24
132:16,21,22

Christopher D. Roche                                February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[test - thousands]**                                         Page 64

| | | | |
|---|---|---|---|
| 133:6,9,18 | 199:17 204:8 | **text** 37:2 42:20 | 107:19 114:8 |
| 135:11,12 | 206:7,9 215:10 | **thank** 4:24 | 122:6 123:15 |
| 136:6 137:3,6 | 231:2,6 | 42:24 43:5,14 | 124:19 128:13 |
| 137:18 146:3 | **testing** 17:3,19 | 44:6,7 49:21 | 130:19 132:3 |
| 146:25 148:10 | 18:13 21:11,25 | 158:6 186:20 | 136:24 140:11 |
| 148:14 169:5 | 22:14,20,24 | 218:19 | 142:22 155:4 |
| 181:18 | 23:21 25:5 | **thanks** 64:22 | 157:21 160:4 |
| **tested** 81:5,6,8 | 26:8 33:15,21 | 78:15,22 128:9 | 161:18 165:15 |
| 81:15,22,22 | 34:2,12,16,22 | 187:1 213:19 | 167:4 169:12 |
| 82:3,5 132:14 | 34:24 35:1 | **thereto** 228:8 | 173:13,23 |
| 150:7 | 37:23 38:13,23 | **thing** 19:10 | 180:4 187:2,13 |
| **testified** 4:20 | 39:18 40:6 | 138:6 157:19 | 187:25 190:9 |
| 28:23 46:5 | 41:12 70:22 | 187:1 | 191:6 194:14 |
| 121:3 126:17 | 73:13 75:1 | **things** 46:18 | 197:8,25 199:9 |
| 169:13 225:22 | 106:14 108:14 | 68:2,25 69:18 | 204:20 206:21 |
| **testify** 49:25 | 109:8 112:3,17 | 87:18 134:1 | 207:10 216:4 |
| 50:12,16,18 | 112:19 121:21 | 154:10 159:22 | 216:23 217:18 |
| 52:1,9,23 | 121:24 122:9 | 166:5 168:2 | 218:18 227:6 |
| 55:13 82:5 | 122:13 131:24 | 190:11 194:11 | **thinking** 43:22 |
| **testifying** | 132:7 135:3 | 198:22 207:10 | 44:8 60:18 |
| 171:20 | 147:5 172:10 | 216:1 218:21 | 80:19 |
| **testimony** 3:13 | 174:12 190:7 | **think** 6:17 8:16 | **third** 18:24,25 |
| 8:14 10:2,5,16 | 191:1 193:1 | 8:18 13:19 | 21:7 26:11 |
| 29:9 30:9,15 | 200:1,1,1 | 15:19 17:1,14 | 33:20 34:6 |
| 47:4 50:20 | 210:21 211:6 | 21:23 23:1,18 | 52:14 |
| 53:14 56:21,25 | 212:11 | 25:9,21 30:1,2 | **thorough** |
| 89:8,22 93:21 | **tests** 16:22,23 | 41:5 43:21 | 178:22 179:1 |
| 109:19 111:23 | 17:13 35:17 | 45:22 46:2 | **thought** 7:18 |
| 121:8 126:15 | 37:10 40:22 | 48:24 53:8 | 225:21,22 |
| 126:21,24 | 75:24 76:2 | 57:25 60:2 | **thoughts** |
| 151:11 159:17 | 81:7 106:21 | 61:18,23 62:6 | 103:24 |
| 161:3 165:2 | 136:5 138:21 | 64:15 65:6,9 | **thousands** |
| 169:3 171:3,18 | 175:7 181:16 | 66:9,21,22 | 148:2,8 156:6 |
| 175:17 180:13 | 201:12 | 72:8 77:4 78:8 | 191:17,19 |
| 181:1 189:19 | | 79:14,22 101:8 | |

