UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

Santana Bryson and Joshua Bryson,    *
as Administrators of the             *
Estate of C.Z.B., and as surviving   *
parents of C.Z.B., a deceased minor, *
                                     *    Civil Action File
        Plaintiffs,                  *
                                     *    No. 2:22-cv-17-RWS
v.                                   *
                                     *
Rough Country, LLC                   *
                                     *
        Defendant.                   *

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION TO EXCLUDE
CERTAIN OPINIONS OF DR. LISA GWIN UNDER
<u>RULE 702 AND DAUBERT</u>**

## I.    INTRODUCTION

Before Rough Country ("RC") sold the lift kit involved in this case, it already knew it was illegal, defective, and deadly.  Due to the industry consensus of the deadly results of raising the height of pickup trucks, RC does not have a *single* expert claiming its product is non-defective.  Instead, RC seeks to avoid responsibility for the death of two-year-old C.Z.B. with a causation defense—RC claims C.Z.B. would have died in the crash even if its defective lift kit had not been installed on the F-250 that rear-ended the Bryson family's Ford Escape.

To support that defense, RC designated Dr. Lisa Gwin as an expert in biomechanics and occupant kinematics.[1]  Dr. Gwin has a longstanding and lucrative relationship with automakers and automotive component manufacturers like RC.  Dr. Gwin's full-time job is consulting in litigation cases like this one— she spends 70 percent of her time testifying on behalf of auto product manufacturers.[2]  Dr. Gwin has testified on behalf of Ford, General Motors, Stellantis/Daimler/Chrysler, Toyota, Mazda, and Subaru.[3]  In her decades-long career, Dr. Gwin has **never** testified for a Plaintiff against an auto manufacturer in **any case** or **any context**.[4]  Due to her longstanding relationship with the auto industry, she *cannot* take cases against automakers due to a conflict of interest.[5]

Given her relationship with the auto industry, Dr. Gwin's purported opinions are unsurprising.  Consistent with RC's claimed defense, Dr. Gwin seeks to testify that C.Z.B. would have died in the collision even if RC's lift kit had not been installed on the F-250 that rear-ended the Bryson family's car.[6]  However, Dr. Gwin's sole support for that opinion is her characterization of the Exponent crash test video as "violent."  Dr. Gwin cannot point to a single publication or standard

---

[1] *See* Ex. 1, RC's Expert Disclosure.
[2] *See* Ex. 2, Gwin Dep., at 81:7-9; 71:1-11.
[3] *Id.* at 80:10-81:6.
[4] *Id.* at 71:25-72:11.
[5] *Id.* at 78:20-23.
[6] *See* Ex. 3, Gwin Report.

permitting experts to make survivability determinations by "eyeballing" a crash test—her opinion is pure ipse dixit.

This motion challenges two of Dr. Gwin's opinions:

***First,*** Plaintiffs seek to exclude Dr. Gwin from speculating that C.Z.B. *would have* suffered fatal injuries if the F-250 was not equipped with RC's lift kit. Her opinion rests entirely on the validity of Exponent's scientifically invalid crash test—that *alone* warrants excluding it. Additionally, Dr. Gwin's subjective belief about the crash test's "violence" is precisely the "subjective belief" the law requires excluding. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993). Dr. Gwin's opinion contains *nested layers* of unreliability; she relies on an unscientific interpretation of an unscientific crash test. The Court should therefore exclude her from offering that opinion at trial.

***Second***, Dr. Gwin's opinion about C.Z.B.'s cause of death is equally unreliable. Dr. Gwin seeks to testify that C.Z.B.'s death occurred due to contact between his head (near his right ear) and a knob on the *top* of his car seat. But Dr. Gwin did not perform any measurements or surrogate testing to confirm whether that contact was even *possible*. Because her cause of death opinion contains "too great an analytical gap between the data and the opinion proffered," the Court should exclude it. *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002).

Dr. Gwin's opinions violate the core tenets of expert testimony. Experts cannot "[take] leaps of faith and substitute[] their own *ipse dixit* for scientific proof on essential points." *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1255 (11th Cir. 2005). That is precisely what Dr. Gwin did here. The Court should therefore limit her testimony and prevent her from offering the above-referenced opinions at trial.

