# EXHIBIT 2

Case 2:22-cv-00017-RWS    Document 147-2    Filed 03/10/25    Page 2 of 38
Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 1

1                UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF GEORGIA

3                   GAINESVILLE DIVISION

4

5    SANTANA BRYSON and JOSHUA        )
     BRYSON, as adminsitrators of     )
6    the Estate of C.Z.B. and as      )
     surviving parents of C.Z.B., a   )
7    deceased minor.,                 )
                                      )
8                 PLAINTIFF,          )
                                      )
9    VS.                              )CASE NO.:2:22=CV=017-RWS
                                      )
10   ROUGH COUNTRY LLC,               )
                                      )
11               DEFENDANT.           )
     _____)

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                 FRIDAY, MAY 5, 2024

15   APPEARANCES:

16       FOR THE PLAINTIFF:

17          CANNELLAS NYDER
            BY:  Tedra Cannella
18               Devin Mashman
                 Attorneys at Law
19          315 West. Ponce De Leon Avenue, Suite 885
            DECATUR, GA 30030
20          TELEPHONE: (404) 800-4828
            FACSIMILE: (404) 393-0365
21          E-MAIL:  info@cannellasnyder.com

22

23   (Appearances continued next page.)

24

25       REPORTED BY:          JUSTUS BALENTINE, CSR 13859

Dr. Lisa P. Gwin                                          May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 10

1     independent and dependant variables?

2          A.    Probably, yes.

3          Q.    And independent is a variable that the

4     researcher changes?

5          A.    Yes.

6          Q.    And the dependant variable, are those variables

7     that change as a result of the independent variable;

8     correct?

9          A.    Correct.

10         Q.    Okay.  Do you agree that a good experiment

11    should change just one variable?

12         A.    Not always.  I mean ideally, sure, but there are

13    almost never can you only do one thing.

14         Q.    The gold standard would be to just change one

15    variable?

16              MR. HILL:  Object to form.

17              THE WITNESS:  I don't know if it's the gold

18    standard, but it would be the ideal world, Nirvana.

19    BY MS. CANNELLA:

20         Q.    And if you change just one variable from the

21    control, then you can really isolate the effects of that

22    one variable; do you agree with that?

23         A.    Yes.  That's why it would be Nirvana or ideal.

24         Q.    Okay. And do you agree that the more variables a

25    researcher changes, the more difficult it is to isolate

Dr. Lisa P. Gwin                                            May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 11

1    which of those variables caused the changed condition in

2    test subject?

3        A.   Yes, in general.

4        Q.   And can you think of a way to use a control to

5    design a set of crashes that would be able to isolate the

6    amount of crush that is due just to a lift in a crash?

7        A.   Can I think of a test?  Is that what the first

8    part of the question was?

9        Q.   Yes.  Can you think of a way to use a control to

10   design a set of crash tests that would be able to isolate

11   the amount of crush that is due just to the lift?

12       A.   Yes.

13       Q.   And what is that?

14       A.   Well, you -- we would take a lifted truck, which

15   is what you're talking about, about a lift, a lift kit,

16   so we would take a lifted truck and do a crash, or we

17   would look at a crash with a lifted truck that already

18   happened.  And then we would take a non-lifted truck,

19   sort of an OEM, or original equipment, OE truck, and do

20   essentially the same crash.

21          So with the same two vehicle, same vehicle

22   lineup, same speeds, et cetera, and then compare the two.

23       Q.   Okay.  And do you agree there were at least two

24   independent variables in the crash test that Exponent did

25   in this case?

Dr. Lisa P. Gwin                                        May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 18

1      Q.    Okay.  A couple of questions on that.  Have you

2    ever done a crash test with an instrumented Hybrid III

3    dummy?

4      A.    Yes.

5      Q.    And how often does the Hybrid III dummy exactly

6    match the person who was in the wreck?

7      A.    Oh, maybe half the time.

8      Q.    Okay.  Second question is, it's your opinion, as

9    I understand it, and correct me if I'm wrong, that the

10   cargo would have increased the forward movement of the

11   second row in the crash test if it had been added enough

12   to cause Cohen's death; correct?

13     A.    Let me clarify.

14     Q.    Okay.

15     A.    So in our test at Exponent, had we known, i.e.

16   had the Brysons known exactly what was in the cargo area

17   in the subject vehicle at the time of the crash and

18   exactly where it was, had we recreated that in our test

19   at Exponent, would there have been more deformation or

20   more forward movement of the Row 2 seat backs, and

21   therefore had Cohen Bryson been in our Exponent crash

22   test, would he still have suffered his fatal injuries in

23   our crash test, I think that's what you're asking, and

24   the answer is yes.

25     Q.    Would he have suffered the same injuries, fatal

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 19

1    injuries, in the Exponent crash test without the cargo?

2        A.    Still likely because of the amount of

3    deformation that we can see on the -- mostly on the

4    videos of the crash test.  So even so, yes, but there

5    would have been more deformation forward had all the

6    stuff been in the cargo area.

7        Q.    How do you know that he would have died in the

8    Exponent crash test, even without the cargo?

9        A.    Because I have seen the crash test results

10   including the videos that show the deformation and

11   forward movement of the Row 2 seat backs, and it's very

12   violent, it's very fast, it's very -- it's a lot of

13   movement, and so all of that structure would have been

14   pushed right into the back of Master Bryson.

