# EXHIBIT 1

Case 2:22-cv-00017-RWS    Document 150-1    Filed 03/10/25    Page 2 of 23
Wesley Grimes                                                May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 1

1                  UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF GEORGIA

2                      GAINESVILLE DIVISION

3

       SANTANA BRYSON and JOSHUA    )

4      BRYSON, as Administrators of)

       the Estate of C.Z.B., and    )

5      as surviving parents of      )

       C.Z.B., a deceased minor,    )

6                                   )

              Plaintiffs,           )

7                                   )   CIVIL ACTION FILE

       vs.                          )

8                                   )   NO. 2:22-cv-17-RWS

       ROUGH COUNTRY, LLC,          )

9                                   )

              Defendant.            )

10     _____

11

12              VIDEOTAPED DEPOSITION OF

13                 WESLEY D. GRIMES

14                   May 9, 2024

15                   10:17 a.m.

16

17     Weinberg Wheeler Hudgins Gunn & Dial

18            3344 Peachtree Road, NE

19                  Suite 2400

20

21              Atlanta, Georgia

22

23

24

25        Reported by:  Marsi Koehl, CCR-B-2424

Page 14

1      Q.  What does it mean to say that you're the

2      "Director of Forensic Services"?

3      A.  Not a lot, really.  It means that I have a

4      role in the forensic side of the business where

5      there's testing or there's data analysis or accident

6      reconstruction, inspections, documentation of crashes

7      for the forensic side of things.

8      Q.  What are your responsibilities as Director

9      of Forensic Services?

10     A.  To do accident reconstruction and to do

11     testing and analysis of testing, downloads, analysis

12     of downloads and so assist others as they need it.

13     Q.  Are those -- those roles that you mentioned

14     accident reconstruction, downloads, testing is that

15     primarily done with respect to litigation or outside

16     the context of litigation?

17     A.  Most of it is either in litigation or in

18     anticipation of litigation.  There's a lot of

19     casework that I do that there -- what we call fast

20     response where I'm there within hours.

21         And there's not a side yet, so there's no

22     litigation.  But it is anticipated -- in anticipation

23     of litigation.  Sometimes the litigation comes;

24     sometimes it doesn't.

25     Q.  And when you say it's in anticipation of

Wesley Grimes                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                        Page 15

1    litigation, who typically is calling you to let you

2    know to go to this site and perform a preliminary

3    reconstruction?

4         A.   Typically trucking companies or insurance

5    companies looking to get things documented, attorneys

6    working for those -- those entities looking to get

7    things documented before evidence dissipates.

8         Q.   And so a trucking company or insurance

9    company would say, Hey, there's been a crash, we need

10   you to come out to the site, perform a preliminary

11   analysis of it because we anticipate this might

12   become a litigation issue later?

13        A.   Yeah.  And, you know, in reality it's more

14   the attorneys that are calling me.  I think 30 years

15   ago sometimes it would be the trucking company or --

16   or even a -- a police agency that maybe knew I had

17   some specialized equipment or something like that.

18             You know, but nowadays, the last 10, 15

19   years it's really more attorneys or attorney offices

20   making that phone call.

21        Q.   And about what percentage of your time do

22   you spend working on matters either in litigation or

23   in anticipation of litigation?

24        A.   I don't know.  It's not something I keep

25   track of.  The majority of it.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 28

1        A.   That's correct.

2        Q.   Do you know how many times you've been

3    disclosed as an expert witness?

4        A.   No.

5        Q.   And what percentage of your cases result in

6    testimony?

7        A.   Not many.  I don't know of some percentage.

8    I testify, you know, a few times a year.  And I do --

9    I don't know.  It depends -- 35, 40, 45, 50 cases a

10   year, generally.

11            A lot of them are fast response, as I

12   explained earlier, where there's not a side and it

13   just never develops into a case.  That's a lot of my

14   work.  So I don't testify very often.

15       Q.   In what percentage of cases are you retained

16   by attorneys representing defendants?

17       A.   I don't know.

18       Q.   Would you say it's the majority of the time?

19       A.   It is.  Yeah, it is.

20       Q.   And of the times you've testified in the

21   last 12 years, it appears that your client

22   represented the defendants in all but three of those

23   cases; is that right?

24       A.   That is correct.

25       Q.   What was Bartley versus Blackwell about?

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 31

1          Q.  That case was back in 2012, right?

2          A.  Yeah, Utah.  It would have been some type of

3     crash analysis.  I don't remember.

4          Q.  Did any of the cases on this list involve

5     allegations related to a lift kit?

