# EXHIBIT 1

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                NORTHERN DISTRICT OF GEORGIA
 3                    GAINESVILLE DIVISION
 4
 5      SANTANA BRYSON and JOSHUA BRYSON,    )
        as Administrators of the Estate      )
 6      of C.Z.B., and as surviving          )
        parents of C.Z.B., a deceased        )
 7      minor,                               )
                                             )
 8             Plaintiffs,                   ) No.
                                             ) 2:22-cv-17-RWS
 9      vs.                                  )
                                             )
10      ROUGH COUNTRY, LLC,                  )
                                             )
11             Defendant.                    )
                                             )
12
13
14       VIDEOTAPED DEPOSITION OF CHARLES CROSBY, P.E.
15                       Phoenix, Arizona
                          May 14, 2024
16                         9:00 a.m.
17
18
19
20
21
22
        REPORTED BY:
23      Robin L. B. Osterode, CSR, RPR
        CA Certified Shorthand Reporter No. 7750
24      AZ Certified Reporter No. 50695
25
```

Case 2:22-cv-00017-RWS   Document 152-1   Filed 03/10/25   Page 3 of 13
Charles Crosby, PE
May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 71

1    A.    Those -- those are typically a percentage
2    and so it's not a specific number, because it's a
3    percentage of the width of the vehicle.  So a vehicle
4    that's 60 inches wide, for example, I -- I -- if it's
5    a 50 percent offset, and it's a 60-inch wide vehicle,
6    then you're going to offset at 30 inches.  If it's an
7    80-inch-wide vehicle and you offset it 50 percent,
8    it's going to be a 40-inch offset, so those offsets
9    are typically given by percentage not by a specific
10   number.
11        Q.    And under those test protocols, how -- how
12   do they ensure that they've hit the offset mark?
13        A.    It depends on the protocol.  There
14   are -- in one of the protocols they actually put a,
15   for lack of a better term, a marker pin on the front
16   of the vehicle that they have set up pointing at a
17   target and the target gives you a window that that
18   marker pin has to be in in order for that to be
19   considered a successful test.
20        Q.    And did you do that with your crash test?
21        A.    We did not.
22        Q.    And why not?
23        A.    It -- one, it's not following that specific
24   protocol, and so that reference window would not
25   necessarily mean anything in this particular case.

Case 2:22-cv-00017-RWS   Document 152-1   Filed 03/10/25   Page 4 of 13
Charles Crosby, PE                                         May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 72

1    Q.    Any other reason?

2    A.    I wasn't requested to -- to verify it in
3    that particular way.

4    Q.    Were you requested to verify it in any way?

5    A.    After the test, we looked at the vehicle,
6    generally, and -- and the offset appeared to be
7    correct. So it was a visual inspection post test.
8    Mr. Grimes and Dr. Gwin both looked at it and
9    basically said that's what they expected with the
10    offset that they had given me.

11    Q.    Do you know of any standardized offset
12    crash procedure that allows the people doing the
13    crash test to visually determine without any kind of
14    measurements whether the offset hit its goal?

15    A.    So the one method I discussed where you
16    kind of have that marker pin on the front, it -- when
17    it hits the -- I'm trying to remember if it hits a
18    barrier or if it's hitting another vehicle, but the
19    marker pin makes a mark, and so then you can visually
