UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| Santana Bryson and Joshua Bryson, | * | |
| as Administrators of the | * | |
| Estate of C.Z.B., and as surviving | * | |
| parents of C.Z.B., a deceased minor, | * | |
| | * | Civil Action File |
| Plaintiffs, | * | |
| | * | No. 2:22-cv-17-RWS |
| v. | * | |
| | * | |
| Rough Country, LLC | * | |
| | * | |
| Defendant. | * | |

## PLAINTIFFS' OMNIBUS MOTIONS IN LIMINE

Rough Country has presented no expert testimony claiming that the subject lift kit was safe or non-defective. Rough Country does not employ anyone with education, experience, or training on vehicle structures or crashworthiness who is qualified to render such an expert opinion. It does not even have a single licensed engineer on staff. When, as here, a manufacturer cannot defend its product, it often will resort to injecting irrelevant and highly prejudicial information into a case to distract and confuse the jury. Rough Country's "Outline of the Case" from the Consolidated PTO, ECF No. 120-6, is full of such attempts to confuse.

In the words of another court, "[y]ou can throw a skunk into the jury box and instruct jurors not to smell it, but it doesn't do any good." *O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1309 (5th Cir. 1977). Some of the arguments Rough

Country will make are so clearly inadmissible that no amount of context at trial could change that analysis. Sustaining objections or offering curative instructions will not remove the prejudice to Plaintiffs, but will, instead, reinforce the prejudicial value of irrelevant and inadmissible evidence. *See McWhorter v. City of Birmingham*, 906 F.2d 674, 678 (11th Cir. 1990) (recognizing "curative instructions do not always eradicate the prejudice resulting from an improper argument").

To avoid any such prejudice, Plaintiffs ask the Court to prohibit argument, evidence, or insinuations, interrogation of witnesses, comments to jurors or prospective jurors, or offers of evidence about the following matters.

**1.**     **Any reference to product tests or safety tests unrelated to vehicle intrusion or crash compatibility.**

Rough Country testified that the only testing it performs on its lift kits is related to vehicle stability and handling under FMVSS 126. Doc. 97, 60:23-62:8; Ex. 1, RC's 2nd Supp Resp to Pls' 1st RPDS at ¶ 6 (producing FMVSS 126 compliance testing in response to a request for any testing).

Neither party contends that the driver handling or a lack of stability caused the subject wreck. Doc. 103-2, Pls' Resp. to RC's SOMF and Pls' SOADMF. Tests demonstrating the stability and handling of vehicles equipped with a lift, and their compliance with FMVSS 126, are completely irrelevant to the question whether Rough Country's suspension lift caused the intrusion that killed the

Brysons' son.  Furthermore, the governing federal statute expressly states that compliance with *any* federal minimum standard, including FMVSS 126, "*does not exempt a person from liability at common law.*"  49 U.S.C. § 30103(e) (emphasis added); *Chrysler Grp., LLC v. Walden*, 792 S.E.2d 754, 761 (Ga. Ct. App. 2016), *aff'd unanimously*, 812 S.E.2d 244 (Ga. 2018) (same).  Introduction of RC's irrelevant testing would be a waste of time and could confuse the jury regarding whether RC's lift was safe or whether RC did testing *relevant to the issues in the case.*  Fed. R. Evid. 401, 402, 403.

**2.**    **Any reference to Rough Country allegedly designed its lift kits to meet any FMVSS standards or to the lift's alleged "overall safety."**

The 2005 Enhancing Vehicle-to-Vehicle Compatibility Agreement ("EVC") was a design standard that automakers created and abided by when designing pickup trucks, to help ensure they would engage with the protective structures of the other vehicles they hit in crashes.  Rough Country, however, did not ensure that pickup trucks fitted with its lift kits would comply with the EVC.  As noted above, Rough Country may try to escape liability by pointing to its effort to comply with the *unrelated* federal minimum standard for vehicle stability and handling, FMVSS 126.  Evidence of such efforts is properly excluded because it is irrelevant, misleading and risks confusing the jury, and no expert qualified to testify to such facts has been disclosed.  *See* Fed. R. Evid. 401, 402, 403, 701, 702, 703, 705.

