## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | |
|---|---|
| SANTANA BRYSON and JOSHUA BRYSON, as Administrators of the Estate of C.Z.B., and as surviving parents of a deceased minor, C.Z.B., | |
| Plaintiffs, | Civil Action No. |
| v. | 2:22-CV-17-RWS |
| ROUGH COUNTRY, LLC, | |
| Defendant. | |

## DEFENDANT ROUGH COUNTRY, LLC'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE CERTAIN OPINIONS OF DR. LISA GWIN UNDER RULE 702 AND *DAUBERT*

Plaintiffs' effort to exclude certain opinions of Dr. Lisa Gwin (Doc. 147) is not unexpected given the strength of her immense qualifications and solid testimony. But Plaintiffs' efforts should be denied because their complaints go to the weight of her testimony and are better dealt with on cross-examination. Dr. Gwin's contested opinions or testimony should not be excluded.

A. PLAINTIFFS DO NOT CONTEST DR. GWIN'S QUALIFICATIONS

Plaintiffs' motion does not contest Dr. Gwin's qualifications as an expert. Nor could it, given Dr. Gwin's extensive training and experience in the field of

biomechanics[1] and human kinematics.[2] Dr. Gwin's distinctive training and background make her uniquely qualified to testify about C.Z.B.'s injuries and what caused them.[3]

At the beginning of her professional life, Dr. Gwin worked for Ford Motor Co. as an engineer for six years. [Ex. 3 (Gwin Curriculum Vitae), at 4.] At Ford, she progressed from a test engineer to a development engineer. [Ex. 1 (Gwin Depo.), at 30 (112:1-6).]

Dr. Gwin holds degrees in both engineering and medicine. She received a Bachelor of Science degree in Engineering in 1997 from the Illinois Institute of Technology, a Bachelor of Science degree in Nursing in 1995 from Wayne State University, and a medical degree in 2003 from Arizona College of Osteopathic Medicine. [*See* Ex. 3 (Gwin Curriculum Vitae), at 2.] Dr. Gwin then completed her Residency in Emergency Medicine in 2006 at the University of Kentucky. (*See id.*) She has been Board Certified in Emergency Medicine since 2008. (*See id.*, at 4.) She then served as an Emergency Physician in multiple hospital facilities across the

---

[1] Biomechanics is the "marriage between medicine and science or physics or engineering. . . . So if we marry those two together, biomechanics looks at how forces act on human tissue and can cause injury." [Ex. 1 (Gwin Depo.), at 4 (7:17-24).]

[2] Human kinematics, or occupant kinematics, is the study of human movement. [Ex. 1 (Gwin Depo.), at 4 (7:25-8:6).]

[3] In the 4 years prior to March 2024, Dr. Gwin testified as an expert at trial at least 14 times. [*See* Ex. 2 (Gwin Testifying History), 4 years ending March 2024.]

United States.[4] (*See id.*, at 2-3.) Over Dr. Gwin's 35-year career as an emergency provider, she has directly cared for thousands of trauma patients with neurological, orthopedic, and other injuries, including fatal or life and limb-threatening injuries. [*See* Doc. 147-3 (Gwin Report), at 3.] Dr. Gwin is also accredited in Traffic Accident Reconstruction. [*See* Ex. 3 (Gwin Curriculum Vitae), at 4.]

In addition to Dr. Gwin's training and work experience, she is involved in research efforts to evaluate restraint systems in frontal crash scenarios in lift trucks. [Doc. 147-3 (Gwin Report), at 3.] Dr. Gwin has also co-authored papers on a range of related topics, including whole body accelerations, crash reconstruction, lumbar accelerations, head accelerations in low-speed rear-end collisions, the risk of injury in low-speed rear-end impacts, and the analysis of restraint system effectiveness in lift truck frontal collisions. (*See id.*, at 3-4.)

Because Plaintiffs cannot attack Dr. Gwin's qualifications, they attempt an end-around to do so indirectly, arguing that Dr. Gwin's opinions – which are based on her skills, experience, and training – are insufficient or unduly biased (which is not a basis for exclusion). Plaintiffs' efforts are without merit.

---

[4] Dr. Gwin has been involved in emergency medicine in some role since 1989, when she worked as an Emergency Medical Technician (EMT). [Ex. 3 (Gwin CV), at 4.] She is further certified in Advanced Trauma Life Support and Pediatric Advanced Life Support. (*See id.*)

B. PLAINTIFF'S ARGUMENTS AGAINST DR. GWIN GO TO "RELIABILITY," WHICH IS GOVERNED BY A FLEXIBLE STANDARD

"The test of reliability is 'flexible,'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 1171, 143 L. Ed. 2d 238 (1999). "Generally, if the principles, theories, and methodologies behind the opinion are scientifically valid and can be applied to the facts at issue in the case, then the opinion has a reliable basis." *Doe v. Gwinnett Cnty. Sch. Dist.*, No. 1:18-CV-05278-SCJ, 2021 WL 12298920, at *4 (N.D. Ga. June 11, 2021) (citing *Daubert*, 509 U.S. at 592-93). Further, when considering reliability, the Court "may consider other questions [factors] in light of the specific facts of the case at hand." *Id.*

