# EXHIBIT 1

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                        Page 1

1                 UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF GEORGIA

3                    GAINESVILLE DIVISION

4

5    SANTANA BRYSON and JOSHUA        )
     BRYSON, as adminsitrators of     )
6    the Estate of C.Z.B. and as      )
     surviving parents of C.Z.B., a   )
7    deceased minor.,                 )
                                      )
8                  PLAINTIFF,         )
                                      )
9    VS.                              )CASE NO.:2:22=CV=017-RWS
                                      )
10   ROUGH COUNTRY LLC,               )
                                      )
11                 DEFENDANT.         )
     _____)

12

13            REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                 FRIDAY, MAY 5, 2024

15   APPEARANCES:

16       FOR THE PLAINTIFF:

17            CANNELLAS NYDER
              BY:  Tedra Cannella
18                 Devin Mashman
                   Attorneys at Law
19            315 West. Ponce De Leon Avenue, Suite 885
              DECATUR, GA 30030
20            TELEPHONE: (404) 800-4828
              FACSIMILE: (404) 393-0365
21            E-MAIL:  info@cannellasnyder.com

22

23   (Appearances continued next page.)

24

25       REPORTED BY:          JUSTUS BALENTINE, CSR 13859

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 2

1    APPEARANCES CONTINUED:
2       FOR THE DEFENDANT:
3       WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
        BY:  Richard H. Hill, II
4          Attorney at Law
        3344 Peachtree Road, NE
5       Atlanta, GA 30326
        TELEPhone: (404) 933-6327
6       FACSIMILE: (404) 875-9433
        E-MAIL:  rhill@wwhgd.com
7
8    VIDEOGRAPHER:  Keigo Painter
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25       REPORTED BY:     JUSTUS BALENTINE, CSR 13859

Page 3

1          M A S T E R   I N D E X
2
3          FRIDAY, MAY 5, 2024
4    ALPHABETICAL/CHRONOLOGICAL INDEX OF WITNESSES
5
    PLAINTIFF'S WITNESSES     DIRECT CROSS REDIRECT RECROSS
6
    Dr. Lisa P. Gwin
7    By Ms. Cannella         6
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1          EXHIBITS
2
3                    WITHDRAWN
    EXHIBIT     FOR I.D.  IN EVD.  OR REJECTED
4
    Exhibit 15 Disclosure    171
5    Exhibit 16 CV          122
    Exhibit 17 File Materials  125
6    Exhibit 18 Testimony History  43
    Exhibit 19 Fee Schedule   110
7    Exhibit 20 Billing      86
    Exhibit 21 Preliminary File  175
8    Exhibit 22 Documents    176
    Exhibit 23 Medical Summary  177
9    Exhibit 24 Prelim Med Sum  155
    Exhibit 25 Report       29
10   Exhibit 26 Photo       155
    Exhibit 27 Radiology    152
11   Exhibit 28 Document    148
    Exhibit 29 Notes       154
12   Exhibit 30 PDF        144
    Exhibit 31 Billing Totals  96
13   Exhibit 32 Photo       153
    Exhibit 35 Annotated Photo  61
14   Exhibit 36 history list  154
    Exhibit 37 Annotated Photo  139
15   Exhibit 38 Annotated Photo  140
    Exhibit 39 Annotated Photo  142
16   Exhibit 40 Annotated Photo  146
    Exhibit 41 Photo       158
17   Exhibit 42 Photo (R0017277) 159
    Exhibit 43 Photo       160
18   Exhibit 44 Photo       161
    Exhibit 45 Photo       162
19   Exhibit 46 Photo       165
    Exhibit 47 Testimony List  185
20   Exhibit 48 Correspondence  190
21   *No Exhibit 35 available.
22
23
24
25

Page 5

1    CASE NUMBER:      2:22=CV=017-RWS
2    CASE NAME:       SANTANA BRYSON, Et Al.
3       VS. ROUGH COUNTRY LLC
4    UNITED STATES DISTRICT COURT, NORTHERN DISTRICT Of
5    GEORGIA, GAINSVILLE DIVISION     FRIDAY, MAY 5, 2024
6    COURT REPORTER:     JUSTUS BALENTINE, CSR NO. 13859
7    TIME:         9:00 A.M.
8
9       THE VIDEOGRAPHER:  Good morning.  We're going on
10   the record at 9:14 a.m. on May 3, 2024.  Please note that
11   the microphones are sensitive and may pick up whispering
12   and private conversations.  Please mute your phone at
13   this time.  Audio and video recording will continue to
14   take place unless all parties agree to go off the record.
15       This is Media Unit I of the video recorded
16   deposition of Dr. Lisa Gwin taken by the counsel for
17   Plaintiff in the matter of Santana Bryson, et al., versus
18   Rough Country LLC, filed in the United States District
19   Court, Northern District of Georgia, Gainsville Division,
20   Case No. 2:22-CV-17-RWS.
21       The location of the deposition is 1 Kaiser
22   Plaza, Suite 250, Oakland, California 94612.
23       My name is Keigo Painter representing Veritext.
24   I'm the videographer.  The court reporter is
25   Justus Balentine from the firm Veritext.  I'm not related

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 6

1 to any party in this action nor financially interested in
2 the outcome.
3       If there are any objections to the proceeding,
4 please state them at the time of your appearance.
5 Counsel and all present including remotely will now state
6 their appearances and liaisons for the record beginning
7 with the noticing attorney.
8       MS. CANNELLA: Tedra Cannella and Devin Mashman
9 for the plaintiff.
10      MR. HILL: Richard Hill for defendant,
11 Rough Country.
12      THE VIDEOGRAPHER: Okay. Will the court
13 reporter please swear in the witness, and then counsel
14 may proceed.
15      THE REPORTER: Do you solemnly state that the
16 evidence you will provide in the cause now pending will
17 be the truth, the whole truth, and nothing but the truth
18 so help you God?
19      THE WITNESS: Yes, I do.
20           DR. LISA P. GWIN,
21      having been previously duly sworn,
22 was examined and testified under oath as follows:
23           DIRECT EXAMINATION
24 BY MS. CANNELLA:
25  Q. Good morning, Dr. Gwin.

Page 7

1  A. Good morning.
2  Q. My name is Tedra Cannella. I represent the
3 plaintiffs, and I know you've done depositions before.
4 So I'll just say for the record, if I ask anything that's
5 unclear, let me know, and I'll try to do better. And if
6 you need a break, let me know as well, please.
7  A. Absolutely.
8  Q. All right. Great. This will be the deposition
9 of Dr. Lisa Gwin taken pursuant to agreement and notice
10 for all purposes permissible under the Federal Rules of
11 Civil Procedure.
12      All right. Dr. Gwin, is it fair to say that
13 biomechanics means the study of human movement?
14  A. No.
15  Q. What do you believe that the -- that
16 biomechanics is?
17  A. It's a marriage between medicine and science or
18 physics or engineering. So bio, like biology is tissue.
19 Mostly what we look at is human tissue. And mechanics is
20 the branch of physics that looks at how forces act upon
21 objects.
22      So if we marry those two together, biomechanics
23 looks at how forces act on human tissue and can cause
24 injury.
25      The definition that you gave is for occupant

Page 8

1 kinematics, which is human movement or human kinematics.
2  Q. Are you going to give testimony about
3 kinematics?
4  A. Yes.
5  Q. Kinematics is the study of human movement?
6  A. Yes.
7  Q. All right.
8       THE VIDEOGRAPHER: Tedra, hold on real quick.
9       MS. CANNELLA: Yes.
10      THE VIDEOGRAPHER: I want to make sure with the
11 video, since the video is not being used by your
12 computer, if you're looking at your computer screen,
13 you're not going to be looking at the camera potentially,
14 so I don't want your whole deposition to be you're
15 looking down at your screen --
16      MS. CANNELLA: Oh, gotcha.
17      THE VIDEOGRAPHER: -- as opposed to the camera.
18 Does that make sense?
19      MS. CANNELLA: Perfect.
20      THE VIDEOGRAPHER: So --
21      THE WITNESS: I'll look at Ms. Cannella --
22      THE VIDEOGRAPHER: Maybe you'll need to look at
23 your screen when you're looking at a document. Does that
24 make sense?
25      MS. CANNELLA: Yes. It looks to me like you're

Page 9

1 looking at me right now, so for what that's worth.
2       THE WITNESS: I am now, yes.
3       MS. CANNELLA: Okay. Great.
4 BY MS. CANNELLA:
5  Q. Would you consider yourself a scientist,
6 Dr. Gwin?
7  A. Yes.
8  Q. And do you experiments as part of your work?
9  A. Yes.
10  Q. What is the control in the context of an
11 experiment?
12  A. Someone who is not being subjected to whatever
13 the experiment is about. So like a drug study, the
14 control does not get drug, and the subject does get the
15 drug.
16  Q. So the control would be basically the normal
17 condition?
18      MR. HILL: Object to form.
19      THE WITNESS: Well, it's the one who's not
20 getting the experimental thing, whether it's a drug or
21 a -- whatever the thing we're testing.
22 BY MS. CANNELLA:
23  Q. And what's a variable?
24  A. Something that can change.
25  Q. And there's two kinds of variables, right,

3 (Pages 6 - 9)

Dr. Lisa P. Gwin                                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 10

1    independent and dependant variables?
2        A.   Probably, yes.
3        Q.   And independent is a variable that the
4    researcher changes?
5        A.   Yes.
6        Q.   And the dependant variable, are those variables
7    that change as a result of the independent variable;
8    correct?
9        A.   Correct.
10       Q.   Okay.  Do you agree that a good experiment
11   should change just one variable?
12       A.   Not always.  I mean ideally, sure, but there are
13   almost never can you only do one thing.
14       Q.   The gold standard would be to just change one
15   variable?
16           MR. HILL:  Object to form.
17           THE WITNESS:  I don't know if it's the gold
18   standard, but it would be the ideal world, Nirvana.
19   BY MS. CANNELLA:
20       Q.   And if you change just one variable from the
21   control, then you can really isolate the effects of that
22   one variable; do you agree with that?
23       A.   Yes.  That's why it would be Nirvana or ideal.
24       Q.   Okay. And do you agree that the more variables a
25   researcher changes, the more difficult it is to isolate

Page 11

1    which of those variables caused the changed condition in
2    test subject?
3        A.   Yes, in general.
4        Q.   And can you think of a way to use a control to
5    design a set of crashes that would be able to isolate the
6    amount of crush that is due just to a lift in a crash?
7        A.   Can I think of a test?  Is that what the first
8    part of the question was?
9        Q.   Yes.  Can you think of a way to use a control to
10   design a set of crash tests that would be able to isolate
11   the amount of crush that is due just to the lift?
12       A.   Yes.
13       Q.   And what is that?
14       A.   Well, you -- we would take a lifted truck, which
15   is what you're talking about, about a lift, a lift kit,
16   so we would take a lifted truck and do a crash, or we
17   would look at a crash with a lifted truck that already
18   happened.  And then we would take a non-lifted truck,
19   sort of an OEM, or original equipment, OE truck, and do
20   essentially the same crash.
21           So with the same two vehicle, same vehicle
22   lineup, same speeds, et cetera, and then compare the two.
23       Q.   Okay.  And do you agree there were at least two
24   independent variables in the crash test that Exponent did
25   in this case?

Page 12

1        A.   Sure, yes.
2        Q.   And what would those be?
3        A.   Oh, my gosh.  So independent variables are
4    things that we can create or we can set up, and those
5    would be things like -- this is not an exhaustive list --
6    things like both -- each vehicle's speed, angles of the
7    vehicle, offset of the vehicles, weights of the vehicles,
8    whether there's a lift kit or we're looking at OE,
9    original equipment.  I'm sure I'm missing things, but
10   those are some great examples.
11       Q.   And my question is about the crash test that
12   Exponent did in this case.  So there were at least two
13   independent variables in the crash test that were
14   different than the control or the crash that actually
15   happened; correct?  The lift was different; correct?
16       A.   Right.  We were testing whether OE equipment --
17   well, original equipment, i.e. no lift kit, would result
18   in similar deformation of the target vehicle.
19       Q.   Right.  So the lift kit was -- the height of the
20   vehicle was changed from the original crash, from the
21   subject crash; correct?
22       A.   Correct.
23       Q.   And then the presence of cargo was also
24   different in the Exponent test than the subject crash;
25   correct?

Page 13

1        A.   Yes.  Because the only people who could tell us
2    exactly what cargo and where it was didn't know, so
3    that's an important part of science is not guessing.  And
4    so if we were to try to put cargo in the test vehicle at
5    Exponent, then we would be guessing, and so we can't do
6    that.
7        Q.   Okay.  So it's important not to guess in
8    science; correct?
9        A.   Right, yeah.
10       Q.   And the presence of cargo and the lift are two
11   things that were different from the subject crash and
12   Exponent crash; correct?
13       A.   Yes.
14       Q.   And then there was also a difference in whether
15   there was a car seat in the Exponent test; correct?
16       A.   Correct.  A child safety seat, I would call it,
17   but yes.
18       Q.   And then there was a difference in whether there
19   were actually dummies placed in the Exponent test;
20   correct?
21       A.   Correct.  And that would be different than the
22   subject crash anyway because we wouldn't have live humans
23   in this crash test.  So you're right, though, there were
24   no dummies.
25       Q.   Could you do a test where you put -- strike

4 (Pages 10 - 13)

Dr. Lisa P. Gwin                                                      May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 14

1  that.
2        Could you take the test that Exponent did and
3  then run it again, but without the lift and use those two
4  tests to isolate how much crush was due to the lift?
5        MR. HILL:  Object to form.
6        THE WITNESS:  Yes, of course, we could.  Sure.
7  BY MS. CANNELLA:
8     Q.  Is it your opinion that the movement of
9  Cohen Bryson during collision would have been the same
10 regardless of whether he was hit by a stock or lifted
11 F250?
12    A.  In general, yes, that is my opinion.  The laws
13 of physics apply whether we're struck by a lifted truck
14 or a stock truck.  And so his movement would have been
15 the same, in that in both case he would have been pushed
16 forward by the rear intruding structures including his
17 child safety seat, as well as the Ford seat, as well as
18 all the cargo area structures, as well as, unfortunately,
19 the Ford F250 front structures.
20       And then as the kinematic part or the inertial
21 part of the crash began, he would move somewhat backward
22 relative to the interior of the vehicle and then rebound
23 forward limited, of course, by his five-point harness,
24 and that would be the same whether the striking vehicle
25 was lifted or stock.

Page 15

1     Q.  Okay.  Would the forces on his body be the same
2  regardless of whether he was hit by a stock or lifted
3  F250?
4     A.  In general, yes.  Would there have been the
5  exact number of pounds?  I don't know.  There's no way to
6  know that really or even test that, but we do know that
7  regardless of whether the truck, the striking vehicle
8  truck was lifted or stock, the intruding structures
9  including his seat and child safety seat would move
10 forward, and he would have similar forces and similar
11 injury mechanisms between the two situations.
12    Q.  And what testing are used to support that
13 opinion?
14    A.  The Exponent testing, and -- not testing, but
15 the actual crash.  The laws of physics, literature
16 regarding rear crashes including crash tests, rear crash
17 tests, et cetera.
18    Q.  Did you do anything to measure the amount of
19 force in the exponent crash test that  -- the amount of
20 force on a child like Cohen?
21    A.  Measuring force on a person isn't something
22 that's done or really even possible to be useful.
23 Certainly, you can put a force gauge on anything and
24 measure it, but even the federal government in vehicular
25 crash testing doesn't use forces because they don't mean

Page 16

1  anything.  So did I?  No, I did not.
2     Q.  What is the difference between what you're
3  saying and using, for example, an instrumented dummy to
4  measure force?
5     A.  So instrumented dummies have some force gauges,
6  but they're in, like, the lower spine and the upper --
7  and the cervical spine, which is not at all what we're
8  here to talk about today.
9        So regarding, like, head injury, which certainly
10 is applicable to what we're here to talk about today,
11 what's measured are accelerations and sometimes in crash
12 testing angular velocities.
13    Q.  Okay.  So the accelerations and forces and
14 angular velocities are different from each other?
15    A.  Do you mean accelerations are different from
16 forces which are different from angular velocities?  Yes.
17    Q.  Okay.  Did you do anything to measure the injury
18 scores?
19    A.  Well, that would take into account had
20 accelerations and angular rates and angular velocities --
21 I'm sorry, angular velocities and angular accelerations,
22 which we didn't measure in our crash test, and we also
23 don't have measured in the control, which is the subject
24 crash.
25    Q.  You testified earlier, though, that the forces

Page 17

1  would have been the same on Cohen regardless of the lift
2  or using a stock F250.
3        Would the accelerations on Cohen have been the
4  same regardless of whether a stock F250 hit him or a
5  lifted F250?
6     A.  Same answer really, in that would it be the
7  exact same number of Gs of acceleration?  I don't know.
8  But it certainly would have been similar and injurious,
9  you know, above IARVs, which are injury criteria, due to
10 the deformation of the vehicle, the Ford Escape vehicle.
11    Q.  Do you agree you could have measured
12 accelerations on a Hybrid III child dummy in the second
13 row in the Exponent crash test?
14    A.  Yes.  But, like I said, we would have been
15 guessing because we would have had to load up the cargo
16 area exactly as it was in the subject vehicle, which the
17 only people who could possible know, don't know.  So we
18 would be guessing as to where everything was and what all
19 was back there in the cargo area.  So sure, we could
20 have.
21       The other thing is Cohen Bryson was not the same
22 age or height and weight as a standard child Hybrid III
23 dummy, and therefore we would have had to guess a bit
24 there -- not guess, but not be exactly correct and using
25 independent variables as we discussed earlier.

5 (Pages 14 - 17)

Dr. Lisa P. Gwin                                            May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 18

1    Q.   Okay.  A couple of questions on that.  Have you
2  ever done a crash test with an instrumented Hybrid III
3  dummy?
4    A.   Yes.
5    Q.   And how often does the Hybrid III dummy exactly
6  match the person who was in the wreck?
7    A.   Oh, maybe half the time.
8    Q.   Okay.  Second question is, it's your opinion, as
9  I understand it, and correct me if I'm wrong, that the
10 cargo would have increased the forward movement of the
11 second row in the crash test if it had been added enough
12 to cause Cohen's death; correct?
13   A.   Let me clarify.
14   Q.   Okay.
15   A.   So in our test at Exponent, had we known, i.e.
16 had the Brysons known exactly what was in the cargo area
17 in the subject vehicle at the time of the crash and
18 exactly what it was, had we recreated that in our test
19 at Exponent, would there have been more deformation or
20 more forward movement of the Row 2 seat backs, and
21 therefore had Cohen Bryson been in our Exponent crash
22 test, would he still have suffered his fatal injuries in
23 our crash test, I think that's what you're asking, and
24 the answer is yes.
25   Q.   Would he have suffered the same injuries, fatal

Page 19

1  injuries, in the Exponent crash test without the cargo?
2    A.   Still likely because of the amount of
3  deformation that we can see on the -- mostly on the
4  videos of the crash test.  So even so, yes, but there
5  would have been more deformation forward had all the
6  stuff been in the cargo area.
7    Q.   How do you know that he would have died in the
8  Exponent crash test, even without the cargo?
9    A.   Because I have seen the crash test results
10 including the videos that show the deformation and
11 forward movement of the Row 2 seat backs, and it's very
12 violent, it's very fast, it's very -- it's a lot of
13 movement, and so all of that structure would have been
14 pushed right into the back of Master Bryson.
15   Q.   So then the cargo is irrelevant?
16   A.   Well, not really irrelevant, like let's not talk
17 about it at all because it was part of the subject crash.
18   Q.   And isn't it true that if the Exponent crash
19 test had included a Hybrid III instrumented dummy in the
20 same place that Cohen was, then we would have a very good
21 idea of whether he would have survived, but for the
22 cargo, regardless of the cargo?
23       MR. HILL:  Object to form.
24       THE WITNESS:  So in other words, had we put a
25 dummy, either an infant or three-year-old dummy, neither

Page 20

1  of which match Cohen Bryson, in the spot, in the No. 4
2  position, and ran the Exponent test -- an instrumented
3  child dummy, and ran the Exponent test, we would have had
4  a really good idea, is what you're saying, of whether he
5  would have had fatal injuries?
6  BY MS. CANNELLA:
7    Q.   Correct.
8    A.   We would have had numbers, but we already know
9  that based on the movement and deformation of the rear
10 structures of the Escape.
11   Q.   Well, you wouldn't have just had numbers, you
12 would have had numbers that correspond to injury values;
13 correct?
14   A.   Right, right, exactly.  We would have had
15 numbers.
16   Q.   And that's -- sorry.  I didn't mean to interrupt
17 you.
18       That's what NHTSA and car manufacturers use to
19 determine whether someone is likely to survive a crash;
20 correct?
21   A.   In frontal and side crashes, yes, that's what
22 they use.
23   Q.   Okay.  The -- you said something else I wanted
24 to ask you about, and I think I've lost it now.
25       Oh, it's your opinion, then, that you can tell

Page 21

1  that Cohen would have died in this crash just by looking
2  at the crash test videos and what's -- and the violence,
3  you said, of the movement inside the car; correct?
4    A.   I mean, it's not just watching the videos.
5  That's the most obvious way to see how much movement
6  there is and how violent it is, et cetera, but based on
7  my experience in injuries, biomechanics, et cetera, and
8  all the other crash tests that I've seen and performed
9  and all the literature regarding real-world crashes as
10 well as crash tests, then I can see that that would have
11 resulted also in catastrophic, i.e. fatal injuries had
12 Master Bryson been in the Exponent test.
13   Q.   Is there any NHTSA procedure that allows someone
14 to decide whether a crash is survivable or someone's
15 likely to get an injury based on looking at the crash
16 tests without any dummy data at all?
17   A.   A NHTSA procedure, no.  But they also don't --
18 there is no NHTSA procedure for injuries in rear crashes
19 at all.
20   Q.   Is there any IIHS procedure that allows someone
21 to decide the likelihood of death or injury based on
22 looking at crash tests with no instrumented dummies at
23 all?
24   A.   Same answer as the NHTSA.
25   Q.   In your experience in the automotive industry,

6 (Pages 18 - 21)

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 22

1  did Ford ever have a crash test procedure where a person
2  could just look at the crash test and say whether there's
3  likely to be significant injury or death?
4      A.   I didn't work in crash testing at all at Ford,
5  so I have no idea.
6      Q.   Your disclosure says you will testify regarding
7  all aspects of the exemplar crash testing; is that
8  correct?
9      A.   All as it pertains to kinematics and
10 biomechanics and injury causation.  There are others,
11 including Mr. Grimes and Mr. Crosby, who will talk about
12 their parts of it.
13     Q.   And can you talk about the setup of the crash
14 test at all, or is that left to somebody else?
15     A.   In terms of biomechanics and injury caution and
16 kinematics, yes, but not, you know, how the crash testing
17 data collectors work and things like that.  That would be
18 others.
19     Q.   Did you help design the crash that Exponent did?
20     A.   In terms of biomechanics and injury caution,
21 yes, but not in terms of speeds and vehicle lineups and
22 things like that.  That was others.
23     Q.   Okay.  And how did that -- how did you give your
24 contributions to the design setup.
25     A.   We had calls before the testing with the group

Page 23

1  where everybody gave their input about their piece,
2  reconstruction, et cetera, and I gave my opinions at that
3  time regarding injury caution, kinematics, and
4  biomechanics.
5      Q.   And what were those opinions at the time?
6      A.   That likely we would find out, but likely based
7  on what I understood others' opinions to be, we would
8  still get lots of deformation of the rear structures even
9  without the lift kit, which would be injurious,
10 catastrophically injurious, and opinions about heights
11 and weights of occupants in the vehicles -- vehicle, the
12 Ford Escape, things like that.
13     Q.   Okay.  And who were on those calls and a part of
14 those discussions in deciding the test setup?
15     A.   Mr. Grimes, Mr. Crosby, and various lawyers.
16 Mr. Hill was certainly on some of them.  Ms. Ferguson was
17 certainly on some of them.
18     Q.   Do you remember how many conversations you had
19 about the test setup?
20     A.   I don't.
21     Q.   Was there somebody who was, like, driving the
22 car on this -- well, that's a bad analogy.
23          Is there somebody who was in charge of the test
24 setup, and everybody else was contributing, like kind of
25 a primary person who was in charge of deciding?

Page 24

1      A.   No.  We all contributed.  Ultimately, the actual
2  doing of it fell to Mr. Crosby, but he wasn't like the
3  one that made final decisions or anything like that.  We
4  all gave our input, but ultimately he was the boots on
5  the ground that made it happen.
6      Q.   And did the lawyers contribute to the decisions
7  about how to set up the test at all?
8      A.   No.  That's an engineering expert role.
9      Q.   Why didn't you or Exponent or any other expert
10 want to put a car seat in the vehicle during the crash
11 test?
12     A.   Well, like we talked about, the child safety
13 seat was deformed by the rear structures including likely
14 the cargo area -- what's a good word for stuff that
15 doesn't sound so -- equipment, I guess, the items that
16 were in the cargo area likely contributed to the
17 deformation of the child safety seat, which likely
18 interacted with Master Bryson's head and caused his
19 catastrophic injuries.
20          So putting a child safety seat in there without
21 the cargo area items was basically same reason as the
22 cargo area items.  Since we don't know exactly what or
23 where any of those items were, putting a child safety
24 seat in there likely wouldn't change anything -- well,
25 let me rephrase that -- likely wouldn't -- what's the

Page 25

1  words I'm searching for -- likely wouldn't be applicable
2  in our crash test because we didn't have the cargo area
3  items back there to interact with the seat, the Row 2
4  seat and the child safety seat.
5      Q.   Do you agree that the child seat helped hold up
6  the second row in the subject crash?
7      A.   Helped hold it up?
8      Q.   Correct.  So the child seat was pushing back
9  against the second row during the subject crash?
10     A.   Somewhat.
11     Q.   And I guess I -- I'm not -- I understand why --
12 I think I understand why you didn't put the cargo in.
13 You didn't put the cargo in because you didn't know where
14 it was; correct?
15     A.   Right.  I mean, the only two people who could,
16 didn't, so we certainly couldn't know.
17     Q.   Okay.  And would the deformation to the second
18 row seat change based on where the cargo was in the
19 trunk, there again?
20     A.   Potentially.  That's exactly it.  So for us to
21 guess, we might be adding a guessed, g-u-e-s-s-e-d, not
22 guest like a visitor, guessed variable.
23     Q.   Is it possible that -- let me strike that.
24          Would the cargo all need to be stacked on top of
25 each other to create the deformation that we see in the

7 (Pages 22 - 25)

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 26

1 subject crash in your opinion?
2     A.  I don't know.  I don't know exactly how it was
3 all in there.  I don't know.
4     Q.  But it is your opinion that if you put the cargo
5 in there, then it will cause the deformation of the
6 second row to look like it did in the Bryson's crash;
7 correct?
8     MR. HILL:  Object to the form.  Go ahead.
9     THE WITNESS:  I guess I will agree, but say --
10 yeah, I'll just agree.  Yes.
11 BY MS. CANNELLA:
12    Q.  How is it not guessing that if you put the cargo
13 back there, that it will cause the same deformation?
14    A.  Because the cargo takes up space.  I mean, we
15 know that the F250 got all the way beyond the C pillar in
16 the Escape, even with no cargo in the area.  So if we add
17 cargo items, it's just a space issue.  It's not guessing.
18 It's just space is taken up and therefore that would push
19 everything in front of the cargo items forward more than
20 they already were.
21    Q.  All right.  But it would push them forward more
22 -- like the amount of how much it would push them forward
23 depends on where you put the items; right?
24    A.  Right.  And that would be the guessing part,
25 about where they were.

Page 27

1     Q.  Right.  But we're still -- we're still
2 guessing -- you're still guessing, though, because you
3 don't know where the items were, so you don't know if
4 they actually would push the car -- the second row
5 forward in the same way?
6     A.  In the same way?  I mean, if they were in the
7 there the same way as they were in the subject vehicle,
8 which we will never know, no one ever will ever know, and
9 therefore we would be guessing if we tried to recreate
10 that, it will push the seat forward more than if they
11 weren't there.
12     The cargo that we do know was in -- was in that
13 area was a stroller -- I know you know this, but a
14 stroller, a shop vac.  I mean, none of these were just
15 tiny things.  But, sure, if we threw, you know, pens and,
16 you know, water bottles on the floor -- and I sound
17 facetious, but I'm trying to make the point that, yeah,
18 that wouldn?t have anything to do with it, or if we took
19 something and put it all the way to the right, but
20 something small, it would have no interaction, and it had
21 no interaction with the left portion of the Row 2 seat,
22 then, right, it wouldn't change anything.
23     But we know that the actual you cargo interacted
24 with the Row 2 seats including the left portion of the
25 rear -- Row 2 seats because there's pieces of the broken

Page 28

1 items in the cargo area on the subject vehicle, and the
2 shop vac drum is just flattened.
3     So we know they're back there.  We just don't
4 know exactly where, but either way, they definitely
5 interacted with the Row 2 seat, and there's evidence on
6 the back of the Row 2 seat of this interaction on the
7 subject vehicle as well to show that.
8     Q.  Have you ever put a dummy in a second row, an
9 instrumented dummy, and taken measurements during a crash
10 test?
11    A.  I don't think I ever have on a test that I've
12 done or been involved in.
13    Q.  Would the Hybrid III child dummy in a car seat
14 in the second row in an Exponent test give you useful
15 data in this case?
16    A.  Maybe, but not likely because the dummy would be
17 different.  I mean, which dummy is the first question.
18 And they're very -- as you know, child dummies are very
19 different between the ages, if you will.  So maybe.
20    Q.  And why did you attend the crash testing in this
21 case?
22    A.  I typically attend crash testing that I'm
23 helping to design because there are always questions at
24 the last minute, A; and, B, because it's really nice to
25 see the whole setup and make sure that everything's been

Page 29

1 communicated right.
2     Mr. Crosby is really good at what he does, so,
3 knock on wood, I've never found anything at the last
4 minute where I said, Charlie, that's not what I said at
5 all.  But I always like to be there just to lay eyes on
6 the entire setup before it runs.
7     Q.  Okay.  I want to -- let me share my screen.  I
8 want to look at your report real quick.
9     Okay.  I've marked it as Plaintiff's Exhibit 29
10 [sic].  Can you see that there?  I think you have it on
11 your computer as well?
12    A.  Yes.
13    Q.  All right.  So it's Plaintiff's Exhibit 25.  I
14 hope I said that.  Page 10 of your report talks about the
15 crash test.  Can you see that there?
16    A.  I do.
17    Q.  Okay.  Is everything that you rely about the
18 crash test in this paragraph, or is there other things
19 that you're relying on?
20    A.  I rely on the entire test, so all the videos,
21 all the photos, the report, and that's why I said at the
22 last, "Please refer to the test report for further
23 details," so there's videos, photos, et cetera.
24    Q.  Were any G measurements taken during the crash
25 testing?

8 (Pages 26 - 29)

Dr. Lisa P. Gwin                                     May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 30

1    A.   Yes.
2    Q.   And what were the results of those?
3    A.   I'd have to look at the report, I don't remember
4  the exact numbers.  I can take a look if you would like
5  me to.
6    Q.   That would be great.  Thank you.
7    A.   Okay.  So I'm starting on page 95 of the
8  Exponent report.  The longitudinal acceleration of the
9  left racker panel at the B pillar of the Ford F250 maxed
10 out at about negative 16 and a half Gs.  The lateral
11 acceleration of the left racker panel at the B pillar of
12 the Ford F250 maxed out about positive and negative 2 Gs.
13   Q.   I'm actually -- I'll stop you and save you some
14 time.  I'm only looking for the Escape.
15   A.   Okay.  I'm on page 119 of the Exponent report.
16 The longitudinal acceleration of the left racker panel at
17 the B pillar of the Ford Escape maxed out about 25 Gs.
18 The lateral acceleration of the left racker at the
19 B pillar of the Ford Escape maxed out about positive
20 9 Gs.  And the vertical acceleration of the left rocker
21 at the B pillar of the Escape maxed out about 16 Gs
22 positive and negative 11 and a half Gs.
23   Q.   Okay.
24   A.   The resultant acceleration at the left racker --
25 of the left racker at the B pillar of the Escape was

Page 31

1  about 25 Gs.
2    Q.   Let me ask you this, and I realize you might not
3  have finished telling me all these things, but what I
4  really would like to know is are these survivable forces?
5    A.   So of a rocker panel, I mean, no one's ever got
6  their body parts on the rocker panel, so there's no
7  number -- there's no answer to that question.
8    Q.   Do you know what the Gs were or would be on
9  occupants in the vehicle in the Exponent crash test?
10   A.   It depends on the occupant, but for the -- for
11 Cohen Bryson if he had been in our crash test, his
12 accelerations are very high because he's in the crush
13 zone.  And, basically, the 50 approximately mile-an-hour
14 truck with the cargo area and rear structures and his
15 seat are pushing against him, and so those numbers are
16 extremely high.
17        The front occupants, their numbers are much
18 lower.  We know in the subject crash -- no, we don't.
19 Never mind.  Strike that last half of a sentence.
20   Q.   Okay.  What I'm -- so a few questions on that.
21 Number one, we don't know what the Gs would be on Cohen
22 in the crash test because there was no instrumented dummy
23 placed there; correct?
24   A.   Right.  Like I said before, I could have a
25 number if we did that, but we don't really need a number

Page 32

1  because I know as a physician and as a biomechanic what
2  sorts of injuries we're going to expect with the
3  deformation of the rear structures including the seat,
4  the Row 2 seat, of the Escape in that position.
5    Q.   Okay.  But my question is specific, that we
6  don't know the Gs that Cohen would have experienced
7  because we don't have the dummy in the back seat of a
8  crash test; correct?
9    A.   Right, exactly.  And we don't have the cargo for
10 the reasons we've talked about already that I won't
11 reiterate.  So, right, I would have a number, but it
12 wouldn't really change anything because we wouldn't be
13 able to compare it to the control because we don't have a
14 number for the actual Cohen Bryson in the actual crash.
15 So then we wouldn't have anything to compare it to.
16        So we talked first in this deposition about
17 controls and then independent variables, and so we
18 wouldn't have a control to compare it to.
19        But we have our test to know that this is a
20 catastrophic crash for a person in that position,
21 unfortunately, regardless of whether there's a lift kit
22 or not.
23   Q.   And we don't have the Gs for the front occupants
24 because there's no Hybrid dummies in the front seat;
25 correct?

Page 33

1    A.   Right, correct.  And again, it wouldn't really
2  mean anything if we did have those numbers because we
3  don't have the controls and because those numbers would
4  be much lower than in the crash zone.
5    Q.   Is it your testimony that you can't use crash
6  test dummy numbers in -- to help you with your analysis
7  unless you have the G numbers and the injury score
8  numbers from the subject test?  I mean, that's never the
9  case; correct?
10   A.   It is almost never the case, but no, that's not
11 what I'm testifying to.  I'm saying that that is one
12 reason that it wouldn't matter.  I'm not saying that I
13 can't use those numbers if we had them.  The problem is
14 those numbers would be based on a guess about the cargo.
15   Q.   Okay.  So kind of going back to what I was
16 saying, it's possible to collect information about Gs on
17 a front occupant and a back occupant in the Exponent
18 crash test; correct?
19   A.   Yes.
20   Q.   And that was not done here; correct?
21   A.   Correct.
22   Q.   Okay.  And do you agree that an instrumented
23 dummy would have told you the forces on Cohen's head
24 during the crash if the F250 had not been lifted?
25   A.   No.

9 (Pages 30 - 33)

Dr. Lisa P. Gwin      May 3, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 34

1  Q. Okay. And the G values that we do have from the
2  crash test are not the level that would cause someone a
3  fatal injury absent some impact to them; correct?
4  A. So just -- you know, is 25 Gs capable of
5  causing a catastrophic brain injury without impact? I
6  mean, anything's possible, but no, that would not rise to
7  the level of a reasonable degree of certainty.
8  Q. And it's your opinion that you could put items
9  in the trunk and run the crash test, but because you
10  don't know where they were, you didn't?
11  A. Where they were and what all they were. We know
12  of some, but we don't know what was back there, and we
13  don't know where everything was back there.
14  Q. Okay. I want to show you a picture from the
15  Exponent crash test that I've marked as Plaintiff's
16  Exhibit 33. Can you see that? That's not helpful.
17  That's not what I wanted. That's the whole thing. One
18  second.
19  Seems that I've marked this as Plaintiff's
20  Exhibit 32. Do you see that picture?
21  A. I do, yes.
22  Q. Is it your opinion that this amount of
23  deformation was enough to cause a fatal injury to Cohen?
24  A. Yes. We're looking at a static photo here, so
25  in this crash -- you know, in the crash that caused this

Page 35

1  deformation, yes.
2  Q. And do you agree that the Exponent crash test is
3  not intended to represent what would have happened in our
4  crash, but for the lift?
5  MR. HILL: Object to form.
6  THE WITNESS: I'm not sure exactly what you're
7  asking me.
8  BY MS. CANNELLA:
9  Q. Well, do you agree that the crash test that
10  Exponent did doesn't represent what would have happened
11  in our crash, but for the lift?
12  MR. HILL: Object to the form.
13  THE WITNESS: I guess it's the "but for the
14  lift." I think I might know what you mean, but I don't
15  want to guess, so I'm not sure how to answer that
16  question.
17  BY MS. CANNELLA:
18  Q. Okay. I'll try again. The picture that I just
19  showed you, Plaintiff's Exhibit 32 -- I'll pull it up
20  again. The crash test -- well, strike that.
21  Plaintiff's Exhibit 32 in your opinion does not
22  look like what the second row seat would have looked like
23  in the subject crash had the F250 not been lifted?
24  MR. HILL: Object to the form.
25  THE WITNESS: In general, it does, yes. It

Page 36

1  would have been deformed forward, rotate the left portion
2  would have been rotated counterclockwise when viewed from
3  above just like it is here, but there would have been
4  more forward deformation of those two seat backs with --
5  Q. How much more?
6  A. The -- cargo in place because we know the cargo
7  was in place in the actual crash.
8  That would be a guess. You asked me how much
9  more, and that would be a guess because we don't, again,
10  know exactly what was back there and where everything was
11  back there.
12  Q. And so again, Plaintiff's Exhibit 32 is not what
13  would have happened in our crash if the F250 had not been
14  lifted?
15  MR. HILL: Object to the form.
16  BY MS. CANNELLA:
17  Q. It would look different?
18  A. It would be even more deformed, but yes, it does
19  show the splitting of the back two seats because it's a
20  60/40 split. It does show counterclockwise rotation of
21  the left seat back. It does show forward tilting of the
22  seat back. So yes, in way more ways than no. The only
23  no is that it would be more deformed.
24  Q. And where would it be more deformed?
25  A. The whole seat -- both seat backs.

Page 37

1  Q. No matter where you put the cargo, both seat
2  backs would be more deformed forward; correct?
3  A. No. As we talked about before, it's possible
4  that you could jam everything maybe all the way to the
5  right side of the vehicle, and then not get any
6  deformation of that left seat back, but that's not what
7  happened in either case, so there's no point in talking
8  about that.
9  But if the cargo had been exactly the same as it
10  was in the actual crash, which we will never know what
11  that was, then we would have even more forward
12  deformation of the Row 2 seat back, even without a lift
13  kit on the F250.
14  Q. And can you tell the Court how many more inches
15  of forward deformation there would have been?
16  A. No. I cannot for the reasons that we've already
17  discussed.
18  Q. Looking at Plaintiff's Exhibit 32, what in this
19  picture causes the impact to Cohen that would kill him?
20  A. What caused the impact to Master Bryson is the
21  deformed child safety seat with the Row 2 seat behind it,
22  which is being deformed in interacting with the child
23  seat and all the cargo behind it and the cargo -- the
24  lift gate behind it and the Ford F250 behind it.
25  Q. Can you circle -- well, back up.

10 (Pages 34 - 37)

Dr. Lisa P. Gwin                                                                May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 38

1      Your report says that his injury has to be
2   caused by something two inches or less; correct?
3      A.   Right.  A diameter, yes, because he has a
4   depressed skull fracture.
5      Q.   So can you circle on Plaintiff's Exhibit 32 the
6   two-inch or less item that would cause the skull
7   fracture?
8      A.   No.  It was the child seat which was interacting
9   with the belt guide for the No. 5 position with all the
10  other things stacked up behind it that I talked about a
11  minute ago.
12     Q.   Which belt guide are you talking about?  Can you
13  see it on this picture?
14     A.   Yes.
15     Q.   Okay.  Can you circle it?
16     A.   Maybe.  I'm trying to remember how to do it, now
17  view options, annotate.
18     Q.   Okay.  So the belt guide that you've just
19  circled is that black piece of plastic that's coming out
20  of the second row seat?
21     A.   Yes.
22     Q.   Okay.  And it's your testimony that that is the
23  two-inch or less diameter piece this caused the focal
24  injury that broke his skull; correct?
25     A.   No.

Page 39

1      Q.   Well, I'll rephrase.  It's that piece that you
2   circled in blue that hit the car seat and then that force
3   got translated to his skull; correct?
4      A.   Yes.  But also it deformed the child safety
5   seat, not just transmitted force.
6      Q.   All right.  I'll take a -- oh, did I mess it up?
7   I probably did.  Oh, well.  We got it on the video.
8           All right.  Do you agree that the kinematics in
9   an offset crash versus a crash that's not offset are
10  different?
11     A.   In general, yes.
12     Q.   And do you agree that kinematics can change when
13  the amount of offset changes?
14     A.   Yes.
15     Q.   Does Ford do any crash testing with items in the
16  cargo area to your knowledge?
17     A.   Not to my knowledge, but I'm not privy to such
18  information, so I have no idea.
19     Q.   Do you agree that Cohen would have been
20  protected from objects flying towards him from the cargo
21  area by the car seat?
22          MR. HILL:  Object to the form.  Go ahead.
23          THE WITNESS:  Flying toward him, so in other
24  words, like airborne objects?
25  BY MS. CANNELLA:

Page 40

1      Q.   Striking him?
2      A.   I'm not aware of any airborne or flying objects,
3   but sure, in theory, if anything was flying through the
4   air behind him, he had a child safety seat behind him
5   that may have interfered with that, those hypothetical
6   items.
7      Q.   Did you look at any testing of the car seat that
8   was used in this case?
9      A.   Any what kind of testing?
10     Q.   Any testing, product safety testing?
11     A.   I'm sure I have for other cases, but, FYI, those
12  are all frontal and maybe side, certainly no rear crashes
13  that I'm aware of.
14     Q.   So you're not relying on any testing of the car
15  seat in this case for your opinions; correct?
16     A.   Correct.
17     Q.   And you didn't consider any for your opinions?
18     A.   Right.  They're inapplicable.
19     Q.   Well, did you ask for any testing from the car
20  seat manufacturer?
21     A.   No.  Because I know what they run from other
22  cases, and it would be inapplicable to this case.
23     Q.   Do they run any materials durability tests?
24     A.   Yeah, probably.
25     Q.   Did you consider any material durability testing

Page 41

1   from the car seat manufacturer in your opinion?
2      A.   No.  Because this isn't about wear and tear,
3   which is what durability testing would test.
4      Q.   Do you agree that car seat manufacturers know
5   there are belt guides that can be behind their car seats
6   in a crash?
7      A.   I have no way of answering that.
8      Q.   Well, have you seen belt guides on second row
9   seats pretty frequently?
10     A.   I don't know.  I've never really thought about
11  it.  There are some that are seat mounted like that,
12  there are some that are roof mounted, there are some that
13  are just lap belts, so I don't know.
14     Q.   Did you do any force testing of the child
15  restraint in this case to see how much force it would
16  take for the belt guide to cause a force that would go
17  through the car seat and reach Cohen and kill him?
18          MR. HILL:  Object to the form.  Go ahead.
19          THE WITNESS:  FYI, I've never said that that
20  happened, so no.
21  BY MS. CANNELLA:
22     Q.   Did you do any kind of testing to analyze the
23  effect of -- or the ability of the car seat to protect a
24  child from the kind of forces that you're talking about?
25          MR. HILL:  Object to the form.

11 (Pages 38 - 41)

Dr. Lisa P. Gwin                                          May 3, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 42

1      THE WITNESS:  Did I do any testing?  No.
2  BY MS. CANNELLA:
3      Q.  Do you know of any papers that talk about how
4  much force a car seat will be able to protecting a child
5  from in a rear impact?
6      MR. HILL:  Same objection.
7      THE WITNESS:  No.
8  BY MS. CANNELLA:
9      Q.  Car seats are designed to protect children in
10 crashes; correct?
11     A.  They are, and they do a fabulous job.
12     Q.  And they do that by packaging the child inside
13 the car seat; correct?
14     A.  I don't know if that's the word that they would
15 use or I would use, but they protect kids in a variety of
16 ways.  One is by tethering them to the vehicle like a
17 seat belt does, which we know is very helpful in reducing
18 injuries.  Child safety seats provide ride down so that
19 forces are reduced, and yes, I think maybe what you mean
20 by packaging is like side wings to protect in side
21 impacts, et cetera.
22     Q.  And how does a car seat protect a child from a
23 rear impact?
24     A.  Well, let's just talk about forward facing seats
25 because that's what's applicable here, and they provide

Page 43

1  tethering, if you will, connecting the child to the
2  vehicle so they're not flying around and moving up,
3  ramping up, seat backs in rear crashes.  They provide
4  some amount of ride down mostly in rebound, but also in
5  the initial impact.  And they do provide surrounding the
6  child on three sides, essentially, or at least their head
7  on three sides if it's sort of an angled collision, rear
8  collision, kind of a thing.
9      Q.  Okay.  Have you served as an expert in a car
10 seat case before?
11     A.  I have.  I've been hired by child safety seat
12 manufacturer lawyers in several cases.
13     Q.  And what were the names of those cases?
14     A.  The only way I could know for sure is to look at
15 my testifying history, and then that would just be the
16 ones that I've testified in.
17         Do you want me to do that?
18     Q.  Sure.  That would be great.  Let me pull it up
19 because I've marked it too, so I'll just pull it up for
20 the record.
21         I have previously marked Plaintiff's Exhibit 18,
22 which is your updated testimony history.  Do you see that
23 there?
24     A.  And it starts with Hofer at the top, H-o-f-e-r?
25     Q.  Yes, ma'am.

Page 44

1      A.  Perfect.  Yes, that is the most recent.
2      Q.  Okay.  And if you want to look at it here, we
3  can, or if you want to look at it on your computer is
4  fine.  But can you tell me which ones were car seat
5  cases?
6      A.  Yes.  Stand by.  The first one is Frost, like
7  cold air, Kristina versus Evenflow.
8      Q.  Which page are you on?
9      A.  Oh, sorry.  Page 3, about half-sh way down.
10     Q.  Okay.
11     A.  Though I've lost it now.  There we go.
12     Q.  Okay.
13     A.  The next is Shelton, Kimberly versus Graco.
14     Q.  Okay.  On page 4?
15     A.  Yes.  And that's it.
16     Q.  Okay.  And what were the facts of the Shelton
17 case?
18     A.  Ms. Kimberly Shelton was driving a Ford Mustang,
19 I think, and her child was in the No. 6 position in a
20 Graco child safety seat.  I don't remember what kind of
21 seat it was or if he was -- I don't remember what kind of
22 seat it was.  I believe he was forward facing.
23         I believe it was a frontal crash, but I don't
24 remember for sure.  And he had some -- the child had some
25 abrasions on his face, likely from striking the No. 3

Page 45

1  seat in front of him, so that's why I think it was a
2  frontal crash.  And that's about all I remember about it.
3      Q.  Okay.  And what was your opinion in the case?
4      A.  Based on the work of other experts and myself,
5  the child was not properly restrained and was able to
6  reach the No. 3 seat back in front of him during the
7  crash sequence.
8      Q.  Okay.
9      A.  And his injuries were abrasion, basically, on
10 his face, but he did not have a catastrophic brain
11 injury.
12     Q.  Okay.  How about the Kristina Frost case, what
13 were the facts there?
14     A.  Mrs. Frost was driving a Buick.  I don't
15 remember the model.  Her school-aged daughter was in the
16 No. 4 position restrained with the vehicle seat belt.
17 Her infant son was in the No. 6 position restrained in
18 a -- an Evenflow child safety seat with a five-point
19 harness.  I believe he was forward facing.
20         The vehicle caught on fire while she was
21 driving.  She pulled to the side of the road and
22 attempted to rescue her children from the back seat and
23 was unable to get either of her children out of the
24 vehicle.  The male child in the Evenflow seat died in the
25 vehicle.

12 (Pages 42 - 45)

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 46

1    Q.  Okay.  And so do you remember the defect alleged
2  there?
3    A.  Yes, that the push button on the crotch strap
4  was inaccessible or too hard to activate, and therefore
5  she couldn't help her child out of the seat.
6    Q.  And what was your opinion in that case?
7    A.  Based on the fire, she couldn't really reach her
8  male child to activate the button based on her injuries
9  and his and testimony, witness testimony, and her own
10  testimony and the fact that she also couldn't extricate
11  her female child who was just in a -- in the vehicle
12  restraint.
13    Q.  Okay.  All right.  Do you have any opinions
14  about the car seat installation in this case?
15    A.  I do not.  It seems like it was proper.  I have
16  no reason to argue that it was proper.
17    Q.  And you agree that the Brysons used the
18  five-point harness to secure Cohen?
19    A.  Yes.
20    Q.  And the five-point harness was being used
21  properly; correct?
22    A.  As far as I can tell, yes.  I have no reason to
23  argue with that.
24    Q.  And you agree that a forward facing positioning
25  was appropriate under the user manual for this car seat

Page 47

1  for Cohen?
2    A.  I do.
3    Q.  Did Cohen stay tethered to his car seat during
4  the crash in your opinion?
5    A.  Yes.
6    Q.  Did his butt come up out of the seat at all?
7    A.  Likely not.  I mean, he certainly had some
8  forward movement as evidenced by the bruising on his
9  thighs, but he stayed restrained in the child safety
10  seat.
11    Q.  He didn't ramp up, like you talked about before?
12    A.  Correct.
13    Q.  Do you agree that dummies would have -- putting
14  dummies in the front seats would have changed the way the
15  front seats moved in the crash, in the crash test?
16    A.  Somewhat.  The applicable one would be the
17  driver's seat, obviously, in this case.  And Mrs. Bryson
18  was pretty tiny, so it wouldn't have changed it much.
19  Her seat didn't yield much in the subject crash, and so I
20  wouldn't expect it to yield much with a tiny dummy -- a
21  light-weight dummy to match basically her weight.
22    Q.  And is your testimony that this seat wouldn't
23  have yielded much with a light dummy based on any
24  testing?
25    A.  Yes.  I mean, based on years of experience in

Page 48

1  this world and the literature about these types of
2  things.
3    Q.  Did you look at any testing of the Ford Escape
4  with dummies in it to come to your opinion that the seat
5  wouldn't have yielded much?
6    A.  I did not because there is no testing with a
7  130-approximately-pound person.
8    Q.  Well, there's a 5 percent Hybrid III dummy;
9  correct?
10    A.  Not in rear testing, no.  They use the 50th male
11  in rear 301 Testing.
12    Q.  Does a Hybrid III dummy, 5th percentile dummy
13  exist?
14    A.  Female?
15    Q.  Yes.
16    A.  Yes.
17    Q.  And how much does that weigh?
18    A.  90 pounds, I think, 87, something like that.
19    Q.  So if you put a 90 -- if you put a 5th
20  percentile dummy in the front seat where Mrs. Bryson was,
21  you could get an idea of how much yielding there would
22  have been in the front seat in the Exponent crash;
23  correct?
24    A.  Not really because the 5th female would be way
25  too short and way too light.

Page 49

1    Q.  So it's your opinion that it wouldn't give you
2  any helpful information --
3    A.  Not as --
4    Q.  -- if you put the dummy in the front seat?
5    A.  Not at helpful as the subject driver's seat on
6  my vehicle inspection did.
7    Q.  Did you -- could you add weights to the
8  Hybrid III dummy to take it equal to the weight of
9  Ms. Bryson?
10    A.  The 5th female, yes, but not add height, not
11  enough height anyway, to get her as tall as Ms. Bryson.
12    Q.  Did she need to be as tall as Mrs. Bryson to see
13  how the seat would yield in response to her weight?
14    A.  Yeah.  I mean, if we really want to know, yes,
15  because of the moment arm.
16    Q.  Is it your opinion that a Hybrid III dummy has
17  to be exactly like the size and weight of the subject
18  person in the crash in order to get useful information
19  from it?
20      MR. HILL:  Object to the form.
21      THE WITNESS:  Not always, but in this case if we
22  want to see if the driver's seat -- how much the driver's
23  seat would yield, then yes, we'd have to have a
24  matching -- a dummy that matched Mrs. Bryson.
25  BY MS. CANNELLA:

13 (Pages 46 - 49)

Dr. Lisa P. Gwin                                              May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 50

1    Q.  Exactly the same?
2    A.  Yes.  And we already have that data from the
3  subject vehicle, so it doesn't really add anything.
4    Q.  Do you know how much the seat yielded during the
5  crash in the subject vehicle?
6    A.  Not much.
7    Q.  Dynamically?
8    A.  Dynamically probably about 10, maybe 15 percent
9  more than it was statically, which was very, very little.
10  I have the angles that I measured if you'd like those.
11    Q.  I'm more interested in whether any of you or
12  your BRC coworkers used dummies that aren't exactly the
13  same as the person in the wreck in order to gather
14  information for your investigations.
15        Has that ever happened?
16    A.  Yes.  But not to determine yielding of a seat.
17    Q.  Never to determine yielding of a seat?
18    A.  Right.
19    Q.  Okay.  And how do you know whether there's not
20  much yielding in Ms. Bryson's seat because of her size
21  versus the fact that she could have hit her child as she
22  yielded back or hit the car seat as she yielded back?
23    A.  Because I know the static deformation compared
24  to the child seat, and if we add 10 or 15 percent to
25  that, we still don't get to the child seat.

Page 51

1    Q.  Okay.  So it's your testimony that dynamically
2  the amount that Cohen's child seat was moving forward and
3  dynamically the amount that Mrs. Bryson's front seat is
4  moving backwards wouldn't result in any contact between
5  those two?
6    A.  No, I didn't say there was no contact.  Cohen
7  has fractured extremities, so there was contact with
8  forward structures, which was likely the driver's seat
9  back.  But what I'm saying is we've certainly seen in
10  other crashes seat back yielding that is clearly stopped
11  or limited because of interaction with a row -- a seat
12  behind it or a child seat behind it, et cetera, and
13  that's not what happened here.
14    Q.  How do you know?
15    A.  Because I've been doing this a long time, and
16  I've seen a lot of crashes, and I've seen the photos from
17  this crash, and I've inspected the vehicle for this
18  crash.
19    Q.  But aside from you just saying I've been doing
20  this a long time, what physical evidence, what testing,
21  what evidence do you have to say that Mrs. Bryson's seat
22  was not held up, or it did not -- the yielding was not
23  affected by the car seat behind it?
24    A.  Photographs of the scene and my vehicle
25  inspection.

Page 52

1    Q.  Can you show me those which -- that prove --
2  that support that opinion that you're saying?
3    A.  Yes.  So I am looking at a folder of 207 photos
4  of the scene by Georgia Highway Patrol Skirt Team, SCRT.
5  Photo No. -- image -- so IMG, underscore --
6    Q.  Is this in your file?  I'm sorry.  Are
7  you just -- I don't see this in what you gave me.  You're
8  just referring to the --
9    A.  Right.  I didn't -- we didn't sort of
10  regurgitate to you with this production everything that
11  we received from Mr. Hill's office.  So yes, these are
12  photos that I received from him that he received -- well,
13  I don't know from where, but they're from Georgia Highway
14  Patrol, scene photos.
15    Q.  Okay.  What's the image number?
16    A.  9392.JPG.
17    Q.  Okay.  Got it.  Okay.  Can you see that?
18    A.  Kind of.  Let me look over here.  Yes.
19    Q.  So what about this image that tells you that
20  there was no -- that the front row driver's seat was not
21  held up by the car seat in any way?
22    A.  Well, there's separation that's relatively large
23  in between the two, and so we know that based on his
24  injuries, Cohen Bryson's injuries, that the seat -- his
25  extremities interacted with the driver's seat, his mom's

Page 53

1  seat, and therefore the driver's seat would not reach the
2  child safety seat.
3        He has a fractured left femur, fractured right
4  tibia, fibula and -- well, and his arm injuries as well.
5    Q.  Doesn't that indicate that his -- that the front
6  seat did reach him?
7    A.  It reached him, absolutely, absolutely.  They
8  reached each other, yes.  He was pushed forward, yes, but
9  her seat didn't reach the child safety seat is what I was
10  saying.
11    Q.  Can you use the annotation tool and show the
12  bottom of the child safety seat, circle that area?
13    A.  I'm going to do a square, not a circle --
14  rectangle.  Sorry.
15    Q.  Okay.  And would you agree that's extremely
16  close to the driver seat?
17        MR. HILL:  Object to the form.
18        THE WITNESS:  I mean, I don't -- I don't know
19  what extremely close really means.  It's closer than when
20  this crash started, yes.
21  BY MS. CANNELLA:
22    Q.  It looks like probably within a couple of
23  inches; wouldn't you agree?
24    A.  I don't know.  I'm -- I would have to measure it
25  to know, and I don't know how to do that on here.  So I'd

14 (Pages 50 - 53)

Dr. Lisa P. Gwin                                      May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 54

1  have to use photogrammetry, and I'd have to go back to
2  the vehicle or an exemplar to probably be able to do
3  that.
4      Q.  Okay.  So you can't give the opinion then that
5  the front seat did not -- was not held up by the car
6  seat, correct, since you don't know how much -- how far
7  it is from the car seat?
8      A.  No, I can.  Because we know that Cohen Bryson's
9  legs are between this driver seat and the seat pan of his
10  child safety seat, and so her seat, the driver's seat,
11  does not reach any part of the child safety seat.
12     Q.  Okay.  But, Dr. Gwin, what I'm trying to
13  establish is how you are basing -- what you have to base
14  your opinion on the idea that we know that the driver
15  seat was not held up by the structures behind it.
16        It's your testimony, as I understand it, that we
17  don't need to put a dummy in the front seat in the
18  Exponent crash test because we already know that the
19  front seat is not going to yield; correct?
20        MR. HILL:  Object to the form.
21  BY MS. CANNELLA:
22     Q.  Or not yield much?
23        MR. HILL:  Same objection.
24  BY MS. CANNELLA:
25     Q.  Is that right?

Page 55

1      A.  That's one of the things, but the more important
2  reason is Cohen Bryson's catastrophic fatal brain
3  injuries were not due to interaction with the driver's
4  seat.  They're not on the front of his face.  They're on
5  the back of his head, essentially.
6        And so we know that that's not the injury
7  mechanism here, so it really doesn't matter.  That's the
8  more important reason.
9      Q.  Okay.  Well, we got to get -- we got to get to
10  the bottom of it, so what I want to do is try to make it
11  simple, and so let me just ask these questions.
12        If you put weight on the front seat during a
13  rear collision, you're going to increase the amount of
14  yielding that you would see absent that weight; correct?
15     A.  Let me answer that in a second, and let me tell
16  you that Keigo, our videographer, says we have five
17  minutes left, probably four now.
18        MS. CANNELLA:  Okay.  That's fine.  We'll take a
19  break in just a few minutes.
20        THE WITNESS:  Yeah, yeah.
21        I want to see if we can finish this.
22        THE WITNESS:  No, no, that's fine.  I just
23  wanted to let you know.
24        MS. CANNELLA:  Thank you.
25        THE WITNESS:  And so the answer is if we put

Page 56

1  weight on the front seat, do we increase the chance of
2  the yielding of the driver's seat back, and the answer is
3  it depends.  I mean, if you just put a dictionary on the
4  seat pan, probably not, or I should just say no.  So it
5  matters how tall it is, et cetera.
6        But yes, if we put enough weight in the right
7  place on a seat in a rear crash test, we could see how
8  much the seat would yield.
9  BY MS. CANNELLA:
10     Q.  Okay.  And there was no weight put on the front
11  seat in the Exponent crash test; correct?
12     A.  I think that's not true.  And I am going to look
13  really quickly to make sure that I am correct on that, so
14  stand by one quick second.
15        That is not true.
16     Q.  What did they put on the front seat?
17     A.  Weight, ballast.
18     Q.  Did they put anything on the back of the front
19  seat or just on the pan?
20     A.  Well, both.  It's on the pan, and it's also up
21  against the back.
22     Q.  Hmm, how much?
23     A.  Well, stand by.  I just saw this the other day,
24  and now I'm not going to be able to find it.  Let's see,
25  54 pounds on the seat.

Page 57

1      Q.  Okay.  And in your opinion, does this help you
2  know how much the seat yielded in the crash?
3        MR. HILL:  Object to the form.
4        THE WITNESS:  No.  Because I don't need to know
5  that.
6  BY MS. CANNELLA:
7      Q.  I'm not asking what you need to know.  I'm
8  asking what the crash is telling you.  Is it true that
9  you would have more yielding with a Hybrid III dummy,
10  5 percent Hybrid III dummy in the front seat than no
11  dummy?
12     A.  Maybe.
13     Q.  Okay.  The answer to that is yes, isn't it?
14     A.  No, not necessarily.  Seats are really strong,
15  and there's a point below which they don't yield at all,
16  and with a 5th female dummy that may not reach the
17  threshold.
18     Q.  Okay.  In a crash where you get hit behind at
19  the speed that this Exponent crash was, you're going to
20  have yielding; correct?
21        MR. HILL:  Object to the form.
22        THE WITNESS:  With a 5th female dummy?
23  BY MS. CANNELLA:
24     Q.  Sure.
25     A.  I don't know.  Maybe.  I don't know.

15 (Pages 54 - 57)

Dr. Lisa P. Gwin                                                May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 58

1    Q.  Okay.  And the reason we don't know is because
2  you didn't put a dummy in the crash test; correct?
3    A.  The reason we don't know is because I don't know
4  if the weight and height of a 5th female dummy rises to
5  the level of yielding of that particular seat design; and
6  yes, if I had put a dummy in there, I would know how much
7  a 5th female dummy would cause the seat to yield, if at
8  all.
9    Q.  Okay.  And we do not know that, but we do know
10  there would be yielding with Ms. Bryson in the front
11  seat, but we don't know how much; correct?
12    MR. HILL:  Object to the form.
13    THE WITNESS:  I don't know that there would be
14  with Mrs. Bryson.
15    MS. CANNELLA:  Okay.  Let's take the break.
16    THE VIDEOGRAPHER:  Going off the record.  The
17  time is 10:47.
18    (Whereupon a short recess break was taken.)
19    THE VIDEOGRAPHER:  We're back on the record.
20  Time is 11:02.
21    MS. CANNELLA:  And just to be clear, the video
22  that's going to be produced at the end is not what I'm
23  seeing.  It's more zoomed in on the deponent; correct?
24    THE VIDEOGRAPHER:  Yes.  That's just for the
25  zoom.

Page 59

1    MS. CANNELLA:  Okay.  I just wanted to make
2  sure.
3    THE VIDEOGRAPHER:  Yes.
4  BY MS. CANNELLA:
5    Q.  Okay.  Dr. Gwin, do you agree that yielding is
6  what the auto industry calls it when the front seat
7  reclines backward during a rear collision?
8    A.  Yes, in general.
9    Q.  And do you agree that yielding is a safety
10  feature of the seat?
11    A.  Absolutely.
12    Q.  And do you agree that yielding is supposed to
13  help reduce whiplash in low-impact crashes?
14    A.  It can, but no, that's not the purpose of
15  yielding.
16    Q.  Okay.  And do you agree that yielding is
17  supposed to reduce injury in rear impact crashes by
18  helping the front seat occupant ride down the crash
19  forces?
20    A.  Yes.
21    Q.  Do you agree it's foreseeable that front seats
22  would yield to the back seat?
23    A.  I don't know.  Foreseeable, I think, is some
24  kind of legal thing, so I don't really know if it's
25  foreseeable or not.  I'll say it certainly happens in

Page 60

1  some rear crashes.
2    Q.  Do you agree that Ford designs front seats to
3  yield in rear collisions?
4    A.  I don't know.  I'm not a Ford design engineer,
5  so I think so, but I don't know.  I certainly have no
6  expert opinion about that.
7    Q.  You mentioned on page 9 of your report, a tear
8  in the cargo cover.  Can you find a picture this explains
9  what you mean by that?
10    A.  I have just managed to minimize Zoom, and now
11  I'm trying to find you again.  Stand by.
12    Q.  Okay.
13    A.  How did I do that?  This is crazy.  Stand by.
14  Sorry.  I don't know what has happened here.  Okay.
15  There you go.  All right.  Stand by.  Let me find the
16  answer to that question.
17    Point where you're finding that in my report,
18  please.
19    Q.  The last sentence of the first paragraph of
20  "Photographic Analysis."
21    A.  I'm sorry.  Say that -- so "Photographic
22  Analysis," first paragraph --
23    Q.  Oh, wait.  Yeah, okay.  No, that's not it.  It's
24  under "Vehicle Inspection."  It's the second to last line
25  on the page.  "There were focal tears in the cloth

Page 61

1  covering on the upper aft corners."
2    A.  That's of the child safety seat.  I thought you
3  were talking about the cargo cover.  That's why I wanted
4  you to find it for me.  I'm talking about the child
5  safety seat.
6    Q.  Okay.  So the -- can you show me which tears
7  you're talking about in the second to last sentence of
8  page 9?
9    A.  Yes.  So you have a folder called "VI 3-6-23."
10    Q.  Got it.
11    A.  And it will be Photo R0017287 is an overall
12  photo that shows the tears in the cloth.
13    Q.  17287, from the rear?
14    A.  Yes.
15    Q.  Okay.  I'm going to share my screen and ask you
16  to circle those tears, and I can make it bigger or zoom
17  in on something if that's helpful.
18    A.  Okay.  Hang on one sec.  Okay.
19    MS. CANNELLA:  I'll save that as Plaintiff's
20  Exhibit 35 -- oh, no.  Am I still here?
21    MR. HILL:  Yes.
22    (Whereupon Plaintiff's Exhibit 35 was marked
23  for identification.)
24    MS. CANNELLA:  It says "Zoom stopped
25  unexpectedly."  All right.  That's great.

16 (Pages 58 - 61)

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 62

1  BY MS. CANNELLA:
2    Q.   Okay.  On the issue of the crash test, do you
3  know how much the crash test cost?
4    A.   No.
5    Q.   And do you know if the vehicles have been
6  preserved from the crash test?
7    A.   I would say yes.  I haven't seen them since
8  then, but that's pretty typical.
9    Q.   Did you do anything to measure the distance
10  between the second row and the front row after the crash
11  test?
12   A.   I did not.
13   Q.   Did you do anything to measure the distance
14  between the second row and the front row before the crash
15  test or during the crash test?
16   A.   I did not.
17   Q.   Did you look at an exemplar car seat as part of
18  your investigation?
19   A.   Not specifically regarding this case, no.
20   Q.   What assumptions did you make in your analysis
21  about Cohen's seated height from the buttocks to the top
22  of his head?
23   A.   Stand by one quick second.  I didn't make any
24  assumptions, but I could certainly measure -- no, due to
25  the poor quality of the films that were taken, I cannot

Page 63

1  measure, so no assumptions and no measurements.
2    Q.   Did you measure the crush in the Exponent
3  vehicle, any of the crashed Exponent vehicles?
4    A.   I personally did not.
5    Q.   And did you measure the crush in the subject
6  vehicles?
7    A.   I certainly did not.
8    Q.   Do you agree there's nothing wrong with people
9  using the cargo area of their vehicle to carry personal
10  items?
11   A.   Absolutely not.  I mean, yes, I agree with that,
12  that there's nothing wrong.  There's nothing wrong with
13  people carrying items in their cargo area.  There's also
14  nothing wrong with people not remembering exactly what
15  was in there or where it was.  I certainly couldn't tell
16  you about my vehicle.
17   Q.   Do you know what kind of camping chair was in
18  the trunk?  What's your understanding of that?
19   A.   Other than camping chair, and then I think I
20  have some photos from my vehicle inspection, but I don't
21  know.  The Brysons didn't know sort of makes or models or
22  brands or anything, so beyond what I've seen, I don't
23  know.
24   Q.   Did you measure -- take any measurements of the
25  camping chair?

Page 64

1    A.   No.
2    Q.   Did you take any measurements of the shop vac?
3    A.   No, I couldn't.  It was destroyed, but no, I did
4  not.
5    Q.   You didn't take any measurements of it as
6  crushed; correct?
7    A.   Correct.
8    Q.   Did you obtain a exemplar shop vac or camping
9  chair?
10   A.   I couldn't because the Brysons didn't know
11  anything about them to be able to do that.
12   Q.   Well, the shop vac, though, was available;
13  correct?
14   A.   I don't know.  I don't think they knew the kind
15  of size or brand or anything that it was, so not that I'm
16  aware of.
17   Q.   Did you have a picture of the shop vac?
18   A.   No.  I have a picture of a smashed drum and many
19  little plastic shards.
20   Q.   Did you take any measurements of what you found
21  of the shop vac?
22   A.   No.
23   Q.   Could you determine what the make or model of
24  the shop vac was based on what you found?
25   A.   No.

Page 65

1    Q.   How about the umbrella stroller, did you take
2  any measurements of the umbrella stroller?
3    A.   No.
4    Q.   And is the umbrella stroller or the frame of the
5  bolted down back seat of an SUV stronger?
6    A.   I have no expert opinion about that.  I could
7  probably guess, but I'm not here to guess about stuff, so
8  I have no expert opinion about that.
9    Q.   Do you have an opinion about whether an umbrella
10  stroller or the bolted down back seat of an SUV would
11  deform first?
12   A.   Same answer.
13   Q.   I'm going to ask you the same questions about
14  the other items.  What's stronger a shop vac or the
15  bolted down back seat of an SUV?
16   A.   No expert opinion.  I could guess, but no expert
17  opinion.
18   Q.   Okay.  And do you have an opinion about whether
19  the shop vac or the back seat of the SUV would deform
20  first?
21   A.   No.  Same.
22   Q.   And do you have any opinion about whether a
23  camping chair or the bolted down back seat of an SUV is
24  stronger?
25   A.   No.

17 (Pages 62 - 65)

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 66

1    Q. Do you have an opinion about which would deform
2  first, the camping chair or the SUV back seat?
3    A. No.
4    Q. And certainly a bag of clothing, you would agree
5  is not stronger than the back of an SUV; correct?
6    A. The back? The Row 2 seat of an SUV?
7    Q. Correct.
8    A. I mean, same answer. I could guess as a lay
9  person, but I certainly don't have an expert opinion
10 about it.
11   Q. Do the scene photos show any of the items that
12 were cargo in the cargo area?
13   A. I think so, but I don't remember.
14   Q. Do you know where the cargo items were found at
15 the scene?
16   A. I believe they were smashed between the rear
17 structures of the SUV, the Ford Escape, and the Row 2
18 seat.
19   Q. And were any of those items found outside the
20 vehicle?
21   A. The spare tire was found outside the vehicle,
22 but I believe it must have been under the vehicle not in
23 the cargo area, so I don't believe any of the cargo area
24 contents were outside the vehicle. Certainly could there
25 have been a piece of plastic from the shop vac? Maybe.

Page 67

1  If you would like me to look, I certainly can.
2    Q. That's okay. Your billing indicates that
3  Dr. Ryan Hernandez, radiologist, worked on this case; is
4  that correct?
5    A. He did, yes.
6    Q. And is he a BRC employee?
7    A. No.
8    Q. And how did you get in touch with him?
9    A. He does -- he's a subcontractor for us, so he
10 has a private radiology practice, but -- maybe not
11 private. He has a radiology practice, but he also works
12 with us from time to time.
13   Q. How often does he work with BRC?
14   A. I don't know. He works with me maybe once a
15 month or so.
16   Q. All right. Are his opinions any different than
17 Dr. Eisenstat's?
18   A. Yes.
19   Q. In what way?
20   A. Dr. Eisenstat missed a left -- no, right tibia
21 and fibula fracture.
22   Q. Okay. Anything else?
23   A. No.
24   Q. And does the right tibia and fibula fracture
25 affect your opinion?

Page 68

1    A. Yes.
2    Q. In what way?
3    A. Well, I have an opinion about how it happened,
4  and that is interaction with the Row 2 seat moving
5  forward and the -- and contact -- and his foot or leg --
6  and leg contacting the driver's seat. "His" being
7  Cohen Bryson, of course.
8    Q. So he got fractures there from contacting the
9  front seat with his foot and leg?
10   A. Yes.
11   Q. Does the right tibia and fibula fracture affect
12 your opinion on cause of death?
13   A. No.
14   Q. On your testimony list, did any of the cases on
15 your testimony list involve a lifted vehicle?
16   A. Well, let me go through them and see. So the
17 first one is Hofer, and the answer is no. Walker, no.
18 Velez, no. Ditter, no. Silva, I don't know, but it
19 certainly isn't part of the case.
20     Snelson, no. Zwierzynski, no. Zieske, no.
21 Hickcox, no. Hillman, no. Thorinson no. No, okay.
22 Ruiz, I don't know if the Ruiz vehicle was lifted or not,
23 but certainly whether it was or not is not part of the
24 case -- was not part of the case.
25     Davis, no. The state of Texas versus Jacob

Page 69

1  Price, no. Youngblood, no. Christianson no. Huber, the
2  Huber -- the vehicle that Ms. Huber was in certainly was
3  not lifted. I don't have any idea if they were hit by a
4  lifted truck or hit a lifted truck. I don't really
5  remember anything about the other vehicle, but it's
6  certainly not part of the case.
7      Mead, I don't know if the Mead vehicle or the
8  vehicle Ms. Mead was in was lifted or not, but it's
9  certainly not part of the case. Rodrigues, no. Watson,
10 no. Blum, no. Flournoy, no. Coiffard, no. Loggins, I
11 don't remember if the vehicle that hit the Loggins
12 vehicle was lifted or not, but it's certainly not part of
13 the case.
14     Eichelberger, I don't remember what kind of
15 vehicle hit the Chrysler vehicle, but it's certainly not
16 part of the case whether anything was lifted or not.
17 Smith, no. Skeete, no. Ramos, no. Frost, no. Gamble,
18 I don't think either vehicle was lifted, but I don't
19 remember, but it's certainly not part of the case.
20     Forge, no. Nelson, no. Moe, no. McCall, no.
21 Naclerio, no. Switalski, no. Watson -- I'm sorry.
22 Walton, no. Reisbeck, I don't remember if Mr. Reisbeck's
23 vehicle was lifted, but whether or not it was is not part
24 of the case.
25     Nash, no. State of Texas versus Stacey Sellers,

18 (Pages 66 - 69)

Dr. Lisa P. Gwin                                                                May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 70

1  no. Richardson no. Butler, no. Edwards, I don't know
2  if Edwards or White vehicle were lifted or not, but it's
3  certainly not part of the case. Bazaldua, I don't
4  remember if the other vehicle, not the Bazaldua vehicle,
5  but the other vehicle was lifted or not, but it's not
6  part of the case.
7      Shelton, Kimberly, certainly she was not in a
8  lifted vehicle, and her child were not in lifted vehicle,
9  and I don't remember the other vehicle at all, but being
10 lifted or not was not part of the case.
11     Shelton, Inga, Mr. Shelton was certainly not in
12 a lifted vehicle, but I don't remember what the striking
13 vehicle was, but a lift kit was not part of this case at
14 all. Mills, no. Kartagener, no. Parker, no.
15     Q.  Okay. So none that you can recall. Do you
16 recall any case that you've worked on where a lift kit
17 was the defective product at issue?
18     MR. HILL: Object to the form.
19     THE WITNESS: I have never worked on a case
20 where the lift kit was the item -- back to that, the
21 product at issue.
22 BY MS. CANNELLA:
23     Q.  Have you ever worked on a case that you recall
24 where the striking vehicle was lifted?
25     A.  Not that I recall.

Page 71

1      Q.  All right. How much of the work that you do
2  involves working for auto manufacturers or auto product
3  manufacturers?
4      A.  Right now of my open cases, 80 percent maybe.
5      Q.  And how much of your work involves other kinds
6  of -- testifying on behalf other kinds of manufacturers?
7      A.  Oh, sorry. I answered that based on all
8  manufacturers of products. So auto manufacturers, if we
9  include heavy trucks, 70.
10     All manufacturers of products, 80 maybe, and
11 then other, 20.
12     Q.  What does the other 20 percent of your
13 constitute?
14     A.  Current cases, criminal cases, cases that are
15 like general negligence where they're not -- no one is
16 suing a product manufacturer. I think that's about it.
17     Q.  Have you ever testified own behalf of a person
18 who was a plaintiff in a case?
19     A.  I have testified for lawyers who represent folks
20 that have been injured, yes.
21     Q.  And how many times?
22     A.  Once -- well, twice, same case, Switalski versus
23 Clevenger, and then once I got really close, and the case
24 settled right before my deposition.
25     Q.  Have you ever testified for a plaintiff against

Page 72

1  an auto manufacturer?
2      A.  I have never been hired in such a case because I
3  would be conflicted out and because generally the defense
4  lawyers are the ones who call is.
5      Q.  So you've never testified for a plaintiff
6  against an auto manufacturer; correct?
7      A.  Correct. Not like a car manufacturer. The
8  products that I almost testified about and then didn't
9  was tree trimming equipment that moved on its own, so
10 technically it's an automobile, but Ford, Chrysler,
11 Toyota, that sort of thing.
12     Q.  Have you ever testified that a product caused
13 death or injury?
14     A.  That would be something that I wouldn't really
15 testify about one way or the other because that would be
16 more of sort of a design thing or a defect thing, which I
17 never -- I have no opinions about, but I've certainly
18 testified that people have died in car crashes or have
19 been injured in car crashes due to, you know, interaction
20 with part of the car, part of the vehicle, et cetera.
21     Q.  So you've never testified that a person was not
22 killed or injured by a product?
23     MR. HILL: Object to the form.
24     MS. CANNELLA: Yeah. That was kind of
25 confusing.

Page 73

1  BY MS. CANNELLA:
2      Q.  Have you ever testified that a product did not
3  cause a person's death or injury?
4      A.  Again, I don't opine about -- I mean, that's
5  more of a design thing, like, you know, did the roof
6  deformation -- you know, should it have happened or not,
7  for example, more of a design thing, but --
8      Q.  That's not my question.
9      A.  Okay. Well, I'm trying to clarify, but I have
10 absolutely testified that a person was killed or injured
11 in a car wreck due to the way the vehicle moved, the way
12 stuff inside the vehicle moved, due to interaction with
13 parts of the vehicle, and I've also testified that people
14 have been catastrophically injured or killed due to
15 interaction with a part of the vehicle, but different
16 from what plaintiff has alleged, and I've also testified
17 that a person did not have the injuries that were being
18 claimed. So does one of those cover what you're trying
19 to ask?
20     Q.  Did the lift kit cause Cohen's death?
21     A.  So that's the question. Did the lift kit cause
22 Cohen's death? No, absolutely not.
23     Q.  Have you ever testified that a product did cause
24 someone's death or injury?
25     A.  Let me give an example and see if this answers

19 (Pages 70 - 73)

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 74

1    it. I had a case where a gentleman was driving his
2    vehicle. It was a Chrysler vehicle. He was rear ended
3    at high speed. His seat yielded. His head struck the
4    No. 4 seat back and caused a catastrophic neck injury.
5    He subsequently died. I certainly didn't say that the
6    seat caused his neck injury. The crash caused his
7    injury. But microscopically what caused his injury was
8    head contact or interaction with the No. 4 seat back, so
9    maybe if that's what you mean.
10        Q.   Have you ever testified that a product caused a
11   person's injury? Have you ever given testimony opposite
12   of what you're giving in this case?
13        MR. HILL: Object to the form.
14        THE WITNESS: Yes.
15   BY MS. CANNELLA:
16        Q.   Okay. Can you tell me which product caused
17   someone's injury?
18        MR. HILL: Same objection.
19        THE WITNESS: I mean, various lift trucks where
20   people stuck their foot out, for example, prior to
21   impact. The case I testified about last Friday, Hofer,
22   Mrs. Hofer was run over by her vehicle. So the product
23   caused her injury, caused her death by asphyxiation.
24   BY MS. CANNELLA:
25        Q.   And who were you testifying on behalf of in that

Page 75

1    case?
2        A.   Lawyers that work for Nissan hired me in the
3    Hofer case.
4        Q.   And you testified the Nissan caused her injury,
5    her death?
6        MR. HILL: Object to the form. Go ahead.
7        THE WITNESS: What caused her injury was she
8    turned the vehicle off from the outside of the vehicle
9    while it was in gear, and there were no brakes on. But
10   ultimately, microscopically again, like my other case,
11   yes, what killed her was the fact this she was under the
12   vehicle's left front wheel.
13   BY MS. CANNELLA:
14        Q.   Dr. Gwin, I'm not asking microscopically. I
15   think we both understand that.
16        My question is have you ever been hired and
17   given testimony that a product was the cause of someone's
18   death or serious injury?
19        MR. HILL: Object to the form.
20        THE WITNESS: I do understand, and that's
21   exactly what I'm answering. I'm not able to say because
22   it's not any area whether some defect caused it, but the
23   product, a Nissan Altima, ran over Ms. Hofer and caused
24   her death, unfortunately.
25   BY MS. CANNELLA:

Page 76

1        Q.   If I ask this question at trial, is this how
2    you're going to answer it? Microscopically, all products
3    cause all injuries?
4        MR. HILL: Object to the form.
5        THE WITNESS: Well, I've never said that, but I
6    would answer it the way I've answered it here.
7    BY MS. CANNELLA:
8        Q.   Well, then, did the lift kit cause Cohen's
9    injury?
10        MR. HILL: Object to the form.
11        THE WITNESS: No.
12   BY MS. CANNELLA:
13        Q.   It was involved. Microscopically, did it cause
14   Cohen's injury?
15        A.   No. Microscopically, and maybe that's a bad
16   word, but microscopically, what caused his injury was his
17   child seat deformation striking him in his head with the
18   Row 2 seat behind it, the cargo behind it, the cargo door
19   lift gate behind it, the Ford behind it.
20        Q.   Have you ever testified that a defect that
21   plaintiff alleged caused a person's death or injury?
22        A.   I don't opine one way or the other about
23   defects.
24        Q.   Have you ever testified that a product that a
25   plaintiff alleged was defective caused the injury?

Page 77

1        MR. HILL: Object to form. Go ahead.
2        THE WITNESS: The whole product, yes. A Nissan
3    Altima was on top of Mrs. Hofer and killed her.
4    BY MS. CANNELLA:
5        Q.   Can you give my other examples that are closer
6    to the situation we have here?
7        MR. HILL: Same objection.
8        THE WITNESS: Well, the one I talked about
9    before, Eichelberger, where Mr. Lewis was driving his
10   Chrysler product vehicle and was rear ended at high
11   speed. His seat yielded, and his head interacted with
12   the Row 4 seat back and caused his injury. So what
13   caused his injury was the crash and the fact that his
14   head interacted with the No. 4 seat back.
15        Do you want me to go through --
16   BY MS. CANNELLA:
17        Q.   And you were testifying for Chrysler in that
18   case; correct?
19        A.   No. I was hired by lawyers who worked for
20   Adient.
21        Q.   Which is the auto manufacturer -- auto product
22   manufacturer?
23        A.   They make the seat that Mr. Lewis was sitting
24   in.
25        Q.   Yes. So I'm looking for a direct answer to the

20 (Pages 74 - 77)

Veritext Legal Solutions
800.808.4958                                                    770.343.9696

Dr. Lisa P. Gwin                                              May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 78

1  question. Have you ever testified on the side of the
2  plaintiff in a case where somebody alleges that a product
3  caused the person's death?
4      A. Say it one more time. Let me make sure I get
5  all the words.
6      Q. Have you ever testified on the side of a
7  plaintiff in a case where someone alleges that a product
8  caused a death or injury?
9      A. Yes -- testified, no. The case settled right
10  before that, my deposition. And like I said before in
11  auto cases, I'm conflicted out on the plaintiff's side
12  and plus defense lawyers are who usually calls us.
13      Q. Have you ever testified on the side of the
14  plaintiff in a case where it is alleged that a product
15  killed the plaintiff?
16      A. I think that's exactly the answer I gave, no.
17      Q. Is the answer no?
18      A. Yes.
19      Q. Okay. The answer is no.
20          Second question. Are you conflicted out of
21  testifying against auto manufacturers?
22      A. Yes. So if you were to call me saying you were
23  hiring me for Ford Motor Company --
24      Q. That's the only question I have. I don't need a
25  story about it. That's just the question.

Page 79

1          Have you ever testified against Ford in a case?
2      A. I've never been across the V from Ford Motor
3  Company.
4      Q. Have you ever done any work with safety
5  organizations?
6      A. Yes.
7      Q. Which ones?
8      A. Transport Canada.
9      Q. Okay. And what did you do for Transport Canada?
10      A. Determined the concussion risk of a trunk lid
11  falling onto a head.
12      Q. And is Transport Canada a safety organization?
13      A. Yes.
14      Q. It's not a transportation company?
15      A. Correct.
16      Q. Okay. And what was the risk of a trunk lid
17  falling on someone's head?
18      A. I have no idea. I measured the risk of
19  concussion if a trunk lid falls on someone's head, so in
20  my case 100 percent risk of the trunk lid falling.
21      Q. Okay. And did you write a paper about it?
22      A. No.
23      Q. Did you give any kind of written product?
24      A. No.
25      Q. When did you do that work?

Page 80

1      A. Somewhere between 2013 and 2015, probably.
2      Q. And did you do, aside from Transport Canada, did
3  you do any work on behalf of safety organizations?
4      A. Not specifically safety organizations, no.
5      Q. Have you done any work for safety -- strike
6  that. Sorry.
7          Have you done any work to determine how to
8  prevent injuries in crashes?
9      A. Any work? Not specifically.
10      Q. How many times have you testified on behalf of
11  Ford?
12      A. I have no idea opinion. I can count them in the
13  last four years, anyway, if you'd like.
14      Q. No, that's okay. I've got the document.
15          Have you testified on behalf of General Motors?
16      A. I have been hired by General Motors' lawyers,
17  yes, and testified, yes.
18      Q. Have you testified on behalf of Daimler
19  Chrysler?
20      A. Not when it was Daimler Chrysler, I don't
21  believe. Daimler is separate from Stellantis now, but
22  when they were together, no, I don't think so.
23          But have I worked and testified in Stellantis
24  cases, yes; or FCA or Chrysler cases, yes; and Daimler
25  cases, yes.

Page 81

1      Q. Have you testified on behalf Toyota?
2      A. I -- there are -- yes.
3      Q. Have you testified on behalf of Mazda?
4      A. Yes.
5      Q. Subaru?
6      A. Yes.
7      Q. How much of the paid work you do is litigation
8  consulting?
9      A. Now, all of it.
10      Q. How many employees does BRC have now?
11      A. 70-ish.
12      Q. How long has BRC existed?
13      A. Since 1986.
14      Q. What is BRC's revenue in a year?
15      A. I have no idea.
16      Q. What's BRC's net profit in a year?
17      A. I have no idea.
18      Q. I'm going to ask you at trial, so I'd like you
19  to look into that. Would you agree to do to that?
20          MR. HILL: Object to the form.
21          THE WITNESS: If Mr. Hill and Ms. Ferguson and
22  BRC -- if they say yes, and BRC can do it, sure.
23  BY MS. CANNELLA:
24      Q. Are you a shareholder of BRC?
25      A. Yes.

21 (Pages 78 - 81)

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 82

1    Q.   Will you remain a shareholder after retirement?
2    A.   No.  Once -- no.
3         Can you go back and tell me?  It's annual
4    profit?  What is it that you're going to want, and then
5    we'll decide if we can do it or not, but I want to be
6    prepared.  Annual profit and?
7    Q.   Revenue.
8    A.   Thank you.
9    Q.   Okay.  What is a shareholder?  What does that
10   mean at BRC?
11   A.   A person who owns shares.
12   Q.   Do they share in profits?
13   A.   Generally, my understanding of profit sharing is
14   that there's like a distribution, so at the end of the
15   year if there's a profit, it's dolled out.  And the
16   answer if that's what profit sharing is, the answer is
17   no.
18   Q.   Okay.  So the shareholders get dividends?
19   A.   Yes.
20   Q.   And do dividends, the amount of the dividends,
21   does that depend on profits?
22   A.   It depends on a lot of things, I'm sure, and the
23   board decides what those things are.
24   Q.   And you've been on the board before; correct?
25   A.   I was, yes.

Page 83

1    Q.   And does the board take into account profits
2    when it decides how much dividends it will pay its
3    shareholders?
4    A.   I mean, that's part of it or lack thereof.
5    Q.   How many shareholders are there at BRC?
6    A.   I don't know.
7    Q.   Do you have to be an employee to be a
8    shareholder?
9    A.   Yes.
10   Q.   Can any employee be a shareholder?
11   A.   I think so.
12   Q.   Where is BRC located?
13   A.   San Antonio, Texas.
14   Q.   Does it have its own building?
15   A.   Yes.
16   Q.   Or is it a building with other people, other
17   companies?
18   A.   Currently by ourselves, formerly with other
19   companies.
20   Q.   Does BRC own the building?
21   A.   Yes.
22   Q.   And what kind of building is it, an office
23   building, or warehouse-type thing?
24   A.   Office building.
25   Q.   How many offices are in it?

Page 84

1    A.   I have no idea.
2    Q.   Is there a facility for testing on the property?
3    A.   It's on the adjacent lot, but yes.
4    Q.   Is there a facility for storing cars there at
5    BRC?
6    A.   No.
7    Q.   How many times have you worked with Rick Hill,
8    the lawyer for Rough Country?
9    A.   This is it, one.
10   Q.   How about Ms. Ferguson, the other lawyer for
11   Rough Country?
12   A.   This is it, one.
13   Q.   How many times have you worked for lawyers at
14   Weinberg Wheeler, the law firm for Rough Country?
15   A.   This is it, I believe, one.
16   Q.   How did you get connected with the lawyers in
17   this case?
18   A.   I'm not sure.
19   Q.   They just called you out of the blue?
20   A.   Yes.  Well, they called my office out of the
21   blue, as far as I know out of the blue.  I'm sure they
22   had some connection, but I don't know what it is.
23   Q.   And are you retiring soon?
24   A.   Let us pray.
25   Q.   Is that your goal?

Page 85

1    A.   Isn't that everybody's goal?  Yes.
2    Q.   It says on your website you're tying up --
3    you're finishing up cases now and not accepting any new
4    cases; is that correct?
5    A.   I don't know.  I'm glad if it does, though.
6    Q.   Well, is it a true fact what the --
7    A.   Yeah.
8    Q.   That statement, okay.
9    A.   Yep.
10   Q.   And how old are you?
11   A.   Good heavens, 58.
12   Q.   Have you ever had training on how to testify?
13   A.   Not really training, certainly the old guys
14   teach the new guys when they start, when you're having a
15   deposition, don't say um too much, things like that, so
16   sort of training, but it's not something official.
17   Q.   Do they grill you and kind of ask you a bunch of
18   questions and see how you answer?
19   A.   Yes.
20   Q.   And how many times did you do that?
21   A.   I don't know.  Two or three, maybe.
22   Q.   And who were the people that were running those
23   sessions or doing the coaching?
24   A.   Dr. Robert Banks and Dr. Ted Bane.
25   Q.   You did an LEC in this case; correct?

22 (Pages 82 - 85)

Dr. Lisa P. Gwin                                           May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 86

1    A.   Yes.
2    Q.   And that stands for lawyer engineering
3  conference?
4    A.   Yeah, or legal engineering conference.
5    Q.   And who was present -- or let me ask you this:
6  Was it in person or over some kind of video conferencing?
7    A.   Video conferencing.
8    Q.   And who attended?
9    A.   Mr. Grimes, Mr. Crosby, me, likely Jessica Gaul
10  from my office, one of our test engineers, and lawyers,
11  likely Mr. Hill and Ms. Ferguson.
12    Q.   Anybody else?
13    A.   I don't think so.
14    Q.   And when was that?
15    A.   I don't know.  Let me see if I can figure it
16  out.  I'd have to look at the bills to see if I could
17  figure that out.  Do you want me to do that?
18    Q.   Let's hold on that.  We'll come back to it.
19        Did anybody give presentations at that LEC?
20    A.   I don't think so.  It was really to discuss the
21  testing that we were going to do, as we discussed before.
22    Q.   And then if I look at the billing --
23        MS. CANNELLA:  Mark them as Plaintiff's
24  Exhibit 20.
25        (Whereupon Plaintiff's Exhibit 20 was marked

Page 87

1  for identification.)
2        MS. CANNELLA:  So I'll put that on the screen so
3  we can get it in the record.  Shared screen doesn't seem
4  to want to work here.  I can't get it up there.  We can
5  try that on a break.
6        I've marked as Plaintiff's Exhibit 20, just for
7  the record, if you pull up your copy for the billing.
8  BY MS. CANNELLA:
9    Q.   Can you see when that happened?
10    A.   Well, there would have been several times that
11  we all talked, like you and I talked about before.  Let's
12  see, likely -- let's see, here we go.  3/27 of '23 was
13  one time we spoke.
14    Q.   And how long did you speak that time?
15    A.   I think it was 2.4 hours, so two hours and 24
16  minutes or some portion thereof the 24 minutes.
17    Q.   And what did you talk about and present?
18    A.   We all talked about testing, like you and I
19  talked about before.
20    Q.   Okay.  And did you make any requests about how
21  to conduct the tests?
22    A.   Yes.
23    Q.   What were your requests?
24    A.   Well, that we should follow the reconstruction
25  of Mr. Grimes and determine the deformation of the rear

Page 88

1  structures of the Escape based on a -- based on being
2  struck by a F250 with stock suspension or no lift kit.
3    Q.   And was there any discussion about whether to
4  put a car seat or any dummies into the Exponent crash
5  test?
6        MR. HILL:  At this point I'm going to object.
7  To the extent that you had discussions with an expert,
8  you can talk about that.  But to the extent your --
9  you're not to disclose discussions with the lawyers
10  regarding any of those type of issues.
11        MS. CANNELLA:  Well, you have to disclose the
12  stuff about assumptions and the work that you did.
13        MR. HILL:  Yeah.  She can disclose her own
14  assumptions and the work she did and her discussions with
15  other experts, but discussions with the lawyers and the
16  directly, that's something that's not discoverable.
17        MS. CANNELLA:  Is it your position she can't
18  talk about discussions with you regarding the assumptions
19  in the case?
20        MR. HILL:  That's correct.
21        MS. CANNELLA:  Okay.  Well, I'm going to ask
22  those questions.  You can instruct her not to answer, but
23  the rules specifically says those communications are
24  discoverable.
25        MR. HILL:  Well, I would disagree.  The

Page 89

1  communication with the lawyers regarding the case are not
2  discoverable.
3        MS. CANNELLA:  All right.  Well, just instruct
4  her not to testify whenever you think that that's the
5  case.
6        MR. HILL:  Sure.
7  BY MS. CANNELLA:
8    Q.   Okay.  So was there any discussions at the LEC
9  about whether to put dummies in the cars in the Exponent
10  test?
11    A.   Yes.
12    Q.   Okay.  And what was that discussion?  What were
13  the contents of that discussion?
14    A.   Well, we talked about whether it would be of any
15  value to add dummies, crash test dummies or
16  anthropomorphic test devices, which is the proper name
17  for them.
18        You don't know this already, Ms. Cannella, but I
19  have a sheet next to me that I'm writing weird spellings
20  down on for Justus, our court reporter.  At the end I'm
21  going to hand this to him, so I just wrote
22  anthropomorphic test devices.
23    Q.   I figured.
24    A.   Yeah.  So we discussed whether it would be of
25  any value to add ATDs to the Ford Escape or the Ford

23 (Pages 86 - 89)

Veritext Legal Solutions
800.808.4958                                            770.343.9696

Dr. Lisa P. Gwin                                      May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 90

1  F250, for that matter, and the answer was no for all the
2  reasons that you and I have already discussed this
3  morning.
4      Q.  Okay.  And did anyone think that it would be
5  helpful to provide helpful data to put dummies into the
6  Exponent crash test?
7      A.  No.
8      Q.  Did you show a presentation at the
9  March 27, 2023, LEC?
10     A.  No.
11     Q.  Did you take any notes?
12     A.  No.
13     Q.  Did anyone else show any slides or exhibits at
14  the March 27, 2023, LEC?
15     A.  I don't think so, no.
16     Q.  Did -- was there any discussions by the lawyers
17  regarding assumptions that they provided that the expert
18  relied on in forming their opinions?
19         MR. HILL:  I'll object.  What do you mean
20  "assumptions"?
21         MS. CANNELLA:  Just straight out of Rule 26.
22         MR. HILL:  All right.  Go ahead and answer if
23  you can.
24         THE WITNESS:  No.  And when lawyers do try to
25  give me assumptions, I ignore them because I'm relying on

Page 91

1  data and evidence, so -- but in this case, no, these
2  lawyers did not try to do that.
3  BY MS. CANNELLA:
4      Q.  Were there any facts or data that the lawyers
5  provided that the experts considered in forming their
6  opinions?
7      A.  Good heavens, yes.  Tons and tons of documents.
8      Q.  And were those -- would the lawyers discuss
9  those during the LEC?
10     A.  The lawyers don't talk much at LECs generally,
11  and this was no different, so no, it was documents that
12  we were provided that we all went through -- I went
13  through to form my opinions.
14         But the lawyers don't, like, point on the
15  certain records or anything like that.
16     Q.  Did anyone express concern that they might not
17  like the measurements that the -- that they got from the
18  dummies if they put dummies in the crash test?
19     A.  No.
20     Q.  What was your understanding of Mr. Grimes'
21  opinions at the time of the March 27, 2023, LEC?
22     A.  I don't remember specifically on that date, but
23  before the testing at some point his reconstruction,
24  which is outlined in my report.
25     Q.  Was Mr. Pasquerella at the LEC?

Page 92

1      A.  No.
2      Q.  Mr. Crosby was and Mr. Grimes?
3      A.  Yes.
4      Q.  How about Ann Grimes?
5      A.  I don't know who that is, so no.
6      Q.  Were you asked to do any work after the LEC, the
7  March 27, 2023, LEC?
8      A.  Not that I can recall.
9      Q.  And you did the crash test after the LEC.
10  Anything else?
11     A.  Anything else what?
12     Q.  Anything else work-wise that you needed to do
13  after the LEC?
14     A.  Write a report, present for deposition, go to
15  trial.
16     Q.  Okay.  But I mean like in this case, just the
17  report and then getting ready for deposition is the main
18  thing?
19     A.  Review any new materials that come in after the
20  LEC, review the testing at Exponent once it's done.
21  That's all I can think of off the top of my head.
22     Q.  Okay.  And can we go through the rest of the
23  bills and let me know what other LECs or meetings you had
24  with the experts?
25     A.  On page 11 of the bills on April 27, '23, it's

Page 93

1  called "Contact With Client."  I don't remember
2  specifically, but likely being two weeks before the
3  testing, this was also a quick call with -- well, not
4  that quick, 1.4 hours, but a call with experts and
5  lawyers to sort of finalize the testing plan.
6      Q.  What's the difference between contact with
7  client and -- one second, let me find it.
8      A.  Technical conference.
9      Q.  Yeah.  What's the difference between a technical
10  conference and the contact with client?
11     A.  Likely in this case which case manager is
12  entering it into our system because likely that's what
13  this was on that date was another call with lawyers and
14  engineers -- experts, I mean.
15     Q.  Okay.  Okay.  When's the next teleconference or
16  conference with lawyers and/or other experts?
17     A.  Page 12, this one is also called "Contact With
18  Client."  There was -- let's see, May 5th, 1.5 hours.  So
19  again, that would have been last-minute conversations
20  about testing with experts and lawyers.
21     Q.  What is being discussed for so much time, like
22  an hour and a half, two times there within a couple
23  weeks, a week and a half?
24     A.  I remember one of the topics that we discussed
25  several times were wheels on the Ford F250, whether we

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 94

1  would use the larger wheels and tires that Mr. Elliott
2  had on his vehicle or whether we would use the stock
3  wheels and tires that would come with the F250.
4      Q.  Uh-huh.
5      A.  So we talked about that a lot.
6      Q.  What was the resolution of that?
7      A.  Because we wouldn't be able -- you wouldn't be
8  able to drive the F250 with the stock suspension and the
9  big wheels, to use the stock wheels.
10     Q.  Okay.  Any other conversations you remember
11 during these meetings?
12     A.  No.  I mean, things like what time are we
13 showing up, you know, things like that, but nothing of
14 any substance that I can remember.
15     Q.  Okay.  All right.  When was the next meeting
16 with experts and/or lawyers?
17     A.  I think that was it.
18     Q.  Okay.  If you look at page 2 of your bills,
19 Plaintiff's Exhibit 20, it says that you purchased an
20 exemplar for $275, what was that -- or $257, excuse me,
21 and 64 cents.
22     A.  Well, that is before I was on the case, so I
23 don't know.  I would be guessing.  Certainly not a
24 vehicle.  I don't know.
25     Q.  There's no pictures of an exemplar in your file?

Page 95

1      A.  No.
2      Q.  When did you start on the case?
3      A.  February, I believe, of '23.
4      Q.  Who would have directed the purchase of an
5  exemplar?
6      A.  I don't know.  Dr. Lars Reinhart was involved in
7  the case prior to my involvement, so perhaps he.
8      Q.  And what was his role?
9      A.  Some -- doing some analysis on the case,
10 preliminary analysis on the case.
11     Q.  Is he a testifying expert?
12     A.  He is.
13     Q.  Do you know why he was not the testifying expert
14 in this case?
15     A.  My understanding is there were some, like,
16 scheduling conflicts with his schedule.  I know that he
17 takes summers off to -- he has little kids still, not
18 little, but school-aged kids still, and so that may have
19 been it.
20     Q.  Typically, would -- if an exemplar is bought for
21 a case, would you have pictures of it be in a file?
22     A.  Only if it's used for something.
23     Q.  Okay.  Why didn't you use an exemplar of the car
24 seat?
25     A.  Because I saw the subject car seat, child safety

Page 96

1  seat.  Sometimes we'll use an exemplar if we don't have
2  the actual one.
3      Q.  My calculation of your total bills is
4  $87,614.49.  Does that sound about right?
5      A.  I don't know.  I'd have to do the math myself,
6  and that's certainly billing for all of BRC, if you're
7  taking it from these bills including expenses and
8  everything.
9      Q.  Correct, yes.
10         MS. CANNELLA:  And I'm marking an exhibit that I
11 can't show you.  When we take a break, I'll log off and
12 log back on and see if I can show exhibits, but
13 Plaintiff's Exhibit 31 is a chart that adds up those
14 amounts.
15         So I would like to enter that and give you some
16 time to look at that.
17         (Whereupon Plaintiff's Exhibit 31 was marked
18 for identification.)
19 BY MS. CANNELLA:
20     Q.  Your bills that we have go through
21 March 31, 2024; correct?
22     A.  Oh, not the bill date, but the event date is
23 what you mean; right?
24     Q.  The work that you did.
25     A.  What was the date, march what?

Page 97

1      Q.  31st, 2024.
2      A.  It's kind of nitpicky, I suppose, but the
3  latest -- the most recent entry I see is 3/29, but yes,
4  the April 10th bill would include all our work through
5  the 31st if there were any, if that's really what you
6  meant, yes.
7      Q.  So the bills that we have go through
8  March 31, 2024; correct?
9      A.  Yes.
10     Q.  And those bills would not include work done in
11 April or May this year; correct?
12     A.  Correct.
13     Q.  Is that when your time preparing for the
14 deposition would have been?
15     A.  Yes.
16     Q.  So if your bills are 87,000 and change at the
17 end of March, is it fair to say that your total bills at
18 this time would be close to $100,000?
19     A.  I doubt it.
20     Q.  All right.  Would you agree to provide the rest
21 of your bills before trial?
22     A.  Yes.
23     Q.  All right.  The radiologist spent -- if you go
24 to page 6 of the bills, he spent about -- I count 4.3
25 hours in March.  And then before that he spent five hours

25 (Pages 94 - 97)

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 98

1  in February -- or .5 hours in February for a total of
2  just under 5 hours.
3        Does it normally take five hours to review
4  radiology?
5        MR. HILL:  Object to the form.
6        THE WITNESS:  I don't think what you just said
7  is true, so hang on one quick second.
8  BY MS. CANNELLA:
9     Q.  Okay.
10    A.  I think what you saw in February -- now, I'm not
11 going to be able to find it again -- was probably
12 radiology coordinator who is a different person, but the
13 answer to your question does it normally take five hours
14 to look at radiology, the answer is it certainly depends
15 on the case.
16       Most cases are a whole lot more than that, but
17 it's not just looking at radiology.  It's looking at the
18 radiology, then looking at it with me to show me the
19 radiology, writing a report, and providing what we call
20 radiology keys or key images in a PowerPoint.
21       So it's all of that time, and if it's about five
22 hours for this case, that would not surprise me and
23 sounds about right.
24    Q.  Okay.  Page 7 has work that an engineer was
25 doing.  What kind of work would an engineer be doing in

Page 99

1  this case?  Do you know?  Page 7, let me find it, where
2  did it go, 6 through 7.
3     A.  So the answer to what would an engineer do is a
4  million things, but in this case, Ms. Gaul, the engineer
5  that I work with, what she did in this case is
6  participated in the phone calls regarding the crash
7  testing, participated in the crash testing, itself, did
8  her review of the file materials to be ready to discuss
9  the case and the testing.
10       As I mentioned before, she's a test engineer, so
11 she has extensive experience with crash testing and all
12 sorts of other testing, so things like that.
13    Q.  What is a document specialist referred to on
14 page 9?
15    A.  That is a person who just organizes records, so
16 we have a paralegal and a nurse analyst.  This would be a
17 person who touches the file before them typically or
18 during the analysis, organizing medical records,
19 organizing legal documents, things like that, putting
20 them all together so the paralegal and the nurse analyst
21 can do their work.
22    Q.  And it would take, like, 40 hours to do that?
23    A.  Depending --
24    Q.  Over the course of --
25    A.  Depending on the case that wouldn?t surprise me.

Page 100

1  I don't review their time, so I don't know, but it
2  wouldn't surprise me based on the amount of materials we
3  usually receive.
4     Q.  What is a visual communications underneath the
5  document specialist?
6     A.  They are medical illustrators who work for BRC
7  that sometimes put together trial exhibits or, you know,
8  other exhibits, things that we can use to demonstrate our
9  ideas.
10    Q.  And what exhibit did they prepare in this case?
11    A.  That's a great question.  I don't know, nor do I
12 know why they would be on a technical conference.  I'm
13 not sure.
14    Q.  And did Ms. Gaul go to the LEC in March?
15    A.  Yes.  As I recall, yes.
16    Q.  The March 5th and 6th, 2023, reflects a file
17 review and an analysis.
18    A.  Where are you?  So I can -- please.
19    Q.  Okay.  Page 6.
20    A.  Okay.
21    Q.  You've got it looks like full days' work on file
22 review and analysis on March 5th and March 6th; is that
23 correct?
24    A.  Yes.
25    Q.  All right.  And the LEC was March 23rd;

Page 101

1  correct -- or March 27th; right?
2     A.  I don't remember, whatever I said before.
3     Q.  Okay.  And the expenses on page 9 for that month
4  have three different entries for air transportation.  Why
5  are there three entries?
6     A.  Likely, the one is Ms. Gaul's round trip ticket,
7  and I never buy round trip tickets, so likely two of --
8  the other two are my one-way ticket to Phoenix, Exponent.
9     Q.  One to Phoenix and one back?
10    A.  One to wherever I was going next and -- yes,
11 yes.
12    Q.  Okay.  Do you usually fly first class?
13    A.  No.
14    Q.  Just it's a lot more than Ms. Gaul's, so I was
15 wondering about, like, if there's a reason for that.
16       MR. HILL:  Object to the form.
17 BY MS. CANNELLA:
18    Q.  Do you know?
19    A.  I would think that hers would be the 877 and
20 mine would be the 578 plus 243, so -- but I don't
21 remember for sure, but considering they're separated like
22 that, I would think that's the case.
23    Q.  What is an equipment usage fee?
24    A.  One of the examples is that an engineer would
25 take a scanner, a 3-D scanner to an inspection or an EDR

26 (Pages 98 - 101)

Dr. Lisa P. Gwin                                              May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 102

1 reader -- not my area, as you can imagine, but some kind
2 of equipment. Probably -- well, 3/6, I believe that's my
3 vehicle inspection, I think.
4      And so Ms. Gaul would have brought the scanner
5 along which means on that 3/5 and 3/6 those flights are
6 not to Phoenix. They're to the vehicle inspection, I
7 think, but I'd have to look at the dates to be sure.
8     Q. Okay. So the dates there are when you're
9 traveling, not when you bought the ticket, usually?
10    A. Yes, yes. Yes, March 6th was my -- yes, that's
11 exactly true.
12    Q. So this usage fee, is that for a scanner in this
13 case?
14    A. Yes.
15    Q. All right. On 5/15, which is page 12, you did
16 eight hours of testing and data analysis.
17       Do you see that, your last entry?
18    A. Yes.
19    Q. How did you receive the data that you were
20 analyzing? Was it by e-mail?
21    A. Hang on a second. So on 5/15 that was the crash
22 testing, itself, so I can answer your question, but it's
23 not about what -- the hours on 5/15, but how did I
24 receive the Exponent crash testing results?
25    Q. Uh-huh.

Page 103

1     A. Either e-mail or more likely like a link, like a
2 share file or Dropbox or something like that, link.
3     Q. On page 20 there's a reference to exhibit
4 preparation. What exhibit is that?
5     A. Once again, I am not sure. Let's see, that was
6 January of this year. I don't know because we've not
7 done exhibits yet.
8     Q. How about the teleconference on
9 January 30, 2024, who was that with?
10    A. I don't recall. Likely, Mr. Hill and/or
11 Ms. Ferguson, but I don't remember that call.
12    Q. Doesn't look like you were actually on it. It
13 looks like it was visual communications?
14    A. Oh, right. Well, there you go, and once again
15 I'm not sure why they'd be on a teleconference, so I'm
16 not sure what these entries mean.
17    Q. Okay. And your written report in the case was
18 done on March 27, 2024; correct?
19    A. I think it was March 29th. March 29th is when
20 it was due. I certainly worked on it before that date.
21    Q. Okay. All right. Then there's a teleconference
22 with -- or it says teleconference and related time on
23 March 29, 2024, page 23.
24       Do you remember that?
25    A. Are you talking about on page 23, technical

Page 104

1 conference related time 329.1?
2     Q. Yes, ma'am.
3     A. Likely, that was Pam sending you my report.
4     Q. And then contact with lawyers several times
5 before that day. Do you remember those conversations?
6     A. Those were likely also regarding my report as I
7 was writing it.
8     Q. Did you have questions for the lawyers?
9     A. I don't really recall the specifics, but
10 generally in federal court I'll send a draft ahead of
11 time, and then sometimes we talk about it. Sometimes
12 they point out that I've spelled something wrong, God
13 forbid, or, you know, asked -- you know, said I put in
14 the wrong date for something or asked me a question about
15 something, things like that.
16       MS. CANNELLA: Do you guys want to take a break,
17 and I'll try signing off and on?
18       THE WITNESS: Sure.
19       THE VIDEOGRAPHER: We're going off the record.
20 Time is 12:22.
21       (Whereupon a lunch recess was taken.)
22       THE VIDEOGRAPHER: We're back on the record.
23 Time is 1:11.
24 BY MS. CANNELLA:
25    Q. Okay. Dr. Gwin, you wanted to clear something

Page 105

1 up for the record?
2     A. I did. Thank you. So you received as part of
3 my production a PDF version of a PowerPoint called,
4 essentially, LEC and a date, I think March 27th. So I
5 didn't find that before, so I thought I must not have
6 presented anything.
7       So earlier when I said I didn't present anything
8 at the LEC, I actually did. And it's the PowerPoint
9 which is now the PDF that you have. And when I said I
10 don't know why the visual communications guys were
11 preparing exhibits, that's what they were preparing is
12 the template for the LEC PowerPoint, but then I edit to
13 show at the conference, so my bad.
14    Q. Okay. And did Mr. Hill tell you to make that
15 correction?
16    A. He did. He said, hey, you did have an LEC in
17 your production, and then I must have missed that, and
18 so I looked at it, and there it is.
19    Q. Okay. And so then the second entry for
20 making -- for the visual communications team making
21 exhibits, what was that? Because that was after the LEC?
22    A. Right. So the first time they did it was that,
23 and then the second time they did, they went back through
24 the original PowerPoint and added what they felt was new
25 information, which wasn't.

27 (Pages 102 - 105)

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 106

1    They always add, like, the police report -- I'm
2 sorry, the police diagram, which I don't need, and so I
3 always take those out. They sometimes add some diagrams
4 of where -- like, if there's a skull fracture in the
5 temporal area, they'll put in a picture of what the
6 temporal area means. I don't need that.
7    So these are things I take out, so there
8 actually was nothing new that I needed for the second
9 one, so there is no second PowerPoint.
10   Q.   Okay. Then January 30, 2024, visual
11 communications time, what was that?
12   A.   That is the second one that I was just talking
13 about.
14   Q.   Okay. So they went into a your PowerPoint like
15 eight months later and just made changes to it?
16   A.   Well, because we had another call coming up that
17 we talked about at some point in January something, and
18 so they went back in and said, hey, here's new stuff.
19 Here's something you might need, and I said so no, I
20 really don't, but thank you.
21   Q.   Okay.
22   THE WITNESS: Keigo, do you a favor. Would you
23 turn that one a smidge this way? This way, clockwise.
24 Perfect. Thank you. Thanks for your patience with that.
25 BY MS. CANNELLA:

Page 107

1    Q.   All right. So when you did -- it looks
2 like the -- if you go to page 20 of your bills, put that
3 up on the screen, the visual communications exhibit
4 preparation occurs on January 30, 2024, January 31, 2024,
5 and then the visual communications person looks like they
6 attend on January 30, 2024, the technical conference;
7 correct?
8    A.   So that still doesn't make any sense to me
9 unless they're talking about making exhibits for the
10 technical conference, but then that would be the exhibit
11 preparation, so I can't understand that billing because
12 the visual communications guys did not come to any calls
13 with me, so I don't really understand that. I can't
14 explain that.
15   Q.   Okay. And then if you scroll down, your time
16 contact with the client then was this point that happened
17 after this visual communication exhibit preparation, the
18 next time spend time on the case, as far as I can tell,
19 is in February; correct?
20   A.   Yes.
21   Q.   And your February time, it looks like the only
22 time you could have used -- correct me if I'm wrong, but
23 it looks like the only time you would have used the new
24 PowerPoint or the amended PowerPoint or PowerPoint at all
25 is February 19th in contact with clients on

Page 108

1 February 23rd; is that correct?
2    A.   Correct.
3    Q.   All right. So what -- why did you -- what kind
4 of contact did you have with the client where you would
5 use a PowerPoint?
6    A.   Honestly, I don't believe those calls on the
7 19th and 23rd would have required a PowerPoint, but the
8 visual communications guys, to their credit, always want
9 me to be ready for anything, and so whenever there's
10 contact with the client coming up, they always make sure
11 that everything is ready for me in terms of PowerPoints,
12 if I want to show them.
13   I didn't. And I didn't need to change anything
14 from the previous one, but if I had, I would have been
15 ready.
16   Q.   Okay. And so the PowerPoint that we have is
17 from the LEC, that's as it existed at the LEC; correct?
18   A.   Yes. And still exists today, there hasn't been
19 an update to it.
20   Q.   And now that you know that you did an LEC, do
21 you recall if anybody did a PowerPoint at the LEC? Do
22 you recall anybody else doing presentations at the LEC?
23   A.   I don't, but they certainly may have, but I
24 don't remember.
25   Q.   Did you usually do PowerPoints for LECs?

Page 109

1    A.   It depends. I mean, more than 50 percent of the
2 times, yeah, probably, but there's a lot of times I don't
3 or nobody does.
4    Q.   Okay. Have you ever been in a dispute where --
5 or in a case where there was a dispute about an
6 aftermarket product?
7    A.   Yes.
8    Q.   And what were those cases?
9    A.   Hmm, the only one I remember off the top of my
10 head, but I may as I go on, is Shelly Mott versus FCA.
11   Q.   Uh-uh, and what was the product?
12   A.   I think a lower control arm, but I could be
13 wrong because, certainly, that has nothing to do with my
14 area, so I could certainly be saying that wrong.
15   Q.   Okay. And this lower control arm is part of the
16 OEM design; correct? It was just an additional -- it was
17 a piece made by an aftermarket manufacturer?
18   A.   I mean, yeah. You buy a truck with a control
19 arm, a lower control arm, for sure, but I think whatever
20 the part was, I think it was a lower control arm, but
21 whatever the part was put on to replace the OE part,
22 as I recall. Again, that's not my area, so I could be
23 wrong.
24   Q.   Okay. Any other cases you remember where
25 there's an aftermarket product involved?

28 (Pages 106 - 109)

Dr. Lisa P. Gwin                                                May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 110

1    A. Hold that thought. Kathleen Ditter versus
2 Subaru had some non OE items that affected her seated
3 position, but they weren't like suspension parts at all.
4 They were like seat cushions and things like that.
5    Q. Okay. And what was your opinion in that case?
6    A. Ms. Ditter received her facial injuries as a
7 result of her phone striking her face.
8    Q. Okay. And so the aftermarket products were not
9 a part of the cause of her injury?
10    A. Whether or not she had the seat cushions, she
11 would have been seated a little bit differently, but it
12 would not have changed her injury outcome.
13    Q. Okay. Any other cases you can recall that you
14 used -- that involved an aftermarket product at issue?
15    A. Not that I can think of.
16    Q. I'm going to show you what I've marked as
17 Plaintiff's Exhibit 19, which is your fee schedule. Do
18 you see that on the screen?
19    A. Yes.
20    Q. Your rate is about $700 an hour; correct?
21    A. It is now, yes.
22    Q. And when somebody hires you, they make payments
23 to BRC; correct?
24    A. Yes.
25    Q. And the same hourly rate applies to work and

Page 111

1 travel, deposition, and trial; correct?
2    A. Yes. Whatever my rate is at that time, whatever
3 I'm doing is the same rate.
4    Q. And do you agree the only person with a bill
5 rate higher than you at BRC is Thomas McNish?
6    A. Other than radiologists, orthopedists,
7 cardiologists, I'm not sure about neurology, they all
8 bill more than my rate.
9    Q. Do you agree that on BRC's consultant hourly
10 billing rates on Plaintiff's Exhibit 19, the only person
11 with a higher billing rate than you is Thomas McNish?
12    A. I do agree with that.
13    Q. Okay. I'm also going to show you what I've
14 marked as Plaintiff's Exhibit 31, which we discussed
15 earlier. And that is the bill totals in the case.
16    Do you see Plaintiff's Exhibit 31 on the screen?
17    A. Yes.
18    Q. Okay. And does this look like an accurate
19 estimate or accurate accounting of what you have charged
20 in the case?
21    A. I don't know by looking at it. I would have to
22 look at each bill. Do you need me to do that?
23    Q. Let's not do it right now, but if you see any
24 problems with it during the break, that would be great if
25 you could let us know.

Page 112

1    Q. Let's talk about your time at Ford briefly. You
2 were at Ford for six years; correct?
3    A. I was.
4    Q. And you were a test engineer?
5    A. For the first two years, yes, and then years
6 three through six, development engineer.
7    Q. Did you do any work on structural integrity?
8    A. Yes. When I was a test engineer, but it was --
9    Q. Can you explain -- go ahead.
10    A. But it was durability, certainly not crash
11 worthiness.
12    Q. Can you explain your work as a test engineer at
13 Ford?
14    A. Yes. It was two years. It was a two-year
15 program. For six months I did emissions testing,
16 both evaporative and tailpipe emissions. For six months
17 I did electrical testing, which was, like, how bright
18 headlamps and tail lamps are. For six months I did the
19 structural testing on trucks, heavy trucks, and passenger
20 vehicles for durability in various climates of structural
21 components. And last, I did heavy truck durability and
22 engine performance testing.
23    Q. Can you give us an example of a durability test
24 you would do?
25    A. On a heavy truck, the vehicles were -- the

Page 113

1 heavy -- the trucks, the frames, and body components and
2 some suspension components like leaf springs, were
3 instrumented with strain gauges and then sprayed with
4 salt water, baked in the sun, and then driven around a
5 track and driven on a durability route, a very bumpy
6 route that would twist the frame a lot.
7    And then photos were taken and strain gauge
8 measurements were taken to determine -- and then
9 ultimately determining the life of various parts like the
10 frames and leaf springs, et cetera, after many, many
11 iterations of that testing.
12    Q. Can you explain what you did as a development
13 engineer at Ford?
14    A. Yes. So years three through six I was a fuel
15 systems development engineer, and so I was responsible
16 for current and past model years of the F-Series trucks
17 as well as some Rangers and some Econoline Vans and
18 Broncos, all the Broncos because it's an F-Series truck,
19 essentially.
20    And so if an assembly plant or a dealership had
21 trouble building the fuel system on one of those trucks
22 or the -- a dealership had problems repairing a fuel
23 system on one of those trucks, and the hotline couldn't
24 help them, then I would go to the dealership or the
25 assembly plant and fix the problem.

29 (Pages 110 - 113)

Dr. Lisa P. Gwin                                May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 114

1    Q.  Okay.  Did you run crash tests at Ford when you
2  worked there?
3    A.  No.
4    Q.  And rear crash tests are part of the fuel
5  systems development; correct?
6    A.  No.  Fuel system design, and I know it's a tight
7  rope there, but that's how Ford describes it.  So the
8  design guys design, and 301 Testing is part of that, but
9  once it goes into production, then it becomes a
10  development engineer's job, mine at the time, and so 301
11  was already done.
12    Q.  If Ford made a change to the structure of a
13  vehicle, would it run testing to make sure the design
14  still met safety standards?
15    MR. HILL:  Object to the form.
16    THE WITNESS:  I don't know, not my area.
17  BY MS. CANNELLA:
18    Q.  Did Ford and its engineers look for structural
19  engagement in car-to-car crashes that it did in-house?
20    A.  I have no idea, not my area at all.
21    Q.  Does Ford consider structural engagement
22  important in crashes?
23    MR. HILL:  Object to the form.
24    THE WITNESS:  That was not my area at all.  I
25  have no idea.  I imagine they do, but I have no idea.

Page 115

1  BY MS. CANNELLA:
2    Q.  Did the Ford Escape structure perform reasonably
3  well from a biodynamic standpoint in the subject crash?
4    MR. HILL:  Object to the form.  Go ahead.
5    THE WITNESS:  I have no opinion about
6  structures.
7  BY MS. CANNELLA:
8    Q.  Did the Ford Escape perform well for the
9  occupants inside in the subject crash?
10    A.  I have no design opinions at all.
11    Q.  Okay.  But that's -- I'm asking about whether
12  you think it performed well for the occupants and their
13  movement and injuries?
14    MR. HILL:  Object to the form.  Go ahead.
15    THE WITNESS:  Right.  But performing well is
16  about designs, and I have no opinions about designs.
17  BY MS. CANNELLA:
18    Q.  Did the Ford offer adequate protection to the
19  occupants in the subject crash?
20    MR. HILL:  Same objection.
21    THE WITNESS:  I think it's really the same
22  question, and so that would also be more of a design
23  question than a biomechanical opinion at all.
24  BY MS. CANNELLA:
25    Q.  So it's not within your expertise to say whether

Page 116

1  a car provided adequate protection to the occupants
2  inside; correct?
3    A.  Right.  That would be a design-type question.
4    Q.  Do you have an opinion about whether there was
5  differences in the engagement of the frame rails in the
6  subject crash versus the crash test?
7    A.  That is a Mr. Grimes question.
8    Q.  So you don't have any opinions about that?
9    A.  Correct.
10    Q.  You don't have any opinions in anything that's
11  different about the structure in one crash versus the
12  other; is that correct?
13    A.  The structure?  I mean, one -- so you're talking
14  about the Exponent test versus the actual crash?
15    Q.  Correct.
16    A.  I mean, what's different is a lift kit or no
17  lift kit.  That's --
18    Q.  But you don't have any -- sorry.  Go ahead.
19    A.  Sorry.  I took I a longer breath.
20    I mean, that's the difference.  As far as my
21  opinions, my understanding, you know, how the bumper
22  structure of the F250 interacted with the bumper
23  structure of the Ford Escape is definitely a Wes Grimes
24  question.
25    I have a general idea, and I know that the F250

Page 117

1  rode up over the bumper structure of the Ford Escape, but
2  really that's just because I saw the test and saw the
3  results of the test.  Mr. Grimes would be able to discuss
4  that with expert opinions.
5    Q.  Are you going to give any expert opinions at
6  trial about differences in what happened to the structure
7  from the crash test to the subject test?
8    A.  Not other than what it has to do with the
9  occupants, and we've already talked about that at the
10  great length at the very beginning of the deposition.
11    Q.  Okay.  So nothing beyond what we've talked
12  about?
13    A.  Correct.
14    Q.  Do you agree design at Ford was a big
15  undertaking?
16    MR. HILL:  Object to form.
17    THE WITNESS:  I don't know anything about design
18  at Ford other than my interaction regarding fuel systems
19  on certain trucks, and I'm not sure what a big
20  undertaking means.  Like, I don't know how to define
21  that, so I don't know.
22  BY MS. CANNELLA:
23    Q.  Have you seen, like, the Ford documents, the big
24  long documents with all the standards for performance and
25  the different specifications for each component and each

30 (Pages 114 - 117)

Dr. Lisa P. Gwin                                              May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 118

1 system?
2     A.  For the Ford Escape, the 2008 or whatever it was
3 Ford Escape, no.
4     Q.  No, just any Ford.
5     A.  I mean, I've seen in my career way back when,
6 which is arguably a really long time ago, drawings and
7 specifications for certain parts, yes.
8     Q.  Oh, I'm talking about, like, the big books that
9 have all the performance requirements and the different,
10 you know, specs and procedures and stuff, testing
11 procedures and that kind of thing.  Have you seen --
12     A.  I've never seen such a thing.
13     Q.  Okay.  Does Ford have extensive testing
14 procedures in your experience for its vehicles?
15         MR. HILL:  Object to the form.  Go ahead.
16         THE WITNESS:  In my experience I didn't -- I
17 wasn't involved in testing at all, so I have no
18 experience with that.
19 BY MS. CANNELLA:
20     Q.  Did Ford do design failure mode analysis
21 documents?
22     A.  In general, I mean, I learned about FMEA when I
23 was there a long time ago.  I was never involved in
24 design, so that wasn't part of it my area, but in
25 general, yes, but I don't know about the subject

Page 119

1 vehicles.
2     Q.  What is an FMEA?
3     A.  Failure mode effects analysis.
4     Q.  And what does it do?
5     A.  In general, certainly I'm no expert at FMEA, but
6 in general, it spurs design engineers to think of
7 potential failure modes of a widget, and then determine
8 how likely that failure mode is and how bad it is if it
9 does happen, and then categorize them by likelihood and
10 severity.
11     Q.  And they put numbers on those categories; right?
12 It's usually 1 to 10?
13     A.  I don't remember what the numbers are, but sure,
14 they rank them somehow.  I don't know if it's letters or
15 numbers.  I don't remember.  It's been a long time ago.
16     Q.  And as part of FMEA engineers identify the
17 solution, potential solutions, to the failure; correct?
18         MR. HILL:  Object to form.  Go ahead.
19         THE WITNESS:  If they can, yes.  I mean, that's
20 the goal of FMEA work.
21 BY MS. CANNELLA:
22     Q.  And FMEAs are very standard things to see in
23 manufacturing and the auto industry; do you agree?
24         MR. HILL:  Object to the form.
25         THE WITNESS:  Oh, I have no idea.  I don't think

Page 120

1 I've seen enough FMEA documents ever in my career at
2 Ford, other than when I did a class, which was -- we
3 learned about ceiling -- like, we did a practice on
4 ceiling fans, so it had nothing to do with automotive at
5 all.
6         So I don't think I've ever seen them at Ford,
7 and I don't think I've ever seen an FMEA in any of my
8 cases in litigation since my time at Ford.
9 BY MS. CANNELLA:
10     Q.  Well, I know we've had a case together, and
11 there is one in our case, so certainly you've seen them
12 in some cases; correct?  I've never seen them.  Is that
13 correct?
14     A.  I don't know.  Not that I recall.
15     Q.  Okay.  Is that something you would normally look
16 for in your cases?
17     A.  No.  Because that's a design issue.  Those are
18 design people that use those tools.
19     Q.  So it's not your testimony that they didn't
20 exist in your prior cases, it's that you just didn't see
21 them in your prior cases; correct?
22     A.  Correct.  I've never seen them that I'm aware
23 of.  If you showed me one in a deposition before, I
24 certainly don't remember it.
25     Q.  Do you -- have you seen any FMEAs that

Page 121

1 Rough Country did?
2     A.  No.
3     Q.  To your knowledge, did Rough Country do any
4 safety testing of its product before this lawsuit was
5 filed?
6     A.  Oh, I have no idea.  I wouldn't know one way or
7 the other.
8     Q.  You wouldn't ask for safety testing as part of
9 your investigation?
10     A.  No.  That's not my area at all.
11     Q.  Okay.  To your knowledge, did RC do any testing
12 that explored the effects of its list when the vehicles
13 were involved in crashes?
14     A.  Not that I'm aware of, but I wouldn't know those
15 things really.  That wouldn?t be part of my investigation
16 or my analysis.
17     Q.  Did Rough Country provide you with any internal
18 testing that it did at all?
19     A.  No.
20     Q.  Did you ask if Rough Country did any internal
21 testing?
22     A.  No.  Because again, that wouldn?t be part of my
23 area or anything that I would look at or analyze.
24     Q.  If Rough Country did crash simulations or crash
25 tests, you wouldn't look at those?

31 (Pages 118 - 121)

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 122

1    A.  I don't think so.
2    Q.  Who paid for your Wayne State degree?
3        THE REPORTER:  Sorry.  Was it Wayne State?
4        THE WITNESS:  Me.
5        Yeah, Wayne State, W-a-y-n-e.
6  BY MS. CANNELLA:
7    Q.  Okay.  So on your experience -- let me just see
8  if I had any questions about that.
9        Have you done any in person physician work since
10 2016?
11   A.  Yes.
12   Q.  And what was that?
13   A.  I volunteer periodically at a homeless clinic in
14 Cheyenne, Wyoming.
15   Q.  Okay.  And what kind of care do you provide
16 there?
17   A.  Like, family practice and urgent care.  It's
18 taking care of people, homeless folks or folks who are
19 under-housed and under-insured or uninsured, taking care
20 of their chronic diseases and urgent-type problems.
21   Q.  Have you done any ER work since 2016?
22   A.  No.
23       MS. CANNELLA:  All right.  I'm going to
24 introduce Plaintiff's Exhibit 16, which is your CV.
25       (Whereupon Plaintiff's Exhibit 16 was marked

Page 123

1  for identification.)
2  BY MS. CANNELLA:
3    Q.  And my question is about your publications.  Are
4  there any papers on your CV that you authored or
5  co-authored that are relevant to the issues in this case?
6    A.  There are two that are tangentially related.
7    Q.  Okay.  And which two are those?
8    A.  The first one, the primary author is me, Gwin.
9  "Measurement of Tolerable and Non injurious Levels of
10 Back-to-Front Whole-Body Accelerations."
11       And I say it's tangential because, certainly, we
12 didn't hurt anyone in our testing, and Master Bryson was
13 killed in this crash, so I'm not saying that it was a
14 tolerable acceleration that he was exposed to, but we did
15 look at measurements of whole-body accelerations in sort
16 of simulated rear crashes the way we did our testing, so
17 it's pretty tangential, but it is a little related.
18   Q.  How did you measure the whole-body accelerations
19 for that paper?
20   A.  We measured with accelerometers on the subjects'
21 bodies in the lumbar area, upper thoracic, and lower
22 cervical area, and the center -- near the center of
23 gravity of the head.
24   Q.  Okay.  And what's the other paper that is
25 relevant to your testimony in this case?

Page 124

1    A.  It's not a paper.  It's a book chapter.  The
2  primary author is Martin, Julia Martin, and me.  And at
3  it's "The Multiply Injured Patient."
4        So it's about trauma and patients involved in
5  trauma with multiple injuries, and certainly
6  Master Bryson had multiple injuries, multiple areas of
7  his body.
8    Q.  Okay.  Anything else?
9    A.  Nope.
10   Q.  All right.  All right.  Have you reviewed your
11 notice of deposition for this case?
12   A.  Yes.
13   Q.  And did you bring everything in your file?
14   A.  Yes.  Except the materials that were sent to my
15 office from Mr. Hill's office, so regurgitating medical
16 records and the radiology and police report and things
17 like that, I did not do except as I relied upon them.
18       So they're found in your preliminary file summary
19 supporting documents and the radiology keys.
20   Q.  Those are the things in your file?  That's what
21 you're saying?
22   A.  Yes.
23   Q.  Did you produce all your communications with the
24 lawyers in this case?
25   A.  Yes.  Except for Zoom that wasn't recorded.

Page 125

1    Q.  There's no e-mails that were withheld on
2  privilege grounds?
3    A.  Not that I'm aware of.  I certainly wouldn't do
4  that.
5    Q.  Okay.
6    A.  And I don't think Mr. Hill did.
7    Q.  Okay.  I'm going to show you Plaintiff's 17.
8  This is your list of file materials.  Do you recognize
9  that?
10   A.  Yes.
11   Q.  Okay.  And this represents everything in your
12 file; correct?
13   A.  Everything that I've received from Mr. Hill's
14 office.
15   Q.  Oh, all right.  And this is comprehensive?
16 There's nothing left off of here that Mr. Hill's office
17 sent you; correct?
18   A.  Correct.
19       MS. CANNELLA:  Okay.  I'm going to introduce
20 that as Plaintiff's Exhibit 17.
21       (Whereupon Plaintiff's Exhibit 17 was marked
22 for identification.)
23 BY MS. CANNELLA:
24   Q.  It doesn't say when you received these items.
25 Do you have records of when you received these things?

32 (Pages 122 - 125)

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 126

1    A.   No.  I certainly have no access to that.
2  Probably the paralegal would, but it's certainly not part
3  of the file materials.
4    Q.   But it's documents that exist; correct?
5    A.   Probably, so the way we used to do it was
6  folders, and they had dates on them and folder numbers.
7  Now, they're virtual, so probably someplace it's
8  documented that way, but not that I have access to or
9  would ever look at.
10   Q.   These things are transmitted via e-mail;
11  correct?
12   A.   Usually or as a link noted in an e-mail.  Every
13  once in a while we get disks or thumb drives or hard
14  drives in the mail or UPS or something like that.
15   Q.   Okay.  Well, those communications are
16  discoverable.  They're specifically listed in the rules,
17  so can we get a copy of all those to show when you were
18  receiving materials?
19   A.   That would be part of correspondence.
20   Q.   Okay.  So you do have a record of when you
21  received things then; correct?
22   A.   I mean, the e-mail will say something like
23  Dear Paralegal that's working with Lisa Gwin, please see
24  below for a link to Dropbox for materials.  But it won't
25  say what the list of things are on there, no.

Page 127

1    Q.   Okay.  So there's no document that shows when
2  you got these things; correct?
3    A.   Correct.
4    Q.   Okay.  Are there any notes that were -- that you
5  took that are not in your file?
6    A.   No.
7    Q.   Any articles that you considered that are not in
8  your file?
9    A.   None of the articles or book chapters or
10  citations or references are in my file.  That would
11  violate copyright unless it's an open access document,
12  but the -- there are no references that I rely upon that
13  aren't cited in my bibliography.
14   Q.   Okay.  Can you provide copies of those articles
15  if we pay the copyright fee?
16   A.   Yes.  Unless it's a book chapter, and generally
17  my understanding is that book chapters don't let you buy
18  carpets, you'd have to buy the book.
19   Q.   Okay.  After this deposition, can you give
20  Mr. Hill the information about what it would cost to get
21  the articles from you guys?
22   A.   Yes.
23   Q.   Great.  Okay.  Aside from the articles, is there
24  anything that you're relying on in this case that's not
25  in the file that we received?

Page 128

1    A.   I mean, just things that are my experience, you
2  know, the years of education that certainly I can't put
3  into a file, but there's nothing in the file -- there's
4  nothing from the file that was withheld or isn't here.
5    Q.   You've written a report for Federal Court many
6  times before; correct?
7    A.   Probably, yeah.
8    Q.   All right.  And so you're familiar with the
9  rules around what has to be involved and included in a
10  federal report?
11   A.   For the most part, yes.
12   Q.   And does your report contain all that
13  information that's required?
14   A.   I think it does, yes.
15   Q.   Does it contain a complete statement of all the
16  opinions you'll express at trial?
17   A.   Yes, yes.
18   Q.   Does it include a complete statement of all the
19  bases and reasons for your opinions?
20   A.   Yes.
21   Q.   And you didn't leave out any of the support for
22  your opinions in your report?
23   A.   Correct.
24   Q.   Did it include all the facts and data and
25  research you considered in forming your opinions?

Page 129

1    A.   Up to the point of my report, yes.
2    Q.   Do you have any new facts and data or research
3  since you wrote your report?
4    A.   Yes.
5    Q.   Does it include all your qualifications?
6    A.   Yes.
7    Q.   Do you hold any opinions about the case that are
8  not covered in your report?
9    A.   Yes.
10   Q.   And what are those?
11   A.   A response, if you will, to Mr. Lewis's
12  additional file materials and his deposition.
13   Q.   Okay.  Anything else aside from that?
14   A.   Not that I'm aware of at the moment, unless or
15  until I get more information.
16   Q.   Can you please walk me through the things that
17  you disagree with, the additional opinions you have
18  regarding Mr. Lewis and his findings?
19   A.   Yeah.  So, well, I'll take it in two parts.  The
20  first one is some case -- two cases that apparently
21  involved Rough Country that Mr. Lewis worked on in the
22  past, Bacho and Mendoza.
23       My opinions are that I don't know anything about
24  these cases, and so without doing some sort of analysis,
25  there's no reason to believe that these two cases have

33 (Pages 126 - 129)

Dr. Lisa P. Gwin                                          May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 130

1  anything to do with the Bryson case.
2       And then the second piece is the two tests that
3  were provided that were run for other cases, one was by
4  Todd Tracy run a Cal Span, and the other one seems to
5  have been run by Dr. Thorbaly at Wichita State.
6       And I don't know enough about what was run. It
7  seems that the Cal Span was a crash test, I believe,
8  where the Wichita State was a sled test. So the sled
9  test would be absolutely inapplicable to the Bryson case
10  because Master Bryson's injuries were caused by contact
11  and intrusion. Therefore, a sled test is completely
12  inapplicable.
13       Not only that, I think the Delta V was, like, 15
14  or something, which is completely lower than our crash,
15  the Bryson crash. Other than that, I don't know anything
16  about the case that it was run for, so I can't say much
17  else about it.
18       Regarding the Todd Tracy, which I think was a
19  crash test. I don't know -- there's no photos. There's
20  no videos, so I don't know what happened inside the
21  vehicle that -- I think it was the Mercedes-Benz that was
22  struck, although it's not entirely clear, but I think so.
23       So I had acceleration measurements for some
24  dummies, but I don't know if there was intrusion, and if
25  not, then that test is also completely inapplicable to

Page 131

1  the Bryson case.
2       I don't remember if the Delta V was even
3  described, so I really don't know if it's applicable in
4  terms of the Delta V or severity of the crash.
5  Certainly, the two vehicles are absolutely different and
6  have nothing to do with the Bryson crash.
7       So, you know, in summary, his -- Mr. Lewis's
8  additional materials don't offer us anything in terms of
9  support for his opinions that if Mr. Elliott's truck
10  didn't have a lift kit, Master Bryson would not have been
11  killed.
12  Q.  Why do you keep calling him Master Bryson
13  instead of Cohen?
14  A.  I'm old. I was taught to call people Mr. and
15  Mrs. and be polite to people that I don't know, so when I
16  work in litigation, I always call children by Miss or
17  Master.
18  Q.  Okay. Did you look at the information from the
19  Mendoza or Bacho cases?
20  A.  What little I was provided, which I think was
21  just Mr. Lewis's reports, I believe.
22  Q.  And did you look at the information that
23  Rough Country produced in this case about those two
24  cases?
25  A.  No. I was not aware that Rough Country produced

Page 132

1  any materials regarding those cases, so no.
2  Q.  Do you have any opinions about similarity of
3  those crashes to this one?
4  A.  One is a side impact, and this one is not,
5  Bryson is not. So other than that, I don't really know
6  anything about those crashes in terms of injuries or
7  where people were seated, et cetera, other than
8  Mr. Lewis's opinions.
9  Q.  Have you asked Rough Country for any of the
10  information, additional information, for those cases?
11  A.  Not particularly because I would have to do a
12  full analysis, and I, you know, would have to see
13  vehicles, do vehicle inspections, et cetera, and Rough
14  Country, I'm sure, doesn't have any access to vehicles in
15  old cases.
16  Q.  Have you ever been involved in a case that
17  involved OSIs, other similar incidences?
18  A.  I've heard that acronym and yes, although,
19  that's usually something I'm not involved in at all, but
20  yes, a few cases, I've heard that there were allegedly
21  OSIs.
22  Q.  And isn't it true that when OSIs are an issue in
23  a case, the decisions about similarity and notice are
24  made from the documents that are available, not from
25  vehicle inspections?

Page 133

1       MR. HILL:  Object to the form.
2       THE WITNESS:  I have no idea. If I were being
3  asked if a certain incident were similar to the Bryson
4  crash or whatever I'm working on, I would need to do a
5  full analysis, which includes medical records, radiology,
6  photographs of injuries, photographs of vehicles, crash
7  report, depositions, vehicle inspection, et cetera.
8       So I don't know if other people can say whether
9  something is an OSI, but I certainly couldn't say whether
10  something was similar or applicable at all without doing
11  an analysis.
12  BY MS. CANNELLA:
13  Q.  And it sounds like you've never been asked to do
14  that before; correct?
15  A.  Right, not my area.
16  Q.  Okay. Any other critiques of Mr. Lewis's work?
17       MR. HILL:  Object to the form. Go ahead.
18       THE WITNESS:  Well, what I answered was since my
19  report, so other than what's in my report and what I've
20  said, so far if nothing else becomes available, no.
21  BY MS. CANNELLA:
22  Q.  Well, your report says that his analysis is
23  incomplete, I think is the word that you used.
24  A.  Yes.
25  Q.  Can you give me all the reason why you contend

34 (Pages 130 - 133)

Dr. Lisa P. Gwin    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 134

1  it's incomplete?
2      A.  Well, I've outlined this in my report.  So first
3  of all, he asserted that Master Bryson's head injuries
4  were due to contact with the driver's seat, and that is
5  erroneous.  The skull fracture was a depressed fracture
6  indicating a relatively small impact surface, like two
7  inches that we tabbed before, which there are none of
8  those on the driver's seat.
9          Mr. Lewis initially opined that the periorbital
10  ecchymosis around Master Bryson's right eye was proof or
11  evidence of impact with the driver's seat.  I
12  understand -- I understood at the time of my report, and
13  I understand now, that he corrected that in the
14  deposition, in his deposition.
15          And like I said a minute ago, most importantly
16  that had Mr. Elliott not had a lift kit on his truck,
17  Master Cohen's injuries would have been prevented.  I
18  disagree with that as well.
19      Q.  Okay.  The ecchymosis issue that you just
20  mentioned, do you agree he was relying on the medical
21  examiner's report, which had an error in it?
22      A.  Not about that, the medical examiner's report
23  had an error in it, but it was unrelated to that, so no.
24      Q.  Okay.  The headrest post of the driver's seat,
25  is that -- are those posts each under two inches?

Page 135

1      A.  Like, in length?
2      Q.  No.  In width?
3      A.  Yes?  Yes.
4      Q.  And do you have any criticisms of Mr. Lewis's
5  education?
6      A.  I don't know anything about his education other
7  than he has a Master's degree, but I don't know.  I have
8  no opinion one way or the other.
9      Q.  Do you have any criticisms of his
10  qualifications?
11      A.  I mean, the fact that he missed that periorbital
12  ecchymosis would be due to a basilar skull fracture,
13  rather than impact might be because he's not a physician,
14  but I've seen Mr. Lewis come to some very correct
15  conclusions as well, so I don't really know.  In this
16  case I think being a physician might have cleared that
17  one problem up.
18      Q.  Did you do any surrogate testing in this case?
19      A.  I did not.
20      Q.  And why not?
21      A.  It wasn't really necessary in this case.
22  Sometimes it is; sometimes it's not.
23      Q.  And why wasn't it necessary?
24      A.  Because if -- so surrogate work includes an
25  exemplar vehicle, and there is -- an exemplar vehicle

Page 136

1  would be undamaged, of course, and therefore would not
2  help us understand how far forward Master Bryson was
3  pushed due to the intruding rear structures in the
4  subject crash.
5          And so it would really just be photographs of a
6  child in a child seat in an undamaged vehicle and
7  wouldn't really help us understand what happened.  It
8  wouldn't add any value.
9      MS. CANNELLA:  Okay.  I'm going to show you a
10  photo.  What exhibit number am I on?  I think we're on
11  37.  Does that sound right?  Anybody keeping track?
12      THE WITNESS:  I don't think so.  Back in the old
13  days of stickers it was so much easier, and everyone was
14  in the same room.
15      MS. CANNELLA:  Okay.  I'm going to show you a
16  photograph from Mr. Lewis's surrogate study.  Can you
17  circle the area of the car seat that Cohen's head was in
18  contact with that caused his -- or where he got his
19  injury?
20      THE WITNESS:  Are we running out of media?  Oh,
21  okay.
22          I could get in the general area, but it's part
23  of the polymer under the covering, so this isn't
24  certainly the best picture to try to do that.
25  BY MS. CANNELLA:

Page 137

1      Q.  Okay.  Well, we can start with a different one
2  if you have one in your photo collection.
3      A.  Okay.  Let me -- looking at my other photo which
4  is from my vehicle inspection, it would be in this area
5  and including-- oops, I just covered part of the Row 2
6  seat, but including the head restraint adjustment knob.
7      Q.  Can you tell me what photo you're looking at?
8      A.  The one that you just had on the screen, but I
9  was looking at my Vehicle Inspection Photo 17376.
10      Q.  So you're at the 3/6/23 vehicle inspection?
11      A.  Yes.
12      Q.  And you're looking at which photo, 17 --
13      A.  376.
14      Q.  Okay.  That photo right there?
15      A.  Right.  And you can see the deformation of the
16  polymer, and right in front of that as we were looking at
17  the surrogate photo from Mr. Lewis, you could see what's
18  in front of that, which is the head restraint knob,
19  adjustment knob on the right-hand side.
20      Q.  Okay.  Can you circle the area that you're
21  talking about where his head would have impacted?
22      A.  I just did it on the picture you showed, so it
23  would be that head --
24      Q.  Oh, I'm sorry.
25      A.  Yeah.  That head restraint adjustment knob on

35 (Pages 134 - 137)

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 138

1  the right.
2      Q.  Well, can we do it on this one as well?
3      A.  Well, this is what pushed forward on the seat
4  and moved the head restraint adjustment knob forward,
5  which hit his head, so no, not exactly.  It's all --
6      Q.  Okay.  Wait.  I'm confused.
7      A.  -- stacked up.
8      Q.  Can you explain to me what -- it's your
9  opinion -- what your opinion is that happened, how the
10  injury happened?
11     A.  Yes.  The truck comes in, the F250 comes in,
12  deforms the liftgate, deforms and breaks whatever's in
13  the cargo area, pushing all that forward, pushes the
14  Row 2 left seat forward, which rotates counter clockwise.
15        The plastic belt guide for the No. 5 belt
16  interacts with the child safety seat in the area that
17  we're looking at right now, where the deformation is of
18  the polymer.
19        Right in front of that all being pushed forward
20  with all this stuff behind it including a truck is the
21  head restraint adjustment knob on the right side, and all
22  of that goes into a Master Cohen's head, about his right
23  ear, right behind his right ear, causing the depressed
24  skull fracture, causing the brain injury, causing the
25  basilar skull fracture, causing the atlanto-occipital

Page 139

1  dissociation and the pontomedullary laceration.
2      Q.  Okay.  So can you circle on the picture in front
3  of you where the belt loop is interacting with the car
4  seat?
5      A.  (Witness complies.)
6      Q.  So the area that you just circled on, we'll call
7  it Exhibit 37, is the area where the belt loop on the
8  bench seat in the second row pushed against the car seat;
9  correct?
10     A.  Yes.
11        (Whereupon Plaintiff's Exhibit 37 was marked
12  for identification.)
13  BY MS. CANNELLA:
14     Q.  Okay.  One second.  And then let's look at the
15  picture of the backseat to make sure we've got that all
16  lined up.
17        Do you see a good picture of that in your
18  vehicle inspection photos, the second row seat, the belt
19  loop?  Oh, I see one.  I think this is a good one for
20  you.  Do you see that picture there?
21     A.  Yes.
22     Q.  Okay.  Can you circle here what it was that
23  interacted with the car seat to cause the deformation you
24  just circled on Exhibit 37?
25     A.  Okay.

Page 140

1      Q.  And is that -- is it your opinion that that area
2  there is -- it's shows physical evidence of contact with
3  the car seat?
4      A.  Yes, it does.
5      Q.  And is it -- can you explain that to me?
6      A.  Explain what the physical evidence is, you mean?
7      Q.  Yes, ma'am.
8      A.  Yeah.  The front left corner of that belt guide
9  is pushed downward, and there's evidence of loading and
10  plastic flow on that polymer.
11     Q.  Okay.  So it's kind of bent down; is that what
12  you mean?
13     A.  That front corner and bent down, yes, and
14  there's plastic flow.
15        MS. CANNELLA:  And we'll mark that annotated
16  picture as Exhibit 38.
17        (Whereupon Plaintiff's Exhibit 38 marked for
18  identification.)
19  BY MS. CANNELLA:
20     Q.  Now let's look at a picture of the front of the
21  car seat.  Do you have a picture of that deformed area of
22  the car seat from the front angle from your vehicle
23  inspection?
24     A.  Not sure.  I don't think so.  I don't think you
25  can really see it from the front because it's on that

Page 141

1  folded polymer, so right, yeah, you couldn't see it from
2  the front.  I can show you where it would be in general
3  from the front, but I can't -- you can't see it from the
4  front.
5      Q.  Okay.  Which picture would you use to show it in
6  general?
7      A.  Let's do my Vehicle Inspection Photo R0017309.
8      Q.  This one?
9      A.  Yes.
10     Q.  All right.  Can you circle the area that
11  interacted -- the front of the area that interacted with
12  the belt loop, the belt guide?
13     A.  Nothing on the front of the child safety seat
14  interacted with the belt guide.  The rear of the child
15  safety seated interacted with the No. 5 belt guide, which
16  then --
17     Q.  Sorry.  Which area in the front corresponds with
18  the area in the back that interacted?
19     A.  It's right around that seam on the right, right
20  behind the right head restraint adjustment.
21        MS. CANNELLA:  Okay.  So we'll mark this
22  Plaintiff's Exhibit 39.
23  BY MS. CANNELLA:
24     Q.  And do you -- well, let me strike that.
25        What is it that actually hit Cohen and caused

36 (Pages 138 - 141)

Dr. Lisa P. Gwin                                              May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 142

1  his fracture, his skull fracture?
2     A.  That head restraint adjustment with the child
3  seat behind it, the vehicle seat behind it, the cargo
4  items behind it, the truck behind it.
5     Q.  I'm looking for the thing that actually touched
6  his head to cause the fracture?
7     A.  Right.
8     Q.  Which thing touched his head?
9     A.  The head restraint adjustment knob.
10    Q.  Is that the thing that you have there in blue?
11    A.  Yes.
12    Q.  Okay.  Gotcha.
13       MS. CANNELLA:  All right.  Marking this as
14  Plaintiff's Exhibit 49 -- or 39, I'm sorry.
15       (Whereupon Plaintiff's Exhibit 39 was marked
16  for identification.)
17       THE WITNESS:  Five minutes to the end of the
18  media.
19  BY MS. CANNELLA:
20    Q.  Okay.  Did you do anything to determine if
21  Cohen's head, if Cohen was tall enough for his head to
22  reach that adjustment knob?
23    A.  Knowing how kids fit in child safety seats with
24  my experience made it clear, and then it turns out that
25  Mr. Lewis did some surrogate work that showed that that

Page 143

1  was true.
2     Q.  You didn't do any measurements; correct?
3     A.  Correct.  I did use my experience, but no, I
4  didn't take a tape measurer out and measure anything.
5       MS. CANNELLA:  Okay.  We can take a break and
6  switch tapes.
7       THE VIDEOGRAPHER:  We're going off the record.
8  The time is 2:17.
9       (Whereupon a short recess break was taken.)
10       THE VIDEOGRAPHER:  We're back on the record.
11  Time is 2:28.
12  BY MS. CANNELLA:
13    Q.  Okay.  All right.  Dr. Gwin, we just looked at
14  the area of the car that impacted the back of the car
15  seat, and the area of the car seat that interacted with
16  the belt guide on the second row, and then we saw from
17  the front the headrest adjustment lever, which is it's
18  your opinion that's what impacted Cohen's skull and
19  caused the skull fracture; correct?
20    A.  Yes.  And the other constellation of injuries
21  that I said before.
22    Q.  Okay.  And the AO dislocation as well?
23    A.  Yes.
24    Q.  Do you agree that an AO dislocation requires
25  opposing forces?

Page 144

1     A.  No, I don't think that's true.
2     Q.  All right.  Let me ask you this:  The headrest
3  lever on the child seat always stays above the headrest.
4  Do you agree with that?
5     A.  Yes, just barely.  Yes.
6     Q.  And if we look at Plaintiff's Exhibit 30, which
7  is the slide show from your LEC with the lawyers and the
8  experts, do you see that on your screen?
9     A.  Yes.
10    Q.  The pictures -- let me go to the injury
11  diagram.  Oh, this one is good actually.
12       Is the arrow in this picture pointing to the
13  area that according to you impacted the headrest lever?
14    A.  So this is a radiology key, so the radiologist
15  put an arrow to the general area of the right temporal
16  bone saying that there is some general flattening there
17  on this AP view or anterior posterior view, saying that's
18  the general area of the fracture, but he doesn't see a
19  fracture.
20       So this is not a great one to look at.  The
21  better place to look is on the autopsy photos so we can
22  see exactly where we're talking about on Master Bryson's
23  head.
24    Q.  Well, so this area on what we're looking at
25  right now on Plaintiff's Exhibit 30, which is page 8 of

Page 145

1  the PDF, this is not a arrow pointing to where the impact
2  was; correct?
3     A.  No.  It's an arrow pointing to mild flattening
4  of the inferior temporal surface of the right skull.
5     Q.  Okay.  Can you -- let's see, can you show us on
6  this picture where the impact with the harness adjustment
7  levers was?
8     A.  No.
9     Q.  You can't see it on this picture?
10    A.  Correct.
11    Q.  How about on this picture?
12    A.  No.
13    Q.  This picture?
14    A.  Yes.
15    Q.  Okay.
16    A.  So we know there's an abrasion behind his ear.
17  There's ecchymosis of the ear pinna, itself, so in that
18  general area.  And then when Dr. Eisenstat did the scalp
19  reflection, we can see even better where it is.
20    Q.  Okay.  Can you circle on the screen in front of
21  you where the impact is with the adjustment harness
22  levers?
23    A.  Well, like I said, it's the general area, so
24  it's behind his year and his ear.
25       MS. CANNELLA:  Okay.  Great.  And we'll mark

37 (Pages 142 - 145)

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 146

1  this as Exhibit -- all right.
2      THE REPORTER:  Sorry.  What was the exhibit,
3  Counsel?
4      MR. HILL:  Yeah, what number, Counsel?
5      MS. CANNELLA:  I don't know yet.  Hold on.
6  Plaintiff's Exhibit 40.
7      (Whereupon Plaintiff's Exhibit 40 was marked
8  for identification.)
9  BY MS. CANNELLA:
10     Q.  All right.  And did you take any measurements to
11  see how far this area of Cohen's head would have been
12  from the headrest adjustment knob?
13     A.  No.
14     MS. CANNELLA:  Rick, I wanted to mention to you
15  I don't have any communications.  I've double-checked
16  while we were -- while we broke.
17     THE WITNESS:  Like correspondence?
18     MS. CANNELLA:  Correct.  Can somebody send those
19  to us real quick before we end today?
20     MR. HILL:  What do you mean by "correspondence"?
21  You mean, like an e-mail from our office that sends a
22  file link or something?
23     MS. CANNELLA:  All e-mails that are discoverable
24  under Rule 26, which includes any e-mails about payment,
25  assumptions, or facts.

Page 147

1      MR. HILL:  All right.  I don't know if we'll be
2  able to get that today, but we'll certainly if there are
3  any such things, and you want to ask her about it, we can
4  all agree to a Zoom deposition where you can ask her
5  those questions.
6      I don't know if we could get that accomplished
7  today.  We just produced the file that she produced that
8  she had maintained -- we didn't search our own outgoing
9  e-mail from when we sent her documents.
10     MS. CANNELLA:  Okay.  Okay.  If we could get
11  that stuff, that would be great, and then, hopefully, we
12  won't need to do anything else, but we do appreciate the
13  offer.
14     MR. HILL:  Or we -- you know, if you want to --
15  if it's just to determine the date that she received
16  certain things, we could provide that in way of a
17  document or whatever you want.
18     MS. CANNELLA:  Yeah.  No, I would rather have
19  the actual communications.
20     MR. HILL:  Sure.
21  BY MS. CANNELLA:
22     Q.  Let's see if there's anything else here.
23     Are you planning on doing any additional work in
24  the case?
25     A.  Not as I sit here today.

Page 148

1      Q.  Okay.
2      A.  Well, I'm sorry.  Trial exhibits.
3      Q.  All right.  What kind of trial exhibits do you
4  think you'll do?
5      A.  A PowerPoint, I usually start with the LEC
6  PowerPoint, and then if there's anything that it's become
7  clear that is -- that needs more demonstration for a
8  jury, I'll put those in there, slides in there to show
9  that, things like that.
10     Q.  Okay.  All right.  One moment.  Let's see what
11  else we got.
12     All right.  I'm going to show you Plaintiff's
13  Exhibit 28, and it is a radiologist PowerPoint.  Can you
14  see that from your file?
15     A.  Yes.
16     Q.  Okay.  Who prepared this?
17     A.  Dr. Hernandez.
18     Q.  All right.  And is this exerted in the LEC
19  presentation we just looked at?
20     A.  Yes.
21     Q.  All right.  This slide right here talks about
22  capacity of the left lung.  Is anything here relevant to
23  your opinion?
24     A.  No.
25     Q.  Do you have any opinion about why his trachea

Page 149

1  deviated to the right?
2      A.  Well, as it says there, likely it's the thymus,
3  the -- kids have really big thymusses, or thymi, if
4  that's the plural in Latin or something, but kids have
5  really big thymusses, and so oftentimes they obscure
6  chest X-rays and can push tracheas one way or the other.
7      You know, the other things we'd have to rule out
8  with a deviated trachea would be, you know, like a
9  pulmonary injury or something which Dr. Eisenstat found
10  no evidence of, so it's likely the thymus.
11     Q.  Okay.  Anything on this slide that relevant to
12  your opinion on the case?
13     A.  No.
14     Q.  Okay.  How about this one, page 8, Plaintiff's
15  Exhibit 28?
16     A.  Not -- no, no.
17     Q.  Okay.  How about page 9?
18     A.  Well, yeah.  I mean, he has a -- fractures of
19  his left radius and ulna.  So that's important.  Every
20  injury is important.  It certainly did not cause
21  Master Bryson's death or contribute to his death, but
22  every injury is important, and I analyze them all.
23     Q.  How do you think he got this arm injury?
24     A.  Like I said before, all of his extremity
25  injuries likely are interaction with the driver seat

Dr. Lisa P. Gwin                                              May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 150

1  back, driver's seat back.
2      Q.  And is this an injury you can get by putting
3  your hand up in the driver's seat coming back toward you?
4      A.  Not usually.  And I guess I should add too
5  certainly his left arm injuries, these injuries could be
6  caused by interaction with the Row 2 left door, the left
7  rear door as well.
8          But no, typically these aren't bracing injuries.
9  They're not generally midshaft fractures when they're
10  bracing injuries like you demonstrated.
11      Q.  Where does a bracing injury usually happen?
12      A.  At the wrist, typically.
13      Q.  Did he have any injuries on his wrist?
14      A.  He did not.
15      Q.  All right.  How about page 11 on Exhibit 28?
16          Oh, you're breaking up.  Did somebody say
17  something?
18      A.  No.  I'm looking at what's here.  So the right
19  panel shows the right distal tib/fib fractures.  And all
20  injuries are important, and I analyze them.  Those likely
21  occurred due to interaction with the driver's seat.
22      Q.  Are those down near his ankle?
23      A.  Yes.
24      Q.  And how about page 12?
25      A.  Same thing, we're looking at the distal tib/fib

Page 151

1  fractures.
2      Q.  Nothing new here?
3      A.  Correct.
4      Q.  How about page 13?
5      A.  Yes.  So on the left panel we see his femur
6  fracture, and on the right panel we see the intraosseous
7  needle in his left tibia.
8      Q.  Okay.  How do you think he got the femoral
9  fracture?
10      A.  Due to the interaction with the driver's seat
11  back.
12      Q.  How does that work?  How does the driver's seat
13  back hit his high thigh or cause a fracture in his thigh?
14      A.  Femur fractures in car wrecks are not always,
15  but typically caused by an axial load on the femur.  So
16  through the knee upward into -- toward the pelvis.
17          And so as he's being pushed forward into a --
18  he's being pushed -- his seat and he are being pushed
19  forward.  Then his knee can interact with the driver's
20  seat back and transmit that force axially, which is
21  typically what fractures a femur.
22      Q.  Is there anything on this page that is
23  particularly important to your cause of death opinion?
24      A.  I mean, it's all the radiology impressions, so
25  yes, as it summarize everything we just talked about in

Page 152

1  the PowerPoint.
2      Q.  Is the mild flattening in the same area that the
3  fracture -- the skull fracture is?
4      A.  Well, that's the big question.  So all we have
5  is an AP view, and it's an X-ray, not a CT scan.  So you
6  can't tell a location.  You can only tell a location left
7  to right on an AP view.
8      Q.  Uh-huh.
9      A.  So that's why Dr. Hernandez said I don't know if
10  this is related to the fracture or not.  The fracture is
11  kind of behind his ear, as we can see on the photographs
12  of the autopsy, and you can't tell on just an AP any
13  depth.
14      Q.  Okay.  Do you believe it's -- it's related --
15  the mild flattening is related to the fracture?
16      A.  I don't know.  The only way to know would be to
17  have an X-ray of Master Bryson's head before this
18  incident to know if that's just his skull or if it's
19  related to the injury.
20      Q.  Okay.  So it's possible the mild flattening is
21  just normal kid stuff; correct?
22      A.  Well, normal for him maybe.  Who knows?  We
23  can't tell.
24      Q.  Okay.  I'm going to show you what I've marked as
25  Plaintiff's Exhibit 27.  Can you see that?

Page 153

1      A.  Yes.
2      Q.  Okay.  And that is the radiology report;
3  correct?
4      A.  Yes.
5      Q.  All right.  And I want to show you what I've
6  marked as Plaintiff's Exhibit 32 as well.  Do you see
7  that photo from your file?
8      A.  Yes.
9      Q.  And this is the backseat of the Escape after the
10  Exponent crash test; correct?
11      A.  I believe so, yes.
12      Q.  So this is Exhibit 32, and is it your opinion
13  that this amount of deformation would be enough to cause
14  the same injury to Bryson Cohen?
15      A.  Yes.
16      Q.  Do you agree that the back seat has left
17  deformation in the Exponent test than it did in the
18  subject crash?
19      A.  Yes.
20      Q.  Okay.  And then -- let's see here, we have some
21  notes from you that I'm not quite able to read.
22      A.  We go to school just for that.  There's a whole
23  class in med school of how to write so no one can read
24  it.
25      Q.  I bet.

Dr. Lisa P. Gwin                                               May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 154

1      MS. CANNELLA:  I'm going to put them in the
2   record as Plaintiff's Exhibit 29.
3      (Whereupon Plaintiff's Exhibit 29 was marked
4   for identification.)
5   BY MS. CANNELLA:
6   Q.  I want to make sure you recognize them before I
7   do that.  Are these your notes from your file?
8   A.  Yes.  Five pages?
9   Q.  Yes, ma'am.
10  A.  Yes.
11  Q.  Okay.  And I'm also going to show you
12  Plaintiff's Exhibit 36.  Can you see that, "History
13  List"?
14  A.  Yes.
15  Q.  Was that accurate as of December 2015?
16  A.  Oh, gosh.  I don't know.  It's too small to see
17  that.  I just recognize the testimony list from BRC.
18  That's what it says, so yes.
19  Q.  Okay.  You just started testifying in September.
20  It looks like you testified once in September 2013, and
21  then didn't testify again for over a year till
22  December 2014; correct?
23  A.  Yes.
24  Q.  Okay.  All right.  I made a contact sheet of
25  your photos so we don't have to number them individually,

Page 155

1   marked as plaintiff's Exhibit 26.  Starts at R17592, and
2   it goes 11 pages to Exhibit R17591; correct?
3   A.  That looks right.
4   Q.  All right.  And does that look like a complete
5   set of your photos?
6   A.  It sure looks like it.
7   Q.  Okay.  I'm just trying to make life a little
8   easier here.
9      Okay.  I'll show you what I've marked as
10  Plaintiff's 24, which is the preliminary medical summary,
11  and that is 53 pages; correct?
12  A.  Oh, hold that thought.  This is preliminary
13  medical summary supporting documents?
14  Q.  Supporting documents.  Thank you.  Yes.
15  A.  53 pages, yes.
16  Q.  Okay.  We'll just put that in the file.  Is this
17  all the medical records or just the ones someone on your
18  staff deemed important?
19  A.  Probably in this case all because we wouldn't
20  really receive anything that wasn't important, so
21  probably all.
22  Q.  Did you review any medical records for Mr. or
23  Mrs. Bryson?
24  A.  No.
25  Q.  Would those be helpful to your opinion, or does

Page 156

1   it not matter?
2   A.  In this case it doesn't matter because there's
3   no allegation of interaction, and I agree that there's no
4   interaction between any of the three people in the
5   vehicle.
6   Q.  And do you agree that Mr. Bryson didn't receive
7   a serious injury?
8   A.  My understanding from his deposition is that he
9   received a concussion, which these days is received as
10  a -- perceived as a lot more serious than they used to
11  be.
12  Q.  Do you agree his only injury was a concussion?
13  A.  I have no way of knowing.  I can only go with
14  what he said in his deposition.  I feel like he said
15  something about his back too, but I don't recall.  I can
16  look at my report to make sure.
17     Do you want me to do that?
18  Q.  Do you agree that Mrs. Bryson was not seriously
19  injured?
20  A.  Yes, that's my understanding.  I don't agree or
21  disagree.  I just -- that's my understanding.
22  Q.  And as far as you know, Chandler Bryson, who was
23  unborn at the time of the wreck, he did not suffer a
24  serious permanent injury; correct?
25  A.  I have no idea.  I know he was born really

Page 157

1   premature, but I don't know anything more about him than
2   that.
3   Q.  Do you agree an unborn child at 24 weeks is more
4   vulnerable to injury than a two-year-old child?
5      MR. HILL:  Object to form.
6      THE WITNESS:  Oh, I don't know of any way to
7   analyze that.  I'm sorry.  And that all being equal,
8   right, so to what stimulus or what injurious mechanism,
9   you know, but even if we knew that, I'm not sure there's
10  any way to know that.  I don't think there's any
11  literature out there to even think about that.
12  BY MS. CANNELLA:
13  Q.  Have you ever cared for a patient with an AO
14  dislocation?
15  A.  I have.
16  Q.  Did they survive?
17  A.  Sometimes yes; sometimes no.
18     THE REPORTER:  Are you saying AO?
19     THE WITNESS:  AO, like atlanto-occipital, so AO.
20  BY MS. CANNELLA:
21  Q.  Is at atlanto-occipital dislocation the same
22  thing as an internal decapitation?
23  A.  Some people call it that.  I think it's a really
24  terrible way to call it, so I don't, but yes, some people
25  call it that.

40 (Pages 154 - 157)

Dr. Lisa P. Gwin                                      May 3, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 158

1    Q.  Do you have any accident reconstruction opinions
2  in the case?
3    A.  I do not.
4    Q.  Was there any stress whitening on the car seat
5  aside from the stress whitening we've talked about so
6  far?
7    A.  Yes.  All over the place.
8    Q.  All right.  Do you have any opinions about where
9  the stress whitening spots came from?
10    A.  Yes.  It all came from the fact that the left
11  portion of the Row 2 seat was pushed forward and rotated
12  counter clockwise into the back of the child safety seat.
13        MS. CANNELLA:  Okay.  I'm going to look at some
14  of your inspection photos again of the car seat.
15        All right.  I am showing you what I'll mark as
16  Plaintiff's Exhibit 41.  It's from your file.  It's Photo
17  R0017284.
18        (Whereupon Plaintiff's Exhibit 41 was marked
19  for identification.)
20  BY MS. CANNELLA:
21    Q.  Is there deformation in this photo on the car
22  seat?
23    A.  I don't know that I'd call it deformation, but I
24  would certainly say that there's significant stress
25  whitening.

Page 159

1    Q.  And what is that from?  Like, did anything
2  contact the car seat here?
3    A.  The whole back of the child safety seat is in
4  contact with the Row 2 left seat back, so yes, but I
5  believe what caused this is likely the seat belt, the
6  vehicle seat belt.  That's typical stress whitening at
7  the slot where the seat belt would go through there.
8    Q.  Okay.  Do you see any other photos in your
9  collection that would be good to look at the other areas
10  of stress whitening?
11    A.  R0017277 shows some stress whitening.
12    Q.  Okay.  Let me pull that up so we can both look
13  at it.  277, you said?
14    A.  Yes.
15    Q.  Okay.  Can you circle it on this photo, please?
16    A.  There's some more here.  Those are the ones I
17  see looking at the small versions.
18    Q.  And does that come from -- have to come from
19  something in contact, direct contact, with the area
20  that's white, or can it just come from being warped from
21  pressure in other areas?
22    A.  The latter, essentially.  Polymer is somewhat
23  pliable.  And so if -- when the Row 2 seat back is
24  rotated and pushed forward, the child safety seat is
25  going to do some movement or twisting, if you will, and

Page 160

1  it will cause stress whitening remote from the place that
2  there is physical contact.
3    Q.  You have a picture of a tear in the cover on the
4  other side of the car seat.  Do you know what caused
5  that?
6    A.  Show me, so I'm sure I'm answering the right
7  question.
8    Q.  Okay.  It's R0017286, if you want to see the big
9  one, and then it's on screen.
10    A.  Okay.  So I'm glad I did that because that's not
11  the one I thought you were talking about.  That is --
12  hang on.  Let me get to another photo.
13        That tear is due to interaction with the --
14  likely due to interaction with the Row 2 seat back and
15  the child safety seat.
16    Q.  Was there something hard on the second row seat
17  back that corresponds with that area?
18    A.  No, not in that area.  So -- and there's not
19  anything in particular below that cover on the polymer,
20  so it's just likely due to interaction.  That one doesn't
21  have an obvious source like the one on the right side
22  does, so is it's likely just due to abrasive forces when
23  that seat is being pushed forward.
24        MS. CANNELLA:  Okay.  Mark this as Exhibit 43.
25        (Whereupon Plaintiff's Exhibit 43 was marked

Page 161

1  for identification.)
2  BY MS. CANNELLA:
3    Q.  Any other stress whitening that you saw on the
4  car seat?
5    A.  Yes, there's tons.  Let me go back to where we
6  were before.  There are certainly more photos of that
7  same area, but I won't torture you with all those.
8    Q.  Thank you.
9    A.  You're welcome.  Photo R0017305.
10    Q.  Okay.  All right.  And I think I see it.  It
11  kind of towards the bottom of the picture in the middle?
12    A.  Yes.
13    Q.  All right.
14    A.  And at the front of the belt slot, yep.
15    Q.  Okay.  And did this result from some direct
16  contact with something or more of a warping-type thing?
17    A.  More of a twisting force.
18        MS. CANNELLA:  Okay.  We'll mark that as
19  Plaintiff's Exhibit 44.
20        (Whereupon Plaintiff's Exhibit 44 was marked
21  for identification.)
22  BY MS. CANNELLA:
23    Q.  All right.  Can you take a look at what we're
24  going to put up, which is R0017309?  Can you see that?
25    A.  Yes.

41 (Pages 158 - 161)

Dr. Lisa P. Gwin           May 3, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 162

1    Q.   Okay.  And can you show us where on that seat
2  Cohen's ear would have been roughly?
3    A.   In the area of the head restraint adjustment
4  knob on the right of the seat, left the of the photo.
5         MS. CANNELLA:  All right.  I'll mark that as
6  Plaintiff's Exhibit 45.
7         (Whereupon Plaintiff's Exhibit 45 was marked
8  for identification.)
9  BY MS. CANNELLA:
10   Q.   Okay.  And you said there was a picture that
11 Mr. Lewis took that showed that the your theory works
12 from a surrogate standpoint.
13        Can you let me know what picture that is?
14   A.   Yes.  So Mr. Lewis's Photo D, like dog, S, like
15 Sam, C, like Charles, underscore, 2462.jpg.
16   Q.   All right.  Let me get to it.  It should be up
17 on your screen.  Can you see it there?
18   A.   Yes.
19   Q.   All right.  Okay.  So tell me what this picture
20 tells you in regards to your opinion?
21   A.   Well, Mrs. Bryson had testified that Cohen was
22 asleep at the time or right before this crash happened.
23 She obviously wasn't looking at him right at the moment
24 and leaning inboard or to his right.
25        So certainly this child is not doing that.  This

Page 163

1  child is very focused on whoever is taking the picture,
2  who I think is Mr. Lewis.  But if we can imagine the
3  child, you know, sleeping, sitting back and leaning
4  inboard, his -- the area of his injury is adjacent to the
5  right head restraint adjustment knob.
6         And so when the vehicle seat is rotated and
7  pushed forward, and the child seat is pushed forward and
8  twisted somewhat to cause all that stress whitening, that
9  knob interacts with Cohen Bryson's ear -- I'm sorry,
10 head, skull, in the area of his ear causing his depressed
11 skull fracture and pushing his head forward and to the
12 left causing his AO dissociation and brainstem injury.
13   Q.   Okay.  So it's your opinion then that the car
14 seat warped enough to get that headrest adjustment knob
15 down close to the top of Cohen's ear; correct?
16   A.   Yes.  And he's pre-positioned closer to it, not
17 like in this photo because, again, this child is very
18 interested in what Mr. Lewis is doing, taking his photos.
19   Q.   Okay.  But does it help that he's -- so he's
20 just looking to the left -- or she, the child is looking
21 to the left in this picture, and that adjustment knob
22 then if you're in -- if you had the opposing forces from
23 what we had in our crash, you think that that adjustment
24 knob could get down to where the left is, the left
25 adjustment knob could get down to the left ear?

Page 164

1    A.   I'm not sure what you mean by opposing forces,
2  but --
3    Q.   Like, if everything was flip-flopped, you know
4  what I'm saying?  We can look at the -- we can look at
5  the distance from the child's ear to the adjustment knob
6  on the left side instead of the right side, is what I'm
7  saying.
8    A.   So this child is leaning forward.  This is not a
9  sleeping kid, who's leaning against the head restraint or
10 headrest of his child safety seat.
11   Q.   Uh-huh.
12   A.   So we'd have to be there, first of all.  And
13 again if it's left, instead of right, and then leaning,
14 the child would have to be leaning outboard in this case,
15 flip-flopped from our -- the real case.
16        And then yes, his ear -- his skull adjacent to
17 his ear would be very near the location, adjacent to the
18 location of that adjustment knob statically, and then
19 dynamically as the seat rotates and the child seat
20 rotates and the child seat is twisted somewhat, and, you
21 know, the crash all happens, yes, it is in that area
22 contacting his skull.
23   Q.   Okay.  But you didn't do any surrogate testing
24 to test that theory; correct?
25   A.   Correct.

Page 165

1         MS. CANNELLA:  I'm going to mark this picture as
2  Plaintiff's Exhibit 46.
3         (Whereupon Plaintiff's Exhibit 46 was marked
4  for identification.)
5  BY MS. CANNELLA:
6    Q.   Do you agree there were milliseconds where the
7  crash had begun, but Cohen had not yet received an
8  injury?
9    A.   Yes.
10   Q.   Do you agree that Cohen only experienced his
11 death once the intrusion reaches him?
12   A.   Yes.
13   Q.   Did you do anything to quantify the amount of
14 second-row intrusion that would have been required to
15 cause Cohen's death?
16   A.   I did not.
17   Q.   Do you agree there's randomness to motor vehicle
18 accidents?
19        MR. HILL:  Object to form.
20        THE WITNESS:  I don't know how to answer that
21 question.
22 BY MS. CANNELLA:
23   Q.   In other words, you could have the exact same
24 wreck twice, but the outcome -- there would be
25 differences in the outcome?

42 (Pages 162 - 165)

Dr. Lisa P. Gwin                                      May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 166

1     MR. HILL:  Object to form.
2     THE WITNESS:  No, not if everything is exactly
3  the same.
4  BY MS. CANNELLA:
5     Q.  Is it your opinion that Cohen -- strike that.
6     Would Cohen have died if there was one
7  millimeter of intrusion into the second row?
8     MR. HILL:  Object to form.
9     THE WITNESS:  I'm not sure I can answer that.  I
10  can't answer the specific number of millimeters or
11  centimeters or inches where he doesn't get the injury
12  versus he does get injury because what's important is the
13  fact that that intrusion is occurring with a lot of
14  velocity to it or speed to it because the intruding
15  structures aren't coming in slowly, you know.
16     So it's not just the fact that there's
17  intrusion.  It's the fact that there's dynamic very fast
18  intrusion, so I don't think there's a specific number
19  where we can say this is how many inches he gets the
20  injury versus this is how many inches or millimeters
21  where he doesn't.
22  BY MS. CANNELLA:
23     Q.  Do you believe that Cohen experienced any pain
24  or suffering in this crash?
25     A.  I don't.  I agree with Dr. Eisenstat that he was

Page 167

1  unconscious immediately, and then, unfortunately,
2  deceased very shortly thereafter.
3     Q.  Do you disagree with anything that Dr. Eisenstat
4  said at his deposition?
5     MR. HILL:  Object to form.  Go ahead.
6     THE WITNESS:  Well, as we talked about before,
7  he missed the tib/fib injury, so that's not really
8  disagreeing with something he said in his dep because he
9  didn't talk about it in his dep, but I disagree with him
10  in that way.
11     Once he clarified the temporal bone fracture, I
12  no longer disagree with him, but in his report where he
13  called it a sphenoid fracture, I disagree with that.
14     And then once he clarified that the basilar
15  skull fracture went all the way across the base of the
16  skull, across the foramen magnum, I agree with that.
17  That was in his deposition, but was not called out in his
18  report.  I think that's it.
19     Q.  Okay.  What evidence do you look for to
20  determine whether there's been pain or suffering that
21  someone experienced?
22     A.  Well, several things.  One, are they conscious;
23  two, are they alive; and then, three, if there's any
24  evidence of pain and suffering.
25     Q.  And how do you know if they're conscious?

Page 168

1     A.  If there's evidence of movement or vocalization.
2  If they say that they're in pain and awake.  They're
3  awake and saying they are in pain.
4     Other people's characterizations of whether a
5  person is conscious or not, although we always have to
6  take those with a grain of salt.
7     And then based on the jury, injuries or injury
8  that they have, whether they could be conscious or could
9  be alive with those injuries.
10     Q.  Did you do anything to analyze the accuracy or
11  reliability of the accident reconstruction in this case?
12     MR. HILL:  Object to form.
13     THE WITNESS:  Not that I did my own
14  reconstruction and compared it to Mr. Grimes'
15  reconstruction, but I always -- being a certified
16  reconstructionist, I always listen to a reconstruction
17  and do a gut check.
18     Does the PDOF seem to be correct, does the
19  Delta V seem to be correct, and in this case, yes, I
20  agree with Mr. Grimes.  I certainly have no independent
21  reconstruction opinions, nor, again, did I do my own
22  reconstruction to compare his and mine.
23  BY MS. CANNELLA:
24     Q.  Have you ever done an autopsy?
25     A.  Not by myself, only participated and assisted.

Page 169

1     Q.  Have you ever worked as a medical examiner?
2     A.  No.
3     Q.  Would you be qualified to serve as a medical
4  examiner in Georgia?
5     A.  I doubt it.  I don't know what their
6  qualifications are, but I suspect they require a
7  residency in forensic pathology, so I doubt it, but I
8  don't know for sure.
9     Q.  Did you design any tests while you were at Ford?
10     A.  Yes.
11     Q.  Can you explain which tests you designed?
12     A.  The one that comes to mind is outlined in my SAE
13  paper regarding onboard refueling vapor collection, which
14  is in my CV.  Do you want more details about it?
15     Q.  No, that's okay.
16     A.  I didn't think so.  There -- so I did a huge
17  recall or campaign regarding a fuel system concern on
18  F Series -- some F Series trucks.  And we had to do
19  testing to figure out if our fix was going to work, so I
20  designed that test.
21     We had a noise vibration and harshness concern
22  on some F Series and Bronco trucks regarding like a water
23  hammer effect in the fuel system, and we had to design a
24  fix.  And so we had to design -- I had to design the test
25  to make sure that our fix worked.

43 (Pages 166 - 169)

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 170

1  Q. Did you design any crash testing?
2  A. Oh, heavens no.
3  Q. Okay. Do you have hospital privileges anywhere?
4  A. Not anymore.
5  Q. Did you visit the scene of this crash?
6  A. No.
7  Q. Did you measure the crash in either the subject
8  wreck or the crash test?
9  A. No. There are scans that we could do some
10 measurements, but I can't tell you what those numbers are
11 today.
12 Q. And there's a scan in your file. Is that one
13 that you performed or someone else?
14 A. Ms. Gaul, the test engineer, performed that
15 scan.
16 Q. And what is it of?
17 A. The subject vehicle.
18 Q. Okay. Did you use -- come to any conclusions
19 based on that scan?
20 A. Not the scan in particular, no.
21 Q. Did you scan the inside of the vehicle or just
22 the outside?
23 A. Probably not the outside at all, just the
24 inside.
25 Q. Okay. You've never published any papers on auto

Page 171

1  design; correct?
2  A. Correct -- oh, I'm sorry. Wait. Only in terms
3  of onboard fuel vapor recovery.
4  Q. Okay.
5  A. But nothing else.
6  Q. All right. I want to look in your report -- or
7  I'm sorry, your disclosure, which I've marked as
8  Plaintiff's Exhibit 15.
9     Do you see that on your screen?
10 A. Yes.
11 Q. Have you seen your disclosure before?
12 A. Yes.
13 Q. I want to look at the highlighted sentence here,
14 so if you could just take a second and read up to that
15 highlighted sentence.
16     Just let me know when you're done.
17 A. Okay.
18 Q. That highlighted sentence says that you're
19 expected to testify regarding the same subjects in
20 relation to the vehicle crash testing performed at
21 Exponent. And the same subjects, as I understand it, are
22 biomechanics of the occupants inside the Escape at the
23 time of the incident, the cause of injury and death to
24 Cohen, and the forces experienced by Cohen in the subject
25 crash.

Page 172

1     Are those the things you're going to testify in
2  relation to the Exponent test?
3  A. I mean, like we talked about before, I'm not
4  going to talk about forces in terms of pounds or newtons
5  or anything like that, so I would better characterize it
6  as noted in my report.
7     So what I will testify about is that injury
8  causation would have -- you know, the same injury outcome
9  would have occurred for Cohen Bryson whether -- in an
10 unlifted -- let me start over.
11    The same injury outcome would have occurred for
12 Cohen Bryson whether or not Mr. Elliott's truck were
13 lifted or not.
14 Q. And how -- can you give me like a short summary
15 of how the crash test informs your opinions about what
16 happened during the crash?
17    MR. HILL: Object to the form, but go ahead.
18 You can answer.
19    THE WITNESS: So our crash test at Exponent
20 doesn't really help us understand what happened during
21 the subject crash because of the independent variable of
22 no lift kit in the Exponent test. So it doesn't because
23 it's a different crash.
24 Q. Okay. And your disclosure says that you relied
25 on the crash reconstructions and simulations. What are

Page 173

1  you talking about there?
2  A. Likely Mr. -- is it Rocha? I'm sorry. I don't
3  remember his name.
4  Q. Rosch?
5  A. Thank you. I think did some simulations, but I
6  didn't really rely upon those. I certainly reviewed
7  them, but more I'm relying on the crash reconstruction.
8  Q. Okay. Did the defense experts do any crash
9  simulations?
10 A. Unless we're going to call the Exponent crash
11 testing a simulation, but not like Mr. Rosch did.
12 Q. Okay. I think you're thinking of Mr. Buckner?
13 A. Okay. You're probably right. Sorry about that,
14 Buckner.
15 Q. All right. What defense experts are you relying
16 on to form your opinion?
17 A. Mr. Wes Grimes and Mr. Charlie Crosby. Unless
18 you asked me something you haven't asked me yet, I don't
19 think Mr. Pasquerella.
20 Q. Was there something I need to ask you about
21 Mr. Pasquerella?
22 A. I don't think so, but those are the only defense
23 experts I know of, so I would have to consider him if you
24 asked me something about what he said, but I rely upon
25 Crosby and Grimes.

44 (Pages 170 - 173)

Dr. Lisa P. Gwin                                                        May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 174

1    Q.  Do you have any opinions about what
2  Mr. Pasquerella said, or are you leaving that to him?
3    A.  I'm leaving that to him.
4    Q.  Okay.  Great.  Did you rely on anything
5  Mr. Buckner did?
6    A.  No.
7    Q.  Did you rely on anything Mr. Lewis did?
8    A.  No.
9    Q.  Did you rely on anything Mr. Rosch did?
10   A.  No.
11   Q.  Did you rely on any RC, Rough Country, documents
12  produced in discovery?
13   A.  I'm probably going to get this wrong because
14  it's a lawyer sort of thing, but I think you mean like
15  documents that were created by Rough Country as opposed
16  to my client is Rough Country, and they produced medical
17  records to me.  I think that's what you mean.
18   Q.  Yeah, I'll rephrase it.
19       Did you rely on any internal Rough Country
20  documents to form your opinion?
21   A.  No.
22   Q.  Does your -- is your opinion -- let's see how to
23  phrase this.  Would you know that Cohen would have
24  survived -- I'm sorry.  Strike that.
25       Would you be able to give the opinion that Cohen

Page 175

1  would have died in an unlifted -- a wreck with an
2  unlifted F250 without having run the crash test?
3       MR. HILL:  Object to the form, but you can go
4  ahead.
5       THE WITNESS:  Yes.  Based on Mr. Grimes'
6  opinion, based on his expertise that the F250 -- unlifted
7  F250 would intrude into the occupant space because of
8  bumper height mismatch, and I will -- I will be corrected
9  by Mr. Grimes if he says that's a terrible way to
10  characterize it.
11       But even before we ran the test, his opinion
12  that it was -- his opinion was that it was likely that
13  due to the bumper heights of the two vehicles, probably a
14  better way to say it, the F250 unlifted would still
15  intrude into the Escape.
16  BY MS. CANNELLA:
17   Q.  So it's Grimes' opinion.  Anything else that you
18  rely on and not need the crash test for your opinion
19  about the alternative design?
20       MR. HILL:  Object to the form.
21       THE WITNESS:  No.
22  BY MS. CANNELLA:
23   Q.  No.  All right.  Okay.  I've marked as
24  Plaintiff's Exhibit 21 the preliminary file summary.  Who
25  prepared this document?

Page 176

1    A.  Is it just preliminary file summary, not the
2  supporting documents?  Yes.  A gentleman named
3  Ed Abucevitch.
4    Q.  And what's his qualifications?
5    A.  He is -- Mr. Abucevitch is a paralegal, who has
6  been working at BRC for more than 20 years.
7    Q.  And he basically just goes through the documents
8  and pulls language and puts it in the summary document?
9    A.  I mean, he summarizes the nonmedical documents
10  that are provided to us in the case and keeps track of,
11  like, the list of materials that's created by
12  Mr. Abucevitch.
13   Q.  The preliminary file summary supporting
14  documents I've marked as Plaintiff's Exhibit 22.
15       2520 pages, is that a complete copy?
16   A.  2520, yes.
17   Q.  That is all the documents you've received in the
18  case or some other subset of it?
19   A.  It's typically not -- well, it's never medical
20  records.  Those are separate.  But then it's generally a
21  subset.  Sometimes it's every single thing we've received
22  except medical, but it's usually a subset.
23       There are usually some things that don't go in
24  there.  Photos don't go in there generally, things like
25  that.

Page 177

1    Q.  But generally it's pretty much everything?
2    A.  Yes.
3    Q.  Asides from medical records and photos, okay.
4       I'm going to show you what I've marked as
5  Plaintiff's Exhibit 23, the medical summary, preliminary
6  medical summary.
7       Do you see that on the screen?
8    A.  Yes.
9    Q.  It's 13 pages; correct?  Is your document 13
10  pages?
11   A.  I'm looking.
12   Q.  Oh, okay.
13   A.  It's opening.  Sorry.
14   Q.  That's all right.
15   A.  Yes, 13 pages.
16   Q.  Okay.  All right.  Let me go through and see
17  what else I've got here.
18       Great.  I want to make sure I understand what
19  injuries the deformation of the child seat caused
20  according to your opinion.
21       The ones that I see in the report are right ear
22  laceration, and ecchymosis, temporal scalp hemorrhage,
23  temporalis muscle hemorrhage, temporal depressed skull
24  fracture with extension across skull base, subarachnoid
25  hemorrhage at the base of the brain; is that correct?

45 (Pages 174 - 177)

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 178

1    A.  That's part of it, yes.
2    Q.  Is that all the ones that the knob -- the
3  headrest adjustment knob caused?
4    A.  No.  Read the next sentence.
5    Q.  What page are you on looking at?
6    A.  Page 11 of my report.  I mean, I can read it.
7  I'm sorry.  I didn't mean that.  So also caused by that
8  interaction was the AO dissociation and brain stem
9  laceration.
10    Q.  Okay.
11    A.  And then as a sequela of the basilar skull
12  fracture, the right periorbital ecchymosis.
13    Q.  Okay.  And are those -- those all -- where are
14  all those injuries?  Are they all in the same area by the
15  ear?
16    A.  No.
17    Q.  Can you kind of explain to us where they are?
18    A.  Yeah.  So the skull fracture, the ear laceration
19  obviously, the temporalis muscle hemorrhage, temporal
20  scalp hemorrhage -- I don't think I said that yet -- are
21  all in the same area, which is around the right ear.
22  There was an abrasion behind his ear as well, which --
23  all that is in that same area.
24    Then the extension of the depressed skull
25  fracture across the base of the brain is inside that

Page 179

1  area.  I can't point to it because it's in there.
2    And then the right periorbital ecchymosis is
3  around the right eye.
4    The AO dissociation I can't really point to
5  either, but that is where the occiput of the skull
6  articulates with the Cervical 1 vertebra, and then if we
7  were to look down into that area, that's where the brain
8  stem is located.
9    Q.  Can you explain in your report where it says
10  that him being immediately unconscious is demonstrated by
11  the lack of bleeding at the interosseous catheter site.
12    Why is that?
13    A.  I didn't say that.  What I said was the lack of
14  bleeding at the IO cite is indicative of cessation of
15  cardiopulmonary function.
16    Q.  So he's not -- his heart is not pumping so
17  there's not blood coming out of that area; correct?
18    A.  Right, or bruising under the skin.  Right,
19  there's no bleeding occurring.
20    Q.  Your report talks a lot about the drunk driver
21  that was involved in the wreck.  Do your opinions depend
22  at all on whether the driver was drunk or not?
23    A.  I mean, I have an opinion that Mr. Elliott was
24  intoxicated, but does that directly affect the exact
25  place that Cohen Bryson received his injuries?  No.

Page 180

1  But it certainly helps to explain why
2  Mr. Elliott ran into the back of the Escape at 50
3  some-odd miles an hour.  That, and that he was apparently
4  Facetiming as well.
5    Q.  The reason that he ran into the back of the
6  truck, or into the back of the Escape, doesn't affect
7  your injury causation opinion; correct?
8    A.  Well, it does because without that, we wouldn't
9  have an injury.  So the whole sequence becomes the injury
10  causation, but as I said a minute ago, whether
11  Mr. Elliott is drunk or not or was Facetiming or not
12  doesn't help me understand exactly what Master Bryson's
13  injuries were and exactly how he received them in the
14  vehicle from the knob, et cetera, et cetera.
15    But yes, the crash doesn't happen at all if
16  Mr. Elliott doesn't run into the back of the Escape, and
17  therefore that's injury causation.
18    Q.  Do you need to be an expert to know that?
19    A.  You don't have to be an expert to know that if
20  the crash doesn't happen, we're not here because there's
21  no injury, but you -- certainly, my expertise as a
22  board-certified ER doctor helps me understand what an
23  alcohol level of -- I believe it was 252 milligrams per
24  deciliter means in terms of decision making and
25  obtundation and things like that.

Page 181

1    Q.  How long was the time lapse between the time
2  Mr. Bryson saw Cohen's head -- I'm sorry.  Strike that.
3    How long was the time lapse between the time
4  Mrs. Bryson saw Cohen's head turn to the right and the
5  time of the crash?
6    A.  Well, she didn't really say turned to the right.
7  She testified that he was the leaning and inboard or to
8  his right, sleeping.  And we don't really know.
9    She said it was about the time that they left
10  Mr. Bryson's mom's house, which they estimated, I think,
11  was about 11:00 p.m.  And the crash occurred, I want to
12  say, at 11:15 p.m., so maybe as long as 15 minutes.
13    But we don't really know because there certainly
14  is no evidence of when they left Mr. Bryson's mother's
15  house.
16    Q.  Is it your expert opinion that Cohen's head
17  didn't move at all from the time that they left the house
18  and Mrs. Bryson saw him and the time of the wreck?
19    A.  I have no opinion as to what he did in between;
20  however, his injuries indicate this he was likely leaned
21  to the right at the time of the injuries or the time of
22  the crash, which would match what Mrs. Bryson said --
23  testified to before the crash.
24    What he did in between those times, I don't
25  know.  I can't say if he stayed there or if he moved

46 (Pages 178 - 181)

Dr. Lisa P. Gwin                                                        May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 182

1  around or not.
2      Q.  Can you show me how you think his head was
3  positioned at the time of the wreck?
4      A.  No.  I can just describe it, I suppose.  I don't
5  have any way to really show it, other than to say he was
6  leaning inboard or to his right and sleeping.
7      Q.  Was his head -- like, were his eyes to the
8  right, or was it more his head down and just kind of
9  flopped to the right?
10     A.  I doubt his head was turned much to the right.
11 I suspect he was just leaning towards the right based on
12 his injuries, the evidence of his injuries and the
13 reconstruction and the child safety seat deformation.
14     Q.  So face forward with the neck cocked to the
15 right?
16     A.  Mostly.  Was his head turned a little to the
17 right?  Sure, maybe.
18     Q.  Can you tell from the AO dislocation, like the
19 fracture, whether there was any angularity to that?
20     A.  The AO dissociation is not a fracture, but from
21 the AO dissociation, no.  Just the fact that there's a
22 dissociation, and that's as much as Dr. Eisenstat
23 documented, no.  If we had a CT scan or an MRI, we likely
24 could because then we would be able to see the
25 orientation of the occiput on C1.

Page 183

1      Q.  Okay.  Your report also talks about Mr. Elliot's
2  DUI plea and the sentence and the time he will serve.  Is
3  that part of your expert opinion?
4      A.  Well, everything that's in my report is part of
5  my expert opinion, but the fact that he received a
6  40-year sentence and will serve 20 likely doesn't
7  necessarily help me understand how Master Bryson received
8  his injuries specifically.
9      Q.  Why didn't you add in your report that
10 Mr. Elliott pled guilty to violating Georgia's criminal
11 statute against lifting the structure of his truck more
12 than two inches?
13     A.  I'm not sure I knew that.
14     MS. CANNELLA:  Okay.  I might be close to done.
15 BY MS. CANNELLA:
16     Q.  Have you told me all your opinions today?
17     A.  Between my report and this, as it stands today
18 we've covered everything.
19     MS. CANNELLA:  Okay.  If we want to take a quick
20 break, I can check my notes, and we might be done.
21     MR. HILL:  Sure.
22     THE WITNESS:  Perfect.
23     THE VIDEOGRAPHER:  We're going off the record.
24 Time is 3:45.
25     (Whereupon a short recess break was taken.)

Page 184

1      THE VIDEOGRAPHER:  We're back on the record.
2  Time is 4:02.
3  BY MS. CANNELLA:
4      Q.  Okay.  Dr. Gwin, did the padding on the car seat
5  come between Cohen and the headrest adjustment knob at
6  all?
7      A.  No.
8      Q.  Did you measure the amount of padding?
9      A.  I don't think I measured the padding anywhere on
10 the child safety seat that I recall.
11     Q.  How many other cases have you seen where there's
12 a child restraint, a child in a child restraint, and an
13 AO dislocation occurs where the child stays loaded into
14 the car seat?
15     A.  So we have a crash.  We have an AO dissociation
16 and?
17     Q.  And the child's head is not getting outside of
18 where it's supposed to be in the car seat?
19     MR. HILL:  Object to the form.
20     THE WITNESS:  Oh, sorry.  The videographer was
21 saying something.  I wanted to make sure I didn't miss
22 something.
23        How many other cases?  I mean, I'm estimating
24 here, five or six probably.
25 BY MS. CANNELLA:

Page 185

1      Q.  Okay.  And what were the names of those cases?
2      A.  Oh, heavens, I don't remember.  I don't think
3  any of them are even on my testifying history.  I could
4  look again to make sure, but I don't remember.
5      MS. CANNELLA:  Okay.  Let me also go ahead and
6  introduce Plaintiff's Exhibit 47, which is the testimony
7  list as of September 2020.
8      (Whereupon Plaintiff's Exhibit 47 was marked
9  for identification.)
10        Do you see that there?
11     A.  Barely.  Let me make it much bigger.  Okay.
12     Q.  Okay.  I'm going to scroll through it and just
13 sure it looks correct?
14     A.  Oh, I wouldn't know.  I'm sure it is if it's --
15 if it's out there.
16     Q.  Okay.  Do you -- I can -- if you want to use
17 this one as well, just let me know when you want me to
18 scroll to go to the next page.
19     A.  Okay.  You can go to the next page.
20        Okay.  Next page.  I believe Harmon,
21 H-a-r-m-o-n, versus Nissan.
22     Q.  Okay.
23     A.  I believe that child had an AO dissociation, but
24 I could be confusing it with a different case, but I
25 think so.

47 (Pages 182 - 185)

Dr. Lisa P. Gwin                                              May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 186

1    Q.  He wasn't in a car seat, was he?
2    A.  Like I said, I could be confusing it with a
3  different case, but I believe he was restrained, so maybe
4  not in a child safety seat, but I believe that child was
5  restrained and stayed restrained and had an AO
6  dissociation.
7    Q.  Okay.  I'm looking for cases specifically with a
8  child in the car seat and his head stays within the
9  confines of the wings.
10    A.  Okay.  Go to the next page.  Boy, as we go
11  longer and longer ago, I don't remember really anything
12  about these cases, so I don't know beyond what I've
13  already said.
14    Q.  Okay.  How about your most recent list of cases,
15  do you see any there?
16    A.  None of them -- none of the cases on my current
17  testifying history involve a child with an AO
18  dissociation at all.
19    Q.  Okay.  All right.  Are you familiar with the
20  FMVSS 213 Standard, site impact crash test for child
21  restraints?
22    A.  Very vaguely, not in detail.
23    Q.  Okay.  Would a -- do you know whether a car seat
24  would pass that test if the headrest adjustment knob
25  impacted the child's -- the dummy's head?

Page 187

1    A.  It certainly could, I would think, but I would
2  certainly defer to a child safety seat expert if they
3  said otherwise.
4    Q.  Do you know, as you sit here today, whether
5  you've seen such a test.
6    A.  Where a child's head has hit the head restraint
7  adjustment knob in a 213 test?
8    Q.  Yes, ma'am.
9    A.  No, not that I can think of.
10    Q.  And just to be clear, in your opinion Cohen's
11  head is inside the wings of the car seat.  He's not over
12  the wings at all; correct?
13    A.  I would say that the top of his head is probably
14  a little taller than the head restraint and the lateral
15  wing, but the area of his injury is right there on that
16  adjustment knob, which is inside the wing.
17    Q.  Can you say that again?
18    A.  I think the top of his head is likely above the
19  wing, but the area of his injury is below the lateral
20  wing and in the area of the adjustment knob.
21    Q.  Below the lateral wing, what does that mean?
22    A.  Below the top of the lateral wing, the wing.
23    Q.  Okay.  Okay.  All right.  I just want to make
24  sure I get this understanding clear.
25       I'm going to show you what was previously marked

Page 188

1  PX39.  Can you use a different color to draw a line where
2  you think the top of Cohen's head was?
3    A.  Sure.  Maybe.
4    Q.  Or you can use the same color.  It's fine.  It
5  will be a line versus a shape.
6    A.  You're asking for the top of his head; right?
7    Q.  Yes?
8    A.  I mean, correct.  Generally, that's probably a
9  little tall, a little high, but generally in that area.
10    Q.  Okay.  So before the crash that's where his head
11  was?
12    A.  No.  As he's receiving his injury.
13    Q.  Oh, okay.
14    A.  So this would be the distance between his
15  skull -- his depressed skull fracture and the top of his
16  head.
17    Q.  Okay.  So before the crash happens, where is the
18  top of his head?
19    A.  I don't have a way of saying that with a
20  reasonable degree of scientific certainty because there's
21  so many moving parties.
22    Q.  There's so many moving parts, what do you mean?
23    A.  In the crash there so many moving parts.
24    Q.  Oh, no.  I just mean as they're driving down the
25  road -- as the family is driving down the road, where is

Page 189

1  the top of his head?
2    A.  Right.  I know what you're asking, and I'm
3  saying because of all the things moving in the crash, I
4  can tell you where he is at the moment of his injury,
5  which is about right where I put it, whatever that
6  distance would be between the area of his depressed skull
7  fracture and the top of his head.
8       But because of all the movement of various parts
9  because of the vehicle dynamics, I can't say with a
10  reasonable degree of scientific certainty exactly where
11  his head was before the crash as he's sleeping and
12  driving down -- riding done the road.
13    Q.  Okay.  Can you just draw a line to show the
14  height of it, even if it's not the exact place it is.
15  Just how far up his head would go.
16       MR. HILL:  Object to the form.
17       THE WITNESS:  No, I'm not really sure.  The best
18  way to do that would be to take a surrogate the same
19  height and weight and put him in an exemplar seat and
20  take a photograph.
21       It's orthogonal looking right at his head, other
22  than that, it would be basically a guess, an educated
23  guess, but a guess none the less.
24    Q.  Okay.  Do you agree there's no breaking of the
25  plastic material on the car seat?

48 (Pages 186 - 189)

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 190

1    A.  Not that I recall, just deformation.  I don't
2  recall any fracturing.
3    Q.  And his extremity injuries, you said they were
4  associated with the contact of the driver's seat;
5  correct?
6    A.  Yes.  And his left arm could be due to the door
7  or his child seat, like I said before, but his lower
8  extremities, yes, due to interaction with the driver's
9  seat back.
10   Q.  And is there anything more you can tell us about
11  how this happened, like, did they get squished between
12  the front seat and the car seat or just run into it?  Do
13  we know anything more about that?
14   A.  Nothing more than I talked about before.
15      MS. CANNELLA:  Okay.  I'm going to mark as an
16  exhibit your correspondence.  I'll mark it Plaintiff's
17  Exhibit 48.
18      (Whereupon Plaintiff's Exhibit 48 was marked
19  for identification.)
20  BY MS. CANNELLA:
21   Q.  Do you see that on the screen?
22   A.  Yes.
23   Q.  And that is 48 pages.  Does it sound like a full
24  copy of your correspondence?
25   A.  Yes.

Page 191

1    Q.  Okay.  There's a reference to photos from
2  Charlie Crosby's inspection.  I didn't see those in your
3  file.  Do you have those photos?
4    A.  Like I told you before, we didn't regurgitate to
5  you everything we received from Counsel, from Rick --
6  from Mr. Hill's office, so you wouldn't see those in my
7  file that was produced to you, but yes, I have them.
8    Q.  Okay.  We do not have those, so I would like to
9  see those.  Do you have those with you?
10      MR. HILL:  They have been produced to you.  They
11  were produced as part of the test data, documents,
12  scanned photos that you asked for that we sent a link to
13  last week or earlier this week.
14      MS. CANNELLA:  Oh, okay.  Okay.  Great.
15  BY MS. CANNELLA:
16   Q.  And did the individual who was originally the
17  expert on the case -- I'm blanking on his name now.
18   A.  Dr. Reinhart.
19   Q.  Yeah.  Did Dr. Reinhart withdraw from the case
20  because he had opinions that would be detrimental to
21  Rough Country's positions in this case?
22   A.  No.  Like I said before, my understanding is
23  that he had a scheduling conflict.  And like I said,
24  every summer he takes time off for a -- usually an
25  overseas vacation with his kids, and so that likely

Page 192

1  interfered somehow.
2    Q.  And when did you decide that the thing that
3  hit -- or that caused Bryson's fracture was the headrest
4  adjustment knob?
5    A.  I don't know that I can speak to a date, but
6  certainly when I saw the child seat and understood
7  Master Bryson's injuries and saw his autopsy photographs,
8  somewhere in that time frame.  I don't know what the date
9  was.
10   Q.  So somewhere around the time that you did your
11  first vehicle inspection?
12   A.  I've only done one vehicle inspection, and
13  assuming I had the autopsy photos and all of his medical
14  records then, yes, and I don't know why that wouldn?t be
15  true, but I don't remember the order that I received
16  everything.
17   Q.  Do you agree that your LEC presentation doesn't
18  mention the headrest adjustment knob?
19   A.  It generally wouldn't.  It's just usually
20  photographs, so, you know, I wouldn't -- those words
21  wouldn't be found in there.
22   Q.  Do you agree that the LEC presentation doesn't
23  mention the headrest adjustment knob?
24   A.  Yes.
25   Q.  And do you agree that your report doesn't

Page 193

1  mention the headrest adjustment knob?
2    A.  Perhaps.  But it talks about the child seat in
3  the area of the deformation, so maybe I didn't say those
4  words.
5      MS. CANNELLA:  That's all I've got.
6      THE WITNESS:  Great.  Thank you.
7      MR. HILL:  All right.  I have no questions.
8      THE WITNESS:  I will read and sign.
9      MS. CANNELLA:  Okay.  And I'll send a link to
10  the exhibits.  Who should I e-mail it to?
11      THE VIDEOGRAPHER:  Can I take is off, Counsel?
12      MR. HILL:  That's fine with me.
13      MS. CANNELLA:  Yes, absolutely.
14      THE VIDEOGRAPHER:  We're off the record at
15  4:22 p.m.  This concludes today's testimony given by
16  Dr. Lisa Gwin.  The total number of media units used was
17  five, and it will be retained by Veritext.
18      (Whereupon the proceedings were concluded at
19  4:22 p.m.)
20      THE VIDEOGRAPHER:  Counsel, are you ordering
21  video with the transcript?
22      MS. CANNELLA:  Yes.
23      THE VIDEOGRAPHER:  Thank you.
24      THE REPORTER:  And do you need a copy too,
25  Mr. Hill?

49 (Pages 190 - 193)

Dr. Lisa P. Gwin                          May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 194

1    MR. HILL:  Yes, I do.
2    THE VIDEOGRAPHER:  And do you need a video?
3    MR. HILL:  I need a video as well?
4    THE VIDEOGRAPHER:  Synced with the transcript?
5    MR. HILL:  Yes.
6    THE VIDEOGRAPHER:  Thank you.
7    MR. HILL:  I also need the transcript expedited.
8    If I could get it by Tuesday, that would be great.
9    THE REPORTER:  Okay.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 195

1    STATE OF CALIFORNIA        )
2                              ) ss.
3    COUNTY OF ALAMEDA          )
4
5
6        I, JUSTUS BALENTINE, Certified Shorthand
7    Reporter No. 13859, hereby certify that the foregoing
8    proceeding was taken by me at the time and place herein
9    set forth;
10       That the said proceeding was taken down by me
11   in shorthand and thereafter transcribed under fmy
12   direction and supervision, and I hereby certify the
13   foregoing proceeding is a full, true, and correct
14   transcript of my shorthand notes so taken;
15       That dismantling this transcript will void the
16   certification by the Certified Shorthand Reporter.
17       I further certify that I am neither counsel for
18   nor am I in any way related to any party to said action,
19   nor am I in any way interested in the outcome thereof.
20       IN WITNESS WHEREOF, I have subscribed my name
21   this 17th day of June, 2024.
22
23
24
         JUSTUS BALENTINE, CSR NO. 13859
25

Page 196

1    Dr. Lisa P. Gwin
2
3                    June 17, 2024
4    RE: Bryson, Santana And Joshua v. Rough Country, LLC
5    5/3/2024, Dr. Lisa P. Gwin (#6676182)
6        The above-referenced transcript is available for
7    review.
8        Within the applicable timeframe, the witness should
9    read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12       The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   litsup-ga@veritext.com
16       Return completed errata within 30 days from
17   receipt of testimony.
18       If the witness fails to do so within the time
19   allotted, the transcript may be used as if signed.
20
21
22       Yours,
23       Veritext Legal Solutions
24
25

Page 197

1    Bryson, Santana And Joshua v. Rough Country, LLC
2    Dr. Lisa P. Gwin (#6676182)
3        E R R A T A   S H E E T
4    PAGE_____ LINE_____ CHANGE_____
5    _____
6    REASON_____
7    PAGE_____ LINE_____ CHANGE_____
8    _____
9    REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____  _____
24   Dr. Lisa P. Gwin              Date
25

Dr. Lisa P. Gwin                                              May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 198

1  Bryson, Santana And Joshua v. Rough Country, LLC

2  Dr. Lisa P. Gwin (#6676182)

3         ACKNOWLEDGEMENT OF DEPONENT

4    I, Dr. Lisa P. Gwin, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____   _____

12  Dr. Lisa P. Gwin              Date

13  *If notary is required

14         SUBSCRIBED AND SWORN TO BEFORE ME THIS

15         _____ DAY OF _____, 20___.

16

17

18         _____

19         NOTARY PUBLIC

20

21

22

23

24

25

51 (Page 198)

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[& - 27]**                                                        Page 1

**&**

**&**   2:3

**0**

**017**   1:9 5:1

**1**

**1**   5:21 119:12
179:6
**1.4**   93:4
**1.5**   93:18
**10**   29:14 50:8
50:24 119:12
**100**   79:20
**100,000**   97:18
**10:47**   58:17
**10th**   97:4
**11**   30:22 92:25
150:15 155:2
178:6
**110**   4:6
**119**   30:15
**11:00**   181:11
**11:02**   58:20
**11:15**   181:12
**12**   93:17
102:15 150:24
**122**   4:5
**125**   4:5
**12631**   195:23
**12:22**   104:20
**13**   151:4 177:9
177:9,15
**130**   48:7
**13859**   1:25
2:25 5:6 195:7

195:24
**139**   4:14
**140**   4:15
**142**   4:15
**144**   4:12
**146**   4:16
**148**   4:11
**15**   4:4 50:8,24
130:13 171:8
181:12
**152**   4:10
**153**   4:13
**154**   4:11,14
**155**   4:9,10
**158**   4:16
**159**   4:17
**16**   4:5 30:10,21
122:24,25
**160**   4:17
**161**   4:18
**162**   4:18
**165**   4:19
**17**   4:5 5:20
125:7,20,21
137:12 196:3
**171**   4:4
**17287**   61:13
**17376**   137:9
**175**   4:7
**176**   4:8
**177**   4:8
**17th**   195:21
**18**   4:6 43:21
**185**   4:19

**19**   4:6 110:17
111:10
**190**   4:20
**1986**   81:13
**19th**   107:25
108:7
**1:11**   104:23

**2**

**2**   18:20 19:11
25:3 27:21,24
27:25 28:5,6
30:12 32:4
37:12,21 66:6
66:17 68:4
76:18 94:18
137:5 138:14
150:6 158:11
159:4,23
160:14
**2.4**   87:15
**20**   4:7 71:11,12
86:24,25 87:6
94:19 103:3
107:2 176:6
183:6 198:15
**2008**   118:2
**2013**   80:1
154:20
**2014**   154:22
**2015**   80:1
154:15
**2016**   122:10,21
**2020**   185:7
**2023**   90:9,14
91:21 92:7

100:16
**2024**   1:14 3:3
5:5,10 96:21
97:1,8 103:9
103:18,23
106:10 107:4,4
107:6 195:21
196:3
**207**   52:3
**21**   4:7 175:24
**213**   186:20
187:7
**22**   4:8 176:14
**23**   4:8 87:12
92:25 95:3
103:23,25
177:5
**23rd**   100:25
108:1,7
**24**   4:9 87:15,16
155:10 157:3
**243**   101:20
**2462.jpg.**
162:15
**25**   4:9 29:13
30:17 31:1
34:4
**250**   5:22
**252**   180:23
**2520**   176:15,16
**257**   94:20
**26**   4:10 90:21
146:24 155:1
**27**   4:10 90:9,14
91:21 92:7,25

Dr. Lisa P. Gwin                                                May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[27 - 96]**                                                    Page 2

103:18 152:25
**275** 94:20
**277** 159:13
**27th** 101:1
105:4
**28** 4:11 148:13
149:15 150:15
**29** 4:9,11 29:9
103:23 154:2,3
**29th** 103:19,19
**2:17** 143:8
**2:22** 1:9 5:1,20
**2:28** 143:11

**3**

**3** 5:10 44:9,25
45:6 101:25
**3-6-23** 61:9
**3/27** 87:12
**3/29** 97:3
**3/5** 102:5
**3/6** 102:2,5
**3/6/23** 137:10
**30** 4:12 103:9
106:10 107:4,6
144:6,25
196:16
**30030** 1:19
**301** 48:11
114:8,10
**30326** 2:5
**31** 4:12 96:13
96:17,21 97:8
107:4 111:14
111:16

**315** 1:19
**31st** 97:1,5
**32** 4:13 34:20
35:19,21 36:12
37:18 38:5
153:6,12
**329.1** 104:1
**33** 34:16
**3344** 2:4
**35** 4:13,21
61:20,22
**36** 4:14 154:12
**37** 4:14 136:11
139:7,11,24
**376** 137:13
**38** 4:15 140:16
140:17
**39** 4:15 141:22
142:14,15
**393-0365** 1:20
**3:45** 183:24

**4**

**4** 20:1 44:14
45:16 74:4,8
77:12,14
**4.3** 97:24
**40** 4:16 99:22
146:6,7 183:6
**404** 1:20,20 2:5
2:6
**41** 4:16 158:16
158:18
**42** 4:17
**43** 4:6,17
160:24,25

**44** 4:18 161:19
161:20
**45** 4:18 162:6,7
**46** 4:19 165:2,3
**47** 4:19 185:6,8
**48** 4:20 190:17
190:18,23
**49** 142:14
**4:02** 184:2
**4:22** 193:15,19

**5**

**5** 1:14 3:3 5:5
38:9 48:8
57:10 98:1,2
138:15 141:15
**5/15** 102:15,21
102:23
**5/3/2024** 196:5
**50** 31:13 109:1
180:2
**50th** 48:10
**53** 155:11,15
**54** 56:25
**578** 101:20
**58** 85:11
**5th** 48:12,19,24
49:10 57:16,22
58:4,7 93:18
100:16,22

**6**

**6** 3:7 44:19
45:17 97:24
99:2 100:19

**60/40** 36:20
**61** 4:13
**64** 94:21
**6676182** 196:5
197:2 198:2
**6th** 100:16,22
102:10

**7**

**7** 98:24 99:1,2
**70** 71:9 81:11
**700** 110:20

**8**

**8** 144:25
149:14
**80** 71:4,10
**800-4828** 1:20
**86** 4:7
**87** 48:18
**87,000** 97:16
**87,614.49.** 96:4
**875-9433** 2:6
**877** 101:19
**885** 1:19

**9**

**9** 30:20 60:7
61:8 99:14
101:3 149:17
**90** 48:18,19
**933-6327** 2:5
**9392.jpg.** 52:16
**94612** 5:22
**95** 30:7
**96** 4:12

Dr. Lisa P. Gwin                                        May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[9:00 - agree]**                                        Page 3

| | | | |
|---|---|---|---|
| **9:00**  5:7 | 123:14 130:23 | **activate**  46:4,8 | 141:20 142:2,9 |
| **9:14**  5:10 | **accelerations** | **actual**  15:15 | 142:22 143:17 |
| **a** | 16:11,13,15,20 | 24:1 27:23 | 145:6,21 |
| | 16:21 17:3,12 | 32:14,14 36:7 | 146:12 162:3 |
| **a.m.**  5:7,10 | 31:12 123:10 | 37:10 96:2 | 163:5,14,21,23 |
| **ability**  41:23 | 123:15,18 | 116:14 147:19 | 163:25 164:5 |
| **able**  11:5,10 | **accelerometers** | **actually**  12:14 | 164:18 178:3 |
| 32:13 42:4 | 123:20 | 13:19 27:4 | 184:5 186:24 |
| 45:5 54:2 | **accepting**  85:3 | 30:13 103:12 | 187:7,16,20 |
| 56:24 64:11 | **access**  126:1,8 | 105:8 106:8 | 192:4,18,23 |
| 75:21 94:7,8 | 127:11 132:14 | 141:25 142:5 | 193:1 |
| 98:11 117:3 | **accident**  158:1 | 144:11 | **adminsitrators** |
| 147:2 153:21 | 168:11 | **add**  26:16 49:7 | 1:5 |
| 174:25 182:24 | **accidents** | 49:10 50:3,24 | **affect**  67:25 |
| **above**  17:9 | 165:18 | 89:15,25 106:1 | 68:11 179:24 |
| 36:3 144:3 | **accomplished** | 106:3 136:8 | 180:6 |
| 187:18 196:6 | 147:6 | 150:4 183:9 | **affected**  51:23 |
| 198:7 | **account**  16:19 | **added**  18:11 | 110:2 |
| **abrasion**  45:9 | 83:1 | 105:24 | **aft**  61:1 |
| 145:16 178:22 | **accounting** | **adding**  25:21 | **aftermarket** |
| **abrasions** | 111:19 | **additional** | 109:6,17,25 |
| 44:25 | **accuracy** | 109:16 129:12 | 110:8,14 |
| **abrasive** | 168:10 196:9 | 129:17 131:8 | **age**  17:22 |
| 160:22 | **accurate** | 132:10 147:23 | **aged**  45:15 |
| **absent**  34:3 | 111:18,19 | **additions**  198:6 | 95:18 |
| 55:14 | 154:15 | **adds**  96:13 | **ages**  28:19 |
| **absolutely**  7:7 | **acknowledge...** | **adequate** | **ago**  38:11 |
| 53:7,7 59:11 | 198:3 | 115:18 116:1 | 118:6,23 |
| 63:11 73:10,22 | **acknowledg...** | **adient**  77:20 | 119:15 134:15 |
| 130:9 131:5 | 196:12 | **adjacent**  84:3 | 180:10 186:11 |
| 193:13 | **acronym** | 163:4 164:16 | **agree**  5:14 |
| **abucevitch** | 132:18 | 164:17 | 10:10,22,24 |
| 176:3,5,12 | **act**  7:20,23 | **adjustment** | 11:23 17:11 |
| **acceleration** | **action**  6:1 | 137:6,19,25 | 25:5 26:9,10 |
| 17:7 30:8,11 | 195:18 | 138:4,21 | 33:22 35:2,9 |
| 30:16,18,20,24 | | | |

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[agree - ap]                                              Page 4

39:8,12,19
41:4 46:17,24
47:13 53:15,23
59:5,9,12,16,21
60:2 63:8,11
66:4 81:19
97:20 111:4,9
111:12 117:14
119:23 134:20
143:24 144:4
147:4 153:16
156:3,6,12,18
156:20 157:3
165:6,10,17
166:25 167:16
168:20 189:24
192:17,22,25
**agreement** 7:9
**ahead** 26:8
39:22 41:18
75:6 77:1
90:22 104:10
112:9 115:4,14
116:18 118:15
119:18 133:17
167:5 172:17
175:4 185:5
**air** 40:4 44:7
101:4
**airborne** 39:24
40:2
**al** 5:2,17
**alameda** 195:3
**alcohol** 180:23

**alive** 167:23
168:9
**allegation**
156:3
**alleged** 46:1
73:16 76:21,25
78:14
**allegedly**
132:20
**alleges** 78:2,7
**allotted** 196:19
**allows** 21:13,20
**alphabetical**
3:4
**alternative**
175:19
**altima** 75:23
77:3
**amended**
107:24
**amount** 11:6,11
15:18,19 19:2
26:22 34:22
39:13 43:4
51:2,3 55:13
82:20 100:2
153:13 165:13
184:8
**amounts** 96:14
**analogy** 23:22
**analysis** 33:6
60:20,22 62:20
95:9,10 99:18
100:17,22
102:16 118:20

119:3 121:16
129:24 132:12
133:5,11,22
**analyst** 99:16
99:20
**analyze** 41:22
121:23 149:22
150:20 157:7
168:10
**analyzing**
102:20
**angle** 140:22
**angled** 43:7
**angles** 12:6
50:10
**angular** 16:12
16:14,16,20,20
16:21,21
**angularity**
182:19
**ankle** 150:22
**ann** 92:4
**annotate** 38:17
**annotated** 4:13
4:14,15,15,16
140:15
**annotation**
53:11
**annual** 82:3,6
**answer** 17:6
18:24 21:24
31:7 35:15
55:15,25 56:2
57:13 60:16
65:12 66:8

68:17 76:2,6
77:25 78:16,17
78:19 82:16,16
85:18 88:22
90:1,22 98:13
98:14 99:3
102:22 165:20
166:9,10
172:18
**answered** 71:7
76:6 133:18
**answering** 41:7
75:21 160:6
**answers** 73:25
**anterior** 144:17
**anthropomor...**
89:16,22
**antonio** 83:13
**anybody** 86:12
86:19 108:21
108:22 136:11
**anymore** 170:4
**anything's** 34:6
**anyway** 13:22
49:11 80:13
**ao** 143:22,24
157:13,18,19
157:19 163:12
178:8 179:4
182:18,20,21
184:13,15
185:23 186:5
186:17
**ap** 144:17
152:5,7,12

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[apparently - awake]**                                      Page 5

**apparently**
  129:20 180:3
**appearance**  6:4
**appearances**
  1:15,23 2:1 6:6
**appended**
  198:7
**applicable**
  16:10 25:1
  42:25 47:16
  131:3 133:10
  196:8
**applies**  110:25
**apply**  14:13
**appreciate**
  147:12
**appropriate**
  46:25
**approximately**
  31:13 48:7
**april**  92:25
  97:4,11
**area**  14:18
  17:16,19 18:16
  19:6 24:14,16
  24:21,22 25:2
  26:16 27:13
  28:1 31:14
  39:16,21 53:12
  63:9,13 66:12
  66:23,23 75:22
  102:1 106:5,6
  109:14,22
  114:16,20,24
  118:24 121:10

121:23 123:21
123:22 133:15
136:17,22
137:4,20
138:13,16
139:6,7 140:1
140:21 141:10
141:11,17,18
143:14,15
144:13,15,18
144:24 145:18
145:23 146:11
152:2 159:19
160:17,18
161:7 162:3
163:4,10
164:21 178:14
178:21,23
179:1,7,17
187:15,19,20
188:9 189:6
193:3
**areas**  124:6
  159:9,21
**arguably**  118:6
**argue**  46:16,23
**arm**  49:15 53:4
  109:12,15,19
  109:19,20
  149:23 150:5
  190:6
**arrow**  144:12
  144:15 145:1,3
**articles**  127:7,9
  127:14,21,23

**articulates**
  179:6
**aside**  51:19
  80:2 127:23
  129:13 158:5
**asides**  177:3
**asked**  36:8 92:6
  104:13,14
  132:9 133:3,13
  173:18,18,24
  191:12
**asking**  18:23
  35:7 57:7,8
  75:14 115:11
  188:6 189:2
**asleep**  162:22
**aspects**  22:7
**asphyxiation**
  74:23
**assembly**
  113:20,25
**asserted**  134:3
**assisted**  168:25
**associated**
  190:4
**assuming**
  192:13
**assumptions**
  62:20,24 63:1
  88:12,14,18
  90:17,20,25
  146:25
**atds**  89:25
**atlanta**  2:5

**atlanto**  138:25
  157:19,21
**attached**
  196:11
**attempted**
  45:22
**attend**  28:20,22
  107:6
**attended**  86:8
**attorney**  2:4
  6:7 196:13
**attorneys**  1:18
**audio**  5:13
**author**  123:8
  124:2
**authored**  123:4
  123:5
**auto**  59:6 71:2
  71:2,8 72:1,6
  77:21,21 78:11
  78:21 119:23
  170:25
**automobile**
  72:10
**automotive**
  21:25 120:4
**autopsy**  144:21
  152:12 168:24
  192:7,13
**available**  4:21
  64:12 132:24
  133:20 196:6
**avenue**  1:19
**awake**  168:2,3

Dr. Lisa P. Gwin                                                              May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[aware - billing]**                                                           Page 6

**aware**  40:2,13
  64:16 120:22
  121:14 125:3
  129:14 131:25
**axial**  151:15
**axially**  151:20

**b**

**b**  28:24 30:9,11
  30:17,19,21,25
**bacho**  129:22
  131:19
**back**  17:19
  19:14 25:3,8
  26:13 28:3,6
  32:7 33:15,17
  34:12,13 36:10
  36:11,19,21,22
  37:6,12,25
  45:6,22 50:22
  50:22 51:9,10
  54:1 55:5 56:2
  56:18,21 58:19
  59:22 65:5,10
  65:15,19,23
  66:2,5,6 70:20
  74:4,8 77:12
  77:14 82:3
  86:18 96:12
  101:9 104:22
  105:23 106:18
  118:5 123:10
  136:12 141:18
  143:10,14
  150:1,1,3
  151:11,13,20

153:16 156:15
158:12 159:3,4
159:23 160:14
160:17 161:5
163:3 180:2,5
180:6,16 184:1
190:9
**backs**  18:20
  19:11 36:4,25
  37:2 43:3
**backseat**
  139:15 153:9
**backward**
  14:21 59:7
**backwards**
  51:4
**bad**  23:22
  76:15 105:13
  119:8
**bag**  66:4
**baked**  113:4
**balentine**  1:25
  2:25 5:6,25
  195:6,24
**ballast**  56:17
**bane**  85:24
**banks**  85:24
**barely**  144:5
  185:11
**base**  54:13
  167:15 177:24
  177:25 178:25
**based**  20:9 21:6
  21:15,21 23:6
  25:18 33:14

45:4 46:7,8
47:23,25 52:23
64:24 71:7
88:1,1 100:2
168:7 170:19
175:5,6 182:11
**bases**  128:19
**basically**  9:16
  24:21 31:13
  45:9 47:21
  176:7 189:22
**basilar**  135:12
  138:25 167:14
  178:11
**basing**  54:13
**bazaldua**  70:3
  70:4
**began**  14:21
**beginning**  6:6
  117:10
**begun**  165:7
**behalf**  71:6,17
  74:25 80:3,10
  80:15,18 81:1
  81:3
**believe**  7:15
  44:22,23 45:19
  66:16,22,23
  80:21 84:15
  95:3 102:2
  108:6 129:25
  130:7 131:21
  152:14 153:11
  159:5 166:23
  180:23 185:20

185:23 186:3,4
**belt**  38:9,12,18
  41:5,8,16
  42:17 45:16
  138:15,15
  139:3,7,18
  140:8 141:12
  141:12,14,15
  143:16 159:5,6
  159:7 161:14
**belts**  41:13
**bench**  139:8
**bent**  140:11,13
**benz**  130:21
**best**  136:24
  189:17
**bet**  153:25
**better**  7:5
  144:21 145:19
  172:5 175:14
**beyond**  26:15
  63:22 117:11
  186:12
**bibliography**
  127:13
**big**  94:9 117:14
  117:19,23
  118:8 149:3,5
  152:4 160:8
**bigger**  61:16
  185:11
**bill**  96:22 97:4
  111:4,8,15,22
**billing**  4:7,12
  67:2 86:22

Dr. Lisa P. Gwin                                           May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[billing - building]**                                              Page 7

| | | | |
|---|---|---|---|
| 87:7 96:6 | **bodies** 123:21 | 82:10 83:5,12 | 49:9,11,12,24 |
| 107:11 111:10 | **body** 15:1 31:6 | 83:20 84:5 | 58:10,14 68:7 |
| 111:11 | 113:1 123:10 | 96:6 100:6 | 123:12 124:6 |
| **bills** 86:16 | 123:15,18 | 110:23 111:5 | 130:1,9,15 |
| 92:23,25 94:18 | 124:7 | 154:17 176:6 | 131:1,6,10,12 |
| 96:3,7,20 97:7 | **bolted** 65:5,10 | **brc's** 81:14,16 | 132:5 133:3 |
| 97:10,16,17,21 | 65:15,23 | 111:9 | 136:2 153:14 |
| 97:24 107:2 | **bone** 144:16 | **break** 7:6 55:19 | 155:23 156:6 |
| **bio** 7:18 | 167:11 | 58:15,18 87:5 | 156:18,22 |
| **biodynamic** | **book** 124:1 | 96:11 104:16 | 162:21 172:9 |
| 115:3 | 127:9,16,17,18 | 111:24 143:5,9 | 172:12 179:25 |
| **biology** 7:18 | **books** 118:8 | 183:20,25 | 181:2,4,18,22 |
| **biomechanic** | **boots** 24:4 | **breaking** | 183:7 196:4 |
| 32:1 | **born** 156:25 | 150:16 189:24 | 197:1 198:1 |
| **biomechanical** | **bottles** 27:16 | **breaks** 138:12 | **bryson's** 24:18 |
| 115:23 | **bottom** 53:12 | **breath** 116:19 | 26:6 50:20 |
| **biomechanics** | 55:10 161:11 | **briefly** 112:1 | 51:3,21 52:24 |
| 7:13,16,22 | **bought** 95:20 | **bright** 112:17 | 54:8 55:2 |
| 21:7 22:10,15 | 102:9 | **bring** 124:13 | 130:10 134:3 |
| 22:20 23:4 | **boy** 186:10 | **broke** 38:24 | 134:10 144:22 |
| 171:22 | **bracing** 150:8 | 146:16 | 149:21 152:17 |
| **bit** 17:23 | 150:10,11 | **broken** 27:25 | 163:9 180:12 |
| 110:11 | **brain** 34:5 | **bronco** 169:22 | 181:10,14 |
| **black** 38:19 | 45:10 55:2 | **broncos** 113:18 | 192:3,7 |
| **blanking** | 138:24 177:25 | 113:18 | **brysons** 18:16 |
| 191:17 | 178:8,25 179:7 | **brought** 102:4 | 46:17 63:21 |
| **bleeding** | **brainstem** | **bruising** 47:8 | 64:10 |
| 179:11,14,19 | 163:12 | 179:18 | **buckner** |
| **blood** 179:17 | **brakes** 75:9 | **bryson** 1:5,5 | 173:12,14 |
| **blue** 39:2 84:19 | **branch** 7:20 | 5:2,17 14:9 | 174:5 |
| 84:21,21 | **brand** 64:15 | 17:21 18:21 | **buick** 45:14 |
| 142:10 | **brands** 63:22 | 19:14 20:1 | **building** 83:14 |
| **blum** 69:10 | **brc** 50:12 67:6 | 21:12 31:11 | 83:16,20,22,23 |
| **board** 82:23,24 | 67:13 81:10,12 | 32:14 37:20 | 83:24 113:21 |
| 83:1 180:22 | 81:22,22,24 | 47:17 48:20 | |

Dr. Lisa P. Gwin
Bryson, Santana and Joshua v. Rough Country, LLC

May 3, 2024

**[bumper - cardiopulmonary]**

Page 8

**bumper** 116:21
116:22 117:1
175:8,13
**bumpy** 113:5
**bunch** 85:17
**butler** 70:1
**butt** 47:6
**buttocks** 62:21
**button** 46:3,8
**buy** 101:7
109:18 127:17
127:18

**c**

**c** 26:15 162:15
**c.z.b.** 1:6,6
**c1** 182:25
**cal** 130:4,7
**calculation**
96:3
**california** 5:22
195:1
**call** 13:16 72:4
78:22 93:3,4
93:13 98:19
103:11 106:16
131:14,16
139:6 157:23
157:24,25
158:23 173:10
**called** 61:9
84:19,20 93:1
93:17 105:3
167:13,17
**calling** 131:12

**calls** 22:25
23:13 59:6
78:12 99:6
107:12 108:6
**camera** 8:13,17
**campaign**
169:17
**camping** 63:17
63:19,25 64:8
65:23 66:2
**canada** 79:8,9
79:12 80:2
**cannella** 1:17
3:7 6:8,8,24
7:2 8:9,16,19
8:21,25 9:3,4
9:22 10:19
14:7 20:6
26:11 35:8,17
36:16 39:25
41:21 42:2,8
49:25 53:21
54:21,24 55:18
55:24 56:9
57:6,23 58:15
58:21 59:1,4
61:19,24 62:1
70:22 72:24
73:1 74:15,24
75:13,25 76:7
76:12 77:4,16
81:23 86:23
87:2,8 88:11
88:17,21 89:3
89:7,18 90:21

91:3 96:10,19
98:8 101:17
104:16,24
106:25 114:17
115:1,7,17,24
117:22 118:19
119:21 120:9
122:6,23 123:2
125:19,23
133:12,21
136:9,15,25
139:13 140:15
140:19 141:21
141:23 142:13
142:19 143:5
143:12 145:25
146:5,9,14,18
146:23 147:10
147:18,21
154:1,5 157:12
157:20 158:13
158:20 160:24
161:2,18,22
162:5,9 165:1
165:5,22 166:4
166:22 168:23
175:16,22
183:14,15,19
184:3,25 185:5
190:15,20
191:14,15
193:5,9,13,22
**cannellas** 1:17
**cannellasnyd...**
1:21

**capable** 34:4
**capacity**
148:22
**car** 13:15 20:18
21:3 23:22
24:10 27:4
28:13 39:2,21
40:7,14,19
41:1,4,5,17,23
42:4,9,13,22
43:9 44:4
46:14,25 47:3
50:22 51:23
52:21 54:5,7
62:17 72:7,18
72:19,20 73:11
88:4 95:23,25
114:19,19
116:1 136:17
139:3,8,23
140:3,21,22
143:14,14,15
151:14 158:4
158:14,21
159:2 160:4
161:4 163:13
184:4,14,18
186:1,8,23
187:11 189:25
190:12
**cardiologists**
111:7
**cardiopulmo...**
179:15

Dr. Lisa P. Gwin                                        May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[care - causing]**                                              Page 9

| | | | |
|---|---|---|---|
| **care** 122:15,17 | 46:6,14 47:17 | 164:15 168:11 | **caught** 45:20 |
| 122:18,19 | 49:21 62:19 | 168:19 176:10 | **causation** |
| **cared** 157:13 | 67:3 68:19,24 | 176:18 185:24 | 22:10 172:8 |
| **career** 118:5 | 68:24 69:6,9 | 186:3 191:17 | 180:7,10,17 |
| 120:1 | 69:13,16,19,24 | 191:19,21 | **cause** 6:16 7:23 |
| **cargo** 12:23 | 70:3,6,10,13,16 | **cases** 40:11,22 | 18:12 26:5,13 |
| 13:2,4,10 | 70:19,23 71:18 | 43:12,13 44:5 | 34:2,23 38:6 |
| 14:18 17:15,19 | 71:22,23 72:2 | 68:14 71:4,14 | 41:16 58:7 |
| 18:10,16 19:1 | 74:1,12,21 | 71:14,14 78:11 | 68:12 73:3,20 |
| 19:6,8,15,22,22 | 75:1,3,10 | 80:24,24,25 | 73:21,23 75:17 |
| 24:14,16,21,22 | 77:18 78:2,7,9 | 85:3,4 98:16 | 76:3,8,13 |
| 25:2,12,13,18 | 78:14 79:1,20 | 109:8,24 | 110:9 139:23 |
| 25:24 26:4,12 | 84:17 85:25 | 110:13 120:8 | 142:6 149:20 |
| 26:14,16,17,19 | 88:19 89:1,5 | 120:12,16,20 | 151:13,23 |
| 27:12,23 28:1 | 91:1 92:16 | 120:21 129:20 | 153:13 160:1 |
| 31:14 32:9 | 93:11,11 94:22 | 129:24,25 | 163:8 165:15 |
| 33:14 36:6,6 | 95:2,7,9,10,14 | 130:3 131:19 | 171:23 |
| 37:1,9,23,23 | 95:21 98:15,22 | 131:24 132:1 | **caused** 11:1 |
| 39:16,20 60:8 | 99:1,4,5,9,25 | 132:10,15,20 | 24:18 34:25 |
| 61:3 63:9,13 | 100:10 101:22 | 184:11,23 | 37:20 38:2,23 |
| 66:12,12,14,23 | 102:13 103:17 | 185:1 186:7,12 | 72:12 74:4,6,6 |
| 66:23 76:18,18 | 107:18 109:5 | 186:14,16 | 74:7,10,16,23 |
| 138:13 142:3 | 110:5 111:15 | **catastrophic** | 74:23 75:4,7 |
| **carpets** 127:18 | 111:20 120:10 | 21:11 24:19 | 75:22,23 76:16 |
| **carry** 63:9 | 120:11 123:5 | 32:20 34:5 | 76:21,25 77:12 |
| **carrying** 63:13 | 123:25 124:11 | 45:10 55:2 | 77:13 78:3,8 |
| **cars** 84:4 89:9 | 124:24 127:24 | 74:4 | 130:10 136:18 |
| **case** 1:9 5:1,2 | 129:7,20 130:1 | **catastrophica...** | 141:25 143:19 |
| 5:20 11:25 | 130:9,16 131:1 | 23:10 73:14 | 150:6 151:15 |
| 12:12 14:15 | 131:23 132:16 | **categories** | 159:5 160:4 |
| 28:15,21 33:9 | 132:23 135:16 | 119:11 | 177:19 178:3,7 |
| 33:10 37:7 | 135:18,21 | **categorize** | 192:3 |
| 40:8,15,22 | 147:24 149:12 | 119:9 | **causes** 37:19 |
| 41:15 43:10 | 155:19 156:2 | **catheter** 179:11 | **causing** 34:5 |
| 44:17 45:3,12 | 158:2 164:14 | | 138:23,24,24 |

**[causing - child]**                                                    Page 10

138:25 163:10
163:12
**caution** 22:15
22:20 23:3
**ceiling** 120:3,4
**center** 123:22
123:22
**centimeters**
166:11
**cents** 94:21
**certain** 91:15
117:19 118:7
133:3 147:16
**certainly** 15:23
16:9 17:8
23:16,17 25:16
40:12 47:7
51:9 59:25
60:5 62:24
63:7,15 66:4,9
66:24 67:1
68:19,23 69:2
69:6,9,12,15,19
70:3,7,11
72:17 74:5
85:13 94:23
96:6 98:14
103:20 108:23
109:13,14
112:10 119:5
120:11,24
123:11 124:5
125:3 126:1,2
128:2 131:5
133:9 136:24

147:2 149:20
150:5 158:24
161:6 162:25
168:20 173:6
180:1,21
181:13 187:1,2
192:6
**certainty** 34:7
188:20 189:10
**certification**
195:16
**certified**
168:15 180:22
195:6,16
**certify** 195:7,12
195:17
**cervical** 16:7
123:22 179:6
**cessation**
179:14
**cetera** 11:22
15:17 21:6,7
23:2 29:23
42:21 51:12
56:5 72:20
113:10 132:7
132:13 133:7
180:14,14
**chair** 63:17,19
63:25 64:9
65:23 66:2
**chance** 56:1
**chandler**
156:22

**change** 9:24
10:7,11,14,20
24:24 25:18
27:22 32:12
39:12 97:16
108:13 114:12
197:4,7,10,13
197:16,19
**changed** 11:1
12:20 47:14,18
110:12
**changes** 10:4
10:25 39:13
106:15 196:10
198:6
**chapter** 124:1
127:16
**chapters** 127:9
127:17
**characterizati...**
168:4
**characterize**
172:5 175:10
**charge** 23:23
23:25
**charged** 111:19
**charles** 162:15
**charlie** 29:4
173:17 191:2
**chart** 96:13
**check** 168:17
183:20
**checked** 146:15
**chest** 149:6

**cheyenne**
122:14
**child** 13:16
14:17 15:9,20
17:12,22 20:3
24:12,17,20,23
25:4,5,8 28:13
28:18 37:21,22
38:8 39:4 40:4
41:14,24 42:4
42:12,18,22
43:1,6,11
44:19,20,24
45:5,18,24
46:5,8,11 47:9
50:21,24,25
51:2,12 53:2,9
53:12 54:10,11
61:2,4 70:8
76:17 95:25
136:6,6 138:16
141:13,14
142:2,23 144:3
157:3,4 158:12
159:3,24
160:15 162:25
163:1,3,7,17,20
164:8,10,14,19
164:20 177:19
182:13 184:10
184:12,12,12
184:13 185:23
186:4,4,8,17,20
187:2 190:7
192:6 193:2

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[child's - compare]**                                              Page 11

**child's** 164:5
184:17 186:25
187:6
**children** 42:9
45:22,23
131:16
**christianson**
69:1
**chronic** 122:20
**chronological**
3:4
**chrysler** 69:15
72:10 74:2
77:10,17 80:19
80:20,24
**circle** 37:25
38:5,15 53:12
53:13 61:16
136:17 137:20
139:2,22
141:10 145:20
159:15
**circled** 38:19
39:2 139:6,24
**citations**
127:10
**cite** 179:14
**cited** 127:13
**civil** 7:11
**claimed** 73:18
**clarified**
167:11,14
**clarify** 18:13
73:9

**class** 101:12
120:2 153:23
**clear** 58:21
104:25 130:22
142:24 148:7
187:10,24
**cleared** 135:16
**clearly** 51:10
**clevenger**
71:23
**client** 93:1,7,10
93:18 107:16
108:4,10
174:16
**clients** 104:4
107:25
**climates** 112:20
**clinic** 122:13
**clockwise**
106:23 138:14
158:12
**close** 53:16,19
71:23 97:18
163:15 183:14
**closer** 53:19
77:5 163:16
**cloth** 60:25
61:12
**clothing** 66:4
**coaching** 85:23
**cocked** 182:14
**cohen** 14:9
15:20 17:1,3
17:21 18:21
19:20 20:1

21:1 31:11,21
32:6,14 34:23
37:19 39:19
41:17 46:18
47:1,3 51:6
52:24 54:8
55:2 68:7
131:13 141:25
142:21 153:14
162:21 163:9
165:7,10 166:5
166:6,23
171:24,24
172:9,12
174:23,25
179:25 184:5
**cohen's** 18:12
33:23 51:2
62:21 73:20,22
76:8,14 134:17
136:17 138:22
142:21 143:18
146:11 162:2
163:15 165:15
181:2,4,16
187:10 188:2
**coiffard** 69:10
**cold** 44:7
**collect** 33:16
**collection**
137:2 159:9
169:13
**collectors**
22:17

**collision** 14:9
43:7,8 55:13
59:7
**collisions** 60:3
**color** 188:1,4
**come** 47:6 48:4
86:18 92:19
94:3 107:12
135:14 159:18
159:18,20
170:18 184:5
**comes** 138:11
138:11 169:12
**coming** 38:19
106:16 108:10
150:3 166:15
179:17
**communicated**
29:1
**communication**
89:1 107:17
**communicati...**
88:23 100:4
103:13 105:10
105:20 106:11
107:3,5,12
108:8 124:23
126:15 146:15
147:19
**companies**
83:17,19
**company** 78:23
79:3,14
**compare** 11:22
32:13,15,18

Dr. Lisa P. Gwin

May 3, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[compare - correct]**

Page 12

168:22

**compared**
50:23 168:14
**complete**
128:15,18
155:4 176:15
198:8
**completed**
196:16
**completely**
130:11,14,25
**complies** 139:5
**component**
117:25
**components**
112:21 113:1,2
**comprehensive**
125:15
**computer** 8:12
8:12 29:11
44:3
**concern** 91:16
169:17,21
**concluded**
193:18
**concludes**
193:15
**conclusions**
135:15 170:18
**concussion**
79:10,19 156:9
156:12
**condition** 9:17
11:1

**conduct** 87:21
**conference**
86:3,4 93:8,10
93:16 100:12
104:1 105:13
107:6,10
**conferencing**
86:6,7
**confines** 186:9
**conflict** 191:23
**conflicted** 72:3
78:11,20
**conflicts** 95:16
**confused** 138:6
**confusing**
72:25 185:24
186:2
**connected**
84:16
**connecting**
43:1
**connection**
84:22
**conscious**
167:22,25
168:5,8
**consider** 9:5
40:17,25
114:21 173:23
**considered**
91:5 127:7
128:25
**considering**
101:21

**constellation**
143:20
**constitute**
71:13
**consultant**
111:9
**consulting** 81:8
**contact** 51:4,6
51:7 68:5 74:8
93:1,6,10,17
104:4 107:16
107:25 108:4
108:10 130:10
134:4 136:18
140:2 154:24
159:2,4,19,19
160:2 161:16
190:4
**contacting** 68:6
68:8 164:22
**contain** 128:12
128:15
**contend** 133:25
**contents** 66:24
89:13
**context** 9:10
**continue** 5:13
**continued** 1:23
2:1
**contribute** 24:6
149:21
**contributed**
24:1,16
**contributing**
23:24

**contributions**
22:24
**control** 9:10,14
9:16 10:21
11:4,9 12:14
16:23 32:13,18
109:12,15,18
109:19,20
**controls** 32:17
33:3
**conversations**
5:12 23:18
93:19 94:10
104:5
**coordinator**
98:12
**copies** 127:14
196:14
**copy** 87:7
126:17 176:15
190:24 193:24
**copyright**
127:11,15
**corner** 140:8
140:13
**corners** 61:1
**correct** 10:8,9
12:15,15,21,22
12:25 13:8,12
13:15,16,20,21
17:24 18:9,12
20:7,13,20
21:3 22:8 25:8
25:14 26:7
31:23 32:8,25

Dr. Lisa P. Gwin                                                May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[correct - crash]**                                              Page 13

| | | | |
|---|---|---|---|
| 33:1,9,18,20,21 | 152:21 153:3 | **counter** 138:14 | **crash** 11:6,10 |
| 34:3 37:2 38:2 | 153:10 154:22 | 158:12 | 11:16,17,20,24 |
| 38:24 39:3 | 155:2,11 | **counterclock...** | 12:11,13,14,20 |
| 40:15,16 42:10 | 156:24 163:15 | 36:2,20 | 12:21,24 13:11 |
| 42:13 46:21 | 164:24,25 | **country** 1:10 | 13:12,22,23 |
| 47:12 48:9,23 | 168:18,19 | 5:3,18 6:11 | 14:21 15:15,16 |
| 54:6,19 55:14 | 171:1,2 177:9 | 84:8,11,14 | 15:16,19,25 |
| 56:11,13 57:20 | 177:25 179:17 | 121:1,3,17,20 | 16:11,22,24 |
| 58:2,11,23 | 180:7 185:13 | 121:24 129:21 | 17:13 18:2,11 |
| 64:6,7,13 66:5 | 187:12 188:8 | 131:23,25 | 18:17,21,23 |
| 66:7 67:4 72:6 | 190:5 195:13 | 132:9,14 | 19:1,4,8,9,17 |
| 72:7 77:18 | 198:8 | 174:11,15,16 | 19:18 20:19 |
| 79:15 82:24 | **corrected** | 174:19 196:4 | 21:1,2,8,10,14 |
| 85:4,25 88:20 | 134:13 175:8 | 197:1 198:1 | 21:15,22 22:1 |
| 96:9,21 97:8 | **correction** | **country's** | 22:2,4,7,13,16 |
| 97:11,12 | 105:15 | 191:21 | 22:19 24:10 |
| 100:23 101:1 | **corrections** | **county** 195:3 | 25:2,6,9 26:1,6 |
| 103:18 107:7 | 198:6 | **couple** 18:1 | 28:9,20,22 |
| 107:19,22 | **correspond** | 53:22 93:22 | 29:15,18,24 |
| 108:1,2,17 | 20:12 | **course** 14:6,23 | 31:9,11,18,22 |
| 109:16 110:20 | **corresponden...** | 68:7 99:24 | 32:8,14,20 |
| 110:23 111:1 | 4:20 126:19 | 136:1 | 33:4,5,18,24 |
| 112:2 114:5 | 146:17,20 | **court** 1:1 5:4,6 | 34:2,9,15,25,25 |
| 116:2,9,12,15 | 190:16,24 | 5:19,24 6:12 | 35:2,4,9,11,20 |
| 117:13 119:17 | **corresponds** | 37:14 89:20 | 35:23 36:7,13 |
| 120:12,13,21 | 141:17 160:17 | 104:10 128:5 | 37:10 39:9,9 |
| 120:22 125:12 | **cost** 62:3 | **cover** 60:8 61:3 | 39:15 41:6 |
| 125:17,18 | 127:20 | 73:18 160:3,19 | 44:23 45:2,7 |
| 126:4,11,21 | **counsel** 5:16 | **covered** 129:8 | 47:4,15,15,19 |
| 127:2,3 128:6 | 6:5,13 146:3,4 | 137:5 183:18 | 48:22 49:18 |
| 128:23 133:14 | 191:5 193:11 | **covering** 61:1 | 50:5 51:17,18 |
| 135:14 139:9 | 193:20 195:17 | 136:23 | 53:20 54:18 |
| 143:2,3,19 | 196:14 | **coworkers** | 56:7,11 57:2,8 |
| 145:2,10 | **count** 80:12 | 50:12 | 57:18,19 58:2 |
| 146:18 151:3 | 97:24 | | 59:18 62:2,3,6 |

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[crash - defect]                                                      Page 14

62:10,14,15
74:6 77:13
88:4 89:15
90:6 91:18
92:9 99:6,7,11
102:21,24
112:10 114:1,4
115:3,9,19
116:6,6,11,14
117:7 121:24
121:24 123:13
130:7,14,15,19
131:4,6 133:4
133:6 136:4
153:10,18
162:22 163:23
164:21 165:7
166:24 170:1,5
170:7,8 171:20
171:25 172:15
172:16,19,21
172:23,25
173:7,8,10
175:2,18
180:15,20
181:5,11,22,23
184:15 186:20
188:10,17,23
189:3,11
**crashed**  63:3
**crashes**  11:5
15:16 20:21
21:9,18 40:12
42:10 43:3
51:10,16 59:13

59:17 60:1
72:18,19 80:8
114:19,22
121:13 123:16
132:3,6
**crazy**  60:13
**create**  12:4
25:25
**created**  174:15
176:11
**credit**  108:8
**criminal**  71:14
183:10
**criteria**  17:9
**criticisms**
135:4,9
**critiques**
133:16
**crosby**  22:11
23:15 24:2
29:2 86:9 92:2
173:17,25
**crosby's**  191:2
**cross**  3:5
**crotch**  46:3
**crush**  11:6,11
14:4 31:12
63:2,5
**crushed**  64:6
**csr**  1:25 2:25
5:6 195:24
**ct**  152:5 182:23
**current**  71:14
113:16 186:16

**currently**  83:18
**cushions**  110:4
110:10
**cv**  1:9 4:5 5:1
5:20 122:24
123:4 169:14

**d**

**d**  3:1 25:21
101:25 162:14
**daimler**  80:18
80:20,21,24
**data**  21:16
22:17 28:15
50:2 90:5 91:1
91:4 102:16,19
128:24 129:2
191:11
**date**  91:22
93:13 96:22,22
96:25 103:20
104:14 105:4
147:15 192:5,8
197:24 198:12
**dates**  102:7,8
126:6
**daughter**  45:15
**davis**  68:25
**day**  56:23
104:5 195:21
198:15
**days**  100:21
136:13 156:9
196:16
**de**  1:19

**dealership**
113:20,22,24
**dear**  126:23
**death**  18:12
21:21 22:3
68:12 72:13
73:3,20,22,24
74:23 75:5,18
75:24 76:21
78:3,8 149:21
149:21 151:23
165:11,15
171:23
**decapitation**
157:22
**decatur**  1:19
**deceased**  1:7
167:2
**december**
154:15,22
**decide**  21:14,21
82:5 192:2
**decides**  82:23
83:2
**deciding**  23:14
23:25
**deciliter**  180:24
**decision**  180:24
**decisions**  24:3
24:6 132:23
**declare**  198:4
**deemed**  155:18
198:6
**defect**  46:1
72:16 75:22

Dr. Lisa P. Gwin                                              May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[defect - dictionary]**                                      Page 15

76:20
**defective** 70:17
76:25
**defects** 76:23
**defendant** 1:11
2:2 6:10
**defense** 72:3
78:12 173:8,15
173:22
**defer** 187:2
**define** 117:20
**definitely** 28:4
116:23
**definition** 7:25
**deform** 65:11
65:19 66:1
**deformation**
12:18 17:10
18:19 19:3,5
19:10 20:9
23:8 24:17
25:17,25 26:5
26:13 32:3
34:23 35:1
36:4 37:6,12
37:15 50:23
73:6 76:17
87:25 137:15
138:17 139:23
153:13,17
158:21,23
177:19 182:13
190:1 193:3
**deformed**
24:13 36:1,18

36:23,24 37:2
37:21,22 39:4
140:21
**deforms** 138:12
138:12
**degree** 34:7
122:2 135:7
188:20 189:10
**delta** 130:13
131:2,4 168:19
**demonstrate**
100:8
**demonstrated**
150:10 179:10
**demonstration**
148:7
**dep** 167:8,9
**depend** 82:21
179:21
**dependant** 10:1
10:6
**depending**
99:23,25
**depends** 26:23
31:10 56:3
82:22 98:14
109:1
**deponent** 58:23
196:13 198:3
**deposing**
196:13
**deposition** 5:16
5:21 7:8 8:14
32:16 71:24
78:10 85:15

92:14,17 97:14
111:1 117:10
120:23 124:11
127:19 129:12
134:14,14
147:4 156:8,14
167:4,17
**depositions** 7:3
133:7
**depressed** 38:4
134:5 138:23
163:10 177:23
178:24 188:15
189:6
**depth** 152:13
**describe** 182:4
**described**
131:3
**describes** 114:7
**design** 11:5,10
22:19,24 28:23
58:5 60:4
72:16 73:5,7
109:16 114:6,8
114:8,13
115:10,22
116:3 117:14
117:17 118:20
118:24 119:6
120:17,18
169:9,23,24,24
170:1 171:1
175:19
**designed** 42:9
169:11,20

**designs** 60:2
115:16,16
**destroyed** 64:3
**detail** 186:22
**details** 29:23
169:14
**determine**
20:19 50:16,17
64:23 80:7
87:25 113:8
119:7 142:20
147:15 167:20
**determined**
79:10
**determining**
113:9
**detrimental**
191:20
**development**
112:6 113:12
113:15 114:5
114:10
**deviated** 149:1
149:8
**devices** 89:16
89:22
**devin** 1:18 6:8
**diagram** 106:2
144:11
**diagrams** 106:3
**dial** 2:3
**diameter** 38:3
38:23
**dictionary** 56:3

Veritext Legal Solutions
800.808.4958                                       770.343.9696

Dr. Lisa P. Gwin                                          May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[died - dr]**                                                  Page 16

**died**  19:7 21:1
45:24 72:18
74:5 166:6
175:1
**difference**
13:14,18 16:2
93:6,9 116:20
**differences**
116:5 117:6
165:25
**different**  12:14
12:15,24 13:11
13:21 16:14,15
16:16 28:17,19
36:17 39:10
67:16 73:15
91:11 98:12
101:4 116:11
116:16 117:25
118:9 131:5
137:1 172:23
185:24 186:3
188:1
**differently**
110:11
**difficult**  10:25
**direct**  3:5 6:23
77:25 159:19
161:15
**directed**  95:4
**direction**
195:12
**directly**  88:16
179:24

**disagree**  88:25
129:17 134:18
156:21 167:3,9
167:12,13
**disagreeing**
167:8
**disclose**  88:9,11
88:13
**disclosure**  4:4
22:6 171:7,11
172:24
**discoverable**
88:16,24 89:2
126:16 146:23
**discovery**
174:12
**discuss**  86:20
91:8 99:8
117:3
**discussed**  17:25
37:17 86:21
89:24 90:2
93:21,24
111:14
**discussion**  88:3
89:12,13
**discussions**
23:14 88:7,9
88:14,15,18
89:8 90:16
**diseases**  122:20
**disks**  126:13
**dislocation**
143:22,24
157:14,21

182:18 184:13
**dismantling**
195:15
**dispute**  109:4,5
**dissociation**
139:1 163:12
178:8 179:4
182:20,21,22
184:15 185:23
186:6,18
**distal**  150:19
150:25
**distance**  62:9
62:13 164:5
188:14 189:6
**distribution**
82:14
**district**  1:1,2
5:4,4,18,19
**ditter**  68:18
110:1,6
**dividends**
82:18,20,20
83:2
**division**  1:3 5:5
5:19
**doctor**  180:22
**document**  4:11
8:23 80:14
99:13 100:5
127:1,11
147:17 175:25
176:8 177:9
**documented**
126:8 182:23

**documents**  4:8
91:7,11 99:19
117:23,24
118:21 120:1
124:19 126:4
132:24 147:9
155:13,14
174:11,15,20
176:2,7,9,14,17
191:11
**dog**  162:14
**doing**  24:2
51:15,19 85:23
95:9 98:25,25
108:22 111:3
129:24 133:10
147:23 162:25
163:18
**dolled**  82:15
**door**  76:18
150:6,7 190:6
**double**  146:15
**doubt**  97:19
169:5,7 182:10
**downward**
140:9
**dr**  3:6 5:16
6:20,25 7:9,12
9:6 54:12 59:5
67:3,17,20
75:14 85:24,24
95:6 104:25
130:5 143:13
145:18 148:17
149:9 152:9

Dr. Lisa P. Gwin                                                      May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[dr - either]**                                                    Page 17

166:25 167:3
182:22 184:4
191:18,19
193:16 196:1,5
197:2,24 198:2
198:4,12
**draft** 104:10
**draw** 188:1
189:13
**drawings** 118:6
**drive** 94:8
**driven** 113:4,5
**driver** 53:16
54:9,14 149:25
179:20,22
**driver's** 47:17
49:5,22,22
51:8 52:20,25
53:1 54:10
55:3 56:2 68:6
134:4,8,11,24
150:1,3,21
151:10,12,19
190:4,8
**drives** 126:13
126:14
**driving** 23:21
44:18 45:14,21
74:1 77:9
188:24,25
189:12
**dropbox** 103:2
126:24
**drug** 9:13,14
9:15,20

**drum** 28:2
64:18
**drunk** 179:20
179:22 180:11
**due** 11:6,11
14:4 17:9 55:3
62:24 72:19
73:11,12,14
103:20 134:4
135:12 136:3
150:21 151:10
160:13,14,20
160:22 175:13
190:6,8
**dui** 183:2
**duly** 6:21
**dummies** 13:19
13:24 16:5
21:22 28:18
32:24 47:13,14
48:4 50:12
88:4 89:9,15
89:15 90:5
91:18,18
130:24
**dummy** 16:3
17:12,23 18:3
18:5 19:19,25
19:25 20:3
21:16 28:8,9
28:13,16,17
31:22 32:7
33:6,23 47:20
47:21,23 48:8
48:12,12,20

49:4,8,16,24
54:17 57:9,10
57:11,16,22
58:2,4,6,7
**dummy's**
186:25
**durability**
40:23,25 41:3
112:10,20,21
112:23 113:5
**dynamic**
166:17
**dynamically**
50:7,8 51:1,3
164:19
**dynamics**
189:9

**e**

**e** 1:21 2:6 3:1,1
25:21,21 43:24
102:20 103:1
122:5 125:1
126:10,12,22
146:21,23,24
147:9 193:10
197:3,3,3
**ear** 138:23,23
145:16,17,24
152:11 162:2
163:9,10,15,25
164:5,16,17
177:21 178:15
178:18,21,22
**earlier** 16:25
17:25 105:7

111:15 191:13
**easier** 136:13
155:8
**ecchymosis**
134:10,19
135:12 145:17
177:22 178:12
179:2
**econoline**
113:17
**ed** 176:3
**edit** 105:12
**edr** 101:25
**educated**
189:22
**education**
128:2 135:5,6
**edwards** 70:1,2
**effect** 41:23
169:23
**effects** 10:21
119:3 121:12
**eichelberger**
69:14 77:9
**eight** 102:16
106:15
**eisenstat** 67:20
145:18 149:9
166:25 167:3
182:22
**eisenstat's**
67:17
**either** 19:25
28:4 37:7
45:23 69:18

Dr. Lisa P. Gwin                                     May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[either - example]**                                Page 18

103:1 170:7
179:5
**electrical**
112:17
**elliot's** 183:1
**elliott** 94:1
134:16 179:23
180:2,11,16
183:10
**elliott's** 131:9
172:12
**emissions**
112:15,16
**employee** 67:6
83:7,10
**employees**
81:10
**ended** 74:2
77:10
**engagement**
114:19,21
116:5
**engine** 112:22
**engineer** 60:4
98:24,25 99:3
99:4,10 101:24
112:4,6,8,12
113:13,15
170:14
**engineer's**
114:10
**engineering**
7:18 24:8 86:2
86:4

**engineers**
86:10 93:14
114:18 119:6
119:16
**enter** 96:15
**entering** 93:12
**entire** 29:6,20
**entirely** 130:22
**entries** 101:4,5
103:16
**entry** 97:3
102:17 105:19
**equal** 49:8
157:7
**equipment**
11:19 12:9,16
12:17 24:15
72:9 101:23
102:2
**er** 122:21
180:22
**errata** 196:11
196:13,16
**erroneous**
134:5
**error** 134:21,23
**escape** 17:10
20:10 23:12
26:16 30:14,17
30:19,21,25
32:4 48:3
66:17 88:1
89:25 115:2,8
116:23 117:1
118:2,3 153:9

171:22 175:15
180:2,6,16
**essentially**
11:20 43:6
55:5 105:4
113:19 159:22
**establish** 54:13
**estate** 1:6
**estimate**
111:19
**estimated**
181:10
**estimating**
184:23
**et** 5:2,17 11:22
15:17 21:6,7
23:2 29:23
42:21 51:12
56:5 72:20
113:10 132:7
132:13 133:7
180:14,14
**evaporative**
112:16
**evd** 4:3
**evenflow** 44:7
45:18,24
**event** 96:22
**everybody** 23:1
23:24
**everybody's**
85:1
**everything's**
28:25

**evidence** 6:16
28:5 51:20,21
91:1 134:11
140:2,6,9
149:10 167:19
167:24 168:1
181:14 182:12
**evidenced** 47:8
**exact** 15:5 17:7
30:4 165:23
179:24 189:14
**exactly** 13:2
17:16,24 18:5
18:16,18 20:14
24:22 25:20
26:2 28:4 32:9
35:6 36:10
37:9 49:17
50:1,12 63:14
75:21 78:16
102:11 138:5
144:22 166:2
180:12,13
189:10
**examination**
6:23
**examined** 6:22
**examiner** 169:1
169:4
**examiner's**
134:21,22
**example** 16:3
73:7,25 74:20
112:23

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[examples - exposed]**                                    Page 19

**examples** 12:10
77:5 101:24
**except** 124:14
124:17,25
176:22
**excuse** 94:20
**exemplar** 22:7
54:2 62:17
64:8 94:20,25
95:5,20,23
96:1 135:25,25
189:19
**exerted** 148:18
**exhaustive** 12:5
**exhibit** 4:3,4,5
4:5,6,6,7,7,8,8
4:9,9,10,10,11
4:11,12,12,13
4:13,14,14,15
4:15,16,16,17
4:17,18,18,19
4:19,20,21
29:9,13 34:16
34:20 35:19,21
36:12 37:18
38:5 43:21
61:20,22 86:24
86:25 87:6
94:19 96:10,13
96:17 100:10
103:3,4 107:3
107:10,17
110:17 111:10
111:14,16
122:24,25

125:20,21
136:10 139:7
139:11,24
140:16,17
141:22 142:14
142:15 144:6
144:25 146:1,2
146:6,7 148:13
149:15 150:15
152:25 153:6
153:12 154:2,3
154:12 155:1,2
158:16,18
160:24,25
161:19,20
162:6,7 165:2
165:3 171:8
175:24 176:14
177:5 185:6,8
190:16,17,18
**exhibits** 4:1
90:13 96:12
100:7,8 103:7
105:11,21
107:9 148:2,3
193:10
**exist** 48:13
120:20 126:4
**existed** 81:12
108:17
**exists** 108:18
**expect** 32:2
47:20
**expected**
171:19

**expedited**
194:7
**expenses** 96:7
101:3
**experience** 21:7
21:25 47:25
99:11 118:14
118:16,18
122:7 128:1
142:24 143:3
**experienced**
32:6 165:10
166:23 167:21
171:24
**experiment**
9:11,13 10:10
**experimental**
9:20
**experiments**
9:8
**expert** 24:8,9
43:9 60:6 65:6
65:8,16,16
66:9 88:7
90:17 95:11,13
117:4,5 119:5
180:18,19
181:16 183:3,5
187:2 191:17
**expertise**
115:25 175:6
180:21
**experts** 45:4
88:15 91:5
92:24 93:4,14

93:16,20 94:16
144:8 173:8,15
173:23
**explain** 107:14
112:9,12
113:12 138:8
140:5,6 169:11
178:17 179:9
180:1
**explains** 60:8
**explored**
121:12
**exponent** 11:24
12:12,24 13:5
13:12,15,19
14:2 15:14,19
17:13 18:15,19
18:21 19:1,8
19:18 20:2,3
21:12 22:19
24:9 28:14
30:8,15 31:9
33:17 34:15
35:2,10 48:22
54:18 56:11
57:19 63:2,3
88:4 89:9 90:6
92:20 101:8
102:24 116:14
153:10,17
171:21 172:2
172:19,22
173:10
**exposed** 123:14

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[express - finding]**                                              Page 20

express  91:16
  128:16
extension
  177:24 178:24
extensive  99:11
  118:13
extent  88:7,8
extremely
  31:16 53:15,19
extremities
  51:7 52:25
  190:8
extremity
  149:24 190:3
extricate  46:10
eye  134:10
  179:3
eyes  29:5 182:7

**f**

f  43:24 113:16
  113:18 169:18
  169:18,22
f250  14:11,19
  15:3 17:2,4,5
  26:15 30:9,12
  33:24 35:23
  36:13 37:13,24
  88:2 90:1
  93:25 94:3,8
  116:22,25
  138:11 175:2,6
  175:7,14
fabulous  42:11
face  44:25
  45:10 55:4

110:7 182:14
facetiming
  180:4,11
facetious  27:17
facial  110:6
facility  84:2,4
facing  42:24
  44:22 45:19
  46:24
facsimile  1:20
  2:6
fact  46:10
  50:21 75:11
  77:13 85:6
  135:11 158:10
  166:13,16,17
  182:21 183:5
facts  44:16
  45:13 91:4
  128:24 129:2
  146:25
fails  196:18
failure  118:20
  119:3,7,8,17
fair  7:12 97:17
falling  79:11,17
  79:20
falls  79:19
familiar  128:8
  186:19
family  122:17
  188:25
fans  120:4
far  46:22 54:6
  84:21 107:18

116:20 133:20
  136:2 146:11
  156:22 158:6
  189:15
fast  19:12
  166:17
fatal  18:22,25
  20:5 21:11
  34:3,23 55:2
favor  106:22
fca  80:24
  109:10
feature  59:10
february  95:3
  98:1,1,10
  107:19,21,25
  108:1
federal  7:10
  15:24 104:10
  128:5,10
fee  4:6 101:23
  102:12 110:17
  127:15
feel  156:14
fell  24:2
felt  105:24
female  46:11
  48:14,24 49:10
  57:16,22 58:4
  58:7
femoral  151:8
femur  53:3
  151:5,14,15,21
ferguson  23:16
  81:21 84:10

86:11 103:11
fib  150:19,25
  167:7
fibula  53:4
  67:21,24 68:11
figure  86:15,17
  169:19
figured  89:23
file  4:5,7 52:6
  94:25 95:21
  99:8,17 100:16
  100:21 103:2
  124:13,18,20
  125:8,12 126:3
  127:5,8,10,25
  128:3,3,4
  129:12 146:22
  147:7 148:14
  153:7 154:7
  155:16 158:16
  170:12 175:24
  176:1,13 191:3
  191:7
filed  5:18 121:5
films  62:25
final  24:3
finalize  93:5
financially  6:1
find  23:6 56:24
  60:8,11,15
  61:4 93:7
  98:11 99:1
  105:5
finding  60:17

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[findings - forward]**                                        Page 21

| | | | |
|---|---|---|---|
| **findings**  129:18 | **flopped**  164:3 | 161:17 | **forge**  69:20 |
| **fine**  44:4 55:18 | 164:15 182:9 | **forces**  7:20,23 | **form**  9:18 |
| 55:22 188:4 | **flournoy**  69:10 | 15:1,10,25 | 10:16 14:5 |
| 193:12 | **flow**  140:10,14 | 16:13,16,25 | 19:23 26:8 |
| **finish**  55:21 | **fly**  101:12 | 31:4 33:23 | 35:5,12,24 |
| **finished**  31:3 | **flying**  39:20,23 | 41:24 42:19 | 36:15 39:22 |
| **finishing**  85:3 | 40:2,3 43:2 | 59:19 143:25 | 41:18,25 49:20 |
| **fire**  45:20 46:7 | **fmea**  118:22 | 160:22 163:22 | 53:17 54:20 |
| **firm**  5:25 84:14 | 119:2,5,16,20 | 164:1 171:24 | 57:3,21 58:12 |
| **first**  11:7 28:17 | 120:1,7 | 172:4 | 70:18 72:23 |
| 32:16 44:6 | **fmeas**  119:22 | **ford**  14:17,19 | 74:13 75:6,19 |
| 60:19,22 65:11 | 120:25 | 17:10 22:1,4 | 76:4,10 77:1 |
| 65:20 66:2 | **fmvss**  186:20 | 23:12 30:9,12 | 81:20 91:13 |
| 68:17 101:12 | **fmy**  195:11 | 30:17,19 37:24 | 98:5 101:16 |
| 105:22 112:5 | **focal**  38:23 | 39:15 44:18 | 114:15,23 |
| 123:8 129:20 | 60:25 | 48:3 60:2,4 | 115:4,14 |
| 134:2 164:12 | **focused**  163:1 | 66:17 72:10 | 117:16 118:15 |
| 192:11 | **folded**  141:1 | 76:19 78:23 | 119:18,24 |
| **fit**  142:23 | **folder**  52:3 | 79:1,2 80:11 | 133:1,17 157:5 |
| **five**  14:23 | 61:9 126:6 | 89:25,25 93:25 | 165:19 166:1,8 |
| 45:18 46:18,20 | **folders**  126:6 | 112:1,2,13 | 167:5 168:12 |
| 55:16 97:25 | **folks**  71:19 | 113:13 114:1,7 | 172:17 173:16 |
| 98:3,13,21 | 122:18,18 | 114:12,18,21 | 174:20 175:3 |
| 142:17 154:8 | **follow**  87:24 | 115:2,8,18 | 175:20 184:19 |
| 184:24 193:17 | **follows**  6:22 | 116:23 117:1 | 189:16 |
| **fix**  113:25 | **foot**  68:5,9 | 117:14,18,23 | **formerly**  83:18 |
| 169:19,24,25 | 74:20 | 118:2,3,4,13,20 | **forming**  90:18 |
| **flattened**  28:2 | **foramen** | 120:2,6,8 | 91:5 128:25 |
| **flattening** | 167:16 | 169:9 | **forth**  195:9 |
| 144:16 145:3 | **forbid**  104:13 | **foregoing** | **forward**  14:16 |
| 152:2,15,20 | **force**  15:19,20 | 195:7,13 198:5 | 14:23 15:10 |
| **flights**  102:5 | 15:21,23 16:4 | **forensic**  169:7 | 18:10,20 19:5 |
| **flip**  164:3,15 | 16:5 39:2,5 | **foreseeable** | 19:11 26:19,21 |
| **floor**  27:16 | 41:14,15,16 | 59:21,23,25 | 26:22 27:5,10 |
| | 42:4 151:20 | | 36:1,4,21 37:2 |

Dr. Lisa P. Gwin
May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[forward - give]**
Page 22

37:11,15 42:24
44:22 45:19
46:24 47:8
51:2,8 53:8
68:5 136:2
138:3,4,13,14
138:19 151:17
151:19 158:11
159:24 160:23
163:7,7,11
164:8 182:14
**found** 29:3
64:20,24 66:14
66:19,21
124:18 149:9
192:21
**four** 55:17
80:13
**fracture** 38:4,7
67:21,24 68:11
106:4 134:5,5
135:12 138:24
138:25 142:1,1
142:6 143:19
144:18,19
151:6,9,13
152:3,3,10,10
152:15 163:11
167:11,13,15
177:24 178:12
178:18,25
182:19,20
188:15 189:7
192:3

**fractured** 51:7
53:3,3
**fractures** 68:8
149:18 150:9
150:19 151:1
151:14,21
**fracturing**
190:2
**frame** 65:4
113:6 116:5
192:8
**frames** 113:1
113:10
**frequently** 41:9
**friday** 1:14 3:3
5:5 74:21
**front** 14:19
26:19 31:17
32:23,24 33:17
45:1,6 47:14
47:15 48:20,22
49:4 51:3
52:20 53:5
54:5,17,19
55:4,12 56:1
56:10,16,18
57:10 58:10
59:6,18,21
60:2 62:10,14
68:9 75:12
123:10 137:16
137:18 138:19
139:2 140:8,13
140:20,22,25
141:2,3,4,11,13

141:17 143:17
145:20 161:14
190:12
**frontal** 20:21
40:12 44:23
45:2
**frost** 44:6
45:12,14 69:17
**fuel** 113:14,21
113:22 114:4,6
117:18 169:17
169:23 171:3
**full** 100:21
132:12 133:5
190:23 195:13
**function**
179:15
**further** 29:22
195:17
**fyi** 40:11 41:19

**g**

**g** 25:21 29:24
33:7 34:1
**ga** 1:19 2:5
196:15
**gainesville** 1:3
**gainsville** 5:5
5:19
**gamble** 69:17
**gate** 37:24
76:19
**gather** 50:13
**gauge** 15:23
113:7

**gauges** 16:5
113:3
**gaul** 86:9 99:4
100:14 102:4
170:14
**gaul's** 101:6,14
**gear** 75:9
**general** 11:3
14:12 15:4
35:25 39:11
59:8 71:15
80:15,16
116:25 118:22
118:25 119:5,6
136:22 141:2,6
144:15,16,18
145:18,23
**generally** 72:3
82:13 91:10
104:10 127:16
150:9 176:20
176:24 177:1
188:8,9 192:19
**gentleman** 74:1
176:2
**georgia** 1:2 5:5
5:19 52:4,13
169:4
**georgia's**
183:10
**getting** 9:20
92:17 184:17
**give** 8:2 22:23
28:14 49:1
54:4 73:25

Dr. Lisa P. Gwin                                              May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[give - gwin]**                                                 Page 23

77:5 79:23
86:19 90:25
96:15 112:23
117:5 127:19
133:25 172:14
174:25
**given**  74:11
75:17 193:15
198:9
**giving**  74:12
**glad**  85:5
160:10
**go**  5:14 26:8
39:22 41:16,18
44:11 54:1
60:15 68:16
75:6 77:1,15
82:3 87:12
90:22 92:14,22
96:20 97:7,23
99:2 100:14
103:14 107:2
109:10 112:9
113:24 115:4
115:14 116:18
118:15 119:18
133:17 144:10
153:22 156:13
159:7 161:5
167:5 172:17
175:3 176:23
176:24 177:16
185:5,18,19
186:10,10
189:15

**goal**  84:25 85:1
119:20
**god**  6:18
104:12
**goes**  114:9
138:22 155:2
176:7
**going**  5:9 8:2
8:13 32:2
33:15 53:13
54:19 55:13
56:12,24 57:19
58:16,22 61:15
65:13 76:2
81:18 82:4
86:21 88:6,21
89:21 98:11
101:10 104:19
110:16 111:13
117:5 122:23
125:7,19 136:9
136:15 143:7
148:12 152:24
154:1,11
158:13 159:25
161:24 165:1
169:19 172:1,4
173:10 174:13
177:4 183:23
185:12 187:25
190:15
**gold**  10:14,17
**good**  5:9 6:25
7:1 10:10
19:20 20:4

24:14 29:2
85:11 91:7
139:17,19
144:11 159:9
**gosh**  12:3
154:16
**gotcha**  8:16
142:12
**government**
15:24
**graco**  44:13,20
**grain**  168:6
**gravity**  123:23
**great**  7:8 9:3
12:10 30:6
43:18 61:25
100:11 111:24
117:10 127:23
144:20 145:25
147:11 174:4
177:18 191:14
193:6 194:8
**grill**  85:17
**grimes**  22:11
23:15 86:9
87:25 91:20
92:2,4 116:7
116:23 117:3
168:14,20
173:17,25
175:5,9,17
**ground**  24:5
**grounds**  125:2
**group**  22:25

**gs**  17:7 30:10
30:12,17,20,21
30:22 31:1,8
31:21 32:6,23
33:16 34:4
**guess**  13:7
17:23,24 24:15
25:11,21 26:9
33:14 35:13,15
36:8,9 65:7,7
65:16 66:8
150:4 189:22
189:23,23
**guessed**  25:21
25:22
**guessing**  13:3,5
17:15,18 26:12
26:17,24 27:2
27:2,9 94:23
**guest**  25:22
**guide**  38:9,12
38:18 41:16
138:15 140:8
141:12,14,15
143:16
**guides**  41:5,8
**guilty**  183:10
**gunn**  2:3
**gut**  168:17
**guys**  85:13,14
104:16 105:10
107:12 108:8
114:8 127:21
**gwin**  3:6 5:16
6:20,25 7:9,12

Dr. Lisa P. Gwin                                          May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[gwin - hill]**                                              Page 24

9:6 54:12 59:5
75:14 104:25
123:8 126:23
143:13 184:4
193:16 196:1,5
197:2,24 198:2
198:4,12

**h**

**h** 2:3 43:24
185:21 197:3
**half** 18:7 30:10
30:22 31:19
44:9 93:22,23
**hammer**
169:23
**hand** 89:21
137:19 150:3
**hang** 61:18
98:7 102:21
160:12
**happen** 24:5
119:9 150:11
180:15,20
**happened**
11:18 12:15
35:3,10 36:13
37:7 41:20
50:15 51:13
60:14 68:3
73:6 87:9
107:16 117:6
130:20 136:7
138:9,10
162:22 172:16
172:20 190:11

**happens** 59:25
164:21 188:17
**hard** 46:4
126:13 160:16
**harmon** 185:20
**harness** 14:23
45:19 46:18,20
145:6,21
**harshness**
169:21
**head** 16:9
24:18 33:23
43:6 55:5
62:22 74:3,8
76:17 77:11,14
79:11,17,19
92:21 109:10
123:23 134:3
136:17 137:6
137:18,21,23
137:25 138:4,5
138:21,22
141:20 142:2,6
142:8,9,21,21
144:23 146:11
152:17 162:3
163:5,10,11
164:9 181:2,4
181:16 182:2,7
182:8,10,16
184:17 186:8
186:25 187:6,6
187:11,13,14
187:18 188:2,6
188:10,16,18

189:1,7,11,15
189:21
**headlamps**
112:18
**headrest**
134:24 143:17
144:2,3,13
146:12 163:14
164:10 178:3
184:5 186:24
192:3,18,23
193:1
**heard** 132:18
132:20
**heart** 179:16
**heavens** 85:11
91:7 170:2
185:2
**heavy** 71:9
112:19,21,25
113:1
**height** 12:19
17:22 49:10,11
58:4 62:21
175:8 189:14
189:19
**heights** 23:10
175:13
**held** 51:22
52:21 54:5,15
**help** 6:18 22:19
33:6 46:5 57:1
59:13 113:24
136:2,7 163:19
172:20 180:12

183:7
**helped** 25:5,7
**helpful** 34:16
42:17 49:2,5
61:17 90:5,5
155:25
**helping** 28:23
59:18
**helps** 180:1,22
**hemorrhage**
177:22,23,25
178:19,20
**hereto** 198:7
**hernandez** 67:3
148:17 152:9
**hey** 105:16
106:18
**hickcox** 68:21
**high** 31:12,16
74:3 77:10
151:13 188:9
**higher** 111:5,11
**highlighted**
171:13,15,18
**highway** 52:4
52:13
**hill** 2:3 6:10,10
9:18 10:16
14:5 19:23
23:16 26:8
35:5,12,24
36:15 39:22
41:18,25 42:6
49:20 53:17
54:20,23 57:3

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[hill - imagine]**                                          Page 25

57:21 58:12
61:21 70:18
72:23 74:13,18
75:6,19 76:4
76:10 77:1,7
81:20,21 84:7
86:11 88:6,13
88:20,25 89:6
90:19,22 98:5
101:16 103:10
105:14 114:15
114:23 115:4
115:14,20
117:16 118:15
119:18,24
125:6 127:20
133:1,17 146:4
146:20 147:1
147:14,20
157:5 165:19
166:1,8 167:5
168:12 172:17
175:3,20
183:21 184:19
189:16 191:10
193:7,12,25
194:1,3,5,7
**hill's**  52:11
  124:15 125:13
  125:16 191:6
**hillman**  68:21
**hired**  43:11
  72:2 75:2,16
  77:19 80:16

**hires**  110:22
**hiring**  78:23
**history**  4:6,14
  43:15,22
  154:12 185:3
  186:17
**hit**  14:10 15:2
  17:4 39:2
  50:21,22 57:18
  69:3,4,11,15
  138:5 141:25
  151:13 187:6
  192:3
**hmm**  56:22
  109:9
**hofer**  43:24
  68:17 74:21,22
  75:3,23 77:3
**hold**  8:8 25:5,7
  86:18 110:1
  129:7 146:5
  155:12
**homeless**
  122:13,18
**honestly**  108:6
**hope**  29:14
**hopefully**
  147:11
**hospital**  170:3
**hotline**  113:23
**hour**  31:13
  93:22 110:20
  180:3
**hourly**  110:25
  111:9

**hours**  87:15,15
  93:4,18 97:25
  97:25 98:1,2,3
  98:13,22 99:22
  102:16,23
**house**  114:19
  181:10,15,17
**housed**  122:19
**huber**  69:1,2,2
**hudgins**  2:3
**huge**  169:16
**huh**  94:4
  102:25 152:8
  164:11
**human**  7:13,19
  7:23 8:1,1,5
**humans**  13:22
**hurt**  123:12
**hybrid**  17:12
  17:22 18:2,5
  19:19 28:13
  32:24 48:8,12
  49:8,16 57:9
  57:10
**hypothetical**
  40:5

**i**

**i.d.**  4:3
**i.e.**  12:17 18:15
  21:11
**iarvs**  17:9
**idea**  19:21 20:4
  22:5 39:18
  48:21 54:14
  69:3 79:18

80:12 81:15,17
84:1 114:20,25
114:25 116:25
119:25 121:6
133:2 156:25
**ideal**  10:18,23
**ideally**  10:12
**ideas**  100:9
**identification**
  61:23 87:1
  96:18 123:1
  125:22 139:12
  140:18 142:16
  146:8 154:4
  158:19 161:1
  161:21 162:8
  165:4 185:9
  190:19
**identify**  119:16
**ignore**  90:25
**ii**  2:3
**iihs**  21:20
**iii**  17:12,22
  18:2,5 19:19
  28:13 48:8,12
  49:8,16 57:9
  57:10
**illustrators**
  100:6
**image**  52:5,15
  52:19
**images**  98:20
**imagine**  102:1
  114:25 163:2

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[img - injury]                                                        Page 26

| | | | |
|---|---|---|---|
| **img**  52:5 | **inch**  38:6,23 | **index**  3:4 | **injuries**  18:22 |
| **immediately** | **inches**  37:14 | **indicate**  53:5 | 18:25 19:1 |
| 167:1 179:10 | 38:2 53:23 | 181:20 | 20:5 21:7,11 |
| **impact**  34:3,5 | 134:7,25 | **indicates**  67:2 | 21:18 24:19 |
| 37:19,20 42:5 | 166:11,19,20 | **indicating** | 32:2 42:18 |
| 42:23 43:5 | 183:12 | 134:6 | 45:9 46:8 |
| 59:13,17 74:21 | **incidences** | **indicative** | 52:24,24 53:4 |
| 132:4 134:6,11 | 132:17 | 179:14 | 55:3 73:17 |
| 135:13 145:1,6 | **incident**  133:3 | **individual** | 76:3 80:8 |
| 145:21 186:20 | 152:18 171:23 | 191:16 | 110:6 115:13 |
| **impacted** | **include**  71:9 | **individually** | 124:5,6 130:10 |
| 137:21 143:14 | 97:4,10 128:18 | 154:25 | 132:6 133:6 |
| 143:18 144:13 | 128:24 129:5 | **industry**  21:25 | 134:3,17 |
| 186:25 | **included**  19:19 | 59:6 119:23 | 143:20 149:25 |
| **impacts**  42:21 | 128:9 | **inertial**  14:20 | 150:5,5,8,10,13 |
| **important**  13:3 | **includes**  133:5 | **infant**  19:25 | 150:20 168:7,9 |
| 13:7 55:1,8 | 135:24 146:24 | 45:17 | 177:19 178:14 |
| 114:22 149:19 | **including**  6:5 | **inferior**  145:4 | 179:25 180:13 |
| 149:20,22 | 14:16 15:9,16 | **info**  1:21 | 181:20,21 |
| 150:20 151:23 | 19:10 22:11 | **information** | 182:12,12 |
| 155:18,20 | 24:13 27:24 | 33:16 39:18 | 183:8 190:3 |
| 166:12 | 32:3 96:7 | 49:2,18 50:14 | 192:7 |
| **importantly** | 137:5,6 138:20 | 105:25 127:20 | **injurious**  17:8 |
| 134:15 | **incomplete** | 128:13 129:15 | 23:9,10 123:9 |
| **impressions** | 133:23 134:1 | 131:18,22 | 157:8 |
| 151:24 | **increase**  55:13 | 132:10,10 | **injury**  7:24 |
| **inaccessible** | 56:1 | **informs**  172:15 | 15:11 16:9,17 |
| 46:4 | **increased** | **inga**  70:11 | 17:9 20:12 |
| **inapplicable** | 18:10 | **initial**  43:5 | 21:15,21 22:3 |
| 40:18,22 130:9 | **independent** | **initially**  134:9 | 22:10,15,20 |
| 130:12,25 | 10:1,3,7 11:24 | **injured**  71:20 | 23:3 33:7 34:3 |
| **inboard**  162:24 | 12:3,13 17:25 | 72:19,22 73:10 | 34:5,23 38:1 |
| 163:4 181:7 | 32:17 168:20 | 73:14 124:3 | 38:24 45:11 |
| 182:6 | 172:21 | 156:19 | 55:6 59:17 |
| | | | 72:13 73:3,24 |

Dr. Lisa P. Gwin                                              May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[injury - items]**                                              Page 27

| | | | |
|---|---|---|---|
| 74:4,6,7,7,11 | 139:18 140:23 | 68:4 72:19 | 165:11,14 |
| 74:17,23 75:4 | 141:7 158:14 | 73:12,15 74:8 | 166:7,13,17,18 |
| 75:7,18 76:9 | 191:2 192:11 | 117:18 149:25 | **investigation** |
| 76:14,16,21,25 | 192:12 | 150:6,21 | 62:18 121:9,15 |
| 77:12,13 78:8 | **inspections** | 151:10 156:3,4 | **investigations** |
| 110:9,12 | 132:13,25 | 160:13,14,20 | 50:14 |
| 136:19 138:10 | **installation** | 178:8 190:8 | **involve**  68:15 |
| 138:24 144:10 | 46:14 | **interacts** | 186:17 |
| 149:9,20,22,23 | **instruct**  88:22 | 138:16 163:9 | **involved**  28:12 |
| 150:2,11 | 89:3 | **interested**  6:1 | 76:13 95:6 |
| 152:19 153:14 | **instrumented** | 50:11 163:18 | 109:25 110:14 |
| 156:7,12,24 | 16:3,5 18:2 | 195:19 | 118:17,23 |
| 157:4 163:4,12 | 19:19 20:2 | **interfered**  40:5 | 121:13 124:4 |
| 165:8 166:11 | 21:22 28:9 | 192:1 | 128:9 129:21 |
| 166:12,20 | 31:22 33:22 | **interior**  14:22 | 132:16,17,19 |
| 167:7 168:7 | 113:3 | **internal**  121:17 | 179:21 |
| 171:23 172:7,8 | **insured**  122:19 | 121:20 157:22 | **involvement** |
| 172:11 180:7,9 | **integrity**  112:7 | 174:19 | 95:7 |
| 180:9,17,21 | **intended**  35:3 | **interosseous** | **involves**  71:2,5 |
| 187:15,19 | **interact**  25:3 | 179:11 | **io**  179:14 |
| 188:12 189:4 | 151:19 | **interrupt**  20:16 | **irrelevant** |
| **input**  23:1 24:4 | **interacted** | **intoxicated** | 19:15,16 |
| **inside**  21:3 | 24:18 27:23 | 179:24 | **ish**  81:11 |
| 42:12 73:12 | 28:5 52:25 | **intraosseous** | **isolate**  10:21,25 |
| 115:9 116:2 | 77:11,14 | 151:6 | 11:5,10 14:4 |
| 130:20 170:21 | 116:22 139:23 | **introduce** | **issue**  26:17 |
| 170:24 171:22 | 141:11,11,14 | 122:24 125:19 | 62:2 70:17,21 |
| 178:25 187:11 | 141:15,18 | 185:6 | 110:14 120:17 |
| 187:16 | 143:15 | **intrude**  175:7 | 132:22 134:19 |
| **inspected**  51:17 | **interacting** | 175:15 | **issues**  88:10 |
| **inspection**  49:6 | 37:22 38:8 | **intruding** | 123:5 |
| 51:25 60:24 | 139:3 | 14:16 15:8 | **item**  38:6 70:20 |
| 63:20 101:25 | **interaction** | 136:3 166:14 | **items**  24:15,21 |
| 102:3,6 133:7 | 27:20,21 28:6 | **intrusion** | 24:22,23 25:3 |
| 137:4,9,10 | 51:11 55:3 | 130:11,24 | 26:17,19,23 |

**[items - know]**                                         Page 28

27:3 28:1 34:8
39:15 40:6
63:10,13 65:14
66:11,14,19
110:2 125:24
142:4
**iterations**
113:11

**j**

**jacob** 68:25
**jam** 37:4
**january** 103:6
103:9 106:10
106:17 107:4,4
107:6
**jessica** 86:9
**job** 42:11
114:10
**joshua** 1:5
196:4 197:1
198:1
**julia** 124:2
**june** 195:21
196:3
**jury** 148:8
168:7
**justus** 1:25
2:25 5:6,25
89:20 195:6,24

**k**

**kaiser** 5:21
**kartagener**
70:14

**kathleen** 110:1
**keep** 131:12
**keeping** 136:11
**keeps** 176:10
**keigo** 2:8 5:23
55:16 106:22
**key** 98:20
144:14
**keys** 98:20
124:19
**kid** 152:21
164:9
**kids** 42:15
95:17,18
142:23 149:3,4
191:25
**kill** 37:19 41:17
**killed** 72:22
73:10,14 75:11
77:3 78:15
123:13 131:11
**kimberly** 44:13
44:18 70:7
**kind** 23:24
33:15 40:9
41:22,24 43:8
44:20,21 52:18
59:24 63:17
64:14 69:14
72:24 79:23
83:22 85:17
86:6 97:2
98:25 102:1
108:3 118:11
122:15 140:11

148:3 152:11
161:11 178:17
182:8
**kinds** 9:25 71:5
71:6
**kinematic**
14:20
**kinematics** 8:1
8:1,3,5 22:9,16
23:3 39:8,12
**kit** 11:15 12:8
12:17,19 23:9
32:21 37:13
70:13,16,20
73:20,21 76:8
88:2 116:16,17
131:10 134:16
172:22
**knee** 151:16,19
**knew** 64:14
157:9 183:13
**knob** 137:6,18
137:19,25
138:4,21 142:9
142:22 146:12
162:4 163:5,9
163:14,21,24
163:25 164:5
164:18 178:2,3
180:14 184:5
186:24 187:7
187:16,20
192:4,18,23
193:1

**knock** 29:3
**know** 7:3,5,6
10:17 13:2
15:5,6,6 17:7,9
17:17,17 19:7
20:8 22:16
24:22 25:13,16
26:2,2,3,15
27:3,3,8,8,12
27:13,13,15,16
27:23 28:3,4
28:18 31:4,8
31:18,21 32:1
32:6,19 34:4
34:10,11,12,13
34:25 35:14
36:6,10 37:10
40:21 41:4,10
41:13 42:3,14
42:17 43:14
49:14 50:4,19
50:23 51:14
52:13,23 53:18
53:24,25,25
54:6,8,14,18
55:6,23 57:2,4
57:7,25,25
58:1,3,3,6,9,9
58:11,13 59:23
59:24 60:4,5
60:14 62:3,5
63:17,21,21,23
64:10,14 66:14
67:14 68:18,22
69:7 70:1

Dr. Lisa P. Gwin                                          May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[know - legal]**                                          Page 29

72:19 73:5,6
83:6 84:21,22
85:5,21 86:15
89:18 92:5,23
94:13,23,24
95:6,13,16
96:5 99:1
100:1,7,11,12
101:18 103:6
104:13,13
105:10 108:20
111:21,25
114:6,16
116:21,25
117:17,20,21
118:10,25
119:14 120:10
120:14 121:6
121:14 128:2
129:23 130:6
130:15,19,20
130:24 131:3,7
131:15 132:5
132:12 133:8
135:6,7,15
145:16 146:5
147:1,6,14
149:7,8 152:9
152:16,16,18
154:16 156:22
156:25 157:1,6
157:9,10
158:23 160:4
162:13 163:3
164:3,21

165:20 166:15
167:25 169:5,8
171:16 172:8
173:23 174:23
180:18,19
181:8,13,25
185:14,17
186:12,23
187:4 189:2
190:13 192:5,8
192:14,20
**knowing**
  142:23 156:13
**knowledge**
  39:16,17 121:3
  121:11
**known**  18:15
  18:16
**knows**  152:22
**kristina**  44:7
  45:12

**l**

**laceration**
  139:1 177:22
  178:9,18
**lack**  83:4
  179:11,13
**lamps**  112:18
**language**  176:8
**lap**  41:13
**lapse**  181:1,3
**large**  52:22
**larger**  94:1
**lars**  95:6

**lateral**  30:10,18
  187:14,19,21
  187:22
**latest**  97:3
**latin**  149:4
**law**  1:18 2:4
  84:14
**laws**  14:12
  15:15
**lawsuit**  121:4
**lawyer**  84:8,10
  86:2 174:14
**lawyers**  23:15
  24:6 43:12
  71:19 72:4
  75:2 77:19
  78:12 80:16
  84:13,16 86:10
  88:9,15 89:1
  90:16,24 91:2
  91:4,8,10,14
  93:5,13,16,20
  94:16 104:8
  124:24 144:7
**lay**  29:5 66:8
**leaf**  113:2,10
**leaned**  181:20
**leaning**  162:24
  163:3 164:8,9
  164:13,14
  181:7 182:6,11
**learned**  118:22
  120:3
**leave**  128:21

**leaving**  174:2,3
**lec**  85:25 86:19
  89:8 90:9,14
  91:9,21,25
  92:6,7,9,13,20
  100:14,25
  105:4,8,12,16
  105:21 108:17
  108:17,20,21
  108:22 144:7
  148:5,18
  192:17,22
**lecs**  91:10
  92:23 108:25
**left**  22:14 27:21
  27:24 30:9,11
  30:16,18,20,24
  30:25 36:1,21
  37:6 53:3
  55:17 67:20
  75:12 125:16
  138:14 140:8
  148:22 149:19
  150:5,6,6
  151:5,7 152:6
  153:16 158:10
  159:4 162:4
  163:12,20,21
  163:24,24,25
  164:6,13 181:9
  181:14,17
  190:6
**leg**  68:5,6,9
**legal**  59:24
  86:4 99:19

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[legal - longitudinal]**                                          Page 30

196:23
**legs** 54:9
**length** 117:10
  135:1
**leon** 1:19
**letters** 119:14
**level** 34:2,7
  58:5 180:23
**levels** 123:9
**lever** 143:17
  144:3,13
**levers** 145:7,22
**lewis** 77:9,23
  129:18,21
  134:9 135:14
  137:17 142:25
  162:11 163:2
  163:18 174:7
**lewis's** 129:11
  131:7,21 132:8
  133:16 135:4
  136:16 162:14
**liaisons** 6:6
**lid** 79:10,16,19
  79:20
**life** 113:9 155:7
**lift** 11:6,11,15
  11:15 12:8,15
  12:17,19 13:10
  14:3,4 17:1
  23:9 32:21
  35:4,11,14
  37:12,24 70:13
  70:16,20 73:20
  73:21 74:19

76:8,19 88:2
116:16,17
131:10 134:16
172:22
**lifted** 11:14,16
  11:17,18 14:10
  14:13,25 15:2
  15:8 17:5
  33:24 35:23
  36:14 68:15,22
  69:3,4,4,8,12
  69:16,18,23
  70:2,5,8,8,10
  70:12,24
  172:13
**liftgate** 138:12
**lifting** 183:11
**light** 47:21,23
  48:25
**likelihood**
  21:21 119:9
**likely** 19:2
  20:19 21:15
  22:3 23:6,6
  24:13,16,17,24
  24:25 25:1
  28:16 44:25
  47:7 51:8 86:9
  86:11 87:12
  93:2,11,12
  101:6,7 103:1
  103:10 104:3,6
  119:8 149:2,10
  149:25 150:20
  159:5 160:14

160:20,22
173:2 175:12
181:20 182:23
183:6 187:18
191:25
**limited** 14:23
  51:11
**line** 60:24
  188:1,5 189:13
  197:4,7,10,13
  197:16,19
**lined** 139:16
**lineup** 11:22
**lineups** 22:21
**link** 103:1,2
  126:12,24
  146:22 191:12
  193:9
**lisa** 3:6 5:16
  6:20 7:9
  126:23 193:16
  196:1,5 197:2
  197:24 198:2,4
  198:12
**list** 4:14,19
  12:5 68:14,15
  121:12 125:8
  126:25 154:13
  154:17 176:11
  185:7 186:14
**listed** 126:16
**listen** 168:16
**literature**
  15:15 21:9
  48:1 157:11

**litigation** 81:7
  120:8 131:16
**litsup** 196:15
**little** 50:9 64:19
  95:17,18
  110:11 123:17
  131:20 155:7
  182:16 187:14
  188:9,9
**live** 13:22
**llc** 1:10 2:3 5:3
  5:18 196:4
  197:1 198:1
**load** 17:15
  151:15
**loaded** 184:13
**loading** 140:9
**located** 83:12
  179:8
**location** 5:21
  152:6,6 164:17
  164:18
**log** 96:11,12
**loggins** 69:10
  69:11
**long** 51:15,20
  81:12 87:14
  117:24 118:6
  118:23 119:15
  181:1,3,12
**longer** 116:19
  167:12 186:11
  186:11
**longitudinal**
  30:8,16

Dr. Lisa P. Gwin                                                May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[look - mark]**                                                Page 31

**look**  7:19 8:21
  8:22 11:17
  22:2 26:6 29:8
  30:3,4 35:22
  36:17 40:7
  43:14 44:2,3
  48:3 52:18
  56:12 62:17
  67:1 81:19
  86:16,22 94:18
  96:16 98:14
  102:7 103:12
  111:18,22
  114:18 120:15
  121:23,25
  123:15 126:9
  131:18,22
  139:14 140:20
  144:6,20,21
  155:4 156:16
  158:13 159:9
  159:12 161:23
  164:4,4 167:19
  171:6,13 179:7
  185:4
**looked**  35:22
  105:18 143:13
  148:19
**looking**  8:12,13
  8:15,23 9:1
  12:8 21:1,15
  21:22 30:14
  34:24 37:18
  52:3 77:25
  98:17,17,18

  111:21 137:3,7
  137:9,12,16
  138:17 142:5
  144:24 150:18
  150:25 159:17
  162:23 163:20
  163:20 177:11
  178:5 186:7
  189:21
**looks**  7:20,23
  8:25 53:22
  100:21 103:13
  107:1,5,21,23
  154:20 155:3,6
  185:13
**loop**  139:3,7,19
  141:12
**lost**  20:24
  44:11
**lot**  19:12 51:16
  82:22 84:3
  94:5 98:16
  101:14 109:2
  113:6 156:10
  166:13 179:20
**lots**  23:8
**low**  59:13
**lower**  16:6
  31:18 33:4
  109:12,15,19
  109:20 123:21
  130:14 190:7
**lumbar**  123:21
**lunch**  104:21

**lung**  148:22

**m**

**m**  3:1 185:21
**ma'am**  43:25
  104:2 140:7
  154:9 187:8
**made**  24:3,5
  106:15 109:17
  114:12 132:24
  142:24 154:24
  198:5
**magnum**
  167:16
**mail**  1:21 2:6
  102:20 103:1
  126:10,12,14
  126:22 146:21
  147:9 193:10
**mails**  125:1
  146:23,24
**main**  92:17
**maintained**
  147:8
**make**  8:10,18
  8:24 27:17
  28:25 49:8
  55:10 56:13
  59:1 61:16
  62:20,23 64:23
  77:23 78:4
  87:20 105:14
  107:8 108:10
  110:22 114:13
  139:15 154:6
  155:7 156:16

  169:25 177:18
  184:21 185:4
  185:11 187:23
**makes**  63:21
**making**  105:20
  105:20 107:9
  180:24
**male**  45:24
  46:8 48:10
**managed**  60:10
**manager**  93:11
**manual**  46:25
**manufacturer**
  40:20 41:1
  43:12 71:16
  72:1,6,7 77:21
  77:22 109:17
**manufacturers**
  20:18 41:4
  71:2,3,6,8,8,10
  78:21
**manufacturing**
  119:23
**march**  90:9,14
  91:21 92:7
  96:21,25 97:8
  97:17,25
  100:14,16,22
  100:22,25
  101:1 102:10
  103:18,19,19
  103:23 105:4
**mark**  86:23
  140:15 141:21
  145:25 158:15

Dr. Lisa P. Gwin                                      May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[mark - medical]**                                          Page 32

| | | | |
|---|---|---|---|
| 160:24 161:18 | 152:17 180:12 | 31:5 33:2,8 | 123:18 143:4 |
| 162:5 165:1 | 183:7 192:7 | 34:6 35:14 | 170:7 184:8 |
| 190:15,16 | **master's** 135:7 | 42:19 47:7,25 | **measured** |
| **marked** 29:9 | **match** 18:6 | 49:14 53:18 | 16:11,23 17:11 |
| 34:15,19 43:19 | 20:1 47:21 | 56:3 60:9 | 50:10 79:18 |
| 43:21 61:22 | 181:22 | 63:11 66:8 | 123:20 184:9 |
| 86:25 87:6 | **matched** 49:24 | 73:4 74:9,19 | **measurement** |
| 96:17 110:16 | **matching** 49:24 | 82:10 83:4 | 123:9 |
| 111:14 122:25 | **material** 40:25 | 90:19 92:16 | **measurements** |
| 125:21 139:11 | 189:25 | 93:14 94:12 | 28:9 29:24 |
| 140:17 142:15 | **materials** 4:5 | 96:23 103:16 | 63:1,24 64:2,5 |
| 146:7 152:24 | 40:23 92:19 | 109:1,18 | 64:20 65:2 |
| 153:6 154:3 | 99:8 100:2 | 116:13,16,20 | 91:17 113:8 |
| 155:1,9 158:18 | 124:14 125:8 | 118:5,22 | 123:15 130:23 |
| 160:25 161:20 | 126:3,18,24 | 119:19 126:22 | 143:2 146:10 |
| 162:7 165:3 | 129:12 131:8 | 128:1 135:11 | 170:10 |
| 171:7 175:23 | 132:1 176:11 | 140:6,12 | **measurer** 143:4 |
| 176:14 177:4 | **math** 96:5 | 146:20,21 | **measuring** |
| 185:8 187:25 | **matter** 5:17 | 149:18 151:24 | 15:21 |
| 190:18 | 33:12 37:1 | 164:1 172:3 | **mechanics** 7:19 |
| **marking** 96:10 | 55:7 90:1 | 174:14,17 | **mechanism** |
| 142:13 | 156:1,2 | 176:9 178:6,7 | 55:7 157:8 |
| **marriage** 7:17 | **matters** 56:5 | 179:23 184:23 | **mechanisms** |
| **marry** 7:22 | **maxed** 30:9,12 | 187:21 188:8 | 15:11 |
| **martin** 124:2,2 | 30:17,19,21 | 188:22,24 | **med** 4:9 153:23 |
| **mashman** 1:18 | **mazda** 81:3 | **means** 7:13 | **media** 5:15 |
| 6:8 | **mccall** 69:20 | 53:19 102:5 | 136:20 142:18 |
| **master** 19:14 | **mcnish** 111:5 | 106:6 117:20 | 193:16 |
| 21:12 24:18 | 111:11 | 180:24 | **medical** 4:8 |
| 37:20 123:12 | **mead** 69:7,7,8 | **meant** 97:6 | 99:18 100:6 |
| 124:6 130:10 | **mean** 10:12 | **measure** 15:18 | 124:15 133:5 |
| 131:10,12,17 | 15:25 16:15 | 15:24 16:4,17 | 134:20,22 |
| 134:3,10,17 | 20:16 21:4 | 16:22 53:24 | 155:10,13,17 |
| 136:2 138:22 | 25:15 26:14 | 62:9,13,24 | 155:22 169:1,3 |
| 144:22 149:21 | 27:6,14 28:17 | 63:1,2,5,24 | 174:16 176:19 |

Dr. Lisa P. Gwin                                                            May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[medical - need]**                                                        Page 33

176:22 177:3,5
177:6 192:13
**medicine**  7:17
**meeting**  94:15
**meetings**  92:23
94:11
**mendoza**
129:22 131:19
**mention**  146:14
192:18,23
193:1
**mentioned**  60:7
99:10 134:20
**mercedes**
130:21
**mess**  39:6
**met**  114:14
**microphones**
5:11
**microscopica...**
74:7 75:10,14
76:2,13,15,16
**middle**  161:11
**midshaft**  150:9
**mild**  145:3
152:2,15,20
**mile**  31:13
**miles**  180:3
**milligrams**
180:23
**millimeter**
166:7
**millimeters**
166:10,20

**million**  99:4
**milliseconds**
165:6
**mills**  70:14
**mind**  31:19
169:12
**mine**  101:20
114:10 168:22
**minimize**  60:10
**minor**  1:7
**minute**  28:24
29:4 38:11
93:19 134:15
180:10
**minutes**  55:17
55:19 87:16,16
142:17 181:12
**mismatch**
175:8
**missed**  67:20
105:17 135:11
167:7
**missing**  12:9
**mode**  118:20
119:3,8
**model**  45:15
64:23 113:16
**models**  63:21
**modes**  119:7
**moe**  69:20
**mom's**  52:25
181:10
**moment**  49:15
129:14 148:10
162:23 189:4

**month**  67:15
101:3
**months**  106:15
112:15,16,18
**morning**  5:9
6:25 7:1 90:3
**mother's**
181:14
**motor**  78:23
79:2 165:17
**motors**  80:15
80:16
**mott**  109:10
**mounted**  41:11
41:12
**move**  14:21
15:9 181:17
**moved**  47:15
72:9 73:11,12
138:4 181:25
**movement**  7:13
8:1,5 14:8,14
18:10,20 19:11
19:13 20:9
21:3,5 47:8
115:13 159:25
168:1 189:8
**moving**  43:2
51:2,4 68:4
188:21,22,23
189:3
**mri**  182:23
**multiple**  124:5
124:6,6

**multiply**  124:3
**muscle**  177:23
178:19
**mustang**  44:18
**mute**  5:12

**n**

**n**  3:1 122:5
185:21
**naclerio**  69:21
**name**  5:2,23
7:2 89:16
173:3 191:17
195:20
**named**  176:2
**names**  43:13
185:1
**nash**  69:25
**ne**  2:4
**near**  123:22
150:22 164:17
**necessarily**
57:14 183:7
**necessary**
135:21,23
198:6
**neck**  74:4,6
182:14
**need**  7:6 8:22
25:24 31:25
49:12 54:17
57:4,7 78:24
106:2,6,19
108:13 111:22
133:4 147:12
173:20 175:18

Dr. Lisa P. Gwin                                                May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[need - occupants]**                                                Page 34

180:18 193:24
194:2,3,7
**needed** 92:12
106:8
**needle** 151:7
**needs** 148:7
**negative** 30:10
30:12,22
**negligence**
71:15
**neither** 19:25
195:17
**nelson** 69:20
**net** 81:16
**neurology**
111:7
**never** 10:13
27:8 29:3
31:19 33:8,10
37:10 41:10,19
50:17 70:19
72:2,5,17,21
76:5 79:2
101:7 118:12
118:23 120:12
120:22 133:13
170:25 176:19
**new** 85:3,14
92:19 105:24
106:8,18
107:23 129:2
151:2
**newtons** 172:4
**nhtsa** 20:18
21:13,17,18,24

**nice** 28:24
**nirvana** 10:18
10:23
**nissan** 75:2,4
75:23 77:2
185:21
**nitpicky** 97:2
**noise** 169:21
**non** 11:18
110:2 123:9
**nonmedical**
176:9
**nope** 124:9
**normal** 9:16
152:21,22
**normally** 98:3
98:13 120:15
**northern** 1:2
5:4,19
**notary** 198:13
198:19
**note** 5:10
196:10
**noted** 126:12
172:6 198:7
**notes** 4:11
90:11 127:4
153:21 154:7
183:20 195:14
**notice** 7:9
124:11 132:23
**noticing** 6:7
**number** 5:1
15:5 17:7 31:7
31:21,25,25

32:11,14 52:15
136:10 146:4
154:25 166:10
166:18 193:16
**numbers** 20:8
20:11,12,15
30:4 31:15,17
33:2,3,6,7,8,13
33:14 119:11
119:13,15
126:6 170:10
**nurse** 99:16,20
**nyder** 1:17

**o**

**o** 43:24 185:21
**oakland** 5:22
**oath** 6:22
**object** 9:18
10:16 14:5
19:23 26:8
35:5,12,24
36:15 39:22
41:18,25 49:20
53:17 54:20
57:3,21 58:12
70:18 72:23
74:13 75:6,19
76:4,10 77:1
81:20 88:6
90:19 98:5
101:16 114:15
114:23 115:4
115:14 117:16
118:15 119:18
119:24 133:1

133:17 157:5
165:19 166:1,8
167:5 168:12
172:17 175:3
175:20 184:19
189:16
**objection** 42:6
54:23 74:18
77:7 115:20
**objections** 6:3
**objects** 7:21
39:20,24 40:2
**obscure** 149:5
**obtain** 64:8
**obtundation**
180:25
**obvious** 21:5
160:21
**obviously**
47:17 162:23
178:19
**occipital**
138:25 157:19
157:21
**occiput** 179:5
182:25
**occupant** 7:25
31:10 33:17,17
59:18 175:7
**occupants**
23:11 31:9,17
32:23 115:9,12
115:19 116:1
117:9 171:22

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[occurred - okay]**                                    Page 35

| | | | |
|---|---|---|---|
| **occurred** | 137:24 139:19 | 70:15 73:9 | 140:11 141:5 |
| 150:21 172:9 | 144:11 150:16 | 74:16 78:19 | 141:21 142:12 |
| 172:11 181:11 | 154:16 155:12 | 79:9,16,21 | 142:20 143:5 |
| **occurring** | 157:6 170:2 | 80:14 82:9,18 | 143:13,22 |
| 166:13 179:19 | 171:2 177:12 | 85:8 87:20 | 145:5,15,20,25 |
| **occurs** 107:4 | 184:20 185:2 | 88:21 89:8,12 | 147:10,10 |
| 184:13 | 185:14 188:13 | 90:4 92:16,22 | 148:1,10,16 |
| **odd** 180:3 | 188:24 191:14 | 93:15,15 94:10 | 149:11,14,17 |
| **oe** 11:19 12:8 | **okay** 6:12 9:3 | 94:15,18 95:23 | 151:8 152:14 |
| 12:16 109:21 | 10:10,24 11:23 | 98:9,24 100:19 | 152:20,24 |
| 110:2 | 13:7 15:1 | 100:20 101:3 | 153:2,20 |
| **oem** 11:19 | 16:13,17 18:1 | 101:12 102:8 | 154:11,19,24 |
| 109:16 | 18:8,14 20:23 | 103:17,21 | 155:7,9,16 |
| **offer** 115:18 | 22:23 23:13 | 104:25 105:14 | 158:13 159:8 |
| 131:8 147:13 | 25:17 29:7,9 | 105:19 106:10 | 159:12,15 |
| **office** 52:11 | 29:17 30:7,15 | 106:14,21 | 160:8,10,24 |
| 83:22,24 84:20 | 30:23 31:20 | 107:15 108:16 | 161:10,15,18 |
| 86:10 124:15 | 32:5 33:15,22 | 109:4,15,24 | 162:1,10,19 |
| 124:15 125:14 | 34:1,14 35:18 | 110:5,8,13 | 163:13,19 |
| 125:16 146:21 | 38:15,18,22 | 111:13,18 | 164:23 167:19 |
| 191:6 | 43:9 44:2,10 | 114:1 115:11 | 169:15 170:3 |
| **offices** 83:25 | 44:12,14,16 | 117:11 118:13 | 170:18,25 |
| **official** 85:16 | 45:3,8,12 46:1 | 120:15 121:11 | 171:4,17 |
| **offset** 12:7 39:9 | 46:13 50:19 | 122:7,15 123:7 | 172:24 173:8 |
| 39:9,13 | 51:1 52:15,17 | 123:24 124:8 | 173:12,13 |
| **oftentimes** | 52:17 53:15 | 125:5,7,11,19 | 174:4 175:23 |
| 149:5 | 54:4,12 55:9 | 126:15,20 | 177:3,12,16 |
| **oh** 8:16 12:3 | 55:18 56:10 | 127:1,4,14,19 | 178:10,13 |
| 18:7 20:25 | 57:1,13,18 | 127:23 129:13 | 183:1,14,19 |
| 39:6,7 44:9 | 58:1,9,15 59:1 | 131:18 133:16 | 184:4 185:1,5 |
| 60:23 61:20 | 59:5,16 60:12 | 134:19,24 | 185:11,12,16 |
| 71:7 96:22 | 60:14,23 61:6 | 136:9,15,21 | 185:19,20,22 |
| 103:14 118:8 | 61:15,18,18 | 137:1,3,14,20 | 186:7,10,14,19 |
| 119:25 121:6 | 62:2 65:18 | 138:6 139:2,14 | 186:23 187:23 |
| 125:15 136:20 | 67:2,22 68:21 | 139:22,25 | 187:23 188:10 |

Veritext Legal Solutions
800.808.4958                                    770.343.9696

Dr. Lisa P. Gwin                                           May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[okay - page]**                                          Page 36

188:13,17
189:13,24
190:15 191:1,8
191:14,14
193:9 194:9
**old**  19:25 85:10
85:13 131:14
132:15 136:12
157:4
**onboard**
169:13 171:3
**once**  67:14
71:22,23 82:2
92:20 103:5,14
114:9 126:13
154:20 165:11
167:11,14
**one's**  31:5
**ones**  43:16 44:4
72:4 79:7
155:17 159:16
177:21 178:2
**oops**  137:5
**open**  71:4
127:11
**opening**  177:13
**opine**  73:4
76:22
**opined**  134:9
**opinion**  14:8,12
15:13 18:8
20:25 26:1,4
34:8,22 35:21
41:1 45:3 46:6
47:4 48:4 49:1

49:16 52:2
54:4,14 57:1
60:6 65:6,8,9
65:16,17,18,22
66:1,9 67:25
68:3,12 80:12
110:5 115:5,23
116:4 135:8
138:9,9 140:1
143:18 148:23
148:25 149:12
151:23 153:12
155:25 162:20
163:13 166:5
173:16 174:20
174:22,25
175:6,11,12,17
175:18 177:20
179:23 180:7
181:16,19
183:3,5 187:10
**opinions**  23:2,5
23:7,10 40:15
40:17 46:13
67:16 72:17
90:18 91:6,13
91:21 115:10
115:16 116:8
116:10,21
117:4,5 128:16
128:19,22,25
129:7,17,23
131:9 132:2,8
158:1,8 168:21
172:15 174:1

179:21 183:16
191:20
**opposed**  8:17
174:15
**opposing**
143:25 163:22
164:1
**opposite**  74:11
**options**  38:17
**order**  49:18
50:13 192:15
**ordering**
193:20
**organization**
79:12
**organizations**
79:5 80:3,4
**organizes**
99:15
**organizing**
99:18,19
**orientation**
182:25
**original**  11:19
12:9,17,20
105:24
**originally**
191:16
**orthogonal**
189:21
**orthopedists**
111:6
**osi**  133:9
**osis**  132:17,21
132:22

**outboard**
164:14
**outcome**  6:2
110:12 165:24
165:25 172:8
172:11 195:19
**outgoing**  147:8
**outlined**  91:24
134:2 169:12
**outside**  66:19
66:21,24 75:8
170:22,23
184:17
**overall**  61:11
**overseas**
191:25
**own**  46:9 71:17
72:9 83:14,20
88:13 147:8
168:13,21
**owns**  82:11

**p**

**p**  3:6 6:20
196:1,5 197:2
197:24 198:2,4
198:12
**p.m.**  181:11,12
193:15,19
**packaging**
42:12,20
**padding**  184:4
184:8,9
**page**  1:23
29:14 30:7,15
44:8,9,14 60:7

Dr. Lisa P. Gwin                                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[page - performed]**                                                              Page 37

60:25 61:8
92:25 93:17
94:18 97:24
98:24 99:1,14
100:19 101:3
102:15 103:3
103:23,25
107:2 144:25
149:14,17
150:15,24
151:4,22 178:5
178:6 185:18
185:19,20
186:10 197:4,7
197:10,13,16
197:19
**pages** 154:8
155:2,11,15
176:15 177:9
177:10,15
190:23
**paid** 81:7 122:2
**pain** 166:23
167:20,24
168:2,3
**painter** 2:8
5:23
**pam** 104:3
**pan** 54:9 56:4
56:19,20
**panel** 30:9,11
30:16 31:5,6
150:19 151:5,6
**paper** 79:21
123:19,24

124:1 169:13
**papers** 42:3
123:4 170:25
**paragraph**
29:18 60:19,22
**paralegal** 99:16
99:20 126:2,23
176:5
**parents** 1:6
**parker** 70:14
**part** 9:8 11:8
13:3 14:20,21
19:17 23:13
26:24 54:11
62:17 68:19,23
68:24 69:6,9
69:12,16,19,23
70:3,6,10,13
72:20,20 73:15
83:4 105:2
109:15,20,21
109:21 110:9
114:4,8 118:24
119:16 121:8
121:15,22
126:2,19
128:11 136:22
137:5 178:1
183:3,4 191:11
**participated**
99:6,7 168:25
**particular** 58:5
160:19 170:20
**particularly**
132:11 151:23

**parties** 5:14
188:21
**parts** 22:12
31:6 73:13
110:3 113:9
118:7 129:19
188:22,23
189:8
**party** 6:1
195:18
**pasquerella**
91:25 173:19
173:21 174:2
**pass** 186:24
**passenger**
112:19
**past** 113:16
129:22
**pathology**
169:7
**patience**
106:24
**patient** 124:3
157:13
**patients** 124:4
**patrol** 52:4,14
**pay** 83:2
127:15
**payment**
146:24
**payments**
110:22
**pdf** 4:12 105:3
105:9 145:1

**pdof** 168:18
**peachtree** 2:4
**pelvis** 151:16
**pending** 6:16
**pens** 27:15
**people** 13:1
17:17 25:15
63:8,13,14
72:18 73:13
74:20 83:16
85:22 120:18
122:18 131:14
131:15 132:7
133:8 156:4
157:23,24
**people's** 168:4
**perceived**
156:10
**percent** 48:8
50:8,24 57:10
71:4,12 79:20
109:1
**percentile**
48:12,20
**perfect** 8:19
44:1 106:24
183:22
**perform** 115:2
115:8
**performance**
112:22 117:24
118:9
**performed** 21:8
115:12 170:13
170:14 171:20

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[performing - plaintiff's]**                              Page 38

| | | | |
|---|---|---|---|
| **performing** | 4:18,18,19 | **physical** 51:20 | 158:7 160:1 |
| 115:15 | 34:24 52:5 | 140:2,6 160:2 | 179:25 189:14 |
| **periodically** | 61:11,12 | **physician** 32:1 | 195:8 |
| 122:13 | 136:10 137:2,3 | 122:9 135:13 | **placed** 13:19 |
| **periorbital** | 137:7,9,12,14 | 135:16 | 31:23 |
| 134:9 135:11 | 137:17 141:7 | **physics** 7:18,20 | **plaintiff** 1:8,16 |
| 178:12 179:2 | 153:7 158:16 | 14:13 15:15 | 5:17 6:9 71:18 |
| **permanent** | 158:21 159:15 | **pick** 5:11 | 71:25 72:5 |
| 156:24 | 160:12 161:9 | **picture** 34:14 | 73:16 76:21,25 |
| **permissible** | 162:4,14 | 34:20 35:18 | 78:2,7,14,15 |
| 7:10 | 163:17 | 37:19 38:13 | **plaintiff's** 3:5 |
| **person** 15:21 | **photogramm...** | 60:8 64:17,18 | 29:9,13 34:15 |
| 18:6 22:1 | 54:1 | 106:5 136:24 | 34:19 35:19,21 |
| 23:25 32:20 | **photograph** | 137:22 139:2 | 36:12 37:18 |
| 48:7 49:18 | 136:16 189:20 | 139:15,17,20 | 38:5 43:21 |
| 50:13 66:9 | **photographic** | 140:16,20,21 | 61:19,22 78:11 |
| 71:17 72:21 | 60:20,21 | 141:5 144:12 | 86:23,25 87:6 |
| 73:10,17 82:11 | **photographs** | 145:6,9,11,13 | 94:19 96:13,17 |
| 86:6 98:12 | 51:24 133:6,6 | 160:3 161:11 | 110:17 111:10 |
| 99:15,17 107:5 | 136:5 152:11 | 162:10,13,19 | 111:14,16 |
| 111:4,10 122:9 | 192:7,20 | 163:1,21 165:1 | 122:24,25 |
| 168:5 | **photos** 29:21 | **pictures** 94:25 | 125:7,20,21 |
| **person's** 73:3 | 29:23 51:16 | 95:21 144:10 | 139:11 140:17 |
| 74:11 76:21 | 52:3,12,14 | **piece** 23:1 | 141:22 142:14 |
| 78:3 | 63:20 66:11 | 38:19,23 39:1 | 142:15 144:6 |
| **personal** 63:9 | 113:7 130:19 | 66:25 109:17 | 144:25 146:6,7 |
| **personally** 63:4 | 139:18 144:21 | 130:2 | 148:12 149:14 |
| **pertains** 22:9 | 154:25 155:5 | **pieces** 27:25 | 152:25 153:6 |
| **phoenix** 101:8 | 158:14 159:8 | **pillar** 26:15 | 154:2,3,12 |
| 101:9 102:6 | 161:6 163:18 | 30:9,11,17,19 | 155:1,10 |
| **phone** 5:12 | 176:24 177:3 | 30:21,25 | 158:16,18 |
| 99:6 110:7 | 191:1,3,12 | **pinna** 145:17 | 160:25 161:19 |
| **photo** 4:10,13 | 192:13 | **place** 5:14 | 161:20 162:6,7 |
| 4:13,14,15,15 | **phrase** 174:23 | 19:20 36:6,7 | 165:2,3 171:8 |
| 4:16,16,17,17 | | 56:7 144:21 | 175:24 176:14 |

Veritext Legal Solutions

Dr. Lisa P. Gwin                                                      May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[plaintiff's - private]**                                            Page 39

177:5 185:6,8
190:16,18
**plaintiffs** 7:3
**plan** 93:5
**planning**
147:23
**plant** 113:20,25
**plastic** 38:19
64:19 66:25
138:15 140:10
140:14 189:25
**plaza** 5:22
**plea** 183:2
**please** 5:10,12
6:4,13 7:6
29:22 60:18
100:18 126:23
129:16 159:15
**pled** 183:10
**pliable** 159:23
**plural** 149:4
**plus** 78:12
101:20
**point** 14:23
27:17 37:7
45:18 46:18,20
57:15 60:17
88:6 91:14,23
104:12 106:17
107:16 129:1
179:1,4
**pointing**
144:12 145:1,3
**police** 106:1,2
124:16

**polite** 131:15
**polymer**
136:23 137:16
138:18 140:10
141:1 159:22
160:19
**ponce** 1:19
**pontomedull...**
139:1
**poor** 62:25
**portion** 27:21
27:24 36:1
87:16 158:11
**position** 20:2
32:4,20 38:9
44:19 45:16,17
88:17 110:3
**positioned**
163:16 182:3
**positioning**
46:24
**positions**
191:21
**positive** 30:12
30:19,22
**possible** 15:22
17:17 25:23
33:16 34:6
37:3 152:20
**post** 134:24
**posterior**
144:17
**posts** 134:25
**potential** 119:7
119:17

**potentially**
8:13 25:20
**pound** 48:7
**pounds** 15:5
48:18 56:25
172:4
**powerpoint**
98:20 105:3,8
105:12,24
106:9,14
107:24,24,24
108:5,7,16,21
148:5,6,13
152:1
**powerpoints**
108:11,25
**practice** 67:10
67:11 120:3
122:17
**pray** 84:24
**pre** 163:16
**prelim** 4:9
**preliminary**
4:7 95:10
124:18 155:10
155:12 175:24
176:1,13 177:5
**premature**
157:1
**preparation**
103:4 107:4,11
107:17
**prepare** 100:10
**prepared** 82:6
148:16 175:25

**preparing**
97:13 105:11
105:11
**presence** 12:23
13:10
**present** 6:5
86:5 87:17
92:14 105:7
**presentation**
90:8 148:19
192:17,22
**presentations**
86:19 108:22
**presented**
105:6
**preserved** 62:6
**pressure**
159:21
**pretty** 41:9
47:18 62:8
123:17 177:1
**prevent** 80:8
**prevented**
134:17
**previous**
108:14
**previously** 6:21
43:21 187:25
**price** 69:1
**primary** 23:25
123:8 124:2
**prior** 74:20
95:7 120:20,21
**private** 5:12
67:10,11

Dr. Lisa P. Gwin                                      May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[privilege - put]**                                      Page 40

**privilege** 125:2
**privileges**
  170:3
**privy** 39:17
**probably** 10:2
  39:7 40:24
  50:8 53:22
  54:2 55:17
  56:4 65:7 80:1
  98:11 102:2
  109:2 126:2,5
  126:7 128:7
  155:19,21
  170:23 173:13
  174:13 175:13
  184:24 187:13
  188:8
**problem** 33:13
  113:25 135:17
**problems**
  111:24 113:22
  122:20
**procedure** 7:11
  21:13,17,18,20
  22:1
**procedures**
  118:10,11,14
**proceed** 6:14
**proceeding** 6:3
  195:8,10,13
**proceedings**
  1:13 193:18
**produce** 124:23
**produced**
  58:22 131:23

131:25 147:7,7
  174:12,16
  191:7,10,11
**product** 40:10
  70:17,21 71:2
  71:16 72:12,22
  73:2,23 74:10
  74:16,22 75:17
  75:23 76:24
  77:2,10,21
  78:2,7,14
  79:23 109:6,11
  109:25 110:14
  121:4
**production**
  52:10 105:3,17
  114:9
**products** 71:8
  71:10 72:8
  76:2 110:8
**profit** 81:16
  82:4,6,13,15,16
**profits** 82:12
  82:21 83:1
**program**
  112:15
**proof** 134:10
**proper** 46:15
  46:16 89:16
**properly** 45:5
  46:21
**property** 84:2
**protect** 41:23
  42:9,15,20,22

**protected**
  39:20
**protecting** 42:4
**protection**
  115:18 116:1
**prove** 52:1
**provide** 6:16
  42:18,25 43:3
  43:5 90:5
  97:20 121:17
  122:15 127:14
  147:16
**provided** 90:17
  91:5,12 116:1
  130:3 131:20
  176:10
**providing**
  98:19
**public** 198:19
**publications**
  123:3
**published**
  170:25
**pull** 35:19
  43:18,19 87:7
  159:12
**pulled** 45:21
**pulls** 176:8
**pulmonary**
  149:9
**pumping**
  179:16
**purchase** 95:4
**purchased**
  94:19

**purpose** 59:14
**purposes** 7:10
**pursuant** 7:9
**push** 26:18,21
  26:22 27:4,10
  46:3 149:6
**pushed** 14:15
  19:14 53:8
  136:3 138:3,19
  139:8 140:9
  151:17,18,18
  158:11 159:24
  160:23 163:7,7
**pushes** 138:13
**pushing** 25:8
  31:15 138:13
  163:11
**put** 13:4,25
  15:23 19:24
  24:10 25:12,13
  26:4,12,23
  27:19 28:8
  34:8 37:1
  48:19,19 49:4
  54:17 55:12,25
  56:3,6,10,16,18
  58:2,6 87:2
  88:4 89:9 90:5
  91:18 100:7
  104:13 106:5
  107:2 109:21
  119:11 128:2
  144:15 148:8
  154:1 155:16
  161:24 189:5

189:19
**puts** 176:8
**putting** 24:20
24:23 47:13
99:19 150:2
**px39** 188:1

**q**

**qualifications**
129:5 135:10
169:6 176:4
**qualified** 169:3
**quality** 62:25
**quantify**
165:13
**question** 11:8
12:11 18:8
28:17 31:7
32:5 35:16
60:16 73:8,21
75:16 76:1
78:1,20,24,25
98:13 100:11
102:22 104:14
115:22,23
116:3,7,24
123:3 152:4
160:7 165:21
**questions** 18:1
28:23 31:20
55:11 65:13
85:18 88:22
104:8 122:8
147:5 193:7
**quick** 8:8 29:8
56:14 62:23

93:3,4 98:7
146:19 183:19
**quickly** 56:13
**quite** 153:21

**r**

**r** 3:1 43:24
185:21 197:3,3
**r0017277** 4:17
159:11
**r0017284**
158:17
**r0017286** 160:8
**r0017287** 61:11
**r0017305** 161:9
**r0017309** 141:7
161:24
**r17591** 155:2
**r17592** 155:1
**racker** 30:9,11
30:16,18,24,25
**radiologist**
67:3 97:23
144:14 148:13
**radiologists**
111:6
**radiology** 4:10
67:10,11 98:4
98:12,14,17,18
98:19,20
124:16,19
133:5 144:14
151:24 153:2
**radius** 149:19
**rails** 116:5

**ramos** 69:17
**ramp** 47:11
**ramping** 43:3
**ran** 20:2,3
75:23 175:11
180:2,5
**randomness**
165:17
**rangers** 113:17
**rank** 119:14
**rate** 110:20,25
111:2,3,5,8,11
**rates** 16:20
111:10
**rather** 135:13
147:18
**ray** 152:5,17
**rays** 149:6
**rc** 121:11
174:11
**reach** 41:17
45:6 46:7 53:1
53:6,9 54:11
57:16 142:22
**reached** 53:7,8
**reaches** 165:11
**read** 153:21,23
171:14 178:4,6
193:8 196:9
198:5
**reader** 102:1
**ready** 92:17
99:8 108:9,11
108:15

**real** 8:8 21:9
29:8 146:19
164:15
**realize** 31:2
**really** 10:21
15:6,22 17:6
19:16 20:4
28:24 29:2
31:4,25 32:12
33:1 41:10
46:7 48:24
49:14 50:3
53:19 55:7
56:13 57:14
59:24 69:4
71:23 72:14
85:13 86:20
97:5 104:9
106:20 107:13
115:21 117:2
118:6 121:15
131:3 132:5
135:15,21
136:5,7 140:25
149:3,5 155:20
156:25 157:23
167:7 172:20
173:6 179:4
181:6,8,13
182:5 186:11
189:17
**rear** 14:16
15:16,16 20:9
21:18 23:8
24:13 27:25

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[rear - reiterate]**                                               Page 42

31:14 32:3
40:12 42:5,23
43:3,7 48:10
48:11 55:13
56:7 59:7,17
60:1,3 61:13
66:16 74:2
77:10 87:25
114:4 123:16
136:3 141:14
150:7
**reason** 24:21
33:12 46:16,22
55:2,8 58:1,3
101:15 129:25
133:25 180:5
196:11 197:6,9
197:12,15,18
197:21
**reasonable**
34:7 188:20
189:10
**reasonably**
115:2
**reasons** 32:10
37:16 90:2
128:19
**rebound** 14:22
43:4
**recall** 70:15,16
70:23,25 92:8
100:15 103:10
104:9 108:21
108:22 109:22
110:13 120:14

156:15 169:17
184:10 190:1,2
**receipt** 196:17
**receive** 100:3
102:19,24
155:20 156:6
**received** 52:11
52:12,12 105:2
110:6 125:13
125:24,25
126:21 127:25
147:15 156:9,9
165:7 176:17
176:21 179:25
180:13 183:5,7
191:5 192:15
**receiving**
126:18 188:12
**recent** 44:1
97:3 186:14
**recess** 58:18
104:21 143:9
183:25
**reclines** 59:7
**recognize**
125:8 154:6,17
**reconstruction**
23:2 87:24
91:23 158:1
168:11,14,15
168:16,21,22
173:7 182:13
**reconstructio...**
168:16

**reconstructions**
172:25
**record** 5:10,14
6:6 7:4 43:20
58:16,19 87:3
87:7 104:19,22
105:1 126:20
143:7,10 154:2
183:23 184:1
193:14
**recorded** 5:15
124:25
**recording** 5:13
**records** 91:15
99:15,18
124:16 125:25
133:5 155:17
155:22 174:17
176:20 177:3
192:14
**recovery** 171:3
**recreate** 27:9
**recreated** 18:18
**recross** 3:5
**rectangle** 53:14
**redirect** 3:5
**reduce** 59:13
59:17
**reduced** 42:19
**reducing** 42:17
**refer** 29:22
**reference** 103:3
191:1
**referenced**
196:6

**references**
127:10,12
**referred** 99:13
**referring** 52:8
**reflection**
145:19
**reflects** 100:16
**refueling**
169:13
**regarding**
15:16 16:9
21:9 22:6 23:3
62:19 88:10,18
89:1 90:17
99:6 104:6
117:18 129:18
130:18 132:1
169:13,17,22
171:19
**regardless**
14:10 15:2,7
17:1,4 19:22
32:21
**regards** 162:20
**regurgitate**
52:10 191:4
**regurgitating**
124:15
**reinhart** 95:6
191:18,19
**reisbeck** 69:22
**reisbeck's**
69:22
**reiterate** 32:11

Dr. Lisa P. Gwin                                                May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[rejected - return]**                                          Page 43

| | | | |
|---|---|---|---|
| **rejected** 4:3 | 70:12 91:22 | 183:4,9,17 | **resolution** 94:6 |
| **related** 5:25 | 93:1,24 94:10 | 192:25 | **response** 49:13 |
| 103:22 104:1 | 94:14 101:2,21 | **reported** 1:25 | 129:11 |
| 123:6,17 | 103:11,24 | 2:25 | **responsible** |
| 152:10,14,15 | 104:5 108:24 | **reporter** 5:6,24 | 113:15 |
| 152:19 195:18 | 109:9,24 | 6:13,15 89:20 | **rest** 92:22 |
| **relation** 171:20 | 119:13,15 | 122:3 146:2 | 97:20 |
| 172:2 | 120:24 131:2 | 157:18 193:24 | **restrained** 45:5 |
| **relative** 14:22 | 173:3 185:2,4 | 194:9 195:7,16 | 45:16,17 47:9 |
| **relatively** 52:22 | 186:11 192:15 | **reporter's** 1:13 | 186:3,5,5 |
| 134:6 | **remembering** | **reports** 131:21 | **restraint** 41:15 |
| **relevant** 123:5 | 63:14 | **represent** 7:2 | 46:12 137:6,18 |
| 123:25 148:22 | **remote** 160:1 | 35:3,10 71:19 | 137:25 138:4 |
| 149:11 | **remotely** 6:5 | **representing** | 138:21 141:20 |
| **reliability** | **repairing** | 5:23 | 142:2,9 162:3 |
| 168:11 | 113:22 | **represents** | 163:5 164:9 |
| **relied** 90:18 | **rephrase** 24:25 | 125:11 | 184:12,12 |
| 124:17 172:24 | 39:1 174:18 | **requests** 87:20 | 187:6,14 |
| **rely** 29:17,20 | **replace** 109:21 | 87:23 | **restraints** |
| 127:12 173:6 | **report** 4:9 29:8 | **require** 169:6 | 186:21 |
| 173:24 174:4,7 | 29:14,21,22 | **required** 108:7 | **result** 10:7 |
| 174:9,11,19 | 30:3,8,15 38:1 | 128:13 165:14 | 12:17 51:4 |
| 175:18 | 60:7,17 91:24 | 198:13 | 110:7 161:15 |
| **relying** 29:19 | 92:14,17 98:19 | **requirements** | **resultant** 30:24 |
| 40:14 90:25 | 103:17 104:3,6 | 118:9 | **resulted** 21:11 |
| 127:24 134:20 | 106:1 124:16 | **requires** | **results** 19:9 |
| 173:7,15 | 128:5,10,12,22 | 143:24 | 30:2 102:24 |
| **remain** 82:1 | 129:1,3,8 | **rescue** 45:22 | 117:3 |
| **remember** | 133:7,19,19,22 | **research** | **retained** |
| 23:18 30:3 | 134:2,12,21,22 | 128:25 129:2 | 193:17 |
| 38:16 44:20,21 | 153:2 156:16 | **researcher** 10:4 | **retirement** 82:1 |
| 44:24 45:2,15 | 167:12,18 | 10:25 | **retiring** 84:23 |
| 46:1 66:13 | 171:6 172:6 | **residency** | **return** 196:13 |
| 69:5,11,14,19 | 177:21 178:6 | 169:7 | 196:16 |
| 69:22 70:4,9 | 179:9,20 183:1 | | |

Dr. Lisa P. Gwin                                              May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[revenue - row]**                                          Page 44

| | | | |
|---|---|---|---|
| **revenue** 81:14 | 71:24 78:9 | 162:22,23,24 | **rotated** 36:2 |
| 82:7 | 89:3 90:22 | 163:5 164:6,13 | 158:11 159:24 |
| **review** 92:19 | 94:15 96:4,23 | 171:6 173:13 | 163:6 |
| 92:20 98:3 | 97:20,23 98:23 | 173:15 175:23 | **rotates** 138:14 |
| 99:8 100:1,17 | 100:25 101:1 | 177:14,16,21 | 164:19,20 |
| 100:22 155:22 | 102:15 103:14 | 178:12,21 | **rotation** 36:20 |
| 196:7 | 103:21 105:22 | 179:2,3,18,18 | **rough** 1:10 5:3 |
| **reviewed** | 107:1 108:3 | 181:4,6,8,21 | 5:18 6:11 84:8 |
| 124:10 173:6 | 111:23 115:15 | 182:6,8,9,10,11 | 84:11,14 121:1 |
| **rhill** 2:6 | 116:3 119:11 | 182:15,17 | 121:3,17,20,24 |
| **richard** 2:3 | 122:23 124:10 | 186:19 187:15 | 129:21 131:23 |
| 6:10 | 124:10 125:15 | 187:23 188:6 | 131:25 132:9 |
| **richardson** | 128:8 133:15 | 189:2,5,21 | 132:13 174:11 |
| 70:1 | 134:10 136:11 | 193:7 | 174:15,16,19 |
| **rick** 84:7 | 137:14,15,16 | **rise** 34:6 | 191:21 196:4 |
| 146:14 191:5 | 137:19 138:1 | **rises** 58:4 | 197:1 198:1 |
| **ride** 42:18 43:4 | 138:17,19,21 | **risk** 79:10,16 | **roughly** 162:2 |
| 59:18 | 138:22,23,23 | 79:18,20 | **round** 101:6,7 |
| **riding** 189:12 | 141:1,10,19,19 | **road** 2:4 45:21 | **route** 113:5,6 |
| **right** 7:8,12 8:7 | 141:19,20 | 188:25,25 | **row** 17:13 |
| 9:1,25 12:16 | 142:7,13 | 189:12 | 18:11,20 19:11 |
| 12:19 13:9,23 | 143:13 144:2 | **robert** 85:24 | 25:3,6,9,18 |
| 19:14 20:14,14 | 144:15,25 | **rocha** 173:2 | 26:6 27:4,21 |
| 25:15 26:21,23 | 145:4 146:1,10 | **rocker** 30:20 | 27:24,25 28:5 |
| 26:24 27:1,19 | 147:1 148:3,10 | 31:5,6 | 28:6,8,14 32:4 |
| 27:22 29:1,13 | 148:12,18,21 | **rode** 117:1 | 35:22 37:12,21 |
| 31:24 32:9,11 | 148:21 149:1 | **rodrigues** 69:9 | 38:20 41:8 |
| 33:1 37:5 38:3 | 150:15,18,19 | **role** 24:8 95:8 | 51:11 52:20 |
| 39:6,8 40:18 | 151:6 152:7 | **roof** 41:12 73:5 | 62:10,10,14,14 |
| 46:13 50:18 | 153:5 154:24 | **room** 136:14 | 66:6,17 68:4 |
| 52:9 53:3 | 155:3,4 157:8 | **rope** 114:7 | 76:18 77:12 |
| 54:25 56:6 | 158:8,15 160:6 | **rosch** 173:4,11 | 137:5 138:14 |
| 60:15 61:25 | 160:21 161:10 | 174:9 | 139:8,18 |
| 67:16,20,24 | 161:13,23 | **rotate** 36:1 | 143:16 150:6 |
| 68:11 71:1,4 | 162:4,5,16,19 | | 158:11 159:4 |

Dr. Lisa P. Gwin                                              May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[row - seat]**                                                    Page 45

| | | | |
|---|---|---|---|
| 159:23 160:14 | 114:14 121:4,8 | 94:19 103:22 | 61:15 87:2,3 |
| 160:16 165:14 | 138:16 141:13 | 133:22 149:2 | 107:3 110:18 |
| 166:7 | 141:15 142:23 | 154:18 171:18 | 111:16 137:8 |
| **ruiz** 68:22,22 | 158:12 159:3 | 172:24 175:9 | 144:8 145:20 |
| **rule** 90:21 | 159:24 160:15 | 179:9 | 160:9 162:17 |
| 146:24 149:7 | 164:10 182:13 | **scalp** 145:18 | 171:9 177:7 |
| **rules** 7:10 | 184:10 186:4 | 177:22 178:20 | 190:21 |
| 88:23 126:16 | 187:2 | **scan** 152:5 | **scroll** 107:15 |
| 128:9 | **salt** 113:4 | 170:12,15,19 | 185:12,18 |
| **run** 14:3 34:9 | 168:6 | 170:20,21 | **scrt** 52:4 |
| 40:21,23 74:22 | **sam** 162:15 | 182:23 | **seam** 141:19 |
| 114:1,13 130:3 | **san** 83:13 | **scanned** 191:12 | **search** 147:8 |
| 130:4,5,6,16 | **santana** 1:5 5:2 | **scanner** 101:25 | **searching** 25:1 |
| 175:2 180:16 | 5:17 196:4 | 101:25 102:4 | **seat** 13:15,16 |
| 190:12 | 197:1 198:1 | 102:12 | 14:17,17 15:9 |
| **running** 85:22 | **save** 30:13 | **scans** 170:9 | 15:9 18:20 |
| 136:20 | 61:19 | **scene** 51:24 | 19:11 24:10,13 |
| **runs** 29:6 | **saw** 56:23 | 52:4,14 66:11 | 24:17,20,24 |
| **rws** 1:9 5:1,20 | 95:25 98:10 | 66:15 170:5 | 25:3,4,4,5,8,18 |
| **ryan** 67:3 | 117:2,2 143:16 | **schedule** 4:6 | 27:10,21 28:5 |
| **s** | 161:3 181:2,4 | 95:16 110:17 | 28:6,13 31:15 |
| | 181:18 192:6,7 | **scheduling** | 32:3,4,7,24 |
| **s** 3:1 25:21,21 | **saying** 16:3 | 95:16 191:23 | 35:22 36:4,21 |
| 162:14 197:3 | 20:4 33:11,12 | **school** 45:15 | 36:22,25,25 |
| **sae** 169:12 | 33:16 51:9,19 | 95:18 153:22 | 37:1,6,12,21,21 |
| **safety** 13:16 | 52:2 53:10 | 153:23 | 37:23 38:8,20 |
| 14:17 15:9 | 78:22 109:14 | **science** 7:17 | 39:2,5,21 40:4 |
| 24:12,17,20,23 | 123:13 124:21 | 13:3,8 | 40:7,15,20 |
| 25:4 37:21 | 144:16,17 | **scientific** | 41:1,4,11,17,23 |
| 39:4 40:4,10 | 157:18 164:4,7 | 188:20 189:10 | 42:4,13,17,22 |
| 42:18 43:11 | 168:3 184:21 | **scientist** 9:5 | 43:3,10,11 |
| 44:20 45:18 | 188:19 189:3 | **score** 33:7 | 44:4,20,21,22 |
| 47:9 53:2,9,12 | **says** 22:6 38:1 | **scores** 16:18 | 45:1,6,16,18,22 |
| 54:10,11 59:9 | 55:16 61:24 | **screen** 8:12,15 | 45:24 46:5,14 |
| 61:2,5 79:4,12 | 85:2 88:23 | 8:23 29:7 | 46:25 47:3,6 |
| 80:3,4,5 95:25 | | | |

Dr. Lisa P. Gwin                                          May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[seat - sense]**                                            Page 46

| | | | |
|---|---|---|---|
| 47:10,17,19,22 | 150:1,3,21 | 38:20 41:8 | 146:11 147:22 |
| 48:4,20,22 | 151:10,12,18 | 55:15 56:14 | 148:10,14 |
| 49:4,5,13,22,23 | 151:20 153:16 | 60:24 61:7 | 151:5,6 152:11 |
| 50:4,16,17,20 | 158:4,11,12,14 | 62:10,14,23 | 152:25 153:6 |
| 50:22,24,25 | 158:22 159:2,3 | 78:20 93:7 | 153:20 154:12 |
| 51:2,3,8,10,11 | 159:4,5,6,7,23 | 98:7 102:21 | 154:16 159:8 |
| 51:12,21,23 | 159:24 160:4 | 105:19,23 | 159:17 160:8 |
| 52:20,21,24,25 | 160:14,15,16 | 106:8,9,12 | 161:10,24 |
| 53:1,1,2,6,9,9 | 160:23 161:4 | 130:2 139:8,14 | 162:17 171:9 |
| 53:12,16 54:5 | 162:1,4 163:6 | 139:18 143:16 | 174:22 177:7 |
| 54:6,7,9,9,10 | 163:7,14 | 160:16 165:14 | 177:16,21 |
| 54:10,10,11,15 | 164:10,19,19 | 166:7 171:14 | 182:24 185:10 |
| 54:17,19 55:4 | 164:20 177:19 | **secure** 46:18 | 186:15 190:21 |
| 55:12 56:1,2,4 | 182:13 184:4 | **see** 19:3 21:5 | 191:2,6,9 |
| 56:7,8,11,16,19 | 184:10,14,18 | 21:10 25:25 | **seeing** 58:23 |
| 56:25 57:2,10 | 186:1,4,8,23 | 28:25 29:10,15 | **seem** 87:3 |
| 58:5,7,11 59:6 | 187:2,11 | 34:16,20 38:13 | 168:18,19 |
| 59:10,18,22 | 189:19,25 | 41:15 43:22 | **seems** 34:19 |
| 61:2,5 62:17 | 190:4,7,9,12,12 | 49:12,22 52:7 | 46:15 130:4,7 |
| 65:5,10,15,19 | 192:6 193:2 | 52:17 55:14,21 | **seen** 19:9 21:8 |
| 65:23 66:2,6 | **seated** 62:21 | 56:7,24 68:16 | 41:8 51:9,16 |
| 66:18 68:4,6,9 | 110:2,11 132:7 | 73:25 85:18 | 51:16 62:7 |
| 74:3,4,6,8 | 141:15 | 86:15,16 87:9 | 63:22 117:23 |
| 76:17,18 77:11 | **seats** 27:24,25 | 87:12,12 93:18 | 118:5,11,12 |
| 77:12,14,23 | 36:19 41:5,9 | 96:12 97:3 | 120:1,6,7,11,12 |
| 88:4 95:24,25 | 42:9,18,24 | 102:17 103:5 | 120:22,25 |
| 96:1 110:4,10 | 47:14,15 57:14 | 110:18 111:16 | 135:14 171:11 |
| 134:4,8,11,24 | 59:21 60:2 | 111:23 119:22 | 184:11 187:5 |
| 136:6,17 137:6 | 142:23 | 120:20 122:7 | **sellers** 69:25 |
| 138:3,14,16 | **sec** 61:18 | 126:23 132:12 | **send** 104:10 |
| 139:4,8,8,18,23 | **second** 17:12 | 137:15,17 | 146:18 193:9 |
| 140:3,21,22 | 18:8,11 25:6,9 | 139:17,19,20 | **sending** 104:3 |
| 141:13 142:3,3 | 25:17 26:6 | 140:25 141:1,3 | **sends** 146:21 |
| 143:15,15 | 27:4 28:8,14 | 144:8,18,22 | **sense** 8:18,24 |
| 144:3 149:25 | 34:18 35:22 | 145:5,9,19 | 107:8 |

Veritext Legal Solutions

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[sensitive - site]                                         Page 47

sensitive  5:11
sent  124:14
    125:17 147:9
    191:12 196:14
sentence  31:19
    60:19 61:7
    171:13,15,18
    178:4 183:2,6
separate  80:21
    176:20
separated
    101:21
separation
    52:22
september
    154:19,20
    185:7
sequela  178:11
sequence  45:7
    180:9
series  113:16
    113:18 169:18
    169:18,22
serious  75:18
    156:7,10,24
seriously
    156:18
serve  169:3
    183:2,6
served  43:9
sessions  85:23
set  11:5,10 12:4
    24:7 155:5
    195:9

settled  71:24
    78:9
setup  22:13,24
    23:14,19,24
    28:25 29:6
several  43:12
    87:10 93:25
    104:4 167:22
severity  119:10
    131:4
sh  44:9
shape  188:5
shards  64:19
share  29:7
    61:15 82:12
    103:2
shared  87:3
shareholder
    81:24 82:1,9
    83:8,10
shareholders
    82:18 83:3,5
shares  82:11
sharing  82:13
    82:16
sheet  89:19
    154:24 196:11
shelly  109:10
shelton  44:13
    44:16,18 70:7
    70:11,11
shop  27:14
    28:2 64:2,8,12
    64:17,21,24
    65:14,19 66:25

short  48:25
    58:18 143:9
    172:14 183:25
shorthand
    195:6,11,14,16
shortly  167:2
show  19:10
    28:7 34:14
    36:19,20,21
    52:1 53:11
    61:6 66:11
    90:8,13 96:11
    96:12 98:18
    105:13 108:12
    110:16 111:13
    125:7 126:17
    136:9,15 141:2
    141:5 144:7
    145:5 148:8,12
    152:24 153:5
    154:11 155:9
    160:6 162:1
    177:4 182:2,5
    187:25 189:13
showed  35:19
    120:23 137:22
    142:25 162:11
showing  94:13
    158:15
shows  61:12
    127:1 140:2
    150:19 159:11
sic  29:10
side  20:21 37:5
    40:12 42:20,20

45:21 78:1,6
    78:11,13 132:4
    137:19 138:21
    160:4,21 164:6
    164:6
sides  43:6,7
sign  193:8
    196:12
signature
    195:23
signed  196:19
significant  22:3
    158:24
signing  104:17
silva  68:18
similar  12:18
    15:10,10 17:8
    132:17 133:3
    133:10
similarity
    132:2,23
simple  55:11
simulated
    123:16
simulation
    173:11
simulations
    121:24 172:25
    173:5,9
single  176:21
sit  147:25
    187:4
site  179:11
    186:20

Dr. Lisa P. Gwin                                                     May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[sitting - squished]**                                              Page 48

**sitting**  77:23
  163:3
**situation**  77:6
**situations**
  15:11
**six**  112:2,6,15
  112:16,18
  113:14 184:24
**size**  49:17
  50:20 64:15
**skeete**  69:17
**skin**  179:18
**skirt**  52:4
**skull**  38:4,6,24
  39:3 106:4
  134:5 135:12
  138:24,25
  142:1 143:18
  143:19 145:4
  152:3,18
  163:10,11
  164:16,22
  167:15,16
  177:23,24
  178:11,18,24
  179:5 188:15
  188:15 189:6
**sled**  130:8,8,11
**sleeping**  163:3
  164:9 181:8
  182:6 189:11
**slide**  144:7
  148:21 149:11
**slides**  90:13
  148:8

**slot**  159:7
  161:14
**slowly**  166:15
**small**  27:20
  134:6 154:16
  159:17
**smashed**  64:18
  66:16
**smidge**  106:23
**smith**  69:17
**snelson**  68:20
**solemnly**  6:15
**solution**  119:17
**solutions**
  119:17 196:23
**somebody**
  22:14 23:21,23
  78:2 110:22
  146:18 150:16
**someone's**
  21:14 73:24
  74:17 75:17
  79:17,19
**someplace**
  126:7
**somewhat**
  14:21 25:10
  47:16 159:22
  163:8 164:20
**son**  45:17
**soon**  84:23
**sorry**  16:21
  20:16 44:9
  52:6 53:14
  60:14,21 69:21

  71:7 80:6
  106:2 116:18
  116:19 122:3
  137:24 141:17
  142:14 146:2
  148:2 157:7
  163:9 171:2,7
  173:2,13
  174:24 177:13
  178:7 181:2
  184:20
**sort**  11:19 43:7
  52:9 63:21
  72:11,16 85:16
  93:5 123:15
  129:24 174:14
**sorts**  32:2
  99:12
**sound**  24:15
  27:16 96:4
  136:11 190:23
**sounds**  98:23
  133:13
**source**  160:21
**space**  26:14,17
  26:18 175:7
**span**  130:4,7
**spare**  66:21
**speak**  87:14
  192:5
**specialist**  99:13
  100:5
**specific**  32:5
  166:10,18

**specifically**
  62:19 80:4,9
  88:23 91:22
  93:2 126:16
  183:8 186:7
**specifications**
  117:25 118:7
**specifics**  104:9
**specs**  118:10
**speed**  12:6
  57:19 74:3
  77:11 166:14
**speeds**  11:22
  22:21
**spelled**  104:12
**spellings**  89:19
**spend**  107:18
**spent**  97:23,24
  97:25
**sphenoid**
  167:13
**spine**  16:6,7
**split**  36:20
**splitting**  36:19
**spoke**  87:13
**spot**  20:1
**spots**  158:9
**sprayed**  113:3
**springs**  113:2
  113:10
**spurs**  119:6
**square**  53:13
**squished**
  190:11

Dr. Lisa P. Gwin                                                      May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[ss - subsequently]**                                              Page 49

ss  195:2
stacey  69:25
stacked  25:24
  38:10 138:7
staff  155:18
stand  44:6
  56:14,23 60:11
  60:13,15 62:23
standard  10:14
  10:18 17:22
  119:22 186:20
standards
  114:14 117:24
standpoint
  115:3 162:12
stands  86:2
  183:17
start  85:14
  95:2 137:1
  148:5 172:10
started  53:20
  154:19
starting  30:7
starts  43:24
  155:1
state  6:4,5,15
  68:25 69:25
  122:2,3,5
  130:5,8 195:1
statement  85:8
  128:15,18
states  1:1 5:4
  5:18
static  34:24
  50:23

statically  50:9
  164:18
statute  183:11
stay  47:3
stayed  47:9
  181:25 186:5
stays  144:3
  184:13 186:8
stellantis  80:21
  80:23
stem  178:8
  179:8
stickers  136:13
stimulus  157:8
stock  14:10,14
  14:25 15:2,8
  17:2,4 88:2
  94:2,8,9
stop  30:13
stopped  51:10
  61:24
storing  84:4
story  78:25
straight  90:21
strain  113:3,7
strap  46:3
stress  158:4,5,9
  158:24 159:6
  159:10,11
  160:1 161:3
  163:8
strike  13:25
  25:23 31:19
  35:20 80:5
  141:24 166:5

174:24 181:2
striking  14:24
  15:7 40:1
  44:25 70:12,24
  76:17 110:7
stroller  27:13
  27:14 65:1,2,4
  65:10
strong  57:14
stronger  65:5
  65:14,24 66:5
struck  14:13
  74:3 88:2
  130:22
structural
  112:7,19,20
  114:18,21
structure  19:13
  114:12 115:2
  116:11,13,22
  116:23 117:1,6
  183:11
structures
  14:16,18,19
  15:8 20:10
  23:8 24:13
  31:14 32:3
  51:8 54:15
  66:17 88:1
  115:6 136:3
  166:15
stuck  74:20
study  7:13 8:5
  9:13 136:16

stuff  19:6 24:14
  65:7 73:12
  88:12 106:18
  118:10 138:20
  147:11 152:21
subarachnoid
  177:24
subaru  81:5
  110:2
subcontractor
  67:9
subject  9:14
  11:2 12:21,24
  13:11,22 16:23
  17:16 18:17
  19:17 25:6,9
  26:1 27:7 28:1
  28:7 31:18
  33:8 35:23
  47:19 49:5,17
  50:3,5 63:5
  95:25 115:3,9
  115:19 116:6
  117:7 118:25
  136:4 153:18
  170:7,17
  171:24 172:21
subjected  9:12
subjects  123:20
  171:19,21
subscribed
  195:20 198:14
subsequently
  74:5

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[subset - takes]**                                    Page 50

**subset** 176:18
 176:21,22
**substance**
 94:14
**suffer** 156:23
**suffered** 18:22
 18:25
**suffering**
 166:24 167:20
 167:24
**suing** 71:16
**suite** 1:19 5:22
**sum** 4:9
**summarize**
 151:25
**summarizes**
 176:9
**summary** 4:8
 124:18 131:7
 155:10,13
 172:14 175:24
 176:1,8,13
 177:5,6
**summer** 191:24
**summers** 95:17
**sun** 113:4
**supervision**
 195:12
**support** 15:12
 52:2 128:21
 131:9
**supporting**
 124:19 155:13
 155:14 176:2
 176:13

**suppose** 97:2
 182:4
**supposed** 59:12
 59:17 184:18
**sure** 8:10 10:12
 12:1,9 14:6
 17:19 27:15
 28:25 35:6,15
 40:3,11 43:14
 43:18 44:24
 56:13 57:24
 59:2 78:4
 81:22 82:22
 84:18,21 89:6
 100:13 101:21
 102:7 103:5,15
 103:16 104:18
 108:10 109:19
 111:7 114:13
 117:19 119:13
 132:14 139:15
 140:24 147:20
 154:6 155:6
 156:16 157:9
 160:6 164:1
 166:9 169:8,25
 177:18 182:17
 183:13,21
 184:21 185:4
 185:13,14
 187:24 188:3
 189:17
**surface** 134:6
 145:4

**surprise** 98:22
 99:25 100:2
**surrogate**
 135:18,24
 136:16 137:17
 142:25 162:12
 164:23 189:18
**surrounding**
 43:5
**survivable**
 21:14 31:4
**survive** 20:19
 157:16
**survived** 19:21
 174:24
**surviving** 1:6
**suspect** 169:6
 182:11
**suspension**
 88:2 94:8
 110:3 113:2
**suv** 65:5,10,15
 65:19,23 66:2
 66:5,6,17
**swear** 6:13
**switalski** 69:21
 71:22
**switch** 143:6
**sworn** 6:21
 198:14
**synced** 194:4
**system** 93:12
 113:21,23
 114:6 118:1
 169:17,23

**systems** 113:15
 114:5 117:18

**t**

**t** 3:1 27:18
 99:25 121:15
 121:22 192:14
 197:3,3
**tabbed** 134:7
**tail** 112:18
**tailpipe** 112:16
**take** 5:14 11:14
 11:16,18 14:2
 16:19 30:4
 39:6 41:16
 49:8 55:18
 58:15 63:24
 64:2,5,20 65:1
 83:1 90:11
 96:11 98:3,13
 99:22 101:25
 104:16 106:3,7
 129:19 143:4,5
 146:10 161:23
 168:6 171:14
 183:19 189:18
 189:20 193:11
**taken** 5:16 7:9
 26:18 28:9
 29:24 58:18
 62:25 104:21
 113:7,8 143:9
 183:25 195:8
 195:10,14
**takes** 26:14
 95:17 191:24

Dr. Lisa P. Gwin    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[talk - testified]**    Page 51

| | | | |
|---|---|---|---|
| **talk**  16:8,10 | **tape**  143:4 | **telling**  31:3 | 32:8,19 33:6,8 |
| 19:16 22:11,13 | **tapes**  143:6 | 57:8 | 33:18 34:2,9 |
| 42:3,24 87:17 | **target**  12:18 | **tells**  52:19 | 34:15 35:2,9 |
| 88:8,18 91:10 | **taught**  131:14 | 162:20 | 35:20 41:3 |
| 104:11 112:1 | **teach**  85:14 | **template** | 47:15 54:18 |
| 167:9 172:4 | **team**  52:4 | 105:12 | 56:7,11 58:2 |
| **talked**  24:12 | 105:20 | **temporal**  106:5 | 62:2,3,6,11,15 |
| 32:10,16 37:3 | **tear**  41:2 60:7 | 106:6 144:15 | 62:15 86:10 |
| 38:10 47:11 | 160:3,13 | 145:4 167:11 | 88:5 89:10,15 |
| 77:8 87:11,11 | **tears**  60:25 | 177:22,23 | 89:16,22 90:6 |
| 87:18,19 89:14 | 61:6,12,16 | 178:19 | 91:18 92:9 |
| 94:5 106:17 | **technical**  93:8 | **temporalis** | 99:10 112:4,8 |
| 117:9,11 | 93:9 100:12 | 177:23 178:19 | 112:12,23 |
| 151:25 158:5 | 103:25 107:6 | **terms**  22:15,20 | 116:6,14 117:2 |
| 167:6 172:3 | 107:10 | 22:21 108:11 | 117:3,7,7 |
| 190:14 | **technically** | 131:4,8 132:6 | 130:7,8,9,11,19 |
| **talking**  11:15 | 72:10 | 171:2 172:4 | 130:25 153:10 |
| 37:7 38:12 | **ted**  85:24 | 180:24 | 153:17 164:24 |
| 41:24 61:3,4,7 | **tedra**  1:17 6:8 | **terrible**  157:24 | 169:20,24 |
| 103:25 106:12 | 7:2 8:8 | 175:9 | 170:8,14 172:2 |
| 107:9 116:13 | **teleconference** | **test**  11:2,7,24 | 172:15,19,22 |
| 118:8 137:21 | 93:15 103:8,15 | 12:11,13,24 | 175:2,11,18 |
| 144:22 160:11 | 103:21,22 | 13:4,15,19,23 | 186:20,24 |
| 173:1 | **telephone**  1:20 | 13:25 14:2 | 187:5,7 191:11 |
| **talks**  29:14 | 2:5 | 15:6,19 16:22 | **testified**  6:22 |
| 148:21 179:20 | **tell**  13:1 20:25 | 17:13 18:2,11 | 16:25 43:16 |
| 183:1 193:2 | 37:14 44:4 | 18:15,18,22,23 | 71:17,19,25 |
| **tall**  49:11,12 | 46:22 55:15 | 19:1,4,8,9,19 | 72:5,8,12,18,21 |
| 56:5 142:21 | 63:15 74:16 | 20:2,3 21:2,12 | 73:2,10,13,16 |
| 188:9 | 82:3 105:14 | 22:1,2,14 | 73:23 74:10,21 |
| **taller**  187:14 | 107:18 137:7 | 23:14,19,23 | 75:4 76:20,24 |
| **tangential** | 152:6,6,12,23 | 24:7,11 25:2 | 78:1,6,9,13 |
| 123:11,17 | 162:19 170:10 | 28:10,11,14 | 79:1 80:10,15 |
| **tangentially** | 182:18 189:4 | 29:15,18,20,22 | 80:17,18,23 |
| 123:6 | 190:10 | 31:9,11,22 | 81:1,3 154:20 |

Dr. Lisa P. Gwin                                                          May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[testified - think]**                                                   Page 52

| | | | |
|---|---|---|---|
| 162:21 181:7 | 87:18 91:23 | **thereof** 83:4 | 189:3 |
| 181:23 | 92:20 93:3,5 | 87:16 195:19 | **think** 11:4,7,9 |
| **testify** 22:6 | 93:20 99:7,7,9 | **thigh** 151:13,13 | 18:23 20:24 |
| 72:15 85:12 | 99:11,12 | **thighs** 47:9 | 25:12 28:11 |
| 89:4 154:21 | 102:16,22,24 | **thing** 9:20,21 | 29:10 35:14 |
| 171:19 172:1,7 | 112:15,17,19 | 10:13 17:21 | 42:19 44:19 |
| **testifying** 33:11 | 112:22 113:11 | 34:17 43:8 | 45:1 48:18 |
| 43:15 71:6 | 114:8,13 | 59:24 72:11,16 | 56:12 59:23 |
| 74:25 77:17 | 118:10,13,17 | 72:16 73:5,7 | 60:5 63:19 |
| 78:21 95:11,13 | 121:4,8,11,18 | 83:23 92:18 | 64:14 66:13 |
| 154:19 185:3 | 121:21 123:12 | 118:11,12 | 69:18 71:16 |
| 186:17 | 123:16 135:18 | 142:5,8,10 | 75:15 78:16 |
| **testimony** 4:6 | 164:23 169:19 | 150:25 157:22 | 80:22 83:11 |
| 4:19 8:2 33:5 | 170:1 171:20 | 161:16 174:14 | 86:13,20 87:15 |
| 38:22 43:22 | 173:11 | 176:21 192:2 | 89:4 90:4,15 |
| 46:9,9,10 | **tests** 11:10 14:4 | **things** 12:4,5,6 | 92:21 94:17 |
| 47:22 51:1 | 15:16,17 21:8 | 12:9 13:11 | 98:6,10 101:19 |
| 54:16 68:14,15 | 21:10,16,22 | 22:17,22 23:12 | 101:22 102:3,7 |
| 74:11 75:17 | 40:23 87:21 | 27:15 29:18 | 103:19 105:4 |
| 120:19 123:25 | 114:1,4 121:25 | 31:3 38:10 | 109:12,19,20 |
| 154:17 185:6 | 130:2 169:9,11 | 48:2 55:1 | 110:15 115:12 |
| 193:15 196:9 | **tethered** 47:3 | 82:22,23 85:15 | 115:21 119:6 |
| 196:17 198:8 | **tethering** 42:16 | 94:12,13 99:4 | 119:25 120:6,7 |
| **testing** 9:21 | 43:1 | 99:12,19 100:8 | 122:1 125:6 |
| 12:16 15:12,14 | **texas** 68:25 | 104:15 106:7 | 128:14 130:13 |
| 15:14,25 16:12 | 69:25 83:13 | 110:4 119:22 | 130:18,21,22 |
| 22:4,7,16,25 | **thank** 30:6 | 121:15 124:16 | 131:20 133:23 |
| 28:20,22 29:25 | 55:24 82:8 | 124:20 125:25 | 135:16 136:10 |
| 39:15 40:7,9 | 105:2 106:20 | 126:10,21,25 | 136:12 139:19 |
| 40:10,10,14,19 | 106:24 155:14 | 127:2 128:1 | 140:24,24 |
| 40:25 41:3,14 | 161:8 173:5 | 129:16 147:3 | 144:1 148:4 |
| 41:22 42:1 | 193:6,23 194:6 | 147:16 148:9 | 149:23 151:8 |
| 47:24 48:3,6 | **thanks** 106:24 | 149:7 167:22 | 157:10,11,23 |
| 48:10,11 51:20 | **theory** 40:3 | 172:1 176:23 | 161:10 163:2 |
| 84:2 86:21 | 162:11 164:24 | 176:24 180:25 | 163:23 166:18 |

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[think - transcribed]**                                          Page 53

| | | | |
|---|---|---|---|
| 167:18 169:16 | **tibia** 53:4 67:20 | 192:8,10 195:8 | **tool** 53:11 |
| 173:5,12,19,22 | 67:24 68:11 | 196:18 | **tools** 120:18 |
| 174:14,17 | 151:7 | **timeframe** | **top** 25:24 43:24 |
| 178:20 181:10 | **ticket** 101:6,8 | 196:8 | 62:21 77:3 |
| 182:2 184:9 | 102:9 | **times** 71:21 | 92:21 109:9 |
| 185:2,25 187:1 | **tickets** 101:7 | 80:10 84:7,13 | 163:15 187:13 |
| 187:9,18 188:2 | **tight** 114:6 | 85:20 87:10 | 187:18,22 |
| **thinking** | **till** 154:21 | 93:22,25 104:4 | 188:2,6,15,18 |
| 173:12 | **tilting** 36:21 | 109:2,2 128:6 | 189:1,7 |
| **thomas** 111:5 | **time** 5:7,13 6:4 | 181:24 | **topics** 93:24 |
| 111:11 | 18:7,17 23:3,5 | **tiny** 27:15 | **torture** 161:7 |
| **thoracic** 123:21 | 30:14 51:15,20 | 47:18,20 | **total** 96:3 97:17 |
| **thorbaly** 130:5 | 58:17,20 67:12 | **tire** 66:21 | 98:1 193:16 |
| **thorinson** | 67:12 78:4 | **tires** 94:1,3 | **totals** 4:12 |
| 68:21 | 87:13,14 91:21 | **tissue** 7:18,19 | 111:15 |
| **thought** 41:10 | 93:21 94:12 | 7:23 | **touch** 67:8 |
| 61:2 105:5 | 96:16 97:13,18 | **today** 16:8,10 | **touched** 142:5 |
| 110:1 155:12 | 98:21 100:1 | 108:18 146:19 | 142:8 |
| 160:11 | 103:22 104:1 | 147:2,7,25 | **touches** 99:17 |
| **three** 19:25 | 104:11,20,23 | 170:11 183:16 | **toward** 39:23 |
| 43:6,7 85:21 | 105:22,23 | 183:17 187:4 | 150:3 151:16 |
| 101:4,5 112:6 | 106:11 107:15 | **today's** 193:15 | **towards** 39:20 |
| 113:14 156:4 | 107:18,18,21 | **todd** 130:4,18 | 161:11 182:11 |
| 167:23 | 107:22,23 | **together** 7:22 | **toyota** 72:11 |
| **threshold** | 111:2 112:1 | 80:22 99:20 | 81:1 |
| 57:17 | 114:10 118:6 | 100:7 120:10 | **trachea** 148:25 |
| **threw** 27:15 | 118:23 119:15 | **told** 33:23 | 149:8 |
| **thumb** 126:13 | 120:8 134:12 | 183:16 191:4 | **tracheas** 149:6 |
| **thymi** 149:3 | 143:8,11 | **tolerable** 123:9 | **track** 113:5 |
| **thymus** 149:2 | 156:23 162:22 | 123:14 | 136:11 176:10 |
| 149:10 | 171:23 181:1,1 | **tons** 91:7,7 | **tracy** 130:4,18 |
| **thymusses** | 181:3,3,5,9,17 | 161:5 | **training** 85:12 |
| 149:3,5 | 181:18,21,21 | **took** 27:18 | 85:13,16 |
| **tib** 150:19,25 | 182:3 183:2,24 | 116:19 127:5 | **transcribed** |
| 167:7 | 184:2 191:24 | 162:11 | 195:11 |

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[transcript - underscore]**                                    Page 54

**transcript**  1:13
193:21 194:4,7
195:14,15
196:6,19 198:5
198:8
**translated**  39:3
**transmit**
151:20
**transmitted**
39:5 126:10
**transport**  79:8
79:9,12 80:2
**transportation**
79:14 101:4
**trauma**  124:4,5
**travel**  111:1
**traveling**  102:9
**tree**  72:9
**trial**  76:1 81:18
92:15 97:21
100:7 111:1
117:6 128:16
148:2,3
**tried**  27:9
**trimming**  72:9
**trip**  101:6,7
**trouble**  113:21
**truck**  11:14,16
11:17,18,19
14:13,14 15:7
15:8 31:14
69:4,4 109:18
112:21,25
113:18 131:9
134:16 138:11

138:20 142:4
172:12 180:6
183:11
**trucks**  71:9
74:19 112:19
112:19 113:1
113:16,21,23
117:19 169:18
169:22
**true**  19:18
56:12,15 57:8
85:6 98:7
102:11 132:22
143:1 144:1
192:15 195:13
198:8
**trunk**  25:19
34:9 63:18
79:10,16,19,20
**truth**  6:17,17
6:17
**try**  7:5 13:4
35:18 55:10
87:5 90:24
91:2 104:17
136:24
**trying**  27:17
38:16 54:12
60:11 73:9,18
155:7
**tuesday**  194:8
**turn**  106:23
181:4
**turned**  75:8
181:6 182:10

182:16
**turns**  142:24
**twice**  71:22
165:24
**twist**  113:6
**twisted**  163:8
164:20
**twisting**  159:25
161:17
**two**  7:22 9:25
11:21,22,23
12:12 13:10
14:3 15:11
25:15 36:4,19
38:2,6,23 51:5
52:23 85:21
87:15 93:2,22
101:7,8 112:5
112:14,14
123:6,7 129:19
129:20,25
130:2 131:5,23
134:6,25 157:4
167:23 175:13
183:12
**tying**  85:2
**type**  83:23
88:10 116:3
122:20 161:16
**types**  48:1
**typical**  62:8
159:6
**typically**  28:22
95:20 99:17
150:8,12

151:15,21
176:19

**u**

**u**  25:21
**uh**  94:4 102:25
109:11,11
152:8 164:11
**ulna**  149:19
**ultimately**  24:1
24:4 75:10
113:9
**um**  85:15
**umbrella**  65:1
65:2,4,9
**unable**  45:23
**unborn**  156:23
157:3
**unclear**  7:5
**unconscious**
167:1 179:10
**undamaged**
136:1,6
**under**  6:22
7:10 46:25
60:24 66:22
75:11 98:2
122:19,19
134:25 136:23
146:24 179:18
195:11
**underneath**
100:4
**underscore**
52:5 162:15

Dr. Lisa P. Gwin                                          May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[understand - vehicle]**                                    Page 55

**understand**
  18:9 25:11,12
  54:16 75:15,20
  107:11,13
  134:12,13
  136:2,7 171:21
  172:20 177:18
  180:12,22
  183:7
**understanding**
  63:18 82:13
  91:20 95:15
  116:21 127:17
  156:8,20,21
  187:24 191:22
**understood**
  23:7 134:12
  192:6
**undertaking**
  117:15,20
**unexpectedly**
  61:25
**unfortunately**
  14:18 32:21
  75:24 167:1
**uninsured**
  122:19
**unit** 5:15
**united** 1:1 5:4
  5:18
**units** 193:16
**unlifted** 172:10
  175:1,2,6,14
**unrelated**
  134:23

**update** 108:19
**updated** 43:22
**upper** 16:6
  61:1 123:21
**ups** 126:14
**upward** 151:16
**urgent** 122:17
  122:20
**usage** 101:23
  102:12
**use** 11:4,9 14:3
  15:25 20:18,22
  33:5,13 42:15
  42:15 48:10
  53:11 54:1
  94:1,2,9 95:23
  96:1 100:8
  108:5 120:18
  141:5 143:3
  170:18 185:16
  188:1,4
**used** 8:11 15:12
  40:8 46:17,20
  50:12 95:22
  107:22,23
  110:14 126:5
  133:23 156:10
  193:16 196:19
**useful** 15:22
  28:14 49:18
**user** 46:25
**using** 16:3 17:2
  17:24 63:9
**usually** 78:12
  100:3 101:12

102:9 108:25
119:12 126:12
132:19 148:5
150:4,11
176:22,23
191:24 192:19

**v**

**v** 79:2 130:13
  131:2,4 168:19
  196:4 197:1
  198:1
**vac** 27:14 28:2
  64:2,8,12,17,21
  64:24 65:14,19
  66:25
**vacation**
  191:25
**vaguely** 186:22
**value** 89:15,25
  136:8
**values** 20:12
  34:1
**vans** 113:17
**vapor** 169:13
  171:3
**variable** 9:23
  10:3,6,7,11,15
  10:20,22 25:22
  172:21
**variables** 9:25
  10:1,6,24 11:1
  11:24 12:3,13
  17:25 32:17
**variety** 42:15

**various** 23:15
  74:19 112:20
  113:9 189:8
**vehicle** 11:21
  11:21 12:7,18
  12:20 13:4
  14:22,24 15:7
  17:10,10,16
  18:17 22:21
  23:11 24:10
  27:7 28:1,7
  31:9 37:5
  42:16 43:2
  45:16,20,24,25
  46:11 49:6
  50:3,5 51:17
  51:24 54:2
  60:24 63:3,9
  63:16,20 66:20
  66:21,22,24
  68:15,22 69:2
  69:5,7,8,11,12
  69:15,15,18,23
  70:2,4,4,5,8,8,9
  70:12,13,24
  72:20 73:11,12
  73:13,15 74:2
  74:2,22 75:8,8
  77:10 94:2,24
  102:3,6 114:13
  130:21 132:13
  132:25 133:7
  135:25,25
  136:6 137:4,9
  137:10 139:18

Dr. Lisa P. Gwin                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[vehicle - way]**                                    Page 56

140:22 141:7
142:3 156:5
159:6 163:6
165:17 170:17
170:21 171:20
180:14 189:9
192:11,12
**vehicle's** 12:6
75:12
**vehicles** 12:7,7
23:11 62:5
63:3,6 112:20
112:25 118:14
119:1 121:12
131:5 132:13
132:14 133:6
175:13
**vehicular** 15:24
**velez** 68:18
**velocities** 16:12
16:14,16,20,21
**velocity** 166:14
**verify** 196:9
**veritext** 5:23,25
193:17 196:14
196:23
**veritext.com**
196:15
**version** 105:3
**versions** 159:17
**versus** 5:17
39:9 44:7,13
50:21 68:25
69:25 71:22
109:10 110:1

116:6,11,14
166:12,20
185:21 188:5
**vertebra** 179:6
**vertical** 30:20
**vi** 61:9
**vibration**
169:21
**video** 5:13,15
8:11,11 39:7
58:21 86:6,7
193:21 194:2,3
**videographer**
2:8 5:9,24 6:12
8:8,10,17,20,22
55:16 58:16,19
58:24 59:3
104:19,22
143:7,10
183:23 184:1
184:20 193:11
193:14,20,23
194:2,4,6
**videos** 19:4,10
21:2,4 29:20
29:23 130:20
**view** 38:17
144:17,17
152:5,7
**viewed** 36:2
**violate** 127:11
**violating**
183:10
**violence** 21:2

**violent** 19:12
21:6
**virtual** 126:7
**visit** 170:5
**visitor** 25:22
**visual** 100:4
103:13 105:10
105:20 106:10
107:3,5,12,17
108:8
**vocalization**
168:1
**void** 195:15
**volunteer**
122:13
**vs** 1:9 5:3
**vulnerable**
157:4

| w |
| --- |

**w** 122:5
**wait** 60:23
138:6 171:2
**walk** 129:16
**walker** 68:17
**walton** 69:22
**want** 8:10,14
24:10 29:7,8
34:14 35:15
43:17 44:2,3
49:14,22 55:10
55:21 77:15
82:4,5 86:17
87:4 104:16
108:8,12 147:3
147:14,17

153:5 154:6
156:17 160:8
169:14 171:6
171:13 177:18
181:11 183:19
185:16,17
187:23
**wanted** 20:23
34:17 55:23
59:1 61:3
104:25 146:14
184:21
**warehouse**
83:23
**warped** 159:20
163:14
**warping**
161:16
**watching** 21:4
**water** 27:16
113:4 169:22
**watson** 69:9,21
**way** 11:4,9 15:5
21:5 26:15
27:5,6,7,19
28:4 36:22
37:4 41:7
43:14 44:9
47:14 48:24,25
52:21 67:19
68:2 72:15
73:11,11 76:6
76:22 101:8
106:23,23
118:5 121:6

Dr. Lisa P. Gwin                                                    May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[way - work]**                                                      Page 57

| | | | |
|---|---|---|---|
| 123:16 126:5,8 | **weinberg** 2:3 | **wings** 42:20 | 168:13 172:19 |
| 135:8 147:16 | 84:14 | 186:9 187:11 | 175:5,21 |
| 149:6 152:16 | **weird** 89:19 | 187:12 | 183:22 184:20 |
| 156:13 157:6 | **welcome** 161:9 | **wise** 92:12 | 189:17 193:6,8 |
| 157:10,24 | **went** 91:12,12 | **withdraw** | 195:20 196:8 |
| 167:10,15 | 105:23 106:14 | 191:19 | 196:10,12,18 |
| 175:9,14 182:5 | 106:18 167:15 | **withdrawn** 4:3 | **witnesses** 3:4,5 |
| 188:19 189:18 | **wes** 116:23 | **withheld** 125:1 | **wondering** |
| 195:18,19 | 173:17 | 128:4 | 101:15 |
| **wayne** 122:2,3 | **west** 1:19 | **witness** 6:13,19 | **wood** 29:3 |
| 122:5 | **whatever's** | 8:21 9:2,19 | **word** 24:14 |
| **ways** 36:22 | 138:12 | 10:17 14:6 | 42:14 76:16 |
| 42:16 | **wheel** 75:12 | 19:24 26:9 | 133:23 |
| **we've** 32:10 | **wheeler** 2:3 | 35:6,13,25 | **words** 19:24 |
| 37:16 51:9 | 84:14 | 39:23 41:19 | 25:1 39:24 |
| 103:6 117:9,11 | **wheels** 93:25 | 42:1,7 46:9 | 78:5 165:23 |
| 120:10 139:15 | 94:1,3,9,9 | 49:21 53:18 | 192:20 193:4 |
| 158:5 176:21 | **when's** 93:15 | 55:20,22,25 | **work** 9:8 22:4 |
| 183:18 | **whereof** 195:20 | 57:4,22 58:13 | 22:17 45:4 |
| **wear** 41:2 | **whiplash** 59:13 | 70:19 74:14,19 | 67:13 71:1,5 |
| **website** 85:2 | **whispering** | 75:7,20 76:5 | 75:2 79:4,25 |
| **week** 93:23 | 5:11 | 76:11 77:2,8 | 80:3,5,7,9 81:7 |
| 191:13,13 | **white** 70:2 | 81:21 90:24 | 87:4 88:12,14 |
| **weeks** 93:2,23 | 159:20 | 98:6 104:18 | 92:6,12 96:24 |
| 157:3 | **whitening** | 106:22 114:16 | 97:4,10 98:24 |
| **weigh** 48:17 | 158:4,5,9,25 | 114:24 115:5 | 98:25 99:5,21 |
| **weight** 17:22 | 159:6,10,11 | 115:15,21 | 100:6,21 |
| 47:21,21 49:8 | 160:1 161:3 | 117:17 118:16 | 110:25 112:7 |
| 49:13,17 55:12 | 163:8 | 119:19,25 | 112:12 119:20 |
| 55:14 56:1,6 | **wichita** 130:5,8 | 122:4 133:2,18 | 122:9,21 |
| 56:10,17 58:4 | **widget** 119:7 | 136:12,20 | 131:16 133:16 |
| 189:19 | **width** 135:2 | 139:5 142:17 | 135:24 142:25 |
| **weights** 12:7 | **wing** 187:15,16 | 146:17 157:6 | 147:23 151:12 |
| 23:11 49:7 | 187:19,20,21 | 157:19 165:20 | 169:19 |
| | 187:22,22 | 166:2,9 167:6 | |

Dr. Lisa P. Gwin                                          May 3, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[worked - zwierzynski]**                                  Page 58

**worked** 67:3
  70:16,19,23
  77:19 80:23
  84:7,13 103:20
  114:2 129:21
  169:1,25
**working** 71:2
  126:23 133:4
  176:6
**works** 67:11,14
  162:11
**world** 10:18
  21:9 48:1
**worth** 9:1
**worthiness**
  112:11
**wouldn** 27:18
  99:25 121:15
  121:22 192:14
**wreck** 18:6
  50:13 73:11
  156:23 165:24
  170:8 175:1
  179:21 181:18
  182:3
**wrecks** 151:14
**wrist** 150:12,13
**write** 79:21
  92:14 153:23
**writing** 89:19
  98:19 104:7
**written** 79:23
  103:17 128:5
**wrong** 18:9
  63:8,12,12,14

  104:12,14
  107:22 109:13
  109:14,23
  174:13
**wrote** 89:21
  129:3
**wwhgd.com**
  2:6
**wyoming**
  122:14

**x**

**x** 3:1 149:6
  152:5,17

**y**

**y** 122:5
**yeah** 13:9
  26:10 27:17
  40:24 49:14
  55:20,20 60:23
  72:24 85:7
  86:4 88:13
  89:24 93:9
  109:2,18 122:5
  128:7 129:19
  137:25 140:8
  141:1 146:4
  147:18 149:18
  174:18 178:18
  191:19
**year** 19:25
  81:14,16 82:15
  97:11 103:6
  112:14 145:24
  154:21 157:4

  183:6
**years** 47:25
  80:13 112:2,5
  112:5,14
  113:14,16
  128:2 176:6
**yep** 85:9
  161:14
**yield** 47:19,20
  49:13,23 54:19
  54:22 56:8
  57:15 58:7
  59:22 60:3
**yielded** 47:23
  48:5 50:4,22
  50:22 57:2
  74:3 77:11
**yielding** 48:21
  50:16,17,20
  51:10,22 55:14
  56:2 57:9,20
  58:5,10 59:5,9
  59:12,15,16
**youngblood**
  69:1

**z**

**zieske** 68:20
**zone** 31:13 33:4
**zoom** 58:25
  60:10 61:16,24
  124:25 147:4
**zoomed** 58:23
**zwierzynski**
  68:20

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.