**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

Santana Bryson and Joshua Bryson, as
Administrators of the Estate of C.Z.B.,
and as surviving parents of C.Z.B., a
deceased minor,

        Plaintiffs,

v.

Rough Country, LLC,

        Defendant.

Civil Action File

No. 2:22-CV-017-RWS

**DEFENDANT ROUGH COUNTRY, LLC'S RESPONSE IN OPPOSITION**
**TO PLAINTIFFS' MOTION TO LIMIT THE TESTIMONY OF**
**WESLEY GRIMES UNDER RULE 702 AND _DAUBERT_**

Plaintiffs' motion to exclude certain opinions of Wesley Grimes, Rough Country's accident reconstruction expert, amounts to nothing more than a re-hashed airing of grievances about Rough Country's vehicle crash test (the "Crash Test"). As shown by the video from that Crash Test (Doc. 123), the impact from an unlifted/stock 2016 Ford F-250 truck into the rear of a 2008 Ford Escape at approximately 50 miles per hour would have resulted in C.Z.B.'s death even in the absence of a lift kit. Rough Country previously addressed Plaintiffs' criticisms of the Crash Test in its Response in Opposition to Plaintiffs' _Daubert_ Motion to Exclude

Unrepresentative Crash Test (Doc. 127), and Rough Country hereby incorporates that Response as if fully set forth herein.

A. The "Variables" in the Crash Test Were Not Manipulated

Although the reliability of the Crash Test has been exhaustively briefed in response to Plaintiffs' claims, as referenced above, Plaintiffs' mischaracterization of the alleged "variables" in the Crash Test in the present Motion warrant clarification.

First, Plaintiffs allege, as if it is a stipulated fact, that the lateral offset in the Crash Test was significantly "changed" by Exponent. This is not an accepted fact, as Plaintiffs claim. Rather, it is a hotly contested issue that is within the purview of the jury to decide. Rough Country's experts have presented reliable and credible evidence that the lateral offset in the Crash Test was within an "inch or two" of the offset, calculated by Plaintiffs' own experts, as explained in detail in Doc. 127 at pages 9-12. Regardless, none of Plaintiffs' experts have presented *any* opinion, or made any effort to quantify or explain in any way, how any specific amount of offset would impact intrusion in the Crash Test.  Plaintiffs simply state that this variable "would directly influence the amount of intrusion into the Ford Escape" without citing to either any testimony from their experts or any evidence in this case to support this presumption, much less any testimony or evidence regarding how any specific amount of lateral offset would impact the Crash Test and/or by how much.

Second, Plaintiffs state that the speeds and braking were manipulated by Exponent in the Crash Test, again, without citing to any evidence to support this assertion. To the contrary, the speed of the F-250 truck used in the Crash Test was virtually *identical* to the speed calculated by Plaintiffs expert, Mr. Buchner, and used by Mr. Buchner in conducting *all* of his HVE simulations. (In fact, the Crash Test speed of the F-250 truck was 49.9 mph, while Mr. Buchner used 51 mph in his HVE calculations.)

Third, Plaintiffs simply state, without support, that the "vehicle strength" was manipulated in the Crash Test. Rough Country can only presume that this is a reference to the absence of a sunroof in the Crash Test Escape. Again, Plaintiffs fail to cite any support that a lack of a sunroof in the Test Escape played any role in manipulating the results of the test. None of Plaintiffs' experts have done any analysis, testing, calculations, or work of any kind to quantify or explain how the lack of a sunroof in the Crash Test Escape impacted the level of intrusion experienced in the Crash Test. (*See* Doc. 127, at 14-17.) This is simply another example of Plaintiffs outlining an alleged "difference" between the Crash Test vehicles and the subject vehicles, without any evidence or expert testimony supporting their argument that the difference "manipulated" the Crash Test in any way.

Finally, Plaintiffs again cite the lack of cargo in the Crash Test Escape without providing any explanation as to how cargo would, or would not, impact *intrusion*. Since there is no evidence or testimony of any kind relating cargo to *intrusion*, this is just another misdirection. The critical distinction between *intrusion* and *rear seat deflection* is explained in more detail below addressing Section IV, (B), of Plaintiffs' Motion.

