# EXHIBIT 10

Case 2:22-cv-00017-RWS    Document 182-10    Filed 03/17/25    Page 2 of 388
G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF GEORGIA

3                 GAINESVILLE DIVISION

4

5    CASE NUMBER:  2:22-CV-017-RWS

6

7    SANTANA BRYSON, et al.,

8            Plaintiffs,

9            vs.

10   ROUGH COUNTRY, LLC,

11           Defendant.

12

13           *  *  *  *  *  *  *  *  *  *  *  *

14

15

16              THE ORAL PROCEEDINGS

17    OF THE DEPOSITION OF G. BRYANT BUCHNER

18              JULY 11, 2024

19

20

21   REPORTER:  Paul Morse

22            Certified Court Reporter

23            and Notary Public

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 2

1              IT IS FURTHER STIPULATED AND AGREED

2     that the signature to and the reading of the

3     deposition by the witness is not waived, the

4     deposition to have the same force and effect as

5     if full compliance had been had with all laws

6     and rules of Court relating to the taking of

7     depositions.

8              IT IS FURTHER STIPULATED AND AGREED

9     that it shall not be necessary for any

10    objections to be made by counsel to any

11    questions except as to form or leading

12    questions, and that counsel for the parties may

13    make objections and assign grounds at the time

14    of the trial, or at the time said deposition is

15    offered in evidence, or prior thereto.

16             IT IS FURTHER STIPULATED AND AGREED

17    that the notice of filing of the deposition by

18    the Commissioner is waived.

19

20

21              *  *  *  *  *  *  *  *  *  *  *  *  *

22

23

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 3

1                          I N D E X

2

3                        EXAMINATION

4                                              PAGE

5    By Mr. Hill............................. 6

6    By Ms. Cannella......................... 296

7    By Mr. Hill............................. 304

8

9

10

11            EXHIBITS FOR THE DEPOSITION

12                                             PAGE

13   Exhibit 1, Mr. Buchner's Report.......... 7

14   Exhibit 2, Rebuttal Report............... 178

15   Exhibit 3, PowerPoint.................... 186

16   Exhibit 4, PowerPoint.................... 251

17   Exhibit P1, Example Image................ 303

18

19

20              * * * * * * * * * * * * * *

21

22

23

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 4

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF GEORGIA

3              GAINESVILLE DIVISION

4

5

6    BEFORE:

7          Paul Morse, Commissioner.

8

9    APPEARANCES:

10          RICHARD HILL, ESQUIRE, of WEINBERG,

11    WHEELER, HUDGINS, GUNN & DIAL, 3344 Peachtree

12    Road, Suite 2400, Atlanta, Georgia 30326,

13    appearing on behalf of the Defendant.

14          TEDRA CANNELLA, ESQUIRE, of CANNELLA

15    SNYDER, LLC, 315 West Ponce de Leon Avenue,

16    Suite 885, Decatur, Georgia 30030, appearing on

17    behalf of the Plaintiff.

18          DEVIN MASHMAN, ESQUIRE, of CANNELLA

19    SNYDER, LLC, 315 West Ponce de Leon Avenue,

20    Suite 885, Decatur, Georgia 30030, appearing on

21    behalf of the Plaintiff.

22          ALSO PRESENT:  Jess Wiggins, Video

23              *  *  *  *  *  *

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                    Page 5

1                 I, Paul Morse, CCR, a Court Reporter of

2       Mobile, Alabama, acting as Commissioner,

3       certify that on this date, as provided by the

4       Federal Rules of Civil Procedure and the

5       foregoing stipulation of counsel, there came

6       before me via Remote Videoconference, beginning

7       at 10:00 a.m., G. Bryant Buchner, witness in

8       the above cause, for oral examination,

9       whereupon the following proceedings were had:

10

11                THE VIDEOGRAPHER:  Today's date is

12      July 11, 2024.  And the time is 10:15 a.m.

13      This will be the videotaped deposition of

14      George Bryant Buchner.

15        Would counsel present please identify

16      themselves for the record, starting with the

17      taking attorney.

18                MR. HILL:  This is Rick Hill on

19      behalf of Defendant Rough Country.

20                MS. CANNELLA:  Tedra Cannella and

21      Devin Mashman on behalf of the Plaintiffs, the

22      Bryson family.

23                THE VIDEOGRAPHER:  Thank you.

Page 6

1    Would the Court Reporter please swear in the

2    witness.

3

4                    G. BRYANT BUCHNER,

5    having first been duly sworn, testified as

6    follows:

7

8                    EXAMINATION

9    BY MR. HILL:

10          Q.    Thank you, Mr. Buchner.  I'm going

11   to start with your May 8, 2024 letter to

12   Ms. Cannella.  And I will share my screen or at

13   least attempt to share it --

14          A.    Okay.

15          Q.    -- and put that letter up.  I'm

16   sure you probably have it there in front of

17   you.

18          A.    I'm really bad on dates.  So I'll

19   look at it and see what we're -- what we're

20   talking about when you pull it up.

21          Q.    All right.  Are you able to see

22   the screen now?

23          A.    Yes, sir.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 7

1          Q.    All right.   This is a letter from

2    you to Ms. Cannella dated May 8, 2024.  It's

3    bates labeled Bryson 09348 through 09377.  And

4    I'd like to mark this as Exhibit 1 to your

5    deposition.

6                (Defendant's Exhibit Number 1

7                is marked for identification.)

8          A.    Can we call it the FR26 amended

9    report?  Because that's -- that's why I didn't

10   know what you were talking about.  I'm okay if

11   you call it a letter.  But I'd rather call it

12   the amended report.

13         Q.    Sure.   The Re line says FR26

14   amended report.  And so I'll reference it by

15   that name.

16         A.    Thank you kindly.

17         Q.    Sure.  In the first paragraph

18   you'll see that you use -- you state that an

19   unforeseen technical issue resulted in the loss

20   of the original simulation file.  Just so we're

21   clear, what do you mean by an unforeseen

22   technical issue?

23         A.    Well, I think that the simulation

G. Bryant Buchner                                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                                  Page 8

1    was run in October-ish of '23.  The depo was in

2    January.  And I hadn't opened the file or

3    looked at it.  And when we went to retrieve it,

4    it basically didn't exist.  The run file did

5    not exist.  And so we could not -- we did

6    everything we could to try to locate it and

7    find it.  And all that we can think of is that

8    something happened during the save process.

9         And so I had -- just had no idea that that

10   thing wasn't there.  I hadn't looked for it in

11   months.  So that's -- that's the unforeseen

12   technical issue.  It happens to, you know, all

13   of us at times when you think you've saved

14   something and it didn't get saved properly or

15   maybe there was a corruption in the -- you

16   know, on the computer disc somewhere.  I don't

17   know.

18        Maybe somebody opened it later on and

19   thought it was something else and moved it to a

20   folder and we can't find it.  I don't know.

21             Q.    What is the process after you run

22   an HVE simulation to save the files associated

23   with that simulation?

Page 9

1          A.     Well, it -- it really ought to be
2     saved and moved into the -- you know, into the
3     job file and put into engineering analysis,
4     which you've probably seen my EA folders,
5     engineering analysis folders.  It wasn't --
6     that -- that final step apparently didn't
7     happen.  It was still on the simulation
8     computer.  At least that's where we thought it
9     was.  And but it didn't -- it just wasn't in
10    any other place.  I don't think it ever got
11    moved was the problem.  That's the reason I --
12    I needed to go get a copy of it.
13         Q.     And when you say later on in
14    this -- on this page that -- at the bottom you
15    said since the simulation had been corrupted,
16    what do you mean by the term corrupted?
17         A.     Well, whatever we found did not --
18    we went back to the archives and everything.
19    We never found anything that looked like the
20    accident one.  And it's even suspect that the
21    printout that I was using was -- was from the
22    one that I had looked at back in October.
23         So the word corrupted is kind of a general

G. Bryant Buchner
Bryson, Santana and Joshua v. Rough Country, LLC
July 11, 2024

Page 10

1    term between losing it, between, you know,

2    not -- not having the right data.  It's just --

3    it was meant to be a -- I think originally we

4    thought maybe it had been corrupted.  But in

5    the end I think it's -- corrupted, the term

6    changed or something.  But it couldn't be

7    opened.

8        But in the end, we -- we've never found one

9    that we think was it, period.

10            Q.    So when you produced the printouts

11    prior to your deposition in January that

12    related to this original simulation, are you

13    saying that you are not sure whether those

14    printouts were the same printouts or data that

15    you were looking at when you ran the original

16    simulation in October?  Explain that to me.

17            A.    Yeah.  That -- that's true.  Back

18    in October I looked at the data.  I looked at

19    the answers.  They were printed -- or at least

20    I asked for them to be printed.  I don't -- you

21    know, I'm not the printer guy or the filer guy.

22    And it's almost as if what was picked up was an

23    early iteration or something because some of

G. Bryant Buchner
Bryson, Santana and Joshua v. Rough Country, LLC

July 11, 2024

Page 11

1    the data was just wrong.

2        And so I -- you know, it was months before,

3    but I thought that we had had -- that we had

4    all of that.  And during the deposition, I

5    clearly said, no, these are all of the reports

6    that are there.  I hadn't gone back and

7    checked.  They clearly weren't all of the

8    reports.  And so we went and just did

9    everything we could, and we could not resurrect

10   anything that I can be confident was what I had

11   looked at back in October.

12       So we can make some guesses.  But I can't

13   make -- I can't know.  So my opinions are --

14   you know, were well recorded in my depo and,

15   you know, the opinions haven't changed.  But we

16   really just had to re-enter the data.  And we

17   made an improvement or two, you know, that --

18   you know, to make sure that we had it right

19   like the 0.04 inches on the tire or something

20   like that, whatever it was.  But you know, so

21   at the end of the day, we don't have anything

22   that survived that I can validate as being what

23   I looked at back in October.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 12

1     But what we have now is -- is a
2  representation of everything I said in my -- in
3  my deposition.  And it gives the right answers.
4  It gives the same answers that I thought I had
5  at the time of the depo.
6          Q.    When did you discover that the
7  printouts that you provided to us related to
8  the original simulation that were provided a
9  week before your deposition in January, when
10  did you discover that those were not correct or
11  did not have the, you know, appropriate data
12  reflecting the simulation that you produced
13  that we discussed in your first deposition?
14          A.    Well, it -- I mean, it may have
15  been a couple of months.  We were under the
16  mistaken belief that we were just looking for a
17  file.  And then as time went on and we kept
18  pealing back, looking and thinking, we went all
19  the way back and finally opened that up and
20  looked and said, okay, let's try to rerun with
21  this data.  And then we started trying to do
22  the rerun and we realized things weren't -- I'm
23  going to use the -- things were consistent with

G. Bryant Buchner                                           July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 13

1   what I'd said in my deposition.  So I mean, it

2   was -- and we had other work that was going on.

3   We had prepared for the depo, and we were busy

4   with other things.

5       And so what I thought was a simple, hey, go

6   find the file and present it kept getting

7   harder and more complicated and more

8   complicated.  And we kept realizing that we had

9   a bad concept, which is that we were just

10  looking for a missing file.  What we were

11  looking for was something that probably didn't

12  exist.

13          Q.    So just to be clear, when you run

14  an HV simulation, it produces a graphical

15  depiction of the crush --

16          A.    Yes.

17          Q.    -- based on the simulation.

18  Correct?

19          A.    Yes.  If you -- if you ask it to,

20  it will.

21          Q.    Right.  It can do that?

22          A.    Yes.

23          Q.    And that was produced with regard

G. Bryant Buchner
Bryson, Santana and Joshua v. Rough Country, LLC
July 11, 2024

Page 14

1    to your original simulation prior to your first

2    deposition?

3              A.    Yes.

4              Q.    And was that graphical

5    representation of the crush with the other data

6    that's on there, was that consistent with the

7    HV simulation that you actually ran in October,

8    or was that also corrupted as well?

9              A.    I -- all I have is the images.

10   I -- I can't tell.  That's part of the problem.

11   So we've generated new images.  You can't tell

12   the difference in the new images and the old

13   images, at least I can't visually looking at

14   them because the -- the crush is very similar.

15       In other words, it would take -- you know,

16   you'd have to make some pretty fine

17   measurements to see if there's differences.

18   But so I don't know.  What I know is that what

19   we've -- what we have provided in this

20   supplemental report is consistent with what

21   I've said in the deposition.  And it's -- and

22   we have made sure as best of our ability to get

23   the numbers that I used in my deposition the

G. Bryant Buchner                                       July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 15

1    way I said I thought we had run it correct
2    here.
3           Q.    All right.  I appreciate that.
4    But I'd like to just first talk about the
5    original simulation.  We'll get to the rerun or
6    amended simulation.  But with regard to the
7    original simulation that was produced to us in
8    October of 2023 and upon which your initial
9    deposition was based and upon which your report
10   was based, I want to make sure I'm
11   understanding.  What you produced to us in
12   January that related to that original
13   simulation, not just the backup files but also
14   the results of the simulation, are you saying
15   that you can't confirm that anything related to
16   the simulation that was produced to us prior to
17   your deposition was actually representative of
18   the October simulation that you ran that you
19   based your opinions on?
20          A.    Okay.  Really long question.  Ask
21   the last part of it so I know the crux of the
22   question.  I heard every -- I heard the lead-in
23   really well.  I didn't hear the question really

G. Bryant Buchner                                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 16

1    well.

2            Q.    Sure.    Sorry if it wasn't crafted

3    very artfully.    Let me try to make it simpler.

4      So you just said that the graphical

5    representation of the crush and the data on

6    that that was produced to us prior to your

7    deposition, that it -- you can't confirm

8    whether it actually is representative of the

9    simulation you ran in October of 2023?

10           A.    Not exactly.    It is -- it is

11   representative in that I can't tell the

12   difference between it and what we ran.    In

13   other words, it looks -- it looks like what I

14   remember.    It looks like what our results are

15   today.    But I can't tell you if it actually was

16   the printout from it.    But the crush that's

17   shown there is -- is representative because

18   it's indiscernible from the crush that we know

19   is reasonable and accurate in the rerun.

20           Q.    Right.    When you --

21           A.    Yeah.    So thank you.

22           Q.    Well, that's a -- that's a good

23   answer.    But even though it may be similar or

Case 2:22-cv-00017-RWS    Document 182-10    Filed 03/17/25    Page 18 of 388
G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 17

1    representative, you can't verify that it's the

2    actual result of the -- the original

3    simulation?

4          A.    Right.  It was indiscernible to me

5    from the actual result.

6          Q.    Right.

7          A.    But I can't tell you if that was

8    actually printed from the actual result.  But I

9    can tell you that it was good enough that it --

10    that I did not detect it when I was using it

11    for the deposition.

12          Q.    Right.  And the same question with

13    regard to all of the backup files that related

14    to that original.  I don't want to go through

15    every one individually, so we'll start it with

16    a broad question.

17       You have a certain number of backup files,

18    an environment file, this file, that file.  Is

19    the same true that all of those files that

20    were -- that were printed and produced to us,

21    the ones you could find prior to your

22    deposition, you can't verify if those were the

23    actual files that were generated when you ran

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 18

1    the original simulation?

2            A.    I don't -- I don't think at the

3    end of the day they were.  I mean, that's part

4    of my problem that, you know, that work had

5    been done back in October.  Somehow in the

6    saving and filing process, what we -- what I

7    was looking at and what I did, did not make it

8    into the file.

9            Q.    Okay.  And so another way maybe to

10   put it would be the October simulation upon

11   which you base your report was not saved and

12   put aside in the file in the form that it

13   existed when the original simulation was run?

14           A.    Yes.

15           Q.    And then when you went to produce

16   it prior to your deposition, you went back in,

17   and it had been changed or corrupted or

18   something was different about it when you went

19   back in to produce it to us prior to your

20   deposition?

21           A.    Right.  We could never find a file

22   that we had any confidence -- or that was the

23   file that we had used in October.  It just --

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 19

1    just we could not in any shape, form, or

2    fashion locate that.  So we had to redo it.

3          Q.    Okay.  And so none of the data

4    files, whatever, related to the original

5    simulation upon which you based your -- your

6    initial report in October exist as this -- as

7    of this time, at least that you can find?

8          A.    That is true.

9          Q.    Okay.  And when did you discover

10   that all of the data and all of the files

11   related to that original simulation no longer

12   existed?

13         A.    Like I said, it took a couple of

14   months.  We were working on other things.  I

15   thought it was a simple procedure.  It happens

16   commonly that a file gets left on another

17   computer, doesn't make it in, or a miscopy is

18   put in.  And we were doing other work that was

19   scheduled.  And every time I inquired, we're

20   working on it and we thought somebody would say

21   they -- they did something.  And when I

22   investigated, I said no, this isn't it; you've

23   got to keep looking.  And then eventually, you

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 20

1    know, we -- it took a couple of months.  I

2    don't know the exact time.  But it wasn't a

3    week for sure.  It was unfortunately an

4    extended period of time because I was -- I

5    thought it was going to be an easy process, and

6    it wasn't.  And then in the end, you know, it

7    took more -- a couple months or more.

8            Q.    And when you say it took a couple

9    months or more, you mean from when?  From the

10   time of your deposition?

11           A.    Oh yeah.  It was months after the

12   deposition.

13           Q.    That's what I'm trying to clarify.

14           A.    Yes.  But I don't know how long.

15   I'm just trying to give you an approximate

16   feeling for the timeframe.  It wasn't days or

17   weeks.  It was months.  I don't know how long.

18           Q.    And so you don't know an exact

19   date that you finally realized, hey, not only

20   can we not find the missing files, but the

21   files that we produced during the deposition

22   were not connected with the initial simulation.

23   You -- those were two different discoveries.

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 21

1    Right?

2            A.    Ask that question again.

3            Q.    Sure.  So there were certain

4    backup files that were missing at the time of

5    your deposition.  There was -- there was no

6    data produced of any type at your deposition.

7    Correct?

8            A.    No.  You're --

9                  MS. CANNELLA:  Object to the form

10   of the question as vague.

11           A.    The -- the HVE run files were not

12   produced at the time of the deposition.

13           Q.    Right.

14           A.    Some printout reports -- some

15   printout reports were produced.  Thank you.

16           Q.    Right.  And so you thought you

17   were just looking for the missing HVE run file

18   at the time after --

19           A.    After -- when I -- when I walked

20   out of my deposition, I thought I was missing

21   whatever HVE files were used to generate the

22   reports that I -- that were in the book in the

23   deposition.  Yes.

Page 22

1          Q.    Right.  But you believed the files

2     that you did print and produce were actually

3     accurate and associated with the original

4     simulation?

5          A.    Yes.

6          Q.    Okay.  And so that's two different

7     discoveries.  One is we can't find the HVE run

8     file.  Right?

9          A.    Yes.

10         Q.    And two is, oh, the files we did

11    produce were not associated with the original

12    simulation?

13         A.    Well, the reports we did produce,

14    yes.

15         Q.    Right.  And so when did you

16    discover that the reports that you produced

17    were not associated with the original

18    simulation?

19         A.    Well, that took a long time, as I

20    said earlier, because we thought we were just

21    looking for a missing electronic copy.  When we

22    couldn't find that, then we said, okay, we need

23    to reproduce a reasonable electronic copy.

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 23

1      We started trying to use the reports, and I

2   found some things that -- that were

3   inconsistent with what my memory was as to what

4   should have been there.  So suddenly we started

5   looking at those reports and we realized, hey,

6   something -- something looks like it happened

7   on that level as well.  So that took a while.

8   It was -- it was not weeks or days.  It was --

9   it was, you know, over a month for sure.

10          Q.    How did the reports survive but

11   the HVE run files did not?

12          A.    Okay.  Well, and that's -- I've

13   already alluded to that.  But at the time of my

14   deposition, I thought all of the reports had

15   been printed and that's what I testified to.  I

16   thought they had just been printed and put in

17   the file.  That's what me belief was back in

18   October when we did it.  But what was there was

19   only partial reports.

20      And so somehow in the printing process --

21   and whoever was getting them or whoever was

22   filing them, what -- what I was using back in

23   October did not end up in the file.

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 24

1    Something -- something from another preliminary

2    effort, you know, made it in there.  That's --

3    so it's a filing error.  That's -- that's all

4    that happened.  I don't know what it was.  I

5    had no idea other than when I tried to

6    validate what I testified to, what I had

7    recorded as, you know, what the runs showed me

8    and what I tried to testify to, it didn't -- it

9    was inconsistent with what I had that was in

10   the file.

11           Q.    And you just alluded to you think

12   those were preliminary runs, meaning runs done

13   prior to your original simulation?

14           A.    Right.  The -- all simulations are

15   iterative.  All calculations are iterative.

16   You have to start building it and work on it.

17   But there were -- yeah, so it's just -- this --

18   that was not the final work that was there

19   and -- period.

20           Q.    But it existed in January.  And

21   you went to print them out to produce them for

22   your deposition?

23           A.    No.  No.  They had been printed

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 25

1    way back in October.  And I hadn't touched them

2    for months.  I didn't even -- I didn't even

3    look at them getting ready for the deposition

4    because they -- all of that work had been

5    finished in October, to my knowledge, and it

6    had been put in the file.  And we had

7    summarized the results in I think the -- the

8    FR26 report we did, and that's what I was

9    using.

10        Q.    Okay.  So that's what I want to

11   make sure I understood.  So the printouts of

12   the reports that were produced, including the

13   results of the simulation, you're -- you're

14   saying those were printed out back in October

15   contemporaneous with the running of the

16   original simulation?

17        A.    Well, that's -- that's the problem

18   is I don't know because the -- my -- look, my

19   intent is to do the work and then file the

20   work.  Do the work, file the work, use the

21   work.  I -- something happened between when I

22   did that and wrote the report.  I don't

23   remember the date of the report.  Does anybody

G. Bryant Buchner                                           July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 26

1    remember the original report?  Because it will

2    help me.

3         Q.    October 13, I believe.

4         A.    Okay.  So that's why I keep saying

5    I didn't -- as we were writing that report, I'm

6    using -- I'm looking at something on a computer

7    screen, and I'm doing my work.  I'm getting my

8    report done.  Then months later I -- you know,

9    I believe that that stuff has been properly

10   filed by my staff.  And -- and you know, I

11   mean, heck, it could be me that didn't hand the

12   right document.  I thought something had been

13   printed.

14       I'm not blaming anybody.  I'm just saying

15   something happened with whatever I was using in

16   October that I relied on that was still there

17   in January.  I testified using my final report.

18   And then when I tried to give it to you or

19   referenced it, it -- the documents that I

20   thought were there weren't there.  That's --

21   that's what happened.

22       I -- if I had known there was a mistake in

23   October, I would have -- I gladly would have

Page 27

1    fixed it, you know, before the deposition or

2    would have, you know, reproduced that work.

3    I -- I just didn't know.  We had too many other

4    things we were working on in this case and

5    other cases that -- I had confidence in my

6    filing process.  And anybody that's ever tried

7    to file anything knows that that happens from

8    time to time.

9          Q.    All right.  Well, whatever reports

10   are associated with your original simulation --

11         A.    Uh-huh.

12         Q.     -- or let me -- or scratch that.

13   I'll ask it a different way.

14      The reports related to an -- no.  Scratch

15   that.  Let me think through this a second.

16   Hold on.

17      You -- your office produced to us prior to

18   your deposition in January of 2024 reports

19   related to an HVE simulation.  And are you

20   telling me that you can't identify when those

21   documents were printed that were produced to us

22   prior to your deposition?

23         A.    No, I didn't -- I don't know.  I

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 28

1    know what my intent was with what I was using.

2    But as I sit here, I -- I don't know.  That was

3    a -- that was some kind of a problem that

4    happened.  And I don't know when it happened

5    exactly.  But I do know that when I wrote my

6    report in October 12, I think is what you told

7    me, 2023, I had data that I was using.  And

8    I -- you know, it's not uncommon for me to have

9    my working copy that I'm using to type the

10   report, and then my work copy goes in the trash

11   can.

12       And the file copy is supposed to be in the

13   file.  Well, that file copy wasn't what I used

14   to do my FR26 report.  I mean, that's just --

15   and then the electronic file was supposed to be

16   there to go back and resurrect.  It -- it's not

17   there.

18           Q.   So you don't know when the file

19   copy was printed that was produced to us?  That

20   was my question.

21           A.    My -- my belief was it would have

22   been done back in August.  But I mean, it's

23   possible someone, you know -- I said August.

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 29

1    In October is what I meant.  I don't -- I don't

2    know.

3        When I started this conversation, I would

4    have said it was in October because that's when

5    it was supposed to have been.  But as I sit

6    here, I didn't do the printing of that

7    document.  And I didn't do the filing of that

8    document to the best of my knowledge.  And it's

9    not the same document I was using when I did my

10   October letter.

11           Q.    Prior to -- sorry.  Go ahead.  I

12   didn't mean to --

13           A.    So the answer is I don't know.

14   Thank you.

15           Q.    And prior to your deposition, you

16   also produced some digital files related to the

17   HVE simulation.  Correct?

18           A.    I don't remember that.

19           Q.    Okay.  We asked for you to produce

20   the actual digital files that related to your

21   HVE simulation.  And my understanding is that

22   you produced to us the digital files you could

23   find, but you couldn't find the HVE run file.

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 30

1    Is that your understanding?

2            A.    I don't -- I don't remember that.

3    My memory is just not -- it's just blank on

4    that.  I don't know.  If you have those files,

5    that's great.  If you don't, I don't -- I don't

6    know the answer to the question.

7            Q.    Well, they would obviously

8    represent the printouts.  And so if those files

9    were actually produced, you don't know, you

10   know, if they relate to the original simulation

11   or not.  Right?

12           A.    Because I don't know what files

13   you're talking about.  I can't even answer the

14   question.

15           Q.    Okay.  When you did the rerun,

16   you -- you did properly save the HVE files

17   related to the rerun.  Right?

18           A.    And those were -- and those were

19   sent out with the amended report.  My

20   understanding is you should have those, yes.

21           Q.    Right.  And what was the process

22   used to save those files?

23           A.    I don't know.  I didn't do that.

G. Bryant Buchner                                      July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 31

1    It was -- it was done by the gentleman that

2    input the data.  And I haven't actually opened

3    that file myself.  I said -- I verified that

4    that file is this file that I have these

5    reports from.  He said he did that.  And then

6    that was sent to you.

7           Q.    Okay.  So explain that to me.  So

8    you don't actually run the simulation.  You

9    just provide instructions for someone else to

10   run the simulation?

11          A.    No, I'll never open it and I'll

12   never save it.  I'll go -- I will go make

13   adjustments to it or look at it and I will sit

14   with him when he does that as needed.  Yes.

15   But I'm not the -- I don't open/take care of

16   the HVE software suite.  All of that is done by

17   someone else.  I'm a user of it.  And I don't

18   end up saving it because we -- I don't want to

19   make a mistake on it.  I want the person who's

20   running that to -- to do that job.

21          Q.    Who is --

22          A.    And I can't run them on my

23   computer in here because I don't have the right

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 32

1    licenses.  That's on another computer.

2          Q.    Who was the person that performed

3    that job with regard to the original

4    simulation?

5          A.    Jacob Brennan.

6          Q.    All right.  And so who performed

7    that job with regard to the rerun?

8          A.    Jacob Brennan.

9          Q.    Okay.  And you're saying that you

10   don't know the process for saving and

11   preserving the HVE files, that I would have to

12   have -- ask Jacob about that process?

13         A.    No.  You click save, and it goes

14   on that computer.  And then you take a copy of

15   that, and you put it, you know, on the server

16   where it could be provided to people like you.

17   That's -- I don't -- you know, that's the same

18   for every single file.  Everybody in the

19   building has their own work and they save it

20   how they want to under what name they want and

21   just put it on the server.  And then I -- you

22   know, if I want to change the name of it or

23   something, I can.  But it's the same -- I don't

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 33

```
 1    know what -- I mean, I wasn't there when he

 2    clicked the button.  But we all know how to

 3    save a file.

 4           Q.    Okay.  And how do you review it

 5    once he runs the report?  Does he print it out

 6    for you?  Do you click on the report on a

 7    computer?  How do you review it once it's been

 8    run?

 9           A.    All of the above.  I mean, it

10    depends on how I want to do it that day.

11           Q.    Okay.  And so you might actually

12    access the actual file on your computer and

13    look at it in digital form?

14           A.    You may be misleading there.

15           Q.    Okay.

16           A.    If it's -- if it's saved as a

17    PDF --

18           Q.    Okay.

19           A.    -- I can access it and read it at

20    my computer.  But I can also print it and then

21    just look at it in hard copy form.  However I

22    want to do it on that day depending on what my

23    schedule is and what I'm -- you know, what my
```

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 34

1    needs are.  I mean, someone else may be -- you

2    know, it may be better for me to go to a

3    conference room where I can spread out.  It

4    depends on what I'm -- on what's convenient for

5    me on that day.

6          Q.    Right.  I guess what I'm trying to

7    clarify is you're not actually going into the

8    HVE software and opening up that.  You're

9    looking at it either in a PDF of the results or

10   a printed version of the results?

11         A.    Right.  Of the report.  And but --

12   but when he's running it, I have the option to

13   go back in sitting with him.  And you know, if

14   he has a question, I'll drop in and -- and, you

15   know, talk about what's going on and where he

16   is or he can come and, you know, make a choice

17   for him.  Or if he wants he'll come down here

18   and ask me a question when he's doing it.

19       So you know, it's all of the above.  It's,

20   you know, pretty normal stuff.  It's the way

21   all of our technical programs work.

22         Q.    Right.  So -- so you might sit

23   there and advise him at his computer station

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 35

1    with regard to modifications or inputs into the

2    software?

3           A.    Sure.

4           Q.    Right.  But then when you go to

5    review the results, you're going to look at the

6    results that have been generated and converted

7    to a PDF file?

8           A.    Well, I can -- I can look at them

9    on his computer as well over his shoulder

10   before he saves them as well.

11          Q.    Right.  Which did you do in

12   preparing your October 2023 report?

13          A.    I would have had something I could

14   work from.  I mean, as I told you earlier, I

15   mean, I would have had a working copy for me

16   that's just a working copy.  If I want to edit

17   a report, I'll print it out and I'll edit it

18   and I'll get on the computer and make the

19   changes and then I'll throw the working copy

20   away --

21          Q.    Right.

22          A.    -- because it's just a working

23   copy.  So I don't remember at this time exactly

Case 2:22-cv-00017-RWS   Document 182-10   Filed 03/17/25   Page 37 of 388
G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 36

1    how I did that.  But I do know that when I
2    wrote the report, I was looking at outputs that
3    I was confident from a -- were the
4    representative simulation run that I was
5    intending to run at that time.
6           Q.    And those outputs would have been
7    either a printed format or a PDF file?
8           A.    Potentially, yes.  I don't know.
9           Q.    And in order to print them, you
10   have to convert them to a PDF file.  Correct?
11          A.    Usually, yes.
12          Q.    Okay.
13          A.    But I'm not -- you know, he can --
14   he can probably print them directly.  I don't
15   know.  I have not done the printing out of the
16   program.  I'd have to go see.  I don't know if
17   he can print just directly from
18   Engineering Dynamics HVE Suite.  I don't know
19   the answer.
20          Q.    Well, with regard to the rerun,
21   after he ran the report, he created a PDF file
22   which you then used to produce to us prior to
23   this deposition.

G. Bryant Buchner                                           July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 37

1          A.      Yes.

2          Q.      Correct?

3          A.      Yes.  And that's what -- that's

4    what I thought had been done in a proper

5    fashion before the first deposition.  I thought

6    I was using -- I thought I had in the file a

7    complete file of what was then printed because

8    that's what I testified to.  That's what was my

9    understanding.  But it wasn't -- it wasn't

10   accurate.

11         Q.      The actual HVE files are different

12   obviously from the PDF file that is just a -- a

13   collection of the results.  Those are two

14   different types of files.  Correct?

15         A.      Yes.

16         Q.      All right.  And -- well, scratch

17   that.  That's enough.  On the second page of

18   what I have up on the screen bates labeled

19   9349 --

20         A.      Yes, sir.

21         Q.      -- second paragraph you say our

22   attempts to precisely reproduce the simulation

23   discussed in your October 12, 2023 report were

G. Bryant Buchner                                      July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 38

1    unsuccessful because data used in that

2    simulation was lost.

3        Did I read that correctly?

4            A.    Yes.

5            Q.    And my question is, there were

6    printouts and data from -- that were produced

7    to us that were believed to be from the

8    original simulation.  And so when you say the

9    data was lost, what do you mean by that?

10           A.    Two fold.  Potential answers and

11    then you can choose what's relevant to your

12    question.  I've already told you that the run

13    files were lost and -- and the -- whatever

14    files were used to generate the documents that

15    I used to do my initial report as far as the

16    electronic copies were not present.

17       The second thing is, in the reports that

18    were printed out, HVE does surrounding and

19    doesn't report all of the input data

20    necessarily.  So -- so numbers can have

21    extended decimal places beyond what the report

22    shows.  So let's say a 0.8 might show up as a

23    one because of rounding.  Because of that

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 39

1   it's -- when we tried to use the data that was
2   shown, we just did not -- we knew that -- that
3   that was not accurate to what had been used
4   because it didn't produce the right result.  So
5   the -- I think it's a 17.92 mile per hour
6   delta-V for the F-250 wasn't working.  So what
7   it means is the reported -- the reports are
8   incomplete as far as to the level of detail
9   that's needed sometimes to regenerate the --
10  the run.
11      So on two levels, we just could not -- we
12  could not use what we had to reproduce the
13  simulation run.  So we just -- like I said, it
14  took a couple of months to figure out that it
15  wasn't going to work.  And then we just said,
16  okay, let's just rerun with the input data that
17  we know is accurate, the weights, the
18  delta-V's, everything, and you know, just do it
19  the way that I said in the deposition.  And
20  that's what we have today.
21          Q.    When you first attempted to
22  reproduce the original simulation with the data
23  that you had, did you save that simulation run?

Page 40

```
 1        A.    Well, no because we were still
 2   under the confusion that we could do that.  In
 3   other words, we didn't -- basically if someone
 4   wanted to try to reproduce -- wanted to put the
 5   data we have in, I mean, they could do it and
 6   they'd get the same answer we'd get.  But we
 7   didn't understand the problem fully.  It took a
 8   while to discover all of the problems.  So no,
 9   we weren't -- we didn't even know what problem
10   we were solving at that time.
11        Q.    All right.  Did you -- I know
12   you're saying the data that you used from the
13   printouts you produced to us did not create the
14   result that you expected.  Was there any
15   missing data or was it just you had all of the
16   data but it didn't -- it wasn't correct?
17        A.    There's missing data as well.  The
18   reports -- remember, not all of the reports
19   were printed.  I told you that.  There just --
20   there was missing data.  And we couldn't -- we
21   realized we were going to have to start adding
22   to those reports.  And then we also knew that
23   the report numbers weren't precise.  So you
```

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 41

1    couldn't just input the report numbers.  You

2    wouldn't get a robust answer.  I mean, you'd

3    probably get, you know, an approximate answer.

4    But we wanted the right answer, similar to what

5    was in my FR26 report.

6          Q.    All right.  So obviously if you're

7    not able to reproduce the original simulation

8    based upon the data you have, you wouldn't

9    expect anyone else to be able to reproduce your

10   original simulation because the only data they

11   would have would be the same data that you had?

12         A.    Well, they could use my deposition

13   and -- and the file materials that I had and

14   pluck the data out of my deposition and the

15   file materials and input it, and they would get

16   a very similar result to what we have, yes.

17   They could do it that way.  But you could not

18   use the reports, just like I couldn't use the

19   reports.  Nobody could use those reports to get

20   it as accurate as it should be.

21         Q.    How many simulations have you run

22   beyond the original simulation and the rerun

23   simulation?

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 42

1              A.    I don't -- I don't know.

2              Q.    You haven't saved any other than

3        the rerun simulation.  Correct?

4              A.    Now, there will be -- some of our

5        attempts are archived.  In other words, some of

6        the process that we used is archived.  It's not

7        relevant though to my final opinions if you

8        want to do a forensic examination of the

9        process.  You know, I mean, there's something

10       around you could use for that.  But I'm here to

11       give opinions about a particular accident.  And

12       so I'm confident in what we have given you.

13       But yeah, some of that process is saved.  But

14       it's -- it was basically put aside because we

15       realized that we didn't have the files to do

16       it.  And then we just redid it per my

17       deposition, per the data in the file, per the

18       right everything and -- and ran it.

19             Q.    And those archived files related

20       to your other run simulations, they've not been

21       produced to Ms. Cannella.  Correct?

22             A.    No.  Because they're not relevant

23       to my opinions.

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 43

1          Q.    They relate to your work in this
2    case though.  Correct?
3          A.    But not work to give my opinions
4    in the -- in what happened in the accident.
5    They only relate to us trying to find a missing
6    file and missing data.  So we worked really
7    hard, but that was -- and that's -- that's just
8    bonus -- that's a bad word to use.  That's --
9    that's work that we did trying to fix a
10   problem.
11       But as far as my -- and that had nothing to
12   do with my analysis of this accident.  That
13   just had to do with trying to -- trying to
14   resurrect information.  So practically you have
15   everything that we did to fix the simulation
16   run to be accurate for the use of engineering
17   on this file.  If there's some in between
18   that's unrelated -- and that's what I'm telling
19   you about in our efforts to resurrect it -- we
20   do have some stuff for that.  But no, that
21   hasn't been given to anybody because it's not
22   worth anything as an engineering opinion.
23         Q.    Are there any other archived files

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 44

1    other than what you've described that you

2    haven't produced to Ms. Cannella that relate to

3    your work in this case?

4           A.    Oh, they don't relate to my work

5    in this case.  They relate to my work to try to

6    find the file and try to -- try to use a file

7    that, you know, was corrupt.  But no, there's

8    nothing -- you have everything I'm using for my

9    opinions.  You have everything that I have done

10   in this simulation to try to -- well, to

11   reproduce the work and even, you know, slightly

12   improve the work, consistent with my

13   deposition.  You have that.

14          Q.    All right.  When did you first

15   become aware of the date of Wes Grimes's

16   deposition, your counterpart for the Defense?

17          A.    I knew of it.  I'm guessing, but

18   it's, you know, a few weeks at most before

19   that.

20          Q.    Okay.  So --

21          A.    His deposition date is not

22   particularly an issue for me.

23          Q.    Right.  But I'm -- I'm curious

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 45

1    when were you told about his deposition date.

2    Do you recall?

3            A.    I don't.

4            Q.    All right.  Did you -- did you

5    talk with Ms. Cannella and help her to prepare

6    for that deposition?

7            A.    If anybody remembers when Wes

8    Grimes's materials were produced, that -- I'm

9    sure I looked at those and told her what we

10   saw.  And I remember one thing very

11   specifically.  So yes, I did help her in some

12   way.  Yes, I did.

13           Q.    All right.  And what was the

14   date -- the date that you ran the rerun

15   simulation, or at least when you finalized it?

16   We know that you did some preliminary runs that

17   haven't been produced that weren't the final

18   run that you're relying upon.  But when did you

19   produce the final simulation run that you've

20   produced to us and that you're relying upon in

21   this case?

22           A.    Yeah, I disagree with your

23   characterization.  But I understand the

G. Bryant Buchner                                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 46

1    question.  So when was it run?  I don't know

2    off the top of my head.  There may be a date on

3    it if I can find it here.  This is the FR26.

4    You've got it up right there.  All you have to

5    do is look at the top and see if there's a

6    date.

7            Q.    I don't whether it's when it was

8    printed or when it was run.  But if you look at

9    appendix B that I have up on the screen -- it's

10   not showing up for some reason.  I don't know.

11   I want you to verify, it has a date on what you

12   produced as appendix B of May 8, 2024, 17:10.

13   Is that the date that you ran the simulation?

14           A.    That -- I don't know.  It could

15   just be -- the simulation can be run on that

16   date to generate all of the reports and printed

17   on that date.  Yes, sir.  I don't know if

18   that's the exact date it was originally run.

19   But it was probably rerun on that date to make

20   sure we had the right copies printed out so

21   that whatever adjustments or whatever inputs

22   had been refined for the report were accurate

23   to the report.

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 47

1          Q.    Is there a way to determine the

2     date the report was actually run?

3          A.    I don't know.  But I think it was

4     run on that date.

5          Q.    All right.  So you believe that at

6     least it was run for the purposes of producing

7     a PDF file to produce to us?

8          A.    That's my belief.  But -- that's

9     my belief, yes.  But I'm just giving you the

10    best answer I can.

11         Q.    Right.  But it could have been run

12    any time before that date, original?

13         A.    Well, not any time.  Approximate

14    of that, yes.  I understood that I needed to

15    write a report.  And we were -- what was -- the

16    report was about this simulation.  And the

17    simulation was run proximally doing the report.

18    I would have done the report at the time we

19    were finishing the simulation, yes.  But it's

20    proximal to that.  It takes a while to write a

21    report though, so you know, it could have been

22    a week before.

23         Q.    Right.  So the report is dated

G. Bryant Buchner                                  July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 48

1    May 8, the same day as this.  And you would

2    have needed this prior to preparing your

3    report, I believe is what you just said, in

4    order to prepare the report?

5         A.    Right.  So I had some working copy

6    printouts we would have used.  And then we

7    would have tried to run and save and get

8    everything compiled to go with this for whoever

9    wanted it.

10         Q.    Now, you verified that others

11    could not have used the original HVE data used

12    by -- in order to reproduce your simulation or

13    to test your simulation?

14         A.    I didn't hear a word you said -- I

15    missed a couple of your words, please, if you

16    could help me.

17         Q.    All right.  Sorry.  Can you hear

18    me now?

19         A.    I can hear you.  Just a couple of

20    them were garbled.

21         Q.    Okay.  I believe what you

22    testified to is that in order for someone to

23    attempt to simulate your original simulation or

G. Bryant Buchner                                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 49

1    to test it, they would have had to have ignored

2    the HVE data that you produced originally and

3    have relied solely upon your deposition

4    testimony and disregarded the actual HVE data

5    in order to try to reproduce your original

6    simulation.  Is that fair?

7                MS. CANNELLA:  Object to the form

8    of the question.  Misstates his testimony.

9        Q.    Well, you can correct me if it's

10   wrong.

11       A.    I didn't feel like that was fair.

12   No, sir.  I...

13       Q.    Well, what's the answer to the

14   question?

15       A.    You asked me was it fair.

16       Q.    No.  No.  I didn't ask you -- I

17   asked you to answer the question if you can.

18                MS. CANNELLA:  The question was,

19   is that fair, I think is what Mr. Buchner's

20   saying.

21       Q.    Is that a fair characterization of

22   your testimony?

23       A.    What?

G. Bryant Buchner                                        July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 50

1          Q.    I'll re-ask it.

2          A.    Yeah.

3          Q.    So we've already agreed that

4    another expert could not use your HVE data that

5    you produced to re-create or test your original

6    simulation?

7          A.    No, we have not.

8          Q.    Okay.  But then you alluded to,

9    well, they could have read my deposition and

10   ignored the HVE data and just listened to what

11   I said in the deposition and they could have

12   reproduced it or tested it that way?

13         A.    I'm sorry, sir.  The answer to the

14   previous question was no, we have not agreed to

15   that.  You could --

16         Q.    Okay.

17         A.    Yeah.  You could do a reasonable

18   rerun of the data we gave and understand you're

19   going to get a very similar answer to what we

20   got.  But they're not going to be as accurate

21   as they need to be so that what's in my report

22   would be precisely produced.  But you could get

23   a very similar answer.  If you wanted to do it

G. Bryant Buchner                                        July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 51

1    as precise as I would like to have it done, you

2    would want to read the deposition and use what

3    I said in the deposition, yes.

4       We'd like to be accurate.  We'd like to have

5    the right amount of detail.  But someone could

6    put in the data we have and they would -- they

7    would get a reasonable result of what we got.

8    It just wouldn't be the same results that were

9    in my FR26 report.  But they would be close.

10   So as I said earlier, to do what we did, anyone

11   else who wanted to do it would have to -- to

12   get it as accurate as we would like for it to

13   be, not just accurate enough to understand the

14   work, but accurate so that my FR26 report in my

15   deposition was accurate, you'd need to use --

16   use what I said I did in my deposition and the

17   supporting data.

18           Q.    All right.  And you would need the

19   supporting data that you produced with your

20   FR26 amended report --

21           A.    No.

22           Q.    -- to get it as accurately as you

23   wanted to do it?

G. Bryant Buchner                                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 52

1              A.     No.   The -- all of the data was
2      already in my deposition and in my files.
3      There really isn't anything -- I did exactly
4      what I said in the -- in the amended, I did
5      what I said I had done or would do in my
6      deposition to run a simulation.   So we followed
7      what I said in my deposition as -- as the way,
8      you know, that we wanted to do the work.   And
9      then we followed that script to produce this.
10         We did make -- as I already said, there was
11     a 0.04 inches or something tire diameter
12     discrepancy or maybe 0.45 inches that we did
13     correct.
14             Q.     Well, we'll talk about your
15     changes to -- in your amended simulation in a
16     minute.   With regard to your original HVE
17     simulation, what version of the HVE software
18     did you use?   Do you know?
19             A.     Yeah.   17, I believe.   Let me look
20     and see.   I don't -- I don't have the original
21     report.   Let me see if I can find that.   Yeah.
22     17 on both of them.
23             Q.     And when you say both of them, you

G. Bryant Buchner                                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 53

1    mean the rerun report, which is reflected in

2    your -- the May 8 printout of 2024?

3           A.    Right.

4           Q.    Okay.  You don't know when that

5    was run, but you know it was -- it was run

6    using the 17.00 version of the software?

7           A.    Right.  Because it says that at

8    the top.

9           Q.    Right.  And it says 2021.  Is that

10   the year that that version came out?

11          A.    Yes.

12          Q.    Okay.  And do you know whether

13   there's been any updates or new versions to the

14   HVE software since?

15          A.    Yes.  Yeah.  There was -- there

16   have been updates.  We actually have a more

17   current version.  We're trying to stick with

18   the version when we started working on the file

19   that we had opened.  So we -- it can be rerun

20   on a new version if somebody wants to.

21          Q.    All right.  So you actually

22   possess a more current version than version

23   17.00?

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 54

 1          A.    Yes.  Our --

 2          Q.    What is the -- sorry.

 3          A.    We -- we get subscription updates

 4    from HVE, yes.  We have a more current version.

 5          Q.    What's the most current version

 6    that you have now?  Do you know?

 7          A.    I don't know the number on it.

 8    No, sir.

 9          Q.    All right.  When you ran the

10    original simulation, do you know the date that

11    it was run?

12          A.    On or about October 12, a little

13    bit before.

14          Q.    Of 2023.  Correct?

15          A.    Yes.

16          Q.    And do you know whether at that

17    time the most current version of HVE was

18    version 17.00?

19          A.    It was not.  We had started on

20    version 17.  We -- we got an update.  As I went

21    back and figured out through this process, we

22    had a more current version.  But we had started

23    the process with 17, and we -- we kept it on 17

G. Bryant Buchner                                         July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 55

1    just for consistency.  But yeah, we did have a

2    more current version at the time.  I think I

3    misspoke in my depo on that.

4            Q.    You misspoke in your prior

5    deposition about that.  Is that what you said?

6            A.    Yes.

7            Q.    All right.  And so when you say

8    you started the process, what do you mean by

9    that?

10           A.    Well, it takes a while to do a

11   simulation.  So whatever -- when we -- when

12   the -- when the work was started, 17 was open.

13   Whether -- why it was open, I don't know.  But

14   that was the one that we started the process

15   with.  And once we start a version, we tend to

16   stay with that version.  And that's what

17   happened here.

18      It doesn't mean that there weren't more

19   available versions.  But that one -- that was

20   the one that was used.  And so we just stayed

21   consistent with it.  So we're consistent with

22   it to this day.

23           Q.    Why would you not run the rerun on

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 56

1    the most current version of the software that

2    you possess?

3          A.    Probably because we were trying to

4    reproduce the prior work.  And that was the

5    version we -- we had up and were using.  If

6    someone wants to do it on a later version, I'm

7    happy to go do it.  But I don't -- it's not

8    going to change any of the answers -- any of

9    the opinions because there haven't been any --

10   but that was -- we were just trying to be

11   consistent.

12      We always try to be consistent when we start

13   a project because when you adjust the versions,

14   some program may adjust some of your data.  And

15   that can cause some issues.  So it's just an

16   engineering habit we have, and we stayed with

17   it.

18         Q.    Wouldn't the most current version

19   of the software have included improvements in

20   the software that would give you the most

21   reliable result?

22         A.    Well, that's wishful thinking.  We

23   don't know.  It's not -- not necessarily known.

G. Bryant Buchner                                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 57

1   If the program wasn't good enough in version

2   17, they would have let us know that version

3   17, don't use it.  But -- and you don't even

4   know -- it's got so many manuals, you don't

5   know what the changes were.  I'm don't -- I'm

6   not -- I can't agree with that as we sit here.

7   No, sir.

8           Q.    Well, do you -- when you say --

9   when did the process start prior to October of

10  2023?  You say it takes a long time.  How long?

11  How long were you working on this before you

12  created the simulation -- the original

13  simulation?

14          A.    I don't know.  I don't know.  And

15  I don't know that version 17 was the most

16  updated one when we started.  But once we

17  start, we stay with it.

18          Q.    Well, you said you had to start

19  the rerun from scratch basically because the

20  old data was not the correct data.  Right?

21          A.    Right.  We -- right.  We basically

22  had to reenter it.  Yes, sir.

23          Q.    All right.  And you didn't start

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 58

1    that rerun process for, you said months after

2    your deposition?

3             A.    Yes.

4             Q.    All right.  So your deposition was

5    at the end of January.  So you have February

6    and March.  As best you can recall, you haven't

7    discovered the problem with the original

8    simulation.  And then sometime after those two

9    months between then and May 8, you run the

10   rerun.  Correct?

11            A.    Similar, yes, sir.

12            Q.    And you run it from scratch?

13            A.    Yes.

14            Q.    All right.  So that's a month to

15   six weeks worth of time to run a simulation

16   from scratch.  Correct?

17            A.    I can't agree on the dates.  I've

18   already told you that.  But yeah, there was

19   time to run it from scratch.

20            Q.    All right.  And are you aware that

21   between August of 2021 when version 17 came out

22   and February of 2023, which was seven months

23   prior to your original simulation, there had

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 59

1    been -- three new versions of HVE had come out?

2          A.    I don't know the number.  No, sir.

3          Q.    All right.  You can't dispute that

4    though?

5          A.    I'm not trying to dispute it.  No,

6    sir.

7          Q.    All right.  And since February of

8    2023 up until the time of your running of the

9    rerun, there is an additional version of HVE

10   that's come out.  Were you aware of that?

11         A.    Well, I know we have -- I know

12   there -- I know there is a version that we

13   could have used as the new version, yes.  I

14   don't know the dates of all the versions.  No,

15   sir.

16         Q.    All right.  When you start a case

17   from scratch now that you want to use HVE,

18   which -- which version do you use?

19         A.    17.

20         Q.    So you're still using 17 for all

21   your cases even though you possess a more

22   current version of HVE?

23         A.    No.  If we opened a case today, we

G. Bryant Buchner                          July 11, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 60

 1    would be using the latest version because we --

 2    we have the latest version.

 3          Q.    Well, that was my question.  That

 4    was exactly my question.  If you opened a

 5    case -- a new case today, what version of HVE

 6    would you use?

 7          A.    Well, we'd probably use whatever

 8    version was opening at that time on that

 9    computer.  I would anticipate we would use the

10    latest version, just like I said in my

11    deposition.

12          Q.    All right.

13          A.    But if -- if the file was already

14    functioning, we would -- you know, we'd make a

15    decision based on the situation of the file.

16    But I was -- I was trying to stay with what we

17    had originally done to be as consistent as

18    possible with what we had originally done.  I

19    understand you want to argue there's a

20    different idea.

21       I don't have any problem with it.  Somebody

22    can take our data and rerun it on version --

23    whatever they want.  12 if they want.

G. Bryant Buchner
July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 61

1          Q.    All right.

2               MR. HILL:  We've been going a

3     little over an hour.  Want to take a -- I need

4     a restroom break.  And please let me know if

5     you need a break obviously.

6               THE WITNESS:  Yeah.

7               MR. HILL:  This would be a good

8     time.

9               THE VIDEOGRAPHER:  The time -- the

10    time is 11:13 a.m.  We're off the video record.

11          (A break was taken.)

12               THE VIDEOGRAPHER:  The time is

13    11:28 a.m.  We're back on the video record.

14               MR. HILL:  Thanks.

15          Q.    (Mr. Hill) Hold on.  I'm having an

16    issue sharing my screen.

17          A.    I can see your screen.  Yes, sir.

18          Q.    Okay.  Great.  All right.  Up on

19    the screen is that FR26 amended report.  And I

20    want to move now to the sections where you

21    discuss the comparison between the initial

22    simulation and the rerun simulation.  And as I

23    understand your report, with the rerun you

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 62

1    were -- you used for the F-250, the default

2    properties for -- for stiffness coefficents

3    that were within the software, the

4    Vehiclemetrics database.  Is that correct?

5            A.    Yes.

6            Q.    And is the Vehiclemetrics database

7    part of the HVE software?

8            A.    No.  Vehiclemetrics is an approved

9    vendor to do things like make vehicles for the

10   HVE software.

11           Q.    How is the different from the

12   Neptune data that you used with the original

13   simulation?

14           A.    You mean for crush stiffness?

15           Q.    No.  I don't mean the actual.  How

16   is using Vehiclemetrics -- in other words, you

17   just said it was approved by HVE for use as a

18   method for determining the stiffness

19   coefficients.  Is -- is Neptune not approved?

20   I'm trying to understand that.  I thought

21   Vehiclemetrics was contained within the HVE

22   software.

23           A.    Okay.  HVE has vehicles that come

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 63

1    in it.

2            Q.      Right.

3            A.      HVE had an F-250, but it was not

4    the Crew Cab.  It was an Extended Cab, I

5    believe.  So it's essentially the same vehicle,

6    but a little bit -- the weight is going to be a

7    little bit different.  The length will be a

8    little bit different.  And we wanted a

9    Crew Cab.

10       So Vehiclemetrics is a vendor for HVE that

11   we contracted with to make us the right shape

12   Crew Cab from our scans.  We gave them the

13   scan, and they made the right shape Crew Cab.

14   And -- and with that vehicle from them came

15   crush stiffness coefficients.

16       Their crush stiffness coefficients were

17   higher than Neptune's.  I think Neptune's were

18   reasonable.  Vehiclemetrics, because they

19   provided some -- I didn't realize they had --

20   that's closer to using the defaults of HVE than

21   Neptune.  So I -- in the update we used them.

22   And to be clear, they're higher crush stiffness

23   coefficients.  So the F-250 in the rerun was

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 64

1    stronger and stiffer.

2        So you know, that would be to the Escape's

3    disadvantage.  We hit it the a stronger truck

4    in the rerun -- I mean a stronger simulated

5    truck.

6        So that's -- that's -- I thought that would

7    be most consistent with my deposition and the

8    most consistent with my intent, especially

9    because we had done the calculations of crush

10   originally with the hand calculations or the

11   computer calculations with -- with Neptune's

12   data.  Now we were going to use the pure

13   simulation data or as pure as we could get.

14       Q.    And why didn't you follow that

15   same process with the original simulation?

16       A.    Because I asked if we had crush

17   stiffness coefficients for the Crew Cab.  And

18   the answer was no.  And I didn't realize when

19   Vehiclemetrics provided a vehicle, they -- they

20   provided stiffness coefficients as well, the

21   numbers side.

22       So in the rerun when we were making sure to

23   do things per my deposition, we went through it

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 65

1    and said, okay, I would use defaults if they

2    were there.  This vehicle has defaults.  We're

3    going to use those because that's what I said

4    we would do.

5         Q.    So were you told by Jacob or

6    whoever was running the test the first time

7    that there was -- there were no default values

8    for an F-250 in the HVE system?

9         A.    To an extent, yes.  I asked for

10    the Crew Cab, and he said no.  So I didn't

11    think there were.  I didn't ask for Vehicle --

12    Vehiclemetrics to ultimately provide it.  I

13    asked the question -- I think I got the

14    question -- the correct answer to my question.

15    I think I just misunderstood that it applied --

16    that it only applied to -- the HVE has we

17    opened it, it didn't have them.

18      I don't think that I asked the question did

19    it come with Vehiclemetrics.  So just a

20    communication error.

21         Q.    All right.  So back when you ran

22    the original simulation, you could have

23    followed the process that you followed with the

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 66

1    rerun?  There's nothing new about that.  It's

2    just you didn't recognize that that was a

3    possibility when you did the original run?

4            A.    Right.  Right.

5            Q.    Vehiclemetrics and the process you

6    followed was available back in October of 2023?

7            A.    Yes.  Yes.  And we had it.  We had

8    the vehicle.  We had it in there.  We just

9    didn't use the AV values that came with the

10   truck because I mistakenly didn't think they'd

11   come with some.

12           Q.    All right.  It appears another

13   change that was made is to the tire sizes on

14   the F-250.  Explain the change you made between

15   the original run and the amended run with

16   regard to the tire sizes on the F-250.

17           A.    Sure.  We have the tire sizes

18   right in the file as a whole.  But when we ran

19   the simulation, the tire size -- I don't see

20   the paragraph in there.  Can you -- do you have

21   it?

22           Q.    It's --

23           A.    Oh, yeah.  Yeah.  So there was a

G. Bryant Buchner
Bryson, Santana and Joshua v. Rough Country, LLC
July 11, 2024

Page 67

1    point -- a 0.35 inches difference in the tire

2    size that -- 0.7 in the diameter and 0.35

3    inches in the -- in the radius.  So we were off

4    by, you know, a third of an inch in height.

5    And I think that was corrected.  In fact, I

6    know it was corrected.

7           Q.    And that's not based on any new

8    information.  Right?  I mean, the tire size on

9    the subject F-250 was known at the time you ran

10   your original simulation?

11          A.    Right.  We -- we had done it -- we

12   used the right tire size throughout most of the

13   file, but just in inputting the data in the

14   simulation, it didn't -- we didn't catch that

15   we should change the size of the tire by

16   that -- you know, by that much.

17          Q.    If you don't know what original

18   data was used for the original simulation

19   because you don't have it anymore, how do --

20   how do you know what was or wasn't used with

21   the original simulation?

22          A.    Well, I don't remember where it

23   is.  But Mr. Grimes is the one that located it

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 68

1    and pointed it out.  So it was in the data that

2    we provided.  I don't know where it is in

3    the -- in the data as we sit here.  My memory

4    doesn't go back that far.  But the -- so it's

5    in the data we provided, whether it's in one of

6    the reports or printouts.

7           Q.    But we've -- we've already

8    established that the data you provided, you

9    can't verify whether it correlates to your

10   simulation -- original simulation or not.

11          A.    You could be right on that.  The

12   one that -- the one that I wrote the report on

13   may have actually had the right size in it.

14   But in the -- in what we provided, it looked

15   wrong.  So we made sure it was right in the

16   rerun.

17      Whether or not the data we provided was

18   actually about the simulation that I used to

19   right the report or not, well, that's a great

20   point you made.  But whatever data we had

21   available, it looked like the tire size was

22   wrong.  So we made sure we got the tire size

23   right in the rerun because that was our whole

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 69

1    intent.  We just wanted to get it right.

2            Q.    Hold on one second.  Just real

3    quickly while we're talking about HVE data

4    reports, have you seen a screen like what's up

5    there now from HVE?

6            A.    I -- I can't read it.  It's small.

7            Q.    All right.  This is a graphical

8    representation of crush from an HVE run.  Have

9    you --

10           A.    No.  We -- we only see a list of

11   files.  At least I only see a list of files.

12           Q.    So you've never seen a

13   depiction --

14               MS. CANNELLA:  Rick, we see your

15   e-mail, I think.

16               MR. HILL:  You see my e-mail?

17               MS. CANNELLA:  Yeah.

18               MR. HILL:  I think I shared the

19   wrong screen.

20               MS. CANNELLA:  Yeah.

21           A.    I couldn't read it, so there's,

22   you know, no harm no foul.

23           Q.    There's nothing in there important

Case 2:22-cv-00017-RWS    Document 182-10    Filed 03/17/25    Page 71 of 388
G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 70

1    anyways.  All right.  How about now?

2            A.    Yes.

3            Q.    All right.  So have you seen this

4    type of output from an HVE simulation?

5            A.    I don't know if I've seen it

6    exactly like that.  But I've seen something

7    similar.

8            Q.    All right.  And did you create

9    anything like this based upon your rerun

10   simulation?

11           A.    No.  Yeah, we have the image of

12   the vehicle.  And we also have the crush.  But

13   it's not compiled like that, no.  But we

14   have -- we have the same information in --

15   in -- compartmentalized though.

16                MS. CANNELLA:  One moment.  What

17   are we looking at right now?  Is this from our

18   wreck?

19                MR. HILL:  No.  This is a

20   representative of -- of an HVE output, a form

21   of HVE showing the data from a simulation.  So

22   I'm just asking him generically has he seen

23   something like this for any of the simulations

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 71

1    he's run.

2              MS. CANNELLA:  This is -- we

3    haven't produced this.  No simulation has been

4    produced to us of our wreck.  This is our Ford

5    Escape with a similar crush profile.  So why

6    haven't we seen this before?

7              MR. HILL:  This is just a sample.

8    This is not -- this is a sample HVE output from

9    just a random run.  I'm just asking if he's

10   seen this type of presentation.  That's it.

11             MS. CANNELLA:  But this is -- no,

12   this is -- this is our crash.  This is our

13   crash right here.

14             MR. HILL:  Right.  This is just a

15   sample.  This is not our crash.  I can

16   represent that to you.  It's not our crash.

17   It's nothing -- it is nothing.  It's just a

18   sample.  I'm just saying if he's ever had a

19   representation or seen this type of

20   information.  Because if you look at --

21             MS. CANNELLA:  Has somebody done a

22   simulation of our crash --

23             MR. HILL:  No.

G. Bryant Buchner                                   July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                    Page 72

1            MS. CANNELLA:  -- for Defense?

2            MR. HILL:  No.  That's just a

3    random simulation showing a type of data.  And

4    certainly if I want to just get a sample of

5    what HVE outputs are like, I can do that.

6    That's all that is.  It's a representation

7    sample of the type of data HVE can put out.

8            MS. CANNELLA:  Okay.  Well, we

9    want to get whatever communication that came

10   from and whatever file that came from as well.

11           MR. HILL:  Sure.  All right.

12      Q.    (Mr. Hill) You produced what's on

13   the screen now as 9376.  It's a graphical

14   representation of the crush on the Escape in

15   your rerun simulation.  Is that what's depicted

16   on 9376?

17      A.    That's part of it, yes.

18      Q.    Okay.  And was that generated by

19   HVE or was that generated by you using the HVE

20   data?

21      A.    That's HVE.

22      Q.    Okay.  So HVE creates this --

23      A.    Yes.

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 73

1          Q.     -- from the simulation?

2          A.     Yes.

3          Q.     Okay.  And are you aware of

4    whether it can create any other graphical

5    depictions of crush from a simulation?

6          A.     Well, you can rotate it and look

7    at it in different ways, yes.  That was -- we

8    wanted a representative one.  If somebody wants

9    more, I guess they can rerun it and do it.  But

10   this is -- we wanted an output so you could see

11   what the car looked like.  And the best way to

12   do it is this.

13         Q.     Right.  All right.  Do you choose

14   like what, like, HVE is going to -- what side

15   it's going to show or how it's going to display

16   this?  I mean, is there other options?  How

17   does it work?

18         A.     I think you can rotate it and

19   choose the image you want, yes.  So this is --

20   this is -- I like a perspective, a 3D

21   perspective so you can see it.  It's

22   representative of the numbers that are in the

23   reports above this.  So this is the one that I

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 74

1    chose, yes.

2         Q.    Right.  All right.  The documents

3    in appendix B, do they contain all of the HVE

4    files that were generated when you ran the

5    rerun simulation?

6         A.    They were -- they're the reports

7    that HVE provided for the rerun simulation.

8    The file is a -- this is a PDF.  The file is an

9    electronic copy of the file that was provided

10   with the report.

11        Q.    Right.  So this is a printout of

12   the PDF of the results from the test, the

13   reports?

14        A.    Yes.

15        Q.    And you have the electronic files

16   used to generate this -- these reports?

17        A.    Yes.  It was provided with the

18   report.

19        Q.    Okay.  All right.  Going back to

20   the vehicles used in the simulation, you talk

21   about the F-250 that was in the volume

22   metrics -- the Vehiclemetrics database was a

23   regular cab body style.  Our subject truck was

G. Bryant Buchner                                        July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 75

1    a Crew Cab.  And so you used a modeling partner

2    to convert to a Crew Cab.  Is that a

3    layperson's way to describe that?

4          A.    Yes.  The modeling partner we used

5    was Vehiclemetrics.  It's a typo and it says

6    Baker Sneddon.  That was -- that was -- it was

7    Vehiclemetrics.  Everything came from

8    Vehiclemetrics in the first part of this

9    section.  I don't know why it was typed

10   Baker Sneddon.  That's a mistake.

11         Q.    That was my question.  I didn't

12   understand what that -- so that sentence

13   shouldn't be in this?

14         A.    The sentence should be.  But the

15   modeling partner should be Vehiclemetrics.

16         Q.    All right.  Gotcha.  And when you

17   did the original simulation, was there a

18   transfer from -- I mean, how did you account

19   for it being a Crew Cab in the actual accident?

20         A.    Well, the original we used

21   Vehiclemetrics.  We had them do exactly what

22   was said here.  Regular cab geometry was

23   replaced with a scan-based Crew Cab geometry.

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 76

1    So we've had that since, you know, October of

2    last year, and that's what we used.

3            Q.    I'm saying you used the Neptune

4    data in the original simulation.  So was it for

5    a Crew Cab or a cab body style?

6            A.    I'd have to look and see.  I

7    didn't understand that that's what you were

8    asking about.  We have that in the

9    calculations.  We have the printout right here

10   if I can take a minute to find it.

11      All right.  It's a Super Crew four-door.  So

12   we had a Crew -- the Neptune data that was

13   used in our crush calculations -- because we've

14   done two things, crush calculations and a crush

15   simulation.  The crush calculations were a

16   Super Duty Crew.  And the original one was the

17   Super Duty Crew with Neptune.

18           Q.    Okay.  And we have a Super Duty

19   Crew in the accident?

20           A.    Yes.

21           Q.    Yeah.  Okay.  All right.  On this

22   page I have up here, you're talking about the

23   bumper height that you used for the F-250 in

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 77

1    the rerun simulation.  And I believe you agree

2    that it was 29 inches and that that was

3    verified through measuring both the exemplar

4    truck that you had and the measurement of the

5    crash test F-250 used in the Defense crash

6    testing and that they were all consistent.  Is

7    that correct?

8          A.     Reasonably.  They're never

9    perfect.  But yeah, they're all approximately

10   29 inches.

11         Q.     Okay.  So you don't have any issue

12   with the height of the crash test F-250 as

13   tested?

14         A.     No.

15         Q.     Okay.  The vehicle you used in the

16   rerun simulation for the Escape, it doesn't

17   appear like you made any changes to that in

18   comparison to your original run.  Is that

19   correct?

20         A.     Correct.

21         Q.     Okay.  And so the only

22   modifications we have to either vehicle are

23   what we've already talked about for the F-250.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 78

1    You used a different default coefficient

2    stiffness because you used the Vehiclemetrics

3    instead of Neptune.  Right?

4            A.    Yes.

5            Q.    You changed the tire sizes to

6    mirror the subject F-250.  For the Escape you

7    didn't make any changes compared to the

8    original run?

9            A.    Correct.

10           Q.    All right.  And so the only real

11   modifications beyond those would be to the

12   weight of the vehicle.  Right?

13           A.    Seemingly.

14           Q.    Right.  And so here we have

15   appendix A, which I believe is your -- showing

16   how you determined the weight used in the

17   simulation for both vehicles?

18           A.    Yes.

19           Q.    Okay.  Here is the F-250 first.

20   And the first weight I see here, weight 250

21   equals 8,040 pounds.  I'm assuming that is the

22   weight of the crash vehicle that you weighed

23   after the crash?

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 79

1          A.    Yes.

2          Q.    Okay.  And then you added weight

3    for the driver and certain items that were on

4    the F-250?

5          A.    Yes.

6          Q.    Okay.  And that gave you a total

7    weight that's highlighted here that was used

8    for the total weight in the simulation?

9          A.    Yes.

10         Q.    Okay.  Does HVE allow you to

11   account for the position of these additional

12   weights?  In other words, does it -- do you put

13   in the location of the driver and add 170

14   pounds in the driver's seat or is it just a

15   total weight that's input into the software?

16         A.    You can do it either way.

17         Q.    Okay.  So it does allow you to

18   actually position weight within the vehicle in

19   a specific location?

20         A.    Well, generally the way we do it

21   is we would redistribute the weight ratios.  So

22   I believe in the past we've actually put actual

23   weights in like occupants and things.  But we

Case 2:22-cv-00017-RWS    Document 182-10    Filed 03/17/25    Page 81 of 388
G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 80

1    normally just redistribute the weight ratios,

2    if we do it at all.

3         Q.    Okay.  In this case did you

4    redistribute the weight ratios?

5         A.    No, we did not.  We just added the

6    weights to the vehicle at the CG.

7         Q.    All right.  So there was no

8    factoring in the specific location of the items

9    in the truck; it was -- you didn't use that as

10   part of your rerun simulation?

11        A.    Correct.

12        Q.    Okay.  Did you account for any

13   loss of fluids that the F-250 may have suffered

14   in the crash?

15        A.    No.

16        Q.    Okay.  Do you know the level of

17   fuel in the gas tank of the F-250 at the time

18   it was measured?

19        A.    Not specifically.  Just what was

20   in there.  It's part of the 8,040.  We know the

21   weight of it.  But you know, not an exact

22   amount.

23        Q.    You don't know if the tank was

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 81

1    full, empty?  You don't know what fuel level
2    was in the tank at the time it was weighed?
3          A.    Just what it was after the
4    accident.  There's no evidence it leaked out.
5          Q.    And the same with regard to
6    whatever fluid was in the radiator, that wasn't
7    accounted for?
8          A.    Yeah, the radiator did leak some
9    out.  We know that.  But no, we did not think
10   that was --
11         Q.    (Inaudible) fluids contained
12   within the vehicle?
13         A.    Pardon?
14         Q.    And you didn't account for any
15   other loss of fluids from the vehicle?
16         A.    No.  We knew some radiator fluid
17   had leaked out.  We weren't worried about that.
18   The rest of the fluid should have been the same
19   at the time of the accident.
20         Q.    All right.  And the weight for the
21   chainsaw, did you actually measure the
22   chainsaw?  Did you weigh it?
23         A.    No.  We didn't have the chainsaw.

G. Bryant Buchner                                        July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 82

1    So you had to look something up.  It's an Stihl

2    chainsaw, so you had to look something up for

3    the original.

4         Q.    Same -- same question for the

5    tools.  Is that based upon measuring the weight

6    of the tools, or is that just an estimation?

7         A.    Nobody knows what was in the

8    toolbox.  We needed a weight to put in.  So we

9    thought 100 would be reasonable.  We don't know

10   exactly what it is.  Nobody has ever seen

11   inside the toolbox.

12        Q.    And what about the storage box, is

13   that an estimation or is that -- you didn't

14   actually weigh the storage box, did you?

15        A.    No.  It was missing.  So I think

16   we did some internet research to come up with a

17   reasonable weight, just like Mr. Grimes did.

18        Q.    All right.  The bottom of the page

19   is the weight you used for the Ford Escape.  In

20   your simulation, again I'm assuming that your

21   weight 3,410 is the measured weight of the

22   vehicle after the crash?

23        A.    Yes, it is.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 83

1          Q.    All right.  And with the Escape,

2     did you add any weight for the cargo that was

3     behind the second row seat?

4          A.    Well, it was already in the

5     vehicle when we weighed it, so --

6          Q.    All right.  That --

7          A.    -- yes, it's in the weight.

8          Q.    That's my question.  So there

9     was -- the cargo was still in the back of the

10    Ford Escape at the time you weighed it?

11         A.    Yes.

12         Q.    Okay.  Do you know the level of

13    the fuel tank in the Escape at the time you

14    weighed it?

15         A.    Well, nothing leaked out at the

16    scene.  So it was whatever it was at the time

17    of the accident.  That's all we were concerned

18    about.

19              MS. CANNELLA:  Mr. Hill, I'm

20    trying to give you some leeway here, but this

21    is not new information.  And this is a

22    deposition on his supplemental report.  So

23    we're not -- we're going to object to a bunch

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 84

1    of questions about work that -- that could have

2    been discussed at his first deposition.

3                    MR. HILL:  That's fine.  You can

4    lodge that -- lodge that objection.  But this

5    was produced as part of his amended report.

6                    MS. CANNELLA:  I understand that.

7    But my -- my statement stands.

8                    MR. HILL:  All right.  Well, I

9    disagree with your objection.

10          Q.    (Mr. Hill) The Escape in the

11    accident suffered quite a bit of broken glass.

12    You would agree with that?

13          A.    Yes.

14          Q.    All right.  Did you account for

15    the weight of the glass that was missing when

16    you weighed the crashed Escape?

17          A.    Whatever glass -- normally it's

18    all shoveled up and thrown in the vehicle or it

19    falls in the vehicle.  Whatever glass was in

20    there, it got accounted for.  Whatever glass

21    wasn't in there didn't get accounted for.

22          Q.    Okay.  And do you know whether the

23    glass was actually -- the shards of glass was

G. Bryant Buchner                                           July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 85

1    put in the vehicle at the time you weighed it?

2            A.    Well, some of it was.  But I

3    don't -- I didn't account -- try and account

4    for each shard of glass.  No, sir.  It's -- the

5    weight of the vehicle is a reasonable

6    approximation in the condition it's shown in at

7    the time of our photographs.  And we think

8    that's reasonable for the accident, plus the

9    occupants the car seats.

10           Q.    And the same question with regard

11   to the placement of the weight.  Just to be

12   clear, similar to the F-250 you didn't account

13   for the location of the occupants in the

14   vehicle when you ran the simulation?

15           A.    Well, they're near the CG.  But

16   no, we didn't.  We just added their weight to

17   the total vehicle, yes.

18           Q.    Okay.  All right.  Now we can --

19   let's just confirm a few things that were not

20   changed between the original simulation and the

21   amended simulation.

22       Just to be clear, the offset that you used

23   in both simulations was twelve inches.  Is that

Case 2:22-cv-00017-RWS    Document 182-10    Filed 03/17/25    Page 87 of 388
G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 86

1    correct?

2            A.    Yes.

3            Q.    All right.  And the speed --

4            A.    Time out.  Pardon me.  Pardon me.

5            Q.    Sure.

6            A.    You've actually made a really good

7    point.  And you did it a little while ago.

8    I -- we know the offset is eleven inches

9    from -- or approximately a foot.  That's what I

10   said in my first depo.  But it's eleven from

11   the Ford emblem marks on the tailgate.

12      So in the original simulation, I don't

13   know -- I believe it was -- I don't know if it

14   was eleven inches or one foot.  But in my depo

15   I was asked what the offset was.  I said, well,

16   I haven't exactly measured it.  And I made a

17   measurement on a drawing, and it said one foot.

18   So I'm going to use one foot because that's

19   consistent with my deposition.  But the

20   precise -- you made a good point earlier.  I

21   don't know the precise offset that was used

22   other than from my memory it could have been

23   eleven inches or a foot.

Case 2:22-cv-00017-RWS    Document 182-10    Filed 03/17/25    Page 88 of 388
G. Bryant Buchner                                   July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 87

1        But it was -- it was -- it was done from the
2    scan data we had and everything.  And so it's
3    approximately a foot.  And that's what we used.
4    I don't know why I thought I needed to clarify
5    all of that.  But thank you for listening.
6            Q.    Sure.  But regardless, the offset
7    you used in the rerun was twelve inches to the
8    left of the Escape?
9            A.    Thank you.  Yes.
10           Q.    Right.  And -- and there's no
11   dispute that that's the offset that you believe
12   occurred, in fact?
13           A.    Well, I actually think it's eleven
14   from the -- in the depo I did an approximate
15   using a -- a manual scale.  But we know where
16   the -- we know it's precisely eleven if we go
17   to the best data we have.
18           Q.    All right.  So why did you use
19   twelve if you now have determined that it was
20   eleven?
21           A.    Because I -- earlier we were using
22   the orientation from the scans, which was
23   eleven.  But in the depo I said one foot, so we

G. Bryant Buchner

Bryson, Santana and Joshua v. Rough Country, LLC

July 11, 2024

Page 88

1    used a foot because I -- I wanted to do it

2    exactly from my depo.  And that's a -- that's

3    an advantage to the F-250.  That would produce

4    more crush.

5        So it keeps my analysis conservative, which

6    is fine.  And I'm not worried about an inch

7    left or right, up or down.

8            Q.    All right.  And you used a speed

9    of 51 miles per hour for the F-250?

10           A.    Yes.

11           Q.    And you have said repeatedly

12   throughout your initial deposition and then now

13   in this report that the speed of the F-250 at

14   the time of the accident was 51 miles per hour.

15   Correct?

16           A.    That's my best number.  Yes, sir.

17           Q.    All right.  I know it hasn't been

18   a full hour, but I need another break.  So

19   let's just take a five-minute break.  What do

20   you want to do about lunch, Mr. Buchner?  I

21   don't want to make you work through lunch, but

22   it's up to you.

23           A.    I'll cry when I need lunch.  Right

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 89

1    now I don't need lunch.

2            Q.     All right.

3                   MR. HILL:  Well, let's just take a

4    quick five-minute break.

5                   THE WITNESS:  Thank you.

6                   MS. CANNELLA:  Okay.

7                   THE VIDEOGRAPHER:  The time -- the

8    time is 12 o'clock p.m.  We're off the video

9    record.

10                  (A break was taken.)

11                  THE VIDEOGRAPHER:  The time is

12   12:15 p.m.  We're back on the video record.

13                  MR. HILL:  Thanks.

14           Q.     (Mr. Hill) The HVE parameters for

15   the Escape that you used in the rerun

16   simulation, they don't differentiate with

17   regard to whether the Escape has a sunroof or

18   doesn't have a sunroof.  Correct?

19           A.     What are you asking?

20           Q.     Yeah.  So you used a vehicle in

21   your simulation for the Escape that you got

22   from the Volume Metric's (sic) database.

23   Correct?

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                    Page 90

 1          A.    Well, from Engineering Dynamics.
 2     It was in their database originally, yes.
 3          Q.    Right.  In HVE's database?
 4          A.    Yes.
 5          Q.    And did that vehicle have a
 6     sunroof that you used in your simulation?
 7          A.    It doesn't show a sunroof.
 8          Q.    Okay.  And it doesn't
 9     differentiate.  You can't choose Escape with a
10     sunroof or Escape without a sunroof within the
11     HVE software?
12          A.    HVE doesn't have a choice for with
13     or without sunroof.  No.
14          Q.    Okay.  And so it doesn't consider
15     whether it has a sunroof or not in determining
16     its prediction of crush?
17          A.    That would be up to the user to
18     consider whether or not, you know, that should
19     be included more than likely.  But where the
20     crush is in the simulation we ran is the bumper
21     level.  So as long as you go to bumper level
22     crush, I would say the sunroof would be not a
23     particular factor that the simulation could or

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 91

1    could not include.  But it doesn't mean that if

2    you were to -- in other words, say Mr. Grimes's

3    crash test, you would want to use the most

4    representative vehicle.  In the HVE we use the

5    most representative vehicle.  And sunroofs --

6    I've never investigated presence or

7    non-presence on other vehicles.

8        But yeah, as far as HVE goes, it doesn't --

9    to my knowledge, it's not including sunroofs in

10   its -- in what it has.

11          Q.    And you did not modify the Escape

12   vehicle in your simulation to account for the

13   sunroof?

14          A.    No.  We were not modifying it, no.

15   We were attempting to use it, you know, as --

16   as their default vehicle.  That is correct.

17          Q.    Okay.  And the simulation also

18   does not allow you to place cargo within the

19   hatch of the Escape to determine whether that

20   will have any impact on the crush.  Correct?

21          A.    We don't think it has any impact.

22   No, sir.  But if -- we don't think it did.  The

23   intent wasn't to put it in there.  But what it

Case 2:22-cv-00017-RWS    Document 182-10    Filed 03/17/25    Page 93 of 388
G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 92

1    clearly shows is that the structure of the
2    vehicle itself would have produced less crush
3    if it were hit at the bumper level, which was
4    the intent of the run.
5         Q.    Right.  I'm just trying to
6    establish that in your simulation, you didn't
7    place any cargo in the back of the Escape used
8    in the simulation?
9         A.    No, we did not.
10        Q.    All right.  Likewise you didn't
11   place a car seat in the Escape in the
12   simulation?
13        A.    No.  We were studying how the
14   Escape performed relative to a bumper level
15   contact.  We wanted to study the structure of
16   the Escape.
17        Q.    You're aware obviously that the
18   Defense performed a real-world crash test back
19   in May of 2023, and the crush that is seen on
20   the Escape in the real-world crash test is very
21   different from the crush seen in your rerun
22   simulation.  You would agree with that?
23        A.    No.  Both produced what we -- what

G. Bryant Buchner
Bryson, Santana and Joshua v. Rough Country, LLC
July 11, 2024

Page 93

1    is the critical factor in this case is that

2    they both produced -- demonstrated that

3    bumper-level impacts produce less crush than

4    override impacts.  So we do have -- that's

5    really the only value of the test is to

6    demonstrate that there would not be any

7    override.  That's what we're trying to do with

8    our simulation is that if you can hit the

9    bumper of a vehicle, then you -- then you end

10   up producing a much more favorable result as

11   far as the, you know, increasing forces and

12   able to decrease crush.  But there are a lot of

13   differences beyond that that makes the crash

14   test not representative of our accident.

15          Q.    Well, that's a separate question.

16   But let me start with this.  How do you define

17   override?  Let's make sure we understand that.

18   Do you define it as the bumper completely

19   misses the other bumper?  Is that your

20   definition?

21          A.    I don't have a definition.

22   There's an understanding -- there can be -- the

23   term doesn't have the exact definition in every

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 94

1    crash.  Every crash is slightly different.  But

2    override typically discusses that the -- that

3    some part of one vehicle that's like the bumper

4    is overriding some part of the other vehicle.

5    In this case we're talking about the bumpers or

6    the bumper-level frames.

7        So yeah, that's -- that's what we're using

8    here.  But it's -- you know, it needs to be

9    discussed openly, not -- it's not just one

10   definition that can be perfectly applied to

11   everything.

12        Q.    Okay.  So there's no one

13   definition of override in your opinion?

14        A.    Well, there's one understanding of

15   it.  But there's no one exact definition.  If

16   you're teaching a class, you'd say it's when

17   one bumper goes over the top of another to get

18   the concept across.  But we have a lot of

19   different vehicles that hit a lot of different

20   ways.  So you have to look at each accident

21   somewhat uniquely.

22        Q.    So when you say there was no

23   override in the exponent crash test, what --

G. Bryant Buchner

Bryson, Santana and Joshua v. Rough Country, LLC

July 11, 2024

Page 95

1           MS. CANNELLA:  Sorry.

2    Mr. Buchner, were you done with your answer?

3           THE WITNESS:  I was.  Thank you.

4        Q.    So when you say that there was no

5    override in the exponent crash testing, what do

6    you mean by that statement?

7        A.    Well, the bumper -- the rear

8    bumper of the -- and the structure supporting

9    it specifically because the rear bumper did

10   shift some.  But the frame rails of the unibody

11   of the Escape and -- on one side went into the

12   center of the bumper and stayed there

13   throughout the entire crash test.  So we had

14   that bumper level was secure and the strong

15   structures were secure on the bumper of the

16   F-250 on the driver's side.  And on the

17   passenger side F-250, the tow hook went into

18   the bumper and pushed it in.

19      So we maintained bumper-level, frame-level

20   engagement between the two vehicles throughout

21   the entirety of the crash pulse phase of the

22   accident.  And the physical evidence concretely

23   shows that.

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 96

1      Q.    The measured crush in your

2    simulation is over 20 inches short of the

3    observed crush in the crash test.  Would you

4    agree with that?

5      A.    Well, are you saying someone

6    measured the crush in the crash test like

7    Mr. Grimes and published that?  Because I

8    haven't seen that if he did.

9      Q.    No.  You overlaid it yourself in

10   comparing the two crushes.

11     A.    Well, my intent wasn't to do

12   Grimes's work and provide measurements and

13   things.  He didn't measure it.  I'm just trying

14   to show that there's less crush visually

15   obviously between the crash test.  So his

16   representation of the crash test is inaccurate.

17     Q.    What about his representation of

18   the crash test is inaccurate?

19     A.    Well, he claims there was more

20   crush.  And then he changes that to the same

21   crush in his depo.  So that's -- in our report

22   we just showed the two vehicles overlaid so

23   that anyone can make their own determination as

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 97

1    to the crush.

2            Q.    All right.

3            A.    He didn't -- he didn't do that.

4    He said he visually saw it.  But he didn't

5    provide any evidence of it.  So we just

6    provided visual evidence of it.

7            Q.    Well, we have photographs of the

8    crash test vehicles.

9            A.    Visual evidence.

10           Q.    Right.  And have you requested to

11   inspect the crash test vehicles?

12           A.    No.

13           Q.    Has anyone from Rough Country ever

14   prevented you from inspecting the crash test

15   vehicles?

16           A.    I mean, I've never talked to

17   Rough Country, so I don't know.

18           Q.    Any lawyer on behalf of

19   Rough Country said that you -- you are not

20   allowed to inspect the crash test vehicles?

21           A.    You know every time I've ever

22   talked to a Rough Country lawyer because it's

23   been you.  And so --

G. Bryant Buchner                        July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 98

1          Q.     Okay.

2          A.     -- you haven't ever talked about

3     it, so no.

4          Q.     Have you ever --

5          A.     If the crash test is provided and

6     documented, I'm using what was provided and

7     documented.  And I think -- and that's --

8     that's all I've used.  If someone wants me to

9     inspect the vehicles, I -- I haven't done that.

10    No.

11         Q.     Have you ever asked Ms. Cannella

12    for permission to inspect the vehicles?

13         A.     I don't know.  I don't remember.

14         Q.     Okay.  And you know from reading

15    Mr. Crosby's deposition that those vehicles

16    have been preserved and are available at the

17    Exponent location in Phoenix.  Correct?

18         A.     That's what he said.

19         Q.     All right.  Do you have any reason

20    to dispute that?

21         A.     No.

22         Q.     Okay.  Let's talk about comparing

23    your rerun simulation to the real-world crash

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 99

1    test performed by the Defense.  And I just want

2    to make sure we're clear on what's the same and

3    what's different among those two.  Okay?  The

4    height of the F-250 is the same in both the

5    simulation and the crash test.  We can agree on

6    that?

7            A.    Reasonably, yes, sir.

8            Q.    And same with the -- with regard

9    to the Escape.  Correct?

10           A.    Reasonably, yes, sir.

11           Q.    All right.  And in both there --

12   in neither the simulation nor the crash test

13   were the -- was cargo placed in the rear of the

14   Escape.

15           A.    Right.

16           Q.    We can agree on that?

17           A.    Correct.

18           Q.    Okay.  There was no sunroof

19   involved in either your simulation or the crash

20   testing for the Escape?

21           A.    Correct.  Correct.

22           Q.    There was no child seat placed in

23   the rear position where Cohen is in either your

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 100

1    simulation or the crash testing?

2            A.    Correct.

3            Q.    The speed of the crash test was

4    49.9 miles per hour.  And the speed you ran

5    your simulation was 51.  So we have a slight

6    differentiation there.  The crash test was 1.1

7    mile an hour slower than your simulation.  Do

8    you agree with that?

9            A.    Yes.

10           Q.    Okay.  And at a slower speed,

11   you're going to have less crush indicated on

12   the Escape the lower the speed with all other

13   variables being equal.  Would you agree with

14   that?

15           A.    Not in the context of your line of

16   questions, no, because we know that the crash

17   test was -- missed to the left by 45 percent --

18   at 45 percent more offset.  So that's an apples

19   and oranges problem.  So no, you can't say

20   that.

21           Q.    Well, I'm not talking about the

22   offset variable.  I'm talking about whatever

23   test you run at any offset.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 101

1          A.      Well, then you need to start a new
2      line of questions because basically you're
3      saying let's compare my simulation to a
4      real-world crash test.  Well, my simulation
5      compared it to the real-world accident.  Your
6      crash test is not the real-world accident.
7      Your crash test -- if I say it that way, I
8      apologize.  Exponent's crash test had 45
9      percent more offset, which changes an unknown
10     number of things.
11         Q.      Okay.  Let's --
12         A.      Certainly -- but it certainly
13     will, as a minimum, disadvantage the Escape.
14         Q.      Okay.  Let's say that there was,
15     in the crash testing, the identical offset as
16     what you simulated.  Let's assume that.
17         A.      Okay.  So we're not talking about
18     the Exponent crash test at all now?
19         Q.      Right.  We're talking about -- in
20     your opinion we're talking about a hypothetical
21     real-world crash test.  Would it be appropriate
22     to run that real-world crash test at 49.9 miles
23     per hour to compare it to your simulation

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 102

1    assuming all other variables were the same?

2                MS. CANNELLA:   Object to the form

3    of the question.   It's confusing.

4         A.    Yeah, that's -- that's an

5    engineering problem.

6         Q.    Well, what speeds -- go ahead.

7         A.    It's using information that we

8    haven't -- that no one has ever done, you know.

9    So you know, normally I'm not worried about a

10   mile per hour.   But sometimes I'm very worried

11   about a mile per hour.   So that's -- I don't --

12   so that's actually a new analysis that I

13   haven't done before now.   So I'm -- I'm not

14   comfortable in doing that.   But I'll try to

15   answer your questions.

16        Q.    Let me ask it this way.   Do you

17   have any criticism of the speed of the impact

18   in the crash test?

19        A.    In a sense, I do because he

20   reported that the accident speed of the truck

21   could have been down in the forties.   That's

22   part of his opinions.   So I was confused as to

23   why he -- why he chose the speed he chose.   I

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 103

1    know why I chose 51 because I wanted a worst

2    case scenario.  But I'm not sure -- if he's

3    trying to work in favor of, you know, proving

4    his opinion, which is why he said he needed the

5    crash test so he could say that, you know,

6    override doesn't -- or not override, but that

7    lift kits don't matter, well, he needs to do a

8    study to show that.  So there's a whole lot

9    involved in this line of questions that goes

10   way beyond just what you're saying.

11           Q.    Well, if you -- if you're going to

12   compare the real-world crash test to your

13   simulation, you would need to run them at

14   approximately the same a speed to be able to do

15   an apples-to-apples comparison between the two.

16   Correct?

17           A.    Generically, yes.

18           Q.    Okay.  That's all.  So let's talk

19   now about the differences between the crash

20   testing done by Exponent and your simulation.

21   You've brought up -- you've brought up the

22   offset.

23           A.    Yeah.  The primary difference that

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                        Page 104

1    causes -- first, the simulation is -- is one

2    tool.  The crash test is another tool.  The

3    primary difference between these two tools that

4    is the most significant is the excessive offset

5    of the crash test.  Thank you for listening.  I

6    don't know why I felt a need to point that out.

7    Thank you.

8           Q.    Sure.  And the weights of the

9    vehicles, when you compared the weights that

10   you used in your simulation to the weights of

11   the vehicles in the crash test, that's another

12   difference between the two tests -- or between

13   the two pools, as you describe them?

14          A.    Well, I don't remember what the

15   weights were.  But he said he used full gas

16   tanks.  I -- so I'm thinking why are you using

17   full gas tanks.  You're pumping the weight up

18   on the F-250.  But I didn't look at his weight

19   compared to what my weight -- what my measured

20   weight was.

21          Q.    Okay.

22          A.    I'm wondering why he's not using

23   the measured weight of the vehicle as a

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 105

1    foundation.  So yeah, there are -- so that is

2    something that could be looked at.

3           Q.    All right.  Are there any other --

4    other than the offset, which you said is the

5    primary difference, what are -- what are the

6    other differences between the crash test and

7    your simulation?

8           A.    I think we discussed things to be

9    considered.  I haven't tried to see the

10   differences between the two.  That's not been a

11   concern of mine.  I tried to look at his crash

12   test as to what he represented it to be.  My

13   simulation was not done for his crash test.

14   Mine was another methodology.  So I don't -- I

15   don't know the answer to the question off the

16   top of my head.

17                MS. CANNELLA:  Mr. Hill, what --

18   what in his supplemental reports are we

19   referring to here?

20                MR. HILL:  We're referring to his

21   criticisms of the crash test in his June 14

22   supplemental report.

23           A.    Well, I can do that.  But that's

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 106

1     different than comparing it to the simulation.

2          Q.    Well, it's -- it's within the same

3     realm.  You've made an allegation that the

4     crash test is invalid because the offset was

5     improper.  And so I'm trying to establish how

6     that compares to your simulation -- your rerun

7     simulation that I've never had a chance to ask

8     you the first question about.

9               MR. HILL:  So I think this is well

10    within the scope of his -- both of his reports.

11         Q.    And so this leads to the question

12    of, with HVE, right, you could change the

13    parameters within your simulation to match the

14    parameters that were found in the crash

15    testing.  Correct?

16         A.    No.

17         Q.    And why not?

18         A.    Because I'm not -- I'm not trying

19    to re-create his crash test.  I'm -- I'm trying

20    to understand the effect of -- on the subject

21    accident of lowering the truck and to

22    demonstrate what is intuitively obvious and has

23    been in the business as engineers using physics

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 107

1    and Newton's laws that when you strike the

2    structure of a vehicle, the frame of the

3    vehicle, you get less crush.  And when you

4    don't strike those and hit tailgates, you get

5    more crush.  That was the purpose of it.

6      I'm criticizing his crash test just purely

7    based on his crash test compared to the

8    accident.  You're asking for another -- you're

9    asking me to do an analysis I haven't done.

10            Q.    I'm asking you is it possible to

11   do that if you wanted to.  Could you change the

12   offset in your simulation to the offset that

13   you claim existed in the crash testing?  Is

14   that even possible within the HVE software?

15            A.    Not in the line of the way I think

16   you're asking the questions.  No.  I mean,

17   somebody could go put in some numbers if they

18   want.  But I wouldn't -- I don't know that I

19   would -- I don't know that I would compare

20   those two.  But I'd certainly know that I would

21   compare my simulation to the accident.

22            Q.    So you'd compare your simulation

23   to the accident --

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 108

1          A.     His crash test --

2          Q.     Go ahead.

3          A.     The problem is his crash test is

4     not this accident.  So if -- but I know what

5     the accident was.  And I did a simulation for

6     that.  But to just start doing a simulation to

7     compare to his crash test, I would have to

8     start the whole process over.  And I don't know

9     where that would lead me.  Certainly I'm -- I'm

10    not going to agree that I would even use a

11    simulation to analyze this crash test.  I'd

12    have to do that analysis, and that hasn't been

13    done.

14         Q.     Well, your simulation does not

15    analyze the actual subject crash in this case?

16         A.     Sure, it does.  It's a

17    representation of the subject crash with the

18    vehicles lower.  It's -- it's not analyzing the

19    accident.  But it's used to study the accident.

20    And I've determined that it's reasonable to do

21    it the way that we've done it, yes.  But that

22    takes work to do.  You can't just do that with

23    his crash test because that's -- he -- that's a

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 109

1   new accident.  That's a different animal.  I

2   can't -- I can't study raccoons as a zoologist

3   and then turn around and say I'm going to study

4   opossums, you know, the same way.  You've got

5   to take the work -- you've got to do the work

6   and see if the methodologies you were using to

7   study it are going to -- are going to be

8   reasonable.

9           Q.     That's exactly what I'm getting

10  at.  To the determine whether the methodology

11  you used is reasonable, what have you done to

12  verify that HVE is a scientifically reliable

13  methodology for predicting crush in a

14  hypothetical accident like you've used it in

15  this case?

16          A.     Well, that's -- I mean, I've seen

17  HVE used many, many times to study potential

18  accidents.  You know, that's a use of it.  I

19  mean, I've seen, you know, companies -- I mean,

20  I'm even sure I've seen auto manufacturers use

21  it, but the -- to study events that may or may

22  not happen.  But in this case HVE was

23  specifically designed for crash reconstruction

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 110

1    using the -- the stock vehicles that hit frame

2    to frame like they -- like at levels that are

3    absorbing the energy, where the AV stiffness

4    coefficients are generated.

5         And therefore because in the simulation we

6    ran we did hit the vehicles bumper to bumper,

7    it means that it's a -- and it calculates it

8    using a methodology that's been well

9    established in the industry.  And there's

10   papers that say that it's valid for this type

11   of study.  That's why HVE sells it, is for us

12   to be able to do this.  So we -- and in this

13   case we also have a treasure-trove of data in

14   the black box from the truck.  We know the

15   delta-V's.  We know the -- the -- you know, the

16   speed of the truck at impact.  So therefore we

17   have reasonable constraints.

18        We have given stress test coefficients.  We

19   have given geometries.  We know we're hitting

20   bumper to bumper.  We know we're engaging the

21   two structures of the two vehicles.  We know

22   we're looking for an impact speed of X and a

23   delta-V of X.  And we're using it to predict,

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 111

1    using Newton's laws, what the crush would be.

2            Q.    What article -- you just mentioned

3    there are papers that said you could use HVE in

4    this context.  Can you cite to any of them in

5    this deposition?

6            A.    I don't have them memorized off

7    the top of my head.  But I mean they

8    certainly --

9            Q.    Okay.

10           A.    -- are out there.

11           Q.    All right.  Have you done

12   anything -- my question -- my original

13   question -- and I move to strike your answer.

14      My original question is, have you performed

15   any testing or any analysis to validate that

16   your use of HVE in this case was a

17   scientifically reliable methodology?

18                  MS. CANNELLA:  Object to the form.

19   Asked and answered.  Misstates the prior

20   question.

21           Q.    Go ahead.  It's a yes-or-no

22   question.  Have you personally done anything to

23   validate that your simulation is a

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 112

1    scientifically reliable methodology?

2                    MS. CANNELLA:   Asked and answered.

3            Q.     Go ahead.

4            A.     I think that's what I described a

5    minute ago.  I've been using the program for a

6    long time.  My understanding that this is -- we

7    have plenty of data to -- that we're targeting

8    for, that we're given.  We have crush stiffness

9    that are available from the program itself.  So

10   literally purely within the program, it will

11   predict crush based on the impact speed that

12   we're given from the black box.  And so we can

13   use that and match the delta-V's.  And then the

14   program is designed to report what the crush

15   would be.

16       That is clearly a proper use of the program

17   based on my experience, my training, and the

18   literature that's out there in the industry.

19   This is -- this is -- as an engineer, I have no

20   concerns about that at all.  We're not doing

21   anything new or novel with the program.  This

22   is what we buy it for.

23            Q.     Okay.  You mentioned all of the

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 113

1    knowns -- all of the known information that you

2    use, which you say supports the use of HVE such

3    as all those things you just mentioned, the

4    block box data, the delta-V's, the speeds, and

5    so forth.  All of that applies to the -- to the

6    actual crash testing as well, like the crash

7    testing has the benefit of all of those same

8    known data points.  Correct?

9          A.    I disagree.  I don't -- that is a

10   huge broad question.  You just went from asking

11   me what I did to about Grimes.  I think that

12   that same black box data is available.  But to

13   just blanket somehow how that relates to the

14   crash test, I need something specific about the

15   crash test.  I can't just -- I don't know what

16   the -- what I'm being asked, it's just too

17   broad of a -- of a potential here.

18          Q.    It's pretty simple.  Other than

19   the offset, okay, what other data point did the

20   crash test not follow?

21          MS. CANNELLA:  Object to the form

22   of the question.  I think -- I think this is

23   outside the scope of his report.

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 114

1           MR. HILL:  Not even close to being

2      outside the scope.

3           Q.    But go ahead.

4           MS. CANNELLA:  Which -- which part

5      of the report are you asking about, the

6      supplemental --

7           MR. HILL:  He is -- he is

8      critical -- the entire report is critical of

9      the crash testing.  And I'm asking him a

10     specific question about what part of the crash

11     testing other than the offset was incorrect.

12          A.    Well, we've said the offset is the

13     thing that really invalidates it because it's a

14     completely different crash to the accident.

15     And then after that Grimes -- most of my report

16     is about Grimes's characterization of it

17     without actually having any data that he used.

18     He wants to say it was a visual.  And so we

19     tried to provide in the report things that

20     demonstrated those things.  So the first part

21     of it is the crash test is not valid because

22     it's not a reasonable representation of the

23     accident.  And Grimes himself admits that in

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 115

1    his deposition.

2        And then the second part of the report has

3    to do with basically you can -- basic

4    misrepresentations Mr. Grimes makes about

5    conclusions.  As far as differences, I don't

6    know that I have any cataloged.  The offset is

7    the thing that has been most foremost in my

8    mind.  I think that -- I think that we have to

9    go to the results and, you know, after that

10   look at the results as -- as issues such as

11   that, you know, the impact wasn't in the right

12   location, that type of stuff.

13            Q.    Okay.  So what does it take in the

14   HVE software to change the impact location, the

15   offset?  How would you do that if you wanted to

16   do it?

17            A.    We just change the position of the

18   vehicles.

19            Q.    Okay.  If you were to be asked by

20   Ms. Cannella to run an HVE simulation that

21   would replicate the crash testing, what would

22   you need to do other than what you just

23   described, which is change the offset or impact

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 116

1    location to what you believe it was in the

2    crash test?

3                   MS. CANNELLA:   Object to the form

4    of the question.   Goes outside his supplemental

5    report.

6            Q.    Go ahead.

7            A.    I -- I'd take time to study before

8    I even tried to do anything.   I would have to

9    look at the crash test from that perspective,

10   which I haven't done.   I've literally just used

11   his data and his answers.   You're asking me to

12   do a separate engineering analysis.   I'm not --

13   I'm not willing to tell you what I can do or

14   how I would do it or discuss even concepts of

15   it until I take the time to look at it from

16   that perspective.   I know it sounds simple to

17   you, but it's not.   That's -- that's how

18   mistakes are made.   I mean, it needs to -- it's

19   an engineering problem that needs its due time

20   and effort before I can start answering those

21   questions.

22           Q.    But as you sit here today, you

23   can't identify what you would need to do as

G. Bryant Buchner                    July 11, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

Page 117

1    part of that engineering effort in order to

2    simulate the crash test?

3          A.    I wouldn't start until I took the

4    time to answer that question.  And I would

5    start -- I would open that concept up.  And I

6    would arrange my file materials, and I would

7    start looking at it, and I would start asking

8    the questions.  I'm not arrogant enough to

9    think that I know the answer before I do the

10   work.  I would do some work to prepare myself

11   to answer that question, and I have not done

12   that.

13         Q.    But it would be possible to do

14   that?

15               MS. CANNELLA:  Objection to the

16   form of the question.  Goes outside the

17   supplemental report.

18         Q.    Go ahead.

19         A.    No.  We don't know if it's

20   possible or not.  We have to -- we have to

21   start looking at that.

22         Q.    What about if it's possible to

23   compare your simulation to the actual crash,

G. Bryant Buchner                     July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 118

1    how is it not possible to compare your

2    simulation to the crash testing?

3              A.    Well, because we haven't done the

4    work.  You have to sit down and look at the

5    crash test and then understand it and then

6    start from a simulation standpoint, is this

7    something that we should or should not be

8    seeing.  See, Grimes's whole ridiculous

9    argument is that because -- is that there was

10   some kind of an offset that renders the

11   simulation useless.  This is not an offset --

12   not an offset.  Excuse me -- an override crash.

13   It's not an override.  If his crash test proved

14   anything, it's that if you lower the bumpers,

15   you lose the override component of this

16   accident.

17       And so if his argument is you can't use the

18   simulation because there is override, then we

19   have to do the same thing when we start moving

20   the impact location.  We have to stop and look

21   at that and see if it affects something like

22   that.  So I'm just saying I can't answer your

23   questions about trying to simulate the crash

G. Bryant Buchner                            July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 119

1    test because I have to take the time to look at

2    it and -- and consider that as an engineer.  I

3    shouldn't answer questions I haven't looked at

4    and considered because there's reasons as to --

5    that might come into play.  And I don't presume

6    to know all of those things off the top of my

7    head for something I have not analyzed from

8    that perspective.

9       I have looked at his crash test relative to

10   the accident.  I've looked at my simulation

11   relative to the accident.  You're asking for a

12   whole other piece of analysis.  I'm not -- I'm

13   not prepared to do the analysis sitting here on

14   a new problem.  It's a whole new problem.

15          Q.    I appreciate your answer,

16   Mr. Buchner.  We're going to be here all day.

17             MR. HILL:  I move to strike the

18   response.

19          Q.    It was a simple question.  I said

20   is it possible.  And then you went on to --

21   your response was, well, I haven't started that

22   yet.

23          A.    Well, I can't answer if it's

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 120

1    possible.  An engineer should not answer if

2    it's possible unless he can reasonably know if

3    it's possible.  I can't reasonably know that

4    until I do the work.  And that's -- I mean, and

5    that's the difference between you and me.  I'm

6    an engineer.  I actually know that there's a

7    reason you have to go do the work.  You just

8    think it's, hey, just, you know, change the

9    number and put it in and it magically -- that's

10   not -- that's not a reasonable response to me

11   as a professional engineer.  I can't answer

12   your question because I don't know enough to

13   answer it.

14           Q.    Let me ask it this way.  Do you

15   have any reason to believe that it would not be

16   possible?

17               MS. CANNELLA:  Objection.  Asked

18   and answered.

19           Q.    Go ahead.

20               MS. CANNELLA:  And confusing.

21           A.    I'd have to -- I'd have to look at

22   that question from an engineering perspective

23   and take tame to look at it.  I don't -- I have

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 121

1    not done that.  I cannot do a completely brand

2    new complete accident investigation or a

3    complete test versus simulation investigation

4    in a casual conversation where you just bring

5    it up for the first time.  No.  I -- that would

6    be inappropriate.

7              MR. HILL:  Move to strike as

8    unresponsive.

9         A.    Excuse me.  I'm going to respond

10   to that.  Just because you don't understand

11   what I'm saying, don't say it's not responsive.

12   I'm giving you the exact right answer as an

13   engineer.  Professionally this is the right

14   answer.  Just because you don't appreciate it,

15   I'm sorry.

16      It's the right answer.  It's not as easy as

17   you want it to be.  And it's not that simple

18   answer that you want.  The answer is, we don't

19   know until we do it, so I can't tell you the

20   answer.

21         Q.    Let's --

22         A.    I can't speculate the answer.

23         Q.    Let's approach it this way.  In

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 122

1    your prior deposition when talking about this,

2    you said that HVE is a robust program for

3    analyzing bumper-to-bumper or

4    structure-to-structure crashes.

5            A.    Yes, sir.

6            Q.    We can agree?

7            A.    Yes.

8            Q.    The crash testing was a

9    bumper-to-bumper, structure-to-structure crash?

10           A.    Actually no.  They missed some of

11   the structure in the way they did it.  They

12   moved the -- they moved the tow hook, which is

13   the tip of the frame, outside the main

14   structure of the Escape.  They moved it so far

15   to the left that it's not actually -- there's

16   some -- there's some worry about how -- the

17   effect of that.  It obviously over -- it

18   disadvantaged the Escape and made the crush

19   more than it would have been had that not

20   happened.

21       In the accident, that frame horn, that tow

22   hook, the tip of the frame, that bumper area

23   did hit on the rear of the Escape and left a

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 123

1    really nice mark that we can see on that rear

2    structure area.  So if we -- if we just lower

3    it, well, we're getting good engagement.  But

4    as far as a move to the outside, you're now

5    starting to mess with that thing that you just

6    asked about or that you said I told you about

7    previously.  That was a -- that was very

8    accurate, what I said previously.  Those are

9    the types of things that have to be gone

10   through.

11       That's just an example of the types of

12   things.  It doesn't mean it's all the things.

13   And I don't know what all the things are.  So I

14   can't answer the question until we do the work.

15   That's just a good example of the type of thing

16   that ought to be considered.

17            Q.    I did not ask you whether the

18   crash test was representative of the accident.

19   I didn't ask you about whether it properly

20   represented the offset.  This question was

21   simple.  Regardless of the offset, regardless

22   of the positioning, do you agree it was a

23   bumper-to-bumper and structure-to-structure

Case 2:22-cv-00017-RWS    Document 182-10    Filed 03/17/25    Page 125 of 388
G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 124

1   accident in the crash test?

2               MS. CANNELLA:  Objection.  Asked

3   and answered.

4        Q.    That's a yes-or-no question.

5               MS. CANNELLA:  Asked and answered.

6        A.    I explained it very well in the

7   last answer.

8        Q.    You have testified in your report

9   that this was not an override.  It was a

10  bumper-to-bumper, structure-to-structure crash

11  test.  Are you now saying that you don't --

12              MS. CANNELLA:  Objection.

13       Q.    -- believe that?

14              MS. CANNELLA:  Objection.  You

15  mis-testified -- you mischaracterized his

16  testimony and report.  And asked and answered.

17       Q.    Go ahead.

18       A.    I'm not a hundred percent sure

19  what you were asking.

20       Q.    It's very simple.  You put in your

21  report that --

22       A.    I'm sorry.  I'm sorry.  We've

23  already -- I don't -- the very simple part of

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 125

1  the question is your perspective.  That doesn't

2  mean I can answer -- it doesn't mean it's going

3  to be a simple question from my perspective

4  because you don't -- you don't have all of the

5  perspective I have.  We cannot say very simple

6  before the question.  I wouldn't have to answer

7  to something and agree to something that may or

8  may not be true.

9          Q.    Well, wait a second now.  I can --

10  I'm not asking a complicated question.

11          A.    You are.  That's the problem.

12  Just don't say very simple and insinuate it's a

13  simple question.  Just please, very simple is a

14  statement followed by a question.  If we could

15  just have the question and let me determine

16  whether --

17          Q.    I don't need to be lectured about

18  how I ask my questions.  If you disagree with

19  my characterization of the question, that's

20  fine.  I'm trying to make the question --

21          MS. CANNELLA:  Mr. Hill, calm

22  down.  Calm down.  Don't be yelling at the

23  witness.  He's trying to explain to you his

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 126

1    answer.  You don't like it.  You want it to be

2    yes or no.  And he doesn't have a yes or no

3    answer.

4                    MR. HILL:  No.  He's criticizing

5    the form of my question, which I can use the

6    word --

7          Q.    If you don't like very simple,

8    then explain that it's not a very simple

9    question.

10                   MS. CANNELLA:  That's what he just

11   did.

12         Q.    I'm trying to make the question

13   as -- as limited as possible so that it doesn't

14   bring in all of these other variables that

15   you're bringing up.  I'm trying to establish

16   that HVE, if you can use it to simulate a

17   bumper-to-bumper crash like you did, you could

18   use it to simulate a bumper-to-bumper crash

19   like the crash test by just simply changing the

20   offset because that's the one thing you've

21   identified that's different between the crash

22   test and your simulation?

23                   MS. CANNELLA:  Asked and answered.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 127

1          Q.    And you're denying that that's

2    true?

3          A.    I'm not denying anything.  I'm

4    telling you, you can't just blanket say that's

5    true.  You've got to --

6          Q.    So you --

7          A.    -- go do the work --

8          Q.    No.  You --

9          A.    Can I answer?

10          Q.    Sure.

11          A.    For the reasons I explained, it's

12    a very -- I have concerns over answering the

13    question at all.  And that's what I'm telling

14    you.  It -- it takes some effort.  And that's

15    an analysis that hasn't been done.  And so it's

16    not a simple question at all.  It's an

17    incredibly complex question.

18          Q.    All right.  If you ran an HVE

19    simulation mirroring yours in this case exactly

20    except you changed the offset --

21          A.    Let me turn the volume down.

22    You're -- you're -- I mean, literally it's

23    hurting my ears.  Let me just --

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 128

1      Q.    Sorry.  I've had trouble in the
2    past with people hearing me.  So I'll turn it
3    down myself.  I apologize.  I've had multiple
4    instances in this very case where they said my
5    speaker doesn't work.
6           A.    And I remember that from the last
7    depo.  I mean, that's -- that's a hundred
8    percent fair.  Thank you.  We're good.
9           Q.    Yeah.  So my question is, could
10   you -- is it possible -- not have you done it.
11   Is it possible to take your exact HVE
12   simulation that you ran in this case and change
13   the offset to match the crash testing offset as
14   you've determined that offset to be?  Is that
15   even -- is that possible?
16          A.    For the reasons we've talked
17   about, I don't know.
18          Q.    Okay.
19          A.    I don't know if it would be
20   representative or not.  I have great concerns
21   if it would work.  So we don't know.
22          Q.    Well, I'm not asking you if it
23   would be representative.  I'm asking is it

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 129

1    possible to run that type of simulation?

2            A.    Well, I already told you anybody

3    can go in and change a number and run

4    something.  It doesn't mean that it's valid or

5    that it's good or anything like that.  I mean,

6    you can -- so I mean, is it possible to move

7    the positions?  Yes.  Is it reasonable, will

8    you get any value from it?  I don't know.

9    That's -- the analysis has to be done.  You

10   can't -- but yeah, people can make -- I mean, I

11   can make it fly out of the air and land on top,

12   I mean, if I want to.  But that doesn't mean

13   that's representative or reasonable or a good

14   use of the program or that it would be

15   accurate.

16           Q.    What can you cite to as we sit

17   here today that would cause that HVE run I've

18   just proposed, your exact run but with a

19   different offset to all of a sudden be

20   unrepresentative or unreliable?

21           A.    Well, I've explained, you have to

22   do an analysis to think about this.  That is a

23   complete separate engineering analysis than

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 130

1    what we're dealing with here.  We're using a
2    simulation to look at the accident, which we
3    decided is reasonable and appropriate.  It's
4    just part of our range.  Remember, we did it
5    hand calculations or standard crush
6    calculations.  We wanted to do it a different
7    way, and we found the simulation.  The one that
8    gave the worst results, we're reporting as our
9    answers, which is the simulation.  So it's just
10   our attempt to get a range.  If we go try to
11   model the crash test with a simulation, we have
12   to go -- we have to go do the same thing again.
13   We have to go through all of that stuff again,
14   and nobody has done that.  So I don't know how
15   to answer the question.  You're asking me to do
16   a whole test reconstruction as I'm sitting
17   here.  And we've got, you know, hundreds of
18   hours of engineering in on -- on these things
19   we have done.
20        You're asking me to do all -- to answer
21   questions about something we haven't done.  And
22   I'm not comfortable doing that.  And there are
23   concerns.  I gave you one big example is that

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 131

1    they moved the tow hook and the frame outside

2    the back of the vehicle.  That -- you know, and

3    that's -- that's an issue.  That would be

4    one -- an example of an issue that would have

5    to be looked at.

6             Q.    How would you look at that issue

7    other than changing the offset?

8             A.    I don't know.  I haven't done the

9    work.  That's the thing about it.  You have to

10   do the work.  I have to sit down and say, okay,

11   we're going to prepare ourselves to look at

12   this.  That's -- you think I'm -- I'm not

13   omnipotent.  I have to do the work.

14            Q.    What work are you referring to?

15   You just said the tow hook is outside of where

16   it was in the crash.  That relates solely to

17   the offset.  What work would you need to

18   determine how to deal with that?

19            MS. CANNELLA:  Objection.  Outside

20   the scope of his supplemental reports.

21            Q.    Go ahead.

22            A.    How does that affect the -- what

23   we call the frame level impact?  You've

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 132

1    actually moved a good part of the truck

2    outside the -- outside the -- where it was in

3    the accident.  Well, we've got good overlap in

4    the accident.  You increased the offset by 45

5    percent.

6        I don't know as I sit here the answer to

7    that question.  I'm not smart enough.  I have

8    to do the work, just like I did in this one.  I

9    have to -- I have to -- I have to sit and study

10   that.  I don't know.

11            Q.    Well, I'm not asking --

12            A.    I can't give you the answer.

13            Q.    I'm not asking --

14            A.    Go ahead.

15            Q.    I'm not asking what the result of

16   an HVE simulation with those parameters would

17   be.  I know you can't answer that.

18            A.    No, I'm not even pretending to

19   tell you a result.  I've never even mentioned

20   result today.  I'm saying I don't know that I

21   can use it for that.  It takes work to look at

22   that because there's going to be -- that's a

23   new analysis.  I can't tell you how your house

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 133

1    is going to look until I draw it and design it.

2    I can't tell you if it's a good house.  I have

3    to do actually do the work if I'm an architect.

4    You're asking me to tell you an answer that --

5    that I can't know.

6         Q.    I'm asking you, are you saying

7    that you can't answer the question as to

8    whether HVE is capable of simulating the crash

9    test?

10              MS. CANNELLA:  Asked and answered

11   many times.

12        Q.    Is that your answer, that without

13   doing work, without doing an investigation,

14   without -- you can't answer here today whether

15   HVE is even capable of simulating an accident

16   like the crash test?

17              MS. CANNELLA:  Same objection.

18        A.    Yes.  For all of the things I've

19   talked about.

20        Q.    Okay.

21        A.    That can't be given today.

22        Q.    All right.  And you've explained

23   all of the reasons already why you can't answer

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 134

1    the question as to whether HVE is capable of

2    simulating the crash test?

3                    MS. CANNELLA:  Objection.

4            Q.    You've given us all the reasons

5    for why you can't answer that question?

6                    MS. CANNELLA:  Objection.  Asked

7    and answered.

8            Q.    Okay.  Asked and answered.  So

9    it's been answered.  That's what I want to

10   confirm.

11           A.    Well, we don't know the -- we

12   don't -- we have to do the analysis before we

13   can give all the answers.  We can give you an

14   example of an answer.  But we don't know.  So

15   no, the analysis has to be done before the

16   question can be answered.  That's -- that's my

17   answer is you don't know until you do the

18   analysis.  And -- and that's what you're

19   saying.

20       So no, we don't know.  And I've given you

21   examples of why and tried to explain why -- why

22   it's not simple at all.  That's the -- that's

23   the correct answer.  And it's the same thing

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 135

1    I've been trying to say for the last half hour.

2         Q.    Is it possible to run the HVE --

3    you ran it at twelve inches offset.  Can you

4    run it at 13?

5         A.    We've answered this question.

6         Q.    So the answer is yes?  I want to

7    make sure it's clear.

8         A.    No.  No.

9         Q.    You can run it at 13?

10        A.    No.  You're wrong.  We've told you

11   that when -- that you can make it do any -- you

12   can put the number in and run it.  But it's not

13   necessarily going to be valuable or

14   representative, just like the dropping the car

15   from the moon.

16        Q.    That's -- but that's not my point.

17        A.    But no, it is your point.

18        Q.    Okay.

19        A.    And you're not listening to my

20   point.  My point is, we don't -- we cannot

21   change those things until we do an analysis

22   about them.  I would not do it at 13 and say it

23   had any use for analyzing this subject accident

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 136

1    at all, period.  To go to 13 means we're now

2    studying other accidents.

3        At twelve I know I'm conservative, and I

4    know I'm consistent with my deposition, and I

5    know that it allows me to give my opinions.  It

6    doesn't mean we couldn't use 13, but I have to

7    sit and decide if it would be appropriate to do

8    that.

9        I've done that at twelve.  You keep wanting

10   me to answer questions that haven't been

11   engineering processed as a -- as a responsible

12   engineer.  I can't answer the question because

13   we haven't -- that's outside the scope of what

14   we've done in the past.

15           Q.    I haven't asked you whether that

16   type of test would be relevant to this case.  I

17   didn't ask you whether it was relevant to the

18   subject accident.

19           A.    I need a restroom break.  I need a

20   restroom break.

21           Q.    The question was only, can you run

22   the --

23               THE WITNESS:  Can I take a

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 137

1    restroom break?

2                    MR. HILL:  Sure.

3                    THE WITNESS:  Okay.  Thanks.

4                    THE VIDEOGRAPHER:  The time is

5    1:03 p.m.  We are off the video record.

6                    (A break was taken.)

7                    THE VIDEOGRAPHER:  The time is

8    1:13 p.m.  We're back on the video record.

9                    MR. HILL:  Thanks.

10            Q.    (Mr. Hill) Mr. Buchner, I'm sorry

11    if we got a little sideways there.  I -- I was

12    only trying to speak loudly so that you could

13    hear me because I know we had problems the last

14    time.  And I apologize about the frustration of

15    us misfiring.  And I'm trying to ask you as --

16    as direct and as, you know, intelligent

17    questions as I can.  And so I appreciate your

18    attempts to answer.  But I think we've

19    established a record now of what you can and

20    can't answer.  And I'm glad to revisit that --

21    any of that if you would like, but I don't

22    intend to.

23                    MS. CANNELLA:  I would like to say

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 138

1    for the record that the volume of your voice

2    and the aggressiveness with your questioning

3    was not related to the -- to the technical

4    difficulties and it goes up the more irritated

5    you are with him.  So if you could please lay

6    off of that, we would appreciate that.

7                MR. HILL:  I'm fine with that.  I

8    will note that he was irritated with me as

9    well.

10         A.    I'm happy to proceed, sir.  Thank

11   you.

12         Q.    All right.

13         A.    And I did need the break.

14         Q.    Yeah, I understand.  And I'm happy

15   to take a break at any time.  And I'll admit, I

16   needed a break as well.  So can you cite to any

17   instance that you're aware of where an HVE

18   simulation was found admissible in court to

19   support opinions regarding the level of crush

20   that would be predicted in a hypothetical

21   crash?

22         A.    I've never tried to do that.  No,

23   sir.  I would imagine that we've used it to

G. Bryant Buchner                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 139

1    demonstrate before.  But I've never even

2    thought about that question before now.  I

3    don't know.

4           Q.    But you're not aware of any

5    instances where that's actually happened?

6           A.    I might be.  I -- that's a big

7    question.

8           Q.    And you have never in your career

9    attempted to use an HVE simulation like this

10   one as admissible evidence in court to support

11   opinions regarding the predicted level of crush

12   in a hypothetical crash before this case?

13          A.    I can't say I haven't.  I mean,

14   we -- we use it to study accidents all the

15   time.  I mean, that's -- that's what it's there

16   for.  And I've seen other people, you know, use

17   it.  I think I've even seen the auto

18   manufacturers use it to study what happens in

19   crashes so they don't have to crash cars, which

20   is exactly what we're doing here.  So I think

21   we've done this many times, just not here

22   knowing any examples of it.  I'm here to look

23   at this case.

G. Bryant Buchner                        July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 140

1          Q.    Well, that wasn't my question.

2    Can you cite to an example where you've given

3    testimony like this using HVE before where it

4    was found admissible in court?

5          A.    Yeah, I don't know.  That's too

6    big a question for me to know the answer to

7    here today.  I don't know.

8          Q.    Okay.  I think I already know how

9    you're going to answer this, but I feel like I

10   have to ask the question.  If the HVE software

11   that you use is accurate in predicting crush

12   and intrusion, would you agree that it should

13   be able to predict the levels of crush and

14   intrusion that were seen in the crash test if

15   the proper parameters that were involved with

16   the crash test are input into the software?

17              MS. CANNELLA:  Object to the form

18   of the question.  Goes outside the scope of his

19   supplemental testimony.  And asked and

20   answered.

21          Q.    Go ahead.

22          A.    The answer to that is the same as

23   the other questions.  I don't know.  I can't

G. Bryant Buchner                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 141

1    agree to that at all as I sit here for the same

2    reasons we've been talking about.

3            Q.    And I don't want to revisit that.

4    But one of the main reasons is that you haven't

5    tried that and haven't done the work.  Is that

6    fair?

7            MS. CANNELLA:  I object to the

8    form of the question.  Asked and answered.

9    Mis-summarizes his testimony.

10            MR. HILL:  That's why I'm asking.

11            MS. CANNELLA:  Mr. Hill, if we're

12   going to keep going on this line of

13   questioning, I need you to explain to me why

14   questions about whether Mr. Buchner used HVE to

15   re-create Mr. Grimes's crash test are relevant

16   to his report -- his supplemental report.  I

17   don't -- he did not do it.  And you've been

18   asking him questions about if he could do it

19   for probably close to an hour now.  So if it's

20   not work he did, I don't understand how this is

21   relevant to his supplemental reports.

22            MR. HILL:  It's relevant to his

23   supplemental report of May 8 of 2024 where for

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 142

1    the first time he actually provided legitimate

2    HVE data and produced a simulation that

3    included the axle of data upon which that

4    simulation was based.  And so well within the

5    scope of this deposition is the reliability of

6    the HVE methodology that he used in generating

7    his FR26 amended report.

8                    MS. CANNELLA:  And -- and those

9    questions are fine.  But the questions you've

10   been asking him are about could he use HVE to

11   re-create a Defense expert -- Exponent crash

12   test, which is not -- not in his report.  It's

13   not work he did.  It's not work he was asked to

14   do or tried to do.  It's not work that the

15   Defense did.  So it's not an issue here.

16       And you know, if you want to ask him about

17   his data that he produced with his May report

18   or reliability of HVE in general, that's fine.

19   But the questions about whether he could do

20   work that he didn't do for the Defense side is

21   not -- it's not in his report.  It's not

22   relevant to his report.  And I'm going to

23   object to any more of that.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 143

1          MR. HILL:  It relates to the

2     reliability of HVE.

3          MS. CANNELLA:  It doesn't.  It

4     doesn't.  It relates to the reliability of HVE

5     in a crash test that he did not analyze.  That

6     he didn't -- he did analyze it, but he didn't

7     use HVE to create it.

8          MR. HILL:  All right.  I'm not

9     going to sit here and argue with you.  I'll ask

10    my questions.  You can object, and we can take

11    it up with the --

12          MS. CANNELLA:  Well, I'm getting

13    real close to telling him not to answer things.

14    So that's why I understand what your argument

15    is.  So if we have to call the Court, I want to

16    understand what your argument is.  So I'll

17    agree to it if it's reasonable.  But it doesn't

18    seem reasonable to me at this point.

19          MR. HILL:  The argument is that

20    HVE, if it's reliable, it should be reliable

21    across simulation of all accidents.

22          MS. CANNELLA:  That's absolutely

23    not true.  That's actually opposite of what

G. Bryant Buchner                     July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 144

1    Mr. Grimes even said.

2                MR. HILL:  Well, that's the point

3    I'm trying to make.  So if you disagree with

4    it, that's fine.  But in analyzing whether HVE

5    is reliable in the way he used it, I can ask

6    questions about what situations it is and what

7    situations it's not reliable.

8                MS. CANNELLA:  And he's answered

9    that question a hundred times.

10               MR. HILL:  He's never even

11   answered the question about whether it's

12   reliable in predicting the results of the crash

13   test.  That's the question he won't answer.

14               MS. CANNELLA:  He -- he has

15   answered that many times.  He said it's

16   reliable in ours.  And he would have to study

17   it to know if it's reliable in a crash -- in

18   the Exponent test.  That's what he said for the

19   last 45 minutes.  So you know, that's -- those

20   questions -- that line of questions, unless

21   there's something else you haven't told me

22   about why it would be permissible to go into

23   this stuff for so long, I'm going to object to

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                              Page 145

1    that.  Just when you ask --

2              MR. HILL:  He can't answer the

3    question or doesn't have the ability to answer

4    doing future work as to whether HVE could

5    reliably predict the crash test if the proper

6    inputs were put into the software.

7              MS. CANNELLA:  You're talking

8    about the crash test again.  He didn't do that.

9              MR. HILL:  I'm not asking whether

10   he's done it.  I'm saying with his knowledge

11   and expertise and his -- you know, he says he

12   knows all about HVE and how it's reliable and

13   how it's used in the industry and all its

14   applications.  And so based upon all that, he

15   chose to use it in this case.  And I'm asking

16   based upon all of that knowledge and

17   information and, you know, experience with HVE,

18   should it be able to predict the crash test

19   results if the proper inputs are put into the

20   software.

21             MS. CANNELLA:  And he said he

22   doesn't know.  I mean, he's literally said that

23   probably about twenty times.

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 146

1              MR. HILL:  Okay.  Great.  Then

2     that's good.  If he can't answer that question,

3     that's fine.

4              MS. CANNELLA:  Can we move on?

5              MR. HILL:  Yeah.  That was the

6     last question I was asking on the issue, and

7     he's answered it.

8              MS. CANNELLA:  Great.

9         Q.    (Mr. Hill) Hold on.  Let me share

10    my screen.  Can you see my screen?

11        A.    Yes, sir.

12        Q.    All right.  This is your June 14,

13    2024 letter to Ms. Cannella that's titled

14    rebuttal report.  Is that okay if we call it

15    rebuttal report?

16        A.    Yes, sir.  Thank you.

17        Q.    All right.  And in connection with

18    preparing this report, the additional material

19    you received was the report and deposition of

20    Mr. Grimes and Mr. Crosby, their file --

21    Grimes's file material, and the scanned data

22    photos and video data from the crash test.  Is

23    that the full list of material that was new

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 147

1    that you used in generating this rebuttal

2    report?

3            A.    Yes, sir.

4            Q.    Okay.

5            A.    It says Grimes's file materials

6    too.  I don't know if you listed that.  But

7    that -- that lists everything.

8            Q.    I did.  I meant to if I didn't.

9            A.    All right.  We're good.

10           Q.    All right.  Under your observation

11   section, your first point is the total crush on

12   the test Escape is significantly less than in

13   the accident.  How do you define total crush?

14           A.    We did a PowerPoint based on that.

15   In other words, you'd look at the -- I mean,

16   clearly the crush at the bumper level in the

17   crash test is going to be more than in the

18   accident because there was bumper-to-bumper

19   contact.  So you know, at the -- at the

20   critical level, which is the frame level,

21   there's more crush.  But if you look at the

22   whole car, there's -- there's more crush in the

23   accident because the frame wasn't engaged.

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 148

1          Q.    And I'm just asking how you -- how

2     do you quantify that?  What do you mean by

3     total crush, and how did you make that

4     determination?

5          A.    This PowerPoint that goes through,

6     we went level by level and sliced the -- sliced

7     the car into levels.  And we actually

8     quantified it at each level.  And at every

9     level there was more crush except for, you

10    know, at that frame level.

11         Q.    Right.  And so that's just a

12    summation of your level-by-level analysis of

13    the two crushes.

14         A.    Yep.

15         Q.    That's what I'm trying to get.

16         A.    Yes, sir.  Thank you.

17         Q.    All right.  And did you quantify

18    an actual amount -- or you call it

19    significantly less.  Did you actually come up

20    with a number?

21         A.    No.  Remember, Grimes didn't make

22    any measurements.  We didn't either.  We did a

23    visual comparison at the levels, and we did it

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 149

1    so everybody could see it.  So no, I -- I don't
2    know that I've done a number.  I don't remember
3    a number.  If I did, it would be in here
4    somewhere.
5            Q.    And that same applies to item
6    number two, you don't know if -- is that right?
7            A.    Right.  We did the drawings.  We
8    can see it in the drawings.  Yeah.  Let me --
9    let me go down here and look at the drawings.
10   Maybe we did quantify it on the drawings.  So
11   I'm running down in the report.  Yeah.  Sorry.
12   Let me make it so I can move it a little
13   quicker.
14      Nope.  I don't think we did a number unless
15   it's stated in a paragraph somewhere.
16           Q.    All right.  Item number three
17   states, the slope of the crash pulse was
18   greater in the test vehicles than the accident
19   vehicles.  That's also true of your HVE
20   simulation.  Correct?
21           A.    Well, yeah.  Because the vehicle
22   is stronger.  The -- the Escape is stronger at
23   the frame level.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 150

1          Q.    And the fact that there is -- the
2     slope of the crash pulse was different -- was
3     different between your simulation and the
4     accident vehicles doesn't invalidate your
5     simulation, does it?
6          A.    No.  Because he -- he simulated
7     it -- he did a crash test for a different
8     accident than our accident.  In other words,
9     they're different accidents.  He did one with
10    the truck going too far to the left.  And we
11    did one that represents the subject accident.
12         Q.    Right.  But in both instances, the
13    slope of the crash pulse was greater than the
14    accident vehicles.  And that fact did not make
15    your simulation invalid?
16         A.    No.  No, it doesn't.  That -- that
17    fact alone just tells you that the Escape is
18    stronger, that the Escape at the bumper
19    level -- even with this advantage by moving the
20    vehicles 45 percent further to the left, the
21    Escape still is stronger and resists crushing
22    more.
23         Q.    Right.  So there's nothing

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 151

1    unexpected about item number three with either

2    test?

3            A.    There's nothing what?

4                  MS. CANNELLA:  There's nothing

5    what?

6                  MR. HILL:  Unexpected.

7                  MS. CANNELLA:  I object to the

8    form of the question as vague.

9            Q.    I think you already answered it.

10   Right?

11           A.    Okay.

12           Q.    All right.  Item number four, when

13   comparing the crash test to the accident, you

14   said the vehicle-to-vehicle force was greater

15   in the test than in the accident.

16           A.    Yes.

17           Q.    Okay.  Is that also true about

18   your HVE simulation?

19           A.    Yes.

20           Q.    Okay.  We -- and I think we've

21   covered this.  But item five, the basis of your

22   opinion that the F-250 did not override in the

23   test is because there was bumper-to-bumper

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 152

1    contact?

2          A.    Well, there was full

3    bumper-to-bumper -- there was bumper-to-bumper

4    contact.  And the frame level structure of the

5    Escape remained in contact with the frame level

6    bumper level of the F-250 the whole time.  I

7    show it in photographs and PowerPoints.

8          Q.    Was there any point where the

9    F-250 bumper was on top of or beyond the level

10   of the bumper of the -- of the Escape in the

11   test?

12         A.    Well, we're now getting into --

13   because of the way the test was run, there's --

14   there's problems with it.  But when we look at

15   the structure, I would say no.  If you want to

16   argue about the bumper, where the bumper was

17   able to engage the -- the -- the tow hook of

18   the F-250, it stayed engaged the whole time.

19   And where the frame was able -- of the Escape

20   was able to engage the bumper, it stayed

21   engaged the whole time.

22         Q.    All right.  And item number six,

23   when you talk about the F-250's bumper striking

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 153

1    the test Escape's bumper flush, was the impact

2    from the F-250, was it the secondary energy

3    absorption brackets that impacted the Escape's

4    bumper or was it actually the F-250 bumper?

5              A.    It was the -- it was -- the bumper

6    was flush to -- the two bumpers were flush to

7    each other.  You know, the tow hook sticks out

8    a little bit.  But no, we're not talking about

9    the seize brackets engaging that level -- that

10   frame level.  They were down below that.  It

11   was the bumper-to-bumper level that was flush.

12             Q.    Right.  And so that's what I

13   wanted to clarify.  In the test the seize

14   brackets didn't have any impact on the

15   accident -- on the crash test.  Is that true?

16             A.    Well, leaving the offset problem

17   out, the seize brackets were not called upon in

18   the test -- yeah, they were kind of called upon

19   because of the offset, so I can't say that.

20   Yeah.  Because of the offset, they were called

21   upon on the driver side.

22             Q.    All right.  Number seven says the

23   test resulted in less rear seat deflection and

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 154

1    movement than in the accident.  Do you agree

2    that there was rear seat deflection in the

3    crash test?

4              MS. CANNELLA:  Objection.

5    Which -- which seat are we talking about?

6              MR. HILL:  Well, I'm using what he

7    says up here, less rear seat deflection.  So

8    I'm talking about whatever he's talking about.

9    He -- you tell me.

10         A.    Well -- well, less doesn't mean

11   there was some.

12         Q.    And that's what I'm getting at.

13         A.    Well, let me answer.  Grimes

14   agrees with this.  I think from my memory there

15   was some.  But he didn't measure the position

16   of the seat and report the relative positions

17   of the seat start to finish of his crash test.

18   So my memory is that there was -- that I think

19   there was some, but it was remarkably less than

20   in the accident.  But I don't know.  So that's

21   my memory right now.  But the photos show what

22   they show.

23         Q.    Okay.  And you haven't examined

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 155

1    the crash test to determine whether there was

2    seat deflection in the crash test or how much

3    seat deflection per, if there was?

4            A.    Well, if the floor pane moves, it

5    would be some movement.  So maybe I can say

6    there was some movement in the seat.  But I

7    don't remember if there was deflection in the

8    seat relative to the attachment points and

9    whatnot.  But it certainly wasn't -- I mean, in

10   the accident the rear seat is tilted way

11   forward.  And in the crash test, it's still

12   reasonably the same reclined level and that

13   type of stuff.  So the items will speak for

14   itself.

15       But you know, there -- there probably was

16   some shifting where the seat is just due to the

17   crush at the floor pan level and other -- other

18   things.  Regardless of the reasons why, there

19   was less in the crash test than in the

20   accident.  And that's what this says.

21           Q.    All right.  A related question you

22   mentioned the deformation of the floor pan.  Do

23   you know whether the rear hatch of the Escape

G. Bryant Buchner                        July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 156

1    was pushed in enough to actually impact the

2    rear seat in the crash?

3         A.    Yeah.  Well, the cameras that were

4    supposed to show that didn't function in the

5    crash test.  You know, the cameras moved.  So

6    we don't -- we're kind of deprived of some of

7    the information that could have been had.  I

8    haven't thought to -- I don't believe they did,

9    but I don't -- as I sit here, I haven't been

10   able to do that analysis either.

11        Q.    Okay.  So as we sit here today, if

12   I understand you, you don't know whether the

13   rear hatch of the Escape impacted the second

14   row seat back in the crash test?

15        A.    In the crash test, no.  What I

16   tried to use to look for that type of stuff, I

17   think there's two video cameras, and neither

18   one of them functioned.

19        Q.    Do you know whether there was any

20   gap after the crash test between the rear hatch

21   and the rear seat?

22        A.    My recollection is there is, yes,

23   sir.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 157

1          Q.     All right.  Did you -- do you have

2     a photograph or whatever that shows that?  Do

3     you -- what proof do you have that there was a

4     gap between the hatch and the rear seat?

5          A.     Well, when we did the slice, there

6     was a gap, a space between the hatch and the

7     rear seat.

8          Q.     Was there a space between the

9     hatch and the rear seat in the subject Escape

10     after the accident?

11          A.     Yes.

12          Q.     And did you compare the size of

13     that space from the subject accident to

14     whatever space that you say existed in the

15     crash Escape -- in the crash test Escape?

16     Sorry.

17          A.     No, I haven't -- I haven't done

18     that.

19          Q.     Okay.  Do you have any opinions

20     with regard to whether the crash test could

21     have resulted in injury to Cohen Bryson if he

22     had been in that vehicle at the time of the

23     test?

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 158

1              MS. CANNELLA:  Objection.  Outside

2      the scope of his expertise and testimony.

3              MR. HILL:  Well, that's exactly

4      what I'm trying to establish.

5         Q.    That's outside of your expertise.

6      Right?

7         A.    Yes.  I'm not talking about

8      injuries in the crash test.  No, sir.

9         Q.    Right.  That's all I was trying to

10     establish is that you're not an expert in

11     biomechanics.  And you don't intend to give any

12     opinions as to whether the intrusion, crush,

13     however you want to describe it that occurred

14     in the crash test, would or would not have

15     caused an injury to Cohen Bryson?

16        A.    Right.

17        Q.    Okay.  If we go down in this

18     report a little bit -- let's see here -- give

19     me one second.  Sorry.  Item number two on the

20     page right now, you talk about test did not

21     provide markers to record what the test vehicle

22     offset was.  What type of markers would you

23     have expected to be on the vehicle?

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 159

1        A.    Crosby describes what he typically

2    does to document it.  He didn't show a photo of

3    it, but he could have used whatever he used

4    because I'm sure it would have been good

5    enough.  In the past we've put a stick or

6    something coming out the front, something that

7    is brittle and will break and, you know, that

8    will leave a mark.  We've -- we've put paint on

9    the vehicles.  One of the easiest things to do

10   is put -- put marks on the ground so that the

11   overhead camera and the other cameras can see

12   if the vehicle goes along those marks.  And if

13   it doesn't it can easily tell how far off the

14   mark it is.  So it basically uses a simple

15   series of targets, markers, indentures, paint

16   transfer, things like that.  Even tape -- even

17   tape will -- will transfer so you can tell

18   where it is, any one of those.  Or put the

19   cameras where you can do the work.

20        Q.    And when you say tape, you're not

21   talking about the centerline tape.  You're

22   talking about a tape that would leave a mark

23   that would be on the edge of -- the front of

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 160

1    the vehicle?

2          A.    Right.  Put a piece of tape where

3    it's likely to leave a mark or put a piece of

4    tape, you know, so that you get good transfer

5    of the color and that type of stuff.

6          Q.    Okay.

7          A.    All kinds of ways to do it.  But

8    the best is a pointer type device that -- that

9    leads.  Then you can see in the video -- you'd

10   put a target on the Escape.  You'd put a

11   pointer on the -- on the F-250.  And in the

12   video you -- and it's scale, so when it

13   touches, you know -- and that's before anything

14   else touches.  You know exactly the

15   orientation.

16         Q.    Right.  Well, item number three

17   you talk about Grimes, you know, he testified

18   he didn't put the centerline tape on.  But you

19   did read Mr. Crosby's deposition, right, where

20   he described that it was on the center of the

21   vehicle?

22         A.    Yes.

23         Q.    And you have no reason to dispute

G. Bryant Buchner                      July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 161

1    that the centerline tape was not on the
2    centerline of the test vehicle?
3            A.    That's agreed.
4            Q.    Okay.  On the next pages, which is
5    bates 9401, the paragraph beginning on based on
6    Grimes's deposition, you make the point that in
7    your opinion that Mr. Grimes should have
8    crashed a lifted Escape -- a lifted truck into
9    an Escape in order to establish the speed of
10   the truck in the accident.  Can you explain
11   that opinion?  How could Mr. Grimes have
12   established the speed of the truck in the
13   accident by running a crash test with a lifted
14   F-250?
15           A.    He gives -- this is -- he gives
16   his speed range of 43.9 to -- into the low 50s
17   based on potential for braking and whatnot.  I
18   mean, it seems like he's uncertain about the
19   speed.  If he doesn't know the speed, he ought
20   to establish his own speed.
21           Q.    Okay.  Well, that's -- I'll go
22   back to my question.  But let's talk about
23   that.  Do you recall in his deposition that he

Case 2:22-cv-00017-RWS    Document 182-10    Filed 03/17/25    Page 163 of 388
G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 162

1    stated that the extremes using the potential

2    braking at 0.5 seconds would be 43.9 at the

3    lowest end if you have assumed full braking

4    power at exactly 0.5 seconds.  And then he had

5    a high-end range that would assume that you

6    didn't have full braking and you had braking

7    just minimal right before the impact, and it

8    just provided him a preliminary range depending

9    upon various hypothetical braking situations.

10   Is that a fair description of his testimony as

11   you understand it?

12        A.    That's a good start for a

13   conversation.  Yes, sir.

14        Q.    Right.  But we know -- and you

15   agree that -- and he even said he didn't

16   believe that braking occurred.  And that he

17   believed that that accident occurred at 50 or

18   51 miles an hour, which is consistent with your

19   belief as to what the speed of the F-250 was at

20   the time of the impact.  Is that correct?

21        A.    I think so.  There's a lot in it.

22   Can you make sure I've got it all?

23        Q.    Sure.  Well, we don't have a

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 163

1    dispute here.  You used 51 miles per hour as

2    the impact speed in every one of your

3    simulations.

4              A.    Uh-huh.

5              Q.    Correct?

6              A.    Yes.

7              Q.    All right.  And so you don't have

8    any criticism of his using 49.9 in the crash

9    test?

10             A.    I actually -- based on his work,

11   yes.  I'm looking -- I'm using 51 and getting

12   more crush.  If -- if the -- if the vehicle was

13   really going 44, then I'm -- I'm using a worst

14   case scenario in my simulation.  But if his

15   opinion is that the lifted truck -- that an

16   unlifted truck produces the same amount of

17   crush as a lifted truck -- or even more is

18   actually what his opinion is -- then he needs

19   to make sure he's got the speeds right.

20        See, because what if the -- what if

21   according to him the accident was 44 miles an

22   hour.  And is it fair to really compare it to a

23   crash test that he ran at 49.9 miles an hour?

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 164

1    He is disadvantaging --

2            Q.    And --

3            A.    He --

4            Q.    Oh, sorry.

5            A.    He is disadvantaging the Escape by

6    a full five miles per hour.  So that's what

7    this is saying here.  If -- if his range was

8    43.9 to 49.9 or 43.9 to 50 or whatever it is,

9    he can't compare a 43.9 mile per accident to a

10   51 mile per hour crash test if he's doing -- if

11   he's trying to seek the equation -- the answer

12   he says he's trying to seek which is, as he

13   says, clearly I'm trying to seek to show that a

14   lifted vehicle doesn't provide more crush than

15   an unlifted vehicle.  Well, we use 51 in the

16   simulation, which is conservatively high

17   because we know the driver was on the brakes.

18   I think 51 is probably a good number though.

19   But if his -- if his opinion is that it may

20   have been as slow as 44, then he needs to -- or

21   43.9 -- if he's --

22            Q.    Did he ever give the opinion --

23            A.    -- going to compare -- if he's

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 165

1    going to compare apples and apples, he just

2    ought to compare apples and apples.

3           Q.    Did he ever give the opinion that

4    he thought the accident occurred at 44 miles

5    per hour?

6           A.    Well, I thought he said the

7    accident may have been as low as 44 based on

8    one of his calculations.  But you know, if I

9    misread that, I misread that.

10          Q.    Okay.  Well, back to my other

11   question, and that is about your statement that

12   he could have established the speed of the

13   truck in the accident by crashing a lifted

14   truck.  So I don't understand that.  How could

15   he establish the speed of the truck in the

16   accident by first testing a lifted truck?

17          A.    Okay.  Well, he's the one trying

18   to compare -- try to say that lifted versus

19   unlifted doesn't matter.  The way to do that is

20   you do two tests at the same speed, lifted and

21   unlifted so you only have one variable that's

22   changing, and you can answer that question.

23   He -- he is comparing his crash test to the

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 166

1    accident under the belief that he's hitting

2    them at the same speed, which he -- the way I

3    read his work or looked at his work, he didn't

4    fully establish that.

5          Q.    So he would not -- and again, if I

6    understand your answer, it's based upon your

7    assumption as to the purpose of his test.  I'm

8    trying to figure out -- so he couldn't

9    establish the actual speed that the accident

10   truck was traveling by running any type of

11   test.  He can't actually establish that speed?

12         A.    Sure, he can.  He can -- if he

13   wants to do a crash test with a lifted truck,

14   he can demonstrate at 51 miles an hour.  He can

15   demonstrate that that matches the crash pulses

16   and everything and then he can lower the truck

17   and run the same impact again.  And then he'll

18   have a direct comparison as long as he gets the

19   offset right.

20         Q.    So you're saying that he should

21   have run the accident with a lifted truck at 51

22   miles per hour and then compared those results

23   to the black box data in the actual accident.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 167

1    Is that what you're saying?

2           A.    Well, he could have done that to

3    know the exact speed.  But if he -- if he did

4    both at 51, both the lifted truck and the

5    unlifted truck and the only thing he varied was

6    the lift, then we would know the effect of the

7    lift.  He says very clearly in his

8    deposition -- and I'm working off of memory

9    here.  But it basically says, hey, I did this

10   to show that a lifted truck doesn't do any more

11   damage than an unlifted truck or whatever he

12   said; it doesn't have more crush or -- and so I

13   remember that quote in there.  My words aren't

14   going to be right, but I'm really close.

15      So he's actually -- in order to do that,

16   he's got to -- in order to say that an unlifted

17   truck produces the same or more crush than a

18   lifted truck, he needs to make sure that he's

19   got the speed of the two trucks the same.  And

20   I will point here that regardless of the

21   offset, he -- he didn't seem to do that.

22           Q.    Wouldn't that same theory apply to

23   your simulation, in order for the simulation to

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 168

1    show whether -- or what the difference in crush

2    would be between the actual accident and your

3    simulation, you have to run them both at the

4    same speed?

5           A.    Well, not necessarily because

6    we -- we -- we know the driver of the truck was

7    on his brakes at impact because I think we have

8    that indicated.  So he's not going to speed up.

9    And when we ran our simulation, when we dropped

10   it, we weren't even close.  In other words,

11   there was a big discrepancy there in the amount

12   of crush.  So within the level of braking, all

13   that would do is -- if we reduce the speed

14   below 51, that would just reduce the amount of

15   crush.  So it wouldn't change any of my

16   opinions.  My opinions would be -- my opinions

17   are robust.  But my opinions are different

18   slightly than his.

19      The way he's going about it, his opinion

20   is -- maybe we just ought to find it in his

21   depo.  I wrote it down where he gives the

22   purpose of it was to show that an unlifted

23   truck has the -- that the lift doesn't increase

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 169

1    or decrease or doesn't change the crush on a

2    car.  Well, to do that, he's -- he's got to

3    have both pieces of test data to do it.  He's

4    only got one.

5          Q.    And that's based upon your

6    interpretation or your quote of what he -- you

7    say he's trying to do?

8          A.    Well, it's -- let me find the

9    quote.  Yes.  Yes, you're right.  If you don't

10   want me to find it, I won't.  But yes.

11         Q.    I'm not asking you to find it.

12   I'm just saying your opinion is based upon that

13   interpretation of the purpose of the test?

14         A.    It's based on what he said, yes.

15   I -- yes.

16         Q.    And I think this relates to this

17   opinion.  And I want to make sure that I

18   understand it.  The reason that you didn't do

19   what you're saying he should have done, which

20   is run an HVE simulation of the actual accident

21   to compare it to the black box data is because

22   you don't believe HVE is robust enough to

23   properly model if it's not a bumper-to-bumper,

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 170

1    structure-to-structure accident.

2         A.    Okay.

3         Q.    Is that fair?

4         A.    I heard the last part of your

5    question.  So I really understand it now.  I

6    think what you're asking is -- ask it again

7    because I'm -- the first part was confusing,

8    and the last part I thought clarified it.

9    Please ask it again.

10        Q.    Okay.  Sure.  The -- you're saying

11   that one way that he could compare apples to

12   apples is to first run a lifted test and

13   compare the delta-V's and the crush or whatever

14   to the actual accident.  And it would tell him

15   whether he's got the speed right to compare it

16   to the real accident.  Is that -- is that --

17   that would be one thing you would benefit from

18   by running an actual crash test with a lifted

19   vehicle in the same configuration as the actual

20   crash.  Right?

21        A.    Well, you're putting me in an

22   equation and the use -- I'm using his file.  He

23   calculated 43.9.  If his -- if the potential

G. Bryant Buchner                   July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 171

1    accident speed is as low as 44 in his work and

2    then he's going to go crash it at 49.9, then

3    that's -- then that's not reasonable.  That's

4    his work.  Not mine.

5            Q.    I'm just -- I'm not going into

6    that.

7            A.    Okay.

8            Q.    I'm saying that you're critical of

9    him for not running first a crash with a lifted

10   truck.  Right?

11           A.    The way he opines, yes.

12           Q.    Right.  And you also didn't run a

13   simulation with a lifted truck in it.  Right?

14   You've never run a simulation with a lifted

15   truck.  Correct?

16           A.    That's correct.  That's correct.

17           Q.    And I would think there's two

18   reasons.  One would be that you don't need it

19   because you used 51, which is kind of like the

20   maximum speed in your opinion.  So you don't

21   need to determine the actual speed because

22   that's worst case scenario or the most

23   conservative approach?

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 172

1          A.    Yes.  That's one of the things.

2          Q.    Right.  And another reason would

3    be -- I want to make sure I understand it -- is

4    that HVE would not be appropriate for a lifted

5    accident because HVE is designed to study

6    bumper-to-bumper, structure-to-structure type

7    incidents.  And that would be another reason

8    why you wouldn't use HVE to simulate the actual

9    accident?

10         A.    It means you'd have to do some

11   more work.  It doesn't -- I think that there's

12   justification for trying to use it.  But it

13   would be -- it would be -- you would have to

14   start that whole process and do that.  And you

15   know, that would -- that would be a -- I don't

16   know what the value would show anyways.  I

17   don't know what the value would show because we

18   have the -- we have the accident.  But I don't

19   know -- I don't know that we could use HVE for

20   that, for the subject accident the way it was

21   hit.

22       We can use it to study a frame -- a bumper

23   level hit.  But you would have to do a lot of

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 173

1    work to see if you wanted to or could simulate
2    the actual accident because of the difference
3    in elevations.  But there's papers out there
4    that says it's -- you know, that -- that it
5    could be done for that.  But it's just -- it
6    wouldn't be -- I wouldn't use the stock stuff
7    out of the -- the default stuff out of the
8    program.
9         Q.    And you can't cite to me any of
10   those papers that say it would be appropriate
11   to use in a lifted truck situation as we sit
12   here today?
13        A.    No.  I'm saying I think he said
14   you could do it.  But you couldn't do it in the
15   stock condition.  You would have to -- I mean,
16   stock meaning the default conditions.  You
17   would have to start manipulating the program to
18   make it perfect.  And we didn't -- you know,
19   that's a whole new problem.
20        Q.    Right.  But you can't cite to any
21   of those papers that say that?
22        A.    No.  That's knowledge I have in
23   my -- in my past.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 174

1          Q.    Yeah.

2          A.    But no, I didn't bring those

3    papers.

4          Q.    All right.  Do you know what type

5    of modifications you would have to make in

6    order to run -- modifications from the stock

7    vehicles in order to run that type of

8    simulation in HVE?

9          A.    I used the word stock.  That was

10   my mistake.  Default.  Yeah, you're now --

11   you're -- that would take some real work to do.

12         Q.    Right.

13         A.    But I don't -- you know, as I sit

14   here, I'm not -- I'm not saying you can do it.

15   I'm not saying absolutely the papers say you

16   can do it.  I'm saying I think there's papers

17   out there that indicate it can be done.  But it

18   would not -- it would be -- it would be quite

19   an effort.

20         Q.    Would -- do you -- would you know

21   how to do it?

22         A.    I'm actually sure that if it could

23   be done, I could.  But I'm not -- I don't know

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 175

1    that it can be done.  I mean, in other words,

2    it's not -- it's just a -- it's just a physics

3    problem.  But I don't know -- I mean, I think

4    I'm -- but that work hasn't been done, just

5    like the other thing you asked me about.  I

6    can't even talk about starting it right now.

7         Q.    Yeah.  I'm not talking about

8    how -- I'm just saying do you know how to do it

9    without having to --

10        A.    Well, it hasn't -- it hasn't been

11   done yet.  So I can't say I know how to do it.

12        Q.    Okay.  Would it involve modifying

13   the stiffness coefficient for the different

14   areas of the rear of the Escape, meaning you'd

15   have to input a different stiffness coefficient

16   for the rear hatch versus the window versus the

17   bumper?  Is that kind of the process it would

18   take?

19        A.    I don't know.  I'd have to -- I

20   haven't done it yet.

21        Q.    All right.

22             THE WITNESS:  I do hate to ask,

23   but I need to run down the hall and run back.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 176

1    You don't --

2                   MR. HILL:  Oh, no problem.  We can

3    take a break at any time.

4                   THE WITNESS:  Okay.  I apologize.

5                   MR. HILL:  We're getting through

6    it now.  We're -- we're on the same page now.

7    We're doing better.

8                   THE WITNESS:  Okay.  I agree.

9                   THE VIDEOGRAPHER:  The time is

10   1:57 p.m.  We are off the video record.

11                  (A break was taken.)

12                  THE VIDEOGRAPHER:  The time is

13   2:07 p.m.  We are back on the video record.

14        Q.    (Mr. Hill) All right.  Moving

15   ahead to the offset portion of your -- what did

16   you call it again -- rebuttal report.  All

17   right.  So that I can understand this, you

18   indicate that you used three methods to

19   determine the offset in the crash.  Two of them

20   are based upon the Ford logo imprints, and one

21   of them is based on the crash testing.  Is that

22   fair?  Is that correct?

23        A.    Those are the three methods that

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 177

1    we did independent of Grimes's work.  Grimes

2    actually has work that shows the offset as

3    well.  It doesn't require any rebuttal.  It

4    just requires showing it.  So yes, as far as

5    our work, that's what this shows.

6         Q.    And I was just reading straight

7    from the paragraphs here that begins with of

8    the three methods.

9         A.    Yeah.

10        Q.    Yeah.

11        A.    I'm clarifying to make sure that

12   everything is understood.

13        Q.    Right.  And the first method

14   involves producing a photomodel of the test

15   vehicle and the accident vehicle, using a photo

16   where the logo imprint is visible.  And then

17   you show in figure 3A a crash test photo of --

18   with a yellow line around the logo area -- the

19   logo imprint area.  Is that fair?

20        A.    Yes.

21        Q.    And while Ms. Cannella was

22   mentioning exhibits, I would like to attach --

23   and I should have done this at the beginning --

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 178

1    as I think Exhibit 2 this June 14, 2024

2    rebuttal report.

3        All right.  And then figure 3B is from Jeff

4    Kidd's inspection after the incident where

5    again you've sort of outlined what you believe

6    shows the logo imprint from the Ford logo on

7    the F-250?

8                (Defendant's Exhibit Number 2

9                is marked for identification.)

10            A.    Yes.

11            Q.    All right.  And figure four is

12   where you used photomodels where you -- and

13   correct me if I'm wrong.  You indicate a point

14   on the photo, and then the PhotoModeler uses

15   its magic to determine a 3D distance between

16   those two points?

17            A.    Yes.

18            Q.    Okay.  And so the distance it

19   calculates depends upon the start and endpoints

20   that you indicate on the photo?

21            A.    Right.

22            Q.    Okay.  And figure 5B, same thing,

23   that's PhotoModeler Premium showing the

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 179

1    distance between the two points that you marked

2    on the test Escape.

3              A.    Yes.

4              Q.    Is that correct?

5              A.    Yes.

6              Q.    And again, that's figure, you

7    know, 5A and 5B showing those distances on the

8    subject Escape and the crash Escape.  Those

9    measurements are dependent upon the points you

10   indicate you want the software to measure to

11   and from?

12             A.    Correct.

13             Q.    Okay.  Now, the Ford logo on the

14   F-250, you would agree, was not the first part

15   of the F-250 to impact the Escape in the

16   subject accident?

17             A.    I do.  It was really, really -- it

18   was really, really close though because, you

19   know --

20             Q.    Yeah.

21             A.    -- it was definitely not the first

22   point of contact.

23             Q.    I agree.  But the bumper or the

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 180

1    tow hooks, there are other items that stuck out

2    farther than the logo on the front rail?

3           A.    Forgive me.  I was answering with

4    respect to the accident.  You may have asked

5    about the test.  I -- I don't know.  I mean --

6           Q.    I started with the accident.  But

7    wouldn't the same thing be true of the crash

8    test?

9           A.    Well, the crash test is a little

10   further because you've actually got bumper to

11   bumper.

12          Q.    Right.

13          A.    But in the accident -- in the

14   accident you're -- I mean, you're not hitting

15   bumper to bumper, so the logo is -- is, you

16   know, twice as close -- let's put it that

17   way -- as in the test.  Thanks.

18          Q.    Right.  But either way though,

19   it's -- the logo is not the first thing to

20   impact the Escape?

21          A.    Yes.

22          Q.    That's all I was trying to

23   establish.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 181

1           A.    Right.

2           Q.    And the logo itself is -- is not

3     flat.  Do you agree with that?

4           A.    Yeah.  It's got a little convex to

5     it.

6           Q.    Right.  It's a little -- right.

7     So the -- like the center of the logo is going

8     to stick out a little bit more than the edges?

9           A.    Correct.

10          Q.    Right.  And so if you look at --

11    I'll use one of your photos here if I can find

12    one that's clear.  I don't seem to have a large

13    picture.

14          A.    We do.  There you go.

15          Q.    This is the logo on the Escape,

16    which you agree is a different size than the

17    logo on the F-250?

18          A.    It is.

19          Q.    But it has the similar concave

20    shape -- or convex shape you just mentioned.

21    Right?

22          A.    Yes, sir.

23          Q.    And so you wold agree that the O

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 182

1    and the R in Ford are -- I'm not making you --
2    asking you to be exact.  But they're towards
3    the middle of the logo?
4            A.    Yes.
5            Q.    And so they would be sticking out
6    more than the edges of the logo?
7            A.    At first contact, yes.
8            Q.    Yes.  Sure.  All right.  Basically
9    the closer you get to the center of the logo,
10   the more convex the logo is.  Is that true?
11           A.    I think I know what you mean.
12   Yes.
13           Q.    Okay.  All right.  Let me stop
14   sharing for a second and see if I can find
15   something here.
16                 MR. HILL:  Okay.  We need to take
17   like a one-minute break.  Don't leave your
18   seat.  I just -- I'm having some technical
19   difficulties accepting my files.  Can we just
20   go off the record for -- it won't take more
21   than a minute.
22                 THE WITNESS:  That will work.
23                 THE VIDEOGRAPHER:  The time is

G. Bryant Buchner                     July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 183

1    2:15 p.m.  We're off the video record.

2              (A break was taken.)

3              THE VIDEOGRAPHER:  The time is

4    2:18 p.m.  We're back on the video record.

5         Q.    (Mr. Hill) All right.  I have up

6    on the screen here the photograph that's on

7    page 9404 of your rebuttal report.  And it is a

8    photograph of the test Escape after the test.

9    Correct?

10        A.    Yes, sir.

11        Q.    And can you see on this photo, can

12   you point out where the imprint of the D is

13   from the Ford logo?

14        A.    I don't know that I -- it would be

15   on the left side if it was there.  I'm not a

16   hundred percent sure it's there.

17        Q.    So in analyzing this logo, you

18   didn't look for or notice the imprints of the

19   letters from the word Ford on -- on the Escape?

20        A.    Well, no.  There are some.  But I

21   don't know that the D showed up looking at it

22   on that particular slide.  Let me see.

23        Q.    Did you, in reviewing any of the

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 184

1    photos of the crash test Escape, locate the --
2    the location of any of the letters in the word
3    Ford as part of your analysis?
4         A.    A is always the easiest to find.
5         Q.    The what?  I'm sorry.
6         A.    The A is the easiest to see
7    because it's got a little tail on it.  So the
8    D -- the D is kind of off on the edge.  The A
9    sticks out.  The A and the R stick out the
10   furthest.  But we have a -- part of what I sent
11   you was an overlay of the Ford emblem on top of
12   this.
13        Q.    I'm confused about the A.  What --
14   do you mean the O?
15        A.    Yeah.  I'm sorry.  The O, it's got
16   a tail on it like an A.  I apologize.
17        Q.    All right.
18        A.    I'm an engineer -- I'm an engineer
19   looking at a letter backwards.  But the way
20   they wrote it, it looks like a cursive A.
21   Excuse me.
22        Q.    Right.
23        A.    Fixing it...

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 185

1          Q.    Did you use the cursive A (sic) to

2     overlay the logo on the crash test Escape?

3               MS. CANNELLA:  Objection.  Can we

4     be -- can we not use the cursive A since there

5     is no cursive A?  Are we talking about the O or

6     the D?  What are we talking about?

7               MR. HILL:  I'm talking about the

8     O, the R, the D, any of the letters.

9               MS. CANNELLA:  Yeah.

10          A.    It's in the -- in the PowerPoint

11    we sent, there's an overlay on top of it that

12    we sent.  But if you'll go back to that image,

13    it was just -- you're doing -- the image we had

14    up, the left edge is very visible.  And so we

15    used the left edge of the emblem over there

16    because you can see where it comes to a point

17    at the edge of the oval.  And so we were able

18    to measure to that point between the crash test

19    vehicle and the accident vehicle because the

20    letters are a little smeared and somebody might

21    have a different interpretation as to what

22    letter is what letter.  But yes, I have

23    overlaid them, and I have looked at them.  And

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 186

1    it's in my PowerPoint.

2         Q.    Let me see here.  I've found what

3    I think you were talking about.

4         A.    All right.

5         Q.    This is from your PowerPoint,

6    which we'll -- I'll go back up.  We'll mark

7    this as Exhibit 3.  This is the PowerPoint you

8    were referencing with the crash test offset?

9              (Defendant's Exhibit Number 3

10             is marked for identification.)

11        A.    Yes.

12        Q.    All right.  And so if you could go

13   down here, here are photographs of the back of

14   the subject Escape and the crash test Escape.

15   And I think what you're saying here is that in

16   analyzing the position of the crash test Escape

17   logo imprint that you used what you perceive as

18   the edge of the logo, you didn't reference any

19   imprints on the letters in the word Ford?

20        A.    Right.  But we did provide visual

21   aid so people could understand it.

22        Q.    Right.  And I'm going to go down

23   to that.

Case 2:22-cv-00017-RWS    Document 182-10    Filed 03/17/25    Page 188 of 388
G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 187

1          A.    Okay.

2          Q.    But is it your testimony that in

3    this photo right here, that you're not able to

4    see the image of any of the letters in the word

5    Ford?

6          A.    No.  You can see the O and the R.

7    You know, we know where the D is, but I can't

8    say we can see the D.  But the O is the best

9    one.

10         Q.    Can you in some way -- if I give

11   you the screen, can you point to where you can

12   see the O on this image that I have up on the

13   screen?

14         A.    Yes.  I can tell you where it is.

15         Q.    All right.

16         A.    If you see the Escape emblem at

17   the bottom --

18         Q.    Uh-huh.

19         A.    -- the Escape XLT, from the right

20   side of the Escape emblem, come straight up and

21   you run into -- keep coming up a little bit

22   higher, a little higher and go left some.

23   Right there.  You're -- you're covering the

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 188

1    part of the O with your hand right now.

2              Q.    Okay.

3                    MR. HILL:  Do y'all know how to

4    write on this?

5              A.    Yeah.  But it won't come off my

6    computer screen.  I'm sorry.  That was a joke.

7    I'm sorry.  Jokes don't come off.  I don't know

8    how to write on that.

9                    MR. HILL:  Tedra, do you know how

10   to mark on this?  I guess not.

11             Q.    All right.  But anyways --

12             A.    Hey, if you go down in the

13   slide --

14             Q.    Right.

15             A.    -- a few slides, it will -- it

16   will show an overlay, I believe.  It's above

17   that.

18             Q.    All right.  Well, let's look at

19   this picture here.  This is on page 9459.  And

20   this shows you indicating that your belief that

21   the Ford logo edge is over here at the far left

22   of the pink line above the edge of the S in

23   Escape?

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 189

1           A.      Correct.

2           Q.      And that's the reference point you

3      used to determine where the logo impacted the

4      crash Escape?

5           A.      For this particular method, yes.

6           Q.      Right.  And so your reference

7      point is not from any of the letters; it's from

8      what you believe to be the edge?

9           A.      Yes.

10          Q.      Okay.  And there's what you're

11     talking about as your overlay?

12          A.      Right.

13          Q.      Right?

14          A.      It needs -- it needs to be tweaked

15     a little bit.  But it's just for visual

16     explanation, yes.

17          Q.      Right.  And again, you're not

18     matching up the letters here.  You're matching

19     up the logo with what you believe to be the

20     mark from the far left edge?

21          A.      Right.

22          Q.      Right.  And at no time did you use

23     the imprints of the word Ford as your reference

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 190

1   point?

2          A.    No.  We always use the center of

3   the logo or the edge of the logo.

4          Q.    Right.  But you couldn't

5   compare -- you don't know where the center of

6   the logo is in this instance.  Correct?

7          A.    Well, in this one, no.  But in

8   others, we do.  But yeah, in this one, no.  So

9   that's why we use the edge because we know

10  where the edge is of that logo.  And of the

11  Escape logo, we know where the center is.

12         Q.    Right.  And so when you say in

13  this one, you mean in this case.  Like you

14  don't -- you didn't use the center of the logo

15  at all in this case.  You just used what you

16  believe to be the left edge?

17         A.    In Grimes's work that he provided

18  in his file, you can see the center of the

19  logo.  We use the center of the logo versus the

20  center of the logo on his.  But when we were

21  using the stamp marks, we went to the edge of

22  the stamp because that's what we thought was

23  the most reliable for comparison purposes.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 191

1        Q.    Well, the difference from the end

2    of the D in the word Ford and the edge of the

3    logo is a known distance.  Right?  I mean,

4    that's something that can be measured.  Do you

5    agree with that?

6        A.    Not in this photo because you

7    can't -- don't really know where the D is.

8        Q.    All right.  So but I'm saying in

9    general, you could measure -- we know the

10   distance between a point on the D and the edge

11   of the logo.  That could be measured?

12       A.    If you're just asking can somebody

13   take a logo and measure the distances on the

14   logo itself, absolutely.  A hundred percent.

15       Q.    Right.  Right.  And so you didn't

16   attempt to measure what you believed to be the

17   edge of the logo in connection with any of the

18   imprints of the letter Ford.  Did you -- did

19   you undertake an effort to verify whether this

20   edge is the proper distance from any of the

21   letter imprints that you may or may not be able

22   to see on the Escape?

23       A.    Nothing -- no.  Nothing more than

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 192

1    the overlay we showed you a minute ago just to

2    give perspective.  No, sir.

3          Q.    All right.  But the overlay was

4    based on your belief of the location of the

5    edge, not the location of any of the letters.

6    Right?

7          A.    Well, you -- you keep using the

8    edge.  And I heard that a long time ago, and I

9    thought what does he really mean by edge.

10   There's some marks on the outside of the logo

11   that are in an oval.

12         Q.    Right.

13         A.    We're using that mark there as if

14   it's the edge.  If it's really not on the edge,

15   then the measurement gets a little bit bigger

16   than what we get.  So we're trying to do

17   something that's conservative.  And we're

18   trying to do something that's repeatable and

19   something that's not up to interpretation as to

20   what letter you're looking at.

21      We think that that green arc up there can

22   only be the edge or something inboard of the

23   edge of the logo.  So that's what we used

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 193

1    because we think it's reproducible, repeatable,

2    and really doesn't -- you know, isn't subject

3    to interpretation.  If someone wants to use the

4    letters, that's fine.  We didn't use the

5    letters though.

6         Q.    And that's all I'm trying to

7    establish is that all of your measurements are

8    dependent upon this green arc here being the

9    edge or slightly inside the edge of the logo?

10        A.    Thank you.  Yes, sir.

11        Q.    Okay.  And the same I guess --

12   here's a picture of the accident Escape.  And

13   you have red markings here.  This is 9454.

14   Explain -- you've got what appears to be a

15   similar mark on what would be the edge of the

16   logo.  But then you also have some marks that

17   it looks like would be the letters of the logo.

18   Is that right?  Or what do the lines represent

19   on this page?

20        A.    Well, I think that the F and the O

21   are visible, the swoop to the F and then the

22   bottom of the O.  So the -- we just did it

23   different ways.  Here we added those.  I think

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 194

1    there's an overlay of that logo somewhere else

2    in this same PowerPoint.  But there we are

3    marking some letters.  But we're still not

4    using those letters other than for our

5    understanding.

6          Q.    Okay.  So even in this instance,

7    you didn't use the letters to perform the

8    overlay.  You used the markings of what you

9    perceive are the edge of the logo?

10         A.    Right.  You've actually presented

11   my PowerPoint, not in the order we did it.  We

12   started with something to help everyone

13   visualize the logo on the blue vehicle, and

14   then we ended with the silver vehicle -- or the

15   gold vehicle, whichever one it is.  So yeah,

16   that's all we're doing is we're trying to give

17   context so that people can see that that is a

18   Ford logo stamp mark for that, for those images

19   you're showing.  And then later on we show the

20   measurements.

21         Q.    Right.  All right.  I didn't mean

22   to take it out of order.  I'm just trying to

23   understand it and make sure I understand the

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 195

1    reference point.  And in both cases the
2    reference point is, based on this overlay, what
3    is perceived as the edge or just inside the
4    edge of the logo?

5         A.    Yes.  For those measurements.

6         Q.    All right.  And they're not
7    dependent upon the imprint of the letters?

8         A.    Correct.  For that -- for those
9    measurements.

10        Q.    Okay.  All right.  My screen froze
11   again.

12             MR. HILL:  Can y'all -- I hate to
13   do this, but can y'all give me like a
14   five-minute break so I can -- if I can get this
15   fixed, then I won't hold it up, and it will go
16   much faster.

17             THE VIDEOGRAPHER:  The time is
18   2:33 p.m.  We're off the video record.

19             (A break was taken.)

20             THE VIDEOGRAPHER:  The time is
21   2:56 p.m.  We are back on video record.

22        Q.    (Mr. Hill) All right.  I'm going
23   to begin to share my screen.  And I hope it

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 196

1    doesn't cause everything to crash.

2        All right.  Can you see that this is from

3    your rebuttal report, figure 3A on the screen?

4            A.    Yes.

5            Q.    Okay.  Great.  And we're talking

6    about this marking here above the E that you

7    believe is the O in Ford.  Is that correct?

8            A.    No.  I was talking about the one

9    just above that.

10           Q.    Where?

11           A.    Right there.  Left a little.

12   Right there.

13           Q.    Right there (indicating)?

14           A.    That is an O in Ford, yes.

15           Q.    Okay.  And if someone were to have

16   the opinion that that is the curve in the D --

17   you can see the shape of the D right here --

18           A.    Right.

19           Q.    -- not the O, that would change

20   the location of the overlay of the logo.

21   Correct?

22           A.    If someone has a different opinion

23   of a different impact point, it would change

G. Bryant Buchner                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 197

1    the overlay, yes.  But there's a lot of reasons

2    why that's not true.

3            Q.    All right.  And what are the

4    reasons that that is not the D and has to be

5    the O?

6            A.    Well, you see the -- to the left

7    over there you have the edge that we've already

8    talked about.  But in the lower right, you can

9    see the tow hook, which is the first thing to

10   hit.  And it's under -- it's -- it's -- we --

11   we deal with that in a minute in the PowerPoint

12   where the tow hook has also been shifted left

13   considerably.  So I mean, that -- that's why

14   you don't use the letters because there can be

15   different interpretations with the curves.

16   They're all curves.  But it wouldn't fit with

17   the rest of the damage on the vehicle if that

18   were true.  So you can have the opinion.  It

19   will change it if you move it, but it won't

20   change my opinion because I think there's too

21   many other factors.

22           Q.    Have you determined or measured

23   the distance from the edge here that you say,

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 198

1    the edge of the logo, to where you say the tow

2    hook is to verify whether that's the proper

3    distance between the tow hook and the edge of

4    the logo?

5          A.    Yeah.  I did look at that, yes.

6    Not so much in distance, but Grimes did this --

7    Grimes lined up the tow hook in that hole there

8    and he got the Escape logo to hit where I'm

9    saying it hit and not where you said it just

10   hit.  That's in -- that's in his file.  I don't

11   know if he knows it's in his file, but it's in

12   his file.  I looked at his work that's in his

13   file that -- that shows where it matched.

14         Q.    What specifically in his file

15   matches the overlay of the logo from the Ford

16   with where you say the left edge of the logo

17   hit?  What specifically in his file matches

18   that?

19         A.    He's got a scan of the two

20   vehicles that he -- it looks like he colorized

21   and -- and made 3D models of a mesh, and

22   then -- we'll just call it a scan, a 3D point

23   cloud of the two vehicles fit together at

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 199

1    maximum engagement.  And they're -- they're fit

2    together at maximum engagement with 16 inches

3    between the Ford logo on the Escape and the

4    Ford logo on the front of the truck.  That's it

5    the only place he actually shows those logos

6    and things.  And they match exactly what I'm

7    showing you here with our work.  Remember we

8    had four to six inches with -- with a probable

9    five.  He just gives it, you know, five exactly

10   in his work.  And I have a PowerPoint of that

11   in this folder.

12          Q.    All right.  Is that part of this

13   report or is that separate?

14          A.    It's not part of the report

15   just -- because it's just -- it's just using

16   his work.  Before we could use his work, we --

17   we did all of our work independently from the

18   raw data that happens to match his data.  So

19   it's the five inches that I gave as my opinion

20   as -- as a composite of his file and my file,

21   and -- and the models that we built from his

22   file.

23          Q.    All right.  Looking now at page --

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 200

1    and we'll get to that in a second -- 9406

2    figure 5B, the left side photograph is the

3    crash test Escape after the test obviously.

4    Correct?

5              A.    Yes.

6              Q.    And did you notice that the Ford

7    emblem on the Escape is not lined up with the

8    center line tape on the roof of the vehicle?

9              A.    Well, that's the beauty of it is

10   the -- before the vehicle crushed to where it

11   is now, the two logos already hit.  In other

12   words, the logos are hitting very quickly and

13   they're comparative.  From the two crashes

14   whatever -- you know, they -- they hit and the

15   logos left their stamp marks.  So if the test

16   is actually representative of the accident,

17   then of course the -- the logo should be in the

18   same place except for vertically.  But they're

19   not.  They're off vertically, you know, and

20   laterally.

21             Q.    Well, the -- the actual crash you

22   have a different endpoint -- impact point

23   vertically on the Escape.  So I don't

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 201

1    understand your -- your point.  You're --
2    you're going to have a different crush pattern
3    between the subject accident and the crash test
4    regardless because they're impacting at
5    different points on the back of the Escape.
6              A.     Well, that's the point.  You can
7    see the change of height, you know, which we
8    all know is supposed to be there.  But there
9    should be alignment -- the logo should be in
10   the same place, and it's -- it's way off.  I
11   mean, because this is one of the earliest
12   things that contacted.  And this truck is, you
13   know, how many thousand pounds.  You can't get
14   this truck to move over in that amount of time.
15   You're talking almost -- we're talking about 75
16   feet per second.  You're talking about moving a
17   foot.  You're talking about a 75th of a second
18   until this thing hits.  You know, as an
19   approximation, you know, that's -- that's
20   before -- I mean, that's -- that's a very small
21   amount of time to do that, 75, 1 over X, that's
22   a hundredth of a second approximately if you
23   round it.  And we're -- so we're usually

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 202

1    looking at crashes that are a 150 milliseconds

2    or 1.5 hundredths.  So that's a big difference.

3        If -- one is called a bullet and one is

4    called a target.  The bullet vehicle is -- is

5    going to crush in and align on a path that the

6    front logo is not.  It's going to be very

7    representative when it hits.  And -- and both

8    experts said they used a crush pattern to

9    determine the impact pattern.  And -- and

10   grimes got 10.9 and I got 11.  So we're off by

11   a tenth of an inch.  But the -- the logo is

12   going to be part of that match that he's using.

13       In other words, he can't -- he can't somehow

14   say -- none of us can say that, oh, you know,

15   these -- we're going to use these parts at

16   maximum engagement to determine first contact,

17   but we're not going to use these parts.  We're

18   going to say these parts didn't follow the same

19   physics.  I didn't expect this argument.  But

20   the bottom line is, that logo imprint, there's

21   only one in both of them -- or one very

22   specific spot.  It has to represent impact

23   because that logo is going to hit before your

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 203

1    crush happens to any great extent.

2          Q.    Right.  And I -- I wasn't talking

3    about the striking bullet vehicle's logo.  I

4    was talking about the logo on the Escape.

5          A.    Right.  But they're relative to

6    each other.  The relative position -- we don't

7    mind it moving eventually.  I mean, look at

8    where the bumper on the truck -- on the car is.

9    We're using -- in fact, Grimes said he used the

10   tow hook location mark to put the vehicles

11   together at -- at impact.  Well, that tow hook

12   mark is, you know, three feet forward of where

13   the bumper started, but he's still using that

14   as his mark.  That's the way it's done because

15   physics dictates that the crush will be along

16   the line of force.  And then we can look at

17   where the contact is and then un-crush the

18   vehicles and use that contact.

19         Q.    Right.  But this is what I was

20   trying to get at.

21         A.    Sure.

22         Q.    Are you -- are you saying that

23   because the logo on the Escape in the crash

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 204

1    test after the test is not aligned with the

2    center line of the roof of the Escape, that

3    that is somehow evidence that the vehicle

4    offset was -- was improper?

5            A.    No, I'm not -- forgive me.  I was

6    accepting your premise as true in trying to

7    answer the questions.  Just because you're

8    looking at a photo that's taken here, it

9    doesn't mean that those things aren't lined up.

10   They're not in plane with each other, so the

11   perspective of the photo may be what's causing

12   it.  That was a mistake on my part.  We

13   haven't -- we haven't established that logo --

14   that that logo isn't lined up with the accident

15   of the vehicle.  It just looks that way because

16   it just might be the perspective of the photo.

17           Q.    Okay.  Well, that's what I was

18   trying to get.  That's not the basis of your

19   offset argument --

20           A.    No.

21           Q.    -- your offset argument is limited

22   to the location of the left edge of the logo

23   imprint on the Escape and then the tow hook

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 205

1    impact that you interpret?

2            A.    Yes.   They both -- those are

3    the -- those are the two strongest indicators

4    is the tow hook impact and the logo impact,

5    they're the simplest to see and understand,

6    although there is other crush profiles and

7    things that could be used, those are the ones

8    that are, you know, rock solid if you choose to

9    use them, and those are the ones that I used.

10           Q.    Gotcha.   And then you add the

11   overhead photograph as your third method.   And

12   I just want to make sure I understand all of

13   the methods that you used to calculate the

14   offset in the crash test.

15           A.    Yeah.

16           Q.    Would those be the main three?

17   The location of the tow hook impact, the left

18   edge of the logo imprint, and then the overhead

19   video.   Does that cover the gamut of what

20   you're relying upon to establish the offsetting

21   in the crash test?

22           A.    Logo, tow hook, overhead, yes.

23           Q.    Okay.   That's -- that's all I'm

G. Bryant Buchner                           July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 206

1    getting at with this.  All right.  This is

2    figure 6 on page 9407.  And this is in

3    reference to what I believe you described as

4    your third method on page 9406 at the top-down

5    crash test video and frames.

6            A.    Yes.

7            Q.    Right.  And then you are using

8    this still photograph from the crash test video

9    to analyze the offset based upon this topdown

10   view?

11           A.    Yes.

12           Q.    All right.  And kind of explain

13   for me, if you can, what the different lines

14   that you've added to this still represent.

15   There's green lines and there's a red dash.

16   What do those represent?

17           A.    The green line is a projection of

18   a center line of the roof of the F-250.  The

19   red line is a projection of the hood of the

20   F-250 so that we get a range of offset between

21   the center line of the Escape, which we can use

22   one line that goes through the hood and the

23   roof of the Escape.  So those are about 1.42

G. Bryant Buchner                      July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 207

1    from the center of the Escape over and 1.25 to

2    get a range.  So that's going to be plus or

3    minus 16 inches, something like that.

4         Q.    And that's 1.42 feet?

5         A.    Yes.

6         Q.    And 1.25 feet?

7         A.    Yes.

8         Q.    And how did you conduct those

9    measurements between the lines?

10        A.    Well, the 5.92 is the width of the

11   Escape.  So we can calibrate the image

12   approximately and make measurements on it by

13   knowing a known width.  And then we can try to

14   measure other objects in the -- in the image.

15        Q.    So that 1.42 and 1.25 depend upon

16   your reference of the overall width of the

17   Escape?

18        A.    Partially, yes.  Yes.

19        Q.    All right.  And does this account

20   in any way for the parallax in this photograph?

21        A.    That's why we're giving it a

22   range.  Clearly, you know, according to Crosby

23   the test was not set up to allow measurements

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 208

1    from the photo.  So we're disadvantaged.  It
2    could have been.  It didn't even get the camera
3    directly over the rail according to him.  But
4    you know, within reason -- within range, we --
5    based on the other work, this is consistent
6    with the other work.  And we believe it's --
7    it's clearly demonstrates, you know, that the
8    offset is approximately five inches plus or
9    minus as the report says.
10        Q.    Do you know the height off the
11   ground of the roof of the F-250?
12        A.    It's in the specs, yes.  I don't
13   know off the top of my head.  But it's a little
14   over six feet probably.
15        Q.    All right.  And do you know the
16   height of the hood of the F-250?
17        A.    It's in the specs.  I don't know
18   it exactly, no, sir.
19        Q.    All right.  And do you know the
20   height of -- you see on this photograph there's
21   a hinge right here and right (indicating) here
22   for the rear window of the Escape?  Do you see
23   those hinges?

G. Bryant Buchner                         July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 209

1          A.    I don't know as I sit here, no.

2          Q.    You don't know if there's hinges

3    on the Escape?

4          A.    I don't know the height of it, but

5    I do see the hinges.

6          Q.    Right.  And so you don't know the

7    height of the hinges?

8          A.    Not as I sit here, no.

9          Q.    Okay.  And you didn't factor in

10   any of those heights in analyzing the photo

11   parallax here with this --

12         A.    Of course I did.  I used -- I used

13   something that was higher than the roof of the

14   Escape and something that was lower than the

15   roof of the Escape to get a range.  We know

16   that the roof of the Escape is above the hood

17   of the F-250.  But the roof of the Escape is

18   below the roof of the F-250.

19         Q.    Right.  So the impact -- the

20   center line impact then following that logic

21   would be somewhere between the red dotted line

22   and the green dotted line?

23         A.    Yes.

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                    Page 210

1          Q.    Okay.  And you see that the

2    hinge --

3          A.    Yeah.  But you're not -- no.

4    You're -- for a measurement, that's what we're

5    using.  You know, the -- the impact -- you may

6    be bringing in other things in that.  But for

7    scaling, that's what we're doing.  We need

8    something higher and lower.  I'm not talking

9    about anything but the center lines of the

10   vehicles there because whatever problems there

11   are with these cameras, I know I can track the

12   center lines because he's got tape on it.  The

13   rest of the things are different elevations.

14         Q.    Right.  Well, I'm just talking

15   about in reference to the center line.

16         A.    Okay.  That's what I'm talking

17   about.

18         Q.    Right.  You've got a green center

19   line that's higher than the Escape.  You've got

20   a red center line that's lower.  And so the

21   center line impact would be, according to your

22   analysis, somewhere between the red line and

23   the green one?

G. Bryant Buchner                                      July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 211

1          A.    For the -- for the purposes of the
2     analysis, yes.
3          Q.    Right.  And do you see the hinge
4     there is between the red line and the green
5     line?
6          A.    Well, I -- I can't see it.  But --
7          Q.    All right.  Well, hold on a
8     second.  Would it help if I pulled up the
9     actual video from the crash test, if I can do
10    that?
11               MS. CANNELLA:  How is he suppose
12    to know if that helps or not?  I object to the
13    question.
14               MR. HILL:  I'm just saying --
15         Q.    Okay.  Can you see on the screen
16    now the video from the crash test?
17         A.    Sure.
18         Q.    All right.  And so this is right
19    before impact.  And if I take it to the point
20    of impact, all right, we now have, as you can
21    see, the center lines for the hood and the
22    roof.  This is basically the same picture you
23    had except I don't know why yours was flipped

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 212

1    in the other direction.  But can you see the

2    hinge clearly in this, the actual crash video?

3              A.    I can.

4              Q.    Okay.  And you would agree that

5    the center line on the hood is to the front --

6    the inside edge of that hinge?

7              A.    Yes.

8              Q.    And then if you extrapolated the

9    hood, it's naturally due to photo parallax,

10   going to be lower because it's higher than the

11   Escape, and so it's going to impact somewhere

12   around the other edge of the hinge?

13             A.    Close.

14             Q.    Close.  Right.  So this is what I

15   was -- the point I was trying to make before is

16   that according to this analysis, using the

17   overhead, the center of the F-250 would be

18   somewhere between the right edge of that hinge

19   or the top edge and then somewhere along the

20   hinge.  Correct?

21             A.    Well, you're -- you're adding a

22   point that we -- the problem is you can -- you

23   can find a large number of points and do a

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 213

1    large number of analyses, and the cameras

2    weren't set up well to do that.  We're using

3    this as best we can.  And I'm not saying it's

4    relative to the hinge.  I'm saying based on the

5    way we scale, the way we did it, you're looking

6    at the measurements I gave you.

7        What is true is the impact was -- was under

8    that hinge.  The logo was under that hinge at

9    impact, and we know that.  And so generally

10   speaking your analysis is good.  But I'm -- you

11   know, I'm not saying it's to the level I think

12   you're trying to point out there.  But I do

13   agree that the -- that the logo was below the

14   hinge at impact.

15            Q.    Right.  Do you know if distance

16   from the inside of this hinge to the center of

17   the Escape?  Have you measured that?

18            A.    I haven't.  But it's going to be

19   close to 18 inches.

20            Q.    Okay.  And that's from the edge of

21   the hinge -- on this photograph, it would be

22   the -- let's use it from the perspective of the

23   F-250.  So you're looking at it from the back.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 214

1    It would be the right edge of the left hinge.

2    You're saying the distance from that -- sorry?

3          A.    My report gives a spacing between

4    the hinges.  And we can just take -- take half

5    of that.  It's -- it's in the original FR26

6    report.

7          Q.    Okay.  And in order for your

8    analysis of the F-250 logo imprint to be

9    correct, you're saying the distance between the

10   hinge and the center of the Escape is 18

11   inches?

12         A.    No.  I was giving an estimate.

13   Let's -- let's open up a -- open up a -- we're

14   doing an analysis based on the center lines we

15   were provided.  The hinge itself is where the

16   hinge itself.  I'm not trying to measure the

17   hinge.  I'm doing an offset between the dotted

18   center lines that he gave us.  Okay?  And it's

19   just a technique that we can use.  It gives a

20   range.  The hinges are however far the hinges

21   are.  I'm not trying to estimate that.  But

22   wherever they are, they are.  And I know the

23   measurement because I've got it in my first

G. Bryant Buchner                        July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 215

1    report.  I just would have to take time to open

2    up the report if you want me to do it.

3            Q.    But are you saying that you can't

4    use the hinge as a reference point to determine

5    the impact point of the F-250?  I mean, it's --

6    it's no different than using the center lines.

7    It's just another reference point.  Correct?

8            A.    That's false.

9            Q.    Okay.  What's false about that?

10           A.    Remember, Crosby has routinely

11   marked the impact point with markers.  He has

12   routinely set up cameras to allow measurements

13   to be made.  He did take photographs of his

14   intended impact quite accurately.  But he did

15   not document the impact.  In fact, his report

16   is false.  When it shows the impact

17   orientation, we know it's wrong and that his

18   report is misleading.  He gave an impact

19   location that is one hundred percent not

20   represented by his video.  And he -- but he

21   reported it as an impact location.  The only --

22   so we have limited tools because he left out

23   those tools.  Apparently, at someone's

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 216

1    direction or because someone didn't ask him to

2    allow measurements to be made.  I don't know

3    which one.  You can read his depo and see which

4    one.

5        But what we're doing here is one -- I

6    wouldn't even know where the center lines of

7    the vehicles are if he didn't put the tape on,

8    I'd have to be estimating that.  But he did --

9    Grimes didn't know the tape was on the center

10   line.  Okay?  In his deposition, he didn't know

11   it.  Crosby confirms it's on the center line.

12   Thank you, Mr. Crosby.  I appreciate having

13   something I can measure to.  And so we are

14   using those center lines because it's what was

15   provided.  You are now trying to do an analysis

16   based on hinge, which I have no problem doing.

17   The impact was under the hinge.  The logo was

18   under the hinge.  But we would do that looking

19   at the rear of the vehicle where we wouldn't

20   have depth problems and scaling problems.

21   The -- the problem is that Crosby didn't do it

22   in a way to facilitate this.  So we -- we have

23   to find reasonably reliable ways.  I'm not

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 217

1    going to profess to know where the hinge is

2    based off of this photo.  I'm going to profess

3    to know where the hinge is because I can

4    measure the hinge.  It's been documented and we

5    know where it is.  I'm only able to use what --

6    because it wasn't properly documented, all

7    someone had to do was take a tape measurer and

8    hold it up where the logo imprint is and take a

9    photo of it.  Crosby said he went out there and

10   looked at it and held a measure -- the tape up

11   to it and says it's offset by an inch, but he

12   didn't do it.  So now I'm left using these

13   methods from my own independent analysis, and I

14   get five inches.

15       But remember, Grimes did do a point cloud

16   match when he got the same answer, and I have

17   that to show you.  So that's his work that we

18   can also use.  We don't even have to do this.

19   But when we did it to make sure of where it

20   was, we got five inches using these methods.

21   But I'm not here to measure a hinge this way.

22   This is not the right way to do it.  We're only

23   stuck doing it this way because someone didn't

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 218

1    do it reasonably well in the crash test.

2         Q.    Let's go back.  Again, I'm

3    simply -- the question was, if you can measure

4    the center line that's referenced in this photo

5    that -- you're saying but you can't reliably

6    refer to the hinge in this photo.  What's the

7    basis of that?

8              MS. CANNELLA:  Asked and answered.

9         A.    I didn't do it to measure the

10   hinges.  I -- I used it to measure the distance

11   between the two yellow lines.

12        Q.    Right.

13        A.    That's why I did it.  I don't like

14   the method.  I -- I'm stuck with the method

15   because the cameras, you know, as Crosby went

16   through, the camera was -- was improperly

17   positioned.  So it's an imperfect method.  If I

18   know where something is, I'm going to measure

19   it in the proper way.  If I don't know where it

20   is and I have to do this type work and do it

21   multiple ways, that's why we have a range of

22   four to six inches.  There's some error

23   involved in this.  So I'm -- the hinge, I know

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 219

1    where it is and I can measure it.  And we can

2    look at the back of the car and tell the logo

3    mark is under the hinge just like what we see

4    right here.  So if we know where the hinge is,

5    we can come down and know where the logo is.

6    But I don't need to estimate where the hinge

7    is.  I know where the hinge is.  It's the logo

8    mark I need.

9         Q.    Right.  But the logo mark is

10   dependent upon your conclusion that the left

11   edge of the logo mark is, indeed, a

12   representation of the left edge of the logo.

13   All of your opinions depend upon that being

14   accurate?

15        MS. CANNELLA:  Object to the form

16   of the question.  Misstates his testimony.

17        A.    Well, the logo mark that I see

18   needs to be understood as a logo mark.  You're

19   correct.  But the tow hook mark needs to be

20   understood as a tow hook.  And by the way,

21   Grimes -- excuse me, Crosby said that he didn't

22   put any marking tape or put any marks on there

23   so we could tell where the impact was.  And

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 220

1    I've already told you that his report is
2    erroneous as to where the impact was.  His
3    drawings are wrong.  We do have one very small
4    fortunate piece of luck, and that is that the
5    tape that someone put on the tow hook to hold
6    the trigger or the light trigger on, that tape
7    did leave a white mark on the rear of the
8    Escape so we can actually use it.  Obviously
9    Grimes doesn't know it, and Crosby doesn't know
10   it, but if you look at the photos, you can see
11   it.  And then if we go to Grimes's own crush
12   match, we can measure 16 inches, just like I've
13   been telling you all along.  There's -- there's
14   45 percent more offset, 16 inches logo to logo
15   that's in his work in his file.  But he didn't
16   testify about it in his deposition and, in
17   fact, claimed that he hadn't done it.
18          Q.    What is erroneous about Crosby's
19   report?  What specifically did he put in there
20   that you say is an error?
21          A.    Well, if you look at this image
22   right here -- well, if you back up the video
23   one frame, you'll see that the truck isn't

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 221

1    centered over the rail.  And he shows it

2    centered over the rail.  And then if you look

3    at where -- yeah, and then if you look at where

4    the impact is on the car, the impact is in a

5    different spot.  That truck is not centered on

6    that rail.

7          Q.    Well, he did not, in his report,

8    indicate anything about the location of the --

9    the F-250 at the time of impact.  Correct?

10         A.    Oh, of course he did.  He drew it

11   and he stated it was centered over the rail.

12   It says it verbally -- it says it verbally on

13   page two or three or four and shows a diagram

14   on page three or four or five.  And it's --

15   it's wrong.  It is -- it is wrong.  It is a

16   misstatement of what he did in his crash test.

17   And he knew it, and he left it in there.

18         Q.    Well, he stated that the center

19   line was above the center of the truck at the

20   time the test was initiated?

21         A.    No.  Let's -- let's go back and

22   read it.  Let's not argue.  Let's just go --

23   let's go look at the diagram.  That's the best

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 222

1    one.  He actually has the rail labeled.

2          Q.    Right.  And all of those diagrams

3    are running the test.  Correct?

4          A.    He labels it impact.  He labels it

5    impact.

6          Q.    All right.  What else do you claim

7    is erroneous about his report?

8          A.    Well, let me -- let me show you

9    that first.  I -- I want to show you here.

10   Okay.  So it will take a minute.  I don't know

11   where his report is.  In fact, it's -- in fact,

12   I didn't include the report in what I sent you.

13   Can you pull it up and let's go to page three

14   or four?  Just because I didn't want to resend

15   all of Grimes's stuff.  You have it in his

16   stuff.

17         Q.    You want Grimes's report or

18   Crosby's report.

19         A.    Let's go with -- excuse me --

20   Crosby's.  I didn't send it back to you, but in

21   his file something says report and on page five

22   he labels impact configuration and draws the

23   rail down the center of the vehicle, which is

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 223

1    false.  And then --

2           Q.    Let me see if I can find it.

3           A.    Sure.

4                 MS. CANNELLA:  I believe we're

5    talking about the Exponent report?

6                 THE WITNESS:  Is that Crosby?

7                 MS. CANNELLA:  Yeah.  He had a

8    letter report too.

9                 THE WITNESS:  Oh.  I'm talking --

10                MS. CANNELLA:  You're talking

11   about the crash test report?

12                THE WITNESS:  Yeah.  Yep.

13          A.    So on page four he states it

14   verbally.  On page five he does it with the

15   drawing.  The drawing is the proper way to

16   communicate it clearly and he labels it impact.

17   He uses the words and gets the same inclusion,

18   and it's a misstatement of what happened.

19          Q.    Okay.  Here's page four of his

20   report.

21          A.    All right.  Last paragraph.  And

22   it says in this orientation the front of the

23   F-250 struck the rear of the Escape.  And

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 224

1    that's the third line from the bottom.  In this

2    orientation the front of the F-250 struck the

3    rear of the Escape.  And above that it

4    describes the orientation with -- it says the

5    F-250 was towed into the impact rolling

6    straight ahead with it's longitudinal center

7    line collinear with the center line of the

8    exponent crash rail.  There's only one

9    interpretation of those two sentences.  He

10   intended to have it collinear with the crash

11   rail, and it was collinear with the crash rail.

12   It was not.  Although, I fully believe that was

13   his intent.

14       Q.    Right.  But that -- and that's the

15   entire basis of your argument that he has

16   testified that at impact the F-250 was exactly

17   collinear to the center line of the tape.

18   That's the entire basis of that opinion?

19            MS. CANNELLA:  Object to the form

20   of the question.

21       Q.    What you decided?

22       A.    Yes.  First, the report is wrong.

23   And then -- and the basis is the work I've

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 225

1  shown you and Grimes's work, which I need to

2  show you, and then the second page of this

3  gives the drawing, if you just flip to it,

4  which is page five, it shows it unequivocally

5  the offset is supposed to be 10.9.  The vehicle

6  is supposed to be center line both of which are

7  false and this is labeled impact configuration.

8  And then there's one other page in this report

9  that was wrong.  Just on this one topic.

10            Q.    All right.  Anything else that --

11            A.    Well, we've kind of --

12            MS. CANNELLA:  The basis of what?

13  Object to the form of the question.

14            MR. HILL:  The basis of his

15  statement that Crosby's report was wrong.

16            A.    Well, we're talking about just

17  with respect to the offset.  If you go to

18  page 94 of the report, he reports to a tenth of

19  the inch the impact, which he's off by, you

20  know, five inches which is, you know, erroneous

21  to the reported impact, but it wasn't.

22            Q.    And again, that's dependent upon

23  your evaluation of the -- where the logo impact

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 226

1    is on the Escape --

2              A.    No.  That's -- that's Grimes's.  I

3    didn't need to show you Grimes's.  I guess I

4    need to show you Grimes's.  Grimes's own work

5    shows that.  He doesn't -- he doesn't discuss

6    it in his depo.  But let me just show you his

7    point cloud that has the vehicles center line

8    16 inches apart.

9              Q.    All right.  Did you produce that

10   with your files related to the -- your -- what

11   did you call it, rebuttal report?

12             A.    No.  No.  That's his file.  I --

13   that is his file.

14             Q.    All right.

15             A.    That's his cloud -- all I did is

16   view it the way I normally would viewing my own

17   work.  I sat this morning and worked on cloud

18   for other things.  I can view it.  I can open

19   windows.  I can close windows.  Turn vehicles

20   on and turn vehicles off and I can show you how

21   -- what we did.  I saved the viewing of it to

22   present to you today to make it easy.  But I

23   can open up cloud compare if you want.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 227

1          Q.    Whatever you want to do to

2    illustrate the point.  I didn't know if you

3    needed me to could open it or if you could open

4    it.

5          A.    Sure.  I can open it.

6          Q.    All right.

7          A.    Okay.  So I'm going to share

8    screen.  And that's going to work today.

9    Share.  I'm going to open up a PowerPoint that

10   I -- I did so I didn't have to open up cloud

11   compare today because it's very hard to open up

12   on Zoom.  And this is it.

13      So it's Grimes's offset.  I added those

14   words.  The rest of this is -- is his title

15   from his file, test MMC both vehicles.  And the

16   first page here is an image of his file that he

17   gave me.  So it's in the testing folder.  Open

18   up the testing folder, page two, it's in the

19   point clouds.  In the point clouds, this is his

20   cloud compare file and it's titled test MMC

21   both vehicles.  And all I do is I open that.

22      And when I open it, this is what I see.  So

23   this is -- this is what he -- the only place

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 228

1    I've found a point cloud or any work that shows

2    the vehicles put together in the point cloud

3    with this original document, and then I zoomed

4    down on it.  And then I look at it from the

5    front.  So now I can look at the alignment of

6    the two vehicles.  This is his work.  And in

7    cloud compare I can -- I can turn the top off.

8        So now I turn the top off, and I can see the

9    Ford logo.  And the first thing you notice is

10   the front of this truck is inside the Escape.

11   You don't see any hash on the Escape.  He has

12   the vehicle's position forward so that the

13   truck is inside the Escape, which of course

14   isn't a good match when that happens, but he

15   does have the logo.  And then here we kind of

16   hold in the front of the Ford so we can see

17   where the Escape logo is inside of the Ford.

18   And then we just measure the distance between

19   the two, and it's 16 inches.  So his -- this is

20   his original work that was provided with his

21   deposition.  This is his file.

22           Q.    Can you leave that up, please.

23           A.    Sure.  I'm -- yeah, there we go.

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 229

1    That was -- my computer is glitchy today too.

2    So that's --

3            Q.    Go ahead.  Sorry.

4            A.    Let me just finish.  That --

5    the -- the left is the center of the Ford logo.

6    In his cloud compare, the right is the center

7    of the Ford logo of the truck in his cloud

8    compare and the measurements at the top are

9    what's important.  The key to the measurements,

10   is in the lower right, it gives you the X, Y

11   and Z orientations.  So the delta-Y is the

12   number to look at.  It's 16 inches logo to logo

13   in the work that he did.

14           Q.    Okay.  And now you just explained

15   that this cloud point is not representing the

16   vehicles at the point of impact.  Correct?

17           A.    Right.  This is his -- this is a

18   representation of where they -- where they are.

19   And because he said it was a twelve o'clock

20   impact, those are 16 inches apart.

21           Q.    Right.  That's not my question.

22   Is -- you said like the front of the F-250 in

23   this comparison that you're using is already

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 230

1    well past impact.  It's not -- this is not

2    representative of the point of impact?

3          A.    Oh, it is very representative.

4    But this is his maximum -- this is worse than

5    maximum engagement.  He's actually pushed the

6    Ford too far into the Escape.  But his

7    alignment -- this is the only place in the file

8    that the impact alignment is documented where

9    it can directly be measured without the effort

10   that we had to put into it.  This file is the

11   only one we can measure, it's the only one of

12   proof of where the center of the vehicles are,

13   and he -- he has it at 16 inches, which is the

14   impact orientation.

15         Q.    Well, let's -- let's back up now.

16   You said this represents the point of maximum

17   impact from -- from Grimes perspective.

18   Correct?

19         A.    Yes.  This seems -- this is what

20   he's been using to give his opinions off of,

21   but not -- I don't know why he didn't show it,

22   but it's buried in his file.  Yeah.  It's -- he

23   still met the length of the vehicles and

G. Bryant Buchner                      July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 231

1    everything, and this is why the length has an

2    issue, but yeah this is much closer to maximum

3    engagement than it is first contact.

4            Q.    All right.  So this is

5    representing the -- the location of the logos

6    at maximum impact, maximum crush, not at the

7    point of impact between the two vehicles?

8            A.    Right.  The drawing is near

9    maximum.  But because it's a collinear impact

10   it does -- it is -- it is the most represented

11   of the first point of contact that exists

12   that -- that we can do.  In other words,

13   he's -- he cannot get a five -- a 10.9 inch

14   offset from this rest or this maximum contact

15   point.  These points should still be 11 inches

16   apart because it's a collinear -- excuse me,

17   it's a -- it's a six o'clock PDOF.  The truck

18   should push in with five inches -- eleven

19   inches of offset, not 16 inches of offset

20   that's shown here.

21           Q.    So your opinion depends upon the

22   crush being perfectly linear with the center

23   line of both vehicles at maximum crush?

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 232

```
 1          A.    No.  Because we have the stamp at
 2    near first contact that matches this
 3    measurement.  So we get the Ford emblem stamp
 4    at first contact about 16 inches over that
 5    matches this.  And then we have his work that
 6    shows they're still 16 inches apart, what he's
 7    calling maximum engagement.  And that's
 8    consistent with a straight rear end impact of
 9    zero degrees by the -- as -- as the Crosby
10    report says Grimes had him lined up.  So we
11    have a record very near first contact.  We have
12    a record at maximum contact.  And Grimes never
13    showed any of this and -- and -- or revealed
14    this in his deposition, but his file does
15    reveal it.
16          Q.    Well, he wasn't asked in his
17    deposition about comparing the Ford logos at
18    maximum crush depth, which is the only thing
19    this shows.  And this was produced in his
20    deposition and was part of the basis of his
21    opinion with regard to the maximum depth.  So
22    if he didn't feel like the maximum crush depth,
23    which is several feet into the vehicles, was
```

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 233

1    representative of impact point, then it's not

2    like he's hiding anything; he just didn't think

3    they had anything to do with each other.

4                    MS. CANNELLA:   Object to whatever

5    that was.  Not a question.

6            Q.    Do you agree with that?

7            A.    As long as we don't have physics

8    and Newton's laws and the other evidence, I

9    could agree with you.  But we -- we actually

10   have the problem of science and engineering and

11   the ability to calculate, and even know that

12   this truck didn't move sideways.  We have a

13   record of this truck on the video where it's

14   not moving sideways during this.  For your

15   statement to be true, we would have to throw

16   out everything else we know about this and we

17   would have to have a video of the truck coming

18   in and dancing, you know, as it comes in.

19   And -- and that didn't happen.  And so in a

20   vacuum of uneducated persons, yes.  But if

21   we're going to do engineering and science and

22   physics, we -- we know that this is

23   representative of first contact.  And so I

G. Bryant Buchner                       July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                          Page 234

1    disagree with the statement you make

2    wholeheartedly.

3          Q.    Well, even in this -- this scan

4    that you have up here, the Ford logo of the

5    Escape is not lined up with the center line of

6    the Escape.  Correct?

7          A.    Oh, it is.  It is.

8          Q.    Well, if you look at the bottom of

9    this image, if you would leave it up there,

10   please.

11         A.    I'm doing everything I can.  The

12   computer doesn't want to cooperate.  I

13   apologize.  It has -- it has went black and

14   it's freezing.  It's why I can't open the

15   original files.  Just give it a second and see

16   if it -- let me see if I can stop sharing and

17   if it will come back.  With the video image and

18   all this, it's -- I don't know if you can see

19   me.  I can't even see you.

20         Q.    I can see you.  I can't see

21   anything being shared.

22         A.    Yeah, I've got a -- I've got a

23   black screen.  There we go.  Okay.  It says the

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 235

1    picture can't be displayed, so something has

2    happened to the PowerPoint.  It's one of those

3    things that happens with computers.  Let me try

4    to close it and reopen it.  Yeah.  We're

5    catching some grief here.  Okay.  Yeah.

6    This -- okay.  That's -- that's where we are.

7    Thank you.

8          Q.    Do we need a break for you to try

9    to get it up there?

10         A.    Well, I -- I thought it was up

11   there.

12         Q.    I can't see it.

13         A.    Here, try that.  How about that?

14   How about that?

15         Q.    Right.  Okay.  If you'd look at

16   the bottom of the screen, you have a yellow

17   tape there in the scan that indicates the

18   center line on the hood of the Escape.

19   Correct?

20         A.    Yes.

21         Q.    All right.  And you're saying that

22   that is aligned with the Ford logo on the back

23   of the Escape in this scan?

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 236

1          A.    I'm -- I'm not --

2                MS. CANNELLA:  Object to the form

3     of the question.  Mischaracterizes his

4     testimony.

5          A.    I'm saying his logos -- his logos

6     are 16 inches apart, which is the same distance

7     they were apart at impact.

8          Q.    Right.

9          A.    And we can make measurement of

10    that.  We don't have to -- we -- we don't have

11    to try to visualize it.  We have an exact

12    measurement of it two different ways.  That's

13    what I'm saying.

14         Q.    Well, my question is at this point

15    in the crash sequence, what evidence do you

16    have that the Ford Escape logo is still aligned

17    with the center of the Ford Escape?

18         A.    Well, it -- well, this is -- it's

19    been pinned and caught by the front of the

20    vehicle.  It may not be aligned with the

21    center, but it is definitely -- the

22    relationship between these two is -- is -- has

23    been anchored in the impact.  And that's why we

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 237

1    have this imprint and we have this -- and them

2    coming in and that's why they're here with the

3    crushed vehicles.  That's the reason everything

4    lined up, that's the way Grimes lined it up.

5    It doesn't mean you didn't -- the car was bent.

6    But it's aligned with essentially where it was

7    at the beginning of the impact.  But where the

8    front is now, we would have to go look at the

9    video and see what shifting it did.  But we

10   don't see the F-250 coming in and going

11   sideways.  We don't see the back of the car

12   going sideways to this level.  This is --

13   Grimes said to 10.9 inches, and he got it from

14   this, by the way.  This is how he got 10.9.  He

15   didn't see the crash happen.  He used this type

16   of analysis to get 10.9.  And he measured

17   between where they were now and projected back

18   to where they were at the time.  And he was

19   able to say 10.9.  I'm doing in reverse exactly

20   what he did with this crash test, and this is

21   16.

22        Q.    So your opinion depends upon the

23   position of the logo as being anchored

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 238

1    permanently throughout the crash scene?

2                MS. CANNELLA:   Object to the form

3    of the question.  Misstates his testimony.

4          A.    Look, I change height throughout

5    the day.  The more I stand up, the shorter I

6    get.  When I lay down at night, I get a little

7    bit longer.  But I'm always 6' 2, you know,

8    within reason.  Yeah.  There -- this is -- this

9    is a really good -- this is the best

10   representation that whatever exists for how the

11   vehicles were at maximum engagement and also at

12   initial contact, and it's the same method

13   Grimes used to get 10.9 inches of offset and I

14   used to get 11 inches of offset, and yes.  But

15   perfect within a millionth of an inch, no.  But

16   certainly within an inch.

17         Q.    All right.  And how did you

18   measure the points here between these two

19   edges?

20         A.    I just opened up his file and

21   clicked measure between here and here.  And it

22   gives me the lateral measurement of 16 inches.

23   It's -- it's -- it is literally the

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 239

1    measurements of all of these points that are

2    embedded in his file.  I just have to ask the

3    computer to display it.

4          Q.    All right.  And this measurement

5    scan here was not produced to us prior to the

6    deposition.  Correct?

7          A.    It was in Grimes's file.

8          Q.    Well, not your input of the points

9    and the measurement between the two points.

10   That's not in Grimes's file.

11         A.    Yes, it is.  All of these

12   measurements are embedded.  That's how it

13   generates the images, it knows the measurement

14   between each point.  I'm just showing -- I'm

15   just exposing it.  That's all I did.

16         Q.    Right.  But Grimes's scan doesn't

17   contain this pink line and the distance window

18   up there that you've inputted into this, does

19   it?

20               MS. CANNELLA:  I'm just going to

21   object to the suggestion that something --

22   something was not produced.  That's ridiculous.

23   This is Grimes's data we're looking at right

G. Bryant Buchner                        July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 240

1    now.

2            Q.    That -- you have on the screen

3    right now -- if you back up -- that is

4    contained within Grimes's file, that image

5    right there (indicating).  Is that correct?

6            MS. CANNELLA:  All of this data is

7    from -- from Grimes's file, Rick.  This is --

8    he's just -- he's showing us the file that

9    Grimes produced.  That's what we're looking at.

10           MR. HILL:  Right.

11           Q.    But the image that you just had on

12   the screen with the pink lines and the

13   measurement box, that's not in Grimes's file?

14           MS. CANNELLA:  You asked him to

15   create that for you.  You asked him to show it

16   to you.

17           MR. HILL:  Right.  But he created

18   that prior to the deposition.  Correct?

19           MS. CANNELLA:  No.  He did it

20   right in front of us.  Sorry.  Go ahead,

21   Bryant.

22           A.    I -- I did not.  I can do it right

23   in front of you if I open cloud compare.  These

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 241

1    are scaled vehicles all of these measurements
2    are embedded in his file.  That's how it knows
3    where all these things are.  That's what we do
4    with a scale drawing.  When we do a scale
5    drawing, we can take a scale and the scale, it
6    has an infinite number of measurements on it
7    that we just read off.  You asked me for the
8    distance between these two points, I put the
9    scale on it.  Now, the computers it's AutoCAD
10   so you want the distance between two points, we
11   just put it up and measure them.  In this 3D
12   point cloud, all of these measurements are
13   already in there.  I'm just going to expose the
14   ones I want to see.  So I don't have to make
15   that pink line.  I did that to demonstrate how
16   we can use it to show the measurements that are
17   in his file already.  I'm just exposing them.
18   It -- because -- because I have to open the
19   cloud compare file, I don't even have the cloud
20   compare file on my laptop that I use for Zoom.
21   It's on a bigger, stronger computer.  All we
22   have to do is open his file and say -- and we
23   can get any -- we can get millions of

Case 2:22-cv-00017-RWS    Document 182-10    Filed 03/17/25    Page 243 of 388
G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 242

1    measurements from his file just by telling the
2    computer, show us -- show us these scale
3    measurements it already has in it.  We're just
4    exposing it.  If it had all the measurements
5    showing, you wouldn't even know what it was
6    because it would just be a cloud of millions of
7    numbers.  So this is how builders build houses.
8    This is how re-constructionists draw a scene.
9    This is how re-constructionists look at cars
10   that are stuck together.  We use a computer
11   program to open it up.  And if I open it up, I
12   can spin it around and look at it and show his
13   work, and I can measure any point that I want
14   to measure and demonstrate it.  I'm not really
15   measuring.  I'm just exposing the measurement
16   that's in there.  So what I did was when I
17   opened the -- the cloud compare, I was going to
18   open it and just show it to you in the depo and
19   then I realized I'm using a non-cloud compare
20   computer and it will also probably kill my
21   video link.  I said, okay, let me show them how
22   I would do it if I had the opportunity to show
23   them.  It's just -- I'm -- I'm just showing

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 243

1    you -- I'm just zooming up a photo is all I'm

2    doing.

3          Q.    Right.  Well, let me ask this way.

4    Is there any mention in your rebuttal report of

5    your reliance upon Mr. Grimes's point cloud

6    images that you've just shown me as a basis for

7    your opinion regarding the offset in the crash

8    test?

9          A.    No.  That was his work.  He

10   already provided the measurements.  I'm just

11   showing you his measurements to support that my

12   work, you know, is accurate.  We didn't -- we

13   knew that the videos and whatnot showed it

14   being off.  So we went through the upwards.

15   And Mr. Grimes didn't even understand there was

16   a stamp there.  So I thought that would be the

17   easiest way for someone to understand it.

18   You're obviously having trouble understanding

19   this cloud compare file and how it functions.

20   But if I just open up his own file and show you

21   this drawing, I mean, that's all I'm doing

22   here.

23          Q.    I -- I totally understand the

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 244

1    cloud drawings.  I'm saying there's no mention
2    in your report that you will be relying upon
3    Grimes's cloud drawings in -- regarding the
4    offset.
5              A.    Yeah.  I -- I said I used his
6    file.  I mean, that's what we used.  That's
7    what we used was Crosby's file and Grimes's
8    file and Crosby's depo and Grimes's depo.
9              Q.    All right.  Well, I think it's
10   pretty clear you said there's three methods
11   that you used to determine the offset --
12             A.    My work.  This is his work.
13             Q.    If you'll let me finish.  But if
14   you're going to rely upon his work --
15             A.    Sir -- sir, I can't see you the
16   way we're doing this.  Can I go back to where I
17   can use the camera to see you?
18             Q.    Sure.
19             A.    That's why I'm interrupting you.
20   Thanks.
21             Q.    Can you see me now?
22             A.    Nope.  Not yet.  I'm trying.  I
23   can see you now.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 245

1          Q.    Okay.  All I'm trying to establish

2     is, can you point to where in your rebuttal

3     report you indicate that you intend to rely

4     upon the cloud scans done by Mr. Grimes to give

5     opinions regarding the offset in the crash

6     test?

7          A.    I would -- I think it's in the

8     file materials I listed.  This is just one of

9     his file materials.  He didn't -- remember, the

10    photos we're using, you know, are his photos.

11    I've got hundreds of photos I didn't show you,

12    but I'm using all of those.  So this is just

13    part of his file.  I think I said file.  Let

14    me -- let me -- let me open up -- let me open

15    up my report if I could find it.

16         Q.    Sure.

17         A.    Man, yeah, it says I have reviewed

18    and analyzed report and deposition of Grimes,

19    report and deposition of Crosby, scan data,

20    which is what we're looking at, and photos and

21    video data from the crash test performed by

22    Grimes and Crosby.  And then I -- I go on to

23    say one more time to say Grimes's file

G. Bryant Buchner                     July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 246

1    materials.  And I say based on the above, and

2    then -- then I used it.  And then the other is

3    my own work.  But if -- if Grimes had a photo,

4    I would expect that I could use it.

5           Q.    Well, I'm saying you specifically

6    delineate in your report that you use three

7    methods -- three methods to determine the crash

8    test offset.

9           A.    That's my independent --

10          Q.    Let me finish my question.  Was

11   this method of using Grimes's scan data listed

12   as one of the methods that you used to

13   determine the test offset?

14          A.    No.  Because my methods were

15   independent of this.  This is just his data

16   that's in his file that follows the same

17   methodology that he did to reconstruct the

18   accident and that I used to reconstruct the

19   accident.  He's presented it for us just like

20   he did all of his other data, just like he

21   presented scanned images of how the accident

22   vehicles hit.  I'm just using his presentation

23   to point out what the measurements actually are

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 247

1    in his work because he didn't know.  But it is

2    in there just to be -- just to be measured.  So

3    no, I'm -- I'm just -- I was just going over my

4    work.  This is his work.

5         Q.    Are there any other methods,

6    whether it's based upon your work or

7    Mr. Grimes's work or Mr. Crosby's work, that

8    you're going to rely upon to give testimony

9    regarding the offset in the crash test?

10        A.    In the -- in the PowerPoint we

11   show where his tow hook hit the crash test

12   versus where it hit in the accident.  That's

13   just using the photos.  I put them in here.  I

14   don't need the PowerPoint.  I can show you the

15   photos.  But I did put you some photos in what

16   we did yesterday to show the tow hook.  If you

17   want me to use the original photos, I'll use

18   the original photos.  And we don't get a

19   measurement out of it, per se, unless we use

20   Grimes's work.  Then -- then you can measure

21   it.  But you can see the tow hook really well

22   in some of the photos.

23        Q.    I just want to make sure I've

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 248

1    covered every basis for your -- or all of the

2    information you're relying upon to give

3    opinions regarding the offset in the crash

4    test.  We've --

5              A.    I'd like to show a photo then.

6              Q.    Sure.

7              A.    Share screen.  Let me find which

8    photo it is.  Come on, computer.  It's -- it's

9    refusing to open.

10             MS. CANNELLA:  We can see the

11   PowerPoint, Bryant.  We just -- probably like

12   you, it's just blank.

13             THE WITNESS:  Yes.

14             A.    The image on the left, slide 16 in

15   what I've given -- maybe the attorney can open

16   up slide 16 in -- in what we gave you.

17             Q.    All right.  Let me look.

18             A.    I've got to stop sharing and try

19   to get this off my screen.  Apparently, when I

20   share it, it locks me up.

21             Q.    Yeah.  I've been having the same

22   issue.

23             A.    You know, the bigger the computer

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 249

1    gets, the -- the files seem to always stay in

2    front of them.

3            Q.    So you need slide 16 from -- from

4    which document?

5            A.    Intended impact versus actual

6    impact.

7            Q.    And this is from your file that

8    you produced in association with this report?

9            A.    Yes.

10           Q.    The rebuttal report?

11           A.    It's in the GBB Post Depo Plus.

12           Q.    What did you call that again?

13           A.    I have a folder called GBB Post

14   Depo Plus.  I assume it's -- yeah.  It's --

15           Q.    I don't have such a folder.

16           A.    The -- the PowerPoints I've been

17   showing you and my amended report were in that

18   folder.

19           Q.    And the title again is what?  I'm

20   sorry.

21           A.    10519 -- this says it's Quest Post

22   Depo.

23                 MS. CANNELLA:  Yeah, that's what

Case 2:22-cv-00017-RWS    Document 182-10    Filed 03/17/25    Page 251 of 388
G. Bryant Buchner                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 250

1    we sent -- that's the -- that's what we sent

2    you.  That was their name of the file.

3                    THE WITNESS:  Yep.  If I said GBB,

4    I meant Quest.  10519 Quest Post Depo.

5                    MS. CANNELLA:  And then aside of

6    that is, approach angle plus, photomodels plus,

7    and then a whole bunch -- not a whole bunch,

8    but a number -- a dozen or so or less PDFs.

9            Q.    I don't see that file.  Sorry.

10                   MS. CANNELLA:  What's the name of

11   it, Bryant, did you say?

12                   THE WITNESS:  It is 10519 Quest

13   Post Depo Plus.

14                   MS. CANNELLA:  Yeah.  But what

15   inside of that file did you want?

16                   THE WITNESS:  Let me verify.

17   Intended versus actual impact.

18                   MS. CANNELLA:  Intended impact

19   versus actual impact?

20                   THE WITNESS:  Yes.

21                   MS. CANNELLA:  If you need me to

22   get that --

23                   MR. HILL:  No, I have that once

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 251

1    you explained it that way.

2              THE WITNESS:  Yeah.

3              MS. CANNELLA:  All right.

4         Q.    Is that it (indicating)?

5         A.    Yes, sir.  Slide 16.

6         Q.    Let's go ahead and mark this

7    document, intended impact versus actual impact.

8    It's Bryson 09487 through 9508 as whatever the

9    next exhibit is.

10             (Defendant's Exhibit Number 4

11             is marked for identification.)

12        Q.    Okay.  That slide appears to be

13   elite page 16, although you call it slide 16.

14        A.    That's it.

15        Q.    All right.

16        A.    Okay.

17        Q.    And what did you want to -- you

18   said you wanted to refer to this photo as

19   additional support for your offset opinions?

20        A.    Yes.  If you go down one slide --

21        Q.    Slide 17?

22        A.    Yeah.  17, the red arrow shows

23   where the tow hook hit in the accident.  And

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 252

1    slide 17 shows where the tow hook hit in the
2    crash test.  And there's an orange line dropped
3    down from the bolt poles on the tailgate of
4    where the license plate is.  It's one foot
5    across.  And we can clearly see that the tow
6    hook imprint in the accident is to the right of
7    those bolt holes.  And in the crash test the
8    tow hook imprint is to the left of those bolt
9    holes.
10           Q.    Right.  And this is the position
11   after both crashes, not at the point of initial
12   impact?
13           A.    Well, no.  The one on the right is
14   initial impact because that tow hook is -- left
15   a dent in the tailgate right there.  I mean,
16   that's -- the tow hook sticks out the furthest
17   in the front of the truck.  And on the left,
18   that dent in the bumper is from the tow hook.
19   And if we go on to zoom up on it, it's got a
20   little bit of white paint on it from the tape
21   on the front of the tow hook.  And that's what
22   bent the bumper the way it is.  So that's where
23   the tow hook hit there as well.  So that's --

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 253

1    those represent as good as accident

2    re-constructionists can do in an initial impact

3    because of the -- the orientation of the impact

4    and everything.  So yeah, that's -- that's --

5    that's where it was pushed to.  But it's also

6    the piece of metal where it started.  And it

7    also proves it's not an override because that

8    tow hook is stuck on that bumper all the way to

9    maximum engagement.  If it was an override,

10   then that tow hook which is located on the

11   bumper of the truck wouldn't still be pushing

12   on the bumper of the car.

13          Q.    And do you have a photograph that

14   shows the white tape that you mentioned?

15          A.    Go to the next slide.

16          Q.    Yeah.  And that's --

17          A.    And -- sorry.

18          Q.    Is that correct?

19          A.    Go down a slide or two in this

20   presentation and we'll get up close on it.

21          Q.    All right.

22          A.    Keep going.  There we go.  Okay.

23   That slide right there (indicating), we can see

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 254

1    the white on the bumper in the top image.  And

2    we see the bumper is caved in because the tow

3    hook hit it in the crash test.  But in the

4    bottom half of this slide, that's the bumper

5    from the accident vehicle.  And it -- you know,

6    it's still got its original shape for the most

7    part.  But you can see the tape marks up in

8    that hole a lot better in that photo.

9          Q.    All right.  Where exactly are the

10   tape marks on the photo on the top?

11         A.    If you follow the bumper in, at

12   the maximum point of the bumper.  So right

13   there (indicating).  Yep.  Right there.  Those

14   white marks are from the tape.  I need to --

15   let me see if I can find the image.  This is --

16   give me just a second.  Oh, okay.  Go to slide

17   13.  There we go.  There's a close-up of the

18   tow hook, a little bit of black on the end on

19   top of the white tape.  And there's the white

20   tape mark up on the bumper of the Escape.

21         Q.    Gotcha.  And that's Bryson 9499.

22         A.    Oh good.

23         Q.    All right.  Anything else about

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 255

1    this photograph that you're relying upon or

2    these photographs or this presentation with

3    regard to the offset?

4           A.    Yes.  Go to slide 20.  Slide 20 is

5    not the -- not the same one I was looking at.

6    15 would be it.  I'm sorry.  15 is kind of a

7    comparison of the one we just looked at to show

8    where the frame horn hit in the accident

9    compared to where the frame horn hit on slide

10   13 that we were just talking about.  And I say

11   the frame horn.  I actually mean the tow hook.

12   I apologize.

13          Q.    So slide 15, which is Bryson 9501,

14   you're matching up the tow hook in the accident

15   F-250 on where you think the tow hook impacted

16   the accident Escape?  That's the premise of the

17   red area?

18          A.    Yes, and that gives eleven inches

19   of offset.

20          Q.    And what basis do you have to

21   conclude that the point of the red arrow is

22   indicative of the point where the tow hook

23   impacted the accident Escape?  Like what's --

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 256

1      what all supports that opinion?

2              A.      Well, physics, accident

3      reconstruction experience, and both Grimes and

4      Buchner did it exactly the same way.  We used

5      the tow hooks.  He says, he used the tow hooks

6      to match them together.  That's how he got his

7      10.9 and, you know, we got our approximately a

8      foot, which is, you know, 11.  We're -- we're

9      both using the same methodology to match the

10     damage profile.  That's how it's taught in the

11     accident reconstruction books.  You -- you

12     match up the damage profiles on to the known

13     areas.  And then you know where those known

14     areas were, you know, before they were

15     undamaged, and that gives you your

16     measurements.  It's -- it's -- that's accident

17     reconstruction 101.  How else could you do it?

18             Q.      And you used a similar indication

19     of the tow hook impact location on the bumper

20     cover of the crash test Escape to analyze the

21     offset?

22             A.      We did.  In my photos of the seize

23     bracket, we located the seize bracket on the

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 257

1    bumper.  If you go down to -- what was it?
2    Slide 21.  In my report, in my work, in my
3    depo, there's a dent on the -- on the bumper
4    there at the bottom that corresponds to the
5    four and a half inches wide seize bracket.
6    That's working out of memory, four and a half
7    inches.  But there is a dent on the right
8    center of that, that corresponds to that seize
9    bracket as well.
10          Q.    Right.  So that shows you that the
11   C's bracket impacted the bumper in the actual
12   subject accident?
13          A.    Yep.  As an override.  So it went
14   up and over it and kept going.  And the bumper
15   went out of the way and that's why it was --
16   you know, it was already compromised by that
17   point in time.
18          Q.    Right.  But the seize bracket did
19   at least impact the bumper in the actual
20   accident?
21                MS. CANNELLA:  Asked and answered.
22          A.    Yeah.  But in the crash test the
23   seize bracket did not hit the bumper.  Only the

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 258

1    tow hook hit it, and that's why it's not an

2    override.

3            Q.    And so my question was did you --

4    you see here -- and this is slide 20, Bryson

5    9506.  And you see here there is the bumper

6    cover hanging down on the bottom right of the

7    crash Escape.  Did you reference any tow hook

8    marks on the bumper cover to determine the

9    offset in the crash deck?

10           A.    I don't -- I don't have enough to

11   do that with.  No, sir.  I just have the photos

12   that were provided.  I have a better record of

13   it.  I have a permanent record in the bumper

14   that I can see, so I'm happy with that.  No, I

15   haven't used the bumper cover of the crash

16   test.

17           Q.    That was my only question.  Okay.

18           A.    Sorry.

19           Q.    All right.  Looking here at the

20   slide we have up, slide 20, it's a rear view of

21   the accident -- I'm sorry, the crash test

22   Escape on the left.  And looking at that

23   photograph, can you tell whether the rear seat

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 259

1    was deflected by the hatch on the Escape?

2            A.    No.

3            Q.    Okay.  What would you need to look

4    at in order to determine that?

5            A.    We've talked about that already.

6    I thought there was some motion of it.  But I

7    wasn't sure if it was the floor pan or the

8    hatch or what.  I didn't have -- you know,

9    Grimes didn't measure or scan it.

10           Q.    Yeah.

11           A.    I don't know.  It's irrelevant to

12   me because this crash test is not relevant --

13   not representative of the accident.  But I

14   think -- I said I think it was displaced some,

15   but I don't know why.

16           Q.    Yeah.  I was just asking what

17   would you need to look at to -- to confirm the

18   source of the displacement in the crash test.

19   Whether you think it's relevant or not, what

20   would you need to do to do that?

21           A.    I'd have to start working to see

22   if I could figure it out.  But of course I'd

23   need to see the inside of the vehicle, which

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 260

1    I -- I haven't seen.

2            Q.    Right.  All right.

3                  MR. HILL:  Let's take about

4    another four-minute break.

5                  MS. CANNELLA:  Before we go off

6    the record -- just before we go off the record,

7    Rick, can you send me that -- that image that

8    you put on the screen with the HVE of the wreck

9    Escape?

10                 MR. HILL:  Sure.  I'm going to

11   have to find it.  I'll do it when we go off the

12   record at the end.

13                 MS. CANNELLA:  Thank you.

14                 MR. HILL:  All right.

15                 THE VIDEOGRAPHER:  The time is

16   4:11 p.m.  We're now off the record.

17                 (A break was taken.)

18                 THE VIDEOGRAPHER:  The time is

19   4:39 p.m.  We're back on the record.

20                 MR. HILL:  Thanks.

21           Q.    (Mr. Hill) Mr. Buchner, what

22   evidence do you have or that you intend to cite

23   to that Mr. Grimes used the distance between

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 261

1    the logos in his point -- in his cloud scans of

2    the subject accident to determine the offset in

3    the subject accident?

4         A.    I'm not saying he did because he

5    didn't even notice the logos according to his

6    depo.  I'm just using his work.  That was the

7    easiest way I thought I could demonstrate it

8    because it's the easiest way to find the center

9    of the vehicle in his -- in his -- the scan he

10   gave us.  But we could probably, you know, use

11   the center line markings or some other things.

12   But the logos are -- just were the simplest to

13   me because I knew where the logos were at first

14   contact -- or represented at first contact.

15   And I also knew that we had used -- he had used

16   things like a tow hook to back it up at the

17   crash.  So this is just the same methodology.

18   So no, he's -- he's free to use whatever he

19   wants.  He -- he basically -- I don't think

20   he -- he even opined to what the offset was

21   unless he said 10.9 inches in the crash test.

22        Q.    Okay.  I think -- I think we

23   misfired there.  I was asking about the subject

Case 2:22-cv-00017-RWS    Document 182-10    Filed 03/17/25    Page 263 of 388
G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 262

1    crash.

2           A.    Oh.

3           Q.    Not -- not the crash test.  So it

4    was the subject crash.  What evidence do you

5    have that Mr. Grimes used the distance between

6    the logos at maximum crush to determine the

7    offset in the actual crash?

8           A.    Well, that's -- it was 10.9 inches

9    according to him because that is -- would be

10   the offset.  I don't know if he used that or

11   whether he used other things.  I don't think he

12   had ever seen the logo imprints if he was -- in

13   his depo.  He was probably using the tow hooks

14   or something similar.  But you know, they're

15   all geometrically tied together.  So whether he

16   is using it or not, that's the answer.  I'm not

17   saying he did use it.  I'm saying that's --

18   that's something I can use to easily show some

19   additional work within the accident.  I

20   don't -- I think he was probably using the tow

21   hooks.

22          Q.    Okay.  So if we read your

23   deposition transcript from earlier today and it

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 263

1    says that you opined that Mr. Grimes used the

2    distance between the logos and his scans of the

3    actual subject vehicles to determine the offset

4    in the actual crash, that would be a misreading

5    or a misinterpretation of your testimony?

6    You -- you don't know whether he used that or

7    not to come up with the 10.9 number that he

8    decided was the offset in the subject crash?

9           A.    I can look at it both ways.  Yes,

10   that is a good accurate statement I made.  And

11   we can also look at it where it is inaccurate.

12   The bottom line is the only point cloud match

13   that he provided that could be opened and used

14   shows 16 inches between the logos.  There isn't

15   one that shows 10.9 and there's nothing in his

16   file that's a point cloud where they match that

17   he provided that can show 10.9.  Every -- every

18   reference that we use would give 16.  I just

19   use those.  And they are his measurements

20   because they're part of the point cloud.  But

21   he didn't reference them.  So I agree he didn't

22   reference them, and I'm not saying he said he

23   referenced them.  I'm saying, in what he

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 264

1    provided, he provided that measurement.

2         Q.    Right.  You keep switching back

3    between the crash test and the subject

4    accident.  I'm not talking about the crash

5    test.  I'm talking about the subject accident.

6    In Mr. Grimes's analysis of the subject

7    accident.  You testified earlier today that you

8    believed his methodology for coming up with

9    10.9 in the subject crash was based upon his

10   point cloud scans of the subject vehicles and

11   the measurement of the distance between the

12   logos in those scans.  And I'm saying, do you

13   have any basis to believe that he used the

14   distance between the logos and the point scans

15   of the actual vehicles to come up with the

16   offset in the actual crash?

17        A.    In the actual crash, whether he

18   clicked on the logos or not, they're in his

19   point cloud.  Similarly, you can measure

20   between them.  I'm not saying he used those.

21   I'm not even saying he looked at those.  He

22   might have just been using the -- the tow hooks

23   and things that he testified to.  But as I sit

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 265

1    here, I haven't -- to my knowledge, I haven't
2    seen his point cloud match for the accident.
3            Q.    Okay.
4            A.    If I can find it though, I could
5    do a better job of answering the question.
6            Q.    Sure.  Did you use your scans --
7    your point cloud data from the actual crash to
8    measure the distance between the logos at
9    maximum crush to calculate your offset in the
10   subject crash?
11           A.    No.  We -- we didn't calculate the
12   offset.  We matched the vehicles together to
13   demonstrate the offset.
14           Q.    Right.
15           A.    And then -- then of course we can
16   measure between any references on the vehicle
17   we want to get it.  When we actually went back
18   and did the eleven inches, I don't -- I don't
19   remember if we were -- I'm pretty sure we were
20   using the logos before that.  But we could have
21   done it two or three other ways.  But -- but
22   because you want to check it a few times, a few
23   different ways.  I don't remember exactly what

G. Bryant Buchner                      July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 266

1    the process was.  But we got, you know, eleven.

2    I think there's something -- I think there's

3    even something -- I think we are measuring the

4    logos for the eleven.

5            Q.   Can you say for certain how you --

6    first of all, it's my understanding in your

7    original report and your original deposition

8    and in your original simulation you determined

9    the offset was twelve inches.  And you indicate

10   that you actually determined the offset in the

11   subject crash to be eleven.

12           A.   Okay.  It's almost an

13   understanding or a semantics issue.  In my

14   deposition I didn't have the offset recorded or

15   written down.  I was asked so I took a ruler to

16   our scale drawings and -- and said, hey, it's

17   approximately a foot.  You know, it's very hard

18   on those drawings to see an inch at the size

19   they were printed out for.  So once I said a

20   foot, I've been true to a foot.  But I know

21   that Grimes said 10.9.  And I've checked our

22   work since then, and I'm like, okay, if we

23   really push our work and our clouds and

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 267

1    everything, 11 inches is the right number.
2    So -- so I'm not changing, I'm just able to be
3    more accurate because I went back and did it
4    more precisely with a better tool.
5        To be clear, the offset is determined by the
6    damage match on the vehicles.  I don't measure
7    it and then decide how to put the vehicles
8    together.  I put the vehicles together.  And
9    then if I want it, I open up the file and I
10   measure it.  In other words, the -- the
11   physics, the geometry of the vehicles
12   determines it.  So it's -- it's an oversight on
13   my part not to have recorded it, written it
14   down or saved that measurement, but it's a
15   product of the -- of the work we do.  It's --
16   and it's contained in the work with all the
17   millions of other measurements that are in
18   there.  I just had not formally presented it.
19   And I did the best I could in the depo to give
20   a good answer, which was twelve.
21        Q.    Okay.  You had to have done that
22   work you just described in order to decide what
23   offset to use in your original simulation.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 268

1      A.    Right.  At -- at the time the

2  simulation was set up, I could have opened it,

3  measured it or Ms. Porter could have done that

4  and then put it in the simulation.  In other

5  words, that's the way it would have worked

6  because we have the measurement contained --

7  not in a contained simulation, but contained in

8  the point clouds.

9      Q.    Right.  So you -- at the time you

10  ran the original simulation, you went through

11  that process and you decided to input twelve

12  inches as the offset in the original

13  simulation?

14      A.    I think we probably put in eleven.

15  But like I said, I don't have that file

16  anymore.  Now, since -- since we redid it, I

17  said I want to be true to what I said in the

18  depo.  And that errs in the favor of -- of

19  producing more crush.

20      Q.    Yep.

21      A.    So I gone with the twelve because

22  that's what I said in my depo, but if you --

23  you want to know what I believe it is in my

G. Bryant Buchner                   July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 269

1    heart, I believe it's 11.  But both of them are
2    approximately 11, approximately 12.  Either one
3    is fine.
4           Q.    Right.  But you don't know as we
5    sit here today what offset you used in your
6    original simulation that formed the basis of
7    your -- your -- your report in this case?
8           A.    That's right.  I would say 0.9
9    plus or minus 0.1 along in there depending on
10   what we measured that day.
11          Q.    Okay.  Right.  And now that you
12   say that you've looked at it closer after your
13   deposition and you think it's closer to eleven,
14   what -- how did you come to that conclusion?
15   What -- what was the methodology you used to
16   come to that conclusion?
17          A.    Well, I'll give you -- I've
18   provided you an image of it, of one of them and
19   one that's easy for the jury and everybody to
20   understand.  It's in the crash test offset
21   PowerPoint, if you'd like to open it or I'll
22   try to open it.
23          Q.    I can do it.  Hold on.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 270

1        A.    I -- I produced something that was
2    simple.
3        Q.    Yeah.  All right.  Can you see
4    the -- this is the -- we've marked this as an
5    exhibit somewhere along the lines.  This is
6    crash test offset, that's what you're referring
7    to?
8        A.    Yeah.  Slide two.
9        Q.    All right.  Slide two.  This slide
10   here?
11       A.    Yes.
12       Q.    All right.  And so this appears to
13   be a measurement of a photograph -- or is this
14   a scan of the subject, Escape?
15       A.    This is a -- this is a photomodel
16   of the Escape, the accident Escape where we can
17   see the logo imprint of the Ford on it, of the
18   Ford F-250 on it.  So in the -- in the process
19   of doing our work for the rebuttal, we had to
20   make a photomodel of the Ford with a logo on
21   it.  We've already talked about that.
22       Q.    Right.
23       A.    And so then we made a measurement

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 271

1    on here, and we got a little less than eleven

2    inches.

3            Q.    All right.  And is this the --

4    it's not a photograph that you put in the

5    photomodel.  It's a -- it's a point cloud,

6    correct, scan?

7            A.    You use the scan.  But you also

8    put in hundreds of photos.  And the --

9            Q.    Okay.

10           A.    If your scan is accurate and your

11   photos are decent, it can -- it can create a

12   photomodel, which is more than just a point

13   cloud.

14           Q.    I got you.  So it uses both the

15   point cloud and the photographs and all of that

16   combined?

17           A.    Yes.

18           Q.    Okay.  And then the software then

19   based upon you indicating the points will tell

20   you the 3D distance between the two points?

21           A.    Right.

22           Q.    And that's what the pink line

23   is -- is represents?

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 272

1          A.      Yes.

2          Q.      On page two of the crash test

3     offset.

4          A.      Yes.

5          Q.      How did you determine the midpoint

6     of the Ford logo you can see in this

7     photograph?

8          A.      It's visually.  It could be a

9     little bit to the left of where it is.  But if

10    I missed it, I wanted to miss it a little bit,

11    you know, to the right.  So it's -- it's a

12    visual determination.  Trying to -- the bottom

13    of the arc in the left and the center of the

14    logo in the right because they are about the

15    same level and measure it.

16         Q.      Okay.  So -- so you didn't measure

17    the width of the Ford logo here and determine

18    the exact midpoint of the logo when you input

19    the points for the photomodel to do the

20    measure.  You just eyeballed it?

21         A.      Right.  I just clicked on the

22    center and then clicked on the bottom of the

23    arc on the left.  If somebody wants to do it

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 273

1    again and come up with a little bit different
2    number, I'm okay with that.
3            Q.    Sure.  And then as far as the
4    bottom of the arc, you just eyeballed that.
5    That's in your mind an approximate bottom of
6    the middle of the arc of the F-250?
7            A.    Right.  If I were going to do it
8    again, I might move them both left about a
9    quarter of an inch, but it's still going to be
10   eleven inches.  Well, this is actually a little
11   less than eleven inches.  So it's going to be
12   right at eleven.
13           Q.    All right.  Did you undertake any
14   other methodology to determine the offset in
15   the subject crash?
16           A.    Other than using our scan, no.
17   But it's not written down or recorded.  It's
18   just clicking on a scan.  I used the scan of a
19   depo, say a twelve, and then I'm using this to
20   get a little less than eleven.  I'm -- I'm
21   convinced eleven is the right number.
22           Q.    All right.  What is the relevance
23   of the crash test offset not matching the

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 274

1    subject crash offset?  Why is that relevant to

2    you?

3              A.    You're engaging less of the back

4    of the Escape, so you're still -- you're still

5    hitting, you know, at the frame level.  But

6    you're engaging less of the back of the Escape.

7    So you know, it's -- it -- it probably

8    overstates the crush from that, just one

9    observation.  And what we'd like to see is a --

10   is something that doesn't have unnecessary

11   variables.  We have a lot of variables in the

12   crash test, too many to actually get a final

13   opinion out of anything other than that, hey,

14   it didn't override, which we already knew it

15   wasn't going to override, you know, just based

16   on the structure of the vehicles and their

17   original design.  We didn't need a crash test

18   for that, but other -- that's -- that's what it

19   provides.  Beyond that, I don't know that it

20   provides information.

21             Q.    Okay.  And when you say it

22   probably overstates the crush, have you

23   undertaken any work to determine whether it

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 275

1    does overstate the crush?

2            A.    Well, logic would say that it

3    would.  But since we don't have a crash that

4    represents, you know, the proper elevation, the

5    proper over -- over -- overlap, all we can say

6    is that it probably does because as Mr. Grimes,

7    he confirmed that in his deposition.  We know

8    that -- we know historically that the less

9    overlap we have, the more crush we have because

10   the width and the depth are the two things that

11   develop crush -- that determine crush.  If we

12   have less width, we have more crush, because

13   they're mathematically related in the physics,

14   in the calculations that we -- we use in

15   accident reconstruction.  So the formulas we

16   have state that there will be less -- will be

17   more crush in the test because it has less

18   offset or more offset.

19           Q.    And did you make any effort to

20   calculate the -- the increase in crush that you

21   say would be attributed to an increase in

22   offset?

23           A.    No, I have not.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 276

1          Q.    Okay.  And so you're not able to

2    quantify the difference in crush that would be

3    caused by the alleged five plus or minus one

4    inch additional offset that occurred in the

5    crash test?

6          A.    No.

7          Q.    Okay.  Hold on one second.  I

8    thought somebody on here was sending me a chat.

9    So -- apparently not.  So I'm sorry.

10      Is one way that you could make an effort to

11   quantify the difference in crush that would be

12   attributed to an increase in offset would be to

13   run an HVE simulation, use your exact

14   parameters that you used in your simulation,

15   and increase the offset and then see what the

16   program spit out as far as an increase in

17   crush?

18         A.    I don't know.

19         Q.    So you dont know if the software

20   would be able to tell you the difference in

21   crush based upon a difference in offset?

22         A.    Not to the level the crash test

23   would have done with accuracy.  I think

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 277

1    intuitively we all know there would be more

2    crush.  But we don't know if it would be

3    representative.  And we don't know if it would

4    be a reliable methodology because we've been

5    through that already.  That's -- that's a -- a

6    simulation compared to a crash test.  Grimes

7    used a crash test to try to compare the

8    accident.  And now you're going to do a

9    complete new analysis to compare a simulation

10   to a crash test.  That's -- that's not possible

11   to do sitting here.  We've been through this.

12          Q.    Well, I'm not asking you about

13   that.  I'm asking you, you could run an HVE

14   simulation with increased offset and compare

15   that to your other simulation, and so you'd be

16   comparing the exact identical simulations with

17   the only change being the offset.  That's

18   possible.  Correct?

19          A.    Nope.  For the reasons we talked

20   about, I cannot agree with you on that.

21          Q.    Okay.

22          A.    Thank you.

23          Q.    Yeah.  So it's not possible to run

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 278

1    your exact same simulation, but increase the

2    offset to 17 inches.  That's not --

3              MS. CANNELLA:  Objection.  Asked

4    and answered multiple times for hours on end.

5         Q.    You can answer.

6         A.    I've answered that as good as I

7    can.  I don't have any more to say.  I mean --

8    I -- I do not -- I cannot say that we can do

9    that, no, for all of the reasons I've been

10   going over.

11        Q.    And therefore you cannot say

12   whether that would be an appropriate

13   methodology for verifying whether the HVE

14   software is a scientifically reliable

15   methodology for predicting crush?

16        A.    Pardon?

17        Q.    Yeah.  If you can't say that any

18   variation in offset is necessarily going to be

19   a reliable HVE test, that's what you're saying

20   is that the only reliable HVE test you know of

21   or simulation you know of is the one you ran.

22   And if you change the offset, you can't verify

23   whether that simulation would be a reliable and

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 279

1    accurate simulation?

2              MS. CANNELLA:  Objection.  He did

3    not say that the only reliable HVE he's ever

4    seen is the one that he ran.

5         Q.    All right.  You can explain it.

6              MS. CANNELLA:  What's the

7    question?  I mean, object to the form of the

8    question.  Misstates his testimony.

9         Q.    Go ahead.  Answer it if you can.

10             MS. CANNELLA:  No.  Don't answer

11   it, Bryant.  It doesn't -- it's not a

12   question -- it's not a question that makes any

13   sense because he never said that.  So how can

14   he answer that if you're saying he said that

15   and he didn't say that.

16             MR. HILL:  Are you instructing him

17   not to answer?

18             MS. CANNELLA:  Yes, I'm

19   instructing him not to answer because it's

20   getting crazy.  You keep telling him your --

21   it's your testimony that X, Y, Z and he doesn't

22   testify to those things.  So ask him whatever

23   question you want to ask him without

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 280

1    characterizing his testimony -- or

2    mischaracterizing it.

3              MR. HILL:  I've asked him that.

4         Q.    Would a -- do you have an opinion

5    as to whether an HVE simulation run exactly the

6    way you ran the simulation in this case, your

7    amended simulation, with the only change being

8    to increase the offset to the offset that you

9    said occurred in the crash test, do you have an

10   opinion as to whether that simulation would be

11   a proper scientific methodology to evaluate

12   what the simulation would produce at that

13   different offset?

14             MS. CANNELLA:  Object to the form

15   of the question.  Asked and answered.  Outside

16   the form -- the scope of his supplemental

17   testimony.  He did not run an HVE on the

18   Exponent crash test, and he has explained

19   multiple times why he cannot tell you whether

20   it would be an accurate methodology as he sits

21   here today.  This is a conversation we already

22   had, and you said you were done with this line.

23             MR. HILL:  Yeah, I'm asking in a

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                            Page 281

1    different way now.  I'm -- I'm not talking

2    about comparing it to the crash test.  All

3    right?  I'm saying -- he says that there is a

4    differentiation in crush that occurs based upon

5    the level of offset.  And I'm asking him, is it

6    his opinion that it's impossible to use HVE to

7    determine how much additional crush occurs per

8    a set distance of offset.

9            Q.    Is it your opinion that that's

10   impossible to use HVE for that type of

11   determination?

12               MS. CANNELLA:  Same objections.

13           Q.    Go ahead.

14           A.    I answered the question.  It's not

15   using HVE.  I just used standard accident

16   reconstruction calculation methodologies for

17   crush and width.  There is a relationship

18   between the two.  And when width is decreased,

19   crush goes up by every formula that I've ever

20   seen written in accident reconstruction.

21       As for as using the simulation, I haven't

22   done that analysis and I'm totally

23   uncomfortable for the reasons we've been over

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 282

1    many times already.  I cannot tell you that we

2    could use the simulation for that, the way

3    you're asking and I don't -- because that's

4    a -- that's a new analysis, and I'm not willing

5    to -- to state we can.  I'm not even willing to

6    start doing the analysis here.  But I did try

7    to give you some examples earlier, my concerns.

8        But no, I don't have an opinion about that.

9    And -- but I do have an opinion that decreasing

10   width -- increased width of overlap increases

11   crush.  And we know that because every single

12   crush formula that's ever been written that I'm

13   aware of that we use our calculators for,

14   would -- would show that there is a

15   relationship that when the width is -- is

16   decreased, the crush increases.

17           Q.    Would you agree that in order for

18   the HVE simulation to be a reliable methodology

19   as you've used in this case, that software

20   would need to follow that same relationship you

21   just mentioned that the calculations show as a

22   part of science, it would need to follow that

23   same methodology in order to mirror the actual

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 283

1   science that you know of with regards to the

2   truck?

3               MS. CANNELLA:  Object to the form

4   of the question as vague and confusing.

5               Q.    Go ahead.

6               A.    In general we know that we'll

7   follow that generic methodology, but that's

8   generic.  In other words, but to apply it to a

9   particular crash test, which is what you're

10  asking me to do, you would have to go through a

11  whole process to see whether it was applicable

12  and reasonable.

13              Q.    I'm not --

14              A.    I'm sorry.  I haven't done that.

15  And so the answers I've given have been true

16  and accurate today.  We're not -- we understand

17  how the simulation works.  We understand how

18  the calculations work.  That's fine.  We just

19  can't make the leap -- and is it a leap you're

20  asking.

21              Q.    Well, I'm not asking you to

22  compare it to the crash test.  I'm asking a

23  simple -- I won't use the term simple, but

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 284

1    could there be a scenario where HVE, as you

2    increase the offset, it doesn't match the

3    mathematics that show how much crush should

4    increase as you increase the offsets?

5              A.    You're asking a blind question

6    with information that I don't know what you're

7    asking about.  You won't even let me relate it

8    to the crash test.  So you know, we've -- we've

9    used it to change one variable, the height, so

10   that we got contact.  And I think it's very

11   robust for that near -- with -- with lots of

12   overlap between the vehicles.  That's what we

13   use it for.  Beyond that, all of these other

14   things, I -- I don't have any opinions about

15   those.  I can't help you.

16             Q.    Okay.

17             A.    But I can tell you that --  that,

18   you know, there is a relationship between crush

19   and width and the program will generally follow

20   that.  But there are other concerns that have

21   to be all addressed before we can start

22   agreeing to -- to what you're asking me to

23   agree to.  I can't do that.

Case 2:22-cv-00017-RWS    Document 182-10    Filed 03/17/25    Page 286 of 388
G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 285

1          Q.    What is your basis for your

2    opinion that changing the height of the vehicle

3    allows HVE to be a robust simulation program

4    and to properly simulate the hypothetical crash

5    with the height being changed?  What's your

6    basis for that opinion?

7                MS. CANNELLA:  Object to the form

8    of the question as vague, confusing.

9          Q.    Go ahead.

10          A.    Because we now -- once we remove

11    the lift kit, we've got now a bumper level,

12    frame level to frame level, bumper level

13    impact.  The simulation program, I've been

14    using it since 19 -- 1991, so over 30 years for

15    things like this, and it's been acceptable

16    since for that period of time.  There's been

17    plenty of papers written to validate its

18    reasonableness.  It came with the crush

19    stiffness coefficients that were needed to do

20    it.  All I had to do was tell it the speed at

21    impact and I could verify that those speeds we

22    got the delta-V's.  So -- so I have -- I'm

23    using it well within its constraints.  And I

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 286

1    don't have any concerns about how the vehicle
2    was contacted because I'm getting that good --
3    that good match up that I think would have
4    happened in the accident had it not been a --
5    not jacked up, but raised, lifted.  So I think
6    I'm using the program exactly as it's supposed
7    to be used for -- for this particular purpose
8    and how I've seen it used before.
9          Q.    And if you change the offset, you
10   don't have an opinion as to whether you'd be
11   using the program exactly as it's designed to
12   be used?
13         A.    You'd have to go through the
14   analysis before you used it.  It wouldn't be
15   right just to say, yeah, let's just go use it
16   for whatever -- you know, someone can ask a
17   question about it.  I'd need to take the time
18   to look at it as an engineer.  I mean, that's
19   the truth.
20         Q.    So if you changed the offset and
21   ran it, what would -- what kind of result would
22   you need to analyze or look at to decide as an
23   engineer whether it was still valid at the

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 287

1    different offset level?

2                MS. CANNELLA:  Objection.  I'm

3    sorry, I feel like you're drawing this

4    objection, but don't answer it anymore.  We're

5    done with this.  I can point to the Court to

6    hours of this question over and over again.

7    And we're not doing it anymore.

8                MR. HILL:  Are you instructing him

9    not to answer?

10               MS. CANNELLA:  Yes, I am.  It's

11   five o'clock.  We've been going for -- since

12   ten o'clock this morning and we've had many,

13   many discussions about this exact topic.

14               MR. HILL:  That's great.  We'll

15   take it up with the Court.  We've had hours of

16   discussions about it because he refuses to

17   answer the question, but that's fine.

18               MS. CANNELLA:  I've even answered

19   it for you.  I've rephrased -- rephrased what

20   he said.  So I don't know what else you want,

21   Mr. Hill.  This is a wild experience.

22               MR. HILL:  It's...

23          Q.    How can you independently verify

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 288

1    that HVE -- that your HVE simulation in this

2    case is accurate?  Is there any way you know of

3    other than citing to the fact that you believe

4    there's articles that say it's a proper

5    software for this application?  Is there

6    anything you can do beyond what you've read or

7    what others have said in order to test or

8    verify that your simulation was accurate?

9           A.    This is a tool that we commonly

10   use.  It's generally accepted in the industry.

11   I'm using it simply as it would normally be

12   used in accident reconstruction to demonstrate

13   a -- a crash, to simulate a crash.  There is

14   nothing special about what I'm doing.  I've got

15   the shape of the vehicles.  I have the crush

16   stiffness for the vehicles that came with the

17   program.  I'm hitting it at a known speed.  And

18   i'm producing a known delta-V.  It is -- unless

19   you call into question the whole program, which

20   it's been used for -- I've been using it for 30

21   years and never had a problem using it or

22   having it utilized.  I did vet it before I used

23   it.  I made sure it was appropriate.  There's

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 289

1    other programs that I might use for other types
2    of things.  You know, you're -- it's kind of
3    like what you did earlier when we were asked
4    about how can you tell where an impact was.
5    You look at maximum engagement crush.  Well,
6    that's what we use.  We don't get to the
7    vehicle's hit.  We use maximum engagement crush
8    and we follow generally accepted principles.
9    It's generally accepted to use computer
10   simulations like HVE, S-Mac, SIMON in the
11   industry.  It's one of our normal calculation
12   tools just like a calculator is a normal
13   calculation tool.  If it had not been generally
14   accepted, then I wouldn't be using it.  But we
15   did it by hand or on a calculator.  We got a
16   crush level.  Then we did it with a simulation
17   program.  We got different results.  And for
18   mine I'm using the higher of the two.  I'm
19   using it as just an alternative calculation
20   methodology, which is appropriate.  So I
21   believe it's reasonably accurate.  Not
22   perfectly, but I believe it's reasonably
23   accurate for what it was designed to be used

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 290

1    for.  And I think that if we -- if I go do the

2    research, I'll find plenty of papers that show

3    that to you.  I've been using it for 30 years.

4         Q.    Are there any other simulation

5    software programs you could use other than HVE?

6         A.    Let's do something else.

7    Mr. Grimes, I think, claims to be an instructor

8    in it.  Who is he instructing -- if it's -- if

9    it's not a valid tool for accident

10   reconstruction, why is he using it?  Why is he

11   instructing it?  It's -- he's used it.  He

12   knows it's valid.  It's a good tool for the

13   purpose.  His only complaint was that it was an

14   override.  I can show you why it's not an

15   override.  It's clearly not an override.  And

16   if -- if you take his objection away that it's

17   an override, then he is as far as I can tell

18   agreeing to use it because he had no other

19   objection in his deposition to it.

20        Q.    All right.  Did you see his

21   testimony where he unequivocally testified that

22   HVE is not an appropriate software to use in a

23   situation like this where you have a complex

G. Bryant Buchner                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 291

1    crush situation?  He clearly gave the opinion

2    that when he teaches classes on this, he

3    instructs people not to use it in this

4    environment?

5          A.    Well, that's a conversation you

6    and him had because he didn't say that under

7    oath in the deposition.

8          Q.    I would ask you to go back and

9    read it.  Are you aware of any other simulation

10   software that you could have used to run your

11   simulations in this case?

12         A.    No.

13         Q.    Okay.  And I want to go back to my

14   question, and this is different.  It's -- I

15   understand all of your basis to believe that

16   HVE is an appropriate simulation tool for you

17   to use to test your hypothetical crash at a

18   different height.  I understand all of that.

19      My question is, is there any independent way

20   for you to verify that your simulation in this

21   case was accurate?

22         A.    Well, is there an independent way

23   for me to verify that the hand calculations we

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 292

1    do every day that are based on the works of

2    Campbell and others in the past, well, I'd have

3    to go back and do all of the work.  That --

4    that groundwork has been laid by others,

5    otherwise this simulation program wouldn't

6    be -- having been used by me for 30 years and

7    others in the industry, like Mr. Grimes.  I'm

8    not going to go back and redo all of the

9    validation of the program.  That's been done

10   by others.  Just like the crush calculations

11   that we normally do are and the methodologies

12   that we use in the book over there.  The book

13   behind me says HVE is a robust method.  You

14   know, I'm -- I'm using a tool that's generally

15   accepted in the industry in a way that's

16   generally accepted in the industry.  I don't

17   know what else I -- I mean, I'm not going to go

18   back and -- and redo all of that history of

19   work and research.  And I've paid people to

20   train me in using it.

21          Q.    Do you know whether you can run

22   a -- other HVE simulation and compare it to

23   yours and use that as a way to validate the

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 293

1    accuracy of your simulation?

2           A.    Oh, that's -- that's like --

3    that's a broad, broad can of worms.  You know,

4    I -- there's -- there's about 400 answers to

5    that question.  I'm not sure what you're --

6    what you're poking at.

7           Q.    All right.  I'll put it this way.

8    If we ran an actual crash test and we ran it

9    identical to your simulation in this case where

10   the speeds were identical to your simulation,

11   the weights, everything was identical, the

12   impact point offset identical, what should the

13   result of that actual crash test be?  Should it

14   mirror your simulation?

15          A.    It should be whatever the answer

16   is.

17          Q.    So you can't --

18          A.    The simulation --

19          Q.    -- state whether -- I'm sorry.  I

20   thought you finished.

21          A.    The simulations is -- all

22   calculations are simulations.  All simulations

23   are approximations of reality.  The -- the

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 294

1    results of the test would be the results of the

2    test if someone would do it that way.  And then

3    you'd have those results, and you wouldn't need

4    the simulation.

5            Q.    Okay.  And so if the results of

6    that actual crash test were different than the

7    simulation, you would defer to the actual crash

8    test, and you wouldn't need the simulator?

9            A.    If it was as you said, yes.

10           Q.    Okay.  And if it varied from the

11   actual crash test, would that be evidence to

12   you that the simulation was not scientifically

13   reliable in predicting the real world crash?

14           A.    No.  A simulation is exactly that.

15   It's a simulation.  It's -- it's not the real

16   world.  If you could actually -- and let's just

17   be clear here, you are not referring to the

18   test run by Grimes and --

19           Q.    No, I'm not.

20           A.    Okay.  So if someone were to

21   actually do one along the certain path, it

22   wouldn't invalidate the simulation because the

23   simulation is -- is what it is.  It's an

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 295

1    approximation of reality.  It's not reality.

2    But if you had reality, you would use reality.

3            Q.    Okay.

4                  MR. HILL:  All right.  I believe

5    that's all I have.  Thank you, Mr. Buchner.

6    Sorry if we got a little testy there.  That's

7    normally not my style.  But I -- I apologize

8    for that.  And I -- I know in the future I will

9    try to avoid that.  It was a little bit of

10   making sure you heard me and a little bit of

11   frustration.  I appreciate your time, and --

12   and thank you.

13                 THE WITNESS:  Wimbledon is going

14   on right now, and those -- those competitors

15   are intense and they do their job well and then

16   they shake hands at the end.  I'm -- I'm more

17   than happy to have talked to you today.

18                 MS. CANNELLA:  Can we take a break

19   and let me just see if I have anything?

20                 MR. HILL:  Sure.  I need to use

21   the restroom anyway.  So...

22                 THE VIDEOGRAPHER:  The time is

23   5:19 p.m.  We're now off the record.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 296

1          (A break was taken.)

2               THE VIDEOGRAPHER:  The time is

3     5:34 p.m.  We're back on the record.

4

5                    EXAMINATION

6     BY MS. CANNELLA:

7          Q.    Mr. Buchner, did you do the work

8     that's reflected in your May 2024 report to

9     formulate new opinions or to show the work and

10    how you developed opinions in your original

11    report?

12         A.    Our amended report was just to

13    provide the basis for the opinions that were

14    already given.  There aren't any new opinions

15    in there.  It was just -- just trying to make

16    sure we had the supporting materials.

17         Q.    And did your opinions base -- did

18    your opinions change based on what was

19    disclosed in May?

20         A.    No.

21         Q.    All right.  When you were talking

22    about working in the simulation files, can you

23    explain when you run a simulation and you run

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 297

1    different iterations of it, is that akin to,

2    like, editing in a document?  Like, in other

3    words, when you run a simulation, do you create

4    a new -- well, strike that.  That's a bad

5    question.

6        When you run a simulation, are you creating

7    a new thing or are you just editing the -- the

8    inputs that are on the program?

9             A.    Well, you have to open it.  And

10   then once you open it, if you're typing a

11   letter, every paragraph you type is new.  It's

12   not -- it's -- just every keystroke is new.

13   You have to build it and work through it.  Same

14   thing with simulation.  You have to start with,

15   you know, opening it up, getting the vehicles

16   imported, positioning the vehicles, telling the

17   program what speeds to use, updating the --

18   it's just an ongoing typing process, you know,

19   that doesn't -- you know, you just keep -- keep

20   inputting the data until you get it all in

21   there.  And it runs using the proper data, and

22   then you save it.

23             Q.    So if we were to equate it to

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 298

1    using a Word software and, you know, we were

2    editing a document as we go along, we could

3    just delete a paragraph or rewrite a paragraph,

4    for example, we haven't created an entirely new

5    document when we do that; we're just editing

6    that document?

7            A.    Right.  That's the way it works.

8            Q.    Okay.  So you're kind of inputting

9    different data points or assumptions and then

10   seeing what happens in the outcome?

11           A.    Well, right.  You're -- you're not

12   necessarily putting in different assumptions.

13   You're -- you're trying to get the data

14   properly input, but it takes time to do that.

15   You do make mistakes too.  I mean sometimes the

16   car goes backwards because you've got the

17   velocity stuck in the wrong way.  So you got to

18   fix that problem.

19           Q.    Were any files deleted that you

20   know of?

21           A.    No.  Other than the -- somehow

22   the -- the original run file or the final run

23   file, I can't get it.  I don't know where it

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 299

1    is.  But there's no intent to delete any files.

2    It's just updating and keep running.  Every now

3    and then a backup will get made or something

4    like that.  We're still just working on the

5    same file.

6            Q.    Right.  Okay.  The -- there was

7    some discussion about how much -- or that the

8    fluid had leaked out of the radiator in the

9    subject -- in the subject F-250 when you

10   weighed it, and the weight of the glass that

11   was broken, and so there was some broken shards

12   in the car and some broken shards out of the

13   car.  Can you talk a little bit about

14   differences in weight and when there's kind of

15   a tipping point of -- of how much weight

16   matters when there's variations like that?

17           A.    Well, the vehicles weigh thousands

18   of pounds.  You know, we normally don't even

19   consider the -- the change of weight in a gas

20   tank to be particularly critical.  And but as

21   far as glass and, you know, radiator fluid,

22   that's -- I don't know that I've ever added

23   water in for a leaking radiator fluid because

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 300

1    it's -- it's, you know, 20 to 30 pounds worth

2    of fluid usually.  To a big F-250, maybe it's a

3    hair more.  But our calculations are not that

4    precise.  We're -- we're looking, you know, for

5    a reasonable answer.

6        Now, we did weigh the vehicles, so it means

7    we are very close to the weight of the

8    vehicles.  It's much better than using

9    specifications.  When you use specifications

10   they have one weight for virtually every

11   vehicle that was made that year, you know.

12   So -- it's -- it's -- we've already started out

13   being more accurate because we actually have

14   the vehicles with the various -- the type of

15   battery.  The type of battery can change the

16   weight of a car.  We don't ever change the type

17   of battery.  But we weigh the car with the

18   battery that's in it, in it.  So you know,

19   changes of a few hundred pounds usually are

20   inconsequential.  If we think they are

21   consequential, then we'll be, you know, will be

22   more robust.  Usually a few hundred pounds is

23   -- is inconsequential.

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 301

1          Q.    The differences that the

2    Rough Country lawyer asked you about between

3    the HVE and the subject wreck or subject

4    vehicles include the fact that the HVE didn't

5    have a sunroof in that design using -- and I

6    think you spoke to this to some degree, but

7    using the sunroof or the -- the vehicle without

8    the sunroof would actually make the results of

9    your analysis less favorable to Plaintiffs.

10   Correct?  In other words, it would mean -- it

11   would mean that there would be more crush in

12   the HVE than if you used a structure that had

13   that extra support in it?

14         A.    Well, HVE does not have the

15   capability to include or exclude a sunroof

16   specifically.  What it -- the way it's included

17   is with the crush stiffness coefficients.  So

18   you know, we would -- so that's actually a

19   user -- we can put one in that looks like it's

20   got a sunroof.  But HVE is really using the

21   data from crash tests or the crush stiffness

22   coefficients derived from past accidents or

23   crash tests to -- to -- to do a calculation

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 302

1    model.  It doesn't -- we tell it about those

2    things.  The program doesn't know about those

3    things.  But to know whether or not our data

4    included a sunroof or not specifically, we'd

5    need to go back -- you'd have to go back to the

6    original crash tests and things.  But in this

7    case, HVE has the number in there.  It's robust

8    enough for what we were doing with or without.

9    But if I were going to run a crash test, I

10   would try to get the same vehicle and use it

11   because the roof does get involved in a crash

12   test.

13           Q.    The -- I was sitting here trying

14   to think when I've seen HVE used by automakers.

15   And have you seen automakers use HVE to

16   simulate NTSA, federal FMVSS testing, dynamic

17   testing?

18           A.    Yes.  Yes, I've seen studies done

19   using it to try to predict what will happen

20   in -- in accidents or crashes of -- of designed

21   like various crash test and whatnot.

22           Q.    Okay.  And the government

23   accepts -- accepts the certifications based on

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 303

1    HVE-type testing?

2            A.    Right.    The government doesn't

3    require a crash test.    They just require the

4    manufacturer to certify that if they do, do the

5    crash test, it will pass it.    And the

6    manufacturers have lots of tools at that.    And

7    HVE is one of those types of tools, just like

8    the government has HVE available to do a study

9    if they want to avoid all of the expenses of

10   doing actual crash testing.    So I'm pretty sure

11   all of that is common in the industry.    I

12   didn't pull any reference to that.    I didn't

13   expect that to be an issue here.    But yes, it

14   can be used for those types of things.    And in

15   my opinion, it has.

16           Q.    Okay.    And I'm going to mark the

17   visual that Rough Country showed you as

18   Plaintiff's Exhibit 1 to your deposition.    I

19   can share my screen and pull that up.    One

20   second.    Okay.    Can you see that?

21               (Plaintiff's Exhibit Number 1

22               is marked for identification.)

23           A.    I can.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 304

1          Q.     All right.  And so we'll mark that
2     as Plaintiff's Exhibit 1.
3                 MS. CANNELLA:  That's all I have.
4                 MR. HILL:  That's all the
5     questions you have, you said?
6                 MS. CANNELLA:  Yes.
7                 MR. HILL:  All right.  I've just
8     got one quick follow-up based upon what you
9     just asked.
10
11                EXAMINATION CONTINUED
12    BY MR. HILL:
13         Q.     In this case, Mr. Buchner, do you
14    intend to give any opinion as to whether
15    Rough Country could have used HVE prior to this
16    incident to simulate crashes involving vehicles
17    with their lift kits in place?
18         A.     I know they could have considered
19    it.  I don't know if they could have.  I'd have
20    to do a little consideration and come up with
21    an exact answer.  But it's one of the tools
22    that is available for consideration, yes.
23         Q.     I believe you've testified that

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 305

1   you did not use HVE to simulate the actual

2   crash in this case because the override would

3   prevent the program from being designed as

4   used, which is when there's bumper-to-bumper or

5   structure-to-structure impact.

6                MS. CANNELLA:  This is outside the

7   scope of the supplemental report.

8          Q.    Go ahead.

9          A.    That's not exactly --

10               MS. CANNELLA:  There's no

11  question.

12         A.    Okay.  I don't think that that's

13  what I said, but thank you.

14         Q.    Well, was there any testimony that

15  you gave in your original deposition regarding

16  the usage of HVE that you intend to change

17  based upon your supplemental work in this case

18  and since the time of your first deposition?

19               MS. CANNELLA:  Object to the form

20  of the question.  It's vague.

21         A.    Yeah, I -- I actually haven't -- I

22  can't tell you exactly what I said in the first

23  deposition.

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 306

1          Q.    Right.  But as we -- go ahead.

2     Sorry.  I thought you were finished.

3          A.    I did the best I could to answer

4     the questions at the time.  But I don't -- I

5     don't have any comments one way or the other as

6     I sit here.

7          Q.    Okay.  And how -- how do you

8     define a couple hundred pounds?  Just to make

9     sure there's no discrepancy there, in answering

10    those -- in all those questions, I believe you

11    said a couple hundred pounds this way or that

12    way is not a weight that would concern you.

13       What -- what is a couple hundred pounds?

14         A.    I thought I actually said a few

15    hundred pounds.

16         Q.    Yeah.  So what's a few.  Yep.

17    Thank you for correcting me.

18         A.    Just starting out for vehicles of

19    this size, you know, 300 pounds -- if it was

20    getting close to 300 pounds, I might start

21    worrying about it.  But you know, I don't -- in

22    this case we tried to get the -- the weights

23    more accurate.  That's why we weighed it.  I

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 307

1    had those vehicles weighed.  I made sure they

2    were weighed so we had the best starting point

3    we could.  So little things like a lit bit of

4    radiator fluid is -- is inconsequential.

5    Because if you just use the specs, you don't

6    know how far off you are when you're starting.

7    The specs are -- in my experience, with all the

8    number of vehicles that I have weighed, I've

9    had them off over a thousand pounds.  So you

10   know, in this case I wanted it close.  I wanted

11   it within, you know, one or two hundred pounds

12   for sure.  So we -- we weighed them and then

13   added in reasonable weights.

14        Q.    Sure.

15        A.    But I don't have an exact number.

16   But we're -- we're close enough for what I've

17   done it -- for the work that I've done.  I'm

18   sure of that.

19        Q.    Sure.  So if the weights are

20   within 200 pounds, you would consider that to

21   be accurate enough -- accurate enough from a

22   weight perspective to properly test the

23   vehicles?

G. Bryant Buchner                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 308

1          A.    Yeah.   But there's no -- there's

2     no one exact right answer.   I mean, if it's

3     a -- if it's a motor scooter off by 200 pounds,

4     we've got a real problem.   If it's a tractor

5     trailer off by 200 pounds, it's more than

6     irrelevant --

7          Q.    Well, I'm talking about vehicles

8     in this case.

9          A.    I know.   I know.   But we've got

10    one really big vehicle and one smaller vehicle.

11    So you know, the big vehicle, you can have much

12    larger discrepancies and it's irrelevant than

13    the smaller vehicle.   So there isn't one answer

14    for this.   We want to be close.   We like to

15    be -- a hundred pounds I'm not even going to

16    bat an eye at.   Two hundred pounds, that's

17    normal between experts to be off a couple

18    hundred pounds.   I'm not arguing about that.   I

19    don't think Mr. Grimes is either.   He says our

20    weights are different but our weight ratios

21    are, you know, very close to the same.   You

22    know, we have a depth of knowledge that's

23    greater than just 200 pounds is the go or

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 309

1    no-go.  It's not a pass/fail.  Get it

2    reasonably close.  And at a few hundred pounds,

3    that's generally always reasonably close.

4             Q.    Okay.  Great.

5                   MR. HILL:  Thank you for your

6    time.  That's all I have.

7                   THE WITNESS:  Okay.

8                   THE VIDEOGRAPHER:  Anything

9    further?

10                   MS. CANNELLA:  No.

11                   THE VIDEOGRAPHER:  All right.

12   This concludes the videotaped deposition.

13   We're off the record at 5:48 p.m.

14                   MS. CANNELLA:  Do you want to read

15   and sign?

16                   THE WITNESS:  I want to read.

17

18

19      (The deposition ended at 5:50 p.m. EST.)

20

21

22

23

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                        Page 310

1                  REPORTER'S CERTIFICATE

2    STATE OF ALABAMA,

3    BALDWIN COUNTY,

4            I, Paul Morse, Certified Court Reporter

5    and Commissioner for the State of Alabama at

6    Large, do hereby certify that the above and

7    foregoing proceedings was taken down by me by

8    stenographic means, and that the content herein

9    was produced in transcript form by computer aid

10   under my supervision, and that the foregoing

11   represents, to the best of my ability, a true

12   and correct transcript of the proceedings

13   occurring on said date and at said time.

14           I further certify that I am neither of

15   kin nor of counsel to the parties to the action

16   nor in any manner interested in the result of

17   said case.

18

19

20

21

22           Paul Morse, CCR

23           ACCR #588 Expires 9/30/24

Page 311

1    Tedra L. Cannella

2    tedra@cannellasnyder.com

3                        August 2, 2024

4    RE: Bryson, Santana And Joshua v. Rough Country, LLC

5         7/11/2024, G. Bryant Buchner (#6793607)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-southeast@veritext.com.

16        Return completed errata within 30 days from

17   receipt of testimony.

18        If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                Yours,

23                Veritext Legal Solutions

24

25

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                              Page 312

1    Bryson, Santana And Joshua v. Rough Country, LLC

2    G. Bryant Buchner (#6793607)

3                 E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   G. Bryant Buchner                       Date

25

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 313

1    Bryson, Santana And Joshua v. Rough Country, LLC

2    G. Bryant Buchner (#6793607)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, G. Bryant Buchner, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   G. Bryant Buchner                Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20____.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

G. Bryant Buchner    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[& - 250]**                                                        Page 1

| **&** |
|---|

**&**   4:11

| **0** |
|---|

**0.04**   11:19
   52:11
**0.1**   269:9
**0.35**   67:1,2
**0.45**   52:12
**0.5**   162:2,4
**0.7**   67:2
**0.8**   38:22
**0.9**   269:8
**017**   1:5
**09348**   7:3
**09377**   7:3
**09487**   251:8

| **1** |
|---|

**1**   3:13 7:4,6
   201:21 303:18
   303:21 304:2
**1.1**   100:6
**1.25**   207:1,6,15
**1.42**   206:23
   207:4,15
**1.5**   202:2
**10.9**   202:10
   231:13 237:13
   238:13 256:7
   261:21 262:8
   263:7,15 264:9
**10.9.**   225:5
   237:14,16,19
   263:17 266:21

**100**   82:9
**101**   256:17
**10519**   249:21
   250:4,12
**10:00**   5:7
**10:15**   5:12
**11**   1:18 5:12
   202:10 231:15
   238:14 256:8
   267:1 269:1,2
**11:13**   61:10
**11:28**   61:13
**12**   28:6 37:23
   54:12 60:23
   89:8 269:2
**12:15**   89:12
**13**   26:3 135:4,9
   135:22 136:1,6
   254:17 255:10
**14**   105:21
   146:12 178:1
**15**   255:6,6,13
**150**   202:1
**16**   199:2 207:3
   220:12,14
   226:8 228:19
   229:12,20
   230:13 231:19
   232:4,6 236:6
   237:21 238:22
   248:14,16
   249:3 251:5,13
   251:13 263:14
   263:18

**17**   52:19,22
   54:20,23,23
   55:12 57:2,3
   57:15 58:21
   59:19,20
   251:21,22
   252:1 278:2
**17.00**   53:6,23
   54:18
**17.92**   39:5
**170**   79:13
**178**   3:14
**17:10**   46:12
**18**   213:19
   214:10
**18378**   310:21
**186**   3:15
**19**   285:14
**1991**   285:14
**1:03**   137:5
**1:13**   137:8
**1:57**   176:10

| **2** |
|---|

**2**   3:14 178:1,8
   238:7 311:3
**20**   96:2 255:4,4
   258:4,20 300:1
   313:15
**200**   307:20
   308:3,5,23
**2021**   53:9
   58:21
**2023**   15:8 16:9
   28:7 35:12
   37:23 54:14

**57:10 58:22**
   59:8 66:6
   92:19
**2024**   1:18 5:12
   6:11 7:2 27:18
   46:12 53:2
   141:23 146:13
   178:1 296:8
   311:3
**21**   257:2
**23**   8:1
**2400**   4:12
**250**   39:6 62:1
   63:3,23 65:8
   66:14,16 67:9
   74:21 76:23
   77:5,12,23
   78:6,19,20
   79:4 80:13,17
   85:12 88:3,9
   88:13 95:16,17
   99:4 104:18
   151:22 152:6,9
   152:18 153:2,4
   160:11 161:14
   162:19 178:7
   179:14,15
   181:17 206:18
   206:20 208:11
   208:16 209:17
   209:18 212:17
   213:23 214:8
   215:5 221:9
   223:23 224:2,5
   224:16 229:22

**[250 - absolutely]**                                      Page 2

237:10 255:15
270:18 273:6
299:9 300:2
**250's** 152:23
**251** 3:16
**29** 77:2,10
**296** 3:6
**2:07** 176:13
**2:15** 183:1
**2:18** 183:4
**2:22** 1:5
**2:33** 195:18
**2:56** 195:21

**3**

**3** 3:15 186:7,9
**3,410** 82:21
**30** 285:14
288:20 290:3
292:6 300:1
311:16
**300** 306:19,20
**30030** 4:16,20
**303** 3:17
**30326** 4:12
**304** 3:7
**315** 4:15,19
**3344** 4:11
**3a** 177:17
196:3
**3b** 178:3
**3d** 73:20
178:15 198:21
198:22 241:11
271:20

**4**

**4** 3:16 251:10
**400** 293:4
**43.9** 161:16
162:2 164:8,8
164:9,21
**43.9.** 170:23
**44** 163:13,21
164:20 165:4,7
171:1
**45** 100:17,18
101:8 132:4
144:19 150:20
220:14
**49.9** 100:4
101:22 163:8
163:23 164:8
171:2
**4:11** 260:16
**4:39** 260:19

**5**

**5.92** 207:10
**50** 162:17
164:8
**50s** 161:16
**51** 88:9,14
100:5 103:1
162:18 163:1
163:11 164:10
164:15,18
166:14,21
167:4 168:14
171:19
**588** 310:23

**5:19** 295:23
**5:34** 296:3
**5:48** 309:13
**5:50** 309:19
**5a** 179:7
**5b** 178:22
179:7 200:2

**6**

**6** 3:5 206:2
238:7
**6793607** 311:5
312:2 313:2

**7**

**7** 3:13
**7/11/2024**
311:5
**75** 201:15,21
**75th** 201:17

**8**

**8** 6:11 7:2
46:12 48:1
53:2 58:9
141:23
**8,040** 78:21
80:20
**885** 4:16,20

**9**

**9/30/24** 310:23
**9349** 37:19
**9376** 72:13,16
**94** 225:18
**9401** 161:5
**9404** 183:7

**9406** 200:1
206:4
**9407** 206:2
**9454** 193:13
**9459** 188:19
**9499** 254:21
**9501** 255:13
**9506** 258:5
**9508** 251:8

**a**

**a.m.** 5:7,12
61:10,13
**ability** 14:22
145:3 233:11
310:11
**able** 6:21 41:7
41:9 93:12
103:14 110:12
140:13 145:18
152:17,19,20
156:10 185:17
187:3 191:21
217:5 237:19
267:2 276:1,20
**above** 5:8 33:9
34:19 73:23
188:16,22
196:6,9 209:16
221:19 224:3
246:1 310:6
311:6 313:7
**absolutely**
143:22 174:15
191:14

Case 2:22-cv-00017-RWS    Document 182-10    Filed 03/17/25    Page 317 of 388
G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[absorbing - actually]                                           Page 3

**absorbing**
  110:3
**absorption**
  153:3
**acceptable**
  285:15
**accepted**
  288:10 289:8,9
  289:14 292:15
  292:16
**accepting**
  182:19 204:6
**accepts** 302:23
  302:23
**access** 33:12,19
**accident** 9:20
  42:11 43:4,12
  75:19 76:19
  81:4,19 83:17
  84:11 85:8
  88:14 93:14
  94:20 95:22
  101:5,6 102:20
  106:21 107:8
  107:21,23
  108:4,5,19,19
  109:1,14
  114:14,23
  118:16 119:10
  119:11 121:2
  122:21 123:18
  124:1 130:2
  132:3,4 133:15
  135:23 136:18
  147:13,18,23

149:18 150:4,8
150:8,11,14
151:13,15
153:15 154:1
154:20 155:10
155:20 157:10
157:13 161:10
161:13 162:17
163:21 164:9
165:4,7,13,16
166:1,9,21,23
168:2 169:20
170:1,14,16
171:1 172:5,9
172:18,20
173:2 177:15
179:16 180:4,6
180:13,14
185:19 193:12
200:16 201:3
204:14 246:18
246:19,21
247:12 251:23
252:6 253:1
254:5 255:8,14
255:16,23
256:2,11,16
257:12,20
258:21 259:13
261:2,3 262:19
264:4,5,7
265:2 270:16
275:15 277:8
281:15,20
286:4 288:12

290:9
**accidents**
  109:18 136:2
  139:14 143:21
  150:9 301:22
  302:20
**account** 75:18
  79:11 80:12
  81:14 84:14
  85:3,3,12
  91:12 207:19
**accounted** 81:7
  84:20,21
**accr** 310:23
**accuracy**
  276:23 293:1
  311:9
**accurate** 16:19
  22:3 37:10
  39:3,17 41:20
  43:16 46:22
  50:20 51:4,12
  51:13,14,15
  123:8 129:15
  140:11 219:14
  243:12 263:10
  267:3 271:10
  279:1 280:20
  283:16 288:2,8
  289:21,23
  291:21 300:13
  306:23 307:21
  307:21
**accurately**
  51:22 215:14

**acknowledge...**
  313:3
**acknowledg...**
  311:12
**acting** 5:2
**action** 310:15
**actual** 17:2,5,8
  17:23 29:20
  33:12 37:11
  49:4 62:15
  75:19 79:22
  108:15 113:6
  117:23 148:18
  166:9,23 168:2
  169:20 170:14
  170:18,19
  171:21 172:8
  173:2 200:21
  211:9 212:2
  249:5 250:17
  250:19 251:7
  257:11,19
  262:7 263:3,4
  264:15,16,17
  265:7 282:23
  293:8,13 294:6
  294:7,11
  303:10 305:1
**actually** 14:7
  15:17 16:8,15
  17:8 22:2 30:9
  31:2,8 33:11
  34:7 47:2
  53:16,21 68:13
  68:18 79:18,22

G. Bryant Buchner
July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[actually - analysis]**
Page 4

| | | | |
|---|---|---|---|
| 81:21 82:14 | 276:4 281:7 | 263:21 277:20 | **allegation** |
| 84:23 86:6 | **additions** 313:6 | 282:17 284:23 | 106:3 |
| 87:13 102:12 | **addressed** | **agreed** 2:1,8,16 | **alleged** 276:3 |
| 114:17 120:6 | 284:21 | 50:3,14 161:3 | **allotted** 311:19 |
| 122:10,15 | **adjust** 56:13,14 | **agreeing** | **allow** 79:10,17 |
| 132:1 133:3 | **adjustments** | 284:22 290:18 | 91:18 207:23 |
| 139:5 142:1 | 31:13 46:21 | **agrees** 154:14 | 215:12 216:2 |
| 143:23 148:7 | **admissible** | **ahead** 29:11 | **allowed** 97:20 |
| 148:19 153:4 | 138:18 139:10 | 102:6 108:2 | **allows** 136:5 |
| 156:1 163:10 | 140:4 | 111:21 112:3 | 285:3 |
| 163:18 166:11 | **admit** 138:15 | 114:3 116:6 | **alluded** 23:13 |
| 167:15 174:22 | **admits** 114:23 | 117:18 120:19 | 24:11 50:8 |
| 177:2 180:10 | **advantage** 88:3 | 124:17 131:21 | **alternative** |
| 194:10 199:5 | 150:19 | 132:14 140:21 | 289:19 |
| 200:16 220:8 | **advise** 34:23 | 176:15 224:6 | **amended** 7:8 |
| 222:1 230:5 | **affect** 131:22 | 229:3 240:20 | 7:12,14 15:6 |
| 233:9 246:23 | **affects** 118:21 | 251:6 279:9 | 30:19 51:20 |
| 255:11 265:17 | **aggressiveness** | 281:13 283:5 | 52:4,15 61:19 |
| 266:10 273:10 | 138:2 | 285:9 305:8 | 66:15 84:5 |
| 274:12 294:16 | **ago** 86:7 112:5 | 306:1 | 85:21 142:7 |
| 294:21 300:13 | 192:1,8 | **aid** 186:21 | 249:17 280:7 |
| 301:8,18 | **agree** 57:6 | 310:9 | 296:12 |
| 305:21 306:14 | 58:17 77:1 | **air** 129:11 | **amount** 51:5 |
| **add** 79:13 83:2 | 84:12 92:22 | **akin** 297:1 | 80:22 148:18 |
| 205:10 | 96:4 99:5,16 | **al** 1:7 | 163:16 168:11 |
| **added** 79:2 | 100:8,13 | **alabama** 5:2 | 168:14 201:14 |
| 80:5 85:16 | 108:10 122:6 | 310:2,5 | 201:21 |
| 193:23 206:14 | 123:22 125:7 | **align** 202:5 | **analyses** 213:1 |
| 227:13 299:22 | 140:12 141:1 | **aligned** 204:1 | **analysis** 9:3,5 |
| 307:13 | 143:17 154:1 | 235:22 236:16 | 43:12 88:5 |
| **adding** 40:21 | 162:15 176:8 | 236:20 237:6 | 102:12 107:9 |
| 212:21 | 179:14,23 | **alignment** | 108:12 111:15 |
| **additional** 59:9 | 181:3,16,23 | 201:9 228:5 | 116:12 119:12 |
| 79:11 146:18 | 191:5 212:4 | 230:7,8 | 119:13 127:15 |
| 251:19 262:19 | 213:13 233:6,9 | | 129:9,22,23 |

132:23 134:12
134:15,18
135:21 148:12
156:10 184:3
210:22 211:2
212:16 213:10
214:8,14
216:15 217:13
237:16 264:6
277:9 281:22
282:4,6 286:14
301:9
**analyze**   108:11
108:15 143:5,6
206:9 256:20
286:22
**analyzed**   119:7
245:18
**analyzing**
108:18 122:3
135:23 144:4
183:17 186:16
209:10
**anchored**
236:23 237:23
**angle**   250:6
**animal**   109:1
**answer**   16:23
29:13 30:6,13
36:19 40:6
41:2,3,4 47:10
49:13,17 50:13
50:19,23 64:18
65:14 95:2
102:15 105:15

111:13 117:4,9
117:11 118:22
119:3,15,23
120:1,11,13
121:12,14,16
121:18,18,20
121:22 123:14
124:7 125:2,6
126:1,3 127:9
130:15,20
132:6,12,17
133:4,7,12,14
133:23 134:5
134:14,17,23
135:6 136:10
136:12 137:18
137:20 140:6,9
140:22 143:13
144:13 145:2,3
146:2 154:13
164:11 165:22
166:6 204:7
217:16 262:16
267:20 278:5
279:9,10,14,17
279:19 287:4,9
287:17 293:15
300:5 304:21
306:3 308:2,13
**answered**
111:19 112:2
120:18 124:3,5
124:16 126:23
133:10 134:7,8
134:9,16 135:5

140:20 141:8
144:8,11,15
146:7 151:9
218:8 257:21
278:4,6 280:15
281:14 287:18
**answering**
116:20 127:12
180:3 265:5
306:9
**answers**   10:19
12:3,4 38:10
56:8 116:11
130:9 134:13
283:15 293:4
**anticipate**   60:9
**anybody**   25:23
26:14 27:6
43:21 45:7
129:2
**anymore**   67:19
268:16 287:4,7
**anyway**   295:21
**anyways**   70:1
172:16 188:11
**apart**   226:8
229:20 231:16
232:6 236:6,7
**apologize**   101:8
128:3 137:14
176:4 184:16
234:13 255:12
295:7
**apparently**   9:6
215:23 248:19

276:9
**appear**   77:17
**appearances**
4:9
**appearing**   4:13
4:16,20
**appears**   66:12
193:14 251:12
270:12
**appended**
313:7
**appendix**   46:9
46:12 74:3
78:15
**apples**   100:18
103:15,15
165:1,1,2,2
170:11,12
**applicable**
283:11 311:8
**application**
288:5
**applications**
145:14
**applied**   65:15
65:16 94:10
**applies**   113:5
149:5
**apply**   167:22
283:8
**appreciate**   15:3
119:15 121:14
137:17 138:6
216:12 295:11

G. Bryant Buchner
July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[approach - auto]

Page 6

**approach**
121:23 171:23
250:6
**appropriate**
12:11 101:21
130:3 136:7
172:4 173:10
278:12 288:23
289:20 290:22
291:16
**approved** 62:8
62:17,19
**approximate**
20:15 41:3
47:13 87:14
273:5
**approximately**
77:9 86:9 87:3
103:14 201:22
207:12 208:8
256:7 266:17
269:2,2
**approximation**
85:6 201:19
295:1
**approximatio...**
293:23
**arc** 192:21
193:8 272:13
272:23 273:4,6
**architect** 133:3
**archived** 42:5,6
42:19 43:23
**archives** 9:18

**area** 122:22
123:2 177:18
177:19 255:17
**areas** 175:14
256:13,14
**argue** 60:19
143:9 152:16
221:22
**arguing** 308:18
**argument**
118:9,17
143:14,16,19
202:19 204:19
204:21 224:15
**arrange** 117:6
**arrogant** 117:8
**arrow** 251:22
255:21
**artfully** 16:3
**article** 111:2
**articles** 288:4
**aside** 18:12
42:14 250:5
**asked** 10:20
29:19 49:15,17
64:16 65:9,13
65:18 86:15
98:11 111:19
112:2 113:16
115:19 120:17
123:6 124:2,5
124:16 126:23
133:10 134:6,8
136:15 140:19
141:8 142:13

175:5 180:4
218:8 232:16
240:14,15
241:7 257:21
266:15 278:3
280:3,15 289:3
301:2 304:9
**asking** 70:22
71:9 76:8
89:19 107:8,9
107:10,16
113:10 114:5,9
116:11 117:7
119:11 124:19
125:10 128:22
128:23 130:15
130:20 132:11
132:13,15
133:4,6 141:10
141:18 142:10
145:9,15 146:6
148:1 169:11
170:6 182:2
191:12 259:16
261:23 277:12
277:13 280:23
281:5 282:3
283:10,20,21
283:22 284:5,7
284:22
**assign** 2:13
**associated** 8:22
22:3,11,17
27:10

**association**
249:8
**assume** 101:16
162:5 249:14
**assumed** 162:3
**assuming** 78:21
82:20 102:1
**assumption**
166:7
**assumptions**
298:9,12
**atlanta** 4:12
**attach** 177:22
**attached**
311:11
**attachment**
155:8
**attempt** 6:13
48:23 130:10
191:16
**attempted**
39:21 139:9
**attempting**
91:15
**attempts** 37:22
42:5 137:18
**attorney** 5:17
248:15 311:13
**attributed**
275:21 276:12
**august** 28:22
28:23 58:21
311:3
**auto** 109:20
139:17

G. Bryant Buchner
Bryson, Santana and Joshua v. Rough Country, LLC
July 11, 2024

[autocad - believe]                                                      Page 7

**autocad** 241:9
**automakers**
  302:14,15
**av** 66:9 110:3
**available** 55:19
  66:6 68:21
  98:16 112:9
  113:12 303:8
  304:22 311:6
**avenue** 4:15,19
**avoid** 295:9
  303:9
**aware** 44:15
  58:20 59:10
  73:3 92:17
  138:17 139:4
  282:13 291:9
**axle** 142:3

**b**

**b** 46:9,12 74:3
**back** 9:18,22
  10:17 11:6,11
  11:23 12:18,19
  18:5,16,19
  23:17,22 25:1
  25:14 28:16,22
  34:13 54:21
  61:13 65:21
  66:6 68:4
  74:19 83:9
  89:12 92:7,18
  131:2 137:8
  156:14 161:22
  165:10 175:23
  176:13 183:4

185:12 186:6
186:13 195:21
201:5 213:23
218:2 219:2
220:22 221:21
222:20 230:15
234:17 235:22
237:11,17
240:3 244:16
260:19 261:16
264:2 265:17
267:3 274:3,6
291:8,13 292:3
292:8,18 296:3
302:5,5
**backup** 15:13
  17:13,17 21:4
  299:3
**backwards**
  184:19 298:16
**bad** 6:18 13:9
  43:8 297:4
**baker** 75:6,10
**baldwin** 310:3
**base** 18:11
  296:17
**based** 13:17
  15:9,10,19
  19:5 41:8
  60:15 67:7
  70:9 75:23
  82:5 107:7
  112:11,17
  142:4 145:14
  145:16 147:14

161:5,17
163:10 165:7
166:6 169:5,12
169:14 176:20
176:21 192:4
195:2 206:9
208:5 213:4
214:14 216:16
217:2 246:1
247:6 264:9
271:19 274:15
276:21 281:4
292:1 296:18
302:23 304:8
305:17
**basic** 115:3
**basically** 8:4
  40:3 42:14
  57:19,21 101:2
  115:3 159:14
  167:9 182:8
  211:22 261:19
**basis** 151:21
  204:18 218:7
  224:15,18,23
  225:12,14
  232:20 243:6
  248:1 255:20
  264:13 269:6
  285:1,6 291:15
  296:13
**bat** 308:16
**bates** 7:3 37:18
  161:5

**battery** 300:15
  300:15,17,18
**beauty** 200:9
**beginning** 5:6
  161:5 177:23
  237:7
**begins** 177:7
**behalf** 4:13,17
  4:21 5:19,21
  97:18
**belief** 12:16
  23:17 28:21
  47:8,9 162:19
  166:1 188:20
  192:4
**believe** 26:3,9
  47:5 48:3,21
  52:19 63:5
  77:1 78:15
  79:22 86:13
  87:11 116:1
  120:15 124:13
  156:8 162:16
  169:22 178:5
  188:16 189:8
  189:19 190:16
  196:7 206:3
  208:6 223:4
  224:12 264:13
  268:23 269:1
  288:3 289:21
  289:22 291:15
  295:4 304:23
  306:10

G. Bryant Buchner
July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[believed - built]**

Page 8

**believed** 22:1
  38:7 162:17
  191:16 264:8
**benefit** 113:7
  170:17
**bent** 237:5
  252:22
**best** 14:22 29:8
  47:10 58:6
  73:11 87:17
  88:16 160:8
  187:8 213:3
  221:23 238:9
  267:19 306:3
  307:2 310:11
**better** 34:2
  176:7 254:8
  258:12 265:5
  267:4 300:8
**beyond** 38:21
  41:22 78:11
  93:13 103:10
  152:9 274:19
  284:13 288:6
**big** 130:23
  139:6 140:6
  168:11 202:2
  300:2 308:10
  308:11
**bigger** 192:15
  241:21 248:23
**biomechanics**
  158:11
**bit** 54:13 63:6,7
  63:8 84:11

153:8 158:18
181:8 187:21
189:15 192:15
238:7 252:20
254:18 272:9
272:10 273:1
295:9,10
299:13 307:3
**black** 110:14
  112:12 113:12
  166:23 169:21
  234:13,23
  254:18
**blaming** 26:14
**blank** 30:3
  248:12
**blanket** 113:13
  127:4
**blind** 284:5
**block** 113:4
**blue** 194:13
**body** 74:23
  76:5
**bolt** 252:3,7,8
**bonus** 43:8
**book** 21:22
  292:12,12
**books** 256:11
**bottom** 9:14
  82:18 187:17
  193:22 202:20
  224:1 234:8
  235:16 254:4
  257:4 258:6
  263:12 272:12

272:22 273:4,5
**box** 82:12,14
  110:14 112:12
  113:4,12
  166:23 169:21
  240:13
**bracket** 256:23
  256:23 257:5,9
  257:11,18,23
**brackets** 153:3
  153:9,14,17
**brakes** 164:17
  168:7
**braking** 161:17
  162:2,3,6,6,9
  162:16 168:12
**brand** 121:1
**break** 61:4,5,11
  88:18,19 89:4
  89:10 136:19
  136:20 137:1,6
  138:13,15,16
  159:7 176:3,11
  182:17 183:2
  195:14,19
  235:8 260:4,17
  295:18 296:1
**brennan** 32:5,8
**bring** 121:4
  126:14 174:2
**bringing**
  126:15 210:6
**brittle** 159:7
**broad** 17:16
  113:10,17

293:3,3
**broken** 84:11
  299:11,11,12
**brought** 103:21
  103:21
**bryant** 1:17 5:7
  5:14 6:4
  240:21 248:11
  250:11 279:11
  311:5 312:2,24
  313:2,4,12
**bryson** 1:7 5:22
  7:3 157:21
  158:15 251:8
  254:21 255:13
  258:4 311:4
  312:1 313:1
**buchner** 1:17
  5:7,14 6:4,10
  88:20 95:2
  119:16 137:10
  141:14 256:4
  260:21 295:5
  296:7 304:13
  311:5 312:2,24
  313:2,4,12
**buchner's** 3:13
  49:19
**build** 242:7
  297:13
**builders** 242:7
**building** 24:16
  32:19
**built** 199:21

G. Bryant Buchner
July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[bullet - cannella]**

Page 9

**bullet** 202:3,4
203:3
**bumper** 76:23
90:20,21 92:3
92:14 93:3,9
93:18,19 94:3
94:6,17 95:7,8
95:9,12,14,15
95:18,19 110:6
110:6,20,20
122:3,3,9,9,22
123:23,23
124:10,10
126:17,17,18
126:18 147:16
147:18,18
150:18 151:23
151:23 152:3,3
152:3,3,6,9,10
152:16,16,20
152:23 153:1,4
153:4,5,11,11
169:23,23
172:6,6,22
175:17 179:23
180:10,11,15
180:15 203:8
203:13 252:18
252:22 253:8
253:11,12
254:1,2,4,11,12
254:20 256:19
257:1,3,11,14
257:19,23
258:5,8,13,15

**bumpers** 94:5
118:14 153:6
**bunch** 83:23
250:7,7
**buried** 230:22
**business**
106:23
**busy** 13:3
**button** 33:2
**buy** 112:22

**c**

**c's** 257:11
**cab** 63:4,4,9,12
63:13 64:17
65:10 74:23
75:1,2,19,22,23
76:5,5
**calculate**
205:13 233:11
265:9,11
275:20
**calculated**
170:23
**calculates**
110:7 178:19
**calculation**
281:16 289:11
289:13,19
301:23
**calculations**
24:15 64:9,10
64:11 76:9,13
76:14,15 130:5

130:6 165:8
275:14 282:21
283:18 291:23
292:10 293:22
300:3
**calculator**
289:12,15
**calculators**
282:13
**calibrate**
207:11
**call** 7:8,11,11
131:23 143:15
146:14 148:18
176:16 198:22
226:11 249:12
251:13 288:19
**called** 153:17
153:18,20
202:3,4 249:13
**calling** 232:7
**calm** 125:21,22
**camera** 159:11
208:2 218:16
244:17
**cameras** 156:3
156:5,17
159:11,19
210:11 213:1
215:12 218:15
**campbell** 292:2
**cannella** 3:6
4:14,14,18
5:20,20 6:12
7:2 21:9 42:21

44:2 45:5 49:7
49:18 69:14,17
69:20 70:16
71:2,11,21
72:1,8 83:19
84:6 89:6 95:1
98:11 102:2
105:17 111:18
112:2 113:21
114:4 115:20
116:3 117:15
120:17,20
124:2,5,12,14
125:21 126:10
126:23 131:19
133:10,17
134:3,6 137:23
140:17 141:7
141:11 142:8
143:3,12,22
144:8,14 145:7
145:21 146:4,8
146:13 151:4,7
154:4 158:1
177:21 185:3,9
211:11 218:8
219:15 223:4,7
223:10 224:19
225:12 233:4
236:2 238:2
239:20 240:6
240:14,19
248:10 249:23
250:5,10,14,18
250:21 251:3

G. Bryant Buchner                                   July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[cannella - change]**                                      Page 10

257:21 260:5
260:13 278:3
279:2,6,10,18
280:14 281:12
283:3 285:7
287:2,10,18
295:18 296:6
304:3,6 305:6
305:10,19
309:10,14
311:1
**cannellasnyd...**
311:2
**capability**
301:15
**capable** 133:8
133:15 134:1
**car** 73:11 85:9
92:11 135:14
147:22 148:7
169:2 203:8
219:2 221:4
237:5,11
253:12 298:16
299:12,13
300:16,17
**care** 31:15
**career** 139:8
**cargo** 83:2,9
91:18 92:7
99:13
**cars** 139:19
242:9
**case** 1:5 27:4
43:2 44:3,5

45:21 59:16,23
60:5,5 80:3
93:1 94:5
103:2 108:15
109:15,22
110:13 111:16
127:19 128:4
128:12 136:16
139:12,23
145:15 163:14
171:22 190:13
190:15 269:7
280:6 282:19
288:2 291:11
291:21 293:9
302:7 304:13
305:2,17
306:22 307:10
308:8 310:17
**cases** 27:5
59:21 195:1
**casual** 121:4
**cataloged**
115:6
**catch** 67:14
**catching** 235:5
**caught** 236:19
**cause** 5:8 56:15
129:17 196:1
**caused** 158:15
276:3
**causes** 104:1
**causing** 204:11
**caved** 254:2

**ccr** 5:1 310:22
**center** 95:12
160:20 181:7
182:9 190:2,5
190:11,14,18
190:19,20
200:8 204:2
206:18,21
207:1 209:20
210:9,12,15,18
210:20,21
211:21 212:5
212:17 213:16
214:10,14,18
215:6 216:6,9
216:11,14
218:4 221:18
221:19 222:23
224:6,7,17
225:6 226:7
229:5,6 230:12
231:22 234:5
235:18 236:17
236:21 257:8
261:8,11
272:13,22
**centered** 221:1
221:2,5,11
**centerline**
159:21 160:18
161:1,2
**certain** 17:17
21:3 79:3
266:5 294:21

**certainly** 72:4
101:12,12
107:20 108:9
111:8 155:9
238:16
**certificate**
310:1
**certifications**
302:23
**certified** 1:22
310:4
**certify** 5:3
303:4 310:6,14
**cg** 80:6 85:15
**chainsaw** 81:21
81:22,23 82:2
**chance** 106:7
**change** 32:22
56:8 66:13,14
67:15 106:12
107:11 115:14
115:17,23
120:8 128:12
129:3 135:21
168:15 169:1
196:19,23
197:19,20
201:7 238:4
277:17 278:22
280:7 284:9
286:9 296:18
299:19 300:15
300:16 305:16
312:4,7,10,13
312:16,19

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[changed - comfortable]**                              Page 11

changed  10:6
  11:15 18:17
  78:5 85:20
  127:20 285:5
  286:20
changes  35:19
  52:15 57:5
  77:17 78:7
  96:20 101:9
  300:19 311:10
  313:6
changing
  126:19 131:7
  165:22 267:2
  285:2
characterizati...
  45:23 49:21
  114:16 125:19
characterizing
  280:1
chat  276:8
check  265:22
checked  11:7
  266:21
child  99:22
choice  34:16
  90:12
choose  38:11
  73:13,19 90:9
  205:8
chose  74:1
  102:23,23
  103:1 145:15
cite  111:4
  129:16 138:16

140:2 173:9,20
  260:22
citing  288:3
civil  5:4
claim  107:13
  222:6
claimed  220:17
claims  96:19
  290:7
clarified  170:8
clarify  20:13
  34:7 87:4
  153:13
clarifying
  177:11
class  94:16
classes  291:2
clear  7:21
  13:13 63:22
  85:12,22 99:2
  135:7 181:12
  244:10 267:5
  294:17
clearly  11:5,7
  92:1 112:16
  147:16 164:13
  167:7 207:22
  208:7 212:2
  223:16 252:5
  290:15 291:1
click  32:13 33:6
clicked  33:2
  238:21 264:18
  272:21,22

clicking  273:18
close  51:9
  114:1 141:19
  143:13 167:14
  168:10 179:18
  180:16 212:13
  212:14 213:19
  226:19 235:4
  253:20 254:17
  300:7 306:20
  307:10,16
  308:14,21
  309:2,3
closer  63:20
  182:9 231:2
  269:12,13
cloud  198:23
  217:15 226:7
  226:15,17,23
  227:10,20
  228:1,2,7
  229:6,7,15
  240:23 241:12
  241:19,19
  242:6,17,19
  243:5,19 244:1
  244:3 245:4
  261:1 263:12
  263:16,20
  264:10,19
  265:2,7 271:5
  271:13,15
clouds  227:19
  227:19 266:23
  268:8

coefficient  78:1
  175:13,15
coefficients
  62:2,19 63:15
  63:16,23 64:17
  64:20 110:4,18
  285:19 301:17
  301:22
cohen  99:23
  157:21 158:15
collection
  37:13
collinear  224:7
  224:10,11,17
  231:9,16
color  160:5
colorized
  198:20
combined
  271:16
come  34:16,17
  59:1,10 62:23
  65:19 66:11
  82:16 119:5
  148:19 187:20
  188:5,7 219:5
  234:17 248:8
  263:7 264:15
  269:14,16
  273:1 304:20
comes  185:16
  233:18
comfortable
  102:14 130:22

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[coming - confirmed]**                                    Page 12

| | | | |
|---|---|---|---|
| coming   159:6 | 277:7,9,14 | complex | concerns |
| 187:21 233:17 | 283:22 292:22 | 127:17 290:23 | 112:20 127:12 |
| 237:2,10 264:8 | compared   78:7 | compliance   2:5 | 128:20 130:23 |
| comments | 101:5 104:9,19 | complicated | 282:7 284:20 |
| 306:5 | 107:7 166:22 | 13:7,8 125:10 | 286:1 |
| commissioner | 255:9 277:6 | component | conclude |
| 2:18 4:7 5:2 | compares | 118:15 | 255:21 |
| 310:5 | 106:6 | composite | concludes |
| common | comparing | 199:20 | 309:12 |
| 303:11 | 96:10 98:22 | compromised | conclusion |
| commonly | 106:1 151:13 | 257:16 | 219:10 269:14 |
| 19:16 288:9 | 165:23 232:17 | computer   8:16 | 269:16 |
| communicate | 277:16 281:2 | 9:8 19:17 26:6 | conclusions |
| 223:16 | comparison | 31:23 32:1,14 | 115:5 |
| communication | 61:21 77:18 | 33:7,12,20 | concretely |
| 65:20 72:9 | 103:15 148:23 | 34:23 35:9,18 | 95:22 |
| companies | 166:18 190:23 | 60:9 64:11 | condition   85:6 |
| 109:19 | 229:23 255:7 | 188:6 229:1 | 173:15 |
| comparative | compartment... | 234:12 239:3 | conditions |
| 200:13 | 70:15 | 241:21 242:2 | 173:16 |
| compare   101:3 | competitors | 242:10,20 | conduct   207:8 |
| 101:23 103:12 | 295:14 | 248:8,23 289:9 | conference |
| 107:19,21,22 | compiled   48:8 | 310:9 | 34:3 |
| 108:7 117:23 | 70:13 | computers | confidence |
| 118:1 157:12 | complaint | 235:3 241:9 | 18:22 27:5 |
| 163:22 164:9 | 290:13 | concave   181:19 | confident   11:10 |
| 164:23 165:1,2 | complete   37:7 | concept   13:9 | 36:3 42:12 |
| 165:18 169:21 | 121:2,3 129:23 | 94:18 117:5 | configuration |
| 170:11,13,15 | 277:9 313:8 | concepts | 170:19 222:22 |
| 190:5 226:23 | completed | 116:14 | 225:7 |
| 227:11,20 | 311:16 | concern   105:11 | confirm   15:15 |
| 228:7 229:6,8 | completely | 306:12 | 16:7 85:19 |
| 240:23 241:19 | 93:18 114:14 | concerned | 134:10 259:17 |
| 241:20 242:17 | 121:1 | 83:17 | confirmed |
| 242:19 243:19 | | | 275:7 |

G. Bryant Buchner                                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[confirms - corresponds]**                                        Page 13

**confirms**
  216:11
**confused**
  102:22 184:13
**confusing**
  102:3 120:20
  170:7 283:4
  285:8
**confusion** 40:2
**connected**
  20:22
**connection**
  146:17 191:17
**consequential**
  300:21
**conservative**
  88:5 136:3
  171:23 192:17
**conservatively**
  164:16
**consider** 90:14
  90:18 119:2
  299:19 307:20
**considerably**
  197:13
**consideration**
  304:20,22
**considered**
  105:9 119:4
  123:16 304:18
**consistency**
  55:1
**consistent**
  12:23 14:6,20
  44:12 55:21,21

56:11,12 60:17
64:7,8 77:6
86:19 136:4
162:18 208:5
232:8
**constraints**
  110:17 285:23
**constructioni...**
  242:8,9 253:2
**contact** 92:15
  147:19 152:1,4
  152:5 179:22
  182:7 202:16
  203:17,18
  231:3,11,14
  232:2,4,11,12
  233:23 238:12
  261:14,14
  284:10
**contacted**
  201:12 286:2
**contain** 74:3
  239:17
**contained**
  62:21 81:11
  240:4 267:16
  268:6,7,7
**contempora...**
  25:15
**content** 310:8
**context** 100:15
  111:4 194:17
**continued**
  304:11

**contracted**
  63:11
**convenient**
  34:4
**conversation**
  29:3 121:4
  162:13 280:21
  291:5
**convert** 36:10
  75:2
**converted** 35:6
**convex** 181:4
  181:20 182:10
**convinced**
  273:21
**cooperate**
  234:12
**copies** 38:16
  46:20 311:14
**copy** 9:12
  22:21,23 28:9
  28:10,12,13,19
  32:14 33:21
  35:15,16,19,23
  48:5 74:9
**correct** 12:10
  13:18 15:1
  21:7 29:17
  36:10 37:2,14
  40:16 42:3,21
  43:2 49:9
  52:13 54:14
  57:20 58:10,16
  62:4 65:14
  77:7,19,20

78:9 80:11
86:1 88:15
89:18,23 91:16
91:20 98:17
99:9,17,21,21
100:2 103:16
106:15 113:8
134:23 149:20
162:20 163:5
171:15,16,16
176:22 178:13
179:4,12 181:9
183:9 189:1
190:6 195:8
196:7,21 200:4
212:20 214:9
215:7 219:19
221:9 222:3
229:16 230:18
234:6 235:19
239:6 240:5,18
253:18 271:6
277:18 301:10
310:12 313:8
**corrected** 67:5
  67:6
**correcting**
  306:17
**corrections**
  313:6
**correctly** 38:3
**correlates** 68:9
**corresponds**
  257:4,8

Veritext Legal Solutions

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[corrupt - crash]**                                          Page 14

| | | | |
|---|---|---|---|
| **corrupt** 44:7 | **covered** 151:21 | 123:18 124:1 | 205:21 206:5,8 |
| **corrupted** 9:15 | 248:1 | 124:10 126:17 | 211:9,16 212:2 |
| 9:16,23 10:4,5 | **covering** | 126:18,19,21 | 218:1 221:16 |
| 14:8 18:17 | 187:23 | 128:13 130:11 | 223:11 224:8 |
| **corruption** | **crafted** 16:2 | 131:16 133:8 | 224:10,11 |
| 8:15 | **crash** 71:12,13 | 133:16 134:2 | 236:15 237:15 |
| **counsel** 2:10,12 | 71:15,16,22 | 138:21 139:12 | 237:20 238:1 |
| 5:5,15 310:15 | 77:5,5,12 | 139:19 140:14 | 243:7 245:5,21 |
| 311:14 | 78:22,23 80:14 | 140:16 141:15 | 246:7 247:9,11 |
| **counterpart** | 82:22 91:3 | 142:11 143:5 | 248:3 252:2,7 |
| 44:16 | 92:18,20 93:13 | 144:12,17 | 254:3 256:20 |
| **country** 1:10 | 94:1,1,23 95:5 | 145:5,8,18 | 257:22 258:7,9 |
| 5:19 97:13,17 | 95:13,21 96:3 | 146:22 147:17 | 258:15,21 |
| 97:19,22 301:2 | 96:6,15,16,18 | 149:17 150:2,7 | 259:12,18 |
| 303:17 304:15 | 97:8,11,14,20 | 150:13 151:13 | 261:17,21 |
| 311:4 312:1 | 98:5,23 99:5 | 153:15 154:3 | 262:1,3,4,7 |
| 313:1 | 99:12,19 100:1 | 154:17 155:1,2 | 263:4,8 264:3 |
| **county** 310:3 | 100:3,6,16 | 155:11,19 | 264:4,9,16,17 |
| **couple** 12:15 | 101:4,6,7,8,15 | 156:2,5,14,15 | 265:7,10 |
| 19:13 20:1,7,8 | 101:18,21,22 | 156:20 157:15 | 266:11 269:20 |
| 39:14 48:15,19 | 102:18 103:5 | 157:15,20 | 270:6 272:2 |
| 306:8,11,13 | 103:12,19 | 158:8,14 | 273:15,23 |
| 308:17 | 104:2,5,11 | 161:13 163:8 | 274:1,12,17 |
| **course** 200:17 | 105:6,11,13,21 | 163:23 164:10 | 275:3 276:5,22 |
| 209:12 221:10 | 106:4,14,19 | 165:23 166:13 | 277:6,7,10 |
| 228:13 259:22 | 107:6,7,13 | 166:15 170:18 | 280:9,18 281:2 |
| 265:15 | 108:1,3,7,11,15 | 170:20 171:2,9 | 283:9,22 284:8 |
| **court** 1:1,22 | 108:17,23 | 176:19,21 | 285:4 288:13 |
| 2:6 4:1 5:1 6:1 | 109:23 113:6,6 | 177:17 179:8 | 288:13 291:17 |
| 138:18 139:10 | 113:14,15,20 | 180:7,9 184:1 | 293:8,13 294:6 |
| 140:4 143:15 | 114:9,10,14,21 | 185:2,18 186:8 | 294:7,11,13 |
| 287:5,15 310:4 | 115:21 116:2,9 | 186:14,16 | 301:21,23 |
| **cover** 205:19 | 117:2,23 118:2 | 189:4 196:1 | 302:6,9,11,21 |
| 256:20 258:6,8 | 118:5,12,13,23 | 200:3,21 201:3 | 303:3,5,10 |
| 258:15 | 119:9 122:8,9 | 203:23 205:14 | 305:2 |

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[crashed - data]**                                    Page 15

| | | | |
|---|---|---|---|
| **crashed** 84:16 | **crosby** 146:20 | 155:17 158:12 | **curious** 44:23 |
| 161:8 | 159:1 207:22 | 163:12,17 | **current** 53:17 |
| **crashes** 122:4 | 215:10 216:11 | 164:14 167:12 | 53:22 54:4,5 |
| 139:19 200:13 | 216:12,21 | 167:17 168:1 | 54:17,22 55:2 |
| 202:1 252:11 | 217:9 218:15 | 168:12,15 | 56:1,18 59:22 |
| 302:20 304:16 | 219:21 220:9 | 169:1 170:13 | **cursive** 184:20 |
| **crashing** | 223:6 232:9 | 201:2 202:5,8 | 185:1,4,5 |
| 165:13 | 245:19,22 | 203:1,15,17 | **curve** 196:16 |
| **crazy** 279:20 | **crosby's** 98:15 | 205:6 220:11 | **curves** 197:15 |
| **create** 40:13 | 160:19 220:18 | 231:6,22,23 | 197:16 |
| 50:5 70:8 73:4 | 222:18,20 | 232:18,22 | **cv** 1:5 |
| 106:19 141:15 | 225:15 244:7,8 | 262:6 265:9 | |

**d**

| | | | |
|---|---|---|---|
| 142:11 143:7 | 247:7 | 268:19 274:8 | **d** 3:1 183:12,21 |
| 240:15 271:11 | **crush** 13:15 | 274:22 275:1,9 | 184:8,8 185:6 |
| 297:3 | 14:5,14 16:5 | 275:11,11,12 | 185:8 187:7,8 |
| **created** 36:21 | 16:16,18 62:14 | 275:17,20 | 191:2,7,10 |
| 57:12 240:17 | 63:15,16,22 | 276:2,11,17,21 | 196:16,17 |
| 298:4 | 64:9,16 69:8 | 277:2 278:15 | 197:4 |
| **creates** 72:22 | 70:12 71:5 | 281:4,7,17,19 | **damage** 167:11 |
| **creating** 297:6 | 72:14 73:5 | 282:11,12,16 | 197:17 256:10 |
| **crew** 63:4,9,12 | 76:13,14,14,15 | 284:3,18 | 256:12 267:6 |
| 63:13 64:17 | 88:4 90:16,20 | 285:18 288:15 | **dancing** 233:18 |
| 65:10 75:1,2 | 90:22 91:20 | 289:5,7,16 | **dash** 206:15 |
| 75:19,23 76:5 | 92:2,19,21 | 291:1 292:10 | **data** 10:2,14,18 |
| 76:11,12,16,17 | 93:3,12 96:1,3 | 301:11,17,21 | 11:1,16 12:11 |
| 76:19 | 96:6,14,20,21 | **crushed** 200:10 | 12:21 14:5 |
| **critical** 93:1 | 97:1 100:11 | 237:3 | 16:5 19:3,10 |
| 114:8,8 147:20 | 107:3,5 109:13 | **crushes** 96:10 | 21:6 28:7 31:2 |
| 171:8 299:20 | 111:1 112:8,11 | 148:13 | 38:1,6,9,19 |
| **criticism** | 112:14 122:18 | **crushing** | 39:1,16,22 |
| 102:17 163:8 | 130:5 138:19 | 150:21 | 40:5,12,15,16 |
| **criticisms** | 139:11 140:11 | **crux** 15:21 | 40:17,20 41:8 |
| 105:21 | 140:13 147:11 | **cry** 88:23 | 41:10,11,14 |
| **criticizing** | 147:13,16,21 | **cs** 311:15 | 42:17 43:6 |
| 107:6 126:4 | 147:22 148:3,9 | | 48:11 49:2,4 |

G. Bryant Buchner                                      July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[data - depicted]                                                Page 16

50:4,10,18
51:6,17,19
52:1 56:14
57:20,20 60:22
62:12 64:12,13
67:13,18 68:1
68:3,5,8,17,20
69:3 70:21
72:3,7,20 76:4
76:12 87:2,17
110:13 112:7
113:4,8,12,19
114:17 116:11
142:2,3,17
146:21,22
166:23 169:3
169:21 199:18
199:18 239:23
240:6 245:19
245:21 246:11
246:15,20
265:7 297:20
297:21 298:9
298:13 301:21
302:3
**database** 62:4
62:6 74:22
89:22 90:2,3
**date** 5:3,11
20:19 25:23
44:15,21 45:1
45:14,14 46:2
46:6,11,13,16
46:17,18,19
47:2,4,12

54:10 310:13
312:24 313:12
**dated** 7:2 47:23
**dates** 6:18
58:17 59:14
**day** 11:21 18:3
33:10,22 34:5
48:1 55:22
119:16 238:5
269:10 292:1
313:15
**days** 20:16 23:8
311:16
**de** 4:15,19
**deal** 131:18
197:11
**dealing** 130:1
**decatur** 4:16,20
**decent** 271:11
**decide** 136:7
267:7,22
286:22
**decided** 130:3
224:21 263:8
268:11
**decimal** 38:21
**decision** 60:15
**deck** 258:9
**declare** 313:4
**decrease** 93:12
169:1
**decreased**
281:18 282:16
**decreasing**
282:9

**deemed** 313:6
**default** 62:1
65:7 78:1
91:16 173:7,16
174:10
**defaults** 63:20
65:1,2
**defendant** 1:11
4:13 5:19
**defendant's** 7:6
178:8 186:9
251:10
**defense** 44:16
72:1 77:5
92:18 99:1
142:11,15,20
**defer** 294:7
**define** 93:16,18
147:13 306:8
**definitely**
179:21 236:21
**definition**
93:20,21,23
94:10,13,15
**deflected** 259:1
**deflection**
153:23 154:2,7
155:2,3,7
**deformation**
155:22
**degree** 301:6
**degrees** 232:9
**delete** 298:3
299:1

**deleted** 298:19
**delineate** 246:6
**delta** 39:6,18
110:15,23
112:13 113:4
170:13 229:11
285:22 288:18
**demonstrate**
93:6 106:22
139:1 166:14
166:15 241:15
242:14 261:7
265:13 288:12
**demonstrated**
93:2 114:20
**demonstrates**
208:7
**dent** 252:15,18
257:3,7
**denying** 127:1
127:3
**depend** 207:15
219:13
**dependent**
179:9 193:8
195:7 219:10
225:22
**depending**
33:22 162:8
269:9
**depends** 33:10
34:4 178:19
231:21 237:22
**depicted** 72:15

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[depiction - different]**                                    Page 17

**depiction** 13:15
69:13
**depictions** 73:5
**depo** 8:1 11:14
12:5 13:3 55:3
86:10,14 87:14
87:23 88:2
96:21 128:7
168:21 216:3
226:6 242:18
244:8,8 249:11
249:14,22
250:4,13 257:3
261:6 262:13
267:19 268:18
268:22 273:19
**deponent**
311:13 313:3
**deposing**
311:13
**deposition** 1:17
2:3,4,14,17
3:11 5:13 7:5
10:11 11:4
12:3,9,13 13:1
14:2,21,23
15:9,17 16:7
17:11,22 18:16
18:20 20:10,12
20:21 21:5,6
21:12,20,23
23:14 24:22
25:3 27:1,18
27:22 29:15
36:23 37:5

39:19 41:12,14
42:17 44:13,16
44:21 45:1,6
49:3 50:9,11
51:2,3,15,16
52:2,6,7 55:5
58:2,4 60:11
64:7,23 83:22
84:2 86:19
88:12 98:15
111:5 115:1
122:1 136:4
142:5 146:19
160:19 161:6
161:23 167:8
216:10 220:16
228:21 232:14
232:17,20
239:6 240:18
245:18,19
262:23 266:7
266:14 269:13
275:7 290:19
291:7 303:18
305:15,18,23
309:12,19
**depositions** 2:7
**deprived** 156:6
**depth** 216:20
232:18,21,22
275:10 308:22
**derived** 301:22
**describe** 75:3
104:13 158:13

**described** 44:1
112:4 115:23
160:20 206:3
267:22
**describes** 159:1
224:4
**description**
162:10
**design** 133:1
274:17 301:5
**designed**
109:23 112:14
172:5 286:11
289:23 302:20
305:3
**detail** 39:8 51:5
**detect** 17:10
**determination**
96:23 148:4
272:12 281:11
**determine** 47:1
91:19 109:10
125:15 131:18
155:1 171:21
176:19 178:15
189:3 202:9,16
215:4 244:11
246:7,13 258:8
259:4 261:2
262:6 263:3
272:5,17
273:14 274:23
275:11 281:7
**determined**
78:16 87:19

108:20 128:14
197:22 266:8
266:10 267:5
**determines**
267:12
**determining**
62:18 90:15
**develop** 275:11
**developed**
296:10
**device** 160:8
**devin** 4:18 5:21
**diagram**
221:13,23
**diagrams** 222:2
**dial** 4:11
**diameter** 52:11
67:2
**dictates** 203:15
**difference**
14:12 16:12
67:1 103:23
104:3,12 105:5
120:5 168:1
173:2 191:1
202:2 276:2,11
276:20,21
**differences**
14:17 93:13
103:19 105:6
105:10 115:5
299:14 301:1
**different** 18:18
20:23 22:6
27:13 37:11,14

G. Bryant Buchner
Bryson, Santana and Joshua v. Rough Country, LLC
July 11, 2024

[different - draw]                                                    Page 18

60:20 62:11
63:7,8 73:7
78:1 92:21
94:1,19,19
99:3 106:1
109:1 114:14
126:21 129:19
130:6 150:2,3
150:7,9 168:17
175:13,15
181:16 185:21
193:23 196:22
196:23 197:15
200:22 201:2,5
206:13 210:13
215:6 221:5
236:12 265:23
273:1 280:13
281:1 287:1
289:17 291:14
291:18 294:6
297:1 298:9,12
308:20
**differentiate**
89:16 90:9
**differentiation**
100:6 281:4
**difficulties**
138:4 182:19
**digital**  29:16,20
29:22 33:13
**direct**  137:16
166:18
**direction**  212:1
216:1

**directly**  36:14
36:17 208:3
230:9
**disadvantage**
64:3 101:13
**disadvantaged**
122:18 208:1
**disadvantaging**
164:1,5
**disagree**  45:22
84:9 113:9
125:18 144:3
234:1
**disc**  8:16
**disclosed**
296:19
**discover**  12:6
12:10 19:9
22:16 40:8
**discovered**
58:7
**discoveries**
20:23 22:7
**discrepancies**
308:12
**discrepancy**
52:12 168:11
306:9
**discuss**  61:21
116:14 226:5
**discussed**  12:13
37:23 84:2
94:9 105:8
**discusses**  94:2

**discussion**
299:7
**discussions**
287:13,16
**displaced**
259:14
**displacement**
259:18
**display**  73:15
239:3
**displayed**
235:1
**dispute**  59:3,5
87:11 98:20
160:23 163:1
**disregarded**
49:4
**distance**  178:15
178:18 179:1
191:3,10,20
197:23 198:3,6
213:15 214:2,9
218:10 228:18
236:6 239:17
241:8,10
260:23 262:5
263:2 264:11
264:14 265:8
271:20 281:8
**distances**  179:7
191:13
**district**  1:1,2
4:1,2
**division**  1:3 4:3

**document**
26:12 29:7,8,9
159:2 215:15
228:3 249:4
251:7 297:2
298:2,5,6
**documented**
98:6,7 217:4,6
230:8
**documents**
26:19 27:21
38:14 74:2
**doing**  19:18
26:7 34:18
47:17 102:14
108:6 112:20
130:22 133:13
133:13 139:20
145:4 164:10
176:7 185:13
194:16 210:7
214:14,17
216:5,16
217:23 234:11
237:19 243:2
243:21 244:16
270:19 282:6
287:7 288:14
302:8 303:10
**door**  76:11
**dotted**  209:21
209:22 214:17
**dozen**  250:8
**draw**  133:1
242:8

Case 2:22-cv-00017-RWS    Document 182-10    Filed 03/17/25    Page 333 of 388
G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[drawing - engineer]                                Page 19

drawing  86:17
  223:15,15
  225:3 231:8
  241:4,5 243:21
  287:3
drawings  149:7
  149:8,9,10
  220:3 244:1,3
  266:16,18
draws  222:22
drew  221:10
driver  79:3,13
  153:21 164:17
  168:6
driver's  79:14
  95:16
drop  34:14
dropped  168:9
  252:2
dropping
  135:14
due  116:19
  155:16 212:9
duly  6:5
duty  76:16,17
  76:18
dynamic
  302:16
dynamics
  36:18 90:1

          e

e  3:1 69:15,16
  196:6 312:3,3
  312:3

ea  9:4
earlier  22:20
  35:14 51:10
  86:20 87:21
  262:23 264:7
  282:7 289:3
earliest  201:11
early  10:23
ears  127:23
easiest  159:9
  184:4,6 243:17
  261:7,8
easily  159:13
  262:18
easy  20:5
  121:16 226:22
  269:19
edge  159:23
  184:8 185:14
  185:15,17
  186:18 188:21
  188:22 189:8
  189:20 190:3,9
  190:10,16,21
  191:2,10,17,20
  192:5,8,9,14,14
  192:22,23
  193:9,9,15
  194:9 195:3,4
  197:7,23 198:1
  198:3,16
  204:22 205:18
  212:6,12,18,19
  213:20 214:1
  219:11,12

edges  181:8
  182:6 238:19
edit  35:16,17
editing  297:2,7
  298:2,5
effect  2:4
  106:20 122:17
  167:6
effort  24:2
  116:20 117:1
  127:14 174:19
  191:19 230:9
  275:19 276:10
efforts  43:19
either  34:9 36:7
  77:22 79:16
  99:19,23
  148:22 151:1
  156:10 180:18
  269:2 308:19
electronic
  22:21,23 28:15
  38:16 74:9,15
elevation  275:4
elevations
  173:3 210:13
eleven  86:8,10
  86:14,23 87:13
  87:16,20,23
  231:18 255:18
  265:18 266:1,4
  266:11 268:14
  269:13 271:1
  273:10,11,12
  273:20,21

elite  251:13
embedded
  239:2,12 241:2
emblem  86:11
  184:11 185:15
  187:16,20
  200:7 232:3
empty  81:1
ended  194:14
  309:19
endpoint
  200:22
endpoints
  178:19
energy  110:3
  153:2
engage  152:17
  152:20
engaged  147:23
  152:18,21
engagement
  95:20 123:3
  199:1,2 202:16
  230:5 231:3
  232:7 238:11
  253:9 289:5,7
engaging
  110:20 153:9
  274:3,6
engineer
  112:19 119:2
  120:1,6,11
  121:13 136:12
  184:18,18
  286:18,23

G. Bryant Buchner

Bryson, Santana and Joshua v. Rough Country, LLC

July 11, 2024

**[engineering - exact]**

Page 20

| | | | |
|---|---|---|---|
| **engineering** 9:3 | 78:6 82:19 | 209:17 210:19 | **estimate** |
| 9:5 36:18 | 83:1,10,13 | 212:11 213:17 | 214:12,21 |
| 43:16,22 56:16 | 84:10,16 87:8 | 214:10 220:8 | 219:6 |
| 90:1 102:5 | 89:15,17,21 | 223:23 224:3 | **estimating** |
| 116:12,19 | 90:9,10 91:11 | 226:1 228:10 | 216:8 |
| 117:1 120:22 | 91:19 92:7,11 | 228:11,13,17 | **estimation** 82:6 |
| 129:23 130:18 | 92:14,16,20 | 230:6 234:5,6 | 82:13 |
| 136:11 233:10 | 95:11 99:9,14 | 235:18,23 | **et** 1:7 |
| 233:21 | 99:20 100:12 | 236:16,17 | **evaluate** |
| **engineers** | 101:13 122:14 | 254:20 255:16 | 280:11 |
| 106:23 | 122:18,23 | 255:23 256:20 | **evaluation** |
| **enter** 11:16 | 147:12 149:22 | 258:7,22 259:1 | 225:23 |
| **entire** 95:13 | 150:17,18,21 | 260:9 270:14 | **events** 109:21 |
| 114:8 224:15 | 152:5,10,19 | 270:16,16 | **eventually** |
| 224:18 | 155:23 156:13 | 274:4,6 | 19:23 203:7 |
| **entirely** 298:4 | 157:9,15,15 | **escape's** 64:2 | **everybody** |
| **entirety** 95:21 | 160:10 161:8,9 | 153:1,3 | 32:18 149:1 |
| **environment** | 164:5 175:14 | **especially** 64:8 | 269:19 |
| 17:18 291:4 | 179:2,8,8,15 | **esquire** 4:10,14 | **evidence** 2:15 |
| **equal** 100:13 | 180:20 181:15 | 4:18 | 81:4 95:22 |
| **equals** 78:21 | 183:8,19 184:1 | **essentially** 63:5 | 97:5,6,9 |
| **equate** 297:23 | 185:2 186:14 | 237:6 | 139:10 204:3 |
| **equation** | 186:14,16 | **est** 309:19 | 233:8 236:15 |
| 164:11 170:22 | 187:16,19,20 | **establish** 92:6 | 260:22 262:4 |
| **errata** 311:11 | 188:23 189:4 | 106:5 126:15 | 294:11 |
| 311:13,16 | 190:11 191:22 | 158:4,10 161:9 | **exact** 20:2,18 |
| **erroneous** | 193:12 198:8 | 161:20 165:15 | 46:18 80:21 |
| 220:2,18 222:7 | 199:3 200:3,7 | 166:4,9,11 | 93:23 94:15 |
| 225:20 | 200:23 201:5 | 180:23 193:7 | 121:12 128:11 |
| **error** 24:3 | 203:4,23 204:2 | 205:20 245:1 | 129:18 167:3 |
| 65:20 218:22 | 204:23 206:21 | **established** | 182:2 236:11 |
| 220:20 | 206:23 207:1 | 68:8 110:9 | 272:18 276:13 |
| **errs** 268:18 | 207:11,17 | 137:19 161:12 | 277:16 278:1 |
| **escape** 71:5 | 208:22 209:3 | 165:12 204:13 | 287:13 304:21 |
| 72:14 77:16 | 209:14,15,16 | | 307:15 308:2 |

G. Bryant Buchner                                      July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[exactly - f]**                                              Page 21

| | | | |
|---|---|---|---|
| **exactly** 16:10 | **excuse** 118:12 | **experts** 202:8 | **extrapolated** |
| 28:5 35:23 | 121:9 184:21 | 308:17 | 212:8 |
| 52:3 60:4 70:6 | 219:21 222:19 | **expires** 310:23 | **extremes** 162:1 |
| 75:21 82:10 | 231:16 | **explain** 10:16 | **eye** 308:16 |
| 86:16 88:2 | **exemplar** 77:3 | 31:7 66:14 | **eyeballed** |
| 109:9 127:19 | **exhibit** 3:13,14 | 125:23 126:8 | 272:20 273:4 |
| 139:20 158:3 | 3:15,16,17 7:4 | 134:21 141:13 | |

**f**

| | | | |
|---|---|---|---|
| 160:14 162:4 | 7:6 178:1,8 | 161:10 193:14 | **f** 39:6 62:1 63:3 |
| 199:6,9 208:18 | 186:7,9 251:9 | 206:12 279:5 | 63:23 65:8 |
| 224:16 237:19 | 251:10 270:5 | 296:23 | 66:14,16 67:9 |
| 254:9 256:4 | 303:18,21 | **explained** | 74:21 76:23 |
| 265:23 280:5 | 304:2 | 124:6 127:11 | 77:5,12,23 |
| 286:6,11 | **exhibits** 3:11 | 129:21 133:22 | 78:6,19 79:4 |
| 294:14 305:9 | 177:22 | 229:14 251:1 | 80:13,17 85:12 |
| 305:22 | **exist** 8:4,5 | 280:18 | 88:3,9,13 |
| **examination** | 13:12 19:6 | **explanation** | 95:16,17 99:4 |
| 3:3 5:8 6:8 | **existed** 18:13 | 189:16 | 104:18 151:22 |
| 42:8 296:5 | 19:12 24:20 | **exponent** 94:23 | 152:6,9,18,23 |
| 304:11 | 107:13 157:14 | 95:5 98:17 | 153:2,4 160:11 |
| **examined** | **exists** 231:11 | 101:18 103:20 | 161:14 162:19 |
| 154:23 | 238:10 | 142:11 144:18 | 178:7 179:14 |
| **example** 3:17 | **expect** 41:9 | 223:5 224:8 | 179:15 181:17 |
| 123:11,15 | 202:19 246:4 | 280:18 | 193:20,21 |
| 130:23 131:4 | 303:13 | **exponent's** | 206:18,20 |
| 134:14 140:2 | **expected** 40:14 | 101:8 | 208:11,16 |
| 298:4 | 158:23 | **expose** 241:13 | 209:17,18 |
| **examples** | **expenses** 303:9 | **exposing** | 212:17 213:23 |
| 134:21 139:22 | **experience** | 239:15 241:17 | 214:8 215:5 |
| 282:7 | 112:17 145:17 | 242:4,15 | 221:9 223:23 |
| **except** 2:11 | 256:3 287:21 | **extended** 20:4 | 224:2,5,16 |
| 127:20 148:9 | 307:7 | 38:21 63:4 | 229:22 237:10 |
| 200:18 211:23 | **expert** 50:4 | **extent** 65:9 | 255:15 270:18 |
| **excessive** 104:4 | 142:11 158:10 | 203:1 | 273:6 299:9 |
| **exclude** 301:15 | **expertise** | **extra** 301:13 | 300:2 |
| | 145:11 158:2,5 | | |

G. Bryant Buchner                                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[facilitate - find]**                                          Page 22

| | | | |
|---|---|---|---|
| **facilitate** | **farther** 180:2 | 28:13,15,18 | 299:5 |
| 216:22 | **fashion** 19:2 | 29:23 31:3,4,4 | **filed** 26:10 |
| **fact** 67:5 87:12 | 37:5 | 32:18 33:3,12 | **filer** 10:21 |
| 150:1,14,17 | **faster** 195:16 | 35:7 36:7,10 | **files** 8:22 15:13 |
| 203:9 215:15 | **favor** 103:3 | 36:21 37:6,7 | 17:13,17,19,23 |
| 220:17 222:11 | 268:18 | 37:12 41:13,15 | 19:4,10 20:20 |
| 222:11 288:3 | **favorable** | 42:17 43:6,17 | 20:21 21:4,11 |
| 301:4 | 93:10 301:9 | 44:6,6 47:7 | 21:21 22:1,10 |
| **factor** 90:23 | **february** 58:5 | 53:18 60:13,15 | 23:11 29:16,20 |
| 93:1 209:9 | 58:22 59:7 | 66:18 67:13 | 29:22 30:4,8 |
| **factoring** 80:8 | **federal** 5:4 | 72:10 74:8,8,9 | 30:12,16,22 |
| **factors** 197:21 | 302:16 | 117:6 146:20 | 32:11 37:11,14 |
| **fail** 309:1 | **feel** 49:11 140:9 | 146:21 147:5 | 38:13,14 42:15 |
| **fails** 311:18 | 232:22 287:3 | 170:22 190:18 | 42:19 43:23 |
| **fair** 49:6,11,15 | **feeling** 20:16 | 198:10,11,12 | 52:2 69:11,11 |
| 49:19,21 128:8 | **feet** 201:16 | 198:13,14,17 | 74:4,15 182:19 |
| 141:6 162:10 | 203:12 207:4,6 | 199:20,20,22 | 226:10 234:15 |
| 163:22 170:3 | 208:14 232:23 | 220:15 222:21 | 249:1 296:22 |
| 176:22 177:19 | **felt** 104:6 | 226:12,13 | 298:19 299:1 |
| **falls** 84:19 | **figure** 39:14 | 227:15,16,20 | **filing** 2:17 18:6 |
| **false** 215:8,9,16 | 166:8 177:17 | 228:21 230:7 | 23:22 24:3 |
| 223:1 225:7 | 178:3,11,22 | 230:10,22 | 27:6 29:7 |
| **family** 5:22 | 179:6 196:3 | 232:14 238:20 | **final** 9:6 24:18 |
| **far** 38:15 39:8 | 200:2 206:2 | 239:2,7,10 | 26:17 42:7 |
| 43:11 68:4 | 259:22 | 240:4,7,8,13 | 45:17,19 |
| 91:8 93:11 | **figured** 54:21 | 241:2,17,19,20 | 274:12 298:22 |
| 115:5 122:14 | **file** 7:20 8:2,4 | 241:22 242:1 | **finalized** 45:15 |
| 123:4 150:10 | 9:3 12:17 13:6 | 243:19,20 | **finally** 12:19 |
| 159:13 177:4 | 13:10 17:18,18 | 244:6,7,8 | 20:19 |
| 188:21 189:20 | 17:18 18:8,12 | 245:8,9,13,13 | **find** 8:7,20 13:6 |
| 214:20 230:6 | 18:21,23 19:16 | 245:23 246:16 | 17:21 18:21 |
| 273:3 276:16 | 21:17 22:8 | 249:7 250:2,9 | 19:7 20:20 |
| 290:17 299:21 | 23:17,23 24:10 | 250:15 263:16 | 22:7,22 29:23 |
| 307:6 | 25:6,19,20 | 267:9 268:15 | 29:23 43:5 |
| | 27:7 28:12,13 | 298:22,23 | 44:6 46:3 |

G. Bryant Buchner
July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[find - form]**

Page 23

| | | | |
|---|---|---|---|
| 52:21 76:10 | 182:7 197:9 | **fluids** 80:13 | **ford** 71:4 82:19 |
| 168:20 169:8 | 202:16 214:23 | 81:11,15 | 83:10 86:11 |
| 169:10,11 | 222:9 224:22 | **flush** 153:1,6,6 | 176:20 178:6 |
| 181:11 182:14 | 227:16 228:9 | 153:11 | 179:13 182:1 |
| 184:4 212:23 | 231:3,11 232:2 | **fly** 129:11 | 183:13,19 |
| 216:23 223:2 | 232:4,11 | **fmvss** 302:16 | 184:3,11 |
| 245:15 248:7 | 233:23 261:13 | **fold** 38:10 | 186:19 187:5 |
| 254:15 260:11 | 261:14 266:6 | **folder** 8:20 | 188:21 189:23 |
| 261:8 265:4 | 305:18,22 | 199:11 227:17 | 191:2,18 |
| 290:2 | **fit** 197:16 | 227:18 249:13 | 194:18 196:7 |
| **fine** 14:16 84:3 | 198:23 199:1 | 249:15,18 | 196:14 198:15 |
| 88:6 125:20 | **five** 88:19 89:4 | **folders** 9:4,5 | 199:3,4 200:6 |
| 138:7 142:9,18 | 151:21 164:6 | **follow** 64:14 | 228:9,16,17 |
| 144:4 146:3 | 195:14 199:9,9 | 113:20 202:18 | 229:5,7 230:6 |
| 193:4 269:3 | 199:19 208:8 | 254:11 282:20 | 232:3,17 234:4 |
| 283:18 287:17 | 217:14,20 | 282:22 283:7 | 235:22 236:16 |
| **finish** 154:17 | 221:14 222:21 | 284:19 289:8 | 236:17 270:17 |
| 229:4 244:13 | 223:14 225:4 | 304:8 | 270:18,20 |
| 246:10 | 225:20 231:13 | **followed** 52:6,9 | 272:6,17 |
| **finished** 25:5 | 231:18 276:3 | 65:23,23 66:6 | **foregoing** 5:5 |
| 293:20 306:2 | 287:11 | 125:14 | 310:7,10 313:5 |
| **finishing** 47:19 | **fix** 43:9,15 | **following** 5:9 | **foremost** 115:7 |
| **first** 6:5 7:17 | 298:18 | 209:20 | **forensic** 42:8 |
| 12:13 14:1 | **fixed** 27:1 | **follows** 6:6 | **forgive** 180:3 |
| 15:4 37:5 | 195:15 | 246:16 | 204:5 |
| 39:21 44:14 | **fixing** 184:23 | **foot** 86:9,14,17 | **form** 2:11 |
| 65:6 75:8 | **flat** 181:3 | 86:18,23 87:3 | 18:12 19:1 |
| 78:19,20 84:2 | **flip** 225:3 | 87:23 88:1 | 21:9 33:13,21 |
| 86:10 104:1 | **flipped** 211:23 | 201:17 252:4 | 49:7 70:20 |
| 106:8 114:20 | **floor** 155:4,17 | 256:8 266:17 | 102:2 111:18 |
| 121:5 142:1 | 155:22 259:7 | 266:20,20 | 113:21 116:3 |
| 147:11 165:16 | **fluid** 81:6,16,18 | **force** 2:4 | 117:16 126:5 |
| 170:7,12 171:9 | 299:8,21,23 | 151:14 203:16 | 140:17 141:8 |
| 177:13 179:14 | 300:2 307:4 | **forces** 93:11 | 151:8 219:15 |
| 179:21 180:19 | | | 224:19 225:13 |

G. Bryant Buchner
July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[form - georgia]** Page 24

236:2 238:2
279:7 280:14
280:16 283:3
285:7 305:19
310:9
**formally**
267:18
**format** 36:7
**formed** 269:6
**formula** 281:19
282:12
**formulas**
275:15
**formulate**
296:9
**forth** 113:5
**forties** 102:21
**fortunate** 220:4
**forward** 155:11
203:12 228:12
**foul** 69:22
**found** 9:17,19
10:8 23:2
106:14 130:7
138:18 140:4
186:2 228:1
**foundation**
105:1
**four** 76:11
151:12 178:11
199:8 218:22
221:13,14
222:14 223:13
223:19 257:5,6
260:4

**fr26** 7:8,13
25:8 28:14
41:5 46:3 51:9
51:14,20 61:19
142:7 214:5
**frame** 95:10,19
107:2 110:1,2
122:13,21,22
131:1,23
147:20,23
148:10 149:23
152:4,5,19
153:10 172:22
220:23 255:8,9
255:11 274:5
285:12,12
**frames** 94:6
206:5
**free** 261:18
**freezing** 234:14
**front** 6:16
159:6,23 180:2
199:4 202:6
212:5 223:22
224:2 228:5,10
228:16 229:22
236:19 237:8
240:20,23
249:2 252:17
252:21
**froze** 195:10
**frustration**
137:14 295:11
**fuel** 80:17 81:1
83:13

**full** 2:5 81:1
88:18 104:15
104:17 146:23
152:2 162:3,6
164:6
**fully** 40:7 166:4
224:12
**function** 156:4
**functioned**
156:18
**functioning**
60:14
**functions**
243:19
**further** 2:1,8
2:16 150:20
180:10 309:9
310:14
**furthest** 184:10
252:16
**future** 145:4
295:8

**g**

**g** 1:17 5:7 6:4
311:5 312:2,24
313:2,4,12
**gainesville** 1:3
4:3
**gamut** 205:19
**gap** 156:20
157:4,6
**garbled** 48:20
**gas** 80:17
104:15,17
299:19

**gbb** 249:11,13
250:3
**general** 9:23
142:18 191:9
283:6
**generally** 79:20
213:9 284:19
288:10 289:8,9
289:13 292:14
292:16 309:3
**generate** 21:21
38:14 46:16
74:16
**generated**
14:11 17:23
35:6 72:18,19
74:4 110:4
**generates**
239:13
**generating**
142:6 147:1
**generic** 283:7,8
**generically**
70:22 103:17
**gentleman** 31:1
**geometrically**
262:15
**geometries**
110:19
**geometry** 75:22
75:23 267:11
**george** 5:14
**georgia** 1:2 4:2
4:12,16,20

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[getting - going]**                                    Page 25

| | | | |
|---|---|---|---|
| **getting** 13:6 | 229:10 238:22 | 187:22 188:12 | 40:21 50:19,20 |
| 23:21 25:3 | 255:18 256:15 | 195:15 218:2 | 56:8 61:2 63:6 |
| 26:7 109:9 | **giving** 47:9 | 220:11 221:21 | 64:12 65:3 |
| 123:3 143:12 | 121:12 207:21 | 221:22,23 | 73:14,15,15 |
| 152:12 154:12 | 214:12 | 222:13,19 | 74:19 83:23 |
| 163:11 176:5 | **glad** 137:20 | 225:17 228:23 | 86:18 100:11 |
| 206:1 279:20 | **gladly** 26:23 | 229:3 234:23 | 103:11 108:10 |
| 286:2 297:15 | **glass** 84:11,15 | 237:8 240:20 | 109:3,7,7 |
| 306:20 | 84:17,19,20,23 | 244:16 245:22 | 119:16 121:9 |
| **give** 20:15 | 84:23 85:4 | 251:6,20 | 125:2 131:11 |
| 26:18 42:11 | 299:10,21 | 252:19 253:15 | 132:22 133:1 |
| 43:3 56:20 | **glitchy** 229:1 | 253:19,22 | 135:13 140:9 |
| 83:20 132:12 | **go** 9:12 13:5 | 254:16,17 | 141:12,12 |
| 134:13,13 | 17:14 28:16 | 255:4 257:1 | 142:22 143:9 |
| 136:5 158:11 | 29:11 31:12,12 | 260:5,6,11 | 144:23 147:17 |
| 158:18 164:22 | 34:2,13 35:4 | 279:9 281:13 | 150:10 163:13 |
| 165:3 187:10 | 36:16 48:8 | 283:5,10 285:9 | 164:23 165:1 |
| 192:2 194:16 | 56:7 68:4 | 286:13,15 | 167:14 168:8 |
| 195:13 230:20 | 87:16 90:21 | 290:1 291:8,13 | 168:19 171:2,5 |
| 234:15 245:4 | 102:6 107:17 | 292:3,8,17 | 181:7 186:22 |
| 247:8 248:2 | 108:2 111:21 | 298:2 302:5,5 | 195:22 201:2 |
| 254:16 263:18 | 112:3 114:3 | 305:8 306:1 | 202:5,6,12,15 |
| 267:19 269:17 | 115:9 116:6 | 308:23 309:1 | 202:17,18,23 |
| 282:7 304:14 | 117:18 120:7 | **goes** 28:10 | 207:2 212:10 |
| **given** 42:12 | 120:19 124:17 | 32:13 91:8 | 212:11 213:18 |
| 43:21 110:18 | 127:7 129:3 | 94:17 103:9 | 217:1,2 218:18 |
| 110:19 112:8 | 130:10,12,12 | 116:4 117:16 | 227:7,8,9 |
| 112:12 133:21 | 130:13 131:21 | 138:4 140:18 | 233:21 237:10 |
| 134:4,20 140:2 | 132:14 136:1 | 148:5 159:12 | 237:12 239:20 |
| 248:15 283:15 | 140:21 144:22 | 206:22 281:19 | 241:13 242:17 |
| 296:14 313:9 | 149:9 158:17 | 298:16 | 244:14 247:3,8 |
| **gives** 12:3,4 | 161:21 171:2 | **going** 6:10 | 253:22 257:14 |
| 161:15,15 | 181:14 182:20 | 12:23 13:2 | 260:10 273:7,9 |
| 168:21 199:9 | 185:12 186:6 | 20:5 34:7,15 | 273:11 274:15 |
| 214:3,19 225:3 | 186:12,22 | 35:5 39:15 | 277:8 278:10 |

**[going - he'll]**                                                    Page 26

278:18 287:11
292:8,17
295:13 302:9
303:16 308:15
**gold**   194:15
**good**   16:22
17:9 57:1 61:7
86:6,20 123:3
123:15 128:8
129:5,13 132:1
132:3 133:2
146:2 147:9
159:4 160:4
162:12 164:18
213:10 228:14
238:9 253:1
254:22 263:10
267:20 278:6
286:2,3 290:12
**gotcha**   75:16
205:10 254:21
**government**
302:22 303:2,8
**graphical**
13:14 14:4
16:4 69:7
72:13 73:4
**great**   30:5
61:18 68:19
128:20 146:1,8
196:5 203:1
287:14 309:4
**greater**   149:18
150:13 151:14
308:23

**green**   192:21
193:8 206:15
206:17 209:22
210:18,23
211:4
**grief**   235:5
**grimes**   67:23
82:17 96:7
113:11 114:15
114:23 115:4
144:1 146:20
148:21 154:13
160:17 161:7
161:11 177:1
198:6,7 202:10
203:9 216:9
217:15 219:21
220:9 230:17
232:10,12
237:4,13
238:13 240:9
243:15 245:4
245:18,22
246:3 256:3
259:9 260:23
262:5 263:1
266:21 275:6
277:6 290:7
292:7 294:18
308:19
**grimes's**   44:15
45:8 91:2
96:12 114:16
118:8 141:15
146:21 147:5

161:6 177:1
190:17 220:11
222:15,17
225:1 226:2,3
226:4,4 227:13
239:7,10,16,23
240:4,7,13
243:5 244:3,7
244:8 245:23
246:11 247:7
247:20 264:6
**ground**   159:10
208:11
**grounds**   2:13
**groundwork**
292:4
**guess**   34:6 73:9
188:10 193:11
226:3
**guesses**   11:12
**guessing**   44:17
**gunn**   4:11
**guy**   10:21,21

**h**

**h**   312:3
**habit**   56:16
**hair**   300:3
**half**   135:1
214:4 254:4
257:5,6
**hall**   175:23
**hand**   26:11
64:10 130:5
188:1 289:15
291:23

**hands**   295:16
**hanging**   258:6
**happen**   9:7
109:22 233:19
237:15 302:19
**happened**   8:8
23:6 24:4
25:21 26:15,21
28:4,4 43:4
55:17 122:20
139:5 223:18
235:2 286:4
**happens**   8:12
19:15 27:7
139:18 199:18
203:1 228:14
235:3 298:10
**happy**   56:7
138:10,14
258:14 295:17
**hard**   33:21
43:7 227:11
266:17
**harder**   13:7
**harm**   69:22
**hash**   228:11
**hatch**   91:19
155:23 156:13
156:20 157:4,6
157:9 175:16
259:1,8
**hate**   175:22
195:12
**he'll**   34:17
166:17

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[head - hook]**                                                    Page 27

**head** 46:2
  105:16 111:7
  119:7 208:13
**hear** 15:23
  48:14,17,19
  137:13
**heard** 15:22,22
  170:4 192:8
  295:10
**hearing** 128:2
**heart** 269:1
**heck** 26:11
**height** 67:4
  76:23 77:12
  99:4 201:7
  208:10,16,20
  209:4,7 238:4
  284:9 285:2,5
  291:18
**heights** 209:10
**held** 217:10
**help** 26:2 45:5
  45:11 48:16
  194:12 211:8
  284:15
**helps** 211:12
**hereto** 313:7
**hey** 13:5 20:19
  23:5 120:8
  167:9 188:12
  266:16 274:13
**hiding** 233:2
**high** 162:5
  164:16

**higher** 63:17,22
  187:22,22
  209:13 210:8
  210:19 212:10
  289:18
**highlighted**
  79:7
**hill** 3:5,7 4:10
  5:18,18 6:9
  61:2,7,14,15
  69:16,18 70:19
  71:7,14,23
  72:2,11,12
  83:19 84:3,8
  84:10 89:3,13
  89:14 105:17
  105:20 106:9
  114:1,7 119:17
  121:7 125:21
  126:4 137:2,9
  137:10 138:7
  141:10,11,22
  143:1,8,19
  144:2,10 145:2
  145:9 146:1,5
  146:9 151:6
  154:6 158:3
  176:2,5,14
  182:16 183:5
  185:7 188:3,9
  195:12,22
  211:14 225:14
  240:10,17
  250:23 260:3
  260:10,14,20

260:21 279:16
280:3,23 287:8
287:14,21,22
295:4,20 304:4
304:7,12 309:5
**hinge** 208:21
  210:2 211:3
  212:2,6,12,18
  212:20 213:4,8
  213:8,14,16,21
  214:1,10,15,16
  214:17 215:4
  216:16,17,18
  217:1,3,4,21
  218:6,23 219:3
  219:4,6,7
**hinges** 208:23
  209:2,5,7
  214:4,20,20
  218:10
**historically**
  275:8
**history** 292:18
**hit** 64:3 92:3
  93:8 94:19
  107:4 110:1,6
  122:23 172:21
  172:23 197:10
  198:8,9,10,17
  200:11,14
  202:23 246:22
  247:11,12
  251:23 252:1
  252:23 254:3
  255:8,9 257:23

258:1 289:7
**hits** 201:18
  202:7
**hitting** 110:19
  166:1 180:14
  200:12 274:5
  288:17
**hold** 27:16
  61:15 69:2
  146:9 195:15
  211:7 217:8
  220:5 228:16
  269:23 276:7
**hole** 198:7
  254:8
**holes** 252:7,9
**hood** 206:19,22
  208:16 209:16
  211:21 212:5,9
  235:18
**hook** 95:17
  122:12,22
  131:1,15
  152:17 153:7
  197:9,12 198:2
  198:3,7 203:10
  203:11 204:23
  205:4,17,22
  219:19,20
  220:5 247:11
  247:16,21
  251:23 252:1,6
  252:8,14,16,18
  252:21,23
  253:8,10 254:3

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[hook - images]**                                          Page 28

254:18 255:11
255:14,15,22
256:19 258:1,7
261:16
**hooks** 180:1
256:5,5 262:13
262:21 264:22
**hope** 195:23
**horn** 122:21
255:8,9,11
**hour** 39:5 61:3
88:9,14,18
100:4,7 101:23
102:10,11
135:1 141:19
162:18 163:1
163:22,23
164:6,10 165:5
166:14,22
**hours** 130:18
278:4 287:6,15
**house** 132:23
133:2
**houses** 242:7
**hudgins** 4:11
**huge** 113:10
**huh** 27:11
163:4 187:18
**hundred**
124:18 128:7
144:9 183:16
191:14 215:19
300:19,22
306:8,11,13,15
307:11 308:15

308:16,18
309:2
**hundreds**
130:17 245:11
271:8
**hundredth**
201:22
**hundredths**
202:2
**hurting** 127:23
**hv** 13:14 14:7
**hve** 8:22 21:11
21:17,21 22:7
23:11 27:19
29:17,21,23
30:16 31:16
32:11 34:8
36:18 37:11
38:18 48:11
49:2,4 50:4,10
52:16,17 53:14
54:4,17 59:1,9
59:17,22 60:5
62:7,10,17,21
62:23 63:3,10
63:20 65:8,16
69:3,5,8 70:4
70:20,21 71:8
72:5,7,19,19,21
72:22 73:14
74:3,7 79:10
89:14 90:11,12
91:4,8 106:12
107:14 109:12
109:17,22

110:11 111:3
111:16 113:2
115:14,20
122:2 126:16
127:18 128:11
129:17 132:16
133:8,15 134:1
135:2 138:17
139:9 140:3,10
141:14 142:2,6
142:10,18
143:2,4,7,20
144:4 145:4,12
145:17 149:19
151:18 169:20
169:22 172:4,5
172:8,19 174:8
260:8 276:13
277:13 278:13
278:19,20
279:3 280:5,17
281:6,10,15
282:18 284:1
285:3 288:1,1
289:10 290:5
290:22 291:16
292:13,22
301:3,4,12,14
301:20 302:7
302:14,15
303:1,7,8
304:15 305:1
305:16
**hve's** 90:3

**hypothetical**
101:20 109:14
138:20 139:12
162:9 285:4
291:17

**i**

**idea** 8:9 24:5
60:20
**identical**
101:15 277:16
293:9,10,11,12
**identification**
7:7 178:9
186:10 251:11
303:22
**identified**
126:21
**identify** 5:15
27:20 116:23
**ignored** 49:1
50:10
**illustrate** 227:2
**image** 3:17
70:11 73:19
185:12,13
187:4,12
207:11,14
220:21 227:16
234:9,17 240:4
240:11 248:14
254:1,15 260:7
269:18
**images** 14:9,11
14:12,13
194:18 239:13

G. Bryant Buchner                                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[images - incorrect]                                                 Page 29

| | | | |
|---|---|---|---|
| 243:6 246:21 | 250:18,19 | **improper** 106:5 | 229:12,20 |
| **imagine** 138:23 | 251:7,7 252:12 | 204:4 | 230:13 231:15 |
| **impact** 91:20 | 252:14 253:2,3 | **improperly** | 231:18,19,19 |
| 91:21 102:17 | 256:19 257:19 | 218:16 | 232:4,6 236:6 |
| 110:16,22 | 285:13,21 | **improve** 44:12 | 237:13 238:13 |
| 112:11 115:11 | 289:4 293:12 | **improvement** | 238:14,22 |
| 115:14,23 | 305:5 | 11:17 | 255:18 257:5,7 |
| 118:20 131:23 | **impacted** 153:3 | **improvements** | 261:21 262:8 |
| 153:1,14 156:1 | 156:13 189:3 | 56:19 | 263:14 265:18 |
| 162:7,20 163:2 | 255:15,23 | **inaccurate** | 266:9 267:1 |
| 166:17 168:7 | 257:11 | 96:16,18 | 268:12 271:2 |
| 179:15 180:20 | **impacting** | 263:11 | 273:10,11 |
| 196:23 200:22 | 201:4 | **inappropriate** | 278:2 |
| 202:9,22 | **impacts** 93:3,4 | 121:6 | **incident** 178:4 |
| 203:11 205:1,4 | **imperfect** | **inaudible** 81:11 | 304:16 |
| 205:4,17 | 218:17 | **inboard** 192:22 | **incidents** 172:7 |
| 209:19,20 | **important** | **inch** 67:4 88:6 | **include** 91:1 |
| 210:5,21 | 69:23 229:9 | 202:11 217:11 | 222:12 301:4 |
| 211:19,20 | **imported** | 225:19 231:13 | 301:15 |
| 212:11 213:7,9 | 297:16 | 238:15,16 | **included** 56:19 |
| 213:14 215:5 | **impossible** | 266:18 273:9 | 90:19 142:3 |
| 215:11,14,15 | 281:6,10 | 276:4 | 301:16 302:4 |
| 215:16,18,21 | **imprint** 177:16 | **inches** 11:19 | **including** 25:12 |
| 216:17 219:23 | 177:19 178:6 | 52:11,12 67:1 | 91:9 |
| 220:2 221:4,4 | 183:12 186:17 | 67:3 77:2,10 | **inclusion** |
| 221:9 222:4,5 | 195:7 202:20 | 85:23 86:8,14 | 223:17 |
| 222:22 223:16 | 204:23 205:18 | 86:23 87:7 | **incomplete** |
| 224:5,16 225:7 | 214:8 217:8 | 96:2 135:3 | 39:8 |
| 225:19,21,23 | 237:1 252:6,8 | 199:2,8,19 | **inconsequent...** |
| 229:16,20 | 270:17 | 207:3 208:8 | 300:20,23 |
| 230:1,2,8,14,17 | **imprints** | 213:19 214:11 | 307:4 |
| 231:6,7,9 | 176:20 183:18 | 217:14,20 | **inconsistent** |
| 232:8 233:1 | 186:19 189:23 | 218:22 220:12 | 23:3 24:9 |
| 236:7,23 237:7 | 191:18,21 | 220:14 225:20 | **incorrect** |
| 249:5,6 250:17 | 262:12 | 226:8 228:19 | 114:11 |

G. Bryant Buchner
Bryson, Santana and Joshua v. Rough Country, LLC
July 11, 2024

**[increase - interrupting]**                                                Page 30

| | | | |
|---|---|---|---|
| **increase**  168:23 | 254:13 271:19 | **input**  31:2 | **instructions** |
| 275:20,21 | **indication** | 38:19 39:16 | 31:9 |
| 276:12,15,16 | 256:18 | 41:1,15 79:15 | **instructor** |
| 278:1 280:8 | **indicative** | 140:16 175:15 | 290:7 |
| 284:2,4,4 | 255:22 | 239:8 268:11 | **instructs**  291:3 |
| **increased** | **indicators** | 272:18 298:14 | **intelligent** |
| 132:4 277:14 | 205:3 | **inputs**  35:1 | 137:16 |
| 282:10 | **indiscernible** | 46:21 145:6,19 | **intend**  137:22 |
| **increases** | 16:18 17:4 | 297:8 | 158:11 245:3 |
| 282:10,16 | **individually** | **inputted** | 260:22 304:14 |
| **increasing** | 17:15 | 239:18 | 305:16 |
| 93:11 | **industry**  110:9 | **inputting**  67:13 | **intended** |
| **incredibly** | 112:18 145:13 | 297:20 298:8 | 215:14 224:10 |
| 127:17 | 288:10 289:11 | **inquired**  19:19 | 249:5 250:17 |
| **indentures** | 292:7,15,16 | **inside**  82:11 | 250:18 251:7 |
| 159:15 | 303:11 | 193:9 195:3 | **intending**  36:5 |
| **independent** | **infinite**  241:6 | 212:6 213:16 | **intense**  295:15 |
| 177:1 217:13 | **information** | 228:10,13,17 | **intent**  25:19 |
| 246:9,15 | 43:14 67:8 | 250:15 259:23 | 28:1 64:8 69:1 |
| 291:19,22 | 70:14 71:20 | **insinuate** | 91:23 92:4 |
| **independently** | 83:21 102:7 | 125:12 | 96:11 224:13 |
| 199:17 287:23 | 113:1 145:17 | **inspect**  97:11 | 299:1 |
| **indicate**  174:17 | 156:7 248:2 | 97:20 98:9,12 | **interested** |
| 176:18 178:13 | 274:20 284:6 | **inspecting** | 310:16 |
| 178:20 179:10 | **initial**  15:8 | 97:14 | **internet**  82:16 |
| 221:8 245:3 | 19:6 20:22 | **inspection** | **interpret**  205:1 |
| 266:9 | 38:15 61:21 | 178:4 | **interpretation** |
| **indicated** | 88:12 238:12 | **instance**  138:17 | 169:6,13 |
| 100:11 168:8 | 252:11,14 | 190:6 194:6 | 185:21 192:19 |
| **indicates** | 253:2 | **instances**  128:4 | 193:3 224:9 |
| 235:17 | **initiated** | 139:5 150:12 | **interpretations** |
| **indicating** | 221:20 | **instructing** | 197:15 |
| 188:20 196:13 | **injuries**  158:8 | 279:16,19 | **interrupting** |
| 208:21 240:5 | **injury**  157:21 | 287:8 290:8,11 | 244:19 |
| 251:4 253:23 | 158:15 | | |

G. Bryant Buchner                                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[intrusion - know]**                                          Page 31

**intrusion**
140:12,14
158:12
**intuitively**
106:22 277:1
**invalid** 106:4
150:15
**invalidate**
150:4 294:22
**invalidates**
114:13
**investigated**
19:22 91:6
**investigation**
121:2,3 133:13
**involve** 175:12
**involved** 99:19
103:9 140:15
218:23 302:11
**involves** 177:14
**involving**
304:16
**irrelevant**
259:11 308:6
308:12
**irritated** 138:4
138:8
**ish** 8:1
**issue** 7:19,22
8:12 44:22
61:16 77:11
131:3,4,6
142:15 146:6
231:2 248:22
266:13 303:13

**issues** 56:15
115:10
**item** 149:5,16
151:1,12,21
152:22 158:19
160:16
**items** 79:3 80:8
155:13 180:1
**iteration** 10:23
**iterations**
297:1
**iterative** 24:15
24:15

**j**

**jacked** 286:5
**jacob** 32:5,8,12
65:5
**january** 8:2
10:11 12:9
15:12 24:20
26:17 27:18
58:5
**jeff** 178:3
**jess** 4:22
**job** 9:3 31:20
32:3,7 265:5
295:15
**joke** 188:6
**jokes** 188:7
**joshua** 311:4
312:1 313:1
**july** 1:18 5:12
**june** 105:21
146:12 178:1

**jury** 269:19
**justification**
172:12

**k**

**keep** 19:23 26:4
136:9 141:12
187:21 192:7
253:22 264:2
279:20 297:19
297:19 299:2
**keeps** 88:5
**kept** 12:17 13:6
13:8 54:23
257:14
**key** 229:9
**keystroke**
297:12
**kidd's** 178:4
**kill** 242:20
**kin** 310:15
**kind** 9:23 28:3
118:10 153:18
156:6 171:19
175:17 184:8
206:12 225:11
228:15 255:6
286:21 289:2
298:8 299:14
**kindly** 7:16
**kinds** 160:7
**kit** 285:11
**kits** 103:7
304:17
**knew** 39:2
40:22 44:17

81:16 221:17
243:13 261:13
261:15 274:14
**know** 7:10 8:12
8:16,17,20 9:2
10:1,21 11:2
11:13,14,15,17
11:18,20 12:11
14:15,18,18
15:21 16:18
18:4 20:1,2,6
20:14,17,18
23:9 24:2,4,7
25:18 26:8,10
27:1,2,3,23
28:1,2,4,5,8,18
28:23 29:2,13
30:4,6,9,10,12
30:23 32:10,15
32:17,22 33:1
33:2,23 34:2
34:13,15,16,19
34:20 36:1,8
36:13,15,16,18
39:17,18 40:9
40:11 41:3
42:1,9 44:7,11
44:18 45:16
46:1,10,14,17
47:3,21 52:8
52:18 53:4,5
53:12 54:6,7
54:10,16 55:13
56:23 57:2,4,5
57:14,14,15

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[know - knows]**                                              Page 32

| | | | |
|---|---|---|---|
| 59:2,11,11,12 | 137:13,16 | 208:17,19 | 288:2 289:2 |
| 59:14 60:14 | 139:3,16 140:5 | 209:1,2,4,6,15 | 292:14,17,21 |
| 61:4 64:2 67:4 | 140:6,7,8,23 | 210:5,11 | 293:3 295:8 |
| 67:6,16,17,20 | 142:16 144:17 | 211:12,23 | 297:15,18,19 |
| 68:2 69:22 | 144:19 145:11 | 213:9,11,15 | 298:1,20,23 |
| 70:5 75:9 76:1 | 145:17,22 | 214:22 215:17 | 299:18,21,22 |
| 80:16,20,21,23 | 147:6,19 | 216:2,6,9,10 | 300:1,4,11,18 |
| 81:1,9 82:9 | 148:10 149:2,6 | 217:1,3,5 | 300:21 301:18 |
| 83:12 84:22 | 153:7 154:20 | 218:15,18,19 | 302:2,3 304:18 |
| 86:8,13,13,21 | 155:15,23 | 218:23 219:4,5 | 304:19 306:19 |
| 87:4,15,16 | 156:5,12,19 | 219:7 220:9,9 | 306:21 307:6 |
| 88:17 90:18 | 159:7 160:4,13 | 222:10 225:20 | 307:10,11 |
| 91:15 93:11 | 160:14,17 | 225:20 227:2 | 308:9,9,11,21 |
| 94:8 97:17,21 | 161:19 162:14 | 230:21 233:11 | 308:22 |
| 98:13,14 | 164:17 165:8 | 233:16,18,22 | **knowing** |
| 100:16 102:8,9 | 167:3,6 168:6 | 234:18 238:7 | 139:22 207:13 |
| 103:1,3,5 | 172:15,16,17 | 242:5 243:12 | **knowledge** |
| 104:6 105:15 | 172:19,19 | 245:10 247:1 | 25:5 29:8 91:9 |
| 107:18,19,20 | 173:4,18 174:4 | 248:23 254:5 | 145:10,16 |
| 108:4,8 109:4 | 174:13,20,23 | 256:7,8,13,14 | 173:22 265:1 |
| 109:18,19 | 175:3,8,11,19 | 257:16 259:8 | 308:22 |
| 110:14,15,15 | 179:7,19 180:5 | 259:11,15 | **known**  26:22 |
| 110:19,20,21 | 180:16 182:11 | 261:10 262:10 | 56:23 67:9 |
| 113:15 115:6,9 | 183:14,21 | 262:14 263:6 | 113:1,8 191:3 |
| 115:11 116:16 | 187:7,7 188:3 | 266:1,17,20 | 207:13 256:12 |
| 117:9,19 119:6 | 188:7,9 190:5 | 268:23 269:4 | 256:13 288:17 |
| 120:2,3,6,8,12 | 190:9,11 191:7 | 272:11 274:5,7 | 288:18 |
| 121:19 123:13 | 191:9 193:2 | 274:15,19 | **knowns**  113:1 |
| 128:17,19,21 | 198:11 199:9 | 275:4,7,8 | **knows**  27:7 |
| 129:8 130:14 | 200:14,19 | 276:18,19 | 82:7 145:12 |
| 130:17 131:2,8 | 201:7,8,13,18 | 277:1,2,3 | 198:11 239:13 |
| 132:6,10,17,20 | 201:19 202:14 | 278:20,21 | 241:2 290:12 |
| 133:5 134:11 | 203:12 205:8 | 282:11 283:1,6 | |
| 134:14,17,20 | 207:22 208:4,7 | 284:6,8,18 | |
| 136:3,4,5 | 208:10,13,15 | 286:16 287:20 | |

G. Bryant Buchner
July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[l - line]**

| l | | | |
|---|---|---|---|
| **l** 311:1 | **leap** 283:19,19 | **letter** 6:11,15 | **levels** 39:11 |
| **labeled** 7:3 | **leave** 159:8,22 | 7:1,11 29:10 | 110:2 140:13 |
| 37:18 222:1 | 160:3 182:17 | 146:13 184:19 | 148:7,23 |
| 225:7 | 220:7 228:22 | 185:22,22 | **license** 252:4 |
| **labels** 222:4,4 | 234:9 | 191:18,21 | **licenses** 32:1 |
| 222:22 223:16 | **leaving** 153:16 | 192:20 223:8 | **lift** 103:7 167:6 |
| **laid** 292:4 | **lectured** 125:17 | 297:11 | 167:7 168:23 |
| **land** 129:11 | **leeway** 83:20 | **letters** 183:19 | 285:11 304:17 |
| **laptop** 241:20 | **left** 19:16 87:8 | 184:2 185:8,20 | **lifted** 161:8,8 |
| **large** 181:12 | 88:7 100:17 | 186:19 187:4 | 161:13 163:15 |
| 212:23 213:1 | 122:15,23 | 189:7,18 192:5 | 163:17 164:14 |
| 310:6 | 150:10,20 | 193:4,5,17 | 165:13,16,18 |
| **larger** 308:12 | 183:15 185:14 | 194:3,4,7 | 165:20 166:13 |
| **lateral** 238:22 | 185:15 187:22 | 195:7 197:14 | 166:21 167:4 |
| **laterally** | 188:21 189:20 | **level** 23:7 39:8 | 167:10,18 |
| 200:20 | 190:16 196:11 | 80:16 81:1 | 170:12,18 |
| **latest** 60:1,2,10 | 197:6,12 | 83:12 90:21,21 | 171:9,13,14 |
| **laws** 2:5 107:1 | 198:16 200:2 | 92:3,14 93:3 | 172:4 173:11 |
| 111:1 233:8 | 200:15 204:22 | 94:6 95:14,19 | 286:5 |
| **lawyer** 97:18 | 205:17 214:1 | 95:19 131:23 | **light** 220:6 |
| 97:22 301:2 | 215:22 217:12 | 138:19 139:11 | **likely** 90:19 |
| **lay** 138:5 238:6 | 219:10,12 | 147:16,20,20 | 160:3 |
| **layperson's** | 221:17 229:5 | 148:6,6,8,9,10 | **likewise** 92:10 |
| 75:3 | 248:14 252:8 | 148:12,12 | **limited** 126:13 |
| **lead** 15:22 | 252:14,17 | 149:23 150:19 | 204:21 215:22 |
| 108:9 | 258:22 272:9 | 152:4,5,6,9 | **line** 7:13 |
| **leading** 2:11 | 272:13,23 | 153:9,10,11 | 100:15 101:2 |
| **leads** 106:11 | 273:8 | 155:12,17 | 103:9 107:15 |
| 160:9 | **legal** 311:23 | 168:12 172:23 | 141:12 144:20 |
| **leak** 81:8 | **legitimate** | 213:11 237:12 | 177:18 188:22 |
| **leaked** 81:4,17 | 142:1 | 272:15 274:5 | 200:8 202:20 |
| 83:15 299:8 | **length** 63:7 | 276:22 281:5 | 203:16 204:2 |
| **leaking** 299:23 | 230:23 231:1 | 285:11,12,12 | 206:17,18,19 |
| | **leon** 4:15,19 | 285:12 287:1 | 206:21,22 |
| | | 289:16 | 209:20,21,22 |

G. Bryant Buchner                                      July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[line - look]**                                                    Page 34

210:15,19,20
210:21,22
211:4,5 212:5
216:10,11
218:4 221:19
224:1,7,7,17
225:6 226:7
231:23 234:5
235:18 239:17
241:15 252:2
261:11 263:12
271:22 280:22
312:4,7,10,13
312:16,19
**linear** 231:22
**lined** 198:7
200:7 204:9,14
232:10 234:5
237:4,4
**lines** 193:18
206:13,15
207:9 210:9,12
211:21 214:14
214:18 215:6
216:6,14
218:11 240:12
270:5
**link** 242:21
**list** 69:10,11
146:23
**listed** 147:6
245:8 246:11
**listened** 50:10
**listening** 87:5
104:5 135:19

**lists** 147:7
**lit** 307:3
**literally** 112:10
116:10 127:22
145:22 238:23
**literature**
112:18
**little** 54:12 61:3
63:6,7,8 86:7
137:11 149:12
153:8 158:18
180:9 181:4,6
181:8 184:7
185:20 187:21
187:22 189:15
192:15 196:11
208:13 238:6
252:20 254:18
271:1 272:9,10
273:1,10,20
295:6,9,10
299:13 304:20
307:3
**llc** 1:10 4:15,19
311:4 312:1
313:1
**locate** 8:6 19:2
184:1
**located** 67:23
253:10 256:23
**location** 79:13
79:19 80:8
85:13 98:17
115:12,14
116:1 118:20

184:2 192:4,5
196:20 203:10
204:22 205:17
215:19,21
221:8 231:5
256:19
**locks** 248:20
**lodge** 84:4,4
**logic** 209:20
275:2
**logo** 176:20
177:16,18,19
178:6,6 179:13
180:2,15,19
181:2,7,15,17
182:3,6,9,10
183:13,17
185:2 186:17
186:18 188:21
189:3,19 190:3
190:3,6,10,11
190:14,19,19
190:20 191:3
191:11,13,14
191:17 192:10
192:23 193:9
193:16,17
194:1,9,13,18
195:4 196:20
198:1,4,8,15,16
199:3,4 200:17
201:9 202:6,11
202:20,23
203:3,4,23
204:13,14,22

205:4,18,22
213:8,13 214:8
216:17 217:8
219:2,5,7,9,11
219:12,17,18
220:14,14
225:23 228:9
228:15,17
229:5,7,12,12
234:4 235:22
236:16 237:23
262:12 270:17
270:20 272:6
272:14,17,18
**logos** 199:5
200:11,12,15
231:5 232:17
236:5,5 261:1
261:5,12,13
262:6 263:2,14
264:12,14,18
265:8,20 266:4
**long** 15:20
20:14,17 22:19
57:10,10,11
90:21 112:6
144:23 166:18
192:8 233:7
**longer** 19:11
238:7
**longitudinal**
224:6
**look** 6:19 25:3
25:18 31:13
33:13,21 35:5

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[look - make]**                                          Page 35

35:8 46:5,8
52:19 71:20
73:6 76:6 82:1
82:2 94:20
104:18 105:11
115:10 116:9
116:15 118:4
118:20 119:1
120:21,23
130:2 131:6,11
132:21 133:1
139:22 147:15
147:21 149:9
152:14 156:16
181:10 183:18
188:18 198:5
203:7,16 219:2
220:10,21
221:2,3,23
228:4,5 229:12
234:8 235:15
237:8 238:4
242:9,12
248:17 259:3
259:17 263:9
263:11 286:18
286:22 289:5
**looked** 8:3,10
9:19,22 10:18
10:18 11:11,23
12:20 45:9
68:14,21 73:11
105:2 119:3,9
119:10 131:5
166:3 185:23

198:12 217:10
255:7 264:21
269:12
**looking** 10:15
12:16,18 13:10
13:11 14:13
18:7 19:23
21:17 22:21
23:5 26:6 34:9
36:2 70:17
110:22 117:7
117:21 163:11
183:21 184:19
192:20 199:23
202:1 204:8
213:5,23
216:18 239:23
240:9 245:20
255:5 258:19
258:22 300:4
**looks** 16:13,13
16:14 23:6
184:20 193:17
198:20 204:15
301:19
**lose** 118:15
**losing** 10:1
**loss** 7:19 80:13
81:15
**lost** 38:2,9,13
**lot** 93:12 94:18
94:19 103:8
162:21 172:23
197:1 254:8
274:11

**lots** 284:11
303:6
**loudly** 137:12
**low** 161:16
165:7 171:1
**lower** 100:12
108:18 118:14
123:2 166:16
197:8 209:14
210:8,20
212:10 229:10
**lowering**
106:21
**lowest** 162:3
**luck** 220:4
**lunch** 88:20,21
88:23 89:1

**m**

**mac** 289:10
**made** 2:10
11:17 14:22
24:2 63:13
66:13,14 68:15
68:20,22 77:17
86:6,16,20
106:3 116:18
122:18 198:21
215:13 216:2
263:10 270:23
288:23 299:3
300:11 307:1
313:5
**magic** 178:15
**magically**
120:9

**mail** 69:15,16
**main** 122:13
141:4 205:16
**maintained**
95:19
**make** 2:13
11:12,13,18
14:16 15:10
16:3 18:7
19:17 25:11
31:12,19 34:16
35:18 46:19
52:10 60:14
62:9 63:11
78:7 88:21
93:17 96:23
99:2 125:20
126:12 129:10
129:11 135:7
135:11 144:3
148:3,21
149:12 150:14
161:6 162:22
163:19 167:18
169:17 172:3
173:18 174:5
177:11 194:23
205:12 207:12
212:15 217:19
226:22 234:1
236:9 241:14
247:23 270:20
275:19 276:10
283:19 296:15
298:15 301:8

G. Bryant Buchner                                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[make - meant]**                                                  Page 36

306:8
**makes**  93:13
  115:4 279:12
**making**  64:22
  182:1 295:10
**man**  245:17
**manipulating**
  173:17
**manner**  310:16
**manual**  87:15
**manuals**  57:4
**manufacturer**
  303:4
**manufacturers**
  109:20 139:18
  303:6
**march**  58:6
**mark**  7:4 123:1
  159:8,14,22
  160:3 186:6
  188:10 189:20
  192:13 193:15
  194:18 203:10
  203:12,14
  219:3,8,9,11,17
  219:18,19
  220:7 251:6
  254:20 303:16
  304:1
**marked**  7:7
  178:9 179:1
  186:10 215:11
  251:11 270:4
  303:22

**markers**
  158:21,22
  159:15 215:11
**marking**  194:3
  196:6 219:22
**markings**
  193:13 194:8
  261:11
**marks**  86:11
  159:10,12
  190:21 192:10
  193:16 200:15
  219:22 254:7
  254:10,14
  258:8
**mashman**  4:18
  5:21
**match**  106:13
  112:13 128:13
  199:6,18
  202:12 217:16
  220:12 228:14
  256:6,9,12
  263:12,16
  265:2 267:6
  284:2 286:3
**matched**
  198:13 265:12
**matches**  166:15
  198:15,17
  232:2,5
**matching**
  189:18,18
  255:14 273:23

**material**
  146:18,21,23
**materials**  41:13
  41:15 45:8
  117:6 147:5
  245:8,9 246:1
  296:16
**mathematically**
  275:13
**mathematics**
  284:3
**matter**  103:7
  165:19
**matters**  299:16
**maximum**
  171:20 199:1,2
  202:16 230:4,5
  230:16 231:2,6
  231:6,9,14,23
  232:7,12,18,21
  232:22 238:11
  253:9 254:12
  262:6 265:9
  289:5,7
**mean**  7:21 9:16
  12:14 13:1
  18:3 20:9
  26:11 28:14,22
  29:12 33:1,9
  34:1 35:14,15
  38:9 40:5 41:2
  42:9 53:1 55:8
  55:18 62:14,15
  64:4 67:8
  73:16 75:18

91:1 95:6
97:16 107:16
109:16,19,19
111:7 116:18
120:4 123:12
125:2,2 127:22
128:7 129:4,5
129:6,10,12,12
136:6 139:13
139:15 145:22
147:15 148:2
154:10 155:9
161:18 173:15
175:1,3 180:5
180:14 182:11
184:14 190:13
191:3 192:9
194:21 197:13
201:11,20
203:7 204:9
215:5 237:5
243:21 244:6
252:15 255:11
278:7 279:7
286:18 292:17
298:15 301:10
301:11 308:2
**meaning**  24:12
  173:16 175:14
**means**  39:7
  110:7 136:1
  172:10 300:6
  310:8
**meant**  10:3
  29:1 147:8

250:4
**measure** 81:21
  96:13 154:15
  179:10 185:18
  191:9,13,16
  207:14 214:16
  216:13 217:4
  217:10,21
  218:3,9,10,18
  219:1 220:12
  228:18 230:11
  238:18,21
  241:11 242:13
  242:14 247:20
  259:9 264:19
  265:8,16 267:6
  267:10 272:15
  272:16,20
**measured**
  80:18 82:21
  86:16 96:1,6
  104:19,23
  191:4,11
  197:22 213:17
  230:9 237:16
  247:2 268:3
  269:10
**measurement**
  77:4 86:17
  192:15 210:4
  214:23 232:3
  236:9,12
  238:22 239:4,9
  239:13 240:13
  242:15 247:19

264:1,11
  267:14 268:6
  270:13,23
**measurements**
  14:17 96:12
  148:22 179:9
  193:7 194:20
  195:5,9 207:9
  207:12,23
  213:6 215:12
  216:2 229:8,9
  239:1,12 241:1
  241:6,12,16
  242:1,3,4
  243:10,11
  246:23 256:16
  263:19 267:17
**measurer** 217:7
**measuring** 77:3
  82:5 242:15
  266:3
**memorized**
  111:6
**memory** 23:3
  30:3 68:3
  86:22 154:14
  154:18,21
  167:8 257:6
**mention** 243:4
  244:1
**mentioned**
  111:2 112:23
  113:3 132:19
  155:22 181:20
  253:14 282:21

**mentioning**
  177:22
**mesh** 198:21
**mess** 123:5
**met** 230:23
**metal** 253:6
**method** 62:18
  177:13 189:5
  205:11 206:4
  218:14,14,17
  238:12 246:11
  292:13
**methodologies**
  109:6 281:16
  292:11
**methodology**
  105:14 109:10
  109:13 110:8
  111:17 112:1
  142:6 246:17
  256:9 261:17
  264:8 269:15
  273:14 277:4
  278:13,15
  280:11,20
  282:18,23
  283:7 289:20
**methods**
  176:18,23
  177:8 205:13
  217:13,20
  244:10 246:7,7
  246:12,14
  247:5

**metric's** 89:22
**metrics** 74:22
**middle** 182:3
  273:6
**midpoint** 272:5
  272:18
**mile** 39:5 100:7
  102:10,11
  164:9,10
**miles** 88:9,14
  100:4 101:22
  162:18 163:1
  163:21,23
  164:6 165:4
  166:14,22
**millions** 241:23
  242:6 267:17
**millionth**
  238:15
**milliseconds**
  202:1
**mind** 115:8
  203:7 273:5
**mine** 105:11,14
  171:4 289:18
**minimal** 162:7
**minimum**
  101:13
**minus** 207:3
  208:9 269:9
  276:3
**minute** 52:16
  76:10 88:19
  89:4 112:5
  182:17,21

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[minute - need]**                                              Page 38

| | | | |
|---|---|---|---|
| 192:1 195:14 | **misses** 93:19 | **modify** 91:11 | 201:16 203:7 |
| 197:11 222:10 | **missing** 13:10 | **modifying** | 233:14 |
| 260:4 | 20:20 21:4,17 | 91:14 175:12 | **multiple** 128:3 |
| **minutes** 144:19 | 21:20 22:21 | **moment** 70:16 | 218:21 278:4 |
| **mirror** 78:6 | 40:15,17,20 | **month** 23:9 | 280:19 |
| 282:23 293:14 | 43:5,6 82:15 | 58:14 | |

**n**

**mirroring**
127:19

**mis** 124:15
141:9

**mischaracteri...**
124:15

**mischaracteri...**
236:3

**mischaracteri...**
280:2

**miscopy** 19:17

**misfired**
261:23

**misfiring**
137:15

**misinterpreta...**
263:5

**misleading**
33:14 215:18

**misread** 165:9
165:9

**misreading**
263:4

**misrepresent...**
115:4

**missed** 48:15
100:17 122:10
272:10

84:15

**misspoke** 55:3
55:4

**misstatement**
221:16 223:18

**misstates** 49:8
111:19 219:16
238:3 279:8

**mistake** 26:22
31:19 75:10
174:10 204:12

**mistaken** 12:16

**mistakenly**
66:10

**mistakes**
116:18 298:15

**misunderstood**
65:15

**mmc** 227:15,20

**mobile** 5:2

**model** 130:11
169:23 302:1

**modeling** 75:1
75:4,15

**models** 198:21
199:21

**modifications**
35:1 77:22
78:11 174:5,6

**months** 8:11
11:2 12:15
19:14 20:1,7,9
20:11,17 25:2
26:8 39:14
58:1,9,22

**moon** 135:15

**morning**
226:17 287:12

**morse** 1:21 4:7
5:1 310:4,22

**motion** 259:6

**motor** 308:3

**move** 61:20
111:13 119:17
121:7 123:4
129:6 146:4
149:12 197:19
201:14 233:12
273:8

**moved** 8:19 9:2
9:11 122:12,12
122:14 131:1
132:1 156:5

**movement**
154:1 155:5,6

**moves** 155:4

**moving** 118:19
150:19 176:14

**n** 3:1

**name** 7:15
32:20,22 250:2
250:10

**naturally** 212:9

**near** 85:15
231:8 232:2,11
284:11

**necessarily**
38:20 56:23
135:13 168:5
278:18 298:12

**necessary** 2:9
313:6

**need** 22:22
50:21 51:15,18
61:3,5 88:18
88:23 89:1
101:1 103:13
104:6 113:14
115:22 116:23
125:17 131:17
136:19,19
138:13 141:13
171:18,21
175:23 182:16
210:7 219:6,8
225:1 226:3,4
235:8 247:14

G. Bryant Buchner
July 11, 2024

Bryson, Santana and Joshua v. Rough Country, LLC

**[need - objections]**

Page 39

| | | | |
|---|---|---|---|
| 249:3 250:21 | 288:21 | **note** 138:8 | 187:8,12 188:1 |
| 254:14 259:3 | **new** 14:11,12 | 311:10 | 193:20,22 |
| 259:17,20,23 | 53:13,20 59:1 | **noted** 313:7 | 196:7,14,19 |
| 274:17 282:20 | 59:13 60:5 | **notice** 2:17 | 197:5 |
| 282:22 286:17 | 66:1 67:7 | 183:18 200:6 | **o'clock** 89:8 |
| 286:22 294:3,8 | 83:21 101:1 | 228:9 261:5 | 229:19 231:17 |
| 295:20 302:5 | 102:12 109:1 | **novel** 112:21 | 287:11,12 |
| **needed** 9:12 | 112:21 119:14 | **ntsa** 302:16 | **oath** 291:7 |
| 31:14 39:9 | 119:14 121:2 | **number** 1:5 7:6 | **object** 21:9 |
| 47:14 48:2 | 132:23 146:23 | 17:17 54:7 | 49:7 83:23 |
| 82:8 87:4 | 173:19 277:9 | 59:2 88:16 | 102:2 111:18 |
| 103:4 138:16 | 282:4 296:9,14 | 101:10 120:9 | 113:21 116:3 |
| 227:3 285:19 | 297:4,7,11,12 | 129:3 135:12 | 140:17 141:7 |
| **needs** 34:1 94:8 | 298:4 | 148:20 149:2,3 | 142:23 143:10 |
| 103:7 116:18 | **newton's** 107:1 | 149:6,14,16 | 144:23 151:7 |
| 116:19 163:18 | 111:1 233:8 | 151:1,12 | 211:12 219:15 |
| 164:20 167:18 | **nice** 123:1 | 152:22 153:22 | 224:19 225:13 |
| 189:14,14 | **night** 238:6 | 158:19 160:16 | 233:4 236:2 |
| 219:18,19 | **non** 91:7 | 164:18 178:8 | 238:2 239:21 |
| **neither** 99:12 | 242:19 | 186:9 212:23 | 279:7 280:14 |
| 156:17 310:14 | **nope** 149:14 | 213:1 229:12 | 283:3 285:7 |
| **neptune** 62:12 | 244:22 277:19 | 241:6 250:8 | 305:19 |
| 62:19 63:21 | **normal** 34:20 | 251:10 263:7 | **objection** 84:4 |
| 76:3,12,17 | 289:11,12 | 267:1 273:2,21 | 84:9 117:15 |
| 78:3 | 308:17 | 302:7 303:21 | 120:17 124:2 |
| **neptune's** | **normally** 80:1 | 307:8,15 | 124:12,14 |
| 63:17,17 64:11 | 84:17 102:9 | **numbers** 14:23 | 131:19 133:17 |
| **never** 9:19 10:8 | 226:16 288:11 | 38:20 40:23 | 134:3,6 154:4 |
| 18:21 31:11,12 | 292:11 295:7 | 41:1 64:21 | 158:1 185:3 |
| 69:12 77:8 | 299:18 | 73:22 107:17 | 278:3 279:2 |
| 91:6 97:16 | **northern** 1:2 | 242:7 | 287:2,4 290:16 |
| 106:7 132:19 | 4:2 | | 290:19 |
| 138:22 139:1,8 | **notary** 1:23 | **o** | **objections** 2:10 |
| 144:10 171:14 | 313:13,19 | **o** 181:23 | 2:13 281:12 |
| 232:12 279:13 | | 184:14,15 | |
| | | 185:5,8 187:6 | |

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[objects - okay]**                                    Page 40

| | | | |
|---|---|---|---|
| **objects** 207:14 | **offset** 85:22 | 258:9 261:2,20 | 31:7 32:9 33:4 |
| **observation** | 86:8,15,21 | 262:7,10 263:3 | 33:11,15,18 |
| 147:10 274:9 | 87:6,11 100:18 | 263:8 264:16 | 36:12 39:16 |
| **observed** 96:3 | 100:22,23 | 265:9,12,13 | 44:20 48:21 |
| **obvious** 106:22 | 101:9,15 | 266:9,10,14 | 50:8,16 53:4 |
| **obviously** 30:7 | 103:22 104:4 | 267:5,23 | 53:12 61:18 |
| 37:12 41:6 | 105:4 106:4 | 268:12 269:5 | 62:23 65:1 |
| 61:5 92:17 | 107:12,12 | 269:20 270:6 | 72:8,18,22 |
| 96:15 122:17 | 113:19 114:11 | 272:3 273:14 | 73:3 74:19 |
| 200:3 220:8 | 114:12 115:6 | 273:23 274:1 | 76:18,21 77:11 |
| 243:18 | 115:15,23 | 275:18,18,22 | 77:15,21 78:19 |
| **occupants** | 118:10,11,12 | 276:4,12,15,21 | 79:2,6,10,17 |
| 79:23 85:9,13 | 123:20,21 | 277:14,17 | 80:3,12,16 |
| **occurred** 87:12 | 126:20 127:20 | 278:2,18,22 | 83:12 84:22 |
| 158:13 162:16 | 128:13,13,14 | 280:8,8,13 | 85:18 89:6 |
| 162:17 165:4 | 129:19 131:7 | 281:5,8 284:2 | 90:8,14 91:17 |
| 276:4 280:9 | 131:17 132:4 | 286:9,20 287:1 | 94:12 98:1,14 |
| **occurring** | 135:3 153:16 | 293:12 | 98:22 99:3,18 |
| 310:13 | 153:19,20 | **offsets** 284:4 | 100:10 101:11 |
| **occurs** 281:4,7 | 158:22 166:19 | **offsetting** | 101:14,17 |
| **october** 8:1 | 167:21 176:15 | 205:20 | 103:18 104:21 |
| 9:22 10:16,18 | 176:19 177:2 | **oh** 20:11 22:10 | 111:9 112:23 |
| 11:11,23 14:7 | 186:8 204:4,19 | 44:4 66:23 | 113:19 115:13 |
| 15:8,18 16:9 | 204:21 205:14 | 164:4 176:2 | 115:19 128:18 |
| 18:5,10,23 | 206:9,20 208:8 | 202:14 221:10 | 131:10 133:20 |
| 19:6 23:18,23 | 214:17 217:11 | 223:9 230:3 | 134:8 135:18 |
| 25:1,5,14 26:3 | 220:14 225:5 | 234:7 254:16 | 137:3 140:8 |
| 26:16,23 28:6 | 225:17 227:13 | 254:22 262:2 | 146:1,14 147:4 |
| 29:1,4,10 | 231:14,19,19 | 293:2 | 151:11,17,20 |
| 35:12 37:23 | 238:13,14 | **okay** 6:14 7:10 | 154:23 156:11 |
| 54:12 57:9 | 243:7 244:4,11 | 12:20 15:20 | 157:19 158:17 |
| 66:6 76:1 | 245:5 246:8,13 | 18:9 19:3,9 | 160:6 161:4,21 |
| **offered** 2:15 | 247:9 248:3 | 22:6,22 23:12 | 165:10,17 |
| **office** 27:17 | 251:19 255:3 | 25:10 26:4 | 170:2,10 171:7 |
| | 255:19 256:21 | 29:19 30:15 | 175:12 176:4,8 |

G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[okay - original]**                                    Page 41

| | | | |
|---|---|---|---|
| 178:18,22 | **old** 14:12 57:20 | **openly** 94:9 | 284:14 296:9 |
| 179:13 182:13 | **omnipotent** | **opined** 261:20 | 296:10,13,14 |
| 182:16 187:1 | 131:13 | 263:1 | 296:17,18 |
| 188:2 189:10 | **once** 33:5,7 | **opines** 171:11 | **opossums** |
| 193:11 194:6 | 55:15 57:16 | **opinion** 43:22 | 109:4 |
| 195:10 196:5 | 250:23 266:19 | 94:13 101:20 | **opportunity** |
| 196:15 204:17 | 285:10 297:10 | 103:4 151:22 | 242:22 |
| 205:23 209:9 | **ones** 17:21 | 161:7,11 | **opposite** |
| 210:1,16 | 205:7,9 241:14 | 163:15,18 | 143:23 |
| 211:15 212:4 | **ongoing** 297:18 | 164:19,22 | **option** 34:12 |
| 213:20 214:7 | **open** 31:11,15 | 165:3 168:19 | **options** 73:16 |
| 214:18 215:9 | 55:12,13 117:5 | 169:12,17 | **oral** 1:16 5:8 |
| 216:10 222:10 | 214:13,13 | 171:20 196:16 | **orange** 252:2 |
| 223:19 227:7 | 215:1 226:18 | 196:22 197:18 | **oranges** 100:19 |
| 229:14 234:23 | 226:23 227:3,3 | 197:20 199:19 | **order** 36:9 48:4 |
| 235:5,6,15 | 227:5,9,10,11 | 224:18 231:21 | 48:12,22 49:5 |
| 242:21 245:1 | 227:17,21,22 | 232:21 237:22 | 117:1 161:9 |
| 251:12,16 | 234:14 240:23 | 243:7 256:1 | 167:15,16,23 |
| 253:22 254:16 | 241:18,22 | 274:13 280:4 | 174:6,7 194:11 |
| 258:17 259:3 | 242:11,11,18 | 280:10 281:6,9 | 194:22 214:7 |
| 261:22 262:22 | 243:20 245:14 | 282:8,9 285:2 | 259:4 267:22 |
| 265:3 266:12 | 245:14 248:9 | 285:6 286:10 | 282:17,23 |
| 266:22 267:21 | 248:15 267:9 | 291:1 303:15 | 288:7 |
| 269:11 271:9 | 269:21,22 | 304:14 | **orientation** |
| 271:18 272:16 | 297:9,10 | **opinions** 11:13 | 87:22 160:15 |
| 273:2 274:21 | **opened** 8:2,18 | 11:15 15:19 | 215:17 223:22 |
| 276:1,7 277:21 | 10:7 12:19 | 42:7,11,23 | 224:2,4 230:14 |
| 284:16 291:13 | 31:2 53:19 | 43:3 44:9 56:9 | 253:3 |
| 294:5,10,20 | 59:23 60:4 | 102:22 136:5 | **orientations** |
| 295:3 298:8 | 65:17 238:20 | 138:19 139:11 | 229:11 |
| 299:6 302:22 | 242:17 263:13 | 157:19 158:12 | **original** 7:20 |
| 303:16,20 | 268:2 | 168:16,16,16 | 10:12,15 12:8 |
| 305:12 306:7 | **opening** 34:8 | 168:17 219:13 | 14:1 15:5,7,12 |
| 309:4,7 | 60:8 297:15 | 230:20 245:5 | 17:2,14 18:1 |
| | | 248:3 251:19 | 18:13 19:4,11 |

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[original - parameters]**                                Page 42

22:3,11,17
24:13 25:16
26:1 27:10
30:10 32:3
38:8 39:22
41:7,10,22
47:12 48:11,23
49:5 50:5
52:16,20 54:10
57:12 58:7,23
62:12 64:15
65:22 66:3,15
67:10,17,18,21
68:10 75:17,20
76:4,16 77:18
78:8 82:3
85:20 86:12
111:12,14
214:5 228:3,20
234:15 247:17
247:18 254:6
266:7,7,8
267:23 268:10
268:12 269:6
274:17 296:10
298:22 302:6
305:15
**originally**   10:3
46:18 49:2
60:17,18 64:10
90:2
**ought**   9:1
123:16 161:19
165:2 168:20

**outcome**
298:10
**outlined**   178:5
**output**   70:4,20
71:8 73:10
**outputs**   36:2,6
72:5
**outside**   113:23
114:2 116:4
117:16 122:13
123:4 131:1,15
131:19 132:2,2
136:13 140:18
158:1,5 192:10
280:15 305:6
**oval**   185:17
192:11
**overall**   207:16
**overhead**
159:11 205:11
205:18,22
212:17
**overlaid**   96:9
96:22 185:23
**overlap**   132:3
275:5,9 282:10
284:12
**overlay**   184:11
185:2,11
188:16 189:11
192:1,3 194:1
194:8 195:2
196:20 197:1
198:15

**override**   93:4,7
93:17 94:2,13
94:23 95:5
103:6,6 118:12
118:13,15,18
124:9 151:22
253:7,9 257:13
258:2 274:14
274:15 290:14
290:15,15,17
305:2
**overriding**   94:4
**oversight**
267:12
**overstate**   275:1
**overstates**
274:8,22
**own**   32:19
96:23 161:20
217:13 220:11
226:4,16
243:20 246:3

**p**

**p.m.**   89:8,12
137:5,8 176:10
176:13 183:1,4
195:18,21
260:16,19
295:23 296:3
309:13,19
**p1**   3:17
**page**   3:4,12
9:14 37:17
76:22 82:18
158:20 176:6

183:7 188:19
193:19 199:23
206:2,4 221:13
221:14 222:13
222:21 223:13
223:14,19
225:2,4,8,18
227:16,18
251:13 272:2
312:4,7,10,13
312:16,19
**pages**   161:4
**paid**   292:19
**paint**   159:8,15
252:20
**pan**   155:17,22
259:7
**pane**   155:4
**papers**   110:10
111:3 173:3,10
173:21 174:3
174:15,16
285:17 290:2
**paragraph**
7:17 37:21
66:20 149:15
161:5 223:21
297:11 298:3,3
**paragraphs**
177:7
**parallax**
207:20 209:11
212:9
**parameters**
89:14 106:13

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[parameters - photomodel]**                                    Page 43

106:14 132:16
140:15 276:14
**pardon**  81:13
86:4,4 278:16
**part**  14:10
15:21 18:3
62:7 72:17
75:8 80:10,20
84:5 94:3,4
102:22 114:4
114:10,20
115:2 117:1
124:23 130:4
132:1 170:4,7
170:8 179:14
184:3,10 188:1
199:12,14
202:12 204:12
232:20 245:13
254:7 263:20
267:13 282:22
**partial**  23:19
**partially**
207:18
**particular**
42:11 90:23
183:22 189:5
283:9 286:7
**particularly**
44:22 299:20
**parties**  2:12
310:15
**partner**  75:1,4
75:15

**parts**  202:15,17
202:18
**pass**  303:5
309:1
**passenger**
95:17
**past**  79:22
128:2 136:14
159:5 173:23
230:1 292:2
301:22
**path**  202:5
294:21
**pattern**  201:2
202:8,9
**paul**  1:21 4:7
5:1 310:4,22
**pdf**  33:17 34:9
35:7 36:7,10
36:21 37:12
47:7 74:8,12
**pdfs**  250:8
**pdof**  231:17
**peachtree**  4:11
**pealing**  12:18
**people**  32:16
128:2 129:10
139:16 186:21
194:17 291:3
292:19
**perceive**
186:17 194:9
**perceived**
195:3

**percent**  100:17
100:18 101:9
124:18 128:8
132:5 150:20
183:16 191:14
215:19 220:14
**perfect**  77:9
173:18 238:15
**perfectly**  94:10
231:22 289:22
**perform**  194:7
**performed**  32:2
32:6 92:14,18
99:1 111:14
245:21
**period**  10:9
20:4 24:19
136:1 285:16
**permanent**
258:13
**permanently**
238:1
**permissible**
144:22
**permission**
98:12
**person**  31:19
32:2
**personally**
111:22
**persons**  233:20
**perspective**
73:20,21 116:9
116:16 119:8
120:22 125:1,3

125:5 192:2
204:11,16
213:22 230:17
307:22
**phase**  95:21
**phoenix**  98:17
**photo**  159:2
177:15,17
178:14,20
183:11 187:3
191:6 204:8,11
204:16 208:1
209:10 212:9
217:2,9 218:4
218:6 243:1
246:3 248:5,8
251:18 254:8
254:10
**photograph**
157:2 183:6,8
200:2 205:11
206:8 207:20
208:20 213:21
253:13 255:1
258:23 270:13
271:4 272:7
**photographs**
85:7 97:7
152:7 186:13
215:13 255:2
271:15
**photomodel**
177:14 270:15
270:20 271:5
271:12 272:19

G. Bryant Buchner
Bryson, Santana and Joshua v. Rough Country, LLC
July 11, 2024

**[photomodeler - possible]**

Page 44

photomodeler
  178:14,23
photomodels
  178:12 250:6
photos  146:22
  154:21 181:11
  184:1 220:10
  245:10,10,11
  245:20 247:13
  247:15,15,17
  247:18,22
  256:22 258:11
  271:8,11
physical  95:22
physics  106:23
  175:2 202:19
  203:15 233:7
  233:22 256:2
  267:11 275:13
picked  10:22
picture  181:13
  188:19 193:12
  211:22 235:1
piece  119:12
  160:2,3 220:4
  253:6
pieces  169:3
pink  188:22
  239:17 240:12
  241:15 271:22
pinned  236:19
place  9:10
  91:18 92:7,11
  199:5 200:18
  201:10 227:23

230:7 304:17
placed  99:13,22
placement
  85:11
places  38:21
plaintiff  4:17
  4:21
plaintiff's
  303:18,21
  304:2
plaintiffs  1:8
  5:21 301:9
plane  204:10
plate  252:4
play  119:5
please  5:15 6:1
  48:15 61:4
  125:13 138:5
  170:9 228:22
  234:10
plenty  112:7
  285:17 290:2
pluck  41:14
plus  85:8 207:2
  208:8 249:11
  249:14 250:6,6
  250:13 269:9
  276:3
point  67:1
  68:20 86:7,20
  104:6 113:19
  135:16,17,20
  135:20 143:18
  144:2 147:11
  152:8 161:6

167:20 178:13
179:22 183:12
185:16,18
187:11 189:2,7
190:1 191:10
195:1,2 196:23
198:22 200:22
201:1,6 211:19
212:15,22
213:12 215:4,5
215:7,11
217:15 226:7
227:2,19,19
228:1,2 229:15
229:16 230:2
230:16 231:7
231:11,15
233:1 236:14
239:14 241:12
242:13 243:5
245:2 246:23
252:11 254:12
255:21,22
257:17 261:1
263:12,16,20
264:10,14,19
265:2,7 268:8
271:5,12,15
287:5 293:12
299:15 307:2
pointed  68:1
pointer  160:8
  160:11
points  113:8
  155:8 178:16

179:1,9 201:5
212:23 231:15
238:18 239:1,8
239:9 241:8,10
271:19,20
272:19 298:9
poking  293:6
poles  252:3
ponce  4:15,19
pools  104:13
porter  268:3
portion  176:15
position  79:11
  79:18 99:23
  115:17 154:15
  186:16 203:6
  228:12 237:23
  252:10
positioned
  218:17
positioning
  123:22 297:16
positions  129:7
  154:16
possess  53:22
  56:2 59:21
possibility  66:3
possible  28:23
  60:18 107:10
  107:14 117:13
  117:20,22
  118:1 119:20
  120:1,2,3,16
  126:13 128:10
  128:11,15

G. Bryant Buchner
Bryson, Santana and Joshua v. Rough Country, LLC
July 11, 2024

[possible - probably]                                              Page 45

129:1,6 135:2
277:10,18,23
**post** 249:11,13
249:21 250:4
250:13
**potential** 38:10
109:17 113:17
161:17 162:1
170:23
**potentially**
36:8
**pounds** 78:21
79:14 201:13
299:18 300:1
300:19,22
306:8,11,13,15
306:19,20
307:9,11,20
308:3,5,15,16
308:18,23
309:2
**power** 162:4
**powerpoint**
3:15,16 147:14
148:5 185:10
186:1,5,7
194:2,11
197:11 199:10
227:9 235:2
247:10,14
248:11 269:21
**powerpoints**
152:7 249:16
**practically**
43:14

**precise** 40:23
51:1 86:20,21
300:4
**precisely** 37:22
50:22 87:16
267:4
**predict** 110:23
112:11 140:13
145:5,18
302:19
**predicted**
138:20 139:11
**predicting**
109:13 140:11
144:12 278:15
294:13
**prediction**
90:16
**preliminary**
24:1,12 45:16
162:8
**premise** 204:6
255:16
**premium**
178:23
**prepare** 45:5
48:4 117:10
131:11
**prepared** 13:3
119:13
**preparing**
35:12 48:2
146:18
**presence** 91:6,7

**present** 4:22
5:15 13:6
38:16 226:22
**presentation**
71:10 246:22
253:20 255:2
**presented**
194:10 246:19
246:21 267:18
**preserved**
98:16
**preserving**
32:11
**presume** 119:5
**pretending**
132:18
**pretty** 14:16
34:20 113:18
244:10 265:19
303:10
**prevent** 305:3
**prevented**
97:14
**previous** 50:14
**previously**
123:7,8
**primary**
103:23 104:3
105:5
**principles**
289:8
**print** 22:2
24:21 33:5,20
35:17 36:9,14
36:17

**printed** 10:19
10:20 17:8,20
23:15,16 24:23
25:14 26:13
27:21 28:19
34:10 36:7
37:7 38:18
40:19 46:8,16
46:20 266:19
**printer** 10:21
**printing** 23:20
29:6 36:15
**printout** 9:21
16:16 21:14,15
53:2 74:11
76:9
**printouts** 10:10
10:14,14 12:7
25:11 30:8
38:6 40:13
48:6 68:6
**prior** 2:15
10:11 14:1
15:16 16:6
17:21 18:16,19
24:13 27:17,22
29:11,15 36:22
48:2 55:4 56:4
57:9 58:23
111:19 122:1
239:5 240:18
304:15
**probable** 199:8
**probably** 6:16
9:4 13:11

Case 2:22-cv-00017-RWS    Document 182-10    Filed 03/17/25    Page 360 of 388
G. Bryant Buchner                                        July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[probably - provided]**                                    Page 46

36:14 41:3
46:19 56:3
60:7 141:19
145:23 155:15
164:18 208:14
242:20 248:11
261:10 262:13
262:20 268:14
274:7,22 275:6
**problem** 9:11
14:10 18:4
25:17 28:3
40:7,9 43:10
58:7 60:21
100:19 102:5
108:3 116:19
119:14,14
125:11 153:16
173:19 175:3
176:2 212:22
216:16,21
233:10 288:21
298:18 308:4
**problems** 40:8
137:13 152:14
210:10 216:20
216:20
**procedure** 5:4
19:15
**proceed** 138:10
**proceedings**
1:16 5:9 310:7
310:12
**process** 8:8,21
18:6 20:5

23:20 27:6
30:21 32:10,12
42:6,9,13
54:21,23 55:8
55:14 57:9
58:1 64:15
65:23 66:5
108:8 172:14
175:17 266:1
268:11 270:18
283:11 297:18
**processed**
136:11
**produce** 18:15
18:19 22:2,11
22:13 24:21
29:19 36:22
39:4 45:19
47:7 52:9 88:3
93:3 226:9
280:12
**produced**
10:10 12:12
13:23 15:7,11
15:16 16:6
17:20 20:21
21:6,12,15
22:16 25:12
27:17,21 28:19
29:16,22 30:9
38:6 40:13
42:21 44:2
45:8,17,20
46:12 49:2
50:5,22 51:19

71:3,4 72:12
84:5 92:2,23
93:2 142:2,17
232:19 239:5
239:22 240:9
249:8 270:1
310:9
**produces** 13:14
163:16 167:17
**producing** 47:6
93:10 177:14
268:19 288:18
**product** 267:15
**profess** 217:1,2
**professional**
120:11
**professionally**
121:13
**profile** 71:5
256:10
**profiles** 205:6
256:12
**program** 36:16
56:14 57:1
112:5,9,10,14
112:16,21
122:2 129:14
173:8,17
242:11 276:16
284:19 285:3
285:13 286:6
286:11 288:17
288:19 289:17
292:5,9 297:8
297:17 302:2

305:3
**programs**
34:21 289:1
290:5
**project** 56:13
**projected**
237:17
**projection**
206:17,19
**proof** 157:3
230:12
**proper** 37:4
112:16 140:15
145:5,19
191:20 198:2
218:19 223:15
275:4,5 280:11
288:4 297:21
**properly** 8:14
26:9 30:16
123:19 169:23
217:6 285:4
298:14 307:22
**properties** 62:2
**proposed**
129:18
**proved** 118:13
**proves** 253:7
**provide** 31:9
65:12 96:12
97:5 114:19
158:21 164:14
186:20 296:13
**provided** 5:3
12:7,8 14:19

G. Bryant Buchner                                        July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[provided - questions]**                                Page 47

| | | q | |
|---|---|---|---|
| 32:16 63:19 | 169:13 286:7 | | 128:9 130:15 |
| 64:19,20 68:2 | 290:13 | **quantified** | 132:7 133:7 |
| 68:5,8,14,17 | **purposes** 47:6 | 148:8 | 134:1,5,16 |
| 74:7,9,17 97:6 | 190:23 211:1 | **quantify** 148:2 | 135:5 136:12 |
| 98:5,6 142:1 | **push** 231:18 | 148:17 149:10 | 136:21 139:2,7 |
| 162:8 190:17 | 266:23 | 276:2,11 | 140:1,6,10,18 |
| 214:15 216:15 | **pushed** 95:18 | **quarter** 273:9 | 141:8 144:9,11 |
| 228:20 243:10 | 156:1 230:5 | **quest** 249:21 | 144:13 145:3 |
| 258:12 263:13 | 253:5 | 250:4,4,12 | 146:2,6 151:8 |
| 263:17 264:1,1 | **pushing** 253:11 | **question** 15:20 | 155:21 161:22 |
| 269:18 | **put** 6:15 9:3 | 15:22,23 17:12 | 165:11,22 |
| **provides** | 18:10,12 19:18 | 17:16 21:2,10 | 170:5 211:13 |
| 274:19,20 | 23:16 25:6 | 28:20 30:6,14 | 218:3 219:16 |
| **proving** 103:3 | 32:15,21 40:4 | 34:14,18 38:5 | 224:20 225:13 |
| **proximal** 47:20 | 42:14 51:6 | 38:12 46:1 | 229:21 233:5 |
| **proximally** | 72:7 79:12,22 | 49:8,14,17,18 | 236:3,14 238:3 |
| 47:17 | 82:8 85:1 | 50:14 60:3,4 | 246:10 258:3 |
| **public** 1:23 | 91:23 107:17 | 65:13,14,14,18 | 258:17 265:5 |
| 313:19 | 120:9 124:20 | 75:11 82:4 | 279:7,8,12,12 |
| **published** 96:7 | 135:12 145:6 | 83:8 85:10 | 279:23 280:15 |
| **pull** 6:20 | 145:19 159:5,8 | 93:15 102:3 | 281:14 283:4 |
| 222:13 303:12 | 159:10,10,18 | 105:15 106:8 | 284:5 285:8 |
| 303:19 | 160:2,3,10,10 | 106:11 111:12 | 286:17 287:6 |
| **pulled** 211:8 | 160:18 180:16 | 111:13,14,20 | 287:17 288:19 |
| **pulse** 95:21 | 203:10 216:7 | 111:22 113:10 | 291:14,19 |
| 149:17 150:2 | 219:22,22 | 113:22 114:10 | 293:5 297:5 |
| 150:13 | 220:5,19 228:2 | 116:4 117:4,11 | 305:11,20 |
| **pulses** 166:15 | 230:10 241:8 | 117:16 119:19 | **questioning** |
| **pumping** | 241:11 247:13 | 120:12,22 | 138:2 141:13 |
| 104:17 | 247:15 260:8 | 123:14,20 | **questions** 2:11 |
| **pure** 64:12,13 | 267:7,8 268:4 | 124:4 125:1,3 | 2:12 84:1 |
| **purely** 107:6 | 268:14 271:4,8 | 125:6,10,13,14 | 100:16 101:2 |
| 112:10 | 293:7 301:19 | 125:15,19,20 | 102:15 103:9 |
| **purpose** 107:5 | **putting** 170:21 | 126:5,9,12 | 107:16 116:21 |
| 166:7 168:22 | 298:12 | 127:13,16,17 | 117:8 118:23 |

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[questions - reasonableness]                              Page 48

| | | | |
|---|---|---|---|
| 119:3 125:18 | **ran** 10:15 14:7 | 313:5 | **rear** 95:7,9 |
| 130:21 136:10 | 15:18 16:9,12 | **reading** 2:2 | 99:13,23 |
| 137:17 140:23 | 17:23 36:21 | 98:14 177:6 | 122:23 123:1 |
| 141:14,18 | 42:18 45:14 | **ready** 25:3 | 153:23 154:2,7 |
| 142:9,9,19 | 46:13 54:9 | **real** 69:2 78:10 | 155:10,23 |
| 143:10 144:6 | 65:21 66:18 | 92:18,20 98:23 | 156:2,13,20,21 |
| 144:20,20 | 67:9 74:4 | 101:4,5,6,21,22 | 157:4,7,9 |
| 204:7 304:5 | 85:14 90:20 | 103:12 143:13 | 175:14,16 |
| 306:4,10 | 100:4 110:6 | 170:16 174:11 | 208:22 216:19 |
| **quick** 89:4 | 127:18 128:12 | 294:13,15 | 220:7 223:23 |
| 304:8 | 135:3 163:23 | 308:4 | 224:3 232:8 |
| **quicker** 149:13 | 168:9 268:10 | **reality** 293:23 | 258:20,23 |
| **quickly** 69:3 | 278:21 279:4 | 295:1,1,2,2 | **reason** 9:11 |
| 200:12 | 280:6 286:21 | **realize** 63:19 | 46:10 98:19 |
| **quite** 84:11 | 293:8,8 | 64:18 | 120:7,15 |
| 174:18 215:14 | **random** 71:9 | **realized** 12:22 | 160:23 169:18 |
| **quote** 167:13 | 72:3 | 20:19 23:5 | 172:2,7 208:4 |
| 169:6,9 | **range** 130:4,10 | 40:21 42:15 | 237:3 238:8 |
| **r** | 161:16 162:5,8 | 242:19 | 311:11 312:6,9 |
| | 164:7 206:20 | **realizing** 13:8 | 312:12,15,18 |
| **r** 182:1 184:9 | 207:2,22 208:4 | **really** 6:18 9:1 | 312:21 |
| 185:8 187:6 | 209:15 214:20 | 11:16 15:20,23 | **reasonable** |
| 312:3,3 | 218:21 | 15:23 43:6 | 16:19 22:23 |
| **raccoons** 109:2 | **rather** 7:11 | 52:3 86:6 93:5 | 50:17 51:7 |
| **radiator** 81:6,8 | **ratios** 79:21 | 114:13 123:1 | 63:18 82:9,17 |
| 81:16 299:8,21 | 80:1,4 308:20 | 163:13,22 | 85:5,8 108:20 |
| 299:23 307:4 | **raw** 199:18 | 167:14 170:5 | 109:8,11 |
| **radius** 67:3 | **read** 33:19 38:3 | 179:17,17,18 | 110:17 114:22 |
| **rail** 180:2 | 50:9 51:2 69:6 | 179:18 191:7 | 120:10 129:7 |
| 208:3 221:1,2 | 69:21 160:19 | 192:9,14 193:2 | 129:13 130:3 |
| 221:6,11 222:1 | 166:3 216:3 | 238:9 242:14 | 143:17,18 |
| 222:23 224:8 | 221:22 241:7 | 247:21 266:23 | 171:3 283:12 |
| 224:11,11 | 262:22 288:6 | 301:20 308:10 | 300:5 307:13 |
| **rails** 95:10 | 291:9 309:14 | **realm** 106:3 | **reasonableness** |
| **raised** 286:5 | 309:16 311:9 | | 285:18 |

G. Bryant Buchner                                         July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[reasonably - relative]**                              Page 49

**reasonably**
  77:8 99:7,10
  120:2,3 155:12
  216:23 218:1
  289:21,22
  309:2,3
**reasons**  119:4
  127:11 128:16
  133:23 134:4
  141:2,4 155:18
  171:18 197:1,4
  277:19 278:9
  281:23
**rebuttal**  3:14
  146:14,15
  147:1 176:16
  177:3 178:2
  183:7 196:3
  226:11 243:4
  245:2 249:10
  270:19
**recall**  45:2 58:6
  161:23
**receipt**  311:17
**received**
  146:19
**reclined**  155:12
**recognize**  66:2
**recollection**
  156:22
**reconstruct**
  246:17,18
**reconstruction**
  109:23 130:16
  256:3,11,17

  275:15 281:16
  281:20 288:12
  290:10
**record**  5:16
  61:10,13 89:9
  89:12 137:5,8
  137:19 138:1
  158:21 176:10
  176:13 182:20
  183:1,4 195:18
  195:21 232:11
  232:12 233:13
  258:12,13
  260:6,6,12,16
  260:19 295:23
  296:3 309:13
**recorded**  11:14
  24:7 266:14
  267:13 273:17
**red**  193:13
  206:15,19
  209:21 210:20
  210:22 211:4
  251:22 255:17
  255:21
**redid**  42:16
  268:16
**redistribute**
  79:21 80:1,4
**redo**  19:2 292:8
  292:18
**reduce**  168:13
  168:14
**reenter**  57:22

**refer**  218:6
  251:18
**reference**  7:14
  186:18 189:2,6
  189:23 195:1,2
  206:3 207:16
  210:15 215:4,7
  258:7 263:18
  263:21,22
  303:12
**referenced**
  26:19 218:4
  263:23 311:6
**references**
  265:16
**referencing**
  186:8
**referring**
  105:19,20
  131:14 270:6
  294:17
**refined**  46:22
**reflected**  53:1
  296:8
**reflecting**
  12:12
**refuses**  287:16
**refusing**  248:9
**regard**  13:23
  15:6 17:13
  32:3,7 35:1
  36:20 52:16
  66:16 81:5
  85:10 89:17
  99:8 157:20

  232:21 255:3
**regarding**
  138:19 139:11
  243:7 244:3
  245:5 247:9
  248:3 305:15
**regardless**  87:6
  123:21,21
  155:18 167:20
  201:4
**regards**  283:1
**regenerate**  39:9
**regular**  74:23
  75:22
**relate**  30:10
  43:1,5 44:2,4,5
  284:7
**related**  10:12
  12:7 15:12,15
  17:13 19:4,11
  27:14,19 29:16
  29:20 30:17
  42:19 138:3
  155:21 226:10
  275:13
**relates**  113:13
  131:16 143:1,4
  169:16
**relating**  2:6
**relationship**
  236:22 281:17
  282:15,20
  284:18
**relative**  92:14
  119:9,11

Veritext Legal Solutions

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[relative - reports]**                                        Page 50

| | | | |
|---|---|---|---|
| 154:16 155:8 | **remained** 152:5 | 25:8,22,23 | 220:1,19 221:7 |
| 203:5,6 213:4 | **remarkably** | 26:1,5,8,17 | 222:7,11,12,17 |
| **relevance** | 154:19 | 28:6,10,14 | 222:18,21 |
| 273:22 | **remember** | 30:19 33:5,6 | 223:5,8,11,20 |
| **relevant** 38:11 | 16:14 25:23 | 34:11 35:12,17 | 224:22 225:8 |
| 42:7,22 136:16 | 26:1 29:18 | 36:2,21 37:23 | 225:15,18 |
| 136:17 141:15 | 30:2 35:23 | 38:15,19,21 | 226:11 232:10 |
| 141:21,22 | 40:18 45:10 | 40:23 41:1,5 | 243:4 244:2 |
| 142:22 259:12 | 67:22 98:13 | 46:22,23 47:2 | 245:3,15,18,19 |
| 259:19 274:1 | 104:14 128:6 | 47:15,16,17,18 | 246:6 249:8,10 |
| **reliability** | 130:4 148:21 | 47:21,23 48:3 | 249:17 257:2 |
| 142:5,18 143:2 | 149:2 155:7 | 48:4 50:21 | 266:7 269:7 |
| 143:4 | 167:13 199:7 | 51:9,14,20 | 296:8,11,12 |
| **reliable** 56:21 | 215:10 217:15 | 52:21 53:1 | 305:7 |
| 109:12 111:17 | 245:9 265:19 | 61:19,23 68:12 | **reported** 39:7 |
| 112:1 143:20 | 265:23 | 68:19 74:10,18 | 102:20 215:21 |
| 143:20 144:5,7 | **remembers** | 83:22 84:5 | 225:21 |
| 144:12,16,17 | 45:7 | 88:13 96:21 | **reporter** 1:21 |
| 145:12 190:23 | **remote** 5:6 | 105:22 112:14 | 1:22 5:1 6:1 |
| 216:23 277:4 | **remove** 285:10 | 113:23 114:5,8 | 310:4 |
| 278:14,19,20 | **renders** 118:10 | 114:15,19 | **reporter's** |
| 278:23 279:3 | **reopen** 235:4 | 115:2 116:5 | 310:1 |
| 282:18 294:13 | **repeatable** | 117:17 124:8 | **reporting** |
| **reliably** 145:5 | 192:18 193:1 | 124:16,21 | 130:8 |
| 218:5 | **repeatedly** | 141:16,16,23 | **reports** 11:5,8 |
| **reliance** 243:5 | 88:11 | 142:7,12,17,21 | 21:14,15,22 |
| **relied** 26:16 | **rephrased** | 142:22 146:14 | 22:13,16 23:1 |
| 49:3 | 287:19,19 | 146:15,18,19 | 23:5,10,14,19 |
| **rely** 244:14 | **replaced** 75:23 | 147:2 149:11 | 25:12 27:9,14 |
| 245:3 247:8 | **replicate** | 154:16 158:18 | 27:18 31:5 |
| **relying** 45:18 | 115:21 | 176:16 178:2 | 38:17 39:7 |
| 45:20 205:20 | **report** 3:13,14 | 183:7 196:3 | 40:18,18,22 |
| 244:2 248:2 | 7:9,12,14 | 199:13,14 | 41:18,19,19 |
| 255:1 | 14:20 15:9 | 208:9 214:3,6 | 46:16 68:6 |
| | 18:11 19:6 | 215:1,2,15,18 | 69:4 73:23 |

G. Bryant Buchner
Bryson, Santana and Joshua v. Rough Country, LLC
July 11, 2024

**[reports - right]**                                                    Page 51

74:6,13,16
105:18 106:10
131:20 141:21
225:18
**represent** 30:8
71:16 193:18
202:22 206:14
206:16 253:1
**representation**
12:2 14:5 16:5
69:8 71:19
72:6,14 96:16
96:17 108:17
114:22 219:12
229:18 238:10
**representative**
15:17 16:8,11
16:17 17:1
36:4 70:20
73:8,22 91:4,5
93:14 123:18
128:20,23
129:13 135:14
200:16 202:7
230:2,3 233:1
233:23 259:13
277:3
**represented**
105:12 123:20
215:20 231:10
261:14
**representing**
229:15 231:5
**represents**
150:11 230:16

271:23 275:4
310:11
**reproduce**
22:23 37:22
39:12,22 40:4
41:7,9 44:11
48:12 49:5
56:4
**reproduced**
27:2 50:12
**reproducible**
193:1
**requested**
97:10
**require** 177:3
303:3,3
**required**
313:13
**requires** 177:4
**rerun** 12:20,22
15:5 16:19
30:15,17 32:7
36:20 39:16
41:22 42:3
45:14 46:19
50:18 53:1,19
55:23 57:19
58:1,10 59:9
60:22 61:22,23
63:23 64:4,22
66:1 68:16,23
70:9 72:15
73:9 74:5,7
77:1,16 80:10
87:7 89:15

92:21 98:23
106:6
**research** 82:16
290:2 292:19
**resend** 222:14
**resists** 150:21
**respect** 180:4
225:17
**respond** 121:9
**response**
119:18,21
120:10
**responsible**
136:11
**responsive**
121:11
**rest** 81:18
197:17 210:13
227:14 231:14
**restroom** 61:4
136:19,20
137:1 295:21
**result** 17:2,5,8
39:4 40:14
41:16 51:7
56:21 93:10
132:15,19,20
286:21 293:13
310:16
**resulted** 7:19
153:23 157:21
**results** 15:14
16:14 25:7,13
34:9,10 35:5,6
37:13 51:8

74:12 115:9,10
130:8 144:12
145:19 166:22
289:17 294:1,1
294:3,5 301:8
**resurrect** 11:9
28:16 43:14,19
**retrieve** 8:3
**return** 311:13
311:16
**reveal** 232:15
**revealed**
232:13
**reverse** 237:19
**review** 33:4,7
35:5 311:7
**reviewed**
245:17
**reviewing**
183:23
**revisit** 137:20
141:3
**rewrite** 298:3
**richard** 4:10
**rick** 5:18 69:14
240:7 260:7
**ridiculous**
118:8 239:22
**right** 6:21 7:1
10:2 11:18
12:3 13:21
15:3 16:20
17:4,6,12
18:21 21:1,13
21:16 22:1,8

G. Bryant Buchner                                      July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[right - rolling]**                                          Page 52

| | | | |
|---|---|---|---|
| 22:15 24:14 | 88:8,17,23 | 186:4,12,20,22 | 240:20,22 |
| 26:12 27:9 | 89:2 90:3 92:5 | 187:3,15,19,23 | 243:3 244:9 |
| 30:11,17,21 | 92:10 97:2,10 | 188:1,11,14,18 | 248:17 251:3 |
| 31:23 32:6 | 98:19 99:11,15 | 189:6,12,13,17 | 251:15 252:6 |
| 34:6,11,22 | 101:19 105:3 | 189:21,22 | 252:10,13,15 |
| 35:4,11,21 | 106:12 111:11 | 190:4,12 191:3 | 253:21,23 |
| 37:16 39:4 | 115:11 121:12 | 191:8,15,15 | 254:9,12,13,23 |
| 40:11 41:4,6 | 121:13,16 | 192:3,6,12 | 257:7,10,18 |
| 42:18 44:14,23 | 127:18 133:22 | 193:18 194:10 | 258:6,19 260:2 |
| 45:4,13 46:4 | 138:12 143:8 | 194:21,21 | 260:2,14 264:2 |
| 46:20 47:5,11 | 146:12,17 | 195:6,10,22 | 265:14 267:1 |
| 47:23 48:5,17 | 147:9,10 | 196:2,11,12,13 | 268:1,9 269:4 |
| 51:5,18 53:3,7 | 148:11,17 | 196:17,18 | 269:8,11 270:3 |
| 53:9,21 54:9 | 149:6,7,16 | 197:3,8 199:12 | 270:9,12,22 |
| 55:7 57:20,21 | 150:12,23 | 199:23 203:2,5 | 271:3,21 |
| 57:21,23 58:4 | 151:10,12 | 203:19 206:1,7 | 272:11,14,21 |
| 58:14,20 59:3 | 152:22 153:12 | 206:12 207:19 | 273:7,12,13,21 |
| 59:7,16 60:12 | 153:22 154:21 | 208:15,19,21 | 273:22 279:5 |
| 61:1,18 63:2 | 155:21 157:1 | 208:21 209:6 | 281:3 286:15 |
| 63:11,13 65:21 | 158:6,9,16,20 | 209:19 210:14 | 290:20 293:7 |
| 66:4,4,12,18 | 160:2,16,19 | 210:18 211:3,7 | 295:4,14 |
| 67:8,11,12 | 162:7,14 163:7 | 211:18,18,20 | 296:21 298:7 |
| 68:11,13,15,19 | 163:19 166:19 | 212:14,18 | 298:11 299:6 |
| 68:23 69:1,7 | 167:14 169:9 | 213:15 214:1 | 303:2 304:1,7 |
| 70:1,3,8,17 | 170:15,20 | 217:22 218:12 | 306:1 308:2 |
| 71:13,14 72:11 | 171:10,12,13 | 219:4,9 220:22 | 309:11 |
| 73:13,13 74:2 | 172:2 173:20 | 222:2,6 223:21 | **road**  4:12 |
| 74:2,11,19 | 174:4,12 175:6 | 224:14 225:10 | **robust**  41:2 |
| 75:16 76:9,11 | 175:21 176:14 | 226:9,14 227:6 | 122:2 168:17 |
| 76:21 78:3,10 | 176:17 177:13 | 229:6,10,17,21 | 169:22 284:11 |
| 78:12,14 80:7 | 178:3,11,21 | 231:4,8 235:15 | 285:3 292:13 |
| 81:20 82:18 | 180:12,18 | 235:21 236:8 | 300:22 302:7 |
| 83:1,6 84:8,14 | 181:1,6,6,10,21 | 238:17 239:4 | **rock**  205:8 |
| 85:18 86:3 | 182:8,13 183:5 | 239:16,23 | **rolling**  224:5 |
| 87:10,18 88:7 | 184:17,22 | 240:3,5,10,17 | |

G. Bryant Buchner                                   July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[roof - scale]**                                                    Page 53

| | | | |
|---|---|---|---|
| **roof** 200:8 | 53:5 54:11 | **rws** 1:5 | 167:1 169:12 |
| 204:2 206:18 | 55:23 58:9,12 | **s** | 169:19 170:10 |
| 206:23 208:11 | 58:15,19 66:3 | | 171:8 173:13 |
| 209:13,15,16 | 66:15,15 69:8 | **s** 188:22 289:10 | 174:14,15,16 |
| 209:17,18 | 71:1,9 77:18 | 312:3 | 175:8 186:15 |
| 211:22 302:11 | 78:8 92:4 | **sample** 71:7,8 | 191:8 198:9 |
| **room** 34:3 | 100:23 101:22 | 71:15,18 72:4 | 203:22 211:14 |
| **rotate** 73:6,18 | 103:13 115:20 | 72:7 | 213:3,4,11 |
| **rough** 1:10 | 129:1,3,17,18 | **santana** 1:7 | 214:2,9 215:3 |
| 5:19 97:13,17 | 135:2,4,9,12 | 311:4 312:1 | 218:5 235:21 |
| 97:19,22 301:2 | 136:21 152:13 | 313:1 | 236:5,13 244:1 |
| 303:17 304:15 | 166:17,21 | **sat** 226:17 | 246:5 261:4 |
| 311:4 312:1 | 168:3 169:20 | **save** 8:8,22 | 262:17,17 |
| 313:1 | 170:12 171:12 | 30:16,22 31:12 | 263:22,23 |
| **round** 201:23 | 171:14 174:6,7 | 32:13,19 33:3 | 264:12,20,21 |
| **rounding** 38:23 | 175:23,23 | 39:23 48:7 | 278:19 279:14 |
| **routinely** | 187:21 276:13 | 297:22 | 281:3 |
| 215:10,12 | 277:13,23 | **saved** 8:13,14 | **says** 7:13 53:7 |
| **row** 83:3 | 280:5,17 | 9:2 18:11 | 53:9 75:5 |
| 156:14 | 291:10 292:21 | 33:16 42:2,13 | 145:11 147:5 |
| **ruler** 266:15 | 294:18 296:23 | 226:21 267:14 | 153:22 154:7 |
| **rules** 2:6 5:4 | 296:23 297:3,6 | **saves** 35:10 | 155:20 164:12 |
| **run** 8:1,4,21 | 298:22,22 | **saving** 18:6 | 164:13 167:7,9 |
| 13:13 15:1 | 302:9 | 31:18 32:10 | 173:4 208:9 |
| 18:13 21:11,17 | **running** 25:15 | **saw** 45:10 97:4 | 217:11 221:12 |
| 22:7 23:11 | 31:20 34:12 | **saying** 10:13 | 221:12 222:21 |
| 29:23 31:8,10 | 59:8 65:6 | 15:14 25:14 | 223:22 224:4 |
| 31:22 33:8 | 149:11 161:13 | 26:4,14 32:9 | 232:10 234:23 |
| 36:4,5 38:12 | 166:10 170:18 | 40:12 49:20 | 245:17 249:21 |
| 39:10,13,23 | 171:9 222:3 | 71:18 76:3 | 256:5 263:1 |
| 41:21 42:20 | 299:2 | 96:5 101:3 | 281:3 292:13 |
| 43:16 45:18,19 | **runs** 24:7,12,12 | 103:10 118:22 | 308:19 |
| 46:1,8,15,18 | 33:5 45:16 | 121:11 124:11 | **scale** 87:15 |
| 47:2,4,6,11,17 | 297:21 | 132:20 133:6 | 160:12 213:5 |
| 48:7 52:6 53:5 | | 134:19 145:10 | 241:4,4,5,5,9 |
| | | 164:7 166:20 | |

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[scale - seeing]**                                          Page 54

242:2 266:16
**scaled** 241:1
**scaling** 210:7
  216:20
**scan** 63:13
  75:23 87:2
  198:19,22
  234:3 235:17
  235:23 239:5
  239:16 245:19
  246:11 259:9
  261:9 270:14
  271:6,7,10
  273:16,18,18
**scanned** 146:21
  246:21
**scans** 63:12
  87:22 245:4
  261:1 263:2
  264:10,12,14
  265:6
**scenario** 103:2
  163:14 171:22
  284:1
**scene** 83:16
  238:1 242:8
**schedule** 33:23
**scheduled**
  19:19
**science** 233:10
  233:21 282:22
  283:1
**scientific**
  280:11

**scientifically**
  109:12 111:17
  112:1 278:14
  294:12
**scooter** 308:3
**scope** 106:10
  113:23 114:2
  131:20 136:13
  140:18 142:5
  158:2 280:16
  305:7
**scratch** 27:12
  27:14 37:16
  57:19 58:12,16
  58:19 59:17
**screen** 6:12,22
  26:7 37:18
  46:9 61:16,17
  61:19 69:4,19
  72:13 146:10
  146:10 183:6
  187:11,13
  188:6 195:10
  195:23 196:3
  211:15 227:8
  234:23 235:16
  240:2,12 248:7
  248:19 260:8
  303:19
**script** 52:9
**se** 247:19
**seat** 79:14 83:3
  92:11 99:22
  153:23 154:2,5
  154:7,16,17

155:2,3,6,8,10
155:16 156:2
156:14,21
157:4,7,9
182:18 258:23
**seats** 85:9
**second** 27:15
  37:17,21 38:17
  69:2 83:3
  115:2 125:9
  156:13 158:19
  182:14 200:1
  201:16,17,22
  211:8 225:2
  234:15 254:16
  276:7 303:20
**secondary**
  153:2
**seconds** 162:2,4
**section** 75:9
  147:11
**sections** 61:20
**secure** 95:14,15
**see** 6:19,21
  7:18 14:17
  36:16 46:5
  52:20,21 61:17
  66:19 69:10,11
  69:14,16 73:10
  73:21 76:6
  78:20 105:9
  109:6 118:8,21
  123:1 146:10
  149:1,8 158:18
  159:11 160:9

163:20 173:1
182:14 183:11
183:22 184:6
185:16 186:2
187:4,6,8,12,16
190:18 191:22
194:17 196:2
196:17 197:6,9
201:7 205:5
208:20,22
209:5 210:1
211:3,6,15,21
212:1 216:3
219:3,17
220:10,23
223:2 227:22
228:8,11,16
234:15,16,18
234:19,20,20
235:12 237:9
237:10,11,15
241:14 244:15
244:17,21,23
247:21 248:10
250:9 252:5
253:23 254:2,7
254:15 258:4,5
258:14 259:21
259:23 266:18
270:3,17 272:6
274:9 276:15
283:11 290:20
295:19 303:20
**seeing** 118:8
  298:10

**seek** 164:11,12
164:13
**seem** 143:18
167:21 181:12
249:1
**seemingly**
78:13
**seems** 161:18
230:19
**seen** 9:4 69:4
69:12 70:3,5,6
70:22 71:6,10
71:19 82:10
92:19,21 96:8
109:16,19,20
139:16,17
140:14 260:1
262:12 265:2
279:4 281:20
286:8 302:14
302:15,18
**seize** 153:9,13
153:17 256:22
256:23 257:5,8
257:18,23
**sells** 110:11
**semantics**
266:13
**send** 222:20
260:7
**sending** 276:8
**sense** 102:19
279:13
**sent** 30:19 31:6
184:10 185:11

185:12 222:12
250:1,1 311:14
**sentence** 75:12
75:14
**sentences** 224:9
**separate** 93:15
116:12 129:23
199:13
**sequence**
236:15
**series** 159:15
**server** 32:15,21
**set** 207:23
213:2 215:12
268:2 281:8
**seven** 58:22
153:22
**several** 232:23
**shake** 295:16
**shape** 19:1
63:11,13
181:20,20
196:17 254:6
288:15
**shard** 85:4
**shards** 84:23
299:11,12
**share** 6:12,13
146:9 195:23
227:7,9 248:7
248:20 303:19
**shared** 69:18
234:21
**sharing** 61:16
182:14 234:16

248:18
**sheet** 311:11
**shift** 95:10
**shifted** 197:12
**shifting** 155:16
237:9
**short** 96:2
**shorter** 238:5
**shoulder** 35:9
**shoveled** 84:18
**show** 38:22
73:15 90:7
96:14 103:8
152:7 154:21
154:22 156:4
159:2 164:13
167:10 168:1
168:22 172:16
172:17 177:17
188:16 194:19
217:17 222:8,9
225:2 226:3,4
226:6,20
230:21 240:15
241:16 242:2,2
242:12,18,21
242:22 243:20
245:11 247:11
247:14,16
248:5 255:7
262:18 263:17
282:14,21
284:3 290:2,14
296:9

**showed** 24:7
96:22 183:21
192:1 232:13
243:13 303:17
**showing** 46:10
70:21 72:3
78:15 177:4
178:23 179:7
194:19 199:7
239:14 240:8
242:5,23
243:11 249:17
**shown** 16:17
39:2 85:6
225:1 231:20
243:6
**shows** 38:22
92:1 95:23
157:2 177:2,5
178:6 188:20
198:13 199:5
215:16 221:1
221:13 225:4
226:5 228:1
232:6,19
251:22 252:1
253:14 257:10
263:14,15
**sic** 89:22 185:1
**side** 64:21
73:14 95:11,16
95:17 142:20
153:21 183:15
187:20 200:2

G. Bryant Buchner                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[sideways - simulation]**                                    Page 56

| | | | |
|---|---|---|---|
| **sideways** | **simpler** 16:3 | 42:3 43:15 | 107:12,21,22 |
| 137:11 233:12 | **simplest** 205:5 | 44:10 45:15,19 | 108:5,6,11,14 |
| 233:14 237:11 | 261:12 | 46:13,15 47:16 | 110:5 111:23 |
| 237:12 | **simply** 126:19 | 47:17,19 48:12 | 115:20 117:23 |
| **sign** 309:15 | 218:3 288:11 | 48:13,23 49:6 | 118:2,6,11,18 |
| 311:12 | **simulate** 48:23 | 50:6 52:6,15 | 119:10 121:3 |
| **signature** 2:2 | 117:2 118:23 | 52:17 54:10 | 126:22 127:19 |
| 310:21 | 126:16,18 | 55:11 57:12,13 | 128:12 129:1 |
| **signed** 311:19 | 172:8 173:1 | 58:8,15,23 | 130:2,7,9,11 |
| **significant** | 285:4 288:13 | 61:22,22 62:13 | 132:16 138:18 |
| 104:4 | 302:16 304:16 | 64:13,15 65:22 | 139:9 142:2,4 |
| **significantly** | 305:1 | 66:19 67:10,14 | 143:21 149:20 |
| 147:12 148:19 | **simulated** 64:4 | 67:18,21 68:10 | 150:3,5,15 |
| **silver** 194:14 | 101:16 150:6 | 68:10,18 70:4 | 151:18 163:14 |
| **similar** 14:14 | **simulating** | 70:10,21 71:3 | 164:16 167:23 |
| 16:23 41:4,16 | 133:8,15 134:2 | 71:22 72:3,15 | 167:23 168:3,9 |
| 50:19,23 58:11 | **simulation** 7:20 | 73:1,5 74:5,7 | 169:20 171:13 |
| 70:7 71:5 | 7:23 8:22,23 | 74:20 75:17 | 171:14 174:8 |
| 85:12 181:19 | 9:7,15 10:12 | 76:4,15 77:1 | 266:8 267:23 |
| 193:15 256:18 | 10:16 12:8,12 | 77:16 78:17 | 268:2,4,7,10,13 |
| 262:14 | 13:14,17 14:1 | 79:8 80:10 | 269:6 276:13 |
| **similarly** | 14:7 15:5,6,7 | 82:20 85:14,20 | 276:14 277:6,9 |
| 264:19 | 15:13,14,16,18 | 85:21 86:12 | 277:14,15 |
| **simon** 289:10 | 16:9 17:3 18:1 | 89:16,21 90:6 | 278:1,21,23 |
| **simple** 13:5 | 18:10,13 19:5 | 90:20,23 91:12 | 279:1 280:5,6 |
| 19:15 113:18 | 19:11 20:22 | 91:17 92:6,8 | 280:7,10,12 |
| 116:16 119:19 | 22:4,12,18 | 92:12,22 93:8 | 281:21 282:2 |
| 121:17 123:21 | 24:13 25:13,16 | 96:2 98:23 | 282:18 283:17 |
| 124:20,23 | 27:10,19 29:17 | 99:5,12,19 | 285:3,13 288:1 |
| 125:3,5,12,13 | 29:21 30:10 | 100:1,5,7 | 288:8 289:16 |
| 125:13 126:7,8 | 31:8,10 32:4 | 101:3,4,23 | 290:4 291:9,16 |
| 127:16 134:22 | 36:4 37:22 | 103:13,20 | 291:20 292:5 |
| 159:14 270:2 | 38:2,8 39:13 | 104:1,10 105:7 | 292:22 293:1,9 |
| 283:23,23 | 39:22,23 41:7 | 105:13 106:1,6 | 293:10,14,18 |
| | 41:10,22,23 | 106:7,13 | 294:4,7,12,14 |

G. Bryant Buchner                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[simulation - sorry]**                                          Page 57

| | | | |
|---|---|---|---|
| 294:15,22,23 | 129:16 131:10 | 254:4,16 255:4 | 276:19 278:14 |
| 296:22,23 | 132:6,9 136:7 | 255:4,9,13 | 282:19 288:5 |
| 297:3,6,14 | 141:1 143:9 | 257:2 258:4,20 | 290:5,22 |
| **simulations** | 156:9,11 | 258:20 270:8,9 | 291:10 298:1 |
| 24:14 41:21 | 173:11 174:13 | 270:9 | **solely**  49:3 |
| 42:20 70:23 | 209:1,8 264:23 | **slides**  188:15 | 131:16 |
| 85:23 163:3 | 269:5 306:6 | **slight**  100:5 | **solid**  205:8 |
| 277:16 289:10 | **sits**  280:20 | **slightly**  44:11 | **solutions** |
| 291:11 293:21 | **sitting**  34:13 | 94:1 168:18 | 311:23 |
| 293:22,22 | 119:13 130:16 | 193:9 | **solving**  40:10 |
| **simulator** | 277:11 302:13 | **slope**  149:17 | **somebody**  8:18 |
| 294:8 | **situation**  60:15 | 150:2,13 | 19:20 53:20 |
| **single**  32:18 | 173:11 290:23 | **slow**  164:20 | 60:21 71:21 |
| 282:11 | 291:1 | **slower**  100:7 | 73:8 107:17 |
| **sir**  6:23 37:20 | **situations** | 100:10 | 185:20 191:12 |
| 46:17 49:12 | 144:6,7 162:9 | **small**  69:6 | 272:23 276:8 |
| 50:13 54:8 | **six**  58:15 | 201:20 220:3 | **someone's** |
| 57:7,22 58:11 | 152:22 199:8 | **smaller**  308:10 | 215:23 |
| 59:2,6,15 | 208:14 218:22 | 308:13 | **somewhat** |
| 61:17 85:4 | 231:17 | **smart**  132:7 | 94:21 |
| 88:16 91:22 | **size**  66:19 67:2 | **smeared** | **sorry**  16:2 |
| 99:7,10 122:5 | 67:8,12,15 | 185:20 | 29:11 48:17 |
| 138:10,23 | 68:13,21,22 | **sneddon**  75:6 | 50:13 54:2 |
| 146:11,16 | 157:12 181:16 | 75:10 | 95:1 121:15 |
| 147:3 148:16 | 266:18 306:19 | **snyder**  4:15,19 | 124:22,22 |
| 156:23 158:8 | **sizes**  66:13,16 | **software**  31:16 | 128:1 137:10 |
| 162:13 181:22 | 66:17 78:5 | 34:8 35:2 | 149:11 157:16 |
| 183:10 192:2 | **slice**  157:5 | 52:17 53:6,14 | 158:19 164:4 |
| 193:10 208:18 | **sliced**  148:6,6 | 56:1,19,20 | 184:5,15 188:6 |
| 244:15,15 | **slide**  183:22 | 62:3,7,10,22 | 188:7 214:2 |
| 251:5 258:11 | 188:13 248:14 | 79:15 90:11 | 229:3 240:20 |
| **sit**  28:2 29:5 | 248:16 249:3 | 107:14 115:14 | 249:20 250:9 |
| 31:13 34:22 | 251:5,12,13,20 | 140:10,16 | 253:17 255:6 |
| 57:6 68:3 | 251:21 252:1 | 145:6,20 | 258:18,21 |
| 116:22 118:4 | 253:15,19,23 | 179:10 271:18 | 276:9 283:14 |

G. Bryant Buchner                                                July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[sorry - stock]**                                                    Page 58

| | | | |
|---|---|---|---|
| 287:3 293:19 | 103:14 110:16 | 40:21 55:15 | **states**  1:1 4:1 |
| 295:6 306:2 | 110:22 112:11 | 56:12 57:9,17 | 149:17 223:13 |
| **sort**  178:5 | 161:9,12,16,19 | 57:18,23 59:16 | **station**  34:23 |
| **sounds**  116:16 | 161:19,20 | 93:16 101:1 | **stay**  55:16 |
| **source**  259:18 | 162:19 163:2 | 108:6,8 116:20 | 57:17 60:16 |
| **southeast** | 165:12,15,20 | 117:3,5,7,7,21 | 249:1 |
| 311:15 | 166:2,9,11 | 118:6,19 | **stayed**  55:20 |
| **space**  157:6,8 | 167:3,19 168:4 | 154:17 162:12 | 56:16 95:12 |
| 157:13,14 | 168:8,13 | 172:14 173:17 | 152:18,20 |
| **spacing**  214:3 | 170:15 171:1 | 178:19 259:21 | **stenographic** |
| **speak**  137:12 | 171:20,21 | 282:6 284:21 | 310:8 |
| 155:13 | 285:20 288:17 | 297:14 306:20 | **step**  9:6 |
| **speaker**  128:5 | **speeds**  102:6 | **started**  12:21 | **stick**  53:17 |
| **speaking** | 113:4 163:19 | 23:1,4 29:3 | 159:5 181:8 |
| 213:10 | 285:21 293:10 | 53:18 54:19,22 | 184:9 |
| **special**  288:14 | 297:17 | 55:8,12,14 | **sticking**  182:5 |
| **specific**  79:19 | **spin**  242:12 | 57:16 119:21 | **sticks**  153:7 |
| 80:8 113:14 | **spit**  276:16 | 180:6 194:12 | 184:9 252:16 |
| 114:10 202:22 | **spoke**  301:6 | 203:13 253:6 | **stiffer**  64:1 |
| **specifically** | **spot**  202:22 | 300:12 | **stiffness**  62:2 |
| 45:11 80:19 | 221:5 | **starting**  5:16 | 62:14,18 63:15 |
| 95:9 109:23 | **spread**  34:3 | 123:5 175:6 | 63:16,22 64:17 |
| 198:14,17 | **staff**  26:10 | 306:18 307:2,6 | 64:20 78:2 |
| 220:19 246:5 | **stamp**  190:21 | **state**  7:18 | 110:3 112:8 |
| 301:16 302:4 | 190:22 194:18 | 275:16 282:5 | 175:13,15 |
| **specifications** | 200:15 232:1,3 | 293:19 310:2,5 | 285:19 288:16 |
| 300:9,9 | 243:16 | **stated**  149:15 | 301:17,21 |
| **specs**  208:12,17 | **stand**  238:5 | 162:1 221:11 | **stihl**  82:1 |
| 307:5,7 | **standard**  130:5 | 221:18 | **stipulated**  2:1,8 |
| **speculate** | 281:15 | **statement**  84:7 | 2:16 |
| 121:22 | **standpoint** | 95:6 125:14 | **stipulation**  5:5 |
| **speed**  86:3 88:8 | 118:6 | 165:11 225:15 | **stock**  110:1 |
| 88:13 100:3,4 | **stands**  84:7 | 233:15 234:1 | 173:6,15,16 |
| 100:10,12 | **start**  6:11 | 263:10 | 174:6,9 |
| 102:17,20,23 | 17:15 24:16 | | |

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[stop - sure]**                                                    Page 59

**stop**  118:20
  182:13 234:16
  248:18
**storage**  82:12
  82:14
**straight**  177:6
  187:20 224:6
  232:8
**stress**  110:18
**strike**  107:1,4
  111:13 119:17
  121:7 297:4
**striking**  152:23
  203:3
**strong**  95:14
**stronger**  64:1,3
  64:4 149:22,22
  150:18,21
  241:21
**strongest**  205:3
**struck**  223:23
  224:2
**structure**  92:1
  92:15 95:8
  107:2 122:4,4
  122:9,9,11,14
  123:2,23,23
  124:10,10
  152:4,15 170:1
  170:1 172:6,6
  274:16 301:12
  305:5,5
**structures**
  95:15 110:21

**stuck**  180:1
  217:23 218:14
  242:10 253:8
  298:17
**studies**  302:18
**study**  92:15
  103:8 108:19
  109:2,3,7,17,21
  110:11 116:7
  132:9 139:14
  139:18 144:16
  172:5,22 303:8
**studying**  92:13
  136:2
**stuff**  26:9 34:20
  43:20 115:12
  130:13 144:23
  155:13 156:16
  160:5 173:6,7
  222:15,16
**style**  74:23 76:5
  295:7
**subject**  67:9
  74:23 78:6
  106:20 108:15
  108:17 135:23
  136:18 150:11
  157:9,13
  172:20 179:8
  179:16 186:14
  193:2 201:3
  257:12 261:2,3
  261:23 262:4
  263:3,8 264:3
  264:5,6,9,10

  265:10 266:11
  270:14 273:15
  274:1 299:9,9
  301:3,3
**subscribed**
  313:14
**subscription**
  54:3
**sudden**  129:19
**suddenly**  23:4
**suffered**  80:13
  84:11
**suggestion**
  239:21
**suite**  4:12,16,20
  31:16 36:18
**summarized**
  25:7
**summarizes**
  141:9
**summation**
  148:12
**sunroof**  89:17
  89:18 90:6,7
  90:10,10,13,15
  90:22 91:13
  99:18 301:5,7
  301:8,15,20
  302:4
**sunroofs**  91:5,9
**super**  76:11,16
  76:17,18
**supervision**
  310:10

**supplemental**
  14:20 83:22
  105:18,22
  114:6 116:4
  117:17 131:20
  140:19 141:16
  141:21,23
  280:16 305:7
  305:17
**support**  138:19
  139:10 243:11
  251:19 301:13
**supporting**
  51:17,19 95:8
  296:16
**supports**  113:2
  256:1
**suppose**  211:11
**supposed**  28:12
  28:15 29:5
  156:4 201:8
  225:5,6 286:6
**sure**  6:16 7:13
  7:17 10:13
  11:18 14:22
  15:10 16:2
  20:3 21:3 23:9
  25:11 35:3
  45:9 46:20
  64:22 66:17
  68:15,22 72:11
  86:5 87:6
  93:17 99:2
  103:2 104:8
  108:16 109:20

**[sure - tell]**                                                    Page 60

124:18 127:10
135:7 137:2
159:4 162:22
162:23 163:19
166:12 167:18
169:17 170:10
172:3 174:22
177:11 182:8
183:16 194:23
203:21 205:12
211:17 217:19
223:3 227:5
228:23 244:18
245:16 247:23
248:6 259:7
260:10 265:6
265:19 273:3
288:23 293:5
295:10,20
296:16 303:10
306:9 307:1,12
307:14,18,19
**surrounding**
38:18
**survive** 23:10
**survived** 11:22
**suspect** 9:20
**swear** 6:1
**switching**
264:2
**swoop** 193:21
**sworn** 6:5
313:14
**system** 65:8

**t**

**t** 312:3,3
**tail** 184:7,16
**tailgate** 86:11
252:3,15
**tailgates** 107:4
**take** 14:15
31:15 32:14
60:22 61:3
76:10 88:19
89:3 109:5
115:13 116:7
116:15 119:1
120:23 128:11
136:23 138:15
143:10 174:11
175:18 176:3
182:16,20
191:13 194:22
211:19 214:4,4
215:1,13 217:7
217:8 222:10
241:5 260:3
286:17 287:15
290:16 295:18
**taken** 61:11
89:10 137:6
176:11 183:2
195:19 204:8
260:17 296:1
310:7
**takes** 47:20
55:10 57:10
108:22 127:14
132:21 298:14

**talk** 15:4 34:15
45:5 52:14
74:20 98:22
103:18 152:23
158:20 160:17
161:22 175:6
299:13
**talked** 77:23
97:16,22 98:2
128:16 133:19
197:8 259:5
270:21 277:19
295:17
**talking** 6:20
7:10 30:13
69:3 76:22
94:5 100:21,22
101:17,19,20
122:1 141:2
145:7 153:8
154:5,8,8
158:7 159:21
159:22 175:7
185:5,6,7
186:3 189:11
196:5,8 201:15
201:15,16,17
203:2,4 210:8
210:14,16
223:5,9,10
225:16 255:10
264:4,5 281:1
296:21 308:7
**tame** 120:23

**tank** 80:17,23
81:2 83:13
299:20
**tanks** 104:16
104:17
**tape** 159:16,17
159:20,21,22
160:2,4,18
161:1 200:8
210:12 216:7,9
217:7,10
219:22 220:5,6
224:17 235:17
252:20 253:14
254:7,10,14,19
254:20
**target** 160:10
202:4
**targeting** 112:7
**targets** 159:15
**taught** 256:10
**teaches** 291:2
**teaching** 94:16
**technical** 7:19
7:22 8:12
34:21 138:3
182:18
**technique**
214:19
**tedra** 4:14 5:20
188:9 311:1,2
**tell** 14:10,11
16:11,15 17:7
17:9 116:13
121:19 132:19

Case 2:22-cv-00017-RWS   Document 182-10   Filed 03/17/25   Page 375 of 388
G. Bryant Buchner                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[tell - testing]                                                    Page 61

| | | | |
|---|---|---|---|
| 132:23 133:2,4 | 102:18 103:5 | 163:23 164:10 | 280:9,18 281:2 |
| 154:9 159:13 | 103:12 104:2,5 | 165:23 166:7 | 283:9,22 284:8 |
| 159:17 170:14 | 104:11 105:6 | 166:11,13 | 288:7 291:17 |
| 187:14 219:2 | 105:12,13,21 | 169:3,13 | 293:8,13 294:1 |
| 219:23 258:23 | 106:4,19 107:6 | 170:12,18 | 294:2,6,8,11,18 |
| 271:19 276:20 | 107:7 108:1,3 | 177:14,17 | 302:9,12,21 |
| 280:19 282:1 | 108:7,11,23 | 179:2 180:5,8 | 303:3,5 307:22 |
| 284:17 285:20 | 110:18 113:14 | 180:9,17 183:8 | **tested**  50:12 |
| 289:4 290:17 | 113:15,20 | 183:8 184:1 | 77:13 |
| 302:1 305:22 | 114:21 116:2,9 | 185:2,18 186:8 | **testified**  6:5 |
| **telling**  27:20 | 117:2 118:5,13 | 186:14,16 | 23:15 24:6 |
| 43:18 127:4,13 | 119:1,9 121:3 | 200:3,3,15 | 26:17 37:8 |
| 143:13 220:13 | 123:18 124:1 | 201:3 204:1,1 | 48:22 124:8,15 |
| 242:1 279:20 | 124:11 126:19 | 205:14,21 | 160:17 224:16 |
| 297:16 | 126:22 130:11 | 206:5,8 207:23 | 264:7,23 |
| **tells**  150:17 | 130:16 133:9 | 211:9,16 218:1 | 290:21 304:23 |
| **ten**  287:12 | 133:16 134:2 | 221:16,20 | **testify**  24:8 |
| **tend**  55:15 | 136:16 140:14 | 222:3 223:11 | 220:16 279:22 |
| **tenth**  202:11 | 140:16 141:15 | 227:15,20 | **testimony**  49:4 |
| 225:18 | 142:12 143:5 | 237:20 243:8 | 49:8,22 124:16 |
| **term**  9:16 10:1 | 144:13,18 | 245:6,21 246:8 | 140:3,19 141:9 |
| 10:5 93:23 | 145:5,8,18 | 246:13 247:9 | 158:2 162:10 |
| 283:23 | 146:22 147:12 | 247:11 248:4 | 187:2 219:16 |
| **test**  48:13 49:1 | 147:17 149:18 | 252:2,7 254:3 | 236:4 238:3 |
| 50:5 65:6 | 150:7 151:2,13 | 256:20 257:22 | 247:8 263:5 |
| 74:12 77:5,12 | 151:15,23 | 258:16,21 | 279:8,21 280:1 |
| 91:3 92:18,20 | 152:11,13 | 259:12,18 | 280:17 290:21 |
| 93:5,14 94:23 | 153:1,13,15,18 | 261:21 262:3 | 305:14 311:9 |
| 95:13 96:3,6 | 153:23 154:3 | 264:3,5 269:20 | 311:17 313:8 |
| 96:15,16,18 | 154:17 155:1,2 | 270:6 272:2 | **testing**  77:6 |
| 97:8,11,14,20 | 155:11,19 | 273:23 274:12 | 95:5 99:20 |
| 98:5 99:1,5,12 | 156:5,14,15,20 | 274:17 275:17 | 100:1 101:15 |
| 100:3,6,17,23 | 157:15,20,23 | 276:5,22 277:6 | 103:20 106:15 |
| 101:4,6,7,8,18 | 158:8,14,20,21 | 277:7,10 | 107:13 111:15 |
| 101:21,22 | 161:2,13 163:9 | 278:19,20 | 113:6,7 114:9 |

G. Bryant Buchner                                           July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[testing - thousands]**                                          Page 62

| | | | |
|---|---|---|---|
| 114:11 115:21 | 134:23 167:5 | 24:11 25:7 | 261:19,22,22 |
| 118:2 122:8 | 170:17 175:5 | 27:15 28:6 | 262:11,20 |
| 128:13 165:16 | 178:22 180:7 | 39:5 47:3 | 266:2,2,3 |
| 176:21 227:17 | 180:19 197:9 | 49:19 55:2 | 268:14 269:13 |
| 227:18 302:16 | 201:18 228:9 | 63:17 65:11,13 | 276:23 284:10 |
| 302:17 303:1 | 232:18 297:7 | 65:15,18 66:10 | 286:3,5 290:1 |
| 303:10 | 297:14 | 67:5 69:15,18 | 290:7 300:20 |
| **tests**  104:12 | **things**  12:22,23 | 73:18 81:9 | 301:6 302:14 |
| 165:20 301:21 | 13:4 19:14 | 82:15 85:7 | 305:12 308:19 |
| 301:23 302:6 | 23:2 27:4 62:9 | 87:13 91:21,22 | **thinking**  12:18 |
| **testy**  295:6 | 64:23 76:14 | 98:7 105:8 | 56:22 104:16 |
| **thank**  5:23 6:10 | 79:23 85:19 | 106:9 107:15 | **third**  67:4 |
| 7:16 16:21 | 96:13 101:10 | 112:4 113:11 | 205:11 206:4 |
| 21:15 29:14 | 105:8 113:3 | 113:22,22 | 224:1 |
| 87:5,9 89:5 | 114:19,20 | 115:8,8 117:9 | **thought**  8:19 |
| 95:3 104:5,7 | 119:6 123:9,12 | 120:8 129:22 | 9:8 10:4 11:3 |
| 128:8 138:10 | 123:12,13 | 131:12 137:18 | 12:4 13:5 15:1 |
| 146:16 148:16 | 130:18 133:18 | 139:17,20 | 19:15,20 20:5 |
| 193:10 216:12 | 135:21 143:13 | 140:8 149:14 | 21:16,20 22:20 |
| 235:7 260:13 | 155:18 159:9 | 151:9,20 | 23:14,16 26:12 |
| 277:22 295:5 | 159:16 172:1 | 154:14,18 | 26:20 37:4,5,6 |
| 295:12 305:13 | 199:6 201:12 | 156:17 162:21 | 62:20 64:6 |
| 306:17 309:5 | 204:9 205:7 | 164:18 168:7 | 82:9 87:4 |
| **thanks**  61:14 | 210:6,13 | 169:16 170:6 | 139:2 156:8 |
| 89:13 137:3,9 | 226:18 235:3 | 171:17 172:11 | 165:4,6 170:8 |
| 180:17 244:20 | 241:3 261:11 | 173:13 174:16 | 190:22 192:9 |
| 260:20 | 261:16 262:11 | 175:3 178:1 | 235:10 243:16 |
| **theory**  167:22 | 264:23 275:10 | 182:11 186:3 | 259:6 261:7 |
| **thereto**  2:15 | 279:22 284:14 | 186:15 192:21 | 276:8 293:20 |
| **thing**  8:10 | 285:15 289:2 | 193:1,20,23 | 306:2,14 |
| 38:17 45:10 | 302:2,3,6 | 197:20 213:11 | **thousand** |
| 114:13 115:7 | 303:14 307:3 | 233:2 244:9 | 201:13 307:9 |
| 118:19 123:5 | **think**  7:23 8:7 | 245:7,13 | **thousands** |
| 123:15 126:20 | 8:13 9:10 10:3 | 255:15 259:14 | 299:17 |
| 130:12 131:9 | 10:5,9 18:2 | 259:14,19 | |

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[three - tow]**                                                    Page 63

**three** 59:1
149:16 151:1
160:16 176:18
176:23 177:8
203:12 205:16
221:13,14
222:13 244:10
246:6,7 265:21
**throw** 35:19
233:15
**thrown** 84:18
**tied** 262:15
**tilted** 155:10
**time** 2:13,14
5:12 12:5,17
19:7,19 20:2,4
20:10 21:4,12
21:18 22:19
23:13 27:8,8
35:23 36:5
40:10 47:12,13
47:18 54:17
55:2 57:10
58:15,19 59:8
60:8 61:8,9,10
61:12 65:6
67:9 80:17
81:2,19 83:10
83:13,16 85:1
85:7 86:4
88:14 89:7,8
89:11 97:21
112:6 116:7,15
116:19 117:4
119:1 121:5

137:4,7,14
138:15 139:15
142:1 152:6,18
152:21 157:22
162:20 176:3,9
176:12 182:23
183:3 189:22
192:8 195:17
195:20 201:14
201:21 215:1
221:9,20
237:18 245:23
257:17 260:15
260:18 268:1,9
285:16 286:17
295:11,22
296:2 298:14
305:18 306:4
309:6 310:13
311:18
**timeframe**
20:16 311:8
**times** 8:13
109:17 133:11
139:21 144:9
144:15 145:23
265:22 278:4
280:19 282:1
**tip** 122:13,22
**tipping** 299:15
**tire** 11:19 52:11
66:13,16,17,19
67:1,8,12,15
68:21,22 78:5

**title** 227:14
249:19
**titled** 146:13
227:20
**today** 16:15
39:20 59:23
60:5 116:22
129:17 132:20
133:14,21
140:7 156:11
173:12 226:22
227:8,11 229:1
262:23 264:7
269:5 280:21
283:16 295:17
**today's** 5:11
**together**
198:23 199:2
203:11 228:2
242:10 256:6
262:15 265:12
267:8,8
**told** 28:6 35:14
38:12 40:19
45:1,9 58:18
65:5 123:6
129:2 135:10
144:21 220:1
**took** 19:13 20:1
20:7,8 22:19
23:7 39:14
40:7 117:3
266:15
**tool** 104:2,2
267:4 288:9

289:13 290:9
290:12 291:16
292:14
**toolbox** 82:8,11
**tools** 82:5,6
104:3 215:22
215:23 289:12
303:6,7 304:21
**top** 46:2,5 53:8
94:17 105:16
111:7 119:6
129:11 152:9
184:11 185:11
206:4 208:13
212:19 228:7,8
229:8 254:1,10
254:19
**topdown** 206:9
**topic** 225:9
287:13
**total** 79:6,8,15
85:17 147:11
147:13 148:3
**totally** 243:23
281:22
**touched** 25:1
**touches** 160:13
160:14
**tow** 95:17
122:12,21
131:1,15
152:17 153:7
180:1 197:9,12
198:1,3,7
203:10,11

G. Bryant Buchner                                              July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[tow - two]**                                                      Page 64

204:23 205:4
205:17,22
219:19,20
220:5 247:11
247:16,21
251:23 252:1,5
252:8,14,16,18
252:21,23
253:8,10 254:2
254:18 255:11
255:14,15,22
256:5,5,19
258:1,7 261:16
262:13,20
264:22
**towards** 182:2
**towed** 224:5
**track** 210:11
**tractor** 308:4
**trailer** 308:5
**train** 292:20
**training** 112:17
**transcript**
  262:23 310:9
  310:12 311:6
  311:19 313:5,8
**transfer** 75:18
  159:16,17
  160:4
**trash** 28:10
**traveling**
  166:10
**treasure**
  110:13

**trial** 2:14
**tried** 24:5,8
  26:18 27:6
  39:1 48:7
  105:9,11
  114:19 116:8
  134:21 138:22
  141:5 142:14
  156:16 306:22
**trigger** 220:6,6
**trouble** 128:1
  243:18
**trove** 110:13
**truck** 64:3,5
  66:10 74:23
  77:4 80:9
  102:20 106:21
  110:14,16
  132:1 150:10
  161:8,10,12
  163:15,16,17
  165:13,14,15
  165:16 166:10
  166:13,16,21
  167:4,5,10,11
  167:17,18
  168:6,23
  171:10,13,15
  173:11 199:4
  201:12,14
  203:8 220:23
  221:5,19
  228:10,13
  229:7 231:17
  233:12,13,17

252:17 253:11
  283:2
**trucks** 167:19
**true** 10:17
  17:19 19:8
  125:8 127:2,5
  143:23 149:19
  151:17 153:15
  180:7 182:10
  197:2,18 204:6
  213:7 233:15
  266:20 268:17
  283:15 310:11
  313:8
**truth** 286:19
**try** 8:6 12:20
  16:3 40:4 44:5
  44:6,6,10 49:5
  56:12 85:3
  102:14 130:10
  165:18 207:13
  235:3,8,13
  236:11 248:18
  269:22 277:7
  282:6 295:9
  302:10,19
**trying** 12:21
  20:13,15 23:1
  34:6 43:5,9,13
  43:13 53:17
  56:3,10 59:5
  60:16 62:20
  83:20 92:5
  93:7 96:13
  103:3 106:5,18

106:19 118:23
  125:20,23
  126:12,15
  135:1 137:12
  137:15 144:3
  148:15 158:4,9
  164:11,12,13
  165:17 166:8
  169:7 172:12
  180:22 192:16
  192:18 193:6
  194:16,22
  203:20 204:6
  204:18 212:15
  213:12 214:16
  214:21 216:15
  244:22 245:1
  272:12 296:15
  298:13 302:13
**turn** 109:3
  127:21 128:2
  226:19,20
  228:7,8
**tweaked**
  189:14
**twelve** 85:23
  87:7,19 135:3
  136:3,9 229:19
  266:9 267:20
  268:11,21
  273:19
**twenty** 145:23
**twice** 180:16
**two** 11:17
  20:23 22:6,10

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[two - update]**                                           Page 65

| | | | |
|---|---|---|---|
| 37:13 38:10 | 174:4,7 218:20 | **understand** | **undertaken** |
| 39:11 58:8 | 237:15 281:10 | 40:7 45:23 | 274:23 |
| 76:14 95:20 | 297:11 300:14 | 50:18 51:13 | **uneducated** |
| 96:10,22 99:3 | 300:15,16 | 60:19 61:23 | 233:20 |
| 103:15 104:3 | 303:1 | 62:20 75:12 | **unequivocally** |
| 104:12,13 | **typed** 75:9 | 76:7 84:6 | 225:4 290:21 |
| 105:10 107:20 | **types** 37:14 | 93:17 106:20 | **unexpected** |
| 110:21,21 | 123:9,11 289:1 | 118:5 121:10 | 151:1,6 |
| 148:13 149:6 | 303:7,14 | 138:14 141:20 | **unforeseen** |
| 153:6 156:17 | **typically** 94:2 | 143:14,16 | 7:19,21 8:11 |
| 158:19 165:20 | 159:1 | 156:12 162:11 | **unfortunately** |
| 167:19 171:17 | **typing** 297:10 | 165:14 166:6 | 20:3 |
| 176:19 178:16 | 297:18 | 169:18 170:5 | **unibody** 95:10 |
| 179:1 198:19 | **typo** 75:5 | 172:3 176:17 | **uniquely** 94:21 |
| 198:23 200:11 | **u** | 186:21 194:23 | **united** 1:1 4:1 |
| 200:13 205:3 | | 194:23 201:1 | **unknown** 101:9 |
| 218:11 221:13 | **uh** 27:11 163:4 | 205:5,12 | **unlifted** 163:16 |
| 224:9 227:18 | 187:18 | 243:15,17,23 | 164:15 165:19 |
| 228:6,19 231:7 | **ultimately** | 269:20 283:16 | 165:21 167:5 |
| 236:12,22 | 65:12 | 283:17 291:15 | 167:11,16 |
| 238:18 239:9 | **un** 203:17 | 291:18 | 168:22 |
| 241:8,10 | **uncertain** | **understanding** | **unnecessary** |
| 253:19 265:21 | 161:18 | 15:11 29:21 | 274:10 |
| 270:8,9 271:20 | **uncomfortable** | 30:1,20 37:9 | **unrelated** |
| 272:2 275:10 | 281:23 | 93:22 94:14 | 43:18 |
| 281:18 289:18 | **uncommon** | 112:6 194:5 | **unreliable** |
| 307:11 308:16 | 28:8 | 243:18 266:6 | 129:20 |
| **type** 21:6 28:9 | **undamaged** | 266:13 | **unrepresentat...** |
| 70:4 71:10,19 | 256:15 | **understood** | 129:20 |
| 72:3,7 110:10 | **under** 12:15 | 25:11 47:14 | **unresponsive** |
| 115:12 123:15 | 32:20 40:2 | 177:12 219:18 | 121:8 |
| 129:1 136:16 | 147:10 166:1 | 219:20 | **unsuccessful** |
| 155:13 156:16 | 197:10 213:7,8 | **undertake** | 38:1 |
| 158:22 160:5,8 | 216:17,18 | 191:19 273:13 | **update** 54:20 |
| 166:10 172:6 | 219:3 291:6 | | 63:21 |
| | 310:10 | | |

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[updated - using]**                                        Page 66

| | | | |
|---|---|---|---|
| **updated** 57:16 | 173:6,11 | 28:13 30:22 | 238:13,14 |
| **updates** 53:13 | 181:11 185:1,4 | 36:22 38:1,14 | 244:5,6,7,11 |
| 53:16 54:3 | 189:22 190:2,9 | 38:15 39:3 | 246:2,12,18 |
| **updating** | 190:14,19 | 40:12 42:6 | 256:4,5,18 |
| 297:17 299:2 | 193:3,4 194:7 | 48:6,11,11 | 258:15 260:23 |
| **upwards** | 197:14 199:16 | 55:20 59:13 | 261:15,15 |
| 243:14 | 202:15,17 | 62:1,12 63:21 | 262:5,10,11 |
| **usage** 305:16 | 203:18 205:9 | 67:12,18,20 | 263:1,6,13 |
| **use** 7:18 12:23 | 206:21 213:22 | 68:18 74:16,20 | 264:13,20 |
| 23:1 25:20 | 214:19 215:4 | 75:1,4,20 76:2 | 269:5,15 |
| 39:1,12 41:12 | 217:5,18 220:8 | 76:3,13,23 | 273:18 276:14 |
| 41:18,18,19 | 241:16,20 | 77:5,15 78:1,2 | 277:7 281:15 |
| 42:10 43:8,16 | 242:10 244:17 | 78:16 79:7 | 282:19 284:9 |
| 44:6 50:4 51:2 | 246:4,6 247:17 | 82:19 85:22 | 286:7,8,12,14 |
| 51:15,16 52:18 | 247:17,19 | 86:21 87:3,7 | 288:12,20,22 |
| 57:3 59:17,18 | 261:10,18 | 88:1,8 89:15 | 289:23 290:11 |
| 60:6,7,9 62:17 | 262:17,18 | 89:20 90:6 | 291:10 292:6 |
| 64:12 65:1,3 | 263:18,19 | 92:7 98:8 | 301:12 302:14 |
| 66:9 80:9 | 265:6 267:23 | 104:10,15 | 303:14 304:15 |
| 86:18 87:18 | 271:7 275:14 | 108:19 109:11 | 305:4 311:19 |
| 91:3,4,15 | 276:13 281:6 | 109:14,17 | **useless** 118:11 |
| 108:10 109:18 | 281:10 282:2 | 114:17 116:10 | **user** 31:17 |
| 109:20 111:3 | 282:13 283:23 | 138:23 141:14 | 90:17 301:19 |
| 111:16 112:13 | 284:13 286:15 | 142:6 144:5 | **uses** 159:14 |
| 112:16 113:2,2 | 288:10 289:1,6 | 145:13 147:1 | 178:14 223:17 |
| 118:17 126:5 | 289:7,9 290:5 | 159:3,3 163:1 | 271:14 |
| 126:16,18 | 290:18,22 | 171:19 174:9 | **using** 9:21 |
| 129:14 132:21 | 291:3,17 | 176:18 178:12 | 17:10 23:22 |
| 135:23 136:6 | 292:12,23 | 185:15 186:17 | 25:9 26:6,15 |
| 139:9,14,16,18 | 295:2,20 | 189:3 190:15 | 26:17 28:1,7,9 |
| 140:11 142:10 | 297:17 300:9 | 192:23 194:8 | 29:9 37:6 44:8 |
| 143:7 145:15 | 302:10,15 | 202:8 203:9 | 53:6 56:5 |
| 156:16 164:15 | 305:1 307:5 | 205:7,9,13 | 59:20 60:1 |
| 170:22 172:8 | **used** 14:23 | 209:12,12 | 62:16 63:20 |
| 172:12,19,22 | 18:23 21:21 | 218:10 237:15 | 72:19 87:15,21 |

G. Bryant Buchner
July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[using - vehicles]**

Page 67

94:7 98:6
102:7 104:16
104:22 106:23
109:6 110:1,8
110:23 111:1
112:5 130:1
140:3 154:6
162:1 163:8,11
163:13 170:22
177:15 190:21
192:7,13 194:4
199:15 202:12
203:9,13 206:7
210:5 212:16
213:2 215:6
216:14 217:12
217:20 229:23
230:20 242:19
245:10,12
246:11,22
247:13 256:9
261:6 262:13
262:16,20
264:22 265:20
273:16,19
281:15,21
285:14,23
286:6,11
288:11,20,21
289:14,18,19
290:3,10
292:14,20
297:21 298:1
300:8 301:5,7
301:20 302:19

**usually** 36:11
201:23 300:2
300:19,22
**utilized** 288:22

**v**

**v** 39:6 110:23
288:18 311:4
312:1 313:1
**v's** 39:18
110:15 112:13
113:4 170:13
285:22
**vacuum** 233:20
**vague** 21:10
151:8 283:4
285:8 305:20
**valid** 110:10
114:21 129:4
286:23 290:9
290:12
**validate** 11:22
24:6 111:15,23
285:17 292:23
**validation**
292:9
**valuable**
135:13
**value** 93:5
129:8 172:16
172:17
**values** 65:7
66:9
**variable** 100:22
165:21 284:9

**variables**
100:13 102:1
126:14 274:11
274:11
**variation**
278:18
**variations**
299:16
**varied** 167:5
294:10
**various** 162:9
300:14 302:21
**vehicle** 63:5,14
64:19 65:2,11
66:8 70:12
77:15,22 78:12
78:22 79:18
80:6 81:12,15
82:22 83:5
84:18,19 85:1
85:5,14,17
89:20 90:5
91:4,5,12,16
92:2 93:9 94:3
94:4 104:23
107:2,3 131:2
149:21 151:14
151:14 157:22
158:21,23
159:12 160:1
160:21 161:2
163:12 164:14
164:15 170:19
177:15,15
185:19,19

194:13,14,15
197:17 200:8
200:10 202:4
204:3,15
216:19 222:23
225:5 236:20
254:5 259:23
261:9 265:16
285:2 286:1
300:11 301:7
302:10 308:10
308:10,11,13
**vehicle's** 203:3
228:12 289:7
**vehiclemetrics**
62:4,6,8,16,21
63:10,18 64:19
65:12,19 66:5
74:22 75:5,7,8
75:15,21 78:2
**vehicles** 62:9
62:23 74:20
78:17 91:7
94:19 95:20
96:22 97:8,11
97:15,20 98:9
98:12,15 104:9
104:11 108:18
110:1,6,21
115:18 149:18
149:19 150:4
150:14,20
159:9 174:7
198:20,23
203:10,18

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[vehicles - want]**                                      Page 68

210:10 216:7
226:7,19,20
227:15,21
228:2,6 229:16
230:12,23
231:7,23
232:23 237:3
238:11 241:1
246:22 263:3
264:10,15
265:12 267:6,7
267:8,11
274:16 284:12
288:15,16
297:15,16
299:17 300:6,8
300:14 301:4
304:16 306:18
307:1,8,23
308:7
**velocity**   298:17
**vendor**   62:9
63:10
**verbally**   221:12
221:12 223:14
**verified**   31:3
48:10 77:3
**verify**   17:1,22
46:11 68:9
109:12 191:19
198:2 250:16
278:22 285:21
287:23 288:8
291:20,23
311:9

**verifying**
278:13
**veritext**   311:14
311:23
**veritext.com.**
311:15
**version**   34:10
52:17 53:6,10
53:17,18,20,22
53:22 54:4,5
54:17,18,20,22
55:2,15,16
56:1,5,6,18
57:1,2,15
58:21 59:9,12
59:13,18,22
60:1,2,5,8,10
60:22
**versions**   53:13
55:19 56:13
59:1,14
**versus**   121:3
165:18 175:16
175:16 190:19
247:12 249:5
250:17,19
251:7
**vertically**
200:18,19,23
**vet**   288:22
**video**   4:22
61:10,13 89:8
89:12 137:5,8
146:22 156:17
160:9,12

176:10,13
183:1,4 195:18
195:21 205:19
206:5,8 211:9
211:16 212:2
215:20 220:22
233:13,17
234:17 237:9
242:21 245:21
**videoconfere...**
5:6
**videographer**
5:11,23 61:9
61:12 89:7,11
137:4,7 176:9
176:12 182:23
183:3 195:17
195:20 260:15
260:18 295:22
296:2 309:8,11
**videos**   243:13
**videotaped**
5:13 309:12
**view**   206:10
226:16,18
258:20
**viewing**   226:16
226:21
**virtually**
300:10
**visible**   177:16
185:14 193:21
**visual**   97:6,9
114:18 148:23
186:20 189:15

272:12 303:17
**visualize**
194:13 236:11
**visually**   14:13
96:14 97:4
272:8
**voice**   138:1
**volume**   74:21
89:22 127:21
138:1
**vs**   1:9

**w**

**wait**   125:9
**waived**   2:3,18
**walked**   21:19
**want**   15:10
17:14 25:10
31:18,19 32:20
32:20,22 33:10
33:22 35:16
42:8 46:11
51:2 59:17
60:19,23,23
61:3,20 72:4,9
73:19 88:20,21
91:3 99:1
107:18 121:17
121:18 126:1
129:12 134:9
135:6 141:3
142:16 143:15
152:15 158:13
169:10,17
172:3 179:10
205:12 215:2

G. Bryant Buchner                                    July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[want - went]**                                        Page 69

222:9,14,17
226:23 227:1
234:12 241:10
241:14 242:13
247:17,23
250:15 251:17
265:17,22
267:9 268:17
268:23 279:23
287:20 291:13
303:9 308:14
309:14,16
**wanted** 40:4,4
41:4 48:9
50:23 51:11,23
52:8 63:8 69:1
73:8,10 88:1
92:15 103:1
107:11 115:15
130:6 153:13
173:1 251:18
272:10 307:10
307:10
**wanting** 136:9
**wants** 34:17
53:20 56:6
73:8 98:8
114:18 166:13
193:3 261:19
272:23
**water** 299:23
**way** 12:19 15:1
18:9 25:1
27:13 34:20
39:19 41:17

45:12 47:1
50:12 52:7
73:11 75:3
79:16,20 101:7
102:16 103:10
107:15 108:21
109:4 120:14
121:23 122:11
130:7 144:5
152:13 155:10
165:19 166:2
168:19 170:11
171:11 172:20
180:17,18
184:19 187:10
201:10 203:14
204:15 207:20
213:5,5 216:22
217:21,22,23
218:19 219:20
223:15 226:16
237:4,14 243:3
243:17 244:16
251:1 252:22
253:8 256:4
257:15 261:7,8
268:5 276:10
280:6 281:1
282:2 288:2
291:19,22
292:15,23
293:7 294:2
298:7,17
301:16 306:5
306:11,12

**ways** 73:7
94:20 160:7
193:23 216:23
218:21 236:12
263:9 265:21
265:23
**we've** 10:8
14:11,19 50:3
61:2 68:7,7
76:1,13 77:23
79:22 108:21
114:12 124:22
128:16 130:17
132:3 135:5,10
136:14 137:18
138:23 139:21
141:2 151:20
159:5,8,8
197:7 225:11
248:4 259:5
270:4,21 277:4
277:11 281:23
284:8,8 285:11
287:11,12,15
300:12 308:4,9
**week** 12:9 20:3
47:22
**weeks** 20:17
23:8 44:18
58:15
**weigh** 81:22
82:14 299:17
300:6,17
**weighed** 78:22
81:2 83:5,10

83:14 84:16
85:1 299:10
306:23 307:1,2
307:8,12
**weight** 63:6
78:12,16,20,20
78:22 79:2,7,8
79:15,18,21
80:1,4,21
81:20 82:5,8
82:17,19,21,21
83:2,7 84:15
85:5,11,16
104:17,18,19
104:20,23
299:10,14,15
299:19 300:7
300:10,16
306:12 307:22
308:20
**weights** 39:17
79:12,23 80:6
104:8,9,10,15
293:11 306:22
307:13,19
308:20
**weinberg** 4:10
**went** 8:3 9:18
11:8 12:17,18
18:15,16,18
24:21 54:20
64:23 95:11,17
113:10 119:20
148:6 190:21
217:9 218:15

G. Bryant Buchner
July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[went - worried]**                                                      Page 70

| | | | |
|---|---|---|---|
| 234:13 243:14 | **wishful** 56:22 | 25:4,19,20,20 | 228:20 229:13 |
| 257:13,15 | **witness** 2:3 5:7 | 25:20,21 26:7 | 232:5 242:13 |
| 265:17 267:3 | 6:2 61:6 89:5 | 27:2 28:10 | 243:9,12 |
| 268:10 | 95:3 125:23 | 32:19 34:21 | 244:12,12,14 |
| **wes** 44:15 45:7 | 136:23 137:3 | 35:14 39:15 | 246:3 247:1,4 |
| **west** 4:15,19 | 175:22 176:4,8 | 43:1,3,9 44:3,4 | 247:4,6,7,7,20 |
| **whatnot** 155:9 | 182:22 223:6,9 | 44:5,11,12 | 257:2 261:6 |
| 161:17 243:13 | 223:12 248:13 | 51:14 52:8 | 262:19 266:22 |
| 302:21 | 250:3,12,16,20 | 55:12 56:4 | 266:23 267:15 |
| **wheeler** 4:11 | 251:2 295:13 | 73:17 84:1 | 267:16,22 |
| **whichever** | 309:7,16 311:8 | 88:21 96:12 | 270:19 274:23 |
| 194:15 | 311:10,12,18 | 103:3 108:22 | 283:18 292:3 |
| **white** 220:7 | **wold** 181:23 | 109:5,5 117:10 | 292:19 296:7,9 |
| 252:20 253:14 | **wondering** | 117:10 118:4 | 297:13 305:17 |
| 254:1,14,19,19 | 104:22 | 120:4,7 123:14 | 307:17 |
| **wholeheartedly** | **word** 9:23 43:8 | 127:7 128:5,21 | **worked** 43:6 |
| 234:2 | 48:14 126:6 | 131:9,10,13,14 | 226:17 268:5 |
| **wide** 257:5 | 174:9 183:19 | 131:17 132:8 | **working** 19:14 |
| **width** 207:10 | 184:2 186:19 | 132:21 133:3 | 19:20 27:4 |
| 207:13,16 | 187:4 189:23 | 133:13 141:5 | 28:9 35:15,16 |
| 272:17 275:10 | 191:2 298:1 | 141:20 142:13 | 35:19,22 39:6 |
| 275:12 281:17 | **words** 14:15 | 142:13,14,20 | 48:5 53:18 |
| 281:18 282:10 | 16:13 40:3 | 145:4 159:19 | 57:11 167:8 |
| 282:10,15 | 42:5 48:15 | 163:10 166:3,3 | 257:6 259:21 |
| 284:19 | 62:16 79:12 | 171:1,4 172:11 | 296:22 299:4 |
| **wiggins** 4:22 | 91:2 147:15 | 173:1 174:11 | **works** 283:17 |
| **wild** 287:21 | 150:8 167:13 | 175:4 177:1,2 | 292:1 298:7 |
| **willing** 116:13 | 168:10 175:1 | 177:5 182:22 | **world** 92:18,20 |
| 282:4,5 | 200:12 202:13 | 190:17 198:12 | 98:23 101:4,5 |
| **wimbledon** | 223:17 227:14 | 199:7,10,16,16 | 101:6,21,22 |
| 295:13 | 231:12 267:10 | 199:17 208:5,6 | 103:12 294:13 |
| **window** 175:16 | 268:5 283:8 | 217:17 218:20 | 294:16 |
| 208:22 239:17 | 297:3 301:10 | 220:15 224:23 | **worms** 293:3 |
| **windows** | **work** 13:2 18:4 | 225:1 226:4,17 | **worried** 81:17 |
| 226:19,19 | 19:18 24:16,18 | 227:8 228:1,6 | 88:6 102:9,10 |

G. Bryant Buchner                                          July 11, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[worry - zooming]**                                          Page 71

worry  122:16

worrying
  306:21

worse  230:4

worst  103:1
  130:8 163:13
  171:22

worth  43:22
  58:15 300:1

wreck  70:18
  71:4 260:8
  301:3

write  47:15,20
  188:4,8

writing  26:5

written  266:15
  267:13 273:17
  281:20 282:12
  285:17

wrong  11:1
  49:10 68:15,22
  69:19 135:10
  178:13 215:17
  220:3 221:15
  221:15 224:22
  225:9,15
  298:17

wrote  25:22
  28:5 36:2
  68:12 168:21
  184:20

**x**

x  3:1 110:22,23
  201:21 229:10
  279:21

xlt  187:19

**y**

y  229:10,11
  279:21

y'all  188:3
  195:12,13

yeah  10:17
  16:21 20:11
  24:17 42:13
  45:22 50:2,17
  52:19,21 53:15
  55:1 58:18
  61:6 66:23,23
  69:17,20 70:11
  76:21 77:9
  81:8 89:20
  91:8 94:7
  102:4 103:23
  105:1 128:9
  129:10 138:14
  140:5 146:5
  149:8,11,21
  153:18,20
  156:3 174:1,10
  175:7 177:9,10
  179:20 181:4
  184:15 185:9
  188:5 190:8
  194:15 198:5
  205:15 210:3
  221:3 223:7,12
  228:23 230:22
  231:2 234:22
  235:4,5 238:8
  244:5 245:17

248:21 249:14
249:23 250:14
251:2,22 253:4
253:16 257:22
259:10,16
270:3,8 277:23
278:17 280:23
286:15 305:21
306:16 308:1

year  53:10 76:2
  300:11

years  285:14
  288:21 290:3
  292:6

yelling  125:22

yellow  177:18
  218:11 235:16

yep  148:14
  223:12 250:3
  254:13 257:13
  268:20 306:16

yesterday
  247:16

**z**

z  229:11 279:21

zero  232:9

zoologist  109:2

zoom  227:12
  241:20 252:19

zoomed  228:3

zooming  243:1

800.808.4958                                          770.343.9696

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.