# EXHIBIT 12

Case 2:22-cv-00017-RWS   Document 182-12   Filed 03/17/25   Page 2 of 131
Christopher D. Roche                              July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 1

1             UNITED STATES DISTRICT COURT

              NORTHERN DISTRICT OF GEORGIA

2                  GAINESVILLE DIVISION

3       SANTANA BRYSON and

        JOSHUA BRYSON, as Admnistrators

4       of the Estate of C.Z.B. and as

        surviving parents of C.Z.B, a

5       deceased minor,

6            Plaintiffs,

7       vs.           CASE NO.:  2:22-CV-017-RWS

8       ROUGH COUNTRY, LLC,

9            Defendant.

10      _____

        VIDEOTAPED

11      DEPOSITION OF:   CHRISTOPHER D. ROCHE

12      DATE:            July 17, 2024

13      TIME:            9:14 a.m.

14      LOCATION:        Ann Arbor, Michigan

15      TAKEN BY:        Counsel for the Defendant

16      REPORTED BY:     Mary K. Stepp, Court Reporter

17      _____

18

19

20

21

22

23

24

25

Page 2

```
 1
              APPEARANCES OF COUNSEL:
 2
                  ATTORNEY FOR PLAINTIFF:
 3
                      (Appearance via Zoom)
 4                    CANNELLA SNYDER, LLC
                      TEDRA L. CANNELLA, ESQUIRE
 5                    DEVIN L. MASHMAN, ESQUIRE
                      315 Ponce de Leon Avenue
 6                    Suite 885
                      Decatur, Georgia 30030
 7                    tedra@cannellasnyder.com
                      devin@cannellasnyder.com
 8
 9
                  ATTORNEY FOR DEFENDANT:
10
                      (Appearance via Zoom)
11                    WEINBERG WHEELER HUDGINS
                         GUNN & DIAL, LLC
12                    RICHARD H. HILL, ESQUIRE
                      3344 Peachtree Road, N.E.
13                    Suite 2400
                      Atlanta, Georgia 30326
14                    rhill@wwhgd.com
15
16
         ALSO PRESENT:
17
              Mike Brown, Videographer
18
19
                  (INDEX AT REAR OF TRANSCRIPT)
20
21
22
23
24
25
```

Page 3

1          THE VIDEOGRAPHER:  We're on the record.

2    The date, July the 17th, 2024.  Time on the video

3    monitor, 9:14 a.m., marks the beginning of video 1,

4    deposition of Christopher Roche, in the matter

5    Santana and Joshua Bryson versus Rough Country, LLC.

6          My name is Mike Brown, representing

7    Veritext Legal Solutions.  I'm the videographer.  Our

8    court reporter is Mary Stepp.

9          Counsel, please state your name for the

10   record and whom you represent.

11         MS. CANNELLA:  Tedra Cannella, Devin

12   Mashman for the Plaintiffs, the Bryson family.

13         MR. HILL:  Rick Hill for Defendant Rough

14   Country.

15         THE VIDEOGRAPHER:  Will the court reporter

16   please swear in the witness.

17         (Witness sworn.)

18         CHRISTOPHER D. ROCHE,

19   having been duly sworn, testified as follows:

20                       EXAMINATION

21   BY MR. HILL:

22       Q.   Thank you, Mr. Roche.  I'm going to share

23   my screen here, at least attempt to.

24         Are you able to see the screen now?  It's

25   a -- should have on there the Investigation of the

Page 4

1        Bryson Crash, your report dated June 14th, 2024.

2              A.    Yes, I can.

3                    MR. HILL:  All right.  And this -- I'd

4        like to mark this as Exhibit 1 to the deposition.

5        It's Bryson 9379 through 9398.

6                    (Defendant's Exhibit No. 1 was marked for

7        identification.)

8        BY MR. HILL:

9              Q.    Have you brought this with you today to

10       the deposition?

11             A.    Yes, I have.  I have it in front of me.

12             Q.    Okay.  Great.

13                   MR. HILL:  And now I would like to mark as

14       Exhibit 2 a document that we received just minutes

15       prior to the start of your deposition.

16                   (Defendant's Exhibit No. 2 was marked for

17       identification.)

18       BY MR. HILL:

19             Q.    Let me see if I can share my screen again.

20       Sorry for the technological delay.  On the screen now

21       should be a document entitled "Material Received -

22       Amended List."  Are you able to see that?

23             A.    No, I can't see that at the moment.

24             Q.    All right.  Are you able to see it now?

25             A.    Yes, I can.

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 5

1        Q.    Okay.  Great.  This document is

2   Bates-labeled Bryson 10995.  This Amended List, when

3   was this prepared?

4        A.    So, I think it was prepared in the last

5   day or so.  I am noticing that some of that Amended

6   List is an over -- is a duplication of my first

7   supplemental report, list of availables -- materials

8   available for review.  So that for production had

9   already been stated in my prior supplemental report.

10        Q.    Okay.  Well, let's --

11              MS. CANNELLA:  I'll just state for the

12   record what I stated while the witness and counsel

13   were here earlier.  We -- our -- my office produced

14   this moments ago because we realized that the Buchner

15   two -- last two Buchner reports and the Buchner rough

16   rebuttal deposition is not on it.  So the list is the

17   same in all things, except for the last three items.

18   BY MR. HILL:

19        Q.    Okay.  So if we look at the bottom of this

20   list, I think what Ms. Cannella is referring to is

21   everything below where it says "Deposition of

22   Jonathan Eisenstat with all exhibits."  Is it your

23   testimony, Mr. Roche, that the material below what

24   I've just mentioned are the new materials that you're

25   adding to your list of materials reviewed in

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 6

 1     connection with your June 14th report?

 2          A.    So those materials have been made

 3     available to me.  I have seen the Buchner amended

 4     report, the rebuttal report, and his deposition, but

 5     that was subsequent to this report being authored.

 6          Q.    Okay.  So the material listed in your June

 7     14th report, that is material that you reviewed or

 8     was made available to you prior to June 14th that was

 9     in addition to the material that was listed in your

10     initial and supplemental reports, is that a fair

11     statement under Section B of your June 14th report?

12          A.    Yes, I would agree with that.

13          Q.    Okay.  And prior to issuing your June 14th

14     report, is there any material that was made available

15     to you for review, other than what's listed in

16     Section B of your June 14th report and what was

17     listed in prior reports of -- you know, predating

18     June 14th?

19          A.    No, I don't believe so.

20          Q.    Okay.  And then now moving to this Bryson

21     10995, which I'd like to mark as Exhibit 2, if I

22     didn't mention that earlier.  I believe what you're

23     saying is that the bulk of this is repetitive of

24     material you've already listed, and that the only new

25     material you've reviewed since June 14th are

Christopher D. Roche                                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 7

1          Bucknel -- Buchner's rebuttal.  And it says "depa."

2      I assume that means -- meant to be "depo" file

3      materials, which is listed as Bryson 9409 through

4      9527; the Quest FR26 Report; the Quest FR26 Report

5      Support; the Buchner Amended FR26 Report; the Buchner

6      Rebuttal Report; and the Rough Draft of Bryant

7      Buchner's Rebuttal Deposition.  Is that -- have I

8      correctly described that?

9          A.    Yes, I think that's a fair description.

10          Q.    All right.  And when it references the

11     Quest FR26 Report, 10519 Bryson, what -- what is

12     that?  Is that the original Quest report or is

13     that -- what is that referring to?

14          A.    Yes, I think that's Mr. Buchner's original

15     report.

16          Q.    And same when -- with regard to Quest FR26

17     Report's Support?  Is that -- that the support that

18     references his original support?

19          A.    I believe so, yes.

20          Q.    Okay.  And did you review those for the

21     first time after June 14th?

22          A.    I guess.

23          Q.    Okay.  And was this document here that's

24     been listed as Exhibit 2, did -- did you draft this?

25          A.    I did not.  Ms. Cannella's office drafted

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 8

1    that.

2         Q.    Okay.  And was that at your direction

3    or -- or tell me how that came to be.

4         A.    Well, those materials were provided to me

5    in the last few days.  And obviously my current

6    report that you have dated June 14th doesn't

7    accurately reflect those new materials.  So it was

8    agreed that we should make sure that was clear.

9         Q.    All right.  Do you know exactly when you

10   were provided with these additional materials after

11   June 14th?

12        A.    Uhm, I know the deposition transcript or

13   the initial draft of it was provided on Friday, uhm,

14   but the dates of the others I don't remember.  It's

15   been in the last few days.

16        Q.    All right.  And did you produce any

17   correspondence from Ms. Cannella that relates to your

18   receipt of these additional materials?

19        A.    I did provide correspondence files that

20   were relevant.  I don't recall if I captured this

21   most recent correspondence, though.  Because I had

22   that file, assuming we would depose on Friday, and so

23   I captured the correspondence up till Friday.  I

24   don't think I've managed to capture any

25   correspondence subsequent to that.

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 9

1                MS. CANNELLA:  We can get that to you,

2        Rick.

3                MR. HILL:  Sure.

4                MS. CANNELLA:  No problem.

5        BY MR. HILL:

6            Q.    Is it safe to say that the opinions that

7        you've rendered in your June 14th report, that if we

8        look at the materials listed in -- under paragraph B

9        of that report and we combine it with all of the

10        material you have listed in prior reports, that we

11        have an exhaustive list of the material that you had

12        available to you in issuing your June 14th report?

13            A.    Yes, that's correct.

14            Q.    Okay.  If we then add the material on

15        10995, do we have an exhaustive list of all of the

16        material you've reviewed or been made available to

17        you prior to today?

18            A.    Yes, I think that's also true.

19            Q.    Okay.  Have you ever requested an

20        opportunity to inspect the crash test vehicles?

21            A.    I was not aware that those vehicles were

22        available, at the time I was authoring this -- this

23        report.

24            Q.    Did you ask if they were available?

25            A.    I think Ms. Canne- -- Cannella and I

Christopher D. Roche                          July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 10

1          discussed it.  Uhm, but frankly their first step was

2          to go through the materials provided and to see if it

3          was sufficient for me to write this report, and they

4          were, at that time.

5                Q.    When did you learn that the materials -- I

6          mean, that the test vehicles were available for

7          inspection?

8                A.    Well, frankly, that was only really

9          confirmed when I read Mr. Buchner's deposition

10         transcript.

11               Q.    And when you say last Friday, that would

12         be July 15th or -- wait, no, I'm sorry.  July 12th?

13               A.    Last -- last Friday.  July 12th, yes.

14               Q.    All right.  How many crash tests in your

15         career have you performed or participated in, in

16         connection with your work as a consultant in

17         litigation?

18               A.    So you're referring specifically to my

19         time at Robson Forensic?

20               Q.    Yeah.  As a -- your time at Robson

21         Forensic, you work as a consultant.  And I think we

22         talked in your previous depositions about your

23         experience in that capacity in a litigation context.

24                     And so my question is, how many crash

25         tests have you been involved in, in connection with

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

```
                                              Page 11

 1       your consulting work in litigation?

 2           A.    And by -- can you define what you mean by

 3       "crash test"?

 4           Q.    Sure.  An actual, real wor- -- real world

 5       crash test, where vehicles are crashed in connection

 6       with the litigation.

 7           A.    So, I can think of -- so, sorry to be

 8       asking so many questions.  But you mean where I

 9       initiated, uhm, the request for testing and conducted

10       the testing or was involved in reviewing crash

11       testing that had been conducted by another party?

12           Q.    Either one.  We know you've reviewed the

13       crash test conducted by another party in this case,

14       so we'll start with that.

15                 Have you in any other cases reviewed crash

16       testing conducted by another party?

17           A.    Yes, I have.

18           Q.    All right.  Tell me about that.

19           A.    So, that is a case that was -- it's listed

20       on my deposition history.  So that was -- I'll have

21       to look at that list.  It was the case against Ford.

22       It is the Young versus Procomm Advanced Quality

23       Solutions is -- is the case that's listed on my

24       testimony history.  So the one back when I was

25       deposed in October of last year.
```

Christopher D. Roche                       July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                    Page 12

1          Q.    Right.   All right.   Any other cases where

2     you analyzed any type of crash testing done by the

3     other party?

4          A.    I'm currently engaged in organizing

5     testing for another case, so I would -- that case

6     is -- testing in that case is still ongoing.   So

7     that's another example.

8              In terms of -- for vehicle crash tests,

9     no, I think the -- I think that is the -- the one --

10    one other case I've examined for vehicle crash

11    tests --

12         Q.    All right.   And -- and -- go ahead.

13    Sorry.   Thought you were finished.

14         A.    Yeah, with respect to litigation,

15    obviously my prior experience was involved in many,

16    many crash tests.

17         Q.    Right.   Well, I'm -- I'm asking just in

18    the context of litigation.   So I don't want you to

19    disclose any confidential information about the other

20    tests.   But you said you're -- you're currently, I

21    guess, consulting as an expert in another case where

22    you said you are organizing testing for that case.

23    Did I hear that correctly?

24         A.    Yeah.   I'm investigating the possibility

25    of conducting testing related to -- to that

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 13

 1    particular case.

 2         Q.    Okay.  So testing hasn't actually occurred

 3    in that other case?

 4         A.    That's correct.

 5         Q.    All right.  And is that the only case in

 6    the litigation context where you have either

 7    organized, directed or participated in any way in --

 8    in an actual crash test?

 9         A.    No.  There's been other cases where we

10    were looking at the possibility or actually

11    determining the test setup and procedures.  So there

12    have been other instances where I was involved in

13    test setup, test planning.

14         Q.    And did those tests actually go forward?

15         A.    They -- they did not in that case.

16         Q.    Okay.  So has there ever been a case where

17    you have participated in, in the ways you've

18    described, a crash test that actually went forward in

19    the litigation context?

20         A.    Well, the -- the example I gave you

21    earlier was the case where I was deposed last year,

22    where two crash tests were performed.  And I was able

23    to review all the materials related to those crash

24    tests.

25         Q.    Yeah.  Maybe I asked it the wrong way.  I

Christopher D. Roche                       July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 14

1    mean, in situations where your side of the V, the

2    client that you were retained by, where crash testing

3    was done on their behalf, have you ever been involved

4    in a case where crash testing of that type actually

5    went forward?

6         A.    Not at this time.

7         Q.    Okay.  Now that you've had a chance to

8    review the deposition of Mr. Buchner and his amended

9    and rebuttal reports, are you aware whether he has

10   any criticisms of the way the test Escape was

11   ballasted in this case?

12        A.    I'm not going to try and summarize

13   Mr. Buchner's opinions.  I'm here to discuss my -- my

14   report and my opinions.

15        Q.    Well, do you know if he has any criticisms

16   of the weight ratio of the Escape in the crash test?

17        A.    I don't know.  There's an awful lot of

18   dialogue about the weights.  I'm aware of that.  He

19   measured the -- the weights.  I know he and

20   Mr. Grimes have some disagreement there.  But, again,

21   that's -- I highlighted my own concerns with the way

22   the test was run and ballasted, so I would prefer to

23   discuss that.

24        Q.    Are you aware that the HVE software that

25   Mr. Buchner used to run his simulations did not allow

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 15

1        him to ballast the Escape, as you suggest should have

2        occurred in the actual crash testing in this case?

3                    MS. CANNELLA:  Objection.

4                    THE WITNESS:  I don't --

5                    MS. CANNELLA:  It's not -- sorry, Chris.

6        Objection, foundation.  And I believe -- I'll just do

7        the form objection.

8        BY MR. HILL:

9            Q.    You can go ahead and answer, if you can.

10           A.    Yeah, I -- I didn't run any HVE simulation

11       as part of my work in this particular case, and I

12       will defer to Mr. Buchner regarding the work he's

13       done.

14           Q.    All right.  You're familiar with HVE

15       simulation software, correct?

16           A.    HVE software is not a software package

17       that I at Robson Forensic currently utilize.

18           Q.    Have you ever util- -- utilized it?

19           A.    No, I haven't to date used HVE software.

20           Q.    All right.  You make reference in your

21       report with regard to the ballasting of the Escape of

22       industry standards for ballasting vehicles.  Can you

23       state any source that you have for an industry

24       standard for ballasting a vehicle for a crash test in

25       a litigation context?

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 16

1          A.    Well, the industry standards I am

2    referring to relate to industry crash tests.  For

3    example, I reference FMVSS 301.  So there are

4    procedures, there are very well-documented procedures

5    for 301, and that's what I'm referencing against.

6                In this particular crash test that was

7    performed, you know, the stated objective was to

8    match the weights of the subject crash.  So I'm

9    commenting on whether that is a fair statement,

10   whether it -- it does represent or not, and that's

11   really what I'm commenting on.

12         Q.    Other than the procedures for FMVSS 301,

13   are there any other standards that you claim apply to

14   ballasting of a test vehicle in a -- in a forensic or

15   litigation context?

16         A.    Well, there are -- there are many FMVSSs.

17   There are many tests standards.  There's IIHS,

18   there's other -- other standards around the world.

19   Those are the standards that are used to certify or

20   evaluate vehicle performance.  As -- it's in that

21   instance I'm referring to industry practice.

22                So, for the -- for example, the use of

23   Stoddard solvent.  So if you're trying to represent

24   the fuel weight, Stoddard solvent is a good solution

25   for that.  So the weight is placed in the correct

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 17

1      location.  So that's really what I'm discussing in my

2      report.

3              Q.    What is the FMVSS 301 test?  What does

4      that relate to?  What is that for?

5              A.    301 relates to fuel system integrity.

6              Q.    Right.  And it's a -- FMVSS is the Federal

7      Motor Vehicle Safety Standards, so it's a compliance

8      test.  You'd agree with that, correct?

9              A.    I would agree with that, yes.

10             Q.    All right.  Speaking of the Stoddard

11     solvent.  Do you agree that Mr. Crosby and Mr. Grimes

12     used the published curb weight of the Escape as a

13     starting point for their ballasting of the test

14     Escape?

15             A.    Uhm, I would -- I would say I've reviewed

16     what they supplied, in terms of the capacity of the

17     weight and the document related to the test weight,

18     and I've compared those two.  And I can see some

19     aspects of how they -- I know what they claim the

20     test weight was.

21                   No photographs were provided of the

22     vehicle in the test weight condition on a scale, for

23     example.  And I can see that there are certain items

24     that were fitted to the test vehicle, where the

25     weight wasn't provided.

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 18

1              So really that's -- that's what I've

2       assessed is the comparison of the documents they

3       provided, in terms of the weight and the weight

4       distribution.

5              Q.    Yeah, I understand that.  But my question

6       was, did they use the published curb weight of the

7       Escape, as their starting point in ballasting the

8       test Escape?

9              A.    I -- at this time, I don't recall the

10      foundation of -- of their starting weight.  I know --

11      I know what -- they reported the weight they're

12      attempting to get to.  I was really more interested

13      in how they achieved that by the distribution of the

14      ballast.

15             Q.    Assuming that they did use the published

16      curb weight of the Escape as a starting point, do you

17      agree that the weight of the fuel is already

18      represented in the published curb weight of the

19      vehicle?

20             MS. CANNELLA:  Objection to the form of

21      the question.  Confusing.

22      BY MR. HILL:

23             Q.    Answer, if you can.

24             A.    So, you know, Mr. Grimes' assertion was

25      that he was trying to match the weight condition of

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 19

1    the subject vehicle.  So what I know from reviewing

2    the test is that the crash test was conducted with an

3    empty fuel system.  And we know that the subject

4    vehicle had fuel in its system.  And, therefore, the

5    weight is not in the correct location.  The fuel

6    weight is going to be applied to the vehicle in a

7    different location than the fuel tank.

8          Q.    Do you know how much fuel was in the

9    subject vehicle, at the time of the incident?

10          A.    Not off the top of my head.

11          Q.    Do you know was -- whether Mr. Buchner

12    accounted for any weight of the fuel in his

13    simulation?

14               MS. CANNELLA:  Objection to the form.

15               (Cross-talking.)

16               THE WITNESS:  I don't know what to say.  I

17    will defer.

18    BY MR. HILL:

19          Q.    Okay.  Simple question -- and I got

20    criticized for calling it a simple question in the

21    last deposition, so maybe I shouldn't use that term.

22               But do you agree that the published curb

23    weight of a vehicle includes the weight of a

24    fuel -- of a full tank of gas?

25          A.    I know that some manufacturers view it

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 20

 1      that way, but I can't say that every manufacturer

 2      does.

 3              Q.    Do you know whether that is true for a

 4      Ford Escape?

 5              A.    No, I didn't evaluate Ford's particular

 6      published data.

 7              Q.    So as we sit here today, you're not aware

 8      as to whether the published curb weight by Ford for

 9      the Ford Escape involved in this crash included

10      weight for fuel?

11              A.    No, I do not.

12              Q.    Okay.  Can you please state any industry

13      standard or federal standard that you know that

14      applies to ballasting a vehicle to act to the

15      condition, when no test dummies are used in a crash?

16                   MS. CANNELLA:  Can you say that again?

17      I'm sorry.

18                   MR. HILL:  The court reporter can read it

19      back, yes.

20                   (The foregoing question was read back by

21      the court reporter.)

22                   MS. CANNELLA:  Object to the form of the

23      question.  It's confusing.

24      BY MR. HILL:

25              Q.    Go ahead.

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 21

1        A.    So, that's a very broad question.    There

2    are a lot of test procedures and standards out there

3    between FMVSS, the NCAP program, IIHS testing.    Uhm,

4    I am -- for most dynamic forward-vehicle crash

5    testing, occupants are, as to the test procedure,

6    where -- as they are typically designed to assess

7    occupant injuries.    So...

8            Again, I have -- you know, I haven't

9    considered that question.    There's a lot of tests out

10   there that may well be an instance, but as I sit here

11   today I cannot give you one.

12       Q.    Do you have any support for the

13   application of the procedures used in NCAP or FMVSS

14   compliance testing to forensic testing in the

15   litigation context?

16       A.    I think there's a great deal of --

17           MS. CANNELLA:    Object, because that calls

18   for a legal -- legal conclusion, legal opinion,

19   foundation.

20   BY MR. HILL:

21       Q.    Go ahead and answer, if you can.

22       A.    I think there's a great deal of testing

23   conducted in industry to FMVSS and other

24   nonregulatory test modes.    And that amount of

25   testing, there are a lot of resources.    And so there

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                        Page 22

1        is the money available to help develop the right

2        types of procedures, methodologies, instrumentation,

3        so on and so forth, that the reconstruction crash

4        world or crash testing environment can utilize.

5             Q.    Just so I make sure I understand this.

6        You've listed the FMVSS testing standards, NCAP, and

7        the IIHS testing as resources or sources for industry

8        standards related to crash testing.

9                  My question is, did all of the impact

10       testing that you've cited to in your multiple reports

11       follow each of those three testing standards?

12                 MS. CANNELLA:  Object to the form of the

13       question.  Which impacts testing are you talking

14       about?  Defendant's --

15                 MR. HILL:  All of them.

16                 MS. CANNELLA:  -- impact testing?

17                 MR. HILL:  No, he cited to multiple -- and

18       I don't want to go back and pull out every -- each

19       individual one.  But my question is, he is -- should

20       be familiar with the testing done in relation to, you

21       know, the NHTSA testing he's referred to,

22       the -- there's testing actually in this June 14th

23       report that he references regarding NHTSA's

24       compat- -- compatibility testing in 2007.

25                 Does he know whether the testing of that

Christopher D. Roche                                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 23

1          sort that he's referred to, whether those tests

2          complied with these industry standards that he's

3          referenced?

4                    MS. CANNELLA:  Objection, a compound

5          question and unclear.

6          BY MR. HILL:

7               Q.    Go ahead.

8               A.    So, specific to the compatibility testing,

9          those were research tests that were conducted to try

10         and evaluate the performance of vehicles, where there

11         is a lack of compatibility in terms of vertical

12         alignment.  Uhm, so those were attempting to

13         replicate, to some degree, field crashes and -- and

14         field data that was available.

