# Exhibit 6

Case 2:22-cv-00017-RWS   Document 183-6   Filed 03/17/25   Page 2 of 8
Wesley Grimes                                                May 9, 2024
Bryson, Santana and Joshua v. Rough Country, LLC

Page 1

```
 1                UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF GEORGIA
 2                    GAINESVILLE DIVISION
 3
        SANTANA BRYSON and JOSHUA   )
 4      BRYSON, as Administrators of)
        the Estate of C.Z.B., and   )
 5      as surviving parents of     )
        C.Z.B., a deceased minor,   )
 6                                  )
                 Plaintiffs,        )
 7                                  )   CIVIL ACTION FILE
        vs.                         )
 8                                  )   NO. 2:22-cv-17-RWS
        ROUGH COUNTRY, LLC,         )
 9                                  )
                 Defendant.         )
10      _____
11
12                 VIDEOTAPED DEPOSITION OF
13                     WESLEY D. GRIMES
14                       May 9, 2024
15                       10:17 a.m.
16
17         Weinberg Wheeler Hudgins Gunn & Dial
18                3344 Peachtree Road, NE
19                      Suite 2400
20
21                    Atlanta, Georgia
22
23
24
25         Reported by:  Marsi Koehl, CCR-B-2424
```

1    the crash test?
2         A.   No.
3         Q.   And who else was there?
4         A.   All of the Exponent staff and an attorney
5    from Mr. Hill's office.
6         Q.   Was Dr. Nguyen there?
7         A.   Oh, yes, yes.  Thank you.  She was.
8         Q.   How many Exponent staff were present
9    approximately?
10        A.   I don't know.  Five or six.  You know, I'm
11   running cameras and setting up things.  There may
12   have been 10.  I don't know.
13        Q.   Did you make any changes to the crash test
14   setup on the day of the test?
15        A.   No.
16        Q.   Was the purpose of the crash test to
17   recreate the subject collision if the F-250 had not
18   been lifted?
19        A.   It wasn't really to recreate it.  It was to
20   explore what type of intrusion would occur without
21   the lift kit on the vehicle.  We're not trying to
22   recreate it because we don't have cargo in the back.
23        Q.   The purpose of it was to isolate how
24   different the intrusion would be had the F-250 not
25   been lifted; is that fair?

1    A.  That was one goal, yeah.  And for me, that
2    was the primary goal was to -- to look at if we make
3    the test as simple as we can with a nonlifted
4    vehicle, but we want to match as closely as we
5    reasonably can the speeds, the weights, the offset,
6    the angles; things like that.  We want to match all
7    of that as much as we can.
8         But we don't have cargo in the vehicle, so
9    I'm not going to say we're trying to recreate the
10   crash.  We're looking at what type of intrusion is
11   going to happen without a lift kit on the pickup
12   truck.
13        Q.  Why do you want to match the speeds, weight,
14   offsets and angles?
15        A.  So that we can -- I can come to the
16   conclusion that the lifted -- the lift kit on the
17   pickup didn't affect significantly the amount of
18   intrusion that would have occurred.
19        Q.  If the speeds, weights, offsets and angles
20   weren't matched, are you saying that you wouldn't be
21   comfortable coming to that conclusion?
22            MR. HILL:  Object to form.
23            THE WITNESS:  I think there's a range
24        for all of those things and we want to be
25        within that range.

1  BY MR. MASHMAN:
2      Q.  But the goal of matching is so that you can
3  reasonably say as a scientific principle that the
4  difference in height is what resulted in the
5  difference of intrusion; is that fair?
6          MR. HILL:  Object to form.
7          THE WITNESS:  Or didn't.  Yeah, yeah.
8  We want to be able to draw conclusions.
9  BY MR. MASHMAN:
10     Q.  And the way to do that is to isolate the
11 variable that you're changing; is that fair?
12     A.  Well, we're -- the way to do it for what we
13 did is to run the simplest test we could for a pickup
14 to match the key components of the crash without a
15 lifted truck.
16     Q.  Why didn't you run a second crash test with
17 all of the cargo directly behind Cohan as a worst
18 case scenario to see how it affected the intrusion?
19     A.  Because we didn't know exactly where the
20 cargo was and I didn't to subject myself to the
21 criticism of you had the bag of clothing in the wrong
22 place or you had the Shop-Vac in the wrong place or
23 whatever.
24         And really more importantly is Dr. Nguyen
25 looked at the actual vehicle and said it was

```
 1   BY MR. MASHMAN:
 2        Q.  I want to ask you about the emergency brake
 3   we talked about a second ago.
 4             Did you direct Exponent to engage the
 5   emergency brake of the Escape before the crash test?
 6        A.  Not specifically.  I think that was a
 7   decision -- first of all, I don't know that it was on
 8   at the actual impact.  It may have been on to make
 9   sure the vehicle didn't move before the test.  I
10   don't know.  As I sit here, I don't know.
11             But it doesn't bother me because you then
12   have an axle that's locked.  That's not an issue for
13   me because the vehicle was in gear.
14        Q.  I think my -- my question was whether you
15   directed Exponent to engage the emergency --
16        A.  I did not.
17        Q.  Were you ware that Exponent had pulled the
18   emergency brake before the test?
19        A.  You know, they may have told me that out
20   there.  I don't specifically recall being told that.
21        Q.  Do you have any recollection of Exponent
22   telling you why they did that?
23        A.  No.
24        Q.  The test Escape did not have any cargo in
25   the cargo area during the crash test, correct?
```

1    A.  Correct.

2    Q.  Why not?

3    A.  Because we didn't feel it was necessary to
4  put that in for our purposes and we didn't know
5  exactly where the cargo was -- was at the time of the
6  crash.

7         Ms. Kelley and Mr. Bryson didn't recall
8  either.  And so instead of guessing at that, we
9  wanted to understand what would happen without the
10 cargo.  We always knew that if we put cargo in,
11 whatever displacement we had of the tailgate would be
12 amplified if there were materials in there taking up
13 that space.

14        So it was the simplest test we could run
15 without -- without compromising those types of
16 things.

17   Q.  I think you said earlier you didn't want to
18 guess where the cargo was located in the Escape; is
19 that fair?

20   A.  Yes.

21   Q.  Why is it important not to guess where the
22 cargo was located in the Escape?

23   A.  Because if we had put the cargo in and we
24 got whatever that result was, we could be subject to
25 criticism for not knowing where it was and

Page 194

1    purposefully placing it for some purp- -- some of our
2    own purposes and we had no desire to do that.
3         Q.   And that criticism would be that the cargo
4    was in a different location than where it was in the
5    subject wreck, right?
6         A.   Yes.
7         Q.   And isn't it true by not including any
8    cargo, the cargo was not in the same location that it
9    was in the subject wreck?
10        A.   That's true.  But it also then doesn't have
11   an artificial effect on the seat back displacement.
12            MR. MASHMAN:  I'm showing you
13        Plaintiff's Exhibit -- I think that says
14        75 -- yes.  It's two pictures of the damage
15        to the Escape after the crash test.
16            (Plaintiff's Exhibit 75 was marked for
17        identification.)
18   BY MR. MASHMAN:
19        Q.   The second picture might be a little better
20   for this, picture 385.  Do you see that?
21        A.   Yes.
22        Q.   Do you see a mark left by the Ford F-250's
23   Ford emblem on the rear of the Escape?
24        A.   No.
25        Q.   I'm looking at this mark above where it