# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| SANTA BRYSON and JOSHUA BRYSON, as Administrators of the Estate of C.Z.B. and as surviving parents of deceased minor, C.Z.B., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. |
| v. | ) ) | 2:22-CV-17-RWS |
| ROUGH COUNTRY, LLC., | ) ) | |
| Defendant. | ) ) ) | |

**DECLARATION OF PAUL LEWIS, JR., MS, B.M.E.
IN RESPONSE TO DEFENDANT ROUGH COUNTRY'S
*DAUBERT* MOTION TO EXCLUDE CERTAIN OPINIONS**

1. I have reviewed "Defendant's Rough Country's *Daubert* Motion to Exclude Certain Opinions from Paul R. Lewis, Jr.". The purpose of this affidavit is to address the issues raised in the motion.

2. I am a Biomedical Engineer who provides expertise in the areas of biomechanics, occupant kinematics, crash dynamics, and injury causation.

3. Biomechanics is the study and effect of motion and forces on the human body. Kinematics is the study of motion- as applied to occupant kinematics it is the study of the body's motion. Dynamics is the study of forces on the human body that result in that motion and failure of the body due to the forces. These areas are related to medicine but are separate disciplines. The role of a medical doctor is to diagnose an injury and treat it. The role of biomedical/biomechanical engineer is to identify the injury and consider the forces and motions

necessary to cause the injury due to his/her specialized knowledge in injury mechanisms and tolerance values.

4. My qualifications are set forth in detail in my Curriculum Vitae that was provided with my report in this case. Both my CV and report are attached hereto as Exhibits A and B, respectively.

5. My educational background consists of a Master of Science in Biomedical Engineering from the University of Alabama Birmingham received in 1995 and a Bachelor of Science in Industrial Engineering from the University of Alabama received in 1991. From September 1996 through September 1998, I was an intern at the Office of the Medical Examiner in Metropolitan, Atlanta, Georgia. In September 1998, I began working for Burton & Associates, a consulting firm, in Alpharetta, Georgia. In 2011, I formed my own company, Bioforensic Consulting, Inc., providing consulting in the areas of biomedical and biomechanical engineering, occupant kinematics, and injury causation in a wide range of accident scenarios including transportation crashes.

6. As a Forensic Investigator and Primary Biomechanical Engineering Consultant, I have assisted with on scene and follow up investigation of traffic fatalities, homicides, suicides and natural deaths. I have also assisted in hundreds of postmortem examinations, autopsies and exhumations of victims that lead to the determination of the cause and manner of injuries and death. This includes responding to scenes of motor vehicle crashes to extricate the victims and then participate in the autopsies performed to identify the injuries that were sustained and resulted in death while at the Medical Examiner's Office.

7. As of 2025, I have been involved in the investigation of over 5,000 vehicle accidents/incidents with fatality, life threatening and permanently disabling injuries, most of which are brain and spinal injuries. Further, I have been involved in numerous forms of testing simulating automobile accidents with and without dummies, and I have authored and co-authored numerous papers pertaining to such. A list of these papers, as well as further details of my background and training, is contained in my attached Curriculum Vitae.