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[three - trucks]**                                                    Page 65

| | | | |
|---|---|---|---|
| **three** 140:23 | 226:17 227:13 | **top** 21:7 76:22 | 149:20,21 |
| 166:11 212:4 | 229:22 230:14 | **topic** 12:24 | **trip** 205:11,13 |
| **thresholds** | **times** 29:8 | 16:12 165:13 | **trouble** 14:16 |
| 183:15 | 46:24 122:22 | 226:7 | 43:10 107:23 |
| **time** 4:9 5:14 | 133:13 137:7 | **total** 64:6 | **truck** 14:1,7,10 |
| 7:24 8:17 | 169:2 185:16 | **touches** 177:8 | 15:19,23 16:3 |
| 11:21 18:6,7 | 185:16 224:4 | **towers** 25:2 | 16:10 17:17 |
| 21:4 22:12 | **timing** 72:2 | **towing** 71:22 | 23:3 26:2 |
| 23:18 26:2 | **tire** 183:14 | 72:7,11 | 32:20 33:15,17 |
| 27:5 42:25 | **tires** 144:20 | **track** 10:8 | 35:18 36:2,15 |
| 43:3,7 46:2 | **today** 5:13 6:9 | 80:16 173:4,5 | 36:19,23 37:24 |
| 48:6 55:7 | 6:13 7:11 8:14 | **traffic** 224:20 | 38:1,4,7 41:22 |
| 60:18 63:17 | 9:2,11 13:22 | 224:23,25 | 56:4,14 57:21 |
| 65:3,10,11 | 30:3 37:14 | **train** 144:19 | 58:3 59:25 |
| 66:9 67:10 | 61:24 63:22 | **training** 9:9 | 61:15,18 77:14 |
| 68:11 78:16,20 | 64:13,19 84:13 | 116:6 | 86:17,17 88:5 |
| 83:17,21,24,25 | 84:15 85:1 | **transcript** | 91:19 93:5,6,9 |
| 85:6,12,13 | 94:7,21 152:18 | 66:11 228:7,11 | 93:12,23 97:6 |
| 87:1,8,22 | 159:20 160:3 | 229:4,7 230:6 | 99:3 116:17 |
| 99:20 100:15 | 199:17 209:24 | 230:12,15 | 118:1 147:13 |
| 103:14 104:2,9 | **together** 7:19 | 231:2 | 162:10 168:19 |
| 113:23 114:1 | 80:25 | **tree** 45:10 | 169:9 171:17 |
| 116:4,8 127:22 | **told** 151:23 | **tremor** 91:1 | 172:7 180:19 |
| 127:23,25 | 152:3 | 95:15,18 96:3 | 196:22,25 |
| 128:2,4,7 | **ton** 146:23 | **trial** 24:11 29:9 | 197:18 198:1 |
| 131:14 140:11 | **took** 39:11 | 46:5 47:1 | 198:10 199:21 |
| 142:7 155:1 | 67:13,17,24 | 51:17 | 201:7 202:15 |
| 159:16 160:4 | 71:16,24 78:11 | **trials** 10:9 | 207:11,21 |
| 162:2 184:6 | 78:11 128:11 | **tried** 24:1,4 | 214:9 218:6,11 |
| 186:14,21,24 | 188:16 205:16 | 151:15,16 | **trucks** 3:20 |
| 191:24 201:14 | **tool** 129:7,13 | 215:13 | 13:19 14:20,25 |
| 211:22 213:20 | 129:18 137:8 | **trigger** 185:4 | 16:4 23:16 |
| 213:23 217:23 | **tools** 122:11 | **trim** 71:4,10 | 33:14,16 34:20 |
| 223:16 224:6 | 129:24 148:3 | 87:6,11,14,16 | 39:12 60:4 |
| 225:23 226:1,4 | 196:18 | 90:5 91:7 95:9 | 94:6,7 98:25 |

Christopher D. Roche
February 1, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

[trucks - understand]

Page 66

99:15 100:12
100:14 101:14
103:1 112:5
145:15 166:12
176:24 224:2
**true** 65:15
67:18 87:11
102:9 105:13
130:1 148:15
173:3 209:19
211:13,23
215:16 228:11
229:6,10
**truncated**
150:12
**trust** 80:17
**try** 5:2 7:19
9:13 17:5
38:20 72:6
103:12 132:15
147:12 172:4
172:13 182:18
186:18 189:8
192:6,23 202:2
202:5,12
**trying** 14:22
19:5 24:14
35:24 45:18
60:8 61:13
69:15 76:21
113:12 116:20
119:17 120:4
136:15 141:20
143:1,3 144:13
145:2 148:20

150:14 156:21
156:23 162:9
177:10 178:11
181:5 186:6
190:1 193:18
206:13
**turn** 73:6
163:25 178:17
**turned** 94:22
99:6
**twice** 28:23
**twin** 140:19
**two** 13:7 15:9
16:22,23 22:5
25:24 29:14
31:11 37:10
42:19 45:17
46:8,24 47:4
53:22 55:25
56:3 57:14
73:24 81:24
82:10 89:1
92:3,17,25
97:1 117:8
119:2,25 124:9
127:5 134:23
146:4,10,10,18
196:19 199:18
211:14 218:12
223:4
**type** 18:4,5
20:22 23:9
32:17 55:20
56:23 70:15,21
92:22 93:2