## II.    SUMMARY OF DR. GWIN'S OPINIONS

On March 29, 2024, RC disclosed Dr. Gwin as an expert in biomechanics, injury causation, occupant kinematics, motor vehicle collisions, automotive engineering, accident reconstruction, and general medicine.[7] RC disclosed that Dr. Gwin would "opine about the biomechanics of the occupants inside the Escape at the time of the incident, the cause of injury and death to CZB, and the forces experienced by CZB in the subject crash."[8] RC also stated that Dr. Gwin would testify about the same subjects with respect to the Exponent crash test.[9] RC also included Dr. Gwin's conclusion that, based on the crash test, "if the Ford F-250 had been equipped with a stock suspension [the crash would have caused] the same outcome for CZB."[10]

---

[7] *See* Ex. 1, RC's Expert Disclosure, at 3.

[8] *Id.*

[9] *Id.*

[10] *Id.*

Dr. Gwin's report summarizes the conclusions she intends to offer at trial. This motion concerns two of those opinions:

(1) "If the F-250 were equipped with a stock suspension, there still would have been intrusion of the rear structures and deformation of the row 2 seat. Therefore, Master Bryson's injury outcome would not have changed."[11]

(2) "Master Bryson's head injuries were caused by contact with the focally deformed upper right area of the child safety seat. The child safety seat damage was caused by intrusion of the rear structures of the Escape."[12]

Because both opinions lack support from any reliable principles and methods, Plaintiffs seek their exclusion.

Dr. Gwin's first conclusion that C.Z.B. *would not* have survived the collision even if the F-250 had a stock suspension is based entirely on Exponent's crash test. Dr. Gwin has virtually no methodology supporting her survivability conclusion—she just watched the video of Exponent's crash test and determined it appeared "violent" enough to cause C.Z.B. to suffer a fatal injury.[13] Based on her *visual* impression of the crash test video and a general reference to her "experience in injuries, biomechanics, et cetera," Dr. Gwin seeks to offer the expert conclusion that an unlifted F-250 would have deformed C.Z.B.'s second-row seat enough to cause his death.[14]

---

[11] *See* Ex. 3, Gwin Report, at 11.
[12] *Id.*
[13] *See* Ex. 2, Gwin Dep., at 18:25-19:14; 20:23-21:12.
[14] *See Id.*; Ex. 3, Gwin Report, at 11.

Dr. Gwin did not point to any literature, industry standard, or publication permitting her to determine whether an occupant would have survived a crash test just by looking at it. Neither NHTSA nor the IIHS have procedures permitting a person to conclude whether a passenger would have survived a crash test by "eyeballing" a crash test video.[15]

Dr. Gwin has *no* measurements or data supporting her survivability opinion. Automakers and researchers regularly use instrumented crash test dummies to measure the force a person would experience on their body in a crash. But Dr. Gwin has no injury scores supporting her opinion because she inexplicably decided not to place a crash test dummy in C.Z.B.'s second-row seat.[16] She does not know whether C.Z.B.'s car seat would have deformed *at all* because Exponent did not place a car seat in the second-row of the crash test Escape.[17] Dr. Gwin does not even know how far the Ford Escape's second-row seat deformed in the crash test— she claims the deformation was sufficient to cause C.Z.B. to suffer fatal injuries without measuring the amount of deformation that actually occurred.[18] Even more critically, Dr. Gwin does not know how much second-row deformation would have been necessary to cause C.Z.B. to suffer fatal injuries.[19]

---

[15] *See* Ex. 2, Gwin Dep., at 21:13-24.
[16] *Id.* at 33:2-25.
[17] *Id.* at 24:9-25:10.
[18] *Id.* at 62:9-16; 170:7-11.
[19] *Id.* at 165:13-16.