15       Q.    So then the cargo is irrelevant?

16       A.    Well, not really irrelevant, like let's not talk

17   about it at all because it was part of the subject crash.

18       Q.    And isn't it true that if the Exponent crash

19   test had included a Hybrid III instrumented dummy in the

20   same place that Cohen was, then we would have a very good

21   idea of whether he would have survived, but for the

22   cargo, regardless of the cargo?

23            MR. HILL:  Object to form.

24            THE WITNESS:  So in other words, had we put a

25   dummy, either an infant or three-year-old dummy, neither

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 20

 1    of which match Cohen Bryson, in the spot, in the No. 4

 2    position, and ran the Exponent test -- an instrumented

 3    child dummy, and ran the Exponent test, we would have had

 4    a really good idea, is what you're saying, of whether he

 5    would have had fatal injuries?

 6    BY MS. CANNELLA:

 7        Q.   Correct.

 8        A.   We would have had numbers, but we already know

 9    that based on the movement and deformation of the rear

10    structures of the Escape.

11        Q.   Well, you wouldn't have just had numbers, you

12    would have had numbers that correspond to injury values;

13    correct?

14        A.   Right, right, exactly.  We would have had

15    numbers.

16        Q.   And that's -- sorry.  I didn't mean to interrupt

17    you.

18             That's what NHTSA and car manufacturers use to

19    determine whether someone is likely to survive a crash;

20    correct?

21        A.   In frontal and side crashes, yes, that's what

22    they use.

23        Q.   Okay.  The -- you said something else I wanted

24    to ask you about, and I think I've lost it now.

25             Oh, it's your opinion, then, that you can tell

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 21

1    that Cohen would have died in this crash just by looking

2    at the crash test videos and what's -- and the violence,

3    you said, of the movement inside the car; correct?

4         A.   I mean, it's not just watching the videos.

5    That's the most obvious way to see how much movement

6    there is and how violent it is, et cetera, but based on

7    my experience in injuries, biomechanics, et cetera, and

8    all the other crash tests that I've seen and performed

9    and all the literature regarding real-world crashes as

10   well as crash tests, then I can see that that would have

11   resulted also in catastrophic, i.e. fatal injuries had

12   Master Bryson been in the Exponent test.

13        Q.   Is there any NHTSA procedure that allows someone

14   to decide whether a crash is survivable or someone's

15   likely to get an injury based on looking at the crash

16   tests without any dummy data at all?

17        A.   A NHTSA procedure, no.  But they also don't --

18   there is no NHTSA procedure for injuries in rear crashes

19   at all.

20        Q.   Is there any IIHS procedure that allows someone

21   to decide the likelihood of death or injury based on

22   looking at crash tests with no instrumented dummies at

23   all?

24        A.   Same answer as the NHTSA.

25        Q.   In your experience in the automotive industry,

Dr. Lisa P. Gwin                                           May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                    Page 24

1       A.   No.  We all contributed.  Ultimately, the actual

2   doing of it fell to Mr. Crosby, but he wasn't like the

3   one that made final decisions or anything like that.  We

4   all gave our input, but ultimately he was the boots on

5   the ground that made it happen.

6       Q.   And did the lawyers contribute to the decisions

7   about how to set up the test at all?

8       A.   No.  That's an engineering expert role.

9       Q.   Why didn't you or Exponent or any other expert

10  want to put a car seat in the vehicle during the crash

11  test?

12      A.   Well, like we talked about, the child safety

13  seat was deformed by the rear structures including likely

14  the cargo area -- what's a good word for stuff that

15  doesn't sound so -- equipment, I guess, the items that

16  were in the cargo area likely contributed to the

17  deformation of the child safety seat, which likely

18  interacted with Master Bryson's head and caused his

19  catastrophic injuries.

20           So putting a child safety seat in there without

21  the cargo area items was basically same reason as the

22  cargo area items.  Since we don't know exactly what or

23  where any of those items were, putting a child safety

24  seat in there likely wouldn't change anything -- well,

25  let me rephrase that -- likely wouldn't -- what's the

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 25

1    words I'm searching for -- likely wouldn't be applicable

2    in our crash test because we didn't have the cargo area

3    items back there to interact with the seat, the Row 2

4    seat and the child safety seat.

5         Q.   Do you agree that the child seat helped hold up

6    the second row in the subject crash?

7         A.   Helped hold it up?

8         Q.   Correct.  So the child seat was pushing back

9    against the second row during the subject crash?

10        A.   Somewhat.

11        Q.   And I guess I -- I'm not -- I understand why --

12   I think I understand why you didn't put the cargo in.

13   You didn't put the cargo in because you didn't know where

14   it was; correct?

15        A.   Right.  I mean, the only two people who could,

16   didn't, so we certainly couldn't know.

17        Q.   Okay.  And would the deformation to the second

18   row seat change based on where the cargo was in the

19   trunk, there again?

20        A.   Potentially.  That's exactly it.  So for us to

21   guess, we might be adding a guessed, g-u-e-s-s-e-d, not

22   guest like a visitor, guessed variable.