6          A.  No, not that I recall.

7          Q.  Have you ever testified that a safety defect

8     caused or contributed to the severity of a collision?

9              MR. HILL:  Object to form but go ahead.

10             THE WITNESS:  Not that I recall.

11     BY MR. MASHMAN:

12         Q.  Have you ever testified that an auto product

13     was defective?

14         A.  Not that I recall.

15         Q.  Have you ever been retained by the lawyers

16     representing Rough Country in this case which would

17     be Rick Hill and Lindsay Ferguson?

18         A.  I don't think so.

19         Q.  How many cases have you worked on for the

20     law firm representing Rough Country, Weinberg

21     Wheeler?

22         A.  I think this is the only one.

23         Q.  Have you ever -- I think my earlier question

24     was only about testimony.

25             Have you ever been retained in a case

Wesley Grimes                                                May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 172

1          A.   That was one goal, yeah.  And for me, that
2     was the primary goal was to -- to look at if we make
3     the test as simple as we can with a nonlifted
4     vehicle, but we want to match as closely as we
5     reasonably can the speeds, the weights, the offset,
6     the angles; things like that.  We want to match all
7     of that as much as we can.
8               But we don't have cargo in the vehicle, so
9     I'm not going to say we're trying to recreate the
10    crash.  We're looking at what type of intrusion is
11    going to happen without a lift kit on the pickup
12    truck.
13         Q.   Why do you want to match the speeds, weight,
14    offsets and angles?
15         A.   So that we can -- I can come to the
16    conclusion that the lifted -- the lift kit on the
17    pickup didn't affect significantly the amount of
18    intrusion that would have occurred.
19         Q.   If the speeds, weights, offsets and angles
20    weren't matched, are you saying that you wouldn't be
21    comfortable coming to that conclusion?
22              MR. HILL:  Object to form.
23              THE WITNESS:  I think there's a range
24         for all of those things and we want to be
25         within that range.

Page 173

1    BY MR. MASHMAN:

2         Q.  But the goal of matching is so that you can

3    reasonably say as a scientific principle that the

4    difference in height is what resulted in the

5    difference of intrusion; is that fair?

6              MR. HILL:  Object to form.

7              THE WITNESS:  Or didn't.  Yeah, yeah.

8         We want to be able to draw conclusions.

9    BY MR. MASHMAN:

10        Q.  And the way to do that is to isolate the

11   variable that you're changing; is that fair?

12        A.  Well, we're -- the way to do it for what we

13   did is to run the simplest test we could for a pickup

14   to match the key components of the crash without a

15   lifted truck.

16        Q.  Why didn't you run a second crash test with

17   all of the cargo directly behind Cohan as a worst

18   case scenario to see how it affected the intrusion?

19        A.  Because we didn't know exactly where the

20   cargo was and I didn't to subject myself to the

21   criticism of you had the bag of clothing in the wrong

22   place or you had the Shop-Vac in the wrong place or

23   whatever.

24             And really more importantly is Dr. Nguyen

25   looked at the actual vehicle and said it was

Wesley Grimes                               May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 192

1    BY MR. MASHMAN:

2        Q.  I want to ask you about the emergency brake

3    we talked about a second ago.

4            Did you direct Exponent to engage the

5    emergency brake of the Escape before the crash test?

6        A.  Not specifically.  I think that was a

7    decision -- first of all, I don't know that it was on

8    at the actual impact.  It may have been on to make

9    sure the vehicle didn't move before the test.  I

10   don't know.  As I sit here, I don't know.

11           But it doesn't bother me because you then

12   have an axle that's locked.  That's not an issue for

13   me because the vehicle was in gear.

14       Q.  I think my -- my question was whether you

15   directed Exponent to engage the emergency --

16       A.  I did not.

17       Q.  Were you ware that Exponent had pulled the

18   emergency brake before the test?

19       A.  You know, they may have told me that out

20   there.  I don't specifically recall being told that.

21       Q.  Do you have any recollection of Exponent

22   telling you why they did that?

23       A.  No.

24       Q.  The test Escape did not have any cargo in

25   the cargo area during the crash test, correct?

Wesley Grimes                                                  May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                              Page 193

1          A.   Correct.

2          Q.   Why not?

3          A.   Because we didn't feel it was necessary to

4     put that in for our purposes and we didn't know

5     exactly where the cargo was -- was at the time of the

6     crash.

7               Ms. Kelley and Mr. Bryson didn't recall

8     either.  And so instead of guessing at that, we

9     wanted to understand what would happen without the

10    cargo.  We always knew that if we put cargo in,

11    whatever displacement we had of the tailgate would be

12    amplified if there were materials in there taking up

13    that space.