20    see where that mark was made and where your offset
21    actually ended up.

22    Q.    I guess -- I guess I didn't ask the
23    question right. But my question is whether there's
24    any test procedure that allows the people performing
25    the procedure to essentially eyeball it without a

1           So what I'm looking for is whether there is
2    any test procedure that is just take a look at it and
3    see if it looks right for the offset?
4           MR. HILL:  Object to the form.
5           But go ahead.
6           THE WITNESS:  So -- so in this case we do
7    have forensic evidence that lines up.  I mean, you
8    showed me in Plaintiffs' Exhibit --
9    BY MS. CANNELLA:
10       Q.   I'm not talking about --
11          MR. HILL:  Let him finish.  He needs to
12   finish.
13   BY MS. CANNELLA:
14       Q.   You're answering a different question,
15   so --
16          MR. HILL:  I don't think he is.  Let him
17   answer the question.
18   BY MS. CANNELLA:
19       Q.   -- a test procedure -- just a test
20   procedure, like, NHTSA, IIHS, SAE, like, whatever
21   kind of organization that has a procedure that we can
22   go look at and say, you know, after you're done with
23   your offset, in order to make sure that you hit your
24   mark, just look at it so there's no point, match
25   point requirement, there's no measurement

Page 76

1    requirement, there's nothing like that.
2              Do you know of any test procedure like
3    that?
4              MR. HILL: Object to the form.
5              THE WITNESS: So that's what I was
6    answering before. So we talked about the pointer,
7    and I'm not talking about that pointer, there is, in
8    some of the offset tests, there is just a piece of --
9    you've got your pre-test measurement with your
10   offset, and then you look at the -- the vehicle post
11   test and you can see where the damage pattern starts.
12   And if it's where you've got that offset mark at,
13   then you're within your -- your test parameters, and
14   you've offset the vehicle the correct amount.
15   BY MS. CANNELLA:
16       Q.   So what I'd like to do is be able to go
17   look at those procedures so that we can see.
18       A.   Uh-huh.
19       Q.   What are they?
20       A.   I would look at the IIHS offset frontal
21   tests.
22       Q.   Okay. Any others?
23       A.   You can look at the -- probably the NHTSA
24   or NCAP frontal tests to see -- I don't believe there
25   is any procedure or protocol in there that has a

Case 2:22-cv-00017-RWS   Document 152-1   Filed 03/10/25   Page 7 of 13
Charles Crosby, PE
May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 77

1    specific measurement like you have to go and put a
2    tape measure on it to make sure your offset's the
3    correct way, it would just be a post-test visual.
4        Q.   Okay.  All right.  And do you know the name
5    of those tests, like for NHTSA, FMVSS number, number,
6    number?
7        A.   Yeah, so your FMVSS tests, you can run
8    several of those with a single crash test, so you can
9    go and look at your 35-mile-an-hour frontal barrier
10   NCAP test, trying to think of what other NHTSA
11   testing you could go and look at.  Maybe some of the
12   side impact testing that NHTSA runs.
13       Q.   Is that offset?
14       A.   Those are full overlap, but they are
15   crabbed, meaning that the -- the vehicle coming in is
16   actually coming in at an angle.
17       Q.   Okay.  I'm looking for offset ones, though.
18       A.   Okay.
19       Q.   Any offset ones?
20       A.   I can't remember any more.
21       Q.   Okay.  That's a fine answer.  I'm just
22   trying to make sure.
23            THE REPORTER:  Is this a good time for a
24   restroom break?
25            MS. CANNELLA:  Yes, ma'am.

Page 145