Rough Country advertises in its product guide that its suspension systems

are "certified compliant" with FMVSS No. 126[1] and do not interfere with the

vehicle's Electronic Stability Control.  *See* Ex. 2, Excerpt of Rough Country's

2016 Product Guide, RC000283.  Rough Country may make claims such as its lift

kits "complied with all applicable FMVSS standards," or "the lift kit passed

FMVSS compliance testing" to distract the jury from the actual issues in this case.

Such testimony would be completely irrelevant and mislead the jury as to

the actual issues involved in this case. Fed. R. Evid. 401; 402; 403.  Suggesting

that the product is safe because it complies with an irrelevant standard is also

impermissible character evidence and thus properly excluded.  Fed. R. Evid.

404(b); *see Boateng v. Bayerische Motoren Werke Aktiengesellschaft,* No. 17-CV-

209(KAM)(SIL), 2024 WL 1513601, at *12 (E.D.N.Y. Apr. 8, 2024) (declining

"to allow Defendants to introduce evidence of compliance with unrelated

[FMVSS] standards"); *Est. of Thompson v. Kawasaki Heavy Indus*., Ltd., 933 F.

Supp. 2d 1111, 1150 (N.D. Iowa 2013) (same).

Likewise, Rough Country should not be permitted to argue that lift kits are

safe "overall."  *See Easterling v. Ford Motor Co*., No. 2:14-CV-2353-JEO, 2020

WL 607207, at *8 (N.D. Ala. Feb. 7, 2020) (excluding "overall safety record of

vehicle" and explaining a seatbelt was at issue but the "overall safety

---

[1] Rough Country has not identified any other FMVSS standards its lift kits
allegedly comply with.

considerations of Ford with regard to the vehicle in general are not at issue"); *Ake v. Gen. Motors Corp.*, 942 F. Supp. 869, 874 (W.D.N.Y. 1996) ("evidence of its 'overall' safety or the number of accidents in which these trucks were involved, is too tangential to the defect alleged here, and should be excluded under Rule 403 on the ground that it would be confusing to the jury, a waste of time, and of minimal relevance.").

**3.    Suggestion that C.Z.B.'s car seat was defective.**

Rough Country has presented no evidence—expert or otherwise—that the car seat was defective, and it should not be permitted to now make such an argument after all discovery is closed.  *See* Fed. R. Civ. P. 26; Fed. R. Evid. 703, 705; Fed. R. Civ. P. 26(a)(1)(ii), 37(c)(1) (excluding evidence not timely disclosed).

**4.    Any suggestion that there was no feasible alternative design.**

Plaintiffs anticipate that Rough Country may attempt to introduce evidence, elicit testimony, or otherwise argue that no reasonable alternative design existed or that the alternative design somehow impaired the utility of the lift kit.  That is not only untrue, but also utterly unsupported by any evidence.

Plaintiffs' mechanical and automotive engineer expert, Chris Roche, who worked for Chrysler and other automotive companies and has more than 25 years of experience, testified about inexpensive and easy alternative designs.  One of Mr.

Roche's opinions is that safer, feasible, alternative designs existed at the time the

subject lift kit was manufactured that would have preserved the utility of the design

and resulted in significantly less risk of injury and/or death due to foreseeable

collisions.[2]

Examples of this include "secondary energy absorption system" ("SEAS")

mechanisms such as brackets that are big enough to account for the height of the

lift, and which would help increase engagement between two vehicles in a crash,

thus satisfying the requirements of the Vehicle Compatibility Agreement.  Similar

designs are sold by Ford for the F-250 model and retail for a mere $25 each.[3]

These SEAS brackets have been designed, manufactured, and sold by auto

manufacturers for trucks like the F-250 for the last 20-25 years.[4]  Rough Country

does not disagree that SEAS brackets have existed in the market for years.

Nonetheless, Rough Country's questioning of Mr. Roche suggests Rough

Country may argue that Mr. Roche's alternative design is not feasible or that

people would not be able to park in their driveways if they used it.  Rough Country

counsel stated: "if I have the -- the SEAS brackets installed, I'm going to scrape

leaving my driveway, so I need that extra clearance that's provided by the SEAS

---

[2] Ex. 3, Supplement to Plaintiffs' Initial Disclosures, Attachment B.
[3] Ex. 4, Expert Report of Christopher Roche at 26-28; Ex. 5, 2/1/24 Roche Dep., at 55:15-56:15.
[4] *Id.*, 2/1/24 Roche Dep., at 60:4-5.

brackets not being on my truck when I exit my driveway." Ex. 5, 2/1/24 Roche Dep. 197:12-20. There is no evidence whatsoever that Mr. Roche's alternative design would prevent people from getting in their driveways. Rough Country has produced no documents that indicate Mr. Roche's alternative design is not feasible or would impede the F250's utility, and no Rough Country expert has offered such an opinion. This is not something Rough Country asked its expert to even consider. It is just something Rough Country made up.