Plaintiffs do not dispute Dr. Gwin's qualifications as an expert to issue her opinions. Plaintiffs simply do not like her opinions or the factual and evidentiary basis of her opinions. But if Plaintiffs believe that Dr. Gwin's opinions are based on a weak foundation, then that "go[es] to its weight rather than its admissibility." *Noe v. Metro. Gen. Ins. Co.*, No. 1:11-CV-02026-SCJ, 2012 WL 7760143, at *3 (N.D. Ga. Dec. 10, 2012). Similarly, Plaintiff's complaint that Dr. Gwin did not perform measurements goes to the accuracy of Dr. Gwin's underlying elements, and "[i]ssues of accuracy are best resolved through cross-examination and the adversarial process." *Doe*, 2021 WL at *4.

C. Dr. Gwin Performed a Substantive, Non-Speculative Analysis (ICA).

According to Plaintiffs, Dr. Gwin's opinions are pure speculation. They are wrong. Plaintiffs' claim of improper "subjective belief" requires that Dr. Gwin lack "facts which enable [her] to express a reasonably accurate conclusion," *Cooper v. Toshiba Home Tech. Corp.*, 76 F. Supp. 2d 1269, 1277 (M.D. Ala. 1999).

But Dr. Gwin offers a comprehensive scientifically reasoned explanation for her opinions, and this "is all that Rule 702 and *Daubert* require." *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19MD2885, 2021 WL 6327375, at *12 (N.D. Fla. Sept. 2, 2021) ("scientifically reasoned explanation [is] clearly 'founded on more than subjective beliefs or unsupported speculation'"). In her Report and at her deposition, Dr. Gwin explained how she reached her rendered opinions and conclusions, and she identified and explained the evidentiary support for them. As Dr. Gwin explained to Plaintiffs (and will explain to the jury), her opinions are not speculative. They are based on her actual work, investigation, and analysis. Dr. Gwin's opinions are the antithesis of "subjective belief" or speculation.

Dr. Gwin performed an Injury Causation Analysis ("ICA") in connection with her opinions in this case. [*See, e.g.*, Ex. 4 (Gwin Decl.), at ¶¶ 6, 8, and 9.] Dr. Gwin explains ICA in detail in her accompanying Declaration (Exhibit 4).

An ICA "is the examination of a collision event in order to understand its nature and to determine its essential features, including the causation of injuries." [Cit. omitted.] ICA has been subject to peer review and publication

in multiple technical publications. [Cit. omitted.] Courts have previously accepted the ICA as reliable. [Cit. omitted.] The Court finds that Dr. Scott's methodology is sufficiently reliable under *Daubert*.

*Henson v. Deepwell Energy Servs., LLC*, No. 1:20-CV-141, 2021 WL 3388036, at *10 (E.D. Tex. June 14, 2021); *see also Taylor v. Royal Caribbean Cruises, Ltd.*, No. 18-CV-24093, 2019 WL 8362117, at *3 (S.D. Fla. Oct. 24, 2019) (ICA "is commonly applied to vehicle accidents" and ICA's "causation methodology . . . is generally accepted in medicine and epidemiology").[5] "Under *Quiet Tech*, because the ICA methodology appears scientifically sound and because [a party] can vigorously cross-examine [the expert] on inconsistencies, erroneous assumptions, and potential flaws in data inputs, the Court cannot exclude [the expert's] based on [a] reliability argument." *Johnson v. ABF Freight Sys., Inc.*, No. 2:18-CV-01835-MHH, 2020 WL 7320994, at *4 (N.D. Ala. Dec. 11, 2020).

Specifically, in this case,[6] Dr. Gwin reviewed medical records related to C.Z.B.'s injuries. [*See* Doc. 147-3 (Gwin Report), at 9-10 (describing review of medical records).] This review included reviewing imaging (radiological) studies. (*See id.*, at 10.) Next, Dr. Gwin examined photographs of Plaintiffs' 2008 Ford

---

[5] Dr. Gwin explains the ICA process, its principles, and methodology in her Declaration, including that its peer review and publication as demonstrated by Exhibit A thereto. [Ex. 4 (Gwin Decl.), at ¶¶ 5 and 6.]

[6] Dr. Gwin explains her methodology and analysis in this case in detail in her Declaration in ¶¶ 8 through 13 (responding to Plaintiff's specific complaints).

Escape and C.Z.B.'s autopsy and coroner photographs, among other images. (*See id.*) Additionally, Dr. Gwin personally inspected the vehicle actually involved in the collision (*i.e.*, Plaintiffs' 2008 Ford Escape). (*See id.*, at 10-11.) This inspection also included visually inspecting the car seat that C.Z.B. was seated in, and which showed "stress-whitening throughout," "focal tears in the cloth covering on the upper aft corners," and deformation of the car seat's shell. [*Id.*, at 10.]