As with their other contentions, Plaintiffs fail to provide the Court with the complete context. Rough Country's experts, including Mr. Grimes, made the intentional decision not to include cargo in the test Escape because they would have been speculating at the cargo, and that would be inappropriate. [*See* Declaration of Lisa Gwin, D.O., B.S.E.E. (the "Gwin Decl."), filed contemporaneously as Exhibit 4 to Rough Country's Response to Doc. 147, at ¶ 9.]

| Counsel: | And the presence of cargo was also different in the Exponent test than the subject crash; correct? |
|---|---|
| Dr. Gwin: | Yes. Because the *only people who could tell us exactly what cargo and where it was didn't know, so that's an important part of science is not guessing*. And so if we were to try to put cargo in the test vehicle at Exponent, then *we would be guessing, and so we can't do that.* |

[Deposition of Dr. Gwin (the "Gwin Depo."), filed contemporaneously as Exhibit 1 to Rough Country's Response to Doc. 147, at 5 (13:1-6).] Mr. Grimes further explained that "we generally defaulted to we don't know where the cargo would be

located, so let's not put the cargo in," (Doc. 102-3, at 94:12-14.) Indeed, one can confidently say that, if the Crash Test had included cargo, Plaintiffs would make the opposite complaint, that the cargo was included despite not knowing its exact makeup or where it actually was located in the cargo hold. Plaintiffs would surely then argue that the "misplacement" of the cargo increased the rear seat deflection in the Crash Test, and thus it was unrepresentative of the actual crash.

It was also more favorable to Plaintiffs that the Crash Test did not have cargo. Cargo is "just space is taken up and therefore that would push everything in front of the cargo items forward more than they already were." [Gwin Depo., at 9 (26:18-20).] The presence of cargo would have likely made the Crash Test demonstrate *more* rear seat deflection than it already showed. [*Id.,* at 11 (37:9-13) ("if the cargo had been exactly the same as it was in the actual crash, . . . then *we would have had even more forward deformation* of the Row 2 seat back") (italics added); *see also* Gwin Decl., at ¶¶ 9 and 12.] By excluding the unknown cargo, the Crash Test showed that the level of rear seat deflection would have been sufficient to cause C.Z.B.'s fatal injuries even without the presence of a lift kit and even without any cargo.

   B.   WHETHER MR. GRIMES PHYSICALLY MEASURED THE STATIC REAR SEAT DEFLECTION PRIOR TO PROVIDING HIS INITIAL OPINIONS IS IRRELEVANT AND IMMATERIAL

As a threshold matter, Plaintiffs' Motion fails to delineate and properly explain two important concepts: 1) *intrusion*, and 2) *rear seat deflection*. These concepts,

while related, are separate and distinct. *Intrusion*, as referenced by the experts from both parties, refers to the level that the physical structure or body of one vehicle dynamically intrudes into the structure of another vehicle during a vehicle-to-vehicle impact. *Rear seat deflection*, to the contrary, refers solely to the level that the rear seat of the Escape was dynamically deflected from its static, pre-crash position. The two concepts are not interchangeable.

In this case, there is no dispute that Mr. Grimes measured the level of *intrusion* in both the subject crash and the Crash Test. This is explained in his March 27, 2024, Report where Mr. Grimes details how he used scan data and point clouds from scans of all four vehicles to create an overlay of the vehicles to measure the distance from the front bumper of the F-250 truck to the front bumper of the Escape at the point of maximum static crush in both crashes.  (*See* Doc. 119-3, at 34). Mr. Grimes's methodology for calculating and measuring *intrusion* is not disputed by Plaintiffs in the present motion.

Mr. Grimes separately explained to Plaintiffs during his deposition that specific measurements of static *rear seat deflection* in the Crash Test were unnecessary to assist Dr. Gwin or himself in reaching their conclusions regarding the similarity between the two crashes. An important point left unaddressed by Plaintiffs is the fact that their case is based upon their experts' opinion that the rear seat deflection caused C.Z.B.'s head to impact the *back of the driver's seat*. Rough

Country's biomechanical expert, Dr. Gwin, opines that the cause of death was *impact of the rear seat* into the right ear and temple of C.Z.B., *not* deflection into the driver's seat. As explained at length by Dr. Gwin, the level of rear seat deflection observed in the Crash Test was sufficient to cause an impact to the right ear/temple of a child's head who was sitting in C.Z.B.'s position. The exact measured difference, if any, between the amount of rear seat deflection in the subject crash as compared to the Crash Test is not relevant to an analysis of whether a child similar to C.Z.B. would have survived the Crash Test. Plaintiffs' argument that Mr. Grimes should have taken measurements is a red herring: it places form over substance.