15              Q.    Do you know whether that test complied

16         with the FMVSS, NCAP, and/or IIHS procedures?

17                    MS. CANNELLA:  Object to the form of the

18         question.  The specific procedures you're asking

19         about is unclear --

20                    MR. HILL:  Go ahead.

21                    MS. CANNELLA:  -- as to the different

22         tests.

23         BY MR. HILL:

24              Q.    Go ahead.

25              A.    Yeah, the -- the procedures I'm citing,

Christopher D. Roche                        July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 24

1      obviously they're not very specific to certain types

2      of crash tests.  So the compatibility tests are

3      designed for a different purpose.  There is

4      commonality, in terms of the test setup, but they are

5      not the same tests.  So, of course, they differ.

6          Q.    So the question is, they differ, you say,

7      because they're not the same tests.  And, therefore,

8      they did not comply with the FMVSS, NCAP, or IIHS

9      procedures you referenced, correct?

10                MS. CANNELLA:  Object to the form of the

11     question, misstates his testimony.  The procedures is

12     unclear what you're talking about.  You're

13     compounding multiple things.

14                MR. HILL:  Go ahead.  We've only got three

15     hours because he's limited the deposition, so I'm

16     trying to --

17                MS. CANNELLA:  I -- I understand, but

18     asking --

19                MR. HILL:  Go ahead.

20                MS. CANNELLA:  -- questions that are

21     designed to get him to give a sound byte on something

22     that isn't clear is not a fair question.

23                MR. HILL:  I think it's perfectly clear.

24                MS. CANNELLA:  Not clear --

25                MR. HILL:  I'm using -- I'm referencing

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 25

1     the very procedures that he's cited to, so he

2     should --

3               MS. CANNELLA:  Mr. --

4               MR. HILL:  -- know what I mean by

5     procedures.

6               MS. CANNELLA:  Mr. Hill, there's pages and

7     pages and pages of procedures in those testing

8     reports.  So if you have specific questions about

9     procedures, then please ask him about the specific

10    procedure you're talking about.

11    BY MR. HILL:

12         Q.    Go ahead and answer the question, if you

13    can.

14         A.    So in my report, I obviously understand

15    that the crash test that was conducted was attempting

16    to try and replicate this subject crash.  And,

17    therefore, obviously it is not going to conform to

18    any one of the standard industry tests, because this

19    is a very specific crash.  It's a real world crash.

20    And this Exponent test was attempting to replicate it

21    in some fashion.

22               My reference here relates to the

23    differences in the specific test setup that are both

24    inconsistent with the subject crash, nor consistent

25    with other procedures I'm aware of that are used

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 26

1      within industry for crash testing.

2            Q.     Okay.  So he was ab- -- able to answer the

3      question.

4                   Do you know whether the weight of the

5      equipment that was placed into the test Escape was

6      calculated into the ballasting of the test Escape?

7            A.     I'm -- well, based on the documentation

8      that was provided, it was hard to understand the

9      exact weight of the instrumentation and the exact

10     location of the instrumentation.  Uhm, but I have --

11     given that there was a target test weight, I am

12     taking it on good faith that that was included, and

13     so the test weight reflects the weight of those

14     individual test pieces of equipment.

15           Q.     And if individual pieces of that test

16     equipment was placed in the front axle position of

17     the vehicle, would you agree that it would be

18     improper to ballast the weight of the front

19     passengers, specific to their actual weight, because

20     you then would not be accounting for the weight of

21     the equipment?

22                  MS. CANNELLA:  Object to the form of the

23     question.  Foundation, incomplete hypothetical,

24     misrepresents the evidence that's been presented in

25     the case.

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 27

1          BY MR. HILL:

2               Q.    Go ahead.

3               A.    So, I didn't see any evidence or

4          ballasting on the front axle, therefore, there's no

5          point related to that because no -- no documentation,

6          photographs or -- or explanation of that was

7          provided.

8               Q.    You're aware that there was ballasting in

9          the front two seats, correct?

10              A.    Yes.

11              Q.    Okay.  Do you know whether the ballasting

12         of the test Escape increased the crush or intrusion

13         that occurred in the test?

14              A.    What I know is that -- and as I state in

15         my report -- 83 percent of the ballast was located in

16         the second row area, which is behind the center of

17         gravity of the Ford Escape.  And that

18         significantly -- is significantly different to the

19         weight of the occupant and cargo in the second row in

20         the subject crash.

21              Q.    Do you know whether this difference

22         between the weight in the subject crash and the crash

23         test, resulted in any increased crush or intrusion in

24         the test?

25              A.    I'm not saying one way or the other, if

Christopher D. Roche                                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 28

1    that's the case.  I'm simply saying that the

2    ballasted weight doesn't conform to the subject

3    crash, which is not consistent with the stated aim of

4    the crash test.

5           Q.    Have you quantified the impact of this

6    difference in ballasting between the subject crash

7    and the test crash?

8           A.    No, I've -- I've not attempted to quantify

9    that.

10          Q.    Have you done any testing to determine the

11   impact of the ballasting issue, as you've described

12   on the test?

13          A.    No, I have not conducted any testing

14   related to that.

15          Q.    Have you performed any calculations

16   related to that issue?

17          A.    I've not performed calculations either --

18          Q.    Have you --

19          A.    -- as to that issue.

20          Q.    Sorry, I thought you were finished.  I

21   apologize.

22                Have you run any simulations to determine

23   the impact of the difference in the weight ballasting

24   between the crash test and subject crash?

25          A.    I've not conducted simulations as part of

Christopher D. Roche                                July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 29

1      my work in this case.

2          Q.    Do you agree that the axle weight between

3      the test crash and the subject crash were within

4      appropriate limits, in order to perform an

5      appropriate crash test?

6                MS. CANNELLA:  Object to the form of the

7      question.  It's vague.  Appropriate's not defined.

8      BY MR. HILL:

9          Q.    Go ahead.

10         A.    Uhm, I haven't seen any of the defense

11     experts state what they believe the axle weights were

12     on the subject vehicle at the time of the crash.  I

13     can see from their own report that the ax- -- rear

14     axle weight increased relative to the original test

15     that the original vehicle's weight pretest as

16     delivered.

17               And it increased, I think, off the top of

18     my head, somewhere around 3 percent, which is

19     obviously consistent with applying most of the

20     ballast behind the center of gravity.

21     That's -- that's my view on the ballasting.

22         Q.    Okay.  Any other opinions regarding the

23     ballasting of the test Escape that we haven't

24     discussed?

25         A.    Oh, that the ballasting was

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 30

1        unrepresentative of the subject crash.

2              Q.    Right.   Instead of -- that you have on

3        that that we haven't discussed?

4              A.    Not at this time.

5              Q.    All right.   Great.   I'll turn next to the

6        issue of overlap or offset.   Not sure which term you

7        prefer, so if I misuse them, please let me know.

8                    But I believe your report concludes that

9        there was an additional offset by at least four

10       inches in the crash test.   And so I'd like to know

11       how did you conclude that the offset in the test was

12       at least four inches different from the subject

13       crash?

14             A.    Yes.   I'm saying that the offset was at

15       least an additional four inches.   I know the test was

16       set up to try and achieve an offset of around 10.8

17       inches.   I looked at the damage pattern and compared

18       the damage pattern of both the crash test vehicle and

19       the subject crash vehicle, as well as studying the --

20       the high-speed video and still images that were

21       available.

22                   And the four inches is based on the fact

23       that the sheet metal of the liftgate, outboard of the

24       flipper glass, is induced damage in the crash test.

25       And the four inches comes from the width of that

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 31

1      sheet metal.  In the -- in the subject crash we can

2      see that there's direct contact damage in that --

3      in -- in that area of the liftgate.

4             Q.    And just so I understand that, that you --

5      your report says, "Based upon the deformation pattern

6      of the liftgate and the width of the structure."  So

7      I think that's what you were just talking about.  The

8      width --

9             A.    Yes.

10            Q.    -- that the structure you referred to is

11     what?  Just so I know --

12            A.    It --

13            Q.    -- for sure.

14            A.    Yes, it -- it is -- maybe a picture would

15     help.

16            Q.    I'll stop sharing so you can share your

17     screen.  I didn't realize I --

18            A.    Well, I'll --

19            Q.    -- was still sharing.

20            A.    I'm referring you to Image 2 of my report.

21            Q.    All right.

22            A.    So in Image 2, there are two dashed red

23     overall circular shapes, and that's the area of the

24     liftgate that I'm identifying, as comparing on the

25     left in the crash test, induced damage on the right

Christopher D. Roche                                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 32

1          subject crash with direct contact damage.  And so

2          that measurement of four inches is the width of the

3          sheet metal to the right of the flipper glass.

4                 Q.    The last part is what I didn't understand.

5          And I put up the -- I think you can see my screen --

6          the photo -- the image you're referring to.

7                 A.    Yes.

8                 Q.    And when you say the width, the very last

9          thing you said, are you talking about the width from

10         the -- where I'm pointing to here, the glass to the

11         edge of the vehicle?  What exactly are you

12         referencing, when you say the width of that

13         structure?

14                A.    Yes.  I -- I -- in some of my work

15         product, you'll see there's an actual measurement

16         taken from the exemplar scan data.  So I measured the

17         width of the liftgate sheet metal towards the base of

18         this structure, but that's above that lower edge of

19         the lift glass -- the liftgate through the flipper

20         glass.

21                Q.    All right.  In the subject crash, just so

22         I understand this, the -- there was an offset in the

23         subject crash.  Do you know what that offset was?

24                A.    I know that Mr. Grimes reported it at

25         around 10.8 inches.

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 33

1        Q.    And do you agree with that determination

2    of the offset in the subject crash?  Excuse me.

3        A.    Uhm, I haven't personally analyzed that,

4    but I -- I -- I understand his methodology and it

5    seems a reasonable approach for his particular crash

6    test setup.

7        Q.    And what was his methodology in

8    termining -- in determining the offset of the subject

9    crash?

10        A.    He com- -- he compared the point cloud

11    data of both -- of the two vehicles in a -- in a

12    crash position, when he overlaid the two point clouds

13    of the subject Escape and subject F250.

14        Q.    And so you haven't done -- I'm sorry.  I

15    thought you were finished.  I apologize.

16        A.    Well, he just compared the lines of both

17    cloud data, but that was just to conclude his

18    methodology.

19        Q.    And that's your understanding of his

20    methodology?

21        A.    That's right.

22        Q.    Okay.  And you haven't undertaken to make

23    that type of determination or, you know, used any

24    type of scientific methodology to determine the

25    offset in the subject crash?

Christopher D. Roche                          July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 34

1        A.    So, I'm not -- my responsibility in this

2    case is not reconstruction.  So Mr. Buchner's

3    responsibility is reconstruction.  So I'm not trying

4    to duplicate what Mr. Buchner is doing.

5              What -- what I'm trying to highlight here

6    is that clearly, simply from a damage pattern

7    analysis of the two vehicles, the crash test and the

8    subject vehicle, we can see that the damage pattern

9    is inconsistent between the two.

10             Now, obviously there is a vertical height

11   difference, which I have accounted for.  And I'm --

12   I'm going off what the stated aim of the test was,

13   which was to match the offset, which Mr. Grimes

14   asserts is 10.8 inches, about 10.8 inches.  And

15   whether or not he achieved that, that's what I'm

16   opining on here.

17       Q.    All right.  Now, I'm a little confused.

18   You've referenced both Mr. Grimes and Mr. Buchner

19   with regard to their analysis of the offset and the

20   subject crash.  Which of the two experts' work are

21   you relying upon with regard to that issue?

22       A.    Uhm, okay.  I understand that may be a

23   little confusing response.  So in this case, I have a

24   specific focus as directed by Ms. Cannella that is

25   not crash reconstruction.  So I have not attempted,

Christopher D. Roche                          July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 35

1    during the course of my work on this case, to do

2    reconstruction.  I'm aware that there is a crash

3    reconstructionist for the plaintiff's side.

4              But when I compared these images and the

5    stated objective of the crash test and what

6    Mr. Grimes was attempting to do, it was apparent to

7    me that he didn't achieve the offset he set out to

8    achieve.  I'm not trying to reconstruct the subject

9    crash.  I'm not trying to reconstruct his crash test.

10   I'm simply observing that the offset didn't achieve

11   the pretest objective.

12        Q.    Okay.  And other than looking at the

13   photographs in Image 2 or any other photographs you

14   might have referenced, is there any other evidence or

15   information that you relied upon in concluding that

16   the offset was at least four inches different from

17   the subject crash?

18        A.    Well, it's a combination of looking at the

19   photographs and some of the films available.  So

20   there is -- there is high-speed film available of the

21   crash test, and you can look at the alignment of the

22   hood to the Escape during that high-speed film.  So

23   that's what I've used for the basis of that opinion.

24        Q.    So the -- I'm assuming you're referring to

25   the overhead view, high-speed film of the crash test?

Christopher D. Roche                              July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 36

1          A.    Correct.

2          Q.    And how did you use that to form your

3    opinion that the offset was at least four inches

4    different from the subject crash?

5          A.    No, that wasn't what I used to determine

6    the four inches.  I've just described the method I

7    used to determine the four inches.  But you can kind

8    of get a sense from reviewing the film of the loading

9    of that part of the -- of the liftgate.

10         Q.    In the subject crash, did any portion of

11   the F-250 impact the right side of the subject Escape

12   to the right of the window of the hatch?  I'm trying

13   to understand that opinion.  So, I'm referencing your

14   Image 2 and the area that you've circled with the

15   dotted circle.

16               Are you saying that that portion of the

17   subject Escape was impacted directly by the subject

18   F-250?

19         A.    I'm saying that that area in the circle is

20   consistent with direct contact damage.

21         Q.    Okay.  So you believe that the area in the

22   circle on the subject Escape and Image 2 is evidence

23   of direct impact from the F-250?  Just trying to make

24   sure that's clear.

25         A.    Yes.

Christopher D. Roche                July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 37

1      Q.    Okay.  And the circled area for the test

2    crash Escape, your opinion is that in that area there

3    was no direct impact by the test F-250?

4      A.    That's right.  I'm saying that's induced

5    damage.

6      Q.    Okay.  And other than looking at these

7    photographs, can you tell -- tell me, you know, the

8    basis for that opinion?

9      A.    Just described the basis for that opinion.

10    I just walked you through that process.

11      Q.    Right.  I'm just saying, so it's the

12    visual representation of the damage to the vehicles

13    that you're relying upon for that conclusion?

14      A.    It's the damage pattern analysis, combined

15    with measuring an exemplar Ford Escape, yes.

16      Q.    And just to be clear, what did you measure

17    on the exemplar Ford Escape?

18      A.    I measured --

19          MS. CANNELLA:  Objection, asked and

20    answered.

21    BY MR. HILL:

22      Q.    Go ahead.

23      A.    I measured the width of the sheet metal to

24    the right of the flipper glass.

25      Q.    And that's from the edge of the flipper

Christopher D. Roche
Bryson, Santana and Joshua v. Rough Country, LLC
July 17, 2024

Page 38

1      glass to the edge of the vehicle; is that correct?

2          A.    It's to the rear-facing surface of the

3      liftgate.

4          Q.    Okay.  Do you know if the difference in

5      the offset or overlap, whichever term you prefer,

6      that occurred in the crash test had any impact on the

7      level of crush or intrusion seen in the crash test?

8          A.    So in my experience, uhm, you have what

9      we've discussed at great length, physical alignment.

10     You also have lateral alignment between structures.

11     So in the instance where there is less lateral

12     alignment, so less overlap or more offset, the forces

13     are concentrated on a smaller part of the -- the

14     struct- -- the structure.

15         Q.    With the forces being applied to a smaller

16     part of the structure, have you determined how much

17     those greater forces increased intrusion or crush in

18     the crash test?

19         A.    No.  My opinion is that, again, if the

20     objective of the crash test was to replicate the

21     subject crash, this is another instance where it

22     hasn't been replicated.

23         Q.    Have you done any work to determine

24     whether this example of where the test crash did not

25     replicate the subject crash had any impact to -- on

Christopher D. Roche          July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 39

1          the crash test?

2                    MS. CANNELLA:  Object to the form of the

3          question.  Vague.

4          BY MR. HILL:

5                Q.    Go ahead.

6                A.    In terms of -- do you mean in terms of

7          quantifying intrusion levels?

8                Q.    That's right.  Correct.

9                A.    No, I haven't tried to quantify difference

10         in intrusion levels, other than looking at the

11         survival space in the second --

12                   THE REPORTER:  The what space?  I'm sorry.

13                   THE WITNESS:  Survival space.

14                   THE REPORTER:  Thank you.

15                   MS. CANNELLA:  In the second row.

16                   THE WITNESS:  Right.

17                   MS. CANNELLA:  I just want to finish it

18         for her.

19                   THE WITNESS:  In the second row.

20                   MS. CANNELLA:  Yes.

21         BY MR. HILL:

22                Q.    Analyzing the survival space in the second

23         row between the subject crash and the crash test

24         gives you an analysis comparing the crash test to the

25         subject test.

Christopher D. Roche                           July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                    Page 40

 1            But my question is, have you done anything
 2      to quantify how the crash test would have been
 3      different, if the offset or overlap matched the
 4      subject crash?
 5            A.    The purpose of my analysis was to really
 6      understand how representative the crash test is to
 7      the subject crash.  That's -- that's, uh -- that was
 8      what I -- my objective and that's why I've written
 9      this report and formed the opinions I've had -- I --
10      I have.
11            Q.    All right.  Well, have you done any
12      testing to determine the impact of the difference in
13      offset on the results of the crash test?
14              MS. CANNELLA:  Asked and answered.
15      BY MR. HILL:
16            Q.    Go ahead.
17            A.    No, I haven't.  I've simply identified the
18      discrepancy between the crash test that was performed
19      and the subject crash.
20              MR. HILL:  We've been going about an hour,
21      let's take a quick break.  I need --
22              MS. CANNELLA:  Okay.
23              MR. HILL:  -- to use the restroom.  I'll
24      be back fast.
25              THE VIDEOGRAPHER:  Off the record 10:06.

Case 2:22-cv-00017-RWS    Document 182-12    Filed 03/17/25    Page 42 of 131
Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 41

1          (Recess was taken from 10:06 a.m. to

2      10:13 a.m.)

3                  THE VIDEOGRAPHER:  Back on the record.

4      The time 10:13.

5      BY MR. HILL:

6          Q.    Let's say that the crash test -- well, let

7      me back up.  Scratch that.

8                  When you testified that there was at least

9      a four-inch difference in the offset, are you

10     referencing the 10.8 offset calculated by Mr. Grimes

11     or the 12-inch offset originally tested to --

12     testified to by --

13                 MS. CANNELLA:  Hey, guys --

14                 MR. HILL:  -- by Mr. Buchner.

15                 MS. CANNELLA:  -- sorry.  I wasn't in the

16     room.  Can you -- can y'all check for me before you

17     get started next time?

18                 MR. HILL:  Oh, yeah.  I thought you said

19     you were ready.  I -- I apologize.

20                 MS. CANNELLA:  No.

21                 MR. HILL:  Somebody said they were --

22                 MS. CANNELLA:  I'm here.

23                 MR. HILL:  -- ready.  I thought it was

24     you.

25                 MS. CANNELLA:  No.

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                    Page 42

1              MR. HILL:  Yeah, I was trying to sneak in

2       a question there before you got back.  Sorry.

3              MS. CANNELLA:  That's okay.

4              MR. HILL:  Are you -- are you ready now?

5       Sorry about that.

6              MS. CANNELLA:  I'm ready, don't worry.

7       Yeah, I'll turn on my camera so you can see me.

8              MR. HILL:  All right.  Sure.  Sorry.  I'll

9       reask the question.

10             MS. CANNELLA:  Thanks.

11      BY MR. HILL:

12         Q.    Uhm, the four-inch offset that you

13      testified about, Mr. Roche, is that relative to the

14      10.8 offset determined by -- by Mr. Grimes or the

15      12-inch offset that Mr. Buchner testified to,

16      originally --

17             MS. CANNELLA:  Object to --

18             MR. HILL:  -- just so we're --

19             MS. CANNELLA:  -- the form of the

20      question.

21             MR. HILL:  -- just so we're clear.

22             MS. CANNELLA:  Object to the form of the

23      question.  Misstates Mr. Buchner's opinion.

24      BY MR. HILL:

25         Q.    Go ahead.

Page 43

1      A.    Yeah, my -- my reference here is related

2    to Mr. Grimes' 10.8 inches.

3      Q.    Okay.  And so your testimony, just to be

4    clear, is that the offset is at least four inches

5    from 10.8?

6      A.    Yeah.  My testimony is that in the crash

7    test we can see induced damage in the liftgate in the

8    area that we discussed.  There's -- there's contact

9    damage in the subject crash and that width is four

10   inches.

11     Q.    Okay.  Great.  Have you done any work at

12   all to determine how the crash test would have been

13   different, if the offset in the crash test would have

14   been exactly 10.8?

15     A.    So my report really, as I mentioned

16   earlier, is trying to identify how representative the

17   crash test is to the subject crash and -- and what,

18   if any, conclusions can be drawn from it.  And what I

19   highlight throughout the report -- and I know you're

20   working through it, we're not there yet -- is there

21   are multiple instances where the crash test isn't

22   representative and there are multiple variables that

23   have been changed between the subject crash and the

24   crash test.  So, therefore, isolating the

25   contribution of any one variable becomes impossible.

Christopher D. Roche                                July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                        Page 44

1                So how Mr. Grimes reaches his conclusion

2        based on the crash test is -- is really what I'm

3        forming an opinion about, which is later in my

4        report.

5            Q.    I'll ask it again.  Have you done any work

6        to determine whether a crash test that hit the exact

7        10.8 offset, how the results would differ from the

8        actual crash test?

9                MS. CANNELLA:  Object to the form of the

10       question.  Number one, no one has testified that --

11       or the witness has not testified that the offset was

12       exactly 10.8.  He explained what the four inches

13       meant.  Two, asked and answered.

14       BY MR. HILL:

15           Q.    Go ahead.

16           A.    So, again, my objective was to understand

17       the relevancy and the representativeness of this

18       crash test to the subject crash and what we can draw

19       from it, if anything, based on how it's conducted.

20       And so my goal was to identify or -- I have just

21       reported areas of discrepancy.

22                In terms of understanding the contribution

23       of each of the discrepancies, I would think that the

24       onus would fall on the people who ran the crash test,

25       not -- not myself.

Christopher D. Roche                              July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 45

1          Q.    So you have not reached any conclusions or

2     done any work to formulate those conclusions based

3     upon the discrepancies in the crash test?

4               MS. CANNELLA:  Object to the form of the

5     question.  It's confusing.  And to the extent you're

6     asking if he was able to isolate the effect of the

7     misrepresentativeness of the Exponent crash test, he

8     has already stated his answer to that question.

9               THE WITNESS:  What I'm saying is, there's

10    too many variables changed between the subject and

11    the crash test, so you can't draw meaningful

12    conclusions because it's unrepresentative.

13    BY MR. HILL:

14         Q.    You cannot contra- -- draw meaningful

15    conclusions about what?

16         A.    So, Mr. Grimes draws meaningful

17    conclusions from his crash test, right?  So, for

18    example -- and I quote from page 11 of my report --

19    "The difference in the seat deformation in both

20    Escapes is probably due to the lack of cargo in the

21    rear cargo area of the test Escape."

22               I -- what I'm saying in my report is, you

23    can't make that determination because he's not

24    accounting for the other discrepancies, the other

25    differences that he's introduced in the crash test

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 46

1      relative to the subject crash.