8. One federal district court summarized my qualifications as follows:

"Lewis is a highly qualified biomechanical and biomedical engineer with substantial experience in the investigation and analysis of automobile/heavy truck accidents, especially accidents with fatalities or serious injuries. Lewis has a Master of Science in Biomedical Engineering from the University of Alabama Birmingham (1995). His undergraduate degree is a Bachelor of Science in Industrial Engineering from the University of Alabama, Tuscaloosa, Alabama (1991). His course of study for his undergraduate degree included numerous mechanical engineering courses. He served a two-year internship in forensic pathology at the Office of the Medical Examiner, Metropolitan Atlanta, Georgia (1996–1998). From 1991 to 1998, he worked as a consultant in injury causation, occupant kinematics (body movement), accident reconstruction, and vehicle testing. Since 1998, he has worked as a forensic investigator and biomechanical 3 engineering consultant. He has been involved in the investigation of approximately 3000 vehicle accidents with fatality or significant injuries since 1995. Lewis' CV lists 15 manuscripts to his credit in the field of vehicular accidents and injuries, several presentations and lectures on biomechanical and biomedical issues in accidents, and 15 professional development classes, seminars, and symposiums. … Lewis has published articles and presented papers about the dynamics of accidents with a particular focus on the reaction of the body to different types of force. Lewis has conducted on scene and follow up investigation of traffic fatalities, homicides, suicides, and natural death. Lewis has conducted post-mortem examinations, autopsies and exhumations of victims to determine cause and manner of injuries and/or death. He has researched and prepared technical support issues regarding injury causation, prevention and control, occupant kinematics and accident reconstruction. He has membership in five professional engineering organizations. (Bullock v. Daimler Trucks North America, LLC, 2010 WL 4530417, *3 (D.Colo. Sept. 30, 2010)

9. I testify for both plaintiffs and defendants. My case acceptance criteria are based on the truth and merits of the case and not on which side is retaining my services.

10. I utilized the same methodology in this case that I utilize in every case, the Scientific Method of Inquiry. This is the same accepted methodology employed by my peers in the field of biomechanical engineering.

11. I have given deposition and trial testimony in Federal and State Court cases well over 1,200 times, including in the State of Georgia. The following are a list of deposition and trials on my current testimony list for the last 4 years of the cases I have testified in Georgia (none of which I was limited or stricken on). In consideration of the fact that I have been testifying for

3

over 25-years, if this list was all inclusive of that time frame the number of cases would be significantly greater:

- *Christine Carlisle, Plaintiff, v. St. Paul Apartments, Inc. Individually and d/b/a St. Paul's Apartments & Village, and St. Paul Village, Inc., individually and d/b/a St. Paul Apartments & Village, Defendants*, In the State Court of Bibb County, State Georgia, Civil Action No. 85985

- *Brittany Trice, Individually, and as Parent and Natural Guardian of Minor Z.S.R. II, Plaintiff, v. Dorel Juvenile Group, Inc.; Toyota Motor Corporation et al*, In the State Court of Dekalb County, State of Georgia, Civil Action Case No: 18A70371

- *Rebekah Youngers and Leonard Greene, as Guardians and Conservators for Brenda Elaine Greene, Plaintiffs, v. Ford Motor Company and Alexander Chase Wilson, Defendants*, In the State Court of Forsyth County, State of Georgia, Civil Action File No. 17-SC-0892-B

- *William Richardson, individually and on behalf of Seanesse Richardson, as his legal guardian and parent, and Seanesse Richardson, Plaintiffs, v. Fiat Chrysler Automobiles (FCA) US, LLC, DaimlerChrysler AG, Chrysler LC, Chrysler Group LLC, Kimberly Richardson, and John Doe, Defendants*, In the United States District Court for the Middle District of Georgia Valdosta Division, Civil Action File No. 7:19-cv-00015-HL

- *John Hartman, Plaintiff, vs. Liberty Chrysler Dodge Jeep, Inc., Thomas Albert Ward, III, David B. Clark, and John Does 1-10, Defendants*, In the State Court of Liberty County, State of Georgia, Civil Action File Number: STSV2019000044

- *Gaoly N. Lee, Individually, and as Surviving Parent of Kana Vang, Deceased, and Gaoly N. Lee, as Administratix of the Estate of Kana Vang, Plaintiff, v. Toyota Motor Corporation, Toyota Motor Sales, et al.*, In the State Court of Gwinnett County, Georgia, Case No. 20-C-03495-S4

- *Samantha Marie Loggins, Individually and as Natural Mother and Guardian for Ava Loggins, a Minor, Plaintiff, vs. Kia Motors Corporation, Kia motors America, Inc., and Heather Nicole Morgan, Defendants*, In the State Court of Gwinnett County, State of Georgia, Civil Action File No. 20C02417-S1