94:9 125:12
133:17 134:20
135:1 138:25
141:24 142:9
142:19 147:11
154:12 157:12
183:16 184:14
186:10 189:17
193:15 206:24
210:14
**types** 72:19
136:4 147:19
166:11
**typewriting**
228:9
**typical** 139:15
**typically** 72:22
133:3 139:12
144:12 153:14
221:2

**u**

**u.s.** 75:25 112:9
160:9,13,23
**uh** 80:14
**ultimately** 40:3
121:25 122:9
172:13
**unadjusted**
183:14
**unavailable**
211:21,21
**unbolted**
195:19 198:21
**unclear** 123:13
152:11 159:8

**uncommon**
176:17
**uncover** 192:13
**under** 11:25
21:7,20 23:12
23:17 25:14
30:10 48:25
56:24 58:17
65:23 82:22
83:1,7 85:23
89:1 91:2,3
95:12 101:8
170:11 208:14
228:9 229:19
**underbody**
52:18 115:4,13
115:18,23
116:11 117:11
117:13,19
118:25 120:21
121:1 124:1,13
**undermined**
88:4 168:18
188:7,8,11,18
**underneath**
196:21
**underride**
115:16,20
**undersigned**
231:2
**understand**
28:23 37:7
40:2 41:4 56:8
56:19,21 57:10
58:24 72:10

76:5,8,20 79:5
87:8 95:25
98:4 116:16,21
120:13 132:8
134:5 137:19
143:19,20
154:8 156:22
157:3 158:9
161:12 162:9
165:7 174:18
182:9,13,18
190:25,25
193:20 201:19
207:14 212:10
220:17
**understanding**
38:12 39:20,22
47:13 74:24
75:4 81:13,20
116:8 135:4
147:2,10 155:9
159:3 182:7
217:7 221:6
222:20
**understands**
157:21
**understood**
37:23 123:15
158:8,17
**unequivocal**
109:13
**unequivocally**
103:16
**unfortunately**
198:8

**unibody**   17:16
**unique**   41:17
72:20 148:18
226:3
**united**   1:1
110:8 112:6
224:20
**unmodified**
159:24
**unnecessary**
124:11
**unquote**   60:12
60:23 103:8
187:16
**unreasonable**
50:1,13,18
51:18 52:1,9
**unrelated**   23:8
**update**   146:13
148:20
**updated**   9:5,25
28:25
**upfitters**
152:15,17
153:15 155:19
155:25 156:4
157:14 209:16
**uplifters**
158:22 159:19
209:16 210:9
210:13
**usage**   195:7
**use**   13:24 14:9
20:12,17,22
27:25 33:8

52:5 55:10
75:14 88:18
103:3 120:12
121:23 122:14
122:25 128:15
129:2,5,15
131:16 132:24
132:25 135:20
138:2,16 139:7
139:15 140:14
141:6 142:16
146:3 148:17
153:20 186:16
194:17,24
195:1,3,4,4
205:19 210:4
216:22 231:7
**used**   13:20 49:6
54:13 60:11,22
72:23 88:24
91:9 111:9
122:10 126:3
129:22 130:6
132:14 134:9
138:25 139:8
139:18 141:9
141:10 150:1
152:5 168:22
169:16 200:23
201:1,4,10
219:15,17
221:4,5,6
**users**   40:24
197:10

**uses**   51:3 55:8
119:20 122:1,5
122:11 138:22
138:22
**using**   26:12
51:16 71:15
79:2 125:9
126:2 128:23
129:6 130:1
133:17,21
134:1 138:7,17
138:20,20
139:4 141:14
145:8 146:3
148:12 179:3
185:1 217:21
**usually**   133:16
144:4
**utility**   17:25
180:8,10,18,23
194:3,10,17,19
195:2,13,20
205:5,9,18,24
206:4,19,22
207:1,6,12
208:4 209:1,5
**utilized**   20:25
35:1,9
**utilizing**   21:5

| v |

**v**   183:13,17
184:18 185:7,9
185:18,23
**v2v**   3:16 80:12
81:11

Christopher D. Roche
Bryson, Santana and Joshua v. Rough Country, LLC
February 1, 2024