That fact bears repeating: Dr. Gwin concluded the crash test Escape's second-row seat deformed enough to cause C.Z.B.'s injuries without knowing (1) the amount of deformation necessary to cause fatal injuries, or (2) how much the second-row seat deformed in the crash test.[20]

Dr. Gwin's cause of death opinion is equally flawed. Despite admitting the lifted F-250 pushed C.Z.B.'s seat so far forward he contacted the front-row seat in front of him, Dr. Gwin dismissed that as a possible cause of death.[21] Instead, she believes C.Z.B.'s fatal injury occurred because the side of his head (near his right ear) contacted a knob on the top of his car seat during the collision.[22] However, she did not measure whether that contact would even be *possible*—despite testifying that C.Z.B. did not "ramp up" in his car seat during the collision,[23] Dr. Gwin did not perform a surrogate test or otherwise measure whether C.Z.B. was tall enough to contact the knob she claims caused his fatal injuries.[24]

Dr. Gwin's sole claimed support for the possibility that C.Z.B. contacted the knob on the top of the car seat actually *disproves* it. When pressed on her support for her cause of death opinion, Dr. Gwin pointed to a surrogate study performed by

---

[20] *Supra*, fn. 18-19.
[21] *See* Ex. 2, Gwin Dep., at 53:5-10.
[22] *Id.* at 141:25-142:16; 145:20-146:8; Ex. 4, Gwin Dep. Ex. 39 (knob circled in blue); Ex. 5, Gwin Dep. Ex. 40 (autopsy photo showing purported contact area of C.Z.B.'s head).
[23] *See* Ex. 2, Gwin Dep., at 47:6-12.
[24] *Id.* at 146:10-13; 164:23-25.

Plaintiffs' expert Paul Lewis.[25]  However, that surrogate study shows that a child of C.Z.B.'s height sits *significantly* lower in the car seat than where Dr. Gwin claims C.Z.B.'s head would have to reach to support her theory.[26]

 

*Fig. 1. The left image shows a surrogate model of C.Z.B.'s height and weight.  In the right image, Dr. Gwin circled where C.Z.B.'s ear would need to contact to support her theory.  The surrogate model's ears are significantly lower in the seat than where Dr. Gwin contends the injury occurred.*

In the surrogate study that Mr. Lewis did, the child's right ear is visibly many inches below the plastic piece that Dr. Gwin circled.  It is nowhere near touching that plastic piece.  Because C.Z.B. was properly belted and (as Dr. Gwin concedes) he did not ramp up the carseat, his ear physically cannot touch the plastic piece she identified.  It is therefore no surprise that she did not conduct her own surrogate study or take any measurements.

Dr. Gwin's failure to perform any measurements or analysis of whether C.Z.B.'s right ear could have possibly reached the knob she claims he contacted renders her analysis unreliable.

---

[25] *Id.* at 142:20-143:4.
[26] *See* Ex. 6, Lewis Surrogate Study Photo; Ex. 7, Gwin Dep. Ex. 45.

## III.  LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony.

It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and
>>
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702(b).  The party proffering expert testimony must prove that the Rule 702 requirements have been satisfied.  *United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc).

Rule 702 requires the Court to perform a "gatekeeping" role concerning the admissibility of expert testimony.  *Daubert,* 509 U.S. at 597; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  To determine whether an expert's opinion is sufficiently reliable, the Supreme Court identified a familiar, non-exhaustive four-factor test:

> (1) Whether the theory can and has been tested;
>
> (2) Whether it has been subjected to peer review;

(3) The known or expected rate of error; and

(4) Whether the theory and methodology employed is generally accepted in the relevant scientific community.

*McClain*, 401 F.3d at 1251 (citing *Daubert*, 509 U.S. at 593-94).

Ultimately, the purpose of the *Daubert* inquiry "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. The Court's gatekeeping must ensure "that speculative and unreliable opinions do not reach the jury." *McClain*, 401 F.3d at 1237. The Court's exclusion of expert testimony "will not be disturbed absent a manifest abuse of discretion." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1308 (11th Cir. 2014) (citing *Kumho Tire*, 526 U.S. at 152).

## IV.   ARGUMENT

Several of Dr. Gwin's opinions violate established limitations on expert testimony. Experts cannot—as Dr. Gwin did here—offer opinions without factual support in the guise of expert testimony. The Court should limit Dr. Gwin's testimony and exclude (1) her opinion that C.Z.B. would have suffered fatal injuries if RC's lift had not been installed on the F-250, and (2) her opinion that C.Z.B.'s death was caused by interaction with a knob *above* where he was seated.