23        Q.   Is it possible that -- let me strike that.

24             Would the cargo all need to be stacked on top of

25   each other to create the deformation that we see in the

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 26

1    subject crash in your opinion?

2         A.   I don't know.  I don't know exactly how it was

3    all in there.  I don't know.

4         Q.   But it is your opinion that if you put the cargo

5    in there, then it will cause the deformation of the

6    second row to look like it did in the Bryson's crash;

7    correct?

8              MR. HILL:  Object to the form.  Go ahead.

9              THE WITNESS:  I guess I will agree, but say --

10   yeah, I'll just agree.  Yes.

11   BY MS. CANNELLA:

12        Q.   How is it not guessing that if you put the cargo

13   back there, that it will cause the same deformation?

14        A.   Because the cargo takes up space.  I mean, we

15   know that the F250 got all the way beyond the C pillar in

16   the Escape, even with no cargo in the area.  So if we add

17   cargo items, it's just a space issue.  It's not guessing.

18   It's just space is taken up and therefore that would push

19   everything in front of the cargo items forward more than

20   they already were.

21        Q.   All right.  But it would push them forward more

22   -- like the amount of how much it would push them forward

23   depends on where you put the items; right?

24        A.   Right.  And that would be the guessing part,

25   about where they were.

Dr. Lisa P. Gwin                                      May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 33

1        A.   Right, correct.  And again, it wouldn't really

2   mean anything if we did have those numbers because we

3   don't have the controls and because those numbers would

4   be much lower than in the crash zone.

5        Q.   Is it your testimony that you can't use crash

6   test dummy numbers in -- to help you with your analysis

7   unless you have the G numbers and the injury score

8   numbers from the subject test?  I mean, that's never the

9   case; correct?

10       A.   It is almost never the case, but no, that's not

11  what I'm testifying to.  I'm saying that that is one

12  reason that it wouldn't matter.  I'm not saying that I

13  can't use those numbers if we had them.  The problem is

14  those numbers would be based on a guess about the cargo.

15       Q.   Okay.  So kind of going back to what I was

16  saying, it's possible to collect information about Gs on

17  a front occupant and a back occupant in the Exponent

18  crash test; correct?

19       A.   Yes.

20       Q.   And that was not done here; correct?

21       A.   Correct.

22       Q.   Okay.  And do you agree that an instrumented

23  dummy would have told you the forces on Cohen's head

24  during the crash if the F250 had not been lifted?

25       A.   No.

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 37

1      Q.   No matter where you put the cargo, both seat

2    backs would be more deformed forward; correct?

3      A.   No.  As we talked about before, it's possible

4    that you could jam everything maybe all the way to the

5    right side of the vehicle, and then not get any

6    deformation of that left seat back, but that's not what

7    happened in either case, so there's no point in talking

8    about that.

9           But if the cargo had been exactly the same as it

10   was in the actual crash, which we will never know what

11   that was, then we would have even more forward

12   deformation of the Row 2 seat back, even without a lift

13   kit on the F250.

14     Q.   And can you tell the Court how many more inches

15   of forward deformation there would have been?

16     A.   No.  I cannot for the reasons that we've already

17   discussed.

18     Q.   Looking at Plaintiff's Exhibit 32, what in this

19   picture causes the impact to Cohen that would kill him?

20     A.   What caused the impact to Master Bryson is the

21   deformed child safety seat with the Row 2 seat behind it,

22   which is being deformed in interacting with the child

23   seat and all the cargo behind it and the cargo -- the

24   lift gate behind it and the Ford F250 behind it.

25     Q.   Can you circle -- well, back up.

Dr. Lisa P. Gwin                                      May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                        Page 47

1    for Cohen?

2         A.   I do.

3         Q.   Did Cohen stay tethered to his car seat during

4    the crash in your opinion?

5         A.   Yes.

6         Q.   Did his butt come up out of the seat at all?

7         A.   Likely not.  I mean, he certainly had some

8    forward movement as evidenced by the bruising on his

9    thighs, but he stayed restrained in the child safety

10   seat.

11        Q.   He didn't ramp up, like you talked about before?

12        A.   Correct.

13        Q.   Do you agree that dummies would have -- putting

14   dummies in the front seats would have changed the way the

15   front seats moved in the crash, in the crash test?

16        A.   Somewhat.  The applicable one would be the

17   driver's seat, obviously, in this case.  And Mrs. Bryson

18   was pretty tiny, so it wouldn't have changed it much.

19   Her seat didn't yield much in the subject crash, and so I

20   wouldn't expect it to yield much with a tiny dummy -- a

21   light-weight dummy to match basically her weight.

22        Q.   And is your testimony that this seat wouldn't

23   have yielded much with a light dummy based on any

24   testing?

25        A.   Yes.  I mean, based on years of experience in

Dr. Lisa P. Gwin                                                              May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 53

1    seat, and therefore the driver's seat would not reach the

2    child safety seat.

3            He has a fractured left femur, fractured right

4    tibia, fibula and -- well, and his arm injuries as well.

5    Q.   Doesn't that indicate that his -- that the front

6    seat did reach him?

7    A.   It reached him, absolutely, absolutely.  They

8    reached each other, yes.  He was pushed forward, yes, but

9    her seat didn't reach the child safety seat is what I was

10   saying.