14              So it was the simplest test we could run

15    without -- without compromising those types of

16    things.

17         Q.   I think you said earlier you didn't want to

18    guess where the cargo was located in the Escape; is

19    that fair?

20         A.   Yes.

21         Q.   Why is it important not to guess where the

22    cargo was located in the Escape?

23         A.   Because if we had put the cargo in and we

24    got whatever that result was, we could be subject to

25    criticism for not knowing where it was and

Case 2:22-cv-00017-RWS    Document 150-1    Filed 03/10/25    Page 11 of 23
Wesley Grimes                                                          May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 194

1    purposefully placing it for some purp- -- some of our

2    own purposes and we had no desire to do that.

3        Q.  And that criticism would be that the cargo

4    was in a different location than where it was in the

5    subject wreck, right?

6        A.  Yes.

7        Q.  And isn't it true by not including any

8    cargo, the cargo was not in the same location that it

9    was in the subject wreck?

10       A.  That's true.  But it also then doesn't have

11   an artificial effect on the seat back displacement.

12           MR. MASHMAN:  I'm showing you

13           Plaintiff's Exhibit -- I think that says

14           75 -- yes.  It's two pictures of the damage

15           to the Escape after the crash test.

16           (Plaintiff's Exhibit 75 was marked for

17           identification.)

18   BY MR. MASHMAN:

19       Q.  The second picture might be a little better

20   for this, picture 385.  Do you see that?

21       A.  Yes.

22       Q.  Do you see a mark left by the Ford F-250's

23   Ford emblem on the rear of the Escape?

24       A.  No.

25       Q.  I'm looking at this mark above where it

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 196

1    a 2016 F-250?

2         A.  No.

3         Q.  Did you perform any calculations to

4    determine how much .5 seconds of braking lowered the

5    front bumper of a 2016 F-250?

6         A.  No.

7              MR. MASHMAN:  I'm going to hand you

8         three exhibits.  These are Exhibits 76, 77

9         and 78.

10             (Plaintiff's Exhibit 76, Exhibit 77 and

11        Exhibit 78 were marked for identification.)

12   BY MR. MASHMAN:

13        Q.  Here's 76.  That's a figure from your

14   report.  77 is a series of pictures of the Escape

15   after the crash test.  And 78 is a series of pictures

16   of the subject Escape after the collision.

17             Do you agree that the second row seat Cohan

18   was sitting in deformed farther forward in the

19   subject collision than in the crash test?

20        A.  It certainly appears to have.  Yes.

21        Q.  Did you quantify how much the second row

22   seat deformed statically in the subject collision?

23        A.  No.

24        Q.  Did you take any measurements of how much

25   the second row seat deformed statically in the

Wesley Grimes                                        May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 197

```
 1     subject collision?
 2          A.  We have scans where we can pull measurements
 3     off of that, but we have not done that.
 4          Q.  Did you quantify how much the second row
 5     seat deformed statically in the crash test?
 6          A.  No.
 7          Q.  Did you quantify how much farther forward
 8     the subject Escape's seat back is deformed compared
 9     to the test Escape's seat back?
10          A.  No.
11          Q.  Did you measure the angle of either seat
12     back?
13          A.  No.
14          Q.  Do you have your report in front of you?
15          A.  Yes.
16              Are you done with these images or --
17          Q.  I'd like to keep them --
18          A.  Okay.
19          Q.  On page 33 of your report --
20              (Discussion ensued off the record.)
21              THE WITNESS:  Page 33?
22              MR. MASHMAN:  Yes.
23              THE WITNESS:  Okay.
24     BY MR. MASHMAN:
25          Q.  You offer the opinion that the test Escape
```

Page 198

1    would have sustained more seat deformation if it had

2    been loaded with exemplar cargo; is that right?

3        A.  Yes.

4        Q.  What is the basis of your opinion that the

5    difference between the second row seat deformation

6    was due to the lack of cargo in the test Escape?

7        A.  Because the rear hatch came forward and made

8    contact with the seat back.  And if there has been

9    cargo there, it would have taken up that space and

10   would have caused the seat back of the second seat in

11   the Escape to have been displaced more forward.

12       Q.  Did you base that conclusion on any testing?

13       A.  The crash test.

14       Q.  The crash -- I'm specifically talking about

15   the conclusion that if cargo had been placed in the

16   cargo area, the seat back would have deformed more

17   than in the crash test.

18       A.  There was not any additional testing for

19   that, no.