```
 1              MR. HILL:  Object to the form.
 2              But go ahead.
 3              THE WITNESS:  Yes, to -- to the degree of
 4     which they were set up for, you can rely on them for
 5     their -- their designated purpose.
 6     BY MS. CANNELLA:
 7         Q.   Which is?
 8         A.   A visual representation of -- of the
 9     interaction between the vehicles.
10         Q.   Okay.  Is that -- is that narrower than
11     just relying on them?
12         A.   Well, in some cases we will specifically
13     set up cameras to then do not just a visual, we want
14     to see what happened, we may actually do some video
15     analysis with the cameras where you can actually take
16     the video and make certain measurements or estimates
17     of deformations or speeds or angles or anything like
18     that.
19         Q.   With photogrammetry you're talking about?
20         A.   Photogrammetry or -- or some video tracking
21     software that's available.
22         Q.   Did you set up videos in this crash test to
23     be able to take measurements?
24         A.   These videos were not specifically set up
25     for -- to do those measurements in this case.
```

1   Q.   And why not?
2   A.   The cameras were requested to be put there
3   as a -- as a visual only.
4   Q.   Okay.  And what would you have done
5   differently to be able to take measurements?
6   A.   There's a couple of things.  We do
7   not -- we don't do them all every time, it just
8   depends.  But we may have had different marker boards
9   on the ground.  We may have also done what's called a
10  camera calibration where you take a known grid or
11  kind of photo set and you record that and then you
12  can use that in the software to understand your
13  distortion in the camera.  All lenses, you know, have
14  some distortion, because we're trying to make a
15  square image with a round lens, so you can get some
16  lens distortion, and if you set it up correctly and
17  do some stuff preliminarily you can eliminate that or
18  reduce that distortion, I should say.
19  Q.   Okay.  And so is there distortion in the
20  photos and videos that you took?
21  A.   Yes.
22  Q.   Okay.  So how can the jury know how to
23  assess that distortion?
24  A.   So specifically for -- for, like, the
25  photos that I take, even on a still camera there's

Case 2:22-cv-00017-RWS   Document 152-1   Filed 03/10/25   Page 10 of 13
Charles Crosby , PE                                      May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 151

1      3 feet after impact, correct?
2           A.    Correct.  3 feet over top of the Escape.
3           Q.    Okay.  Wait, let me make sure I understand.
4      So from the ground, 3 feet from the ground?
5           A.    No, no, no.  So if you -- so if you -- if
6      your zero reference is at the point of where the F250
7      and the Escape are going to make first contact and
8      center line of the rail, then that camera was 3
9      feet -- approximately 3 feet, what I'll call
10     downstream, which is going to put it over the top of
11     the Ford Escape, because the zero is the Ford
12     Escape's bumper.
13          Q.    Got it.
14          A.    I will say after looking at the video, it
15     does appear that we probably weren't directly over
16     the rail left to right.  So we did the our best to
17     center the camera over the center of the rail, but
18     we're not likely directly over that.
19          Q.    And why do you say that?
20          A.    Because there's a little bit of distortion
21     and you can kind of look at the overhead video and
22     you can start to tell which direction the camera may
23     have been slightly moved or which direction the
24     camera was angled.
25          Q.    And tell me everything that that opinion is

Case 2:22-cv-00017-RWS   Document 152-1   Filed 03/10/25   Page 11 of 13
Charles Crosby, PE
May 14, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 161

1     then we'll mark that as Plaintiffs' Exhibit 122.
2               THE REPORTER:  We already have a 122.
3               MS. CANNELLA:  123.
4               THE REPORTER:  We already have a 123.
5               MS. CANNELLA:  124.  Okay.  I tried.  I
6     failed.
7               THE REPORTER:  That's okay.
8               (Marked for identification Exhibit 124.)
9               MS. CANNELLA:  All right.  Moving on.
10              MR. HILL:  And that was just a screen
11    capture of where he circled the lines?
12              MS. CANNELLA:  Yes.
13         Q.   Okay.  Can we agree that the F250 got off
14    course, to some degree?
15         A.   Yes.
16         Q.   Okay.  And do we have any other way to
17    measure how much it got off course aside from the
18    video?
19         A.   Yes.
20         Q.   And that would be using the physical Ford
21    emblem, correct?
22         A.   That would be one of the things we can look
23    at, yeah.
24         Q.   And what else, scan data?
25         A.   Scan data.  There is evidence from the tow

| | |
|---|---|
| 1 | Q. And January 11th, 2023? |
| 2 | I'll let you go through this, because it |
| 3 | looks like that's what we've got for February as |
| 4 | well, and March. |
| 5 | A. Did we go up through March? |
| 6 | Q. Yeah, so if you want to go ahead and add |
| 7 | those instead of me reading them all to you, that |
| 8 | would be great. |
| 9 | A. I've got my phone off, if someone has a |
| 10 | calculator I can borrow. |
| 11 | MS. CANNELLA: Can you share your phone |
| 12 | with him so I don't hand over mine. |
| 13 | Thank you. |
| 14 | Q. Do you have it? |
| 15 | A. Yes. |
| 16 | Q. What's the total? |
| 17 | A. So I have a total through March of |
| 18 | $222,634.13. |
| 19 | Q. 222,600 and -- |
| 20 | A. 34. |
| 21 | Q. And that's how much RC paid to Exponent for |
| 22 | crash testing, including your services, correct? |
| 23 | MR. HILL: Object to the form. |
| 24 | But go ahead. |
| 25 | THE WITNESS: Correct. |

```
1    STATE OF ARIZONA      )
     COUNTY OF MARICOPA    )
2

3                  CERTIFICATE
4        I, ROBIN L. B. OSTERODE, Certified Shorthand
5    Reporter for the State of California and Certified
6    Reporter for the State of Arizona certify:
7        That the foregoing proceeding was taken by
8    me; that I am authorized to administer an oath; that
9    any witness, before testifying, was duly sworn to
10   testify to the whole truth; that the questions and
11   answers were taken down by me in shorthand and
12   thereafter reduced to print by computer-aided
13   transcription under my direction; that review and
14   signature was requested; that the foregoing pages are
15   a full, true, and accurate transcript of all
16   proceedings, to the best of my skill and ability.
17       I FURTHER CERTIFY that I am in no way
18   related to nor employed by any of the parties hereto,
19   nor am I in any way interested in the outcome hereof.
20       DATED this 28th day of May, 2024.
21
22
23            [signature: Robin L. B. Osterode]

24            ROBIN L. B. OSTERODE, CSR, RPR
              CA CSR No. 7750
25            AZ CR No. 50695
```