If Rough Country is permitted to suggest that Mr. Roche's proffered alternative design would impede the utility of the F250 or the lift without any evidence, it will cause the jury to falsely believe that Rough Country's statements are facts or are supported by evidence. *See* Fed. R. Evid. 401, 402, 403. In truth, they are simply statements by lawyers. Attorney argument is not evidence. *Gonzalez v. Batmasian*, 734 Fed. Appx. 677, 683 (11th Cir. 2018) (court instructed jury to disregard lawyer's reference to audit stating "[w]hat this lawyer is saying is not evidence" where the report was never introduced into evidence and person who supposedly conduct audit was never deposed). A lay person is not qualified to render an opinion that Mr. Roche's alternative design would impede the utility of the F250 or the suspension lift. And Rough Country has not identified any expert who will offer testimony on this topic.

Injecting speculation or unfounded suggestions serves no purpose but to confuse and mislead the jury.  Deciding this issue now would save valuable time and resources at trial and foreclose an irrelevant and prejudicial topic that, once presented to the jury, cannot be cured.  *See McWhorter*, 906 F.2d at 678.

5.  **Suggestion that the striking driver was misusing the lift or that the lift should not have been used on public roads.**

Rough Country should not be able to argue at trial that its lift kit should not have been used on a public road.  Rough Country has stipulated that it "agrees that its lifts have to be designed to be safe in crashes because crashes happen."  Doc. 120-7, Plaintiffs' Proposed Facts Stipulated By The Parties, at ¶¶ 12 & 13.  Further, throughout this litigation, Rough Country has made clear that its lift kits can be used on public roads, not merely for off-roading.[5]  At this late date, Rough Country cannot be allowed to walk these facts back or introduce an entirely new contention or defense of alleged product misuse.  *See* Fed. R. Civ. P. 26 (a)(1)(ii), 37(c)(1).

---

[5] *See* Doc. 97, RC 30(b)(6) Dep., at 10:23-25 ("And with the millions of our product on the road, we've never had any incidents"); 59:21-24 ("we've -- again, your statement as far as for on vehicle – for on road use, you know, our vehicles and our kits, you know would need to comply"); Doc. 103-18, RC's 2nd Supp Resp to Pls' 1st ROGS, ¶ 6 (admitting that it knew its lift kits were used on public roadways), Ex. 6; Rough Country 4.5 in Ford Suspension Lift Kit (15-16 F-250 4WD), RC000284-286, (under features, explaining that it includes shock absorbers which "offer the best in balanced performance for on and off-road use").

**6. <u>Suggestion or argument that Rough Country has been placing its products into commerce for over 30 years or that lift kits have been around for 40 years.</u>**

Rough Country also stated in its Outline of the Case that "Rough Country has been placing its product into commerce for over 30 years." Doc. 120-6 at 2. It is unclear which "product" Rough Country is talking about. It cannot be the 6" lift kit (marketed as a 4.5" lift kit) for the F250, because the F250 hasn't existed for 30 years. The number of years Rough Country has been placing some unknown "product" into commerce is irrelevant. *See* Fed. R. Evid. 401, 402, 403.

Furthermore, there is no evidence of this "fact" in the case—Rough Country did not disclose any documents to support it during discovery, even though the Federal Rules and Local Rules required it to provide Plaintiffs with "a copy of . . . all documents, data complications . . . you may use to support your claims or defenses . . . identifying the subject of the information." Fed. R. Civ. P. 26 (a)(1)(ii). Failure to disclose this evidence means "the party is not allowed to use that information . . . at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).[6]

---

[6] Rough Country's failure was certainly not harmless—Plaintiffs have not had the opportunity to explore this claim with any discovery and they do not know what "product" Rough Country is talking about. Rough Country has not alleged it was "substantially justified."