Dr. Gwin then performed an "Occupant Kinematics" review and analysis. [*See* Doc. 147-3 (Gwin Report), at 11.] This review was based on numerous factors and evidence, including the uncontested "crash reconstruction" of Wesley Grimes[7], Dr. Gwin's personal inspection of Plaintiffs' 2008 Ford Escape, "the laws of physics," and other materials. [*See* Doc. 147-3 (Gwin Report), at 11 and 12.] *It is based on this analysis that Dr. Gwin reached her opinions about C.Z.B.'s fatal injuries.* [*See* Doc. 147-3 (Gwin Report), at 12 ("[t]he mechanisms of [C.Z.B.]'s reported injuries were determined" based on this review).]

This review is amply sufficient to render Dr. Gwin's opinions reliable and admissible. *See Klingenberg v. Vulcan Ladder USA, LLC*, 936 F.3d 824, 829 (8th

---

[7] Although Plaintiffs filed a *Daubert* motion as to Mr. Grimes, they do not contest Mr. Grimes's qualifications or his accident reconstruction efforts or opinions. [*See* Doc. 150 (limiting challenge to Mr. Grimes's opinions related to or arising from the Exponent crash test); *see also id.*, at 4 (admitting that "Mr. Grimes can offer his opinions about the reconstruction of the subject collision").]

Cir. 2019) (expert's testimony admissible where "conclusions were based on his experience and expertise . . ., general engineering principles, information . . . about the accident, and his examination of the damaged ladder, its design and specifications, . . ., and photos of the accident scene"); *Russell v. Whirlpool Corp.*, 702 F.3d 450, 457–58 (8th Cir. 2012) (expert "did more than simply 'eyeball'" when "[h]e observed the relevant evidence, applied his specialized knowledge, excluded alternative causal theories, and reached a conclusion," which was "more rigorous that the vague theorizing and ipse dixit logic we have rejected in the past").

There is no proverbial leap of faith because Dr. Gwin explains the evidentiary chain of causation, step-by-step, that lead to C.Z.B.'s death. According to Dr. Gwin,

> When the Ford F-250 struck the rear of the Ford Escape and deformed the rear structures including the row 2 left seat back, the child safety seat was focally deformed in the upper right area, in the location of the right side of Master Bryson's head. This caused Master Bryson's right ear laceration and ecchymosis, temporal scalp hemorrhage, temporalis muscle hemorrhage, temporal depressed skull fracture with extension across the skull base, and subarachnoid hemorrhage at the base of the brain.

[Doc. 147-3 (Gwin Report), at 12.][8]

---

[8] "The rotation of the row 2 seat back (the top of the seat back moving more than the bottom of the seat back) caused the properly anchored child safety seat to also rotate forward (top greater than bottom since it was anchored to the vehicle at the bottom). The seat belt guide on the row 2 seat back interacted with the child seat, damaging the seat belt guide. The child safety seat was twisted and bent, resulting in the documented stress whitening and buckling. This documented deformation of the

*First*, Dr. Gwin explained that, during the actual collision, "[t]he plastic belt guide for the No. 5 belt interacts with the child safety seat . . ., where the deformation is of the polymer." [Ex. 1 (Gwin Depo.), at 37 (138:15-18).] This is reflected in Exhibits 37 and 38 to her deposition:[9]



"The front left corner of that belt guide is pushed downward, and there's evidence of loading and plastic flow on that polymer." [Ex. 1 (Gwin Depo.), at 37 (140:8-10).] Exhibit 38 shows where the belt guide impacted against C.Z.B.'s car seat. [*Id.*, at 37 (140:1-10).]

*Second*, Exhibit 37 shows the "areas where the belt loop on the bench seat pushed against the car seat," [*id.*, at 37 (139:6-10)].

---

child seat brought the area to the right head restraint adjustment knob down into position to contact  [C.Z.B.]'s right ear and temple," [Ex. 4 (Gwin Decl.), at ¶ 8].

[9] Dr. Gwin drew the blue markings on Exhibits 37 to 39 during her deposition.



This chain of impacts – belt guide impacting the car seat – then caused C.Z.B.'s car seat's head restraint knob, as show in Deposition Exhibit 39 (Doc. 147-4), to impact C.Z.B's head, causing the fatal skull fracture/depression. [*See* Ex. 1 (Gwin Depo.), at 37-38 (141:25-142:11).] The point where the head restraint knob impacted C.Z.B. is indicated by the blue box on Doc. 147-5 (filed under seal). The horizontal line on Deposition Exhibit 45 (Doc. 147-7) shows where C.Z.B.'s ear would have roughly been at the time of the actual collision.




In short, Exhibit 38 impacted Exhibit 37, which caused Exhibit 39 to impact C.Z.B., thereby depressing his skull and killing him, (Doc. 147-5).