Mr. Grimes's opinions are based upon his own observations of the Crash Test and the vehicles involved, as well as his independent analysis of the evidence. Plaintiffs' disagreement with Mr. Grimes's (and Dr. Gwin's) observations of the rear seat deformation, or their counter-interpretation of the evidence, based solely upon their experts' viewing of photographs/videos from the Crash Test (since they have never inspected the Crash Test vehicles) does not render Mr. Grimes's observations unreliable. In any event, Plaintiffs remain free to cross-examine him about them. "[I]t remains the jury's responsibility to make credibility determinations." *LeVeille v. Upchurch*, No. 3:19-CV-908-BJD-MCR, 2021 WL 6125468, at *1 (M.D. Fla. Sept. 2, 2021).

C.     Plaintiffs' own Expert, Christopher Roche, Repeatedly used the Identical Methodology as Mr. Grimes that Plaintiffs Criticize

While Plaintiffs complain that Mr. Grimes relied upon visual observations instead of specific measurements of the static rear seat deflection in the Crash Test to support his opinion that the seat deflection was similar in both crashes, Plaintiffs' expert Christopher Roche admits that he also reached conclusions by visually examining photographs and other images. When asked if he knew "how far [a] seat was displaced," Mr. Roche responded "I didn't measure that. But, I mean, you can get a sense from that – that image." [Doc. 127-2 (Roche Rebuttal Depo.), at 21 (81:14-17); *see also id.*, at 10 (35:14-36:9) ("is there any other evidence or information that you relied upon . . . Well, it's a combination of looking at the photographs and some of the films available . . . [and] you can kind of get a sense from reviewing the film of the loading of that part of the – of the lift gate"); and *id.*, at 10 (34:5-9) ("what I'm trying to highlight here is that clearly, simply from a damage pattern analysis of the two vehicles, the crash test and the subject vehicle, we can see that the damage pattern is inconsistent between the two").] Moreover, not only does Mr. Roche provide his opinions regarding the Crash Test without relying upon any actual measurements of rear seat deflection, Mr. Roche has never even inspected the Crash Test vehicles despite Rough Country maintaining those vehicles for inspection to this day. If specific measurements of rear seat deflection are necessary, Mr. Roche certainly would have performed those measurements.

Ultimately, experts frequently rely on their training to assess and interpret evidence in forming their opinions, and that is what Mr. Grimes did in this case. If the Court strikes Mr. Grimes's opinion that the rear seat deflection was substantially similar in both crashes based on his visual review of evidence, then it should similarly strike Roche's visually based opinions as well.

D.    OPINIONS REGARDING THE DIFFERENCE IN DELTA-V BETWEEN THE CRASH TEST AND SUBJECT CRASH ARE BASED UPON KNOWING SCIENTIFIC PRINCIPLES AND ARE RELIABLE

Plaintiffs attribute a single paragraph in their motion to address Mr. Grimes's opinions regarding the difference in the delta-V measured in the Crash Test when compared to the actual collision. Plaintiffs incorrectly state that Mr. Grimes attributed the difference solely to the lack of cargo in the Crash Test, citing to pages 207-208 of Mr. Grimes's deposition. Mr. Grimes testified on those very pages as follows:

Counsel:        In your report, you conclude that the difference between the two delta-vs in this diagram is due to the cargo not being present in the rear of the Escape in the crash test; is that right?

Mr. Grimes:    Well, it's not just a difference in the cargo but also you're a - - little bit lower, so you are engaging some of the lower structures that in the crash vehicle, the subject vehicle, those lower structures weren't engaged.

[Doc. 102-3 (Grimes Depo.), at 207:6-14.]

The difference in delta-Vs is consistent with Plaintiffs' entire theme of the case --- that the subject crash was different from what would occurred had the F-250 truck not been lifted. Plaintiffs' experts agree that different structures engage in the hypothetical crash of an unlifted F-250 truck, and therefore physics dictate that the forces impacted on the vehicles, or the delta-Vs, would not be the same in the subject crash when compared to a hypothetical crash involving a non-lifted F-250 truck.