2           Q.    All right.  Well, we haven't even broached

3      that subject yet, and so I'm not talking about that

4      subject.  I'm talking about your work and your

5      conclusions.  And you just said you couldn't draw

6      conclusions, based upon the discrepancies.  And I

7      asked you conclusions about what.  And what -- what

8      do you mean, other than your conclusion that

9      Mr. Grimes' cargo hypothesis is not, you know, backed

10     by a scientific methodology?  I understand that

11     conclusion.

12          What other conclusions were you

13     referencing that you can't make, based upon the crash

14     test?

15          MS. CANNELLA:  Object to the form of the

16     question.  It's, uhm --  sounds to me like you're

17     suggesting that you're saying he can't conclude

18     something, when the testimony is that no one can

19     conclude something.  And so --

20          MR. HILL:  Well, these speaking objections

21     are getting outrageous, Tedra.  Just object to the

22     form of the question.  And if he can't answer it, he

23     can't answer.

24          MS. CANNELLA:  Mr. Hill --

25          MR. HILL:  You're only allowed to object

Christopher D. Roche                         July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 47

1    to the form of the question.  You're not allowed to

2    go into a long diatribe speaking -- instructing the

3    witness about the problems with the question in your

4    mind.

5              MS. CANNELLA:  Mr. Hill, I am allowed to

6    try to make an objection that allows you to correct

7    it.  And to the extent you're trying to

8    mischaracterize what he said, I absolutely am allowed

9    to address that.  You said --

10             MR. HILL:  Go ahead --

11             MS. CANNELLA:   -- that he can't draw

12   conclusions and his report and his testimony is that

13   no one can draw conclusions.  That's -- that's

14   misleading.

15             MR. HILL:  That -- that includes him.  And

16   that's what he was talking about.  I was asking him

17   about his conclusions.  And I was clarifying his

18   answer to the last question, where he said that you

19   can't draw conclusions.  And I was asking what

20   conclusions is he not able to draw from it.  That was

21   the basis of the question.

22   BY MR. HILL:

23        Q.   So answer, please, if you can.

24        A.   So the state- -- so it wasn't my crash

25   test, but according to Mr. Grimes the purpose of the

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 48

1       test was to explore what type of intrusion would

2       occur without the lift kit on the vehicle.

3               So the point I'm making is that with all

4       these differences, all these variables that have

5       changed between his crash test and the subject crash,

6       you're not going to be able to isolate how that one

7       variable, the lift kit, the right height can make.

8       Q.    Well, one of the variables between the

9       crash test and the subject crash was the color of the

10      vehicles.  That's a variable that existed between the

11      subject crash and the test crash.  But we can

12      conclude that the color the vehicles are painted had

13      no relevance to the results of the crash test,

14      correct?

15      A.    Yeah, the color is not a significant

16      variable in this instance.

17      Q.    Right.  And what did you do to determine

18      whether any of the variables you've mentioned are

19      significant to the crash test?

20      A.    So, what I'm doing is identifying the --

21      the differences, how additional variables have been

22      changed, and reporting based on the available

23      materials, what those differences are.

24              And from experience, I know that those

25      variables are significant.  We know that the amount

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 49

1      of overlap in a crash test is significant.  There's a

2      great deal of published test data, research that

3      quantifies how overlap influences intrusions and

4      occupant injuries.

5              We also know that weight from, you know,

6      basic physics, basic scientific principles can

7      influence vehicle motion, the dynamics of the

8      vehicle, based on where that weight is placed

9      relative to the center of gravity.

10             So these are -- you know, the -- the test

11     was set up to run apparently in a way that was --

12     replicated the subject crash.  But yet I'm pointing

13     out all the ways that it didn't.

14     Q.   Have you done any work to quantify the

15     impact of either the offset or the weight issues that

16     you just mentioned?

17             MS. CANNELLA:  Objection, asked and

18     answered.

19             THE WITNESS:  So I think if Mr. Grimes

20     wants to draw significant conclusions about the

21     influence of the lift kit on -- on this subject

22     crash, he needed to do that work.  He needed to run

23     either additional tests or run the tests in a

24     different way that more closely replicated the

25     subject crash.

Case 2:22-cv-00017-RWS    Document 182-12    Filed 03/17/25    Page 51 of 131
Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 50

1      BY MR. HILL:

2           Q.    Okay.  Speaking of that, how would you

3      have ballasted the Ford Escape, if you were the

4      person directing the test?

5                MS. CANNELLA:  Objection, foundation, I

6      guess.

7                THE WITNESS:  So, I highlight later in my

8      report that we know -- we -- we -- we know who the

9      occupants were.  We can identify the weights of the

10     occupants.  So, for example, the -- the ballasting

11     for the front row could have represented Santana,

12     Kelly and Joshua Bryson's weights.

13               We know Cohen Bryson's weight.  We know

14     the car seat weight.  So all of those could have been

15     represented much more accurately with ballast than --

16     than was actually performed.

17     BY MR. HILL:

18          Q.    And how would you do that?

19          A.    So there are more ballasting methods you

20     can use.  For example, for the occupants you can

21     use -- there are water ballast tanks that can

22     represent the human form that could be used.  Or an

23     ATD could be used.

24          Q.    What additional modifications you would --

25     would you make to the -- to the test Escape with

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 51

1      regard to the ballasting?

2                    MS. CANNELLA:  Asked and answered.

3                    MR. HILL:  No, it's what additional.

4      He -- he just said he'd add weight for the passengers

5      and so forth.

6      BY MR. HILL:

7           Q.    Would you do anything else?

8           A.    Well, if the purpose of the test was to

9      replicate the subject crash as closely as possible

10     with only the variable off, right, then you would

11     also represent the cargo.

12          Q.    And how would you represent the weight of

13     the cargo in your test?

14          A.    Well, by placing the objects that were

15     clearly identified.  So we know the Shop Vac, we know

16     the camping chairs.  We have images from the scene

17     and subsequent inspections that -- that help to

18     locate that luggage in the cargo space and on the

19     second row seat.

20                    So you would -- the approach that you

21     could take would be to match as closely as possible

22     with the available weight information the subject

23     crash and then see where -- where the weight

24     deficiency was.  And then establish what additional

25     ballasting, if any, was necessary, including adding

Christopher D. Roche                                July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 52

1        fuel to the fuel tank or Stoddard solvent to the --

2        to the fuel tank.

3                Q.    Anything else?

4                A.    Those are some examples of the process

5        that could have been followed that would have more

6        accurately represented the weight in the crash test.

7                Q.    All right.  With regard to the offset and

8        overlap, what would you change, if you were the

9        person directing the crash test?

10               A.    So, some significant effort was made to

11       align the Escape to the guide rail.  So the tolerance

12       of the guidance system for the F-250 was presumably

13       understood by the -- by the Exponent test engineer.

14       So that would be where I would start, is

15       understanding the accuracy and tolerance -- lateral

16       tolerance from the guide system to see how that

17       would -- how that could possibly affect the actual

18       impact offset.

19               Q.    All right.  And once you understood that

20       guidance process, what changes would you make to it?

21               A.    I haven't been to the test site.  I don't

22       know all the details in the guidance system.  It's

23       not -- that's something, at least, beyond my ability

24       to answer at this stage.

25                     THE REPORTER:  I'm sorry.  I need you to

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 53

1       repeat what you just said, sir.

2                   THE WITNESS:  Yeah, that's a -- that's a

3       question I can't answer, because I haven't sufficient

4       information on -- on the guidance system used, other

5       than it failed to hold the intended offset.

6       BY MR. HILL:

7           Q.   Are you aware of any guidance system in

8       your experience that is able to hold a specific

9       offset?

10          A.   I'm aware of partial overlap tests being

11      conducted, where there is a tolerance related to

12      those overlaps and those testing agencies are able to

13      control those overlaps for their tests.

14          Q.   Do you know what the tolerance levels are

15      for those tests?

16          A.   Uhm, no, I -- I -- I haven't prepared for

17      that question today.  I know that they -- they do

18      hold tol- -- tolerances for valid tests, but off the

19      top of my head I can't figure those.

20          Q.   Do you know the tolerance level that is

21      applicable to the crash test in this case?

22          A.   Well, based on my analysis of an

23      additional four inches of offset, what I can see is

24      that the error is somewhere around 36 percent.  That

25      is -- that's a significant error relative to the

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 54

1      original stated objective of the offset of 10.8

2      inches -- of about 10.8 inches.

3              Q.    What would you consider to be a -- an

4      appropriate tolerance for the offset in this crash

5      test?

6              A.    I think, in this instance, you'd be

7      looking at trying to achieve something significantly

8      lower than 34 percent.  Again, what I would

9      reference, if it was me conducting the test, would be

10     standard industry offset test procedures and the

11     acceptable tolerance that they allow to still have a

12     test that's consistent with their intended procedure.

13     And I would reference that offset.  I don't have that

14     for you today, but that was what -- that is what I

15     would reference.

16             Q.    All right.  Let's talk about the parking

17     brake.  If I understand, one of your opinions is that

18     the Escape's parking brake was possibly engaged in

19     the test.  Were you able to read the deposition of

20     Charlie Crosby, prior to this deposition?

21             A.    Uhm, I have reviewed some of it.  I

22     believe he stated that the parking brake was

23     disengaged.

24             Q.    Do you have any reason to dispute his

25     testimony?

Christopher D. Roche                                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                        Page 55

1          A.    Uhm, the process of documenting the test

2    with the photographs showing engagement and then

3    disengaging it seems unusual to me.  In the sense

4    that if you're trying to run a test with parking

5    brake disengaged, why would you engage it at all and

6    run the possibility that someone forgets to disengage

7    it?

8          Q.    Do you have any evidence that the parking

9    brake was engaged, other than the photograph

10   Mr. Crosby took prior to the test?

11         A.    No, that's the evidence I'm utilizing to

12   say it's possibly engaged during the test.

13         Q.    How would the parking brake, if it was

14   engaged, add resistance to forward motion?

15         A.    Well, you have braking applied to the

16   vehicle that wasn't the case during the subject

17   crash.

18         Q.    How would that manifest itself?  Would --

19   would the rear wheels of the Escape skid during the

20   test?

21         A.    Sorry, you're asking a hypothetical

22   question I'm not sure when, in relation to what.

23         Q.    Yeah, let me ask it another way.  If the

24   parking brake were engaged during the test, would it

25   prevent the rear wheels of the Escape from rolling

Christopher D. Roche                          July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 56

1       upon impact?

2              A.    So, it, uh -- it depends on the time of

3       the duration allowed for the F-250 to strike the rear

4       wheels.  And that -- and the distance that's traveled

5       during that period.  So it would depend on the

6       engagement of the structures.  So it would be

7       different between the -- the subject crash and crash

8       test, because there's a full line of difference.

9              So there -- again, that's -- that's not a

10      straightforward question to answer.  But the point

11      is, is that, again, if the parking brake was engaged,

12      it is inconsistent with the subject crash.

13             Q.    Yeah, my question was just about the crash

14      test, not about the subject crash.  Because we -- we

15      don't believe the subject crash -- the parking brake

16      was not engaged, at the time of the subject crash,

17      correct?

18             A.    That's my understanding.

19             Q.    Right.  So I'm just asking about the crash

20      test, all right?  And the question is, in the crash

21      test, if the parking brake had been engaged, would it

22      prevent the rear wheels of the test Escape from

23      rolling upon impact?

24             A.    It's, uhm -- it certainly could influence

25      either the rolling or the rate of rolling.

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 57

1          Q.    And how would it influence it?

2          A.    Well, you have braking applied to the rear

3      axle versus in a disengaged state no braking.

4          Q.    So would the parking brake prevent the

5      rear wheels of the Escape from rolling upon impact?

6          A.    I think I've just answered your question.

7          Q.    Well --

8          A.    You need --

9          Q.    Go ahead.

10         A.    So they would either affect -- either

11     prevent rolling or change the rolling rate --

12         Q.    I --

13         A.    -- or the resistance to rolling.

14         Q.    And how would they change the rolling

15     rate?

16         A.    You now have additional braking affect on

17     the rear wheels.  So the force to push a vehicle with

18     braking versus without braking is -- is different.

19         Q.    Have you done anything to determine how

20     the parking brake being engaged would have changed

21     the rolling rate of the rear wheels in the crash

22     test?

23         A.    So, as I've stated previously, my

24     objective was to highlight inconsistencies between a

25     crash test and the subject crash.  This is

Christopher D. Roche                          July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 58

1        potentially another one.

2             Q.    So the answer is no, you haven't done

3        anything to determine what the change in the rolling

4        rate would be of the rear wheels in the test, if the

5        parking brake had been engaged?

6                  MS. CANNELLA:   Object to the form of the

7        question.   Misstates the testimony.

8        BY MR. HILL:

9             Q.    Go ahead.

10            A.    The -- the emphasis is on the test

11       engineer to ensure that the stated objective is

12       satisfied.   My -- my objective in -- in looking at

13       the test data and writing this report wasn't to try

14       and determine the difference of all of these

15       variables.   That is -- it's certainly beyond the

16       scope of work.   And the point simply is that that is

17       another potential difference between the crash test

18       and the subject crash.

19            Q.    Have you performed any calculations to

20       determine how this difference between the subject

21       crash and the test crash would have impacted the test

22       crash?

23            A.    Sorry, I didn't follow that question.   Can

24       you repeat it, please?

25            Q.    Sure.   You just pointed out that another

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 59

1        potential difference between the subject crash and

2        the test crash is the potential for the parking gate

3        (sic) to be -- having been engaged during the test

4        crash.

5                    Have you performed any simulations,

6        calculations, analysis or testing to determine the

7        impact of this difference between the test crash and

8        the subject crash on the test crash?

9              A.    I believe I already provided that answer,

10       but it's not -- in forming the opinions I have in

11       this report, I am trying to understand the veracity,

12       accuracy of the crash test and whether or not

13       meaningful conclusions can be drawn compared to the

14       subject crash.

15                   I'm not trying to isolate and identify the

16       contribution or the differences in all of these

17       variables.  That -- that is something that should

18       have been considered, when performing the crash test

19       and making sure that only one variable was being

20       changed during the crash test.

21             Q.    So can we agree the answer is no, you've

22       not performed any testing, calculations, simulation

23       or analysis to determine the impact of the parking

24       brake on the level of crush or intrusion that

25       occurred in the test?

Christopher D. Roche                          July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 60

1            MS. CANNELLA:  Object to the form of the

2        question.  He just described his analysis.

3        BY MR. HILL:

4            Q.    Go ahead.

5            MS. CANNELLA:  Misstates his testimony.

6            THE REPORTER:  I'm sorry, what was the

7        last part of your objection, Ms. Cannella?

8            MS. CANNELLA:  Misstates his testimony.

9        BY MR. HILL:

10           Q.    Go ahead.

11           A.    Yeah, the -- the opinion is -- is that if

12       the parking brake was engaged during the crash test,

13       that is inconsistent with the subject crash.

14           Q.    I'm going to move to strike as

15       unresponsive.

16           Let me ask it this way.  Please describe

17       for me all testing, calculations or simulations that

18       you have done in connection with your analysis of the

19       crash test.

20           A.    So, I've described my observations, my

21       opinions in the course of my report.  I provided you

22       my work product.  So, you're welcome to review that.

23       That's a very broad question.  I'm not going to try

24       and answer that, when we can go through both my

25       report and my work product.

Christopher D. Roche                                      July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 61

1          Q.    Is it fair to say that all testing,

2    calculations, simulations, and/or analysis that

3    you've done in connection with analyzing the crash

4    test are contained within your report?

5          A.    Uhm, certainly my -- my report contains my

6    opinions and findings of that analysis and my work

7    product and the file that you have contains any

8    associated and supported work.

9          Q.    Great.  Turning now to the sunroof.  Do

10   you know whether the Escape used in Mr. Buchner's

11   simulation had a sunroof?

12         A.    I, uhm -- I will defer you to Mr. Buchner

13   on that question.

14         Q.    Okay.  So you don't know, as we sit here

15   today, whether it did or not -- did not?

16         A.    I have not spent a great deal of time

17   understanding the simulation that Mr. Buchner was

18   performing.

19         Q.    Okay.  You mentioned before that the

20   height of the crash F-250 was higher than the height

21   of the test F-250.  We can agree on that, correct?

22         A.    That's right.  The height in the subject

23   crash was higher.

24         Q.    Have you done any work to determine the

25   impact of the F-250 height difference on the roof

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 62

1      crush experienced in the test Escape?

2           A.    I've made observations on the deformation

3      patterns of the crash test relative to the -- the

4      subject crash.  And I'm simply stating, because maybe

5      Mr. Grimes wasn't aware, that roof structures do

6      differ, maybe more than he understands, between

7      sunroof vehicles and none sun- -- and nonsunroof

8      vehicles.

9           Q.    Have you done any work to determine the

10     impact of the height of the F-250 in the test crash

11     on the extent of the roof crush experienced by the

12     test Escape?

13          A.    As compared, I think you can see it on

14     page 9 -- Image 9.  I looked at the change in roof

15     deformation between the crash test and the exemplar

16     Escape.

17          Q.    Okay.

18          A.    And you can see that there is -- sorry,

19     the crash test and the subject crash.  And you can

20     see that there's bulging in the roof in the crash

21     test.

22          Q.    And this is Image 9 of your report; is

23     that correct?

24          A.    That's -- that's right.

25          Q.    And that's what I've put on the screen?

Christopher D. Roche                           July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 63

1          A.      Correct.

2          Q.      And that is a comparison between the crash

3     test and an exemplar Escape roof comparison.

4     Under -- I don't understand that -- that description

5     of the image.  Can you explain that for me?

6          A.      Yeah, that's an overlay of the point cloud

7     data, I think, of all three vehicles in Exemplar A,

8     the subject crash and the crash test.  And the --

9     what you're seeing is the surface of the roof from

10    the crash test and the bulging of the roof pattern,

11    which is not exhibited on the subject crash.

12         Q.      And the exemplar Escape that you used, did

13    it have a sunroof or did it -- or not?

14         A.      Well, the -- the roof height and surface

15    doesn't change significantly between the sunroof and

16    nonsunroof.

17         Q.      Well, what was the purpose of adding a --

18    a third vehicle to this image, the exemplar Escape?

19    I don't understand.

20         A.      Simply, I compared an overlay of the scan

21    data and observed that the roof deformation on the

22    crash test was greater than in the subject crash.

23         Q.      And did you do any work to determine

24    whether the height of the F-250 in the test crash was

25    a factor in the difference between the roof crush in

Page 64

1    the subject crash and the roof crush in the test

2    crash?

3         A.    Uhm, I'm pointing out that roof structures

4    vary between sunroof and nonsunroof vehicles.  And so

5    if you're trying to replicate the subject crash, it

6    would be advisable to use a body structure that is

7    the same, which has a sunroof.  This crash test was

8    conducted with a nonsunroof body and we know that

9    sunroof structures are reinforced relative to

10   nonsunroof structures.

11        Q.    Did you do any work to determine the

12   impact of the difference in height between the test

13   F-250 and the subject F-250 on the roof crush

14   exhibited in the test Escape?

15        A.    Uhm, I'm pointing out that the roof

16   strength and stiffness in a nonsunroof body structure

17   is lower than with a sunroof body structure.  So it's

18   another example of the crash test not matching or

19   being inconsistent with the subject crash.

20        Q.    Move to strike as unresponsive.

21             I'll ask it again.  Did you do any work to

22   determine the impact of the difference in heights

23   between the subject F-250 and the crush -- crash

24   F-250 on the level of roof crush exhibited by the

25   test Escape?

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 65

1            MS. CANNELLA:  Object to the form of the

2      question.  Confusing and he's testified about this

3      already.

4            MR. HILL:  He hasn't answered the

5      question.  It's a yes or no question.  Have you done

6      any work in that regard?

7            MS. CANNELLA:  Same objections.

8            THE WITNESS:  I mean, I comment on the

9      level of roof deformation between the subject crash

10      and the crash test vehicle.

11      BY MR. HILL:

12      Q.    And have you determined the impact of the

13      height of the subject F-250, as compared to the test

14      crash F-250 with regard to your observations of the

15      difference in the roof crush between the test Escape

16      and the subject Escape?

17      A.    So, I've highlighted the -- the

18      differences in the deformation pattern of the crash

19      test Escape versus the subject Escape.  Again, we

20      know there's a difference in the body stiffness.  In

21      terms of how it would influence the results of the

22      crash test, I've not tried to isolate one of many

23      variables that were changed.

24      Q.    Great.  Have you done -- expanding on the

25      answer you just gave.  Have you done any work,

Christopher D. Roche                            July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 66

 1      whether it be testing, calculations, simulations,

 2      analysis, to isolate the variable of a sunroof versus

 3      not having a sunroof on the results of the crash

 4      test?

 5          A.    So, again, there's a -- an example here of

 6      the way the crash test was run that is inconsistent

 7      with the aims of the crash test as stated by the

 8      crash engineer.  And I've not attempted to understand

 9      any contribution that may have arisen from that

10      variable being changed.

11          Q.    Thank you.  Do you know whether the lack

12      of a sunroof in the test Escape increased the crush

13      experienced by the test Escape?

14          A.    I know from my experience that sunroof

15      body structures are both stiffer and stronger based

16      on prior vehicles I've worked on.  And so, therefore,

17      by testing a nonsunroof Escape, you have a slightly

18      softer structure, based on the geometry of the

19      sunroof reinforcement versus the baseline roof bows.

20          Q.    Have you quantified this difference?

21          A.    I'm simply pointing out that there is a

22      difference and it would add yet another variable to

23      the difference in the subject crash and the crash

24      test.

25          Q.    Have you quantified the difference?

Christopher D. Roche                              July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 67

```
 1              A.    I've identified that there is additional

 2        roof deformation in the crash test than the subject

 3        crash.  Beyond that, no.

 4              Q.    You say -- I'm sorry.  Did you say beyond

 5        that, no?  I couldn't hear your response, I'm sorry.

 6              A.    That's right.  I just -- the image you

 7        have on the screen, I'm showing -- I quantified that

 8        the roof bowed for the crash test, relative to the

 9        subject crash.

10              Q.    Okay.  And that's the extent of your work

11        or efforts with regard to determining whether the

12        lack of a sunroof increased the crush in the test?

13              A.    So my objective here was to identify

14        whether or not the crash test was run in a consistent

15        manner to the subject crash.  Here is another example

16        where that wasn't the case.

17              Q.    Right.  That's not my question.  I

18        understand that.  My question was, have you done

19        anything to quantify or explain your opinion that --

20        no, scratch that.  I'll go back to my original

21        question.

22                    Have you done anything to quantify whether

23        the lack of a suncruf -- sunroof increased the crush

24        in the test?

25              A.    I am simply providing the opinion that
```

Christopher D. Roche                                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 68

1        sunroof roof structures are stiffer and stronger than
2        nonsunroof roof structures.  And if you -- the
3        objective of the crash test was simply to isolate the
4        height difference, where everything else is being
5        matched as closely as possible, then why wasn't a
6        sunroof Escape used in the crash test?
7                    MR. HILL:  All right.  I think it's time
8        we need to take another break.  Let's go off the
9        record for about five to ten minutes.
10                   THE VIDEOGRAPHER:  Okay.  Off the record,
11       10:51.
12                   (Recess was taken from 10:51 a.m. to 11:16
13       a.m.)
14                   THE VIDEOGRAPHER:  Back on the record.
15       The time, 11:16.
16       BY MR. HILL:
17            Q.    Mr. Roche, do you know whether vehicle
18       manufacturers are required to run separate compliance
19       tests for rear impacts for the same model vehicle,
20       comma, one with a sunroof, comma, one without?
21            A.    No.  In my experience, compliance tests
22       are certainly performed for roof crush and also for
23       overall body stiffness.  Testing is conducted with
24       both, with and without sunroof.  As to 301, I -- I'm
25       not sure.