- *Ronald Stewart and Jeannie Stewart, Plaintiffs, vs. Jay Wilson Moon, James Moon, Jaguar Land Rover North America, LLC, Jaguar Land Rover Limited, and Jaguar Land Rover Automotive, PLC, Defendants*, In the Superior Court of Morgan County, State of Georgia, Civil Action File No. 2019-SU-CA-226

- *Taneki Samaria Davis, Plaintiff, vs. Kia Corporation, Kia America, Inc., Adient US LLC, and Terral Andre Leak, Defendants*, In the State Court of Liberty County, State of Georgia, Civil Action No. STSV2022000248

- *James Edward ("Dusty") Brogdon, Jr., as Executor of the Estate of Debra Sue Mills, deceased, and James Edward Brogdon, Jr. and Ronald Brian ("Rusty") Brogdon, Individually and as surviving children of Debra Sue Mills et al, Plaintiffs, vs. Ford Motor Company, Defendant*, In the United States District Court for the Middle District of Georgia Columbus Division, Civil Action File No. 4:23-cv-00088-CDL

- *Damien Deon Bostick, Individually, and as Surviving Spouse of Vicky Elaine Bostick, and Damien Deon Bostick as Administrator of the Estate of Vicky Elaine Bostick, Plaintiffs, v. Toyota Motor Corporation, Toyota Mmotor North America, Inc., Toyota Motor Manufacturing Canada, Inc., Toyota Boshoku America, Inc., Toyota Boshoku Canda, Inc., Asbury Automotive Group, Inc. d/b/a Nalley Automotive Group, and PACCAR, Inc, Defendants*, In the State Court of Gwinett County State of Georgia, Civil Action File No.: 22-C-05174-S7

- *Joshua Kyle Hill, Plaintiff, v. Paccar Inc., Kenworth Truck Company, Indiana Mills & Manufactuing, Inc., Commercial Vehicle Group, Inc., CVG National Seating Company LLC, (F/K/A National Seating Company), Defendants*, In the State Court of Gwinnett County, State of Georgia, Civil Action File No. 17-C-07188-1

12. I am attaching to this affidavit two orders for *Daubert* motions I received in the State of Georgia that were denied. (*Meeks v. Newcomb et al,* and, *Silva v. Bad Boy Enterprises, et al).*

13. I have strictly contained my opinions in this case to my areas of expertise: occupant kinematics, biomechanics, injury causation, and injury prevention.

14. This case involves Cohen Bryson ("Cohen"), a 2-year-old male, who was seated in the left rear outboard (#4) seat in a forward facing car seat that the police report documented was installed properly and the shoulder and lap belt that secured the child seat to the vehicle was locked properly. Cohen and his parents, who were in the front seat, were riding in a Ford Escape vehicle that was rear-ended by a Ford F250 truck. Cohen received fatal injuries in this incident while his parents in the front seat were not seriously injured.

15. My role as a biomedical engineer in this case was to evaluate and determine Cohen's occupant kinematics (body movement) in relation to the accident reconstruction (the amount and directionality of the crash forces and vehicle movements), the Escape's structural deformation

5

profile (intrusion of vehicle structures into Cohen's occupant survival space, and the mechanism of his fatal injuries.

16. The striking Ford truck was equipped with a Rough Country lift kit that raised the vehicle approximately 6 inches above factory recommendation. This created a size differential or mismatch between the Escape and the Ford truck.

17. My work as a biomechanic requires me to understand how bodies move in collisions, how injuries can occur, and—in connection with those topics—how vehicles respond to crashes. Biomechanics understand, for example, that vehicles are built with "crush zones", i.e. areas of the vehicle that absorb energy instead of passing that energy onto the occupants of the vehicle. Examples of structures that absorb energy in the typical crash include the front and rear bumpers. When bumpers of two cars engage in an accident, it helps to mitigate and distribute the forces of the crash, and therefore reduces the forces on the occupants. This is information that I and other biomechanics use to understand the dynamics of how crash energy affects the human body during a collision.