**[vague - vehicle]**

Page 68

| | | | |
|---|---|---|---|
| **vague** 39:5 | **vary** 134:8,8 | 79:4,4 81:18 | 147:20,23 |
| 54:4 74:12 | **vast** 83:14 | 84:23 86:9,19 | 148:14,18 |
| 76:14 84:19 | 84:22 112:5 | 87:20,22 88:13 | 149:13 152:1,8 |
| 85:12 115:8 | **vector** 13:15 | 88:21,24 90:3 | 152:20 153:1 |
| 122:18 144:9 | **vehicle** 3:19,19 | 90:8,8,18 91:1 | 153:20,23 |
| 152:11 159:8 | 12:2,11,20 | 91:6,8,9,9,17 | 154:9,24 155:1 |
| 180:3 182:1 | 13:9,11 14:11 | 91:21,24,25 | 157:20 158:10 |
| 183:7 197:5 | 14:22 15:2,4,5 | 93:8,10,23,25 | 158:23 163:13 |
| 222:18 225:3 | 15:6,7,8,9 | 94:8,16,19 | 164:24 165:7,9 |
| **valid** 64:9 | 16:21,23,24 | 95:9,11 97:8 | 169:6,6,14,21 |
| **value** 111:2 | 17:8,19,22,24 | 97:13,17 98:7 | 170:9,19,21,22 |
| 149:7 | 17:24,25 20:1 | 98:12,19,19 | 170:25 171:11 |
| **values** 138:17 | 21:10,13,16 | 103:3,3 114:13 | 171:13 172:5 |
| **van** 14:8,10 | 22:4,7,11,20,21 | 114:13,24 | 172:22,22,23 |
| 26:2 | 22:22,24 23:2 | 116:3,7,23 | 173:6,24,25 |
| **vans** 13:19 | 23:4,10,11,14 | 117:11,18 | 174:3,11,11,11 |
| 14:20,25 99:1 | 25:12 26:6,22 | 120:10,17,17 | 175:5,7,7,7 |
| **variable** 104:7 | 26:23 32:4,6,7 | 121:18 122:20 | 177:23 179:20 |
| **variables** 87:15 | 32:10,11,12,13 | 122:21,25 | 179:21,22 |
| 123:9 126:7,11 | 32:14,15,18,23 | 123:19 124:18 | 182:7,11 |
| 135:9 166:11 | 33:1,6 35:19 | 129:11 133:25 | 183:11 188:12 |
| **variance** 41:22 | 35:22 36:1,6 | 135:6,14,15,21 | 188:19 190:17 |
| **variation** 62:3 | 36:10,24 37:4 | 135:24 136:2,3 | 194:10,22 |
| 121:12,17,18 | 37:22 38:9,16 | 136:9,11,14,16 | 195:21 196:17 |
| 122:22,24 | 38:17 39:13,19 | 137:10,14,17 | 196:21 198:11 |
| 123:10 | 39:19,19,24 | 137:19 139:9,9 | 199:14 200:1,4 |
| **varied** 16:24 | 40:21,23 41:8 | 139:13,13,14 | 200:20 202:3 |
| **variety** 86:25 | 42:12,14,15,16 | 139:19,19,23 | 202:21 203:16 |
| 120:12 140:3 | 45:6,6 52:4,6 | 139:25,25 | 204:14,14,14 |
| 145:14 | 54:16,24 55:17 | 140:2,2,10,10 | 204:18,22,25 |
| **various** 56:17 | 56:1 57:8,19 | 140:13,21 | 205:9,14,20 |
| 61:19 87:1 | 59:6,13 62:4 | 141:3,16,20 | 207:6,9,16,19 |
| 112:7 129:19 | 68:4 72:3,15 | 142:1,25,25 | 208:17 209:11 |
| 135:6 141:4,16 | 72:17 73:21 | 143:13 144:24 | 209:11,19,19 |
| | 75:25 77:7,10 | 145:17 147:7 | 212:5 213:1 |

Christopher D. Roche                                February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[vehicle - warning]**                                          Page 69