**A.** **The Court should exclude Dr. Gwin's opinion that C.Z.B. would have still suffered fatal injuries if RC's lift kit had not been installed on the F-250.**

Dr. Gwin seeks to offer the opinion that C.Z.B. would have suffered fatal injuries even if RC's lift kit was not installed on the F-250.[27]  But Dr. Gwin's sole basis for that opinion is her belief that the Exponent test appeared "violent."[28]  That opinion warrants exclusion for two reasons.  First, it is based entirely on Exponent's unscientific and unreliable crash test, which Plaintiffs have already moved to exclude.  Second, it is pure "ipse dixit"—Dr. Gwin has no tangible methodology supporting her conclusion that C.Z.B. would have sustained fatal injuries.  Because Dr. Gwin's survivability opinion is based solely on an unreliable "eyeball" examination of an unreliable crash test, the Court should exclude it.

**1.** **Dr. Gwin's survivability opinion must be excluded because it is based entirely on Exponent's unreliable and inadmissible crash test.**

Dr. Gwin's sole support for her opinion is her visual impression of the Exponent crash test.[29]  As detailed in Plaintiffs' pending motion to exclude the

---

[27] *See* Ex. 3, Gwin Report, at 11.
[28] *See* Ex. 2, Gwin Dep., at 19:7-17; 20:23-21:24.
[29] *See* Ex. 2, Gwin Dep., at 171:18-172:13.  Although Dr. Gwin also referenced Mr. Grimes' opinion about the amount of intrusion that would have been present if the F-250 did not have a lift kit installed, Mr. Grimes' opinion is entirely based on the Exponent crash test.  *See id.* at 174:25-175:21; *see also* Ex. 8, Grimes Report, at 36, Opinion 11 (basing his intrusion opinion solely on the Exponent crash test).

crash test,[30] Exponent introduced several confounding variables, making it impossible to draw scientifically valid conclusions.  Plaintiffs will not repeat the contents of that motion here, but it is worth noting that even Dr. Gwin agrees: a crash test that introduces additional variables is less reliable from a scientific perspective.[31]  When asked, Dr. Gwin testified that isolating the effect of a lift kit would require "the same two vehicle[s], same vehicle lineup, same speeds, et cetera[.]"[32]  Exponent changed those variables, but Dr. Gwin still relied on the test. Thsu, she failed to meet *even her own standard* for reliable principles and methods. *See* Fed. R. Civ. P. 702(b) (emphasis added); *see also Frazier*, 387 F.3d at 1263 (the reliability standard is only satisfied when "the reasoning or methodology *underlying* the testimony is scientifically valid […] [and] properly can be applied to the facts in issue") (emphasis added).

When expert testimony "is based upon the results of tests which were conducted under such different circumstances than those obtaining at the time of the accident complained of so as to make the results largely irrelevant, if not misleading, that testimony must be excluded."  *Tunnell v. Ford Motor Co.*, 330 F. Supp. 2d 731, 746 (W.D. Va. 2004) (citing *Gladhill v. Gen. Motors Corp.*, 743 F.2d 1049, 1051 (4th Cir. 1984) (cleaned up).  Exponent's crash test meets that

---

[30] *See* Doc. 115.
[31] *See* Ex. 2, Gwin Dep., at 10:24-11:3.
[32] *Id.* at 11:4-22.

standard—it significantly altered *four* variables affecting the amount of intrusion. Dr. Gwin's survivability opinion is premised entirely on a scientifically invalid crash test and therefore warrants exclusion.

### 2. Dr. Gwin's survivability opinion is unreliable and must be excluded.

Even if the Court disagrees and does not exclude Exponent's crash test altogether, Dr. Gwin's use of the crash test to conclude C.Z.B. *would not have* survived the subject collision if the F-250 did not have a lift kit installed must be excluded as unreliable.

Dr. Gwin's belief that the crash test video appeared "violent" does not *approach* a reliable methodology for her survivability opinion. She does not support that opinion with any tangible methodology or measurements from the crash test *at all*—she merely states it. Dr. Gwin's opinion about whether C.Z.B. would have survived the collision if the F-250 was unlifted is precisely the sort of "subjective belief" requiring exclusion. *See McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) ("[E]xpert testimony must be reliable, so that it must be 'scientific,' meaning grounded in the methods and procedures of science, and must constitute 'knowledge,' meaning something more than subjective belief or unsupported assumptions.") (citing *Daubert*, 509 U.S. at 590).