11   Q.   Can you use the annotation tool and show the

12   bottom of the child safety seat, circle that area?

13   A.   I'm going to do a square, not a circle --

14   rectangle.  Sorry.

15   Q.   Okay.  And would you agree that's extremely

16   close to the driver seat?

17           MR. HILL:  Object to the form.

18           THE WITNESS:  I mean, I don't -- I don't know

19   what extremely close really means.  It's closer than when

20   this crash started, yes.

21   BY MS. CANNELLA:

22   Q.   It looks like probably within a couple of

23   inches; wouldn't you agree?

24   A.   I don't know.  I'm -- I would have to measure it

25   to know, and I don't know how to do that on here.  So I'd

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 62

1    BY MS. CANNELLA:

2         Q.    Okay.  On the issue of the crash test, do you

3    know how much the crash test cost?

4         A.    No.

5         Q.    And do you know if the vehicles have been

6    preserved from the crash test?

7         A.    I would say yes.  I haven't seen them since

8    then, but that's pretty typical.

9         Q.    Did you do anything to measure the distance

10   between the second row and the front row after the crash

11   test?

12        A.    I did not.

13        Q.    Did you do anything to measure the distance

14   between the second row and the front row before the crash

15   test or during the crash test?

16        A.    I did not.

17        Q.    Did you look at an exemplar car seat as part of

18   your investigation?

19        A.    Not specifically regarding this case, no.

20        Q.    What assumptions did you make in your analysis

21   about Cohen's seated height from the buttocks to the top

22   of his head?

23        A.    Stand by one quick second.  I didn't make any

24   assumptions, but I could certainly measure -- no, due to

25   the poor quality of the films that were taken, I cannot

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 63

1    measure, so no assumptions and no measurements.

2        Q.    Did you measure the crush in the Exponent

3    vehicle, any of the crashed Exponent vehicles?

4        A.    I personally did not.

5        Q.    And did you measure the crush in the subject

6    vehicles?

7        A.    I certainly did not.

8        Q.    Do you agree there's nothing wrong with people

9    using the cargo area of their vehicle to carry personal

10   items?

11       A.    Absolutely not.  I mean, yes, I agree with that,

12   that there's nothing wrong.  There's nothing wrong with

13   people carrying items in their cargo area.  There's also

14   nothing wrong with people not remembering exactly what

15   was in there or where it was.  I certainly couldn't tell

16   you about my vehicle.

17       Q.    Do you know what kind of camping chair was in

18   the trunk?  What's your understanding of that?

19       A.    Other than camping chair, and then I think I

20   have some photos from my vehicle inspection, but I don't

21   know.  The Brysons didn't know sort of makes or models or

22   brands or anything, so beyond what I've seen, I don't

23   know.

24       Q.    Did you measure -- take any measurements of the

25   camping chair?

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 64

1        A.    No.

2        Q.    Did you take any measurements of the shop vac?

3        A.    No, I couldn't.  It was destroyed, but no, I did

4    not.

5        Q.    You didn't take any measurements of it as

6    crushed; correct?

7        A.    Correct.

8        Q.    Did you obtain a exemplar shop vac or camping

9    chair?

10       A.    I couldn't because the Brysons didn't know

11   anything about them to be able to do that.

12       Q.    Well, the shop vac, though, was available;

13   correct?

14       A.    I don't know.  I don't think they knew the kind

15   of size or brand or anything that it was, so not that I'm

16   aware of.

17       Q.    Did you have a picture of the shop vac?

18       A.    No.  I have a picture of a smashed drum and many

19   little plastic shards.

20       Q.    Did you take any measurements of what you found

21   of the shop vac?

22       A.    No.

23       Q.    Could you determine what the make or model of

24   the shop vac was based on what you found?

25       A.    No.

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 65

1          Q.   How about the umbrella stroller, did you take

2     any measurements of the umbrella stroller?

3          A.   No.

4          Q.   And is the umbrella stroller or the frame of the

5     bolted down back seat of an SUV stronger?

6          A.   I have no expert opinion about that.  I could

7     probably guess, but I'm not here to guess about stuff, so

8     I have no expert opinion about that.

9          Q.   Do you have an opinion about whether an umbrella

10    stroller or the bolted down back seat of an SUV would

11    deform first?

12         A.   Same answer.

13         Q.   I'm going to ask you the same questions about

14    the other items.  What's stronger a shop vac or the

15    bolted down back seat of an SUV?

16         A.   No expert opinion.  I could guess, but no expert

17    opinion.

18         Q.   Okay.  And do you have an opinion about whether

19    the shop vac or the back seat of the SUV would deform

20    first?

21         A.   No.  Same.

22         Q.   And do you have any opinion about whether a

23    camping chair or the bolted down back seat of an SUV is

24    stronger?

25         A.   No.

Page 66

1      Q.   Do you have an opinion about which would deform

2   first, the camping chair or the SUV back seat?

3      A.   No.

4      Q.   And certainly a bag of clothing, you would agree

5   is not stronger than the back of an SUV; correct?

6      A.   The back?  The Row 2 seat of an SUV?

7      Q.   Correct.

8      A.   I mean, same answer.  I could guess as a lay

9   person, but I certainly don't have an expert opinion

10  about it.