20       Q.  Did you perform any calculations to reach

21   that conclusion?

22       A.  No.

23       Q.  Does your report cite any literature for

24   that conclusion?

25       A.  I don't think so.

Wesley Grimes                                            May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                              Page 199

1        Q.  Did you perform any analysis to determine

2    what the total volume is of the cargo that was in the

3    subject Escape?

4        A.  No.

5        Q.  Did you perform any analysis to determine

6    whether the cargo would have deformed before the

7    second row seat deformed?

8        A.  No.  We didn't do a specific analysis for

9    that.

10       Q.  Did you analyze whether the Shop-Vac is

11   stronger than the bolted down second row seat of the

12   Bryson's SUV?

13       A.  No.

14       Q.  Did you analyze whether a bag of clothing is

15   stronger than the second row of the Bryson's SUV?

16       A.  We didn't, but it would depend upon how much

17   it was compressed obviously.

18       Q.  But you didn't analyze how much it was

19   compressed relative to the strength --

20       A.  We did not.

21       Q.  Did you analyze whether the camping chairs

22   were stronger than the second row of the Bryson's

23   SUV?

24       A.  We did not.

25            THE REPORTER:  Slow down.

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 200

1      BY MR. MASHMAN:

2          Q.  I apologize.

3              Did you analyze whether the umbrella

4      stroller was stronger than the second row of the

5      Bryson's SUV?

6          A.  We did not.

7          Q.  And I think you mentioned this earlier.

8              Do you hold yourself out as an expert in

9      seat back design?

10         A.  No.

11         Q.  Do you have any basis to offer an expert

12     opinion on seat back design?

13         A.  On seat back design?  No.

14         Q.  Isn't it true that seat backs have a frame

15     around the outer edge and the inside of that frame is

16     mostly filling?

17         A.  I think in some cases there is a lot of

18     filling.  I think there's some substructures.  You

19     would have to deglove that seat.  Again, I'm not an

20     expert on seat backs.

21         Q.  And did you de-trim the seat in either the

22     subject wreck or the test Escape to determine the

23     internal make-up of the seat?

24         A.  No.

25         Q.  Do you have an opinion about how much more

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 201

1    the second row seat in the test Escape would have

2    been deformed if you had loaded the same cargo into

3    it that was in the subject wreck?

4         A.  No.

5              MR. MASHMAN:  I'm going to show you

6         Plaintiff's Exhibit 79.

7              (Plaintiff's Exhibit 79 was marked for

8         identification.)

9    BY MR. MASHMAN:

10        Q.  This is an interrogatory that the

11   plaintiff's responded to in this case.

12             Did Rough Country provide this to you before

13   the crash test?

14        A.  I don't remember seeing this, but we may

15   have seen it.

16        Q.  Do you agree that this itemizes what was in

17   the back seat of -- strike that.

18             Do you agree that this itemizes what was in

19   the rear compartment of the Bryson's Escape?

20        A.  That's what it says it does.  Yes.

21        Q.  Did you rely on this in any way when you

22   decided on how to configure the crash test?

23        A.  No.  Because we weren't putting cargo back

24   there.

25        Q.  Do you agree that if you had made the

Wesley Grimes                                      May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 204

1     I understand fully exactly what he did.

2          Q.  Do you have any disagreement with

3     Mr. Buchner's conclusion about the amount of dynamic

4     deformation in the subject collision?

5          A.  I haven't looked at that.  I -- I agree that

6     there would be dynamic deformation.  I just am not

7     sure that you can quantify it as accurately as he

8     calculates.

9          Q.  Sitting here today, you haven't looked at

10    the amount of dynamic deformation and don't disagree

11    with the number he came up with; is that fair?

12         A.  I don't --

13             MR. HILL:  Object to the form.  Go

14         ahead.

15             THE WITNESS:  I don't agree or disagree.

16         I -- I agree that there would be dynamic

17         deformation.  I haven't made any attempt to

18         quantify it.

19    BY MR. MASHMAN:

20         Q.  Your report -- I'm going back to static

21    deformation.

22             Your report says that the static deformation

23    of the second row of the subject Escape and test

24    Escape are substantially similar.

25             What is your basis for that conclusion?

Wesley Grimes                              May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 205

1          A.   Just looking at the two vehicles and looking

2      at photographs.

3          Q.   So that's a visual conclusion; is that fair?

4          A.   It is.

5          MR. MASHMAN:   I'm showing you what's

6          been marked as Plaintiff's Exhibit 81.   This

7          is figure 29 from your report.

8          (Plaintiff's Exhibit 81 was marked for

9          identification.)