Rough Country should also be prohibited from arguing or presenting evidence that "lift kits are a product that has been on the market for over 40 years." *See* Doc. 120-6 at 2.  The only reason to make such a statement is to leave the jury with the impression that (a) they cannot be dangerous, because they have been around for so long,[7] or (b) the jury would hear more instances of injury or death in crashes involving lift kits if they were dangerous.

As discussed below in MIL No. 12, neither Rough Country nor any of its witnesses know how many wrecks involving lift kits resulted in serious injury or death.  That data is not collected or available, and Rough Country has made no effort to find such data.  Allowing it to create the false impression that "only" three people have died as the result of lift kits in 40 years is wrong, confusing, and misleading, and thus should be prohibited.  *See* Fed. R. Evid. 401, 402, 403.

**7.** **Reference to "QVMs" or Ford placing lift kits on vehicles or Ford or Ford dealerships shipping vehicles to converters to put lift kits on.**

Rough Country has several times suggested in passing that Ford puts lift kits on its vehicles, or it ships vehicles to "converters" to install lift kits, or that dealerships arrange to have lift kits installed on vehicles.  *See, e.g.*, 11/28/22 Hrg. Tr. 21:18-22:11.  During the deposition of Mr. Roche, Rough Country asked him

---

[7] Two-point seatbelts, cars without airbags, and cigarettes are proof that the length of time a product is made is not evidence of its safety.

about "QVM" arrangements between auto manufacturers and third party converters.

However, Rough Country testified at its 30(b)(6) deposition that it has never had a meeting with Ford and has had no communications with Ford about vehicle compatibility. *See* Doc. 97, at 18:16-19:11. Rough Country did not depose any Ford witness or put any Ford witness on its witness list.[8] Evidence about conversations Ford had with third-party converter companies is therefore hearsay. *See* Fed. R. Evid. 803, 805. More importantly, the lift kit in this case was not installed by a converter. Nor did the Ford dealership ask Ford to ship the F250 to a converter so that it could sell the truck as new with the lift on. Instead, an individual citizen ordered the lift kit directly and had it installed by Ronnie Thompson Ford.

Rough Country hopes that by introducing this argument, it can suggest that Ford has somehow blessed the installation of suspension lifts. That suggestion is false: Ford designed the F250 with the specific goal of keeping the bumper at a level that would be compatible with other cars in crashes. *See* Doc. 103-6, at 7 (requiring Ford's EVC compliance by 2009). Ford's owner's manual also warns against altering the suspension. *See* Doc. 120-12, at 24-27. The truth is that QVM

---

[8] Rough Country disclosed an "expert" who is not qualified to testify about the topic Rough Country disclosed him on. *See generally* Pl's Daubert Mot. Pascarella.

relationships are very different than what RC has suggested by innuendo, and Ford

dealerships are independent and separate businesses from the Ford Motor

Company that designed and manufactured the F250.

Plaintiffs' case is centered around the EVC, which is a voluntary agreement

Ford helped to create and which Ford abided by when it built the F250 to keep its

trucks at a height that would be compatible with other vehicles in crashes.

Suggesting that Ford did not really care if trucks violate the EVC would be

unfairly prejudicial, especially when such a suggestion depends on vague and

unsupported hearsay that has never been properly disclosed in discovery. Fed. R.

Civ. P. 26 (a)(1)(ii) (requiring such information be disclosed); Fed. R. Civ. P.

37(c)(1) (requiring exclusion of information not properly disclosed).

Rough Country has the burden to show that any evidence it would introduce

regarding third-party installers, converters, or QVM relationships is relevant, non-

hearsay, and that its probative value outweighs any unfair prejudice to Plaintiffs.  It

has failed to do so.  *See* Fed. R. Evid. 401, 402, 403, 801, 802, 805.

**8.**    **Any reference to offers of settlement or compromise.**

Offers of settlement and compromise are not admissible to prove liability for

or invalidity of any claim or its amount.  Fed. R. Evid. 408; *see also Hinton v.*

*Georgia Power Co.*, 126 Ga. App. 416, 418 (1972) ("negotiations for settlement

and compromise are improper as matters of pleading or as evidence.").  This is true

even when the proponent of the evidence is the party who makes the monetary offer of settlement and compromise.  This evidence is inadmissible.