In addition to the stress whitening and cited deformations, there is further objective evidence to support Dr. Gwin's opinions: C.Z.B.'s "skull fracture was depressed, indicating contact with a small surface with a diameter of approximately 2 inches or less,"[10] [Doc. 147-3 (Gwin Report), at 12]; this is roughly a similar size at the adjustment knob at the top of the seat.

Given her specifically identified evidentiary basis and her personal examination of the seat back and child seat, it is evident that Dr. Gwin performed a "comprehensive evaluation and detailed analysis . . . in arriving at [her] opinions." *Sims v. BMW of N. Am. LLC*, No. 6:22-CV-1685-PGB-UAM, 2025 WL 714027, at *2 (M.D. Fla. Mar. 5, 2025) (allowing expert testimony where "Dr. Lichtblau's expert opinions are predicated on his independent judgment . . . and [a]

---

[10] Dr. Gwin's analysis affirmatively demonstrates that Plaintiffs' theory of C.Z.B.'s death – that his head impacted the driver's seat in front of him – is incorrect. "[T]he more important reason is Cohen Bryson's catastrophic fatal brain injuries *were not due to interaction with the driver's seat.* They're not on the front of his face. They're on the back of his head, essentially. And so we know that that's not the injury mechanism here." [Ex. 1 (Gwin Depo.), at 16 (55:1-7) (italics added); *see also* Ex. 4 (Gwin Decl.). at ¶ 13 ("we know that based on his injuries. . . his **extremities** interacted with the driver's seat . . . and therefore the driver's seat would not reach the child safety seat") (bold in original).]

comprehensive evaluation and detailed analysis performed by [him] in arriving at his opinions.").

    D.  WHETHER DR. GWIN PERFORMED ANY MEASUREMENTS IS IRRELEVANT OR IMMATERIAL TO HER OPINIONS.

Dr. Gwin repeatedly explained to Plaintiffs during her deposition that any measurements would have been irrelevant and immaterial to her analysis. Plaintiffs' argument that Dr. Gwin should have taken measurements is a red herring: it places form over substance.

What happened during the actual collision to cause C.Z.B.'s death was not based on measurements or other sorts of calculations. The photographic evidence, including C.Z.B.'s autopsy photographs (Doc. 147-5), affirmatively demonstrate what happened. Plaintiffs' disagreement with Dr. Gwin's determinations, or their counter-interpretation of the evidence, does not render Dr. Gwin's opinions unreliable, and they remain free to cross-examine her about them. "[I]t remains the jury's responsibility to make credibility determinations." *LeVeille v. Upchurch*, No. 3:19-CV-908-BJD-MCR, 2021 WL 6125468, at *1 (M.D. Fla. Sept. 2, 2021).

    1.  *Dr. Gwin Did Not Need to Measure to Determine that C.Z.B.'s Head Hit the Adjustment Knob.*

Plaintiffs argue that Dr. Gwin's testimony is unreliable and speculative because she did not take measurements to support her conclusion that C.Z.B. died because his head hit an adjustment knob on his car seat. But Dr. Gwin explained that

she reached her conclusion based on "[k]nowing how kids fit in child safety seats" and her experience. [Ex. 1 (Gwin Depo.), at 38 (142:23-143:3).] Dr. Gwin "know[s] as a physician and as a biomechanic what sorts of injuries we're going to expect with the deformation of the rear structures including the seat, the Row 2 seat, of the Escape in that position." [*Id.*, at 10 (32:1-4).] Further, as previously explained, the objective physical evidence – markings and "stress whitening" – show dynamic movement that would render measurements inaccurate. "In any crash, dynamic motion is greater than the residual static motion, which means any measurement taken would under-report the deformation" of the rest seat structures. [Ex. 4 (Gwin Decl.), at ¶ 12.]

Dr. Gwin also cited to Lewis's own surrogate work. Lewis took a photograph[11] of a surrogate child sitting in a car seat, and that photograph supports Dr. Gwin's opinions and testimony because:

---

[11] Plaintiffs filed this photograph as Doc. 147-6 because they claim that it shows that C.Z.B.'s head would be "lower in the car seat than where Dr. Gwin claims C.Z.B.'s head would have to reach to support her theory," (Doc. 147, at 8). This is an issue for the jury. Plaintiffs have no corroborating measurement to validate their conclusion.

The irony of this argument – that a photograph disproves Dr. Gwin's theory – is obviously lost on Plaintiffs, who spend significant ink complaining that Dr. Gwin bases her opinions, in part, on viewing photographic evidence without actual measurements.

. . . Mrs. Bryson had testified that Cohen was asleep at the time or right before this crash happened. She obviously wasn't looking at him right at the moment and [he was] leaning inboard or to his right.