Regardless, Rough Country is not arguing that C.Z.B.'s fatal injuries were caused by "forces" or the delta-V experienced in the subject crash. Dr. Gwin testified at length regarding the physical evidence supporting her conclusions that C.Z.B.'s fatal injuries were caused by a traumatic injury to the right ear/temple and that a similar impact would have occurred had the F-250 truck not been lifted. As such, Mr. Grimes's testimony on cross examination regarding the potential explanation for the different measurements of delta-Vs between the subject crash and the Crash Test are not relied upon by Dr. Gwin or any other witness. Mr. Grimes was simply explaining that the different delta-Vs registered in the subject crash and the Crash Test were to be expected, and they do not represent a manipulation of any variable between the subject crash and the Crash Test by Exponent.

E.    PLAINTIFFS' ARGUMENTS AGAINST MR. GRIMES'S OPINIONS ADDRESS ONLY "RELIABILITY," WHICH IS GOVERNED BY A FLEXIBLE STANDARD

"The test of reliability is 'flexible,'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 1171, 143 L. Ed. 2d 238 (1999). "Generally, if the

principles, theories, and methodologies behind the opinion are scientifically valid and can be applied to the facts at issue in the case, then the opinion has a reliable basis." *Doe v. Gwinnett Cnty. Sch. Dist.*, No. 1:18-CV-05278-SCJ, 2021 WL 12298920, at *4 (N.D. Ga. June 11, 2021) (citing *Daubert*, 509 U.S. at 592-93). Further, when considering reliability, the Court "may consider other questions [factors] in light of the specific facts of the case at hand." *Id.*

Plaintiffs do not dispute Mr. Grimes's qualifications as an expert to issue his opinions. Plaintiffs simply do not like his opinions or the factual and evidentiary basis of his opinions. But if Plaintiffs believe that Mr. Grimes's opinions are based on a weak foundation, then that "go[es] to its weight rather than its admissibility." *Noe v. Metro. Gen. Ins. Co.*, No. 1:11-CV-02026-SCJ, 2012 WL 7760143, at *3 (N.D. Ga. Dec. 10, 2012). Similarly, Plaintiff's complaint that Mr. Grimes did not perform measurements goes to the accuracy of his underlying elements, and "[i]ssues of accuracy are best resolved through cross-examination and the adversarial process." *Doe*, 2021 WL at *4.

[*Signature Page Follows.*]

This 17th day of March, 2025.

WEINBERG, WHEELER, HUDGINS,
GUNN & DIAL, LLC

/s/ Aaron Chausmer

3344 Peachtree Road, N.E.                    Richard H. Hill, II
Suite 2400                                   Georgia Bar No. 354425
Atlanta, GA 30326                            Aaron B. Chausmer
Phone:  404-876-2700                         Georgia Bar No. 119998
Fax:   404-875-9433                          *Attorneys for Defendant Rough Country,*
rhill@wwhgd.com                              *LLC*
achausmer@wwhgd.com

## **RULE 7.1D CERTIFICATE OF TYPE, FORMAT AND FONT SIZE**

Pursuant to Local Rule 7.1D of the United States District Court of the Northern District of Georgia, the undersigned certifies that the foregoing submission to the Court complies with Local Rule 5.1 in that it was computer-processed, double-spaced between lines, and used Times New Roman font of 14 point size.

This 17th day of March, 2025.

*/s/ Aaron Chausmer*
Aaron B. Chausmer
Georgia Bar No. 119998

## **CERTIFICATE OF SERVICE**

This is to certify that I have electronically served the foregoing filing with the

Clerk of Court via CM/ECF, which will send a copy to the following attorneys of

record:

Tedra L. Cannella
Robert H. Snyder, Jr.
Devin Mashman
CANNELLA SNYDER LLC
315 W Ponce de Leon Ave
Suite 885
Decatur, GA 30030

### ***ATTORNEYS FOR PLAINTIFFS***

This 17th day of March, 2025.

*/s/ Aaron Chausmer*
Aaron B. Chausmer
Georgia Bar No. 119998