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 69

1          Q.    Are you aware of tests beyond 301 that
2     actually require the manufacturer to perform a test
3     both with and without a sunroof?
4          A.    I'm sorry.  Can you just ask that
5     question, again, please?
6          Q.    Sure.  I believe you said you're not sure
7     if 301 requires both tests, as I've described, right?
8          A.    Right.
9          Q.    And you made a general reference to
10    testing with and without.  And I'm saying, are you
11    aware of any other compliance test that's out there
12    that does require the manufacturer to test both a
13    sunroof model and a nonsunroof model?
14         A.    And the example I gave you was roof crush,
15    which is 216A.
16         Q.    216A; is that correct?
17         A.    That's right.
18         Q.    And it's your understanding that the
19    manufacturer must test both the sunroof and the
20    nonsunroof model to comply with 216A?
21         A.    Correct.  When I was writing compliance
22    reports for Jeep for roof crush performance, we would
23    always run both configurations and submit compliance
24    reports.  But I was -- I was not responsible for
25    compliance to 301, per se, because that's a -- that's

Christopher D. Roche                                July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 70

1      a vehicle test, not a body system test.

2               MS. CANNELLA:  Can I ask a question, if

3      you're done, Mr. Roche, just on the record?  Is there

4      anybody else attending the deposition by video or

5      phone or anything aside from you, Mr. Hill for

6      Defendants?

7               MR. HILL:  No.

8               MS. CANNELLA:  Okay.  Thank you.

9      BY MR. HILL:

10          Q.    While you were in the automotive industry,

11     you mentioned you were involved with compliance

12     testing.  Were you ever involved in any testing

13     outside of the compliance framework?

14          A.    Yeah, absolutely.

15          Q.    All right.  Can you just describe that for

16     me briefly, just so I understand it.

17          A.    Yes.  By compliance testing, I mean

18     specific to FMVSS.  But there's plenty of other

19     testing that is conducted for both crashworthiness

20     and other test requirements that is -- that is

21     considered noncompliance -- or it's not that it's

22     noncompliant, it's that it's not a compliance test.

23          Q.    Right.  And in all of those tests that you

24     performed that relate to vehicle performance, did you

25     comply with the procedures that related to compliance

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 71

testing?

1

2        A.    I'm -- so, I think I understood your

3    question correctly.  When -- the way compliance

4    testing works in the auto industry is certainly for

5    Federal Regulations.  It is a self-compliance system.

6    For European regulations, it is not.  But -- but as

7    part of self-compliance, you have to run the tests

8    according to the test procedure, in order to have a

9    valid compliance report.

10       Q.    Right.  And I -- I'm referencing

11   the -- what you called, I think, noncompliance

12   testing, the vehicle performance testing, testing

13   that would be done by automakers, not for compliance

14   purposes, but for performance purposes.  You said you

15   had experience with the noncompliance-type testing.

16   Did I understand that correctly?

17       A.    That's correct, yes.

18       Q.    And give me some example of the

19   noncompliance/vehicle performance related testing

20   that you were involved with.

21       A.    Yes, so better term is nonregulatory.  So

22   there's lots of tests that I was involved in that was

23   nonregulatory tests.  Meaning, that those are tests

24   you still wanted to satisfy for a variety of reasons.

25   An example related to crash would be NCAP, for

Christopher D. Roche                July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 72

1    example.  Although, NCAP is administered by NHTSA,

2    you don't have to satisfy any sort of star rating for

3    NCAP.  NCAP is a consumer information test.

4           So manufacturers -- some of the ones I

5    would work with -- would run tests to see if they

6    were meeting their objectives relative to

7    nonregulatory test modes.  So that when the

8    regulatory body tested their vehicle, they knew --

9    they would know what sort of performance they would

10   achieve.

11        Q.    Right.  And NCAP stands for New Car

12   Assessment Program?

13        A.    That's correct.

14        Q.    All right.  And are you saying it -- it

15   doesn't deal at all with the compliance with

16   regulatory standards?

17        A.    NCAP is -- is a testing that goes above

18   and beyond FMVSS.  So although the tests may look

19   similar, the tests aren't meant to be in some

20   instances identical.  But complying with 208 and your

21   NCAP star rating are two different things.

22        Q.    Right.  So 208 would be a 30-mile-per-hour

23   test, where like NCAP might be a 35-mile-per-hour

24   test?

25        A.    208 is a whole host of different tests --

Christopher D. Roche                                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 73

1          Q.    Right.

2          A.    -- it's not just one test.

3          Q.    Right.  But you would agree, I mean -- so,

4     NCAP might be performance testing that's not required

5     by regulation, but you would follow the procedure for

6     the FMVSS standard that related to that testing, is

7     that what you're saying?

8          A.    No.  I was just describing some

9     nonregulatory test modes from -- that I have been

10    involved with.

11         Q.    Okay.

12         A.    You know, so, uhm, maybe slightly easier

13    explanation, if you switch to IIHS, which is the same

14    thing.  IIHS conducts testing on vehicles.  And

15    that's entirely nonregulatory.  They -- they perform

16    tests and they inform the public about performance of

17    the vehicles, according to their tests.  And they

18    produce test protocols that are available to explain

19    to manufacturers who are interested, how they will

20    conduct their tests when they -- if they elect to buy

21    and test their vehicles.

22              So manufacturers typically will conduct

23    their own testing according to the IIHS test

24    standards.  And they will follow, obviously, the

25    protocol that IIHS would use.  And that way they can

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 74

1      get a good indication of whether -- how that vehicle

2      will perform to the IIHS test.  Same applies for

3      NCAP.

4           Q.   Do you know whether any IIHS procedures

5      for conducting their testing were not complied with

6      by Exponent and the tash cresh (sic) in this case?

7           A.   So, these crash tests that were conducted

8      was trying to replicate the subject crash.  And the

9      subject crash wasn't similar to any IIHS test that

10     I'm aware of.  And, therefore, there wouldn't be an

11     IIHS procedure that encompassed the entire test.

12          Q.   And is the same thing true for procedures

13     related to FMVSS testing?

14          A.   So, FMVSS, which is a compliance test,

15     there is a fuel system integrity test.  There is a

16     well-defined procedure on how to run a fuel system

17     integrity test.  Again, that test is different from

18     the subject crash.  But it is a good reference point

19     on how to conduct a high-speed, rear-impact test.

20          Q.   Are there any FMVSS required regulatory

21     tests that are similar to the subject crash?

22               MS. CANNELLA:  Object to the form of the

23     question.  Similar is a vague word.

24               MR. HILL:  He used the term "similar" in

25     his last answer.  So I'm using it in the way he used

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 75

1          it.

2                    MS. CANNELLA:  Just stating my objection.

3          BY MR. HILL:

4                    Q.    Go ahead.

5                    A.    So, the closest FMVSS is 301 to the

6          subject crash, but -- but I'm not suggesting it's

7          identical.

8                    Q.    Okay.  Were you ever involved in any --

9          and correct me if I use the wrong terms, I'm trying

10         to use what you stated -- nonregulatory

11         performance-related crash testing that involved

12         analysis of rear-impact collisions?

13                   A.    Uhm, so in addition to nonregulatory

14         tests, there are, uhm -- some manufacturers have --

15         do carry load -- load cases or test modes.  So these

16         are -- these are tests that are not required by any

17         government agency and are not going to be used for

18         informing the public, but the manufacturer has

19         established that their own internal requirements

20         require them to do additional testing.  And so I have

21         been involved in rear impact load cases and tests,

22         which are not compliance for nonregulatory tests,

23         yes.

24                   Q.    And you say rear impact load cases, is

25         that -- load test.  Was that the term you used?

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 76

1          A.     Yeah, load cases, crash tests.

2          Q.     All right.  And in any of those load cases

3     or crash tests involving rear impact, were any of

4     those performed without Stoddard solvent in the gas

5     tank?

6          A.     Yeah, off the top of my head I -- I can't

7     answer that.  This is some time ago.  You know, I'd

8     refer you to my earlier answer, which is -- you know,

9     even in -- even in due care load cases, you're still

10    trying to relate either back to prior incidents that

11    the manufacturers' learned from or some sort of

12    established test procedure.

13               You know, it's very infrequent that

14    vehicles are impacted with an empty fuel tank.  So

15    fuel is usually -- and fuel leakage is -- is a big

16    concern.  And so representing a fuel substitute that

17    allows you to monitor the potential for fuel leakage

18    is -- is very typical in my experience.

19         Q.     Fuel leakage was not an issue in the

20    subject crash, correct?

21         A.     Uhm, yes.  I don't remember that being

22    noted on the police report or any of the scene

23    images.

24         Q.     And I believe your answer to the last

25    question was that you're not -- you can't recall, as

Christopher D. Roche                          July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 77

1        you sit here today, whether any of the testing you

2        just described that you were involved with involved a

3        test that did not include Stoddard solvent; is that

4        correct?

5            A.    Yeah.  I can't remember the detail of any

6        fuel care --

7            Q.    Okay.

8            A.    -- test I've been involved with.  But what

9        I did state very clearly was that typically,

10       especially rear impacts, fuel system leakage is a

11       concern.  And oftentimes that was a focus of any

12       testing that was conducted.  Therefore, the fuel was

13       represented, so that could be checked.

14           Q.    Sure.  I'm going to attempt to share --

15       whoops.  All right.  Can you see my shared screen?

16           A.    Yes, I can.

17               MR. HILL:  All right.  This comes from the

18       material that you presented -- or produced to us or

19       that Ms. Cannella produced to us.  And I believe it's

20       just entitled PowerPoint presentation.  But it's

21       labeled as Bryson 9643 through 9646.  And I'd like to

22       mark this as whatever our next exhibit is.

23               (Defendant's Exhibit No. 3 was marked for

24       identification.)

25       BY MR. HILL:

Case 2:22-cv-00017-RWS    Document 182-12    Filed 03/17/25    Page 79 of 131
Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 78

1          Q.    Is this a PowerPoint presentation from

2     your files in this case?

3          A.    Yeah, I think the name of the document is

4     Scan Comparison.

5          Q.    All right.  Sorry if I -- it did -- I just

6     was reading from the top, and I guess it didn't show

7     it.  Sorry.

8               All right.  So, the first page of this we

9     have the subject and an exemplar placed over each

10    other from a number of different angles.  And I

11    assume the purpose of this is just to show that the

12    subject wheelbase did not change after the subject

13    accident; is that fair?

14         A.    That's -- that's right.  That was the

15    point of that image showing the -- obviously, the

16    subject vehicle was on a hoist.  So you -- you've got

17    a slight difference in the wheel positions there.

18    And the alignment is based on the body, the undamaged

19    body.

20         Q.    Sure.  And we've already talked about the

21    next page, where you have the roof panel bowing

22    figure or image that was in your report.

23         A.    Yes.

24         Q.    Is that the same image?  Am I correct

25    about that?

Christopher D. Roche                                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 79

1         A.    Right.

2         Q.    And then you also have a exemplar

3    wheelbase compared to the crash test wheelbase

4    showing a 5-inch reduction in the wheelbase?

5         A.    Yes, about five inches.

6         Q.    Okay.  Yeah, I'm sorry, about.

7              All right.  And then if we go ahead to

8    what's labeled as Bryson 9646.  This doesn't really

9    have much of an explanation.  I think I understand

10   what it means.  But could you explain what these two

11   images represent?

12        A.    Yes.  So this -- this image is actually in

13   my report.  It's Image 7.

14        Q.    Right.

15        A.    So, it's entitled "Static Seat Angle

16   Comparison."  So here on the left, you've got the

17   point cloud from the crash test overlaid with the

18   subject.  Sorry, the crash test overlaid with the

19   exemplar Escape data.  On the right you have the

20   subject Escape overlaid with the exemplar.  And I'm

21   simply trying to compare the amount of seat back

22   deformation.

23        Q.    And this is the static deformation from

24   after both crashes; is --

25        A.    That's right, it's --

Case 2:22-cv-00017-RWS    Document 182-12    Filed 03/17/25    Page 81 of 131
Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 80

1          Q.    -- that correct?

2          A.    These scans were taken post-crash, so it's

3     the static deformation, that's correct.

4          Q.    Right.  And you're saying that the crash

5     test deformation is the image on the left?

6          A.    That's correct, yes.

7          Q.    And it shows a 65-degree angle there.

8     What is that ang- -- what does that 65 degrees

9     represent?

10         A.    That is the seat back relative to

11    horizontal plane.

12         Q.    All right.  And is that to represent where

13    the seat back was moved during the test crash?

14         A.    No.  So, it shows that the seat back angle

15    is largely unchanged between the crash test seat and

16    the exemplar seat.  So the exemplar seat, as you can

17    see, is almost parallel.  Seat back angle is almost

18    parallel to the dotted line, which is the crash test

19    seat back angle.

20         Q.    Gotcha.  And then the figure on the right

21    is showing the static position of the subject Escape

22    seat, correct?

23         A.    That's correct, yeah.

24         Q.    Okay.

25         A.    You can see that that angle now is more

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 81

1    than 90 degrees to the horizontal, as shown in the --

2    in the crash vehicle.

3         Q.    Great.  Would you agree that the rear seat

4    back was deformed in the crash test?

5         A.    Uhm, so I think I'm saying that there was

6    some translation of the seat back and the seat in the

7    crash test.

8         Q.    And how is translation different from

9    deformed?

10        A.    So, the seat appears to have moved

11   relative to the original position in the X direction,

12   as opposed to the seat back being displaced in a way

13   that would effect the occupant kinematics.

14        Q.    Do you know how far the seat was displaced

15   in the X direction?

16        A.    No, I -- I didn't measure that.  But, I

17   mean, you can get a sense from that -- that image.

18        Q.    All right.  And are you saying that in the

19   Y direction the seat back did not move at all from

20   its original position?

21        A.    No, I'm not saying that.  You can see from

22   some of the pictures of the seat -- I think we have a

23   picture on page -- on page 6, which is Image 5.  You

24   can see the -- the seats appear to have -- so the

25   60/30 split has separated slightly and so there's a

Christopher D. Roche                          July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 82

1       little bit of rotation around the X's axis.  But in

2       terms of the forward displacement of the seat back,

3       it's certainly significantly less than the subject

4       vehicle.

5               Q.    But there was some forward seat

6       displacement of the rear back in the crash test?

7               A.    As -- as -- along with the seat base, yes,

8       this -- as is shown in that image that you have on

9       the screen.

10              Q.    Okay.  So you would agree that something

11      impacted the rear of the second row seat in the crash

12      test and displaced it both in the X and the Y axis?

13              A.    No, that's not what I'm saying.  I'm

14      saying --

15              Q.    Okay.

16              A.    -- that the underbody was loaded, the

17      underbody is deformed, as I -- as you mentioned

18      earlier.  The wheelbase was actually reduced.  And so

19      you've got some translation of -- of the seat and the

20      structure, which the seat is mounted to.  And that's

21      depicted in that image.

22              Q.    So is it your opinion that all of the

23      movement of the second row seat was due to the floor

24      displacement?  Am I understanding that correctly?

25              A.    I'm saying that, uhm, that level of

Christopher D. Roche                          July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 83

1       intrusion analysis, I haven't conducted that.  I'm --

2       I am showing you that the relative position of the

3       seat between the crash test and the subject crash --

4       I'm highlighting the seat back angle between the two.

5       And I'm stating that the entire seat was translated

6       in the -- in the crash test.  And -- and

7       that's -- that's the degree of my observations.

8             Q.    Okay.  So just to be -- be clear, and I

9       don't mean to put words in your mouth.  I believe I

10      just heard you say that you haven't analyzed the full

11      extent of the cause of the translation of the rear

12      seat in the crash test, other than to say that you

13      observed that at least some of that translation was

14      due to the movement of the floor of the Escape in the

15      crash test, is that fair?

16            A.    Yeah, that's -- that's part of it.  I

17      mean, there was no analysis conducted as part of

18      Grimes' work.  He didn't really analyze seat motion

19      significantly, so I haven't been able to form any

20      opinions on his analysis.

21                  Obviously, if the seat back had been

22      loaded significantly, you would expect the seat back

23      angle to change.  And what I'm showing here is that

24      the seat back angle is largely unchanged between the

25      crash test post -- crash test Escape post-test to an

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 84

1          exemplar seat back.

2                Q.    And you haven't analyzed it, just like

3          Mr. Grimes haven't -- hasn't analyzed it, beyond what

4          you just described to me, is that fair?

5                A.    That's right.

6                      MS. CANNELLA:  Objection, asked --

7                      THE WITNESS:  This is his test.

8                      MS. CANNELLA:  -- and answered.

9          BY MR. HILL:

10               Q.    Okay.  Sure.  And you're not an expert in

11         biomechanics, correct?

12               A.    Yeah, I don't -- I don't offer any

13         biomechanical opinions here.

14               Q.    And you're not going to offer any opinions

15         in this case regarding the cause of Cohen

16         Bryant -- Cohen's injuries or death, correct?

17               A.    No.  I mean, the opinions I've offered

18         relate to occupant motion when a seat is rotated more

19         than 90 degrees.  That would tend to force the

20         occupant towards the back of the front seat.  And

21         that's the extent of my opinion.

22               Q.    Okay.  On page -- well, let's first cover

23         a general top- -- general term, "override."  How do

24         you define the term "override," in the context of --

25         of its application to this case?

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 85

1              MS. CANNELLA:  Objection.  How is this in

2        the scope of his report and supplemental report?

3              MR. HILL:  Because he talks in the

4        supplemental report that the crash test did not

5        involve an override situation.  It's one of his

6        opinions --

7              MS. CANNELLA:  Okay.

8              MR. HILL:  -- in the report.  It's

9        directly --

10             MS. CANNELLA:  I --

11             MR. HILL:  -- relevant to his opinion.

12             MS. CANNELLA:  I withdraw my objection.

13       BY MR. HILL:

14            Q.    Go ahead.

15            A.    Yes.  So in an override or underride case,

16       you have a lack of structural engagement between, in

17       this case, the frame rails of the truck and the

18       longitudinals of the SUV.

19                 So here in the crash test, we can see that

20       the underbody and the longitudinals were engaged,

21       were deformed, were crushed, which is in stark

22       contrast to the subject crash vehicle, where the

23       underbody longitudinals were largely left intact and

24       the floor and upper structure was peeled away from

25       it.

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 86

1          Q.    And just -- I think I understand it, but

2     just so the jury understands it.  What do you mean by

3     "longitudinals"?

4          A.    So, those are the energy-absorbing

5     structures in a -- in a unibody vehicle, a unitary

6     construction vehicle like a Ford Escape, when you

7     don't have a separate body and frame.  So the frame

8     rails effectively are integrated within the body

9     structure.  And so those -- there's various industry

10    terms, rails, longitudinals, essentially substitute

11    for the frame rails in a unibody vehicle.  The rear

12    bumper beam, the beam structure is attached in line

13    with those rails.  And that is the structure that is

14    designed and intended to absorb energy and dissipate

15    energy in a rear-impact event or conversely in the

16    front of the vehicle, front impact.

17         Q.    Right.  So -- just so I make sure I

18    understand, if the -- if there's any engagement

19    between the longitudinals and the bumper of the

20    F-250, that would not qualify as an override?

21         A.    You can have --

22         Q.    That --

23         A.    You can have partial overlap, partial

24    misalignment.  In this instance, there was good

25    engagement, there was good structural deformation of

Christopher D. Roche                          July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 87

1       the underbody, and that's what I'm using to form the

2       basis that there was compatibility and no override in

3       this crash.

4            Q.    Okay.  In the subject crash, was there

5       impact between the Cs (ph) brackets and the bumper

6       beam of the -- of the Escape?

7            A.    So, I've got a comparison image on --

8       which is Image No. 2, where I compared the rearview

9       of both Escapes, crash test on the left, subject

10      crash vehicle on the right.  And in terms of

11      override, that's really what I'm talking about.

12                 On the left you can see the underbody has

13      been deformed and displaced forward in vehicle.  On

14      the right, the underbody is largely exposed and the

15      upperbody is being pushed forward relative to the

16      underbody.

17           Q.    My question was, was -- was there contact

18      between the F-250 Cs (ph) bracket in the subject

19      crash and the bumper beam of the Escape in the

20      subject crash?

21           A.    Yes, I think that question is going to be

22      beyond the scope of this report.  This -- I can

23      happily talk to you about my opinions related to the

24      Cs (ph) brackets on the crash test.  I certainly

25      reviewed those.  And I'm prepared today to discuss my

Christopher D. Roche                           July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 88

1          opinions on -- on the Cs (ph) brackets in the crash

2          test.

3                    Q.    Well, I'm trying to understand your

4          definition of override.  And there's a description of

5          override that you just gave that I'm trying to see if

6          that applies to the subject crash or not.

7                         So the question is, if there's Cs (ph)

8          impact to the bumper beam in the subject crash, why

9          do you still consider that to be an override

10         condition, as opposed to the crash test, which you've

11         opined is not an override condition?  That's what --

12                        MS. CANNELLA:  Objection to --

13                        MR. HILL:  -- that's how it's relevant to

14         your subject opinions.

15                        MS. CANNELLA:  I'll object to that

16         question as to how it relates to subject crash, but

17         not as to it relates to the crash test.

18         BY MR. HILL:

19                   Q.    Go ahead.

20                   A.    Yeah, so when you describe an override,

21         you're -- you're talking about many aspects and not

22         necessarily the behavior of one single part of the

23         structural engagement.  So rather than the

24         effectiveness of the Cs (ph) bracket, it's effect on

25         the subject crash, I'm making an override opinion

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 89

1      based on the fact that the large part of the front of

2      the F-250 was able to move relative to the underbody

3      without engaging it significantly, without causing it

4      to crush and collapse in a way that it was designed

5      to.

6               So in that right image there, if there had

7      been compatibility, if there had been no override, we

8      wouldn't see those exposed longitudinals hanging

9      rearward of the vehicle with the upper structure

10     stripped off of it.

11        Q.    I understand.  Based upon your answer

12     there, do you believe that in the crash test the

13     longitudinals operated as designed in the test

14     Escape?

15        A.    No.  I'm offering the opinion that the

16     longitudinals and underbody structure was involved in

17     a crash event, was deformed, and absorbed energy and

18     dissipated the energy.

19               Relative to design -- Ford's design

20     intent, I can't opine on that.  But I can tell you

21     that those structures played a -- a role in the crash

22     test that didn't in the subject crash.

23        Q.    Understood.  You give the opinion on page

24     12 that the Exponent crashed (sic) test intrusion

25     increase is likely due to the test setup.  Can you

Christopher D. Roche                        July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 90

1    say, with a reasonable degree of scientific

2    certainty, that the Exponent crash test -- crash test

3    intrusion increase was due to the test setup?

4        A.    Well, on page 12 what I say is, if the

5    crash test intrusions were higher -- because I'm

6    simply responding to what Mr. Grimes' claims, that

7    the intrusions were higher in the crash test.  I'm

8    simply responding.  I didn't do an intrusion

9    analysis.  I don't have intrusion values or a

10   comparison of the intrusion values.  Mr. Grimes came

11   up with an opinion on that, which I think I discuss

12   somewhere else in the report.

13            But my comment there is related to the

14   fact that if they were higher, it would be unusual

15   because you have good underbody structural

16   engagement.  And based on my experience, based on the

17   research, based on the available testing out there

18   for compatibility, when you have greater

19   compatibility, you have less intrusion, not more.

20       Q.    Move to strike as unresponsive.  I'll ask

21   it again.

22            Can you say, with a reasonable degree of

23   scientific certainty, that the Exponent crash test

24   intrusion increase was due to the test setup?  Yes or

25   no?