18. Vehicle compatibility affects biomechanics and occupant kinematics, because of the effect on vehicle structure intrusion into the occupant survival space. NHTSA (National Highway Traffic Safety Administration) from the IIHS (Insurance Institute for Highway Safety) have documented the effect of a lack of compatibility in car-to-car impacts from an occupant safety perspective. Biomechanics like myself regularly rely on such studies and literature. Based on that literature and my study of occupant kinematics in the more than 5,000 casess I have investigated, I know that mismatched vehicles pose significant problems for occupants because the struck vehicle's safety features and crumple zones are often overwhelmed and negated due to the mismatch, as well as increased vehicle structure intrusion into the occupant survival space.

19. Given Defendant's criticism of the foundation of my opinions, I am compelled to summarize some academic literature that I have reviewed and relied on in this case. A NHTSA supported study, for example, defined vehicle mismatch "as design differences between vehicle

6

types which result in disproportionate damage patterns to the vehicles involved in a collision; these design differences include weight, frame height, and stiffness. This is also known as crash incompatibility (IIHS, 1999). The damage patterns can result in a violation of the structural integrity of the passenger compartment resulting in increased risk of serious injury or death to the occupants." ("Vehicle mismatch: injury patterns and severity", Acierno et al, *Accident Analysis & Prevention"*, 36 (2004) 761-772). Studying injury patterns and severity of injuries associated with vehicle mismatch is exactly the kind of subjects that an expert in biomechanics and occupant kinematics would do.

20. "The IIHS is currently using a barrier 30 cm higher than the NHTSA barrier to simulate LTV (Light Trucks and Vans) impacts. Revision of FMVSS 214 to require better performance when vehicles are struck by higher barriers may help minimize injuries from side impact mismatch collisions." (Id.)

21. "Re-designing the front ends of LTV can also improve outcomes from front end collisions by eliminating the override/underride problem seen in our cases. There are definite differences in bumper frame height between LTV and PVs (Passenger Vehicles). By designing a lower, reinforced bumper in continuity with the LTV frame, the impact to the PV could be applied to its strong frame, rather than the much weaker grill. This would allow the crumple zones and other designed safety features to absorb a majority of the impact, minimizing intrusion into the occupant compartment. This would also prevent the toe pan intrusion seen in the LTV, reducing the frequency of severe lower extremity fractures. Several automobile manufacturers are voluntarily re-designing their LTV to make them more compatible with passenger vehicles (Bradshear, 2000). However, industry wide design improvements of both LTV and PV will be needed to reduce the effect of mismatch." (Id.)

22. "In conclusion, vehicle mismatch is associated with death and serious injury in automotive crashes... Our findings support the following recommendations: revision of FMVSS 214 to improve performance of vehicles when struck by a higher barrier, re-design of LTV and PV front ends to improve collision compatibility to minimize over/underride, and consider

installation of side airbags to protect the head and chest." (Id.)

23.  The image in the below paragraph is from a letter to NHTSA (National Highway Traffic Safety Administration) from the IIHS (Insurance Institute for Highway Safety) in 2008 regarding a "Petition for Rulemaking; 49 CFR 581 Bumper Standard". The letter includes that "LTV (Light Trucks and Vans) bumpers can be so much higher than car bumpers, so they inflict excessive damage to the cars with which they collide at low speeds…By applying car bumper requirements to LTVs, NHTSA would make bumpers more compatible across the range of passenger vehicles. This would enhance occupant safety…" (iihs.org)

24.  This image shows how bumpers would ideally align for maximum energy mitigation:



Figure 1A
Bumper alignments of 4 midsize SUVs versus rear bumpers of Hyundai Sonatas

2008 Ford Explorer          2008 Hyundai Sonata

25.  A 2019 IIHS study is entitled "SUVs no longer pose outsize risk to car occupants, but pickup compatibility lags" (iihs.org). It discusses how pickups due to their larger size compared to other vehicles pose a risk due to vehicle mismatch.