214:8,17 216:2
216:12 217:14
218:5,5,10,10
218:15,15
219:10,13
220:15,21
222:3,14,20
223:11 225:5
226:14
**vehicle's**  39:9
188:15 202:1
216:14
**vehicles**  14:1
14:21 15:12,18
16:7,20 17:14
18:11,12 21:22
23:16 31:13
40:4 41:24
42:10 67:8,10
67:14,14,17,23
68:23 72:19,20
72:22,24 73:1
73:3,4 81:5,6,8
81:14,21,22,23
82:2,5,14,18
85:16 87:9
88:15 89:18
90:1 92:3,17
92:25 94:24
97:1,25 98:2,6
98:16 103:5
104:8 112:14
116:14 119:19
120:13 121:5
121:24 122:7

122:10 125:9
138:17 139:10
140:6 142:24
146:4,10,11,18
147:5 148:1
151:1,8 152:21
153:4 155:13
159:21 160:21
166:18 168:17
169:7 172:8
173:2 175:11
175:22 177:18
177:21 189:25
216:8,11
222:22,25
224:1 225:18
226:9
**venture**  28:19
**verification**
181:14
**verify**  72:9
**veritext**  229:1,4
229:9,19 230:9
230:18
**veritext.com**
230:21
**veritext.com.**
229:17
**version**  6:12,18
9:1,5 11:10,12
113:5 188:2
214:2
**versus**  29:4,22
46:1 134:15,24
177:22 178:10

**vertical**  120:2
**victor**  14:2
**video**  227:10
227:14
**videographer**
2:16 4:7,17
42:25 43:3
78:16,20 128:4
128:7 186:21
186:24 213:20
213:23 227:2,9
227:12
**videotaped**
1:14 3:10 4:1,9
227:13
**view**  201:21
207:1
**violate**  170:4
**violated**  164:9
168:13,21
169:18
**violates**  170:3
**violation**  50:9
**virtual**  141:3
**visit**  70:5 154:3
**voice**  225:20
**voluntarily**
80:1 108:12
113:19 226:23
**voluntary**  74:1
79:7,9,17,19,21
84:20 94:25
98:24 112:11
204:11 226:16
226:18

**volunteered**
110:17
**volunteering**
79:23
**vs**  1:10

**w**

**w**  2:5
**want**  5:2,15
7:13,25 10:1
11:7,20,21
35:11 42:19
47:18 52:22
53:16,23 58:11
58:23 61:4
72:18 73:8
76:20 78:4,5,7
78:25 80:20
89:10 93:1
101:17 117:7
121:4 127:19
127:22 135:12
135:13,19
137:9 139:6
150:15 165:21
187:1 190:24
199:15 204:15
212:14
**wanted**  10:10
61:11 72:1,9
128:11 130:6
145:7 146:6,25
148:10,14
154:8 166:6
**warning**  209:7
209:11,21

Christopher D. Roche                                    February 1, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[warnings - write]**                                    Page 70