Each of *Daubert*'s "guideposts" confirms the unreliability of Dr. Gwin's opinion. Dr. Gwin's characterization of the crash test as "violent" enough to cause

fatal injury has not been tested, nor is it capable of being tested; it has never been

subjected to peer review or publication; it has no error rate; and it is not generally

accepted in the field as a proper methodology.  *See Daubert*, 509 U.S. at 593-94.

Because her opinion is based on nothing more than her own "ipse dixit" assertion

that C.Z.B. would not have survived, it must be excluded.  *See McDowell*, 392

F.3d at 1300 (excluding causation opinion on surgery timing because "an expert's

opinion is inadmissible when the only connection between the conclusion and the

existing data is the expert's own assertions, as we have here").  To state the

obvious: all crashes are "violent" by definition.  Dr. Gwin's observation is not only

unscientific, it is meaningless.

Critically, Dr. Gwin reached her opinion without knowing (1) the amount of

second-row deformation needed to cause C.Z.B. to suffer fatal injuries ***or*** (2) the

amount of deformation that occurred in the second-row seat in Exponent's crash

test.[33]  She believes Exponent's decision to run the crash test without cargo in the

trunk *may have* affected the amount of second-row deformation, but she has no

support for that belief and she performed no measurements or analysis to

determine what effect, if any, changing that variable had on the results.[34]  Her lack

of tangible data supporting her opinion is fatal—Gwin lacks the "sufficient facts or

---

[33] *See* Ex. 2, Gwin Dep., at 62:9-16; 165:13-16; 170:7-11.
[34] *Id.* at 25:11-26:25; 37:14-17; 63:17-66:18.

data" necessary to adequately support her opinion about whether C.Z.B. would have suffered fatal injuries in a hypothetical crash with an unlifted F-250.

Dr. Gwin's unreliable methodology resulted from her choice not to place a crash test dummy in a car seat where C.Z.B. would have been sitting. Automakers and NHTSA use crash test dummies, not "eyeball" tests, to determine whether an occupant would have survived a crash test.[35] Dr. Gwin could not cite any industry publication, NHTSA protocol, or IIHS protocol permitting experts to "eyeball" the survivability of a crash test without data from a crash test dummy.[36] Dr. Gwin's claim that she could not find a dummy with the correct parameters to measure C.Z.B.'s injury scores is both inadequate and false—Mr. Crosby, the Exponent employee who ran the crash test, testified that Exponent owns child dummies that can be ballasted to match an occupant's weight.[37] A crash test dummy would have provided data about the forces and injury scores C.Z.B. would have experienced in the crash test.[38] With no injury score data from a crash test dummy, Dr. Gwin merely speculates about C.Z.B.'s survival with no tangible data supporting her opinion.

---

[35] *Id.* at 19:18-20:22.
[36] *Id.* at 20:23-21:24.
[37] *See* Ex. 9, Crosby Dep., at 44:3-45:4.
[38] *See* Ex. 2, Gwin Dep., at 33:5-21.

Setting aside the possibility of using a crash test dummy, Dr. Gwin could have taken measurements of a similarly sized child and the interior of the crash tested vehicle to determine whether her opinion holds water. She has no explanation for her failure to do so.

RC cannot save Dr. Gwin's speculative survivability opinion with general references to her "experience." An expert cannot merely cite "experience" as support—the expert must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Payne v. C.R. Bard, Inc.*, 606 F. App'x 940, 942-43 (11th Cir. 2015) (quoting *Frazier*, 387 U.S. at 1261). Dr. Gwin failed to do that. She cites nothing in her experience—or anyone's experience—permitting her to "eyeball" whether C.Z.B. would have sustained fatal injuries in the crash test.

Dr. Gwin's survivability opinion stacks unreliability on top of unreliability. Her opinion about C.Z.B.'s survival in a hypothetical crash scenario is based solely on an unreliable and unscientific crash test, which she then interpreted without any tangible measurement or methodology. The Court should exclude her opinion because "there is simply too great an analytical gap between the data and the opinion proffered." *Hughes v. Kia Motor Corp.*, 766 F.3d 1317, 1331 (11th Cir. 2014).

### B.    Dr. Gwin's opinion about C.Z.B.'s cause of death is unreliable and must be excluded.

Dr. Gwin's opinion that C.Z.B.'s death was caused by an impact with a knob on the top of his car seat is equally unreliable—she did not confirm whether that interaction was even *possible*. Because Dr. Gwin did not perform any surrogate testing or measurements to confirm C.Z.B.'s ear could have impacted the car seat's knob, the Court should exclude her opinion that such an impact caused his death.