11     Q.   Do the scene photos show any of the items that

12  were cargo in the cargo area?

13     A.   I think so, but I don't remember.

14     Q.   Do you know where the cargo items were found at

15  the scene?

16     A.   I believe they were smashed between the rear

17  structures of the SUV, the Ford Escape, and the Row 2

18  seat.

19     Q.   And were any of those items found outside the

20  vehicle?

21     A.   The spare tire was found outside the vehicle,

22  but I believe it must have been under the vehicle not in

23  the cargo area, so I don't believe any of the cargo area

24  contents were outside the vehicle.  Certainly could there

25  have been a piece of plastic from the shop vac?  Maybe.

Dr. Lisa P. Gwin                           May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 71

1        Q.   All right.  How much of the work that you do

2    involves working for auto manufacturers or auto product

3    manufacturers?

4        A.   Right now of my open cases, 80 percent maybe.

5        Q.   And how much of your work involves other kinds

6    of -- testifying on behalf other kinds of manufacturers?

7        A.   Oh, sorry.  I answered that based on all

8    manufacturers of products.  So auto manufacturers, if we

9    include heavy trucks, 70.

10            All manufacturers of products, 80 maybe, and

11   then other, 20.

12       Q.   What does the other 20 percent of your

13   constitute?

14       A.   Current cases, criminal cases, cases that are

15   like general negligence where they're not -- no one is

16   suing a product manufacturer.  I think that's about it.

17       Q.   Have you ever testified own behalf of a person

18   who was a plaintiff in a case?

19       A.   I have testified for lawyers who represent folks

20   that have been injured, yes.

21       Q.   And how many times?

22       A.   Once -- well, twice, same case, Switalski versus

23   Clevenger, and then once I got really close, and the case

24   settled right before my deposition.

25       Q.   Have you ever testified for a plaintiff against

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 72

1    an auto manufacturer?

2         A.    I have never been hired in such a case because I

3    would be conflicted out and because generally the defense

4    lawyers are the ones who call is.

5         Q.    So you've never testified for a plaintiff

6    against an auto manufacturer; correct?

7         A.    Correct.  Not like a car manufacturer.  The

8    products that I almost testified about and then didn't

9    was tree trimming equipment that moved on its own, so

10   technically it's an automobile, but Ford, Chrysler,

11   Toyota, that sort of thing.

12        Q.    Have you ever testified that a product caused

13   death or injury?

14        A.    That would be something that I wouldn't really

15   testify about one way or the other because that would be

16   more of sort of a design thing or a defect thing, which I

17   never -- I have no opinions about, but I've certainly

18   testified that people have died in car crashes or have

19   been injured in car crashes due to, you know, interaction

20   with part of the car, part of the vehicle, et cetera.

21        Q.    So you've never testified that a person was not

22   killed or injured by a product?

23             MR. HILL:  Object to the form.

24             MS. CANNELLA:  Yeah.  That was kind of

25   confusing.

Dr. Lisa P. Gwin                                          May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 78

1    question.  Have you ever testified on the side of the

2    plaintiff in a case where somebody alleges that a product

3    caused the person's death?

4         A.   Say it one more time.  Let me make sure I get

5    all the words.

6         Q.   Have you ever testified on the side of a

7    plaintiff in a case where someone alleges that a product

8    caused a death or injury?

9         A.   Yes -- testified, no.  The case settled right

10   before that, my deposition.  And like I said before in

11   auto cases, I'm conflicted out on the plaintiff's side

12   and plus defense lawyers are who usually calls us.

13        Q.   Have you ever testified on the side of the

14   plaintiff in a case where it is alleged that a product

15   killed the plaintiff?

16        A.   I think that's exactly the answer I gave, no.

17        Q.   Is the answer no?

18        A.   Yes.

19        Q.   Okay.  The answer is no.

20             Second question.  Are you conflicted out of

21   testifying against auto manufacturers?

22        A.   Yes.  So if you were to call me saying you were

23   hiring me for Ford Motor Company --

24        Q.   That's the only question I have.  I don't need a

25   story about it.  That's just the question.

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 80

1      A.   Somewhere between 2013 and 2015, probably.

2      Q.   And did you do, aside from Transport Canada, did

3  you do any work on behalf of safety organizations?

4      A.   Not specifically safety organizations, no.

5      Q.   Have you done any work for safety -- strike

6  that.  Sorry.

7           Have you done any work to determine how to

8  prevent injuries in crashes?

9      A.   Any work?  Not specifically.

10     Q.   How many times have you testified on behalf of

11  Ford?

12     A.   I have no idea opinion.  I can count them in the

13  last four years, anyway, if you'd like.

14     Q.   No, that's okay.  I've got the document.

15          Have you testified on behalf of General Motors?

16     A.   I have been hired by General Motors' lawyers,

17  yes, and testified, yes.

18     Q.   Have you testified on behalf of Daimler

19  Chrysler?

20     A.   Not when it was Daimler Chrysler, I don't

21  believe.  Daimler is separate from Stellantis now, but

22  when they were together, no, I don't think so.