10     BY MR. MASHMAN:

11         Q.   This graph compares the delta-v for the

12     subject F-250 and crash test F-250, correct?

13         A.   It does.

14         Q.   And you note in your report that the

15     delta-vs are different between approximately 50

16     milliseconds and 130 milliseconds, correct?

17         A.   There is a short area there where they

18     are -- they do diverge.

19         Q.   And you call it a short area.   Is the

20     subject test shorter or is the crash test shorter?   I

21     think that I said wrong.

22         MR. HILL:   Object to the form.

23         MR. MASHMAN:   I apologize.   Let me say

24         that question again.   I think I made a

25         mistake.

Wesley Grimes                                              May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                       Page 206

1      BY MR. MASHMAN:

2          Q.  Are you saying that the subject collision

3      has a shorter delta-v or the crash test has a shorter

4      delta-v?

5              MR. HILL:  Object to the form.

6              THE WITNESS:  There's -- I think I

7          understand what you're asking me.  Shorter

8          delta-v doesn't make sense to me.

9              If you -- if you look at, say,

10         100 milliseconds, the delta-v on the

11         collision Ford is slightly lower than the

12         delta-v on the crash test Ford.  And if you

13         look at the slope there, then the crash test

14         was a little bit stiffer during that time.

15     BY MR. MASHMAN:

16         Q.  Okay.  And I'll try -- let me see if I can

17     get this right.

18             The crash test achieved a higher delta-v in

19     less time between 50 milliseconds and

20     130 milliseconds; is that fair?

21         A.  Well, I don't know that it's 131, but it

22     will be close to that.  Whatever it is.  I mean, the

23     data is what the data is.

24         Q.  But the relationship I described is

25     correct --

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 207

1        A.  It does.  Yeah, the Ford in the crash

2    test -- it appears to me that it encounter some

3    siffer -- some stiffer structures during that time

4    period just because the slope of the delta-v is

5    different.

6        Q.  In your report, you conclude that the

7    difference between the two delta-vs in this diagram

8    is due to the cargo not being present in the rear of

9    the Escape in the crash test; is that right?

10       A.  Well, it's not just the difference in the

11   cargo but also your -- you are a little bit lower, so

12   you are engaging some of the lower structures that in

13   the crash vehicle, the subject vehicle, those lower

14   structures weren't engaged.

15       Q.  So it's not just the cargo in the rear area

16   of the Escape but also the different structures were

17   interacted with in the crash test; is that fair?

18       A.  I think that that's it.  Again, we

19   haven't -- we haven't done a detailed analysis why

20   they are different, but those are some of the things

21   that make sense to me.

22       Q.  When we talk about the cargo, we're talking

23   about the items in the trunk of the Escape, right,

24   the Shop-Vac, the camping chairs, the stroller and

25   the bag of clothes?

Wesley Grimes                                    May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 208

1        A.   Right.  But the difference between the crash
2    test and the subject crash is that the F-250 was
3    lower, so it engaged some of the lower structures and
4    those structures are different.
5        Q.   I understand that.  With respect to the
6    cargo, what you say contributed to the difference in
7    the delta-vs, what is that portion of your conclusion
8    based on, that the cargo caused some of that
9    difference?
10       A.   I think that what may be happening there --
11   again, we haven't done a film analysis or anything
12   like that.  But I think that the tailgate engages the
13   seat back in the test where the tailgate engages
14   cargo in the subject crash.
15       Q.   What is that based on?
16       A.   There wasn't any cargo there in the test.
17       Q.   I apologize.  The tailgate engaging the seat
18   back in the test?
19       A.   There wasn't any cargo there in the test.
20   There wasn't any cargo for it to interact with.
21       Q.   Do you agree that in the subject collision
22   the lateral delta-vs for the F-250 were initially
23   positive and then subsequently negative?
24       A.   I haven't looked at that detail, but we can
25   go look at it.

Wesley Grimes                                      May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 234

1                          CERTIFICATE

2

3       STATE OF GEORGIA:

4       COUNTY OF FULTON:

5

6              I hereby certify that the foregoing

7       transcript was taken down, as stated in the caption,

8       and the colloquies, questions, and answers were

9       reduced to typewriting under my direction; that the

10      transcript is a true and correct record of the

11      evidence given upon said proceeding.

12              I further certify that I am not a relative

13      or employee or attorney of any party, nor am I

14      financially interested in the outcome of this action.

15              This the 5th day of June, 2024.

16

17

18

19      _____

20              Marsi Koehl, CCR-B-2424

21

22

23

24

25