Plaintiffs ask the Court to prohibit Rough Country from doing indirectly what they cannot do directly.  Specifically, Plaintiffs ask the Court to prevent Rough Country from resorting to innuendo or suggestion or attempting to hint to the jury that the case "didn't settle" or that they have offered to settle this case but Plaintiffs haven't accepted the offer.  For example, Rough Country or its attorneys may make comments that the jury has been empaneled because Plaintiffs or their lawyers are greedy, that Rough Country "tried to do the right thing before trial," or that this case would not be before the jury but for the "lawyers getting involved." Such comments are frequently made by defendants and are only intended to suggest that prior attempts to settle have been rejected by the plaintiffs.

**9.** **Evidence, suggestion, or argument regarding the original owner of the F250 who purchased the lift.**

Rough Country's Outline of the Case dedicates a large amount of real estate to Will Holloway, the person who first owned the F250, purchased the lift kit from Rough Country, and had it installed on the F250.  Rough Country's Outline states:

> Rough Country sold the lift kit at issue to Will Holloway on or about June 21, 2016. Rough Country mailed the lift kit to Mr. Holloway at his home address in Blue Ridge, Georgia. The lift kit at issue was a 4.5-inch lift kit.

Mr. Holloway then took the lift kit to Ronnie Thompson Ford, where a technician installed the lift kit onto his 2016 Ford F-250 Super Duty truck.

Mr. Elliott then subsequently obtained the Ford F-250 Super Duty truck with the lift kit already installed.

On March 15, 2020, almost four years after Rough Country sold the lift kit to Mr. Holloway, Mr. Elliott drove into the rear of Plaintiffs' Ford Escape while it was stopped at a red light.

Doc. 120-6 at 3-4.

Product liability claims no longer require privity of contract. It is therefore irrelevant that someone owned the F250 before Hunter Elliott or that someone else purchased the lift kit from Rough Country or that these things happened four years ago. Rough Country's attempt to suggest that it shouldn't be liable because it didn't sell the lift kit to Hunter Elliott or because it had been four years since it sold the lift kit is improper, since those things have no bearing on its liability. *See* Fed. R. Evid. 401, 402, 403.

**10.**     **Suggestion or argument that Plaintiffs contend all suspension lifts are defective, the entire lift kit industry should be shut down, all cars with suspension lifts should be removed from the road, or any similar suggestion or argument.**

Rough Country has misrepresented Plaintiffs' case and their contentions to this Court in the past, and Plaintiffs ask the Court to prohibit it from doing so at trial in front of the jury. During the same 2022 hearing described above, Rough Country told the Court that Plaintiffs had "to prove that basically the entire [suspension lift] industry should be shut down and that all these cars should be

removed from the road." *See* 11/28/22 Hrg. Tr. 31:25-32:2. It claimed that Plaintiffs were "basically arguing that any lift kit that raises a vehicle to the point where it might override the bumper or the frame of any other vehicle on the road, makes it inherently dangerous and defective and strict liability should apply. They're basically arguing that every single lift kit in the country -- and there's hundreds of thousands of these lift kits that are installed on vehicles every year." *Id.* at 31:9-17.

Plaintiffs do not contend that the entire suspension lift industry should be shut down or that any cars should be removed from the road. They have never argued that every single lift kit in the country is defective. Plaintiffs' case is about *this* Rough Country suspension lift which effectively raised the suspension of *this* F-250 by 6 inches. There are undoubtedly other suspension lifts that are not defective. In fact, Plaintiffs' alternative design is not to eliminate lifts, but to install an inexpensive "secondary absorption system" to help lifted vehicles engage with any vehicle they might hit. Rough Country's inaccurate characterizations of Plaintiffs' claims are meant to scare the jury into thinking their neighbors, friends, and family will not be able to drive lifted vehicles anymore if they render a verdict for Plaintiffs' in this case. That is improper. *See* Fed. R. Evid. 401, 402, 403.

15

11. **Suggestion or argument that there are millions of vehicles on the road with lift kits or that hundreds of thousands of these lift kits are installed on vehicles every year.**

At the 2022 hearing, Rough Country told the Court "there's hundreds of thousands of these lift kits that are installed on vehicles every year. There are millions of vehicles on the road." *See* 11/28/22 Hrg. Tr. 31:9-17. Rough Country's corporate representative made the same claim: "[W]ith the milliions of kits and billions of miles of exposure of our product on the road, we've never had any incidents." *See* Doc. 97, at 10:16-11:3.