So certainly this child is not doing that. This child is very focused on whoever is taking the picture, who I think is Mr. Lewis. But if we can imagine the child, you know, sleeping, *sitting back and leaning inboard, his -- the area of his injury is adjacent to the right head restraint adjustment knob.*

And so when the vehicle seat is rotated and pushed forward, and *the child seat is pushed forward and twisted somewhat to cause all that stress whitening, that knob interacts with Cohen Bryson's ear – I'm sorry, head, skull, in the area of his ear causing his depressed skull fracture and pushing his head forward and to the left causing his AO dissociation and brainstem injury.*

[Ex. 1 (Gwin Depo.), at 43 (162:21-163:12) (italics added).] She further explained that "the car seat warped enough to get that headrest adjustment knob down close to the top of Cohen's ear" and "he [was] pre-positioned closer to" the knob. [*Id.*, at 43 (163:13-16).] Based on the evidence of how C.Z.B. was sleeping,

his skull adjacent to his ear would be very near the location, adjacent to the location of that adjustment knob statically, and [*then dynamically as the seat rotates and the child seat rotates and the child seat is twisted somewhat, and, you know, the crash all happens, yes, it is in the area contacting his skull*.]

[*Id.*, at 43 (164:16-22)(italics added).]

2. *Surrogate Testing Would Not Have Helped Dr. Gwin*

Plaintiffs also attempt to compare Dr. Gwin's failure to use surrogate testing as part of her analysis with Lewis's use of surrogates. However, Dr. Gwin explained both why surrogate testing was not necessary in this case: surrogate testing "would

not help [Dr. Gwin] understand how far forward [C.Z.B.] was pushed due to the intruding rear structures in the subject crash." [*Id.*, at 36 (135:21-136:4).] Surrogate testing – for Dr. Gwin – "would really just be photographs of a child in a child seat in an undamaged vehicle and *wouldn't really help us understand what happened. It wouldn't add any value*" [*Id.*, at 36 (136:5-8) (italics added).]

3. *Plaintiffs' Argument about the Lack of Cargo is Immaterial*

Plaintiffs again raise the issue of the lack of cargo in the test Escape. As with their other contentions, Plaintiffs fail to provide the Court with a complete context. Rough Country's experts, including Dr. Gwin, made the intentional decision not to include cargo in the test Escape because they would have been speculating at the cargo, and that would be inappropriate.[12] [*See also* Ex. 4 (Gwin Decl.), at ¶ 9.]

| | |
|---|---|
| Counsel: | And the presence of cargo was also different in the Exponent test than the subject crash; correct? |
| Dr. Gwin: | Yes. Because the *only people who could tell us exactly what cargo and where it was didn't know, so that's an important part of science is not guessing*. And so if we were to try to put cargo |

---

[12] It was also more favorable to Plaintiffs that the test crash did not have cargo. Cargo is "just space is taken up and therefore that would push everything in front of the cargo items forward more than they already were." [Ex. 1 (Gwin Depo.), at 9 (26:18-20).] The presence of cargo would have likely made the test crash demonstrate *more* intrusion than it already showed. [*Id.*, at 11 (37:9-13) ("if the cargo had been exactly the same as it was in the actual crash, . . . then *we would have had even more forward deformation* of the Row 2 seat back") (italics added); *see also* Ex. 4 (Gwin Decl.), at ¶¶ 9 and 12.]

> in the test vehicle at Exponent, then *we would be guessing, and
> so we can't do that.*

[Ex. 1 (Gwin Depo.), at 5 (12:23-13:6) (italics added).] Indeed, one can confidently say that, if the test Crash had included cargo, that Plaintiffs would make the opposite complaint, that the cargo was included despite not knowing where it actually was.

4. *Measurements from Crash Test Dummies Would Have Been Irrelevant*

Plaintiffs argue that Dr. Gwin could have obtained data from anthropomorphic test devices ("ATDs," *i.e.*, crash test dummies) and that her failure to do so renders her opinions unreliable. Plaintiffs' argument ignores the fact that the ATDs would, like the surrogate study, would provide no value to her analysis. [*Id.*, at 24-25 (89:24-90:2).] This is in part because an ATD with gauges to measure force would not aid or assist Dr. Gwin in reaching her opinions in this case.[13] "Measuring force on a person isn't something that's done or really even possible to be useful. . . . [E]ven the federal government in vehicular crash testing doesn't use forces because they don't mean anything." [*Id.*, at 6 (15:21-16:1); *see also id.*, at 10 (33:22-25) (an instrumented ATD would not have indicated the forces on C.Z.B.'s head during the crash).] The simple fact is that what happened during the actual collision, causing C.Z.B.'s death, is already known; the "numbers" would not add anything. [*Id.*, at 7

---

[13] "[I]nstrumented dummies have some force gauges, but they're in, like, the lower spine and the upper – and the cervical spine, which is not at all what we're here to talk about today." [Ex. 1 (Gwin Depo.), at 6 (16:5-8).]

(20:8-10) ("We would have had numbers, but we already know that [C.Z.B. "would have had fatal injuries"] based on the movement and deformation of the rear structures of the Escape").]

Egregiously, Plaintiffs withhold from the Court that the test crash did include relevant measurements. The test crash was set up to track and record "G measurements." [*Id.*, at 9-10 (29:24-30:22).] These measurements confirm that the test crash would have been very harmful to C.Z.B. [*Id.*, at 10 (31:10-16) ("if [C.Z.B.] had been in our crash test, his accelerations are very high because he's in the crush zone . . . those numbers are extremely high").]