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 91

1          MS. CANNELLA:  Asked and answered.

2          THE WITNESS:  I'm not -- I'm not opining

3     on whether the intrusions were increased or not.  I'm

4     responding to Mr. Grimes' statement that he thinks

5     they were.

6     BY MR. HILL:

7          Q.    Okay.

8          A.    And I'm also saying that there are so many

9     differences, so many variables have been changed

10    between the crash test and subject crash that drawing

11    any conclusion about the level of intrusions is -- is

12    impossible, because too many variables to -- have

13    been -- been modified, which is against the stated

14    intent of GSI 34 (ph), which is the right height

15    change.

16         Q.    So for that very same reason, it's

17    impossible for you to opine as to whether the test

18    setup led to the test intrusion increase, correct?

19         MS. CANNELLA:  Object to the form.

20         THE WITNESS:  I'm saying that there were

21    many inconsistencies in the -- in the crash test

22    relative to the subject crash.  And it was conducted

23    in an improper manner, if you're trying to follow

24    scientific process to isolate the contribution of

25    just right height difference.

Page 92

1      BY MR. HILL:

2            Q.    Have you told me, during this deposition,

3      the -- a -- a full list -- well, scratch that.

4      Scratch that.

5                  MR. HILL:  Let's take a -- like a

6      two-minute break.

7                  MS. CANNELLA:  How much longer do you

8      have?  Because we only have ten minutes left.

9                  MR. HILL:  Yeah, I won't need more than

10     two minutes.

11                 MS. CANNELLA:  Okay.  Great.

12                 THE VIDEOGRAPHER:  Off the record at

13     11:50.

14                 (Recess was taken from 11:50 a.m. to 11:57

15     a.m.)

16                 THE VIDEOGRAPHER:  Back on the record.

17     The time, 11:57.

18     BY MR. HILL:

19           Q.    Mr. Roche, are there any opinions that we

20     did not discuss today and that are not listed in your

21     report that you intend to give with regard to the

22     crash testing conducted by Exponent?

23           A.    Well, some of the opinions that are in the

24     report we haven't discussed.

25           Q.    And that's why I -- why I asked it the way

Christopher D. Roche                                July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 93

1      I asked it.  So we have what we discussed, and then

2      we have the opinions in the report.  Are there any

3      opinions beyond those two topics that you intend to

4      give with regard to the Exponent crash testing?

5             A.    No, they are captured in this report.

6             Q.    All right.  And the basis for those

7      opinions, all testing, simulations, calculations,

8      analysis, work, scientific methodology, all of that

9      that goes to support the opinions you intend to give

10     regarding the crash test have either been discussed

11     today in the deposition or are contained in your

12     report; is that correct?

13            A.    That's correct.

14            MR. HILL:  Okay.  I have no further

15     questions.  Thank you, Mr. Roche.

16            MS. CANNELLA:  (Indicating.)  I don't have

17     any questions either.

18            THE VIDEOGRAPHER:  Okay.  Off the record

19     11:58.

20            (The witness, after having been advised of

21     his right to read and sign the transcript, does not

22     waive that right.)

23            (Deposition was concluded at 11:58 a.m.)

24

25

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 94

CERTIFICATE OF REPORTER

1

2          I, MARY K. STEPP, Notary Public for the State of

3     South Carolina at Large, do hereby certify that the

4     foregoing transcript is a true, accurate, and

5     complete record.

6          I further certify that I am neither related to

7     nor counsel for any party to the cause pending or

8     interested in the events thereof.

9          Witness my hand, I have hereunto affixed my

10    official seal this 1st day of August, 2024, at

11    Campobello, Spartanburg County, South Carolina.

12

13

14

15

16

17

18

19

                    Mary K. Stepp, Notary Public

20                  My Commission Expires:

                    March 1, 2028

21

22

23

24

25

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 95

1                    I N D E X

2                                    Page      Line

3        Examination

4            By Mr. Hill                   3        20

5        Certificate of Reporter          94         2

6

7                REQUESTED INFORMATION

8            (No information requested.)

9

10                 E X H I B I T S

11       Defendant's Marked for Identification

12       Exhibit 1  6-14-24 Report        4         6

         Exhibit 2   Material Rec'd/Amended

13               List                     4        16

         Exhibit 3  Scan Comparison      77        23

14

15

16

17

18

19

20

21

22

23

24

25

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 96

1    Tedra L. Cannella

2    tedra@cannellasnyder.com

3                      August 2, 2024

4    RE: Bryson, Santana And Joshua v. Rough Country, LLC

5        7/17/2024, Christopher D. Roche (#6801963)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-southeast@veritext.com.

16       Return completed errata within 30 days from

17   receipt of testimony.

18       If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22               Yours,

23               Veritext Legal Solutions

24

25

Christopher D. Roche                           July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 97

1    Bryson, Santana And Joshua v. Rough Country, LLC

2    Christopher D. Roche (#6801963)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Christopher D. Roche                    Date

25

Christopher D. Roche                                  July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

                                                        Page 98

1    Bryson, Santana And Joshua v. Rough Country, LLC

2    Christopher D. Roche (#6801963)

3                  ACKNOWLEDGEMENT OF DEPONENT

4        I, Christopher D. Roche, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Christopher D. Roche                Date

13   *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20___.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

Christopher D. Roche                                July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[& - accounted]**                                           Page 1

| & | | | |
|---|---|---|---|

**&** 2:11

**0**

**017** 1:7

**1**

**1** 3:3 4:4,6 94:20 95:12
**10.8** 30:16 32:25 34:14,14 41:10 42:14 43:2,5,14 44:7 54:1,2
**10.8.** 44:12
**10519** 7:11
**10995** 5:2 6:21 9:15
**10:06** 40:25 41:1
**10:13** 41:2,4
**10:51** 68:11,12
**11** 45:18
**11:50** 92:13,14
**11:58** 93:19,23
**12** 41:11 42:15 89:24 90:4
**12th** 10:12,13
**14th** 4:1 6:1,7,8 6:11,13,16,18 6:25 7:21 8:6 8:11 9:7,12 22:22
**15th** 10:12
**16** 95:13

**17** 1:12
**17th** 3:2
**1st** 94:10

**2**

**2** 4:14,16 6:21 7:24 31:20,22 35:13 36:14,22 87:8 95:5,12 96:3
**20** 95:4 98:15
**2007** 22:24
**2024** 1:12 3:2 4:1 94:10 96:3
**2028** 94:20
**208** 72:20,22,25
**216a** 69:15,16 69:20
**21890** 94:19
**23** 95:13
**2400** 2:13
**250** 36:11,18,23 37:3 52:12 56:3 61:20,21 61:25 62:10 63:24 64:13,13 64:23,24 65:13 65:14 86:20 87:18 89:2
**2:22** 1:7

**3**

**3** 29:18 77:23 95:4,13
**30** 72:22 96:16

**30030** 2:6
**301** 16:3,5,12 17:3,5 68:24 69:1,7,25 75:5
**30326** 2:13
**315** 2:5
**3344** 2:12
**34** 54:8 91:14
**35** 72:23
**36** 53:24

**4**

**4** 95:12,13

**5**

**5** 79:4 81:23

**6**

**6** 81:23 95:12
**6-14-24** 95:12
**60/30** 81:25
**65** 80:7,8
**6801963** 96:5 97:2 98:2

**7**

**7** 79:13
**7/17/2024** 96:5
**77** 95:13

**8**

**83** 27:15
**885** 2:6

**9**

**9** 62:14,14,22
**90** 81:1 84:19
**9379** 4:5

**9398** 4:5
**94** 95:5
**9409** 7:3
**9527** 7:4
**9643** 77:21
**9646** 77:21 79:8
**9:14** 1:13 3:3

**a**

**a.m.** 1:13 3:3 41:1,2 68:12 68:13 92:14,15 93:23
**ab** 26:2
**ability** 52:23
**able** 3:24 4:22 4:24 13:22 26:2 45:6 47:20 48:6 53:8,12 54:19 83:19 89:2
**above** 32:18 72:17 96:6 98:7
**absolutely** 47:8 70:14
**absorb** 86:14
**absorbed** 89:17
**absorbing** 86:4
**acceptable** 54:11
**accident** 78:13
**accounted** 19:12 34:11

Case 2:22-cv-00017-RWS    Document 182-12    Filed 03/17/25    Page 101 of 131
Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[accounting - appearances]**                                        Page 2

**accounting**
26:20 45:24
**accuracy** 52:15
59:12 96:9
**accurate** 94:4
**accurately** 8:7
50:15 52:6
**achieve** 30:16
35:7,8,10 54:7
72:10
**achieved** 18:13
34:15
**acknowledge...**
98:3
**acknowledg...**
96:12
**act** 20:14
**actual** 11:4
13:8 15:2
26:19 32:15
44:8 52:17
**actually** 13:2
13:10,14,18
14:4 22:22
50:16 69:2
79:12 82:18
**add** 9:14 51:4
55:14 66:22
**adding** 5:25
51:25 63:17
**addition** 6:9
75:13
**additional** 8:10
8:18 30:9,15
48:21 49:23

50:24 51:3,24
53:23 57:16
67:1 75:20
**additions** 98:6
**address** 47:9
**administered**
72:1
**admnistrators**
1:3
**advanced**
11:22
**advisable** 64:6
**advised** 93:20
**affect** 52:17
57:10,16
**affixed** 94:9
**agencies** 53:12
**agency** 75:17
**ago** 5:14 76:7
**agree** 6:12 17:8
17:9,11 18:17
19:22 26:17
29:2 33:1
59:21 61:21
73:3 81:3
82:10
**agreed** 8:8
**ahead** 12:12
15:9 20:25
21:21 23:7,20
23:24 24:14,19
25:12 27:2
29:9 37:22
39:5 40:16
42:25 44:15

47:10 57:9
58:9 60:4,10
75:4 79:7
85:14 88:19
**aim** 28:3 34:12
**aims** 66:7
**align** 52:11
**alignment**
23:12 35:21
38:9,10,12
78:18
**allotted** 96:19
**allow** 14:25
54:11
**allowed** 46:25
47:1,5,8 56:3
**allows** 47:6
76:17
**amended** 4:22
5:2,5 6:3 7:5
14:8 95:12
**amount** 21:24
48:25 79:21
**analysis** 34:7
34:19 37:14
39:24 40:5
53:22 59:6,23
60:2,18 61:2,6
66:2 75:12
83:1,17,20
90:9 93:8
**analyze** 83:18
**analyzed** 12:2
33:3 83:10
84:2,3

**analyzing**
39:22 61:3
**ang** 80:8
**angle** 79:15
80:7,14,17,19
80:25 83:4,23
83:24
**angles** 78:10
**ann** 1:14
**answer** 15:9
18:23 21:21
25:12 26:2
45:8 46:22,23
47:18,23 52:24
53:3 56:10
58:2 59:9,21
60:24 65:25
74:25 76:7,8
76:24 89:11
**answered**
37:20 40:14
44:13 49:18
51:2 57:6 65:4
84:8 91:1
**anybody** 70:4
**apologize** 28:21
33:15 41:19
**apparent** 35:6
**apparently**
49:11
**appear** 81:24
**appearance** 2:3
2:10
**appearances**
2:1

Christopher D. Roche                                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[appears - basic]**                                          Page 3

**appears** 81:10
**appended** 98:7
**applicable**
  53:21 96:8
**application**
  21:13 84:25
**applied** 19:6
  38:15 55:15
  57:2
**applies** 20:14
  74:2 88:6
**apply** 16:13
**applying** 29:19
**approach** 33:5
  51:20
**appropriate**
  29:4,5 54:4
**appropriate's**
  29:7
**arbor** 1:14
**area** 27:16 31:3
  31:23 36:14,19
  36:21 37:1,2
  43:8 45:21
**areas** 44:21
**arisen** 66:9
**aside** 70:5
**asked** 13:25
  37:19 40:14
  44:13 46:7
  49:17 51:2
  84:6 91:1
  92:25 93:1
**asking** 11:8
  12:17 23:18

24:18 45:6
47:16,19 55:21
56:19
**aspects** 17:19
  88:21
**assertion** 18:24
**asserts** 34:14
**assess** 21:6
**assessed** 18:2
**assessment**
  72:12
**associated** 61:8
**assume** 7:2
  78:11
**assuming** 8:22
  18:15 35:24
**atd** 50:23
**atlanta** 2:13
**attached** 86:12
  96:11
**attempt** 3:23
  77:14
**attempted** 28:8
  34:25 66:8
**attempting**
  18:12 23:12
  25:15,20 35:6
**attending** 70:4
**attorney** 2:2,9
  96:13
**august** 94:10
  96:3
**authored** 6:5
**authoring** 9:22

**auto** 71:4
**automakers**
  71:13
**automotive**
  70:10
**available** 5:8
  6:3,8,14 9:12
  9:16,22,24
  10:6 22:1
  23:14 30:21
  35:19,20 48:22
  51:22 73:18
  90:17 96:6
**availables** 5:7
**avenue** 2:5
**aware** 9:21
  14:9,18,24
  20:7 25:25
  27:8 35:2 53:7
  53:10 62:5
  69:1,11 74:10
**awful** 14:17
**ax** 29:13
**axis** 82:1,12
**axle** 26:16 27:4
  29:2,11,14
  57:3

**b**

**b** 6:11,16 9:8
  95:10
**back** 11:24
  20:19,20 22:18
  40:24 41:3,7
  42:2 67:20
  68:14 76:10

79:21 80:10,13
80:14,17,19
81:4,6,12,19
82:2,6 83:4,21
83:22,24 84:1
84:20 92:16
**backed** 46:9
**ballast** 15:1
  18:14 26:18
  27:15 29:20
  50:15,21
**ballasted** 14:11
  14:22 28:2
  50:3
**ballasting**
  15:21,22,24
  16:14 17:13
  18:7 20:14
  26:6 27:4,8,11
  28:6,11,23
  29:21,23,25
  50:10,19 51:1
  51:25
**base** 32:17 82:7
**based** 26:7
  30:22 31:5
  44:2,19 45:2
  46:6,13 48:22
  49:8 53:22
  66:15,18 78:18
  89:1,11 90:16
  90:16,17
**baseline** 66:19
**basic** 49:6,6

Christopher D. Roche                              July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[basis - capture]**                                        Page 4

**basis**  35:23
  37:8,9 47:21
  87:2 93:6
**bates**  5:2
**beam**  86:12,12
  87:6,19 88:8
**beginning**  3:3
**behalf**  14:3
**behavior**  88:22
**believe**  6:19,22
  7:19 15:6
  29:11 30:8
  36:21 54:22
  56:15 59:9
  69:6 76:24
  77:19 83:9
  89:12
**better**  71:21
**beyond**  52:23
  58:15 67:3,4
  69:1 72:18
  84:3 87:22
  93:3
**big**  76:15
**biomechanical**
  84:13
**biomechanics**
  84:11
**bit**  82:1
**body**  64:6,8,16
  64:17 65:20
  66:15 68:23
  70:1 72:8
  78:18,19 86:7
  86:8

**bottom**  5:19
**bowed**  67:8
**bowing**  78:21
**bows**  66:19
**bracket**  87:18
  88:24
**brackets**  87:5
  87:24 88:1
**brake**  54:17,18
  54:22 55:5,9
  55:13,24 56:11
  56:15,21 57:4
  57:20 58:5
  59:24 60:12
**braking**  55:15
  57:2,3,16,18,18
**break**  40:21
  68:8 92:6
**briefly**  70:16
**broached**  46:2
**broad**  21:1
  60:23
**brought**  4:9
**brown**  2:17 3:6
**bryant**  7:6
  84:16
**bryson**  1:3,3
  3:5,12 4:1,5
  5:2 6:20 7:3,11
  77:21 79:8
  96:4 97:1 98:1
**bryson's**  50:12
  50:13
**buchner**  5:14
  5:15,15 6:3 7:5

7:5 14:8,25
  15:12 19:11
  34:4,18 41:14
  42:15 61:12,17
**buchner's**  7:1,7
  7:14 10:9
  14:13 34:2
  42:23 61:10
**bucknel**  7:1
**bulging**  62:20
  63:10
**bulk**  6:23
**bumper**  86:12
  86:19 87:5,19
  88:8
**buy**  73:20
**byte**  24:21

**c**

**c.z.b**  1:4
**c.z.b.**  1:4
**calculated**  26:6
  41:10
**calculations**
  28:15,17 58:19
  59:6,22 60:17
  61:2 66:1 93:7
**called**  71:11
**calling**  19:20
**calls**  21:17
**camera**  42:7
**camping**  51:16
**campobello**
  94:11
**canne**  9:25

**cannella**  2:4,4
  3:11,11 5:11
  5:20 8:17 9:1,4
  9:25 15:3,5
  18:20 19:14
  20:16,22 21:17
  22:12,16 23:4
  23:17,21 24:10
  24:17,20,24
  25:3,6 26:22
  29:6 34:24
  37:19 39:2,15
  39:17,20 40:14
  40:22 41:13,15
  41:20,22,25
  42:3,6,10,17,19
  42:22 44:9
  45:4 46:15,24
  47:5,11 49:17
  50:5 51:2 58:6
  60:1,5,7,8 65:1
  65:7 70:2,8
  74:22 75:2
  77:19 84:6,8
  85:1,7,10,12
  88:12,15 91:1
  91:19 92:7,11
  93:16 96:1
**cannella's**  7:25
**cannellasnyd...**
  2:7,7 96:2
**capacity**  10:23
  17:16
**capture**  8:24

Christopher D. Roche                              July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[captured - compatibility]**                                    Page 5

**captured** 8:20
8:23 93:5
**car** 50:14 72:11
**care** 76:9 77:6
**career** 10:15
**cargo** 27:19
45:20,21 46:9
51:11,13,18
**carolina** 94:3
94:11
**carry** 75:15
**case** 1:7 11:13
11:19,21,23
12:5,5,6,10,21
12:22 13:1,3,5
13:15,16,21
14:4,11 15:2
15:11 26:25
28:1 29:1 34:2
34:23 35:1
53:21 55:16
67:16 74:6
78:2 84:15,25
85:15,17
**cases** 11:15
12:1 13:9
75:15,21,24
76:1,2,9
**cause** 83:11
84:15 94:7
**causing** 89:3
**center** 27:16
29:20 49:9
**certain** 17:23
24:1

**certainly** 56:24
58:15 61:5
68:22 71:4
82:3 87:24
**certainty** 90:2
90:23
**certificate** 94:1
95:5
**certify** 16:19
94:3,6
**chairs** 51:16
**chance** 14:7
**change** 52:8
57:11,14 58:3
62:14 63:15
78:12 83:23
91:15 97:4,7
97:10,13,16,19
**changed** 43:23
45:10 48:5,22
57:20 59:20
65:23 66:10
91:9
**changes** 52:20
96:10 98:6
**charlie** 54:20
**check** 41:16
**checked** 77:13
**chris** 15:5
**christopher**
1:11 3:4,18
96:5 97:2,24
98:2,4,12
**circle** 36:15,19
36:22

**circled** 36:14
37:1
**circular** 31:23
**cited** 22:10,17
25:1
**citing** 23:25
**claim** 16:13
17:19
**claims** 90:6
**clarifying**
47:17
**clear** 8:8 24:22
24:23,24 36:24
37:16 42:21
43:4 83:8
**clearly** 34:6
51:15 77:9
**client** 14:2
**closely** 49:24
51:9,21 68:5
**closest** 75:5
**cloud** 33:10,17
63:6 79:17
**clouds** 33:12
**cohen** 50:13
84:15
**cohen's** 84:16
**collapse** 89:4
**collisions** 75:12
**color** 48:9,12
48:15
**com** 33:10
**combination**
35:18

**combine** 9:9
**combined**
37:14
**comes** 30:25
77:17
**comma** 68:20
68:20
**comment** 65:8
90:13
**commenting**
16:9,11
**commission**
94:20
**commonality**
24:4
**compare** 79:21
**compared**
17:18 30:17
33:10,16 35:4
59:13 62:13
63:20 65:13
79:3 87:8
**comparing**
31:24 39:24
**comparison**
18:2 63:2,3
78:4 79:16
87:7 90:10
95:13
**compat** 22:24
**compatibility**
22:24 23:8,11
24:2 87:2 89:7
90:18,19

Christopher D. Roche                                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[complete - correspondence]**                                Page 6

| complete 94:5 | conclusion | confirmed 10:9 | 15:25 16:15 |
|---|---|---|---|
| 98:8 | 21:18 37:13 | conform 25:17 | 21:15 84:24 |
| **completed** | 44:1 46:8,11 | 28:2 | **contra** 45:14 |
| 96:16 | 91:11 | **confused** 34:17 | **contrast** 85:22 |

complete  94:5
98:8
completed
96:16
compliance
17:7 21:14
68:18,21 69:11
69:21,23,25
70:11,13,17,22
70:25 71:3,5,7
71:9,13 72:15
74:14 75:22
complied  23:2
23:15 74:5
comply  24:8
69:20 70:25
complying
72:20
compound  23:4
compounding
24:13
concentrated
38:13
concern  76:16
77:11
concerns  14:21
conclude  30:11
33:17 46:17,19
48:12
concluded
93:23
concludes  30:8
concluding
35:15

conclusion
21:18 37:13
44:1 46:8,11
91:11
conclusions
43:18 45:1,2
45:12,15,17
46:5,6,7,12
47:12,13,17,19
47:20 49:20
59:13
condition  17:22
18:25 20:15
88:10,11
conduct  73:20
73:22 74:19
conducted  11:9
11:11,13,16
19:2 21:23
23:9 25:15
28:13,25 44:19
53:11 64:8
68:23 70:19
74:7 77:12
83:1,17 91:22
92:22
conducting
12:25 54:9
74:5
conducts  73:14
confidential
12:19
configurations
69:23

confirmed  10:9
conform  25:17
28:2
confused  34:17
confusing
18:21 20:23
34:23 45:5
65:2
connection  6:1
10:16,25 11:5
60:18 61:3
consider  54:3
88:9
considered
21:9 59:18
70:21
consistent
25:24 28:3
29:19 36:20
54:12 67:14
construction
86:6
consultant
10:16,21
consulting  11:1
12:21
consumer  72:3
contact  31:2
32:1 36:20
43:8 87:17
contained  61:4
93:11
contains  61:5,7
context  10:23
12:18 13:6,19

15:25 16:15
21:15 84:24
contra  45:14
contrast  85:22
contribution
43:25 44:22
59:16 66:9
91:24
control  53:13
conversely
86:15
copies  96:14
correct  9:13
13:4 15:15
16:25 17:8
19:5 24:9 27:9
36:1 38:1 39:8
47:6 48:14
56:17 61:21
62:23 63:1
69:16,21 71:17
72:13 75:9
76:20 77:4
78:24 80:1,3,6
80:22,23 84:11
84:16 91:18
93:12,13 98:8
corrections
98:6
correctly  7:8
12:23 71:3,16
82:24
corresponden...
8:17,19,21,23
8:25

**counsel** 1:15
2:1 3:9 5:12
94:7 96:14
**country** 1:8 3:5
3:14 96:4 97:1
98:1
**county** 94:11
**course** 24:5
35:1 60:21
**court** 1:1,16
3:8,15 20:18
20:21
**cover** 84:22
**crash** 4:1 9:20
10:14,24 11:3
11:5,10,13,15
12:2,8,10,16
13:8,18,22,23
14:2,4,16 15:2
15:24 16:2,6,8
19:2 20:9,15
21:4 22:3,4,8
24:2 25:15,16
25:19,19,24
26:1 27:20,22
27:22 28:3,4,6
28:7,24,24
29:3,3,5,12
30:1,10,13,18
30:19,24 31:1
31:25 32:1,21
32:23 33:2,5,9
33:12,25 34:7
34:20,25 35:2
35:5,9,9,17,21