> "It may feel uncomfortable to be a car driver surrounded by taller vehicles, but today's SUVs aren't a major threat to occupants of smaller vehicles, new research from the Insurance Institute for Highway Safety shows. Pickups, on the other hand, still represent an outsize danger when they crash with cars, and the weight imbalance is a likely reason."

> "The trend toward increased compatibility of SUVs with cars and minivans was documented by IIHS researchers in 2011. They attributed the change to stronger structures and side airbags in cars and minivans and to newer SUV designs that lowered the vehicles' front ends to better align with cars' energy-absorbing structures. These more

8

>compatible designs were the result of a 2003 voluntary commitment by automakers that the Institute helped broker."
>
>"For a long time, the front ends of SUVs were so high that they bypassed the energy-absorbing structures of the fronts of cars," says Joe Nolan, IIHS senior vice president for vehicle research and a co-author of both the earlier study and the new one. "The changes prompted by the voluntary commitment largely resolved that issue."
>
>"More sophisticated designs that do a better job of managing forces in a crash, along with electronic stability control and other crash avoidance features, have made the sheer weight of a vehicle less important," Nolan says. "This suggests that reducing the weight of the heaviest vehicles for better fuel economy — for example, by switching from steel to aluminum — can improve safety for other road users without sacrificing occupant protection."

26. In the supplemental report I authored in this case on March 15, 2024, I discussed two other cases that I have investigated with lift-kits manufactured by Rough Country installed on pickup trucks. In both those cases, the height differential in the lifted vehicle and the struck vehicle created a mismatch of the two involved vehicles when the impact occurred, and the occupants sustained fatal injuries. These two cases are *Bacho* and *Mendoza*. I know there was a height differential in the vehicles because of the evidence I personally reviewed, including photographs, measurements, and in-person inspections of the involved vehicles. I also reviewed the work of the other experts in the case and their conclusions. All the documents I reviewed and relied upon was available to Rough Country in those cases. Rough Country has produced much of it in this case, and I provided my entire case file from those cases to Rough Country at my deposition in this case.

27. I am not an accident reconstructionist or an automotive design engineer and I am not holding myself out to be either, as I testified to in my deposition. Nonetheless, the first sub-header "A" lists "Lewis is Not Qualified to Opine About Accident Reconstruction or Vehicular Structural Matters." The opinions I am offering in this case, however, are within my area of expertise utilizing the same methodology that is employed by my peers in the field of biomedical/biomechanical engineering.

28. The very specific question in this case, as well as with the occupants in *Bacho* and *Mendoza,* is whether Rough Country suspension lifts caused the occupants' injuries/deaths.

9

Analyzing injury patterns and causation is at the heart of what biomechanics do. Answering that question required me to analyze the effect the lift kit had on the structural damage profile and intrusion into the occupant space, in addition to the literature about the effect of suspension lifts vehicles crashworthiness. Answering this question also required me to analyze whether the occupants' injuries outcome would have been the same or better (i.e., could they have survived theirs collision with non-life threatening injuries and with no permanent sequelae) if the lift kit would not have been installed.

29.    In this case, both plaintiff and defense have an accident reconstruction expert. An accident reconstructionist's work includes, but is not limited to: determining the speeds of the vehicles at impact; determining the angle and/or offset of the impact if there is one; identifying where the primary impact occurred on the vehicle (i.e. right front bumper or mid-driver's door, etc.), determine the velocity change (Delta V) each vehicle underwent; map the deformation profile of the vehicles; determine the amount of time from impact to final rest; and create diagrams or 3D visuals of the accident sequence. I do not and have not done any such work as that in this case or *Bacho* or *Mendoza*.