| | | | |
|---|---|---|---|
| **warnings** | **went** 59:20 | 229:12 | **worked** 15:13 |
| 209:14,18 | 154:23 204:6 | **wk** 16:2 | 15:17,21 16:6 |
| **way** 11:25 | **whatsoever** | **wording** 69:19 | 16:6 17:18 |
| 13:20 14:6 | 183:25 | **words** 50:24 | 18:12 21:25 |
| 19:19 31:8,11 | **wheeler** 2:9 | **work** 5:3 6:5,23 | 22:6 23:3,15 |
| 49:3,12 51:8 | **wheels** 144:20 | 7:5,6 8:15 12:6 | 24:23 25:7 |
| 53:1,11 54:19 | **white** 21:15 | 13:6 15:12 | 45:19 142:13 |
| 58:5 59:4 | **wider** 177:2 | 16:9,11,18 | 153:8 155:8 |
| 89:17 108:10 | 221:6 | 17:7,18,23 | 193:14 218:13 |
| 120:8 122:23 | **wished** 55:20 | 18:3,12 19:21 | 220:1 224:16 |
| 124:3 131:22 | **withhold** 6:21 | 19:24 22:10,13 | **working** 18:8 |
| 134:22 143:9 | **witness** 4:18 | 22:17,19 23:4 | 19:17 45:20 |
| 168:6 169:19 | 11:14 14:4 | 23:19 24:12,15 | 64:8 154:21 |
| 173:5 177:21 | 20:14,20 24:7 | 24:25 26:3,5 | 157:25 167:15 |
| 179:21 182:20 | 24:22 60:16 | 26:24 28:12 | 212:6 220:12 |
| 188:3,8,21 | 74:6 76:15 | 29:25 30:24 | 224:15 226:2 |
| 190:6 191:2 | 78:5 84:20 | 31:3,4 35:5 | **works** 8:4 |
| 193:3 195:20 | 85:15 90:14 | 44:19 45:16 | 63:17 109:20 |
| 201:23 217:16 | 93:3,22 97:24 | 46:14,15,22 | 128:3 140:16 |
| 224:11 | 99:25 106:6 | 62:17 69:7,8 | 165:14 |
| **ways** 113:2 | 107:5,9 110:1 | 69:12,24 70:3 | **world** 121:4 |
| 140:5 143:2,8 | 114:6 115:11 | 70:18,23 84:10 | 122:9,13 |
| 192:24 203:4 | 122:19 125:18 | 113:1 116:9 | 124:20 132:12 |
| **we've** 108:5 | 127:5 138:15 | 127:12 128:13 | 132:21,22,24 |
| **weaker** 52:15 | 144:10 145:13 | 134:19,20 | 137:2,4,5 |
| 116:12 | 149:16 151:23 | 139:8 142:11 | 138:21 139:9 |
| **weaknesses** | 152:13 153:5 | 142:19 154:4 | 140:4 179:22 |
| 37:23,25 38:4 | 157:2,21 | 157:16,17 | 192:22 198:25 |
| **website** 145:19 | 161:11 164:16 | 158:24 161:11 | 205:4 225:19 |
| 206:25 208:7 | 169:4 171:4 | 190:16,18,23 | **worries** 44:10 |
| **weeks** 7:1 8:12 | 180:4,14 183:8 | 203:7 212:8,9 | **wrap** 216:1 |
| **weight** 196:8 | 189:20 200:18 | 217:8,11 218:1 | **wrench** 196:19 |
| **weinberg** 2:9 | 202:19,25 | 220:5,6,17 | 219:18 |
| **weld** 134:24 | 203:25 222:19 | 221:24 225:25 | **write** 50:24 |
| 135:3 | 225:4 227:18 | | 53:5 |

Christopher D. Roche

Bryson, Santana and Joshua v. Rough Country, LLC

February 1, 2024

**[writing - zone]**

Page 71

| | | |
|---|---|---|
| **writing** 64:14 | 136:1 138:5 | 220:1,5 |
| **written** 50:7 | 140:18 142:12 | **yesterday** 5:22 |
| 51:21 96:16 | 143:23 144:3,4 | 5:25 |
| 217:21 | 148:1,17 149:1 | **young** 29:4,22 |
| **wrong** 79:6 | 150:12,14 | 30:24 31:17,20 |
| 80:20 99:8 | 151:23 152:13 | 32:13,16,19 |
| **wrote** 103:20 | 153:5,8 155:4 | 33:22 34:2,13 |
| 109:2 217:23 | 155:9 156:6 | 34:19 35:6 |
| **y** | 157:24 159:21 | 37:18 39:14 |
| | 160:3 162:5 | 44:12 47:6,21 |
| **y'all** 48:12 | 165:6 169:20 | 114:11 218:7 |
| **yeah** 6:7 8:4,5 | 176:12 178:13 | **z** |
| 10:4 11:17 | 180:14 183:4,8 | |
| 13:16 14:15 | 185:14 186:8 | **zone** 40:15 |
| 15:7 21:13 | 187:19 189:20 | |
| 24:7,22 26:14 | 192:5 194:13 | |
| 40:13 42:8 | 197:8,25 | |
| 43:20 44:4 | 198:17 201:20 | |
| 46:16 55:3 | 206:8 207:3,17 | |
| 58:9 59:13 | 208:1,13 211:8 | |
| 63:14,23 64:14 | 213:9 215:13 | |
| 70:23 71:19 | 218:13 221:16 | |
| 74:14 75:9 | 224:12,16 | |
| 76:15 77:4,9 | 226:1 227:4,11 | |
| 78:14 79:14,19 | **year** 34:20 39:8 | |
| 81:3 83:4,11 | 86:1,5,12 93:4 | |
| 85:3 86:7 | 110:7 111:20 | |
| 88:14 91:17 | 191:19 | |
| 94:6 96:11 | **years** 16:10 | |
| 98:12 100:25 | 31:13 60:5 | |
| 102:9,13 105:1 | 82:13,17 93:3 | |
| 106:16 107:5 | 113:10 147:18 | |
| 107:14 115:11 | 177:18,19 | |
| 116:5 118:6 | 193:2 217:6 | |
| 125:2,6 128:3 | 219:23,25 | |
| 131:5 134:11 | | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.