An expert may only testify to opinions "based on sufficient facts or data." Fed. R. Evid. 702(b). The Court therefore "*may not* admit evidence when there is simply too great an analytical gap between the data and the opinion proffered." *Rider*, 295 F.3d at 1197 (citing *Joiner*, 522 U.S. at 146) (emphasis added).

The "analytical gap" in Dr. Gwin's cause of death opinion goes to its core— whether C.Z.B. could have *possibly* contacted the knob she claims caused his death. Dr. Gwin admits C.Z.B. did not "ramp up" in the car seat during the crash.[39] Despite agreeing that C.Z.B. remained at the *same height* in his seat throughout the crash, Dr. Gwin performed no measurements or surrogate testing to assess whether he was tall enough for his ear to impact the car seat's knob.[40] Dr. Gwin cannot credibly attribute C.Z.B.'s death to the knob *above* the car seat when she failed to measure whether he could have impacted that knob at all.

---

[39] *Id.* at 47:3-12.
[40] *Id.* at 62:20-63:1; 142:20-143:4; 146:10-13.

Dr. Gwin's failure to perform any measurements to determine the viability of her theory about C.Z.B.'s cause of death is fatal. Mr. Lewis's surrogate study shows C.Z.B.'s ears are significantly below where Dr. Gwin claims he contacted the knob. Without any tangible testing or measurements confirming whether C.Z.B. *could have* contacted the car seat's knob, Dr. Gwin's cause-of-death opinion lacks the "appropriate validation" for admissibility. *See Frazier*, 387 F.3d at 1261 ("[I]t remains a basic foundation for admissibility that proposed expert testimony must be supported by appropriate validation, *i.e.*, 'good grounds,' based on what is known.") (citation omitted).

## V.    CONCLUSION

Through Dr. Gwin, RC seeks to offer speculation in the guise of expert testimony. Plaintiffs respectfully request that the Court exclude Dr. Gwin's opinions that (1) C.Z.B. would not have survived the collision even if RC's lift kit had not been installed on the F-250, and (2) that C.Z.B.'s death was caused by contact with a knob on the top of his car seat.

Respectfully submitted on March 10, 2025.

CANNELLA SNYDER LLC

*/s/ Tedra L. Cannella*
TEDRA L. CANNELLA
 Georgia Bar No. 881085
 tedra@cannellasnyder.com
ROBERT H. SNYDER, JR.
 Georgia Bar No. 404522

rob@cannellasnyder.com
DEVIN L. MASHMAN
  Georgia Bar No. 257588
  devin@cannellasnyder.com

315 W. Ponce de Leon Ave.
Suite 885
Decatur, GA 30030
(404) 800-4828
(404) 393-0365 (fax)

***Attorneys for Plaintiffs***

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rules 5.1(B) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font and size requirements and is formatted in 14-point Times New Roman font.

CANNELLA SNYDER LLC

*/s/ Tedra L. Cannella*
TEDRA L. CANNELLA
  Georgia Bar No. 881085
  tedra@cannellasnyder.com
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
  rob@cannellasnyder.com
DEVIN L. MASHMAN
  Georgia Bar No. 257588
  devin@cannellasnyder.com

315 W. Ponce de Leon Ave.
Suite 885
Decatur, GA 30030
(404) 800-4828
(404) 393-0365 (fax)

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing *PLAINTIFF'S BRIEF IN SUPPORT OF THEIR MOTION TO EXCLUDE CERTAIN OPINIONS OF DR. LISA GWIN UNDER RULE 702 AND DAUBERT* was electronically filed with the Clerk of Court via CM/ECF, which will automatically serve the following attorneys of record:

Richard H. Hill
Claire C. Murray
Lindsay G. Ferguson
Aaron B. Chausmer
3344 Peachtree Road, N.E.
Suite 2400
Atlanta, GA 30326
rhill@wwhgd.com
cmurray@wwhgd.com
lferguson@wwhgd.com
achausmer@wwhgd.com

This 10th day of March, 2025.

CANNELLA SNYDER LLC

*/s/ Tedra L. Cannella*
Tedra L. Cannella
Georgia Bar No. 881085
*Attorney for Plaintiffs*