23          But have I worked and testified in Stellantis

24  cases, yes; or FCA or Chrysler cases, yes; and Daimler

25  cases, yes.

Dr. Lisa P. Gwin                                        May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 81

1        Q.    Have you testified on behalf Toyota?

2        A.    I -- there are -- yes.

3        Q.    Have you testified on behalf of Mazda?

4        A.    Yes.

5        Q.    Subaru?

6        A.    Yes.

7        Q.    How much of the paid work you do is litigation

8    consulting?

9        A.    Now, all of it.

10       Q.    How many employees does BRC have now?

11       A.    70-ish.

12       Q.    How long has BRC existed?

13       A.    Since 1986.

14       Q.    What is BRC's revenue in a year?

15       A.    I have no idea.

16       Q.    What's BRC's net profit in a year?

17       A.    I have no idea.

18       Q.    I'm going to ask you at trial, so I'd like you

19    to look into that.  Would you agree to do to that?

20            MR. HILL:  Object to the form.

21            THE WITNESS:  If Mr. Hill and Ms. Ferguson and

22    BRC -- if they say yes, and BRC can do it, sure.

23    BY MS. CANNELLA:

24       Q.    Are you a shareholder of BRC?

25       A.    Yes.

Dr. Lisa P. Gwin                                      May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 141

```
 1    folded polymer, so right, yeah, you couldn't see it from

 2    the front.  I can show you where it would be in general

 3    from the front, but I can't -- you can't see it from the

 4    front.

 5        Q.   Okay.  Which picture would you use to show it in

 6    general?

 7        A.   Let's do my Vehicle Inspection Photo R0017309.

 8        Q.   This one?

 9        A.   Yes.

10        Q.   All right.  Can you circle the area that

11    interacted -- the front of the area that interacted with

12    the belt loop, the belt guide?

13        A.   Nothing on the front of the child safety seat

14    interacted with the belt guide.  The rear of the child

15    safety seated interacted with the No. 5 belt guide, which

16    then --

17        Q.   Sorry.  Which area in the front corresponds with

18    the area in the back that interacted?

19        A.   It's right around that seam on the right, right

20    behind the right head restraint adjustment.

21             MS. CANNELLA:  Okay.  So we'll mark this

22    Plaintiff's Exhibit 39.

23    BY MS. CANNELLA:

24        Q.   And do you -- well, let me strike that.

25             What is it that actually hit Cohen and caused
```

Dr. Lisa P. Gwin                                        May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 142

1    his fracture, his skull fracture?

2        A.   That head restraint adjustment with the child

3    seat behind it, the vehicle seat behind it, the cargo

4    items behind it, the truck behind it.

5        Q.   I'm looking for the thing that actually touched

6    his head to cause the fracture?

7        A.   Right.

8        Q.   Which thing touched his head?

9        A.   The head restraint adjustment knob.

10       Q.   Is that the thing that you have there in blue?

11       A.   Yes.

12       Q.   Okay.  Gotcha.

13            MS. CANNELLA:  All right.  Marking this as

14   Plaintiff's Exhibit 49 -- or 39, I'm sorry.

15            (Whereupon Plaintiff's Exhibit 39 was marked

16   for identification.)

17            THE WITNESS:  Five minutes to the end of the

18   media.

19   BY MS. CANNELLA:

20       Q.   Okay.  Did you do anything to determine if

21   Cohen's head, if Cohen was tall enough for his head to

22   reach that adjustment knob?

23       A.   Knowing how kids fit in child safety seats with

24   my experience made it clear, and then it turns out that

25   Mr. Lewis did some surrogate work that showed that that

Dr. Lisa P. Gwin                                  May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 143

1    was true.

2         Q.   You didn't do any measurements; correct?

3         A.   Correct.  I did use my experience, but no, I

4    didn't take a tape measurer out and measure anything.

5              MS. CANNELLA:  Okay.  We can take a break and

6    switch tapes.

7              THE VIDEOGRAPHER:  We're going off the record.

8    The time is 2:17.

9              (Whereupon a short recess break was taken.)

10             THE VIDEOGRAPHER:  We're back on the record.

11   Time is 2:28.

12   BY MS. CANNELLA:

13        Q.   Okay.  All right.  Dr. Gwin, we just looked at

14   the area of the car that impacted the back of the car

15   seat, and the area of the car seat that interacted with

16   the belt guide on the second row, and then we saw from

17   the front the headrest adjustment lever, which is it's

18   your opinion that that's what impacted Cohen's skull and

19   caused the skull fracture; correct?

20        A.   Yes.  And the other constellation of injuries

21   that I said before.

22        Q.   Okay.  And the AO dislocation as well?

23        A.   Yes.

24        Q.   Do you agree that an AO dislocation requires

25   opposing forces?

Dr. Lisa P. Gwin                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 145

1    the PDF, this is not a arrow pointing to where the impact

2    was; correct?

3        A.    No.    It's an arrow pointing to mild flattening

4    of the inferior temporal surface of the right skull.

5        Q.    Okay.    Can you -- let's see, can you show us on

6    this picture where the impact with the harness adjustment

7    levers was?