But there is no evidence that there are "hundreds of thousands of lift kits" installed on vehicles every year, "millions of vehicles" on the road with them, or "billions of miles of exposure" on the road. Those numbers are made up. Rough Country's discovery responses reveal that in Georgia ***during a five-year period***, it only sold ███ suspension kits over 2 inches. *See* Ex. 7, (RC 30(b)(6) Dep., Ex. 12 at 10). In 2022, the *nationwide* sales numbers for its 6" lift kits were only ███. *See* Ex. 8, 30(b)(6) Dep. 94:17-19. In 2021, that number was less than ███. *See* Ex. 8, 30(b)(6) Dep. 95:4-6. When Rough County counted every lift kit it sold in Georgia over the course of five years, it only came up with roughly ███ lift kits. *See* Ex. 8, 30(b)(6) Dep., at 96:6-23. This is a far cry from evidence that "there's hundreds of thousands of these lift kits that are installed on vehicles every year. There are millions of vehicles on the road." *See* 11/28/22 Hrg.

16

Tr. 31:9-17.  Made up evidence has no probative value.  *See* Fed. R. Evid. 401, 402, 403.  If Rough Country has never produced any evidence supporting those facts or figures, or identified any witness with that knowledge.  Thus, if such evidence exists it should be excluded as improperly withheld and untimely.  *See* Fed. R. Evid. 701, 702, 703, 705; Fed. R. Civ. P. 26 (a)(1)(ii), 37(c)(1).

12.    **Evidence, argument, or suggestion that very few people are killed or seriously injured given the number of lift kits on the road.**

Rough Country has not attempted to prove that the serious injuries and deaths involving lifted vehicles are limited to the present case, or the two prior cases, *Bacho* and *Mendoza*.  It should not be permitted to tell the jury that these are the only instances of death or serious injury that have ever been linked to a lift that violates the EVC.  *First*, not all wrecks are recorded.  *Second*, while there are databases with records of some wrecks, those records are pure hearsay and are often wrong or incomplete.  *Third*, Rough Country has presented no evidence that it monitored all wrecks or that it investigated whether any wreck involved a lifted vehicle (except when it has been sued).  The entire automotive industry voluntarily agreed to make vehicles compatible in wrecks—it is not possible that it made that decision if incompatibility did not cause serious injuries and deaths.

As a result, any statement or argument about an alleged lack of other similar incidents resulting in serious injury or death is irrelevant to the issues the jury will decide and misleading.  Fed. R. Evid. 402.  Admitting such a statement or

argument will confuse and unfairly prejudice the jury into thinking that Plaintiff

must prove another person was killed or suffered a serious injury in a similar

incident before Rough Country can be held liable.  That is not the law.  Fed. R.

Evid. 403; *see also Innov. Ventures, LLC v. NVE, Inc.*, 90 F. Supp. 3d 703, 711

(E.D. Mich. 2015) (excluding evidence that, if accepted by the jury, would

contradict the applicable legal standard).

**13.    <u>Argument or testimony about Rough Country's supposed general<br>character.</u>**

Rough Country may try to characterize itself as a "good" corporate entity in

various ways.  For example, it may try to make statements or argument about its

philanthropic actions, its employment of Georgia or US citizens, or its "overall

safety" records.  That is inadmissible.  "Evidence of a person's character or

character trait is not admissible to prove that on a particular occasion the person

acted in accordance with the character or trait."  Fed. R. Evid. 404.

**14.    <u>Argument or testimony about any alleged prejudice arising from Rough<br>Country's inability to rely on tests or testimony excluded by this Court.</u>**

If the Court excludes Rough Country's Exponent litigation testing, it should

not be able to imply, or solicit its witnesses to imply, that there is other evidence

that would be before the jury but for the Court's order.  The admissibility of that

proposed evidence will be decided by the Court and any reference to excluded

evidence would be irrelevant and intended to prejudice and confuse the jury.  Fed.

R. Evid. 402, 404.  *See, e.g.*, *Eli Research, LLC v. Must Have Info Inc.*, No. 2:13-cv-695, 2015 WL 6501070, at *2 (M.D. Fla. Oct. 22, 2015) ("Mention of motions made or efforts to exclude evidence shall not be brought up before the jury.").  The Court should thus prohibit any statement or argument about motions to exclude evidence or evidence excluded by this Court before trial.