Finally, as with the cargo issue, Plaintiffs would have argued against the test crash's use or non-use of ATDs, no matter how it was conducted. If the test crash used an ATD, Plaintiffs would be complaining that they did not reliably represents C.Z.B. This is because "Cohen Bryson was not the same age or height of as a standard child Hybrid III dummy," [*Id.*, at 6 (17:21-23); *see also id.*, at 9 (28:16-19) ("the dummy would be different. I mean, which dummy is the first question. And they're very – as you know, child dummies are very different between the ages").] Plaintiffs fixate on the fact that Exponent "owns child dummies that can be ballasted to match an occupant's weight,"[14] (Doc. 147, at 15), *but they omit the more*

---

[14] *See* Ex. 4 (Gwin Decl.), at ¶ 10 ("there is no such capability in child dummies").

*significant issue of height*. According to Lewis, C.Z.B. was 87 centimeters tall. (Doc. 104-2, at 8.) But the smallest ATD, which represents a 3-year old (and not a 2-year old like C.Z.B.) is 95 centimeters (950.5 mm), a difference of over three inches (8 cm).[15] Thus, if Exponent had used a Hybrid III child ATD, not only would it not provide any value, but Plaintiffs would complain that the ATD was too tall and that that was done to skew the test crash in Rough Country's favor by bringing the ATD's (*i.e.*, C.Z.B.'s) head closer to the car seat's adjustment knob.

### 5. *Plaintiffs' Own Expert, Christopher Roche, Did the Same Thing As Dr. Gwin*

While Plaintiffs complain that Dr. Gwin did not take measurements to support her conclusions, Plaintiffs' expert Christopher Roche admits that he also reached conclusions by visually examining photographs and other images. When asked if he knew "how far [a] seat was displaced," Roche responded "I didn't measure that. But, I mean, you can get a sense from that – that image." [Doc. 127-2 (Roche Rebuttal Depo.), at 21 (81:14-17); *see also id.*, at 10 (35:14-36:9) ("is there any other evidence or information that you relied upon . . . Well, it's a combination of looking at the photographs and some of the films available . . . [and] you can kind of get a sense

---

[15] *See* https://www.humaneticsgroup.com/products/anthropomorphic-test-devices/child/hybrid-iii-children-series/3-year-old (under Product Specifications) (visited on March 13, 2025); *see also* Ex. 4 (Gwin Decl.), at ¶ 10.

from reviewing the film of the loading of that part of the – of the lift gate").] Roche

used visual examination for other opinions, too.

| Counsel: | Have you done any work to determine the impact of the height of the F-250 in the test crash on the extent of the roof crush experienced by the test Escape? |
| Roche: | . . . I looked at the change in roof deformation between the crash test and the exemplar Escape. |
| Counsel: | Okay. |
| Roche: | And you can see that there is – sorry, the crash test and the subject crash. And you can see that there's bulging in the roof in the crash test. |

[Doc. 127-2 (Roche Rebuttal Depo.), at 17 (62:9-21); *see also id.*, at 10 (34:5-9)

("what I'm trying to highlight here is that clearly, simply from a damage pattern

analysis of the two vehicles, the crash test and the subject vehicle, we can see that

the damage pattern is inconsistent between the two").]

Ultimately, experts frequently rely on their training to assess and interpret

evidence in forming their opinions, and that is what Dr. Gwin did in this case.[16] (If

---

[16] "Plaintiffs inexplicably conflate Dr. Naidich's reliance on his medical expertise and his application of that experience to the medical records at hand with inadmissible "*ipse dixit*". However, both his expert report and deposition testimony make abundantly clear that Dr. Naidich's opinions are based on the different imaging tests of Ms. Aguila's head, *his review and interpretation of those images*, his experience as a neuroradiologists for many years, and the basic relevant medical literature. [Cit. omitted.] As noted above, *these analytical steps constitute the archetypical kind of reliable methodology that this court regularly deems Daubert*

the Court strikes Dr. Grimes's opinions based on her visual review of evidence, then it should similarly strike Roche's visually-based opinions as well.)

### E. DR. GWIN'S OPINION THAT C.Z.B. WOULD HAVE SUFFERED FATAL INJURIES IF THE F-250 WAS NOT LIFTED IS ADMISSIBLE EVEN WITHOUT THE CRASH TEST

Because Plaintiffs assert that the test crash performed by Exponent is inadmissible, Plaintiffs contend that Dr. Gwin's opinion that C.Z.B. would have suffered fatal injuries is also inadmissible. This assertion is incorrect.