35:25 36:4,10
37:2 38:6,7,18
38:20,21,24,25
39:1,23,23,24
40:2,4,6,7,13
40:18,19 41:6
43:6,9,12,13,17
43:17,21,23,24
44:2,6,8,18,18
44:24 45:3,7
45:11,17,25
46:1,13 47:24
48:5,5,9,9,11
48:11,13,19
49:1,12,22,25
51:9,23 52:6,9
53:21 54:4
55:17 56:7,7
56:12,13,14,15
56:16,19,20
57:21,25,25
58:17,18,21,21
58:22 59:1,2,4
59:7,8,8,12,14
59:18,20 60:12
60:13,19 61:3
61:20,23 62:3
62:4,10,15,19
62:19,20 63:2
63:8,8,10,11,22
63:22,24 64:1
64:2,5,7,18,19
64:23 65:9,10
65:14,18,22
66:3,6,7,8,23

66:23 67:2,3,8
67:9,14,15
68:3,6 71:25
74:7,8,9,18,21
75:6,11 76:1,3
76:20 79:3,17
79:18 80:2,4
80:13,15,18
81:2,4,7 82:6
82:11 83:3,3,6
83:12,15,25,25
85:4,19,22
87:3,4,9,10,19
87:20,24 88:1
88:6,8,10,16,17
88:25 89:12,17
89:21,22 90:2
90:2,5,7,23
91:10,10,21,22
92:22 93:4,10
**crashed** 11:5
89:24
**crashes** 23:13
79:24
**crashworthin...**
70:19
**cresh** 74:6
**criticisms**
14:10,15
**criticized** 19:20
**crosby** 17:11
54:20 55:10
**cross** 19:15
**crush** 27:12,23
38:7,17 59:24

62:1,11 63:25
64:1,13,23,24
65:15 66:12
67:12,23 68:22
69:14,22 89:4
**crushed** 85:21
**cs** 87:5,18,24
88:1,7,24
96:15
**curb** 17:12 18:6
18:16,18 19:22
20:8
**current** 8:5
**currently** 12:4
12:20 15:17
**cv** 1:7

**d**

**d** 1:11 3:18
95:1 96:5 97:2
97:24 98:2,4
98:12
**damage** 30:17
30:18,24 31:2
31:25 32:1
34:6,8 36:20
37:5,12,14
43:7,9
**dashed** 31:22
**data** 20:6 23:14
32:16 33:11,17
49:2 58:13
63:7,21 79:19
**date** 1:12 3:2
15:19 97:24
98:12

Christopher D. Roche
July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[dated - direct]**
Page 8

**dated**  4:1 8:6
**dates**  8:14
**day**  5:5 94:10
   98:15
**days**  8:5,15
   96:16
**de**  2:5
**deal**  21:16,22
   49:2 61:16
   72:15
**death**  84:16
**decatur**  2:6
**deceased**  1:5
**declare**  98:4
**deemed**  98:6
**defendant**  1:9
   1:15 2:9 3:13
**defendant's**  4:6
   4:16 22:14
   77:23 95:11
**defendants**
   70:6
**defense**  29:10
**defer**  15:12
   19:17 61:12
**deficiency**
   51:24
**define**  11:2
   84:24
**defined**  29:7
   74:16
**definition**  88:4
**deformation**
   31:5 45:19
   62:2,15 63:21

65:9,18 67:2
79:22,23 80:3
80:5 86:25
**deformed**  81:4
81:9 82:17
85:21 87:13
89:17
**degree**  23:13
80:7 83:7 90:1
90:22
**degrees**  80:8
81:1 84:19
**delay**  4:20
**delivered**  29:16
**depa**  7:1
**depend**  56:5
**depends**  56:2
**depicted**  82:21
**depo**  7:2
**deponent**  96:13
98:3
**depose**  8:22
**deposed**  11:25
13:21
**deposing**  96:13
**deposition**  1:11
3:4 4:4,10,15
5:16,21 6:4 7:7
8:12 10:9
11:20 14:8
19:21 24:15
54:19,20 70:4
92:2 93:11,23
**depositions**
10:22

**describe**  60:16
70:15 88:20
**described**  7:8
13:18 28:11
36:6 37:9 60:2
60:20 69:7
77:2 84:4
**describing**  73:8
**description**  7:9
63:4 88:4
**design**  89:19,19
**designed**  21:6
24:3,21 86:14
89:4,13
**detail**  77:5
**details**  52:22
**determination**
33:1,23 45:23
**determine**
28:10,22 33:24
36:5,7 38:23
40:12 43:12
44:6 48:17
57:19 58:3,14
58:20 59:6,23
61:24 62:9
63:23 64:11,22
**determined**
38:16 42:14
65:12
**determining**
13:11 33:8
67:11
**develop**  22:1

**devin**  2:5,7
3:11
**dial**  2:11
**dialogue**  14:18
**diatribe**  47:2
**differ**  24:5,6
44:7 62:6
**difference**
27:21 28:6,23
34:11 38:4
39:9 40:12
41:9 45:19
56:8 58:14,17
58:20 59:1,7
61:25 63:25
64:12,22 65:15
65:20 66:20,22
66:23,25 68:4
78:17 91:25
**differences**
25:23 45:25
48:4,21,23
59:16 65:18
91:9
**different**  19:7
23:21 24:3
27:18 30:12
35:16 36:4
40:3 43:13
49:24 56:7
57:18 72:21,25
74:17 78:10
81:8
**direct**  31:2 32:1
36:20,23 37:3

Christopher D. Roche                                              July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[directed - errata]**                                              Page 9

| | | | |
|---|---|---|---|
| **directed** 13:7 34:24 | **dispute** 54:24 | **draws** 45:16 | **elect** 73:20 |

**directed** 13:7
34:24
**directing** 50:4
52:9
**direction** 8:2
81:11,15,19
**directly** 36:17
85:9
**disagreement**
14:20
**disclose** 12:19
**discrepancies**
44:23 45:3,24
46:6
**discrepancy**
40:18 44:21
**discuss** 14:13
14:23 87:25
90:11 92:20
**discussed** 10:1
29:24 30:3
38:9 43:8
92:24 93:1,10
**discussing** 17:1
**disengage** 55:6
**disengaged**
54:23 55:5
57:3
**disengaging**
55:3
**displaced** 81:12
81:14 82:12
87:13
**displacement**
82:2,6,24

**dispute** 54:24
**dissipate** 86:14
**dissipated**
89:18
**distance** 56:4
**distribution**
18:4,13
**district** 1:1,1
**division** 1:2
**document** 4:14
4:21 5:1 7:23
17:17 78:3
**documentation**
26:7 27:5
**documented**
16:4
**documenting**
55:1
**documents**
18:2
**doing** 34:4
48:20
**dotted** 36:15
80:18
**draft** 7:6,24
8:13
**drafted** 7:25
**draw** 44:18
45:11,14 46:5
47:11,13,19,20
49:20
**drawing** 91:10
**drawn** 43:18
59:13

**draws** 45:16
**due** 45:20 76:9
82:23 83:14
89:25 90:3,24
**duly** 3:19
**dummies** 20:15
**duplicate** 34:4
**duplication** 5:6
**duration** 56:3
**dynamic** 21:4
**dynamics** 49:7

**e**

**e** 95:1,10 97:3,3
97:3
**earlier** 5:13
6:22 13:21
43:16 76:8
82:18
**easier** 73:12
**edge** 32:11,18
37:25 38:1
**effect** 45:6
81:13 88:24
**effectively** 86:8
**effectiveness**
88:24
**effort** 52:10
**efforts** 67:11
**eisenstat** 5:22
**either** 11:12
13:6 28:17
49:15,23 56:25
57:10,10 76:10
93:10,17

**elect** 73:20
**emphasis** 58:10
**empty** 19:3
76:14
**encompassed**
74:11
**energy** 86:4,14
86:15 89:17,18
**engage** 55:5
**engaged** 12:4
54:18 55:9,12
55:14,24 56:11
56:16,21 57:20
58:5 59:3
60:12 85:20
**engagement**
55:2 56:6
85:16 86:18,25
88:23 90:16
**engaging** 89:3
**engineer** 52:13
58:11 66:8
**ensure** 58:11
**entire** 74:11
83:5
**entirely** 73:15
**entitled** 4:21
77:20 79:15
**environment**
22:4
**equipment**
26:5,14,16,21
**errata** 96:11,13
96:16

Christopher D. Roche
July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[error - fall]**

Page 10

| | | | |
|---|---|---|---|
| **error**  53:24,25 | **estate**  1:4 | **exhaustive**  9:11 | **explore**  48:1 |
| **escape**  14:10,16 | **european**  71:6 | 9:15 | **exponent**  25:20 |
| 15:1,21 17:12 | **evaluate**  16:20 | **exhibit**  4:4,6,14 | 45:7 52:13 |
| 17:14 18:7,8 | 20:5 23:10 | 4:16 6:21 7:24 | 74:6 89:24 |
| 18:16 20:4,9 | **event**  86:15 | 77:22,23 95:12 | 90:2,23 92:22 |
| 26:5,6 27:12 | 89:17 | 95:12,13 | 93:4 |
| 27:17 29:23 | **events**  94:8 | **exhibited**  63:11 | **exposed**  87:14 |
| 33:13 35:22 | **evidence**  26:24 | 64:14,24 | 89:8 |
| 36:11,17,22 | 27:3 35:14 | **exhibits**  5:22 | **extent**  45:5 |
| 37:2,15,17 | 36:22 55:8,11 | **existed**  48:10 | 47:7 62:11 |
| 45:21 50:3,25 | **exact**  26:9,9 | **expanding** | 67:10 83:11 |
| 52:11 55:19,25 | 44:6 | 65:24 | 84:21 |
| 56:22 57:5 | **exactly**  8:9 | **expect**  83:22 | **f** |
| 61:10 62:1,12 | 32:11 43:14 | **experience** | **f**  36:11,18,23 |
| 62:16 63:3,12 | 44:12 | 10:23 12:15 | 37:3 52:12 |
| 63:18 64:14,25 | **examination** | 38:8 48:24 | 56:3 61:20,21 |
| 65:15,16,19,19 | 3:20 95:3 | 53:8 66:14 | 61:25 62:10 |
| 66:12,13,17 | **examined** | 68:21 71:15 | 63:24 64:13,13 |
| 68:6 79:19,20 | 12:10 | 76:18 90:16 | 64:23,24 65:13 |
| 80:21 83:14,25 | **example**  12:7 | **experienced** | 65:14 86:20 |
| 86:6 87:6,19 | 13:20 16:3,22 | 62:1,11 66:13 | 87:18 89:2 |
| 89:14 | 17:23 38:24 | **expert**  12:21 | **f250**  33:13 |
| **escape's**  54:18 | 45:18 50:10,20 | 84:10 | **facing**  38:2 |
| **escapes**  45:20 | 64:18 66:5 | **experts**  29:11 | **fact**  30:22 89:1 |
| 87:9 | 67:15 69:14 | 34:20 | 90:14 |
| **especially** | 71:18,25 72:1 | **expires**  94:20 | **factor**  63:25 |
| 77:10 | **examples**  52:4 | **explain**  63:5 | **failed**  53:5 |
| **esquire**  2:4,5 | **except**  5:17 | 67:19 73:18 | **fails**  96:18 |
| 2:12 | **excuse**  33:2 | 79:10 | **fair**  6:10 7:9 |
| **essentially** | **exemplar**  32:16 | **explained** | 16:9 24:22 |
| 86:10 | 37:15,17 62:15 | 44:12 | 61:1 78:13 |
| **establish**  51:24 | 63:3,7,12,18 | **explanation** | 83:15 84:4 |
| **established** | 78:9 79:2,19 | 27:6 73:13 | **faith**  26:12 |
| 75:19 76:12 | 79:20 80:16,16 | 79:9 | **fall**  44:24 |
| | 84:1 | | |

**familiar**  15:14
  22:20
**family**  3:12
**far**  81:14
**fashion**  25:21
**fast**  40:24
**federal**  17:6
  20:13 71:5
**field**  23:13,14
**figure**  53:19
  78:22 80:20
**file**  7:2 8:22
  61:7
**files**  8:19 78:2
**film**  35:20,22
  35:25 36:8
**films**  35:19
**findings**  61:6
**finish**  39:17
**finished**  12:13
  28:20 33:15
**first**  5:6 7:21
  10:1 78:8
  84:22
**fitted**  17:24
**five**  68:9 79:5
**flipper**  30:24
  32:3,19 37:24
  37:25
**floor**  82:23
  83:14 85:24
**fmvss**  16:3,12
  17:3,6 21:3,13
  21:23 22:6
  23:16 24:8

70:18 72:18
  73:6 74:13,14
  74:20 75:5
**fmvsss**  16:16
**focus**  34:24
  77:11
**follow**  22:11
  58:23 73:5,24
  91:23
**followed**  52:5
**follows**  3:19
**force**  57:17
  84:19
**forces**  38:12,15
  38:17
**ford**  11:21 20:4
  20:8,9 27:17
  37:15,17 50:3
  86:6
**ford's**  20:5
  89:19
**foregoing**
  20:20 94:4
  98:5
**forensic**  10:19
  10:21 15:17
  16:14 21:14
**forgets**  55:6
**form**  15:7
  18:20 19:14
  20:22 22:12
  23:17 24:10
  26:22 29:6
  36:2 39:2
  42:19,22 44:9

45:4 46:15,22
  47:1 50:22
  58:6 60:1 65:1
  74:22 83:19
  87:1 91:19
**formed**  40:9
**forming**  44:3
  59:10
**formulate**  45:2
**forth**  22:3 51:5
**forward**  13:14
  13:18 14:5
  21:4 55:14
  82:2,5 87:13
  87:15
**foundation**
  15:6 18:10
  21:19 26:23
  50:5
**four**  30:9,12,15
  30:22,25 32:2
  35:16 36:3,6,7
  41:9 42:12
  43:4,9 44:12
  53:23
**fr26**  7:4,4,5,11
  7:16
**frame**  85:17
  86:7,7,11
**framework**
  70:13
**frankly**  10:1,8
**friday**  8:13,22
  8:23 10:11,13

**front**  4:11
  26:16,18 27:4
  27:9 50:11
  84:20 86:16,16
  89:1
**fuel**  16:24 17:5
  18:17 19:3,4,5
  19:7,8,12,24
  20:10 52:1,1,2
  74:15,16 76:14
  76:15,15,16,17
  76:19 77:6,10
  77:12
**full**  19:24 56:8
  83:10 92:3
**further**  93:14
  94:6

**g**

**gainesville**  1:2
**gas**  19:24 76:4
**gate**  59:2
**general**  69:9
  84:23,23
**geometry**  66:18
**georgia**  1:1 2:6
  2:13
**getting**  46:21
**give**  21:11
  24:21 71:18
  89:23 92:21
  93:4,9
**given**  26:11
  98:9
**gives**  39:24

Christopher D. Roche                                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[glass - horizontal]**                                    Page 12

**glass** 30:24 32:3,10,19,20 37:24 38:1

**go** 10:2 12:12 13:14 15:9 20:25 21:21 22:18 23:7,20 23:24 24:14,19 25:12 27:2 29:9 37:22 39:5 40:16 42:25 44:15 47:2,10 57:9 58:9 60:4,10 60:24 67:20 68:8 75:4 79:7 85:14 88:19

**goal** 44:20

**goes** 72:17 93:9

**going** 3:22 14:12 19:6 25:17 34:12 40:20 48:6 60:14,23 75:17 77:14 84:14 87:21

**good** 16:24 26:12 74:1,18 86:24,25 90:15

**gotcha** 80:20

**government** 75:17

**gravity** 27:17 29:20 49:9

**great** 4:12 5:1 21:16,22 30:5 38:9 43:11 49:2 61:9,16 65:24 81:3 92:11

**greater** 38:17 63:22 90:18

**grimes** 14:20 17:11 18:24 32:24 34:13,18 35:6 41:10 42:14 43:2 44:1 45:16 46:9 47:25 49:19 62:5 83:18 84:3 90:6,10 91:4

**gsi** 91:14

**guess** 7:22 12:21 50:6 78:6

**guidance** 52:12 52:20,22 53:4 53:7

**guide** 52:11,16

**gunn** 2:11

**guys** 41:13

**h**

**h** 2:12 95:10 97:3

**hand** 94:9

**hanging** 89:8

**happily** 87:23

**hard** 26:8

**hatch** 36:12

**head** 19:10 29:18 53:19 76:6

**hear** 12:23 67:5

**heard** 83:10

**height** 34:10 48:7 61:20,20 61:22,25 62:10 63:14,24 64:12 65:13 68:4 91:14,25

**heights** 64:22

**help** 22:1 31:15 51:17

**hereto** 98:7

**hereunto** 94:9

**hey** 41:13

**high** 30:20 35:20,22,25 74:19

**higher** 61:20,23 90:5,7,14

**highlight** 34:5 43:19 50:7 57:24

**highlighted** 14:21 65:17

**highlighting** 83:4

**hill** 2:12 3:13 3:13,21 4:3,8 4:13,18 5:18 9:3,5 15:8

18:22 19:18 20:18,24 21:20 22:15,17 23:6 23:20,23 24:14 24:19,23,25 25:4,6,11 27:1 29:8 37:21 39:4,21 40:15 40:20,23 41:5 41:14,18,21,23 42:1,4,8,11,18 42:21,24 44:14 45:13 46:20,24 46:25 47:5,10 47:15,22 50:1 50:17 51:3,6 53:6 58:8 60:3 60:9 65:4,11 68:7,16 70:5,7 70:9 74:24 75:3 77:17,25 84:9 85:3,8,11 85:13 88:13,18 91:6 92:1,5,9 92:18 93:14 95:4

**history** 11:20 11:24

**hit** 44:6

**hoist** 78:16

**hold** 53:5,8,18

**hood** 35:22

**horizontal** 80:11 81:1

Christopher D. Roche
July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[host - instance]**

Page 13

**host**  72:25
**hour**  40:20
  72:22,23
**hours**  24:15
**hudgins**  2:11
**human**  50:22
**hve**  14:24
  15:10,14,16,19
**hypothesis**  46:9
**hypothetical**
  26:23 55:21

**i**

**identical**  72:20
  75:7
**identification**
  4:7,17 77:24
  95:11
**identified**
  40:17 51:15
  67:1
**identify**  43:16
  44:20 50:9
  59:15 67:13
**identifying**
  31:24 48:20
**iihs**  16:17 21:3
  22:7 23:16
  24:8 73:13,14
  73:23,25 74:2
  74:4,9,11
**image**  31:20,22
  32:6 35:13
  36:14,22 62:14
  62:22 63:5,18
  67:6 78:15,22

78:24 79:12,13
80:5 81:17,23
82:8,21 87:7,8
89:6
**images**  30:20
  35:4 51:16
  76:23 79:11
**impact**  22:9,16
  28:5,11,23
  36:11,23 37:3
  38:6,25 40:12
  49:15 52:18
  56:1,23 57:5
  59:7,23 61:25
  62:10 64:12,22
  65:12 74:19
  75:12,21,24
  76:3 86:15,16
  87:5 88:8
**impacted**  36:17
  58:21 76:14
  82:11
**impacts**  22:13
  68:19 77:10
**impossible**
  43:25 91:12,17
**improper**  26:18
  91:23
**inch**  41:9,11
  42:12,15 79:4
**inches**  30:10,12
  30:15,17,22,25
  32:2,25 34:14
  34:14 35:16
  36:3,6,7 43:2,4

43:10 44:12
53:23 54:2,2
79:5
**incident**  19:9
**incidents**  76:10
**include**  77:3
**included**  20:9
  26:12
**includes**  19:23
  47:15
**including**  51:25
**incomplete**
  26:23
**inconsistencies**
  57:24 91:21
**inconsistent**
  25:24 34:9
  56:12 60:13
  64:19 66:6
**increase**  89:25
  90:3,24 91:18
**increased**
  27:12,23 29:14
  29:17 38:17
  66:12 67:12,23
  91:3
**index**  2:19
**indicating**
  93:16
**indication**  74:1
**individual**
  22:19 26:14,15
**induced**  30:24
  31:25 37:4
  43:7

**industry**  15:22
  15:23 16:1,2
  16:21 20:12
  21:23 22:7
  23:2 25:18
  26:1 54:10
  70:10 71:4
  86:9
**influence**  49:7
  49:21 56:24
  57:1 65:21
**influences**  49:3
**inform**  73:16
**information**
  12:19 35:15
  51:22 53:4
  72:3 95:7,8
**informing**
  75:18
**infrequent**
  76:13
**initial**  6:10
  8:13
**initiated**  11:9
**injuries**  21:7
  49:4 84:16
**inspect**  9:20
**inspection**  10:7
**inspections**
  51:17
**instance**  16:21
  21:10 38:11,21
  48:16 54:6
  86:24

Christopher D. Roche                                      July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[instances - liftgate]**                                    Page 14

| | | | |
|---|---|---|---|
| **instances** 13:12 | **involve** 85:5 | **jury** 86:2 | **l** |
| 43:21 72:20 | **involved** 10:25 | **k** | **l** 2:4,5 96:1 |
| **instructing** | 11:10 12:15 | | **labeled** 5:2 |
| 47:2 | 13:12 14:3 | **k** 1:16 94:2,19 | 77:21 79:8 |
| **instrumentati...** | 20:9 70:11,12 | **kelly** 50:12 | **lack** 23:11 |
| 22:2 26:9,10 | 71:20,22 73:10 | **kind** 36:7 | 45:20 66:11 |
| **intact** 85:23 | 75:8,11,21 | **kinematics** | 67:12,23 85:16 |
| **integrated** 86:8 | 77:2,2,8 89:16 | 81:13 | **large** 89:1 94:3 |
| **integrity** 17:5 | **involving** 76:3 | **kit** 48:2,7 49:21 | **largely** 80:15 |
| 74:15,17 | **isolate** 45:6 | **knew** 72:8 | 83:24 85:23 |
| **intend** 92:21 | 48:6 59:15 | **know** 6:17 8:9 | 87:14 |
| 93:3,9 | 65:22 66:2 | 8:12 11:12 | **lateral** 38:10,11 |
| **intended** 53:5 | 68:3 91:24 | 14:15,17,19 | 52:15 |
| 54:12 86:14 | **isolating** 43:24 | 16:7 17:19 | **leakage** 76:15 |
| **intent** 89:20 | **issue** 28:11,16 | 18:10,11,24 | 76:17,19 77:10 |
| 91:14 | 28:19 30:6 | 19:1,3,8,11,16 | **learn** 10:5 |
| **interested** | 34:21 76:19 | 19:25 20:3,13 | **learned** 76:11 |
| 18:12 73:19 | **issues** 49:15 | 21:8 22:21,25 | **led** 91:18 |
| 94:8 | **issuing** 6:13 | 23:15 25:4 | **left** 31:25 79:16 |
| **internal** 75:19 | 9:12 | 26:4 27:11,14 | 80:5 85:23 |
| **introduced** | **items** 5:17 | 27:21 30:7,10 | 87:9,12 92:8 |
| 45:25 | 17:23 | 30:15 31:11 | **legal** 3:7 21:18 |
| **intrusion** 27:12 | **j** | 32:23,24 33:23 | 21:18,18 96:23 |
| 27:23 38:7,17 | | 37:7 38:4 | **length** 38:9 |
| 39:7,10 48:1 | **jeep** 69:22 | 43:19 46:9 | **leon** 2:5 |
| 59:24 83:1 | **jonathan** 5:22 | 48:24,25 49:5 | **level** 38:7 53:20 |
| 89:24 90:3,8,9 | **joshua** 1:3 3:5 | 49:5,10 50:8,8 | 59:24 64:24 |
| 90:10,19,24 | 50:12 96:4 | 50:13,13 51:15 | 65:9 82:25 |
| 91:18 | 97:1 98:1 | 51:15 52:22 | 91:11 |
| **intrusions** 49:3 | **july** 1:12 3:2 | 53:14,17,20 | **levels** 39:7,10 |
| 90:5,7 91:3,11 | 10:12,12,13 | 61:10,14 64:8 | 53:14 |
| **investigating** | **june** 4:1 6:1,6,8 | 65:20 66:11,14 | **lift** 32:19 48:2,7 |
| 12:24 | 6:11,13,16,18 | 68:17 72:9 | 49:21 |
| **investigation** | 6:25 7:21 8:6 | 73:12 74:4 | **liftgate** 30:23 |
| 3:25 | 8:11 9:7,12 | 76:7,8,13 | 31:3,6,24 |
| | 22:22 | 81:14 | |