30.    As stated above, I have evaluated over 5,000 cases during the scope of my career and as a result, have reviewed thousands of accident reconstructions. I have to be able to understand the reconstruction in order to correlate it to the injury mechanisms. Utilizing accident reconstruction (which is what I have done) is different than determining the accident reconstruction or coming up with my own independent calculations (which I have not done).

31.    I also have to understand the damage profile to the vehicle and how it correlates to the occupant's injuries. Utilizing the analysis and conclusions of the vehicle design expert (which I have done) is not the same as coming up with my own deformation measurements due to the lift and what the difference would have been had there been no lift (which I have not done).

32.    Relying on other experts who are outside the scope of one's expertise for crucial components of determining injury mechanism is an accepted practice and one utilized by my

10

peers in the field of biomedical engineering in every investigation.

33. I did not map out or quantify the structural damage that occurred to the Escape or the Ford truck, the accident reconstructionist and the vehicle deign expert did. I did not determine what the crash forces were, the angle of the impact, the Delta V, or the crash pulse, the accident reconstructionist did. I did not analyze what part of the damage was attributed to the Ford truck being 6 inches higher than it was supposed to be, the vehicle design expert did. I did not analyze what the damage profile to the Escape would have been had the lift kit not been on the vehicle, the vehicle design expert did.

34. I did accept and utilize the injuries that are documented in the autopsy report by the medical examiner that Cohen sustained. I did utilize the accident reconstruction and the vehicle structural deformation with the lift kit from the vehicle design expert to determine Cohen's occupant kinematics and injury mechanism. I did utilize the information from the accident reconstruction about the crash forces to determine if this crash was not a survivable crash for Cohen based on crash force alone. Lastly, I did use the information from the design expert regarding what the deformation profile of the Escape would be had the lift kit not been present to determine if Cohen would have survived this crash based on the reduction of intrusion without a lift kit.

35. The motion states that "Inherent in Lewis' Opinion No. 1 though 5 are opinions related to accident reconstruction and vehicle design."

36. In their list of these opinions, the first one is "The *Bacho* victim's "fatal head injuries were…due to Rough Country's lift-kit elevating it high enough to impact it through her window and side curtain airbag." That quote in its entirety is "Abigail's fatal head injuries were caused by her head being impacted by the front of the Chevrolet due to the Rough Country lift-kit elevating it high enough to impact it through her window and side curtain airbag."

37. This is not an accident reconstruction or design opinion. Another expert reconstructed this crash and determined where the front of the Chevrolet impacted the side of the Toyota

11

Sienna minivan Abigail was in. This same expert also determined the crash forces. Another expert determined where the front of the Chevrolet would have struck the minivan had it not been elevated by the lift kit.

38. Abigail received blunt force trauma impact injuries to her head so severe they caused immediate death. I was asked to determine Abigail's occupant kinematics in reference to the accident reconstruction, deformation profile to the minivan, her side curtain airbag, and the occurrence of her fatal head injuries. That is all within the scope of my expertise as a biomedical engineer. I accepted and utilized the accident reconstruction, the information about where point on the minivan that the front of the Chevrolet struck, and the information received about where the impact point would have been had there not been a lift kit.

39. The accident reconstruction provided that the front of the Chevrolet struck right the window where Abigail was seated, i.e. the front structures of the Chevrolet were right outside her window. I determined based on the location of the front of the Chevrolet, the established amount of force and motion to create the head trauma Abigail sustained, and knowledge of what type of structure in this set of facts Abigail had to impact with her head to create her injuries, to determine that her head impacted the hard front structures of the Chevrolet that was at her window to sustain her head injuries. Side curtain airbags are designed to keep occupants within the confines of the vehicle and cushion blows to the head, not to prevent the front structures of a pickup truck from impacting a victim's head when they are right outside the window.

40. I utilized the information I received about where the point of impact would have been had the vehicle not been lifted, which was below Abigail's seated position. This impact would have been into the metal side structures of the minivan below where Abigail's head was located. Had such occurred, her head would have just interacted with the side curtain airbag and her fatal head injuries would have been prevented.