8        A.    No.

9        Q.    You can't see it on this picture?

10       A.    Correct.

11       Q.    How about on this picture?

12       A.    No.

13       Q.    This picture?

14       A.    Yes.

15       Q.    Okay.

16       A.    So we know there's an abrasion behind his ear.

17   There's ecchymosis of the ear pinna, itself, so in that

18   general area.    And then when Dr. Eisenstat did the scalp

19   reflection, we can see even better where it is.

20       Q.    Okay.    Can you circle on the screen in front of

21   you where the impact is with the adjustment harness

22   levers?

23       A.    Well, like I said, it's the general area, so

24   it's behind his year and his ear.

25            MS. CANNELLA:    Okay.    Great.    And we'll mark

Dr. Lisa P. Gwin                                      May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 146

1    this as Exhibit -- all right.

2              THE REPORTER:  Sorry.  What was the exhibit,

3    Counsel?

4              MR. HILL:  Yeah, what number, Counsel?

5              MS. CANNELLA:  I don't know yet.  Hold on.

6    Plaintiff's Exhibit 40.

7              (Whereupon Plaintiff's Exhibit 40 was marked

8    for identification.)

9    BY MS. CANNELLA:

10       Q.   All right.  And did you take any measurements to

11   see how far this area of Cohen's head would have been

12   from the headrest adjustment knob?

13       A.   No.

14             MS. CANNELLA:  Rick, I wanted to mention to you

15   I don't have any communications.  I've double-checked

16   while we were -- while we broke.

17             THE WITNESS:  Like correspondence?

18             MS. CANNELLA:  Correct.  Can somebody send those

19   to us real quick before we end today?

20             MR. HILL:  What do you mean by "correspondence"?

21   You mean, like an e-mail from our office that sends a

22   file link or something?

23             MS. CANNELLA:  All e-mails that are discoverable

24   under Rule 26, which includes any e-mails about payment,

25   assumptions, or facts.

Dr. Lisa P. Gwin                                          May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                          Page 164

 1       A.    I'm not sure what you mean by opposing forces,

 2   but --

 3       Q.    Like, if everything was flip-flopped, you know

 4   what I'm saying?  We can look at the -- we can look at

 5   the distance from the child's ear to the adjustment knob

 6   on the left side instead of the right side, is what I'm

 7   saying.

 8       A.    So this child is leaning forward.  This is not a

 9   sleeping kid, who's leaning against the head restraint or

10   headrest of his child safety seat.

11       Q.    Uh-huh.

12       A.    So we'd have to be there, first of all.  And

13   again if it's left, instead of right, and then leaning,

14   the child would have to be leaning outboard in this case,

15   flip-flopped from our -- the real case.

16             And then yes, his ear -- his skull adjacent to

17   his ear would be very near the location, adjacent to the

18   location of that adjustment knob statically, and then

19   dynamically as the seat rotates and the child seat

20   rotates and the child seat is twisted somewhat, and, you

21   know, the crash all happens, yes, it is in that area

22   contacting his skull.

23       Q.    Okay.  But you didn't do any surrogate testing

24   to test that theory; correct?

25       A.    Correct.

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 165

1          MS. CANNELLA:  I'm going to mark this picture as

2     Plaintiff's Exhibit 46.

3          (Whereupon Plaintiff's Exhibit 46 was marked

4     for identification.)

5     BY MS. CANNELLA:

6     Q.  Do you agree there were milliseconds where the

7     crash had begun, but Cohen had not yet received an

8     injury?

9     A.  Yes.

10    Q.  Do you agree that Cohen only experienced his

11    death once the intrusion reaches him?

12    A.  Yes.

13    Q.  Did you do anything to quantify the amount of

14    second-row intrusion that would have been required to

15    cause Cohen's death?

16    A.  I did not.

17    Q.  Do you agree there's randomness to motor vehicle

18    accidents?

19         MR. HILL:  Object to form.

20         THE WITNESS:  I don't know how to answer that

21    question.

22    BY MS. CANNELLA:

23    Q.  In other words, you could have the exact same

24    wreck twice, but the outcome -- there would be

25    differences in the outcome?

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 170

```
 1        Q.    Did you design any crash testing?

 2        A.    Oh, heavens no.

 3        Q.    Okay.  Do you have hospital privileges anywhere?

 4        A.    Not anymore.

 5        Q.    Did you visit the scene of this crash?

 6        A.    No.

 7        Q.    Did you measure the crash in either the subject

 8   wreck or the crash test?

 9        A.    No.  There are scans that we could do some

10   measurements, but I can't tell you what those numbers are

11   today.

12        Q.    And there's a scan in your file.  Is that one

13   that you performed or someone else?

14        A.    Ms. Gaul, the test engineer, performed that

15   scan.

16        Q.    And what is it of?

17        A.    The subject vehicle.

18        Q.    Okay.  Did you use -- come to any conclusions

19   based on that scan?

20        A.    Not the scan in particular, no.

21        Q.    Did you scan the inside of the vehicle or just

22   the outside?

23        A.    Probably not the outside at all, just the

24   inside.

25        Q.    Okay.  You've never published any papers on auto
```

Dr. Lisa P. Gwin                          May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 171

1    design; correct?

2        A.    Correct -- oh, I'm sorry.  Wait.  Only in terms

3    of onboard fuel vapor recovery.