**15.**    **Argument or testimony about statistics.**

Rough Country has not disclosed any expert to discuss statistics and it has not disclosed any statistics it plans to rely upon.  Therefore, any attempt to introduce statistics (for example, the percentage of collisions involving lifts in which occupants are injured or killed, or the percentage of collisions that occur at speeds or configurations similar to the subject collision) must be excluded as improper lay opinion and/or facts, data, or expert opinions that were not timely disclosed in discovery.  *See* Fed. R. Evid. 701, 702, 703, 705; Fed. R. Civ. P. 26 (a)(1)(ii), 37(c)(1).

**16.**    **Argument or testimony that Rough Country counsel represents "employees of Rough Country," "engineers at Rough Country," or that Rough Country employees or engineers have been sued, or that Rough Country or any of its employees have been accused of criminal conduct.**

Plaintiff has sued Rough Country, the corporate entity, not any of its employees or engineers.  Plaintiff's claims are civil, not criminal.  Rough Country cannot tell the jury otherwise.  *See* Ex. 9, Order, *Katz v. DaimlerChrysler* (Judge T. Jackson Bedford).

*First*, Rough Country's counsel does not represent its "employees" or "engineers," or, as automakers' counsel sometimes try to put it, "the men and women of Rough Country." Rough Country's counsel represents the company, not its employees who are nonparties. There is a difference. *See Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 805 n.16 (1987) ("A lawyer employed or retained by a corporation or similar entity owes his allegiance to the entity and not to a stockholder, director, officer, employee, representative, or other person connected with the entity."). Liability for Plaintiff's damages will be the responsibility of Rough Country, not its "employees" or "engineers."

*Second*, although Plaintiff contends that Rough Country's design misconduct was reckless or wanton, Plaintiff does not allege a criminal act or accuse Rough Country, its "employees," or its "engineers" of being "criminals." To suggest otherwise is false, misleading, and prejudicial.

## 17.    Effect of verdict on Rough Country's employees and operations.

The possible effects of a verdict against Rough Country on its employees and company operations are irrelevant. Rough Country may try to tell the jury that an adverse verdict will cause Rough Country to lay off workers, go into bankruptcy, close plants or company offices, or "outsource" jobs to countries or states where "big verdicts do not happen."

Arguments to the jury must be supported by evidence introduced at trial. There will be no evidence about the financial consequences on Rough Country from a verdict for Plaintiff. Any statement or argument about the possible effect of an adverse verdict would be irrelevant, unfairly prejudicial, and misleading and thus should be prohibited. *See* Ex. 9, Order, *Katz v. DaimlerChrysler;* Fed. R. Evid. 402, 403; *Swoope v. CSX Transp., Inc.*, No. 4:13-cv-307-HLM, 2015 WL 12564948, at *14 (N.D. Ga. July 29, 2015) (holding that "evidence or argument" about the verdict's effect "is clearly improper").

## 18. <u>Any reference to Plaintiffs' experts being challenged, excluded, or having their testimony limited in prior unrelated cases.</u>

Plaintiffs ask this Court to preclude Rough Country from introducing evidence, eliciting testimony, or otherwise referencing any prior court proceeding where Plaintiffs' experts may have been challenged, excluded, or had their testimony limited. "Courts within the 11th Circuit have generally granted similar motion in limine requests to preclude the introduction of evidence of a prior *Daubert* challenge to an expert in unrelated cases, unless the party seeking exclusion can demonstrate that the specifics of the prior *Daubert* challenge make it extremely relevant to this particular case." *See Jolly v. Hoegh Autoliners Shipping AS*, No. 3:20-CV-01150-JAR-MCR, 2024 WL 3859800, at *2 (M.D. Fla. Mar. 13, 2024) (precluding previous Daubert rulings and judicial criticisms of plaintiffs' experts in unrelated cases); *Smith v. Carnival Corp.*, No. 22-CV-22853, 2023 WL

8370478, at *8 (S.D. Fla. Dec. 4, 2023) (same); *Kroll v. Carnival Corp.*, No. 19-23017-CIV, 2021 WL 8323589, at *2-3 (S.D. Fla. Nov. 2, 2021) (same); *Siplin v. Carnival Corp.*, No. 17-CIV-23741, 2018 WL 3439452, at *6 (S.D. Fla. July 17, 2018) (same).