Plaintiffs fail to inform the Court that Dr. Gwin explained why C.Z.B.'s movement during the collision(s) would have been the same regardless of whether Mr. Elliott was driving a stock or unlifted F-250, *independent of the test crash*:[17]

> Counsel:    Is it your opinion that the movement of Cohen Bryson during collision would have been the same regardless of whether he was hit by a stock or lifted F250?
>
> Dr. Gwin:    In general, yes, that is my opinion. *The laws of physics apply whether we're struck by a lifted truck or a stock truck. And so his movement would have been the same*, in that in both case he would have been pushed forward by the rear intruding structures including his child safety seat, as well as the Ford seat, as well as all the cargo area structures, as well as, unfortunately, the Ford F250 front structures.

---

*complaint.*" *Del Campo-Aguila v. Am. Inst. for Foreign Study, Inc.*, No. 22-21146-CIV, 2023 WL 5317831, at *8 (S.D. Fla. July 24, 2023) (italics added).

[17] *See also* Ex. 4 (Gwin Decl.), at ¶ 8 ("the conclusions I have set forth in my Report are clearly not a mere characterization of a crash as 'violent'") and ¶ 11.

> And then *as the kinematic part or the inertial part of the crash began, he would move somewhat backward relative to the interior of the vehicle and then rebound forward limited, of course, by his five-point harness, and that would be the same whether the striking vehicle was lifted or stock*.

Counsel:    Okay. Would the forces on his body be the same regardless of whether he was hit by a stock or lifted F250?

Dr. Gwin:    In general, yes. Would there have been the exact number of pounds? I don't know. There's no way to know that really or even test that, but *we do know that regardless of whether the truck, the striking vehicle truck was lifted or stock, the intruding structures including his seat and child safety seat would move forward, and he would have similar forces and similar injury mechanisms between the two situations*.

Counsel:    And what testing are used to support that opinion?

Dr. Gwin:    The Exponent testing, and -- not testing, but *the actual crash*. *The laws of physics*, literature regarding rear crashes including crash tests, rear crash tests, et cetera.

[Ex. 1 (Gwin Depo.), at 6 (14:8-15:11) (italics added).] As a result, "[d]id the lift kit cause Cohen's death? No, absolutely not." [*Id.*, at 20 (73:21-22).]

When Plaintiffs' expert G. Bryant Buchner, P.E. insisted that his use of computer HVE software or mathematical calculations – rather than actual testing – was appropriate, he said it was because "[t]hey follow physics."[18] [Doc. 119-4

_____

[18] Rough Country is seeking to exclude Buchner's HVE simulations because he used the computer simulations inappropriately and for a purpose for which they were

(Buchner's Initial Depo.), at 5 (15:10); *see also id.*, at 39 (152:12-17) ("you also just use standard, you know, physics calculations from accident reconstruction . . . that's fundamentally just physics relationships").] According to Buchner, he effectively tried to do the same thing that Plaintiffs now complain Dr. Gwin did: he was "trying to . . . demonstrate *what is intuitively obvious* . . . using physics and Newton's laws," [Doc. 119-6 (Buchner's Rebuttal Depo.), at 28 (106:19-107:1) (italics added); *see also id.*, at 52 (203:14-15) ("[t]hat's the way it's done because physics dictates that"); *id.*, at 59 (233:7-9)  ("As long as we don't have physics and Newton's laws and the other evidence, I could agree with you. But we – we actually have the problem of science"); and *id.*, at 68 (267:10-11) ("the physics, the geometry of the vehicles determines it") ] Ultimately, Buchner relied on similar things as Dr. Gwin in reaching his opinions: "physics [and] accident reconstruction experience," [*id.*, at 65 (256:1-3).] (If the Court strikes Dr. Grimes's opinions based on her reliance on physics principles, then it should similarly strike Buchner's HVE-based opinions because they too are based on physics.)

F.  DR. GWIN'S INTERPRETATION OF THE "VIOLENT" CRASH TEST VIDEO AS PART OF HER ANALYSIS WAS APPROPRIATE

Dr. Gwin is an expert on how the body moves and how forces would act on a body in a collision, such as Plaintiffs' collision or the crash test. (*See* n. 1 and 2.)

---

not designed. Rough Country acknowledges that "HVE can be a reliable tool for purposes *other than calculating crush*." [Doc. 137 at 14 n. 9 (italics in original).]

Plaintiffs characterize Dr. Gwin's opinion as being based on the "violent" nature of the test crash. Again, Plaintiffs' statement is only half-truth. Dr. Gwin did not simply say the test crash was "violent," and leave it there. Rather, as noted previously, Dr. Gwin expanded on her analysis by also noting that "it's a lot of movement, and so all that structure [Row 2 seat backs] would have been pushed right into the back of" C.Z.B. [Ex. 1 (Gwin Depo.), at 7 (19:11-14).] Dr. Gwin specifically stated that her opinion was based "not just on watching the videos":

> That's the most obvious way to see how much movement there is and how violent it is, et cetera, but based on my experience in injuries, biomechanics, et cetera, and all the other crash tests that I've seen and performed and all the literature regarding real-world crashes as well as crash tests, then I can see that that would have resulted also in catastrophic, i.e. fatal injuries had Master Bryson been in the Exponent test.