Christopher D. Roche                                          July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[liftgate - mentioned]**                                        Page 15

32:17,19 36:9
38:3 43:7
**likely**  89:25
**limited**  24:15
**limits**  29:4
**line**  56:8 80:18
86:12 95:2
97:4,7,10,13,16
97:19
**lines**  33:16
**list**  4:22 5:2,6,7
5:16,20,25
9:11,15 11:21
92:3 95:13
**listed**  6:6,9,15
6:17,24 7:3,24
9:8,10 11:19
11:23 22:6
92:20
**litigation**  10:17
10:23 11:1,6
12:14,18 13:6
13:19 15:25
16:15 21:15
**little**  34:17,23
82:1
**llc**  1:8 2:4,11
3:5 96:4 97:1
98:1
**load**  75:15,15
75:21,24,25
76:1,2,9
**loaded**  82:16
83:22

**loading**  36:8
**locate**  51:18
**located**  27:15
**location**  1:14
17:1 19:5,7
26:10
**long**  47:2
**longer**  92:7
**longitudinals**
85:18,20,23
86:3,10,19
89:8,13,16
**look**  5:19 9:8
11:21 35:21
72:18
**looked**  30:17
62:14
**looking**  13:10
35:12,18 37:6
39:10 54:7
58:12
**lot**  14:17 21:2,9
21:25
**lots**  71:22
**lower**  32:18
54:8 64:17
**luggage**  51:18

**m**

**made**  6:2,8,14
9:16 52:10
62:2 69:9 98:5
**make**  8:8 15:20
22:5 33:22
36:23 45:23
46:13 47:6

48:7 50:25
52:20 86:17
**making**  48:3
59:19 88:25
**managed**  8:24
**manifest**  55:18
**manner**  67:15
91:23
**manufacturer**
20:1 69:2,12
69:19 75:18
**manufacturers**
19:25 68:18
72:4 73:19,22
75:14 76:11
**march**  94:20
**mark**  4:4,13
6:21 77:22
**marked**  4:6,16
77:23 95:11
**marks**  3:3
**mary**  1:16 3:8
94:2,19
**mashman**  2:5
3:12
**match**  16:8
18:25 34:13
51:21
**matched**  40:3
68:5
**matching**  64:18
**material**  4:21
5:23 6:6,7,9,14
6:24,25 9:10
9:11,14,16

77:18 95:12
**materials**  5:7
5:24,25 6:2 7:3
8:4,7,10,18 9:8
10:2,5 13:23
48:23
**matter**  3:4
**mean**  10:6 11:2
11:8 14:1 25:4
39:6 46:8 65:8
70:17 73:3
81:17 83:9,17
84:17 86:2
**meaning**  71:23
**meaningful**
45:11,14,16
59:13
**means**  7:2
79:10
**meant**  7:2
44:13 72:19
**measure**  37:16
81:16
**measured**
14:19 32:16
37:18,23
**measurement**
32:2,15
**measuring**
37:15
**meeting**  72:6
**mention**  6:22
**mentioned**  5:24
43:15 48:18
49:16 61:19

Christopher D. Roche
July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[mentioned - objective]**
Page 16

70:11 82:17
**metal** 30:23
31:1 32:3,17
37:23
**method** 36:6
**methodologies**
22:2
**methodology**
33:4,7,18,20,24
46:10 93:8
**methods** 50:19
**michigan** 1:14
**mike** 2:17 3:6
**mile** 72:22,23
**mind** 47:4
**minor** 1:5
**minute** 92:6
**minutes** 4:14
68:9 92:8,10
**misalignment**
86:24
**mischaracteri...**
47:8
**misleading**
47:14
**misrepresent...**
45:7
**misrepresents**
26:24
**misstates** 24:11
42:23 58:7
60:5,8
**misuse** 30:7
**model** 68:19
69:13,13,20

**modes** 21:24
72:7 73:9
75:15
**modifications**
50:24
**modified** 91:13
**moment** 4:23
**moments** 5:14
**money** 22:1
**monitor** 3:3
76:17
**motion** 49:7
55:14 83:18
84:18
**motor** 17:7
**mounted** 82:20
**mouth** 83:9
**move** 60:14
64:20 81:19
89:2 90:20
**moved** 80:13
81:10
**movement**
82:23 83:14
**moving** 6:20
**multiple** 22:10
22:17 24:13
43:21,22

**n**

**n** 95:1
**n.e.** 2:12
**name** 3:6,9
78:3
**ncap** 21:3,13
22:6 23:16

24:8 71:25
72:1,3,3,11,17
72:21,23 73:4
74:3
**necessarily**
88:22
**necessary**
51:25 98:6
**need** 40:21
52:25 57:8
68:8 92:9
**needed** 49:22
49:22
**neither** 94:6
**new** 5:24 6:24
8:7 72:11
**nhtsa** 22:21
72:1
**nhtsa's** 22:23
**noncompliance**
70:21 71:11,15
71:19
**noncompliant**
70:22
**nonregulatory**
21:24 71:21,23
72:7 73:9,15
75:10,13,22
**nonsunroof**
62:7 63:16
64:4,8,10,16
66:17 68:2
69:13,20
**northern** 1:1

**notary** 94:2,19
98:13,19
**note** 96:10
**noted** 76:22
98:7
**noticing** 5:5
**number** 44:10
78:10

**o**

**object** 20:22
21:17 22:12
23:17 24:10
26:22 29:6
39:2 42:17,22
44:9 45:4
46:15,21,25
58:6 60:1 65:1
74:22 88:15
91:19
**objection** 15:3
15:6,7 18:20
19:14 23:4
37:19 47:6
49:17 50:5
60:7 75:2 84:6
85:1,12 88:12
**objections**
46:20 65:7
**objective** 16:7
35:5,11 38:20
40:8 44:16
54:1 57:24
58:11,12 67:13
68:3

Christopher D. Roche                                  July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[objectives - page]**                                        Page 17

**objectives**  72:6
**objects**  51:14
**observations**
  60:20 62:2
  65:14 83:7
**observed**  63:21
  83:13
**observing**
  35:10
**obviously**  8:5
  12:15 24:1
  25:14,17 29:19
  34:10 73:24
  78:15 83:21
**occupant**  21:7
  27:19 49:4
  81:13 84:18,20
**occupants**  21:5
  50:9,10,20
**occur**  48:2
**occurred**  13:2
  15:2 27:13
  38:6 59:25
**october**  11:25
**offer**  84:12,14
**offered**  84:17
**offering**  89:15
**office**  5:13 7:25
**official**  94:10
**offset**  30:6,9,11
  30:14,16 32:22
  32:23 33:2,8
  33:25 34:13,19
  35:7,10,16
  36:3 38:5,12

40:3,13 41:9
41:10,11 42:12
42:14,15 43:4
43:13 44:7,11
49:15 52:7,18
53:5,9,23 54:1
54:4,10,13
**oftentimes**
  77:11
**oh**  29:25 41:18
**okay**  4:12 5:1
  5:10,19 6:6,13
  6:20 7:20,23
  8:2 9:14,19
  13:2,16 14:7
  19:19 20:12
  26:2 27:11
  29:22 33:22
  34:22 35:12
  36:21 37:1,6
  38:4 40:22
  42:3 43:3,11
  50:2 61:14,19
  62:17 67:10
  68:10 70:8
  73:11 75:8
  77:7 79:6
  80:24 82:10,15
  83:8 84:10,22
  85:7 87:4 91:7
  92:11 93:14,18
**once**  52:19
**ones**  72:4
**ongoing**  12:6

**onus**  44:24
**operated**  89:13
**opine**  89:20
  91:17
**opined**  88:11
**opining**  34:16
  91:2
**opinion**  21:18
  35:23 36:3,13
  37:2,8,9 38:19
  42:23 44:3
  60:11 67:19,25
  82:22 84:21
  85:11 88:25
  89:15,23 90:11
**opinions**  9:6
  14:13,14 29:22
  40:9 54:17
  59:10 60:21
  61:6 83:20
  84:13,14,17
  85:6 87:23
  88:1,14 92:19
  92:23 93:2,3,7
  93:9
**opportunity**
  9:20
**opposed**  81:12
  88:10
**order**  29:4 71:8
**organized**  13:7
**organizing**
  12:4,22
**original**  7:12
  7:14,18 29:14

29:15 54:1
67:20 81:11,20
**originally**
  41:11 42:16
**outboard**  30:23
**outrageous**
  46:21
**outside**  70:13
**overall**  31:23
  68:23
**overhead**  35:25
**overlaid**  33:12
  79:17,18,20
**overlap**  30:6
  38:5,12 40:3
  49:1,3 52:8
  53:10 86:23
**overlaps**  53:12
  53:13
**overlay**  63:6,20
**override**  84:23
  84:24 85:5,15
  86:20 87:2,11
  88:4,5,9,11,20
  88:25 89:7
**own**  14:21
  29:13 73:23
  75:19

**p**

**package**  15:16
**page**  45:18
  62:14 78:8,21
  81:23,23 84:22
  89:23 90:4
  95:2 97:4,7,10

Christopher D. Roche                                July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[page - prepared]                                              Page 18

97:13,16,19
**pages** 25:6,7,7
**painted** 48:12
**panel** 78:21
**paragraph** 9:8
**parallel** 80:17
80:18
**parents** 1:4
**parking** 54:16
54:18,22 55:4
55:8,13,24
56:11,15,21
57:4,20 58:5
59:2,23 60:12
**part** 15:11
28:25 32:4
36:9 38:13,16
60:7 71:7
83:16,17 88:22
89:1
**partial** 53:10
86:23,23
**participated**
10:15 13:7,17
**particular** 13:1
15:11 16:6
20:5 33:5
**party** 11:11,13
11:16 12:3
94:7
**passengers**
26:19 51:4
**pattern** 30:17
30:18 31:5
34:6,8 37:14

63:10 65:18
**patterns** 62:3
**peachtree** 2:12
**peeled** 85:24
**pending** 94:7
**people** 44:24
**percent** 27:15
29:18 53:24
54:8
**perfectly** 24:23
**perform** 29:4
69:2 73:15
74:2
**performance**
16:20 23:10
69:22 70:24
71:12,14,19
72:9 73:4,16
75:11
**performed**
10:15 13:22
16:7 28:15,17
40:18 50:16
58:19 59:5,22
68:22 70:24
76:4
**performing**
59:18 61:18
**period** 56:5
**person** 50:4
52:9
**personally** 33:3
**ph** 87:5,18,24
88:1,7,24
91:14

**phone** 70:5
**photo** 32:6
**photograph**
55:9
**photographs**
17:21 27:6
35:13,13,19
37:7 55:2
**physical** 38:9
**physics** 49:6
**picture** 31:14
81:23
**pictures** 81:22
**pieces** 26:14,15
**placed** 16:25
26:5,16 49:8
78:9
**placing** 51:14
**plaintiff** 2:2
**plaintiff's** 35:3
**plaintiffs** 1:6
3:12
**plane** 80:11
**planning** 13:13
**played** 89:21
**please** 3:9,16
20:12 25:9
30:7 47:23
58:24 60:16
69:5
**plenty** 70:18
**point** 17:13
18:7,16 27:5
33:10,12 48:3
56:10 58:16

63:6 74:18
78:15 79:17
**pointed** 58:25
**pointing** 32:10
49:12 64:3,15
66:21
**police** 76:22
**ponce** 2:5
**portion** 36:10
36:16
**position** 26:16
33:12 80:21
81:11,20 83:2
**positions** 78:17
**possibility**
12:24 13:10
55:6
**possible** 51:9
51:21 68:5
**possibly** 52:17
54:18 55:12
**post** 80:2 83:25
83:25
**potential** 58:17
59:1,2 76:17
**potentially**
58:1
**powerpoint**
77:20 78:1
**practice** 16:21
**predating** 6:17
**prefer** 14:22
30:7 38:5
**prepared** 5:3,4
53:16 87:25

Christopher D. Roche                                July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

[present - real]                                                    Page 19

**present** 2:16
**presentation**
  77:20 78:1
**presented**
  26:24 77:18
**presumably**
  52:12
**pretest** 29:15
  35:11
**prevent** 55:25
  56:22 57:4,11
**previous** 10:22
**previously**
  57:23
**principles** 49:6
**prior** 4:15 5:9
  6:8,13,17 9:10
  9:17 12:15
  54:20 55:10
  66:16 76:10
**probably** 45:20
**problem** 9:4
**problems** 47:3
**procedure** 21:5
  25:10 54:12
  71:8 73:5
  74:11,16 76:12
**procedures**
  13:11 16:4,4
  16:12 21:2,13
  22:2 23:16,18
  23:25 24:9,11
  25:1,5,7,9,25
  54:10 70:25
  74:4,12

**process** 37:10
  52:4,20 55:1
  91:24
**procomm**
  11:22
**produce** 8:16
  73:18
**produced** 5:13
  77:18,19
**product** 32:15
  60:22,25 61:7
**production** 5:8
**program** 21:3
  72:12
**protocol** 73:25
**protocols** 73:18
**provide** 8:19
**provided** 8:4
  8:10,13 10:2
  17:21,25 18:3
  26:8 27:7 59:9
  60:21
**providing**
  67:25
**public** 73:16
  75:18 94:2,19
  98:19
**published**
  17:12 18:6,15
  18:18 19:22
  20:6,8 49:2
**pull** 22:18
**purpose** 24:3
  40:5 47:25
  51:8 63:17

78:11
**purposes** 71:14
  71:14
**push** 57:17
**pushed** 87:15
**put** 32:5 62:25
  83:9

**q**

**qualify** 86:20
**quality** 11:22
**quantified** 28:5
  66:20,25 67:7
**quantifies** 49:3
**quantify** 28:8
  39:9 40:2
  49:14 67:19,22
**quantifying**
  39:7
**quest** 7:4,4,11
  7:12,16
**question** 10:24
  18:5,21 19:19
  19:20 20:20,23
  21:1,9 22:9,13
  22:19 23:5,18
  24:6,11,22
  25:12 26:3,23
  29:7 39:3 40:1
  42:2,9,20,23
  44:10 45:5,8
  46:16,22 47:1
  47:3,18,21
  53:3,17 55:22
  56:10,13,20
  57:6 58:7,23

60:2,23 61:13
  65:2,5,5 67:17
  67:18,21 69:5
  70:2 71:3
  74:23 76:25
  87:17,21 88:7
  88:16
**questions** 11:8
  24:20 25:8
  93:15,17
**quick** 40:21
**quote** 45:18

**r**

**r** 97:3,3
**rail** 52:11
**rails** 85:17 86:8
  86:10,11,13
**ran** 44:24
**rate** 56:25
  57:11,15,21
  58:4
**rather** 88:23
**rating** 72:2,21
**ratio** 14:16
**reached** 45:1
**reaches** 44:1
**read** 10:9 20:18
  20:20 54:19
  93:21 96:9
  98:5
**reading** 78:6
**ready** 41:19,23
  42:4,6
**real** 11:4,4
  25:19

Christopher D. Roche                                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[realize - repeat]**                                                    Page 20

**realize**  31:17
**realized**  5:14
**really**  10:8
  16:11 17:1
  18:1,12 40:5
  43:15 44:2
  79:8 83:18
  87:11
**rear**  2:19 29:13
  38:2 45:21
  55:19,25 56:3
  56:22 57:2,5
  57:17,21 58:4
  68:19 74:19
  75:12,21,24
  76:3 77:10
  81:3 82:6,11
  83:11 86:11,15
**rearview**  87:8
**rearward**  89:9
**reask**  42:9
**reason**  54:24
  91:16 96:11
  97:6,9,12,15,18
  97:21
**reasonable**
  33:5 90:1,22
**reasons**  71:24
**rebuttal**  5:16
  6:4 7:1,6,7
  14:9
**rec'd**  95:12
**recall**  8:20 18:9
  76:25

**receipt**  8:18
  96:17
**received**  4:14
  4:21
**recent**  8:21
**recess**  41:1
  68:12 92:14
**reconstruct**
  35:8,9
**reconstruction**
  22:3 34:2,3,25
  35:2
**reconstructio...**
  35:3
**record**  3:1,10
  5:12 40:25
  41:3 68:9,10
  68:14 70:3
  92:12,16 93:18
  94:5
**red**  31:22
**reduced**  82:18
**reduction**  79:4
**refer**  76:8
**reference**  15:20
  16:3 25:22
  43:1 54:9,13
  54:15 69:9
  74:18
**referenced**  23:3
  24:9 34:18
  35:14 96:6
**references**  7:10
  7:18 22:23

**referencing**
  16:5 24:25
  32:12 36:13
  41:10 46:13
  71:10
**referred**  22:21
  23:1 31:10
**referring**  5:20
  7:13 10:18
  16:2,21 31:20
  32:6 35:24
**reflect**  8:7
**reflects**  26:13
**regard**  7:16
  15:21 34:19,21
  51:1 52:7 65:6
  65:14 67:11
  92:21 93:4
**regarding**
  15:12 22:23
  29:22 84:15
  93:10
**regulation**  73:5
**regulations**
  71:5,6
**regulatory**  72:8
  72:16 74:20
**reinforced**  64:9
**reinforcement**
  66:19
**relate**  16:2 17:4
  70:24 76:10
  84:18
**related**  12:25
  13:23 17:17

  22:8 27:5
  28:14,16 43:1
  53:11 70:25
  71:19,25 73:6
  74:13 75:11
  87:23 90:13
  94:6
**relates**  8:17
  17:5 25:22
  88:16,17
**relation**  22:20
  55:22
**relative**  29:14
  42:13 46:1
  49:9 53:25
  62:3 64:9 67:8
  72:6 80:10
  81:11 83:2
  87:15 89:2,19
  91:22
**relevance**
  48:13
**relevancy**
  44:17
**relevant**  8:20
  85:11 88:13
**relied**  35:15
**relying**  34:21
  37:13
**remember**  8:14
  76:21 77:5
**rendered**  9:7
**repeat**  53:1
  58:24

Christopher D. Roche
Bryson, Santana and Joshua v. Rough Country, LLC
July 17, 2024

**[repetitive - road]**                                                      Page 21

**repetitive**  6:23
**replicate**  23:13
  25:16,20 38:20
  38:25 51:9
  64:5 74:8
**replicated**
  38:22 49:12,24
**report**  4:1 5:7,9
  6:1,4,4,5,7,11
  6:14,16 7:4,4,5
  7:6,11,12,15
  8:6 9:7,9,12,23
  10:3 14:14
  15:21 17:2
  22:23 25:14
  27:15 29:13
  30:8 31:5,20
  40:9 43:15,19
  44:4 45:18,22
  47:12 50:8
  58:13 59:11
  60:21,25 61:4
  61:5 62:22
  71:9 76:22
  78:22 79:13
  85:2,2,4,8
  87:22 90:12
  92:21,24 93:2
  93:5,12 95:12
**report's**  7:17
**reported**  1:16
  18:11 32:24
  44:21
**reporter**  1:16
  3:8,15 20:18

20:21 39:12,14
  52:25 60:6
  94:1 95:5
**reporting**
  48:22
**reports**  5:15
  6:10,17 9:10
  14:9 22:10
  25:8 69:22,24
**represent**  3:10
  16:10,23 50:22
  51:11,12 79:11
  80:9,12
**representation**
  37:12
**representative**
  40:6 43:16,22
**representativ...**
  44:17
**represented**
  18:18 50:11,15
  52:6 77:13
**representing**
  3:6 76:16
**request**  11:9
**requested**  9:19
  95:7,8
**require**  69:2,12
  75:20
**required**  68:18
  73:4 74:20
  75:16 98:13
**requirements**
  70:20 75:19

**requires**  69:7
**research**  23:9
  49:2 90:17
**resistance**
  55:14 57:13
**resources**
  21:25 22:7
**respect**  12:14
**responding**
  90:6,8 91:4
**response**  34:23
  67:5
**responsibility**
  34:1,3
**responsible**
  69:24
**restroom**  40:23
**resulted**  27:23
**results**  40:13
  44:7 48:13
  65:21 66:3
**retained**  14:2
**return**  96:13,16
**review**  5:8 6:15
  7:20 13:23
  14:8 60:22
  96:7
**reviewed**  5:25
  6:7,25 9:16
  11:12,15 17:15
  54:21 87:25
**reviewing**
  11:10 19:1
  36:8

**rhill**  2:14
**richard**  2:12
**rick**  3:13 9:2
**right**  4:3,24
  7:10 8:9,16
  10:14 11:18
  12:1,1,12,17
  13:5 15:14,20
  17:6,10 22:1
  30:2,5 31:21
  31:25 32:3,21
  33:21 34:17
  36:11,12 37:4
  37:11,24 39:8
  39:16 40:11
  42:8 45:17
  46:2 48:7,17
  51:10 52:7,19
  54:16 56:19,20
  61:22 62:24
  67:6,17 68:7
  69:7,8,17
  70:15,23 71:10
  72:11,14,22
  73:1,3 76:2
  77:15,17 78:5
  78:8,14 79:1,7
  79:14,19,25
  80:4,12,20
  81:18 84:5
  86:17 87:10,14
  89:6 91:14,25
  93:6,21,22
**road**  2:12

Christopher D. Roche                                              July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[robson - share]**                                                      Page 22

**robson** 10:19
  10:20 15:17
**roche** 1:11 3:4
  3:18,22 5:23
  42:13 68:17
  70:3 92:19
  93:15 96:5
  97:2,24 98:2,4
  98:12
**role** 89:21
**rolling** 55:25
  56:23,25,25
  57:5,11,11,13
  57:14,21 58:3
**roof** 61:25 62:5
  62:11,14,20
  63:3,9,10,14,21
  63:25 64:1,3
  64:13,15,24
  65:9,15 66:19
  67:2,8 68:1,2
  68:22 69:14,22
  78:21
**room** 41:16
**rotated** 84:18
**rotation** 82:1
**rough** 1:8 3:5
  3:13 5:15 7:6
  96:4 97:1 98:1
**row** 27:16,19
  39:15,19,23
  50:11 51:19
  82:11,23
**run** 14:22,25
  15:10 28:22

49:11,22,23
55:4,6 66:6
67:14 68:18
69:23 71:7
72:5 74:16
**rws** 1:7

**s**

**s** 95:10 97:3
**safe** 9:6
**safety** 17:7
**santana** 1:3 3:5
  50:11 96:4
  97:1 98:1
**satisfied** 58:12
**satisfy** 71:24
  72:2
**saying** 6:23
  27:25 28:1
  30:14 36:16,19
  37:4,11 45:9
  45:22 46:17
  69:10 72:14
  73:7 80:4 81:5
  81:18,21 82:13
  82:14,25 91:8
  91:20
**says** 5:21 7:1
  31:5
**scale** 17:22
**scan** 32:16
  63:20 78:4
  95:13
**scans** 80:2
**scene** 51:16
  76:22