41. While this analysis includes the reconstruction information and the vehicle design information given to me by experts in those fields, it does not include an independent reconstruction or design analysis of my own, nor opinions that are solely about reconstruction or

vehicle design.

42. Defendant also criticizes an opinion regarding the Mendoza case, which it characterizes as: "In connection with Mendoza, "(d)ue to the Rough Country lift-kit significantly elevating the structures of the vehicle, it essentially ran over the Mustang and struck Mrs. Mendoza's head." Defendant quotes selectively from the report, however. That sentence in its entire context is "The Dodge struck the front of the Mustang, causing catastrophic deformation to the structures of it. Due to the Rough Country lift-kit significantly elevated the structure of the vehicle, it essentially ran over the Mustang and struck Mrs. Mendoza's head with the right corner of its front bumper. As a result she sustained multiple skull fractures and permanently debilitating brain injuries."

43. My analysis for this *Mendoza* case is the exact same as the subject case and *Bacho*. I utilized the accident reconstruction information and the design information to form my opinions about how Mrs. Mendoza's catastrophic fatal head injuries occurred. Because I described the damage to the vehicle structures means I am describing it, it was catastrophic because it resulted in Ms. Mendoza's death. I am not determining anything outside the scope of what I was given by the accident reconstructionist.

44. The front of the Dodge literally was so mismatched to the front of the Mustang it ran up over it, on top of the Mustang, all the way to the occupant compartment where the actual front bumper struck Mrs. Mendoza in the head as evidenced by forensic marks on her left forehead. Per the design expert this negated any force mitigating abilities of the front of the Mustang and negated any help a frontal airbag could have provided her. The design expert determined that if there had not been a lift kit, then the vehicles would have collided, i.e. the Dodge would have impacted the front of the Mustang, not overridden it and traveled on top of the vehicle, making it a completely different crash Mrs. Mendoza could have survived.

45. The next three opinions the motion lists as being problematic simply repeat and restate Opinions 1 and 2. Therefore, my explanation of why I am qualified to give those opinions is the

same as what I have already stated.

46. My analysis regarding how Cohen's fatal injuries occurred are given within the confines of my expertise and are based on science and a thorough analysis of all the facts, as well as my background, education, and training as a biomedical engineer and forensic investigator. The opinions I gave in the *Bacho* and *Mendoza* cases about how those occupants at issue fatal injuries occurred were given within the confines of my expertise and are based on science and a thorough analysis of all the facts, as well as my background, education, and training as a biomedical engineer and forensic investigator.

47. My opinions about the injury causation in this case do not rely on *Bacho* or *Mendoza*. This should be exceptionally clear as they were not considered or included in my first report. They were not included in my first report because I was not asked to include them by counsel.

48. The fact that neither Buchner or Roche have opinions about *Bacho* or *Mendoza* does not change my methodology or accuracy of my conclusions. In *Bacho* and *Mendoza*, different people occupied those roles, but just as in this case, the other experts provided the information I needed to reach my conclusions. I relied on the other experts' opinions in *Bacho* in *Mendoza* in the same way that I rely on Buchner's and Roche's opinions here. I rely on other experts in virtually every case I work on. That is the standard and accepted practice of all biomechanics in my field.

49. My testimony regarding *Bacho* and *Mendoza* will be that my first-hand investigation in those cases revealed that the Rough Country kit caused the injuries, and that Rough Country would have known about my conclusions because my opinions were disclosed in those cases. I will also testify that both cases involved allegations of vehicle mismatch, and I will explain to the jury from an occupant kinematic / biomechanical perspective why vehicle mismatch creates an increased risk of serious injury and death.

50. The Defendant also asks the Court to exclude any experts who rely on my opinions. There is no such expert, to my knowledge. Although I rely on the reconstructionist and structural engineer, they do not rely on me.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 17, 2025.

_____
**PAUL LEWIS, JR., MS, B.M.E.**