4        Q.    Okay.

5        A.    But nothing else.

6        Q.    All right.  I want to look in your report -- or

7    I'm sorry, your disclosure, which I've marked as

8    Plaintiff's Exhibit 15.

9              Do you see that on your screen?

10       A.    Yes.

11       Q.    Have you seen your disclosure before?

12       A.    Yes.

13       Q.    I want to look at the highlighted sentence here,

14   so if you could just take a second and read up to that

15   highlighted sentence.

16             Just let me know when you're done.

17       A.    Okay.

18       Q.    That highlighted sentence says that you're

19   expected to testify regarding the same subjects in

20   relation to the vehicle crash testing performed at

21   Exponent.  And the same subjects, as I understand it, are

22   biomechanics of the occupants inside the Escape at the

23   time of the incident, the cause of injury and death to

24   Cohen, and the forces experienced by Cohen in the subject

25   crash.

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 172

1          Are those the things you're going to testify in

2     relation to the Exponent test?

3          A.   I mean, like we talked about before, I'm not

4     going to talk about forces in terms of pounds or newtons

5     or anything like that, so I would better characterize it

6     as noted in my report.

7          So what I will testify about is that injury

8     causation would have -- you know, the same injury outcome

9     would have occurred for Cohen Bryson whether -- in an

10    unlifted -- let me start over.

11         The same injury outcome would have occurred for

12    Cohen Bryson whether or not Mr. Elliott's truck were

13    lifted or not.

14         Q.   And how -- can you give me like a short summary

15    of how the crash test informs your opinions about what

16    happened during the crash?

17         MR. HILL:  Object to the form, but go ahead.

18    You can answer.

19         THE WITNESS:  So our crash test at Exponent

20    doesn't really help us understand what happened during

21    the subject crash because of the independent variable of

22    no lift kit in the Exponent test.  So it doesn't because

23    it's a different crash.

24         Q.   Okay.  And your disclosure says that you relied

25    on the crash reconstructions and simulations.  What are

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 174

1         Q.   Do you have any opinions about what

2    Mr. Pasquerella said, or are you leaving that to him?

3         A.   I'm leaving that to him.

4         Q.   Okay.  Great.  Did you rely on anything

5    Mr. Buckner did?

6         A.   No.

7         Q.   Did you rely on anything Mr. Lewis did?

8         A.   No.

9         Q.   Did you rely on anything Mr. Rosch did?

10        A.   No.

11        Q.   Did you rely on any RC, Rough Country, documents

12   produced in discovery?

13        A.   I'm probably going to get this wrong because

14   it's a lawyer sort of thing, but I think you mean like

15   documents that were created by Rough Country as opposed

16   to my client is Rough Country, and they produced medical

17   records to me.  I think that's what you mean.

18        Q.   Yeah, I'll rephrase it.

19             Did you rely on any internal Rough Country

20   documents to form your opinion?

21        A.   No.

22        Q.   Does your -- is your opinion -- let's see how to

23   phrase this.  Would you know that Cohen would have

24   survived -- I'm sorry.  Strike that.

25             Would you be able to give the opinion that Cohen

Dr. Lisa P. Gwin                                      May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 175

1    would have died in an unlifted -- a wreck with an

2    unlifted F250 without having run the crash test?

3              MR. HILL:  Object to the form, but you can go

4    ahead.

5              THE WITNESS:  Yes.  Based on Mr. Grimes'

6    opinion, based on his expertise that the F250 -- unlifted

7    F250 would intrude into the occupant space because of

8    bumper height mismatch, and I will -- I will be corrected

9    by Mr. Grimes if he says that's a terrible way to

10   characterize it.

11             But even before we ran the test, his opinion

12   that it was -- his opinion was that it was likely that

13   due to the bumper heights of the two vehicles, probably a

14   better way to say it, the F250 unlifted would still

15   intrude into the Escape.

16   BY MS. CANNELLA:

17        Q.   So it's Grimes' opinion.  Anything else that you

18   rely on and not need the crash test for your opinion

19   about the alternative design?

20             MR. HILL:  Object to the form.

21             THE WITNESS:  No.

22   BY MS. CANNELLA:

23        Q.   No.  All right.  Okay.  I've marked as

24   Plaintiff's Exhibit 21 the preliminary file summary.  Who

25   prepared this document?

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 195

1    STATE OF CALIFORNIA        )

2                               )  ss.

3    COUNTY OF ALAMEDA          )

4

5

6            I, JUSTUS BALENTINE, Certified Shorthand

7    Reporter No. 13859, hereby certify that the foregoing

8    proceeding was taken by me at the time and place herein

9    set forth;

10           That the said proceeding was taken down by me

11   in shorthand and thereafter transcribed under fmy

12   direction and supervision, and I hereby certify the

13   foregoing proceeding is a full, true, and correct

14   transcript of my shorthand notes so taken;

15           That dismantling this transcript will void the

16   certification by the Certified Shorthand Reporter.

17           I further certify that I am neither counsel for

18   nor am I in any way related to any party to said action,

19   nor am I in any way interested in the outcome thereof.

20           IN WITNESS WHEREOF, I have subscribed my name

21   this 17th day of June, 2024.

22

23

24

             JUSTUS BALENTINE, CSR NO. 13859

25