The only purpose of introducing such evidence, if it exists, would be to prejudice the jury and attempt to ask the jury to substitute this Court's judgment on the admissibility of Plaintiffs' expert for those of another court, in another case. *See Est. of Thompson v. Kawasaki Heavy Indus., Ltd.*, 933 F. Supp. 2d 1111, 1152 (N.D. Iowa 2013) (prohibiting defendant from attempting to present a *Daubert* ruling of another court regarding plaintiff's expert because the court had already made a decision on the expert's admissibility and this "would be an attempt to circumvent [the court's] role as the 'gatekeeper' in this case by asking the jurors to substitute for [the court's] the judgment of another court, in another case"). Because any such irrelevant challenges or exclusions of Plaintiffs' experts have no probative value and are highly prejudicial, Rough Country should be precluded from referencing any such evidence, if it exists. *See* Fed. R. Evid. 401, 402, 403.

**19.**    **<u>Any reference to cars driven by witnesses.</u>**[9]

Whether any witness owns or has ridden in a lifted vehicle is irrelevant.  Too frequently in product cases like this, defense counsel will try to elicit testimony or argue that they, or some witness owns or drives a vehicle like the subject vehicle or bought a vehicle like the subject vehicle for their children.  Whether any witness owns, has ridden in or would ride in a lifted pickup truck does not have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401; 402.  Even assuming such evidence did have some probative value, its probative value is substantially outweighed by its unfairly prejudicial effect.  Fed. R. Evid. 403.

Such personal "vouching" is irrelevant, improper, and has absolutely nothing to do with Rough Country's lift kit raising the Ford F-250 by six inches and making the Ford F-250 tall enough to bypass the structural crash protection features of the Brysons' car.  Therefore, it should be excluded.  *See* Fed. R. Evid. 401, 402, 403; *Reynolds v. Gen. Motors Corp.*, No. 2:04-CV-106-RWS, 2008 WL 11336901, at *3 (N.D. Ga. June 2, 2008) (granting motion in limine to prevent

---

[9] RC agreed to a consent order prohibited discussion of what vehicles lawyers drive, but declined to agree to exclusion of what witnesses drive.

defense counsel from arguing or tendering evidence about cars plaintiffs' experts,

counsel, or other witnesses drive).

Respectfully submitted this 10th day of March, 2025

CANNELLA SNYDER LLC

*/s/ Tedra L. Cannella*

TEDRA L. CANNELLA
  Georgia Bar No. 881085
  tedra@cannellasnyder.com
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
  rob@cannellasnyder.com
DEVIN L. MASHMAN
  Georgia Bar No. 257588
  devin@cannellasnyder.com

315 W. Ponce de Leon Ave.
Suite 885
Decatur, GA 30030
(404) 800-4828
(404) 393-0365 (fax)
**Attorneys for Plaintiffs**

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rules 5.1(B) and 7.1(D), I hereby certify that the

foregoing filing complies with the applicable font and size requirements and is

formatted in 14-point Times New Roman font.

CANNELLA SNYDER LLC


*/s/ Tedra L. Cannella*

TEDRA L. CANNELLA
  Georgia Bar No. 881085
  tedra@cannellasnyder.com
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
  rob@cannellasnyder.com
DEVIN L. MASHMAN
  Georgia Bar No. 257588
  devin@cannellasnyder.com

315 W. Ponce de Leon Ave.
Suite 885
Decatur, GA 30030
(404) 800-4828
(404) 393-0365 (fax)

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed with the Clerk of Court via CM/ECF, which will automatically serve the following attorneys of record:

Richard H. Hill
Claire C. Murray
Lindsay G. Ferguson
Aaron B. Chausmer
3344 Peachtree Road, N.E.
Suite 2400
Atlanta, GA 30326
rhill@wwhgd.com
cmurray@wwhgd.com
lferguson@wwhgd.com
achausmer@wwhgd.com

This 10th day of March, 2025.

CANNELLA SNYDER LLC

*/s/ Tedra L. Cannella* _____
Tedra L. Cannella
Georgia Bar No. 881085
*Attorney for Plaintiffs*