[*Id.*, at 7 (21:5-12).] As an expert in biomechanics and human kinematics, Dr. Gwin is amply qualified to form an opinion based on her review of video evidence related to a crash test that she helped design.

G. PLAINTIFFS' CASES DO NOT ESTABLISH THAT DR. GWIN'S OPINIONS AND TESTIMONY SHOULD BE EXCLUDED

The cases cited by Plaintiffs stand for similar general propositions: essentially, that there cannot be "too great an analytical gap between the data and the opinion proffered." [Doc. 147, at 3 (quoting *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002).] The cases all tie into Plaintiffs' argument that Dr. Gwin's opinion was a "subjective belief," and therefore not reliable.

But Plaintiffs' argument and premise is simply not supported by the facts or evidence. Dr. Gwin repeatedly explained how and why her opinions and testimony were not merely "subjective belief," and how she came to form her opinions based on the available data/evidence. Ultimately, the flaw in Plaintiffs' premise and arguments is the belief that "data" must be objective and measurable. That is not the case. Dr. Gwin properly relied on photographic and tangible evidence, such as "stress whitening" and various deformations, and her experience to formulate her opinions. "Trained experts commonly extrapolate from existing data" or evidence. *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1331 (11th Cir. 2014). That is exactly what Dr. Gwin did; there is no "great analytical gap," unlike in *Rider*, a medial pharmaceutical where there was no epidemiological study evidence "upon which to base a conclusion that [a drug] caused hemorrhagic stroke." *Rider*, at 1203. Cases such as *Rider* have no applicability when an expert is looking at a singular event. The evidence that Dr. Gwin relied on in forming her opinions in this case is the same that any other similar expert would rely on, including Lewis and Buchner, Plaintiffs' own experts. Dr. Gwin's opinions are "empirically supported [and] rationally explained," as required by "[t]he *Daubert* trilogy," *Rider*, at 1197.

Finally, Plaintiffs argue that *Payne v. C.R. Bard, Inc.*, 606 F. App'x 940, 942-943 (11th Cir. 2015), means that Dr. Gwin cannot rely on her experience. Plaintiffs' application of *Payne* in this case is inapposite. In *Payne*, the expert was excluded

because the district court found he was not qualified to testify as an expert. 606 F. App'x at 943 (district court "conclude[ed] that Dr. Hetzl was unqualified to testify") Here, Plaintiffs do not contest Dr. Gwin's qualifications.

The Eleventh Circuit has recognized that "an expert's overwhelming qualifications may bear on the reliability of [their] proffered testimony," *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004). Admittedly, this is not the only factor and it is not determinative. "[I]t remains a basic foundation for admissibility that '[p]roposed [expert] testimony must be supported by appropriate validation—*i.e.,* 'good grounds,' based on what is known'." *Id.* What is clear is that this Court "ha[s] considerable leeway in deciding . . . whether particular expert testimony is reliable." *Id.* Dr. Gwin explained – repeatedly – her "good grounds," including known factors, such as what the photographs showed, *i.e.*, the impact of the belt guard into the car seat, which then caused the car seat's adjustment knob to impact C.Z.B.'s head, thereby killing him.

H. CONCLUSION

Accordingly, for the foregoing reasons, Rough Country shows that Plaintiffs' *Daubert* motion to exclude certain of Dr. Gwin's opinions should be DENIED.

[*Signature Page Follows.*]

-25-

This 17th day of March, 2025.

WEINBERG,  WHEELER,  HUDGINS,
GUNN & DIAL, LLC

3344 Peachtree Road, N.E.          /s/ Aaron Chausmer
Suite 2400                         Richard H. Hill, II
Atlanta, GA 30326                  Georgia Bar No. 354425
Phone:  404-876-2700               Aaron B. Chausmer
Fax:   404-875-9433                Georgia Bar No. 119998
rhill@wwhgd.com                    *Attorneys for Defendant Rough Country,*
achausmer@wwhgd.com                *LLC*

## **RULE 7.1D CERTIFICATE OF TYPE, FORMAT AND FONT SIZE**

Pursuant to Local Rule 7.1D of the United States District Court of the Northern District of Georgia, the undersigned certifies that the foregoing submission to the Court complies with Local Rule 5.1 in that it was computer-processed, double-spaced between lines, and used Times New Roman font of 14 point size.

This 17th day of March, 2025.

*/s/ Aaron Chausmer*
Aaron B. Chausmer
Georgia Bar No. 119998

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that I have electronically served the foregoing filing with the

Clerk of Court via CM/ECF, which will send a copy to the following attorneys of

record:

Tedra L. Cannella
Robert H. Snyder, Jr.
Devin Mashman
CANNELLA SNYDER LLC
315 W Ponce de Leon Ave
Suite 885
Decatur, GA 30030

***ATTORNEYS FOR PLAINTIFFS***

This 17th day of March, 2025.

*/s/ Aaron Chausmer*
Aaron B. Chausmer
Georgia Bar No. 119998