**scientific** 33:24
  46:10 49:6
  90:1,23 91:24
  93:8
**scope** 58:16
  85:2 87:22
**scratch** 41:7
  67:20 92:3,4
**screen** 3:23,24
  4:19,20 31:17
  32:5 62:25
  67:7 77:15
  82:9
**se** 69:25
**seal** 94:10
**seat** 45:19
  50:14 51:19
  79:15,21 80:10
  80:13,14,15,16
  80:16,17,19,22
  81:3,6,6,10,12
  81:14,19,22
  82:2,5,7,11,19
  82:20,23 83:3
  83:4,5,12,18,21
  83:22,24 84:1
  84:18,20
**seats** 27:9
  81:24
**second** 27:16
  27:19 39:11,15
  39:19,22 51:19
  82:11,23
**section** 6:11,16

**see** 3:24 4:19
  4:22,23,24
  10:2 17:18,23
  27:3 29:13
  31:2 32:5,15
  34:8 42:7 43:7
  51:23 52:16
  53:23 62:13,18
  62:20 72:5
  77:15 80:17,25
  81:21,24 85:19
  87:12 88:5
  89:8
**seeing** 63:9
**seems** 33:5 55:3
**seen** 6:3 29:10
  38:7
**self** 71:5,7
**sense** 36:8 55:3
  81:17
**sent** 96:14
**separate** 68:18
  86:7
**separated**
  81:25
**set** 30:16 35:7
  49:11
**setup** 13:11,13
  24:4 25:23
  33:6 89:25
  90:3,24 91:18
**shapes** 31:23
**share** 3:22 4:19
  31:16 77:14

Christopher D. Roche                                      July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[shared - stated]**                                              Page 23

| | | | |
|---|---|---|---|
| **shared**  77:15 | **simply**  28:1 | **solvent**  16:23 | 70:18 |
| **sharing**  31:16 | 34:6 35:10 | 16:24 17:11 | **specifically** |
| 31:19 | 40:17 58:16 | 52:1 76:4 77:3 | 10:18 |
| **sheet**  30:23 | 62:4 63:20 | **somebody** | **speed**  30:20 |
| 31:1 32:3,17 | 66:21 67:25 | 41:21 | 35:20,22,25 |
| 37:23 96:11 | 68:3 79:21 | **sorry**  4:20 | 74:19 |
| **shop**  51:15 | 90:6,8 | 10:12 11:7 | **spent**  61:16 |
| **show**  78:6,11 | **simulation** | 12:13 15:5 | **split**  81:25 |
| **showing**  55:2 | 15:10,15 19:13 | 20:17 28:20 | **stage**  52:24 |
| 67:7 78:15 | 59:22 61:11,17 | 33:14 39:12 | **standard**  15:24 |
| 79:4 80:21 | **simulations** | 41:15 42:2,5,8 | 20:13,13 25:18 |
| 83:2,23 | 14:25 28:22,25 | 52:25 55:21 | 54:10 73:6 |
| **shown**  81:1 | 59:5 60:17 | 58:23 60:6 | **standards** |
| 82:8 | 61:2 66:1 93:7 | 62:18 67:4,5 | 15:22 16:1,13 |
| **shows**  80:7,14 | **single**  88:22 | 69:4 78:5,7 | 16:17,18,19 |
| **sic**  59:3 74:6 | **sir**  53:1 | 79:6,18 | 17:7 21:2 22:6 |
| 89:24 | **sit**  20:7 21:10 | **sort**  23:1 72:2,9 | 22:8,11 23:2 |
| **side**  14:1 35:3 | 61:14 77:1 | 76:11 | 72:16 73:24 |
| 36:11 | **site**  52:21 | **sound**  24:21 | **stands**  72:11 |
| **sign**  93:21 | **situation**  85:5 | **sounds**  46:16 | **star**  72:2,21 |
| 96:12 | **situations**  14:1 | **source**  15:23 | **stark**  85:21 |
| **signature**  94:19 | **skid**  55:19 | **sources**  22:7 | **start**  4:15 |
| **signed**  96:19 | **slight**  78:17 | **south**  94:3,11 | 11:14 52:14 |
| **significant** | **slightly**  66:17 | **southeast**  96:15 | **started**  41:17 |
| 48:15,19,25 | 73:12 81:25 | **space**  39:11,12 | **starting**  17:13 |
| 49:1,20 52:10 | **smaller**  38:13 | 39:13,22 51:18 | 18:7,10,16 |
| 53:25 | 38:15 | **spartanburg** | **state**  3:9 5:11 |
| **significantly** | **sneak**  42:1 | 94:11 | 15:23 20:12 |
| 27:18,18 54:7 | **snyder**  2:4 | **speaking**  17:10 | 27:14 29:11 |
| 63:15 82:3 | **softer**  66:18 | 46:20 47:2 | 47:24 57:3 |
| 83:19,22 89:3 | **software**  14:24 | 50:2 | 77:9 94:2 |
| **similar**  72:19 | 15:15,16,16,19 | **specific**  23:8,18 | **stated**  5:9,12 |
| 74:9,21,23,24 | **solution**  16:24 | 24:1 25:8,9,19 | 16:7 28:3 |
| **simple**  19:19,20 | **solutions**  3:7 | 25:23 26:19 | 34:12 35:5 |
| | 11:23 96:23 | 34:24 53:8 | 45:8 54:1,22 |

Christopher D. Roche
July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[stated - system]**
Page 24

| | | | |
|---|---|---|---|
| 57:23 58:11 | **structure** 31:6 | 59:8,14 60:13 | 63:13,15 64:4 |
| 66:7 75:10 | 31:10 32:13,18 | 61:22 62:4,19 | 64:7,9,17 66:2 |
| 91:13 | 38:14,16 64:6 | 63:8,11,22 | 66:3,12,14,19 |
| **statement** 6:11 | 64:16,17 66:18 | 64:1,5,13,19,23 | 67:12,23 68:1 |
| 16:9 91:4 | 82:20 85:24 | 65:9,13,16,19 | 68:6,20,24 |
| **states** 1:1 | 86:9,12,13 | 66:23 67:2,9 | 69:3,13,19 |
| **static** 79:15,23 | 89:9,16 | 67:15 74:8,9 | **supplemental** |
| 80:3,21 | **structures** | 74:18,21 75:6 | 5:7,9 6:10 85:2 |
| **stating** 62:4 | 38:10 56:6 | 76:20 78:9,12 | 85:4 |
| 75:2 83:5 | 62:5 64:3,9,10 | 78:12,16 79:18 | **supplied** 17:16 |
| **step** 10:1 | 66:15 68:1,2 | 79:20 80:21 | **support** 7:5,17 |
| **stepp** 1:16 3:8 | 86:5 89:21 | 82:3 83:3 | 7:17,18 21:12 |
| 94:2,19 | **studying** 30:19 | 85:22 87:4,9 | 93:9 |
| **stiffer** 66:15 | **subject** 16:8 | 87:18,20 88:6 | **supported** 61:8 |
| 68:1 | 19:1,3,9 25:16 | 88:8,14,16,25 | **sure** 8:8 9:3 |
| **stiffness** 64:16 | 25:24 27:20,22 | 89:22 91:10,22 | 11:4 22:5 30:6 |
| 65:20 68:23 | 28:2,6,24 29:3 | **submit** 69:23 | 31:13 36:24 |
| **stoddard** 16:23 | 29:12 30:1,12 | **subscribed** | 42:8 55:22 |
| 16:24 17:10 | 30:19 31:1 | 98:14 | 58:25 59:19 |
| 52:1 76:4 77:3 | 32:1,21,23 | **subsequent** 6:5 | 68:25 69:6,6 |
| **stop** 31:16 | 33:2,8,13,13,25 | 8:25 51:17 | 77:14 78:20 |
| **straightforward** | 34:8,20 35:8 | **substitute** | 84:10 86:17 |
| 56:10 | 35:17 36:4,10 | 76:16 86:10 | **surface** 38:2 |
| **strength** 64:16 | 36:11,17,17,22 | **sufficient** 10:3 | 63:9,14 |
| **strike** 56:3 | 38:21,25 39:23 | 53:3 | **survival** 39:11 |
| 60:14 64:20 | 39:25 40:4,7 | **suggest** 15:1 | 39:13,22 |
| 90:20 | 40:19 43:9,17 | **suggesting** | **surviving** 1:4 |
| **stripped** 89:10 | 43:23 44:18 | 46:17 75:6 | **suv** 85:18 |
| **stronger** 66:15 | 45:10 46:1,3,4 | **suite** 2:6,13 | **swear** 3:16 |
| 68:1 | 48:5,9,11 | **summarize** | **switch** 73:13 |
| **struct** 38:14 | 49:12,21,25 | 14:12 | **sworn** 3:17,19 |
| **structural** | 51:9,22 55:16 | **sun** 62:7 | 98:14 |
| 85:16 86:25 | 56:7,12,14,15 | **suncruf** 67:23 | **system** 17:5 |
| 88:23 90:15 | 56:16 57:25 | **sunroof** 61:9 | 19:3,4 52:12 |
| | 58:18,20 59:1 | 61:11 62:7 | 52:16,22 53:4 |

Christopher D. Roche                                July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[system - testing]**                                          Page 25

| | | | |
|---|---|---|---|
| 53:7 70:1 71:5 74:15,16 77:10 | **ten** 68:9 92:8 | 38:18,20,24 | 70:1,20,22 |

**t**

**t** 95:10 97:3,3
**take** 40:21
  51:21 68:8
  92:5
**taken** 1:15
  32:16 41:1
  68:12 80:2
  92:14
**talk** 54:16
  87:23
**talked** 10:22
  78:20
**talking** 19:15
  22:13 24:12
  25:10 31:7
  32:9 46:3,4
  47:16 87:11
  88:21
**talks** 85:3
**tank** 19:7,24
  52:1,2 76:5,14
**tanks** 50:21
**target** 26:11
**tash** 74:6
**technological**
  4:20
**tedra** 2:4,7
  3:11 46:21
  96:1,2
**tell** 8:3 11:18
  37:7,7 89:20

**ten** 68:9 92:8
**tend** 84:19
**term** 19:21
  30:6 38:5
  71:21 74:24
  75:25 84:23,24
**termining** 33:8
**terms** 12:8
  17:16 18:3
  23:11 24:4
  39:6,6 44:22
  65:21 75:9
  82:2 86:10
  87:10
**test** 9:20 10:6
  11:3,5,13 13:8
  13:11,13,13,18
  14:10,16,22
  15:24 16:6,14
  17:3,8,13,17,20
  17:22,24 18:8
  19:2,2 20:15
  21:2,5,24
  23:15 24:4
  25:15,20,23
  26:5,6,11,13,14
  26:15 27:12,13
  27:23,24 28:4
  28:7,12,24
  29:3,5,14,23
  30:10,11,15,18
  30:24 31:25
  33:6 34:7,12
  35:5,9,21,25
  37:1,3 38:6,7

38:18,20,24
39:1,23,24,25
40:2,6,13,18
41:6 43:7,12
43:13,17,21,24
44:2,6,8,18,24
45:3,7,11,17,21
45:25 46:14
47:25 48:1,5,9
48:11,13,19
49:1,2,10 50:4
50:25 51:8,13
52:6,9,13,21
53:21 54:5,9
54:10,12,19
55:1,4,10,12,20
55:24 56:8,14
56:20,21,22
57:22,25 58:4
58:10,13,17,21
58:21 59:2,3,7
59:8,12,18,20
59:25 60:12,19
61:4,21 62:1,3
62:10,12,15,19
62:21 63:3,8
63:10,22,24
64:1,7,12,14,18
64:25 65:10,13
65:15,19,22
66:4,6,7,12,13
66:24 67:2,8
67:12,14,24
68:3,6 69:2,11
69:12,19 70:1

70:1,20,22
71:8 72:3,7,23
72:24 73:2,9
73:18,21,23
74:2,9,11,14,15
74:17,17,19
75:15,25 76:12
77:3,8 79:3,17
79:18 80:5,13
80:15,18 81:4
81:7 82:6,12
83:3,6,12,15,25
83:25,25 84:7
85:4,19 87:9
87:24 88:2,10
88:17 89:12,13
89:22,24,25
90:2,2,3,5,7,23
90:24 91:10,17
91:18,21 93:10
**tested** 41:11
  72:8
**testified** 3:19
  41:8,12 42:13
  42:15 44:10,11
  65:2
**testimony** 5:23
  11:24 24:11
  43:3,6 46:18
  47:12 54:25
  58:7 60:5,8
  96:9,17 98:8
**testing** 11:9,10
  11:11,16 12:2
  12:5,6,22,25

Christopher D. Roche                      July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[testing - two]**                                          Page 26

| | | | |
|---|---|---|---|
| 13:2 14:2,4 | 76:1,3 | 10:19,20 14:6 | **translation** |
| 15:2 21:3,5,14 | **thank** 3:22 | 18:9 19:9 | 81:6,8 82:19 |
| 21:14,22,25 | 39:14 66:11 | 29:12 30:4 | 83:11,13 |
| 22:4,6,7,8,10 | 70:8 93:15 | 41:4,17 56:2 | **traveled** 56:4 |
| 22:11,13,16,20 | **thanks** 42:10 | 56:16 61:16 | **tried** 39:9 |
| 22:21,22,24,25 | **thereof** 94:8 | 68:7,15 76:7 | 65:22 |
| 23:8 25:7 26:1 | **thing** 32:9 | 92:17 96:18 | **truck** 85:17 |
| 28:10,13 40:12 | 73:14 74:12 | **timeframe** 96:8 | **true** 9:18 20:3 |
| 53:12 59:6,22 | **things** 5:17 | **today** 4:9 9:17 | 74:12 94:4 |
| 60:17 61:1 | 24:13 72:21 | 20:7 21:11 | 98:8 |
| 66:1,17 68:23 | **think** 5:4,20 | 53:17 54:14 | **try** 14:12 23:9 |
| 69:10 70:12,12 | 7:9,14 8:24 | 61:15 77:1 | 25:16 30:16 |
| 70:17,19 71:1 | 9:18,25 10:21 | 87:25 92:20 | 47:6 58:13 |
| 71:4,12,12,12 | 11:7 12:9,9 | 93:11 | 60:23 |
| 71:15,19 72:17 | 21:16,22 24:23 | **tol** 53:18 | **trying** 16:23 |
| 73:4,6,14,23 | 29:17 31:7 | **told** 92:2 | 18:25 24:16 |
| 74:5,13 75:11 | 32:5 44:23 | **tolerance** 52:11 | 34:3,5 35:8,9 |
| 75:20 77:1,12 | 49:19 54:6 | 52:15,16 53:11 | 36:12,23 42:1 |
| 90:17 92:22 | 57:6 62:13 | 53:14,20 54:4 | 43:16 47:7 |
| 93:4,7 | 63:7 68:7 71:2 | 54:11 | 54:7 55:4 |
| **tests** 10:14,25 | 71:11 78:3 | **tolerances** | 59:11,15 64:5 |
| 12:8,11,16,20 | 79:9 81:5,22 | 53:18 | 74:8 75:9 |
| 13:14,22,24 | 86:1 87:21 | **took** 55:10 | 76:10 79:21 |
| 16:2,17 21:9 | 90:11 | **top** 19:10 29:17 | 88:3,5 91:23 |
| 23:1,9,22 24:2 | **thinks** 91:4 | 53:19 76:6 | **turn** 30:5 42:7 |
| 24:2,5,7 25:18 | **third** 63:18 | 78:6 84:23 | **turning** 61:9 |
| 49:23,23 53:10 | **thought** 12:13 | **topics** 93:3 | **two** 5:15,15 |
| 53:13,15,18 | 28:20 33:15 | **towards** 32:17 | 13:22 17:18 |
| 68:19,21 69:1 | 41:18,23 | 84:20 | 27:9 31:22 |
| 69:7 70:23 | **three** 5:17 | **transcript** 2:19 | 33:11,12 34:7 |
| 71:7,22,23,23 | 22:11 24:14 | 8:12 10:10 | 34:9,20 44:13 |
| 72:5,18,19,25 | 63:7 | 93:21 94:4 | 72:21 79:10 |
| 73:16,17,20 | **till** 8:23 | 96:6,19 98:5,8 | 83:4 92:6,10 |
| 74:7,21 75:14 | **time** 1:13 3:2 | **translated** 83:5 | 93:3 |
| 75:16,21,22 | 7:21 9:22 10:4 | | |

Christopher D. Roche                                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[type - vehicle]**                                                    Page 27

| | | | |
|---|---|---|---|
| **type** 12:2 14:4 | **underride** | 90:20 | **vague** 29:7 |
| 33:23,24 48:1 | 85:15 | **unusual** 55:3 | 39:3 74:23 |
| 71:15 | **understand** | 90:14 | **valid** 53:18 |
| **types** 22:2 24:1 | 18:5 22:5 | **upper** 85:24 | 71:9 |
| **typical** 76:18 | 24:17 25:14 | 89:9 | **values** 90:9,10 |
| **typically** 21:6 | 26:8 31:4 32:4 | **upperbody** | **variable** 43:25 |
| 73:22 77:9 | 32:22 33:4 | 87:15 | 48:7,10,16 |

| **u** |
|---|

| | | | |
|---|---|---|---|
| | 34:22 36:13 | **use** 16:22 18:6 | 51:10 59:19 |
| **uh** 40:7 56:2 | 40:6 44:16 | 18:15 19:21 | 66:2,10,22 |
| **uhm** 8:12,13 | 46:10 54:17 | 36:2 40:23 | **variables** 43:22 |
| 10:1 11:9 | 59:11 63:4,19 | 50:20,21 64:6 | 45:10 48:4,8 |
| 17:15 21:3 | 66:8 67:18 | 73:25 75:9,10 | 48:18,21,25 |
| 23:12 26:10 | 70:16 71:16 | **used** 14:25 | 58:15 59:17 |
| 29:10 33:3 | 79:9 86:1,18 | 15:19 16:19 | 65:23 91:9,12 |
| 34:22 38:8 | 88:3 89:11 | 17:12 20:15 | **variety** 71:24 |
| 42:12 46:16 | **understanding** | 21:13 25:25 | **various** 86:9 |
| 53:16 54:21 | 33:19 44:22 | 33:23 35:23 | **vary** 64:4 |
| 55:1 56:24 | 52:15 56:18 | 36:5,7 50:22 | **vehicle** 12:8,10 |
| 61:5,12 64:3 | 61:17 69:18 | 50:23 53:4 | 15:24 16:14,20 |
| 64:15 73:12 | 82:24 | 61:10 63:12 | 17:7,22,24 |
| 75:13,14 76:21 | **understands** | 68:6 74:24,25 | 18:19 19:1,4,6 |
| 81:5 82:25 | 62:6 86:2 | 75:17,25 96:19 | 19:9,23 20:14 |
| **unchanged** | **understood** | **using** 24:25 | 21:4 26:17 |
| 80:15 83:24 | 52:13,19 71:2 | 74:25 87:1 | 29:12 30:18,19 |
| **unclear** 23:5,19 | 89:23 | **usually** 76:15 | 32:11 34:8 |
| 24:12 | **undertaken** | **util** 15:18 | 38:1 48:2 49:7 |
| **undamaged** | 33:22 | **utilize** 15:17 | 49:8 55:16 |
| 78:18 | **unibody** 86:5 | 22:4 | 57:17 63:18 |
| **under** 6:11 9:8 | 86:11 | **utilized** 15:18 | 65:10 68:17,19 |
| 63:4 | **unitary** 86:5 | **utilizing** 55:11 | 70:1,24 71:12 |
| **underbody** | **united** 1:1 | | 71:19 72:8 |
| 82:16,17 85:20 | **unrepresentat...** | **v** | 74:1 78:16 |
| 85:23 87:1,12 | 30:1 45:12 | | 81:2 82:4 |
| 87:14,16 89:2 | **unresponsive** | **v** 14:1 96:4 | 85:22 86:5,6 |
| 89:16 90:15 | 60:15 64:20 | 97:1 98:1 | 86:11,16 87:10 |
| | | **vac** 51:15 | |

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[vehicle - wwhgd.com]**                                    Page 28

87:13 89:9
**vehicle's**  29:15
**vehicles**  9:20
  9:21 10:6 11:5
  15:22 23:10
  33:11 34:7
  37:12 48:10,12
  62:7,8 63:7
  64:4 66:16
  73:14,17,21
  76:14
**veracity**  59:11
**verify**  96:9
**veritext**  3:7
  96:14,23
**veritext.com.**
  96:15
**versus**  3:5
  11:22 57:3,18
  65:19 66:2,19
**vertical**  23:11
  34:10
**video**  3:2,3
  30:20 70:4
**videographer**
  2:17 3:1,7,15
  40:25 41:3
  68:10,14 92:12
  92:16 93:18
**videotaped**
  1:10
**view**  19:25
  29:21 35:25
**visual**  37:12

**vs**   1:7

**w**

**wait**  10:12
**waive**  93:22
**walked**  37:10
**want**  12:18
  22:18 39:17
**wanted**  71:24
**wants**  49:20
**water**  50:21
**way**  13:7,25
  14:10,21 20:1
  27:25 49:11,24
  55:23 60:16
  66:6 71:3
  73:25 74:25
  81:12 89:4
  92:25
**ways**  13:17
  49:13
**we've**  24:14
  38:9 40:20
  78:20
**weight**  14:16
  16:24,25 17:12
  17:17,17,20,22
  17:25 18:3,3,6
  18:10,11,16,17
  18:18,25 19:5
  19:6,12,23,23
  20:8,10 26:4,9
  26:11,13,13,18
  26:19,20 27:19
  27:22 28:2,23
  29:2,14,15

49:5,8,15
50:13,14 51:4
51:12,22,23
52:6
**weights**  14:18
  14:19 16:8
  29:11 50:9,12
**weinberg**  2:11
**welcome**  60:22
**went**  13:18
  14:5
**wheel**  78:17
**wheelbase**
  78:12 79:3,3,4
  82:18
**wheeler**  2:11
**wheels**  55:19
  55:25 56:4,22
  57:5,17,21
  58:4
**whichever**  38:5
**whoops**  77:15
**width**  30:25
  31:6,8 32:2,8,9
  32:12,17 37:23
  43:9
**window**  36:12
**withdraw**
  85:12
**witness**  3:16,17
  5:12 15:4
  19:16 39:13,16
  39:19 44:11
  45:9 47:3
  49:19 50:7

53:2 65:8 84:7
91:2,20 93:20
94:9 96:8,10
96:12,18
**wor**  11:4
**word**  74:23
**words**  83:9
**work**  10:16,21
  11:1 15:11,12
  29:1 32:14
  34:20 35:1
  38:23 43:11
  44:5 45:2 46:4
  49:14,22 58:16
  60:22,25 61:6
  61:8,24 62:9
  63:23 64:11,21
  65:6,25 67:10
  72:5 83:18
  93:8
**worked**  66:16
**working**  43:20
**works**  71:4
**world**  11:4
  16:18 22:4
  25:19
**worry**  42:6
**write**  10:3
**writing**  58:13
  69:21
**written**  40:8
**wrong**  13:25
  75:9
**wwhgd.com**
  2:14

Christopher D. Roche                    July 17, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

**[x - zoom]**                                              Page 29

| x |
|---|
| **x**  81:11,15 |
| 82:12 95:1,10 |
| **x's**  82:1 |
| **y** |
| **y**  81:19 82:12 |
| **y'all**  41:16 |
| **yeah**  10:20 |
| 12:14,24 13:25 |
| 15:10 18:5 |
| 23:25 41:18 |
| 42:1,7 43:1,6 |
| 48:15 53:2 |
| 55:23 56:13 |
| 60:11 63:6 |
| 70:14 76:1,6 |
| 77:5 78:3 79:6 |
| 80:23 83:16 |
| 84:12 88:20 |
| 92:9 |
| **year**  11:25 |
| 13:21 |
| **young**  11:22 |
| **z** |
| **zoom**  2:3,10 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.